# Exhibit E

1            HIGHLY CONFIDENTIAL - J. HRASKA

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS            Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

      ----------------------x

11

12            * * *HIGHLY CONFIDENTIAL* * *

13            DEPOSITION OF JAMES HRASKA

14              New York, New York

15              August 14, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24039

Page 6

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    answer the questions.
3         On occasion, your counsel will state
4    an objection or, you know, make some kind of
5    objection for the record.  That doesn't relieve
6    you of the obligation to answer the question.
7    It's just him trying to either correct a portion
8    of my question or preserve an objection.
9         In that regard, throughout the day, I
10   am undoubtedly going to a misuse a word or some
11   kind of acronym or some technical term that you
12   folks use every day in your line of business
13   which I'm not as familiar with as you are,
14   obviously, so please correct me if I misuse a
15   word or I ask a question that's misleading in
16   any way or you just don't understand the
17   question because I would like to ask a clear
18   question so you can answer it.
19        Is that okay?
20   A.   That's fine.  Thank you.
21        MR. SHAW:  Just before we begin,
22   again, I want to put on the record our
23   understanding that we will designate the
24   entire transcript highly confidential and
25   then we'll go back and redesignate.

Page 7

1    HIGHLY CONFIDENTIAL - J. HRASKA
2         MR. HINE:  Yes.  That's true.  That's
3    fine.
4    Q.   One other thing before we get started,
5    Mr. Hraska.  I imagine you're aware that you've
6    been designated as what's called a 30(b)(6)
7    witness by your employer, by Barclays, as to
8    particular topics, and they relate to Schedules
9    A and B which we'll discuss later.  So when we
10   get to that portion of the deposition, I'll let
11   you know and we'll treat that portion as a
12   30(b)(6) deposition, but I'll let you know as we
13   get there.
14        MR. SHAW:  Just so we're, again,
15   clear, Bill, as I think you know, he is one
16   of several witnesses who's been designated
17   as partially responsive to those particular
18   topics.
19        MR. HINE:  I understand.
20   Q.   So, unless you have any questions, we
21   can get started.
22   A.   No, I'm fine.
23   Q.   Okay.  Can we just review briefly your
24   employment history with Lehman?  What was the
25   last position you held at Lehman?  I'm talking

Page 8

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    about in the period of September 2008.
3    A.   I was senior vice president from a
4    corporate title perspective and I managed the
5    Secured Financing Operations Group.
6    Q.   And can you just describe for me what
7    that means?  What were your responsibilities and
8    duties in that position?
9    A.   The Financing Operations, also known
10   as a financing middle office, is a group that
11   sits between a bunch of groups, but primarily
12   trading and sales individuals and clearance and
13   settlements folks, and we do tasks such as, you
14   know, monitoring positions, reconciling
15   differences, dealing with, you know, customer,
16   you know, concerns, bringing the attention of
17   customers' concerns to either sales staff or
18   trading staff.
19        We also deal with legal and compliance
20   and regulatory on certain matters.  If there
21   are, you know, questions or queries as to the
22   nature of the transactions, if somebody needs
23   some technical expertise on, we usually provide
24   that expertise as to the structure of the
25   transactions and things like that.

Page 9

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Q.   And who did you report to in that
3    position?
4    A.   At Lehman Brothers at the time, I was
5    reporting to Monty Forrest.
6    Q.   Did you report directly to anyone
7    else?
8    A.   No, under that structure I was a
9    direct report of Monty Forrest.
10   Q.   And who were your direct reports?
11   A.   My direct reports now or at the time?
12   Q.   At the time in September of 2008.
13   A.   Okay, my direct reports in the U.S.
14   were Nancy Denig, D-E-N-I-G, and Paul Lindner.
15   Q.   Prior to this position -- or, let me
16   ask you another question.  How long were you in
17   this senior vice president position?
18   A.   Approximately five to six years.  I
19   don't remember the exact date, actually.  I
20   don't remember the exact date when I got my
21   senior vice presidentship.
22   Q.   Okay.  How long had you been in the
23   position of managing the secured financing?
24   A.   It began in 2001, but it began in a
25   much smaller scale.  I only managed a portion of

HIGHLY CONFIDENTIAL - J. HRASKA
1
2   it and over time it grew into a larger and
3   larger responsibility.  At the point of
4   September, I was managing both equity and fixed
5   income.  I was managing that globally as well.
6       Q.   Okay.  When did you join Lehman?
7       A.   August of '93.
8       Q.   So you held this management position
9   since 2001, you said?
10      A.   That particular one related to
11  Financing Operations since 2001, yes.
12      Q.   What did you do before that at Lehman?
13      A.   I did a host of different roles, all
14  in derivatives-based.  I worked in Derivative
15  Settlements, I worked in Derivatives Middle
16  Office, and I also worked in a Structured
17  Products and Reinsurance Middle Office as well.
18      Q.   Okay:
19      A.   And over the period of time I also
20  held management positions in those roles as
21  well.
22      Q.   When you say middle office, could you
23  just tell me what that means?
24      A.   Middle office is similar to the way I
25  described it before for financing, only it was

HIGHLY CONFIDENTIAL - J. HRASKA
1
2   for derivative-related products.  So same types
3   of trader inquiries, sales inquiries, customer
4   resolutions to problems, things like that.
5       Q.   Did there come a point when you left
6   Lehman and moved to Barclays?
7       A.   Yeah, I mean after the -- after the
8   declaration of bankruptcy, Barclays extended an
9   offer of employment to me, which I accepted.
10      Q.   Okay.  And when did you start working
11  for Barclays, do you recall the date?
12      A.   I don't know, I can't for certain be
13  given the official date.  When I started, I was
14  extended an employment contract, which I signed,
15  and I believe I signed that sometime in October,
16  but I don't know what the specific date that
17  Barclays considers me an official employee
18  versus when I stopped my Lehman employment.
19          Like I was never out of work for a
20  period of time.  I mean, I continued to show up
21  every day.  I'm just not sure what point in time
22  they considered me officially a Barclays
23  employee.
24      Q.   I understand.  When did you consider
25  yourself to be working for Barclays?

HIGHLY CONFIDENTIAL - J. HRASKA
1
2       A.   I mean, I guess I considered myself to
3   be working for Barclays in the week after the
4   declaration of bankruptcy.
5       Q.   Okay.  We're going to be talking about
6   these weeks for the whole deposition, so the
7   week of September 15 is the week you're
8   referring to as the week where they declared
9   bankruptcy; is that right?
10      A.   The week is when -- September 15 is
11  when Lehman declared bankruptcy.  I wasn't
12  completely confident that I was a Barclays
13  employee until I guess the week of the 22nd,
14  because I was still working, you know, with LBI
15  in the U.S. broker-dealer, so I wasn't actually
16  sure of my status at that point, to be
17  completely honest.
18      Q.   I understand.  Okay.  So that
19  September 22 was a Monday, correct?
20      A.   I believe so, yeah.
21      Q.   Had you had any discussions with folks
22  at Barclays prior to September 22 about the
23  possibility of you going to work for Barclays?
24      A.   No.
25      Q.   When do you recall first speaking to

HIGHLY CONFIDENTIAL - J. HRASKA
1
2   anyone at Barclays about you becoming a Barclays
3   employee?
4       A.   I would say it was in that week of the
5   22nd.
6       Q.   Okay.  Had you spoken to any folks at
7   Lehman prior to September 22 about the
8   possibility of you moving over and becoming a
9   Barclays employee?
10      A.   Well, wait.  Could I just go back to
11  that previous question?
12      Q.   Sure.
13      A.   When I spoke on that week of September
14  22, like I had never had any employment
15  conversations with a legacy Barclays employee.
16  All my conversations were with legacy Lehman
17  employees, so either my manager, which was Monty
18  Forrest, or Alastair Blackwell.
19          So like nobody from like Barclays HR
20  had approached me or had offered me any
21  conversations prior to my conversations with my
22  legacy Lehman managers.  I don't know if that's
23  important or not.
24      Q.   No, I just want to make sure we're all
25  on the same page here.

Page 14

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    So when you say legacy Lehman
3  managers, you're talking about people who were
4  previously employed with Lehman who may now be
5  employed with Barclays?
6    A.   Yes.
7    Q.   Okay.  So am I correct to say that,
8  prior to September 22, you had had no
9  conversations with anyone who was -- who had
10  always been a Barclays employee as to your
11  possibility of you going over working for
12  Barclays; is that right?
13    A.   That's correct.
14    Q.   So had you had conversations with
15  legacy Lehman employees or people who were
16  employed with Lehman at the time prior to
17  September 22 about the possibility of you going
18  to work for Barclays?
19    A.   No.
20    Q.   Okay.  Do you recall any conversations
21  with Mr. Forrest or anyone in your chain of
22  command about the possibility of you going to
23  work for Barclays?
24    MR. SHAW:  Asked and answered.
25    A.   No.

Page 15

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Q.   Okay.  Before I forget, what is your
3  current position at Barclays?
4    A.   I am in a very similar role.
5  Corporate title-wise I'm a director, which is
6  equivalent to SVP.  I manage, again, Secured
7  Financing Operations for both equities globally
8  and fixed income in North America.
9    Q.   Is it fair to say your role is -- your
10  duties and responsibilities are relatively the
11  same as you had when you were at Lehman?
12    A.   Responsibilities are reasonably the
13  same, not quite as extensive as they were at
14  Lehman from a global perspective.
15    Q.   Who do you report directly to now?
16    A.   I have a dual reporting line.  From a
17  product perspective, I still report to Monty
18  Forrest.  And Barclays is structured a little
19  bit different, so from a regional perspective, I
20  report to Alastair Blackwell.
21    Q.   And who are your direct reports?
22    A.   My direct reports now are still Nancy
23  Denig, Paul Lindner, and a gentleman by the name
24  of Henry Duarte, D-U-A-R-T-E.
25    Q.   Okay.  Anyone else?

Page 16

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    A.   No.  Not direct reports, no.
3    (Exhibit 136B, a document bearing
4  Bates Nos. BCI-EX-00077317 through 77319,
5  marked for identification, as of this date.)
6    Q.   Mr. Hraska, I apologize, I'm not
7  trying to be intrusive here, but I need to ask
8  you some questions about your compensation.
9    A.   That's fine.
10    Q.   So I'm handing you a copy of Exhibit
11  136B, which appears to be an agreement between
12  yourself and Barclays dated September 22, 2008,
13  and my question to you is, have you ever seen
14  this document before?
15    MR. SHAW:  Take a minute to look at as
16  much of it as you need to.
17    A.   Yes, I've seen this before.
18    Q.   What is this document?
19    A.   This was the document offering me
20  employment at Barclays.
21    Q.   Okay.  And is this your current
22  employment contract with Barclays?
23    A.   It is, yes.
24    Q.   Okay.  Did you sign it on September
25  22?

Page 17

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    A.   I don't believe so.
3    No, on October 2, when it's dated.
4    Q.   Okay.  Any understanding of why it's
5  dated September 22, but you didn't sign it until
6  October 2?
7    MR. SHAW:  Foundation.
8    A.   I have no idea.  I mean, I'm -- I
9  signed it September 22nd because that's when I
10  decided to agree to the terms.
11    Q.   Okay.  Was there any negotiations
12  between you and Barclays as to the compensation
13  part of your employment?
14    A.   No.
15    Q.   Okay.  How did it take place?  Did
16  they just give you a copy of this letter and ask
17  you to sign it?
18    A.   The letter was sent to me via
19  interoffice mail.
20    Q.   Uh-huh.
21    A.   It was preceded by a phone call which
22  said, you know, you're a key employee that we
23  would like to retain, we're going to be sending
24  you a letter for, you know, an offer to join
25  Barclays.  We would like you to review it and,

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  MR. SHAW:  If you know.
3      A.   It was used -- it was to be used for
4  anybody who would provide us secured financing.
5  In the end, it ended up being the Fed, but --
6      Q.   Did you have any understanding during
7  that weekend that there were discussions between
8  Lehman and the Fed about providing financing?
9      A.   No, not specifically.
10     Q.   Okay.  Let's just continue through the
11 week briefly and then we'll come back to
12 different topics.
13          On the Monday of the 15th, were you
14 involved in any negotiations between Barclays
15 concerning the sale transaction that ultimately
16 took place between Barclays and Lehman?
17     A.   No.
18     Q.   Were you asked to provide any
19 information to those who were involved in those
20 negotiations?
21     A.   No.
22     Q.   Were you involved in negotiations with
23 the Fed about the Fed financing that was
24 provided during that week?
25     A.   No.

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      Q.   Were you asked to provide information
3  in support of that financing?
4      A.   No.
5      Q.   Okay.  What did you do ultimately on
6  that Monday, if you recall?
7      A.   A year ago?
8      Q.   Well, it's a big day.  It's an
9  eventful day in Lehman's history, correct?
10     A.   It is.
11     Q.   What do you recall doing the Monday
12 when Lehman Holdings filed for bankruptcy?
13     A.   Well, I mean, I guess the first thing
14 to do was, you know, talk to my manager and ask
15 him, you know, kind of what our next steps were.
16 Do we carry on as normal, do we do something
17 different, or do we wait for further
18 instructions or, you know, basically what do we
19 do.
20     Q.   Okay.
21     A.   He advised me that we were going to
22 carry on as normal.  We were, at the time, we
23 were still trying to preserve the liquidity and
24 functioning of the broker-dealer, and as far as
25 financing transactions, just to clarify, you

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  know, our involvement was to find collateral and
3  those -- that financing by the Fed that you
4  referred to was -- those programs are open to
5  every broker-dealer, and every broker-dealer at
6  the time -- the market was in a very, you know,
7  as you know, very turbulent situation -- every
8  broker-dealer was taking advantage of those
9  programs so it was normal course for us to
10 figure out what assets we could finance with the
11 Fed that potentially wouldn't be financeable
12 with other counterparties.
13          And that was our focus that week, was
14 to try to locate all the collateral that we had
15 available to finance that the Fed would deem
16 acceptable in their programs.
17     Q.   Okay.  And so were you involved in the
18 selection of the securities that were ultimately
19 pledged to the Fed?
20     A.   I wasn't involved in the selection of
21 what was pledged to the Fed.  I was involved in
22 identifying assets which were not encumbered and
23 could be used as collateral to be pledged to the
24 Fed.
25     Q.   Okay.  And who actually selects which

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  collateral was pledged to the Fed?
3      A.   The Fed programs are, at least the
4  ones we used for financing, were tri-party
5  transactions.
6      Q.   Right.
7      A.   And the actual selection criteria
8  itself was done by the tri-party agent.
9      Q.   Who was that?
10     A.   JPChase.  JPMorgan.
11     Q.   And can you describe for me your role,
12 if any, in supporting the financing that was
13 provided by the Fed?
14     A.   My role was to communicate between
15 the -- between the trading desks and the
16 tri-party operations groups and just coordinate,
17 you know, the availability of collateral and the
18 booking of the transactions which would
19 ultimately represent that financing.
20     Q.   Okay.
21     A.   So the trading desk basically books
22 the transaction onto a system.  My group's role
23 is to ensure that that booking makes it all the
24 way through the front-end booking system all the
25 way through to the system that is the books and

1        HIGHLY CONFIDENTIAL - J. HRASKA
2    records and what transmits that transaction to
3    our tri-party agent and that there's no
4    discrepancies, everything matches with what the
5    traders know to have raised from a financing
6    perspective.
7            And then we coordinate with the
8    tri-party operations folks to make sure that
9    there were no mechanical difficulties in the
10   allocation that's performed by the tri-party
11   agent, that there wasn't any shortfalls of
12   collateral and things of that nature, and then
13   report back to the trading desk.
14       Q.   Do you have any involvement in how
15   that collateral is valued?
16       A.   No.
17       Q.   Who does that?
18       A.   The tri-party agent.
19       Q.   And that would be Chase?
20       A.   JPChase, yes.
21       Q.   Does Lehman --
22       A.   Going forward, should we just refer to
23   it as Chase?  Because I'm not sure JPMorgan
24   Chase, JPChase.
25       Q.   That's fine.  We'll use Chase as a

1        HIGHLY CONFIDENTIAL - J. HRASKA
2    shorthand.
3        A.   That's fine.
4        Q.   So, to your knowledge, with respect to
5    that Fed financing of the week of September 15,
6    Chase placed a value on the collateral that was
7    used?
8        A.   That's correct.
9        Q.   Did Lehman place its own value on that
10   collateral?
11           MR. SHAW:  Objection.  Vague.
12       A.   I don't know that -- Lehman, as a
13   normal broker-dealer would have their own marks
14   for collateral on their books and records.
15       Q.   Right.
16       A.   The final determinant of that
17   collateral with respect to the financing
18   transaction would be the responsibility of the
19   tri-party agent.
20       Q.   Okay.  And do you know if there's
21   any -- were there any differences in the
22   valuations that Lehman would -- placed on that
23   collateral versus what Chase placed on that
24   collateral during that week?
25       A.   I don't know.

1        HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.   Okay.  Would you be involved in that
3    normally?
4        A.   No.
5        Q.   Okay.  Before we go further on in that
6    week, do you have any understanding of the
7    actual sale transaction, the terms of the sale
8    transaction between Lehman and Barclays?
9        A.   No, I don't.
10       Q.   Did you ever have a chance to look at
11   what's known as the Asset Purchase Agreement?
12       A.   No, I didn't.
13       Q.   Did you ever have any understanding
14   about the terms of the transaction whereby
15   Lehman assets were going to be transferred to
16   Chase -- I mean to Barclays?
17           MR. SHAW:  Objection to form.
18       A.   At what point in time are you
19   referring to?
20       Q.   Okay.  Let's break it down.  Early in
21   the week, Monday, Tuesday?
22       A.   Of the week of the 15th?
23       Q.   Of the week of the 15th.
24           Did you have any understanding of the
25   terms of the deal between Lehman and Barclays?

1        HIGHLY CONFIDENTIAL - J. HRASKA
2        A.   I did not.
3        Q.   Did you have any understanding that
4    the Asset Purchase Agreement called for the sale
5    of $70 billion in long positions to Barclays?
6        A.   I did not.
7        Q.   Had you ever heard that phrase used?
8        A.   No.  That number is a completely new
9    number to anything I've had heard.
10       Q.   You never heard that number during
11   that week?
12       A.   During -- to this day.
13       Q.   Okay.  I'm just trying to get a sense
14   of what you were involved in.
15       A.   That's fine.
16       Q.   Had you ever heard during that week
17   that the transaction involved the transfer of
18   $69 billion in short positions to Barclays?
19       A.   No.
20       Q.   Okay.  Going further on in the week,
21   did there come a time when you learned some of
22   the terms of the transaction between Lehman and
23   Barclays?
24       A.   During that week, no.
25       Q.   After moving to Barclays, have you

## Page 34

HIGHLY CONFIDENTIAL - J. HRASKA

learned some of the terms of the transaction between Lehman and Barclays?

A.   At a much later time, yes.

Q.   What have you learned about it?

A.   I learned that Barclays has purchased the unencumbered assets -- the way I understand it is they purchased the unencumbered assets of Lehman Brothers' clearance boxes.

Q.   Anything else that Barclays purchased?

A.   The building at 745.

Q.   Anything else?

A.   No.

Q.   When you say "unencumbered assets," what do you mean by that?

A.   An unencumbered asset, from my perspective, as an operations professional, is an asset which does not have a lien on it by any other party, primarily customers.

Q.   And when you say "in the clearance boxes," what are you referring to?

A.   Clearance boxes are -- it's a loose term that can be defined in two ways:  A clearance box can be a location at a depository institution, such as DTC, or it can be a

## Page 35

HIGHLY CONFIDENTIAL - J. HRASKA

clearance or -- a location at a clearing bank, such as a JPChase or Bank of New York, or it can refer to the record of your having those accounts on your stock records.  So basically your stock record represents your position of those locations at those outside agents.  So it's used intermittently, depending upon the use or the person using it.

Q.   And what is your understanding of the amount or the value of the assets that were transferred from Lehman to Barclays?

MR. SHAW:  Objection.  Just for clarification, do you mean as unencumbered assets or overall?

MR. HINE:  Whatever assets he thinks.

Q.   Let me clarify that.  Let's take out the real estate.

A.   Okay.

Q.   What is your understanding of the value of the assets other than the real estate that were transferred from Lehman to Barclays?

A.   At what point in time?

Q.   Now.

A.   As of today?

## Page 36

HIGHLY CONFIDENTIAL - J. HRASKA

Q.   Yes.

A.   As of today, my understanding is that the value of unencumbered collateral that was transferred was approximately 1.4 billion.

Q.   Have you heard the term "Schedule B"?

A.   I have, yes.

Q.   And what is your understanding of what that is?

A.   Schedule B, to my understanding, is the schedule of assets which were part of the transaction between Barclays and Lehman Brothers.

Q.   And is the 1.4 billion that you just mentioned, is that the approximate amount of the assets on Schedule B?

A.   The 1.4 -- the short answer is I don't know.

Q.   Okay.

A.   You had asked me what had been transferred to date.  So what had been transferred is approximately 1.4.

Q.   Okay.  Are you drawing a distinction between transferred and some other -- other --

A.   Originally, yes, because you

## Page 37

HIGHLY CONFIDENTIAL - J. HRASKA

originally asked what had been transferred.

Q.   Right.

A.   And based on, you know, transactions, 1.4 or so billion had been transferred.

Q.   Right.

A.   There may have been a different total value on Schedule B.  I can't be certain what that value is.  There's been people who have talked about a number.

Q.   Okay.

A.   So I have a general sense, but I wouldn't testify that I knew a hundred percent what that value of Schedule B was.

Q.   Do you have any knowledge of what has been called Schedule A with respect to that transaction?

A.   Schedule A, as I understood it, was related to a transaction prior to that transaction which was the financing between Lehman Brothers and Barclays.

Q.   Okay.  And do you have any --

A.   I'm not sure, is it all part of the same transaction?  I don't know that it's part. I view those as distinctly different

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  transactions, Schedule A and what became
3  Schedule B, but...
4      Q.    Okay.  Well, I just want to understand
5  what your understanding is.
6      A.    Okay.
7      Q.    So let me just try to understand.  You
8  mentioned a separate transaction between
9  Barclays and Lehman that eventually led to a
10 collection of securities that has been known as
11 Schedule A; is that right?
12     A.    That's correct.
13     Q.    Okay.  And what was the transaction
14 that you understood took place that led to
15 Schedule A?
16     A.    There was a secured financing
17 transaction, a repo transaction -- from Lehman's
18 perspective, it was a repo transaction with
19 Barclays which took place on the 18th of
20 September, and the assets related to that
21 transaction became Schedule A.
22     Q.    Okay.  And is it all right -- was that
23 a tri-party repo?
24     A.    That transaction was a -- was a repo.
25 There were -- it was sort of a unique

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  transaction.  It was one that took on elements
3  of tri-party as well as a bilateral contract,
4  but it was governed under the documents of a
5  tri-party repo, yes.
6      Q.    And who is the agent with respect to
7  that transaction?
8      A.    There was -- well, that's what made it
9  unique.  There were two tri-party agents
10 involved.  There was Chase, who was a tri-party
11 agent, who held our collateral with the Fed that
12 we had pledged to the Federal Reserve, and then,
13 in effecting the transaction, according to the
14 tri-party terms, there was Bank of New York, who
15 was the agent for Barclays.
16     Q.    I see reference in some of the
17 documents to the BONY tri-party?
18     A.    Uh-huh.
19     Q.    Is that the tri-party we're -- is that
20 the transaction we're talking about?
21     A.    Yes, that's correct.  We moved the
22 assets from JPChase, who was our tri-party
23 agent, to Bank of New York, who was, as I
24 mentioned, Barclays' agent.
25     Q.    Just so I understand the sequence,

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  tell me if I'm wrong here.  There was a
3  financing with the Fed in which there was a
4  certain amount of collateral posted by Lehman,
5  correct?
6      A.    That's correct.
7      Q.    At some point in time, that collateral
8  gets transferred to Chase?  Withdrawn.  Let me
9  start again.
10         At some point in time that collateral
11 gets transferred to Bank of New York in
12 connection with this transaction you have just
13 described?
14     A.    That's correct.
15     Q.    Okay.  And were you involved in that
16 transfer of collateral from the Fed program to
17 Bank of New York?
18     A.    I was, yes.
19     Q.    You were, okay.  And did all the
20 collateral make it from the Fed program to the
21 Bank of New York?
22     A.    It did not.
23     Q.    And do you know -- do you recall how
24 much made it and how much didn't?
25     A.    I can't give you the figure of exactly

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  how much that was in the Fed program made it to
3  Barclays of the original collateral because
4  there were difficulties in the collateral all
5  moving over to Barclays.
6          I can tell you how much collateral,
7  approximately, made it to Barclays, but it
8  wouldn't necessarily be all of the same
9  collateral that was with the Fed.
10     Q.    Okay.  Did you mean to say Bank of New
11 York or Barclays?
12     A.    Well, it was to Barclays -- I'm sorry,
13 to the Bank of New York for the benefit of
14 Barclays.
15     Q.    Okay.  So how much made it to the Bank
16 of New York in connection with that transfer
17 from the Fed program?
18     A.    On the night of the 18th,
19 approximately $42 billion worth of collateral.
20     Q.    And that figure is based on a
21 valuation of the collateral provided by who?
22     A.    By Bank of New York.
23     Q.    So $42 billion is how Bank of New York
24 valued the amount of money -- the amount of
25 collateral that was transferred from the Fed

Page 42

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  program to it on the 18th?
3      A.   From the Fed -- that was the way that
4  they valued the collateral that was transferred
5  to them, not necessarily just from the Fed,
6  because as I mentioned earlier, not all from the
7  Fed program, because there was collateral which
8  was not part of the Fed program which was
9  transferred to Barclays as well.
10     Q.   Okay.  Can you explain to me
11 generally -- I think I understand what you said,
12 but where did the rest of the collateral come
13 from that made it to Bank of New York?
14     A.   It was other unencumbered collateral
15 in Lehman's clearance boxes.
16     Q.   Okay.  Are you referring to what I've
17 seen referred to as an O74 box?
18     A.   It was -- that was one of the sources
19 of collateral, yes.
20     Q.   Where else did it come from?
21     A.   It came from another DTC location,
22 which was 636, and it also came from our
23 government clearance location.  Chase was also a
24 government clearance custodian, so from our
25 government clearance box.

Page 43

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      Q.   Does that have a number?
3      A.   It does, but it has an acronym number
4  that I'm not familiar with off the top of my
5  head.
6      Q.   Okay.  So were you involved -- let me
7  just -- I want to get a sense of your
8  involvement now.  You were involved in the
9  transfer of collateral from the Fed program to
10 Bank of New York, and were you then involved in
11 the efforts to unwind that September 18 repo
12 arrangement?
13     A.   Unwind from the perspective of a deal
14 negotiation or unwind from the perspective of
15 the mechanics of --
16     Q.   I'm trying to get a sense of what your
17 involvement was.  What did you do, after the
18 collateral made it to Bank of New York, what was
19 your role in connection with getting that
20 collateral eventually to Barclays?
21     A.   We didn't have any more involvement
22 with getting that collateral to Barclays.  Once
23 Bank of New York took possession of it --
24     Q.   Uh-huh.
25     A.   -- Bank of New York got the collateral

Page 44

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  to Barclays.
3      Q.   Okay.  Did you have any role in
4  preparing what has been called Schedule A with
5  respect to that collateral?
6      A.   I did not prepare Schedule A.  What
7  I -- what I did provide is I provided
8  information which reflected the assets that
9  Lehman knew to have transferred to Barclays in
10 respect to that transaction, or to Bank of New
11 York for the benefit of Barclays.
12     Q.   Okay.  Well, from September 18 through
13 that weekend, I think I've seen in some
14 documents some efforts to find additional assets
15 that were eventually going to be transferred to
16 Barclays; is that correct?
17     A.   That is correct.
18     Q.   And were you involved in that effort
19 to locate additional assets that were going to
20 be transferred to Barclays?
21     A.   I was, yes.
22     Q.   What did you do in connection with
23 that?
24     A.   I pretty much performed the same role.
25 I looked across the stock record for assets that

Page 45

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  didn't have liens on them by customers,
3  primarily.
4      Q.   Okay.  How many assets were located in
5  that effort?
6      A.   I don't know a specific number.  I
7  know there were -- there were significant number
8  of individual securities which were located.
9      Q.   Okay.  Was that securities that came
10 out of the O74 box and 636 box?
11     A.   Those were securities that, yes, out
12 of O74 and 636, yes.
13     Q.   Previously you had said there were $42
14 billion transferred to Bank of New York.  Did
15 that include assets from the O74 and 636 box?
16     A.   On the night of the 18th?
17     Q.   Yes.
18     A.   Yes, those assets were sourced from
19 those two boxes as well, yes.
20     Q.   Okay.  And then were there -- is it
21 correct to say there were additional assets
22 found over the weekend in those two boxes that
23 were also later sent to Barclays?
24     A.   At a later date, yes, there were
25 assets from those two boxes that were sent.

Page 46

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  Q.  So when you add up all these assets
3  that were eventually made their way to Barclays,
4  do you have a number that would reflect the
5  value of those assets?
6      A.  I don't know what the value of those
7  assets are today.  I know that there was a value
8  assigned to the assets on the night of the 18th
9  for what made it, which were -- what was $42
10 billion.  My approximate evaluation of what was
11 subsequently transferred was about 1.4 billion
12 of physically moving from Lehman to Barclays.
13      So those are the two figures that I'm
14 reasonably comfortable with.  And the market
15 valuation of those things has been changing over
16 time, being that it's a year later and things
17 like that.
18      Q.  I just want to get a -- just so I
19 understand your perspective on this, from your
20 perspective, there was $42 billion moved to Bank
21 of New York which eventually makes its way to
22 Barclays, correct?
23      A.  That's correct.
24      Q.  And there's a separate amount of 1.4
25 billion which is gathered sometime late in the

Page 47

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  week and that eventually makes it to Barclays as
3  well, correct?
4      A.  That's correct.
5      Q.  And is the 1.4 billion what's called
6  Schedule B?
7      A.  The 1.4 --
8      MR. SHAW:  Objection.  Asked and
9  answered.  Mischaracterizes prior testimony.
10     MR. HINE:  I didn't say anything about
11 his prior testimony.
12     Q.  I'm just trying to figure out, do you
13 consider the 1.4 billion the assets that are on
14 Schedule B?
15     A.  I have subsequently learned that the
16 1.4 billion are assets that are on Schedule B,
17 yes.
18     Q.  And were you involved in preparing
19 Schedule B?
20     A.  I was not involved in preparing the
21 official Schedule B.  I provided assets which
22 were used as the securities that would be later
23 selected and placed on Schedule B, but I didn't
24 prepare the official Schedule B.
25     Q.  Who selected the assets ultimately

Page 48

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  that would become part of Schedule B?
3      A.  I provided that information through my
4  manager at the time.  I don't recall whether I
5  had sent it to Monty or to Alastair, but
6  nonetheless, they forwarded it to Paolo Tonucci
7  and I believe Paolo sort of crystallized the
8  official Schedule B.
9      Q.  Is it fair to say over that weekend
10 your role was to just find unencumbered assets
11 that they could possibly decide what to do with?
12     A.  That's correct.
13     Q.  Okay.  Did you have an understanding
14 of why you were doing that?
15     A.  No.
16     Q.  Did anyone tell you that there was any
17 kind of shortfalls in what Barclays was
18 expecting to receive at the end of that week?
19     A.  My understanding at the time was that
20 I was still trying to complete the repo
21 transaction, and part of that repo transaction
22 was we had placed cash as well as an asset to
23 Barclays, and, you know, my understanding at the
24 time was that I was looking to, in addition
25 to -- I was looking for assets that would be

Page 49

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  able to be sent to Barclays for the purposes of
3  also substituting that cash.
4      Q.  When you say the repo transaction, are
5  you talking about the September 18 transaction
6  that we previously discussed?
7      A.  Involving the Federal Reserve, yes.
8      Q.  I think I just misunderstood you.  The
9  September 18 transaction was between Barclays,
10 Lehman and BONY, right?
11     A.  It was Barclays, Lehman and BONY, but
12 it was -- well, yes, it was Lehman.  It was
13 basically like I guess a transaction where I
14 guess the collateral that Lehman had on fine
15 with the Fed was being -- instead now being
16 financed with Barclays and Barclays was then I
17 guess going to finance that transaction with the
18 Fed.  So that's why I referenced the Fed.
19     Q.  Okay.  When you said you were
20 concerned with the repo at that time, what were
21 you doing with respect to the repo?  Again, I'm
22 talking Friday of that week.
23     A.  Friday of that week, I -- it was my
24 understanding that we were looking to substitute
25 the cash that we had placed on deposit for the

---

Page 50

```
1          HIGHLY CONFIDENTIAL - J. HRASKA
2    benefit of Barclays with assets as opposed to
3    leaving cash, because it's not efficient from a
4    lending transaction to collateralize a cash loan
5    with cash.  So we were looking to find available
6    assets which were suitable under the repo
7    agreement to substitute.
8        Q.   How much cash are we talking about?
9        A.   On the night of the 18th, Lehman
10   Brothers placed $7 billion on deposit for the
11   benefit of Barclays.
12       Q.   Just so I understand it, in layman's
13   terms -- well, before I ask that, let me -- was
14   that cash part of the $42 billion that you
15   mentioned?
16       A.   It was not.  42 billion was the value
17   of the assets, physical securities, that had
18   made it to Bank of New York for the benefit of
19   Barclays.
20       Q.   And so there was $7 billion in cash on
21   top of that?
22       A.   Yes.
23       Q.   And so am I correct to say you were
24   trying to locate other assets that could be
25   transferred to Barclays so Lehman could keep the
```

Page 51

```
1          HIGHLY CONFIDENTIAL - J. HRASKA
2    cash portion?
3        A.   So, yes, Lehman could get a return of
4    the cash in lieu of assets.  So a substitution
5    of one asset for another.
6        Q.   And were you able to come up with any
7    assets to do that?
8        A.   Yes, I was.  On Friday.
9        Q.   How much?
10       A.   Approximately a billion, just a little
11   over a billion.  Something like a billion-34,
12   -35, something along those lines.
13       Q.   Okay.  And did those assets in fact
14   get substituted in and make their way to
15   Barclays?
16       A.   Well, they made their way into
17   Barclays.  My expectation of a return of the
18   cash never occurred.
19       Q.   Why is that?
20       A.   Well, with the mechanics and
21   everything that happened with the relationship
22   with Chase that day, Chase didn't return any of
23   the cash at that point.
24       Q.   Can you explain to me the problems you
25   had with the relationship with Chase that day?
```

---

Page 52

```
1          HIGHLY CONFIDENTIAL - J. HRASKA
2        A.   The morning of the 19th, Chase had
3    effectively shut down our clearing accounts and
4    stopped having communication with anything other
5    than I think some very senior folks in Lehman
6    Brothers.
7        Q.   And why did they do that?
8            MR. SHAW:  Objection.  Foundation.
9        A.   I don't know particularly why they do
10   that.  I mean, there was, you know, there was
11   some speculation as to why they did that because
12   of the status of our situation from a credit
13   perspective and things like that, but I don't
14   know if there was a particular trigger that
15   caused them to do that.
16       Q.   Did you have any conversation with
17   folks at Chase about this?
18       A.   On the morning of the 19th, no.
19       Q.   At any time?
20       A.   I mean, I had conversations with folks
21   at Chase all through the night on the 18th,
22   actually, technically, I guess into the morning
23   of the 19th while we were trying to finalize the
24   transaction.  And after the morning of the 19th,
25   I guess the very early morning, like in the 1, 2
```

Page 53

```
1          HIGHLY CONFIDENTIAL - J. HRASKA
2    o'clock range, that was the last conversation I
3    had with anybody at Chase.
4        Q.   What was that about?
5        A.   That was primarily about --
6            The last conversation or the last
7    series of conversations?
8        Q.   Last series of conversations?
9        A.   The last series of conversations were
10   in relation to securing a loan to create the $7
11   billion which we placed on deposit with
12   Barclays.
13       Q.   I see something referred to in the
14   documents as a box loan.  Is that the loan
15   you're talking about?
16       A.   The 7 billion was a box loan, yeah.
17   Lehman took a box loan from Chase and let -- as
18   a result, Chase puts a lien on the assets for
19   that $7 billion in cash, yes.
20       Q.   What assets was that lien on?
21       A.   There were assets which were
22   unencumbered assets sitting in Lehman's
23   clearance boxes at Chase.
24       Q.   Is that an identifiable set of assets
25   that now has a lien on them from Chase?
```

**Page 54**

HIGHLY CONFIDENTIAL - J. HRASKA

2    MR. SHAW:  When you say "now," you
3  mean as we sit here?
4    Q.   As a result of that box loan, is there
5  now a lien on a particular set of assets,
6  identifiable set of assets in Lehman's box?
7    MR. SHAW:  Objection to form.
8    A.   Chase, in extending the loan to us,
9  selected the assets that they thought suitable
10  for collateralization on that loan.
11    Q.   Did Lehman have any say in the
12  selection of those assets?
13    A.   No.
14    Q.   Let me go back.  I think I have a
15  general sense of what you were working on at the
16  time.  I just want to go back with a couple of
17  particular questions.
18      I wanted to go back to the Fed
19  financing for a minute.  Do you know what the
20  repo rate was for that financing?
21    A.   I don't know.
22    Q.   What is a repo rate?
23    A.   A repo rate is the rate of interest
24  that you pay for the extension of the cash loan.
25    Q.   Have you ever seen any schedules of

**Page 55**

HIGHLY CONFIDENTIAL - J. HRASKA

2  repo rates with respect to the Fed financing?
3    A.   Schedules of rates, no.
4    Q.   So you don't -- I think you just said
5  you don't know the repo rate for that Fed
6  financing program?
7    A.   Well, to be clear, there was more than
8  one program.
9    Q.   Right.
10    A.   And I didn't know the rates on any of
11  the programs.
12    Q.   What was the repo rate on the
13  September 18 transaction we've been talking
14  about?
15    A.   I don't recall.
16    Q.   What is a repurchase price with
17  respect to a repo?
18    MR. SHAW:  Objection.  Calls for a
19  legal conclusion, but you can answer.
20    THE WITNESS:  Okay.
21    A.   A repurchase price -- a repo
22  transaction is a collateralized loan.  It's
23  based on an initial sale of collateral and a
24  repurchase of collateral.  The price of that
25  collateral on both, what are called both legs,

**Page 56**

HIGHLY CONFIDENTIAL - J. HRASKA

2  which is the on leg, or start leg, or the off
3  leg, or maturity leg, are the same thing.  So
4  the repurchase price would have been the price
5  that was assigned to that collateral on the
6  start of the transaction.  There's no difference
7  between the repurchase price and the initial
8  price.
9    Q.   What was the, just -- what was the
10  initial price on the September 18 repo we've
11  been talking about?
12    A.   Well --
13    MR. SHAW:  Objection.  Foundation.
14    A.   There were, if you're asking me about
15  prices, prices of securities, there were prices
16  on something along the lines of 10,000
17  securities.  So...
18    Q.   No, I'm asking the aggregate price on
19  the September 18 repo.  Am I correct to say
20  that --
21    A.   Well, it --
22    Q.   -- Barclays, through bank of New York
23  on behalf of Barclays, received collateral
24  valued at $42 billion, correct?
25    A.   Right.

**Page 57**

HIGHLY CONFIDENTIAL - J. HRASKA

2    Q.   And they also received $7 billion in
3  cash pursuant to the box loan, right?
4    A.   That's correct.
5    Q.   What did Barclays give to Lehman?
6    A.   Barclays gave to Lehman $45 billion of
7  cash.
8    Q.   And is that the price that you were
9  just referring to when you talked about the
10  on --
11    A.   No.
12    Q.   Okay.
13    A.   That's the -- that's what's known as
14  the repo principal or the loan amount.
15    Q.   Okay.  And so how is that different
16  from the prices you were just talking about?
17    A.   Prices are the prices of the
18  underlying collateral that securitized that
19  loan.
20    Q.   And how are they different from the
21  principal of the loan?
22    A.   The principal of the loan is the
23  extension of the dollar amount or what the
24  value -- what the value of cash that's being
25  extended is.  That's the loan principal.

Page 58

1     HIGHLY CONFIDENTIAL - J. HRASKA
2     Q.   Right.
3     A.   The price, the prices, are the prices
4  of the individual collateral that make up that
5  loan, and in order for a loan to be effective,
6  the value of the price times the par amount of
7  the collateral should exceed the principal
8  extended.
9     Q.   Okay.  Is that what's known as the
10  haircut, the amount by which it exceeds?
11     A.   The amount by which it would exceed
12  the loan is known as the haircut, that's
13  correct.
14     Q.   And so what was the haircut associated
15  with the September 18 repo?
16     A.   There wasn't a -- there wasn't a
17  specific stated haircut.  There was a total loan
18  amount, which was this $45 billion, and the
19  total collateral value that we were trying to
20  transfer over to Barclays or what we were
21  directed to transfer over to Barclays was
22  approximately $50 billion.
23     Q.   And that $50 billion was comprised of
24  the approximately $42 billion in securities that
25  you mentioned earlier plus the cash?

Page 59

1     HIGHLY CONFIDENTIAL - J. HRASKA
2     A.   It turned out that that was the case.
3  It was initially intended to be all collateral,
4  but the market value of what we were to transfer
5  initially was $50 billion.
6     Q.   Okay.  And Barclays was, after the --
7  after they received the proceeds of the loan and
8  the collateral, was Barclays satisfied that it
9  had received the entire amount of collateral
10  that it was expecting with respect to that repo?
11     MR. SHAW:  Objection.  Foundation.
12     A.   Yeah, I don't know whether they were
13  satisfied or not.  I mean, we completed the
14  securities transfers until the point that we
15  couldn't make any transfers because the system
16  had been shut down, and we were requested at
17  that point to deliver an additional 7 billion in
18  cash, which we did.
19     Q.   Okay.  When was that transferred,
20  approximately?
21     A.   The 7 billion in cash?
22     Q.   Yes.
23     A.   Somewhere between 2 and 3 o'clock in
24  the morning on the 19th.
25     Q.   Friday?

Page 60

1     HIGHLY CONFIDENTIAL - J. HRASKA
2     A.   Well, it was -- it was -- we worked
3  through the night of the 18th.  So I guess it
4  was very, very early in the 19th.  So it was the
5  morning of the 19th at like maybe 2 o'clock in
6  the morning or something like that.
7     Q.   So, back to the notion of a haircut,
8  the haircut for that transaction is the
9  difference between the approximate $50 billion
10  in collateral and cash that was transferred to
11  Bank of New York and the 45 billion that
12  Barclays transferred to Lehman, correct?
13     A.   Could you repeat that one more time?
14  I'm sorry.
15     Q.   I'm just trying to figure out what the
16  haircut is for that transaction.  I thought you
17  said that approximately 50 billion was
18  transferred to Bank of New York or Barclays?
19     A.   That's correct.
20     Q.   In the form of either collateral or
21  cash?
22     A.   Uh-huh.
23     Q.   And that Barclays gave Lehman 45
24  billion in cash?
25     A.   Right, that's correct.

Page 61

1     HIGHLY CONFIDENTIAL - J. HRASKA
2     Q.   So that makes the haircut
3  approximately $5 billion?
4     A.   That would be correct.
5     Q.   Do you know what the haircut was for
6  the Fed program earlier in that week?
7     A.   I don't.  Again, the haircut, each
8  security class had its own individual haircut,
9  so there would have been a, I guess what's
10  called a synthetic haircut, which, you know,
11  would equate to something similar to what you
12  did there, you know, so -- and I believe it was
13  similar because the transaction was described to
14  me as we were going to take the extension of
15  financing that the Fed had offered to Lehman and
16  we were going to help effect the transfer of
17  that to Barclays so that Barclays could then
18  step back into that transaction.  So I believe
19  it was similar.  I don't know exactly what the
20  haircut was.
21     Q.   Okay.  And who described the
22  transaction to you like that?
23     A.   John Rodefeld, who was held of North
24  American Operations at the time, had contacted
25  Alastair and myself to talk about the

Page 62

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    transaction.
3    Q.    And what did he say about it?
4    A.    He basically told us that Barclays had
5    been contacted by the Fed and Barclays was asked
6    to provide a credit, a counterparty credit
7    upgrade to the Fed, in essence.  They were fine
8    with financing the collateral basket that they
9    were financing, but they would prefer not to
10   have Lehman as a counterparty on the other side
11   of that.
12        They asked Barclays to basically
13   intermediate a transaction where Barclays
14   offered Lehman the same financing that they had
15   been -- that the Fed had been financing with
16   them throughout that week, and then that
17   Barclays would take that collateral and place it
18   back on deposit with the Fed to make them whole
19   on the cash transaction.
20   Q.    I think I understand what you just
21   said.
22        What else did Mr. Rodefeld say on that
23   call?
24   A.    Well, that call was on the 17th, and
25   they initially were looking to actually effect

Page 63

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    that transaction the same day on the 17th.  And
3    then, you know, with some subsequent
4    conversations, it just became -- it basically
5    became an impossibility not just for Lehman
6    Brothers, but for Bank of New York, JPChase,
7    Barclays to do a transaction of that magnitude
8    in the course of a day.
9        So from the 17th through the --
10   basically the whole 17th into the night of the
11   17th and even morning of the early 18th, we
12   discussed the mechanics on how we would effect
13   that transfer in the most efficient manner.
14   Q.    So do you recall anything else about
15   what Mr. Rodefeld told you on that call?
16   A.    Not other than what I just described
17   to you.
18   Q.    So am I correct to say that the
19   initial intent was to have this transaction take
20   place on the Wednesday of that week?
21   A.    From the first phone call, yes, it was
22   intended to take place on Wednesday, but...
23   Q.    And just why mechanically was that not
24   possible?
25   A.    There were numerous reasons from each

Page 64

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    of the parties.  Purely from the size of the
3    transaction, it was an extremely large
4    transaction, and the number of securities
5    involved were in the multiple thousand range,
6    you know, I would say in the double-digit
7    thousand range.  So that was one of the issues.
8        So not just from a transactional
9    perspective, but also from a static perspective
10   on the Bank of New York's side, they didn't have
11   a lot of these securities set up on their
12   systems.  It was going to take them time to set
13   the securities up to be able to set up receipts
14   for these securities and things along that
15   nature.
16   Q.    So how was it possible to do it on
17   Thursday as opposed to Wednesday?
18   A.    People were working 24 hours a day to
19   get it done and bunches of people were brought
20   in to help set things up and there were
21   technologists brought in on all different sides
22   to help do away from ordinary type transactions
23   and things like that to get the securities
24   transferred.
25   Q.    So am I correct to say that you

Page 65

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    learned of the possibility of this transaction
3    sometime on Wednesday, late Wednesday, and then
4    people worked through Wednesday night and then
5    all the way through Thursday night to get it
6    done?
7    A.    That's correct.
8    Q.    Okay.  Did the nature of that transfer
9    change at all?  In other words -- let me
10   rephrase that.
11        You just described what Mr. Rodefeld
12   told you about the transaction.  Did that
13   transaction change at all over the course of
14   that Wednesday into Thursday?
15        MR. SHAW:  Objection.  Foundation.
16   A.    The nature of the transaction itself,
17   the spirit of the transaction, nothing changed,
18   no.
19   Q.    Okay.  That makes sense.
20   A.    Could I -- I apologize.
21        (Discussion off the record.)
22        (Recess; Time Noted:  10:31 A.M.)
23        (Time Noted:  10:38 A.M.)
24   BY MR. HINE:
25   Q.    Mr. Hraska, I just want to take a

1        HIGHLY CONFIDENTIAL - J. HRASKA
2   second to just talk again about your
3   understanding of the transaction between
4   Barclays and Lehman.
5        Did you ever have any understanding
6   that there was supposed to be a discount
7   associated with that transaction?
8        A.   Which transaction?  The repo
9   transaction?
10       Q.   No.  No, the sale transaction between
11  Barclays and Lehman.
12       A.   I didn't have any knowledge as to what
13  the terms of that transaction were.
14       Q.   Did you ever hear the phrase "block
15  discount" used in connection with either that
16  transaction or the repo that we have been
17  talking about?
18       A.   No.
19       Q.   Did you ever have any understanding
20  that Barclays was going to be paying less than
21  full value for the assets that it was buying
22  from Lehman?
23       A.   No.
24       Q.   Did you ever hear any discussion about
25  the possibility of defaulting on the repo that

1        HIGHLY CONFIDENTIAL - J. HRASKA
2   we have been discussing?
3        A.   There was discussions related to that
4   topic on the week of the 22nd.
5        Q.   Tell me what you recall about that,
6   those discussions.
7        A.   Well, there was -- it was news that
8   obviously LBI had filed for I guess SIPC
9   protection.  So the margin folks had contacted
10  me on the morning of -- I don't know which
11  morning, I believe it was on the 22nd, but if
12  not, on the 23rd, to ask me if that transaction
13  was being considered a default by Barclays.  And
14  at the time, I didn't know, but there was -- I
15  then had conversations about whether that was
16  going to be treated as default with my manager,
17  and at the time, you know, we didn't actually
18  know when it was or if it was going to be
19  treated as in default.
20       Q.   When we talk about "it," we're talking
21  about the September 18 repo?
22       A.   Repo itself, yes.
23       Q.   And LBI filed for bankruptcy on
24  Friday, the 19th?
25       A.   That's my understanding.

1        HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.   And so you had conversations the
3   following Monday about this?
4        A.   Yes.
5        Q.   And who were the conversations with?
6        A.   I don't recall specifically.  Somebody
7   from the Margin Group.  I don't recall
8   specifically who it was from the Margin Group
9   that I had a conversation with.  And I also had
10  a conversation with Monty Forrest, which is my
11  manager.
12       Q.   The Margin Group at Barclays?
13       A.   The Margin Group at legacy Lehman
14  Brothers.
15       Q.   Do you recall the names of the
16  individuals that you spoke to?
17       A.   No, I just said I didn't recall it.
18       Q.   To your understanding, was the
19  September 18 repo unwound in some way?
20       A.   To my understanding, it was defaulted
21  and the collateral that was put up to securitize
22  that loan was seized by Bank of New York for the
23  benefit of Barclays.
24       Q.   Okay.  And did Bank of New York also
25  seize the cash that had been posted?

1        HIGHLY CONFIDENTIAL - J. HRASKA
2        MR. SHAW:  Objection.  Foundation.
3        A.   The cash itself was not in an account
4   that or in a position for Bank of New York to
5   seize.  The cash itself was being held for the
6   benefit of Barclays at JPChase.
7        Q.   Okay.  And what happened to that cash?
8        MR. SHAW:  Foundation.
9        A.   Barclays, because the cash was put
10  into the account of their benefit, they -- later
11  I understood, and it would make sense, that they
12  claimed ownership of that cash.  What happened
13  to the cash after that, I sort of was removed
14  from the transaction after they laid ownership
15  claim to that cash.
16       Q.   Okay.  I guess do you understand that
17  there was an ensuing dispute between Chase and
18  Barclays as to the ownership of that cash, among
19  other things?
20       A.   I did, yes.
21       Q.   And were you involved in that
22  resolution of that dispute?
23       A.   My only -- not in the resolution, no.
24       Q.   What was your involvement in
25  connection with that dispute?

1  **HIGHLY CONFIDENTIAL - J. HRASKA**
2      A.   To do some fact-finding to describe
3  how that cash --
4           MR. SHAW:  Actually, let me just stop
5      you here.  If this was any work you did for
6      counsel, I don't want you to get into the
7      details of it.
8           THE WITNESS:  Okay.
9      A.   It was purely to describe how that
10 cash got there, why was there cash in a repo
11 transaction.
12     Q.   **And who were you describing that for?**
13     A.   My initial conversation on that was
14 with -- was with the Treasury folks, and that
15 was more so just to -- was more so just to
16 review sort of what happened on that evening
17 and --
18     Q.   **When you say "the Treasury folks," are**
19 **you talking about Mr. Tonucci?**
20     A.   Mr. Tonucci and his organization,
21 yeah.
22     Q.   **Okay.  And so am I understanding you**
23 **correctly that you explained to them the genesis**
24 **of the box loan that we just previously**
25 **discussed and how the cash came to be involved**

1  **HIGHLY CONFIDENTIAL - J. HRASKA**
2  **in that transaction?**
3      A.   Yes.
4      Q.   **And did you have any other involvement**
5  **in the dispute between Barclays and Chase over**
6  **that cash?**
7      A.   No.
8      Q.   **Okay.  I would like to revisit some of**
9  **the things we talked about earlier.**
10          There was a pool of collateral that
11 was used to secure the Fed financing early in
12 the week, correct?
13     A.   That's correct.
14     Q.   **And I think you told me you weren't**
15 **aware of the value of that pool; is that right?**
16     A.   That's correct.
17     Q.   **At some point that pool was supposed**
18 **to be transferred to Bank of New York for the**
19 **benefit of Barclays, but not all of it makes it,**
20 **right?**
21     A.   That's correct.
22     Q.   **And now do you know why it didn't make**
23 **it, that portion of it didn't make it?**
24     A.   There were multiple reasons why not
25 all the collateral made it.

1  HIGHLY CONFIDENTIAL - J. HRASKA
2      Q.   **Can you tell me what they are?**
3      A.   I can tell you the ones that I'm aware
4  of.  I may not tell you every reason, but ...
5           The first reason was that some of the
6  collateral that was pledged to the Bank of New
7  York -- I'm sorry, that was pledged to the Fed
8  was obtained through a program called GCF, which
9  stands for General Collateral Financing.
10     Q.   **Uh-huh.**
11     A.   As a result of this program, you
12 obtain collateral.  It's basically it's a
13 dealer-to-dealer tri-party program.  So you
14 obtain collateral, which is credited on a
15 book-entry-only basis to your clearing bank, and
16 that clearing bank -- you can use that
17 collateral to -- you can basically rehypothecate
18 that collateral.  You can use it as collateral
19 for an ongoing transaction.
20          The transference of that collateral is
21 purely governed by the Fixed Income Clearing
22 Corporation, or FICC, in conjunction with the
23 two clearing banks, Bank of New York and
24 JPChase.  So when a transaction is agreed and
25 it's put on and when it's unwound, what happens

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  is is that the transference of that collateral
3  is purely governed, as I mentioned, by FICC.
4           And so we had previously purchased
5  collateral under that program and we were using
6  some of that collateral purchased under that
7  program, and when the morning of the 18th hit,
8  some of those programs had matured, and as a
9  result of that maturity, that collateral was
10 taken out of our clearance boxes on an automated
11 fashion away from us having any involvement in
12 or being able to even stop that.  Because just
13 as part of the program, collateral comes in and
14 goes out.
15          So what was previously sourced from
16 that program and listed as a rehypothecated
17 asset to the Fed on the morning of the 18th was
18 no longer available for us to actually transfer
19 to Bank of New York.
20     Q.   **And do you know the value of the**
21 **collateral that was -- falls into that category?**
22     A.   I don't know the value of specifically
23 the GCF collateral.  I know that there was -- it
24 was a significant value.  There was a value
25 of -- GCF collateral is typically Fed-eligible

Page 74

```
 1          HIGHLY CONFIDENTIAL - J. HRASKA
 2   collateral.  We had a discrepancy of
 3   approximately 8 billion in Fed-eligible
 4   collateral, but I don't know whether that
 5   discrepancy -- I can't say for certain whether
 6   that discrepancy was purely related to GCF or
 7   not.
 8          Q.    When you say 8 billion, is that the
 9   amount that didn't make it from the Fed program
10   to the Bank of New York?
11          A.    That was the amount at the time when
12   we tried to effect the transfer of the Cusips
13   that were out there that we were unable to
14   transfer on the 18th.
15          Q.    And so am I correct to say there was
16   approximately $8 billion in collateral that was
17   not able to transfer on the 18th from the Fed
18   program to Bank of New York; is that right?
19          A.    Yeah, initially, yes.
20          Q.    Okay.  And a portion of that 8 billion
21   wasn't able to transfer due to this --
22          A.    GCF.
23          Q.    -- GCF issue that you just described?
24          A.    Yes.
25          Q.    Do you know what portion of it falls
```

Page 75

```
 1          HIGHLY CONFIDENTIAL - J. HRASKA
 2   into that category?
 3          A.    I don't, unfortunately.
 4          Q.    Do you know if it's most of it or only
 5   a small portion?
 6          A.    I don't think it's most of it, but
 7   it's somewhere between most and small.  It's
 8   probably somewhere in midrange.  I don't
 9   honestly know.
10          Q.    I'm not trying to get you --
11          A.    It's not insignificant, but I don't
12   think it's most of it.
13          Q.    So that leaves another portion of the
14   8 billion that didn't make it.  Why did the rest
15   of it not make it?
16          A.    All right.  So there were other things
17   that were happening on that day.  Collateral
18   over securities that were moving were securities
19   that were also traded by our inventory traders,
20   proprietary traders at Lehman.  They were also
21   securities that, you know, customers maybe were
22   asking to move out of their accounts and move to
23   other broker-dealers.
24          When all these transactions take
25   place, there are a queue of deliveries that get
```

Page 76

```
 1          HIGHLY CONFIDENTIAL - J. HRASKA
 2   built out of the delivery boxes, and when there
 3   becomes availability, there's no way without
 4   manually intervening in every single delivery to
 5   say, okay, wait a minute, this Security A goes
 6   to Customer A and Security A goes to Customer B
 7   or C.
 8          So what was happening, unfortunately,
 9   is many of the securities that were going --
10   that had deliveries onward to Bank of New York
11   for the benefit of Barclays also had onward
12   delivery instructions for other people as well.
13   So when the availability -- when the securities
14   became available, some of those securities were
15   first delivered to other onward obligations.
16          Q.    Do you know approximately how the
17   amount of securities that fall into that
18   category?
19          A.    I don't.  I actually have no idea on
20   that because that was -- that was a non-stop
21   request of, you know, customer transfers, new
22   trades and, you know, inventory traders were
23   trying to sell assets to raise cash.  So it was
24   just an enormous amount of transactions in a
25   particular time period.
```

Page 77

```
 1          HIGHLY CONFIDENTIAL - J. HRASKA
 2          Q.    Did those securities, I think I
 3   understood what you said, they got used for
 4   other purposes, basically, and is that -- does
 5   that relate to the winding down of the matched
 6   book that was managed by the Finance Department,
 7   the Financial Department within Lehman?
 8          A.    I wouldn't attribute it to a winding
 9   down of the matched book.  All I can say is that
10   there were -- there were trades booked in the
11   system that were, you know, outward-going
12   deliveries.  They could have multiple sources.
13          So, as the securities came in, they
14   just made on those deliveries and they could
15   have multiple reasons why they were pending for
16   delivery.
17          Q.    I think you were describing reasons
18   that some of the collateral didn't make it to
19   BONY.  Are there any other reasons?
20          A.    There is one other reason in my mind
21   that was a reason of the initial -- there was an
22   initial shortfall, right?  And that was because
23   we were initially going to do the transfer in
24   increments of $5 billion, and Barclays had
25   forwarded the first $5 billion and our tri-party
```

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  agent was then, upon receipt of that $5 billion,
3  supposed to released $5 billion worth of
4  collateral that was previously held in the Fed
5  program.
6       They had sent in a request to Lehman
7  Brothers, "they" being JPChase sent in a request
8  to Lehman Brothers as to which securities -- or
9  did we have a preference as to which securities
10 were released first.  The response back was
11 there was no particular order that needs to be
12 released first.  However, just release the
13 securities that are in the program.
14      Unfortunately, there was a
15 miscommunication and JPChase understood that to
16 be any $5 billion, and it released also some
17 securities that were not in the program.
18     **Q.   When you say "the program," you're**
19 **talking about --**
20     A.   "The program," meaning that were being
21 financed by the Fed the previous evening.
22     **Q.   And so I interrupted your story, but**
23 **continue.**
24     A.   So, as a result of that release, those
25 securities had some onward obligations as well

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  because they were subject to other transactions,
3  as we described earlier, and those securities as
4  well had gone out away from Bank of New York,
5  and as a result of all these different things
6  taking place, the first delivery of collateral
7  only accomplished somewhere in the neighborhood
8  of around probably 2 billion or less.
9      **Q.   Can you explain that?  I mean Chase**
10 **thinks they're releasing 5 billion?**
11     A.   Uh-huh.
12     **Q.   And only 2 billion or less makes it to**
13 **BONY?**
14     A.   Right.
15     **Q.   And how does the rest get diverted?**
16 **Just automatic?**
17     A.   Well, per the process we just talked
18 about, those assets get released to our
19 availability, and because there were pending
20 deliveries in our clearance locations at both
21 DTC, 636, O74, the Fed box, when those
22 securities became available, they were
23 immediately delivered on other obligations and
24 they weren't available any more to be delivered
25 to Bank of New York.

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      **Q.   So, just to continue the story, Chase**
3  **thinks it's delivering 5 billion, but they get**
4  **diverted to other purposes and only a little**
5  **less than 2 billion makes it to BONY out of that**
6  **first delivery?**
7      A.   Chase releases their lien on 5
8  billion, and as a result, yes, Lehman, through
9  it's clearance relationships, only delivered 2
10 billion.  I think it was under 2 billion, but I
11 just don't -- somewhere under 2 billion I think
12 is the figure.
13     **Q.   So what happens next?**
14     A.   At that point in time we were
15 contacted by John Rodefeld, who was representing
16 operations at Barclays.  He said we were going
17 to suspend -- we were going to suspend the next
18 increment of $5 billion in cash being wired
19 because Barclays didn't feel comfortable in
20 wiring another 5 billion when they hadn't fully
21 received the assets on the first 5 billion, and
22 he asked us to hold off until we heard back from
23 him with further instructions.
24     **Q.   And did you eventually get further**
25 **instructions?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

1
2      A.   We did very late in the day, I would
3  say somewhere in the neighborhood of between 4
4  and 5 o'clock.  He said that it was decided that
5  Barclays was going to extend the remainder of
6  the loan balance in a single transaction, which
7  would have been the $40 billion, and at that
8  point in time, you know, expect to have, you
9  know, Chase release the availability of the
10 remaining 40 billion, I think, or of 40 billion
11 that they had, and we were asked to coordinate
12 with the clearance folks, to the best that they
13 could, to try to monitor assets going and give
14 priority of the assets to Barclays.
15      And that was -- it was a difficult
16 task, but they, you know, they brought in extra
17 people and tried to watch deliveries and that
18 kind of thing.  It was all on a manual basis so
19 it was very difficult to do that, but they did
20 the best they could with, you know, being that
21 it was manual in nature.
22     **Q.   Why, if Chase was -- I mean, if --**
23 **excuse me.  If Barclays was concerned about not**
24 **sending the next 5 billion, why did they decide**
25 **to go ahead and send 40 billion instead?**

Page 82

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    A.    I honestly don't know.
3    Q.    And so were you eventually successful
4 in releasing the remainder of the collateral
5 that Barclays was expecting?
6    A.    Well, as we discussed a little bit
7 earlier, the -- we did manage to get over a
8 total of 42 billion out of the 50 billion in
9 collateral that we were expecting to send over.
10    Q.    Okay.  Am I correct to say that 42
11 billion -- they had 2 billion from the initial
12 release from Chase and then so there was an
13 additional 40 transferred over?
14    A.    Rough approximation, that's correct.
15    Q.    So now you're continuing to tell me
16 the reasons that not all the Fed collateral made
17 it to BONY.  Are there any other reasons that
18 you know of?
19    A.    No, those are the primary items.
20    Q.    Okay.
21    A.    At least the ones that I was aware of.
22 There might have been something else that I'm
23 not aware of.
24    Q.    I believe you said that approximately
25 8 billion did not make it from the Fed program

Page 83

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 to Bank of New York, correct?
3    A.    There was, yes, that's correct.
4    Q.    And so I know you don't know the exact
5 numbers, but is 3 billion of that 8 billion the
6 result of this initial shortfall problem that
7 you just described?
8    A.    I wouldn't have any way to determine
9 that.
10    Q.    I thought you said the initial release
11 from Chase was supposed to be 5 billion and only
12 about 2 billion made it to BONY out of that
13 release; is that right?
14    A.    That's correct.
15    Q.    So --
16    A.    But I don't know if what you're asking
17 me is the -- is the 3 billion shortfall
18 comprised of, you know, these GCF and whatever
19 assets.  I don't know what percentage of that
20 was GCF or other deliveries or other
21 transactions.  That's, unfortunately, I have no
22 way of knowing that.
23    Q.    Okay.  Was any of the 8 billion
24 shortfall later transferred to BONY?
25    A.    Well, what was transferred was a total

Page 84

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 of 42 billion.  I mean, there was 8 billion of
3 the Fed program, and those were Fed -- we
4 probably need to make a distinction between the
5 Fed program securities and what are deemed Fed
6 wirable or Fed securities, right?
7        So there was, you know, what was held
8 in the program, which were DTC-eligible
9 securities, Fed wirable securities and that kind
10 of thing.  So the 8 billion shortfall, it was
11 not only a shortfall of what was in the Fed
12 program, it was basically a shortfall of Fed
13 wirable security types.
14        So we found substitutes of a good
15 portion of that 8 billion.  I couldn't tell you
16 the exact quantities, but that's why we were
17 able to, you know, to manage to get, you know, a
18 good portion of the collateral over to Bank of
19 New York.
20    Q.    I think I understood what you just
21 said, but let me see if I can see if I got that
22 right.
23        $8 billion does not make it for any
24 number of reasons to the BONY in the course of
25 this transfer over Thursday night, and are you

Page 85

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 saying --
3    A.    Well, let me clarify that.  8 billion
4 that was initially intended to be transferred --
5    Q.    Right.
6    A.    -- was not going to be eligible to be
7 transferred for various reasons.
8    Q.    Okay.  Then you relayed that 42
9 billion in securities ultimately did make it to
10 BONY, right?
11    A.    Uh-huh.  Yes, that's correct.
12    Q.    Now, was some of that 42 substitute
13 securities for the 8 billion?
14    A.    Yes, it was.
15    Q.    Do you know how much?
16    A.    I don't.  I mean, we managed to make
17 up as much as we could.  I don't know the
18 percentages of what was substituted from the
19 original 8.  I mean, at that point we knew 8 and
20 there were other things that were causing
21 problems.  And then the goal became you need to
22 get the $50 billion worth of collateral over and
23 make sure you get every collateral that doesn't
24 have lien on it or unencumbered collateral
25 that's eligible for the Barclays transaction

Page 86

HIGHLY CONFIDENTIAL - J. HRASKA

2  over there.
3        So, you know, it stopped being about
4  this pool or that pool or this type of
5  collateral or that type of collateral.  You
6  know, there were specific, you know, buckets and
7  things, but at a certain point in time, we were
8  instructed by John Rodefeld to deliver all
9  eligible collateral that fit the criteria to
10  Barclays in as most efficient, quick manner as
11  possible.
12      Q.  I had one question.  I know we're
13  talking round numbers here, but if you were
14  supposed to deliver 50 and you delivered 42, how
15  does the 7 billion box loan make up the entire
16  difference?  Was there -- seems to be another
17  billion dollars missing.
18      A.  Again, it was 42 and change that made
19  it and there was I think it might have been just
20  under 50.  It was 49 and some mid to high
21  change.
22      Q.  So the --
23      A.  You know, what's a half a billion
24  between friends?
25      Q.  So I just want to make sure I wasn't

Page 87

HIGHLY CONFIDENTIAL - J. HRASKA

2  missing a billion here or there.
3      A.  No.  No.
4      Q.  It's really the 50 billion that was
5  supposed to make it, made it in the form of
6  approximately 42 and change --
7      A.  Yeah.
8      Q.  -- in securities, and the balance was
9  the box loan?
10      A.  Yes, that's correct.
11      Q.  What securities were used to secure
12  the box loan?
13      A.  I don't know the specific securities.
14  I'm sure that could be provided by --
15      Q.  Well --
16      A.  I mean, if you're asking me like -- I
17  think we talked a little bit about this before.
18  There were securities which were unencumbered
19  still at our clearance box at Chase.  So Chase
20  looked at the securities that were available and
21  said, you know, you have market value that, you
22  know, far exceed 7 billion.
23        So we requested a loan.  They, you
24  know -- we basically booked the transaction for
25  a 7 billion loan on our books and Chase went

Page 88

HIGHLY CONFIDENTIAL - J. HRASKA

2  ahead and allocated securities that they deemed
3  appropriate that were being held in their
4  clearance box.
5      Q.  Am I correct to say that the assets
6  used to secure that box loan had nothing to do
7  with the assets you have just described that
8  were supposed to go from the Fed program to
9  BONY?
10      A.  I wouldn't know specifically whether
11  there were any circumstances where there might
12  have been a Cusip that was or a security that
13  was the same that were on the initial intended
14  list.  It's possible.  I wouldn't know for sure.
15      Q.  Okay.  I see reference in some of the
16  documents to something called fails on around
17  Thursday.  What is that term meant to entail, in
18  your understanding?
19      A.  The general term "fails" or --
20      Q.  Well, I see it in the Thursday night
21  e-mail traffic, and I just wondered how that
22  term is used in connection with what we're just
23  talking about, if at all.
24      A.  Okay.  Well, a fail is an interesting
25  term, actually.  It, for most operations

Page 89

HIGHLY CONFIDENTIAL - J. HRASKA

2  professionals, a security transaction is booked,
3  and until the point of delivery, it's considered
4  a fail.
5        So that may mean if I book a
6  transaction let's call it last night, 8 o'clock
7  in the morning I haven't delivered it yet, it's
8  still failing.  You know, I may make delivery by
9  the end of the day, and at that point, you know,
10  it becomes cleaned up.
11        Other people in the industry refer to
12  fails as, you know, after settlement date, but
13  from an operations perspective, which is
14  probably a good part of the mail you see, fails
15  are related to undelivered securities at a
16  particular point in time.
17        So on that day we had a enormous
18  amount, as we talked about those, sort of those
19  trades that were queued up before that I
20  referenced, those were all pending deliveries or
21  fails.  So over the course of time, as
22  availability -- as securities became available,
23  those fails were getting cleaned up.  So there
24  were --
25      Q.  Okay.

Page 102

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  on the morning of the 19th, somewhere in before
3  noon.  I don't know exactly when it was.
4    Q.    Changed to who?
5    A.    Changed to Chase being the
6  beneficiary.
7    Q.    Can we discuss for a couple minutes
8  the -- what happens to the September 18 repo
9  after it's now been collateralized and the box
10  loan has been granted?  So there's a bunch of
11  collateral supporting that loan.  What happens
12  on Friday with respect to that loan?
13    MR. SHAW:  Foundation.
14    A.    With respect to the overall loan, in
15  other words, the whole repo transaction, or the
16  loan to support the 7 billion in cash?
17    Q.    The whole repo transaction.
18    A.    The whole repo transaction, okay.  So
19  as a result of the fact that we deposited the 7
20  billion in cash, you know, normal course is for
21  my group to work with tri-party operations to
22  try to maximize the efficiency of our
23  collateral.
24    So it's typical -- it's not typical to
25  leave cash on deposit as collateral.  I mean,

Page 103

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  it's done on tri-party transactions in, you
3  know, somewhat normal course, but, you know,
4  ideally you try to substitute collateral.
5    So I had worked with the trading desk
6  and the Tri-Party Ops folks and we started
7  looking for collateral to substitute for that 7
8  billion.  So that's I think we referenced a
9  little bit earlier the billion-35 that we had
10  come up with.
11    Q.    Okay.
12    A.    And again, the intent was to deliver
13  the billion-35 in and to receive a portion of
14  the cash -- equivalent market value of cash
15  back.
16    Q.    And what ended up happening?
17    MR. SHAW:  Objection.  Foundation.
18    A.    Yeah, I mean what ended up happening
19  was we lived up to our part, we delivered the
20  collateral in, and then there was some, you
21  know, some dispute about the cash and, you know,
22  some other things, and at the end of the day,
23  you know, we never got returned the cash by
24  Chase.
25    Q.    Okay.  On Friday of that week, LBI

Page 104

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  files for bankruptcy, correct?
3    A.    That's correct.
4    Q.    And do you recall any discussions
5  about whether that would cause a default of the
6  September 18 repo?
7    A.    I think we talked about that a little
8  bit.  I mean, you know, I started thinking about
9  it over the weekend, but I didn't have any real
10  conversations about it until I got a call from
11  the margin folks and until I sat down with Monty
12  and we talked about whether that was going to
13  trigger a default or not.  Our assumption was
14  that it was going to.
15    Q.    At some point over that weekend, you
16  work on transferring the collateral that was
17  used to support the September 18 repo to
18  Barclays, correct?
19    A.    Not over the weekend, but --
20    Q.    When --
21    A.    The collateral was all transferred on
22  the night of the 18th, and then there was that
23  additional piece that we just talked about,
24  which was transferred on the 19th.
25    Q.    Right.

Page 105

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    A.    On the weekend we worked to try to
3  locate additional collateral that would be
4  eligible for a transfer.
5    Q.    And that's the 1.4 billion we talked
6  about earlier?
7    A.    That's the 1.4 billion, yeah.
8    Q.    I had a question about that.  Is that
9  1.4 billion as of that weekend; that's the value
10  of that collateral over that weekend?
11    A.    That was --
12    MR. SHAW:  Objection.  Foundation.
13    A.    Again, that was -- the 1.4 billion is
14  the assets that were actually transferred over a
15  period of time, ending I believe on the 29th of
16  September, and it was based off of values that
17  were -- I actually don't know what the value,
18  what they were based off of.
19    I think they were based off of some
20  initial list, but they wouldn't have been based
21  off of the date of transfer.  Like nobody was --
22  I wasn't involved in any repricing of assets or
23  anything like that, so I believe they were based
24  off of initial pricing.
25    Q.    You say you identified a pool of

Page 106

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    assets that were approximately worth 1.4
3    billion.  Was that -- did Barclays end up
4    getting all those assets?
5        A.   Let me just --
6            MR. SHAW:  Mischaracterizes prior
7    testimony.
8        Q.   Go ahead, Mr. Hraska.
9        A.   I identified the list that I think was
10   probably greater than 1.4 billion.  The 1.4
11   billion was only the securities that truly made
12   the transfer over.  So, you know, we identified
13   the list of everything that we thought was
14   unencumbered and available for transfer.  What
15   was physically able to be transferred equaled
16   approximately the 1.4 billion.
17       Q.   And what happened to the rest of the
18   assets that you identified?  Were they ever
19   transferred to Barclays?
20       A.   They were hot.
21       Q.   Does Barclays thinks it's entitled to
22   those assets?
23            MR. SHAW:  Objection.  Foundation.
24       A.   I honestly don't know.
25       Q.   Since you've been working at Barclays,

Page 107

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    have you heard any discussions about whether
3    they should be getting those assets?
4        A.   I was instructed to continue to search
5    for available collateral that was to be
6    transferred to Barclays as part of the larger
7    transaction between Barclays and Lehman, which I
8    continue to do in my capacity in working with
9    the Treasury folks and things like that, but I
10   don't know specifically whether it was those
11   same assets.
12           At that point in time, again, things
13   had changed a little bit.  You know, we stopped
14   focusing on the repo because that had sort of
15   been taking care of already and it was a matter
16   of looking -- helping to continue to look for
17   unencumbered assets.
18       Q.   So, just so I understand, you
19   identified a list of unencumbered assets that
20   was, to your mind, worth more than 1.4, but only
21   1.4 made it to Barclays; is that right?
22       A.   That's correct, yes.
23       Q.   Do you know how much more than 1.4 the
24   assets were that you identified?
25           MR. SHAW:  Objection.  Asked and

Page 108

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    answered.
3        A.   I -- I know that it was probably in
4    the neighborhood of around 2 billion, but I
5    don't know how much more than that.
6        Q.   Okay.
7        A.   We had a lot of discussions about the
8    assets that, you know, and I can't recall
9    whether it was what is -- what ended up being
10   the list was assets that are only in the DTC
11   boxes or, you know, we were looking across
12   international boxes and all that stuff.  So
13   there was just so much going and I know it was
14   north 1.4.  I want to say it was 2 billion, but
15   I can't be sure.
16       Q.   Were you involved, since you've been
17   at Barclays, have you been involved in any
18   efforts to prepare an opening balance sheet that
19   would relate to the Lehman/Barclays transaction?
20       A.   No.
21       Q.   Did you have any role in connection
22   with their declaration -- or, let me withdraw
23   that.  Do you have any knowledge of or
24   understanding of how Barclays was able to
25   declare a $4.2 billion gain on acquisition as a

Page 109

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    result of this transaction?
3        A.   No.
4        Q.   Do you have any current role in the
5    preparation of Barclays' balance sheets?
6        A.   No, the typically balance sheet and
7    things like that are performed by the Finance
8    folks and Product Control folks, which is
9    completely aware from Operations.
10       Q.   Do you give them any input during the
11   course of their preparation of the balance
12   sheets?
13       A.   If they have questions as to the
14   nature of transaction -- are we talking related
15   to the transaction between LBI and --
16       Q.   Yes.
17       A.   Okay.  I have provided information as
18   to that transaction on the 18th and what assets
19   were transferred over, and I provided some
20   information around 1.4 billion as to what those
21   assets were that made it to Barclays, but as far
22   as determination of balance sheet or if those
23   assets were eligible for balance sheet, I don't
24   have any knowledge of that.
25       Q.   Okay.  When you say -- who did you

Page 110

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2  **provide that information to?  The Treasury**
3  **Department?**
4        A.   That would have been, yeah, Paolo and
5  his team.
6       **Q.   How did you come to be involved in**
7  **what we have called Schedule A and Schedule B?**
8        A.   Well, I guess I provided the assets
9  that ultimately became -- I provided lists of
10  assets that ultimately became Schedule A and
11  Schedule B.  I was asked to provide schedules of
12  the assets that made it to Bank of New York,
13  which we did, and then as well as, you know --
14  you know, and over a period of dates, right?
15        So, to be very simple, I basically
16  provided a spreadsheet with tabs that said on
17  this date we moved these assets, on this date we
18  moved these assets, and those subsequently
19  became categorized as either Schedule A or
20  Schedule B, depending on I guess the timing of
21  the transfer.
22       **Q.   Do you have any knowledge of what has**
23  **been called a clarification letter in connection**
24  **with this transaction?**
25        A.   I've had -- I've heard the term, but

Page 111

1       HIGHLY CONFIDENTIAL - J. HRASKA
2  honestly I don't know what it means.
3       **Q.   Have you ever read anything called a**
4  **clarification letter?**
5        A.   No.
6       **Q.   You have to say verbally say no?**
7        A.   I'm sorry.  No.
8       **Q.   Did you have any understanding when**
9  **you were preparing these schedules that that**
10  **would become Schedules A and B to a**
11  **clarification letter?**
12        A.   No.
13       **Q.   Did you have any understanding of the**
14  **purpose of this clarification letter?**
15        A.   No.
16       **Q.   I want to spend a little time going**
17  **through these schedules.  Do you want to take a**
18  **break before we do that?**
19        MR. SHAW:  Why don't we take a short
20  break before we do that.
21        THE WITNESS:  Thank you.
22        (Recess; Time Noted:  11:33 A.M.)
23        (Time Noted:  11:40 A.M.)
24  BY MR. HINE:
25       **Q.   Mr. Hraska, I now want to talk about**

Page 112

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2  **Schedules A and B, so this is going to be the**
3  **30(b)(6) portion of your deposition because**
4  **that's the two topics that you have been**
5  **designated in part to cover.**
6        **So what I'd like to do is walk through**
7  **some of the different schedules that I have seen**
8  **and discuss them in connection with Schedules A**
9  **and B.**
10        A.   Okay.
11        (Exhibit 139B, Printout of Schedules,
12  marked for identification, as of this date.)
13       **Q.   Mr. Hraska, I'm handing you a document**
14  **which I've marked as Exhibit 139B.**
15        A.   Okay.
16       **Q.   Which is a voluminous printout of**
17  **schedules of some sort.  It is marked with the**
18  **Bates stamps BCI-EX-00009798 through 10368.**
19        MR. SHAW:  I'm not suggesting you read
20  this cover to cover, but take whatever time
21  you need to review.
22       **Q.   I'm not going to ask you questions**
23  **about detailed entries in here, but I'm going to**
24  **ask you questions primarily about the first two**
25  **pages, but take whatever time you need just to**

Page 113

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2  **familiarize yourself with the document.**
3        A.   Thank you.
4        (Document review.)
5        A.   Okay.
6       **Q.   Have you had a chance to review it**
7  **briefly?**
8        A.   I have, yes.
9       **Q.   Have you ever seen this document**
10  **before?**
11        A.   Yes, I have.  I created it.
12       **Q.   And is this a -- or, well, let's start**
13  **this way.  What is this document?**
14        A.   This is an e-mail to John Rodefeld,
15  who was Barclays, as we mentioned, Operations,
16  and Kevin Caffrey, who is the managing director
17  at Bank of New York in charge of like clearing,
18  custody, tri-party, things like that.
19        And what I was looking to do here was
20  to confirm what Lehman believed that, you know,
21  they transferred as a result of the repo
22  transaction on the 18th.  We wanted to
23  reconcile -- we wanted to do a three-way
24  reconciliation.  Basically, we wanted Lehman's
25  books to tie out with both Barclays and with

Page 114

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  Bank of New York so that we could confirm the
3  secured identifiers, the par amounts, and things
4  like that of the transaction.
5          And so the spreadsheet itself attached
6  was my department's collaboration of what we
7  believed we transferred on the 18th, and then
8  the last point here is me reaching out to Kevin
9  to talk about, you know, clearance relationships
10 going forward for the broker-dealer, LBI.
11     Q.   That's point number 4 on the e-mail
12 you're talking about?
13     A.   That's point number 4 on the e-mail,
14 yes.
15     Q.   Can you turn to the second page of
16 this document?
17     MR. SHAW:  That's the one with the
18 Bates number ending in 9799?
19     MR. HINE:  Correct.
20     Q.   That's a very small chart with columns
21 A and B, do you see that?
22     A.   Uh-huh.
23     Q.   Now, I think I understand what this
24 is, but could you explain to me what you
25 understand this chart to be capturing?

Page 115

HIGHLY CONFIDENTIAL - J. HRASKA
1
2      A.   This chart was my group's attempt to
3  summarize the market value on the collateral in
4  these appropriate buckets just to give people an
5  understanding of the composition of the
6  collateral and market value that we associated
7  with that.
8          So the Fed collateral would be -- the
9  Fed wirable type collateral, as I defined
10 earlier, and then 74 and 636 would have been the
11 positions that came out of the Depository Trust
12 Company.
13         And then what's referred to as TP cash
14 is the 7 billion pure cash that we talked about
15 as well.
16     Q.   Okay.  The TP cash is the proceeds
17 from the box loan that we talked when earlier?
18     A.   Yes, that's correct.
19     Q.   And when you say "Fed wirable," that
20 is the -- that is securities that were
21 successfully transferred from the Fed program to
22 BONY on Thursday; is that right?
23     A.   No, let me clarify that.  Those are
24 the securities that were transferred that were
25 Fed wirable security types because the

Page 116

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  securities that were transferred were this
3  entire list other than TP cash.
4      Q.   Okay.
5      A.   Because these other two are included
6  in the Fed program.  So this was Fed program
7  securities that were Fed wire eligible.  That's
8  what that first line is.
9      Q.   What does "Fed wire eligible" mean?
10     A.   Well, Fed wire eligible is a type of
11 security that's transferred on the Federal
12 Reserve's book entry transfer system.  So
13 examples are U.S. Treasuries, Fannie Maes, Ginne
14 Maes, collateral types of those classes.
15         Other types of collateral are
16 typically transferred through DTC, which is
17 represented by the participant IDs here, DTC
18 participant IDs.
19     Q.   Just to harken back to our prior
20 discussion, this reflects the approximately 42
21 billion in securities plus the 7 billion in cash
22 that was ultimately transferred under the
23 September 18th repo, correct?
24     A.   That's correct.
25     Q.   Now, how were these market values

Page 117

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  determined?
3      A.   I don't know how they were determined.
4  They were provided from what Lehman had in their
5  systems at the time.
6      Q.   So these are Lehman's values?
7      A.   I know those to be Lehman's values.
8      Q.   And I think we might have touched on
9  this before, but Bank of New York ascribed its
10 own values to those securities?
11     A.   They did, yes.
12     Q.   So am I correct to say that this chart
13 and spreadsheet would not include Bank of New
14 York valuations, but only included the Lehman
15 valuations?
16     A.   That would be correct, yes.
17     Q.   Okay.  Now, did you get -- your
18 covering e-mail asks I presume Mr. Rodefeld and
19 Mr. Caffrey to verify the positions.  Did they
20 in fact try to do that?
21     A.   Yes, we did that.  They sent us back
22 files and we reconciled all the positions.
23     Q.   Okay.  Let me show you another chart.
24 I think it'll relate to the story, but I'm not
25 sure.

1           HIGHLY CONFIDENTIAL - J. HRASKA
2               Mr. Hraska, I hand you an exhibit
3       that's previously been marked as Exhibit 83B,
4       which is an e-mail dated Sunday, September 21st.
5               MR. SHAW:  Do you have a copy which is
6       not cut off on the side?
7               MR. HINE:  We'll try to locate one.
8               MR. SHAW:  He needs one that's
9       complete rather than ...
10              (Document handed.)
11          A.  Okay.
12          Q.  Mr. Hraska, have you had a chance to
13      look at the document?
14          A.  I have.
15          Q.  Have you ever seen this document
16      before?
17          A.  No.
18          Q.  To your knowledge, are the people
19      listed in the "to" and "from" portions of the
20      e-mail Barclays employees, generally?
21          A.  Primarily, yes.
22          Q.  You'll see in the first -- the first
23      bullet point in the text that says, "We should
24      book all positions from the Lehman financing
25      facility to BCI (approximately 45 billion)

1           HIGHLY CONFIDENTIAL - J. HRASKA
2       securities.  See attached files."  Do you see
3       that?
4           A.  I do see that, yes.
5           Q.  When you had this effort to reconcile
6       your position with Barclays and BONY, did you
7       ever hear the figure of approximately 45 billion
8       used as the value for the securities that were
9       in the September 18 repo?
10          A.  No, not specifically 45 billion.
11          Q.  Do you have any knowledge of where
12      this figure might have come from?
13          A.  Unfortunately, no.  I don't think I'm
14      CC'd on here.  I didn't see myself and I don't
15      recognize it.
16          Q.  No, you're not CC'd.  I'm just
17      wondering, in your discussions between at or
18      about, you know, Saturday, Sunday that weekend,
19      if you heard any use of a number of about 45
20      billion in connection with the securities that
21      were listed in your prior exhibit?
22              MR. SHAW:  Objection.  Asked and
23      answered.
24          A.  I hadn't heard any discussions related
25      to 45 billion securities.  People mistakenly

1           HIGHLY CONFIDENTIAL - J. HRASKA
2       like we were talking terms earlier, referred to
3       the $45 billion in cash.  So it's possible that
4       somebody was referring to the cash and not
5       securities here, but I'm speculating on that.  I
6       don't really know.
7           Q.  Can you describe for me the
8       reconciliation process that took place with
9       respect to these securities?  Was there a debate
10      as to the value assigned to the securities?
11              MR. SHAW:  Objection to form.
12          A.  There was --
13              MR. SHAW:  And foundation.
14          A.  There was -- from an operations
15      perspective, our primary objective was to make
16      sure that the quantities and the Cusips all
17      matched.  You know, as we talked about the
18      market values that we knew was based off of
19      Lehman's systems, there was some discussion
20      about the value of the securities.
21              I wasn't privy to the actual
22      discussions.  I knew there was going to be a
23      value -- a discussion about value of securities
24      because Bank of New York informed me that they
25      didn't agree with some of the pricing that we

1           HIGHLY CONFIDENTIAL - J. HRASKA
2       had attached to some of these securities.
3           Q.  And what did they tell you about that?
4           A.  Very generically, they basically said
5       that we're going to have to review these prices,
6       we don't necessarily agree with these, and at
7       that point it kind of went out of my camp,
8       because, again, I don't really deal with the
9       pricing side of it.  I just have to make sure
10      the securities make it, the right quantities
11      make it, there's no stock record breaks and all
12      that kind of stuff.
13          Q.  Who deals with the pricing part of it?
14          A.  The pricing part at both Barclays and
15      at Lehman would be handled by the Financial
16      Control folks.  So I would say like, you know,
17      in the current organization, I guess Marty Klein
18      and those folks, and at Lehman it would have
19      been Gerry Reilly's organization.
20          Q.  Okay.  Is there any, in this
21      reconciliation effort that you talked about, is
22      there a reconciliation as to price or is it just
23      the identifying Cusips and the particular
24      securities that were transferred?
25          A.  My reconciliation was purely to

## Page 122

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  securities quantities, that kind of thing.  And
3  like I said, I know that the finance teams were
4  going back and forth on the pricing issue, but,
5  unfortunately, I didn't really partake in those
6  discussions.
7      Q.  Do you know how -- what price they
8  arrived at the end?
9      A.  I don't, unfortunately.
10      Q.  It appears in some documents that the
11  BONY pricing was higher than the prices ascribed
12  to the securities on your -- on the prior
13  exhibit.  Do you have any idea why that would be
14  the case?
15         MR. SHAW:  Objection to form.
16      A.  I don't.  It's actually very
17  surprising to me as well, because the initial
18  conversation that I just referenced a few
19  minutes ago was from Bank of New York that we
20  had over-valued a few securities and, therefore,
21  they were concerned about the total market value
22  that we had sent them.  So, you know...
23      Q.  Do you recall any discussions about
24  writing down the value of securities during this
25  period?

## Page 123

HIGHLY CONFIDENTIAL - J. HRASKA

1
2         MR. SHAW:  Objection to form.
3      A.  During -- could I ask a clarification?
4  During which period?  During the period at any
5  point in time after the transaction, or during
6  like a period of the week, or what point in
7  time?
8      Q.  Let's break it down.  Let's talk about
9  this -- during this reconciliation period that
10  you mentioned, which I take it is from Friday,
11  the 19th, through the weekend, correct?
12      A.  Okay.
13      Q.  So were there any discussions during
14  that period about writing down the value of
15  securities?
16         MR. SHAW:  Just so we're clear,
17  because this is a 30(b)(6), are there
18  discussions that he participated in?
19         MR. HINE:  That he's aware of.
20      A.  I'm aware there were discussions about
21  the values of the securities.  As to writing up
22  or down, I wasn't made privy to that.
23      Q.  At any time during this week were you
24  privy to any discussions where the possibility
25  of writing down the value of securities were

## Page 124

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  discussed?
3      A.  No.
4      Q.  So, back to Exhibit 83B, based on your
5  experience, is it fair to assume that this is
6  probably a document generated by Barclays in
7  connection with that reconciliation effort that
8  you were discussing?
9      A.  I would assume that's the case, yes.
10      Q.  Okay.  But you have no specific
11  knowledge about how this document was prepared
12  or --
13      A.  I don't, unfortunately, no.
14      Q.  Mr. Hraska, I'm handing you a copy of
15  a document marked as Exhibit 84B.  If you
16  wouldn't mind taking a moment to review it.
17  Just for the record, the document is
18  Bates-stamped BCI-008149 through 8670.
19         (Document review.)
20      A.  Presentation of these is definitely
21  not user-friendly.
22      Q.  Forced to print them out for purposes
23  of a deposition.
24      A.  I understand that.
25         (Document review.)

## Page 125

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.  Okay.
3      Q.  Have you had a chance to look at the
4  document?
5      A.  I have.
6      Q.  Have you ever seen this document
7  before?
8      A.  No.  Well, actually, I have seen this
9  in the preparation to my -- this portion of the
10  deposition.
11      Q.  Okay.
12      A.  I actually reviewed some files, and I
13  believe this is one of the ones on that list.
14  I'm not a hundred percent sure, but I think it
15  is.
16      Q.  Okay.  Other than your preparation for
17  this deposition, do you recall seeing this
18  document at all?
19      A.  No.
20      Q.  I noticed they misspelled your name on
21  the front.  Is that a possible reason why you
22  might have not received this document?
23      A.  Yeah, because it wouldn't have gone to
24  my e-mail, if that's the case.
25      Q.  Would it be fair to say you have no

Page 126

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2  familiarity with how this document was prepared?
3      A.   That's true.
4      Q.   Okay.  And the covering e-mail says --
5  it's an e-mail from Mr. Yang, which says, "I've
6  attached a schedule produced by Barclays' Ops of
7  the collateral currently held at BONY under the
8  repo financing provided to Lehman."  It
9  continues to say that -- it says "a total BONY
10 market value of approximately 45 billion."  You
11 see that?
12     A.   I do, yes.
13     Q.   Is it probably safe to assume that
14 this was prepared in connection with your
15 reconciliation effort between Lehman and Bank of
16 New York and Barclays as to the securities that
17 were involved in the September 18 repo?
18         MR. SHAW:  Objection.  Foundation.
19 Calls for speculation.
20     A.   Yeah, I guess it's fair to assume
21 then.
22     Q.   Again, do you see the number of 45
23 billion?
24     A.   Uh-huh.
25     Q.   Does this refresh your recollection at

Page 127

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2  all or does this remind you of anything in
3  connection with how Bank of New York valued this
4  pool of securities?
5          MR. SHAW:  Objection to form.
6      A.   Unfortunately, not.  I mean, I -- the
7  only 45 billion that I was aware of was the
8  actual principal value, and I don't remember
9  assets being referred to as 45 billion in any of
10 the conversations that I had.
11     Q.   Okay.  And when you say the principal
12 value, you're talking about the amount of --
13     A.   Cash extended on the transaction.
14     Q.   Okay.  So is it correct to say that in
15 this reconciliation process that you discussed
16 you don't recall anyone ever mentioning a value
17 of this pool of securities being about $45
18 billion?
19         MR. SHAW:  Asked and answered.
20     A.   That's correct.
21     Q.   So, just to complete the record, you
22 have no way of explaining how this value in this
23 document would differ with the $42.9 billion
24 number in Exhibit -- in the prior exhibit that
25 you looked at; is that right?

Page 128

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2          MR. SHAW:  Prior exhibit, are you
3  referring to 139B?
4      Q.   139B.  Let me rephrase the question.
5      A.   Okay.
6      Q.   In Exhibit 139B --
7      A.   Right, that's my document.
8      Q.   -- which is the document you prepared,
9  has a value of 42.9 billion, approximately?
10     A.   Right.
11     Q.   This one seems to ascribe a value of
12 45 billion.
13     A.   Okay.
14     Q.   Do you have any way to -- any
15 explanation for why they would come to different
16 values?
17         MR. SHAW:  Objection.  Calls for
18 speculation.
19     A.   My opinion is that the Lehman pricing
20 was different than the Bank of New York pricing.
21     Q.   In what way?
22     A.   Well, in the tune of $3 billion.  I
23 mean -- I mean, I'm not trying to be sarcastic.
24 I mean, you know, to the extent that they're
25 valuing a pool of collateral at 45 and we're

Page 129

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2  valuing it at 42, the average price on a basket
3  basis would mean that they valued the basket
4  higher.  I'm sure there were multiple assets
5  where there were pricing differentials, but as
6  an aggregate, it appears that they gave higher
7  values to most securities.
8      Q.   Let me ask you this.  In this
9  reconciliation -- well, scratch that.  The
10 difference could arise, could it not, either
11 from how you value individual securities or
12 whether you have the same pool of securities
13 that you're looking at, correct?
14     A.   That's correct.  I thought the -- yes,
15 okay.
16     Q.   Well, my question is, in this
17 reconciliation process, did it end up that there
18 was a vast difference in the pool of securities
19 that were being considered?
20     A.   That's a different question.
21     Q.   Between the Barclays folks and your
22 list?
23     A.   From a security delivery perspective,
24 we tied out completely to the number of
25 securities and the security identifiers that we

Page 130

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    delivered versus what Bank of New York and
3    Barclays knew.
4        Q.    When you say "tied out"?
5        A.    "Tied out," meaning we reconciled that
6    there were no discrepancies.
7        Q.    So the difference in any values would
8    have to be in the method of pricing, then,
9    correct?
10       A.    Yes, the one thing, we tied out -- the
11   tieout process took a few days, so I don't know
12   whether on September 22 we were completely tied
13   out, but the initial tieout itself, though,
14   there were minimal, minimal discrepancies.  I
15   would say, you know, probably less than a
16   hundred.
17       Q.    So would you agree with me, then, that
18   if there is a difference in pricing, it would
19   probably be the result of how you price
20   individual securities instead of --
21       A.    And not so much --
22       Q.    -- the composition of the pool?
23           MR. SHAW:  Objection to form.  You
24   need to let him finish his question and then
25   let me object so we have a clean record.

Page 131

HIGHLY CONFIDENTIAL - J. HRASKA

1
2        A.    So then could you repeat the question?
3        (Record read.)
4            MR. SHAW:  Objection to form.
5        A.    Yes.
6        Q.    Okay.
7            (Exhibit 140B, a document bearing
8    Bates Nos. BCI-CG00052538 through 53173,
9    marked for identification, as of this date.)
10       Q.    Mr. Hraska, I'm handing you a document
11   that's been marked as Exhibit 140B.
12       A.    Okay.
13       Q.    Again, another voluminous schedule
14   with Bates Nos. BCI-CG-00052538 through 53173.
15   And again, it's a voluminous schedule, but take
16   your time to review it.
17       A.    Uh-huh.
18       Q.    I was really going to ask you about
19   the, primarily, the first and last page.
20       A.    Okay.
21       (Document review.)
22       A.    Okay.
23       Q.    Mr. Hraska, have you had a chance to
24   look at it briefly?
25       A.    I have, yes.

Page 132

HIGHLY CONFIDENTIAL - J. HRASKA

1
2        Q.    You'll see the -- first of all, have
3    you ever seen this document before?
4        A.    In preparation for the deposition,
5    yes, but other than that, no.
6        Q.    Okay.  You'll see on the cover page
7    that this is dated Friday, September 26?
8        A.    Uh-huh.
9        Q.    And at the bottom of the covering
10   e-mail it mentions Schedule A, you see that?
11       A.    Okay.
12       Q.    It says here, "Our guys are still
13   running the reconciliation to confirm that there
14   are no errors in the Barclays list."  Do you see
15   that?
16       A.    Uh-huh.
17       Q.    And then if you turn to the last tab
18   in the document, it's a lengthy schedule which
19   concludes with a number, a figure on the last
20   page --
21       A.    The last page?
22       Q.    -- of 44, of approximately $44.1
23   billion, do you see that?
24       A.    I do, yes.
25       Q.    And so my question is, do you have any

Page 133

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    understanding of why the value of this schedule
3    of the securities embodied in the schedule is
4    now at this point in time at $44.1 billion as
5    opposed to the 42.9 that we saw earlier?
6        A.    No is the short answer.  We talked
7    earlier about pricing differentials.  So, to me,
8    I don't know whether this is a Lehman-produced
9    or Barclays produced it.  It doesn't appear to
10   me to be a Lehman-produced, so ...
11       Q.    When you say it doesn't appear to be a
12   Lehman-produced document, are you referring to
13   the last tab, which is purportedly Schedule A?
14       A.    Well, this is an e-mail I wasn't
15   included on.
16       Q.    Right.
17       A.    So it doesn't look like the format of
18   any of the files that I produced, so that's why
19   I'm assuming -- well, me being Lehman at the
20   time, Lehman-produced.
21       Q.    Okay.  Do you recall the figure $44.1
22   billion ever being used in connection with the
23   value of the securities on Schedule A?
24       A.    No.
25       Q.    And I think you said earlier, but I

## Page 138

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    Q.   I know you're not -- you didn't
3    recognize some of the other numbers we just
4    talked about.  So, in your mind, approximately
5    42.9 billion is the value of the securities on
6    Schedule A, correct?
7         MR. SHAW:  Objection.
8    Mischaracterizes.  You can --
9         A.   It was the value that I knew at the
10   time of transfer, and whether or not that value
11   changed or was subsequently discussed, I don't
12   know, but it was the value that I knew at the
13   time of transfer.
14        Q.   Okay.  And you weren't involved in any
15   discussions about other values with respect to
16   that schedule, correct?
17        A.   No.
18        Q.   And do you think that's the value in
19   your mind of the final version of Schedule A?
20        MR. SHAW:  Objection to form.
21        A.   Again, I don't know if it was the
22   final version.  I know it was the value when I
23   transferred it.
24        Q.   Maybe that was a bad question.  Did
25   Schedule A change in composition, to your

## Page 139

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    knowledge, from the original chart that we
3    looked at?
4         A.   In composition of securities?  The
5    number of securities and things like that?  The
6    schedule did not change.  The pricing may have
7    changed.
8         Q.   Okay.  But you don't have any
9    knowledge of whether the pricing changed?
10        A.   Other than the knowledge of looking at
11   these documents here, there's obviously a
12   discrepancy, but no upfront knowledge that it
13   changed.
14        Q.   And you don't have any knowledge of
15   the value of any securities on Schedule A being
16   written down in connection with this
17   reconciliation process?
18        A.   No.  You asked that earlier, right?
19   No.
20        Q.   Do you recall what the par value was
21   for the security listed on Schedule A?
22        A.   I don't, no.
23        Q.   Okay.  That's all I have with that
24   document.
25        Mr. Hraska, you were involved in

## Page 140

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    preparing Schedule B, correct?
3         A.   I was involved in giving a list of
4    unencumbered collateral, which I understand some
5    of which became Schedule B.
6         Q.   But you're not familiar with the terms
7    Part 1 and Part 2 of Schedule B; is that right?
8         A.   No.
9         Q.   Are you familiar with any kind of
10   discussions about the valuation of the
11   securities that are on Schedule B?
12        A.   Well, there was the valuation that I
13   knew to have transferred, which is 1.4 billion.
14   I don't know what the ultimate valuation of that
15   or the -- I don't know what the final version of
16   that list was or the market value associated
17   with that, so ...
18        Q.   Do you recall any discussions about
19   any discrepancies in the valuation of the
20   securities that comprised Schedule B?
21        A.   I remember there being discussions in
22   valuation of those securities, discrepancies in
23   general.  I don't know whether they were
24   specifically Schedule B or if they were just
25   purely related to the repo we were discussing

## Page 141

HIGHLY CONFIDENTIAL - J. HRASKA

1    
2    earlier, so ...
3         Q.   Well, I guess I'm just trying to --
4    was there a reconciliation process that went on
5    with respect to the securities in Schedule B?
6         A.   There was a -- there was a
7    reconciliation process from the standpoint of we
8    were asked what securities were delivered, which
9    we provided to the Finance folks, and the
10   Finance folks did a spreadsheet compared to what
11   they knew to be Schedule B and at one point told
12   us something along the lines of -- I don't
13   remember whether it was 800 Cusips or 800
14   million in value, but there was a number of 800,
15   which whatever was the discrepancy on that.  I
16   believe it was Cusips.
17        Q.   800 Cusips?
18        A.   800 Cusips or security identifiers
19   which weren't delivered.
20        Q.   And was that reconciled in some way?
21        MR. SHAW:  Objection to form.
22        A.   The Cusips in question were looked at
23   by the Clearance folks and my teams as to
24   whether they were delivered or whether they
25   could be delivered, and we verified that in fact

Page 142

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     they were not delivered.
3        Q.   And was there any effort to then
4     deliver them later?
5        A.   There was an effort to see if they
6     were available for delivery, and in most
7     instances, they were actually not available for
8     delivery.
9        Q.   So was any further action taken on
10    that?
11       A.   For that -- for the particular
12    securities on that list, no.
13       Q.   Were substitute securities delivered
14    instead?
15       A.   Substitute securities were not
16    delivered.
17       Let me just think about that.  Yeah,
18    no, there was no substitute securities delivered
19    after that, no.
20       Q.   Was that possibility considered?
21       MR. SHAW:  Objection to form,
22    foundation.
23       A.   That possibility was considered.
24    There was conversations that I had with the
25    Treasury folks, who were prior legacy Lehman,

Page 143

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     but now, as a result of the timing, were now
3     employed by Barclays, so Robert Azerad and those
4     folks, as to whether or not there were other
5     securities which were unencumbered that could be
6     substituted for the securities that could not be
7     delivered on the original Schedule B.
8        Q.   And what was the result of that
9     discussion?
10       A.   The result of that discussion was is
11    that we went through yet again another
12    identification process to try to locate
13    unencumbered securities that were available or
14    that could be made available to transfer.  At
15    that point in time, by then, we no longer had
16    capability to just go ahead and make a transfer.
17    It would have been subject to approval by
18    Deloitte and a few other folks before anything
19    could be done.
20       Q.   So where does that effort now stand?
21       A.   The effort basically concluded with a
22    subsequent set of lists that, you know, we feel
23    are securities that are eligible to be
24    transferred to Barclays.
25       Q.   And why have they not been

Page 144

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     transferred?
3        MR. SHAW:  Objection to form and
4     foundation.
5        A.   The clearance boxes in which they
6     reside are presently under administration.  So,
7     as Barclays employees, we wouldn't have the
8     ability to go and make those transfers without
9     the administration's approval.
10       Q.   So does Barclays thinks it's entitled
11    to these securities?
12       A.   I'm not a hundred percent sure what
13    Barclays thinks.  I was asked to go find
14    something that was unencumbered in the Lehman
15    boxes, which I did.  I would speculate that
16    Barclays would think they're entitled if they
17    asked me to do that exercise.
18       Q.   Who would know at Barclays whether
19    they think they're entitled to those securities?
20       MR. SHAW:  Objection to form,
21    foundation.
22       A.   I would start with the Treasury team
23    and possibly the Legal team.
24       Q.   And who is the Treasury team to which
25    you are referring?

Page 145

HIGHLY CONFIDENTIAL - J. HRASKA

1
2        A.   Robert Azerad would be the point
3     person that I would use, or Alan Kaplan in
4     Legal.
5        Q.   Can you tell me an approximate value
6     for those securities that are -- that you
7     identified that were not able to be transferred?
8        A.   I would say 6 to 7 hundred million.
9        Q.   And that's based on Lehman valuations?
10       A.   Based on Lehman valuations at a
11    particular point in time, which was November 17
12    of 2008.
13       Q.   Just so I have a little clarity, this
14    effort to identify these additional securities
15    took place after you transferred over to
16    Barclays?
17       A.   That's correct.
18       Q.   Did it start during the weekend of
19    September 20th at all?
20       A.   This particular exercise, no.  It
21    started I would say early October.
22       Q.   Okay.  We had -- in discussing
23    Schedule A, I think you said there was a
24    reconciliation effort, but to the extent there
25    was an effort to reconcile the values, that's

Page 146

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 really not something that fell under your
3 purview; is that right?
4     A.   That's correct.
5     Q.   Now, is that the same case for
6 reconciliation efforts related to Schedule B?
7     A.   With regards to the valuation?
8     Q.   Yes.
9     A.   Yes.
10     Q.   So who would I ask about that if I
11 wanted to learn about efforts to reconcile
12 values related to Schedule B?
13     A.   Robert Azerad would be your best
14 source.
15     Q.   Am I correct to say that you were, to
16 the extent you were involved in reconciling
17 anything with respect to Schedule B, it would be
18 related to locating securities and Cusips
19 numbers and identifying what would comprise the
20 pool of Schedule B; is that right?
21     A.   Yes, we reconciled what was given
22 to -- well, we were given an exception list of
23 what was, you know, what we believe was
24 delivered versus what was on the original
25 Schedule B, and we were asked to verify that

Page 147

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 those securities were in fact delivered.
3     Q.   And were they?
4     A.   They were not.  Well, securities that
5 were delivered were delivered, but the
6 securities that were given as an exception were
7 not delivered.
8     Q.   And that's the 800 Cusips you
9 mentioned?
10     A.   That's approximately 800, somewhere in
11 that number.
12     MR. SHAW:  Does it make sense to take
13 a lunch break sometime soon?
14     MR. HINE:  Let me just finish up on
15 this.
16     Q.   Other than those 800 Cusips that you
17 mentioned, were there any other discrepancies
18 that you came across in your efforts to
19 reconcile the transfer of securities under
20 Schedule B?
21     A.   Under Schedule B, no.
22     Q.   So am I correct to say -- I think
23 previously you used the phrase "tie-in."  Did
24 your -- Lehman's records of the transfers for
25 Schedule B securities tie in with the Barclays

Page 148

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 records other than this 800 Cusips that you
3 mentioned?
4     A.   Yes.
5     MR. HINE:  Why don't we break for
6 lunch.
7     THE WITNESS:  Okay.  That would be
8 great.  Thanks.
9     (Recess; Time noted: 12:34 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 149

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 AFTERNOON SESSION
3 (Time Noted:  1:19 P.M.)
4 JAMES HRASKA, resumed and
5 testified further as follows:
6 EXAMINATION BY (Cont'd.)
7 MR. HINE:
8     Q.   Good afternoon, Mr. Hraska.
9     A.   Good afternoon.
10     Q.   I just had a couple of follow-up
11 questions with some of the schedules we talked
12 about.  Just look briefly at 84B.  That's the
13 one where your name is misspelled on the front
14 page.  You see that?
15     A.   Okay.  That's correct.
16     Q.   I think I see some e-mails that
17 suggest you did eventually get this document; is
18 that right?
19     A.   I may have.  I, honestly, I don't
20 know.
21     Q.   You don't recall?
22     A.   No.
23     Q.   Okay.  That's fine.  That's all I had
24 on this one.  I just wanted to clarify that one
25 issue.

HIGHLY CONFIDENTIAL - J. HRASKA

1  GFS system?
2      A.    They were extracted out of GFS.  They
3  were existing prices that were -- that were I
4  guess downloaded into a spreadsheet.
5      Q.    And where were they downloaded from?
6      A.    From GFS.
7      Q.    Okay.  But where does GFS get them, do
8  you know?  I mean, I'm trying to find out what's
9  the origin of those prices.  I understand you
10 downloaded them from the GFS system.
11     A.    Right.
12     Q.    Where does the GFS system get those
13 prices?
14     A.    I can tell you generically it gets
15 pricing -- it gets its pricing from various
16 vendor sources and there's a hierarchy of vendor
17 selection.
18     Q.    Uh-huh.
19     A.    And to the extent there's no price,
20 typically the Product Control organization would
21 talk to traders to get traders' marks.
22     Q.    Okay.  So where there's no market
23 information, the traders themselves can do -- do
24 they use a model of some sort?

HIGHLY CONFIDENTIAL - J. HRASKA

1      A.    How they would determine the marks I
2  don't know, unfortunately.
3      Q.    Okay.  Any other sources of data that
4  would go into that pricing?
5      A.    From my prospective, no.
6      Q.    When you actually prepared that
7  spreadsheet, how did you instruct the GFS system
8  to give you those prices?
9      A.    Well, I -- actually, the spreadsheet
10 itself was created by somebody who works for me,
11 which is Nancy Denig.
12     Q.    Okay.
13     A.    And I know the methodology in how she
14 got the prices, but if you're asking me
15 specifically how did I mechanically pull the
16 prices, I don't know, because unfortunately --
17     Q.    She would know?
18     A.    Yeah.
19     Q.    I guess I'm trying to understand, if I
20 wanted to recreate those prices, how would I go
21 about doing it if I had access to the GFS
22 system, do you know?
23     A.    You would look to the data from that
24 specific date and you would want to download the

HIGHLY CONFIDENTIAL - J. HRASKA

1  pricing from that date, if it was available.
2      Q.    But Nancy Denig is the one who
3  actually did that downloading to prepare this
4  spreadsheet?
5      A.    She obtained the prices.  I don't know
6  whether it was her that downloaded it or a
7  technologist that provided it or -- but she
8  obtained the pricing for it.
9      Q.    Did any of those values come from any
10 source other than the GFS system, do you know?
11     A.    That I wouldn't know.  I mean, what I
12 know is that we got it from GFS.  Other than the
13 methodology of how GFS got them other than what
14 I have described, I mean, I don't really know.
15     Q.    Okay.  Very good.
16           Mr. Hraska, you were talking about the
17 800 Cusips that you identified but never made it
18 to Barclays?
19     A.    Uh-huh.
20     Q.    Remember that testimony?
21     A.    Uh-huh.
22           MR. SHAW:  You need to say yes or no.
23     A.    I'm sorry.  Yes.
24     Q.    Where were those Cusips residing

HIGHLY CONFIDENTIAL - J. HRASKA

1  before you identified them?
2      A.    Could you be more specific?
3      Q.    Well, when did you identify the 800
4  Cusips?
5           MR. SHAW:  Objection to form.
6      A.    The 800 Cusips were not actually
7  identified by me.  They were identified by the
8  Finance organization as Cusips which were on
9  Schedule B but were not on the list of
10 securities that we had transferred over to
11 Barclays.
12     Q.    So where are those Cusips now?
13     A.    From a location perspective or a --
14     Q.    Well, where are those securities now?
15     A.    The securities themselves?  They would
16 be still in Lehman clearance boxes.
17     Q.    Okay.  Do you know which boxes or --
18     A.    Well, various boxes.
19     Q.    Okay.  You don't know specific --
20 well, let me ask you this way:  Is there a list
21 somewhere of these 800 Cusips?
22     A.    Well, the list of the 800 Cusips is
23 the list.  I'm sorry, I'm not --
24     Q.    Is there a file in Barclays that has a

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  list of these 800 Cusips?
3      A.   Yeah, that would have been the file
4  that the Finance organization had sent to me
5  that they asked me to look at these 800.
6      Q.   So if I find an e-mail -- I would find
7  an e-mail, presumably, with an attachment of 800
8  Cusips addressed to you?
9      A.   Yeah, that's reasonable.  If not to
10 me, it would have been to somebody either in my
11 organization or to my manager, who subsequently
12 forwarded it to me.
13     Q.   And how do I find out what boxes those
14 800 Cusips are in now?
15     A.   I honestly don't know.
16     Q.   Were you involved at all since your
17 time at Barclays in any efforts to sell any of
18 the securities that came over to Barclays as
19 part of Schedules A or B?
20     A.   No.
21     Q.   Do you have any knowledge about any
22 efforts to sell those securities?
23     A.   No.
24     Q.   Do you have any understanding about
25 whether they were sold or not?

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.   No.
3      Q.   Do you have any understanding about
4  whether they were sold at prices differing from
5  the ones that are on your sheet?
6      A.   No.
7      Q.   Who would I ask those types of
8  questions to?  Who would know that at Barclays?
9          MR. SHAW:  Objection.  Foundation.
10         Answer if you know.
11     A.   Trading desk at Barclays.
12     Q.   Who's in charge of the trading desk at
13 Barclays?
14     A.   Fixed Income would be Harry Harrison.
15     Q.   Okay.  Is it fair to say that you have
16 no involvement in the sale of those securities
17 since you've been at Barclays?
18     A.   That's true.
19     Q.   Do you have any involvement in -- and
20 I think I might have asked this previously, but
21 I just want to close this loop -- do you have
22 any involvement in how Barclays accounts for the
23 assets that came over on Schedules A and B?
24     A.   The accounting treatment of the
25 assets.

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      Q.   Yes.
3      A.   No.
4      Q.   Do you have any involvement in how
5  Barclays translated the values of those
6  securities to its balance sheet?
7      A.   No.
8      Q.   Okay.  I think we'll conclude the
9  30(b)(6) portion of the deposition, but I still
10 have a few more questions to ask you,
11 unfortunately.
12     A.   That's okay.
13     Q.   Mr. Hraska, I'm handing you a copy of
14 an exhibit that's previously been marked as
15 number 25.  It's what we have been referring to
16 as the clarification letter.  And I know you
17 testified earlier that you had no real
18 familiarity with this, but I wanted to see if
19 you'd just take a minute to review it so I can
20 confirm that.
21     A.   Okay.
22         (Document review.)
23     A.   I can confirm this is not familiar to
24 me.  I haven't seen this document.
25     Q.   Let me just ask it for the record.

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  Have you ever seen this document before?
3      A.   No.
4      Q.   If I recall correctly, is it correct
5  to say you have no understanding of why this
6  clarification letter was prepared in connection
7  with the Barclays/Lehman transaction?
8      A.   That's correct.
9      Q.   If you look on page -- the paragraph
10 that ends at the bottom of page 1 and continues
11 on to page 2?
12     A.   Okay.
13     Q.   You'll see references to Schedule A
14 and a Schedule B.  You see where I'm referring
15 to?
16     A.   The A and B in parentheses -- oh, no,
17 further down.  "As specified in Schedule A,"
18 okay.
19     Q.   I know we've been talking about those
20 schedules, but did you have any understanding
21 when you were working on those schedules that
22 they would somehow comprise purchased assets
23 under the agreement between Barclays and Lehman?
24     A.   No.
25     Q.   Okay.  If we turn to the next --

Page 186

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  testified about that earlier?
3      A.  Yes.
4          MR. SHAW:  Object.  Just so we're
5  clear, I don't think he testified there was
6  a transfer from the Fed to the Bank of New
7  York, unless I misunderstood it.
8      Q.  I think you testified there was a
9  movement of collateral from the Fed financing to
10 the Bank of New York financing?
11         MR. SHAW:  Right.  The question is
12 whether Chase was --
13     Q.  I understand.  I'm not trying to
14 mischaracterize your testimony.  I just want to
15 bring you to that period of time where you were
16 working on the transfer of collateral that had
17 previously supported the Fed to now supporting
18 the September 18 repo; do you recall your
19 testimony on that?
20     A.  Yes.
21     Q.  Okay.  Were there any assets that were
22 supposed to be excluded from that?
23         MR. SHAW:  Objection.  Foundation.
24 Calls for speculation.  Calls for legal
25 conclusion.

Page 187

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.  There were -- there was a list of
3  eligible collateral types and there was one
4  particular Cusip that was very specifically
5  supposed to be excluded.
6      Q.  Which was what?
7      A.  It was called a Racer Note.
8      Q.  Okay.  Who wanted it excluded?
9      A.  Barclays.
10     Q.  Okay.  So am I correct to say Barclays
11 would not accept that as a form of collateral
12 for the September 18 repo?
13     A.  Yes, that's correct.
14     Q.  Did they have any other restrictions
15 on the types of collateral that could be posted
16 toward the September 18 repo?
17         MR. SHAW:  Objection to form.
18     A.  They -- there was a list that was
19 provided, and I believe we referenced the list
20 as we were -- as we were searching for available
21 collateral.
22     Q.  What types of collateral were
23 excluded?
24     A.  Honestly, we didn't look at the
25 collateral type so much as we focused on the

Page 188

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  body of Cusips, and we kept doing look-ups
3  against that body of Cusips to make sure that we
4  were not including those Cusips.
5      Q.  Why did Barclays not want the racer
6  securities --
7          MR. SHAW:  Objection.  Foundation.
8      Q.  -- posted as collateral?
9          MR. SHAW:  Calls for speculation.
10     A.  In my opinion, racer note is something
11 that is backed partially by the credit of
12 Lehman.  So if you're extending credit to
13 somebody, you wouldn't want to take collateral
14 of the same credit.
15     Q.  Okay.  Is that the only reason?
16     A.  That's my opinion.
17         MR. SHAW:  Same objection.
18     A.  I don't -- I assume Barclays made the
19 same conclusion, but I don't know.
20     Q.  Okay.  Was Barclays unwilling to
21 accept as collateral securities that were tied
22 to mortgages?
23         MR. SHAW:  Objection to form.
24     A.  There, back to what I said earlier,
25 there may have been mortgages or mortgage-type

Page 189

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  collateral on that Cusip exclusion list.
3      Q.  Do you know one way or the other
4  whether there was?
5      A.  Definitively, no.
6      Q.  When we talk about mortgages, I see
7  the phrase "resis," R-E-S-I-S.  Is that a term
8  you are familiar with?
9      A.  Well, mortgage collateral is a pretty
10 wide array.  A resi, a residential mortgage, is
11 a type of mortgage security, yes.
12     Q.  Okay.  And did Barclays exclude
13 residential mortgages from the list of
14 acceptable collateral?
15         MR. SHAW:  Objection to form.
16     A.  I don't know whether they excluded it
17 as a complete asset class or not.
18     Q.  Do you recall any discussions about
19 whether residential mortgages, mortgage-backed
20 securities could be transferred to Barclays
21 during that week?
22     A.  I remember there was a discussion of
23 it.  I don't remember the outcome of it.
24     Q.  Okay.  Do you have any recollection at
25 all about it?

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        A.    The only recollection I have is that
3    the person who ran the middle office at the time
4    was -- was involved with looking at the
5    residential portfolio, but other than that, I
6    don't -- I don't know what the outcome of that
7    was.
8            (Exhibit 143B, an e-mail chain, the
9    first in time dated September 17, 2008, at
10   2:42, with attachment, marked for
11   identification, as of this date.)
12       Q.    Mr. Hraska, I'm handing you a document
13   marked as Exhibit 143B, which is an e-mail
14   stream dated September 18, 2008, and an
15   attachment.  Will you please take a moment to
16   review the document?
17       A.    Sure.
18           (Document review.)
19       A.    Okay.
20       Q.    Have you had a chance to look at the
21   document?
22       A.    I did.
23       Q.    Have you ever seen this document
24   before?
25       A.    Yes, I have.

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.    What is this?
3        A.    This was an e-mail string that was
4    sent to me and then I forwarded it on to one of
5    the financing traders on the trading desk.
6        Q.    That's Mr. Webb?
7        A.    That's Mr. Webb.
8        Q.    And what's the attachment to this
9    document?
10       A.    The attachment to this doc was a file
11   that was a file of assets that Barclays did not
12   want, included on the pledge of the repo.
13       Q.    Is this the list you previously
14   mentioned about excluded assets?
15       A.    Yes.
16       Q.    And this was a list provided by
17   Barclays to Lehman?
18       A.    Well, it was provided to me from
19   Lehman.  I think the person who originated this
20   is David Petrie.  Yes, Dave Petrie was Barclays.
21   So the answer to that would be yes.
22       Q.    So, as I understand it, this was a
23   list prepared by Barclays of the items of
24   securities that they would not want -- would not
25   accept as collateral in support of the September

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    18 repo?
3            MR. SHAW:  Objection to form.
4        A.    That's my understanding of what it
5    was.
6        Q.    And is this the list you then used to
7    review the collateral that you were posting to
8    make sure it wasn't on this list?
9        A.    We used the list that looked like
10   this.  I don't know if this was the final list,
11   but a list that looked like this, yes, was used.
12       Q.    At the subject line of your e-mail, it
13   says, "Excluded mortgage asset files."  You see
14   that?
15       A.    Uh-huh.
16       Q.    Are these Cusips on this list
17   primarily mortgaged -- mortgage-related
18   securities?
19       A.    They were primarily mortgage and
20   asset-backed-related securities on this list.
21       Q.    So why were they to be excluded as
22   collateral?
23           MR. SHAW:  Objection to form.
24       A.    I don't know.  I was given a list to
25   use in the selection criteria and was told to

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    exclude them, so I don't know.
3        Q.    Do you have any understanding of why
4    they might be excluded?
5        A.    No.
6        Q.    Now, when these are excluded, is it
7    correct to say that these securities had been
8    posted as collateral to the Fed but were not
9    allowed to be posted as collateral to the
10   September 18 repo?
11       A.    I never cross-referenced the two, so I
12   don't know for certain.
13       Q.    Do you know if the Fed in its
14   financing excluded mortgage-backed assets like
15   this as being eligible collateral?
16       A.    The Fed excluded certain classes and
17   ratings of mortgages, but in general, the Fed
18   would accept mortgage collateral.
19       Q.    Okay.  So is it correct to say that
20   this list, this list reflects a change in the
21   type of collateral that Barclays would accept in
22   connection with the September 18 repo from the
23   collateral that had been posted to the Fed
24   financing?
25       A.    Well, without knowing whether these

Page 194

HIGHLY CONFIDENTIAL - J. HRASKA

1   HIGHLY CONFIDENTIAL - J. HRASKA
2   specific assets were pledged to the Fed or not,
3   I wouldn't know that, whether it represented a
4   change.
5   Q.   Okay.  What do you think?
6   MR. SHAW:  Objection.  Calls for
7   speculation.
8   A.   I don't know, honestly.
9   Q.   Okay.  Do you recall any
10  discussions -- is it possible that these
11  mortgage-related securities were just considered
12  too risky by Barclays to be accepted as
13  collateral?
14  MR. SHAW:  Objection.  Calls for
15  speculation.
16  A.   It would be a logical conclusion.  I
17  don't know why, but it would be a logical
18  conclusion.
19  Q.   Okay.  Do you recall any other
20  discussions during the week of September 15th
21  about what types of collateral Barclays would
22  not accept in support of the September 18 repo?
23  A.   I don't know.
24  Q.   Do you have any understanding about
25  whether there were any differences in the types

Page 195

1   HIGHLY CONFIDENTIAL - J. HRASKA
2   of collateral that could be posted to the Fed
3   financing as opposed to the collateral that
4   could be used to support the September 18 repo?
5   A.   No.
6   Q.   Do you have any understanding about
7   whether the collateral that was posted to
8   support the Fed repo was in any way riskier or
9   less risky than the collateral that was posted
10  toward the September 18 repo?
11  A.   Well, I don't typically determine
12  risk, so I wouldn't really necessarily be able
13  to determine whether one set of assets is
14  riskier than another, to tell you the truth,
15  so...
16  Q.   Okay.
17  (Exhibit 144B, a document bearing
18  Bates Nos. 10297377 through 10300510, marked
19  for identification, as of this date.)
20  Q.   Mr. Hraska, I'm handing you a copy of
21  a document marked as Exhibit 144B.  I have very
22  few questions about the document, but
23  essentially it involves just getting an
24  understanding of what this database includes.
25  So if you might take a minute to

Page 196

1   HIGHLY CONFIDENTIAL - J. HRASKA
2   review it, I'll ask you a question or two.
3   A.   Sure.
4   (Document review.)
5   Q.   Have you had a chance to look at it?
6   A.   I have.
7   Q.   You'll see, Mr. Hraska, on the front
8   there's an attachment with the title
9   "BAR-PDCF-074.XLS."  Does that -- well, can you
10  explain to me the convention for titling
11  databases like this?  What is that meant to
12  encompass, if you know?
13  MR. SHAW: Objection.  Assumes facts
14  not in evidence.  Calls for speculation.
15  Q.   Let me withdraw that question.  Let's
16  start again.
17  Have you ever seen this document
18  before?
19  A.   I have, yes.
20  Q.   And what is this?
21  A.   This is an e-mail that I had -- that I
22  had forwarded on to Peter Hadingham, who was on
23  the trading desk, the financing trading desk.
24  Q.   And what is this attachment?
25  A.   This is a file of collateral that was

Page 197

1   HIGHLY CONFIDENTIAL - J. HRASKA
2   sourced from clearance box O74 and had been -- I
3   believe it had been previously deposited to the
4   Fed under the PDCF program.
5   Q.   Okay.  And was this collateral
6   eventually transferred or posted as collateral
7   for the September 18 repo?
8   A.   This was collateral that we had --
9   that we had contemplated posting.  I can't
10  verify that all of this collateral was posted,
11  but the intention was to take this collateral
12  and post it to Barclays.
13  Q.   Okay.  If you look on page 2 of the
14  document, you'll see three headings under
15  columns E, F and G.  I just wanted to get your
16  understanding of what they mean.
17  The first one is entitled "Market
18  Price Factored."  Can you explain to me what
19  that means?
20  A.   I don't specifically know what it
21  means on this file.  I know what "price
22  factoring" means, but it doesn't seem, from the
23  data in this file, doesn't seem to mean what
24  price factoring is.
25  Q.   What is it typically?

Page 202

HIGHLY CONFIDENTIAL - J. HRASKA
1
2    the way I define "paydown," but you can see that
3    it's a lesser value.  So, you know, my
4    impression of what this was was the -- was
5    the -- was the cash that was being extended on
6    this as a result of the program from the night
7    before, but I can't be sure.
8        Q.  I'm not sure I understood what you
9    meant.  Are you talking about the program from
10   the night before meaning the Fed program that
11   had rolled over another night?
12       A.  The Fed program that was on for the
13   night of the 17th.
14       Q.  That is Wednesday night?
15       A.  That's Wednesday night, yes.
16       Q.  Okay.  So I'm not sure I understood
17   your explanation.  What is paydown amount?
18       A.  Paydown amount would be the -- paydown
19   amount would be the proceeds that would be -- I
20   guess, simply put, it would be the value that
21   was given to the securities after haircut,
22   probably the simplest way to put it.  So this
23   amount would -- in other words, this amount of
24   securities, 49 million, would support a loan in
25   the value of 43,457,000.

Page 203

HIGHLY CONFIDENTIAL - J. HRASKA
1
2        Q.  Okay.  And then if you see the next
3    column, it talks about "Anticipated Prefunding
4    Dollar Amount."  Do you see that?
5        A.  Yes.
6        Q.  And now -- and that totals to 44.2
7    billion, you see that?
8        A.  Yes.
9        Q.  What does that column signify?
10           MR. SHAW:  Objection to form.
11       A.  I don't know.  Actually, I questioned
12   that at the time.  My impression was that was
13   the amount that was going to be wired to Chase
14   to release the collateral, but it turned out not
15   to be the case and I was never explained as to
16   why that was not the case.  Because, as you
17   know, it turned out to be 45 billion, so I don't
18   know.
19       Q.  So you, just so I understand what you
20   are saying, you, at the time, you thought 44.2
21   billion would be the amount that had to be wired
22   to Chase to release the Fed collateral that was
23   then going to be transferred to the September
24   18th repo?
25       A.  Being that this was provided by Chase,

Page 204

HIGHLY CONFIDENTIAL - J. HRASKA
1
2    and these were their requirements to release the
3    collateral, the way I read this was that that
4    was the case, and having discussions with Chase,
5    I found out that, no, that was not the case,
6    that they were expecting an amount of 45
7    billion.
8        Q.  And did they ever explain to you why
9    the difference?
10       A.  No.
11       Q.  Did they ever explain to you what this
12   column was to signify in their view?
13       A.  No.
14       Q.  Okay.
15           MR. SHAW:  We've been going over an
16   hour, Bill, if we could take a short break.
17           MR. HINE:  Sure.
18           (Recess; Time Noted:  2:28 P.M.)
19           (Time Noted:  2:39 P.M.)
20   BY MR. HINE:
21       Q.  Mr. Hraska, could you pull out the
22   exhibit we were talking about before we broke,
23   which I think was Exhibit 18.
24           MR. SHAW:  60B?
25       Q.  I'm sorry, 60B.

Page 205

HIGHLY CONFIDENTIAL - J. HRASKA
1
2        Because you might want to refer to
3    that when I hand you the next exhibit.  So I
4    don't have any questions on that specifically,
5    but let me hand you another document that's been
6    marked as Exhibit 125.  If you could take a
7    moment to review that before I ask you a
8    question, I would appreciate it.
9           (Document review.)
10       A.  Okay.
11       Q.  Have you had a moment to look at it?
12       A.  Yes.
13       Q.  Mr. Hraska, turning to Exhibit 125,
14   have you ever seen in document before?
15       A.  Yes.
16       Q.  What is this document?
17       A.  This is a document that was prepared
18   by Nancy, who works for me.  It was how we had
19   broken up the -- how we had broken up what we
20   called the tri-party shells or how we had
21   assembled the baskets of collateral that we were
22   going to be pledging over to Barclays.
23       Q.  Can you explain to me what you mean by
24   that, tri-party shells?
25       A.  In a tri-party transaction, you are --

Page 206

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  you're lending securities based off of, as we
3  talked about, the schedules and typically
4  according to asset classes and requirements.  So
5  you typically book the money amount that's going
6  to be associated with a generic bucket of
7  securities that will fit these criterias, and
8  that loan amount or that dollar amount is --
9  what you book is called typically a shell.  By
10  some firms, it's known as a loan amount.
11        So it's sort of the dollar value that
12  you're going to associate a various basket of
13  securities to.
14    Q.   Okay.  And is that what's called the
15  booking amount?
16    A.   These -- the booking amounts would be
17  the dollar value of the loan, yes.
18    Q.   And the baskets of securities, are
19  those listed on the left-hand column coming from
20  various Fed programs; is that right?
21    A.   That's correct, yes.
22    Q.   And could you just walk me through the
23  different columns on this chart and explain to
24  me what each column signifies?  We can start
25  with the column that totals down to $47.5

Page 207

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  billion.  Do you see that column?
3    A.   Yes.
4    Q.   Do you know what that column is
5  supposed to represent?
6    A.   The total market value of the
7  securities.
8    Q.   And these are the securities that have
9  been posted to the Fed financing programs?
10    A.   These were the securities that we had
11  that we were anticipating pledging over to the
12  Barclays transaction for the 18th.
13    Q.   So this document that we had
14  previously talked about how $8 billion never
15  made it, we had long discussions about that, but
16  this chart is prepared prior to that?
17    A.   This was prepared prior to that.
18    Q.   So this is what you are anticipating
19  being able to take from the Fed programs over to
20  BONY; is that right?
21    A.   Actually, looking at the date of this,
22  this -- this was prepared later that evening.
23  So this must have been where we were at a
24  particular point in time, or where we -- what we
25  had booked at a particular point in time, not

Page 208

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  necessarily what was delivered yet at that
3  particular point in time.
4    Q.   I guess, could you explain that to me
5  in terms of the different columns?
6    A.   These columns represent items that
7  were actually booked on our systems.  That
8  trade, as we talked about, there were different
9  collateral classes and substitutions that
10  happened all day based on deliveries, available
11  in the box, that kind of thing.
12        So we were using this spreadsheet to
13  try to capture all of the collateral that we
14  were looking and the market value that we were
15  booking, so these were the amounts that were
16  being booked.  From the time stamp, I can see it
17  was 7 o'clock, so it was -- we weren't done
18  until much later in the evening, so it was a --
19  this is an interim file, basically.  It's not
20  the beginning file.  And it's not at the end of
21  the day.  It's not the ending file either.  It
22  was an interim step around 7 o'clock.
23    Q.   So if I found a file entitled
24  BarCapSummary.xls, later than this, I would
25  eventually get to a final file?

Page 209

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    MR. SHAW:  Objection to form.
3    A.   There is a final file, yes.
4    Q.   Okay.  And it would have the same
5  title as this file?
6    MR. SHAW:  Objection to form.
7    A.   I don't know whether it would have the
8  same title.
9    Q.   Okay.  Would Ms. Denig probably know
10  that?
11    MR. SHAW:  Objection to form.
12    A.   She would know whether she prepared a
13  file.  Again, whether it was the final file she
14  may not necessarily know.
15    Q.   Was she charged with monitoring this
16  process?
17    A.   Yes.
18    Q.   Okay.  So is she the originator of
19  this chart?
20    A.   She is the originator of, yes, this
21  format.
22    Q.   This chart is a snapshot at some point
23  during that day of this transfer?
24    A.   Yes, that's correct.
25    Q.   Okay.  Now, just so I understand the

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  different columns, the first column that totals
3  to $47.5 billion, approximately, is the market
4  value of the securities that had been posted to
5  the Fed programs?
6      A.   That's what I believe that to be, yes.
7      Q.   Okay.  What is the next column, which
8  starts with $7.1 billion, what is that column?
9      A.   To be honest, I actually don't recall
10 what that specific amount is.  I can venture a
11 guess, but I would rather not.
12     Q.   Venture a guess, if you don't mind.
13         MR. SHAW:  Calls for speculation.
14     A.   My guess is it's the par amount of
15 the -- of the securities.
16     Q.   And then the next column totals to
17 $44.2 billion, you see that?
18     A.   Yes.
19     Q.   And do you know what that column
20 represents?
21     A.   That would have represented the
22 principal proceeds of the repo or the amount
23 after haircut.
24     Q.   Okay.  And what does the last column
25 represent, do you know?

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.   No, unfortunately, I actually don't
3  know what the next column is.
4      Q.   The $44.2 billion that you just
5  testified about, does that relate in any way to
6  the $44.2 billion on the previous exhibit?
7         MR. SHAW:  Objection to form.
8      A.   It was what we believed we need to
9  fund over to Chase as per the column of this
10 previous spreadsheet.  So in our initial
11 bookings that's where we were trying to get
12 collateral that ultimately totaled the amount
13 equal to that amount.
14     Q.   And later you learned that it had to
15 be 45 billion?
16     A.   That's correct.
17     Q.   Mr. Hraska, in the interest of trying
18 to save you looking through another chart, I see
19 one spreadsheet that's entitled Depot Analysis.
20 Do you recall what that is?
21     A.   No, not off the top of my head.
22     Q.   Let me show it to you then.
23         (Exhibit 145B, a document bearing
24 Bates Nos. 10328099 through 10319396, marked
25 for identification, as of this date.)

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      Q.   Mr. Hraska, I'm handing you a
3  documents marked as Exhibit 145B.
4      A.   Okay.
5      Q.   And as promised, it's -- it has the
6  attachment entitled Depot Analysis.  Do you see
7  that?
8      A.   I do, yes.
9      Q.   If you wouldn't mind taking a moment
10 to take a look at this document.
11         Just for the record, it's an e-mail
12 dated September 21, 2008, from Mr. Hraska to
13 Monty Forrest and Mark Lee.
14         (Document review.)
15     A.   Okay.
16     Q.   Have you had a chance to look at it?
17     A.   I have, yes.
18     Q.   Have you ever seen this document
19 before?
20     A.   Yes.
21     Q.   Will you tell me what it is?
22     A.   This is a document that -- the
23 e-mail's a document that I created with an
24 attachment that I worked on with Nancy Denig and
25 Bill Parrinello over the weekend of the 20th and

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  21st.  It was -- it was our analysis of
3  available unencumbered assets that we had
4  referenced earlier in the testimony.
5      Q.   Okay.  Is this -- okay.  You testified
6  I think earlier about an effort to locate
7  unencumbered assets, and this is an analysis you
8  did in that regard?
9      A.   Yes.
10     Q.   Is this the list of unencumbered
11 assets that you came up with?
12     A.   This is a list.  On the course of that
13 weekend, there was I would say over a dozen
14 lists that were as we went through it and we
15 revised it and things like that.  I mean, it
16 was -- this list was created or sent at 7:36 in
17 the morning.  I'm not sure that this is the
18 final list, but this was a later version of the
19 list, yes.
20     Q.   Why is it called Depot Analysis?
21     A.   A depot is another name for a
22 clearance box, depository, depot.  It's just an
23 industry slang term.  The 9/19 date was
24 referencing the fact that this was the close of
25 business 9/19.

Page 214

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Q.   When I see the title, it says
3    "9/19/2008.5."  Does this suggest that it's a
4    version 5 of this analysis?
5    A.   I would say yes.
6    Q.   And would it be your expectation that
7    if I looked through the files, I should find
8    later versions of this analysis?
9    A.   I don't know for certain.  I know that
10   we worked all through Sunday, so it's a --
11   there's a good chance there may be a different
12   file later, but ...
13   Q.   Okay.  Does this analysis ultimately
14   identify the $1.4 billion worth of securities
15   that we talked about earlier that were
16   transferred to Barclays?
17   A.   No.
18   Q.   Okay.  What is the end product of this
19   analysis?  I'm trying to understand how this
20   analysis fits into the testimony you gave
21   earlier about the 1.4 billion and the 800
22   Cusips.  So I'm just trying to understand what
23   is the end product of this analysis?
24   A.   The end product of this analysis is
25   that this was sent over as available collateral

Page 215

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    to be transferred.  I can't confirm a hundred
3    percent that the assets that are in the 1.4 list
4    are all on this list.
5    Q.   Okay.  I think you testified earlier
6    that you sent a list over of unencumbered
7    assets.  Am I correct to say that $1.4 billion
8    worth of those assets on that list eventually
9    did make it to Barclays, right?
10   A.   I sent over a list of unencumbered
11   assets and 1.4 billion of assets made it to
12   Barclays.  I can't be sure that it's the same
13   1.4 that was on the final list that I sent over.
14   Q.   Okay.  And is the list that you sent
15   over entitled Depot Analysis or was that a
16   separate list?
17   A.   I don't recall what the final name
18   was.
19   Q.   Okay.  What is the analysis part of
20   it?
21   A.   The analysis was trying to determine
22   whether the securities were available or
23   unencumbered.
24   Q.   Did the analysis entail valuing those
25   securities at all?

Page 216

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    A.   No.
3    Q.   If you look on page 2 of this
4    document?
5    A.   Uh-huh.
6    Q.   I just wonder if you can explain to me
7    the last two columns -- I'm sorry.
8    A.   Page 2 or a different page?
9    Q.   The first page of the chart.
10   A.   This is what I've got.  Summary, that
11   page?  Or the spreadsheet first page?
12   MR. SHAW:  Use the Bates numbers.
13   Q.   Let me see if I'm referring to the
14   correct document.  I have a misprint in my
15   document.
16   Page 3 of the chart.
17   A.   Okay.
18   Q.   You see column F says "Firm DTC MV"?
19   A.   Yes.
20   Q.   What does that column represent?
21   A.   That represents a market value which
22   was held in GFS, which is the system we
23   referenced earlier.
24   Q.   Okay.
25   A.   So that would have been the market

Page 217

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    value that GFS had assigned to that position.
3    Q.   Why does it say "DTC"?
4    A.   GFS was a database storage of multiple
5    pricing sources, and in addition to Lehman's
6    marks, in some instances we -- GFS also took in
7    how the depository knew the value of the
8    collateral to be.
9    Q.   Okay.  And the previous column says
10   "Firm DTC POS," you see that?
11   A.   Yes.
12   Q.   What does that column represent?
13   A.   Those represent the firm positions.
14   Q.   "Positions" meaning numbers of
15   securities or dollar value?
16   A.   Numbers of securities.
17   Q.   Okay.  Now, if you turn to the second
18   page of the chart, you'll see a chart which
19   totals $1.19 billion, you see that?
20   A.   The second page of the document, not
21   of the chart.
22   Q.   Yes, I'm sorry.  You're right.
23   Is 1.19 billion the value of the list
24   of unencumbered assets that you sent over to
25   Barclays?

Page 218

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.   It was the market value that GFS
3  assigned at the time of the creation of this
4  particular file.
5      Q.   Okay.  But you don't know if this is
6  the final list, correct?
7      A.   I don't know.
8      Q.   At this particular time, GFS assigned
9  that value to this list of securities; is that
10 right?
11     A.   That's correct.
12     Q.   Mr. Hraska, I'm handing you a copy of
13 a document previously marked as Exhibit 75B,
14 which is an e-mail stream dated September 20.
15         Please take a moment to take a look at
16 it.
17         (Document review.)
18     A.   Okay.
19     Q.   Have you had a chance to look at it?
20     A.   I have.
21     Q.   Have you ever seen this document
22 before?
23     A.   Yes, I have.
24     Q.   What is this?
25     A.   This is an e-mail that I was a

Page 219

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  recipient on.  That was one of the -- the
3  status updates when we were trying to identify
4  unencumbered collateral in various sources.
5      Q.   If you look -- so am I correct this is
6  in connection with your efforts to identify
7  unencumbered assets that could be transferred to
8  Barclays?
9      A.   Yes.
10     Q.   If you look at the bottom of the first
11 page, it says, "Goal is 1.9 billion in
12 unencumbered."  You see that?
13     A.   I do.
14     Q.   Was that the goal you folks were
15 shooting for at the time?
16     A.   That was the goal as it was described
17 to me, yes.
18     Q.   Who described it to you like that?
19     A.   Monty Forrest.
20     Q.   Okay.  And where did that goal come
21 from?
22     A.   I don't know.
23     Q.   I thought I heard you say previously
24 that the effort was simply to find as many
25 unencumbered assets as possible; is that right?

Page 220

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.   Yes, that's correct.
3      Q.   How does the $1.9 billion goal fit in
4  with that?  It seems like a very specific target
5  to be shooting for.
6      A.   I don't know where specifically that
7  number came from.  In my mind, I was looking for
8  as many unencumbered collateral pieces that I
9  could because I still was unsure of the status
10 of that repo transaction that we talked about,
11 the September 18 repo, where we pledged the 7
12 billion in cash.
13         So in my mind I needed to come up with
14 assets that would continue to be able to
15 substitute that collateral versus cash, and at
16 that point, I was still unsure whether or not
17 anything further was going to happen on that
18 transaction or not.  So I was looking for an
19 unencumbered collateral.  You know, they gave us
20 this goal of 1.9 billion, but, you know, in my
21 line of work, it's, you know, to the extent that
22 you are given a task to find an unencumbered
23 collateral, it's usually best to find the entire
24 population.  And to the extent somebody gives
25 you 1.9, you say, great, I've done it.  If it

Page 221

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  turns to 2.9, you have to do it again.
3      Q.   So was the search for unencumbered
4  collateral an effort to find replacement
5  collateral for the cash?
6         MR. SHAW:  Objection to form.
7      A.   I was looking to find unencumbered
8  collateral.  You know, the firm may have had its
9  own specific goal of the 1.9, in which I was
10 trying to ascertain at least 1.9, because that's
11 what they were looking for.  But I was
12 specifically not tied to 1.9 as, you know, the
13 only thing that I was going to find.  I was
14 looking to find as many unencumbered collateral
15 as I could.
16     Q.   I guess I want to understand what -- I
17 thought you had previously said that you found
18 $1 billion in unencumbered collateral that was
19 then posted towards the $7 billion in cash and
20 you had hoped to receive the $7 billion or some
21 of that cash back, right?
22     A.   That's correct.
23     Q.   Now, was that effort to find
24 unencumbered collateral different from this goal
25 of 1.9 billion?

Page 222

HIGHLY CONFIDENTIAL - J. HRASKA

1
2       A.   I've subsequently learned that this
3    1.9 was different than the effort to search for
4    unencumbered collateral on this weekend.  At the
5    time of that weekend, you know, I was again
6    searching for unencumbered collateral in its
7    entirety.  So, in my mind, you know, we still
8    needed to do a substitution on that cash event.
9       Q.   Okay.
10      A.   And until I was told otherwise, I was
11   going to try to find collateral that potentially
12   fit the bill for that.
13      Q.   Okay.  What did you learn subsequently
14   that was different than what you understood at
15   the time?
16      A.   Well, you know, subsequently, I was
17   made aware of, you know, Schedule B, which had
18   some, you know, 1.9 to 2 billion dollars worth
19   of, you know, collateral on it.  But at the
20   time, I wasn't aware of that.
21      Q.   Okay.  So now it's your understanding
22   that the $1.9 billion goal was in connection
23   with preparing the Schedule B?
24          MR. SHAW:  Objection.
25   Mischaracterizes prior testimony.

Page 223

HIGHLY CONFIDENTIAL - J. HRASKA

1
2       A.   I'm sorry, could you repeat the
3    question?
4       Q.   Is it now your understanding,
5    notwithstanding what you understood at the time,
6    is it now your understanding that the $1.9
7    billion goal was, with respect to the search for
8    unencumbered collateral, was to prepare
9    securities that would go to Barclays under
10   Schedule B?
11          MR. SHAW:  Objection to form.
12      A.   Could you read back to me --
13          (Record read.)
14      A.   Yes.
15      Q.   Okay.  Now, further up on this e-mail
16   we see a report apparently by Mr. Forrest of the
17   latest status, or some form of status report.
18   Can we just go through those items and tell me
19   what you recall about those items?
20          It says 800 million at BONY.  Do you
21   see that?
22      A.   Yes.
23      Q.   And what's that referring to?
24      A.   Honestly, I don't recall what that 800
25   million was.

Page 224

HIGHLY CONFIDENTIAL - J. HRASKA

1
2       Q.   Okay.  And did that 800 million
3    eventually make its way to Barclays?
4           MR. SHAW:  Objection.  Foundation.
5       A.   Stating that it's at BONY would have
6    indicated that fact, because we didn't have --
7    Lehman didn't have a relationship with BONY,
8    so...
9       Q.   Okay.  Then further down, number 2,
10   you see it references 746 million in O74, see
11   that?
12      A.   Yes.
13      Q.   And what does that reflect?
14      A.   That's referring to, at the time of
15   this, it was believed that there was 746 million
16   in market value in securities unencumbered in
17   O74.
18      Q.   And did that collateral make its way
19   to Barclays?
20          MR. SHAW:  Objection to form.
21      A.   I don't know whether that 746
22   reference here made it to Barclays or not.
23      Q.   Do you know whether the collateral in
24   the O74 account was -- made its way to Barclays?
25      A.   Some collateral in O74 made it to

Page 225

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Barclays, yes.
3       Q.   Some did not?
4       A.   That's correct.
5       Q.   How much did not?
6           MR. SHAW:  Asked and answered.
7       A.   There's a portion in O74 that's still
8    outstanding, hasn't made it to Barclays.
9       Q.   Do you know how much?
10          MR. SHAW:  Asked and answered.
11      A.   I believe that amount to be somewhere
12   in the neighborhood of 6 to 7 hundred million.
13      Q.   Is that the 800 Cusips that you
14   mentioned earlier?
15      A.   No, as I had mentioned earlier, there
16   was the original list which had the discrepancy
17   of 800 Cusips, and there was a separate analysis
18   which produced different collateral that was
19   available, potentially, to be transferred.
20      Q.   Okay.  And that's the 6 or 7 hundred
21   million that you're discussing that you just
22   mentioned did not make it to Barclays?
23      A.   That's correct.
24      Q.   Then we see in item number 3 a
25   reference to 435 million in Canada, do you see

Page 226

HIGHLY CONFIDENTIAL - J. HRASKA

1 that?
2    A.   Yes.
3    Q.   What is that referencing?
4    A.   Unencumbered market value in our
5 Canadian depository.
6    Q.   And did those securities make it to
7 Barclays?
8    A.   No.
9    Q.   Where are they now?  Still in that
10 same depository?
11    A.   I don't know for certain, but it would
12 be my assumption, yes.
13    Q.   Does Barclays think they're entitled
14 to that collateral?
15        MR. SHAW:  Objection to form.  Calls
16 for speculation.
17    A.   I don't know.
18    Q.   And you see the next item, number 4,
19 300 million in mortgages in 636.  Do you see
20 that?
21    A.   Yes.
22    Q.   What is that referring to?
23    A.   Market value of securities held in our
24 depository at DTC Number 636.

Page 227

HIGHLY CONFIDENTIAL - J. HRASKA

1    Q.   And did that collateral make it to
2 Barclays?
3    A.   I don't know how much of that or if
4 any of that collateral made it to Barclays.
5    Q.   Okay.  Then the next line says a
6 total -- this totals to 2.18 billion.  You see
7 that?
8    A.   I do, yes.
9    Q.   Does that mean you made your goal of
10 1.9 billion?
11    A.   That would indicate that we had enough
12 collateral to satisfy the collateral
13 requirement, yes.
14    Q.   Do you recall any discussions about
15 whether you made the goal of 1.9 billion?
16    A.   No.
17    Q.   Did you think at the time that you had
18 achieved the goal of 1.9 billion?
19    A.   Based on this mail, I thought that I
20 achieved what was asked from me by Monty, yes.
21    Q.   Did anyone call you up and say,
22 congratulations, you made the goal of 1.9
23 billion?
24    A.   No.

Page 228

HIGHLY CONFIDENTIAL - J. HRASKA

1    Q.   So how did it end?  Did you think you
2 had to continue searching?
3    A.   This was pretty early on in the
4 weekend.  It was only Saturday at 8:30 P.M.  So,
5 you know, this continued to go on because there
6 were -- I don't remember what the nature of the
7 circumstances are, but I remember we continued
8 to search for collateral for pretty much the
9 whole rest of the weekend.
10    Q.   So the 1.9 billion goal was put aside
11 and just kept searching?
12    A.   I don't believe that the 1.9 billion
13 goal was set aside.  It was just a matter of
14 there might have been some either additional
15 problems in the collateral that we identified or
16 we were doing verification exercises like
17 looking at securities in depositories and
18 accounts on our stock record to make sure that
19 everything tied out.  And so throughout some of
20 those additional reconciliations, some of the
21 previous things that had been identified had to
22 be revised.
23    Q.   Okay.  I wanted to ask you one
24 follow-up question about I think we previously

Page 229

HIGHLY CONFIDENTIAL - J. HRASKA

1 were discussing the list of excluded assets.  Do
2 you recall that testimony?
3    A.   Yes.
4    Q.   That was a list of assets that
5 Barclays would not accept as collateral for the
6 September 18th repo, right?
7    A.   Yes.
8    Q.   And one of the assets that they would
9 not accept are the racer notes that you
10 mentioned, right?
11    A.   That's correct.
12    Q.   Do you know the value of those racer
13 notes at the time?
14    A.   Approximately 5 billion.
15    Q.   5 billion?
16    A.   Yes.
17    Q.   Okay.  Do you know the value of the
18 pool of excluded assets that had been posted to
19 the Fed financing but Barclays would not accept
20 in the September 18 repo?
21    A.   No.
22    Q.   Did you make an effort to look through
23 the collateral that had been posted to the Fed
24 and exclude out those items that Barclays would

Page 230

HIGHLY CONFIDENTIAL - J. HRASKA

2 not accept as collateral on the 9/18 repo?
3    A.   Yes, we did look-ups on the securities
4 we were going to pledge to make sure that they
5 were not on that excluded list.
6    Q.   Okay.  And did you have any sense of
7 the value of the ones that were excluded because
8 of that review?
9    A.   No.  Once they were excluded, we
10 didn't keep track of what was excluded.  It was,
11 in our mind, there was no need to because we
12 weren't going to pledge it.
13    Q.   Do you recall if it was a substantial
14 amount of securities?
15    A.   Well, we didn't do it as one exercise.
16 As we went and found baskets of securities in
17 groups, we might have found exceptions in that
18 exercise with multiple iterations.  So I don't
19 honestly recall how many were on that list.
20       (Exhibit 146B, a document bearing
21       Bates Nos. BCI-EX-(S)-00014389 through 14393
22       with attachment, marked for identification,
23       as of this date.)
24    Q.   Mr. Hraska, I've handed you a copy of
25 a document marked as Exhibit 146B.  It is

Page 231

HIGHLY CONFIDENTIAL - J. HRASKA

2 Bates-stamped BCI-EX-(S)00014389 through 14393,
3 and then there are a series of attachments which
4 don't have Bates stamps.
5    A.   Okay.
6    Q.   Have you had a chance to take a look
7 at the document?
8    A.   Sure.
9       (Document review.)
10    A.   Okay.
11    Q.   Have you had a chance to look at it?
12    A.   I have, yes.
13    Q.   Have you ever seen this document
14 before?
15    A.   Yes, I have.
16    Q.   Can you tell me what it is?
17    A.   This was an e-mail sent by Robert
18 Azerad who's on Paolo Tonucci's team in the
19 Treasury Department.  He had been given a file
20 that Barclays had worked on comparing it to --
21 comparing what they believed to be what Lehman
22 knew to deliver versus what Barclays had known
23 was delivered, and there were a few
24 discrepancies in the Fed items versus a few
25 hundred discrepancies in the DTC bucket of

Page 232

HIGHLY CONFIDENTIAL - J. HRASKA

2 collateral.  So he asked us to look into it and
3 try to reconcile through why there was these
4 particular discrepancies.
5    Q.   And were you able to do that?
6    A.   We were, yes.
7    Q.   Why were there such discrepancies?
8    A.   I'm not sure why there were
9 discrepancies with the information provided.
10 We -- we verified that the information that we
11 had originally provided was correct, so I don't
12 know the sourcing of the file that -- or of the
13 information that they relied on when they
14 created this.
15    Q.   Now, is this -- I take it this e-mail
16 is sent in connection with your reconciliation
17 effort that you talked about earlier?
18    A.   We had -- we had done a
19 reconciliation -- well, there were, to be clear,
20 there were multiple reconciliation efforts that
21 were done after this transaction, but my group
22 had performed a reconciliation effort with --
23 with the Bank of New York and the Operations
24 folks at Barclays, you know, prior to receiving
25 this and we were -- we were reconciled with

Page 233

HIGHLY CONFIDENTIAL - J. HRASKA

2 respect to the number of securities and the
3 Cusip identifiers, as we had talked a little bit
4 earlier about.
5    Q.   And you said that your records tied in
6 with Barclays records on that score, right?
7    A.   That's correct, yes.
8    Q.   And so why did this come up later?
9    A.   I honestly don't know.
10    Q.   Are these from a different set of
11 records?
12    A.   My presumption is that, yes, and they
13 were, in my opinion, incomplete records because
14 they were missing securities.
15    Q.   So the Barclays records which appear
16 to show a thousand-some-odd Cusips missing were
17 incomplete?
18    A.   I don't think there was a thousand
19 missing.
20       MR. SHAW:  Objection.
21    Mischaracterizes the document.
22    Q.   Let's read through this e-mail here
23 for a second.  It says you'll see in the
24 larger -- largest paragraph on the first page it
25 says, "For DTC settled securities, there are

Page 238

HIGHLY CONFIDENTIAL - J. HRASKA
1       HIGHLY CONFIDENTIAL - J. HRASKA
2   that we just discussed.
3       Q.   Okay.  If I look on the front page of
4   the e-mail, the first e-mail, it references
5   looks like a file entitled "Barclays Financing
6   Collateral Lists, BARC Ops," is that this
7   database?
8       A.   I don't know.
9       Q.   Okay.  How about the last database
10  behind the final blue sheet, do you know what
11  that document is?
12      A.   Again, I'd have to speculate that it's
13  the supporting documentation to the other
14  summary totals.
15      Q.   Okay.  Do you know which one -- I see
16  on the opening e-mail there's a document
17  entitled "Corrected Thursday Transfers to
18  Barclays.  BONY Agreed."  You see that?
19      A.   I do, yes.
20      Q.   Is that one of these two lengthy
21  databases at the end, do you know?
22      A.   I don't know.
23          MR. HINE:  Okay.  I think, Mr. Hraska,
24  I have no further questions for you.  Thank
25  you very much for your time.  I think some

Page 239

1       HIGHLY CONFIDENTIAL - J. HRASKA
2   of my colleagues might.
3          (Discussion off the record.)
4          (Recess; Time Noted:  3:26 P.M.)
5          (Time Noted:  3:31 P.M.)
6   EXAMINATION BY
7   MR. OXFORD:
8       Q.   Mr. Hraska, we met off the record, but
9   let me introduce myself on the record.  I'm Neil
10  Oxford and I'm with Hughes, Hubbard & Reed.  We
11  represent the SIPA Trustee.
12      A.   Okay.
13      Q.   You testified that sometime after the
14  closing of the transaction you learned that
15  Barclays purchased the unencumbered assets of
16  LBI's clearance boxes, correct?
17      A.   Can you specify, when you say "the
18  closing of the transaction," which transaction
19  you're referring to?
20      Q.   I mean the closing of the sale of
21  LBI's assets to Barclays on the 22nd of
22  September?
23      A.   Okay.  So I'm sorry, can I ask you to
24  repeat the whole question based on that?
25          (Record read.)

Page 240

1       HIGHLY CONFIDENTIAL - J. HRASKA
2       A.   That's correct.
3       Q.   From whom did you learn that?
4       A.   Paolo Tonucci.
5       Q.   When did Mr. Tonucci advise you of
6   this?
7       A.   I don't recall a specific date.
8       Q.   Do you recall whether it was shortly
9   after the closing on the 22nd of September?
10          MR. SHAW:  What do you mean by
11  "shortly after"?
12      Q.   Well, was it within a week, within a
13  month of that closing?
14      A.   It was within a month, yes.
15      Q.   Can you tell me anything else you
16  remember about that conversation with Mr.
17  Tonucci?
18      A.   I remember that he had said that, as a
19  result of this transaction, we were to search
20  for all of the assets that were considered
21  unencumbered in the Lehman boxes.
22      Q.   From whom did you get your
23  instructions over the weekend of the 20th and
24  21st to search for unencumbered assets?  Was
25  that Mr. Forrest?

Page 241

1       HIGHLY CONFIDENTIAL - J. HRASKA
2       A.   My direct instructions came from Mr.
3   Forrest as my supervisor, yes.
4       Q.   Did you talk to anybody else about
5   what your instructions were that weekend with
6   respect to identifying unencumbered assets in
7   LBI's clearance boxes?
8       A.   With respect to identifying the assets
9   and instructions, no, those all came from Mr.
10  Forrest.
11      Q.   The 1.4 billion, approximately, in
12  assets that you believe were transferred from
13  LBI's clearance boxes, do you believe that they
14  include the assets that were transferred on the
15  18th of September?
16      A.   No.
17      Q.   Why do you say that?
18      A.   Because, from my previous testimony,
19  all the assets that were transferred on the 18th
20  were reconciled through, and the assets that we
21  delivered from the 18th onward -- like I have a
22  record of all the assets that were transferred
23  beyond the 18th, and so when I surmise that it
24  was 1.4 billion, it was based off of the assets
25  that were transferred subsequent to the 18th

Page 242

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    from my records.
3    Q.    Does the 1.4 billion figure you have
4    testified about include assets that were
5    transferred on the 19th of September?
6    A.    Yes, it does.
7    Q.    And what's the approximate value, to
8    your knowledge, of the assets that were
9    transferred on the 19th?
10    A.    A little bit over a billion.  I
11    believe it's like 1.034 or 35 billion.
12    Q.    You said that you looked across stock
13    records the weekend of the 20th and 21st for
14    assets over which there was no lien; is that
15    correct?
16    A.    That's correct.
17    Q.    Is it fair to conclude that the
18    results of your search for unencumbered assets
19    or assets with no lien was the results were
20    imperfect?
21    A.    That's fair to say, yes.
22    Q.    And it's fair to say because of the
23    800 or so Cusips that you testified earlier were
24    identified to you as actually encumbered or
25    other than unencumbered, correct?

Page 243

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    A.    That's correct, yes.
3    Q.    Can you tell me how you went about
4    identifying --
5    A.    Can I just clarify something?
6    Q.    Of course.
7    A.    They were identified as -- on the
8    system as not movable or encumbered, but we
9    needed to do some more investigation because we
10    didn't know whether they truly needed to remain
11    encumbered or whether they were erroneously
12    encumbered.
13    Q.    And did you do that investigation?
14    A.    I didn't personally do that
15    investigation.  There was -- there was a
16    reconciliation effort that took place that
17    reconciles stock record breaks which then later
18    helped unencumber some of that collateral.
19    Q.    So, as I understand this, you were
20    given a list that you called an exception list;
21    is that correct?
22    A.    That's correct, yes.
23    Q.    Who gave you that exception list?
24    A.    I don't recall the person.  I remember
25    it came from Finance.

Page 244

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Q.    And Finance is?
3    A.    Finance is like product control.
4    Finance -- those are the names of the
5    organization, Product Control Finance.  I
6    believe it's managed now by Martin Kelly and his
7    team here at Barclays.
8    Q.    And can you tell me what an exception
9    list is, please?
10    A.    The exception list as defined by what
11    we're discussing was the Schedule B list
12    versus -- the official Schedule B list versus
13    the actual collateral delivered to Barclays
14    subsequent to the 18th.
15    Q.    And at some point did you get a list
16    of 800 Cusips that had not been delivered?  Are
17    we talking about the same list?
18    A.    That's the same list, yes.
19    Q.    And a reconciliation effort was then
20    undertaken; is that correct?
21    A.    There was a reconciliation effort --
22    well, there was two things that were done.
23    There was a verification to see whether or not
24    those, in fact, those 800 were or were not
25    delivered.  We verified that those 800 were not

Page 245

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    delivered, and then there was a reconciliation
3    just in general to resolve stock breaks at the
4    firm which was done.
5    Q.    Of the 800 Cusips that you have
6    verified or your team had verified were not
7    delivered, did you determine whether or not any
8    of those securities were in fact unencumbered?
9    A.    I didn't determine that, no.
10    Q.    Do you know if such a determination
11    was made?
12    A.    I don't, no.
13    Q.    When were you given this exception
14    list?
15    A.    I don't recall, honestly.
16    Q.    Can you give me any idea as the
17    whether it was 2008 or 2009?
18    A.    Honestly, no.
19    Q.    Was it around the same time, Mr.
20    Hraska, that you were asked to go and find
21    additional unencumbered assets in Lehman's
22    clearance boxes?
23    A.    Yes, but I was asked that multiple
24    times at multiple stages.  We talked about it
25    over the weekend and then there was times where

Page 246

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  much further beyond that. So when you're
3  referring to -- at what period of time were you
4  referring to?
5      Q.   The period of time that you can't
6  remember where you were given the exception
7  list.
8      A.   Yes, so around that time, yes.
9      Q.   Do you recall who asked you, at around
10 the time you were given the exception list, who
11 asked you to go and find additional unencumbered
12 assets in Lehman's clearance boxes?
13     A.   At that time, it would have been
14 Robert Azerad.
15     Q.   Did Mr. Azerad tell you why he wanted
16 you to go and find these additional unencumbered
17 assets?
18     A.   It was in connection with the -- with
19 the Asset Purchase Agreement between Barclays
20 and Lehman.
21     Q.   Did he give you any more detail than
22 that?
23     A.   No.
24     Q.   I think you testified that you went on
25 to identify an additional amount of unencumbered

Page 247

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  assets in response to Mr. Azerad's request; is
3  that correct?
4      A.   Yes, that's correct.
5      Q.   And the figure I have written down is
6  approximately 6 to 7 hundred million dollars of
7  unencumbered assets that you previously had not
8  identified; is that correct?
9      A.   That's correct.
10     Q.   Can you tell me how you went about,
11 over the weekend of the 20th and 21st of
12 September, identifying unencumbered assets?
13     A.   Sure. We -- we relied primarily on
14 GFS, which we talked about a little bit earlier,
15 which is a system that was a database aggregator
16 that took information from multiple mainframes
17 which represented the books and records of
18 Lehman Brothers.
19        We then took that data and we looked
20 for primarily assets which were held in firm
21 trading accounts, and we compared the firm asset
22 side versus the balances which were held in the
23 depositories to make sure that there was enough
24 assets in the depositories to support that
25 inventory balance, and if there was enough, we

Page 248

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  deemed that be to be unencumbered assets.
3      Q.   Did you take any steps to determine
4  whether or not the assets you identified could
5  have been owned by Lehman's customers?
6      A.   The accounts we searched in were firm
7  trading accounts and stock loan borrow accounts,
8  and in either of these accounts it would have
9  been deemed as inventory because it as in a firm
10 inventory trading ledger, or if it was in a
11 stock loan account, it would have been as a
12 result of having rehypothecation rights. We
13 would have been allowed to borrow it so we would
14 have used that as a source for collateral.
15     Q.   Is it possible that, taking the
16 hypothetical example of 100 shares of IBM stock
17 that's sitting in the DTC box at O74, is it
18 possible that there could be a claim on that,
19 those 100 shares by both a Lehman customer and
20 by Lehman?
21        MR. SHAW:  Objection, form.
22     Q.   Do you understand my question?
23     A.   Could you repeat it, please?
24     Q.   Yes.  If there are -- if there's a
25 particular Cusip or set of Cusips sitting in

Page 249

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  Lehman's DTC box O74 --
3      A.   Okay.
4      Q.   -- is it possible that there could be
5  a claim on those Cusips by both Lehman as a firm
6  and by Lehman's customers?
7        MR. SHAW:  Objection to form.
8      A.   In your first question, you specified
9  a quantity and you specified whether each of
10 those could have lay to the same claim for that
11 quantity.
12        Is that still your question, or is
13 your question now in general could -- could
14 customers and firm have claim to the same Cusip
15 number, meaning the identifier, not the actual
16 number of shares?
17     Q.   The actual number of shares.  I meant
18 to reask my first question.
19     A.   Okay.  So if the stock record is
20 reconciled, you would not have situation where
21 you would have both the firm and customer having
22 a claim to the same number of shares at the
23 depository.
24     Q.   Were Lehman stock records reconciled
25 fully over the weekend of September 20 and 21?

Page 250

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    A.    No, which is what led to the
3    inconsistencies you referenced on my set of
4    files that I first produced.
5        Q.    Those are those 800 Cusips that were
6    not delivered, many of which were in fact
7    determined ultimately to be encumbered, not
8    unencumbered securities, correct?
9        A.    Yes.
10        Q.    Why were Lehman's stock records not
11    fully reconciled over that weekend?
12        A.    Well, as I'm sure you're aware, the
13    financial markets were going through down --
14    quite of a meltdown in that period and, more
15    specifically, Lehman Brothers.  There was an
16    inordinate amount of activity going through our
17    clearance boxes, through our front ends and back
18    ends processing systems.
19        In addition to that, there were
20    relationship troubles with JPMorgan Chase, and
21    as a result of that, there was information that
22    was typically received, like file transfers that
23    represent statement balances and things like
24    that, that we would normally expect to receive
25    from our custodians which were not sent to

Page 251

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    Lehman Brothers on either the 19th or during bat
3    or during bat cycles on the 20th.  So it was
4    very difficult to do a reconciliation without a
5    complete set of data.
6        Q.    Did you ever get to have a complete
7    set of data such that you could make that
8    reconciliation?
9        A.    The firm received additional data.  I
10    personally wasn't in charge of those
11    reconciliations.  So, as to the nature of its
12    completeness, I couldn't testify to that.
13        Q.    Who was in charge of any subsequent
14    reconciliations of the firm's stock records?
15    And my question is with respect to Schedule B or
16    subsequent iterations of Schedule B, as far as
17    you're aware, sir.
18        A.    Well, that's two questions.  So
19    there's a group that's responsible for the stock
20    record reconciliations, which is the firm
21    Balancing Department, which I don't remember who
22    was in charge of it at the time, but it would
23    have been the firm Balancing Department that's
24    responsible for that in conjunction with the
25    Clearance folks.

Page 252

HIGHLY CONFIDENTIAL - J. HRASKA

1
2        They focused on putting the stock
3    record back in balance, but I don't know whether
4    there was any reconciliation once the stock
5    record was back in balance to the original
6    Schedule B.
7        Q.    The securities that were transferred
8    from Lehman to Barclays on the 19th?
9        A.    Yes.
10        Q.    Was it your idea to transfer those or
11    was that the idea of someone you reported to?
12        A.    It wasn't that it was a unique idea of
13    my own.  What it was, it was a normal course
14    transaction, which we had previously deposited
15    cash as a result of the problems we had the
16    night before.
17        And in a repo transaction, I think I
18    mentioned earlier, you typically wouldn't
19    deposit cash to get cash.  So it's, you know,
20    it's a normal course transaction and it was a
21    situation where you're not using your collateral
22    efficiently to try to find substitute
23    collateral.  Especially in a tri-party
24    arrangement, you have full rights to go ahead
25    and do that, and that type of transaction is

Page 253

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    typically affected by Operations personnel, not
3    Trading personnel.
4        So, you know, I discussed with the
5    folks at Barclays the previous night and, you
6    know, and at Lehman that we were going to, you
7    know, the next morning we were going to look to
8    do exactly that and replace the cash with, you
9    know, substitute collateral.
10        Q.    Can you be more specific about the
11    names of the people you discussed this with?
12        A.    At Barclays I spoke to John Rodefeld
13    about it, and at Lehman I would have spoke to
14    Monty Forrest and Alastair Blackwell about it.
15        Q.    And did Mr. Forrest and Mr. Blackwell
16    approve of this transaction?
17        A.    Yes, they understood it to be a normal
18    course function that I would have done at any
19    other point in time.
20        Q.    So I'm clear, it was something that --
21    this transfer of approximately $1.1 billion was
22    done on your initiative, correct?
23        A.    That's correct, yes.
24        Q.    But what you say is this is something
25    that was --

Page 254

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     A.   Commonplace.
3     Q.   -- commonplace in this commercial
4  situation?
5     A.   Yes.
6     Q.   And the underlying commercial contract
7  that governed this transaction was the tri-party
8  repo that you've testified about today?
9     A.   Yes.
10    Q.   And just so the record is clear, no
11  cash was ever returned to Lehman in return for
12  this transfer of $1.1 billion in additional
13  unencumbered collateral to Bank of New York on
14  the 19th of September, correct?
15    A.   To my knowledge, that's correct.
16    Q.   I have a few documents to show you.
17       (Exhibit 147B, an e-mail sent from Mr.
18    Hraska to Paolo Tonucci, copying others, on
19    Friday, the 19th of September, 2008, marked
20    for identification, as of this date.)
21    Q.   Showing you, Mr. Hraska, what I've
22  marked as Tab 147B.  Let me know when you've had
23  a chance to look at that document.
24       (Document review.)
25    A.   Okay.

Page 255

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     Q.   I'll identify this for the record as
3  an e-mail sent from Mr. Hraska to Paolo Tonucci,
4  copying others, on Friday, 19th of September,
5  and at this time written here 2:28 P.M. is in
6  GMT.  So in Eastern Standard Time, that's about
7  10:30 in the morning.
8     A.   Uh-huh.
9     Q.   Do you recognize this document, sir?
10    A.   I do.
11    Q.   The subject is pledges.  It says,
12  "Paolo," and you write to Mr. Tonucci, "We
13  managed to pledge over about 800 MM in MV to
14  BarCap."  What does that mean?
15    A.   "MM" is a term that means millions,
16  and "MV" is market value.  So the assets that we
17  had pledged over up to that point were, in our
18  estimation, from the, you know, our systems, the
19  way we had them marked, was worth about 800
20  million in value.
21    Q.   So the 800 in MV is Lehman's marks?
22    A.   Those are Lehman's marks, yes.
23    Q.   And was this a transfer that you had
24  instructed on Friday morning, the 19th?
25    A.   That was part of it.  Being that it's

Page 256

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  only 800 million, I don't believe it was all of
3  it that ultimately ended up getting transferred
4  over.
5     Q.   Is this 800 million part of the 1.1
6  million we have just been discussing that was
7  transferred that same day, the 19th?
8     A.   It would have been, yes.
9     Q.   You go on to say, "We may have
10  identified another 500 million, but I wanted to
11  check with you first before pledging it to
12  them."
13    A.   Yes.
14    Q.   Do you recall whether Mr. Tonucci
15  replied to you?
16    A.   I don't recall.
17    Q.   That's all I have for that document.
18       (Exhibit 148B, an e-mail chain, the
19    first in time dated September 19, 2008, at
20    3:43 P.M., marked for identification, as of
21    this date.)
22    Q.   I've handed you a document I have
23  marked as Exhibit 148B.  Tell me when you've had
24  a chance to look through it.
25       (Document review.)

Page 257

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     Q.   Of course, you are welcome to look at
3  the whole document.  It's really the original
4  e-mail at 3:43 P.M. that I'm going to focus my
5  questioning on.  It's a two-page document.  It's
6  double-sided.
7     A.   I didn't realize it was double-sided.
8  I'm sorry.
9       (Document review.)
10    A.   Okay.
11    Q.   At 3:43 P.M. on Friday, 19th, you
12  write to Mr. Feraca, Mr. Aronow, and others, on
13  the subject of an urgent tri unwind.  You say,
14  "We pledged only 800 million of new collats to
15  BarCap.  All is frozen."
16    A.   Are we talking about the same
17  document?
18       (Indicating.)
19    A.   Oh, on the very last sentence.  I'm
20  sorry.  Okay.  I'm sorry.  Go ahead.
21    Q.   Do you see where it says, "We pledge
22  only 800 million of new collat to BarCap.  All
23  is frozen"?
24    A.   I do, yes.
25    Q.   Does that refresh your recollection

Page 258

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  about the amount of collateral you posted with
3  Barclays on the 19th of September?
4      A.  It may have been the market value at
5  that particular point in time.  We are still
6  able to pledge through -- at 3:43 it would have
7  been a time that we still technically would have
8  been able to pledge assets from DTC to Barclays
9  if we determined there was availability.
10      So at the time, I'm comfortable that
11  that's what it was, but as it determined later,
12  we moved more than 800 million worth of
13  securities.
14      Q.  What do you mean "all is frozen"?
15      A.  I don't know.  Looking at it now, I
16  don't really recall the context of what I was
17  referring to with "frozen."  I apologize.
18      Q.  Does it perhaps refer to your earlier
19  testimony and to Chase freezing the movement of
20  any further cash?
21      A.  To be honest, I don't know.
22      Q.  Okay.
23      MR. SHAW:  Are you done with this one?
24      MR. OXFORD:  Yes.
25      (Exhibit 149B, an e-mail from Gene

Page 259

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  Lempert, to Mr. Hraska, Sunday, September
3  21, at 3:38 A.M. GMT, or 11:38 P.M. EST,
4  marked for identification, as of this date.)
5      Q.  Did you have an understanding, Mr.
6  Hraska, that the 800 million of collateral we
7  have just been discussing was of particular
8  importance to the deal?
9      A.  Can you specify the deal you're
10  referring to?
11      Q.  The transaction between Lehman and
12  Barclays, the purchase transaction.
13      A.  At that point in time, the
14  significance of that transaction to me was that
15  we were trying to do a substitution for part of
16  the 7 billion that we had pledged over the
17  previous night in cash.
18      Q.  And what was the purpose of the
19  substitution of this collateral for cash?
20      A.  The purpose was purely efficiency of
21  collateral usage.  If you're going to obtain
22  financing on a secured loan, you typically get
23  cash, right?  You pledge an asset.  It wouldn't
24  make sense to get cash and pledge cash right
25  back again, so that's why we were looking to

Page 260

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  substitute securities as opposed to cash on that
3  repo transaction.
4      Q.  Was Lehman trading that day, the 19th?
5      A.  Lehman was -- was trading, yes.
6      Q.  And was the cash needed for any
7  particular activity?
8      A.  I don't know that I could effectively
9  comment on that.  I mean, they were trading.
10  They would have had cash requirements.  So but
11  as to whether it was for a particular activity,
12  I don't know.
13      Q.  No one articulated a particular need
14  or purpose behind this cash?
15      A.  No.
16      Q.  If you look at what I have marked as
17  Exhibit 149B, please.
18      A.  Sure.
19      Q.  And let me know when you've had a
20  chance to look at it.
21      (Document review.)
22      MR. OXFORD:  For the record, I'll
23  identify this as an e-mail from Gene
24  Lempert, to Mr. Hraska, Sunday, September
25  21, at 3:38 A.M. GMT, or 11:38 P.M. EST.

Page 261

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      MR. SHAW:  The previous night.
3      MR. OXFORD:  Yes, previous night.
4  Thank you.
5      A.  Okay.
6      Q.  Do you recall this document, sir?
7      A.  I do, yes.
8      Q.  It appears from the document that some
9  technical staff were trying to restore a
10  database; is that correct?
11      A.  Yes, that's correct.
12      Q.  And that's the database called Magics?
13      A.  That's correct.
14      Q.  What is the particular file that the
15  technical people are trying to restore, if you
16  know?
17      A.  This was the file of the assets
18  transferred on the 19th which made up the 1.0345
19  million.
20      Q.  Do you have an understanding of why
21  there was an attempt made to restore this file?
22      A.  At some point in time, I don't recall
23  who it was, but somebody had asked that we made
24  sure we were able to retain records of
25  everything that we had transferred over or were

Page 262

HIGHLY CONFIDENTIAL - J. HRASKA

1 we sure that all the records that we had were
2 going to be able to prove out what we
3 transferred over.
4        For the assets that were held in the
5 O74, the mechanism that we used to transfer was
6 the front end system Magics connected to our O74
7 DTC depo, and because we were delivering them to
8 the Bank of New York, which was not anyplace
9 that we had delivered prior to the 18th, we
10 weren't 100 percent sure that these records
11 would have been stored in the database.  So I
12 was double-checking to make sure the database
13 hadn't been overwritten because it was a
14 brand-new process.
15        I testified a little bit earlier we
16 had no connectivity to the Bank of New York
17 prior to the 18th, so that was me confirming
18 that we in fact would have had the records
19 available to us.
20   **Q.   If I understand your testimony**
21 **correctly, it was your idea to have the file**
22 **restored; is that correct?**
23   A.   Yes, that's correct.
24   **Q.   Do you see on the front page of the**

Page 263

HIGHLY CONFIDENTIAL - J. HRASKA

1 **document I have marked as the exhibit that you**
2 **write to Mr. Lempert at 11:17 P.M. on Saturday,**
3 **do you see that?**
4   A.   Yes.
5   **Q.   It says you're working through the**
6 **night, as I imagine a number of other people**
7 **were.  The second paragraph says, "The BarCap**
8 **purchase of us hinges on us having enough**
9 **collateral to cover shortfall."**
10        **What did you mean by that?**
11   A.   Honestly, I don't know.  I assume it
12 was based off of a comment that somebody had
13 made to me, but I just don't remember the
14 particular context of that.  I'm sorry.
15   **Q.   Do you know what "shortfall" means in**
16 **this context?**
17   A.   I don't.  I mean, prior to seeing
18 this, I didn't remember making that comment, so
19 I don't.
20   **Q.   If I understand your testimony**
21 **correctly, your having restored a file that**
22 **relates to the transfer of a billion dollars of**
23 **collateral that's already gone to BarCap?**
24   A.   That's true, yes.

Page 264

HIGHLY CONFIDENTIAL - J. HRASKA

1   **Q.   I guess your comment doesn't make any**
2 **sense to me in that context.  Why would the**
3 **restore of a file for a transfer of a billion**
4 **dollars of data that's already -- I'm sorry, a**
5 **billion dollars of collateral that's already**
6 **been transferred relate to the question of**
7 **whether or not you have enough collateral to**
8 **cover a shortfall?**
9   MR. SHAW:  Objection to form.
10   A.   I honestly don't know.  If I could
11 remember the context of why I wrote the
12 sentence, I would be able to answer you, but I
13 just don't remember why I put this in here.
14   **Q.   Maybe if you hadn't been up all night,**
15 **you would remember.**
16        **The next sentence says, "This 800**
17 **million is critical to the deal."  Do you recall**
18 **writing that?**
19   A.   I don't recall writing it.  Obviously
20 I did write it, but I don't recall writing it,
21 no.
22   **Q.   Sitting here today, do you know what**
23 **you meant when you told Mr. Lempert that this**
24 **800 million is critical to the deal?**

Page 265

HIGHLY CONFIDENTIAL - J. HRASKA

1   A.   No.  Quite honestly, I'm confused on
2 the number of 800 because it doesn't tie into
3 any of the other things we were talking about in
4 this.  I know that on that day we transferred --
5 on the 19th, we transferred a billion-35.  So I
6 honestly don't know where that 800 number ties
7 in.
8        (Exhibit 150B, Mr. Lempert to J.
9 Hraska and others, Sunday, 9/21, at 1:34
10 A.M. GMT, marked for identification, as of
11 this date.)
12   **Q.   I'm handing you what I have marked as**
13 **Exhibit 150B, which is an e-mail from Mr.**
14 **Lempert to you and others, Sunday, 9/21, at 1:34**
15 **A.M. GMT, which is 9:34 P.M. Eastern, on**
16 **Saturday.  Let me know when you've had a chance**
17 **to look through that document.**
18        (Document review.)
19   A.   Okay.
20   **Q.   This is an e-mail that I think relates**
21 **to the same topic as Exhibit 149.  On the second**
22 **page there's an entry in the string at 8:19 P.M.**
23 **There's an e-mail from you to Mr. Lempert and**
24 **others.  It says, "Mike, I urgently need to get**

Page 266

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   a hold of a file that shows all the items we
3   pledged to BONY 885 on Friday.  Pete says it was
4   around about 800 million MV.  Need this for
5   Paolo.  Please send to Nancy and I."
6       Is this your original request for the
7   restore to Mr. Lempert?
8       A.   It is, yes.
9       Q.   What's BONY 885?
10      A.   This is the Bank of New York pledge
11  location at DTC.
12      Q.   You say, "Need this for Paolo."
13      A.   I believe --
14      MR. SHAW:  There's no question
15  pending.
16      Q.   What do you believe?  Was this
17  something that Mr. Tonucci had asked you for?
18      A.   I believe that Paolo had requested
19  that we make sure we had complete records of
20  everything that we transferred on the deal,
21  which is why I needed it for Paolo.
22      Q.   You'll see there's a file attached to
23  this document and the file is named
24  Tri49192008.XLS, you see that?
25      A.   I'm sorry.

Page 267

HIGHLY CONFIDENTIAL - J. HRASKA

1
2       Q.   It's the attachment on --
3       A.   Right.  Okay.  And this file behind
4   it -- that's it, right.
5       Q.   Is it that file?
6       Do you believe that this is the
7   restored file of the unencumbered collateral
8   that you had transferred to the Bank of New York
9   for the benefit of Barclays on September 19,
10  2008?
11      A.   Yes.
12      Q.   That's all I had for that document.
13          (Exhibit 151B, an e-mail from Monty
14  Forrest to Mr. Lowitt, Mr. Blackwell, Mr.
15  Ullman and J. Hraska, copying Mr. Tonucci
16  and others, sent on Sunday, 9/21, at 9:16
17  A.M. GMT, marked for identification, as of
18  this date.)
19      Q.   Mr. Hraska, I've handed you a document
20  marked Exhibit 151B, which I'll identify for the
21  record as an e-mail from Monty Forrest to Mr.
22  Lowitt, Mr. Blackwell, Mr. Ullman and you,
23  copying Mr. Tonucci and others, sent on Sunday,
24  9/21, at 9:16 A.M., GMT, or 5:16 A.M. eastern.
25  Let me know when you've had a chance to review

Page 268

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   that.
3       (Document review.)
4       A.   Okay.
5       Q.   Do you recall this document?
6       A.   I do.
7       Q.   First of all, if I can direct your
8   attention to the e-mail that begins at the
9   bottom of page 1, the top of page 2, from Mr.
10  Lowitt that is sent to you, Monty Forrest,
11  Alastair Blackwell and Neal Ullman.
12      Do you recall receiving that e-mail
13  from Mr. Lowitt?
14      A.   I remember this string.  I don't
15  particularly remember this particular blurb.
16      Q.   Did you attend the 7 A.M. meeting?
17      A.   I did not, no.
18      Q.   Mr. Lowitt says, "Good luck getting
19  additional collateral, but to get accurate
20  presentation of the collateral is also critical
21  as we will append to the agreement," do you see
22  that?
23      A.   I do, yes.
24      Q.   Do you recall reading that at the
25  time?

Page 269

HIGHLY CONFIDENTIAL - J. HRASKA

1
2       A.   No.
3       Q.   Did you have any understanding at the
4   time you received this e-mail or at any time
5   over the weekend that the work you did to
6   identify additional collateral would be appended
7   to any type of agreement?
8       A.   No, unfortunately.  The weekend, as we
9   discussed previously, I mean, I can't even tell
10  you how many hundreds of e-mails I got.  So it's
11  conceivable that I didn't see everything in
12  every e-mail, so...  I just don't recall this
13  passage.
14      Q.   Monty Forrest replies to the chain and
15  he says, "We have analyzed any unencumbered
16  assets in all boxes that were not picked up by
17  financing systems."  Do you know what that
18  means?
19      MR. SHAW:  Objection to form.
20      A.   I don't know what he means by that
21  phrase.  It wouldn't have been the way I would
22  have phrased it, but ...
23      Q.   How would you know how to phrase it if
24  you don't know what he means?
25      A.   Well, he provides a market value of

Page 270

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 the collateral, and those market values came
3 from the work that me and my team did. So I
4 don't know why he's referencing finance systems
5 here. These were collateral pieces that were
6 based in the mainframe which was picked up by
7 GFS. I'm just not sure what he's referring to
8 by "financing systems."
9     Q.    So you see there's a total there, Mr.
10 Hraska, of close to $2.3 billion?
11     A.    Yes.
12     Q.    Does that represent the unencumbered
13 assets that, at least as of the date of this
14 e-mail, you and your team had been able to
15 identify?
16     MR. SHAW: Objection to form.
17     A.    I can't be certain. I can't be a
18 hundred percent certain. I don't know.
19     Q.    Did you look for unencumbered assets
20 in any location other than those listed in the
21 e-mail from Mr. Forrest here?
22     A.    We looked for all unencumbered assets
23 in the stock records. These were the ones that
24 we thought that had the highest probability of
25 having unencumbered assets in them. They were

Page 271

HIGHLY CONFIDENTIAL - J. HRASKA

1
2 our primary clearance boxes.
3     Q.    Were you looking for physical
4 securities as well, Mr. Hraska, that weekend?
5     A.    We had, yes, we had looked through
6 some of the clearance locations for physical
7 securities, but based on the analysis, we, over
8 the course of that weekend, weren't confident
9 enough that we could determine whether those
10 assets were unencumbered or not so we left them
11 off of this analysis.
12     Q.    Did you leave physical securities off
13 not just this analysis, but any analysis of
14 unencumbered assets you provided to Mr. Forrest?
15     MR. SHAW: Objection. Vague as to
16 time.
17     Q.    My question is specifically with
18 respect to this weekend of the 20th and 21st of
19 September.
20     A.    We did an analysis of this weekend.
21 Based on that analysis, we didn't forward any
22 value of unencumbered securities which were
23 physical.
24     Q.    You see the paragraph immediately
25 following the 2.3 billion number?

Page 272

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     A.    Uh-huh.
3     Q.    Relates to BONY Tri Pledge line item?
4     A.    Yes.
5     Q.    Does that refresh your recollection
6 about any of your prior testimony about the
7 reason the file was restored?
8     A.    Well, it was restored because we
9 wanted to maintain records, but according to
10 this, it appears that complete restore maybe
11 wasn't possible. But I wouldn't change my
12 reason to have requested the restore on the
13 file.
14     Q.    After reading this e-mail, is it still
15 your testimony that the transfer of
16 approximately $1.1 billion from Lehman to BONY
17 pledged to Barclays on the 19th of September
18 settled?
19     A.    Yes.
20     Q.    That's all I have with that exhibit.
21     I'm handing you, Mr. Hraska, a
22 one-page document that's previously been marked
23 Exhibit 93B. If you can take a look at that and
24 let me know when you've reviewed it, please.
25     I'm sorry, it's a two-page document.

Page 273

HIGHLY CONFIDENTIAL - J. HRASKA

1
2     (Document review.)
3     Q.    I'll direct your attention to item 1
4 in the box, and if you would just identify for
5 the record. This document is entitled
6 "Management of Unencumbered Asset Gap."
7     Actually, let me first direct your
8 attention to the first line that says,
9 "Objective: Delivery to BCI of 1.95 billion of
10 unencumbered collateral by COB Friday, September
11 19." Do you see that?
12     A.    I do, yes.
13     Q.    Were you aware of any objective to
14 deliver 1.95 billion of unencumbered collateral
15 to Barclays by the close of business on Friday,
16 the 19th?
17     A.    No.
18     Q.    Item 1 in the box that's headed
19 "Current Status Summary" is "Actual Delivery EOD
20 Friday." Do you see that?
21     A.    I do.
22     Q.    Do you believe that refers to the
23 approximately $1.1 billion of collateral that
24 we've been discussing that was transferred from
25 Lehman to Bank of New York on Friday, 19th?

Page 282

HIGHLY CONFIDENTIAL - J. HRASKA

1      HIGHLY CONFIDENTIAL - J. HRASKA
2   transfers.
3      Q.   That's all I have for that document.
4      Could you pick out Exhibit 140B and
5   maybe 141B while you're at it.
6      A.   Would these have been much earlier or
7   were these exhibits marked earlier on?
8      Q.   These would have been exhibits marked
9   by Mr. Hine.
10     A.   What was the number?
11     Q.   140B and 1401B.
12     A.   You said 140B and 141B?
13     Q.   140 and 141.
14     A.   Okay.
15     Q.   Let's do 140B first.
16     A.   Okay.  Did you have any involvement in
17  preparing any of the schedules that are attached
18  to this document?
19     MR. SHAW:  Asked and answered.
20     Q.   And the answer was no?
21     A.   The answer is no.
22     Q.   Are you able to identify what the
23  first spreadsheet attached here is, either by
24  reference to the spreadsheet itself or by
25  reference to the e-mail?  And if it helps, the

Page 283

1      HIGHLY CONFIDENTIAL - J. HRASKA
2   fourth paragraph of the e-mail says, "The
3   attached document entitled DTC O74 and 636
4   available.  Call," is the second part of
5   Schedule B.
6      A.   No, these file names don't appear
7   familiar to me.  By looking at this file, this
8   doesn't look like a file that I produced.
9      Q.   If you look at Bates range ending
10  52704?
11     A.   52704?
12     Q.   Which is just before the second blue
13  piece of paper.
14     A.   Okay.
15     Q.   Do you see that?
16     A.   52704?  Yes.
17     Q.   Do you see at the bottom of the column
18  headed "Lehman Market Value" there's a figure
19  approximately $269 million?
20     A.   Yes, right.
21     Q.   Does that refresh your recollection
22  about what this spreadsheet refers to?
23     A.   269 million was approximately one of
24  the market values from one of the DTC boxes.  I
25  don't recall which, but that's what that would

Page 284

1      HIGHLY CONFIDENTIAL - J. HRASKA
2   have -- that's what that would have referred to.
3      Q.   I take it since you were not involved
4   in the preparation of this document you are not
5   able to tell me whether or not these records
6   included the 800 Cusips that were on the
7   exception list we've previously discussed?
8      A.   No.
9      Q.   Okay.  That's all I have for that
10  document.
11     Can you have 141 in front of you,
12  please?  Sorry, 141B.  Same question.  I just
13  wanted to make sure I understood your testimony.
14     So you were not involved in the
15  preparation of these attachments?
16     A.   I was not involved in the preparation
17  of these.
18     Q.   And from a review of the e-mail on the
19  attachments themselves quickly, are you able to
20  tell me what they are?
21     A.   Based off the e-mail, they appear to
22  be Schedule A and B, but I --
23     Q.   But beyond that, you have no
24  independent knowledge?
25     A.   No.  Sorry.

Page 285

1      HIGHLY CONFIDENTIAL - J. HRASKA
2      Q.   Thanks.  That's all I have for that.
3      I'm handing you a document that's
4   previously been marked as Exhibit 85B.  If you
5   could take a moment to look at the e-mail, and
6   in particular to the first page behind the blue
7   sheet, which is entitled "Lehman
8   Brothers/Barclays APA Lead Sheet."
9      And let me know when you've had a
10  chance to do that, please.  The Bates range of
11  85B is BCI-EX-S-00004396 through 4675.
12     (Document review.)
13     A.   Okay.
14     Q.   Do you recognize this document, sir?
15     A.   Only from the preparation I did for my
16  deposition of my 30(b)(6).
17     Q.   Other than in preparation for your
18  deposition, have you ever seen this before?
19     A.   No.
20     Q.   Do you know who the people are who are
21  identified on this e-mail chain from Mary
22  Korycki sent September 29 at 8:19 P.M.?
23     MR. SHAW:  Are you going to go through
24  each person and say who they are?
25     MR. OXFORD:  Uh-huh.

---

Page 290

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2  knowledge, there were no transfers on 9/26. I
3  believe that's the market value of the positions
4  that were transferred on 9/19.
5      Q.   If there were transfers from the DTC
6  box of Lehman to Barclays on 9/26, would you
7  know about it?
8          MR. SHAW:  Objection to form.
9      A.   I don't know.
10     Q.   Would you expect to know about it?
11         MR. SHAW:  Objection to form.
12  Incomplete hypothetical.
13     A.   I would hope to know about them.
14     Q.   The next set of entries relates to
15  Monday transfers.  Do you see those?
16     A.   Yes.
17     Q.   Are you aware of any transfers from
18  Lehman to Barclays of unencumbered securities on
19  Monday, September 29?
20     A.   Yes, I am.
21     Q.   Are those transfers the transfers that
22  are reflected in this lead sheet totaling
23  approximately 333 million?
24     A.   I recognize the 269.  I can't confirm
25  the 63.

---

Page 291

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2      Q.   How is it you recognize the 269?
3      A.   I recognize the 269 as positions that
4  we had in 636.
5      Q.   I notice that the figure that you say
6  you recognize of a Monday transfer of
7  $269,921,368 is similar to the figure above?
8      A.   Yes.
9      Q.   At 36 -- sorry, 636?
10     A.   Right.
11     Q.   But not identical?
12     A.   Yes, that's true.
13     Q.   Do you believe the relationship
14  between these figures is anything other than
15  coincidental?
16     A.   I'm sorry, could you repeat that one
17  more time?
18     Q.   Do you believe there's any
19  relationship between those two figures of 269
20  million as they appear on this page?
21         MR. SHAW:  Objection to form.
22     A.   I believe they are the same block of
23  securities, meaning that this is what was deemed
24  to be available and this was when it was
25  actually transferred.

---

Page 292

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2      Q.   And you believe those to be
3  unencumbered securities that were in Lehman's
4  636 box at DTC as of Monday, September 29, 2008,
5  correct?
6      A.   As of Monday, I'm sorry, which date?
7      Q.   As of Monday, September 29.
8      A.   Yes, that's correct.
9      Q.   Do you have any information about the
10  figure that appears below the 269, the second
11  269 million figure we've been looking at,
12  $63,569,597?
13     A.   No, that figure is not familiar to me.
14     Q.   If you wanted to find out what that
15  figure referred to, who would you ask?
16     A.   Well, in relation to this document, I
17  would ask one of the people CC'd on this e-mail.
18     Q.   There's a reference in Footnote 1 to
19  chilled securities, do you see that?
20     A.   Yes.
21     Q.   Do you know what that chilled
22  securities are?
23     A.   Yes, I know what chilled securities
24  are.
25     Q.   What are they?

---

Page 293

HIGHLY CONFIDENTIAL - J. HRASKA

1  
2      A.   They are securities which have their
3  movement between DTC locations restricted for
4  one reason or another.
5      Q.   That's all I have for this document.
6          (Exhibit 155B, a document bearing
7      Bates Nos. BCI-EX-S-00017385 and 7386,
8      marked for identification, as of this date.)
9      Q.   I'm handing you, Mr. Hraska, what I
10  have marked as Exhibit 155B, a document marked
11  BCI-EX-S-00017385 and 7386.  The attachment was
12  produced to me in native form, which is why it
13  doesn't have a Bates range.
14         MR. SHAW:  So that's also why a number
15  of columns are truncated.
16     Q.   If you could let me know when you've
17  had a chance to review that, Mr. Hraska, I've
18  got a couple questions.
19         (Document review.)
20     A.   Okay.
21     Q.   Do you recognize this document?
22     A.   I do, yes.
23     Q.   It appears to be a document e-mailed
24  by Mr. Forrest to Alastair Blackwell and Mr.
25  Tonucci, copying you, on the subject of

## Page 294

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  "additional collateral moved to BarCap."  Is
3  that right?
4      A.   That's correct, yes.
5      Q.   There's an attachment to this
6  document.  Were you involved in creating it?
7      A.   My team provided the data to create
8  it, but we didn't actually create it.
9      Q.   When you say "your team," who do you
10 mean by "your team"?
11     A.   Meaning myself, and this particular
12 data was provided by myself and Nancy Denig.
13     Q.   Do you have a recollection of
14 providing this data specifically to Mr. Forrest
15 on or around September 30, 2008?
16     A.   Yes.
17     Q.   Do you know the purpose for which you
18 were providing this data to Mr. Forrest?
19     A.   He had asked me for a summary of
20 collateral that we had transferred to Barclays
21 from the 19th to present day that we actually
22 physically were able to move from the Lehman
23 depositories over to Barclays.
24     Q.   Where did you find the information to
25 provide to Mr. Forrest?

## Page 295

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.   They were from spreadsheet records
3  that I had kept in my group.  The same
4  spreadsheet records which we referenced earlier
5  had been reconciled with both the Barclays
6  Operations folks and Bank of New York.
7      Q.   Are these spreadsheets you took with
8  you when you moved to Barclays?
9      A.   The spreadsheets are saved in a common
10 drive somewhere.  I don't know that I still have
11 access to them or not.
12     Q.   "Mr. Hraska, here is a summary of the
13 what has been moved in order to satisfy the
14 additional collateral move of 1.95 billion to
15 BarCap.  I had also shown the outstanding amount
16 due.  We will continue to identify available
17 unencumbered collateral as the stock record
18 breaks clean up."
19     Do you see that?
20     A.   Yes.
21     Q.   Do you know what Mr. Forrest meant
22 when he said, "We will continue to identify
23 available unencumbered collateral as the stock
24 record breaks clean up"?
25     A.   Yes.  When we had spoke a little

## Page 296

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  earlier about the inconsistencies with the stock
3  record and the initial collateral availability
4  lists that were provided not being accurate, so
5  after we had moved over some of the collateral,
6  and as the stock record breaks cleared up, we
7  kept looking for -- looking at the stock record
8  and trying to find additional available
9  collateral that was now unencumbered as a result
10 of resolution of the breaks.
11     Q.   Do you recall for how long you were
12 engaged in that effort to find additional
13 unencumbered collateral?
14     A.   During which timeframe?
15     Q.   At any time post the closing of the
16 transaction between Lehman and Barclays on the
17 22nd of September, 2008?
18     A.   I was involved in an effort up until
19 probably approximately a month ago.
20     Q.   Who else was involved in that effort?
21     A.   Robert Azerad's team.
22     Q.   Who is on Mr. Azerad's team with
23 respect to this effort?
24     A.   Well, he's no longer on the team
25 anymore.  It would have been a gentleman by the

## Page 297

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  name of Colin Telmer, T-E-L-M-E-R.  He's still
3  employed at Barclays.  He's just not working
4  with Mr. Azerad anymore.
5      Q.   Anybody else?
6      A.   There was another gentleman initially
7  involved, but he subsequently left the firm, and
8  as well Mr. Telmer took over his work and
9  continued -- his name was John Virgil Del Dios,
10 I believe.  I'm not exactly a hundred percent
11 sure of the spelling of that.  I believe it's
12 D-E-L  D-I-O-S, but best I can do.
13     Q.   Do you understand that this effort to
14 identify additional collateral to move from
15 Lehman to Barclays is still ongoing within
16 Barclays, or do you believe that it's complete?
17     A.   From my perspective, I believe it's
18 complete.  I haven't been asked to do anything
19 else in probably at least a month or so's time.
20     Q.   Who asked you to identify this
21 additional collateral?
22     A.   Robert Azerad.
23     Q.   These requests at any time from
24 September 30th or thereabouts, 2008, until about
25 a month ago all came from Mr. Azerad?

Page 298

HIGHLY CONFIDENTIAL - J. HRASKA

1
2    A.    Yes.
3    Q.    Did you have any conversations with
4  anybody other than Mr. Azerad, Mr. Telmer, and
5  Mr. Del Dios about your ongoing efforts to
6  identify additional unencumbered assets to be
7  moved from Lehman's clearance boxes to Barclays?
8    A.    I had conversations just to keep them
9  informed of my activities with both Messieurs
10 Forrest and Blackwell.
11   Q.    Could you take a look at the last page
12 of the spreadsheet that I have marked as Exhibit
13 155B.
14   A.    Uh-huh.
15   Q.    This spreadsheet includes data that
16 you provided to Mr. Forrest?
17   A.    Yes, that's correct.
18   Q.    Do you believe that data is accurate?
19   A.    Yes.  The one thing that -- the one
20 thing that I'm not sure is accurate is the
21 market value of the BONY, the BONY pledge.  I
22 knew that value to be a little bit less, so I'm
23 not sure why that's not a billion-035 that we've
24 been discussing.
25   Q.    And the second entry is the $269

Page 299

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  million transfer from Box 636 on the 29th of
3  September that we discussed previously, yes?
4    A.    Yes, that's correct.
5    Q.    There's another entry under Summary of
6  Collateral Moved from O74?
7    A.    Yes.
8    Q.    A transfer on 9/30/09, do you see
9  that?
10   A.    Yes.
11   Q.    That transfers, as reflected here, is
12 of $161,482,771, do you see that?
13   A.    Yes.
14   Q.    Do you know anything about that
15 transfer?
16   A.    That was the value of the assets that
17 were transferred on the 30th from O74 to
18 Barclays.
19   Q.    And were you involved in that
20 transfer?
21   A.    Yes.
22   Q.    What was your involvement in that
23 transfer?
24   A.    My involvement was can you help
25 identify the assets and coordinate with the

Page 300

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  settlement teams to get that transferred.
3    Q.    Did you or anyone on your team do any
4  due diligence to satisfy yourself that those
5  assets were not encumbered?
6    A.    Yes.
7    Q.    Can you tell me briefly what that was?
8    A.    Myself and the Settlements Team headed
9  by Neal Ullman verified that those were in fact
10 unencumbered and those transfers both for 636
11 and O74 were verified by Deloitte.
12   Q.    Who at Deloitte verified them?
13   A.    Ultimately, Margo -- I forgot her last
14 name.
15   Q.    Marlo.
16   A.    Marlo Karp.
17   Q.    And it's your testimony that Marlo
18 Karp verified them as transfers of Lehman's
19 proprietary assets that were to be transferred
20 from Lehman to Barclays under the purchase
21 agreement?
22   A.    I know that Marlo was involved in the
23 approval.  I don't know if she was specifically
24 the one that did the verification.  I know that
25 she was aware of it and someone from her team

Page 301

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  did the verification.
3    Q.    Do you have an understanding as to
4  when this verification that you say happened by
5  Deloitte, do you understand when it happened?
6    A.    It would have happened a few days
7  prior to the transfer dates.
8    Q.    If you were to learn that Deloitte was
9  not engaged by the trustee as of the date of
10 this supposed transfer, would that change your
11 testimony?
12   A.    No.
13   Q.    You still think even though they
14 weren't engaged they still did the verification?
15   A.    I know for a fact that they approved
16 these transfers.
17   Q.    How is it you can be so certain?  Did
18 you talk to someone about it?
19   A.    Well, I had conversations with Neal
20 Ullman, who said that that transfer was
21 approved, and I believe I have e-mails stating
22 that fact.  But I'm not a hundred percent
23 certain, but I believe I do.
24   Q.    So the basis of your -- because you
25 just testified that you were certain Deloitte

Page 302

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  approved these transfers a few days prior to the
3  29th and 30th.  That was your testimony,
4  correct?
5      A.  Yes, it was.
6      Q.   And the basis of your sworn testimony
7  is that Mr. Ullman told you this?
8      A.  Yes.
9      Q.   And you're sure that Mr. Ullman told
10  you Deloitte approved them?
11      A.  I'm -- I thought, unless it was the
12  trustee approved them.  They were definitely
13  approved, according to him, so -- it's my
14  recollection that it was Deloitte, but I -- it's
15  possible that it was the trustee itself and
16  not -- not Deloitte.
17      Q.   And any information you have about the
18  approval of these transfers, whether by Deloitte
19  or the trustee or the trustee's staff, comes
20  from which sources, Mr. Ullman?
21      A.  Mr. Ullman, yes.
22      Q.  Any other source?
23      A.  No.  I didn't see, if you're asking
24  for approval, I didn't see an approval document
25  from Deloitte or the trustee themselves.

Page 303

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      Q.   Have you seen any correspondence
3  reflecting that Deloitte or the trustee approved
4  this transfer?
5      A.  I can't be certain about that.
6      Q.  By this transfer, that was a bad
7  question, but I meant both the transfers on the
8  29th and the 30th that are reflected in this
9  document?
10      A.  Yes.
11      Q.   So, apart from this conversation with
12  Mr. Ullman, you have no independent basis to
13  testify that Deloitte or the trustee approved
14  these transfers on these dates, correct?
15      A.  That would be correct.
16      Q.  Do you remember when the conversation
17  with Mr. Ullman took place?
18      A.  It should have taken place on the --
19  prior to the transfers.  Period of a few days
20  prior to the transfers.  I can give you a range.
21  I don't know specifically what date.
22      Q.  That's fine.  Thank you.
23          Is it possible that those transfers
24  relate to the repo transaction?  And "those
25  transfers," again, I'm referring to the

Page 304

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  transfers on the 29th and 30th of September from
3  the 636 and O74 boxes at DCT that are reflected
4  on the spreadsheet attached to Exhibit 155B.
5      A.  So you're referring to the 29th and
6  30th, these transfers?
7      Q.  Yes.
8          MR. SHAW:  Objection to form.
9      A.  I'm sorry, could you read back the
10  question?
11          (Record read.)
12      A.  No.
13      Q.  How is it you can be sure of that?
14      A.  Because the repo had a maturity date
15  of September 25th, and prior to the maturity
16  date, the repo had been declared in default.
17      Q.  Just moving down that summary page,
18  sir, it reads, "Amount identified to be moved to
19  BarCap, $1.95 billion."  Was that a figure that
20  you provided to Mr. Forrest?
21      A.  No.
22      Q.  So this -- the math here about the
23  delta between the 1.95 billion and the total of
24  the amount of unencumbered security transferred
25  of 1.587 billion, that's Mr. Forrest's math?

Page 305

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.  Yes.
3      Q.  Do you believe that that figure of
4  total pledged/transferred that appears in this
5  spreadsheet we're looking at is an accurate
6  reflection of the collateral moved from Lehman's
7  unencumbered box to Barclays between the 19th
8  and 30th of September, 2008?
9          MR. SHAW:  Objection.  Asked and
10  answered.
11      A.  Yes, with the exception of the
12  discrepancy on market value, that I believe the
13  market value to be a billion-035.
14      Q.  Right.  I appreciate that
15  clarification.  You did say that.
16          You testified in response to one of
17  Mr. Hine's questions that you believed that
18  there was an additional amount of somewhere
19  between 6 and 7 hundred million dollars of
20  unencumbered securities --
21      A.  Uh-huh.
22      Q.   -- that you understand was due from
23  Lehman to Barclays?
24      A.  Yes, that's correct.
25      Q.  That's obviously a different number to

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  this delta figure of 362 million here?
3      A.   Yes, that's correct.
4      Q.   Do you have any understanding of the
5  reason for the difference?
6      A.   Well, this is purely a delta of the
7  two figures that Mr. Forrest provided.  The 600
8  to 700 million that I was referring to were
9  based off an analysis of unencumbered securities
10 in the Lehman boxes at a later date and time.
11 So I think that's where there's a discrepancy
12 because of the timing.
13     Q.   Are you able to estimate a total of
14 the unencumbered securities in the various
15 Lehman clearance boxes that you reviewed, either
16 over the weekend of the 20th and 21st of
17 September or subsequently, are you able to give
18 me a total of the unencumbered securities that
19 you believe you identified?
20     A.   On that weekend?  Or, when you say
21 "subsequently"?
22     Q.   At any time subsequently.  Obviously
23 you identified a figure that fluctuated, as we
24 saw in the documents that we looked at and you
25 looked at with Mr. Hine of approximately 1.9 to

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  2 billion dollars?
3      A.   Yes.
4      Q.   And you've subsequently identified
5  additional collateral you say of at least a few
6  hundred million?
7      A.   That's correct.
8      Q.   Correct.  Are you able to give me,
9  just in broad terms, an estimate of the total
10 amount of unencumbered collateral that you
11 believe you have identified?
12     A.   That would be available let's say as
13 of today if nothing had happened in the
14 clearance box?
15     Q.   Yes.  That's a much better question
16 than I would have been able to articulate.
17 Thank you.
18     A.   Yes, that's the 6 to 7 hundred million
19 dollar figure.
20     Q.   And the total would be the 6 to 7
21 hundred million dollar figure plus this $1.587
22 billion figure that has already been transferred
23 subject, of course, to your caveat that you
24 believe the BONY Tri Pledge number may be off by
25 a factor of 10 percent or so, is that correct?

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      A.   That's correct, yes.
3      Q.   Last document.
4          (Exhibit 156B, a letter from Cleary
5      Gottlieb Stein & Hamilton is James Kobak at
6      Hughes Hubbard dated October 6, 2009, marked
7      for identification, as of this date.)
8          (Discussion off the record.
9          (Recess; Time Noted:  5:24 P.M.)
10         (Time Noted:  5:30 P.M.)
11 BY MR. OXFORD:
12     Q.   You testified in response to a
13 question from Mr. Hine that you had been
14 involved, Mr. Hraska, in efforts to refine
15 Schedule B, do you remember saying that?
16     A.   Yes.
17     Q.   Can you tell me briefly about those
18 efforts to refine Schedule B?
19     A.   I don't know that I testified that I
20 was involved in an effort to refine Schedule B
21 but, rather, to identify additional assets that
22 perhaps were not on the original Schedule B that
23 were unencumbered.
24     Q.   And you were also involved, I think
25 you testified, in ascertaining that certain

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  assets that were on the exception list were in
3  fact encumbered and unavailable for delivery; is
4  that correct?
5      A.   I'm sorry, could you repeat that
6  question or just read it back to me?
7          (Record read.)
8      A.   That they were unavailable for
9  delivery.  I can't be certain that they were
10 unencumbered; just they were unavailable for
11 delivery.
12     Q.   Why would they be unavailable for
13 delivery other than the fact that they are
14 encumbered?
15     A.   It's possible that at a point in time
16 a particular asset wouldn't have been in the
17 actual box itself.  So, in other words, there
18 might have been an inventory position versus a
19 break account instead of versus the actual
20 repository.
21     Q.   Can you take a look at what I've
22 marked as 156B?
23     A.   Sure.
24     Q.   Which is a letter from Cleary Gottlieb
25 Stein & Hamilton is James Kobak at Hughes

Page 310

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Hubbard dated October 6, 2009.
3         Do you see that there are certain
4    attachments to that letter?  There are two
5    spreadsheets attached to that letter at the
6    back.
7         If you could take a moment to review
8    the spreadsheets and let me know, first of all,
9    if you need a magnifying glass and, second of
10   all, if you had any involvement in preparing
11   these spreadsheets.
12       (Document review.)
13   A.    The spreadsheets are not titled like
14   the content of the spreadsheet.
15   Q.    There's the description on the last
16   paragraph of page 2 going into page 3.
17   A.    Okay.  Last paragraph of page 2,
18   you're saying, right?
19   Q.    Yes.  The second line reads, "The
20   revised spreadsheet attached hereto as Exhibit A
21   lists undelivered clearance box assets having
22   Cusip numbers in which no LBI customers had long
23   positions on September 20, 2008."
24       MR. SHAW:  Why don't you take a minute
25   to read that paragraph of the letter.

Page 311

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Were you serious about the offer of a
3    magnifying glass?  Because I could use one.
4         MR. OXFORD:  I actually think I have
5    larger copies, which I don't intend to mark.
6    A.    I can't tell where Schedule A and B
7    are cut off.
8    Q.    Exhibits A and B?
9    A.    I'm sorry, Exhibits A and B.
10       (Document handed.)
11       MR. SHAW:  What is this you have
12   handed us?  Is this A, B, or --
13       MR. OXFORD:  These are blown up
14   versions of Exhibits A and B to the Cleary
15   letter dated March 6.  I don't think Cleary
16   marked them as either Exhibits A or B.
17   Q.    Mr. Hraska, I don't mean to cut short
18   your time to review these documents, but maybe
19   we can short-circuit it a little bit this way.
20       Do you recall being involved in the
21   preparation of these documents or any analysis
22   to determine lists of undelivered clearance box
23   assets having Cusip numbers in which no LBI
24   customers had long positions as of September 22,
25   2008?

Page 312

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    A.    Yes.
3    Q.    Tell me about your involvement in that
4    process.
5    A.    Sometime in October, we had changed
6    the sourcing of our search from unencumbered
7    collaterals from GFS to the pure stock record of
8    ADP, and the reason we did that is that we felt
9    that to be a more accurate source at that time
10   because, by that time, a lot of the stock record
11   breaks had been resolved and we were going to
12   go -- and the other mainframe, the MTS
13   mainframe, we felt was exhausted so there was no
14   need to use GFS to try to aggregate all that
15   data together at that point.
16       Also, GFS became a system that was
17   purchased or became part of the property that
18   was purchased by Barclays, so we thought it was
19   better just to refer to the pure mainframe,
20   which was considered books and records.  And the
21   methodology used was that we took a download of
22   the data from the technology folks of everything
23   on the stock record, and the logic that was
24   employed was that the first query was to return
25   us all the situations where there was a firm

Page 313

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    inventory long offset by a depo short, which
3    would be the depository, you know, off side of
4    that position, and where the Cusip had no other
5    position reflected on the stock record.  So,
6    therefore, no customer positions or anything of
7    that nature.
8         So, in our mind, we felt that that was
9    very clearly firm inventory only, there was no
10   chance that there was customer collateral in
11   that mix, and as long as there was a depo short
12   which offset to the asset long, we felt
13   confident that that would be considered a firm
14   unencumbered asset.
15       The next query was, there were Cusips
16   where there were a mix of firm inventory ledgers
17   long and customer account longs.  Those
18   positions would have been offset by, again, a
19   position in depo.  Every long has a short in an
20   amount in the stock record.  And the -- to be as
21   conservative as possible on the second list --
22   so the first list became known as List A in our
23   terms, right?  The second list became known as B
24   and we had to subdivide it.  So it became --
25   there is a B1 and a B2.

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   B1 was the situation where we compared
3   the total amount of customer positions into the
4   total amount in the depo, and we reduced the
5   amount of the depo balance by the customer long
6   position, and to the extent that anything was
7   left after reducing that balance down by what
8   the customer was long, we took that to be firm
9   unencumbered assets.
10      So just to -- because there's a lot
11  just to recoup that. So there was positions
12  where we had inventory in customer longs that
13  were mixed. To be conservative, we secured the
14  customer positions regardless of them having
15  debit balances or not. We said, to be the most
16  conservative, just reserve the amount of
17  customer long position, take it out of the
18  position in the depo, and whatever was left in
19  the depo would be considered List B1.
20      The B2 list was, looking at that same
21  population, we said, as a lender of cash or an
22  extension of credit to clients, you're entitled
23  to rehypothecate up to 140 percent of the debit
24  balance. So what we did then is we looked at
25  situations where clients had long positions but

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   they were running a debit balance, and to the
3   extent that they ran a debit balance, we claimed
4   that we had entitlement to a hundred percent of
5   the debit balance of the securities that were
6   long in those customers' accounts, and that
7   became B2.
8       And the last sample population was
9   scenarios where the only positions on the stock
10  record were customer long versus the depo
11  position, and those scenarios, using the same
12  rules I just described about the margin debit
13  balances, we looked at customer margin debit
14  balances, and to the extent that they had margin
15  debit balances, we took 100 percent of the
16  market value, or we took market value equal to
17  100 percent of the debit balance. That became
18  list C.
19      Q.  That's B3. That's the --
20      A.  Well, the way I classified them is the
21  way I knew them. So there was A, there was B1
22  and B2, and C. There was some discussions
23  about, because of the margin debit balance
24  calculation, there was some discussion about
25  combining B2 and C into one list by Robert

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   Azerad's team. I don't know if they ever
3   combined those lists or not. That may have
4   become, as you reference, either B3 or a C list,
5   I don't know.
6       Q.  In the analysis that you have just
7   described for me, did you make any distinction
8   between customers whose accounts were
9   transferred to Barclays and customers whose
10  accounts were not transferred to Barclays?
11      A.  In the analysis that we did, we used
12  the stock record of Lehman Brothers, Inc. prior
13  to those customers being put on the stock
14  record. The -- well, wait. Let me clarify
15  that.
16      The stock record we used was a solely
17  Lehman Brothers stock record. The stock record
18  that Barclays now owns as a result of the
19  technology that it had purchased in the Lehman
20  acquisition is a different stock record. So
21  it's the same -- it's the same mainframe and
22  it's the same vendor provider, but it's a
23  completely different set of records from Lehman
24  Brothers.
25      Q.  Are you able to summarize for me how

HIGHLY CONFIDENTIAL - J. HRASKA

1
2   it's different?
3       A.  The Lehman Brothers stock record only
4   has the Lehman Brothers entity and the -- and
5   all the Lehman Brothers stock record data,
6   whereas the new stock record is purely the
7   activity that's in the new Barclays Wealth
8   Entity and the Barclays activity that resides on
9   ADP Company 224.
10      The legal entities on ADP are known as
11  these company codes. So 224 is a BCI company
12  code on ADP, and that stock record is related to
13  the BCI entity on ADP. The company code for LBI
14  was 012, and it was, again, held on a different
15  version of ADP.
16      So the vendor basically copied the
17  functionality that he provided us under Lehman
18  Brothers and provided a new instance of the
19  package and the software and everything else,
20  but it was a completely different entity and it
21  was a different software.
22      Q.  Who else was involved with you in this
23  effort to create lists A, B and C?
24      A.  Robert Azerad, Colin Telmer. There
25  was some -- there was some Barclays Finance

Page 318

```
1        HIGHLY CONFIDENTIAL - J. HRASKA
2    folks who were also reviewing some of the
3    spreadsheets that we had produced over that
4    period.  I don't recall who was on the Barclays
5    finance side, but I'm sure Robert would.
6        And to the extent we had questions
7    about a particular status of a clearance box or
8    anything like that, Neal Ullman would have been
9    consulted.
10       Q.   Do you believe, Mr. Hraska, that the
11   work you, along with Mr. Azerad and others, did
12   to create lists A, B and C are ultimately
13   reflected in the spreadsheets that are attached
14   to the Cleary letter of March 6?
15       A.   These are versions of the spreadsheets
16   it looks like in form that we used.  I'm not a
17   hundred percent certain that these are the final
18   spreadsheets that Colin and I agreed that came
19   up to the total in assets.
20       List A appears to have all 931
21   accounts on it, and the 931 range that -- the
22   prefix of this account, are all firm inventory
23   ledgers.  So it appears to be the list that's
24   first described in that letter.  However, I
25   can't be a hundred percent certain since I
```

Page 319

```
1        HIGHLY CONFIDENTIAL - J. HRASKA
2    didn't actually provide it.
3        Q.   Are you able to draw any similar
4    conclusions about the second spreadsheet that is
5    attached to the Cleary letter and any work that
6    you and your team did in preparing the data that
7    may have gone into it?
8        A.   This was one of the initial data
9    spreadsheets that was used to analyze the B1, B2
10   relationship, but there was a summary document
11   which was prepared based on the findings which,
12   you know, broke out what we felt was B1 and
13   which I, being conservative, reserving customer
14   assets versus there was a separate schedule
15   which then broke out what we thought, based off
16   of margin debit balances, what the entitlements
17   would be for that B2 and C.  That doesn't appear
18   to be included in these documents, at least the
19   way I understood them to be.
20       Q.   Was there any other documentation
21   provided or created by you and your team as a
22   result of the effort to identify lists A, B and
23   C as you've testified?
24       A.   Nothing more than what I just
25   described to you, no.
```

Page 320

```
1        HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.   That's all I have on those.
3        I'm hoping -- I think we're all hoping
4    the answer to this is no.  Did you have any
5    involvement in the calculation or recalculation
6    of Lehman's 15c3-3 requirements over the weekend
7    of September 20th and 21st?
8        A.   No.
9        (Continued on the next page to include
10   the jurat.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 321

```
1        HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.   Did you have any discussions with
3    anybody about the recalculation of Lehman's
4    15c3-3 requirement?
5        A.   No.
6        MR. OXFORD:  I've got nothing further
7    for you, Mr. Hraska.  Thank you.
8        THE WITNESS:  You're welcome.
9        MR. KAY:  No questions.
10       MR. HINE:  I think we're done, unless
11   you have any, John.
12       MR. SHAW:  Tempting though it is, I
13   will declare this deposition closed.
14       MR. OXFORD:  Thank you very much.
15       THE WITNESS:  Thank you.
16       (Time Noted:  5:53 P.M.)
17
18
19                _____
                   JAMES HRASKA
20
21   Subscribed and sworn to
     before me this     day
22   of       2009.
23
                   _____
24
25
```

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

             SOUTHERN DISTRICT OF NEW YORK

3

    IN RE:                        )

4                                 )

    LEHMAN BROTHERS HOLDINGS, INC.,)

5   et al.,                       ) Chapter 11

                                  ) 08-13555(JMP)

6            Debtors.             ) (Jointly

                                  ) Administered)

7                                 )

    ------------------------------)

8

9

10

11            DEPOSITION OF JIM HRASKA

12               New York, New York

13            Friday, January 15, 2010

14

15

16

17

18

19

20

21

22

23

    Reported by:

24  Philip Rizzuti

    JOB NO. 27206

25

## Page 6

```
1                    Hraska
2          MR. OXFORD:  Would you mark this
3    document as Exhibit 561-D, spreadsheets.
4          (Exhibit 561-D, spreadsheets,
5    marked for identification, as of this
6    date.)
7          MR. OXFORD:  Would you mark as
8    Exhibit 562-D, document headed Jim Hraska
9    30(b)(6) deposition notes.
10          (Exhibit 562-D, document headed
11          Jim Hraska 30(b)(6) deposition notes,
12          marked for identification, as of this
13          date.)
14    J I M    H R A S K A , called as a witness,
15    having been duly sworn by a Notary
16    Public, was examined and testified as
17    follows:
18    EXAMINATION BY
19    MR. OXFORD:
20    Q.   Good morning, Mr. Hraska.
21    A.   Good morning.
22    Q.   As you know, we met before, I am
23    Neil Oxford from Hughes Hubbard & Reed, we
24    represent the SIPA trustee in this litigation.
25    I also know you have been through this
```
TSG Reporting - Worldwide    877-702-9580

## Page 7

```
1                    Hraska
2    deposition process before.  You know the
3    ground rules, but if there is anything unclear
4    about any of my questions ask me and I will
5    clarify it.
6          If you answer any of my questions
7    without asking me to clarify it I will assume
8    that you have understood it.  Is that fair?
9    A.   Fair.
10    Q.   Can you tell me how you define the
11    term clearance box, Mr. Hraska?
12    A.   Sure.  To me a clearance box is an
13    account at either a depository or a custodial
14    bank into which securities can be moved into
15    or out of.
16    Q.   Does your definition include a
17    vault or depository that holds physical
18    securities?
19    A.   Yes.  That would be an account at
20    a custodial bank.
21    Q.   Does it include settlement
22    accounts?
23    A.   What I have just described is
24    also -- can be termed a settlement account.
25    Q.   Does your definition of clearance
```
TSG Reporting - Worldwide    877-702-9580

## Page 8

```
1                    Hraska
2    box also include safekeeping accounts?
3    A.   A safekeeping account would be a
4    further clarification of a clearance account.
5    So basically the clearance account is the most
6    broad definition.  And if an account is to be
7    a safe custody account it would be a further
8    distinction which earmarks it as a safekeeping
9    account I guess.
10    Q.   If I understand your testimony you
11    are saying that a safekeeping account is a sub
12    set of the clearing boxes?
13    A.   Well that depends on -- it depends
14    on the clearing relationship.  In some
15    instances a safekeeping account is a
16    completely distinct and separate account.  In
17    some instances it is a sub set of an existing
18    clearance account.
19    Q.   Is that definition of clearance
20    box one that you applied in your involvement
21    in the creation of Schedule B to the
22    clarification letter?
23    A.   That definition would have been
24    something that I would have applied, yes, to
25    Schedule B.
```
TSG Reporting - Worldwide    877-702-9580

## Page 9

```
1                    Hraska
2    Q.   Is that the definition to your
3    understanding that Lehman applied in its role
4    in creating Schedule B?
5    A.   Yes.  I would assume that is
6    the -- my understanding that that would be the
7    same definition, yes.
8    Q.   Mr. Hraska, can you have in front
9    of you Exhibit 156-B?
10          MR. SHAW:  156-B, yes?
11    A.   Yes.  Okay.
12    Q.   Mr. Hraska, do you recognize
13    Exhibit 156-B?
14    A.   There is actually two documents as
15    part of this exhibit, right; are you asking if
16    I recognize both documents?
17    Q.   Actually three documents.  The
18    first is a letter from Cleary Gottlieb dated
19    March 6, March 6, 2009 and there are two
20    attachments to that, Exhibit A and Exhibit B?
21    A.   Yes, I recognize all the
22    attachments and the letter.
23    Q.   Could you turn to the start of
24    Exhibit A, please?
25    A.   Yes.
```
TSG Reporting - Worldwide    877-702-9580

Page 10

```
1              Hraska
2       Q.   Just to make sure we are on the
3  same page here, the first CUSIP number I have
4  appears to be 23321PUA4?
5       A.   Yes.  That is correct.
6       Q.   I would like to ask you a few
7  questions about the particular depots that are
8  listed in column 6, do you see that, do you
9  see the depot listing?
10      A.   Yes.
11      Q.   First of all the IMD conversion
12 omni account which appears on line 2, do you
13 see that reference?
14      A.   I do, yes.
15      Q.   Do you know what that depot is a
16 reference to?
17      A.   I have a general idea of what that
18 specific account is for.  But I don't -- that
19 particular account is not an account where --
20 that wouldn't be an account as described
21 earlier.  That is an account that securities
22 are held at a -- well, I want to clarify this.
23       This is a temporary location, so
24 it is basically a transit location for
25 securities.
```

TSG Reporting - Worldwide    877-702-9580

Page 11

```
1              Hraska
2       Q.   If I understand your testimony, it
3  is not within your definition of clarification
4  letter that you gave me a few moments ago; is
5  that correct?
6       MR. SHAW:  Objection to the form.
7  You said clarification letter, I think
8  you may have meant clearance.
9       Q.   Let me ask that again.
10       If I understand your testimony,
11 Mr. Hraska, the depot that appears in line 2
12 of the first page of Exhibit A in Exhibit
13 156-B, the IMD conversion omni, is that
14 included within the definition of clearance
15 box you gave me at the start of the
16 deposition, or is it not included within that
17 definition.
18      A.   Yes, I think it is included in it.
19 It is just a way to further segregate a
20 security in a particular transitory state.
21      Q.   Do you know what the reference is,
22 Mr. Hraska, to the conversion omni?
23      A.   I am not a hundred percent sure
24 what this particular omni is used for.  A
25 conversion omni is typically a transitory type
```

TSG Reporting - Worldwide    877-702-9580

Page 12

```
1              Hraska
2  of location.  I am not sure what the IMD depot
3  is specifically used for.
4       Q.   Do you know whether or not this is
5  a PAM conversion account?
6       A.   Not with a hundred percent
7  certainty that it is, but...
8       Q.   Do you have any understanding?
9       A.   I think it may be, but I am not a
10 hundred percent certain.
11      Q.   If it is a PAM conversion account
12 do you think it should be on the schedule?
13      A.   I am not sure that I can answer
14 whether it should be on the schedule.  I am
15 saying I know that it could be on the schedule
16 based off of the fact that the mechanics in
17 which assets are transferred in and out of
18 customer accounts would set it up to
19 potentially be on that schedule.  But as to
20 whether that particular one belongs on there
21 or not I don't know.
22       I mean it is basically a
23 transitory location, so while a customer is
24 instructing to move assets out, those assets
25 are temporarily moved into a transitory
```

TSG Reporting - Worldwide    877-702-9580

Page 13

```
1              Hraska
2  location.  Those assets, you know, may or may
3  not have been originally in different
4  location, and they also may be in fail status.
5       But as to whether or not -- I am
6  not a hundred percent sure.  I would say that
7  while they are still in transitory status to
8  me it makes sense that they are there.
9       Q.   Assuming for the purposes of the
10 next series of questions that it is in fact
11 the PAM conversion account, can you tell me
12 what your understanding is of the PAM
13 conversion account?
14      MR. SHAW:  Objection to the form.
15      A.   My understanding of the PAM
16 conversion account is to the extent that
17 securities are being moved out of the normally
18 held custodial depot to an external depot or
19 to another depot, whether it be to either
20 another depo internally or to be made the
21 delivery to an external custodian away from a
22 particular institution, those securities will
23 end up temporarily in that account.
24      Q.   Do you know what the designation
25 PAM, P-A-M, means in the context of a PAM
```

TSG Reporting - Worldwide    877-702-9580

## Page 14

Hraska

1
2 conversion account?
3      A.   I don't know.
4      Q.   You don't have any understanding
5 that PAM was a particular type of customer
6 that Lehman had?
7      A.   Yes, the PAM, I don't remember
8 what the acronym stood for, they were
9 primarily I believe the wealth customers.
10      Q.   Those wealth customers were not
11 moved to Barclays as of the closing of this
12 transaction on the 22nd of September; is that
13 correct?
14      A.   That is correct.
15      Q.   Those PAM customers were in fact
16 moved to Neuberger Berman; is that correct?
17      A.   Yes.
18      Q.   So can you think of any reason why
19 an asset that is in a PAM conversion account
20 would appear on a list of securities that
21 Barclays is claiming from Lehman?
22      MR. SHAW:  Objection to the form.
23      A.   It could have been a processing
24 error, it could have been it was instructed to
25 at a particular time and it showed up in the

## Page 15

Hraska

1
2 account, it had not been settled, or it
3 couldn't be settled because of securities not
4 being in a location accordingly.  It could
5 have also been a clerical error in a clearance
6 process.  Once a trade is cleared if it is
7 cleared incorrectly or it is cleared to an
8 incorrect location it could actually show up
9 in that particular box or in that particular
10 account without truly being there.  So without
11 actually looking at the account and knowing I
12 wouldn't really know.
13      Q.   Scrolling down the first page
14 about three inches below the entry we just
15 looked at you see there is a depot described
16 as 097-00074-15?
17      A.   Yes.
18      Q.   Can you tell me, Mr. Hraska, what
19 that is a reference to?
20      A.   I don't know.
21      Q.   Do you know whether or not that is
22 a reference to physical securities held at 70
23 Hudson Street?
24      A.   I don't know.  I mean just for
25 purposes of clarity we were -- in doing our

## Page 16

Hraska

1
2 exercise we were given a list of eligible
3 clearance accounts by the clearance folks
4 which we used as a criteria.  So, you know, my
5 involvement in creating some of these lists, I
6 mean we used that criteria.  So, you know,
7 some of these don't have descriptions on it.
8      Q.   What do you mean by your reference
9 in that last answer to eligible clearance
10 accounts?
11      A.   To the extent that they are an
12 account where we would have been looking at
13 securities which were without encumbrances I
14 guess.
15      Q.   Who provided to you this list of
16 eligible securities as you defined it?
17      A.   Eligible securities or eligible
18 accounts; did I say securities?
19      Q.   You said securities.  Either way?
20      A.   It was accounts, not securities.
21      Q.   Either way who provided you,
22 Mr. Hraska, with a list of eligible accounts?
23      A.   The clearance department.
24      Q.   Whose clearance department?
25      A.   At the time it was managed by Neil

## Page 17

Hraska

1
2 Ullman.
3      Q.   This is Lehman's clearance
4 department?
5      A.   Yes.
6      Q.   When you say at the time, what
7 time are you referencing?
8      A.   It was the time when we were --
9 let's see, when was this.  I honestly don't
10 recall the time.  I know we had asked for it,
11 but I don't recall when it was provided.
12      Q.   Do you know whether it was before
13 or after the closing of the transaction?
14      A.   It would have been after the
15 closing.
16      Q.   Do you know if it was 2008 or
17 2009?
18      A.   I don't know.  I don't know
19 specifically.  It was either the end of 2008
20 or early 2009, probably 2009.  I know it is a
21 year gap.
22      Q.   Again I think we got it covered,
23 but can you tell me again if you know what
24 criteria Mr. Ullman used in providing you a
25 list of, quote unquote, eligible accounts?

## Page 18

Hraska

2    A.  I don't know what criteria he
3 used.  We asked for the list of accounts, he
4 provided them.  So I can speculate what he
5 would have done.
6    MR. SHAW:  Don't speculate.
7    Q.  I am not asking for your
8 speculation, only asking for your knowledge.
9 Can you tell me, Mr. Hraska, exactly what it
10 is that you asked Mr. Ullman for?
11    A.  If I remember correctly when you
12 say specifically, what I recall asking for is
13 accounts which would not have been safe
14 custody accounts or segregated accounts.
15    Q.  Can you explain what you mean by
16 each of those terms; first of all safe
17 custody; secondly segregated account?
18    A.  Yes.  A safe custody account is,
19 and a segregated account is basically one in
20 the same.  I mean a safe custody account is
21 used to segregate positions for a particular
22 purpose.  The purposes for segregation are
23 when the customer is fully paid for an asset,
24 those assets need be protected away from firm
25 assets.  So they are typically put into either

TSG Reporting - Worldwide     877-702-9580

## Page 19

Hraska

2 A, a separate account as we talked about
3 earlier, or in a segregated location of a
4 clearance location depending on whether, you
5 know, the relationship of the account.
6    Q.  So it is correct to say that
7 Mr. Ullman provided you to the best of your
8 knowledge the list of accounts that included
9 every account of Lehman other than safe
10 custody or segregated accounts; is that
11 correct?
12    A.  Yes.
13    Q.  That list was the basis on which
14 you and Barclays created Exhibits A and B to
15 the Cleary letter of March 6th; is that right?
16    A.  That is correct.
17    Q.  Scrolling down the depot column
18 again do you see about two thirds of the way
19 there is an entry to depot 097-00104-19?
20    A.  I do.
21    Q.  Do you know what that code is a
22 reference to?
23    A.  No.
24    Q.  Do you know whether or not it is a
25 reference to a location in the United Kingdom?

TSG Reporting - Worldwide     877-702-9580

## Page 20

Hraska

2    A.  I don't know.
3    Q.  Three lines below that entry, sir,
4 it reads LBI alternative physical security
5 department, or sec dep?
6    A.  Yes.
7    Q.  Do you understand what that is a
8 reference to?
9    A.  Again it would be another
10 description of a type of depository fund.  The
11 description written here would be a physical
12 depository.
13    Q.  Do you know where that physical
14 depository is located, sir?
15    A.  That specific one I couldn't say
16 with certainty.
17    Q.  Do you know whether it is a DTC or
18 not?
19    A.  I don't know.
20    Q.  At the bottom of page there are
21 three entries for a depot LBIE clearance and
22 custody?
23    A.  Yes.
24    Q.  Do you see that, sir?
25    A.  Yes.

TSG Reporting - Worldwide     877-702-9580

## Page 21

Hraska

2    Q.  Do you know what that is a
3 reference to?
4    A.  It would have been a depository
5 that LBI was holding that would have used in
6 transactions that it did with one of its
7 affiliates which was LBIE, that is the
8 affiliate, but it is listed.
9    Q.  So if I understand your testimony
10 correctly LBI maintained a clearance box at
11 LBIE?
12    MR. SHAW:  No.  Objection.
13 Mischaracterizes the prior testimony.
14    A.  I am sorry, could you repeat the
15 question.
16    Q.  Could you explain to me again
17 because I clearly misunderstood your last
18 answer, how it is that the LBI clearance and
19 custody depot first of all relates to Lehman's
20 business prior to close?
21    A.  This --
22    MR. SHAW:  Objection to the form.
23 Just so we are clear when you say Lehman,
24 it introduces an element --
25    Q.  I am sorry, LBI?

TSG Reporting - Worldwide     877-702-9580

Page 22

```
1              Hraska
2      A.   Repeat the question.
3      Q.   Can you tell me what the LBI
4  clearance and custody depot is in the context
5  of its appearance on this list?
6      A.   Well this is LBIE, so there is a
7  distinction there.  So this is the -- the way
8  this appears on this list, this would have
9  been an account that LBI maintained related to
10 transactions that it was -- that it had done
11 for its -- or with its affiliate LBIE, which
12 is Lehman Brothers International Europe.
13     Q.   Would the account be held with
14 LBI, sir, or LBIE?
15     A.   The account would be held with LBI
16 and it would have been an account called LBI
17 for the customer LBIE.
18     Q.   Coming back up the page five or
19 six lines up from the LBIE reference,
20 097-00093-12?
21     A.   Yes.
22     Q.   Do you know what that is a
23 reference to?
24     A.   I don't know.
25     Q.   Do you know whether or not that is
```
TSG Reporting - Worldwide    877-702-9580

Page 23

```
1              Hraska
2  a reference to a Euroclear account?
3      A.   I don't.  Is there a distinction
4  between the two questions, like if you asked
5  me and I say I don't know, then you ask me
6  pretty much the same thing.  I am not sure
7  that I understand what the difference between
8  the two questions is.
9           So if you ask me if I know what
10 the account is and I say no and then you ask
11 me if the zero clears, so if I say know the
12 first time what is the distinction between the
13 two questions.  I am not trying to be
14 sarcastic, I am trying to understand the
15 difference between the two, maybe it is a
16 legal distinction.
17          MR. SHAW:  He is trying to see if
18 he can refresh your recollection by
19 suggesting what the answer might be.
20     Q.   There is no finer legal point.
21     A.   I will just keep answering no, but
22 I am not trying to be difficult if I say no
23 twice.
24     Q.   I understand.  We are all trying
25 to get through it.  I am trying to probe your
```
TSG Reporting - Worldwide    877-702-9580

Page 24

```
1              Hraska
2  recollection as your counsel suggests?
3      A.   Fine.
4      Q.   I realize I skipped over an entry,
5  do you see two thirds of the way down the
6  reference that we discussed to LBI alternative
7  securities?
8      A.   Yes.
9      Q.   Three lines up from that is an
10 entry 097 -- I did ask you about that, let's
11 move on.
12     A.   Okay.
13     Q.   Flipping over the page do you see
14 the entry --
15          MR. SHAW:  Second page of Exhibit
16 A to the Exhibit 156-B?
17          MR. OXFORD:  Correct.
18     Q.   You see the entry to restricted
19 physical box at the top of the page?
20     A.   Yes.
21     Q.   Then there is a depot reference
22 097-00033-15?
23     A.   Yes.
24     Q.   Do you know what that relates to?
25     A.   It would have related to a
```
TSG Reporting - Worldwide    877-702-9580

Page 25

```
1              Hraska
2  physical location that had legally restricted
3  securities in there.
4      Q.   Can you explain what you mean by
5  legally restricted securities?
6      A.   Securities that would have had --
7  I will say this as accurate as possible.
8           They would have needed additional
9  legal documentation which is outside the
10 normal scope of standard physical securities
11 that are not restricted.  So for instance a
12 standard physical security just needs a bond
13 power.  A restricted security may need
14 additional documentation in order to make it
15 eligible for the delivery.
16     Q.   When you asked Mr. Ullman to
17 provide you with a list of eligible accounts,
18 Mr. Hraska, did you intend to include in your
19 request that he provide you with the list of
20 such restricted accounts that you just told me
21 about?
22     A.   Well my intention was to not get
23 any accounts that were safe kept.  A
24 restricted, although the term is restricted,
25 doesn't necessarily mean that the firm doesn't
```
TSG Reporting - Worldwide    877-702-9580

```
 1              Hraska
 2  have access to use it.  It just means that
 3  there is a restriction beyond the normal
 4  method for delivering a physical security
 5  which again is related to the legal
 6  requirements on attaching to that security
 7  before making a delivery.
 8       Q.   So you didn't mean to exclude
 9  those types of accounts from your request to
10  Mr. Ullman?
11       A.   I didn't consider excluding them
12  or including them.  I just meant to exclude
13  fully paid for.
14       Q.   Understand.  The entry immediately
15  below that.
16       A.   Yes.
17       Q.   097-00122-17?
18       A.   Yes.
19       Q.   Do you see that?
20       A.   I do.
21       Q.   Do you know what that is a
22  reference to?
23       A.   I am sorry, I don't.
24       Q.   Three lines down from that, sir,
25  097-00123-16, do you see that entry, sir?
```

TSG Reporting - Worldwide     877-702-9580

```
 1              Hraska
 2       A.   Yes.
 3       Q.   Do you know what that is?
 4       A.   I don't.
 5       Q.   Do you know whether that is a
 6  reference to a settlement account at Royal
 7  Bank of Canada?
 8       A.   I don't.
 9       Q.   If you wanted to find out the
10  answer to the questions that I am asking you
11  about what these codes relate to how would you
12  go about doing that?
13       A.   There is two ways.  Partially we
14  would have gotten an account list back, and I
15  would have to go back and see where that
16  account list is from the settlements team and
17  compare the accounts.  The thing that I don't
18  recall is whether or not that list that we had
19  actually had descriptions on it or not.  So to
20  the extent that it didn't we would have to go
21  back and find an original account list of LBI
22  clearance accounts and then cross reference
23  them.  I am sure something like that exist, I
24  just don't have it.
25       Q.   A few lines down, sir, again on
```

TSG Reporting - Worldwide     877-702-9580

```
 1              Hraska
 2  page 2 of Exhibit A to the letter of March
 3  2009 there is a reference to PIM conversion
 4  omnibus?
 5       A.   Right.
 6       Q.   Can you tell me what that relates
 7  to, sir?
 8       A.   It would have been a conversion
 9  account and it related to the PIM business as
10  opposed to the PAM business.  I honestly don't
11  know the distinction between the two
12  businesses.  I assume that they were somewhat
13  similar, but I don't know the distinction
14  between the two.
15       Q.   You do know, sir, that Barclays
16  assumed responsibility for only one of these
17  businesses, don't you?
18       A.   I don't.  I know that they did not
19  assume responsibility of PAM.  I don't know if
20  they assumed responsibility for PIM or not.
21       Q.   Is there anything about the
22  appearance on this list of the PIM conversion
23  omnibus that suggests to you that it may
24  contain customer securities?
25            MR. SHAW:  Objection to the form.
```

TSG Reporting - Worldwide     877-702-9580

```
 1              Hraska
 2       A.   It may, it may not.  I just --
 3  without doing further research I wouldn't
 4  know.
 5       Q.   If you could turn to the ninth
 6  page of Exhibit A, sir?
 7       A.   Yes.
 8       Q.   I have the first account number as
 9  097-00027-13?
10       A.   For a quantity of 15,776 to the
11  right, next column over?
12       Q.   No, I have a different quantity.
13       A.   For a quantity of 426,183?
14       Q.   Yes.
15            MR. SHAW:  What is the name of the
16  first security in the second column on
17  the page you are looking at?
18            MR. OXFORD:  Ermis Maritime
19  Holdings, E-R-M-I-S.
20       Q.   You see Mr. Hraska a few lines
21  down, ten lines down there is a reference
22  Euroclear?
23       A.   Yes.
24       Q.   The account is 097-00092-13?
25       A.   Okay.
```

TSG Reporting - Worldwide     877-702-9580

Page 30

1           Hraska
2     Q.   Do you know what that is a
3  reference to?
4     A.   Yes, that would have been the LBI
5  Euroclear clearance account.
6     Q.   Just so we are clear, that is not
7  a DTC account?
8     A.   It is not a DTC account.
9     Q.   Anything with the designation
10 Euroclear relates to a LBI account at
11 Euroclear as it appears in the depot column
12 here, is that a fair assumption?
13    A.   Yes.
14    Q.   Three below Euroclear, sir, there
15 is a reference to an account 097-00097-18?
16    A.   Okay.
17    Q.   Do you know what that is a
18 reference to?
19    A.   I don't know.
20    Q.   Do you know whether or not it is a
21 reference to a settlement account at Paribas
22 in Germany?
23    A.   I do not.
24    Q.   Six lines down from that there is
25 a reference to a depot number 097-00105-18?
      TSG Reporting - Worldwide   877-702-9580

Page 31

1           Hraska
2     A.   Yes.
3     Q.   Do you see that?
4     A.   Yes.
5     Q.   Do you know what that is a
6  reference to?
7     A.   No.
8     Q.   Do you know whether or not that is
9  a reference to a UK settlement account?
10    A.   I do not.
11    Q.   Further five lines down there is a
12 reference to 097-00167-13, do you see that,
13 sir?
14    A.   Yes.
15    Q.   Do you know what that is a
16 reference to?
17    A.   I do not.
18    Q.   You don't know whether or not that
19 is a reference to a Citibank account in Peru?
20    A.   I do not.
21    MR. OXFORD:  Off the record for a
22 second.
23    (Recess taken.)
24    Q.   Sticking on the same page we were
25 discussing, Mr. Hraska, page 9?
      TSG Reporting - Worldwide   877-702-9580

Page 32

1           Hraska
2     A.   Yes.
3     Q.   Third of the way down there is a
4  reference to BNP Paribas France?
5     A.   Yes.
6     Q.   Do you know what that is a
7  reference to?
8     A.   A clearance account held at BNP
9  Paribas.
10    Q.   That is again not an account held
11 at DTC?
12    A.   That is not an account held at
13 DTC.
14    Q.   Six lines down, sir, do you see
15 there is a reference to physical escrow
16 receipts held?
17    A.   Yes.
18    Q.   Can you explain to me what that is
19 a reference to?
20    A.   It is a physical location, again a
21 depot for physical securities of the escrow
22 type.
23    Q.   Do you know the location of that
24 depository?
25    A.   I don't.
      TSG Reporting - Worldwide   877-702-9580

Page 33

1           Hraska
2     Q.   Finally if you could turn three
3  more pages, sir, Exhibit A, takes us to page
4  12.  So we have a clear record I have the
5  first CUSIP name in column 2 at the top of my
6  page is Solution Net International?
7     A.   Yes.
8     Q.   Do you have that page?
9     A.   Yes.
10    Q.   About a third of the way down
11 there is a reference to a Lehman Brothers
12 account which starts 097-0093-12, Lehman
13 Brothers, do you see that?
14    A.   Yes.
15    Q.   Do you know what that is a
16 reference to?
17    A.   I don't know.
18    Q.   Do you know whether or not that is
19 a reference to a location where collateral
20 that had been seized by Bank of New York was
21 located?
22    A.   I don't know.
23    Q.   Is that account in DTC, sir?
24    A.   I don't know.
25    Q.   That is all the questions I have
      TSG Reporting - Worldwide   877-702-9580

Page 34

```
 1              Hraska
 2  on this exhibit.  Did you want to take a short
 3  break?
 4       A.   Yes.  That would be great, thanks.
 5       MR. OXFORD:  Off the record.
 6       (Recess taken.)
 7       Q.   Are you ready, everybody ready to
 8  go back on?
 9       A.   Sure.
10       Q.   Mr. Hraska, I have placed in front
11  of you what I have marked as Exhibit 561-D,
12  which I will identify for the record as the
13  native file of a document that was produced to
14  us last night by Boise Schiller, which I
15  understand to be another version of Exhibits A
16  and B to the Cleary letter with some
17  additional analysis.
18       Jonathan, does that comport with
19  your understanding of what this purports to
20  be?
21       MR. SHAW:  Are you asking whether
22  it is list A and list B1; that was one of
23  the things that we sent you last night,
24  but looking at the spreadsheet I couldn't
25  tell you which it was.
        TSG Reporting - Worldwide     877-702-9580
```

Page 35

```
 1              Hraska
 2       Q.   Looking at the covering E-mail
 3  from last night it appears to be a version of
 4  list A and B1 that was produced to us last
 5  night.
 6       A.   Okay.
 7       Q.   Mr. Hraska, could you turn to the
 8  section of the document that appears after the
 9  last blue sheet?
10       MR. SHAW:  The last blue sheet?
11       MR. OXFORD:  Yes.
12       A.   There are multiple blue sheets.
13       Q.   I have two.
14       A.   Got to find it.  There we go, yes.
15       Q.   Just so we are sure we are on the
16  same page, the first CUSIP that appears in the
17  description of the page that I am looking at
18  is New York NY City Transitional, are we on
19  the same page?
20       A.   Yes.
21       Q.   First of all do you know the
22  document I have marked as Exhibit 561-D, do
23  you know what it is?
24       A.   Yes, I do.
25       Q.   Can you tell me what it is,
        TSG Reporting - Worldwide     877-702-9580
```

Page 36

```
 1              Hraska
 2  please, sir?
 3       MR. SHAW:  Are you talking about
 4  the entire document or just that piece?
 5       Q.   Generally do you know what the
 6  document is?
 7       A.   Yes.
 8       Q.   Can you tell me what it is,
 9  please, sir?
10       A.   Yes.  It would have been what
11  was -- what has been referred to as list A and
12  B1.  I am sorry, you are asking me overall or
13  just this particular section.  Overall you
14  asked me?
15       Q.   Yes.  Overall?
16       A.   Yes.  So overall it would have
17  been both of those.
18       Q.   It appears on my copy that there
19  are three sections to this each divided by a
20  blue sheet.  If you could look at the first
21  page and tell me what that is, please, sir?
22       A.   Yes.
23       Q.   There is a reference to sheet A at
24  the top left-hand corner?
25       A.   So now we are at --
        TSG Reporting - Worldwide     877-702-9580
```

Page 37

```
 1              Hraska
 2       MR. SHAW:  No, here (indicating).
 3  Very first page of 561-D.
 4       A.   Okay.  So what was the question?
 5       Q.   Were you involved in creating this
 6  page, sir?
 7       A.   No, I was not.
 8       Q.   Do you know who was?
 9       A.   I do not.
10       Q.   Have you seen it before?
11       A.   I have seen it before, but I was
12  not involved in creating it.
13       Q.   In what context did you see it,
14  sir?
15       A.   I saw it in preparation for this
16  deposition.
17       Q.   Can you explain to me what the
18  first page of 561-D represents?
19       A.   No, I cannot.
20       Q.   Do you know who did create this?
21       A.   Specific person; I don't know.
22       Q.   Do you have an understanding of
23  the process by which it was created?
24       A.   No.
25       MR. SHAW:  Again with those last
        TSG Reporting - Worldwide     877-702-9580
```

Page 38

```
 1                  Hraska
 2   questions were only focussed on the first
 3   page?
 4          MR. OXFORD:  Correct.
 5        Q.   If you could turn to the second
 6   attachment to that first page, sir, after the
 7   second blue sheet, the page we first looked at
 8   it has the description in the first CUSIP
 9   column, or row rather, of New York City NY
10   Transition?
11        A.   Yes.
12        Q.   Are you at that page?
13        A.   Yes.
14        Q.   I am going to ask you a series of
15   questions about the depot locations that
16   appear across the top of the page.
17        A.   Okay.
18        Q.   Do you see there is a column
19   entitled Schedule B Quantities?
20        A.   Yes.
21        Q.   About a third of the way along?
22        A.   Yes.
23        Q.   Is it accurate to say that the
24   list of numbers that follow as you read along
25   the page left to right are depot numbers?
```
TSG Reporting - Worldwide    877-702-9580

Page 39

```
 1                  Hraska
 2        A.   From left to right across the top
 3   of the page?
 4        Q.   Yes.
 5        A.   Yes.  Those would be depot
 6   numbers, yes.
 7        Q.   Taking each of these in turn can
 8   you tell me what they relate to; can you tell
 9   me what the first depot 0007-03, do you know
10   what that relates to?
11        A.   I do not.
12        Q.   Do you know what the next one
13   relates to, the one that ends in 7-11?
14        A.   That would have been DTC.
15        Q.   Skipping across to the fourth
16   entry after that, 097-0033-15, do you know
17   what that is?
18        A.   I do not.
19        Q.   Same question for the next entry,
20   097-00074-15?
21        A.   I do not.
22        Q.   Do you know whether the next two
23   entries that end in 13 and 12 are Euroclear
24   accounts?
25        A.   I do not.
```
TSG Reporting - Worldwide    877-702-9580

Page 40

```
 1                  Hraska
 2        Q.   097-00099-16, do you see that,
 3   sir?
 4        A.   I do.
 5        Q.   You don't know what that is a
 6   reference to?
 7        A.   I do not.
 8        Q.   Then the next four entries, sir,
 9   to the right of the one ending 16 that I just
10   asked you about, do you know what those are a
11   reference to?
12        A.   Sorry, I do not.
13        Q.   If you could read along then to
14   the second to last entry in the list of
15   numbers across the top of the page,
16   097-00183-13, do you know what that is a
17   reference to?
18        A.   I do not.
19        Q.   Were you involved in preparing the
20   spreadsheet that appears after the second blue
21   page here, the one that we have just been
22   talking about, sir?
23          MR. SHAW:  You mean preparing the
24   physical spreadsheet or --
25        Q.   Start with that.
```
TSG Reporting - Worldwide    877-702-9580

Page 41

```
 1                  Hraska
 2        A.   Let me ask you.  I was not
 3   involved in preparing this specific version
 4   you see before you here, but I was involved in
 5   preparing data that became this spreadsheet
 6   that you see in front of you as the exhibit.
 7        Q.   Do you know who prepared this
 8   particular spreadsheet?
 9        A.   Specific person; no.
10        Q.   Do you know the group of
11   individuals who were involved in preparing
12   this spreadsheet?
13        A.   This particular version; it would
14   have been Barclays finance group.
15        Q.   Is there a particular person you
16   can identify in Barclays finance group that
17   was involved in or responsible for the
18   creation of this document?
19        A.   I think there were multiple people
20   involved.  I would be speculating as to who
21   specifically created this spreadsheet
22   themselves.
23        Q.   You said there were multiple
24   people involved --
25        A.   There were people, a lot of people
```
TSG Reporting - Worldwide    877-702-9580

1    Hraska
2  reviewing the data in finance.  So I don't
3  know who ultimately created this version that
4  you are looking at today.
5       Q.   Can you list for me the people in
6  finance who were involved in reviewing the
7  data?
8       A.   One of the people that I dealt
9  with was Sean Teague.
10      Q.   Any others?
11      A.   That was my primary contact.  Then
12 there were others, I just don't recall the
13 names.
14      Q.   What was your involvement, sir, in
15 preparing the data that is reflected in the
16 spreadsheet that we have just been looking at?
17      A.   My involvement was gathering the
18 original source data and creating rules that
19 would have selected securities that were
20 deemed to be not fully paid for assets, and
21 working with some folks in treasury to create
22 a spreadsheet which applied those rules and
23 gave back a data set which we then distributed
24 to the treasury group.
25      Q.   Generally speaking, sir, is that

1    Hraska
2  process that you have told me about in your
3  last answer, is that the same process that is
4  reflected in the notes to your 30(b)(6)
5  deposition?
6       A.   Yes.  So if in this particular
7  case this is B1.  If we wanted to go to the
8  section on B1 we could talk through that
9  process if you want.
10      Q.   Okay.  We will get to that in a
11 second, but that is a useful orientation.  The
12 spreadsheet, the last spreadsheet that appears
13 as part of Exhibit 561-D, you just described
14 that as list B1; is that correct?
15      A.   I believe this to be B1.  I think
16 it was entered into, into the records as A and
17 B1.
18      Q.   Which records are you referring
19 to, sir?
20      A.   This document, right, is A and B1
21 in its entirety; right?
22      Q.   It is not my document, sir, so I
23 can't really tell you that.
24      A.   Yes.  This is A and B1.
25      Q.   I was hoping you could.

1    Hraska
2       A.   I am sorry, I thought we said that
3  already.
4       Q.   So we have a clear record, is it
5  your testimony, sir, that the second section
6  of the document that appears after the first
7  blue page is list A?
8       A.   Second document would be list B1.
9         MR. SHAW:  No, no.  You are
10 getting confused.  After the first blue
11 page?
12      A.   Okay.  The first blue page would
13 be list A.
14      Q.   After the second blue page appears
15 list B1?
16      A.   That is correct.
17      Q.   Those descriptions of list A and
18 list B1 are referenced in -- withdrawn.
19      When you reference in your
20 deposition notes, 562-D, list A and list B1,
21 the lists that I have marked as Exhibit 561-D,
22 those are the lists that we are discussing?
23      A.   Yes, correct.
24      Q.   Just a couple more questions.  But
25 list B1, do you see, sir, looking at the top

1    Hraska
2  of the page a column description I believe it
3  is the eighth column along that reads Sched B
4  Quantities?
5       A.   Yes, I do.
6       Q.   Can you tell me what that is a
7  reference to, please?
8       A.   That is a reference to quantities
9  of securities that were part of what is known
10 as Schedule B.
11      Q.   When you reference Schedule B in
12 that context, sir, can you be specific about
13 what you are talking about?
14      A.   Schedule B would have been the
15 schedule which was part of the purchase
16 agreement.
17      Q.   Is it a reference to the version
18 of Schedule B that was used at the closing of
19 the transaction on September 22, 2008?
20      A.   Yes.
21         MR. SHAW:  Objection.  Foundation.
22      Q.   What is the basis for the last
23 answer you just gave me, sir?
24      A.   I only know there to be one
25 Schedule B.

Page 46

1              Hraska
2        Q.    To your knowledge, sir, was the
3    version of Schedule B ever filed with the
4    Bankruptcy Court in this case?
5        A.    Schedule B filed with the
6    Bankruptcy Court?
7        Q.    Yes.
8        A.    Yes, I believe it was.
9        Q.    And is that the same Schedule B to
10   your knowledge that is referenced in list B1?
11       A.    To my knowledge yes.
12       Q.    Was there any analysis underlying
13   the data that appears under the column
14   Schedule B Quantities?
15       A.    By analysis can you be more
16   specific?
17       Q.    Maybe I could ask it this way.
18       A.    Is this 32-C in the question, is
19   that --
20       Q.    No, I have a more general question
21   first.
22       A.    Okay.
23       Q.    Can you explain to me why there is
24   a column entitled Schedule B Quantities in
25   list B1?
         TSG Reporting - Worldwide    877-702-9580

Page 47

1              Hraska
2        A.    Yes.  The finance group wanted to
3    compare the assets that were retrieved by this
4    exercise versus assets that would have
5    appeared on the original Schedule B.
6        Q.    How did you come to learn,
7    Mr. Hraska, that the finance group wanted to
8    compare the assets that were retrieved by the
9    exercise that you described to the assets that
10   appeared on the original Schedule B?
11       A.    I basically when I had seen a -- I
12   had seen a copy of this at one point and I had
13   actually questioned what that reference was
14   there.  That is what I was told.
15       Q.    Who did you ask about that
16   reference?
17       A.    I don't recall.  It would have
18   been a meeting with the finance folks.
19       Q.    Can you tell me the names of the
20   finance folks who would have been at that
21   meeting?
22       A.    Again my primary contact for most
23   of this stuff from the finance perspective
24   would have been Sean Teague.
25       Q.    You referenced a meeting that you
         TSG Reporting - Worldwide    877-702-9580

Page 48

1              Hraska
2    would have had with the finance folks.  On the
3    finance side who else would have been at that
4    meeting or those meetings with Sean Teague?
5        A.    I don't recall.  Probably sometime
6    ago now.
7        Q.    Did anybody explain to you why the
8    finance group wanted to compare the assets
9    that were retrieved or identified by the
10   exercise culminating in List B1 and stay with
11   the assets that were on the original Schedule
12   B?
13       A.    Yes.  We were trying to identify
14   all assets which were not fully paid for in
15   the clearance boxes and we wanted to see if
16   there were assets -- these exercises were to
17   see if there were additional assets which had
18   not been previously identified.
19       Q.    You gained that understanding,
20   sir, from your conversation with a person in
21   finance who may have been Sean Teague?
22       A.    May have been Sean Teague, yes.
23       Q.    Can you explain to me then, sir,
24   what it means when there is an entry on either
25   List A or List B1 under the heading Schedule B
         TSG Reporting - Worldwide    877-702-9580

Page 49

1              Hraska
2    Quantities?
3        A.    This would have been the quantity
4    that appeared on Schedule B as filed with the
5    court that you referenced earlier.
6        Q.    The Schedule B you are referencing
7    is to your knowledge the version of Schedule B
8    that was filed with the Bankruptcy Court?
9        A.    Yes.
10       Q.    If there is no entry or a dash in
11   Lists A and B1 under the heading Schedule B
12   Quantities what does that indicate to you?
13       A.    That indicates to me that that
14   particular security when this exercise, this
15   comparison exercise was done it was not found
16   on Schedule B.
17       Q.    Do you know who performed the
18   comparison exercise between the securities on
19   Lists A and B1 with the securities on Schedule
20   B?
21       A.    I do not.
22       Q.    If you had to find out the answer
23   to that question who would you ask?
24       A.    I would start with Sean Teague.
25       Q.    Do you have any reason to believe
         TSG Reporting - Worldwide    877-702-9580

Hraska

1
2  this analysis of the securities on Lists A and
3  B1, and the securities on the original
4  Schedule B filed with the Bankruptcy Court is
5  inaccurate?
6      A.   The data is as accurate as it can
7  be based off of what data set we had available
8  and we applied the rules to it.  As to its
9  accuracy I couldn't say.
10     Q.   Could you have in front of you,
11 please, what I have marked as Deposition
12 Exhibit 562-D?
13     A.   Yes.
14     Q.   Could you tell me what those are?
15     A.   These are my notes that I made in
16 preparation for this deposition.
17     Q.   What did you do to prepare for
18 this deposition other than write these notes?
19     A.   I reviewed the questions.  I went
20 back through historical E-mails.  I looked at
21 some of the spreadsheets that were created.  I
22 looked at the spreadsheets that -- the final
23 spreadsheets that operations and treasury
24 worked on together and that had submitted
25 forwarded.  I wanted to refresh myself with

Hraska

1
2  some of the pivot tables and macros and some
3  of the spreadsheet methodology that kind of
4  contained the rules that we held, and how we
5  wrote those rules into the look ups and
6  macros.
7      To do that I met with a gentleman
8  by the name of Colin Telmer, T-E-L-M-E-R.  And
9  we just reviewed kind of the methodology and
10 reviewed how the spreadsheets worked.  Then I
11 met with counsel as well to --
12     MR. SHAW:  Don't talk about
13 anything involving your meetings with us.
14     Q.   Was counsel present when you were
15 meeting with Mr. Telmer?
16     A.   No.
17     Q.   Can you tell me as precisely as
18 possible what it is that you reviewed with Mr.
19 Telmer?
20     A.   We reviewed the data set and the
21 rules that we applied, and how the pivots and
22 look ups in the spreadsheet itself worked.
23     Q.   Which data set are you referring
24 to, sir?
25     A.   Our original data set for this was

Hraska

1
2  the TMS stock record, and it would have been
3  as of November 17th date, and --
4      Q.   That is November 17, 2008?
5      A.   Yes.
6      Q.   TMS stands for Trade Management
7  System?
8      A.   Yes.
9      Q.   The rules that you reviewed with
10 Mr. Telmer, are those the rules that are
11 generally described in your deposition notes,
12 562-D?
13     A.   No.  The -- well we reviewed these
14 rules, but my focus with Mr. Telmer was more
15 so how the spreadsheet applied these rules to
16 the data set.  So he is more of the
17 spreadsheet expert with pivots and look ups
18 and things, those are spreadsheet functions.
19     Q.   When you say the spreadsheet, sir,
20 what are you referring to?
21     A.   There were spreadsheets which
22 analyzed the data that we took from the TMS
23 stock record.  So the spreadsheets I am
24 referring to are the original spreadsheets
25 that we used as having the raw data and the

Hraska

1
2  application of the rules that I described here
3  in the notes.
4      Q.   Why is it you met with Mr. Telmer
5  in particular, why him?
6      A.   Because based on the questions
7  themselves I was -- I wanted to be as
8  knowledgeable as I could about -- if I was
9  looking at the spreadsheet itself, you know,
10 how in particular number 1 how it was
11 organized and also how it appeared and why the
12 data appeared that way on the spreadsheet.
13     Q.   Again you are referring to a
14 particular spreadsheet or a set of
15 spreadsheets generally?
16     A.   There were spreadsheets that Mr.
17 Telmer and I worked on which were the basis of
18 what we concluded the positions were, and
19 those spreadsheets were sent to finance and to
20 treasury, and data from those spreadsheets in
21 various forms have been, you know, cut, paste.
22 I referenced earlier that the spreadsheet that
23 we saw there was work that came from work that
24 Mr. Telmer and I had done, but that particular
25 version was not the spreadsheet specifically

1          Hraska
2    topic by topic?
3         A.   Okay.
4         Q.   Topic 32, Schedule B to the
5    clarification letter including A, the origin
6    of Schedule B, including who compiled it.
7              Do you see that section, sir?
8         A.   Yes.
9    DI   Q.   Did you prepare these notes by the
10   way?
11             MR. SHAW:  The notes were prepared
12        through a process that involves
13        privileged communication and we are not
14        going to go into it.
15        Q.   Are these notes accurate to the
16   best of your knowledge, sir?
17        A.   Yes.
18        Q.   Under topic A it says, in your
19   notes, Schedule B was referenced in the
20   clarification letter and represented the
21   party's best effort, based on the information
22   available at the time, to list the quote,
23   clearance box, quote, securities that Barclays
24   was entitled to receive.
25             It goes on to say because there

1          Hraska
2    was imperfect information when Schedule B was
3    filed with the court the parties agreed that
4    Barclays retain its right to amend or
5    supplement that list.
6              Do you see that?
7         A.   Yes, I do.
8         Q.   Can you tell me please as Barclays
9    30(b)(6) witness on this topic which
10   individuals on behalf of Lehman agreed that
11   Barclays retained its right to amend or
12   supplement that list?
13             MR. SHAW:  A joint motion filed
14        with the court.
15        A.   I wouldn't --
16             MR. OXFORD:  Are you testifying?
17             MR. SHAW:  I am letting you know
18        that, you know --
19        A.   I don't know who on Lehman's
20   behalf agreed to retain the rights.
21        Q.   Do you know who agreed on
22   Barclays' behalf?
23        A.   I don't know.
24        Q.   Do you know whether there was any
25   such agreement at the time of the closing on

1          Hraska
2    September 22nd?
3         A.   It has been referenced there was
4    an agreement.  I wasn't part of the closing on
5    September 22nd, I didn't witness that
6    agreement.
7         Q.   But, sir, you are Barclays'
8    30(b)(6) witness and your 30(b)(6) deposition
9    notes --
10        A.   It is my understanding there was
11   an agreement.
12        Q.   But you are not able to tell me
13   who in particular was a party to that
14   agreement, sir?
15        A.   No.
16        Q.   Do you know whether there is any
17   such agreement reflected in the clarification
18   letter, sir?
19        A.   I don't know, but I would have to
20   review the clarification.
21        Q.   I believe you have in your
22   document set Exhibit 25?
23        A.   Okay.
24        Q.   You have seen this document
25   before, sir, correct?

1          Hraska
2         A.   I have, yes.
3         Q.   Are you familiar, sir, with the
4    section in this document that references the
5    Schedule B that is the topic of your 30(b)(6)
6    deposition?
7         A.   Could you repeat the question.
8         Q.   The section of the clarification
9    letter that deals with Schedule B that is the
10   topic of your 30(b)(6) deposition today?
11        A.   Yes, I would want to review it
12   again.
13        Q.   Please do so as you need and let
14   me know when you have done it.
15             MR. SHAW:  You want to tell him
16        which parts of the letter you want to
17        look at?
18             MR. OXFORD:  Yes.
19        Q.   I believe the only section of this
20   letter that references Schedule B is clause
21   1-A (ii) under purchased assets on page 1
22   which spills over to the first few lines of
23   page 2.
24        A.   All right.
25        Q.   Have you had a chance to conduct a

1          **Hraska**
2   sufficient review of Exhibit 25, sir?
3       A.   Yes, I have.
4   DI   Q.   Can you tell me, sir, as Barclays'
5   30(b)(6) witness whether there is any --
6   anywhere reflected in the clarification letter
7   any agreement between the parties that
8   Barclays retained any right to amend or
9   supplement Schedule B?
10          MR. SHAW:  Objection.  Beyond the
11      scope of the 30(b)(6) testimony.  He is
12      not here to testify about the content or
13      meaning of the clarification letter.  As
14      I already indicated to you the agreement
15      in question was contained in a joint
16      motion filed with the court and not the
17      clarification letter.
18      Q.   Do you have the question in front
19   of you, sir?
20      A.   Could you read it back.
21      (Record read.)
22          MR. SHAW:  I continue to object.
23   Beyond the scope of the 30(b)(6)
24   designation and I am going to instruct
25   him not to answer this question as

TSG Reporting - Worldwide    877-702-9580

1          Hraska
2   Barclays witness.  If you want to ask him
3   that question in his personal capacity
4   you are welcome to do so.
5       Q.   Well, we can disagree or agree on
6   the scope of the notice, but I will ask it in
7   the witness' personal capacity.
8          Do you have the question in front
9   of you, sir?
10      A.   Read it back.
11      (Record read.)
12      A.   From the review of this document
13   it does not appear there to be any agreement
14   in that section.
15      Q.   Or any other section that you can
16   see today, sir?
17      A.   Well I only reviewed that section.
18      Q.   Moving further down your notes,
19   sir, again under topic 32-A, you say that
20   Schedule B was compiled by many people
21   including -- and then you List A number of
22   names here?
23      A.   Yes.
24      Q.   Can you tell me, please, for each
25   of them in turn who they were employed by

TSG Reporting - Worldwide    877-702-9580

1          **Hraska**
2   prior to the closing of the deal on September
3   22nd and what their role was in compiling
4   Schedule B?
5       A.   Sure.  Anthony Crispino employed
6   by Lehman Brothers was a clearance
7   representative.  William -- let me go back to
8   Anthony Crispino.  He provided data as to the
9   depot accounts along with -- depot accounts is
10   enough.
11          William Parrinello was a
12   technologist whose specialty was in the GFS
13   system.  Myself also employed by Lehman
14   Brothers who worked interpreting the data once
15   retrieved.  Nancy Denig who also worked at
16   Lehman Brothers who works in my organization
17   also to do interpretation work and spreadsheet
18   work.
19          Paolo Tonucci also at Lehman
20   Brothers was the recipient of the data from
21   the treasury group.  Robert Azerad at Lehman
22   Brothers, worked for Robert Azerad at
23   treasury, also a recipient of data, as well as
24   reviewing the data and providing the
25   spreadsheets.  And the legal, the gentleman

TSG Reporting - Worldwide    877-702-9580

1          Hraska
2   from Weil, Gotshal, I am not sure what their
3   role was.
4       Q.   You write that Schedule B was
5   compiled by many people including the list of
6   people that you named here.  Do you know
7   whether there were any other people involved
8   in the compilation of Schedule B?
9       A.   How broad are you defining
10   involved; the primary people for its genesis
11   are listed.  There may have been other people
12   who worked in the organizations for these
13   people who either reviewed a portion or made
14   suggestions or something like that.  But
15   beyond the scope of the list of people listed
16   here I wouldn't know who these people might
17   have instructed somebody else to look at.
18      Q.   That is understood.
19      A.   Yes.
20      Q.   Can you give me more information
21   on the interpretation work that Nancy Denig
22   did in the compilation of Schedule B?
23      A.   She was primarily my spreadsheet
24   mechanic.  She is -- I am an average
25   spreadsheet user, she is a much better

TSG Reporting - Worldwide    877-702-9580

Page 66

1                    Hraska
2    spreadsheet user with results around pivoting
3    and macro'ing, and sorting and filtering.
4        Q.    That doesn't sound like
5    interpretation work to me.  I asked you about
6    the interpretation work that Nancy Denig did?
7        A.    So then I would say that that
8    is -- that was an incorrect description then.
9    She would have taken the spreadsheet, I would
10   have asked her for specifics -- series of data
11   and she would have filtered it out and
12   provided that.
13       Q.    Yes.
14       A.    She was also familiar with -- she
15   was very familiar with the GFS system and we
16   were using that as a primary search tool.  So
17   William Parrinello, Nancy and myself were
18   working to create the rules to pull data using
19   the GFS system.
20       Q.    I think you testified that
21   Mr. Tonucci and Mr. Azerad were recipients of
22   did data, do you remember that testimony?
23       A.    Yes, I do.
24       Q.    In your notes you list both of
25   those individuals as people who were involved

TSG Reporting - Worldwide    877-702-9580

Page 67

1                    Hraska
2    in compiling Schedule B.  Can you tell me what
3    the role was of Mr. Tonucci in compiling
4    Schedule B?
5        A.    He had primarily instruction to
6    look for clearance box assets came from Mr.
7    Tonucci.  So it was at his direction that we
8    were doing it.  So I interpreted that to be
9    that he was involved in compilation work.
10       Q.    Is it accurate to say that Mr.
11   Tonucci wasn't involved in the gathering or
12   analysis of data to your knowledge?
13       A.    I would say he was not involved in
14   the gathering of data.  I believe he was
15   heavily involved in the analysis of data.
16       Q.    Tell me what you recall or rather
17   tell me what you know about Mr. Tonucci's
18   instruction to look for clearance box assets?
19       A.    He had requested us to look for
20   assets which were not segregated or fully paid
21   for which could be -- which could be delivered
22   to Barclays if requested as part of the
23   purchase agreement.
24       Q.    When did Mr. Tonucci issue that
25   request to you?

TSG Reporting - Worldwide    877-702-9580

Page 68

1                    Hraska
2        A.    He didn't issue it directly to me.
3    He would have issued it to Alister Blackwell.
4    I would have been on call subsequent to that
5    where he would have been describing what his
6    request was.  But that would have been -- I am
7    not certain the time it would have been I
8    believe on that Saturday.  I believe that is
9    the 20th of September.
10       Q.    Did Mr. Tonucci issue a -- or
11   request Mr. Blackwell gather a specific amount
12   of non-segregated or non-fully paid for assets
13   that could be delivered to Barclays?
14       A.    I believe we were looking for a
15   target of approximately 1.9 billion.
16       Q.    Who was that target set by, sir?
17       A.    From my perspective Mr. Tonucci.
18   I don't know who agreed or who set it.
19       Q.    It is from your perspective Mr.
20   Tonucci, how do you know that?
21       A.    Because we were asked to find the
22   clearance box assets and we were asked to find
23   at least 1.9 billion of them.
24       Q.    Was it Mr. Blackwell who asked you
25   to find at least 1.9 billion of assets that

TSG Reporting - Worldwide    877-702-9580

Page 69

1                    Hraska
2    could be delivered to Barclays?
3        A.    I mean Mr. Blackwell would have
4    sent a communication down to me.  I don't know
5    whether it would have been to join a meeting
6    to discuss it or he directly told either
7    myself or Mr. Forest who I worked for to send
8    that message down to us.  At the end of the
9    day I mean the instruction came from Mr.
10   Tonucci.  So specifically who gave it to me I
11   don't recall.
12       Q.    You don't list any Barclays
13   personnel as involved in the compilation of
14   Schedule B; is that correct?
15       A.    That is correct.
16       MR. SHAW:  A point of
17   clarification, you mean --
18       MR. OXFORD:  Is it correct --
19       MR. SHAW:  You mean preclosing
20   Barclays employees or --
21       MR. OXFORD:  We are going to get
22   there.
23       A.    Could you repeat the question
24   again.
25       Q.    Focusing on the timeframe prior to

TSG Reporting - Worldwide    877-702-9580

Page 70

Hraska

1
2  closing?
3      A.  Prior to closing, okay.
4      Q.  Were any employees of Barclays or
5  representatives of Barclays involved in the
6  compilation of Schedule B?
7      A.  In the compilation of Schedule B,
8  I would -- not to my knowledge.
9      Q.  Focusing on the timeframe between
10 the closing on the 22nd of September and
11 September 30, 2008 do you know whether any
12 employee of Barclays, including legacy Lehman
13 employees who transferred to Barclays, worked
14 on the compilation of Schedule B?
15     A.  Yes.
16     Q.  Are those Barclays employees the
17 former Lehman employees that are listed in
18 paragraph 2 of your notes?
19     A.  Yes.
20     Q.  Are there any others?
21     A.  Not that I am aware of, no.
22     Q.  Does Barclays have any knowledge,
23 sir, about the role if any of the Weil,
24 Gotshal firm in the compilation of Schedule B
25 at any time?

TSG Reporting - Worldwide    877-702-9580

Page 71

Hraska

1
2      A.  I would say yes.
3      Q.  What is that knowledge, sir?
4      A.  I don't know what that knowledge
5  is, but as a matter that Barclays is entitled
6  to and has possibly reviewed previous E-mails,
7  you know, regarding any of these testimonies,
8  I would have to think that firm's name or
9  references to Schedule B would have come up.
10     Q.  Your 30(b)(6) deposition notice
11 includes the topic the origin of Schedule B
12 and who compiled it; correct?
13     A.  Right, and the reason -- okay,
14 yes.
15     Q.  Your notes reflect the involvement
16 of the Weil, Gotshal firm including David
17 Murgio, M-U-R-G-I-O?
18     A.  Yes.
19     Q.  You have testified on behalf of
20 Barclays, Barclays believes that the Weil,
21 Gotshal firm is involved in the compilation of
22 Schedule B; is that correct?
23     A.  Yes.
24     Q.  Can you tell me, please, as
25 Barclays representative what the involvement

TSG Reporting - Worldwide    877-702-9580

Page 72

Hraska

1
2  is Barclays says Weil, Gotshal had in the
3  compilation of Schedule B?
4      A.  In my review for this I saw that
5  there was an E-mail that Weil, Gotshal was --
6  on which discussed some of the components of
7  Schedule B, which is why I included them on
8  this.
9      Q.  What is the date of that E-mail?
10     A.  I don't recall.
11     Q.  Can you give me an approximate
12 date?
13     A.  Can I give you a range?
14     Q.  Yes, a range would be a good
15 start?
16     A.  The 22nd to the 30th of September.
17     Q.  The E-mail was from whom and to
18 whom?
19         MR. SHAW:  If you recall?
20     A.  I honestly don't recall.  I
21 reviewed -- I honestly don't recall.
22     Q.  Was either the sender or the
23 recipient an employee of the Weil, Gotshal law
24 firm?
25     A.  Yes.  It would have been David

TSG Reporting - Worldwide    877-702-9580

Page 73

Hraska

1
2  Murgio who is listed probably.
3      Q.  The basis for your testimony about
4  Weil, Gotshal's involvement, is it just this
5  one E-mail or are there any other documents?
6      A.  The basis of my testimony was
7  based on that E-mail.
8      Q.  Are you aware of any other
9  documents as Barclays representative that form
10 the basis of Barclays's belief that the Weil,
11 Gotshal law firm was involved in the
12 compilation of Schedule B?
13     A.  I am not aware from the documents,
14 no.
15     Q.  What can you tell me, sir, about
16 the content of the E-mail that is the basis
17 for your testimony for Barclays that Weil,
18 Gotshal was involved in the compilation of
19 Schedule B?
20     A.  If I recall it was a discussion
21 of -- it was a discussion of the assets and I
22 remember there was a discussion about the
23 assets, there was a distinction as to
24 different assets and potentially their
25 locations.  But beyond that I don't remember

TSG Reporting - Worldwide    877-702-9580

Page 74

1              Hraska
2    the details.
3        Q.    Turning to topic 32-B, sir?
4        A.    Yes.
5        Q.    Was it your intention in compiling
6    Schedule B to exclude any fully paid customer
7    or affiliate securities?
8        A.    Yes.
9        Q.    Do you believe that was the
10   intention of all of the individuals who you
11   have testified were involved in compiling
12   Schedule B?
13       A.    Yes.
14       Q.    Did someone issue to you a
15   direction to exclude any fully paid customer
16   or affiliate securities from Schedule B?
17       A.    Yes, that would have been Paolo.
18       Q.    Do you agree with me, sir, that if
19   any fully paid customer or affiliates were
20   accidentally included on Schedule B, they
21   should be removed from that list?
22       MR. SHAW:  Objection.  Calls for a
23   legal conclusion.  Beyond the scope of
24   the 30(b)(6).
25       Q.    Was it the intention, sir, in
         TSG Reporting - Worldwide    877-702-9580

Page 75

1              Hraska
2    compiling Schedule B that only unencumbered
3    assets in Lehman's clearing box be included?
4        A.    Yes.
5        Q.    Can you tell me please what you
6    mean by the term or understand by the term
7    unencumbered assets?
8        A.    Assets which would have been fully
9    paid for by a -- I am sorry, assets which were
10   not fully paid for by a customer.
11       Q.    If assets had been pledged by
12   Lehman for example as part of a bank loan,
13   would those assets be eligible to your
14   understanding for the inclusion in Schedule B?
15       A.    It would have depended on whether
16   the pledge itself was carried out in a manner
17   which would have reflected on the stock record
18   that it was a segregated account versus a
19   non-segregated account.  Had it been placed in
20   a segregated account they would have been
21   excluded from Schedule B.
22       Q.    If it was pledged but not placed
23   in a segregated account it would have been
24   included in Schedule B?
25       A.    If the securities would have been
         TSG Reporting - Worldwide    877-702-9580

Page 76

1              Hraska
2    in an account which would have appeared on the
3    stock record as unsegregated, then it would
4    have appeared on Schedule B.
5        Q.    Did you understand the direction
6    from Mr. Tonucci to identify approximately 1.9
7    billion of assets in the Lehman clearing boxes
8    to include a direction to search for assets
9    that Lehman had pledged but not segregated?
10       A.    Could you be more specific on
11   pledged?
12       Q.    I am not sure I can.  Can you be
13   more -- can you answer my question like that?
14       A.    Well Schedule B as referenced here
15   was the composition of two components.  One
16   which were securities which were pledged to
17   the Bank of New York for the benefit of
18   Barclays.  Those assets were skill in Lehman's
19   clearance boxes, but were pledged for the
20   benefit of Bank of New York.  And then the
21   second component of that would have been the
22   work that was done around the review of the
23   stock record using GFS which would have
24   yielded securities in accounts which were in
25   non-segregated locations.
         TSG Reporting - Worldwide    877-702-9580

Page 77

1              Hraska
2        Q.    Was it your intention, sir, to
3    include both of those categories of assets in
4    Schedule B, or only one?
5        MR. SHAW:  Asked and answered.
6        Q.    Was it your intention, sir, to
7    include on Schedule B the assets that Lehman
8    pledged on Friday the 19th of September?
9        A.    The original exercise was to look
10   for assets which were purely on the Lehman
11   stock record as unencumbered.  We were later
12   instructed by Mr. Tonucci to also include
13   these assets which were pledged on the 19th as
14   well as part of Schedule B.
15       Q.    When did that instruction to
16   include the pledged assets from September 19th
17   come from Mr. Tonucci?
18       A.    I don't have a specific time, but
19   it would have been in the latter part of that
20   weekend.
21       Q.    So before the closing of the
22   transaction?
23       A.    Yes, correct.
24       Q.    If a security was pledged by
25   Lehman as part of a bank loan but not placed
         TSG Reporting - Worldwide    877-702-9580

Page 78

Hraska

1  in the segregated account did you understand
2  Mr. Tonucci's direction to you, you or
3  Mr. Blackwell, to include such a security on
4  Schedule B or exclude it from Schedule B?
5           MR. SHAW: Objection to the form.
6      A.   His direction was never specific
7  about securities which were pledged on bank
8  loan or not.  The first part of the direction
9  was to include assets as I testified which
10  were not fully paid for.  Later the direction
11  was to add to the list that we had already
12  created the securities which were pledged on
13  the 19th.  As to why I don't remember.
14      Q.   When you were creating the
15  Schedule B prior to closing or were involved
16  in the process that led to the creation of
17  Schedule B prior to closing, did you include
18  assets that Lehman had pledged as part of a
19  bank loan but had not placed in a segregated
20  account?
21           MR. SHAW: You mean other than as
22  stated in the sentence you are focusing
23  on, or just that?
24      Q.   My question was without reference

TSG Reporting - Worldwide      877-702-9580

Page 79

Hraska

1  to any sentence?
2      A.   To the best of my knowledge it
3  would have not included that.  It would not
4  have included securities that were pledged to
5  bank loans by the definition of the rules
6  applied to the search.
7      Q.   Can you be more specific about
8  that?
9      A.   To specify that, if something was
10  pledged for the purposes of a specific bank
11  loan, typically a transaction like that would
12  be in an account that was fully segregated.
13  So by our rules of not including fully
14  segregated accounts we wouldn't have
15  anticipated to pick up any assets that were
16  part of a bank loan transaction.
17      Q.   If for some reason there were in
18  the accounts that you were looking at under
19  the rules you just testified to securities
20  that were pledged for a bank loan, do you have
21  an understanding of whether or not those
22  securities should be included on Schedule B or
23  excluded from Schedule B?
24           MR. SHAW: Objection.  Calls for a

TSG Reporting - Worldwide      877-702-9580

Page 80

Hraska

1  legal conclusion.  Incomplete
2  hypothetical.
3      A.   So do I answer?
4           MR. SHAW: If you can answer it.
5           THE WITNESS: Could you repeat the
6  question.
7           (Record read.)
8      A.   I don't have an understanding as
9  to whether they would be -- should be included
10  or not because it would have been dependent on
11  the terms of the bank loan.
12      Q.   Why would it have been dependent
13  on the terms of the bank loan, sir?
14      A.   Some agreements require a full
15  segregation of assets and some do not.
16      Q.   You see in your notes at 562-D,
17  page 1, the second paragraph under topic 32-B,
18  the methodology for compiling it.  Do you see
19  that you write:  After the closing those same
20  individuals and others attempted to verify
21  that the assets on the list had either been
22  transfers (on the 19th, 29th or 30th), or
23  showed on Lehman's stock record as available
24  to be transferred.

TSG Reporting - Worldwide      877-702-9580

Page 81

Hraska

1      A.   Yes.
2      Q.   Who were the others that you were
3  referencing in that sentence?
4      A.   It would have been individuals who
5  worked for the people listed above.  So -- and
6  not necessarily that there were folks who
7  worked for every single person listed above,
8  but there may have been individuals who worked
9  for particular people who were involved.  For
10  example in clearance.
11      Q.   You go on to say in that same
12  paragraph:  There was also an attempt to
13  identify any additional assets in Lehman's
14  clearance boxes that were not customer or
15  affiliate assets that had been fully paid for.
16      A.   Yes.  Right.
17      Q.   Schedule B was a result of those
18  processes.
19           Do you see that?
20      A.   I do, yes.
21      Q.   Is that for those processes that
22  you described in that paragraph, did they take
23  place between the closing of the deal on
24  September 22nd and September 30, 2008?

TSG Reporting - Worldwide      877-702-9580

**Hraska**

1
2  A.  Yes.
3  Q.  I think I have your prior
4  testimony on this, but you as Barclays
5  30(b)(6) representative on Schedule B are not
6  aware of any differences between the Schedule
7  B that was available at the closing of the
8  transaction and the Schedule B that was
9  ultimately filed with the Bankruptcy Court; is
10  that correct?
11       MR. SHAW:  Objection to the form.
12  A.  I don't know of any differences
13  between the schedules.  There is a possibility
14  after I had submitted the work that we did on
15  that weekend that it might have been an asset
16  or two which was, or maybe more, which were
17  added or deleted.  But I was not -- I didn't
18  do a comparison of those two to see if there
19  were differentials.
20  Q.  Again as Barclays 30(b)(6)
21  representative on topic number 2 you don't
22  have any information about any differences
23  between the Schedule B version that was
24  available at the closing on the 22nd and the
25  version of Schedule B that was ultimately

**Hraska**

1
2  filed with the Bankruptcy Court; is that
3  correct?
4       MR. SHAW:  Objection to the form.
5  Goes beyond the scope of his 30(b)(6)
6  testimony.  You can answer though.
7  A.  That is correct.
8  Q.  Turning to topic C, Barclays has
9  analyzed Schedule B, you write:  Barclays is
10  not aware of any non-privileged analysis of
11  schedule.
12       Do you see that?
13  A.  Yes.
14  Q.  When we were looking at Exhibit
15  561-D you testified about a column entitled
16  Schedule B Quantities.  Do you remember that
17  testimony?
18  A.  I do, yes.
19  Q.  You testified about what you
20  understood to be the analysis that underlay
21  the data in that column?
22  A.  Yes.
23  Q.  Do you not consider that to be an
24  analysis of Schedule B?
25  A.  I took analysis to be more so

Hraska

1
2  related to assets, asset types, you know, that
3  kind of thing, sort of the nature of the
4  assets, and not necessarily analysis of what
5  was on one schedule versus another or
6  delivered or not, and that kind of thing.  It
7  could possibly be just my interpretation.
8       MR. OXFORD:  Off the record for a
9  second.
10       (Luncheon recess:  12:32 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Hraska

1
2  A F T E R N O O N   S E S S I O N
3  (Time noted:  12:55 p.m.)
4  J I M   H R A S K A,  resumed and
5  testified as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. OXFORD:
8  Q.  Mr. Hraska, could you have in
9  front of you again your notes for the 30(b)(6)
10  deposition, Exhibit 562-D, please?
11  A.  Yes.
12  Q.  I would like to turn now to topic
13  33 and your notes on that subject?
14  A.  Yes.
15  Q.  Topic 33 is Exhibits A and B to
16  the Granfield letter, including A, who
17  prepared each exhibit and the methodology used
18  to prepare each exhibit?
19  A.  Yes.
20  Q.  You list individuals primarily
21  involved in the creation of what you described
22  as Lists A, B1, B2 and C, we will get into the
23  detail of that momentarily, but if you could
24  just generally describe for me what you
25  understand to be meant by Lists A, B1, B2 and

## Page 86

```
 1              Hraska
 2    C in turn?
 3         A.   In the aggregate or individually?
 4         Q.   Individually if you could just
 5    give me a top line understanding of List A and
 6    the other lists that you reference there,
 7    please?
 8         A.   List A would have been securities
 9    which were firm inventory only positions.  So
10    there would have been no other entries to the
11    stock record other than firm inventory
12    accounts and depot accounts for those
13    particular securities.
14         List B1 was the subset of data
15    where securities had positions on a stock
16    record where -- I want to clarify this so it
17    is not confusing.
18         List B1 were securities that we
19    believed were firm securities, however they
20    were securities on a stock record which
21    included positions in a depot that had both
22    firm inventory as well as non-firm inventory.
23         List C would have been securities
24    where there were only customer securities on
25    the stock record and the depot securities.
```
TSG Reporting - Worldwide    877-702-9580

## Page 87

```
 1              Hraska
 2         Q.   Thank you.
 3         A.   Your welcome.
 4         Q.   You List A number of individuals
 5    primarily involved in the creation of those
 6    lists?
 7         A.   Yes.
 8         Q.   There are two names I don't
 9    believe you testified about before today.  The
10    first name that is new to me is John Vergel,
11    V-E-R-G-E-L, de Dios?
12         A.   Yes.
13         Q.   Can you tell me what his
14    involvement was in the creation of Lists A
15    through C?
16         A.   His involvement was he did some
17    spreadsheet work along with Colin Telmer.  So
18    he worked in treasury for Robert Azerad, and
19    both he and Colin did some spreadsheet work
20    around the analysis of the results.  John had
21    primarily focussed on the spreadsheet work on
22    the earlier -- sort of the earlier phases, and
23    then I don't know if John left the firm or if
24    he was no longer in treasury, but Colin took
25    over the spreadsheet work for Robert at a
```
TSG Reporting - Worldwide    877-702-9580

## Page 88

```
 1              Hraska
 2    later point in time.
 3         Q.   The next name new to me is Josie
 4    Ocreto?
 5         A.   Yes.  She was a technologist from
 6    the TMS system.
 7         Q.   Below those names you explain that
 8    Exhibit A reports the results of List A?
 9         A.   Yes.
10         Q.   And Exhibit B reports to results
11    of List B, do you see that?
12         A.   Yes.
13         MR. SHAW:  List B1.
14         A.   Yes.
15         Q.   Are those Exhibit A and Exhibit B
16    that you reference in that section of your
17    notes the same Exhibits A and B to the Cleary
18    Gottlieb letter from March of 2009 that I
19    marked as Exhibit 156-B?
20         A.   Yes.
21         Q.   You go on to write:  Exhibit C
22    reports the results of a subset of Lists B2/C,
23    sometimes referred to as B2 and C?
24         A.   Yes.
25         Q.   Exhibit C is an exhibit to what
```
TSG Reporting - Worldwide    877-702-9580

## Page 89

```
 1              Hraska
 2    document if you know, sir?
 3         A.   I don't recall.
 4         Q.   When was Exhibit C created?
 5         A.   Exhibit C would have been created
 6    in late June of 2009.  I believe late June.
 7    Well the data that went into -- I should
 8    clarify that the data that went into the
 9    Exhibit C as you see it was done in late June.
10    I am not a hundred percent certain when C was
11    created as you see it after that.  I would
12    assume very shortly thereafter.
13         Q.   The underlying data analysis that
14    is reflected in Exhibit C was performed in
15    June of 2009?
16         A.   Yes, that is correct.
17         Q.   Do you have any information, sir,
18    about when if at all Exhibit C has been
19    provided to the SIPA trustee?
20         A.   I believe it has, yes.
21         Q.   Tell me what you know about that,
22    please?
23         A.   From a conversation I had with --
24         MR. SHAW:  I don't want you to get
25    into any privileged conversations.
```
TSG Reporting - Worldwide    877-702-9580

Page 90

```
 1                    Hraska
 2         THE WITNESS:  So then somebody who
 3    is Barclays legal is considered a
 4    privileged conversation?
 5         MR. SHAW:  That is right.
 6    In-house lawyers are lawyers too.
 7         If you can't answer the question
 8    on the basis of non-privileged
 9    information just say so.  Let me step
10    outside for a moment.  Off the record.
11         (Recess taken.)
12    A.   I have no non-privileged
13    information on the topic.
14    Q.   It appears at the bottom of page 2
15    and on through page 3 Mr. Hraska your notes
16    describe the process by which in the first
17    instance List A was compiled; is that correct?
18    A.   That is correct.
19    Q.   Can you tell me if in the process
20    of compiling List A Barclays provided for any
21    exceptions in the depot ranges?
22         MR. SHAW:  Objection to the form.
23    Vague.
24    A.   No.  There was no exception in the
25    depot ranges.
```

TSG Reporting - Worldwide    877-702-9580

Page 91

```
 1                    Hraska
 2    Q.   Can you tell me why that was,
 3    please?
 4    A.   I cannot, no.
 5    Q.   Did Barclays perform any testing
 6    of the results that were generated in the
 7    process described on page 2 and page 3 of your
 8    notes in generating List A?
 9         MR. SHAW:  Objection to the form.
10    Vague.
11    A.   I am not aware of any testing that
12    was done, or that any would have been
13    possible.  The data that we had was the stock
14    record and we applied these selection criteria
15    to it.
16    Q.   On the basis of these, the
17    application of these selection criteria is
18    Barclays confident that every CUSIP listed on
19    Exhibits A and B actually existed in Lehman's
20    clearance boxes as at the closing of the
21    transaction on September 22nd?
22         MR. SHAW:  Objection to the form.
23    A.   These criteria were applied from a
24    data set that was taken as of November 17th,
25    not September 22nd.  So that it would not have
```

TSG Reporting - Worldwide    877-702-9580

Page 92

```
 1                    Hraska
 2    necessarily reflected what was on September
 3    22nd.
 4    Q.   Do you have any basis to believe
 5    that any of the CUSIP's on Exhibits A and B
 6    were added to Lehman's clearance boxes after
 7    the closing of the transaction on September
 8    22, 2008?
 9    A.   Could you repeat the question.
10         (Record read.)
11    A.   Well all I can say is that we took
12    the position off of the stock record which was
13    the in-house books and records.  So as it
14    appeared to the books and records, whatever
15    was there as of that date would have been what
16    we reported on.
17         As to whether physically anything
18    was moved in or out of the clearance box in
19    that time period, I wouldn't have any
20    knowledge of that.
21    Q.   You said you took the position off
22    of the stock record as of which date, November
23    17th or September 22nd?
24    A.   November 17th.
25    Q.   Did Barclays in conducting its
```

TSG Reporting - Worldwide    877-702-9580

Page 93

```
 1                    Hraska
 2    analysis assume that all securities that were
 3    in the stock record on November 17, 2008 were
 4    also in the stock record as of September 22,
 5    2008?
 6    A.   The period of September 22nd or
 7    the time around September 22nd the stock
 8    record had a lot of what we would define as
 9    breaks which were inconsistencies due to what
10    was going on in the market at that time.  You
11    know, data providers not sending in data,
12    things along that nature.  It took some time
13    to work through some of these discrepancies
14    to create accurate records, and it was not until
15    November that we felt that these breaks and
16    differences had been reconciled through to the
17    point that we felt confident with the stock
18    record data.  So that is why we took the data
19    in November.
20    Q.   And did the data that you worked
21    from in November after the reconciliation
22    process you just testified to that you used to
23    create Exhibits A and B, did that reflect the
24    securities that were in Lehman's clearance
25    boxes at the time of closing on September
```

TSG Reporting - Worldwide    877-702-9580

1              Hraska
2    22nd, or securities that were in Lehman's
3    clearance boxes at some later date such as
4    November 2008?
5         A.   It would have been what was on the
6    stock record as a reflection of what was in
7    the clearance box, not necessarily what was in
8    the actual clearance box being held either at
9    the custodian or DTC.  We only have the stock
10   record information available to us to analyze.
11   And because of the breaks that needed to be
12   resolved as well as there should not have been
13   any other new activity other than break
14   resolution going on, we felt confident that
15   the positions once reconciled through in
16   November should have reflected reasonably what
17   would have been expected to have been there on
18   the 22nd as well.
19        Q.   If I understand your testimony
20   correctly, Mr. Hraska, you used in November
21   2008 in compiling the data that came in
22   Exhibits A and B, two sources of data.
23   Firstly Lehman's stock record, and secondarily
24   information from the custodians including DTC;
25   is that correct?

1              Hraska
2         MR. SHAW:  Objection.
3    Mischaracterizes the testimony.
4         A.   No.  We used the data from the
5    stock record and we did not use specific data
6    for that analysis from the custodian's
7    directly.
8         Q.   What was the date of the data --
9    withdrawn.
10        The data from the stock record
11   that you used in November of 2008 to compile
12   what became Exhibits A and B reflected the
13   position in Lehman's clearing boxes as of
14   which date, sir?
15        A.   As reflected on the stock record
16   it would have been the positions that were
17   there on the 17th of November.
18        Q.   Turning to your notes at the
19   bottom of page 3?
20        A.   Yes.
21        Q.   On topic B1, do you see those
22   notes?
23        A.   Yes.
24        Q.   I think I understand it, but I
25   wanted to ask you a question by way of a

1              Hraska
2    hypothetical example so I can put some numbers
3    in this and make sure that I am not missing
4    something.
5         If for example the stock record
6    showed that there were 300 CUSIP's, 200 of
7    which belonged to the customer, and there were
8    only 90 remaining at the depot, did the rules
9    result in only 90 CUSIP's being added to B1?
10        A.   I think you might have -- or maybe
11   I didn't describe it clear enough.
12        These rules were not to the number
13   of CUSIP's, but rather for each CUSIP how the
14   quantity was determined.  So to use an
15   example, if there were -- if there was one
16   CUSIP that had a hundred shares in the
17   depository or in the depot account, and there
18   was a customer position of 50, we would have
19   subtracted out the customer position to
20   reserve those shares of -- those 50 shares for
21   the customer, and we would have reflected the
22   remaining 50 shares on B1.
23        We would have done that for every
24   CUSIP, which is why the lists yielded what
25   they did.  Some securities only had customer

1              Hraska
2    positions and some only had firm, and some had
3    a mixture of both, which is why we had to
4    split B into B1 and B2.
5         Q.   Sir in your example if the stock
6    record showed that there were 110 shares of
7    that CUSIP in the depot and the customer
8    position of 50, but there were only a hundred
9    shares in the depot record, how many shares
10   would be added to B1?
11        A.   I am not sure that your question
12   makes sense.  Could you repeat it -- based on
13   the terms you used.
14        Q.   Can you read it back.
15        (Record read.)
16        A.   We only had a view of the depot
17   record.  So in that case we would have only
18   seen that there was a hundred in the depot.
19        Q.   So there was no analysis of the
20   stock record in your steps to compile B1?
21        A.   I think it is too broad of a
22   question.  There was an analysis, the analysis
23   was based off of these criteria.  We did that
24   analysis based off of the depot positions as
25   reflected on the stock record at a point in

Page 98

```
1                Hraska
2    time where the depots on the stock record
3    should have been reasonably reconciled to the
4    actual custodians where they would resolve
5    numerous breaks up to that point.  So at that
6    point we felt confident to purely use the
7    stock record.
8        Q.   You see in the list of report
9    rules, you see item 3, it says:  From the
10   remaining depot balances after customer
11   positions have been taken away, take the
12   lesser of the summary of the inventory
13   positions (931 range) for remaining depot
14   balance.
15           That is what prompted my
16   questions?
17       A.    So the reason that rule was put
18   into place was that if there were still breaks
19   which had not fully been resolved, as I
20   testified there was a large number had been
21   resolved, but to the extent there were not
22   stock records have to be balanced.  Long being
23   the asset side, short being depository.
24           So in the example of if there was
25   a hundred shares in the stock record as being
```
TSG Reporting - Worldwide    877-702-9580

Page 99

```
1                Hraska
2    in the depot, 50 of it belonging to a
3    customer, perhaps 40 of it belonging to an
4    inventory trader, and 10 sitting in a break
5    account because it was unresolved, we would
6    have taken the lesser of the quantity and not
7    taken the full depot position at that point in
8    time.
9        Q.   I understand.  That explanation
10   was helpful, thank you.
11           If you can turn the page to number
12   4, page 4, topic, customer only list, List C?
13       A.   Yes.
14       Q.   Can you tell me when this, the
15   effort behind the List C was begun; is that
16   the same process that was begun in June of
17   2009 that you testified about earlier?
18       A.   Yes.  For List C that is correct.
19       Q.   And from whom did you --
20   withdrawn.
21           Who asked you to get involved in
22   the process that generated List C?
23       A.   List C, not Exhibit C, List C as
24   listed on this page 4; right?
25       Q.   Yes.
```
TSG Reporting - Worldwide    877-702-9580

Page 100

```
1                Hraska
2        A.   List C would have been ultimately
3    still at the direction of treasury along with
4    Lists A, B1 and B2.  That exercise was all
5    done at the same time, and the reason we
6    separated it was to understand the nature of
7    those securities.  So it was
8    one data set that was broken out to subsets
9    according to ownership.
10       Q.   Who asked you personally to get
11   involved in the data analysis that resulted in
12   List C?
13       A.   Robert Azerad.
14       Q.   When did he first ask you to get
15   involved in the List C creation process?
16           MR. SHAW:  When you say the List C
17   creation process, you mean A, B1, B2 and
18   C process?
19       Q.   No, the List C creation process?
20       A.   As previously testified they are
21   one in the same.  So that would have been --
22   that specific process would have -- the
23   discussions to do the analysis would have been
24   in early November, and then subsequently we
25   pulled the data in mid November, I believe
```
TSG Reporting - Worldwide    877-702-9580

Page 101

```
1                Hraska
2    November 17th, and worked on it from there.
3        Q.   So it is your testimony that from
4    November 17th forward Barclays was working on
5    the analysis of the data that is contained in
6    List C?
7        A.   Yes.
8        Q.   That is November 17, 2008?
9        A.   2008, yes, correct.
10       Q.   Again focusing on List C, can you
11   tell me with as much specificity as you can
12   the direction that Mr. Azerad gave you in
13   connection with your role in analyzing the
14   List C data?
15           MR. SHAW:  Objection.
16   Mischaracterizes prior testimony.
17   Assumes facts not in evidence.
18       A.   Mr. Azerad had directed us to make
19   sure that we could separate securities off of
20   the analysis that we did, which were purely
21   customer where there was no inventory or any
22   other positions on the stock record not
23   related to customers.  We had told him as part
24   of the analysis we did which created A, B1 and
25   B2, that C was the portion of that list --
```
TSG Reporting - Worldwide    877-702-9580

Page 102

Hraska

1
2  that C was the result of the securities which
3  were purely belonging to customers.  Again
4  List C as specified on page 4.
5      Q.    What is the distinction between
6  List C and Exhibit C; is it that Exhibit C
7  includes data from List B2 and C?
8      A.    There are a few distinctions.
9  One, Exhibit C does in fact include data from
10 List B2.  Another is that Exhibit C is the
11 result of analyzing customer debit balances
12 versus the present marked value of securities
13 in the system, and then creating an
14 entitlement amount which would have equated to
15 up to a hundred percent of the debit balance
16 in the customer's account.
17          One more distinction is that the
18 customers that were in question on Exhibit C
19 were the 732 range customers, which is a range
20 defined for prime broker customers.
21     Q.    I see that you have explained in
22 your notes the court rules on definition of
23 criteria used in the creation of List C?
24     A.    Again this is back to page 4,
25 middle of the page.

TSG Reporting - Worldwide    877-702-9580

Page 103

Hraska

1
2      Q.    Yes, over on to 5?
3      A.    Okay.
4      Q.    Can you give me a hypothetical
5  example that would help me understand the
6  application of those rules?
7      A.    Well for List C it would have been
8  securities where the only positions in the
9  stock record would have been a position which
10 was on one side of the stock record belonging
11 to a customer.  On the location side of the
12 stock record, the other side of the stock
13 record being in a depot.
14          So to the extent that there were a
15 hundred shares in the depot, that hundred
16 shares would have been owned by one or more
17 customers only and not by any other entity or
18 inventory trader or anything like that.
19     Q.    Anything else for List C?
20     A.    For List C, no.
21     Q.    Are those the selection criteria
22 that appear in the immediately below customer
23 lists -- sorry, customer only (List C)?
24     A.    The selection criteria goes
25 through the end of page 4 up to but not

TSG Reporting - Worldwide    877-702-9580

Page 104

Hraska

1
2  including the sentence customer based firm
3  entitlements.  So List C goes from the point
4  you said up to, but not including that
5  sentence.
6      Q.    The report rules that you included
7  in your note appear in item 2, select only PB
8  range; is that accurate?
9      A.    MR. SHAW:  Where?
10     Q.    Page 4, about two thirds of the
11 way down, report rules, point 2?
12     A.    Yes.
13     Q.    Are those rules that apply to the
14 creation of List C, sir?
15     A.    Yes.
16     Q.    So we should add them into your
17 earlier answer?
18          MR. SHAW:  Well, no, because your
19 earlier question was about selection
20 criteria, not report rules.
21     Q.    Then can you give me a
22 hypothetical example that will help me
23 understand in addition to the selection
24 criteria also the report rules that you used
25 in connection with List C?

TSG Reporting - Worldwide    877-702-9580

Page 105

Hraska

1
2      A.    Hypothetical example meaning, so
3  if we had to the extent that we used an
4  example before, that hundred shares that was
5  in the depot was in a 732 range, we would have
6  put it on lists C from the selection criteria
7  above for this particular section.  If it was
8  not included we would not have included it.
9      Q.    Can you explain what is meant by
10 your notes under that, what appears to be the
11 heading customer based firm entitlements, List
12 B2 and C in parens?
13     A.    Yes.  So we had segregated out
14 from the previous exercises what securities
15 belonged to PB customers, the two exercises
16 that denoted customer securities were in List
17 B2 and as we just talked about in C.  But that
18 was just the position itself that was on the
19 stock record as a position which would have
20 been sitting in a PB defined account.
21     Q.    PB just so we have a clear record
22 stands for prime broker?
23     A.    Yes.  However to determine the
24 entitlements we needed to understand whether
25 or not the customer maintained a debit balance

TSG Reporting - Worldwide    877-702-9580

Page 106

1                     Hraska
2    in the account.  So we got the debit balances
3    from the stock record as well in each of the
4    customer accounts in those two lists.  And
5    then we filtered out and looked at only
6    customers that had debit balances.
7             And then we compared the marked
8    value of the securities to the debit balance.
9    And then we claimed entitlement to all of the
10   securities that -- all of the securities that
11   had a marked value of up to the value of the
12   debit balance.
13            So to clarify that, we would have
14   not -- we would have not claimed entitlement
15   to any more securities that in sum would have
16   equalled any more than the debit balance.
17        Q.   I understand, that is a very
18   helpful explanation, I appreciate that.
19        A.   Okay.
20        Q.   You mentioned in that answer that
21   the steps that you just described were to
22   determine entitlement.  What did you mean by
23   the term entitlement; whose entitlement?
24        A.   Well entitlement from the sense of
25   whether the customer still had entitlement, or
           TSG Reporting - Worldwide    877-702-9580

Page 107

1                     Hraska
2    whether the firm would have had entitlement
3    based off of the rehypothecation rights which
4    would have been afforded based on the debit
5    balance.
6        Q.   Did you consider in your analysis,
7    sir, whether the securities in these prime
8    broker customer accounts had in fact been
9    rehypothecated by Lehman?
10       A.   If there were -- if there were
11   debit balances in the account they were
12   rehypothecated.
13       Q.   If I understand your answer, you
14   are trying to tell me that all securities that
15   are in this analysis you just testified to
16   would automatically have been rehypothecated;
17   is that correct?
18       A.   Yes, that is correct.
19       Q.   Just so we can bring this down to
20   a level that a layman such as me can
21   understand.  The rehypothecation would involve
22   a transaction such as Lehman pledging that
23   security to a bank for a bank loan, correct;
24   would that be an example of such a
25   rehypothecation that Lehman would have done in
           TSG Reporting - Worldwide    877-702-9580

Page 108

1                     Hraska
2    the circumstances that you just described?
3        A.   As just described the
4    rehypothecation process would have been the
5    rights of Lehman to have had access to that
6    security because it was providing financing to
7    the customer.  It would have been a separate
8    transaction where Lehman might have used those
9    securities to raise financing to replenish the
10   financing that it had given to the customer,
11   but that would have been a separate
12   transaction.
13       Q.   Did Barclays in creating List C
14   include in that analysis any data relating to
15   whether or not Lehman had in fact
16   rehypothecated the securities in question?
17       MR. SHAW:  Objection to the form.
18       A.   Can you define what you are
19   defining as rehypothecated, because to me it
20   means if Lehman has access to the security it
21   has been rehypothecated.  Are you asking me
22   whether we did any analysis as to whether
23   those same securities were used as part of a
24   financing transaction?
25       Q.   Yes.
           TSG Reporting - Worldwide    877-702-9580

Page 109

1                     Hraska
2        A.   It would have been those
3    securities then in that particular case we
4    would have deemed that, that once the first
5    leg of the rehypothecation was done, which
6    means that we took entitlement from the
7    customer, that those securities at that point
8    were -- would have been Lehman's to do what
9    they had chose to do with them regarding
10   financing.
11            So at that point if they were in
12   another financing transaction, whoever was on
13   the other side of that financing transaction
14   would have been on the stock record as well.
15   So in that case those wouldn't have been in a
16   depot, but rather as an obligation to another
17   financing counterparty.
18            So in that case we would have --
19   we would have had a long customer versus a
20   loan of those securities to another financing
21   counterparty.  Those would have not come up on
22   our search because that other side of that
23   equation would not have shown up as a depot
24   where the securities were available.
25       Q.   So if Lehman did once the
           TSG Reporting - Worldwide    877-702-9580

## Page 110

Hraska

1
2  securities that were in the prime broker
3  accounts and had been rehypothecated to Lehman
4  then pledged them as part of a bank loan to
5  replenish the finance that it used to purchase
6  the securities in the first place.  Securities
7  that were the subject of such refinancing by
8  Lehman would be excluded from your analysis in
9  List C; is that your testimony?
10      A.   I am trying to think from a stock
11  record perspective.  From a stock record
12  perspective it all depends on the nature of
13  the bank loan.  You would have to be very
14  specific about bank loan for me to answer
15  that.  I am sorry, I am not trying to be
16  difficult.
17      Q.   I understand, I think you are
18  trying to be very helpful.
19          Why would it depend on the nature
20  of the bank loan, sir?
21      A.   If it was a bank loan type
22  transaction, if you are referring to a
23  tri-party transaction, then in that case the
24  securities would have been in an account where
25  that would have been in a clearance account

TSG Reporting - Worldwide    877-702-9580

## Page 111

Hraska

1
2  where it would have fallen in the range of a
3  depot where we would have said even though we
4  are arranging financing, the positions were
5  still sitting in a clearance box that would
6  have belonged to Lehman and we would have made
7  a claim against them.
8          Whether or not we would have
9  gotten them as a result of anything, as a
10  result of the bank loan might have been a
11  different story.  But they would have been in
12  an account which would have been defined as
13  one that we would lay claim to.  If they were
14  done on a non-tri-party or a deliverable type
15  bank loan transaction where the securities
16  would have been delivered out of our clearance
17  box to a recipient's clearance box, in that
18  case we wouldn't have showed them on the stock
19  record in a location that was defined as a
20  depot, so we wouldn't have been on the List C
21  in that case.
22      Q.   In the first example, the
23  tri-party example that you just gave me you
24  mentioned that Barclays would lay claim to a
25  security even though it may not be available.

TSG Reporting - Worldwide    877-702-9580

## Page 112

Hraska

1
2  Can you explain that a little further?
3      A.   It would have been available in
4  the normal course because it would have been
5  in our clearance box.  But had we pledged it
6  to the financing counterparty who would have
7  as a result of the events that took place
8  seized the asset, it wouldn't have been
9  available as I described.
10          From a stock record position
11  perspective it would have appeared as though
12  we had entitlement, but physically we might
13  not have been able to take possession of the
14  asset.
15      Q.   Because in a bankruptcy situation
16  the counterparty would have seized the
17  securities that had been pledged as a result
18  for that?
19      A.   Yes.
20      Q.   Correct?
21      A.   Yes.
22      Q.   In the analysis that results in I
23  believe Exhibit C and in the processes that
24  are described on pages 4 and 5 of your notes
25  to create Exhibit C, was there any account

TSG Reporting - Worldwide    877-702-9580

## Page 113

Hraska

1
2  taken of the obligation on the part of Lehman
3  under the financing transaction when Lehman
4  rehypothecated the security to a party such as
5  a bank to provide additional finance?
6      MR. SHAW:  Objection to the form.
7      A.   There was an analysis that was --
8  are you asking me if there was an analysis
9  done by Lehman or Barclays?
10      Q.   Barclays?
11      A.   Barclays, no.
12      Q.   Was there an analysis done by
13  Lehman?
14      MR. SHAW:  Objection.  Foundation.
15      A.   There were conversations that I
16  was asked to be a part of which very early
17  stages people were asking questions about the
18  scenario that we just described from the
19  trustee's perspective.  And so from that I
20  assume there was a Lehman analysis done, but I
21  was not part of it.
22      Q.   With whom did you have this early
23  conversation?
24      A.   From the Lehman side it would have
25  been David Aronow at the time, he was

TSG Reporting - Worldwide    877-702-9580

Page 114

```
 1              Hraska
 2  primarily running the point on that with the
 3  trustee.
 4      Q.   Who is David Aronow?
 5      A.   David Aronow used to work in the
 6  prime brokerage front office, but he had done
 7  previous jobs at Lehman such as running
 8  clearance and a few other things.  So he was
 9  asked to be a point person on that particular
10  topic.
11      Q.   If I understand your testimony
12  correctly, he was an employee of the trustee's
13  office?
14      A.   No, he was an employee of Lehman
15  Brothers and he was liaising with somebody
16  from the trustee's office, but I don't
17  remember who.
18      Q.   Can you give me an estimation as
19  to the date of this conversation; was it pre
20  or post closing?
21      A.   Honestly I don't know.  There was
22  a lot of things going on during that time
23  period.
24      Q.   Maybe I can approach it this way.
25  If I can represent to you for the purposes of
```

TSG Reporting - Worldwide    877-702-9580

Page 115

```
 1              Hraska
 2  the rest of this examination that the SIPA
 3  trustee was not appointed until the afternoon
 4  of Friday the 19th of September, which was a
 5  couple of days before the closing on the 22nd,
 6  did that help you answer my question when did
 7  this early conversation about the trustee's
 8  perspective on --
 9      A.   The closing being defined as the
10  22nd, right?
11      Q.   Yes.  Does it help you answer my
12  question and give me a more specific timeframe
13  about this conversation that involved David
14  Aronow and prime brokers?
15      A.   That would have taken place I
16  believe the week of the 22nd.
17      Q.   Were you involved in this
18  conversation?
19      A.   I was involved in an initial
20  conversation to understand how rehypothecation
21  works with respect to our stock record.
22      Q.   In this conversation it was you,
23  David Aronow, and who else?
24      A.   I don't recall who it was from the
25  trustee who was involved in that conversation.
```

TSG Reporting - Worldwide    877-702-9580

Page 116

```
 1              Hraska
 2  There may have been somebody from clearance,
 3  but I don't recall.
 4      Q.   Can you tell me everything that
 5  you remember about that conversation?
 6      A.   The initial conversation was
 7  purely to understand what mechanics there were
 8  around rehypothecation, how the systems
 9  worked, that kind of thing.
10      Q.   Was the predicate for the
11  conversation that someone from the trustee's
12  office was trying to understand
13  rehypothecation, is that what you are saying?
14      A.   Was trying to understand
15  rehypothecation with respect to how did it
16  function internally within our internal
17  mechanisms.
18      Q.   The week of the 22nd, sir, 22nd of
19  September 2008 you were employed by Barclays
20  at this time?
21      A.   As of September 22nd I was
22  employed by Barclays.
23      Q.   Does the same apply to Mr. Aronow?
24      A.   Yes.
25      Q.   Do you remember any other
```

TSG Reporting - Worldwide    877-702-9580

Page 117

```
 1              Hraska
 2  conversations with anyone from the trustee's
 3  office on this same topic, rehypothecation and
 4  prime broker accounts?
 5      A.   No.
 6      Q.   The data set that is used in the
 7  analysis that underlies Exhibit C, sir, is
 8  that the same November 17, 2008 data set?
 9      A.   Yes.
10      Q.   It is correct to say that Barclays
11  did not assume responsibility for Lehman's
12  prime broker accounts after the closing?
13          MR. SHAW:  Objection.  Foundation.
14      Beyond the scope of the 30(b)(6).  If you
15      know you can answer.  Calls for a legal
16      conclusion as well.
17      A.   Barclays did not assume
18  responsibilities to the best of my knowledge
19  of the Lehman prime broker accounts.
20      Q.   At what date did Barclays --
21  withdrawn.
22          What date did Barclays use to
23  value the CUSIP's on Exhibit C in calculating
24  what they say is their entitlement?
25          MR. SHAW:  Objection to the form,
```

TSG Reporting - Worldwide    877-702-9580

Page 118

```
1                    Hraska
2     foundation, including beyond the scope of
3     the 30(b)(6).  If you know you can try to
4     answer it.
5          A.   The analysis that we performed was
6     based off of November 17th debit balances as
7     well as November 17th prices which would have
8     been in the TMS stock record.
9          MR. OXFORD:  Off the record for a
10    second.
11         (Recess taken.)
12         MR. OXFORD:  Would you mark
13    Exhibit 563-D, one-page document headed
14    Exhibit C-Additional Clearance Box
15    Securities.
16         (Exhibit 563-D, one-page document
17    headed Exhibit C-Additional Clearance
18    Box Securities, marked for
19    identification, as of this date.)
20         MR. OXFORD:  Would you mark as
21    Exhibit 564-D, document headed 732
22    Accounts With Securities That May Be
23    Potential Firm Claims If Firm Financed.
24         (Exhibit 564-D, document headed
25    732 Accounts With Securities That May Be
```
TSG Reporting - Worldwide     877-702-9580

Page 119

```
1                    Hraska
2     Potential Firm Claims If Firm Financed,
3        marked for identification, as of this
4        date.)
5          Q.   Mr. Hraska, I have placed in front
6     of you two additional exhibits marked 563-D
7     and 564-D.  Looking at 563-D first, can you
8     tell me if you know what that document is?
9          A.   I don't know.
10         Q.   It bears a legend, Exhibit C
11    additional clearance box securities.  Do you
12    see that?
13         A.   Yes, I do.  Nothing that I have
14    been involved with the creation of.
15         Q.   If I can direct your attention
16    back to 562-D, which are your notes?
17         A.   Yes.
18         Q.   Your deposition notes on page 2?
19         A.   Yes.
20         Q.   Topic 33?
21         A.   Yes.
22         Q.   Just below the list of names,
23    second sentence reads:  Exhibit C reports the
24    results of a subset of Lists B2/C, sometimes
25    referred to as the List B2 and C?
```
TSG Reporting - Worldwide     877-702-9580

Page 120

```
1                    Hraska
2          A.   Right.
3          Q.   Are those your notes, sir?
4          A.   They are my notes, yes.
5          Q.   Do those notes help you answer my
6     question what is Exhibit 563-D?
7          A.   No, because Exhibit C is as it was
8     previously marked and shown, and that Exhibit
9     C is a subset of B2 and C.  But this is
10    neither of those.
11         Q.   When you say it was previously --
12    Exhibit C was previously marked and shown,
13    where and shown to who?
14         MR. SHAW:  I think he is confused.
15         MR. OXFORD:  Off the record for a
16    second.
17         (Recess taken.)
18         MR. OXFORD:  While we were off the
19    record we sorted out the confusion.  I
20    marked a different document as 563-D.
21         Q.   Do you see the newly marked 563-D
22    in front of you?
23         A.   Yes.
24         Q.   Do you recognize that document?
25         A.   Yes.
```
TSG Reporting - Worldwide     877-702-9580

Page 121

```
1                    Hraska
2          Q.   What is it, please?
3          A.   Exhibit C.
4          Q.   That is the Exhibit C that you
5     referenced in your testimony prior today?
6          A.   Yes.
7          Q.   That is the Exhibit C that you
8     have referenced in your deposition notes
9     marked as 562-D?
10         A.   Yes.
11         MR. SHAW:  He has one point to
12    make about something on Exhibit C, a
13    clarification about something.
14         MR. OXFORD:  Okay.
15         Q.   Okay.
16         A.   So in preparing for the deposition
17    I looked at Exhibit C versus -- which came
18    from a spreadsheet that I had prepared which
19    was the B2/C list, and I noticed that the last
20    two quantities on Exhibit C are incorrect.
21         On the work that we had done where
22    we had described B2/C in comparing the debit
23    balances, in every security except the last
24    two the marked value of the securities in
25    their entirety were less than the debit
```
TSG Reporting - Worldwide     877-702-9580

## Page 122

1              Hraska
2    balance, therefore we claimed a hundred
3    percent of the quantity as an entitlement.
4              For the last two securities we
5    were only able to claim a pro rata portion of
6    these quantities, and the pro rata portion
7    that we would claim is not listed here.  So it
8    is a lesser quantity obviously being pro rata.
9         Q.    If I understand your testimony
10   correctly what you are saying is for the last
11   two entries in Exhibit C that we marked as
12   Exhibit 563-D, Met Life Inc. and Net Gear
13   Inc., what is stated in the quantity column is
14   100 percent of the value of the CUSIP's, and
15   Barclays claim in fact is to less than 100
16   percent of the value of the CUSIP's?
17        A.    Yes.  For the last two Barclays
18   would not claim a hundred percent value.
19        Q.    Do you know off the top of your
20   head what percentage Barclays is claiming?
21        A.    The quantity?
22        Q.    Yes.
23        A.    Off the top of my head no, but the
24   electronic form of this --
25             MR. SHAW: Leave a gap in the

TSG Reporting - Worldwide     877-702-9580

## Page 123

1              Hraska
2    record, we can fill that in.
3             MR. OXFORD:  Yes, that is a good
4    idea.
5    TO BE FURNISHED:_____
6                                          .
7         Q.    Do I understand correctly,
8    Mr. Hraska, that Barclays claim is not for
9    these securities that are listed on Exhibit C,
10   but for the value of those securities?
11        A.    No.  It would be for these
12   specific securities.
13        Q.    Is it your testimony, sir, that
14   all of these securities were held in the
15   accounts of prime brokers?
16        A.    Yes.
17        Q.    Do you know what the prefix 931
18   means in connection with Lehman securities
19   accounts?
20        A.    Yes, they are firm inventory
21   accounts.
22             Can I just back up to your
23   question prior to that question?
24        Q.    Sure.
25        A.    If you wouldn't mind please read

TSG Reporting - Worldwide     877-702-9580

## Page 124

1              Hraska
2    that back.
3             (Record read.)
4         A.    Could I make a clarification to
5    that?
6         Q.    Please do.
7         A.    Exhibit C as stated here is a
8    subset of B2 and C.  In B2 was a list where
9    there were securities on the stock record that
10   could have been both the prime broker
11   accounts -- wait a minute, I'm sorry.  I am
12   sorry, never mind, my answer is still yes.  I
13   am confused.
14             MR. SHAW: That is okay.  No
15        problem.
16        Q.    Do you have an understanding, sir,
17   of what the prefix 950 means in connection
18   with Lehman securities accounts?
19        A.    They would have been an affiliate
20   type range, 950.
21        Q.    In the processes that resulted in
22   the creation of Exhibit C, sir, did Barclays
23   do any checking or due diligence to determine
24   whether or not the securities listed on
25   Exhibit C were also contained in firm

TSG Reporting - Worldwide     877-702-9580

## Page 125

1              Hraska
2    inventory accounts rather than prime broker
3    accounts or affiliate accounts -- withdrawn.
4             In the processes to create Exhibit
5    C, sir, were any accounts other than prime
6    brokerage accounts taken into consideration?
7         A.    For Exhibit C; no, there should
8    not have been any other accounts that were
9    prime broker -- other than prime brokerage
10   accounts.
11        Q.    So you wouldn't expect there to be
12   on Exhibit C securities that are also
13   contained in Lehman affiliated accounts; is
14   that correct?
15        A.    I just need a minute, I apologize,
16   because something is bottoming me that I
17   hesitated before on.  So can I just take a
18   minute to think through.
19        Q.    Sure.  Go off the record for a
20   second.
21             (Recess taken.)
22        A.    Back on the record.
23             So I can answer this question and
24   then -- so to answer this question, it is
25   possible that CUSIP's or security numbers that

TSG Reporting - Worldwide     877-702-9580

Page 126

Hraska

1
2  end up on Exhibit C would have been in firm or
3  affiliated accounts as well.  I can explain
4  why based on a clarification on that earlier
5  testimony that I had sort of referred back to.
6      Q.    Okay, please explain?
7      A.    List B1 and B2 were basically
8  broken out for securities where there were
9  positions in that CUSIP which were a mix of
10 firm inventory as well as customer.  In order
11 to separate out the lists as to what were
12 considered for customer purposes and what were
13 considered for firm purposes we went through
14 that process where we -- where I testified
15 earlier where we took the customer portion, we
16 reserved that portion of the depot, and then
17 the other portion based on the lesser quantity
18 was the firm's security which became List B1.
19      So Exhibit C is a combination of
20 List B2 which was from that pool of securities
21 that may have been in both places.  So as a
22 result of it -- if there was a security number
23 that came from the derivation List B2, there
24 is a possibility that that security has a
25 quantity that is partially for the benefit of

TSG Reporting - Worldwide    877-702-9580

Page 127

Hraska

1
2  customer, which is why it would be on this
3  list.
4      And there would be partially --
5  there could be an instance where there was a
6  quantity which would have been for the firm
7  which would have been on the B1 list.
8      Q.    Does that answer explain why --
9      A.    That answer explains your last
10 question to me and why.
11      Q.    My question was not just related
12 to firm inventory accounts, my question
13 related to affiliate inventory accounts as
14 well.  Does the answer that you just put on
15 the record after the break explain why there
16 would be on Exhibit C CUSIP's that also appear
17 in Lehman's affiliate inventory accounts?
18      A.    I don't believe you should find
19 affiliate securities on the list.
20      Q.    Could you take a look, sir, at
21 Exhibit 564-D, please?
22      A.    Yes.
23      Q.    Just take a minute to flip through
24 that and tell me if you have seen it before?
25      A.    Yes.

TSG Reporting - Worldwide    877-702-9580

Page 128

Hraska

1
2      Q.    Tell me what it is, please?
3      A.    It is the B2/C list.
4      Q.    That is the B2/C list that you
5  referred to in your deposition notes, Exhibit
6  562-D, and in your testimony here today?
7      A.    Yes.
8      Q.    Did you create this list, sir?
9      A.    I created it, yes.  I created
10 this.
11      Q.    There are a number of tabs to this
12 spreadsheet that are separated by blue pieces
13 of paper.  Did you create every single one of
14 the tabs?
15      A.    No.
16      Q.    Can you identify for me please
17 which ones you did create?
18      A.    I created the first page -- the
19 first tab -- the blues I assume delineate the
20 tabs in the spreadsheet?
21      Q.    That is my understanding, yes.
22      A.    I created the second tab.  The
23 third tab, fourth tab, and the fifth tab I
24 don't recall -- this is raw data that we used,
25 I don't recall if we created this tab the way

TSG Reporting - Worldwide    877-702-9580

Page 129

Hraska

1
2  you see it, or whether it was provided to us
3  in the format that you see it.  But some of
4  the raw data.
5      Q.    Thank you Mr. Hraska.
6      Do you see at the top left-hand
7  side of page 1 of Exhibit 564-D?
8      A.    Yes.
9      Q.    The first spreadsheet?
10     A.    Yes.
11     Q.    That you created it.  It says 732
12 accounts with securities that may be potential
13 claims if firm financed.
14     A.    Yes.
15     Q.    Do you see that?
16     A.    Yes.
17     Q.    When you created the spreadsheet
18 what did you mean by that sentence that I just
19 read?
20     A.    Meaning if there was a debit
21 balance against these firm accounts we would
22 have financed -- had been considering to have
23 lend the customers in essence cash for the
24 purchase of these.  So those would have been
25 firm financed.

TSG Reporting - Worldwide    877-702-9580

Page 130

```
 1              Hraska
 2      Q.   You used the words may be
 3   potential firm claims, do you see that?
 4      A.   Because in the initial analysis we
 5   didn't -- not all accounts had debit balances.
 6   So I think this tab at one point was initially
 7   larger until we got to the point of filtering
 8   out the ones that had debit balances versus
 9   the ones that didn't.
10      Q.   So by filtering out the accounts
11   that had debit balances you go from an earlier
12   version of 564-D, page 1, to Exhibit C,
13   Exhibit 563-D to the deposition; is that
14   right?
15      A.   No.  The number on the first tab
16   here of securities should be the same as what
17   is on Exhibit C.  I think when we first got
18   the lists of B2 and C, which included more
19   accounts than you see here on the summary tab,
20   all those accounts were initially included,
21   but then once we applied the rules then it got
22   down to this number of accounts and
23   securities.
24          I think -- not I think, you look
25   at the CUSIP list here versus the CUSIP list
        TSG Reporting - Worldwide    877-702-9580
```

Page 131

```
 1              Hraska
 2   on the original, it is one in the same.  It is
 3   just that this list doesn't include
 4   information around the market values and a few
 5   other columns that appear on the spreadsheet.
 6      Q.   There is a column as you averted
 7   to a second ago in the summary spreadsheet
 8   that is page 1 of 564-D?
 9      A.   Yes.
10      Q.   That is market value?
11      A.   Yes.
12      Q.   Do you see that it is the fifth
13   column from the right?
14      A.   Yes.
15      Q.   What is the data source for the
16   numbers that appear below market value?
17      A.   The TMS stock record.
18      Q.   With --
19      A.   With, sorry?
20      Q.   With which date?
21      A.   It would have been November 17th
22   date.
23      Q.   November 17, 2008?
24      A.   Yes.  We requested that it come
25   with the same data set from technology that
        TSG Reporting - Worldwide    877-702-9580
```

Page 132

```
 1              Hraska
 2   the original data pull was from.
 3      Q.   Does that same data set carry over
 4   into the last column that is headed
 5   entitlement market value?
 6      A.   Yes.  By virtue of formula this
 7   market value was directly from TMS.  The
 8   market price in order for us to figure out the
 9   entitlement market value we just applied a
10   formula to the number of shares and market
11   value.
12      Q.   Exhibit C you testified contains
13   only the securities that were held in the
14   accounts or shown in the stock record as being
15   the accounts of prime brokers at Lehman as of
16   closing; correct?
17      A.   As of November 17th.
18      Q.   Did Barclays perform any analysis
19   to determine whether these same CUSIP's were
20   in the prime broker accounts as of the close?
21      A.   There was no further analysis, but
22   we were confident that the securities were
23   there as a result of the stock record as well
24   as the resolution of the breaks and
25   discrepancies that we had talked about in the
        TSG Reporting - Worldwide    877-702-9580
```

Page 133

```
 1              Hraska
 2   previous round of testimony.
 3      Q.   How is it that the resolution of
 4   the breaks gave Barclays confidence that the
 5   securities listed here using the November 17th
 6   date were in the prime broker accounts at
 7   Lehman as of close?
 8      A.   There should not have been any
 9   other activity to the stock record other than
10   resolution of breaks.  There should not have
11   been any unauthorized transfers, movements,
12   anything like that.  So we were going under
13   the assumption that the stock record was
14   accurate, and once the breaks were resolved it
15   gave us a much better picture as to what would
16   have been in those, I will call it the stock
17   record and the clearance box as of the 22nd.
18      Q.   You say what would have been, I
19   will call it the stock record and clearance
20   box as of the 22nd?
21      A.   So what would have been the
22   reflective stock record on the 22nd.
23      Q.   Had those records --
24      A.   Had those records done
25   properly under the normal course of business
        TSG Reporting - Worldwide    877-702-9580
```

Page 134

1                Hraska
2    on that date.
3        Q.   But you are unable to testify as
4    to whether or not those records -- withdrawn.
5            You are unable to testify as to
6    whether or not as a matter of fact the records
7    that you used that had the November 17, 2008
8    data accurately reflect the actual status of
9    Lehman's books and records including its
10   clearance box accounts as of the close; is
11   that correct?
12       MR. SHAW:  Objection,
13   mischaracterizes prior testimony and
14   vague.  You can answer if you can.
15       A.   Could you read it back one more
16   time.
17       (Record read.)
18       A.   As a matter of fact it represents
19   the best availability of data that Lehman has
20   as to its position at the time of the close.
21   But there is no other record as to that time
22   with regards to Lehman's books and records as
23   of the 22nd.
24       Q.   The stock records that you
25   described as the best available records, sir,
     TSG Reporting - Worldwide    877-702-9580

Page 135

1                Hraska
2    did they show the securities that are listed
3    on Exhibit C as being for the account of prime
4    brokers?
5        A.   The list on Exhibit C, each one of
6    these accounts is a prime broker account, so
7    yes.
8        Q.   It is accurate, is it not,
9    Mr. Hraska, that prime brokers were not the
10   only type of customer Lehman had prior to the
11   closing who did not fully pay for their
12   securities; is that correct?
13       A.   That is true.
14       Q.   For example customers known as PIM
15   customers had securities with Lehman that they
16   didn't fully pay for; is that correct?
17       A.   Yes.
18       Q.   The same is true for the PAM
19   customers?
20       A.   Yes.
21       Q.   Was there a reason that the PIM
22   and PAM customers for example were not
23   included in the analysis that led to the
24   creation of Exhibit C?
25       A.   Mr. Azerad instructed us to take
     TSG Reporting - Worldwide    877-702-9580

Page 136

1                Hraska
2    the most conservative approach and to only
3    include prime brokerage customers in our
4    analysis.
5        Q.   Why was that the most conservative
6    approach, sir?
7        A.   I don't know, that was his
8    opinion.
9        Q.   Do you have any understanding of
10   what Mr. Azerad meant when he said we should
11   take the most conservative approach and only
12   include prime broker customers in your
13   analysis?
14       A.   Just one more time read it back,
15   please.
16       (Record read.)
17       A.   I don't know the specific reasons
18   or why he thought that.  I do remember him
19   thinking that it was more conservative to do
20   so.  So based on that we acted on his
21   instruction.
22       Q.   Did you have any discussion with
23   him about why this was the conservative
24   approach?
25       A.   I know that there were some
     TSG Reporting - Worldwide    877-702-9580

Page 137

1                Hraska
2    discussions that were taking place about PIM
3    and PAM customers away from my organization.
4    So that may have had something to do with it,
5    but I would have to speculate whether it did
6    or didn't.  So he instructed me -- as a matter
7    of fact I believe I might have run that past
8    Alister Blackwell and I think he agreed to use
9    that as a filter criteria and that is where it
10   was from my role.
11       Q.   In the situations where Lehman
12   rehypothecated the partly paid security that
13   is listed on, or any of the partly paid
14   securities that are listed on Exhibit C,
15   Mr. Hraska, is Barclays in connection with its
16   claim to the trustee for the securities listed
17   here assuming any liabilities to repay the
18   loan that is secured by these CUSIP's?
19       MR. SHAW:  Objection to the form.
20   Calls for a legal conclusion.
21       A.   Repay the loan; they would have
22   extended the loan to the customer which is why
23   they claimed entitlement.  They wouldn't have
24   taken a loan.
25       Q.   In the circumstances where they
     TSG Reporting - Worldwide    877-702-9580

Page 138

1              Hraska
2    pledged, Lehman --
3          A.    Took loans to replace the cash?
4          Q.    That was used to purchase the
5    CUSIP's that was partly paid for by the prime
6    broker customer, you understand that Lehman
7    has an obligation to pay that too?
8          A.    I didn't realize that that is what
9    you were referring to.  So based on that could
10   you please repeat the question to me.
11         (Record read.)
12         MR. SHAW:  I object.  Beyond the
13   scope of the 30(b)(6) testimony.  It
14   lacks foundation.  Calls for legal
15   conclusion.
16         THE WITNESS:  Can I answer?
17         MR. SHAW:  If you know the answer
18   you can answer.
19         A.    Based on the previous testimony
20   these positions should have been in a stock
21   record location that we would have shown the
22   assets still being held in one of our
23   clearance boxes.  If they were being financed
24   and the securities were no longer in our
25   possession we wouldn't have made any attempt

TSG Reporting - Worldwide    877-702-9580

Page 139

1              Hraska
2    to try to repay the loan in a scenario like
3    that, because under those scenarios as we
4    discussed earlier the person that we gave the
5    securities to would have kept them under the
6    default of the financing.
7          Q.    Just back to the original creation
8    of Schedule B for a second.  The instruction
9    came --
10         A.    Schedule B, back to 32 then?
11         Q.    Yes.  Did the instruction from Mr.
12   Tonucci to identify unencumbered assets, was
13   that instruction limited to any particular
14   depository locations?
15         A.    The initial request was not.  So
16   we were to look at all clearance locations
17   available on the stock record which were not
18   fully paid for customers.
19         Q.    Did you do so?
20         A.    We did, yes.
21         Q.    And the fruits of that initial
22   instruction and your labor consequent to that
23   instruction are reflected on Exhibit B; is
24   that correct?
25         A.    That is correct.  That was what we

TSG Reporting - Worldwide    877-702-9580

Page 140

1              Hraska
2    produced on that weekend which subsequently
3    became Schedule B.  The one place we had some
4    difficulty on that weekend was we knew we had
5    a lot of physical securities in physical
6    locations and we were unable to confidently
7    determine what were firm physical securities
8    and what were not until later on.  So that
9    further analysis that was done after the 22nd
10   yielded some physical securities that we felt
11   then confident later that we would be entitled
12   to.
13         So I think I would like to
14   clarify, I think I testified earlier that
15   there were no changes to the security list
16   initially put forth versus what was filed on
17   the 30th.  I would like to amend that by
18   saying that the physical securities were added
19   to the list that was finally submitted on the
20   30th.
21         Q.    To your knowledge when there any
22   other changes to the version of Schedule B
23   that was available at the closing of the
24   transaction on the 22nd and the finally
25   submitted Schedule B that was filed with the

TSG Reporting - Worldwide    877-702-9580

Page 141

1              Hraska
2    Bankruptcy Court on the 30th of September
3    other than this addition of physical
4    securities that you just testified to?
5          A.    I believe there may have been some
6    discrepancies on some of the CUSIP's, but I
7    don't know what the materiality of those
8    discrepancies are.  I think primarily they are
9    essentially the same.
10         Q.    Did you personally add the
11   physical securities to the list, Schedule B?
12         A.    I don't believe I personally added
13   the physical securities, no, I created the
14   initial list.  I think Robert Azerad's team
15   did.
16         Q.    Mr. Hraska, included on Schedule B
17   are a number of securities that are in
18   accounts other than the DTC; right?
19         A.    Yes.
20         Q.    That reflects your initial
21   instruction coming down from Mr. Tonucci that
22   you and the rest of the team involved in
23   gathering and identifying the securities
24   should look everywhere for available
25   inventory; is that accurate?

TSG Reporting - Worldwide    877-702-9580

Page 142

```
 1              Hraska
 2      A.   Yes, that is accurate.
 3      Q.   That search for additional
 4  inventory, sir, that you and your team
 5  conducted subsequent to September 30th that
 6  led to the creation of Exhibits B and C that
 7  you testified to today also included search
 8  for inventory outside of the DTC boxes; is
 9  that correct?
10      A.   Yes, that is correct.
11      Q.   Do you know, Mr. Hraska, whether
12  there were any residential mortgage securities
13  that were identified as a separate category of
14  assets that were to be purchased by Barclays
15  under the original asset purchase agreement?
16          MR. SHAW:  Objection.  Beyond the
17      scope of the 30(b)(6).  You already had
18      your shot with him as an individual
19      witness.
20      Q.   Do you know, sir?
21      A.   Just repeat the question.
22          MR. OXFORD:  If you want to go off
23      for a second I can explain why I am
24      asking the question.  Off the record.
25          (Recess taken.)
```
TSG Reporting - Worldwide    877-702-9580

Page 143

```
 1              Hraska
 2      Q.   Mr. Hraska, I am asking this
 3  question in your individual capacity, not as a
 4  30(b)(6) witness of Barclays.  Do you know
 5  whether or not there were any residential
 6  mortgage backed securities that were
 7  identified as a separate category of assets
 8  that were to be transferred to Barclays under
 9  the original asset purchase agreement?
10          MR. SHAW:  Objection.  Foundation.
11      A.   Read it back, please.
12          (Record read.)
13      A.   I believe that there was, but they
14  would have been included in the assets that
15  were available to be transferred in the
16  overall list.  So there was a discussion about
17  residential mortgages, but those resided in
18  the same clearance boxes and locations as the
19  other securities that were in question.
20      Q.   Do you know whether those
21  residential mortgage securities ended up on
22  Schedule B?
23          MR. SHAW:  Objection.
24      Q.   Do you know whether any of those
25  residential mortgage securities that were
```
TSG Reporting - Worldwide    877-702-9580

Page 144

```
 1              Hraska
 2  identified as a separate category in the
 3  original APA ended up being included on
 4  Schedule B to the clarification letter?
 5          MR. SHAW:  Objection.  Foundation.
 6      A.   I am sorry, can you read that back
 7  again.
 8          (Record read.)
 9      A.   I don't know for a fact, but it is
10  plausible that some of them might have ended
11  up on Schedule B based off of the criteria
12  that was used to create Schedule B.
13      Q.   If I asked you the same question
14  with respect to Exhibits A and B would you
15  have the same answer?
16      A.   Exhibits A and B?
17      Q.   Yes.
18      A.   Its possible that Exhibits A and B
19  would have contained that asset class, but it
20  is less likely.
21      Q.   Why is it less likely, sir?
22      A.   Because those asset classes were
23  held in a different system.
24      Q.   Which two systems are you talking
25  about in your testimony here?
```
TSG Reporting - Worldwide    877-702-9580

Page 145

```
 1              Hraska
 2      A.   The residential mortgages would
 3  have been held in the system called MTS, and
 4  would have been held in a clearance box DTC
 5  participant ID 636.
 6      Q.   I take it that these two locations
 7  for the residential mortgage securities were
 8  not sources that you were looking at for the
 9  compilation of the data that led to Exhibits A
10  and B; is that correct?
11      A.   That is correct, yes.
12      Q.   You mentioned that there were some
13  conversations about residential mortgage
14  securities.  What were you referencing?
15      A.   Trying to recall, it was a long
16  time ago.  I honestly don't recall the
17  specifics.  I remember us talking about
18  residential mortgages.  I remember us talking
19  about where were they located.  Would they be
20  physically able to be moved as part of the
21  asset purchase agreement to Barclays.  What
22  type of assets were they, were they DTC or
23  physical, that type of stuff.  Beyond that I
24  don't remember much more.
25      Q.   Who is the "us" that you are
```
TSG Reporting - Worldwide    877-702-9580

```
 1              Hraska
 2  talking about?
 3       A.   It would have been some of the
 4  same folks mentioned earlier.  It would have
 5  been myself, Neil Ullman, Robert Azerad, Paolo
 6  Tonucci primarily.
 7       Q.   Do you know whether any of those
 8  residential mortgage backed securities were
 9  transferred back to Barclays as part of the
10  Fed settlement securities?
11       A.   Is that part --
12            MR. SHAW:  No, it is not part of
13       the 30(b)(6).
14       Q.   The whole line of questioning
15  relates to your individual.
16       A.   Okay.  I didn't know if we were
17  still -- it is very possible that some of the
18  residential mortgages ended up in the
19  transaction from the 18th, which was the repo
20  transaction.
21       Q.   Why do you say that it is very
22  possible?
23       A.   They were an asset class which was
24  available in the DTC location 636.  So we were
25  pledging assets from that location.  So it is
```

```
 1              Hraska
 2  possible that some assets classified as
 3  residential mortgages made their way to
 4  Barclays on the night of the 18th.
 5       Q.   If you wanted to determine whether
 6  that possibility was in fact actuality, how
 7  would you go about finding that out?
 8       A.   Well there is a list of what -- a
 9  CUSIP list of what was sent over to Barclays
10  as a result of the transaction that took place
11  on that night.
12       Q.   Uh-hum.
13       A.   Which confirmed the deliveries by
14  both parties of being delivered and received,
15  and you could look up the CUSIP's and their
16  asset classes and determine whether any of
17  those were residential mortgages or not.
18       Q.   Do you have a list of the
19  residential mortgage securities that were
20  originally identified in the asset purchase
21  agreement that you could compare to the list
22  of CUSIP's that were delivered to Barclays on
23  the 18th?
24       A.   I don't personally have a list,
25  but I am sure a list -- well, I am not sure.
```

```
 1              Hraska
 2  A list may exist somewhere.  If provided a
 3  list we could do it.
 4       Q.   Do you have any personal knowledge
 5  as to whether such a list exist?
 6       A.   I know there was talk of a list
 7  about residential securities.  I don't know
 8  whether -- at one point there was a list of
 9  securities, but I honestly don't -- I don't
10  recall much more than that.  I know there was
11  talk of putting a list together.
12       Q.   With whom was there talk?
13       A.   The talk I had would have been
14  with the same people mentioned before about
15  determining whether or not we could move those
16  assets over to Barclays or not.  Where they
17  were residing and whether they were physical
18  form or book entry form.
19       Q.   Would that conversation have taken
20  place prior to closing, sir?
21       A.   That conversation would have taken
22  place prior to closing, yes.
23       Q.   And the people you identified
24  before, can you just, so we have a clear
25  record, the people you think were involved in
```

```
 1              Hraska
 2  this conversation you testified to moments ago
 3  were whom; did they include Mr. Azerad?
 4       A.   It would have been Azerad,
 5  Tonucci, myself, Ullman.  I am not sure
 6  whether Blackwell or not, but most likely
 7  Blackwell also.
 8       Q.   I just have one clarified question
 9  suggested by your counsel here.  If you can
10  have in front of you Exhibits 563-D and 564-D,
11  if you look at the last two lines of Exhibit
12  564-D, do those help you fill in the blank
13  that we left in the transcript earlier?
14       A.   Yes.
15       Q.   Which was to amend downwards the
16  quantity of CUSIP's that Barclays is claiming
17  for the last two CUSIP's -- sorry, the last
18  two lines in Exhibit C, Met Life and Net Gear?
19       A.   Yes.  If you go from the far right
20  column and go in two columns there is a column
21  called entitlement position.  If you go down
22  to the last two rows the quantities listed in
23  entitlement position would be what Barclays
24  would claim.
25       Q.   So in exhibit --
```

Page 150

```
 1              Hraska
 2      A.   5,017 for Met Life, and 476 for
 3   Net Gear.
 4          MR. OXFORD:  Thank you,
 5   Mr. Hraska.  I don't have any further
 6   questions for you at this time, I think
 7   Mr. Hine has a couple of questions.
 8   EXAMINATION BY
 9   MR. HINE:
10      Q.   I just want to take a couple of
11   minutes of your time, I know you have to
12   leave.  Just to be clear these are questions
13   that I am asking of you in your capacity as a
14   30(b)(6) witness.
15      A.   Yes.
16      Q.   Do you recall in response to some
17   of Mr. Oxford's questions he talked about the
18   $1.9 billion target that you folks at Lehman
19   were shooting for when you were assembling the
20   assets that would later become Schedule B.  Do
21   you remember that testimony?
22      A.   Yes.
23      Q.   I just want to drill down a little
24   on that target.  I believe you testified that
25   that number, that target was communicated to
```

TSG Reporting - Worldwide    877-702-9580

Page 151

```
 1              Hraska
 2   you by Mr. Tonucci; is that correct?
 3      A.   Yes.
 4      Q.   Do you know where that target
 5   originated from?
 6          MR. SHAW:  Objection.  Foundation.
 7      A.   I believe as a 30(b)(6) it was in
 8   the conversations he was having regarding the
 9   purchase agreement.  But he didn't specify
10   that.
11      Q.   Mr. Tonucci wasn't acting alone in
12   coming up with the target; right?
13          MR. SHAW:  Objection.  Foundation.
14      A.   I don't believe he did, no.
15          MR. SHAW:  We are way beyond the
16   scope of 30(b)(6).
17          MR. HINE:  We are talking about
18   the origin of Schedule B.
19      Q.   Can you tell me whether that $1.9
20   billion target originated from the Barclays
21   side of the transaction or the Lehman side of
22   the transaction; if you know?
23          MR. SHAW:  Continuing objection.
24   Beyond the scope of the 30(b)(6), but you
25   can answer if you know.
```

TSG Reporting - Worldwide    877-702-9580

Page 152

```
 1              Hraska
 2      A.   I believe it originated from the
 3   Lehman side of the transaction.
 4      Q.   And on what do you base that
 5   belief?
 6          MR. SHAW:  Same objection.
 7      A.   I believe Mr. Tonucci was getting
 8   those numbers from assets that he considered
 9   unencumbered which were -- which were on a
10   report out of that GFS system that we talked
11   about called non-actionable, meaning financed
12   with the firm's capital.
13      Q.   Why do you believe he was getting
14   them from that; I guess I didn't understand
15   that answer.
16          MR. SHAW:  Same objections.
17      Q.   Do you know why those types of
18   assets -- scratch that.
19          Why were non-actionable assets
20   used to develop the $1.9 billion target?
21          MR. SHAW:  Objection.  Beyond the
22   scope of the 30(b)(6).
23      A.   I believe the reason he went to
24   actionable versus non-actionable were, the
25   non-actionable security was typically one that
```

TSG Reporting - Worldwide    877-702-9580

Page 153

```
 1              Hraska
 2   was classified as something that the front end
 3   financing systems might not have been able to
 4   typically use in a financing transaction --
 5   secured financing transaction.  Something that
 6   customers possibly are going to provide
 7   liquidity wouldn't necessarily take.  However
 8   it didn't mean that they didn't necessarily
 9   have value, it just wouldn't be an asset class
10   or anything that potentially a liquidity
11   provider would give.
12          The repo transaction would have
13   used tools because it was a repo, which was
14   secured financing.  That transaction would
15   have used very similar type criteria as to
16   what were asset classes that would typically
17   be more actionable as opposed to
18   non-actionable.  So because on the night of
19   the 18th Lehman ended up being short
20   collateral to deliver to Barclays and have to
21   take a cash loan, I think Mr. Tonucci felt
22   that there may have been other securities
23   which had value but wouldn't have normally
24   have been available or eligible to pledge on a
25   secured financing transaction.
```

TSG Reporting - Worldwide    877-702-9580

## Page 154

Hraska

1
2    So therefore he wanted to look at
3    those securities and their locations and
4    determine whether they were physically able to
5    be moved to Barclays as a result of the
6    transaction.
7        Q.   I think I understand.
8        So during that effort to locate
9    these additional assets to be transferred to
10   Barclays was there some consequence associated
11   with not meeting this $1.9 billion target?
12           MR. SHAW:  Objection.  Beyond the
13       scope of the 30(b)(6).  Foundation.
14       A.   Can you define consequence?
15       Q.   Was Barclays not going to close if
16   you didn't meet the $1.9 billion?
17           MR. SHAW:  This is so far beyond
18       the scope of the 30(b)(6).
19           MR. HINE:  This is the origin of
20       Schedule B.  This is the --
21           MR. SHAW:  No.  The origin of
22       Schedule B is a far more discreet topic.
23       I mean under your theory the fact that
24       Lehman went bankrupt would be something
25       that you would be entitled to because

TSG Reporting - Worldwide    877-702-9580

## Page 155

Hraska

1
2    absent the bankruptcy we wouldn't have
3    had a deal and so forth.  At some point
4    we have to draw a line between the origin
5    of Schedule B and everything that led up
6    to the transaction.
7           MR. HINE:  That entire weekend is
8       assembling the assets that eventually
9       become Schedule B.  I am just asking --
10          MR. SHAW:  I continue to object.
11      Way beyond the scope of the 30(b)(6).  I
12      will let him answer if he knows anything
13      about this.  But it is not something that
14      he has been put forth as a 30(b)(6)
15      witness on and he is not prepared on
16      this.
17      A.   Repeat the question, please.
18      (Record read.)
19          MR. SHAW:  Same objections.
20      Q.   If you know?
21      A.   As a 30(b)(6) witness I can't
22   answer that question.
23      Q.   In your individual capacity do you
24   know; I am asking you --
25      A.   I guess my question is, we have

TSG Reporting - Worldwide    877-702-9580

## Page 156

Hraska

1
2    done it a couple of times, but if this
3    30(b)(6) subpoena, I am going to keep flipping
4    back and forth, I am happy to answer --
5           MR. SHAW:  Off the record for a
6       second.
7       (Recess taken.)
8       Q.   Back on the record.
9       A.   So I apologize, could you repeat
10   the question to me.
11      (Record read.)
12          MR. SHAW:  Objection.  Foundation.
13      This is an individual question, not
14      30(b)(6).
15          MR. HINE:  I asked it in a
16      30(b)(6), I note your objection, and he
17      is not answering the 30(b)(6), so I would
18      like his answer as an individual.
19      A.   As an individual, as a Lehman
20   employee at that time I had no knowledge as to
21   whether Barclays would close or not.
22      Q.   Did your team assembling these
23   assets that would eventually become Schedule B
24   in fact meet that target?
25      A.   The target of raising assets which

TSG Reporting - Worldwide    877-702-9580

## Page 157

Hraska

1
2    had a value of --
3        Q.   The $1.9 billion target that Mr.
4    Tonucci communicated to you?
5        A.   Yes, we did.
6        Q.   Did you exceed that target?
7        A.   Yes, we did.
8        Q.   By how much?
9        A.   Without having my spreadsheets, to
10   approximate I would say 300ish million.
11       Q.   Why didn't you stop when you met
12   the target?
13       A.   We didn't stop because I was asked
14   from my perspective from an operational
15   perspective did we feel that -- what was the
16   probability of us being able -- what were the
17   mechanical probabilities of us being able to
18   actually deliver assets to Barclays that were
19   located in the various locations that we
20   found.
21           Some of the locations were
22   locations which were held by custodial banks
23   outside the U.S., and as a result of the
24   holding situation some of those accounts, our
25   access had been frozen.  So even though the

TSG Reporting - Worldwide    877-702-9580

Page 158

Hraska

1
2  securities showed as unencumbered, the
3  probability of us being able to action or move
4  any of those securities was very likely not
5  going to happen.
6         So based on that we tried to
7  assemble as much unencumbered collateral as we
8  could in locations where we still felt we had
9  the capability to action that collateral and
10 deliver it to Barclays.
11     Q.   So when you assembled this
12 additional 300 million in assets that you
13 testified about --
14     A.   Can I stop you there?
15     Q.   Yes.
16     A.   There was never an assemblage of
17 an additional 300, there was an assemblage of
18 approximately 2 point something billion of
19 which we felt that 300 of it was not going to
20 be very easy to transfer.
21     Q.   So once you assembled that 2 point
22 something billion you stopped in your search
23 for additional assets; is that correct?
24     A.   At that time that is what the
25 entire exercise yielded.  It is not that we

TSG Reporting - Worldwide    877-702-9580

Page 159

Hraska

1
2  stopped, it was what the total result was.
3     Q.   When did you get to this 2 point
4  something billion figure?
5     A.   Specific time?
6     Q.   Like over the weekend?
7     A.   Very late Sunday, I don't
8  remember -- potentially into the hours of
9  Monday morning.  We pretty much -- I didn't
10 sleep that whole weekend, so I don't know what
11 point.
12     Q.   Can you turn for a minute to your
13 Exhibit 562-D which is your notes we talked
14 about today?
15     A.   Yes.
16     Q.   In the first sentence of the
17 section under topic 32-A I would like to refer
18 you to that sentence which reads:  Schedule B
19 was referenced in the clarification letter
20 representing the parties best effort based on
21 the information available at the time to list
22 the clearance box securities that Barclays was
23 entitled to receive.
24         Do you see that?
25     A.   I do.

TSG Reporting - Worldwide    877-702-9580

Page 160

Hraska

1
2     Q.   What do you mean by the phrase
3  entitled to receive in that context?
4     A.   Entitled to receive as a result of
5  the purchase agreement.
6     Q.   And how does that relate, the
7  concept of what they are entitled to receive
8  relate to the $1.9 billion target that we were
9  talking about?
10        MR. SHAW:  Objection to the form.
11     A.   They were entitled to receive
12 clearance box securities as per the selection
13 criteria.  What was returned were clearance
14 box securities for which customers had not
15 fully paid for them.
16     Q.   I guess my question is were they
17 entitled to receive all clearance box
18 securities for which customers had not paid,
19 or did you think they were entitled to receive
20 $1.9 billion of such securities?
21        MR. SHAW:  Objection.  Foundation.
22 Beyond the scope.  Calls for a legal
23 conclusion.  Speaks for itself.
24     A.   I think they were entitled to
25 receive all clearance box securities that were

TSG Reporting - Worldwide    877-702-9580

Page 161

Hraska

1
2  not fully paid for.
3     Q.   Then I guess I don't understand
4  why you had a $1.9 billion target?
5     A.   I didn't -- I was given that
6  target.  So I testified as to where I think
7  that target came from.  As to why I had that
8  target I honestly don't know.
9     Q.   I understand.  I guess my question
10 is was the $1.9 billion target a
11 quantification of what the parties thought
12 Barclays was entitled to receive, or did it
13 come from some other basis?
14        MR. SHAW:  Objection.  Calls for
15 legal conclusion.  Beyond the scope of
16 the 30(b)(6).  Lack of foundation.
17        If you know you can try to answer
18 this in your individual capacity.
19     Q.   If you know?
20     A.   Can you repeat the question again.
21 (Record read.)
22        MR. SHAW:  I would add the further
23 objection that it is vague as to time.
24     Q.   During that weekend?
25        MR. SHAW:  It is still vague as to

TSG Reporting - Worldwide    877-702-9580

Page 162

Hraska

1
2  time because it matters very much whether
3  you are talking before or after the
4  agreement that is reflected in the
5  clarification letter that was written.
6  Q.   You can answer the question?
7      MR. SHAW:  With all of my
8  objections.
9      A.   I believe it was Mr. Tonucci's
10 impression of what Barclays was entitled to
11 receive based off of the analysis that he did
12 prior to that instruction.
13 Q.   Analysis of what?
14     A.   Analysis of the unencumbered
15 list -- not the unencumbered list, the
16 non-actionable list.  His feeling was that
17 there had to be off of his analysis at least
18 $1.9 billion of assets which were not being
19 used for secured financing transactions which
20 is evidenced by the fact that they were not
21 used the previous night.
22     Therefore he asked us to look for
23 all unencumbered clearance box assets, and his
24 opinion was that there should be at least $1.9
25 billion because that is what he deemed to show

Page 163

Hraska

1
2  up on this non-actionable list.  That should
3  add some clarity to it.  So the search yielded
4  more than the $1.9 billion which was great
5  because we were able to capture the securities
6  that potentially Mr. Tonucci felt would have
7  been eligible for transfer.
8      But on the further analysis as
9  previously testified we didn't deem that all
10 those securities would be probable to deliver,
11 therefore we removed them from the initial
12 result.
13     MR. HINE:  That is all I have,
14 thank you.
15     MR. SHELLEY:  No questions.
16     MR. OXFORD:  Nothing further.
17 Thank you.
18     MR. SHAW:  No questions.
19     (Time noted 3:34 p.m.)
20
21 _____
            JIM HRASKA
22 Subscribed and sworn to before me
23 this ___ day of _____, 2010
24
25 _____

Page 164

1
2      C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                 : ss.
5  COUNTY OF NEW YORK  )
6
7      I, Philip Rizzuti, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10     That JIM HRASKA, the witness
11 whose deposition is hereinbefore set forth,
12 was duly sworn by me and that such
13 deposition is a true record of the
14 testimony given by the witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of this
19 matter.
20     IN WITNESS WHEREOF, I have
21 hereunto set my hand this 16th day of
22 January, 2010.
23 _____
24          PHILIP RIZZUTI
25

Page 165

1
2  ----------------- I N D E X ----------------
3  WITNESS      EXAMINATION BY      PAGE
4  JIM HRASKA      Mr. Oxford      6
5           Mr. Hine      150
6
7  ------------ INFORMATION REQUESTS -----------
8  DIRECTIONS:      58, 62
9  RULINGS:      None
10 TO BE FURNISHED:  123
11 REQUESTS:      57
12 MOTIONS:      None
13
14 ----------------- EXHIBITS -----------------
15 Exhibit 561-D, spreadsheets,      6
16 Exhibit 562-D, document headed  6
17 Jim Hraska 30(b)(6) deposition
18 notes,
19 Exhibit 563-D, one-page document  118
20 headed Exhibit C-Additional
21 Clearance Box Securities,
22 Exhibit 564-D, document headed   118
23 732 Accounts With Securities
24 That May Be Potential Firm
25 Claims If Firm Financed,

Page 1

1                    C. JONES

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10   ----------------------x

11

12

13

14          DEPOSITION OF CRAIG JONES

15             New York, New York

16              March 4, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 28628

Page 6

C. JONES

1
2    break at any time, please just let me know.
3    I'll be happy to accommodate you.
4         If you don't understand any of my
5    questions, please let me know; I'll be happy to
6    rephrase them.  And if you do answer my
7    questions, I will assume that you have
8    understood it be.  Is that fair?
9         A.   Yes.
10        Q.   How long were you employed by Lehman,
11   sir?
12        A.   Nine and a half years.
13        Q.   Were you always in the Treasury
14   Department for that time, sir?
15        A.   Yes.
16        Q.   What was your title when you first
17   joined Lehman?
18        A.   Vice President, Creditor Relations.
19        Q.   How long were you in that position,
20   sir?
21        A.   Four years.  Maybe five.
22        Q.   What was your next position?
23        A.   Vice President, Cash and Collateral
24   Management.
25        Q.   How long were you in that position

Page 7

C. JONES

1
2    for?
3         A.   Five years.
4         Q.   Was that until you joined Barclays?
5         A.   Yes.
6         Q.   Was it in the position of Vice
7    President, Cash and Collateral Management that
8    you were responsible for managing the margin and
9    clearing fund deposits at the OCC?
10        A.   At that time I was a senior vice
11   president.
12        Q.   But otherwise, the answer is "yes"?
13        A.   Yes.
14        Q.   Can you tell me what you mean by
15   managing the margin and clearing fund deposits?
16        A.   My team would ensure that the OCC
17   requirement is funded every day.
18        Q.   And how would the OCC communicate
19   these requirements to Lehman, sir?
20        A.   Generally, we would get a report in
21   the morning.
22        Q.   Were there times when you wouldn't get
23   a report in the morning and the requirement
24   would be communicated in some other way by the
25   OCC?

Page 8

C. JONES

1
2         A.   Yes.
3         MS. BLOOMER:  Objection to form.
4         Q.   Can you describe for me those other
5    methodologies through which the OCC would
6    communicate its margin requirements to Lehman?
7         A.   Can you repeat that?
8         Q.   Sure.
9         (Record read.)
10        A.   My understanding is generally it would
11   be in a phone call to somebody on my team that
12   there's a margin call.
13        Q.   When you say generally Lehman would
14   get a report in the morning, is that an e-mail
15   report that would be sent?  How is that report
16   communicated?
17        A.   I know most recently it has been
18   through their Website.
19        Q.   Focusing on the timeframe of September
20   2008, sir, how were -- how did Lehman learn of
21   the OCC's margin and clearing fund requirements?
22        MS. BLOOMER:  Objection.  Lacks
23   foundation.
24        Q.   Do you have my question in mind, sir?
25        A.   Sorry.  Can you repeat that?

Page 9

C. JONES

1
2         (Record read.)
3         A.   It was -- it was largely the same way,
4    the same process of, you know, viewing the
5    report in the morning, subject to any other call
6    that they would make.
7         Q.   Is it correct that one of your team
8    would view a report on the OCC's systems that
9    Lehman had access to?
10        A.   That's right.
11        Q.   What's the name of that system, sir?
12        A.   I'm not sure.
13        Q.   Which members of your team in
14   September 2008 had responsibility for viewing
15   the information on the OCC system to determine
16   the margin requirements?
17        A.   The primary person at the time was
18   Sharon Blake.
19        Q.   Was there a secondary person at the
20   time, sir?
21        A.   I'm sure there would have been.
22        Q.   Do you know who that was?
23        A.   I can't recall.
24        Q.   Was the margin that your team was
25   responsible for managing related to equity

3 (Pages 6 to 9)

Page 14

C. JONES

1
2     A.   It's more of a sort of a general
3  understanding, you know, market knowledge, I
4  guess.
5     Q.   In paragraph 4 you state that, "The
6  OCC has its own proprietary methods for setting
7  margin and clearing fund requirements," sir.
8  You see that?
9     A.   Yes.
10     Q.   Are you familiar with how it is the
11  OCC sets its margin and clearing fund
12  requirements?
13     A.   No.
14     Q.   Do you know how it's calculated?
15     A.   No.
16     Q.   Do you know, sir, whether or not
17  Lehman traded equity options other than through
18  the OCC?
19     A.   I don't know.
20     Q.   Are you familiar, Mr. Jones, with the
21  various margining levels that the OCC applies to
22  its clearing members?
23         MS. BLOOMER:  Objection to form.
24     A.   No.
25     Q.   To your understanding, are all of

Page 15

C. JONES

1
2  OCC's clearing members margined at the same
3  level and in the same way?
4     A.   I don't know.
5     Q.   In your time at Lehman, did the manner
6  in which LBI was margined at the OCC changed?
7     A.   I don't think I'd know.
8     Q.   And you wouldn't know because it was
9  simply your responsibility to meet the funding
10  requirements on a day-to-day basis, whatever
11  those funding requirements may be; is that
12  correct?
13         MS. BLOOMER:  Objection to form.
14     A.   Generally, yes.
15     Q.   Do you know whether LBI was on a watch
16  list at the OCC in September 2008?
17         MS. BLOOMER:  Objection to form.
18     A.   I'm not aware.
19     Q.   Did you have any conversations with
20  anyone at any time, sir, about the OCC
21  increasing its margin requirements for Lehman in
22  September 2008?
23         MS. BLOOMER:  Object to the form.
24     A.   Sorry, can you repeat the question?
25         (Record read.)

Page 16

C. JONES

1
2     A.   Yes.
3     Q.   Tell me about those conversations,
4  please.
5         MS. BLOOMER:  Objection to form.
6     A.   We were expecting about $400 million
7  back on Friday, the 19th of September, and it
8  didn't come back, obviously, so I called the OCC
9  to find out why.
10     Q.   Who did you speak to at the OCC?
11     A.   I can't recall.
12     Q.   Did the OCC explain to you why this
13  400 million that you were expecting to come back
14  did not come back?
15     A.   Not in detail, no.
16     Q.   Please tell me everything you remember
17  about that telephone call.
18     A.   Generally, they reserved the right to
19  take any collateral -- I can't remember the
20  exact phrasing of the call, but they couldn't --
21  they had -- they reserved the right to increase
22  their requirement.  I vaguely remember something
23  about going a hundred percent or increasing the
24  requirement.
25     Q.   Did you take any notes of those calls,

Page 17

C. JONES

1
2  sir?
3     A.   I don't recall.
4     Q.   Was there just one telephone call or
5  more than one with the OCC on this subject on
6  the 19th?
7     A.   Yeah, I don't recall.
8     Q.   Do you recall sending any e-mails
9  reporting the conversation with the OCC?
10     A.   I'm not sure if it's a privilege
11  question or not.
12         MS. BLOOMER:  The question is just do
13  you recall sending any e-mails, so I don't
14  think it would call for privileged
15  information.
16     A.   I don't recall.
17     Q.   You don't recall one way or the other
18  whether you sent any e-mails on this subject,
19  sir, to report what the OCC had told you on the
20  19th, is that -- is that your testimony?
21         MS. BLOOMER:  Objection.  Asked and
22  answered.
23     A.   Yes, I don't recall.
24     Q.   Do you remember discussing your
25  conversation with the OCC on the 19th with

5  (Pages 14 to 17)

Page 22

C. JONES

1  matter?
2      A.   I can't recall at that time.  She
3  probably reported in to somebody -- sorry.
4  Sorry.  She reported to somebody else.
5      Q.   Who was that someone else, sir?
6      A.   Carol Keith.
7      Q.   Carol Keith?
8      A.   Yes.
9      Q.   What was Carol Keith's role?
10     A.   She was responsible for the, what we
11  called the Cash Control Team.
12     Q.   And did Carol Keith report directly in
13  to you?
14     A.   I believe so.
15     Q.   Carol Keith does not appear on this
16  e-mail, correct?
17     A.   That's right.
18     Q.   Do you have any understanding of why
19  Carol Keith doesn't appear on the e-mail but you
20  do?
21          MS. BLOOMER:  Objection.  Lacks
22  foundation.
23     A.   Yeah, I'm not sure.
24     Q.   Can you turn over the page in your

Page 23

C. JONES

1  declaration to the second page of your e-mail,
2  sir.
3      A.   I'm just trying to remember
4  specifically Sharon's reporting line, that's
5  what I'm hesitating on, at the time.  Because
6  things have been moved around a bit.  So I can't
7  say for sure it was Carol Keith.  It could have
8  been Tamir Shafir, who's on here.  I can't
9  recall for sure.  I just am not clear.
10     Q.   Thank you.  Could you turn overleaf,
11  sir, looking at what is the second page of
12  Exhibit 2 to your declaration, do you know the
13  source of the data contained there?
14     A.   Not for sure.
15     Q.   What's your best understanding of the
16  source of that data, sir?
17          MS. BLOOMER:  Objection.  Lacks
18  foundation.
19     A.   I would have expected it to be the OCC
20  Website.
21     Q.   In your declaration at paragraph 5,
22  sir, you say, "In general, prior to September
23  2008, LBI posted collateral primarily in the
24  form of treasury securities and letter of

Page 24

C. JONES

1  credit."  Do you see that, sir?
2      A.   Yes.
3      Q.   Then in paragraph 14, you explain how,
4  by the opening of business on September 28,
5  2008, there was approximately $1.1 billion of
6  cash in the LBI OCC account posted as margin.
7  Do you see that, sir?
8          MS. BLOOMER:  Objection.  I think you
9  misspoke.  You said September 28 instead of
10  September 22.
11          MR. OXFORD:  Sorry.  I misspoke.  If
12  that's true, I meant September 22.  Thanks,
13  Trish.
14     A.   Sorry.  What's the question?
15     Q.   Do you see in paragraph 14, sir, how
16  you describe that on September 22, 2008, as of
17  the opening of business, approximately $1.1
18  billion of cash was posted at the OCC by way of
19  clearing fund and margin, do you see that, sir?
20          MS. BLOOMER:  Objection.  I don't
21  think it says that any of the cash was
22  clearing fund.  It mischaracterizes the
23  document.
24     Q.   Do you know, sir, what the reason was

Page 25

C. JONES

1  for the change between the general statement
2  about Lehman's practice prior to September 2008
3  of posting collateral at the OCC in the form of
4  treasury securities and letters of credit and
5  why, by September 22, there was over a billion
6  dollars of cash posted at the OCC?
7      A.   Can you repeat that?
8          (Record read.)
9      A.   I don't remember the date, but our
10  settlement bank, Bank of America, closed our
11  bank account for the OCC.  At that point, the
12  only way to settle with them in the time --
13  settle with them was by wiring money directly to
14  the OCC, to their bank.
15     Q.   Just trying to narrow down the date,
16  sir, on which the bank, Bank of America, closed
17  down Lehman's account for the OCC, was it in the
18  week beginning September 15, 2008?
19     A.   I can't remember.
20     Q.   Again, just to press on this just a
21  little bit, sir, you started to work at Barclays
22  on the 22nd of September, 2008?
23          MS. BLOOMER:  Objection.  Assumes
24  facts not in evidence.

7 (Pages 22 to 25)

C. JONES

1
2   THE WITNESS:  What was that?
3   MS. BLOOMER:  I said, "Objection.
4   Assumes facts not in evidence."
5   Q.   I don't think it's controversial since
6   you say that in paragraph 2 of your declaration.
7   A.   Okay, if that's what it says.
8   MS. BLOOMER:  Maybe it is in evidence.
9   A.   Sorry, did you say was I employed
10  September 22 with Barclays?
11  Q.   Yes.  I'm just trying to orient you as
12  to the timing, sir.  Focusing on the fact that
13  your employment with Barclays started on the
14  22nd of September, 2008, which I will represent
15  to you is the date of the closing of the sale
16  transaction between Lehman and Barclays?
17  A.   Okay.
18  Q.   Does that date help you recall with
19  any more precision when it was Bank of America
20  closed down Lehman's account at the OCC?
21  A.   No.  It was, you know -- I can't
22  remember if it was the week before or the two
23  weeks before.  I can't ...
24  Q.   The assets that Lehman posted by way
25  of margin and clearing fund at the OCC were

C. JONES

1
2   LBI's proprietary assets, weren't they, sir?
3   A.   That's correct.
4   Q.   Do you know whether customers and
5   affiliates who had their options positions
6   placed through LBI at the OCC also provided
7   collateral to LBI?
8   A.   I don't know.
9   Q.   When the OCC communicated to your team
10  a need for additional margin in September 2008,
11  sir, how would you and your team go about
12  meeting that request or requirement?
13  A.   I'm sorry, which date are you asking?
14  Q.   Generally in September 2008, sir.
15  What was the practice if, hypothetically, the
16  OCC had required LBI to post an additional $300
17  million --
18  A.   Right.
19  Q.   -- say on September 1?
20  A.   Okay.
21  Q.   What would you and your team do next?
22  A.   They would generally either post
23  additional treasuries, or if we had letters of
24  credit available, they would use letters of
25  credit.

C. JONES

1
2   Q.   To your knowledge, sir, was there any
3   limit placed by the OCC on the amount of
4   collateral that could be posted at the OCC by
5   way of letters of credit?
6   A.   For Lehman?
7   Q.   Yes.
8   A.   The OCC has limits around any -- they
9   have specific banks that they will allow letters
10  of credit from, but I'm not aware of any
11  specific limits on Lehman per se.
12  Q.   To your understanding, sir, could
13  Lehman have met a hundred percent of its margin
14  and clearing fund requirements at the OCC by way
15  of letters of credit?
16  MS. BLOOMER:  Objection, form and
17  calls for speculation.
18  A.   I mean, that's sort of a -- you know,
19  there's assumptions in there that I'd have to
20  make.  You know, do we have an infinite amount
21  of letters of credit available to us?
22  Q.   On the assumption that Lehman
23  possessed sufficient letters of credit, are you
24  aware, sir, one way or the other whether or not
25  the OCC had any limits on the satisfaction of

C. JONES

1
2   its margin and clearing fund requirements by way
3   of letters of credit?
4   A.   Can you repeat that?
5   (Record read.)
6   A.   Again, other than the limits posed by
7   the OCC for the specific banks, I'm not aware of
8   anything else.  I don't recall anything else.
9   Q.   Other than your responsibility, sir,
10  in managing the margin and clearing fund
11  requirements for the OCC, did you have any other
12  responsibilities that in any way related to
13  Lehman's exchange-traded derivatives trading?
14  MS. BLOOMER:  Objection to form.
15  A.   Sorry.  Can you be more specific?
16  Q.   I'm afraid I can't, sir, because I'm
17  asking a general question to find out what -- I
18  don't know what you did, so I'm trying to find
19  out generally what you did.
20  A.   Again, can you repeat that question?
21  (Record read.)
22  A.   I guess that's what's sort of throwing
23  me.  You know, I guess you're using the term
24  "exchange-traded derivatives."  We wouldn't be
25  looking at it in that context.

Page 30

C. JONES

1
2       Sorry.  Can you repeat the question?
3       Q.   Is the difficulty with my question,
4   sir, because you didn't -- to the extent you
5   dealt with exchange-traded derivatives, they
6   were not separated from over-the-counter
7   derivatives?
8       A.   I wouldn't really be looking at
9   anything from the perspective of whether it's a
10  derivative or not.  I'd be looking at what the
11  funding requirement is for any particular
12  clearing house or exchange.  So I didn't
13  differentiate between the underlying products.
14      Q.   Okay.  You say in your declaration,
15  sir, that one of your team's regular
16  responsibilities was to minimize the amount of
17  excess margin maintained by LBI at the OCC.  Can
18  you tell me why that is, please?
19      A.   We don't earn any return on excess
20  left at the OCC.
21      Q.   I see.  So it's an efficient use of
22  capital, in essence?
23      A.   Exactly.
24      Q.   When the daily margin requirement was
25  computed by the OCC and showed an excess, sir,

Page 31

C. JONES

1
2   was it Lehman's practice in September 2008 to
3   request the withdrawal of 100 percent of that
4   excess or some number less than 100 percent?
5       A.   Generally, we should be pulling back
6   everything.  There's obviously rounding issues
7   when you're dealing with treasury securities
8   that you can't get 100 percent back, so there
9   might be something -- we couldn't go below the
10  requirement, obviously.  So there might be a
11  minute amount excess over.
12      Q.   Can you turn to Exhibit 3 to your
13  declaration, sir.
14           MS. BLOOMER:  They're not numbered, so
15  you might just want to --
16      A.   Can you tell me the head line?
17      Q.   It's the third one after, sir.
18           MS. BLOOMER:  I think it's the one
19  with the zero, zero, zero at the top.
20      Q.   I'll identify it.  It's the e-mail
21  from Sharon Blake on Friday, September 19, 2008
22  at 14:19:43 GMT.
23      A.   Right.  Got it.
24      Q.   And the subject line is "Forward:  OCC
25  for today/Revised Copy."  Do you see that?

Page 32

C. JONES

1
2       A.   Yes.  Carol Keith is on this one.
3       Q.   Does this refresh your recollection
4   one way or the other, sir, about the reporting
5   chain to Sharon Blake?
6       A.   No.  It makes me more confused.
7       Q.   I'm glad I'm not alone in that
8   respect.
9            And you'll see down the chain, sir,
10  there's the original e-mail that we looked at a
11  few moments ago at 9:32 A.M. in which Sharon
12  Blake communicates the OCC's daily requirement,
13  including the excess of $401 million, do you see
14  that?
15      A.   Yes.
16      Q.   Under the e-mail at the top of the
17  chain, Ms. Blake sends a revised set of
18  requirements which appears to show an excess of
19  zero, do you see that?
20      A.   Yes.
21      Q.   Other than this e-mail, did Sharon
22  Blake communicate the revised OCC requirements
23  on September 19, 2008 to you in any way?
24      A.   I can't recall.
25      Q.   You don't remember if you talked to

Page 33

C. JONES

1
2   Sharon Blake about it?
3            MS. BLOOMER:  Objection.  Asked and
4   answered.
5       A.   I don't remember.
6            Sorry.  Can you repeat that question?
7   (Record read.)
8       A.   Sorry.  Yes.  No, after -- I can't
9   remember which one came first, you know, but
10  after -- I thought your question was how did I
11  find out about it.
12           Yes, at some point I asked her why is
13  it zero.
14      Q.   And what did Sharon Blake say to you
15  in response to that question?
16      A.   I can't recall the exact words.
17      Q.   Okay.  Generally, what do you recall
18  about what she told you?
19      A.   That the OCC had increased the
20  requirement.  I'm not sure if it was -- if that
21  was the words, but something along those lines.
22      Q.   Other than the testimony you gave me
23  a few minutes ago, do you recall anything else
24  about the conversation you had with the OCC?
25           MS. BLOOMER:  Objection.  Asked and

9 (Pages 30 to 33)

Page 34

C. JONES

1    answered.
2        A.    Directly with the OCC?
3        Q.    Yes.
4        A.    No.
5        Q.    Do you remember anything, sir, about
6    any conversations you had with anyone, whether
7    directly at the OCC or otherwise, about the
8    apparently revised requirements for the OCC's
9    margin on September 19, 2008?
10       A.    No, I don't recall.
11       Q.    We're sitting here today on March --
12           MS. BLOOMER:  4.
13       Q.    -- 4, 2010.  As a general matter, sir,
14   would you say that your recollection of the
15   events is better today than it was on the 19th
16   of September 2008, or do you think your
17   recollection would have been better on September
18   19, 2008 than it is today?
19           MS. BLOOMER:  Objection to the form.
20       A.    My recollection of what happened on
21   September 19, 2008, versus now?
22       Q.    Yes.
23       A.    I would hope my recollection would be
24   better on September 19.

Page 35

C. JONES

1        (Exhibit 679A, an e-mail chain, marked
2    for identification, as of this date.)
3        Q.    Mr. Jones, I've handed you what I have
4    marked as Exhibit 679A.  Take a moment to review
5    that, please, sir, and let me know when you're
6    done.
7        (Document review.)
8        A.    Okay.
9        Q.    Have you seen this document before,
10   sir?
11       A.    I mean, since the 19th?
12       Q.    Yes.
13       A.    I don't -- I don't recall.  Obviously
14   I commented on it on the 19th.
15       Q.    Do you see on the first page of
16   Exhibit 679A, sir, there's an e-mail from you at
17   5:01 P.M. on Friday, the 19th?
18       A.    Uh-huh.
19       Q.    Excuse me.  You're writing to a number
20   of people here, including Michael Evans.
21           Who is Michael Evans?
22       A.    I don't remember.
23       Q.    Do you remember who Christopher
24   Anderson is?

Page 36

C. JONES

1        A.    He's in our Margin Group.
2        Q.    Who's Michael Ross?
3        A.    Don't know.
4        Q.    Who's Michael Dubie?
5        A.    Don't know.
6        Q.    Do you know who Frank McGregor is?
7        A.    Frank is in the Options Group.
8            MS. BLOOMER:  Is it Frank or Michael?
9    Oh, it is frank.
10           THE WITNESS:  It's Frank McGregor.
11       Q.    And Joe Lodato?
12       A.    Joe's in Equity Compliance.
13       Q.    Sir, you write to these individuals,
14   and others, "We do not show any margin
15   requirement.  I spoke with the OCC who advised
16   that we have a significant excess, but due to a
17   policy decision, they have decided to lock up
18   our account.  I have asked for someone in the
19   policy group to give me a call ASAP.  Craig."
20           Do you see that, sir?
21       A.    Yes.
22       Q.    Do you recall writing that e-mail,
23   sir?
24       A.    I mean, vaguely.

Page 37

C. JONES

1        Q.    When you wrote, "We do not show any
2    margin requirement," sir, what did you mean by
3    that?
4        A.    That's what I was wondering the same
5    thing.  I don't know for sure.  I could -- it
6    would be speculation.  It doesn't make sense to
7    me.
8        Q.    You then go on to say, "I spoke with
9    the OCC, who advised we have a significant
10   excess, but due to a policy decision, they have
11   decided to lock up our account."  Do you see
12   that, sir?
13       A.    Yes.
14       Q.    Does that refresh your recollection
15   about the conversation you had with the OCC?
16       A.    I can't recall if this is -- if
17   there's one conversation or two, if this relates
18   to the same one that I had earlier or if
19   this is a different discussion.  I can't recall
20   that.
21       Q.    You would agree, sir, that this does
22   reflect that you had a conversation with the OCC
23   in which the OCC advised that Lehman had a
24   significant excess?

10  (Pages 34 to 37)

C. JONES

1
2    A.    Yes.
3    Q.    And do you have any reason to believe
4    that this relates to something other than LBI's
5    excess margin posted at the OCC?
6        MS. BLOOMER: Objection to form.
7    A.    No.
8    Q.    Do you agree that this e-mail reflects
9    that the OCC had advised not only that Lehman
10   had a significant excess margin at the OCC on
11   Friday, September 19th, but also that, due to a
12   policy decision, the OCC has decided to lock up
13   Lehman's account?
14       MS. BLOOMER: Objection to form.
15   A.    Can you repeat that question?
16       (Record read.)
17   A.    Yeah, I don't know.
18   Q.    Why don't you know that, sir?
19   A.    I don't recall the details of what --
20   that conversation.
21   Q.    Right.  My question is a little
22   different.  I understand you don't recall the
23   details of many of these conversations, but I'm
24   asking you what this e-mail reflects, sir.
25   A.    And as I said, I don't understand the

C. JONES

1
2    first sentence, and the rest of it, I don't know
3    what -- what the reference was.
4    Q.    Can you think of any meaning, sir,
5    that you could ascribe to the second sentence
6    other than the OCC has advised you on September
7    19, 2008 that Lehman has a significant excess
8    margin posted at the OCC, but due to a policy
9    decision, the OCC has decided to lock up that
10   account?
11       MS. BLOOMER: Objection to form.  The
12   e-mail does not say that the OCC advised him
13   of anything on September 19.
14   Mischaracterizes the document.
15   A.    Can you repeat that last question?
16       (Record read.)
17   A.    It doesn't say significant excess
18   margin.  It just says significant excess.  I
19   could see why you might make the assumption it's
20   a margin.  But that's what I mean, I can't -- I
21   can't say for sure what the meaning is.
22   Q.    Sure.  I'm not asking you for sure
23   what the meaning is, sir.  I understand that you
24   don't remember writing this e-mail other than
25   vaguely.  I'm asking you whether it could mean

C. JONES

1
2    anything other than what I just read to you.
3        MS. BLOOMER: Objection to form.
4    Q.    Can you think of anything to which
5    "significant excess" could be a reference other
6    than excess margin posted by Lehman at the OCC?
7    A.    No.
8    Q.    And in the same vein, sir, can you
9    think of any explanation for the second sentence
10   of your e-mail other than that it reflects a
11   conversation that you had with the OCC, who
12   advised you that Lehman had a significant excess
13   margin posted at the OCC, but due to a policy
14   decision, had nevertheless decided to lock up
15   LBI's account?
16       MS. BLOOMER: Objection to form.
17   Asked and answered.
18   A.    I may have asked and answered.  I'm
19   going to ask you to give me the question again.
20       (Record read.)
21       MS. BLOOMER: Objection.  I don't know
22   how that question is any different.
23   A.    I don't know what -- generally, no, I
24   don't know what it means by locking up our
25   account.

C. JONES

1
2    Q.    At the risk of extending this
3    deposition unnecessarily, that wasn't my
4    question.  My question wasn't what does it mean
5    to say the OCC is locking up your account.  Did
6    you read -- did you hear that as my question,
7    sir?
8    A.    Not that you asked about the second
9    sentence, and I'm trying to interpret the --
10   what I was trying to write in that sentence.
11       MR. OXFORD: Can you read back my
12   question that I have asked a few times,
13   please?
14       (Record read.)
15       MS. BLOOMER: Objection to form.
16   Asked and answered.
17   A.    No.
18   Q.    The third sentence of your e-mail
19   says, "I have asked for someone in the policy
20   group to give me a call, ASAP."  Do you see
21   that?
22   A.    Yes.
23   Q.    Is that reference, sir, to someone in
24   the policy group of OCC or at Lehman?
25   A.    I assume it was somebody at the OCC.

Page 42

C. JONES

1
2    Q.   Do you recall whether or not someone
3  in the policy group at the OCC did call you?
4    A.   I can't recall for sure.
5    Q.   You think they might have, but you
6  just don't recall?
7    A.   Very possibly.
8    Q.   If you did have a conversation with
9  someone in the policy group at the OCC, would
10 you have taken notes on that call?
11      MS. BLOOMER:  Objection.  Calls for
12 speculation.
13   A.   I don't know.
14   Q.   Was it your practice to take notes of
15 calls with the OCC, sir?
16   A.   Not necessarily.  Sometimes yes,
17 sometimes no.
18      MR. OXFORD:  Okay.  We'll take a
19 five-minute break.
20      (Recess; Time Noted.  3:09 P.M.)
21      (Time Noted:  3:28 P.M.)
22 BY MR. OXFORD:
23   Q.   Mr. Jones, can you have your
24 declaration in front of you and turn to
25 paragraph 9, please.

Page 43

C. JONES

1
2    A.   Okay.
3    Q.   Your report in paragraph 9 of your
4  declaration that you spoke to the OCC, who
5  confirmed that LBI would not be permitted to
6  withdraw any of the margin excess that had been
7  reported to LBI on the morning of September
8  19th, 2008, correct?
9    A.   That's right.  Yes.
10   Q.   You then go on to say that you were
11 advised that the OCC had full authority to take
12 this measure and were referred to the relevant
13 OCC rules.  Do you see that?
14   A.   Yes.
15   Q.   Did you actually go and look at those
16 OCC rules, sir?
17   A.   No.
18   Q.   Did you have any further conversations
19 with anyone on Friday, the 19th, that you recall
20 about the Lehman margin at the OCC?
21   A.   Other than Sharon?
22   Q.   Other than Sharon.
23   A.   I don't recall except for what you
24 have in this e-mail.
25   Q.   And by "this e-mail," do you mean --

Page 44

C. JONES

1
2    A.   679A.
3    Q.   Do you remember any conversations you
4  had with anyone about the topic of Lehman's
5  margin at the OCC on the Saturday, the 20th of
6  September, 2008?
7    A.   I don't recall any specific
8  conversation.  I would have expected I would
9  have, but I don't recall any conversations.
10   Q.   Why would you expected that you would
11 have?
12   A.   We were in that weekend, you know,
13 trying to figure out where all of our, you know,
14 liquidity and everything was, so that obviously
15 would have been sort of a sore thumb around, you
16 know, something that you would expect that's not
17 available.
18   Q.   Did you have any conversations with
19 anyone, sir, on Sunday, the 21st of September,
20 2008, about LBI's margin at the OCC?
21   A.   Again, it would be the same answer as
22 Saturday.  It would be -- I don't remember
23 exactly the details of what was going on, but I
24 would imagine that that would have been
25 discussed at some point or someplace.

Page 45

C. JONES

1
2    Q.   Do you recall asking anyone to check
3  the OCC's requirements over the weekend of the
4  20th and 21st of September, 2008?
5    A.   Yes.  Yes.  I'm sure we would have.
6    Q.   What do you recall about that, sir?
7    A.   Again, similar to before.  We were
8  trying to figure out where the potential -- what
9  our overall liquidity position is, so I would
10 have said can you give me what, you know, where
11 we have potential cash coming in, where do we
12 have potential cash going out.  So I had, you
13 know, most people in that weekend kind of
14 sourcing wherever we have more normal cash flows
15 to figure out what's happening.  So it would
16 have been in that context.
17   Q.   For what purpose were you trying to
18 identify liquidity over the weekend for the 20th
19 through 21st, sir?
20   A.   It basically was part of the role.
21 You know, you would need to kind of understand
22 what was happening, you know, where your money
23 was going, where it was coming in.  So we didn't
24 know what was -- you have to understand it was a
25 big confusion.  So --

C. JONES

1
2    Q.   I've heard that.
3    A.   I'm sure.
4         Ultimately, the idea was just to be
5    prepared for anything.  We didn't know what was
6    going on.
7    Q.   Were you trying to identify liquidity
8    so that assets could be transferred to Barclays,
9    sir?
10   A.   No.
11   Q.   At whose direction were you searching
12   for these sources of liquidity?
13        MS. BLOOMER:  Objection to form.
14   A.   It's just, again, part of our role,
15   just our job to understand where we have cash
16   going in and cash going out.  So there was no
17   specific direction, at least not that I recall,
18   but I mean, I would have been -- I do that every
19   day.
20   Q.   Do you recall any conversations with
21   Mr. Ullman over the weekend of the 20th and 21st
22   of September, sir, about the transfer of assets
23   to Barclays?
24   A.   Mr. Ullman?
25   Q.   Yes.  I thought you said you reported

C. JONES

1
2    to Mr. Ullman.
3    A.   No, Dan Fleming.
4    Q.   Oh, sorry.
5         Same question with respect to Mr.
6    Fleming.
7    A.   Okay.  Sorry.  Can you repeat that
8    question?
9         (Record read.)
10   A.   Yes, no.
11   Q.   Do you recall any conversations with
12   anyone, sir, prior to September 22, 2008
13   regarding the transfer of assets to Barclays?
14   A.   No.
15   Q.   Do you recall receiving an answer to a
16   request that a member of your staff check the
17   OCC's systems to determine whether or not there
18   was any excess margin in LBI's account at the
19   OCC?
20        MS. BLOOMER:  Objection to form.
21   A.   Can you say that again?
22        (Record read.)
23   Q.   And my question, sir, is directed to
24   the weekend of the 20th and 21st of September,
25   2008.

C. JONES

1
2    A.   Sorry, answer to my request for that?
3    Do I remember getting an answer?
4    Q.   Yes.
5         MS. BLOOMER:  Objection to form.
6    A.   I don't recall specifically.  I assume
7    I would have.  Someone would have told me.
8    Q.   I'm handing you, sir, what I've marked
9    previously in this depositions as Exhibit 634B.
10   I'd like you to take a moment and review that
11   document, and when you're done, tell me whether
12   you've seen it before.
13        MS. BLOOMER:  I'm going to object to
14   the form of that question about a request
15   because I don't know where -- your question
16   about a request assumed a fact that was not
17   in evidence, and I want to make a formal
18   objection to that statement.
19        MR. OXFORD:  I think that's your
20   second formal objection to that.  That's
21   your first speaking objection, but it's your
22   second objection.
23        MS. BLOOMER:  I don't think I objected
24   to an assumed fact in evidence before, so I
25   wanted to make that clear.  Thank you.

C. JONES

1
2    A.   Okay.
3    Q.   Have you seen this document before,
4    sir?
5    A.   I mean, I received an e-mail.  I -- I
6    don't recall it, but obviously I got it.
7    Q.   Did you review this document in
8    preparation for your deposition today, sir?
9    A.   I, to be honest with you, don't
10   recall.
11   Q.   Does this document refresh your
12   recollection that you asked Ms. Blake over the
13   weekend of the 20th and 21st to check the OCC's
14   current requirements for margin in LBI's
15   accounts at the OCC?
16        MS. BLOOMER:  Objection to the form.
17   Assumes facts not in evidence.
18   A.   I mean, it's to Dan and copied to me.
19   It's indicating maybe one of us asked her for
20   it.  So it doesn't -- did that answer your
21   question?  What was the question again?
22   Q.   My question is does it refresh your
23   recollection as to whether or not you asked Ms.
24   Blake to report on the current requirements?
25   A.   Sorry.

Page 50

C. JONES

1
2    Q.   Does it indicate to you that either
3  you or Mr. Fleming asked Ms. Blake to check
4  current requirements for the OCC margin
5  requirements in Lehman's account over the
6  weekend of the 20th through 21st of September?
7         MS. BLOOMER:  Objection to form and
8  calls for speculation.
9    A.   Yes, it indicated one of us asked.
10    Q.   Can you tell me, please, what the
11  e-mail indicates to you about the existence or
12  otherwise of an excess in Lehman's accounts at
13  the OCC?
14         MS. BLOOMER:  Objection to form.
15    A.   Can you repeat that question?
16    (Record read.)
17    A.   It's the report that she pulled that
18  indicates that their system is showing that we
19  have an excess.
20    Q.   And what is that excess, sir?
21    A.   The system looks like it's saying it's
22  668 million.
23    Q.   Do you agree, sir, that LBI had access
24  to the OCC accounts on Sunday, the 21st of
25  September, 2008?

Page 51

C. JONES

1
2         MS. BLOOMER:  Objection.  Form.
3    A.   Can you repeat that question?
4    (Record read.)
5    A.   I probably wouldn't be counting on
6  that, no.
7    Q.   How was it, then, that Ms. Blake was
8  able to obtain this information?
9    A.   Well, again, this is a
10  system-generated.  I'm assuming, you know, this
11  is, again, sort of me making assumptions, that
12  she had gotten this of their Website, and this
13  is from their $668 million excess that their
14  system would be showing.
15         So if that's real, I mean, that's sort
16  of a good indication for us, but, you know, is
17  that the final?  Obviously, you know, as we saw
18  Friday, it wasn't.  So we would look at it and
19  say, okay, there's potential excess, but we
20  don't know if that's actually available.
21    Q.   Did you have any follow-up calls with
22  anyone at the OCC after you received this
23  e-mail, sir?
24    A.   I don't recall.
25    Q.   Do you know if Mr. Fleming had any

Page 52

C. JONES

1
2  follow-up calls with anyone at the OCC after
3  receiving this e-mail?
4    A.   I don't know.
5    Q.   Do you agree, sir, that as of the date
6  of this e-mail, it appears that the OCC's
7  records reflected that there was in excess of
8  668 million in Lehman's accounts at the OCC?
9         MS. BLOOMER:  Objection to form.
10    A.   Can you repeat that?
11    (Record read.)
12    A.   As I said, it -- I can't speak for
13  their records, but their system is showing that
14  there's an excess.
15    Q.   Mr. Jones, I've handed you what has
16  been marked in prior depositions as Exhibit
17  635B.  Could you review that, please, sir, and
18  let me know when you're done.
19    A.   Sure.  Okay.
20    Q.   Do you recall this e-mail, sir?
21    A.   No.
22    Q.   You see that two e-mails down the
23  chain you write at 3:58 P.M. to Sharon Blake
24  regarding the OCC requirement that they would
25  normally charge in the morning for premiums, do

Page 53

C. JONES

1
2  you see that?
3    A.   Yes.
4    Q.   What do you mean when you ask Ms.
5  Blake to send the OCC requirement that they
6  would normally charge in the morning for
7  premiums?
8    A.   There's two portions to, you know, the
9  daily change in the OCC requirement or --
10  basically, there's the daily margin requirement
11  and then what's called a pay collect, and the
12  premiums go through that pay collect
13  calculation.  So you may have an excess in your
14  margin, but then you'll have a shortfall in your
15  premiums or vice-versa.  It can go either way.
16         So I was just asking her -- what she
17  just sends along, if I remember right, is just
18  the excess deficit of the margin not taking into
19  account the actual pay collect.
20    Q.   And under what circumstances would --
21  well, withdrawn.  Can you explain what you mean
22  by "pay collect"?
23    A.   Depending upon which way the premiums
24  are going, you know, we're either paying
25  premiums or we're receiving premiums, you know,

14  (Pages 50 to 53)

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,   (Jointly Administered)

9            Debtors.

10      ------------------------x

11

12          DEPOSITION OF ALAN KAPLAN

13             New York, New York

14              March 1, 2010

15

16   Reported by:

17   MARY F. BOWMAN, RPR, CRR

18   JOB NO. 28619

19

20

21

22

23

24

25

Page 6

```
 1              KAPLAN
 2  ALAN KAPLAN,
 3      called as a witness by the parties,
 4      having been duly sworn, testified as follows:
 5  EXAMINATION BY
 6  MS. DEL MEDICO:
 7      Q.   Good morning, Mr. Kaplan.  My name is
 8  Jennifer Del Medico.  I represent LBHI, the
 9  debtors in this case.
10          Mr. Kaplan, who is your employer?
11      A.   I work for Barclays Capital.
12      Q.   What is your position at Barclays
13  Capital?
14      A.   Deputy general counsel, Americas.
15      Q.   How long have you held that position?
16      A.   About nine and a half years.
17      Q.   In September of 2008, you held that
18  position, correct?
19      A.   That's correct.
20      Q.   What are your general responsibilities
21  in that position?
22      A.   My -- I have a broad background and so
23  my responsibilities change from time to time
24  depending on the needs.  Among the areas which I
25  cover are regulatory matters.  I help supervise
```

Page 7

```
 1              KAPLAN
 2  our litigation.  I tend to get involved with
 3  workouts and restructurings and then as there
 4  are particular projects or transactions which
 5  require my assistance, I will get involved with
 6  those as well.  I also manage a number of
 7  lawyers.
 8      Q.   Did you have any responsibilities in
 9  September 2008 related to the sale transaction
10  between Lehman and Barclays?
11      A.   I was involved with the sales
12  transaction.  I was looking at a number of
13  issues as they would arise in terms of
14  responsibilities.  There were a number of people
15  who were, in a sense, thrown at the transaction
16  and people were handling different matters as
17  they saw fit as matters arose.
18          I would say the two areas where I had
19  primary responsibility or significant
20  responsibility would be the, in the Fed
21  replacement repo and then -- I am trying to
22  decide if there was a second primary area.
23  Otherwise, it was more general assistance with
24  the transaction.
25      Q.   To whom did you report with respect to
```

Page 8

```
 1              KAPLAN
 2  your responsibilities with the Fed replacement
 3  repo?
 4      A.   Well, both with respect to that matter
 5  and more generally, I reported to Jonathan
 6  Hughes, global general counsel of Barclays
 7  Capital.
 8      Q.   Was there anyone else?
 9      A.   I guess "reporting" is a difficult
10  term for me.  I mean, on the Fed replacement
11  repo transaction, on the business side, the
12  person probably needing our efforts there was
13  Gerard Larocca.  I'm not sure whether I reported
14  to him or not.
15      Q.   With respect to the Fed replacement
16  repo, did you have a team working under you who
17  reported up to you?
18          MR. SHAW:  Do you mean a team on the
19  legal side?
20      Q.   Yes, a team of lawyers.
21      A.   I wouldn't describe it that way.  I
22  think -- some of that we were putting
23  documentation in place for potential triparty
24  repo.  One of my lawyers, Andy Georgalas, was
25  assisting with that.  Otherwise, I don't think
```

Page 9

```
 1              KAPLAN
 2  there were lawyers who were significantly
 3  involved with the replacement repo.
 4      Q.   And on the business side, were you
 5  interacting with business people at Barclays
 6  with respect to the Fed replacement repo?
 7      A.   Yes.
 8      Q.   Who were those individuals?
 9      A.   Gerard Larocca, David Petrie, and to
10  some extent with some of our operations team, I
11  believe it was John Rodefeld, possibly John
12  Haley.
13      Q.   I am going to hand you, not mark it,
14  just a calendar from September of 2008.  Using
15  this calendar, can you tell me when you first
16  became involved with working on the Fed
17  replacement repo, approximately?
18      A.   I think I first got involved with an
19  earlier proposed repo transaction between
20  Barclays and Lehman and I believe that was on
21  Saturday the 13th and this was at the time when
22  people were considering the transaction of
23  actually acquiring all of Lehman and so I was
24  asked to assist with putting repo documentation
25  or triparty repo documentation in place.
```

1           KAPLAN
2      But that wasn't specifically for the
3   Fed.  But it turned out that the same
4   documentation was also used for the Fed repo and
5   I think the Fed replacement repo involvement
6   probably started on either the 16th or early on
7   the 17th.
8      Q.   Describe to me what happened on
9   Saturday the 13th when you began working on an
10  early proposed repo and that repo did not go
11  through, correct?
12     A.   Right, that was intended to be part of
13  the financing for the original transaction.  I
14  believe I had a call from -- call or e-mail from
15  Jonathan Hughes.
16         MR. SHAW:  Alan, let me caution you,
17     again, because you're a lawyer, I want to be
18     certain that none of what you are answering
19     involves matters that you know only in a
20     privileged context.
21         THE WITNESS:  Can I consult with you
22     for just a second?
23         MR. SHAW:  Sure, sure.
24         (Discussion held off the record)
25     Q.   Describe to me what happened on

1           KAPLAN
2   Saturday the 13th when you began working on an
3   early proposed repo?
4      A.   I was home and received either an
5   e-mail or a telephone call and I believe from
6   Jonathan Hughes asking me to come to the office
7   and work with Gerard Larocca, I think on a
8   financing transaction or repo transaction.
9         I remember being at the office that
10  day, that weekend.  I also had, I believe,
11  conversations with and maybe even met with a
12  couple of lawyers at Lehman to discuss the
13  documentation and my recollection now is Locke
14  McMurray and Scott Lechner.  I don't recall when
15  those meetings were, on Saturday or Sunday.
16     Q.   When you refer to the documentation,
17  what are you referring to specifically?
18     A.   One was confirming that we had an
19  appropriate master repurchase agreement in place
20  which between Lehman Brothers Inc. and Barclays
21  Capital Inc. and at that time, I think there was
22  also some question as to which parties might be
23  the relevant parties and some also are, I think,
24  confirming that we had documentation in place
25  between Barclays Bank PLC and Lehman Brothers

1           KAPLAN
2   Inc. and we were also looking to insure that we
3   had, if needed, appropriate triparty custody
4   arrangements in place with both BoNY and JP
5   Morgan.
6      Q.   What happened to the documentation
7   with respect to this repo; did you use it when
8   you went into the stage that you were working at
9   the Fed replacement repo or did it just get
10  trashed?
11     A.   Well, the master repurchase agreement
12  between Barclays Capital Inc. and Lehman
13  Brothers Inc. was already in place and that was
14  used.  And there was a new triparty agreement
15  between Barclays Capital Inc., Lehman Brothers
16  Inc. and JP Morgan which we signed and put in
17  place and thought we might use.  My
18  understanding is ultimately it was not
19  necessary.
20     Q.   I am going to hand you a document,
21  Mr. Kaplan, that has already been marked as
22  Exhibit 117.  Take a look at that.  Take a look
23  at this document and tell me if you recognize
24  it.
25     A.   This appears to be the master

1           KAPLAN
2   repurchase agreement that was in place between
3   LBI and BCI.
4      Q.   Let me hand you a document that has
5   already been marked 579B.  If you could take a
6   look at that and tell me if you can identify it.
7      A.   This is the declaration which I
8   provided on January 26, 2010.
9      Q.   And in paragraph 3 of your
10  declaration, you state that, "The repo
11  transaction that Barclays entered into with
12  Lehman Brothers at the behest of the Fed
13  Reserve, the Fed replacement repo, was
14  transacted using the parties' standing master
15  purchase agreement dated as of July 23, 1998
16  between LBI and Barclays Capital Inc."  Correct?
17     A.   That's correct.
18     Q.   What do you mean by "at the behest of
19  the Federal Reserve"?
20     A.   My understanding from nonprivileged
21  documents that I have seen is that the Fed
22  essentially required Barclays to enter into this
23  transaction to replace the Fed financing
24  provided to LBI.
25     Q.   And what nonprivileged documents are

Page 14

KAPLAN

1           KAPLAN
2  you referring to?
3     A.   I believe there were discussion of
4  this, among other places, in the JP Morgan -- in
5  the settlement documentation relating to the JP
6  Morgan Chase settlement in December 2008.
7     Q.   And when you say at the behest of the
8  Federal Reserve, are you referring to certain
9  individual or individuals at the Federal
10  Reserve?
11     A.   I don't think I have any nonprivileged
12  information on that.
13     Q.   Did you have conversations with anyone
14  at Lehman or its representatives at Weil about
15  the Fed replacement repo?
16     A.   I had conversations with Scott Lechner
17  and possibly Locke McMurray.  I'm not sure if he
18  was involved at that later stage.
19     Q.   Anyone at Weil Gotshal?
20     A.   I don't believe so.
21     Q.   And when did you have these
22  conversations with Mr. Lechner and possibly
23  Mr. McMurray?
24     A.   I believe on September 17.
25     Q.   And what did you discuss with

Page 15

1           KAPLAN
2  Mr. Lechner and possibly Mr. McMurray on the
3  17th?
4     A.   I recall the conversation with
5  Mr. Lechner, and in part, it was about using the
6  master repurchase agreement to document the Fed
7  replacement repo.
8      So it was in part about the
9  documentation and there was also some discussion
10  about how the underlying securities would be
11  treated if the transaction went forward, sale
12  purchase transaction went forward.  It was
13  obvious that LBI would not be in a position to
14  repurchase the securities and that we would have
15  to deal with the securities as part of the
16  purchase transaction.
17     Q.   And that conversation was on September
18  17th?
19     A.   That's my recollection.
20     Q.   Was there any other discussion about
21  how the underlying securities would be treated
22  if the transaction went forward?
23      MR. SHAW:  You mean other than with
24  Mr. Lechner?
25      MS. DEL MEDICO:  Right.

Page 16

1           KAPLAN
2     A.   No.
3      MR. SHAW:  And I assume you are
4  excluding any privileged conversations?
5      MS. DEL MEDICO:  Right.
6      MR. SHAW:  He has answered no.
7     A.   I'm not sure I understand the
8  question.  No further discussions with
9  Mr. Lechner about that or others at Lehman.
10     Q.   Or others at Lehman.  OK.  And when,
11  just to be clear, when we discuss that there
12  could possibly have been a conversation with
13  Locke McMurray, would that have been during the
14  same conversation with Mr. Lechner or would that
15  have been a separate conversation?
16     A.   I don't recall whether it was more
17  than one conversation.  I remember that
18  conversation with Mr. Lechner.  I remember
19  Mr. McMurray being involved with the repo
20  documentation, certainly on the weekend before,
21  and what I don't recall is whether in some of
22  those conversations or just some back and forth
23  on the repo documentation that may have involved
24  Mr. McMurray.
25     Q.   What happened after September 17th

Page 17

1           KAPLAN
2  with respect to the Fed replacement repo?
3      MR. SHAW:  Objection to form, vague.
4     Q.   You can answer.
5     A.   I'm not sure what you're asking about.
6     Q.   Did you have other involvement in the
7  Fed replacement repo after September 17th?
8     A.   Certainly anything prior to the
9  closing I believe would have been privileged.
10     Q.   And I'm not asking for conversations
11  or -- just involvement.
12      MR. SHAW:  Objection to form, vague.
13     Q.   Did you have any involvement with
14  anyone else at Lehman or any other third parties
15  with respect to the Fed repo after September
16  17th?
17      MR. SHAW:  By third parties you're
18  excluding outside counsel for Barclays, I
19  take it?
20      MS. DEL MEDICO:  Yes.
21     A.   At least before the closing of the
22  transaction, I do not believe so.  I mean, it's
23  possible -- one possibility is, and I don't
24  recall, is, I don't remember whether the
25  documents were actually signed on the 17th or

KAPLAN

1
2   there may have been a little more back and forth
3   in terms of signing documents after that, but I
4   just don't recall.
5       Q.   After your conversation with
6   Mr. Lechner on the 17th, was there any more
7   substance to that conversation besides the fact
8   that the securities involving the repo would be
9   part of the purchase transaction?
10          MR. SHAW:  Objection, asked and
11      answered.
12      A.   Not that I recall.
13      Q.   OK.  With regard to Exhibit 117 that
14  you have in front of you, the master repurchase
15  agreement that we discussed, do you know whether
16  the Fed replacement repo was transacted under
17  any other standing agreement between the
18  parties?
19      A.   The only other possible agreement, I'm
20  not sure if it is the Fed replacement repo, but
21  there was 7 million (sic) dollars of cash which
22  was provided initially by LBI to cover a
23  shortfall in securities and -- is that a
24  privilege issue?
25          MR. SHAW:  Let's step outside.  And

KAPLAN

1
2   that's 7 billion, not million.
3       (Discussion held off the record)
4       Q.   Do you --
5       A.   I don't think I have any further
6   nonprivileged information.
7       Q.   Was Bank of New York involved in the
8   Fed replacement repo?
9           MR. SHAW:  Objection to form, vague.
10      A.   They were involved at least to some
11  degree because some of the securities Barclays
12  received were held or custodied at an account in
13  Bank of New York.
14      Q.   Do you know whether they had any other
15  involvement?
16      A.   There was a -- there was an employee
17  of Bank of New York who attended the meeting, a
18  meeting we had at the New York Fed on September
19  17 primarily to assist, helping out with some of
20  the arrangements for the transfer of securities.
21      Q.   Do you remember who that employee of
22  BoNY was?
23      A.   First name is Art.  I can't recall his
24  last name.
25      Q.   Regarding the meeting on September

KAPLAN

1
2   17th with the New York Fed, who was in
3   attendance at that meeting?
4       A.   From the Barclays side, myself, Gerard
5   Larocca, Dave Petrie, Elena Matrullo, Art from
6   BoNY and from the Lehman side, Ian Lowitt, and
7   there were a number of New York Fed staff people
8   there and I don't recall any of the names.
9       Q.   What was discussed at that meeting?
10      A.   Primarily logistics for the transfer
11  of securities from LBI to BCI.
12      Q.   And how were the securities to be
13  transferred from LBI to BCI?
14      A.   There were a number of different
15  technical discussions about how that would work
16  and how it would work and partial transfers or
17  one block transfer, you know, what kind of
18  financing would be used to start a potential
19  chain.  There was some discussion of triparty
20  repo as well.
21      Q.   What is your understanding of what
22  actually happened --
23          MR. SHAW:  Objection.
24      Q.   -- regarding the logistics of the
25  transfer?

KAPLAN

1
2           MR. SHAW:  Objection to form, vague.
3       A.   Can you be more specific?
4       Q.   Sure.  You said that at the meeting
5   with the Fed, different types of transfers were
6   discussed.  And what I am looking to find out is
7   what transfers, what type of transfer was
8   actually used to transfer the collateral from
9   LBI to BCI?
10      A.   Yeah, I think my knowledge of that is
11  based on privileged communications.
12      Q.   So you never had any conversations
13  with anyone at the Fed or with Lehman about the
14  actual type of transfer that was taking place?
15      A.   I don't believe so.
16      Q.   Did you have any, besides the meeting
17  on September 17 that we just spoke about, did
18  you have any other conversations with anyone at
19  the Fed about the Fed replacement repo?
20      A.   I don't recall.  It's possible --
21  there were no further meetings.  There may have
22  been a follow-up conference call, I just don't
23  recall.
24      Q.   After this meeting on September 17th,
25  did you personally do anything further with

KAPLAN

1
2  regard to the Fed replacement repo?
3      A.   Can you be more specific?
4      Q.   Sure, did you, after this meeting on
5  September 17th, did you do any further work on
6  the Fed replacement repo, including
7  conversations with how the repo would work or
8  facilitating the repo, anything at all
9  regarding --
10     A.   I think its privileged.
11        MR. SHAW:  You can answer yes or no.
12  But if it involves a legal work you did for
13  Barclays or discussions with Barclays
14  personnel, I think that would be privileged.
15     A.   The answer is yes, but it would be
16  privileged.
17     Q.   Can you turn to your declaration,
18  579B.  In paragraph 4 of your declaration, you
19  state that on February -- I am sorry, "On
20  Friday, September 19th, 2008, the Securities
21  Investor Protection Corporation sought and
22  obtained an order putting Lehman Brothers Inc.
23  under the control of a trustee," and you go on
24  to say, "This triggered contractual termination
25  rights for Barclays under eight master

KAPLAN

1
2  agreements between various Barclays entities and
3  LBI and launched a routine process within
4  Barclays that resulted in Barclays' serving on
5  LBI notices of termination or default under each
6  of those agreements.
7        "Among the agreements with respect to
8  which a notice of early termination was served
9  was the master repo agreement."
10        Do you know what part of the master
11  repurchase agreement triggered contractual
12  termination rights for Barclays?  And you have
13  it, so.
14     A.   In one of the events of default, under
15  section 11 is an act of insolvency.
16     Q.   And what is the routine process under
17  which Barclays exercises its rights under
18  section 11?
19        MR. SHAW:  Objection to form.
20     A.   I'll answer, I mean, it is not just
21  with respect to section 11 of the MRA, but there
22  are other master agreements, such as ISDAs, and
23  when we have a defaulting counterparty, one of
24  the things we will do typically in advance is
25  determine what agreements we have in place with

KAPLAN

1
2  them and what notices are required to be served
3  and where and prepare the forms of notice so
4  that we are ready to go out with them when the
5  actual event happens.
6      Q.   Who at Barclays determines whether
7  there is a triggering event?
8      A.   Depending on the circumstances, it may
9  be a number of people involved, but no one would
10  send out a notice of default or termination
11  without the legal department preparing those
12  notices and saying it was appropriate to send
13  them out.
14     Q.   Help me understand, how does that
15  information get to the legal department?  Is
16  there a department at Barclays that is
17  monitoring potential issues that would trigger
18  termination rights?
19        MR. SHAW:  Objection to form.
20     Q.   Do you understand?
21     A.   I understand the question.  I continue
22  to have questions about privilege.
23        MR. SHAW:  Let's consult.
24        (Discussion held off the record.)
25     A.   Generally speaking, at Barclays, there

KAPLAN

1
2  would be a number of people who were concerned
3  with these events and trying to coordinate their
4  actions including in our credit department, but
5  legal as well, and certainly in the case of a
6  bankruptcy filing, it would often be the case
7  that legal might be the first to know or be able
8  to verify that it had occurred or in any kind of
9  insolvency proceeding.
10     Q.   So there is no -- it can vary?  It is
11  not like the credit department is on the lookout
12  for a triggering event and send that information
13  to legal?
14     A.   They might be.  They probably would
15  be.  It is really a matter of coordination
16  and if in some kind of proceeding, there is a
17  good chance it would be legal which would be the
18  first to either know or verify that.
19     Q.   Then what would happen next?
20     A.   Again, typically there would be a
21  certain amount of coordination between legal,
22  credit and potentially the relevant front office
23  desks that were transacting with a counterparty,
24  and the process will vary somewhat depending on
25  whether there was time to prepare ahead of time

Page 26

KAPLAN

1  or whether there was notice of the event and
2  there is a much more expedited reaction to it.
3      Q.   Who at Barclays decides whether
4  Barclays should exercise its rights under 11 of
5  the master repurchase agreement?
6      A.   Again, it may depend on the particular
7  circumstances.
8      Q.   So is there a routine process that
9  Barclays follows or does it vary?  Depending
10 upon --
11     MR. SHAW:  Objection to form.
12     A.   There is a fairly routine process in
13 terms of getting our arms around what master
14 agreements there are, determining whether or not
15 there are transactions standing under them,
16 preparing notices, and coordinating with front
17 office and credit.
18     Q.   Understanding that it may depend on
19 the particular circumstances of an event as to
20 who ultimately decides whether Barclays should
21 exercise its rights -- strike that.
22     I understand that different people in
23 different departments may decide whether
24 Barclays should exercise its rights under 11A,

Page 27

KAPLAN

1  correct?
2      MR. SHAW:  Objection to the form,
3  vague as to circumstances.  Are you talking
4  about in the event of an act of insolvency?
5      Q.   In the event of an act of insolvency.
6      MR. SHAW:  I object.  It
7  mischaracterizes section 11A which states
8  that the option shall be deemed to have been
9  exercised immediately upon the occurrence of
10 an act of insolvency.
11     Q.   Is there an individual at Barclays who
12 determines whether or not rights should be
13 exercised under 11A?
14     A.   There is not necessarily one
15 individual, no.
16     Q.   What groups of individuals' input go
17 into making this decision?
18     A.   As I mentioned earlier, credit
19 department, legal department, and depending on a
20 counterparty, somebody in the front office.
21 There could be more than one.
22     Q.   Are there any other departments or is
23 that it?
24     A.   Those come to mind.

Page 28

KAPLAN

1      Q.   Is there anyone at Barclays who needs
2  to sign off on a notice of termination going
3  out?
4      MR. SHAW:  Objection to form.
5      A.   I don't think there is any one
6  individual, but clearly legal has to be on board
7  with it.
8      Q.   Could you -- I know you just described
9  to me the routine process that -- within
10 Barclays that results in Barclays serving
11 notices of termination in general, but with
12 respect to the notice of early termination that
13 was served regarding the master repurchase
14 agreement, what specific steps were taken within
15 Barclays?
16     A.   We, prior to the 19th, sort of an
17 inventory was put together of what master
18 agreements various Barclays entities had with,
19 in this case, Lehman Brothers Inc.  There were
20 people in the legal department who prepared the
21 forms of notices that were required in
22 connection with master agreements.  And then
23 would arrange for them to be signed and sent
24 out.

Page 29

KAPLAN

1      Q.   Who at Barclays put the inventory
2  together?
3      A.   I believe two people who were involved
4  with that were Jim Brown, James Brown, a lawyer
5  in the legal department and Chen Sethi, an
6  analyst working in the legal department, and
7  there may have been others working with them.
8      Q.   Who arranged -- who prepared the forms
9  of notices that were required in connection with
10 the master agreement?
11     A.   I believe they did or others working
12 with them.
13     Q.   I am going to give to you what has
14 already been marked Exhibit 27.  Could you take
15 a look at this document and tell me if you
16 recognize it?
17     A.   Yes, I recognize it.
18     Q.   What is this document?
19     A.   This is the notice of termination that
20 was sent out with respect to the master
21 repurchase agreement between BCI and LBI.
22     Q.   Is this the agreement that you refer
23 to in paragraph 4 of your declaration?
24     MR. SHAW:  Do you mean is this the

KAPLAN

1
2  notice he referred to?
3      MS. DEL MEDICO:  I am sorry, the
4  notice.
5      Q.   I am sorry, the notice?
6      A.   Yes, it is.
7      Q.   Were you a party to any discussions
8  with Lehman or its representatives at Weil
9  Gotshal about what, if anything, the master
10 repurchase agreement or the sale transaction
11 document said that addressed the possibility of
12 a termination over the repo?
13     A.   No, other than the conversation
14 mentioned earlier with Scott Lechner that it was
15 clear that LBI would not be in a position to
16 repurchase the securities.
17     Q.   Did the topic of the termination -- a
18 possible termination specifically come up?
19     A.   Just in the context of if the deal
20 went forward, that the normal termination
21 arrangements didn't make sense.
22     Q.   Why wouldn't the normal termination
23 arrangements make sense?
24     A.   Do you want to rephrase that a little.
25 I'm not sure if there was a discussion or maybe

KAPLAN

1
2  just a brief acknowledgment, but under the
3  master repurchase agreement, there are
4  provisions for either selling securities or
5  valuing them and I believe we both understood or
6  maybe acknowledged that there was no point in
7  going through that kind of exercise in the
8  context of the purchase transaction.
9      Q.   Why?
10     A.   My understanding, again, I'm not sure
11 the conversation was this specific, but you had
12 thousands of securities, a number of which might
13 be difficult to value, and essentially, the
14 termination process is a process where one party
15 is in default and the other party is making
16 various judgments.  It didn't seem to be
17 necessary in the context of a consensual
18 purchase agreement.
19     Q.   Did you discuss valuation any further
20 with Mr. Lechner?
21     MR. SHAW:  Objection to form.
22     A.   I don't believe so.
23     Q.   To your knowledge, was anybody on
24 Barclays' side of the table, Barclays or its
25 representatives involved in discussions with

KAPLAN

1
2  Lehman or its representatives about what, if
3  anything, the master repurchase agreement or the
4  sale transaction documents said that addressed
5  the possibility of a termination of the repo?
6      MR. SHAW:  I'll again remind you not
7  to disclose any privileged communications.
8      Q.   I'm just asking if you know of any
9  communications between Barclays or its lawyers
10 with Lehman and its lawyers?
11     MR. SHAW:  If you have nonprivileged
12 knowledge of any such communications, you
13 may answer.
14     A.   Based on what's in the -- based on the
15 provisions in the clarification letter, there
16 must have been communications.
17     Q.   Who is Michael Montgomery?
18     A.   Michael Montgomery is a Barclays
19 employee who has been with Barclays about ten
20 years.  I'm not sure what his specific
21 involvement was in this transaction.
22     Q.   If you turn on Exhibit 27 that I gave
23 you, the notice -- 27.  Do you see that Michael
24 Montgomery signed this notice of termination and
25 you're cc'd on the bottom?

KAPLAN

1
2      A.   Yes, one of Mike's roles is he is an
3  officer and director of Barclays Capital Inc.
4      Q.   Do you know whether he routinely signs
5  notices of termination?
6      A.   I'm not sure that he routinely signs
7  them, but as a Barclays Capital Inc. officer and
8  director, he may sign documents from time to
9  time.
10     Q.   Do you know why you were cc'd on this
11 notice of termination?
12     MR. SHAW:  Objection to form,
13 foundation.
14     A.   I'm cc'd on most if not all of the
15 notices of termination which get sent out in the
16 U.S.
17     Q.   What do you do with these notices that
18 you're cc'd on as a matter of course?
19     A.   Take the e-mail and file it in a
20 relevant PST folder.
21     Q.   With respect to this notice of
22 termination, do you recall receiving this
23 document on or around September 19?
24     A.   I recall after September 19th,
25 probably on the 20th, either learning of a

KAPLAN

1
2  notice of termination or possibly receiving this
3  or noticing that I had received it.
4      Q.   What did you -- did you read the
5  document then on September 20th for the first
6  time?
7      A.   I don't recall if I read the document,
8  but I understood that a notice of termination
9  had been sent with respect to the master
10 repurchase agreement.
11     Q.   If you didn't read it, how did you
12 understand that it had been sent?
13     A.   I may have read it, I don't recall.
14     Q.   Did it come to you via e-mail or did
15 someone hand it to you, do you recall?
16     A.   I believe I would have received a
17 privileged e-mail.
18     Q.   If -- so you didn't receive this via
19 e-mail like you did in the ordinary course with
20 other notices of termination that you would get
21 and file in the PST files?
22         MR. SHAW:  Objection,
23 mischaracterizes --
24     A.   No, I didn't say that.  I don't recall
25 how I received it.  I probably received it by

KAPLAN

1
2  e-mail.  Whether I read it or not, I don't
3  recall.
4          There was a lot going on at the time
5  and whether I noticed it right away or after the
6  fact and whether I immediately moved it into a
7  PST folder, I just can't recall in this case.
8      Q.   Did someone at Barclays bring it to
9  your attention?
10         MR. SHAW:  Again, if this, if the
11 answer is a question involved with
12 privileged communication, please don't
13 divulge the details of that.
14     A.   It would have involved a privileged
15 communication.
16         MS. DEL MEDICO:  Well, Jonathan, I
17 think I am allowed to inquire into the
18 notice of termination and whether or not it
19 was an error.  It is information that you
20 have affirmatively put at issue in
21 Mr. Kaplan's declaration.
22         MR. SHAW:  I understand your position
23 and our position is he is not going to
24 divulge any privileged communications.
25         MS. DEL MEDICO:  Well, we will keep

KAPLAN

1
2  moving and make our record.
3      Q.   What did you do after you -- did you
4  eventually review this document?
5      A.   I don't recall if I reviewed the
6  document because I know what the contents would
7  have been.  But I became aware that we had
8  provided this termination notice which clearly
9  should not have been sent.
10     Q.   Back to your declaration, you state
11 that -- in paragraph 4 of your declaration, you
12 state that the notice of termination that was
13 served pursuant to the master purchase agreement
14 should not have been sent.  Then you refer to
15 this notice as an error, correct?
16     A.   Correct.
17     Q.   Do you recall when you first realized
18 that the notice should not have been sent?
19         MR. SHAW:  Objection, asked and
20 answered.
21     A.   I believe on the 20th when I learned
22 that the notice had been sent, as soon as I
23 focused on the fact that it was one of the --
24 among the other notices, one for the master
25 repurchase agreement, that's when I recognized

KAPLAN

1
2  there was a mistake.
3      Q.   And what did you do after you
4  recognized that?
5          MR. SHAW:  And to the extent it would
6  call for you to divulge any privileged
7  communications, I instruct you not to
8  answer.
9      A.   Yeah, it would involve privileged
10 communications.
11     Q.   Did you speak to anyone at Lehman or
12 its representatives at Weil Gotshal about the
13 notice of termination?
14     A.   I don't believe so, no.
15     Q.   Do you know whether anyone on
16 Barclays -- anyone at Barclays or any of
17 Barclays' representatives spoke with anyone at
18 Weil about the document?
19         MR. SHAW:  Objection; orally,
20 communicated otherwise?  What are you
21 asking?
22     Q.   If someone at Barclays or Barclays
23 representatives communicated with anyone at Weil
24 Gotshal or Lehman Brothers about the document?
25     A.   Yes, based on the language in the

Page 38

KAPLAN

1
2  clarification letter regarding this notice of
3  termination, I assume they did.
4      Q.   Do you have personal knowledge that
5  they did?
6          MR. SHAW:  Again, if any such
7      knowledge, if you have it, it would come
8      from a privileged communication, I instruct
9      you not to divulge that.
10     A.   Yeah, any knowledge would come from
11 privileged communications.
12     Q.   What is your understanding of how
13 sending the notice of termination was in error?
14     A.   As I mentioned earlier, my
15 understanding is that the securities under the
16 repo were to be purchased assets under the sales
17 transaction and, therefore, sending a notice to
18 terminate the repo was a mistake.
19     Q.   Were there any sale transaction
20 documents that serve as the basis for your
21 understanding that the securities under the repo
22 were to be purchased assets under the sales
23 transaction?
24         MR. SHAW:  Objection to the form.
25     A.   I mean, the clarification letter was a

Page 39

KAPLAN

1
2  basis for it then.
3      Q.   I am going to hand what you has been
4  marked as Exhibit 25.  Do you recognize this
5  document, Mr. Kaplan?
6      A.   Yes, I do.
7      Q.   What is it?
8      A.   It's the clarification letter between
9  Barclays Capital Inc. and various Lehman
10 entities.
11     Q.   Is this the document that served as a
12 basis for your understanding that the securities
13 under the repo were to be purchased assets under
14 the sale transaction?
15     A.   Yes, it was one of the bases.
16     Q.   What were the other bases?
17     A.   Privileged communications.
18         MR. SHAW:  Let's discuss that outside
19 for a moment.
20         (Discussion held off the record)
21     A.   Another basis was my conversations
22 with Scott Lechner that I was reminded was not a
23 privileged communication.
24     Q.   That conversation was on
25 September 17th, correct?

Page 40

KAPLAN

1
2      A.   Correct.
3      Q.   At that time, were there any other
4  bases for your understanding that the securities
5  under the repo were to be purchased assets under
6  the sale transaction?
7      A.   Only pursuant to privileged
8  communications.
9      Q.   Is there any other way, besides what
10 we have discussed, that serving this notice was
11 an error?
12         MR. SHAW:  Objection to form.
13     A.   I'm not sure what you're asking.
14     Q.   Have you told me about all the ways in
15 which serving the notice of termination was an
16 error?
17         MR. SHAW:  Objection to form.
18     A.   I mean, from my perspective, the basic
19 error was that there was no need to send a
20 notice that was -- given that the intention was
21 to have Barclays purchase the securities under
22 the sale transaction.
23     Q.   Do you know whether the intention to
24 have Barclays purchase securities under the sale
25 transaction was a part of the asset purchase

Page 41

KAPLAN

1
2  agreement?
3          MR. SHAW:  Objection to form.
4      To the extent any such knowledge might
5      come from privileged communications, I would
6      ask you not to divulge those.
7          MS. DEL MEDICO:  Again, I object to
8      your objection.  This is material that you
9      affirmatively offered in his declaration.
10         MR. SHAW:  I understand your position.
11     And we will stick with my objection.
12     A.   I don't recall.
13     Q.   Would you --
14     A.   I don't recall, but I don't think the
15 Fed replacement transaction was, you know, it
16 was agreed that Barclays would enter into that
17 at the time that the original asset purchase
18 agreement was signed, but I don't recall and
19 whether it is referred to in there or not.
20         MS. DEL MEDICO:  Can we take a break?
21         MR. SHAW:  Sure.
22         (Recess)
23     Q.   Mr. Kaplan, when we first began the
24 deposition, you told me that you, in your time
25 at Barclays, had been involved with workouts and

Page 42

```
1              KAPLAN
2    restructuring.  Have you, were any of the
3    workouts or restructuring that you were involved
4    in workouts in bankruptcy court?
5        A.    Some have involved bankruptcy court,
6    yes.
7        Q.    What types of workouts have you been
8    involved in in the bankruptcy court context?
9        A.    The primary -- my primary one that
10   comes to mind is the Enron bankruptcy.
11       Q.    And have any of these bankruptcies
12   dealt with repurchase agreements?
13           MR. SHAW:  Objection, foundation.
14       A.    I'm trying to recall.  In the case of
15   Enron, we did not have any repurchase agreements
16   and I'm certain that we have closed -- I've been
17   involved with closing out and terminating
18   repurchase transactions with some insolvent
19   counterparties, although I don't think our
20   involvement or my involvement included the
21   bankruptcy court in those cases.
22       Q.    Are you aware of Section 559 of the
23   Bankruptcy Code?
24       A.    I am.
25       Q.    What do you know about Section 559 of
```

Page 43

```
1              KAPLAN
2    the Bankruptcy Code?
3           MR. SHAW:  To the extent your
4    knowledge of Section 559 of the Bankruptcy
5    Code involves legal advice from Barclays'
6    counsel, I would caution you not to reveal
7    that.
8        A.    I'm familiar with 559 as dealing with
9    safe harbor for repo transactions, repurchase
10   transactions.
11       Q.    What -- can you describe the safe
12   harbor for repo transactions for me?
13           MR. SHAW:  If you have an
14   understanding apart from any legal advice
15   and legal analysis, you can give that.
16       A.    I mean, like other safe harbors, it
17   deals with the ability to terminate the
18   transactions without having to be concerned
19   about the stays and also deals with -- it is a
20   safe harbor for preferences and transfers as
21   well.
22       Q.    Do you know what happens to excess
23   collateral in a repurchase agreement under
24   Section 559?
25           MR. SHAW:  Are you asking for a legal
```

Page 44

```
1              KAPLAN
2    opinion?
3        Q.    I am asking his --
4        A.    I am aware that there is a part of 559
5    that talks about excess value, and I don't have
6    the exact words in front of me, having to be
7    returned to the debtor, yes.
8        Q.    In September of 2008, did you have any
9    conversations with anyone about any potential
10   issues under Section 559 of the Bankruptcy Code
11   that could be implicated based on the notice of
12   termination that Barclays issued?
13       A.    No, I did not.
14       Q.    Were you a part of any discussions
15   with Lehman or its representatives at Weil
16   Gotshal about what Barclays' rights would be in
17   the event of a termination of a repo?
18       A.    No.
19       Q.    And I understand that you never spoke
20   to anyone on the Lehman side of the table,
21   including Weil, about Section 559 of the
22   Bankruptcy Code, correct?
23       A.    That's correct.
24       Q.    Do you know if anyone at Barclays,
25   Barclays or its representatives spoke with
```

Page 45

```
1              KAPLAN
2    anyone on the Lehman side of the table,
3    including Weil Gotshal about Section 559 of the
4    Bankruptcy Code?
5           MR. SHAW:  And again, if you have any
6    such knowledge, if such knowledge comes from
7    privileged communications, please don't
8    divulge that.
9        A.    I am unaware of anything, I am unaware
10   of any conversations with Lehman or Weil on
11   those issues.
12       Q.    After you understood that the notice
13   of termination was sent, did you know whether
14   there could be any potential consequences to
15   Barclays as a result of the error?
16           MR. SHAW:  Objection to form.
17       A.    Yeah, I wasn't concerned about
18   consequences.  It was more it was inconsistent
19   with the transaction.  And in the context of the
20   clarification letter, I thought it ought to be
21   cleaned up.
22       Q.    Was the notice of termination sent
23   prior to the clarification letter being sent?
24       A.    Yes.
25       Q.    And how do you know that?
```

```
1              KAPLAN
2       A.   The notice was sent on the 19th and
3  the clarification letter wasn't signed until
4  early morning on the 22nd.
5       Q.   Was one of the reasons -- was serving
6  the notice of termination pursuant to the master
7  repurchase agreement an error because of its
8  implications under Section 559 of the Bankruptcy
9  Code?
10      A.   No, it was an error because there was
11 no intention to terminate the transaction and
12 deal with it outside of the purchase agreement.
13      Q.   Can you turn to Exhibit 25 of the
14 clarification letter, please.  And also your
15 declaration, if you can get those all the
16 together.
17           In paragraph 4 of your declaration,
18 you state that the parties corrected the error
19 in paragraph 13 of the clarification letter.
20 Paragraph 13 of the clarification letter
21 provides in pertinent part that the notice of
22 termination relating to the Barclays repurchase
23 agreement dated September 19, 2008 is hereby
24 deemed and rescinded and void ab initio in all
25 respects, is that correct?
```

```
1              KAPLAN
2       A.   That's correct.
3       Q.   When did you first become aware of
4  paragraph 13 of the clarification letter?
5       A.   Privilege question.
6  Sorry.
7           (Discussion held off the record)
8       A.   Outside of the context of privileged
9  communications, I was certainly aware of it when
10 I saw the final clarification letter.  It must
11 have been on Monday the 22nd.
12      Q.   And did you, prior to Monday the 22nd
13 or -- strike that.
14           At any time, did you have any
15 involvement in drafting paragraph 13 of the
16 clarification letter?
17      MR. SHAW:  Objection to the extent it
18 calls for any privileged information.
19      MS. DEL MEDICO:  Drafted personally.
20      MR. SHAW:  That's not the question you
21 asked.
22      MS. DEL MEDICO:  I asked if he had any
23 involvement in drafting paragraph 13 of the
24 clarification letter.
25      MR. SHAW:  Which is not quite a draft.
```

```
1              KAPLAN
2  Do you want to change the question to did
3  you draft paragraph 13?
4       MS. DEL MEDICO:  No, I want him to
5  answer whether he had any involvement in the
6  drafting paragraph 13.
7       MR. SHAW:  To the extent that you had
8  any privileged communications regarding
9  paragraph 13, I would caution you not to
10 answer.
11      A.   I would answer nothing that's not
12 privileged.
13      MR. MILLS:  Can you answer that yes or
14 no?
15      MR. SHAW:  Answer it yes or no.
16      A.   Yes, I had some involvement in
17 drafting section 13.
18      Q.   Do you know who else had involvement
19 in drafting Section 13?
20      A.   Yes, I know at least some of the
21 people involved.
22      Q.   Who?
23      A.   One of my colleagues, Jason White.
24      Q.   Anyone else?
25      A.   I would assume lawyers representing
```

```
1              KAPLAN
2  Barclays either at Cleary Gottlieb and Sullivan
3  & Cromwell, but exactly which ones, I'm not
4  sure.
5       Q.   I am going to hand what you has been
6  marked already Exhibit 580B.  Could you just
7  take a look at this document and tell me if you
8  have seen it before?
9       A.   OK.  Don't know if I have or not.  I
10 don't recall it specifically.
11      Q.   Did paragraph 13 have any other
12 purpose in the clarification letter other than
13 correcting the error that you describe in
14 paragraph 4 of your declaration?
15      MR. SHAW:  Objection, calls for legal
16 conclusion, foundation, vague.
17      Q.   Do you understand what I asked?
18      A.   I'm not sure if I do, no.
19      Q.   What was the purpose of paragraph 13
20 in the clarification letter?
21      A.   In just reading it, in addition to the
22 last sentence, which talks about the notice of
23 termination being rescinded and void, the whole
24 first part of it very clearly talks about the
25 way that the repurchase agreement was being
```

KAPLAN

1
2    dealt with under the sales transaction; namely,
3    no further obligations of the parties, so no
4    obligation on the part of LBI to, you know, pay
5    a repurchase price or make any payments or any
6    obligation on the part of Barclays to return
7    securities or any other obligations.
8        Q.   Does paragraph 13 correct any other
9    error other than the serving of the notice of
10   termination?
11       A.   Not that I am aware of.
12       Q.   At any time, were you part of any
13   discussions with Lehman or its representatives
14   at Weil Gotshal about paragraph 13 of the
15   clarification letter?
16       A.   No, I was not.
17       Q.   To your knowledge, was anybody on
18   Barclays' side of the table, Barclays or its
19   representatives involved in discussions with
20   Lehman or its representatives about provisions
21   in the clarification letter that address the
22   issue of the termination of the repo?
23           MR. SHAW:  Again, to the extent that
24   you -- that any information that you might
25   have relates or is a privileged

KAPLAN

1
2    communication, I would caution you not to
3    divulge it.
4            MS. DEL MEDICO:  Even on a yes or no
5    answer on that?
6        A.   I don't have any specific knowledge
7    aside from this document you just showed me.
8            MS. DEL MEDICO:  They may have some
9    clean up.
10   EXAMINATION BY
11   MR. DAKIS:
12       Q.   Just a couple of clean-up questions.
13           For the record, I am Robert Dakis from
14   Quinn, Emanuel, Urquhart, Oliver & Hedges.  We
15   represent the committee of unsecured creditors
16   in this matter.
17           You testified earlier that you were
18   aware of Section 559 of the Bankruptcy Code,
19   correct?
20       A.   Correct.
21       Q.   Were you aware of Section 559 in
22   September of 2008?
23       A.   Yes, I would have been, yes.
24       Q.   Can you please pull out Exhibit 117.
25           MR. SHAW:  The master repo?

KAPLAN

1
2        Q.   It is the master repurchase agreement.
3        A.   OK.
4        Q.   I just have a couple of follow-up
5    questions on the master repurchase agreement.
6    Section 11 of the master repurchase agreement
7    sets out the events of default, correct?
8        A.   Correct.
9        Q.   And as Mr. Shaw so ably pointed out,
10   section 11A provides that there is an event of
11   default automatically upon an act of insolvency,
12   correct?
13       A.   Correct.
14       Q.   Are you aware of any writings signed
15   by both Barclays and Lehman prior to September
16   of 2008 that modify section 11 of the master
17   repurchase agreement?
18       A.   I'm not aware of it, no.
19           MR. DAKIS:  I have nothing further.
20   EXAMINATION BY
21   MR. MILLS:
22       Q.   I just have a few questions.  I'm Carl
23   Mills from Hughes, Hubbard & Reed and we
24   represent the SIPA trustee, James Giddens.
25           You testified earlier, in addition to

KAPLAN

1
2    the Fed repo, you were involved in some other
3    aspects of the Lehman Barclays deal, correct?
4        A.   That's correct.
5        Q.   Do you remember any specific aspects
6    of the deal you were also working on?
7        A.   I was involved with some of the
8    discussions involving DTCC.
9        Q.   When did you first become involved in
10   discussions involving the DTCC?
11       A.   In the evening of September 17th.
12       Q.   And what was the nature of those
13   discussions?
14           MR. SHAW:  I assume you're asking only
15   about nonprivileged discussions with outside
16   parties, not about the internal discussions
17   with Barclays or its outside counsel.
18           MR. MILLS:  If the nature of those
19   discussions was privileged, then no.
20       A.   After the meeting at the New York Fed,
21   Gerard Larocca said he wanted to go over to the
22   DTCC and asked me to join him.  So we went to
23   DTCC and met with maybe, among others, Larry
24   Thompson, Issac Montal and Don Donahue.  And I
25   think that from Gerard's perspective, we were

Page 1

1

2               UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4    ------------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,   (Jointly Administered)

9              Debtors.

10   ------------------------x

11

12              DEPOSITION OF MARLO KARP

13                 New York, New York

14                 January 20, 2010

15

16   Reported by:

17   MARY F. BOWMAN, RPR, CRR

18   JOB NO. 27306

19

20

21

22

23

24

25

Page 6

KARP

1
2         THE VIDEOGRAPHER:  This is the start
3     of tape number one of the videotape
4     deposition of Marlo Karp in the matter In Re
5     Lehman.  Today's date is January 20, 2010,
6     at approximately 9:45 a.m.
7         Will the court reporter please swear
8     in the witness.
9   MARLO KARP,
10     called as a witness by the parties,
11     having been duly sworn, testified as follows:
12   EXAMINATION BY
13   MR. THOMAS:
14     Q.   Good morning, Mrs. Karp.  Would you
15     please state your full name and address for the
16     record?
17     A.   Marlo L. Karp, 2 Ashley Place, Towaco,
18   New Jersey, 07082.
19     Q.   Have you been deposed before?
20     A.   No.
21     Q.   Do you have an understanding of how
22   this process works in terms of, I'll be asking
23   questions and the court reporter will be taking
24   down your answers, and your attorney may from
25   time to time have an objection to the form of

Page 7

KARP

1
2   the question, after which he makes the
3   objection, you can go ahead and answer the
4   question, unless he instructs you not to, and if
5   at any point in time you're not clear what I am
6   asking you, please ask me to go ahead and
7   rephrase.
8     A.   OK.
9     Q.   Would you please briefly describe your
10   professional background?
11     A.   Sure.  I have been with Deloitte since
12   1990, right out of college.  I started out in
13   the audit practice for banking and securities
14   and continued in that role until 1995, in the
15   summer, where I joined the regulatory consulting
16   practice and focused more on projects where
17   there were issues where firms had -- brokerage
18   firms had with regulators, and helping them deal
19   with those issues with the regulators.
20         I have also done SIPA liquidations
21   during that time, as well as fraud
22   investigations.
23     Q.   And your current position?
24     A.   I'm a partner.
25     Q.   Can you please briefly describe your

Page 8

KARP

1
2   educational background?
3     A.   I have a BS/BA from Washington
4   University in St. Louis, and I have a master's
5   from Columbia University.
6     Q.   And what is the master's in?
7     A.   Finance.
8     Q.   So are you an accountant?
9     A.   Yes, I am.
10     Q.   When did you first have any
11   involvement with the Lehman/Barclays
12   transaction?
13         MR. ROTHMAN:  Are you asking her
14     personally or Deloitte?
15     Q.   That's a good distinction.  They may
16   conflate.
17         When did Deloitte first have any
18   involvement with the Barclays/Lehman
19   transaction?
20     A.   We received a call from SIPC, either
21   the 15th or 16th of September, asking whether or
22   not Deloitte might be -- have the time and be
23   able to help if Lehman Brothers, Inc. went into
24   liquidation.
25     Q.   And was it a -- what was your

Page 9

KARP

1
2   understanding of what the role would be for
3   Deloitte?
4     A.   They spoke to John Manley about it,
5   and it was to be the advisors to the trustee and
6   provide bookkeeping services, help with claims.
7   It was typically the role that we play.
8   Sometimes it would involve some forensic
9   analysis, as well.
10         But they weren't clear as to what the
11   role would be, just at that point they just
12   wanted us to know whether or not we would be
13   able to do -- work on the liquidation if it came
14   to fruition.
15     Q.   You understand you have been
16   designated as a witness here to give testimony
17   on behalf of Deloitte on various topics?
18     A.   Um-hm, yes.
19     Q.   And did you personally become involved
20   in any way in the Barclays/Lehman transaction
21   that week of, let's say September 15th to the
22   22nd?
23     A.   The transaction itself?
24     Q.   Well, in the transaction, and I mean
25   that loosely.  I don't mean actually sitting

3  (Pages 6 to 9)

Page 10

```
 1              KARP
 2   down and typing it up, but in -- were you aware
 3   it was going to on, the negotiations?
 4       A.  We had received a couple phone calls
 5   from SIPC as things progressed.  As it got
 6   closer they wanted to know whether or not we had
 7   cleared conflicts in case the liquidation did
 8   come to fruition, and about the 18th, some of my
 9   partners had had discussions with Jim Giddens,
10   who hadn't yet been appointed trustee, about
11   what the potential role might be and whether or
12   not it was getting close to fruition.
13           He also shared a draft copy of the
14   APA, which I received as well, just to read
15   through.  They had asked whether or not we had
16   any specific questions.
17       Q.  Did you have any questions or comments
18   regarding the APA?
19       A.  I didn't.  I believe a couple of my
20   partners responded back with one or two
21   questions, but for the most part they really
22   didn't have many questions, as our role wasn't
23   really defined except to say was anything
24   unclear to us.
25       Q.  If there was something unclear in the
```

Page 11

```
 1              KARP
 2   contract, you may have raised that?
 3       A.  It was purely unclear as if we
 4   understood -- if we had any specific questions
 5   as to -- that might affect our role, and we
 6   didn't have any specific questions regarding our
 7   role.  That was all we looked at it from.
 8       Q.  At any point did anyone from Deloitte
 9   provide an analysis of the APA or the purchase
10   agreement?
11       A.  No.  We were not asked to do so.
12       Q.  Let me go ahead and show you a
13   document that without the cover has been
14   previously marked, but we will go ahead and mark
15   this as 566.
16           (Exhibit 566, document Bates stamped
17       DT 303 to 356 marked for identification, as
18       of this date.)
19           MR. ROTHMAN:  Go ahead, look through
20       it.
21       Q.  Does that appear to be the document
22   you referred to as the APA and that Deloitte
23   received on approximately September 18, 2008?
24       A.  The draft that we received had a bunch
25   of markups on it, handwritten notes.  So it
```

Page 12

```
 1              KARP
 2   doesn't appear to be the same.
 3       Q.  OK.  Does it -- allowing -- and we
 4   will try to grab the version with the
 5   handwritten notes, but does it otherwise appear
 6   to be the same document, allowing for the fact
 7   that you may have seen a draft that was
 8   initially attached to the motion for the sale
 9   order which had handwriting on it?
10       A.  I mean they both said "asset purchase
11   agreement" on them.  I don't know if all the --
12   if everything stayed the same within it.
13       Q.  Did you ever get a different copy or
14   did Deloitte ever receive a different copy of
15   the APA other than that one originally provided
16   on September 18?
17       A.  Yeah.  Later on sometime in October, I
18   think we got a final version of the APA with the
19   signed pages.
20           MR. THOMAS:  Counsel, do you know what
21       the -- I am going to go ahead and mark this
22       now even though it has been marked before.
23           (Exhibit 567, letter dated 9/20/2008
24       marked for identification, as of this date.)
25       Q.  Showing you a document we have marked
```

Page 13

```
 1              KARP
 2   as Exhibit 567, do you recognize this document?
 3       A.  Yes.
 4       Q.  Can you describe what it is, please.
 5       A.  I believe it is referred to as the
 6   clarification letter.
 7       Q.  And did you understand it to revise
 8   and amend the original asset purchase agreement?
 9           MR. ROTHMAN:  Objection to the form.
10       A.  I understood that it was in addition
11   to the asset purchase agreement.  I don't know
12   that it -- I know it was afterwards that may
13   have changed some of the terms.
14       Q.  And is it your understanding that this
15   is part of the deal that the parties consummated
16   on September 22, 2008?
17       A.  That's how it has -- sorry.
18           MR. ROTHMAN:  Go ahead.
19       A.  That's how it has been described to
20   me.
21       Q.  When was the first time you received
22   that document, the clarification letter?
23       A.  It would have been the same time I
24   received the final version of the APA, so early
25   October.
```

Page 14

KARP

1
2    Q.    And what was the -- why was Deloitte
3    sent a version of the final APA and the
4    clarification letter?
5         MR. ROTHMAN:  Let me just caution you
6    not to reveal any conversations or things
7    that you might have learned from counsel
8    concerning that question.
9    A.    We generally request documents for our
10   engagements for our file so we understand what's
11   going on.  These would be typical documents we
12   would have requested versions of to understand.
13   Q.    Was anyone from Deloitte at any of the
14   bankruptcy court hearings related to the
15   Lehman/Barclays transaction in September of
16   2008?
17   A.    No.
18   Q.    Was Deloitte following those hearings
19   in any way?
20   A.    Following, no.  I believe we received
21   a phone call that weekend letting us know
22   that the hearing, that the hearing had gone
23   through, the sale was going to go through, but
24   we were asked not to do anything else at that
25   time.

Page 15

KARP

1
2    Q.    Is that a phone call you received
3    personally?
4    A.    No.
5    Q.    Was -- was Deloitte aware that the
6    clarification letter was being finalized over
7    that weekend of the 20th and 21st over at Weil
8    Gotshal?
9    A.    I don't know when we knew about the
10   clarification letter.
11   Q.    Was anyone from Deloitte ever over at
12   Weil or Lehman prior to September 22?
13   A.    No.
14   Q.    So you were, Deloitte was relying on
15   reports from others in terms of what was going
16   on with the negotiation of the deal, the
17   finalization of the deal?
18   A.    Yes.
19   Q.    And what was the -- what work did
20   Deloitte do in that month of September?
21   A.    We attended a meeting on the 22nd at
22   75 -- the 745 building, the building with the
23   trustee, his counsel, Weil Gotshal, a lot of
24   attorneys, a lot of former Lehman personnel
25   there as well, where we started getting some

Page 16

KARP

1
2    information about where we could sit, how we
3    would get documents, how we would get books and
4    records.
5         Basically sat there -- it was an
6    organizational meeting at that point, and that
7    is all we were asked to do for pretty much that
8    first week, was just try to get organized, start
9    getting teams organized, people, because we were
10   asked to not do anything while the customer
11   transfers were going on.
12   Q.    What was the goal of the getting
13   organized?  Getting organized to do what?
14   A.    To proceed with the SIPA liquidation
15   process, so how would we do claims, how would we
16   marshal the assets of the firm, just build on --
17   what teams would work on what with which
18   attorneys from Hughes Hubbard, and that was --
19   and where would we sit, because it would be a
20   large group of people.
21   Q.    When was the first time Deloitte had
22   conversations with someone other than Hughes
23   Hubbard or the trustee concerning the
24   transaction?
25   A.    We received a phone call from SIPC

Page 17

KARP

1
2    back on the 15th or 16th about the potential for
3    it, and John Manley had subsequent conversations
4    with SIPC once or twice during that week as it
5    became clear it might actually go into
6    liquidation, to find out if there were
7    conflicts.
8    Q.    Did Deloitte ever meet with Weil
9    Gotshal to discuss the deal?
10   A.    No.
11   Q.    Do you know if they met with Houlihan?
12   A.    No.
13   Q.    No, you don't know or --
14   A.    No, they did not.
15   Q.    Did it ever become important to
16   Deloitte's work to understand what assets and
17   liabilities had been transferred as part of the
18   Lehman Barclays sale transaction and what
19   hadn't?
20   A.    Not in that context.  It became
21   important to understand what assets were under
22   the trustee's control in order to begin the
23   customer claim process, which is where our focus
24   was.
25   Q.    To understand what assets were still

5  (Pages 14 to 17)

Page 18

KARP

1
2  under the trustee's control, was it important to
3  understand which of LBI's assets had been
4  transferred over to Barclays?
5      A.   It was part of the -- it was part of
6  the understanding, but our first priority was to
7  get a handle on what assets were -- what cash
8  securities and other assets were under the
9  trustee's control or we needed to get under the
10 trustee's control.  That was our primary
11 responsibility.
12     Q.   So you were -- the goal was more in
13 terms of establishing what the trustee still
14 controlled, but one part of achieving that goal
15 was understanding what had been transferred in
16 the purchase agreement and what had been
17 retained, correct?
18     MR. ROTHMAN:  Objection to the form.
19 You can answer the question.
20     A.   That became the next step of the
21 process, but we didn't have access to the books
22 and records to validate a lot of that
23 information, so it became more important for us
24 to make sure that we could get all the assets
25 that were -- that we thought belonged to LBI

Page 19

KARP

1
2  under the trustee's control first, and as we got
3  access we would then proceed to see what was
4  left, what was still owed to customers.
5      Q.   When Deloitte received the
6  clarification letter in early October, did it
7  review the clarification letter?
8      A.   I know I read through parts of it.  I
9  would -- I don't know about the others.
10     Q.   Let me ask you to look at 567 and ask
11 about a few sections that are -- on the first
12 page, see where it says "purchased assets,
13 excluded assets"?
14     A.   Yes.
15     Q.   And then subparagraph 2 there,
16 capital A, it says, "The securities owned by LBI
17 and transferred to purchaser or its affiliates
18 under the Barclays repurchase agreement as
19 defined below, as specified on Schedule A,
20 previously delivered by seller and accepted by
21 purchaser."  Do you see that?
22     A.   Yes.
23     Q.   And if you flip to page 5,
24 paragraph 13, where it's entitled "Barclays
25 Repurchase Agreement," it says, "Effective at

Page 20

KARP

1
2  closing, all securities and other assets held by
3  purchaser under the September 18, 2008
4  repurchase agreement, among purchaser and/or its
5  affiliates and LBI and/or its affiliates and the
6  Bank of New York as collateral agent (the
7  Barclays repurchase agreement), shall be deemed
8  to constitute part of the purchased assets in
9  accordance with paragraph 1A2 above."
10     Do you see that language?
11     A.   Yes.
12     Q.   Was it your understanding that as part
13 of the Barclays sale transaction, Barclays was
14 acquiring all of the collateral associated with
15 what was the Fed repo?
16     MR. ROTHMAN:  Objection to form.
17     I don't know if you laid enough of a
18 foundation here, but she has testified she
19 had nothing to do with the negotiation or
20 the drafting of this agreement, so if all
21 you're asking her -- I guess I am not clear
22 whether you are asking her independent of
23 the agreement or what she understood as she
24 read it in October.  I don't think you're
25 entitled to her interpretation of it in

Page 21

KARP

1
2  October.
3      MR. THOMAS:  The objection I guess is
4  to foundation.
5      I am asking based upon her receiving
6  it and having read it and the plain language
7  of it.  And if she had some different
8  understanding, that's fine.  But this
9  relates to what assets went over and what
10 assets didn't, what assets were under the
11 control of the LBI.  So that's the basis for
12 it.
13     MR. ROTHMAN:  I will give you a little
14 leeway on this, but she is not an expert,
15 and she had no personal involvement with
16 drafting or creating this document.  So it
17 is not really fair to ask her to just
18 interpret for you her view.
19     MR. THOMAS:  We are getting into kind
20 of a long speaking, coaching objection, and
21 I understand the objection is to foundation.
22 I think there is some foundation if you read
23 the plain language of the letter.
24     Q.   So again, the question is, did you
25 understand that as part of the sale transaction,

Page 22

```
                KARP
 1
 2    Barclays was acquiring all of the collateral
 3    associated with the Fed repo?
 4       A.   I didn't understand that as part of
 5    this clarification letter.  It had been told to
 6    me through counsel, the trustee's counsel.
 7          MR. ROTHMAN:  Please don't reveal
 8    things that have been told to you by the
 9    lawyers.
10          THE WITNESS:  OK.
11       Q.   Reading this language, is that how you
12    understand these terms, that Barclays is to
13    receive the collateral associated with what was
14    the Fed repo?
15          MR. ROTHMAN:  Objection to the form.
16       A.   I'm not an attorney, but reading this,
17    I mean it says purchased assets include the
18    collateral.  And it defines the collateral here.
19    So --
20       Q.   So it is pretty clear that they get
21    that collateral?
22          MR. ROTHMAN:  Objection to the form.
23    It is not a proper question to ask her.  It
24    really isn't.
25          MR. THOMAS:  Counsel, we can't have
```

Page 23

```
                KARP
 1
 2    these long speaking objections in violation
 3    of the federal rules.  OK.  Just a clear
 4    statement.  I understand "objection to form
 5    based on lack of foundation."
 6          MR. ROTHMAN:  You need to ask proper
 7    questions of the witness.
 8          MR. THOMAS:  Those are proper
 9    questions.
10          MR. ROTHMAN:  They are not.
11          MR. THOMAS:  We can argue that later.
12    What is not proper is for you to try to
13    coach the witness into answering a certain
14    way while I am asking the question.
15          MR. ROTHMAN:  I am not doing that.
16          MR. THOMAS:  We can argue about
17    foundation later, but the rules are very
18    clear.  Objections are to be limited.
19       Q.   Let me ask you to turn back to page 1,
20    subsection 2, part capital B, where it says,
21    "Such securities and other assets in LBI's
22    clearance boxes as of the time of the closing
23    which at the close of business on September 21,
24    2008 were specified -- were as specified on
25    Schedule B."
```

Page 24

```
                KARP
 1
 2    Do you see that language?
 3       A.   Um-hm, yes.
 4       Q.   Did you understand as part of the
 5    sales transaction, Barclays was acquiring
 6    clearance box assets?
 7          MR. ROTHMAN:  Objection to the form.
 8    Again, I caution you not to reveal
 9    information that you received from the
10    lawyers.
11       A.   Then I can't really talk about it.
12       Q.   Just reading this document, not based
13    on what lawyers may have said, is that how you
14    would interpret capital B of subsection 2, that
15    Barclays was acquiring clearance box assets?
16          MR. ROTHMAN:  Objection to the form.
17    Again, if you can't answer that
18    question because of the things that lawyers
19    have already told you, then please don't
20    answer the question.
21       A.   All my discussions were with attorneys
22    on this.
23       Q.   Did you read that when you received
24    the clarification letter in early October?
25       A.   I may have.  I honestly don't
```

Page 25

```
                KARP
 1
 2    remember.
 3       Q.   So independent, do you have an
 4    understanding -- can you read that language and
 5    tell me independently how you interpret it?
 6          MR. ROTHMAN:  Sitting here today?
 7          MR. THOMAS:  Yeah, independent of --
 8          MR. ROTHMAN:  I'm not going to let her
 9    do that.  She has already talked to
10    attorneys about it.  It has already infected
11    whatever she is going to think about it as
12    she reads it now.
13          It's not -- we are not here to have
14    her sit here and read documents as of today.
15          MR. THOMAS:  Well --
16          MR. ROTHMAN:  That's not -- you are
17    here to elicit facts from her.
18          MR. THOMAS:  You are really
19    obstructing the deposition.  You are really
20    doing a lot of coaching and speaking.  I
21    really prefer you just do it the way the
22    rules provide.
23          If you are going to instruct the
24    witness not to answer a question, that's
25    fine.  We'll just build it into the motion.
```

KARP

1
2      Q.    If you would turn to the page -- the
3  second page and subpart capital C.
4  "Exchange-traded derivatives."  Do you see where
5  it says, "Exchange-traded derivatives and any
6  property that may be held to secure obligations
7  under such derivatives"?
8      A.    Yes.
9      Q.    Do you recall if when you received
10 this document back in October and reviewed it,
11 that you understood that exchange-traded
12 derivatives and any property that may be held to
13 secure obligations under such derivatives were
14 part of the assets being transferred to
15 Barclays.
16     MR. ROTHMAN:  Objection to the form.
17     A.    I don't remember reading it and
18 understanding.  What I would have understood
19 came from attorneys.
20     Q.    Have you ever had -- have you ever
21 believed that the exchange-traded derivatives
22 were not transferred as far as this sale
23 transaction?
24     MR. ROTHMAN:  Objection to the form.
25     Again, please don't reveal anything

KARP

1
2  you learned solely from attorneys.
3      A.    Were not transferred as in not
4  physically transferred or --
5      Q.    Were not transferred pursuant to the
6  agreement.
7      A.    Could you define exchange-traded
8  derivatives for me, as to what that includes?
9      Q.    OK.  Well, are you familiar with that
10 term?
11     A.    I am, but I've heard it used different
12 ways, and so I'm -- I just want to make sure
13 that I'm talking about the right --
14     Q.    How do you use the term
15 "exchange-traded derivatives"?
16     A.    I would -- my interpretation is
17 futures and options on futures.
18     Q.    Using that definition, has there ever
19 been any question in your mind that those
20 exchange-traded derivatives as you just defined
21 them were transferred to Barclays as part of the
22 sale transaction?
23     A.    My understanding from a meeting where
24 the CFTC participated was that futures, the
25 futures business related to customers was

KARP

1
2  transferred to Barclays.
3      Q.    And what was your understanding with
4  respect to the options business from that
5  meeting?
6      A.    The options --
7      MR. ROTHMAN:  Objection to form.
8      A.    The options, you mean the OCC options
9  or the options on futures?
10     Q.    OCC options.
11     A.    My understanding from the -- for the
12 options was that options were being transferred
13 in total to Barclays.
14     Q.    Turning back to the first exhibit we
15 looked at, 566, if you turn to the section
16 "Definition of Purchased Assets," page 6 of the
17 document, Bates stamped DT 313, do you see it
18 has a list of purchased assets?
19     A.    Yes.
20     Q.    Did Deloitte at any time attempt to
21 value any of the assets listed under "purchased
22 assets"?
23     A.    The only time we attempted to value --
24 sorry, we did not attempt to value anything
25 related to this listing.

KARP

1
2      Q.    Can I ask what -- it seems like you
3  were clarifying your language.  Was there
4  something you were going to say before that?
5      A.    We have been in the process of
6  creating a draft balance sheet, but Deloitte
7  hasn't been doing the valuations.
8      Q.    Who has been doing the valuations for
9  the draft balance sheet?
10     A.    The valuations have been coming from
11 third-party sources and Barclays.
12     Q.    What were the third-party sources?
13     A.    They are publicly available sources.
14 The two that I remember are Bloomberg and IDSI.
15     Q.    Is that work still going on?
16     A.    Yes.
17     Q.    When did Deloitte first work on in any
18 way a balance sheet for BLI?
19     A.    It started in late '08.  We did not
20 have access to the books and records until
21 around that time to be able to get the details
22 to start creating a balance sheet.
23     Q.    What was the purpose of creating a
24 balance sheet?
25     A.    To determine what the assets and

8  (Pages 26 to 29)

Page 30

KARP

1
2  liabilities existed as of 9/19/08, the date of
3  liquidation.
4     Q.    And Deloitte is still working on that
5  balance sheet today?
6     A.    Yes.
7     Q.    After you got the books and so forth,
8  records, why is it taking so long to do the
9  balance sheet?
10       MR. ROTHMAN:  Objection to the form.
11    A.    There is a lot of reconciliation work
12  that had to be done in order to create the
13  balance sheet.
14    Q.    And just explain in a little more
15  detail the type of reconciliation work.
16    A.    Yes.  There were over 200,000 failed
17  transactions between LBI and LBIE that need to
18  be reconciled.
19       There were, I believe, 10, 11 thousand
20  cash breaks related to the bank accounts.
21       We had difficulties in obtaining
22  statements from depositories where securities
23  were being held.  All that took time to get the
24  statements and the information and to begin
25  reconciling the data.

Page 31

KARP

1
2       And in addition, our ability to access
3  the data came in spurts, as we worked through
4  different issues with Barclays on access.
5     Q.    Was it difficult to value some of
6  LBI's assets?
7       MR. ROTHMAN:  Objection to the form.
8  Objection -- go ahead.
9     A.    We didn't value the assets.
10    Q.    Was it difficult to obtain valuations
11  of the assets that you believed, that Deloitte
12  believed were reliable valuations?
13       MR. ROTHMAN:  Objection to form.
14    A.    We didn't say one way or the other
15  whether or not the valuations were reliable.
16  That determination was not made by Deloitte.
17    Q.    Who made that determination?
18    A.    That -- Barclays provided services by
19  which their price verification group looked at
20  the valuations that were provided and questioned
21  whether or not, whether or not -- they did their
22  questioning methodologies to determine whether
23  or not the valuation methods were appropriate.
24    Q.    Did Deloitte agree or disagree with
25  Barclays' determinations?

Page 32

KARP

1
2       MR. ROTHMAN:  Objection to the form.
3     A.    We didn't -- we didn't agree or
4  disagree.  That was -- the agreement was to rely
5  upon Barclays' pricing.
6     Q.    Let me ask more specifically about a
7  couple of these items.  First, do you know as of
8  September 16 or thereabouts the amount of
9  retained cash that LBI had?
10    A.    No.
11    Q.    And when I say "you," I mean Deloitte,
12  not just yourself.
13    A.    No, we didn't.
14    Q.    Just so I understand, Deloitte has
15  never attempted to identify or figure out the
16  value of these items listed under the purchased
17  assets?
18    A.    No.
19    Q.    And that would include efforts even
20  using some other third parties to help with
21  valuation?  Deloitte has never made that effort
22  to try to identify the value of these items?
23       MR. ROTHMAN:  Objection to the form.
24    A.    Not these specific -- not -- we -- we
25  only effort we made from putting together

Page 33

KARP

1
2  information was for a balance sheet.  We did not
3  work off this document for these items.
4     Q.    OK.  Did Deloitte, either itself or --
5  when I ask if Deloitte values something, I am
6  going to include efforts where Deloitte might
7  rely on some third party to help establish that
8  value.  Understood?
9     A.    Yes.
10    Q.    Did Deloitte ever attempt to value the
11  assets in subpart B of the purchased assets, the
12  deposits referred there?  As of -- value them as
13  of September 16, 2008, or anytime that week?
14    A.    No.
15    Q.    Same question for subpart C, the
16  transferred real property leases.
17    A.    No.
18    Q.    Now, subpart D refers to a list of
19  securities and other assets.  Do you see that?
20    A.    Yes.
21    Q.    Has Deloitte ever attempted to value
22  as of September 16 or anytime that week the
23  assets in subpart D?
24    A.    To the extent that those assets would
25  be there on 9/19, they would have been part of

Page 34

                    KARP
1
2    the value, the balance sheet that was prepared
3    for -- in that inventory section.
4        Q.    Does Deloitte know what precise assets
5    are being referred to in subpart D?
6        A.    No.
7        Q.    Is there any list of CUSIPs, to
8    Deloitte's knowledge, that identifies what
9    assets -- list of CUSIPs or other list or
10   document that identifies exactly what are the
11   assets in subpart D?
12       A.    Not that total to 70 billion -- that
13   total to 70 billion, we don't have that list.
14       Q.    What other list do you have that might
15   relate to subpart D?
16       A.    We have a list of firm inventory off
17   the stock record as of 9/19.
18       Q.    But Deloitte doesn't have an
19   understanding of how that list relates to the
20   category of items in subpart D?
21       A.    No.
22       Q.    To your knowledge, does anyone have a
23   list of the securities and other assets being
24   described in subpart D?
25       A.    Not to my knowledge.

Page 35

                    KARP
1
2        Q.    Does Deloitte have any idea of whether
3    the assets referenced in subpart D are, or were
4    worth 70 billion dollars or more or less as of
5    September 16?
6        A.    No.
7        Q.    Has Deloitte attempted to figure that
8    out?
9        A.    No.
10       Q.    In subpart E, it refers to 50 percent
11   of each position in the residential real estate
12   mortgage security.  Do you see that?
13       A.    Yes.
14       Q.    Has Deloitte ever attempted to value
15   those positions?  I am going to say ever, at any
16   time?
17       A.    No.
18       Q.    Is Deloitte aware of what assets
19   exactly are being referred to here?
20       A.    We believe it refers to the TBA
21   mortgages.
22       Q.    Is there a list of those mortgages?
23       A.    Yes.
24       Q.    Is that a list that Deloitte has?
25       A.    Yes.

Page 36

                    KARP
1
2        Q.    Has the value of those items on the
3    list been updated at any point since
4    September 16, if you know?
5        MR. ROTHMAN:  Objection to the form.
6        A.    The items don't exist.
7        Q.    What happened to the items?
8        A.    DTC's FICC division stepped in and
9    liquidated the securities.  Or closed them out.
10       Q.    And when did that happen?
11       A.    My understanding is that they stepped
12   in that week right after bankruptcy, and I'm not
13   sure how long the process continued.  We are
14   still waiting for information from DTC on all
15   the closeouts.
16       Q.    And if I went through the rest of
17   these lists, would Deloitte have any idea as to
18   the value of these items as of September 16,
19   2008, or thereabouts?
20       A.    No.
21       Q.    Do you know if the trustee has any
22   further knowledge about the value of these items
23   listed under "Purchased Assets"?
24       MR. ROTHMAN:  Again, let me just
25   caution you not to reveal information you

Page 37

                    KARP
1
2    may have learned solely from lawyers.
3        Q.    You can give a yes or no to begin
4    with.
5        A.    I don't know.
6        Q.    Now, you referenced an effort by
7    Deloitte to establish some valuations as of
8    September 19, 2008.  Is that correct?
9        MR. ROTHMAN:  Objection,
10   mischaracterizes her testimony.
11       A.    We prepared a balance sheet, but we
12   did not do the valuations.
13       Q.    But you attempted to gather
14   valuations, correct?
15       A.    Yes.
16       Q.    And can you describe the items that
17   you attempted to get valuations for?
18       A.    It would have been market value of
19   assets and liabilities on the balance sheet to
20   the extent that these required outside market
21   values.
22       Q.    What did Deloitte do to first
23   establish what assets were still -- still
24   belonged to LBI after the Barclays transaction?
25       MR. ROTHMAN:  Objection to form.

                            10 (Pages 34 to 37)

Page 38

KARP

1
2    A.   We prepared a balance sheet as of
3  9/19, irrespective of any transaction, and
4  obtained bank statements and depository
5  statements to reconcile to 9/19.
6    Q.   Did that include obtaining a list of
7  securities that were posted earlier in the week
8  with the Fed as part of the Fed repo?
9    A.   Not for the 9/19 balance sheet, it did
10 not.  It was only what existed at that date.
11   Q.   So you're familiar with the collateral
12 that was supposed to go to Barclays, that was
13 part of the repo that was supposed to go to
14 Barclays in return for Barclays putting up
15 45 billion dollars?
16   A.   I understand that there was a Barclays
17 repo transaction.
18   Q.   And the securities, for the purposes
19 of your 9/19 balance sheet, how were the repo
20 securities treated as still belonging to LBI or
21 not belonging to LBI?
22      MR. ROTHMAN:  Objection to the form.
23   A.   We would show a repo transaction.  So
24 it would be in a liability.
25   Q.   And the liability at that point, the

Page 39

KARP

1
2  liability would still be -- so the securities,
3  the assets would still be on LBI's books but
4  they would owe the 45 billion dollars; is that
5  right?
6    A.   Yeah.  A repo transaction would be
7  mark to market, so it wouldn't show 45 billion,
8  but yes, in effect.
9    Q.   How does it -- what does that mean,
10 mark to market?
11   A.   The securities are shown at the market
12 value of the collateral versus the cash.
13   Q.   OK.  And what -- how did you determine
14 what the market value was of those securities?
15      MR. ROTHMAN:  Objection to the form.
16   A.   The market value would have come --
17 excuse me -- would have come from the -- from
18 Barclays.
19   Q.   And do you recall the figure, the
20 market value they identified for those
21 securities?
22   A.   I believe it was -- it was in the --
23 around 42, 43 billion was the market value of
24 the securities delivered, plus there was some
25 cash.

Page 40

KARP

1
2    Q.   Do you know if that was, Barclays was
3  identifying actual market value, or that was
4  just the nominal -- the marks that had been on
5  those securities placed by others?
6    A.   I don't know.
7    Q.   Are you aware of Barclays raising
8  questions that week as to the actual realizable
9  value of some of those securities of LBI's?
10   A.   Which week?
11   Q.   That week of September 16th.
12   A.   I wasn't involved that week.
13   Q.   But I mean, by the 18th, you had
14 reviewed the asset purchase agreement, Deloitte
15 was at least doing something in -- so during --
16 putting aside whether you were involved at the
17 time, are you aware that during that week,
18 Barclays raised an issue concerning the actual
19 market values of the securities of LBI, that LBI
20 had put up for the repo?
21      MR. ROTHMAN:  Objection to the form.
22   A.   I would have learned any of that from
23 counsel.  Any discussion would have been with
24 counsel.
25   Q.   Let me show you a document we will

Page 41

KARP

1
2  mark as 568.  Do you recognize this as an e-mail
3  from Vikram Ramani to you and others dated
4  November 12, 2008?
5    A.   Yes.
6       (Exhibit 568, document Bates stamped
7  DT 495 marked for identification, as of this
8  date.)
9    Q.   And who is Vikram Ramani?
10   A.   He is a member of my team.
11   Q.   And do you see where it says, "Can you
12 send me the list of securities that make up the
13 42.3 billion collateral that was delivered to
14 Barclays via Lehman"?
15   A.   Yes.
16   Q.   What was the purpose of this work that
17 Deloitte was doing at this time?
18   A.   This work was in preparation for the
19 December settlement that was eventually filed.
20   Q.   What was Deloitte's role with respect
21 to the December settlement?
22   A.   Our role was to create a time line of
23 the repo transaction for how securities moved,
24 and to document it.
25   Q.   Was it to make a recommendation with

Page 42

                              KARP
1
2    respect to the settlement?
3              MR. ROTHMAN:  Objection to form.
4              That's a yes or no question.
5    Q.    Yes.
6    A.    No.
7    Q.    Do you know if you received this list
8    that is being requested here, the list of
9    securities that made up the 42.3?
10   A.    Yes.
11   Q.    So you did receive it?
12   A.    Yes.
13   Q.    And after receiving it, what did
14   Deloitte do with it?
15   A.    We compared it to the books and
16   records of LBI.
17   Q.    For what purpose?
18   A.    To see if we could see that that had
19   been recorded.
20   Q.    I'm sorry, what does that mean, been
21   recorded?
22   A.    That the records reflected that these
23   securities had been moved as part of a repo
24   transaction with Barclays.
25   Q.    So Deloitte was just confirming that

Page 43

                              KARP
1
2    those securities had actually moved to Barclays?
3    A.    That the records reflected that that
4    movement had occurred.
5    Q.    Was there any other purpose in looking
6    at the securities that had already moved in
7    connection with the settlement agreement?
8    A.    We also compared it to the list of the
9    original securities pledged under the repo that
10   LBI had with the Federal Reserve, to see if they
11   were the same securities.
12   Q.    And what did you find out?
13   A.    We found out that there were
14   differences, that there were -- it was not the
15   same pool of securities.
16   Q.    And did you obtain an understanding as
17   to why it was a different pool?
18   A.    We had discussions with JPMorgan Chase
19   where part of the original 50 billion could not
20   move because it was part of a GCS program, which
21   restricted its ability to leave JP Morgan.  So a
22   substitution had to occur from that.
23         We also understand that there were
24   operational inefficiencies that occurred during
25   the movement of the rest of the securities,

Page 44

                              KARP
1
2    which resulted in other substitutions.
3    Q.    Do you know that rough total volume of
4    substitutions that occurred?
5    A.    Our rough estimate was approximately
6    about 9 billion out of the 42.3 billion, but at
7    the time we did it, the records weren't fully up
8    to date and we didn't rerun that since.
9    Q.    Was it your understanding that the
10   collateral that was supposed to be transferred
11   to Barclays on that Thursday or Friday had
12   nominal marks placed on it by someone, in the
13   value -- in the range of roughly 49.7 billion?
14             MR. ROTHMAN:  Objection to the form.
15   A.    I'm sorry, for what was transferred?
16   Q.    To what was supposed to be transferred
17   to Barclays?  Do you recall that -- strike that.
18         Do you recall that there was kind of a
19   missing 7 billion dollars?
20   A.    In my meetings with Barclays and with
21   JP Morgan, we had been told by both parties that
22   there was a gap of 7 billion that was expected
23   to be delivered.
24   Q.    And what was your understanding of how
25   that gap occurred?

Page 45

                              KARP
1
2    A.    My understanding from the JP Morgan
3    perspective was that they had released -- that
4    they had released approximately 42.3 billion.
5    There was a hard stop at DTC at 11 p.m., so no
6    more collateral could transfer, and that they
7    were requested by LBI to provide 7 billion
8    dollar cash financing to Barclays to cover the
9    difference.
10         And when I had conversations with
11   Barclays personnel, they explained that they --
12   there was a shortfall of approximately 7 billion
13   dollars in collateral that they had expected to
14   receive.
15   Q.    Let me show you a document we will
16   mark as 569.
17         (Exhibit 569, document Bates stamped
18   DT 280 through 285 marked for
19   identification, as of this date.)
20   Q.    Do you recognize this document?
21   A.    Yes.
22   Q.    Can you describe what it is, please?
23   A.    This is a time line analysis, based
24   upon our discussions with JP Morgan on the
25   movement of the securities related to the repo

Page 46

KARP

1
2  transaction, and some other information
3  regarding LBI's -- what LBI owed to JP Morgan.
4        And then after the time line is a
5  summary bullet discussion of -- discussions that
6  we had with Barclays senior management and some
7  former LBI employees.
8    Q.  And who prepared this analysis?
9    A.  Myself, Vikram Ramani and Chris
10  Acosta.
11    Q.  And looking at Bates stamp page
12  DT 281, under the 7:30 p.m. column, or row, do
13  you see in the second box where it says
14  "Conclusion, LBI sent wrong files to JPM"?
15    A.  Yes.
16    Q.  Is that Deloitte's conclusion?
17    A.  No.  That was JP Morgan's -- how they
18  relayed it to us.
19    Q.  And what is -- can you just elaborate
20  what that refers to, LBI sending the wrong files
21  to JPM?
22    A.  JP Morgan explained that securities
23  that they released to be transferred back to
24  Lehman, which would then move on to Barclays'
25  account at Bank of New York, were being returned

Page 47

KARP

1
2  or rejected by Bank of New York, and when that
3  happened, the securities ended up coming back
4  into the pledge -- into a pledged account at
5  JP Morgan,LBI's pledge account at JP Morgan.
6        There was -- JP Morgan explained that
7  they had a conference call with LBI to find out
8  why this was occurring, and they said LBI came
9  back and said, "We sent you the wrong file for
10  the releases, and we are going to send a new
11  one."
12    Q.  And how did the wrong, sending the
13  wrong file play into this?  Is that what caused
14  Bank of New York to reject some of them?
15    A.  My understanding from JP Morgan was
16  that Bank of New York was not expecting these
17  specific securities, which is why they rejected
18  them.
19    Q.  Bank of New York, is it your
20  understanding that Bank of New York was
21  expecting securities that were posted as part of
22  the Fed repo?
23    A.  I don't know what Bank of New York was
24  expecting.
25    Q.  OK.  JPM didn't explain why --

Page 48

KARP

1
2    A.  They didn't, they didn't know, they
3  didn't have a listing of what Bank of New York
4  was expecting.
5    Q.  Did anyone from LBI or anyone else
6  contradict the fact that LBI had sent wrong
7  files to JPM?
8    A.  No.
9    Q.  OK.  Can you pick up the story from
10  there?  Did they send the right files?  Next
11  line is, "LBI sends new files," and --
12    A.  That's my understanding, is that LBI
13  sent new files, and securities started to move
14  again from JP Morgan.
15    Q.  The next box down says, "JPM
16  understands that Barclays is not getting the
17  securities it was expecting and Lehman's DKs
18  those securities."
19        Can you explain what DK'ing means?
20    A.  DK is a term "don't know" and where
21  they reject the securities, so they go back to
22  where they started.
23    Q.  And it says, "LBI continues to look
24  for collateral to meet obligation to Barclays."
25        Why were they doing that?  Can you

Page 49

KARP

1
2  elaborate a little bit more on that?
3    A.  My understanding from JP Morgan was
4  that they, LBI had told them that they were
5  looking for additional collateral to send to
6  Barclays.
7    Q.  And why did they need to do that?
8    A.  JP Morgan, when we had the discussion
9  with them, said that there was -- that they
10  hadn't released enough collateral for the repo
11  transaction.  So LBI was looking for more
12  collateral.
13    Q.  And how much collateral was -- were
14  they supposed to release in total?  Do you
15  recall?
16    A.  It was approximately 49 billion of
17  collateral, was the -- was what we had been told
18  by JP Morgan.
19    Q.  Is that -- in the bottom box there, it
20  says, "Total of 42.3 billion in collateral has
21  been sent to Lehman, comprised of 49.7 billion
22  of deliveries and net 7 billion of DKs."
23        Can you explain what is being said
24  there?
25    A.  JP Morgan had told us that a total

13 (Pages 46 to 49)

Page 50

KARP

1
2 amount released from JP Morgan Chase to Lehman
3 was 49.7 billion, and there were some returns of
4 approximately 7 billion, which in their records
5 gave -- in their records showed a total release
6 market value of 42.3 billion.
7       Q.   And your subsequent studies showed
8 that of the 42.3 billion collateral that did go
9 over to Barclays, approximately 9 billion of
10 that was collateral that was not part of the Fed
11 repo collateral, that was different collateral,
12 correct?
13       A.   As I said before, that was based upon
14 the stock record as it exists at that time,
15 which was not fully updated.  But yes, that was
16 the estimate when we did the analysis.
17       Q.   So from the Barclays perspective, A,
18 they were short 7 billion in collateral, and B,
19 approximately 9 billion of the collateral they
20 got was different than what they were expecting?
21       MR. ROTHMAN:  Objection to the form.
22       MR. TECCE:  Join in the objection.
23       A.   I don't know what Barclays was
24 expecting.
25       Q.   What they got was 7 billion dollars

Page 51

KARP

1
2 less of collateral, plus of the collateral they
3 got, approximately 9 billion of it was different
4 than the Fed collateral, correct?
5       MR. HINE:  Objection.
6       MR. ROTHMAN:  Objection to the form.
7       MR. TECCE:  Join in the objection.
8       Q.   You can answer.  They don't like me
9 summing up your testimony, but --
10       A.   My understanding is they didn't
11 receive 7 billion worth of collateral, and our
12 estimate was that 9 billion was not part of the
13 Fed repo, but I do not know what Barclays was
14 expecting to receive as part of the collateral.
15       Q.   Turning the page -- sorry, let me go
16 back.
17       The numbers that are being used here,
18 49.7 billion, 42.3 billion, do you know where
19 those numbers come from?
20       A.   The numbers on this page would have
21 come from JP Morgan and their reports that they
22 shared.
23       Q.   Do you know -- and did JP Morgan
24 caution Deloitte that these collateral figures
25 really weren't reliable in terms of identifying

Page 52

KARP

1
2 what the actual realizable market value is?
3       MR. ROTHMAN:  Objection to the form.
4       A.   No.
5       Q.   At no time did JP Morgan caution
6 Deloitte about assuming that collateral value
7 equated with actual realizable market value?
8       A.   Are you talking in context of this
9 repo transaction?
10       Q.   In context of -- any context.
11       A.   In context with the repo transaction,
12 they did not -- they gave us reports with market
13 value and did not say don't rely on this.
14       In context with other collateral that
15 they were holding for LBI, they did raise
16 questions about value, but that was their
17 question.
18       Q.   Let me go ahead and show you a
19 document we will mark as Exhibit 570.
20       (Exhibit 570, document Bates stamped
21 DT 276 through 278 with attachment marked
22 for identification, as of this date.)
23       Q.   Do you recognize this e-mail as being
24 from JP Morgan's counsel to a number of people,
25 including yourself?

Page 53

KARP

1
2       A.   Yes.
3       MR. ROTHMAN:  You are referring to the
4 top e-mail?
5       MR. THOMAS:  Yes.
6       A.   Yes.
7       Q.   And have you had a chance to review
8 this document recently?
9       A.   I read the top part of the e-mail.
10       Q.   The e-mail says, "I have attached this
11 spreadsheet with collateral values as of
12 September 17, which was the last evening on
13 which the Fed provided financing.  I understand
14 that these collateral values were furnished
15 principally by third-party pricing sources, and
16 we caution against using those values as
17 reliable indicators of realizable value."
18       Do you see that?
19       A.   Yes.
20       Q.   Now, the collateral values that are
21 being referred to are referring to securities
22 that were once a part of the Fed repo, correct?
23       A.   Yes.  According to what this says,
24 yes.
25       Q.   So this is JP Morgan cautioning that

14  (Pages 50 to 53)

Page 54

KARP

1
2  the collateral value that were furnished by
3  third-party pricing sources may not be reliable
4  indicators of realizable value, correct?
5      A.   Yes, for Annex A.
6      Q.   Right.  And can you describe what
7  Annex A is?
8      A.   Annex A is the list of securities that
9  were going to be used for the settlement
10  agreement to -- for the 7 billion dollar
11  shortfall that was in dispute.
12      Q.   Right.
13          And did Deloitte contest -- or did
14  Deloitte believe that the collateral values
15  associated with the securities in Annex A really
16  were reliable as indicators of realizable value?
17      A.   Deloitte didn't give an opinion on
18  that.
19      Q.   So just to understand what the
20  securities are in Annex A, these are some of the
21  securities that were part of the Fed repo that
22  were supposed to go over to Barclays but didn't
23  make it over there.  Is that your understanding?
24      A.   I don't know specifically what list
25  Barclays may or may not have received of what

Page 55

KARP

1
2  they were supposed to get.  My understanding was
3  that these were securities that were going to be
4  used to make, to make -- do the settlement.
5      Q.   I think earlier you indicated that
6  these securities were in fact securities that
7  were once part of the Fed repo, pledged as part
8  of the Fed repo, correct?
9      A.   That's what the e-mail says, yes.
10      Q.   And do you have any reason to believe
11  that -- strike that.
12          So a good portion of what Barclays
13  actually received in the 42.3 billion were part
14  of securities pledged as part of the Fed repo,
15  correct?
16      A.   Yes.
17      Q.   Do you have any reason to believe that
18  the collateral value numbers for the securities
19  attached to this exhibit as Annex A are any more
20  or less reliable than the collateral value
21  figures attached to the other Fed securities
22  that Barclays actually did receive back in
23  September?
24          MR. ROTHMAN:  Objection to the form.
25      A.   I didn't receive any indication from

Page 56

KARP

1
2  JP Morgan to question the value of the
3  securities.
4      Q.   That's because those securities
5  weren't at issue as far as the settlement,
6  correct?
7      A.   I have no idea why they did or didn't.
8      Q.   Did Deloitte -- obviously JP Morgan
9  thinks it is relevant to the settlement as to
10  what the actual values of the securities are
11  that are going to be part of the settlement,
12  correct?
13          MR. ROTHMAN:  Objection to the form.
14      A.   That's their attorney's
15  interpretation.
16      Q.   Did you ever -- did Deloitte ever have
17  occasion to ask JP Morgan or anyone else whether
18  the collateral values associated with the
19  42.3 billion marked, sent to Barclays, was any
20  more reliable than the collateral values in
21  Annex A to this document?
22      A.   We didn't ask.
23      Q.   Do you have any basis -- does Deloitte
24  have any basis for saying that the 42 point --
25  the securities that make up the 42.3 billion,

Page 57

KARP

1
2  their collateral values are more reliable than
3  the collateral values identified by JP Morgan in
4  this document as being unreliable?
5          MR. ROTHMAN:  Objection to the form.
6      A.   I'm not sure I understand the
7  question.
8      Q.   Sure, let me try again.
9          JP Morgan is pointing out that the
10  collateral values of the securities in
11  Appendix A are not reliable, right?
12      A.   I -- it doesn't say that they -- it
13  says they caution against using them as reliable
14  indicators.  I don't know that they are saying
15  they are unreliable.
16      Q.   OK.  JPM cautions against using them
17  as reliable indicators.
18      A.   Um-hm.
19      Q.   Does Deloitte have any reason to
20  believe that collateral value numbers associated
21  with the securities that make up the
22  42.3 billion are any more reliable than any
23  collateral value numbers that are associated
24  with the securities in Appendix A of this
25  exhibit?

15  (Pages 54 to 57)

Page 58

KARP

1
2          MR. ROTHMAN:  Objection to the form.
3          A.    We didn't receive any note of caution
4    on the 42.3 billion.
5          Q.    But you didn't receive any note from
6    JP Morgan about the values one way or another on
7    the 42.3 billion, correct?
8          A.    Correct.
9          Q.    But that wasn't part of the settlement
10   consideration that was being considered,
11   correct?
12         MR. ROTHMAN:  Objection to the form.
13         A.    I think the entire transaction was
14   part of the settlement consideration in order to
15   know what the settlement should be.
16         Q.    Was there any occasion for Deloitte
17   and JPM to have a discussion about the
18   collateral values of the 42.3 billion the way
19   they are having here in this exhibit?
20         A.    I don't remember such a discussion.
21         Q.    In any event, Deloitte has never
22   looked at or assessed or reached any conclusions
23   about the reliability or accuracy of that
24   42.3 billion collateral value number; is that
25   correct?

Page 59

KARP

1
2          A.    That's correct.
3          THE WITNESS:  Could we take just a
4    five-minute break.
5          MR. THOMAS:  Oh, sure, sure.  Anytime
6    you want to take a break.
7          THE VIDEOGRAPHER:  Time is 10:58.  We
8    are going off the record.
9          (Recess)
10         THE VIDEOGRAPHER:  The time is 11:09.
11   We are back on the record.
12   BY MR. THOMAS:
13         Q.    Let me ask you to turn back to the
14   analysis that you did of the JP Morgan tri-party
15   agreement.  And what exhibit number is that?
16         MR. ROTHMAN:  569.
17         Q.    569.  Turning back to Exhibit 569, on
18   the second page, which is DT 282, there is an
19   entry in the second column, first row, that says
20   "Lehman requests that cash collateral for
21   7 billion in two tripartite shells, 1.7 billion
22   and 5.3 billion."
23         Can you explain what all that means?
24         A.    My understanding from JP Morgan was
25   that although Lehman was requesting a total of

Page 60

KARP

1
2    7 billion, they wanted 1.7 billion to go
3    directly to BONY and 5.3 billion to go into -- I
4    am sorry, 1.7 to go directly to BONY in an
5    account for the benefit of Barclays, and
6    5.3 billion would be in an account for the
7    benefit of Barclays that would be held at
8    JP Morgan.
9          Q.    And then down below that, Lehman sets
10   aside collateral to cure the repo.  What did you
11   mean by curing the repo?
12         A.    This was JP Morgan's explanation that
13   Lehman said to cure the repo, that they had
14   identified additional collateral that had come
15   in to offset the balance of funds that they owe
16   them.
17         But this was JP Morgan's explanation,
18   to the extent that specifically means I'm not
19   really -- they never really explained it in full
20   detail.
21         Q.    Was it your understanding of what
22   JP Morgan was saying, that Lehman was looking
23   for, trying to identify additional collateral to
24   make up for the securities that were supposed to
25   go over but didn't go over?

Page 61

KARP

1
2          A.    More for the loan that it received,
3    the cash loan it received, which would be in
4    anticipation of settling with Barclays.
5          Q.    OK.  On the couple columns over to the
6    right, it says, "LBI ends up with a deficit of
7    23.2 billion," paren, "15.8 billion in unfunded
8    Barclays tri-party and 7.4," parentheses, "8.6B
9    collateral value, broker loan."  Do you see
10   that?
11         A.    Yes.
12         Q.    Can you explain the difference between
13   the 7.4 billion and 8.6 billion dollar numbers
14   there?
15         A.    There was an overdraft balance in
16   LBI's main cash account with JP Morgan, which
17   was due to 7.4 billion related to settlements of
18   transactions that had a -- which had collateral
19   pledged against it of 8.6 billion.
20         Q.    The 7.4 would be -- seemed to be the
21   exact difference between 42.3 and 49.7.  Can you
22   explain the relationship there?
23         MR. HINE:  Object to the form.
24         A.    This was their analysis of what was
25   owed to JP Morgan at the end of the day on the

16  (Pages 58 to 61)

KARP

1
2    Q.    Why is it taking so long?
3    A.    There were several very large
4  entries -- it took a long time for JP Morgan to
5  provide data, and then it has taken a very long
6  time to piece apart the data.  They had some
7  issues providing details on a lot of the
8  information that they provided in summary
9  format.
10        And then it was very difficult for us
11  to compare that information back to LBI's
12  records.  So we continue to work with them.
13    Q.    We will take a look at it in a minute,
14  but at some point you got a list of CUSIPs of
15  the securities that went over to Barclays,
16  correct?
17    A.    Yes.
18    Q.    And did you -- you may have answered
19  this, but did you try to value those securities,
20  did Deloitte independently try to value those
21  securities?
22    A.    We had sent a sample of those
23  securities to our -- to our Deloitte's pricing
24  center to use just publicly available pricing
25  services like Bloomberg to see what type of

KARP

1
2  prices we might be able to get.  We had a very
3  low hit rate on getting prices, so we stopped.
4    Q.    So you, to get a sense -- what was the
5  reason to get a sense of whether the pricing --
6  how the pricing would compare to -- what was the
7  reason for that effort?
8        MR. ROTHMAN:  Let me caution the
9  witness not to reveal any attorney/client
10  communications.
11        But it -- I'll give you some leeway
12  here, but can we have an agreement this
13  won't be a waiver of any kind of privilege
14  or protection?
15        MR. THOMAS:  Yes, yes.
16        MR. ROTHMAN:  OK.  And we are talking
17  about this line of questioning here?
18        MR. THOMAS:  Yes.  Nothing else comes
19  to mind, but just let me do this.
20    Q.    Let me ask it this way, just so I
21  understand what was done.  The CUSIPs for the
22  securities -- you got a list of CUSIPs of
23  securities that made up what was referred to as
24  42.3 billion, right?  That was transferred to
25  Barclays?

KARP

1
2    A.    Yes.
3    Q.    And you took a sample of those and
4  tried to price them independently, but it proved
5  too difficult to price and so you gave up on
6  that effort?  Is that correct?
7    A.    We received a file from Barclays of
8  what was transferred to them under the repo
9  transaction.  That file showed a different
10  market value than what JP Morgan showed on their
11  file.
12        We were asked by the trustee to see
13  if -- which -- whether or not the -- which
14  prices were more accurate.  So we did a sample
15  and sent it out for just publicly available
16  pricing services.  We did that, we got very --
17  we got a low hit rate on those prices, so a
18  number of them came back as not being available
19  through publicly available sources, and at that
20  point, we were told not to move further into
21  that.
22    Q.    And you did no other further work in
23  attempting to value the 42.3 billion or the
24  securities that were marked by JP Morgan as
25  42.3 billion and marked as something else by

KARP

1
2  Barclays -- strike that.
3        You did nothing else to try to
4  determine which valuations were more accurate in
5  terms of market value?
6    A.    The only other analysis that we
7  performed was looking at the Barclays file,
8  because we noted that the same CUSIP showed up
9  more than once in the file sometimes and had two
10  different prices.  So we had noted that and
11  asked Barclays the reasoning behind the two
12  different prices.
13        That's the only other analysis that we
14  did from a pricing perspective.
15    Q.    Did they explain the reasoning behind
16  it?
17    A.    It was an error.
18    Q.    Was it a significant portion of the --
19  I mean just a couple CUSIPs here and there or
20  was it a significant --
21    A.    It was more than a couple of CUSIPs.
22  The total market value was, I believe, several
23  hundred million on the total, 43 billion,
24  43.9 billion.
25    Q.    Do you know if Barclays corrected it

KARP

1
2  after?
3      A.    We did not receive a new file from
4  them.
5      Q.    I think you said Barclays had a
6  different market value than JPM Morgan, but I
7  think again, as we established earlier, you're
8  not sure whether that 42.3 was something that
9  JP Morgan actually considered a market value or
10 whether it was something they considered a
11 collateral value, hence they used that term in
12 some of the documents we looked at?
13     A.    My understanding from discussions with
14 them, it was market value.  I'm not sure of the
15 difference in term when they refer to it as
16 collateral value, that it is different than
17 market value.
18     Q.    Well, you recall that warning, caution
19 not to assume that the collateral values
20 associated with some of the Fed securities was
21 really indicative of realizable value.  Do you
22 recall that?
23             MR. TECCE:  Objection to form.
24             MR. HINE:  Objection.
25             MR. ROTHMAN:  Objection to form.

KARP

1
2      A.    Yes, but that was for the Annex A
3  securities for the settlement that was being
4  done in December.
5      Q.    That was part of the Fed repo
6  securities, and you have no reason -- I think as
7  we established, there is no reason for you to
8  believe that collateral values were any more
9  reliable as market value indicators for that set
10 of Fed repo securities than they were for the
11 other set of Fed repo securities that were
12 actually transferred to Barclays?
13             MR. TECCE:  Objection to the form of
14 the question.
15             MR. ROTHMAN:  Objection to form.
16     A.    As a tri-party custodian, it is
17 JP Morgan's responsibility to make sure that the
18 value is appropriate for the collateral it is
19 receiving under a tri-party arrangement.  So at
20 the time when I did the analysis, I would not
21 have a reason to expect that the 42.3 billion
22 value was incorrect, and they not indicate that
23 there was such an issue with the valuation of
24 those securities.
25     Q.    But it wasn't discussed one way or the

KARP

1
2  other?
3      A.    I don't recall it being discussed one
4  way or the other.  I don't recall them saying
5  anything that I had to worry about the value of
6  those securities when I was doing this analysis.
7      Q.    Well, when you did this analysis, did
8  you have other e-mails back and forth with JPM
9  Morgan or their counsel concerning their
10 analysis, or did you just speak with them about
11 this and then do the analysis?
12     A.    We met with them several times about
13 the analysis and showed it to them before we
14 discussed it with the trustee.
15     Q.    Do you have any idea where JP Morgan
16 got their marks from, whether it was just on the
17 books or in the records?
18     A.    We didn't ask them.
19     Q.    You have no idea how they came up with
20 the 42.3 billion?
21     A.    No.
22     Q.    Do you have any knowledge as to
23 whether Lehman was updating their books after
24 they filed -- strike that.
25         Do you have any knowledge as to

KARP

1
2  whether Lehman was updating their marks after
3  September 12, 2008?
4      A.    The books and records that we have
5  seen show market values on a daily basis.
6      Q.    From what date?
7      A.    From their -- we have seen reports,
8  not full reports, we have seen some reports that
9  you can pull off their historical system that
10 show market values.  I don't know all the dates
11 that we have looked at.  But there were -- we
12 have, in the reconciliation related to LBIE, we
13 have been rolling forward from September 12, and
14 the reports that we have seen there for some of
15 those positions and the breaks we have been
16 reconciling have market values on them.
17     Q.    Do you know if they are being updated
18 daily?  Have you checked that?
19     A.    I wouldn't know if they are being
20 updated daily.  My understanding from
21 conversations with former LBI personnel is the
22 records were running that week as normal and
23 that they were able to prepare a customer
24 reserve formula computation on the 19th, which
25 would have required market values.

Page 86

```
               KARP
 1
 2      A.   Yes.
 3      Q.   You're aware that Barclays placed some
 4   valuations on the securities -- you're aware
 5   that Barclays placed valuations on the
 6   securities that it received as part of the
 7   transaction, correct?
 8           MR. ROTHMAN:  Objection to the form.
 9           And let me caution you, again, not to
10   reveal information that you learned from
11   attorneys only.
12      A.   I have a file from Barclays which
13   shows a market value of securities received
14   under the repo transaction.
15      Q.   Do you have any basis for disputing
16   that value that they have put on it?
17           MR. ROTHMAN:  Objection to the form.
18      A.   We haven't done any work that would
19   indicate -- we didn't value the securities.  We
20   attempted but we didn't -- we weren't able to
21   value the securities.  So I would not know
22   whether or not the valuation is correct or not.
23      Q.   And any efforts to actually look at
24   the TMS system to see whether the marks were
25   being updated after the bankruptcy filing until
```

Page 87

```
               KARP
 1
 2   September 20 -- 19th was done at the direction
 3   of counsel?
 4      A.   Whose bankruptcy filing?
 5      Q.   LBHI's.  In any event, September 12 --
 6   any work you have done, Deloitte has done, to
 7   actually determine whether securities that
 8   either were associated with the original asset
 9   purchase agreement or the later purchase
10   agreement as revised by the clarification
11   letter --
12           MR. TECCE:  Objection to form.
13           MR. HINE:  Same here.
14           MR. THOMAS:  I'm not done with my
15   question.
16           MR. TECCE:  Sorry.
17      Q.   Any work that has been done by
18   Deloitte to determine whether the marks for
19   LBI's securities were actually being updated on
20   a daily basis between September 12th and
21   September 19th has been done at the direction of
22   counsel; is that correct?
23           MR. ROTHMAN:  Objection to the form.
24      A.   I wouldn't say that we have done any
25   work to verify that marks were being updated on
```

Page 88

```
               KARP
 1
 2   a daily basis.  We saw some update in certain
 3   other work we were doing, but we did not
 4   specifically look to see if marks were being
 5   updated daily.
 6      Q.   Is it fair to say that sitting here
 7   today, that you don't know whether marks were
 8   being updated daily, the LBI marks, between
 9   September 12th and September 19th?
10      A.   We -- I don't know for sure.
11      Q.   Let me ask you to turn back to the
12   e-mail from JPM with the Appendix A attached to
13   it, Exhibit 570.
14           In the attachment, there is a -- at
15   the top, the different columns, on the
16   right-hand column it, says, "Collateral Value."
17      A.   Um-hm.
18      Q.   And as I understand it, you don't --
19   do you have an understanding of what collateral
20   value is vis-a-vis market value?
21      A.   In this sense, it is supposed to mean
22   market value, according to our discussions with
23   JP Morgan.
24      Q.   OK.  If you turn back to the e-mail,
25   in the second sentence, it says, "I understand
```

Page 89

```
               KARP
 1
 2   that these collateral values were furnished
 3   principally by third-party pricing sources, and
 4   we caution against using those values as
 5   reliable indicators of realizable value."
 6           Don't you understand realizable value
 7   to be a reference to market value?
 8           MR. ROTHMAN:  Objection to the form.
 9      A.   My understanding of realizable value,
10   based upon my experience, is if I sold it today,
11   is that the value I would get.  That's not
12   necessarily the last market price the securities
13   sold in the marketplace, which was my
14   understanding of these prices, was the market
15   price as of the 17th of September, based upon
16   this e-mail.
17      Q.   Do you understand that a lot of the
18   securities that were conveyed to Barclays were
19   not very liquid?
20      A.   I understand that people have said
21   that.
22      Q.   Do you understand that it may not --
23   some of those securities may not have actually
24   sold in a long time?
25      A.   I don't know that for sure.
```

Page 102

KARP

1
2  sources.  If there were other avenues to
3  explore, we did not do that.
4        I don't know what avenues JP Morgan
5  took to try to value anything.
6    Q.   Well, you did try to explore.  You
7  took a sample and tried to value them and
8  decided it was --
9    A.   Only publicly available pricing
10 services.
11   Q.   So you're saying you didn't dig
12 deeper, trying to value them using nonpublicly
13 available sources?
14   A.   Correct.
15   Q.   Do you disagree with JPM's assessment
16 that some are difficult to value?
17        MR. ROTHMAN:  Objection to the form.
18   A.   I don't know whether or not they are
19 difficult to value.  We only did a sample on a
20 limited view.
21   Q.   Do you see in the second paragraph, it
22 says, "Please note the collateral value was
23 obtained from third-party pricing sources, and
24 JPM Morgan cautions that collateral value may
25 not be a reliable indicator of realizable

Page 103

KARP

1
2  value"?  Do you see that language?
3    A.   Yes.
4    Q.   So JPM is again cautioning against
5  using the collateral value as a reliable
6  indicator of realizable value, correct?
7    A.   That's what it says.
8    Q.   I am going to go ahead and mark a
9  document as Exhibit 572.
10        (Exhibit 572, subpoena marked for
11   identification, as of this date.)
12   Q.   Let me ask you, have you seen this
13 document before?
14   A.   Yes.
15   Q.   And what is it?
16   A.   It's a request, it is a subpoena
17 request for a deposition.
18   Q.   And on page 9, you see a list of
19 examination topics.
20        Do you see that list?
21   A.   Yes.
22   Q.   And you understand you are the witness
23 on these topics for Deloitte?
24   A.   Yes.
25   Q.   And can you describe briefly what you

Page 104

KARP

1
2  did to prepare for your deposition today?
3    A.   I met several times with Hughes
4  Hubbard.
5    Q.   Anything other than that?
6    A.   I read through some documents that
7  they had showed me.
8    Q.   Did you speak with anyone else other
9  than Hughes Hubbard?
10   A.   I spoke to some of my partners that
11 would have made -- that may have answers to
12 some of these comments -- some of these topics.
13   Q.   And who were those people that you
14 spoke to?
15   A.   Felicia Sokalski, John Manley and
16 Chris Harris.
17   Q.   And did they provide you with any
18 useful information on these topics?
19   A.   They, John and Felicia were the people
20 that were in -- on the ground in the beginning,
21 so for topic 11, they had the most information.
22   Q.   And what is your understanding,
23 Deloitte's understanding of when a SIPC
24 liquidation of LBI was first considered,
25 anticipated or planned?

Page 105

KARP

1
2    A.   On September 15th or 16th, John
3  received a call from -- John Manley received a
4  call from SIPC saying that there was a
5  possibility that Lehman Brothers, Inc. was going
6  into liquidation.  And they wanted to know
7  whether or not Deloitte would be able to clear
8  conflicts and had the people available to assist
9  if necessary.
10   Q.   Looking at topic 2, and -- which is
11 your analysis, reconciliation, evaluation of
12 each of the acquired financial assets, and those
13 assets are defined in the document to include a
14 number of items.  I just want to ask you about
15 some of them.
16        The -- I think we have discussed
17 the -- any efforts to value the repo collateral,
18 correct?
19   A.   Yes.
20   Q.   Is there -- was there any efforts to
21 value the repo collateral that we haven't
22 already discussed?
23   A.   No.
24   Q.   In terms of the clearance box assets,
25 has -- do you know what I am referring to when I

27 (Pages 102 to 105)

Page 106

KARP

1
2    say clearance box assets?
3        A.    My understanding is that that's the
4    boxes at -- the box at DTC.
5        Q.    And is it your understanding those
6    assets were being conveyed to Barclays?
7            MR. ROTHMAN:    Objection to the form,
8        and I caution you not to reveal any
9        information that you have learned solely
10       from counsel.
11       A.    My understanding from some of the
12   Barclays personnel is that these -- that they
13   believe these assets should be transferred to
14   them.
15       Q.    And have you attempted, has Deloitte
16   done any valuations of those assets?
17           MR. ROTHMAN:    You can answer that one
18       yes or no, but --
19       A.    Deloitte has not done -- no.
20       Q.    Has Deloitte assisted in the
21   evaluation of those assets?
22           MR. ROTHMAN:    Objection to the form.
23       A.    No.
24       Q.    I'm hearing long pauses, so I just --
25   let me ask you, what is it that you are thinking

Page 107

KARP

1
2    about, you are distinguishing?
3        A.    Well, those assets would have been
4    part of the balance sheet.
5        Q.    OK.
6        A.    So they would have been valued for the
7    balance sheet of 9/19.  It would have included
8    that pool.
9        Q.    Is the balance sheet -- when do you
10   expect to complete the balance sheet for 9/19?
11       A.    I'm not sure.
12       Q.    Is it complete with respect to items
13   such as the clearance box assets?
14       A.    It's being reviewed at this time by
15   the trustee and his counsel --
16           MR. ROTHMAN:    No, don't talk about
17       things that the lawyers are doing, please.
18       Q.    It is OK to just indicate that it is
19   not in your bailiwick.  It is being reviewed I
20   think is OK to say.  Otherwise, it is hard to
21   figure out the story of why.
22           OK, just let me talk about any
23   valuations you have placed on the clearance box
24   assets.  Has Deloitte placed, assigned a value
25   to the clearance box assets?

Page 108

KARP

1
2        A.    Deloitte has not done valuation.
3        Q.    The valuation that's on the draft
4    balance sheet, do you know how it was obtained?
5        A.    They would have been through
6    third-party pricing sources and Barclays.
7        Q.    The third-party pricing sources, did
8    Deloitte go out and make use of third-party
9    pricing sources?
10       A.    No.  Those sources would have come
11   through Barclays and existing Lehman Brothers
12   relationships that continued past bankruptcy.
13       Q.    Can you be a little bit more specific
14   on the last part?
15       A.    We still have a relationship with
16   Bloomberg to obtain some pricing information.
17       Q.    "We" being LBI, the trustee?
18       A.    LBI, the estate.
19       Q.    Do you know the amounts that are on
20   the draft balance sheet for clearance box
21   assets?
22           MR. ROTHMAN:    Objection to the form.
23       A.    There is no specific amount for
24   clearance box assets.  It's listed as firm
25   inventory.

Page 109

KARP

1
2        Q.    And do you know what that adds up to?
3        A.    There are still open questions on
4    those numbers, as we are still waiting for
5    information from JP Morgan and DTC.  So those
6    numbers are not finalized.
7        Q.    What information are you waiting for
8    from JP Morgan and DTC?
9        A.    JP Morgan, there are some open
10   questions on the unwinding of some transactions
11   that happened that week, the 18th and 19th.
12   Some journal -- some entries that hit the bank
13   accounts that affect security settlements that
14   we are waiting for details on.
15           And for DTC, we are still waiting for
16   the -- some information on some of the
17   securities' movements and settlements that they
18   did through their various clearing
19   organizations.
20       Q.    Accepting that there is maybe some
21   margin of error here because of those unknown
22   elements, do you know the rough range of order
23   of magnitude of the clearance box assets?
24           MR. ROTHMAN:    Objection to the form.
25       Calls for speculation.

28   (Pages 106 to 109)

Page 126

KARP

1
2    MR. ROTHMAN:  Objection to the form.
3    A.    I don't know who approved it.
4    Q.    Do you understand whether it required
5  approval?
6    A.    No.
7    Q.    So you just don't know any of the
8  facts -- you knew it was transferred but you
9  don't know any of the facts surrounding who
10  approved it and so forth?
11    A.    Who -- no.
12    Q.    When did Deloitte first learn that
13  proceeds of certain government securities held
14  by JPM as margin in its OCC accounts were
15  released to Barclays?
16    A.    They were not released to Barclays.
17    Q.    And why do you say that?
18    A.    Because they are still held in an
19  account at JP Morgan.
20    Q.    So you're not aware of any proceeds of
21  any government securities held at one point by
22  JPM as margin for the OCC accounts being
23  released to Barclays?
24    A.    Could you explain what you mean by
25  "proceeds"?

Page 127

KARP

1
2    Q.    Well, money.
3    A.    There was -- if I remember correctly,
4  there was a -- one of the securities matured and
5  I believe that cash may have been transferred to
6  Barclays.  I believe -- I believe that's
7  what happened.
8    Q.    Do you understand roughly when that
9  happened?
10    A.    I think it happened around the same
11  time that the cash moved, but I don't -- I'm not
12  sure when it actually happened.
13    Q.    Would you have been aware roughly at
14  the time it happened?
15    A.    I don't believe so.  I wasn't really
16  involved in cash at that point, you know, in the
17  early days of the -- of our role.
18    Q.    Do you know when Deloitte was aware of
19  that release?
20    A.    We would have known -- we would have
21  known a couple days later for the people that
22  were reconciling cash because it would have
23  shown up as a cash movement.  But otherwise, I
24  don't know the exact date.
25    Q.    Do you know if Deloitte had any

Page 128

KARP

1
2  involvement in the release of those funds, those
3  proceedings?
4    A.    No.
5    Q.    Is Deloitte aware that LBI had
6  collateral and accounts with other domestic and
7  foreign exchange brokers of clearing houses to
8  support its business as a futures commission
9  merchant?
10    MR. ROTHMAN:  Objection to the form.
11    A.    Yes.
12    Q.    Are you aware of any discussions with
13  Barclays prior to the closing concerning how the
14  transfer of this business was to be implemented?
15    A.    No.
16    Q.    Even today, you're not aware of any
17  such discussions?
18    A.    No.
19    Q.    Is Deloitte aware that collateral held
20  in these accounts had been transferred to
21  Barclays, either by transferring the accounts or
22  by transferring the collateral?
23    MR. ROTHMAN:  Objection to the form,
24  and again, let me caution you not to reveal
25  things that you have learned solely from the

Page 129

KARP

1
2  lawyers.
3    A.    From some of the statements we have
4  received from the exchanges, we understand from
5  those documents that some collateral has moved
6  to Barclays.
7    Q.    When did you understand that?
8    A.    I'm not sure when we first started
9  getting statements.  It look a long time to get
10  information from the CME.  I believe it was
11  sometime in '09, not before then.
12    Q.    Can you estimate a month?
13    A.    I really -- I really don't remember.
14    Q.    It would have been statements from the
15  CME -- what statements would have alerted you to
16  that?
17    A.    We asked for statements from the CME
18  showing the positions and any margin so that on
19  those statements, we would have seen if any
20  funds had been transferred out.
21    Q.    If there comes a point that I am
22  asking you a fact that you think only came from
23  your lawyer and you're not sure, if you would
24  let us know so we can discuss whether that's --
25  so you can discuss that first with your

33 (Pages 126 to 129)

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     -------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     -------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9           DEPOSITION OF MIKE KEEGAN

10             New York, New York

11           Friday, August 28, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24379

22

23

24

25

Page 6

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    Quinn, Emanuel, Urquhart, Oliver &
3    Hedges for the Official Committee of
4    Unsecured Committee.
5        MR. LAYDEN:  Good morning.  David
6    Layden from Jenner & Block for the
7    Examiner.
8    BY MR. TAMBE:
9        Q.   Mr. Keegan, by whom are you
10   employed currently?
11       A.   Barclays Bank, PLC.
12       Q.   And how long have you been
13   employed by Barclays Bank, PLC?
14       A.   I've been an employee of Barclays
15   since July of 1996.  But during that time
16   period, because of overseas assignments and
17   things like that, I've been employed by a
18   number of various entities within Barclays.
19       Q.   Starting in July of 1996 to the
20   present, if you could just give us a broad
21   overview of what your positions have been and
22   what your duties have been at Barclays.
23       A.   Sure.  In July of '96 I actually
24   joined BZW which was the investment bank
25   subsidiary of Barclays Bank located in London.

Page 7

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    I joined in London as a chief operating
3    officer of the markets division of BZW
4    reporting to Bob Diamond.
5        I did that job for two years until
6    the formation of Barclays Capital in January
7    of 1997 -- sorry.  January of 1999.  And I was
8    the C -- sorry.  It was January of '97.  Sorry
9    about that.  So it was 18 months as COO.  Then
10   I was -- became the first CFO of Barclays
11   Capital when Barclays Capital was formed.  I
12   did that job until November of 1999 and then I
13   returned to New York at that point in time as
14   the chief administrative officer for the
15   Barclays Capital operations in the US.  I did
16   that until 2001 when I became the chief
17   operating officer for Barclays Capital's
18   credit trading and investment banking
19   businesses.  And that was the position I had
20   until I guess November '07.  And at that point
21   became head of principal credit trading which
22   is the job I currently have.
23       Q.   Just focusing on your current job
24   and your prior job, so starting in 2001
25   through the present, starting sometime in 2001

Page 8

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    it sounds like you were head of credit
3    trading?
4        A.   No.  Chief operating officer which
5    in Barclays Capital it's different things to
6    different people.  All right?  So I worked for
7    an individual named Grant Kavalheim.
8        Q.   How do you spell that last name?
9        A.   It's K-A-V-A-H -- let me write it
10   out.
11       MR. STERN:  We can look it up.
12       Q.   Grant was the first name?
13       A.   Yeah.  Grant.
14       Q.   All right.
15       A.   K-A-V-A-L-H-E-I-M.
16       Q.   Okay.
17       A.   So Grant was head of trading and
18   investment banking.  I was his COO and as his
19   COO, yeah, I had a bunch of different duties
20   in charge of planning, budgeting, execution of
21   any strategic plans that we wanted to
22   implement.  I took on responsibility for
23   managing a number of businesses for him which
24   included our -- initially a business called
25   risk finance which was a credit arbitrage

Page 9

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    trading business.  Then I took on
3    responsibilities for managing our loan
4    portfolio which is the portions of the loans
5    that we would make to clients that we would
6    retain on our balance sheet, managing that.
7    Took on responsibility for our distressed
8    proprietary trading business.  And, finally,
9    more recently, our real estate business.
10       Q.   And if I understand the change in
11   the nature of your duties starting in November
12   2007, you specified that date as the date at
13   which you became head of prime credit trading?
14       A.   No.  Principle credit trading.
15       Q.   Principle.
16       A.   So Grant departed the firm.  All
17   of the trading businesses rolled up to Jerry
18   del Missier.  Jerry del Missier had another
19   individual by the name of Justin Bull who was
20   his chief operating officer.  So basically my
21   chief operating officer duties for credit went
22   away and I was left with what was my trading
23   and risk management supervisory
24   responsibilities.
25       Q.   Okay.

## Page 10

M. KEEGAN - HIGHLY CONFIDENTIAL

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2          A.   And I was renamed as head of
3     principle credit trading.
4          Q.   So starting with November 2007
5     through to the present if you could describe
6     who you directly reported to.
7          A.   November 2000?
8          Q.   Seven.
9          A.   Seven?
10         Q.   Yeah.
11         A.   As of November 2007 until today I
12    directly report to Jerry del Missier.
13         Q.   And who are the folks who directly
14    report to you, if any?
15         A.   Today it's Fred Orlan.  It is an
16    individual named Rene Canezen.  It's an
17    individual named Matt Barrett.  An individual
18    named Haejin Baek.  And I'm pretty sure
19    that's -- I'm trying to think.  That's it
20    right now the way we're organized.
21         Q.   Okay.  When we were earlier
22    talking about some of the work you did when
23    you were working with Grant you'd mentioned
24    managing loan portfolios, distressed
25    proprietary trading, et cetera.

## Page 11

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2          Do you still do all those --
3     manage all those types of trading?
4          A.   Yes.
5          Q.   So that's included within
6     principle credit trading.
7          A.   Yeah.  What principle credit is
8     any risk that we are taking as a firm in the
9     credit space in a non-market-making capacity
10    is supposed to roll up into principle credit.
11    It doesn't but...
12         Q.   Other than the duties you have
13    with respect to the principle credit trading
14    business in the past twelve months have you
15    been involved in any strategic initiatives
16    by -- taken on behalf of Barclays?
17         A.   I was involved in the Lehman
18    acquisition, yes.
19         Q.   And other than the Lehman
20    acquisition, have you been involved in any
21    other strategic initiatives, acquisitions,
22    dispositions, things of that nature?
23         A.   Nothing major.
24         Q.   Broad terms, if you could just
25    describe your involvement in the Lehman

## Page 12

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     transaction.
3          MR. STERN:  Jay, if it helps, I
4     have a September 2008 monthly calendar,
5     you know, just to keep the days of the
6     week in mind.  I just put that up here
7     in front of Mr. Keegan.
8          MR. TAMBE:  That's perfectly fine.
9          A.   So my role I guess began Friday
10    the 12th.  And was one of the people who was
11    brought in to examine portions of Lehman's
12    balance sheet and operations in preparation
13    for a bid to buy Lehman Brothers from what
14    looked like it was going to be the -- in fact,
15    the government at that point in time.
16         Q.   And over the course of that next
17    week, starting on the 12th going forward say
18    ten days until the 22nd of September, if you
19    could give us a little bit more detail in
20    terms of what tasks you were doing in
21    connection with the Lehman transaction.
22         A.   Sure.  I had responsibility
23    specifically for looking at the commercial
24    real estate portfolio, their loan portfolios,
25    their private equity investments, and their

## Page 13

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     corporate credit/debt positions.
3          And, you know, that process took
4     basically, you know, the weekend through -- I
5     don't know -- 3:00 or 4:00 on Sunday when it
6     was determined that the trade wasn't going to
7     happen.
8          Q.   After that Sunday -- the Sunday
9     you're referring to is the 14th of September,
10    correct?
11         A.   I believe it was, yes.
12         Q.   After Sunday, the 14th, did you
13    have any further involvement?
14         A.   Yes, I did.
15         Q.   Okay.
16         A.   On Monday, the 15th, somewhere
17    around 10, 10:30, 11:00 I got a phone call to
18    show up to the conference room at Lehman
19    Brothers' offices on the 32nd floor and to
20    await instruction.
21         Q.   And did some instructions arrive?
22         A.   They did.  I believe it was -- I'm
23    not sure if it was actually but I believe it
24    was Richard came in and told us that we had an
25    opportunity to buy the US operations of Lehman

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    Brothers I guess prior to bankruptcy
3    because -- at least with respect to the
4    broker/dealer.  The broker/dealer was not
5    filed on that Monday morning.
6        Q.    And so after you were told about
7    that opportunity what involvement did you have
8    in those efforts to purchase Lehman's
9    operations?
10       A.    So I was asked to take a look at,
11   you know, the potential assets that we were
12   buying within the categories that I explained
13   to you before.  And it did not include any
14   commercial real estate because our board told
15   us we weren't eligible to take over any
16   commercial real estate.  It did not include
17   any private equity investments because during
18   the work we did over the weekend we determined
19   that the private equity investments were not
20   something that we wanted to take.
21            It did not include any of the loan
22   portfolios, should not have included any of
23   the loan portfolios, because that was another
24   asset category we determined we did not want
25   to take.

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    So it basically came down to,
3    within my world, what I looked at, was the
4    corporate debt securities that were on the
5    books of the broker/dealer for the most part.
6        Q.    And just to be clear on what you
7    mean by corporate debt securities, what do you
8    mean by that?
9        A.    Commercial paper, bonds, credit
10   link notes.  Any other, you know, security
11   instruments that they might have housed in
12   broker/dealer that, you know, involved
13   corporate credit risk.
14       Q.    And for this asset class,
15   corporate debt securities, would you typically
16   be provided with a list of CUSIP numbers,
17   identifiers for the securities that were held
18   by the broker/dealer?
19            MR. STERN:  I'm just going to
20       object to the form.  Are you asking him
21       if he was?  It says would you typically
22       have been.
23       Q.    That's fine.  I could restate the
24   question.  Are you provided with CUSIP numbers
25   out of the debt securities held by the

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    broker/dealer?
3        A.    Over the weekend we were.  And
4    then on Monday I'm not sure that we were given
5    a complete list again but we were shown -- it
6    was indicated what was on the books of the
7    broker/dealer and I guess we had a list
8    because I had determined whether we looked at
9    it or not -- or didn't look at it over the
10   weekend.  That was the first step.  You know,
11   had we seen it before.  We should have.
12            And then for particular areas
13   where we identified over the weekend as being
14   problematic with respect to value or other
15   concerns, yes, we were given a CUSIP -- we
16   asked for and were given a CUSIP list.
17            So Lehman obviously hadn't planned
18   on going bankrupt and they were totally
19   unprepared for the whole process on Monday so
20   it was a struggle to get any information quite
21   frankly.
22       Q.    And throughout that week, the week
23   of the 15th of September, was the focus of
24   your efforts limited to analyzing the
25   corporate debt securities aspect of the

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    portfolio or did you do other things as well?
3        A.    It was primarily that.  I also was
4    more or less coordinating the communication
5    internally between other individuals that had
6    responsibility for various parts of the
7    portfolio -- of Lehman's portfolio and
8    analyzing it.  And our team just -- and
9    that's -- no one said, Mike, you're -- you
10   know, you're in charge.  Just that I'm more
11   senior than the other guys.  So I know -- I
12   know Rich.  I know Archie Cox.  People like
13   that.
14            I worked on the -- securing -- we
15   were going to make a DIP loan to Lehman for
16   the week and looking at the collateral
17   associated with the DIP loan and how much --
18   what collateral might be available for the DIP
19   loan and how much we might be willing to
20   provide.  That was principally it.
21       Q.    And the loan that you're referring
22   to as the DIP loan was that, in fact, extended
23   by Barclays to Lehman?
24       A.    It was.
25       Q.    And in what amount?

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2       A.   I think it was $500 million.  I'm
3    not positive what credit finance determined.
4    The collateral was Newburger Berman property.
5       Q.   And just to be clear, this DIP
6    loan is different than the tri-party repo or
7    any other repo --
8       A.   Absolutely, yeah.
9       Q.   You said you were -- you played a
10   coordinating role to some extent during that
11   week.  You mentioned two names.  I believe you
12   mentioned Rich Ricci.  I think you mentioned
13   Rich but that was Rich Ricci?
14      A.   That's Rich Ricci, yes.
15      Q.   And Archie Cox, right?
16      A.   Yes.
17      Q.   Who else were you coordinating
18   with during that week?
19      A.   Jonathan Hughes, our legal
20   counsel.  A few conversations with Patrick
21   Clackson.
22      Q.   And who is Mr. Clackson?
23      A.   He's the chief financial officer
24   of Barclays.
25      Q.   Were you involved at all in

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2    negotiating --
3       MR. STERN:  Excuse me.  Excuse
4    me.  I don't know if you -- if you
5    completed your answer.
6       King.
7       THE WITNESS:  Oh, the guys I was
8    coordinating with.  Sorry.  I thought
9    you were looking upward, not downward.
10      MR. STERN:  It's a gen -- just to
11   clarify, it's a general question about
12   all the people he was coordinating with.
13   Not just the more senior people.
14      MR. TAMBE:  That's fine.
15      Q.   Let's go through the list of
16   everyone you were coordinating with.  You got
17   to Mr. Clackson.  Mr. King.
18      A.   Right.  So Stephen King was
19   responsible for looking at all of the ABS and
20   mortgage -- residential mortgage assets with
21   Lehman Brothers.  Similar role to what I had
22   on the credit side.  John Mahon took that
23   responsibility for, I guess you would call
24   them the rates, assets, government bonds
25   principally.  Anything that they might have

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2    done with repo would have rolled up to him.
3    The exposures, if any, on derivative
4    contracts.
5       Q.   Anyone else in this coordination
6    circle that you --
7       A.   That was pretty much it.  There
8    was other people that -- like I said, I was
9    not in the coordination but I was working with
10   our guys in credit on the DIP loan.  A guy
11   named Mark Manski and Ian Prior on that.  I
12   had conversations with James Walker.  James
13   was controller of the US.  Another lawyer
14   named Jason White.  Jason was working on the
15   DIP loan.  And Gerard LaRocco I guess as well.
16   And Gerard was working on putting a repo
17   facility in place.
18      Q.   Anyone else?
19      A.   Not that I -- not that I remember.
20   I'm not saying there wasn't.  I just don't
21   remember.
22      Q.   Were you part of the group of
23   people from Barclays that was negotiating the
24   terms of the transaction with the folks from
25   Lehman?

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2       A.   I wouldn't say I was negotiating
3    the terms of the transaction but I was
4    involved in -- you know, I was also involved
5    on Thursday.
6       Q.   And you say you were also involved
7    on Thursday.  What do you mean by that?
8       A.   So we struck a deal on Monday in
9    effect as to what we were going to buy.  And
10   then -- you know, so I worked from, you know,
11   at Lehman from whatever time, 10:30 in the
12   morning, 10:00 to roughly 2:30, 3:00 in the
13   morning, Tuesday morning.  Went and got some
14   sleep.  Tuesday was more worried about other
15   things in our world than I was worried about
16   anything in Lehman's world whose world was
17   melting down.  And more focused on that
18   Tuesday and Wednesday.
19       And then Thursday afternoon I got
20   called in around 4:00 to come over again to
21   Lehman by Rich to start taking a look at the
22   inventories that were coming in related to,
23   you know, an effective settlement of the asset
24   purchase to make sure we were getting, you
25   know, what we bought and everything we bought.

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2          And Stephen was there as well and
 3   John was back in UK at that point in time.
 4          Q.   And the Stephen you're referring
 5   to is Stephen King.
 6          A.   Yes.
 7          Q.   And the John you were referring to
 8   is who?
 9          A.   John Mahon.
10          Q.   Have you ever seen a copy of the
11   Asset Purchase Agreement between Lehman and
12   Barclays?
13          A.   Only in preparation for this.
14   Prior to that, no.
15          Q.   So it's fair to say the first time
16   you ever laid eyes on the Asset Purchase
17   Agreement was sometime in the past couple
18   weeks.
19          A.   Yeah.  I saw a version of the
20   agreement early on.  I was asked a specific
21   question which escapes me now why I was given
22   the agreement.  But it was very -- it was
23   specific to, you know, is this worded
24   properly, yes or no.  And I just don't
25   remember what it was.
```

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2          Q.   And you say it was early on.
 3   Would you put it during that week of the 15th?
 4          A.   Yeah.  During the week prior to
 5   Thursday, I believe.
 6          Q.   And the provision you were shown,
 7   were you shown that provision in the signed
 8   APA or an APA that was being drafted?
 9          A.   I think it was a draft.
10          Q.   And who showed you that provision?
11          A.   I think it was the legal
12   department.  It may have been the finance
13   department.  I don't remember.
14          Q.   You don't down remember the
15   substance of the discussion.
16          A.   The substance was --
17          MR. STERN:  If it was a discussion
18   with legal, don't talk about the
19   substance.
20          THE WITNESS:  I don't remember who
21   it was with.
22          Q.   Okay.  So what was the substance
23   of the discussion?
24          MR. TAMBE:  He doesn't know if it
25   was with a lawyer.
```

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2          MR. STERN:  Well, since it may
 3   have been with a lawyer I think I'll
 4   instruct you not to answer because it
 5   may have been a privileged conversation.
 6          THE WITNESS:  Okay.
 7          A.   I don't know then.
 8          MR. STERN:  If you remember what
 9   provision you discussed I think that's
10   fine.
11          A.   No, I don't.  If you put some
12   documents in front of me I might remember but
13   right now I don't remember.
14          Q.   There's a document that's been
15   referred to as the clarification letter.  Does
16   that term have any meaning to you?
17          A.   I'm not sure what that is.
18          Q.   Okay.  Did you have any
19   understanding that there were features of the
20   transaction that changed over the course of
21   that week, the week of the 15th?
22          A.   Oh, yeah.  Yes, I did.
23          Q.   And what's your understanding of
24   the features of the deal that changed over the
25   course of that week?
```

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2          A.   All right.  So Monday night when I
 3   left we had come to a conclusion as to what we
 4   would buy and what we wouldn't buy.  There
 5   were assets -- you know, we did have problems
 6   with the valuations with a number of the
 7   assets that Lehman had on the books.  And
 8   overall our conclusion from the weekend was
 9   that Lehman was aggressive with the rest of
10   the valuations.  And, you know, we went back
11   to them on Monday and told them that, you
12   know, we didn't agree with certain prices.  We
13   also went back to them with the knowledge that
14   the market was melting down and that that deal
15   wasn't closing until the end of the week,
16   saying that, you know, we need to put a
17   haircut on these assets because the volume of
18   the assets plus the timing -- you know, we're
19   trying to predict what the assets of are going
20   to be worth on Thursday, Friday when the deal
21   closes.  We know Lehman's employees have all
22   lost their jobs in effect as of right now and
23   they're not too focused on marketing the
24   inventory, et cetera.
25          So we had proposed some haircuts
```

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2  to them.  It was assets that we thought were
3  materially -- you know, relative to those
4  assets themselves, materially mismarked and we
5  went back to Lehman on those and told them
6  where we thought the valuation of those assets
7  were.  Some of those we agreed.  Some of those
8  weren't agreed.  And we told them to keep the
9  assets.
10         I've lost my focus on the
11 question.  Could you just repeat the question?
12      Q.   The question was about what the
13 features of the deal that changed over the
14 course of the week.
15      A.   Okay.  So that was the deal.  So
16 we basically came to a definitive list of what
17 we said we would purchase in effect.
18      Q.   I just want to drill down a little
19 bit on a couple of things you said.
20         MR. STERN:  Just for
21 clarification, we've talked about the
22 status as of Monday and then you're
23 going to clarify that and then you'll go
24 to the changes.
25         MR. TAMBE:  Yeah.

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2          MR. STERN:  Okay.  That's fine.
3      Q.   You had some concerns about the
4  valuations of the assets on Monday, correct?
5  Lehman's valuations.
6      A.   Yeah.
7      Q.   And you went back to them and
8  proposed haircuts on these assets.
9      A.   Well, we proposed valuation
10 adjustments and haircuts, yes.
11      Q.   Do I gather from your answer that
12 on some of the haircuts or valuation
13 adjustments you proposed you reached agreement
14 with Lehman?
15      A.   On some of them, yeah.
16      Q.   And others you didn't?
17      A.   No.  Other's they just thought we
18 were nuts.
19      Q.   On the ones where you reached an
20 agreement with Lehman as to the haircut or the
21 valuation adjustment, were those included then
22 in the list of assets that Barclays would be
23 purchasing?
24      A.   Yes.
25      Q.   And the ones that you did not

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2  reach an agreement with Lehman on on valuation
3  were those excluded from the list of assets?
4      A.   That's correct.
5          MR. STERN:  Let me just pause.
6  I'm sorry.  For the reporter.  There's a
7  question "And others you didn't."  What
8  do you have as the answer?
9          (Discussion held off the record.)
10 BY MR. TAMBE:
11      Q.   In round numbers, for the
12 valuation adjustments or haircuts where you
13 did reach an agreement --
14      A.   I don't know.
15      Q.   $5 billion?
16      A.   No idea.
17      Q.   Have you ever heard about a
18 $5 billion adjustment or mark-down in the book
19 value of Lehman's assets around that period of
20 time?
21      A.   No.  Again, only in preparation
22 for this deposition.  But not otherwise.
23      Q.   When you said you proposed
24 haircuts or valuation adjustments to Lehman on
25 Monday, was there a document that had

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2  asset-by-asset proposed mark-downs?
3      A.   Yeah.  There was a period -- there
4  was an asset -- there was asset-by-asset where
5  we thought we had problems with valuations.
6  But then there was also a summary where we
7  just said that, you know, we're talking so
8  much -- you know, we're taking on so much
9  inventory, the market is melting down, you
10 aren't getting your hands on it till Thursday.
11 You know, what do you need to protect yourself
12 between now and Thursday or Friday.  So we can
13 manage the assets if the deal closes, right?
14         So that was the Monday night
15 process.  And I have no idea what the number
16 actually added up to.  We weren't targeting a
17 number or anything like that.  We were just
18 saying based on this type of asset, based on
19 what's going on in the market, how much
20 protection do you think you need between then.
21      Q.   Just to get a better understanding
22 of your proposal that Barclays made, was it by
23 asset category or was it even more granular,
24 particular asset by asset?
25         MR. STERN:  Objection to the form.

## Page 30

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  Q.  Do you understand my question?
3  A.  Ask it again.  Or repeat it.
4  Q.  The question I'm asking --
5      MR. STERN:  I'm objecting to the
6  proposal term.
7      MR. TAMBE:  That's fine.
8  Q.  You proposed some haircuts or
9  valuation adjustments, right?
10  A.  Yeah.  By category we said we
11  think we need --
12  Q.  When I use the word proposal
13  that's what I'm talking about, okay?
14  A.  Okay.
15  Q.  That proposal.  Was it by asset
16  category or by specific asset?
17  A.  If we had a valuation adjustment
18  it was by asset.  And if we had a haircut it
19  was by category.
20  Q.  Do you recall any of the category
21  type haircuts that you proposed?
22  A.  The actual amount?
23  Q.  Yeah.
24  A.  No, I don't.  Off the top of my
25  head I don't know.  I'd have to look at the

## Page 31

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  documents.
3  Q.  But you believe there's a document
4  or documents from Monday which would contain
5  that information.
6  A.  There was a Monday -- there was a
7  document that contained that information on
8  the Monday, okay?  That deal didn't happen so
9  I have no idea if that still exists or doesn't
10  exist.
11  Q.  All right.  We got down this
12  discussion talking about how the deal changed
13  or how features of the deal changed during
14  that week.  That deal that was being discussed
15  on Monday, did that deal get done?
16  A.  So the deal on Monday, okay, in
17  the context of the bigger deal, I guess yes,
18  it got down.  But in the context of what I was
19  looking at, which was the purchase of the
20  inventory, that aspect of the deal didn't get
21  done, okay?
22      When I showed up on Thursday night
23  there was a -- I got there around 4:00.
24  Somewhere around there.  And I expected to
25  take a look at, you know, the settlement list

## Page 32

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  of what inventory we got and then just do a
3  simple comparison back to what we bought
4  Monday and say, Yeah, it's the same list.  It
5  wasn't the same list.  And, in fact, there was
6  a huge delay in us getting anything back, you
7  know.  We had wired out through JPMorgan money
8  and they were supposed to deliver us
9  securities and were having difficulties
10  delivering us securities for some reason.  So
11  there was a long delay.  Several hours.
12      And my recollection is around 8:00
13  at night, you know, we started getting stuff
14  in and looking at it.  We might have started
15  getting it a little bit earlier, around 7, but
16  we started looking at it.
17      But about 8:00 at night on
18  Thursday night we noticed that this wasn't the
19  inventory that we had agreed to purchase on
20  Monday.  It was different.  And it included a
21  lot of the inventory that we thought was
22  overvalued.  At least the initial deliveries
23  were a lot of what we thought was overvalued
24  in the mortgages area, mortgage agencies, that
25  we said we couldn't come to an agreement with

## Page 33

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  Lehman on valuation and we were leaving
3  behind.
4      So it was at that point I learned
5  for the first time that the agreement had
6  changed and apparently sometime on Tuesday the
7  Federal Reserve came in to us and said -- you
8  know, it's been relayed to me by third
9  parties, I have no idea what they actually
10  said -- but, in effect, what I've been told,
11  if you guys want the deal to go through you
12  need to take us out of our repo.  And so the
13  construct of the deal changed from a purchase
14  of inventory to taking an assignment of repo.
15  Q.  And who described that change in
16  the nature of the deal to you?
17  A.  Could have been Ian Lowitt from
18  the Lehman side.  It could have been Rich.  It
19  could have been Jonathan Hughes.  It could
20  have been -- I don't know.  I mean, I was kind
21  of stunned when I heard it.  But I don't
22  remember exactly who told me that.
23      I do know what I did after that is
24  I had a conversation with Ian Lowitt, and
25  said, "Ian, we're getting stuff we didn't

Page 34

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   want.  You need to take it back and give us
 3   the stuff we bought."
 4          And he explained that he couldn't
 5   do that because even though they hadn't filed
 6   bankruptcy, the counterparties to the repo for
 7   the securities company were grabbing
 8   collateral and liquidating it on them.  And
 9   they didn't have the inventory we bought
10   anymore.  They only had what was in repo at
11   the Fed.
12        Q.   Did you have any discussions with
13   Ian Lowitt or others about finding additional
14   inventory beyond the inventory that had been
15   identified on Monday?
16        A.   Yeah.  Because we had value -- we
17   were getting, for instance, these mortgage
18   securities, agency mortgage securities.  I
19   think the number, and I don't recall, Stephen
20   would know the exact number, but I think we
21   thought the adjustment should be as much as a
22   billion eight of new securities.  And Lehman
23   did not agree with us.  So those securities
24   were to be left behind.  And then all of a
25   sudden they show up in our box.  Our
```

Page 35

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   inventory.  And so we knew they were marked
 3   wrong.  Or we believed they were marked wrong.
 4          And, therefore, we were, you know,
 5   short cushion or haircut, if you will, on the
 6   repo.  And, you know, that was a concern to us
 7   because we had -- on Monday in effect
 8   negotiated, you know, what we thought was a
 9   cushion to protect us, and -- similar to a
10   haircut on repo.  And on Thursday night we
11   were finding out that the actual repo haircuts
12   were in effect getting absorbed by the mismark
13   of Lehman securities.
14          So, yeah, we needed additional
15   collateral to protect us.
16        Q.   And did you have in mind a number
17   or target amount of that additional
18   collateral?
19        A.   I did not.  I just -- I didn't --
20   I didn't -- you know, we didn't -- we knew,
21   for instance, the billion eight, but we didn't
22   know what else we got.  And we were struggling
23   all night long to find out what we were
24   actually getting in terms of inventory,
25   because it came in dribs and drabs through the
```

Page 36

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   evening because of what we believed was
 3   operational errors that JPMorgan made.
 4          MR. STERN:  Let me just pause for
 5   one minute.
 6          (Discussion held off the record.)
 7   BY MR. TAMBE:
 8        Q.   Did you discuss with anyone a
 9   target number for the additional collateral
10   that Barclays was looking for after the
11   Thursday night transfer?
12        A.   No.  I did not discuss a specific
13   number.
14        Q.   Did you discuss a range?
15        A.   No.  What we were asked was -- the
16   question we were asked was how much your
17   haircut -- so -- we gave a number -- you know,
18   an amount of money to the Fed, in essence,
19   which was I think gross somewhere in the $45
20   million area.  Okay?  The Fed delivered the
21   securities that went through JPMorgan.  I have
22   no idea if what we got was what came out of
23   the Fed and went to JPMorgan or how JPMorgan
24   determined what we got.  All right?  But we
25   got stuff from JPMorgan.
```

Page 37

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2          We were trying to find out all
 3   Thursday night, all Friday morning, what
 4   securities we got, were getting, were likely
 5   to get, what Lehman thought the value of those
 6   securities were.  Right?  So we could know, we
 7   could understand what the magnitude of the
 8   repo haircut that we received was.
 9          And Lehman wasn't able to provide
10   us that information.  JPMorgan wasn't able to
11   provide us that information.  And you know,
12   we had some general idea but not specific idea
13   of what the haircut cushion was.  And the
14   question we were being asked was I guess the
15   way the deal was structured initially there
16   was some liabilities we're assuming as well,
17   is there enough cushion to pay for those
18   liabilities.  And we couldn't answer that
19   question.
20        Q.   Was it a feature of the
21   transaction as you understood it that the
22   cushion you had negotiated on Monday would be
23   sufficient to pay for the liabilities you were
24   assuming?
25        A.   No.  Not on Monday night, no.  I
```

Page 38

M. KEEGAN - HIGHLY CONFIDENTIAL

1  M. KEEGAN - HIGHLY CONFIDENTIAL
2  had nothing to do -- I had no idea that there
3  were liabilities that we were assuming.
4      Q.   On Thursday was there a discussion
5  about ensuring that there would be enough of a
6  cushion to cover the liabilities that Barclays
7  was assuming?
8          MR. STERN:  Objection to the form.
9      A.   Read the question.
10         (Record read.)
11     A.   No, there was not a specific
12  discussion that there was enough cushion for
13  the liabilities that we were assuming.
14     Q.   Was there a discussion of the size
15  of the cushion versus the amount of the
16  liabilities on Thursday night?
17     A.   Not versus the liability.  I had
18  no idea what the liabilities were, okay?  So I
19  did not have a view of that side of the
20  transaction.
21         MR. STERN:  When you're asking was
22     there a discussion, Jay, are you asking
23     a discussion that he participated in or
24     are you asking about if he knows about
25     other discussions?

Page 39

1  M. KEEGAN - HIGHLY CONFIDENTIAL
2          MR. TAMBE:  Either way.
3          MR. STERN:  Because it's
4  misleading the way you're asking it.
5          MR. TAMBE:  So you have an
6  objection to form?
7          MR. STERN:  I'm just trying to
8  clarify what you mean when you asked was
9  there a discussion.
10  BY MR. TAMBE:
11     Q.   Were you involved in any such
12  discussions, sir?
13     A.   I was told at one point in time
14  that the problem we had because of the deal
15  changing with respect to other aspects outside
16  the inventory, okay, was that Lehman had no
17  way to pay for certain liabilities that we
18  were absorbing.  I'm assuming -- and this is
19  an assumption because of the issue what
20  happened with the close-out of the repos by
21  their counterparties -- that somehow that
22  would -- those liabilities were being paid for
23  in the overall structure of the deal and now
24  there was a hole in the deal.
25         And so how you plug that hole was

Page 40

1  M. KEEGAN - HIGHLY CONFIDENTIAL
2  the question.  And what we were asked was how
3  much do we think we have in haircut that could
4  plug that hole.  And the difficulty that we
5  had is we didn't know how much we had in
6  haircut because we didn't have reliable
7  valuations on what we were getting.  We did
8  know we were getting inventory that we had
9  valuation problems with and we had -- on those
10  items we had a relative understanding of how
11  much that was and how much shortfall you had
12  and therefore how much "haircut" would be
13  being absorbed by just valuation errors on
14  Lehman's part.
15         And then how much -- you know,
16  what do you think is kind of left over and
17  that's the question we were trying to answer
18  all day.  All night.
19     Q.   Okay.  And this effort of trying
20  to identify that question -- trying to answer
21  that question, did that effort continue into
22  the next day, the Friday?
23     A.   Yeah.  It continued into Friday.
24     Q.   And did it continue after Friday?
25     A.   I'm not aware that it continued

Page 41

1  M. KEEGAN - HIGHLY CONFIDENTIAL
2  after Friday.  But what did continue after
3  Friday was the process of understanding
4  exactly what we did get and marking it
5  appropriately.
6      Q.   Now, for the collateral that was
7  transferred over on Thursday you did at some
8  point receive a valuation report from Bank of
9  New York for that collateral, correct?
10         MR. STERN:  Objection to the form.
11     A.   We received an indication what
12  they thought the value might be.
13     Q.   And when did you receive that
14  indication?
15     A.   My recollection is that was Friday
16  morning because we still hadn't been able to
17  get the information out of JPMorgan and we
18  still hadn't been able to get the information
19  from Lehman Brothers.  And we were pretty
20  desperate to try to understand where we were
21  at that point in time.
22     Q.   And do you recall the value that
23  Bank of New York but on the collateral?
24     A.   There was several different runs.
25  There was one that was above 50.  There was

Page 42

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    one that was 47.  There was -- there were
 3    several different runs.
 4           You know, the Bank of America
 5    numbers --
 6        Q.   You mean the Bank of York numbers.
 7        A.   Bank of New York.  Sorry.  Bank of
 8    New York, correct.
 9           You can't put that much reliance
10    on them or we couldn't put that much reliance
11    on them because they're not the agent for
12    Lehman.  They don't have Lehman's marks.  They
13    wouldn't know securities necessarily that
14    don't trade and aren't actively quoted.  They
15    wouldn't have reliable, accurate marks on
16    those.
17        Q.   If they're not the agent for
18    Lehman whose agent were they?
19        A.   They're our agent.  They were
20    seeing this stuff for the first time.
21        Q.   Did you ever make it down to the
22    courthouse for any of hearings about this
23    matter?
24        A.   No.
25        Q.   Did you ever talk to anyone who
```

Page 43

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    was down at the courthouse about the
 3    courthouse hearings?
 4        A.   Yeah, I did.
 5        Q.   Who did you speak with?
 6        A.   I spoke with Michael Klein at one
 7    point asking him how it went.  I think I spoke
 8    with -- I'm drawing a blank on the guy's name.
 9    It was our restructuring guy.  Dan Shapiro.
10        MR. STERN: Mark Shapiro?
11        THE WITNESS: Mark Shapiro.  I'm
12    sorry.
13        Q.   Do you recall anything that Mr.
14    Klein and Mr. Shapiro told you about the
15    courtroom proceedings?
16        A.   I was -- after the fact I was
17    interested in knowing, you know, what
18    happened.  And, you know, is the judge going
19    to approve the deal or not approve the deal.
20    How did it go.  And it was more along those
21    lines.
22           I guess during the -- while they
23    were in the courtroom I got asked the question
24    pretty late at night from Mark -- I think he
25    sent an e-mail out that he was trying to get a
```

Page 44

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    question answered.  I answered that question.
 3        Q.   Do you recall what the question
 4    was?
 5        A.   The question as I read it were did
 6    we take any assets from JPMorgan out of the
 7    tri-party repo.  And, you know, I don't know
 8    if you know what the tri-party repo was or not
 9    but --
10        Q.   When you refer to the tri-party
11    repo what are you referring to?
12        A.   So, again, on the Monday night one
13    of the things that was going on in addition to
14    the asset purchase is JPMorgan came back to us
15    and said, Listen, you guys are buying these
16    guys.  If you're buying some of the inventory
17    can you help us out, all right, and take some
18    of the repo of the securities you're buying
19    and provide -- take some of the load off of
20    them because everybody was strapped for cash
21    after this -- strapped for cash after the
22    bankruptcy.
23           And so they wanted to know if we
24    could provide any repo for what we were
25    buying.  And so we agreed to buy -- to provide
```

Page 45

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2    5 billion of repo of the inventory that we
 3    agreed to buy on Monday night.
 4           For some reason unknown to me
 5    again that proved to be about 15 billion by
 6    Thursday.  And it contained securities that we
 7    did not purchase or agree to purchase on
 8    Monday night.
 9           So the first thing I was asked
10    when I got to Lehman on Monday -- on Thursday
11    night, sorry, not Monday -- Thursday night,
12    was for -- Jerry del Missier called me up and
13    said take a look at the repo with JPMorgan and
14    tell me whether we should roll this or not.
15           And I got the list of collateral
16    that was in repo and there was a $5 billion
17    security.  I have no idea what it was but I
18    know we didn't purchase any $5 billion
19    notional amount of security.  So I advised
20    Jerry this is not what we agreed on Monday
21    night.  It was not what we purchased.  And,
22    you know, my recommendation would be not to
23    roll a repo with JPMorgan.
24           So Archie sent an e-mail out.  I
25    guess he was trying to get a question
```

M. KEEGAN - HIGHLY CONFIDENTIAL

2 Subtracting five hours from GMT, right?
3      A.   No, no.
4           Three in the morning.  So, yeah.
5 Sorry.  Yeah.  I don't know why his e-mail is
6 in GMT.  I have no idea.  But, yeah, he's --
7 yeah, that would have added five hours.  So
8 it's 10:00 -- you're right.  It's 10:00 on
9 Sunday night.  10:30 on Sunday night.
10     Q.   In his e-mail he makes reference
11 to I guess Lehman people walking out of the
12 Lehman building.  It's being carried on the TV
13 coverage.
14          Do you see that?
15     A.   Yeah.
16     Q.   At this point, late Sunday night,
17 early Monday morning, the transaction that you
18 were contemplating and working on on the 13th
19 and 14th, that transaction was not going to go
20 forward, correct?
21     A.   That's correct.
22     Q.   Was there ever a contemplation
23 that you would hire the former Lehman
24 employees without buying any of the assets of
25 Lehman?

M. KEEGAN - HIGHLY CONFIDENTIAL

2      A.   I did suggest that actually.  So
3 on Monday -- it wasn't over the weekend that
4 we did that, right?  So over the weekend, no,
5 the answer to your question.  But on Monday,
6 right, when I was going through the assets
7 that were in Lehman's broker/dealer and what
8 other entities we might be buying or assets we
9 might be buying, one of the people I talked to
10 was Eric Felder.  I was specifically talking
11 to him about -- one of the things was that I
12 recall talking to him about was auction rate
13 securities and there was a bunch of Lehman
14 commercial paper and notes that were in his
15 inventory as well which I talked to him about
16 which obviously weren't -- you know, weren't
17 marked correctly at that point in time after
18 the bankruptcy.
19          There were some credit link notes
20 that Lehman was the payor on that they
21 obviously wouldn't be able to pay them
22 forward.  So those were the kind of topics I
23 was talking to him about.  And, you know, how
24 should we look at the value of these things,
25 right?  Because it's like Lehman is bankrupt

M. KEEGAN - HIGHLY CONFIDENTIAL

2 now and Lehman is the payor on these things
3 and, you know, they can't possibly be worth
4 what you paid for them which is what they're
5 marked at.
6          And in the context of that
7 discussion we got onto the auction rate
8 securities and the auction rate securities I
9 suggested that we didn't want to take them
10 because of all the noise around auction rate
11 securities and the whole remarketing and how
12 we would do that if we were to take them, et
13 cetera.
14          And he said to me something to the
15 effect, Well, I didn't realize that you
16 couldn't take them, that we could leave stuff
17 behind.  I said, Yeah, this is going to be an
18 asset purchase.  It's not going to be the
19 purchase of a company.  So we can leave
20 whatever we want behind.
21          And he suggested then you should
22 leave it all behind.  You shouldn't take
23 anything.  And I was kind of curious.  He
24 said, Do you realize what's going on out
25 there, and then actually that Monday morning I

M. KEEGAN - HIGHLY CONFIDENTIAL

2 didn't because we went over it -- you know,
3 Sunday night the transaction and, you know, we
4 ended it pretty depressed.  Monday I came
5 in -- what I was really focused on Monday was
6 what's our exposure to Lehman.  You know, what
7 swaps are going away.  You know, that's what I
8 was focused open.  I wasn't focused on what
9 was happening in the market.
10          So he said, "Do you realize what's
11 happening in the market?"
12          And I said, "No, I've been locked
13 up in your office all day.  I don't have
14 access to anything.  I have no idea what's
15 going on."
16          He said, "The whole world is
17 melting down out there."
18          He said, "So you guys are nuts if
19 you take anything.  If you could leave it all
20 behind you should leave it all behind."
21          And actually when you sat back and
22 thought about it that seemed like a brilliant
23 idea.
24          So our first proposal to our
25 management when they said, Okay, you know,

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2   what are you guys comfortable buying, was --
3   we said nothing.  Just leave it all here.
4   Just take the people.
5           And that didn't happen though,
6   obviously.  We were told to go back and try
7   again.  Actually, we were instructed to take
8   everything that we could take because the
9   concern over whether -- you know, what you'd
10  be leaving Lehman with without people to
11  manage the inventory and leaving all of that
12  inventory on their balance sheet in markets
13  that were, you know, falling apart.
14      Q.   Was there also discussion that
15  some of Lehman's inventory was worth
16  purchasing at the right price?
17      A.   I don't recall if there was or
18  not.  I mean, that wasn't the instruction.
19  The instruction was in effect if you want the
20  deal to go through you got to try to take
21  everything you can because if you leave too
22  much behind and you leave -- and you leave --
23  and no people to manage it, that will never
24  get approved.
25      Q.   And who did you have that

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2   discussion with about whether all should be
3   left behind or none should be left behind?
4           MR. STERN:  Let me just pause here
5   because I think we're blurring over into
6   privileged conversations but I think you
7   can answer.  You can answer that
8   question and then we'll take it a
9   question at a time.
10      A.   It was our bankruptcy counsel
11  basically.
12      Q.   Your in-house bankruptcy counsel?
13      A.   No, no.  Our outside advisors plus
14  Archie Cox.
15      Q.   Who was your external bankruptcy
16  counsel at that time?
17          MR. STERN:  You can answer that if
18  you remember.
19      A.   I think it's Cleary but I could be
20  wrong.
21      Q.   You were in discussions with
22  Cleary?
23      A.   They were in the room when I --
24  when we came in and suggested that we take
25  nothing.

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2      Q.   Who else was in the room when you
3   came in and suggested --
4      A.   Archie Cox.
5      Q.   And who else from Barclays?
6      A.   That was it.
7      Q.   So it was you, Archie Cox, and
8   someone from Cleary?
9      A.   Two people from Cleary, yeah.
10     Q.   Do you remember who the people
11  were from Cleary?
12     A.   Well, actually, Michael Klein
13  might have been in the room.  I can't say for
14  certain, but he might have been in the room.
15  I can't say -- no, I can't say for certain.
16  You know, I don't know.  It was a woman and a
17  guy.
18     Q.   Lindsay Grandfield?
19     A.   I don't remember the name.
20     Q.   And do you recall when that
21  meeting was?
22     A.   It was about 6:30, 7:00 on Monday
23  night.
24          (Deposition Exhibit 301A, document
25  bearing production numbers

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2   BCI-EX-(S)-00082251, marked for
3   identification as of this date.)
4   BY MR. TAMBE:
5      Q.   Sir, I've handed you a one-page
6   document marked 301A.  Take a moment to look
7   at it and let me know when you're done.
8          (Document review.)
9      A.   Okay.
10     Q.   When you'll see this is an
11  exchange of e-mails between Rich Ricci, Robert
12  LeBlanc, and Patrick Clackson.
13         Do you see that?
14     A.   Yep.
15     Q.   Who is Robert LeBlanc?
16     A.   Rob LeBlanc is head of group risk
17  at Barclays PLC.
18     Q.   And you see there's a reference in
19  the first e-mail at the bottom of the chain to
20  the assets that would be included.
21         Do you see that?
22     A.   Yeah.  "Please could you let me
23  know who I can speak to later today to broadly
24  understand the assets that would be included.
25  Thanks."

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    Q.    And then at the top of the
3    document, Rich Ricci's e-mail states, "Looks
4    like roughly $50 billion."
5        Do you see that?
6    A.    Yep.
7    Q.    Was it your understanding that the
8    assets that would be included in the purchase
9    as of Monday, September 15th, were roughly
10   $50 billion?
11   A.    We were paying -- I don't know how
12   he knows that necessarily, right?  We were
13   paying 45 billion for assets that were under
14   repo at the Fed, right?  So, you know, repo
15   lending basically is secured lending.  And a
16   percentage of the value of the assets is
17   typically advanced, not a hundred cents on the
18   dollar but a percentage.
19       That difference between the
20   advance amount and the asset market value --
21   or mark is probably a better term -- is the
22   haircut or cushion that the financier requires
23   in order to protect themselves in the event
24   they need to liquidate the inventory.
25       MR. STERN:  Can you reread the

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    question, please, Francis.
3        (Record read.)
4    A.    I didn't know what they were.  So
5    that's a better answer.  I didn't know what
6    they were necessarily.
7    Q.    Did you understand the reference
8    in Rich Ricci's e-mail of 50 billion to be the
9    value of the assets to be included in the
10   purchase?
11   A.    No.  What I was actually trying to
12   explain to you was if we were paying 40 -- I
13   don't know what they were exactly, but if we
14   were paying 45 billion to take the Fed out of
15   its repo, plus some haircut on top of that to
16   get to 50 billion, I'm not surprised.  But I
17   don't know for a fact one way or the other
18   what they were.  That's the information we
19   were trying to get from Lehman and couldn't
20   get.
21       (Deposition Exhibit 302A, document
22   bearing production number
23   BCI-EX-00054270 with attached
24   spreadsheet, marked for identification
25   as of this date.)

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    A.    I just noticed that this is
3    actually a Monday e-mail.  So it's 4:03
4    Monday.
5    Q.    Yeah.
6    A.    So this was the first deal, right?
7    And everything I said to you was -- on the
8    repo had to do with Thursday's deal, not
9    Monday's deal.  So that was an error on my
10   part giving you that answer.  I thought this
11   was Thursday's deal.  Okay?  So --
12       MR. STERN:  The "this" you're
13   referring to is Exhibit 301A?
14       THE WITNESS:  Yes.  301A.
15   Q.    So let's go back to now you're
16   focused on the fact that it's Monday's deal.
17   What's the 50 billion that Rich Ricci is
18   talking about?
19   A.    I don't know.  At that point in
20   time I don't know.  Because at that point in
21   time we were still going through -- I mean, we
22   were still going through the assets, and I
23   probably didn't have my conversation with
24   Felder until about 3:00 on Monday.  And as I
25   said earlier, Lehman -- one thing they weren't

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    prepared for certainly was bankruptcy.  So
3    that whole exercise on Monday getting us
4    information, they had a very difficult time.
5    So I have no idea where he got his information
6    of 50 billion from.  But he did know the
7    process we were going to go through at that
8    point in time which was we were going to go
9    through and sift through the inventory and
10   take what we wanted.  It was going to be an
11   asset purchase and so we would take what we
12   wanted and not take what we didn't want.
13   Q.    And in his e-mail, Rich Ricci's
14   e-mail at the top of Exhibit 301, he makes a
15   reference to you and Mahon.
16       Do you see that?
17   A.    Yes.
18   Q.    And he makes a reference to "all
19   good and clean."
20       Do you see that?
21   A.    Yes.
22   Q.    That's a reference that you'd been
23   separating out excluded assets from the assets
24   that you wished to have included; is that
25   right?

Page 82

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2      A.  You got to ask Rich.
 3      Q.  Well, you were looking to identify
 4  the good and clean assets, right?
 5      A.  We were looking to identify assets
 6  that we'd be comfortable purchasing, yes.
 7      Q.  And those would be the good and
 8  the clean ones.
 9          MR. STERN:  Objection to the form.
10      A.  You got to ask Rich.
11      Q.  Well, were you identifying assets
12  that were, you know, of questionable value?
13      A.  My assumption was we were going to
14  take all the assets initially, okay, and that
15  we were supposed to come up with a value that
16  we would take them at, that we felt
17  comfortable taking them at, right?
18          And we knew from the weekend that
19  Lehman's assets weren't -- you know, weren't
20  marked tightly, that they were marked very
21  much on the aggressive side, which isn't
22  surprising since they were struggling
23  financially and potentially going out of
24  business, that they marked things, you know,
25  less than conservatively, right?
```

Page 83

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2  So we knew that going in that we
 3  had to -- we had to get a good mark on them,
 4  or a good reasonable mark on them.
 5          Now, the time frame in which
 6  you're doing this in everything is done kind
 7  of, you know, rough numbers.  It's not -- you
 8  know, we didn't have time to take every CUSIP
 9  and validate a price for each security.  In
10  fact, none of that was done on Monday.  I
11  mean, we took the information that we had
12  developed over the weekend which, you know, on
13  certain inventory that's what we did, we
14  took -- we did the CUSIP pretty much and came
15  up with what we thought the value was and how
16  much we thought we were off.
17          We took that information and kind
18  of overlaid it on what we were actually being
19  asked to take on Monday.
20      Q.  Did you ever give Rich Ricci a
21  list of good and clean assets on Monday, the
22  15th of September?
23      A.  Certainly not by 4:03 p.m., no.
24      Q.  At some point on Monday?
25      A.  Not a list that we called good and
```

Page 84

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2  clean.  We gave him a list of things we
 3  thought they could buy and at a suggested
 4  price.
 5          MR. TAMBE:  Let's just take a
 6  short break.
 7          (Recess taken.)
 8  BY MR. TAMBE:
 9      Q.  So, sir, I've placed before you a
10  document marked Exhibit 302A which is a cover
11  e-mail with a large set of spreadsheets behind
12  it.  I'm not going to quiz you in detail about
13  the spreadsheets but if you could review the
14  cover e-mail and flip through the spreadsheets
15  and I'll ask you some questions.
16          (Document review.)
17      A.  Okay.
18      Q.  Looking at the cover e-mail and
19  the attached schedules, is this part of the
20  effort relating to the transaction we talked
21  about, the Monday transaction, as opposed to
22  the Thursday transaction?
23      A.  Looks like it, yeah.
24      Q.  And it's an e-mail -- the cover
25  e-mail is an e-mail from Stephen King to
```

Page 85

```
 1          M. KEEGAN - HIGHLY CONFIDENTIAL
 2  Archie Cox and you're shown as a c.c.
 3          Do you see that?
 4      A.  Yep.
 5      Q.  And what role did Archie Cox play
 6  in this transaction?
 7      A.  I don't really know actually.  He
 8  was a senior guy.  I mean, he was chairman of
 9  the US.  So -- but did he have a line
10  responsibility in this transaction, you know,
11  I'm not so sure.  I mean, he --
12      Q.  When you think of the group of
13  Barclays business people who were leading the
14  Lehman/Barclays transaction in its various
15  forms who are the people that come to your
16  mind?
17      A.  Rich Ricci.  John Hughes in legal.
18  I guess myself with respect to the inventory.
19  Stephen King.  Jerry.  And Bob Diamond and
20  Archie.  I mean, Archie -- and also Michael
21  Klein.
22      Q.  And of this grouping of people,
23  the folks who were actually negotiating the
24  terms of the transaction, would it be a subset
25  of this group?
```

Page 86

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2    A.   Yeah.  I would say the terms of
3 the transaction were negotiated by, you know,
4 Rich and Jonathan Hughes.  And our counsel.
5    Q.   And what role did Michael Klein
6 play in all this?
7    A.   He was an advisor to Barclays over
8 the weekend principally.
9    Q.   At any time during the September
10 12th on period, did you have any conversations
11 with Michael Klein about the assets to be
12 purchased?
13    A.   From what time period are you
14 talking about?
15    Q.   Starting on the 12th of September
16 onwards.
17    A.   Yeah.  Periodically I had
18 conversations.  You'd have to be more specific
19 with your question what you're asking me.
20    Q.   Do you recall specifically
21 conversations that you had with Mr. Klein
22 about the assets that Barclays was going to
23 purchase from Lehman?
24    A.   The only conversation -- specific
25 conversation that -- substantive conversation

Page 87

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2 that I know -- that I know I had with him was
3 with respect to -- it was on the Friday
4 morning with respect to -- Friday morning, the
5 19th -- with respect to the -- I don't know
6 what you want to call them.  They were called
7 unpledged assets, which was the list of assets
8 that were sitting in Lehman's -- purportedly
9 sitting in Lehman's box that were not pledged
10 against financing principally because they
11 were, you know, some sort of unique security
12 or private security that may be in some cases
13 physical securities that weren't easy to put
14 into repo.  That wasn't easy to finance.
15    Q.   And what was your discussion with
16 Mr. Klein about those unpledged securities?
17    A.   This is on Friday morning and it
18 was again we were asked -- Lehman was trying
19 to come up with additional value to close the
20 gap on the liabilities and to -- and also on
21 the -- to a certain extent on the excluded
22 inventory that we had been delivered that we
23 felt was marked incorrectly.
24      And one -- there was several items
25 that were proposed as potentially having value

Page 88

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2 for Barclays to close that gap and one of them
3 was this list.  And I was asked to look
4 through the list to see if we thought the
5 securities were worth what they were putting
6 on the piece of paper to be worth.  And
7 actually could do very little with respect to
8 the list because it wasn't a book quite this
9 thick (indicating) but it was thick.  Most of
10 it was a lot of zero valued securities which
11 was principally the residuals and junior
12 pieces of their -- of Lehman's asset backed
13 securitization deals they had done through the
14 years that they had held onto or didn't sell.
15      The bulk of the value -- and I
16 forget what the value of this list was -- but
17 the bulk of the value was made up by a handful
18 of municipal securities which we were able to
19 get some comfort on the pricing that was
20 reasonable based on going to Bloomberg.
21      There was another security,
22 Navigator, which was a restructured private
23 equity security that I talked to a guy named
24 Bob Mallard about.  He ran -- he was the
25 person at Lehman that ran -- I had no idea

Page 89

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2 what Navigator was.  I knew it was a
3 hundred -- if I remember correctly it was 144
4 million, so it was a reasonable amount of what
5 the value in this account was.  And, you know,
6 is it worth 144 million, I have no idea.  So
7 they put me in touch with Bob Mallard and I
8 talked to him about it.  And he explained to
9 me what Navigator was.  It didn't give me a
10 whole lot of comfort on the value but at least
11 I knew what it was.  It was a real operating
12 company.
13    Q.   What's your understanding of the
14 value of the unpledged assets?
15    A.   You know, off the top of my head I
16 honestly don't remember.
17    Q.   There's $1.9 million that's
18 referenced in some of the e-mails.  Does that
19 refresh your recollection?
20    A.   Could be.  I don't remember.
21    Q.   You said there were several items
22 proposed to plug the gap.  The unpledged
23 assets was one of those items.  What other
24 items were proposed?
25    A.   There was an FX clearing account

Page 90

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    which it was purportedly up to a billion
3    dollars of good faith deposits in which turned
4    out not to be real.  It may have been real at
5    one point in time but C Corp was the
6    settlement agent for Lehman for FX.  And I
7    know Gerard LaRocco called Citicorp to find
8    out what they thought about the value of that
9    account.  They kind of laughed at him.  They
10   said, Of course that's gone.  They closed out
11   all their accounts and used up -- closing out
12   their contracts.
13           There was some exchange traded
14   futures that I had nothing to do with and
15   don't understand.
16           There was a couple other dead-ends
17   which I don't remember what they are off the
18   top of my head.
19       Q.    Was one of the items 15(c)(3)
20   cash?
21       A.    Might have been.  I don't
22   remember.
23       Q.    Is that a term you're familiar
24   with?
25       A.    Restricted cash?  Yeah, sure.

Page 91

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    Customer cash?
3        Q.    Right.  Customer cash.
4        A.    Yeah.
5        Q.    And are you familiar with the
6    notion of customer cash being one of the items
7    that was proposed to plug the gap here?
8        A.    Not really.  I mean, I don't know
9    how you would plug it with customer cash
10   unless they had deposits -- that Lehman had
11   deposits within the 15 -- their own 15(c)(3)
12   deposits, right?  Which that might be their
13   money.
14       Q.    The exchange traded futures that
15   you referenced, was that -- were those OCC
16   transactions?
17       A.    I believe they were exchange
18   traded futures.
19       Q.    On what exchange?
20       A.    I wasn't involved.  I just know
21   there was a list of five or six items that
22   they proposed.  You know, can you get us some
23   additional value to cover the cost for some
24   liability that we were taking on so...
25       Q.    And you told us the FX clearing

Page 92

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    account, that was an item that in your opinion
3    went nowhere.  There was no value there; is
4    that right?
5        A.    I was actually in Gerard's office
6    when Gerard was on the phone with Citicorp,
7    the clearing agent at Citicorp, and the
8    clearing agent at Citicorp assured him that
9    through the process of liquidating the open FX
10   contracts that Lehman Brothers' various
11   entities had open with Citicorp, that that
12   deposit was fully consumed in that process and
13   that there was no value.
14       Q.    Do you know whether there was any
15   value on the exchange traded futures?
16       A.    I don't know if there was.
17       Q.    And you don't know one way or the
18   other whether there was any additional value
19   or accessible value in the 15(c)(3) accounts?
20       A.    Nope.
21       Q.    At that time have you heard of any
22   excess margin, excess OCC margin that was
23   transferred from Lehman to Barclays?
24       A.    No.  I mean, I just wasn't
25   involved with that aspect of it, right?  I

Page 93

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    don't know anything about futures and exchange
3    traded contracts and clearing and settlement.
4    It wasn't what I was asked to do.
5        Q.    Over the week -- the following
6    weekend, the weekend of the 20th-21st, did you
7    remain involved in aspects of the transaction?
8        A.    Well, I went home Friday so I
9    basically worked Thursday night till 4 in the
10   morning.  Went to the Four Seasons and slept
11   from 4 to 6.  Came back at 6.  And then Rich
12   been to bed at -- you know, 6 to -- he was
13   back by 9 I think.  And then I worked that
14   morning until probably again 2:30, 3:00.  Went
15   home.  Checked in on Saturday morning to try
16   to find out what happened at the court
17   hearing.  Asked if I was needed and was told I
18   wasn't needed.  So I stayed home.  And then I
19   ended up having to get on the phone and spent
20   really pretty much most of the weekend on the
21   phone talking to various Lehman employees that
22   we had hoped were coming to join us but were
23   talking to other firms about not coming and so
24   I talked them out of doing that and coming
25   with us instead.  So that's that I spent the

| | |
|---|---|
| Page 94 | Page 95 |

**Page 94**

1         M. KEEGAN - HIGHLY CONFIDENTIAL
2     weekend doing mostly.
3         Q.   With respect to movement of
4     collateral or valuation of collateral did you
5     have any involvement in that?
6         A.   I didn't do anything in that.
7         Q.   How about the following week, the
8     week of the 22nd, were you involved in any
9     movement of collateral or valuation of
10    collateral that week?
11        A.   No.  Not really.  That was --
12    once -- once the -- you know, we closed on the
13    trade, got possession of what we got
14    possession of, that was -- Stephen was the
15    point person for that.  He was the point
16    person for coordinating with all the other
17    desks and putting the proper value on it and,
18    you know, distributing it out to the desks and
19    hedging it, et cetera.  That was his job.  He
20    kept me informed of what he was doing in the
21    big picture, but I wasn't involved day to day.
22        Q.   Do you have any knowledge of a
23    settlement that was entered into between
24    JPMorgan, Barclays, LBI, Lehman Brothers,
25    Inc., the broker/dealer, in December of 2008?

**Page 95**

1         M. KEEGAN - HIGHLY CONFIDENTIAL
2         A.   I don't know what the terms of the
3     settlement were if you're asking me that.
4         Q.   I'm asking you if you were aware
5     of the fact of the settlement.
6         A.   Yeah.  I believe there was a
7     settlement.  I know that after -- so Lehman --
8     so JPMorgan and -- I believe because they had
9     operational problems were unable to deliver
10    securities to us timely on that night.  Were
11    unable to deliver everything that was in
12    the -- the we thought was in the repo to us.
13    So they delivered -- and they delivered us
14    securities late.  Our clearing agent stayed
15    open as late as they could which was well past
16    what they normally would do.  You know, say, 2
17    in the morning.  And we hadn't received -- we
18    put 45 billion of value out, but by JPMorgan's
19    measurements they hadn't given us 45 billion
20    yet.  And so they posted another 7 billion in
21    cash is what I know.  We got 7 billion in
22    cash.
23         And that -- we did have cash.  And
24    then we went to move the cash later apparently
25    and JPMorgan said you don't have cash.

| | |
|---|---|
| Page 96 | Page 97 |

**Page 96**

1         M. KEEGAN - HIGHLY CONFIDENTIAL
2     obviously there was a dispute about that.
3         Q.   And your understanding is that the
4     settlement was to settle up that dispute.
5         A.   Yeah.
6             MR. STERN:  You marked 302A.  Are
7     we going to use that?
8             MR. TAMBE:  We used it a little
9     bit.  We'll go back and use it some
10    more.
11            MR. STERN:  Okay.  I just want to
12    note for the record that 302A may be a
13    privileged document at least in part.
14    I'm not sure.  I would have to talk to
15    some people about that.  But I just want
16    to reserve my position on that.
17    BY MR. TAMBE:
18        Q.   So I've put before you, sir, a
19    document marked Exhibit 144A.  Take a moment
20    to look at that document and let me know when
21    you're done.
22            (Document review.)
23        A.   Okay.
24        Q.   And you'll see the bottom of the
25    document there's an e-mail from Marty Malloy

**Page 97**

1         M. KEEGAN - HIGHLY CONFIDENTIAL
2     to J. LaRocco and others.
3             Do you see that?
4         A.   Um-hum.
5         Q.   Yes?
6         A.   Yes.
7         Q.   And there's a totalling up of
8     values and cash amounts.
9             Do you see that?
10        A.   Yeah.
11        Q.   There's a line item in that e-mail
12    that says Excess Collateral, 7.19.
13            Do you see that?
14        A.   7.19.  Yeah.  I see that.  Okay.
15    I see it.
16        Q.   You don't know what that means?
17        A.   No, I don't know what it means off
18    the top of my head.
19        Q.   And further up there's a
20    line that says Repo Cash Settlement 7.00.
21            Do you see that?
22        A.   Sorry.  I may be looking at the
23    wrong line on your last question because the
24    1.7 was on the same line as the repo cash of 7
25    billion.  So is that correct?  Is that the 1.7

Page 98

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  you were referring to?
3      Q.    No.  I was asking you to look at
4  the line that says Excess Collateral.
5      A.    Oh, sorry.  Sorry, sorry, sorry,
6  sorry, sorry.  Okay.  I answered the
7  question -- I did answer the question
8  incorrectly because I was looking at the 1.7
9  trying to figure out what that is.
10     Q.    So let's go to the line that says
11  Excess Collateral, 7.19.
12     A.    Sorry.  I didn't understand your
13  question properly.
14     Q.    Do you have any understanding of
15  what that means?
16     A.    Yeah.  I do have an understanding
17  of what that means.  This BoNY -- I think I
18  testified earlier that we were trying to find
19  out how much value we received from the repo
20  from Lehman Brothers, JPMorgan, and they
21  couldn't tell us.  Okay?  BoNY, because it
22  passed through their clearance systems, has a
23  rough estimate of what they believe that
24  number is to be, okay?  And gave -- and that's
25  their -- the total securities in cash received

Page 99

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  is the sum of their rough estimates, right?
3      Plus the 7 billion in cash that's posted in
4  the repo plus another small DTC cash item to
5  come to I guess $52.19 billion of value.
6      And then I assume the 45 billion
7  is a repo cash that -- the cash we sent out to
8  JPMorgan.  And so what is referred to as
9  excess collateral is the -- probably a better
10  term.  And that is the haircut differential if
11  you believe BoNY's values.
12     Q.    Who's Marty Malloy?
13     A.    Marty was a prime brokerage
14  employee.  A security borrow lending.  I'm not
15  sure -- because it was repo I guess he was
16  involved.
17     Q.    After his name on that e-mail
18  address Marty Malloy it says CFG MGMT.  Does
19  that phrase have any management to you?
20     A.    CFG management.  Collateral
21  something -- yeah.  Collateral from the
22  finance group.  I have no idea.  I don't know
23  what it means.  I don't know definitively.
24     Q.    Okay.  If you go back to
25  Exhibit 302A there are a series of numbered

Page 100

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  items.
3      Do you see that?
4      A.    Yep.
5      Q.    And the first numbered item ends
6  with a question.  "Can securities be sold by
7  LBI without approval at a discount to current
8  mark?"
9      Do you see that?
10     A.    Um-hum.
11     Q.    Yes?
12     A.    Yeah, I see it.
13     Q.    Do you know what that means?
14     A.    Not definitively, no.
15     Q.    Was it your understanding that LBI
16  was selling securities to Barclays at a
17  discount to the current mark?
18     A.    This is Wednesday so this was the
19  Monday night transaction.  We did go through
20  and identify haircuts is the term I would use
21  as opposed to discounts.  But we applied to
22  the various security line items to account for
23  the fact that we were buying inventory in
24  bulk, to account for the fact that we were not
25  being able to close on the inventory until

Page 101

M. KEEGAN - HIGHLY CONFIDENTIAL

1
2  Friday at the earliest, to account for the
3  fact that the markets were melting down, and
4  that we didn't have certainty of the valuation
5  that Lehman -- we knew that Lehman had been
6  aggressive with their valuations and we didn't
7  have, you know, clear certainty with respect
8  to what the value of all the securities were.
9  So there were, you know, haircuts applied to
10  the inventory.
11     Q.    Sir, I'm showing you a document
12  that's previously been marked as Exhibit 19.
13  Have you seen this document before today?
14     A.    Again, only in prep for this
15  deposition.
16     Q.    Okay.  Is it fair to say that
17  you -- well, do you understand the information
18  that's contained in this document?
19     MR. STERN:  Objection to the form.
20     A.    I understand what I've been told I
21  guess.
22     Q.    By counsel?
23     A.    By counsel, yeah.
24     Q.    Okay.  And putting aside anything
25  you were told by counsel, do you have any

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2 billion of cash out in the market because
3 markets were so skitterish and so concerned
4 about, you know, banks failing that we felt
5 that people might -- if they found that we had
6 a 7 billion hole, a potential hole in our
7 balance sheet, people might pull their
8 financial support.  I believe that was the
9 reason.
10      So to get the settlement we agreed
11 to forgive the lawsuit.  Drop the lawsuit.
12    **Q.   When did Barclays first now it had**
13 **a $7 billion hole?**
14    A.   I have no idea.  It was -- I mean,
15 we didn't we had a hole at all because the
16 cash was put in the account but when they went
17 to remove it which was, you know, days later
18 JPMorgan said the cash isn't there so...
19    **Q.   In some of your prior testimony**
20 **you stated that some of the collateral that**
21 **was delivered --**
22    A.   I'm sorry.  I missed the beginning
23 of your question.
24    **Q.   Yeah.  In some of your prior**
25 **testimony you had stated that some of the**

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2 **collateral that was delivered on Thursday**
3 **night included securities that Barclays did**
4 **not wish to purchase, correct?**
5    A.   Um-hum.  Yes.
6    **Q.   Did Barclays return that**
7 **collateral?**
8    A.   No, we didn't return the
9 collateral.  I testified that I went to Ian
10 Lowitt and said, "Ian, you got to take this
11 back and swap us into the collateral we
12 bought."
13    And he said, "That's impossible."
14    I should say the collateral we
15 agreed to buy on Monday night.  So collateral
16 not on the excluded list.
17    And he said, "That's impossible
18 because our counterparties had been grabbing
19 -- our repo counterparties have been grabbing
20 collateral and liquidating it and buying us
21 in" is the term "on our repo and we don't have
22 it anymore.  So this is what you got."
23    **Q.   So Barclays kept the collateral**
24 **that had been transferred over Thursday night**
25 **and you had additional collateral then**

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2 **transferred to you on Friday, the items that**
3 **we were talking about to fill the gap.**
4    MR. STERN:  Objection to the form.
5    A.   We had the repo collateral from
6 the Fed that JPMorgan delivered to us.  We had
7 the deposit from JPMorgan.  And, to my
8 knowledge, we had the additional thing that I
9 knew at the time that we had was the -- or
10 should have had was the unpledged box.  That's
11 what I knew we were supposed to have.
12    The only thing I'd say is that
13 that may not be the only thing that we were
14 supposed to have.  There were pieces of the
15 transaction that I -- you referred to them
16 earlier, the 15(c)(3).  I have no idea whether
17 they were supposed to have it or didn't have
18 it.  I don't know.  And the exchange traded
19 derivative contracts were one of the things
20 that were proposed by Lehman for us to have.
21 But I wasn't looking at it.  And I didn't
22 follow up with it.  That was decided for us to
23 have it or not have it.  I don't know.
24    (Deposition Exhibit 305A, document
25 bearing production number

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2 BCI-EX-(S)-00036496, marked for
3 identification as of this date.)
4 BY MR. TAMBE:
5    **Q.   Sir, I've handed you a one-page**
6 **document marked 305A.  Would you take a moment**
7 **and look at it and let me know when you're**
8 **done.**
9    **(Document review.)**
10    A.   Okay.  I read it.  I don't quite
11 understand it right now.
12    **Q.   You're anticipating my question.**
13    A.   No, I'm not anticipating your
14 question.  I just don't -- I'm anticipating
15 you're going to ask me what it means and I'm
16 struggling to remember at the time.
17    **Q.   But you see this is an e-mail**
18 **exchange between Jasen Yang, Stephen King, and**
19 **yourself.**
20    A.   Yeah.
21    **Q.   And it has to do with valuation of**
22 **Fed collateral.**
23    Do you see that?
24    A.   Yeah.
25    **Q.   Having read this e-mail can you**

Page 110

M. KEEGAN - HIGHLY CONFIDENTIAL

1    explain what this -- the issue that's being
2    discussed in this e-mail?
3         A.   Well, my interpretation of it, and
4    I don't know whether it's an accurate
5    interpretation, 18.6 billion of lost Fed
6    collateral, right, so that's collateral that
7    we expected to get from the Fed that was
8    supposedly in the Fed box that JPMorgan was
9    supposed to deliver and didn't deliver, right?
10        He's saying it was about --
11   1.1 billion wasn't able to get prices for.
12   They're mainly structured notes, large
13   potential discount, Yankee bonds, unlikely to
14   have a large discount.  When I couldn't get
15   the Barclays price I used the custodian price.
16        So I guess reading that again I
17   don't know what he means by lost Fed
18   collateral.  Whether it's 18.6 of collateral
19   that we got that we didn't anticipate getting
20   or whether it was 18.6 that we were supposed
21   to get and didn't get.  I just don't recall
22   right now.
23        Q.   Going to your e-mail at the top of
24   the page you say if I read this right, "There

Page 111

M. KEEGAN - HIGHLY CONFIDENTIAL

1    is a $1.9 billion difference."
2         A.   Yeah, that's what I'm trying to
3    figure --
4         Q.   Any idea what that means?
5         A.   I don't know what -- I'm trying --
6    I'm trying to figure that out right now.  I'm
7    trying to remember what that means.  What that
8    was referring to.  I just don't remember right
9    now off the top of my head.
10        Q.   And in the next line you have a
11   reference to 20 -- a swing of 28 billion gross
12   inventory differences.  What does that mean?
13        A.   (Reading document.)
14        Q.   What does that mean?
15        A.   That's the one I'm trying to --
16   I'm stumped on.  I know it's my own e-mail.
17   I'm stumped right now.
18        Q.   Did you play any role -- you can
19   put the document aside, yeah.  We're done with
20   the document.
21        A.   Sorry.
22        Q.   Did you play any role in the fall
23   of 2008 or early 2009 in helping Barclays'
24   auditors account for the acquisition of the

Page 112

M. KEEGAN - HIGHLY CONFIDENTIAL

1    Lehman assets?
2         A.   No.
3         Q.   All right.  Let's just take a
4    short break.
5         A.   The auditor -- by the way, the
6    auditor you're referring to is PriceWaterhouse
7    I assume?
8         Q.   I assume it's PriceWaterhouse.  I
9    don't know who all the auditors might be for
10   Barclays.
11        MR. STERN:  I'm sure it's
12   PriceWaterhouse.
13        A.   Okay.  But you're -- the external
14   auditors.
15        Q.   The external auditors.
16        A.   No.  The answer to that is no.
17        Q.   Let me ask the follow-up question.
18   Have you worked with any internal auditors at
19   Barclays?
20        A.   None.  Zero.  But I was just
21   curious.
22        (Recess taken.)
23   BY MR. TAMBE:
24        Q.   Mr. Keegan, are you aware of any

Page 113

M. KEEGAN - HIGHLY CONFIDENTIAL

1    sales of assets that were purchased by
2    Barclays from Lehman?
3         A.   You mean liquidation of the
4    inventory?
5         Q.   Liquidation of the, yeah,
6    collateral that was transferred over.
7         A.   I know we did liquidate a lot of
8    it, yeah.  Not all of it but...
9         Q.   And do you know generally the
10   values at which you liquidated it?
11        A.   No.  I don't know.
12        Q.   And was any of the collateral
13   liquidated by you or was this just something
14   you heard about it?
15        A.   No.  I didn't liquidate any of the
16   collateral.
17        Q.   And how do you know that you did
18   liquidate a lot of it?
19        A.   Because that was -- you know, that
20   was the goal.  The goal was that we weren't --
21   owning assets during this time period was not
22   a good thing.  So you're trying to hedge it
23   and get your risk down.
24        Q.   Are you generally familiar with

Page 114

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2  the gain on the acquisition that was reported
3  by Barclays?
4      A.  I'm familiar that we reported a
5  gain in our financial statements, yeah.
6      Q.  And are you familiar with the
7  reasons for the gain?
8      A.  Only, again, in preparation for
9  the deposition.  So generally no.
10     Q.  All right.  I --
11     A.  I don't believe any of it came
12 from securities.
13     Q.  You don't believe any of it came
14 from securities?
15     A.  I have no knowledge where it came
16 from but I don't know why it would come
17 from -- I don't know why.  Under the
18 circumstances of what happened -- what was
19 happening and what happened subsequently in
20 market values, that we would have been booking
21 gains from the liquidation of the inventory if
22 that's what you're asking.
23         You know, I mean, I know there's
24 one bond, for instance, that we got that was
25 on the excluded list that we don't want --

Page 115

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2  didn't want.  We got it.  It was Pine.  It was
3  one of the structured transactions that Lehman
4  did that took their revolve -- it was for the
5  financing of their revolvers for their
6  commitments that they gave out to corporate
7  companies.
8          They securitized them so they
9  could finance them with the Fed.  And it was
10 like the Racers which you referred to earlier.
11 It was a billion dollar security.  It had a
12 billion dollar mark on it.  We valued it at
13 like $600 million in our valuation over the
14 weekend.  We ended up with that.  And, you
15 know, we backed it up with all the loans which
16 we didn't want.
17         So the estate's been trying to buy
18 it from us ever since and they're offering us
19 like 650 for it or 600.  I think that's going
20 to be the best offer is the 600.  Now, we got
21 that at a billion minus, maybe, you know, a
22 regular corporate haircut of 5 percent.
23         So that was -- you know, that was
24 one example of a security that we still
25 haven't liquidated that we still hold onto

Page 116

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2  that was on the excluded list initially.  And
3  unfortunately under the circumstances we ended
4  up with it.  And they're kind of validating
5  our price.  And your estate is kind of
6  validating our price -- your client is
7  validating our price by offering us 650 for
8  it.
9      Q.  Putting aside Pine are you aware
10 of the circumstances of any other securities
11 that were transferred over?  Whether it was
12 sold or whether they're being held.
13         MR. STERN:  Objection to the form.
14 I'm not sure what the question is.
15     Q.  Do you understand the question?
16     A.  No, I don't.  I really don't.  I
17 don't know what you're after.
18     Q.  You described in detail the
19 details of Pine and the valuation of Pine.
20 Putting Pine aside, are you aware of the
21 circumstances, the specifics of any other
22 securities that were transferred over, whether
23 they're being held, whether they're being
24 liquidated, whether there have been offers for
25 the purchase of those securities?

Page 117

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2      A.  So the process was securities
3  which were liquid, okay, were -- well, all
4  securities were hedged, you know, to the
5  extent we could hedge them immediately.  And
6  then the hedges and the securities for stuff
7  that was liquid, and we liquidated the market,
8  were passed back to the various trading desks
9  to be liquidated, to be sold, as ordinary
10 course of business.
11         The stuff that was unusual or
12 illiquid and all of the ABS securities stayed
13 with Stephen and Stephen liquidated them over
14 time.  But that's just ordinary business.  I'm
15 not aware -- you know, I'm not aware of any
16 extraordinary gains or necessarily met
17 extraordinary losses that we had coming into
18 that so...
19         MR. TAMBE:  No further questions.
20 Thanks.
21         MR. STERN:  Okay.  So the
22 trustee's lawyer will move over here and
23 ask his questions.
24         THE WITNESS:  Okay.
25              * * *

Page 122

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    cetera, right?  Because they had a huge -- I
3    don't know what was reported, 25 billion or
4    something like that, secured exposure to
5    Lehman.  That they would ultimately liquidate
6    that exposure and you'd see those securities
7    in the marketplace and then we might be a
8    natural buyer for something like the B note
9    for Pine since we owned the A note already.
10   But we never saw the paper come out.
11        Q.   I'm sorry.  What was the last --
12        A.   We never saw the paper come out
13   so...
14            (Deposition Exhibit 307A, document
15        bearing production numbers
16        BCI-EX-00053873 through BCI-EX-00054261,
17        marked for identification as of this
18        date.)
19   BY MR. WOOD:
20        Q.   I've handed you what's been marked
21   as Exhibit 307A.  As you'll see it's an e-mail
22   chain with a pretty hefty attachment.  Feel
23   free to look at the attachment if you'd like
24   but I'm really just going to ask you some
25   questions about the e-mails themselves.

Page 123

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        A.   Okay.
3            MR. STERN:  So, Mike, you may want
4    to read through the e-mails and then
5    just glance at the attachments.
6            THE WITNESS:  Yeah, no.  That's
7    fine.  I just want to see what this is
8    to see if I understand it.
9            MR. WOOD:  And just so the record
10   is, clear this, is an e-mail and the
11   first page is BCI Exhibit 00053873.
12           MR. STERN:  Well, it's Bates
13   number BCI-EX-0053873 through -- the
14   numbers appear to be cut off on this
15   copy.  So, Mike, just let us know after
16   you've had time to review this.
17           THE WITNESS:  Okay.  The problem
18   is there's two bids floating around.
19   I'm trying to figure out which one this
20   is.
21           (Document review.)
22        A.   Okay.
23        Q.   If you look on page 2 of the
24   e-mail, so the earliest e-mail
25   chronologically, it's an e-mail from Jasen

Page 124

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    Yang, Monday, September 22nd.  The subject is
3    Financing Facilitate Schedule.  He writes,
4    "Robert, James, I've attached the schedule
5    produced by Barclays ops of the collateral
6    currently held at BoNY under the repo
7    financing provided to Lehman (with a total
8    BoNY market value of approximately 45
9    million).  It appears to differ substantially
10   from the file received from Lehman on Friday
11   evening.  We're looking at the differences
12   now."
13           Just one first point of
14   clarification.  That 45 million, do you think
15   that's accurate or is that supposed to be 45
16   billion?
17           MR. STERN:  Objection to the form.
18        A.   Total BoNY market value 45
19   billion.  I would -- I'm speculating but I
20   think it's probably billion he's probably
21   referring to.  I said there were several
22   different versions of BoNY collateral value
23   list put in front of us.  There was a 47 list,
24   there was a 45 list, there was a 52 list.
25        Q.   And when you're referring to --

Page 125

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    I'm sorry.
3        A.   There was another e-mail I was
4    presented earlier which is Exhibit --
5            MR. STERN:  144A.
6        A.   144A, right?
7            So it says Total securities and
8    cash received 52.19, right?  That
9    theoretically is BoNY's valuation in effect of
10   the cumulative assets of what we got.  It's
11   one of many evaluations they had.  They had a
12   45 one.  There was a 47 one floating around.
13   So, you know, at the end of the day what I was
14   trying to get a handle on was how much value
15   did we actually receive to do the repo.  The
16   Fed repo.  And we couldn't get it from Lehman.
17   And we couldn't get it from JPMorgan.  We
18   tried to get it from BoNY but BoNY just kept
19   giving us different numbers.  So I think
20   that's what he's referring to.
21        Q.   And then if you look at the first
22   page of the e-mail string, the second e-mail
23   down from Robert Azerad dated Monday,
24   September 22nd and, again, it looks like you
25   are not on this but it was forwarded to you.

## Page 130

M. KEEGAN - HIGHLY CONFIDENTIAL

A.   Off the top of my head I don't remember specifically.  I do know -- I think I know what she's talking about.  But I don't know what the security actually is.  But it's another one of the -- it's another one of the Lehman structured finance trades where they basically were taking their loan books, turning it into AAA securities so they could post it with the Fed and get the funding.

Q.   And so is that what you understand the $1.1 with JPM to refer to at the beginning of the e-mail?

A.   That JPM is holding 1.1 billion of SAS and we got 80 million of it delivered to us.

Q.   Okay.  I don't have anything further on that document.

Mr. Keegan, were you involved in any way in the creation of any schedules -- actually, strike that.

Were you involved in any discussions with Lehman Brothers employees regarding any schedules of unencumbered clearing box assets at DTC?

## Page 131

M. KEEGAN - HIGHLY CONFIDENTIAL

A.   Yeah.  I referred to it several times as the unpledged asset schedule.  Yeah.

Q.   And what was your involvement in that?

A.   Friday morning, the 19th, I was called into Rich's office --

Q.   And that's Rich Ricci?

A.   Rich Ricci.  Who was working out of the Lehman office.

And I was presented this schedule. I think it was Paolo Tonucci may have provided it to Rich and Paolo may have been in the room at the time.  It was Paolo or anybody else. It was definitely a Lehman employee.  And they said that this was the schedule of unencumbered assets that they could provide us, they could get -- you know, incorporate in the deal and give to us if we wanted it for the values they were indicated.

So I was asked by Rich to take a quick look at the values and try to substantiate the values and determine whether we thought this was something we thought had value or not and whether we would be willing

## Page 132

M. KEEGAN - HIGHLY CONFIDENTIAL

to take it as part of the deal, payment as part of the deal.

Q.   And what did you conclude?

A.   That it did have value and we should take it.

Q.   And just to be clear, unencumbered box -- I'm sorry.  The unencumbered assets you were referring to were at DTC?

A.   I don't remember if they D -- I don't remember if they were DTC or whose assets they were.  I couldn't tell you they were all DTC because I believe some of them were at JPMorgan, in fact.

I mean, I've been led to believe that the Navigator stock which to my knowledge to this day we still haven't gotten is sitting in safekeeping at JPMorgan.  I have no idea if that's a fact or not.

Q.   Do you recall whether you came up with a number for the valuation of these unencumbered assets?

A.   No.  It was kind of take it for what's on the piece of paper or don't take it. Because most of the value was in like five or

## Page 133

M. KEEGAN - HIGHLY CONFIDENTIAL

six, maybe eight max, muni securities.  I believe these were munies.  And then Navigator.  And on the muni securities we were able to go to Bloomberg and actually get a price but that for all -- you know, for all intents and purposes that was Lehman's price. So I have no idea if that was a good price or not.

But we weren't able to do much more than that with that list.  And we had Navigator and, you know, the bottom line I guess is you weren't getting anything else. There wasn't anything else to give us.  So we could take it or not take it.

Q.   Do you recall any other assets besides the munies and the Navigator?

A.   What was on that list, the list was yea thick (indicating).  This might be the list for all I know.

MR. STERN:  Yea thick is how thick?

THE WITNESS:  An inch.  Inch and a half.

A.   Most of that list was comprised of

Page 138

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2  in the marketplace, and they do that
3  mathematical extension, that is one of the
4  several numbers that they came up with.  Okay?
5  They came up with a 45 billion number.
6  There's another e-mail that talks about they
7  came up with a $47 billion number.  Another
8  e-mail talks about -- this is all in the
9  course of like, you know, six hours.
10        So, you know, I wouldn't say it's
11  a -- we didn't put a whole lot of stock in it,
12  right?  So...
13        Q.   And earlier you testified that if
14  you could believe Bank of New York's value.
15  Is that what you meant by if you could believe
16  their value?
17        A.   Yeah.  If you could believe their
18  value we would have 50 -- we would have 7
19  billion of haircut.
20        Q.   And aside from what you just
21  testified about the values shifting up and
22  down, did you have any other reason not to
23  believe Bank of New York's value?
24        A.   Yeah.  Absolutely.
25        MR. STERN:  Objection.  Wait,

Page 139

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2  wait, wait, wait.  Objection to the
3  form.
4        Can you repeat the question,
5  please, Francis?
6        (Record read.)
7        A.   The only reason that -- the only
8  thing that they would be -- would competently
9  value, okay, were things like exchange traded
10  equities that were very liquid.  Liquid
11  corporate debt.  Treasuries.  They'd probably
12  put a pretty good price on that stuff.
13        Any kind of structured paper,
14  asset-backed paper, all that stuff, they've
15  never seen it before.  They haven't been
16  provided prices.  They'd have no clue what
17  that really -- what that paper should really
18  be valued at.  Lehman didn't have it valued
19  right.
20        Q.   Where would you go to get values
21  for that paper?
22        MR. STERN:  Objection to the form.
23  Can I hear that again?
24        (Record read.)
25        A.   You would go to Bloomberg and

Page 140

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2  you'd find out what it was.  If you didn't
3  what the security was you'd get the
4  prospectus, you'd take a look at it.  You'd
5  see what the security was.  You'd get the cash
6  remittance reports if it's an ABS security.
7  You'd look at what -- at how the security's
8  actually performing.  You'd put a projection
9  of what you think cash flow is going to be out
10  of the securities and you'd value that from
11  those cash flows.  That's how you come up with
12  a value.
13        Q.   Did you personally value any of
14  the securities transferred in the sale
15  transaction?
16        A.   No.  I didn't value any of the
17  securities.
18        Q.   Anyone from your team do the
19  valuations?
20        A.   Stephen King.  When you talk to
21  him about that information if you talk to him
22  he would have much -- give you much better
23  information on that than I could give you on
24  that.
25        MR. DAKIS:  Nothing further.

Page 141

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2        MR. STERN:  We'll just take a
3  break.  I may have some questions.
4  Let's go off the record.
5        (Recess taken.)
6  EXAMINATION BY
7  MR. STERN:
8        Q.   Let's go back on the record.
9        Mr. Keegan, from your perspective
10  what was the purpose of the haircut in the
11  reverse repo that was the basis of the Fed
12  replacement transaction?
13        MR. TAMBE:  Objection to the form.
14  Lack of foundation.
15        Q.   Go ahead.
16        A.   So the repo -- the Fed was
17  providing financing to Lehman Brothers.  It
18  was ordinary course repo.  And they provided
19  haircuts that -- a repo provider takes
20  haircuts because I'm giving you cash and I'm
21  getting back a security.  That security is
22  subject to market movements.  It's subject to
23  liquidity risk.  And if you have to liquidate
24  it it will take a while to liquidate it.  And
25  that haircut is supposed to be the cushion

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  that's provided to the financier so that he
3  has a reasonable probability to recover the
4  amount of his loan from the security if the
5  counterparty defaults and can't pay it back.
6      Q.   And is that the way it's supposed
7  to work in a normal market?
8      A.   Well, yeah.  That's the way in the
9  normal market it works.  But the Fed couldn't
10  have anticipated Lehman's bankruptcy either.
11  I doubt they anticipated Lehman's bankruptcy,
12  you know, weeks ahead of time.  So the
13  haircuts that they were using were traditional
14  haircuts that would be in the normal market
15  and a market that is deteriorating rapidly as
16  the market did after Lehman Brothers'
17  bankruptcy, you know, those haircuts wouldn't
18  necessarily be sufficient to protect you
19  against market movements during the period of
20  time it would take you from the time you took
21  the possession of the collateral to liquidate
22  it.
23      Q.   Now, let's turn to the period you
24  testified to from late on Thursday, September
25  18th going into Friday, September 19th.

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2      Do you have that time frame in
3  mind?
4      A.   Okay.
5      Q.   In that time frame why from your
6  perspective did Barclays need an additional
7  value cushion beyond the repo haircut?
8      A.   I mean, the first reason why we
9  were being delivered securities that, based on
10  the prior work that we did over the weekend,
11  the prior weekend, based on the fact that we
12  didn't come to an agreement with Lehman on --
13  on adjusting the value of the securities and
14  we were getting those securities, that the
15  haircut that we were getting -- that those
16  securities that we were getting were
17  overvalued and therefore they were in effect
18  being used -- they were burning up the
19  haircut, they were using it up, and that
20  needed to be replaced.
21      Q.   Did anybody ask you if there was
22  any excess available through the repo?
23      A.   Yeah, we were asked --
24      MR. TAMBE:  Objection to the form
25  of the question.

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2      A.   Yeah, I was asked by I believe
3  Rich Ricci how much did we think we might have
4  in terms of "excess value" to pay for certain
5  liabilities that Barclays was absorbing in the
6  transaction.  And, you know, I thought the
7  question was -- the question was naive under
8  the circumstances.
9      And, you know, again, we couldn't
10  tell exactly what we had and didn't have at
11  that point in time.  And we knew that what we
12  did have, while it was done on haircuts that
13  were -- you know, if it were a normal market
14  and they were done at haircuts that assumed
15  the securities were valued properly.  I mean,
16  if they weren't valued properly, and some of
17  them were weren't valued properly, then they
18  were overvalued.  And, therefore, the haircut
19  wasn't adequate to protect us against the risk
20  that was inherent in Lehman Brothers were
21  taking itself, never mind to have excess to
22  pay for liabilities.
23      Q.   Turning back to Exhibit 144A and
24  looking at the figures that are listed on this
25  document, from your perspective were any of

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  the figures listed here reliable?
3      MR. TAMBE:  Objection to the form
4  of the question.
5      A.   The repo cash amount was the cash
6  that we sent out to JPMorgan so that's a good
7  number.
8      Q.   And what is that number?
9      A.   45 billion.
10      We thought the repo cash amount on
11  the deposit that was at JPMorgan, the 7
12  billion was a good number as well, but that
13  was ultimately taken back by JPMorgan.
14      Q.   What about the rest of the
15  figures?
16      A.   There'd be aspects of BoNY's
17  valuations that would be okay, but there would
18  be significant portions of it that weren't
19  which kind of takes the whole -- you know,
20  renders the whole number not reliable so...
21      Q.   Going back to the Monday,
22  September 15th, discussions between you and
23  people at Lehman concerning haircuts and
24  valuation adjustments on certain securities,
25  were there any disagreements between you and

Page 146

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  the people at Lehman?
3      A.   This is Monday.
4      Q.   This is on Monday the 15th.
5      A.   Yeah.  There was -- there was a
6  number of disagreements, right?  That's in
7  part the context of the exclude list.  We
8  couldn't come to an agreement on -- we
9  disagreed with their values.  We couldn't come
10  to an agreement on their values.  So we just
11  said, Fine, you know, you own it, you know,
12  keep it.  We won't take it so...
13      MR. STERN:  I have no further
14  questions.
15      MR. TAMBE:  Just a couple of
16  follow-up questions.
17      * * *
18  EXAMINATION BY
19  MR. TAMBE:
20  DI   Q.   When you took the break before
21  your own lawyer began questioning you did you
22  discuss the content of your testimony with
23  your lawyer?
24      MR. STERN:  I'm going to object
25  and I'm going to instruct you not to

Page 147

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  answer.
3  DI   Q.   Did you discuss the questions that
4  Mr. Stern was going to ask when you came back
5  from the break?
6      MR. STERN:  I'm going to instruct
7  you not to answer.
8  DI   Q.   And did you discuss with Mr. Stern
9  the answers that you were going to give in
10  response to those questions?
11      MR. STERN:  Again, I'll instruct
12  you not to answer.
13      Q.   On the Fed repo that you testified
14  about in response to Mr. Stern's questions, do
15  you know what the size of the Fed financing to
16  Lehman was the week prior to the week in
17  question?  So the week that began on the 8th
18  of September?
19      A.   No, I don't.
20      Q.   And do you know what the haircut
21  schedule was that was charged by the Fed
22  during that week?
23      A.   Precisely, no, I don't.  If you're
24  asking about the adjustment that week, I don't
25  know.

Page 148

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      Q.   Do you know of any adjustments in
3  the haircut schedule proposed by the Fed
4  either on Friday, September 12th, or Monday,
5  September 15th?
6      A.   No.
7      MR. TAMBE:  No further questions.
8      MR. STERN:  I think we're done.
9  Off the record.
10      (Time Noted:   12:39 p.m.)
11
12
13
14
15
16
17
18
19    _____
20    MIKE KEEGAN
21
22  Subscribed and sworn to before me
23  this ___ day of _____, 2009.
24
25  _____

Page 149

1
2    C E R T I F I C A T E
3  STATE OF NEW YORK   )
4           : ss.
5  COUNTY OF NEW YORK  )
6      I, FRANCIS X. FREDERICK, a Notary
7  Public within and for the State of New
8  York, do hereby certify:
9      That MIKE KEEGAN, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 28th day of
21  August, 2009.
22
23    _____
24    FRANCIS X. FREDERICK
25

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------x
    In Re:                        Chapter 11
5   LEHMAN BROTHERS               Case No. 08-13555 (JMP)
    HOLDINGS, INC., et al.,       (Jointly Administered)
6   ------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9      VIDEOTAPED DEPOSITION OF ANDREW KELLER

10            New York, New York

11          Friday, January 8, 2010

12

13

14

15

16

17

18

19

20  Reported by:

    FRANCIS X. FREDERICK, CSR, RPR, RMR

21  JOB NO. 27031

22

23

24

25

1      A. KELLER - HIGHLY CONFIDENTIAL
2  Emmanuel on behalf of the Official
3  Creditors Committee.
4      MS. LEE:  Shinzong Lee, Simpson
5  Thacher.
6      MR. ROTHMAN:  Seth Rothman from
7  Hughes Hubbard & Reed for the SIPA
8  Trustee.
9      THE VIDEOGRAPHER:  Will the court
10  reporter please swear in the witness.
11          * * *
12  A N D R E W   K E L L E R,  called as a
13  witness, having been duly sworn by a
14  Notary Public, was examined and
15  testified as follows:
16  EXAMINATION BY
17  MR. THOMAS:
18      Q.  Good morning, Mr. Keller.  Could
19  you please state your full name.
20      A.  Andrew Keller.
21      Q.  And have you been deposed before?
22      A.  No.
23      Q.  Are you familiar with how this
24  process works generally in terms of I'll be
25  asking questions and the court reporter will

TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2  be taking down the questions and the answers
3  and so forth?
4      A.  Yes.
5      Q.  And if at any time you're not sure
6  of the question or what I'm trying to ask,
7  please feel free to ask me to rephrase it.
8  I'll be happy to try to do that.
9      A.  Sure.
10      Q.  Thanks.  Can you tell me how long
11  you've been with Simpson Thacher?
12      A.  I started in 1983.
13      Q.  And what is your area of practice?
14      A.  Corporate finance.
15      Q.  And within corporate finance do
16  you have any particular specialty or area of
17  practice?
18      A.  I do a combination of advising
19  clients such as Lehman in their disclosure
20  documentation.  And then also do a number of
21  securities offerings and had done a number of
22  securities offerings as underwriter's counsel
23  for Lehman and various others of our investing
24  banking clients.
25      Q.  Have you been involved in any

TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2  mergers and acquisitions?
3      A.  Only tangentially.  M&A is not my
4  area of practice.
5      Q.  And when there's mergers and
6  acquisitions and you tangentially become
7  involved, why do you get involved with those?
8      A.  Actually, I could only, within at
9  least the recent past, remember this
10  particular transaction to the extent that we
11  classify it as M&A as something that I got
12  involved in.  Otherwise, it would just be
13  diligencing an M&A transaction in connection
14  with a securities offering.  Or if you did a
15  securities offering that was financing for an
16  acquisition.  Just to understand the
17  transaction.
18      Q.  And can you describe just
19  generally Simpson's kind of history with
20  working with or for Lehman Brothers?
21      A.  I don't know exactly when it
22  started but it's been a long relationship with
23  the investment bank.
24      Q.  Going back many years?
25      A.  Yes.  Long before -- it started

TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2  long before I started at the firm.  And,
3  again, typically as underwriter's counsel for
4  Lehman offerings and corporate counsel for the
5  company.
6      Q.  So Simpson has done a lot of work
7  for Lehman over the years.
8      A.  Yes.
9      Q.  When did you first become involved
10  in any way in a possible transaction between
11  Lehman and Barclays?
12      A.  That probably would have been the
13  Thursday before what unfortunately turned out
14  to be the bankruptcy filing when we got the
15  call to help with the potential sale of the
16  company.
17      Q.  September 11th, 2008?
18      A.  Yes.
19      Q.  And what was your individual
20  personal involvement -- role with that
21  process?
22      A.  I think Lehman called us to -- at
23  that point Lehman called and said that they
24  were talking to two potential buyers, Bank of
25  America and Barclays.  And Sullivan & Cromwell

TSG Reporting - Worldwide    877-702-9580

Page 10

1      A. KELLER - HIGHLY CONFIDENTIAL
2  had been helping Lehman over the past couple
3  of months also.  And the way Lehman was going
4  to split the work was that although everybody
5  would be involved in helping -- in helping
6  Lehman, Sullivan & Cromwell would take the
7  principal responsibility for the BofA --
8  potential BofA transaction and we would do the
9  documentation for the potential sale to
10  Barclays.
11        Q.   And when you say documentation you
12  also mean the legal advice concerning the
13  transaction, too, right?
14        A.   Yes.
15        Q.   And did that -- how did Simpson's
16  role change at all after the bankruptcy filing
17  by Lehman?
18        A.   Well, we were drafting a merger
19  agreement with Barclays over that weekend, and
20  then got the call roughly sometime mid-day
21  Sunday that the deal had died for whatever
22  reason, and essentially went home at that
23  point.  Sometime during the day late morning
24  that Monday I think we got a call from Lehman
25  to come over to their offices, that there was

TSG Reporting - Worldwide    877-702-9580

Page 11

1      A. KELLER - HIGHLY CONFIDENTIAL
2  now another potential deal with Barclays.  And
3  we showed up there and at that point already
4  there were -- at Lehman's conference room
5  floor Weil Gotshal was there representing
6  Lehman, and Sullivan & Cromwell and Clearly
7  Gottlieb representing Barclays, and many
8  people from Lehman and Barclays in many
9  conference rooms on that floor.
10        So we were called over to help
11  given our knowledge of the company and just
12  help review the documents that were being
13  drafted.
14        Q.   And we'll pick up there in just a
15  minute.
16        A.   Sure.
17        Q.   But is it your understanding that
18  you've been designated to be Simpson's
19  30(b)(6) witness on certain topics today?
20        A.   I don't even know what a 30(b)(6)
21  witness is.
22        Q.   Do you understand that you've been
23  designated to give testimony on behalf of
24  Simpson on certain issues today?
25        A.   Of the -- on behalf of the firm.

TSG Reporting - Worldwide    877-702-9580

Page 12

1      A. KELLER - HIGHLY CONFIDENTIAL
2        Q.   Yes.
3        A.   Yes.
4        Q.   Okay.  And can I just ask what you
5  did do to prepare to give testimony today?
6        A.   Just looked at a few e-mails.
7  Went over the contracts again to try to
8  refresh my memory.
9        Q.   So I assume you met with your
10  counsel.
11        A.   Yes.
12        Q.   Did you meet with anyone other
13  than counsel or speak with anyone other than
14  counsel --
15        A.   No.
16        Q.   -- with respect to the deposition?
17        And -- okay.  So picking up where
18  we left off, did you personally go over there
19  Monday?
20        A.   Yes.
21        Q.   And what did you do that first
22  day, Monday?
23        A.   That Monday and Monday night we
24  essentially would -- the process would be that
25  the -- for the most part the lawyers would be

TSG Reporting - Worldwide    877-702-9580

Page 13

1      A. KELLER - HIGHLY CONFIDENTIAL
2  in a room going over the contract.  Lawyers
3  from both sides.  Giving comments.  Then the
4  contract would be turned.  And we would wait
5  and then review the contract and more comments
6  back and forth.  So it was just a technical
7  negotiation, drafting process.
8        Q.   And Simpson was involved in that
9  drafting process of that original contract,
10  correct?
11        A.   Yes.
12        Q.   Let me go ahead and show you a
13  document we'll mark as -- that's been
14  previously marked as Exhibit 1.
15        (Document review.)
16        Q.   Is this the ultimately executed
17  version of the contract that you were
18  referring to?
19        A.   Yes.  Looks like it.
20        Q.   And if you don't mind for purposes
21  of the day I'll refer to this as the original
22  APA.
23        A.   (Witness nods.)
24        Q.   If I do so you'll understand I'm
25  referring to this document?

TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2      A.   Right.
3      Q.   I'm going to give you another
4  document.  This is -- let me give a document
5  marked -- previously marked as 440.
6           (Document review.)
7      Q.   Do you recognize Exhibit 440?
8      A.   This is --
9           MR. AMER:  Are you talking about
10  the whole document, because it's
11  multiple --
12          MR. THOMAS:  The whole document.
13  I'm going to ask him about one of the
14  attachments, too, but just the whole
15  document.
16      A.   Yeah.  As I recall, this is the
17  version that was submitted to the bankruptcy
18  court.
19      Q.   When you say this is the version,
20  you're referring to the second exhibit which
21  is a version of the original Asset Purchase
22  Agreement that has a number of hand-marked
23  interlineations on it?
24      A.   Which I assume then matches this
25  one.
           TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2      Q.   And are you familiar with -- have
3  you ever seen the motion that the exhibit's
4  attached to?  The sale order motion.
5      A.   Not until yesterday.
6      Q.   Okay.  Let me ask you then about
7  Exhibit -- the version of the original Asset
8  Purchase Agreement attached.  Do you know
9  whose handwriting that is showing the marks on
10  that version of the agreement?
11      A.   Yes.  That's Elizabeth Cooper's,
12  an associate of this firm.
13      Q.   Okay.  And can you just describe
14  the process by which this particular document
15  was created, the handwritten marks?
16      A.   That, as I understand it -- I'm
17  not even sure that it was there at the time
18  because it would have been on the Tuesday that
19  we were there.  And I went home to get some
20  sleep because it was at the point where we
21  were essentially done with the negotiations
22  and what was left was to put together the
23  filing for the bankruptcy court.  And that was
24  essentially the last round of comments.  And
25  people were -- it was urgent to get the filing
           TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2  with the court as soon as possible and another
3  turn through the word processing was going to
4  take too long.  We were on Lehman's conference
5  call and didn't quite have the word processing
6  facilities that we were typically used to or
7  that a law firm would have.  So in order to
8  shorten the time to get it filed, what was
9  agreed by all the law firms was something that
10  Elizabeth just wrote in by hand in order to
11  get the filing done.
12      Q.   Let me ask you to turn back to
13  Exhibit 1 which is the executed copy of the
14  original APA.  And let me ask you to turn to
15  page 6 and the definition of purchased assets.
16      A.   Yeah.
17      Q.   And this is a document you're
18  familiar with, right, this contract?
19      A.   Yes.
20      Q.   Okay.  The first purchased asset
21  there where it says the retained cash, do you
22  know the value of that asset as of the time
23  this document was executed?
24           Or strike that.
25           As of roughly September 16th or
           TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2  September 17th.
3      A.   I don't recall.  I would look at
4  the definition and see whether it's spelled
5  out there.
6           (Document review.)
7      A.   Now I can't find it but -- but I
8  don't recall what the value was.
9      Q.   Okay.  Do you recall whether there
10  was any value given or not in the contract?
11      A.   I don't.  I'd have to look through
12  it again.
13      Q.   Okay.  The second asset there
14  referring to deposits, do you know what the
15  rough value of the assets identified in
16  category B were?
17      A.   No.
18      Q.   Do you know the value of the
19  assets identified in category C?
20      A.   No.
21      Q.   How about E?
22      A.   No.
23      Q.   Why was -- do you know why there
24  was no values put on these various assets or
25  any total valuation placed on the assets?
           TSG Reporting - Worldwide    877-702-9580

Page 18

A. KELLER - HIGHLY CONFIDENTIAL

2  A.  No.
3  Q.  Do you know if that was an
4  important -- I mean, was that an element of
5  the deal, that certain assets be worth certain
6  amounts?
7  A.  Well, I wasn't part of the
8  discussions between the principals as to
9  exactly how the deal was cut and so I can't
10 say what elements of the deal were important
11 to them.
12 Q.  But since Simpson was involved in
13 the drafting up of this contract, can you
14 explain why it wasn't necessary to try to
15 total up the value of the assets and the value
16 of the liabilities?
17 A.  In my experience in the M&A world
18 which is, as I said, a little limited, it does
19 not strike me as unusual that at least the
20 values of these listed assets weren't broken
21 down; that the principals would agree to
22 essentially how you define the business and in
23 an Asset Purchase Agreement lay out the
24 assets, describe the assets that are being
25 purchased, and describe the liabilities that

TSG Reporting - Worldwide    877-702-9580

Page 19

A. KELLER - HIGHLY CONFIDENTIAL

2  are being assumed, and that essentially is
3  what it was.  But to break down each -- the
4  value of each item by item is not -- the fact
5  that it was not broken down is not unusual.
6  Q.  Is it not necessary to do that
7  because the deal wasn't predicated on assets
8  having certain values or liabilities having
9  certain values?
10 A.  I don't know what -- again, I just
11 don't know how the buyer and seller approached
12 the overall valuation of the business or how
13 they got to what they got.  By the time we got
14 the call and were brought in that seemed to
15 have already taken place.
16 Q.  And based upon the contract the
17 conclusion of that would have been that it
18 didn't matter -- the deal wasn't predicated on
19 assets having certain values or liabilities
20 having certain values, but rather that
21 Barclays was essentially buying the business?
22 MR. AMER:  Objection to the form
23 of that question.
24 MR. KAY:  Objection to form.
25 Q.  You can answer it.

TSG Reporting - Worldwide    877-702-9580

Page 20

A. KELLER - HIGHLY CONFIDENTIAL

2  MR. AMER:  If you understand what
3  the question is.
4  A.  Well, to my understanding of your
5  question, you're asking how the buyer and
6  seller -- the principals approached the deal.
7  I mean, again, I just wasn't part
8  of those conversations.  And so I don't know
9  to what extent value of particular assets was
10 important or factored into the decision or
11 what discussions they had among themselves.
12 Q.  Well --
13 A.  At this point it was just -- from
14 my perspective just running through what
15 the -- lawyers would go back to their clients,
16 principally Weil and Clearly Gottlieb, and say
17 do we have the description of the assets that
18 are being transferred and the liabilities that
19 are being assumed correct.
20 Q.  You're not aware of any reason to
21 believe that there was a disconnect between
22 Simpson and the other attorneys drafting this
23 contract and what the principals wanted, are
24 you?
25 A.  Not that I know of.

TSG Reporting - Worldwide    877-702-9580

Page 21

A. KELLER - HIGHLY CONFIDENTIAL

2  Q.  Okay.  So based on how the
3  contract was drafted, at least, in terms of
4  the contract it was a deal that was not
5  predicated on assets having a certain value or
6  liabilities having a certain value; is that
7  right?
8  MR. HINE:  Objection.
9  MR. KAY:  Objection.
10 MR. ROTHMAN:  Objection to the
11 form.
12 MR. AMER:  Objection to form.
13 A.  Again, I don't know on what basis
14 the principals had put this together.
15 Q.  I understand.  But looking at the
16 contract and the fact that there's no values
17 put on -- no values put on many of the
18 purchased assets and no values put on all the
19 liabilities, doesn't that mean to you that the
20 deal wasn't predicated on assets having a
21 certain value or liabilities having a certain
22 value?
23 MR. HINE:  Object to the form.
24 MR. KAY:  Join.
25 MR. ROTHMAN:  Same.

TSG Reporting - Worldwide    877-702-9580

Page 22

1      A. KELLER - HIGHLY CONFIDENTIAL
2      Q.   You can answer.
3      A.   Again, not necessarily because if
4   they had -- and this is just speculating here
5   because I wasn't part of the conversation --
6   but if they had put together a deal based on
7   the values and then told the lawyers these are
8   the types of assets and liabilities we're
9   assuming, describe them, it could have been.
10     Q.   Is there any provision in the
11  contract that Simpson helped prepare that
12  requires the assets, the value of the assets
13  to value of the assumed liabilities?
14     MR. HINE:  Object to the form.
15     A.   I'm trying to think of how --
16     Q.   Sure.  You're welcome to look
17  through the contract.  If you want to take a
18  few minutes to look through it you're welcome
19  to.
20     A.   Yeah.
21     (Document review.)
22     A.   I'd have to spend a fair amount of
23  time looking through the whole contract.  I
24  mean, just quickly the contract does go into
25  the value of the long positions and the short
     TSG Reporting - Worldwide   877-702-9580

Page 23

1      A. KELLER - HIGHLY CONFIDENTIAL
2   positions.  But there are other assets and
3   liabilities included in the deal as a whole.
4      Q.   So is there anything from your --
5   from your review, from your knowledge of the
6   contract, from your preparation for your
7   testimony today, do you have anything that you
8   can identify in the contract that requires the
9   asset -- the value of the assets to end up
10  equalling the value of the liabilities assumed
11  or consideration paid?
12     A.   Just on the face of the contract I
13  can't as of this moment.  I'd have to go
14  through it.  I don't recall any provision that
15  said that.
16     Q.   And you're not aware of -- was
17  this contract drafted in a fairly normal
18  drafting process as far as you can tell?
19     A.   Yes.  Other than the fact that we
20  had a very short period of time to do it.  The
21  normal process would have taken at least a
22  week or maybe several weeks.  But we had about
23  a day.
24     Q.   And each party had one or more
25  large law firms working on the contract?
     TSG Reporting - Worldwide   877-702-9580

Page 24

1      A. KELLER - HIGHLY CONFIDENTIAL
2      A.   Yes.
3      Q.   And from everything you know did
4   it appear to be a good faith arm's-length
5   negotiating process?
6      A.   Yes.
7      Q.   You have no reason to believe
8   there was a disconnect between what the
9   principals may have agreed to and what's
10  reflected in the contract, do you?
11     MR. HINE:  Object to form.
12     A.   I have no reason believe -- sorry.
13     Q.   Go ahead and answer.  Do you want
14  to complete that answer?  "I have no reason to
15  believe" is what you said.
16     A.   Yes.  I have no reason to believe.
17     Q.   Let me ask you to turn back to the
18  version with handwriting on it.  Exhibit 440.
19  The version of the APA -- original APA with
20  handwriting on it.  And let me ask you to look
21  at page 11, please.
22     A.   (Witness complies.)
23     Q.   Strike that.
24     Let me ask you to turn back to
25  page 7 first.  There's a section that begins
     TSG Reporting - Worldwide   877-702-9580

Page 25

1      A. KELLER - HIGHLY CONFIDENTIAL
2   on Purchased Assets on page 6 and then it
3   carries over to page 7.
4      A.   Right.
5      Q.   Do you see that?
6      And at the top of page 7 you'll
7   see there's a Section D that says Government
8   securities, commercial paper -- and this is
9   before the changes were made.
10     It says government securities,
11  commercial paper, mortgage loans, corporate
12  debt, corporate equity, exchange traded
13  derivatives, and collateralized short-term
14  agreements.
15     Do you see that?
16     A.   Yes.
17     Q.   And then there's some handwritten
18  changes made including at the end there is a
19  phrase added "...with a book value as of the
20  date hereof of approximately $70 billion."
21     Do you see that?
22     A.   Yes.
23     Q.   Do you know why that was added?
24     A.   No.
25     Q.   Do you know who added it?
     TSG Reporting - Worldwide   877-702-9580

A. KELLER - HIGHLY CONFIDENTIAL

2  A.    Well, again, the language -- the
3  words were actually written by Elizabeth
4  Cooper but this was a part of the negotiations
5  between the two sides and agreed to.
6         Q.    And have you spoken with Ms.
7  Cooper about this edit?
8         A.    No.
9         Q.    Do you know if anyone at Simpson
10  has spoken with her about --
11        A.    That particular edit?
12        Q.    Yes.
13        A.    Not to my knowledge.
14        Q.    Do you know why -- do you know who
15  directed her to make that edit?
16        A.    Well, it would have been a markup
17  that both sides had agreed to.  And
18  essentially instead of giving it to the word
19  processor to type in somebody handed it to
20  Elizabeth to just do by hand.
21        Q.    Do you know who --
22        A.    She volunteered to do it.
23        Q.    Do you know, was she at a meeting?
24  Where physically was she when --
25        A.    She was there at the conference --

TSG Reporting - Worldwide    877-702-9580

1         A. KELLER - HIGHLY CONFIDENTIAL
2  at the conference room floors where everybody
3  was negotiating the agreement.
4         Q.    At 745?
5         A.    Yes.
6         Q.    And do you know who else from
7  Simpson was there?
8         A.    I was until I left that morning.
9  John Finley was there.  And Alvin Brown may or
10  may not -- was at least there for part of the
11  time.
12        Q.    And do you know which side or who,
13  what person, suggested this inclusion?
14        A.    I don't know where it originated
15  from.
16        Q.    Do you understand the inclusion to
17  be describing some subset of assets listed in
18  Section D?
19        A.    I would read that to lend
20  description to what assets were covered by D.
21        Q.    And is it fair to say that at
22  least one earlier version of the contract did
23  not have that language in it, that
24  description?
25        A.    That's what it looks like, yes.

TSG Reporting - Worldwide    877-702-9580

1         A. KELLER - HIGHLY CONFIDENTIAL
2         Q.    Do you have any knowledge of where
3  that $70 billion figure came from?
4         A.    No.
5         Q.    Do you have any knowledge of what
6  it represents?
7         A.    Well, other than reading the
8  words.  Represents -- just simply that it
9  represents the book value of those long
10  positions as defined.
11        Q.    Do you know -- is there a -- are
12  you aware of any defined term "book value" as
13  part of the contract?
14        A.    No.
15        Q.    Does book value mean one precise
16  thing or could it mean different things to
17  different people?
18        MR. HINE:  Object to the form.
19        MR. AMER:  I'll object to the form
20  as well.
21        Q.    You can answer.  They object.
22  They preserve their objection.
23        A.    Right.  It means one thing to me.
24  And I would assume it means the same thing to
25  others but can't speak for others.

TSG Reporting - Worldwide    877-702-9580

1         A. KELLER - HIGHLY CONFIDENTIAL
2         Q.    Okay.  Do you know if Lehman,
3  after the bankruptcy filing, the week of
4  September 15th, whether they were continuing
5  to update their marks on securities?
6         A.    I do not know for a fact.
7         Q.    Well, do you have any information
8  as to whether that was occurring?
9         A.    Well, I would not be surprised if
10  it were.  I do know from reviewing, for
11  instance, the -- some of the statements that
12  were made to the bankruptcy court that the
13  assets were in the 45, $49 billion range.  So
14  presumably people did follow the values of the
15  assets.
16        Q.    Are you just speculating or do you
17  know?
18        A.    I am just speculating.
19        Q.    Do you know how those other later
20  numbers were calculated?
21        A.    No.
22        Q.    Okay.  Do you have any personal
23  knowledge of any valuations of marks going on
24  that week?
25        A.    No personal knowledge.

TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2        Q.    Let me strike the personal
3    knowledge.
4        A.    Right.
5        Q.    Do you have any knowledge of
6    valuations going on that week of Lehman
7    securities?
8        A.    It was my impression that people
9    were discussing valuations.  And that that
10   week things were changing incessantly.
11       Q.    Were the value of Lehman's
12   securities and other assets going down that
13   week?
14       A.    I would assume they were as were
15   everybody's.
16       Q.    Are you aware of, on that Monday
17   when you were over at Lehman, efforts by
18   people from Barclays and people from Lehman to
19   try to update valuations of the Lehman assets?
20       A.    On that Monday?
21       Q.    Yes.
22       A.    I was not aware.
23       Q.    At any other time during that week
24   are you aware of people from Barclays and
25   Lehman sitting down and trying to get together
         TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2    and come up with updated values of Lehman
3    assets?
4        A.    Again, I assume that that may have
5    been going on but, you know, as we progressed
6    and started talking about that clarification
7    agreement.  That process.  As the week
8    progressed.
9        Q.    So are you just assuming it or are
10   you aware of it going on?
11       A.    There was a lot going on at that
12   point in Weil's offices and certainly
13   principals of Lehman and Barclays were
14   meeting.  At this point it's a little hard for
15   me to recall exactly what the discussions were
16   but it would not surprise me if this were part
17   of that.
18       Q.    I'm sorry.  I don't mean to
19   belabor this but it wouldn't surprise you if
20   you were part of it, but were you actually --
21   was Simpson actually aware that those
22   discussions between Barclays and Lehman were
23   going on to try to update the falling values
24   of Lehman assets?
25       A.    I at this point don't know whether
         TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2    I can recall it as a fact but would assume --
3    my impression was that those conversations
4    were going on.
5        Q.    And you would have been aware of
6    that at the time.
7        A.    Just from milling around the
8    hallways and seeing the people.
9        Q.    Let me ask you to turn in the
10   executed copy of the original APA to Section
11   2.5, please.  Take a moment to review that
12   section, please.
13            (Document review.)
14       A.    Okay.
15       Q.    And do you see the section
16   entitled cure amounts obligates the purchaser
17   to pay a couple different types -- or assume a
18   couple different types of liability, one being
19   cure amounts or past amounts owed on contracts
20   that they elect to assume and the other being
21   certain ordinary course amounts?
22       A.    Yes.
23       Q.    Why was there no value placed on
24   the liability that's being assumed here by the
25   purchaser?
         TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2        MR. HINE:  Object to the form.
3        A.    I would think that the -- my
4    understanding was that this is typical in a
5    bankruptcy situation and as you can -- as
6    reading this paragraph as of the day of this
7    contract I could not tell you what the
8    ultimate obligation was going to be.  Because
9    it's forward looking.
10       Q.    So it's impossible to know the
11   amount of the liability that would be assumed
12   by the purchaser?
13       MR. HINE:  Object to the form.
14       A.    Impossible is a tough standard
15   but -- I would -- I do not know -- I mean, to
16   put an exact dollar amount on it, probably
17   not.  Could somebody knowing -- having a good
18   knowledge of the business make a reasonable
19   estimate, that I don't know.
20       Q.    Well, if it's up to the discretion
21   of the purchaser which contracts it elects to
22   assume --
23       A.    Yes.
24       Q.    -- and -- couldn't the purchaser
25   elect to assume zero contracts and assume
         TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2   zero?
3      A.   As I understand it, yes.
4           MR. HINE:  Object to the form.
5      Q.   So the actual amount of the
6   liability here could be zero.
7           MR. HINE:  Same objection.
8      A.   It is possible, yes.
9      Q.   Well, are you aware of any efforts
10  to try to require Barclays to accept certain
11  contracts or determine which -- a fortiori
12  which contracts it's going to assume?
13     A.   No, I am not.
14     Q.   Were you -- did you attend any of
15  the court hearings?
16     A.   No.
17     Q.   Did anyone from Simpson attend any
18  of the court hearings?
19     A.   Not to my knowledge.
20     Q.   And you made reference to
21  statements made to the court.  Is that because
22  you reviewed the transcripts of those
23  hearings?
24     A.   Just a couple of pages that were
25  referenced by Lori Fife to those dollar
        TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2   amounts items.
3      Q.   When did you review those?
4      A.   Within the past week.  The past
5   two weeks.
6           MR. AMER:  Just to be clear, those
7      were the pages that were referenced in
8      your 30(b)(6) notice.
9           MR. THOMAS:  Sure.
10     A.   So I, having read that, just asked
11  what those were.
12     Q.   Were you getting -- how did
13  Simpson have an understanding of what was
14  going on in court?  Was somebody reporting
15  back to Simpson?
16          MR. AMER:  I'll object to the form
17     of the question.
18     A.   It's not something that was being
19  formally done.  We heard high-level summaries.
20  Obviously everybody was interested in what was
21  going on in court but...
22     Q.   Let me ask you to turn to Section
23  8.5, please.
24     A.   (Witness complies.)
25     Q.   Subsection A says, "Each of seller
        TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2   and purchaser shall use its commercially
3   reasonable efforts to take all actions
4   necessary or appropriate to consummate the
5   transactions contemplated by this agreement."
6           Do you see that language?
7      A.   Yes.
8      Q.   Would that include obtaining court
9   approvals to the extent they're necessary?
10     A.   Yes.
11     Q.   Do you believe that Lehman
12  obtained all necessary court approvals for the
13  sale transaction that was consummated on
14  September 22nd, 2008?
15     A.   Yes.
16     Q.   If you would -- are you familiar
17  with a schedule drafted by Steve Berkenfeld of
18  Lehman that was referred to in this contract?
19          MR. HINE:  Object to the form.
20     A.   I -- yes.  I was trying to think
21  of whether it was referred to in this contract
22  but I believe it was.
23     Q.   But it was not an exhibit to the
24  contract, correct?
25          MR. HINE:  Object to the form.
        TSG Reporting - Worldwide    877-702-9580

1      A. KELLER - HIGHLY CONFIDENTIAL
2      A.   Yeah.  I don't believe that it
3   was.
4      Q.   Were -- and I think we're going to
5   have another witness on compensation issues,
6   but were you involved in calculating any
7   potential compensation liabilities being
8   assumed by purchaser?
9      A.   No.
10     Q.   Mr. Brown would be more
11  knowledgeable about that?
12     A.   He may be.
13     Q.   Did you attend any LBI or LBHI
14  board meetings during this week?
15     A.   The only one I attended was the
16  morning -- I think it was the morning we
17  signed this contract or were about to sign the
18  contract.
19     Q.   By the way, if at any time you
20  want to take a break just speak up.
21     A.   Sure.
22     Q.   Let me go ahead and show you a
23  document that's been previously marked as 489.
24  Please take a moment to review that.
25          (Document review.)
        TSG Reporting - Worldwide    877-702-9580

Page 38

A. KELLER - HIGHLY CONFIDENTIAL
1
2      A.    Okay.
3      Q.    Is this the board meeting you
4  attended?
5      A.    Yes.
6      Q.    The notes from the board meeting
7  you attended.
8          If you would turn to page 3,
9  please.
10     A.    (Witness complies.)
11     Q.    At the second paragraph it reads,
12 "Mr. Roberts resumed by describing that it is
13 a condition to the transaction that eight
14 specific firm employees enter into employment
15 agreements with Barclays.  He stated that Mr.
16 McGee was one of those employees so interested
17 firm employees were involved in the
18 transaction negotiations on behalf of the
19 firm."
20         Do you see that?
21     A.    Yes.
22     Q.    Were you aware at this time that
23 certain employees were negotiating employment
24 contracts -- certain Lehman employees that
25 were also involved in the transaction

TSG Reporting - Worldwide    877-702-9580

Page 39

A. KELLER - HIGHLY CONFIDENTIAL
1
2  negotiations were also negotiating employment
3  transactions with Barclays?
4      A.    Yes.
5      Q.    Did that strike you as odd or
6  inappropriate or problematic in any way?
7      A.    As Mr. Roberts pointed out it was
8  something to point out to people as a
9  potential conflict.  But seemed given the
10 circumstances unavoidable.
11     Q.    And were part of the circumstances
12 the need for Barclays, if they were going to
13 buy the business, to try to retain the
14 employees that made up the business they were
15 buying from Lehman those that they thought
16 were particularly valuable and important to
17 it?
18     A.    At least those that they deemed
19 valuable.
20     Q.    So given the circumstances was
21 there any way to avoid that situation?
22     MR. HINE:  Object to the form.
23     A.    Not that I know of.
24     Q.    So the board and Weil and Simpson
25 were aware of the situation with respect to

TSG Reporting - Worldwide    877-702-9580

Page 40

A. KELLER - HIGHLY CONFIDENTIAL
1
2  what is referred to as interested firm
3  employees --
4      A.    Yes.
5      Q.    -- negotiating the transaction at
6  the same time they were also negotiating
7  employment and bonus agreements with Barclays.
8      A.    Yes.
9          (Pause on the record.)
10     Q.    Any time I pause I'm skipping over
11 documents so we're actually gaining time.
12     A.    That's good.
13     MR. AMER:  Pause away.
14     A.    Pause away, yeah.
15     Q.    Let me show you a document we'll
16 mark as 519.
17         (Deposition Exhibit 519, document
18         bearing production number STB 09637,
19         marked for identification as of this
20         date.)
21 BY MR. THOMAS:
22     Q.    Do you recognize this document as
23 a --
24     A.    I don't recall it.  But...
25     Q.    It's a document produced by

TSG Reporting - Worldwide    877-702-9580

Page 41

A. KELLER - HIGHLY CONFIDENTIAL
1
2  Simpson Thacher.  You can tell by the Bates
3  stamps down below.  And it appears to be an
4  e-mail from you to James Killerlane and Edgar
5  Lewandowski, dated September 17th, 2008.
6      A.    Yes.
7      Q.    And you don't have any reason to
8  doubt that this is one of -- an e-mail from
9  you, do you?
10     A.    No.
11     Q.    Your message says, "LBHI guarantee
12 is still full and unconditional and LBI is now
13 in bankruptcy or soon will be."
14         Can you explain what you're
15 referring to?
16     A.    I can explain at least part of it.
17 I would have to think a little bit more about
18 the second part.  The -- Jim's question -- I
19 assume he was just at that point looking at
20 what ongoing filings LBHI and LBI might have
21 to make with the SEC.  There was LBI debt
22 issued, that had been issued publicly.  So
23 your starting point is that that company then
24 has to make public filings with the SEC,
25 10-Ks, 10-Qs, et cetera.

TSG Reporting - Worldwide    877-702-9580

Page 54

1    A. KELLER - HIGHLY CONFIDENTIAL
2    e-mail change -- chain.
3        A.    Mr. Lewkew sent an e-mail asking
4    about the -- I assume what the exact nature of
5    the assets and the liability in the contract
6    are.
7        Q.    Were there difficulties that week
8    in identifying Lehman assets, what they
9    actually had and didn't have?
10       A.    As I -- as I understand it now,
11   and I can't remember how much of this I was
12   aware of at the time or, you know, from having
13   read things subsequently, but with everything
14   going on for the Lehman bankruptcy and the
15   markets generally, that lots of their
16   customers were backing out of contracts,
17   grabbing assets, all sorts of things.  So --
18   so if there were difficulties, again that
19   wouldn't surprise me.
20       Q.    Let me go ahead and show you a
21   document we'll mark as 523.
22            (Deposition Exhibit 523, document
23       bearing production number WGM-LEHMAN-E
24       00020028, marked for identification as
25       of this date.)
        TSG Reporting - Worldwide     877-702-9580

Page 55

1    A. KELLER - HIGHLY CONFIDENTIAL
2    BY MR. THOMAS:
3        Q.    Whoop.  Excuse me.  Let me take
4    that back.  I marked...
5            (Pause on the record.)
6        Q.    Let me show you a document marked
7    as 523.
8            (Document review.)
9        Q.    Do you recognize this as an e-mail
10   from John Finley in which you're copied dated
11   September 18th, 2008?
12       A.    Yes.
13       Q.    And the lower e-mail, earlier in
14   time e-mail from Weil attaches a draft
15   clarification letter for discussion.  And then
16   Mr. Finley writes back, "Consider at what
17   point the changes would be significant enough
18   that you would want to run through the board."
19            Do you see that?
20       A.    Yes.
21       Q.    Were there any further board
22   meetings of LBHI or LBI after the one you
23   attended?
24       A.    I don't know.
25       Q.    To your knowledge were there?  Not
        TSG Reporting - Worldwide     877-702-9580

Page 56

1    A. KELLER - HIGHLY CONFIDENTIAL
2    that you're aware of.
3        A.    To my knowledge, no.
4        Q.    Is it fair to say that Simpson was
5    giving consideration to the issue of whether
6    any changes were significant enough to have to
7    bring them back to the board?
8            MR. HINE:  Object to the form.
9        A.    From -- certainly from this e-mail
10   one could see that since changes were made --
11   were being made to the agreement that it is
12   something that people should consider.  But as
13   John stated here, Weil is closer to what
14   discussions had been had with the board and
15   the agreement.  He's in a better position to
16   make that judgment.  At least in our view.
17       Q.    Although, Simpson did attend the
18   board meeting on the sale transaction.
19       A.    Yes.  But presumably there were
20   discussions with the board before that that we
21   were not part of.
22       Q.    Well, are you aware of any
23   determination by anyone at Simpson or Weil
24   that any of the changes being made to the sale
25   transaction were significant enough to require
        TSG Reporting - Worldwide     877-702-9580

Page 57

1    A. KELLER - HIGHLY CONFIDENTIAL
2    going back to either the LBHI or LBI board?
3            MR. HINE:  Can we just hold on
4    second?  Can we get a time frame here?
5    You're talking about before -- because
6    we do have a privilege waiver issue
7    here.  You're asking him at the time,
8    right?  In other words, there was -- you
9    appear to be bordering on what could be
10   privileged issues if it's after
11   September 30th.
12           MR. THOMAS:  I think I understand
13   your question -- your point.
14           MR. HINE:  And just before you
15   correct it, the witness, I just want to
16   warn you, there's a limited waiver of
17   privilege here but it extends up to
18   September 30th only.  So to the extent
19   you're learning things after that that
20   are privileged you're not authorized to
21   waive the privilege.  But I think you
22   understand my point, Todd.
23           MR. ROTHMAN:  Please note my
24   objection to the question.
25   BY MR. THOMAS:
        TSG Reporting - Worldwide     877-702-9580

| Page 58 | Page 59 |
|---|---|

**Page 58**

1      A. KELLER - HIGHLY CONFIDENTIAL
2      Q.   Are you aware of any determination
3   by anyone at Simpson or Weil Gotshal prior to
4   September 30th that any of the changes that
5   were being made to the sale transaction after
6   September 16th were significant enough to
7   require going back to either the LBHI or LBI
8   boards?
9      A.   No.
10      Q.   Let me going ahead and show you a
11   document we'll mark as -- strike that.
12      Let me show you a document we'll
13   mark as 524.
14      (Deposition Exhibit 524, document
15   bearing production numbers WGM-LEHMAN-E
16   00014009 through WGM-LEHMAN-E 00014029,
17   marked for identification as of this
18   date.)
19      MR. THOMAS:  And let me also show
20   you a document we'll mark as 525.
21      (Deposition Exhibit 525, document
22   bearing production numbers WGM-LEHMAN-E
23   00006149 through WGM-LEHMAN-E 00006168,
24   marked for identification as of this
25   date.)

TSG Reporting - Worldwide    877-702-9580

**Page 59**

1      A. KELLER - HIGHLY CONFIDENTIAL
2      (Document review.)
3   BY MR. THOMAS:
4      Q.   Let me start with 525 which is an
5   e-mail from -- Robert Messineo?
6      A.   Messineo.
7      Q.   Messineo.  Is he at Weil Gotshal?
8      A.   Yes.
9      Q.   And it's to a number of folks
10   including yourself dated September 20th, 2008,
11   2:38 p.m.
12      Do you see that?
13      A.   Yes.  That was Saturday.
14      Q.   Okay.  That was Saturday.
15      And then looking at 424 -- strike
16   that.
17      On 525 it's sending you the latest
18   version of the clarification letter.
19      A.   Um-hum.
20      Q.   And then Exhibit 524 you're being
21   sent another more updated version of the
22   clarification letter showing changes being
23   made; is that right?
24      A.   Yes.
25      Q.   Is this consistent with your prior

TSG Reporting - Worldwide    877-702-9580

| Page 60 | Page 61 |
|---|---|

**Page 60**

1      A. KELLER - HIGHLY CONFIDENTIAL
2   testimony that you remained involved in the
3   sale transaction, negotiation, drafting
4   process throughout that weekend?
5      A.   Yes.
6      Q.   Let me show you a document we'll
7   mark as 526.
8      (Deposition Exhibit 526, document
9   bearing production numbers WGM-LEHMAN-E
10   00002784 through WGM-LEHMAN-E 00002786,
11   marked for identification as of this
12   date.)
13   BY MR. THOMAS:
14      Q.   This is an e-mail from Steve
15   Berkenfeld to yourself copying -- and other
16   people at -- excuse me.  This is an e-mail
17   from Steve Berkenfeld to yourself and two
18   attorneys at Weil dated September 20th, 2008,
19   2:50 p.m.
20      Do you recognize it as such?
21      A.   Yes.
22      Q.   And do you see an e-mail in the
23   chain from you to Mr. Berkenfeld asking the
24   question whether certain changes to the
25   clarification letter would require the

TSG Reporting - Worldwide    877-702-9580

**Page 61**

1      A. KELLER - HIGHLY CONFIDENTIAL
2   Trustee's approval?
3      A.   Yes.
4      Q.   Was it your understanding that the
5   Trustee or representatives of the Trustee were
6   also involved in the drafting and negotiation
7   of the clarification letter?
8      MR. ROTHMAN:  Objection to form.
9      A.   It was my understanding that they
10   were there but it depends what you mean by
11   involved in the drafting.  They were not
12   involved in the drafting to it.
13      Q.   Were they involved in the
14   discussions about it?
15      Strike that.
16      When you say "there" do you mean
17   physically at Weil Gotshal's office where --
18      A.   Physically at Weil.
19      Q.   And that's where the clarification
20   letter was being finalized.
21      A.   Yes.  But I was not aware of any
22   direct conversations with the Trustee.
23      Q.   Is it your recollection that the
24   parties had agreed to the terms of the changes
25   to the APA just prior to the Friday night sale

TSG Reporting - Worldwide    877-702-9580

Page 62

A. KELLER - HIGHLY CONFIDENTIAL

1
2  hearing but that the documentation had not
3  been finalized?
4        MR. HINE:  Object to the form.
5     Q.   And that process continued?
6        MR. ROTHMAN:  Join in the
7  objection.
8     A.   Sorry.  Could you repeat the
9  question?
10    Q.   Sure.  Do you recall generally
11 that the parties had reached agreement on
12 Friday about changes to the deal prior to the
13 court hearing but that then the actual
14 drafting and finalization of the document
15 continued over the weekend?
16       MR. HINE:  Object to the form.
17       MR. KAY:  Object.
18       MR. ROTHMAN:  Objection.
19    A.   Again, our role was more -- more
20 of a back seat.  I was not aware of the direct
21 conversations between the principals.  And
22 then the letter would come first to Weil and
23 to Cleary and then through them to us.  But --
24 so to what extent people had agreed to the
25 deal as of a particular point in time is very

TSG Reporting - Worldwide    877-702-9580

Page 63

A. KELLER - HIGHLY CONFIDENTIAL

1
2  difficult for me to say.
3     Q.   So Simpson -- part of Simpson's
4  role was once it heard or was informed about
5  the terms, to make sure that the contract
6  document -- documents reflected the agreement
7  of the principals, correct?
8        MR. HINE:  Object to the form.
9     A.   At least to the extent we
10 understood what that was, yes.  Or raise
11 questions or at least assist where we could.
12    Q.   And here where you raised a
13 question concerning the Trustee's approval, is
14 it fair to say Simpson was conscious of making
15 sure that everyone who needed to agree agreed
16 to the deal?
17       MR. HINE:  Object to the form.
18       MR. ROTHMAN:  Objection.
19    A.   I'm sorry.  Repeat the question
20 again.
21    Q.   Is it fair to say that Simpson was
22 conscious of making sure that any approvals or
23 agreements necessary for the deal were
24 obtained?
25       MR. HINE:  Same objection.

TSG Reporting - Worldwide    877-702-9580

Page 64

A. KELLER - HIGHLY CONFIDENTIAL

1
2     A.   At least where we could think of
3  what approvals might be necessary or ask if
4  approvals were necessary.
5     Q.   Was there ever a time when you
6  concluded that a necessary approval was not
7  obtained?
8     A.   No.
9     Q.   And were you over at Weil that
10 weekend, Saturday, Sunday?
11    A.   Yes.  Both days.
12    Q.   Was anyone from the Trustee there?
13    A.   My understanding was that somebody
14 from -- a representative of the Trustee was
15 there but...
16    Q.   That someone from Houlihan?  Or
17 excuse me.
18       MR. KAY:  Hughes Hubbard.
19       MR. THOMAS:  Hughes Hubbard.
20    A.   That I don't recall.
21    Q.   And was anyone from the Creditors
22 Committee there or any representatives of the
23 Creditors Committee?
24    A.   I believe that they were, yes.
25    Q.   So you were there and the best of

TSG Reporting - Worldwide    877-702-9580

Page 65

A. KELLER - HIGHLY CONFIDENTIAL

1
2  your recollection is that the Trustee and the
3  Creditors Committee were also represented by
4  someone there.
5     A.   Yes.
6     Q.   And were the Creditors Committee
7  and Trustee representatives participating in
8  discussions with other parties?
9        MR. ROTHMAN:  Objection to the
10 form.
11       MR. KAY:  Same objection.
12    A.   Not -- well, I had no direct
13 knowledge, but since they were there -- but at
14 least for the meetings that we were a part of,
15 that was just among the law firms, Cleary,
16 Weil, going over the agreements.  They were
17 not in the room with us.
18    Q.   Were any -- so there was a
19 separate room where attorneys were having
20 discussions?
21    A.   Yes.  There were many separate
22 conference rooms.  And the attorneys would
23 often meet in one.
24    Q.   And do you know whether one of the
25 attorneys there was from Hughes Hubbard?

TSG Reporting - Worldwide    877-702-9580

Page 70

1        A. KELLER - HIGHLY CONFIDENTIAL
2        MR. THOMAS:  We have to change
3    tapes so why don't we go ahead and take
4    a break.
5        MR. AMER:  Okay.
6        THE VIDEOGRAPHER:  The time is
7    11:17.  We're going off the record.
8        (Recess taken.)
9        THE VIDEOGRAPHER:  The time is
10    11:27.  We're on the record.
11    BY MR. THOMAS:
12        Q.    Let me go ahead and show you a
13    document that's previously been marked
14    Exhibit 25.
15        Actually, can I see that document
16    for a moment?
17        A.    Sure.  (Handing.)
18        Q.    Do you recognize that as the
19    letter agreement or clarification letter that
20    the parties were finalizing over the weekend
21    of September 20th and September 21st?
22        A.    Yes.
23        Q.    And you received a -- in addition
24    to the revisions going on over the weekend,
25    you also received a copy of the final version
        TSG Reporting - Worldwide      877-702-9580

Page 71

1        A. KELLER - HIGHLY CONFIDENTIAL
2    of this at the time, correct?
3        A.    Yes.
4        Q.    Let me show you a document
5    previously marked as Exhibit 464A.
6        (Document review.)
7        Q.    I'm going to ask you a number of
8    questions about the document but using the
9    document as more of a prop for the questions
10    than anything else, it's an e-mail from
11    someone at Alvarez & Marsal.  What was Alvarez
12    & Marsal's role during this week at Lehman?
13        A.    During which week?
14        Q.    The week of September 15th.  Do
15    you recall generally?
16        A.    I don't recall them in the
17    process.
18        Q.    Okay.  Do you recall Mr. Marsal
19    being appointed chief restructuring officer
20    shortly after the bankruptcy filing?
21        A.    Yes.  But I don't remember exactly
22    when I knew that.
23        Q.    This is an e-mail chain that's
24    entitled, "Here's all we have at the moment
25    that makes an effort to describe what Barclays
        TSG Reporting - Worldwide      877-702-9580

Page 72

1        A. KELLER - HIGHLY CONFIDENTIAL
2    got, didn't get."
3        And let me ask you to turn to page
4    3, please.
5        A.    The first page of --
6        Q.    The third page which is 2293.
7        A.    Yes.
8        Q.    Under Purchased Assets it reads,
9    "At the closing Barclays acquired all
10    purchased assets..." and then it goes on to
11    list various assets.  Under Securities and
12    Trading Operations it says "The securities set
13    forth on Schedule A to the clarification
14    letter i.e., the securities subject to the
15    Barclays repurchase agreement."
16        A.    Um-hum.
17        Q.    Was that consistent with your
18    understanding that as part of the final deal
19    Barclays was getting all of the repo
20    collateral?
21        MR. HINE:  Object to the form.
22        MR. ROTHMAN:  Same objection.
23        A.    Yes.
24        Q.    And that's something that you and
25    Simpson were aware of prior to the closing of
        TSG Reporting - Worldwide      877-702-9580

Page 73

1        A. KELLER - HIGHLY CONFIDENTIAL
2    the deal, correct?
3        MR. HINE:  Object to the form.
4        A.    To the extent that the letter
5    talks about the Barclay repo, yes.  We were
6    not aware of the process by which that came
7    about, that happened outside of our
8    involvement.
9        Q.    But you're aware as part of the
10    clarification letter all of the repo
11    collateral was being transferred to Barclays
12    as part of the sale transaction, correct?
13        MR. HINE:  Object to the form.
14        MR. ROTHMAN:  Objection.
15        A.    Or that it had -- had it stepped
16    into that repo transaction in doing that,
17    would get these assets.
18        Q.    So as part of the sales
19    transaction all of the repo collateral would
20    be transferred to Barclays, correct?
21        MR. HINE:  Same objection.
22        MR. ROTHMAN:  Objection.
23        MR. AMER:  I'll object to the form
24    of the question.
25        Q.    And you're welcome to refer back
        TSG Reporting - Worldwide      877-702-9580

Page 78

```
1        A. KELLER - HIGHLY CONFIDENTIAL
2        Q.    You don't -- you don't
3   specifically recall any limitation on the
4   exchange traded derivatives?
5        A.    I do not recall.
6        Q.    And you don't see any limitation
7   in the clarification --
8        A.    Not any express limitation.
9        Q.    Do you see any implied limitation?
10       A.    Well, only to the extent that the
11  word "all" is used.
12       Q.    The parenthetical that says -- the
13  parenthetical that's in the clarification
14  letter, (ii), part C --
15       A.    Um-hum.
16       Q.    -- and any property that may be
17  held to secure obligations under such
18  derivatives, do you understand that to be
19  referring to collateral associated with the
20  exchange traded derivatives?
21            MR. ROTHMAN:  Objection to the
22       form.
23       A.    Yes.
24       Q.    And that would be referring to all
25  collateral, whether it were securities or cash
```

TSG Reporting - Worldwide    877-702-9580

Page 79

```
1        A. KELLER - HIGHLY CONFIDENTIAL
2   or some other type of collateral?
3            MR. HINE:  Object to the form.
4            MR. ROTHMAN:  Objection.
5        A.    I would read the words "any
6   property" referring back to such derivatives,
7   yes.  Collateral for such derivatives.
8        Q.    Which would include securities and
9   cash and any other type of property?
10            MR. ROTHMAN:  Same objection.
11       A.    Any property.
12       Q.    I'm sorry.  Was that yes?
13       A.    I would read property to include
14  cash.
15       Q.    And is that consistent with your
16  reading of it at the time?
17       A.    Yes.
18       Q.    Let me turn back to Exhibit 464A
19  and the eighth page, AM 2296.
20       A.    Yes.
21       Q.    And -- we're actually still --
22  there's a number of pages that are still under
23  the subheading on 2293 that says Purchased
24  Assets.  And we're under the sub-subheading of
25  customer accounts which is the bottom of 2295.
```

TSG Reporting - Worldwide    877-702-9580

Page 80

```
1        A. KELLER - HIGHLY CONFIDENTIAL
2        Do you see the bullet point at the
3   top of the page that says Purchaser shall
4   receive...and then the second subpart there
5   says "...to the extent permitted by applicable
6   law and as soon as practicable after closing,
7   769 million of securities as held by or on
8   behalf of LBI on the date hereof pursuant to
9   Rule 15(c)3-3 of the Securities Exchange Act
10  of 1934 as amended or securities of
11  substantially the same nature and value"?
12        Do you see that?
13       A.    Yes.
14       Q.    Do you understand that to mean
15  that to the extent permitted by law there's
16  769 million of 15(c)3 securities would be
17  transferred to Barclays as part of this
18  transaction, or if not permitted by law then
19  securities of substantially the same nature
20  and value would be transferred?
21            MR. HINE:  Objection to the form.
22            MR. KAY:  Objection.
23            MR. ROTHMAN:  Objection to the
24       form.
25            MR. HINE:  Also caution the
```

TSG Reporting - Worldwide    877-702-9580

Page 81

```
1        A. KELLER - HIGHLY CONFIDENTIAL
2   witness that if he's -- in answering
3   that question you have to rely on any
4   kind of privileged information
5   post-dating September 30th, you're not
6   allowed to reveal it.
7        A.    I had not focused on that question
8   and reading it now the language is ambiguous
9   to me.  I could read it either way.
10       Q.    What is the other way?
11       A.    The other way being you have to
12  transfer value to the extent you can by
13  applicable law of 769 million of securities
14  held pursuant to 15(c)3-3 or other securities
15  of substantially the same nature and value.
16        So that hypothetically if you
17  could only transfer 500 million you transfer
18  either 500 million held pursuant to 15(c)3-3
19  or 500 million of securities of substantially
20  the same nature or value is the other way I
21  could read that.
22       Q.    What would be -- in that reading
23  what would be the meaning of the second
24  clause?  Because obviously no seller is going
25  to gratuitously --
```

TSG Reporting - Worldwide    877-702-9580

Page 82

1       A. KELLER - HIGHLY CONFIDENTIAL
2       MR. ROTHMAN: Objection to form.
3       MR. HINE: Objection to form.
4       MR. AMER: I'm going to object
5 because I think you can only get at what
6 his understanding was at the time.
7       MR. THOMAS: Okay.
8       **Q.   What -- was it your understanding**
9 **at the time as part of the sale transaction**
10 **15(c)3 assets were being transferred to**
11 **Barclays?**
12       A.   I do not know exactly what
13 15(c)3-3 assets are. It's not an area of the
14 business that I'm familiar with. My
15 understanding on this particular clause as a
16 general matter was to the extent that LBI held
17 customer assets and the business moved over to
18 Barclays, those customer assets had to move
19 over in order to keep doing business with the
20 customers. They weren't really anyone's
21 assets since they were the customers' assets
22 but the people and the business running it
23 were moving over to Barclays.
24       **Q.   Let me go ahead and show you a**
25 **document we'll mark as 527.**
      TSG Reporting - Worldwide    877-702-9580

Page 83

1       A. KELLER - HIGHLY CONFIDENTIAL
2       (Deposition Exhibit 527, Lehman
3 Brothers Holdings, Inc. Form 8-K, marked
4 for identification as of this date.)
5 BY MR. THOMAS:
6       **Q.   Before I do that, let me ask you**
7 **one other question.**
8       A.   On the same page?
9       **Q.   Let's go back to 2293. The**
10 **clearance box assets.**
11       A.   Um-hum.
12       **Q.   Do you know -- or do you have an**
13 **understanding -- did you have an understanding**
14 **of whether those assets identified there would**
15 **have been transferred to Barclays as part of**
16 **the original APA agreement?**
17       MR. ROTHMAN: Objection to form.
18       **Q.   You're welcome to refer back to**
19 **the agreement.**
20       MR. HINE: Objection to form.
21       A.   That might take a while.
22       (Document review.)
23       A.   I don't recall the clearance boxes
24 being referred to in the APA. That said,
25 again, this is an area that -- of the business
      TSG Reporting - Worldwide    877-702-9580

Page 84

1       A. KELLER - HIGHLY CONFIDENTIAL
2 that I wasn't as familiar with. The part of
3 the normal trading operations which is
4 something we didn't typically get involved
5 with. So if someone else were to read the
6 contract to include them, in my mind this was
7 one of those things I would have expected to
8 see as a clarification because this was
9 drafted in one day.
10       **Q.   This being the original APA?**
11       A.   Yes.
12       **Q.   Let me show you a document we'll**
13 **mark as 527.**
14       **(Document review.)**
15       **Q.   Do you recognize this document?**
16       **A.   Yes.**
17       Q.   Would you describe what it is,
18 please?
19       A.   I'm sorry?
20       **Q.   Would you describe what it is,**
21 **please?**
22       **A.   It's an 8-K that Lehman Brothers**
23 **Holding as a public reporting company had to**
24 **file under the 8-K given the entry into the**
25 **Asset Purchase Agreement as a material**
      TSG Reporting - Worldwide    877-702-9580

Page 85

1       A. KELLER - HIGHLY CONFIDENTIAL
2 **contract.**
3       **Q.   And let me show you a document**
4 **we'll mark as 528 in connection with this.**
5       **(Deposition Exhibit 528, document**
6 **bearing production numbers STB 07579**
7 **through STP 07582, marked for**
8 **identification as of this date.)**
9 BY MR. THOMAS:
10       **Q.   528 is an e-mail chain dated**
11 **September 22nd e-mail chain. It includes**
12 **e-mails to and from yourself.**
13       A.   Um-hum.
14       Q.   Do you recognize it as such?
15       A.   Yes.
16       Q.   And in your e-mail you're asking
17 about "Has the agreement with Alvarez & Marsal
18 been approved by the bankruptcy court, or is
19 it still subject to that approval (as we say
20 in this draft 8-K)?"
21       Do you see that?
22       A.   Yes.
23       **Q.   You were involved in the drafting**
24 **of the 8-K?**
25       A.   Yes. Reviewing it.
      TSG Reporting - Worldwide    877-702-9580

Page 86

1      A. KELLER - HIGHLY CONFIDENTIAL
2      Q.   And did you offer -- did Simpson
3 review and revise the document before it was
4 issued?
5      A.   They certainly reviewed and
6 commented.  I don't recall who was actually
7 the draftsman.
8      Q.   But Simpson would have reviewed
9 it --
10      A.   Yes.
11      Q.   -- to make sure it was accurate
12 and appropriate?
13      A.   Yeah.
14      Q.   And if you would turn back to the
15 actual 8-K itself.
16      A.   (Witness complies.)
17      Q.   There's a description -- looking
18 at the first two paragraphs, it says Asset
19 Purchase Agreement with Barclays, Inc.  And
20 about half way down the first paragraph it
21 says, "In addition, Lehman and Barclays
22 entered into a letter agreement dated as of
23 September 20th, 2008 (the letter agreement and
24 together with the original agreement in the
25 first amendment the Asset Purchase

     TSG Reporting - Worldwide    877-702-9580

Page 87

1      A. KELLER - HIGHLY CONFIDENTIAL
2 Agreement)."
3      Do you see that language?
4      A.   Yes.
5      Q.   And was that in fact an accurate
6 description of the documents that constituted
7 the transaction?
8      A.   Yes.
9      Q.   And in the second paragraph at the
10 end it notes that the bankruptcy court granted
11 the sale on September 20th, 2008.
12      Do you see that?
13      A.   Yes.
14      Q.   And was it your view that the sale
15 that was granted was the sale divined by the
16 agreements identified in the prior paragraph?
17      MR. HINE:  Objection to form.
18      MR. ROTHMAN:  Same objection.
19      A.   That is my understanding, although
20 I wasn't involved, as I said, with the
21 bankruptcy court proceeding so I don't know
22 what was described and actually approved.
23      Q.   You had no reason to believe that
24 the sale -- strike that.
25      You knew that the bankruptcy

     TSG Reporting - Worldwide    877-702-9580

Page 88

1      A. KELLER - HIGHLY CONFIDENTIAL
2 court's approval of the transaction came late
3 on the night of Friday, September 19th, or
4 early in the morning of --
5      A.   It would have been early morning
6 of the 20th, yes.
7      Q.   Okay.  You knew that.
8      And you knew at that time the
9 clarification letter had not been finalized,
10 at least in writing, correct?
11      A.   Correct.
12      Q.   And you knew that there was --
13 that the clarification eventually -- the
14 letter was finalized on the morning of
15 September 22nd, correct?
16      A.   Yes.
17      Q.   And --
18      MR. HINE:  Object to the form.
19      Q.   -- you knew there was no further
20 approval of the sale documents including the
21 clarification letter after September -- the
22 early morning hours of September 20th,
23 correct?
24      A.   I did not know of any others.
25      Q.   You didn't believe there was any

     TSG Reporting - Worldwide    877-702-9580

Page 89

1      A. KELLER - HIGHLY CONFIDENTIAL
2 other court hearing or approval process?
3      A.   Was not aware.
4      MR. KAY:  Object to the form.
5      Q.   Did anyone -- did Simpson or
6 anyone else, any other party, to your
7 knowledge, express any belief that any further
8 court approval of the clarification letter or
9 sale transaction was necessary?
10      A.   I don't know of anyone at Simpson
11 that did but I can't speak for others but
12 that's something I would have assumed Weil was
13 responsible for.
14      Q.   But you were at Weil during the
15 negotiations of the clarification letter and
16 to your knowledge no one took the position
17 that any further court approval was needed for
18 the clarification letter, correct?
19      A.   I don't recall anyone taking that
20 position.
21      Q.   And in the subsequent week after
22 the closing of the deal, do you recall anyone
23 at Simpson or otherwise expressing that point
24 of view that further court approval was
25 necessary?

     TSG Reporting - Worldwide    877-702-9580

Page 90

1          A. KELLER - HIGHLY CONFIDENTIAL
2      A.   No.
3      Q.   Let me ask you to turn the page to
4  page 3 of the 8-K.
5          MR. HINE:  You said the 8-K or the
6  APA?
7          MR. THOMAS:  8-K.
8          MR. HINE:  Okay.
9      Q.   And under Key Assets Sold By
10 Lehman, do you see that section?
11     A.   Yes.
12     Q.   It says, "Lehman's United States
13 and Canadian investment banking and capital
14 markets business."
15     Do you see that?
16     A.   Yes.
17     Q.   Is that consistent with your view
18 of this transaction that it was essentially a
19 sale of a business?
20     A.   Yes.  In the broadest -- in the
21 broad sense.
22     Q.   And that same bullet point at the
23 end it says Barclays also acquired certain
24 securities of LBI as part of its trading
25 operations.

TSG Reporting - Worldwide    877-702-9580

Page 91

1          A. KELLER - HIGHLY CONFIDENTIAL
2      A.   It says that, yes.
3      Q.   Now, why were there no dollar
4  amounts given with respect to assets acquired
5  or liabilities assumed?
6          MR. AMER:  In the 8-K?
7          MR. THOMAS:  In the 8-K.
8          THE WITNESS:  Right.
9          MR. THOMAS:  Or the sale
10 transaction or anything else.  The 8-K.
11     A.   For purposes of 8-K dislocation we
12 wanted to describe the transaction in all
13 material respects but that means more
14 generally.  So it wouldn't necessarily have
15 needed to get into specific dollar values.  We
16 talk about the sale of the businesses.
17     Q.   The specific dollar values or
18 estimates would not have been a material
19 disclosure for this purpose.
20         MR. HINE:  Object to the form.
21         MR. AMER:  Object to the form of
22 the question.
23     A.   Not in our view.
24     Q.   Do you know if it would have been
25 possible the week of September 15th to have

TSG Reporting - Worldwide    877-702-9580

Page 92

1          A. KELLER - HIGHLY CONFIDENTIAL
2  come up with an accurate valuation of Lehman's
3  assets?
4      A.   I do not.
5      Q.   At any point were you ever told or
6  otherwise informed that either of the parties
7  intended for the value of assets to end up
8  being exactly equal to the value of assumed
9  liabilities?
10         MR. AMER:  Can we just put a limit
11 on that, up through September 30?
12         MR. THOMAS:  Sure.
13     A.   I'm not quite sure in what context
14 you're asking the question.  For the overall
15 transaction or -- I mean, there is certainly
16 the --
17     Q.   The overall transaction.
18     A.   Yeah.  The overall transaction,
19 no.  You know, if -- I mean, just very
20 theoretically if assets equals liabilities --
21 well, again, it depends how you look -- for
22 the overall transaction, no.
23     Q.   And would that have been possible
24 without knowing what the value of the assets
25 were or would be at closing or the value of

TSG Reporting - Worldwide    877-702-9580

Page 93

1          A. KELLER - HIGHLY CONFIDENTIAL
2  the assumed liabilities since some of them
3  would be assumed in the future or conditioned
4  on Barclays' election?
5          MR. HINE:  Object to the form.
6          MR. AMER:  Objection to the form
7  of the question.
8      A.   I don't know what you mean by
9  would it have been possible.  If somebody
10 wanted to do the deal that way and certain
11 assets or liabilities had to be estimated then
12 they would come up with their best estimate.
13     Q.   But in terms of -- in a situation
14 like this where the value of certain Lehman
15 assets couldn't be estimated and value of
16 certain liabilities wasn't known, in your view
17 would it have been possible to structure this
18 in a way that required that the value of
19 assets have to equal value of liabilities as
20 of a particular closing?
21         MR. HINE:  Objection to form.
22         MR. KAY:  Same objection.
23         MR. AMER:  Objection to the form
24 of the question.
25         MR. ROTHMAN:  Join the objection.

TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2        A.   I suppose that could be said.
It's a matter of degree.  Depending on the
business.  But for any business that you sell,
people may have different views on assets and
liabilities.
7        Q.   At any point did Simpson consider
putting a true-up provision into the agreement
as a way of after the fact trying to balance
out value of assets and value of liabilities?
11       MR. HINE:  Object to the form.
12       A.   No not to my knowledge.
13       Q.   So just to be clear, at no point
14  were you told that the deal was supposed to
15  be -- it was supposed to somehow be predicated
16  upon or involve the value of assets ultimately
17  equalling the value of liabilities?
18       MR. HINE:  Object to the form.
19       A.   I'm unclear as to the exact
20  meaning of the question.  There's certainly a
21  portion of the business that was sold that's
22  referred to as the matched book.  But that was
23  part of the assets and liabilities.  That was
24  sort of viewed generally my understanding was
25  as assets equals liabilities.  But that was
         TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2   part of the overall transaction.
3        Q.   So there was no requirement --
4        A.   So that's why I ask what do you
mean by the transaction.  With the overall
transaction there were other aspects to it
that could -- could affect that answer.
8        Q.   And did the matched book values
9   change drastically throughout that week?
10       MR. HINE:  Object to the form.
11       A.   They could have given what was
going on in the market.
13       MR. AMER:  Can you just read back
the question.
15       (Record read.)
16       MR. AMER:  The question is whether
you have knowledge about whether that
changed.
19       A.   I don't have direct knowledge of
it.
21       Q.   Was there any reference in the
22  final agreement to any -- to matched book?
23       MR. HINE:  Object to the form.
24       A.   Not those words, no.
25       Q.   Conceptually was it?
         TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2        MR. HINE:  Objection.
3        Q.   I mean, you say not those words.
4   Were they referred -- other words referred to
5   some type of matched book?
6        A.   I had viewed in the initial draft
of the APA the long positions and short
positions as reflecting the two sides of that
matched book.
10       Q.   The 70 billion versus the 69
11  billion?
12       A.   Right.
13       Q.   Do you know how that 70 billion
14  was calculated?
15       A.   No.
16       Q.   Do you know if there was a list of
17  CUSIPs for that -- making up that 70 billion?
18       A.   At the time that 70 billion was
that schedule that we referred to earlier.
And I don't know of a list of CUSIPs at that
time.  Because that was, as I'd said, the
first day we came to Lehman's offices was my
understanding had been already agreed to by
the principals.
25       Q.   Was it your understanding that was
         TSG Reporting - Worldwide    877-702-9580

1        A. KELLER - HIGHLY CONFIDENTIAL
2   an updated valuation of certain Lehman
3   securities?
4        MR. HINE:  Object to the form.
5        A.   I'm not sure what you mean by
updated or how updated but it would have been
the value of the -- it was my understanding
that that was the value of the assets in the
matched book.
10       Q.   That that was -- do you understand
11  what the value of the -- those assets were on
12  Friday, September 12th?
13       A.   I don't know as of exactly when.
14       Q.   Do you know -- were you aware of
15  values placed on the amount of the repo
16  collateral that was transferred to Barclays?
17       MR. HINE:  Object to the form.
18       A.   The repo collateral being the
19  collateral in the Barclays repo.
20       Q.   Yes.
21       A.   Yeah.  I was not directly aware of
22  values.  Those values.
23       Q.   Were you indirectly aware?
24       A.   Well, my impression is that it was
25  at least part of if not the values that we
         TSG Reporting - Worldwide    877-702-9580

Page 102

1    A. KELLER - HIGHLY CONFIDENTIAL
2        THE VIDEOGRAPHER: The time is
3    12:21. We're on the record.
4    BY MR. THOMAS:
5        Q.    The clarification letter involved
6    changes to the assets and liabilities being
7    conveyed as part of the sale transaction,
8    correct?
9        A.    Yes. Changes to the language.
10       Q.    And changes to the assets and
11   liabilities also.
12       A.    It could be. It was difficult for
13   me to understand to the -- to what extent the
14   language was just further description of the
15   intent of the original agreement or a change.
16       Q.    Because the intent of the original
17   agreement was to sell a business, not to sell
18   some particular value of assets or
19   liabilities.
20           MR. HINE: Objection to form.
21           MR. ROTHMAN: Objection to form.
22       A.    No. Not necessarily. Because the
23   language used in the definition of purchased
24   assets, again, my sense was I was not
25   surprised to see a clarification letter

TSG Reporting - Worldwide    877-702-9580

Page 103

1    A. KELLER - HIGHLY CONFIDENTIAL
2    putting a finer line on what may have been
3    intended in that definition of purchased
4    assets or liabilities. A more description as
5    to what particular assets, broader terms might
6    have covered. In part. If there were actual
7    changes to the agreement that again was
8    something that was between -- discussions
9    between the principals that we weren't a part
10   of.
11       Q.    I'm not sure I understand. The
12   clarification letter changed the assets that
13   were being conveyed --
14       A.    I'm saying it could have been a
15   combination of two things. It was changes in
16   language that could have changed assets, or
17   added more detailed explanation of the
18   original assets that were intended to be
19   covered as to exactly what that encompassed in
20   further detail. And between the two I'm
21   not -- having not been part -- part of those
22   discussions don't know how much of one or the
23   other it was.
24       Q.    Did you make -- did Simpson make
25   any effort to add up the total value of the

TSG Reporting - Worldwide    877-702-9580

Page 104

1    A. KELLER - HIGHLY CONFIDENTIAL
2    assets being conveyed after the revisions made
3    in the clarification letter to the original
4    APA?
5        A.    No.
6        Q.    Are you aware of anyone else
7    trying to sit down and add up assets and
8    liabilities at that point?
9        A.    I am not aware of it but, again,
10   those conversations were in other rooms.
11       Q.    You didn't consider it important
12   to --
13       A.    No, what I considered important
14   was making sure that the language that the
15   lawyers put together reflected the
16   understanding between the -- between the
17   principals. And just making sure that people
18   did go back to the principals and have them
19   look at the language, say, is this the deal.
20       Q.    And as you sit here today do you
21   think that you did that successfully?
22           MR. HINE: Object to the form.
23       A.    I would hope so.
24       Q.    At any point did you ever hear or
25   understand there to be any type of cap or

TSG Reporting - Worldwide    877-702-9580

Page 105

1    A. KELLER - HIGHLY CONFIDENTIAL
2    limit placed on the value of assets being
3    transferred?
4        MR. AMER: I think we have to
5    limit that up to September 30th.
6        THE WITNESS: Yes.
7        MR. AMER: Otherwise we're going
8    to run into the privilege issue.
9        MR. THOMAS: Okay.
10   BY MR. THOMAS:
11       Q.    Other than from your lawyers, or
12   lawyers for any of the movants after September
13   30th, did you ever hear that there was -- did
14   you ever hear or understand that there was
15   some type of cap or ceiling placed on the
16   assets to be transferred?
17       A.    No. Other than depending on
18   specific types of -- referring to a matched
19   book if that's what you mean by a cap. But a
20   specific dollar amount, no.
21       Q.    Well, putting aside a specific
22   dollar amount, did you ever hear that the deal
23   that was struck between the parties
24   involved -- did you ever hear or understand
25   that the deal between the parties involved any

TSG Reporting - Worldwide    877-702-9580

Page 106

1    A. KELLER - HIGHLY CONFIDENTIAL
2 type of agreement that there was a cap on
3 assets such that assets over some dollar
4 figure couldn't be transferred?
5    A.  No.
6    Q.  Let me ask you to go ahead and
7 look at document what's been previously marked
8 as Exhibit 442.
9    MR. AMER:  I assume you've got a
10 specific page.
11    MR. THOMAS:  No.  Just go ahead
12 and read it.
13    THE WITNESS:  I'll tell you when
14 I'm done.
15    Q.  And before we dig into this, one
16 of the deposition topics was the 47.4 billion
17 and 45.5 billion mentioned at one point in the
18 257-page hearing transcript by Ms. Fife.
19    Does Simpson have any
20 understanding of how that was calculated or
21 what it comprises?
22    A.  No.
23    Q.  Does Simpson have any
24 understanding of what the 45.5 figure was
25 calculated or comprised of?

TSG Reporting - Worldwide    877-702-9580

Page 107

1    A. KELLER - HIGHLY CONFIDENTIAL
2    MR. AMER:  Isn't that what just
3 asked him?
4    MR. THOMAS:  Did I ask both?
5 Okay.  Fine.  I'll withdraw it.  I'm
6 covered.
7    Q.  Simpson doesn't have any
8 understanding as to how either of those
9 figures, the 47.4 or 45.5 --
10    A.  Were calculated.
11    Q.  -- were calculated or what they
12 comprise.
13    A.  Or what?
14    Q.  Or what they comprise.
15    A.  That's right.
16    Q.  And you don't recall hearing any
17 of those numbers mentioned over the weekend at
18 Weil when the agreement was being finalized.
19    A.  No, I do not.
20    Q.  Okay.  If you would turn to page
21 47, please.  This is the hearing transcript,
22 September 19th sale hearing.  The third
23 paragraph there says, "Barclays is still
24 agreeing to pay the cure amounts on any leases
25 that it assumes or that we assume and assign

TSG Reporting - Worldwide    877-702-9580

Page 108

1    A. KELLER - HIGHLY CONFIDENTIAL
2 to it."
3    Do you see that?
4    A.  Yes.
5    Q.  Is that consistent with your
6 understanding of the contract term that we
7 looked at earlier with respect to Barclays
8 assuming certain cure and other payments on
9 contracts that it elects to keep?
10    A.  Generally, yes.  Although, I
11 focused less on the real estate piece of it
12 because there was a separate Weil team that
13 was working on that.  So to the extent the
14 leases were involved, I know there were a lot
15 of negotiations and discussions about that
16 which I did not focus on since there were
17 experts in those areas who were doing that.
18    Q.  Okay.  But the notion that
19 Barclays would only incur liability on leases
20 or other contracts that it assumes was
21 consistent with your understanding of the
22 actual sale documents, correct?
23    MR. HINE:  Object to the form.
24    A.  Assumes or that it would have --
25 assumed either as part of this cure amount

TSG Reporting - Worldwide    877-702-9580

Page 109

1    A. KELLER - HIGHLY CONFIDENTIAL
2 process or assumed under the contract.
3    Q.  And you recall there was -- strike
4 that.
5    Let me ask you to turn to page
6 100, please.
7    A.  (Witness complies.)
8    Q.  It says "Barclays is also assuming
9 the cure amounts relating to contracts and
10 leases that will be assumed pursuant to the
11 Asset Purchase Agreement and that has a
12 potential exposure, Your Honor, of $1.5
13 million that he would testify to."
14    When it's referenced as potential
15 exposure do you understand that to be an
16 estimate of a potential maximum amount of
17 exposure if Barclays assumed all the
18 contracts?
19    MR. HINE:  Object to the form.
20    MR. AMER:  Yeah, I'm going to
21 object.  Can we just establish if he was
22 aware of this at the time and then you
23 can ask him.
24    MR. THOMAS:  No, I assume --
25    MR. HINE:  Or if he was at the

TSG Reporting - Worldwide    877-702-9580