# Exhibit F

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    ------------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,   (Jointly Administered)

9            Debtors.

10   ------------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF STEPHEN KING

14           New York, New York

15           September 10, 2009

16

17   Reported by:

18   MARY F. BOWMAN, RPR, CRR

19   JOB NO. 24299

20

21

22

23

24

25

Page 6

KING - HIGHLY-CONFIDENTIAL

1  STEPHEN KING,
2
3      called as a witness by the parties,
4      having been duly sworn, testified as
5      follows:
6  EXAMINATION BY
7  MR. HINE:
8      Q.  Good morning, Mr. King.
9      A.  Good morning.
10     Q.  We met briefly off the record.  My
11 name is Bill Hine.  I am from Jones Day, which is
12 the law firm representing, or acting as special
13 counsel for Lehman Brothers Holdings, Inc. in
14 connection with the bankruptcy proceeding that's
15 ongoing, and this deposition is related to that
16 proceeding.
17     Have you ever been deposed before?
18     A.  No.
19     MR. STERN:  Can we just introduce the
20 other people in the room.
21     MR. HINE:  Sure.  Myself from Jones
22 Day, and my associate is George Spencer, who
23 will be joining us shortly.
24     Do you want to go around the table?
25     MR. OXFORD:  Neil Oxford with the law

Page 7

KING - HIGHLY-CONFIDENTIAL

1  firm of Hughes Hubbard & Reed.  We represent
2  the SIPA trustee, and my colleague is Fara
3  Tabatabai.
4      MR. DAKIS:  I'm Robert Dakis.  I'm
5  from the law firm of Quinn, Emanuel,
6  Urquhart, Oliver & Hedges, and we represent
7  the official committee of unsecured
8  creditors.
9      MR. LAYDEN:  David Layden from Jenner
10 & Block.
11     MR. HINE:  This is Ingrid Christian,
12 who has lost her voice, from Alvarez &
13 Marsal, so I will do the honors of
14 introducing her.
15 BY MR. HINE:
16     Q.  Mr. King, as I'm sure your counsel has
17 explained, I am going to ask you a series of
18 questions.  You are going to provide the answers
19 as best you can.
20     I did want to alert you to one
21 procedural rule we have here.  From time to time
22 during the deposition, your lawyer will
23 undoubtedly state an objection or make some kind
24 of statement on the record as to the form of my

Page 8

KING - HIGHLY-CONFIDENTIAL

1  question.
2      MR. STERN:  Very unlikely.
3      Q.  I just want to let you know that does
4  not relieve you of the obligation to answer the
5  question.  It is just Jack being Jack.  It is Jack
6  doing his job, stating objections to the form of
7  the question.
8      In that regard, I will undoubtedly ask
9  a confusing question or a question that misuses a
10 term that you folks in your profession use all the
11 time.  I feel like I am learning a new language
12 here in some sense.  So please correct me if I
13 make a mistake with the term or abbreviation or
14 some kind of concept, because I really do want to
15 ask a clear question so you can then give me a
16 clear answer.  OK?
17     A.  Um-hm.
18     Q.  And if at any time you need a break,
19 let me know.  This is not an endurance test, so
20 just let me know if you need a break.
21     A.  Sure.
22     Q.  Can we start with your title at
23 Barclays?  What is your title?
24     A.  I am managing director and head of a

Page 9

KING - HIGHLY-CONFIDENTIAL

1
2  group called PMTG.
3      Q.  And PMTG stands for what?
4      A.  Portfolio mortgage trading group.
5  Principal mortgage trading group.  I forgot what
6  the P was.  It has been so long since we named it.
7      Q.  How long have you held that title?
8      A.  MD I have had for three, four years, I
9  think, and the PMTG group was formed in late 2007.
10     Q.  Could you describe for me briefly your
11 duties in this position?
12     A.  I run the group.  It is ostensibly a
13 trading and risk management group.  It is -- once
14 upon a time its primary asset was mortgages and
15 mortgage-related securities and derivatives
16 thereon.
17     We manage a portfolio of assets which
18 the bank owned that were mortgage assets, and we
19 also have a proprietary trading activity.
20     Q.  Who do you report to directly?
21     A.  I report to Eric Bommensath.
22     Q.  And do you know his title?
23     A.  He is global head of -- global head of
24 fixed income, I think, and there are some other
25 bits to it, too.

1           KING - HIGHLY-CONFIDENTIAL
2        Q.    And who reports directly to you?
3        A.    Do I need to list all of them?
4        Q.    No.  I'm just interested in the
5    principal folks that report to you directly.
6        A.    The team is -- well, the team is
7    slightly different today than it was a few months
8    ago.  It is about 30 or so people.  They are --
9    the senior folks are -- a number of them are
10    senior traders who trade a range of securities.  I
11    can give you their names if you like, if it is
12    relevant, for those traders, and then there are
13    also operations and risk management personnel as
14    well.
15        Q.    Could you give me the heads of the --
16    let me just ask it this way:  Is your group broken
17    into separate divisions or --
18        A.    Separate not divisions but functions.
19    It is one trading operation, but within that, we
20    have different products, different risks.
21    Therefore, the group is organized along those
22    risks.  But it is really -- in the terminology of
23    a bank, it is one desk.
24        Q.    OK.  Does Mr. Yang report directly to
25    you?

1           KING - HIGHLY-CONFIDENTIAL
2        A.    Yes, yes.  Jasen reports directly to
3    me.
4        Q.    Is it fair to say that you held this
5    same position during the week of September 15,
6    2008?
7        A.    Yes.
8        Q.    And --
9           MR. STERN:  I am just going to put out
10    the blank September 2008 calendar, just in
11    case Mr. King needs to reference it.
12           MR. HINE:  That's a good idea.
13        A.    It is fair to say that this group came
14    into existence or was derived from another group
15    which I ran in 2007 in a response to the crisis in
16    credit markets and mortgage-related assets.  So
17    therefore, the group's character has changed in
18    response to those conditions over the two years,
19    or three years.  I guess it is going on towards
20    three years now.
21           One of those things that prompted
22    change was the bankruptcy or seize of Lehman
23    itself.  So we expanded the group in response to
24    the need to manage the substantial portfolio of
25    risks and assets which the bank had taken on as a

1           KING - HIGHLY-CONFIDENTIAL
2    result of that acquisition.  So there is a slight
3    change in character immediately prior to and
4    immediately following the purchase.
5        Q.    When you say that acquisition, you are
6    meaning the acquisition of Lehman assets?
7        A.    The Lehman assets, yes.
8        Q.    As you can probably expect, most of
9    this deposition is going to center around the week
10    of September 15.
11        A.    Right.
12        Q.    Could you give me just a general
13    description of your role in connection with the
14    Lehman acquisition during that week?
15        A.    Yes.  My -- we are a -- I forgot P is
16    principal and not portfolio.  We are a principal
17    risk taking or risk managing unit, so -- and
18    essentially we were -- we manage or managed
19    illiquid risks, particularly difficult to trade
20    risks, particularly things like mortgages,
21    mortgage-backed securities.
22           So during this week and in the lead up
23    to the week, our job was -- my job was to
24    facilitate in gathering estimates as best as
25    possible in a very short period of time for the --

1           KING - HIGHLY-CONFIDENTIAL
2    for useful marks or valuations or prices for
3    various securities that were part of the various
4    different proposed purchase -- asset purchases,
5    and then the on boarding of this risk and then the
6    risk management of that risk.  That was our
7    function.
8        Q.    When you say illiquid risks or
9    illiquid assets, is there a separate unit within
10    Barclays that performs your function with respect
11    to more liquid assets?
12        A.    No.  A -- I mean I guess the answer
13    probably is yes, at some point.  It may be it
14    would be Treasury or it would be something else in
15    the bank.  For the most part, banks don't hold
16    large amounts of liquid risks, that trading
17    functions -- the reason this group was formed was
18    to deal with the fact that these are incredibly
19    difficult assets to dispose of.
20        Q.    I understand.
21        A.    And they trade, many of them trade by
22    appointment, meaning there is no exchange or
23    obvious market that you can easily trade the
24    assets.
25           So we all, we do use liquid

KING - HIGHLY-CONFIDENTIAL

1
2 instruments and liquid assets in the risk
3 management of these illiquid assets, so we trade
4 everything. But that's really the reason for the
5 existence of the business.
6     Q.   I understand.
7         Before we get into the week of
8 September 15, is your group separate and distinct
9 from something I see referred to as PCG?
10     A.   PCG is a control function. So
11 that's -- we are a trading group as opposed to
12 a -- so we work, I work for Eric Bommensath, who
13 works for Jerry in the business, if you like, as
14 opposed to product control, which is a control
15 function which reports up ultimately into Patrick.
16     Q.   Patrick Clackson?
17     A.   Yes.
18     Q.   So just I'm trying to picture the
19 structure of Barclays. The PCG group reports
20 under his reporting line, not yours, correct?
21     A.   PCG is a firm-wide function. It is
22 product control group, so it is a control
23 function. It deals with -- our interaction on a
24 daily basis with product control is to insure that
25 we have mandates to trade, that we are marking our

KING - HIGHLY-CONFIDENTIAL

1
2 books appropriately, that we are reporting
3 appropriately, and that all of the things that we
4 have to do on a normal basis are administered in
5 such a way that they can roll up into the firm's
6 books and records, et cetera, appropriately.
7     Q.   Can we talk specifically about the
8 week of September 15, and just to set some
9 parameters in case you are as bad with dates as I
10 am, September 15 is the date that Lehman Brothers
11 Holdings declared bankruptcy.
12         Can I ask you this question first.
13 You are aware there was some discussions between
14 Barclays and Lehman prior to that filing of
15 bankruptcy?
16     A.   Yes, yes.
17     Q.   Did you have any involvement in those
18 discussions?
19     A.   No.
20     Q.   Could you describe for me generally --
21 and again we are talking about the weekend of,
22 say, the 12th, 13th and 14th of September, right?
23     A.   Yes.
24     Q.   Could you just describe for me
25 generally your role in those sessions?

KING - HIGHLY-CONFIDENTIAL

1
2     A.   The same.
3     Q.   Meaning --
4     A.   That we were provided a list of
5 securities and assets that were -- at least what
6 we understood were owned or held by -- the 14th is
7 prior to the bankruptcy -- up to the bankruptcy of
8 LBM, so that then we were looking at the assets of
9 Lehman Brothers in its entirety.
10     Q.   OK.
11     A.   And then -- and there, our function
12 was to look at just the mortgage-related assets of
13 the Lehman Brothers overall group. But the
14 function was then the same, so assess estimates of
15 value or prices for categories of assets, and we
16 never really got to the risk management stage,
17 obviously because no transaction occurred.
18     Q.   When you say assess the category or --
19 categories of assets, were you provided a list of
20 all the CUSIPs that Lehman held at the time or --
21     A.   We were provided various lists of
22 CUSIPs or other such descriptions of assets that
23 Lehman held. I mean in the lead up to the 14th,
24 it was -- because it was the whole Lehman entity,
25 there were other assets, too, that weren't

KING - HIGHLY-CONFIDENTIAL

1
2 securities. For example, loan portfolios in
3 Europe, so they didn't have CUSIPs. But we would
4 also attempt to assess some kind of price for
5 those based on some simple analysis.
6     Q.   Your mandate during that period was
7 beyond just securities, it was any illiquid asset?
8     A.   No. Then we were really strictly
9 mortgage or asset-backed type assets. There was
10 an overall coordination of many groups. At that
11 point there were many groups or many trading desks
12 at Barclays in Europe and the U.S. that were
13 attempting to assess the entire Lehman Brothers
14 balance sheet or list of securities and assets.
15 So we were then just one, we were focused on one
16 part of that.
17     Q.   And did you come to New York to
18 participate in those discussions?
19     A.   We are based in New York.
20     Q.   So you participated in meetings with
21 Lehman folks during that weekend?
22     A.   I don't know whether we did by that
23 weekend. That was really -- I thought that was --
24 I thought in the lead up to that week, there was a
25 data room that was set up by Lehman. I never went

Page 18

```
1              KING - HIGHLY-CONFIDENTIAL
2    to it actually, but one of the people that works
3    for me did.
4             I would have been at Lehman over the
5    weekend, but most of what we did was phone calls
6    to people and -- I mean in reality, there is a --
7    it is a -- there were many, many -- this was a
8    phenomenally complex situation just because of the
9    number of line items.  So in many respects, the
10   approach that we took to the analysis was high
11   level down rather than bottom up, meaning to have
12   accurately assessed the value of an individual
13   security by reference to talking to a trader when
14   there were then, say, 10,000 line items was less
15   useful than being able to initially categorize
16   things as residential mortgage-backed securities,
17   credit card securities, et cetera, et cetera,
18   subordinate, senior, and then have broad
19   valuations based on where we know similar markets
20   trade, and then each day we just refined.
21        Q.   OK, I think I understood what you
22   said.  When you said bottom up, you mean if you
23   had the luxury of time, you -- one might go CUSIP
24   by CUSIP or security by security and try to assess
25   the value of an individual security?
```

Page 19

```
1              KING - HIGHLY-CONFIDENTIAL
2        A.   Right, right.
3        Q.   But you didn't have the luxury of
4    time.  Is that what I hear you saying?
5        A.   Luxury of time and even time -- then
6    markets are actually moving, so I would have to
7    be -- if you had infinite resources for a very
8    short period of time, then you might try to go
9    bottom up.
10            As -- once we had a definitive set --
11   it was really -- so the first exercise was -- and
12   this was repeated as we went through the 15th,
13   through the various iterations of the asset
14   population, was one, do we have a complete
15   description of the population, can we categorize
16   the population, can we estimate valuations for the
17   categories within the population, can we refine
18   and improve those estimates, increasingly becoming
19   more granular.  Have we engaged the appropriate
20   desks, trading desks within Barclays to -- or
21   existing Lehman desks, to provide us as much input
22   to where markets are or what securities -- what a
23   particular security is.
24            And then the last part was how do we
25   risk -- what is the risk associated with these
```

Page 20

```
1              KING - HIGHLY-CONFIDENTIAL
2    categories of securities and how might we either
3    plan to dispose of the assets or in the short term
4    risk manage the assets.
5        Q.   When you say risk manage, you mean
6    hedging?
7        A.   For example, hedging, yeah.
8        Q.   So the process you have described, is
9    it correct to say it started on the weekend of the
10   13th or 14th and then continued in some form
11   throughout the week of the 15th?
12       A.   Yes.
13       Q.   And how did it change -- well, as I
14   understand it, on the 14th, it was concluded that
15   there was no deal between Barclays and Lehman,
16   correct?
17       A.   That's what I understand, yeah.
18       Q.   And how did you learn that the talks
19   were going to start again?
20       A.   I think it was at some point on the
21   15th or 16th, we were once again asked to look at
22   another population of assets that was a subset of
23   the population of assets that we had been looking
24   at the previous week.
25       Q.   That was going to be my question.  How
```

Page 21

```
1              KING - HIGHLY-CONFIDENTIAL
2    did the population of assets change from the
3    weekend to the 15th?
4        A.   It was now the assets of LBI or what
5    we thought were the assets of LBI as opposed to
6    the assets of, say, LB.  Because there were
7    looking at all assets regardless of whether they
8    were held by LBH or LBIE or -- so, but by that
9    point we knew we were just looking at or what we
10   thought we were looking at was the assets that
11   were included in the balance sheet for LBI.
12       Q.   OK.  Now, were you provided additional
13   information on the 15th or did you just use the
14   information you had previously acquired or --
15       A.   No, we -- I'm not sure -- we may have
16   been provided some of that information the
17   previous week.  Again, because the scope of the
18   exercise had narrowed from the entire -- you know,
19   us participating in a small part of assessing the
20   overall assets of Lehman Brothers to a larger part
21   of a much -- a subset of that overall population,
22   which was now just the LBI assets.
23            In keeping with the process of
24   improved granularity of analysis as the population
25   shrunk or the -- we were able to look at a more
```

Page 22

KING - HIGHLY-CONFIDENTIAL

1
2  refined list of assets on the 15th and spend more
3  time. But we definitely reused the -- where there
4  was overlap with analysis that we had done the
5  previous week, we definitely reused it.
6      Q. Let's start with this document. I
7  think -- well, during the -- now we are in the
8  week of the 15th, starting Monday. Ultimately
9  some kind of agreement was concluded between
10 Lehman and Barclays on the 16th, correct?
11     A. In relation to --
12     Q. Well, an agreement was signed on the
13 16th. Are you aware of that?
14        MR. STERN: Objection to the form.
15     A. I don't --
16     Q. Did you ever see what has been termed
17 the asset purchase agreement in connection with
18 the Lehman-Barclays transaction?
19     A. I have seen drafts of it.
20     Q. Were you involved in the -- I am just
21 trying to get a scope of what your involvement
22 was. Were you involved in the back and forth
23 negotiations as to the terms of the asset purchase
24 agreement?
25     A. No, no.

Page 23

KING - HIGHLY-CONFIDENTIAL

1
2      Q. In the course of your -- well, let me
3  get back to the 15th. On the 15th and 16th, did
4  you participate in meetings between Barclays and
5  Lehman?
6      A. I don't think so. I mean we may have
7  done on the 16th, but if it was, it was strictly
8  to do with identifying the -- you know, a trader
9  who may have been able to provide us clarity about
10 what a particular security was. But I think --
11 but there wasn't an awful lot of that that we had
12 to do.
13        And it was very -- you know, we did
14 more of that in the previous week when we were
15 trying to understand what the asset population
16 was. That was really when we needed some
17 assistance with people from Lehman.
18        But on the 16th, around the 15th and
19 16th, the only thing I could think, we probably --
20 there must have been some dialog, have we got a
21 list of securities to look at. So I would think
22 that we were sent lists, so if you wanted to
23 include e-mails sending us lists of securities,
24 I'm sure that yes, there is communication.
25        But communication in the sense of did

Page 24

KING - HIGHLY-CONFIDENTIAL

1
2  we sit down and have conversations with people,
3  very, very limited.
4      Q. Well, I understand the providing of
5  information part of the discussion, but separate
6  from that, was there a back and forth as to the
7  valuation or marking of particular Lehman assets
8  that were the subject of the discussions?
9      A. I don't think so really. The -- on
10 the 15th and 16th. No. I think for the most part
11 the 15th and 16th was trying to establish have we
12 got -- these exercises are -- they take a lot of
13 effort.
14     Q. Sure.
15     A. And the reason why we were involved
16 was because we had some proficiency in dealing
17 with understanding new populations of securities
18 or assets, because that's what we had been doing
19 for the last year and a half.
20        So one thing that we -- one thing that
21 is critical is to insure that you are not spending
22 a tremendous amount of time working on things that
23 were irrelevant. So the first thing we need is to
24 be sure that we have got the correct population.
25 If we are spending time analyzing something that

Page 25

KING - HIGHLY-CONFIDENTIAL

1
2  isn't going to be delivered, then we have
3  definitely wasted time. We are coming up with a
4  wrong valuation and we will never manage the
5  correct risk.
6        So I think mostly around the 15th and
7  16th would have been, well, OK, what are we
8  looking at this time? And of course during the
9  course of that week, and that's why -- you know,
10 my -- the only reason why I am vague as to exactly
11 what happened the 15th, 16th and 17th, is that it
12 changed so much so rapidly, that most of what was
13 happening on the 15th and 16th and almost all of
14 what we were looking at became redundant by some
15 time on the 16th, 17th or 18th.
16        MR. STERN: Let me just to clarify, I
17 take it you are focusing on what Mr. King's
18 role was and what he was involved in, and
19 when he uses the term "we," he is referring
20 to himself and his group as opposed to
21 Barclays as a whole.
22        THE WITNESS: That's absolutely
23 correct.
24        MR. HINE: I understand. I
25 understand.

Page 26

KING - HIGHLY-CONFIDENTIAL

1
2    Q.    But, Mr. King, you folks didn't accept
3  the -- at face value the valuations or marks that
4  Lehman had put on various asset groups, did you?
5    A.    No.
6    Q.    Did you come to some conclusions about
7  the accuracy of Lehman's marks when you were
8  looking at all these asset groups?
9    A.    It is a peculiar way to describe it,
10  did we come up with some assessment of the
11  accuracy of Lehman's marks.  In some respects I
12  could say I didn't care about Lehman's marks.  I
13  cared about what was a reasonable assessment for
14  the value of the assets and ultimately what was
15  the risk that we were going to have to manage.
16        If you think about the way a -- as a
17  trader would think, we received phone calls from
18  somebody saying I'd like you to buy -- would you
19  be interested in buying the following at a price
20  or 72.  It is fascinating it is 72 they would like
21  to sell it to me at, but mostly I am interested in
22  where we would be interested in buying it, 55.
23        So can I therefore say ex post facto
24  that, you know, well, I have got some -- I didn't
25  think their offer of 72 was particularly accurate,

Page 27

KING - HIGHLY-CONFIDENTIAL

1
2  that's an inadvertent output of the fact that we
3  wanted to bid it at 50-something.
4    Q.    I think my question exhibited my
5  inexperience in this field, so I will try again.
6        Did you -- when you received the
7  information from Lehman, it had some kind of book
8  value ascribed to it by Lehman, correct?
9    A.    Yes.
10    Q.    Did you understand that by the time
11  Barclays and Lehman signed an agreement, that
12  there was going to be some kind of discount off of
13  that book value for the pool of assets that
14  Barclays was going to be acquiring?
15    A.    The signing of the agreement on the
16  Tuesday that you have told me about?
17    Q.    Yes, yes.
18    A.    -- or later --
19    Q.    Yes.
20    A.    I don't know much -- I don't really
21  know what agreement was reached on the 16th.  All
22  I know is that there was some assets that we were
23  looking at.  I would assume that it wouldn't have
24  been at all a surprise to anybody that a bid, even
25  a reasonable bid or reasonable assessment of a bid

Page 28

KING - HIGHLY-CONFIDENTIAL

1
2  for small size would be at a discount to book
3  value if that's the valuation that you are
4  referring to.  Book value being where it is held
5  in books and records.
6    Q.    Well, I guess I understand your
7  answer, but do you have any recollection of
8  discussions during that period of time -- and
9  again I'm talking the 15th and 16th -- about
10  either discounting or reducing the values that
11  Lehman had ascribed to these pools of assets in
12  order to come to an agreement as to the pool of
13  assets or the marks for the pool of assets that
14  Barclays was going to acquire?
15        MR. STERN: This is you personally.
16    A.    This is me personally.  I have never
17  had any conversations with anybody at Lehman about
18  discounting Lehman's marks.  It is definitely the
19  case that in the crudest -- if somebody said to
20  me, Stephen, here is a security, you don't know
21  what it is, but, you know, it is -- it has a
22  price -- the last time it traded it had a price of
23  50, let's say, mentally, I would say, well, I know
24  it is not -- I certainly wouldn't be bidding 50.
25  I would be bidding half of that or 20 percent of

Page 29

KING - HIGHLY-CONFIDENTIAL

1
2  that or 80 percent of that or some number.
3        So it is definitely the case that when
4  we were trying to guess what might be a reasonable
5  value, in a very, very distressed market --
6    Q.    Sure.
7    A.    A very, very distressed market for a
8  very, very substantial number of assets that
9  Barclays would want to be selling, and Barclays
10  didn't -- bear in mind, Barclays didn't want these
11  assets.  The assets were -- you wouldn't want to
12  hold on to them.  They consume capital.  They need
13  to be funded.  Funding was expensive, capital was
14  expensive.
15        The assets were part of, you know, a
16  deal, and therefore, they would -- and, you know,
17  the -- I avoided the word "hedging" when you used
18  hedging because hedging doesn't really -- hedging
19  still means there is a left-over risk.  You never
20  really -- especially with assets like this.
21  Hedging is just, well, I have got one thing that
22  I'm short against something I am long.  It is not
23  very well hedged, there is still a risk, and
24  that's why banks and hedge funds have had quite a
25  lot of difficulty in the last few months.

Page 30

KING - HIGHLY-CONFIDENTIAL

1
2    So we knew that the objective would be
3  that we need to dispose of this risk.  That was
4  the objective.  So if I was looking at a portfolio
5  of assets, and you held the assets at 100, let's
6  say, I'd say I don't know -- and I felt
7  comfortable that I understand what the assets are,
8  my bet is I couldn't sell those for more than
9  80 cents of where you have currently ascribed a
10  value to them.
11    So yes, when we -- as a desk, the "we"
12  meaning my group, one of the first things that we
13  did was say, let's just assume that the stuff we
14  don't know is at 50 percent of book value.  The
15  stuff that is exchange traded equities is at
16  95 percent of where it is, because that was a --
17  the crudest form of guess.
18    Q.   Is that the type of analysis you were
19  doing on the 15th and 16th when you described -- I
20  think you previously talked about a top-down
21  approach as opposed to bottom up?
22    A.   Yes.  Because you do that -- really if
23  you think about it, you repeatedly do that same
24  process at an ever-more granular level.  Even if
25  you got down to an individual security, a trader

Page 31

KING - HIGHLY-CONFIDENTIAL

1
2  would say I've projected -- the thing about some
3  of these securities and assets is, unlike -- not
4  all of them but some of them, and certainly the
5  ones that we would have been looking at at this
6  time, they are not -- even though many of them are
7  called fixed income or debt instruments, the
8  amount of cash that they would be expected to
9  ultimately pay is actually uncertain, either
10  because there is a lot of risk associated with the
11  borrower or there is a prepayment risk or there is
12  something that makes the cash flow uncertain.
13    So the way a trader would look at it
14  is to say, I'll make a -- I'll form a view of how
15  much cash that I would want -- that I expect to
16  receive on this security, and then I would want to
17  discount the amount of cash back to some price
18  that I felt that I was earning an appropriate
19  yield on.  And then when a trader was then
20  subsequently bidding, they then may provide --
21  say, actually I'll bid 80 percent of that.
22    So whether it is at the portfolio
23  level, when we are looking at a whole balance
24  sheet, or an individual CUSIP, in many respects
25  the process is the same.  It is about how

Page 32

KING - HIGHLY-CONFIDENTIAL

1
2  confident you can be that you have assessed
3  everything correctly, because there is so much
4  uncertainty.
5    Q.   I think I understand that.
6    So during this early stage now, the
7  15th and 16th, is it correct to say you're looking
8  at particular asset classes or groups of assets by
9  type and performing this type of analysis on them?
10    A.   Yes, yes.
11    Q.   And so certain groups of assets, you
12  would be willing to pay a higher percent than
13  other groups, right, or --
14    A.   Yeah.  Because to reflect the idea
15  that the uncertainty about the price or the cash
16  flows was more or less clear.
17    Q.   So were there particular assets or
18  groups of assets within the Lehman portfolio that
19  was supposed to be sold to Barclays that warranted
20  much deeper discounts than others?
21    A.   Yes.
22    Q.   And which were the most discounted --
23  or which groups would require the most discount
24  from your perspective?
25    A.   The assets that are the typical assets

Page 33

KING - HIGHLY-CONFIDENTIAL

1
2  that my group manages, which is things like
3  mortgage-backed securities, deeply distressed
4  credit securities, things for which there is a
5  very, very limited market and poor visibility on
6  the expected cash flows.
7    Q.   And what kind of discounts would those
8  groups of assets get during this week?
9    A.   To what?
10    Q.   I don't know, did you -- again,
11  talking about the 15th and 16th, did you say --
12  again, I might be showing my ignorance here --
13  here is a pool of mortgage-backed security, a lot
14  of uncertainty here, let's mark their -- let's
15  discount their marks down by, say, 50 percent?
16    A.   Right.
17    Q.   You did.
18    A.   Yes.
19    Q.   OK.  And then other, presumably other
20  categories more secure, more visible -- again, I
21  might be displaying my ignorance, but perhaps
22  government securities might warrant a much smaller
23  discount in the mark?
24    A.   Precisely.
25    Q.   Is that right?

Page 34

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2      A.  Precisely.
3          (Exhibit 388-B, document Bates stamped
4      BCI-EX-S 74256 through 257 marked for
5      identification, as of this date.)
6      Q.  Mr. King, I am handing you a copy of a
7  document marked as 388-B, which is a two-page
8  document with Bates numbers BCI-EX-S 00074256
9  through 257.
10         After you have had a minute to look at
11 it, let me know, and I have a question or two
12 about it.
13     A.  OK.
14     Q.  Have you had a chance to look at the
15 document?
16     A.  Yeah.
17     Q.  Have you ever seen this document
18 before?
19     A.  Yes.
20     Q.  When?
21     A.  I remember -- this actually is, I
22 think this is my handwriting on it, and I also saw
23 it yesterday.
24     Q.  When you say "my handwriting on it,"
25 you are referring to the second page of the

Page 35

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  document?
3      A.  Yes, yes.  Sorry, I thought you were
4  suggesting that I look at both pages.
5      Q.  Yes, yes, I was.
6          And is it fair to assume that this
7  document was sent to you on the 17th by Mr. Yang?
8      A.  Well, I would have seen this document
9  before the 17th.  He is sending it to James
10 Walker.  He just happens to be copying me.
11     Q.  Let me distinguish, when you say "this
12 document," the covering e-mail is on the 17th, but
13 the second page, you have seen that before the
14 17th?
15     A.  Yes.
16     Q.  Can you tell me when you first saw
17 that, the second page?
18     A.  I saw -- I think I saw a hard copy of
19 this at some point -- was this -- yeah.  This is
20 an e-mail and this is a hard copy, so I don't
21 quite know how -- whether Jasen had scanned it or
22 how the two became connected, but we had seen --
23 can I ask that?  Is that --
24     Q.  Well, this is how it was produced.  It
25 doesn't really matter about the -- where Mr. Yang

Page 36

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  got it, so I'm not going to ask you about that.  I
3  just want to focus on the second page of this
4  document.
5      A.  I'd seen this in hard copy, which is
6  why I have scribbled on it at some point after
7  the -- after the 12th.  It was produced on the
8  12th.
9      Q.  This was produced by Lehman to
10 Barclays on the 12th?
11     A.  That's what it says on the top
12 left-hand corner of the page, Lehman
13 Brothers balance sheet by GAAP asset type 9/12.
14 So I couldn't have seen it before the 12th, but I
15 must have seen it at some point thereafter, but
16 I'm not exactly sure when.
17     Q.  You believe you saw it over that
18 weekend at some point?
19     A.  I had seen it during the weekend.  I
20 might have seen it during the weekend, but that
21 was in the old -- that was in the first iteration
22 of the potential acquisition.
23         So I don't know when I saw it.  All I
24 know is I definitely saw it before he sent it to
25 James Walker.

Page 37

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2      Q.  I guess that was my question.  Was
3  this part of your analysis or discussion over the
4  weekend for the first iteration, or did you --
5      A.  I don't remember.
6      Q.  Or did you use it in connection with
7  the second iteration on, say, the 15th and 16th?
8      A.  I can confirm the latter part.  I might
9  don't remember the former.  We might have seen it
10 in relation to the first part, but then it is only
11 a subset.  I don't really know why -- in the first
12 iteration of the transaction, where it was buying
13 Lehman, we never really had thought about Lehman
14 as being multiple entities.  So looking at LBI
15 specifically prior to Sunday would have been
16 something I wouldn't have focused on.
17         So I don't think I looked at it at the
18 weekend.  I would think I looked at it on the
19 Monday or Tuesday when we were told here is the
20 next iteration of the transaction.
21     Q.  OK, OK.  And you are referring to the
22 Lehman Brothers, Inc. at the top of this document?
23     A.  Yes.  This is Lehman Brothers, Inc.,
24 as opposed to Lehman Brothers.  But up to the
25 Sunday, we were thinking Lehman Brothers.  So the

KING - HIGHLY-CONFIDENTIAL

1       KING - HIGHLY-CONFIDENTIAL
2 first thing I would have asked if somebody sent me
3 this is, to my point about population, am I
4 looking at everything, because otherwise this is
5 redundant.
6      Whereas on the Monday, if someone said
7 we are now looking at LBI, I can say is it correct
8 that this is the population of what we are
9 supposed to look at, and someone could say yes,
10 and that would make sense.  Now we have got
11 something to work on.
12      So I would think that I saw this on the --
13 and also, by the way, these things, even though
14 they say 9/12, typically it would take 24 to 48
15 hours at least for somebody to produce this.
16    Q.  OK.
17    A.  So I very much doubt this -- although
18 it is of the 12th, the 12th is close of business
19 on the Friday, which means it almost certainly
20 didn't exist until something like the Sunday, and
21 I would think it was shown to us on the Monday or
22 Tuesday.
23    Q.  OK, fair enough.
24    Do you recall what you were -- I see a
25 lot of handwriting and a lot of numbers.  Do these

1       KING - HIGHLY-CONFIDENTIAL
2 refresh your recollection about what you were
3 analyzing?
4    A.  No.  These are sort of typical
5 scribble from me.  The e-mail is -- the e-mail
6 covering is quite elucidating because it
7 highlights -- the fact that it is a physical --
8 one of the problems we had at that time was this
9 is a physical.  There also was -- I remember that
10 there was -- and I don't have this, but there was
11 a paper copy again of securities that -- these
12 numbers are produced by Lehman's systems.  So
13 there would have been line items of all the
14 individual securities that fed up into these
15 numbers.
16    What Jasen is highlighting on the
17 front is that we have obviously by the 17th, this
18 definitely would have been the case as well,
19 started to receive files, which would have been
20 Excel files, I would think, and what he is
21 starting to explain is, all right, we have started
22 to try to understand what is the population that
23 leads to this.  If this is what we are buying, is
24 the assets that are currently on -- the assets
25 that are currently on LBI's balance sheet, his

1       KING - HIGHLY-CONFIDENTIAL
2 e-mail explains that we have started to get files
3 that should be all of this, but they don't tie
4 out.
5    He actually points out, you know,
6 corporate obligations, corporate stocks do not tie
7 out to the summary.  So we have been sent files
8 that purport to be the same but that don't tie
9 out.
10    Q.  So tie out in your understanding means
11 he is trying to compare the files of individual
12 securities with the line item in the -- on this
13 balance sheet and see that they add up to that
14 total?
15    A.  Exactly right.  So he would have had
16 something that says total corporate obligations
17 and spot total, let's say.  If he would have been
18 sent a file that also purports to be corporate
19 obligations and let's say included then the line
20 items, a notional or a price, so he could
21 calculate a mark, add the marks up, he ought to
22 get back to that number, and his e-mail indicates
23 that they don't.
24    Q.  His e-mail is trying to, as you said,
25 get the proper population of the securities in

1       KING - HIGHLY-CONFIDENTIAL
2 each group?
3    A.  Yeah.  And you see, as you say -- my
4 sentence is that I have asked Jasen to send this
5 to James, because I thought I'd seen something
6 that looked similar to it that might help us to be
7 able to find out.  Because with this, there is
8 almost -- again there is almost nothing you could
9 do.  You would say -- using the percentage
10 approach, you would have to just take very heavy
11 haircuts to these large numbers and say I don't
12 really know what is behind this.
13    Then on his e-mail he is saying, we
14 have got some stuff but it doesn't tie out to
15 those numbers, and furthermore, we don't have
16 listings for derivatives category.  We are able to
17 tie out the asset listings we were given on
18 Monday.  We were given some asset listings on
19 Monday, so he is showing on Monday there were some
20 files.
21    And then the last sentence is pretty
22 interesting because it highlights the fact that
23 the problem wasn't a static problem.  It was a
24 dynamic problem.  So he has a list of securities,
25 but he says the government and agencies book is --

Page 42

KING - HIGHLY-CONFIDENTIAL

1  
2  although we understand from Clement Bernard that
3  the government and agencies book is shrinking as
4  trades are unwound.
5        The problem here was the
6  counterparties to Lehman were terminating their
7  trades.  So we all have now realized that although
8  Lehman was sending us populations, minute by
9  minute, counterparties to Lehman were terminating
10  trades.  Therefore, this population is changing.
11     Q.   I understand.
12     A.   And this was only supposedly as of the
13  12th, which is the Friday.  So by the 17th, the
14  probability that these securities still were on or
15  available to LBI was low.
16     Q.   OK.  Thank you for that.
17        I would like to step back to before
18  the Wednesday, back to the Monday when you're
19  somehow using this document in connection with
20  your assessment of the Lehman assets.  Are
21  these -- if you look on the left-hand column, it
22  has "GAAP asset class."  Do you see that?
23     A.   Yes.
24     Q.   And then it has six different asset
25  classes listed.  Are these the -- are these asset

Page 43

KING - HIGHLY-CONFIDENTIAL

1  
2  classes that fell within your purview in the
3  principal mortgage trading group as groups of
4  assets that you were asked to look at?
5     A.   Not on -- not at this time.
6     Q.   Not on the 15th or 16th?
7     A.   No.  We were -- the assets that we
8  were looking at were the -- it was starting to be
9  the case around the 15th and 16th that I had -- I,
10  we, my group, had two hats that we were wearing.
11  One was to look specifically to end up as the
12  ultimate risk -- actually that's not true, not to
13  end up as the ultimate risk manager, but to assess
14  the value of specific instruments.  Here the line
15  item in here that would say total mortgage or
16  mortgage-backed total, the 6 and a half billion.
17  So that is a category that my group would have
18  expected to -- or be capable of risk managing.
19     Q.   Right.
20     A.   That's one hat.
21        There is a second hat that we were
22  starting to wear, which was to facilitate in the
23  coordination and aggregation of the opinions of
24  other expert desks within Barclays on the other
25  line items.  So, for example, total government and

Page 44

KING - HIGHLY-CONFIDENTIAL

1  
2  agencies securities, governments and agencies are
3  traded by a -- you know, there is a desk at
4  Barclays that trades governments and agencies.
5     Q.   Is that desk outside your principal
6  mortgage trading group?
7     A.   Yes, yes.  It is in Eric's world, but
8  it is a trading desk.
9     Q.   Eric who?
10     A.   Eric Bommensath, my boss.  It is a
11  trading desk, a customer trading desk, and we
12  would have no -- my desk would have no advantage
13  in providing a practical assessment of whether --
14  of what the valuation pricing or risk management
15  issues were associated with 39 billion dollars
16  worth of governments and agencies.
17        But with the hat of coordinating, we
18  were starting around the 15th or 16th to
19  facilitate in coordinating and aggregating that
20  information.
21     Q.   So can I just see if I understand what
22  you said.
23        Your group, the principal mortgage
24  trading group would have -- were provided the
25  assessment, if you will, as to the total mortgage

Page 45

KING - HIGHLY-CONFIDENTIAL

1  
2  and total -- and mortgage-backed securities line
3  item, but as to the other five line items here you
4  would have acted as facilitator?
5     A.   Correct.
6     Q.   Assembling the assessments of other
7  groups within Barclays?
8     A.   Correct.
9     Q.   After you assembled those, presumably
10  that enters into the negotiations between Lehman
11  and Barclays in some way?
12     A.   Then I would have provided an
13  assessment to somebody as to where the current
14  estimate for the cumulative value in our view of
15  value was for this portfolio and particular
16  categories.
17     Q.   Who did you provide that to?
18     A.   I don't remember.  It might have been
19  a variety of people.  It could have been to -- it
20  would have been at various times to Patrick or to
21  Mike or to whoever was asking me for it at that
22  moment, James Walker, whoever.  Some various
23  people at various times asked for an assessment of
24  value for different purposes, and we would provide
25  it.

Page 46

KING - HIGHLY-CONFIDENTIAL

1
2  Q.   Now, are you talking about people
3  within Barclays or are you talking -- in other
4  words, here is my -- my confusion here is this:
5  Are you engaged in any kind of one-on-one
6  conversations within Lehman as to the types of
7  discounts we might apply to these different
8  groups?
9      A.   No.
10     Q.   Or are you just providing it to other
11 people within Barclays?
12     A.   Other people within Barclays.
13     Q.   Do you recall the conclusions you
14 reached on the 15th or 16th about these particular
15 asset types as far as the amount of discount that
16 would be required?
17     A.   Not particularly.  I remember that
18 the -- I remember that the mortgage securities,
19 for example, we carried around -- we had just said
20 I would -- I don't think -- I would be -- I think
21 we used something like 50 percent for the mortgage
22 securities, for example.
23     Q.   OK.  OK.  Do you recall what you used
24 for the other categories, any of the other
25 categories?

Page 47

KING - HIGHLY-CONFIDENTIAL

1
2      A.   No.
3      Q.   Is it fair to say, as I think we
4  previously discussed for the less risky or more, I
5  think you used the word visible categories, you
6  would use a smaller discount than the 50 percent?
7      A.   Yes.  And that's an interesting thing,
8  because I remember actually that one of the
9  categories here, total government and agencies, I
10 remember thinking -- I think you can sort of see
11 in some of the scribble here as well, for example,
12 the 3.2, I could see a number 3.2 here, which I
13 would guess is half of the 6.5 billion or the half
14 that we were saying that -- one of the problems
15 with that category in particular was that we
16 didn't even know what some of the securities were.
17 They were just -- you know, because if you look at
18 a CUSIP, a CUSIP doesn't tell you anything.  You
19 have to get a description to go with a CUSIP.
20     Q.   When you say "that category," talking
21 about mortgage backed?
22     A.   Mortgage backed.  Unfortunately banks
23 have a tendency of using mortgage and
24 mortgage-backed securities to mean anything that
25 isn't obviously something else.  So it isn't just

Page 48

KING - HIGHLY-CONFIDENTIAL

1
2  mortgages.  It is CDOs, it is manufactured
3  housing, it is franchise loans.  It is a lot of
4  stuff.  Because you notice it doesn't obviously
5  fit into any of those other categories, so it is
6  stuff.
7           Because it is stuff, some of it you
8  would have no idea from the CUSIP or even the
9  description whether it was a performing or
10 nonperforming security, a senior obligation or a
11 junior obligation.  You would actually have to go
12 to Bloomberg, or if in some cases it wasn't listed
13 on Bloomberg, go to a trader and say what is this.
14          Some of these, for example, were what
15 they call whole business securitizations, which
16 are secured lendings against assets of corporates.
17 And there you would have to understand something
18 about the company.
19     Q.   So in the end, because of all these
20 uncertainties, you ascribed a 50 percent discount
21 rate to that line item?
22     A.   If someone said -- yeah.  But for a --
23 if I was asked for an initial guess, a guess, I
24 would say, you know, I can't imagine that -- if
25 you turned around and asked somebody for a bid of

Page 49

KING - HIGHLY-CONFIDENTIAL

1
2  6 and a half billion dollars -- these securities
3  for example, mortgage and mortgage-backed
4  securities, they trade in -- they have -- many of
5  them have face values, notionals of millions of
6  dollars.  Single numbers of millions of dollars.
7  So you can see that 6 and a half billion dollars
8  of assets is thousands of line items.
9           Furthermore, many of them will trade
10 at a few cents on the dollar, 5, 10, 3, 20.  So
11 there is a tremendous level of uncertainty and
12 inaccuracy about it.  And the 6 and a half billion
13 dollars of assets, to sell 6 and a half billion
14 dollars of assets would take a tremendous amount
15 of time.  Actually, it did ultimately take the
16 better part of a year.
17          So therefore, to just guess, I can't
18 believe that if they are marked there, that if you
19 needed to sell them or you wanted to bid them,
20 that you would bid more than 50 cents on the
21 dollar, would have been a guess.
22          Now, remember, subsequently we did
23 some work on it and came up with similar sort of
24 numbers on it, which is why I happen to remember
25 that one.

KING - HIGHLY-CONFIDENTIAL

1
2    Q.   That's the one that is within your
3    group?
4    A.   That's the one within the group.
5    Interesting thing, the government and agencies
6    securities, 39 billion, I remember on -- at around
7    this time on the 15th and 16th, I had a pretty
8    rosy view of the liquidity of government
9    securities and agencies, mostly because I was
10   pretty ignorant of what they were.  Of course
11   because of the collapse of Lehman in the previous
12   two days, there was no liquidity in these either.
13           So these agency securities turned out
14   to be some of the hardest securities to sell
15   subsequently.  There was a -- there wasn't
16   39 billion dollars of them, but there was a
17   significant population of agencies securities that
18   were in the Fed repo facility.
19           They took nine months to sell at a
20   significant discount, much more than I would have
21   ever guessed on that day, because I would have
22   thought they were liquid.  There were no liquid
23   markets at this point.
24       MR. STERN:  Bill, could we take a
25       brief break?

KING - HIGHLY-CONFIDENTIAL

1
2       MR. HINE:  Sure, sure.
3       (Recess)
4    BY MR. HINE:
5    Q.   Mr. King, I would like to continue
6    with the second page of Exhibit 388-B, if you
7    will.  On the right-hand side of the balance sheet
8    it's entitled "Net Short Inventory."  Do you see
9    that?
10   A.   Um-hm.
11   Q.   Was this side of the balance sheet
12   something that you worked on in connection with
13   these transactions, or is that someone else at
14   Barclays?
15   A.   No.  There were -- it was one of the
16   things that -- they weren't really separable
17   because the longs and shorts obviously were
18   supposedly interrelated.  And you can see that --
19   it kind of highlights as well that something like
20   the mortgage or mortgage-backed pool, if you will
21   notice, is -- there are very few in the way of
22   shorts against that because it is not written --
23   it is not a -- something that is hedgeable that
24   you would expect to have two directional markets.
25   People buy stuff, therefore they are long,

KING - HIGHLY-CONFIDENTIAL

1
2    therefore all of the asset -- there is assets and
3    there is no liabilities.
4           Whereas something like government and
5    agencies is an active two-way market, people
6    borrow and sell.  You can borrow securities and
7    you can sell them, so there would be shorts.
8    Likewise, you know, corporate equities and stocks,
9    et cetera.  Again, nonmoney market instruments and
10   CDs, there is no way to short them.
11   Q.   So is it fair to say with respect to
12   the right side of this balance sheet, you
13   performed the same function you previously
14   described, assembling assessments for the first
15   five line items, and supervising your group and
16   providing assessments for the last line item?
17   A.   That's correct.  And as you see, there
18   is really nothing there.  So really it would have
19   been that we would have provided the list of longs
20   and shorts in files and sent them to the
21   respective desks.
22           And as Jasen says, of course, in
23   reality -- therefore, I can't really comment much
24   on those values because there are -- there is
25   almost nothing that's relevant to the work that my

KING - HIGHLY-CONFIDENTIAL

1
2    group was doing for itself for the last line item.
3    As Jasen's e-mail on the front says, the shorts
4    were evaporating as people closed out trades --
5    bad choice of words I suppose.  They were
6    disappearing as people actually closed out trades
7    against Lehman, and within 24 hours of this
8    Wednesday, I think they became irrelevant.  So
9    there is very little work that was done on that
10   right-hand side.
11   Q.   I understand.
12           I think you said earlier that you were
13   not engaged in one-on-one discussions with Lehman
14   about the valuations of these different groups of
15   assets?
16   A.   Correct.
17   Q.   Was there someone at Barclays who was
18   so engaged?
19   A.   I don't know.
20   Q.   You don't know.  OK.
21           Before we leave this sheet, can I ask
22   for a translation on some of your handwriting.
23   The phrase says 3.8 and there's a text.  Do you
24   see that?
25   A.   Yeah.

## Page 66

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  the 65.115, whether they are even based on the
3  same date, same populations.  But I do remember
4  that fact about the mortgage and mortgage-backed
5  part.
6        MR. STERN:  And that's independent of
7  Exhibit 19?
8        A.  Yes.  You can't derive that from --
9  you can't see that -- I don't remember that from
10 seeing Exhibit 19 previously, and I'm not deriving
11 it from that.
12       I am deriving it from a combination of
13 memory about discussions around that 6 and a half
14 billion dollars of mortgage and mortgage-backed
15 securities that are on the 388 page 2, and the
16 fact that I can see there is only 2.7 billion on
17 the mortgage line on Exhibit 19.
18       Q.  I understand.
19       A.  But I don't really -- I don't know
20 the -- I haven't seen this before, I haven't seen
21 Exhibit 19 before.  At least I don't remember
22 seeing it.  Therefore, I don't remember.  It
23 wouldn't surprise me that 72 and a half or 70
24 were -- because, as Jasen's e-mail says, things
25 changed by that day.

## Page 67

1  KING - HIGHLY-CONFIDENTIAL
2        Q.  Let's talk about the mortgage-backed
3  securities for a second.  At some point in time it
4  was agreed that Barclays would only take half of
5  those securities, correct?
6        A.  Yeah.
7        Q.  And was it later agreed that they
8  would take more than that?
9        A.  As I say, as I pointed out earlier on,
10 one of the difficulties here is that all of what
11 we are discussing, as far as I know, as far as we
12 were concerned, became irrelevant within hours or
13 days of the 16th.  So the entire discussion about
14 this by the 17th we had put out of our minds.  Or
15 the 18th.
16       Q.  "This" meaning the valuation exercise
17 you were talking about earlier?
18       A.  Yes.  Because -- and that's very
19 challenging -- and we had to prioritize, because
20 in many respects around this time we were working
21 literally 24 hours a day.  And so the only way to
22 manage this was to say that's now redundant, I
23 don't want to discuss it, I don't care about it,
24 we need to focus on what we need to deliver,
25 because someone has asked us something within an

## Page 68

1  KING - HIGHLY-CONFIDENTIAL
2  hour and a half.  So now we are going to move to
3  that.
4        So at some point -- so there are --
5  unfortunately you are asking me about things that
6  within a day or so were irrelevant to us.
7        Q.  "Us" meaning --
8        A.  "Us" meaning my group.
9        Q.  OK.  Well, tell me then why this all
10 became relevant.  I assume you are talking about
11 in the Wednesday-Thursday time frame?
12       A.  Yeah, at the point that we started to
13 be asked to focus on the securities that were
14 collateralizing the Fed repo facility.
15       Q.  And what were you told in that regard?
16       A.  That here is a population of
17 securities that is collateralizing a loan that was
18 provided to LBI by the Fed, and we were being --
19 we, Barclays being asked to step into the
20 position of the Fed.  I don't know -- I wasn't
21 part of the discussions as to why that would be
22 the case or whether it -- or how it had come about
23 or whether we would do it.
24       My group was then asked once again to
25 provide an assessment of the probable value or --

## Page 69

1  KING - HIGHLY-CONFIDENTIAL
2  not just even the value actually.  What was in the
3  Fed facility.
4        Q.  And who told you -- who told you all
5  this?  Who gave you these instructions?
6        A.  The instructions to start to do that
7  work?
8        Q.  Yeah.
9        A.  I think, I think it was Mike at the
10 time asked us to look at it.
11       Q.  Mike who?
12       A.  Keegan.
13       Q.  And did you -- you understand that
14 there was a repo transaction entered into on
15 September 18 involving Barclays and Lehman,
16 correct?
17       A.  Yes.
18       Q.  That's the Thursday?
19       A.  Yes.
20       Q.  And so was this assessment you were
21 asked to do prior to that repo transaction or
22 was -- were you assessing the securities that had
23 been posted into that repo transaction?
24       A.  Both.
25       Q.  So am I correct -- I assume the

KING - HIGHLY-CONFIDENTIAL

1
2  securities that were -- supported the Fed repo
3  earlier in the week were somehow supposed to make
4  their way into the September 18 repo involving
5  Barclays and Lehman, correct?
6      A.   Yes.
7      Q.   So you were asked to assess both the
8  Fed pool of securities and then what ultimately
9  made it into the repo?
10     A.   That's correct, yes.
11     Q.   And did you come to any conclusions
12 after that assessment?
13     A.   Yes, the same -- we did the same
14 process that we had done on each of the previous
15 iterations.  We were able to reuse some of the
16 information because there was an overlap between
17 the list of securities that were in the Fed
18 facility, ostensibly, the Fed facility and also on
19 the balance sheet of LBI.
20        We had -- I thought it was on the
21 Wednesday, we were -- I thought it was on the
22 Wednesday, not the Thursday, we were first asked
23 to look at it, which is why I say about the
24 Wednesday we started to put our pens down on what
25 we were doing previously, and I remember that we

KING - HIGHLY-CONFIDENTIAL

1
2  had literally something like about an hour or hour
3  and a half when we were first asked to look at it
4  to -- and the population was 49 or so billion
5  dollars of assets, and the question was, Stephen,
6  what do you think these are worth?
7      Q.   That was a population in the Fed repo
8  or September 18 repo?
9      A.   In the Fed -- sorry, is there a
10 difference between --
11        MR. STERN:  I think he is asking if
12 you were looking at the Fed portfolio.
13     A.   Well, we thought -- yes, at this point
14 we were on the Wednesday or Thursday prior to the
15 funding the night of the 18th, so there was a list
16 of -- another list that was sent to us.  I can't
17 remember where the list came from, whether it was
18 a list from the Fed to operations to us.  I don't
19 remember the information flow.  But there was a
20 list of securities.  We were able to put that list
21 of securities, you know, in a spreadsheet, compare
22 it to various -- do various look-ups to see
23 whether we could find whether we had ever put a
24 price on anything that was in the Fed facility.
25        Recognizing that during the course of

KING - HIGHLY-CONFIDENTIAL

1
2  this week, Lehman had -- Lehman Holdings had
3  become bankrupt on the 13th.  So almost anything
4  that we were saying about valuations was becoming
5  redundant each minute because markets were moving
6  so much.
7         MR. STERN:  You said the 13th.  Did
8  you mean the 15th?
9      A.   I am sorry, the 15th.  I think -- the
10 deal stopped happening on the 14th.  Right.  So
11 that week that we are talking about, markets were
12 moving tremendously because there was disarray
13 because of the bankruptcy.
14     Q.   There were other events taking place
15 at the time as well, correct?
16     A.   Yes.  Also Merrill, so other things
17 were going on that meant that, you know, literally
18 if you had a portfolio of equities or a portfolio
19 of Treasuries or portfolio of hedges or portfolio
20 of mortgages, I would say during that week, there
21 was no -- I mean the exercise to some extent was
22 academic because we are putting a price on
23 something for which there was no bid on any of it.
24 No bid.
25     Q.   Well, I think you said previously you

KING - HIGHLY-CONFIDENTIAL

1
2  were asked -- you mentioned a close to 50 billion
3  dollar number.
4      A.   Yeah.
5      Q.   I still don't know that you answered.
6  Is that the Fed pool or is that the collateral
7  that was ultimately posted to the September 18
8  repo?
9      A.   There I am describing what we were
10 doing prior to the settlement, which was to
11 provide -- the question that had been asked to us
12 is, there is a Fed facility, I seem to remember it
13 was 45 billion dollars, and it is backed by
14 securities which have a value -- which I think
15 subsequently or around that time we found was not
16 of course -- it is neither a Barclays assessment
17 of value or Lehman assessment of value, it is a JP
18 as custodian for the securities assessment of
19 value.  Not a trader's value, so not a mark, just
20 a -- you know, a price, a matrix price or wherever
21 they got their prices from, assessment of how much
22 collateral was supposedly supporting the Fed
23 facility, and the Fed facility was sized by
24 reference to haircuts to that assumed value.
25        So we were then asked to say, well, do

KING - HIGHLY-CONFIDENTIAL

1
2  we think that if you had to liquidate this
3  portfolio, that you could recover the amount of
4  the loan that was being made.
5      Q.   And this is Wednesday night you're
6  asked this?
7      A.   This was I think Wednesday.  I
8  remember it being in the afternoon.  And I would
9  think it was --
10     MR. STERN:  And Wednesday was the
11     17th?
12     A.   I feel -- for some reason in my head I
13  am carrying it around as a Thursday, but I think I
14  have lost a day in there somewhere because I don't
15  think I had a night.  So --
16     MR. STERN:  Just to help, I mean I
17     don't think there is any dispute about this,
18     the Fed replacement transaction was executed
19     on the 18th, into the evening of the 18th,
20     which is a Thursday.  So if that helps you
21     put things in perspective.
22     A.   Yes.  In my mind, the time between
23  when we first were asked to look -- first became
24  aware of the Fed facility transaction and the
25  funding of it, was much shorter than a day and a

KING - HIGHLY-CONFIDENTIAL

1
2  half.  So that may just have been because we
3  didn't have a night.
4      Q.   I appreciate that, for all of us who
5  have missed nights as well.
6      So is this -- when you said you had
7  about an hour and a half or two --
8      A.   We had an hour and a half.  There was
9  a phone call to say we are being asked to take the
10  Fed out of this.  We didn't know the reason why or
11  reason for the transaction or whether it was even
12  necessarily related to it.
13     MR. STERN:  "We" being you?
14     A.   "We" being Barclays at that point.
15  That Barclays was being asked to take the Fed out
16  of its facility, out of this loan, and the
17  question to us as my group was, what do you think
18  about this value of securities?
19     Q.   And what did --
20     A.   And I found that an extraordinary
21  situation, because we had just had the bankruptcy
22  of Lehman and we were being asked whether or not
23  we thought a portfolio of securities, which we
24  barely knew, because we had only really
25  encountered them a handful of days before, it was

KING - HIGHLY-CONFIDENTIAL

1
2  actually worth 45 billion dollars, and therefore,
3  should we permit Barclays to lend 45 billion
4  dollars against a portfolio of securities, and in
5  any normal circumstances I would never make that
6  statement or assertion.
7      Q.   When you say 45, that's the amount of
8  the Fed facility?
9      A.   That's the amount I remember being the
10  Fed facility.
11     Q.   Secured by -- 45 was the value of the
12  pool in the Fed, to your recollection, or was that
13  the amount that the Fed --
14     A.   That was the loan amount.
15     Q.   And the value or purported value in
16  the pool was about 5 billion more than that?
17     A.   Well, you are using -- you are saying
18  "value" as if that was value.
19     Q.   OK.
20     A.   The numbers that were the JP Morgan
21  marks I think at some date, and I don't remember
22  which date it was, they may have even been from
23  the Monday or Tuesday or Wednesday, I don't
24  remember how current they were.  Markets were that
25  volatile, but that they -- those numbers added up

KING - HIGHLY-CONFIDENTIAL

1
2  to -- I remember it being anything from 48 and a
3  half to 49, to 49.7.  There was some -- if you add
4  up those numbers, it would appear that if it were
5  possible, if it were possible to sell into the
6  open market at those JP Morgan marks, then you
7  would get 49 point or 48 point whatever it is for
8  the portfolio.
9      Of course that's not a -- that's not a
10  value.
11     Q.   OK.  But -- I understand that.  I
12  didn't mean to misuse that word.
13     So what did you conclude as to the --
14  what did you respond to the people who had asked
15  you to make this assessment?
16     A.   We thought it was possible that in a
17  controlled way, we might be able to recover enough
18  to cover the loan.
19     Q.   Meaning the 45 number?
20     A.   Meaning the 45.
21     Q.   Now ultimately, that pool of
22  collateral or a pool of collateral with some
23  overlap to that gets rolled in -- gets used in
24  connection with the September 18 repo, correct?
25     A.   Yeah.

Page 78

KING - HIGHLY-CONFIDENTIAL

1
2    Q.    And were you asked to do anything in
3    connection with that pool of collateral?
4        A.    Yes.  So now -- so that exercise of
5    assessing the value of, liquidatable value of the
6    securities that were supporting the facility --
7    the Fed facility was needed to be refined.  So we
8    just carried on.
9            Even though we had given that initial
10   assessment, the reason why I think it fills a very
11   compressed amount of time, we just kept refining
12   and refining and refining our views as we analyzed
13   the portfolio.
14       Q.    Right.
15       A.    As we went into the Thursday -- sorry,
16   Thursday night into the Friday, there was
17   another -- there is another very difficult piece
18   that was in the middle of that, which is
19   operationally how do you settle this transaction
20   and then how do you risk manage it once the trade
21   has come in.
22       Q.    Can you specify "this transaction"?
23       A.    The Fed transaction.
24           The peculiarity of this, and we didn't
25   really understand this at the beginning, but it

Page 79

KING - HIGHLY-CONFIDENTIAL

1
2    became clear, is, of course, the normal
3    circumstances, a repo transaction shouldn't mean
4    that the lender on the loan is long the underlying
5    risk of the securities collateralizing the loan.
6    They have a secured lending to a borrower that's
7    collateralized.
8            Here, of course, we knew that we were
9    lending to a borrower that was expected to be
10   bankrupt within a short period of time, and whose
11   parent was bankrupt.  Therefore, although it was a
12   loan to a counterparty, at some point we were
13   going to be long the underlying assets.
14           And if we were long the underlying
15   assets, we therefore needed to risk manage them.
16   Because just because we had assessed that as of
17   the Thursday they were worth some amount,
18   hopefully more than 45 billion dollars, by the
19   Monday, they might have been worth 35 billion
20   dollars.
21       Q.    Right.
22       A.    So we better do something about that.
23   So the focus started to move from how do we
24   manage, how do we even see and book -- how do we
25   book securities that are not just going to be

Page 80

KING - HIGHLY-CONFIDENTIAL

1
2    collateral for a repo but are effectively going to
3    need to be shadow booked into risk systems so that
4    we can generate appropriate risk metrics so that
5    we can risk manage them.  So we -- our process
6    started to change to that.
7        Q.    And this started even before you
8    booked the September 18 --
9        A.    Yes, yes.
10       Q.    -- repo?
11       A.    Yes.  Because we had to say how are we
12   going to manage this transaction?  How are we
13   going to manage this risk once Barclays has
14   lent -- once Barclays has lent -- in Barclays'
15   book, it is going to have -- the repo desk seems
16   to have lent 45 billion dollars to a counterparty
17   that is going to default, and that is
18   collateralized with a number of securities.
19           And if it followed its normal process,
20   it would be marking these securities, asking
21   desks, asking price services to -- it wouldn't
22   actually be assuming that it was going to get long
23   the collateral and have to liquidate it.
24           But here we knew that was going to be
25   the case, and it is mostly the case in other

Page 81

KING - HIGHLY-CONFIDENTIAL

1
2    distressed -- it is frequently the case, and we
3    have obviously seen this because of what happened
4    with Bear and Bear's hedge funds that had
5    defaulted on repo-secured lending, that the moment
6    the repo -- the borrower defaults under the repo,
7    you seek to liquidate the collateral, and you
8    invariably don't recover enough to cover the loan.
9    You hope you are going to, but markets are
10   distressed at that moment.
11           Well, this was the mother of all
12   distress.  We are in the middle of a bank, a major
13   bank defaulting that many people had thought
14   wouldn't have been left to default, but had
15   defaulted, and we were about to undertake a
16   45 billion dollar lending in which we would be
17   long this risk with very limited ways of risk
18   managing it.
19       Q.    So what did you do to risk manage it?
20       A.    Well, so Thursday we had to assess how
21   are we going to record in our books securities,
22   when we haven't actually booked the securities, we
23   booked a repo facility.  So we had to construct
24   shadow books that were going to represent the risk
25   of the securities that were in the repo facility,

Page 82

KING - HIGHLY-CONFIDENTIAL

1
2  and then we sought to insure that -- our plan was
3  on the Thursday, each of the desks had a list of
4  the securities that they were expecting to
5  receive, and we had informed them that of course
6  repo is -- this was overnight repo. We weren't
7  but -- a week earlier, by the way, we were not
8  experts in repo. So some of what I am able to
9  talk about now about that repo facility, I
10 actually only learned afterwards.
11        But this was overnight repo, which
12 meant that strictly speaking the borrower could
13 switch the collateral within the repo facility
14 each night. So we had advised the respective
15 desks, thinking about, you know, in a similar way
16 we categorized the assets that were in the repo
17 facility in a similar way to the way they are
18 categorized on 388-B, and we passed those out to
19 the relevant desks and said tomorrow, you are
20 going to be -- we need you to help us manage this
21 exposure.
22        And we sent lists to each of the
23 desks. Of course -- but we told them they may
24 marginally change overnight, and until we are
25 certainly long the risk, we can't hedge. We

Page 83

KING - HIGHLY-CONFIDENTIAL

1
2  couldn't hedge prior because of course if for some
3  reason the transaction hadn't settled, we would be
4  short the market, so there was no way to hedge
5  until we knew that we actually were long the risk.
6        Q.   OK then.  There was a lot there, so
7  let me ask a couple of questions.
8            When you say we were certain we were
9  long the risk, that would be when there was a
10 default?
11       A.   No.  Once the securities had settled
12 into Barclays.
13       Q.   Oh.
14       A.   Which would have been the Thursday
15 night, Friday morning.
16            MR. STERN:  You might just explain
17       what you mean when you talk about long the
18       risk and so on.
19       A.   On Thursday, there was -- we knew that
20 there was a Fed facility.  Barclays had not lent
21 any money to Lehman.  The Fed had lent money to
22 Lehman and collateralized that lending with
23 securities.
24       Q.   Right.
25       A.   That night, Barclays would effectively

Page 84

KING - HIGHLY-CONFIDENTIAL

1
2  replace the Fed, thereby knowing for certain that
3  it had a secured loan out to Lehman, LBI, where
4  LBI was expected to default.
5            So it is not until for certain that
6  Barclays has funded that loan that it could say
7  that it definitely is long the risk of the
8  underlying securities.
9        Q.   OK. So if --
10       A.   So for example -- maybe it is easiest
11 by example.  If we took a single security on the
12 Thursday, in normal trading, in a normal trading
13 environment, I might be negotiating with a
14 counterparty to buy something and I might be
15 agreeing the price and we might be trading, but --
16 and I might know that the moment that I want to --
17 moment that I know I am going to be long the
18 security, I will need to hedge, and I have worked
19 out how I am going to hedge, but until the trader
20 tells me done, not just at some point while we are
21 discussing the price, if I decide to hedge before
22 he says done and then he says, you know what,
23 change my mind, now I have put a hedge on against
24 nothing and I have got to take the hedge off.
25            So until we know that this repo

Page 85

KING - HIGHLY-CONFIDENTIAL

1
2  transaction -- this replacement repo transaction
3  has settled, it would be -- it was a trading
4  decision whether or not we should hedge before it
5  settles or after it settles.  And we elected to
6  start hedging after it settled.
7        Q.   So when you say settles, that's on
8  Thursday, the 18th?
9        A.   Thursday night into Friday morning.
10       Q.   So that -- OK, I think I understand
11 that.
12            But aren't you -- I guess I didn't
13 understand the shadow book concept.  I thought you
14 weren't long the security until LBI defaults on
15 the Friday.
16       A.   Formally -- exactly right.  Until the
17 Friday when there is the default of LBI, then the
18 systems would record a secured lending facility.
19 As I say, some of this, you know, back filling the
20 knowledge because we learned how it really would
21 happen after the fact.
22       Q.   Sure.
23       A.   But that there would be a loan and the
24 repo desk would say, I have got a loan out to LBI
25 and it is collateralized by the following

Page 86

1           KING - HIGHLY-CONFIDENTIAL
2    securities, but it isn't equipped to hedge or
3    manage those underlying securities because it is
4    not expecting to ever need to.  It thinks it has
5    got an overcollateralized loan.
6        Q.   Right.
7        A.   Where it hopes -- where a repo desk
8    risk management ought to be, I've lent you money,
9    I have got some additional margin over and above
10   the amount of money that you have lent, that I
11   have lent you, and if you default, I am going to
12   sell it all as quickly as possible.  I am not
13   going to reflect on it and think about whether I
14   would like to -- those are trading decisions for
15   someone else.  I am going to sell it.
16           And hence, when you try to sell
17   something in that way, you would invariably,
18   regardless of whether the last trade observed in
19   the market was 95, if you phone up somebody and
20   say I need a bid, you might get a 85, and that's
21   why they need the margin.  But that would be their
22   normal repo risk management decision.
23           Here we were going into this lending
24   with the benefit of knowledge that within 24 hours
25   to 48 hours, it would be the case that this

Page 87

1           KING - HIGHLY-CONFIDENTIAL
2    borrower would default, so that there was no value
3    to the counterparty, and furthermore, we were
4    therefore going to be long a humongous number of
5    securities that we would have no ability to sell.
6        Q.   So for that reason you start risk
7    managing those securities the minute the repo
8    settles?
9        A.   First we say -- many of these
10   securities have -- so the -- maybe again it is
11   worth just touching on this for a second.
12           When I talk about risk, what I mean is
13   that what is the expected change in value of a
14   security with respect to a change in something
15   else.  So many of the securities have interest
16   rate sensitivity.
17       Q.   Right.
18       A.   How much would the value of these
19   bonds change if the interest rates went up.
20       Q.   OK.
21       A.   We would also come up with some crude
22   estimates for, say, the equities portfolio, which
23   would be how much of the S&P 500 does this equity
24   portfolio look like.  For the RMBS securities we
25   might say how much of a particular mortgage-backed

Page 88

1           KING - HIGHLY-CONFIDENTIAL
2    index does this portfolio look like.
3           Because we can't know -- we know there
4    is no way we can sell.  If we go out and start
5    selling at 8 a.m. on the Friday morning, five days
6    after the bankruptcy of Lehman, we would
7    recover -- I don't know what we would recover.
8           And we already knew that where we had
9    seen some of the bids in the market during that
10   week where other people have been selling -- bear
11   in mind, the market was flooded with collateral
12   from the bankrupt Lehman Brothers Holding and
13   LBIE, so that people were closing out other repo
14   facilities.  So the market was full of Barclays --
15   of Lehman's securities that were already being
16   sold.  So -- and we were about to get long another
17   45 billion dollars of them.
18           So there would be no way for us to
19   manage that.  The only way we could do it was
20   bring the risk on to our systems, assess how
21   volatile it was going to be and what parts of that
22   volatility we would have to hedge with instruments
23   in more liquid markets.  For example, S&P.  For
24   example, interest rate derivatives.
25           And that's what we started to do on

Page 89

1           KING - HIGHLY-CONFIDENTIAL
2    the Thursday in anticipation, what systems are we
3    going to need to help manage that and what are we
4    going to do on the Friday.  Of course, that was
5    complicated, further complicated by the fact on
6    the Friday morning we woke up to discover we don't
7    own the same portfolio we thought we were going to
8    own a day earlier.
9        Q.   OK.  Let me put that issue aside for a
10   minute here.  I think I followed you.  It is an
11   area that I am not familiar with, so I apologize.
12           So on Thursday, you are risk managing
13   or hedging the volatility that you foresee in that
14   pool of securities as a result of all this market
15   activity that you have seen?  The plan was to
16   hedge the portion you needed to hedge and then
17   sell the securities later?
18       A.   Yeah.  So I think the answer to your
19   question is actually no, we were not hedging on
20   the Thursday.  We were starting to work out
21   that -- the process up to the decision of will
22   Barclays lend against this pool of assets was one
23   that would incorporate both an assessment of
24   Barclays' assessment, not JP's assessment or
25   Lehman's assessment or anybody else, but Barclays'

KING - HIGHLY-CONFIDENTIAL

1
2  traders' assessment of what was the realizable
3  value of the securities and the amount of -- it
4  would need to have some amount of cushion over and
5  above the amount that it started to sell, because the
6  moment that it started to sell, Barclays itself
7  would drive the market down.
8      Q.   Right, right.
9      A.   So we needed to do two things on
10  Wednesday and Thursday.  One, an assessment of an
11  estimate of what we thought was a reasonable
12  liquidation value for the portfolio, and then,
13  two, what was a reasonable guess at the risks that
14  we were taking by being long that portfolio.
15  That's what we were doing Thursday.
16      On Friday then --
17      MR. STERN:  "That portfolio" is the
18  Fed portfolio?
19      A.   For the portfolio we thought we were
20  going to take delivery of, or best guess of the
21  portfolio we thought we were going to take
22  delivery of on the Friday.
23      But it wasn't until -- and then we
24  made a decision not to hedge on the Thursday.  And
25  then on the Friday, once we knew the transaction

KING - HIGHLY-CONFIDENTIAL

1
2  had been consummated, so we knew that we were
3  actually long --
4      Q.   That's Thursday night, Friday morning?
5      A.   So some point Thursday night, somebody
6  would have phoned me and said, Stephen, we are
7  long.  So then we knew we had eliminated one risk,
8  which was the execution risk.
9      Q.   Right, right.
10      A.   Because we couldn't -- the reason for
11  not hedging was we could never manage -- never
12  hedge the execution risk.
13      Q.   Right.
14      A.   But on Friday we now know we are long.
15  Let's say that was at 2 o'clock in the morning or
16  something.  No markets are open, so there is no
17  way to start selling or to manage -- actually we
18  couldn't start selling because actually it is just
19  a repo facility, it is not that we are long the
20  assets, so you couldn't sell on the Friday.
21      So therefore, we would have to think
22  up things we could use to hedge the risk.  And
23  that's -- we started that process on Thursday.  By
24  Friday we started to realize there are securities
25  that we thought we were going to take delivery of

KING - HIGHLY-CONFIDENTIAL

1
2  that we haven't, and there were securities that we
3  have never seen before.
4      Q.   What happens when you -- is that early
5  in the morning Friday?
6      A.   We started to be aware of that early
7  in the morning Friday.
8      Q.   So take me through what happens.  I
9  assume you take that to someone's attention?
10      A.   Yes.
11      Q.   What happens in that regard?
12      A.   They say what -- so what do you want
13  to do, Stephen, and we start the process again,
14  which is OK, we have got a list of securities, do
15  we have a complete population -- bear in mind --
16  the reality is, this was -- there was a tremendous
17  number of people that were involved in this,
18  because this was a -- you know, it had to be a
19  very sensibly and carefully risk managed process.
20  We couldn't eliminate the uncertainty associated
21  with prices, but we ought to be eliminating the
22  uncertainty associated with how we managed the
23  process.
24      So a lot of people involved, but the
25  Friday morning therefore we just started to do

KING - HIGHLY-CONFIDENTIAL

1
2  again what we had done the day before, how many of
3  the securities do we know?  Do we have a complete
4  population?  How do we categorize the securities
5  that we haven't seen before, what are they, and
6  actually less what do we think they are worth at
7  that point, because it doesn't matter.  More what
8  matters is what are they and how do we manage
9  them, and that's what we did on the Friday.
10      Q.   Can I ask you a question.  I think --
11  tell me if I am wrong.  I understood that there
12  was some kind of glitch in transferring the Fed
13  pool of securities to the repo to the tune of
14  about 7 billion dollars, and that Lehman, to make
15  up that shortfall, took a loan and put it into the
16  repo.  Is that your understanding?
17      MR. STERN:  Objection to the form.
18      A.   All I know is -- I reiterate the role
19  that we were playing.  The role that we were
20  playing is we are not operations people.  We are
21  traders and risk managers.  Our job was to assess
22  value and then manage the multitude of risks
23  associated with the acquisition of the assets.
24      I know by construction that there were
25  differences between what we thought we were going

KING - HIGHLY-CONFIDENTIAL

1
2 to be risk managing on the Thursday and what we
3 were actually risk managing on the Friday, and I
4 know that that is -- that there was 7 billion
5 dollars of supposed value, and I think they were
6 using -- I don't know what marks they were using,
7 but 7 billion dollars that had been substituted
8 for cash, which therefore cash doesn't -- nice
9 thing about cash, you don't have to risk manage
10 it, or at least we didn't think so.
11     Q.   I would assume so.
12         MR. STERN:  Turns out you did.
13     A.   Turns out we did.  Cash is supposed to
14 be cash.
15         And then in addition to that -- so
16 there was a -- there were less secure -- rather
17 than -- and I'm using these numbers just to try to
18 indicate population as opposed to the accuracy of
19 the numbers.
20         So that we had anticipated that at JP
21 marks, that there was a population that JP
22 assessed as being worth 49.7 of securities, that
23 actually was 42.7.  Therefore -- and there
24 was 7 billion of cash.
25         In addition, though, within the

KING - HIGHLY-CONFIDENTIAL

1
2 securities, they were not the same population.  So
3 it wasn't even that it was just a subset of the
4 original population, the Thursday population, it
5 was a subset of the original population plus about
6 10 billion dollars of stuff that we had never seen
7 before.
8     Q.   That's where I was leading with the
9 question.  In other words, the difference that you
10 saw between what you expected and what you
11 received is both in the size of the pool as well
12 as the composition of part of the pool?
13     A.   Correct.  There was approximately --
14 again I am using these numbers, using -- by
15 reference to the JP marks, not my assessment of
16 value or what we were ultimately able to sell them
17 for.  There was something like 49 -- we thought
18 that there was going to be something like 49, a
19 population that JP would mark at 49.7.  There
20 actually was only about 32 billion dollars of that
21 population was delivered.
22         Then there was 7 billion of cash or
23 cash that -- you know, cash was cash, and then
24 there was 10 billion dollars, and now -- for which
25 we didn't have any equivalent JP valuations, but

KING - HIGHLY-CONFIDENTIAL

1
2 that once they arrived at BoNY, which was our
3 custodian, BoNY assessed as having marks in total
4 of about 10 billion dollars, and that portfolio we
5 had not seen before.
6     Q.   What did you do with respect to that
7 portfolio and the BoNY ones?
8     A.   The exact same as we had done with all
9 the preceding lists of securities.  We tried to
10 assess had we got the entire population.
11         Bear in mind, the reason we do that,
12 there is no point in risk managing something if it
13 isn't what you actually own.  So it has to start
14 with do I really own this.  We spent a tremendous
15 amount of time focusing on do I have this, is this
16 a population, categorizing the population, because
17 now all we have got is a list of CUSIPs, so you
18 have to get from CUSIPs to a description of the
19 asset by name, by asset type, then to break it out
20 into asset types, and then to assess what we think
21 its risk is and what its value ought to be.
22     Q.   And so that's a process you started
23 with respect to this 10 billion dollars --
24     A.   On that Friday morning.
25     Q.   -- on that Friday.  Did you come to a

KING - HIGHLY-CONFIDENTIAL

1
2 conclusion on that Friday or when?
3     A.   I think one thing that's also worth
4 pointing out, the idea of a conclusion suggests
5 finality.  We had -- and I don't think we -- the
6 conclusion probably should be the date on which
7 ultimately it was sold, and stuff took a year to
8 sell.
9         On that Friday, yes, we did start to
10 think that we had a list of all the securities
11 that were delivered.  That took time.  And we
12 started to estimate our own -- you know, Barclays'
13 trading desk values for them in -- you know, in
14 the environment that we were in, and the risk.
15     Q.   And did you come to any interim
16 assessments on that Friday?
17     A.   Yes, yes.
18     Q.   What did you assess on that Friday?
19     A.   In relation to -- I don't really
20 remember too much on that Friday about the
21 valuations, because we were very focused on the
22 risk.
23     Q.   OK.  Would you have the same answer if
24 I said over the weekend?
25     A.   Yeah.  I mean over -- no, over the

KING - HIGHLY-CONFIDENTIAL
1
2  weekend, then it started to change.  The -- we
3  were, you know, reassess -- we -- between that
4  and the end of the year, end of the financial
5  year, we were constantly reassessing what we
6  thought was the value of the securities.
7       So you're right, over the weekend we
8  started to revert back to what do we think the --
9  what number are we going to use as a -- when
10 management is asking me, well, Stephen, what did
11 we take delivery of, they would like an answer and
12 they would like it now, not a better answer in
13 three weeks' time.  So we had to come up with
14 something.  But that was a crude response.
15      And in some respects it didn't really
16 matter to what we were doing, "we" being my desk,
17 because what really mattered is, do we have the
18 population and what is the risk of it.
19      I know that obviously some of the
20 valuation work we were doing would then be feeding
21 back into the negotiations that other parties were
22 having about a deal with Lehman, but it actually
23 wasn't very germane to what we ourselves were
24 doing.
25      Q.   I think I understand that.

KING - HIGHLY-CONFIDENTIAL
1
2       You have mentioned two different --
3  this is Friday now.  You mentioned two different
4  sets.  One is 32 billion dollars worth of
5  securities which had JP marks on them, and the
6  other is this 10 billion dollars of securities
7  that you had never seen before which had BoNY
8  marks on them.
9       A.   BoNY marks on it.
10      Q.   Is this assessment that you are doing
11 over that weekend primarily focused on the 10
12 billion dollar pool?
13      A.   No, everything.
14      Q.   Are you coming to some interim
15 conclusions during that weekend about the marks?
16      A.   Yes.
17      Q.   And what are you finding out that
18 weekend?
19      A.   I don't really -- the one thing that I
20 remember is saying that I felt that the cumulative
21 amount of securities and cash that we had received
22 in an orderly disposal, in not just a fire sale,
23 we couldn't just sell -- we couldn't say let's
24 sell these over the weekend and then we are done
25 by Monday.

KING - HIGHLY-CONFIDENTIAL
1
2       The -- there was -- the loan was
3  adequately collateralized.  And that I remember.
4       Q.   And you told that to your supervisors
5  or whoever was asking?
6       A.   Yes, yeah, yeah.  And then on the
7  Friday we started to hedge.
8       Q.   You started to hedge both the 32
9  billion pool and the 10 billion?
10      A.   We didn't differentiate.  We really
11 didn't start talking too much about what we had
12 received.  Much of the discussion about what we
13 had received versus hadn't received really didn't
14 go on until later on.
15      We only really cared about what
16 would -- you know, the cumulative amount of what
17 we had received.
18      Q.   Later on meaning after the weekend?
19      A.   Yeah, weeks later.
20      Q.   So did you have any discussions over
21 that weekend with Lehman or did anyone from
22 Barclays have discussions with Lehman as to, in
23 words or substance, hey, how come we got
24 10 billion dollars of securities we weren't
25 expecting?

KING - HIGHLY-CONFIDENTIAL
1
2       A.   I know there were discussions, both
3  with JP and Lehman.  We weren't -- my desk weren't
4  part of those discussions.
5       Q.   All right.  Do you have any
6  understanding of what happened in those
7  discussions?
8       A.   In relation to what?
9       Q.   Well, do you have any -- someone from
10 Barclays said words to that effect to Lehman,
11 right?
12      A.   Or to JP.  I don't know -- the deck
13 securities had come from JP.  So why -- so -- all
14 we cared about, why have we not got the same
15 population that the Fed thought it had the night
16 before?
17      Q.   You are comparing what you got on
18 Thursday night and Friday to the population that
19 you had spreadsheets about what was previously
20 comprised of the Fed pool?
21      A.   Yes.
22      Q.   And there was a difference in about
23 10 billion dollars worth of those securities?
24      A.   17 or so billion, because there is
25 some missing, 7, and then the 10, and using those

Page 102

```
1              KING - HIGHLY-CONFIDENTIAL
2    JP or combination of JP and BoNY numbers.  But we
3    weren't ever part of the conversations about what
4    had happened and why it had happened.
5          Q.   OK.  Just so I am clear, you had a
6    pool of some close to 50 billion dollars of marked
7    securities for the Fed.  What you get on Thursday
8    night or Friday is about 7 billion in cash,
9    32 billion with -- that had been in that pool, and
10   about 10 billion of new securities; is that right?
11   Am I understanding the groups now?
12         MR. STERN:  Can I hear the question,
13   the question back.
14         MR. HINE:  Let me try again.  It was a
15   long convoluted question.
16         Q.   You previously had a list or some kind
17   of data that showed about 50 billion dollars worth
18   of assets in the Fed pool, correct?
19         MR. STERN:  Objection to the form.
20         A.   Well, the -- we had a population of
21   securities which we were expecting to take
22   delivery of which we understood was supporting a
23   Fed facility.
24         Q.   And that -- I'm just trying to -- I am
25   drawing a Venn diagram in my head.  I want to see
```

Page 103

```
1              KING - HIGHLY-CONFIDENTIAL
2    how what you expected to be in the Fed facility
3    compared to what you ultimately received.
4          A.   Right.
5          Q.   As I understand your testimony, tell
6    me if I am wrong, it is about 32 billion dollars
7    of what you ultimately did receive had previously
8    been in the Fed facility, to your understanding;
9    is that right?
10         MR. STERN:  Objection to the form.
11         A.   Unfortunately what we are having to do
12   is to use -- because we couldn't -- when we are
13   talking about the population, we can't describe --
14   between you and I, we can't discuss CUSIPs and we
15   can't discuss asset types, so we are ending up
16   using JP Morgan numbers to describe populations.
17         So I'm just being a little bit
18   cautious about the fact when you say 32 billion,
19   that 32 billion dollars is just the sum of the JP
20   Morgan marks at a particular time.
21         Q.   Right, right.
22         A.   That was probably a different time to
23   the time of the 49 billion dollars worth of
24   JP Morgan prices on securities that we thought to
25   take delivery of.  So I am just being particular
```

Page 104

```
1              KING - HIGHLY-CONFIDENTIAL
2    about that.
3          Are we saying that they are of a
4    population that JP Morgan at some point had marked
5    at 49.7, I seem to remember, did we take delivery
6    of a subset of that, using your Venn diagram, that
7    JP Morgan had assessed at about the time of the
8    settlement as 32 billion dollars, yes.
9          Q.   And in addition, you took delivery of
10   a pool that BoNY had assessed at about 10 billion
11   dollars of new securities that were not part of
12   the Fed pool?
13         A.   Yes, yeah.
14         MR. STERN:  Objection to the form.
15   Can I hear the question again.
16         (Record read)
17         MR. STERN:  You can answer that.
18         A.   Yeah, I think that's right.  I also
19   don't know -- when I come to think about it, I
20   don't even know whether the 32 -- I think the 32
21   that you are referring to probably was -- we had a
22   list of securities that from a number of days
23   before we had JP Morgan's -- bear in mind, the
24   moment that the securities moved from JP as
25   custodian to BoNY as custodian, they are not
```

Page 105

```
1              KING - HIGHLY-CONFIDENTIAL
2    then -- the availability of the marks by the
3    previous custodian at that moment are not
4    available.
5          So it may be even that the 32 billion
6    dollars is actually BoNY as opposed to the
7    original JP.  I think it was the mark -- it was
8    the sum of the marks that JP had put on the
9    portfolio the last time JP had provided it.
10         Q.   OK.
11         A.   Then there was a population of
12   securities which then BoNY provided, because BoNY
13   provided custodial marks.  We actually used to
14   call them custodial, although that's a desk
15   colloquial term.  The custodial marks provided by
16   BoNY on the population we hadn't seen before was
17   approximately 10 billion dollars.
18         (Exhibit 389-B, document Bates stamped
19   BCI-EX-S 75200 through 201 marked for
20   identification, as of this date.)
21   Q.   Mr. King, handing you a copy of a
22   document marked as Exhibit 389-B, which is Bates
23   stamped BCI-EX-S 00075200 through 201.  Please
24   take a minute, and I will have a few questions
25   about this.
```

1        KING - HIGHLY-CONFIDENTIAL
2    that means?
3        A.   Right.  So I'm not sure where this --
4    this may have actually -- I think -- there were
5    two -- you mentioned that there were -- there
6    was -- there is sort of multiple tracks that may
7    have been going on simultaneously here.  We
8    were -- my desk was focused on what assets do we
9    have, what do we think we can recover from them,
10   in valuation, you know, in liquidation valuation,
11   and how do we risk manage them.
12       There also was a formal process of how
13   do we and how do Barclays and Lehman mark the
14   books and records, the securities.
15       I don't even know whether this was
16   something that was Lehman asking Lehman people to
17   mark their securities or Barclays asking Lehman
18   people to mark their securities or for what
19   purpose it was.
20       Bear in mind, traders were supposed to
21   still be sitting in their seats of a nonbankrupt
22   entity on the Friday marking their books.  They
23   still had a -- they worked for a broker dealer.
24   They have long risk positions.  They have an
25   obligation to mark every day.

1        KING - HIGHLY-CONFIDENTIAL
2        Q.   Well, Lehman, LBI declared bankruptcy
3    on that Friday, right?
4        A.   Maybe that was it.  Was it on the
5    Friday?
6        MR. STERN:  The 19th?
7        A.   OK.  I don't know.  Maybe that was on
8    the Thursday -- I don't know the timing of this
9    particularly, but the -- presumably there was -- I
10   could see that they -- the traders had to mark
11   certain things.
12       I think this, David's involvement here
13   is because we would like to have a mark on what we
14   have just taken delivery of, because all we have
15   got is a list of securities, and what was clear,
16   it is not clear from this e-mail, is that some of
17   the securities at the BoNY marks were atrociously
18   mismarked.  So you need a trader.
19       Most price testing functions work
20   extremely hard.  Price testing functions meaning
21   groups.  We have a price testing group within
22   Barclays.  There is a price testing group within
23   Lehman.  BoNY and JP as custodians need to try to
24   come up with prices for thousands and thousands
25   and thousands of securities every day.  So they

1        KING - HIGHLY-CONFIDENTIAL
2    have to do it in some kind of batch way.  So they
3    come up with heuristics by which they mark things,
4    because otherwise how could you do it?
5        But that's not the same as where a
6    trader on a minute, who sat in his seat, talks to
7    other traders and says, I would be willing to
8    trade.  It is supposed to be a pretty good guess,
9    but it is never perfect.
10       And in between the bankruptcy of LBH
11   and bankruptcy of LBI, it was -- you know, it
12   is -- the tracking error of that kind of approach
13   is bound to be big.  So as soon as we have taken
14   delivery, it is great -- at least we have got
15   BoNY's assessment of where they thought they would
16   be willing to advance against -- bear in mind, the
17   other thing about the BoNY and JP marks is that
18   the Fed was using -- what the Fed does when it
19   takes those marks is -- I can't remember the
20   advance rates.  I learned them later on.
21       But when the Fed lends, if you looked,
22   went to the Fed's website and looked at the
23   advance rates of the securities, what it does is,
24   it says, we will assess a value of security at
25   some mark that the custodian has provided us, and

1        KING - HIGHLY-CONFIDENTIAL
2    then we will advance less than that as the loan.
3        So for example, for mortgage-backed
4    securities that might only be 50 percent of the
5    supposed mark.  So they are not as worried, and in
6    normal market conditions that's supposed to be
7    fine.  They are not actually as worried that they
8    have got the mark perfect, because they are only
9    lending 50 cents on the dollar, or on equities,
10   for example, I think they lend 90 cents on the
11   dollar.  For agencies maybe they lend 80 cents on
12   the dollar.
13       So they are saying, I think I have got
14   this, I know statistically I must have some error
15   on it, but I am only lending 80.  Whereas the
16   trader when he trades, he is trading there, and he
17   is exposed to the first dollar of mispricing, not
18   the dollar after the haircut.  So they have very
19   different tolerances for error.
20       So this, on that Friday morning what I
21   asked David to do, let's see if we can get an
22   assessment as quickly as possible of the -- what
23   the things we haven't seen before are worth, and
24   it may have been, I don't remember, also the
25   stuff, what we long today, worth today, not

Page 114

KING - HIGHLY-CONFIDENTIAL

1
2 yesterday, because that also is different.
3         And what he is highlighting is that
4 there are -- in the first paragraph he highlights
5 that of course the Lehman guys hadn't actually got
6 in their inventory the list of securities that
7 were part of the repo.  Because of the
8 intercreditor relationships between the various
9 Lehman Brothers entities, it wasn't necessarily
10 the case that everything that was in the repo
11 facility was also on the Lehman balance sheet,
12 Lehman Brothers, LBI balance sheet.
13         And in the second paragraph it also
14 has -- there must have been a separate
15 conversation going on.  There is a typo in there,
16 actually, but it says, "an orderly liquidation
17 mark."  Notice the use of the term "orderly
18 liquidation mark," not liquidation today mark.
19 Because we couldn't -- that would have been
20 50 cents on -- that would have been who knows, but
21 20 billion dollars.  There just could be no bid.
22 There was no bid for any of this on this date.
23         And the second is a typo in there.  It
24 says "at a bin in comp."  That should be "a bid in
25 comp mark."  That was presumably supposed to be

Page 115

KING - HIGHLY-CONFIDENTIAL

1
2 more of an assessment of, you know, if you had
3 to -- if you were willing to buy it today, where
4 would you buy it.
5         So they are being asked to provide an
6 assessment of both.  But that wasn't for us.
7     Q.   "It wasn't for us" meaning --
8     A.   It wasn't for my group.  That might
9 have been for Lehman, it might have been for --
10    Q.   So is your group, this whole -- I
11 understand you to be saying that your group was
12 focused on getting the population that we had been
13 provided, at least an accurate assessment of what
14 we got?
15    A.   Yes, yes.
16    Q.   Was there another group focused on how
17 to mark them price-wise?  Or how to book them into
18 Lehman's system -- I mean Barclays' system?
19    A.   No.  Not -- not that part, but product
20 control -- and -- I'm trying -- I was trying to
21 explain what I do know about this e-mail and about
22 things that happened on the Friday.  So hopefully
23 I have answered that question.
24    Q.   Yeah.
25    A.   This feels like a different question,

Page 116

KING - HIGHLY-CONFIDENTIAL

1
2 which is was there another group that was also
3 marking securities.  Is that right?
4         MR. STERN:  I think what Bill wants to
5 know is, who was involved in the booking of
6 the securities and ultimately marking them
7 on the Barclays side.
8     A.   As a formal matter, it is always the
9 trader's responsibility to mark a book.  As a
10 practical matter then, there are price testing
11 groups that are within that product control group,
12 PCG function, that have a responsibility to assess
13 whether the traders have marked their books
14 correctly, and they can ask them to revisit their
15 marking and remark them.
16    Q.   OK.
17    A.   That's the logic of the trader and the
18 control function.
19    Q.   OK.
20    A.   So that would have been -- that at
21 some point -- I don't know whether it was
22 happening on the Friday.  At some point that would
23 have had to have happened.
24         In addition, Barclays would have to
25 construct the balance sheet, an acquisition

Page 117

KING - HIGHLY-CONFIDENTIAL

1
2 balance sheet that represented what it had
3 ultimately purchased by way of this transaction.
4 That again would be a finance -- it is finance's
5 responsibility, not the desk's responsibility, to
6 produce balance sheets.
7         Therefore, finance would have to make
8 a determination of what it thought was the
9 appropriately price tested valuation for the
10 securities that were acquired on the acquisition
11 date.
12    Q.   OK.
13    A.   That didn't really happen.  That
14 happened over a very long period of time.  So
15 hopefully that answers that second question.
16    Q.   It does.
17         The finance function and the
18 preparation of the balance sheet I take it is in
19 the finance department, not in the PMTG
20 department; is that right?
21    A.   That's right.  Under normal
22 circumstances, if everything worked well, traders
23 would mark their books.  Those marks would be
24 picked up by systems -- the same for Barclays as
25 any other bank.  Those marks would be picked up in

Page 126

1          KING - HIGHLY-CONFIDENTIAL
2   transaction, as I said, was not in isolation of
3   the fact that we were acquiring, you know, other
4   things.
5          So I never really think of them as
6   separate. I thought of it as being Barclays is
7   having to put money out of the door against what I
8   know is a portfolio of assets that have an
9   estimated value that hopefully is more than the
10  loan, but that doesn't look like a very good
11  trade. So therefore, there has to be other stuff
12  that's going on.
13         But that's not part of our
14  responsibility.
15     Q.   I guess this is what I am driving at.
16  You told me before that on that Friday, you
17  received 10 -- assets marked at 10 billion dollars
18  that you hadn't expected?
19     A.   Yes.
20     Q.   Is the additional assets that Lehman
21  provides over that weekend the result of Barclays'
22  dissatisfaction with the securities it had been
23  provided under the repo?
24     A.   I don't know. Not to -- no, I
25  think -- no, not to the best of my knowledge. It

Page 127

1          KING - HIGHLY-CONFIDENTIAL
2   was -- no, not to the -- I think it was another
3   list -- to us, it was another list of securities
4   that was part of -- I mean, I think by the Friday,
5   it must be the case that I had seen the draft of
6   the asset purchase agreement, so I -- you know, I
7   knew that there was a list of these securities
8   that were in this repo facility, but there were
9   lots of other things that were subject to the
10  purchase agreement as well.
11         So the fact that from time to time
12  somebody would ask us, by the way, also there are
13  these other things that look like things, Stephen,
14  that you would be able to put an estimate of value
15  on, and ultimately you will end up risk managing,
16  that would come to me. Then I would respond to
17  them, and I would assume that this was part of
18  something that was a -- the repo transaction was
19  just a subset of a liability and an asset that
20  makes up the larger transaction.
21         Obviously later on, I saw the
22  acquisition balance sheets and things, so I could
23  see that there were those pieces. So none of that
24  was a surprise to me. But I wasn't part of the
25  conversations.

Page 128

1          KING - HIGHLY-CONFIDENTIAL
2     Q.   OK, very good.
3          MR. STERN: Should we take a quick
4   lunch break?
5          MR. HINE: Sure. Let's go off the
6   record.
7          (Recess)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 129

1          KING - HIGHLY-CONFIDENTIAL
2          AFTERNOON SESSION
3               1:14 p.m.
4   BY MR. HINE:
5     Q.   Good afternoon, Mr. King. I wanted to
6   go over a few documents with you based on some of
7   the things you have already talked about, but I
8   did want to start off with two topics.
9          First is the -- you have described how
10  you received a bunch of assets through Lehman
11  transactions on Friday, and then later on you
12  received additional assets.
13         Eventually, these assets get booked
14  into Barclays' system, and is it correct that
15  Barclays intended to conduct an orderly
16  liquidation of those assets over time?
17     A.   On the -- it wasn't until later that
18  we concluded that that's what we would do or how
19  we would do it.
20     Q.   Do you know how much later? Do you
21  have a time frame in mind?
22     A.   Days and weeks and -- days and weeks.
23     Q.   Is it fair to say probably sometime
24  before the end of September of '08?
25     A.   We had been -- we had already disposed

Page 130

1         KING - HIGHLY-CONFIDENTIAL
2 of some by the end of September. Prior to the
3 19th, it had been -- my expectation and
4 understanding was that we would -- there were
5 going to be a number of teams that were coming in
6 from Lehman that would be integrated with the
7 relevant Barclays team.
8         There was work that was going on -- it
9 was a very fluid environment, very, very fluid
10 environment. There was work that was going on in
11 the front office trading teams to interview and
12 integrate people, and it was our working
13 assumption -- this is only really coming into play
14 in the middle of that week -- that we would
15 facilitate the booking and on boarding of the
16 assets, and then we would be pushing them back
17 into the relevant trading teams.
18         And at various times, the expression,
19 you know, well, these are the guys that are going
20 to be managing the assets, was used to refer to
21 the Lehman people or the Barclays people. They
22 would go to a desk.
23         As it transpired, as we went through
24 the following days and weeks, we started to
25 conclude that markets were much, much more broken

Page 131

1         KING - HIGHLY-CONFIDENTIAL
2 at a very, very fundamental level than we had
3 really anticipated. And "we" being I think -- I'm
4 not even talking about my group or Barclays, but
5 "we" meaning financial markets and the general
6 public at large hadn't quite realized how broken
7 it was.
8         And we, very close to what was
9 happening at Lehman, could see that some things
10 are irreparably damaged here, and the ability to
11 unwind quickly some of these assets is going to be
12 very, very difficult.
13         And at that point I suggested, and
14 this was then subsequently taken up, that rather
15 than just push the assets back into the trading
16 desks, even with segregated books in the trading
17 desks, that we ought to manage them at a more
18 coordinated -- in a more coordinated and central
19 way and liquidate them in a more orderly fashion.
20         But that really was not -- and you may
21 remember I said earlier on that my -- our group,
22 my group PMTG changed at some point around the
23 time. We actually brought additional resources
24 into PMTG to facilitate that and took some
25 responsibility for liquidating of the assets over

Page 132

1         KING - HIGHLY-CONFIDENTIAL
2 and above the assets that we were originally
3 managing.
4         So there was a bit of a change in
5 plan, you know. There wasn't much of a plan, but
6 the understanding changed over those -- over about
7 ten days or so.
8     Q.  So the assets that you received from
9 Lehman in different tranches never were parceled
10 out to the trading desks?
11     A.  They were parceled out -- some of
12 them, they were parceled out so that the trading
13 desks could originally review them. We further
14 refined that to say certain of the assets will be
15 parceled out and managed by the respective trading
16 desk and some of them won't be.
17         So it is a -- it is not as simple and
18 straightforward a division as all assets were
19 handed down to the respective trading desks. Some
20 of them were. Some of them we sold to the
21 respective trading desks so they could go out and
22 sell them as quickly as possible.
23         Otherwise, PMTG retained the risk
24 management responsibility but was facilitated by
25 the respective trading desk in the liquidation,

Page 133

1         KING - HIGHLY-CONFIDENTIAL
2 and others we just kept and managed within our
3 group and brought additional resources in to
4 facilitate the management.
5         So there was three categories.
6     Q.  When you say facilitate the
7 management, meaning your group liquidated --
8     A.  Managed and liquidated it.
9     Q.  So has this orderly liquidation now
10 been completed?
11     A.  No. I think also to suggest --
12 "orderly liquidation" to me tends to convey -- it
13 is a term that's often used when trying to
14 describe how -- what type of valuation you would
15 attribute to a particular asset. I don't think
16 anyone ever used the term "orderly liquidation" to
17 describe particularly what we were doing. It was
18 liquidation.
19     Q.  OK, fair enough. I think I was using
20 it because I saw it in one of the documents here.
21     But you say sometime in September the
22 approach changed. Is the approach still to this
23 day to liquidate all the assets that were acquired
24 by Lehman or just select types of assets or
25 categories?

Page 134

```
1            KING - HIGHLY-CONFIDENTIAL
2        A.   It was, it was never -- it was never
3   described to me that the intention was to retain
4   for longer than was necessary or sensible any of
5   the assets.
6        Q.   So is there a way to assess now,
7   several months later, whether Barclays made money
8   on this pool of assets it received from Lehman?
9        A.   We made -- some assets were sold at or
10  above their marks, and many of them were sold
11  below, and many of them are still there.
12       Q.   Let me ask it differently.  Has
13  Barclays undertaken some kind of after-action
14  assessment or any kind of assessment or review to
15  see if, in fact, they made money on the securities
16  and other assets that they acquired from Lehman?
17       A.   No.
18       Q.   You have never seen any reports to
19  that effect or any kind of spreadsheets to that
20  effect?
21       A.   At various times, at various times,
22  more for management reporting purposes I think
23  than financial reporting purposes, we, my group or
24  Barclays had -- product control has attempted to
25  describe how much money was made or lost over a
```

Page 135

```
1            KING - HIGHLY-CONFIDENTIAL
2   period of time on certain aspects -- certain
3   assets.
4        A -- I think it was included, I think
5   it was included in a footnote to the year-end
6   financial statement, is the acquisition balance
7   sheet for Lehman.  I don't remember whether it was
8   actually published or whether I just saw it and it
9   was somehow integrated into it.  I think it was
10  published.
11       You know, that report is a negative
12  goodwill number, is purportedly a profit of the
13  acquisition, but it includes many things that are
14  nothing to do with the assets that we have talked
15  about here because it includes items such as
16  goodwill, real estate, receivables, et cetera.
17       So there was -- there is a statement
18  there about supposedly some number that is
19  attached to the profitability.  But I think of
20  that as an accounting requirement report for
21  financial reporting purposes of the transaction.
22       But that describes the valuation of
23  the securities according to a set of rules that
24  are influenced by accounting guidelines and rules
25  on a particular day.  And I think the date that
```

Page 136

```
1            KING - HIGHLY-CONFIDENTIAL
2   was picked was the 22nd.
3            And a very sophisticated set of rules
4   were developed over the subsequent months that
5   would guide PWC and Barclays' product control and
6   finance to be able to be comfortable that it had
7   adequately come up with an asset value for these
8   assets and for other things that were -- so
9   including certain contingent claims that were
10  going to be included on the balance sheet.
11           But it doesn't say anything there
12  about how much profit or loss was made on those
13  assets after that date, and it is an incredibly
14  difficult exercise to actually aggregate all of
15  that because of the three different places that I
16  described to you that the assets ended up.
17           Some assets were sold to traders and
18  then they subsequently sold them.  So there is a
19  P&L item, if you like, that turns up in the
20  negative goodwill that's on that acquisition
21  balance sheet.  There is a P&L that we experienced
22  between what was the price that PMTG seemed to
23  acquire the assets and where it sold them to the
24  desks, and then there is another item where the
25  desk sold it to the street and there are gains and
```

Page 137

```
1            KING - HIGHLY-CONFIDENTIAL
2   losses on the various hedges, and I'm using that
3   word in the way you were using "hedges," the
4   various instruments that were used to try to risk
5   manage while the assets were in situ in the P&L.
6   There is the gains and losses on those.
7        So I have never seen a number which
8   says how much did we make.
9        Q.   I think I understand what you are
10  saying, but the disclosure that was made in the
11  financial statement is a snapshot of the gain on
12  acquisition, right?  It doesn't even purport to
13  cover gains that might have taken place later as
14  to those securities?
15       A.   Or losses, more importantly losses,
16  right.
17       Q.   So my question is, I see the snapshot
18  of the gain on acquisition of about 4.2 billion
19  dollars.  Has Barclays undertaken any efforts
20  after that to assess what we are talking about,
21  the possibility that it gained or lost on all the
22  securities it acquired?
23       A.   Not in an isolated way.  Clearly, all
24  those gains and losses are part of the normal P&L
25  that all of the desks report, but there isn't a
```

KING - HIGHLY-CONFIDENTIAL

1
2 line item --
3    Q.   OK.
4    A.   -- that says P&L related to Lehman
5 securities.
6    Q.   I understand that. I was just -- as a
7 layman, outside the organization, I would think
8 someone would have said, hey, did we make any
9 money on that pool of securities we bought last
10 year?
11    A.   There is certainly -- people
12 frequently asked, but it is not easy to answer
13 because -- and it is a tremendous amount of work,
14 so no one bothered to answer it.
15    Q.   Just to trace them in all the places
16 they went?
17    A.   Trace them, and there were some
18 aspects of it that had to be done so there was
19 adequate reporting in trading statements and
20 year-end statements and things, but -- and I don't
21 think it is ever, you know, that -- the
22 acquisition gain that you are referring to doesn't
23 ascribe gains or losses on the securities. It
24 just talks about on everything that was subject
25 to -- was either -- just the difference between

KING - HIGHLY-CONFIDENTIAL

1
2 the assumed assets and liabilities of the
3 transaction.
4    Q.   Were you involved in helping provide
5 information that would go into the assessment of
6 that initial gain on acquisition?
7    A.   Yeah, once again we could -- the
8 estimated values for the securities was provided
9 by my desk to finance.
10    Q.   And you mentioned some stringent rules
11 that were applied in that regard?
12    A.   That's somewhat after the fact. As I
13 described it, you know, it is not exactly a
14 normal -- as much as possible Barclays, given the
15 environment we were in, was attempting to follow
16 as many of the normal rules and procedures that it
17 would do for an acquisition, even though this one
18 was obviously extremely large.
19       So, you know, initial estimates of
20 what that balance sheet would have looked like
21 were on -- in relation to the securities, were
22 derived from my desk's estimates, where they were
23 available, of the values for the securities.
24       With time, obviously the individual
25 desks that were receiving the assets marked the

KING - HIGHLY-CONFIDENTIAL

1
2 assets. I don't think we -- I don't think we ever
3 went back to remark -- we didn't really -- my desk
4 didn't really care very much about what the mark
5 was on the 19th in many respects. We cared about
6 what it was for a certain date that we took a
7 snapshot, so that we could report day two P&L, or
8 day one P&L, day two P&L, day two P&L being
9 everything after -- all the P&L associated with
10 the assets after they have been booked.
11       So we cared about a particular
12 snapshot, and I think we took a number that was
13 closer to -- a date that was closer to the end of
14 the month for that purpose. End of September.
15 And then we looked at P&L changes from that date
16 on individual line items. Not aggregate but just
17 individual line items.
18    Q.   That was your best estimate at the
19 time --
20    A.   At that time, and then that continued
21 to be refined as we found out more about the
22 securities or passed them out to the respective
23 desks or sold them or what have you.
24    Q.   Sure. But for financial reporting
25 purposes, that was your best estimate at that

KING - HIGHLY-CONFIDENTIAL

1
2 time?
3    A.   That was the best estimate. We
4 provided the best estimate, and then product
5 control started to -- as things started to
6 stabilize, product control took over its normal
7 process about starting to think about how it would
8 prepare its financial statements, and then
9 therefore, obviously our information was an input
10 to that, but it was only an input, and they used
11 multiple sources, I think, to construct the
12 assumed valuations for the 19th.
13       (Exhibit 390-B, document Bates stamped
14 BCI-EX-S 52667 through 68 with attachment
15 marked for identification, as of this date.)
16    Q.   Mr. King, handing you a copy of a
17 document marked as Exhibit 390-B, which has Bates
18 ranges BCI-EX-S 00052667 through 668, and then
19 there is an attachment which is produced in native
20 form which we have attached to the exhibit.
21       It is a Monday, September 22nd e-mail
22 entitled "Long Island Draft Balance Sheet/Goodwill
23 Calc." Do you see that?
24    A.   Um-hm.
25    Q.   After you have had a moment to review

Page 142

KING - HIGHLY-CONFIDENTIAL

1  it, I would like to ask you a question about it.
2        MR. STERN:  Have you read the e-mail?
3        THE WITNESS:  Yeah, I will come back
4     to that in one second.
5     A.   Yes.
6     Q.   My question is, do you see the entry
7  on the first covering e-mail -- I understand that
8  you are not a party to that e-mail, but it is
9  discussing the acquisition balance sheet, and the
10 fourth bullet down refers to the "2.83B valuation
11 adjustment is S. King's first cut only."  Do you
12 see that?
13    A.   Yes.
14    Q.   And if we refer to the last page of
15 the document, I see an entry for 2.83 billion.  Do
16 you know what -- is that the 2.83 adjustment,
17 first-cut adjustment that the e-mail is talking
18 about?
19    A.   Yes.
20    Q.   Do you know what -- can you explain to
21 me what that valuation adjustment is?
22    A.   Yes.  It is linked to your previous
23 questions.  There has to be -- and this changed
24 over time.  There has to be -- this concept, and

Page 143

KING - HIGHLY-CONFIDENTIAL

1  we have touched on it a few times during the --
2  through the course of the conversations, of there
3  being a value, a valuation, seems to imply that
4  there is a single price, but of course that isn't
5  actually the case.
6        When you are referring to orderly
7  liquidation -- for example, I think the e-mail
8  that we had in front of us earlier was that the
9  CMO guys told me he was told to give two months
10 orderly liquidation in the bid in comp.  So there
11 he has used -- you can see he is being given an
12 instruction.  That is actually a quite formal
13 instruction.
14       An orderly liquidation mark is
15 something that people understand to mean -- that
16 was on Exhibit 389-B.  That was something that
17 people sort of understand to mean if there is --
18 sometimes we come into work in the mornings and we
19 get a phone call saying, will you bid on the
20 following.  And if we have got enough capital and
21 we feel like doing it, then we may say yes, and
22 the guy may want to sell us the stuff for
23 30 million dollars and we may bid 10.  And if he
24 really needs a bid, then he will hit our 10.

Page 144

KING - HIGHLY-CONFIDENTIAL

1        I wouldn't describe that as an orderly
2  liquidation.  And in fact, we have seen a lot of
3  that during the course of the last two years, of
4  course, as so many counterparties have defaulted
5  on obligations and their assets have been seized
6  and liquidated.
7        Under normal circumstances it is not a
8  straightforward process.  In marking our books, we
9  have to try to assess whether or not we are
10 supposed to use those pricing points in marking
11 assets.
12       They are clearly actually where
13 something just traded.  Something was sold from
14 one party to another party at that price.
15 Somebody was willing to trade.  But they weren't
16 really willing to trade -- it wasn't particularly
17 by design that they traded there, they had to
18 trade, it was sold.  Maybe it was seized and sold
19 or they needed to sell it to create liquidity, but
20 it wasn't exactly orderly.
21       So on that page 389-B, where it says
22 "orderly liquidation mark and bidding comp,"
23 that's kind of -- it's trying to highlight there
24 really is a little bit of a difference between the

Page 145

KING - HIGHLY-CONFIDENTIAL

1  two of those.
2        We mostly mark our positions as if
3  there was an orderly disposal.  Not necessarily
4  that that's what we plan on doing with them.  We
5  might hold them, might sell them.  There is lots
6  of things we try to do, but we try to keep that
7  concept in mind.
8        At this stage, on Monday, the 22nd,
9  this balance sheet, the valuation adjustment was
10 equal to the difference between -- I think it was
11 the 45 point -- Thursday close.  The
12 45.18 billion, which is the Thursday -- this is
13 the inventory Thursday close, 45.18.  That would
14 have been, if memory serves, the BoNY marks for
15 the portfolio.
16       And -- there is a little bit of P&L in
17 here.  I think that is probably carried, and then
18 the valuation adjustment on this day, this isn't
19 necessarily on subsequent balance sheets, but on
20 this day would be equal to the difference between
21 the BoNY -- I think the BoNY marks and our current
22 best guess, based on everything that we have got
23 available to us, of the orderly liquidation mark.
24       So it is trying to get from one number

Page 146

KING - HIGHLY-CONFIDENTIAL

1
2 to another number.  With time, both of those, the
3 definitions of those were clarified, but that was
4 what this was on that date, and that's why Gary
5 refers to it as valuation adjustment, as S. King's
6 first cut only.
7          It is not an upper-case term,
8 valuation adjustment.  It was just a term that we
9 started to use to be the difference between where
10 there was some observable marks that could have
11 been the BoNY marks and where we were saying we
12 would probably book things.  Again, it was to try
13 to make the difference between the day one and day
14 two P&L.
15     Q.   This is Monday, the 22nd.  That's the
16 date on which the financial statement ultimately
17 says, let's report the acquisition as of on that
18 date, right?
19     A.   Yes.
20     Q.   If you look at 5, I don't know if that
21 helps in your answer.  I'm not sure you saw that.
22     A.   OK.
23     Q.   So that confirms that the --
24     A.   That's actually -- so we put that --
25 it is in there, initial estimate of the adjustment

Page 147

KING - HIGHLY-CONFIDENTIAL

1
2 to Barclays' marks, BoNY prices and Barclays'
3 marks.  That's precisely that.
4     Q.   The BoNY price of 45 billion is the
5 BoNY marks assessed on what pool of assets?
6     A.   What is -- I don't know if this is
7 clear on this.  It is just inventory on this day.
8     Q.   Maybe I could ask a clarifying
9 question while you look at that.
10          Is the 45 -- my question is, is the
11 45.18 the BoNY marks for the assets you received
12 from the repo, or does it also include other
13 assets that you received later?
14     A.   That's what I was just trying to
15 check.  There is a version of this where they are
16 separated.  But I don't think we were able to do
17 that as early as the 22nd.
18     Q.   That's the Monday following.
19     A.   Yeah.  Because I can only see one --
20 45.18 inventory, 15c3, financial assets.
21          Yes, I think it is 45.18.  It is just
22 whatever we -- at this point whatever we knew of.
23     Q.   If you read further down on that
24 column, you will see a reference to 15c3 assets,
25 so that's a separate asset that you received over

Page 148

KING - HIGHLY-CONFIDENTIAL

1
2 that weekend, correct?
3          MR. STERN:  Objection to the form.
4     Q.   If you can describe that, that's fine.
5     A.   On the 22nd, I wouldn't even have
6 known what 15c3 meant, and 15c3 asset wasn't -- is
7 not a security or anything that we -- it is just a
8 line item on here.  It is not an asset -- it is
9 not a tradable asset.
10     Q.   OK.  And the 7 billion in cash, is
11 that the -- in the next, next line item, 7 billion
12 in cash, is that the 7 billion that came over to
13 Barclays as a result of the repo transaction?
14          MR. STERN:  Objection to the form.
15          You can answer.
16     A.   The cash, the 7 billion was the cash
17 item on here.  Actually, I have seen -- obviously
18 I've seen this before and various subsequent
19 iterations of it.  But we didn't prepare this.
20 So --
21     Q.   "We" meaning --
22     A.   My desk.  So we didn't have any input
23 to anything that was -- you know, we would provide
24 Gary numbers, and we wouldn't have had any input
25 below inventory, because they are not securities.

Page 149

KING - HIGHLY-CONFIDENTIAL

1
2          Now, the 7 billion dollars is the
3 cash, but I know that the 7 billion dollars is the
4 cash that we thought we had in relation to the
5 nonsecurity-based collateral for the repo
6 facility.
7     Q.   If I look on here, I don't see --
8 well, could you tell me if there is any entry on
9 here that covers what we have been calling
10 unencumbered assets or the clearance box assets,
11 or have they not yet come over to Barclays?
12     A.   I -- as I say, there must be a hundred
13 of these balance sheets that were, you know, as
14 product control refined them.  I don't know how
15 many I have seen, but I've seen a few of them
16 between here and the end of the year.  This is an
17 early version of it.  And so you will have to
18 forgive me if I can't remember exactly the 45.18.
19          Inventory on the Friday morning, I
20 think from memory, is everything that we thought
21 we received at the -- by the date of -- by some
22 date on which we provided -- I don't know what
23 date -- I don't know what date Gary is producing
24 this, so it might have been this is from the
25 Friday numbers or Saturday numbers or Sunday

Page 150

KING - HIGHLY-CONFIDENTIAL

1    numbers.  It is probably not the Monday numbers,
2    because it is produced on Monday.  I suppose it is
3    produced late on Monday.
4             But it doesn't separate out the
5    unencumbered assets that we had already received
6    by that point.  It doesn't separate it out.  So I
7    think that everything that we had received to this
8    point was in that number.
9        Q.   Back to the 2.83 valuation adjustment.
10   How did you come up with that 2.83 number?  Is
11   that the top-down analysis we talked about
12   earlier?
13       A.   No.  We never came up, so we, my group
14   never came up with 2.83.  2.83 is a difference
15   between a set of marks and our marks.  So it is
16   not like I come up with -- it is not that I come
17   up with 2.83.  We would come up with on here 42.55
18   as a -- on the spreadsheet or the inventory, and
19   say we've marked all the individual line items,
20   and then product control will tell us at that --
21   based on all your individual marks or your best
22   estimate here -- I think by this date we were
23   still working on spreadsheets -- we estimate that
24   what we have got is worth 42 and a half billion

Page 151

KING - HIGHLY-CONFIDENTIAL

1    dollars.
2             Then they would compare that to the
3    marks for some of the inventory at the BoNY marks,
4    and that's what that last paragraph says.  It said
5    the trades are initially booked at BoNY prices, so
6    no one is calculating the 2.83.  The 2.83 is the
7    difference between the BoNY marks and the desk
8    marks.
9        Q.   And the desk marks are -- Barclays is
10   going CUSIP by CUSIP and putting a mark in for --
11       A.   Where possible, yes.  Where possible.
12   And it is the best guess by the desk, by my desk
13   using input from as many other sources as we
14   possibly can of an orderly liquidation mark, not
15   where we would -- if we were to -- if we had
16   turned around and asked somebody to bid on this
17   day for 42 and a half billion dollars worth of
18   securities, it would have been 30-something
19   billion.
20       Q.   I understand that.  I'm just trying to
21   understand the origin of the marks that Barclays
22   put on it.  Did Barclays adopt marks that Lehman
23   had put on these assets?
24       A.   No.

Page 152

KING - HIGHLY-CONFIDENTIAL

1        Q.   I have heard testimony in other
2    instances where Lehman valued those assets at
3    42.9.  This appears to be very close to the
4    Barclays marks.  Did you have any consideration or
5    discussion between Lehman and Barclays as to their
6    own marks?
7        A.   Well, some of the marks were -- we
8    actually used to make the unfunny joke that 42 and
9    a half versus 49, you know, or 50 versus 48 and a
10   half, it is kind of close.  It is -- that's half
11   of a billion dollars, so that's a gap.  That's
12   500 million dollars of, you know, rounding.
13            And that would have come from more of
14   a -- it just sort of highlights just how much
15   uncertainty there was.  You would be very
16   surprised if there was absolutely no relationship
17   between the BoNY marks, the JP marks, the Lehman
18   marks, the Barclays estimates.  If they weren't of
19   some similar order of magnitude, you know you have
20   a major failing of a control system somewhere.
21            But still, I don't -- we never really
22   needed to use the Lehman marks, other than -- the
23   only place where we used the Lehman marks was
24   where we had no idea what the security was other

Page 153

KING - HIGHLY-CONFIDENTIAL

1    than a CUSIP, some generic name, and the Lehman
2    mark, then we would have said we will value it at
3    a discount to the Lehman mark because we have
4    nothing else to go on.  It could be worth nothing.
5             Many of them were worth nothing.  Not
6    because Lehman had -- bear in mind, the Lehman
7    marks were from days -- they were old, they were
8    what we call stale.  Many of them were -- I think
9    most of the stuff we were looking at earlier was
10   on the 12th, which was before the bankruptcy of
11   Lehman Brothers Holdings, and even during that
12   previous week, most of the traders were out -- at
13   Lehman were more worried about their own futures
14   than necessarily marking their books, and markets
15   were already very, very distressed.
16            So the idea that those markets were
17   good on -- those marks were good on the 22nd after
18   two bankruptcies and Merrill being acquired by --
19   or being bailed out, is -- there is a
20   tremendous -- you know, the value of them is
21   that -- so there were cases where we said -- and
22   some of them were appropriately marked by Lehman
23   but worthless to Barclays.
24            A good example would be there were

1           KING - HIGHLY-CONFIDENTIAL
2    warrants that were in the repo facility, I
3    remember roughly it was 300 million dollars as a
4    good example.  300 million dollars issued by
5    Lehman referencing other credits.
6           Now, those, as long as Lehman exists,
7    are worth roughly the amount of the reference
8    credit, but the moment that Lehman defaults, they
9    are worthless.  So Lehman had them appropriately
10   marked where they would have traded them prior to
11   Lehman's insolvency.  They are just called fixed
12   income security on a schedule that we had, and
13   they are actually worthless, and there were
14   instruments like that in the repo facility.
15          Now, we wouldn't have known that until
16   days, many days later.
17       Q.   So this 2.83 adjustment is derived
18   from comparing the BoNY marks to Barclays' own
19   marks?
20       A.   PMTG's current best guess at an
21   orderly liquidation.
22       Q.   At that particular date?
23       A.   On that particular date.  It doesn't
24   say if the other bidding -- you know, that's an
25   orderly liquidation as opposed to a bidding comp

1           KING - HIGHLY-CONFIDENTIAL
2    liquidation.
3           MR. STERN:  Should we take a short
4       break?
5           THE WITNESS:  Sure.
6           (Recess)
7    BY MR. HINE:
8       Q.   Mr. King, I am going to hand you a
9    copy of a document marked as Exhibit 86-B.  After
10   you have had a minute to look at it, I would then
11   like to ask you a couple of questions, first
12   regarding whether you have ever seen this document
13   before.
14          MR. STERN:  Take your time and look at
15      it, and that's the question:  Have you ever
16      seen it before?
17          THE WITNESS:  OK.
18       Q.   Have you ever seen this document
19   before, Mr. King?
20       A.   I've never seen the document before.
21   I don't think I have seen the spreadsheet before.
22       Q.   Does it look like anything else you
23   have seen before?
24       A.   Unfortunately, it looks like a
25   tremendous number of things I have seen before,

1           KING - HIGHLY-CONFIDENTIAL
2    but I don't think I have -- I don't know -- I
3    don't really recognize this one.
4       Q.   Do you have any understanding or can
5    you give me your best -- withdrawn.
6           Do you have any understanding of what
7    this document is modeling?
8           MR. STERN:  Objection to the form.
9       Calls for speculation.
10       Q.   Attempting to model?
11          MR. STERN:  You are asking for him to
12      guess or --
13          MR. HINE:  Yeah.
14          MR. STERN:  I object to guessing.
15       Q.   You can answer the question.
16       A.   Well, it describes PMTG and it -- and
17   the cumulative amounts are the same as the sheet
18   we looked at before.  Slightly different.  So it
19   looks like -- it looks like many reports that were
20   produced around this time that are of a population
21   of securities that in some way are linked back to
22   that, but I don't know this -- especially not
23   with -- without any date or anything on it, it is
24   just one of any number of spreadsheets.
25       Q.   Do you know -- can you tell by looking

1           KING - HIGHLY-CONFIDENTIAL
2    at it, the form, who, which department within
3    Barclays might have prepared this?
4       A.   Only by the fact that it talks about
5    PCG values, as well as PMTG, and -- I would think
6    it is a -- well, it is a reconciliation of
7    something with something, and it looks -- it
8    clearly has a similar set of securities as the
9    previous -- as 39-B, I think it is, but what it
10   was trying to achieve or who prepared it -- it
11   could be either our desk or PCG.  It would have to
12   be one of the two.
13       Q.   Have you ever heard of anything
14   referred to as PCG liquidity value?
15       A.   Isn't that just --
16       Q.   That's the column heading for column
17   F.  Do you see that?
18       A.   Isn't that just D minus E?
19       Q.   It very well could be.  I'm curious if
20   you ever heard the term used, "PCG liquidity
21   value."
22       A.   No.
23       Q.   Is that -- do you see the column
24   marked E which says "MV09/22 with bid-offer"?  Do
25   you see that column?

Page 158

1         KING - HIGHLY-CONFIDENTIAL
2      A.   Yes.
3      Q.   Did your department undertake any
4   efforts to, on or around 9/22, to solicit bids or
5   offers for these types of securities?
6      A.   No.
7      Q.   Did you have any idea of where that,
8   the entries in that column would have come from?
9         MR. STERN:  Objection to the form.
10         You can answer.
11      A.   I -- I would -- I am -- I would be
12   very surprised if column E -- column E, market
13   value 09/22 with bid offer, is a term that we in
14   PMTG -- those could be -- they could have come
15   from PMTG.  They might have come from an aggregate
16   of other places.
17         I would think they came from PMTG, and
18   as far as I can see, F is just D minus E.
19      Q.   OK.  Do you see on the left-hand
20   column there appears to be a list of various
21   categories of securities?  Do you see that?
22      A.   Yeah.
23      Q.   Below that, PMTG and then another
24   entry for PMTG2.  Are those -- other than being
25   the initials for your department, would you --

Page 159

1         KING - HIGHLY-CONFIDENTIAL
2   could you -- do you have any idea what securities
3   are being pooled in those entries?
4         MR. STERN:  Objection to the form.
5      A.   No.  I mean over there -- you say this
6   is on the 22nd?
7      Q.   I don't have a date for it.  I see the
8   entry -- well, the title at the top appears to be
9   22 September.
10      A.   Oh.
11         MR. STERN:  The question is, do you
12         have any idea what securities are being
13         pooled in those entries.  That's the
14         question.
15      A.   1.17 billion.  I think.  I would just
16   be guessing.
17      Q.   Don't know?
18      A.   No.  I mean I would be guessing rather
19   than I know.
20      Q.   OK.  Mr. King, I would like to walk
21   through a couple of documents here just to ask you
22   some specific questions of those documents.
23         The first one, I am going to hand you
24   what was previously marked as Exhibit 302-A.  It
25   is very thick.  I don't want to ask you about the

Page 160

1         KING - HIGHLY-CONFIDENTIAL
2   whole document, I just want to ask you about the
3   cover e-mail.  But take your time to review
4   whatever you need to review.
5         It appears.  This is dated Wednesday,
6   the 17th.  It appears that you are providing
7   comments to the asset purchase agreement; is that
8   correct?
9         MR. STERN:  Objection to the form.
10      Q.   Let me rephrase.
11         What is this covering e-mail?
12      A.   It is an e-mail from me to Patrick,
13   Mike and Jonathan.  It is called asset purchase
14   agreement comments.  And those are comments to the
15   asset purchase agreement that I would have
16   provided to them.
17      Q.   OK.  Do you recall providing comments
18   to the asset purchase agreement?
19      A.   I now do.  But I would have forgotten
20   about it otherwise.
21      Q.   OK.  I guess my first question:  The
22   agreement is signed on the 16th, so why are you
23   providing comments the day after it is signed?
24      A.   I don't know.  On that, I -- don't
25   forget, to me, I then didn't know -- until you

Page 161

1         KING - HIGHLY-CONFIDENTIAL
2   told me earlier today that there was an agreement
3   signed on the Tuesday, I didn't know that.  Or at
4   least I certainly didn't remember it.
5      Q.   Why would you be sending these
6   agreements to Mr. -- these comments to Mr. Cox?
7   Do you recall?
8      A.   No.
9      Q.   Do you see in the first entry it talks
10   about purchase assets, and the third sentence in
11   that entry, entry number one, says, "Can
12   securities be sold to LBI without approval at a
13   discount to current mark?"  Do you see that?
14      A.   Yeah.
15      Q.   Do you recall why you were making that
16   comment?
17      A.   No, though reading it in its entirety,
18   it also says, "Are hedges put on by LBI after the
19   agreement is signed included?  Any limits or
20   restrictions?"
21         So on the 17th, you know, on the 17th
22   is before we got into the repo.  This is the --
23   these are -- these are commenting on something
24   before we actually -- not on the final form of the
25   transaction.

Page 166

1            KING - HIGHLY-CONFIDENTIAL
2        Q.    Now, when it says discount, do you
3    recall any discussions or having any understanding
4    at the time that Barclays was acquiring assets
5    from Lehman at a discount?
6            MR. STERN:  Objection to the form.
7        Asked and answered.
8        A.    I wasn't -- can you repeat that
9    actually.
10            (Record read)
11        A.    As I pointed out before, I wasn't
12    party to any of those discussions.
13            I would have to also question
14    discounts to what.  If it is a discount to BoNY's
15    marks or something, then I would say I was
16    assuming that my desk was viewing the assets as
17    not being worth the BoNY marks, but I don't know
18    if that's what you mean by discount.
19        Q.    I'm just trying to exhaust your
20    recollection on discussions you might have heard
21    or understandings you might have heard about the
22    discussions between Barclays and Lehman.
23            MR. STERN:  Your question?  I don't
24        think there is a question.
25        Q.    So let's reread the question.  Do you

Page 167

1            KING - HIGHLY-CONFIDENTIAL
2    recall any discussions or having any understanding
3    at the time that Barclays was acquiring assets
4    from Lehman at a discount?
5        A.    So I wasn't party to the
6    discussions -- to any discussions, but I didn't
7    think that -- if I -- I would have to define
8    discount to what, and then if I -- if you said --
9    if you had asked me the question did I think that
10    the -- we should pay less than where Lehman had
11    marked the securities on the 12th or where BoNY or
12    JP had marked them on the 17th, then I would say
13    yes.  But I don't know whether that's what you are
14    asking.
15        Q.    I understand your answer.  I was
16    asking if you have any knowledge of the
17    discussions between Lehman and Barclays --
18        A.    No.
19        Q.    -- as to that subject?
20        A.    No.
21        Q.    Can we skip ahead to the repo
22    transaction, which is the September 18 repo.
23        A.    Yeah.
24        Q.    Did Barclays provide a list of assets
25    that it wanted excluded from the repo or would not

Page 168

1            KING - HIGHLY-CONFIDENTIAL
2    accept as collateral in the repo?
3        A.    No.  We didn't have any option on
4    the -- going into the -- we weren't -- "we" being
5    PMTG, weren't aware of any flexibility as to what
6    we were going to receive.  That was part of the
7    problem, was we are going to take delivery of --
8    remember you asked me the questions earlier about
9    what were you looking at, Steve, and I was
10    provided an inventory of securities on the
11    Wednesday, Thursday, that represented what I would
12    take delivery of.
13            And then it did happen to change by
14    Friday, but that was not what we were expecting to
15    receive, that list of securities.
16        Q.    I am talking about before the Friday.
17    I'm talking about in the Wednesday, Tuesday,
18    whenever you are talking about the repo, were
19    there certain assets that Barclays would not
20    accept as collateral for that repo?
21        A.    No.  I -- on the Wednesday -- so the
22    Wednesday or Thursday we are analyzing the repo,
23    we just assumed we were taking delivery of
24    whatever was described to us as being in the repo
25    on the Thursday.

Page 169

1            KING - HIGHLY-CONFIDENTIAL
2        Q.    Described to you by who?
3        A.    In the schedule of securities
4    provided -- you asked me the question earlier as
5    to -- about a list of securities that was in the
6    repo, and I answered that I didn't know where it
7    came from, whether it was from operations or the
8    Fed or whoever, but somebody provided us a list of
9    securities on the Thursday, which is the list we
10    thought we would take delivery of.  It wasn't the
11    list that we ultimately took delivery of, but it
12    was the list that we passed out to the various
13    traders.
14            We didn't think that we had any option
15    to pick and choose.
16            MR. STERN:  Is that the list that you
17        referred to as having an hour and a half to
18        look at?
19            THE WITNESS:  The hour and a half to
20        look at, yes.
21        Q.    This might clarify the question.  I am
22    going to hand you a document that was previously
23    marked as 143-B.  It is an e-mail stream of which
24    you are not a party to until you get to page 2.
25            MR. STERN:  Take a look at the whole

## Page 170

KING - HIGHLY-CONFIDENTIAL

1    thing.
2        Q.    You can look at the whole thing.  I am
3    just directing your attention to an entry on
4    page 2, which is an e-mail from you to David
5    Petrie, and it attaches something called excluded
6    mortgage assets.
7        A.    Right.
8        Q.    So take your time to look at the
9    document, but my questions are going to be
10   primarily about that attachment.
11       A.    OK.
12       Q.    Have you ever seen this document
13   before?
14       A.    Yes.
15       Q.    Can you tell me what the attachment
16   which is titled "Excluded Mortgage Assets 9/17/08"
17   is?
18       A.    Yeah.  It is from the 6.5 billion
19   dollars of assets on the -- let me look here.
20       Q.    Is that the exhibit we first used in
21   this --
22       A.    Yeah, I think so.
23       Q.    I think it is --
24       A.    388-B.

## Page 171

KING - HIGHLY-CONFIDENTIAL

1        Q.    The 6.6 billion in mortgage?
2        A.    Yeah.  So once upon a time in the
3    first part of the week, we had suggested that we
4    wouldn't -- remember I said that we wouldn't take
5    all of the mortgage and mortgage-backed total.  So
6    we divided it into two pools, the included and the
7    excluded.
8        So that e-mail from the 17th, unless I
9    have made a mistake, it is an e-mail about the
10   assets that we wouldn't be taking out of the
11   mortgage and mortgage-backed securities.
12       Q.    So these are mortgages you are not
13   going to take?
14       A.    These would be -- yes, that's the --
15   well, it was -- in the early part of the week it
16   was the list of securities which we were
17   suggesting that we wouldn't take, "we" being my
18   group, suggesting that we would rather not take
19   out of the total mortgage and mortgage-backed
20   total.
21       Q.    It is really nothing to do with the
22   repo.  It has to do with the agreement to only
23   take a portion of the mortgage-related securities?
24       A.    That's correct.

## Page 172

KING - HIGHLY-CONFIDENTIAL

1        Q.    And then that agreement eventually
2    changes toward the end of the week?
3        MR. STERN:  Objection to the form.
4        A.    As I have said, I only know that what
5    we were looking at at the beginning of the week
6    didn't end up being the transaction.  I don't know
7    how the agreement changed.
8        Q.    Let's talk about mortgage, the pool of
9    mortgages-related securities itself.  What
10   happened to that?  Did Barclays end up getting
11   those securities?
12       A.    Some of them, because some of them
13   were in the repo, but not all of them were in the
14   repo.
15       Q.    And is the part that was in the repo
16   the securities that did not make it to this
17   schedule?
18       A.    I think I described --
19       MR. STERN:  Let me hear that question
20   again, please.
21       MR. HINE:  Let me try again.  That was
22   confusing.
23       Q.    You talked about this schedule, and I
24   am talking about Exhibit --

## Page 173

KING - HIGHLY-CONFIDENTIAL

1        MR. STERN:  143-B.
2        Q.    143 -- all right, 143-B, that's the
3    schedule of mortgage-related securities that --
4        A.    Correct.
5        Q.    -- Barclays did not want included in
6    the transaction, correct?
7        A.    Right.
8        Q.    And that was -- the counterpart to
9    that is the securities that Barclays would allow
10   in the transaction, right?
11       MR. STERN:  Objection to the form.
12       A.    I'm not sure what we mean by -- if we
13   mean what we understood at the beginning of the
14   week my group was asked to assess as a portfolio
15   of assets that would end up being part of the
16   purchase agreement, then this pertains to that.
17   What ultimately happened was of course completely
18   different.
19       Q.    Well, that's what I am asking.  What
20   ultimately happened to the pool of mortgage-backed
21   securities?
22       A.    Some of them I don't know, because the
23   388-B balance sheet was -- was not completely --
24   you know, it -- what does he have, 65.1 -- it says

Page 174

1            KING - HIGHLY-CONFIDENTIAL
2    65.16 billion dollars.  That's on 388-B again,
3    65.16 billion.
4            So it is bigger than -- that number is
5    bigger than the repo facility which at any one of
6    the various marks that people had put on was less
7    than 50 billion dollars.
8            So not -- using your Venn diagram, not
9    all of these securities are in the repo facility.
10           MR. STERN:  And you're pointing to
11   388-B.
12           THE WITNESS:  I'm pointing to 388-B.
13       Q.   I'm just trying to chase what happens
14   to the pool of mortgage-backed securities that
15   were originally marked as 60 billion on 388-B,
16   what happens to them by the end of the week?
17       A.   I don't know on all of them.  All I
18   know is some of them were in the list -- some of
19   them -- some of them were collateral that was
20   pledged to the Fed as far as my desk knew on the
21   Thursday, Wednesday, Thursday.
22       Q.   The Fed?
23       A.   Yeah.  Some of them were in the Fed
24   facility.  Every single -- a bank -- I mean every
25   single -- a balance sheet is made up of assets and

Page 175

1            KING - HIGHLY-CONFIDENTIAL
2    liabilities.  Some of them -- all assets have to
3    be financed, especially for a broker dealer like
4    Lehman.  So, many of these assets were financed by
5    the Fed.  Therefore, they would have also been in
6    the Fed facility.
7        Q.   Right.
8        A.   But there is 65 billion of assets
9    here, so they couldn't all fit in the Fed
10   facility, which was only 50 billion.
11       Q.   I understand.
12       A.   Some of them weren't even in what we
13   thought was the Fed facility on the Wednesday,
14   Thursday.
15       Q.   OK.
16       A.   So some of them were just gone.
17           MR. STERN:  But he is asking you about
18   Exhibit -- the list on Exhibit 143-B.
19           THE WITNESS:  Yeah.
20           MR. STERN:  What happened to those.
21       Q.   No, I am asking the pool of securities
22   on 388-B --
23           MR. STERN:  You didn't ask that.
24           MR. HINE:  Yes, I did.
25       Q.   It was originally marked at

Page 176

1            KING - HIGHLY-CONFIDENTIAL
2    6.5 billion, and you were describing to me that
3    some of that made it into the repo, as I
4    understand it.
5        A.   Some of them were in the -- some of
6    them -- if we looked at a list of securities on
7    388-B, some of those securities, many of those
8    securities were also in -- also being financed by
9    the Fed.
10       Q.   Right.
11       A.   So they were what we thought were in
12   the repo facility that we were going to assume
13   when we reviewed that list of securities on the
14   Wednesday, Thursday.  Not all of them, though.
15   Some of them were just not there.  And some of
16   them would have therefore been excluded assets and
17   some of them would have been included assets.
18          I seem to -- I remember that there was
19   not many of the excluded assets -- no, actually I
20   can't remember exactly how many of the included
21   or -- since the included and excluded list
22   pertained to the Lehman balance sheet, not to the
23   repo facility, there were both included and
24   excluded assets in the Thursday repo facility.
25       Q.   So in the Thursday -- September 18

Page 177

1            KING - HIGHLY-CONFIDENTIAL
2    Thursday repo facility --
3        A.   Before it was the Barclays -- the Fed
4    one.
5        Q.   No.  I want to know -- I want to keep
6    the story going.  The September 18 repo facility,
7    some of those assets eventually make their way to
8    Barclays, and within that pool of assets, there
9    are a certain number of mortgage-related
10   securities; is that right?
11       A.   Yes.  There was some -- some of the
12   mortgage-related securities were in the Fed
13   facility.  Some other securities as well.
14       Q.   Do you know how many of the securities
15   within -- that came to Barclays constituted
16   mortgage-related securities?
17       A.   There is a difference.  Again on the
18   Thursday when we were looking at what we thought
19   we were going to receive from the Fed, there was a
20   certain amount of the securities that were on that
21   list.
22          On the Friday, by the Friday when
23   we -- after the Fed facility has been refinanced
24   by the Barclays repo facility, then there were --
25   out of the 30 or so billion dollars of the

Page 178

1    KING - HIGHLY-CONFIDENTIAL
2    securities that were both in the Fed facility that
3    ended up in the Barclays facility, there were some
4    of the mortgage assets, but in addition there were
5    other assets, other mortgage assets, some other of
6    the mortgage assets which we hadn't looked at on
7    Thursday, but we had looked at on Tuesday, that
8    turned up in the extra 10 billion.
9        Q.    So as you talked about earlier, on
10   Friday you realize there is two different types --
11   you assumed two different types of securities,
12   about 32 billion worth of securities that you
13   already knew about using the JPM marks?
14       A.    Correct.
15       Q.    And 10 billion using the BoNY marks of
16   securities that you didn't expect to receive?
17       A.    Correct.
18       Q.    There were mortgage securities in both
19   of those groups; is that right?
20       A.    That's correct.  Yes.
21       Q.    Do you know about how much?
22       A.    I remember it being about 3, 3 billion
23   I think.  It was about 3 billion, and we thought
24   they were worth about 1 and a half.
25       Q.    And those are the types of -- when you

Page 179

1    KING - HIGHLY-CONFIDENTIAL
2    say 3 billion, that's within both of those two
3    groups?
4        A.    Yeah.  That's what I remember.
5        Q.    And those are the types of securities
6    that you have been focusing on because they get
7    put into your group eventually?
8        A.    That's correct, yeah.
9             MR. STERN:  Is there a question?
10            MR. HINE:  No.  He answered it.
11            MR. STERN:  Just wait for a question.
12   BY MR. HINE:
13       Q.    Did you want to elaborate on
14   something?
15       A.    No.  I was just thinking about that.
16   That's fine.
17       Q.    Mr. King, I am going to hand you
18   another document, that has been previously marked
19   as 144-A, and my question is whether you have ever
20   seen that before.
21       A.    Yes.
22       Q.    What is this document?
23       A.    I've seen it before, but I don't
24   really know.
25       Q.    Did you receive a copy of this from

Page 180

1    KING - HIGHLY-CONFIDENTIAL
2    Mr. Malloy around -- on Friday, the 19th?
3        A.    I'm on the e-mail, so yes.
4        Q.    Do you have any understanding of why
5    Mr. Malloy prepared this analysis?
6        A.    Marty was just involved in the
7    settlement of the repo, so he -- I don't know why
8    he produced this in particular.  It is a pretty --
9    the original e-mail is a pretty vanilla e-mail
10   just saying -- I don't know who Jackie Stanley
11   Jones is, but it is just a description of Fed wire
12   securities, but I don't know what it is other than
13   that.
14       Q.    You don't know why he prepared it?
15       A.    Marty and others, Gerard and others
16   needed to know what was being received by
17   Barclays, so there would have been a lot of
18   e-mails on Friday morning saying -- starting to
19   try to get a handle on what had been received.
20   This looks like one of many of those.
21       Q.    Did you ever hear any discussions on
22   Thursday or Friday of that week about the amount
23   of excess collateral that had been posted towards
24   the repo?
25       A.    I've never heard -- I don't think I

Page 181

1    KING - HIGHLY-CONFIDENTIAL
2    have heard the term "excess collateral" per se,
3    but there was -- we were obviously extremely
4    worried on the Friday.  We were very worried on
5    Wednesday and Thursday.  We had a population of
6    securities and we were very worried that those
7    really might not be worth 45 billion dollars.
8        We were even more worried -- that was
9    with at least a list that was purportedly going to
10   be delivered to us.
11        We were even more worried over
12   Thursday night and into Friday that now we just
13   had a list of stuff that we had no idea whether it
14   was worth what we just lent against it.  So there
15   was lots of discussion of whether there was
16   adequate collateral or how -- actually, no one
17   really talked about whether there was adequate
18   collateral.  It was just how much was the
19   collateral worth.
20        So there was that discussion, but not
21   excess collateral per se.
22            (Exhibit 391-B, document Bates stamped
23            BCI-EX-S 136198 marked for identification,
24            as of this date.)
25       Q.    Mr. King, I am handing you a document

KING - HIGHLY-CONFIDENTIAL

1
2  to relevant Barclays desks or we had marked them
3  ourselves, or if we didn't know what it is, we had
4  estimated it in some variety of ways.
5      Q.   Were some of the marks, marks that you
6  had put on these assets earlier in the week, say
7  back in Monday or Tuesday?
8      A.   Yeah.  Unfortunately, the process
9  lagged, you know, because it was always -- it was
10  almost impossible to keep marks -- so for this
11  balance sheet for example, for example, this would
12  have had to have been produced based on data that
13  we had provided to Gary over the weekend that
14  would have been based on marks that we had put on
15  the portfolio or -- marks that we had put into our
16  spreadsheet on the 19th, some of which would have
17  been based on marks that we had come up with at
18  the beginning of the week.
19      Q.   So it is the accumulated marking by
20  Barclays starting in the 15th all the way through
21  that week?
22      A.   Yeah.
23      Q.   Is the set of marks you used?
24      A.   I think it is also -- rather than
25  using Barclays, it is PMTG at that point.  I'm not

KING - HIGHLY-CONFIDENTIAL

1
2  sure the firm had espoused our position, so that
3  was -- it was PMTG's latest estimate line by line,
4  and then that was refined over a period of time.
5      Q.   And then so PMTG -- I didn't mean to
6  ascribe a difference between PMTG and Barclays,
7  but PMTG has been trying to put marks on these
8  various securities dating back to the prior
9  Monday, all the way to the 15th?
10      A.   Correct.
11      Q.   This 2.83 is the product of a series
12  of marks created by that process that -- as of the
13  22nd?
14          MR. STERN:  Objection to the form.
15      Q.   Let me rephrase that.  Let me rephrase
16  it.
17          The marks that you used to come up
18  with the 2.83 number were PMTG marks, as of the
19  22nd --
20      A.   No, I don't know whether these are --
21  no.
22      Q.   OK.
23      A.   This e-mail is as of the 22nd.
24      Q.   OK, I understand.
25      A.   I notice it is at the end of the

KING - HIGHLY-CONFIDENTIAL

1
2  London day, but it is still as of the 22nd.
3          I don't remember -- we were very, very
4  heavily embroiled in the risk management of the
5  assets that we had acquired by this Monday.
6      Q.   OK.
7      A.   So I don't remember whether this
8  was -- some of the marks that PMTG was using may
9  well have been updated on this Monday.  Some of
10  them may have been latest guess over the weekend.
11          I think probably over the weekend, and
12  then, in other words, they may have come -- some
13  of them would have come from various stages during
14  the course of the previous week.
15      Q.   I guess that was my question.  I
16  didn't mean to -- I am sorry.
17      A.   The 2.83 is -- what we would have done
18  was put the value that we thought was on the
19  portfolio of the 42.55, let's say, and then there
20  was the sum of the BoNY marks, which was the
21  45.18, and the 2.83 just drops out as the
22  difference between the two.
23      Q.   While we are looking at that, what
24  does the "Friday P&L approx." entry mean?
25      A.   There is always carry and yield on a

KING - HIGHLY-CONFIDENTIAL

1
2  portfolio.  That would have been that.  But I'm
3  not sure -- that would have been what that is.
4      Q.   So other than that -- I think you have
5  explained to me where you get the 2.83, but the
6  marks that you used for PMTG were accumulated by
7  PMTG from the period of the 15th through that
8  weekend, the following weekend; is that right?
9          MR. STERN:  Objection to the form.
10          You can answer.
11      A.   The -- there was a production line, if
12  you like, of Barclays' desks, my people, me, Gary,
13  that would have resulted in a steady evaluation of
14  the best estimate at the mark, of what we thought
15  would be an orderly liquidation mark or whatever
16  mark we were being asked for at a particular time,
17  to go into -- to go up to product control so that
18  they could produce this.
19      Q.   And that process is what took place
20  for the week of September 15?
21      A.   No.
22          MR. STERN:  Object to the form.
23      A.   No, that -- no.  All that happened
24  during the week of the 15th was that -- we
25  didn't -- I don't remember seeing any acquisition

Page 194

1        KING - HIGHLY-CONFIDENTIAL
2    balance sheets during the course of the week. All
3    our desk did was try to ascertain the risk and the
4    best guess of both a liquidation valuation and an
5    orderly liquidation valuation during the course of
6    that week.
7        Once the transaction had closed on the
8    Monday, then there was a -- there was both the
9    risk management process, which was my problem, and
10   also a control process, which was product
11   control's, and obviously we had to have an input
12   to product control, which is where the 42.55 would
13   have been the latest -- Gary is using our latest
14   estimate of value -- you can see it hadn't been
15   updated because it still had the cash on it, for
16   example, of the 7 that wasn't received and so on.
17       Q.   I didn't mean to suggest you were
18   doing the acquisition balance sheet during the
19   week. I just wanted to see when the -- the marks
20   that you used were developed during that week; is
21   that right?
22       MR. STERN: Objection to the form.
23       Objection to the form. I don't know what
24       the question is.
25       Q.   You can answer.

Page 195

1        KING - HIGHLY-CONFIDENTIAL
2        MR. STERN:  The question is, is that
3    right?  What's the question?
4        Q.   You can answer.
5        MR. STERN:  Well, the question is, "I
6    wanted to see when the marks that you used
7    were developed during that week."
8        MR. HINE:  Jack, if you have an
9    objection to the form, just state it.  Don't
10   coach him.
11       MR. STERN:  I am asking you what your
12   question is.
13       Q.   When the marks that you used -- let me
14   restate it.
15       I didn't mean to suggest that you were
16   working on the acquisition balance sheet, as I
17   thought I might have confused you with my last
18   question, during that week, the prior week, the
19   15th.
20       A.   Right.
21       Q.   But in developing this 2.83, the marks
22   that PMTG used were the product of its
23   accumulating knowledge about the marks from the
24   15th through the following weekend; is that right?
25       A.   We would have -- depending on the

Page 196

1        KING - HIGHLY-CONFIDENTIAL
2    product type -- some -- the 8 -- for example, of
3    that 42.55, approximately 8 billion dollars was
4    cash equities.  That's incredibly easy to mark
5    from an accounting point of view.  There is an
6    exchange, you type in the ticker for the equity
7    and you get a price.  Therefore, that process took
8    one of my analysts approximately -- I think he had
9    Nick Leyhane in London do it for him -- 20 minutes
10   to mark 8 billion dollars in assets.
11       As a trading matter, it's useless
12   because the -- but it is necessarily where a firm
13   has to mark cash equities.  Because there is an
14   exchange.  It says the price is 22 dollars for --
15   you know, Barclays stock is at 3.98.  Therefore,
16   you better mark all the Barclays stock at 3.98.
17       If you happen to be long a billion
18   dollars of Barclays stock and you go out and sell
19   it, you are never going to get 3.98, but the
20   process is pretty easy from the point of view of
21   providing an accounting number.
22       What we had to do over and above
23   that -- so that could have been updated and may
24   well have been updated on Saturday or Sunday.  We
25   would have actually had the Bloomberg ticker in a

Page 197

1        KING - HIGHLY-CONFIDENTIAL
2    spreadsheet, so it would have kept updating it.
3        Other things are less easy.  Other
4    things are, you have to run a model.  You have to
5    take cash in and do all sorts of things to be able
6    to determine what the price is.  So there is a
7    full range.
8        8 billion dollars worth of equities
9    doesn't trade at where those marks are.  A good
10   example would be, we had cash equities where the
11   amount of the cash equity that we owned
12   represented 400 days of the historical trading
13   volume.  That means if we would have traded as
14   much of that stock as trades every day for the
15   last 400 days, we still couldn't get out of our
16   position.
17       But still, the last mark, last penny
18   of stock that traded was where we had to mark that
19   position.  It took us a year at that point to get
20   out of those positions, and many of them therefore
21   by construction every time we sold them took a
22   loss every time.  300 million dollars of loss or
23   whatever it was in the end, but every time we sold
24   we were selling at a discount to the published
25   mark.  Easy to provide, put the published mark

Page 198

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    into that spreadsheet.
3            The desk estimates were an attempt to
4    then say, we have taken that, you know, where the
5    exchange, such and such, and we assume it is going
6    to cost us an additional 300 million dollars to
7    bid side for us to be able to sell them.  So we
8    would have deducted that from that price, and that
9    would have gone into the 42.55.
10           Now, many times we were just wrong,
11   because the market was also deteriorating as we
12   went along.  So it was going to end up costing us
13   an awful lot more to actually sell the stuff.
14           Not only did we have that problem,
15   over the subsequent days we realized the 7 billion
16   dollars wasn't going to turn up 7 billion dollars.
17   We were going to get another slew of securities as
18   well, many of which were securities that were on
19   the excluded asset list that we didn't think were
20   worth anything.
21           So the problem was just getting -- but
22   that's the reason why -- some aspects of providing
23   that 42.55 could have been done on an ongoing
24   basis and others -- but would still have been
25   subject to a -- you know, an observable exchange

Page 199

1    KING - HIGHLY-CONFIDENTIAL
2    traded mark minus an estimate, and then others
3    would have been things that would have really
4    taken models or input from other desks to come up
5    with.
6    Q.    OK.  If you see further down on the
7    spreadsheet, it says, "Previously excluded 50
8    percent MBS."  Do you see that?
9    A.    Yeah.
10   Q.    That's mortgage-backed securities?
11   A.    Is that a zero?
12         MR. STERN:  The question is what MBS
13   means.
14   A.    Is that what --
15   Q.    Yes.
16   A.    MBS means mortgage-backed securities.
17   Q.    If you look at footnote 3 on that
18   line, it says, "September 20 clarification letter
19   indicates we no longer receive these assets."  Do
20   you see that?
21   A.    Yes.
22   Q.    Do you have any understanding of what
23   the September 20 clarification letter does?
24         MR. STERN:  Objection to form.
25   Q.    With respect to mortgage-backed

Page 200

1    KING - HIGHLY-CONFIDENTIAL
2    securities?
3    A.    No.
4    Q.    OK.  Did, in fact -- I know we have
5    talked about earlier some of the mortgage-backed
6    securities made their way into the 32 point -- 32
7    billion dollar pool we talked about earlier and 10
8    billion dollar pool from the repo.  Do you recall
9    that testimony?
10   A.    Can you say that again.
11   Q.    I'm just trying to get you back to the
12   testimony, but we had previously talked about some
13   of the mortgage-backed securities ended up in the
14   pool of assets that Barclays received as a result
15   of the repo, correct?
16   A.    Yes.
17   Q.    And we compared that to the original
18   number of 6.6 billion in mortgage-related
19   securities.  Do you recall that?
20   A.    Yes.
21   Q.    How many mortgage -- did Barclays
22   ultimately get the entirety of the 6.6
23   mortgage-backed securities?  And I'm not talking
24   about -- I'm not trying to confuse you with the
25   valuation, but I'm just talking about the pool we

Page 201

1    KING - HIGHLY-CONFIDENTIAL
2    originally were talking about --
3    A.    I understand.  No.
4    Q.    Did Barclays get all that?
5    A.    No.
6    Q.    Do you know how much Barclays did get?
7    A.    Eventually -- like by the end of the
8    year?  Or by --
9    Q.    Yeah.
10   A.    Because we got -- we got some -- we
11   didn't get all of it.  We weren't even supposed to
12   get all of it for this thing.  We got some of it
13   in the Fed facility that we -- the 30-odd billion
14   dollars of Fed facility assets that we thought we
15   were going to get.
16   Q.    Right.
17   A.    We got some of it in the 10 billion
18   dollars that we didn't think we were going to get,
19   and got some of it as part of the JP settlement in
20   lieu of the 7 billion dollars, and then some of it
21   we never got.
22   Q.    Have you liquidated those securities
23   yet?
24   A.    Some of them.
25   Q.    Most of them or a small portion of

Page 202

KING - HIGHLY-CONFIDENTIAL

1
2      them?
3          A.   Of what we are calling the
4      mortgage-backed securities?
5          Q.   Yes, the entire pool of
6      mortgage-backed securities that Barclays received,
7      no matter how you got it, from Lehman.
8              MR. STERN:  Objection to --
9          Q.   Can you give me an estimate of the
10     percentage of it that you have liquidated by now?
11             MR. STERN:  Objection to the form.
12         A.   We had about 4 point -- we only -- we
13     estimated that the 6.5 billion was only worth at
14     most about 3 point something billion, so -- and in
15     the Lehman -- in the repo that we thought we were
16     going to get, I think we thought that was about
17     1.5, even though JP had it at about 3.3.
18             And some of those are very obvious
19     mistakes as well.  Because JP doesn't know any
20     more than we do what some of the securities are.
21     Sometimes it says, if I don't know what it is,
22     mark it at par, but it may actually be worth zero,
23     and that's the reason why that number comes out so
24     wrong, because these are so complicated
25     securities.

Page 203

KING - HIGHLY-CONFIDENTIAL

1
2          Q.   OK.
3          A.   So they are worth a tremendous amount
4      less.
5              If you mean of those securities, that
6      value, I think it was about -- we thought it was
7      worth about 2 billion dollars or so.  What we
8      eventually ended up with, 2.2 I think, and we must
9      have sold about -- the last time I was involved
10     with it, it would have been about 60 percent, I
11     think, or so.
12         Q.   Do you know if Barclays made money on
13     those securities, the mortgage-backed securities?
14         A.   We lost money.
15         Q.   Do you know how much or --
16         A.   I don't remember.
17         Q.   Do you know if there has been any kind
18     of assessment of how much money Barclays made or
19     lost with respect to the mortgage-backed
20     securities that it received from Lehman?
21         A.   No, never tried.
22         Q.   For the same reasons we talked about
23     before, it would be difficult to do?
24         A.   No.  It would actually be easy to do,
25     just not useful.  We had our own portfolio of

Page 204

KING - HIGHLY-CONFIDENTIAL

1
2      mortgage-backed securities that were also losing
3      money, so we just put them in with those, and
4      therefore, I didn't track -- even though I could,
5      I didn't track what was a Lehman security versus
6      what was a Barclays security.  We just organized
7      them for appropriate liquidation or retention.
8              MR. HINE:  OK, Mr. King, that is all
9          the questions I have.  I think one of my
10         colleagues has some questions to ask you as
11         well.
12             (Recess)
13     EXAMINATION BY
14     MR. OXFORD:
15         Q.   Good afternoon, Mr. King.  I
16     introduced myself earlier on.  My name is Neil
17     Oxford.  I represent the SIPA trustee for LBI.
18             Following up on the examination by
19     Mr. Hine, initially you testified about the
20     portion of the 6.5 billion of mortgage-backed
21     securities that Barclays ended up purchasing.
22     Do you recall that?
23         A.   Yeah, yeah.
24             MR. STERN:  Wait a second.
25             OK, OK.

Page 205

KING - HIGHLY-CONFIDENTIAL

1
2          Q.   I just want to make sure I understand
3      your testimony.  So leaving aside for the moment
4      the question of value, are you able to estimate
5      what percentage of that 6.5 billion of
6      mortgage-backed securities that we have been
7      discussing that is represented on Exhibit 388-B,
8      are you able to estimate what percentage of those
9      mortgage-backed securities ended up in the hands
10     of Barclays?
11             MR. STERN:  Objection to the form.
12         Get out 388-B.  And let's hear the question
13         again.
14             MR. OXFORD:  Can you read it back.
15             (Record read)
16         A.   Not accurately, and the reason for
17     that is that we got the ultimate delivery of
18     securities that Barclays received, first the
19     subset of the ones that it expected to receive in
20     the original repo, the ones that it got in the 10
21     billion dollars of repo that it didn't expect to
22     receive and the ones that it got as part of the
23     settlement against the 7 billion dollars of cash.
24     We actually received a lot of securities that we
25     had -- that would have fallen into that category

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4      ---------------------------X

5      IN RE:

6                               Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,

9

10                     Debtors.

11     ---------------------------X

12

13

14

15          HIGHLY CONFIDENTIAL DEPOSITION OF

16                CHRISTOPHER KIPLOK

17                New York, New York

18              Thursday, March 4, 2010

19

20

21

22

23

24     Reported by:
       JOMANNA DeROSA, CSR
25     JOB NO. 27494

Page 2

```
 1
 2
 3
 4              March 4, 2010
 5              1:08 p.m.
 6
 7
 8         HIGHLY CONFIDENTIAL Deposition of
 9    CHRISTOPHER KIPLOK, held at the offices of
10    Boies Schiller & Flexner, LLP, 575 Lexington
11    Avenue, New York, New York, pursuant to
12    Notice, before Jomanna DeRosa, a Certified
13    Shorthand Reporter and Notary Public of the
14    States of New York, New Jersey, California
15    and Arizona.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S :
 3        JONES DAY, LLP
 4        Attorneys for Lehman Brothers, Inc.
 5            222 East 41st Street
 6            New York, New York 10017-6702
 7        BY:   JENNIFER L. DEL MEDICO, ESQ.
 8
 9        BOIES SCHILLER & FLEXNER, LLP
10        Attorneys for Barclays
11            5301 Wisconsin Avenue, N.W.
12            Washington, D.C. 20015
13        BY:  JONATHAN SHAW, ESQ.
14
15        HUGHES HUBBARD & REED, LLP
16        Attorneys for SIPA Trustee
17            One Battery Park Plaza
18            New York, New York 10004
19        BY:  SETH D. ROTHMAN, ESQ.
20
21
22
23
24
25
```

Page 4

```
 1
 2    A P P E A R A N C E S (Continued):
 3        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 4        Attorneys for the Creditors Committee
 5            51 Madison Avenue, 22nd Floor
 6            New York, New York 10010
 7        BY:  ERIC M. KAY, ESQ.
 8
 9    ALSO PRESENT:
10
11    JOSH LIPSON, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              KIPLOK - HIGHLY CONFIDENTIAL
 2              THE VIDEOGRAPHER:  This is the
 3        start of Tape No. 1 of the videotaped
 4        deposition of Christopher Kiplok in the matter
 5        In re Lehman.  Today's date is March 4th,
 6        2010, at approximately 1:08 p.m.
 7              Will the court reporter please
 8        swear in the witness.
 9    C H R I S T O P H E R   K I P L O K, called as a
10        witness, having been duly affirmed by a
11        Notary Public, was examined and testified
12        as follows:
13    EXAMINATION BY
14    MR. SHAW:
15        Q.   Good afternoon, Mr. Kiplok.
16        A.   Good afternoon.
17        Q.   As I said off the record, my name
18    is Jonathan Shaw.  I'm with Boies, Schiller &
19    Flexner.  I represent Barclays Capital in this
20    case.
21              You are a partner at the law firm
22    of Hughes Hubbard & Reed.  Is that correct?
23        A.   Yes.
24        Q.   I take it that's a recent
25    promotion.  Is that right?
```

2 (Pages 2 to 5)

Page 6

KIPLOK - HIGHLY CONFIDENTIAL
1
2    A.   Yes.
3    Q.   Before that, you were an associate
4  with Hughes Hubbard & Reed.  Is that correct?
5    A.   Yes.
6    Q.   And you were an associate of Hughes
7  Hubbard & Reed as of -- in September of 2008.
8        Is that right?
9    A.   Yes.
10   Q.   Okay.  You're here today both in
11 your individual capacity and as a 30(b)(6)
12 witness.  Is that your understanding?
13   A.   Yes, it is, as to two topics on the
14 30(b)(6).
15       (Exhibit 676-B marked for
16 identification.)
17       MR. SHAW:  I'm showing you what's
18 been marked as Exhibit 676-B.
19   Q.   Do you recognize this as a 30(b)(6)
20 notice to which you've been designated or for
21 which you've been designated the Trustee's witness
22 on two topics?
23   A.   Yes.
24   Q.   And those would be Topics Nos. 4
25 and 5.  Is that correct?

Page 7

KIPLOK - HIGHLY CONFIDENTIAL
1
2    A.   Yes.
3    Q.   What did you do to prepare to
4  testify as a 30(b)(6) witness on those two topics?
5    A.   I spoke with other -- others of the
6  Trustee's professionals, including professionals
7  at Hughes Hubbard and Deloitte & Touche.
8    Q.   Which professionals did you speak
9  with at Hughes Hubbard?
10   A.   There were several that include
11 Mr. Kobak, a couple of associates, and -- and some
12 others.
13   Q.   Who are the associates?
14   A.   Mr. Mills.  And that's all I
15 recall.
16   Q.   Who were the couple of others?
17   A.   I believe -- I have chatted with
18 Mr. Giddens, and I believe Mr. Frelinghuysen as
19 well, actually.
20   Q.   And who at Deloitte have you spoken
21 with in preparation for your 30(b)(6) deposition?
22   A.   Ms. Karp and Mr. Harris.
23   Q.   What is Mr. Harris' first name?
24   A.   Christopher.
25   Q.   What did you speak to Mr. Kobak

Page 8

KIPLOK - HIGHLY CONFIDENTIAL
1
2  about, for purposes of preparing for your 30(b)(6)
3  deposition?
4    A.   General background in connection
5  with Topics 4 and 5.
6    Q.   Okay.  And what do you recall
7  Mr. Kobak telling you?
8    A.   I recall my conversations with
9  Mr. Kobak, and confirming my own understanding
10 of -- of those two topics.
11   Q.   And when did your conversation with
12 Mr. Kobak take place?
13   A.   Over the last several days.  Either
14 earlier this week or late last week.
15   Q.   Okay.  And you talked to Mr. Mills.
16 What did you and Mr. Mills discuss in preparation
17 for your 30(b)(6) testimony?
18   A.   The Topics 4 and 5 that you alluded
19 to.
20   Q.   And what specifically did you
21 discuss?
22   A.   The -- I think they're enunciated
23 in those topics.  Specifically it was confirming
24 my understanding of those topics.
25   Q.   Did Mr. Kobak provide you with any

Page 9

KIPLOK - HIGHLY CONFIDENTIAL
1
2  facts as to which you will testify today
3  concerning those topics?
4    A.   I don't think so.  I think I've --
5  he confirmed my understanding, which -- which was
6  the goal of our conversation.  If there's any
7  disagreement, he may -- he may have done so, but
8  there was not.
9    Q.   What about Mr. Mills?  Did he
10 provide you with any factual information
11 concerning those two topics?
12   A.   I -- I recall Mr. Mills providing
13 me with some documents, which included -- the one
14 document that I recall is a letter from Jonathan
15 Hughes, addressed to the Trustee, and there were
16 some others, but I don't specifically recall.
17   Q.   When did you talk with Mr. Mills?
18   A.   This week.
19   Q.   And the letter from Mr. Hughes to
20 the Trustee, what was the topic of that letter?
21   A.   Claims Barclays has made that I
22 understand are now the subject of this litigation.
23   Q.   Did Mr. Mills explain to you why he
24 was providing you with a copy of that letter?
25       MR. ROTHMAN:  Let me just

3  (Pages 6 to 9)

KIPLOK - HIGHLY CONFIDENTIAL

1
2  interject.  Mr. Mills doesn't -- isn't a
3  person who has personal knowledge of these
4  topics or who were -- was involved in these
5  topics.  He was preparing Mr. Kobak for the
6  deposition and showing him documents in
7  connection with the preparation.
8         MR. SHAW:  All right.
9       Q.   What did you discuss with
10 Mr. Giddens about these two topics?
11      A.   It was similar to my conversation
12 with Mr. Kobak, confirming my understanding of --
13 frankly, to be sure I had a fulsome understanding
14 of both topics, and he confirmed that I had such
15 an understanding.
16      Q.   And when did you talk with
17 Mr. Giddens?
18      A.   Yesterday.  Yesterday.  I don't
19 remember whether it was morning or afternoon.
20      Q.   For about how long?
21      A.   I don't recall.  Less than an hour.
22      Q.   And when did you speak with
23 Mr. Frelinghuysen about those two topics?
24      A.   I think it was earlier this week.
25      Q.   And what did you discuss with

KIPLOK - HIGHLY CONFIDENTIAL

1
2  Mr. Frelinghuysen about those topics?
3       A.   I recall my discussion with
4  Mr. Frelinghuysen was limited to, I think, Topic
5  4, the clearance box asset topic.
6       Q.   And what did Mr. Frelinghuysen tell
7  you about that topic?
8       A.   Again, I presented him with my
9  understanding, and I don't think he added anything
10 to the understanding I had.
11      Q.   And when did you speak to Ms. Karp?
12      A.   This morning.
13      Q.   And how long did you speak to her?
14      A.   I don't recall specifically.  I'd
15 estimate maybe 30 minutes or so.
16      Q.   Was that by telephone?
17      A.   In person.
18      Q.   In person.  And did Ms. Karp convey
19 any facts to you about either Topic 4 or Topic 5?
20      A.   She conveyed to me what I'll call a
21 high level understanding of the work Deloitte had
22 done around Schedule B, to the extent that would
23 impact Topic No. 4.
24      Q.   And what work did she tell you that
25 Deloitte had done around Schedule B?

KIPLOK - HIGHLY CONFIDENTIAL

1
2       A.   That Deloitte had tried to
3  comprehend the schedule, had requested, on several
4  occasions, to meet with Barclays to further
5  understand the schedule, that such requests were
6  repeatedly denied, and that from Deloitte's
7  perspective, the schedule was not helpful.
8       Q.   Did she say when Deloitte tried to
9  comprehend the schedule?
10      A.   I don't recall specifically, but --
11 or if she mentioned it.  I -- I do recall that --
12 and she refreshed my recollection -- that a
13 request to meet with Barclays as to the schedule
14 was raised at a meeting that I and others and she
15 participated in with some of your partners and
16 your client in June, when the request for
17 assistance in -- in understanding the schedule was
18 refused.
19      Q.   That would be June of 2009?
20      A.   Yes.
21      Q.   And what did you discuss with
22 Mr. Harris about Topics 4 or 5?
23      A.   Mr. Harris was with Ms. Karp when
24 we had this discussion.  And so, I think my prior
25 answers would cover that.

KIPLOK - HIGHLY CONFIDENTIAL

1
2       Q.   Aside from Mr. Mills, did anyone
3  provide you with any documents to review in
4  preparation for your 30(b)(6) testimony?
5       A.   Mr. Mills was assisted with others
6  in preparation for my deposition, you know, a
7  paralegal and another associate.  And whether that
8  was in connection with 30(b)(6) or generally, I --
9  I don't recall.
10      Q.   Let's start with Topic No. 5.  Has
11 the Trustee or any of his representatives had any
12 communication with the Securities and Exchange
13 Commission concerning any proposed transfer of
14 securities to Barclays under Paragraph 8, sub 2,
15 of the clarification letter?
16      A.   The Trustee has not proposed
17 transferring securities.  I understand 8 sub 2 to
18 refer to the 15c3 account.
19      Q.   That's correct.
20      A.   Such proposal has not been made.
21      Q.   Has the Trustee sought permission
22 from the SEC or any other regulatory agency to
23 transfer securities to Barclays pursuant to that
24 provision?
25      A.   The claim that Barclays has made to

4  (Pages 10 to 13)

Page 14

KIPLOK - HIGHLY CONFIDENTIAL

1
2  those assets has been the subject of certain
3  discussions with the SEC, and the SEC has
4  confirmed -- in those discussions, I'd say that
5  the SEC staff that those discussions occurred with
6  agreed with the Trustee's position that, at best,
7  it would be premature for even a proposal of such
8  transfer to be made.
9      Q.   Who at the SEC has had those
10  discussions with the Trustee or the Trustee's
11  staff?
12      A.   Individuals in the Department of
13  Market Regulation.
14      Q.   What were their names?
15      A.   They included Mr. Machiaroli and
16  Mr. McGowan.
17      Q.   Who representing the Trustee was
18  involved in those communications?
19      A.   I was, as well as Mr. Kobak.
20      Q.   When did those discussions take
21  place?
22      A.   We meet or have met on what I'll
23  call a semi-regular basis with the staff,
24  including the two individuals I referenced, the
25  SEC staff, you know, throughout the proceeding,

Page 15

KIPLOK - HIGHLY CONFIDENTIAL

1
2  and I don't recall specifically when these issues
3  were raised.
4      Q.   2010, 2009, 2008; when?
5      A.   Well, again, I don't recall
6  specifically when they were made.  I know it
7  wasn't apparent to the estate that Barclays was
8  making these claims until several months into the
9  proceeding.  I would say generally 2009, but,
10  again, I don't recall specifically, and I believe
11  these discussions occurred on more than one
12  occasion.
13      Q.   Were there any written
14  communications concerning these discussions or the
15  topic of these discussions?
16      A.   No.  You mean with the SEC?
17      Q.   SEC.
18      A.   There have been written
19  communications with Barclays, but not with the
20  SEC.
21      Q.   Are these discussions recorded in
22  any way?
23      A.   No.
24      Q.   What about any regulatory agency
25  other than the SEC?  Are there any such

Page 16

KIPLOK - HIGHLY CONFIDENTIAL

1
2  discussions with such an entity?
3      A.   I recall a brief discussion with
4  FINRA that included Barclays, I'll call it claim
5  or demand to the 3-3 assets.  The SEC staff was
6  present, and that FINRA's, at least the
7  individuals we met with, confirmed or had the same
8  understanding that the estate and the SEC did.
9      That, again, at best, until
10  customer claims have been satisfied, it would be
11  premature to even have a proposed release of those
12  3-3 assets.
13      Q.   Who representing FINRA attended
14  that meeting?
15      A.   I recall Ms. Vogel and Mr. Wollman.
16      Q.   And you have summarized what you
17  understood to be the position of the SEC and
18  FINRA.
19      Can you recall anything that they
20  actually said, the actual words?
21      A.   I don't recall specifically who
22  said it, but at one point I think I do recall the
23  phrase "that claim is crazy" being used, but I
24  don't recall specifically who said it or when.
25      Q.   Let's look at Topic 4 now.

Page 17

KIPLOK - HIGHLY CONFIDENTIAL

1
2      What have you done to ascertain
3  what the disposition of securities or other assets
4  in LBI's clearance boxes at the time of the
5  closing was, to the extent the Trustee no longer
6  retains them?
7      A.   Would you repeat the question?  I
8  mean, are you reading me the topic?
9      Q.   What I'm really doing is misreading
10  the topic.
11      A.   Okay.
12      Q.   To the extent that the LBI Trustee
13  or the LBI estate no longer holds any security or
14  other asset that was held in LBI's clearance boxes
15  as of the time of the closing, how are such
16  securities or other assets disposed of?
17      A.   Well, first I think Barclays is
18  probably very familiar with the disposition of
19  clearing box assets used to satisfy certain
20  customer claims, including, you know, over $42
21  billion that transferred as part of the PIM
22  conversion to Barclays, and a slightly larger
23  amount that transferred to the PAM conversion.
24      So, you know, I'm assuming your
25  question is aside from those -- what I'll call

5  (Pages 14 to 17)

Page 26

KIPLOK - HIGHLY CONFIDENTIAL

1    KIPLOK - HIGHLY CONFIDENTIAL
2  Others were on the phone.  I didn't quite know who
3  was there.
4        But what I principally remember
5  when I walked in was a negotiation or a dispute, I
6  frankly couldn't tell when I walked into the room,
7  between Mr. Cox of Barclays, and Mr. Cutler of
8  Chase, and my understanding going to Weil Gotshal
9  was that there was an issue that could prevent the
10  closing, and it became apparent, when I arrived at
11  Weil Gotshal, that that issue appeared to be an
12  issue between Chase and Barclays because there was
13  a substantial and sustained discussion between
14  Mr. Cutler.  And I believe some of the Wachtell
15  lawyers were with him, but I just don't recall,
16  and Mr. Cox.  And that ensued -- if I arrived at
17  5:00 or so, that had to ensue for a couple of
18  hours.
19    Q.   Did you participate in any other
20  discussions between then and -- and the closing on
21  Monday morning?
22    A.   Well, first of all, I clearly did
23  not participate in any of those discussions.  I
24  walked in, in the middle of them, and at best was
25  trying to make heads or tails of what could

Page 27

1    KIPLOK - HIGHLY CONFIDENTIAL
2  possibly prevent the closing.
3        You know, to be clear, that entire
4  weekend we were focused on transferring accounts
5  and what, in our view, was fulfill the public
6  interest of the deal, which was moving as many
7  accounts as possible, and then, secondly,
8  preparing for the days and weeks of the SIPA case
9  that would follow.
10        It was never my intention to
11  participate, nor frankly seeing what I walked
12  into, did I have the resources to participate in
13  the discussions that were occurring either in that
14  conference room or on the phone.  So, I first say
15  that.
16        There was initially that discussion
17  with Chase.  Later in the evening there were
18  discussions, I recall, involving issues that DTCC
19  had.  And, again, I was trying to monitor those
20  discussions, and as the night wore on, there were
21  some multiple documents.  But we were, frankly,
22  doing all we could to be sure the closing occurred
23  so that the transfer of accounts happened.  We
24  were looking to the days and weeks to come.  We
25  thought the deal had been done Friday evening

Page 28

1    KIPLOK - HIGHLY CONFIDENTIAL
2  before Judge Peck.
3    Q.   Tell me what you recall about this
4  issue involving the DTCC.
5    A.   I recall the DTCC had some concerns
6  regarding its exposure, and -- and the collateral
7  available to cover that exposure.  I -- I don't
8  recall much of the specifics.  I -- I do recall
9  that DTCC issues were, in part, discussed at some
10  point late in the evening around midnight or
11  12:30.  The whole -- there were many occasions, by
12  the way, when I refer to this group, where the
13  group would disburse.
14        And I recall Barclays had two or
15  three conference rooms, and Weil was obviously in
16  their firm, so Lehman had two or three conference
17  rooms.  The Creditors Committee had a conference
18  room, all filled with their professionals.  And
19  there would be these gaps in the evening where,
20  frankly, it would be Mr. Frelinghuysen and me
21  perhaps alone in the large conference room because
22  the other parties had broken out, what I'll call
23  the parties who -- at least Barclays and Lehman --
24  who were participating in the transaction.
25        But I -- I recall at one point,

Page 29

1    KIPLOK - HIGHLY CONFIDENTIAL
2  midnight or 12:30, and this is in connection with
3  DTCC, the group reconvened in a large room, and a
4  pronouncement was made, I believe, by Mr. Harvey
5  Miller, that the $250 million consideration that
6  Barclays was going to pay would first be deposited
7  with the DTCC, and only at such time that DTCC had
8  covered its exposure -- I'm speaking in broad
9  terms -- would such $250 million be released to
10  the estate.
11        I remember thinking that that
12  basically meant Barclays was getting 72,000
13  accounts for nothing from the estate.  But, again,
14  we were focused on the customer account transfer
15  process and -- and the transaction proceeded.
16    Q.   Were you privy to any other
17  discussions about the DTCC issue?  And I exclude
18  internal discussions at Hughes Hubbard or with the
19  Trustee.
20    A.   You know, I do recall early morning
21  hours speaking to Shelly Hirshon at Proskauer, but
22  I -- I just recall that happening.  I don't recall
23  any of the specifics.  And I know Larry Thompson
24  and some others from DTCC were on and off the
25  phone at various points.  So, I guess what I'm

Page 30

KIPLOK - HIGHLY CONFIDENTIAL

1
2  saying I remember there were other discussions,
3  but I just don't remember specifics.  The specific
4  is the point I mentioned about the 250 million.
5      Q.   Were you involved at all in the
6  negotiation of the terms of the clarification
7  letter?
8      A.   No, not at all.
9      Q.   Were you involved in any
10 discussions concerning the terms of the
11 clarification letter over the course of that
12 weekend?
13     A.   First of all, I don't think I was
14 aware that a clarification letter existed until
15 sometime into the evening on Sunday, which I guess
16 is the 21st. I was aware that after the parties
17 had left the courtroom, that certain statements
18 had been made on the record that needed to be --
19 I'll use your word -- "clarified," but that -- the
20 understanding I had was that such would have been
21 accomplished shortly after the sale hearing or
22 first thing Saturday morning.
23        So, again, I was focused on account
24 transfers and the like.  But Sunday evening I do
25 recall the term "clarification letter" quite

Page 31

KIPLOK - HIGHLY CONFIDENTIAL

1
2  clearly.  I think there were drafts on conference
3  room tables.  I never had an opportunity to what
4  I'd say read or review the document.  The one
5  thing I do remember is at some point being in a
6  conference room.  You know, I was in and out of
7  many as different documents and issues were
8  percolating through the wee hours of the morning,
9  where I believe Mr. Messineo from Weil Gotshal was
10 at a laptop computer, and there was an issue as to
11 the 15c3 account, the clarification letter.  And
12 at some point I recall saying to him we need that
13 asset or something along those lines, and his
14 response being, you know, don't worry -- don't
15 worry, we've made -- you know, we've got that
16 covered, and he raised his hand off of the laptop.
17 I recall that.
18        But beyond that session where I was
19 in that conference room, which was -- I think
20 there were three or four Weil Gotshal lawyers and
21 at least a half dozen Cleary lawyers, and a couple
22 of Simpson Thatcher lawyers in the room, I don't
23 recall any -- anything else regarding drafting of
24 the clarification letter.
25     Q.   Were you present for any

Page 32

KIPLOK - HIGHLY CONFIDENTIAL

1
2  discussions concerning the economic terms of the
3  sale transaction?
4      A.   No.
5      Q.   Did anyone, over the course of that
6  weekend, state or suggest, in any way, to your
7  knowledge, that the -- that the terms of the sale
8  transaction, as captured in the APA and the
9  clarification letter, differed from what had been
10 approved by the Court?
11     A.   I don't recall.  I don't recall
12 that.
13     Q.   Was anyone representing the Trustee
14 tasked with monitoring the negotiation of the
15 clarification letter?
16     A.   No. We were -- I think
17 Mr. Frelinghuysen and myself -- Mr. Frelinghuysen
18 had been at Weil Gotshal from the early morning of
19 Saturday, actually.  We asked him to go up to
20 execute whatever needed to be done to finalize the
21 deal that had been presented to Judge Peck.  And
22 he remained at Weil Gotshal for countless hours
23 and even into Sunday for that to occur, and that
24 did not happen.
25        When I arrived at Weil Gotshal, I

Page 33

KIPLOK - HIGHLY CONFIDENTIAL

1
2  was there to monitor, frankly, any -- as I've said
3  before, issues attendant to anything that could
4  prevent account transfers from occurring.  I was
5  not -- it was not my understanding, in arriving at
6  Weil Gotshal, or while I was there, that I would
7  be, you know, participating in a negotiation.  I
8  tried to keep my eye on as much as possible, but
9  there were a number of documents and a number of
10 issues that evening.  And all the while still
11 focused on our team back at Hughes Hubbard that
12 was working on, you know, motions for the first
13 days of the case, and -- and what was going on
14 with the transfers of accounts.
15     Q.   I just want to be clear.  You may
16 have said this already.  You did not have an
17 opportunity, between the time you got there or
18 whenever it was on Sunday, and the closing on
19 Monday morning, to ever read the clarification
20 letter.  Is that correct?
21     A.   No, I don't recall being able to
22 sit down and read through the letter, no.
23     Q.   Do you know whether the Trustee or
24 any of his representatives requested any changes
25 to the terms of the clarification letter at any

9 (Pages 30 to 33)

Page 34

KIPLOK - HIGHLY CONFIDENTIAL

1     KIPLOK - HIGHLY CONFIDENTIAL
2  point over the weekend?
3      A.   The only thing I recall was what I
4  mentioned earlier in connection with the 3-3
5  account.  And -- and I don't recall much more than
6  what I've already said, that I know it was an
7  issue, and I don't want to travel on any privilege
8  grounds, but that was of a concern to Mr. Kobak
9  and to me, based on our understanding of what a
10  3-3 account was, and the role it would play for
11  customer accounts, because we were very concerned.
12  We did have an understanding that the customer
13  accounts would be left in the estate.  We had an
14  understanding that substantial assets would be
15  left to satisfy them.  But that the 3-3 account
16  would be one of the primary assets to do that.
17          So, I do recall what I said
18  earlier, saying -- you know, speaking to
19  Mr. Messineo and having -- and I don't recall
20  specifically if that was language being added or
21  the like.  I just don't recall more than that.  It
22  was, you know, 3:00 in the morning on Monday.
23      Q.   Were you aware that weekend that
24  the clarification letter referenced a Schedule A
25  and a Schedule B?

Page 35

1     KIPLOK - HIGHLY CONFIDENTIAL
2      A.   No, I was not.
3      Q.   Did you learn that post-closing?
4      A.   I believe at -- I mean, the terms
5  are not unfamiliar to me now, so at some point,
6  but I don't -- I really can't recall when.
7      Q.   Do you think it might have been
8  within the month of September 2008?
9      A.   Frankly, no, largely because I -- I
10  know what happened when I left Weil Gotshal that
11  morning, and it was full speed ahead, largely
12  transferring assets to accounts that now reside
13  with Barclays.
14          From the night -- from 1:30 in the
15  morning on that Saturday forward, you know, we
16  were moving forward with the mission of customer
17  protection.  I don't recall focusing on APA
18  transactions or anything else, but I do recall
19  spending countless hours and weekends on transfers
20  of accounts for customers.
21      Q.   Did you stay at Weil Gotshal until
22  the closing on -- on Monday morning?
23      A.   Yes.  I left Weil Gotshal roughly
24  8:30 in the morning.  I believe the wires hit a
25  few minutes before 8:00 is my best memory.

Page 36

1     KIPLOK - HIGHLY CONFIDENTIAL
2      Q.   Why was the Trustee concerned that
3  the deal close?
4      A.   You know, as I said earlier, the
5  primary concern -- again, I'm saying my
6  understanding --
7      Q.   Sure.
8      A.   -- is -- was with the transfer of
9  accounts to Barclays and Neuberger Berman.  So,
10  that trading could resume on as seamless a basis
11  as possible.
12      Q.   So, after you left Weil Gotshal at
13  about 8:30 in the morning on Monday, where did you
14  then go?
15      A.   I went home and took a shower and I
16  was at Hughes Hubbard by about 9:30.
17      Q.   Okay.  And if you can give me an
18  overview of what you did between then -- in
19  connection with this deal, obviously -- between
20  then and the end of September 2008?
21      A.   I was focused primarily on the
22  transfer of accounts and the various pleadings,
23  motions, and I forget when the first controversies
24  arose, but disputes of the SIPA proceeding.
25      Q.   In terms of the transfer of

Page 37

1     KIPLOK - HIGHLY CONFIDENTIAL
2  accounts and assets, what was the allocation
3  responsibilities between yourself and
4  Mr. Frelinghuysen?
5      A.   I'm not sure there was a direct
6  allocation of responsibilities.  I recalled that
7  Tuesday morning, which I think is the 23rd, early
8  that morning the Trustee asked Mr. Frelinghuysen
9  to head to Lehman's operation center in Jersey
10  City, New Jersey, I believe it's 70 Hudson Street,
11  now premises occupied by Barclays, and asked me to
12  head to 745 Seventh Avenue to go to Mr. Russo's
13  office so the Trustee had his personnel on site to
14  facilitate the transfers.
15          As I was heading up there, I was
16  directed to 1271 -- I think it's Sixth Avenue --
17  it's the Barclays office now -- which is where I
18  headed.  And so, to the extent there was a
19  division at all, it was I would be up at the New
20  York office and Anson would be in Jersey City.
21      Q.   Did you deal -- strike that.
22          In connection with the -- with
23  requests for transfers -- strike that.
24          In connection with the request that
25  assets be transferred, did you deal with former

10  (Pages 34 to 37)

Page 38

1          KIPLOK - HIGHLY CONFIDENTIAL
2  Lehman employees who are now employed by Barclays?
3          A.   Yes.
4          Q.   Who particularly did you deal with?
5          A.   The -- I guess beginning that
6  Tuesday, my primary contact was a managing
7  director named Laura Vecchio, and the idea was --
8  the premise was that we wanted -- and "we" being
9  the estate -- wanted to transfer customer assets
10  as promptly as possible, knowing that ultimately
11  there would be, as there has now been, a
12  reconciliation of all those transfers.
13          Ms. Vecchio's role was to be a
14  central point so that I wouldn't be getting
15  requests from multiple -- what I'll call
16  Lehman/Barclays people.  That did still happen.  I
17  recall in particular Ms. Black sending me many
18  varied and confusing and different instructions
19  that had to be then vetted through Ms. Vecchio.  I
20  recall a Mr. Jennings doing the same thing.
21          I don't think anything was being
22  done in bad faith, but I think having the central
23  point of contact was helpful because otherwise the
24  demands being made by different Barclays personnel
25  were often inaccurate and appeared to be confused

Page 39

1          KIPLOK - HIGHLY CONFIDENTIAL
2  on their side.
3          Q.   In determining whether to approve
4  or reject any particular request for a transfer,
5  what criteria did you apply?
6          A.   The entire premise was that we were
7  transferring customer assets, and that was the
8  understanding that we portrayed at the beginning.
9  Literally when I went up to Lehman, I said this
10  is -- my role is to provide whatever
11  authorization, you know, the depositories -- in
12  connection with me, it ended up primarily being
13  Chase -- would need to release customer assets to
14  get into customer accounts.
15          And it was with that understanding
16  that all -- that I was -- that I had been made
17  available, and in general that I would be
18  authorizing any of the request.  So, a request
19  would be made, and I would be sure it was verified
20  through Ms. Vecchio that it was related to
21  customer accounts, again, on the entire
22  understanding that should there be any missed
23  delivers, over-deliveries, under-deliveries, that
24  would be reconciled in due course, which, I think
25  as Barclays knows, was accomplished over a year

Page 40

1          KIPLOK - HIGHLY CONFIDENTIAL
2  and a half with this past December's motion and
3  order.
4          Q.   You said when you went up to Lehman
5  you stated that your role was to provide whatever
6  authorization, depository is needed in connection
7  with the release of customer assets.
8          To whom did you convey that?
9          A.   I -- I said that to Ms. Vecchio.  I
10  remember having a conversation at some point, I
11  believe, during the week of the 22nd, or the
12  following week with Mr. Raisler at Sullivan &
13  Cromwell when there were certain issues by Chase
14  Bank, and I remember saying to him our role is to
15  facilitate customer account transfers.
16          And he actually said he had always
17  worried that if there ever was a large
18  broker-dealer failure, it would be the Trustee
19  that would be the block to customers getting their
20  assets, not the depository, and that he was
21  very -- and how grateful he was that the Trustee
22  was trying to move customer assets on an expedited
23  basis.
24          So, those are the two conversations
25  I, in particular, remember having.  There very

Page 41

1          KIPLOK - HIGHLY CONFIDENTIAL
2  well may have been others.
3          I recall conversations with
4  Mr. Novikoff (phonetic), I believe Mr. Minland at
5  Wachtell, that it was my role to provide them with
6  the authorizations they required to accomplish,
7  again, the transfer of customer assets.
8          Q.   You say you recall a conversation
9  with Ms. Vecchio.  When did that conversation take
10  place?
11          A.   I don't recall specifically, but
12  likely it would have been the 23rd when I arrived.
13  Sort of this is just -- this is who I am, this is
14  why I'm here, how can I be helpful to the transfer
15  of customer accounts.
16          Q.   Do you remember any of the specific
17  words used in that discussion?
18          A.   No.
19          Q.   In determining whether to approve
20  any given request for a transfer of assets, what
21  steps did you take to ensure or to verify that the
22  assets in question were customer assets?
23          A.   I was relying primarily on
24  Ms. Vecchio as a gatekeeper, and the fact that
25  should there be a reconciliation, it could be done

11 (Pages 38 to 41)

Page 42

KIPLOK - HIGHLY CONFIDENTIAL

1
2  so later.  Largely I was relying on the fact that
3  I was acting in good faith, and that the parties
4  would be too, to be sure customer assets were
5  transferred.  And there were -- there were
6  over-deliveries that were -- that did come back to
7  the estate later.
8          But there was, I think,
9  intentionally not, you know, a large diligence
10 process at the time, for the very reason that we
11 wanted customers to get their assets as quickly as
12 possible.  We weren't about to have 1,000 Deloitte
13 accountants descend on Lehman.  We intended to
14 step back, allow the transfers to occur, and deal
15 with the remaining customers that were left, and
16 in a reconciliation, and as much was presented to
17 the Court.  I believe Mr. Caputo made that clear,
18 that that was the intent at the beginning of the
19 proceeding.
20         Q.   Did you require any representations
21 from Barclays explicitly that assets being
22 requested were customer assets?
23         A.   I believe that the process I had
24 with Ms. Vecchio was to get her okay that these
25 were assets for the transfer of customer accounts.

Page 43

KIPLOK - HIGHLY CONFIDENTIAL

1
2          And I generally recall that the
3  language used in the authorizations, as a general
4  matter, included authorizing the transfer of
5  customer accounts.
6          Q.   Did you take steps to ensure that
7  that language that you just referred to would
8  appear in authorizations of customer account
9  transfers?
10         A.   I'd say I used my best efforts at a
11 time when there was a lot going on.  So, it
12 wouldn't shock me if it didn't happen each and
13 every time.  But more to the point, it was clearly
14 my intent, with any authorization I made, that it
15 was for a customer asset used to support a
16 customer account.
17         Q.   Did you come to learn, during that
18 week, that Mr. Frelinghuysen had had a discussion
19 with Alastair Blackwell concerning the transfer of
20 non-customer assets to Barclays pursuant to the
21 APA?
22         A.   I don't recall that, no.
23         Q.   Did you have any communications
24 with Neal Ullman during that week?
25         A.   If I did, I don't recall them.  I

Page 44

KIPLOK - HIGHLY CONFIDENTIAL

1
2  mean, I have spoken to Neal.  I know who he is.
3  But I don't recall -- you know, I don't recall
4  anything specific with Mr. Ullman that week.  He
5  was not where I was.  Neal worked in Jersey City.
6          Q.   Ms. Vecchio was in Manhattan?
7          A.   That's right.
8          Q.   I'm showing you what has previously
9  been marked as Exhibit 671-B.
10          Do you recognize that document as
11 an e-mail from Mr. Frelinghuysen to Mr. Blackwell,
12 on which you were copied on Thursday, September
13 25th, 2008?
14         A.   I can read it, sitting here today.
15 That is what it appears to be, yes.
16         Q.   Do you have any recollection of
17 receiving this document at the time?
18         A.   No.
19         Q.   Do you have any understanding of
20 what the issue that this document related to was?
21         A.   No.
22         Q.   I'm showing you what has previously
23 been marked as Exhibit 447 in this case.
24         A.   Okay.
25         Q.   Do you recognize that as an e-mail

Page 45

KIPLOK - HIGHLY CONFIDENTIAL

1
2  to you from Laura Vecchio, dated Friday, the 26th
3  of September, 2008?
4          A.   I can read it today, and that is
5  what it appears to be, yes.
6          Q.   Do you recall receiving this e-mail
7  at the time?
8          A.   No, I do not.
9          Q.   Do you recall anything about the --
10 the request for a transfer of $269 million in
11 securities from the DTC to the 636 box?
12         A.   No, I do not.
13         Q.   Do you recall how you responded to
14 this request?
15         A.   No, I don't.
16         Q.   Do you recall any discussion with
17 Ms. Vecchio or anyone else about this request?
18         A.   Not this request specifically.  I
19 spoke to Ms. Vecchio at that time, probably
20 multiple times a day.
21         (Exhibit 677-B marked for
22 identification.)
23         THE WITNESS:  Okay.
24         Q.   You've had a chance to review
25 Exhibit 677-B?

12 (Pages 42 to 45)

1           KIPLOK - HIGHLY CONFIDENTIAL
2        A.   I've looked at it, yes.
3        Q.   And do you recognize that as an
4    e-mail string that you were sent -- or that you
5    were copied on various parts of -- and as you
6    wrote various parts of on the 24th of September,
7    2008?
8        A.   Reading it today, that's -- that's
9    what it appears, yes.
10       Q.   Do you have any recollection of
11   the -- the transfers that are being discussed in
12   this e-mail string?
13       A.   Not specifically.
14            Generally, this is reflective of
15   what I believe I had mentioned earlier, and it was
16   Ms. James.  I don't know if I used her proper
17   name, and Mr. Jennings as a couple of the -- what
18   I'll call Lehman/Barclays people who are reaching
19   out to me directly for requests.
20            And in this instance I can see,
21   reading the document, that it was an instance
22   where I went back to Ms. Vecchio on the e-mail to
23   see if she indeed concurred with the transfers of
24   the customer foreign futures and foreign options
25   security account, which I -- I did do.

1           KIPLOK - HIGHLY CONFIDENTIAL
2            But beyond that, I don't recall
3    this or any other transfers in -- in particular.
4        Q.   So I'm clear, you now believe that
5    when you earlier said Ms. Black, you were thinking
6    of Ms. James?
7        A.   If that's what I said, I think I
8    may have -- I -- I recall Ms. James on the future
9    side.  And the reason I, in part, recall her is
10   her e-mail signature had this kind of funky thing
11   where her name slid in.  But I remember Ms. James.
12   Ms. Black I may have -- I think I meant Ms. James,
13   if that's what I said.
14            But I do recall Ms. James making
15   some requests, which at first she had asked for,
16   just to use a round number, 300 million from the
17   XYZ account, and then it would come back as less
18   than that, and she'd ask for less.  And I just
19   remember having the sense that there was confusion
20   on the Barclays side.  And that was one of the
21   reasons that we took some comfort in funneling
22   things through Ms. Vecchio.
23            (Exhibit 678-B marked for
24   identification.)
25       Q.   Do you recognize this document as

1           KIPLOK - HIGHLY CONFIDENTIAL
2    an e-mail sent by you to Ms. Vecchio and
3    Mr. Frelinghuysen on Wednesday, the 1st of
4    October, 2008?
5        A.   Reading it, I don't recall it, but
6    that is -- that is what it appears to be, at least
7    the top message.
8        Q.   And the top message says:
9            "Anson, please do not take action
10   in this yet.  Laura is clarifying this
11   instruction."
12            What did you mean by "Laura is
13   clarifying this instruction"?
14       A.   I don't recall specifically.
15   Generally, I would believe this would refer to --
16   there were several instances where -- again, I
17   mentioned were people would try to reach out to
18   me.
19            There were instances where
20   Ms. Vecchio, I recall, would get several requests
21   and she would try to filter them through herself.
22   So, this may have been an instance where
23   Ms. Vecchio said to me, perhaps in person or by
24   the telephone, wait a minute, we need to have
25   further clarity.

1           KIPLOK - HIGHLY CONFIDENTIAL
2            But, again, I don't recall
3    specifically.  I mean, reading it, it seems to me
4    that I was telling Anson not to act on this.  And
5    I would assume he did not act on it, based on my
6    saying so.
7        Q.   But you have no specific
8    recollection of this particular incident?
9        A.   I don't recall this specific
10   message, no, not -- not specifically.
11       Q.   And you don't recall any discussion
12   with Ms. Vecchio about this particular issue; do
13   you?
14       A.   Not specifically, no.
15            THE VIDEOGRAPHER:  The time is
16   2:13.  We are going off the record.
17            (Recess taken.)
18            THE VIDEOGRAPHER:  The time is
19   2:21.  We are back on the record.
20            (Exhibit 679-B marked for
21   identification.)
22            THE WITNESS:  Okay.
23       Q.   Do you recognize this, sir, as an
24   e-mail chain involving you, I believe, at every
25   stage, although at one point your e-mail address

Page 50

KIPLOK - HIGHLY CONFIDENTIAL
1
2   was misspelled and it was later forwarded to you?
3        A.   Reading it, this is -- that's --
4   that is what it appears to be, yes.
5        Q.   Okay.  Looking at the most recent
6   e-mail on the chain, so, the very first one, you
7   say:
8             "I think we are okay with the
9   below.  We should revisit the LOC issue later
10  after transfers of collateral are affected."
11            Do you see that?
12       A.   I do.
13       Q.   When you say "I think we are okay
14  with the below," were you referring to the first
15  paragraph of the e-mail from Mr. McDaniel to you
16  that's dated October 2nd at 1:28 p.m.?
17       A.   I -- I don't recall specifically.
18  I can read the document as well as you can.  I
19  recall generally that this was an issue that
20  became a topic of great discussion and
21  consideration, without breaching any privilege
22  within my firm, and I believe it went on much
23  later than the first few days of October.
24            So, I can read what I said, and you
25  may well be right, that it refers to that, that,

Page 51

KIPLOK - HIGHLY CONFIDENTIAL
1
2   you know, my reading today would seem to -- that
3   that may make sense, but I also -- what I do
4   recall was that this was not the end of this
5   discussion.
6        Q.   As you read it today, do you have
7   any recollection of whether you -- when you said
8   "I think we're okay with the below," the below
9   you're referring to is the first paragraph of the
10  first e-mail in this chain?
11       A.   I actually do not have that
12  recollection.  I may well be referring to Jim
13  McDaniel's second note to me, which it appears he
14  had a discussion with my partner, Carolyn Levine,
15  but I don't -- I just don't recall either way.
16  I'm reading it, you're reading it, but I don't
17  recall.
18            (Continued on next page for jurat.)
19
20
21
22
23
24
25

Page 52

KIPLOK - HIGHLY CONFIDENTIAL
1
2            MR. SHAW:  I have no further
3   questions for you, sir.
4            MR. ROTHMAN:  I have no questions
5   for the witness.
6            MR. STERN:  No questions.
7            MR. DAKIS:  No questions.
8            MR. SHAW:  Thank you very much.
9            THE VIDEOGRAPHER:  The time is
10  2:25.  We are going off the record.
11            (Time Ended:  2:25 p.m.)
12
13            _____
14        CHRISTOPHER KIPLOK
15
16  Subscribed and sworn to
17  before me this     day
18  of March, 2010.
19
20            _____
21
22
23
24
25

Page 53

1
2                INDEX:
3   WITNESS       EXAM BY:         PAGE:
4   C. Kiplok      Mr. Shaw          5
5
6
7
8              EXHIBITS
9   EXHIBIT NO.                 PAGE:
10  Exhibit 676-B  30(b)(6) Notice of Deposition  6
        (No Bates)
11
    Exhibit 677-B  Series of E-mails        45
12      (HHR_00009013 - 17)
13  Exhibit 678-B  Series of E-mails        47
        (HHR_00017164 - 166)
14
    Exhibit 679-B  Series of e-mails        49
15      (BCI-EX(S)-00140141 - 42)
16
17
18
19
20
21
22
23
24
25

14  (Pages 50 to 53)

1      HIGHLY CONFIDENTIAL - A. KIRK

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

         Debtors.

10

     ----------------------x

11

12         * * * HIGHLY CONFIDENTIAL * * *

13         DEPOSITION OF ALEX KIRK

14           New York, New York

15           August 31, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24545

## Page 6

HIGHLY CONFIDENTIAL - A. KIRK

1
2  myself down. And I'm going to ask you please to
3  wait until there's a full question asked before
4  you answer so that we can, as best we can, get a
5  clear record.
6     A.  Uh-huh.
7     Q.  Okay?
8       Did you have discussions with anyone
9  other than your counsel, Mr. Kelley, to prepare
10  for your deposition today?
11     A.  Yes.
12     Q.  With whom?
13     A.  I don't remember.
14     Q.  Mr. Kelley or anybody from his firm?
15  Anybody outside of his firm?
16     A.  Outside his firm we met with the
17  Barclays lawyers.
18     Q.  Okay.
19     A.  I don't remember their names.
20     Q.  And by whom are you employed, sir?
21     A.  Currently I'm not employed.
22     Q.  Was there a time when you were
23  employed at Lehman Brothers?
24     A.  Yes.
25     Q.  Can you give me, sir, just a brief

## Page 7

HIGHLY CONFIDENTIAL - A. KIRK

1
2  description of the positions you held?
3       How long were you at Lehman?
4     A.  I was at Lehman two separate stints.
5  I was at Lehman from December of 1994 until
6  January of 2008.
7     Q.  Uh-huh.
8     A.  And I returned to Lehman in July of
9  2008. When I went to Lehman Brothers from
10  basically July of -- or, December of 1994 till
11  December 2001, I ran the distressed debt
12  business for Lehman Brothers. From 2002 until
13  2006, I ran the high-yield and leveraged loan
14  business for Lehman Brothers. From 2006 until
15  October of 2007, I ran the global credit
16  businesses. From October 2007 until January of
17  '08, I was co-chief operating officer of fixed
18  income, and from -- and then I left the firm.
19  When I returned, I was global head of principal
20  businesses for that brief period of time.
21     Q.  And why did you leave the firm in
22  January of '08?
23     A.  The global head of fixed income, Roger
24  Nagioff, had resigned; my partner, Andy Morton,
25  was promoted to head of fixed income; and I

## Page 8

HIGHLY CONFIDENTIAL - A. KIRK

1
2  reached a mutual agreement to leave the firm
3  with senior -- with the president of Lehman
4  Brothers.
5     Q.  And where did you work in between
6  January of '08 and July of '08 when you returned
7  to Lehman?
8     A.  Didn't work.
9     Q.  And what occasioned your return to
10  Lehman in July of '08?
11     A.  They had promoted Bart McDade to be
12  president of the firm, and he requested that I
13  return to the firm within a few days of his
14  elevation.
15     Q.  And I take it you worked at Lehman --
16  well, for how long after July of '08 did you
17  work at Lehman Brothers?
18     A.  Until the end. Until most of the
19  employees were transferred to Barclays, U.S.
20  employees.
21     Q.  And at the end, did you transfer over
22  to Barclays yourself?
23     A.  Yes.
24     Q.  And when did you start work at
25  Barclays?

## Page 9

HIGHLY CONFIDENTIAL - A. KIRK

1
2     A.  I don't remember the transfer date, to
3  be honest with you. I worked there till the
4  first week of November.
5     Q.  First week of November '08?
6     A.  Yes.
7     Q.  What positions did you hold at
8  Barclays?
9     A.  I didn't have a position at Barclays.
10     Q.  Was there -- I know it was sort of
11  tumultuous times. Was there any break in
12  between leaving Lehman and going to Barclays, or
13  did you just sort of start working at Barclays
14  at the end of the Lehman --
15     A.  Whenever the actual HR records
16  transferred.
17     Q.  Okay. Did you have a written
18  employment agreement with Barclays?
19     A.  No.
20     Q.  Was any written employment agreement
21  ever offered to you by Barclays?
22     A.  No.
23     Q.  Would you describe to me your
24  compensation package at Lehman -- withdrawn.
25       What was your compensation arrangement

**HIGHLY CONFIDENTIAL - A. KIRK**

1  **HIGHLY CONFIDENTIAL - A. KIRK**
2  for Lehman when you returned in July of '08?
3      A.   I would, when I returned, I would
4  receive salary.
5      **Q.   And what was the salary?**
6      A.   It was supposed to be $400,000, but
7  through an administrative mistake, I got paid
8  $225,000.
9      **Q.   And what was your salary at Barclays?**
10     A.   The same.
11     **Q.   Did you have any arrangements or**
12  **agreements for a bonus at Lehman?**
13     A.   No.
14     **Q.   Did you have any arrangements or**
15  **agreements for a bonus at Barclays?**
16     A.   Yes.
17     **Q.   What were those?**
18     A.   Let me clarify.
19     **Q.   Sure.**
20     A.   About two weeks after I arrived at
21  Lehman, I was granted, without a request --
22  maybe two or three weeks, I don't remember the
23  exact time -- equity under a program they had
24  started that spring.  They were granting equity
25  to a lot of the senior executives, and I was

1      HIGHLY CONFIDENTIAL - A. KIRK
2  granted I think it was 750,000 shares of Lehman
3  equity.
4      **Q.   And what were your bonus arrangements**
5  **or agreements with Barclays?**
6      A.   About the end of October, I reached
7  out to Bart McDade suggesting that perhaps
8  Barclays could pay me a bonus before I left.
9  About a week later, they informed me that they
10  would pay me $15 million in two separate
11  installments.
12     **Q.   And were those installments to be paid**
13  **on the first and second anniversary of your**
14  **Barclays tenure; was that the arrangement?**
15     A.   No, it was November 15th and
16  February -- sometime in February.
17     **Q.   Did you receive either of those**
18  **payments?**
19     A.   Yes.
20     **Q.   The first one, I take it?**
21     A.   Both.
22     **Q.   Both, okay.**
23          Why did you leave Barclays?
24     A.   I had -- because I wanted to leave the
25  sell side of the business, broadly, and move to

1      HIGHLY CONFIDENTIAL - A. KIRK
2  the buy side of the business.
3      **Q.   Could you explain to me what you mean**
4  **by that?**
5      A.   Meaning I wanted to go work as a
6  principal in a hedge fund or a money management
7  firm.
8      **Q.   Did you do that?**
9      A.   I'm in the process of setting up a
10  firm right now.
11     **Q.   Before you went to work at Barclays,**
12  **before the end of Lehman, had you had any**
13  **discussions with anyone at Barclays about the**
14  **prospects of working there after the Lehman sale**
15  **was concluded?**
16     A.   I was approached by Bob Diamond to see
17  if I was interested in a job, broadly, as
18  opposed to a specific job.  I told him I wasn't.
19     **Q.   Pardon me?**
20     A.   I was not.
21     **Q.   And when were you approached by Bob**
22  **Diamond?**
23     A.   At some point within the first week or
24  two that they were -- I would say probably that
25  week that they were negotiating to buy the firm.

1      HIGHLY CONFIDENTIAL - A. KIRK
2  If not that week, the week after.
3      **Q.   Okay.  We're going to spend a lot of**
4  time today talking about the negotiations on
5  that point, so let me take this point to frame
6  out some dates.
7          I put before you a blank calendar
8  which may help you with days of the week that
9  we'll talk about, but when you talk about the
10  week in which there were negotiations, could you
11  tell me what week or weeks you're talking about?
12     A.   The week of September -- Monday,
13  September 15th through Friday, you know, through
14  Sunday, September 21st.
15     **Q.   And at what point during that week did**
16  **Mr. Diamond talk to you about coming to work for**
17  **Barclays?**
18     A.   I don't remember if it was that week
19  or the following week.
20     **Q.   Again, just to give us a time point,**
21  the transaction we're talking about closed on
22  September 22.  Do you recall if it was before or
23  after the closing?
24     A.   I don't recall.
25     **Q.   Was it just you and Mr. Diamond in the**

Page 14

HIGHLY CONFIDENTIAL - A. KIRK

1
2 conversation?
3    A.   Yes.
4    Q.   And apart from this conversation with
5 Mr. Diamond, had you had discussions with anyone
6 about going to work for Barclays?
7    A.   No.
8    Q.   And when you had the discussion with
9 Mr. Diamond, did he talk to you about a
10 compensation package?
11    A.   No.
12    Q.   When did you first talk to anyone at
13 Barclays about a compensation package?
14    A.   First conversation I had with anybody
15 at Barclays was the meeting I sat down with Rich
16 Ricci where he told me what the
17 severance/compensation packet bonus would be,
18 which was in late October.
19    Q.   Had you had any conversations with any
20 of your fellow Lehman employees about the topic
21 of compensation at Barclays?
22    A.   Bart McDade.
23    Q.   Can you describe that conversation
24 with Mr. McDade?
25    A.   Yes.  Several of my colleagues were --

Page 15

HIGHLY CONFIDENTIAL - A. KIRK

1
2 who had signed employment agreements were
3 resigning from the firm and receiving large
4 payouts upon their leaving the firm, and I
5 suggested to Bart that it would be fair if I was
6 treated in a similar way, despite not having a
7 written contract.
8    Q.   And what did Mr. McDade say to you?
9    A.   He said he agreed and he would talk to
10 Barclays about that.  He was on point for those
11 sorts of issues with Barclays.
12    Q.   Do you know if he did talk to anyone
13 at Barclays about you in that regard?
14    A.   I assume he did.
15    Q.   And why do you assume that?
16    A.   Because they approached me with a
17 deal --
18    Q.   Was the conversation --
19    A.   -- a couple weeks later.
20    Q.   I beg your pardon.
21         Was the conversation with Mr. McDade
22 during the week of the negotiations between the
23 15th and the 22nd?
24    A.   No, it was sometime in late October.
25    Q.   Did you have conversations with anyone

Page 16

HIGHLY CONFIDENTIAL - A. KIRK

1
2 at Lehman during that week, the 15th through the
3 22nd?
4    A.   No.
5    Q.   Let me just put a full question so
6 that we have a clear record, okay?
7    A.   Yeah.
8    Q.   Did you have conversations with anyone
9 during the week of the 15th to the 22nd about
10 compensation that would be paid to you at
11 Barclays after the 22nd?
12    A.   No.
13    Q.   I think you referred a moment ago to
14 people receiving payouts when you left the firm.
15 What firm were you referring to?
16    A.   Barclays.
17    Q.   And who were those people you were
18 referring to?
19    A.   Mike Gelband was one.  I believe
20 Kaushik Amin was another.
21    Q.   Anyone else?
22    A.   Not that I recall directly.
23         I'm sorry.  Yeung Lee was another.
24    Q.   Anyone else?
25    A.   That's all I can recall.  There were

Page 17

HIGHLY CONFIDENTIAL - A. KIRK

1
2 many people leaving Barclays at that time.
3    Q.   Just as a general matter, when you say
4 there were many people leaving Barclays, are you
5 referring to former Lehman employees --
6    A.   Yes.
7    Q.   -- who transferred?
8    A.   Yes.
9    Q.   And then left Barclays?
10    A.   Yes.
11    Q.   And if you know, sir, why were these
12 people who were leaving Barclays, Gelband, for
13 example, receiving payouts from Barclays on
14 their departure?
15         MR. HUME:  Objection.  Calls for
16 speculation.
17    A.   I don't know.
18    Q.   Why did you get payments in the
19 amounts that you did from Barclays having worked
20 there for such a short period of time?
21         MR. KELLEY:  I'll make the same
22 objection.
23    Q.   You can answer, I think.
24    A.   I don't know.
25    Q.   Did you talk to anybody about that?

## Page 18

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.  No.
3    Q.  Were you surprised to receive payments
4  in that amount from Barclays, having worked
5  there for such a short period of time?
6    A.  No.
7    Q.  I may have been a bit confused about
8  the time periods, but when you said you were to
9  be paid 15 million by -- actually, just remind
10  me, when did you leave Barclays?
11    A.  November, first week.
12    Q.  When we talked about the bonus to be
13  paid to you, the $15 million in total, I think
14  you had told me it would be paid in November and
15  then in February?
16    A.  Yes. Uh-huh.
17    Q.  You left before the February payment
18  would have come due, correct?
19    A.  Yes.
20    Q.  Do you know why they paid you the
21  second piece?
22    A.  It was agreed that they would pay me.
23    Q.  When was it agreed?  At the time you
24  left or at some time before that?
25    A.  When I was leaving, as long as I

## Page 19

HIGHLY CONFIDENTIAL - A. KIRK

1
2  didn't compete with them or solicit their
3  employees for six months, I was paid -- I would
4  be paid those amounts of money.
5    Q.  Was the non-compete/non-solicitation
6  in a written agreement?
7    A.  Yes.
8    Q.  Did you have a written agreement
9  concerning your departure from Barclays?
10    A.  Yes.
11    Q.  That went beyond the non-compete
12  and -- withdraw.  That's a terrible question.
13    When did you sign the written
14  agreement with Barclays?
15    A.  Sometime in November.
16    Q.  Do you have a copy of that agreement?
17    A.  I do.
18    Q.  Did you bring it with you?
19    A.  No.
20    Unless you brought it.
21    MR. ENRIGHT:  No.
22    MR. GAFFEY:  Just for the record, I
23  should say I think it's probably called for
24  by the subpoena.  We don't have to have a
25  colloquy about it now.  I just want to make

## Page 20

HIGHLY CONFIDENTIAL - A. KIRK

1
2  my record.
3    I think it was called for by the
4  subpoena.  I also think it would be called
5  for by our document request to Barclays.
6    MR. HUME:  I think it's from November,
7  a different kind of agreement.  That's the
8  only reason.  We'll look for it.
9    MR. GAFFEY:  If you could, and if --
10  Can we go off the record for a minute?
11    (Discussion off the record.)
12  BY MR. GAFFEY:
13    Q.  Now, when you met, Mr. Kirk, with
14  Mr. Hume or people from his firm, did you talk
15  about events during a time period other than the
16  time you were employed by Barclays?
17    MR. KELLEY:  Objection.  Privileged.
18    MR. GAFFEY:  I think I can inquire to
19  find out -- a yes or no will tell me whether
20  or not I can press on the privilege point.
21    Q.  If you just answer yes or no.
22    MR. KELLEY:  No, I'll make the same
23  objection.
24    Q.  When did you meet with the lawyers for
25  Barclays?

## Page 21

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.  Last Thursday.
3    Q.  Who was present?
4    A.  Mr. Hume and -- who was the other?
5    MR. KELLEY:  If you know.
6    A.  I don't remember that guy's name.
7    Q.  And I take it Mr. Kelley or people
8  from his firm were there as well?
9    A.  Yes.
10    Q.  Anyone else other than lawyers from
11  Mr. Kelley's firm or Mr. Hume's firm?
12    A.  No.
13    Q.  Did you review any documents?  Just
14  answer that yes or no, please.
15    Q.  Did any of those documents have the
16  effect of refreshing your recollection about the
17  events concerning the sale of assets from Lehman
18  to Barclays?
19    A.  Some.
20    Q.  Which ones?
21    A.  I don't remember specifically.
22    Q.  Are there any that you remember
23  specifically that refreshed your recollection
24  about matters?

Page 22

HIGHLY CONFIDENTIAL - A. KIRK

1
2     A.   Not in particular.
3     Q.   In general?
4     A.   Not in -- generally, yes.
5        Q.   Did those documents cover a time
6  period prior to -- on or prior to September 22?
7        MR. KELLEY:  I object to that.
8        MR. GAFFEY:  I'm not sure of the
9  nature of the objection, David.
10    Q.   Can you answer it?
11       MR. KELLEY:  Privileged.
12       MR. HUME:  We would assert the same
13 objection.
14       MR. GAFFEY:  Do you contend you have a
15 privilege with this witness?
16       MR. HUME:  I think the objection -- I
17 assume what you're questioning is to try to
18 attack this privilege.
19       MR. GAFFEY:  I'm not attacking the
20 privilege.  I'm just trying to find out if
21 you have a basis to assert it.
22       Do you contend you have a privilege?
23       MR. HUME:  Yes, I think that your
24 motion suggested that there were fiduciary
25 breach claims that you were considering as

Page 23

HIGHLY CONFIDENTIAL - A. KIRK

1
2  to senior Lehman officers and as part of
3  your investigation of potential claims
4  against Barclays, but the same theory would
5  give rise to claims against the officers and
6  against Barclays.  So, yes, I think we do
7  have a common interest privilege in that we
8  both deny those claims.
9        MR. GAFFEY:  I'll leave that, but I
10 don't want to have a colloquy on the record.
11 I disagree.
12 BY MR. GAFFEY:
13    Q.   Let's talk about that week, the week
14 in September that's brought us here.  Can you
15 tell me, sir, as a general matter, did you play
16 any role in the negotiations of the agreement
17 between Lehman and Barclays that led to the sale
18 of assets to Barclays?
19       (The witness confers with Mr. Kelley.)
20    A.   Is the week you're referring to the
21 15th through the 21st?
22    Q.   Yes.  Well, let me reframe it because
23 you asked that question.  At any point during
24 September of 2008, were you involved in any
25 discussions or negotiations with Barclays?

Page 24

HIGHLY CONFIDENTIAL - A. KIRK

1
2     A.   Yes.
3     Q.   When?
4     A.   I was involved in discussions that
5  went from Friday, the 12th of September, until
6  Sunday, the 14th, of the transaction that
7  ultimately failed, and I was asked to
8  participate in the discussions, facilitate the
9  discussions starting Friday morning, the 19th.
10    Q.   So if I understand your answer
11 correctly, you're not involved in any
12 discussions or negotiations with Barclays in the
13 period from the 15th through the 18th?
14    A.   That is correct.
15    Q.   Okay.  Describe for me, if you would,
16 generally the nature of what you did in
17 connection with the negotiations from the 12th
18 to the 14th, that is, from the Friday to the
19 Sunday?
20    A.   Generally, I helped organize the due
21 diligence of the assets of Lehman Brothers that
22 I was responsible for specifically and helped
23 coordinate with some of the other departments
24 meetings that would take place with Barclays.
25       In addition, I was down at the Federal

Page 25

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Reserve both Saturday and Sunday, so I
3  participated in probably two different
4  discussions with Barclays on Saturday and
5  Sunday.
6     Q.   And what was the -- actually, if you
7  don't mind, just so we have some term we can use
8  and I don't have to keep saying it this way,
9  could you give me, you referred to the assets
10 you were responsible for specifically.  What
11 were those assets called?
12    A.   The global principal business.
13    Q.   What was the nature of the transaction
14 that was being discussed from the Friday and the
15 Saturday and the Sunday, the 12th through the
16 14th?
17    A.   The nature of that transaction was
18 Barclays was going to buy all of Lehman
19 Brothers.
20    Q.   Do you know what the structure of that
21 transaction was?  Was it an asset purchase?
22 Stock purchase?  Did you have any sense of that?
23    A.   It was a -- I'm not an M&A expert, but
24 I believe they were going to assume the debt and
25 other contractual obligations of Lehman

Page 26

HIGHLY CONFIDENTIAL - A. KIRK

1 
2  Brothers.  They were going to not assume the
3  preferred stock of Lehman Brothers and they were
4  going to pay a nominal, less than a dollar, per
5  share price for part of the equity and they were
6  going to spin off the real estate and private
7  equity positions into a new company which would
8  be capitalized with debt by a consortium of
9  lenders and have as its equity capital the
10 preferred stock of Lehman Brothers and the
11 equity.
12     Q.   And you said that that transaction
13 failed.  Why did that transaction fail, do you
14 know?
15     A.   I was told by Bart McDade that the FSA
16 had turned down the application to close that
17 transaction.
18     Q.   When were you told this by Mr. McDade?
19     A.   Sunday around noon.
20     Q.   Now, did you have any role in those
21 negotiations, again I'm on the 12th through the
22 14th, other than as you described, the sense I'm
23 getting is primarily involved with due diligence
24 for the global principal business.
25     A.   Yes, we had -- I spent most of my time

Page 27

HIGHLY CONFIDENTIAL - A. KIRK

1  trying to coordinate due diligence with our
2  principals and the rest of the street, meaning
3  Goldman Sachs, Citigroup, First Boston, et
4  cetera, around the value of those assets which
5  they were going to make a loan to the spun-off
6  company.
7  
8      Q.   And were Barclays personnel involved
9  in that process?
10     A.   Not in the due diligence process, no.
11     Q.   Were you in touch with Barclays
12 personnel about this due diligence process?
13     A.   There were some joint meetings that
14 were arranged between Goldman Sachs and
15 Citigroup as point for the street and Barclays
16 and Lehman Brothers together.  Barclays
17 personnel were obviously in those meetings.
18     Q.   To your knowledge, at any point in
19 that period from Friday to Sunday were people
20 from Barclays given an opportunity to review
21 Lehman's books for due diligence purposes?
22     A.   Yes, I believe they continued to do
23 due diligence over the weekend.
24     Q.   And did you have any involvement in
25 that project, that process, giving access to

Page 28

HIGHLY CONFIDENTIAL - A. KIRK

1  Lehman's books to personnel from Barclays?
2      A.   I don't recall specifically, but
3  probably.  We were down at the Federal Reserve
4  in rooms across the hallway.
5      Q.   During the period from Friday, the
6  12th, through Sunday, the 14th, were you dealing
7  with any particular people at Barclays who you
8  could name?
9      A.   Archibald Cox.  Bob Diamond.  Rich
10 Ricci.  Michael Klein, as their agent.
11     Q.   Anyone else?
12     A.   Those are the ones I recall.
13     Q.   And was there a principal -- were
14 there a group of people you would describe as
15 the principal negotiators for Lehman?  Again,
16 I'm in the 12th through the 14th.
17     A.   Mark Shafir, who was head of M&A; Bart
18 McDade, who was president; and via telephone,
19 Dick Fuld.
20     Q.   Anyone else you would characterize,
21 that you would describe as Lehman's principal
22 negotiators?
23     A.   I was the advisor.  I believe,
24 although I don't know for sure, I don't have any

Page 29

HIGHLY CONFIDENTIAL - A. KIRK

1  direct knowledge, but I have secondhand
2  knowledge that Skip McGee was involved.
3      Q.   Anyone else?
4      A.   That's all I know.
5      Q.   What's the basis of your secondhand
6  knowledge that McGee was involved?
7      A.   Mark Shafir would call Skip from the
8  Federal Reserve.
9      Q.   After that transaction failed, did
10 there come a time when you learned that
11 negotiations had begun again between Barclays
12 and Lehman?
13     A.   Late Sunday night sometime between 11
14 and 2 in the morning.
15     Q.   Would you describe that to me?  How
16 did you learn it?  Where were you when you
17 learned it?
18     A.   I believe I was in Bart McDade's
19 office, and he mentioned that Barclays had --
20 they had had contact with Barclays and Barclays
21 was interested -- "they" meaning Dick himself,
22 Skip and Barclays was interested in pursuing an
23 acquisition of the U.S. businesses of Lehman
24 Brothers.
25

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Did he tell you anything more than
3  that?  Who called who or anything that was said
4  in the conversation?
5    A.   No, nothing more than that.
6    Q.   Who else was present when you learned
7  this from Mr. McDade on Sunday night?
8    A.   I don't recall specifically, but
9  probably Mike Gelband.
10   Q.   I should tell you, and I should have
11  said this upfront, I don't want you, please, to
12  speculate during the day.
13   A.   Okay.
14   Q.   Once or twice you've answered by
15  saying "probably," and it's common usage, but if
16  you can give me your memory of things, as you
17  have been, tell me when you'd have to speculate,
18  okay --
19   A.   Okay.
20   Q.   -- so the record will be clear.
21       So do you know if Mr. Gelband was in
22  that conversation?
23   A.   I don't recall.
24   Q.   Now, do you know if that conversation
25  took place before or after Lehman filed for

HIGHLY CONFIDENTIAL - A. KIRK

1
2  bankruptcy protection?
3    A.   I don't remember exactly when the firm
4  filed, but that's a matter of record, so ...
5    Q.   Well, do you know, do you remember
6  when you learned, first learned the firm was
7  going to file?  Withdrawn.
8        Did you know before the firm filed
9  that it was going to do so?
10   A.   Yes.
11   Q.   When did you learn, first learn that
12  the firm was going to file?
13   A.   After the board meeting on Sunday
14  night, approximately 8 o'clock.
15   Q.   Did you attend that board meeting?
16   A.   No.
17   Q.   From whom did you learn the substance
18  of the board meeting?
19   A.   I don't recall.
20   Q.   And the conversation with Mr. McDade
21  about renewed negotiations with Barclays, did it
22  take place after the board meeting?
23   A.   Yes.
24   Q.   Did Mr. McDade ask you to do anything
25  in connection with these renewed negotiations?

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   No.
3    Q.   Did anyone ask you to do anything in
4  connection with these new renewed negotiations?
5    A.   No.
6    Q.   Did there come a time when you learned
7  the negotiations --
8    A.   I'm sorry.
9    Q.   Beg your pardon.  Go ahead.
10   A.   No, not that evening.
11   Q.   Not that evening, okay.
12       Did come a time where you were asked
13  to perform some tasks or do something in
14  connection with the negotiations?
15   A.   Yes.
16   Q.   And when did that happen?
17   A.   Late Thursday night, the 18th of
18  September.
19   Q.   I'm coming there.
20       Did there come a time when you learned
21  there was an agreement reached between Lehman
22  and Barclays concerning the sale of Lehman
23  assets to Barclays?
24   A.   Yes.
25   Q.   When did you learn that?

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   Sometime Tuesday.
3    Q.   From whom did you learn that?
4    A.   I don't recall.
5    Q.   Did you learn whether that agreement
6  was reduced to a writing?
7    A.   No.
8    Q.   Have you ever seen any -- the written
9  agreement, have you ever seen a written
10  agreement between Lehman and Barclays concerning
11  the asset sale?
12   A.   No.
13   Q.   So you learn on maybe the Tuesday that
14  there's a deal between Lehman and Barclays, and
15  then -- and on late Thursday night you're asked
16  to participate in some way.
17       How are you spending your time between
18  the Tuesday and Thursday?
19   A.   I'm spending, between really Sunday
20  night and Thursday, I was spending all my time
21  attempting to help coordinate the risk reduction
22  and risk management of the firm so it could
23  survive for a few days to get to closure.
24   Q.   Now, did those -- now I'm in the
25  period from, that you just described, from the

Page 34

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Sunday up until Thursday.
3        A.    Uh-huh.
4        Q.    Are you working with any people from
5    Barclays in connection with those activities?
6        A.    I don't recall specifically working
7    with Barclays employees.  Just Lehman employees.
8        Q.    Were you in communications with
9    Barclays employees?
10        A.    Not directly.  I would have
11    communicated to our finance staff and they would
12    have communicated to Barclays.
13        Q.    And who on the finance staff?
14        A.    Ian Lowitt, Paolo Tonucci.
15        Q.    Did you also deal with Martin Kelly?
16        A.    Maybe once, twice.
17        Q.    When you learned about a deal between
18    Lehman and Barclays having been concluded, what
19    was your understanding of the nature of the
20    deal?
21        A.    That I was -- that it was going to be
22    an asset purchase deal and that they were going
23    to purchase some amount of assets and assume the
24    employees of Lehman, some of the limited
25    obligations of Lehman Brothers.

Page 35

HIGHLY CONFIDENTIAL - A. KIRK

1
2        Q.    Did you have an understanding of the
3    asset components that were going to be
4    purchased?
5        A.    No.
6        Q.    Did you ever learn what asset
7    components were going to be purchased?
8        A.    Are you specifically asking about the
9    deal that was struck on that Tuesday?
10        Q.    Yes.
11        A.    No.
12            No, let me be more specific.
13        Q.    Sure.
14        A.    I got an e-mail that said they were
15    going to purchase the building and a pool of
16    other broadly defined assets.
17        Q.    Who did you get that e-mail from?
18        A.    Ajay Nagpal.
19        Q.    Could you spell that so we have it in
20    the record, please?
21        A.    A-J-A-Y  N-A-G-P-A-L.
22        Q.    What understanding did you have of the
23    constituent parts of the pool of the defined
24    assets apart from the building?
25        A.    None.

Page 36

HIGHLY CONFIDENTIAL - A. KIRK

1
2        Q.    Did you have an understanding who the
3    principal negotiators for Lehman of that
4    transaction were?
5        A.    I understood it to be Mark Shafir,
6    Skip McGee.
7        Q.    Did Mr. McDade have any role in those
8    negotiations, to your understanding?
9        A.    I believe he did.
10        Q.    But you wouldn't describe him as one
11    of the principal negotiators?
12        A.    He might have been.
13        Q.    Do you have a reason to think he might
14    have been?  Is it that --
15        A.    He was the president of the firm.
16        Q.    But other than his title, do you have
17    a basis for thinking he might have been one of
18    the principal negotiators?
19        A.    No.
20        Q.    Did you talk to Shafir about the
21    negotiations?
22        A.    No.
23        Q.    Did you talk to McGee about the
24    negotiations?
25        A.    No.

Page 37

HIGHLY CONFIDENTIAL - A. KIRK

1
2        Q.    Did you have an understanding of the
3    nature of the liabilities that Barclays was
4    going to assume under the agreement?
5        A.    Not at the time.
6        Q.    Did there come a time when you did
7    gain an understanding of the liabilities
8    Barclays was going to assume under the
9    agreement?
10        A.    A very cursory understanding on
11    Friday.
12        Q.    That's on Friday, the 19th?
13        A.    Correct.
14        Q.    From whom did you get that
15    understanding?
16        A.    Paolo Tonucci.
17        Q.    What did Mr. Tonucci tell you in that
18    regard?
19        A.    That there were two categories.  One
20    was assumption of certain trade liabilities and
21    the other was the assumption of compensation
22    liabilities, and that they together totaled
23    somewhere over $4 billion.
24        Q.    Did you talk to anyone other than
25    Mr. Tonucci about these assumed liabilities that

---

Page 38

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2   totaled somewhere over $4 billion?
3       A.   During Friday, the amount of those
4   liabilities were referenced several times by
5   Paolo, who was attempting to accurately estimate
6   them, and by Barclays in their description of
7   the deal later in the afternoon.
8       Q.   Let's go back to the earlier part of
9   the week.  I swear I'm getting to Thursday and
10  Friday.
11      A.   That's all right.
12      Q.   Now I'm still sort of in the early
13  part of the week.
14          Were you asked to be involved in any
15  assessment of the value of the pool of
16  securities that was to be sold?
17      A.   No.
18      Q.   Did you ever come to understand that
19  the agreement between Lehman and Barclays
20  included a loss, an overall loss against the
21  amount at which those assets were carried on
22  Lehman's books?
23      A.   No.
24      Q.   Did you ever at any time have an
25  understanding that that agreement involved a

---

Page 39

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2   discount of any kind given to Barclays against
3   the amount shown on Lehman's books of those
4   assets?
5       A.   No.
6       Q.   Apart from your counsel and counsel
7   from Mr. Hume's firm, have you spoken to anybody
8   about that topic?
9       A.   No.
10      Q.   When you learned about the sale of a
11  pool of assets, and again, apart from the real
12  estate on Tuesday, did you have an understanding
13  it was to be sold at book value?
14      A.   I didn't have an understanding one way
15  or the other.
16      Q.   So on the Monday, the Tuesday, the
17  Wednesday and during the day on Thursday, if I
18  understand what we've talked about so far
19  correctly, you're essentially involved in
20  managing risk?
21      A.   Yes.
22      Q.   And the purpose, apart from the
23  inherent reason for doing it --
24      A.   Keep the firm funded.
25      Q.   Did you have an understanding, while

---

Page 40

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2   you were doing that, of how long you needed to
3   do that?  What the timetable was for things?
4       A.   We knew we were -- I believe they were
5   trying to schedule a meeting with the bankruptcy
6   court on Friday evening, Friday afternoon.
7          It was really a day-to-day operation.
8       Q.   And during that day-to-day operation,
9   did any of your activities involve entering into
10  or addressing repurchase agreements, repos?
11      A.   Some of them.
12      Q.   Could you describe that for me?  What
13  was the nature of your activities in connection
14  with repos?
15      A.   The firm had a number, a large number
16  of clients whose assets had been trapped under
17  repurchase agreements in the European
18  subsidiaries, so we spent some time trying to
19  figure out how we were going to help solve those
20  issues.  That was a big piece of it.
21          And then we were also trying to shrink
22  the matched book because it used liquidity at
23  the firm as a way to raise liquidity, so where
24  you would finance client positions with other
25  client's money.

---

Page 41

HIGHLY CONFIDENTIAL - A. KIRK

1
2       Q.   Financing of client positions with
3   other client's money; is that what you're
4   talking about when you talk about the matched
5   book?
6       A.   Yes.
7       Q.   And by shrinking the matched book,
8   you're reducing that level of activity of --
9       A.   Yes.
10      Q.   -- using --
11      A.   And you're -- it would -- I was told
12  it would free up liquidity.
13      Q.   And did you have any involvement, sir,
14  in connection with the Repurchase Agreement that
15  Lehman had with the Fed?
16      A.   Only -- my only involvement there was
17  I was at the Fed when they told us Sunday
18  evening that they would lend us money to pay
19  back the tri-party repo lenders the following
20  morning.
21      Q.   And did Lehman enter into a Repurchase
22  Agreement with the Fed for that purpose, do you
23  know?
24      A.   Yes, they did.
25      Q.   Were any of your activities devoted to

Page 42

HIGHLY CONFIDENTIAL - A. KIRK

1
2  the making of that Repurchase Agreement with the
3  Fed?
4      A.  No.
5      Q.  Did there come a time when the Fed
6  made it known it wanted to come out of that
7  Repurchase Agreement, to your knowledge?
8      A.  Yes.
9      Q.  Describe to me how you came to learn
10  that.
11      A.  I don't recall specifically who told
12  me.
13      Q.  As a general matter, tell me what you
14  remember about learning that the Fed wanted to
15  get out of the Repurchase Agreement with Lehman?
16      A.  At some point on Wednesday, the Fed
17  said that they wanted to get paid back, I
18  believe it was Wednesday, and Lehman had to
19  figure out how to arrange alternative financing,
20  and there was only one party that would provide
21  that financing and that was Barclays.
22      Q.  And what did you do in connection with
23  those activities, if anything?
24      A.  I was not a repo expert.  I didn't --
25  I was not -- I'm not a repo expert.  I did not

Page 43

HIGHLY CONFIDENTIAL - A. KIRK

1
2  participate in those.
3      Q.  How did you learn about those
4  activities?  From whom?
5      A.  I don't recall specifically.
6      Q.  Do you have any general recollection?
7      A.  Probably the finance staff.
8      Q.  And that would be Tonucci?
9      A.  Ian Lowitt or Tonucci, one or the
10  other.
11      MR. GAFFEY:  Can we take a five-minute
12  break?
13      THE WITNESS:  Sure.
14      (Recess; Time Noted:  10:21 A.M.)
15      (Time Noted:  10:29 A.M.)
16  BY MR. GAFFEY:
17      Q.  In a question I asked you a little
18  while ago, Mr. Kirk, you clarified by saying,
19  "You mean the agreement made on Tuesday?"  Did
20  there come a point where you learned that the
21  deal had changed?
22      A.  Friday.
23      Q.  Okay.  Here we are.  Tell me about
24  Friday.
25      Actually, let me just back up.  I

Page 44

HIGHLY CONFIDENTIAL - A. KIRK

1
2  think you also told me there was a conversation
3  late on Thursday night that began your Friday
4  activities?
5      A.  Yes.
6      Q.  Okay.  Let's talk about that one
7  first.  Who's the conversation with, where are
8  you, and what's the content of the conversation?
9      A.  I'm at home.  I get a call from Bart
10  McDade.  He informs me that Mark Shafir has left
11  Lehman Brothers and that he needs some help
12  wrapping up the Barclays deal the following day.
13      Q.  Had Shafir left on the Thursday?
14      A.  I believe so.
15      Q.  You described Shafir as one of the
16  principal negotiators.  As of the Thursday, to
17  your knowledge, has he now gone?
18      A.  Yes.
19      Q.  Did McDade have anything to say about
20  that topic?
21      A.  He said he went -- he quit and he went
22  to work at Citigroup.
23      Q.  Other than telling you that Shafir had
24  quit and gone to work at Citigroup, did
25  Mr. McDade have anything to say about

Page 45

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Mr. Shafir's departure --
3      A.  No.
4      Q.  -- on this Thursday?
5      A.  No.
6      Q.  Did Mr. McDade say anything about the
7  departure, Shafir's departure having any impact
8  on the deal?
9      A.  He said that, given his departure, he
10  would need extra help and he asked for my help.
11      Q.  What did he ask you to do?
12      A.  That evening he did not specify what
13  he wanted me to do.
14      Q.  Tell me what Mr. McDade said and what
15  you said in that conversation on Thursday night,
16  as best you remember.
17      A.  He said that Mark Shafir has quit,
18  gone to Citigroup, I need some help wrapping
19  this up tomorrow, can you help me, I said yes.
20      Q.  That's the entire conversation as you
21  remember it?
22      A.  Yes.
23      Q.  Did you ask him what he needed you to
24  do?
25      A.  I think I asked him, Do you want me to

HIGHLY CONFIDENTIAL - A. KIRK

1  come in the office tonight?  He said no, he was
2  already home.  I said, What time do you want me
3  to come in the morning?  And he said, you'll get
4  an e-mail about an early morning meeting.
5      Q.   Did you speak to anyone else that
6  Thursday night about the deal after you spoke to
7  Mr. McDade?
8      A.   Not that I recall.
9      Q.   So let's just get through the rest of
10  Thursday night, okay?  After you have the
11  conversation with Mr. McDade, he says he needs
12  your help, there will be an early morning
13  meeting.
14      Did you do anything else with respect
15  to the transaction on the Thursday night?
16      A.   I don't recall specifically or
17  generally.
18      Q.   On the Thursday, sir -- I'll show you
19  a document about this in a second -- do you
20  recall reaching out to others in the firm,
21  including Kaushik Amin and Gerald Donini and
22  Eric Felder, to ask them to put together
23  information to -- that would be necessary to
24  portray a fire sale liquidation of the

HIGHLY CONFIDENTIAL - A. KIRK

1  securities?
2      A.   I may have done so by e-mail.
3      Q.   Okay.  I'll show you the e-mail, but
4  first, if you don't mind, what's your
5  independent recollection of that, if you have
6  any?
7      A.   My independent recollection is that I
8  got an e-mail for a scheduled meeting the
9  following day and I got a request, I didn't
10  recall when it was specifically, to help
11  organize a valuation exercise on behalf of Barry
12  Ridings.  I don't recall whether that was
13  Thursday night or Friday morning.
14      Q.   And who is Barry Ridings?
15      A.   A Lazard restructuring banker hired by
16  the firm to testify in bankruptcy court.
17      Q.   And who made this request of you?
18      A.   I don't recall specifically who asked
19  me to do that.
20      Q.   I'm showing you, Mr. Kirk, what has
21  been marked at a prior deposition as Exhibit 3
22  an e-mail from you to an address
23  4955214@archwireless.net.  Is that your wireless
24  account?

HIGHLY CONFIDENTIAL - A. KIRK

1      A.   I believe we've determined that was a
2  wireless account that was used in the late '90s
3  when there were wireless pagers, if you recall
4  those devices.
5      Q.   Okay.  Uh-huh.
6      A.   But had been inoperative but still
7  alive in the system.
8      Q.   Okay.  You're about to solve one of
9  the great mysteries of this case.
10      A.   Yeah, we had --
11      Q.   Did you have that account?  Are you
12  sending it to your home e-mail?
13      A.   I don't -- no, this is auto-forwarded
14  by the computers.
15      Q.   Okay.
16      A.   So like they auto-forward to your
17  BlackBerry, these are things that auto-forward
18  from the --
19      Q.   You would love it right now if I said
20  I have nothing further, but that wasn't the key
21  question, so let me go to the exhibit that I
22  showed you.
23      A.   We had to ask ourselves the same
24  question when we saw this.

HIGHLY CONFIDENTIAL - A. KIRK

1      Q.   Okay.  Take a minute to look through
2  what was marked as Exhibit 3, sir.  I have a
3  couple questions for you about it.
4      (Document review.)
5      A.   Okay.
6      Q.   In this, who is Daniel Flores, the man
7  from whom the underlying e-mail is sent?
8      A.   I believe Daniel worked for Mark
9  Shapiro.  It's indicated he worked in the
10  restructuring group that was run by a fellow
11  named Mark Shapiro at Lehman.
12      Q.   And in the e-mail, you see that
13  Mr. Flores recounts, "Alex Kirk suggested we
14  contact each of you to help us understand on a
15  theoretical basis what would happen in a fire
16  sale liquidation of the securities that are
17  being transferred to Barclays as part of the
18  proposed transaction."
19      Did you have a conversation or
20  communication with Mr. Flores about that topic?
21      A.   This indicates I must have.
22      Q.   Apart from seeing it written on this
23  e-mail, do you have any recollection?
24      A.   I don't recall.

Page 50

HIGHLY CONFIDENTIAL - A. KIRK

2    Q.    Does this e-mail refresh your
3  recollection in any way of a communication with
4  Mr. Flores about that topic?
5    A.    Again, I assume that I must have
6  talked to him.
7    Q.    But again, sir, apart from seeing it
8  on the page in front of you, do you have a basis
9  for that assumption?
10    A.    No.
11    Q.    You said that that was -- well, let me
12  continue down into Mr. Flores' e-mail where he
13  talks about, "We will be leaving on your desks a
14  list of the top 100 positions in each of your
15  area's expertise."  Did that exercise take
16  place, to your knowledge?
17    A.    Yes, I believe it did.
18    Q.    And what was the result of the
19  exercise?  Was there a fire sale liquidation
20  scenario put together?
21    A.    So these positions were delivered to
22  each of the recipients of this e-mail, Kaushik
23  Amin, Charlie Spero, Eric Felder, Gerry Donini,
24  were the various business heads in charge of
25  parts of fixed income or equities, and they

Page 51

HIGHLY CONFIDENTIAL - A. KIRK

2  would have been -- had those delivered early in
3  the morning, and then we were attempting to have
4  an 11 o'clock meeting to go over the findings of
5  their -- their assumptions and analysis about
6  the value of those positions.
7    Q.    And did that meeting take place?
8    A.    Yes, it did.
9    Q.    Were you at it?
10    A.    Yes.
11    Q.    Who was at the meeting?
12    A.    Mike Gelband, Kaushik Amin, Charlie
13  Spero and Gerry Donini, and Daniel Flores was
14  there as well as Gerry Reilly.
15    Q.    Was James Seery there?
16    A.    He might have been.  I recall he was
17  there.
18    Q.    You do recall he was there?
19    A.    I recall he was there.
20    Q.    Was a determination made about
21  liquidation value?
22    A.    No.  The data had been delivered in --
23  the position data had been delivered in a way
24  that, given the short period of time, a couple
25  hours, the business heads were not able to

Page 52

HIGHLY CONFIDENTIAL - A. KIRK

2  determine in any comprehensive way the values.
3  So we adjourned the meeting with the -- with a
4  plan that Barry Ridings would talk to each of
5  these individuals separately closer to the end
6  of the day when they might have a better sense.
7    Q.    Do you know if Mr. Ridings did that?
8    A.    I don't know that.
9    Q.    Did he speak to you at all?
10    A.    Not about this topic.  I saw him later
11  in the day in a meeting.
12    Q.    Let me just back up a little bit.  Did
13  Ridings know you were organizing this project?
14    A.    Yes.
15    Q.    Would he have known you're the contact
16  guy on it?
17    A.    Yes.  I probably called him and told
18  him call these people directly.
19    Q.    Did you have any conversations that
20  you recall with Mr. Ridings about the need for a
21  liquidation scenario to be analyzed?
22    A.    I assume he clarified the reasoning as
23  a test for the court.
24    Q.    When you say you assume that, what's
25  the basis of that assumption?

Page 53

HIGHLY CONFIDENTIAL - A. KIRK

2    A.    I vaguely recall having a conversation
3  with him.
4    Q.    Let's go to the early morning of
5  Friday, the 19th.  You spoke a moment ago about
6  getting a call from Mr. McDade.  Shafir's quit.
7  He asked for your help, can you come to meet
8  with him in the morning.  Did you do that?
9    A.    Yes.
10    Q.    And where was the meeting?
11    A.    It was a -- I believe it was in my
12  office.
13    Q.    In your office, sir?
14    A.    Yes.
15    Q.    Who was in attendance?
16    A.    Ian Lowitt, Chris O'Meara, Gerry
17  Reilly, Paolo Tonucci.  I think that was it.
18    Q.    Was Mr. McDade there?
19    A.    I don't believe, no, I don't believe
20  he was there.
21    Q.    Now, in your conversation with
22  Mr. McDade the night before, he had told you
23  Shafir quit, he told you he needed your help,
24  you offered to come in, he said come in in the
25  morning, if I remember your testimony right, and

Page 54

HIGHLY CONFIDENTIAL - A. KIRK

1  that's not what governs, that's basically the
2  topics you covered with McDade on Thursday
3  night.
4
5        So here you are in a meeting with
6  Lowitt, O'Meara, Reilly and Tonucci.  Do you
7  learn more at the meeting about the nature of
8  the help that you're going to have to give?
9    A.  They broadly outlined the first
10 transaction.  That was a quick summary.  Then we
11 discussed an issue that had come up earlier that
12 morning around JPMorgan as our clearing bank
13 shutting down Lehman's DTC account and what
14 effect that would have on the transaction as
15 planned.
16   Q.  Now, you referred to -- you said they
17 broadly outlined the first transaction.  By the
18 Friday morning, is it your understanding there's
19 a second transaction, a subsequent transaction?
20   A.  By the time we had this meeting --
21   Q.  Uh-huh.
22   A.  -- it was my view, my opinion, that
23 there would have to be a reworking of the
24 transaction because a vast majority of those
25 securities that had been planned for transfer

Page 55

HIGHLY CONFIDENTIAL - A. KIRK

1
2  were held at JPMorgan.  There was a -- and
3  JPMorgan had a dispute of some sort about the
4  transfer of the repo with Barclays, which was
5  described to me by Mike Keegan, and in addition
6  to that, they shut down Lehman's -- they closed
7  down Lehman's DTC account, which led me to
8  believe that JPMorgan would not cooperate and
9  transfer the aforementioned securities to
10 Barclays on that Friday.
11   Q.  When had you spoken to Mike Keegan?
12   A.  I got up and I went to the office
13 about 5 A.M. and I ran into him about 5:30 in
14 the morning.
15   Q.  Had you met Mr. Keegan before?
16   A.  I had met him the week before during
17 the due diligence process.
18   Q.  So you say "they," that's some
19 combination of Lowitt, O'Meara, Reilly and
20 Tonucci, broadly outlined the first transaction
21 to give you a quick summary?
22   A.  Yes.
23   Q.  How did they summarize -- tell me what
24 you remember about their broad outline of the
25 first transaction, the quick summary that they

Page 56

HIGHLY CONFIDENTIAL - A. KIRK

1  gave you.
2    A.  They summarized it as a purchase of
3  the building, purchase of assets, and an
4  assumption of this 4 billion, 4 and a quarter
5  billion dollars in liabilities.
6        That discussion ended very quickly
7  because of my belief that that transaction,
8  given what had just transpired -- what I had
9  learned from Keegan and the action that JPMorgan
10 had taken, that I believe that they would act as
11 a hostile party towards the closing of this
12 transaction and that whatever had taken place
13 before was irrelevant.
14   Q.  Did Mr. Tonucci tell you anything
15 other than there was an assumption of
16 liabilities in an approximate amount of 4 and a
17 quarter billion for compensation of payables?
18   A.  No.
19   Q.  Did you have any knowledge as to how
20 that number came to be determined?
21   A.  No.  I was not concerned with that
22 part of the transaction.
23   Q.  I'm sort of away from the Friday
24 meeting for a moment.
25

Page 57

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.  No.
3    Q.  At any point did you come to an
4  understanding as to how those, those components
5  of assumed liabilities came to be calculated?
6    A.  No.  No.
7    Q.  When the transaction, the first
8  transaction was outlined to you by Tonucci,
9  O'Meara, Reilly and Lowitt, or some combination,
10 did you have an understanding as to where the
11 assets would come from to fund those assumed
12 liabilities?
13   A.  I believe there was a schedule,
14 one-page schedule, which I think you have, that
15 broadly gave an asset and liability balance
16 sheet.
17   Q.  Have you ever seen that schedule?
18   A.  Yes.
19   Q.  When did you first see that schedule?
20   A.  I believe it was that morning.  It was
21 that morning.
22   Q.  Apart from the schedule, did you look
23 at any other documents that morning?
24   A.  No.
25   Q.  I'm putting before you what previously

Page 58

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    has been marked as Deposition Exhibit 19.
3        A.    Yes, that's the schedule.
4        Q.    And the schedule that you saw that
5    morning was the one with the annotation in the
6    upper right-hand corner "9/16/08, Final SB"?
7        A.    Uh-huh.
8        Q.    Do you remember that?
9        A.    Yes.
10       Q.    Okay.  Who gave you the schedule?
11       A.    One of the gentleman.
12       Q.    Do you recall which one?
13       A.    No.
14       Q.    Did anybody tell you anything about
15   the schedule?
16       A.    They briefly described it as an asset
17   sale that was approximately this size of this
18   characteristics of the category of assets that
19   they were going to buy, category of liabilities
20   that they were going to assume, including
21   financing liabilities and the aforementioned
22   cure payment and comp.
23       Q.    When you refer to the financing
24   liabilities, are you just sort of broadly
25   describing the liabilities opposite the

Page 59

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    particular assets in ST borrowings, government
3    and agencies?
4        A.    Yes.
5        Q.    The ones that add up to 33.9?
6        A.    Well, in addition, there's the 34.5
7    below that.
8        Q.    For collateralized short-term funding,
9    right?
10       A.    Yes.
11       Q.    Now, did you have an understanding
12   when you were shown this schedule of where the
13   values for assets -- from where the values for
14   assets were derived?
15       A.    I don't recall.  We quickly moved on
16   from this.
17       Q.    Did whoever described the schedule to
18   you, did they give you any description of the
19   role that any of that schedule played in the
20   first transaction?
21       A.    They described it as the template for
22   the first transaction.
23       Q.    And do you know who put together the
24   schedule that was the template for the first
25   transaction?  Did they tell you that?

Page 60

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.    No.
3        Q.    Did you ask?
4        A.    No.
5        Q.    Now, present at the meeting was
6    Lowitt, O'Meara, Reilly and Tonucci.  Was
7    anybody participating by telephone?
8        A.    I don't recall.
9        Q.    Was there any participation in that
10   Friday morning meeting by anybody from Barclays?
11       A.    No.
12       Q.    So they broadly outlined the first
13   transaction.  They tell you the problem with
14   JPM, one of them or some combination of them.
15   What happens next in that meeting?
16       A.    We break up.  I tell them that I'm
17   going to go try to shepherd the valuation
18   process that I have been asked to follow up on
19   for this 11 o'clock meeting and that I'm going
20   to try to arrange a meeting with the senior
21   executives at Barclays to explain to them what
22   my view was, that this transaction as outlined
23   couldn't be closed on that Friday night, which
24   they agreed with.
25           Oh, I tell them I'm first going to go

Page 61

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    inform senior Lehman executives, Bart and Dick,
3    of this problem.
4           (Mr. Kelley confers with the witness.)
5        A.    I'm sorry, just to clarify, my
6    assumption about this being problem -- this
7    transaction being problematic was agreed to.
8    The basis for that worry was verified by or
9    agreed to by Ian Lowitt and Paolo Tonucci in
10   that meeting.
11       Q.    As I understand it, your primary
12   activities for the week until this Friday
13   morning meeting had been in risk management --
14       A.    Uh-huh.
15       Q.    -- had been in shrinking the matched
16   book, keeping the firm alive so that the Friday
17   hearing had some possibility of succeeding, is
18   that a fair summary?
19       A.    Yes.
20       Q.    And you're called into this meeting on
21   Friday morning and told that the transaction
22   that's been on the table all week can't go
23   forward because of this problem.  This may seem
24   an odd question, sir, but why are you now the
25   guy that has to call Barclays and call senior

Page 62

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2   management?  Did you have an understanding of
 3   why you're the lucky winner of that
 4   responsibility?
 5       A.  Because I volunteered.  Yeah, I --
 6       Q.  Did you have --
 7       A.  Believe me, I almost had a heart
 8   attack just thinking about that.
 9           (Mr. Kelley confers with the witness.)
10       A.  That's true.  In addition to Mark
11   Shafir had left the firm, so ...
12       Q.  That's sort of implicit in my
13   question.  Why are you the guy who has to step
14   up to the plate when Shafir leaves?  Why not
15   McGee?  Why not Tonucci?  Why not Lowitt?
16       A.  Because Bart trusted me.
17       Q.  So did you go and inform more senior
18   Lehman executives of the issues of the problem?
19       A.  Yes.
20       Q.  Okay.  Tell me about that.  Who did
21   you contact and what did you tell them, what did
22   they say to you?
23       A.  I contacted Bart, I don't recall who
24   else was in the meeting exactly, but I walked
25   in, and there were others, I don't remember who
```

Page 63

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2   exactly, Fuld, most likely, that the assets and
 3   liabilities that had been assumed to be
 4   transferred in the first transaction were all
 5   held in custody or had to be cleared through
 6   JPMorgan, and because JPMorgan had taken this
 7   hostile action, there was a dispute, which I
 8   didn't understand the exact nature of, with the
 9   transfer of collateral between Barclays and --
10   between the Fed through JPMorgan to Barclays.
11           I knew at a very high level there was
12   a dispute between the two firms as to what
13   collateral was accept -- what collateral was
14   transferred and what collateral was left at
15   JPMorgan, and I knew that JPMorgan had shut down
16   Lehman's DTC account and failed all the
17   settlements on that Friday, and a combination of
18   those two pieces of information led me to
19   believe that JPMorgan wouldn't transfer these
20   assets on this schedule and liabilities, both
21   sides, in any normal course.
22       Q.  And when you reported this to McDade,
23   you said -- withdrawn.  You said Fuld was there,
24   most likely.
25           Do you have a recollection of him
```

Page 64

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2   being there, or are you assuming again, because
 3   of his role, his title, that he might have been?
 4       A.  Yes, I'm assuming because of his title
 5   he might have been.
 6       Q.  But you do recall talking to McDade
 7   about it?
 8       A.  Yes.
 9       Q.  Do you recall anyone else other than
10   McDade to whom you spoke?
11       A.  No.
12       Q.  And what did Mr. McDade say?
13       A.  He said we should have a sit-down with
14   the Barclays senior team and we should explain
15   our point of view on this ASAP.
16       Q.  And what happened next?
17       A.  We had a meeting with Bart, myself,
18   and then it was Michael Klein, Rich Ricci, and
19   Mike Keegan from Barclays.
20       Q.  Where was the meeting?
21       A.  It was in an office on 31 that
22   Barclays was using as temporary space.
23       Q.  And who's there from the Lehman side
24   of the table?
25       A.  Bart and I were there.
```

Page 65

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2       Q.  Anyone else?
 3       A.  Ian was there as well, I'm pretty
 4   sure.
 5       Q.  Was Tonucci there?
 6       A.  I don't remember.
 7       Q.  Do you recall whether or not with
 8   regard to which ones there were, do you recall a
 9   bigger meeting than that, or is this the
10   assembly of people that you remember?
11       A.  It was an assembly of no more than ten
12   people total.
13           MR. GAFFEY:  Can we go off the record
14   for a minute?
15           (Discussion off the record.)
16           (Recess; Time Noted:  10:59 A.M.)
17           (Time Noted:  11:09 A.M.)
18   BY MR. GAFFEY:
19       Q.  We were, before the break, we were at
20   this Friday morning meeting, and so I want to go
21   through in as much detail as I can what happened
22   at that meeting and who said what.
23           I have a general sense that the JPM
24   problem has arisen.  Did you have a sense, was
25   there any discussion about the JPM problem being
```

HIGHLY CONFIDENTIAL - A. KIRK

1
2  related in any way to the Repurchase Agreement
3  with Barclays?
4      A.   Yes.
5      Q.   Describe that for me.  What was your
6  understanding?
7      A.   So, to be clear, I'm not an expert,
8  was not an expert on repo, so I was learning
9  things for the first time that day that I didn't
10  understand how they actually worked prior to
11  that.  So I got what was a cursory as opposed to
12  a detailed explanation of the issue, but as I
13  understood it from the way that Mike Keegan
14  explained it to me was that the Fed had been
15  providing a repo for Lehman Brothers earlier in
16  the week of approximately $50 billion, that the
17  Fed had made it known that they wanted to be
18  repaid on that repo, and that Barclays had
19  agreed to assume that repo obligation from the
20  Fed.  Without that financing the firm would have
21  collapsed the next morning.
22          So the way it was explained to me was,
23  during the transfer of those -- that loan and
24  the collateral associated with that loan, there
25  were many pieces of collateral that Barclays

HIGHLY CONFIDENTIAL - A. KIRK

1
2  could not value, so they did not accept them in
3  transfer from the Fed.  And mechanically, it was
4  explained to me the way that worked was, in a
5  tri-party repo, the Fed transferred all of the
6  positions to JPMorgan and then JPMorgan began
7  transferring those positions upon the receipt of
8  money from Barclays transferred money, and then
9  they would transfer the positions that secured
10  that repo.
11          And at some point during that process,
12  Barclays became very uncertain as to some
13  percentage of that collateral, I don't recall
14  the exact amount, but it was a large number,
15  maybe as much as, you know, 20 percent of the
16  collateral, and when Barclays didn't accept
17  those positions, they, by definition, just got
18  left at JPMorgan.
19          They -- so JPMorgan was left with
20  collateral that they were not comfortable with
21  but Barclays would not accept, so -- and
22  JPMorgan, I guess they attempted to negotiate
23  but couldn't get that negotiation done.
24      Q.   Who was the "they" who attempted to
25  negotiate?

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.   That JPMorgan and Barclays attempted
3  to negotiate, but they couldn't complete a
4  negotiation for a transfer of that collateral.
5      Q.   And when you say Keegan's explanation,
6  I take it you're talking about the conversation
7  you had with Keegan before the meeting?
8      A.   Yes.
9      Q.   Okay.
10      A.   The 5:30 in the morning.
11      Q.   And did Keegan give you any level of
12  detail about why Barclays was uncertain about
13  some percentage of that collateral?
14      A.   It was collateral that they didn't --
15  was either they didn't have the expertise to
16  value or was not transparent, meaning that there
17  were financing vehicles that Lehman set up that
18  went into the repo that you couldn't look
19  through to what was in those financing vehicles.
20      Q.   And did Mr. Keegan give you any
21  information about what that collateral was, what
22  type of securities?
23      A.   He didn't know.
24      Q.   Well --
25      A.   In some cases he didn't know.  In

HIGHLY CONFIDENTIAL - A. KIRK

1
2  other cases it was, yes, it was illiquid and
3  either high-yield or defaulted or consumer
4  mortgage securities that were the ones he could
5  identify that were very hard to value.
6      Q.   I'm hearing this in two categories,
7  and I want to be sure you and I are on the same
8  page.  There's a component of this collateral
9  that's hard to value and there's a component
10  that is not transparent, which may also make it
11  hard to value --
12      A.   Yes.
13      Q.   -- but some of it's transparent and
14  hard to value?
15      A.   Yes.
16      Q.   Okay.  Did he identify any particular
17  categories of hard-to-value securities?  I get
18  it, high-yield or mortgage-backed, but did he --
19      A.   Distressed.
20      Q.   Did he use the term "racers" at all?
21      A.   That was the non-transparent category.
22      Q.   Okay.  Tell me what Mr. Keegan said to
23  you about racers.
24      A.   "What are they?"
25      Q.   Anything else?

HIGHLY CONFIDENTIAL - A. KIRK

1
2  A.  "And what's in them?" I said, "I
3  don't know."  I then went and -- Paolo Tonucci,
4  I directed him to Paolo, who would be able to
5  tell him what was in those various financing
6  vehicles.
7  Q.  Do you know what Paolo Tonucci then
8  spoke to Mr. Keegan about?
9  A.  I don't know.
10  Q.  Did Mr. Keegan say anything else about
11  racers other than he didn't know what they were?
12  A.  He asked how would I find out.
13  Q.  Did Mr. Keegan say anything to you
14  that, in sum or substance, compared the assets
15  that Barclays had agreed to buy in the first
16  transaction, to use your term, and the assets
17  that were in the repo that were the subject of
18  this transfer problem?
19  A.  He summarized it as it was a very
20  different and riskier category of assets.
21  Q.  Was anyone else present when
22  Mr. Keegan and you had this early morning
23  conversation?
24  A.  No.
25  Q.  Did you understand from Mr. Keegan, in

HIGHLY CONFIDENTIAL - A. KIRK

1
2  sum or substance, whether he had spoken to
3  others at Lehman about this problem by the time
4  he had spoke to you?
5  A.  I understood I was the first person he
6  had explained it to, at Lehman that he had
7  explained it to.
8  Q.  When you spoke to him and about this
9  topic, did you let him know that there was a
10  Friday meeting planned with -- that you had been
11  asked to come to an early morning meeting by
12  Mr. McDade?
13  A.  Yes.
14  Q.  And did you tell him you'd get back to
15  him after that meeting to see if there was a
16  solution to this problem?
17  A.  Yes.
18  Q.  So, in the course of that meeting, now
19  we've got the JPM issue, it's been identified,
20  you've had the first transaction outlined to you
21  broadly, the JPM problem --
22  A.  Right.
23  Q.  -- has been also described.  What
24  happens next?
25  A.  I'm sorry, so where -- what time of

HIGHLY CONFIDENTIAL - A. KIRK

1
2  day are we now?
3  Q.  I'm sorry.  I've got you back at the
4  Friday meeting with -- we're back at the Friday
5  meeting with Bart, yourself, Klein --
6  A.  Okay.
7  Q.  -- Ricci and Keegan.
8  A.  Yeah.
9  Q.  Okay.
10  A.  So at that meeting I walk through -- I
11  summarized the issues, as I understand them, for
12  this dispute with Barclays.  I inform Barclays
13  that those executives -- that JPMorgan had shut
14  down Lehman's DTC account, and I made the
15  supposition that that would make it impossible
16  to complete the transaction as contemplated.
17  Q.  And what, if anything, did Mr. McDade
18  have to say about those topics?
19  A.  He said he agreed with me.
20  Q.  Did you speak first in outlining the
21  issues?
22  A.  Yes.
23  Q.  And how did Klein, Ricci and Keegan or
24  any combination of those three men react to that
25  news?

HIGHLY CONFIDENTIAL - A. KIRK

1
2  A.  There was some question as to, well,
3  what do we do now?  I suggested that the only
4  reasonable course of action would be to proceed
5  with the transaction substituting the repo
6  assets, the assets that Barclays had lent
7  against, for all the other securities that had
8  been contemplated in the transaction and leave
9  the rest of the transaction as was.
10  Q.  So if I understand this -- I want to
11  make sure I understand this correctly.  Your
12  suggestion was to take the assets that were the
13  subject of the first transaction roughly
14  outlined in that schedule?
15  A.  Yeah.
16  Q.  And instead of transferring that body
17  of assets, transfer the body of assets that are
18  in the repo, correct?
19  A.  Yes.
20  Q.  Maybe I'm not understanding.  Is the
21  problem here, doesn't it involve the assets that
22  are in the repo?  Hasn't Mr. Keegan told you
23  that Barclays is uncertain about some components
24  of the repo collateral?
25  A.  So, again, the issue was that it was

HIGHLY CONFIDENTIAL - A. KIRK

1
2  my view that JPMorgan would not transfer one
3  dollar of one asset unless they got whatever
4  they wanted in a negotiation from Barclays or
5  anybody else, and even then they wouldn't -- it
6  didn't appear that they would do anything but be
7  hostile, having shut down our DTC account, which
8  is a, I mean, that's a colossal nightmare.  You
9  know, you've got tens of billions of dollars of
10 securities supposed to settle a regular way that
11 you've been transacting with your clients, and
12 every single one of them fails -- both sides,
13 buys and sells.
14     Q.    How is JPM in a position to shut down
15 Lehman's?
16     A.    They're our clearing bank.
17         So it was, again, my supposition,
18 which was confirmed by, you know, the senior
19 finance staff and Bart and then finally the
20 Barclays guys, that, you know, JPMorgan should
21 be viewed as not going to cooperate.  And
22 Barclays was attempting to reach JPMorgan and
23 never got a return call, was my understanding.
24 I was told that by probably Gerard LaRocca or
25 Keegan, one of them, and hence, you know, the

HIGHLY CONFIDENTIAL - A. KIRK

1
2  only assets that could participate in any way in
3  this transfer were ones that Barclays had held
4  in custody at their clearing bank, Bank of New
5  York, and potentially any assets at Lehman that
6  were unencumbered and were held away from
7  JPMorgan.
8      Q.    So, again, forgive me if I'm thick
9  here, but is the problem with JPMorgan --
10 withdrawn.
11         When you talk about the assets that
12 Barclays had at Bank of New York, those were
13 assets within the repo?
14     A.    Yes.
15     Q.    Within the Barclays repo, yes?
16     A.    Yes.
17     Q.    Do you know the amount, the value of
18 the assets that were at Bank of New York within
19 the Barclays repo?
20     A.    I didn't know that.  I didn't know the
21 amount or the value of those assets.
22     Q.    Okay.  And again, so we're clear, you
23 didn't know at the time or you don't remember
24 now, or both?
25     A.    I didn't know at the time.

HIGHLY CONFIDENTIAL - A. KIRK

1
2      Q.    Okay.  And the problem with JPM
3  refusing to transfer assets over, is that away
4  from the repo?
5      A.    Yes.
6      Q.    Okay.  So your suggestion is to focus
7  on the repo as the body of assets that can be
8  transferred to Barclays?
9      A.    Right.
10     Q.    Plus unencumbered, other unencumbered
11 assets?
12     A.    That were not held or cleared through
13 JPMorgan.
14     Q.    That are away from JPMorgan?
15     A.    Correct.
16     Q.    Now, did you have an idea then of what
17 the value of that total package could be?
18     A.    No.
19     Q.    So you've made --
20     A.    Because I wasn't clear on what
21 actually got transferred and what didn't get
22 transferred.  I knew broadly the size of the Fed
23 repo.  I didn't know what the disputed amount
24 was or the assets.
25     Q.    I just need to follow up a bit on the

HIGHLY CONFIDENTIAL - A. KIRK

1
2  disputed amount.
3      A.    Yeah.
4      Q.    I'm trying to be as clear as I can --
5      A.    Yeah.
6      Q.    -- as to what's the JPM problem and
7  how much of that is --
8      A.    Right.
9      Q.    -- whether that's -- we've established
10 the JPM problem is away from the repo, right?
11     A.    The JPM problem vis-a-vis Lehman
12 Brothers was away from the repo, that is
13 correct.
14     Q.    But vis-a-vis Barclays, it was not
15 away from the repo?
16     A.    My understanding was there was a
17 dispute about Barclays not accepting all the
18 collateral out of the Fed, only some of it, and
19 that collateral they didn't accept got left
20 behind or, by definition, stays at the clearing
21 bank, which was JPMorgan.  JPMorgan clears for
22 the Fed.
23     Q.    And I think you had an -- a rough idea
24 of what percentage of that.  It was some
25 percentage.  It could have been as much as 20

1      **HIGHLY CONFIDENTIAL - A. KIRK**
2   percent that Barclays would not accept, yes?
3      A.   Yes.
4      Q.   Did you have a sense of a dollar
5   amount of what was net of the amount that
6   Barclays would not accept?
7      A.   It was somewhere in the 40s.
8      Q.   And when you're talking about the
9   amount of the repo, are you talking about the
10  amount that was financed or the total collateral
11  as pledged?  Withdrawn.
12        You told me you're not an expert in
13  repos --
14     A.   Yeah.
15     Q.   -- and neither am I, but I understand
16  there's a haircut.
17     A.   Yeah, I think I was talking about the
18  amount financed, but I'm not -- I'm sketchy on
19  that.
20     Q.   So you make this proposal.  McDade
21  says he thinks you're right.  What's the
22  reaction from Klein, Ricci and Keegan?
23     A.   Ricci says -- there was some
24  discussion, I don't recall the specifics of it,
25  but Ricci then I recall specifically says, I

1      HIGHLY CONFIDENTIAL - A. KIRK
2   believe he's right.  We have to change course.
3      Q.   I know it's a long time ago, but just
4   given that phrase, is that -- are you quoting
5   him?  Are you summarizing him?
6      A.   I'm summarizing him.  So I'm under a
7   tremendous amount of pressure and stress, so my
8   memory is a little fuzzy from that.
9      Q.   Sure.
10     A.   At one point in this meeting, Mike
11  Klein looked at me and said, "Do you need a
12  doctor?"
13     Q.   Really?
14     A.   Yeah.
15     Q.   Well, you're kind of a last-minute
16  volunteer in this thing, you know?
17     A.   Yeah.  Story of my life.
18     Q.   What did Klein say?
19     A.   He said, okay, let's get to it.
20     Q.   And did Keegan say anything?
21     A.   He said, well, we haven't analyzed
22  this collateral so we don't know what it's
23  worth.  How are we going to figure out what it's
24  worth?  And we said we had started a process
25  with these large positions.

1      HIGHLY CONFIDENTIAL - A. KIRK
2         The problem turned out to be not only
3   was the data delivered in a not usable fashion
4   to the heads of the desk, but it was a different
5   set of securities.  So we had to -- it was
6   determined that the finance staff of Lehman
7   Brothers needed to work with the finance staff
8   at Barclays and get a list of everything that
9   was in their repo line, and then take that off
10  the systems and try to put it together in a way
11  that could be delivered to the various trading
12  desks to try to put some value on it.
13     Q.   When you referred before to, you know,
14  we had started that process, was that a -- were
15  you referring --
16     A.   From the night of the --
17     Q.   Yes.
18     A.   -- Daniel Flores' e-mail.
19     Q.   That's the one that refers to trying
20  to come up with fire-sale-type prices?
21     A.   Yes.
22     Q.   What in your mind was the connection
23  between the, what I'll call the fire sale
24  analysis and the problem you were dealing with
25  on Friday?  I'm not sure I'm clear on that.

1      **HIGHLY CONFIDENTIAL - A. KIRK**
2      A.   Only that we had -- that I could tell
3   the Barclays guys that we were already trying to
4   value some collateral and relative to the marks.
5   The -- Lehman suffered, you know, two issues
6   that week around valuations.  One was the
7   markets were unbelievably volatile and
8   incredibly illiquid, and that we were a less
9   than desirable counterparty for our -- so that
10  we had been, when we had been liquidating
11  collateral, we had been losing a lot of money,
12  and in addition to that, a smaller problem was,
13  you know, since the firm had filed for
14  bankruptcy, not every person was showing up to
15  work.
16     Q.   Now, the fire sale liquidation
17  analysis, the top 100 positions there, did
18  you -- are you saying that some of those might
19  have been in the repo?
20     A.   Yeah, but we didn't know which ones.
21     Q.   You didn't know?
22     A.   We had no idea.
23     Q.   That's not, so we're clear, the 100
24  positions we're talking about there is not with
25  direct reference to what was in the repo?

Page 82

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.    No, not at all.  We didn't know we had
3    this problem Thursday night.
4       Q.    What's the tone of the Friday meeting?
5    I know it's tense and Klein says do you need a
6    doctor, but are people angry?  Are they calm?
7    Are they -- what's the temperature in this
8    meeting?
9       A.    Anxious.  It's very, very anxious.
10   How are we going to be able to try to get
11   anything over the goal line by 4 o'clock this
12   afternoon, and if we don't, you we don't believe
13   we can survive the weekend.
14      Q.    And why 4 o'clock that afternoon?  Was
15   that the bankruptcy hearing?
16      A.    Yeah, that was the bankruptcy hearing,
17   the scheduled bankruptcy hearing.
18      Q.    Is there any discussion in this
19   meeting about what, if anything, needs to be
20   said to the bankruptcy court about this event,
21   these events?
22      A.    That it would have to be explained.
23   This transaction was very different than what
24   had been previewed two days before, and it would
25   have to be explained why it came up.

Page 83

HIGHLY CONFIDENTIAL - A. KIRK

1
2       Q.    Who said it would have to be
3    explained?
4       A.    Barry -- in that meeting -- I
5    apologize, some of these meetings are blurs.
6       Q.    Sure.
7       A.    But at some point during the day,
8    Barry Ridings, I was in a meeting with him, I
9    believe it was maybe at the tail-end of this
10   meeting, he came in and, you know, he listened
11   to this explanation again and then he said,
12   okay, we're going to have to be able to explain
13   this.
14      Q.    And did the Barclays folks in the
15   meeting -- and by that, I'm including Klein
16   here, Klein, Ricci, Keegan -- did they have
17   anything to say about whether and when this
18   would have to be explained to the court?
19      A.    No, they were taking Barry's lead.
20      Q.    Now --
21      A.    We all knew that there was a court
22   hearing scheduled at 4 o'clock.
23      Q.    Why do you describe this as a very
24   different agreement?
25      A.    The list of assets is different.

Page 84

HIGHLY CONFIDENTIAL - A. KIRK

1
2       Q.    Was there any discussion about the
3    consideration Barclays was to give in the
4    agreement also changing?
5       A.    Besides the amount, no.
6       Q.    Well --
7       A.    Meaning besides the fact that it
8    wasn't 72 million, you know, the attempt was to
9    get it so that the assets and liabilities would
10   balance.
11      Q.    And the 72 million, you're looking at
12   Exhibit 19, yeah?
13      A.    Yes.
14      Q.    That financial schedule.
15            Was there any discussion of the
16   compensation and cure components of the assumed
17   liabilities changing?
18      A.    Not at that meeting.
19      Q.    Did you at some point hear a
20   discussion about the compensation and cure
21   components changing?
22      A.    At some point late in the day, there
23   was a -- not on the compensation, there was no
24   discussion of compensation.  Ian -- not Ian,
25   Paolo was attempting to figure out a better

Page 85

HIGHLY CONFIDENTIAL - A. KIRK

1
2    estimate.  I think they had always continually
3    worked on it, but they were trying to figure a
4    better estimate.
5            Ian -- I remember Paolo coming into a
6    meeting I was in, I don't remember who it was
7    with, but he came in and said I'm working
8    through the cure payments to try to see if
9    there's some wiggle room there, so to speak, in
10   terms of what is that estimate.  I never got
11   a -- I was -- that was not part of the
12   transaction I was concerning myself with.  I was
13   supposed to try to shepherd along as best as
14   possible in this incredible short timeframe some
15   valuation work that we could get to on the
16   assets.
17      Q.    Wiggle room up or wiggle room down, or
18   both?
19      A.    I don't -- he didn't mention it one
20   way or another.  Some variance I guess is a
21   better way to put it.  I don't remember whether
22   it was higher or lower.
23      Q.    In the Friday meeting with McDade and
24   you and Klein and Ricci and Keegan, was there
25   any discussion about Lehman defaulting on the

Page 86

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2 repo?
3    A.   No.
4    Q.   Were you ever involved in any
5 discussion concerning the topic of Lehman
6 defaulting on the repo?
7    A.   Not a discussion.  I received an
8 e-mail that referenced it, but --
9    Q.   From whom did you receive the e-mail?
10    A.   I don't have it in front of me.
11       You've got it, Gerry Reilly.  That was
12 a couple days earlier when I wasn't involved, so
13 I didn't pay attention to it.
14    Q.   Do you recall that as an e-mail where
15 Reilly proposed defaulting on the repo was the
16 best way to deliver the bulk discount to
17 Barclays?
18    A.   I would have to look at it again.
19    Q.   We'll get to that a little later.
20    A.   Fine.
21    Q.   Is there any discussion in the Friday
22 meeting of that, of using the repo as a means of
23 delivering a haircut to Barclays?
24    A.   No.
25    Q.   Was there any discussion in the Friday

Page 87

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2 meeting of terminating the repo?
3    A.   I recall a discussion, I don't
4 remember who was in the meeting, but with
5 Barclays that if we couldn't get to closure that
6 day --
7    Q.   That Friday?
8    A.   That Friday.
9    Q.   Okay.
10    A.   -- it was likely they would terminate
11 the repo.
12    Q.   Do you know if at any point Barclays
13 did terminate the repo?
14    A.   I don't know the answer to that.
15    Q.   When the Barclays folks said if they
16 couldn't get to closure on Friday, they would
17 have to terminate the repo, was there any
18 reaction from the Lehman folks to that
19 statement?
20    A.   We understood they had to do what was
21 within their rights and what they felt was
22 appropriate.
23    Q.   Who said that?
24    A.   McDade.
25    Q.   I'm going to show you, Mr. Kirk,

Page 88

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2 what's previously been marked as Exhibit 21.
3 Take a moment to look through the document.
4       (Document review.)
5    A.   Okay.
6    Q.   Is that the document, the e-mail you
7 referred to a moment ago?
8    A.   Yes.
9    Q.   At the very bottom of the document,
10 paragraph 3, and this is within the e-mail from
11 Reilly to Lowitt, Gelband, Tonucci and Kelly, is
12 the following, "Not clear on the amount of block
13 discount or how we make it happen.  Defaulting
14 on repo could be the best, as discount could be
15 taken from haircut."  Do you see that?
16    A.   Uh-huh.
17    Q.   You may have said something a moment
18 ago about this, but let me ask you, did you have
19 an understanding when you saw this e-mail of
20 what it was Mr. Reilly was talking about, using
21 the repo?
22    A.   No, this was before I was involved,
23 and I was CC'd on this e-mail because of my work
24 in the auction rate book and the prime brokerage
25 financing at the time.

Page 89

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Okay.  So the first paragraph of
3 Mr. Reilly's e-mail refers to the auction rate
4 book?
5    A.   Yeah.
6    Q.   And the question appears to be whether
7 it's staying or going in the transaction, yes?
8    A.   Right.
9    Q.   And was it your understanding that it
10 was that first question that was the reason it
11 was forwarded to you, because you're in the ARS
12 world?
13    A.   I had been in the ARS world in my
14 previous job, and I assumed it was forwarded to
15 me so they could figure out who should answer
16 these questions, who would be most expert to
17 answer them.
18    Q.   All right.  So when you got the whole
19 e-mail, including the other two questions --
20    A.   Yep.
21    Q.   -- am I fairly understanding your
22 testimony that you didn't really focus on 3
23 because it wasn't in your area of
24 responsibility, you didn't understand it to be
25 addressed to you?

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2    A.   As a matter of fact, my answer
3 indicates what I did was I redirected them to
4 people I thought could be helpful.
5    Q.   Okay.
6    A.   That's what I thought my
7 responsibility would be.
8    Q.   Okay.
9    A.   Try to put point them in a direction.
10    Q.   Beg your pardon.
11        And with respect to the third
12 question, you say, "The third question is
13 definitely for Cogs," C-O-G-S.  Is that a
14 reference to Mr. Coghlan?
15    A.   John Coghlan, yes.
16    Q.   John Coghlan, okay.  And why was it a
17 question for John Coghlan?
18    A.   Because he was head of repo financing
19 at the firm.
20    Q.   Do you know if Mr. Coghlan ever did
21 address the third question?
22    A.   No idea.
23    Q.   Now, when you were in the Friday
24 meeting and the topic of the repo was being
25 discussed -- withdrawn.

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2    This is sent, this e-mail comes to you
3 on Thursday?
4    A.   Yes.
5    Q.   At roughly 6:40 in the morning.  Note
6 that that's Greenwich mean time shown there.
7    A.   Yeah.
8    Q.   The next morning you're in a meeting
9 where the repo is being discussed.  Did that
10 trigger any recollection in your mind about, you
11 know, an e-mail discussion the prior day about
12 using the repo as a means of making the block
13 discount happen?
14    A.   No, I, you know, I get 500 e-mails a
15 day, and during this period of time we were
16 getting probably twice that.  So ...
17    Q.   And when you saw a reference --
18    A.   I was answering all of them, so, you
19 know, or as many of them as I could.
20    Q.   And also to the mysterious number that
21 we finally identified.
22    A.   Yes, and then there's the mysterious
23 number.
24    Q.   Now, the --
25    A.   I don't think the company's in

HIGHLY CONFIDENTIAL - A. KIRK

1
2 business anymore.
3    Q.   Was there a reference to the -- any
4 discussion in the Friday meeting of a discount?
5    A.   No, not that I recall.
6    Q.   Okay.  So I'll summarize it just to
7 frame my next question so you're not married to
8 how I do this.  But as I understand it, the
9 meetings happened, you identified the JPM
10 problem, the recommendation is made to transfer
11 what's in the repo, and there's some issues
12 about how to value what's in there; is that a
13 fair summary?
14    A.   Yes.
15    Q.   Okay.  And the general sense of the
16 meeting from both sides of the table is, okay,
17 let's go to it and try and figure this out, we
18 have until about 4 o'clock to see if we can
19 solve this, yes?
20    A.   Yes.
21    Q.   And Barclays says if we can't reach a
22 resolution of that by about 4 o'clock, we may
23 have to terminate the repo, correct?
24    A.   Correct.
25    Q.   And McDade has said if that comes to

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2 be, you know, you have to do what you have to
3 do?
4    A.   Those are your rights.
5    Q.   And you don't know if the repo was in
6 fact ever terminated by Barclays?
7    A.   I don't know that.
8    Q.   Okay.  So now what happens?  Does the
9 meeting end or is there further discussion?
10    A.   I recall the meeting ending at that
11 time.
12    Q.   And what did you do next?
13    A.   I went back to my office.  I called
14 the various senior executives I was going to
15 meet with and told them that we should be
16 getting a new schedule at some point of assets
17 that we would have to -- they should ignore that
18 schedule of assets and we would be getting a new
19 schedule of assets at some point to try to put
20 some values on.
21    Q.   When you say "ignore that schedule of
22 assets," again, for clarity of record, are you
23 talking about Exhibit 19, the original financial
24 schedule?
25    A.   I'm sorry, no, I'm talking about the

Page 94

HIGHLY CONFIDENTIAL - A. KIRK

1
2  list of hundred assets that was delivered to the
3  desk early that morning.
4      Q.   Got it.  As part of the fire sale
5  liquidation?
6      A.   Correct.
7      Q.   And you told them they would be
8  getting a new list of assets.  Who is it you're
9  having these communications with?
10     A.   I certainly called Mike Gelband and I
11 would have called some subset, although I don't
12 recall who I spoke to specifically or who Mike
13 spoke to, but I would have called either
14 Kaushik, Charlie, Eric and Gerry.
15     Q.   Eric is Eric Felder?
16     A.   Yes.
17     Q.   And Gerry is Gerald Donini?
18     A.   Yes.
19     Q.   And who is Charlie?  Is that Charlie
20 Spero?
21     A.   Spero, uh-huh.
22     Q.   And did do you this on a conference
23 call?  Call them separately?  In a meeting?
24     A.   Probably called them separately.
25     Q.   And what happened after that?

Page 95

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.   We waited for a deliverable schedule
3  from finance.
4      Q.   Did you get one?
5      A.   Got one at sometime within the hour.
6      Q.   And from whom within finance did you
7  receive that?
8      A.   I don't remember who it was.
9      Q.   Who within finance was in charge of
10 that piece?
11     A.   It would have been some combination --
12 well, no, most likely it would have been Paolo,
13 working with accounting.
14     Q.   And Paolo or somebody at his direction
15 delivers a schedule.  To whom is it delivered?
16     A.   I don't recall, but I'm sure it was
17 instructed to be delivered directly to the
18 people on this list that I mentioned before and
19 myself and Mike.
20     Q.   And what happened with the list?
21     A.   We asked the senior managers to try to
22 value the list given the market conditions that
23 day, and generally the response was the markets
24 are too volatile, there's too many line items,
25 it's not possible to get this done in any

Page 96

HIGHLY CONFIDENTIAL - A. KIRK

1
2  pinpoint fashion in this timeframe, but we'll
3  try.
4      Q.   And at some point was there -- did
5  they solve that problem?  Did they produce
6  valuations?
7      A.   The only valuations we got was that --
8  I don't know what they communicated to Barry
9  Ridings or the people working on that specific
10 testimony.
11     Q.   Uh-huh.
12     A.   But I got the word back generally that
13 many of these positions were so illiquid that,
14 you know, that if we were to try to sell them,
15 given our circumstances, you know, the bids
16 might be down 20 percent.
17     Q.   Was there any discussion about looking
18 at the valuations that Bank of New York had
19 given to what was in the repo?
20     A.   We didn't have access to Bank of New
21 York's valuations, I don't believe.
22     Q.   Did you talk to anyone who was
23 familiar with how repurchase -- more familiar
24 than you with how repurchase agreements worked
25 to see if the collateral agent applied

Page 97

HIGHLY CONFIDENTIAL - A. KIRK

1
2  valuations to what was held as collateral?
3      A.   I don't recall having that specific
4  conversation.
5      Q.   Do you know if anyone did have that
6  discussion, that conversation with Barclays?
7      A.   They might have.
8      Q.   Without regard to the particular
9  detail or even the number --
10     A.   Yeah.
11     Q.   -- you had a sense of whether by, you
12 know, at some point on that Friday a value was
13 put on the collateral within the repo?
14     A.   We at Lehman determined that the
15 out -- the volatility of those outcomes we
16 couldn't put a number that was specific on it.
17 It was, given how illiquid many of the assets
18 were, some of the assets you could value, but
19 the markets were tremendously volatile all week.
20     We had had, you know, been getting
21 closed out of -- just the prior day we got
22 closed out of a repo, a futures position on the
23 CME that had excess margin of, you know, $1.6
24 billion.
25     As far as we could tell, the markets

Page 98

HIGHLY CONFIDENTIAL - A. KIRK

1
2  hadn't moved that much.  Many of them were in
3  Treasury and government bond futures, but the
4  CME called us to inform us they had closed us
5  out of the position and we had lost all the
6  money in excess margin.  So it was becoming very
7  hard to value even what were deemed to be liquid
8  securities.
9      Q.  Just so we're clear here, the closing
10  out of the position by the Chicago Merc doesn't
11  bear on the collateral that's within the repo;
12  that's a separate event, correct?
13      A.  That is a separate event, but it
14  was -- it was demonstrative of the volatility
15  and the issues we were wrestling with.
16      Q.  And the question that I would like to
17  put is, did Lehman come to some number, did it
18  come to a value, a valuation of the collateral
19  that was within the Barclays Repurchase
20  Agreement?
21      A.  We couldn't come up with a specific
22  value.  We didn't have time.  We knew we
23  didn't -- we tried, but we couldn't, and we knew
24  the risk was that Barclays would close out of
25  the repo and take all that collateral, so they

Page 99

HIGHLY CONFIDENTIAL - A. KIRK

1
2  owned it, that we would end up with no excess
3  from that collateral, and that from the very
4  high-level work that the senior risk managers
5  did, which we were relying upon, that we could
6  be well out of the money, it was likely that we
7  could be well -- we would be well out of the
8  money in that below the haircut, which I
9  believe, understood to be somewhere between 5
10  and 10 percent.
11      Q.  When you referred to a moment ago to
12  one of the risks was that we would not end up
13  with -- we would not end up with no excess, what did
14  you mean by that?
15      A.  Meaning that if Barclays closed us out
16  of the repo, our experience had been, not just
17  in that period of time but other cases, but
18  certainly in that week, that their liquidation
19  of that collateral would eat through more than
20  the haircut they had and that they would not get
21  back a hundred cents on the dollar.  So we,
22  Lehman, would not receive any proceeds back from
23  the liquidation of that collateral.
24      Q.  What was your understanding of what
25  would happen if there was excess collateral

Page 100

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Who would keep that?
3      A.  If there was excess collateral, Lehman
4  would keep that value.
5      Q.  Was that discussed at the Friday
6  meeting, that if there was excess collateral, it
7  would say with Lehman?
8      A.  There was not a discussion of closing
9  out the repo and the mechanics of it.
10      Q.  So did there come a point on Friday
11  where Lehman communicated to Barclays either --
12  where it communicated a value of the repo or it
13  said it couldn't?  What happens next vis-a-vis
14  talking to Barclays.
15      A.  In terms of talking to Barclays, the
16  next meeting was at some point, call it 3
17  o'clock in the afternoon, and they were
18  indicating that the -- their view of the value
19  of the repo securities was far below the stated
20  value and below their loan value and that Lehman
21  should attempt to find other unencumbered
22  assets, should continue to attempt to find other
23  unencumbered assets or the transaction may not
24  take place.
25      Q.  Now, is this response from Barclays

Page 101

HIGHLY CONFIDENTIAL - A. KIRK

1
2  after the Friday meeting has ended?  I want to
3  get a sense of the timeline within Friday of
4  when Barclays does this.
5      A.  This is like 3 o'clock in the
6  afternoon.
7      Q.  Does Barclays tell you, does Barclays
8  tell Lehman how much difference has to be made
9  up?
10      A.  No.
11      Q.  Is your answer that you don't remember
12  or that you remember that they didn't?
13      A.  I remember they didn't.
14      Q.  So what happens now?
15      A.  We said we'll continue to look.  And
16  Ian and I had a conversation with McDade
17  offline, just he and I.  I said, I don't have
18  any basis or enough information to argue with
19  them about their point of view, about the value
20  of collateral, and that the high-level work
21  we've been doing leads me to believe that they
22  have a reason to be nervous about this.
23      Q.  And what was --
24      (Mr. Kelley confers with the witness.)
25      A.  Barclays.

Page 102

1    HIGHLY CONFIDENTIAL - A. KIRK
2        I'm sorry.  Who is "they," he asked
3    me.  Barclays has a reason to be nervous.
4        Q.    And did McDade give any instructions
5    or suggestions about what to do next?
6        A.    He said, well, make sure Ian is
7    working on any possible unencumbered assets.
8        Q.    So did McDade give a target of any
9    kind of how much in unencumbered assets needed
10   to be found?
11       A.    At that point, all we could do was
12   figure out what was there, and specifically I
13   don't recall, but I do -- I do recall that the
14   shortfall was described as, you know, billions
15   of dollars.
16       Q.    And by "the shortfall," you're
17   referring to what?
18       A.    The value that Barclays thought those
19   repo assets were worth versus their stated
20   value.
21       Q.    That's the shortfall between what
22   Barclays thought they were actually worth and
23   the amount of the repo?
24       A.    Yeah.
25       Q.    So your recollection is that the

Page 103

1    HIGHLY CONFIDENTIAL - A. KIRK
2    shortfall was in the billions of dollars?
3        A.    Yes.
4        Q.    But do you have a recollection of
5    whether it was between 2 billion and a gazillion
6    billion?  Is there some range you were thinking
7    of at the time?
8        A.    Somewhere between 2 and 5.
9        Q.    And I'm trying to get a sense here,
10   that's why I keep pushing at the number --
11       A.    Yeah.
12       Q.    -- I'm trying to get a sense here of
13   what the project is.  Is it go find every
14   unencumbered asset we have on the one end of the
15   possibilities, or we have to make up this
16   specific shortfall, go find that amount at the
17   other?
18       A.    I didn't have the conversation.  Bart
19   had the conversation with Ian, so I didn't have
20   that conversation specifically with him.
21       Q.    So you don't know one way or the other
22   whether Mr. McDade gave a target of some kind to
23   Mr. Lowitt?
24       A.    No, I don't know that.
25       Q.    Your understanding from your view of

Page 104

1    HIGHLY CONFIDENTIAL - A. KIRK
2    things was there was a shortfall?
3        A.    Yes.
4        Q.    It wasn't Barclays was saying it
5    wouldn't be made up out of the repo bucket?
6        A.    Yeah.
7        Q.    Therefore, other assets, unencumbered
8    assets, capable of delivery had to be found?
9        A.    Right.
10       Q.    It was in the billions, but for
11   your -- for the purposes of what you were doing,
12   you didn't really need to know the number, you
13   just needed to know the problem had --
14       A.    Right, I was not the one who was going
15   to solve those specific issues, so that was
16   someone else's job.
17       Q.    Was anyone other than Lowitt involved
18   in the particulars of solving the problem?
19       A.    I don't know the answer to that.
20       Q.    Did you ever learn whether Lowitt
21   enlisted others in the task of finding
22   unencumbered assets?
23       A.    No, I didn't, I didn't find out.
24       Q.    Did there come a time when you learned
25   whether additional value, additional

Page 105

1    HIGHLY CONFIDENTIAL - A. KIRK
2    unencumbered assets were located that could be
3    transferred to Barclays?
4        A.    Sometime late in the afternoon between
5    3 and 4, Ian came into a meeting where I was
6    about to start a phone call with Bart, the Weil
7    Gotshal lawyers on the phone, and I was sitting
8    in the room with Mark Shapiro and I think it was
9    Jim Seery and the Barclays, again, Diamond,
10   Ricci, Klein and Keegan, and Ian came in and he
11   said there's a -- there's a schedule of assets
12   that we have that are unencumbered.  I believe
13   the number was $1.9 billion of marked value.
14       In addition, he said there might be
15   value in our 15c3 margin, which at the time I
16   remember that specifically because I was like,
17   "Gee, what's that?  I've never heard of that."
18   So he said there might be value there, I don't
19   know yet, and there might be others.
20       So we said to Ian, well, get us a
21   schedule of what's in the 1.9 billion in the --
22   I think he referred to it as being in the box
23   unencumbered of these unencumbered assets, i.e.,
24   they were being financed by Lehman's unsecured
25   debt, I believe at the time, or equity, and he

HIGHLY CONFIDENTIAL - A. KIRK

1
2  came back with that list, showed it to myself
3  and to Keegan and some others.
4        Keegan looked at it and said, you
5  know, this is the -- these assets are even
6  harder to value than what we already have.  I
7  don't even know what these are.  I specifically
8  remember there being residential mortgage
9  residual interests and things like IOs and some
10 very illiquid aged positions in high-yield and
11 distressed debt.  I don't specifically recall
12 what else it was, but I do recall the list was
13 a -- there was a reason why there was nobody
14 financing those assets and it was because they
15 were the most illiquid and hardest to value
16 securities that Lehman Brothers owned on its
17 balance sheet.
18     Q.   So when Keegan said these are even
19 harder to value than --
20     A.   Yeah.
21     Q.   -- than the other stuff, was he
22 comparing this new schedule with the
23 hard-to-value stuff in the repo?
24     A.   Yes.
25     Q.   And apart from saying it was hard to

HIGHLY CONFIDENTIAL - A. KIRK

1
2  value, did Keegan have anything to say about
3  that?
4     A.   He said I don't know how I'm going to
5  put a value on this of any positive number.
6     Q.   Describe for me as best you can the
7  conversation about that topic and who said what.
8     A.   Ian came in.  He delivered this -- he
9  said -- we started the conversation with Ian
10 delivering the list of assets, and he handed it
11 to Keegan -- he handed out probably five copies.
12 Most people were just staring at it saying
13 nothing.
14        Mike looked at it and said, you know,
15 I -- what's this asset?  What's that asset?  I
16 think Ian may have answered specifically if he
17 knew what the nature of those assets were,
18 because in like residential mortgages you have
19 names for deals that unless you knew that that
20 was a residential mortgage deal, you wouldn't
21 know what it was, you know, Sasco or things of
22 that nature.
23        And Ian had some familiarity with
24 the -- with what the assets were because he had
25 been responsible for financing those sorts of

HIGHLY CONFIDENTIAL - A. KIRK

1
2  assets or, in this case, having the equity
3  finance the assets.  And so there was some back
4  and forth around that, and Keegan made the
5  conclusion that he was not going to warrant any
6  positive value on these assets from his seat,
7  and he made that -- he sort of said that to Rich
8  Ricci and Bob Diamond:  "I can't value these.  I
9  would be very nervous about putting a positive
10 value on them."
11     Q.   So, just to kind of cut to the end of
12 the sequence here, does Barclays agree to take
13 these additional buckets of value, you know, the
14 15c3 and the assets, the unencumbered assets in
15 the box?
16     A.   Yes.
17     Q.   And when they make that agreement, are
18 you present?  Was that at this meeting?
19     A.   Yes.
20     Q.   And tell me what was said in that
21 regard.
22     A.   That, all right, we don't know what
23 they're worth.  They might be worth something,
24 so we want them.  And Bart was on the phone, he
25 agreed -- he agreed to that, and I think that

HIGHLY CONFIDENTIAL - A. KIRK

1
2  was the sum and the substance as to what was
3  said about those assets.
4     Q.   Was any number put on now the total
5  value of the deal, combining the assets that
6  were in the repo plus the 15c3 and the
7  unencumbered assets in the box?
8     A.   I don't recall a specific number being
9  put on the -- on the deal.
10    Q.   Whether you recall today what the
11 number was, I'm going to press on this a little
12 bit, do you recall if a number was put out
13 there?
14    A.   I'm sorry, I don't recall what --
15 whether -- I don't recall whether there was a
16 number specifically put out there.
17    Q.   Okay.  And did you have a sense after
18 this conversation, Mr. Lowitt reports on the
19 15c3 assets and the unencumbered assets and
20 Keegan says, I can't value those and then the
21 agreement's made, well, we'll take them because
22 there may be some value, whether after that
23 point there were additional searches for value?
24 Do you know one way or the other?
25    A.   I don't recall one way or another.  I

Page 110

HIGHLY CONFIDENTIAL - A. KIRK

1
2 don't recall what the whole -- I recall 15c3. I
3 recall this 1.9 billion because I was sitting
4 there with the list and I said, "Gee, what is
5 15c3?" So I recall those two. I don't recall
6 if there were other categories discussed during
7 that meeting.
8     Q.   You said a moment ago that Lowitt,
9 when he reported on the 15c3 piece, he put that
10 at about 1.9 billion?
11     A.   That was the marked value.
12     Q.   Of marked value. And that there was
13 some value, but -- of what was in the box, but
14 he didn't know what it was?
15     A.   It was some value in 15c3, but he
16 didn't know how much there would be.
17     Q.   So when that meeting ended, did you
18 have, whether you remember the number or not
19 today, did you have a sense of what the total
20 additional value was between the 15c3 and the
21 contents of the box?
22     A.   No.
23     Q.   Was there any plan made to calculate
24 that number?
25     A.   I think Ian was putting together a

Page 111

HIGHLY CONFIDENTIAL - A. KIRK

1
2 schedule that he would communicate to Bart
3 with -- there was a, first of all, in that
4 discussion there was a wrap-up of this is what
5 the deal looks like. It's got the 45 billion,
6 it's got the, on the asset side, it's got this
7 1.9, it's got 15c3, it may have had, you know,
8 other components to it.
9     Bart agreed, Ian and Bart agreed that
10 these were the components on the assets side.
11 It had the assumed liabilities. They agreed
12 that those were the assumed liabilities that
13 were going to agree, I don't remember the exact
14 numbers, and they said, okay, do we have an
15 agreement? Barclays said yes. Ian was going to
16 go codify that, I believe, and talk to Bart.
17     Bart was in a car with Weil lawyers on
18 his way to bankruptcy court. That's why he
19 wasn't in the room.
20     Q.   When you say Ian was going to go away
21 and codify that, you mean put the schedules
22 together?
23     A.   I think so, yes, that's what I mean.
24     Q.   Did Mr. Klein say anything about this
25 process adding additional value for Barclays?

Page 112

HIGHLY CONFIDENTIAL - A. KIRK

1
2     A.   No, not adding additional value. He
3 didn't comment on that.
4     Q.   Did Klein make any recommendation in
5 your hearing as to whether Barclays should or
6 should not accept this deal?
7     A.   Klein recommended that they accept the
8 deal if -- when they got the additional, all the
9 additional collateral.
10     Q.   I don't mean this to be sarcastic. I
11 just can't come up with another way of phrasing
12 it.
13         We're looking around for all this
14 additional value and your memory is not clear on
15 whether there was a target or not?
16     A.   Yeah.
17     Q.   Framed that way, what was the project
18 here? Was it to go find everything else and
19 turn it over, or was it to find some, some
20 identifiable bucket of value until Barclays
21 said, yeah, that's enough? Do you see the
22 distinction I'm making?
23     A.   Yes, it's -- the project was the
24 second, not the first.
25     Q.   Okay. So the idea was there would be

Page 113

HIGHLY CONFIDENTIAL - A. KIRK

1
2 some value left in Lehman; it was just a
3 question of finding enough additional value to
4 make Barclays still close?
5     A.   Yeah. And that project was Ian's
6 project, not mine. I wasn't -- I was an
7 observer to this part of the process.
8     Q.   What was Ian's manner in this meeting?
9 I mean, it's a tough week for everybody, but
10 what's his demeanor?
11     A.   He hadn't slept in a week, so he was a
12 little harried.
13     Q.   Did Ian identify other potential
14 sources of additional value that he had looked
15 at apart from the box and 15c3?
16     A.   He --
17         MR. HUME: Objection. Asked and
18 answered.
19     Q.   You can answer.
20     A.   No, he, as I said, he may have, but I
21 didn't -- I don't remember.
22     Q.   You don't remember, then, any
23 particular other sources that he might have
24 discussed?
25     A.   No, I don't.

Page 114

1          HIGHLY CONFIDENTIAL - A. KIRK
2          (Discussion off the record.)
3    BY MR. GAFFEY:
4        Q.   While we're pulling a couple of
5    documents out, Mr. Kirk, let me see if I can get
6    the rest of, you know, the blocks of your day.
7          This meeting ends.  Lowitt is given
8    the task of codifying -- your word -- you know,
9    getting a list together?
10       A.   Yes.
11       Q.   What do you do next?
12       A.   I just go back to my office.  Sit
13   there silently, depending on --
14       Q.   Maybe try to get some sleep?
15       A.   Yeah.
16       Q.   Do you have any role or involvement in
17   this asset collection process we've been talking
18   about after this point?
19       A.   No.
20       Q.   Did you go to the hearing?
21       A.   No.
22       Q.   Did anyone render reports to you from
23   the hearing --
24       A.   Yes.
25       Q.   -- as to what was going on?

Page 115

1          HIGHLY CONFIDENTIAL - A. KIRK
2          Okay.  Who did that?
3        A.   I got a couple e-mails from Jim Seery
4    and I had a conversation with Jean-Francois
5    Astier.
6        Q.   And what were the, in sum and
7    substance, what were you hearing in the reports
8    from -- we don't have to go through this chapter
9    and verse, but what were the nature of the
10   reports you were getting back from the --
11       A.   There was, first of all, they were --
12   JF and Jim were trying to understand what the
13   new deal was, so I had a conversation with JF
14   trying to explain to him what I knew, and
15   because they were, I believe, going to
16   participate in a meeting with the creditors
17   explaining this, what the deal was.
18         And then I got -- so there was some
19   back and forth to just try to reach me on that
20   front, and then there was -- they sent me a
21   couple updates of, you know, Bart's proffers
22   being read and there's cross-examination, and
23   then ultimately the deal was done with some
24   quotes from Judge Peck later that night.
25       Q.   Did anyone --

Page 116

1          HIGHLY CONFIDENTIAL - A. KIRK
2        A.   And then somebody called me when it
3    was done.
4        Q.   Somebody called to say the judge has
5    approved the deal?
6        A.   Yeah.
7        Q.   Did you get reports from anyone that
8    told you whether or not anyone had told the
9    judge that this was a new transaction, different
10   transaction?
11       A.   I didn't get presented -- one early
12   conversation I had with JF, I didn't talk to
13   anybody directly by phone, and I just got a few
14   cursory e-mails.
15       Q.   And --
16       A.   But at one point there was, you know,
17   my understanding was there was -- and early,
18   there was discussions before they went, you
19   know, to court to wrap it up with various
20   constituents.  And certainly there were
21   constituents there, Bart, Michael Klein and
22   others, that had the details.
23       Q.   Now, did you stay in your office until
24   you heard about the --
25       A.   No.  No.  I went home and I went to

Page 117

1          HIGHLY CONFIDENTIAL - A. KIRK
2    bed sometime late that evening.
3        Q.   Sometime after you heard that the deal
4    had been approved?
5        A.   No.  No.  I went to bed before that.
6    Somebody woke me up out of bed.
7        Q.   Did you continue to do any work or did
8    you perform any tasks in connection with the
9    transaction --
10       A.   No.
11       Q.   -- over the weekend?
12       A.   Saturday I had no involvement.  On
13   Sunday, Bart asked me to come in and try to
14   participate in the closing of the transaction at
15   Weil Gotshal.
16       Q.   Did you do that?
17       A.   Yes.
18       Q.   Just so I can plan a little bit for
19   what I want to ask you after lunch break, give
20   me an outline of what you did on the Sunday.
21       A.   So we went over to Weil.  We, Bart and
22   I, were put in a room.  You know, we were there
23   as a resource as people were trying to put
24   schedules together, et cetera.
25         An issue came up early in the morning

**Page 118**

HIGHLY CONFIDENTIAL - A. KIRK

1
2 around the settlement of trades on Monday and
3 how they were going to be handled, Lehman
4 trades, customer trades with Lehman.  We tried
5 to help work that issue out, and then we
6 effectively became observers of this dispute
7 between JPMorgan and Barclays, as there were
8 many meetings held into the evening that
9 JPMorgan came to Weil about 6 o'clock Sunday
10 night and at the urging of the Federal Reserve
11 and they walked through, described in very large
12 group meetings the issues they had.
13      We sort of hung around and eventually
14 were told that Barclays and JPMorgan had
15 resolved their dispute and that the deal could
16 go to closure.
17      Q.   When you say "we," are you talking
18 about yourself and Mr. McDade?
19      A.   And there were others at Lehman as
20 well.
21      Q.   Who else?
22      A.   Jim Seery was there.  I called him
23 late in the afternoon.  Ian Lowitt was there.
24 Paolo was there.  A guy name Alastair Blackwell
25 was there.  Steve Berkenfeld was there.  That's

**Page 119**

HIGHLY CONFIDENTIAL - A. KIRK

1
2 everybody I recall.
3      Q.   Did you learn how the dispute between
4 JPM and Barclays had been resolved, what the
5 terms of that resolution were?
6      A.   They didn't tell us.
7      Q.   So did anybody ask, anybody say how
8 did this issue get resolved?
9      A.   Yeah, and they said it's between us
10 and -- Barclays representatives told us -- well,
11 I don't remember if it was the lawyer or who
12 specifically, but a representative from Barclays
13 said that's between Barclays and JPMorgan.
14      Q.   So the closing did not take place on
15 the Sunday, correct?
16      A.   It eventually I think closed Monday
17 morning, but it was one continuous -- I left at
18 2 A.M., and then they worked towards closing at
19 some point in the morning prior to the markets
20 opening.
21      Q.   Did you go back for the closing?
22      A.   No.
23      Q.   Do you know if any additional
24 documentation was done to reflect the new
25 agreement that had been reached on Friday?

**Page 120**

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.   Oh, I'm sure there was lots of
3 documentation, but I'm not a lawyer so I wasn't
4 reviewing it.
5      Q.   Do you know, apart from whether you
6 read it or reviewed it, my question is do you
7 know if a new -- a new contract or an amendment
8 or anything else was written up that would
9 reflect the fact that the deal had changed on
10 Friday?
11      A.   I assume so.  I don't -- I never saw
12 actual evidence of it, but ...
13      Q.   I've asked you a couple of times when
14 you said you've assumed.  What's the basis of
15 the assumption?  The fact that it --
16      A.   That you couldn't proceed with a
17 commercial transaction without it.
18      Q.   Do you have any factual basis to think
19 that it was?  Did you talk to anybody about it?
20 Did you see any documents?
21      A.   I didn't see any documents.  Certainly
22 we were advised by Weil that the documents were
23 in good order.
24      (Exhibit 316, an e-mail chain with
25 attached balance sheet, marked for

**Page 121**

HIGHLY CONFIDENTIAL - A. KIRK

1
2 identification, as of this date.)
3      Q.   I have put before you, Mr. Kirk, a
4 three-page document.  I'll ask you to take a
5 look through it sufficiently to tell me whether
6 you've seen it before.
7      A.   Yes, I've seen it.
8      Q.   Did you see it at or around the time
9 that it's -- of September 19 at 6:16 A.M.?
10 That's the date at the top.
11      A.   Yes.
12      Q.   And was this sent to you -- was it
13 your understanding this was sent to you to
14 prepare for that Friday meeting we've been
15 talking about?
16      A.   It was one, one of the documents that
17 I assumed we would review.
18      Q.   Okay.  And do you recall --
19      MR. HUME:  Are you marking it as an
20 exhibit?
21      MR. GAFFEY:  Yes, I did, Hamish.  It's
22 316.
23      MR. HUME:  I'm sorry.
24      Q.   Do you recall reviewing it at the
25 Friday meeting?

## Page 122

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2    A.    No, I actually don't recall reviewing
3    this.
4    Q.    Let me just direct your attention,
5    sir, to the third page -- well, to the second
6    page.  You'll see that that's a balance sheet
7    that's attached to the e-mail and then referred
8    to in the second e-mail.
9    A.    Yes.
10    Q.    Do you know who prepared this balance
11    sheet?
12    A.    I don't know specifically who prepared
13    it, but it would have been prepared by
14    accounting.
15    Q.    Okay.  And --
16    A.    Well, the e-mail seems to indicate
17    Martin -- somebody who worked for Martin Kelly
18    had prepared it.
19    Q.    And within the balance sheet, sir, the
20    fifth column that's entitled Transaction
21    Adjustments, do you see that?
22    A.    Yes.
23    Q.    Do you know what that column
24    represents, what the entries in that column are
25    meant to represent?

## Page 123

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2    A.    Only from reading it.
3    Q.    I don't want you just to guess from
4    the face of the document.
5    A.    No.
6    Q.    Do you recall any discussion of
7    transaction adjustments?
8    A.    No.
9    Q.    And in particular, if you could take a
10    look at the last page of the document, I would
11    ask you to take a look at the Transaction
12    Adjustments column where it says 2 billion and
13    1.645 billion, are you with me?
14    A.    Uh-huh.
15    Q.    And you'll see that those relate to,
16    if you read across to the left, items Bonus
17    Payable and Cure Payments?
18    A.    Uh-huh.
19    Q.    And if you read across with me on the
20    Cure Payments line, you'll see, as of 8/31/08,
21    the number 701 is there, you with me?
22    A.    Uh-huh.
23    Q.    And then as of 9/17/08, 605?
24    A.    Uh-huh.
25    Q.    And then there's a transaction

## Page 124

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2    adjustment of 1,645,000,000?
3    A.    Uh-huh.
4    Q.    Resulting in a balance sheet transfer
5    total of 2.25 billion, do you see that?
6    A.    Uh-huh.  Uh-huh.
7    Q.    2.25 is the amount that you recall
8    Mr. Tonucci telling you was the assumed
9    liability for cure that was Barclays'
10    consideration in the deal?
11    A.    Yes.
12    Q.    Do you have any knowledge or have you
13    been involved in any discussion where a
14    transaction adjustment of 1.645 billion was made
15    against Lehman's books?  Do you know if that
16    number was written up?
17    A.    If it was written up, meaning?
18    Q.    Do you know if the amount for cure
19    payments shown on Lehman's books was written up
20    by 1.645 billion?
21    A.    Oh, I have no idea.
22    Q.    Did you ever have a discussion with
23    Mr. Tonucci or Mr. Kelly or Mr. Lowitt about
24    that topic?
25    A.    No.

## Page 125

**HIGHLY CONFIDENTIAL - A. KIRK**

1
2    Q.    And I'll ask you the same question,
3    sir, with respect to the line for bonus payable.
4    Do you see a transaction adjustment of 2
5    billion, and the 2 billion is contained in the
6    Balance Sheet Transferred column?
7    A.    Yes.
8    Q.    Any conversations with Lowitt, Kelly
9    or Tonucci about that topic?
10    A.    No, no conversations.
11    Q.    Any conversations with anyone else
12    about that topic?
13    A.    No.
14    Q.    Was that topic addressed at the Friday
15    meeting we've been talking about, to your
16    recollection?
17    A.    Only to the extent that there was a
18    liability that was 2 billion and 2 and a quarter
19    billion that's reflected in this balance sheet
20    that had been agreed to prior.
21    Q.    Do you know if those liabilities of 2
22    billion and 2 and a quarter billion were based
23    on Lehman's accruals on its books, or were they
24    agreed numbers?
25    A.    I don't know.

Page 150

HIGHLY CONFIDENTIAL - A. KIRK
1
2  7:18 P.M. on that Friday, did you have a
3  discussion with anyone else about Barclays
4  taking the collateral that was in the repo at
5  any point?
6     A.  No.
7     Q.  Did you talk to anybody about that
8  over the weekend?
9     A.  No.
10    Q.  Was there any conversation about that
11 when you and Mr. McDade were at Weil in
12 connection with preparing for the closing?
13    A.  Not that I recall.
14    Q.  Do you know if the issue of Barclays
15 taking the collateral in the repo was addressed
16 at the closing in any way?
17    A.  I assume not, because if the
18 transaction was that they were -- well, I don't
19 remember is the better answer.  I don't remember
20 that being discussed.
21    Q.  And as you sit here today, you have no
22 recollection of you yourself engaging in a
23 conversation with anyone about Barclays taking
24 the collateral that was in the repo?
25    A.  Except for a vague recollection that

Page 151

HIGHLY CONFIDENTIAL - A. KIRK
1
2  Jim would have called me about it.
3     Q.  And just so I'm clear on that, because
4  you're gesturing at the document saying "Jim
5  would have," do you have a recollection --
6     A.  Yeah.
7     Q.  -- or are you just inferring that from
8  the document?
9     A.  It's vague.  I don't recall the
10 specific conversation.
11    Q.  Okay.
12    A.  But if it had been an issue, I'm sure
13 I would remember it.
14    Q.  Okay.
15    A.  Since it wasn't.
16    Q.  And from the discussions on Friday, it
17 was your understanding that if Barclays got --
18 if this value collection effort gave Barclays
19 enough value to support the financing in the
20 repo, that Lehman would get the excess back,
21 right?
22       MR. HUME:  Objection.
23 Mischaracterizes the testimony.
24    A.  I don't --
25       MR. KELLEY:  Do you want the question

Page 152

HIGHLY CONFIDENTIAL - A. KIRK
1
2  read back?
3       THE WITNESS:  Yeah, why don't you read
4  the question back, please.  I'm not quite
5  sure exactly...
6       (Record read.)
7       MR. HUME:  Same objection.
8     A.  No, that discussion never took place.
9  There was too much uncertainty about the values.
10    Q.  Was there, in connection with this
11 value of additional profit we talked about on
12 Friday, was there any discussion about what it
13 would take to get Barclays up to the value of
14 the financing in the repo?
15    A.  Not that I was present at.  I don't
16 know if there were any away from me.
17    Q.  This sort of goes to a few other
18 questions I have asked you about, whether there
19 was a goal or a cap on how much had to be
20 collected on Friday.
21       Without regard to what the number may
22 or may not have been, was the goal to find
23 enough assets to replace the loss in value
24 within the repo?
25       MR. HUME:  Objection.  Vague and

Page 153

HIGHLY CONFIDENTIAL - A. KIRK
1
2  ambiguous and lack of foundation.
3     A.  In the end, I was the witness to an
4  agreement that was agreed to between Bart and
5  Ian and the Barclays team, but I wasn't part of
6  any discussions as to the basis for that
7  agreement.
8     Q.  And the agreement that you were a
9  witness to is the one you described to me before
10 where they said, do we have a deal?
11    A.  Yes.
12    Q.  And the agreement was we have a deal.
13    (Exhibit 321, a document bearing Bates
14 Nos. AK-LB-BANKR00002 through 27, marked for
15 identification, as of this date.)
16    Q.  Mr. Kirk, I have put before you a
17 document bearing Bates number AK-LB-BANKR000002
18 through 27.  Do you recognize the document?
19    A.  Yes.
20    Q.  What is it?
21    A.  It's a notebook.
22    Q.  Is it your notebook?
23    A.  Yes, my notebook.
24    Q.  Is it in your handwriting?
25    A.  Yes.

Page 158

HIGHLY CONFIDENTIAL - A. KIRK

1
2      A.   Yes.
3      Q.   Anything to add?  Any knowledge as to
4   why you're listing those eight names there?
5      A.   I don't recall specifically.  Some of
6   these people I'm responsible for, some of them
7   I'm not, so I don't recall exactly what this
8   list was -- why it's there.  This would have
9   been during the week, early in the week of the
10  15th.
11     Q.   And if you would turn to starting at
12  page 24, it's the following four pages are --
13  following three pages are a typewritten balance
14  sheet of some kind.
15          Are we in the same place?
16     A.   Yes.
17     Q.   And it's entitled Funding 2008 Q3
18  Balance Sheet?
19     A.   This was a schedule which was faxed to
20  Bart Saturday morning at the Fed that he and I
21  used to prepare for a meeting with John Mack,
22  Vickram Pandit, John Thayne and their associates
23  to discuss the possible iterations of Lehman
24  Brothers going forward.  This was those -- that
25  was the first -- well, that's the first pages of

Page 159

HIGHLY CONFIDENTIAL - A. KIRK

1   funding.
2          This second page is a -- is an
3   analysis that B of A did marking down our assets
4   earlier in the week, which we also discussed at
5   that meeting.  B of A's valuation of Lehman
6   Brothers' assets.
7      Q.   You can put that aside.  I'm done with
8   that document.
9      A.   Okay.
10         (Exhibit 322, a document bearing Bates
11  Nos. AK-LB-BANKR000028, marked for
12  identification, as of this date.)
13     Q.   Before you, Mr. Kirk, is Exhibit 322,
14  a one-page set of notes bearing Bates number
15  AK-LB-BANKR000028.  Is that your handwriting?
16     A.   Yes.
17     Q.   Do you have any recollection of making
18  these notes?
19     A.   Yeah, this was somebody trying to
20  explain to me in broad terms what 15c3-3 was.
21     Q.   Okay.  I take it you're looking at the
22  reference to customer accounts segregated in
23  margin in the box in the upper left-hand corner.
24     A.   I'm looking at the whole page, yes.
25

Page 160

HIGHLY CONFIDENTIAL - A. KIRK

1
2      Q.   Do you know, these numbers on the
3   right-hand side, 1B and 1.7B, what do they
4   represent?
5      A.   I don't recall what they represent.
6          (Exhibit 323, a document bearing Bates
7   Nos. AK-LB-BANKR000030, marked for
8   identification, as of this date.)
9      Q.   You have before you, Mr. Kirk, what we
10  have marked as Exhibit 323, bearing Bates number
11  AK-LB-BANKR000030.  Are these notes in your
12  handwriting?
13     A.   Yes.
14     Q.   Can you, as you look at them, do you
15  remember the circumstances under which you took
16  the notes?
17     A.   I think these were notes on Sunday
18  during the closing.
19     Q.   And why is it you think they're notes
20  on Sunday during the closing?
21     A.   Because I see a reference to Alastair,
22  which would be Alastair Blackwell, who I didn't
23  deal with prior to Sunday, and Tom Hamilton, who
24  was head of mortgage trading at Barclays, who
25  was trying to deal with this issue of the

Page 161

HIGHLY CONFIDENTIAL - A. KIRK

1
2   settlements.
3          The dispute that arose on Sunday was
4   who was going to guarantee the settlements of
5   the trades that were supposed to settlement on
6   Lehman Brothers' account starting Monday
7   morning.
8      Q.   And that dispute, broadly speaking,
9   involved DTC needing some comfort as to who was
10  going to guarantee those settlements?
11     A.   Yes.
12     Q.   Now, on the notes themselves there is,
13  amidst the names and above the name Tom Hamilton
14  and Harry Harnson -- I'm just giving you that
15  for placement on the document.
16     A.   Uh-huh.
17     Q.   -- is what appears to be an Assets and
18  Liabilities column; is that right?
19     A.   Yes.
20     Q.   Okay.  Can you explain to me what that
21  represents?
22     A.   To the extent that I understand it, it
23  represents some assets of 45 and a half billion,
24  goodwill would be the next line of 250 million,
25  and then it had a loan from BarCap that says 45

## Page 166

HIGHLY CONFIDENTIAL - A. KIRK

2  MR. HUME: Objection.
3  MR. KELLEY: Objection. Speculation.
4  Misstates prior answers.
5  MR. HUME: Vague and ambiguous as to
6  valuation.
7  A.  I didn't have that understanding.
8  Q.  Did you have --
9  A.  Nowhere did anybody say they should be
10 equal.
11 Q.  Okay. Did you have an understanding
12 that Barclays was going to get more than it had
13 funded?
14 A.  In terms of assets?
15 Q.  Yes.
16 A.  Yeah, they were going to get assets
17 that were unencumbered.
18 Q.  And when you added the unencumbered to
19 the amount in the repo, was it your
20 understanding that Barclays was going to take
21 more out than it had funded into the repo?
22 A.  Well, they were also assuming other
23 liabilities away from the repo.
24 Q.  I understand that.
25 Did you understand that they were going to

## Page 167

HIGHLY CONFIDENTIAL - A. KIRK

1  take out more than they had funded into the
3  repo?
4  MR. KELLEY: Objection. That's based
5  on speculation. Calls for speculation, I
6  should say.
7  THE WITNESS: So I --
8  Q.  You can answer that question.
9  MR. KELLEY: It just asks him to
10 identify the source of his knowledge.
11 MR. GAFFEY: No, I'm going to ask him
12 to answer the question I asked.
13 Will you read it back?
14 (Record read.)
15 A.  I don't understand the nature of, when
16 you say "take out more," what does that mean?
17 Q.  Barclays funds the repo to the tune of
18 $45.5 billion, you understand that, right?
19 A.  Right.
20 Q.  In the asset transfer agreement that's
21 at issue for the bankruptcy court, Barclays is
22 going to take a certain amount of assets out of
23 Lehman, correct?
24 A.  Yes.
25 Q.  Was it your understanding that that

## Page 168

HIGHLY CONFIDENTIAL - A. KIRK

2  latter bucket of assets was to equal or to
3  exceed the amount that Barclays had paid into
4  the repo for funding?
5  MR. HUME: Again, objection. Vague
6  and ambiguous as to the valuations posed in
7  your question.
8  A.  My understanding was the totality of
9  the assets should attempt to get somewhere close
10 to covering all the liabilities.
11 Q.  The liabilities, you mean the
12 liabilities in the repo plus the assumed
13 liabilities?
14 A.  Yes.
15 Q.  Is that what you mean?
16 MR. HUME: Objection to the phrase
17 "assumed liabilities."
18 A.  Yes.
19 Q.  And the assumed liabilities you're
20 referring to are the assumed liabilities for
21 payable and comp in the amount of 4.25 billion,
22 correct?
23 A.  Correct, and then ultimately the
24 assumed liabilities in guaranteeing the trading
25 obligations which they were agreed to do come

## Page 169

HIGHLY CONFIDENTIAL - A. KIRK

2  Sunday.
3  Q.  Okay. And do you know what the
4  resolution was of the issue of guaranteeing --
5  the dollar resolution was of the guarantee of
6  the trading liabilities?
7  A.  I don't recall specifically, but they
8  agreed to I think fund into DTC some amount of
9  cash to make good on the liabilities. I don't
10 remember what the number was.
11 Q.  Do you recall that the number was
12 about $250 million?
13 A.  Sounds reasonable.
14 Q.  Okay. So Barclays is to take out of
15 the deal an amount roughly in balance to the
16 amount in the repo, the assumed liability for
17 comp, the assumed liability for payables, and
18 the guarantee to the DTC; is that your
19 understanding?
20 MR. HUME: Object to the form of the
21 question.
22 A.  And the goodwill.
23 Q.  And the goodwill. And the goodwill is
24 about 250 million, correct?
25 A.  Right, so that -- well, they were

Page 170

HIGHLY CONFIDENTIAL - A. KIRK

1
2  buying the business of Lehman Brothers and they
3  were buying a whole bunch of assets which had,
4  in my opinion, quite uncertain value so that
5  they could lose many billions of dollars or make
6  many billions of dollars on those assets given
7  the volatility of the markets, and in addition
8  to that, they would obviously get the ongoing
9  operations of Lehman Brothers.
10     Q.   Was it your understanding that --
11     A.   So that it was --
12     Q.   Sorry.
13     A.   What I would say is that, in my
14  opinion, there was, at least from my seat, no
15  way to know what the actual value of those
16  assets would end up being for Barclays, you
17  know, over -- because I had no idea what
18  strategies they were going to pursue about those
19  assets, whether they were going to hedge them,
20  you know, all the variety of things that they
21  might end up choosing to do to execute a large,
22  huge block of -- the size of a transfer of this
23  size of assets is, you know, enormous and at the
24  time maybe even unprecedented.
25     Q.   Was it your understanding that the

Page 171

HIGHLY CONFIDENTIAL - A. KIRK

1
2  transaction was supposed to give Barclays a gain
3  on day one?
4     A.   No.
5     Q.   I hear what you're saying about longer
6  term they may operate the business and make
7  money out of it.  The question about day one, I
8  want to be sure we're --
9     A.   Yeah.
10     Q.   -- hearing each other here.  Was it
11  your understanding that there was any immediate
12  gain embedded for Barclays in the deal that was
13  made on Friday?
14          MR. HUME:  Objection.  Lacks
15  foundation.
16     A.   No, there was no understanding on my
17  part that there was a gain.
18          (Recess; Time Noted:  2:10 P.M.)
19          (Time Noted:  3:15 P.M.)
20          (Exhibit 324, a document bearing Bates
21  Nos. AK-LB-BANKR0000987 through 119, marked
22  for identification, as of this date.)
23  BY MR. GAFFEY:
24     Q.   Mr. Kirk, you have before you what we
25  have marked as Exhibit 324, a document bearing

Page 172

HIGHLY CONFIDENTIAL - A. KIRK

1
2  Bates number AK-LB-BANKR000097 through 119.  Do
3  you recognize the document?
4     A.   Yes.
5     Q.   What is the document?
6     A.   This is a document that describes the
7  deal that was cut early in the week between
8  Lehman and Barclays.
9     Q.   Is that your handwriting on the
10  document?
11     A.   No.
12     Q.   Do you know whose handwriting it is on
13  the document?
14     A.   No.
15     Q.   I would note that the document was
16  produced to us by you.  Do you know how you came
17  into possession of this document with somebody
18  else's handwriting on it?  Any memory?
19     A.   No, I don't know what this is.
20     Q.   Do you have any knowledge of what the
21  annotations mean on the asset side where
22  somebody has written "ACT" and "HC"?
23     A.   No.
24     Q.   Would you understand the phrase "HC"
25  to mean haircut?

Page 173

HIGHLY CONFIDENTIAL - A. KIRK

1
2     A.   That could be.
3     Q.   Would you understand the phrase "ACT"
4  to mean actual?
5     A.   That's not usually a vernacular, but
6  maybe.
7     Q.   I asked you --
8     A.   It could be "account."
9     Q.   Could be.  I don't know what your --
10     A.   Yeah.  Yeah.
11     Q.   I asked you earlier this morning if
12  you had any knowledge of a discount or a haircut
13  being given to Barclays on the book value of the
14  assets being traded for in the early part of the
15  week.  Does this refresh your recollection as to
16  whether there was an agreement on the deal as it
17  originally was made on Monday and Tuesday to
18  give Barclays a discount from book value?
19     A.   No.
20     Q.   Could you put before you Exhibit 19?
21  It's within the pile.
22     A.   What does it look like?
23     Q.   It's the other copy of that financial
24  statement, the one-pager.
25     A.   Yeah.

Page 182

HIGHLY CONFIDENTIAL - A. KIRK

1       HIGHLY CONFIDENTIAL - A. KIRK
2   be assuming all kinds of risks from failed
3   trades on Friday and in addition to the trades
4   going forward on Monday, and that they wanted
5   some -- they needed a margin safety to be able
6   to do that.  So they were concerned that they
7   were exposed.
8       Q.   And did you hear anything about the
9   extent of that exposure?
10      A.   No.
11      Q.   Do you know if the deposit or the
12  guarantee was meant to cover the entire
13  potential exposure?
14      A.   I don't know the answer to that.
15  Those discussions happened directly, that is, my
16  understanding those discussions happened
17  directly between DTC and Barclays.
18      Q.   Do you know if there was a written
19  agreement?
20      A.   I don't know that.
21      Q.   You never saw a written agreement
22  resolving this dispute with the DTC?
23      A.   No.  No.
24      Q.   Did you hear anything about what would
25  happen to the guarantee if it turned out not to

Page 183

HIGHLY CONFIDENTIAL - A. KIRK

1       HIGHLY CONFIDENTIAL - A. KIRK
2   be used?
3       A.   No.
4       Q.   Changing the subject.  You mentioned
5   back on September 14 that Mr. McDade told you
6   that the first transaction that was being
7   discussed with Barclays wasn't going to go
8   forward.  Do you remember that?
9       A.   Yes.
10      Q.   And I think you said he told you that
11  the FSA had turned down the application to close
12  that transaction?
13      A.   Yes.
14      Q.   Did he tell you why?
15      A.   Yes, that Barclays needed a waiver to
16  guarantee the trading obligations -- I'm sorry,
17  Barclays -- for Lehman to -- for them to close
18  the transaction, they would have to get a
19  shareholder vote, which would take some period
20  of time, I forget if it was 30 or 45 days, but
21  some reasonable period of time, and that it was
22  the view of all the participants, including
23  Treasury and the Fed and everybody, that Lehman
24  would not make it for 30 days without somebody
25  else guaranteeing the trading obligations for

Page 184

HIGHLY CONFIDENTIAL - A. KIRK

1       HIGHLY CONFIDENTIAL - A. KIRK
2   that period of time.
3            The only person who would do that was
4   Barclays.  Barclays apparently needed a waiver
5   of shareholder approval to make that guarantee,
6   which the FSA deemed they would not give.
7       Q.   Okay.  Let me now switch topics again
8   and take you back to the Friday meeting that you
9   testified that I think you said started around 3
10  o'clock on Friday afternoon?
11      A.   Uh-huh.
12      Q.   This is the meeting that you had with,
13  among others, Mr. Klein, Mr. Diamond and
14  Mr. Keegan from Barclays?
15      A.   Uh-huh.
16      Q.   You have to give me an out-loud
17  answer --
18      A.   Yes.
19      Q.   -- for the court reporter.  Thanks.
20           Was Mr. McDade physically present in
21  that meeting or is he on the phone?
22      A.   He's on the phone.
23      Q.   And were there any discussions about
24  that during that meeting about having to go back
25  and explain the deal to the Barclays board?

Page 185

HIGHLY CONFIDENTIAL - A. KIRK

1       HIGHLY CONFIDENTIAL - A. KIRK
2       A.   No, not in that meeting.
3       Q.   Did you hear that at another meeting?
4       A.   No, I didn't hear it in any meeting.
5       Q.   When you say no, you don't think it
6   happened or you don't remember?
7       A.   No, I didn't hear it.  Didn't
8   happen -- that was not discussed in front of me.
9            This was what day again?  This was the
10  19th?
11      Q.   On Friday, the 19th.
12      A.   Friday, yes, no.
13      Q.   You had a meeting --
14      A.   Yeah.
15      Q.   -- late in the afternoon where -- this
16  is late in the afternoon where I think you said
17  this is when Barclays came back and said they
18  thought the value of the securities didn't match
19  the value of the loan and so they were looking
20  for additional unencumbered assets?
21      A.   Uh-huh.
22      Q.   Is that right?
23      A.   Yes.
24      Q.   And Mr. Gaffey asked you a couple of
25  times about whether they gave a target or a

## Page 186

HIGHLY CONFIDENTIAL - A. KIRK

1
2    number for how much more they would need?
3    A.    Yes.
4    Q.    Right?
5         As best you can recall, they didn't
6    give you such a number, correct; is that right?
7    A.    That's correct.
8    Q.    And nobody -- Mr. Klein didn't say
9    anything about having to have a certain number
10   to go back to the Barclays board?
11   A.    No.
12   Q.    I'm going to mark as my only exhibit
13   as 326 an e-mail from you to Mr. McDade.
14        (Exhibit 326, an e-mail chain, marked
15        for identification, as of this date.)
16   A.    Right.
17   Q.    Do you recall sending this e-mail to
18   Mr. McDade?
19   A.    I do recall that.
20   Q.    So the bottom e-mail on the page is
21   from you to Mr. McDade.  It's sent on that
22   Friday at 3:39.
23   A.    Uh-huh.
24   Q.    Do you see that?
25   A.    Yes.

## Page 187

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.    You write to Mr. McDade, "Rich Ricci
3    just told me he won't blow up this trade by
4    being a pig."
5         Do you recall the context for that?
6    A.    Well, the Barclays team had left.
7    Bart was on the road and he was having
8    discussions with Ian about whatever additional
9    assets there were.  You know, I implored to
10   these guys that they shouldn't blow this deal
11   up, 10,000 jobs were at stake, you know, there
12   was a tremendous amount of pressure on all of
13   us, and Rich said to me something to this
14   effect: I won't blow the deal up by being too
15   piggish.
16        I wanted to make sure Bart knew that
17   because they were wrapping up with he and Ian
18   whatever issues there were, so that's why I sent
19   the e-mail.
20   Q.    Was there a concern on the Lehman said
21   that the Barclays people were being too piggish?
22   A.    I was concerned that we were going to
23   go into bankruptcy court, which there's always
24   uncertainty, and try to describe a deal that
25   didn't look like the deal that they had heard

## Page 188

HIGHLY CONFIDENTIAL - A. KIRK

1
2    about two days before.
3         So my primary concern at that point
4    was that there be as much flexibility, so to
5    speak, at least give the -- enough operating
6    room that we wouldn't go into court, have the
7    transaction denied, and have to put the padlocks
8    on the building Saturday morning.
9         So -- and I've been around many, many
10   bankruptcy cases over two decades.  Wildly
11   uncertain things happen in these courts in
12   circumstances.
13   Q.    Sorry.  Is that what you meant by
14   "blow up the trade"?
15   A.    Yes.
16   Q.    That the bankruptcy court wouldn't
17   approve the deal?
18   A.    That's correct.
19   Q.    And you were, just so I understand
20   your testimony, you were concerned that that
21   might happen if Barclays was too piggish?
22   A.    Yeah, I think there were a myriad of
23   risks that could have done, you know, I mean,
24   the -- the stress of that not happening that
25   evening and you only had one shot at it, you

## Page 189

HIGHLY CONFIDENTIAL - A. KIRK

1
2    know, it was -- certainly everybody was very
3    concerned that this was sort of a do-or-die
4    situation, literally.
5    Q.    Was the comment about being a pig
6    related to the effort to find unencumbered
7    assets?
8    A.    Yes.
9    Q.    And you didn't -- so you don't have,
10   since that's in Mr. Lowitt's bailiwick, you
11   don't have a specific number or value that
12   would --
13   A.    No, this comment had been made to me.
14   I just wanted to pass it along.
15   Q.    And then Mr. McDade asks you back,
16   "Are the shorts all gone?"  What was that a
17   reference to?  Did you have an understanding as
18   to what he meant?
19   A.    I don't recall specifically why he
20   asked that, but that was a problem we were
21   dealing with all week at Lehman, that we were
22   naturally getting longer every day because our
23   hedges were either derivatives that had been
24   wiped out by the terms of their contracts or
25   short positions that were being bought in on the

Page 190

1          HIGHLY CONFIDENTIAL - A. KIRK
2    other side.
3          So, you know, asset prices were
4    imploding and we were naturally getting longer
5    every day.  So his question was how long is the
6    firm, so to speak, at this moment in time.  I
7    believe -- I don't -- so that's what I -- I
8    guess I tracked that down.
9          Q.    And that's what your answer to
10   Mr. McDade says?
11         A.    Yeah.  Yeah.
12         MR. ROTHMAN:  That's all the questions
13   I have.  Thank you.
14         THE WITNESS:  You're welcome.
15   EXAMINATION BY
16   MR. TECCE:
17         Q.    Mr. Kirk, my name is James Tecce.  I'm
18   an attorney at Quinn Emanuel.  We are special
19   counsel to the Creditors Committee.  I just
20   wanted to ask you a couple of follow-up
21   questions.
22         Going back to Friday, September 19th,
23   I believe it is, I think that you had said that
24   it was your belief on that day that JPMorgan
25   Chase would be "hostile," I believe the word

Page 191

1          HIGHLY CONFIDENTIAL - A. KIRK
2    that you used, with respect to the transaction.
3          What was the basis for that belief?
4          A.    The fact that they had shut our DTC
5    account down was one issue.  The other issue was
6    that Barclays had described to me they were
7    having a dispute with JPMorgan about the
8    transfer of collateral.  In addition to that,
9    JPMorgan had been, my -- my understanding, it
10   had been described to me by Ian that JPMorgan
11   over time prior to the bankruptcy had been
12   squeezing a lot of additional collateral out of
13   Lehman Brothers along the way.
14         Q.    Do you have an understanding as to
15   when JPMorgan froze the DTC account?
16         A.    You know, it was either Thursday or
17   Friday.  I don't remember.  I think it was --
18   I'm pretty sure it was Friday, but it may have
19   been Thursday.
20         Q.    And when were you told about the
21   dispute between Chase and Barclays that you
22   described?
23         A.    Friday morning.
24         Q.    Going forward --
25         A.    And that's when I learned about the

Page 192

1          HIGHLY CONFIDENTIAL - A. KIRK
2    DTC account.  So I don't remember whether they
3    had closed -- I learned about it all on Friday.
4    I just don't remember if it was for that day or
5    it was for the previous day.
6          Q.    Do you know what the basis -- do you
7    have an understanding of the basis of
8    Mr. Lowitt's statements that Chase had been
9    taking collateral?
10         A.    Well, he was dealing with them
11   directly, so they were -- my understanding was
12   that they were threatening to not clear our
13   transactions without additional collateral prior
14   to the bankruptcy.
15         Q.    Did he provide any examples of that to
16   you?
17         A.    The one example that he provided was
18   that they requested Thursday night, the 11th --
19   is that right?  Yeah, the 11th, that Lehman
20   deliver another $5 billion to them prior to the
21   opening on Friday.
22         Q.    Going forward to the 21st, I believe
23   Sunday, the day of the closing, September 21,
24   you had just spoken briefly about the dispute
25   regarding the guarantee of trades with the DTC.

Page 193

1          HIGHLY CONFIDENTIAL - A. KIRK
2          Were you aware of any other disputes
3    besides that issue between Chase and Barclays at
4    that time?
5          A.    They were still arguing about the
6    transfer of collateral, your clients were there
7    for some of those arguments, in a, what I would
8    refer to as a giant conference room with 50
9    people in it and a lot of yelling.
10         Q.    Right.  And do you remember the
11   substance of those disputes regarding the
12   collateral?
13         A.    JPMorgan felt as if Barclays should
14   pay them and take additional collateral to
15   complete the repo transfer from the Fed, and in
16   addition to that, they actually asked for
17   Barclays to buy additional collateral even
18   beyond that that they had gotten from Lehman
19   Brothers earlier.
20         Q.    And do you have an understanding as to
21   what the resolution of that dispute was?
22         A.    No, they wouldn't tell us.
23         Q.    Do you have an understanding of anyone
24   at Lehman who does know the resolution of that
25   dispute?

Page 198

HIGHLY CONFIDENTIAL - A. KIRK

1
2 been part of the Fed repo or would they have
3 been part of the, quote/unquote, unencumbered?
4     A.   The issues that I'm discussing with
5 him here are settlements.  So these are going
6 forward -- they're not actually positions.
7 They're going-forward settlements between Lehman
8 and other counterparties that Lehman's standing
9 in the middle buying and selling all kind of
10 securities.  So that the positions were
11 reflected.
12         This would have reflected what risk
13 there would be in settlements not settling in a
14 normal way.  So that -- but to answer your
15 question, I don't -- I don't remember what the
16 percentage of treasuries were in this.  I wasn't
17 dealing with him on any -- on that issue.
18         MR. TECCE:  Those are the only
19     questions I have.  Thank you for your time.
20         MR. HUME:  I have just a few
21     questions.
22 EXAMINATION BY
23 BY MR. HUME:
24     Q.   Mr. Kirk, my name is Hamish Hume.  We
25 met before.  I represent Barclays.

Page 199

HIGHLY CONFIDENTIAL - A. KIRK

1
2     Mr. Kirk, during the week of September
3 15 to September 22, 2008 that you've been
4 questioned about, did you believe there was any
5 other viable purchaser of Lehman Brothers other
6 than Barclays?
7     A.   No.
8     Q.   Did you believe there was any other
9 alternative for Lehman Brothers other than the
10 Barclays acquisition?
11     A.   Liquidation.
12     Q.   Did you believe the Barclays
13 acquisition was the best outcome for the Lehman
14 estate for all stakeholders?
15     A.   Yes.
16     Q.   During the questioning earlier in the
17 deposition, you were asked -- you testified
18 about discussions with Mike Keegan about
19 valuation of assets, do you recall that,
20 generally?
21     A.   Yes.
22     Q.   And I think at one point you were
23 explaining that Mr. Keegan complained about
24 certain asset values and that you at some point
25 huddled with Ian Lowitt and Bart McDade to

Page 200

HIGHLY CONFIDENTIAL - A. KIRK

1
2 discuss whether there was any good basis for
3 disagreeing with Mr. Keegan's concerns.  Do you
4 recall describing that?
5     A.   Yes.
6     Q.   I believe you testified that the three
7 of you concluded there wasn't really a strong
8 basis for disagreeing with Mr. Keegan.  Do you
9 recall that?
10     A.   Yes.
11     Q.   During those discussions, were you
12 attempting to negotiate the best deal you could
13 for Lehman Brothers?
14     A.   Yes.
15     Q.   Do you believe you participated in
16 arm's length negotiations or that you witnessed
17 arm's length negotiations?
18     A.   I'll be clear about that.  I wasn't
19 actually negotiating and I wasn't -- I had no
20 authority to negotiate.  I believe we were
21 participating in arm's length negotiations,
22 Lehman was, with Barclays.
23     Q.   You testified earlier in the
24 deposition that you did not have an
25 understanding regarding whether there would be a

Page 201

HIGHLY CONFIDENTIAL - A. KIRK

1
2 gain at Barclays on day one; do you recall that
3 line of questioning?
4     A.   Yes.
5     Q.   Did you have any knowledge about how
6 Barclays would account for this transaction on
7 its balance sheet?
8     A.   No.
9     Q.   Did you give any thought or analysis
10 to how Barclays would account for the
11 transaction on its balance sheet during the
12 negotiations?
13     A.   No.
14     Q.   Did you have any knowledge of whether
15 Barclays would be required to record an
16 intangible asset in excess of a billion dollars
17 on its balance sheet?
18     A.   No.
19     Q.   Did I understand your testimony
20 earlier that you believed many of the assets
21 being transferred to Barclays were of uncertain
22 value?
23     A.   Yes.
24     Q.   And were many of those assets going to
25 take some time to value?

Page 202

HIGHLY CONFIDENTIAL - A. KIRK

2  A.  Yes.
3  Q.  Did you understand the liabilities for
4  cure payments and compensation to be estimated
5  liabilities?
6  A.  Yes.
7  Q.  Did you understand that Barclays was
8  stepping into the shoes of Lehman with respect
9  to its exchange-traded derivative accounts?
10  A.  I was not aware of any agreements
11  around the derivatives.
12  Q.  You weren't involved one way or the
13  other with derivatives?
14  A.  I wasn't involved one way or the
15  other.
16  Q.  Did you generally understand that both
17  the assets and the liabilities Barclays was
18  taking over were uncertain and difficult to
19  value as of the time of the transaction?
20  A.  Yes.
21  Q.  Therefore, as of the time of the
22  transaction, was it in your mind possible that
23  after Barclays had taken the time to value the
24  assets and the liabilities in accordance with
25  its own methodology and accounted for the

Page 203

HIGHLY CONFIDENTIAL - A. KIRK

2  transaction under its own accounting
3  methodologies, that it would be possible that it
4  record either a gain or a loss on the
5  transaction --
6  MR. GAFFEY:  Objection.
7  Q.  -- as of day one?
8  MR. GAFFEY:  Object to the form.
9  Q.  Do you understand the question?
10  MR. GAFFEY:  You can ignore me.
11  THE WITNESS:  Okay.
12  MR. GAFFEY:  He can't, but you can.
13  THE WITNESS:  Okay.  I never know with
14  these objections if I'm supposed to ignore
15  them or not.
16  I think it was completely a matter
17  of -- I had no idea what their accounting
18  issues were on any of those fronts, so I was
19  not aware of that, and whether they would
20  end up recording a gain or loss over time
21  would depend upon market conditions, hedging
22  strategies, you know, disposition
23  strategies, et cetera, that I had no insight
24  into how they were going to execute them.
25  Q.  I understand that.  I think you said

Page 204

HIGHLY CONFIDENTIAL - A. KIRK

2  that earlier.  I'm saying, wholly apart from
3  what would happen over time, after Barclays took
4  the time to actually value the assets and
5  liabilities as they were valued on day one,
6  given the uncertainties in both the assets and
7  values that Barclays took on and the limitations
8  on what you knew about derivatives and other
9  assets, was it in your mind at least possible
10  that Barclays would record either a gain or a
11  loss on day one, as of day one of the
12  transaction?
13  MR. GAFFEY:  Objection to form.
14  MR. ROTHMAN:  Objection to form.
15  A.  Yes, it was possible.
16  Q.  Mr. Kirk, you testified a little bit
17  about the transfer of collateral when Barclays
18  replaced the Federal Reserve's lending position
19  on the repo transaction, do you recall that,
20  generally?
21  A.  Yes.
22  Q.  Were you aware of that when Barclays
23  advanced its $45 billion in cash to replace the
24  Federal Reserve, Barclays did not receive the
25  same collateral that had been pledged by Lehman

Page 205

HIGHLY CONFIDENTIAL - A. KIRK

2  to the Federal Reserve in its repo?
3  A.  I was not aware of that.
4  Q.  Were you aware of the operational
5  difficulties that arose when the Fed collateral
6  was released into the Lehman clearing account so
7  that some of that collateral disappeared or was
8  tucked into other transactions and, therefore,
9  could not be transferred to Barclays?
10  A.  I was not aware of any specifics of
11  those issues.  I was aware there was a -- some
12  dispute.
13  Q.  I'd like to refer you very quickly to
14  Exhibit 321.
15  A.  Okay.
16  Q.  The third-to-last page with the Bates
17  number, number in the bottom corner, number 25.
18  A.  Okay.
19  Q.  Which I believe you testified
20  reflected write-downs that were being discussed
21  or considered by Bank of America in the
22  potential Bank of America transaction; is that
23  correct?
24  A.  That is correct.
25  Q.  Was this done during that weekend

Page 206

HIGHLY CONFIDENTIAL - A. KIRK

1
2  before the bankruptcy when you were at the Fed?
3      A.   This was done I believe the Friday,
4  December -- September 12th.
5      Q.   And I don't know if you testified or
6  not, but whose handwriting is this on this page?
7      A.   I don't know whose handwriting this
8  is. It's not mine.
9      Q.   Was the general idea that Bank of
10 America wanted haircuts or discounts from the
11 marked to market book values that Lehman had for
12 these assets?
13     A.   Yes.
14     Q.   And was that information shared with
15 the Federal Reserve during discussions?
16     A.   Yes.
17     Q.   And did the Federal Reserve express
18 any surprise or disagreement with that concept?
19     A.   I wasn't there when they shared it,
20 this information.
21     Q.   How do you know it was shared with the
22 Federal Reserve?
23     A.   Because we got this delivered to us at
24 the Federal Reserve. We shared it with -- I
25 think Bart gave a copy to Shafron and we shared

Page 207

HIGHLY CONFIDENTIAL - A. KIRK

1
2  it with John Mack, Vickram Pandit and John
3  Thayne and their teams.
4      Q.   You testified earlier about the
5  unencumbered collateral in the clearance boxes
6  that Ian Lowitt identified as assets to be
7  transferred, do you recall that?
8      A.   Yes.
9      Q.   And you testified that there was an
10 agreement that those assets would be transferred
11 made on the Friday, September 19?
12     A.   Yes.
13     Q.   Is that right?
14     A.   Correct.
15     Q.   You also testified that you were aware
16 of an issue over the weekend relating to the
17 DTC's desire for some support for settlement
18 obligations on the Monday, correct?
19     A.   Correct.
20     Q.   And your general understanding was
21 Barclays agreed to deposit $250 million to
22 address those settlement obligations?
23     A.   Yes.
24     Q.   Did anyone at any time ever tell you
25 or lead you to believe -- let me withdraw that

Page 208

HIGHLY CONFIDENTIAL - A. KIRK

1
2  and say it differently.
3          Did you at any time form an
4  understanding, at any time that weekend or that
5  Monday, the 22nd, did you ever form an
6  understanding that the unencumbered collateral
7  in the clearance boxes that Ian Lowitt had
8  identified to be transferred in the transaction
9  were not going to be transferred in the
10 transaction because of the way in which Barclays
11 was dealing with the DTC settlement issue?
12         MR. ROTHMAN:  Objection to the form.
13         MR. GAFFEY:  Join.
14         MR. TECCE:  Join.
15     A.   No.
16     Q.   That was never your understanding?
17     A.   No.
18         MR. HUME:  No further questions.
19 EXAMINATION BY
20 MR. GAFFEY:
21     Q.   Just one or two.  Your view that there
22 was no other viable purchaser, would that view
23 have changed if there were a $5 billion
24 immediate gain embedded in the transaction?
25 Would you have had the view there might be

Page 209

HIGHLY CONFIDENTIAL - A. KIRK

1
2  viable purchasers then?
3          MR. HUME:  Object to the form.  Calls
4  for speculation.
5      A.   I think the -- there were -- we were
6  open to a transaction with anybody, so if
7  somebody was willing to take that kind of risk,
8  I assume they would have showed up.
9      Q.   Do you think they would have shown up
10 if they were not told there was a $5 billion
11 haircut embedded in the transaction?
12         MR. KELLEY:  Objection.  Calls for
13 speculation.
14     A.   There was no certainty what that
15 number was.
16     Q.   If, in addition to whatever else was
17 said about the deal publicly, it was also said
18 that there was a $5 billion haircut embedded in
19 the transaction, do you think there would have
20 been other viable purchasers, do you know?
21         MR. KELLEY:  Objection. Calls for
22 speculation.
23     A.   I don't know.
24     Q.   Are you able to say one way or the
25 other?

Page 210

**HIGHLY CONFIDENTIAL - A. KIRK**

1    A.  Not really.

2    **Q.  Okay.  Do you know the basis of the**
3    **estimated liabilities?  You told Mr. Hume that**
4    **you knew that the liabilities for comp and cure**
5    **were estimated in some way.  Do you know the**
6    **basis for the estimation?**

7    A.  I assume that the basis was -- I don't
8    know the estimation.  I knew it came from our
9    Finance Department.

10   **Q.  And your understanding at the time on**
11   **the Friday when you were looking at this was**
12   **that those were estimates based upon Lehman's**
13   **books, correct?**

14   A.  Upon the work that Lehman had done.
15   Certain, you know, liabilities only
16   come up in the nature a transaction like this,
17   right?  So you cancel contracts you have
18   liabilities.  So they would be contingent and
19   necessarily not necessarily on your books prior
20   to doing an acquisition like that.
21   So the -- it's -- it's not -- it's not
22   completely -- it wouldn't be completely just
23   what was actually recorded on the books.  There
24   would also be other liabilities that could be

Page 211

HIGHLY CONFIDENTIAL - A. KIRK

1    triggered by the transaction itself.

2    **Q.  And back to this issue of a viable**
3    **purchaser, if it had been announced in addition**
4    **to the other components of the deal that --**
5    **withdrawn.**

6    **You understood the assumed liabilities**
7    **component of the deal to be a cost that Barclays**
8    **would have in the transaction, correct?**

9    A.  Correct.

10   **Q.  If it had been publicly announced that**
11   **the $2 billion cost for compensation had been**
12   **deliberately inflated by a billion dollars, that**
13   **in your view would lower the actual cost for**
14   **Barclays, correct?**

15   MR. KELLEY:  Same objection.

16   A.  If --

17   Q.  If it --

18   A.  If the answer is if it was inflated,
19   it would lower the cost, the answer is yes,
20   that's factual, I think.

21   **Q.  If it had been announced in addition**
22   **to other components of the deal that the assumed**
23   **liability for compensation was deliberately**
24   **inflated by a billion dollars, do you have a**

Page 212

**HIGHLY CONFIDENTIAL - A. KIRK**

1    **view as to whether that might have attracted**
2    **other viable purchasers?**

3    **A.  The market was so uncertain and there**
4    **was so much financial stress in the list of**
5    **potential purchasers that I'm not sure there was**
6    **anybody who could have executed it no matter**
7    **what they thought the gain was because the**
8    **market would have viewed it as too risky, so to**
9    **speak, and too strategically risky in many ways**
10   **and too risky from a financial standpoint to**
11   **approve them for any board to approve it.**

12   **Q.  In your view --**

13   **A.  No matter what the gain was.**

14   **Q.  Sure.  And in your view, was there at**
15   **any point where additional value in the deal**
16   **might have attracted other viable purchasers?**

17   **MR. HUME:  Objection.  Asked and**
18   **answered.**

19   **A.  None with the time to actually execute**
20   **it.**

21   Q.  And what was your role in determining
22   whether or not there were other actual viable
23   purchasers?

24   A.  I didn't have a role in that.

Page 213

HIGHLY CONFIDENTIAL - A. KIRK

1    **Q.  Did you have any role at all in that?**

2    A.  No, that was the role of the FIG, the
3    FIG bankers, Financial Institutions Group.

4    MR. GAFFEY:  Thanks.  Nothing further.

5    THE WITNESS:  Okay.

6    MR. ROTHMAN:  One question.

7    EXAMINATION BY
8    MR. ROTHMAN:

9    **Q.  Fair to say that you don't know how**
10   **the dispute -- the terms of the resolution of**
11   **the dispute with the DTC on that Sunday night?**

12   MR. HUME:  Objection.  Vague and
13   ambiguous.

14   MR. KELLEY:  Asked and answered, too.

15   A.  I don't know.  Did you say is it fair
16   to say I don't know the terms?

17   **Q.  You don't know, yes.**

18   A.  I only know it was described that
19   there was 250 million put into the DTC account.
20   I don't know the full terms.  As I said, there
21   may have been other terms that I was not aware
22   of.

23   **Q.  You don't know, beyond that 250**
24   **million that we discussed, you don't know one**

## Page 214

HIGHLY CONFIDENTIAL - A. KIRK

1
2  way or the other what was supposed to happen to
3  the unencumbered assets that had been in that
4  DTC box, correct?
5      A.   No, I don't know that.
6          MR. ROTHMAN:  Thank you.
7          MR. HUME:  Let me have follow up on
8      that.
9  EXAMINATION BY
10 MR. HUME:
11     Q.   When you say you don't know the
12 unencumbered assets in the DTC box, to the
13 extent that they were identified by Mr. Lowitt
14 as transferable assets, was it your
15 understanding they were going to be transferred
16 as part of the deal?
17         (Continued on the next page to include
18     the jurat.)
19
20
21
22
23
24
25

## Page 215

HIGHLY CONFIDENTIAL - A. KIRK

1
2          MR. ROTHMAN:  Objection to the form.
3      A.   Yes.
4          MR. HUME:  No further questions.
5          THE WITNESS:  I may have misunderstood
6  the earlier question.
7          MR. GAFFEY:  I'm going to have mercy.
8  I have no follow-up questions.
9          (Time Noted:  3:06 P.M.)
10                 oOo
11
12
13
14
15
16
17
18     _____
       ALEX KIRK
19
20  Subscribed and sworn to
    before me this     day
21  of          2009.
22
23     _____
24
25

## Page 216

HIGHLY CONFIDENTIAL - A. KIRK

1
2               CERTIFICATE
3  STATE OF NEW YORK )
                      : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That ALEX KIRK, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 31st day of August, 2009.
25 ------------------------------------
   KATHY S. KLEPFER, RPR, RMR, CRR, CLR

## Page 217

HIGHLY CONFIDENTIAL - A. KIRK

1
2                INDEX
3  WITNESS:       EXAMINATION BY       PAGE
4  A. KIRK     Mr. Gaffey       5, 208
5             Mr. Rothman      176, 213
6             Mr. Tecce        190
7             Mr. Hume         213, 214
8  EXHIBITS:                    PAGE
9  Exhibit 316, an e-mail chain with .......... 121
10 attached balance sheet
11 Exhibit 317, a document bearing Bates ...... 132
12 Nos. 10310050
13 Exhibit 318, a document bearing Bates ...... 137
14 Nos. 10325943 with attachment
15 Exhibit 319, an e-mail chain ............... 140
16 Exhibit 320, a document bearing Bates ...... 145
17 Nos. 10293820
18 Exhibit 321, a document bearing Bates ...... 153
19 Nos. AK-LB-BANKR00002 through 27
20 Exhibit 323, a document bearing Bates ...... 160
21 Nos. AK-LB-BANKR000030
22 Exhibit 324, a document bearing Bates ...... 171
23 Nos. AK-LB-BANKR0000987 through 119
24 Exhibit 325, a document bearing Bates ...... 174
25 Nos. AK-LB-BANKR000188

1      HIGHLY CONFIDENTIAL - M. KLEIN

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4   ---------------------x

5   In Re:

6                        Chapter 11

7   LEHMAN BROTHERS        Case No. 08-13555(JMP)

8   HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

    ---------------------x

11

12      * * *HIGHLY CONFIDENTIAL* * *

13      DEPOSITION OF MICHAEL KLEIN

14         New York, New York

15         September 12, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24546

Page 6

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2   wait until I complete a question before you
 3   answer it, we'll get a cleaner transcript.
 4       A.   Okay.
 5       Q.   Okay?
 6       A.   Thank you.
 7          MR. GAFFEY:  As to confidentiality, we
 8   have a Confidentiality Stipulation and Order
 9   which has been so ordered by Judge Peck.
10   Our agreement has been that all depositions,
11   including depositions of non-parties, as it
12   were, which includes Mr. Klein, are covered
13   by that, and you will have the same rights
14   that the party has under the confidentiality
15   agreement.  If you don't have a copy of it
16   we'll get it.
17          MR. BERNICK:  That's agreeable and we
18   appreciate that.
19          MR. GAFFEY:  I should add, too, we
20   have had a convention over and above that
21   confidentiality stip which has worked well
22   for us up till now, which is that the entire
23   deposition transcript is deemed to be --
24       Is it highly confidential?
25          MR. STERN:  Highly confidential.
```

Page 7

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2          MR. GAFFEY:  -- for some period of
 3   time, seven or ten days or so, and we'll
 4   sort that out, to give you time to sort of
 5   undesignate.
 6          MR. BERNICK:  Great.  Terrific.
 7   BY MR. GAFFEY:
 8       Q.   Mr. Klein, by whom are you employed,
 9   sir?
10       A.   I'm not employed.
11       Q.   Okay.  Was there a time when you
12   worked at Citibank?
13       A.   Yes.  To be correct, I have an ongoing
14   consulting relationship with one company, so --
15   but I'm not employed.
16       Q.   Okay.  And with what company do you
17   have an ongoing consulting relationship?
18       A.   With the Dow Chemical Company.
19       Q.   And was there a time when you were
20   employed at Citibank?
21       A.   Yes.
22       Q.   Could you just give me the time
23   periods?  How long were you there?
24       A.   I was at Citi or the predecessors that
25   amalgamated into Citi from 1985 until 2008.
```

Page 8

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2       Q.   And what was the last position that
 3   you held at Citi?
 4       A.   My final position was a position that
 5   had the title of Chairman of Institutional
 6   Clients Group, and in that regard, I had a
 7   series of responsibilities and relationships
 8   with clients, amongst them governments,
 9   corporations, et cetera.
10       Q.   And when did you leave Citi?  What
11   month of '08?
12       A.   I think my last official date was July
13   21st.  The third week in July.
14       Q.   Did there come a time during 2008
15   where you were asked to become involved in any
16   way in negotiations between Lehman and Barclays?
17       A.   Yes.
18       Q.   When did that occur?
19       A.   Approximately the Thursday before the
20   weekend of the Lehman bankruptcy filing.
21       Q.   We have in front of you a blank
22   calendar which you might want to refer to
23   through the day, because in this case we have
24   sort of shorthanded it to the Tuesday or the
25   Wednesday, and that will help you pick
```

Page 9

```
 1          HIGHLY CONFIDENTIAL - M. KLEIN
 2   particular dates.
 3       Taking a look at that calendar, if you
 4   don't mind, you were referring to the Thursday?
 5       A.   Before the Lehman bankruptcy.
 6       Q.   Okay.  So that would be Thursday, the
 7   11th?
 8       A.   I believe that's so.
 9       Q.   Would you describe for me, please, how
10   you came to be involved, who asked you to be
11   involved, and what you were asked to do?
12       A.   I was called by a gentleman named
13   Hans-Jörg Rudloff at Barclays who asked me just
14   in general where I was, what I was doing.  It
15   was a non-specific conversation.  It was
16   followed by a call from Bob Diamond.  Bob
17   asked me if I could be available, given all that
18   was going on with Lehman Brothers, to be of
19   assistance to Barclays.  And that was his
20   request.
21       Q.   Now, at the time I understand you had
22   some sort of restrictive covenant or a
23   non-compete or a garden leave with regard to
24   your departure from Citi; is that correct?
25       A.   That's right.
```

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  between the discussions that Barclays had to
3  have with all of their own regulators to get
4  sign-off to do anything, walking into this
5  situation, should it be something that should be
6  done.
7        And then, third, and I'm sure there
8  were other things as well, but how do you
9  protect yourself from all of the risks that
10 could emerge. It's one thing to try to make a
11 transaction and fail. It's another thing to
12 make a transaction and fail. And obviously
13 Barclays had a very big global franchise that
14 they would be putting at risk. So that was the,
15 if you will, morning.
16       We then went over to Lehman's
17 building, the Seventh Avenue building, sometime
18 in that afternoon and began to understand what
19 potentially could be achievable. I think the --
20 because there was no understanding of what a,
21 quote, transaction was, it was fairly clear
22 that, when we walked over, we were hoping to be
23 able to effectively see if there was a way to do
24 business with the Lehman people and do business
25 as Lehman.

HIGHLY CONFIDENTIAL - M. KLEIN
1
2        That was the hope behind it, beyond
3  which there was very limited knowledge. There
4  was a substantial amount of noise in the
5  marketplace because the markets had dropped
6  dramatically and there was a view that assets --
7  that Lehman was just hemorrhaging assets so that
8  no one knew what would be left, if you will,
9  when we got over there, and then we went over to
10 the meetings at Lehman.
11    Q.    And before you went over to the
12 meetings at Lehman, what, if any, parameters did
13 Barclays come up with to answer the question of
14 how it would protect itself?
15       MR. BERNICK:  Again, I know that Mr.
16    Gaffey will concur with this. He's really
17    asking these questions of you for what you
18    know. So you're not here representing
19    Barclays. You're here just being Michael
20    Klein. Subject to that, what he's
21    you about is what you know of about that
22    question.
23    Q.    Just I'll restate the question just so
24 we can be efficient today.
25       MR. BERNICK:  Okay.

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    Q.    At no point today do I want you to
3  give me anything other than your personal
4  knowledge, and I agree with Mr. Bernick: You're
5  not here as a representative of Barclays. I'm
6  not asking for the history, the global history
7  of the transaction. I'm asking for what you
8  know, what you saw, what you remember.
9        MR. BERNICK:  And the only reason I
10    kicked off into that is because you asked
11    him how did Barclays come up or what
12    parameters did Barclays come up with, and it
13    sounded like it was a bit broader.
14    Q.    Let's assume, sir, so I don't have to
15 say it ever time, that all my questions begin
16 with "to your knowledge."
17       So, to your knowledge, what parameters
18 did Barclays come up to address the question of
19 how it would protect itself?
20    A.    Again, it's not very easy for me to
21 reconstruct what at any moment in time even to
22 my own knowledge existed. I do know that the
23 concept of walking into the bankruptcy was one
24 that there was a lot of trepidation and there
25 was a sense that this was a -- if there was an

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  opportunity to have some of the right to do
3  business in the areas that the -- that Lehman,
4  old traditional Lehman, could offer, that would
5  be great, but there was no appetite to take risk
6  on things that could, if you will, come out of
7  the woodwork or things that could bite. There
8  just wasn't an ability to do that. That window,
9  if you will, of being the whole owner of a, if
10 you will, a business and a big balance sheet,
11 the whole element, that was the weekend and had
12 passed.
13    Q.    Did Mr. Diamond express to you a view
14 at that time that Barclays would not be willing
15 to pay a premium or market price -- I beg your
16 pardon. Did he express -- let me restate that
17 question.
18       Did Mr. Diamond express to you a view
19    that Barclays would not be willing to pay a
20    premium or book value as opposed to a distressed
21    price for Lehman's assets?
22    A.    I don't recall, but I don't think
23    there was an asset -- it wasn't an asset
24    discussion. We were going over to discuss how
25    to do a business transaction along with the

Page 46

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  ability to do business at Lehman.  I don't know
3  of any parameters other than that there was no
4  sense as to whether there was going to be any
5  assets.  I mean, it wasn't a -- that wasn't the
6  driver of certainly the -- either the roles or
7  the conversations that I was party to.
8      Q.   So you go over to Lehman.  Tell me
9  what happens there.  Who meets with who?
10     A.   Lehman was -- there were quite a lot
11 of people at Lehman at the time, and again, in a
12 similar vernacular, I didn't know many of them,
13 if any of them.
14         There were a series of meetings, and I
15 can't tell you who was in which meeting.  The
16 Cleary lawyers were there and the Weil lawyers
17 were there.  The Lehman professionals were
18 there.  The Barclays team were there.  And for
19 the better part of -- the early part was a
20 question as to does this make any sense because
21 the clock is running out.  The message had been
22 if you can't get something done and have the
23 market believe something was going to be done,
24 your people, your counterparties, your
25 everything would be gone.  So that was sort of

Page 47

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  one piece, as I recall.
3          The second piece is, with that in
4  mind, what in fact can you do that is rapid
5  enough to sustain anything of any value, because
6  the view was that if you couldn't do something
7  quickly, there was not only no value in Lehman
8  as an entity on an ongoing basis, but there was
9  going to be negative value because there's
10 always going to be liabilities, but there was
11 not going to be anything left for the business
12 itself.
13         So the early part was just discussing
14 was in fact there something that could be
15 achieved.  At some point in that day, and I --
16 I'm not by any stretch a bankruptcy expert --
17 let me be clearer, I'm not a bankruptcy expert
18 all in terms of my knowledge.
19         So there were definitions and
20 description amongst the lawyers of what
21 potential paths could be taken, and there was
22 then a discussion of, if we were going to be
23 doing business as Lehman and step into the
24 operational business, if you will, of that North
25 American, how could you do that, how could you

Page 48

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  structure that, and then there was the purchase
3  discussion, the purchase price negotiation on
4  the purchase price.  So that was the sort of
5  path, if you will, of what took place.
6      Q.   Was there a point on the Monday where,
7  to your knowledge, was there a point on Monday
8  where Barclays was given an opportunity to
9  review books and records and otherwise do due
10 diligence?
11     A.   In the rooms I was in --
12     Q.   Uh-huh.
13     A.   -- there was not.  That wasn't
14 ongoing, and I -- there were multiple rooms, of
15 course, that were taking place, but in the rooms
16 that I and in my own role, my responsibility was
17 to attempt to determine was there some kind of a
18 transaction that could take place.
19     Q.   So due diligence is not, or the fruits
20 of it, is not within your portfolio?
21     A.   I wasn't within my portfolio.
22     Q.   You referred to purchase price
23 negotiations.  Were you involved in those?
24     A.   I was involved in the discussions on
25 the elements of the building and the elements of

Page 49

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  the cash paid for the rights to operate the
3  business.
4      Q.   Can you explain to me what you mean
5  when you say "cash paid for the rights to
6  operate the business"?
7      A.   As best as I can.
8      Q.   Sure.
9      A.   The view was that the business didn't
10 have any value as an ongoing business; that if
11 you were going to step in and take on 10,000
12 employees and whatever liabilities to operate
13 that business, when you had no idea of what
14 revenues would be because there's no -- (A) you
15 just have no knowledge, (B) you have no
16 knowledge of what clients or customers think or
17 feel of you at that point in time, you don't
18 know who's going to stay and who's not going to
19 stay, whether that's clients, customers
20 counterparties, you don't know what had taken
21 place in the week prior to that, it was a
22 very -- there was a lot of reasons to believe
23 that this was not an ongoing business.
24         So the view at the outset was there's
25 no value for the ongoing business, so the

Page 50

HIGHLY CONFIDENTIAL - M. KLEIN

discussion as to what then cash was paid for, quote, the rights to do this business, which really was the transaction, is how do you end up stepping into those, if you will, operations of the brokerage business, as it turned out, the North American brokerage business. That's what I'm referring to, which became the $250 million number.

10  Q.   That sort of anticipates my next
11 question.  If the deal was ultimately done,
12 that's the price paid for such things as the
13 right to use the name and license --
14  A.   Well --
15      MR. BERNICK:  Hang on.  Let's let him
16 finish the question.
17  A.   I'm sorry.
18  Q.   -- licenses, that sort of thing, not
19 the price paid for particular assets that were
20 purchased?
21  A.   No, that's right.
22  Q.   Were purchase price negotiations for
23 particular assets that were purchased within
24 your portfolio?
25  A.   No.

Page 51

HIGHLY CONFIDENTIAL - M. KLEIN

2  Q.   Were they ever within your portfolio
3 in the time period from Monday, September 15th,
4 through closing on September 22nd?
5  A.   At the end of that week -- let me
6 answer it very specifically because you said, I
7 think, "pricing of specific assets," and at no
8 point was pricing of specific assets in my
9 domain.
10      The concept of how the transaction
11 changed in the later part of the week and, in
12 addition to those changes, the then resulting
13 shifts of assets and the, what I'll call the
14 weekend of the JPMorgan-related issues I was
15 brought into.
16  Q.   I'm going to come back to each of
17 those pieces through the day today, but just so
18 I can clarify this piece for the record, when
19 you talk about the weekend of the
20 JPMorgan-related issues were on the weekend of
21 the 20th and the 21st after the approval
22 hearing, correct?
23  A.   That's right.
24      MR. GAFFEY:  Can we take a ten-minute
25 break?

Page 52

HIGHLY CONFIDENTIAL - M. KLEIN

2      MR. BERNICK:  Sure.
3      (Recess; Time Noted:  11:37 A.M.)
4      (Time Noted:  11:49 A.M.)
5 BY MR. GAFFEY:
6  Q.   Before the break, Mr. Klein, we were
7 talking briefly about negotiations concerning
8 purchase price of assets.  To your knowledge,
9 was there a team at Barclays who on the Monday
10 was negotiating with Lehman about the purchase
11 price for particular assets?
12      MR. BERNICK:  Your question assumed
13 that there was a separate purchase price.
14      MR. GAFFEY:  Yes, it does.  Apart from
15 what turned out to be the $250 million,
16 apart from the price for the right to do
17 business.
18      MR. BERNICK:  Well, that also is an
19 assumption that the 250 was just for the
20 right to do business.
21      MR. GAFFEY:  Okay.
22      MR. BERNICK:  I don't know what's
23 happened in all the other depositions, but
24 that's not a predicate that exists because
25 of what Mr. Klein has testified to this

Page 53

HIGHLY CONFIDENTIAL - M. KLEIN

2 morning.
3  Q.   You can answer the question, sir.
4  A.   I can only give you the specifics as
5 to what I'm aware to, which we've discussed, but
6 the discussion was the purchase of the rights to
7 operate the business as the business existed,
8 and there were the two principal components,
9 which were the 250 million and then the
10 buildings which Lehman specifically asked
11 Barclays to buy for which the valuation was then
12 set by Lehman on an as-occupied basis.
13      The business was defined as the rights
14 to do business and any assets and associated, if
15 you will, directly associated, liabilities tied
16 to that business that were necessary to operate
17 the business.  I'm not aware of separate
18 specific negotiations.
19  Q.   Does there come a point on Monday or
20 into the morning of Tuesday when an agreement is
21 reached between Lehman and Barclays?
22  A.   I don't know the specific timing.  An
23 agreement was reached, yes.
24  Q.   Describe for me your understanding of
25 the components of the agreement that was

Page 62

HIGHLY CONFIDENTIAL - M. KLEIN

1  described already.
2  
3      Q.   Let me show you what's previously been
4  marked, Mr. Klein, as Deposition Exhibit 19.
5          Have you ever seen that document
6  before?
7      A.   Yes, I have.
8      Q.   When did you first see that document?
9      A.   I'm not certain when I first saw it.
10 I've seen it recently, but I'm not sure when I
11 first saw it.
12     Q.   Apart from reviewing it maybe to
13 prepare for your deposition, I'm more interested
14 in at the time that we're talking about.
15         Did you see it during the week of the
16 15th, which is when Lehman filed, and the
17 closing of the deal on the 22nd?
18     A.   I know I've seen it prior to the
19 meeting I had in preparation, but I don't know
20 specifically when I saw it.
21     Q.   Do you recall if you had any
22 discussions with people from Barclays about this
23 document, Exhibit 19?
24         MR. BERNICK:  At any time?
25         MR. GAFFEY:  During the week.

Page 63

HIGHLY CONFIDENTIAL - M. KLEIN

1  
2         MR. BERNICK:  During that week.
3      Q.   Between the 15th and the 22nd.
4      A.   I don't recall specific discussions
5  about the document itself.  I don't recall
6  specific discussions.
7      Q.   Did you ever attend any meetings that
8  were attended by people from Lehman and Barclays
9  at which this document was the subject of
10 discussion?
11     A.   Not that I can specifically recall;
12 the document itself, not that I can specifically
13 recall.
14     Q.   Do you have any knowledge of what
15 role, if any, this document played in the
16 reaching of an agreement on the 16th of
17 September, the Tuesday?
18     A.   I don't, with the exception of saying
19 that there's -- there was very little data that
20 was (A) forthcoming to Barclays.  The situation,
21 as you know, was exceedingly fluid.  (B) the
22 data that was coming was, if it was dated by
23 more than a few seconds, it was, given the
24 market activity, it was changing, and given the,
25 if you will, the melting iceberg that was

Page 64

HIGHLY CONFIDENTIAL - M. KLEIN

1  
2  ongoing at Lehman, it was outdated.
3         So there was a general sense that
4  there wasn't really any data except the
5  construct of what we were trying to achieve,
6  which is buy the business as it was operating.
7  But I don't know specifically -- I don't know
8  who created this nor what they specifically used
9  it for or, put differently, I don't recall who
10 specifically created it or what it was
11 specifically used for.
12     Q.   You can put that document aside.
13 Thanks.
14         To your knowledge, sir, do you know if
15 part of the agreement that was reached between
16 Lehman and Barclays included a negotiated
17 discount of $5 billion?
18         MR. BERNICK:  Off what?
19         MR. GAFFEY:  Off the value of the
20 assets transferred.
21         MR. BERNICK:  You can answer.
22     Q.   Actually, withdraw that.  Do you know,
23 sir, if the agreement reached between Lehman and
24 Barclays included a negotiated discount of $5
25 billion against the marks that Lehman had for

Page 65

HIGHLY CONFIDENTIAL - M. KLEIN

1  
2  particular securities?
3      A.   I'm sorry, can you ask that for me one
4  more time.
5         (Record read.)
6      A.   Just so I'm clear, because you've used
7  a couple of words here, there were, by the way,
8  a lot of agreements reached at various different
9  points in time, so are you referring to
10 something in specific?
11     Q.   I'm still on the agreement that was
12 first reached on Tuesday, the 16th, the day it
13 was announced.
14     A.   I was, to my knowledge, never apprized
15 of any $5 billion discount at all.
16     Q.   At any point during that week, from
17 the 15th of September, the Monday when Lehman
18 filed, through the 22nd, when the transaction
19 closed, were you ever apprized of the discount?
20         MR. BERNICK:  Again, the $5 billion
21 discount?
22         MR. GAFFEY:  Any discount.
23         MR. BERNICK:  I think that's pretty
24 unclear.  Are you talking about financial
25 assets?

1    HIGHLY CONFIDENTIAL - M. KLEIN
2         MR. GAFFEY:  I think objection to form
3    will suffice.
4    Q.   Can I have an answer to the question?
5         MR. BERNICK:  I'm trying to be --
6         MR. GAFFEY:  I appreciate it.
7         MR. BERNICK:  -- have you be fair with
8    the witness.  I don't really have an
9    objection.  It doesn't make a difference to
10   me or my client.  What I'm trying to do is
11   to help make sure that things are clear to
12   Mr. Klein.
13        MR. GAFFEY:  Okay.
14   Q.   Can you answer the question, sir?  Do
15   you need it read back?
16   A.   Yes, please.
17        (Record read.)
18   A.   I don't really recognize the term
19   "discount" in the way you're describing it.
20   Q.   During the course of the week, from
21   the 15th of September to the 22nd of September,
22   did you have any conversations with John Varley
23   of Barclays about the pricing of the
24   transaction?
25   A.   I don't, I don't recall.  I don't

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    recall that -- I don't recall that I was
3    involved in conversations with John Varley.
4    Q.   In the course of your conversations
5    with anyone from Barclays during the week from
6    the 15th of September through the 22nd of
7    December, did anyone from Barclays ever tell you
8    in sum or substance that Barclays was going to
9    pay a discount in price for the securities it
10   was purchasing from Lehman as part of the
11   transaction?
12        MR. STERN:  Objection to the form.
13        MR. BERNICK:  I think you did
14   misspeak.  You said December.
15        MR. GAFFEY:  Did I?
16        You're absolutely right.
17   Q.   In the course of your conversations
18   with anyone from Barclays during the week from
19   the 15th of September through the 22nd of
20   September, did anyone from Barclays ever tell
21   you in sum or substance that Barclays was going
22   to pay a discount in price for the securities it
23   was purchasing from Lehman as part of the
24   transaction?
25        MR. STERN:  Objection to the form.

1    HIGHLY CONFIDENTIAL - M. KLEIN
2         MR. BERNICK:  Answer if you can.
3    A.   Your specific comment on the discount,
4    no one -- I don't understand the concept of what
5    you're saying by "discount."
6    Q.   Part of what Barclays purchased from
7    Lehman was a body of securities; is that
8    correct?
9    A.   Barclays -- at which point in time are
10   we discussing?
11   Q.   Let's go to the closing and work
12   backwards.  Part of what Barclays ultimately
13   purchased from Lehman was a body of securities;
14   is that correct?
15   A.   The final transaction, as I understand
16   it, was the purchase of a business, and then
17   what had been the erasing, if you will, or the
18   exchanging of a loan against collateral that
19   that loan existed, and that exchange of the loan
20   against the collateral is, in a sense, a
21   purchase of long securities.
22        So, yes, at that end transaction there
23   was a purchase of a business and then the
24   exchange of a loan against assets.
25   Q.   Now, let's wind back to when a deal is

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    first reached.  We're on Tuesday, September
3    16th.  Was there a component of that deal that
4    provided for the purchase of long securities?
5    A.   As I understand the transaction, other
6    than the building, which is effectively the long
7    purchase, the remaining assets as described to
8    me was the net business attached to the
9    businesses purchased.  I hope that answers the
10   question.
11   Q.   It does.  Thank you.
12        On Monday, the 15th, and Tuesday, the
13   16th -- I'm at the day of the filing and the day
14   the deal is announced -- were you involved in
15   any way in separate price negotiations about the
16   long position of securities that would be
17   included in the transaction?
18   A.   I really don't recall that I
19   participated in -- I really don't recall that.
20   Q.   In that same period, that Monday, the
21   15th, and Tuesday, the 16th, did you have
22   discussions with anyone from Barclays about --
23   withdrawn.
24        On Monday, the 15th, and Tuesday, the
25   16th, did you have any discussions with Barclays

## Page 70

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  about the fact that one of its conditions for
3  going forward was that the deal had to be
4  capital-accretive to Barclays?
5      A.  I'm sorry, could you ask that again?
6  Can I read it or do you want to ask it again?
7      Q.  You can read it or we can have it read
8  back.
9      MR. BERNICK:  Just have it read back.
10  This is not really an official transcript.
11  I think it's accurate, but you should
12  formally just let her read it back.
13      (Record read.)
14      A.  That specific term I'm not -- I don't
15  have a recollection of that term being used.
16      Q.  You have no recollection of Mr.
17  Diamond ever using that term?
18      MR. BERNICK:  At any time?
19      MR. GAFFEY:  At any time with respect
20  to this transaction.
21      A.  That particular term, but you're
22  giving me a very specific term, but no, I don't.
23      Q.  Now, when a deal was reached on
24  Tuesday and announced, did you have an
25  understanding of what the structure of the

## Page 71

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  documented deal was?
3      Let me ask you to take look at
4  Deposition Exhibit 1, which you will see is
5  entitled "Asset Purchase Agreement."
6      A.  Yes.
7      Q.  And let me put another question
8  instead.
9      Did you have an understanding on
10  Tuesday, September 16th, that the structure of
11  the deal was described as an Asset Purchase
12  Agreement?
13      MR. BERNICK:  I think the question is,
14  did you have an understanding that the
15  transaction that had been agreed was an
16  Asset Purchase Agreement, or styled that
17  way, separate and apart from what he's
18  looking at now as Exhibit 1.
19      MR. GAFFEY:  Correct.
20      MR. BERNICK:  Do you understand that,
21  Michael?
22      A.  I think, generally speaking, I
23  understood that the estate could sell assets and
24  that that was the form of the transaction.
25      Q.  Now, your portfolio, as I'm

## Page 72

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  understanding it, was essentially to deal with
3  what the structure of the transaction was how
4  this could be achieved?
5      A.  At what point in time?
6      Q.  Well, that's what I'm about to ask.
7  Tuesday there's a deal announced.  Had that, at
8  least at that point, had that goal been reached?
9  There was a structure, there was a proposed
10  transaction that would, if successful, achieve
11  the goal?
12      A.  I'm sorry, you have asked sort of a
13  couple of questions.
14      Q.  I know.
15      A.  I just want to be clear which question
16  you want me to answer.
17      Q.  Well, your task is to determine
18  whether there's a structure that will work to
19  achieve -- to effect a transaction, correct?
20      A.  I ask you again at what time period?
21  Because --
22      Q.  Monday/Tuesday, 15th and 16th.
23      A.  Monday/Tuesday, my role was, as a
24  member of the team, to assist in determining
25  whether a transaction was achievable.  The

## Page 73

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  specific structural reference is more
3  appropriate on that weekend because on that
4  weekend is when the structural complexity of
5  creating a new structure was the most relevant.
6      On the Monday/Tuesday, there was a
7  handful of hours, so I would say all parties
8  were involved in attempting to determine what
9  could be achieved or couldn't be achieved.
10      My specific role was, as I described,
11  on that aspect of discussions on the, quote,
12  business that could be part of the transaction
13  and in the form of that, as I said, 250 and the
14  building purchase, principally.  Again, it's a
15  year ago and there were people running around
16  rooms.  The rooms were designated.  That's the
17  legal room.  That's the -- but there were many
18  people.
19      Q.  Did you have an understanding on
20  Tuesday, the 16th, when the deal was announced
21  that part of it was that Barclays would assume
22  certain liabilities?
23      A.  Yes.  Directly tied to the business,
24  yes.
25      Q.  Could you describe for me what your

Page 74

HIGHLY CONFIDENTIAL - M. KLEIN

1
2 understanding was of the liabilities that
3 Barclays would assume?
4     A.    As I understood it -- well, as I
5 understand it now, thinking back, and again,
6 it's hard to determine what I understood
7 specifically or not, there was the specific
8 liabilities and then general liabilities.
9         The specific liabilities were defined
10 as the, quote, comp and cure discussions,
11 separately the -- if you called them
12 liabilities, the net short positions against
13 assets because it was a net book.  There was a
14 general sense, at least in my recollection, that
15 no matter how much you wanted to make this as
16 clean and clear as to what you were purchasing,
17 the concept and the fluidity of clients and
18 customers and your ability to then go forward
19 and undertake this business would be more costly
20 because you are going to have to have 10,000
21 people, or whatever the people are.  They're
22 going to do day-to-day things, they're going to
23 cost money, and there aren't going to be
24 revenues, so those liabilities in terms of an
25 expense base going forward, and then,

Page 75

HIGHLY CONFIDENTIAL - M. KLEIN

1
2 separately, you would have clients that you
3 would hope to do business with that may have had
4 issues with Lehman that, even though they're not
5 your legal issues, they become commercial issues
6 for you.
7         So the concept of liabilities, as
8 you've asked, you were walking into a situation
9 where conceivably there could have been a lot of
10 liabilities, but clarifying what they were at
11 that point in time was a question of the -- what
12 you could and then, separately and distinctly,
13 how much risk the Barclays team was prepared to
14 take relative to that opportunity.
15     Q.    With respect to the specific
16 liabilities for comp and cure that you
17 mentioned, did you have any involvement in
18 determining what the amounts of those specific
19 liabilities would be?
20     A.    No, I don't believe I had a
21 specific -- certainly the, even the term "cure,"
22 to my knowledge, was a new term for me.  I
23 didn't set those numbers.
24     Q.    Do you know who did?
25     A.    To my knowledge, the cure payments

Page 76

HIGHLY CONFIDENTIAL - M. KLEIN

1
2 were Lehman liabilities, so Lehman created that,
3 if you will.  With regard to the comp, I'm not
4 clear who created that.  I'm not clear on that.
5     Q.    Just to close out that area, did you
6 yourself engage in any discussions with folks at
7 Lehman about these two specific liabilities for
8 comp and cure?
9     A.    I didn't have conversations that I can
10 recall at all on comp with the Lehman
11 professionals at all.  The cure had to be
12 explained to me because, again, I didn't know
13 what it was, and it was explained to me as to
14 what it was regarding the ongoing business
15 expenses of the operation.
16     Q.    Was it someone from Lehman who
17 explained it to you?
18     A.    There was a group of people.  I sort
19 of vaguely remember being in a very big room
20 that looked like it was one of the dining rooms,
21 and there was a group of people that -- I don't
22 know how many were Lehman and how many were
23 attorneys -- who were sort of describing that,
24 because I just didn't understand it.  It wasn't
25 part of my -- so I don't know who all the

Page 77

HIGHLY CONFIDENTIAL - M. KLEIN

1
2 specific people were that were explaining it.
3     Q.    In that discussion, in that meeting
4 with all those people in there, did anyone say
5 anything to indicate to you how the quantum was
6 reached for the cure amount as opposed to the
7 purpose for the cure?
8         MR. BERNICK:  I'm sorry, the --
9         MR. GAFFEY:  The amount.
10         MR. BERNICK:  What quantum?
11     Q.    How the quantum of the liability would
12 be assumed for cure?
13     A.    They had a list of ongoing
14 obligations.
15     Q.    Did they have it there?
16     A.    I didn't -- I never was shown a list.
17     Q.    Now, did you have any discussions with
18 the Barclays folks, separate from Lehman folks,
19 about the amounts to be undertaken in these
20 specific liabilities for comp and cure?
21     A.    I don't --
22         MR. BERNICK:  Again, your question
23 assumes for this witness -- the problem I
24 have is, what do you mean by "undertaken"?
25 That sounds like a contract.  I think you

Page 78

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2    don't have a predicate from this witness
3    about what he understood the role of those
4    two issues to be in the transaction that he
5    personally was involved in.
6        MR. GAFFEY:  Can we read the question
7    back, please?
8        (Record read.)
9        A.   I don't remember specific
10   conversations, except for one general
11   conversation that was a conversation amongst
12   lawyers to discuss the construct of comp, what
13   "comp" meant.  Did it mean comp, bonus?  Did it
14   mean payroll?  Did it mean severance?  I
15   remember a general conversation about that.
16   That's the only conversation that I have a
17   general recollection of.
18       Q.   Did you come away from that
19   conversation with an understanding of what
20   "comp" meant?
21       A.   Well, I, you know, having come from an
22   investment banking background and having a
23   perspective on what sort of total compensation
24   is, I had a perspective just generally that I
25   went into and came away from.  I didn't come
```

Page 79

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2    away from with any great new learning from that
3    conversation.
4        Q.   Now, I want to move into the next
5    couple of days of that week after a deal was
6    announced.  Has the deal changed during the
7    week?
8        THE WITNESS:  Can I take a
9    three-minute break?
10       MR. GAFFEY:  Absolutely.
11       (Discussion off the record.)
12       (Luncheon recess; Time Noted: 12:28
13   P.M.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 80

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2        AFTERNOON SESSION
3        (Time Noted: 1:20 P.M.)
4    MICHAEL KLEIN, resumed and
5        testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8        Q.   Before the break, Mr. Klein, we
9    were -- I think I asked you a question along the
10   lines of whether the deal changed during the
11   week, so let me ask you that.
12       After the Asset Purchase Agreement
13   that we looked at a moment ago was signed, did
14   the deal change during the ensuing week?
15       A.   Yes, the transaction in certain senses
16   changed.  The main transaction, which was the
17   business purchase, didn't change.  The concept
18   of buying the business, of operating the Lehman
19   Brothers old Lehman North American brokerage
20   business didn't change.
21       What did change, however, was that
22   during the week events occurred surrounding the
23   various different assets and counterparties that
24   under -- that were underlying the business that
25   caused elements of the transaction to change,
```

Page 81

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2    but the base transaction, save the adjustment on
3    the real estate value to reflect the valuation
4    that came in, the base transaction and the
5    business construct and what was driving that
6    didn't change.
7        Q.   What were the elements of the deal
8    that did change?
9        A.   The principal elements that changed
10   were a recognition that the, effectively, the
11   assets that were directly aligned and related
12   positions directly aligned to the business were
13   changing and that both volatility, valuations in
14   the market, but, more importantly, other
15   counterparties were taking possession of some of
16   those.
17       Separately, Barclays began to finance,
18   if you will, some of what was the ongoing
19   operations of Lehman, and that the change was
20   that the construct of the transaction became the
21   business purchase plus this very specific loan
22   for asset hand-off, if you will, and then some
23   elements of additional assets came into question
24   or came into the transaction as part and parcel
25   of those loan or collateral, if you will, the
```

Page 82

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  movement in the asset positions and the Barclays
3  loan.
4      Q.    The assets that Lehman was to deliver
5  that changed because of volatility or valuation
6  or counterparties taking possession, let's take
7  that piece first, did you have -- how did you
8  learn about those?
9      A.    I, somewhere just prior to that
10  Friday, I was apprized, one, that the Barclays
11  had been financing the business, the details of
12  which I became more aware of later as part of
13  the JPMorgan weekend; but, two, that the --
14  there had been meaningful problems in that
15  Lehman in their delivering of what was the
16  business that they intended to deliver had
17  limitations, and the net result of which was
18  what had been committed couldn't be delivered,
19  as I understood it, and the result of which was
20  there needed to be, one, both an understanding
21  of could the business operate, how could the
22  business operate, how would the business
23  operate, and what was actually being
24  transitioned.
25      Q.    Actually, did you first learn about

Page 83

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  this situation on the Friday?
3      A.    I can't recall specifically.  I know
4  that the issue became an issue post-Tuesday, at
5  least my own focus was shifted to deal with a
6  bigger set of questions that were on I think the
7  minds of senior management:  How do you deal
8  with integration risk and all of the other
9  elements that come with the transaction, and
10  then, separately, what do they do with Europe
11  and Asia?
12      So that was occurring during those
13  couple of days, but sometime before Friday
14  morning, and I don't know when specifically I
15  became aware of it, I became briefed that we had
16  a series of issues that had to be addressed that
17  were very meaningful in terms of the completion
18  of the transaction.
19      Q.    Who gave you that briefing?
20      A.    I don't know specifically.  At this
21  point I was dealing on a -- most of the basis of
22  dealing were with either Archie Cox or Jonathan
23  Hughes or Rich Ricci, but I can't say
24  specifically who gave me the briefing or whether
25  it came from attorneys involved.  I just don't

Page 84

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  know specifically.
3      Q.    And the loan for asset hand-off you
4  were talking about, the Barclays financing of
5  Lehman, did you have any more specific
6  understanding of the nature of that financing?
7      A.    I later learned, because of the
8  JPMorgan-related matters, quite a lot.  At the
9  time, I wasn't party to those dialogues.  I knew
10  that there was an offer of support and I was
11  then briefed on the quantum of the loan and the
12  issue embedded in the size of capital that they
13  had put up at that stage, but I was -- but that
14  which I learned later about the JPMorgan and
15  other elements of the Fed and so forth I learned
16  subsequent to that.
17      Q.    The financing that you're referring
18  to, did you learn whether it was -- what its
19  form was?  Was it a secured loan? a Repurchase
20  Agreement? anything like that?
21      MR. BERNICK:  Whose financing?
22      MR. GAFFEY:  The Barclays financing of
23  Lehman.
24      A.    I don't, even in hindsight,
25  characterizing it specifically, I couldn't

Page 85

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  characterize it specifically.
3      Q.    So what, if anything, were you asked
4  to do in connection with this new set of
5  problems?
6      A.    I was asked specifically to -- well,
7  let me back up for a moment.
8      The problems that occurred were of a
9  magnitude that they impaired the going-forward
10  nature of the transaction.  The movements of
11  assets and, of course, data was very hard to
12  come by and very volatile, the markets had of
13  course become even more volatile and even more
14  risky.  The transaction was now public, but by
15  the same token, there was a real question as to
16  what the deliverables, not just the deliverables
17  in terms of pure assets, but could the business
18  continue to operate, operate out of the
19  building, operate with the people, operate with
20  the systems, operate in that way.
21      The question, though, that was put
22  directly on the table was, given that a
23  substantial amount of the, quote, net book that
24  was attached to the business that was the
25  business transaction had gone away and the

Page 86

HIGHLY CONFIDENTIAL - M. KLEIN

1      question put forward was, what do we do?
2            The first -- one of the discussions
3      was, well, maybe we just don't have a
4      transaction that has any assets at all.  I mean,
5      this is a business purpose.  If the assets are
6      getting taken by others in different ways, just
7      do a business deal.  And I think that's how I
8      learned that there had been the loan that had
9      then been provided.
10           The second part I was then asked to do
11     was to make a specific request of the parties at
12     Lehman to find more assets to rectify what had
13     been the substantial movement and substantial
14     reduction in the transaction that had taken
15     place.
16      Q.   Did you make the request of the
17     parties at Lehman?
18      A.   I made the request.  I'm not sure that
19     it was just myself who made it, but I was part
20     of requests that were made.  And I don't know
21     who all was involved in sort of the receipt of
22     those requests, but it resulted in a series of
23     conversations on that Friday morning prior to
24     the court.
25

Page 87

HIGHLY CONFIDENTIAL - M. KLEIN

1      Q.   Did you have a particular person on
2      the Lehman side who was your point person?
3      A.   Well, originally it was the Mark
4      Shafir connectivity.  That's the beginning.
5      From that point forward, after the Tuesday
6      event, it, first of all, became far more fluid
7      in the sense that there was an agreement out
8      there; secondly, there was no particular
9      counterpart at that point in time, and frankly,
10     there was no need until that event occurred for
11     there to be a specific counterpart for me.  The
12     others may have had, because of executional
13     things that were taking place, other specific
14     counterpoints, but I don't think I had -- I
15     don't think I could define a specific
16     counterpoint at that point.
17      Q.   Did you learn that Shafir left during
18     the week?
19      A.   We did learn that Shafir had left
20     during the week, which obviously made for
21     complexity in just in that dealing.
22      Q.   So describe for me as best you can,
23     please, how, in what circumstances the request
24     was made for more assets?
25

Page 88

HIGHLY CONFIDENTIAL - M. KLEIN

1      A.   Well, I can only describe what I'm
2      aware of, and what I'm aware of is that the
3      transaction of a net book which had long and
4      shorts and could be managed over time had
5      migrated in the two ways I described:  One,
6      substantial of those assets had been removed;
7      secondly, it wasn't clear at that stage what
8      assets had been necessarily moved into which
9      pockets, but perhaps most importantly, because
10     it was now a net asset purchase, it was a -- it
11     was putting all of your capital up against just
12     assets that you're buying in the midst of this
13     market calamity, the $45 billion of capital,
14     which that was never -- that was never the
15     contemplation of the transaction, to my
16     briefing.  To my briefing, we were stepping into
17     the shoes of operating the business.
18           So the request was what do we do, and
19     the first question was, is that -- are those
20     assets sufficient for that loan, and that was
21     the first debate.  And to my knowledge, there
22     was a fairly significant disagreement as to
23     whether even the remaining assets were
24     sufficient against the collateral of that loan.
25

Page 89

HIGHLY CONFIDENTIAL - M. KLEIN

1      And I wasn't an evaluator of those assets or a
2      participant in those evaluations, but there was
3      that, if you will, debate over can we even get
4      our loan proceeds back, so to speak, and there
5      was a disagreement on that value.  I was at one
6      point in a room where that was communicated
7      between different parties, that this -- there's
8      a disagreement on that.
9            I'm not sure if I'm answering the
10     question that you're --
11      Q.   You were.  Thank you.
12      A.   The net effect of that was, because
13     there was no fundamental agreement and there was
14     both parties taking views, that the agreement
15     was struck that the loan against the assets were
16     essentially going to be equivalent in value, to
17     my understanding.
18           The problem that that then created
19     was, because Barclays was buying an ongoing
20     business and, in buying an ongoing business, had
21     expenses that would be coming and no likely
22     revenues and significant losses during that
23     period, as well as the liabilities that they
24     were assuming that we've discussed previously,
25

Page 90

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    they had a problem in the sense that they now
3    had $45 billion of capital as a purchase, which
4    was not the original intention, as opposed to
5    what was a purchase and then net assets that
6    came with the business.  And they were put in a
7    position where they would have to go back to
8    both their board and their regulators with what
9    was a substantial hit, if you will, not just
10   from the original transaction but to their
11   overall capital base.  They couldn't close the
12   transaction on that basis, as explained to me,
13   and as explained to me, more assets were needed
14   to fill that.  And we delivered the message
15   that, is there anything left that can fill this
16   gap that has been created as a result, and that
17   was the message we delivered.
18       Q.   Who was it who -- let me just back up.
19   Had you had any personal involvement in the
20   decision that led to Barclays financing Lehman?
21       A.   No, not that I'm aware of, no.
22       Q.   Did you have any awareness about the
23   fact that Barclays had decided to finance Lehman
24   in this way at any time before these problems
25   were outlined to you?

Page 91

HIGHLY CONFIDENTIAL - M. KLEIN

1
2       A.   In a general sense, and again, this is
3    recollection of a short window in a general
4    sense, they were trying to be supportive because
5    once they announced the transaction, they were
6    trying to be supportive to preserve value of the
7    ongoing business.
8            The specifics of that, quantums and
9    the form, as I said, I believe I learned --
10   well, I know I learned a lot over that following
11   weekend, the 20th weekend, but prior to that,
12   no, I was not -- I was not briefed on that.
13       Q.   Now, you said that you were in a room
14   where the disagreement about values was
15   discussed?
16       A.   Right.
17       Q.   Who was present?  Is this one meeting
18   you're describing?
19       A.   I'm only aware of one conversation --
20       Q.   Okay.
21       A.   -- that occurred on Friday that I was
22   sort of part of, and the only people at this
23   stage that we were seeing or that I was
24   seeing -- "we" is too broad -- from Lehman on a
25   periodic basis was McDade and Alex Kirk, because

Page 92

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    obviously Shafir was gone at that point in time.
3            There was a -- as part of that
4    rectification, I think Ian Lowitt came into play
5    as well.  I can't tell you that they were all in
6    the room for that discussion, but those would be
7    the principal participants that we dealt with as
8    we tried to resolve this.
9        Q.   In trying to resolve this, did you
10   also deal with either Paolo Tonucci or Martin
11   Kelly?
12       A.   Not that I can recall.  Frankly, I
13   don't -- I don't recall even having heard the
14   name Martin Kelly before, but I don't want to
15   overstep my statement.  I just don't recall.
16       Q.   And this discussion that involved
17   McDade and Kirk, who was there for the Barclays
18   side?
19       A.   Again, I want to be clear.  As I said,
20   McDade and Kirk were the individuals we were
21   principally dealing with.  I don't know who was
22   specifically in the room when the first message
23   was delivered that this was an issue or --
24   because this was very fluid.
25       MR. BERNICK:  I have to tell you, Bob,

Page 93

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    you know, maybe it's clear to everybody
3    else.  You got into this discussion of
4    meeting by talking about the discussion
5    about differences in values, and I'm not
6    sure that -- I don't know exactly what
7    meeting the witness is talking about.  He
8    talked about a meeting where a request was
9    made.
10       MR. GAFFEY:  Let me see if I can
11   clarify this.
12       Q.   You spoke, Mr. Klein, about the fact
13   that there was a fairly significant disagreement
14   as to whether the collateral was sufficient,
15   yes?
16       A.   I said that there was a disagreement
17   over the value of that collateral versus that
18   loan.
19       Q.   And you had not been involved in the
20   valuation?
21       A.   No.
22       Q.   But that you found yourself in a room
23   where there was some disagreement about whether
24   the collateral was sufficient, and that was
25   discussed?

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    A.    That's right.
3    Q.    That's the meeting I'm asking about.
4  Is this the meeting on Friday morning?
5    A.    Again, I don't recall which specific.
6  I know that on Friday we had to clean up the
7  issues and or not, I mean, it was that much of a
8  make-or-break event, and the issue as it had
9  been described to me by my client was we have a
10  problem in that this is, given the significant
11  removal of positions and obviously the impact as
12  a result on the, quote, business deal, we need
13  to be very clear that (A) this is a different --
14  putting 45 billion of cash capital now to buy
15  assets and, secondly, we don't have the same
16  value. So I was instructed to go in and express
17  that we needed more assets. So that's the
18  meeting I'm referring to.
19    Q.    And who gave you those directions?
20    A.    At this stage, the principal people I
21  was dealing with were Rich Ricci and Archie Cox,
22  and Jonathan Hughes from a legal perspective was
23  around most of the time during this time period,
24  and the direction would have come from some
25  subset of that team.

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    Q.    So did you make that request? Did you
3  come in and say -- did you, in sum or substance,
4  did you make it known to Lehman that you needed
5  more value?
6    A.    Well, I made it known to the parties
7  that were involved that there needed to be more
8  assets, because if there weren't more assets,
9  the transaction couldn't take place.
10        Now, to say "I," it was made known and
11  I was part of discussions that were around what
12  could solve that gap. I don't know that I was
13  the person that specifically stated it or not.
14    Q.    How big a gap had to be made up?
15    A.    The quantification of what I was told
16  was that we had an understanding that the value
17  of the assets, if you will, the loan, the $45
18  billion loan, was -- the collateral base could
19  not be assured that that would solve that; that,
20  secondly, we then needed to go and get more
21  assets. No one gave me an instruction that said
22  you need to get X or Y, but we need to go get
23  more.
24        I wasn't, because I wasn't involved in
25  the, if you will, the -- I may not use the right

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  term, but the back end of Barclays in terms of
3  how they were looking at the construct for
4  themselves, I don't know what the accounting
5  was, but I was told you need to go in and get
6  more assets, this won't work.
7        And I think there was a great degree
8  of trepidation. It was already complicated
9  enough because the integration issues. It was
10  already complicated enough because of the market
11  issues. It was now public. It was complicated
12  enough because of the Europe, Asia, everything
13  separating away. It was now already a very
14  complicated event to have what was then this
15  meaningful change and, thus, have a hit to them
16  and that additional incremental risk, and in
17  addition, owning the risk on disposing of what
18  were this 45 billion of securities, there was
19  quite a lot of fear, and at that point there was
20  a sense that this transaction just might not
21  occur.
22        Now, of course, that happened many
23  times over the couple of weeks, the sense that
24  this might not occur, but it was more acute, and
25  I was told you need to -- we need to make it

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  very clear if there's not other assets, we can't
3  get this done.
4    Q.    You have to make it very clear that if
5  there are not more assets, this won't get done,
6  how do you do that without being able to tell
7  Lehman this is how much more we need? Does that
8  present an obstacle here?
9    A.    I don't want to hypothesize.
10    Q.    Let me try this another way. Your
11  instructions are to make it clear to Lehman that
12  if there are not more assets to be added, that
13  it's possible the deal won't get done; is that
14  correct?
15    A.    My recollection of both those
16  discussions and at least the instructions that I
17  got were this transaction was going to fail
18  because of what was the diminution in the
19  original plan. Now, that's -- those are the
20  communications that I was part of.
21    Q.    And were you part of the
22  communications to Lehman of the fact that
23  additional assets had to be added?
24    A.    I think I said that I was in a room
25  where that was discussed, and again, I don't

Page 98

HIGHLY CONFIDENTIAL - M. KLEIN

1
2     know who specifically made which statements, but
3     I was in a room in that and it was made clear
4     you need to find what else there may be because
5     this is a problem.
6         Q.   And in the room where these
7     discussions were had, was anything communicated
8     as to how much more there needed to be added in
9     order for the deal to close?
10        A.   I'm not aware that a specific number
11    was put forward.  I'm not -- I'm not clear that
12    a specific number was put forward and I'm not
13    clear that there was a sense that there was any
14    other assets and I think it was a good faith,
15    which is why I raised the point earlier that
16    this question that certainly I had put forward,
17    should we do something without assets, which, as
18    I said, caused me to learn a bit more about what
19    was this loan question.  But no, I'm not aware
20    of a specific number that was put forward.
21        Q.   You mentioned the number $45 billion.
22    Was that your understanding of the amount that
23    had been advanced by Barclays to Lehman in this
24    financing?
25        A.   My recollection of the, quote, loan

Page 99

HIGHLY CONFIDENTIAL - M. KLEIN

1
2     that Barclays had exposure was 45, although for
3     some reason I have in my mind that occasionally
4     it was 45.5, but I may not be getting that
5     exactly correct.
6         Q.   Did you have an understanding one way
7     or another as to whether the loan of 45 or 45.5
8     was collateralized by security in excess of the
9     amount lent?
10        A.   I was only briefed that it was
11    collateralized, that it was a secure -- that it
12    had securities attached to it.  I didn't get
13    into the particular details, but I will say that
14    what I was briefed on as part of this was that
15    there was real concern on the Barclays side that
16    the assets that they were going to be buying
17    could not be valued or liquidated at that price,
18    at that value.
19        Q.   Did you gain an understanding what the
20    Lehman side of the story was?  What were they
21    saying with respect to the value of the assets?
22        A.   In the rooms I was in -- and again, I
23    can only recollect this being occurring in or
24    around the frenzy, if you will, or the rush --
25    best way for me to say it is I don't remember

Page 100

HIGHLY CONFIDENTIAL - M. KLEIN

1
2     other than the sort of Friday discussions that
3     we're discussing.
4             There could have been other
5     discussions that I'm not aware of that there was
6     a disagreement as to whether it was -- and the
7     disagreement was a plus or minus the 45.  This
8     was a, you know, do you -- are you selling these
9     today?  Are you selling these tomorrow?  Are you
10    holding them for a week, and if you're holding
11    them for the week, are they worth more than the
12    45?
13            I didn't remember anybody saying this
14    is worth 90 and this is worth zero.  I think it
15    was -- and the rationale and the reason why the
16    agreement was reached that it worth the loan
17    was it was a plus-or-minus discussion point.
18    But I wasn't part of the valuation on either
19    side, so I don't, I mean, I don't know what the
20    underlying background of those statements were.
21        Q.   I understand that you're not -- you
22    don't have the underlying data as to who's right
23    or who's wrong in the discussions, but my
24    question goes to what was the nature of the
25    discussion that you heard.

Page 101

HIGHLY CONFIDENTIAL - M. KLEIN

1
2             Was there a range of disagreement that
3     you heard between Lehman and Barclays as to the
4     value of the underlying collateral?
5         A.   I only, as I think I said, I think the
6     only thing I can recollect was that they had
7     differences as to whether you sold it today,
8     held it for a period of time, and it was a plus
9     or minus the loan amount.  It was not -- people
10    weren't -- this wasn't, to my knowledge, because
11    it certainly didn't involve me, a ten-hour
12    discussion over, you know, multiple different
13    you're here and I'm here.  This was there's a
14    difference of opinion, what do we do, and a
15    general understanding that it's not that big of
16    a difference, so let's move forward because we
17    have to move forward.  But that's just the part
18    that I was party to.
19        Q.   I need to push for a little more
20    detail on this, the scope of the difference, if
21    I could.  The request, the demand, whatever verb
22    you want to use, is made from Barclays to Lehman
23    to add more assets so that the deal can close,
24    correct?
25        A.   The -- not precisely correct.  There

1             HIGHLY CONFIDENTIAL - M. KLEIN
2    was a clear understanding that the, quote, net
3    book value transaction could not occur, so what
4    you had was a loan against assets.  There was a
5    message that that loan might not be fully
6    satisfied by those assets and there was a
7    difference of opinion, plus or minus.
8             Secondarily, there was a view that
9    because of all of the risk in liability and the
10   losses that were likely to occur, there needed
11   to be more assets from Barclays' perspective to
12   complete the transaction.  So those messages
13   were messages that were delivered and I was
14   party to at least one conversation on those
15   subjects.
16        Q.    And a while ago you told me one of the
17   issues was that it was probable that Barclays
18   was going to have expenses after the
19   transaction.  Was the request for more assets to
20   cover those expenses?
21             MR. BERNICK:  I think it's unclear
22   what the expenses were that the witness was
23   referring to with his prior answer.
24             MR. GAFFEY:  That's a good point.
25        Q.    What were the nature of the expenses

1             HIGHLY CONFIDENTIAL - M. KLEIN
2    that were at issue?
3        A.    As I understand it, the -- and I
4    wasn't -- there was a whole team of other
5    bankers that were working for Barclays and doing
6    work for board and board presentations and so
7    forth, that wasn't my agreement.  But in looking
8    at this transaction, one had to look at the
9    accounting day one and going forward, and
10   clearly in a world where there's focus on
11   capital and focus from the FSA, potential both
12   day one as well as long-term losses were
13   important.
14             My understanding was that there would
15   be people that were being employed and it's not
16   clear what the revenue streams would have been
17   going forward.  So when I say expenses, there
18   were just operations of the business that --
19   because you wouldn't be up and running.
20             Now, that became more acute even later
21   on June 20th because of the JPMorgan event and
22   the shutdown, but that's what I was referring
23   to.
24        Q.    So this might be a bit simplistic for
25   me to say, but was the idea that now that

1             HIGHLY CONFIDENTIAL - M. KLEIN
2    Barclays needed to have some, at closing, needed
3    to have some equity to support its ongoing
4    expenses once it took over the business?
5             MR. BERNICK:  Answer that question, if
6    you can.  You've got equity, ongoing
7    expense, continuation of business.  I don't
8    want to -- you just answer that if you can.
9        A.    Maybe ask it again because I -- does
10   someone want to --
11        Q.    Was the idea now that Barclays needed
12   to have some, at closing, needed to have equity
13   to support its ongoing expenses once it took
14   over the business?
15        A.    I wouldn't -- I don't think I would
16   characterize it that way.  I wouldn't
17   characterize it that way.  The transaction from
18   Tuesday onward changed meaningfully, and what I
19   was told was that, because of that reduction in
20   the assets and in the asset value, the
21   transaction didn't work for my client and that,
22   as such, I had to work with Lehman to get more
23   assets as part of that.
24             How that all fit into what was the
25   look, if you will, that Barclays had, you'd have

1             HIGHLY CONFIDENTIAL - M. KLEIN
2    to ask the Barclays folks.  The direction I got
3    was that this change was meaningful enough that
4    it had to be fixed.
5        Q.    So your job is go get more?
6        A.    That's right.
7        Q.    And you don't have knowledge as to
8    what Barclays' analysis was of why it needed
9    more?  You understand --
10            MR. BERNICK:  I --
11            MR. STERN:  Objection to the form.
12        Q.    Your instructions from your client are
13   go to Lehman and get more assets, correct?
14        A.    My instructions from the client were
15   this is a very big change, the buying an ongoing
16   business with a net book has now changed,
17   because given what's taken place with
18   counterparties taking assets, given what's
19   taking place, we now don't have that
20   transaction.  It's now become a far greater
21   riskier event for them in that they're putting
22   up this $45 billion of capital and buying long
23   assets and no one wants to buy that much long
24   assets.  This wasn't intended to be an asset
25   transaction.  It was a business that they were

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  stepping into.
3          The concept of buying long assets in
4  that market was great risk, and one had to look
5  at how I value it and how I sell it.  That was
6  sort of one comment that was given to me, and
7  the other comment was, given the moving pieces
8  that had taken place with this and given this
9  risk, we need more assets as part of the
10  transaction to replace what had been taken out
11  of the transaction for us to move forward.  And
12  that's the task that I embarked upon.
13      Q.    And no one from Barclays tells you how
14  many more assets are needed to replace what had
15  been taken out of the transaction?  I'm pushing
16  for a target or a number if you have one here.
17      A.    I don't -- one, let me just say I'm
18  trying to recollect as much as I can recollect.
19      Q.    I understand.
20      A.    Two, I was a part of a team which I
21  had sort of narrow responsibility.  Third, I
22  wasn't running any kind of Barclays pro forma
23  model nor was I doing those presentations to the
24  board.  So it's not a, you know, it wasn't part
25  of what I was doing.

HIGHLY CONFIDENTIAL - M. KLEIN

1
2          The concept of this is a very big
3  problem when your client says this is a very big
4  problem and you're told to help go solve that
5  problem, you go solve that problem.  The quantum
6  of that problem, I think as the assets came
7  forward, became clearer as to when I got
8  responses that, "Here's what's available, can
9  this get us over the finish line?" became
10  clearer, but I don't recall someone saying, "I
11  need to get" -- perhaps I'm not recollecting
12  every conversation.  I just don't remember
13  somebody saying, "I need to get ..."
14      Q.    Need to get a particular amount?
15      A.    Yeah.
16      Q.    Did anyone on the Lehman side of this
17  dialogue ask how much more does Barclays need?
18      A.    I recall the principal focus that was
19  going on at Lehman was, here's what we have,
20  does this help, and I think it was a real -- it
21  seemed to me in good faith they were trying
22  quite hard to find what was there, and basically
23  the two things they found were the two things
24  they put on the table, which were this so-called
25  bag of hammers, as it was related, and then this

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  custodial account balance.
3      Q.    I'm going to ask you to solve one of
4  the great mysteries in the case.  Do you know
5  who used the phrase "bag of hammers"?
6      A.    It's -- I had never heard it before.
7  It has to be a trading term, so I'm presuming it
8  came from one of those two, either Bart or Alex.
9  I don't -- I wouldn't want to attribute such
10  a --
11      Q.    It's not a bad phrase.  I've just been
12  wondering who was its author.
13          Were more assets added to the deal?
14      A.    Well, let me be specific.  Substantial
15  assets were reduced from the transaction, but
16  from the point of the Friday discussion, there
17  were those two asset categories brought into the
18  scope of the transaction.
19      Q.    Okay.
20      A.    So there were certainly not more
21  assets added on an additional basis, but those
22  two categories were brought in to solve the
23  problem at hand.
24      Q.    What was the value in total of those
25  two categories?

HIGHLY CONFIDENTIAL - M. KLEIN

1
2      A.    I don't know today nor do I know then
3  what the real value is of those.
4      Q.    Did you have a view at the time as to
5  what the value was that was added on the Friday?
6      A.    I only know what was told to me.  I
7  don't know what was the reality of it because I
8  never saw any of the securities or the analysis.
9  I was told that the bag of hammers was 1.9, as I
10  recall, and I was told that there would be more
11  than a million and potentially more than a
12  million and a half in this custodial account.
13          That being said, to be quite precise,
14  there was also an e-mail given that described
15  the specific agreement and willingness, I think
16  by an S.E.C. official, to release a number that
17  was more like 750 of that custodial account.  So
18  my understanding of the value that was dealt
19  with as part of that conversation would be those
20  components, and those components then had to be
21  digested as:  Do they exist?  What do they mean?
22          I didn't have any involvement in the
23  work as to do they exist, what do they mean,
24  what is a bag of hammers, what is that involved
25  in, but in discussions with my client, their

Page 110

```
 1         HIGHLY CONFIDENTIAL - M. KLEIN
 2    determination then was that was suitable in
 3    order to go forward.
 4         So, to your question before, it became
 5    then clearer to me what the gap was because
 6    those were suitable to solve that in that
 7    morning.
 8    Q.   The last part of your answer, though,
 9    sir, is an inference.  Did your client tell you
10    that had been the gap or you inferred --
11    A.   No.
12    Q.   -- from the fact that they said they
13    would go forward that it was?
14    A.   There was an agreement to go forward.
15    That's -- there's -- I don't recall that I saw
16    the accounting before or after or subsequent for
17    it, so I don't know what their internal
18    machinations or gap was, but when I delivered
19    that as part of the discussions with the team
20    and it was discussed, and the lawyers then
21    reviewed what that meant, and I tried to
22    determine if I can figure out exactly what time
23    each of those -- I just can't figure out when
24    each of these things occurred, but certainly
25    before the bankruptcy court that -- those two
```

Page 111

```
 1         HIGHLY CONFIDENTIAL - M. KLEIN
 2    asset discussions came into play.  Barclays was
 3    prepared to go forward with the transaction,
 4    which was the relevant issue at hand.
 5    Q.   Did you attend the bankruptcy hearing?
 6    A.   I did attend the Friday bankruptcy
 7    hearing.
 8    Q.   Correct.
 9    A.   That's the only one I would have
10    attended, yes.
11    Q.   And the bankruptcy hearing took place
12    in the late afternoon on Friday?  It started in
13    the late afternoon on Friday, correct?
14    A.   I don't know specific time, but yeah.
15    Q.   Was the issue resolved before you left
16    to go to bankruptcy court?
17    A.   Certainly in concept I'm aware that
18    there had been an agreement reached, otherwise
19    there was no business to go to bankruptcy court.
20    Anything that happened between my leaving and
21    going down to court I can't tell you, but there
22    was an agreement reached.
23    Q.   That's a fair comment.  I guess
24    there's two pieces to this.  One is the
25    agreement reached in concept to add more assets,
```

Page 112

```
 1         HIGHLY CONFIDENTIAL - M. KLEIN
 2    and then, secondly, there's the point where your
 3    client says enough assets have been added, we'll
 4    go forward.  My question goes to the second
 5    part.
 6    A.   My recollection of my own sort of
 7    whereabouts was I was told that that worked and
 8    that we should go down to court to get it done.
 9    Q.   Now, just to clarify a little piece of
10    your testimony, you were talking before about
11    the funds that the S.E.C. had to -- the release
12    the S.E.C. had to approve, you were speaking in
13    terms of millions.  Did you mean to say you were
14    told there would be a billion to a billion and a
15    half?
16         MR. BERNICK:  Wait.  You said the
17    release that the S.E.C. had to approve.
18         MR. GAFFEY:  Let me put some
19    terminology in the here.
20    Q.   The custodial accounts you were
21    talking about, does the phrase "15c3" ring a
22    bell?
23    A.   It does, because I remember being
24    confused as to that political action committee
25    other thing, which is what -- somebody may know
```

Page 113

```
 1         HIGHLY CONFIDENTIAL - M. KLEIN
 2    what that is, but I --
 3    Q.   You joined everybody else in the room.
 4    We've all learned what 15c3 is in the last
 5    couple of weeks.  But you recall the term "15c3
 6    funds" to refer to --
 7    A.   I do.
 8    Q.   And the amount of 15c3 funds that was
 9    at issue was in the billions, not millions?
10    A.   In the billions.
11    Q.   A billion to a billion and a half?
12    A.   A billion to 2 billion at one point,
13    but there was an e-mail, and I only remember it
14    because there were so few pieces of actual data
15    that had been sort of handed in any meeting that
16    I was part of, but I just remember that that
17    e-mail existed and that there was a reference to
18    somebody from the S.E.C. agreeing that a certain
19    amount could be released.
20         And I have a recollection, although I
21    don't have it specifically and I haven't
22    subsequently seen that e-mail, I don't think
23    I've seen that e-mail since that moment, was
24    that it was at least 750, but I don't -- 750
25    million, at least 750 million.
```

Page 118

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    to be careful, because the term "OCC" and all of
3    the different initials came up at various points
4    in time.  I just don't specifically recollect an
5    OCC discussion.  I just don't specifically
6    recollect that.
7       Q.    As a general matter, the effort to
8    find additional assets, does it continue on
9    Saturday and Sunday, the 20th and 21st?
10      A.    No, not that I -- I was not --
11      Q.    As far as you know.
12      A.    As far as I know, the only directional
13   asset change, as far as I understand -- well,
14   let me back up.  Leaving aside every issue
15   relating to what took place with the JPMorgan
16   and the shutting down of the business, which
17   later became very clear, leaving aside that for
18   a moment, which may be hard to do, but it was
19   not part of my understanding or vernacular
20   leading into the bankruptcy Friday event, so
21   leaving aside that as to the core transaction
22   between the business transaction between
23   Barclays and Lehman, which was the 250 plus the
24   buildings, the related assets attached to it,
25   the changes that were made were the changes that

Page 119

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    occurred Tuesday to Friday.
3          Subsequent to that, there was a -- or,
4    somewhere on the Friday time period late, I
5    think, the appraisals were delivered, so there
6    was a change in value in the real estate as the
7    splitting of the two appraisals took place.  The
8    only thing that I can think of right now, and
9    maybe I'm -- but the only thing I can think of
10   right now is the 15c3 give-back.
11         So there was no new assets being
12   searched for.  In addition, there was some
13   discussion over, quote, a brokerage fee
14   additional discount on the real estate, and that
15   became a -- that became a contentious point, so
16   Barclays gave up on that, quote, discount.
17   Those are the only elements that I can recall,
18   again, except for the moving pieces relating to
19   solving the JPMorgan-related matter.
20      Q.    In your discussions with your client
21   about the need for additional value to be added
22   on the Thursday or the Friday, what we've been
23   talking about, did Barclays in sum or substance
24   tell you that they needed a buffer of some kind?
25      A.    I don't think -- I don't think the

Page 120

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    term "buffer" -- I don't think I ever recollect
3    the term "buffer" being used.
4       Q.    Is it fair to say that your
5    understanding is that because of this
6    financing, this loan that you have talked about,
7    that the mechanism of the deal had changed?
8       A.    The basic transaction parameters to
9    buy the business hadn't changed.  The purpose
10   from Monday onward was to step into the shoes of
11   operating the Lehman, if you will, North
12   American business, obviously being clear that
13   some of the activities, including customer
14   activities and all those that occurred before
15   Barclays was not going to take part in, but the
16   business, ongoing business, that transaction
17   didn't change.
18         So the sum and substance of the
19   transaction that was the meaningful transaction
20   didn't change.  What happened was the related
21   assets that were going to come with those
22   businesses effectively went away, so there then
23   was this incremental additional event that took
24   place, which I have always thought of as then
25   being something different, which was you now

Page 121

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    have a loan that you have to satisfy the loan
3    and you are going long 45 billion of securities
4    in this marketplace.  So the main transaction
5    and the substance of that transaction didn't
6    change, it's just that the related assets that
7    would have come with it were no longer the same
8    or comprehensible and a, if you will, distinct
9    event in terms of the loan and the collateral
10   for that loan was undertaken.
11         That's how I understand it.  Now, that
12   may just be how I understand it.
13      Q.    To your knowledge, your personal
14   knowledge, were these differences regarding the
15   related assets documented in any way?  Was there
16   a written agreement reached?
17         MR. BERNICK:  I'm sorry, when you say
18   "related assets," I don't understand what
19   your focus is now.
20      Q.    This addition of value on Friday, were
21   any written agreements, to your knowledge,
22   reached with respect to the addition of these
23   assets?
24      A.    Which assets are you specifically
25   referring to now?

Page 134

HIGHLY CONFIDENTIAL - M. KLEIN
1   HIGHLY CONFIDENTIAL - M. KLEIN
2       A.   I don't think I did.  I don't --
3           Do you remember where the closing was?
4   Maybe that will help me.
5       Q.   I don't know.  I know it was on Monday
6   morning, very early Monday morning.
7       A.   I don't think I was physically there
8   at the closing.  I don't recall being there.
9       Q.   And just to sort of close out a couple
10  of areas, I think I heard you say before, but I
11  want to be clear on that, you were not involved
12  in any of the presentations made to the Barclays
13  board about this transaction; is that right?
14      A.   No.  No.  There had been, early on in
15  the -- at the very beginning of the week on the
16  Thursday I believe there was a board call that I
17  sat in and listened to.  Beyond that, I wasn't
18  party to board presentations, and I don't recall
19  seeing the board materials either that were
20  presented beyond that.
21          So the Thursday -- I think it could
22  have been Thursday, it could have been Friday --
23  conversation was on that early structure that we
24  discussed, which related to the Lehman/Spinco
25  separation, the sort of pre-bankruptcy version.

Page 135

1   HIGHLY CONFIDENTIAL - M. KLEIN
2       Q.   You yourself didn't make any
3   presentation to the Barclays board?  You weren't
4   there?
5       A.   There might have been a question put
6   to me.  I don't -- I don't believe that I was
7   called upon.  I certainly, because I was just a
8   consultant, a person, and because they had a
9   series of other bankers that were giving
10  opinions and doing work and corporate brokers
11  that were doing -- they had other people doing
12  things, I wasn't --
13      Q.   I'm putting before you, Mr. Klein,
14  what previously has been marked as Exhibit 381,
15  an e-mail chain that starts on the second page
16  with an e-mail from you to Rich Ricci dated
17  Friday, September 19, at 21:31 that says, "Rich,
18  three-ring circus.  Two overflow rooms."
19          Could you read, sir, up that plain
20  sufficiently to sort of familiarize yourself
21  with that.
22          (Document review.)
23      A.   Okay.
24      Q.   Just in terms of the where and when of
25  this, I'm assuming from the time and the date

Page 136

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   that you're in the bankruptcy court when this
3   e-mail exchange is taking place; is that right?
4   This will put you on the Friday night.
5       A.   I think it would have to be.
6       Q.   And is it correct, then, that Mr.
7   Ricci was not in the bankruptcy court?
8       A.   I don't believe he was.
9       Q.   And then the next up in the chain is
10  an e-mail from Mr. Ricci to you saying, "Alex
11  tells me they're killing us on 1.9 bucket and
12  not paying anything for it.  What gives?"
13          Can you give me any greater detail of
14  what that's a reference to?
15      A.   I think, as you see my next e-mail, I
16  don't follow.  I don't -- that wasn't a
17  conversation that I had been in that he was
18  relating to.
19      Q.   You also say, "I don't follow.  We are
20  being given 1.9 billion of face."  What's the
21  1.9 billion that you're referring to?
22      A.   The only 1.9 that I'm aware is the bag
23  of hammers.  The only 1.9 that I'm aware of in
24  the transaction.
25      Q.   And then what follows in the two

Page 137

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   subsequent e-mails are, Ricci to you:  "He told
3   me creditors were squawking.  Let's get it
4   then."  And then you to Ricci:  "We are meeting
5   creditors shortly on this."
6           Do you see that interchange?
7       A.   I do, yes.
8       Q.   Can you give me any more detail of
9   what's meant or what you understood to be meant
10  when Mr. Ricci wrote that the creditors were
11  squawking?
12      A.   I don't, because I don't know -- I
13  don't -- I don't know the Alex Kirk
14  conversation.  I do know that during the court
15  the Weil team pulled a bunch of folks aside,
16  including creditor folks, to explain the
17  transaction in sort of elongated, elaborate
18  sidebar.
19          So I assume that that's what my
20  comment back is referring to, but I don't -- I
21  wasn't aware of what the Alex conversation was
22  because I wasn't party to that.
23      Q.   Did you participate in the elongated
24  sidebar?
25      A.   No, I was in the -- it was a very -- I

HIGHLY CONFIDENTIAL - M. KLEIN

1

2   hadn't been to bankruptcy court before.  I was

3   in the very, very last row.

4       Q.   I can tell that from your first note

5   here: "Three-ring circus."

6       A.   And there were people calling in as

7   well, which I was -- I had never seen in court

8   before.  But I was in the very last row, and as

9   a result, I didn't have the ability physically

10  to get to the front.

11          So the sidebar conversation that took

12  place, there had been I think a discussion that

13  the lawyer from Weil would brief various parties

14  prior to the event, which they did in that

15  sidebar, but I was not -- I don't think I was

16  physically there because I think I was

17  physically separated, I believe.

18      Q.   Could you hear what was said?

19      A.   I -- no, I was -- I was literally in

20  the last row.

21      Q.   So you know there was a sidebar, but

22  you have no personal knowledge of what was said

23  in that sidebar conversation?

24      A.   I was told that there would be a full

25  debrief that was sort of part of what they had

HIGHLY CONFIDENTIAL - M. KLEIN

1

2   planned.  I mean, I left and went down to the

3   court.  I was told that they would come down to

4   the court, that they would physically debrief,

5   and then there would be a hearing.

6          So I suspect that that's what that's

7   referring to.  My, best as I can recollect, is

8   that's what that's referring to, but I don't --

9   I wasn't party to that.

10      Q.   Was there a point when you arrived at

11  bankruptcy court where you gave a briefing to

12  lawyers for either Lehman or Barclays about the

13  then current status of the agreement?

14      A.   I don't -- I don't think -- I don't

15  believe that I -- I don't know.  I don't know.

16  I don't know who -- I rode down by subway with

17  this chap Gerard LaRocca, who I hadn't known

18  before, who knew the subway system quite well,

19  and then I went in and was pulled to the back

20  and I sat with Archie Cox and everybody else was

21  up in the front.

22  I don't really recall who I spoke to

23  when I walked in.  The only substantive thing

24  that I was briefed on that I know about was

25  the -- this agreement on the splitting the

HIGHLY CONFIDENTIAL - M. KLEIN

1

2   difference on the real estate because I

3   had to step out and call -- I think I called

4   Rich to tell him and make sure he signed off on

5   that because that was a, sort of an open issue.

6       Q.   You didn't ride down to court in the

7   car with Mr. McDade?

8       A.   No.  I definitely took the subway.

9       Q.   Mr. Klein, I'm putting before you what

10  we previously marked as Deposition Exhibit 382.

11  Take a look through it, please.

12          (Document review.)

13      A.   Okay.

14      Q.   Now, we've moved, just by way of date,

15  we have moved now to Saturday, the 20th, and the

16  earliest e-mail here is on Saturday evening at

17  8:44, where you write to Mr. Ricci and some

18  others: "Team, we need a brief call with Rich,

19  subject to his schedule, to review the language

20  regarding the expense accruals and to ensure

21  that BarCap has appropriate flexibility to run

22  their business as they deem appropriate."

23          What language regarding expense

24  accruals were you referring to in this e-mail?

25      A.   I don't remember specifically the

HIGHLY CONFIDENTIAL - M. KLEIN

1

2   e-mail, but I do recall a conversation I think

3   we talked about earlier today where the lawyers

4   were describing the definition of

5   "compensation."

6          That's the only conversation that I

7   recall that would have had lawyers and

8   otherwise.  I don't remember sending this

9   specific e-mail, but that's the only

10  conversation I can recall that would have been

11  related.

12      Q.   And can you add any more detail beyond

13  the e-mail, sir, to what you would have meant

14  regarding flexibility, "appropriate flexibility

15  for Barclays to run their business"?

16      A.   I can't.  Rich was, at this stage, the

17  principal client and he asked me to arrange a

18  call with people that were involved and I

19  arranged the call, so I can't -- I can't give

20  you anything more.

21      Q.   Beyond arranging the call, Rich Ricci

22  is the principal client, but beyond arranging

23  the call, did you have any involvement of that

24  issue -- involvement in that issue, that is, the

25  expense accruals and BarCap's --

Page 142

1           HIGHLY CONFIDENTIAL - M. KLEIN
2       A.   No. No. No. No. The only subject
3   matter that I'm aware of that was covered was
4   this, you know, definition of "compensation."
5   That's the only thing that I'm aware of at all.
6       Q.   Now, do you know how much value was
7   transferred to Barclays in the deal once the
8   issues were resolved with the addition of the
9   bag of hammers and the 15c3?
10          MR. BERNICK:  I think you --
11      A.   I don't understand the question.
12      Q.   I'm looking for a total here.  Do you
13  know how much value was agreed to be transferred
14  to Barclays?
15          MR. BERNICK:  Go ahead and answer it
16      if you can.  "Value" is a judgmental thing,
17      so if you can give it some factual context,
18      that would be helpful.
19      A.   I don't really view that there was,
20  quote, value transferred.  If you're referring
21  to the Friday events --
22      Q.   Uh-huh.
23      A.   -- where there was the clarification
24  of the issues relating to the assets going away
25  and this 45 billion loan and then the bag of

Page 143

1           HIGHLY CONFIDENTIAL - M. KLEIN
2   hammers and so forth, I don't view that as,
3   quote, value transferred.
4           I view that there was a hole in the
5   transaction and that hole was filled, and the
6   only actions that occurred that have
7   filled that were the bag of hammers and the
8   15c3.  As I said, I think subsequently there was
9   the change in the real estate midpoint
10  valuation, and then subsequent there was the
11  give-back of the certain 15c3.
12          So the total value that was sort of in
13  those events can be quantified, but your
14  question, which said the total value transferred
15  to Barclays, I don't think there was total value
16  transferred to Barclays.
17      Q.   My question now is -- I'm away from
18  the real estate, okay.  Put the real estate
19  aside for a moment.  In terms of securities
20  transferred, filling the hole, as it were, that
21  you talked about, do you have knowledge of the
22  number, the value of the securities?
23      A.   I don't have --
24          MR. BERNICK:  Go back and look at your
25  question, Bob.  It mixes the idea of filling

Page 144

1           HIGHLY CONFIDENTIAL - M. KLEIN
2   the hole, which he's already answered, with
3   value transferred, which may -- or,
4   securities transferred, which may go way
5   beyond filling the hole.  So, which one are
6   you asking about?
7           MR. GAFFEY:  I'm asking about the
8   value of the securities, including that
9   which was added into the hole, the value of
10  the securities.
11          MR. BERNICK:  So you want total value,
12  the total value of the securities that
13  Barclays got in this transaction?
14          MR. GAFFEY:  Yes.
15          MR. BERNICK:  If you can answer that.
16  You're not being asked to answer that
17  question as an expert, Mr. Klein.  This is
18  just purely a question about what you
19  factually know in this deposition.
20      A.   I'm always very sensitive when you use
21  the term "value" because "value" has a --
22  there's a definition that assumes that it has --
23  that is the worth, that is the approximation.  I
24  don't have a view of what the approximation of
25  the, quote, value of that was.

Page 145

1           HIGHLY CONFIDENTIAL - M. KLEIN
2   I have the views that was expressed at
3   that moment as to what the values were of the
4   various different components of the transaction,
5   and I have expressed those I think in prior
6   parts of this, but I don't -- I don't have a,
7   quote, valuation of the assets that were -- I've
8   given you the componentry of what was disclosed
9   as numbers, but I don't -- neither have I done a
10  valuation nor do I have a valuation on them.
11          I don't know if I'm answering your
12  question.
13      Q.   Yeah, I see the issue with value,
14  valuation and it being somewhat judgmental.  Let
15  me ask you this:  Did you have a view, did you
16  have a view on the Friday once the bag -- you
17  know, once the additional assets had been added,
18  the 15c3 and the other assets, what the -- did
19  you have a view of what the value was?
20      A.   I have to be as clear as I can.  I had
21  never heard the term "bag of hammers."  I never
22  saw a list of securities.  So I had no knowledge
23  nor could I have, frankly, a whole lot of
24  confidence into exactly what that would have
25  resulted.

Page 150

HIGHLY CONFIDENTIAL - M. KLEIN

1       HIGHLY CONFIDENTIAL - M. KLEIN
2 I can say that we've had documents produced to
3 us off of servers in the UK, servers in New
4 York, and then further complicated by vendors in
5 New York, so I can never be sure if I'm looking
6 at London or New York time on some of these
7 things.
8     A.  It doesn't seem --
9     MR. BERNICK:  I think --
10     A.  Monday morning was -- Monday morning
11 is the 22nd, is the date of closing, correct?
12 So this would refer to that Sunday evening into
13 the Monday morning.
14     Q.  I suspect --
15     MR. BERNICK:  Well, no, no.  This is
16     probably 10 o'clock --
17     MR. GAFFEY:  I think it's 10 o'clock
18     London time.
19     MR. BERNICK:  -- London time.
20     MR. GAFFEY:  So you're 4 A.M. New
21     York -- or, 5 A.M. New York.
22     MR. BERNICK:  5 A.M. New York time,
23     real early in New York.
24     A.  10 A.M., that's right.  That's 5 A.M.
25 would be consistent.  That's correct.  Then

Page 151

HIGHLY CONFIDENTIAL - M. KLEIN

1       HIGHLY CONFIDENTIAL - M. KLEIN
2 that's why it says 6 and 6:30.
3     Q.  And then the subsequent one is 5:22
4 A.M. of your --
5     A.  I get it.  I understand.
6     Q.  You mentioned before the choices that
7 were given to JPM.  Does this e-mail relate to
8 that issue?
9     A.  Yes, it does.
10     Q.  And Mr. Ricci --
11     MR. BERNICK:  Actually, you say
12     choices given to JPM.  It says "we have a
13     few choices."
14     MR. GAFFEY:  I'm about to follow up on
15     that.
16     Q.  I just want to know if it relates to
17 the topic that we were referring to, the choices
18 that were given to JPM.
19     A.  The subject matter that's in this
20 e-mail relates to the JPM problem and the list
21 of securities that they gave us in the middle of
22 the night and the path to a resolution which was
23 then resolved in that phone call that we had
24 with their people and their lawyer on the phone.
25 That's what it relates to, to the best of my

Page 152

HIGHLY CONFIDENTIAL - M. KLEIN

1       HIGHLY CONFIDENTIAL - M. KLEIN
2 knowledge.
3     To be clear, though, so you don't get
4 mistaken, those three choices were not the same
5 three choices that I indicated that were given.
6     Q.  No, I didn't understand your testimony
7 that way.  That may be my fault in the question.
8 I was just sort of pointing to the topic as
9 opposed to the particulars.
10     A.  I understand.
11     Q.  I'm showing you, Mr. Klein, what was
12 previously marked as Deposition Exhibit 149A.
13 Would you take a look through that, please.
14     A.  Yes.
15     Q.  Let me know when you've had a chance
16 to review it.
17     A.  Yes.
18     Q.  Now, in the first e-mail sent here,
19 it's from you to Mr. Diamond and begins, "The
20 court has approved Barclays' acquisition of
21 Lehman Brothers.  Congratulations.  A great leap
22 forward for BarCap."
23     Do you see that?
24     A.  Yes.
25     Q.  Do you recall sending this particular

Page 153

HIGHLY CONFIDENTIAL - M. KLEIN

1       HIGHLY CONFIDENTIAL - M. KLEIN
2 e-mail to Mr. Diamond?
3     A.  Not this specific, not this specific
4 e-mail.
5     Q.  Further up in the e-mail, Mr. Diamond
6 responds to you, "Yes," exclamation, point,
7 exclamation point, exclamation point, and then
8 you reply, "Bob, great day.  We clawed back 3
9 billion more of value in the transaction and cut
10 the building prices by 160 million tonight."
11     What are you referring to there?
12     A.  This was the Friday morning pain and
13 suffering to get the transaction closed.  Bob at
14 this stage was not intimately involved in the
15 day-to-day, or I certainly wasn't communicating
16 with him, so I didn't see him in part and
17 parcel.  It was Rich who was the day-to-day
18 contact, which was a shift from the sort of Fed
19 weekend, and Rich was sort of intimately
20 involved in the moving pieces.  And the
21 summation up top was meant to sum up all the
22 events that had taken place that got us to get a
23 closing.  It was a hard -- it was a hard day.
24     Q.  Now, the reference to 160 million, is
25 that a reference to the commission issue you

Page 154

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  spoke about before?
3      A.   It was the splitting the difference on
4  the -- I believe, but I don't know this for
5  certainty, that there were two opinions,
6  valuation opinions, both put forward by Lehman.
7  It may well have been that the appraisers had to
8  be agreed to by Barclays.  I don't know the
9  specifics, but the two opinions were then split
10  down the middle.
11      Those opinions resulted in a reduction
12  in value of the two buildings of 160 million.
13  In addition, I think there was a waiving of this
14  brokerage commission, but I think this -- I
15  believe that this 160 refers to the splitting of
16  the difference.  The above was meant to be of
17  kind of a summation of -- well, just of the
18  challenges of the day to get over the finish
19  line.
20      Q.   And the 3 billion that's referred to
21  in that e-mail to is a reference to the
22  additional assets searched for and found on
23  Friday?
24      A.   I would have to -- again, I don't
25  recall the specific e-mail, but that which we

Page 155

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  found, the bag of hammers, 1.9, the 15c3, is
3  entirely consistent with that.
4      Q.   Does this refresh your recollection as
5  to the amount that was added on?
6      A.   I want to be clear.  I don't believe
7  anything was, quote, added on.  I have said --
8      Q.   Let me put a clearer question.  You
9  made that point before, and that's fair.  Let me
10  withdraw the question and rephrase it.
11      Does this refresh your recollection as
12  to the additional value that was put in the deal
13  on Friday?
14      MR. BERNICK:  Go ahead.
15      A.   You've used the term "value" a few
16  times.  I don't know what the value of, in
17  particular, the bag of hammers, I don't know
18  what the value of that was, but what I've said,
19  there was the gap.  We delivered the need to get
20  more assets.  This was a summation of what took
21  place on the Friday.
22      Q.   In your e-mail to Mr. Diamond you used
23  the word "value" and you used it -- you say "3
24  billion more of value."  Was that your view of
25  what the value was?

Page 156

HIGHLY CONFIDENTIAL - M. KLEIN

1
2      A.   I couldn't have a view specifically of
3  the value because I don't have the -- I didn't
4  have the analytics of the value and I never saw
5  the 1.9.  It was a reference made to us in terms
6  of what the value was.  The reference is when
7  someone says you're getting 1.9 billion of
8  securities, that it's 1.9 billion of securities.
9  That's just not something that today or then I
10  could independently verify.
11      (Discussion off the record.)
12      (Recess; Time Noted:  3:07 P.M.)
13      (Time Noted:  3:17 P.M.)
14  EXAMINATION BY
15  MR. TECCE:
16      Q.   Good afternoon, Mr. Klein.  My name is
17  James Tecce.  I am an attorney at Quinn Emanuel
18  and we are counsel to the Creditors Committee.
19      Going to September 19, the day of the
20  sale hearing, I believe when Mr. Gaffey was
21  asking you questions earlier, you referred to a
22  sidebar that took place during the sale hearing
23  that you did not participate in, correct?
24      A.   There was a reference -- are you
25  referring to the e-mail discussion?

Page 157

HIGHLY CONFIDENTIAL - M. KLEIN

1
2      Q.   No, no, no, I'm referring to the sale
3  hearing -- let me back up for a second.  Did you
4  participate in the sale hearing where the
5  transaction was presented to the bankruptcy
6  court for approval on the 19th of September?
7      A.   I sat in and watched, yes.
8      Q.   Okay.  And did there come a point in
9  time during the sale hearing where there was a
10  sidebar discussion among Weil attorneys and
11  creditor attorneys, as you understood?
12      A.   I believe so.
13      Q.   Okay.
14      A.   I believe there was a sidebar amongst
15  the Weil attorneys, other attorneys, and
16  interested parties broadly as a -- I don't
17  believe that it was restricted to attorneys.  It
18  was interested parties fully being briefed, as I
19  understood it to be the case, but I don't know
20  all the people that were in the room.  But it
21  was a fairly broad briefing on what had been the
22  transaction.
23      Again, I don't know, just to respond
24  to your comment about lawyers and lawyers, I
25  think it was far broader than that.

Page 158

HIGHLY CONFIDENTIAL - M. KLEIN
1
2     Q.   Okay.  And to be clear, you did not
3   participate in that discussion, correct?
4     A.   I don't believe I did.
5     Q.   Okay.  Did there come a point in time
6   during the sale hearing that you participated in
7   any discussions with the advisors to the
8   Creditors Committee, their attorneys, their
9   financial advisors?
10    A.   Not during the sale hearing that I'm
11  aware of.
12    Q.   Okay.
13    A.   Or that I can recall.
14    Q.   Was there a point in time prior to the
15  sale hearing that you participated in
16  discussions with the committee?  And just to be
17  clear, when I say "the committee," I mean the
18  committee or their advisors or their attorneys.
19        MR. BERNICK:  I don't know that you
20    have established what the witness really
21    knows about his knowledge of who is on the
22    committee or who their lawyers are such that
23    he could answer your question.  I mean, if
24    he knows who's on the committee, who the
25    lawyers are, then he can answer the

Page 159

HIGHLY CONFIDENTIAL - M. KLEIN
1
2   question.
3        MR. TECCE:  I'm not asking who's on
4    the committee.  I'm asking if he ever had a
5    conversation with their advisors.
6        MR. BERNICK:  But if he doesn't know
7    who their advisors are or he doesn't know
8    whose on the committee, he can't answer the
9    question.  I'm not saying -- he may well
10    know.
11        MR. STERN:  James, in other words, he
12    may have spoken to someone at Houlihan, but
13    he may not have known that the person was
14    from Houlihan.
15        MR. BERNICK:  Or that Houlihan was
16    professionals for somebody.
17    Q.   Do you have an understanding of who
18  the attorneys for the Creditors Committee were?
19    A.   I met you today.  I don't -- I don't
20  know who was representing -- I don't know that
21  there was only one creditor committee or if
22  there was more.  I don't know all the background
23  on the Creditors Committee and who was involved.
24    Q.   Okay.  Did you have an understanding
25  that Houlihan Lokey was the financial advisor to

Page 160

HIGHLY CONFIDENTIAL - M. KLEIN
1
2   the Creditors Committee?
3     A.   I have subsequently learned that
4   official capacity.  I don't know that I knew
5   specifically that they had that role at the
6   time, but I have subsequently learned that.
7     Q.   Okay.  And did you know that Milbank
8   Tweed was counsel to the Creditors Committee?
9     A.   I don't have a recollection of
10  specifically of Milbank Tweed.  I don't.
11    Q.   So, prior to the sale hearing taking
12  place, did you engage in any conversations or
13  discussions with Houlihan Lokey or Milbank Tweed
14  concerning the sale transaction?
15    A.   I can -- to be very precise, there was
16  a series of events at the Weil Gotshal firm
17  where there were a series of meetings in meeting
18  rooms.  I don't recall the specific dates of
19  those meetings or meeting rooms, but there was
20  one evening in which there was a creditors
21  committee of some form meeting.  I don't
22  specifically know what was transpiring.
23        I did get pulled into a side room by
24  a group of people that included some of the Weil
25  lawyers, and again, I don't recall specifically

Page 161

HIGHLY CONFIDENTIAL - M. KLEIN
1
2   which date in the chronology it was, but it was
3   described to me that could I explain some
4   elements of the transaction, and the creditors
5   were involved.  There was a guy with glasses.  I
6   don't -- I don't know what his specific name
7   was.
8        And I remember specifically that
9   meeting only because I drew on a manila folder
10  such as that with a green marker the components
11  of both this 45 and the assets that were then
12  collateralized against it, separately and
13  distinctly, the other, quote, moving pieces in
14  what I understood to be the fund flows.
15        It was not a very long conversation
16  and I can't tell you who other than I think
17  Harvey Miller was in because I got grabbed in
18  there, but I specifically went through, again,
19  only because I grabbed a manila file and there
20  was a green pen and I just have that particular
21  recollection of drawing boxes.
22        And I did it because the Weil firm
23  asked me to, and as I understood it, there was
24  some form of ongoing creditor committee meeting
25  that I wasn't a party to.  That's my only

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  recollection.
3      Q.    Okay.  And did this take place before
4  or after the sale hearing?
5      A.    I don't have a recollection of what --
6  I just don't have a recollection of the -- it
7  was at Weil, but I don't know -- I don't have a
8  recollection.
9      Q.    Is there any reason --
10     A.    And by the way, I know which
11  conference room it was at Weil because we had
12  moved from the corner conference room to the one
13  next to it because I was grabbed, and there was
14  the middle conference room near the entryway was
15  where the Creditors Committee was meeting.  So I
16  sort of know -- I have a picture of the
17  whereabouts, I just don't remember the day.
18     Q.    Do you have any reason to believe that
19  it took place prior to the sale hearing Friday
20  hearing?
21     A.    Again, I don't have a recollection of
22  which -- I don't have a recollection of which
23  day it happened.  I know specifically what I
24  drew and that I was asked to have this
25  discussion and that it related to the Creditors

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  Committee and the fact that they were meeting.
3  Beyond those facts, as to which date and who the
4  people were, because I don't -- I don't think
5  they introduced themselves to me, I'm fairly
6  certain they didn't introduce themselves to me,
7  I don't have more of a recollection than that.
8      Q.    Okay.  And so let's just back up for a
9  second.  I believe that you referenced a larger
10  meeting and then you were pulled into a side
11  room; is that correct?
12     A.    That's right.
13     Q.    And so let's start with the larger
14  meeting.  Did you -- what was your understanding
15  of what the larger meeting -- of who was in
16  attendance at the larger meeting?
17     A.    Something to do with the creditors.  I
18  don't have more detail on it than that because I
19  didn't know the people.  There was just a big
20  room that supposedly there was the creditors
21  meeting and a phone call.  I was asked to be
22  pulled into this other side room --
23     Q.    Okay.
24     A.    -- and I acquiesced.
25     Q.    Okay.  The larger meeting, did you

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  speak with anyone or --
3      A.    I wasn't in that larger meeting.
4      Q.    I believe you mentioned Mr. Miller in
5  the side meeting.  Do you remember anyone else
6  who attended that meeting, the names of anyone
7  else?
8      A.    It was -- there were people floating
9  around, you know, from Barclays and from Cleary
10  Gottlieb and people floating around from the
11  Weil firm as well.  I just don't know -- people
12  were coming in and out of some of those rooms,
13  so I just don't know.  I just remember Harvey
14  asked me to explain it, so that's the only
15  reason why I know Harvey was there.
16     Q.    Do you know why he asked you to
17  explain it?  Do you have an understanding of why
18  he asked you to explain it?
19     A.    No, he just asked me to -- no, I
20  don't.  He just asked me to.
21     Q.    Do you remember the sum and
22  substance -- well, actually, how long did this
23  sidebar, side room meeting last, do you
24  remember?
25     A.    I don't.  I don't.  I don't think it

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  was exceptionally long, but it was long enough
3  for me to draw just a box diagram of the flow of
4  funds on a manila folder and answer one or two
5  questions.  I don't want to speculate how long
6  it was.  I don't think it was an enormously long
7  meeting.
8      Q.    Do you remember the substance of what
9  was discussed with respect to, you know, the
10  folder?
11     A.    It was the principal elements were the
12  45 loan, the assets that were roughly viewed as
13  equivalent to that, the, if you will, bag of
14  hammers and -- I'm sorry, let me be more
15  precise.
16         I recall specifically the funds flows
17  being discussed and the critical element of that
18  discussion being the 45.  Beyond that, I don't
19  know specifically which boxes or otherwise I
20  drew, so I don't want to -- I don't want to go
21  through over-detail because I would be then
22  speculating on the remaining details.
23     Q.    Do you recall whether the liabilities
24  that were being assumed by Barclays was
25  discussed during the meeting?

Page 210

HIGHLY CONFIDENTIAL - M. KLEIN

1  and I indicated that I don't have the authority
2  to do anything like that, and then I think
3  Archie Cox was the individual that was there
4  because he was the presiding, if you will,
5  officer.
6
7     It could well have been that the
8  agreement was other people, because there were
9  other senior people like Jonathan Hughes around.
10  But as I understood it, that was agreed to, that
11  above and beyond that, some minimum number, it
12  could in fact go back to the estate.  That was
13  very late in the process.  I don't remember
14  specifically when, but it was very late in the
15  process.
16     Q.  And do you have a recollection, Mr.
17  Klein, of where you were when this discussion
18  with Mr. Cox and Mr. Miller took place?
19     A.  You know, I want to say again, you
20  have now done this twice to me.  I have not said
21  that there was a conversation between Mr. Cox
22  and Mr. Miller.
23     Q.  I'm sorry.  I did not mean to
24  represent your prior testimony.  I think I must
25  have misunderstood your answer.

Page 211

HIGHLY CONFIDENTIAL - M. KLEIN

1
2     A.  I believe, but I don't know for sure,
3  that the request from Mr. Miller came somewhere
4  at the Weil offices, but I don't -- I don't have
5  a specific recollection, and I just want to be
6  clear that was a request to me that I then
7  passed on to the people at Barclays because it
8  was their decision.
9     Q.  And you say late in the process, so
10  can we at least narrow it down to a date?  Was
11  that request of Mr. Miller to you, was that on
12  the Sunday, the 21st?
13     A.  My apologies.  I don't know the date.
14  I don't -- I don't know the date.
15     Q.  Was it sometime prior to the closing
16  of the deal on Monday morning?
17     A.  Oh, it certainly was prior to the
18  closing.  I don't -- I'm not aware of -- it
19  certainly was prior to the closing.
20     Q.  And just to bookend it, can we agree
21  that that conversation took place sometime
22  between the bankruptcy court hearing on the 19th
23  and the closing on the 22nd, is that fair?
24     A.  I don't, I don't, I really don't.  As
25  I think I've said, the -- I don't think the 15c3

Page 212

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  assets came into play until sometime when this
3  issue of the broader set of asset problems after
4  Tuesday occurred, so it's clearly after that,
5  and it's clearly before closing, but I just -- I
6  just don't know the specific date.  And I would
7  help you if I could remember, but I don't.
8     Q.  I understand, sir.  Forgive me if I'm
9  getting a little repetitive, can you be as
10  precise as possible about the terms of the
11  request from Mr. Miller to you?
12     A.  I've given you what I know.  I
13  don't -- I don't have a recollection above and
14  beyond that.
15     Q.  And just so I understand your
16  testimony, sir, Mr. Miller asked you whether
17  Barclays would agree that if there was more than
18  a certain figure, perhaps around $750 million,
19  available under c3, then that would be returned
20  to the LBI estate; is that accurate?
21     A.  You are using very precise terms and I
22  want to be very careful because (A) this was a
23  year ago or more -- a year ago, and there was a
24  lot of moving pieces.  I don't specifically know
25  who was involved in the conversation other than

Page 213

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  Harvey Miller.
3     I only know that it was a request
4  that, above and beyond what had been represented
5  as being assets that were certainly going to go,
6  which was this e-mail, if there were more, could
7  those come back to the estate, and I said it's
8  not -- that's not something that can be done.
9     Now, I don't know -- not something I
10  can do.  I don't know who else was in the room.
11  It would be -- there was virtually no situation
12  that I can recall, in fact, I can't recall any
13  situation that I was in a room alone with Harvey
14  Miller.  So it would have been as part of some
15  other grouping.  And then a response was given,
16  to my understanding, from Barclays back that
17  that would be okay.  But I don't -- I don't have
18  a recollection beyond what I've just told you.
19     Q.  Did you have an understanding, Mr.
20  Klein, that the transfer of these moneys from
21  Lehman to Barclays, the 15c3 assets, was
22  conditional upon there being an excess beyond
23  the regulatory requirement?
24     MR. BERNICK:  Object to the form.  I'm
25  not objecting.  I think the form of your

Page 214

HIGHLY CONFIDENTIAL - M. KLEIN

1    question, though, is ambiguous.
2
3            The witness has now been over this
4    like four or five different times, and I'm
5    becoming a little concerned that there's
6    something that's turning on a nuance here
7    that's just not known by the witness.
8        A.   I've testified to what I know.
9    Someone handed an e-mail that said this would be
10    available to you.  It was an important part of
11    the decision process in that last Friday.  It's
12    not a subject I knew a lot about before and it's
13    not a subject I know a lot about now.
14        Q.   And the e-mail was, to your
15    understanding, an e-mail from some individual at
16    the S.E.C.; is that correct?
17        A.   There was an e-mail that referenced
18    that there was an approval to release a certain
19    amount of these funds, and as part of that, the
20    Lehman team said this is an asset for you to
21    solve what was the discussion that Mr. Gaffey
22    and I had about the asset issue, and the
23    reference made, as I've said that I can recall,
24    all I can recall is that it was up to 2 billion,
25    but that this note said it was at least 750 that

Page 215

HIGHLY CONFIDENTIAL - M. KLEIN

1    could be released.
2
3            I don't recall any more, but I'm
4    assuming that that e-mail -- that was an e-mail,
5    so you all have a lot of documents.
6        Q.   We have many e-mails, Mr. Klein, you
7    are right.
8            Do you know, Mr. Klein, whether the
9    e-mail about which you have testified -- I
10    understand that this was a year ago and your
11    recollection on this issue is one year old and
12    perhaps not any longer precise, do you recall
13    whether that was an e-mail from someone at the
14    S.E.C. or was it an e-mail that simply
15    referenced the S.E.C.'s supposed approval of
16    this element of the deal, or do you not know
17    either way?
18            MR. BERNICK:  You may want to ask him
19    if he ever saw it.  I don't know, but no one
20    has established whether he saw it.
21            MR. OXFORD:  I think he testified that
22    he hadn't seen it subsequently, from which I
23    inferred that he had seen it earlier.
24        A.   There was -- the only reason I recall
25    the e-mail was it was rare that there was

Page 216

HIGHLY CONFIDENTIAL - M. KLEIN

1            specific things shown to me that said here's an
2    asset, and because of that event on Friday,
3    there was this new subject that came up --
4    whether it was Thursday or Friday, I don't know
5    when, but this new subject of this 15c3.
6            I didn't know what it was, it was
7    referred to as an available set of assets, and
8    that was then promptly handed to the lawyers
9    because it was not a subject matter that I
10    could, and then some determination had to be
11    made was, is that relevant to then consider it
12    as part of this asset pool, and the decision was
13    yes.  Who the e-mail was from and between I
14    don't -- I don't have a recollection.
15        Q.   I think last question on this, and I
16    hope last question overall:  You described
17    earlier a give-back on the 15c3.  Do you have an
18    understanding of the reasons, if any, for the
19    give-back on 15c3, sir?
20        A.   I don't.  I just recall a request
21    coming in.  I don't know why.
22            MR. OXFORD:  Okay.  Mr. Klein, thank
23    you for your time.  I don't have any further
24    questions for you at this time.

Page 217

HIGHLY CONFIDENTIAL - M. KLEIN

1            MR. GAFFEY:  Just before we close the
2    record, I don't know, Mr. Klein --
3            We can go off the record.
4            (Discussion off the record.)
5            MR. BERNICK:  At the outset of the
6    deposition, there was a dialogue between Mr.
7    Gaffey and I regarding production pursuant
8    to the Subpoena that's been served on Mr.
9    Klein through me of what I will call for
10    short form the engagement letter between Mr.
11    Klein and Barclays relating to this matter,
12    and I undertook at that time to see if we
13    could even get a hold of it during the
14    course of the day, didn't have time to do so
15    because we've been working so hard and
16    intensely with these concise and insightful
17    questions that I didn't get a time to break.
18            So I will in fact get a copy of that.
19    I will in fact make it available in this
20    case pursuant to the subpoena.  However, my
21    current intent on behalf of Mr. Klein is
22    to redact the reference to a dollar amount, and
23    we can have further discussion about that,
24    but I will in fact discharge Mr. Klein's

Page 1

1                         J. KOBAK

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4       ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                Debtors.

10

        ----------------------x

11

12        * * * PARTIALLY HIGHLY CONFIDENTIAL * * *

13    (Pages 144-145 have been marked Highly Confidential.)

14

15    VIDEOTAPED DEPOSITION OF JAMES B. KOBAK, JR.

16                 New York, New York

17                 December 7, 2009

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 26430

Page 22

J. KOBAK

1
2  the end of that hearing, yes.
3      Q.   And that sale that was approved was a
4  sale that was negotiated by people other than
5  the trustee and his advisors, correct?
6      A.   That's correct.  Because I believe it
7  was a condition of the deal that we at least
8  agree that it was applied to our proceeding.
9      Q.   And then the contractual documentation
10  was finalized over the weekend and executed by
11  the trustee's representative on Monday morning,
12  correct?
13      A.   A clarification letter, what was
14  called a clarification letter was negotiated and
15  drafted over the weekend and signed by us.
16  Whether it documented the deal that was
17  described to the Court I think is a different
18  matter.
19      Q.   My only question is, I think your
20  affidavit and brief says you were not involved
21  in the negotiations, obviously, of the APA
22  because you weren't appointed yet, correct?
23      A.   That's correct.
24      Q.   And you were not -- I think you say
25  you were not actively involved in the

Page 23

J. KOBAK

1
2  negotiations of the clarification letter,
3  correct?
4      A.   That's correct.
5      Q.   So the trustee's role was to approve
6  the deal as trustee for the LBI SIPC
7  liquidation, correct?
8      A.   Yes.
9      Q.   But the trustee was approving a deal
10  negotiated by the Lehman executives, correct?
11      A.   That's correct.
12      Q.   And the trustee was approving a deal
13  that had been negotiated by Lehman with the
14  advice of its lawyers at Weil Gotshal, correct?
15      A.   That's correct.
16      Q.   The trustee was approving a deal that
17  the trustee did not himself negotiate?
18      A.   That's correct.
19      Q.   And at the time of his approval -- let
20  me refer you back to your affidavit, if I may,
21  paragraph 4.  In paragraph 3 you recount your
22  approval by the judge, Judge Lynch, and then you
23  say following that you went to the Bankruptcy
24  Court for the sale hearing.  And you say in the
25  second sentence of paragraph 4, "We were

Page 24

J. KOBAK

1
2  assisted by professionals at my firm and had
3  engaged Deloitte & Touche to act as
4  accountants."  Do you see that?
5      A.   Yes.
6      Q.   When was Deloitte & Touche engaged?
7      A.   We talked to them again.  I don't know
8  when the engagement letter was signed.  It might
9  have been after the liquidation actually began
10  because, again, that I think was approved by
11  SIPC as well as ourselves, but we talked to them
12  shortly before Friday, I don't know if it would
13  have been Wednesday or Thursday.  And again,
14  they had a few people involved.  Clearly they
15  didn't have time to get a full team together and
16  they really didn't have -- wouldn't have had
17  access to any information anyway.
18      Q.   Can you tell me why Deloitte & Touche
19  was engaged?
20      A.   Well, we knew we would need an
21  accounting firm to assist us.  This is a major
22  liquidation.  There are a lot of books and
23  records.  There's 200,000 computer systems, or
24  something like that.  Substantial work needed to
25  be done to reconcile accounts and so forth, so

Page 25

J. KOBAK

1
2  we would clearly need the assistance of a major
3  accounting firm.
4      It was a very large project, and
5  Deloitte has a lot of experience in this area
6  and didn't seem to have a conflict.  So that's
7  why Deloitte was chosen.
8      Q.   Any other reason?
9      A.   No, they had a good reputation for
10  being experienced in this area.
11      Q.   At the time that Deloitte & Touche was
12  retained, and through the time of the sale
13  closing, were you planning to sue Barclays?
14      A.   No.
15      Q.   Did Deloitte & Touche provide any
16  advice to you over that weekend before the
17  closing about the economics of the sale?
18      A.   I don't believe so.  I really don't
19  believe.  I mostly think they were trying to
20  figure out what they might need to do on Monday
21  morning in terms of what offices to go to, what
22  kind of staff they had to put together, what the
23  size and scope of Lehman might be just as a
24  practical matter.
25      There were a lot of unanswered

J. KOBAK

1
2    questions that everybody had just around the
3    logistics of things.
4         I don't think they made any
5    substantial investigation over the weekend.  I'm
6    not sure how they could have made any
7    substantial investigation because I don't think
8    they really would have had much access to people
9    or records.  Indeed, even when we took over the
10   following week, it was very difficult for us
11   initially to get access to books and information
12   and so forth.
13        Q.   After the closing, did you ask
14   Deloitte to analyze and assess the economics of
15   the sale?
16        A.   Well, the economics of the sale we
17   thought had been described at the hearing, and I
18   can go into that now or later, whatever you'd
19   prefer.  So I think we thought we had a handle
20   on the basic economics.
21        Our real concern was getting our hands
22   around exactly what was left, how we were going
23   to staff things, what kind of customer accounts
24   might be left with us, what was needed to be
25   done to move the accounts to Neuberger.  What

J. KOBAK

1
2    was needed to be done would be needed to be done
3    to move the accounts to Barclays.
4         Q.   Putting aside what you're saying about
5    the sale hearing, specifically, did you ask
6    Deloitte & Touche to do any work after the
7    closing to analyze the economics of the sale?
8         A.   Certainly not immediately after the
9    sale.  I'm not sure what you mean by "analyze
10   the economics of the sale."
11        Q.   Well, let me be more precise then.
12   Did you ever ask Deloitte & Touche, was it part
13   of their responsibility to create a closing
14   balance sheet or an opening balance sheet,
15   whichever you want to call it, for LBI before
16   and after the sale to show on --
17        A.   They had been working on that for some
18   period of time.
19        Q.   They're still working on that?
20        A.   I believe so, yes.
21        Q.   When did they start working on that?
22        A.   I don't recall.
23        Q.   Didn't they start working on that
24   right after the sale closed?
25        A.   I'm not sure it was right after.  It

J. KOBAK

1
2    might have been a few weeks after.
3         Q.   But in order to prepare a balance
4    sheet, an opening balance sheet -- so let me
5    make sure the record is clear and my
6    understanding is clear.
7         One of Deloitte & Touche's tasks is to
8    create a balance sheet for LBI as of the start
9    of the SIPC liquidation; is that correct?
10        A.   We asked them to do that at some
11   point.
12        Q.   And they have not yet completed that,
13   correct?
14        A.   That's correct.
15        Q.   And they began work on that shortly
16   after the SIPC liquidation began?
17        A.   I'm not sure it was shortly after.  It
18   might have been several weeks after.
19        Q.   Well, wouldn't it be one of their
20   immediate tasks that you would ask the
21   accounting firm to do?
22        A.   I don't see why it would be.  You
23   could well do a liquidation without ever having
24   a starting balance sheet, perhaps, and certainly
25   the immediate task would be to get control of

J. KOBAK

1
2    the books and records, figure out what we needed
3    to do, figure out what we needed to do to get
4    customer accounts transferred and reconcile
5    those figures, which involved a lot of
6    coordination with people at Barclays and the
7    staff remaining at LBI, and there were a myriad
8    of other details to attend to.  We were getting
9    calls from prime brokers, you know, minute by
10   minute, basically, with all kinds of questions
11   of where property was and where an account was.
12        So I don't, although it would be nice
13   to have a balance sheet, we asked them
14   eventually to prepare one, I do not think it was
15   an initial priority item by any means.
16        Q.   We have asked Deloitte & Touche to
17   produce documents to us and they have refused.
18   Can you explain to me why the trustee won't
19   allow Deloitte & Touche to produce documents to
20   us to show their understanding of the economics
21   of the sale?
22        MR. MAGUIRE:  The trustee has imposed
23   a -- asserted a privilege over the work that
24   Deloitte did.
25        MR. HUME:  I'm asking --

Page 30

J. KOBAK

1
2     MR. MAGUIRE:  That's not proper.
3  That's addressed to the trustee's counsel.
4  We have a whole series of correspondence
5  with your partner about that.  That's not
6  appropriate for this deposition.
7     (Exhibit 440, Debtors' Motion to (A)
8  Schedule a Sale Hearing; (B) Establish Sales
9  Procedures; (C) Approve a Break-Up Fee; and
10  (D) Approve the Sale of the Purchased Assets
11  and the Assumption and Assignment of
12  Contracts Relating to the Purchased Assets,
13  marked for identification, as of this date.)
14     Q.   Mr. Kobak, Exhibit 440 is the Debtors'
15  Motion to Schedule a Sale Hearing that I believe
16  was filed early in the morning on September 17
17  and that attaches to it a copy of the Asset
18  Purchase Agreement with handwritten edits on it.
19  Do you see that?
20     A.   Yes, I do.
21     Q.   And are you familiar with this
22  document, the version of the APA with the
23  handwritten edits?
24     A.   I believe, and I think my declaration
25  says that we had seen a copy.  I don't know if

Page 31

J. KOBAK

1
2  we were -- had seen it before we got to court
3  when we might have been handed a copy of it.
4     Q.   This would have been -- this was filed
5  with the court on Wednesday, September 17.  Are
6  you saying you're not sure whether the trustee
7  looked at it until September 19?
8     A.   No.  No.  No.  I think we saw it on
9  the 17th.  I don't know that we saw it until we
10  got to the courtroom.
11     Q.   Oh.
12     A.   The bankruptcy courtroom.
13     Q.   You attended the hearing.  Paragraph 5
14  of your affidavit says you attended the hearing
15  on September 17, 2008, correct?
16     A.   Yes, that's correct.
17     Q.   And the first sentence of paragraph 5
18  of your affidavit said you had been able to
19  review the proposed sale order and a hand-marked
20  version of the Asset Purchase Agreement,
21  correct?
22     A.   Right.
23     Q.   So you would have reviewed this on the
24  17th?
25     A.   I think we were given a copy on the

Page 32

J. KOBAK

1
2  17th at some point.
3     Q.   And who at the trustee would have been
4  responsible for reviewing this to understand the
5  nature of the deal?
6     A.   I think at that time it would have
7  been primarily myself and the trustee.
8     Q.   And at the time you reviewed this, did
9  you understand the economics of the deal?
10     A.   We understood primarily the economics
11  of the deal, which originally I think was said
12  to involve some $70 billion of assets against
13  some amount of liabilities, and I think that was
14  the basis for our understanding of the overall
15  economics.  We had some understanding at that
16  time of the items that were to be transferred to
17  Barclays.  Those -- what we were primarily
18  interested in what would remain behind because
19  that would be our job, to liquidate those things
20  and take care of the customers.
21     Q.   And who would you have gotten
22  information from other than Weil Gotshal?
23     A.   I think it was primarily Weil Gotshal.
24  I don't know, they may have had one or two
25  businesspeople who I guess at that time would be

Page 33

J. KOBAK

1
2  Lehman businesspeople.  I can't even remember
3  who they might have been who might have answered
4  some questions.
5     Q.   Can you remember any specific Lehman
6  executives that the trustee consulted with
7  before the sale hearing on September 19?
8     A.   No, I can -- I can speculate, but I
9  cannot remember who was on the other end of the
10  telephone.
11     Q.   Do you remember that there were
12  conversations with some Lehman executives, but
13  you don't remember their names?
14     A.   That's correct.  And there weren't a
15  lot of conversations, but there may have been a
16  couple.
17     Q.   Were there any conversations with
18  Lehman executives after the Friday, September
19  19, sale hearing and before the closing?
20     A.   Well, we did have people at the
21  hearing -- at the weekend clarification letter
22  drafting Sunday evening and Monday morning, and
23  I know that there were Lehman executives, some
24  of whom subsequently became Barclays executives,
25  who were there.

Page 34

J. KOBAK

1
2     I don't know to what extent -- I
3  wasn't there myself.  I was on a telephone for
4  many hours, as was the trustee and as were
5  people from SIPC.  I don't know if there were
6  substantial -- I don't believe there were
7  substantial communications.  There may have been
8  some communications at which our people were
9  present at which Lehman executives may have said
10  something.
11     Q.   Let's go back to this document, if we
12  could.  Let me refer you to page 6 of the Asset
13  Purchase Agreement where the purchased assets
14  are defined.
15     A.   Yes.
16     Q.   And you see towards the bottom of 6
17  where purchased assets are defined.  It says,
18  "'Purchased Assets' means all of the assets of
19  seller used in connection with the business,
20  excluding the excluded assets."  Do you see
21  that?
22     A.   Yes, I do.
23     Q.   And so at the time the trustee
24  received this, did the trustee understand that
25  Barclays was buying all of the assets used in

Page 35

J. KOBAK

1
2  the business as defined in this agreement?
3     A.   Except for that which was -- except
4  for that which was excluded.  That was the
5  intention at that time.
6     Q.   And it then lists numerous categories?
7     A.   Yes.
8     Q.   Subsection A through S, and then
9  there's a handwritten T on page 8.  Do you see
10  that?  I believe it's a total of 19 specific
11  subcategories of purchased assets.  Do you see
12  that?
13     A.   I see that it goes through T.
14     Q.   Okay.  And do you see that -- do you
15  see that there are no valuations given for any
16  of the assets listed in that definition of
17  "purchased assets" except the assets referenced
18  in subsection D?
19     A.   Yes.  In the handwritten delineation,
20  there's a value given for those, a book value.
21     Q.   A book value of 70 billion?
22     A.   Approximately 70 billion, that's
23  correct.
24     Q.   For D.  But that's -- there are
25  numerous other subcategories of assets for which

Page 36

J. KOBAK

1
2  no valuation is given?
3     A.   That's correct.
4     Q.   And are you aware of whether there was
5  ever a total valuation given for all of the
6  purchased assets set forth in the Asset Purchase
7  Agreement?
8     A.   No, there might have been some
9  definition of what amount of retained cash was
10  subsequently -- except for $250 million, there
11  really wasn't any retained cash.  I'm sorry,
12  this is what Barclays -- I mean, there may have
13  been some, and I don't remember what it was,
14  some estimate of the cash.
15        I think there was some estimate that
16  the residential real estate mortgages were
17  worth -- "worth" probably isn't the right word,
18  but had some kind of value of $6 billion, so 50
19  percent of that would be $3 billion, although I
20  don't think anyone thought that they were
21  actually worth anywhere near that, and I don't
22  think any numbers were associated with any of
23  the other items listed.
24     Q.   So other than the retained cash, the
25  residential mortgages, and the long positions in

Page 37

J. KOBAK

1
2  subsection D, to your knowledge, there was never
3  an appraisal or evaluation put on the other
4  subcategories of purchased assets set forth in
5  the APA; is that correct?
6     A.   That's correct, except for the ones
7  that I've stated, and you know, many of these,
8  like furniture and equipment, purchased
9  intellectual property would be unlikely to have
10  substantial value given the values at stake
11  here, but that's correct.
12     Q.   And let's go back to the retained
13  cash.  What was your understanding as of the
14  time of the original Asset Purchase Agreement,
15  as of September 17, of the value of the retained
16  cash?  In other words, the cash that Barclays
17  would acquire?
18     A.   Yeah, I don't remember.  I think there
19  might have been some discussion of that.  I just
20  don't remember what it is.
21     Q.   When you referenced the residential
22  real estate mortgage securities, you recall that
23  a value was represented to the Court of about $6
24  billion.  So 50 percent of that would be 3
25  billion, correct?

Page 38

J. KOBAK

1
2     A.    That's correct.
3     Q.    And so the Asset Purchase Agreement
4  would show that if you added the long positions
5  with the residential real estate mortgage
6  securities, you would have assets with an
7  approximate value of 73 billion, plus whatever
8  these other subcategories would add up to?
9         MR. MAGUIRE:  Objection.  Misstates
10     the record.  I think the witness made clear
11     that he didn't think anybody thought that it
12     was actually worth 3 billion.
13     Q.    What does that mean for something to
14  have a value ascribed to it but not really be
15  worth that?  What does that mean?
16     A.    I don't know what it means because I
17  don't know what people were basing it on.
18     Q.    Are you saying there were valuations
19  given that week that might not have represented
20  what you could actually sell the assets for in
21  the market, is that what you're saying?
22     A.    Yes.
23     Q.    So there were assets for which
24  numerical valuations were estimated which were
25  higher than the amount you could actually sell

Page 39

J. KOBAK

1
2  those assets for in that market at that time?
3     A.    That might well have been the case in
4  that market at that time.  It might well be the
5  case today.
6     Q.    Would you say there were assets
7  included in this transaction, financial assets,
8  that were extremely difficult to value that week
9  because they were illiquid?
10     A.    Yes, I mean, I have been told that
11  about certain securities and other assets, yes.
12     Q.    Were you aware of the fact that the
13  financial markets were in a state of crisis
14  during the week of September 15th, 2008?
15     A.    The newspapers and T.V. and media
16  referred to a financial crisis during that week.
17  It was well-publicized.
18     Q.    Do you think they were just using the
19  word loosely, or do you think there really was a
20  crisis?
21     A.    I don't purport to speak for the
22  press.
23     Q.    Did the trustee understand we were in
24  the middle of a financial crisis?
25     A.    I think it was a severe -- obviously

Page 40

J. KOBAK

1
2  this deal was related to a severe financial
3  crisis.  The reason that we were appointed was
4  because there was a concern that customers be
5  protected.
6     Q.    And in that crisis, certain financial
7  assets on the books of Lehman Brothers that were
8  going to be transferred to Barclays were very
9  difficult to sell, weren't they?
10         MR. CARDEN:  Objection.
11     A.    I don't know.  I'm not in the business
12  of selling assets.
13     Q.    Well, you're in the business of
14  telling me the residential real estate mortgages
15  couldn't be -- had a value that wasn't a real
16  value?
17     A.    I'm telling you that people ascribed a
18  value of $6 billion and I was led to believe,
19  and the trustee was led to believe, that there
20  was no assurance that that value would
21  necessarily be realized.
22     Q.    And I'm asking you, isn't that true of
23  other financial assets that were included in
24  this transaction, that they were difficult to
25  value that week?

Page 41

J. KOBAK

1
2         MR. CARDEN:  Objection to form.
3         MR. DAKIS:  Objection to form.
4         MR. MAGUIRE:  Asked and answered.
5     Q.    Do you agree with that or do you deny
6  that?  It's very simple.
7         MR. MAGUIRE:  Asked and answered.
8         MR. CARDEN:  Same objection.
9     A.    I agree that there was some securities
10  and other positions that I have been told were
11  illiquid and difficult to value in some cases.
12  We've asked Deloitte or others to value them,
13  and we've been told that they were illiquid and
14  difficult to value.
15         MR. HUME:  Let's take a short break
16     because the next exhibit is not ready, I'm
17     afraid.
18         THE VIDEOGRAPHER:  The time is 9:14.
19     We're going off the record.
20         (Recess.)
21         THE VIDEOGRAPHER:  The time is 9:22.
22     We are back on the record.
23  BY MR. HUME:
24     Q.    Mr. Kobak, let's just look a little
25  longer at this version of the APA with the

Page 42

J. KOBAK

1
2  handwriting on it.  If you go back to page 3,
3  really if you start on page 2 where it talks
4  about excluded assets, do you see that at the
5  bottom of page 2?
6      A.   Yes.
7      Q.   It defines "excluded assets" and it
8  includes in that, in subsection B, all cash,
9  cash equivalents, bank deposits or similar cash
10 items of LBI and its subsidiaries other than
11 $1.3 billion in cash.  Do you see that?
12     A.   Cash, cash equivalents, bank deposits,
13 yes.
14     Q.   Yes.  So that suggests there's 1.3
15 billion of cash, cash equivalents, bank deposits
16 or similar cash items that, under this version
17 of the agreement, were going to Barclays,
18 correct?
19     A.   Yeah, and that actually refreshes my
20 recollection as to what I and I think we
21 understood the -- roughly the amount of cash and
22 cash equivalents to be.
23     Q.   Okay.  So, at the time of this version
24 of the APA, you had long positions estimated to
25 be 70 billion, plus cash, cash equivalents, et

Page 43

J. KOBAK

1
2  cetera, of roughly 1.3 billion, plus residential
3  real estate mortgage securities for which a
4  value of 3 billion was given, but the
5  liquidation value might be debatable, correct?
6      A.   Well, yes, but book value -- I mean,
7  the 70 billion was said to be book value, not
8  actual -- not actual value.
9      Q.   What do you mean by that?  What's the
10 difference between book value and actual value?
11     A.   Book value I think is what it's -- was
12 booked for on the books.  I don't know if that
13 means it necessarily marked to market or not.  I
14 really don't know either way, but I'm not sure
15 it means present market value.
16     Q.   So at the time you were looking -- the
17 trustee was looking at this agreement, these
18 numbers, the number 70 billion, did the trustee
19 believe that was a number that represented the
20 value of the long positions or just some random
21 number associated with the long positions?
22          MR. CARDEN:  Objection to form.
23     A.   I don't think it was a random number.
24 I think it was exactly what it says in the
25 document and we didn't have any more or less

Page 44

J. KOBAK

1
2  information than that.
3      Q.   Okay.  Based on that information, book
4  value of 70 billion for long positions plus 3
5  billion for resis plus the 1.3 billion for the
6  cash and cash equivalents, based upon that
7  information in this document, did the trustee
8  inform anyone that this deal was not acceptable
9  to the trustee?
10     A.   No.
11     Q.   If you flip forward to me -- with me
12 to page 11 of this document, it talks about an
13 assumption of liabilities in Section 2.3.  Do
14 you see that?  It lists down at the bottom.
15     A.   Yes.
16     Q.   And it lists out the liabilities
17 Barclays would be assuming, correct?
18     A.   Yes.
19     Q.   On the next page, page 12 in
20 subsection I of this provision, 2.3 of the APA,
21 the handwriting -- the handwritten edits list
22 out a definition of short positions with an
23 approximate book value of 69 billion, do you see
24 that?
25     A.   Yes, I do.

Page 45

J. KOBAK

1
2      Q.   And so under this version of the APA
3  filed with the Court on September 17, Barclays
4  was getting a set of assets, many of which were
5  not valued, but some of which had a value, a
6  book value, of approximately 73.3 billion --
7  sorry, 74.3 billion, and short positions of
8  approximately 69 billion?
9      A.   Valued at 69.
10          MR. CARDEN:  Objection to form.
11     Q.   Would you agree with that?
12          MR. CARDEN:  Objection to form.
13     A.   That's what the deal says, that's what
14 was described, approximately.
15     Q.   You have assets, many of which were
16 not defined, and liabilities, many of which were
17 not -- sorry.  The agreement that was filed with
18 the Court on the 17th had many assets for which
19 values were not given, correct?
20          MR. CARDEN:  Objection to form.
21          MR. MAGUIRE:  Objection to form.
22 Asked and answered.
23     A.   Yes.
24     Q.   And it had several liabilities for
25 which the contract did not give a value,

Page 46

J. KOBAK

1
2 correct?
3    A.   That's correct.
4    Q.   But it did have a series of assets
5 that totaled up to book value of approximately
6 74.3 billion, correct?
7         MR. CARDEN:  Objection to form.
8    A.   Yes.
9    Q.   And it had one set of short positions
10 in the liabilities that was given a value of, a
11 book value of approximately 69 billion, correct?
12    A.   That's correct.
13    Q.   And the trustee never told anyone that
14 that -- the economics of that transaction was
15 unacceptable?
16    A.   No, we did not.  I think our
17 understanding was that the -- there was a rough
18 equivalence probably between the value of the
19 assets and the value of the liabilities.  And
20 again, our concern was that with really the
21 entity that was going to remain behind.
22    Q.   When you say you had an understanding
23 there was a rough equivalence, do you mean 69
24 billion and 74.3 billion represent a rough
25 equivalence of book value?

Page 47

J. KOBAK

1
2         MR. CARDEN:  Objection to form.
3    A.   Well, I think there's a rough
4 equivalent of the long positions and the short
5 positions.  There are a few other assets.  There
6 are also other liabilities.  As I've said, I
7 don't think some of the assets probably had the
8 value ascribed to them, and when you put that
9 all together, it seems to me you have a deal
10 where it's fairly -- the assets and the
11 liabilities are fairly equivalent, at least
12 within a fairly narrow range, I would say.
13    Q.   What was the narrow range?
14    A.   Well, you said 74.3 to 69 plus.  I've
15 told you I don't think the 74.3 probably was
16 really worth quite 74.3, but you're talking
17 about something where you probably have, if
18 there were any profit ascribed to the deal, a
19 very narrow profit, possibly at the end of the
20 day there would be a net cost to Barclays.  And
21 I think that was our understanding of what was
22 involved.
23    Q.   Did the trustee ever communicate to
24 anyone that they would not approve the deal if
25 Barclays recorded a profit on the deal?

Page 48

J. KOBAK

1
2    A.   No.
3    Q.   Did you -- did the trustee have any
4 basis for knowing whether the 69 billion --
5    A.   You're talking about the Asset
6 Purchase Agreement as described here?
7    Q.   Correct.
8    A.   Yeah.  Okay.
9    Q.   But did the trustee at any time before
10 the closing inform anyone that the trustee would
11 not approved the deal if Barclays recorded a
12 profit on the deal?
13    A.   Our understanding was not that there
14 would be a profit on the deal or, if there were
15 a profit, that it would be any kind of
16 substantial profit.  Our understanding was that
17 the assets and liabilities as described to the
18 Court were pretty close together, that there
19 were some additional liabilities, like
20 employment and severance and cure costs, of
21 several billion dollars that were being assumed
22 by Barclays, and if you put those things
23 together, it's unlikely that there would be any
24 substantial profit to Barclays, certainly
25 unlikely, in all probability, there might be a

Page 49

J. KOBAK

1
2 loss to Barclays.
3         And we were also concerned that it was
4 described that we would have at least $20
5 billion of assets left in the broker-dealer, and
6 obviously that number was important to us since
7 our job in life was to liquidate the
8 broker-dealer and make sure the customers were
9 protected.
10    Q.   Mr. Kobak, that was not my question.
11 Just to be clear, at any time before the closing
12 did the trustee communicate to anyone that the
13 trustee would not approve the deal if Barclays
14 was likely to record a profit on the deal?
15    A.   I don't believe that discussion ever
16 came up.
17    Q.   Now, going back to the Asset Purchase
18 Agreement you reviewed on September 17, did the
19 trustee have any greater knowledge about the 69
20 billion and whether that value was accurate than
21 it did about the 70 billion or the 3 billion for
22 resis?  Was there the same doubt about whether
23 that number represented an actual, real,
24 definite market value of those positions?
25         MR. CARDEN:  Objection to form.

J. KOBAK

1
2    MR. DAKIS:  Objection to form.
3    A.   I think there had been discussions
4    that there was a value of 6 billion in the
5    resis, but they probably weren't worth that
6    much.  I don't know if there was -- I don't
7    recall a specific discussion around the 70
8    billion or the 69 billion, just that those two
9    numbers were roughly in harmony with one
10   another.
11        Q.   Who did you -- who do you recall
12   having a discussion with about the 6 billion of
13   resis?
14        A.   I think we might have had a discussion
15   at some point with Mr. Miller.
16        Q.   And what did he tell you in that
17   discussion?
18        A.   And I don't remember if it was at this
19   time or, as I recall, DTC wanted the resis
20   because it was concerned about liabilities to it
21   if the accounts continued to transfer and so
22   forth.  And I think at that time at some point
23   we were told that some amount of the resis was
24   going to go to them, that they had a book value
25   of 3 billion, 6 billion, but that they really --

J. KOBAK

1
2    nobody thought they were worth that much, but
3    basically DTC wanted the most assurance it could
4    have that it would be protected.
5        (Exhibit 441, a document bearing Bates
6    Nos. HHR_00006494 through 95, with
7    attachment, marked for identification, as of
8    this date.)
9        Q.   Mr. Kobak, Exhibit 441 is an e-mail
10   produced by Hughes Hubbard to us in this case
11   that we believe has the attachment which was
12   given in native format of the balance sheet that
13   is stapled to it.  The e-mail is from Richard
14   Krasnow at Weil Gotshal to Jim Giddens as well
15   as to someone at the S.E.C. and Mike Macchiaroli
16   of the S.E.C., copying Brent Beldner at Lehman
17   and Martin Kelly at Lehman, do you see that?
18        A.   Yes, I do.
19        Q.   And the e-mail is dated September 18
20   at 8:30 P.M., do you see that?
21        A.   Yes, I do.
22        Q.   The first line of the e-mail from Mr.
23   Krasnow states, "Attached is the draft LBI
24   balance sheet reflecting unaudited estimated
25   numbers both pre and post Barclays

J. KOBAK

1
2    acquisition -- Barclays transaction."  You see
3    that?
4        A.   That's correct.
5        Q.   Was this e-mail provided to the
6    trustee to give him some sense of what the
7    economics of the transaction were?
8        A.   I don't know if it was the economics
9    of the transaction so much as what our entity
10   might look like, to the extent you could tell
11   that from a balance sheet.  I remember that we
12   had been asking for this information for a
13   while, not -- "a while" in this context meaning
14   maybe a few hours, and we didn't get it until
15   the evening.
16        I think I saw a copy of this and
17   discussed it with the trustee.  Indeed, I think
18   we had a call with Weil about it, and I think it
19   was in that call where a couple of Lehman people
20   were on the phone to try to answer some
21   questions.  And again, I don't recall who those
22   people were at this point.
23        Q.   Do you remember if Brett Beldner or
24   Martin Kelly were involved in those
25   conversations?

J. KOBAK

1
2    A.   I don't remember, and this doesn't
3    refresh my recollection in that regard.
4        Q.   Do you know whether the trustee ever
5    spoke to either of those gentlemen about the
6    transaction?
7        A.   I don't remember.
8        Q.   The next sentence of the e-mail says,
9    "The numbers relating to the transaction are
10   still being finalized, so the post-closing
11   amounts are subject to change."  Do you see
12   that?
13        A.   Yes, I do.
14        Q.   What was the trustee's understanding
15   of that sentence when he received this e-mail?
16        A.   That this was a pretty rough and ready
17   balance sheet that kind of gave you, at most, a
18   gross approximation of what we might be talking
19   about.
20        Q.   Did the trustee understand that the
21   valuations being given for the assets in this
22   transaction were generally estimates?
23        A.   Yes.
24        Q.   Did he understand that, given the
25   emergency nature -- let me just make sure we



Page 54

J. KOBAK

1
2  agree on that.  Would you agree that this
3  transaction was negotiated and approved under
4  emergency circumstances?
5          MR. CARDEN:  Objection to form.
6      A.   I believe the Court described it as
7  extraordinary circumstances, and I would
8  certainly subscribe to that.
9      Q.   Under those extraordinary
10 circumstances, would you agree that there was no
11 time to do a final and formal appraisal of all
12 the assets in the deal?
13     A.   Yes.
14         MR. CARDEN:  Objection to form.
15     Q.   And would you agree there was no time
16 to do a formal and final appraisal of all of the
17 financial trading assets in the deal?
18         MR. CARDEN:  Same objection.
19     A.   Yes, I don't know what kind of
20 analysis might have been done of those things
21 before, if some of them were marked to market on
22 a daily basis, for instance.
23     Q.   You don't know whether the assets were
24 being marked to market on a daily basis during
25 the week of September 15 through to September

Page 55

J. KOBAK

1
2  19?
3      A.   I think they probably were or efforts
4  were probably being made to do that.  Whether
5  they were all successful, and again, I think
6  there may have been some things that were
7  illiquid and that really couldn't be valued very
8  effectively.
9      Q.   When you say other assets were
10 probably being marked, do you have any basis for
11 knowing one way or the other?
12     A.   No, just general understanding of how
13 a brokerage firm would probably work.
14     Q.   Well, you understand it wasn't
15 operating normally that week --
16         MR. CARDEN:  Objection.
17     Q.   -- the brokerage firm?
18     A.   In many respects it was not operating
19 normally, that's correct.
20     Q.   You understand that the president of
21 the firm, Mr. McDade, has testified there was
22 massive human carnage and that the people were
23 not marking the books normally, as far as he
24 knew?
25         MR. MAGUIRE:  Objection to form.

Page 56

J. KOBAK

1
2          MR. CARDEN:  Objection to form.
3      Q.   Are you aware of that?
4      A.   I don't recall seeing that.  I
5  particularly do not recall the phrase "massive
6  human carnage."
7      Q.   Do you have any basis for knowing
8  whether or not Lehman was marking its books in
9  the ordinary course the way it had in the weeks
10 before the bankruptcy?
11     A.   I do not know.  It might have been
12 doing more marked to market since there were
13 assets that were going to be sold.  I don't
14 know.
15     Q.   It might have been doing less?
16     A.   It might have been doing less.  It
17 might have been doing more.
18     Q.   When the trustee received the balance
19 sheet attached to this e-mail, did the trustee
20 say that there was anything objectionable about
21 this transaction as described in this
22 approximate balance sheet?
23     A.   Well, we were trying to --
24         MR. CARDEN:  Objection to form.
25     A.   -- understand it.  It -- it refers to

Page 57

J. KOBAK

1
2  investments in consolidated subs.  There had
3  been some discussion that subsequently happened
4  that the subs in fact would be transferred and,
5  as it turned out, we got this Pich note instead.
6  So there were a lot of uncertain items on the
7  balance sheets.
8          We were trying to get a handle on what
9  kind of assets we were talking about that we
10 might be left with, what the approximate
11 magnitude of those would be, and that was
12 essentially what we were interested in.
13         The total capital of 2.4 would show
14 that you had a solvent entity, so to speak.  I
15 think we took some of that with a little bit of
16 a grain of salt because you had amounts due from
17 receivables and payables to receivables that we
18 thought would probably have a lot of variability
19 into it, but it did give us comfort that there
20 would probably not be a massive shortfall in
21 what would be needed to satisfy customer claims
22 at least, and again, that was our primary focus.
23     Q.   The numbers in this draft balance
24 sheet are different from the numbers in the APA,
25 correct?

J. KOBAK

1
2  and a few other questions of that nature.
3      Q.    Can you remember any other specific
4  questions?
5      A.    No, I cannot.
6      Q.    Can you remember any other information
7  that's referenced by the "limited other
8  information" you reference in paragraph 6 of
9  your affidavit?
10     A.    No.  Again, I think we had some
11 discussions with Lehman -- with Weil or Lehman
12 people and with regulators about to the effect
13 that there didn't seem to be any huge problems
14 in terms of missing customer property, in terms
15 of somebody having walked off with accounts or
16 missing accounts not being there or something of
17 that nature.
18     Q.    And in this first sentence you
19 reference that you got information through the
20 lawyers for the holding company.  I assume
21 you're referring to Weil Gotshal?
22     A.    That's correct.
23     Q.    Any other lawyers, or just Weil
24 Gotshal?
25     A.    Just Weil Gotshal, I believe.

J. KOBAK

1
2      Q.    And then you say, "...from largely
3  unidentified employees of Lehman entities."
4          Again, when you say "largely
5  identified" in paragraph 6 of your affidavit,
6  can you remember any who were identified?
7      A.    No, I can't, and I didn't mean -- I'm
8  sure that somebody told us their names at the
9  time.  I didn't mean that there were anonymous
10 voices on the phone.  I just cannot recall who
11 they were.
12     Q.    So you say, based on all that
13 information, you say, "The trustee and I
14 believed and discussed with SIPC that the sale
15 would facilitate the transfer of customer
16 accounts to solvent broker-dealers with minimal
17 disruption to the customers' ability to access
18 their accounts."  Do you see that in your
19 affidavit?
20     A.    Yes, I do.
21     Q.    Again, does this just go back to what
22 you said earlier, that the idea here was for
23 customers to have their property moved to a
24 solvent broker-dealer so they could have
25 immediate access and not have to go through a

J. KOBAK

1
2  protracted liquidation claims process?
3      A.    To the extent possible, I thought that
4  a purpose of this transaction was to achieve
5  that.  How protracted the claims process would
6  be I don't know, but it certainly would not be
7  likely to give people, even in the best of
8  circumstances, even in a small brokerage house,
9  access to their accounts, you know, immediately
10 on Monday morning, as they might be able to have
11 access if another solvent broker took over the
12 accounts and started trading or allowed people
13 to trade in those accounts.
14     Q.    And that goal or purpose, that phrase,
15 "the sale would facilitate the transfer of
16 customer accounts to solvent broker-dealers,
17 with minimal disruption to the customers'
18 ability to access their accounts," that was
19 accomplished through the Barclays sale, correct?
20     A.    Yes, it proved, as I think your client
21 is well aware, a lot more complicated to
22 transfer all the property.  We're still trying
23 to do the final stages of that, as I think you
24 know, but by and large, as I understand it, at
25 least to the customer, most customers I think

J. KOBAK

1
2  thought that what had been at Lehman was now at
3  Barclays, in the case of Barclays, or at
4  Neuberger & Berman in the case of Neuberger
5  Berman.
6          There were very few instances that
7  that may not have been the case, but I think in
8  99.99 percent of the cases as far as the
9  customer was concerned, everything went
10 smoothly.  There were some number of accounts,
11 as I've said, that remained with us, so they're
12 being satisfied through the claim process.
13     Q.    That goes to the next -- so at least
14 this first part of it has been accomplished in
15 terms of transferring the customer accounts and
16 providing immediate access?
17     A.    Well, assuming the Court approves our
18 order next Thursday, yes, that whole stage will
19 be completed.
20     Q.    The next sentence says, "We believed,
21 based on the information available to us, that
22 there would be sufficient customer property in
23 the reserve account or otherwise segregated or
24 available at depositories to support the
25 transfer of the great bulk of customer accounts

Page 66

J. KOBAK

1
2  and satisfy any remaining customer claims."
3      What was the basis for that belief?
4      A.   Well, the balance sheet -- first of
5  all, we were told that the S.E.C. thought for
6  the most part that property that should have
7  been in segregation was probably in segregation,
8  that Lehman was basically a pretty well run
9  enterprise while it was a functioning
10  broker-dealer, and that nobody knew about any
11  massive amounts of property that weren't there.
12      We were given a little further
13  assurance by the balance sheet in Exhibit 441,
14  which did seem to show, you know, roughly
15  speaking, a solvent brokerage firm.  I think if
16  we had -- if it is -- if even this rough balance
17  sheet had shown a huge negative in total
18  capital, that would have given us a lot of pause
19  that there might well not -- there might well be
20  a big shortfall which would carry over to
21  customer property.
22      Q.   Did you ever tell anyone that?  Did
23  the trustee or its advisors ever tell anyone
24  that if this transaction resulted in any kind of
25  negative balance at Lehman after the deal, that

Page 67

J. KOBAK

1
2  you would not approve it?
3      A.   I don't know if we said we wouldn't
4  approve it.  We certainly had discussions with
5  SIPC.  SIPC was certainly not interested.  What
6  it would have done, you have to ask them, but
7  they would be very concerned about exposure if
8  there were huge massive shortfalls in customer
9  property to start with in a transaction, and we
10  certainly had discussions with the S.E.C.
11      There was also, frankly, just
12  discussions about getting into something where
13  the records were, you know, a nightmare or
14  something where, you know, you couldn't tell
15  what was in people's accounts, and it did turn
16  out that the records, while there are
17  difficulties in access to the records and
18  reconciling them and there were a lot of
19  transactions in the last week, in fact Lehman as
20  an operating broker had maintained pretty good
21  records so that those kind of concerns really
22  didn't exist to nearly the extent that they
23  could have.
24      Q.   Other than in discussions with SIPC
25  and the S.E.C., did the trustee ever communicate

Page 68

J. KOBAK

1
2  to anyone else that it would not approve the
3  deal if the deal would result in a shortfall for
4  remaining customer claims?
5      A.   I don't believe we had any direct
6  discussion of that that I can recall.
7      Q.   The next sentence of your affidavit in
8  paragraph 6 you say, "Based on the information
9  and assurances we received."  What are the
10  assurances you received?
11      A.   I think it's what I testified to.
12      Q.   There were no assurances from
13  Barclays, were there?
14      A.   I think -- I don't know if we were
15  given assurances directly.  I think the
16  regulators -- certainly there were assurances
17  that Barclays would cooperate in the account
18  transfer process and was willing to take the --
19  take the accounts.  Might not be willing to take
20  the liabilities, but it was willing to take the
21  accounts.
22      Q.   You then say, "Based on all of that,
23  the trustee concluded the sale was in the best
24  interests of LBI customers, creditors and the
25  general estate."

Page 69

J. KOBAK

1
2      When exactly did the trustee decide to
3  support and approve the sale?
4      A.   I think we had decided that we would
5  support the transaction certainly by the time of
6  the hearing on the 17th.  It was also obviously
7  important to us what people said during that
8  hearing.
9      Q.   And after that decision to support the
10  transaction on the 17th, was there ever a time
11  where the trustee -- was there ever a time where
12  the trustee considered changing his support and
13  not supporting a transaction?
14      A.   I don't believe so.
15      Q.   Do you know whether before the sale
16  closed on Monday, the 22nd, the trustee or his
17  advisors ever reviewed the minutes from the
18  Lehman board meeting that approved the sale?
19      A.   We did approve -- we did review the
20  minutes.  I don't know if we did it before the
21  closing or at some time after that.
22      Q.   You believe you received the minutes
23  at least before the closing?
24      A.   I don't believe we received the
25  minutes.  I believe my corporate partner Ellen

Page 70

J. KOBAK

1
2 Friedenberg had to make several requests of
3 them. I think she went up to Weil's offices or
4 Lehman's offices several times and basically had
5 to find the minutes. I think it was sometime
6 afterward that we first received the minutes,
7 but it may have only been a draft of the
8 minutes.
9    Q.   So there was some effort before the
10 closing to simply review as a matter of
11 diligence what the board approval was?
12    A.   No. No. No. I think we asked for it
13 after the closing.
14    Q.   I see. So before the close, what, if
15 anything, did the trustee or its advisors do to
16 review what the board had meant and approved,
17 what the board had done?
18    A.   I think we were just told that the
19 board had approved the transaction. I don't
20 think we had any reason to question that.
21    Q.   And so, again, just because I
22 misunderstood, just so the record is clear, your
23 testimony is that you don't believe the trustee
24 or his advisors saw any board minutes from the
25 Lehman board meeting that approved the sale

Page 71

J. KOBAK

1
2 before the closing?
3    A.   I don't believe. I think we saw them
4 for the first time maybe several weeks after the
5 closing.
6    Q.   Did you understand before the closing
7 that the Lehman board had delegated to Lehman
8 officers the task of finalizing the negotiations
9 for the transaction?
10    A.   Well, I think we had been told that
11 the transaction had been authorized, and you
12 would expect that officers of the company would
13 be the people who would negotiate the deal and
14 implement the deal.
15    Q.   And even though as of Friday afternoon
16 Mr. Giddens is now formally appointed the
17 trustee, he's immediately faced with a
18 transaction that's been negotiated by other
19 people. So is his view -- is it his role at
20 that time simply to approve rather than to try
21 to renegotiate?
22    A.   Well, we ran -- I mean, what happened
23 was we were in the Federal District Court at
24 Pearl Street and we got the order signed, and
25 after it was signed and we made copies and so

Page 72

J. KOBAK

1
2 forth, we got in a car and raced down Broadway
3 so we would get to the Bankruptcy Court in time
4 for a 4 o'clock hearing.
5       The time was very tight. After that,
6 we spent from 4 until, you know, whatever time
7 that hearing ended, 1, 2 in the morning in the
8 Bankruptcy Court.
9    Q.   Let's look at paragraph 7 of your
10 affidavit, and we'll look at the sale hearing.
11 We might as well mark it as the next exhibit.
12       (Exhibit 442, Transcript of the Sale
13       Hearing, marked for identification, as of
14       this date.)
15    Q.   You mentioned that shortly after the
16 appointment, you then moved down to the
17 bankruptcy courthouse for the hearing that was
18 to be held to approve the sale on the afternoon
19 of the 19th?
20    A.   That's correct.
21    Q.   And do you arrive just as the hearing
22 is beginning or do you have a chance to meet
23 with people to discuss the transaction before
24 the hearing begins?
25    A.   I can't remember exactly when we got

Page 73

J. KOBAK

1
2 there. I remember that Mr. Caputo and I
3 actually had time to go to Chipotle and get
4 something to eat because we hadn't had anything
5 to eat all day, so we had a few minutes to do
6 that. I think we got to the courthouse, the
7 Bankruptcy Court. We wanted to be sure we were
8 there in advance of 4 o'clock, if possible. The
9 place was jammed. There were over -- you know,
10 we wanted to make sure we got a seat at the
11 table, so to speak, if nothing else.
12       And so we were there for some period,
13 not long, but some period of time I think before
14 the proceeding came to order.
15    Q.   Did you have any substantive
16 discussions before the hearing came to order
17 about any changes in the transaction?
18    A.   We had a discussion with Mr. Miller
19 where Mr. Miller said the transaction has
20 changed. The 70, 69 billion is now 4 -- I'm not
21 sure if he used these terms, these exact
22 numbers, but 47.4 versus 45.9, the same kinds of
23 figures that were subsequently described by Ms.
24 Fife to the Court.
25    Q.   So you're not sure what numbers Mr.

Page 74

J. KOBAK

1
2  Miller gave you, but he told you -- he gave you
3  numbers roughly similar to the ones Ms. Fife
4  gave to the Court?
5      A.   I don't know if he used exactly the
6  same numbers.  He might have said 47, he might
7  have said 47 to 48, but he certainly had a
8  number in that range, and that it was -- there
9  had been changes to what had been -- to the
10 original Asset Purchase Agreement.
11     Q.   And who was it in the meeting in which
12 Mr. Miller made these things?
13     A.   Who?
14     Q.   Who was this -- who was gathered
15 around Mr. Miller when he explained to --
16     A.   Well, there were dozens of people
17 gathered around, but the people he was
18 addressing, I believe, as best I recall, were
19 me -- were Mr. Giddens -- actually, Mr.
20 Harbeck -- I should put them in order of who he
21 was actually talking to -- Harbeck, Giddens, me,
22 Caputo.  I don't know if Mr. Kiplok was there at
23 that time.  So that would have been the group
24 from our side.  I don't remember if anybody else
25 from Weil or elsewhere was with Mr. Miller.  And

Page 75

J. KOBAK

1
2  it was a very brief conversation, you know, I
3  think a few minutes, actually, before the Court
4  proceeding was called to order.
5      Q.   And this was a meeting separate from
6  the discussion that took place in the recess
7  shortly after the hearing began?  You're talking
8  about a meeting that took place before the
9  hearing even came to order?
10     A.   I believe that's correct.
11     Q.   Do you recall that there was a recess
12 shortly after the sale hearing began?
13     A.   I recall one or maybe even two
14 recesses.  I don't recall the exact timing of
15 them.
16     Q.   Well, when you reference the off -- an
17 off-the-record presentation in paragraph 7 of
18 your affidavit, what are you referring to there?
19     A.   Okay.  Well, I think we had this
20 discussion with Mr. Miller.  At some point I
21 think there was an off-the-record presentation
22 to the assembled masses by Ms. Fife, I believe,
23 also explaining some of the changes in the deal,
24 and then I think we went back on the record and
25 some of that was -- maybe it all was described

Page 76

J. KOBAK

1
2  to the Court.
3      Q.   Do you remember what Ms. Fife said in
4  the off-the-record presentation during the
5  recess?
6      A.   No.
7      Q.   Were you in attendance during that?
8      A.   Yes.
9      Q.   You don't recall anything she said?
10     A.   No, I have a hard time separating what
11 she said then from what she said later on the
12 record in Court.
13     Q.   Did anyone for the trustee take any
14 notes during the off-the-record recess?
15     A.   Not that I'm aware.
16     Q.   Have you, in preparing for this
17 deposition, did you consult with anyone at the
18 trustee about what they may remember about what
19 Ms. Fife said during that recess?
20     A.   I didn't personally consult with them,
21 no.
22     Q.   I just want the record to be clear.
23 It was -- your testimony is that the trustee and
24 his advisors do not have a recollection of what
25 Ms. Fife said during that recess?

Page 77

J. KOBAK

1
2      A.   I don't have a recollection.  I don't
3  know if anyone else has a recollection.
4      Q.   I would just like to ask that, since
5  it is part of your affidavit, I think well
6  within the scope of the 30(b)(6), that you make
7  an inquiry as to whether anyone for the trustee
8  or at Hughes Hubbard has a recollection of what
9  Ms. Fife said during that recess.
10     MR. MAGUIRE:  We can leave a space in
11 the transcript and we can take that under
12 advisement.
13     MR. HUME:  Thank you.
14 INFORMATION TO BE PROVIDED: _____
15 _____
16 _____
17     Q.   Going back maybe to the meeting you
18 recall with Mr. Miller where he explained that
19 the numbers had changed, I think you said he
20 explained generally that, instead of the 70 and
21 the 69, it was something on the order of the 47
22 to 48 and 45, roughly, is that accurate?
23     A.   Yeah, pretty close to the -- I mean,
24 I'll put it this way:  When -- we weren't really
25 surprised with the numbers that Ms. Fife used

Page 78

J. KOBAK

1
2    when she reported to the Court 47.4 versus 45.5.
3    So that was very consistent with whatever Mr.
4    Miller told us.
5        Q.    Okay.  And did he explain to you, did
6    Mr. Miller explain to you in the meeting you
7    referenced where he gave you those numbers, why
8    the transaction had changed?
9        A.    No, I don't think specifically.  I
10   think he mentioned all the activity at Lehman so
11   that it might be that assets that might have
12   been available and liabilities that might have
13   been associated with them would be smaller in
14   magnitude because of activity that had taken
15   place.
16            It might also have had to do with
17   market conditions generally, valuation.  I know
18   that Ms. Fife I think attributed it to decline
19   in securities prices during the ensuing days.
20   I'm not sure that's how Mr. Miller described it,
21   and I think we thought it might be more a
22   diminution in Lehman's remaining assets that
23   were available because there had been activity,
24   people had been trying to get property out of
25   Lehman during that week.

Page 79

J. KOBAK

1
2        Q.    So part of your understanding was
3    there may have been counterparties who were
4    seizing collateral, for example?
5        A.    Customers getting things out, people
6    closing transactions, perhaps seizing
7    collateral.  It could be any number of things.
8        Q.    Just changes to what's available on
9    the balance sheet?
10       A.    I think that, you know -- and again, I
11   don't think Mr. Miller said anything very
12   specific along these lines.
13       Q.    Did you understand, meaning did the
14   trustee or his advisors understand, as of the
15   time that he arrived at the sale hearing on
16   September 19 that Barclays had replaced the
17   Federal Reserve's lending position under its
18   repo to the tune of approximately $45 billion?
19       A.    I think we knew that there was a repo
20   that the Fed was very anxious to get out of,
21   that Barclays may have substituted for that.  I
22   don't think we knew or were told the amount of
23   that repo.  I don't think we were told
24   definitely what was involved.  Really a lot of
25   the basis for our knowledge was the fact that

Page 80

J. KOBAK

1
2    I've described these discussions about when we
3    should go to court to do the filing, and part of
4    the concern was the Fed's concern that they
5    didn't want the filing to occur too early, and I
6    think we subsequently learned or learned while
7    we were at the courthouse that they wanted to be
8    sure that their transaction had been unwound, so
9    to speak, before the SIPA proceeding commenced.
10   But I don't think beyond that we had any
11   detailed knowledge of what the arrangements
12   were.
13       Q.    Did you learn during the hearing, the
14   September 19 sale hearing, that the -- what the
15   amount of the repo loan was that Barclays had
16   made?
17       A.    I don't recall.  I don't recall
18   learning that during the course of the hearing.
19       Q.    Well, let me reference you on page --
20   on Exhibit 442 to page 63 of the sale hearing,
21   and I can refer you -- if you get to page 63,
22   let me know when you're there.
23       A.    I'm here.  I'm here.
24       Q.    If you go down to line 16, Mr. Miller
25   says, "Barclays, your Honor, has extended the

Page 81

J. KOBAK

1
2    sale to enable this extraordinary transaction
3    and hopefully to be consummated.  Yesterday, as
4    your Honor has heard, Barclays basically stepped
5    into the shoes of the Federal Reserve in
6    connection with the Primary Dealer Credit
7    Facility as to the $45.5 billion Lehman borrowed
8    last Monday and received the collateral that
9    Lehman had posted in connection therewith."
10           Does that refresh your recollection
11   that during the sale hearing Mr. Miller
12   explained that the repo loan that Barclays had
13   made was approximately $45 billion?
14       A.    It doesn't refresh my recollection
15   specifically, but --
16       Q.    Is it --
17       A.    -- obviously it's what he said.
18       Q.    So did the trustee simply not
19   understand the amount of the repo at the time of
20   the sale hearing?
21       A.    I don't -- I just really don't recall
22   this.  I'm not disputing that it was said.  I'm
23   not disputing that we would have understood this
24   at the time.  I just -- I guess I'm testifying
25   personally now -- just don't recall it having

Page 82

```
1              J. KOBAK
2  been said at this occasion.
3     Q.   Well, did the trustee understand
4  before the closing that the repo loan -- that
5  Barclays had advanced $45 billion of cash?
6     A.   Well, we understood what Mr. Miller
7  was saying.
8     Q.   Okay.  And you understood that there's
9  a haircut in a repo?
10    A.   Yes.
11    Q.   So you understood that the collateral
12 received by Barclays was supposed to be worth
13 more than $45 billion?
14    A.   In all likelihood, it would be worth
15 or at least be valued, potentially valued, at
16 something higher than the face amount of the
17 loan.
18    Q.   And you knew that as part of the final
19 purchase agreement Barclays was to receive all
20 of that collateral in the purchase?
21       MR. CARDEN:  Objection to form.
22    A.   I think that was -- was agreed to,
23 yes, eventually.
24    Q.   When you say "eventually," was it your
25 understanding it was agreed to as of the time
```

Page 83

```
1              J. KOBAK
2  the sale hearing on September 19?
3     A.   Well, I thought --
4        MR. CARDEN:  Same objection.
5     A.   I might have my timing out of
6  sequence, but I thought that it was -- it
7  subsequently became the case that Barclays
8  basically kept the collateral that it had, was
9  my understanding, rather than transfer it and
10 have it transferred back and so forth, and that
11 was said to be the $47.4 of assets that were
12 described to the Court.
13    Q.   So was it --
14    A.   Or a part of the 47.4.
15    Q.   That's exactly what I wanted to get
16 to, which was what was the trustee's
17 understanding of what assets comprised the $47.4
18 billion number?
19    A.   I don't think we had a specific
20 understanding as to the exact composition of
21 what the assets were in total.  There was a
22 representation to the Court, and no one
23 disputed, that they were worth $47.4 billion,
24 and there was a corresponding representation
25 that there were liabilities of 45.5 billion.  I
```

Page 84

```
1              J. KOBAK
2  don't dispute that that's similar to the figures
3  that were described for the repo.
4        There was also a representation to the
5  Court that the broker would have at least $20
6  billion of assets left behind, and so those were
7  the numbers and it was really the 47.4 being
8  described as the value of the transaction and
9  the fact that there was a close correspondence
10 between the value of the assets and the value of
11 liabilities and that there were substantial
12 assets being left behind in the brokerage firm.
13 Those were the things that were material to us.
14    Q.   Did the trustee understand that there
15 was also an amendment to the APA relating to the
16 residential mortgage securities as of September
17 19?
18    A.   I believe so, yes.
19    Q.   And did the trustee understand that
20 that amendment transferred 100 percent rather
21 than just 50 percent of the residential mortgage
22 securities to Barclays?
23    A.   Yes, I believe so.
24    Q.   And did the trustee understand that
25 the additional 50 percent that Barclays was
```

Page 85

```
1              J. KOBAK
2  going to receive plus the 250 million cash
3  consideration that Barclays was going to pay
4  were going to be used to satisfy settlement
5  obligations at the DTC?
6     A.   They were going to be, as I understood
7  it, available for the DTC -- to the DTC for that
8  purpose.  I understood that DTC -- well, I may
9  be jumping ahead, but I understood that DTC was
10 expressing substantial misgivings about going
11 ahead with processing any transactions unless it
12 was fully satisfied that it had no potential
13 liability.
14       It was looking for anything it could
15 get in that regard, and although this is some
16 things it was looking for, I don't think it was
17 by any means all that it demanded.
18    Q.   Did the trustee understand as of the
19 time the sale was approved that Barclays was
20 still going to retain for its own account 50
21 percent of the residential mortgage securities?
22    A.   I think there was an understanding
23 that, if I recall it, DTC got them, if they
24 turned out not to be necessary, some of the 50
25 percent -- whatever part of the 50 percent was
```

## Page 86

J. KOBAK

1
2 not necessary, would actually be returned to
3 LBI. That was my understanding.
4    Q.   Of the additional 50 percent that was
5 being given to Barclays?
6    A.   Yes.
7    Q.   But the original 50 percent in the APA
8 would still remain with Barclays, correct?
9    A.   Yeah, I don't think that was changed.
10    Q.   Now, the 47.4 billion that Ms. Fife
11 referenced, maybe you can look with me at page
12 47 where she references it, and you said she
13 says basically the same that Mr. Miller told
14 you, correct, page 47 at the top?
15    MR. DAKIS:  Objection to form.
16    Q.   You see at the top where she says
17 "originally"?
18    A.   Yes.  No.  No.  I'm just --
19    Q.   And she references approximately 70
20 billion?
21    A.   Yes.
22    Q.   That's a reference to the long
23 positions in the APA, correct?
24    A.   Yes, that's what we understood.
25    Q.   And in your brief, in your Rule 60

## Page 87

J. KOBAK

1
2 brief, which we can show you, you state that
3 your understanding of the deal was that Barclays
4 would obtain the real estate, the business as
5 defined in the APA, and $47.4 billion of other
6 assets; is that correct?
7    MR. MAGUIRE:  Why don't you show the
8 witness the motion.
9    MR. HUME:  I'm happy to show him the
10 brief.
11    (Exhibit 443, The Trustee's Motion for
12 Relief Pursuant to the Sale Orders or,
13 Alternatively, For Certain Limited Relief
14 Under Rule 60(b), marked for identification,
15 as of this date.)
16    Q.   Do you have -- does the witness have
17 Exhibit 443?
18    A.   I do.
19    Q.   Okay.  If you turn to paragraph 3 and
20 4, they both say the same thing, I believe.
21 Paragraph 3 of the trustee's Rule 60 motion, are
22 you at paragraph 3?
23    A.   Yes, I am.
24    Q.   It says in the second sentence, "As
25 presented to and approved by the Court, the

## Page 88

J. KOBAK

1
2 revised deal called for Barclays to acquire the
3 business, as defined in the APA, certain real
4 estate properties and $47.4 billion of
5 additional assets in exchange for a payment of
6 $250 million plus the appraised value of the
7 real estate and Barclays' assumption of $45.5
8 billion in liabilities and certain cure costs
9 and employee-related obligations."  Do you see
10 that sentence?
11    A.   Yes, I do.
12    Q.   So my question is what assets are
13 included in the business that are not included
14 in the $47.4 billion number according to the
15 trustee's understanding of the deal?
16    A.   I'd have to look at the definition of
17 the business.
18    Q.   Okay.  The APA that I gave you earlier
19 with the handwritten edits is the same as the
20 final APA, just the hand draft writing is typed
21 up, so you can look back at that.
22    "Business" is defined without a
23 paragraph break, so it's difficult to find.  On
24 page 2 toward the top of the APA, right after
25 the definition of "breakup fee," you'll see the

## Page 89

J. KOBAK

1
2 definition of "business."  See that?
3    A.   Right.
4    Q.   And I'll just read it into the record:
5 "The APA defines 'business' as:  'The U.S. and
6 Canadian investment banking and capital markets
7 businesses of seller, including the fixed income
8 and equities cash trading, brokerage, dealing,
9 trading and advisory businesses, investment
10 banking operations and LBI's business as a
11 future's commission merchant.'"
12    That is the business -- it was the
13 trustee's understanding that that was the
14 business that Barclays was acquiring?
15    A.   Under the APA, that's correct.
16    Q.   Okay.  And so my question for you is
17 from your brief in paragraph 3, and you say the
18 same thing in paragraph 4, seems to be saying
19 that there are -- the $47.4 billion does not
20 include the real estate.  Let's get that clear
21 first.  Would you agree with that?
22    A.   Yes.
23    Q.   So there are some assets in this
24 transaction that are not included in the $47.4
25 billion, correct?  The trustee understood that?

J. KOBAK

1
2   A.   Well, yeah, whatever assets might be
3   in the business --
4       Q.   So whatever assets --
5       A.   -- as defined.
6       Q.   Whatever assets might be in the
7   business would be included in the deal and not
8   included in the 47.4 billion?
9       MR. CARDEN:  Objection to form.
10      A.   That's what we say.  That's what Mr.
11  Maguire says on page 3 here.
12      Q.   Okay.  So the three real estate
13  buildings are not included in the 47.4, correct?
14      A.   That's correct.
15      Q.   What other assets are not included?
16  Just any assets in the business?
17      A.   That's what it says here.
18      Q.   Okay.  Can you give me any other
19  specific examples of assets that would not be
20  included in the 47.4?
21      A.   Well, I know, I mean, I know there are
22  books and records and things like that.  There
23  are things that are important but don't have
24  substantial monetary value.  That was certainly
25  would be included.

J. KOBAK

1
2       Q.   For example, customer lists, what --
3   and intangible property like customer lists,
4   would that have been included in the 47.4?
5       A.   I think so.  I don't know if there
6   were actual customer lists or just accounts that
7   went over.
8       Q.   Is it your understanding --
9       A.   And Barclays was acquiring and paying
10  for a lot of the employees, so most of the
11  brokers would go over with their customers.  I
12  don't know that any particular value was
13  ascribed to that.
14      Q.   Well, whatever value might be ascribed
15  to it, was it your understanding that customer
16  lists were or were not included in the $47.4
17  billion?
18      A.   I don't think I had any understanding
19  either way.
20      Q.   Well, you're telling us today, the
21  trustee is telling us today that this
22  transaction had a limit, a valuation cap, is
23  that accurate?
24      A.   There was a value ascribed to the
25  things that Lori Fife was talking about that was

J. KOBAK

1
2   very clearly stated as $47.4 billion as against
3   liabilities of 45.9 billion.
4       Q.   But did anyone ever tell you what
5   assets she was talking about or understood she
6   was talking about when she talked about the
7   47.4?
8       A.   She says we're only selling assets
9   that have a value of $47.4 billion.
10      Q.   Right, and she's comparing that to the
11  70 billion, which is in subsection D, the 70
12  billion.  So is it -- was it your understanding,
13  the trustee's understanding, that the assets
14  that replaced the long positions from the
15  original deal had a value now of 47.4 billion?
16      A.   Yeah.  Basically, I think that was our
17  understanding and of the many types of
18  securities that, as I recall, were described as
19  part of the 70 billion would now be worth 47.4
20  billion.
21      Q.   Right.  So what had been the long
22  positions of approximately 70 was now a
23  collection of assets worth approximately 47.4,
24  is that your understanding?
25      A.   A value of 47.4, not approximate

J. KOBAK

1
2   anymore.
3       Q.   Not approximate anymore.  So you
4   understood that the deal no longer involved an
5   approximate number, it was an absolute number?
6       A.   I don't think it was an absolute.  I
7   don't think anyone would have been surprised if
8   things were a few million under or over, but I
9   don't think -- I thought this was supposed to be
10  a good estimate, was presented to the Court and
11  to the creditors and to the regulators as a good
12  estimate by knowledgeable people after a lot of
13  due diligence had been done over the days
14  between the 17th and the 19th.
15      So we thought it was a quite reliable
16  figure.  Maybe not down to the penny, but a
17  quite reliable figure.  We certainly didn't
18  think there would be a material valuation --
19  variation from that range of figure.
20      Q.   Now, let me move you two pages later.
21  Ms. Fife reports to the Court on the change with
22  respect to the residential real estate mortgages
23  on page 49?
24      A.   Yes.
25      Q.   Second paragraph, she says, there was

Page 94

J. KOBAK

1
2  a change -- there was a provision in the old
3  agreement pursuant to which the parties were
4  sharing in the residential real estate
5  mortgages, and then she says Barclays is now
6  taking all of those.  She says at the end -- she
7  talks about the DTC issue and says, "The
8  collateral will remain with Barclays."
9      This is the first amendment we talked
10 about a few minutes ago, you recall that?
11     A.   Uh-huh.  Yes.
12     Q.   Do you know one way or the other
13 whether the estimated value for the 50 percent
14 of residential real estate mortgage securities
15 was included or not included in the 47.4 number
16 Ms. Fife gave the Court?
17     A.   No, I don't know, and as I've
18 testified, I don't think that we took -- anyone
19 really took the $3 billion estimate at face
20 value.
21     Q.   Did you ever -- do you know if the
22 trustee ever discussed with anyone what the
23 components of the $47.4 billion number were,
24 what assets comprise that number?
25     A.   At that time, I don't believe so.

Page 95

J. KOBAK

1
2      Q.   So let me make sure the record is
3  clear on this.  Before the closing of this
4  transaction on September 22, did the trustee
5  ever discuss with anyone what assets were
6  included in the $47.4 billion number?
7      A.   Other than the kind of general
8  descriptions that we've been talking about, no.
9      Q.   So, in other words, there was never a
10 discussion of whether that number included both
11 the repo collateral and the clearance box
12 assets?
13     A.   I don't believe so.
14     Q.   Was there --
15     A.   There were separate discussions, as
16 you know, of the clearance box assets.
17     Q.   Was it -- I mean, was the trustee ever
18 given any components of the 47.4?
19     A.   I don't believe so.
20     Q.   Did the trustee understand the 47.4 to
21 be the repo collateral?
22     A.   Not specifically.  It was obviously
23 consistent with the numbers that were given for
24 the repo collateral, so I think we assumed that
25 a large part of it at least, a very large part

Page 96

J. KOBAK

1
2  of it would be the repo collateral, but I don't
3  believe that we necessarily assumed that that
4  was necessarily all of it.
5      Q.   Did the trustee believe that the 15c3
6  asset, which we'll talk more about later, the
7  $769 million in the 15c3 type asset, the trustee
8  believed that that asset was included in the
9  $47.4 billion number?
10     A.   I don't know and I don't know how
11 Barclays -- in our view, that was all was
12 contingent at best as far as -- because the
13 requirements of the Rule 15c3 had to be
14 satisfied, the S.E.C. had to approve it and so
15 forth, so I don't know how Barclays might have
16 considered or not considered that.
17     Q.   That brings me to another question I
18 wanted to ask.  The trustee believes that the
19 deal that was approved had a valuation cap for
20 any assets that were not real estate assets and
21 not the business, and that cap was 47.4 billion,
22 correct?
23     A.   Yes.
24     Q.   And was that $47.4 billion cap to be
25 determined according to what the value of the

Page 97

J. KOBAK

1
2  assets were on the Lehman balance sheet or how
3  they were valued by Barclays or what their fair
4  market value was determined in some other way?
5      A.   I don't think we knew the specific
6  basis for it.  I think we thought there was an
7  agreed value of 47.4 billion.
8      Q.   What was the basis for believing it
9  was an agreed value?
10     A.   Ms. Fife said that there was a value
11 of 47.4.  That's certainly what LBI must have
12 believed and what must have been described to
13 LB -- to LBHI, I'm sorry, what must have been
14 described to LBHI.
15     Q.   Did anyone at Barclays ever tell the
16 trustee that Barclays agreed that that was the
17 cap on the assets or any subset of the assets in
18 the deal?
19     A.   I don't believe so.  They clearly
20 subsequently had taken the position -- is
21 taking -- are taking the position that that's
22 not the cap.  On the other hand, these figures
23 were used at the hearing and nobody stood up on
24 Barclays' behalf and said there was some
25 approximate approximation involved, that they

Page 98

J. KOBAK

1
2  valued the figures differently, that this wasn't
3  the extent of what was being acquired or
4  anything to that effect.  And this was to a room
5  full of hundreds and hundreds of creditors as
6  well as the Bankruptcy Court and the regulators.
7      Q.   Did the trustee take notes during the
8  hearing in which the $47.4 billion number was
9  written down?
10     A.   Not that I am aware of, I don't
11 believe so.
12     Q.   You understand when I say the trustee,
13 I mean the trustee or his advisors?
14     A.   Those of us who were there is how I'm
15 interpreting the question.
16     Q.   And the answer is the same?
17     A.   I don't believe so.
18     Q.   Do you know when the trustee or his
19 advisors first obtained a transcript from the
20 hearing from the September 19 sale approval
21 hearing?
22     A.   No, I don't specifically recall that.
23     Q.   I assume you did not get one before
24 Monday morning at closing?
25     A.   I doubt it.

Page 99

J. KOBAK

1
2      Q.   What did the trustee do, if anything,
3  to determine how the $47.4 billion number had
4  been formulated after the sale hearing?
5          That was not a well asked question, so
6  let me try again.
7      A.   That's one thing we can agree on.
8      Q.   After the sale hearing, did the
9  trustee do anything to determine how the $47.4
10 billion number was formulated?
11     A.   I don't believe so.
12     Q.   At the time of the closing -- maybe
13 it's better if I ask you these questions with
14 the clarification letter, the final version.
15         This one you don't need to mark.  This
16 is Exhibit 25.  You'll recognize Exhibit 25, Mr.
17 Kobak, as the final executed version of the
18 clarification letter.  Do you recognize it?
19     A.   Yes.  Yes, I do.
20     Q.   It lists at the beginning on the first
21 page in Section 1 of the clarification letter,
22 it replaces certain assets that were in the APA
23 with certain other assets.  Are you familiar
24 with that?
25     A.   Yes.

Page 100

J. KOBAK

1
2      Q.   And in subparagraph A, Romanette ii,
3  it lists out three categories of assets that
4  were defined as purchased assets to be received
5  by Barclays, correct?
6      A.   That's correct.
7      Q.   The first are securities transferred
8  in the repo under Subsection A.  Are you
9  familiar with that?
10     A.   Yes.
11     Q.   Was it your understanding that those
12 assets were to be included -- were included in
13 the $47.4 billion valuation cap?
14     A.   Yes.
15     Q.   Did the trustee make any investigation
16 during the weekend before the closing to
17 determine what the portion of the 47.4 was
18 attributable to those repo securities?
19     A.   No.
20     Q.   Subsection B refers to such securities
21 and other assets held in LBI's clearance boxes.
22 You're familiar with that provision?
23     A.   Yes, I am.
24     Q.   Does the trustee believe that that
25 provision was nullified by the DTC letter

Page 101

J. KOBAK

1
2  under --
3      A.   I'm sorry, I cut off your question.
4      Q.   That's okay.  Let me just ask it
5  again.  Am I correct that the trustee's position
6  is that there were no securities in LBI's
7  clearance boxes that were to be transferred to
8  Barclays?
9      A.   LBI's clearance boxes at DTC, that's
10 correct, because we had a separate tripartite
11 agreement with Barclays, DTC and the trustee
12 which specifically dealt with those assets.
13     Q.   Does the trustee -- did the trustee
14 make any inquiry in terms of what the value was
15 of any clearance box securities that it believes
16 were to be transferred?
17         MR. MAGUIRE:  Objection to form.
18     A.   At that time, no.  At that time, I
19 don't believe so.
20     Q.   Does the trustee believe that the
21 clearance box securities were also supposed to
22 fit within the $47.4 billion valuation cap?
23     A.   I think it's quite possible that they
24 might have.  In some ways, since this all came
25 up over the weekend and, in our view, was dealt

Page 102

J. KOBAK

1
2  with differently, it's, you know, perhaps wasn't
3  really relevant or determinative.
4      Q.   Was the trustee ever informed that the
5  estimated value of the clearance box securities
6  was approximately $1.9 billion?
7          Let me make the question more precise,
8  so I withdraw that.
9          Prior to the closing of the sale on
10 Monday, the 22nd, was the trustee ever informed
11 that the estimated value of the LBI clearance
12 box securities referenced in Section 1(A)(ii)(b)
13 was approximately $1.9 billion?
14     A.   I don't know.  I don't recall that
15 specific number.  I can't really recall if we
16 were given any specific number at that time as
17 to what the contents of those boxes -- what the
18 value might be or might be deemed to be.
19     Q.   Subsection C of this provision refers
20 to exchange-traded derivatives.  You're familiar
21 with that provision?
22     A.   Yes, I am.
23     Q.   And is it the trustee's position that
24 all of the exchange-traded derivatives are
25 supposed to fit within the $47.4 billion

Page 103

J. KOBAK

1
2  valuation cap?
3      A.   Again, I'm not sure.  Again, we have a
4  difference of opinion, I guess, as to what the
5  effect of this provision is, which I presume
6  you'll get to later, particularly the
7  parenthetical.
8      Q.   We're going to get to that, but my
9  question is, this -- given what the agreement
10 says, the trustee understood this agreement was
11 subject to a $47.4 billion valuation cap for all
12 assets other than the real estate and the
13 business, correct?
14     A.   Right.
15     Q.   And all I'm trying to understand is
16 what precisely was supposed to fit within the
17 $47.4 billion valuation cap?
18     A.   I wouldn't have expected either B or C
19 to be considered assets ancillary to the
20 businesses.  Therefore, I think we would have
21 assumed that in one way or another those must
22 have been accounted for in the 47.4 billion.
23     Q.   And also in the 45.5 billion on the
24 liability side, to the extent they carried
25 liabilities, correct?

Page 104

J. KOBAK

1
2          MR. MAGUIRE:  I'm sorry, can you
3  repeat that question?
4      Q.   Well, do you understand -- let me make
5  sure the foundation is clear.  Do you understand
6  that when Barclays took over -- forget about the
7  margin issue, okay?  We'll talk about margin
8  later and collateral for exchange-traded
9  derivatives.  You understand that Barclays took
10 over the LBI exchange-traded derivatives
11 accounts in this transaction?
12         MR. MAGUIRE:  Objection to form.
13     A.   Took over, I believe they assumed to
14 some extent LBI's former position at OCC and
15 assumed the liabilities.
16     Q.   All right.
17     A.   That was the purpose of the transfer
18 agreement.
19     Q.   You understand that, in addition, that
20 the -- withdrawn.  Do you understand that LBI's
21 exchange-traded derivatives included positions
22 that would have been both assets on day one and
23 positions that would have been liabilities on
24 day one?
25     A.   Yes, I did.

Page 105

J. KOBAK

1
2      Q.   And your understanding is Barclays
3  took both the assets and the liabilities
4  associated with those positions, I'm not talking
5  about the margin now, but with those
6  exchange-traded derivative positions?
7      A.   As a result of the transfer and
8  assumption agreement, yes.
9      Q.   And as a result of this position,
10 correct?
11         MR. MAGUIRE:  Here you're talking
12 about positions now, or are you talking
13 about --
14         MR. HUME:  Only positions.
15     Q.   I'm only talking about positions.  The
16 actual options and futures, longs and shorts
17 that are exchange-traded derivatives, that's all
18 I'm asking you now.  We're going to talk about
19 margin later.  I just want to understand, I want
20 to make sure we understand each other that
21 exchange-traded derivatives may include options
22 that on a particular day have value?
23     A.   Or --
24     Q.   And they may have options that are
25 short and are negative value, which are a

Page 106

```
1              J. KOBAK
2  liability on your balance sheet as opposed to an
3  asset.  Do you understand that?
4      A.  I do understand that.
5      Q.   And you understand Barclays took both
6  those liability positions that were derivatives
7  and the asset positions that were derivatives?
8      A.   That would be my understanding.
9  Whether it would be Barclays' interpretation if
10 that were all that the agreement said, I'm not
11 so sure, but there certainly was another
12 agreement by which Barclays clearly assumed
13 liabilities associated with positions.
14     Q.   Now, the liability exchange-traded
15 derivative positions, were they supposed to fit
16 within the $45.5 billion cap that Lori Fife gave
17 the Court?
18     A.  I don't know for sure where the 45.5
19 came from.  As I've said, what was
20 important to us was the rough matching of the
21 assets and the liabilities, which really wasn't
22 so different from the 70 versus the 69 when
23 you're talking about long and short positions
24 and so forth.
25     Q.  I understand that what's important to
```

Page 107

```
1              J. KOBAK
2  you is the matching, but I want to understand
3  what you understood these numbers to mean.  Lori
4  Fife told the judge 47 -- she gave the judge two
5  numbers:  47.4 and 45.5.  I want to know whether
6  the trustee understood that the exchange-traded
7  derivative positions were included in those two
8  numbers?
9      A.  I don't know that we had a view one
10 way or the other.  I think we would have assumed
11 that they were.
12     Q.  How could you know -- you knew there
13 was a repo loan, correct?  Harvey Miller told
14 the Court the repo loan was --
15     A.  Yeah.
16     Q.  And he told the Court the repo loan
17 was 45.5 billion, correct?
18        MR. MAGUIRE:  Asked and answered.
19     A.  That's what the transcript shows.
20     Q.  So the repo loan is the same number
21 that Lori Fife gave the Court as the liabilities
22 associated with assets?
23        MR. CARDEN:  Objection to form.
24     A.  45.5 is the same number.
25     Q.  So there's no room for any
```

Page 108

```
1              J. KOBAK
2  exchange-traded derivative liability
3  positions --
4      A.  I don't know how --
5      Q.  -- in the 45 --
6        Please let me finish the question.
7      A.  I'm sorry.
8      Q.  Based on the trustee's understanding
9  of the numbers given to the Court, there would
10 be no room within the liability number given the
11 Court for any exchange-traded derivative
12 liability positions, correct?
13        MR. MAGUIRE:  Objection to form.
14 Misstates prior testimony where the witness
15 specifically said he assumed a large part of
16 it would be the repo, but not necessarily
17 all.
18     Q.  Harvey Miller -- do you want to go
19 back to the transcript page 63?
20     A.  I answered these questions before.
21     Q.  I don't know --
22     A.  Harvey Miller said there was a repo
23 with the same numbers.  Lori Fife used these
24 numbers.  Lori Fife did not say how the numbers
25 were derived, and no one from Barclays or anyone
```

Page 109

```
1              J. KOBAK
2  else got up and said how they were derived.
3        The Court and the creditors were told
4  this transaction had a value of 47.4 versus 45.5
5  liabilities.  Clearly the repo part would be a
6  substantial portion of that.  How these
7  valuations were reached was not explained.  I
8  think over the weekend changes were made to the
9  deal which we understood were meant to leave
10 people in essentially the same place, and no one
11 got up in court and said the 47.4 versus the
12 45.5 is not in fact the figures, as I would
13 think it would behoove someone to have done.
14        We did not have specific information
15 as to how these numbers were derived or exactly
16 what was included and what was not included in
17 them.
18     Q.  Nor could you at the time of the
19 closing give a coherent explanation of how these
20 assets in the clarification letter fit into
21 those numbers, could you?
22        MR. MAGUIRE:  Objection to form.
23     Q.  You didn't know, is that fair?
24     A.  I think I just answered that question.
25     Q.  Okay.  Let me just make sure I
```

Page 110

J. KOBAK

1
2  understand the position of the trustee.
3        If the exchange-traded derivative
4  liability positions -- is that phrase a clear
5  phrase based on what we talked about earlier?
6  The positions that are liabilities that are
7  derivatives, there would be a liability on the
8  balance sheet net negative value on day one?
9        A.   Uh-huh.
10       Q.   I'm calling those exchange-traded
11  derivative liability positions?
12       MR. MAGUIRE:  I'm sorry, you're saying
13  a net liability?
14       MR. HUME:  They would be a negative.
15  The position itself would be a liability.
16       MR. MAGUIRE:  Are you saying that the
17  short positions exceeded the value of the
18  long positions?
19       MR. HUME:  No, not yet.  I'm not
20  saying that yet.  I'm just saying right
21  now -- I'm talking about the short
22  positions.
23       MR. MAGUIRE:  You're saying if the
24  short and long positions represented
25  separately --

Page 111

J. KOBAK

1
2        MR. HUME:  I'm not saying that.
3        MR. MAGUIRE:  You're talking about a
4  balance sheet.  That's what's confusing
5  everything.
6        Q.   I'm saying if the liability positions
7  from the exchange-traded derivatives plus the
8  repo loan exceeded 45.5.
9        A.   I don't know how the 45.5 or the 47.4
10  were arrived at.  I don't know if somebody
11  looked at this and said the net derivative
12  position is a wash, the net derivative position
13  is a liability, the net derivative position is a
14  plus or we're going to go position by position
15  and add up the assets against the liabilities.
16  I don't know how that was done for purposes of
17  the figures that were given to the Court.
18       Q.   Do you have any basis for believing
19  that it was done?  Do you have any -- let me
20  ask -- make it clear what I'm saying.
21       Do you have any basis for believing
22  that either side to this transaction knew what
23  the value was of the exchange-traded derivative
24  positions at the time this deal was approved or
25  at the time this deal closed?

Page 112

J. KOBAK

1
2        A.   I don't know.  I'm sure they made
3  estimates of that.  I don't know what they were,
4  how they went about it, and in any event, I do
5  not know to what extent -- how these were
6  treated for purposes of the figures that were
7  given to the Court.
8        Q.   If, if the exchange-traded derivative
9  positions cause the assets and the liabilities
10  in this deal to go above 45.5 on the liability
11  side and above 47.4 on the asset side, what's
12  the trustee's position?  Are the derivatives not
13  part of the deal?
14       MR. MAGUIRE:  Objection to form.  I
15  don't think it's -- the witness is not here
16  to give a hypothetical position.
17       MR. HUME:  I need to understand the
18  trustee's position on this, so we're going
19  to have to find a way to ask the question
20  that you will allow me to ask it.
21       Q.   The trustee's position is that there's
22  a valuation cap on all of the assets in the deal
23  that are not -- the business and the real
24  estate, and that cap is 47.4 billion, correct?
25       A.   That's correct.

Page 113

J. KOBAK

1
2        Q.   And the liabilities associated with
3  those assets were supposed to be 45.5 billion,
4  correct?
5        A.   That's correct.  That's what was
6  described to the Court.
7        Q.   And what I'm asking you is, I will
8  represent to you that if those are the caps, the
9  exchange-traded derivative positions on the
10  liability side would cause the liabilities to be
11  higher than 45.5.  Does that mean those
12  liabilities are out of the deal?
13       MR. CARDEN:  Objection to form.
14       MR. MAGUIRE:  Are you also
15  representing that the positive long
16  exchange-traded derivatives were -- had a
17  value that was less than the liabilities?
18       MR. HUME:  I'm not being deposed here.
19       Q.   Let me just take it one step at a
20  time.  I just want to know if the liabilities
21  exceed 45.5, does that allow the asset number to
22  go up?
23       MR. MAGUIRE:  I don't think you can
24  put a hypothetical -- actually, I don't
25  think you can put a hypothetical to the

Page 114

J. KOBAK

1
2  witness at all, but if you're going to put a
3  hypothetical, I think you need to put the
4  whole hypothetical to the witness.  In any
5  event, I don't think a hypothetical is
6  appropriate.
7      Q.   In any event, the trustee did not know
8  the value one way or the other, it was not given
9  any information -- the trustee was not given any
10 information about the value of the
11 exchange-traded derivatives before the closing;
12 is that correct?
13     MR. DAKIS:  Objection to form.
14     A.   I believe that's correct.
15     Q.   Did the trustee ever ask anyone why
16 there were no valuation estimates provided for
17 any of the assets listed in the clarification
18 letter?
19     Let me restate the question so it's
20 completely accurate.  We just went through three
21 purchased assets, the repo collateral, the
22 clearance box assets, and the exchange-traded
23 derivatives, correct?
24     A.   That's correct.
25     Q.   And you would agree with me that there

Page 115

J. KOBAK

1
2  are no valuation estimates provided in the
3  clarification letter for any of those assets,
4  correct?
5      A.   That's correct.
6      Q.   Did the trustee ever ask anyone why
7  the clarification letter did not include
8  valuation estimates?
9      A.   At the time?
10     Q.   Before the closing.
11     A.   I don't believe so.
12     Q.   Did the trustee ever tell anyone that
13 it believed the contract should include $47.4
14 billion valuation cap?
15     A.   I don't think the trustee ever
16 expressed that because it had been expressed to
17 the Court.  I think what we understood was
18 happening over the weekend that certain things
19 in the nature of what substitute assets were
20 being substituted for others so that the overall
21 deal would be in the same framework that I've
22 already described and that was described to the
23 Court, and I think our position is that if
24 someone was going to change the deal materially,
25 that should have been disclosed to the Court and

Page 116

J. KOBAK

1
2  the creditors as well as to the parties.
3      Q.   Did the trustee review the sale order
4  before it was issued?
5      A.   Yes.
6      Q.   Did the trustee recognize that the
7  sale order did not include a valuation number
8  for either the assets or liabilities in the
9  deal?
10     A.   There was no valuation number that I
11 recall in that order.
12     Q.   Did the trustee or his advisors ever
13 tell anyone before the sale order was issued
14 that the sale order ought to include the
15 valuation numbers that the trustee understood to
16 be part of the deal?
17     A.   I don't believe -- I don't recall any
18 such discussion.
19     Q.   Did the trustee tell anyone before the
20 closing that the trustee's understanding was
21 that there was a $47.4 billion valuation cap on
22 all non-real estate assets in the deal?
23     A.   I don't believe so.
24     Q.   And just so my question is precise,
25 did the trustee ever tell anyone that it

Page 117

J. KOBAK

1
2  believed there was a $47.4 billion valuation cap
3  on any assets in the deal?
4      MR. MAGUIRE:  I'm sorry.  Can you
5  repeat that question?
6      Q.   It's the same question.  I just want
7  it to be precise.  I'm not just -- it's still
8  unclear to me which assets the cap applied to.
9      So my question is, did the trustee
10 ever tell anyone before the closing that the
11 trustee understood there to be a $47.4 billion
12 valuation cap on any assets in the deal?
13     A.   I don't believe there was any such
14 discussion.
15     Q.   Now, you said a earlier you understood
16 that the valuations in the APA were estimates of
17 book value, correct?
18     MR. CARDEN:  Objection to form.
19     A.   In the original APA they were said to
20 be approximately, approximately $70 billion at
21 book value, as I recall.
22     Q.   And then in the balance sheet that you
23 were sent on the evening of September 18, you
24 understood that those were estimated numbers,
25 correct?

Page 118

```
 1              J. KOBAK
 2      A.  Yes.
 3      Q.   And you understood those were also
 4  book value numbers?
 5      A.   I didn't -- I'm not sure we understood
 6  what the numbers were based on.
 7      Q.   Okay.  So you had estimated numbers in
 8  the APA and estimated numbers in the balance
 9  sheet, and it's your testimony that you believed
10  the $47.4 billion number was not an estimate?
11          MR. MAGUIRE:  Asked and answered.
12      A.   I believe it was an estimate, but it
13  certainly was not said to be a kind of gross
14  approximation or anything like that.  It was
15  presented as a number, and again, I don't think
16  anyone would be surprised if it was off a little
17  bit, but I do not think we thought there would
18  be a material variation in that or a material
19  variation between the amount of liability
20  that -- the spread between liabilities and
21  assets, and I believe at one point in the
22  hearing the Court said that a difference of $500
23  million would clearly be material.  I think even
24  a lower standard would be material, but we
25  certainly didn't think there would be a
```

Page 119

```
 1              J. KOBAK
 2  difference of any considerable magnitude.
 3          If there had been, then it would seem
 4  to me that's something that should have clearly
 5  been discussed with the parties and the
 6  regulators and should clearly have been
 7  disclosed to the Bankruptcy Court when it was
 8  asked or so that the deal that the Bankruptcy
 9  Court approved had some, you know, was the
10  actual deal that was being done.
11      Q.   If the liabilities had been higher
12  than 45.5, the financial trading liabilities,
13  the short positions in the derivatives had been
14  higher than 45.5 --
15      A.   Assuming those are valued on a
16  position-by-position basis --
17      Q.   Yes.
18      A.   -- and not on some kind of net basis.
19      Q.   Yeah.  Let's -- let me ask you --
20          MR. HUME:  I'm allowed to ask him a
21  hypothetical.
22          MR. MAGUIRE:  No, I don't believe -- I
23  can't imagine how you would be allowed to
24  ask him a hypothetical.
25          MR. HUME:  Are you instructing him not
```

Page 120

```
 1              J. KOBAK
 2  to answer?
 3          MR. MAGUIRE:  This is a 30(b)(6)
 4  witness, not an expert witness.
 5          MR. HUME:  You can instruct him not to
 6  answer, but let me ask the question.
 7          MR. MAGUIRE:  No.  No.  No.  No.  The
 8  witness is here to give the trustee's
 9  knowledge, not to answer hypothetical
10  questions.  The witness has no basis to
11  answer hypothetical questions.
12          MR. HUME:  The witness is here as the
13  trustee's 30(b)(6) to tell us what your
14  position is.  I'm going to ask him a
15  question.  If you want to instruct him not
16  to answer, go ahead.
17      Q.   The question is this:  Is it the
18  trustee's position that if the net position on
19  the exchange-traded derivatives was a negative
20  $1.5 billion over and above the $45.5 billion
21  referenced to the Court, and all of the other
22  assets fit within the 47.4, would Barclays have
23  had the right to come back and get that $1.5
24  billion covered?
25          MR. MAGUIRE:  Objection to form.
```

Page 121

```
 1              J. KOBAK
 2      A.   I don't know the answer to that.  That
 3  would be up to Barclays to -- to argue whatever
 4  it wants to argue at the time.
 5          MR. HUME:  Let's take a break.
 6          THE VIDEOGRAPHER:  The time is 10:54.
 7  We're going off the record.
 8          (Recess.)
 9          THE VIDEOGRAPHER:  The time is 11:05.
10  We are back on the record.
11  BY MR. HUME:
12      Q.   Mr. Kobak, let me refer you to
13  paragraph 8 of the clarification letter.  You're
14  familiar with the provision in paragraph 8,
15  Romanette ii, that refers to the fact that
16  Barclays shall receive $769 million of
17  securities held in the Rule 15c3 account or
18  securities of substantially the same nature and
19  value; are you familiar with that provision?
20      A.   I'm familiar that there was a
21  provision that said that to the extent permitted
22  by applicable law.
23      Q.   And was it your understanding that
24  that asset was supposed to fall within the $47.4
25  billion valuation cap?
```

## Page 122

J. KOBAK

1
2    MR. CARDEN:  Objection to form.
3    A.   I think, as I testified earlier, I'm
4 not sure how I thought Barclays would account
5 for that after the fact, I mean it being added
6 after the fact in relation to the 47.4 figure
7 that had been told to the Court.
8        In our view, this is a contingent
9 liability or a contingent asset, I guess, of
10 Barclays. It's in a part of the agreement that
11 deals with account transfers, which it seems to
12 me it was clearly related to, and we don't
13 believe that the circumstances under which
14 Barclays might be entitled to this $769 million
15 have ever arisen and, in all likelihood, may
16 never arise.
17    Q.   If Barclays had the same view as you
18 do about this provision, which they don't, but
19 if they did, and all the other assets that are
20 not real estate and not the business added up to
21 47.4 billion, would that be what you view to be
22 an acceptable and approved outcome?
23    MR. MAGUIRE:  That's a hypothetical.
24    MR. CARDEN:  Objection to form.
25    A.   I have no idea. I have no idea how

## Page 123

J. KOBAK

1
2 Barclays might or might not have taken this into
3 account with respect to the figures that were
4 used. I understood that the point of the
5 exercise over the weekend was that the deal
6 changed in various ways, but in our
7 understanding, the basic parameters of the deal
8 that I have described never changed or, if they
9 had changed, that should have been disclosed to
10 everyone, including the Court.
11        So I have no idea how Barclays might
12 or might not have accounted for this, and again,
13 I don't think the circumstances under which this
14 amount will ever be received by Barclays have
15 arisen and they may never arise because we may
16 face a very substantial shortfall in being able
17 to pay customers in full.
18    Q.   When you say you don't know how
19 Barclays would account for it, I asked you
20 earlier how this $47.4 billion valuation cap was
21 supposed to be implemented. Does it depend on
22 Barclays accounting?
23    A.   No, no, I didn't -- I'm sorry, I
24 didn't -- I was using "accounting" in a
25 colloquial sense. I meant I don't know what

## Page 124

J. KOBAK

1
2 value, if any, Barclays attributed to it for
3 purposes of trying to equate this with the 47.4
4 billion that was disclosed to the account.
5        It seems to me if it was accretive or
6 additive because Barclays was looking for
7 opportunities to get additional assets that
8 hadn't been disclosed, that's something that
9 should have been disclosed to people and it
10 should have been disclosed to the Court.
11        If it thought, on the other hand, that
12 the other things it was getting were worth
13 substantially less than 47.4, then maybe it
14 could have included this to get back to the
15 47.4, and I don't know how Barclays treated it,
16 but --
17    Q.   So the 15c3 assets might be included
18 in the 47.4 and might not, depending --
19    A.   I don't know. And in our view, it's
20 not something that Barclays is likely to obtain
21 anytime soon until there's compliance with Rule
22 15c3 and there's no shortfall in property due
23 customers, and those circumstances have not
24 arisen.
25    Q.   Knowing what the trustee and his

## Page 125

J. KOBAK

1
2 advisors know now about the assets referenced in
3 the clarification letter, and in particular, in
4 Section 1(A), Romanette ii of the clarification
5 letter, the repo collateral --
6    A.   Uh-huh.
7    Q.   -- the clearance box assets and the
8 exchange-traded derivatives, knowing what the
9 trustee knows now about those assets, do you
10 think it was possible under the circumstances of
11 this transaction to determine that all of those
12 assets were worth approximately $47.4 billion as
13 of September 19?
14    MR. CARDEN:  Objection to form.
15    MR. MAGUIRE:  Objection to form. Can
16 you explain -- maybe rephrase that question?
17    Q.   Do you think it was possible to value
18 those assets under the circumstances of that
19 week with that level of precision?
20    MR. CARDEN:  Objection to form.
21    MR. MAGUIRE:  Same objection.
22    A.   If it wasn't possible to do it, a
23 representation shouldn't have been made in open
24 court as to what the value was, and if it was
25 made and Barclays thought it was too imprecise

J. KOBAK

1
2  or did not accurately state the deal, it seems
3  to me it would have behooved Barclays to have
4  their lawyers, very well qualified lawyers, very
5  experienced lawyers, stand up and say so.
6       Q.   You recall -- you recited for me
7  earlier a conversation you had with Harvey
8  Miller before the hearing, and then obviously
9  we've talked about what was said in the hearing.
10       Other than those two things, did
11  anyone ever tell the trustee or his advisors
12  that the transaction was subject to a $47.4
13  billion valuation cap on all assets other than
14  the real estate and what you call the business?
15       A.   I don't believe there was any such
16  discussion.  I believe that was our
17  understanding, but I don't believe there was any
18  further specific discussion beyond the
19  representations made in open court.
20       Q.   Can you look back -- do you have your
21  brief, the Rule 60 brief in front of you?
22       A.   Yes, I do.
23       Q.   Could you go to paragraph 1 of the
24  brief.
25       A.   Yes, I have it.

J. KOBAK

1
2       Q.   It says in the sentence at the bottom
3  of the first page, "The deal that Barclays wants
4  was supposedly documented over the ensuing
5  weekend of September 20 and 21, 2008 and,
6  according to Barclays, gives it as much as $6.7
7  billion in additional assets from the LBI estate
8  over and above the $47.4 billion in assets that
9  were disclosed to the court."  Do you see that?
10       A.   Yes, I do.
11       Q.   If you go over to paragraph 4, the
12  brief lays out what that 6.7 billion consists
13  of?
14       A.   Right.
15       Q.   Clearance box assets -- we'll come
16  back to that -- 15c3 assets, and the OCC margin.
17  See that?
18       A.   Yes.
19       Q.   And 1 billion in other.  It leaves out
20  the repo collateral.  Is it -- I'm just trying
21  to make sure I understand the trustee's
22  understanding of the numbers.  Is it the
23  trustee's understanding that the repo collateral
24  was worth 47.4 billion?
25       MR. MAGUIRE:  Objection to form.

J. KOBAK

1
2       A.   I think if you look -- maybe I'm not
3  understanding your question, but I think if you
4  look at footnote 1 back on page 2, that also
5  says what we do not include in the $6.7 billion.
6       Q.   That's right.
7       A.   Which would be any additional discount
8  that Barclays obtained.
9       Q.   My question is, I understand --
10       A.   Among other things.
11       Q.   My question is you're saying the 6.7
12  billion is all, all of these things, the
13  clearance box assets, the 15c3 asset, the
14  derivatives margin all are in excess of 47.4?
15       A.   That's what the brief seems to say.
16       Q.   My question is much more simple.  Is
17  it the trustee's position that the repo
18  collateral was worth at least $47.4 billion?
19       MR. CARDEN:  What day?
20       Objection to form.
21       Q.   That's a good question.  What date was
22  this valuation cap supposed to be?  Was it
23  September 19 --
24       MR. MAGUIRE:  The witness is not here
25  to make an assertion as to valuation, which

J. KOBAK

1
2  is clearly not the subject of this
3  deposition.  If you're asking him what his
4  understanding was at the time or any factual
5  information, that's entirely different.
6       MR. HUME:  The 30(b)(6) is your
7  understanding at all times since September
8  15 regarding the value of all the assets in
9  the deal.
10       MR. MAGUIRE:  Right.  That's fine.  So
11  you can ask him about his understanding.
12  You cannot ask him about a position which is
13  something far beyond his expertise to give.
14  BY MR. HUME:
15       Q.   My question is:  Does the trustee
16  currently believe that the value of the repo
17  collateral that Barclays received was $47.4
18  billion or more?
19       MR. DAKIS:  Objection to form.
20       A.   The trustee I believe currently
21  understands that the value was at least 47.4 and
22  might have been more than 47.4.  There seems to
23  be substantial questions about that.
24       Q.   And what is the basis for that
25  understanding?

## Page 134

J. KOBAK

1
2      In that respect, the deal, even though
3  it's different, isn't so different in kind of
4  overall impact as -- as the deal that had
5  originally been proposed with the 70 versus the
6  69 and so forth.
7      Q.    The trustee then receives the
8  clarification letter and its representative --
9  the trustee's representative signs the
10  clarification letter, correct?
11      A.    Yes, I believe it was early --
12      Q.    Was Monday morning?
13      A.    -- Monday morning, and there had been
14  a few other drafts at least over the Sunday
15  night and into the wee hours of Monday morning.
16      Q.    And I believe you state, or the brief
17  states that the trustee and his advisors did not
18  actively participate in the negotiation of the
19  drafting of the clarification letter, is that
20  correct?
21      A.    Yeah, that's correct.
22      Q.    And so you relied on Weil Gotshal to
23  represent Lehman in the negotiations of the
24  clarification letter, is that fair?
25      A.    That's correct.  The regulators were

## Page 135

J. KOBAK

1
2  also there, I believe, so when there were
3  questions about the 15c3, I think they had some
4  role to play in that as well.
5      Q.    After receiving the final version of
6  the clarification letter, did the trustee
7  understand that all of the collateral in the
8  repo was to be a purchased asset acquired by
9  Barclays?
10      A.    Yes, we understood -- yes, that was
11  our understanding.
12      Q.    And was it your understanding that
13  that would include any excess collateral that
14  there might be?
15      A.    Yes.
16      Q.    And did the trustee have an
17  understanding at any point over the weekend
18  before the closing about the $7 billion cash
19  problem with JPMorgan?
20      A.    No, I think we knew that there --
21  because I think there had been some separate
22  negotiations going on between Chase and
23  Barclays, but I don't think we really understood
24  the full effect or implications of that until
25  later at the time or somewhat before the time we

## Page 136

J. KOBAK

1
2  asked the Court to approve that transaction in
3  December.
4      Q.    So the trustee's understanding of the
5  $7 billion problem arose after the closing?
6      A.    I believe so, yes.
7      Q.    So before the trustee's understanding
8  about the $7 billion problem, the trustee just
9  assumed it was all the collateral and the repo
10  would be a purchased asset?
11      MR. DAKIS:  Objection to form.
12      Q.    All I'm trying to understand is
13  whether -- did the trustee have an
14  understanding -- I believe you've already
15  answered this.  Now I just want to be clear.  At
16  the time of the closing, did the trustee have a
17  view as to the value of all of the repo
18  collateral that was being transferred to
19  Barclays as a purchased asset?
20      A.    I don't think the trustee had
21  independent knowledge.  We heard the figures
22  that Harvey Miller used.  We heard the 47.4 that
23  Lori Fife used.  As I've said, I think we
24  thought that the repo collateral must have been
25  a large part of that 47.4 number.  Whether it

## Page 137

J. KOBAK

1
2  was the entirety, we don't know.  I don't know
3  the exact basis on which the valuations were
4  made.
5      Q.    So, at the time of closing, was it the
6  trustee's understanding the repo collateral may
7  be close to 47.4, or even 47.4, but not more?
8      A.    I don't think we would have thought it
9  was more than 47.4.  We probably suspected it
10  might be something less than 47.4.
11      Q.    But you understood there was a haircut
12  and so you understood it might be about $47
13  billion, correct?
14      MR. CARDEN:  Objection to form.
15      MR. DAKIS:  Objection.
16      MR. MAGUIRE:  Objection to form.
17      A.    We thought there would be a stated
18  value of collateral that would be larger by a
19  few percent than the amount of the loan.
20  Whether that reflected the actual value or the
21  way Barclays actually valued it, we didn't know.
22  We didn't have detailed knowledge of what was --
23  of what that collateral was, and as I say, I
24  think some of it might be difficult to value in
25  any circumstance.  But we certainly couldn't

Page 146

J. Kobak

1
2     A.    And I mean to further my answer, if it
3  turned out that in fact Barclays knowingly got
4  collateral that was worth substantially more,
5  that to us would be a violation of the -- of
6  what had been disclosed to the court and, you
7  know, that I think is part of our Rule 60
8  proceedings as it is of the other people who
9  were here.
10    Q.    But that would be based upon actual
11  fair market values, not a mark at the time by a
12  custodian bank, correct?
13         MR. CARDEN:  Objection to form.
14         MR. MAGUIRE:  Same objection.
15    A.    Well, I think if the evidence -- I
16  mean, I don't want to get into what our legal
17  position is, but my understanding is if the
18  evidence showed that Barclays was knowingly
19  telling the court that it was getting something
20  worth 47.4, and in its own mind told its board
21  of directors it was getting something worth over
22  50, I won't characterize how that might be
23  characterized, but it seems to me that would
24  clearly be a material breach -- or, a material
25  change in the contract that should at least have

Page 147

J. Kobak

1
2  been disclosed to the court.
3     Q.    At the time that you were having
4  discussions with Barclays and JPMorgan regarding
5  the settlement in December of 2008, did you --
6  did the trustee or his advisors tell Barclays
7  that they believed there was a $47.4 billion
8  valuation cap on all the non-real estate assets
9  in the deal?
10    A.    I don't think so.  I think we may have
11  had some discussions with Cleary as to the
12  effect that the numbers weren't matching up very
13  well, and that gave us a lot of concern.  And I
14  think we made it very clear that in our
15  application we were going to reserve our rights
16  to investigate the transaction and not limit our
17  rights to look into the sale agreement in the
18  future.
19         And I think when the Creditors
20  Committee got involved, they took that position
21  as well and it eventually got embodied not only
22  in my application but in the order itself that
23  the Court signed.
24    Q.    Can I --
25    A.    So we weren't waiving any rights.

Page 148

J. Kobak

1
2     Q.    I understand.
3     A.    There clearly were some potential
4  factual discrepancies that we wanted to
5  investigate further.
6     Q.    My question was simply whether you
7  raised that.  When you spoke to the Court to ask
8  for the Court to approve the JPMorgan
9  settlement, including what you may have said in
10  chambers off the record, did the trustee or his
11  advisors ever tell the Court that they believed
12  the entire deal was subject to a $47.4 billion
13  valuation cap on all non-real estate assets?
14    A.    I don't think we put it that way, but
15  I think I did tell the Court that we were
16  reserving -- that we had many questions about
17  the deal, others had questions about the deal,
18  exactly what went on over the weekend, what it
19  did to the economics of the deal, and that we
20  were reserving our rights to seek reformation,
21  to deal with questions of interpretation or
22  otherwise under the agreement.
23    Q.    At the time that you asked the Court
24  to approve the JPMorgan settlement, had the
25  trustee or his advisors reached even an

Page 149

J. Kobak

1
2  approximate valuation of all of the assets in
3  the repo collateral, including everything that
4  was being transferred in the JPMorgan
5  settlement?
6         MR. CARDEN:  Objection to form.
7     A.    I don't believe we had reached a final
8  valuation.  We took some comfort from these
9  figures that we got primarily from JPMorgan and
10  from the statements of the parties, including
11  Barclays, that the real value of the collateral
12  was substantially less than any of the stated
13  values.
14         But I don't think that we had signed
15  off on that.  I think we understood that there
16  was going to be further investigation of that,
17  which the Court I think invited and which
18  eventually led to the 2004 examinations.
19    Q.    The trustee must, at a minimum -- am I
20  correct in saying that the trustee must, at a
21  minimum, in December of 2008 have reached a
22  conclusion that the entire repo collateral
23  transferred to Barclays plus everything it was
24  receiving in the JPMorgan settlement was
25  properly and fairly valued at less than $47.4

Page 150

J. Kobak

1
2  billion?
3          MR. CARDEN:  Objection to form.
4          MR. DAKIS:  Objection to form.
5          MR. MAGUIRE:  Objection to form.
6       A.   No, I don't think that's true at all.
7  We thought there was clearly property that
8  should come over to Barclays.  Our position has
9  always been that, to the extent the purchase
10 agreement -- to the extent that the purchase
11 agreement was described to the Court and was
12 described to us and gives Barclays certain
13 rights, Barclays is perfectly entitled to those
14 things.
15         We don't believe that they're entitled
16 to anything more than that, and the purpose of
17 this transaction was to say, look, some of the
18 collateral, whatever its value was, that was
19 supposed to get to Barclays didn't get there.
20 This is a substitute transaction, actually saved
21 the estate money, so it seemed in the best
22 interests of the estate, but we're not waiving
23 our rights to look at the whole transaction.
24         To the extent it makes Barclays whole
25 and they get 47.4 billion as a result of this,

Page 151

J. Kobak

1
2  that's fine, they're entitled to that.  To the
3  extent it might give them several billion
4  dollars more, that's a material change that
5  should have been disclosed to the courts and
6  we'll pursue whatever rights we have to that
7  amount, just as we'll pursue our rights on the
8  questions of interpretation where we think
9  Barclays has taken assets or made claims to
10 assets to which we don't believe they're
11 entitled under the Asset Purchase Agreement.
12      Q.   I really need to make sure I
13 understand what you just said, so I'm going to
14 ask a refined version of the question.
15         Are you saying that the time you
16 asked, you, the trustee, asked the Court to
17 approve the JPMorgan settlement, it was an open
18 question in the trustee's mind as to whether the
19 entire repo collateral, including everything
20 received in the settlement, may or may not
21 exceed $47.4 billion?
22      A.   Yes.  We took comfort that it might
23 not because of what people had told us, but
24 we -- we wanted to look at the whole
25 transaction, the repo collateral, the positions

Page 152

J. Kobak

1
2  Barclays was taking and everything else, and if
3  we thought that Barclays at the end of the day
4  was getting things, it managed to get things
5  over the weekend that it wasn't entitled to, or
6  that weren't consistent with the deal as it was
7  described to the Court, that that might be
8  actionable and we wanted to not waive our rights
9  in that regard.
10      Q.   And by not waiving your rights, did
11 you understand yourself to be asking the Court
12 to approve a settlement whereby assets would be
13 given to Barclays that you would then claw back
14 if you subsequently determined that the assets
15 exceeded $47.4 billion?
16      A.   I don't know if it would be those
17 assets or other assets.  It may be that we had a
18 cause of action.
19      Q.   But you asked the Court to approve a
20 settlement that might have resulted in Barclays
21 receiving assets in excess of the valuation cap
22 at 47.4 billion?
23      A.   It's possible that it could have.  We
24 were comfortable at the time that at least the
25 present value didn't appear to do that, but we

Page 153

J. Kobak

1
2  did have questions about it and I thought we
3  made that very clear to Barclays and to the
4  Court.
5       Q.   Well, you entered into a release with
6  Barclays on the repo collateral, correct?
7       A.   On that specific collateral, movement
8  of that specific collateral, yes.
9       Q.   Well, on all claims related to that
10 collateral, correct?
11         MR. MAGUIRE:  Objection to form.
12      A.   Yeah.
13         MR. MAGUIRE:  Misstating.
14      Q.   If that collateral --
15         MR. MAGUIRE:  Wait.  If you're going
16 to talk about the release, I think you need
17 to get out the release.
18         MR. HUME:  I'll show it to him.  I'm
19 happy to do that.
20         MR. MAGUIRE:  There is a very broad
21 savings clause in that settlement agreement,
22 as you know.
23         MR. HUME:  We'll get to that.  We're
24 not going to -- we'll get to it.
25      Q.   Here's the question:  Subsequent to

J. Kobak

1
2  the settlement that was approved by the Court,
3  has the trustee reached a conclusion that all of
4  the repo collateral, including everything
5  received in the JPMorgan settlement, exceeds
6  $47.4 billion?
7        MR. MAGUIRE:  We have --
8        A.  We have not, as far as I'm aware, we
9  have not received -- not reached a conclusion
10  either way on that particular point.
11       Q.  And for these questions about the
12  value of the assets, my questions are the value
13  of the assets on the date they were received,
14  the date of the closing.
15       Would you agree, I mean, I asked -- I
16  think I asked you earlier, but my questions are
17  designed to understand the trustee's position
18  about this valuation cap.  Is it the trustee's
19  position that the valuation cap is based upon
20  the value on September 22?
21       MR. CARDEN:  Objection to form.
22       Q.  Open of business September 22 at the
23  time of the closing?
24       A.  I think our position -- well, I don't
25  want to speak to what our position was.  I think

J. Kobak

1
2  our understanding was that was the best value
3  that people placed on the assets at that time as
4  we understood it.
5        Q.  Okay.  And has -- you may not have --
6  the trustee may not have reached a final
7  conclusion on the value of all the repo
8  collateral.  Has it reached a conclusion that it
9  was worth more than 47.4 at the time the deal
10  was approved?
11       MR. MAGUIRE:  Objection to form.  If
12  you're asking what -- the trustee has
13  obviously made assertions in its papers and
14  has joined in LBHI's which makes assertions
15  based on documents that have been provided
16  by Barclays.
17       To the extent you're asking about the
18  trustee's position in those papers, that's
19  provided in those papers and is not an
20  appropriate subject of inquiry for this
21  witness.
22       MR. HUME:  I want to know what the
23  trustee thinks it's worth.
24       MR. MAGUIRE:  If you're asking whether
25  the trustee independently has done his own

J. Kobak

1
2  valuation --
3        MR. HUME:  Yes.
4        MR. MAGUIRE:  -- that's a different
5  question.
6        Q.  That's the question.  I want to know
7  if the trustee and his advisors, Deloitte &
8  Touche or whoever else, has done a valuation of
9  the Cusips in the repo collateral, including
10  everything in the JPMorgan settlement, and
11  reached a conclusion that, valued as of whatever
12  you think the operative date is for purposes of
13  your $47.4 billion cap, has that valuation been
14  done for the repo collateral?
15       A.  I think that JPMorgan has done some
16  work.  As I testified earlier, I don't think
17  they have reached a conclusion and I don't think
18  we, speaking collectively, have yet reached a
19  conclusion on that question.  It's still
20  something that's under investigation.
21       Q.  Did you say JPMorgan?  Did you mean
22  Deloitte or is it JPMorgan helping you do this?
23       A.  I'm sorry, Deloitte.
24       Q.  They haven't been able to reach a
25  conclusion.  They have had a year.  Are the

J. Kobak

1
2  assets difficult to value?
3        MR. CARDEN:  Objection.
4        MR. DAKIS:  Objection.
5        A.  I've been told that some of them are
6  difficult to value.
7        Q.  It must be more -- there must be
8  enough of them that are difficult to value that
9  it makes a material difference?
10       MR. MAGUIRE:  Objection to form.
11       MR. DAKIS:  Objection to form.
12       Q.  Would you agree with that?
13       MR. DAKIS:  Objection to form.
14       Q.  Why don't you just look at the marks?
15       MR. DAKIS:  Objection to form.
16       MR. MAGUIRE:  I think you need to
17  rephrase that question.
18       Q.  Your complaint is happy to just look
19  at the marks.
20       MR. MAGUIRE:  I don't think that's a
21  question.
22       MR. DAKIS:  Objection.
23       A.  Our complaint speaks for itself.
24       Q.  Okay.  Let me just ask a question.
25  I'll calm down.

Page 158

1          J. Kobak
2          MR. MAGUIRE:  That would be good.
3     Q.   I'm trying to understand this baffling
4  situation.
5     A.   I have that effect on everyone.
6     Q.   I assume you would agree with me that
7  a significant portion of the assets transferred
8  in that repo collateral were illiquid at the
9  time they were transferred?
10         MR. CARDEN:  Objection to form.
11         MR. MAGUIRE:  You're --
12    A.   I know some of them were.  I don't
13  know what you mean by "a substantial
14  proportion," and even if you want to do it by
15  value or percentage, I don't think I could give
16  you the answer as I sit here today.  I know
17  there was some stuff of more than nominal value
18  that was illiquid and hard to value.
19    Q.   You would agree with me that you
20  cannot simply look at the mark given by either
21  JPMorgan or Bank of New York that night of the
22  transfer, September 18 or the next day, the
23  19th, to determine the value of the assets in
24  the repo, would you agree with that?
25         MR. CARDEN:  Objection to form.

Page 159

1          J. Kobak
2          MR. MAGUIRE:  Objection to form.
3          MR. DAKIS:  Objection to form.
4          MR. MAGUIRE:  Again --
5     A.   Somebody did some valuation to come up
6  with a 47.4 figure that was disclosed to the
7  Court, and if in fact they thought they were
8  over the weekend going to be able to get much
9  more than 47.4 or get additional things that
10  were not disclosed to the Court, that seems to
11  me to be something that should have been
12  disclosed to the Court and it goes to the --
13    Q.   That's not my question.  I'm sorry.
14    A.   -- enforceability of the contract.
15    Q.   I'm going to interrupt you.  You're
16  not asking my question.
17         MR. MAGUIRE:  Please.  Please.  You
18  cannot interrupt the witness.
19         MR. HUME:  I can if he doesn't answer
20  my question.
21         MR. MAGUIRE:  I'm sorry, we cannot
22  conduct the deposition on that basis.  We
23  cannot do a deposition if you're going to do
24  that.
25    Q.   The question is, you've asked Deloitte

Page 160

1          J. Kobak
2  to value the repo collateral.  It's now December
3  2009.  They still haven't done it.  Would you
4  agree with me --
5     A.   They have done work on it.
6     Q.   Now you're interrupting me.
7         MR. MAGUIRE:  We'll agree.  One goes
8  at a time.
9     Q.   Would you agree with me that to
10  properly value the repo collateral for purposes
11  of the $47.4 billion cap, you cannot simply look
12  at the marks provided at the time of the repo
13  transaction by the custodian banks?
14         MR. CARDEN:  Objection to form.
15         MR. DAKIS:  Objection to form.
16         MR. MAGUIRE:  Objection to form.  This
17  witness has no basis to answer that
18  question.
19    A.   I have no basis to -- for once, Mr.
20  Maguire is absolutely right.  I don't know what
21  as an accountant or valuation expert or somebody
22  in this business, what somebody would do, what
23  you would consider a good thing, an accurate
24  gauge to look at or an inaccurate gauge.
25    Q.   It is within the scope of the notice.

Page 161

1          J. Kobak
2  What is your understanding of the value?  You
3  have asked Deloitte to value it.
4         Do you think for a year have they just
5  been staring at the marks from the custodian
6  banks?
7         MR. DAKIS:  Objection to form.
8     Q.   Or are they trying to value it?
9         MR. MAGUIRE:  I think you can rephrase
10  that question.
11    Q.   Would you agree that the trustee is
12  asking for a more thorough valuation from
13  Deloitte than simply to look at the marks from
14  the custodian banks?
15         MR. CARDEN:  Objection to form.
16    A.   I think Deloitte did some work,
17  concluded that they had trouble valuing the
18  securities.  We also asked them to look at the
19  marks or the values that were given us by other
20  parties.
21    Q.   Do you know why the residential
22  mortgage securities came out of the deal?
23    A.   Came out of the deal?
24    Q.   Are you aware of the fact that the
25  clarification letter states that the provision

Page 162

J. Kobak

1  J. Kobak
2  in the APA stating that Barclays would receive
3  50 percent of the residential mortgage
4  securities was to be replaced with the assets
5  set forth in the clarification letter?
6      MR. MAGUIRE:  Can you just tell us
7  what provision you're referring to?
8      MR. HUME:  Sure.
9      Q.   If you look at Section 1(A), Romanette
10 i.  If you need to, you can cross-reference your
11 version of the APA to see what I mean.  But if
12 you look at Section 1(A), Romanette i, of the
13 clarification letter, it says, "The items set
14 forth in Clauses B, C and F" -- I'm sorry, this
15 is not -- you need to look at Romanette ii.
16 "With respect to clauses A, D and E of the
17 definition of 'Purchased Assets' in the original
18 agreement, instead of the items referred to in
19 such clauses," and then it lists the assets
20 described by the clarification letter.  Are you
21 familiar with that?
22     A.   Where are you?  What page?
23     Q.   Okay.  I'm sorry.  Let me try to make
24 a respectable record.
25     A.   I'm sorry, I've got a lot of pages in

Page 163

1  J. Kobak
2  front of me.
3      Q.   That's okay.  So you're looking at the
4  clarification letter.  Maybe it would be
5  simplest to get the APA next to it while we do
6  this.
7      Do you have before you the
8  clarification letter on page 1 and the APA on
9  page 6?
10     A.   Yes.
11     Q.   Okay.  Let me refer you back then on
12 the clarification letter to 1(A), Romanette ii.
13 It says, "With respect to Clauses A, D and E of
14 the definition of 'Purchased Assets' in the
15 original agreement," do you see that reference?
16     A.   Uh-huh.
17     Q.   And it says instead of those items,
18 and then it lists three new items:  Clearance
19 for the repo collateral, clearance box
20 securities and the exchange-traded derivatives?
21     A.   Right.
22     Q.   Right?
23     A.   Right.
24     Q.   And so if you look back at the APA, A,
25 D and E are the retained cash?

Page 164

J. Kobak

1  J. Kobak
2      A.   Right.
3      Q.   That's A.  D is the long positions, do
4  you see that?
5      A.   Yes.
6      Q.   And E are the 50 percent of each
7  position in the resis, the residential mortgage
8  securities?
9      A.   Right.
10     Q.   So Barclays was originally going to
11 acquire residential real estate mortgage
12 securities estimated to be worth about 3
13 billion, with considerable skepticism as to
14 whether they were really worth that, correct?
15     A.   Right.
16     Q.   And that was true as of the time of
17 the sale hearing on Friday night, correct?
18     A.   Yes.
19     Q.   Here that provision is replaced and
20 taken out of the deal, correct?
21     A.   Right.
22     Q.   And that would be a material change,
23 correct?
24     MR. MAGUIRE:  Objection to form.
25     Q.   Well, if 500 million is the definition

Page 165

1  J. Kobak
2  of "material," would you agree that --
3      A.   That's the minimum definition of
4  "material."
5      Q.   The minimum.  Then whatever the resis
6  were worth, there was some value there and now
7  they're no longer in the deal, correct?
8      A.   Correct.
9      Q.   Do you know why they came -- do you
10 know why Barclays went from receiving those
11 residential securities on the Friday night that
12 the deal was approved to not receiving them at
13 the closing under the clarification letter?
14     A.   I thought I remembered that they went
15 to DTC, and my understanding was, yes, there
16 were things that were coming out of the deal and
17 there were other things that were going into the
18 deal, and the idea was that you would come up
19 with a substitute deal that was relative, you
20 know, equivalent to the deal that had
21 described -- had been described to the Court, or
22 one would think you would go back to the Court
23 and describe that you have a materially
24 different deal.
25     Q.   So, as long as what went into the deal

Page 166

J. Kobak

1
2  was roughly equivalent to what came out of the
3  deal, there would be no need to go back, only if
4  it was different, correct?
5      MR. MAGUIRE:  Objection to form.
6      A.   Well, whether one might want to go
7  back is -- maybe that's a question for Barclays,
8  but from our point of view, certainly what would
9  be material would be something that would
10 materially change the economic basis of the
11 deal, meaning the 47.4, its relation to
12 liabilities, the fact that the trustee was going
13 to get a minimum of something like $20 billion
14 in assets at the end of the day.
15     Q.   Would you agree that if Barclays
16 received something for the -- for -- in exchange
17 for giving up the residential real estate
18 securities, Barclays received something of
19 equivalent value or lesser value, then the
20 trustee would not have viewed it as necessary to
21 go back to the Court?
22     MR. DAKIS:  Objection to form.
23     A.   Yeah, I don't think we would have a
24 particular problem with that if that were the
25 fact.

Page 167

J. Kobak

1
2      Q.   Do you know --
3      A.   In fact, that's what we thought was
4  happening over that weekend.
5      Q.   Okay.  Has the trustee performed or
6  the trustee's advisor performed any valuation of
7  what the residential real estate mortgage
8  securities were worth as of the time the
9  transaction?
10     A.   I don't believe so.
11     Q.   Did the trustee ask anyone before the
12 closing -- I'm sorry, if we covered this before.
13 I just want to be clear.  Did the trustee ask
14 anyone before the closing what the estimated
15 value of the clearance box assets were?
16     A.   I think you had asked me a question
17 about 1.9 billion, and I don't recall that
18 figure particularly sticking in my recollection.
19 I really don't recall if we had -- we might have
20 had some general number for the clearance box
21 assets.  I really don't recall.  In our view,
22 they came out of the deal in any case.
23     Q.   Did the trustee ever ask anyone before
24 the closing what the value of the
25 exchange-traded derivatives were?

Page 168

J. Kobak

1
2      A.   I don't believe so.
3      Q.   And did the trustee ever ask anyone
4  before the closing specifically what the value
5  of the repo collateral was?
6      A.   No, I don't believe so.
7      Q.   I'd like to show you what was
8  previously marked in another deposition as
9  Exhibit 338B.  Exhibit 338B was, I believe,
10 produced from the Creditors Committee during the
11 a deposition of Michael Klein, and somebody may
12 have represented that it might have been
13 something written by Michael Klein.
14         In any event, my question to you is,
15 first, are you familiar with this document?
16 Have you seen it before?
17     A.   I don't recall having seen it before.
18     Q.   The question I want to ask is:  Was
19 this rough sketch of information shown to any
20 representative of the trustee before the
21 closing?
22     A.   I don't recall having seen anything
23 like this and I'm not aware that anyone else saw
24 it.
25     Q.   I would just ask, I think it's within

Page 169

J. Kobak

1
2  the scope of the 30(b)(6), for the record for
3  you to confirm with your colleagues who were
4  there that weekend whether anyone at Hughes
5  Hubbard saw this.  Obviously if you have a copy
6  of it in your files, I assume you would have
7  produced it, but I would ask you to look for
8  that too because it may not be in an e-mail, but
9  either way to confirm with people who were there
10 whether they were shown this or in the room when
11 it was shown.
12     MR. MAGUIRE:  We'll leave a space in
13 the transcript and take that request under
14 advisement.
15     MR. HUME:  Thank you.
16 INFORMATION TO BE PROVIDED: _____
17 _____
18 _____
19     Q.   Mr. Kobak, let's go back for a few
20 more questions about presentation to the Court
21 at the sale hearing on September 19.  We can
22 look at the transcript for some of this, if you
23 wish, but let me just make sure we agree on a
24 few things.
25         The trustee understood that it was an

## Page 170

J. Kobak

1  extraordinary hearing to begin with, correct?
2  Friday night, five days after the largest
3  bankruptcy in history to sell broker-dealer
4  operations?
5      A.   I think the Court viewed to it as
6  extraordinary, and I don't think we have any
7  reason to differ with that description.
8      Q.   Did the trustee understand that the
9  Court was also being told that there were major
10 changes to the transaction?
11     A.   On the 19th?
12     Q.   Yes.
13         MR. CARDEN:  Objection to form.
14     A.   I think the Court was told that there
15 were changes, yes, and, you know, the scope of
16 it had -- I mean, the basic relationship had
17 stayed the same, but the amounts involved had
18 apparently been reduced and so forth.
19     Q.   And there were other changes, like the
20 provision regarding a sharing of any profits on
21 sales for a year was taken out?
22     A.   Yes.
23     Q.   Eagle Energy was taken out?
24     A.   Yes.

## Page 171

J. Kobak

1      Q.   There were other changes that Ms. Fife
2  recounted?
3      A.   Yes, the real estate values had
4  changed.
5      Q.   Real estate values.
6         It was clear, wasn't it, to the
7  trustee, that the written contract that had been
8  submitted to the Court had to be amended to
9  reflect those changes, correct?
10     A.   Well, it had to be -- our
11 understanding was there was going to be a
12 clarification letter which was going to -- the
13 deal was described in court, that there was
14 going to be a clarification letter that would
15 clean up some items, would be consistent with
16 the deal as it had been -- and the changes that
17 had been described to the Court.
18         We didn't understand, I don't think
19 anyone understood, that anything more than that
20 would be involved.  Indeed, I have a clear
21 recollection, as I think I say in my
22 declaration, of leaving the hearing, going back
23 to our offices, which is just across the street
24 from the Bankruptcy Court, and basically

## Page 172

J. Kobak

1  expecting that there would be a call that those
2  who were doing the clarification letter would be
3  done with it in 45 minutes or an hour, and then
4  that proved not to be the case.
5         So that's what we expected as of the
6  end of the hearing.
7      Q.   You expected the contract would be
8  amended to reflect what the judge was told and
9  that that would happen promptly after the
10 hearing, correct?
11     A.   Amendment isn't even I don't think the
12 right word.  Clarified, yes.
13     Q.   You don't think 20-plus billion
14 dollars of assets is an amendment?
15         MR. MAGUIRE:  Objection to form.
16     A.   Well, whether it was an amendment or
17 not, it was called a clarification letter, and
18 it was going to be the Asset Purchase
19 Agreement, clarify what had been said in court,
20 make a few other minor, you know, language
21 changes, I guess, or I don't know, scrivener
22 changes.
23     Q.   A subsidiary here, a subsidiary was
24 not something --

## Page 173

J. Kobak

1         MR. MAGUIRE:  Just make sure --
2      A.   I'm not --
3         MR. MAGUIRE:  Wait.  Wait.  We can't
4  have two people speaking at the same time,
5  so Hamish, this is very exciting stuff, but
6  you need to make sure that you allow the
7  witness to conclude his answer before you
8  start your next question.
9      Q.   Do you agree that the APA had to be
10 amended after the Court issued the sale order?
11     A.   It had to be amended or clarified,
12 whatever word you want to use, yes, it should be
13 embodied in an agreement that was consistent
14 with what was said at court when the deal, as it
15 was changed, was described, would incorporate
16 those changes that were described to the Court,
17 and the overall parameters of the deal as
18 described to the Court.
19     Q.   And you expected that that would be
20 done promptly, as you said, within 45 minutes
21 that evening, you were hoping to see something,
22 correct?
23     A.   I think that's what the Court
24 expected, that people would kind of go out in

Page 174

J. Kobak

1  the hallway, you know, the way people do in
2  Bankruptcy Court and hammer things out to the
3  extent there were things to hammer out.  I mean,
4  there was an agreement that had a lot of
5  interlineated changes in it and so forth, so
6  some of that amendment process had already
7  begun.
8      Q.   When you didn't see it within 45
9  minutes or an hour or two hours, and you didn't
10 see it -- and you didn't see a draft on Saturday
11 at all, did you?
12     A.   No.
13     Q.   Did that cause the trustee to be
14 concerned that the deal was being changed?
15     A.   We had a -- I recall, and I cannot
16 tell you exactly who made this call or to whom,
17 but I think we called Weil or somebody to ask
18 what had happened, maybe somebody called us, and
19 basically we were told, well, people are tired,
20 they're going to go home tonight, and maybe
21 people will prepare sometime Saturday or Sunday
22 over the weekend to get it done.
23         So certainly then we did not think
24 that people were contemplating major changes

Page 175

J. Kobak

1  beyond those that had been described.
2      Q.   When you finally did receive a copy of
3  the clarification letter, did the trustee or his
4  advisors review it?
5      A.   Yes, we had people I believe -- I
6  believe we had actually had somebody go to Weil
7  maybe pretty early Saturday, Sunday morning,
8  were basically told nobody else was there yet,
9  and then eventually people came and, you know,
10 the process began.
11         So we did have people there.  There
12 were a lot of discussions that went on that we
13 weren't necessarily party to.  Again, I don't
14 think we -- we did not have a major role in
15 negotiating the agreement, which, after all, we
16 still understood to be basically clarifying the
17 deal that had already been described and struck.
18         In the afternoon, a number of us got
19 on the phone, and then we did have a couple of
20 people at Weil who were there while some of the
21 negotiations went on and some of the -- some of
22 the drafting was done.
23     Q.   You say in your affidavit in paragraph
24 10 that, "Representatives of my firm were

Page 176

J. Kobak

1  present at the officers of debtors' counsel."
2          That's what you were just describing,
3  correct?
4      A.   Yes, that's correct.
5      Q.   Who was it from Hughes Hubbard who
6  were there?
7      A.   I believe it was Mr. Kiplok, and I've
8  dreaded this because the reporter is going to
9  ask me to spell the last name, but it's Anson
10 Frelinghuysen.
11     Q.   We'll spell it in a break.  It's in
12 the --
13     A.   I'm not sure I can.
14     Q.   Well, I think it's written in one of
15 the contracts, so ...
16     A.   But anyway, they were the
17 representatives who were there.
18     Q.   And were they there on both Saturday
19 and Sunday?
20     A.   I think they were there on Sunday.
21 I'm not sure if they were there on Saturday.
22     Q.   And did they communicate back to you
23 or the trustee or other advisors of the trustee?
24     A.   We had some phone calls or e-mails,

Page 177

J. Kobak

1  and there were a couple of drafts.  I think the
2  first one that I saw was in the evening, and
3  then there were a couple more that came in, you
4  know, the early morning hours or really getting
5  close to the beginning of the working day that
6  would have been e-mailed around.  So we had some
7  e-mail correspondence.
8          There was a long period of time when I
9  and the trustee and SIPC and others were on the
10 phone, but during most of that time essentially
11 nothing happened.  I mean, it was hours and
12 hours of radio silence, basically.
13     Q.   Now, when you saw the clarification
14 letter, the trustee, collectively, his advisors,
15 on Sunday with references to clearance box
16 assets, the 15c3 assets, exchange-traded
17 derivatives, did the trustee or his advisors
18 ever conclude that those specific assets were
19 not specifically described in court and that
20 that was a problem?
21     A.   Well, we had some discussions I think
22 in court with DTC and we knew there were some
23 negotiations with DTC and we -- I think we knew
24 that was going to affect what happened to the

Page 178

1           J. Kobak
2  clearing boxes.
3          I'd been presented with a Transfer and
4  Assumption Agreement by OCC, so we knew that
5  those -- we knew about, to some extent we knew
6  about those aspects of the transaction already.
7      Q.    On the Friday night?
8      A.    Well, I certainly knew either Friday
9  night or it might have gotten into Saturday
10 morning I signed the Transfer and Assumption
11 Agreement.
12     Q.    Shortly after the sale hearing?
13     A.    I think it was during a late break in
14 the sale hearing.  And it might have been before
15 midnight.  I just can't really remember.
16     Q.    So as of the time of the sale hearing,
17 you knew the exchange-traded derivatives were in
18 the deal; that wasn't a surprise in the
19 clarification letter?
20     A.    Right.  I think that had been in the
21 Asset Purchase Agreement.
22     Q.    So --
23     A.    I mean, the question was what --
24 whether Barclays was going to assume the
25 liabilities and what happened to the deposits

Page 179

1           J. Kobak
2  and so forth.
3      Q.    You said -- so, in terms of the
4  derivatives appearing in the clarification
5  letter, that was not a surprise given that you
6  had signed the TAA on Friday night and that it
7  was already in the APA?
8      A.    Well, the final version of the A -- of
9  the clarification letter had a parenthetical
10 that I don't believe was in any other draft
11 which deals with deposits.
12     Q.    I'm going to come to that.
13     A.    So I'm sure we'll come to that.
14     Q.    We will come to that, but the question
15 is the concept that the derivatives were in the
16 deal was not something -- was something you knew
17 about on Friday night at the sale hearing?
18     A.    Yeah, that was not a surprise.
19     Q.    The clearance box assets, you
20 mentioned that you had a discussion Friday night
21 with the DTC about that?
22     A.    I think during a break in the hearing
23 or before the hearing or at some point I had
24 some discussion with the DTC.  I certainly was
25 aware that the DTC was -- became unhappy at some

Page 180

1           J. Kobak
2  point that Barclays seemed unwilling to assume
3  liabilities and they were telling people that
4  they were not going to clear anything on Monday
5  when everybody opened for business unless they
6  were fully satisfied that they were secured,
7  protected, whatever word you want to use, and
8  the clearing box -- clearing boxes and where
9  they went became part of that concern in that
10 discussion.
11     Q.    As of the Friday night, then, was it
12 your understanding that clearance box assets
13 were in the deal or not in the deal, or was it
14 not clear?
15     A.    I'm not -- I just am not clear on the
16 sequence completely.  I thought that at the
17 beginning of the hearing DTC was assuming that
18 Barclays would step up and assume the
19 liabilities, and I think they reached the
20 conclusion either at the hearing or shortly
21 thereafter that that wasn't the case, wasn't
22 going to be the case, and they became very, very
23 concerned about that.
24     Q.    And then there were negotiations about
25 that over the weekend?

Page 181

1           J. Kobak
2      A.    That's correct, and I -- we weren't
3  really that much part of the negotiations.  We
4  just understood that DTC was saying we want
5  everything we can get to make sure that we're
6  protected because we do not know what the scope
7  of liabilities might be, and that includes if
8  Barclays is not going to assume liabilities, we
9  want the clearing boxes to stay with LBI.
10     Q.    The clearing boxes, did anyone at DTC
11 at any time before the closing ever tell you
12 that they needed the clearance box assets, the
13 LBI securities and other assets in the clearance
14 boxes at DTC to remain with DTC?
15     A.    To remain with LBI?
16     Q.    Yes, to remain with LBI.
17     A.    So that DTC could look to them in case
18 there were liabilities or obligations that were
19 otherwise unsatisfied because of the tremendous
20 amount of clearing and transactions they would
21 be processing.  I do -- I understood, the
22 trustee understood, I think DTC understood that
23 what we were talking about was the property in
24 the boxes, not empty boxes themselves, which
25 would not satisfy that concern of DTC.

Page 186

J. Kobak

1    J. Kobak
2    difference between those two numbers, correct?
3         MR. MAGUIRE:  I'm sorry, between which
4    numbers?
5    Q.   Okay.  Let's look at paragraph 7.
6    A.   1.9 billion, yes.
7    Q.   1.9.  Let's be precise.  Paragraph 7
8    of your affidavit, you recount these numbers?
9    A.   Uh-huh.  Yes.
10   Q.   I just want to ask you one question:
11   You describe -- you use Ms. Fife's words when
12   you describe that there would be $45.5 billion
13   in liabilities in connection with those assets.
14        Can you just explain to me what you
15   meant or understood that phrase to mean, "in
16   connection with those assets"?
17        MR. DAKIS:  Object to form.
18   A.   I think it meant liabilities that were
19   related in some way to the non-real estate
20   assets, which could be longs and shorts and I
21   guess it could be other things as well.
22   Q.   And did anyone ever explain to you
23   what the 45.5 billion consisted of?
24   A.   Well, I didn't think it included
25   liabilities such as liabilities -- or,

Page 187

J. Kobak

1    J. Kobak
2    obligations that Barclays was undertaking toward
3    employees.  I didn't think it included
4    obligations on cure amounts under contracts and
5    so forth.  So it was related to the assets that
6    were involved.
7    Q.   Okay.  And just so I'm clear, did
8    anyone ever explain to you, anyone from Weil
9    ever explain to you what the $45.5 billion
10   number consisted of?
11   A.   In detail, no.
12   Q.   In any way?
13   A.   No.
14   Q.   Did anyone, other than someone at
15   Weil, ever explain what that number represented,
16   what it consisted of?
17   A.   I don't believe so.
18   Q.   Is it your current understanding that
19   it's an approximation of the repo cash advance
20   that Barclays made?
21        MR. MAGUIRE:  Objection to form.
22   Asked and answered.
23   A.   Yeah, I mean, we've been over this
24   several times.  It is the same number.  I assume
25   that's at least a big part of it.

Page 188

J. Kobak

1    J. Kobak
2    Q.   Now, the $1.9 billion difference
3    between -- that's given in those numbers between
4    the liabilities and the assets, that $1.9
5    billion spread represents assets that would be
6    going to Barclays under this deal that would not
7    be available to satisfy any remaining customer
8    claims in the estate, correct?
9    A.   That's correct.
10   Q.   And that was acceptable to the
11   trustee?
12   A.   Yes.  It was also explained that there
13   would be at least $20 billion left in the
14   brokerage firm.
15   Q.   Who explained that to you?
16   A.   I think Ms. Fife or Harvey Miller said
17   it at the hearing.
18   Q.   Other than what was said at the
19   hearing, did anyone else make any
20   representations to you about the $20 billion
21   that would remain with the estate?
22   A.   Not specifically, no.
23   Q.   And how much money, how much in assets
24   actually did remain with the estate?
25   A.   I think if you look at our interim

Page 189

J. Kobak

1    J. Kobak
2    report which we filed not long ago, we have
3    about $18 billion in assets.  However, 1.9
4    billion of those assets are the assets to
5    complete the customer transaction -- customer
6    transfer transaction with Barclays, so that
7    would take it down to a little over 16, and then
8    there are several hundred million, I don't have
9    the exact figure, at least that are
10   post-transaction principal and interest
11   payments.  So that wouldn't be the 20 billion at
12   the time.  So that would take you down to 15.5.
13        If Barclays succeeded in the claims
14   it's making against us under its interpretations
15   of the clarification letter, I think you'd be
16   down to something lower, depending on how you
17   value some of those assets and what's involved,
18   something like 12 or 13 billion dollars, which
19   is significantly lower than $20 billion, and
20   could put us at risk of a shortfall to
21   customers.
22   Q.   Why was -- if the trustee was willing
23   to accept the 1.9 billion that would be
24   transferred to Barclays, was there an absolute
25   limit on the amount that the trustee was willing

## Page 190

1            J. Kobak
2 to transfer?
3     A.   I think the way we saw it was I think
4 that one reason, and I'm no expert in this, but
5 our understanding was one reason there are
6 haircuts and repos is that you might not, even
7 when stuff was marked to market and stuff, you
8 might not always realize 100 percent on the
9 security values.  There are costs associated
10 with that and so forth.  So there's always
11 supposed to be a cushion.
12       So I think our understanding was that
13 these could be, to the extent you're talking
14 about repo-type assets, things that were
15 basically in balance with one another.  I think
16 if you took the 1.9 even as a figure and set
17 against that some of the obligations, we knew
18 that Barclays was assuming, or was saying it was
19 assuming, like the employee severance, Barclays
20 was either getting the assets for nothing beyond
21 the $250 million or possibly even risking a
22 loss, but certainly wasn't making any windfall
23 profit.
24       And that would leave enough or we
25 thought that would leave enough behind to, you

## Page 191

1            J. Kobak
2 know, reasonably comfortably take care of
3 customers.
4     Q.   There was no way you could know that,
5 even if all of the numbers you were given were
6 correct, there was no way you could know that at
7 the time, correct?
8     A.   No.
9       MR. MAGUIRE:  Know what at the time?
10     Q.   There was no way you could know at the
11 time of the sale transaction whether the amount
12 of money left in the LBI estate was going to be
13 enough to satisfy all remaining customer claims?
14       MR. MAGUIRE:  Objection to form.
15     A.   No, but we were led to understand that
16 that would be the case, and we didn't see
17 anything that suggested it wouldn't be the case.
18     Q.   How were you led -- who led you to
19 believe that would be the case?
20     A.   We had some discussions and SIPC
21 particularly had some discussions I believe with
22 the S.E.C. and other regulators about the status
23 of the accounts and what was in segregation and
24 so forth, and basically I believe was led to
25 believe that there probably would not be a

## Page 192

1            J. Kobak
2 significant shortfall.
3       I believe there were discussions over
4 the weekend when the 15c3 account was an issue
5 where it was believed, and of course, a lot of
6 this comes from the Barclays and LBI people, but
7 it was believed that there was actually a
8 surplus in that account.  I mean, that's why the
9 769 million can even get into the agreement even
10 on a contingent basis.  If people thought there
11 were shortfall, I don't think that would have
12 been the case.
13     Q.   You mentioned something about these
14 other liabilities of cure and comp that you
15 understood Barclays was assuming, correct?
16     A.   Yes.
17     Q.   And let me make sure I understand this
18 correctly.  The liabilities of cure and comp
19 would be a cost to Barclays?
20     A.   Yes.
21     Q.   Correct?  They may be of some
22 benefit -- the cure liability that Barclays
23 assumed would be of some benefit to the estate
24 because there would be that much less in
25 liability claimants, correct?

## Page 193

1            J. Kobak
2     A.   That's correct.
3     Q.   But those liability claimants would be
4 general creditors who would come after
5 customers, correct?
6     A.   Well, technically, the way SIPC works
7 is there's customer property and then there's
8 general estate property.  A lot of property gets
9 allocated to customer property, and that's used
10 to satisfy customers, and only if there's an
11 excess does that get added to the general
12 estate.
13       It's not really -- I mean,
14 colloquially it's a priority.  It's really two
15 different pots of assets.
16     Q.   Okay.  My technical formulation may be
17 wrong, but as a practical matter, any
18 outstanding trade payable to a contracting
19 service provider to Lehman would only get paid
20 their claim after all customers had received
21 full amount of their customer prompt?
22     A.   No, there could be a general -- you
23 could have a situation where there's not
24 sufficient assets to pay customers.  There's
25 still some money in the general estate and you

Page 210

J. Kobak

1
2  questions that were asked and that led to the
3  2004 request, and I think that's basically,
4  that -- those proceedings are basically the
5  answer to the question.
6      Q.   When did the trustee first communicate
7  to Barclays that the trustee believed Barclays
8  may have received assets in the deal in excess
9  of the $47.4 billion cap?
10         MR. CARDEN:  Objection to form.
11     A.   I don't know.  I don't know if we
12  communicated that during the 2004.  I kind of
13  turned that over to a team of litigators who
14  kept me generally apprized of kind of what was
15  happening, but not necessarily on a
16  detail-by-detail basis.
17     Q.   Was the trustee aware that in February
18  2009 Barclays published the acquisition balance
19  sheet for the Lehman acquisition?
20     A.   I remember hearing and maybe seeing
21  the accounting statements that they did that
22  showed a substantial gain on the transaction,
23  which was quite a surprise to us.
24     Q.   Did the acquisition balance sheet --
25  do you recall whether the trustee was aware that

Page 211

J. Kobak

1
2  the acquisition balance sheet showed an
3  acquisition of assets, a total value of assets
4  over $47.4 billions?
5      A.   I don't recall.  I recall a footnote
6  that showed a, if I'm thinking of the same
7  financial statement, that showed a profit of
8  something in the area of 2.2 to 2.3 billion
9  British pounds, which would be about $4 billion,
10  I think, U.S., give or take, which seemed quite
11  inconsistent with the kind of deal that had been
12  described and that we understood to be involved.
13     Q.   Did you notify Barclays of that?
14     A.   I don't know, other than that I recall
15  in one meeting with Jonathan Hughes and others,
16  you yourself might have been there, when we were
17  discussing some of Barclays' claims and our
18  reactions to them that I believe somebody on our
19  side, Mr. Maguire or the trustee himself or me
20  or somebody, I believe said that, you know, we
21  did not expect that Barclays would make a huge
22  profit on the transaction and we certainly
23  didn't think that if they made a big huge profit
24  on the transaction, they should also be seeking
25  yet more assets from us.

Page 212

J. Kobak

1
2      So, and I cannot be any more specific
3  than that.  I just think that some remark like
4  that was made during such a meeting.
5      Q.   I remember that meeting, and I can
6  tell you I don't remember that statement, but
7  that's fine.
8      A.   Well, it may -- we've had other --
9      Q.   Since you brought the meeting up, I
10  have a question.
11     A.   We've had --
12     Q.   I have a --
13     A.   We've had other meetings with Mr.
14  Hughes and others, and so it may have been in
15  some other meeting or even phone call that
16  occurred.
17     Q.   At the meeting you reference on June
18  12 where we met to discuss Barclays claims, am I
19  correct in saying that no one from the trustee's
20  side of the table said anything about there
21  being a $47.4 valuation cap in the deal?
22         MR. CARDEN:  Objection to form.
23     A.   I don't recall that subject coming up.
24         (Exhibit 445, Barclays PLC and
25  Barclays Bank PLC Form 6-K, marked for

Page 213

J. Kobak

1
2  identification, as of this date.)
3      Q.   Mr. Kobak, in front of you is Exhibit
4  445, which is an excerpt from Barclays' Form
5  6-K, S.E.C. filing from February 9, 2009.  It
6  lists the acquisition balance sheet in the first
7  column on the second page of the attachment,
8  which is page 38 of the 6-K.
9      A.   Uh-huh.
10     Q.   Do you see that?
11     A.   Yes.
12     Q.   And it is listed in British pounds.
13  Do you understand that?  It says "pounds,
14  millions" at the top of that column, do you see
15  that?
16     A.   Uh-huh.  Yes, I do.
17     Q.   When this was published, did the
18  trustee review it, or his advisors?
19     A.   We looked at it and the profit that
20  was reported, yes.
21     Q.   And you thought the profit was bigger
22  than you thought -- expected it to be, correct?
23  You mentioned that?
24     A.   We didn't really expect there would be
25  any profit or any profit of any size, yes.

## Page 214

J. Kobak

1
2   Q.   Did you think the total assets listed
3   were in excess of what you thought was
4   authorized?  Do you recall whether the trustee
5   at that time thought that the assets, the total
6   valuation of the assets was in excess of what
7   was authorized?
8        MR. DAKIS:  Objection to form.
9        A.   I don't know to what extent we looked
10   at that.
11        MR. HUME:  I want to mark quickly as
12   an exhibit the transcript from the Barclays
13   teleconference with investors.
14   Q.   As I understand it, the September 17
15   teleconference Barclays held with its investors,
16   you don't know whether the trustee was aware of
17   that?
18   A.   I don't know if the trustee was aware
19   of it.
20   Q.   Was the trustee aware that certain
21   creditors were complaining at the sale hearing
22   that Barclays was getting a discount and a fire
23   sale deal?
24   A.   I believe people were complaining
25   about a fire sale deal.  I'm not a hundred

## Page 215

J. Kobak

1
2   percent sure that -- I don't recall necessarily
3   discussion of a discount in that connection.
4   Q.   Well, it's in the sale hearing
5   transcript, but we won't belabor it.
6        MR. MAGUIRE:  Would you care to give
7   us a reference?
8        MR. HUME:  Sure.  I'll give it to you
9   off the record and you'll see in it our
10   brief.
11        We'll mark the next exhibit.
12   Actually, we don't need to mark it.  Exhibit
13   24.  It's already been marked.
14        MR. MAGUIRE:  You mentioned the -- the
15   teleconference transcript.  Are you marking
16   that?
17        MR. HUME:  I'm waiting to get it.
18   Q.   Just so we do close the loop on the
19   discount point, if you wish, Mr. Giddens, if you
20   go back to the sale hearing transcript, big
21   document there in front of you.
22        MR. MAGUIRE:  Mr. Kobak.
23   A.   I'm Mr. Kobak.
24   Q.   Sorry, Mr. Kobak.
25        If you look at page 174 of the

## Page 216

J. Kobak

1
2   document.
3   A.   Okay.
4   Q.   There's an objection being registered
5   by a Mr. Daniel Golden, who represented
6   creditors, bondholders, I believe, and at the
7   end of the paragraph on page 174, Mr. Golden
8   says, "Nobody ever suggested maybe there's an
9   alternative here that is something less than
10   selling assets on what we perceived to be a
11   discount value."  Do you see that?
12   A.   Yes.
13        MR. MAGUIRE:  I'm sorry, which line?
14        MR. HUME:  Line 6 through 8.  I'm
15   sorry.  I should have given that.
16   Q.   So does seeing that refresh your
17   recollection that there were complaints about
18   possible discount in the deal?
19        MR. CARDEN:  Objection to form.
20   A.   There were complaints that Barclays
21   was basically getting something for nothing, a
22   very valuable and substantial number of customer
23   accounts, among other things, and substantially
24   paying nothing for that other than a nominal
25   $250 million for goodwill, so that that was the

## Page 217

J. Kobak

1
2   spirit in which I took that comment, not the
3   discount the way we have discussed it earlier.
4   Q.   Not withstanding that, the trustee
5   still believed that the sale should be approved,
6   correct?
7        MR. CARDEN:  Objection to form.
8   A.   Again, the trustee was looking at what
9   would be -- what he thought would be their for
10   customers, the protection for customers, the
11   need to protect customers, the fact that SIPC,
12   the S.E.C., the Federal Reserve, everyone else
13   wanted to protect customers, and that's the role
14   of the SIPA trustee.  So that was our primary
15   concern with the transaction, as I think we
16   explained during the hearing.
17   Q.   And the customers were protected?  The
18   PIM customer were protected, correct?
19   A.   They have been protected.
20   Q.   The PAM customers have been protected
21   by going to Neuberger?
22   A.   Yes, that's correct.  There's some
23   customers that Barclays didn't take.  We're
24   protecting them as well as we can.  There's some
25   prime brokers that I thought in the

Page 226

J. Kobak

1  
2  liquidating other securities?
3      A.   They liquidated billions and billions
4  of dollars of securities.  Their wind-down
5  process I don't believe is completed yet.
6      Q.   Do you know what the ultimate
7  settlement obligations were that were guaranteed
8  by this DTC letter agreement?
9      A.   In terms of dollar amount or --
10      Q.   Yes.
11      A.   No, not off the -- no, I don't recall.
12      Q.   Do you know if it was more or less
13  than 250 million?
14      A.   I thought it was a very substantial
15  amount.  There were many other liabilities that,
16  according to -- and obligations according to DTC
17  that the estate was potentially liable for that
18  they would look to, and that's why it's my
19  understanding that they wanted anything that they
20  could get a hold of in addition to this $250
21  million for the Barclays guarantee to make sure
22  that they and their members were protected.
23      Q.   Just so I'm clear, I'm not asking what
24  the potential exposure was.  I'm asking what --
25  do you know today what the ultimate actual

Page 227

J. Kobak

1  
2  settlement obligations were that the DTCC had to
3  absorb after the Lehman liquidation began that
4  was being secured by this DTC letter?
5      A.   No, I don't.  We're in the process of
6  trying to do a full reconciliation of accounts
7  and so forth with DTC.
8      Q.   Now, do you recall that the
9  clarification letter was explicitly amended to
10  reflect the amendment made by the DTC letter to
11  the deal as it was in the First Amendment to the
12  APA?
13          MR. DAKIS:  Objection to form.
14          MR. MAGUIRE:  Can you repeat that
15      question?
16      Q.   Why don't we do it this way.  Can you
17  find and put in front of you yourself the
18  clarification letter, Exhibit 25?
19      A.   I'm having trouble putting my hands on
20  my copy of 25.
21      Q.   I'm sure we have another one.
22      A.   I'm sorry.  It was under something.
23  I'm sorry.
24      Q.   If you to turn to page 3 of the
25  clarification letter, you'll see subsection 1(d)

Page 228

J. Kobak

1  
2  of the agreement?
3          MR. MAGUIRE:  1(d)?
4      Q.   1(d) toward the top of the page, do
5  you see that provision?
6      A.   Yes.
7      Q.   Says, "Sections 3 and 4 of the First
8  Amendment are hereby deleted in their entirety
9  and shall be of no effect ab initio.  LBI hereby
10  instructs purchaser to pay at the closing $250
11  million of the cash amount to the Depository
12  Trust Clearing Corporation for deposit as
13  collateral against LBI's obligations to DTC.
14  Such" -- it then says, "Such collateral account
15  shall be maintained in accordance with the
16  agreement among LBI, Purchaser and DTC entered
17  into in connection with the closing."
18          Do you see that language?
19      A.   Yes.
20      Q.   Would you agree with me that that
21  language in the clarification letter reflects
22  the agreement made in the DTC letter?
23      A.   Well, it refers to that letter.  This
24  is only in part what the agreement covered, the
25  agreement, the tri-party agreement between LBI,

Page 229

J. Kobak

1  
2  the purchaser and DTC.
3      Q.   I understand that's your position, but
4  what I want to make sure we agree on is that the
5  clarification letter was amended to reflect the
6  agreement reached in the DTC letter agreement?
7      A.   Yes.  I mean, it was understood that
8  there would be an agreement with the DTC between
9  the three parties referenced here.
10      Q.   Now, if you turn to the first page of
11  the clarification letter and we go back to the
12  provision we were looking at before, Section
13  1(A), Romanette ii, Subsection (B) of that
14  paragraph provides that purchased assets shall
15  include "such securities and other assets held
16  in LBI's clearance boxes as of the time of the
17  closing."  Do you see that language?
18      A.   Yes.
19      Q.   And do you agree with me that that
20  language was not amended to reflect the
21  agreement set forth in the DTC letter agreement?
22          MR. MAGUIRE:  Objection to form.
23      A.   I believe there was an earlier draft
24  of the clarification letter that specifically
25  referred to DTC clearing boxes, and the specific

Page 230

J. Kobak

1
2  reference to DTC clearing boxes or to DTC was
3  removed from the agreement before this language
4  appeared.
5      Q.   We can show you that draft, but are
6  you saying that this provision should have been
7  written the way it's written?  As it's written,
8  it does not -- let me withdraw and ask a clear
9  question.
10      There's nothing in this provision
11  relating to clearance box securities, is there,
12  that carves out or excludes clearance box
13  securities at the DTC account?
14      MR. MAGUIRE:  Objection to form.
15      Q.   Would you agree with that?
16      A.   There's nothing that either
17  specifically includes them or specifically
18  excludes them --
19      Q.   Well --
20      A.   -- in this agreement.
21      Q.   -- there are securities -- there were
22  securities at that time in LBI's clearance boxes
23  at the DTC, correct?
24      A.   I believe so, yes.
25      Q.   And this language does not exclude

Page 231

J. Kobak

1
2  those securities?
3      A.   Not specifically, no.
4      Q.   Does the trustee think that this
5  should have been written differently to exclude,
6  explicitly exclude, the DTC securities?
7      MR. MAGUIRE:  Objection to form.
8      Q.   The DTC clearance box securities?
9      A.   The trustee feels that there is a
10  clear agreement with DTC and with Barclays which
11  Barclays needed to sign in order to have the
12  account transfers take place which provides
13  that the clearance boxes remain property of the
14  trustee, as we've previously discussed.
15      Q.   Before the closing, Mr. Kobak, did
16  anyone for the trustee ever tell Barclays that
17  the trustee believed that the DTC letter removed
18  the clearing box assets from the deal?
19      MR. CARDEN:  Objection to form.
20      A.   I don't know if anyone specifically
21  discussed that with Barclays, but it was our
22  clear understanding and I believe the DTC's
23  understanding as well.
24      Q.   But you don't know whether that
25  understanding was ever communicated to Barclays?

Page 232

J. Kobak

1
2      A.   I don't recall it being communicated
3  one way or the other to Barclays.
4      Q.   And other than -- you told me about a
5  conversation with the DTC earlier before the
6  lunch break.
7      Other than those communications, did
8  the trustee communicate its understanding about
9  the DTC clearing box assets to anyone else
10  before the closing?
11      A.   I don't clearly remember.  I may have
12  discussed it with Mr. Caputo of SIPC.
13      Q.   Other than Mr. Caputo at SIPC, for
14  example, does the trustee have any recollection
15  of telling anyone its understanding about the
16  clearance box securities and the DTC letter at
17  Weil Gotshal before the closing?
18      A.   Before the closing I don't recall any
19  such discussion.  I just don't recall either
20  way.
21      Q.   Is there any recollection of any such
22  discussion with anyone employed by Lehman?
23      A.   No, I don't recall.  Again, I don't
24  recall either way.
25      Q.   Did anyone, during the negotiations

Page 233

J. Kobak

1
2  and before the closing, did anyone ever
3  explicitly communicate to the trustee that the
4  DTC letter agreement removed the DTC clearance
5  box assets from the sale?
6      MR. MAGUIRE:  Other than in the letter
7  itself?
8      A.   Well, the letter itself clearly says
9  that to me, and I believe that was the substance
10  of my discussions with the representatives of
11  the DTC, that rather than what they would have
12  preferred to have happened, as I understood it,
13  was that Barclays would assume the accounts and
14  the liabilities in their entirety, that the
15  whole 74 box, which I think is what we were
16  talking about, would be transferred to Barclays
17  given whatever the Barclays number is and become
18  the Barclays box, but that since Barclays would
19  not assume liabilities, DTC felt itself exposed
20  and, therefore, it wanted to be sure that the
21  boxes stayed with the trustee.
22      And that was the background for the
23  agreement, as I understood it, and I did have
24  discussions of that with DTC and I believe I
25  also mentioned it briefly to Mr. Caputo at some

Page 234

J. Kobak

1
2 point, perhaps during the court proceedings or
3 over the weekend.
4     Q.     And the discussions you had with the
5 DTC lawyers and representatives you believe were
6 late Friday and early Saturday morning?
7         MR. MAGUIRE:  Objection to form.
8     A.     I believe we had some discussion in
9 court and further discussion I think maybe very
10 early Monday morning around the time of the
11 execution of the DTC letter, as I recall.
12     Q.     After reviewing the clarification
13 letter, the final clarification letter, did the
14 trustee or any of his advisors bring to anyone's
15 attention that the clearance box provision in
16 the clarification letter does not specifically
17 exclude clearance box assets at the DTC
18 accounts?
19     A.     No, I don't believe we discussed that
20 one way or the other.
21     Q.     So until Barclays raised the issue by
22 demanding delivery of those clearance box
23 assets, you don't know of any time where the
24 trustee raised the issue with anyone else?
25     A.     I don't believe that we reached that

Page 235

J. Kobak

1
2 issue in terms of discussing it.  As I say, we
3 were not very actively involved in the
4 negotiations.  Essentially this is the deal that
5 had been done by the holding company and by Weil
6 that we were asked to approve for purposes of
7 our proceeding, and that was still essentially
8 our role in it.
9     Q.     Can you tell me what meaning the
10 trustee ascribes, if any, to the phrase in
11 paragraph 1(A), two little ii, "Such securities
12 and other assets held in LBI's clearance box as
13 of the time of the closing"?
14     A.     I think the trustee would ascribe the
15 normal English language meaning of those words.
16     Q.     Okay.  You're content to live with the
17 normal English reading of those words?
18     A.     Yeah, but I think you have to
19 interpret this in terms of the context, and the
20 context, if it didn't include then, certainly a
21 short time thereafter did include what's now
22 Exhibit 52, the DTC letter, which is dated as of
23 September 22, actually a date or two after the
24 "as of" date of the clarification letter.
25     Q.     In your letter --

Page 236

J. Kobak

1
2     A.     So, in a sense, whatever the words
3 were, there was a specific agreement between all
4 three of the parties involved very specifically
5 dealing with the clearing boxes at DTC which
6 clearly said, in our view, and I believe in
7 DTC's views, that these are specifically
8 excluded assets from the clarification letter in
9 the Asset Purchase Agreement.
10     Q.     You agree that the clarification
11 letter and the DTC letter were executed
12 simultaneously, correct?
13     A.     I believe roughly simultaneously.
14     Q.     And do you recall making the argument
15 to Barclays in one of your letters that the DTC
16 letter should control the clarification letter
17 because it was executed two days later?
18     A.     I believe I made that point.  I think
19 I also made the point that I've just made that
20 this was a very specific agreement about a very
21 specific subject for a very specific purpose
22 between all three parties that were involved.
23     Q.     Do you agree that the first point
24 about the DTC letter being executed and agreed
25 to later than the clarification letter was

Page 237

J. Kobak

1
2 incorrect?
3     A.     No.
4         MR. MAGUIRE:  You're talking now about
5 executed versus dated?
6     Q.     Executed.  Agreed to, finalized and
7 executed?
8     A.     Can you --
9     Q.     I just want a confirmation on the
10 record.  Your affidavit says the clarification
11 letter was executed in the early morning hours
12 of September 22?
13     A.     Yeah, I've never disputed that.  I
14 think the point I meant to make to Barclays, and
15 I realize you dispute this as a legal matter,
16 and I don't think today is the time to, you
17 know, argue our legal disputes rather than our
18 factual understandings, but I think there's some
19 significance to the fact that dates -- "as of"
20 dates were chosen for this agreement and the
21 more specific agreement which specifically deals
22 with the subject we're talking about is also the
23 one that bears the later date.
24     Q.     Following the closing -- this is a
25 complete filing of something or a filing with

Page 238

1           J. Kobak
2  one of its attachments that was made in court.
3  It should be clipped together and labeled as the
4  next exhibit, please.
5           (Exhibit 446, Joint Motion of the
6       Debtors and Barclays Capital, Inc. for Entry
7       of an Order Authorizing to File Under Seal
8       Certain Schedules to the Asset Purchase
9       Agreement, marked for identification, as of
10      this date.)
11      Q.   Mr. Kobak, on September 30, eight days
12  after the closing, Weil Gotshal, acting for the
13  Debtor, and Cleary Gottlieb, acting for
14  Barclays, filed a motion, a joint motion, to
15  file two schedules to the clarification letter.
16  That motion has been marked as the next exhibit,
17  which is number 446?
18      A.   I see this.  I see it, yes, and I have
19  it in front of me.
20      Q.   And at the time that this was filed, I
21  assume it was served on the trustee, do you
22  recall?
23      A.   We get served with an awful lot of
24  papers.  I don't specifically recall.
25      Q.   Were you aware of this filing?

Page 239

1           J. Kobak
2      A.   I knew there was a filing of certain
3  schedules -- I believe I knew there was a filing
4  of certain schedules to the Asset Purchase
5  Agreement and that Barclays wanted the filing to
6  be made under seal.
7      Q.   Did you get the under-seal exhibit
8  list of the securities that were filed?  Did you
9  receive that?
10      A.   I don't know if I ever received it
11  personally, but again, some representative of
12  the trustee did, I'm sure.
13      Q.   And you understood that this was
14  filing Schedules A and B referenced in the
15  clarification letter?
16      A.   Yes, I do.
17      Q.   And you understood Schedule A was the
18  repo collateral?
19      A.   Yes, basically.
20      Q.   And Schedule B were the clearance box
21  assets?
22      A.   Well, that's what -- I believe that's
23  the schedule that's referred to in Exhibit 25,
24  so yes.
25      Q.   Did the trustee -- did the trustee

Page 240

1           J. Kobak
2  make any effort in response to this filing to
3  determine whether the Schedule B assets were in
4  the DTC clearance boxes?
5      A.   I think at a later time -- I don't
6  think this is what you're really asking me, but
7  it's responsive to your question.  I think at a
8  later time during our discussions at Barclays we
9  had Deloitte do an examination of what Barclays
10  was claiming and what was really in the -- in
11  the clearance boxes as compared to the list and
12  so forth.  But as the time, the answer is I
13  don't believe so.
14      Q.   Did the trustee object in any way to
15  the fact that there were all these clearance box
16  assets being described as assets transferred
17  under the agreement, many of which were found in
18  the clearance boxes at the DTC?
19      A.   No, because it didn't really alter our
20  understanding or our position, which is that the
21  DTC letter is controlling.
22      Q.   So, just so I understand, at the time
23  this was filed, were you aware of the fact that
24  there was a schedule with clearance box assets
25  that included assets in the DTC clearance boxes?

Page 241

1           J. Kobak
2      A.   I'm not sure we particularly focused
3  on it, to tell you the truth, because I don't
4  think we thought it was particularly relevant.
5      Q.   You didn't think it was relevant what
6  the schedule of assets were that were being
7  transferred to Barclays, billions of dollars of
8  assets?
9      A.   Schedule A we certainly thought was
10  significant.  That doesn't mean that I spent a
11  lot of time, you know, looking at each Cusip
12  number on Schedule A or B, or paying that much
13  attention to it at the time, because I would --
14  it would be meaningless to me in terms of value
15  or whether it actually was in the boxes or
16  anything else.  And I think our understanding
17  was that what was in the clearance boxes was
18  ours under the DTC agreement.
19      Q.   Then why would Schedule B even be
20  filed?
21      A.   It was referred to in the agreement
22  and it was Barclays that wanted to file these
23  things and file them under seal.  I don't think
24  we paid particular attention to it, to tell you
25  the truth.

**Page 242**

J. Kobak

1
2    Q.   So you understood Barclays to be
3    filing something that Barclays thought it would
4    receive under the transaction that you didn't
5    think they would receive under the transaction?
6    A.   I don't know --
7        MR. MAGUIRE:  Objection to form.
8    Misstates the testimony.
9    Q.   Is that accurate?
10   A.   I don't know what Barclays thought.
11   Q.   Well, wait a minute.  Yes, you do.
12   The agreement itself specifically refers to
13   these assets as assets transferred under the
14   agreement?
15   A.   I know what the agreement -- if you'd
16   let me answer my question.  I don't know how you
17   can know what I thought at the time, even if
18   it's not perhaps what you think I should have
19   thought.
20   Q.   Let me show you -- I didn't mean --
21   A.   Can I finish my answer?
22       I don't know what position Barclays
23   was taking.  There was a lot of suspicion voiced
24   at the time of the hearing about the assets that
25   were involved.  Barclays, as I recall, committed

**Page 243**

J. Kobak

1
2    to file something.  There was a certain amount
3    of suspicion about why it had to file things
4    under seal, but I think the court understood
5    that there were a lot of securities positions
6    that you might not want to get out in the public
7    eye.
8        And there was a reference to a
9    Schedule B.  I think to complete the filing in
10   good order, Barclays may have decided to file
11   Schedule B as well as Schedule A.  Perhaps it
12   was going to take the position that, after all,
13   they were going to make some claim on these
14   boxes, but we felt very clearly, and we still
15   feel, that they're basically ours under Exhibit
16   52, which we believe is the controlling
17   document.
18   Q.   Mr. Kobak, there's no "perhaps" about
19   it and it wasn't just Barclays.  Let me just
20   refer to you page 3 of the motion.  This was
21   filed by Weil Gotshal with Cleary.  Page 3, the
22   last sentence at the bottom of the page, the
23   last complete sentence says, "As more fully
24   described in the Clarifying Letter, the
25   Schedules contain lists of securities and

**Page 244**

J. Kobak

1
2    trading positions transferred under the Purchase
3    Agreement."
4        Was it clear to the trustee at the
5    time this was filed that Weil Gotshal,
6    representing the debtor, as well as Barclays,
7    represented by Cleary, understood the Schedule B
8    assets filed in court were to be transferred to
9    Barclays?
10   A.   No.  I mean, I know that's what these
11   pages say, but that -- we didn't have an
12   understanding to that effect at all.
13   Q.   Well, how could you have understood it
14   any other way?
15   A.   We didn't understand that these assets
16   were going to be Barclays' assets.  We did
17   understand that they were still referred to in
18   the clarification letter.
19   Q.   Did you understand anyone at the time this
20   was filed that it was a mistake?
21   A.   No.
22   Q.   Before this was filed, was the trustee
23   consulted in any way about this filing?
24   A.   I believe we understood, and it may
25   have been from things that Lindsee Granfield

**Page 245**

J. Kobak

1
2    said in court, that there were going to be
3    schedules filed and Barclays, as always, was
4    going to seek to have them filed under seal.
5    Q.   Prior to the September 30 filing of
6    Schedule A and B, did the trustee consult in any
7    way with Weil Gotshal about the filing of those
8    two schedules?
9    A.   Not that I recall.
10   Q.   And prior to the filing on September
11   30, did the trustee consult in any way with
12   Barclays about the filing of those two
13   schedules?
14   A.   Other than that we might have had some
15   discussion that they were going to be filed and
16   Barclays was going to seek to file them under
17   seal, no.
18   Q.   Do you recall whether the trustee
19   communicated to anyone prior to the filing of
20   the September 30 schedule, between the closing
21   and September 30, did the trustee communicate to
22   anyone that it didn't believe the Schedule B
23   securities were included in the deal?
24   A.   In that time period, I don't believe
25   so.

Page 254

J. Kobak

1
2 whether they agreed with your interpretation
3 about the clearance box provision in the
4 clarification letter?
5     A.   I might have had some discussion with
6 Rod Miller about that.  Other than that, I don't
7 recall.
8     Q.   Did anyone from Weil Gotshal ever
9 confirm your understanding that the DTC
10 clearance box assets were not included in the
11 transaction?
12     A.   I don't recall.  I very vaguely have a
13 recollection of calling Rod Miller, who we were
14 dealing with on some other things at that point,
15 and I think he maybe said it really wasn't my
16 department or I'm not sure or whatever.  And
17 other than that, I don't recall specifically any
18 other conversation.
19         (Exhibit 450, a document bearing Bates
20     Nos. HHR_00009562 through 9566 with
21     attachment, marked for identification, as of
22     this date.)
23     Q.   Mr. Kobak, Exhibit 450 is an e-mail
24 exchange between you and Rod Miller.
25     A.   Uh-huh.

Page 255

J. Kobak

1
2     Q.   You are forwarding to him a letter you
3 received from Cleary Gottlieb, which is attached
4 to the e-mail.
5     A.   Correct.
6     Q.   You say in your e-mail to Rod Miller,
7 which is dated December 30, 2008, in the middle
8 of the page, you say, "This is the letter which
9 I called -- about which I called earlier."  You
10 then go on to say, "Among other things, we think
11 the agreement with DTCC and Barclays gave us the
12 contents of the accounts back, but we would
13 appreciate Weil's views and recollections."  Do
14 you see that?
15     A.   Yes.
16     Q.   Did you ever get a substantive
17 response from Weil Gotshal to that inquiry?
18     A.   I got the response that you see here,
19 which is, "I will look back -- take a look as
20 soon as possible and get back to you."  I don't
21 believe he did get back to me.  Frankly, it
22 wasn't that unusual, with all deference to their
23 lawyers, that sometimes Weil didn't get back to
24 us because I'm sure they had a million things on
25 their plate.  I think I recall having a

Page 256

J. Kobak

1
2 discussion with Rod where he basically said he
3 wasn't sure that this was really his department,
4 he wasn't sure who was involved, he didn't -- I
5 thought he said he didn't disagree with our
6 interpretation, but I don't think he had a clear
7 recollection of having been involved one way or
8 the other.
9     Q.   You think you recall that?
10         MR. MAGUIRE:  Objection to form.
11         Is there a question?
12     Q.   The question is you either do or you
13 don't.  I mean, do you have a clear recollection
14 of a conversation?
15     A.   I don't -- I guess what I should have
16 said is I don't have a clear recollection.  I do
17 have a very vague recollection of some follow-up
18 call where Rod Miller disclaimed particularized
19 knowledge of this but, as far as I can see,
20 didn't agree -- disagree with our position;
21 seemed to indicate that he did agree with it.
22     Q.   Can you look back at the Rule 60
23 brief?  Do you have that?
24     A.   This is 443?
25         MR. MAGUIRE: Yes, Exhibit 443.

Page 257

J. Kobak

1
2     Q.   Can you look at paragraph 4 again
3 where it references the amount of clearance box
4 assets that you say we received or are claiming?
5 In the first bullet point there under 4, you
6 say, "Approximately $2.4 billion in assets that
7 were in LBI's clearance boxes."  Do you see
8 that?
9     A.   Yes.
10     Q.   "Including approximately 1.6 billion
11 that has been wrongfully transferred to
12 Barclays," do you see that?
13     A.   Yes.
14     Q.   Has the trustee performed a valuation
15 of the clearance box assets referenced in that
16 paragraph?
17     A.   The ones that have been transferred
18 or --
19     Q.   Both.  Either one.
20     A.   Let me start with the 800 that
21 remains.
22     Q.   Uh-huh.
23     A.   I believe we've asked Deloitte to take
24 a look and give us some idea of the value.  I
25 believe, beyond a fairly general range of the

Page 266

J. Kobak

1
2 million to it, I think we would have a problem
3 with that.  Whether it means they would get this
4 769 million and we would get something else, I
5 don't know how that would get sorted out.
6     Q.   And is that your view of what the
7 contract means or is that just that the contract
8 must be trumped by that?
9         MR. DAKIS:  Objection to form.
10        MR. MAGUIRE:  Yeah, if you could just
11 explain what you mean.
12        MR. HUME:  Forget it.  It doesn't
13 matter.
14    Q.   Did the trustee ever communicate to
15 Barclays that, before the closing -- did the
16 trustee ever communicate to Barclays before the
17 closing that Barclays would receive the $769
18 million of securities referenced in paragraph 8
19 of the clarification letter only after all
20 customer claims were fully satisfied in the SIPA
21 liquidation?
22    A.   I don't know.  I know there was some
23 discussion of this.  There was something that
24 was of particular concern to us.  It came up in
25 the clarification letter, as I recall, in

Page 267

J. Kobak

1
2 connection with paragraph 8, which deals with
3 transfer of customer accounts, not the paragraph
4 that deals with the definition of "purchased
5 assets" and "excluded assets" and so forth, and
6 I think in our view it was always tied in with
7 the question of what accounts were going to be
8 transferred to Barclays, what property might be
9 necessary either to go with those accounts or to
10 stay behind to satisfy the accounts that were
11 left.
12        I think there was discussion that
13 Barclays was actually seeking more than $769
14 million in securities, including maybe a billion
15 dollars in cash, which was inconsistent with
16 representations that were also made that there
17 be no cash going over in the deal, and
18 furthermore, that seemed very unfair to us
19 because it wasn't as if Barclays was getting all
20 the customer accounts that the 15c3 accounts
21 were associated with, it was only getting some
22 of them.  Some of them were going to Neuberger
23 Berman.  Some of them were staying behind.
24        So, in addition to the cash point, if
25 any number was involved, 769 million was a lot

Page 268

J. Kobak

1
2 better than a number in excess of a billion
3 dollars.
4        We thought that -- at this time I
5 think we believed that Barclays was also going
6 to be taking the private brokerage accounts, so
7 they might well have a need for this money to
8 satisfy their liabilities to customer accounts
9 that they were taking over.  But if not, we
10 wanted to make sure that we would have adequate
11 money in the 15c3 account for whatever was left
12 with us, and we understood that that was the
13 S.E.C.'s intent as well.
14    Q.   I understand your position.  You don't
15 have to recite it every time.  We've got to get
16 through the deposition.  We don't have a lot
17 more time.
18    A.   Well, you asked me the question.
19    Q.   Can I ask you to look at the
20 clarification letter, please?
21    A.   The reporter carefully put them in
22 order for me and I screwed up.
23    Q.   It's right there.
24    A.   I got it.
25    Q.   Can I ask you to turn to paragraph 8.

Page 269

J. Kobak

1
2    A.   Yes.
3    Q.   And it says that "The purchaser shall
4 receive," and then little Roman ii says, "to the
5 extent permitted by applicable law, and as soon
6 as practicable after deposing, 769 million of
7 securities, as held by or on behalf of LBI, on
8 the date hereof pursuant Rule 15c3 of the
9 Securities and Exchange Act of 1934, as amended,
10 or securities of substantially the same nature
11 and value."
12        Can you tell me what it is that the
13 "or" clause means?
14    A.   The "or securities of substantially
15 the same nature and value"?
16    Q.   Yes.
17    A.   To us that means that there might be
18 a -- need or desire at some point to
19 substitute other securities for the particular
20 ones that were -- that made up the $769 million.
21    Q.   Did the trustee know why that
22 provision was put in there, the "or" clause?
23    A.   No, but I -- well, our understanding
24 was that we were referring to these specific
25 securities so that cash wasn't involved.  There

J. Kobak

1
2  might -- you might have securities, I guess,
3  that would come due and be redeemed.  There
4  might be all kinds of reasons that you would
5  need to substitute some securities for the
6  particular Cusips that happened to be listed or
7  happened to be in the account at that time.
8        So that was our understanding of what
9  a substitution would be and why it might be
10 necessary.
11     Q.   What is the applicable law that
12 prevents the trustee from transferring
13 securities from outside of the 15c3 account to
14 Barclays?
15        MR. CARDEN:  Objection to form.
16        MR. MAGUIRE:  Same objection.
17     A.   I don't understand that question, from
18 outside.
19        MR. MAGUIRE:  I think your premise --
20        MR. HUME:  Yeah, the premise, exactly.
21     Q.   The premise is it says that you can
22 transfer the 769 million from the 15c3 account
23 or securities of the same nature and value.
24        Would you agree that when it says "or
25 securities of substantially the same nature and

J. Kobak

1
2  value," it's talking about securities that are
3  not in the 15c3 reserve account?
4     A.   No.  My understanding is that those
5  are securities that are not in the 15c3 account
6  at the time this was written, but might be
7  substituted for those accounts.  If the whole
8  purpose was to avoid a violation of 15c3 and to
9  avoid a shortfall of customer property, which is
10 what we always believed, and I think the
11 regulators believed the purpose was, it would
12 make no sense to say, well, you can't take this
13 769 but you can say 769 from somewhere else and
14 get a shortfall that way, or put the broker out
15 of compliance, essentially.
16     Q.   Just so I'm very clear, when it says
17 "or securities of substantially the same nature
18 and value," is it your understanding that that
19 is referring to securities that are in the Rule
20 15c3 or are not in the Rule 15c3 account?
21        MR. CARDEN:  Objection to form.
22     A.   As I just said, it refers, in our
23 view, to a right to substitute securities when
24 it might make sense to do that so that this
25 provision wouldn't just apply to the particular

J. Kobak

1
2  securities that happen to make up the 769
3  million on the account.
4     Q.   So it allows you to substitute
5  securities that are not in the Rule 15c3 reserve
6  account, correct?
7     A.   And you take out the ones that are and
8  you'd end up with 7 -- a maximum of $769
9  million.
10    Q.   So you're saying the "or" clause
11 requires you to put 769 from outside of the
12 account back into the account?
13       MR. MAGUIRE:  Objection to form.
14    A.   No, it doesn't require you to do
15 anything.  It permits substitution so that --
16 otherwise, this would say the only thing that
17 can be transferred from the 15c3 account is the
18 769 million.  If for some reason some of those
19 securities were no longer there because they
20 redeemed and they were now cash or it didn't
21 make sense to hold them, you wouldn't be able to
22 transfer them to Barclays.  I don't think that's
23 what Barclays wanted.
24    Q.   Is the trustee's position that no
25 assets, under any provision in the APA or the

J. Kobak

1
2  clarification, no assets may be transferred to
3  Barclays if, at the time of the transfer, the
4  trustee believes there may be a shortfall in
5  property available for remaining customer claims
6  that remain with the estate; is that the
7  trustee's position?
8     A.   Well, Barclays takes the position that
9  it's --
10    Q.   I didn't ask you Barclays' position?
11       MR. MAGUIRE:  If you can let the
12 witness answer.
13    Q.   But I need an answer to my question.
14    A.   Well, I'm giving you an answer to my
15 question.
16       Barclays is taking the position these
17 are proprietary assets that it has a right to
18 before anyone else.  If there's a shortfall and
19 these are proprietary assets that we hold, I
20 believe that they are no longer in the category
21 of being proprietary assets because they would
22 have been necessary for the broker and they
23 would be necessary for us to make up for
24 shortfalls in customer property.
25       And therefore, just because they

Page 274

```
1              J. Kobak
2   happen to be in a proprietary position
3   temporarily does not mean that you cannot
4   consider them customer property, and I don't see
5   anything in this agreement that says, apart from
6   this one exception for the 769 which was
7   believed to be excess, that Barclays gets
8   customer property other than the property that
9   goes with the accounts that it was actually
10  acquiring.
11      Q.   During the negotiations and prior to
12  the closing, did the trustee have any
13  communications with Weil Gotshal about this
14  provision relating to the 15c3 assets?
15      A.   Yes, we had some discussion with -- I
16  don't know if it was with Weil Gotshal or the
17  Creditors Committee or both about this, about
18  the fact that there was a huge stink, to use the
19  vernacular, I guess, from Harvey Miller, among
20  others, that Barclays was trying to take cash,
21  that cash was absolutely not part of the deal,
22  and I told you that we had our own concerns
23  about the 15c3 account and how much would be
24  taken out of it and what the purpose of it was.
25      Q.   Did you have any communications about
```

Page 275

```
1              J. Kobak
2   what would happen if there were no excess in the
3   15c3 account?  Did you have an explicit
4   communication about what would happen under this
5   provision if there were no excess in the 15c3
6   reserve account?
7       A.   I don't know if we had a specific
8   conversation to that extent.  I do know that, as
9   it was reported to me, the discussion was always
10  on the assumption that there was likely to be an
11  excess.
12          I don't believe the regulators would
13  ever have permitted a transaction that -- if
14  there had been a violation of 15c3.  I don't
15  really see how the parties could have agreed to
16  participate in such a transaction.
17      Q.   At the time of the sale hearing, did
18  you understand that all of the margin deposits
19  associated with LBI's accounts at the Options
20  Clearing Corporation would be transferred to
21  Barclays?
22          MR. CARDEN:  Objection to form.
23      A.   I understood during the sale hearing,
24  or during a break in the sale hearing, that a
25  representative of the OCC whose name I believe
```

Page 276

```
1              J. Kobak
2   was Alex Rovira -- and I don't know how to spell
3   that, I'm sorry -- came up to me with a draft
4   transfer assumption -- Transfer and Assumption
5   Agreement which he asked me to look at very
6   quickly, said that he needed to have signed,
7   said that the OCC had great concern about their
8   potential liability and the obligations to their
9   members and to themselves, and would not
10  transfer any of the accounts, including the
11  customer accounts, unless such a document was
12  signed.
13      Q.   And so you signed the document?
14      A.   Yeah, I signed the document.
15      Q.   Did you sign two documents?
16      A.   I believe I did, although I have
17  reviewed some of the e-mail traffic and I know
18  that there's one that where only the second
19  document is signed and not the first one.  And
20  then there's another one where the first
21  document -- I really don't remember what I did
22  at the hearing.  I know I signed at least one
23  document.  It was my intention to sign the
24  Transfer and Assumption Agreement.  That's what
25  I was asked to do.
```

Page 277

```
1              J. Kobak
2       Q.   And your understanding was that the
3   OCC was insisting upon that because, otherwise,
4   it was going to be exposed to settlement
5   obligations at the open of business on Monday,
6   correct?
7       A.   Yeah, and I think what it was
8   threatening to do was liquidate all the
9   transactions.  Whether that would have been a
10  good thing or bad thing I don't know.  It
11  certainly was inconsistent with the goal as far
12  as customer accounts were concerned of getting
13  the account to the customer so the customer
14  could make its own decision about what to do
15  rather than being closed out.
16          And my understanding was that what was
17  involved was essentially agreeing that if
18  Barclays would assume the accounts and assume
19  the liabilities and obligations associated with
20  those accounts, all the -- the property that was
21  necessary to secure those obligations would go
22  with the accounts.
23          I didn't really understand that the
24  language was asking me to do any more than that.
25  I didn't understand that there was any
```

Page 278

J. Kobak

1           J. Kobak
2   substantial amount of funds in the clearing fund
3   or in any of the margin deposits, securities or
4   cash, that would be greatly in excess of that.
5         And I understood at the time that
6   there was substantial question about what the
7   exposure might be under those positions and that
8   it took Barclays a couple of days, I think, to
9   agree that it would assume the liabilities and,
10  therefore, assign -- the agreement was revised,
11  but I don't think in substantially material
12  ways. It took Barclays a couple of days to sign
13  the agreement and agree to assume those
14  liabilities.
15     Q.  You understood that Barclays was
16  concerned about the risk of assuming those
17  liabilities?
18     A.  Yeah, I understood everybody was
19  concerned about the risk. The OCC was concerned
20  about it and Barclays was concerned about it.
21     Q.  And no one knew for sure what those
22  settlement liabilities would be, correct?
23       MR. MAGUIRE: Objection to form.
24     A.  I don't --
25       MR. MAGUIRE: You're asking this

Page 279

J. Kobak

1           J. Kobak
2   witness for his knowledge.
3     Q.  Did you understand that it -- did you
4   understand that there was an unknown potential
5   liability in assuming the settlement obligations
6   of the OCC accounts?
7       MR. MAGUIRE: That he did not know?
8       MR. HUME: No.
9     Q.  Did you understand that it was an
10  unknown potential liability?
11     A.  I -- I -- I didn't know what it was
12  and I realized there was a substantial doubt or
13  uncertainty of how things might transpire and
14  what the potential liability could be.
15     Q.  And Barclays never, to your knowledge,
16  Barclays never agreed to take on that liability
17  without the margin deposit?
18     A.  I didn't have any direct discussion
19  with Barclays. I signed this agreement and was
20  told that Barclays was not committing to sign it
21  and assume the liabilities, even though, in my
22  understanding, the property to secure those
23  liabilities, to the extent it was at OCC, would
24  be transferred along with them.
25       But I did not discuss that directly

Page 280

J. Kobak

1           J. Kobak
2   with anyone at Barclays.
3     Q.  No one, no one at Barclays ever told
4   you that they would be willing to take on any of
5   the derivatives accounts without the margins; is
6   that correct?
7     A.  No one discussed that with me one
8   way -- one way or the other.
9     Q.  Did you understand --
10     A.  I know that there were versions of the
11  agreement that talked about taking the
12  derivatives. It didn't say anything about the
13  margin deposits held for security, and I believe
14  that came in at the very last draft, the
15  execution copy of the clarification letter. I
16  don't recall that being in earlier drafts, I
17  don't recall it being redlined, and I don't
18  recall it being discussed with anyone.
19     Q.  After you saw it after the closing,
20  did you raise any questions about it with
21  Barclays?
22     A.  Well, to me it wasn't that
23  inconsistent -- it really wasn't inconsistent.
24  In fact, it was more limited than the way
25  Barclays reads the Transfer and Assumption

Page 281

J. Kobak

1           J. Kobak
2   Agreement.
3       (Exhibit 452, a collection of document
4     bearing Bates Nos. HHR_00006072 through
5     6081, marked for identification, as of this
6     date.)
7     Q.  You mentioned Alex Rovira as one of
8   the lawyers for the OCC, I believe. This is an
9   e-mail, Exhibit 452, from Mr. Rovira to you. He
10  references -- it's to you and Jeffrey Margolin.
11  He references seeing you at the sale hearing,
12  and he says, "Please find attached some clean-up
13  comments to the transfer documentation." Do you
14  see that?
15     A.  Yes.
16     Q.  And he attaches the Transfer and
17  Assumption Agreement with some word edits to it,
18  do you see that?
19     A.  Yes.
20     Q.  And then behind that he attaches
21  something called the Collateral Agreement?
22     A.  Yes.
23     Q.  And the second version of that has
24  your signature, the very last page of the
25  exhibit, do you see that?

Page 282

J. Kobak

1
2    A.  Well, it's not the last page of my
3  exhibit, but I do see where I sign.
4    Q.  The Collateral Agreement?
5    A.  The Collateral Agreement.  It's not
6  the last page of the agreement, at least in my
7  copy.
8    Q.  It's got a Bates number 6078 are the
9  last four digits?
10    A.  Yes.
11    Q.  Okay.  The paragraph that begins "in
12  connection with such transfer," do you see that?
13    A.  Yes.
14    Q.  It says, "LBI has assigned to Barclays
15  all rights in securities, cash and other
16  property, defined as collateral, pledged by LBI
17  to the Options Clearing Corporation and held for
18  OCC's benefit at JPMorgan Chase."  Did you see
19  that?
20    A.  Yes.
21    Q.  And was it your understanding that
22  that's what the trustee was authorizing when you
23  signed this?
24    A.  Yes, consistent with the overall deal
25  that there be no cash excess that would go to

Page 283

J. Kobak

1
2  Barclays because that would be inconsistent with
3  the no cash, and that this wouldn't make the
4  deal so rich that it would be way beyond the
5  parameters that we've discussed earlier.
6    Q.  Did you tell anyone, this -- when you
7  say you signed this consistent with the idea
8  that there would be no cash, this says cash;
9  this says cash will be transferred to Barclays?
10    A.  Yeah, but cash would be transferred
11  against the liabilities.  What I'm saying is
12  nobody told us there might be in excess of a
13  billion dollars of cash or something like that
14  that would end up at Barclays when the deal was
15  no cash and when there was an economic parameter
16  to the deal.
17    Q.  So, to the extent the cash was simply
18  needed to cover the liabilities, you thought it
19  was possible to be included in the deal; is that
20  correct?
21    A.  Yes.
22    Q.  But to the extent cash exceeded the
23  liabilities, you thought it should not be in the
24  deal?
25    A.  That's correct, and nobody told us,

Page 284

J. Kobak

1
2  indicated in any way that there was likely to be
3  an excess amount of cash.
4    Q.  Did you ever tell anyone that if there
5  was excess cash in the deal in the margin
6  deposit, then it needed to come back to the
7  estate?  I understand that's your position.  I
8  just want to know, did you ever communicate that
9  to anyone before the closing?
10    A.  No, I don't think we had any
11  discussion.  I don't know -- no one ever told us
12  there was a likelihood there would be
13  substantial excess cash.
14    Q.  Do you remember getting e-mails over
15  the weekend from the OCC trying to confirm the
16  Transfer and Assumption Agreement?
17    A.  I remember some e-mails.
18    Q.  And do you remember e-mails
19  specifically talking about the need to have the
20  Transfer and Assumption Agreement finalized?
21    A.  Yes, I understood the problem was
22  Barclays hadn't signed it.
23    (Exhibit 453, a document bearing Bates
24  Nos. HHR_00006049 through 6051, marked for
25  identification, as of this date.)

Page 285

J. Kobak

1
2    Q.  And Barclays hadn't signed it because
3  they were worried about the risk of the
4  settlement?
5    A.  I'm not a hundred percent sure, but I
6  think that's what I was told.  But generally,
7  Barclays' position, as I understood it, in this
8  entire transaction, was that they didn't want to
9  assume any liabilities.
10    Q.  Next exhibit is marked 453.  Let me
11  ask you to look at the bottom of the e-mail.
12    MR. MAGUIRE:  Can you share this with
13  us?
14    Q.  This is an e-mail with a Bates number
15  HHR00006049 on the first page, and it has two
16  other pages.  At the bottom of the first page is
17  an e-mail from James McDaniel to a group of
18  people, including you and the trustee Jim
19  Giddens and Mr. Margolin at Hughes Hubbard.  Do
20  you see that?
21    A.  Yes, I do.
22    Q.  And it's also e-mailed to Mr. Caputo
23  and Mr. Hurt at SIPC?
24    A.  Yes.
25    Q.  And it says, "To the Group," and it

Page 286

J. Kobak

1
2  says the OCC is still seeking to confirm its
3  understanding that the LBI counts and all
4  positions, cash and securities collateral held
5  by OCC in respect of those accounts are intended
6  to be transferred to Barclays and that Barclays
7  is assuming all obligations with respect to
8  those accounts?
9      A.   Yes.
10     Q.   Do you see that?
11     A.   Yes.
12     Q.   It then goes on to provide further
13  description of what's in those accounts.  I ask
14  you to continue to read the e-mail and look down
15  to the second paragraph, halfway down the second
16  paragraph where it says the words "in addition."
17        Do you see that sentence?
18     A.   Yes.
19     Q.   It says, "In addition, OCC is holding
20  nearly $1 billion in cash for the accounts of
21  LBI."  They say, "It is important that the
22  disposition of these assets is understood and
23  agreed to among all parties and that the
24  documentation addresses it in a consistent way."
25        Do you see that?

Page 287

J. Kobak

1
2      A.   Yes.
3      Q.   Do you have any knowledge of whether,
4  in response to this e-mail, anyone from the
5  trustee or from Hughes Hubbard or from SIPC told
6  the OCC that they did not believe Barclays
7  should receive that cash?
8      A.   No, I didn't understand that it was
9  excess cash.  I still understood that this was
10  cash that was going, and the reason for it was
11  that there might be liabilities that have to be
12  settled up, not that there was likely to be that
13  much of an excess.
14     Q.   And you say no one ever told you that
15  there might be an excess.  The top e-mail in
16  this chain is a reply to this e-mail from the
17  OCC, a reply sent by Ed Rosen, who is a lawyer
18  at Cleary Gottlieb, representing Barclays?
19     A.   Right.
20     Q.   Correct?
21     A.   Right.
22     Q.   And it says, "Jim, can you tell us
23  more about the $1 billion.  Is it excess
24  margin?"  Do you see that?
25     A.   Right.

Page 288

J. Kobak

1
2      Q.   In response to that did you make --
3      A.   No, I thought if the answer was --
4      Q.   Can your let me finish my question?
5      A.   I'm sorry.
6      Q.   Did you make any follow-up inquiries,
7  or did anyone from the trustee, as to whether
8  there was any excess margin in the OCC account?
9      A.   No, I think that -- I felt that, given
10  what we knew about the parameters of the deal
11  and what we understood the purpose of this to
12  be, if someone had determined, there obviously
13  was a question whether there would be any
14  substantial excess or any excess at all for what
15  this billion dollars was, if it turned out there
16  was an excess that wouldn't be needed that was
17  accretive to everything else Barclays was
18  getting, it seemed to me it would be in the
19  nature of a windfall and somebody should be
20  coming back and telling us and telling the other
21  parties and telling the Court about it.
22     Q.   Was there a concern at SIPC that these
23  accounts not be liquidated by the OCC?
24     A.   I believe so.  I believe our
25  understanding was that it would be desirable at

Page 289

J. Kobak

1
2  all -- if at all possible, to get these accounts
3  transferred along with the other accounts so
4  that customers wouldn't find either that their
5  accounts were frozen or that actions were taken
6  in their accounts that they had no control over.
7        (Exhibit 454, a document bearing Bates
8    Nos. HHR_00007387 through 7397, marked for
9    identification, as of this date.)
10     Q.   Mr. Kobak, Exhibit 454 is a draft of
11  the clarification letter circulated from Weil to
12  Hughes Hubbard Sunday evening of September 21,
13  7:54 P.M.  Do you see that?
14     A.   Uh-huh.  Yes.
15     Q.   And it -- the e-mail states it
16  attaches the most recent version of the
17  so-called clarification letter.  Do you see that
18  in the first line of the e-mail?
19     A.   Yes.
20     Q.   The attachment -- I assume you'll be
21  familiar with this because you referenced it I
22  think in your earlier testimony and your lawyers
23  have referenced it in their briefs.  In this
24  draft on the second page there's a provision
25  dealing with excluded assets, subsection D.

Page 294

1           J. Kobak
2    would not be concerned about it if it was
3    excess, and most of all, I was happy about that
4    "except as permitted by law" language --
5        Q.    So --
6        Sorry.
7        A.    -- which seemed to us to protect our
8    position about as clearly and fully as one
9    could.
10       Q.    And during that conversation, there
11   was an understanding that there would be an
12   excess to be transferred?
13       A.    Well, I think the assumption was there
14   would be an excess, and the purport of the
15   language was, if there weren't an excess, if
16   there was shortfall in the account, it wouldn't
17   be permitted by law and, therefore, it wouldn't
18   be allowed.
19       Q.    Did anyone during that conversation or
20   at any other time relay to you what Barclays had
21   told them about this 15c3 issue?
22       A.    Well, I don't know, other than that I
23   know that the over $1 billion cash became the
24   769 million securities and the other changes in
25   the language that we've discussed occurred.

Page 295

1           J. Kobak
2        Q.    The changes occurred, but no one said
3    Barclays said X or Y or Barclays represented X
4    or Y?
5        A.    I don't remember specifically.
6        Q.    Going on in this provision that we
7    were looking at, in terms of what is not an
8    excluded asset, it also says, "Cash, cash
9    equivalents, bank deposits or similar cash
10   items." First it says in the 15c3 account, and
11   then it says, "or by or on behalf of any
12   clearing agency or clearing organization to
13   collateralize, guarantee, secure," long
14   parenthetical, "whether as margin, guaranteed
15   fund deposit, or in any other form, the
16   obligations of LBI or any other person in an
17   account maintained by, or on behalf of, LBI, and
18   for which purchasers shall become responsible as
19   of the closing." Do you see that language?
20       A.    Uh-huh.
21       Q.    Did anyone from the trustee tell
22   anyone involved in the drafting of the
23   clarification letter or otherwise involved in
24   the negotiations to remove that language?
25       A.    I don't believe so.

Page 296

1           J. Kobak
2        Q.    Do you have any recollection or does
3    anyone working for the trustee have any
4    recollection of focusing on that language at the
5    time it was included in this draft?
6        A.    I -- I don't recall.
7        Q.    Was the trustee or the trustee's
8    advisors aware of this language in any way
9    before the closing?
10       A.    Well, I'm sure we or somebody would
11   have seen it, certainly. So, in that sense, we
12   were aware of it.
13       Q.    But you're not aware of any
14   communication that the trustee had with anyone
15   about removing or refining or revising this
16   language?
17       A.    Well, we did have specific agreements
18   with DTC, or we were going to have one with DTC,
19   and we had a specific agreement, or the
20   beginning of a specific agreement with the OCC,
21   so I think to -- to the extent we were focusing
22   on this, we were focusing probably largely on
23   those two things.
24       Q.    Those letter agreements?
25       A.    Yes.

Page 297

1           J. Kobak
2        Q.    Let me ask you, were there any changes
3    to the Transfer and Assumption Agreement that
4    you recall asking the OCC to make over the
5    weekend, "you" meaning anyone on behalf of the
6    trustee?
7        A.    I don't think we requested any
8    changes. I think Cleary on behalf of Barclays
9    had a few language changes.
10       Q.    Let me switch forward. After the
11   closing, am I correct that the trustee agreed --
12   let me withdraw that. After the closing, am I
13   correct that the trustee was aware that all of
14   the margin deposit that LBI had at its OCC
15   accounts were being transferred to Barclays'
16   accounts?
17       A.    Yes.
18       Q.    And after the closing, did the trustee
19   become aware that some portion of the LBI OCC
20   margin was pledged to the OCC in the form of
21   government securities held in an account at
22   JPMorgan?
23       A.    At some point I think we became aware
24   of that, yes, but I can't -- I'm having a hard
25   time filling -- remembering exactly when in the

Page 298

1        J. Kobak
2    sequence of events that was.
3        Q.   Are you aware that the trustee agreed
4    to release a portion of those government
5    securities to Barclays?
6        A.   I think I became aware of that.  I'm
7    not sure we were aware of it at the time.
8        Q.   Well, somebody must have been aware of
9    it for it to happen?
10       A.   Well --
11           MR. MAGUIRE:  Let's wait for the
12   question.
13       Q.   Let me just establish a few basics.
14           You understand that there's a
15   portfolio of government securities of
16   approximately $900 million value, or maybe a bit
17   more, that was pledged to the OCC by LBI and
18   held in accounts at JPMorgan?
19       A.   I understand that now.  I'm not sure I
20   knew at the time how much was involved.
21       Q.   You understand that a portion of
22   that -- those securities were -- do you
23   understand that in order for those securities to
24   be transferred to Barclays, JPMorgan asked for
25   the trustee's consent?

Page 299

1        J. Kobak
2        A.   Yes, it became -- it came to my
3    attention after it occurred, I believe, but yes.
4        Q.   And after that consent was given and
5    the transfer was made, at some point did the
6    trustee form the view that it would not consent
7    to transfer any more of those securities?
8        A.   Yes.
9        Q.   And what was the basis for that change
10   in decision?
11       A.   Well, I think first our -- as I
12   recall, there was a problem, and some of this
13   was lack of visibility because we didn't always
14   have great visibility to JPMorgan accounts, to
15   the software that shows what's happening in
16   accounts.  I know there was a concern, which I
17   think Deloitte first voiced, that there were
18   customer accounts of customers that might --
19   might or might not even be Barclays' customers,
20   but that nevertheless had positions at OCC and
21   we weren't clear whether Barclays was
22   appropriately standing behind those accounts.
23       Q.   And what do you mean by -- sorry.
24       A.   And then I think in the course of
25   investigating that and learning more about it

Page 300

1        J. Kobak
2    and talking to Barclays about it, among others,
3    we came to realize that there was potentially --
4    there appeared to be substantial amounts of what
5    I'll call excess in these JPMorgan accounts.
6        Q.   What do you mean by "excess"?
7        A.   I mean money that was on deposit and
8    was in excess of the amounts that would be
9    needed to satisfy any liabilities or
10   obligations.  So, in that sense, it's excess
11   margin, let's call it.
12       Q.   So any amount that's over and above
13   the amount needed to satisfy the liabilities on
14   what day?  The very first day that Barclays took
15   over the accounts?
16       A.   Whatever -- well, I don't know that we
17   made.  I mean, I think our understanding was we
18   found that there was a very substantial amount
19   of money clearly in excess of what would ever be
20   required to satisfy those liabilities, and that
21   to us was not something we had knowingly
22   bargained away or thought should be transferred
23   to Barclays and it seemed, again, to be perhaps
24   a windfall, but something accretive to what
25   Barclays was supposed to obtain in the

Page 301

1        J. Kobak
2    agreements, which had never been explained to or
3    authorized by the Court.
4        Q.   Do you have any, any evidence or basis
5    at all for believing -- let me ask it in two
6    parts:  Do you believe that Barclays knew what
7    the value was of these margin deposits and how
8    it compared to the liabilities in the OCC
9    accounts at the time that Barclays agreed to do
10   the deal?
11           MR. DAKIS:  Object to form.
12       A.   I don't know.  It might well not have,
13   but I don't know.  I don't know whether it made
14   its own estimate or not.
15       Q.   Do you believe it was possible -- I
16   think I've asked that.
17           Did anyone ever tell Barclays that it
18   was going to have a day-one liability of several
19   billion dollars in order to satisfy the margin
20   requirements at all of the exchange-traded
21   derivative accounts that it was taking over?
22       A.   I don't know.
23       Q.   Would it have made sense to tell
24   Barclays that?
25           MR. DAKIS:  Objection to form.

Page 302

J. Kobak

1
2     MR. MAGUIRE: Objection to form.
3     A.   I mean, is that a question?
4     Q.   Do you believe Barclays -- do you
5  believe Barclays was acquiring all of the margin
6  deposit necessary to satisfy the margin
7  requirements at all the exchange-traded
8  derivative accounts?
9     A.   To the extent there was margin deposit
10 there, it was -- it was acquiring it for that
11 purpose.  We didn't understand that there was
12 any real likelihood that there would be a
13 substantial excess at the end of the day that
14 Barclays would get and claim that it was able to
15 keep on top of everything else in the agreement.
16     If Barclays had thought that at the
17 time, it's something that should have been
18 disclosed.  If nobody thought it at the time, it
19 seems to me it's in the nature of a mutual
20 mistake and a kind of a windfall, but not --
21 nothing contemplated by the agreement.
22     Q.   The agreement doesn't say anything
23 about not getting an excess, does it?
24     MR. MAGUIRE: Does the agreement
25 require --

Page 303

J. Kobak

1
2     Q.   Does any agreement in this deal say
3  anything about Barclays not acquiring excess
4  margin?
5     MR. MAGUIRE: When you say
6  "agreement," you're referring to the
7  written --
8     MR. HUME: Any.  Any of them.
9     MR. MAGUIRE: Are you including the
10 transcript of the sale hearing?
11     Q.   Do you -- Mr. Kobak, do you believe
12 the sale hearing is a contractual document?
13     A.   I believe it goes to the
14 interpretation of the agreement.
15     Q.   Did you and your lawyers understand
16 that the APA had an integration clause?
17     A.   Yes.
18     Q.   Do you understand that if something is
19 going to be a contractual term in a written
20 contract in a multi-billion dollar deal, it's
21 actually supposed to be written in the contract?
22     MR. DAKIS: Objection to form.
23     Q.   Was that understood at the time?
24     A.   Well, I understand, you know, what the
25 rules are.  I understand there are exceptions to

Page 304

J. Kobak

1
2  it.  I'm also not sure that rule, the common law
3  rule controls to what's said at a Bankruptcy
4  Court when people are asking for approval of a
5  deal that will insulate it against attack for
6  all time.
7     Q.   I just want to make sure I understand
8  what the trustee's position is on excess margin.
9  Is it excess over the day-one liability in the
10 accounts or over the margin requirement imposed
11 by the Custodial Clearing Corporation?
12     A.   Well, the -- if you go to the final
13 draft of the clarification letter, which you
14 haven't shown me on this point, and go to the
15 top of page 2, in the definition of "purchased
16 assets" in paragraph 1(a), double I, capital C
17 in parenthesis, the exchange-traded derivatives
18 are described.
19     Added there for the first time,
20 without I believe any prior notice to us, but in
21 any event, is "any property that may be held to
22 secure obligations under such derivatives," and
23 in the context of what we understood, what was
24 explained to us, what was explained to the
25 court, at most that could be meant to say

Page 305

J. Kobak

1
2  Barclays got what was necessary to secure the
3  obligations to the extent there was a liability.
4     It didn't -- it doesn't say if there's
5  excess cash in a clearing fund, that Barclays
6  gets that.  It doesn't say that if there are
7  substantial margin excesses -- excess, Barclays
8  gets that.  So that's the way we see the
9  agreement, and particularly in the context in
10 which these were negotiated and approved by the
11 court.
12     Again, if people thought there was
13 likely to be a substantial excess which would
14 change the value of the deal for everybody,
15 there was no reason that couldn't have been
16 described to people and there's no reason people
17 couldn't have come back to court, if necessary,
18 to explain the changes in the deal to the Court
19 and the creditors as well as the parties.
20     Q.   If the OCC had a margin requirement in
21 excess of the amount of the liabilities, is
22 Barclays allowed to keep the margin for that to
23 meet the requirement, or does it have to give
24 that back, too?
25     MR. MAGUIRE: Objection to form.

Page 306

J. Kobak

1
2  Do you want to rephrase that question?
3  Q.   I want to know what your position is.
4  Is your position that if the margin requirement
5  from the Clearing Corporation is in excess of
6  the day-one liabilities, is it your view
7  Barclays is or is not entitled to keep at least
8  the amount of margin needed to satisfy the OCC's
9  margin requirement?
10  MR. DAKIS:  Objection to form.
11  MR. MAGUIRE:  I have a difficulty with
12  your asking this witness for a position.
13  That's not his role.  His role is to be
14  here --
15  MR. HUME:  He's been giving me his
16  position all day.
17  A.   I've been endeavoring to give you my
18  understanding.  If you trick me into answering
19  some other way, I apologize.  I read the
20  language "any property that may be held to
21  secure obligations under such derivatives," I'm
22  not exactly clear what the word "held" means in
23  that context, but it's my understanding of that
24  would be there was property that would be held,
25  it might be needed to satisfy the obligations

Page 307

J. Kobak

1
2  and that was Barclays', and anything in excess
3  of that is either ours or wasn't dealt with in
4  this contract, but certainly was not a purchased
5  asset.
6  (Exhibit 455, a document bearing Bates
7  Nos. HHR_00014574 through 14575, marked for
8  identification, as of this date.)
9  Q.   Mr. Kobak, Exhibit 455 is a letter
10  that you sent to James McDaniel at Sidley
11  Austin, representing the OCC, on November 14,
12  2008.  You copy Ken Raisler, as counsel to
13  Barclays Capital.  Do you see that?
14  A.   Yes.
15  Q.   In that letter, and you respond to it
16  a November 9 letter, which we probably have
17  here, in which he asks for clarification of the
18  treatment of all the margin deposit.
19  You say in the first paragraph you're
20  aware of the Transfer and Assumption Agreement,
21  which you executed?
22  A.   Yes.
23  Q.   You then say there are certain open
24  issues and concerns surrounding the correlation
25  between the deposited securities and the

Page 308

J. Kobak

1
2  transfer of the options and futures positions
3  they are intended to secure.  Do you see that?
4  A.   Yes.
5  Q.   The second or second full paragraph,
6  third paragraph of the letter, you state as
7  follows:  "Our position is that this collateral
8  can be transferred to Barclays (and the trustee
9  will gladly consent) if Barclays will live up to
10  its bargain and assume the obligations involved
11  for all customers, not just those in the
12  so-called PIM accounts.  We believe that this
13  reflects both the letter and the intent of the
14  Transfer and Assumption Agreement and certainly
15  the trustee's understanding when I signed that
16  agreement.  However, this does not appear to be
17  Barclays' understanding."
18  Let me stop there for a moment and ask
19  you, is that still your position as stated here
20  in this letter of November 14, 2008?
21  A.   Well, what I'm really referring here
22  to I think are the customer accounts, the
23  customer OCC accounts, and yes, this is our
24  position.  We thought -- and it may be that we
25  have satisfied ourselves by now that Barclays

Page 309

J. Kobak

1
2  was living up to this.  I'm not sure they did
3  entirely, but Barclays was satisfying the
4  customer accounts, agreeing to assume the
5  liabilities, it was appropriate that the
6  collateral necessary to satisfy those
7  obligations would be -- be transferred.  Indeed,
8  that would really be part, I would think, of the
9  customer account transfer process.
10  Q.   So you're confirming this is still
11  your position as stated in this letter?
12  A.   To the extent stated in this letter,
13  yes.
14  Q.   And in terms of the customers who are
15  non-PIM customers --
16  A.   Let me rephrase because you have
17  tricked me again.
18  That's my understanding.  My
19  understanding of our position or what we think
20  the agreements mean is as -- remains as stated
21  in the November 14 letter with respect to the
22  issues addressed in that letter.
23  Q.   For the customers who had options
24  positions with Lehman, does the trustee know how
25  much margin in total those options customers had

Page 310

J. Kobak

1    J. Kobak
2  deposited with LBI?
3      A.   I don't know.  I know that that is
4  something, I believe, that Deloitte has looked
5  into and I -- I know we've discussed it at
6  times.  I have no recollection of what the
7  numbers are.  I don't know if their work is
8  completely complete in that regard, but I know
9  that is something they have looked into.
10     Q.   Does the trustee understand that the
11 margin that LBI deposited with the OCC is LBI
12 property, not customer property?
13     A.   I think there's LBI property.  I think
14 also we believe that Barclays might be looking
15 to its customers to satisfy obligations and then
16 claiming a right to the property -- to the LBI
17 property.  That seemed inappropriate to us.  I
18 think that's one of the claims we have made
19 against Barclays.
20     Q.   Is the trustee aware that for the
21 positions in the options -- in the OCC customer
22 account, Barclays is recording payables and
23 receivables to those customers through a bridge
24 account at LBI?
25     A.   I'm not -- Deloitte is probably aware

Page 311

J. Kobak

1    J. Kobak
2  of that or maybe our administrative staff.  I'm
3  not really aware of the details.
4      Q.   Is the trustee aware that futures
5  customers, as opposed to options customers, did
6  transfer to Barclays?
7          MR. MAGUIRE:  You're saying futures
8  customers as opposed to which customers?
9          MR. HUME:  Options customers.
10         MR. MAGUIRE:  So you're saying options
11 customers did not transfer to Barclays?
12         MR. HUME:  I'm saying the question is
13 focused on futures customers.
14     A.   Okay.  I believe some futures
15 customers at least transferred to Barclays.
16 It's my understanding that sometimes those
17 futures customers are also securities customers.
18     Q.   Let me ask the question this way:  Are
19 you aware that there are a large bulk of futures
20 customers for whom Barclays has fronted
21 collateral because the collateral those futures
22 customers had deposited has not yet been
23 transferred to Barclays?
24     A.   Yes, I realize that's happened in a
25 number of cases, I believe.

Page 312

J. Kobak

1    J. Kobak
2      Q.   And do you contest Barclays' right to
3  receive that collateral, segregated customer
4  collateral for futures customers?
5      A.   No.  I think we realize that's a
6  problem really for both of us.
7      Q.   Because it's located in foreign
8  jurisdictions with tied up in other LBI --
9  Lehman administrations?
10     A.   For a variety of reasons, including
11 depositories I think have refused to accept the,
12 you know, jurisdiction of the U.S. court to deal
13 with these things, we haven't been able to get
14 our hands on it.  I think we refer to that in
15 the allocation motion, among other things.
16     Q.   Has the trustee or its staff or
17 Deloitte, advisors of Deloitte, made any effort
18 to value the positions at the OCC accounts as of
19 the time Barclays took over those accounts?
20         MR. DAKIS:  Objection to form.
21     A.   I think Deloitte has made -- they have
22 certainly made efforts to look at the
23 collateral, whether there's any excess, and that
24 may have involved some analysis of what the
25 accounts are worth, what the liabilities would

Page 313

J. Kobak

1    J. Kobak
2  be and so forth.
3      Q.   Let me ask you, if you could, to go
4  back to the exhibit I showed you with the
5  balance sheet that was sent on September 18 at
6  the beginning of the deposition.
7      A.   Yes.
8      Q.   No, not that balance sheet.  The one,
9  the one that the trustee was sent from Weil
10 Gotshal.
11         MR. MAGUIRE:  What's the number of
12 that?
13     A.   This is 441?  Yes, I have it.
14     Q.   And looking at the balance sheet, the
15 assets being sold, for the derivatives line
16 item, the assets being sold say derivatives on
17 the asset side 3.6 and derivatives in the short
18 inventory saying 1.7.  Do you see that?
19     A.   Yes.
20     Q.   So there's almost $2 billion of net
21 value in the derivatives according to this
22 provisional balance sheet on September 18,
23 correct?
24     A.   As of September 17, supposedly.
25     Q.   This was sent to the trustee on the

Page 322

J. Kobak

1  J. Kobak
2  not given as a figure.
3     Q.   By the time Barclays had made its
4  decisions on which contracts to assume or not
5  assume roughly 60 days after the closing, did
6  the trustee at that point understand that the
7  total cure amounts Barclays was going to be
8  paying was substantially less than the $1.5
9  billion number?
10    A.   I'm not sure if we ever -- if at that
11 point we analyzed that number specifically.  I
12 do remember that it was quite a lot of contracts
13 and quite a lot of court filings, as I recall,
14 to indicate the contracts were assumed and cure
15 amounts were paid or rejected.
16    Q.   Was the trustee aware of the total
17 cure amounts at the time that it filed its
18 appellate brief defending the sale?
19    A.   I don't know.
20    Q.   Would it have caused the trustee not
21 to support the sale on appeal if the trustee
22 knew that there was only 230 million of cure
23 amounts rather than 1.5 billion?
24    MR. MAGUIRE:  Objection to form.
25    A.   The position we took on appeal was, as

Page 323

J. Kobak

1  J. Kobak
2  I recall, and I did look at our briefs on this
3  period, and without getting into privileges, did
4  talk about the position that we wanted to take
5  with the trustee, and we basically made two
6  arguments:
7       One was that the equitable mootness
8  doctrine applied because there hadn't been a
9  request for a stay, which limited the grounds
10 of attack; and, second, that we didn't think there
11 was merit to the allegations that the entire
12 procedure leading up to the sale hearing
13 violated due process in terms of notice and
14 opportunity to be heard given the exigent
15 circumstances.
16    We didn't take a position on any other
17 aspect, I don't believe, of the sale and didn't
18 think it was necessary in connection with the
19 specific types of arguments and allegations that
20 were made by the party challenging the deal.
21    Q.   So do you stand by the positions you
22 took on appeal?
23    A.   Yes.
24    Q.   And after the clarification letter was
25 finalized and executed, did the trustee ever

Page 324

J. Kobak

1  J. Kobak
2  consider whether it might be necessary to go
3  back to the court to get additional approval for
4  what was in the clarification letter?
5     A.   Not at the time because, again, we
6  thought that changes that had been made were in
7  the nature of substitutions to get to the kinds
8  of economics that were talked about at the
9  hearing.  Subsequent times, and given some of
10 the positions that Barclays started to take in
11 late December and the fall -- spring of last
12 year, we began to at least begin thinking about
13 that.  We clearly didn't want to go to court, if
14 that were necessary, until we had explored
15 sufficiently to feel that there was merit to
16 anything we would bring to the court.
17    Q.   I just have one more document to show
18 you before -- I know you need to leave, we can
19 talk about that in a second, but there's one
20 more document I want to show you with one or two
21 questions.
22    (Exhibit 456, a document bearing Bates
23 Nos. HHR_00009337 through 9342, marked for
24 identification, as of this date.)
25    Q.   Mr. Kobak, Exhibit 456 is an exchange

Page 325

J. Kobak

1  J. Kobak
2  between you and your colleague Carolyn Lavine or
3  Levine -- I'm not sure.
4     A.   Levine.
5     Q.   -- Levine and some other colleagues
6  and the trustee and Laura Vecchio.
7       This follows a chain of e-mails
8  relating to the transfer of OCC margin, and it
9  attaches -- well, at least an earlier version in
10 the chain attaches the Transfer and Assumption
11 Agreement.  I'll represent that to you.
12    A.   Right.
13    Q.   And I think Laura Vecchio sends it to
14 Jim Giddens down below on October 17, saying,
15 "Jim, this is what Alan Kaplan, the Barclays
16 attorney, passed along regarding the OCC
17 agreement."  Do you see that?
18    A.   Yes.
19    Q.   And that's forwarded then to Carolyn
20 Levine and you then -- and you then respond
21 saying, "This is what we signed at the hearing
22 because, rightly or wrongly, OCC told us nothing
23 would move otherwise.  Barclays had to
24 substitute for LBI."  You see that?
25    A.   Yes.