# Exhibit G

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5   In Re:

6                          Chapter 11

7   LEHMAN BROTHERS          Case No. 08-13555(JMP)

8   HOLDINGS, INC., et al.,   (Jointly Administered)

9

             Debtors.

10

      ----------------------x

11

12

13

14   VIDEOTAPED DEPOSITION OF MARY ALICE KORYCKI

15             New York, New York

16             February 4, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 27495

Page 6

M. Korycki

1
2      THE VIDEOGRAPHER:  Will the reporter
3  please swear in the witness.
4              * * *
5  MARY ALICE KORYCKI, called as a
6      witness, having been duly sworn by a Notary
7      Public, was examined and testified as
8      follows:
9  EXAMINATION BY
10  BY MR. THOMAS:
11      Q.    Good morning.  Would you please state
12  your full name and address for the record?
13      A.    Mary Alice Korycki.  1001 Madison
14  Street, Apartment 517, Hoboken, New Jersey,
15  07030.
16      Q.    Have you been deposed before?
17      A.    No.
18      Q.    Do you have a general understanding of
19  how this process works?  I'll be asking
20  questions and the court reporter will be taking
21  down the questions and answers and so forth.
22      A.    Yes.
23      Q.    And if at any point during the
24  deposition you're not sure what I'm asking,
25  please feel free to ask me to rephrase the

Page 7

M. Korycki

1
2  question.  I'll try to make it clear.
3      A.    Okay.
4      Q.    And if at any point you want a break,
5  just please let me know; we can do that.
6      A.    Okay.
7      Q.    Would you please briefly describe your
8  professional background?
9      A.    I'm a certified public accountant and
10  also a CIRA, Certified Insolvency Restructuring
11  Advisor.  I've had about eight years'
12  restructuring experience, three years' auditing
13  experience.
14      Q.    Okay.  And what is your job now?
15      A.    I work in the Turnaround and
16  Restructuring Group at Alvarez & Marsal.
17      Q.    And how many years have you been at
18  Alvarez?
19      A.    Four and a half.
20      Q.    And where did you work prior to that?
21      A.    BDO Seidman.
22      Q.    And how long were you at BDO Seidman?
23      A.    Four years.
24      Q.    What did you do at BDO Seidman?
25      A.    I worked in their Turnaround Group

Page 8

M. Korycki

1
2  also.
3      Q.    And can you describe briefly what type
4  of work you did for their Turnaround Group?
5      A.    You mean at BDO?
6      Q.    Yes.
7      A.    Preparing cash flow, 13-week cash flow
8  reports and doing some preference analysis work.
9      Q.    Prior to BDO, where did you work?
10      A.    PricewaterhouseCoopers.
11      Q.    How long there?
12      A.    About two years.
13      Q.    And what did you do for Price
14  Waterhouse?
15      A.    I worked in their Auditing Group.
16      Q.    And prior to Price Waterhouse?
17      A.    I started out at Pannell Kerr Foster.
18      Q.    And how long were you there?
19      A.    One year.
20      Q.    And what did you do there?
21      A.    I worked in their Auditing Group as
22  well.
23      Q.    And what academic degrees do you have?
24      A.    Bachelor's degree in accounting.
25      Q.    And are you a certified accountant?

Page 9

M. Korycki

1
2      A.    I said I'm a -- I am a certified
3  public accountant, but a non-practicing CPA now.
4      Q.    Okay.
5      A.    I just want to clarify --
6      Q.    Sure.
7      A.    -- from what I said earlier.
8      Q.    Sure.  And please feel free to clarify
9  things like that throughout the morning.
10      A.    Okay.
11      Q.    Would you describe in a little more
12  detail your positions with Alvarez over the last
13  four years or so?
14      A.    I worked on -- are you looking for the
15  type of work that I've done?
16      Q.    The types of duties and
17  responsibilities, your position, your title and
18  the type of duties and responsibilities you did
19  in that position.
20      A.    A senior associate at Alvarez &
21  Marsal.  So my duties include preparing cash
22  flow, 13-week cash flow forecasts, working on --
23  I'm just, I'm not sure how much, sorry, how much
24  detail.  What are you looking for?
25      Q.    So one of the things you've -- first

Page 10

M. Korycki

1
2  of all, you've been a senior associate the
3  entire time at Alvarez?
4      A.  No.  I started out as an associate.
5      Q.  Okay.  And now you're currently a
6  senior associate?
7      A.  Yes.
8      Q.  And some of the types of things you've
9  worked on are cash flow forecasts; is that
10  right?
11      A.  Yes.
12      Q.  Are there other general types of work
13  or projects that you've done?
14      A.  I've done accounting-related work,
15  monthly -- monthly close work, and also
16  forecasts, like five-year business models,
17  business plans.
18      Q.  And when was your first involvement
19  with Lehman?
20      A.  I started on September 22, 2009.
21      Q.  Now, it's my understanding Alvarez &
22  Marsal became involved with Lehman earlier on
23  than that, the week of September 15th.  Did you
24  not have any involvement that first week, the
25  week of September 15th, with Lehman?

Page 11

M. Korycki

1
2      A.  I did not have any involvement that
3  week, no.
4      Q.  Okay.  And how did you first become
5  involved in any work in connection with Lehman
6  Brothers?  Did someone pick up the phone and
7  call you and tell you to get involved?
8      A.  Someone, yes, received an e-mail that
9  said can you start working on Lehman.
10      Q.  Okay.  And what was your assignment or
11  scope of responsibility in connection with the
12  Lehman work?
13      A.  I started out in the Wind-Down Group.
14      Q.  What is the Wind-Down Group?
15      A.  They handle some of the TSA work,
16  working with the Contracts Management Team, and
17  then also, in conjunction with, they handled
18  some of the Barclays transaction.
19      Q.  And what is that, what do you mean
20  when you say "they handled some of the Barclays
21  transaction"?
22      A.  What I mean by that is some of the
23  work that I had -- documents that I had
24  prepared.  I wasn't actually involved in
25  everything that happened.  I just know top-level

Page 12

M. Korycki

1
2  what -- that some people were involved with
3  that.
4      Q.  Okay.  But in terms of handling some
5  of the Barclays transaction, is that referring
6  to getting an understanding of the Barclays
7  transaction to make sure they understood what
8  assets had been transferred, what liabilities
9  had been transferred, and what assets and
10  liabilities had stayed with Lehman Brothers?
11      A.  I wasn't directly involved with all
12  the people that dealt with that.  I know I
13  came -- when I came on board, I just heard talk
14  about it.  I don't know exactly everything that
15  went on with that.
16      Q.  So you knew that people were working,
17  somehow in connection with the Barclays
18  transaction, some Alvarez & Marsal and people
19  were working with the Barclays transaction, but
20  you weren't sure exactly what they were doing?
21      A.  Yes.  Correct.
22      Q.  And how did your assignment change, if
23  at all, after you started working in connection
24  with Lehman on the 22nd?
25      A.  Can you --

Page 13

M. Korycki

1
2      Q.  Sure.  I'm just looking for just a
3  general description of your role, your duties
4  and responsibilities in connection with the
5  Lehman assignment from September 22 going
6  forward.  I mean, did you continue working with
7  the Wind-Down Group?  Did you switch to another
8  group?  Did you have another area of focus at
9  some later point in time?
10      A.  Yes.
11      Q.  Just a general overview at this point.
12      A.  I worked in the Finance and Accounting
13  Group for a couple months and moved over to the
14  Derivatives Group.
15      Q.  So you started off in the Wind-Down?
16      A.  Yes.
17      Q.  And then when did you move over to the
18  Finance and Accounting Group, approximately?
19      MR. TAMBE:  Objection to form.  I'm
20  not -- maybe she can clarify it, whether
21  there's a distinction between the Wind-Down
22  Group and the Finance and Accounting Group,
23  whether she's doing finance and accounting
24  for the Wind-Down Group.  You may just want
25  to clear that up.  I just don't know if

Page 14

M. Korycki

1
2  that's clear.
3       MR. THOMAS:  I asked her if she moved
4  from the Wind-Down Group to the Finance and
5  Accounting Group and she said yes.
6   Q.   So I'm just asking when that was.
7   A.   I want to say around June timeframe.
8  I don't remember exactly, though.
9   Q.   That would be June of '09?
10  A.   June of '09, yes.
11  Q.   Did you want to expand?
12  A.   Can I just expand?
13      MR. TAMBE:  Yes.  You can just explain
14  if there is any connection between the
15  Wind-Down Group and Finance and Accounting.
16  It wasn't clear to me.
17      THE WITNESS:  They're separate groups.
18  So it would be -- they're separate groups.
19  Q.   And then when did you move to the
20  Derivatives Group?
21  A.   December '09.
22  Q.   And can you just describe in a little
23  more detail your duties and responsibilities as
24  part of the Wind-Down Group?
25  A.   I was responsible for the working

Page 15

M. Korycki

1
2  group list, working with the Contracts Team on
3  the rejection, getting a handle on the
4  rejection, the contracts to be rejected.
5   Q.   Anything else come to mind?
6   A.   That's all that comes to mind.
7   Q.   In the -- sorry.  Go ahead.
8   A.   I also do the U.C.C. presentations.
9   Q.   What does that mean to say that you do
10  the U.C.C. presentations?
11  A.   I collect the slides from each of the
12  asset teams and compile them into one file for
13  the Creditor Committee presentations.  I don't
14  actually prepare the slides.  I just compile
15  them and put them into a deck.
16  Q.   Okay.  Have you made any presentations
17  at those meetings?
18  A.   No.
19  Q.   Do you communicate with members of the
20  Creditors Committee or their representatives?
21  A.   Via e-mail; sending a copy of the deck
22  to them.
23  Q.   Okay.  Other than that, do you have
24  any more substantive communications with the
25  Creditors Committee, or have you?

Page 16

M. Korycki

1
2  A.   I've had a few meetings early on with
3  them.  Nothing, nothing that I would consider --
4  my involvement with them directly, no.
5   Q.   Let me go ahead and show you a
6  document that we'll mark as 579A.
7       (Exhibit 579A, a document bearing
8  Bates Nos. AM4951, marked for
9  identification, as of this date.)
10  Q.   Let me just ask you, have you seen
11  this document before?
12  A.   Yes.
13  Q.   Can you describe what it is, please?
14  A.   These are my notes from a meeting that
15  we had.
16  Q.   Okay.  And there's a 9/19 date at the
17  top.  Would that have been the date of the
18  meeting?
19  A.   I don't believe that was the date of
20  the meeting, no.
21  Q.   Okay.  Do you know the -- when this
22  meeting occurred?
23  A.   Off the top of my head, no.
24  Q.   Do you know who the meeting was with?
25  A.   Jim Fogarty, Bill Gordon, I believe

Page 17

M. Korycki

1
2  Mike Fazio, Jim Sirris.  There were a couple
3  other people there.  I don't remember, don't
4  recall everyone who was there, though.
5   Q.   Would that be Jim Seery?
6   A.   Seera, I believe that's how you
7  pronounce it, yes.
8   Q.   Who is a former Lehman executive?
9   A.   Oh, no.
10  Q.   Are you talking about somebody
11  different?
12  A.   You know, I take that back.  I
13  don't -- there was some other -- I'm talking
14  about someone else that wasn't a former Lehman
15  executive.  I don't recall his name off the top
16  of my head.
17  Q.   Okay.  Do you know where the person
18  was from?
19  A.   I want to say it was an FTI person and
20  there was a Houlihan person.
21  Q.   Is Mike Fazio the Houlihan person
22  you're referring to?
23  A.   Yes.
24  Q.   So this was a meeting with people from
25  Alvarez & Marsal and Houlihan and FTI, who were

Page 18

M. Korycki

1
2   both representatives of the Creditors Committee,
3   correct?
4       A.   Correct.
5           I just want to clarify.  There was a
6   lot going on in the early days, so I don't
7   recall every -- everyone's names.  There was a
8   lot of people to meet.
9       Q.   Sure.  I understand.
10          I'm going to go ahead and show you
11  another set of notes while we're still talking
12  about these.  I want to give it a little more
13  context.
14          Let me show you a document that's been
15  previously marked as 563B.  And do you recognize
16  that document?
17      A.   Yes.
18      Q.   Now, are those your notes from a
19  meeting that occurred on September 29, 2008?
20      A.   Yes.
21      Q.   Okay.  Do you know, the meeting that
22  is reflected in the notes, your first set of
23  notes, which is Exhibit 579A, do you know if the
24  meeting reflected in the 579A notes occurred
25  before or after the meeting, the 9/29 meeting?

Page 19

M. Korycki

2       A.   I believe this 9/29 meeting occurred
3   first and then the 579A occurred second.
4       Q.   Okay.
5       A.   If I recall correctly.
6       Q.   Okay.  Do you believe they were
7   roughly close in time?
8       A.   A couple weeks, yes.
9       Q.   Within a couple weeks?
10      A.   Within a couple weeks, yes.
11      Q.   And as a general matter, did Alvarez &
12  Marsal try to share information it learned about
13  the transaction with the Creditors Committee and
14  their representatives?
15          MR. TAMBE:  Objection to the form of
16  the question.
17      A.   You know, I was just honestly taking
18  notes.  I don't ...
19      Q.   Okay.  Let's look -- looking at 579,
20  please, which is the meeting with Houlihan and
21  FTI, at the top right-hand corner there's a box
22  that says "Transcript from Weil; Lori Fife;
23  Judge said."  Then it says "preliminary order."
24          Am I reading that correctly so far?
25      A.   Yes.

Page 20

M. Korycki

1
2       Q.   What does the rest say there?
3       A.   "Stipulate come back to court."
4       Q.   Okay.  And do you know what this is
5   referring to?
6       A.   Again, I was just really just jotting
7   down things that people were saying.
8       Q.   I understand, but just your -- I'm
9   just asking for your best recollection based
10  upon your notes and your recollection of the
11  meeting what -- what it is that's being
12  described there.  We all take notes in shorthand
13  sometimes, so I'm just trying to understand what
14  it is you're conveying by writing down these
15  notes.
16      A.   The transcript -- it was to get a
17  transcript of -- I believe there was a court
18  hearing, so to get a transcript of that court
19  hearing from Weil.
20      Q.   Okay.  And what was the purpose of
21  getting that transcript, as discussed in the
22  meeting?
23      A.   Someone at the meeting had said, just,
24  I believe, just pointed -- made a comment to get
25  the transcript and I wrote it down as something

Page 21

M. Korycki

1
2   to do.
3       Q.   Okay.  You have no recollection of the
4   purpose or point of getting the transcript?
5       A.   No, I don't remember.
6       Q.   Do you remember what -- was it telling
7   Alvarez to get the transcript?
8       A.   Again, it came up in the meeting to
9   get a transcript of the hearing -- of the
10  hearing.  I don't recall exactly.
11      Q.   All right.  And but do you know if it
12  was Alvarez telling FTI and Houlihan to get a
13  transcript or FTI or Houlihan telling Alvarez to
14  get a transcript?
15      A.   I don't remember.
16      Q.   The second enumerated point there in
17  that box says, "Source of market value 9/18."
18  Am I reading that correctly?
19      A.   Yes.
20      Q.   And what was the issue that was
21  discussed there?
22      A.   I don't remember.
23      Q.   Do you recall any discussion about
24  market values of securities in this meeting?
25      A.   It was brought up.  I don't remember

Page 22

M. Korycki

1
2  anything in detail further than that.
3      Q.   Point number 3 says, or does it say,
4  "Who else negotiating"?
5      A.   That's what it says.
6      Q.   And do you recall what that was in
7  reference to, what the issue was that was being
8  raised?
9      A.   I don't remember.
10     Q.   Do you recall, is that who else was
11 negotiating the Barclays transaction?
12     A.   Again, I don't remember.
13     Q.   Turning to the left side, do you see
14 where it says, "9/19."  Then it says "47.4
15 collateral."  Do you recall what the 47.4 number
16 that was discussed is?
17     A.   I don't remember.
18     Q.   Next line says, "Took 5 billion more
19 collateral."  Do you see that?
20     A.   Yes.
21     Q.   Okay.  What was the point that was
22 being discussed there?
23     A.   I don't remember.
24     Q.   Do you recall there being discussion
25 of the fact that the collateral being

Page 23

M. Korycki

1
2  transferred had a marked value 5 billion more
3  than it was being treated as worth in terms of
4  market value?
5          MR. TAMBE:  Objection to the form of
6  the question.
7      A.   Can you repeat that?
8      Q.   Sure.  Do you recall a discussion at
9  this meeting about the fact that the collateral
10 that was transferred to Barclays had a marked
11 value of approximately $5 billion more than the
12 parties believed it was worth or were treating
13 it for purposes of the transaction?
14         MR. TAMBE:  Objection to the form of
15 the question.
16     A.   I don't recall.  Again, I was just
17 taking notes.  I don't ...
18     Q.   But you were listening to the
19 conversation, correct?
20     A.   Correct.
21     Q.   Okay.  And as we'll see, this issue
22 becomes reflected in other documents, other
23 notes, presentations, including the U.C.C.
24 presentation.  So I'm asking you, what is your
25 recollection of that $5 billion number and what

Page 24

M. Korycki

1
2  does it mean?
3      A.   And I don't -- I don't remember.
4      Q.   Do you understand it to be referring
5  in some way to the repo collateral that was
6  transferred to Barclays as part of the
7  transaction, or was supposed to be transferred?
8          MR. TAMBE:  Objection to the form of
9  the question.  Objection.  Asked and
10 answered.
11     Q.   You can answer.  When he objects, you
12 can just -- he's just preserving it.
13         MR. TAMBE:  I'm also objecting to the
14 fact that you've asked the question now
15 three times.  She's told you she doesn't
16 remember.
17         MR. THOMAS:  It's a different
18 question.  Thank you.
19     Q.   Can you repeat the question again?
20     Q.   Sure.  Do you recall that the $5
21 billion reference here right above "Schedule A"
22 relates to the repo collateral that was
23 transferred or supposed to be transferred to
24 Barclays as part of the Barclays transaction?
25         MR. TAMBE:  Objection to form.

Page 25

M. Korycki

1
2  Objection.  Asked and answered.
3      A.   Again, I was -- I was just taking
4  notes.  I wasn't -- I don't -- I didn't
5  understand everything that was going on at the
6  time.
7      Q.   Again, I'm not asking if you
8  understood everything going on at the time.  Do
9  you understand that this was relating to the $5
10 billion related to the repo collateral that was
11 transferred or was supposed to be transferred to
12 Barclays as part of the Barclays transaction?
13         MR. TAMBE:  Same objections.
14     A.   I don't know if -- I don't know if
15 they're related.
16     Q.   You don't have any understanding of
17 that as you sit here today?
18     A.   No.
19     Q.   Do you have an understanding what
20 Schedule A is that's being discussed in this
21 meeting that you wrote down?
22     A.   These are -- these are my notes from
23 the meeting.  I just, sitting in the meeting, I
24 was just jotting down what things are being
25 said, people are saying.

M. Korycki

1
2      Q.    Okay.  Appreciating that, do you have
3   an understanding of what Schedule A is here
4   that's being referred to?
5      A.    I'm sorry, can you repeat that?
6      Q.    Yes.  Do you have an understanding,
7   any understanding at all, of what Schedule A is
8   that you wrote down in your notes?
9      A.    Again, I was just taking notes at the
10  meeting.
11     Q.    I will stipulate to the fact that you
12  were taking notes to the meeting.  I'm just
13  asking, do you have any understanding what
14  Schedule A is there, what it's referring to?
15     A.    Not in -- not in detail.  A broad
16  understanding, not in detail.
17     Q.    What is your general understanding of
18  what Schedule A refers to?
19     A.    That the assets and liabilities, that
20  was -- there was not -- it was not a -- the
21  assets transferred to Barclays may have not been
22  equal, that Barclays may have taken more than
23  what -- how do I explain it?  That there
24  actually may have been a loss on the sales,
25  really.

M. Korycki

1
2      Q.    That Barclays may have gotten $5
3   billion more of collateral than they were
4   supposed to?
5      A.    That may.  Again, I don't fully -- I
6   don't understand everything that was going on.
7   That may have been.
8      Q.    And do you understand Schedule A to be
9   referring to the collateral that was transferred
10  to Barclays in connection with the transaction?
11        MR. SHELLEY:  Objection.
12     A.    Again, this -- this is not my
13  specialty.  I just, I was taking notes on what
14  was going on in the meeting.
15     Q.    Are you aware of any other Schedule A
16  that this could be referring to?
17        MR. TAMBE:  Objection to the form of
18  the question.  Objection.  Asked and
19  answered.  You've asked her for her
20  recollection about that line four times.
21        MR. THOMAS:  Okay, you're -- just
22  state your objection.
23        MR. TAMBE:  I've stated my objection,
24  and she's answered that question any number
25  of times.

M. Korycki

1
2      A.    You're referring to the third line
3   down, "Schedule A"?
4      Q.    Yes.
5      A.    I don't -- I don't recall what that
6   refers to, no.
7      Q.    Further down, it says, "Bloomberg
8   number of transactions; covered 85 percent in
9   value."  Am I reading that correctly?
10     A.    Yes.
11     Q.    And what was the issue or significance
12  of that statement?
13     A.    I don't recall.
14     Q.    Do you recall anyone at any time
15  trying to identify the value of the repo
16  collateral through public sources such as
17  Bloomberg?
18     A.    I don't recall.
19     Q.    The next line, does that say, "Hard to
20  value.  Meeting -- mortgage-backed securities"?
21     A.    Yes.
22     Q.    And do you know what the issue was
23  being discussed with respect to that?
24     A.    I don't remember.
25     Q.    The next line down says "52.4

M. Korycki

1
2   billion."  Do you know what that number refers
3   to?
4      A.    I don't remember.
5      Q.    And below it, it says, in parentheses,
6   "5," then "billion."  Is that your way of
7   indicating subtraction, the parentheses, 5
8   billion?
9      A.    Yes.
10     Q.    And that adds up to -- totals $47.4
11  billion in collateral?
12     A.    That's what it says here, yes.
13     Q.    And is that the $5 billion difference
14  in valuation that's referred to earlier on in
15  the document?
16        MR. TAMBE:  Objection to the form of
17  the question.
18        MR. SHELLEY:  Objection.
19        MR. TAMBE:  Objection.  Misstates her
20  former testimony.  Objection.  It
21  mischaracterizes the document.
22     A.    Again, I was just -- I don't know if
23  the two are related.
24     Q.    No idea whether those two are related?
25     A.    No.

M. Korycki

1
2    Q.    Do you have any idea of why these
3  figures were being discussed at this meeting?
4    A.    No.
5       MR. MILLS:  Objection to the form.
6    A.    No.  Again, I was just -- I was just
7  taking notes.
8    Q.    You're an accountant with a decade of
9  background experience in this restructuring
10 field, correct?
11      MR. TAMBE:  Objection to the form of
12 the question.
13   A.    I'm a non-practicing accountant and
14 I've had years of experience, just this is a
15 different, different industry that I've never
16 dealt with before.
17   Q.    I understand, but you weren't a
18 secretary coming in just to take dictation.
19 This was part of a project and you were part of
20 a team working on these issues, correct?
21      MR. TAMBE:  Objection to the form.
22   A.    I was part of a team, yes.
23   Q.    And it's your testimony that, as you
24 sit here today, you have no idea what these
25 numbers in your notes refer to?

M. Korycki

1
2    A.    I know that they refer to the Barclays
3  transaction, but in -- what they all represent,
4  no.
5    Q.    Do you know what any of the numbers
6  that we've covered so far represent, just
7  generally?
8    A.    I don't, I don't remember what they --
9  no.
10   Q.    To the right of the 52.4 billion, it
11 says, "7 to 8 billion JPM inventory."  Am I
12 reading that correctly?
13   A.    Yes.
14   Q.    Do you know what that's referring to?
15   A.    I don't remember.
16   Q.    Below the 47.4 it says question mark,
17 "45 or 45.5," arrow, "assumed liability."  Am I
18 reading that correctly?
19   A.    Yes.
20   Q.    What is that referring to?
21   A.    Again, I don't -- I don't remember.
22 It may have been that those were the liabilities
23 that were assumed, but I don't remember.
24   Q.    Assumed by Barclays?
25   A.    Assumed by Barclays, yes.

M. Korycki

1
2    Q.    Do you remember there being any issue
3  as to whether it was 45 or 45.5?
4    A.    I don't remember if it was that I
5  misheard the number or if that was an issue.
6    Q.    The next line says "38 billion."  Is
7  that correct?
8    A.    Correct.
9    Q.    What is -- what is the significance of
10 that number?
11   A.    I don't remember.
12   Q.    Is it the 45 billion simply less the
13 $7 billion that became entangled in an issue
14 with JPM?
15      MR. TAMBE:  Objection to the form.
16   A.    I don't remember.  It's just -- it's
17 just a number I wrote down there.  I don't
18 recall.
19   Q.    To the right it appears to say, "Set
20 up hearing for," and then I can't read that.
21 What does the rest say?
22   A.    "19th."
23   Q.    Then an arrow pointing down to the
24 17th.  And then it says, "Approved hearing for
25 Barclays transaction 2 P.M. to 2 A.M."  Am I

M. Korycki

1
2  reading that correctly?
3    A.    That is correct, yes.
4    Q.    And what was the issue being discussed
5  there?
6    A.    I don't recall exactly.  I -- I
7  believe that the "2 P.M. to 2 A.M." was how long
8  the hearing took, but, again, I don't recall
9  exactly.
10   Q.    So this is referring to the September
11 17 and 19, 2008, correct?
12   A.    Correct.
13   Q.    And generally, it's describing or
14 referring to the bankruptcy court hearings that
15 led to the approval of the Barclays transaction?
16      MR. TAMBE:  Objection to the form.
17   A.    Can you repeat that question?
18   Q.    Sure.  Generally, it's describing the
19 bankruptcy court hearings that led to or were
20 connected with the approval of the Barclays
21 transaction?
22      MR. TAMBE:  Same objection.
23   A.    It's not describing them.  It's -- I'm
24 just writing down that the hearing on the 19 --
25 I believe the 19th took from 2 P.M. to 2 A.M.

M. Korycki

1
2      Q.   It's referring to those hearings, the
3   bankruptcy court hearings in the Barclays
4   transaction?
5      A.   I believe so, yes.  Let me -- when I
6   say the 17th, I don't know exactly what that
7   note means, but ...
8      Q.   And then below that, there's the 22nd.
9   Do you know what the significance of the 22nd
10  is?
11     A.   I don't remember.
12     Q.   Going back over to the left column,
13  does that say, "Give more collateral but saying
14  taking on more risk, 1.9 billion"?
15     A.   That's what it says.
16     Q.   Or does it say, should that be read,
17  "Give 1.9 billion," and then underneath that,
18  "More collateral, but saying taking on more
19  risk"?
20     A.   I don't -- I don't know exactly.  I
21  don't remember what it -- what it was supposed
22  to mean.
23     Q.   Do you recall there being a discussion
24  of having given Barclays an additional $1.9
25  billion in connection with more risk that

M. Korycki

1
2   Barclays took on?
3         MR. TAMBE:  Objection to the form of
4   the question.
5      A.   I don't remember.
6      Q.   Do you recall any discussion at all
7   about $1.9 billion in this hearing -- in this
8   meeting?
9      A.   No, I don't.
10     Q.   Do you know what the 1.9 billion
11  refers to?
12     A.   I don't, no.
13     Q.   To the right, does that say, "2 or 3
14  billion severance"?
15     A.   Yes.
16     Q.   Then below that, does that say "2 or 3
17  billion rejection and avoidance"?
18     A.   Yes.
19     Q.   And under the box to the right, can
20  you read your writing there, please?
21     A.   "Hands on transcripts.  Various
22  hearings held.  Barclays investigation."
23     Q.   And what is that referring to, the
24  "Barclays investigation"?
25         MR. TAMBE:  I caution you not to

M. Korycki

1
2   disclose any conversations you've had either
3   internally at Lehman/A&M or with Lehman's
4   counsel about an investigation into
5   Barclays.  But if you can otherwise answer
6   that question, go ahead.
7      A.   I don't remember what it was referring
8   to.
9      Q.   Was there an investigation into the
10  Barclays transaction ongoing at this time, to
11  your knowledge?
12     A.   Not to my knowledge.
13     Q.   Was there discussion at this hearing
14  of investigating any part of the Barclays
15  transaction?
16     A.   Can you repeat your question?
17     Q.   Was there discussion at this meeting
18  of investigating any part of the Barclays
19  transaction?
20     A.   I don't remember.
21     Q.   Going back to the left side, does that
22  say "Mike Fazio" in the left column?
23     A.   Yes.
24     Q.   Is that to indicate that he's speaking
25  and what you wrote down to the right?

M. Korycki

1
2      A.   If I recall correctly, yes.
3      Q.   And do your notes say, "FMV" -- does
4   that mean fair market value?
5      A.   Yes.
6      Q.   -- "collateral and liabilities
7   assumed.  Believes we should get back -- we
8   should get 5.5 billion back"; did I read that
9   correctly?
10     A.   Yes.
11     Q.   Do you recall Mr. Fazio stating a
12  belief to the effect that he believes the estate
13  should get back $5.5 billion?
14     A.   That's what my notes say.  I don't
15  recall the meeting.
16     Q.   And that belief was based upon an
17  issue concerning the fair market value of the
18  collateral?
19         MR. TAMBE:  Objection to the form.
20  Lack of foundation.
21         What belief?  What belief?
22         MR. THOMAS:  Come on, counsel.  It was
23  expressly referenced in the prior question.
24  Mr. Fazio's belief.
25         MR. TAMBE:  Be clear about it.  Do you

Page 38

M. Korycki

1
2  want to play games with the witness here?
3      MR. THOMAS:  You're making speaking
4  objection, which you always do.
5      MR. TAMBE:  No, I'm talking about
6  fair, your questioning as fair.
7      MR. THOMAS:  The federal rules require
8  you simply to state your objection:
9  "Objection to form."  If you want to go,
10 "Objection to form, foundation," fine.
11 Anything beyond that is trying to coach the
12 witness in the middle of a deposition.
13     MR. TAMBE:  I'm not coaching the
14 witness.  I'm trying to keep your
15 questioning fair.  I would say on several
16 occasions this morning your questioning has
17 been unfair and demeaning to the witness.
18     Carry on.
19     MR. THOMAS:  If you think it's unfair,
20 then you can preserve your objection and
21 bring it up later, but that's not how this
22 process works when you're giving speaking
23 objections to coach the witness.
24     MR. TAMBE:  So you're going to persist
25 on being unfair?

Page 39

M. Korycki

1
2      MR. THOMAS:  Counsel, please just
3  follow the rules.
4      MR. TAMBE:  After you.
5      Q.  The basis of Mr. Fazio's belief,
6  stated belief, that the estate should get back
7  $5.5 billion had something to do with the fair
8  market value of the collateral and the
9  liabilities assumed?
10     MR. TAMBE:  Objection to form.  Lack
11 of foundation.
12     MR. SHELLEY:  Objection to form.
13     A.  It's something that was mentioned at
14 the meeting I took notes on.  I don't know.
15     Q.  What did you do to prepare for today's
16 deposition?
17     A.  I had a meeting with -- with Jay.
18     Q.  Is that your counsel?
19     A.  Counsel, yes.
20     Q.  Okay.  Did you speak with anyone else
21 about the deposition?
22     A.  Just scheduling.  Tom Hummel and Phil
23 Kruse around just scheduling for the deposition.
24     Q.  Anything other than scheduling with
25 anyone other than counsel?

Page 40

M. Korycki

1
2      A.  No.
3      Q.  How much time did you spend with
4  counsel preparing for the deposition?
5      A.  About two hours.
6      Q.  And below the reference to getting
7  back $5.5 billion, could you please read your
8  notes below that?
9      A.  "Jim Sirris said hard to value.  Who
10 else was involved?  Pricing of securities?"
11     Q.  And who is Jim Sirris?
12     A.  I don't recall.  I believe he's with
13 FTI.
14     Q.  Do you recall there being a discussion
15 at this meeting about how it was hard to value
16 the securities?
17     A.  That's what my notes say.  I don't --
18 I don't remember.
19     Q.  So other than what your notes say, do
20 you remember anything about this meeting?
21     A.  No.
22     Q.  Back up just underneath the box to the
23 top right, it says, "52.4," and then I can't
24 read what's between that and "85 percent."  Can
25 you read that?

Page 41

M. Korycki

1
2  "Billion."  Does that say, "52.4
3  billion 85 percent of 52.4 billion"?
4      A.  That's what it says, yes.
5      Q.  Is that referring to a statement by
6  someone that 85 percent of the repo collateral
7  was covered by Bloomberg numbers?
8  Strike that.  Does that refresh your
9  recollection at all on the reference to the left
10 of that concerning, "Bloomberg number of
11 transactions covered.  85 percent in value"?
12     MR. TAMBE:  Objection to the form of
13 the question.
14     A.  I don't remember what that was
15 referring to.
16     Q.  Let's go ahead and take a look at your
17 other set of notes, please.
18     MR. TAMBE:  563B.
19     MR. THOMAS:  563B.
20     Q.  And again, these are notes of a
21 meeting that you attended on September 29, 2008;
22 is that correct?
23     A.  Correct.
24     Q.  And can you tell me who was at that
25 meeting?

Page 42

M. Korycki

1
2      A.   Jim Fogarty, Rod Miller, David Coles,
3   and I have written down here Alex and Paolo.  I
4   believe they were there.
5      Q.   Rod Miller -- sorry.
6      A.   There were other people there.  I
7   don't recall everyone who was in that meeting,
8   though.
9      Q.   What organizations were the other
10   people from?
11      A.   The people that I did not mention?
12      Q.   Yes.
13      A.   They would have been A&M and I -- I
14   don't recall if there were any other Lehman
15   employees there.
16      Q.   And Rod Miller is from Weil Gotshal?
17      A.   Weil Gotshal, yes.
18      Q.   And the second line, does that say,
19   "Barclays agreement - Clarification Agreement,
20   addendum to APA"?
21      A.   Yes.
22      Q.   Have you ever seen the clarification
23   agreement?
24      A.   Yes.
25      Q.   And have you had a chance to read that

Page 43

M. Korycki

1
2   document?
3      A.   I, at the time, I flipped through it.
4   I have not read it recently.
5      Q.   Okay.  What was the purpose of this
6   meeting on the 29th?
7      A.   I believe it was to get an
8   understanding of the Barclays transaction from
9   Alex and Paolo.
10      Q.   And do you recall if anyone else at
11   the meeting was taking notes?
12      A.   I don't remember.
13      Q.   Were you told to be the scrivener,
14   note-taker for this meeting?
15      A.   I wasn't told.  It was just something
16   that I ended up doing.
17      Q.   And you have no recollection of
18   whether anyone else in the room was taking
19   notes?
20      A.   We did have a flip board, someone was
21   writing on that, one of those things that stand
22   up.  Someone wrote on that for everyone to see,
23   but I don't recall if anyone else was taking
24   notes in the meeting, no.
25      Q.   Do you know if anything was done with

Page 44

M. Korycki

1
2   the flip board?  Was that -- that information
3   written on the flip board preserved in any way?
4      A.   I have a copy of it, yes.
5      Q.   And can you describe what it is, the
6   document?  Like how many pages is it?  Is it a
7   PowerPoint or --
8      A.   It's a one-pager, and I have on 563B,
9   page 3, the top half of the page with the boxes,
10   it looks somewhat -- I pretty much -- it's
11   pretty much what's right there.
12      Q.   Okay.  When you say you have it, you
13   have it on a, what, separate piece of paper
14   somewhere?
15      A.   Right.  It's about -- it's one of
16   those pages that are this big, so ...
17      Q.   Okay.  And how was that -- was that
18   used as just a graphic during the meeting?
19      A.   It was just to lay out what was being
20   spoken at the meeting to try to put a diagram so
21   everyone can see and understand.
22      Q.   Was it prepared before the meeting or
23   was it prepared as the meeting went along?
24      A.   As the meeting went along.
25      Q.   And who actually wrote on it, prepared

Page 45

M. Korycki

1
2   it?
3      A.   Al Lakhani was writing.  He's from
4   Alvarez & Marsal.
5      Q.   And it's just one page, one sheet?
6      A.   Yes.
7         MR. TAMBE:  You guys have it.
8      Q.   Prior to this meeting, had you had any
9   communications or been involved in any meetings
10   or phone calls with any of the Lehman executives
11   or ex-Lehman executives?
12      A.   No.
13      Q.   On the first page of your notes, about
14   five or six lines down, does that say, "Repo
15   sell to -- sell to you securities.  Agree to buy
16   back."  And then "sent 44 billion"; am I reading
17   that correctly?  Something after -- what is
18   before "44 billion"?
19      A.   It says "S.E.C."
20      Q.   Okay.  Does that say "sent S.E.C. 44
21   billion"?
22      A.   That's what it says.
23      Q.   And then the "to B," is that "to
24   Barclays"?
25         MR. TAMBE:  Object to the form of the

Page 46

M. Korycki

1
2  question.
3      A.   I don't recall what "B" meant.
4      Q.   Okay.  Do you recall what "H" meant?
5      A.   No.
6      Q.   The -- then it says, "DTC 074, 900
7  plus 300 equals 1.2 billion."  Do you recall
8  what that's referring to?
9      A.   DTC 074 is a file that I had received.
10      Q.   Okay.  And that's a -- is that a file
11  containing certain securities that were to be
12  transferred as -- to Barclays as part of the
13  transaction?
14          MR. TAMBE:  Objection to the form of
15      the question.
16      A.   It's a file I believe that contains
17  securities.  Whether it was supposed to be
18  transferred to Barclays or not, I don't know.
19      Q.   You don't -- you have no idea whether
20  that was supposed to be transferred to Barclays?
21      A.   No.
22      Q.   Do you understand that to be a file
23  associated with securities that were in Lehman's
24  clearing box?
25      A.   I don't know if they were in the

Page 47

M. Korycki

1
2  clearing box.
3      Q.   Could you please give me your general
4  understanding of the sale transaction in terms
5  of assets and liabilities transferred as part of
6  the transaction?
7      A.   I know that --
8          MR. SHELLEY:  Objection to the form of
9      the question.
10      A.   Can you just ask that again?  I don't
11  know exactly what you're asking.
12      Q.   Can you just, as you understand the
13  sale transaction, can you describe just
14  generally at a high level what assets and
15  liabilities were conveyed to Barclays as part of
16  the transaction?
17          MR. SHELLEY:  Same objection.
18      A.   As I stated previously, I wasn't
19  involved in the whole transaction that happened.
20      Q.   Okay.  But can you nonetheless give me
21  your understanding of the transaction?
22      A.   I understand that assets and
23  liabilities went over.
24      Q.   Wasn't it an important part of
25  Alvarez's work, as I think we discussed earlier,

Page 48

M. Korycki

1
2  to understand what assets and liabilities were
3  transferred over to Barclays and what remained
4  with Lehman?
5      A.   Yes.
6      Q.   So don't you have to have an
7  understanding of what was transferred over as
8  part of the transaction in order to have an
9  understanding of what assets and liabilities
10  Lehman still had?
11          MR. TAMBE:  Objection to the form of
12      the question.
13      A.   Could you ask your question again?
14      Q.   Sure.  In order to understand what
15  assets and liabilities Lehman still had, it's
16  important to understand what assets and
17  liabilities were conveyed to Barclays as part of
18  the transaction, correct?
19          MR. TAMBE:  Objection to the form.
20      A.   It was important to understand, yes.
21      Q.   So what was your understanding, based
22  upon your work in connection with Lehman the
23  past year and a half, of the assets and
24  liabilities that were transferred over to
25  Barclays as part of the sale transaction?

Page 49

M. Korycki

1
2          MR. SHELLEY:  Objection to the form of
3      the question.
4      A.   There was a lot going on.  I was
5  taking a lot of notes and working under MDs.  I
6  don't recall everything that was going on,
7  though.
8      Q.   That's not my question.  I'm just
9  asking for your general understanding, in part
10  just so I can know how to refer to certain
11  assets and liabilities for further questioning.
12          So what was your general
13  understanding -- did you understand, for
14  example, that there was repo collateral that was
15  supposed to be transferred to Barclays?
16      A.   I heard the terminology.  I didn't
17  understand what it was -- what it meant at the
18  time.
19      Q.   And another group of assets were
20  clearance box assets?
21      A.   Again, I heard the terminology.  I
22  didn't understand what it meant.
23      Q.   Another group was the 15c3 securities
24  or similar securities?
25          MR. SHELLEY:  Objection to the form of

M. Korycki

1
2  the question.
3       MR. TAMBE:  Is that a question?
4     A.  I don't recall off the top of my head
5  that term.
6     Q.  Okay.  Continuing with your notes, the
7  next line says, "Friday transfers BONY records
8  agreed."  Am I reading that correctly?
9     A.  Yes.
10    Q.  Then the next line says, "Monday file
11 to go."  Am I reading that correctly?
12    A.  Yes.
13    Q.  And the "FN" over to the side, what
14 does that mean?
15    A.  Footnote.
16    Q.  Okay.  What is that referring to?  Why
17 did you write "FN"?
18    A.  I don't remember.
19    Q.  Does that relate to a footnote,
20 financial disclosure?
21       MR. TAMBE:  Objection to the form of
22 the question.
23    A.  Again, it says "FN" for footnote.  I
24 don't remember what it means, what it was there
25 for.

M. Korycki

1
2     Q.  Then it says, "Lead sheet Barclays."
3  Does that say, "Lead sheet Barclays collateral."
4     A.  I believe that's what it says, yes.
5     Q.  And what is a lead sheet?
6     A.  I believe that refers to another
7  document I put together.  It was referring to
8  the top sheet of that document.
9     Q.  What did you use to put that document
10 together?  What was the basis of that document,
11 the other document?
12    A.  The basis of what document are you
13 referring to?
14    Q.  The lead sheet that you just referred
15 to.
16    A.  So I received files and just basically
17 put together a summary of the totals from those
18 files.
19    Q.  I'm going to go ahead and give you a
20 couple more documents.  We're going to stay on
21 your notes for a while, but just in case it's
22 helpful to refer to these other ones.
23       Let me show you a document previously
24 marked as 564B.  Do you recognize that document?
25    A.  Yes.

M. Korycki

1
2     Q.  Would you describe what it is, please?
3     A.  It's a lead sheet that basically has a
4  description of types of securities on the left,
5  and the amounts on the right are just linked to
6  the totals from supporting files.
7     Q.  And when did you prepare this
8  document?
9       MR. SHELLEY:  Object to the form.
10    A.  I don't recall the date.
11    Q.  Did you prepare this document?
12    A.  You're referring to 564B?
13    Q.  Yes.
14    A.  I did prepare it, yes.
15    Q.  Okay.  Is that your handwriting on it?
16    A.  Yes.
17    Q.  Now, there's a reference in the 529
18 notes to lead sheet.  Do you believe the lead
19 sheet was in existence when you wrote that in
20 your notes and you're referring to it, or was
21 that a note to go in the future and create a
22 lead sheet?
23    A.  You're referring to the 56 --
24    Q.  564B, yes.  In your notes --
25    A.  What notes are you referring to?

M. Korycki

1
2     Q.  Of the 9/29 meeting.
3       MR. TAMBE:  563B.
4     A.  It says, "Lead sheet Barclays
5  collateral."  That lead sheet -- I don't know if
6  this was the same exact one, but, yes, I did
7  have a lead sheet prepared at that time.
8     Q.  So at the time of your 5/29 meeting
9  notes, you had some lead sheet prepared and
10 that's what your reference in your notes to lead
11 sheet is to?
12    A.  Yes.  Again, I don't remember if it's
13 the same exact one, though.
14    Q.  I understand.
15    Q.  Okay.  Going back to your notes,
16 Exhibit 563B, the next to the "44, Barclays
17 collateral," you see there's a 28. something and
18 a 58.4?
19    A.  Yes.
20    Q.  Is it your understanding that they
21 were settled, or the total of 44 marked
22 collateral was settled some through the DTC and
23 some through the Fed?
24       MR. TAMBE:  Object to the form of the
25 question.

M. Korycki

1
2    A.   Again, you say "understanding."  I was
3  just putting this lead sheet together.  I didn't
4  have an understanding of what the numbers
5  actually meant.
6    Q.   Is it fair to assume that someone at
7  the meeting didn't just say the numbers, they
8  would have explained what the numbers meant and
9  why they were saying them?
10    A.   The files had "Fed settled" and "DTC
11  settled" on them.  I don't -- other than what
12  they said on the files, that's all I knew.
13    Q.   Okay.  The -- but when you write it
14  down, the distinction between the two is
15  referring to the "Fed settled" and the "DTC
16  settled," right?
17        MR. TAMBE:  Object to the form.
18    A.   I'm referring to -- can you just be a
19  little more clear?  Referring to the two what?
20    Q.   When you have 44 and then you have the
21  28. something and 54.4 something, are you saying
22  that you had two separate files that you had
23  the Fed settled and the DTC and that those add
24  up to the 44?
25    A.   I had two files that add -- one tied

M. Korycki

1
2  to the 28 and one tied to the 15.
3    Q.   Okay.  So the "44" is adding those up?
4    A.   Yes.
5    Q.   Underneath that you have -- is that
6  "unencumbered"?
7    A.   I can't -- can't make out my own
8  handwriting.
9    Q.   Do you understand that to be referring
10  to the unencumbered assets?
11        MR. TAMBE:  Objection to the form.
12    A.   Again, I -- I can't make out what it
13  says.
14    Q.   Are you familiar with the term
15  "unencumbered" in this connection with respect
16  to assets?
17    A.   No.
18    Q.   Next to that it says the "1.3."  I
19  assume that's 1.3 billion; is that right?
20    A.   It would be 1.3 billion, yes.
21    Q.   Okay.  And then there's "1.0 billion"?
22    A.   Yes.
23    Q.   Does the "1.0 billion" relate back to
24  the "Friday transfers BoNY records agreed"?
25        MR. TAMBE:  Objection to the form of

M. Korycki

1
2  the question.
3    A.   I don't recall what it was referring
4  to.
5    Q.   You seem to have underneath -- above
6  the lead sheet reference, you have the 074 file
7  of about 1.2 billion, you have the "Friday
8  transfers," and then you have "Monday file to
9  go."
10        Is that breaking out the clearance box
11  assets basically into three tranches?
12        MR. TAMBE:  Objection to the form of
13  the question.
14    A.   Again, I don't -- I don't know if they
15  were related to the clearing box.  They were
16  just files that I was being sent to try to put
17  together some summary for people to understand.
18    Q.   Okay.  In any event, you have three
19  files or groups of securities there, and then
20  underneath you have the numbers 1.3 and then
21  1.0, and then you have a blank, which would seem
22  to relate to the "Monday file to go," which
23  hasn't gone yet.
24        Is it your understanding that those
25  numbers are referring to the three numbers,

M. Korycki

1
2  including the bank, are referring up above to
3  the three files or groups of securities?
4        MR. TAMBE:  Object to the form of the
5  question.
6    A.   No, that's not -- no.
7    Q.   It's not?
8    A.   No.
9    Q.   Do you have a different understanding?
10    A.   Yes.
11    Q.   What is your understanding?
12    A.   The "Monday file to go," I don't
13  recall exactly.  It may have been I was getting
14  a revised file.  I don't -- it's not -- it's
15  not -- the three don't relate to the three
16  below.
17    Q.   Do you have any idea what the numbers
18  below relate to then?
19        MR. TAMBE:  Which numbers?
20    Q.   The 1.3 and the 1.0 and the blank?
21        MR. SHELLEY:  Objection to the form of
22  the question.
23    A.   I don't recall.  I just --
24    Q.   Down below that it says "sort
25  subtotals" and is that "muni, CS"?  Am I reading

Page 58

M. Korycki

1
2   that right?
3       A.   Yes.
4       Q.   What are "muni" and "CS"?
5       A.   I believe they were just examples of
6   what was in the file.
7       Q.   Which file is that?
8       A.   I don't recall exactly which file it
9   was referring to.
10      Q.   Do you recall why it was wanted or
11  needed to sort the subtotals?
12      A.   No.
13      Q.   And it has Roman numeral III,
14  "Exhibits Detailed File."  Do you know what
15  that's referring to?
16      A.   The lead sheet had some exhibits.  I
17  believe that's what it was referring to.
18      Q.   And then below in the left-hand column
19  it says "Richard."  And who is that referring
20  to?
21      A.   This is something else that I had to
22  take care of.  It has nothing to do with
23  Barclays transaction.
24      Q.   To the far right column it says, "Get
25  approval to" something "puts."  Am I reading

Page 59

M. Korycki

1
2   that right?
3       A.   "Make payments."
4       Q.   "Make payments."  Is that payments to
5   employees?
6       A.   This has nothing to do with the
7   Barclays transaction.  This was something else
8   on my to-do list at the time.
9       Q.   Turning the page, it says, "Rod Miller
10  and Alex Kirk."  Is that to indicate that that's
11  who's talking now?
12      A.   I don't recall.
13      Q.   Does that say, "Wednesday night Fed
14  lent 45 billion through Chase tri-party repo.
15  Couldn't finance position"?
16      A.   That's what it says.
17      Q.   Okay.  Do you have an understanding
18  what that means, "couldn't finance position,"
19  what that's referring to?
20      A.   No, I don't.
21      Q.   "Thursday told Barclays we want to
22  take us out of lending facility."  Do you recall
23  there being discussion to the effect that the
24  Fed told Barclays they wanted Barclays to take
25  the Fed out of the lending facility?

Page 60

M. Korycki

1
2       A.   I -- I don't remember any discussions
3   on that.
4       Q.   You don't remember any discussions at
5   this meeting at all?
6       A.   To restate, there was a lot going on.
7   I was pulled in a lot of different directions.
8   I was taking notes at the -- at this meeting.
9       Q.   So does that mean you don't remember
10  any discussions at all at this meeting?
11      A.   I -- I don't, no.
12      Q.   And your notes don't refresh your
13  recollection in any way about the issues we've
14  discussed so far?
15      A.   No.  Again, no, there was -- there was
16  a lot going on those early days.
17      Q.   Next line is "62 to 65 billion BS."
18  Is that balance sheet?
19      A.   That is balance sheet, yes.
20      Q.   And what is that referring to?
21      A.   I don't remember.
22      Q.   Were you involved in any of Alvarez's
23  efforts to create a post-sale transaction
24  balance sheet?
25      A.   Yes.

Page 61

M. Korycki

1
2       Q.   What was the nature of your
3   involvement in that effort?
4       A.   I was prepared -- basically just
5   typing it up in Excel.
6       Q.   So you didn't do any substantive work,
7   you just typed up information given to you by
8   others in Excel?
9       A.   That is correct.
10      Q.   Were you privy to any of the
11  substantive work, discussions about the balance
12  sheet, communications, issues?
13          MR. TAMBE:  Objection to form.
14      A.   Could you repeat that question?
15      Q.   Let's move on.  "Barclays" -- next
16  line says, "Barclays gave to JPM 45 billion
17  cash"; am I reading that correctly?
18      A.   Yes.
19      Q.   "Got off collateral at Fed."  Did I
20  read that correctly?
21      A.   Yes.
22      Q.   Do you recall generally that that's
23  how this was supposed to work, that Barclays was
24  supposed to step into the Fed's place
25  essentially and get the Fed repo collateral so

Page 62

M. Korycki

1  the Fed could get out of this?
2  the Fed could get out of this?
3      MR. TAMBE:  Object to the form of the
4  question.
5      A.   Again, I don't know exactly everything
6  that was supposed to happen. I --
7      Q.   I understand that, but based upon your
8  year and a half of work on the Lehman project,
9  is that your general understanding?
10      MR. TAMBE:  Object to the form of the
11  question.
12      A.   Can you repeat your question again?
13      Q.   Sure. Was it your general
14  understanding that the Fed asked Barclays to
15  come in in your place at -- on the repo
16  collateral it had -- repo transaction it had
17  with Lehman and that Barclays was supposed to
18  put up the 45 billion and, in return for that,
19  get the Fed repo collateral?
20      MR. SHELLEY:  Object to the form.
21      A.   Again, you say "understanding." I
22  didn't have -- I didn't have an understanding at
23  the time. It was -- I was really pulled --
24  doing -- putting together Excel schedules and
25  reformatting stuff for people to understand it.

Page 63

M. Korycki

1
2      Q.   So, as you sit here today, you had no
3  idea that the Fed asked Barclays to come in and
4  take it out of the repo?
5      A.   I wasn't privy to any -- I wasn't
6  privy to those conversations.
7      Q.   Didn't -- different question. I'm
8  asking if you had that general understanding.
9      MR. SHELLEY:  Objection to form.
10      A.   You keep referring to "understanding."
11  I --
12      Q.   That's because I want to get your
13  understanding. That's what I'm asking for. I
14  understand you can put caveats into your
15  question like it was busy, I was just taking
16  notes and things like that, but I'm asking for
17  your understanding.
18      Was it your understanding -- is it
19  your understanding that the Fed came in, asked
20  Barclays to take it out of the repo that the Fed
21  had with Lehman?
22      MR. TAMBE:  Object to the form. Asked
23  and answered. Argumentative.
24      MR. MILLS:  Objection to the form.
25      MR. SHELLEY:  Objection.

Page 64

M. Korycki

1
2      A.   Again, I don't have an understanding
3  of everything that happened. I was just putting
4  together and reformatting files that I was given
5  to be presentable.
6      Q.   Do you have any understanding
7  whatsoever with respect to whether the Fed asked
8  Barclays to come in and replace it on the repo?
9      A.   No.
10      Q.   And you have no recollection of that
11  from this meeting or from reading your notes?
12      A.   No.
13      Q.   The next line, am I reading that
14  correctly, "$45 billion purchases consideration
15  by Barclays on Thursday morning through JPM on
16  repo contract on all assets funded by Fed"?
17      MR. TAMBE:  Objection to form.
18      A.   Can you ask your question again?
19      Q.   Sure. I'm just asking if I read that
20  correctly. "$45 billion purchases by Barclays."
21  Above that it says "consideration," "on Thursday
22  morning through JPM on repo contract on all
23  assets funded by Fed"?
24      A.   You're asking me if you read it
25  correctly. That is what the notes read.

Page 65

M. Korycki

1
2      Q.   Do you have any understanding of what
3  that's referring to?
4      A.   I don't remember, no.
5      Q.   Below there's a $7 billion figure and
6  a $38 billion figure. What is your
7  understanding of why the $45 is broken out into
8  7 billion and 38 billion, respectively?
9      MR. TAMBE:  Objection to form.
10      A.   Again, your question refers to
11  understanding. I don't have an understanding
12  of --
13      Q.   Let me just make sure I've got your
14  testimony correct. You have no idea what the $7
15  billion refers to or the $38 billion refers to
16  or why the 45 is broken out that way?
17      MR. TAMBE:  Objection.
18      MR. SHELLEY:  Objection.
19      MR. MILLS:  Objection.
20      A.   I don't have an understanding of why
21  it's broken out that way.
22      Q.   On the left, you have a note to Lori
23  Fife. And is that her phone number above it?
24      MR. TAMBE:  Object to form.
25      Q.   Excuse me. You have a note

Page 70

M. Korycki

1
2    Q.   So you now recall differently at the
3  meeting.  You testified previously you don't
4  recall whether anyone did not answer any
5  questions.  Do you now recall someone at the
6  meeting not answering a question?
7    A.   You asked if everyone was cooperative,
8  and I believe I said somewhat.  I would say
9  not -- not that cooperative.
10    Q.   Let's talk about the meeting.  Were
11  they cooperative in answering all of A&M's
12  questions at the meeting?
13        MR. TAMBE:  Object to the form of the
14  question.
15    A.   You say "all the questions."  I -- not
16  all the questions.
17    Q.   What question wasn't answered?
18    A.   I don't remember exactly what
19  questions were not answered.
20    Q.   But do you remember that there was a
21  question unanswered after the break?
22    A.   I don't --
23        MR. TAMBE:  Todd, do you want to ask
24  the witness whether she conferred with me
25  about the testimony?  Go ahead and ask her

Page 71

M. Korycki

1
2  that.  Don't make insinuations and don't
3  suggest that there was anything said to this
4  witness about the substance of the
5  testimony.  There was no discussion between
6  the two of us at the break.  So I resent
7  that, and that's unfair, and that's the kind
8  of unfair stuff that I do object to.
9        MR. THOMAS:  Through?
10        MR. TAMBE:  Yes, I'm through.
11    A.   We did -- we did not have any
12  conversation related.
13    Q.   My question was, do you now recall
14  that there were questions at this meeting that
15  you attended and had taken notes on that were
16  not answered?
17    A.   I don't recall any specific questions.
18    Q.   So as you sit here today you can't
19  identify any questions that were not answered at
20  the meeting?
21    A.   Again, no specific questions.
22    Q.   Now, turning back to A&M 4889, let me
23  just ask, do you recall generally the
24  questions -- do you now recall generally the
25  questions weren't answered but you just can't

Page 72

M. Korycki

1
2  recall the content, or do you know whether there
3  were any questions not answered at this meeting?
4        MR. TAMBE:  Object to the form of the
5  question.
6    A.   It was -- it was a tough meeting.  It
7  was a tough meeting.  There was -- I don't
8  recall any specific questions that were not
9  answered.
10    Q.   Why was it a tough meeting?
11    A.   I rephrase "tough meeting."  There was
12  just a lot going on at the time.
13    Q.   I mean, Alvarez at this point had
14  really stepped into the shoes of Lehman,
15  correct?
16        MR. TAMBE:  Objection to the form of
17  the question.
18    A.   Alvarez came in as advisor, the
19  advisors.
20    Q.   And then Alvarez people took prominent
21  positions at Lehman, such as David Coles became
22  the CFO and Mr. Marsal became First Chief
23  Restructuring Officer and then CEO, correct?
24    A.   Those titles are -- are correct, yes.
25    Q.   And Weil Gotshal is Lehman's counsel,

Page 73

M. Korycki

1
2  correct?
3    A.   That is correct.
4    Q.   At any point in time was Weil Gotshal
5  ever not cooperative in providing information to
6  Lehman or Alvarez?
7        MR. SHELLEY:  Objection to form.
8    A.   Not to my knowledge.
9    Q.   Going back to your notes, AM4889, can
10  you please describe the chart at the top of the
11  page that you said you took down and that was
12  used at the meeting and that you still have a
13  copy of, I think a flip sheet is what you called
14  it?
15        MR. TAMBE:  Objection to the form of
16  the question.
17    A.   Do you want me to read what's --
18    Q.   No.  Can you just give a general
19  description of what it shows?
20    A.   Again, I don't have a full
21  understanding.  I was just taking notes of what
22  was on the flip board at the time.
23    Q.   Is your testimony that you have no
24  idea what the flip board and the notes
25  represent?

Page 74

M. Korycki

1
2      A.   I don't have an understanding, yes.
3      Q.   Do you know why they wrote this up on
4   the flip board during your meeting?
5      A.   Yes.
6      Q.   Why?
7      A.   To get an understanding of the
8   transaction, transactions.
9      Q.   At the top of the page, does that say,
10  "JPM liquidated collateral 8.5 and gave 7
11  billion cash"?  Am I reading that correctly?
12     A.   That -- that's what it says.
13     Q.   And below it says, "JPM, 7 billion --
14  7 billion cash put in account for benefit of
15  Barclays"?
16     A.   That's what it says.
17     Q.   Does this refresh your recollection as
18  to the issue with $7 billion of the $45 billion
19  that Barclays gave the collateral associated
20  with that amount not coming back to Barclays?
21        MR. TAMBE:  Object to the form.
22     A.   Again, I know there was an issue.  I
23  don't have an understanding of ...
24     Q.   Below the box it says -- there's an
25  arrow and it says, "$5 billion collateral.  JPM

Page 75

M. Korycki

1
2   gives LBHI loan."  Am I reading that correctly?
3      A.   That's what it says.
4      Q.   What is the reference to the $5
5   billion collateral?
6      A.   I don't know what it's -- I don't
7   know.  I just wrote it down.
8      Q.   And then below it says "15.8 billion
9   revolver."  Does that refer to a revolving loan
10  that JPM gave to Lehman?
11     A.   I don't know.
12     Q.   In the box next to "Barclays," does
13  that say "38 billion collateral," and then a
14  line, "7 billion cash"?
15     A.   That's what it says.
16     Q.   Do you know what that represents, that
17  division?
18     A.   No, I don't.
19     Q.   Below that it says, "Sunday Barclays
20  talk to JPM, resolve 7 billion cash.  8.4
21  billion securities worth half amount (Barclays 7
22  billion of JPM collateral unresolved.  Will work
23  out over time.)  Did I read that correctly?
24     A.   That's what it says.
25     Q.   And do you have any understanding

Page 76

M. Korycki

1
2   whatsoever of what is being described here, the
3   issue being described?
4      A.   No, I don't.
5      Q.   Where it says "8.4 billion of
6   securities," do you understand that to be Lehman
7   securities that were or were supposed to be part
8   of the repo collateral?
9         MR. TAMBE:  Object to the form of the
10  question.
11     A.   Again, I don't have an understanding.
12  I don't -- I don't know.
13     Q.   Do you have an understanding that
14  they're referring to Lehman securities?
15     A.   I don't know if they were referring to
16  Lehman securities.
17     Q.   In this arrangement being discussed,
18  was anybody else providing securities?
19        MR. TAMBE:  Objection to form.
20     A.   I don't -- I don't know.
21     Q.   Do you recall discussion at this
22  meeting about $8.4 billion worth of Lehman
23  securities being really worth half of that
24  amount?
25     A.   Again, I don't know that they were

Page 77

M. Korycki

1
2   Lehman securities.  I don't recall.
3      Q.   Do you recall any discussion about any
4   set of securities being worth half the mark --
5   the amount they were marked at?
6      A.   I don't recall discussions at the
7   meeting.
8      Q.   Below does that say, "Friday Barclays
9   pay 45 billion cash, only received 38 billion -
10  gap"?
11     A.   It says, "Friday B pay."  The rest
12  of -- the rest of what you read was right.
13     Q.   Do you understand "B" to be short for
14  "Barclays" when you write that "B"?
15     A.   I believe that's what it meant, yes.
16     Q.   Does that refresh your recollection
17  that there was a gap in terms of what Barclays
18  paid and what it actually got back?
19     A.   That's what it says.  I don't, again,
20  I don't recall.
21     Q.   No recollection of that gap?
22     A.   No.
23     Q.   Next line, does that say, "15c3
24  account has to come off table"?
25     A.   That's what it says.

M. Korycki

1
2     Q.   Do you recall discussion of the 15c3
3  account at this meeting?
4     A.   I don't recall.
5     Q.   Do you have any idea what that line is
6  referring to?
7     A.   I don't know.
8     Q.   Do you think you know?
9     A.   I don't. I don't know. It's just a
10  note that I took down.
11     Q.   Next line, "Sunday Unencumbered Box,"
12  with a B for Barclays written above it, "(don't
13  have control over this)"; did I read that
14  correctly?
15     A.   That is correct.
16     Q.   Do you have an understanding what the
17  issue is here?
18     A.   Again, I don't have an understanding,
19  no.
20     Q.   I just want to make sure, when I ask
21  if you have an understanding, it's if you have
22  any understanding at all, not just that whether
23  you know for certain. If you have some
24  understanding or you believe you might know or
25  you think something, please let me know when I

M. Korycki

1
2  ask if you have any understanding at all.
3     A.   Okay.
4     Q.   Does that instruction change any of
5  your prior answers?
6     A.   No, it doesn't.
7     Q.   Okay. The next line, "Sunday morning
8  UB 1.9 billion." I guess valued at -- strike
9  that. Start over. "Sunday morning UB valued at
10  1.9 billion." Am I reading that correctly?
11     A.   Yes.
12     Q.   And the "UB" would refer to the
13  unencumbered box on the line above?
14     A.   I don't want to make an assumption. I
15  don't -- I don't know what I was referring to
16  there.
17     Q.   Can you think of anything other that
18  you would be referring to when you write "UB"
19  underneath "unencumbered box"?
20        MR. TAMBE:  Object to form.
21     A.   Again, I don't -- I don't recall what
22  I was referring to there.
23     Q.   Do you recall that the -- being told
24  at or about this time by anyone that the value
25  of the assets in the unencumbered box to be

M. Korycki

1
2  transferred to Barclays were approximately 1.9
3  billion?
4        MR. MILLS:  Object to the form.
5     A.   I don't recall being told by anyone.
6     Q.   Do you recall that being the case?
7     A.   I don't recall.
8     Q.   Down below under "Barclays" it says
9  "Assets." Can you briefly describe what this
10  section of your notes is referring to?
11     A.   I believe they refer to the assets
12  that were transferred to Barclays.
13     Q.   And the first item is, "Repo assets
14  transferred on Thursday less," and then it says
15  "43.1 billion." Am I reading that correctly?
16     A.   Yes.
17     Q.   Do you know if there was something
18  that was supposed to come after the "less"
19  there?
20     A.   I don't remember.
21     Q.   We'll come back to that issue in
22  another document we'll look at.
23     A.   Okay.
24     Q.   So the 43.1 billion, is that -- do you
25  understand that to be the marked value of the

M. Korycki

1
2  repo assets that were transferred to Barclays on
3  or about that Thursday, September 18, 2008?
4        MR. TAMBE:  Objection to the form of
5  the question.
6     A.   Again, you say "understand." I don't
7  have an understanding of what that number was.
8     Q.   Did you ask a question at that meeting
9  about what it was?
10     A.   No, I didn't.
11     Q.   Did you understand at the meeting? Do
12  you think you understood at the meeting and just
13  don't recall today?
14     A.   I didn't understand at the meeting
15  what it was.
16     Q.   You recall that you didn't understand
17  at the meeting?
18     A.   I know I didn't understand, yes.
19     Q.   Why didn't you ask?
20     A.   I was going to follow up on it later.
21     Q.   Did you follow up on it later?
22     A.   No.
23     Q.   Why not?
24     A.   Just had a lot of other things on my
25  plate.

Page 82

M. Korycki

1
2    Q.    Did you have a sense of what other
3  people from Alvarez at the meeting understood
4  what that number -- what that figure was?
5        MR. TAMBE:  Objection to form.  Lack
6  of foundation.
7    A.    I don't know if anyone understood.
8    Q.    Have you ever heard of a Repurchase
9  Agreement before?
10    A.    No.
11    Q.    The -- did you ask what they were --
12  well, strike that.  Even as you sit here today
13  you don't know what a repo is?  You're not
14  familiar -- are you familiar with the term
15  "repo"?
16    A.    I'm not familiar with it, no.
17    Q.    On page 1 of your notes, do you see a
18  description of what a repo is in terms of
19  selling or transferring securities and agreeing
20  to buy back?
21    A.    Well, yeah.  Yes.  Yes.
22    Q.    So they -- people at this meeting
23  explained what a repo was, correct?
24    A.    It was obviously explained, yes.
25    Q.    So as you -- so at the time you would

Page 83

M. Korycki

1
2  have had some understanding of what a repo was,
3  correct?
4    A.    Yes.
5    Q.    Turning back to 4889, the second item
6  is "Unencumbered Box."  Did I read that
7  correctly?
8    A.    That is correct.
9    Q.    And then you have three groupings
10  there.  The first is, "Friday, 9/19:  1.035
11  billion."  Am I reading that correctly?
12    A.    Yes.
13    Q.    Then it says, arrow, "to move .6
14  billion."  Do you have any idea what that's
15  referring to, the last part, "to move .6
16  billion"?
17    A.    I don't recall.
18    Q.    And below in the second line says,
19  "Move yesterday B-3 box 636, 269,929,000."  Am I
20  interpreting that correctly?
21    A.    You read the first half of it right.
22  The 269 I -- I don't want to assume that it was
23  million.  I don't recall off the top of my head.
24    Q.    In any event, it's identifying a value
25  associated with the grouping in grouping number

Page 84

M. Korycki

1
2  2, correct?
3    A.    I believe so, yes.
4    Q.    And then the third grouping is, "B-1
5  and B-2 to move.  Takes time.  Have to ask DTC
6  to do."  Did I read that correctly?
7    A.    Yes.
8    Q.    And then the value there is 984,
9  whether that be millions or whatever.  It says
10  984; is that right?
11    A.    Yes.
12    Q.    And then down below you use the
13  mathematical symbol for "the sum of" 1, 2, 3
14  equals 2.3 less 0.6 equals 1.7 billion.  Did I
15  read that correctly?
16    A.    Yes.
17    Q.    So what was being described was, in
18  this meeting with Weil and Lehman officials
19  involved with negotiating the transaction, was
20  that, in addition to the repo collateral, other
21  assets would be transferred to Barclays include
22  these three groupings of unencumbered box
23  assets?
24        MR. SHELLEY:  Objection.  No
25  foundation.

Page 85

M. Korycki

1
2        MR. MILLS:  Objection.
3    A.    Again, these were notes that I took at
4  the meeting.  They were topics that came up at
5  the meeting.
6    Q.    Is that your -- but what I described,
7  is that your understanding of what this is and
8  what is reflected in your notes?
9        MR. TAMBE:  Objection to the form.
10  Asked and answered.
11    A.    Again, I don't have a full
12  understanding of all the notes that were taken.
13    Q.    But is that -- is that your general
14  understanding of what is being described here,
15  the assets that were conveyed to Barclays, and
16  there was various groups of assets and those
17  were being described at the meeting?
18        MR. TAMBE:  Objection to form.
19        MR. MILLS:  Objection.
20        MR. SHELLEY:  Objection.  Asked and
21  answered.
22    A.    I think I covered this previously,
23  that I believed these were assets that went over
24  to Barclays.
25    Q.    As part of the sale transaction?

M. Korycki

1
2   A.   Yes.
3   Q.   Then the third item there, does that
4   say, "769 million securities pledged with JPM
5   segregated account 15(c)-3?
6   A.   That's what it says.
7   Q.   Do you recall that being part of the
8   assets that were conveyed to Barclays as part of
9   the sale transaction?
10  A.   I don't recall.
11  Q.   And the last line is, "Building in New
12  York. Two centers New Jersey"; is that right?
13  A.   That's what it was.
14  Q.   Turning the page, it said -- says,
15  "first repo with" -- should that be "Fed Monday,
16  September 15"?
17  A.   I don't recall what it -- what it was
18  meant to be.
19  Q.   Does it literally say, "First repo
20  with Feb., Monday 9/15"?
21  A.   That's what it reads, yes.
22  Q.   And do you believe that "Feb." there
23  should have been "Fed"?
24  A.   Again, I don't -- I don't recall.
25  Q.   Further down, does that say, "45

M. Korycki

1
2   billion with Fed, extinguished liability"?
3   A.   That's what it says.
4   Q.   And the next line is "1.75 billion"?
5   A.   That's what it says.
6   Q.   And those are added up to 46.75 on the
7   left side?
8   A.   Yes.
9   Q.   What is being described here at the
10  meeting?
11  A.   Again, I was taking notes. We were
12  talking about the assets -- or, not we. They
13  were talking about the assets and liabilities.
14  I don't have a full understanding of what was
15  going on.
16  Q.   At this point you were part of a group
17  at Alvarez that was trying to work up a
18  post-Barclays sale transaction balance sheet,
19  correct?
20  A.   That is correct.
21  Q.   Was one reason for this meeting
22  getting this information to work up that balance
23  sheet?
24  A.   I wasn't the one that set up the
25  meeting. I don't know what the purpose of the

M. Korycki

1
2   meeting was.
3   Q.   About halfway down, it says, "Took hit
4   for .76." Do you have any understanding what
5   that's referring to?
6   A.   I don't recall.
7   Q.   Then it says, "1.5 cure period"; is
8   that what it says?
9   A.   Yes.
10  Q.   And then "cure period" has 1.6 below.
11       Do you have any understanding what
12  those numbers are referring to?
13  A.   I don't, no, I don't recall.
14  Q.   Further down it says, "Paid 38 cash to
15  buy 42.9 billion assets. Lehman value different
16  valuation. 5.1." Am I reading that correctly?
17  A.   That's what's written here, yes.
18  Q.   And underneath the "42.9 billion
19  assets," does that say "38 valued assets"?
20  A.   That's what it says.
21  Q.   Do you recall there being discussions
22  at this meeting about there being a different
23  valuation of Lehman assets and the difference
24  between those valuations being approximately $5
25  billion?

M. Korycki

1
2   A.   I -- I don't recall.
3   Q.   You have no recollection of --
4   whatsoever of any discussion about any
5   difference between the marked value of Lehman
6   securities and the actual value of those
7   securities at this meeting?
8       MR. SHELLEY:  Objection.  Asked and
9   answered.
10  A.   Again, I don't -- I don't recall.
11  Q.   Do you know who at the meeting is
12  describing this difference in valuation?
13  A.   I don't recall.
14  Q.   Do you recall anyone asking questions
15  of anyone at Lehman or Weil about this $5
16  billion difference in valuation?
17  A.   Again, I don't remember.
18  Q.   Do you recall any discussion of marks
19  being stale or needed to be updated in this
20  meeting?
21  A.   I don't remember.
22  Q.   Down below it says "1.9 unencumbered
23  securities"; is that correct?
24  A.   That's what it says.
25  Q.   And then "769 securities from lockup";

M. Korycki

1
2  is that correct?
3      A.   That's what it says.
4      Q.   Turning the page, can you describe the
5  chart that's at the top half of the page, top
6  third of the page, and what that is?
7      A.   Left-hand side is the assets and
8  right-hand side is liabilities.
9      Q.   Is this -- is this something you would
10 have written down that was presented at the
11 meeting, or is this your own work?
12     A.   No, I wrote this down.  It's not my
13 own work.
14     Q.   Do you recall who presented this
15 information?
16     A.   I don't remember.
17     Q.   Do you recall, was there anything in
18 written -- like the flip sheet that had this
19 information, or was this all just oral, orally
20 presented?
21     A.   I don't remember.
22     Q.   Under "Assets" you see the 38 billion
23 plus the 5 billion equals 43.1 billion?
24     A.   Yes.
25     Q.   Is that reference or reflect the same

M. Korycki

1
2  delta between the marks of securities and what
3  they were considered to be really worth that was
4  discussed on the previous page?
5          MR. TAMBE:  Objection to form.  Lack
6  of foundation.
7      A.   Again, I just wrote this down.  I
8  don't know the relationship to the previous
9  page.
10     Q.   So, again, you have no idea what the
11 $5 billion difference between 43.1 billion and
12 38 billion represents?
13     A.   I don't know what it represents, no.
14     Q.   Let me ask, as you sit here today, do
15 you have any understanding of what that $5
16 billion difference is?
17     A.   What it's -- on this sheet right here?
18     Q.   No.  Yes, the $5 billion referenced on
19 this sheet, what is that difference?  What does
20 it refer to?
21     A.   I don't -- I don't have a description
22 next to it.  I don't know exactly what I was
23 referring to there.
24     Q.   I understand.  As you sit here today,
25 what is your understanding of what the $5

M. Korycki

1
2  billion difference between the 43.1 and the 38
3  billion represents?
4          MR. MILLS:  Objection.
5      A.   Just a number I wrote down to get to
6  the 43.1.  I don't -- I don't know exactly what
7  it was meant to be here.
8      Q.   Well, so it's your testimony you have
9  no idea what that $5 billion difference between
10 the 38 and the 43 billion represents?
11         MR. SHELLEY:  Objection.  Asked and
12 answered.
13     A.   I already said, I just -- I wrote down
14 the 5.  I don't have a description next to it.
15     Q.   I understand you don't have a
16 description next to it, but you have no idea
17 what the $5 billion represents?
18         MR. TAMBE:  Fourth time.  Asked and
19 answered.
20         MR. THOMAS:  It's not answered yet.
21         MR. TAMBE:  It's been answered any
22 number of times.  You just don't like the
23 answer.
24     A.   I don't recall what it was -- I don't
25 recall what it was meant to be here.

M. Korycki

1
2      Q.   As you sit here today, are you aware
3  of there being an issue as to whether the repo
4  collateral that was transferred to Barclays was
5  worth the nominal marks associated with that
6  repo collateral?
7          MR. TAMBE:  Objection to form.
8      A.   Could you ask your question again?
9      Q.   Sure.  As you sit here today are you
10 aware that there was an issue with respect to
11 whether the nominal mark value of the repo
12 collateral transfer to Barclays was actually
13 worth that amount?
14         MR. TAMBE:  Same objection.
15     A.   I understand that there was -- I know
16 that there was an issue with the sale.  I don't
17 know all -- I'm not into all the details on ...
18     Q.   Do you know that Barclays disagreed
19 that that amount -- that the marked amounts of
20 the Lehman repo collateral that it received was
21 actually worth that amount?
22         MR. TAMBE:  Objection to the form of
23 the question.
24     A.   No, I don't.
25     Q.   The next line is, "Unencumbered, 1.9,"

Page 94

M. Korycki

1
2  and then it says, "Securities, 0.8."  Is the .8
3  just rounded for the 769?
4      A.  I don't want to assume.  I -- I don't
5  recall.
6      Q.  Next column, it says -- you wrote
7  "Deal Hits."  Am I reading that correctly?
8      A.  Yes.
9      Q.  What did you mean by "Deal Hits"?
10     A.  It was a term that someone else called
11  it.  I had no meaning.  I don't know what it
12  actually meant.
13     Q.  You had no idea what "deal hits" meant
14  when you wrote it down?
15     A.  No.  I just wrote it down.
16     Q.  Do you understand that to be the loss
17  on the deal that Lehman would incur?
18         MR. TAMBE:  Objection to the form of
19     the question.
20     A.  Again, you say "understand."  I -- it
21  was something that was given to me and I wrote
22  it down.
23     Q.  Right.  Do you have an understanding
24  that it reflects the difference between the
25  value of the assets sold and the liabilities

Page 95

M. Korycki

1
2  assumed or consideration paid by Barclays?
3         MR. SHELLEY:  Objection to form.
4      A.  I don't know.  I don't have an
5  understanding, no.
6      Q.  Do you recall anyone at that meeting
7  ever expressing any surprise or concern about
8  any of the information provided by Lehman or
9  Weil?
10         MR. TAMBE:  Object to the form of the
11     question.
12     A.  I don't recall.
13     Q.  Do you recall any action items,
14  follow-up coming out of the meeting?
15     A.  I don't remember.
16     Q.  Further down it has the numbers 8 and
17  then, parentheses, 1.0, and then below that,
18  parentheses, 7.6.  Do you know what that's
19  referring to?
20     A.  I don't recall, no.
21     Q.  On the next page, the numbers 48, 45
22  and, arrow, 3 billion and, arrow, 38 billion.
23  Below that 8.6, 1.6 in parens, 7.0 in parens.
24  Do you have an understanding, any understanding
25  at all, of what any of those numbers are

Page 96

M. Korycki

1
2  referring to?
3      A.  I don't have an understanding.  They
4  were just numbers that I wrote down.
5      Q.  Okay.  Let's turn to Exhibit 564B,
6  please.  And I think we established earlier this
7  was a document that you prepared and that's your
8  handwriting.  What was the purpose of your
9  preparing this document?
10     A.  It was to prepare a summary based on
11  files that had been sent to me.
12     Q.  Summary -- why were you preparing the
13  summary?
14     A.  I had been sent a bunch of files
15  trying to find out -- put it in a more
16  presentable format for management.
17     Q.  Do you know to what end?
18         MR. TAMBE:  Objection to form.
19     Ask that again.
20     Q.  Why?  Why did they want this
21  information?
22     A.  I was just asked to prepare it.  I
23  don't know exactly what they were using it for.
24     Q.  It's your testimony you had no idea
25  why management at Alvarez wanted this

Page 97

M. Korycki

1
2  information?
3      A.  Again, I was asked to -- I was
4  basically doing what I was asked to do.
5      Q.  Beyond just doing what you were asked
6  to do, you have no idea why management wanted
7  it?
8         MR. SHELLEY:  Objection to form.
9      A.  I was just -- I was -- didn't have a
10  full understanding, no.
11     Q.  Did you have any understanding?
12     A.  It was basically for a summary for
13  what had been transferred to Barclays.
14     Q.  What was your source of information
15  putting together what had been transferred to
16  Barclays?
17     A.  I had received Excel files.
18     Q.  And did you have discussions with
19  anyone?
20     A.  No.
21     Q.  And well, there must have been
22  something other than just receiving Excel files,
23  right?
24         MR. SHELLEY:  Objection.
25     Q.  That was the basis for putting this

M. Korycki

1  together?
2      A.   I received the Excel files to put this
3  together.  I didn't have any discussions with --
4  on what the Excel files meant.
5      Q.   Did the Excel files say that these are
6  assets that were transferred to Barclays?
7      A.   I don't recall them saying that, no.
8      Q.   So where would you have learned that
9  information from?
10         MR. TAMBE:  Objection to form.
11     A.   I didn't know that they were actually
12  transferred to Barclays.  I -- I was sent the
13  files and this is -- and asked to put together a
14  summary of what the totals on each of those
15  files.
16     Q.   But I think earlier you said your
17  understanding was this was what was transferred
18  to Barclays, right?
19     A.   I did say that, yes.
20     Q.   So was this understanding in part
21  based upon meeting like the one you had with
22  Weil and Lehman Brothers?
23         MR. TAMBE:  Are you talking about the
24  9/29 meeting?

M. Korycki

1      MR. THOMAS:  Yes.
2      MR. TAMBE:  So it's not just Weil and
3  Lehman.  You've got Alex Kirk and Paolo
4  Tonucci there, right?  Who are now with
5  Barclays.
6      MR. THOMAS:  They're Lehman people.
7      MR. TAMBE:  Who are now at Barclays at
8  the time of that meeting.  Are you
9  deliberately saying -- misleading her as to
10  who was at the meeting?
11     MR. THOMAS:  Are you nuts?  I mean,
12  really, are you nuts?  We used the term
13  "Lehman" for the Lehman current or former
14  employees that worked on the deal throughout
15  the deposition.
16     MR. TAMBE:  So we're talking about the
17  same meeting, the 9/29 meeting?
18     MR. THOMAS:  Yes.
19     A.   Can you repeat your question?
20     Q.   Sure.  You're doing -- I just really
21  want to know what the basis of your information
22  was for preparing a sheet listing assets
23  transferred from Lehman to Barclays, and it
24  can't just be Excel files of numbers.  It must

M. Korycki

1  be more than that.
2      So what is your basis of knowledge as
3  to what's included in the description of assets
4  transferred to Barclays.  Is it discussions or
5  meetings with Weil?  Is it communication with
6  Weil?  Is it your own independent review of the
7  contract documents?  What went into that
8  understanding?
9      MR. SHELLEY:  Objection to form.
10     MR. TAMBE:  Objection to form.
11     MR. SHELLEY:  Objection.  Compound.
12     A.   Again, I was sent Excel files and told
13  to summarize them and put a lead sheet together
14  for them.  That -- I didn't have any
15  discussions.  I didn't have an understanding of
16  what was in the files.
17     Q.   Okay.  Let's look at some of your
18  notes on Exhibit 564B.  There's a line that says
19  "Total - Transferred Under Repo Agreement," and
20  originally it was 44 billion something and then
21  it says "less 1.035 billion," I believe, and
22  that adds up to 43 billion something.  Is that
23  right?
24     A.   That's -- that's the way it reads.

M. Korycki

1      Q.   Okay.  And the less -- the reason why
2  there was the 1.035 billion backed out of there
3  was because, while that was transferred at the
4  same time as the repo collateral, it was not
5  transferred -- or, strike that.
6      The 1.035 billion was backed out
7  because it was not part of the repo collateral;
8  is that correct?
9      MR. TAMBE:  Objection to form.
10     MR. MILLS:  Objection to form.
11     A.   I don't -- I don't know why it was
12  backed out.
13     Q.   You have -- as you sit here today, you
14  have no idea why it was backed out, why you
15  backed it out of the 44 billion?
16     MR. TAMBE:  Objection.  Asked and
17  answered.
18     A.   I don't know why it was backed out.
19     Q.   Do you think you knew at the time why
20  it was backed out?
21     A.   No, I don't believe so.
22     Q.   Do you think someone told you to back
23  it out?
24     A.   Someone -- someone had told me to back

Page 102

M. Korycki

1  it out and that's why I did it, yes.
2
3      Q.   But you don't have a recollection of
4  why they told you to back it out?
5      A.   No.
6      Q.   Do you know who told you to back it
7  out?
8      A.   I don't remember.
9      Q.   Okay.  Underneath the circled $43
10  billion, after the backout, does that say,
11  "delivered as repo"?
12      A.   That's what it says.
13      Q.   And is that -- do you understand that
14  $43 billion valuation is based upon marks
15  associated with that repo collateral?
16      A.   I don't have an understanding.  My
17  knowledge is that the Fed settled plus your DTC
18  settled less your 1035.
19          I'm just doing math here.  That's all.
20  I don't have an understanding.
21      Q.   Then you have, further down, you have,
22  "Friday transfers, 9/19 part of unencumbered
23  box"?  Is that -- am I reading that correctly,
24  interpreting that correctly?
25      A.   I believe U -- "UB" meant unencumbered

Page 103

M. Korycki

1  box.
2
3      Q.   Right.  So does this indicate that the
4  1035 billion that was transferred Friday, or
5  shows up as a transfer on this sheet as Friday,
6  was associated with the unencumbered box?
7          MR. TAMBE:  Objection to the form of
8      the question.
9      A.   Again, I don't have an understanding.
10  That -- I just can read you what my notes say.
11      Q.   Do you have an understanding of
12  whether that 1.035 billion was actually
13  transferred out of the unencumbered box on
14  Friday?
15      A.   I don't, no, I don't know.
16      Q.   You have, under the section here
17  titled "Unencumbered Box 'As of Sunday 9/21/08'
18  (also known as Clearance Boxes)," do you see
19  that?
20      A.   I see it.
21      Q.   Does that refresh your recollection
22  that unencumbered box and clearance boxes were
23  sometimes used synonymously?
24          MR. TAMBE:  Objection to form.
25      A.   I have it written here.  I -- I don't

Page 104

M. Korycki

1  recall.
2
3      Q.   You would have tried to make this
4  document as accurate as possible, correct?
5      A.   That is correct.
6      Q.   And then we have -- so under
7  unencumbered or clearance box assets, we again
8  have those same three groupings, or we have
9  three groupings like we saw before in your
10  notes.  Do you recall seeing those before, the
11  three groupings?
12          MR. TAMBE:  Objection to the form.
13      What three groupings?
14      A.   I'm lost.
15      Q.   We can go back to the first page of
16  your 9/29 notes.  Strike that.  Third page of
17  your 9/29 notes, which is AM4889, and we're
18  talking about Exhibit 563B.  Do you see
19  "Unencumbered Box" and then we have three
20  groupings?
21      A.   On page 3, I see that.
22      Q.   Okay.  And then the first numbered
23  grouping is 1035 billion, right?
24      A.   Yes.
25      Q.   Then if you look back at Exhibit 564B,

Page 105

M. Korycki

1  that's also the first grouping, right?
2
3      A.   564B, where are you referring to?
4      Q.   564B, first grouping under
5  "Unencumbered Box," number 1 is the 1035
6  billion, right?  1.035 billion?
7          MR. TAMBE:  You mean the handwritten
8      circled one?  Is that what you're referring
9      to when you say the first one?  It's not the
10      first item there.
11      Q.   The first enumerated, enumerated
12  number 1.
13      A.   Oh, 1.
14      Q.   Says number 1.
15      A.   Okay.  I see what you're referring to.
16      Q.   So in your notes it says -- on your
17  9/29 notes it says "Unencumbered Box."  The
18  enumerated item 1, "Friday, 9/19, 1.035
19  billion," and then in this lead sheet it says,
20  again, the first enumerated item under
21  "Unencumbered Box" is 1.035 billion.  I assume
22  that's the same number, right?
23      A.   Yes.
24      Q.   So my question to you is just
25  whether -- and I think you'll see an enumerated

Page 106

M. Korycki

1
2  item 3 in your notes is 984 and enumerated item
3  3 on 564B is also 984.  So really what I'm just
4  asking you is, are these the same groupings in
5  564B as were discussed in the 9/29 meeting?
6      A.   Yes, these are -- yes.
7      Q.   Okay.
8      A.   Wait.  Let me rephrase.  You say
9  "groupings."  One refers to one to -- yes.
10     Q.   Yes.  And does this suggest to you
11 that one basis for your preparation of the lead
12 sheet was information gathered in the 9/29
13 meeting with Weil and the Lehman or former
14 Lehman executives?
15         MR. TAMBE:  Objection to the form of
16 the question.
17     A.   The meeting was not the basis for the
18 lead sheet.  We had a handout at the meeting.  I
19 don't remember -- recall if it was this exact
20 same lead sheet.
21     Q.   Okay.  So you actually handed out a
22 lead sheet at the meeting?
23     A.   I don't know that it was -- we had one
24 page.  I don't know that it was actually handed
25 out, yes.

Page 107

M. Korycki

1
2      Q.   Well, so you don't recall now whether
3  it was handed out or not at the meeting?
4      A.   We did have a lead sheet at the
5  meeting, yes.
6      Q.   And did everyone have access to that,
7  or did Lehman people -- I mean Alvarez people
8  keep it to themselves?
9      A.   I don't recall if it was handed out.
10     Q.   Do you know if it was the lead sheet
11 that's reflected here and these are your notes
12 from the meeting put onto that lead sheet?
13     A.   Again, I don't recall if this was -- I
14 don't recall.
15     Q.   You recall you had a lead sheet there
16 that you were looking at in connection with the
17 meeting.  It may or may not have been this lead
18 sheet?
19     A.   That is correct.
20     Q.   And is it your understanding that the
21 three groupings there were to make up the
22 unencumbered box assets that were to be
23 transferred to Barclays as part of the sale
24 transaction?
25         MR. MILLS:  Objection to the form.

Page 108

M. Korycki

1
2      A.   Again, you say "understanding."  I
3  was -- I don't -- I didn't have a full
4  understanding of -- that's how it was laid out
5  here.  I didn't have a full understanding.
6      Q.   Well, at the time of your marking up
7  this lead sheet, is it fair to say your
8  understanding was that the 1.035 billion fit not
9  within the repo collateral transferred but,
10 rather, in the unencumbered box assets?
11     A.   Just --
12         MR. TAMBE:  Objection to the form of
13 the question.
14     A.   Can you ask your question again?
15     Q.   Sure.  At the time of this, when you
16 wrote your notes on the lead sheet, it was your
17 understanding that the 1.035 billion was part of
18 the unencumbered box assets being transferred to
19 Barclays, not part of the repo collateral?
20         MR. MILLS:  Objection to form.
21     Q.   Is that correct?
22     A.   You're saying "understanding."  I
23 didn't have an understanding that it should be
24 under "unencumbered box."  I was probably told
25 to put it there and that's where it ended up.

Page 109

M. Korycki

1
2      Q.   Who are the people that could have
3  told you to do that?
4      A.   Possibly Jim Fogarty.
5      Q.   Anyone else comes to mind that would
6  have given you that kind of direction?
7      A.   I don't recall.  Maybe Al Lakhani.
8  Maybe Bill Fox.  I don't recall.
9      Q.   Looking further down on that page, do
10 you see where your handwritten notes say,
11 "Thursday, 42.9 billion reviewed by Barclays,
12 who revalue at 38 billion"?
13     A.   I see that.
14     Q.   Did I read that correctly?
15     A.   Yes.
16     Q.   And is that referring to the fact that
17 when Barclays actually got the $43 billion,
18 approximately, in collateral transferred to it,
19 that it expressed opinion that those assets were
20 not really worth $43 billion, but were worth
21 more like 38 billion?
22         MR. TAMBE:  Objection to form.
23         MR. SHELLEY:  Objection.  Foundation.
24     A.   This is a note that I took down.  I
25 don't know -- have an understanding what it as

1                    M. Korycki
2    referring to.
3         Q.   So as you sit here today you have
4    absolutely no understanding of what this note
5    that Barclays revalued the 42.9 billion as
6    38 point -- 38 billion means, you have no
7    understanding what that means?
8         MR. TAMBE:  Objection.  Asked and
9    answered.
10        A.   No.  I just said it's a note I took
11   down.
12        Q.   And you have no recollection of what
13   it's referring to at all?
14        MR. SHELLEY:  Objection.  Asked and
15   answered.
16        A.   No.
17        Q.   Now, this 42.9 and 38 billion dollar
18   delta, we'll call it, of the same numbers
19   referred to in your 9/29 note, your meeting
20   with Weil and the former Lehman executives; is
21   that right?
22        A.   What page are you referring to?
23        Q.   Referring to page 4890 of Exhibit
24   563B.
25        MR. TAMBE:  Objection to form.

1                    M. Korycki
2    Go ahead.
3         Q.   And that -- my question is simply,
4    that's the same -- those are the same numbers,
5    right, the 42.9 billion and the 38 billion?
6         A.   They are the same numbers.  Whether
7    they -- they're in conjunction with each other,
8    I mean, they're separate notes.  I ...
9         Q.   Do you think that might just be
10   serendipity?
11        MR. MILLS:  Objection.
12        A.   They are the same numbers, so ...
13        Q.   I mean, you understand that's talking
14   about the same delta there, the same issue,
15   right?
16        MR. TAMBE:  Objection to form.
17        A.   Again, the 42.9 ties to the 42.9 and
18   the 38 ties to the 38.
19        Q.   Right.  And you understand that both
20   notes in the 9/29 and in Exhibit 564B on top of
21   your lead sheet, they're talking about the same
22   issue, correct?
23        A.   These are the same topics, yes.
24        Q.   Okay.  And does this suggest to you
25   that the, at least your handwritten information

1                    M. Korycki
2    on Exhibit 564B on the lead sheet was based upon
3    information learned at the 9/29 meeting?
4         MR. SHELLEY:  Objection.  Lacks
5    foundation.
6         A.   I -- I don't know when -- when I
7    actually took this note.  I don't know if it --
8    what it was based off of.
9         Q.   So this note could have been based
10   upon some other information about that delta; is
11   that right?
12        A.   Again, I don't recall what the basis
13   of it was.
14        Q.   Do you recall, does this refresh in
15   any way your recollection as to whether what
16   would have occurred earlier in time, your notes
17   on 564B or your notes in the 9/29 meeting notes,
18   563B?
19        A.   I don't recall what took place first,
20   no.
21        Q.   Do you recall any discussion about
22   this point, the delta in valuation between the
23   42.9 billion and the 38 billion?
24        A.   I don't recall an exact.  I know it
25   was -- I had notes on it, but I don't recall any

1                    M. Korycki
2    exact discussions.
3         Q.   Do you recall any general discussions
4    beyond the words in your notes?
5         A.   I don't remember, no.
6         Q.   Do you recall who you discussed, if --
7    to the extent you discussed this, who you
8    discussed it with?
9         A.   Could you just be more specific?
10   Discussing about what?
11        Q.   Sure.  Do you believe the note on
12   Exhibit 564B that says, "Thursday, 42.9 billion
13   reviewed by Barclays, who revalue at 38
14   billion"; do you recall who you would have
15   discussed that with?
16        MR. TAMBE:  Objection to the form of
17   the question.
18        A.   You're saying "discussed."  I don't
19   know that I actually discussed it with anyone,
20   and I don't recall who would have said it and
21   why I would have wrote it down.
22        Q.   You have no idea who said it and why
23   you wrote it down?
24        A.   I don't recall who said it.
25        Q.   Do you know why you made a note of it?

1           M. Korycki
2       A.  I know it was probably an issue and I
3   wrote it down.  That's ...
4       Q.  Do you remember any more about that
5   issue?
6       A.  No.
7       Q.  Down below on 564B, below that note it
8   says, parentheses, "45 debt.  38 securities from
9   Barclays.  7 balance cash held for Barclays."
10  Am I reading that correctly?
11      A.  The 7 billion?
12      Q.  Yes, the "7 cash balance JPM held for
13  Barclays"?
14      A.  Now you read it correctly, yes.
15      Q.  Below that, does that say, "OCC -
16  exchange rate of derivatives, margin against
17  it"?
18      A.  That's what it reads.
19      Q.  And what is that referring to?
20      A.  I don't know what it refers to.
21      Q.  Do you recall having understanding
22  that the exchange rate derivatives and margin or
23  collateral associated with those derivatives was
24  being conveyed to Barclays as part of the sale
25  transaction?

1           M. Korycki
2       MR. TAMBE:  Objection to form.
3       A.  I did not have an understanding, no.
4       Q.  Do you have a different understanding
5   one way or the other?
6       A.  No.
7       Q.  Do you have any idea why you wrote
8   this note down?
9       A.  No.
10      Q.  You went on to work on the Derivatives
11  Team, right?
12      A.  Excuse me?
13      Q.  You went on to work on the Derivatives
14  Team for Alvarez, correct?
15      A.  Correct.
16      Q.  What did you do as part of the
17  Derivatives Team?
18      A.  I work on the -- with the Live Trades
19  Group.
20      Q.  Okay.  Again, this would -- this note
21  would have been something you just wrote down
22  because you heard someone say it?
23      A.  That is correct.
24      Q.  And you don't know who said it?
25      A.  I don't remember, no.

1           M. Korycki
2       Q.  Let me show you a document previously
3   marked as 565B.
4           Is it Korycki or Korycski?
5       A.  Korycki.
6       Q.  Do you recognize Exhibit 565B?
7       A.  Yes.
8       Q.  And would you describe what it is,
9   please?
10      A.  It's an e-mail I had sent out with
11  files for the meeting that we were having.
12      Q.  What is the meeting that you're
13  referring to there, the APA Schedules Meeting,
14  what was the purpose of it?
15      A.  Again, I didn't set up the meeting,
16  but it was to go through the supporting files
17  and the summary that we had prepared.
18      Q.  And what was your -- what was the
19  purpose of preparing those files and the
20  summary?
21      MR. MILLS:  Object to the form.
22      MR. TAMBE:  Objection.  Asked and
23  answered.
24      A.  Just so clarify, I didn't prepare
25  these files.  They were provided to me.

1           M. Korycki
2       Q.  Okay.  Did you prepare the summary?
3       A.  I prepared the summary, yes.
4       Q.  And was the purpose of reviewing these
5   files part of the broader effort by Alvarez to
6   have a clear understanding of the transaction
7   and what assets and liabilities went over and
8   what didn't?
9       MR. TAMBE:  Objection to the form of
10  the question.
11      A.  Again, I -- I did not set up -- I
12  don't know exactly what the meeting was for.
13      Q.  But the general work stream -- I mean,
14  you're working, doing substantial work putting
15  together these things.  The purpose of it was, I
16  mean, I assume it's not -- I mean, is it for the
17  purpose of -- I think the goal stated earlier
18  about trying to understand what assets and
19  liabilities went over as part of the transaction
20  and what didn't?  If it's not for that purpose,
21  what other purpose was it?
22      MR. TAMBE:  Objection to the form of
23  the question.
24      A.  So the files were to try and figure
25  out what went over to Barclays, but I ...

Page 118

M. Korycki

1
2     Q.   Okay.  What went over to Barclays as
3  part of the sale transaction and what didn't?
4     A.   But I don't know that these -- let me
5  back up.  I don't know that these exact -- this
6  is exactly what went over to Barclays.  These
7  are the files that were provided to me.
8     Q.   I understand.  And the basis of your
9  understanding would have been from a variety of
10  sources, including meeting with 9/29 or any
11  discussions or documents from Weil Gotshal,
12  correct?
13         MR. TAMBE:  Objection to form.
14     A.   Can you repeat that?
15     Q.   We'll just move on.
16     A.   Okay.
17     Q.   Who was attending the -- were all the
18  people on this list who attended the APA
19  Schedules Meeting tomorrow, where it says
20  "tomorrow"?
21     A.   Jim Fogarty was there.  Bill Gordon.
22  No, it -- Jim Fogarty was there.  No, those
23  weren't all the people that were at the meeting.
24     Q.   Was anyone from Weil at the meeting?
25     A.   Rod Miller.

Page 119

M. Korycki

1
2     Q.   Okay.  Now, Lori Fife and Robert
3  Messineo are also sent this information.  Do you
4  know if they were there also?
5     A.   Again, I don't recall if Lori dialed
6  in.
7     Q.   And this would be a meeting the day
8  after the meeting with Weil and former Lehman
9  folks on the 29th, correct?
10     A.   You know, you keep -- I had "9/29"
11  written here on these -- I refer back to 563B.
12  These were the -- this was -- these -- we did
13  have these documents at the meeting that -- we
14  keep referring to this 9/29 meeting, but I
15  believe I had the date wrong on that, on those
16  notes, possibly.
17         I'm looking at this e-mail on 565B
18  now, which says 9/29, but I'm referring to the
19  meeting the next day.
20     Q.   You think the meeting we're discussing
21  was the same meeting as the APA Schedules
22  Meeting?
23     A.   Yes.
24     Q.   Are you sure of that?
25     A.   Yes.

Page 120

M. Korycki

1
2     Q.   Okay.  Do you know whether the -- so
3  you're saying it may have occurred, what we've
4  been referring to as the 9/29 meeting may have
5  occurred on 9/30?
6     A.   That is correct.
7     Q.   Okay.  So is the lead sheet that is
8  attached to your e-mail of 9/29, is that the
9  lead sheet that you marked up in Exhibit 564B?
10     A.   Yes, it is.
11     Q.   So does that indicate to you that the
12  564B handwritten markups would be based upon
13  information learned at the APA Schedules Meeting
14  with Weil and former Lehman executives?
15     A.   It could have been.  I don't recall
16  exactly when these notes were taken.
17     Q.   Do you believe it would have been in
18  this general time period of 9/29 or 9/30 of
19  2008?
20     A.   It would have been around that time
21  period.
22     Q.   How are you doing break-wise?  Do you
23  want to take a short break?
24         MR. THOMAS:  It might make sense to
25  take a short break.

Page 121

M. Korycki

1
2         MR. TAMBE:  That's fine.
3         THE VIDEOGRAPHER:  The time is 12:29
4  P.M.  We're going off the record.
5         (Recess.)
6         THE VIDEOGRAPHER:  The time is 12:38
7  P.M.  We're back on the record.  Video
8  number 3.
9  BY MR. THOMAS:
10     Q.   Let me show you a document that was
11  previously marked as 463B.  Have you ever seen
12  that document before?
13     A.   Page 1 of 2 and 2 of 2 I have not seen
14  before.
15     Q.   Do you recognize the attachments?
16     A.   The attachments 1 through 5 I do
17  recognize, yes.
18     Q.   Can you describe what those
19  attachments are, please?
20     A.   Page 1 is a lead sheet.  Page 2 I had
21  data-sorted the Fed Settled and DTC Settled file
22  and just put the summary by type, the summary by
23  type and the amount.  Page 3 is another file
24  called "Friday Transfers" and I just did a data
25  sort of that file and put a summary of by type

Page 122

```
 1             M. Korycki
 2   and the amount.
 3          Page 4 is the 636 collateral file.  I
 4   just reformatted so that it would print
 5   properly.  Page 5, the DTC 074 File and 636
 6   Available Collateral File, I just data-sorted
 7   and did a summary by type and put the -- and
 8   linked it to the amounts here.
 9       Q.   So these exhibits to 463B are
10   documents that you prepared?
11       A.   I prepared all of them except page 4.
12   This file was provided to me.  All I did was
13   reformat it to print properly.
14       Q.   Okay.  You described the first page of
15   the attachments.  The title says "Lehman
16   Holdings/Barclays Transaction" and it has a
17   column of assets and liabilities.  You described
18   that as a lead sheet, I believe.
19          It looks a little different than the
20   lead sheets we were looking at in the last two
21   exhibits, 564B and 565B.  Is -- so you still
22   call it a lead sheet, the first attachment to
23   463B?
24       A.   I misspoke.  It's -- I wouldn't call
25   it a lead, no.
```

Page 123

```
 1             M. Korycki
 2       Q.   Is this an effort at a balance sheet?
 3       A.   It would be a balance sheet, yes.
 4       Q.   Okay.  But this is a balance sheet
 5   that you prepared?
 6       A.   I typed it up.
 7       Q.   Did someone handwrite out the numbers
 8   and give them to you or feed them to you in some
 9   way?  What do you recall about the process of
10   creating this sheet?
11       A.   I did work with someone.  I don't
12   recall exactly who helped me prepare it.
13       Q.   Under "Assets" you have a line that
14   says "Repo Assets," 38-billion-007, then you
15   have "Negotiated Mark Haircut" and then you have
16   "Assets Transferred Under Repo ('Stale' Marks),"
17   "stale" being in quotes, "33 billion," do you
18   see that?
19       A.   I see that, yes.
20       Q.   Is this the same $5 billion valuation
21   delta that we saw in your earlier notes?
22          MR. TAMBE:  Objection to the form of
23   the question.
24       A.   Again, I was -- I was told what to put
25   here.  I don't know if those two numbers refer
```

Page 124

```
 1             M. Korycki
 2   to each other.
 3       Q.   Would you have been told by somebody
 4   at Alvarez?
 5       A.   I worked with some people at Alvarez
 6   to put this together, yes.
 7       Q.   Okay.  When you say you were told,
 8   you're not sure who?  It would have been
 9   somebody at Alvarez like Jim Fogarty?
10       A.   Again, I don't remember.  It was a
11   while ago.
12       Q.   It wouldn't have been somebody outside
13   Alvarez, right?
14       A.   It would have been A&M, Alvarez.
15       Q.   Okay.  And you wrote, "Negotiated Mark
16   Haircut."  Does that refer to Barclays thinking
17   that the -- by the time they received the
18   collateral, the marks were stale or otherwise
19   inaccurate and were worth about $5 billion less?
20          MR. TAMBE:  Object to the form of the
21   question.
22       A.   Again, I don't have an understanding
23   of what it meant.  I just typed this up.
24       Q.   You typed this up without having any
25   understanding of what either "negotiated mark
```

Page 125

```
 1             M. Korycki
 2   haircut" means or what "stale mark" means?
 3          MR. SHELLEY:  Objection.  Asked and
 4   answered.
 5       A.   I did not have an understanding of
 6   what "negotiated mark haircut" or "stale marks"
 7   meant.
 8       Q.   Did you ask somebody about it?
 9       A.   There was a lot going on.  I don't
10   recall if I inquired about it.
11       Q.   Okay.  And you think someone other
12   than you came up with those terms, "negotiated
13   mark" and "stale marks"?
14          MR. SHELLEY:  Objection.  Foundation.
15       A.   I did not come up with these terms.
16       Q.   Okay.  And you don't know who did?
17       A.   No.
18       Q.   Do you have any reason to believe the
19   $5 billion reflected in your "Assets" column
20   there next to "Negotiated Mark Haircut" is
21   different in any way than the $5 billion
22   valuation differential referenced in your notes
23   that are under the date of September 29?
24          MR. SHELLEY:  Objection.
25          MR. TAMBE:  Objection to form.
```

Page 130

M. Korycki

1
2     Q.   Ms. Korycki, isn't it true that it was
3     explained to you and others at Alvarez by former
4     Lehman executives who worked on the transaction
5     that there was this valuation difference that
6     came up as part of the sale transaction where
7     Barclays believed there were stale Lehman marks
8     and valued those assets that were transferred at
9     about 38 billion as opposed to 43 billion,
10    creating a valuation difference, at least
11    against the marks of Lehman, of about $5 billion
12    and that is simply what you're reflecting in
13    your draft balance sheet that you prepared as
14    part of 463B?
15          MR. SHELLEY:  Objection to the form of
16    the question.
17          MR. MILLS:  Object to the form.
18    A.   Again, this 463B, I worked with
19    someone else to prepare this.  This wasn't my --
20    I didn't come up with this myself.
21    Q.   So it's your testimony that you're not
22    aware if that's the same $5 billion that were
23    being described to you in the meeting with
24    former Lehman executives and Weil Gotshal?
25          MR. TAMBE:  Objection to form.

Page 131

M. Korycki

1
2     A.   Again, I don't know that the two --
3     what was taken in my notes at the meeting and
4     this 5 are the same.
5     Q.   You have no belief one way or the
6     other as to whether it's the same?
7          MR. SHELLEY:  Objection.  Asked and
8     answered.
9     A.   I'm not going to make an assumption.
10    Q.   In the right-hand column under
11    "Liabilities" you see the entry that says "Net
12    'Book' Loss," 3.27 billion?
13    A.   Yes.
14    Q.   What did you mean by that?
15    A.   The terminology is what someone had
16    instructed me to put there.  I didn't have a
17    meaning -- I don't have a meaning behind it.
18    Q.   You have no idea what "Net 'Book'
19    Loss" means in your balance sheet that you
20    prepared?
21    A.   Again, I was told -- that was -- it
22    was a plug number and this was the title that I
23    was given to it.
24    Q.   Is your understanding that -- was your
25    understanding that that was the amount by which

Page 132

M. Korycki

1
2     assets being sold exceeded liabilities being
3     assumed by Barclays?
4          MR. TAMBE:  Objection to the form of
5     the question.
6     A.   From what I recall, it was a plug
7     number to get my assets and liabilities to tie.
8     Q.   Meaning that that would be the difference
9     between the assets conveyed and the liabilities
10    assumed?
11    A.   It's basically taking what we had
12    totaling the assets and what we -- what was on
13    the liability side and plugging that to get your
14    liabilities to tie.
15    Q.   To your knowledge, did anyone raise
16    any concern about or issue or question about the
17    fact that there may have been a net book loss
18    associated with the transaction?
19    A.   I don't recall any specific
20    conversations.
21    Q.   Let me go ask you to look back at
22    Exhibit 579A.  Midway through there, there's a
23    reference to $5 billion.  It says 52.4 billion
24    minus $5 billion equals 47.4 billion.  Do you
25    see that?

Page 133

M. Korycki

1
2     A.   Yes.
3     Q.   Do you know if this $5 billion that
4     you wrote down there that's being subtracted
5     from 52.4 billion is the same $5 billion delta
6     in valuation that was discussed in the meeting
7     with Lehman and Weil folks, former Lehman and
8     Weil folks?
9          MR. SHELLEY:  Objection to the form of
10    the question.
11    A.   Again, I don't know that that was the
12    same 5 billion.
13    Q.   Do you believe it to be the same 5
14    billion?
15          MR. TAMBE:  Objection to form.
16    A.   I'm not going to assume.  I don't know
17    that it was the same 5 billion.
18    Q.   I understand.  I hear you're saying
19    you don't know it and I understand you're not
20    going assume it.  Do you have a belief as to
21    whether it's the same 5 billion?
22          MR. TAMBE:  Objection to form.  Lack
23    of foundation.
24    A.   I don't know that it was the same 5
25    billion.

Page 134

M. Korycki

1
2    Q.   You won't answer the question of
3   whether you believe it's the same 5 billion?
4         MR. TAMBE:  She answered the question.
5    A.   I think I've answered.  I said I'm not
6   going to assume.
7    Q.   You're not going to assume.  You don't
8   know.  Do you believe it to be the same 5
9   billion?
10   A.   I think -- did I not -- am I not
11  answering correctly or --
12        MR. TAMBE:  It's not the answer he
13        wants, evidently, but I think you've
14        answered the question.
15   Q.   Very simple question:  As you sit here
16  today, do you believe that to be the same $5
17  billion number?
18   A.   Again, I'm not -- I'm not going to
19  assume.
20   Q.   I'm not asking you to assume, just
21  what your belief is.
22        MR. TAMBE:  Object to the form.
23   A.   I'm not going to assume that it's the
24  same number.
25   Q.   So you won't answer whether you

Page 135

M. Korycki

1
2   believe that to be the same number or not?
3    A.   No.
4    Q.   No, you won't answer?
5    A.   I think I've already answered it by
6   saying I'm not going to assume that it's the
7   same number.
8    Q.   You understand that I'm not asking you
9   to assume anything.  I just want your belief as
10  you sit here today, and the question is do you
11  believe it's the same number?
12        MR. TAMBE:  Mr. Thomas, you are asking
13        her the same, because she's already told you
14        her knowledge or lack thereof, so at this
15        point all you're doing is asking her to
16        guess.
17   Q.   I understand you don't know for
18  certain and I understand you're not going to
19  assume.  I'm not asking you to do that.  I'm
20  just asking you a very simple question:  Do you,
21  as you sit here today, do you believe that's the
22  same $5 billion number?
23        MR. SHELLEY:  Objection.
24        Argumentative.
25   A.   Again, I'll go back to your -- I'm not

Page 136

M. Korycki

1
2   going to answer that then.  I already said I'm
3   not going to assume.
4    Q.   Let me show you a document previously
5   marked as Exhibit 494.  Do you recognize this
6   document?
7    A.   Yes, I do.
8    Q.   Would you describe what it is, please?
9    A.   The first page is an e-mail that was
10  sent out for a meeting that was supposed to
11  happen.  If I recall correctly, this meeting
12  never actually happened.
13   Q.   What was the meeting that was supposed
14  to happen?
15   A.   Based on the subject, it was a meeting
16  with Paolo Tonucci to go through the --
17  attachment.
18   Q.   How many times did you meet Paolo
19  Tonucci?
20   A.   Maybe twice.
21   Q.   And how many times did you meet Alex
22  Kirk?
23   A.   I think once.
24   Q.   Did you ever meet Jim Seery?
25   A.   I don't believe so.

Page 137

M. Korycki

1
2    Q.   And what was the -- what was the
3   purpose of the meeting that was scheduled with
4   Paolo Tonucci?
5    A.   To go through this document.
6    Q.   And who prepared this document, the
7   attachment to 494?
8    A.   All the pages except for page 5 I
9   prepared in conjunction with other A&M people.
10  Page 5, again, was just a reformatting of the
11  file that I had received.
12   Q.   And the information contained in
13  Attachment A, Recap of the Week Ended 9/19,"
14  which is AM3877.  What was -- where did you get
15  your information to prepare this?
16   A.   I worked with two other A&M -- A&M,
17  Alvarez, MDs who helped me prepare this.
18   Q.   What are MDs?
19   A.   Excuse me?
20   Q.   Did you say MDs?
21   A.   Oh, managing directors.
22   Q.   And who were they?
23   A.   Bill Fox and Al Lakhani.
24   Q.   Do you know where they got information
25  about the events of that week?

Page 138

M. Korycki

1
2   A.   I don't.  I don't recall.
3   Q.   Under "Wednesday, 9/17," the first
4   line says, "As of Wednesday, 9/17, the Fed had
5   loaned Lehman $45 billion in exchange for 48
6   billion in collateral."  Do you see that?
7   A.   Yes.
8   Q.   Do you know what the -- where the $48
9   billion valuation comes from?
10  A.   No.  Again, I don't recall where any
11  of the source information for this document came
12  from.
13  Q.   Under "Thursday" you have a Footnote
14  (a) there that says, "42.9 billion as part of
15  the 9/19 Friday transfers of 43.07 billion," and
16  then it cites something called "Lehman
17  Holdings/Barclays Transaction Recap."  Do you
18  see that?
19  A.   Yes.
20  Q.   What is the document you're citing
21  there?
22  A.   I don't recall.  I don't recall what
23  that document is.
24  Q.   Under "Notes" further down in the
25  second line, the first note there, it says,

Page 139

M. Korycki

1
2   references that "LBHI's claims against JPM may
3   continue to grow," do you see that?
4   A.   Yes.
5   Q.   Do you know what that's referring to?
6   A.   No, I don't.
7   Q.   Two lines down it says, "JPM demanded
8   broader and deeper set-off agreements and more
9   collateral that over time accumulated to
10  approximately 17 billion."  Are you familiar
11  with that issue, JPM demanding broader and
12  deeper set-off agreements?
13  A.   No, I'm not.
14  Q.   Can you describe what the chart at the
15  bottom of the page reflects?  It says "Cash to
16  Lehman," "Collateral."
17  A.   Other than reading it to you, I -- I
18  don't remember.  If you want me to read it for
19  you, I can, but I think you can do it yourself.
20  Q.   That's okay.  But you don't have any
21  understanding of what you're trying to reflect
22  by including this in the document?
23  A.   I don't remember.
24  Q.   How was this document used?
25       MR. TAMBE:  Object to the form of the

Page 140

M. Korycki

1
2   question.
3   Q.   The document being the attachment to
4   494.
5        MR. TAMBE:  Same objection.
6   A.   You're asking me how it was being --
7   how it was used?
8   Q.   Yes.  Do you know if it was used for
9   anything?  Was it sent to somebody?  Was it used
10  by Alvarez for some reason?
11       MR. SHELLEY:  Objection to form.
12  A.   I don't know.  I don't know what it
13  was actually used for.
14  Q.   Looking at Attachment C under
15  "Exhibits," down towards the bottom, at the top
16  it says Securities Transferred Under Barclays
17  Repo Agreement."  Do you see that?
18  A.   Yes.
19  Q.   And do you see at the bottom you have
20  backed out the 1.035 billion from that?
21  A.   I see that.
22  Q.   Why did you do that?
23  A.   I was told to do it.
24  Q.   Do you know the reason you were told
25  to do it?

Page 141

M. Korycki

1
2   A.   I don't know.
3   Q.   Is it your understanding that that
4   wasn't part of the repo collateral, that was
5   instead part of the unencumbered or clearance
6   box assets?
7        MR. SHELLEY:  Objection to form.
8   A.   Again, I don't have an understanding.
9   I was -- I was just told to do it.
10  Q.   And having seen those, all the
11  unencumbered notes, the 1, 2, 3, with this being
12  number 1, this amount, does that refresh your
13  recollection in any way as to why you -- why you
14  were directed to back out the 1.035 billion from
15  the list of Barclays repo collateral?
16       MR. TAMBE:  Objection to form.  Asked
17  and answered.
18  A.   No, I think I covered that.  I
19  don't -- I was told to do this; that's why I
20  subtracted it from there.
21  Q.   Okay.  Let me show you a document
22  previously marked as 461A.  Do you recognize
23  this document?
24  A.   Yes.
25  Q.   Would you describe what it is, please?

Page 142

M. Korycki

1
2      A.   It's a report to the Unsecured
3  Creditors Committee.
4      Q.   And what was your involvement with
5  this document?
6      A.   I think I covered this earlier, but I
7  would receive each of the slides from the asset
8  teams and put them -- compile them into one
9  document.
10     Q.   Did you help prepare any of the
11  slides?
12     A.   I may have typed up a few.  I don't
13  recall exactly everything that I did on this
14  one.
15     Q.   Did you attend the presentation of
16  this document to the Creditors Committee?
17         MR. SHELLEY:  Objection.  Foundation.
18     A.   Yes.
19     Q.   Was this document presented to the
20  Creditors Committee?
21     A.   This document was presented, yes.
22     Q.   Okay.  And at this presentation, where
23  did it take place?
24     A.   I believe it was at Weil's, Weil
25  Gotshal's offices.

Page 143

M. Korycki

1
2      Q.   And approximately how many people were
3  there at the presentation?
4      A.   I don't want -- I don't recall.
5      Q.   Approximately 30?
6      A.   It was a room full of people.  I don't
7  recall.
8      Q.   And did you stay for the entire
9  presentation?
10     A.   Yes.
11     Q.   Did you listen to the presentation?
12     A.   Yes.
13     Q.   Did you take notes about the
14  presentation?
15     A.   No.
16     Q.   Did you notice whether any of the
17  other room full of people were taking notes?
18     A.   I didn't.  I don't recall.
19     Q.   Are you aware whether anyone of the
20  room full of people took notes about the
21  presentation?
22     A.   Again, I don't recall if anyone was
23  taking notes.
24     Q.   Were there any other documents
25  prepared by Alvarez or Lehman in connection with

Page 144

M. Korycki

1
2  the presentation other than this document?
3         MR. TAMBE:  Objection to the form of
4  the question.
5      A.   The only -- we had -- I believe we did
6  have an agenda for the meeting.  That would have
7  been it.
8      Q.   And this document was distributed at
9  the meeting?
10     A.   Yes.
11     Q.   Was there a PowerPoint presentation,
12  too, or an overhead projector, or just handing
13  out the document and just discussing it?
14     A.   There was a PowerPoint presentation.
15     Q.   Was the content of the PowerPoint
16  presentation exactly the same as the document?
17     A.   Yes.
18     Q.   And when you say you might have typed
19  up some of these things, do you know if you
20  typed up any part of the "Significant
21  Transactions" section?
22         Let me direct you to more specific.
23  Page AM4531, you see some of the same numbers
24  there that you have on some of your other
25  documents.  Did you have any role in preparing

Page 145

M. Korycki

1
2  this page of the presentation?
3      A.   I don't recall if I typed it up.
4      Q.   Beyond typing it up, did you -- did
5  you gather and provide the information or did
6  someone else do that?
7      A.   No, someone else did that.
8      Q.   And the -- under "Assets Purchased"
9  where it says "43.1 Billion Repo Assets - Book
10  Value per Lehman 'stale' marks, negotiated a $5
11  billion reduction," do you see that?
12     A.   I see it, yes.
13     Q.   Is this the same $5 billion delta
14  that's reflected in the balance sheet you
15  prepared?
16     A.   Again, I'm not going to assume that
17  any of the numbers are ...
18     Q.   So you don't know whether this is the
19  same $5 billion reduction versus stale marks as
20  is referenced in your balance sheet?
21     A.   If you could just direct me to what
22  exhibit again you're looking at?
23     Q.   Sure.  It is the attachment to Exhibit
24  463B.  The balance sheet that you prepared
25  attached to 463B that says "Repo Assets,"



Page 146

M. Korycki

1
2 "Negotiated Mark Haircut," and then "Assets
3 Transferred Under Repo ('Stale' Marks)" and has
4 the 43 billion, 38 billion and 5 billion, do you
5 understand -- is it your understanding that's
6 the same $5 billion valuation delta that's being
7 referred to in the Creditors Committee
8 presentation?
9      A.   I believe so, yes.
10     Q.   And does -- has anything refreshed
11 your recollection as to whether the -- that $5
12 billion delta valuation is the same $5 billion
13 difference that was described to you in your
14 meeting with Weil and former Lehman executives
15 as reflected in your notes of that meeting?
16     A.   No.
17     Q.   Other than this valuation delta
18 between what is referred to here as stale marks
19 and the 38 billion, are you aware of any other
20 differences or deltas between Lehman marks and
21 values ascribed to those assets for purposes of
22 the CL transaction?
23          MR. TAMBE:  Object to the form of the
24 question and foundation.
25     A.   Again, I was merely compiling and

Page 147

M. Korycki

1
2 reformatting a lot of this data.  I'm not aware
3 of anything else.
4      Q.   Switching topics a little bit, did you
5 ever have occasion to investigate or do any
6 analysis of cure or other payment liabilities
7 associated with contracts as part of the sale
8 transaction?
9          MR. SHELLEY:  Objection to the form.
10     A.   Can you ask me the question again?
11     Q.   Yes.  It wasn't phrased very well.
12 Let me just start off with a document instead.
13 Let me show you a document we'll mark as 580A.
14          (Exhibit 580A, a document bearing
15     Bates Nos. AM004949 through 4950, marked for
16     identification, as of this date.)
17     Q.   Do you recognize this e-mail chain?
18     A.   Yes.
19     Q.   This is an e-mail sent to you.  At the
20 top, it's sent to you by Steve Cohn at Alvarez
21 on October 2, 2008?
22     A.   Yes.
23     Q.   The first, earliest in time e-mail in
24 the chain appears to be an e-mail from you to
25 Mr. Cohn also on October 2, 2008, where you

Page 148

M. Korycki

1
2 write, "We had a meeting yesterday with FTI and
3 Houlihan.  They are requesting the breakout of
4 the estimated cure amount of $2.25 billion from
5 the Barclays transaction.  Do you have the
6 detail behind the $2.25 billion that we could
7 include as support to do our recap scenario."
8 Do you see that?
9      A.   Yes.
10     Q.   The first question is, this meeting
11 yesterday, which would be October 1, with FTI
12 and Houlihan, would that be the meeting
13 reflected in your one page of notes which is
14 Exhibit 579A?
15     A.   Yes.
16     Q.   And that makes sense timewise.  The
17 meeting with Houlihan and FTI would have been a
18 day or two after the meeting with Weil and the
19 former Lehman executives about the details of
20 the Barclays sale transaction?
21     A.   Yes.  Just to refer -- you referred to
22 former Lehman executives.  I don't know what
23 their title was at the time of the meeting.
24     Q.   Right.
25     A.   I wasn't --

Page 149

M. Korycki

1
2     Q.   It's referring to Mr. Kirk and Mr.
3 Tonucci, and whether they were still technically
4 with Lehman or not with Lehman at the time,
5 they're either Lehman or former Lehman
6 executives.
7      A.   Okay.  I just wanted to clarify.
8      Q.   That doesn't change any of your
9 earlier answers?
10     A.   No.  No.
11     Q.   So, on October 1 you had this meeting
12 with FTI and Houlihan and you discussed a number
13 of things as reflected in your notes, and they
14 ask for further detail and a breakout of the
15 estimated cure amounts in connection with the
16 Barclays transaction, is that right?  Just based
17 on what is said at AM4950.
18     A.   Just to clarify, I don't know if they
19 asked for it or if it -- I don't recall how it
20 actually came up.
21     Q.   When it says, "They are requesting the
22 breakout of the estimated cure amount of 2.25
23 billion," do you understand that to be referring
24 to FTI and Houlihan?
25     A.   I'm reading that again.  I would

Page 150

M. Korycki

1
2 assume that it's FTI and Houlihan, yes.
3    Q.    Going back to the first page of
4 Exhibit 580A, you seem to be tasked with finding
5 out more information about the cure amount and
6 the breakout and the backup detail behind it; is
7 that right?
8    A.    That is correct.
9    Q.    And what did you do to find out the
10 breakup and detail behind the estimated cure
11 amount associated with the Barclays transaction?
12    A.    I don't recall exactly. I believe I
13 spoke to Bill Fox after I received this e-mail
14 on how to go about it.
15    Q.    And do you recall how you ended up
16 going about it, investigating the cure amount?
17    A.    I don't recall. No, I don't recall.
18    Q.    I'm going to show you a document we'll
19 mark as 581A.
20        (Exhibit 581A, a document bearing
21    Bates Nos. AM4948, marked for
22    identification, as of this date.)
23    Q.    Do you recognize this as an e-mail
24 from a Bill Fox at Alvarez to yourself dated
25 October 3, 2008?

Page 151

M. Korycki

1
2    A.    Yes.
3    Q.    And here Bill writes, "Please contact
4 Lehman/Barclays person who might have your
5 answer on cure amount - Patrick Costa." Did you
6 in fact contact Mr. Costa?
7    A.    I don't recall contacting him, no.
8    Q.    Do you recall talking to anyone about
9 this issue?
10    A.    Other than Bill Fox and Al Lakhani, I
11 don't recall any conversations about it.
12    Q.    Well, after being tasked with finding
13 the detail and breakout of the estimated cure
14 amount, can you identify any steps that you took
15 to find that information out?
16        MR. TAMBE: Object to the form of the
17 question.
18    A.    I don't recall.
19    Q.    Do you recall whether you did in fact
20 try to find out the requested information that
21 you were tasked with gathering?
22    A.    I don't, I don't recall.
23    Q.    Do you recall whether it may have --
24 you may have been -- I mean, if you were tasked
25 with doing this, wouldn't you have done it,

Page 152

M. Korycki

1
2 or --
3        MR. TAMBE: Objection. Argumentative.
4    Objection. Form.
5    A.    I already said I did not speak to -- I
6 don't recall speaking to Patrick Costa. I don't
7 recall -- there was a lot going on at the time.
8 I don't recall any further work on this.
9    Q.    Do you think this could have been just
10 dropped because there were other priorities at
11 the time?
12        MR. TAMBE: Objection to form.
13    A.    Again, I don't recall any further work
14 that I did, if I did any further work on this.
15    Q.    Do you recall whether anyone did any
16 further work on this at this time in October
17 2008?
18    A.    I don't recall.
19    Q.    Let me show you a document we'll mark
20 as 582A.
21        (Exhibit 582A, a document bearing
22    Bates Nos. FTI503 through 505, marked for
23    identification, as of this date.)
24    Q.    Do you recognize this as an e-mail
25 chain among you and others in the October 14,

Page 153

M. Korycki

1
2 October 15, 2008 time period?
3    A.    Yes.
4    Q.    Going back to the initial, earliest in
5 time e-mail in the chain, an October 14, 2008
6 e-mail from you to Conor Tully.
7        And again, who is Conor Tully?
8    A.    He's with FTI.
9    Q.    And FTI's role in this is what?
10    A.    Advisors to the Creditors Committee.
11    Q.    And you write about a conference call
12 regarding the assumption of vendor contracts; is
13 that right?
14    A.    That is correct.
15    Q.    And under the long e-mail from Conor
16 Tully on October 15 at 11:22 A.M., writing to
17 you, he mentions some of A&M's goals in
18 determining exactly what contracts are being
19 assumed and cure amounts being covered by the
20 Barclays sales transaction where he lists, "I
21 know A&M's goals are as follows: 1. Understand
22 what is being assumed and cured. Understand
23 what is -- 2. Understand what is not being
24 assumed to determine if the contract may be
25 needed by legacy Lehman. 3. Get a general

Page 154

1              M. Korycki
2    understanding of the contract universe to help
3    further develop our understanding and define the
4    services to be provided under the TSA."
5              Is that consistent with your
6    understanding of your work on determining which
7    contracts had been assumed at this time?
8              MR. TAMBE:  Objection to form of the
9    question.
10             MR. SHELLEY:  Objection to form.
11       A.   This e-mail relates to work that I did
12   with our Contract Vendor Group to figure out
13   what contracts could be rejected by Lehman.
14       Q.   As part of that effort, did you have
15   occasion to first figure out what contracts had
16   been assumed by Barclays and what hadn't in
17   order to establish the universe of contracts
18   that could or could not be objected -- rejected
19   by Lehman?
20       A.   Could you just repeat your first part
21   of the question, or repeat your question again?
22       Q.   Sure.  As part of that effort, did you
23   have occasion to first figure out what contracts
24   had been assumed by Barclays and which hadn't in
25   order to establish the universe of contracts

Page 155

1              M. Korycki
2    that could or could not be rejected by Lehman?
3              MR. SHELLEY:  Objection to form.
4        A.   Can you ask that a little -- I don't
5    understand what you're asking.
6        Q.   Sure.  I'm just, from your working --
7    you're involved in a project involving vendor
8    contracts, correct?
9        A.   Lehman had vendor contracts and --
10   yes.
11       Q.   Right.  And in order to, as part of
12   your work with respect to vendor contracts and
13   determining which ones might be rejected by
14   Lehman and which ones might not, you first had
15   to understand which contracts were being assumed
16   by Barclays, correct?
17             MR. TAMBE:  Objection to form.
18       Q.   Because you couldn't reject one of
19   those?
20             MR. TAMBE:  Same objection.
21       A.   Are you -- are you telling -- are you
22   telling me or are you asking?  I'm sorry.
23       Q.   I'm asking.
24       A.   The process -- in order to figure out
25   what was left at the Lehman estate, we did have

Page 156

1              M. Korycki
2    to figure out which ones were assumed by
3    Barclays.
4        Q.   And Mr. Tully writes as one of the
5    goals down in number 5, "It also seems that we
6    should be shadowing Barclays' process of making
7    assumption decisions with the goal of being up
8    to speed on all of the contracts that Barclays
9    chooses not to assume.  We can then make quicker
10   assessments of whether to immediately reject or
11   continue to pay the contract.  In the event that
12   it is a contract we no longer need, we should
13   reject it quickly to minimize the amount of
14   administrative claims created."
15             Did you disagree with anything that
16   Mr. Tully was saying in there?
17             MR. TAMBE:  Objection to the form of
18   the question.
19       A.   The first statement, "shadowing
20   Barclays' process."
21       Q.   Well, did -- I'm sorry, were you
22   finished?
23       A.   Yes.
24       Q.   The -- in an effort to minimize the
25   administrative claims of the Lehman estate, did

Page 157

1              M. Korycki
2    you or A&M generally try to be in a position to
3    quickly assess whether Lehman should reject or
4    continue to pay contracts?
5              MR. TAMBE:  Objection.  Form.
6    Foundation.
7        A.   Can you repeat your question again?
8        Q.   Sure.  As part of an effort to
9    reduce -- it's a good thing to reduce Lehman's
10   estate's administrative claims, correct, from
11   the perspective of Alvarez and Lehman?
12       A.   Yes.
13       Q.   Do you agree with Mr. Tully's point
14   that making quick assessments of whether to
15   reject or continue a contract not assumed by
16   Barclays made sense?
17       A.   No, I don't -- don't agree with that.
18       Q.   Why don't you agree with that?
19       A.   Well, quick assessments, the list, as
20   you probably know, that was filed, the list of
21   contracts that went over to Barclays did not
22   have contract ID numbers on them, so we don't
23   know exactly what contracts Tully went over --
24   at the time, we did not know exactly what
25   contracts went over to Barclays.

Page 158

M. Korycki

1
2    Q.   You had to find out further
3    information about those contracts before you
4    could make an assessment -- that the
5    contracts -- well, the contracts that went over
6    to Barclays you weren't going to reject, right?
7        A.   That is correct.  Let me just clarify.
8    So if we had -- if Lehman had a contract with
9    Vendor A and it was listed on -- Vendor A was
10   listed as it was assumed by Barclays, well,
11   under Vendor A, there may have been different --
12   there may have been 20 different contracts set
13   up with Vendor A.  So we don't know if they took
14   all of them at the time or if they took two of
15   them and they left the rest for Barclays.  So it
16   wasn't a quick -- you couldn't do a quick
17   assessment.
18       Q.   Was it your understanding there's kind
19   of two buckets of contracts being assumed by
20   Barclays, one bucket was the Closing Date
21   Contracts which were listed as of a
22   approximately September 18, 2008 before the deal
23   even closed that were definitely going to be
24   assumed by Barclays; are you aware of that
25   bucket?

Page 159

M. Korycki

1
2        A.   Yes.
3        Q.   And there's another bucket that
4    Barclays had 60 days to decide whether to -- 60
5    days after closing to decide whether to assume
6    or not, correct?
7        A.   That -- I believe so, yes.
8        Q.   Okay.  And that second bucket of -- so
9    obviously at this point in early October,
10   Alvarez understood the first bucket of contracts
11   that were assumed, the Closing Date Contracts,
12   right?  They had a list of those and they knew
13   what the contracts were assumed by?
14       A.   Again, I'm referring to -- I don't
15   believe that there were contract ID numbers
16   associated with all those contracts.
17       Q.   Okay.  So the Lehman list of Closing
18   Date Contracts did not have detailed information
19   about the contract numbers, is that what you're
20   saying?
21       A.   That is, right.
22       Q.   In terms of the second bucket, what
23   Mr. Tully seems to be saying is we should follow
24   what decision Barclays is making with respect to
25   which contracts it's going to assume and which

Page 160

M. Korycki

1
2    contracts it's not going to assume so that we
3    can assess the ones it's not going to assume
4    more quickly in the event that Lehman doesn't
5    want to keep the contract, it wants to reject
6    it; it makes sense to do that sooner rather than
7    later to lower the administrative claims.
8        Does that make sense to you?
9        A.   Yes, it makes -- I see what you're
10   saying, yes.
11       Q.   And so, you know, pursuant to Mr.
12   Tully's, representative from the Creditors
13   Committee's suggestion, did A&M or Lehman estate
14   make efforts to keep track of or keep up to date
15   on which contracts Barclays was assuming and
16   which contracts they were not assuming?
17       A.   Several efforts were made to keep up
18   with that, yes.
19       Q.   So, in roughly the October time
20   period, Alvarez and Lehman had an understanding
21   of what it would follow -- I mean, it could go
22   on the Website and just see what contracts were
23   being assumed and not assumed; is that right?
24       MR. TAMBE:  Objection to form.
25       Q.   Did you understand there was a Website

Page 161

M. Korycki

1
2    put up where the contracts -- it was indicated
3    whether the contracts were being assumed or not
4    being assumed by Barclays?
5        A.   Are you referring to the Epiq Website?
6        Q.   Yes.
7        A.   I'm familiar with the Epiq Website,
8    yes.
9        Q.   Okay.  So that would show --
10   obviously, as of closing, that had the Closing
11   Date Contracts, right?
12       A.   It had the Closing Date Contracts
13   listed, yes.
14       Q.   And it had the cure amounts for those
15   contracts, right?
16       A.   I don't believe all the cure amounts
17   were on there.  I don't recall if all the cure
18   amounts were on there.
19       Q.   Okay.  The -- and then the Epiq, at
20   some point were they on there, all the cure
21   amounts?
22       A.   I know there was a mishap with the
23   file that was, I believe, first filed and a
24   second -- a second one.
25       Q.   And there was a refiling?  There was a

Page 162

M. Korycki

1
2  later refiling corrected and adjusted by about a
3  few million dollars -- or, I'm not sure how
4  much.
5       A.  I don't recall how much it was
6  adjusted by.
7       Q.  Okay.  And do you know ballpark figure
8  about how many -- what the total cure amount
9  assumed by Barclays with respect to the Closing
10  Date Contracts?
11       A.  I don't recall the number.
12       Q.  Is it between 100 million and 200
13  million?
14       A.  Again, I don't recall the number.
15       Q.  Did you have access to the number at
16  the time?
17       A.  At the time I did, yes.
18       Q.  So, at the time you would have known
19  what it was, but you don't recall it as you sit
20  here today?
21       A.  That is correct.
22       Q.  Do you have a -- do you have a just
23  general sense of what the ballpark figure for
24  the amount of cure payments assumed by Barclays
25  in the second bucket, not the Closing Date

Page 163

M. Korycki

1
2  Contracts, but the ones assumed in the 60-day
3  period after the closing?
4       A.  I don't recall.
5       Q.  Do you recall it being a small amount?
6  I mean, less, you know, less than 100 million?
7       A.  Again, I don't recall.
8       Q.  Is that the same thing where you would
9  have known that amount at the time, but
10  currently, you don't recall?
11       A.  I knew it at the time.  Currently, I
12  don't recall.
13       Q.  Okay.  So let's assume that those,
14  without getting into a whole bunch of documents,
15  let's assume that the actual cure amounts
16  assumed by Barclays were less than 200 million,
17  adding up both buckets.
18       So in October -- that's the same time
19  period, early October, we looked at October 2,
20  October 3, where you were tasked with looking at
21  the backup or detail of the estimated cure
22  amounts associated with the Barclays sales
23  transaction.
24       When you learned of the actual cure
25  amounts being taken by Barclays, which are much

Page 164

M. Korycki

1
2  lower than the estimated cure amount in your
3  October 2 e-mail that the Creditors Committee
4  representatives asked you to look into, did that
5  cause you any concern or cause you to take any
6  actions?
7       A.  I don't remember what -- I don't
8  remember.
9       Q.  You have no recollection of that, the
10  issue of there being a difference between the
11  estimated cure amounts and the actual cure
12  amounts, you don't recall that issue being
13  raised or discussed?
14       A.  I know it was raised.  I believe it
15  was raised.  I don't recall.
16       Q.  And you don't know if -- not just you,
17  but do you know if anyone pursued that issue any
18  further or looked into the difference between
19  the estimated potential exposure for cure and
20  the actual amounts of cure incurred?
21       A.  Again, I don't know if anyone looked
22  into it.
23       MR. THOMAS:  Why don't we take a short
24  break.  I'm getting close to being done.
25       MR. TAMBE:  Okay.

Page 165

M. Korycki

1
2       THE VIDEOGRAPHER:  The time is 1:47
3  P.M.  We're going off the record.
4       (Recess.)
5       THE VIDEOGRAPHER:  The time is 1:56
6  P.M.  We're back on the record.
7  BY MR. THOMAS:
8       Q.  Looking back at Exhibit 582A in the
9  long e-mail from the Creditors Committee
10  representative, Conor Tully, to you, on the
11  second page up at the top, point number 2, he
12  says, "Our committee has inquired numerously
13  regarding the estimate of $2 billion in cure
14  costs.  I believe that statement was made on the
15  record in court.  We wanted to understand if
16  that number has a basis.  Also, the committee is
17  interested in understanding the total cost to
18  cure contracts under the Barclays transaction."
19       Do you recall, after the committee
20  saying that it wanted to understand if that
21  number had a basis, the cure cost number of $2
22  billion, whether there was any further
23  discussion of this issue, either internally at
24  Alvarez or with the committee?
25       A.  We did have discussions internally

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12

13          DEPOSITION OF UMA KRISHNAN

14             New York, New York

15              June 29, 2010

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 31616

Page 6

1                Krishnan
2        Schiller & Flexner on behalf of Barclays and
3     the witness.
4     BY MS. CARRERO:
5        Q.    Ms. Krishnan, have you ever been
6     deposed before?
7        A.    No.
8        Q.    Perhaps it's best if we go over some
9     housekeeping rules that might make things
10    easier.  If you would let me finish a question
11    before you answer, and I will try to do the same
12    thing.
13       A.    Okay.
14       Q.    And wait to pose another question
15    until you have finished your response.
16          If you feel like you need to take a
17    break at some point, I just ask that you finish
18    answering whatever pending question there is,
19    and if it's an appropriate time to break, we
20    will do so.
21          The court reporter needs verbal
22    answers to be able to take it down on the
23    record, so I ask that you give verbal responses
24    rather than nodding your head or the like.
25       A.    Okay.

Page 7

1                Krishnan
2        Q.    So with that, let's begin.
3          What is your current title,
4     responsibilities and duties at Barclays?
5        A.    I'm responsible for the GFS system at
6     this time.
7        Q.    And --
8        A.    And I manage a team of four people.
9        Q.    And what is your title?
10       A.    It's assistant vice president.
11       Q.    And do you have any other
12    responsibilities or duties other than for GFS?
13       A.    No, that's about it.
14       Q.    And what do those responsibilities and
15    duties entail?
16       A.    We interact with the users to make
17    sure that they are happy with the data that the
18    system produces, you know, on day-to-day issues.
19    With the system we assist them with any changes
20    that they want, things like that.
21       Q.    When you say the users, who are you
22    referring to?
23       A.    Barclays users.
24       Q.    And who are those Barclays users?
25       A.    Product controllers and financial

Page 8

1                Krishnan
2     controllers.
3        Q.    Does Barclays currently use the GFS
4     system?
5        A.    Yes, they do.
6        Q.    And when did they begin using the GFS
7     system?
8        A.    Probably somewhere in the end of
9     September 2008.  I don't remember the exact
10    date, but around that time.  After the
11    acquisition.
12       Q.    Do you know if it replaced an existing
13    system at Barclays?
14       A.    No, it was -- because they acquired a
15    lot of, you know, like the Lehman business,
16    they -- and GFS was still processing the data
17    from Lehman businesses, they decided to continue
18    to use GFS.
19       Q.    You had mentioned that you were an
20    assistant vice president.  Could you tell me of
21    what group?
22       A.    Finance Technology.
23       Q.    And when did you join Barclays?
24       A.    I joined Barclays in end of September
25    of 2008 like everybody else from Lehman, so ...

Page 9

1                Krishnan
2        Q.    And who do you report to within
3     Finance Technology?
4        A.    Right now I report to Daylas Fuentes.
5        Q.    And Ms. Krishnan, I see that you have
6     notes in front of you.
7          MR. THOMAS:  Go ahead and put those
8     away.
9          THE WITNESS:  Okay.
10       Q.    Were those prepared for purposes of
11    your testimony today?
12       A.    I wanted to, you know, recall myself
13    because it's a long time back, so I just ...
14       Q.    If we could just take one minute for a
15    second.
16          (Pause in the proceedings.)
17       Q.    Ms. Krishnan, what did you do to
18    prepare for your deposition today?
19       A.    We were just talking about the reports
20    that we made for -- for the attorneys.
21       Q.    And did you --
22       A.    How we extracted them.
23          MR. THOMAS:  If you're referring to
24    conversations with the attorneys, you don't
25    want to get in the substance of that because

Page 10

Krishnan

2  that's privileged.
3      THE WITNESS:  Okay.
4      Q.    Did you meet with your attorneys in
5  preparation for your deposition today?
6      A.    Yes, we did.
7      Q.    And did you meet with anybody else
8  other than your attorneys in preparation for
9  your deposition?
10     A.    No.  Anybody else?  No.
11     Q.    Did you speak to any former Lehman or
12  Barclays employees?
13     A.    No.
14     Q.    Did you prepare your notes yourself or
15  with the assistance of others?
16     A.    I --
17     MR. THOMAS:  Objection to form.
18     Q.    You can go ahead and answer.
19     MR. THOMAS:  If you're asking about
20  the notes, she wasn't using them to answer
21  questions.  She does not have them in front
22  of her.  They were notes of conversations
23  taken with counsel.  They're privileged.
24     MS. CARRERO:  For now, we'll accept
25  that, and if need be, we'll follow up later.

Page 11

Krishnan

2      Q.    Prior to your employment at Barclays,
3  what was your position at Lehman Brothers?
4      A.    I was part of a team called Run the
5  Bank.  We were responsible for infrastructure
6  and day-to-day issues with the system, user
7  queries.
8      Q.    And when you say the "system," are you
9  referring to only the GFS system?
10     A.    Yes, primarily the GFS system, but we
11  were trying to get trained in other systems in
12  Finance Technology.
13     Q.    And what other systems were you
14  getting trained in?
15     A.    G Quest and a data system calls PALS,
16  P-A-L-S.
17     Q.    And what is G Quest?
18     A.    I didn't really know that much
19  because, you know, we were just starting to get
20  trained.  It's a P&L system.
21     Q.    Was it replacing an existing system?
22     A.    No, it was a Lehman system.
23     Q.    And what is PALS?
24     A.    PALS was also a P&L system.
25     Q.    Were they P&L systems for different

Page 12

Krishnan

2  businesses of Lehman Brothers?
3      A.    Yes, I think so.
4      Q.    What is GFS?
5      A.    GFS stands for Global Funding System.
6  It produced daily balances and P&L reporting for
7  use -- for product controllers and financial
8  controllers.
9      Q.    And what were your day-to-day
10  responsibilities and duties with respect to GFS?
11     A.    The day-to-day responsibilities
12  included making sure that the system is running
13  fine, without any issues, answering user
14  questions, user issues, infrastructure
15  responsibilities, anything to do with the
16  database, you know, any issues with the
17  database, fix -- reaching out to the right
18  person to fix them.
19     Q.    And are those your same day-to-day
20  responsibilities for GFS in your current
21  position at Barclays as well?
22     A.    I have more responsibilities now in
23  the sense that we are responsible for changing
24  anything in the system plus maintaining the
25  system.

Page 13

Krishnan

2      Q.    And when you say responsible for
3  changing anything in the system, what do you
4  mean?
5      A.    Well, users want different
6  functionalities at different points in time, so
7  depending on what they want and whether it's
8  doable in the system, we make changes.
9      Q.    And who are the users that would be
10  requesting such changes?
11     A.    The users would be product controllers
12  and financial controllers.
13     Q.    And with respect to maintaining the
14  system, what does that entail?
15     A.    That we make sure they are rerun
16  batches, like automated batches, we make sure
17  that there are no failures and failures are
18  handled without affecting the numbers in the
19  system.
20     Q.    And how do you do that?
21     A.    It depends on what the problem is, so
22  depending on it could be like a data issue that
23  the system is not built to handle, we might --
24  we might face something like that, or it could
25  be a very simple problem because the database

Page 14

Krishnan

1
2 was down or something, so it could be ...
3     Q.   And who was responsible for changing
4 and maintaining the system while you were at
5 Lehman?
6     A.   We were split into two groups.  There
7 was another group called Change the Bank or
8 Build the Bank.  I'm not sure, I don't remember
9 who was the manager was for that system at that
10 time.
11     Q.   And the other group perhaps called
12 Build the Bank was responsible for changing or
13 maintaining the GFS system?
14     A.   Changing.  We were responsible for
15 maintaining it.  Run the Bank was responsible
16 for maintaining.
17     Q.   And what did it entail to maintain the
18 system while you were at Lehman?
19     A.   The same things that we do now, like
20 the system issues, any batch job failures, you
21 know, and answering user questions.
22     Q.   Were user questions about the
23 technology itself?
24     A.   The use -- sometimes the users think
25 that the numbers should be some way, and if it's

Page 15

Krishnan

1
2 different, they just need an explanation on why
3 the system generated that number.  So, you know,
4 we look at the code and tell them what exactly
5 it does.  Sometimes the users may be new and
6 they don't know what's going on so they may ask
7 questions.  Sometimes it could be just user
8 training.
9     Q.   Did you or your group have any
10 responsibility for the actual numbers input into
11 GFS?
12     A.   No, we did not have any.
13     Q.   I should say did you or your group
14 have any responsibility for the numbers input
15 while you were at Lehman?
16     A.   No, we did not have any responsibility
17 towards that.
18     Q.   Is that the same answer in your
19 current position at Barclays?
20     A.   Yes, that's correct.
21     Q.   And do you or your group have any
22 responsibility for generating any of the
23 financial reports that might come from GFS while
24 you were at Lehman?
25     A.   No.  Users had access to our -- we had

Page 16

Krishnan

1
2 like a graphical user interface and they would
3 run the reports themselves.  They did not come
4 to us for the reports.
5     Q.   And is that the same answer in your
6 current position at Barclays?
7     A.   Yes, that's correct.
8     Q.   Are you familiar with the reports that
9 were run from GFS while you were at Lehman?
10         MR. THOMAS:  Objection to form.
11         You can answer.
12     A.   Yes.  I'm sorry, what was the question
13 again?
14     Q.   Were you familiar with the types of
15 reports that were run from GFS while you were at
16 Lehman?
17     A.   To some extent, yes, but there were a
18 lot of reports, so I -- I probably was familiar
19 with some of the reports, but there's like a
20 whole lot of reports.
21     Q.   And which reports would you have been
22 familiar with?
23     A.   All the reports were built off tables
24 in the system.  So, you know, we had a very
25 user-friendly environment in which we could go

Page 17

Krishnan

1
2 and click on the report to see what table it's
3 based off.  So I don't remember any of the
4 report names off the top of my head, but if the
5 user sees this report, I could go and find out
6 what it is.
7     Q.   Would you know the report paths that
8 used to generate any given report?
9     A.   I'm sorry?
10     Q.   Would you be familiar with the report
11 paths that would be used to generate any given
12 report?
13     A.   Yes, I would know how the report is
14 getting generated.
15     Q.   Is that a query that you can put into
16 GFS in order to generate the report that you
17 want?
18     A.   Yes, you can put a query to generate
19 the report.
20     Q.   And is the GFS system that's used by
21 Barclays today identical to the one that was
22 used at Lehman?
23     A.   It is identical, yes, but it has a lot
24 of -- I mean, it has some changes post the
25 Barclays acquisition.

Page 18

Krishnan

2  Q.   And what would those post-acquisition
3  changes be?
4      A.   Changes because GFS had this
5  functionality to net down, so they wanted to net
6  down, meaning like it would net the longs with
7  the shorts.  So they wanted to prevent any net
8  down happening between Barclays and these Lehman
9  entities, so that was one of the main changes
10  that they made.
11     Q.   And would those changes have been made
12  only for prospective periods of time or was it a
13  retroactive change to the system?
14     A.   It -- I don't remember exactly when
15  the change was made, but it was sometime around
16  the end of September that change was made.  So
17  we split Barclays entities from the Lehman
18  entities.
19     Q.   And that split would happen for only
20  future dates?
21     A.   Yes, that's correct.
22     Q.   How many people were there in the Run
23  the Bank group at Lehman?
24     A.   Probably ten to twelve, or maybe more
25  globally.  I don't remember the exact number.

Page 19

Krishnan

2      Q.   And who did you report to while in
3  that group at Lehman?
4      A.   While I was at Lehman, I reported to
5  Daylas also.  Daylas Fuentes.
6      Q.   And do you know who -- Mr. Winters did
7  you say?
8      A.   Fuentes.  Daylas Fuentes.
9      Q.   Fuentes, do you know who he reported
10  to?
11     A.   She reported to Dan Marcus.
12     Q.   What systems flow into GFS?
13         MR. THOMAS:  Objection to form.
14     A.   ITS, MTS, Loan I.Q., TMS.  I might
15  miss a few because there's a whole lot of
16  systems.  That's one of the -- some of the main
17  systems.
18     Q.   Perhaps we should back up.  Could you
19  explain to me how the GFS system is set up to
20  receive feeds from other systems?
21     A.   We receive most of the feeds through
22  FTP, File Transfer Protocol, FTP.
23     Q.   And other systems feed into FTP which
24  then feeds into GFS; is that correct?
25     A.   No.  FTP is just a means of

Page 20

Krishnan

2  transferring files from one place to another, so
3  that's the mechanism by which the files were
4  transferred from those source systems to GFS.
5      Q.   And the systems that would transfer
6  into GFS, what type of systems are they?
7      A.   They are -- most of them are
8  settlement systems.
9      Q.   And are there different settlement
10  systems for the various different product
11  classes?
12     A.   I think so.
13     Q.   Would prices for any given security be
14  entered directly into GFS or into another system
15  that would then flow into GFS?
16     A.   It usually flows into GFS.  The only
17  way a price could be entered in GFS is by a user
18  if he were -- he or she were to make like an
19  adjustment.
20     Q.   What would be the process in order to
21  make an adjustment within GFS?
22     A.   There was a specific set of users who
23  have access to adjustments in GFS and the users
24  are trained on, you know, how to make the
25  adjustments on like what security and what

Page 21

Krishnan

2  account.
3      Q.   And who would those users be that
4  would have access to make adjustments?
5      A.   I don't remember the users now.
6      Q.   Within GFS, can you tell if any
7  adjustment has been made to the price of any
8  given security?
9          MR. THOMAS:  Objection to form.
10         THE WITNESS:  I'm sorry.
11         MR. THOMAS:  You can answer, if you
12  can.
13     A.   Yes, I'm sorry, I forget the question.
14     Q.   Sure.  I'll repeat that for you.
15     Within GFS, can you tell if any
16  adjustment has been made to the price of any
17  given security?
18     A.   Yes, there were a lot of adjustments
19  made.
20     Q.   Is there an indication within GFS when
21  an adjustment is made?
22     A.   We have -- we capture the adjustments
23  in a table which has like the user ID who made
24  the adjustment and what it was adjusted to the
25  security and the account.

Page 22

Krishnan

1
2    Q.   Would it show up as an additional
3    column if you were to run a GFS report?
4        A.   No, it would modify the existing -- if
5    it's a price adjustment, it would modify the
6    existing column that was holding that position.
7        Q.   And so if you wanted to see if any
8    adjustment had been made to that value, how
9    would you do that?
10       A.   You mean like if the adjustment was
11   applied or was actually processed through the
12   system?
13       Q.   Yes.
14       A.   You would -- I would go to that
15   account and security and I would check if it has
16   the price that it was supposed to be adjusted
17   to.
18       Q.   And would it tell you the date which
19   it -- on which it was adjusted?
20       A.   Yes, it would tell the date.
21       Q.   And would it tell you what had
22   previously been entered on that date prior to
23   adjustment?
24       A.   I think it holds -- I'm not sure about
25   this -- I think it holds just the price that it

Page 23

Krishnan

1
2    was at the start of the day and then, you know,
3    if a price was adjusted twice, I don't know if
4    it will hold both the prices.
5        Q.   So just to make sure I'm understanding
6    correctly, when an adjustment is made, you're
7    not sure whether the previous price prior to the
8    adjustment would be recorded somewhere; is that
9    correct?
10       A.   Right.
11       Q.   Do you know what GFS captures in terms
12   of value?
13       A.   Meaning?
14           MR. THOMAS:  Objection to form.
15       Q.   Let me see if I can make that clearer.
16   Do you know what GFS is capturing with respect
17   to the value of any given security that can be
18   found in the system?
19           MR. THOMAS:  Objection to form.
20       A.   I think what it does is it presents
21   the trade date balances and the settlement date
22   balances for any given date.
23       Q.   What do you mean by "balances"?
24       A.   By balances, I mean like what the --
25   what an account was holding at the end of the

Page 24

Krishnan

1
2    day.
3        Q.   How about any given security within an
4    account, do you know what value for a security
5    is being recorded?
6            MR. THOMAS:  Objection to form.
7        A.   You mean market value?  I don't
8    understand the question.
9        Q.   That's my question to you, is what is
10   GFS capturing with respect to any given
11   security?
12       A.   It would have the market value of the
13   security and for the security and the account.
14       Q.   And that market value for any given
15   security within GFS would flow in from a
16   settlement system; is that correct?
17       A.   No, the settlement system would send
18   us the quantity and the price in most cases, and
19   we would calculate the market value.
20       Q.   And the market value would be
21   calculated using the price and the size of the
22   position; is that correct?
23       A.   Yes, in most cases.  There are some,
24   you know, there may be some changes for some
25   products.  They could have like a multiplying

Page 25

Krishnan

1
2    factor, a pricing factor, or a multiplier.  It
3    depends on the -- on the security.
4        Q.   And would there be formulas within GFS
5    that would do the calculation of market value
6    using the price and position size and get the --
7    any other relevant information?
8        A.   Yes, that's correct.
9        Q.   And who was responsible for
10   determining what those formulas would be that
11   were entered into GFS?
12       A.   The formulas were built in the form of
13   code in GFS.  I was not there when the formulas
14   were put in so I don't know who was responsible
15   for putting those in.
16       Q.   Would you expect that the formulas
17   would be determined by someone in finance or on
18   the business side?
19           MR. THOMAS:  Objection to form.
20       A.   I don't know.  I really cannot answer
21   that because I was not there with the system
22   then.
23       Q.   In addition to prices that might have
24   flowed into GFS from the various settlement
25   systems, is there anywhere else that the prices

Krishnan

1
2 would flow into GFS from?
3      A.    There might have been other systems.
4 There was a Prime Broker system which might have
5 given prices.
6      Q.    Would there have been feeds into GFS
7 or into the settlement systems that flow into
8 GFS from third-party vendors such as Bloomberg
9 or Reuters, for instance?
10      A.    No, we did not get anything from
11 Bloomberg or Reuters or any third party.  We
12 always got prices from internal Lehman systems.
13      Q.    But would other internal Lehman
14 systems which then flowed into GFS get feeds
15 from various third-party vendors such as
16 Bloomberg and Reuters?
17      A.    I don't know.  I would think they
18 would have got it from third-party vendors, but
19 I don't know where they got their prices from.
20      Q.    And are there any other internal
21 Lehman systems other than settlement systems or
22 the Prime Broker systems that would have flowed
23 into GFS?
24      A.    Could you repeat the question?
25      Q.    Are there any other internal Lehman

Krishnan

1
2 systems other than settlement systems or the
3 Prime Broker systems that would have flowed into
4 GFS?
5      A.    We had a product reference data
6 flowing from a system called Global Products.
7      Q.    And what is Global Products?
8      A.    That was holding information about all
9 securities.  Like, you know, a security could
10 have a currency and like a description of the
11 security and a security has various identifiers
12 like SEDOL, ISIN, so all these would be -- would
13 be sourced from Global Products.
14      Q.    Could you perhaps explain a little bit
15 more what you mean by "various identifiers"?
16      A.    A security could have a lot of
17 identifiers.  So the system called ISIN, it's --
18 I think European securities have the ISIN.  Then
19 there's a SEDOL.  It could be a CUSIP.
20      Q.    And would Global Products also include
21 any sort of pricing or valuation information
22 about any given security?
23      A.    I'm not sure if they had, but we did
24 not get the pricing information from them.
25      Q.    Do you know how pricing information

Krishnan

1
2 was entered into the settlement systems?
3      A.    No, I do not know that.
4      Q.    Do you know how information flowed
5 into GFS?  Let me rephrase that.  We had
6 discussed earlier FTP.
7      A.    Right.
8      Q.    Is that how information flowed into
9 GFS?
10      A.    For the most part, yes.  Sometimes we
11 used to, for example, the Global Products, we
12 used to execute what is called as a remote
13 procedure call in their system to get the data
14 out.
15      Q.    Does that mean that, in order to get
16 information from Global Products, it was not an
17 automated process?
18      A.    We had different types of getting
19 information from Global Products.  One of them
20 was doing a remote procedure call.  The other --
21 there were also other ways.  We also got files
22 through FTP from Global Products.
23      Q.    When you say a remote procedure, is
24 that an automated procedure?
25      A.    Yes, it -- what it means is my system

Krishnan

1
2 makes a call to their system through a remote
3 procedure.  That means I'm remotely sitting
4 somewhere and my system is making that call.
5 That's why it's called a remote procedure call.
6      Q.    And does that remote procedure call
7 happen every day at a set --
8      A.    Every day --
9      I'm sorry.
10      Q.    -- every day at a set time?
11      A.    Every time we see a new product that
12 we don't have we initiate a remote procedure
13 call to get the information for that product.
14      Q.    So I just want to make sure that the
15 record isn't confused here.  You initiate rather
16 than it being an automatic process by which you
17 would receive the information from Global
18 Products; is that correct?
19      A.    No, we do not do it manually.  The
20 system is coded to do that when it sees a
21 security that is not there in our system, it
22 goes to Global Products to get the information.
23      Q.    So the system is set up to
24 automatically, if it sees a product that it does
25 not have information for, to obtain that

Page 30

1      Krishnan
2  information from Global Products; is that
3  correct?
4      A.   Yes, that's correct.
5      Q.   How about any other systems that flow
6  into GFS, is that an automated process?
7      A.   Any -- most of the systems --
8  actually, all of the systems are automated
9  process through FTP.
10     Q.   And how does that automated process
11 work?
12     A.   I think the system from which we are
13 getting the feed, they would have some sort of
14 automated job set up to deliver the files to us
15 through FTP.
16     Q.   And do you know how frequently that
17 automated process occurs?
18     A.   Every night we get feeds from the
19 systems.
20     Q.   And do you know if each system feed
21 occurs at roughly the same time every night?
22     A.   No, it depends on some of the feeds
23 may come in earlier, like around 8 P.M. or 9
24 P.M.  Some of them are later, around 12 or 1
25 A.M. the next day morning.

Page 31

1      Krishnan
2      Q.   And is there a procedure that takes
3  place after the nightly feeds into GFS?
4      MR. THOMAS:  Objection to form.
5      A.   The system takes care of loading the
6  feeds and processing them.
7      Q.   Is that an automated process or does
8  it involve some sort of human input?
9      A.   No, it's an automated process.
10     Q.   Within GFS, how are the various --
11 scratch that.  Before I start handing you
12 documents, just one last question:  How long
13 were you employed by Lehman Brothers?
14     A.   I was employed in 2005 June.
15     Q.   And you worked there through September
16 2008; is that correct?
17     A.   Yes, that's correct.
18     Q.   And did you have the same position the
19 whole time you were at Lehman?
20     A.   I've been with the same group.
21     Q.   Did you have the same duties and
22 responsibilities for the roughly three years
23 while you were at Lehman?
24     A.   For the most part, yes.
25     Q.   Were you working with GFS during that

Page 32

1      Krishnan
2  whole period of time?
3      A.   Yes.
4      (Deposition Exhibit 828, Barclays'
5  Exhibit List, marked for identification, as
6  of this date.)
7      Q.   Ms. Krishnan, I'm putting before you
8  what has been marked as Deposition Exhibit 828.
9  It is a copy of Barclays' exhibit list that was
10 attached to a June 28 e-mail from Barclays'
11 counsel.
12     I'm also going to hand you what has
13 been marked as Deposition Exhibit 829.  It is a
14 copy of movants' exhibit list in this matter
15 which is attached to a June 17 e-mail from Fara
16 Tabatabai.
17     (Deposition Exhibit 829, Movants'
18 Exhibit List attached to a June 17 e-mail
19 from Fara Tabatabai, marked for
20 identification, as of this date.)
21     Q.   I'm also going to hand you what has
22 been marked as Deposition Exhibits 830 through
23 856, which are copies of various GFS reports
24 that have been produced in this matter.
25     (Deposition Exhibit 830 through 856,

Page 33

1      Krishnan
2  copies of various GFS reports, marked for
3  identification, as of this date.)
4      Q.   Deposition Exhibit 857, which is a
5  compilation of document production letters from
6  Barclays' counsel producing the various GFS
7  reports.
8      (Deposition Exhibit 857, a compilation
9  of document production letters from
10 Barclays' counsel producing the various GFS
11 reports, marked for identification, as of
12 this date.)
13     Q.   And finally, Deposition Exhibit 858,
14 which appear to be summary reports that were
15 produced to us by Barclays' counsel last evening
16 which we, you know, object to the production of
17 these documents after the close of discovery and
18 ask Barclays' counsel if there's a reason that
19 they're being produced now.
20     (Deposition Exhibit 858, Summary
21 Reports, marked for identification, as of
22 this date.)
23     MR. THOMAS:  Which document request do
24 you think it's responsive to?
25     MS. CARRERO:  These are documents that

Krishnan

1
2  were produced to us last night and --
3      MR. THOMAS:  As a courtesy because we
4  thought it may come up in the deposition.
5      MS. CARRERO:  We had not requested
6  them and view them as a production
7  subsequent the close of discovery.
8      MR. THOMAS:  You don't have to use
9  them.
10      MS. CARRERO:  But we can discuss that
11  later and have been told that Bates-stamped
12  copies are on their way.
13      MR. THOMAS:  Right.  Obviously if it
14  wasn't clear, we object to the
15  characterization about the timeliness of
16  production.
17      MS. CARRERO:  And again, we just state
18  our objection to the production after the
19  cut-off.
20      MR. THOMAS:  And --
21      MS. CARRERO:  As well as reserve our
22  right to object on any other grounds.
23      Q.   So with all those exhibits in front of
24  you now, why don't we proceed in identifying
25  them for the record so it's clear.

Krishnan

1
2      Starting with what should be
3  Deposition Exhibit 829, which is a copy of
4  movants' trial exhibit list, turning to page 20
5  of that list, do you see the items corresponding
6  to Movants' Trial Exhibits 301 through 306?
7      A.   Uh-huh.  Yes, I do.
8      Q.   Those are identified as GFS Detailed
9  Exposure Reports dated September 12 through
10  September 19.  Do you see that?
11      A.   Yes.
12      Q.   We have for purposes of this
13  deposition marked those as Deposition Exhibits
14  830 through 835, which are before you as well.
15  Do you see those?
16      A.   Yes, I do.
17      Q.   Did you prepare these reports for
18  their production?
19      A.   Either me or my team would have
20  prepared these.
21      Q.   And do you know who requested
22  preparation of these reports?
23      A.   I don't remember who requested.  There
24  are a lot of requests to the GFS system.  Unless
25  there's a ticket number, I would not know who

Krishnan

1
2  requested them.
3      Q.   Do you know the report path that was
4  used to generate any of the reports that are at
5  Deposition Exhibits 830 through 835?
6      A.   You mean do I recognize these reports?
7      Q.   Do you recall being asked to generate
8  them or recognize the reports in order to be
9  able to tell us the report paths that were used
10  to generate them?
11      We can also pull up any of them
12  electronically.  We have the projector set up
13  for purposes of doing so, if necessary.
14      A.   I recognize these reports and the
15  report names and, you know, I do not remember
16  the query or anything because we usually look at
17  this report and we pull the query from the
18  system.
19      Q.   If I were to tell you they had been
20  produced to us in connection with the Expert
21  Report of Professor Paul Pfleiderer in January
22  of 2010, would that refresh your recollection of
23  what query was entered in order to generate
24  these reports that are marked Deposition
25  Exhibits 830 to 835?

Krishnan

1
2      MR. THOMAS:  Objection to form.
3      A.   I have to look at the ticket that was
4  raised to, you know, exactly remember what were
5  the queries, and the queries are pretty long and
6  there's no way I could remember.
7      Q.   And what exactly is a ticket?
8      A.   There is a system called SAM in which
9  any -- any request, data requests related to
10  Lehman are entered and, upon approval, we
11  process those requests.
12      Q.   And who can enter requests through
13  SAM?
14      A.   I know a person who enters requests.
15  I don't know who all can.  There's a person
16  called Rudy Santa Maria.  I don't remember her
17  last name.  I don't even know if it's a she or a
18  he.  First name is Rudy, I think.
19      Q.   And is it your understanding that Rudy
20  would receive requests that he or she would then
21  enter into SAM?
22      A.   Yes, kind of.
23      Q.   And would those requests contain a
24  specific report path or an explanation of the
25  type of end product one wanted and leave

Page 38

```
1              Krishnan
2    discretion to you and your group to determine
3    how to query that information?
4         A.   No.  Most cases they will let us know
5    exactly what they want.  They mostly give us
6    like the report name, any filters that need to
7    be applied, any filters to exclude or include
8    data, everything is specified in the ticket, and
9    the date for which they need the data.
10        Q.   And do you know if Rudy or whoever may
11   have entered the information into SAM would be
12   given that specific information or would be the
13   one entering that specific information after
14   being told what was needed?
15        A.   I don't know who puts that
16   information, but that information is there in
17   the SAM ticket, so that's the one we look at.
18        Q.   Are there ever instances where a SAM
19   ticket might have a query that is not possible
20   or needs to be revised?
21             MR. THOMAS:  Objection to form.
22        A.   Yes, there have been cases like that.
23        Q.   And what do you do in cases like that?
24        A.   We communicate with them that whatever
25   the reason we are not able to do it and they
```

Page 39

```
1              Krishnan
2    come back with an additional request or they
3    change the request.
4         Q.   And the types of queries that are
5    entered into SAM, are they generally uniform
6    type of requests of reports that are generally
7    run on a daily or monthly or regular basis?
8              MR. THOMAS:  Objection to form.
9         A.   We would have the -- it's -- I don't
10   know how frequently it happens, but whenever we
11   get a request, we would run the report for that
12   specific date that's in the ticket, that's in
13   the SAM ticket.
14        Q.   But the report that would be run, is
15   that necessarily a report that would be run
16   regularly, daily, monthly, quarterly, yearly, or
17   could it be a unique query that just captures
18   what's being requested at that moment?
19        A.   I wouldn't know that because I do not
20   run the reports.  None of us in Technology
21   really runs the reports unless they are for
22   dates like these, which may not be available in
23   the system anymore.  It's the users who run the
24   reports, so I don't know which ones they run
25   monthly, quarterly.
```

Page 40

```
1              Krishnan
2         Q.   And when you say may not be available
3    in the system anymore, what do you mean?
4         A.   The system holds only last 23 business
5    dates and last 13 month-ends and last 2
6    year-ends.
7         Q.   And what happens to anything that is
8    older than what the system holds?
9         A.   It -- every night we have an archive
10   process which saves all the data.  So if we need
11   for a date that's not available online, we'll
12   have to -- we have a Tape Archive Team which
13   restores the data.
14        Q.   And do you know what the process of
15   restoration entails?
16        A.   I know the -- that we have to raise a
17   request to have it restored, but other than that
18   it's between the DBAs and the Restore Team,
19   which the Restore Team restores it to a path and
20   the DBAs load it up.
21        Q.   And if a SAM ticket were entered for a
22   query, for instance, of September 2008 data,
23   what would be the next step given the data
24   requested is older than what is stored?
25        A.   For the September 12 and the 19, GFS
```

Page 41

```
1              Krishnan
2    has special environments because those dates
3    were requested very often.  Any date other than
4    that, we would raise a request to the Data
5    Archive Team and they will load it to the right
6    path.
7         Q.   And what exactly do you mean by
8    special environments?
9         A.   GFS -- since GFS production could not
10   hold more than, you know, the 23 business days,
11   and since September 12 was not a month-end, we
12   had to maintain a special environment because it
13   was an important date which a lot of Lehman
14   entities were asking the data for, we -- we set
15   up a special environment for the September 12
16   and the 19.
17        Q.   But by "special environment," you mean
18   on the existing GFS system without it going
19   through the normal archive process?
20        A.   What I mean is we have a production
21   environment which has the last 23 business days
22   and we have a separate GFS instance, which is a
23   completely different way to get into there and
24   that one was holding the September 12 data.
25        Q.   As well as the September 19 data; is
```

Page 42

Krishnan

1
2  that correct?
3      A.   Yes.
4      Q.   And who has responsibility for
5  changing or maintaining the September 12 and
6  September 19 data within the special
7  environment?
8      A.   Any user who has adjustment access.
9      Q.   And do you know who those users are
10  that have adjustment access?
11      A.   I don't recall who are the users.
12      Q.   Are you or your group responsible for
13  changing or maintaining the September 12 and
14  September 19 GFS data?
15      A.   We are responsible for systematically
16  maintaining it, but we do not change anything in
17  the data.
18      Q.   And what does it entail to
19  systematically maintain it?
20      A.   We make sure that we do not touch that
21  database and it's available for users to view,
22  if necessary.
23      Q.   Have you or your group ever undertaken
24  to analyze the accuracy of any of the
25  information within the September 19 or September

Page 43

Krishnan

1
2  12 data contained in the special environment?
3      A.   No, we were not involved in checking
4  the accuracy.
5      Q.   Were you or your group involved in the
6  input of any of the September 12 or September 19
7  GFS data?
8      A.   We were responsible for systematically
9  making it work, but we were not responsible for
10  making any changes to the data.
11      Q.   And any other data within the
12  September 12 to September 30, 2008 date range,
13  other than the 12th and 19th that we just
14  discussed, would be subject to the archive
15  process we discussed before; is that correct?
16      A.   That's correct.
17      Q.   And if a SAM ticket were entered for
18  data related to any of those archive dates, what
19  would be the next step?
20          MR. THOMAS:  Objection to form.
21      A.   The next step would be to -- the Tech
22  Team to get to the Archive Team to restore it
23  and then raise a ticket to the DBAs to load it
24  up in a free environment.
25      Q.   And who are the DBAs?

Page 44

Krishnan

1
2      A.   The database administrators.
3      Q.   And what do you mean by a "free
4  environment"?
5      A.   In order to load the archived data, we
6  need the database to load it.  So we have to
7  free up some environment in the GFS instance to
8  have it loaded.
9      Q.   And once it -- once the archive data
10  was restored and loaded into the free
11  environment, who would run the query requested
12  on the SAM ticket?
13      A.   Because GFS has this limitation with
14  the available front ends, if it's -- if it's a
15  date that's not the 12th or the 19th, we
16  would -- the Technology Team would run the
17  report.
18      Q.   And do you recall if anyone has
19  requested that you or your team run any reports
20  in connection with this matter?
21          MR. THOMAS:  Objection to form.
22      A.   I don't recall anything like that.
23      Q.   Whether that be through a verbal
24  request or a SAM ticket, you have no
25  recollection?

Page 45

Krishnan

1
2      A.   We get a whole lot of tickets, so --
3  like a lot of, two and a half years, all of the
4  time we've had like a lot of tickets.  I don't
5  know specifically which -- I mean, unless you
6  give me the ticket number, I wouldn't know.
7      Q.   If you could take a look at Deposition
8  Exhibit 828 and turn to page 31.  Do you see
9  listed BCI Exhibit Nos. 501 through 503 which
10  are described as GFS reports for September 12,
11  September 15 and September 19, respectively?
12      A.   Uh-huh.
13      Q.   If you would turn to what has been
14  marked as Deposition Exhibits 836 through 843,
15  do you see that Deposition Exhibit 836
16  corresponds with BCI Exhibit 501 and Deposition
17  Exhibit 837 corresponds with BCI Exhibit No.
18  502, and then because the deposition exhibits
19  are in date order, BCI Exhibit No. 503
20  corresponds with Deposition Exhibit 841?
21          MR. THOMAS:  Take as much time as you
22  need to look through all these documents.
23      Q.   There's a lot of paperwork.
24          (Document review.)
25      A.   Okay.

Page 46

Krishnan

1
2      Q.    And then if you would turn to page 41
3  of Deposition Exhibit 828, do you see where BCI
4  Exhibit No. 667 through 671 are listed?  Do you
5  see that, 667 through 671 BCI exhibit numbers?
6      A.    Yes, I see it here on page 41.
7      Q.    And do you see that the descriptions
8  listed next to BCI Exhibit Numbers 667 through
9  671 correspond with what we have marked as
10 Deposition Exhibits 838 through 843?
11         MR. THOMAS:  Objection to form.
12     A.    These are just I guess file names.
13 Here it's report names.  Right?
14     Q.    What we have done here is we have
15 marked as an exhibit the placeholder or cover
16 page of the GFS reports produced and have them
17 available in native form, which is how most of
18 them were produced to us, to the extent that we
19 want to go through them in detail.
20     A.    Okay.
21     Q.    Do --
22         MR. THOMAS:  This stack of papers
23 seems to be spreadsheets or something that
24 says 844 through 856.
25         MS. CARRERO:  That stack corresponds

Page 47

Krishnan

1
2  with what has been marked as 844 through
3  856, which we have not gotten to yet, but
4  will be the next grouping.
5         MR. THOMAS:  Is there a way to tell --
6  for example, you also have a stack of 846
7  through 843.  Is there a way to tell what is
8  Exhibit 836 versus 837 versus 838?
9         MS. CARRERO:  On the witness's copies
10 there is a deposition exhibit --
11         MR. THOMAS:  Oh.  Yeah, thanks.
12         MS. CARRERO:  -- stamp.
13 Unfortunately, we were not able to
14 simultaneously make copies of it, but if you
15 want to take a moment to go off-record and
16 just write down the numbers on each relevant
17 page, we can do that, if that would be of
18 assistance.
19         MR. THOMAS:  Okay.  I'll try to follow
20 now that I know that I have something
21 different than the witness has.
22         MS. CARRERO:  I tried very hard to
23 make it a usable system.  So whatever we
24 need to do to make this as smooth as
25 possible, given --

Page 48

Krishnan

1
2         MR. THOMAS:  I understand.  I was
3  having trouble following the whole thing.
4  Now that I understand that the documents
5  that the witness has have been marked as
6  different exhibits, I'll try to look over
7  her shoulder and follow.
8         MS. CARRERO:  Okay.  Great.
9      Q.    So, with that said, do you see on
10 Barclays trial exhibit list on page 41, BCI
11 Exhibit Nos. 667 through 671, which are
12 described as GFS reports, including equities for
13 September 16 through September 22, and have what
14 we call in legal-speak Bates numbers next to
15 each respective report?
16     A.    Yes, I see that.
17     Q.    And then do you see in front of you
18 what we have marked at this deposition as
19 Deposition Exhibits 838 through 843, which are
20 the placeholder or cover sheets to the GFS
21 reports which were produced to us in native form
22 and should correspond with 667 through 671 on
23 Barclays' trial exhibit list?
24     A.    Yes, I see that.
25     Q.    Did you prepare the reports that were

Page 49

Krishnan

1
2  produced to us as deposition -- did you produce
3  any of the reports that we have marked for
4  purposes of this deposition as Deposition
5  Exhibits 836 through 843?
6      A.    Unless I know the actual ticket number
7  for this, these dates seem to be the dates that
8  are not -- I mean, except for the 19th, the
9  other dates seem to be that's not available
10 online in the system.  So 16th, 17th, 18th and
11 22nd, based on some SAM ticket and approvals, my
12 team or myself might have generated these
13 reports, but for the September 19, I'm not sure
14 because it is online; a user might have
15 retrieved the report.
16     Q.    So if I were to tell you that these
17 have been produced to us in April of 2010, that
18 would not refresh your recollection as to
19 whether or not you, yourself, generated these
20 reports; is that correct?
21     A.    That's correct.
22         MR. THOMAS:  Objection to form.
23     A.    I need the ticket number.
24     Q.    And the same thing, you would need the
25 ticket number to tell us the report paths that

## Page 50

```
 1                  Krishnan
 2      were used to generate any of the reports that we
 3      have marked Deposition Exhibits 836 through 843
 4      which correspond to BCI Exhibit Nos. 501 through
 5      503, 667 through 671; is that correct?
 6          A.   That's correct.
 7              MR. THOMAS:  Objection to form.
 8          Q.   For any of the preceding GFS reports
 9      that we have discussed, would you know when such
10      reports had been run?
11          A.   For the 19th, you mean?
12          Q.   I'm wondering if, when reports are
13      run, is there some way to query when a certain
14      report was run and the report path that was used
15      to generate it?
16          A.   There might be.  I'm not really sure
17      about that.
18              MR. THOMAS:  Counsel, we've been going
19      over an hour.  Probably need a break at some
20      point.
21              MS. CARRERO:  This is a fine time to
22      break.
23              (Recess; Time Noted:  11:16 A.M.)
24              (Time Noted:  11:38 A.M.)
25      BY MS. CARRERO:
```

## Page 51

```
 1                  Krishnan
 2          Q.   So, before the break, we were
 3      discussing what we have been referring to as
 4      Deposition Exhibits 836 through 843, which
 5      correspond to the BCI Exhibits 501 through 503
 6      and 667 through 671, and if you want to turn
 7      back to Deposition Exhibit 828, which is the BCI
 8      exhibit list, I just have a question about that,
 9      the title of the report.
10              If, for instance, on page 41, Exhibits
11      667 through 671 say "GFS Report (Including
12      Equities)"?
13          A.   Yes.
14          Q.   Do you know, is that a standard name
15      for a GFS report?
16          A.   This is no -- I think this is
17      something that you put in, right?  This doesn't
18      look like a GFS report name.
19          Q.   Okay.  So I believe it was Barclays'
20      counsel.  I was just trying to confirm whether
21      that would be a formal name of a GFS report or
22      it was something that had been a name given to
23      it by counsel.
24              So am I correct to say that your
25      testimony is that's not the actual name of the
```

## Page 52

```
 1                  Krishnan
 2      report, correct?
 3          A.   I don't remember exactly the report
 4      name, but this does not look like a GFS report
 5      name.  I think they put the name here for you,
 6      you know, whatever report they gave, they put the
 7      name here.
 8          Q.   And would equities data normally be
 9      contained within GFS?
10          A.   Yes.
11          Q.   And would that be both inventory and
12      financing positions?
13          A.   I think so.
14          Q.   And would equities finance use GFS in
15      order to prepare balance sheet numbers with
16      respect to equities?
17              MR. THOMAS:  Objection to form.
18          A.   I would think so, but I'm not sure for
19      that.
20          Q.   Are you familiar with how any of the
21      balance sheets were generated by Finance within
22      Lehman?
23          A.   You mean like how the users used it?
24          Q.   How, if at all, GFS was used in order
25      to generate balance sheets at Lehman?
```

## Page 53

```
 1                  Krishnan
 2          A.   No, I'm not familiar with that.
 3          Q.   So is it safe to say, then, you don't
 4      know whether GFS is used to create -- was used
 5      to create Lehman's balance sheets?
 6          A.   I know that they were using to pull
 7      some number out of GFS in the 10-Q or something,
 8      but I don't know exactly how they did it or what
 9      numbers they used.
10          Q.   And do you know if any systems other
11      than GFS were used in order to generate Lehman's
12      books or balance sheets?
13          A.   I wouldn't know.
14          Q.   Would you know if the population of
15      securities within GFS changed day-to-day?
16          A.   Could you repeat the question?
17          Q.   Would you know whether the population
18      of CUSIPs or securities in GFS would change on a
19      day-to-day basis?
20          A.   Yes, they could change.
21          Q.   So, for instance, would you expect
22      that the securities or CUSIPs in GFS on, say,
23      September 12 would be identical to the
24      securities and CUSIPs that were in GFS on
25      September 15, September 16, et cetera?
```

Krishnan

1  I see the name here and the name here; they tie
2  out.
3      Q.   Can I ask you where you're pointing to
4  on Deposition Exhibit 8 --
5      A.   844.
6      Q.   -- 44?  And you're pointing to the
7  title "BA: B-S Detailed Exposure Report (Cross
8  System) - 12 Sep. 2008"; is that correct?
9      A.   That's correct.
10     Q.   And that corresponds to the report
11 name --
12     A.   Yes.
13     Q.   -- that's listed in Deposition Exhibit
14 859; is that correct?
15     A.   Yes, that's correct.
16     Q.   And going through the other parts of
17 the report path that are listed in Deposition
18 Exhibit 859, could you tell me what "report
19 group" means?
20     A.   Users belonging to different groups,
21 they put a report under the -- I'm sorry.  Okay,
22 a report group means of which table, because all
23 these reports are running off some tables in the
24 database.  So this one says of which table it

Krishnan

1  runs.  So this report group Balance Sheet
2  Positions means it runs off a table called Bal
3  Pos Report.
4      Q.   I'm sorry, could you repeat what the
5  name of that report is?
6      A.   The report, the report group balance
7  sheet positions, that would tell the system what
8  table it has to run this query of.
9      Q.   And what would balance sheet positions
10 mean?
11     A.   It would be the balance sheet
12 information in GFS.
13     Q.   And would balance sheet information
14 mean inventory positions?
15     A.   Yes, inventory positions.
16     Q.   And would it exclude any financing
17 positions?
18     A.   I don't think it has financing
19 positions in balance sheet positions.  I'm not
20 sure, though.
21     Q.   And do you know if any financing
22 positions were transferred to Barclays through
23 the sale transaction?
24     MR. THOMAS:  Objection to form.

Krishnan

1      A.   I don't know.
2      Q.   Do you know if GFS captures all
3  positions that may have subsequently been
4  transferred to Barclays through the sale
5  transaction?
6      A.   I can -- I don't know the answer to
7  that because I -- GFS processes anything that we
8  get from the source systems, from the other --
9  from the, let me say upstream systems.  So we,
10 if they have captured it, then it would have
11 come down to us.
12     Q.   But you don't know if all of the
13 positions that were transferred to Barclays
14 through the sale transaction are in fact within
15 GFS; is that correct?
16     MR. THOMAS:  Objection to form.
17     A.   I don't know.
18     Q.   Going down the list in Deposition
19 Exhibit 859 of the report path, the next one is
20 report category.  Can you tell me what that
21 means?
22     A.   This is -- the report category is for
23 users to, you know, like if a user comes under
24 "FID," it's easier for them to put the report

Krishnan

1  under "FID" so they are able to easily access
2  it.  So they have various categories.  Like they
3  have probably Equity Product Control.  They
4  probably have like a balance sheet group or
5  something.  This is for ease of the users, so
6  that's a report category.
7      Q.   And would it be FID Product Control,
8  for instance, which is listed next to "report
9  category" here, who would determine what
10 information it would want captured in a query
11 and then your group would help to standardize
12 that format in order to make that query
13 possible?
14     MR. THOMAS:  Objection to form.
15     A.   The user would put his report under
16 FID Product Control.  He will have -- he or she
17 will have control on what the filters.  By
18 "filters," I mean any inclusions/exclusions he
19 wants.  They will have control over that.
20     Q.   And those filters would be entered on
21 a report-by-report basis or standardized and
22 then run regularly by a group such as FID
23 Product Control?
24     A.   They would be -- the filters would be

Krishnan

1  set up and I -- I joined in 2005, so this was
2  functional at the time that I joined, you know,
3  exporting to Excel and that export being
4  correct, you know, when -- when they released
5  that feature for the system, they probably
6  tested it. When I joined Lehman, this
7  functionality was already there.
8      Q.    And there has never been a situation
9  where files exported to Excel are found to be
10 corrupted or inaccurate?
11     A.    Not that I know of.
12     Q.    It's possible, though, that some
13 export of GFS data to Excel could have been
14 corrupted or inaccurate; is that correct?
15         MR. THOMAS:  Objection to form.
16     A.    I don't expect it to happen.  I've
17 never seen it in my five years.
18     Q.    But you don't know that it has not
19 happened; is that correct?
20         MR. THOMAS:  Objection to form.
21     A.    I don't know what I've not seen, so I
22 have not seen it happen.
23     Q.    Similar to my questions about the
24 interplay between the long inventory columns, I

Krishnan

1  have the same question about the columns labeled
2  "Gross Short Inventory" versus the "Short BPM
3  CUSIP Netdown, Trade Date at MV," and then the
4  column named "Short Inventory, TD@MV."
5      A.    I would have to look at the attribute
6  mappings.  I don't know.
7      Q.    And the table you describe, the
8  attribute mapping, is it a discrete document or
9  is it a system in itself?
10     A.    It is just a table and it says like,
11 for example, this gross long inventory, this
12 means maybe the field name in the table is some
13 TD gross market value or something, or it could
14 be that it's populating this value only in some
15 cases because the TD gross market value could be
16 a negative or a positive so it could have a
17 condition saying this -- populate this feed only
18 if the TD gross market value is greater than
19 zero.  I mean, or it could have other
20 conditions.
21     Q.    Do you know which of the three columns
22 that I just identified would be included in
23 financial reporting?
24     A.    I don't know.

Krishnan

1      Q.    Do you know why the column labeled
2  "Long Inventory, TD@MV," which is column U of
3  831, is sometimes negative?
4      A.    I -- I'm just guessing.  I think it
5  may be negative and when it's grouping rows and
6  the sum of those two rows is a negative number.
7  I'm not sure.
8      Q.    Would you expect a long position to be
9  a negative number?
10     A.    Maybe if the price was negative or --
11 I guess in that case it could have been a
12 negative number.
13     Q.    There could be a negative price within
14 GFS?
15     A.    You asked your question whether I knew
16 why the prices were negative, right?  So I have
17 not really seen -- see, as technologists, we
18 don't look at the data day-to-day, so there
19 might have been a negative price, I don't know.
20 I thought you had seen a negative price, that's
21 why you're asking.
22     Q.    Would you expect to see a negative
23 price for anything other than a short position?
24     A.    I wouldn't expect to see a negative

Krishnan

1  price for anything.  I don't know.
2      Q.    And in general, do you know which
3  columns are used for purposes of financial
4  reporting, if any?
5      A.    I don't know.
6      Q.    And if you look at column AA in
7  Deposition Exhibit 831, which is titled "Short
8  Inventory, TD@MV," what does that mean?
9      A.    The "Short Inventory, TD at Market
10 Value," That is the same as the long inventory,
11 but it would be populated if it's a short.
12     Q.    And what does it mean if the number
13 within that column is negative?
14     A.    The "Short Inventory, TD Market Value"
15 is probably a negative a lot because it's --
16 it's populated only if it is negative.
17     Q.    And do you know which column related
18 to short inventories would be included in
19 financial reporting?
20     A.    No, I don't know.
21         MS. CARRERO:
22         (Discussion off the record.)
23     Q.    Do you know what it means when the
24 column "Trade Date Position" is positive but the

Krishnan

1
2    column "Short Inventory, Trade Date at MV" is
3    negative?
4        A.    I don't know what it means, but I
5    would guess that the price was negative.
6    Something has got to be negative to make the
7    market value negative.
8        Q.    Would it -- what sort of procedures
9    were in place to confirm the GFS data was
10   correct -- or, let me rephrase that.
11       If there was a concern that any data
12   within GFS may have been incorrect, what sort of
13   procedures were in place to identify any errors
14   and to fix those errors?
15       A.    Any data-related issues would be
16   detected by the users, financial controllers,
17   product controllers, who look at the report
18   every day.  They would say -- they would come to
19   us saying why this is not what I expect it to be
20   and then we would debug to, you know, we would
21   look at the code to see what it is set up to do
22   or maybe the input was incorrect or maybe there
23   was an adjustment that was incorrect report, so
24   then we find out what are the reasons behind it.
25       Q.    So you and your group would not have

Krishnan

1
2    been responsible for analyzing the data for any
3    potential inaccuracies?
4        A.    No.
5            MR. THOMAS:  Objection to form.
6        Q.    And if any inaccuracies were the
7    consequence not of a technological issue but,
8    rather, a deliberate input, would that come to
9    your attention or would the product controllers
10   or finance take that elsewhere in order to make
11   any necessary adjustments?
12       A.    If they -- if they find something
13   wrong, they would come to us, normally, unless
14   they're able to fix it from their side.  They
15   would come to us and we would tell them like
16   this is why this has happened and, you know, as
17   I said earlier, it could be there could have
18   been a problem with the input that we got.
19       Q.    If a product controller in Finance had
20   an issue with a price input into one of the
21   settlement systems deliberately by, for
22   instance, a trader, would that come to your
23   attention or would that be fixed by Finance or
24   the front office directly?
25       A.    It would be fixed by the user who

Krishnan

1
2    detected it.  They would probably put like an
3    adjustment, a price adjustment, to correct it.
4    We don't even have to know about it.  It just
5    goes through the system.
6        Q.    What does it mean when two rows with
7    the same value in the column headed "Real World
8    CUSIP" have two different values in the column
9    labeled "Fair Value Level"?  If you're looking
10   at 831, you can turn to column N and column BQ.
11       A.    The "Real World CUSIP" is a security
12   identifier.  And I think the "Fair Value Level"
13   is something that the users assign.
14       Q.    I'm sorry, could you repeat that?
15       A.    The "Fair Value Level" is something
16   that the users tag positions.  I'm not sure why
17   you want -- if the CUSIP is the same, why the
18   fair value levels were different.
19       Q.    I mean, do you know if it's possible
20   for one security to be assigned two different
21   fair value levels?
22       A.    I don't -- I don't know about the fair
23   value levels because I think that the fair value
24   levels is something that the user tags, and I
25   don't know, it could have been any reason why

Krishnan

1
2    they didn't tag the other CUSIP.
3        Q.    So you don't know if, when this
4    happens, which fair value level should be
5    considered, correct?
6        A.    No, I don't know.
7        Q.    And do you know why some securities
8    have not been assigned a fair value level?
9        A.    I don't know.  Sorry.
10       Q.    If we wanted to recalculate the long
11   inventory value based on data in GFS, do you
12   know which columns would be used?
13       A.    I think it would be the, for the
14   traded market value, long market value to be the
15   traded position and the price.
16       Q.    Which columns are you looking at in --
17       A.    I'm actually looking at 836.
18       Q.    So in 836, which columns numbers would
19   be the ones used?
20           MR. STEPHENS:  I think, just for
21   clarity, you have an excerpt of 836 behind
22   the first -- you have there.  Sorry.  I
23   believe if you turn -- you've got a second
24   sticker.  I think you're in 837, just for
25   clarity.

Krishnan

1
2       THE WITNESS:  Thank you.  837.
3       A.   There was a trade date position
4    somewhere.  AV.
5       Q.   So in using Deposition Exhibit 836,
6    you would go to column AB?
7       A.   AV, as in Victor.
8       Q.   AV, as in Victor.  And what else would
9    you use in order --
10      A.   I'm not sure if we used the AY or the
11   AZ.  AY is the clean market price and AZ is the
12   dirty market price.
13      Q.   Would you also need the factor in
14   order to calculate?
15      A.   Yes, I would need the factor and the
16   multiplier.  I don't think it's in here.
17      Q.   Is anything else needed in order to
18   calculate the long inventory value using that
19   report?
20      A.   As far as I can remember, I think if
21   you have those values, we can calculate it.
22      Q.   So if you have the values in AV along
23   with either the clean or the dirty market price,
24   and then you would need the factor and
25   multiplier, which is not within the report; is

Krishnan

1
2    that correct?
3       A.   That's correct.
4       Q.   Is there a rounding convention for
5    clean or dirty prices using a certain amount of
6    decimals?
7       A.   I think when they export to Excel, it
8    automatically rounds, but I'm not sure if
9    they're able to specify that.  I'm not sure
10   about the rounding.
11      MS. CARRERO:  This is a fine time to
12   break.
13      (Luncheon recess; time noted:  1:15
14   P.M.)
15
16
17
18
19
20
21
22
23
24
25

Krishnan

1
2       AFTERNOON SESSION
3       (Time Noted:  2:12 P.M.)
4    UMA KRISHNAN, resumed and
5       testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MS. CARRERO:
8       Q.   Ms. Krishnan, before lunch, we had
9    been discussing the various GFS reports
10   produced, and we had talked about three separate
11   productions of GFS reports received, one set in
12   the fall of 2009, a set in January of 2010, and
13   another set in April of 2010.
14      We had stopped our questioning about
15   the January 2010 reports to receive confirmation
16   from counsel on something, and I think that
17   we're ready to proceed now on questioning about
18   the January 2010 reports, those run without
19   equities.
20      If you can look at Deposition Exhibit
21   831, for instance, that being September 15 GFS
22   report that was produced to us on January 18.
23   Do you have that in front of you?
24      A.   Yes.
25      Q.   Looking at Deposition Exhibit 831, can

Krishnan

1
2    you determine from the title of that report the
3    report path that would have been used to
4    generate the report for you?
5       A.   From the title, we cannot say like
6    what filter we applied while running the report,
7    but maybe if we look at the data, we can make a
8    guess.
9       Q.   And so from the report name itself,
10   you would not know exactly what would be
11   captured in the report; is that correct?
12      A.   We would be sure about what data is --
13   what the data is built off, but filters are
14   not -- are not obvious from the report name.
15      Q.   So you wouldn't know just from the
16   report name whether it includes equities, for
17   instance, or doesn't include equities; is that
18   fair?
19      A.   That's correct.
20      Q.   So if we were to turn to the
21   electronic version of 831, is there any specific
22   column or row that would help you to determine
23   what the report path used to generate such a
24   report would have been?
25      A.   I think if we are able to look at "Sum

Page 102

Krishnan

1
2  Equities" in the "Division," if you can filter,
3  it's actually all capitals.
4      Q.   Would it be a specific column heading
5  that we should be looking?
6      A.   Yes, the "Division," the first one.
7      Q.   The "Division"?
8      A.   That's the first column.
9      Q.   Okay.  So if in the "Division" column
10 there are I believe no equities, would it be
11 your understanding that you only used, in
12 connection with this matter, two distinct report
13 paths to generate any GFS reports?
14     A.   Sorry, could you repeat that?
15     Q.   Do you know if you used more than just
16 two report paths in order to generate any
17 reports, GFS reports, in connection with this
18 matter?
19     A.   No, we used only this -- that one
20 report path that we gave for all the reports.
21     Q.   However, I think we had discussed
22 before that the later April 2010 reports that
23 were produced have equities data in addition to
24 fixed income data; is that correct?
25     A.   That's correct.  So we modified the

Page 103

Krishnan

1
2  filter for doing that.
3      Q.   And would that not constitute a
4  distinct report path if the filters were
5  modified with respect to the April 2010 reports?
6      MR. THOMAS:  Objection to form.
7      A.   I wouldn't say it's completely
8  different.  We just changed the filter.  I think
9  we still ran it with the same report name, so
10 you could say that they are different reports,
11 yes.
12     Q.   And the April 2010 reports which are
13 Deposition Exhibits 836 to 843, what were the
14 additional filters that were added to the report
15 path specified in Deposition Exhibit 859?
16     A.   We removed the -- this custom filter
17 LBI entity was including LBIs and excluding Sum
18 Equities, in you know, the Division Sum
19 Equities, so we changed -- we removed the
20 exclusion of Sum Equity and reran the same
21 reports.
22     Q.   If you could just go into more detail
23 about what would have been removed or added?
24     A.   The custom filter, it had an inclusion
25 of LBI and exclusion of sum equities.

Page 104

Krishnan

1
2      Q.   And was it exclusion of sum equities
3  by virtue of the election of LBI?
4      A.   I don't know who created the report,
5  so this was a user-created report that we --
6  that we got in the description of the ticket.
7  So I don't know how they made it.
8      Q.   So the report group would be the same
9  for the April-produced GFS reports, Deposition
10 Exhibits 836 to 843, the report group would be
11 balance sheet positions; is that correct?
12     A.   Yes, that's correct.
13     Q.   And the report category would be FID
14 Product Control, is that correct?
15     A.   That's correct.  Uh-huh.
16     Q.   And the report type would be custom;
17 is that correct?
18     A.   Yes.
19     Q.   And the report name would be BA: B-S
20 Detailed Exposure Report; is that correct?
21     A.   That's correct.
22     Q.   And the custom filter, what was the
23 custom filter?
24     A.   The custom filter was probably we
25 removed the exclusion of Sum Equities and ran it

Page 105

Krishnan

1
2  when we reran it in April.
3      Q.   Would that change the report type from
4  the custom report used previously if a custom
5  filter were changed or added?
6      A.   No, it would still be report type
7  custom.
8      Q.   And was the -- did the custom filter
9  have a specific name?
10     A.   That's the LBI entity.  That's the
11 name.
12     Q.   The custom filter used to generate the
13 April-produced reports, Deposition Exhibit 836
14 to 843?
15     A.   I don't know if we had a separate name
16 for that.  I think what we probably did was
17 removed that exclusion of Sum Equities and ran
18 the report, and I don't know, I think probably
19 we did not save it like that.  You know, we just
20 did like a one-time run removing that exclusion.
21     Q.   So it was -- the exclusion wasn't one
22 that was normally done when running GFS reports?
23     MR. THOMAS:  Objection to form.
24     A.   I cannot answer that question because
25 I don't really normally run reports on this, you

Krishnan

1
2  know.  I get tickets like this.
3      Q.    And would the Fixed Income Department
4  Product Control -- or FID Product Control, would
5  they be ones that ordinarily would run the
6  reports?
7      A.   Yes.
8      Q.    And they would be the ones that
9  ordinarily choose if there would be a custom
10 filter, is that correct?
11     A.   Yes.
12     Q.    And you're not aware if they would use
13 a custom filter that would include the equities;
14 is that correct?
15         MR. THOMAS:  Objection to form.
16     A.   No, I don't know.
17     Q.    Do you know if you or your group are
18 the ones who ran the reports that were produced
19 in April, Deposition Exhibits 836 to 843?
20     A.   Yes, my -- either I or a person from
21 my group ran the reports.
22     Q.    And earlier you had indicated that the
23 report would have been requested through a SAM
24 ticket; is that correct?
25     A.   Yes, that's correct.

Krishnan

1
2      Q.   Is that your recollection with respect
3  to these reports, that you generated them in
4  connection with a SAM ticket?
5      A.   Yes, that's what I recall.
6      Q.    And do you know who entered that
7  request?
8      A.   I don't remember who entered the
9  request.
10     Q.    Do you know when it was entered?
11     A.   I think there was a ticket sometime
12 around November of 2009 and probably later in
13 January or February.  I'm not sure.
14     Q.    And do you know if the report path
15 that you described to me is what was written on
16 that ticket to be run?
17     A.   Yes, this; all these details right
18 there.
19     Q.    And do you know who requested that
20 information, even if not the person to put in
21 the SAM ticket?
22     A.   Who --
23         MR. THOMAS:  Objection to form.
24     A.   It was a request from the attorneys.
25     Q.    And do you know if the attorneys are

Krishnan

1
2  the ones who picked the report path to be run?
3      A.   I don't know who picked the path.
4      Q.   Ms. Krishnan, if I could put before
5  you what has been marked as Deposition Exhibit
6  858, and I am going to also hand you what has
7  previously been marked as Deposition Exhibit 791
8  and BCI Exhibit No. 779.
9          Turning first to Deposition Exhibit
10 858, do you recognize this document?
11     A.   Yes.
12     Q.   Did you prepare this document?
13     A.   Yes.
14     Q.   And could you describe for me what
15 this document is?
16     A.   We wanted to summarize based on the
17 GAAP asset classes because the other Excel
18 reports were really big, so these were for that
19 reason.
20     Q.   And what sort of filter or report path
21 was used to generate the summaries by asset --
22 by GAAP asset class in Deposition Exhibit 858?
23     A.   The filter we used were the same as
24 the ones we used for this 836 and the others --
25 I mean, the ones with the including the

Krishnan

1
2  equities.  And we included only the long
3  inventory market value because that's the
4  numbers that they wanted to be summarized, and
5  we included the GAAP Asset Class 1 number and
6  the name, you know, to group by that feed, those
7  feeds.
8      Q.   And you said that they wanted to
9  summarize.  Who were you referring to?
10     A.   The attorneys.
11     Q.   And is this a summary that you would
12 have prepared regularly in your position?
13         MR. THOMAS:  Objection to form.
14     A.   No, I have not prepared this
15 previously.
16     Q.   And was there a particular report path
17 that you used to generate this summary?
18     A.   It was -- it was based on the big
19 reports, the 831 or 83 -- I don't remember the
20 numbers, the equities.  It was based off that,
21 but when you group the data by just the GAAP
22 asset class, and you know, the GAAP Asset Class
23 1 Number and the name, it sums up the long
24 inventory market value.  So that's how we got a
25 summary.

Page 110

1                    Krishnan
2        Q.   And the "Long Inventory Trade Date at
3   MV" column is a column that comes straight from
4   the GFS reports that we were discussing, is that
5   correct?
6        A.   Yes, it's the same that you see in the
7   other reports.  I don't remember the column
8   name -- I mean the column heading.
9        Q.   When did you run these reports?
10       A.   I think we ran this in April.
11       Q.   If I were to want to recreate this
12  report from the GFS reports with equities that
13  were produced in April, how would I go about
14  doing that?
15       A.   If you wanted to the same reports?
16       Q.   If I wanted to get to, for instance,
17  looking at the first page next to "Total
18  Governments & Agencies" of 37,310,795,798?
19       A.   Uh-huh.
20       Q.   If I wanted to get to that number
21  using the September 12 data, which I believe
22  we've been referring to as Deposition Exhibit
23  836, how would I do that?
24       A.   It could be a tedious process, but in
25  Excel you can -- you can just filter the ones,

Page 111

1                    Krishnan
2   the GAAP Asset Class 1 Name, Total Governments &
3   Agencies.  Is that part of this report?  Should
4   be, I think.
5        Q.   I believe it is at column V.
6        A.   It's not column V.  It's column BK in
7   831.
8        Q.   If we could go to Deposition Exhibit
9   836 and that grouping through 843, because as I
10  understand it, it was those reports produced in
11  April that would be summarized within Deposition
12  Exhibit 858; is that correct?
13       A.   Yes, that's correct.  Let me see.
14  It's column BL and BM.  So you could, in Excel,
15  you could filter BM for the total government and
16  agencies and BL for the, you know, for the
17  number that's there, GAAP Asset Class 1 Number,
18  which is, I think, 70500.  I see "Total
19  Governments & Agencies" has two numbers, 70500
20  and 72260.
21            So if you filter this Excel on those
22  values and you sum those long inventory TD market
23  value, you should get this 37 billion plus that.
24  Okay, 37 billion.
25       Q.   So it would not be limited to just the

Page 112

1                    Krishnan
2   GAAP asset class 70500, which is listed on 858
3   in the column corresponding to the 37 billion
4   figure?
5        A.   Actually, there are two GAAP Asset
6   Class 1 numbers which are associated with the
7   same name, Total Government & Agencies, but for
8   September 12, I can see that the 72260 has a
9   zero long inventory.
10       Q.   Okay.  And where on Deposition Exhibit
11  836, for instance, you see the word "null" under
12  "GAAP Asset Class 1 Name" in column BM, do you
13  know what that's a reference to?
14       A.   That refers to something that the
15  system is not able to map to -- it's not able to
16  put into any of the existing GAAP asset classes.
17       Q.   And would such securities in GFS be
18  captured on your summary?
19       A.   Yes, I believe so.  There is a 7999 in
20  the summary.
21       Q.   So the 488 million figure in
22  Deposition Exhibit 858 would be where that asset
23  class is characterized as null?
24       A.   Yes.
25       Q.   And if you'd look at column BH?

Page 113

1                    Krishnan
2        A.   Uh-huh.
3        Q.   And that column is titled "Security
4   Subtype" and says "Adjustment" in the
5   corresponding rows to where the GAAP asset class
6   is null, what does "adjustment" mean?
7        A.   "Adjustment" means that a user might
8   have entered something to, you know, change that
9   row or maybe it's an entirely new row that the
10  user entered.
11       Q.   And can you tell when any such
12  adjustments would have been made?
13       A.   Adjustments are made in GFS every day.
14       Q.   But can you tell when these specific
15  adjustments would have been made?
16       A.   These are for 9/12, right?  So they
17  were probably made on -- they were probably --
18  they could have been made on September 15 when
19  the system was open for adjustments, but again,
20  we also set up a special environment for the
21  9/12 sometime late in October 2008 and it could
22  have been made at that time.
23       Q.   So adjustments could be made for a
24  previous day at any point after that date; is
25  that correct?

Page 114

Krishnan

1
2    A.   No, adjustments can be made only on
3    the day after.  Say for September 12 was a
4    Friday, so it can be made only on September 15
5    till 6 P.M.  But because the users thought that
6    the data was not -- maybe the input was not
7    correct or the maybe the data was not verified
8    by the users on that day, on September 15, they
9    had requested us to set up a special environment
10   for them for the September 12.
11       Q.   I think we're talking past each other
12   because my question right now is about the
13   September 12 data and the "Adjustment" comment
14   in column BH and whether that adjustment could
15   be made at any point after September 15; is that
16   correct?
17       MR. THOMAS:  Objection to form.
18       A.   I'm trying to explain that.  Any
19   adjustment that was made for September 12 could
20   have been done on September 15, which is the
21   normal time that adjustments would have been
22   made for September 12, but since September 12
23   was an important date for the users and they
24   thought that the input data may not have been
25   right or maybe the users did not check the data

Page 115

Krishnan

1
2    on September 15, they had a special environment
3    set up to be able to make adjustments at a later
4    date.  Normally doesn't happen.
5        So this adjustment could have come in
6    on September 15 or it could have been entered at
7    any time when we had the special environment
8    open for users to make adjustments.
9        Q.   So is there a way of telling when any
10   adjustment was made from the report that's in
11   front of you?
12       A.   No, not from this report.
13       Q.   Is there a way of telling when any
14   adjustment was made from the actual GFS data
15   itself?
16       A.   We have a table that records all the
17   adjustments, so we should be able to tell from
18   that.
19       Q.   And adjustments to September 12 data
20   is still possible even today; is that right?
21       A.   I don't think it's possible today.  I
22   think it's closed for adjustments.
23       Q.   Do you know when the period for
24   adjustments was closed?
25       A.   I think it was closed sometime --

Page 116

Krishnan

1
2    MR. THOMAS:  Objection to form.
3    A.   -- sometime in January of or February
4    of 2009, but I'm not too sure.
5        Q.   And is it your understanding that
6    adjustments were made up through the period when
7    it was closed in January or February of 2010 --
8    or, 2009?
9        MR. THOMAS:  Objection to form.
10       A.   I think so.
11       Q.   And do you know who would have made
12   those adjustments?
13       A.   I would guess that it would be the LBI
14   and LBHI users because we brought up the
15   environment for them, but I have not really
16   checked the users and which group they belong
17   to.
18       Q.   Could adjustments be made to any of
19   the data in the week from September 15 through
20   September 22 after those dates?
21       A.   For September 12, users had to have
22   completed the adjustments by September 15, 6
23   P.M.
24       Q.   I'm confused now, because your earlier
25   testimony was that for September 12 there could

Page 117

Krishnan

1
2    be adjustments all the way until the adjustment
3    period was closed a month later; is that
4    correct?
5        A.   Right, that was a special case for
6    just September 12.
7        Q.   So now what would be the case for,
8    say, September 15, when could adjustments be
9    made to data for September 15?
10       A.   Up to September 16, 6 P.M.
11       Q.   And what would the protocol be in
12   order to make any adjustments after 6 P.M. on
13   the following day?
14       A.   We can't do that.
15       Q.   The GFS data cannot be adjusted,
16   generally speaking, after the cut-off period at
17   6 P.M. the day after?
18       A.   That's correct.
19       Q.   But a special exception was made for
20   the September 12 data; is that correct?
21       A.   Yes, that's correct.
22       Q.   And was a special exception made for
23   data for any other day other than September 12?
24       A.   We had that -- the September 19 data
25   available as well for users to make adjustments,

Page 118

Krishnan

1
2  but I don't think users made adjustments for
3  September 19.
4      Q.  If you could turn your attention to
5  Deposition Exhibit 791.
6      A.  Is this the one?
7      Q.  Yes.  And if you could turn to the
8  Exhibit 1 -- actually, let me first ask you,
9  have you seen this document before?
10     A.  Yes.
11     Q.  When did you see this document?
12     A.  I have seen this because we -- I think
13  the attorneys tried to match up the summaries
14  with what we had here in GFS.
15     Q.  And you're pointing to what has been
16  marked as Deposition Exhibit 858; is that
17  correct?
18     A.  Yes, 858.  Sorry.
19     Q.  And how did they try to match those
20  up?
21     A.  For 9/12, you can see here that we
22  have the long inventory market value as 37.3
23  billion.
24     Q.  And were you asked to create a summary
25  that also arrived at 37.3 billion?

Page 119

Krishnan

1
2      MR. THOMAS:  Objection to form.
3      A.  No, I created a summary and we
4  confirmed that the numbers match.
5      Q.  And when did you do that?
6      A.  April of 2010, I think.
7      Q.  Did you speak with Professor
8  Pflederer in that exercise?
9      A.  No.
10     Q.  Have you ever communicated with
11  Professor Pfleiderer?
12     A.  No, I have never heard of his name
13  before.
14     Q.  Are you aware that Professor
15  Pfleiderer is an expert that's been retained by
16  Barclays in this matter?
17     A.  No, I don't know.
18     Q.  Have you ever read any expert report
19  that's been prepared by Professor Pfleiderer?
20     A.  No, I have not.
21     Q.  Have you ever read the contents of
22  Professor Pfleiderer's declaration that's part
23  of Deposition Exhibit 791?
24     A.  No, I don't recall reading this.
25     Q.  If you turn to footnote 3 of Professor

Page 120

Krishnan

1
2  Pfleiderer's declaration, "Strictly speaking,
3  the asset categories correspond to the various
4  values given in the GFS system for the 'GAAP
5  Asset Class 1 Name' variable associated with
6  each observation.  (The specific category names
7  are slightly different when one observes entries
8  for long versus short positions, but the
9  categories are materially the same; for example,
10  'CDs & Other Money Market' versus 'Total CDs and
11  Other Money Market Instruments.'  Exhibits 1 and
12  2 to this affidavit are based only on data for
13  long positions)."  Do you see that?
14     A.  Yes.
15     Q.  Is that your understanding of how the
16  summaries in Deposition Exhibit 858 that you
17  said you prepared were prepared?
18         MR. THOMAS:  Objection to the form of
19  the question.
20     A.  I'm sorry, what was the question?
21     Q.  My question is, the statements in
22  footnote 3, is it your understanding that they
23  hold true with respect to the summaries you
24  prepared that are in Deposition Exhibit 858?
25         MR. THOMAS:  Objection to form.

Page 121

Krishnan

1
2      A.  I'm sorry, I don't understand why this
3  is not --
4      Q.  Why don't I just break it down a
5  little bit.  Where it says, "For instance,
6  Exhibits 1 and 2 to this affidavit are based
7  only on data for long positions," do you see
8  that?
9      A.  Uh-huh.
10     Q.  Is that also the case for the
11  summaries that you prepared that we have marked
12  in this deposition as Deposition Exhibit 858?
13     A.  It has only long positions.
14     Q.  Only long positions.  Was it created
15  using a GFS report that only contained long
16  positions as opposed to the GFS reports with
17  both longs and shorts that have been produced to
18  us and that we have marked here as Deposition
19  Exhibits 836 through 843?
20     A.  I think that we did not select a short
21  inventory -- I mean, if I remember right, we did
22  not select the feed which had the "Short
23  Inventory, TD at Market Value," because this is
24  what we wanted to compare with that, that other
25  PBF exhibit.  I don't remember what the name

Page 122

Krishnan

2  was.
3      Q.   The other PBF, you mean the
4  declaration that you're looking at, Deposition
5  Exhibit 791?
6      A.   Right.  Uh-huh.
7      Q.   You were comparing when you prepared
8  858; is that correct?
9      A.   No.  No.  We prepared this.
10     Q.   You prepared 858?
11     A.   And then we confirmed that these
12 numbers tie.  These numbers are long inventory
13 positions, right?  So we selected only long
14 inventory positions.  So that's how we can
15 verify that what we have here is the same as
16 what we would if we generated a report in the
17 system.
18     Q.   And were you able to do the summary
19 using the actual GFS reports that were produced
20 in this matter with the GFS reports with the
21 equities, or did you need to go back into the
22 GFS system in order to run the summary?
23     A.   We went back to the GFS system to run
24 the summary, meaning we created a new report
25 which would give us a summary.

Page 123

Krishnan

2      Q.   And the new report was a report that
3  contained only the long positions; is that
4  correct?
5      A.   We selected only this feed, the long
6  inventory.  So, you know, if we had selected the
7  short inventory, that would show up here.
8      Q.   And so you can't say with a hundred
9  percent certainty that the summary in 858 is a
10 summary of, for instance, the September 12 data
11 that's in Deposition Exhibit 836; is that
12 correct?
13         MR. THOMAS:  Objection to form.
14     A.   No, I can say that because we built
15 this data off what we did here.
16     Q.   But correct me if I'm wrong, but you
17 used the reports that were generated in order to
18 prepare the summary that is Deposition Exhibit
19 858, or did you go back into the GFS system in
20 order to create the summary that is in
21 Deposition Exhibit 858?
22     A.   We went back into the system to create
23 this.
24     Q.   So my question is, did you test the
25 summary in 858 against what a summary of the

Page 124

Krishnan

2  actual GFS report that is, for instance,
3  Deposition Exhibit 836, would have generated
4  using the relevant columns that we had discussed
5  before?
6          MR. THOMAS:  Objection to form.
7          THE WITNESS:  Can I -- can I talk to
8  you before I answer this?
9          MR. THOMAS:  Does it relate to an
10 attorney-client communications?
11         THE WITNESS:  I don't know.
12         MR. THOMAS:  Or just confusion about
13 the question?
14         THE WITNESS:  Because I just want a
15 few minutes to talk to one of you.
16         MR. THOMAS:  Okay.
17         MS. CARRERO:  If we can just -- just
18 get a yes/no answer and then we can take a
19 break of was a comparison done to the
20 reports, to the --
21         MR. THOMAS:  If she's -- I'm not sure
22 whether it involves attorney-client
23 privilege, so I don't want to just -- if
24 you're able to answer that question without
25 getting into attorney-client privilege, you

Page 125

Krishnan

2  can do that.  If not, if you're not sure if
3  it may involve something that we have
4  discussed, then we should take a break and
5  talk about it first.
6      Q.   I'm happy -- I just don't like to
7  leave a question pending before we take a break.
8  I'm happy to let you take a break and you can
9  answer further or clarify your answer, but in
10 terms of a yes/no as far as was any sort of
11 comparison done between a summary of the GFS
12 reports produced versus what a summary of, going
13 back into the GFS system, and what a summary of
14 that data would generate as in 858.
15     A.   I would think that this is the
16 comparison, you know, this was built off the
17 Excel, I think.
18     Q.   791 you think was built off of the
19 actual GFS reports that would be Deposition
20 Exhibits 836 to --
21     A.   That's correct.
22     Q.   -- to 843?  And then your summaries
23 you went back into the GFS system and prepared;
24 is that correct?
25     A.   That's correct.

Page 126

Krishnan

1
2  Q.  Thank you.  If you still --
3  A.  No.  I just wanted to find out if I
4  could say that.
5  Q.  And for purposes of arriving at the --
6  so looking at 858 and the totals that appear
7  next to each of the GAAP Asset Class 1 names, is
8  it not a net -- let me reformulate this.
9  If I were to go into the GFS reports
10  and look for the long inventory market value, I
11  could do so by looking at this column "Long
12  Inventory, TD@MV"; is that correct?
13  A.  That's correct.
14  Q.  Are market values also contained
15  within the reports using a net position?
16  A.  I'm sorry, could you repeat that?
17  Q.  Is there a column that calculates
18  market values for the net position for any given
19  CUSIP, meaning both the longs and the shorts of
20  that CUSIP?
21  A.  I think there are feeds which do --
22  which are populated whether it's long or a
23  short, but I'm not sure if they are captured in
24  this report.
25  Q.  And in order to determine the price of

Page 127

Krishnan

1
2  any given CUSIP that rolls up into the sum by
3  asset class, how would you go about finding out
4  the price for each CUSIP that, for instance,
5  rolls up into the 37-billion-odd in governments
6  and agencies?
7  A.  You would go back to this Excel
8  report, the 836, right?
9  Q.  Yes.
10  A.  So the 836, and you would -- you would
11  filter all the total governments and agencies,
12  that is, I think I mentioned it earlier, column
13  BL and BM.
14  Q.  So the "GAAP Asset Class 1" and the
15  "GAAP Asset Class 1 Name"?
16  A.  That's correct.
17  Q.  Okay.  So --
18  A.  And --
19  Q.  Filter those, go ahead.
20  A.  And you would look for this column
21  "Long Inventory, TD Market Value," which is
22  column V.
23  Q.  Okay.
24  A.  And that would be the individual
25  market value for each position.

Page 128

Krishnan

1
2  Q.  And those are market values as opposed
3  to prices; is that correct?
4  MR. THOMAS:  Objection to form.
5  A.  That's correct, they are market
6  values.
7  Q.  And how would you go about determining
8  what the price was for any given security that
9  rolls up into the sum?
10  A.  So now that you have all the total
11  governments and agencies, you can -- there's
12  another feed here, which is "Clean Price" and
13  "Dirty Price."
14  Q.  Column AY and AZ?
15  A.  Yes.
16  Q.  And in order to arrive at the market
17  value, would you need the factor as well?
18  A.  Yes, we would need a factor, which is
19  not here, and we would need the traded position,
20  which is in the AV.
21  Q.  And where would one find the factor
22  that was used to calculate the market value?
23  A.  I'm not sure if it is not included in
24  this report or if it's not part of that report
25  table that we have in GFS.  So it may be part of

Page 129

Krishnan

1
2  some of the product information.
3  Q.  And looking at the business date
4  listed in the right-hand column of each of the
5  pages of Deposition Exhibit 858, on the second
6  page, for instance, it says September 15, 6 A.M.
7  Is the total reflective of the total
8  at 6 A.M. on the business date reference?
9  A.  No, the business date does not have
10  the time in it.  I think it was the data that
11  was formatted in Excel.
12  Q.  So 6 A.M. is not reflective of the
13  time of day which this GFS data would reflect;
14  is that correct?
15  A.  Yes, that's correct.
16  Q.  Turning your attention back to
17  Deposition Exhibit 791, and looking at Exhibit
18  1, do you know if the CUSIPs on each of the days
19  reflected between September 12 and September 19
20  were identical population of securities?
21  A.  I don't know.
22  Q.  And do you know if the price for the
23  CUSIPs for the population of CUSIPs on each day
24  would have changed between September 12 and
25  September 19?

Page 134

1              Krishnan
2  settlement date balances.
3      Q.   And do you know what systems were the
4  subledger and general ledger of Lehman Brothers?
5      A.   The general ledger was a system called
6  DBS, and I'm not really sure about the
7  subledger.  It could be Posting Engine.  I'm not
8  sure.
9         (Deposition Exhibit 860, a document
10        bearing Bates Nos. BCI-EX-(S)-00200951
11        through 53, with attachment, marked for
12        identification, as of this date.)
13     Q.   Ms. Krishnan, you have before you what
14  has been marked as Deposition Exhibit 860.  If
15  you could turn to the last page of that
16  document, which is titled "LBI Inventory by GAAP
17  Asset Class & BPM as at 9/16/2008," and which is
18  a native version of a document produced as
19  BCI-EX-(S)-00200964.  Do you see that?
20     A.   The last page, right?
21     Q.   Yes.
22     A.   Yes.
23     Q.   Do you recognize the format of this
24  report as one being generated from GFS?
25     A.   I think this is something that could

Page 135

1              Krishnan
2  have been generated from GFS, but I cannot be
3  sure unless I know this title here, "LBI
4  Inventory by GAAP Asset Class & BPM."  I don't
5  know, but these columns look like they could
6  have been pulled from a GFS report.
7      Q.   But you have never seen a report
8  exactly in this format before; is that correct?
9      A.   Yes, I have not seen anything like
10  this before.
11     Q.   And in the title do you know what
12  "BPM" stands for?
13     A.   Business Process Mapping, I think.
14     Q.   And that's a reference to Lehman's
15  specific nomenclature, would that be correct?
16     A.   Yes.
17     Q.   For a specific asset types; is that
18  correct?
19     A.   I think it may be for the asset type
20  or sometimes the accounts are also split into
21  BPMs.
22     Q.   Or would it be a reference to the
23  divisions in column B?
24     A.   In this context, it seems to be the
25  division, but I don't know why they said BPM.

Page 136

1              Krishnan
2      Q.   And are you familiar with the
3  different division names that are listed in
4  column B?
5      A.   Yes, these look familiar.
6      Q.   And looking at the divisions
7  corresponding to "Total Corporate Stocks &
8  Options," for instance, what would "Principal
9  Investing" relate to?
10     A.   I don't know what it would relate to,
11  but these look familiar.  The data looks
12  familiar.
13     Q.   Do you know if all of the divisions
14  that are listed in column B in this exhibit
15  would be captured within the summaries in 858 as
16  well as the reports between Deposition Exhibit
17  836 through 843?
18     A.   I would think so, but you can also
19  verify by, you know, looking up each of these in
20  the 836.
21     Q.   And would you in your role at Lehman
22  have been one to have generated a report such as
23  this one in Deposition Exhibit 860?
24     A.   I have not generated a report like
25  this before.

Page 137

1              Krishnan
2      Q.   And who would you expect would be the
3  group that would normally generate such reports?
4      A.   I would expect the users to -- I would
5  think that the users would generate reports like
6  this because they had the capability to make
7  their -- customize their own reports, and we
8  have no responsibility over what kinds of
9  reports they generate.
10     Q.   And the users would be the Product
11  Control Group and Finance?
12     A.   Project Control and Finance.
13     Q.   So that's yes, the Product Control
14  Group and the financial controllers, correct?
15     A.   Yes.  And when I said we have no
16  responsibility, what I mean is if someone gives
17  us the report and tells us to look at it, we can
18  look at it, but on a daily basis, we are not
19  looking at what reports the users generate and
20  what reports they run.
21         MS. CARRERO:  If we can just take five
22  minutes, I think I'm done, but I just want
23  to look over my notes really quick.
24         (Recess; Time Noted:  3:12 P.M.)
25         (Time Noted:  3:30 P.M.)

Page 150

Krishnan

1
2 company, I guess they would have put collateral.
3    Q.   And do you know one way or the other,
4 ma'am, whether securities posted as collateral
5 for derivative positions would be included or
6 excluded from the assets that are under any of
7 the six GAAP asset classes within GFS?
8    A.   I don't know.
9    Q.   You referenced in your testimony
10 earlier a DBS system?
11    A.   Uh-huh.
12    Q.   Can you tell me again what that is,
13 please?
14    A.   The DBS is also called the general
15 ledger.  I don't really know what "DBS" stands
16 for.  It's called general ledger or DBS.
17    Q.   And the number for LBI is quadruple
18 zero?
19    MR. THOMAS:  Objection to form.
20    Q.   Quadruple zero, 0000?
21    A.   I think so.
22    Q.   If, and you may not know this one way
23 or the other, if LBI held securities for an
24 affiliate of LBI, do you know if those --
25 withdrawn.  Let me try again.

Page 151

Krishnan

1
2    If LBI held option positions for an
3 affiliate of LBI, would those options positions
4 be reflected in GFS under the DBS number 0000
5 for LBI or the DBS number for the relevant
6 affiliate?
7    A.   I don't know.
8    Q.   The GAAP asset class "Derivatives and
9 Other Contracts," ma'am, do you know whether
10 that includes or excludes over-the-counter
11 derivatives?
12    A.   I'm sorry?
13    Q.   The GAAP asset class within GFS of
14 "Total Derivatives and Other Contracts"?
15    A.   Uh-huh.
16    Q.   Are you with me?
17    A.   Yes.
18    Q.   Does that -- do you know one way or
19 the other whether or not that includes
20 over-the-counter derivatives?
21    A.   I don't know.
22    Q.   Could you have in front of you Exhibit
23 858, please?  Do you have it there?
24    A.   Uh-huh.
25    Q.   I believe you testified that you

Page 152

Krishnan

1
2 created this summary, correct?
3    A.   Yes.
4    Q.   And this has only long inventory
5 positions and not short inventory positions,
6 correct?
7    A.   Yes.
8    Q.   Can you tell me why you excluded from
9 this the short inventory positions?
10    A.   The purpose of this was to create a
11 report of GFS and see if these numbers tie out
12 with the other number.  I don't remember the
13 number.
14    Q.   With the numbers that are in Professor
15 Pfleiderer's declaration, Exhibit 791?
16    A.   Yes.  So these are long inventory
17 market values, right?
18    Q.   Right.
19    A.   So that's why we did not pick the
20 short inventory here.  That's why we did not
21 choose them.
22    Q.   If you wanted to create a summary
23 similar to Exhibit 858 --
24    A.   Uh-huh.
25    Q.   -- for short --

Page 153

Krishnan

1
2    A.   Uh-huh.
3    Q.   -- inventory positions with respect to
4 the same dates that are in your summaries at
5 858, how would you go about that?
6    A.   I would -- I would include the short
7 inventory instead of this long inventory, and I
8 would create a new report on it of GFS.
9    Q.   With a little more specificity, and
10 with reference perhaps to Exhibit 837, if that
11 would be helpful for you, could you tell me how
12 it is you would go about creating that report?
13    A.   837 is this Excel?  The full report?
14    Q.   Yes.
15    A.   Okay.  First of all, I did not make
16 this report from here.  I ran it from GFS
17 system.
18    Q.   Okay.  And just so the record is
19 clear, when you say "this report," you're
20 referring to Exhibit 858.
21    A.   Yes, Exhibit 858.
22    Q.   Okay.  So let's try it this way.  Can
23 you tell me with reference to -- withdrawn.
24    Would it be possible to create the
25 short inventory analog of Exhibit 858 from

Page 154

Krishnan

1 Exhibit 837?
2     A.   Yes, I think so.
3     Q.   Can you please tell me how you would
4 go about that?
5     A.   You would filter on the "GAAP Asset
6 Class 1 Number" and the name and you would --
7 you would pick just the "Short Inventory, TD at
8 Market Value."
9     Q.   Uh-huh.
10    A.   And then you may have to, you know,
11 like do some sort of summing or pivoting in
12 Excel, I'm not very familiar with how they do it
13 in Excel, and you would get the numbers for the
14 short inventory.
15    Q.   Could you looking at Exhibit 837,
16 could you identify the particular columns that
17 you would use in order to create the short
18 inventory analog of Exhibit 858?
19    A.   I would pick the -- 836.  I would pick
20 the AB and BL and BM and probably the business
21 date -- I don't know where that is -- which is
22 BU.
23    Q.   Sticking with Exhibit 837, the column
24 BU that you just referred to includes not just

Page 155

Krishnan

1 the date but also the time, ma'am, you see that?
2     A.   Yeah, but I was just telling --
3     Q.   Ms. Carrero?
4     A.   -- that the time is not relevant
5 because it's based on the date I think it's some
6 formatting in Excel.
7     Q.   So there's no -- the time of 6 A.M.?
8     A.   It just --
9     Q.   -- is inaccurate?
10    A.   Yeah.
11    Q.   And separate and apart from the
12 inclusion in Deposition Exhibit 837, column BU,
13 of the 6 A.M. time, is this data reflective of
14 end of day or beginning of day prices?
15    A.   End of day.
16    Q.   And if you could turn to Exhibit 831
17 and to the last column, which is BT, again
18 headed "Business Date"?
19    A.   Uh-huh.
20    Q.   Is the answer the same to the same
21 question:  Does the data in Exhibit 831 reflect
22 the values within GFS -- and I use values
23 generally speaking, not specifically
24 monetarily -- as at the end of the business day?

Page 156

Krishnan

1     A.   Yes, that's correct.
2     Q.   Could you have Exhibit 19 in front of
3 you briefly, please?  That's a one-page document
4 shown to you at the end of the deposition.
5         Do you have it there?
6     A.   Uh-huh.
7     Q.   You see at the top left-hand side
8 under "Assets" --
9     A.   Uh-huh.
10    Q.   -- that there are seven entries above
11 the line that says "Total," beginning with "Gov.
12 and AG"?
13    A.   Uh-huh.
14    Q.   And going down through "Cash," do you
15 see those?
16    A.   Yes.  Yes.
17    Q.   With the exception of the cash, do you
18 agree that those six asset categories are
19 reflective of the six GAAP asset categories that
20 are held within GFS?
21        MR. THOMAS:  Objection to form.
22 Foundation.
23    A.   I -- I don't know.  The names are
24 different, so I'll go by the names.

Page 157

Krishnan

1     Q.   Which names are different, ma'am?
2     A.   I'm sorry?
3     Q.   Which names are different?
4     A.   The GAAP asset class names that I have
5 in the GFS summary report are different from
6 what they are here.
7     Q.   Do you think it's possible that these
8 are -- the entries, those six entries on Exhibit
9 19, are shorthand for the GAAP asset classes as
10 reflected in the GFS system?
11        MR. THOMAS:  Objection to form.
12 Foundation.  Calls for speculation.
13        You can answer or respond at least.
14    A.   I'm too tired.  I don't know what it
15 means.  I don't know.  I -- I really don't know.
16        MR. OXFORD:  Okay.  I have no further
17 questions.  I believe Mr. Thomas has some
18 for you.
19        MR. THOMAS:  I do.
20 EXAMINATION BY
21 MR. THOMAS:
22    Q.   Let me ask you to turn to Deposition
23 Exhibit 859, please, which is the e-mail chain
24 from Ms. Carrero.

Page 158

Krishnan

1
2      At some point in 2009 were you asked
3  to run -- asked by Barclays' lawyers to run GFS
4  reports?
5      A.   Yes, that's correct.
6      Q.   Are the reports that you were asked to
7  run at that time described in Ms. Carrero's
8  e-mail here under "Report Group"?
9      A.   Uh-huh.  Balance sheet positions, yes.
10     Q.   So you recognize this report with the
11  description "Report Group," "Report Categories,"
12  "Report Type," "Report Name," "Custom Filter and
13  Dates," you recognize that as the report that
14  Barclays' attorneys asked you to run in 2009?
15     A.   That's correct, yes.
16     Q.   And did you in fact run that report?
17     A.   Yes, we did.
18     Q.   And did you provide it to Barclays'
19  lawyers?
20     A.   Yes.
21     Q.   And is it your understanding those
22  reports were provided to movants in this case?
23  Is it your understanding that those reports were
24  provided to LBHI in this case?
25     A.   Yes, it looks like it.  I see it in

Page 159

Krishnan

1
2  the exhibits.
3      Q.   If I can ask you to turn -- That's
4  good point.  If I ask you to turn to the stack
5  of deposition exhibits which are 844 to 856.  I
6  know you were asked questions about this
7  previously.
8      Does this appear to be excerpts of the
9  reports that you ran consistent with the report
10  request described in Deposition Exhibit 859?
11     A.   Yes, that's correct.
12     Q.   Okay.  And looking at it up on the
13  screen, and if I could ask you to just scroll
14  down, please, so we're looking at the electronic
15  version of 844, and does this appear to be the
16  report that you ran in response to the report
17  request described in Deposition Exhibit 859?
18     A.   That's correct.
19     Q.   And did there come a time when you
20  were asked to modify the report or the filter in
21  any way?
22     A.   Yes, we were asked to modify the
23  filter so we would also include the equities in
24  this report.
25     Q.   Was that sometime in 2010?

Page 160

Krishnan

1
2      A.   Yes.
3      Q.   And did you run such reports?
4      A.   Yes, we did.
5      Q.   And if I could ask you to look at the
6  stack of deposition exhibits that contain Depo
7  Exhibits 836 through 843, please.
8      A.   Yeah.
9      Q.   And does this appear to be extracts of
10  the reports that you were later asked to do that
11  contained equities?
12     A.   That's correct.
13     Q.   And in order to produce this report,
14  you had to modify or change the report requests
15  contained in Deposition Exhibit 859?
16     A.   Right, we had to change the filter to
17  include the LBIs and remove the exclusion that
18  it had on the equities.
19     Q.   And if I could ask you to look
20  electronically on the screen at Deposition
21  Exhibit 836?
22     A.   Uh-huh.
23     Q.   And if I could ask counsel to scroll
24  down for me, please.
25     And you're pointing at the screen.

Page 161

Krishnan

1
2  What are you pointing to?
3      A.   "Sum Equities."
4      Q.   Okay.  And do you recognize this as a
5  report you produced in 2010 that included the
6  equities?
7      A.   That's correct.
8      Q.   And did this include all the long
9  positions in the GFS system?
10     A.   Yes, it included everything in GFS
11  with that filter, with the LBI filter.  It just
12  included everything that was in LBI.
13     Q.   Okay.  And that would be all the long
14  positions including equities?
15     A.   Yes.
16     Q.   When you produced these reports, did
17  you try to make sure you did so accurately?
18     A.   Yes, we did.
19     Q.   And you believe the reports accurately
20  reflect the data in the GFS system?
21     A.   That's correct.
22     Q.   And you were also shown Deposition
23  Exhibit 791, which is BCI Exhibit 779, and in
24  the middle of the page -- you've got it there --
25  it's a chart entitled "Summary of GFS Daily

Page 162

Krishnan

1  Krishnan
2  Exposure Report," do you see that?
3      A.    Yes.
4      Q.    At some point then were you asked to
5  ensure or to check whether these summary data
6  were consistent with the data in the GFS system?
7      A.    That's correct.
8      Q.    For good measure, let me go ahead and
9  mark Deposition Exhibit 808 -- excuse me.  Let
10 me ask that we mark BCI Exhibit No. 808 as
11 Deposition Exhibit number 861.
12     (Deposition Exhibit 861, Summary of
13 GFS Daily Exposure Reports, September 12-19,
14 2008, marked for identification, as of this
15 date.)
16     MR. THOMAS:  Let me also ask that we
17 mark BCI Exhibit No. 809 as Deposition
18 Exhibit 862.
19     (Deposition Exhibit 862, a document
20 bearing Bates Nos. BCI-EX-00302963, with
21 attachment, marked for identification, as of
22 this date.)
23     MR. OXFORD:  Just so I'm clear, Todd,
24 are these the exhibits to Professor
25 Pfleiderer's April declaration?

Page 163

Krishnan

1  Krishnan
2      MR. THOMAS:  I think they are
3  free-standing exhibits, although they may be
4  the exact same.
5      MR. OXFORD:  Thank you.
6      Q.    And I'm going ask you to look at -- we
7  now have three charts in front of you,
8  Deposition Exhibit 861, Deposition Exhibit 862,
9  and Deposition Exhibit 791 --
10     A.    Okay.
11     Q.    -- titled "Summary of GFS Daily
12 Exposure Report"?
13     A.    Uh-huh.
14     Q.    And if you could take a moment to
15 confirm whether the data is essentially the same
16 in the charts.
17     A.    Yes.
18     Q.    Okay.  And did you confirm that the
19 data reflected in the three deposition exhibits
20 you're looking at is accurate and accurately
21 reflects the data contained in the GFS system
22 for these dates?
23     A.    Yes, I did.
24     Q.    And as part of that effort, did you
25 create Deposition Exhibit 858?

Page 164

Krishnan

1  Krishnan
2      A.    Yes, that's correct.
3      Q.    And this was something you created out
4  of GFS yourself?
5      A.    Yes.
6      Q.    Did the numbers that you looked at in
7  GFS and used to create 858 match up with the
8  numbers in Deposition Exhibits 861, 862 and 791?
9      A.    Yes, they matched.
10     Q.    So do the numbers in these charts in
11 Deposition Exhibits 861, 862 and 791 accurately
12 reflect the data in the GFS system?
13     A.    Yes.
14     Q.    Are you familiar with the expression
15 "T+1"?
16     A.    Yes.
17     Q.    Would you explain what that means?
18     A.    It means trade date plus one.
19     Q.    Can you explain how that relates to
20 the Lehman GFS system as of September 2008?
21     A.    What it means is that when, for
22 September 12, the data is available the next
23 business date, which is the Monday.  "T+1"
24 actually means the trade date plus one business
25 date.  So for the 12th, the data is available

Page 165

Krishnan

1  Krishnan
2  for users to view on the 15th morning.
3      Q.    Let's, for example, use the date of
4  September 16.  When would the data for the 16th
5  initially, initial data, come into the system?
6      MR. OXFORD:  Objection.  Form.
7      A.    Can I answer it?
8      Q.    You can answer.
9      A.    So the data would come in on the
10 evening of September 16.  It would keep coming
11 between September 16 night and September 17
12 early morning, and by September 17, say around 8
13 A.M. or 9 A.M., the system is ready with the
14 start of day numbers.
15     Q.    And are there further adjustments that
16 are made to the September 16 numbers on the
17 17th?
18     A.    Yes.
19     MR. OXFORD:  Objection.  Form.
20     A.    Yes.  The users have the capability to
21 make adjustments on September 17 for September
22 16 data.
23     Q.    Is there a cut-off time in the system
24 for such adjustments on the day after?
25     A.    Yes.  6 P.M. is the cut-off time.

Page 166

Krishnan

1
2   Users usually put in adjustments before 5:30 to
3   make sure that the adjustments go through.
4       Q.    So for data, for example, on September
5   16, when would complete data on Lehman's
6   positions be available for September 16?
7       A.    Somewhere between 6 P.M. on September
8   17 and 7 P.M., somewhere between that time you
9   would have the complete data.
10      Q.    And is that what's referred to as T+1
11  because the data isn't available until the night
12  of the next day?
13      A.    We refer to it as T+1 because even the
14  start of day data is not available till, for
15  September 16, is not available until September
16  17. So it's trade date September 16 plus one,
17  September 17.
18      Q.    And the data that flows into the GFS
19  system, that's from other Lehman systems?
20      A.    Yes.
21      Q.    And several times in your testimony
22  today you have used the term "market value," and
23  we've looked at the term "market value" as used
24  in the GFS system and the GFS reports. Do you
25  recall that?

Page 167

Krishnan

1
2       A.    Uh-huh. Yes. Sorry.
3       Q.    And what is your understanding of what
4   the term "market value" means in the GFS system
5   and as you were using it?
6       A.    My understanding is that, based on the
7   end-of-day balances and the end-of-day prices,
8   the system calculates the market value, and
9   also, the system is open for users to make any
10  adjustments to the price or the quantity, to
11  modify it in any way.
12      Q.    If we see something that says "market
13  value" in the GFS system or a GFS report, is
14  that simply a calculation of whatever price is
15  there times the quantity of the position?
16      A.    Most times that's true, but sometimes
17  there is a pricing factor or a multiplier
18  involved.
19      Q.    The price that's in the GFS system?
20      A.    Uh-huh.
21      Q.    Do you know, is that -- that price is
22  being fed into the GFS system by some other
23  system, correct?
24      A.    Sorry?
25      Q.    That price is being fed, flowed into

Page 168

Krishnan

1
2   GFS from some other system?
3       A.    That's correct.
4       Q.    And do you know if the price that's
5   coming in GFS is an exit or last price?
6       A.    I think --
7           MR. OXFORD: Objection. Form.
8       A.    I think it may be the last price
9   because we get the end-of-day balances.
10      Q.    So the "market value" phrase used in
11  GFS and the GFS reports, as you understand it,
12  would be the last price that you receive from
13  another source times the quantity of the
14  position held?
15      A.    Yes, that's my understanding.
16      Q.    You were asked earlier about a special
17  environment that was created for data as of
18  September 12, do you recall that?
19      A.    Yes.
20      Q.    And I think you were asked some
21  questions concerning whether you could --
22  whether the data for September 12 in the GFS
23  system could have been modified anytime after
24  September 15, and I just want to be specific.
25          What periods of time could the data in

Page 169

Krishnan

1
2   the GFS have been modified?
3       A.    For September 12, specifically, it
4   could have been modified on September 15, or at
5   the time that we set up the special environment,
6   after October 28 of 2008.
7           MR. THOMAS: And let me go ahead and
8   mark another document. We'll mark as
9   Deposition Exhibit 863.
10          (Deposition Exhibit 863, an e-mail
11  from Nadya Romero dated October 27, 2008,
12  with attachment, marked for identification,
13  as of this date.)
14      Q.    Were you personally involved in
15  helping set up this special environment for
16  September 12?
17      A.    Yes, I was.
18      Q.    And I've shown you a document that's
19  an e-mail chain and attachment entitled "9/12
20  Global Consolidated Close - on behalf of Alvarez
21  & Marsal"?
22      A.    Uh-huh.
23      Q.    You see it's sent to some group named
24  "DBS USERS"?
25      A.    That's right.

Page 170

Krishnan

1
2    Q.   Do you believe that you would have
3    been included as part of that group?
4    A.   I might have been included.
5    Q.   Do you recall this project that's
6    being described here in this e-mail chain?
7    A.   Yes, I was very much involved in this
8    project and but I cannot remember exactly
9    getting this e-mail because it was way back in
10   October 2008.
11   Q.   But you were personally involved in
12   this project?
13   A.   Yes, I was.
14   Q.   And at whose request was this project
15   done?
16   A.   It -- my understanding was that it was
17   done for LBHI and LBI.
18   Q.   And at the top of this it says "on
19   behalf of Alvarez & Marsal." Did you have an
20   understanding that Alvarez & Marsal was kind of
21   running LBHI at this time?
22   A.   Yes, that's correct.
23   Q.   And in one of the recipients here, do
24   you see David Coles?
25   A.   Uh-huh.

Page 171

Krishnan

2    Q.   Were you aware that he was the CFO of
3    Lehman, LBHI?
4    A.   I'm not -- I'm not sure.
5    Q.   Okay.  And what was your understanding
6    of why there was a special environment being set
7    up?
8    A.   My understanding was that the input
9    data that we received for September 12 might
10   have had some problems, or on September 15, the
11   users did not probably do the adjustments that
12   they were supposed to do and that's why we had
13   to set up this whole new environment so that
14   they are able to put in adjustments for
15   September 12.
16   Q.   So normally adjustments for a
17   particular day can only be made in the GFS
18   system for the next day up until a certain time?
19   A.   That's correct.  Next day until 6 P.M.
20   Q.   And did you mention earlier something
21   about a 23-day period?
22   A.   GFS just holds the last 23 business
23   days of data, but users are not able to adjust
24   this.
25   Q.   So for someone at Lehman who stayed at

Page 172

Krishnan

2    Lehman after the closing of the Barclays deal on
3    September 22, those that had access to the GFS
4    prior to the closing, would they have continued
5    to have access afterwards?
6    A.   I believe so.
7    Q.   Was there anything, to your knowledge,
8    done that would have stopped that access?
9    A.   I don't think we did anything in GFS
10   to stop anybody's access.
11   Q.   And so on September 22 someone with
12   access at Lehman could go into GFS and look at
13   whatever values in the GFS system they wanted?
14   A.   Yes, I believe so.
15   Q.   And for 23 days, they could -- they
16   could go back 23 days in time to see any values
17   they wanted to in GFS?
18   A.   That's correct.  Yes.
19   Q.   This effort, this project described in
20   this e-mail, Exhibit 863, would have been more
21   than 23 days after September 12; is that
22   correct?
23   A.   That's correct.
24   Q.   Now, was this special environment set
25   up so that Alvarez and LBHI and LBI could do

Page 173

Krishnan

2    whatever they wanted to do with respect to
3    September 12 data?
4    MR. OXFORD:  Objection.  Form.
5    Foundation.
6    MS. CARRERO:  Same objection.
7    MR. DAKIS:  Same objection.
8    A.   Can I answer it?
9    Q.   You can answer.
10   A.   I don't know what -- I mean, I don't
11   know what they did, but what I can say is that
12   I've seen adjustments for September 12 in the
13   special environment that was set up.  So I guess
14   they did change the data after this environment
15   was set up.
16   Q.   And by "they," you're referring to
17   Lehman and Alvarez & Marsal?
18   A.   That's correct.
19   Q.   And you personally have seen those
20   adjustments?
21   A.   Yes, I've seen those adjustments.
22   Q.   Were there many adjustments?
23   A.   I think there were about 7,000
24   adjustments.
25   Q.   Now, the data that's reflected in the

Page 174

Krishnan

1
2 GFS reports that you ran and that we've
3 discussed here today and that were marked as
4 deposition exhibits, were they, the data for
5 September 12, would that reflect the adjustments
6 made to the September 12 data by Alvarez &
7 Marsal and Lehman as part of this project?
8     A.   Yes, that's correct.  We pulled the
9 September 12 data from the special environment
10 that we set up.
11         MR. DAKIS:  Objection to the form of
12 the question.
13     Q.    Now, after 23 days had passed, could a
14 user then ask your group to check the archives
15 and provide data from GFS?
16     A.   Yes, they could.
17     Q.    Was it common for there to be a
18 significant number of adjustments to pricing
19 information in the GFS system on the day after?
20     A.   Yes.
21     Q.    And were those adjustments frequently
22 significant?
23         MR. OXFORD:  Objection.  Form.
24     A.   Yes, they would -- they could
25 potentially affect the numbers.

Page 175

Krishnan

1
2     Q.    So when you were previously asked
3 about the process being automated with feeds,
4 were you not including the day-after process of
5 people going in and making adjustments to the
6 price?
7     A.    That's correct, I only included the
8 feed files that we get from the rating systems.
9         MR. THOMAS:  I have nothing further.
10 FURTHER EXAMINATION BY
11 MS. CARRERO:
12     Q.    I have a few follow-up questions for
13 you, Ms. Krishnan.
14         When Mr. Thomas asked you about
15 adjustments to the September 12 data and you
16 said something in the neighborhood of 7,000
17 adjustments had been made; is that correct?
18     A.    Somewhere in the neighborhood.  I
19 don't know the exact number.
20     Q.    And does that include adjustments that
21 were made on September 15 as well as any later
22 adjustments?
23     A.    It -- I don't think that number
24 includes the -- it's too far back.  I don't
25 remember, but I think it's the 7,000 adjustments

Page 176

Krishnan

1
2 was just in the special environment that we had
3 set up.
4     Q.    And how would you determine how many
5 adjustments had been made on September 15?
6     A.    We have a table which records on what
7 date the adjustments were made, so based on that
8 we can determine.
9     Q.    And Mr. Thomas asked you about the
10 concept of trade date plus one, do you recall
11 that?
12     A.   Yes.
13     Q.    And does trade date plus one refer to
14 only the closing of the adjustment period the
15 day after?
16     A.    The trade date plus one means that,
17 after the actual trade date, one date after the
18 actual trade date, the reports are available for
19 the trade date.  So the trade date and the
20 business date mean the same.
21     Q.    But earlier you had testified that if
22 one were to go into the system the following
23 morning, that any of the feeds into GFS would be
24 in the GFS system; is that correct?
25     A.   Yes.

Page 177

Krishnan

1
2     Q.    And so when we talk about trade date
3 plus one?
4     A.   Uh-huh.
5     Q.    Are we referring to the close of the
6 adjustment period as opposed to the availability
7 of the flow of information into GFS; is that
8 correct?
9         MR. THOMAS:  Objection to form.
10     A.    On the trade date plus one morning,
11 the reports are available, but the data keeps
12 changing continuously because of the adjustments
13 that come through during the day.
14     Q.    So if one were to access the system
15 say at 8 P.M. on September 12, is it fair to say
16 that feasibly some of the information has
17 already flowed into the system and one would be
18 able to see what systems had already flowed in?
19         MR. THOMAS:  Objection to form.
20     A.    On for -- like let's -- can we take an
21 example like September 12?
22     Q.    Sure.  So, for instance, if one were
23 to look at the GFS system at 8 P.M. on September
24 12 and say the TMS system had already fed into
25 GFS, would you be able to ascertain that that

Page 178

1              Krishnan
2 flow had happened already?
3      A.   No, we would have to have all the --
4 all the feeds in before the TMS -- before the
5 balance sheet is ready.
6      Q.   My question is not about the entire
7 balance sheet being ready, but if a moment in
8 time, say 8 P.M. on September 12, you were to go
9 into GFS --
10     A.   Uh-huh.
11     Q.   -- and look at any given CUSIP, if the
12 system -- if a system related to that CUSIP had
13 already fed in and updated a price, would you be
14 able to tell that at 8 P.M.?
15         MR. THOMAS:  Objection to form.
16     A.   See, when we get the feeds, we load
17 them into some tables and we do a lot of
18 processing after that.  So just because we got
19 one feed at 8 P.M. doesn't mean that a user is
20 able to view a report based off that feed.
21     Q.   If one were to query a specific CUSIP,
22 for instance, at 8 P.M. and that system -- that
23 CUSIP, whatever system it is that updates that
24 particular CUSIP had already fed in, would one
25 at 8 P.M. see a new price for that CUSIP?

Page 179

1              Krishnan
2         MR. THOMAS:  Objection to form.
3      A.   First of all, the system takes some
4 time.  Take, for example, September 12 night we
5 get a feed.  It takes -- it is ready for
6 September 12 viewing only after like a few hours
7 after it gets all the feeds and it processes.
8         So if you are talking about a user
9 being able to see a price that was entered at 8
10 P.M., I don't think that's possible.  They're
11 not going to be able --
12     Q.   I'm not asking about it being entered
13 at 8 P.M., I'm asking about a system that has
14 already fed into GFS.  I believe your earlier
15 testimony that was between 8 P.M. and 2 A.M., a
16 number of systems feed into GFS.
17         My question is if one of the systems
18 that feeds in around 8 P.M., if for a CUSIP
19 related to that system you were to go into GFS
20 and look at the price for that CUSIP, would you
21 be able to see the price that had just fed in
22 from whatever system populates the price for
23 that CUSIP?
24         MR. THOMAS:  Objection to form.  Asked
25 and answered.

Page 180

1              Krishnan
2      A.   I don't know if the user can see it
3 based on the feeds that got in, but GFS was
4 built to serve the European users as well as the
5 New York users, so at some point earlier in the
6 morning of September -- I mean, September 12 is
7 a Friday.  It's a bad example.  Say September
8 15.  At some point early in the morning on
9 September 16, the European users, you know, if
10 they still were looking at GFS at that point of
11 time, they would have been able to look at the
12 data.
13     Q.   And so if, take, for instance, the
14 London market would be five hours ahead of New
15 York; is that correct?
16     A.   Uh-huh.
17     Q.   And so if the London office wanted to
18 see the close of day prices for, say, September
19 15, would it be your expectation they would have
20 been able to see that at UK open, you know,
21 which would have been around --
22         MR. THOMAS:  You were off by two hours
23 last time.
24     Q.   -- 4 A.M.  So around 4 A.M. New York
25 time, if someone in the UK would query the GFS

Page 181

1              Krishnan
2 system at 9 A.M. their time, would they be able
3 to see certain feeds from the previous evening's
4 close in the U.S.?
5      A.   I think that's possible.
6      Q.   Are some of the positions within GFS
7 updated by traders in other offices other than
8 just the U.S.?
9      A.   I think European users had access to
10 making adjustments, so --
11     Q.   And would you expect that their
12 adjustments, given the time difference, would
13 have been made earlier than those for anyone in
14 the U.S.?
15         MR. THOMAS:  Objection to form.
16     A.   I would -- I would expect that they
17 might have made adjustments earlier.
18     Q.   And just to confirm, all of the GFS
19 reports that you were asked to create for
20 purposes of this litigation and that were
21 produced include both long and short positions
22 within GFS; is that correct?
23         MR. THOMAS:  Objection to form.
24     A.   The full reports included the long and
25 the short positions.

Page 182

Krishnan

1
2      Q.   And in order to ascertain the price
3  for a number of the fixed income positions
4  captured within the GFS reports, you would need
5  to know the factor; is that correct?
6      A.   Yes, that's correct.
7      Q.   And do you know where the factor comes
8  from?
9      A.   I'm not sure if it's one place for all
10  the systems.  For some systems it might have
11  come in the systems feeds or for some systems we
12  might have picked it from some other source.  I
13  don't -- I don't know that, where we get it
14  exactly.
15     Q.   And how many people within your group
16  at Lehman went over to Barclays?
17     A.   Actually, all of us in New York went
18  to Barclays.
19     Q.   And did all of you go to Barclays in
20  September of 2008?
21     A.   Sometime in September, that's correct.
22     Q.   And do you know if there was any
23  trainings provided with respect to GFS to the
24  estate or any of its -- anyone left to manage
25  the estate?

Page 183

Krishnan

1
2      A.   Training for the people who were part
3  of the Lehman estate?
4      Q.   My question I guess relates to the
5  departure of your group from Barclays and how
6  was the estate brought up to speed on the
7  existence and functions of GFS?
8      A.   From the technology side, we were
9  supporting also the Lehman estate.  So if they
10  had any questions or issues, they would still
11  come to us.
12     Q.   And that would include the TSA?
13     A.   Yes.
14         MR. THOMAS:  Objection to form.
15     Q.   And so, in order for any adjustments
16  to be made to September 12 data, would it have
17  been routed through your group?
18         MR. THOMAS:  Objection to form.
19     A.   The users in the Lehman side, most of
20  them had already access to adjustments so they
21  were able to make the adjustments
22  systematically.  They didn't have to come to us
23  to enter the adjustment.
24     Q.   And who would those users have been
25  that were able to make adjustments?

Page 184

Krishnan

1
2      A.   I don't have the list with me.
3      Q.   Is it a certain group that would have
4  been making adjustments?
5      A.   I would think that they were from LBI
6  and LBHI because we made the special environment
7  for them.
8      Q.   But my question is, within those
9  entities, was it a specific group that would
10  have been making any such adjustments?
11     A.   I would think that they would be --
12  they would have been part of Financial Control
13  in Lehman who probably moved to the Lehman
14  estate and they helped in the close.
15     Q.   And just one last point of
16  clarification.  When Mr. Thomas asked you if you
17  recalled seeing the report path in Deposition
18  Exhibit 859 and whether you had been asked by
19  the lawyers to run those reports in late 2009, I
20  believe you had answered yes; is that correct?
21         MR. THOMAS:  Objection to form.
22     A.   Yes.
23     Q.   Earlier I believe that when we had
24  discussed Deposition Exhibits 844 to 856 you had
25  referenced SAM tickets and didn't recall any

Page 185

Krishnan

1
2  specific requests from anyone in particular.
3         Is it -- has that testimony changed?
4         MR. THOMAS:  Objection to form.
5      A.   No.  What I meant is this detail was
6  there in the SAM ticket when we ran the reports.
7      Q.   And do you recall being asked by
8  anyone in particular to run the report, or you
9  just saw a SAM ticket; is that your testimony?
10         MR. THOMAS:  Objection to form.
11     A.   Usually what happens is there are
12  coordinators who line up these requests in a SAM
13  ticket and let us know that there is a ticket
14  for us and request for us to generate the
15  reports, and that's what probably happened.
16     Q.   And so do you recall the lawyers
17  asking you to run the reports, or you just
18  recall a SAM ticket that had a specific report
19  path and that you ran?
20         MR. THOMAS:  Objection to form.
21     A.   I don't understand what difference it
22  makes because, you know, the SAM ticket has all
23  the details, the same details that you have in
24  this e-mail, and that's what we ran.  So when he
25  asked if this is what we ran, and this detail,

```
                    Krishnan
1
2    the same detail was there in the SAM ticket, and
3    that's what we based the reports off and we ran
4    the reports.
5        Q.   And when you reran the reports with
6    the equities, did you have conversations about
7    the reports to be run or was it based solely on
8    SAM tickets with a different report path --
9        MR. THOMAS:  Objection to form.
10       Q.   -- satisfied?
11       MR. THOMAS:  Objection to form.
12       A.   We might have had conversations.  I
13   don't remember.
14       Q.   And your testimony about the reports
15   that were generated with the equities, which
16   were Deposition Exhibits 836 to 843, was that
17   the custom entity filter was removed; is that
18   correct?
19       A.   Yes, the custom filter was changed so
20   this LBI entity would include the equities.
21       Q.   And do you know if a report using the
22   custom filter that was used to generate the GFS
23   reports with equities was used regularly by the
24   product controllers at Lehman?
25       MR. THOMAS:  Objection to form.
```

```
                    Krishnan
1
2        A.   I don't know.
3        Q.   And do you recall how it was
4    determined that the custom filter would be
5    changed?
6        A.   I don't know, but I think it is
7    because we had -- we didn't have -- I mean, the
8    report didn't have the equities and we found
9    that the reason is because the filter was
10   excluding them and we included the equities.
11       Q.   And do you know if the equities
12   balance sheets were created based off of GFS?
13       MR. THOMAS:  Objection to form.
14       A.   I don't know.
15       MS. CARRERO:  That's it.
16       MR. OXFORD:  I've got a couple
17   follow-up questions.
18       MR. DAKIS:  Me too, actually.
19       MR. OXFORD:  I don't mind who goes
20   first.
21       MR. THOMAS:  I'll go last.
22       MR. OXFORD:  Do you want to --
23       MR. DAKIS:  No, you might pick up on
24   it.
25   FURTHER EXAMINATION BY
```

```
                    Krishnan
1
2    MR. OXFORD:
3        Q.   Ms. Krishnan, you told Mr. Thomas, I
4    believe, that the reports that you ran from GFS
5    that were marked as the deposition exhibits that
6    we looked at today, for the 12th they were run
7    from the special environment, correct?
8        A.   That's correct.
9        Q.   Is the same also true of the data in
10   these reports from the 19th of September?
11       A.   For the 19th, I'm not -- see, there
12   were no changes made to the 19th data, so the --
13   we might have pulled it from Production all the
14   special environment that we set up.
15       Q.   Can you explain what you mean by
16   "production" in that last answer?
17       A.   The Production is a GFS online system.
18       Q.   And for the data for the days between
19   the 12th and the 19th, that would have been
20   pulled from what you call the Production
21   environment, correct?
22       A.   No, between the 12th and the 19th, the
23   15th, 16th, 17th and 18th, they were not
24   available online at the time that we had got
25   this request, so we had to pull it from the data
```

```
                    Krishnan
1
2    archive.
3        Q.   And was the 19th available online or
4    was that also needed to be pulled from the data
5    archive?
6        A.   The 19th was available online because
7    we had the special environment, but if we had
8    the 19th data from the data archive, we might
9    have pulled it from there or we might have
10   pulled it from the special environment.
11       Q.   The adjustments that you have
12   testified that were made to the GFS data between
13   the -- withdrawn.  I'll start it again.
14       You testified that certain adjustments
15   were made to the GFS data in your reports from
16   the 12th through the 19th of September, 2008?
17       MR. THOMAS:  Objection to form.
18       A.   I'm sorry?
19       Q.   Is it your testimony that adjustments
20   were only made to the September 15th data in the
21   special environment?
22       A.   The September 12th data.
23       Q.   Only September 12 data in the special
24   environment was adjusted.  The 7,000 adjustments
25   didn't relate to data from the 15th to the 19th?
```

Page 190

Krishnan

1
2     A.    That's correct.
3     Q.    And can you tell me how it is you're
4  aware that these 7,000 adjustments were made?
5     A.    Because we record the adjustments in a
6  table in GFS.
7     Q.    And who is "we"?
8     A.    The system.
9     Q.    The GFS automatically records any
10  adjustment made in the special environment,
11  correct?
12     A.    That's correct.
13     Q.    And does it record the user who made
14  that adjustment?
15     A.    Yes, it has a user.
16     Q.    And have you reviewed those 7,000
17  adjustments?
18     A.    No.
19     Q.    Have you reviewed any one of those
20  7,000 adjustments?
21     A.    No.
22     Q.    So how is it that you're able to
23  testify under oath that you know who made those
24  adjustments?
25     A.    This special environment was created

Page 191

Krishnan

1
2  for LBI and LBHI.
3     Q.    Uh-huh.
4     A.    And the users that made the
5  adjustments are recorded in the table, but I
6  don't think I said I am -- I said I'm guessing
7  that they would have made the adjustments.
8     Q.    Right.  But you don't know?
9        MR. THOMAS:  Objection to form.
10     A.    I don't.  I would say I would expect
11  that LBI and LBHI would have made the
12  adjustments.
13     Q.    Who from LBI do you believe has access
14  to this data?
15     A.    I don't know.
16     Q.    You couldn't identify a person from
17  LBI?
18     A.    Okay, this happened almost more than a
19  year back, so if you had asked me this question
20  in January of 2009, I might have remembered some
21  names because we used to get e-mails.  I don't
22  have a clue what e-mails we got at that time.
23     Q.    But sitting here today, you couldn't
24  identify a single person who is a representative
25  of the LBI estate who had access to the data in

Page 192

Krishnan

1
2  the special environment; is that correct?
3     A.    Right, because that's because of my
4  memory loss.
5     Q.    It happens to us all, Ms. Krishnan.
6        The reports that you and your team
7  generated that have been marked as exhibits, and
8  I'll focus specifically on Exhibits 381 and 837
9  that I asked you about earlier, is it your
10  testimony that they relate only to LBI data?
11     A.    Yes, we applied the filter to include
12  only LBI.
13     Q.    Did you or anybody operating on your
14  behalf check that data to make sure that it
15  didn't include data that relates to a Lehman
16  entity other than LBI?
17     A.    Well, we don't have to check because
18  when we run the query to include only the LBI,
19  that's what the system would do.
20     Q.    So no one ever checked, that's your
21  testimony?
22        MR. THOMAS:  Objection to form.
23     A.    We don't go there and check like so
24  many records to see if there is only LBI
25  entities.  That's the way the system is supposed

Page 193

Krishnan

1
2  to work and --
3     Q.    Okay.
4     A.    -- if the entity's here, you can
5  always check.
6     Q.    If, for example, Exhibit 837 did
7  include non-LBI entities, would you have any
8  explanation for that?
9        MR. THOMAS:  Objection to form.
10     A.    I don't know.  I would be surprised.
11     Q.    Okay.  We've got Exhibit 837 on the
12  screen here.  Do you see the column I has "DBS
13  Entity Name"?
14     A.    Uh-huh.
15     Q.    If you could drop down, there should
16  be two options so you can filter it by the two
17  values in there.  One is Lehman Brothers, Inc.,
18  correct?
19     A.    Uh-huh.
20     Q.    And that's the only entity you would
21  expect to see in there, correct?
22     A.    Actually, I would have filtered with
23  the DBS entity number, that 0000.
24     Q.    Okay.  Can you explain to me why the
25  DBS entity name LBIE is in column I?

Page 194

1                     Krishnan
2        A.   I'm sorry?
3        Q.   You see above Lehman Brothers, Inc. in
4    the drop down menu from column I, there's also
5    Lehman Brothers International Europe?
6        A.   Uh-huh.
7        Q.   Can you explain to me why that is?
8        A.   I don't know.  The system goes by the
9    number, and this filter was built for the DBS
10   entity 0000, if I remember it right.
11       Q.   So if we wanted to check whether there
12   was any extraneous -- and by "extraneous," I
13   mean non-LBI data -- you would check column H,
14   the "DBS Entity"?
15       A.   Yes, I think so, but I'm still not
16   sure why the DBS entity is the same for those
17   two, you know, the number in H.
18       Q.   If I understand your last answer, you
19   don't understand why the DBS entity name for "I"
20   in column "I" includes LBIE, is that what you're
21   saying?
22       A.   I'm saying that the system goes by
23   column H, and you are having both LBIE and LBI
24   under the DBS entity 0000, and that is what we
25   filtered for and that's what we have, and I

Page 195

1                     Krishnan
2    don't know why the DBS entity 0000 has two
3    different DBS entity names.
4        Q.   And you didn't check for that when you
5    were creating your report, did you?
6        A.   I based everything on this filter, and
7    this filter said probably DBS entity 0000 and
8    that's what we got.
9        Q.   Okay.  And can you just for the
10   record --
11       A.   Exhibit 859.
12       Q.   Thank you.
13           MR. OXFORD:  I don't have any further
14   questions for you, Ms. Krishnan.
15           MR. DAKIS:  Neil picked up most of
16   mine, but I just wanted to ask a couple more
17   follow-up questions.
18   FURTHER EXAMINATION BY
19   MR. DAKIS:
20       Q.   You testified earlier about a special
21   environment you created for the September 12 GFS
22   data, and you testified that Lehman Brothers
23   employees have access to that data, correct?
24       A.   That's correct.
25       Q.   Do any Barclays employees have access

Page 196

1                     Krishnan
2    to that system?
3           MR. THOMAS:  Objection to form.
4        A.   I am not sure.  Any -- let me phrase
5    it any Barclays employees who were part -- who
6    were part of Lehman might have had access, but
7    any new -- any new Barclays user after the
8    actual bankruptcy wouldn't have had access.
9        Q.   Just to make sure I'm clear, if there
10   was -- let's call them a legacy employee, is
11   that okay?
12       A.   Okay.
13       Q.   If there was a legacy employee in the
14   Product Control Group, would that -- could that
15   employee have access to the September 12 GFS
16   data?
17           MR. THOMAS:  Objection to form.
18       A.   I think they might have had access.
19           MR. DAKIS:  No further questions.
20           MR. THOMAS:  A couple follow-up.
21   FURTHER EXAMINATION BY
22   MR. THOMAS:
23       Q.   Can you just describe in a little more
24   detail what you mean by "special environment"
25   just for us lawyers who don't really understand

Page 197

1                     Krishnan
2    this computer stuff?
3        A.   Okay.  By "special environment," what
4    I mean is we -- the data that was saved up on
5    the evening of September 15 which was for
6    September 12 end of day, was loaded up into a
7    very similar database as the Production GFS with
8    all the functionalities that the Production GFS
9    has, and users were -- who had access to the
10   Production GFS at that time on September 12 also
11   had access to the special environment and they
12   could use the graphical user interface to modify
13   the data or run the reports for that date.
14       Q.   And it was your understanding that
15   this was done at the request of Lehman and/or
16   Alvarez & Marsal, as indicated in Deposition
17   Exhibit 863?
18       A.   Yes, that's correct.
19           MR. OXFORD:  Objection to form.
20           MS. CARRERO:  Same objection.
21           MR. DAKIS:  Same objection.
22       Q.   And was a special environment also set
23   up for September 19, 2008?
24       A.   Yes, a special environment was set up
25   for September 19.

Page 198

1              Krishnan
2     Q.    Was that done roughly in the same time
3  period of October/November 2008?
4     A.    It was done after -- after the
5  September 12th was -- I think it was done after
6  the -- our users were comfortable with September
7  12.  You know, after they finished, after they
8  were done with the September 12, they said,
9  okay, we don't need September 12 anymore to be
10 adjusted; that's the time we brought the
11 September 19 online.
12    Q.    And when you refer to "users," can you
13 describe generally what entity you're speaking
14 of?
15    A.    The LBI and LBHI.
16    Q.    So you think that September 19 live
17 environment may have been established in roughly
18 the November 2008 time period?
19    A.    I would think more like February or
20 March of 2009.
21    Q.    And do you recall there being any data
22 dumps of September 19 data in the November 2008
23 time period for any reason?
24    A.    Yes, we might have asked for a
25 September 19 dump to -- end of day dump to be

Page 199

1              Krishnan
2  loaded into the special environment.
3     Q.    Do you know someone named Dipesh
4  Patel?
5     A.    I don't remember now.
6     Q.    After the close of the Barclays
7  transaction on September 22, 2008, were there
8  any major changes done to the GFS system?
9        MR. OXFORD:  Objection.  Form.
10       MR. DAKIS:  Same objection.
11    A.    There was one major change to split
12 the entities so they would not -- the Lehman
13 entities and Barclays entities do not, you know,
14 interact with each other.
15    Q.    And when was that done, approximately?
16    A.    Probably like by the end of September.
17 Maybe in the 24th, 25th timeframe of September.
18 I'm not sure.  I don't remember the dates.
19    Q.    Did that result in any change in
20 functionality for the users in terms of how you
21 log into the system and so forth?
22    A.    It did not change anything to the
23 functionality.
24    Q.    So, on September 23, a Lehman user
25 with access to GFS could log in and use GFS the

Page 200

1              Krishnan
2  way they had previously?
3     A.    Yes.
4     Q.    And in that GFS system, that would
5  have all -- they would be able to run whatever
6  reports they wanted to run, including the type
7  of reports that we've seen today as deposition
8  exhibits?
9     A.    That's correct.
10       MR. THOMAS:  Thanks.  I have nothing
11 further.
12       MR. DAKIS:  I have just one more
13 follow-up question.
14 FURTHER EXAMINATION BY
15 MR. DAKIS:
16    Q.    Mr. Thomas just asked you when you
17 talk about the users, you know, what entity
18 generally are you speaking of, and you testified
19 the LBI or the LBHI, correct?
20    A.    That's correct.
21    Q.    Are you including in the LBI and LBHI
22 employees who were with Lehman but went to
23 Barclays after the sale?
24       MR. THOMAS:  Objection to form.
25    A.    I don't know what is included, but

Page 201

1              Krishnan
2  what I mean by LBI and LBHI is the Alvarez &
3  Marsal would be LBHI and I think LBI was some
4  other consulting company.  I don't remember
5  their name now.
6     Q.    But you testified that Barclays
7  employees, the legacy Barclays employees would
8  also have access to the September 12 system, is
9  that correct?
10       MR. THOMAS:  Objection to form.
11    A.    The legacy Barclays employees would
12 have had access, yes, that's correct.
13    Q.    So they would also be users, correct?
14       MR. THOMAS:  Objection to form.
15    A.    Well, it was not set up for them.
16    Q.    But they have access to it and can use
17 it, correct?
18    A.    Yeah, they could have used it.
19       MR. DAKIS:  Nothing further.
20 FURTHER EXAMINATION BY
21 MR. THOMAS:
22    Q.    Could you turn back to Deposition
23 Exhibit 863, please.  Could you read the subject
24 line of the e-mail chain?
25    A.    "9/12 Global Consolidated Close - on

Page 202

Krishnan

1
2  Behalf of Alvarez & Marsal."
3      Q.   And is that consistent with your
4  recollection that this project was driven in
5  part by Alvarez & Marsal?
6      A.   Yes.
7          MS. CARRERO:  Objection.
8          MR. DAKIS:  Same objection.
9          MR. THOMAS:  Thanks.
10         THE WITNESS:  One more thing, I
11  don't -- for your question, if you look at
12  this e-mail, this probably does not include
13  any user who -- legacy employees who went to
14  Barclays.  So they wouldn't even know how to
15  access the September 12 environment.
16  BY MR. THOMAS:
17     Q.   But in any event, whoever this was
18  sent to and whoever might have theoretically had
19  access, it's your understanding that this was a
20  project driven by Lehman and Alvarez & Marsal?
21     A.   Yes.
22         MR. OXFORD:  Objection to form.
23         MS. CARRERO:  Objection to form.
24         MR. DAKIS:  Objection.
25     Q.   And there's no question that Lehman

Page 203

Krishnan

1
2  and Alvarez & Marsal were involved in this
3  project and process of making any adjustments?
4          MS. CARRERO:  Objection to form.
5          MR. DAKIS:  Objection to form.
6          MR. OXFORD:  Objection to form.
7      A.   This was initiated by Alvarez & Marsal
8  and LBI, so this environment was set up for
9  them.
10     Q.   And they remain involved in the
11  project?
12     A.   Yes, that's correct.
13         MR. DAKIS:  Objection to form.
14     Q.   And do you have an understanding of
15  why they wanted to try to get a consolidated
16  close for 9/12?
17         MR. OXFORD:  Objection.
18         MR. DAKIS:  Objection.  Form.
19         MR. OXFORD:  Foundation.
20         MR. DAKIS:  Foundation.
21         MS. CARRERO:  Same objection.
22     A.   I can answer, right?
23     Q.   Yes.
24     A.   My understanding is that they, Alvarez
25  & Marsal and LBI, thought the data might have

Page 204

Krishnan

1
2  been incorrect because of the input and users
3  not looking at the data on September 15, so they
4  wanted to have the capability to make it right.
5          MR. THOMAS:  Thanks.  I have nothing
6  further.
7          MS. CARRERO:  One follow-up.
8  Hopefully I won't prompt any additional
9  questions.
10  FURTHER EXAMINATION BY
11  MS. CARRERO:
12     Q.   Is it possible to query the GFS data
13  for September 12 absent any sort of adjustment
14  that might have taken place within the special
15  environment?
16     A.   I'm sorry?  The September 12?  What
17  are you saying?
18     Q.   Is a query of GFS data for September
19  12 --
20     A.   Uh-huh.
21     Q.   -- possible using data before any
22  purported subsequent adjustments while part of
23  the special environment?
24     A.   It may be possible to do it if we are
25  able to restore the data from the night of

Page 205

Krishnan

1
2  September 15 and load it into another
3  environment, you know, like that was the data
4  before the adjustments for these took place for
5  the 863.
6      Q.   So your understanding would be that
7  the September 12 data was potentially archived
8  as well as loaded onto the special environment
9  that you testified about?
10         MR. THOMAS:  Objection to form.
11     A.   The special environment started with
12  the end of day of September 12 data, which was
13  September 15 evening.  So on September -- on the
14  actual September 15, around 7:30 P.M. the data
15  was saved somewhere.
16         So your question was can we get the
17  September 12 data without these -- the special
18  environment, right?  So if we go back to the
19  data save that we did on September 15 evening,
20  we'll be able to do that.
21     Q.   And have you undertaken any sort of
22  analysis of the September 12 data versus what
23  has been produced to us and based on your
24  testimony comes from the special environment?
25     A.   You mean if --

Page 206

```
1              Krishnan
2      Q.   Would you like me to rephrase?
3      A.   Yes.
4      Q.   Have you or, as far as you know, has
5   there been any analysis of the September 12 data
6   that would have been saved on September 15 --
7      A.   Uh-huh.
8      Q.   -- versus the September 12 data that
9   was produced to the movants in this matter from,
10  based on your testimony, the special environment
11  location?
12     A.   I have not done any analysis to that
13  effect.  I'm not aware of anything like that.
14     MS. CARRERO:  Nothing further.
15     MR. THOMAS:  Just one clarification.
16  FURTHER EXAMINATION BY
17  MR. THOMAS:
18     Q.   When you said the special environment
19  started with the end of day of September 12
20  data, which was September 15 evening --
21     A.   Uh-huh.
22     Q.   -- you don't mean the special
23  environment was set up right after then, do you?
24     A.   No.
25     Q.   The special environment was set up at
```

Page 207

```
1              Krishnan
2   the request of Alvarez & Marsal sometime in
3   October 2008?
4      MS. CARRERO:  Objection to form.
5      MR. DAKIS:  Objection to form.
6      A.   Yes, that's correct.
7      Q.   Okay.  So the adjustments we have been
8   discussing would not have been made between
9   September 15th and the time that the special
10  environment was set up sometime in October of
11  2008; is that correct?
12     A.   That's correct.
13     (Continued on the next page to include
14   the jurat.)
```

Page 208

```
1              Krishnan
2      Q.   So the adjustments in the special
3   environment we're talking about would have been
4   in the October 2008 period, correct?
5      A.   Yes, between October 2008 and January
6   2009.
7      MR. THOMAS:  Thank you.  Nothing
8   further.
9      MS. CARRERO:  Nothing further.
10     MR. DAKIS:  Nothing further.
11     MR. OXFORD:  Nothing further.
12     (Time Noted:  5:04 P.M.)
13             oOo
14
15
16
17
18
          _____
          UMA KRISHNAN
19
20  Subscribed and sworn to
    before me this    day
21  of       2010.
22
          _____
23
24
25
```

Page 209

```
1              Krishnan
2           CERTIFICATE
3   STATE OF NEW YORK )
                      : ss
4   COUNTY OF NEW YORK )
5      I, Kathy S. Klepfer, a Registered
6   Merit Reporter and Notary Public within and
7   for the State of New York, do hereby
    certify:
8
9      That UMA KRISHNAN, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14     I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18     I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23     In witness whereof, I have hereunto
24  set my hand this 29th day of June, 2010.
          ------------------------------
25        KATHY S. KLEPFER, RPR, RMR, CRR, CLR
```

Page 1

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9        DEPOSITION OF PHILIP E. KRUSE

10            New York, New York

11         Thursday, December 17, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 26533

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5          December 17, 2009
 6          9:32 a.m.
 7
 8
 9          HIGHLY CONFIDENTIAL videotaped
10   deposition of PHILIP E. KRUSE, held at
11   the offices of Boies Schiller & Flexner,
12   LLP, 575 Lexington Avenue, New York, New
13   York, pursuant to Notice, before Francis
14   X. Frederick, a Certified Shorthand
15   Reporter, Registered Merit Reporter and
16   Notary Public of the States of New York
17   and New Jersey.
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3      JONES DAY, LLP
 4      Attorneys for Lehman Brothers, Inc.
 5         222 East 41st Street
 6         New York, New York  10017-6702
 7      BY:  JAYANT TAMBE, ESQ.
 8         KELLY CARRERO, ESQ.
 9
10      BOIES SCHILLER & FLEXNER, LLP
11      Attorneys for Barclays Capital
12         401 East Las Olas Boulevard, Suite 1200
13         Fort Lauderdale, Florida  33301
14      BY:  W. TODD THOMAS, ESQ.
15         - and -
16      BOIES SCHILLER & FLEXNER, LLP
17         575 Lexington Avenue - 7th Floor
18         New York, New York  10022
19      BY:  JONATHAN P. KRISBERGH, ESQ.
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S:  (Cont'd.)
 3      QUINN, EMANUEL, URQUHART, OLIVER &
 4      HEDGES, LLP
 5      Attorneys for the Creditors Committee
 6         51 Madison Avenue
 7         New York, New York  10010
 8      BY:  ERIC M. KAY, ESQ.
 9
10      HUGHES, HUBBARD & REED, LLP
11      Attorneys for the SIPA Trustee
12         One Battery Park Plaza
13         New York, New York  10004-1482
14      BY:  SETH ROTHMAN, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2          THE VIDEOGRAPHER:  This is the
 3   start of tape number one of the
 4   videotaped deposition of Philip Kruse in
 5   the matter In Re. Lehman.  Today's date
 6   is December 17th, 2009 at approximately
 7   9:32 a.m.  Will the court reporter
 8   please swear in the witness.
 9          * * *
10   P H I L I P   K R U S E,  called as a
11      witness, having been duly sworn by a
12      Notary Public, was examined and
13      testified as follows:
14   EXAMINATION BY
15   MR. THOMAS:
16      Q.   Good morning, Mr. Kruse.
17      A.   Morning.
18      Q.   Would you please state your name.
19      A.   Philip Kruse.
20      Q.   And will you please state who you
21   work for?
22      A.   I'm with Alvarez & Marsal.
23      Q.   And have you been deposed before?
24      A.   Yes, I have.
25      Q.   Okay.  Approximately how many
```

Page 6

P. KRUSE - HIGHLY CONFIDENTIAL

2  times?
3      A.   Twice.
4      Q.   So you understand how this process
5  works. I'll be asking questions.  If you
6  don't understand any of my questions or want
7  me to clarify them, please do so.  Please ask
8  me to do so and I will.
9      A.   Yes.  Of course.
10     Q.   Okay.  Do you understand you've
11 been designated here today as a corporate
12 representative for both LBHI and Alvarez?
13     A.   Yes.
14     Q.   And can you please describe your
15 career history just at a very high level.
16     A.   Graduated in December of 1982 from
17 the University of Kansas.  Accounting and
18 business administration degree.  Bachelor of
19 science.  Began work in January of '83 with a
20 public accounting firm in Wichita, Kansas.
21 Regier, Carr & Monroe.  I was there for three
22 and a quarter years.  And then began work in
23 Shelby Rucksdashel & Jones in Dallas, Texas.
24 Was with that firm -- that's a public
25 accounting firm.  I was with that firm for

Page 7

P. KRUSE - HIGHLY CONFIDENTIAL

2  about a year.  And then joined Kenneth
3  Leventhal & Company also in Dallas, Texas.  I
4  was with Kenneth Leventhal & Company from the
5  fall -- excuse me -- from the spring of '87
6  through November of '92.  In November of '92 I
7  moved to New York and joined the former
8  Deloitte & Touche.  I was with Deloitte Touche
9  through calendar year 2004 and joined Alvarez
10 & Marsal in January of 2005.
11     Q.   And what is your current position
12 with Alvarez & Marsal?
13     A.   I'm a Managing Director in Our
14 Dispute Analysis and Forensics Services Group.
15     Q.   And what are your duties and
16 responsibilities in that position?
17     A.   Primarily client service.  I
18 oversee forensic accounting engagements of
19 various types.  Litigation consulting
20 engagements.
21     Q.   And when did you first become
22 involved with LBHI or the LBI sale of assets
23 to Barclays?
24     A.   My first involvement was the day
25 the deal closed.  I think I was on site the

Page 8

P. KRUSE - HIGHLY CONFIDENTIAL

2  afternoon of September 22nd.
3      Q.   Do you know when Alvarez's first
4  involvement with that sale transaction was?
5      A.   Well, I know that Brian Marcel was
6  called the evening of September 14th, Sunday
7  evening, by a board member of Lehman.  And at
8  that time was asked to serve as a chief
9  restructuring officer for the entity as it was
10 entering bankruptcy. So I think we had people
11 on the ground that following day, on the 15th.
12     Q.   Let me go ahead and show you two
13 documents we'll mark as 457A and 458A.
14          (Deposition Exhibit 457A, Barclays
15     Capital Inc.'s Rule 30(b)(6) Deposition
16     Notice to Lehman Brothers Holdings Inc.,
17     marked for identification as of this
18     date.)
19          (Deposition Exhibit 458A, Barclays
20     Capital Inc.'s Rule 30(b)(6) Deposition
21     Notice to Alvarez & Marsal, marked for
22     identification as of this date.)
23 BY MR. THOMAS:
24     Q.   Have you seen these documents
25 before?

Page 9

P. KRUSE - HIGHLY CONFIDENTIAL

2      A.   Yes, I have.
3      Q.   Okay.  And you understand them to
4  be -- to contain the topics which you are
5  going to serve as a representative for here
6  today?
7      A.   Yes.
8          MR. TAMBE:  I would only add that,
9  you know, at least 457A -- well, both
10 457A and 458A have been the subject of
11 certain correspondence between my
12 partner, Bill Hein, and yourself.  And
13 there's a letter dated November 2nd in
14 which we have noted certain objections
15 with respect to 457A as well as 458A.
16 And certainly we're producing this
17 witness subject to those objections.
18     MR. THOMAS:  Sure.  And you
19 received my letter in response.
20     MR. TAMBE:  Yeah, yeah.
21     MR. THOMAS:  So you understand --
22     MR. TAMBE:  We understand your
23 position, yeah.
24     MR. THOMAS:  -- how we're moving
25 forward.

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  BY MR. THOMAS:
3      Q.   Since you're kind of wearing two
4  hats here today and at the suggestion of your
5  counsel we've agreed to try to conflate the
6  deposition.  We'll have to -- you and I will
7  both have to be careful to distinguish between
8  LBHI and Alvarez when appropriate.  Sometimes
9  I'll ask questions framed as LBHI and Alvarez.
10  Obviously, if you need to draw any kind of
11  distinction between the two in your answer,
12  you know, please do so.
13      A.   Yes, of course.
14      Q.   Okay.  In terms of your role as an
15  LBHI representative for these topics can you
16  please describe what you did to prepare
17  yourself for answering questions today?
18      A.   My preparation generally entailed
19  rereading and re-reviewing the Rule 60(b)
20  motion that LBHI filed as well as the UCC and
21  the SIPA Trustee and the exhibits to those
22  filings as well.  And I also met with counsel
23  for about a -- for two days earlier this week.
24      Q.   Did you discuss the deposition
25  with anyone else?

P. KRUSE - HIGHLY CONFIDENTIAL

1
2      A.   I had discussions with other
3  people at Alvarez & Marsal in the course of
4  refreshing my memory about some of this
5  material.
6      Q.   Let's stay on LBHI for just a
7  minute.  Did you speak with anyone at LBHI to
8  gain information in order to answer questions
9  today?
10          MR. TAMBE:  Objection to the form
11  of the question.
12      A.   Well, you know, the people at LBHI
13  that generally have knowledge on these topics,
14  substantially all of them had moved over to
15  Barclays, and so I wouldn't have had access by
16  and large to virtually all the people who
17  knowledge on these topics as it relates to
18  LBHI.
19      Q.   Who -- that is who still at LBHI
20  has knowledge on these topics?
21      A.   There are various people who
22  either are with or rejoined the estate -- or
23  joined the estate after the sale that we've
24  had discussions with in the course of our
25  work.

P. KRUSE - HIGHLY CONFIDENTIAL

1
2          THE WITNESS:  Presumably the
3  identity of those people is not subject
4  to any privilege issues.
5          MR. TAMBE:  No.  I think if
6  they're the people who fall under the
7  category as you understand the question
8  and you remember the names then you
9  should identify them.
10      A.   The people that I recall as I sit
11  here, and there may be others, Anthony
12  Collerton, Chris O'Meara.  There are others
13  whose names escape me but, you know, I can --
14  there are probably at least three or four
15  others that I know we spoke to at various
16  times in the course of our work in order to
17  get the benefit of whatever knowledge they
18  had.
19      Q.   Let me just try to prompt you with
20  a couple names and see if you did speak with
21  them or you otherwise know that they have
22  knowledge concerning these topics or the sale
23  transaction.
24          Christopher Mosher?
25      A.   I don't believe I've spoken to

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  him.
3      Q.   Do you know if he has knowledge
4  concerning these topics?
5      A.   I do not know.
6      Q.   Catherine Muller?
7      A.   I know Catherine Muller.  I'd
8  spoken to her before.  I don't recall that it
9  was specifically about the Barclays deal,
10  itself.
11      Q.   Do you know her involvement with
12  the sale transaction?
13      A.   I don't.  She doesn't appear to be
14  a prominent player by virtue of the material
15  that I reviewed.
16      Q.   Bill Olshan?
17      A.   Yes.  I know Bill Olshan.
18      Q.   Was he involved in the Barclays
19  transaction?
20      A.   No, he was not.  To my knowledge.
21      Q.   Lisa Roitman?
22      A.   I know the name but I don't know
23  Lisa and I don't know that she had any
24  involvement either.
25      Q.   Eric Salzman?

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        A.    I don't think I ever spoke to
3    Chris independently on this subject without
4    Jones Day present so I'll follow instructions
5    of counsel and leave it at that.
6        Q.    Okay.  Any of the other people
7    that we've gone through on the list did you
8    speak with them in preparation for you
9    testimony today?
10        A.    Well, I speak routinely to the
11    people in the in-house legal team, Bill
12    Olshan, Tom Hommel, Martha Solinger.  I
13    wouldn't say I spoke to them specifically on
14    the subject of this deposition.  But the other
15    people -- I did not speak to those people
16    directly in connection with my preparation.
17        Q.    Okay.  For example, Catherine
18    Muller, did you reach out to her for purposes
19    of getting ready for the deposition?
20        A.    No, I did not.
21        Q.    Okay.  And what did you do for
22    your preparation with respect to your role as
23    the Alvarez 30(b)(6) witness today?
24        A.    Again, I reviewed the material
25    that was filed in connection with our Rule

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    60(b) motion, the other Rule 60(b) motions by
3    the other interested parties, the exhibits
4    thereto.  I met with counsel.  I had
5    conversations -- a brief conversation with Jim
6    Fogarty, really to just introduce Jim to the
7    Jones Day firm, making him aware that Jones
8    Day would be reaching out to him to schedule
9    his deposition.  We did try to speak to Jim in
10    the last couple of days but he is currently --
11    he left A&M, as you may know, and is currently
12    the CEO of Charming Shops.  And I understand
13    he was embroiled in a preparation for and
14    participation in a board meeting for his
15    company.  And we haven't been able to speak to
16    him in the last couple of days.
17        I spoken to Brian Marsal recently
18    in connection with my preparation.  I've
19    spoken to John Suckow in connection with my
20    preparation.
21        Q.    Anyone else?
22        A.    Not that I recall, as I sit here.
23        Q.    What information did you learn
24    from Mr. Marsal?
25        A.    I just generally spoke to him

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    about his perspectives on what we as a -- we
3    as a firm, A&M were focused on.  And how they
4    related to some of the material I saw.
5        And I'm sorry.  I should back up.
6    In connection with my preparation I also
7    reviewed various e-mail communications that
8    were produced as I understand it in this
9    matter that involve communications A&M was
10    involved in.  And I would have spoken to Brian
11    to get his perspective on some of the material
12    that I'd seen up to that point in my
13    preparation.
14        Q.    Okay.  And what information did
15    you learn from Mr. Suckow?
16        A.    Again, it would have been a
17    similar nature, to try to get a perspective on
18    some of the material I'd seen in connection
19    with my preparation.
20        Q.    So from LBHI you reviewed the Rule
21    60 motions and you met with counsel.  That was
22    pretty much the extent of your getting
23    prepared to be answer the questions for LBHI;
24    is that correct?
25        MR. TAMBE:  Objection to the form

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    of the question.
3        A.    I would agree with that but would
4    also just add a point of emphasis that because
5    of the work that we had been doing up to this
6    point I was generally aware that the people
7    that are currently at the estate did not have
8    substantial knowledge of the transaction.  So
9    I didn't feel an immediate need or utility
10    that would be served by seeking out some of
11    these people you named.
12        Q.    Okay.  In any event, you didn't
13    seek them out or talk to them.
14        A.    Not in connection with the
15    preparation itself, no.
16        Q.    Okay.  Let me go ahead and hand
17    you an exhibit that's already been marked
18    that's the Asset Purchase Agreement.
19        I might try to start with the most
20    boring stuff first while we're all still
21    awake.  And basically what I'd like to do is
22    basically walk through -- and this really
23    relates to topic number 1 in the deposition
24    notices and just walk through and ask you
25    about valuations that were made or not made

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  with respect to the assets and then the
3  liabilities.
4       A.  Um-hum.
5       Q.  So at page 6 of the APA -- and
6  this is a document you're familiar with, I
7  presume.
8       A.  Yes.  I am.
9       Q.  Okay.  Under Purchased Assets --
10 again, I'd like to just walk through and ask
11 pursuant to topic 1 what your understanding --
12 what LBHI's and/or Alvarez's understanding was
13 with respect to the valuations of these
14 various items.  And if the answer is they
15 don't know or no valuation performed, so be
16 it.  But if there were evaluations performed or
17 there was some knowledge I would like to have
18 your information on that.
19      So the first one, the retained
20 cash, do you know how much -- what value the
21 retained cash had as of September 17th?
22      A.  No.  A&M had no understanding of
23 this or any of these categories of assets and
24 what their value was at any point prior to the
25 closing.

P. KRUSE - HIGHLY CONFIDENTIAL

1
2       Q.  Okay.  How about LBHI?
3       A.  I believe LBHI's understanding
4  would have been best represented in the
5  discovery that's been conducted thus far under
6  our Rule 2004 motion.  And that's obviously
7  part of the record in this matter.
8  Substantially all the people that were
9  involved, to my knowledge, have moved over to
10 Barclays.
11      Q.  Well, I mean, have you tried to
12 look at any records at LBHI, at the estate, to
13 determine what the amount of retained cash was
14 as of September 17th?
15      A.  Anything I would have been -- have
16 done in connection with the evaluation of
17 these items would have been done in connection
18 with, as I understand it, privileged work
19 under the direction of counsel.
20      Q.  Okay.  Well, I'm just -- I don't
21 want to get into, you know, anything
22 privileged but I'm just asking simple fact
23 questions.  And I think a fact is not
24 privileged.  So do you know how much retained
25 cash was -- there was on September 17th?

P. KRUSE - HIGHLY CONFIDENTIAL

1
2       A.  As I sit here, no.
3       Q.  Do you know -- are there records
4  at LBHI that would show that?
5       A.  I believe there would be, yes.  To
6  the best of my recollection, I don't believe
7  there was cash, you know, retained.  But I
8  don't know the particular details of that as I
9  sit here.
10      Q.  Do you know which documents at
11 LBHI would show that information?
12      A.  The accounting records generally.
13      Q.  Okay.  And you did -- you
14 mentioned Alvarez did not know the amount of
15 retained cash prior to closing; is that
16 correct?
17      A.  Correct.
18      Q.  Did Alvarez ever seek to find out
19 what the retained cash was prior to closing?
20      A.  No.
21      Q.  Okay.  Did they --
22      MR. TAMBE:  Could I just get a
23 clarification on that.
24      Prior to the closing did they make
25 efforts to find other retained cash or

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  after closing did they look back and
3  say -- I just want clarification on
4  that.
5       MR. THOMAS:  That's a good point.
6  It was the former but I'm going to ask
7  it as to the latter also.
8       MR. TAMBE:  Okay.
9       Q.  At any point, did Alvarez try to
10 identify how much retained cash there was as
11 of September 17th or any point up through
12 closing?
13      A.  We had literally no focus on the
14 deal, itself, as of -- prior to closing so I
15 would say no.
16      Q.  Even at a later point in time you
17 didn't go back and look at the value of the
18 retained cash prior to closing?
19      A.  Well, there was an effort post
20 closing to gather the fact base as to what was
21 transferred over in the deal.  And I know that
22 our -- the A&M team focused on the treasury
23 function.  One of the very first things we do
24 in a matter like this is to try to understand
25 as comprehensively as possible what the cash

Page 26

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   position is of the entity.  So I think there
 3   would have been an undertaking to understand
 4   what cash was retained by LBHI after the
 5   closing and perhaps some of that would have
 6   touched upon what cash, if any, was
 7   transferred over in connection with the deal.
 8        Q.   Okay.  Well, do you know the
 9   amount of retained cash there was as of the
10   closing?
11        A.   As I sit here, no.
12        Q.   Do you know the amount of the
13   retained cash that was transferred over, if
14   any?
15        MR. TAMBE:  Object to the form of
16   the question.
17        A.   Yeah, it seems like a
18   contradiction, retained cash and transferred
19   over.
20        Q.   You're right.  I agree.  Bad
21   question.  I'll withdraw it.
22        And, I mean, obviously LBHI at the
23   time prior to closing would have known how
24   much the retained cash was, correct?
25        MR. TAMBE:  Object to the form of
```

Page 27

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   the question.  You can answer.
 3        A.   Yeah, I would presume LBHI
 4   personnel understood that, yes.
 5        Q.   Did -- what is LBHI's
 6   understanding of the value of the deposits
 7   indicated in subsection B of the Purchased
 8   Assets as of September 17th?
 9        A.   LBHI's understanding?
10        Q.   Yes.
11        A.   Again, I think LBHI's
12   understanding would primarily reside with
13   people who are no longer with the estate and
14   have moved over to Barclays.
15        Q.   Would it also be reflected in
16   documents at the estate?
17        A.   I believe it is reflected in
18   documents obtained in discovery in this
19   matter, yes.
20        Q.   Okay.  Do you know what those
21   documents indicate in terms of the values of
22   the deposits?
23        A.   Not specifically as I sit here.  I
24   have a vague recollection of various documents
25   I've seen on this subject.  But --
```

Page 28

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2        Q.   What are the documents you think
 3   show the valuation of the deposits?
 4        A.   As I say, I don't have a specific
 5   recollection of what the amount is now.  I
 6   would have to go back and gather the documents
 7   that I am vaguely thinking of and undertake to
 8   do that.  I haven't done it specifically.
 9        Q.   Right.  I'm just wondering can you
10   describe the documents that you're thinking of
11   that you're referring to when you...
12        A.   Well, there's material that was
13   produced in the course of the 2004 discovery,
14   for example, that speaks to -- and some of
15   this might depend on whether this qualifies
16   under deposits as defined here.  I'm not
17   prepared to say that it does because I haven't
18   really discussed that particular correlation.
19   But I know there's material speaking to
20   15(c)(3) deposits, for example, that were
21   transferred over or intended to transfer over.
22        Q.   Is it fair to say for A and B, the
23   retained cash and the deposits, the valuations
24   of those two items would be contained in LBHI
25   documents but that you haven't gone to those
```

Page 29

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   documents to go try to determine those values?
 3        MR. TAMBE:  Objection to the form
 4   of the question.
 5        A.   I haven't independently separately
 6   tried to do that.  I know that in the material
 7   produced, for example in the 2004 discovery,
 8   that there is material that would speak to
 9   this issue.
10        Q.   And I think you said there would
11   be obviously documents at LBHI that would have
12   this information, correct?
13        A.   Yeah.  And let me just clarify.
14   When we talk about documents at LBHI, we
15   should understand that all the systems were
16   transferred over to Barclays in connection
17   with the sale.  So anything that LBHI had was
18   then moved over to Barclays, as I understand
19   it, in connection with the transaction.  We've
20   had a process under way for quite some time
21   operating under a Transition Services
22   Agreement with Barclays to retain the data and
23   information that was moved over in connection
24   with that deal.  So I just wanted to offer
25   that point of clarification.
```

1          P. KRUSE - HIGHLY CONFIDENTIAL
2     Q.   Right.  But the estate still has
3   access to those documents and that
4   information, correct?
5     A.   Generally, yes.  There were quite
6   a few difficulties early on in the first
7   quarter particularly in getting the
8   information we needed just to run the estate
9   in the manner we deemed necessary.
10     Q.   Moving on to subpart C, the
11   transferred real estate -- excuse me -- the
12   transferred real property leases.  At any
13   point did -- strike that.
14          What was LBHI's or Alvarez's
15   understanding of the value of those leases as
16   of September 17th?
17     A.   As of September 17th Alvarez would
18   have had no knowledge of it.  LBHI's
19   understanding would have been as probably more
20   appropriately determined through contact with
21   people who moved over to Barclays.
22     Q.   Would the value of the leases also
23   be reflected in LBHI documents?
24     A.   Yes, they would.
25     Q.   And you haven't tried to identify

1          P. KRUSE - HIGHLY CONFIDENTIAL
2   the value from those documents?
3          MR. TAMBE:  Object to the form of
4      the question.
5     A.   Well, there's been an effort to
6   identify the inventory of the items that
7   transferred over.  But the work that we've
8   done in that regard has generally been done
9   under the direction of counsel.
10     Q.   Okay.  But for purposes of this
11   deposition you haven't gone and found out what
12   the LBHI documents say about the value of the
13   leases in subpart C?
14     A.   Well, I've seen documents that
15   speak to issues like this.  I'm not going to
16   be able to quote to you sitting here without
17   anything in front of me what that reflects.
18     Q.   Well, do you have any idea what
19   the value of those leases were as of September
20   17th?
21     A.   Not specifically.  I think it was
22   relatively nominal compared to the overall
23   value of the assets transferred in connection
24   with the deal.
25     Q.   Can you give me some ball park

1          P. KRUSE - HIGHLY CONFIDENTIAL
2   figure?
3     A.   No.
4     Q.   And just to be clear when I'm
5   asking about value of these things as of
6   September 17th, it's whether the valuation was
7   known at the time or later on, just to be
8   clear.  So if Alvarez did a later study to see
9   how much the leases were worth, you know, two
10   months down the road, that would be, you know,
11   contained in my question also.
12          So the question is at any time --
13   or regardless of when they knew the value, did
14   Alvarez make any assessment of the value of
15   these leases in subpart C?
16     A.   As of September 17th, no.
17   Anything that's been done since then as I said
18   was generally done under the direction of
19   counsel.
20     Q.   Okay.  Well, did they make an
21   effort to value these leases at any point
22   whether under the direction of counsel or not?
23          MR. TAMBE:  I think that gets into
24      the subject matter of what may have been
25      done at the direction of counsel.  I

1          P. KRUSE - HIGHLY CONFIDENTIAL
2   think that therefore would work
3   product and attorney-client
4   communications.
5          MR. THOMAS:  Just the fact of it?
6          MR. TAMBE:  The subject matter of
7      what it is that they -- what steps they
8      would have taken.
9          MR. THOMAS:  Okay.
10   BY MR. THOMAS:
11     Q.   Well, let me ask a different
12   question then.
13          Do you have any idea how much
14   these leases were worth?
15     A.   Not specifically, no.
16     Q.   Generally?
17     A.   They were relatively nominal in
18   relation to the value of all the assets that
19   were transferred.
20     Q.   Okay.  Could you tell me what
21   nominal means to you?
22     A.   I believe it was -- I don't know.
23   Actually, as I think about it, I believe
24   Barclays may have ascribed a value to the
25   lease terms, the economic lease terms, versus

Page 34

```
 1           P. KRUSE - HIGHLY CONFIDENTIAL
 2   market in connection with their purchase
 3   accounting that they ascribed, but I don't
 4   recall specifically what the number was.  I
 5   just know that it wasn't a particularly
 6   material item in relation to the overall deal.
 7       Q.   Okay.  Subsection D is Government
 8   Securities, Commercial Paper, Corporate Debt,
 9   Corporate Equity, Exchange Traded Derivatives
10   and Collateralized Short-Term Agreements.
11           Do you see that?
12       A.   Yes.
13       Q.   This describes -- references it
14   having approximately $70 billion book value.
15           Do you see that?
16       A.   Yes.
17       Q.   And it's then referred to as the
18   long positions.  Has Alvarez ever done -- made
19   any efforts to value these items in subpart D?
20           MR. TAMBE:  Objection to the form
21       of the question.
22       A.   Anything we've done in connection
23   with valuing these securities has been done
24   under the direction of counsel.  We certainly
25   didn't have any understanding of this at the
```

Page 35

```
 1           P. KRUSE - HIGHLY CONFIDENTIAL
 2   time the deal was done or closed.
 3       Q.   Do you know the -- does either
 4   Alvarez or LBHI have a list of the actual
 5   CUSIPS for these items in subpart D?
 6           MR. TAMBE:  Objection to the form
 7       of the question.
 8       A.   Yes.
 9       Q.   They do.
10       A.   Yes.
11       Q.   Do you know if that list has been
12   produced?
13       A.   Any list we got I believe would
14   have been part of the production in the Rule
15   2004 discovery if I'm not mistaken.
16       Q.   So without getting into the
17   substance of any efforts to value this at the
18   direction of counsel, when was such efforts
19   made?  The date.
20       A.   The work in that respect would
21   have been since Jones Day was retained in
22   March of 2009.
23       Q.   And as you sit here today as both
24   an Alvarez and an LBHI representative do you
25   have any understanding as -- or what do you
```

Page 36

```
 1           P. KRUSE - HIGHLY CONFIDENTIAL
 2   believe the items in subsection D were worth
 3   as of September 17th?
 4           MR. TAMBE:  Objection to the form
 5       of the question and to the extent you're
 6       asking him to disclose what may have
 7       been obtained through work product done
 8       at the direction of counsel I'd instruct
 9       him not to answer.
10       A.   Anything I could answer with
11   respect to that would be done under direction
12   of counsel.  Again, at the time this deal was
13   done Alvarez & Marsal would have had no
14   understanding of the values of these
15   securities beyond what was disclosed or talked
16   about in court hearings.
17           I know that shortly after the deal
18   closed there was an attempt to just gather the
19   fact set from people who were then Barclays
20   personnel and get a CUSIP-by-CUSIP listing of
21   what was transferred over.  I believe that
22   listing we obtained at that time had
23   values ascribed to but we didn't undertake at
24   that point to independently value or verify
25   what was being portrayed in that data.
```

Page 37

```
 1           P. KRUSE - HIGHLY CONFIDENTIAL
 2       Q.   Well, what was transferred over
 3   ultimately was not what's in subsection D,
 4   correct?
 5       A.   Yes.  You're correct.  Thank you
 6   for that correction.
 7       Q.   Right.  So as I understand it, any
 8   knowledge that you have as a representative of
 9   LBHI or Alvarez as to the actual value of the
10   products, the securities in subpart D as of
11   September 17th, is being claimed as privileged
12   work product?
13       A.   Yes.
14           MR. TAMBE:  Objection to the form
15       of the question.  I think I would take
16       issue with any knowledge.  We can step
17       outside and we can -- outside the
18       hearing of the witness so I can explain
19       to you what I think the disconnect might
20       be.  And you can come back and rephrase
21       the question.
22           I don't want to interrupt your
23       examination but I think you may be
24       talking a little bit past each other.
25       And I could clear that up and I'd rather
```

Page 38

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    do that outside the hearing of the
3    witness so --
4        MR. THOMAS:  Okay.  Sure.  Why
5    don't we go off the record and just take
6    a minute.
7        THE VIDEOGRAPHER:  The time is
8    10:10.  We are going off the record.
9        (Recess taken.)
10        THE VIDEOGRAPHER:  The time is
11    10:12.  We are back on the record.
12    BY MR. THOMAS:
13    Q.   Mr. Kruse, at the suggestion of
14    your counsel I just wanted to clarify whether
15    you believe there is a list of CUSIPS or any
16    other document that identifies the particular
17    items that are contained in subsection D.
18    A.   There is not, to my knowledge.
19    Q.   So when you were talking about a
20    list of CUSIPS that you had what were you
21    referring to?
22    A.   I was referring to the securities
23    actually transferred as the deal was
24    culminated on the 22nd.
25    Q.   The fed repo collateral?

Page 39

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    A.   Yes.  Among others.
3    Q.   Okay.  Turning to subpart E, 50
4    percent of each position in the residential
5    real estate mortgage securities.
6        Do you see that?
7    A.   Yes.
8    Q.   What is LBHI's understanding of
9    the value of those securities as of September
10    17th, 2008?
11        MR. TAMBE:  And objection to the
12    form of the question.
13    A.   LBHI's understanding as of that
14    date?
15    Q.   LBHI's understanding at any time
16    as to the value of those securities as of that
17    date.
18    A.   LBHI's understanding would be
19    embodied from the documents that are available
20    at the time this deal was being negotiated.
21    And in terms of what the individual employees
22    of LBHI understood, again, I think those
23    people have generally moved over to Barclays
24    who would have had a specific understanding of
25    this.

Page 40

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    Q.   When you say generally, which
3    employees still at the estate would have some
4    understanding of this?
5    A.   None that I can think of as I sit
6    here.
7    Q.   Okay.  So the value would be in
8    estate documents but that's -- you haven't
9    gone and tried to figure out the value of
10    these securities as of September 7th for
11    purposes of this deposition.  As of September
12    17th, excuse me.
13    A.   No.  I have not attempted to
14    determine the value of that particular item
15    for purposes of my evaluation.
16    Q.   Has Alvarez ever attempted to
17    value those securities as of September 17th?
18        MR. TAMBE:  Again, I'll caution
19    the witness to the extent that Alvarez
20    has been asked or not asked to do
21    particular tasks by counsel, that would
22    be covered by work product privilege.
23    A.   Yeah.  Anything we've done on
24    this -- in that respect would have been done
25    under a direction of counsel.

Page 41

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    Q.   So Alvarez first got the call to
3    get involved on the night of September 14th;
4    is that right?
5    A.   Yes.
6    Q.   And you said they were involved
7    with Lehman starting the next day.
8    A.   We had people on the ground the
9    next day.
10    Q.   And those people would have been,
11    among other things, working to learn about
12    this sales transaction with Barclays?
13    A.   Well, I think Brian Marsal who
14    you're going to be deposing in a few days can
15    speak to this more directly than I but it's my
16    understanding that the Alvarez & Marsal people
17    who were on site were essentially directed not
18    to get involved in the deal, itself, you know,
19    that this was something that was going to be
20    handled independent of our involvement and our
21    role was really to administer the estate
22    separate and apart from the deal that was
23    being negotiated at that point.
24    Q.   What's the basis of that
25    understanding?

Page 42

P. KRUSE - HIGHLY CONFIDENTIAL

1
2     A.    Discussion with Brian Marsal and
3  various other people who were on site at the
4  time.
5     Q.    Are you saying that somebody at
6  Lehman told Alvarez not to get involved with
7  the sale transaction?
8     A.    In sum and substance.  I don't
9  know if I'd characterize it exactly that way.
10  But it was well understood on the part of our
11  team, as I understand it, that our
12  participation, our involvement in the deal,
13  itself, was not something that anybody wanted
14  or expected.
15     Q.    Can you describe who said what to
16  whom?
17     A.    I think you're probably better
18  asking Brian Marsal the specifics of that.
19     Q.    Can you describe anyone at Lehman
20  who had that type of discussions with anyone
21  at Alvarez?
22     A.    All I can do is guess and I don't
23  think you want me to do that.
24     Q.    Well, if you have any basis for
25  guessing I'll take your guess with the caveat

Page 43

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  that it's a guess.
3     A.    I would infer that Steven
4  Berkenfeld might have been one of the people
5  that was directing that aspect of our
6  retention.
7     Q.    So is it your testimony prior to
8  closing that Alvarez was not involved in any
9  way in the sales transaction?
10     A.    Yes, it is my testimony.
11     Q.    And it was not reviewing
12  documents?
13     A.    In connection with the sales
14  transaction.
15     Q.    Yes.
16     A.    No.  We were not.
17     Q.    When did anyone from Alvarez first
18  review any of the sale documents, to your
19  knowledge?
20     A.    Within a few days after closing
21  I've seen e-mail correspondence speaking to I
22  think what I referred to earlier, an attempt
23  to gather just the factual data of the
24  specific securities and CUSIPS that were
25  transferred over in the deal so that we had

Page 44

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  that data essentially locked down for purposes
3  of administering the estate, knowing what was
4  ours and what was not ours and what had moved
5  over in the deal.
6     Q.    Turning to subpart F, Furniture
7  and Equipment, what is LBHI's understanding of
8  the value of those items as of September 17th?
9     A.    LBHI's understanding?
10     Q.    Yes.
11     A.    Again, I'm going to have sort of a
12  repetitive comment about LBHI because I think
13  anybody LBHI as I say who would have been
14  focused on these particular things was
15  generally moved over to Barclays.  The LBHI
16  documents I think speak for themselves and
17  have been made available in terms of what
18  these things might have been recorded at, et
19  cetera.  I'm not aware of any independent
20  valuation done of furniture and equipment, for
21  example.  I don't even think a value was
22  ascribed in the context of the deal.
23     Q.    Okay.  And, again, you haven't
24  reached out to people still at Lehman to see
25  if they know about these values, correct?

Page 45

P. KRUSE - HIGHLY CONFIDENTIAL

1
2     A.    I think we went over what I had
3  done in preparation for the deposition.  I'd
4  spoken to certain of these people.  But not
5  directly in connection with my preparation for
6  the deposition.
7     Q.    I mean, let me ask.  Did you ask
8  anyone at Lehman if they knew if there was any
9  valuation of the items under Purchased Assets?
10     A.    I don't recall asking that
11  question specifically.  It's pretty clear from
12  the documentation I've seen that nobody
13  attempted to ascribe a value.  It's as if it
14  was thrown into the deal inherently but no one
15  attempted to ascribe furniture and
16  equipment -- ascribe a value.
17     Q.    I'm sorry.
18     A.    No.
19     Q.    Do you have any understanding as
20  to why there was no attempt to ascribe a value
21  for some of these items?
22     A.    I do not.
23     Q.    Let me just ask you then, maybe to
24  speed things up, if you'd take a minute to
25  just go through all -- briefly review all the

Page 46

P. KRUSE - HIGHLY CONFIDENTIAL

2  other subparts under the definition of
3  Purchased Assets.  And I'm going to ask you a
4  very similar line of question that covers all
5  of them.  So if you want to take a minute to
6  review that, please do.
7      A.   Items G through the end of that
8  section?
9      Q.   Yes.  G through S.
10      (Document review.)
11      A.   Okay.
12      Q.   As you sit here today either in
13  your capacity as the LBHI representative or
14  the Alvarez representative, do you have any
15  understanding of the value of any of those
16  items, G through S, as of September 17th,
17  2008?
18          MR. TAMBE:  Objection to the form
19  of the question.
20      A.   There -- as far as I know in
21  connection with the deal, itself, there was
22  little, if any, attempt to ascribe a value to
23  the various individual classes of assets that
24  are described here.
25          You know, I think in the context

Page 47

P. KRUSE - HIGHLY CONFIDENTIAL

2  of the deal there was a $250 million price for
3  the franchise, if you will, that was ascribed
4  and I would think most people who were
5  involved with the deal would have said that
6  was intended to include items like this.
7          If your question is different than
8  that, is there a separate independent attempt
9  to ascribe a value to any of this on the part
10  of LBHI, I think that question could best be
11  answered by the people who are intimately
12  involved in the deal itself who have since
13  moved over to Barclays.
14          In terms of anything A&M has done
15  in that vein, again, the answer would be any
16  work done in the context of valuation of the
17  deal, itself, would have been done under
18  direction of counsel.
19          MR. THOMAS:  And just to be clear,
20  you're instructing him not to answer as
21  to the amount or the valuation of any of
22  these items.
23          MR. TAMBE:  What I'm instructing
24  him not to answer is to the extent the
25  valuation work or the valuation

Page 48

P. KRUSE - HIGHLY CONFIDENTIAL

2  understanding he has learned is from
3  work directed by counsel, he shouldn't
4  be talking about that.  If he has other
5  bases for knowing valuations ascribed by
6  others to those assets you can ask him
7  about that.
8          MR. THOMAS:  Okay.
9  BY MR. THOMAS:
10      Q.   Do you have any basis for knowing
11  the values of any of the items listed under
12  Purchased Assets other than from the work done
13  at the direction of counsel?
14      A.   A stand-alone valuation, no.  I
15  think I've seen information suggesting book
16  value or accounting some of these -- what some
17  of these items might have been recorded at in
18  the books and records of Lehman at the time.
19      Q.   Do you know -- can you identify
20  what those values were recorded in the books
21  and records of Lehman at the time for any of
22  these?
23      A.   No.  Not as I sit here.
24      Q.   Did you understand that to be the
25  information sought in topic 1 of the

Page 49

P. KRUSE - HIGHLY CONFIDENTIAL

2  deposition notice?
3          MR. TAMBE:  I object to the form
4  of that question.  We certainly didn't
5  understand topic 1 to be a memory quiz
6  of various items of valuation for
7  various assets.  If you have documents
8  to show him -- he said documents reflect
9  values ascribed by others.  If you show
10  him documents he can confirm for you
11  what his views are on those documents.
12          MR. THOMAS:  Well, the topic is
13  for the market value of a list of
14  assets.  And your 30(b)(6) witness can't
15  identify any values for any of those
16  assets.  So maybe he certainly could
17  have -- if it was a memory issue he
18  certainly could have prepared a document
19  or notes to tell him what the values
20  are.  But that's what the topic asked
21  for and I just want to confirm --
22          MR. TAMBE:  I disagree in terms of
23  what you think the obligations would be
24  to respond to a notice such as that.
25  But it's fine.  You can ask your

## Page 50

P. KRUSE - HIGHLY CONFIDENTIAL

1
2    question.
3        A.   I think there was a pending
4    question as to what I did in connection with
5    topic number 1.
6        Q.   No.  It's what you under --
7    whether you understood topic number 1 to be
8    seeking information concerning the market
9    values of the assets listed in the definition
10   of Purchased Assets in the APA.
11       A.   I read this topic to say your
12   understanding as of September 17th, 2008 of
13   the market value of each asset set forth in
14   each subparagraph that mention purchased
15   assets, et cetera.  And how that changed at
16   any time before the closing.
17           I think I've testified that
18   generally speaking Alvarez & Marsal had no
19   knowledge of what these items were worth
20   during that time frame.  No involvement.  No
21   knowledge.  Any knowledge on the part of LBHI,
22   as I've testified already that LBHI's
23   knowledge would be best embodied by people who
24   are now employed by Barclays and in the
25   documents that have been produced in this

## Page 51

P. KRUSE - HIGHLY CONFIDENTIAL

1
2    case.
3        Q.   Okay.  So just to be clear,
4    there's information about the values of these
5    items that are in Lehman documents but you
6    haven't gone and tried to identify those
7    values, correct?
8        A.   No.  Not in a comprehensive way.
9    I'm aware generally of the documents that
10   might refer to it but we're talking about
11   volumes of material here.
12       Q.   And I really don't want to belabor
13   this but are there any assets here that you
14   feel that you can tell us the market value as
15   of September 17th?  And here being items
16   listed under Purchased Assets.
17           MR. TAMBE:  Object to the form of
18   the question.
19       A.   I may have misread what this topic
20   intended.  Your understanding as of September
21   17th, 2008 of the market value.  I've said we
22   had no understanding as of September 17th,
23   2008.  We also had no understanding through
24   the date of the closing as to what the market
25   value was.

## Page 52

P. KRUSE - HIGHLY CONFIDENTIAL

1
2        Q.   Okay.
3            Well, we'll revisit that in later
4    topics.
5            In terms of the liabilities -- let
6    me back up one second.
7            I think you made a comment that
8    maybe some of these -- or some or all of the
9    items would have been covered by the
10   $250 million payment.  Do you recall
11   mentioning that?
12           MR. TAMBE:  Objection to the form
13   of the question.
14       A.   I recall saying something along
15   those lines.
16       Q.   Okay.  What was your basis for
17   that?
18       A.   It's really surmising what we
19   learned in the discovery in the case thus far
20   as to what the $250 million acquisition
21   cost -- element of the acquisition cost was
22   intended to be cover.
23       Q.   Is that just your surmise or is
24   there some information that that's based on?
25       A.   I can't quote specifically every

## Page 53

P. KRUSE - HIGHLY CONFIDENTIAL

1
2    source for that but that's a general surmise
3    from the totality of the evidence I'm aware of
4    in this case.  The deposition testimony.
5    Other e-mails and other documents that I've
6    seen.
7        Q.   And you can't point to anything in
8    particular.
9        A.   Not as I sit here, no.
10       Q.   Is it your belief that the value
11   of all of the items underneath Purchased
12   Assets totaled up would be less than 250
13   million?
14           MR. TAMBE:  That's not what he
15   testified to.  That was the answer to
16   items G through S.
17           MR. THOMAS:  Okay.  Thanks for
18   clarifying that.
19           MR. TAMBE:  Yeah.
20       Q.   Are you just referring to items G
21   through S?  When you say 250 million?
22           Or let me just strike that.
23           To be clear, what items do you
24   think were covered by the 250 million?
25       A.   I think as I testified, it's my

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    Alvarez has done at the direction of counsel
3    this year; is that correct?
4          MR. TAMBE:  Objection to the form
5       and that's not his testimony.
6       A.    Specific to your topic as I
7    understood in reading this topic, Alvarez &
8    Marsal's understanding as of September 17th,
9    2008 of the market value of each of these
10   classes of assets under Purchased Assets, we
11   had no understanding as of that date or as of
12   the closing date.
13      Q.    And LBHI obviously did.  So with
14   respect to LBHI, can you tell me your
15   understanding of any of these values?
16         MR. TAMBE:  Again, asked and
17      answered.  Go ahead.
18      A.    I think LBHI's understanding can
19   best be gleaned from speaking to employees
20   that have gone over to Barclays.
21      Q.    When did Alvarez become aware
22   that -- strike that.
23         Looking at topic number 2, what is
24   Alvarez's understanding of the $47.4 billion
25   figure that was referenced during the

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    September 19th sale hearing?
3       A.    I'm sorry.  What is our
4    understanding of that figure?
5       Q.    Yes.  And what it is, what it
6    represents.
7       A.    Alvarez -- I don't believe Alvarez
8    has any understanding of how that number
9    derives or how it was determined at that time.
10      Q.    How about LBHI?  What is its
11   understanding?
12      A.    I've not seen any discovery speak
13   to how this number was derived in the course
14   of anything I've seen.  So while I could give
15   my standard answer as it relates to LBHI and
16   say that that could best be gleaned from
17   speaking to people who have since moved over
18   to Barclays, I haven't seen anything in
19   discovery that would speak to that specific
20   knowledge of that number.
21      Q.    So you have no idea as you sit
22   here today what that number represents?
23         MR. TAMBE:  Objection to the form
24      of the question.
25      A.    I don't know if I would say no

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    idea.  I mean, it's obviously -- you know, you
3    can infer what it was intended to represent.
4    I just haven't seen a correlation how that
5    number was derived and how it was -- how it
6    correlates to the securities that are actually
7    transferred in the deal.
8       Q.    What is your best understanding of
9    what that number represents?
10      A.    My best understanding of what that
11   number represents.
12         MR. TAMBE:  Objection to the form
13      of the question.
14      A.    I don't know specifically what it
15   represents.  I infer that it was intended to
16   represent the value of the securities that
17   were transferred in the deal.
18      Q.    What's your basis for that answer?
19      A.    I've read the transcript that this
20   is cited from at some point previously.  It's
21   been a little while since I've read that
22   specifically but that's what I remember in
23   terms of my impression as I read it.
24      Q.    Have you -- what efforts did you
25   make to be able to describe the $47.4 billion

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    figure for purposes of the deposition?
3       A.    I would say there were efforts
4    throughout the Rule 2004 discovery to
5    understand specifically how that number was
6    derived.  To my knowledge, there was no
7    evidence that I'm aware of that would suggest
8    specifically how that number was derived.
9       Q.    So for purposes of the deposition
10   in your preparation for the deposition did you
11   take any steps to try to find out how that
12   number was derived or what it represented?
13         MR. TAMBE:  Objection to the form
14      of the question.  And asked and
15      answered.
16      A.    Specific to the deposition I would
17   have confirmed in my mind through discussions
18   with others that we don't have any basis for
19   understanding how that number was derived.  I
20   don't know what else to say.  We don't
21   under -- we don't have a specific
22   understanding of how that number was derived.
23      Q.    Okay.  Did you pick up the phone
24   and call someone and ask them about that
25   number?

Page 66

```
 1            P. KRUSE - HIGHLY CONFIDENTIAL
 2   discovery in this matter that may speak to
 3   some of this.  But that's in the record of
 4   this matter as we sit here.
 5        Q.   Okay.  So -- and you said as of
 6   September 17th, and that's true for any time
 7   through closing?
 8        A.   Yes.
 9        Q.   Did Alvarez have any understanding
10   of these liabilities during that period of
11   time?
12        A.   During that period of time, no.
13        Q.   And we'll come back in a later
14   topic to later points in time.
15            All right.  Let's -- can you point
16   me to any particular documents that would show
17   what LBHI thought was the value of any of
18   these liabilities the week of September 17th
19   up to closing?
20        A.   I know there have been various
21   balance sheet data produced in the -- in this
22   matter that would speak to the reported book
23   value of those liabilities.
24        Q.   Can you identify any?
25            MR. TAMBE:  Objection to form.
```

Page 67

```
 1            P. KRUSE - HIGHLY CONFIDENTIAL
 2        A.   Not beyond the general description
 3   of various balance sheet data I've seen in the
 4   course of reviewing the material --
 5        Q.   Okay.
 6        A.   -- in this case.
 7        Q.   Do you know how those values were
 8   derived?
 9        A.   Not specifically.  I understand
10   accounting and I understand how liabilities
11   are generally recorded and on what basis.
12        Q.   Let me show you a document that's
13   been previously marked as Exhibit 25.  Are you
14   familiar with that document?
15            (Document review.)
16            MR. TAMBE:  Just give him a
17   moment.
18        A.   Yes.
19        Q.   Could you describe what you
20   understand it to be, please.
21        A.   It's what's been generally
22   referred to in this matter as the
23   clarification letter.
24        Q.   And when was the first time you
25   saw this document?
```

Page 68

```
 1            P. KRUSE - HIGHLY CONFIDENTIAL
 2        A.   In or about January 2009.
 3        Q.   Do you know when the first time
 4   anyone at Alvarez reviewed this document?
 5        A.   Not specifically.  I can say that
 6   Alvarez as a whole didn't undertake a
 7   comprehensive review of the transaction until
 8   January of 2009.
 9        Q.   Well, putting aside the qualifier
10   of comprehensive review, do you know when
11   anyone at Alvarez first saw this document?
12        A.   When anyone at Alvarez first saw
13   it.
14        Q.   This document, yes.
15        A.   I don't think I could tell you
16   when anybody at Alvarez first saw this
17   document.
18        Q.   Okay.  Is it your understanding
19   that the -- this document, we'll call it the
20   clarification letter, conveys to Barclays all
21   of the collateral associated with the fed
22   repo?
23            MR. TAMBE:  Objection.
24        Q.   Let me stop you.  Do you know what
25   I mean when I refer to the fed repo?
```

Page 69

```
 1            P. KRUSE - HIGHLY CONFIDENTIAL
 2        A.   The fed repo that was in place on
 3   the 17th and then Barclays stepped into that
 4   on the 18th?
 5        Q.   Correct.
 6        A.   Yes.
 7        Q.   Okay.  If I refer to the fed repo
 8   we're on the same page?
 9            To your understanding the
10   clarification letter transferred all of the
11   collateral associated with the fed repo to
12   Barclays.
13            MR. TAMBE:  Objection to the form
14   of the question.
15        A.   I agree that that was the intent
16   of the letter.  Among other items, of course.
17        Q.   And is your qualification because
18   some of the collateral actually didn't get
19   transferred?
20        A.   That's not what I had in mind.
21   I'm disagreeing with your assertion.
22        Q.   Sure.  Sure.
23            So as of closing, presumably LBHI
24   would have understood that the fed repo
25   collateral was being transferred to Barclays,
```

| Page 70 | Page 71 |
|---|---|

**Page 70**

1         P. KRUSE - HIGHLY CONFIDENTIAL
2  correct?
3              MR. TAMBE:  Objection to the form
4  of the question.
5       A.   LBHI would have understood that,
6  yes.
7       Q.   When did Alvarez first come to
8  understand that?
9       A.   I think that a few days after the
10  closing as we began to gather data again as to
11  the specific securities that were transferred
12  to Barclays in connection with the deal, we
13  became aware that they were transferred
14  pursuant to a repo agreement based on the
15  documents that I've seen.  So there was
16  knowledge of the repo deal and its connection
17  to the transfer of the securities in the days
18  after the closing.
19       Q.   Okay.  Are you familiar with the
20  term "haircut"?
21       A.   Yes.
22       Q.   In the context of a repo or a
23  repurchase agreement, what do you understand
24  that term to mean?
25       A.   A haircut is a --

**Page 71**

1         P. KRUSE - HIGHLY CONFIDENTIAL
2              MR. TAMBE:  Just objection to the
3  extent it goes beyond the scope of the
4  30(b)(6).  You can answer the question.
5       A.   I understand a haircut to be a
6  negotiated item between two parties engaged in
7  a repurchase agreement which is intended to
8  compensate for the risk of default to one of
9  the parties of the deal.
10       Q.   Is it the amount of collateral
11  value in excess of the loan amount?
12              MR. TAMBE:  Objection to the form
13  of the question.  Is there a specific
14  topic in the 30(b)(6) this question is
15  aimed at?
16              MR. THOMAS:  Sure.  This is part
17  of the repo.  It's something that you
18  described as a haircut in documents so
19  I'm not sure what you're talking about.
20              MR. TAMBE:  At least to the extent
21  you're asking him generally about the
22  workings of repo and how repo
23  transactions are supposed to work, I
24  think that's not what this witness is
25  here for.  You can ask him about what

| Page 72 | Page 73 |
|---|---|

**Page 72**

1         P. KRUSE - HIGHLY CONFIDENTIAL
2  his understanding may be of the repos
3  used in this context or the repo in this
4  transaction.  It may go to some of your
5  valuation questions.
6              MR. THOMAS:  I think it's within
7  because you've used that term in
8  connection with collateral repo,
9  collateral, and it's hard to examine the
10  witness without having the same
11  understanding of what the term is.
12              MR. TAMBE:  With your
13  characterization I'm going to let him
14  answer the question.  I do think it's
15  beyond the scope of the 30(b)(6).
16              MR. THOMAS:  Okay.
17              MR. TAMBE:  If you have the
18  question in mind.
19              THE WITNESS:  I do not.
20  BY MR. THOMAS:
21       Q.   Okay.  And I'm just asking.  Is
22  your understanding of the term haircut that
23  it's the amount by which the value of the
24  collateral exceeds the loan amount?
25              MR. TAMBE:  I'll object to the

**Page 73**

1         P. KRUSE - HIGHLY CONFIDENTIAL
2  form of the question.  You can answer.
3       A.   Yes.  I would agree with that
4  characterization.  Value as ascribed by the
5  repo agent.
6       Q.   And is that a common term in this
7  industry, haircut?
8       A.   Yes.  I think it is.
9       Q.   So people generally at Alvarez
10  would understand what that term means?
11       A.   Depending on their particular
12  industry focus I believe people would
13  understand, you know, the nature of the term.
14       Q.   Okay.  Let me show you another
15  document we'll mark as 459A.
16              (Deposition Exhibit 459A, document
17  bearing production numbers WGM-LEHMAN-E
18  00005736 through WGM-LEHMAN-E 00005740,
19  marked for identification as of this
20  date.)
21  BY MR. THOMAS:
22       Q.   And I'm not going to ask you about
23  the whole chain but if at any point you feel
24  you need to review it you're certainly welcome
25  to.  But I could start by asking you if you

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2    marks and the valuation.
 3 BY MR. THOMAS:
 4     Q.   Okay.  What was -- what did Lazard
 5 do that week to try to get a better sense of
 6 how the marks had evolved from Friday,
 7 September 12th, 2008?
 8     A.   My general understanding is that
 9 Barry Ridings and perhaps others from Lazard
10 were observing the course of the activities as
11 a deal was being negotiated on I believe the
12 30th floor at the 745 building.  And observed
13 various meetings amongst certain of the
14 parties that were involved.  You know, based
15 on the record I've seen, very unclear to me
16 the degree to which they were able to
17 ultimately fully understand and appreciate how
18 Hugh the marks evolved as it's characterized
19 here in this e-mail.
20     Q.   When you say observing the course
21 of the activities, what are you referring to
22 in particular?
23     A.   Observing the conduct of the
24 people talking to each other in the course of
25 the negotiations.  Just being in various
```

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2 meetings, various rooms, multiple aspects
 3 of the transaction were being discussed.  I
 4 don't have much specifics beyond that.  I
 5 really think the question is ultimately best
 6 directed of course to Lazard representatives.
 7     Q.   Is it your understanding that the
 8 long positions referenced in the APA, the
 9 original APA, had a total approximate value --
10 or strike that.
11          What is your understanding of what
12 the long positions value was marked as on
13 Lehman's books as of September -- Friday,
14 September 12th, 2008?
15          MR. TAMBE:  Objection to the form
16 of the question.
17     A.   The long positions that are
18 contemplated in the 9/16 APA?
19     Q.   Yes.
20     A.   Stated in the APA at $70 billion,
21 roughly.
22     Q.   Approximately.
23     A.   And you're asking me about my
24 knowledge of the value of those securities on
25 September 12th?
```

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2     Q.   Yes.
 3     A.   Okay.  I don't think I have a
 4 specific understanding as I sit here of that.
 5 I think it's perhaps something we've looked
 6 into but I don't -- as I sit here I don't
 7 think I can tell you a specific relationship.
 8     Q.   Have you seen assertions in some
 9 of the Rule 60 motions that those marks were
10 valued at closer to 75 billion on Friday,
11 September 12th?
12     A.   The assertions I've seen are not
13 specific to the date.  I generally understood
14 the assertions to be contemporaneous with the
15 day that they were being talked about.
16     Q.   Well, after the Lehman bankruptcy,
17 after -- what knowledge do you have as to
18 whether there was any efforts -- strike that.
19          What efforts are you aware of to
20 mark those long securities, that is to put a
21 value on them, after September 12th, 2008?
22          MR. TAMBE:  Objection to the form
23 of the question.
24     A.   I'm sorry.  Would you please
25 repeat that?
```

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2     Q.   Sure.  What efforts are you aware
 3 of to value the long positions, Lehman's long
 4 positions, after September 12th and prior to
 5 closing?
 6          MR. TAMBE:  Objection to form.
 7     A.   Well, the -- I understand that
 8 they were -- Lehman was continuing to operate
 9 as close as they could to business as usual,
10 understanding, of course, under the
11 circumstances there were I'm sure a lot of
12 challenges there given that the parent company
13 had filed for bankruptcy on the morning of the
14 15th.  And, you know, the efforts I understand
15 were continuing to value securities in the
16 course of that week.
17     Q.   And who was continuing to value
18 securities during the course of the week?
19     A.   I can't speak specifically.  I've
20 heard -- Ian Lowitt, as you're probably aware,
21 testified in his deposition that he believed
22 the marks were accurate as of the dates that
23 they were stated in Lehman's books during that
24 week.
25     Q.   Other than Ian Lowitt's deposition
```

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  testimony do you have any other basis for
3  knowing whether the marks were accurate or
4  whether they were being kept up to date during
5  that week?
6        MR. TAMBE:  Objection to the form
7  of the question.
8        A.   Well, as I stated, I have a
9  general understanding that there were ongoing
10  efforts to run the business as usual.  And to
11  me that would entail doing what they typically
12  did as marking their books on a daily basis
13  for the trading assets.
14        Q.   Okay.  Other -- what is your basis
15  for that understanding that they were marking
16  their books?  Do you have any other basis for
17  that understanding that they were continuing
18  to mark their books after declaring bankruptcy
19  other than Ian Lowitt's deposition testimony?
20        A.   Well, they would have been -- the
21  securities would have been marked
22  independently by Lehman and also by the
23  clearing agent.  In this case JPMorgan Chase.
24  They have their own independent way in which
25  they valued securities that didn't necessarily

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  equate to Lehman's practices.  So there were
3  ongoing -- as I understand it, ongoing efforts
4  to keep contemporaneous marks on these
5  securities.
6        Q.   Let's focus on Lehman's efforts to
7  mark its securities after September 12th,
8  2008.  Other than Mr. Lowitt's deposition
9  testimony, do you have any basis for knowing
10  that Lehman did, in fact, continue to try to
11  mark those on a daily basis?
12        A.   As I stated, I have a general
13  understanding that they were continuing to
14  attempt to operate business as usual,
15  recognizing that there were likely challenges
16  in that environment.  I'm aware that there
17  were these contemporaneous valuations being
18  done by the clearing agent.  And I have a
19  general understanding that those valuations
20  continued to dovetail relatively closely to
21  what Lehman was marking the positions at at
22  that time.  Based on that totality of
23  information I surmised that there were
24  continuing attempts to value the securities
25  during that week.

P. KRUSE - HIGHLY CONFIDENTIAL

1
2        Q.   Do you have knowledge of what
3  Lehman was marking the securities as of that
4  week?  Of long positions?
5        MR. TAMBE:  Objection to the form
6  of the question.
7        A.   Not specifically beyond what I've
8  just stated.
9        Q.   Do you have any understanding
10  whether the long positions -- there would be a
11  difference in the market value of the long
12  positions between September 12th and September
13  16th?
14        A.   I'm sorry?
15        Q.   Do you have any understanding of
16  whether there was a difference or would have
17  been a difference between the long positions'
18  value on September 12th, 2008 versus September
19  16th, 2008?
20        MR. TAMBE:  Objection to form.
21        A.   Well, there would have been
22  differences just by virtue of any fluctuations
23  in the market, of course.  And you also -- I
24  think it's relevant to recognize that the
25  make-up of the securities likely would have

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  been different to some degree between those
3  two dates.  This is an ongoing operation where
4  securities move in and out, et cetera.
5        Q.   Is it fair to say in those
6  particular days in that market with Lehman
7  declaring bankruptcy that the fluctuations
8  would have been downward as of between
9  September 12th and September 16th?
10        MR. TAMBE:  Objection to the form
11  of the question.  And objection to the
12  extent it extends beyond the scope of
13  the 30(b)(6).  The witness can answer.
14        A.   Probably depends on the nature of
15  the security.  Treasuries may have been more
16  highly valued.  Very low risk securities or
17  securities perceived to be low risk might
18  have, in fact, increased in value during that
19  week given the flight to safety, so to speak,
20  that was occurring.  Securities viewed as
21  being more risky, it's reasonable to assume
22  that they would have been going down in value.
23        Q.   Overall, do you have a sense of
24  whether the values would have gone up or down
25  from September 12th to September 16th?

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        MR. TAMBE: Objection.
3        Q.   The total value of the long
4    positions.
5            MR. TAMBE: Object to the form of
6    the question.
7        A.   I don't know if I can speak
8    specifically to it. Although, certainly my
9    general recollection of the material I've seen
10   would suggest that overall the values were
11   going down.
12       Q.   So you would expect the overall
13   value of Lehman's long positions as of
14   Tuesday, September 16th, to be lower than they
15   were on Friday, September 12th; is that fair?
16           MR. ROTHMAN: Objection to the
17   form.
18       A.   Difficult to generalize. And I
19   don't have any specific data in mind. But,
20   again, depending on the nature of the security
21   and the makeup of the portfolio that
22   fluctuation very well may have been down
23   overall.
24       Q.   Now, do you have any information,
25   hard information, has anyone to your knowledge

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    studied that issue, comparing the values of
3    the longs from September 12th, 2008 to
4    September 16th, 2008?
5            MR. TAMBE: Objection to the form
6    of the question. And objection to the
7    extent that it asks the witness to
8    disclose what may be work product
9    protected analysis.
10       A.   Any work that A&M has done in
11   connection with the general subject of
12   valuation of securities has been done at
13   direction of counsel.
14       Q.   Okay. So let me just go and ask.
15   Can you tell me what the value of the longs
16   were on September 16th based upon anything
17   Alvarez or LBHI has done?
18           MR. TAMBE: Same objection.
19       A.   The value of the longs at
20   September 16th. I think you -- it might be
21   helpful to reflect on the context here. I'm
22   not even sure anybody, as far as I'm aware,
23   can tell you specifically CUSIP by CUSIP what
24   these securities were. It was a general --
25   there were general attempts to identify the

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    available securities that could have gone in a
3    transaction at that date under extraordinarily
4    difficult circumstances. I'm not even aware
5    of a list that would enable anybody to depict
6    this value at that date.
7        Q.   A lot of the assets were illiquid.
8    A lot of the long positions of Lehman's were
9    illiquid; is that fair?
10           MR. TAMBE: Objection to the form
11   of the question.
12       A.   I don't know -- perhaps we would
13   have to agree on what illiquid means in this
14   context.
15       Q.   That's not a term --
16       A.   Obviously any asset is salable
17   under the right circumstances.
18       Q.   Were there any assets -- were any
19   of the LBHI assets what you would consider to
20   be illiquid the assets in the long positions?
21       A.   Were any of the assets in the long
22   positions illiquid?
23           MR. TAMBE: Objection to the form
24   of the question. And beyond the scope
25   of the 30(b)(6).

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   Are you familiar with the term
3    illiquid?
4        A.   Yes.
5        Q.   Okay. Do you contest that some of
6    LBHI's assets were illiquid and therefore
7    difficult to value during this time period of
8    the sale transaction?
9        A.   Perhaps it would help if we
10   agree -- if I understand what your definition
11   of illiquid is. You know, illiquid is a
12   very -- I take it as a term that could have a
13   lot of different meanings to different people.
14       Q.   Well, why don't you give me your
15   definition and we'll go with that.
16       A.   I don't have a definition. I'm
17   not asking the question.
18       Q.   Difficult to sell and therefore
19   difficult to value?
20       A.   No question. There are various
21   types of securities that are easier to sell,
22   have a more active market than others. I
23   accept that premise, yes.
24       Q.   And were LBHI's securities
25   difficult to value?

P. KRUSE - HIGHLY CONFIDENTIAL
1
2        MR. TAMBE:  Objection to the form
3    of the question.
4    Q.    As of September 16th, 2008?
5        MR. TAMBE:  Same objection.
6    A.    I don't think I would accept that
7    characterization, no.
8    Q.    Have you read Mr. McDade's
9    deposition testimony?
10    A.    Yes, I have.
11    Q.    Okay.  Let me go back to the
12    current document which is 460A.  Are you
13    familiar with the Lehman GPS system?
14    A.    Yes.
15    Q.    Would you describe what it is,
16    please?
17        MR. TAMBE:  Object to the form of
18    the question but you can answer.
19    A.    It's one of the systems -- and I
20    equate it in my mind sitting here today as the
21    system that was used to obtain valuations in
22    the context of the ordinary course of
23    business.  I don't have full functionality in
24    mind as I sit here although I've known that at
25    other times better than as I sit here.

P. KRUSE - HIGHLY CONFIDENTIAL
1
2    Q.    Other than Ian Lowitt who was
3    involved in marking Lehman's securities?
4        MR. TAMBE:  Objection to the form
5    of the question.
6    A.    Presumably there were numerous
7    people involved in that.
8    Q.    Did you speak with anyone from
9    Lazard in preparation for your deposition?
10    A.    No.  Not in preparation for my
11    deposition.
12    Q.    The e-mail from Mr. Bruhmuller is,
13    "I think the first priority would be to see
14    the inventory of what's being sold, how the
15    marks have evolved, and info on the buyer
16    'discount'."
17        Do you see that?
18    A.    Yes.
19    Q.    Do you have any understanding of
20    what he's referring to by the buyer discount?
21        MR. TAMBE:  Object to the form of
22    the question.
23    A.    Not specifically, no.
24    Q.    Generally?
25    A.    Well, generally, I'm aware in the

P. KRUSE - HIGHLY CONFIDENTIAL
1
2    case that there was a characterization by many
3    that there was a bulk sale discount being
4    ascribed in the context of the deal.
5    Q.    Other than your reading of case
6    materials, do you have any understanding of
7    what that discount referred to?
8    A.    No.
9    Q.    LBHI under -- well, strike that.
10        Could you be more specific in what
11    you understand the buyer discount to refer to?
12        MR. TAMBE:  Object to the form of
13    the question.
14    A.    More specific on what the buyer
15    discount refers to?
16    Q.    Yes.
17    A.    Not beyond what I've just said.  I
18    don't think so.
19    Q.    It's based on buying in bulk; is
20    that what your understanding was?
21        MR. TAMBE:  Objection to the form
22    of the question.
23        MR. THOMAS:  I'm just repeating
24    back his answer.
25        MR. TAMBE:  It's asked and

P. KRUSE - HIGHLY CONFIDENTIAL
1
2    answered.  But are you asking him what
3    he thinks the author meant by this
4    phrase?  Or what those words mean to
5    him?
6        MR. THOMAS:  No.  His
7    understanding.
8        MR. TAMBE:  Okay.
9    A.    When I use the term bulk sale
10    discount I'm using a phrase I've heard or
11    paraphrasing a phrase I've heard in the course
12    of the discovery in this matter.  I think what
13    people intended to mean can best be
14    directed toward the people who are using it in
15    this context.
16    Q.    Are you aware that Barclays'
17    representatives in the sale negotiations took
18    issue with some of the valuations of the
19    Lehman marks?
20    A.    I'm familiar with the testimony
21    around that subject, yes.
22    Q.    Let's turn to the valuation not of
23    the original assets but of the collateral
24    associated with the fed repo.  Has Alvarez
25    ever attempted to value the fed repo

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  collateral?
3        MR. TAMBE:  Objection to the form
4  of the question.
5    A.  At the risk of being repetitive,
6  anything we'd done in the context of valuation
7  of the securities had been done under
8  direction of counsel and I believe would be
9  covered by the privilege.
10    Q.  Okay.  So if I ask Alvarez's
11  understanding -- its understanding as to what
12  the value of the fed repo collateral was, I'm
13  going to get an instruction not to answer.  So
14  that's the question.
15       MR. TAMBE:  Let me be clear.  If
16  you're asking if A&M has derived at or
17  explored an independent valuation of
18  that collateral, yes, you would get an
19  objection and instruction not to answer.
20     If you ask questions as to their
21  understanding of what values may have
22  been ascribed by others including
23  Barclays to do that collateral, you can
24  get at it that way.
25       MR. THOMAS:  No, no.  I just want

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  to confirm that you're not going to let
3  the witness say what Alvarez's or LBHI's
4  understanding of the value of the fed
5  repo collateral is because it's based on
6  work product.
7       MR. TAMBE:  No.  And that's why I
8  said what I did.  That's not what I'm
9  saying.  If you're asking the witness to
10  describe or state the basis for A&M's
11  understanding or Lehman's understanding
12  of the valuation of the assets, to the
13  extent there's an understanding based on
14  values ascribed by others including
15  Barclays after the closing of the
16  transaction, there's a basis for that
17  understanding and I'll let the witness
18  testify about what his understanding is
19  about that.
20     To the extent your question is
21  have you independently, has LBHI or A&M
22  independently post-closing done a
23  valuation exercise of that collateral,
24  that I am going to object to and say
25  that is work product.

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  BY MR. THOMAS:
3    Q.  Okay.  As you sit here today can
4  you tell me what you believe the value of the
5  fed repo value was as of the closing?
6       MR. TAMBE:  And subject to my
7  objection you can answer the question.
8    A.  So I want to be careful to make
9  sure I understand exactly what you're asking.
10  My current understanding of the value of the
11  collateral?
12    Q.  Yes.
13    A.  My current understanding is
14  based -- to the degree I have an
15  understanding -- on work done under the
16  direction of counsel.
17    Q.  Did Alvarez ever have an
18  understanding of the value of the repo
19  collateral prior to its work that's being
20  claimed as work product?
21       MR. TAMBE:  Objection to the form
22  of the question for the reasons stated
23  below as to what you mean by
24  understanding.
25    A.  Does Alvarez -- I'm sorry.  I

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  just -- I'm trying to be careful as to what
3  you're asking.
4    Q.  Okay.  The claim is that your
5  current knowledge of the value of the fed repo
6  collateral is privileged work product.
7       MR. TAMBE:  No, that's not the
8  position and that's why we're running
9  into trouble here.  You can have an
10  understanding as to --
11      MR. THOMAS:  No, I asked him what
12  his current understanding was and he
13  said --
14      MR. TAMBE:  And there was an
15  objection to that question.
16      MR. THOMAS:  But he said it would
17  have to be biased upon privilege worked.
18      MR. TAMBE:  And the reason there
19  was an objection to that question is you
20  seem to be trying to get at is there
21  independent valuation done by LBHI or
22  A&M independent of information.  There's
23  lots of information on the record about
24  values ascribed to that collateral.  On
25  and before the closing date.  That's

Page 102

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    certainly within their understanding as
3    to values ascribed by others.  Okay.  Go
4    ahead.
5        MR. THOMAS:  I'm not trying to --
6    I know there's nominal marks that exist
7    that he might have read in a paper or
8    something else like that.  I'm asking if
9    Alvarez, prior to -- independent of what
10   is being claimed as work product made
11   any effort to value that collateral, the
12   fed repo collateral.
13       A.  No, we did not.
14       Q.  Okay.  What was Alvarez's
15   understanding as to the value of the fed
16   collateral prior to doing this work product
17   with counsel?
18       A.  Any understanding we had about
19   values ascribed to the collateral would have
20   been gained post closing and in connection
21   with the gathering of data so that we
22   understood the securities that were
23   transferred in connection with the
24   transaction.
25       Q.  And as you sit here today can you

Page 103

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    tell me what that understanding was in terms
3    of the amount of the fed repo collateral?
4        A.  I think it would be more
5    appropriate or perhaps more safe, rather than
6    having me misstate a number, I'm thinking of
7    e-mails that I know some of the A&M people
8    were gathering the data and I think those
9    documents represent what our early
10   understanding was of the ascribed values.
11       Q.  Okay.  After the sale closed, what
12   was the purpose of your trying to get an
13   understanding of the value of the assets that
14   had been transferred?  Yours being Alvarez's.
15       A.  It was really from the perspective
16   of capturing the data that we thought was
17   going to be necessary for us to administer the
18   estate and understanding what was estate
19   assets, what was not estate assets.  Then
20   there was some thought early on that we would
21   try to do a reconciliation of the securities
22   that were transferred, ensure that nothing was
23   transferred that should not have been
24   transferred under the deal.
25       That effort was not really

Page 104

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    feasible based on the information available to
3    us in that first quarter of the administration
4    of the estate.
5        But the context was ensuring we
6    had the data in hand while it was fresh in
7    everybody's mind as to what was transferred in
8    the deal.
9        Q.  Let me show you a document we'll
10   mark as 461A.
11       (Deposition Exhibit 461A, document
12   bearing production numbers AM 004503
13   through AM 004595, marked for
14   identification as of this date.)
15   BY MR. THOMAS:
16       Q.  Is this a document that you've
17   seen before?
18       A.  Yes.  I've seen this.
19       Q.  And when did you see it?
20       A.  When did I see it?
21       Q.  Yes.
22       A.  I would have first seen it pretty
23   much contemporaneous with the date of this,
24   October 8th, or the day or two before.
25       Q.  And can you describe what the

Page 105

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    document is, please.
3        A.  It is a Powerpoint dec assembled
4    by Alvarez & Marsal to report to the Unsecured
5    Creditors Committee on this date of October
6    8th.  It was sort of a guide for communication
7    to the Unsecured Creditors at that point.
8        Q.  And why was Alvarez & Marsal
9    relaying this information to the Creditors
10   Committee?
11       A.  It was in the context of the
12   Creditors Committee is an important
13   constituent that we serve in the
14   administration of the estate and giving them
15   an early download as to our activities and how
16   we're getting ramped up and getting ready to
17   best serve our role as a chief restructuring
18   officer.
19       Q.  If I could ask you to turn to page
20   28, please.
21       A.  (Witness complies.)
22       MR. ROTHMAN:  The Bates number or
23   the page?
24       MR. THOMAS:  That's the page
25   number.  The Bates number is AM 4531.

Page 106

P. KRUSE - HIGHLY CONFIDENTIAL

1
2   Q.   And let me just ask, who would
3   have prepared this document?
4   A.   Who physically prepared it?
5   Q.   Yes.  Or determined what went into
6   the document.
7   MR. TAMBE:  Object to the form.
8   Go ahead.
9   A.   The document as a whole would have
10  been a joint effort.  I had some participation
11  in a slide or two here as well.  So, you know,
12  depending on who you see as the leader or the
13  discussion leader on a given subject that's
14  likely the person who directed the
15  preparation.  The physical preparation was
16  probably somebody working underneath that
17  particularly person.
18  Q.   Did Alvarez work with anyone at
19  Lehman or Lazard or anyone other than Alvarez
20  to pull this information together?
21  A.   Not to my knowledge.
22  Q.   Do you know who would have
23  prepared the information that appears on page
24  28 of the document?
25  A.   I would presume Jim Fogarty was

Page 107

P. KRUSE - HIGHLY CONFIDENTIAL

1
2   the person most responsible for compiling
3   this.
4   Q.   Now, looking at the first arrow
5   where it says Assets Purchased, and then the
6   first bullet it says 43.1 billion repo assets,
7   book value per Lehman stale marks.  Negotiated
8   a $5 billion reduction.
9   Do you see that?
10  A.   Yes.
11  Q.   Do you have an understanding of
12  what's being referred to there?
13  A.   I think the words speak for
14  itself.  I'm not sure what your question is.
15  Q.   Well, they may speak for
16  themselves but can you just describe what's
17  being said there?
18  A.   Book value per Lehman "stale
19  marks" negotiated a $5 billion reduction.  I
20  think that says that at that point we had
21  gained an understanding that there was a
22  negotiated reduction as compared to the Lehman
23  marks because the previous marks were deemed
24  at that point to be stale by whoever was
25  communicating this information to us.

Page 108

P. KRUSE - HIGHLY CONFIDENTIAL

1
2   Q.   And what is your understanding of
3   the term stale there?
4   MR. TAMBE:  Object to the form of
5   the question.
6   A.   I would infer stale to mean that
7   it was outdated.
8   Q.   Were you part of any oral
9   presentation to the Creditors Committee in
10  connection with this written presentation?
11  A.   I was responsible for
12  communicating a relatively small portion of
13  this.  At that point we were so busy we were
14  coming in and out of the room as our sections
15  were approaching.  I was not present when this
16  was discussed.
17  Q.   Um-hum.  Was the document sent to
18  the Creditors Committee and also discussed
19  with them in a meeting?  Or meetings?
20  A.   There was a meeting where this
21  information was covered, yes.
22  Q.   So was this a Powerpoint that was
23  handed out at a meeting and there was a
24  discussion of these -- of the information in
25  this document?

Page 109

P. KRUSE - HIGHLY CONFIDENTIAL

1
2   A.   Yes.  There was a discussion of
3   this document in a meeting at Weil Gotshal's
4   offices.
5   Q.   And the representatives of the
6   Creditors Committee were there?
7   A.   Yes.
8   Q.   Do you recall who in particular?
9   A.   Not specifically.  I mean, I know
10  and have met the two chairs of the Creditors
11  Committee and they're the only people I could
12  probably name by name and I'm fairly certain
13  they were there.
14  Q.   And who are they?
15  A.   July Becker and Noel Purcell.
16  Q.   Other than people from Weil -- who
17  was there from Weil?
18  A.   I don't recall specifically.
19  Again, I was only here in this meeting for a
20  relatively small slice of it.  It was a very
21  large conference room that was quite full.  I
22  know there were Weil people there but I can't
23  tell you specifically who was there at the
24  time I was there.
25  Q.   Do you know if any -- anyone from

P. KRUSE - HIGHLY CONFIDENTIAL
1
2  the trustee was there or from Hughes Hubbard?
3      A.   I don't think so.
4      Q.   Do you know if this was sent to --
5  this document was sent to the trustee at some
6  point?
7      A.   Not to my knowledge.
8      Q.   Are you aware of any communication
9  with the trustee between Alvarez and the
10 trustee concerning the sale transaction?
11          MR. TAMBE:  Object to the form of
12      the question.
13      A.   I'm aware of communications, yes.
14      Q.   With the trustee concerning the
15 sales transaction?
16      A.   Yes.
17      Q.   Can you just generally describe
18 them in terms of time and substance.
19      A.   The one I recall I was in -- I
20 believe it was almost a year ago today, it was
21 December 15th, because I've seen the memo on
22 this in preparation for the deposition.
23 December 15th, 2008 was the meeting I'm
24 remembering.
25      Q.   Okay.  And what was the meeting

P. KRUSE - HIGHLY CONFIDENTIAL
1
2  about?
3      A.   Generally about the sale
4  transaction and -- you know, the context was
5  helping us to perform some due diligence to
6  determine how we should react to the
7  settlement motion that was pending at that
8  point before the court that I'm sure we're all
9  well aware of.
10     Q.   Do you recall the upshot of that
11 discussion?
12          MR. TAMBE:  Objection to the form
13     of the question.
14     A.   I don't know if I'd characterize
15 that upshot.  I mean, I recall generally what
16 we were talking about but I don't -- I
17 wouldn't characterize anything as a particular
18 upshot.
19     Q.   Turning back to this document and
20 particularly page 28, the 43.1 billion repo
21 assets, do you understand where that number
22 comes from and what it represents?
23     A.   I believe it comes from a data --
24 a collection of data we had received from
25 former Lehman people, current -- at this point

P. KRUSE - HIGHLY CONFIDENTIAL
1
2  they would have been Barclays employees when
3  we had requested, again as stated before,
4  the -- you know, the data that supported the
5  individual securities transferred in the sale.
6      Q.   Is it your understanding the 43
7  billion repo assets was a valuation of all of
8  the fed repo collateral?
9      A.   To the best of my recollection, it
10 was, yes.
11     Q.   Are you aware that there were --
12     A.   Oh, I'm sorry.  I should back up.
13 All the fed repo collateral I think as we're
14 all probably aware, there was the issue of
15 certain securities not making its way to
16 Barclays immediately upon closing of the sale.
17 And that's roughly a 7 -- it's a $7 billion
18 figure that's referred to throughout the
19 course of the discovery in this matter, but I
20 should caveat my answer to clarify that I know
21 now that that was not included.  I don't know
22 that we appreciated that fully at the time.
23     Q.   Okay.  We'll refer to that as the
24 $7 billion and put aside whether that's the
25 actual value of the securities or nominal

P. KRUSE - HIGHLY CONFIDENTIAL
1
2  value or anything like that.  Just so we can
3  understand each other.
4      A.   Sure.
5      Q.   So if you add -- would you then
6  add $7 billion to the 43.1 in order to get the
7  stale marks that's referred to there?
8          MR. TAMBE:  Objection to the form
9      of the question.
10     A.   If you're asking me today would I
11 add the 7 billion to determine the full
12 ascribed value of what was transferred today
13 I'd say yes.  I'm not sure we had that
14 understanding at this time.
15     Q.   Okay.  Well, can you think of any
16 other way that 43.1 would have been derived
17 other than taking some stale marks and
18 subtracting out the 7 billion?
19          MR. TAMBE:  Objection to the form
20     of the question.
21     A.   As I think I stated earlier, I
22 believe the 43.1 billion was derived through
23 an individual listing of CUSIP by CUSIP of the
24 assets that were determined to have been
25 transferred at that point.

Page 114

```
1          P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.   Do you know when those marks were
3   marked?  They're being referred as to stale.
4   I just don't know -- do you have knowledge of
5   whether those marks were updated as of since
6   September 12th, 2008?
7          MR. TAMBE:  Objection to the form.
8      A.   Since the data was delivered to us
9   through what people are currently Barclays
10  employees, I think they would have the best
11  understanding of what specifically those
12  numbers were and what they were based on.
13     Q.   I understand that.  But I'm just
14  asking what you know.  We can ask them
15  separately.  It says stale marks.  I'm just
16  treating to think are the stale marks the ones
17  that are, you know, five days old, three days,
18  old, go back to September 12th?  I mean, do
19  you know?
20     A.   I generally -- my current
21  understanding is that the values ascribed at
22  this time, that was the value that the entity
23  as a whole was ascribing to these securities
24  at the time the deal was closed.  I don't know
25  that I accept the characterization of them
```

Page 115

```
1          P. KRUSE - HIGHLY CONFIDENTIAL
2   being stale marks based on what I know now.
3   At the time we obviously had a belief or an
4   understanding that they thought to be
5   stale marks.
6      Q.   And have you learned since then
7   that -- I mean, do you know whether those
8   people -- whether those marks were updated
9   through the week of September 15th?
10         MR. TAMBE:  Objection to the form
11  question.
12     Q.   And the way you phrased it was it
13  was continued to be the value, understanding
14  that the values ascribed at this time.  It's a
15  little more specific.  Do you know -- I think
16  you've said you don't know earlier but do you
17  know whether these marks were updated through
18  the week -- by someone at Lehman through the
19  week of September 15th?
20         MR. TAMBE:  Objection.  Asked and
21  answered.
22     A.   Yeah, I think I'd refer back to
23  what I believe I testified to a few moments
24  which is I had a general understanding that
25  they were attempting to do business as usual
```

Page 116

```
1          P. KRUSE - HIGHLY CONFIDENTIAL
2   and keep the marks current.  And there was
3   also the ongoing contemporaneous marking
4   process that was done by their clearing bank.
5      Q.   And that's based on Ian Lowitt's
6   deposition testimony?
7          MR. TAMBE:  Objection to form.
8      A.   I don't think it's based solely on
9   that.  It's based on an aggregation of my
10  understanding.
11     Q.   Is it just the aggregation we
12  talked about earlier in the deposition?
13     A.   It's based on a -- you know, a
14  series of -- the information I've gathered and
15  absorbed in the course of being involved in
16  this matter.
17     Q.   Is there anything else specific --
18  I mean, can you -- you read the deposition
19  testimony.  You've read, you know, the motion
20  paper -- the litigation papers.
21         Have you talked to someone who
22  said they were updating their marks that week
23  at Lehman?
24     A.   Again, I'm aware that the clearing
25  banks, JPM was doing contemporaneous marks.
```

Page 117

```
1          P. KRUSE - HIGHLY CONFIDENTIAL
2   That's their responsibility as the clearing
3   agent.  Bank of New York who was -- these
4   securities were being transferred to was doing
5   their own independent valuation or ascribing
6   their own independent values to it.  There
7   were -- you know, there wasn't just one source
8   of value during this week.
9      Q.   I'm asking about Lehman.  Other
10  than Lowitt's, Mr. Lowitt's testimony, do you
11  have any knowledge that Lehman was updating
12  these marks during the week?
13         MR. TAMBE:  Objection, asked and
14  answered.
15     A.   I believe it was asked and
16  answered.  And I believe they were attempting
17  to continue to mark the books on a daily
18  basis.
19     Q.   And that belief is based on what
20  other than Mr. Lowitt's testimony?  And they
21  being Lehman.  So not BNY or JPM or the
22  clearing or anything else.
23     A.   I can't tell you specifically the
24  single item or the series of items that lead
25  me to believe that that was the case.  It's
```

Page 118

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  quite possible if I go back and review
3  material I'll be convinced otherwise.  But
4  sitting here today it's my general
5  understanding that the marks were being
6  updated by Lehman continuing on a daily basis.
7      Q.   Did you see Mr. McDade's testimony
8  that he didn't believe that they were being
9  updated?
10     A.   I do recall seeing that testimony,
11  yes.
12     Q.   Okay.  So we have Mr. McDade
13  testifying that he believed they weren't being
14  updated.  We have Mr. Lowitt's testimony.  Is
15  there anything else specific that anyone at
16  Lehman has told you or that you'd gone and
17  looked at the documents to confirm that marks
18  were being updated?
19     MR. TAMBE:  Objection.  Asked and
20        answered.
21     A.   Again, general recollection, we
22  may have gotten data even out of the Lehman
23  GFS system since we began our work.  But I
24  have a general understanding that the marks
25  were being updated daily.

Page 119

P. KRUSE - HIGHLY CONFIDENTIAL

1
2      As to the -- you know, the
3  distinction between Mr. McDade's testimony and
4  Mr. Lowitt's, I'm aware of the contradiction
5  there.  If I were to choose between the CFO
6  who is closer to the marking process on a
7  daily basis than a chief operating officer
8  which I believe was Mr. McDade's title I'd
9  probably take the CFO in that context.
10     Q.   I really want to move on.  I just
11  want to be very specific.  I just need to know
12  if there's some other specific basis you have
13  for believing there were marks being updated
14  by Lehman that week other than Mr. Lowitt's
15  testimony.  Because if there's some other
16  basis I've just got to know.  I'll keep asking
17  it until you answer it.
18     A.   I will refer to my prior
19  testimony.
20     MR. TAMBE:  Objection.  You've
21        asked him this any number of times.
22        He's answered any number of times.
23     MR. THOMAS:  The answer is
24        non-responsive.  The answer is I have a
25        general belief and so forth so --

Page 120

P. KRUSE - HIGHLY CONFIDENTIAL

1
2      MR. TAMBE:  He's given you his
3  answer.  And he's mentioned the GFS data
4  now.  So what else do you want him to
5  talk about?  He's told you the bases for
6  his understanding.
7      MR. THOMAS:  I want to make sure
8  we close that out.
9  BY MR. THOMAS:
10     Q.   So at this time, the time of this
11  document, at the time you were making your
12  presentation to the Creditors Committee, is it
13  fair to say that Alvarez believed the Lehman
14  marks were stale?
15     MR. TAMBE:  Objection to the form
16        of the question.
17     A.   No.  I don't think that's a fair
18  characterization.  I think this was the
19  recitation of something that was communicated
20  to us.  I don't think we were making a
21  qualitative assessment that it was accurate or
22  inaccurate.  We were simply communicating
23  information to a key constituent of ours.
24     Q.   Do you know who communicated that
25  to Alvarez?

Page 121

P. KRUSE - HIGHLY CONFIDENTIAL

1
2      A.   I don't know specifically because
3  I didn't get a chance to get a hold of Jim
4  Fogarty in the last couple of days.  He would
5  be the better person to ask.  But I infer from
6  the documents I've seen Ian Lowitt or somebody
7  that worked with Ian Lowitt.
8      Q.   Okay.  You're aware that --
9      A.   I'm sorry.  Did I say Ian Lowitt?
10     Q.   Yes.
11     A.   I believe it was Paolo Tonucci.
12     Q.   You're aware that Barclays did not
13  believe that the marks of the repo collateral
14  were still accurate as of the time of closing,
15  correct?
16     A.   I'm sorry.  Am I aware sitting
17  here today that Barclays doesn't believe those
18  marks were accurate?
19     Q.   Right.
20     A.   I understand that is an assertion,
21  yes.
22     Q.   Okay.  In any event, Alvarez
23  understood and communicated to the Committee
24  that there was a difference in the value of
25  the repo assets ascribed for purposes of the

P. KRUSE - HIGHLY CONFIDENTIAL

1
2 sales transaction and -- between that and
3 the -- what's referred to here as the stale
4 marks. The nominal marks on the fed repo
5 collateral.
6      MR. TAMBE: Objection to the form
7   of the question.
8      A.   Sorry. I lost the train of that
9 question. Could you repeat it?
10      Q.   Okay. Alvarez understood and
11 conveyed to the Committee at this time that
12 there was a difference between the Lehman
13 marks and the -- of the repo collateral and
14 the value of the repo collateral ascribed to
15 the repo collateral for purposes of the sale
16 transaction by the parties.
17      MR. TAMBE: Object to the form of
18 that question.
19      A.   I think we've gone over this. You
20 know, I think the words communicate that
21 concept. I'm not necessarily agreeing that we
22 accepted it at the time as being -- you know,
23 I take this as Jim was relaying information
24 that we had come to understand through others
25 at that point. I don't think we were making a

P. KRUSE - HIGHLY CONFIDENTIAL

1
2 qualitative judgment at that point that it's
3 right, wrong, or otherwise.
4      Q.   Well, putting aside whether it's
5 correct or not, that's what was being
6 conveyed, though; that there was this
7 difference between the old Lehman marks and
8 the parties' valuation of the repo collateral
9 for purposes of the sale transaction. That's
10 what the reduction is referring to, correct?
11      MR. TAMBE: Object to the form of
12 the question.
13      A.   If I understand that correctly
14 that's probably a fair characterization.
15      Q.   Okay. Let me ask it open ended.
16 What is the reduction that's -- the $5 billion
17 reduction referring to there?
18      A.   What is it referring to?
19      Q.   Yes.
20      A.   Well, it's referring to apparently
21 a negotiated difference between the value
22 which the assets were acquired versus the way
23 they were characterized prior to the
24 transaction.
25      Q.   And Alvarez would have tried to

P. KRUSE - HIGHLY CONFIDENTIAL

1
2 make its presentation to the Creditors
3 Committee as accurate as it could, correct?
4      A.   Yeah. We were certainly trying to
5 convey accurate information to the committee.
6      Q.   And Alvarez also understood that
7 the -- if you look at the next bullet point --
8 that the sale transaction conveyed to Barclays
9 the unencumbered box?
10      A.   Yes.
11      Q.   And is the unencumbered box
12 referring to the clearance box assets?
13      MR. TAMBE: Object to the form.
14 Go ahead.
15      A.   Is unencumbered box relating to
16 the -- unencumbered box I think refers to
17 unencumbered collateral that was transferred
18 that wasn't -- that didn't have a lien on it
19 prior to the transaction.
20      Q.   Would you take a look back at the
21 clarification letter, please.
22      A.   (Witness complies.)
23      Q.   And if you would look at
24 Section -- paragraph 1(a)(ii)(B).
25      A.   Yes.

P. KRUSE - HIGHLY CONFIDENTIAL

1
2      Q.   Do you understand that to be
3 referring to what's being referred to in the
4 Alvarez presentation as the unencumbered box?
5      A.   Yes. Sitting here today I would
6 make that connection.
7      Q.   Okay. So, I mean, as of the time
8 of the presentation Alvarez's understanding
9 was that the sale transaction, specifically
10 the clarification letter, did convey the
11 unencumbered box to Barclays and that that was
12 worth approximately $1.9 billion?
13      MR. TAMBE: Objection to the form
14 of the question.
15      A.   Our understanding at the time was
16 being conveyed here, yes, that that was
17 transferred.
18      Q.   Okay. Did that understanding ever
19 change in terms of the conveyance of
20 1.9 billion unencumbered box?
21      A.   I'm generally aware that there are
22 disputes perhaps between the SIPA trustee and
23 Barclays on this opinion. I may have this
24 mixed up with other categories of securities
25 or assets that were transferred but accepting

Page 126

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  that there may be disputes on that as we sit
3  here today I would answer that, you know, that
4  at the time we were communicating that this
5  was an un -- collateral that was sitting in an
6  unencumbered box at the time it was
7  transferred.
8       Q.   So Alvarez's understanding didn't
9  change with respect to that.  I understand
10 there may be -- with another party there may
11 be some dispute or whatever, but in terms of
12 Alvarez's understanding of that did that
13 change at any point in time that this was
14 being conveyed?
15      A.   If I'm not mistaken I thought this
16 was depicting what was physically transferred
17 at that point.  So I'm not sure that has
18 changed assuming that is the case.  If it was
19 physically transferred, it was transferred.
20 If there are items in dispute currently I'm
21 not certain of the details of that as I sit
22 here.
23      Q.   Was it Alvarez's understanding
24 based upon the term of the clarification
25 letter we just read that these -- this

Page 127

P. KRUSE - HIGHLY CONFIDENTIAL

1  1.9 billion in fact, being conveyed as
2  part of the sale transaction?
3       MR. ROTHMAN:  Objection to form.
4       A.   Well, again, I draw the connection
5  between the words here in this section you
6  drew me to and the unencumbered box.  I assume
7  that is correlated here.
8       Q.   The fourth bullet point refers to
9  .8 billion 15(c)(3)-3 securities.
10      Do you see that?
11      A.   Yes.
12      Q.   And Alvarez understood that that
13 also was being conveyed as part of the sale
14 transaction.
15      A.   Yes.  That's what we were
16 communicating here in terms of our
17 understanding at that point.
18      Q.   Yeah.  And the topic of this is
19 not what's being conveyed.  It's asset
20 purchased, correct?
21      A.   Yeah.  That's how it's depicted,
22 yes.
23      Q.   So your understanding is you're
24 just briefing the Creditors Committee on the
25

Page 128

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  assets that were purchased as part of the
3  sales transaction; is that correct?
4       A.   That's probably a fair
5  characterization.
6       Q.   And then under Liabilities
7  Assumed -- by the way, did anyone -- do you
8  recall anyone at the Creditors Committee
9  raising any questions concerning any of these
10 items in terms of the assets purchased listed
11 here?
12      A.   Well, again, I wasn't in the room
13 at the time this was communicated.  So I can't
14 answer that.
15      Q.   Whether you were there personally,
16 are you aware of any Creditors Committee at
17 any point raising questions about whether
18 these assets were purchased or --
19      MR. TAMBE:  Objection to the form
20      of the question.
21      A.   Sitting here today, I'm not aware,
22 no.
23      Q.   Okay.
24      A.   I'm not aware one way or the
25 other, just to clarify.

Page 129

P. KRUSE - HIGHLY CONFIDENTIAL

1
2       Q.   Are you aware of any
3  communications between Alvarez and the trustee
4  concerning the three bullet points we
5  looked -- we just discussed?
6       A.   Between Alvarez and the SIPA
7  Trustee.
8       Q.   Yeah.  Alvarez and the SIPA
9  Trustee or the trustee's representatives and
10 the fact that -- and the first, second, and
11 third -- first, second and fourth bullet
12 points under the assets purchased?
13      A.   I'm sorry.  Am I aware of any
14 communications between Alvarez & Marsal and
15 the SIPA Trustee on these three bullet points?
16      Q.   Yes.  And by bullet points I mean
17 the topics in the bullet points.
18      Let me just rephrase it.
19      Are you aware of any conversations
20 between Alvarez and the SIPA Trustee or the
21 trustee's representatives and the $1.9 billion
22 unencumbered box?
23      MR. TAMBE:  Object to the form of
24      the question.
25      A.   No.  And I can probably

Page 138

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  from Barclays personnel.  I don't think we had
3  an independent basis for knowing what that
4  number was.
5    Q.   When you say Barclays -- I'm
6  sorry.  When you say Barclays personnel do you
7  mean Lehman's -- former Lehman personnel --
8    A.   Former Lehman personnel.
9       The communications I've seen
10 around this kind of information indicated that
11 we were attempting to meet with people like
12 Paolo Tonucci, Dan Fleming at the time.  So
13 I'm presuming that somebody like that would
14 have provided this information.
15    Q.   Would you have -- at this point in
16 time would Alvarez had a copy of the
17 purchase agreement?
18    A.   I don't know.  We weren't
19 attempting at this time to do a comprehensive
20 evaluation of the deal.  We were just
21 attempting really to lock down the information
22 as to what got transferred in the deal.  This
23 wasn't done for the purpose of a full-blown
24 holistic analysis of the deal and the
25 economics of it.  We were focused on many

Page 139

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  other things at that point in time and this
3  was not in any way a priority.
4    Q.   Are you aware that the -- that
5  Barclays was not obligated to actually assume
6  any particular contracts under the sale
7  transaction?
8       MR. TAMBE:  Objection to the form
9  of the question.
10    A.   Well, sitting here today, I'm
11 aware of -- they had options as to which
12 contracts they would assume and not assume.
13       THE VIDEOGRAPHER:  The time is
14 12:27.  We're going off the record.
15       (Videotape changed.)
16       THE VIDEOGRAPHER:  The time is
17 12:27.  We are back on the record.
18 BY MR. THOMAS:
19    Q.   What's your understanding of what
20 this page represents?
21    A.   I believe it's a summary of data
22 that we were -- had obtained around this time
23 from former Lehman people.  And it's depicting
24 the various categories of securities and the
25 amount at which they were deemed to be

Page 140

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  transferred at -- or the value at which -- in
3  the data set that was relayed to us.
4    Q.   And do you know whether these --
5  specifically where these values came from?
6  Was it --
7    A.   Specifically, no.
8    Q.   The last -- near the bottom there
9  it says, "Less Friday 9/19 transfers."
10       And then it has a negative entry
11 of a little over a billion dollars.  Do you
12 know what that's referring to?
13    A.   Not specifically.  I could make an
14 inference but --
15    Q.   What's your inference?
16    A.   That the amount of the securities
17 that was not -- not transferred by virtue of
18 activity that occurred on Friday, the 19th.
19 They weren't available for transfer for
20 whatever reason and that's how I would infer
21 that item.
22    Q.   Okay.
23       MR. THOMAS:  Why don't we go ahead
24 and take our lunch break if that works
25 for everyone.

Page 141

1    P. KRUSE - HIGHLY CONFIDENTIAL
2       MR. TAMBE:  45 minutes, an hour?
3       MR. THOMAS:  Why don't we do 45
4  minutes.
5       THE VIDEOGRAPHER:  The time is
6  12:29.  We're going off the record.
7       (Luncheon recess taken at 12:39
8  p.m.)

Page 142

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2          A F T E R N O O N   S E S S I O N
 3          (Time noted:      1:27 p.m.)
 4          THE VIDEOGRAPHER:  The time is
 5     1:27.  We are back on the record.
 6          * * *
 7  P H I L I P   K R U S E,   resumed and
 8     testified as follows:
 9  EXAMINATION BY (Cont'd.)
10  MR. THOMAS:
11          Q.    Mr. Kruse, let me ask you to
12     please go back to Exhibit 461A which is the
13     presentation to the Creditors Committee.
14          A.    (Witness complies.)
15          Q.    And, again, at page 28 I believe
16     you indicated that as part of your preparation
17     for your testimony today, you went back and
18     reviewed the Rule 60 motions.  Would that
19     include LBHI's Rule 60 motion?
20          A.    Yes.
21          Q.    And you recall there being a
22     discount talked about in that motion.
23          A.    Yes.
24          Q.    Is that the same discount that's
25     referred to on page 28, the $5 billion
```

Page 143

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2     reduction?
 3          MR. TAMBE:  Object to the form of
 4     the question.
 5          A.    I believe it applies to the same
 6     pool of securities.
 7          Q.    Is it different in any way?
 8          MR. TAMBE:  Objection to the form
 9     of the question.
10          A.    Well, no.  Again, because it
11     applies to the same group of securities, the
12     repo collateral, I think it is the same
13     concept being communicated.
14          Q.    Okay.  And that concept is that
15     there was agreement to value the securities at
16     approximately $5 billion less than the Lehman
17     marks?
18          A.    Well --
19          MR. TAMBE:  Objection -- okay.
20     Objection to the form of the question.
21          A.    We've spoken about what this
22     communicates and how I infer what this was
23     communicating.  This talks about stale marks
24     and negotiated a $5 billion reduction from the
25     marks that were on Lehman's books.  The
```

Page 144

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2     discount, it's characterized probably
 3     differently in the Rule 60 motion and in the
 4     other material we gathered in the course of
 5     discovery.  But I think it's the same concept
 6     at play if that's your question.
 7          Q.    Right.  It's the same difference
 8     in values at play.
 9          A.    The same $5 billion, yes.
10          Q.    LBHI understood as of the time of
11     closing that the purchase agreement was
12     transferring the exchange-traded derivatives
13     to Barclays, correct?
14          A.    You're asking LBHI's
15     understanding.
16          Q.    Yeah.
17          A.    I would presume LBHI understood
18     that.  At the time of the closing, yes.
19          Q.    Right.  And that's your
20     understanding of what the purchase agreement
21     says, correct?
22          A.    The clarification letter, I
23     believe, is where that comes up.  If I'm not
24     mistaken.
25          Q.    You understand the purchase
```

Page 145

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2     agreement to include the clarification letter.
 3          MR. TAMBE:  Objection to the form
 4     of the question.
 5          A.    Yeah.  I'll accept that as a way
 6     to talk about it.
 7          Q.    Did Alvarez ever seek to value the
 8     exchange-traded derivatives that were
 9     transferred to Barclays as part of the deal?
10          A.    Any work, again, we've done on
11     the -- in the area of valuation of the assets
12     transferred is subject to work we've been done
13     under direction of counsel.
14          Q.    Okay.  Other than work you're
15     describing as work being done under direction
16     of counsel for purposes of litigation, did
17     Alvarez ever seek to put a value on the
18     exchange-traded collateral -- exchange-traded
19     derivatives?
20          MR. TAMBE:  Objection to the form
21     of the question.
22          A.    No.  Alvarez, to my knowledge,
23     other than in connection with the work with
24     Jones Day has not.
25          Q.    Are you aware of whether LBHI has
```

Page 146

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    done so?
3        A.    LBHI since the closing, I would
4    say no.  Because, you know, we are essentially
5    LBHI in a way of thinking.
6        Q.    And other than the work being done
7    with Jones Day, are you aware of anyone else
8    attempting to put a value on the derivatives?
9        A.    Not to my knowledge.
10       Q.    Let me show you a document we'll
11   go ahead and mark as 463A.
12           (Deposition Exhibit 463A, document
13       bearing production numbers WGM-LEHMAN-E
14       00005853 through WGM-LEHMAN-E 00005866,
15       marked for identification as of this
16       date.)
17   BY MR. THOMAS:
18       Q.    Is this a document you've seen
19   before?
20       A.    Yes.  I believe I have.
21       Q.    And when is the first time you saw
22   it?
23       A.    The first time that I recall is in
24   connection with my preparation for this
25   deposition.

Page 147

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.    Very recently.
3        A.    Yes.
4        Q.    Do you know one way or another if
5    you saw it earlier?
6        A.    To my knowledge, I did not.
7        Q.    You recognize that as an e-mail
8    from Glenn West at Weil Gotshal dated
9    September 27th, 2008?
10       A.    Yes.
11       Q.    And it goes to, among others, Jay
12   McCarthy.  Who is that?
13       A.    That would probably -- that would
14   be Jack McCarthy.
15       Q.    And he works at Alvarez?
16       A.    Yes.
17       Q.    And D. Ehrmann also with Alvarez?
18       A.    Yes.
19       Q.    And the subject description is,
20   "Here is all we have at the moment that makes
21   an effort to describe what Barclays got and
22   didn't get."
23           Why was Weil sending you this
24   information -- sending Alvarez this
25   information at this time?

Page 148

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        MR. TAMBE:  Objection to form.
3        A.    My presumption would be Jack and
4    Daniel were heading up specific asset teams
5    and were trying to get their bearings on what
6    the estate owned and didn't own and this
7    presumably would have been sent in the context
8    of them getting their bearings on that
9    subject.
10       Q.    And as part of that analysis and
11   work I think you mentioned Alvarez may have
12   spoken with former Lehman people who had gone
13   over in the transaction to Barclays.  But I
14   assume that's not all that Alvarez did.  They
15   also spoke with Weil, for example, and tried
16   to gather information to make a complete
17   analysis as possible.  Is that fair enough?
18       A.    I'm sure that was happening, yes.
19       Q.    If you would turn the page,
20   please.
21       A.    (Witness complies.)
22       Q.    Under Purchased Assets, and the
23   first bullet point under Securities and
24   Trading Operations.  And let me just back up
25   under Purchased Assets.  It says At closing

Page 149

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    Barclay acquired all purchased assets.  And
3    then down below it says The securities set
4    forth on Schedule A to the clarification
5    letter, i.e., the securities subject to the
6    Barclays repurchase agreement.
7            Do you understand that as just
8    listing all the -- or referring to the fed
9    repo collateral?
10       A.    Yes.
11       Q.    And was that consistent with
12   Alvarez's understanding at the time that as
13   part of the deal Barclays was to receive all
14   the fed repo collateral?
15       A.    I think Alvarez would have been
16   gaining that understanding concurrent with an
17   e-mail like this.  I think we were focused on
18   it prior to closing.
19       Q.    Okay.  Did Alvarez ever form any
20   inconsistent -- strike that.
21           Looking at the next bullet point
22   where it says, "The securities and other
23   assets held in LBI's clearance boxes as of the
24   time of the closing."
25           Do you see that?

Page 150

```
1            P. KRUSE - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   And do you understand Schedule B
4    to the clarification letter basically listing
5    the clearance box assets that were being
6    transferred to Barclays as part of the
7    purchase agreement?
8        A.   That's my understanding, yes.
9        Q.   Okay.  And turning the page, the
10   next bullet point where it says, "All exchange
11   traded derivatives and any property that might
12   be held to security obligations under such
13   derivative," do you see that point?
14       A.   Yes.
15       Q.   And is that consistent with what I
16   believe was your earlier testimony that you
17   understood that the purchase agreement
18   transferred to Barclays all exchange-traded
19   derivatives?
20           MR. TAMBE:  Objection to the form
21   of the question.
22       A.   Yeah.  I think that was part of my
23   earlier testimony.
24       Q.   And that was -- that was Alvarez's
25   understanding of the deal at this time?
```

Page 151

```
1            P. KRUSE - HIGHLY CONFIDENTIAL
2        A.   At this time, yes.  Our
3    understanding would have been gained through
4    things like this.
5        Q.   Okay.  At any point did your
6    understanding of the deal with respect to
7    those three items change?  Your being
8    Alvarez's?
9        A.   With respect to those three items
10   I have no knowledge that our understanding
11   changed.
12       Q.   If you would turn a couple more
13   pages to Bates stamp 5857 or page 4 of the
14   document.
15       A.   (Witness complies.)
16       Q.   And if you want to flip back to
17   the prior page you're welcome to.  It's --
18   that bullet point at the top of page 4 is
19   under something entitled Customer Accounts.
20       A.   Um-hum.
21       Q.   Okay.  And we're still under the
22   big heading of Purchased Assets.
23           And this bullet point at the top
24   of 4 says, "Purchaser shall receive for the
25   account of customer any and all property of
```

Page 152

```
1            P. KRUSE - HIGHLY CONFIDENTIAL
2    any customer including any held by or on
3    behalf of LBI to secure the obligations of any
4    customer whose accounts are being transferred
5    to purchaser as part of the business and to
6    the extent permitted by applicable law and as
7    soon as practicable after the closing, 769
8    million of securities as held by or on behalf
9    of LBI on the date hereof pursuant to rule
10   15(c)(3)-3 of the Securities and Exchange Act
11   of 1934 as amended or securities of
12   substantially the same nature and value."
13           Was Alvarez's understanding that
14   as part of the purchase agreement Barclays was
15   to receive $769 million of the 15(c)(3)
16   securities or if that wasn't allowed by law,
17   other securities of the same nature and value?
18       A.   Well, the document as provided to
19   us by Weil Gotshal I think speaks for itself
20   on that point.  I just want to clarify I'm
21   aware now that this is a subject of dispute
22   between LBI and Barclays and I'm not in a
23   position to opine or offer any insight on
24   that.
25       Q.   Right.  I guess the question,
```

Page 153

```
1            P. KRUSE - HIGHLY CONFIDENTIAL
2    though, is was that Alvarez's understanding at
3    the time that Barclays was entitled to either
4    the 769 million of the 15(c)(3) securities if
5    permitted by law or if not permitted by law
6    securities of substantially the same nature
7    and value?
8        A.   I'm not even sure I would go that
9    far.  In the context of what we were trying to
10   accomplish at this time, you know, the
11   intricacies of customer property and things
12   that were probably under the purview at that
13   time of LBI wouldn't have been a particular
14   focus of ours.  Obviously, it's here in the
15   document that was provided to us.  The degree
16   to which Alvarez & Marsal focused on this or
17   really thought about it or considered it, I
18   wouldn't presume anything beyond that it's
19   here on the document.
20       Q.   Is it your understanding at least
21   that that's what Weil was telling you was part
22   of the deal?
23       A.   Well, I think the document speaks
24   for itself in terms of where it came from and
25   what it says.
```

P. KRUSE - HIGHLY CONFIDENTIAL

Q.   So as part of its -- about how
many people at Alvarez were working on this
effort to try to assess the transfers, the
deal, during this period of time?

MR. TAMBE:  Objection to the form
of the question.

A.   Difficult for me to characterize
numbers of people.  It was a substantial part
of our effort at that point.  I think as it
relates to Barclays in particular, our focus
was on, you know, bearing in mind, of course,
that the business and all of its systems, its
records, all of its systems, and substantially
all of its employees were being moved over to
Barclays.  The TSA, the Transition Services
Agreement, was the primary focus of ours as it
related to Barclays at the time.  And so the
numbers of people -- there's within this
October 8th dec I think there's some depiction
of the numbers of people that we were gearing
up with at that time.  But a substantial
portion of those people were involved in this
effort across multiple asset classes and
multiple teams that I think is probably best

P. KRUSE - HIGHLY CONFIDENTIAL

portrayed in this document at that time as
opposed to me trying to recite that for you.

Q.   When Alvarez became aware of the
discount that we discussed and was in the
presentation to the Creditors Committee, did
Alvarez take any action or do anything with
respect to the fact that there was a discount
or a difference between the agreed value of
the repo collateral and certain marks?

MR. TAMBE:  Objection to the form.

A.   No, again, I would characterize,
you know, what we were doing at this time
relaying information that had been given to us
in connection with that transaction to our UCC
constituency.  Some aspects of which they may
have known more than we did at the time
because they had perhaps people involved as
the deal was happening that weekend whereas we
did not.  Did we take action?  This was not a
priority at the time.  We were not -- again,
as it relates to Barclays, the TSA was our
primary focus.  Getting ourselves in a
position where we could run the wind-down of
this enormously large operation in a competent

P. KRUSE - HIGHLY CONFIDENTIAL

way, that was our focus.

Q.   Did anyone at the Committee
express any surprise that there was a
difference between the agreed value of the
marks as part of the transaction and some
prior Lehman marks?

MR. TAMBE:  Objection to form.

A.   At this meeting?  I think I
covered that.

Q.   At the meeting -- okay.  Let's try
it without the meeting.

A.   I was not at the meeting so I
can't offer any insight.

Q.   You tricked me.

Okay.  At any time to your
knowledge.

A.   Just to clarify, I was not at any
part of the meeting so I can't offer any
insight.

Q.   At any time, to your knowledge.

A.   At any time -- I'm sorry.  I
just want to make sure I got your question
straight.  I've lost track.

Q.   At any time did anyone, to your

P. KRUSE - HIGHLY CONFIDENTIAL

knowledge, from the Committee express, you
know, surprise about the fact that there was a
difference in the value of the fed repo
collateral agreed to by the parties for
purposes of the deal and the -- some nominal
prior Lehman marks?

MR. TAMBE:  Objection to form.

A.   You mean people sitting on the
Committee?  I didn't have a lot of
communication with people sitting on the
Committee.

Q.   That may be so but are you aware
of anyone on the Committee expressing surprise
about the fact that there was this delta?

A.   Not that I'm aware.  Again, there
may have been communications I'm not aware of.

Q.   Are you aware of anyone else who
expressed surprise or indicated that that was
news to them?  Anyone at Alvarez or LBHI or
anyone at this period of time?

MR. TAMBE:  Objection to form.

A.   My recollection during the first
quarter of our administration of the estate,
there was a gentleman from Houlihan, I believe

Page 158

P. KRUSE - HIGHLY CONFIDENTIAL

1
2     Mike Fazio, who I think primarily indirectly
3     through others I understood that he was
4     expressing some concerns about the economics
5     of the deal and whether it was ultimately in
6     the best interest of the estate to have the
7     deal done as it was papered.  I -- you know.
8         Q.   Can you think of anything else
9     other than that?
10        A.   Not that I recall.
11        Q.   Was Mr. Fazio's expression of
12    concern more general or particularly with
13    respect to there being a delta between the
14    agreed value of the -- we'll call it the
15    discount as you've used the term.
16        A.   My best recollection is that Mr.
17    Fazio was either -- attended or had heard
18    firsthand about a meeting that I know has been
19    depicted in the prior discovery Sun -- I
20    believe it was Sunday night before the deal
21    was closed Monday morning, where -- and I was
22    in the deposition of Michael Klein who
23    acknowledged that he had a depiction of the --
24    a very high-level depiction of the deal that
25    was written on the back of a manila envelope

Page 159

P. KRUSE - HIGHLY CONFIDENTIAL

1
2     that was shown to Mike and/or others at
3     Houlihan.
4         I remember Mike telling us that
5     they, meaning as advisors to the Unsecured
6     Creditors Committee, had been asked -- had
7     asked Barclays and Lehman people for the
8     details behind the difference between the
9     marked values and what was determined to be
10    the negotiated value as depicted on that
11    envelope.  And they were very unhappy with the
12    fact that they had never gotten any details.
13    They were promised the details at the time and
14    they never got them.  And I think that was
15    part of what was underlying their concerns
16    about the economics of the deal.
17        Q.   So they were aware of the delta
18    but they wanted to get details about the delta
19    further explained.
20        A.   Sure.  If you're a fiduciary for
21    the estate and you're aware of that you'd like
22    to have empirical knowledge, empirical
23    evidence of how it was derived rather than
24    just, you know, somebody saying it was
25    negotiated.

Page 160

P. KRUSE - HIGHLY CONFIDENTIAL

1
2         Q.   The sale transaction didn't
3     require the deal to be a wash, did it?
4         MR. TAMBE:  Objection to form of
5     the question.
6         A.   The sale transaction didn't
7     require the deal to be a wash?
8         Q.   Okay.  I'll rephrase that.  Are
9     you familiar with the term "wash"?
10        A.   Yes.
11        Q.   What does that term mean to you?
12        A.   Well, in the context I know where
13    you're coming from, it's assets essentially
14    equalled liabilities.  And there was little to
15    no exchange of economic value in the deal.
16        Q.   Okay.  And little to no exchange
17    of economic value, can you explain to me?
18        A.   Yeah.  Wash assets equal
19    liabilities, that's how I'm trying to give my
20    understanding of what that concept means.
21        Q.   It was never your understanding
22    there was something that sale transaction
23    documents required that assets match
24    liabilities; is that correct?
25        A.   I don't think it was ever --

Page 161

P. KRUSE - HIGHLY CONFIDENTIAL

1
2         MR. TAMBE:  Objection to form of
3     the question.
4         A.   I don't have any basis to think it
5     was characterized as -- in that way in the
6     sale documents.  Although I would point out
7     that the Asset Purchase Agreement dated
8     October 16th, and I think this is depicted in
9     our Rule 60 papers, it really does -- the end
10    result of that appears to be assets equal
11    liabilities as it relates to the securities
12    and the comp and cure obligations being
13    assumed.  And then you've got an additional
14    element of consideration if you want to look
15    at it that way by virtue of, you know, other
16    liabilities being assumed.
17        Q.   Have you done an analysis of the
18    initial Asset Purchase Agreement to determine
19    what the actual liabilities would have been
20    and what the assets would have been?
21        A.   Well, what I'm describing I think
22    is depicted in our Rule 60(b) motion.  I can
23    picture it now.  There's a little table in the
24    motion that depicts $70 billion of long
25    positions, 69 billion of short positions,

Page 162

P. KRUSE - HIGHLY CONFIDENTIAL
1  
2  $250 million acquisition price, and a $750
3  million profit participation, if you will, in
4  the upside of the securities if they were sold
5  for more than the negotiated price.
6      Q.   Do you know whether the 70 billion
7  long includes residential mortgages valued at
8  50 percent of which valued at 3 billion?
9      A.   My best recollection may not be
10 completely accurate, is that the -- half of
11 the mortgage securities were excluded assets,
12 if I'm not mistaken, as depicted in the APA.
13     Q.   Okay.  But the 70 billion didn't
14 include the 3 billion, 50 percent of the
15 RESI's, correct?
16     A.   That's my recollection, yes.
17     Q.   Were you aware that Barclays had
18 put out a press release before the deal closed
19 saying that it was going to be accretive, the
20 deal was going to be accretive for Barclays?
21         MR. TAMBE:  Objection to the form
22     of the question.
23     A.   I first saw that press release in
24 roughly Oct -- excuse me -- January of this
25 year.

Page 163

P. KRUSE - HIGHLY CONFIDENTIAL
1  
2      Q.   So Alvarez now is working on
3  trying to value some of the assets for
4  purposes of this litigation.  Without getting
5  into the results of that because your counsel
6  has said that that's privileged, how long has
7  Alvarez been doing that work?
8          MR. TAMBE:  Objection to form of
9      the question, and to your
10     characterization that Alvarez is now
11     working on trying to value some of the
12     assets.  What they're doing at the
13     direction of counsel and how far they've
14     come along and how much of it they've
15     done, all of that is within the
16     privilege.
17         MR. THOMAS:  Okay.  But not the
18     dates.
19     Q.   I mean, when did Alvarez start
20 working on the general subject of valuing
21 assets related to the sale transaction?  Just
22 the date.  Rough date.
23     A.   Sometime after Jones Day was
24 engaged the best I recall.
25     Q.   And -- March?

Page 164

P. KRUSE - HIGHLY CONFIDENTIAL
1  
2      A.   We were engaged in March.  I can't
3  give you a specific date of when that
4  activity --
5      Q.   Is it still continuing?
6          MR. TAMBE:  Again, I'd object to
7      that and instruct you not to answer in
8      terms of what you are doing, may have
9      done, whether you're still doing it.
10         MR. THOMAS:  Okay.  Yeah, I mean,
11     I disagree but I don't want to belabor
12     it.  You've got your instruction and I
13     assume you're going to follow it.
14     Q.   Can you tell me roughly how much
15 time Alvarez spent on trying to value assets?
16     A.   No, I can't.
17     Q.   Was it -- I mean, just order of
18 magnitude was it a one-week thing or two-month
19 thing?
20         MR. TAMBE:  Objection to the form
21     of the question.
22     A.   I have no characterization of it.
23     Q.   So prior to that work -- so prior
24 to March 2009 Alvarez never made any effort to
25 go back and value any of the assets or

Page 165

P. KRUSE - HIGHLY CONFIDENTIAL
1  
2  liabilities that were part of the sales
3  transaction; is that correct?
4          MR. TAMBE:  Objection to the form
5      of the question.
6      A.   I don't know if I -- I don't think
7  I'd accept that characterization if I
8  understand it.  You mentioned their both
9  assets and liabilities.  Our initial concerns
10 about the economics of the deal actually were
11 generated as a result of us closing the books
12 as of the closing date -- excuse me -- as of
13 the date of the bankruptcy closing the books
14 and records on behalf of the LBHI estate and
15 coming to some realization that the
16 liabilities that were on the books for comp
17 and call it cure kind of liabilities appear to
18 be much lower than the amounts that were
19 presumed to be the effective liabilities in
20 the deal.  So it was the liability side that
21 really started our concerns.
22     Q.   When was that?
23     A.   Toward the end of December 2008.
24     Q.   And what did you do as a result of
25 those concerns?

Page 166

1       P. KRUSE - HIGHLY CONFIDENTIAL
2       A.    Well, what I did is I took
3   direction from Brian Marsal and started a
4   forensic team that was focused on the Barclays
5   sale.
6       Q.    And did you -- what was the result
7   of that forensic team's work?
8       A.    Well, as is probably obvious we
9   recognized we needed legal counsel and engaged
10  Jones Day in or about March of this year.  And
11  the end result of our joint effort in this
12  process is evident in the Rule 60(b) motion.
13      Q.    So we'll pick up on that in a
14  minute but prior to March did Alvarez ever
15  make any effort to try to value the assets
16  transferred as part of the sale transaction?
17      A.    There were probably analytical
18  kind of exercises to evaluate the value of the
19  assets.  It was a preliminary, you know, sort
20  of attempt to look at it.  Obviously, by that
21  time in early February as everybody knows
22  Barclays had its annual earnings announcement
23  which put sort of a spotlight on the idea that
24  there was a very substantial gain on
25  acquisition that gave us concern as to the

Page 167

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   ultimate economics of the deal.  So we looked
3   at that gain disclosure.  We looked at, you
4   know, tried to make sense out of it.  Where
5   was the gain derived, et cetera.
6       Q.    And can you tell me anything about
7   the results of your evaluation work prior to
8   March in terms of what -- the amounts you came
9   up with for any class of asset?
10      MR. TAMBE:  By this point in time
11  the work that was being done by Alvarez
12  & Marsal is in anticipation potentially
13  of litigation and claims and we have
14  asserted work product privilege on any
15  of that analysis that was done by A&M.
16      MR. THOMAS:  Can you tell me as to
17  what time?
18      MR. TAMBE:  I think it would
19  probably go back to the January time
20  frame when they started looking at it
21  from a forensic perspective as opposed
22  to merely collecting assets and
23  identifying assets which is what they
24  were doing in the first quarter of their
25  engagement when this becomes more of an

Page 168

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   anticipation of litigation or an
3   anticipation of bringing claims
4   exercise.
5   BY MR. THOMAS:
6       Q.    And the assets that prompted this
7   exercise on the books were the comp and cure
8   amounts; is that correct?
9       A.    Well, I guess I'd characterize it
10  differently.  Comp and cure are liabilities.
11      Q.    I'm sorry.  I misspoke.
12  Liabilities.
13      A.    Yes.  My best recollection is that
14  the initial concerns that arose on our part,
15  on A&M's part, emanated from the liabilities
16  side, an apparent overstatement of the
17  liabilities.  That's my best recollection.
18      Q.    Let me show you another document
19  we'll mark as 464A.
20      (Deposition Exhibit 464A, document
21  bearing production numbers AM 002287
22  through AM 002292, marked for
23  identification as of this date.)
24  BY MR. THOMAS:
25      Q.    Before I ask you about this

Page 169

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   document, in your view would it have been
3   possible to accurately value all of the assets
4   transferred as part of the purchase agreement
5   by the time of closing given the short period
6   of time in the negotiation of the deal?
7       MR. TAMBE:  Objection to the form
8   of the question.  Beyond the scope of
9   the 30(b)(6).
10      A.    I would almost reply that they
11  were valued.  There were values being ascribed
12  at that time that depicted the value, for
13  example, of the repo assets being
14  approximately $49.9 billion.
15      Q.    Well, for example, the RESI's you
16  mentioned were valued at $6 billion.  Do you
17  think they were really worth $6 billion?
18      MR. TAMBE:  Objection to the form
19  of the question.
20      A.    I don't know which particular
21  securities you're referring to.  There's been
22  a lot of confusion in my mind about what
23  constitutes those RESI's.  If you're referring
24  to the RESI's that are referenced in the APA.
25      Q.    Right.  I mean, do you think those

Page 170

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    could be easily valued during the week of the
3    deal?
4           MR. TAMBE:  Objection to the form
5       of the question and beyond the scope of
6       the 30(b)(6).
7       A.   As I mentioned, I have a lot of
8    uncertainty as to what securities are even
9    being referred to there.  So it's a
10   difficult -- I can't even answer the question
11   because I don't have a premise from which to
12   answer.
13      Q.   So you weren't even sure which
14   securities were in the deal.
15      A.   It's not clear to me, no.  And
16   when I say in the deal, I'm talking about the
17   RESI assets referred to in the APA.
18      Q.   All right.  Turning to 464A who is
19   W. Gordon?  William Gordon?
20      A.   He's an Alvarez & Marsal employee.
21      Q.   And this appears -- this may just
22   be a further chain that attaches some of the
23   information from Weil but I just wanted to ask
24   you about a couple other names on here.  Who
25   is Mary Karitsky?

Page 171

1        P. KRUSE - HIGHLY CONFIDENTIAL
2       A.   Mary Kariky.
3       Q.   Kariky.
4       A.   She's an Alvarez employee as well.
5       Q.   Okay.  Were they also working on
6    analyzing the sale transaction in terms of
7    what assets went over?
8       A.   Yes.  That was part of their
9    mission, among I'm sure many other things at
10   the time.
11      Q.   We talked a little bit earlier
12   about this wash notion that appears in some of
13   the litigation papers.
14           Can you point to any part of the
15   sales documents that require the deal to be
16   anything like a wash, that place restrictions
17   on what the amount of the assets and
18   liabilities have to be?
19           MR. TAMBE:  Objection to the form
20      of the question.
21      A.   I thought we just discussed that.
22   I described the depiction of the long and the
23   shorts as described in the APA and how that
24   balanced out.
25      Q.   Right.  And you referred to the

Page 172

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    APA and your belief that maybe there was some
3    balance there between long and short.  That,
4    of course, the APA had to get modified because
5    Lehman couldn't deliver those assets.  And so
6    in terms of the transaction that actually went
7    through, the purchase agreement that actually
8    -- or the actual deal that was agreed to and
9    closed, is there anything in there that you're
10   aware of that in your mind could be considered
11   to require that after some post-doc analysis
12   that liabilities and assets had to somehow
13   balance out?
14           MR. TAMBE:  Objection to the form
15      of the question.
16      A.   It's a very long question and I
17   lost track of some of the characterizations
18   early on and I'm not sure I accept some of the
19   early characterizations that sort of formed
20   the premise of it but...
21      Q.   Okay.  You've described your kind
22   of understanding of the term wash, and I'm
23   asking you is there anything that you can
24   point to in the sale agreement, in the
25   purchase agreement that required the deal to

Page 173

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    be a wash?
3           MR. TAMBE:  Objection to form.
4       A.   And you don't want me to repeat, I
5    assume, what I've already talked about in
6    terms of the APA having an implied sort of
7    balancing aspect to it?  That's the primary
8    thing I would look to.
9       Q.   Well, the terms you referred to in
10   the APA came out of the deal because those
11   assets couldn't be delivered, right?
12      A.   Well, that's one way to
13   characterize it.  Another way to think about
14   it is that there wasn't even a specific
15   listing of those assets at the time.  That was
16   people's best estimate of what was on the
17   balance sheet of LBI, as I've gleaned from the
18   discovery at this point.  The idea that they
19   couldn't be delivered may in my mind go too
20   far.
21           The nature of the assets in a
22   broker/dealer are going to change day-to-day
23   because of the typical machinations in and out
24   of a broker/dealer.  But there certainly were
25   less assets available later in the week than

Page 174

1         P. KRUSE - HIGHLY CONFIDENTIAL
2    were there and believed to be there as of the
3    time the APA was negotiated.
4         Q.   Right.  The 70 billion longs
5    weren't there or a lot of them weren't there
6    later in the week; is that right?
7         A.   Some of those assets -- and it's
8    dangerous for me to try to recharacterize
9    what's been in discovery, but I think some of
10   those assets simply weren't available because
11   they were locked up at LBIE, which was under a
12   separate administration at this point, the
13   European broker/dealer.  So there were issues,
14   certainly, that caused a fair amount of
15   confusion as I've seen around the -- which
16   assets could and could not be transferred.
17        Q.   Um-hum.  So other than your sense
18   that there were some rough equivalency
19   associated with some of the initial terms of
20   the APA, is there anything else you can point
21   to that required the deal to be a wash, as you
22   say?
23        MR. TAMBE:  Objection to the form
24   of the question.
25        A.   No, I think ultimately as the deal

Page 175

1         P. KRUSE - HIGHLY CONFIDENTIAL
2    changed, if I can use a -- what may seem like
3    a gratuitous sort of characterization, it
4    seemed like a free for all.  It seemed like
5    the confusion over the delivery of the assets
6    that final night between JPM and Bank of
7    New York caused people to go on a land grab,
8    in a sense get everything they possibly could
9    out of the entity that had any value and
10   wasn't nailed down.  That's -- the deal as it
11   changed seemed to go that direction.
12        Q.   Just -- my question is just
13   whether there's anything that you can point to
14   that you think required the deal to somehow be
15   a wash.
16        MR. TAMBE:  Objection to the form
17   of the question.
18        Q.   Other than what you mentioned
19   about the initial APA.
20        A.   Not specifically in the way the
21   deal was papered, although I do recall that
22   there was a characterization before the court
23   that essentially spoke to that kind of
24   concept.  I don't remember -- I don't recall
25   the exact words but I thought there was some

Page 176

1         P. KRUSE - HIGHLY CONFIDENTIAL
2    communication of a concept that there was
3    generally a wash.  I know it was communicated
4    as a wash kind of transaction to the Lehman
5    board on Tuesday morning according to those
6    minutes.
7         Q.   Okay.  Why don't we go ahead and
8    take a look at some of those minutes.
9         (Pause on the record.)
10        Q.   Do you know who prepared the
11   minutes of the Lehman board?
12        A.   Not specifically.  Jeffrey
13   Welligson I believe served as the secretary.
14        Q.   Was anyone there from Alvarez at
15   the board meeting where this sale was being
16   discussed?
17        A.   No.
18        MR. THOMAS:  Let me mark this
19   document as 465A.
20        (Deposition Exhibit 465A, document
21   bearing production numbers LBHI 017667
22   through LBHI 017673, marked for
23   identification as of this date.)
24   BY MR. THOMAS:
25        Q.   This is a document produced to us

Page 177

1         P. KRUSE - HIGHLY CONFIDENTIAL
2    by LBHI.  Do you recognize the document?
3         A.   Not this specific version of it.
4    I've seen what appeared to me to be a final
5    version of it.  But I haven't seen the track
6    change version that this represents.
7         Q.   Let me ask you to turn to page 5
8    of the document.
9         A.   (Witness complies.)
10        Q.   There's -- in the second full
11   paragraph at the end there's a bracket that
12   says, "For LBHI, the transaction was described
13   as a wash with Barclays assuming liabilities
14   of 64 billion basically equivalent to the
15   assets, 70 billion, plus assuming some
16   employees and accounts."
17        Do you see that?
18        A.   Yes.
19        Q.   Would you consider 70 billion
20   versus 64 billion a wash?
21        A.   Well, in and of itself, no.  But I
22   would infer that they must be coming to the
23   concept of a wash by presumably the additional
24   obligations being incurred, assuming the
25   employees and accounts.

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.   Those additional obligations don't
3  add up to anywhere near $6 billion, though, do
4  they?
5          MR. TAMBE:  Objection to the form
6  of the question.
7      A.   No.  Not if they were depicted in
8  a financial schedule or anything else.  They
9  totalled to 4.25 billion as I recall.
10      Q.   So how close does it have to be,
11  the assets and liabilities, in your view, for
12  you to consider it a wash?
13          MR. GATTO:  Object to the form.
14  Beyond the scope of the 30(b)(6).  He's
15  not here to give you opinions and I
16  instruct him not to answer.
17          MR. THOMAS:  They're valuations --
18          MR. TAMBE:  Yeah.
19          MR. THOMAS:  -- of the assets and
20  liabilities --
21          MR. TAMBE:  He can talk about
22  valuations.
23          MR. THOMAS:  -- which is under
24  the scope of like five topics.
25          MR. TAMBE:  He can talk about

1      P. KRUSE - HIGHLY CONFIDENTIAL
2  valuations but he's not going to give
3  you opinions about what is and what
4  isn't a wash.
5          MR. THOMAS:  So you're instructing
6  him not to answer any questions about
7  opinions about a wash?
8          MR. TAMBE:  About opinions, yeah.
9  He can give you -- he's already
10  described to you what he believes a wash
11  to be.  He's given you his understanding
12  of what he believes a wash to be and
13  he's given you his understanding of this
14  document.
15  BY MR. THOMAS:
16      Q.   Do you understand who prepared
17  this document?
18      A.   No.
19      Q.   Do you understand how the
20  $64 billion calculation was made?
21      A.   No.
22      Q.   Let me ask you to turn -- I'm
23  sorry.  I may have asked you -- I don't know
24  if I asked this or not.  Was anyone from
25  Alvarez -- I think I did ask it.  Was anybody

1      P. KRUSE - HIGHLY CONFIDENTIAL
2  from Alvarez at the board meeting?
3      A.   No.
4      Q.   Was anyone from Alvarez in any way
5  involved in the preparation for that board
6  meeting?
7      A.   No.  Not to my knowledge.
8      Q.   All right.  If you would turn two
9  pages prior to page 3 of the same document.
10      A.   (Witness complies.)
11      Q.   The second full paragraph states,
12  "Mr. Roberts..." do you know Mr. Roberts to be
13  from Weil Gotshal?
14      A.   I would expect that to be
15  Tom Roberts.  Was he in attendance?  I believe
16  he was.
17          Yes.  I would expect that to be
18  Tom Roberts.
19      Q.   Okay.  "Mr. Roberts resumed by
20  describing that it is a condition to the
21  transaction that eight specific firm employees
22  enter into employment agreements with
23  Barclays.  He stated that Mr. McGee was one of
24  those employees.  So interested firm employees
25  were involved in the transaction negotiations

1      P. KRUSE - HIGHLY CONFIDENTIAL
2  on behalf of the firm.  Mr. Roberts reported
3  that Mr. McDade was subsequently advised by
4  Barclay that his agreement of continued
5  employment was a condition of the transaction.
6  Mr. Roberts reported that Weil Gotshal &
7  Manages and Simpson Thacher & Bartlett then
8  told Barclays that after numerous discussions
9  concerning Mr. McDade's employment, all the
10  terms of the firm transaction were completed."
11          LBHI understood that at least some
12  of the executives negotiating the deal with
13  Barclays were also being offered employment by
14  Barclays; is that correct?
15      A.   LBHI -- going back to the
16  characterization I've offered before, during
17  this time certainly LBHI was in the middle of
18  this before the closing.  They were still
19  employees of LBHI and LBI.  So, yes, LBHI
20  would have been aware of this.  Now, just to
21  be clear on how --
22      Q.   That includes the LBHI board, too,
23  right?
24      A.   Well, the LBHI board, to the
25  extent it heard this characterization, would

Page 182

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  have been aware of this.
3      Q.   And Alvarez was aware of this
4  fact, is it fair to say, at some point
5  certainly within a week or two of the closing?
6          MR. TAMBE:  Objection to the form
7      of the question.
8      A.   I think Alvarez's knowledge of an
9  issue like this would have been limited to
10 anything we heard in a court hearing on the
11 19th.  I think we had some people there.  I
12 don't know that we had any particular
13 knowledge or understanding of who was doing
14 the negotiations and what their terms of
15 employment were or were not --
16     Q.   Um-hum.
17     A.   -- at the time.
18     Q.   Okay.  And I'm under topic -- depo
19 topic 8 now concerning Lehman's understanding.
20 Assuming executives were being offered
21 employment by Barclays including offers of
22 bonus payments for 2008, Lehman understood
23 that while during this week the deal was being
24 negotiated, it was -- I mean, Lehman, the
25 board, others at Lehman understood that the

Page 183

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  officers who were negotiating the deal were
3  being offered employment and bonuses by
4  Barclays and indeed employing a lot of these
5  people was a condition of doing the deal for
6  Barclays since they were trying to buy the
7  business?
8          MR. TAMBE:  Objection to the form
9      of the question.
10     A.   All right.  I'm going to try to
11 make sure I understand the question there.
12 Again, I lose track when it goes on.
13         The Lehman -- you know, the same
14 thing Lehman versus Alvarez & Marsal.  Lehman
15 people were clearly knowledgeable about this.
16 They were the people that were getting some
17 offers to some extent.  They were the people
18 who were right in the middle of this.  All
19 those people that we're talking about are no
20 longer employed by LBHI.  They've gone on to
21 Barclays or they've gone their own way.
22         So the short answer to your
23 question is yes, LBHI was aware of this at the
24 time.  They were inherently aware because they
25 were part of it.

Page 184

P. KRUSE - HIGHLY CONFIDENTIAL

1
2      Q.   And in addition to Lehman being
3  aware of this because officers involved in it
4  were aware of it, the LBHI board was aware of
5  that and LBHI's outside counsel was aware of
6  that, too, correct?
7      A.   I would suggest asking members of
8  the board and members of Weil Gotshal
9  specifically what they're aware of.  Anybody
10 can read this and accept the characterizations
11 there to the extent this accurately depicts
12 what was talked about in a board meeting.
13 People who were there heard that.  I mean,
14 there's no arguing that.  I just -- I don't
15 want to characterize anything beyond that
16 because I don't know anything beyond that.
17     Q.   Okay.  But you are the
18 representative of LBHI on this topic.
19         MR. TAMBE:  And he's answered with
20     respect to LBHI.  He's not here as a
21     representative of Weil Gotshal.
22         MR. THOMAS:  Okay.
23     Q.   Let me go ahead and show you
24 another document we'll mark as 466A.
25         (Deposition Exhibit 466A, document

Page 185

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  bearing production numbers LBHI 017761
3      through LBHI 017764, marked for
4      identification as of this date.)
5  BY MR. THOMAS:
6      Q.   Let me ask you, is this a document
7  that you've seen before?
8      A.   Not that I recall.
9      Q.   Okay.  If you would turn to the
10 third page, please.  The third full paragraph.
11 70 billion of assets at LBI, 64 billion of
12 liabilities, so paying the BD 94 percent of
13 assets.  Do you have an understanding what
14 that's saying, so paying the BD 94 percent of
15 assets?
16         MR. TAMBE:  Objection to form.
17     A.   No, I don't understand.  If I
18 reflected on it for a while, perhaps but
19 sitting here right now, no.  I'm guessing BD
20 means broker/dealer but I don't know what the
21 94 percent relates to.
22     Q.   The last sentence there says, "If
23 we don't do this deal today, the broker/dealer
24 would have to declare bankruptcy tonight, at
25 which point all employees would leave and

Page 186

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    there will be nothing."
3               Was it Alvarez's understanding
4    that this was a waste -- LBI was a wasting
5    asset and that some kind of deal needed to be
6    done right away?
7               MR. TAMBE:  Objection to the form
8       of the question.
9       A.   I don't know -- Alvarez & Marsal
10   wasn't involved in the deal itself.  I think
11   anybody recognizes that a broker/dealer with a
12   bankrupt parent can't last long.  I don't
13   think any reasonable person would argue with
14   that.  Just to -- rather than accepting the
15   characterization that it was a wasting asset,
16   as it relates to the estate itself, now, you
17   look at that, you know, there was a net
18   give-away of several billion dollars of
19   economic value as a result of this deal.
20              So I wouldn't accept the
21   characterization that it was a wasting asset.
22   I mean, the creditors were ultimately better
23   off if you just let LBI go down with LBHI.
24      Q.   What is the basis for your saying
25   there was a net give-away of several billion

Page 187

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    dollars?
3       A.   The Barclays disclosure in their
4    February 6 financial announcement that they
5    made $4.2 billion on the acquisition of LBI.
6       Q.   Anything else other than that?
7       A.   There was also characterizations
8    by Mr. Clackson in his deposition that
9    acknowledged the ultimate gain -- accounting
10   gain was closer to 4.9 or $5 billion.  That
11   accounting gain equates to economic value.
12      Q.   You have a good understanding of
13   what went into that accounting gain?
14      A.   Reasonably so, yes.  I consider
15   myself expert on that issue of accounting.
16      Q.   And you've studied that -- the
17   Barclays papers?
18      A.   I've reviewed the Barclays papers
19   there, yes.
20      Q.   And can you explain what you mean
21   when you say an accounting gain?
22      A.   Accounting gain for purposes of
23   acquisition accounting equates to economic
24   gain.  The accounting rules are driven off of
25   determining the fair value of the assets and

Page 188

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    liabilities and any excess of assets acquired,
3    fair market value of assets acquired versus
4    liabilities assumed equates to economic gain.
5    So accounting gain equals economic gain in
6    this vein.
7       Q.   Other than what you've
8    identified --
9               MR. TAMBE:  Can we just tie this
10      down to some 30(b)(6) topic that you've
11      identified.  He's not going to testify
12      on behalf of Barclays.  You had your
13      folks to do that.
14              MR. THOMAS:  First of all, I'm
15      directly following up on what he just
16      testified.
17              MR. TAMBE:  That's fine but you
18      can't exceed the scope of the 30(b)(6)
19      even if you're following up on something
20      he told you.
21              MR. THOMAS:  And that's -- sorry.
22      And it does relate to the valuations and
23      due diligence in terms of what the
24      valuations were going forward after the
25      deal.  I mean, I can stop and go tie it

Page 189

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    to several topics but --
3               MR. TAMBE:  I don't think it does.
4    I think at the end of the day how
5    Barclays accounted for the gain doesn't
6    tie into the valuation from LBHI's
7    perspective.
8               MR. THOMAS:  When his answer to
9    clearly a topic question of the
10   valuation goes to Barclays accounting
11   report, then I'm allowed to at least
12   explore the basis of his knowledge.
13              MR. TAMBE:  And I'll let you do
14   that but if you start going into the
15   accounting theory now and the accounting
16   theory behind Barclays gain, I think
17   you're going too far afield.
18              MR. THOMAS:  Once again, he used a
19   term in his answer.  Okay?  I didn't go
20   out there.  He used the term.  I want
21   him to explain what he meant by that.
22              MR. TAMBE:  And I allowed him to
23   do that.
24              MR. THOMAS:  Okay.  Well, I think
25   we've probably exhausted this.

1        P. KRUSE - HIGHLY CONFIDENTIAL
2            MR. TAMBE:  Okay.
3        Q.   Is there anything other than your
4    interpretation of the Barclays work and the
5    thing with Mr. Clackson you cited that you
6    believe indicates that there was a gain for
7    Barclays?
8        A.   Is there anything else beyond
9    Barclays admission in a public filing?
10       Q.   Yeah.  I'm not questioning it.  I
11   just want to know.  Let me ask you differently
12   because -- did Alvarez do any similar type of
13   analysis as to what the actual agenda was?
14       A.   Certainly not at the time that
15   that announcement came out in February.
16       Q.   Okay.  Did anyone ask Alvarez to
17   say, hey, we have this notion that assets were
18   supposed to roughly equal liabilities.  Could
19   you do an analysis in October, November,
20   December to see whether the assets and
21   liabilities really balanced out?
22       A.   I think we've covered this ground
23   generally but we didn't undertake a true
24   forensic valuation of the deal until January
25   of 2009.

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   Um-hum.
3            MR. THOMAS:  Why don't we take a
4    five-minute break now.
5            MR. TAMBE:  Okay.
6            THE VIDEOGRAPHER:  The time is
7    2:27.  We are going off the record.
8            (Recess taken.)
9            THE VIDEOGRAPHER:  The time is
10   2:42.  We are back on the record.
11   BY MR. THOMAS:
12       Q.   Mr. Kruse, let me ask you to turn
13   back to Exhibit 464A, an e-mail from
14   William Gordon from Alvarez.  And the second
15   page is an attachment which is AM 2294, the
16   Bates number, and up at the top where it says
17   "All exchange-traded derivatives (and any
18   property that may be held in security
19   obligations under such derivatives)."
20           Do you understand the
21   parenthetical to be confirming that the sale
22   transaction was transferring the
23   exchange-traded derivatives and any collateral
24   associated with the delivery of the
25   derivative?

1        P. KRUSE - HIGHLY CONFIDENTIAL
2            MR. TAMBE:  Objection to form.
3        A.   Security and collateral to me
4    probably have the same meaning in that context
5    so I would have to say yes.
6        Q.   Did Alvarez ever attempt to value
7    the exchange-traded derivatives and collateral
8    that were transferred to Barclays as part of
9    the sale transaction?
10       A.   I thought we covered this.
11       Q.   Okay.  Other than -- prior to
12   March, and we may have, apologies, but did you
13   ever attempt to value the amount of the
14   derivatives in the collateral?
15           MR. TAMBE:  Objection.  Asked and
16   answered.  Object to form.
17       A.   No.  Not that I'm aware of.
18       Q.   You accepted that there would be
19   some amount of value associated with the
20   derivatives and collateral, is that fair?
21       A.   I have no basis to answer that.
22       Q.   Let me show you another document
23   we'll mark as 467A.
24           (Deposition Exhibit 467A, document
25   bearing production numbers HHR_00006469

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    with attachment, marked for
3    identification as of this date.)
4    BY MR. THOMAS:
5        Q.   This is an e-mail among a number
6    of people, Weil, the trustee, and a couple
7    people at Lehman.  Do you recognize this
8    document?
9        A.   I don't recall having seen it.
10       Q.   Okay.  Do you know who Brett
11   Beldner is?
12       A.   No.
13       Q.   You know who Martin Kelly is?
14       A.   Yes.
15       Q.   On the attachment to this e-mail,
16   which is described in the e-mail itself as a
17   draft LBI balance sheet reflecting unaudited
18   estimates pre and post Barclays transaction,
19   and on the attached balance sheet under
20   inventory, do you see derivatives there
21   indicating a value of 3.6?
22       A.   Yes, I see that.
23       Q.   Okay.  All right.  And does
24   this -- were you ever aware of any kind of
25   valuation of derivatives in that general

Page 194

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   range?
3        A.   I don't recall.  To me
4   exchange-traded derivatives, they are what
5   they are.  They're exchange traded.  So
6   there's, you know, an active market for them
7   as I infer.
8        Q.   Is your point that because there's
9   an active market for them, their price would
10  be whatever they trade at?
11       A.   Yes.
12       Q.   I mean, I guess you have no basis
13  for denying that the derivatives and
14  collateral transferred to Barclays had
15  significant economic value associated with it?
16       A.   I have no basis for commenting on
17  that.  I know obviously it's part of the deal
18  as it's summarized by Weil in that e-mail.
19       Q.   Let me show you a document that's
20  been previously marked as Exhibit 442.  It's a
21  large document, and I'm going to ask you about
22  something at the top of page 47.  You're
23  welcome to flip a little before and a little
24  after if you want.
25            (Document review.)

Page 195

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   And I'd like to ask you, going
3   back to this 47.4 figure -- and as I
4   understand it, neither LBHI or Alvarez are
5   aware of how that 47.4 figure was calculated;
6   is that right?
7        A.   Alvarez is not.  LBHI, again, I
8   think the employees that have gone over to
9   Barclays, to the extent there is knowledge,
10  would be in the best position to address that.
11       Q.   But in terms of the knowledge that
12  LBHI through documents --
13       A.   Yeah, the knowledge currently at
14  resident in the estate, no, there is no
15  knowledge about how that number is derived.
16       Q.   Did you ask anyone at Weil Gotshal
17  how it was derived?
18       A.   I did not directly.  I think Jones
19  Day has had discussions with them.
20       Q.   Do you have any knowledge for us
21  today about the 47.4 as an LBHI designee on
22  this figure?
23            MR. TAMBE:  If you agree that's
24  not going to be deemed a waiver.
25            MR. THOMAS:  Agreed.

Page 196

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        A.   To my knowledge, Weil Gotshal
3   doesn't remember where they got the number.
4        Q.   Do you have any further knowledge
5   on that?
6        A.   No.
7        Q.   When you look at the number at the
8   top of page 47, it says -- Ms. Fife, Weil
9   Gotshal, speaking to the court, "So originally
10  we were selling assets that had a value of
11  70 -- approximately $70 billion and today,
12  Your Honor, we're only selling assets that
13  have a value of $47.4 billion."
14            The $70 billion, do you understand
15  that to be referring to subsection D of the
16  list of purchased assets in the initial APA?
17            MR. TAMBE:  Objection to form.
18       A.   Just to be clear, I should go back
19  and look at subsection D of the APA.
20            (Document review.)
21       A.   Yes.  The long positions.
22       Q.   Okay.  And from your read of this,
23  would this be saying that the long positions
24  are now down to 47.4?
25            MR. TAMBE:  Objection to the form

Page 197

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   of the question.
3        A.   It says what it says.  But I don't
4   think it's necessarily appropriate to equate
5   70 billion in value going down to 47.4 billion
6   in value.  The mix of securities is different
7   between the APA number and this number I would
8   assume.
9        Q.   Well, the 70 billion would not be
10  all of the assets that Barclays was going to
11  acquire under the initial Asset Purchase
12  Agreement, correct?
13       A.   The 70 billion --
14       Q.   The 70 billion long, subsection D
15  of the purchased asset list did not constitute
16  all of the assets that Barclays was going to
17  obtain in the initial Asset Purchase
18  Agreement, right?
19       A.   No, of course not.  There's
20  obviously numerous subsections that delineate
21  the purchased assets.
22       Q.   Right.  For example, one of the
23  other subsections was 50 percent of the RESIs,
24  right?
25       A.   Yes.

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   And the total RESIs at that time
3   add a Lehman value of $6 billion
4   approximately; is that right?
5            MR. TAMBE:  Objection to the form
6   of the question.
7        A.   I think we've covered this.  And,
8   again, I've got confusion as to what
9   constituted the RESIs.  I've never seen a real
10  separate stand-alone list of what those RESIs
11  were and which CUSIPS made up that number.  I
12  could rattle off what I do recall about it.  I
13  know on the financial schedule attached --
14  that was referred to in the APA, I believe
15  mortgage assets are stated at 2.7 billion but
16  I --
17       Q.   Was that mortgage assets or half
18  of the mortgage assets?
19       A.   My vague recollection is that that
20  is half, but I'm not a hundred percent
21  certain.
22       Q.   Okay.  But, in any event, whether
23  it be 2.7 billion or 3 billion, that was
24  separate from the 70 billion subsection D long
25  positions as listed out in the Asset Purchase

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   Agreement?
3        A.   Yeah, I believe that's the
4   understanding I got actually from the Steven
5   Berkenfeld deposition.
6        Q.   And from looking at the -- that's
7   consistent with your reading of the APA,
8   correct?
9        A.   Yes.
10       Q.   Which is a number of different
11  assets.
12            MR. THOMAS:  Let me go ahead and
13  mark another document.  It will be 468A.
14       (Deposition Exhibit 468A, document
15  bearing production numbers AM 004734
16  through AM 004738, marked for
17  identification as of this date.)
18  BY MR. THOMAS:
19       Q.   This is an e-mail from Jamie
20  Schwarz.  Is that someone who works for
21  Alvarez?
22       A.   I believe so.
23       Q.   And to a number of people that
24  work at Alvarez?
25       A.   Yes, I recognize all these people

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   as being Alvarez people.
3        Q.   And this is dated September 22nd,
4   which is -- 2008, the date of closing.  Can
5   you describe what work this is a part of?
6            MR. TAMBE:  Objection to the form
7   of the question.
8        A.   Well, if I understand what you're
9   asking, I think it would be an attempt early
10  on to categorize and inventory the assets that
11  were transferred to Barclay so that we knew
12  what we were obligated to deal with in the
13  administration of the estate versus what we
14  were not obligated to deal with.
15       Q.   And why was it important for
16  Alvarez to figure that out?
17       A.   It's self-evident to me.  I mean,
18  our mission was to administer the wind-down of
19  the Lehman Brothers estate.  You've got to
20  know what assets are yours in order to begin
21  that process.
22       Q.   If you would turn to the last page
23  of this exhibit.  It says Holdings Barclays
24  Deal up at the top.
25            Do you see that?

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   Under the included assets, the
4   fourth bullet point, it says Trading Assets,
5   47 billion long, and then it lists certain
6   securities underneath it.
7        A.   Yes.
8        Q.   Would that be consistent with the
9   notion that the 47 billion number was related
10  to subsection D of the purchased asset list?
11       A.   Yes.  The terminology is
12  consistent.
13       Q.   Does this refresh your
14  recollection as to whether it was Alvarez's
15  understanding that the $47 billion figure was
16  related not to the total of all assets in the
17  deal but to what had become of the $70 billion
18  long position?
19            MR. TAMBE:  Objection to the form
20  of the question.
21       A.   That's a reasonable inference to
22  me, yes.  When I read the testimony, I
23  assumed, because she started talking about
24  70 billion, she was talking about the
25  corollary of that a few days later.  So I

Page 202

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2    would -- that would be my inference on the
 3    face of the court transcript.
 4         Q.   Thank you.
 5              When was the -- so there was no
 6    analysis of the deal by Alvarez prior to
 7    closing?
 8         A.   No.
 9         Q.   Okay.  Sorry I'm pausing but I'm
10    actually cutting stuff out.  So it's a
11    productive pause.
12              (Pause on the record.)
13         Q.   Let's move to the cure and comp
14    figures, which I believe is one of the depo
15    topics.
16              Can you tell me everything you
17    know either in your capacity as the LBHI or
18    Alvarez witness about how the comp figure
19    referred to in the purchase agreement was
20    derived?
21         A.   At what point in time?  I'm
22    just -- I want to make sure -- the topics seem
23    to focus on what we knew at the time the deal
24    was being done, and I think we've established
25    we knew nothing about this deal at the time.
```

Page 203

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2    So at what point in time?  You know, there's
 3    been a lot of discovery on that topic.  I'm
 4    just trying to narrow down what you want from
 5    me.
 6         Q.   Okay.  Let's start with -- let's
 7    start with what you know now at any time.  So
 8    your total knowledge of what the comp figures
 9    were.
10         A.   Total knowledge of what the comp
11    figures were.  Do you mean total knowledge of
12    how it was derived in the context of the deal?
13         Q.   Yes.
14         A.   Well, our current knowledge is
15    embodied in the discovery and Rule 60(b)
16    motion and the exhibits thereto, but if I can
17    try to characterize that as best I can sitting
18    here now, I think there was real confusion in
19    the record thus far as to whether that was
20    derived from Lehman people and given to Barclays
21    or whether it was a negotiated amount.  I know
22    I've heard in some ways contradictory
23    testimony from people as to how they derived
24    that number.  And I have some lack of clarity
25    sitting here even today as to specifically how
```

Page 204

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2    the number was derived.
 3         Q.   Other than just kind of reading
 4    testimony and litigation materials, do you
 5    have any knowledge as to how that was -- the
 6    comp number was derived, such as by speaking
 7    with people at Lehman or speaking with people
 8    at Alvarez or review of Lehman documents?
 9         A.   Well, I'm not familiar and I could
10    be not remembering this correctly, but I don't
11    recall that there was any sort of empirically
12    derived build-up of how the number was put
13    together at that time.  I've never seen a
14    schedule that says here's our comp accrual.
15    Here's how we're building this up for purposes
16    of a negotiation what the number should be.  I
17    don't have an understanding of that kind of
18    support for it.
19         Q.   Um-hum.  Was it your understanding
20    that the comp figure included severance as
21    well as bonuses?
22         MR. TAMBE:  Objection to the form
23    of the question.
24         A.   No.  I think severance is in a
25    separate section of the agreement.  Severance
```

Page 205

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2    is 9.1(b), if I'm not mistaken.  Bonus is
 3    discussed in 9.1(c).  So I think it's a
 4    separate concept, as I understand it.
 5         Q.   Let me go ahead and show you a
 6    document we'll mark as 469A.
 7              (Deposition Exhibit 469A, document
 8    bearing production numbers
 9    BCI-EX-00115450 through BCI-EX-00115462,
10    marked for identification as of this
11    date.)
12    BY MR. THOMAS:
13         Q.   Do you recognize this document?
14         A.   I believe I've seen this, yes.
15         Q.   And when did you see it?
16         A.   I would have seen this in the
17    course of the Rule 2004 discovery motion as I
18    best recall.
19         Q.   I think I asked you before.  Brett
20    Beldner, do you know if he's still at Lehman?
21         A.   I don't know.
22         Q.   Okay.  Who is Robert Azaron?
23         A.   He was a Lehman employee.  I
24    assume he still is but I don't know that.
25         Q.   And Marie Stewart?
```

Page 206

P. KRUSE - HIGHLY CONFIDENTIAL

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        A.   I don't know that name.
3        Q.   Paragraph 6 here says the comp
4  accrual and cure payment accruals are just
5  estimates.  And then it says comp for a year
6  should probably not be the full accrual and
7  cure payment should be actual.
8             Do you understand what the
9  parenthetical means?
10       A.   Other than just the English
11 interpretation of what it says, I don't have
12 any particular insight about it, no.
13       Q.   Okay.  On the next page for cure
14 payments it says Placeholder for actual
15 accrual.
16            Do you see that?
17       A.   Where are you?
18       Q.   I'm sorry.  I'm looking at the
19 wrong document.
20            MR. TAMBE:  The Bates number?
21            MR. THOMAS:  Hold on.  I have the
22 wrong -- let me see if I can find it.
23 Well, you may get a pass on this
24 document.
25       Q.   All right.  Can you describe at

Page 207

P. KRUSE - HIGHLY CONFIDENTIAL

1        P. KRUSE - HIGHLY CONFIDENTIAL
2  all the process at Lehman for how the bonus
3  number was calculated other than based on your
4  reading of litigation materials?
5        A.   The process that Lehman employed
6  in the ordinary course?
7        Q.   Yes.
8        A.   Of computing its compensation
9  accrual?
10       Q.   Sure.
11       A.   I know I've been in conversations
12 around this.  The best of my recollection
13 sitting here today, I know that they -- for
14 the cash portion Lehman has had a cash and a
15 stock portion of their bonus that went to
16 their people in any given year.  The cash
17 portion was accrued ratably through the year.
18 As I understand it, the stock portion vested
19 at a given date after the end of the year and
20 therefore wasn't part of the accrual.  I've
21 heard I think Ian Lowitt testified in his
22 deposition on this particular subject and he's
23 in a much better position from I am to get
24 that characterization correct.
25       Q.   Um-hum.  And are you -- now, as

Page 208

P. KRUSE - HIGHLY CONFIDENTIAL

1        P. KRUSE - HIGHLY CONFIDENTIAL
2  part of the forensic analysis you did when you
3  became concerned over these assumed
4  liabilities, did you determine how much
5  Barclays actually spent on compensation in
6  2008 for the Lehman employees that came over?
7        A.   We had no way of knowing what
8  Barclays spent on compensation.
9        Q.   Okay.  Were you aware that
10 Barclays paid a higher percentage of cash
11 compensation as compared to Lehman?
12       A.   I've come to the realization
13 seeing the employment agreements in --
14 produced in discovery.
15       Q.   And so even if there can be total
16 compensation is going to be the same as Lehman
17 Brothers and Barclays, Barclays would have to
18 accrue more because they pay more in cash
19 versus Lehman who is going to pay a higher
20 percentage in Lehman stock; is that fair?
21       A.   Well, I don't know how Barclays
22 accounts for it.  I don't know if they have
23 that same distinction between cash and stock.
24 I think from an accounting standpoint it
25 depends on the terms of the stock grants and

Page 209

P. KRUSE - HIGHLY CONFIDENTIAL

1        P. KRUSE - HIGHLY CONFIDENTIAL
2  how they inure or accrue or vest to the
3  employee.  If it's a cliff vesting, you may
4  not record them until after they're granted.
5  It just depends on the facts and
6  circumstances.  I don't know how Barclays
7  accounts for that.
8        Q.   And with respect to the cure, the
9  assumption of the compensation requirement or
10 liability, what with respect to compensation
11 gave you concern?
12       A.   Well, I think the insight in that
13 is embodied in the letter that I think Brian
14 Marsal sent on February 19th to Jonathan
15 Hughes at Barclays.  And in that letter we --
16 it gives a sense of what we're seeing in the
17 books and records of Lehman at the time as to
18 how -- what was on the books for compensation,
19 and it's not close to $2 billion.  So we're
20 just asking the question to Barclays, help us
21 understand this.
22       Q.   In terms of the cure and
23 transaction payment amounts that assumed the
24 liability, do you know how that was
25 calculated?

Page 210

1       P. KRUSE - HIGHLY CONFIDENTIAL
2       A.   I'm sorry.  The cure?
3       Q.   Do you know how they came up with
4  the cure amount?
5       A.   In the context of the deal --
6       Q.   Yes.
7       A.   -- and how it was depicted in
8  the -- for example, the financial schedule?
9       Q.   The 1.5 billion that was
10  referenced to the court.
11      A.   Yeah.  The reference as 1.5 in the
12  court as we know is referenced as 2.25 billion
13  in the financial schedule.  Again, a lot of
14  ambiguity in the record as I currently
15  interpret it as to how that number was
16  derived.  At a minimum it appears to have been
17  dramatically overstated as to what the actual
18  cost in my view was.
19      Q.   You understood that it was on the
20  face of the agreement and, as mentioned to the
21  court, it was a kind of a maximum estimate of
22  a maximum potential exposure.
23          MR. TAMBE:  Objection to form.
24      Q.   I mean, Barclays could have
25  incurred zero cure under the terms of the

Page 211

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  agreement.  What was estimated was a maximum
3  potential exposure, correct?
4       A.   I don't know if that's how it's
5  cure -- I don't think it's characterized as
6  the maximum potential exposure.  It might be.
7  I just don't recall that.
8       Q.   Okay.  I mean, it certainly wasn't
9  something -- I mean, you don't understand that
10  Barclays had determined at that point in time
11  what contracts it was going to assume, right?
12      A.   I understand that process was
13  ongoing after the closing to some extent.
14      Q.   But prior to the closing time, I
15  mean, you had no idea which, if any, contracts
16  Barclays was going to assume, correct?
17      A.   I've seen indications that appear
18  to me to be coming from preclosing documents
19  that would suggest there were people who knew
20  that that liability was grossly overstated at
21  $1.5 billion.
22      Q.   But, again, it wasn't the sort of
23  liability that was going to be taken on.
24  Would you agree it's a potential exposure
25  because Barclays could choose how many and

Page 212

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  which contracts it wanted to assume?
3       A.   You probably don't need me to
4  characterize how it's laid out in the
5  agreement.  I agree it's not a hard and fast
6  number in the agreement.  It's an estimate as
7  characterized.
8       Q.   Well, I'm asking you in terms of
9  your understanding, what LBHI's understanding
10  was prior to closing and after closing as to
11  whether that was an estimate of supposedly
12  what was going to be actually incurred or was
13  it simply an estimate of potential exposure?
14      A.   I'm not sure I can make that
15  distinction.  It was -- you would expect a
16  liability to be estimated to your best
17  efforts.  It doesn't appear to me that that
18  was done.
19      Q.   How would -- if it wasn't known
20  which contracts would be assumed, how would
21  one go about trying to figure out what would
22  be the actual cure amount?
23          MR. TAMBE:  Objection to form.
24      A.   At a high level you could look at
25  the accounts payable activity and look at --

Page 213

1       P. KRUSE - HIGHLY CONFIDENTIAL
2  get some bearings as to, okay, what are the
3  significant contracts, what do we think we
4  need, they're mission critical to run the
5  business.  I've seen indications in some of
6  the documents that are included as exhibits
7  that would suggest -- one of them I recall, if
8  I'm not mistaken, was produced in the Cox
9  deposition and there was notes up to the side
10  that would suggest Cox had an understanding or
11  whoever wrote that note had an understanding
12  that the real liability was really only $200
13  million.  Not 1.5 billion or 2.25 billion.
14      Q.   But other than your kind of
15  interpretation of the litigation materials
16  that you referenced as part of this
17  litigation, do you have any knowledge as to
18  how that figure was calculated?
19          MR. TAMBE:  Objection to the form
20  of the question.
21      A.   At the time?
22      Q.   Did you at the time?
23      A.   Well, certainly not at the time.
24      Q.   Do you now have any knowledge
25  other than your reading of litigation

Page 214

1          P. KRUSE - HIGHLY CONFIDENTIAL
2  materials?
3            MR. TAMBE:  Object to form.
4      Q.   Or being advised by Jones Day.
5      A.   I don't think there's any evidence
6  in the record to suggest that a good faith
7  effort to derive that number prior to closing.
8  Or to support that number prior to closing of
9  the deal.
10     Q.   You're characterizing your view of
11 kind of the record.  My question is just a
12 little bit different.  I just want to make
13 sure I understand whether you have any
14 information other than your characterizing the
15 litigation record about how that was
16 calculated.  I mean, have you talked to people
17 that are involved?  Did you go back and look
18 at documents and so forth?
19     A.   It's hard for me to parse that
20 because my current understanding is based on
21 the litigation record.  I don't have an
22 independent understanding apart from, you
23 know, the work I've been doing in support of
24 this matter.
25     Q.   Okay.  So I just want to make sure

Page 215

1          P. KRUSE - HIGHLY CONFIDENTIAL
2  for preparation -- for discussion of this
3  topic you didn't go back and talk to people or
4  look at documents other than the litigation
5  materials.
6      A.   No.  I looked at the documents we
7  discussed this morning.  I think that's --
8  we've covered that.
9            (Deposition Exhibit 470A, document
10      bearing production numbers
11      LBHI_SEC07940_927774 through
12      LBHI_SEC07940_927779, marked for
13      identification as of this date.)
14 BY MR. THOMAS:
15     Q.   Was Alvarez aware prior to the
16 closing that there were transaction
17 adjustments made to the cure and comp figures?
18           MR. GATTO:  Object to the form.
19     A.   Was Alvarez aware there were
20 transaction adjustments made to the comp and
21 cure.  I think what you're going to show me is
22 a balance sheet that has the transaction
23 adjustment on it that might have been copied
24 to A&M at some point in time.  I don't think
25 anybody had an understanding of that or put a

Page 216

1          P. KRUSE - HIGHLY CONFIDENTIAL
2  focus on that at the time.
3      Q.   Well, let me see if this is what
4  you think I was going to show you.  It's
5  Exhibit 470A.  Have you seen this document
6  before?
7      A.   I believe I have.
8      Q.   Is this the document that you were
9  referring to?
10     A.   What I was fixated on was the
11 balance sheet so I have to look at this and
12 see if it jogs my memory.  There were -- it
13 was characterized as transaction adjustments
14 in the document that I was thinking of.
15           (Document review.)
16     A.   It's not the exact document but
17 it's probably not dissimilar to the one I was
18 thinking about.
19     Q.   Okay.  Let me -- this is a
20 document from Martin Kelly at Lehman.  And
21 it's sent to, among others, David Coles at
22 Alvarez and John Suckow.
23     A.   Suckow.
24     Q.   Suckow.  And James Fogarty.
25 They're all at Alvarez; is that right?

Page 217

1          P. KRUSE - HIGHLY CONFIDENTIAL
2      A.   Well, Dan Fogarty is no longer at
3  Alvarez.  I think you're aware of that.
4      Q.   And this is sent very early in the
5  morning it appears, late on September 19th,
6  2008, 1:12 a.m.  So it's really more like
7  very, very late on the 18th.  And the lower
8  e-mail from David Coles to Kristy Wong at
9  Lehman.  It says, "Kristy, some colleagues and
10 I have met on Tuesday and discussed the
11 consolidated balance sheet and the likely post
12 Bar Cap sale -- " it says BS.
13     A.   Balance sheet.
14     Q.   Oh, balance sheet.  Okay.  Sorry.
15 Not an accountant.
16           "Martin suggested we could get
17 some information from you.  Do you have a
18 current consolidating BS file by entity that
19 you could send or grant us access?"
20           Now, I had thought you had said
21 that Alvarez prior to closing was really not
22 doing any work relating to the sales
23 transaction.  Can you describe to me what's
24 going on here?
25     A.   Yes.  We were trying to understand

Page 218

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  what the entry was going to look like post
3  sale. What's the domain of assets and
4  liabilities we need to deal with. I think
5  that's exactly what they're asking about here.
6  They want a balance sheet that depicts the
7  entity and then the deal gets done.
8      Q.    So as part of that they wanted to
9  know what assets and liabilities were being
10  transferred as part of the sale transaction,
11  correct?
12      A.    You could probably say that by
13  inference but I think the focus on our part
14  would have been what are we going to be
15  responsible for managing.
16      Q.    Do you know -- have you seen the
17  spreadsheet that's attached before?
18      A.    I believe I have. Again, I have a
19  recollection of seeing this.
20      Q.    And you see that there's a
21  Transaction Adjustments column on the
22  right-hand side?
23      A.    Yes.
24      Q.    And then if you go a couple more
25  pages to the Bates ending in 778 you'll see

Page 219

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  under Payables there's transaction adjustments
3  for the bonus payable and a cure payments
4  accounts payable.
5      Do you see that?
6      A.    I'm not there yet. I'm sorry.
7      Q.    The page ending Bates number 778.
8      A.    Yes.
9      Q.    Under Payables.
10      A.    Yes.
11      Q.    Do you see where there's
12  transaction adjustments for the bonus payable
13  and cure payments/accounts payable?
14      A.    Yes.
15      Q.    Do you know if Alvarez was
16  concerned about the fact that there were
17  transaction adjustments to this amount?
18      A.    No. Again, I think our focus was
19  not on the transaction or -- itself. It was
20  on help us understand the assets and
21  liabilities we need to be focused on as we
22  begin to administer the wind-down of this
23  estate.
24      Q.    It's fair to say at least Alvarez
25  was aware of the fact that there was

Page 220

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  transaction adjustments to these items.
3          MR. TAMBE: Objection to the form.
4      A.    I could not say one way or the
5  other whether anybody focused on that. I
6  don't think -- if I were them at the time and
7  what I would have been thinking about I would
8  not have focused on it.
9      Q.    Did you talk to these people to
10  see if they focused on it? These people being
11  the ones that received this at Alvarez.
12      A.    I've spoken to John Suckow so I
13  know that John would not have been thinking
14  about this at the time. Jim Fogarty you're
15  going to get him in a couple of weeks.
16      Q.    Did you ask Mr. Suckow about comp
17  and cure and --
18      A.    I did not ask him specifically
19  about this document. But I reasonably
20  certain given significant interaction with
21  John that he would not have focused on
22  this at the time.
23      Q.    What was your -- why did you call
24  John?
25          MR. TAMBE: Objection to the form

Page 221

P. KRUSE - HIGHLY CONFIDENTIAL

1
2  of the question.
3      Q.    For purposes of this deposition?
4  I think you said you called --
5          MR. TAMBE: Object to the form.
6  He interacts with John almost on a daily
7  basis.
8          MR. THOMAS: I think the testimony
9  was he called him for purposes of
10  deposition.
11          MR. TAMBE: I'm not sure that's
12  what he said so why don't you --
13          MR. THOMAS: Yeah.
14      A.    I reached out to John initially in
15  the context of I think what you're asking when
16  I was shown the October 8th, 2008 Unsecured
17  Creditors Committee presentation because I had
18  never focused on the slide that you questioned
19  me about earlier. And, as I said, most of the
20  A&M team was in and out throughout that
21  process. And I wasn't present at the time
22  this was discussed. John was there the entire
23  time. So I asked John, Do you have any
24  recollection of how this was talked about.
25  You know, what concerns might have been there

Page 226

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2   found the question curious because you
3   guys have the GFS system, we don't.  We
4   have to ask you for data about GFS
5   system.  And we did in discovery.
6   That's how we got it.  So you know more
7   about it than we do.
8        MR. THOMAS:  I will confess I
9   don't know anything so I'm going to
10  just --
11       MR. TAMBE:  I wasn't sure if you
12  knew about it when you were asking the
13  questions anyway but we don't have
14  access --
15       MR. THOMAS:  I know it exists but
16  these little technical details maybe
17  we --
18       MR. TAMBE:  No, we don't have
19  access to it.  So we can't just go into
20  GFS and make queries.  We have to ask
21  you, Barclays, to give us data that we
22  can then review so...
23       MR. THOMAS:  Yeah.
24  BY MR. THOMAS:
25  Q.   Are there any other records
```

Page 227

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2   generated by the marking process?
3   A.   I don't know.  I don't have
4   perhaps extensive understanding of the
5   intricacies of the system that you're looking
6   for.  I do think there's much better resources
7   for you to find out under Barclays' right
8   now.
9        MR. THOMAS:  Why don't we go ahead
10  and take a short break and see how much
11  more I have left.
12       THE VIDEOGRAPHER:  The time is
13  3:30.  We are going off the record.
14   (Recess taken.)
15       THE VIDEOGRAPHER:  The time is
16  3:41.  We are back on the record.
17  BY MR. THOMAS:
18  Q.   Mr. Kruse, I'd just like to walk
19  through some of the deposition topics if you
20  want to pull that -- Exhibits 1 and/or 2 out.
21  I think they're pretty identical.
22  A.   I think you mean 457A and 458A.
23  Q.   Oh, yeah.  That's true.  You're
24  ahead of me.  Excuse me.
25       In looking at topic 2 in terms
```

Page 228

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2   of -- excuse me.  Topic 3.  In terms of when
3   you understood that Barclays acquired -- was
4   acquiring the repo collateral, the clearance
5   box assets, the 15(c)3 assets and the
6   exchange-traded derivatives, and the margin,
7   with respect to you, Alvarez, and we can go
8   back through these exhibits if you want, but
9   certainly as of the e-mail description of the
10  deal by Weil the week after the deal, it's
11  fair to say that Alvarez was aware of these
12  things.
13       MR. ROTHMAN:  Objection to form.
14  A.   Well, I can't attest to how much
15  we would have focused on all the details of
16  that Weil attachment.  I think -- I tried to
17  describe our focus for what it was.  It was
18  really on what's ours and what do we need to
19  be concerned about from an estate
20  administration standpoint.
21  Q.   But putting aside whether that was
22  really your focus at the time, it was
23  information that you had that was provided to
24  you by Weil?
25  A.   Yes.
```

Page 229

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2   Q.   I mean, that was your
3   understanding.  The topic is just when Alvarez
4   understood that Barclays acquired the repo
5   collateral, the clearance box assets, the
6   15(c)3 assets, the exchange-traded derivative
7   and the margin.  If it wasn't -- it was
8   roughly in that time at least within a week or
9   so after closing.  That fair enough?
10       MR. TAMBE:  Objection to form.
11       MR. ROTHMAN:  Join.
12  Q.   I can give you a date if you want.
13  For example, the September 27th e-mail from
14  Weil to a number of people at Alvarez
15  describing the purchase assets.  Roughly in
16  that time period that Alvarez -- certainly by
17  that time period Alvarez would have been aware
18  of -- that Barclays was acquiring those
19  assets, correct?
20       MR. TAMBE:  Objection to form.
21  A.   Generally, yes.
22  Q.   And now putting on your LBHI hat,
23  is it your understanding that Weil who drafted
24  the deal documents, was obviously LBHI's
25  counsel, was obviously aware that Barclay was
```

1      P. KRUSE - HIGHLY CONFIDENTIAL
2    acquiring those assets prior to closing?
3          MR. ROTHMAN:  Objection to the
4    form.
5      A.   Yeah.  As I interpret the
6    e-mail you're referring to
7    where Weil is summarizing the deal terms, I
8    took that to mean they're summarizing, you
9    know, the documentation to the deal, the APA,
10   the clarification letter, et cetera, and
11   putting their own interpretation on that.
12     Q.   So that reflected -- sorry.  So
13   that reflected Weil's understanding.
14     A.   That would be my inference, yes.
15     Q.   Now, number 4, topic 4 deals with
16   communications to or from interested parties.
17   When's the first time that you're aware of
18   post-closing communications between Lehman or
19   Alvarez and the trustee about the terms of the
20   sale?
21     A.   I think this got covered and I
22   recall talking about the December 15th, 2008
23   meeting we had with Hughes Hubbard and certain
24   other representatives.  Including a person
25   from Deloitte & Touche.  That's the first

1      P. KRUSE - HIGHLY CONFIDENTIAL
2    formal communication with the trustee that I'm
3    aware of about the deal.  There may have been
4    others but, you know, that's -- again, we were
5    doing our own diligence on this sale motion
6    order at that point.
7      Q.   Are you aware of any other
8    informal earlier communications?
9      A.   I'm not aware of any, no.
10     Q.   Is it fair to say the
11   information -- any information that you
12   learned about the sale transaction that was
13   news to you after -- let's say after October
14   had to do with the liabilities that you
15   discussed earlier?
16         MR. TAMBE:  Objection to the form
17   of the question.
18     A.   Sorry.  I want to make sure I
19   understand the -- can you repeat it?
20     Q.   Sure.  I mean, just -- is there
21   any material about the sale transaction that
22   you learned after October in your view?  And I
23   think you mentioned earlier some -- you
24   mentioned earlier something about the
25   liabilities.  Is there anything other than the

1      P. KRUSE - HIGHLY CONFIDENTIAL
2    liabilities that you mentioned earlier that
3    you view as significant about the sales
4    transaction?
5          MR. TAMBE:  Objection to the form
6    of the question.
7      A.   As I sit here right now, I know
8    some of the work that we were doing in
9    connection with the sale motion order that was
10   approved by the court on I believe December
11   23rd of 2008, we were doing some work to
12   understand all the facts and information laid
13   out in that motion along with the declarations
14   attached.  So we were learning probably new
15   things at that point about the 7 billion.  I
16   think there was a fair amount of confusion on
17   our part what really happened and there's
18   still some confusion, I'm not sure the record
19   is completely clear on how and why JPM kept
20   the 7 billion and what the basis of that was.
21   But we were learning things in that context
22   certainly.
23     Q.   Okay.  About the 7 billion.
24   Anything else stand out to you?
25         MR. TAMBE:  Objection to the form

1      P. KRUSE - HIGHLY CONFIDENTIAL
2    of the question.
3      A.   Nothing that we haven't already
4    talked about today.
5      Q.   Okay.  And on the liabilities,
6    just to bear down a little bit on what you
7    learned that was new after October about the
8    liability amounts.
9      A.   We talked about this.  I'm not
10   exactly clear what the distinction, the
11   importance of is October.  But -- because I
12   think I already testified -- I believe it was
13   toward the end of December 2008 when our
14   finance team was finalizing the closing of the
15   filing date books and records.  Issues started
16   to bubble up about the amount of the
17   liabilities for comp and to some extent for
18   cure as well.
19         So that created some questions in
20   our mind at that point.
21     Q.   And can you describe what those
22   issues were precisely?
23     A.   I think the -- they're best
24   characterized in the February 19th letter that
25   Brian Marsal wrote, as I mentioned earlier.  I

Page 234

P. KRUSE - HIGHLY CONFIDENTIAL

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   think that really -- obviously we're asking
3   the question to Barclays help us understand
4   this. Here's what we see. Help us understand
5   this. I think that speaks for itself.
6       Q.   Okay. When --
7           MR. TAMBE: Todd, just before
8   you -- just a point of clarification on
9   that. You talked about discovering
10  something new. I assume you're talking
11  about --
12          MR. THOMAS: I mean, I don't want
13  to --
14          MR. TAMBE: I'll ask the question.
15  Fine. We can do it now or I'll ask the
16  question when you're done examining.
17  Although I think there's --
18          MR. THOMAS: Well, is it really a
19  point of your clarification or are you
20  trying to suggest something?
21          MR. TAMBE: The point of
22  clarification is I'm assuming you're not
23  including everything that's learned in
24  the 2004 process that's new. That
25  wasn't known before the 2004 process.

Page 235

1       P. KRUSE - HIGHLY CONFIDENTIAL
2           MR. THOMAS: No, anything new.
3           MR. TAMBE: Okay. Well, then,
4   that wasn't clear.
5           MR. THOMAS: I think it was.
6           MR. TAMBE: Okay.
7   BY MR. THOMAS:
8       Q.   You understand by new I didn't
9   mean to put a deadline on something.
10      A.   I wasn't think of that obviously
11  when I answered the question. There was
12  clearly a lot of information we gained around
13  all these topics in connection the 2004
14  discovery.
15      Q.   Um-hum. But, I mean, you knew
16  much -- or you knew the assets that had been
17  transferred. You knew the -- what did you
18  learn that was new other than something about
19  what's in the Marsal letter about the
20  liabilities and about the 7 billion?
21      A.   There was never a comprehensive
22  attempt for us to fully evaluate the totality
23  of the deal and the economics of the deal
24  until we started a forensic focus on it in
25  January 2009. So the idea that we knew, you

Page 236

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   know, or focused on this issue at some point
3   prior to that, I think that's wrong. There
4   were a lot of other priorities that we were
5   dealing with and this just wasn't anywhere
6   near the early priorities in that first
7   quarter of the administration of the estate.
8   We were gathering facts early on just to lock
9   it down what went over, what didn't go over.
10  We weren't in any way attempting to
11  comprehensively evaluate the Barclays deal in
12  the first quarter of the administration.
13      Q.   So what was new was further
14  understanding about the economics of the deal
15  based upon your further focus on it? Or were
16  there any new -- I mean, you knew the
17  assets -- you knew very early on even by
18  before the end of September Weil telling you
19  these are the assets that were transferred
20  over. And you knew the liabilities assumed.
21  And you had -- obviously, you had the sales
22  documents. And so what are the -- what
23  material new facts did you learn about the
24  deal after the end of September?
25      A.   You mean other than everything

Page 237

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   that's in the Rule 60(b) motion and the
3   attachments thereto?
4       Q.   Yeah. I mean facts.
5       A.   There are volumes of facts that we
6   learned in connection with that discovery.
7       Q.   Okay.
8       A.   Volumes of information we
9   gathered. The idea that we somehow knew that
10  in September is in my mind ridiculous.
11      Q.   Can you identify some particular
12  facts?
13      A.   Yes. Let's get out the Rule 60(b)
14  motion and read it.
15      Q.   Okay. But I mean as you sit here,
16  can you -- I mean, are there assets that, you
17  know, went over that you didn't know went
18  over?
19      A.   I've tried to describe that there
20  was not a comprehensive valuation of the deal
21  at that -- in those early stages. I've tried
22  to characterize as best I can the context of
23  what we were doing and why. I hope the record
24  is clear on that point but we were not
25  attempting in the first quarter of the

Page 238

P. KRUSE - HIGHLY CONFIDENTIAL

1
2    administration of the estate to do a
3    full-blown valuation of the economics of the
4    deal.  There were things that came to our
5    attention toward the end of that quarter that
6    gave us cause for concern and resulted in us
7    putting more focus on it.
8         Q.    Okay.  And I understand what
9    you're saying about increased focus and not
10   doing a full-blown economic analysis.  I'm
11   just honing in on particular specific facts.
12   There's one thing -- it seems to me you had
13   the facts but you didn't focus on them and do
14   a full-blown economic analysis.  Is that a
15   fair summary of what you're saying?
16        MR. TAMBE:  Objection to the form.
17        A.    We had certain limited facts as a
18   result of trying to gain an understanding
19   early on of what went over and what didn't go
20   over.  We were not attempting to
21   comprehensively evaluate the detail in its
22   totality at that stage of the administration
23   of the estate.  It was not a priority.  There
24   were a lot of other things we felt were a
25   higher priority at that state.

Page 239

P. KRUSE - HIGHLY CONFIDENTIAL

1
2         Q.    If it had been a priority for you
3    and you had tried to do that analysis earlier
4    at the time end of September, early October,
5    are there any facts about assets and
6    liabilities that you did not have that would
7    have prevented you from doing that analysis?
8         MR. TAMBE:  Object to the form.
9         A.    There was a very difficult process
10   we had for getting any information from
11   Barclays.  I think I referred earlier in my
12   testimony to extraordinarily difficult
13   circumstances in getting Barclays to execute
14   under the TSA.  That big focus that we had as
15   it related to Barclays as an entity was
16   getting performance of the TSA.  We were at
17   Barclays' mercy in terms of needing their
18   employees, their systems, their information,
19   their insight.  That was the focus, the
20   immediate most important focus for us early on
21   in the administration of the estate.  If we
22   didn't get that right a lot of things were
23   going to go wrong.  That was the priority.  We
24   weren't focusing on the Barclays deal at that
25   stage.  It would have been in my mind

Page 240

P. KRUSE - HIGHLY CONFIDENTIAL

1
2    irresponsible to put an emphasis on that
3    versus the higher priority of getting the
4    information in hand that we needed to minister
5    and run the estate.
6         Q.    I appreciate that.  And you're
7    stating that very strongly and it's
8    understood.  I just want to know if you didn't
9    think there was any facts in terms of the deal
10   in terms of what assets and liabilities were
11   transferred that you didn't have by the end of
12   September.
13        MR. TAMBE:  Objection to the form
14   of the question.
15        A.    Yes.  There were facts that we
16   didn't have about the deal at the end of
17   September.  Certainly there were many facts we
18   didn't have.
19        Q.    What if any facts would have
20   prevented you from doing the economic analysis
21   that you're doing now?
22        A.    I will again try to communicate
23   the issue we were dealing with.  We weren't
24   getting information openly from Barclays.
25   Shortly after the time that we got the

Page 241

P. KRUSE - HIGHLY CONFIDENTIAL

1
2    information we've seen in these e-mails today
3    where we got the CUSIP level detail of what
4    came over, there were repeated problems in
5    performance under the TSA.  It almost resulted
6    in a lawsuit being filed.  I mean, we had
7    it -- we had the lawsuit drafted and it was
8    going to be served if we didn't get
9    cooperation.  That's the degree to which the
10   performance or the lack of performance under
11   the TSA was a concern of ours.
12        So if you're talking about facts
13   that we knew or didn't know, there were -- the
14   entire process was breaking down under which
15   we needed to administer to the estate because
16   of what we felt was the failure to perform
17   under the TSA by Barclays.  There were
18   significant issues that just administering the
19   estate was becoming -- in an appropriate
20   fashion was becoming an issue.
21        To put an emphasis at that stage
22   on looking back at a deal, again, that was not
23   the focus at the time.  It evolved to be a
24   focus.  But we weren't focusing on that in the
25   first quarter.

61

Page 242

P. KRUSE - HIGHLY CONFIDENTIAL

1  
2   Q.   And my question is not about focus
3  or whether you should have focused or
4  shouldn't have focused or anything like that.
5  It's just -- I just want to know if you -- if
6  by the end of September you understood that
7  assets that were transferred and the
8  liabilities assumed and the fact that there
9  was a delta between, you know, Lehman marks,
10  whether they were stale or not, and the kind
11  of agreed value of the assets for purposes of
12  the deal, what's referred to in your documents
13  as the discount, you understood those things,
14  correct?
15          MR. TAMBE:  Objection to the form
16  of the question.
17      A.   Yeah.  I think we've covered the
18  ground earlier but the characterization of a
19  discount, I believe we were relaying
20  information we got from Paolo Tonucci working
21  for him at the time.
22      Now, I'm sorry.  I've lost track
23  of your question in terms of what you
24  specifically wanted.
25      Q.   I just wanted to make sure -- I

Page 243

P. KRUSE - HIGHLY CONFIDENTIAL

1  
2  don't want to get into whether it made sense
3  to focus on this now or later.  I understood
4  your testimony.  I'm just summing up the
5  things we've gone through and it wasn't that
6  you learned new facts -- you -- strike that.
7          You understood that assets that
8  were transferred as part of the deal and the
9  liabilities assumed including the delta
10  between what one document referred to as stale
11  marks and the value put on those securities by
12  the parties, I mean, you understood all that
13  by the end of September, correct?
14          MR. TAMBE:  Objection to the form
15  of the question.
16      A.   We had certain facts that we had
17  gathered at that time.  We had not evaluated
18  those facts in a comprehensive fashion.  So we
19  weren't in a position -- if what you're
20  ultimately trying to get at is were we in a
21  position at the end of September to file a
22  Rule 60(b) motion, no, I don't believe we
23  were.  We wouldn't have done that without
24  appropriate legal counsel and we hadn't gone
25  down that path until the first quarter of

Page 244

P. KRUSE - HIGHLY CONFIDENTIAL

1  
2  2009.
3      Q.   Right.  I just -- I'm just focused
4  on the facts.  You had the information but you
5  felt you weren't in a position to analyze it
6  at that time because you had other focuses.
7      A.   We had other priorities.
8          MR. TAMBE:  Objection to the form
9  of the question.
10      Q.   Turning to topic number 10, when
11  was to your knowledge a civic liquidation of
12  LBI first considered or planned?
13      A.   Well, presumably if you filed the
14  holding company, as I stated earlier, I think
15  most people would recognize that the
16  broker/dealer is not going to survive forever
17  under those circumstances.  So I would have to
18  believe that there is a recognition that a
19  civic liquidation was going to be occurring at
20  some point relatively soon.  I don't know the
21  specifics of that.  I'm just speaking as a
22  general state of knowledge of analyzing the
23  situation.
24      Q.   Okay.  But you're not aware
25  factually when that was, when it was

Page 245

P. KRUSE - HIGHLY CONFIDENTIAL

1  
2  considered and so forth.
3      A.   No.
4      Q.   Was Alvarez involved in any
5  discussions leading up to the presentation to
6  the court on September 19th, 2008?
7      A.   No.
8      Q.   Was Alvarez involved in the
9  presentation to the court concerning the
10  December 2008 JPMC settlement approval motion?
11          MR. TAMBE:  Objection to the form.
12      A.   No.  Alvarez didn't present to the
13  court in that context.  Weil presented to the
14  court on behalf of Lehman Brothers Holdings.
15      Q.   And did the -- LBHI -- did LBHI
16  coordinate with the trustees and the Creditors
17  Committee in connection with that settlement
18  motion?
19          MR. TAMBE:  Objection to the form.
20  Use of the word "coordinate."
21      A.   Any such coordination, to the
22  extent it happened it would probably be best
23  addressed by Weil because I think it was
24  happening at that level to the extent it was
25  happening.

Page 1

1

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9

10                   Debtors.

10     ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF RICHARD LANDREMAN

14             New York, New York

15              June 16, 2010

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 31053

Page 6

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2     A.   No.
 3     Q.   So perhaps it's best if we go over
 4  some housekeeping rules.  It's easiest and
 5  things run smoothly if you let me finish a
 6  question before responding and I'll try to do
 7  the same and wait to follow up with any
 8  questions until you have finished your response.
 9  If you need to take a break, I just ask that you
10  answer whatever question is pending and then
11  request a break and if it's an appropriate time
12  to break, we'll try to accommodate your request.
13        And, you know, if you have any
14  questions or don't understand a question,
15  please, you know, feel free to ask me to
16  rephrase it and I'll try to clarify.  So with
17  that, let's get started.
18        Mr. Landreman, can I ask you to tell
19  us a little bit about your position with
20  Barclays?
21     A.   I am a director of Securitized
22  Products Independent Valuation Group.  I've been
23  with the firm now for six years.  I manage a
24  team of 11 analysts who perform all
25  securitization tasks related to -- I'm sorry,
```

Page 7

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  all valuation tasks related to balance sheet
 3  assets and that fall within the realm of
 4  securitized products.
 5     Q.   And when you say the Independent
 6  Valuation Group, is that also what's known as
 7  the Product Control Group?
 8     A.   We're a subcomponent of Product
 9  Control.  We're -- we report in to Product
10  Control, but within the Product Control lines,
11  Independent Valuations has been pulled out as a
12  specialty.  I think that was done even before
13  the Lehman acquisition in order to focus
14  valuation resources towards valuation as opposed
15  to line controllers and the accountants who do
16  the daily reconciliations.
17     Q.   Could you explain to me a little bit
18  more about how the PCG group is set up?  You
19  mentioned that the Independent Valuation Group
20  is a subpart.  What other parts are there of
21  PCG?
22     A.   Well, within Product Control, the --
23  or the middle office, they do a lot of
24  reconciliation of the P&L for the lines, the
25  businesses.  So, for example, there may be, for
```

Page 8

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  securitized products, there will be a group of
 3  controllers who manage the daily balance sheet
 4  P&L process for the business and then, on a
 5  monthly basis, that group is tasked with having
 6  the assets on the balance sheet independently
 7  reviewed by a pricing expert to make sure that
 8  the general ledger that's being reported and
 9  published is reviewed.
10     Q.   And are there any other components of
11  PCG other than reconciliation of P&L as being
12  one group and then your Independent Valuation
13  Group?
14     A.   I mean, there's a Controls Group to
15  make sure that the controls that are set in
16  place are all managed, there's the Valuations
17  Group, there's a Tax Specialty Group and whether
18  those are part of Financial Control or Product
19  Control.  But every -- every business has its
20  own line controller groups.
21     Q.   And when you say every business, how
22  is it broken down?
23     A.   Well, by product specialties like
24  commodities, securitized products, you know,
25  agency debt, agency mortgages, fixed income,
```

Page 9

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  credit.  All the different businesses that the
 3  bank's involved with.
 4     Q.   And are those official divisions
 5  within PCG by specialty group?
 6     A.   I mean, there would be subject matter
 7  experts who know those assets and those
 8  businesses that would be managing the processes
 9  for each group.
10     Q.   And is it divided between Global PCG
11  as opposed to US PCG?
12     A.   It's a big company.  They're all over.
13  Some businesses are global.  Some businesses are
14  local.  It depends upon the specialty.
15     Q.   And in your six years with Barclays,
16  have you been in the same role the entire time?
17     A.   With the growth of the mortgage
18  business within Barclays during the time that I
19  have been there, my role has gone from price
20  testing to managing larger groups, a larger
21  group of analysts who perform valuation on
22  different mortgage-related assets.
23        When I joined the firm, there was only
24  an agency mortgage desk.  We bought a mortgage
25  servicer.  We bought a sub-prime originator.
```

3 (Pages 6 to 9)

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.   And what would be the difference
3  between price testing as opposed to valuation on
4  different mortgage-related assets?
5      A.   Well, I mean, if I'm giving -- we
6  would always call price testing a theoretical
7  process where the trader gives us a mark and we
8  test that price to see if it's valid.
9      Q.   And by contrast, what would valuation
10  on different mortgage-related assets be?
11      A.   Well, I mean, we'll be performing a
12  valuation on the mortgages.  It's the matter is
13  am I valuing mortgages or am I performing a test
14  of the trader's price?
15      Q.   And in the instance where you're
16  valuing mortgages, is that after the trader has
17  already done it himself or in lieu of the trader
18  doing it himself?
19      A.   Well, when we perform a valuation, it
20  would be the same process regardless of whether
21  I have a trader's price or not, so the way we
22  price or we value securities.
23      Q.   I guess what I'm trying to understand
24  is when would you have a trader's price and,
25  therefore, engage in price testing as opposed to

1      HIGHLY CONFIDENTIAL - Landreman
2  when would you and your group engage in
3  valuation of mortgages in the first instance?
4      A.   I'm not sure that -- what you're
5  asking on that question, because the valuation
6  is really -- it's the same.  It's we're
7  performing a valuation of a security.  The
8  question is, you know, do I have a data point
9  from a trader who is responsible for this to --
10  to review.
11      Q.   Following up on that, when would you
12  have a data point from a trader to review as
13  opposed to when would you not?
14      A.   We would have a data point to review
15  if the traders own the assets because they're
16  required to mark their portfolios to market on a
17  daily basis.
18      Q.   And so would you, in the event that
19  it's a new position, be the person or the group
20  to value it in the first instance?
21      A.   No, the trader would.  Whatever the
22  trader actually acquired the asset for or traded
23  it for.
24      Q.   And so you would be valuing it
25  subsequent to the acquisition of it at whatever

1      HIGHLY CONFIDENTIAL - Landreman
2  price the trader --
3      A.   Right, we would be given the
4  population at the end of the month and this is a
5  portfolio and these were the trader's marks at
6  the time.
7      Q.   And you would engage in a ground-up
8  valuation of the securities as opposed to just a
9  theoretical price testing in that instance?
10      A.   Correct.  Well, in all instances, the
11  valuation --
12          MR. THOMAS:  Go ahead and let her
13  finish her question.  You're starting to
14  anticipate the finish of her question.  But
15  pause and let her finish her question,
16  please.
17          THE WITNESS:  Okay.
18      Q.   It might help just to have a document
19  in front of us.
20          I'm going to put in front of you what
21  we have premarked as 799B.
22          (Exhibit 799B, Exhibit C, described as
23  Bio for ABS, marked for identification, as
24  of this date.)
25      Q.   Mr. Landreman, I have put in front of

1      HIGHLY CONFIDENTIAL - Landreman
2  you what I will represent to you was attached to
3  an exhibit to a brief filed by counsel for
4  Barclays in opposition to a motion we had filed
5  to exclude Barclays' expert, Professor Paul
6  Pfleiderer.
7          Have you ever seen this document
8  before?
9      A.   This document in front of me, yes.
10      Q.   And when did you see this document?
11      A.   I mean, I have a bio for my group and
12  I've had this and the bio for my group always in
13  existence because I always have qualifications
14  of my staff available for audit and regulatory
15  reviews.  So this is a standard document that we
16  normally have.
17      Q.   And is this document itself the bio
18  for your group that was already in existence?
19          MR. THOMAS:  Objection to form.
20      A.   I'm sorry?
21      Q.   Perhaps let me rephrase that.  Did you
22  assist in preparing this document for purposes
23  of this litigation?
24      A.   This document was in existence for at
25  least for my group prior to this litigation.  So

HIGHLY CONFIDENTIAL - Landreman

1
2    it wasn't prepared specifically for this
3    litigation. It was a standard document that we
4    would have on file.
5        Q.    And when you say for your group, do
6    you mean the people that fall in the first two
7    pages under I guess 1(A), Fixed Income APS, and
8    1(B), Fixed Income -- I'm sorry, I just mean 1A.
9        A.    Just 1(A).
10       Q.    And if you will look at the top of the
11   document, it says "Global Independent
12   Valuations." Is that the name of your group
13   within the Product Control Group?
14       A.    Correct.
15       Q.    And is that group run by Marcus
16   Morton?
17       A.    Yes, he is -- yes, it is.
18       Q.    And do you directly report to Mr.
19   Morton?
20       A.    In the U.S., there's a U.S. head of
21   Valuations, Charles Utley, and Charles reports
22   directly to Marcus.
23       Q.    And so would it be safe to say that
24   both you and Mr. Teague, who on this list fall
25   under Morton, actually have another layer

HIGHLY CONFIDENTIAL - Landreman

1
2    between, and that would be Mr. Utley?
3        A.    Correct. At the time of the Lehman
4    valuation, we were reporting directly to Marcus.
5    Charles was with the firm, but not in his role
6    as U.S. head of Valuations.
7        Q.    When you say at the time of the
8    acquisition, does that include throughout the
9    period of time thereafter that you were valuing
10   the assets acquired?
11           MR. THOMAS: Objection to form.
12       Q.    Go ahead and answer.
13       A.    Charles was not involved in the
14   valuation of the opening day balance sheet for
15   or in supervising my group at that time.
16       Q.    Could you tell me a little bit about
17   what products would be covered under your group,
18   which appears to be titled "Fixed Income ABS"?
19       A.    We would be doing agency
20   mortgage-backed securities, agency
21   mortgage-backed securities CMOs, collateralized
22   mortgage obligations, all non-agency mortgage
23   structured products, including all day, option
24   ARM, prime, non-Agency RMBS, CDOs, CLOs that
25   were ABS or mortgage-related.

HIGHLY CONFIDENTIAL - Landreman

1
2          CMBS, commercial mortgage-backed
3    securities, asset-backed securities for
4    franchises, credit cards, student loans, auto
5    loans, et cetera.
6        Q.    Would your group also be responsible
7    for munis?
8        A.    No, they would not.
9        Q.    How about corporates?
10       A.    We would not be corporate or agency
11   debentures or Treasuries.
12       Q.    And by that, would another name be
13   rates?
14       A.    That would be under rates, yes.
15       Q.    And how about options?
16       A.    That would not be.
17       Q.    Futures?
18       A.    No.
19       Q.    Equities?
20       A.    No.
21       Q.    With respect to the acquisition of
22   assets from Lehman, what asset classes did your
23   group have direct responsibility for
24   independently valuing?
25       A.    Everything I mentioned earlier.

HIGHLY CONFIDENTIAL - Landreman

1
2    Agency mortgages, agency CMOs, non-agency,
3    mortgage-backed securities, franchise ABS,
4    credit card ABS, student loan ABS.
5        Q.    And is there a specific front office
6    desk or department that corresponds with the
7    assets that you are responsible for valuing?
8        A.    Yes. There's a front office flow desk
9    for various assets, including agency mortgages,
10   non-agency mortgages, all the asset-backed
11   securities, and we also had some proprietary
12   trading desks in place as well that may have
13   owned mortgages that would have been performing
14   valuations that we reviewed their prices as
15   well.
16       Q.    And if we could break it down a little
17   bit more in terms of, is it one desk that would
18   cover all of them? Is it various desks for each
19   of the respective assets?
20       A.    Well, as we manage the businesses, so,
21   for example, Tom Hamilton, who owns the
22   securitized product business, has several
23   traders who manage desks for him, so I will have
24   a trader who only trades agency pass-throughs,
25   who only trades agency CMOs, who only trades all

## Page 18

HIGHLY CONFIDENTIAL - Landreman

1
2  day mortgages.  So you can break it by
3  product specialists and there's a managing
4  director or a director who runs that desk for
5  that business.
6      Q.    And in the process of your group
7  valuing the securities acquired in the Lehman
8  transaction, would you work hand-in-hand with
9  the traders in valuing them or are they
10  independent processes?
11      A.    They're independent processes.
12      Q.    And are they undertaken simultaneously
13  or concurrently?
14      A.    I'm sorry, I don't --
15      Q.    I'm just trying to understand, the
16  processes that are independent, are they being
17  undertaken one after the other or at the same
18  time?
19      A.    Well, the business is required to mark
20  their books on a daily basis, so they mark to
21  market every day.  We're mandated to test on a
22  monthly basis.
23      Q.    Now, this brings us back to something
24  that I think I wasn't understanding from earlier
25  line of questions.  The difference between price

## Page 19

HIGHLY CONFIDENTIAL - Landreman

1
2  testing as opposed to ground-up valuation.
3          When you say that your group
4  normally test on a monthly basis, do you mean
5  price test or do you mean independently value on
6  a monthly basis?
7      A.    There really is not a difference.  I
8  have to perform a valuation in order to conduct
9  a test, so I have to value the securities.
10      Q.    Are there instances where price
11  testing wouldn't involve conducting an
12  independent valuation and might be some other
13  form of testing?
14          MR. THOMAS:  Objection to form.
15      A.    I mean, there could be, you know, some
16  tests that are performed that maybe are like a
17  proxy or a benchmark comparison to similar
18  assets.
19      Q.    I apologize.  I'm still not
20  understanding the distinction you were drawing
21  earlier in terms of the evolution of your role
22  and where you made the distinction between price
23  testing as opposed to valuation of the
24  mortgages, and if you could explain to me what
25  the difference is between what you were doing in

## Page 20

HIGHLY CONFIDENTIAL - Landreman

1
2  your earlier years at Barclays, price testing as
3  opposed to what you were doing in your later
4  years in terms of valuations.
5      A.    Well, early in my career, I was the
6  primary analyst performing the valuation of all
7  of the agency and non-agency mortgages.  It was
8  a smaller business when I first started, and the
9  businesses have all grown since I've been there.
10          So when we acquired the mortgage
11  servicer, I also brought on two staff members to
12  perform valuation of the mortgage servicing
13  rights and also assist in other asset categories
14  that were growing and becoming critical within
15  my world.
16          So I had a staff as of, you know, two
17  years into it, and then, as more and more
18  mortgage product was coming on and the credit
19  crisis was starting to evolve, there was a
20  centralization of all mortgage products into one
21  group.  So that all fell under me, so all of the
22  sub-prime mortgages, we also had sub-prime whole
23  loans when we acquired Equifirst down in North
24  Carolina.
25          So, as the business grew, my group

## Page 21

HIGHLY CONFIDENTIAL - Landreman

1
2  grew, and then we also consolidated all mortgage
3  analytics in one group.  Now I manage a group of
4  12 people, the people that I brought in, I built
5  the team, handpicked the analysts, and now it's
6  really, similar to how the businesses are
7  structured, I have specialists for each group
8  and that person would conduct the price testing
9  or the valuations for those assets and they
10  would perform that regardless of whoever owns
11  the assets.  Because you may have some
12  proprietary trading desks that might own similar
13  assets to what a flow business would be.
14      Q.    And in terms of the business growing,
15  which asset classes were not currently within
16  Barclays' portfolio at the time of the Lehman
17  acquisition that, subsequent to it, they had
18  acquired?
19          MR. THOMAS:  Objection to form.
20          Go ahead.
21      A.    The only category that I recall would
22  have been the franchise ABS.  We didn't have a
23  large presence in the franchise ABS for my
24  world.
25      Q.    How about Alt A?

6  (Pages 18 to 21)

HIGHLY CONFIDENTIAL - Landreman
1
2    A.    We had that business.
3    Q.    And were there dedicated people within
4    your group for each of the categories of ABS
5    covered?
6    A.    There would be people who could cover
7    multiple categories.  So like Victor, Victor
8    Tian would be my Alt A specialist.  He was hired
9    from American Home Mortgage.  He worked on the
10    trading desk at American Home Mortgage
11    structuring Alt A securities.  I had worked with
12    Victor seven years ago in my prior life as a
13    consultant on a Freddie Mac, so I'm aware of his
14    expertise in the product space.
15    Q.    Why don't we continue down the list.
16    Under Victor, and I apologize if I butcher any
17    names here, what would Usman Babar cover?
18    A.    Usman was a Lehman employee, so he was
19    still in the integration period while we were
20    doing the valuations.  He now does like
21    asset-backed credit default swaps and illiquid
22    sub-prime and manages a portfolio valuation
23    which he distributes to people in the group.
24    Q.    And were former Lehman employees that
25    went over to Barclays, were they involved in the

HIGHLY CONFIDENTIAL - Landreman
1
2    valuation of the securities that were acquired?
3    A.    No.
4    Q.    Were they consulted in any way in the
5    process of valuing securities?
6    A.    To a very limited extent.
7    Q.    And what extent would that be?
8    A.    Well, Usman was, you know, familiar
9    with who was doing some of the price testing of
10    the assets, but on my initial interviews with
11    certain people within the firm, I felt that we
12    had a superior process to the valuation
13    methodologies that were being employed within
14    the Product Control space and we only hired two
15    people out of their group.
16    Q.    And were those two people Usman and
17    Jay Park?
18    A.    Yes.
19    Q.    And is that reflective of all that was
20    hired or all that remained?
21    A.    All that was hired.
22    Q.    So let's just continue down the list.
23    Richard Beame?
24    A.    Richard Beame has been with Barclays
25    doing primarily all commercial mortgage-backed

HIGHLY CONFIDENTIAL - Landreman
1
2    securities and commercial whole loans.
3    Q.    And was he the primary person
4    responsible for valuing any CMBS that was
5    acquired from Lehman?
6    A.    No.
7    Q.    And who would have been that person?
8    A.    That would have been Victor Tian and
9    myself.  We didn't receive any investment -- I
10    mean any quality CMBS.  Most of this was mapping
11    to one of the index for defaulted CMBS.
12    Q.    And moving down the list, Scott
13    Ginsberg, what product did he cover?
14    A.    He would have been doing the agency
15    mortgages.  He had been with me for four years
16    at that point.
17    Q.    And was he the primary person
18    responsible for valuing any agency mortgages
19    acquired from Lehman?
20    A.    Yes.  Under my supervision.
21    Q.    Moving down the list to Vincent Pini,
22    is -- would you tell me what his area of
23    specialty is?
24    A.    His area of specialty would have been
25    sub-prime mortgages and mortgage servicing

HIGHLY CONFIDENTIAL - Landreman
1
2    rights.
3    Q.    And did he have primary responsibility
4    for valuing any of the securities that were
5    acquired from Lehman?
6    A.    No.  He would have been a participant
7    in the analysis.
8    Q.    And did he participate in connection
9    with any specific category?
10    A.    Mostly with the sub-prime
11    mortgage-backed securities.
12    Q.    And could you be a little more
13    specific when you say sub-prime?  Would those
14    fall within a specific asset category --
15    A.    The non-agency mortgage-backed
16    securities.
17    Q.    And who else would have been involved
18    in the valuation of the non-agency
19    mortgage-backed securities?
20    A.    Jessica Wong.  There was a large
21    portion of securities that she had a specialist
22    in -- specialist's knowledge in, which were like
23    net interest margin securities and post-NIM, net
24    interest margin residuals, which were very
25    popular in the sub-prime market which we

Page 26

HIGHLY CONFIDENTIAL - Landreman

1
2  received from Lehman, which we looked to see if
3  there was any value to those securities because
4  we had already written off nearly all of ours to
5  zero at that time. So when we got those
6  securities, we wondered what they were.
7     Q. Was anybody else within your group
8  involved in the valuation of non-agency
9  mortgage?
10    A. Imran Ansari would have been involved
11 in the CDOs and CLOs that would have been able
12 to have been modeled within our group.
13    Q. I got confused there because I think
14 he's the only one whose name is backwards.
15    A. No, Imran Ansari. Ansari is his last
16 name.
17    Q. The others are first, last.
18    A. Oh, okay.
19    Q. So, okay. I got it.
20    Anyone else for non-agency mortgages?
21    A. That should be about it.
22    Q. And who had primary responsibility for
23 the valuation of non-agency mortgages?
24    A. Victor Tian.
25    Q. I think we've covered everybody but

Page 27

HIGHLY CONFIDENTIAL - Landreman

1
2  perhaps the last name on the list.
3     A. Eli Bloshtein.
4     Q. Yes. And did he have any involvement
5  in valuing any of the securities?
6     A. Minimal. He would have been -- he's a
7  junior analyst who was part of a finance
8  rotation analyst program. So he would have, if
9  anything, done formatting of reports and
10 learning how to value securities.
11    Q. Earlier when I had asked you about
12 whether any of the former Lehman people who
13 joined your group had any involvement in valuing
14 any of the assets acquired, you had said no but
15 mentioned some interviews at the outset of
16 valuing. And perhaps I'm misstating that.
17    My question really is, at the outset
18 of the valuation process, did you conduct any
19 interviews of any former Lehman employees?
20    MR. THOMAS: Objection to form.
21    A. No, I was -- I returned from vacation.
22 I was handed a group of securities that needed
23 to be valued and I assigned my team the
24 responsibility of commencing the valuations, and
25 we were working on that for a few weeks before I

Page 28

HIGHLY CONFIDENTIAL - Landreman

1
2  actually met anybody from Lehman.
3     Q. So, in the process of valuing any of
4  the securities for which you and your team had
5  responsibility, you did not use any information
6  obtained from Lehman or any information based
7  off of interviews with anybody from Lehman?
8     MR. THOMAS: Objection to form.
9     A. No.
10    (Exhibit 800B, a document bearing
11 Bates Nos. BCI-EX-(S)207964 through 207969,
12 with attachment, marked for identification,
13 as of this date.)
14    Q. Mr. Landreman, I'm going to hand you
15 what has been premarked as Deposition Exhibit
16 800B.
17    MR. THOMAS: When you're saying
18 "premarked," they have been premarked for
19 this deposition? They haven't been
20 premarked in other depositions?
21    MS. CARRERO: Yes, thank you for
22 clarifying. In an effort to save time, I
23 had done it before we started.
24    Q. Let's take a moment to look through
25 the document.

Page 29

HIGHLY CONFIDENTIAL - Landreman

1
2     A. Okay.
3     Q. If I could just direct your attention
4  to the e-mail at the top from Mr. Teague to you,
5  among others, dated October 27. Do you see
6  where in that e-mail it starts, "Each
7  spreadsheet should back up one of the tabs in
8  the attached file," which is followed by a list
9  of asset classes and names next to it?
10    A. Yes.
11    Q. Do the names next to each of these
12 asset classes fairly reflect the people that
13 were working on the valuations of each of those
14 asset classes?
15    MR. THOMAS: Objection to form.
16 Foundation.
17    A. I really can speak to the areas that
18 I'm familiar with, which would be the PMTG and
19 RMBS, which it -- say yes. I would need to see
20 what he -- in terms of rates, I would only be
21 involved in the rates as it related to their
22 mortgage involvement, not the fixed income,
23 Treasuries or agency debentures.
24    Q. Using the asset class names that we
25 had used before, what would PMTG cover?

8 (Pages 26 to 29)

1     HIGHLY CONFIDENTIAL - Landreman
2    A.   Everything in my world.
3    Q.   Could you be more specific?
4    A.   Agency mortgage-backed securities,
5 agency collateralized mortgage obligations,
6 non-agency, all day non-agency sub-prime,
7 non-agency ABS, credit card securitizations,
8 auto securitizations, student loans, franchise
9 securitizations.
10   Q.   And so would it be fair to say the
11 only thing not covered under PMTG that your
12 group is also responsible for is RMBS?
13     MR. THOMAS: Objection to form.
14   A.   I'm sorry, could you repeat that?
15   Q.   My question is, based off of the
16 division within Deposition Exhibit 800B of RMBS
17 and PMTG, I'm asking, does that reflect what
18 your group would cover?
19   A.   Does -- so does the listing of the
20 product categories as defined by Sean in his
21 e-mail coincide with the products that I would
22 price test?
23   Q.   Exactly.
24   A.   As I said, yes, and PMTG, the assets
25 in PMTG that were related to my business would

1     HIGHLY CONFIDENTIAL - Landreman
2 be price tested or valued in my group; and if
3 they held corporates or if they held munis or
4 they held equities, we would distribute those to
5 the subject matter experts who would do the
6 valuation of those specific instruments for that
7 portfolio.
8   Q.   So you cover some asset categories
9 that would fall under PMTG, but not all asset
10 categories that fall under PMTG?
11   A.   Correct.
12   Q.   And your group would cover all RMBS;
13 is that correct?
14   A.   Correct.
15   Q.   And while your name is next to
16 "Rates," your group would not ordinarily cover
17 rates; is that correct?
18   A.   Correct.
19   Q.   And going down the list, starting with
20 rates, next to your name there's a name E-L-L-Y.
21    Do you know who that is?
22   A.   Yes.  That's Elly Pu.
23   Q.   And is Elly Pu within your group?
24   A.   She was in Sean's group working on the
25 municipals valuations.

1     HIGHLY CONFIDENTIAL - Landreman
2   Q.   And by Sean, you mean Sean Teague?
3   A.   Yes.
4   Q.   And how about Scott, do you know who
5 Scott is?
6   A.   Yes.  Scott would be reference to
7 Scott Ginsberg, and he would have been doing the
8 agency mortgage-backed securities.
9   Q.   So some securities within rates would
10 fall under your group's responsibilities; is
11 that correct?
12   A.   Only if they were mortgage-backed
13 securities.
14   Q.   And the term "agency" here reflects
15 agency mortgage-backed securities?
16   A.   I don't know that.  You should ask
17 Sean what he was referencing.
18   Q.   And RMBS next to your name, there's
19 Victor and Scott.  Would that be the Victor and
20 Scott that were referenced on Deposition Exhibit
21 799B?
22   A.   Correct.
23   Q.   Kevin Jhea and Heidi Su, would those
24 be individuals within Sean Teague's group?
25   A.   Correct.

1     HIGHLY CONFIDENTIAL - Landreman
2   Q.   And how about Mr. Washtell?
3   A.   Mr. Washtell is a director in charge
4 of equities.  He would be my counterpart in the
5 equities world.
6   Q.   And did he have primary responsibility
7 for valuing the equity positions acquired from
8 Lehman?
9   A.   It's my understanding that he did, but
10 you may want to check with him just to make
11 sure.
12   Q.   And are you aware of any other asset
13 classes for which he had responsibility valuing
14 securities from the Lehman acquisition?
15   A.   I couldn't say with certainty what
16 other asset categories he covers.
17   Q.   Mr. Landreman, I'm putting before you
18 what has been marked Deposition Exhibit 801B.
19    (Exhibit 801B, a document bearing
20 Bates Nos. BCI-EX-(S)201185 through 201187,
21 marked for identification, as of this date.)
22   Q.   Can you take a moment to review it.
23    If I could direct your attention to
24 the attachment to this document, and --
25   A.   Okay.

Page 34

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.   The very left-hand column has a list
3   of asset classes, and then a column or two
4   columns over, there are lists of names under a
5   column titled "PCG Owner."  Do you see that?
6      A.   Yes, I do.
7      Q.   Are you familiar with most of the
8   names on this list?
9      A.   Yes, I am.
10      Q.   Can we just take a look at the "U.S.
11   Agency CMO" line as well as the "U.S. Agency
12   Pool" line, there's an individual by the name of
13   Joe Kaczka.  Could you tell me who he is?
14      A.   Joe Kaczka is the controller for the
15   businesses, the line controller for the
16   businesses.  He's responsible for the day-to-day
17   middle office operation of the balance sheet
18   reconciliation, the P&L reporting.
19      Q.   So this would tie back to our earlier
20   discussion about the different subgroups within
21   Product Control and the functions of controller
22   as opposed to your group, which did independent
23   valuations?
24      MR. THOMAS:  Objection to the form of
25   the question.  Lack of foundation,

Page 35

1      HIGHLY CONFIDENTIAL - Landreman
2   especially with respect to the document.
3      A.   My understanding is that the names
4   here were the line controllers for the
5   respective businesses that were on this
6   spreadsheet.
7      Q.   And these individuals were not within
8   the Valuation Group, whether it be yours or Sean
9   Teague's; they work for a different part of PCG;
10   is that correct?
11      MR. THOMAS:  Objection to form.
12      A.   Correct.  These were the line
13   controllers.
14      Q.   Are any of these line controllers
15   former Lehman employees?
16      A.   I don't know.
17      Q.   Can you tell me a little bit about --
18   can you tell me, starting with the non-Agency
19   RMBS, how in the normal course you and
20   individuals within your group would go about
21   valuing a security of that class?
22      MR. THOMAS:  Objection to form.
23      A.   For the non-Agency RMBS, as part of
24   our monthly process, we have full transparency
25   to see what our trading desk is doing, so we see

Page 36

1      HIGHLY CONFIDENTIAL - Landreman
2   all of the positions that they buy and sell on a
3   daily basis.  So we monitor those trades and we
4   use those trades as observable benchmarks to
5   produce a spread matrix or a valuation input
6   from those observable trades.
7      Victor manages that process.  So, as
8   we're benchmarking our trades, we'll solve for,
9   using the trade price on that day, we'll solve
10   for a spread.  We'll look at the characteristics
11   of that bond and provide certain measurements in
12   terms of amounts of credit support, current
13   ratings, current delinquency pipelines of that
14   specific bond so we could take the trade price
15   from that bond and make a rationalization as to
16   what a comparable bond might trade.
17      So we track all of the spread
18   matrices.  We look at all of the historical
19   data.  We do also review our competitor spread
20   publications for standard market research.  We
21   do source and obtain vendor prices to see if
22   there's any reliability in some of their marks
23   or their indications.
24      So but it's really on a bond-by-bond
25   basis we will review each bond and we will look

Page 37

1      HIGHLY CONFIDENTIAL - Landreman
2   to see what the current collateral performance
3   is of the underlying bond.  We'll apply a spread
4   to that from an observable trade matrix and
5   perform a valuation and review that in
6   conjunction with our expectations of where we
7   think things would trade or how we currently
8   price things in our existing books and records.
9      Q.   And is there a formal policy and
10   procedure that governs what steps are taken in
11   the valuation process of non-Agency RMBS?
12      A.   Yes.  There was a policy and
13   procedure that's been published and documented
14   and reviewed by internal audit, by PwC.  The
15   entire process is regularly audited by our
16   external auditors and also our internal auditors
17   and other regulatory agencies.
18      (Exhibit 802B, a document bearing
19   Bates Nos. BCI-EX-297092 through 297113,
20   marked for identification, as of this date.)
21      (Exhibit 803B, a document bearing
22   Bates Nos. BCI-EX0297114 through 297134,
23   marked for identification, as of this date.)
24      (Exhibit 807B, a document bearing
25   Bates Nos. PwC-BarCap45788 through 45792,

10  (Pages 34 to 37)

Page 46

1      HIGHLY CONFIDENTIAL - Landreman
2  for securitization purposes, so the majority of
3  this policy was around the valuation of
4  commercial whole loans, and then there was a
5  subsection there for commercial mortgage-backed
6  securities.
7      Q.   Would this policy have governed any of
8  the commercial mortgage-backed securities that
9  were acquired from Lehman?
10     A.   To some degree.  Most of the
11 commercial mortgage-backed securities that we
12 received from Lehman were so bad that we would
13 have put them at the bottom of the scale in
14 terms of you really had to look at the
15 performance of these individual securities and
16 make some judgment around if you were going to
17 get your principal back and how long the
18 interest would be paying, and we looked through
19 each one of these positions bond-by-bond to
20 review the valuations.
21     So I think our policy would state in
22 there that we would look at non-investment grade
23 loan securities, or but it would -- it would
24 cover, you know, what to do to price these
25 securities.

Page 47

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.   So just so I understand, it does or it
3  doesn't cover the CMBS securities that came over
4  from Lehman?
5      A.   It's general guidelines for how we
6  should be pricing securities.  When we created
7  this policy, we never had the low-quality assets
8  that were given to us as part of the Lehman
9  asset group.
10     Q.   So some of the assets that were
11 acquired from Lehman were not valued according
12 to the policy and procedures because they were
13 of a lower grade; is that what you're saying?
14     MR. THOMAS:  Objection to form.
15     A.   They were generally poorly performing
16 securities that should have been priced to this
17 policy or would have been priced in a very
18 similar methodology.
19     Q.   So if they weren't priced to this
20 policy, what policy would they have been priced
21 according to?
22     A.   They would have been priced upon
23 observable trade data, which is part of our
24 policy, is to use observable trade information
25 and other proxy data to provide the best

Page 48

1      HIGHLY CONFIDENTIAL - Landreman
2  estimate of where the security would trade in
3  the market.
4      MR. THOMAS:  To the extent we're going
5  to ask the witness questions about the
6  document, I just ask the witness be allowed
7  time to review the document.
8      MS. CARRERO:  That's fair.  Take as
9  much time as you need to take a look at it.
10     (Document review.)
11     A.   Okay.  So within this policy, 5.1 for
12 secondary trading, secondary bond testing, bond
13 price testing methodology is generally
14 consistent with how we value those securities
15 that we were given that would have fallen under
16 this policy.
17     Q.   And would it be accurate to say that
18 most of the CMBS securities that were acquired
19 from Lehman were valued using prices from late
20 September reflecting sales to desks within
21 Lehman?
22     MR. THOMAS:  Objection to form.
23     A.   We didn't sell anything to Lehman.
24     Q.   My apologies.  I misphrased.
25     Do the prices used for purposes of

Page 49

1      HIGHLY CONFIDENTIAL - Landreman
2  Barclays' acquisition accounting for CMBS
3  reflect internal sales prices to desks within
4  Barclays?
5      MR. THOMAS:  Objection to form.
6      A.   The prices that my group created
7  reflected what we felt were the best estimates
8  of fair value at the time.
9      Q.   And how do those best estimates of
10 fair value correspond, though, with 5.1 of the
11 CMBS policy in Deposition Exhibit 804B?
12     A.   Well, for investment grade CMBS, we
13 would look at spreads that are currently
14 available in the marketplace, and for
15 non-investment grade bonds, we would -- we know
16 that these are much less liquid and we have
17 proxies that we can benchmark to, and also we
18 can model these specific positions and use
19 required yields that we would have expected or
20 we can proxy to comparable bonds in our own
21 books and records, if we had any at those
22 levels.
23     Q.   Perhaps we should take a step back,
24 because what I'm not understanding is, are the
25 prices at which the securities were sold to

Page 50

1      HIGHLY CONFIDENTIAL - Landreman
2   various desks within Barclays the prices that
3   your group came up with using this section of
4   Barclays' CMBS policy, or were you price testing
5   the prices at which they were sold to Barclays'
6   desks?
7      A.   The desks --
8          MR. THOMAS:  Objection to form.
9      Go ahead.  Pause after the question.
10     A.   The desks would have determined the
11  values that they would be willing to acquire
12  assets at.
13     Q.   And so what price was your group
14  coming up with?
15     A.   The prices that we calculated and
16  published as part of the record.
17     Q.   Could you be more specific when you
18  say "part of the record"?
19     A.   I mean, we published the prices that
20  we tested to and our -- all of the support
21  around the prices we created, and the values
22  that we created were part of the working papers
23  that we provided.
24     Q.   Specific to the acquisition balance
25  sheet and the prices used therein for CMBS

Page 51

1      HIGHLY CONFIDENTIAL - Landreman
2   securities, did you price test those prices?
3      A.   I would have to look at the specific
4   securities that you're talking about and see
5   those prices, because I know in my working
6   papers we would have defined how that price was
7   derived.
8      Q.   To save us all a lot of time, I mean,
9   I can go and pull out those working papers, but
10  if on the acquisition balance sheet a price at
11  which the security was sold to a desk within
12  Barclays was used, did you price test that
13  internal sales price?
14         MR. THOMAS:  Objection to form.
15     A.   We would have had our price as well or
16  we would have reviewed the trade price for
17  reasonability, yes.
18     Q.   So there may have been two prices:
19  One that your group generated according to your
20  policies and procedures, and another price that
21  would reflect the price used for purposes of
22  acquisition accounting based on the internal
23  sales price?
24         MR. THOMAS:  Objection to form.
25     A.   If there was a dialogue around a

Page 52

1      HIGHLY CONFIDENTIAL - Landreman
2   trader's mark and it was different than our
3   mark, we would have documented the reason or the
4   rationale why those prices were different and
5   why we would have accepted one price over the
6   other.
7      Q.   So there was a process under way to
8   compare the prices at which positions were sold
9   to desks within Barclays and compared them to
10  the prices that your processes had generated
11  based on your policies and procedures?
12         MR. THOMAS:  Objection to form.
13     A.   It was my understanding that there was
14  a PMTG management book where all of the assets
15  came to and they distributed the assets to the
16  desks.  So the prices that the PMTG management
17  line items were using I thought were my prices,
18  but I don't know that for sure.
19     Q.   Normally would the prices that you
20  price test be the ones that would roll up into
21  any financial statements that are generated by
22  the firm?
23     A.   No, they would not.
24     Q.   And what prices would ordinarily roll
25  up into financial statements?

Page 53

1      HIGHLY CONFIDENTIAL - Landreman
2      A.   The traders' marks.
3      Q.   Would they only roll up into financial
4   statements after your group had price tested the
5   traders' marks?
6      A.   Correct.
7      Q.   Where price testing shows a difference
8   between the traders' marks and where the
9   policies and procedures show the marks should
10  be, what ordinarily was the next step?
11     A.   Well, there are a full set of variance
12  procedures as to what is a required review for a
13  variance breach.  So we define by product
14  category and by asset quality limits that we
15  review price testing within.
16         If a specific position falls outside
17  of a certain range of variance, the analysts
18  would be required to go and get additional
19  detail or supporting assumptions to make sure
20  that, you know, we can either confirm or deny
21  whatever that price is.
22         There's a full review, and then at a
23  business level, we also present all of the
24  results to the traders and we also present it to
25  senior management as well if there are any

14 (Pages 50 to 53)

Page 54

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   issues that require escalation.
 3        Q.   And is that process usually an
 4   informal one with various e-mails being
 5   exchanged, or would you characterize it as more
 6   formal?
 7        A.   It's been more formal.  There's --
 8   there was usually a price testing file that gets
 9   produced, and management is reviewing the
10   results.  We would always send the business, for
11   example, Tom Hamilton's business of securitized
12   products, we would send him all of our price
13   testing results broken out by business and he
14   would review the file and acknowledge that he's
15   reviewed the data.
16        Q.   And did that happen with the
17   securities that were acquired from Lehman, would
18   there be a price testing file for each CUSIP
19   where there was any sort of deviation?
20        A.   Well, as we said, there was no trader
21   marks on the positions when we initially
22   received the portfolio, so we were asked to
23   provide a fair value on those positions that
24   were in that portfolio.
25        Q.   In the instance of where internal
```

Page 55

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   sales prices were used to reflect the fair value
 3   of the positions, would there have been any sort
 4   of price testing file if those internal sales
 5   prices deviated from --
 6        A.   Once the positions are in that
 7   trader's books, they would go through the
 8   standard policies and procedures and processes
 9   that we would normally price test.
10        MR. THOMAS:  Go ahead and make sure
11   you let her finish the question.  You're
12   starting to cut her off again.
13        Q.   So any of the positions that were
14   priced based off of internal sales prices, there
15   would be a price testing policy they would go
16   through, and if there were any differences, a
17   file would exist for those CUSIPS; is that
18   correct?
19        MR. THOMAS:  Objection to form.
20        A.   Once the securities are in a
21   portfolio, we would perform a monthly price test
22   on that portfolio.
23        Q.   So in this instance, if a September
24   30th internal sales price was used to price
25   securities acquired from Lehman, at what point
```

Page 56

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   would that price be tested by your group?
 3        MR. THOMAS:  Objection to form.
 4        A.   A September 30th price would be priced
 5   when we received the file within four to five
 6   business days after day one once the books and
 7   records are closed or once the population has
 8   been confirmed.
 9        Q.   So do you recall whether or not there
10   was a process under way to price test all of the
11   securities at which an internal sales price was
12   used four or five days after they were sold to
13   the desks or recorded as sold to the desks?
14        MR. THOMAS:  Objection to form.
15        A.   In the circumstance you're describing,
16   that portfolio would have been part of that
17   trader's books and records, so I would have had
18   those prices and whatever prices they assigned
19   it to those -- that portfolio would have been
20   the price I would have tested.
21        Q.   We're talking about a large number of
22   CUSIPS here.  Do you recall that process of
23   price testing a number of securities that were
24   sold to desks within Barclays which constituted
25   internal sales a couple of days after they were
```

Page 57

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   sold to those desks?
 3        A.   We price tested the portfolios and the
 4   assets that came across at multiple points in
 5   time during the review.  So if there was a group
 6   of assets that were sold at month-end, we would
 7   have price tested those file -- those assets as
 8   well, and if they booked those at the sale
 9   prices, we would have price tested the books and
10   records as the sale prices.
11        Q.   And based on your testimony, you're
12   saying that process would have taken place a
13   couple of days after the internal sale; is that
14   correct?
15        MR. THOMAS:  Objection to form.
16        A.   We received the trader's books and
17   records reconciled to the general ledger from
18   the line controllers usually within two to three
19   business days after the month-end.
20        Q.   And if there were any deviances
21   between the sale price and what your group
22   thought the fair value was, would that have been
23   conveyed for purposes of the acquisition
24   accounting?
25        A.   If there was a material variance or a
```

15 (Pages 54 to 57)

1    HIGHLY CONFIDENTIAL - Landreman
2    breach of a price testing limit threshold, we
3    would have reviewed those positions on a
4    case-by-case basis with the traders who marked
5    the positions, and if we were unable to resolve
6    a discrepancy, we would escalated that to senior
7    management or we would have had adjustment made
8    to books and records to reflect a change in the
9    trader's marks, but the trader's marks are the
10   books and records once they acquired the asset.
11       Q.   And do you recall that material
12   variances were determined and there were any
13   discussions with front office individuals or
14   with Finance in terms of preparing the
15   acquisition balance sheet?
16       MR. THOMAS:  Objection to form.
17       A.   There were lots of discussions, but
18   across every asset category.  The markets were
19   highly illiquid and there were lots of really,
20   really bad bonds that we were given that we had
21   never seen a portfolio of this low quality in
22   our experience.  So there were lots of questions
23   around how to value some of the most illiquid,
24   toxic assets that we received.
25       Q.   While the majority of the PMTG assets

1    HIGHLY CONFIDENTIAL - Landreman
2    appeared to be valued on the acquisition balance
3    sheet at internal sales prices, there are some
4    that are not.  Would those be situations where a
5    material variance was discovered?
6        MR. THOMAS:  Objection to the form.
7        A.   I don't know.  I would have to see the
8    cases and points, the specific positions.
9        MR. THOMAS:  We've been going for
10   about an hour and a half now.  I don't know
11   if this is a good time for a break.
12       MS. CARRERO:  That's fine.
13       (Recess; Time Noted:  11:03 A.M.)
14       (Time Noted:  11:10 A.M.)
15   BY MS. CARRERO:
16       Q.   Mr. Landreman, if you could just turn
17   your attention back to Deposition Exhibit 804B.
18   Just one last question before we move on from
19   this document.
20       Is this the policy and procedure that
21   was in place at the time of the Lehman
22   acquisition?
23       MR. THOMAS:  Objection to form.
24       A.   This should have been the policy and
25   procedure that was in process, yes.

1    HIGHLY CONFIDENTIAL - Landreman
2        (Exhibit 805B, a document bearing
3    Bates Nos. PwC-BarCap46090 through 46102,
4    marked for identification, as of this date.)
5        (Exhibit 806B, a document bearing
6    Bates Nos. BCI-EX-297183 through 297200,
7    marked for identification, as of this date.)
8        Q.   Mr. Landreman, I'm putting before you
9    what have been marked Deposition Exhibits 805B
10   and 806B.  I will identify them for the record.
11       805B is titled "Barclays Capital
12   Provisioning Policy Statement," dated December
13   2008.  Cover page Bates number is PwC-BarCap
14   00046090.  And Deposition Exhibit 806B is titled
15   "Product Control Price Testing Policy," dated
16   May 2009, and Bates number on the cover page is
17   BCI-EX-00297183.
18       Would you take a moment to review the
19   first, which is Deposition Exhibit 805B.
20       (Document review.)
21       Q.   Please let me know when you're ready.
22       A.   I think I'm ready.
23       Q.   Okay.  Have you ever seen this
24   document before?
25       A.   Which document are you referencing?

1    HIGHLY CONFIDENTIAL - Landreman
2        Q.   Deposition Exhibit 805B.
3        A.   805B.  No, I have not.
4        Q.   Have you seen similar earlier or a
5    later version of such document?
6        MR. THOMAS:  Objection to form.
7        A.   No, I have not.
8        Q.   Are you aware of any policy in place
9    at Barclays related to valuation adjustments to
10   securities?
11       A.   Yes.  Normally, valuation adjustments
12   in terms of provisioning of reserves are
13   calculated for the asset categories that they're
14   applicable to, which mostly do not fall in my
15   world.
16       Q.   In what world do they fall?
17       A.   Fixed Income and Credit.
18       Q.   And why do they not fall within your
19   world?
20       A.   The majority of the assets in the
21   securitized products world tend to be cash bond
22   basis, so there's -- the traders would be long
23   the position.  There's not a concept of being
24   long or short the majority of the positions.  So
25   they may be hedging the positions, but they

1      HIGHLY CONFIDENTIAL - Landreman
2    would be taking a position in that bond.  So
3    there would be a cash bond with a price to that
4    bond.
5       Q.   If you could just turn to page 4 under
6    2.2, "Classification of Adjustment Type," the
7    last sentence of the first paragraph says, "Fair
8    value adjustments may arise for three main
9    reasons," and then it's followed by three bullet
10   points:  "Model uncertainty or adjustment;
11   market data uncertainty or adjustment;
12   transaction booking reflecting amended or
13   simplified economics."
14        Is it fair to say that the securities
15   that your group covers don't fall within any of
16   those three reasons?
17      MR. THOMAS:  Objection to form.
18      A.   They would.  However, we are mandated
19   to report fair value on our balance sheet, so
20   reserves or adjustments for cash bonds, we would
21   show that these positions are fair value assets.
22   So ...
23      Q.   Are the fair value adjustments that
24   are being discussed here different than the
25   liquidity adjustments or haircuts that were

1      HIGHLY CONFIDENTIAL - Landreman
2    taken on certain asset classes in the Lehman
3    transaction?
4       MR. THOMAS:  Objection to form.
5    Foundation.
6       A.   As I'm not overly familiar with this
7    document, I'm not exactly clear what they're
8    trying to distinguish within this form.  This is
9    a very general classification across all asset
10   categories for a global database.
11      Q.   Would your understanding, though, of a
12   liquidity adjustment be similar to the concept
13   of a fair value adjustment?
14      MR. THOMAS:  Objection to form.
15      A.   A liquidity and a fair value
16   adjustment would be similar in my mind.
17      Q.   If you could turn your attention to
18   Deposition Exhibit 806B, and take a moment to
19   review, if you haven't already.
20      (Document review.)
21      A.   Okay.
22      Q.   Have you ever seen this document
23   before?
24      A.   Yes, I have.
25      Q.   And if you turn to the front page, you

1      HIGHLY CONFIDENTIAL - Landreman
2    see it says, "Product Control, Price Testing
3    Policy, Date:  May 2009"; is that correct?
4       A.   Correct.
5       Q.   Is this the same policy that was in
6    place at the time of the Lehman transaction?
7       A.   This is a global policy for our
8    Central Price Testing Group, so this would be
9    the highest level of price testing policy.  So I
10   believe this would have been in place.  I don't
11   know for certain because I had my own regional
12   policies that we applied which would have been
13   supporting of this policy.
14      Q.   So let me just make sure that I
15   understand what you're saying.  You believe
16   there would have been an earlier policy that
17   governed the Central Price Testing, but this is
18   not it; is that correct?
19      A.   I don't know that.
20      MR. THOMAS:  Objection to form.
21      Q.   Would you agree that based on the date
22   of the document as May 2009, that it is dated
23   after the Lehman transaction?
24      A.   The date on this document is after the
25   Lehman transaction.

1      HIGHLY CONFIDENTIAL - Landreman
2       Q.   You had mentioned regional policies
3    that would fall under this central policy.
4    Could you be more specific in naming those
5    policies?
6       A.   For example, you provided Exhibit
7    802B, which was your fixed income credit
8    products price testing policy, is an example of
9    a regional guidance or a product-specific policy
10   that would be supportive of this global policy.
11      Q.   If I could just ask you to be more
12   specific, though, about the ones that governed
13   the products you were directly responsible for.
14      A.   I do not see those specific policies
15   here, but we had those policies and procedures
16   in place at the time.
17      Q.   And could you name those for me?  Are
18   you familiar with the policies and procedures
19   that govern your area?
20      A.   Yes, I'm familiar with the policies
21   and procedures I wrote that govern my area, yes.
22      Q.   And would you be able to tell me how
23   many policies and procedures there are that
24   govern your area?
25      A.   There should be one policy that covers

1      HIGHLY CONFIDENTIAL - Landreman
2  all Agency RMBS products and non-Agency RMBS
3  products.
4      Q.    And that would be in addition to the
5  CMBS policy that we have already seen?
6      A.    Correct.
7      Q.    Would there be any other policies and
8  procedures that govern your group?
9      A.    I don't recall.
10      Q.    Could you explain what the difference
11  between the Central Price Testing guidance would
12  be as opposed to the more specific regional
13  policies that were in existence?
14          MR. THOMAS:  Objection to form.
15  Foundation.
16      A.    I mean, if you look at the price
17  testing policy as created by Central, it's
18  really more of a generalized approach:  Timing,
19  how to report the data, what are some of the
20  requirements in terms of data sources or how to
21  handle specific issues, like untested items.
22          So, I mean, it really provides a
23  general framework that everybody is responsible
24  for adhering to.  And then within your specific
25  asset category or product specialty, you would

1      HIGHLY CONFIDENTIAL - Landreman
2  then document and fully, you know, list what
3  your processes and your procedures and the
4  acceptable values, et cetera, would be.
5          So, I mean, if your sources for
6  mortgage-backed securities, pricing for vendors
7  would be Financial Times, interactive data, we
8  would specify those vendors in our policy,
9  whereas somebody on the other side of a
10  different product may not use that pricing
11  source because it is not applicable to their
12  product space.
13      Q.    If you could turn to page 12 of the
14  exhibit.
15      A.    Okay.
16      Q.    At the top, do you see the line that
17  says "The Pricing Template - A Product
18  Controller's Guide"?
19      A.    Yes, I do.
20      Q.    Would this be the template used by
21  your group in the event that any differences
22  were found between a trader's marks and the
23  results of your price testing?
24          MR. THOMAS:  Objection to form.
25      A.    No, this would not.  This would be

1      HIGHLY CONFIDENTIAL - Landreman
2  a -- a centralized, a standard reporting format
3  that we can aggregate all of our pricing data
4  and deliver that to Central for a central
5  reporting database.
6      Q.    And was this template followed for any
7  of the CUSIPs that were acquired in the Lehman
8  transaction?
9          MR. THOMAS:  Objection to form.
10      A.    I don't recall.  This would have been
11  not applicable to the assets in question because
12  they were reported at a very detailed level, and
13  once the assets were sold to a trading desk,
14  then they would be reported in this format.
15      Q.    And so you would expect that any
16  assets that were sold to a trading desk would
17  have a pricing template at some point generated
18  for it?
19          MR. THOMAS:  Objection to form.
20      A.    The business would have had their
21  portfolio presented to Central Price Testing
22  using this reporting format.
23      Q.    And would this be across all asset
24  classes?
25      A.    Yes.

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.    And when you say reported to Central,
3  could you explain what you mean by that term?
4      A.    There is a group in London that is
5  responsible for consolidated reporting of price
6  testing results.
7      Q.    And what sort of reporting are they
8  responsible for?
9      A.    Consolidated, high-level reporting of
10  the price testing results, business-level or
11  business-level variance explanations.
12      Q.    And when you say business-level
13  variance explanations, who would those go to?
14      A.    These reports go into the Central
15  Price Testing database.  They are all presented
16  to -- we would present the business-level
17  results to the head of the business or the
18  trader responsible for the business.
19          Then we would also use this reporting
20  format to create business-level summaries at the
21  highest levels, whether it's for the head of
22  mortgage-backed securities trading or if it's
23  the head of fixed income rates trading, who the
24  head of mortgage trading would report in to.
25      Q.    And how frequently would these reports

HIGHLY CONFIDENTIAL - Landreman

1  be generated?
2      A.    Monthly.
3      Q.    And would they be generated for every
4  CUSIP on a trader or a business' books?
5      A.    No, they would not.
6      Q.    And for which CUSIPS would they be
7  generated?
8      A.    Well, they would be generated for the
9  portfolio and presented by an asset category as
10  a summary line.  So, as opposed to every
11  individual security being reported in this
12  format, you would report all non-agency, all day
13  mortgages, and the results of the price testing,
14  with any meaningful commentary about the
15  portfolio.
16      Q.    You can put that aside.
17          Earlier we had talked about the marks
18  that roll up in ito Barclays' acquisition
19  accounting and whether those were values that
20  came from your group, and I believe your answer
21  was that it would be the trader's marks that
22  would roll up; is that correct?
23      A.    I didn't say that.
24      Q.    Okay.  I'm sorry.  Could you tell me

HIGHLY CONFIDENTIAL - Landreman

1  where do the prices that roll up into the
2  acquisition balance sheet come from?
3          MR. THOMAS:  Objection to form.
4      A.    For the components that I was
5  responsible for valuing, it is my understanding
6  that the majority of those prices would have
7  been either the Product Control prices or, if we
8  had trade prices, we would have reviewed the
9  trade prices.
10      Q.    Maybe we should take a step back and
11  just ask, in the ordinary course, when doing
12  financial statements, where do the prices come
13  from that feed into the financial statements?
14          MR. THOMAS:  Objection to form.
15      A.    As we said, the traders are
16  responsible for the positions that they manage
17  on their balance sheet to mark those positions
18  to market every day.
19      Q.    And how do they enter those marks?  Is
20  there a system into which they enter those
21  marks?
22      A.    There would be a trading system for
23  each business, whether -- you know, whatever is
24  appropriate for that product class, and they

HIGHLY CONFIDENTIAL - Landreman

1  would manage those -- the input of the pricing
2  on their -- within their own resources and they
3  would enter those prices in the system and we
4  would receive those prices and those inventories
5  from the line controllers.
6      Q.    And what's the name of the system
7  through which you receive those trader marks?
8      A.    Each business gives me a different
9  one, and the results are delivered to me on
10  Excel spreadsheets.
11      Q.    And of the businesses that you cover,
12  do you know which systems correspond to which
13  business?
14      A.    The mortgage trading uses an
15  application called Winfits, and some of the
16  other -- I believe everyone is using Winfits
17  now.  There may have been some different front
18  office systems at the time.  I don't know
19  exactly which systems were in place, but Winfits
20  has been the standard for the securitized
21  products business that I cover.
22      Q.    Is there any other system to which
23  Winfits feeds into?
24      A.    Yes.

HIGHLY CONFIDENTIAL - Landreman

1          MR. THOMAS:  Objection to form.
2      A.    Yes.
3      Q.    Are you familiar with the systems to
4  which it feeds?
5      A.    Not personally.
6      Q.    I don't want to go through a long
7  discussion on your systems.  I'm just trying to
8  get an understanding of whether there's some
9  sort of repository that houses most of the marks
10  that are entered by traders at Barclays and are
11  you aware of such a system?
12      A.    It's my understanding that the traders
13  will mark their positions in Winfits.  The data
14  is stored in the Winfits and all of the
15  repositories.
16          There's also individual bond pricing
17  data stored in a global referential called Asset
18  Control, but the front office trading systems
19  store all the pricing data for the bonds.
20      Q.    Are you familiar with a system that
21  would eventually generate the general ledger,
22  what that would be called?
23      A.    SAP.
24      Q.    So is it fair to say that at some

Page 74

1        HIGHLY CONFIDENTIAL - Landreman
2   point Winfits feeds into SAP?
3           MR. THOMAS:  Objection to form.
4       A.   That would be a line controller
5   function, so I don't know if Winfits feeds
6   directly into SAP or if the line controllers
7   record entries into SAP or how that process
8   works operationally.
9       Q.   So when your group goes about price
10  testing a trader's marks, you would do so based
11  off of the marks that are handed to you on an
12  Excel spreadsheet; is that correct?
13      A.   We would be given a population with
14  all of the values and ask that those values be
15  reconciled back to the general ledger by the
16  line controllers, so we have a population
17  completeness control check as a part of our
18  standard course of doing business or price
19  testing or doing valuations.
20      Q.   And the general ledger being SAP; is
21  that correct?
22      A.   Correct.
23      Q.   Do you know what SOPHIS is?
24      A.   No.
25          MR. THOMAS:  This may not be necessary

Page 75

1        HIGHLY CONFIDENTIAL - Landreman
2   under agreement, but to the extent it is,
3   I'm designating the transcript highly
4   confidential.
5       Q.   The marks that the traders enter and
6   that are subsequently price tested by your
7   group, what measure of value would they reflect?
8       A.   Fair value.
9       Q.   And would fair value -- what is your
10  definition of "fair value"?
11      A.   Definition of "fair value" would be a
12  value which we believe would reasonably be
13  expected to be obtained in the marketplace.
14      Q.   Would those marks be in accordance
15  with how "fair value" is defined under FAS 157?
16          MR. THOMAS:  Objection to form.
17      A.   I believe it would be consistent with
18  that.
19      Q.   Would it be consistent with the --
20  with IFRS?
21          MR. THOMAS:  Objection.  Form.
22      A.   I believe it would be.
23      Q.   To the extent that FAS 157 and IFRS
24  are not exactly the same, do you know if the
25  marks are reflective or favor one over the

Page 76

1        HIGHLY CONFIDENTIAL - Landreman
2   other?
3           MR. THOMAS:  Objection to form.
4       A.   As an international firm, that is
5   subject to IFRS reporting standards, we would
6   probably defer to the International Accounting
7   Standards.
8       Q.   Does your --
9       A.   If there was a difference.
10      Q.   Does your group take into
11  consideration FAS 157 or IFRS when price
12  testing?
13          MR. THOMAS:  Objection to form.
14      A.   I'm not sure what you mean by that.
15      Q.   In terms of testing the marks that a
16  trader has ascribed to a security, what sort of
17  guidance does your group follow, whether it be
18  FAS 157 or IFRS or something else?
19          MR. THOMAS:  Objection to form.
20      A.   The International Accounting Standards
21  and the U.S. accounting standards tend to be
22  relatively similar.  To the extent that there
23  may be a minor difference, in the asset
24  categories that I review, it would be less of an
25  issue because there's a wide range of values and

Page 77

1        HIGHLY CONFIDENTIAL - Landreman
2   there's a fairly common method as to how these
3   bonds trade and how they're priced in the
4   market.
5       Q.   Would a mark take into consideration
6   the size of the asset?  I'm sorry, let me strike
7   that.
8           Would a trader's mark take into
9   account the lot size of that specific security?
10          MR. THOMAS:  Objection to form.
11      A.   A trader's mark will reflect that
12  trader's view as to the ability to sell that
13  bond and at what level they could sell that bond
14  at.
15      Q.   And so is your answer that if the size
16  of the position would affect whether they could
17  sell or not, that they would take into
18  consideration the size of a position?
19          MR. THOMAS:  Objection to form.
20      A.   To the extent that it's within the
21  accounting guidelines, they might consider that,
22  but generally, that's less of an issue.
23      Q.   When price testing, does your group
24  take into consideration the size of a position
25  in determining whether or not a mark is

1    HIGHLY CONFIDENTIAL - Landreman
2    reflective of fair value?
3         A.    We look at all information that's
4    available to us, and if we have a large trade of
5    a position or a small trade of a position and
6    that affects the data that goes into our model,
7    we would consider that as part of our overall
8    analysis.
9         Q.    So is the answer yes, that size would
10   be considered in the analysis?
11        MR. THOMAS:  Objection to form.
12        A.    Size is one factor in reviewing a
13   trade to determine the validity of the trade
14   data.
15        Q.    Is it your understanding that any of
16   the assets that were acquired from Lehman were
17   valued at a lower price based off of the bulk
18   size of any given position?
19        MR. THOMAS:  Objection to form.
20        A.    I don't recall.  I'm not aware of any.
21        Q.    If that were the case, would it be
22   your opinion that that would be a proper basis
23   to mark down a security?
24        MR. THOMAS:  Objection to form.
25        A.    There would definitely be issues with

1    HIGHLY CONFIDENTIAL - Landreman
2    the ability to trade certain positions and
3    liquidate certain positions if the transaction
4    costs might be higher than the actual nominal of
5    the bond or if there were no buyers for specific
6    instruments or you would have to repackage those
7    securities.
8         Q.    Are you aware of whether it's proper
9    to take into consideration the size of a
10   position when marking to fair value under FAS
11   157 or IFRS?
12        MR. THOMAS:  Objection to form.
13        A.    I'm familiar with some of the
14   concepts, yes.
15        Q.    And is it your understanding that it
16   is or is not proper under either of those two
17   regs.?
18        MR. THOMAS:  Objection to form.
19        A.    I would need to confirm by seeing the
20   actual standard before I responded just to make
21   sure of that.  I believe it is considered that
22   block size is a factor, but it's not the
23   determinant in a bond's price.
24        Q.    Typically speaking, would a mark be
25   reflective of a so-called round lot of a

1    HIGHLY CONFIDENTIAL - Landreman
2    particular CUSIP?
3         MR. THOMAS:  Objection, form.
4         A.    I'm not sure what you mean by that.
5         Q.    As opposed to bulk size position,
6    would you expect a mark to reflect what would be
7    the typical lot of -- that a security would
8    trade between a buyer and a seller?
9         MR. THOMAS:  Objection to form.
10        A.    I mean, yes.  A lot of these concepts
11   are fine in other asset categories.  Most of
12   what my world reviews, it has, you know, highly
13   customized asset classes that are, you know,
14   different shapes and forms and have different
15   sizing.
16        So there is no round lot designation
17   to say that, you know, mezzanine bonds trade at,
18   you know, a hundred million dollar increments.
19   There's very little standardization, as opposed
20   to the fixed income world, where you might have
21   a hundred-million-dollar issuances that sell in
22   $20 million round lots.
23        So in the securitized products world
24   that's less of a concept that gets considered in
25   our analysis.

1    HIGHLY CONFIDENTIAL - Landreman
2         Q.    What's your understanding of the
3    meaning of an "orderly exit price"?
4         A.    A willing buyer and a willing seller
5    negotiating in an arm's length transaction.
6         Q.    Is there any temporal limitations on
7    the concept of an orderly exit?
8         MR. THOMAS:  Objection to form.
9         A.    Can you define what you mean by
10   "temporal."
11        Q.    When you say a willing buyer and a
12   willing seller, are you saying a minute from now
13   or five days from now?
14        MR. THOMAS:  Objection to form.
15        A.    I think it depends upon which asset
16   category you're talking about.  In many cases,
17   securitized products world, these are custom
18   bonds.  These are very unique, very few of these
19   structures are alike and there's always
20   something different, so it takes a fair amount
21   of analysis to price or to review each bond.
22        So to say that there's a temporal
23   difference in terms of I can have a price within
24   an hour, generally the trades that come in on
25   these positions are negotiated over time, and

Page 82

HIGHLY CONFIDENTIAL - Landreman
1
2  our flow business may buy a position and sell it
3  out, but that would that be prenegotiated.  We
4  probably would not have bought the position
5  unless we had a seller on the other side.
6        So it isn't like I just push a button
7  and this trades and someone comes along and buys
8  it.  It's generally a negotiated sale over time.
9    Q.   To the extent that a mark from a
10  trader is reflective of an orderly exit price,
11  when price testing that mark, what would you
12  expect that orderly exit to look like for the
13  asset classes that you cover?
14        MR. THOMAS:  Objection to form.
15    A.   Since the beginning of 2007, I don't
16  know how to answer that question.
17    Q.   Are you saying, since the beginning of
18  2007, there is no such thing as an orderly exit?
19    A.   Since the beginning of 2007, during
20  the credit crisis, there's been a lot of, you
21  know, differing types of sales, and to say
22  that -- we look at every transaction that we
23  have the ability to see, but we also have to
24  look at the performance of the underlying
25  collateral and there's a lot of information that

Page 83

HIGHLY CONFIDENTIAL - Landreman
1
2  has to go into our analyses and a lot of data
3  has to be researched and reviewed.
4        So to say that in the last two to
5  three years there's been an orderly disposition,
6  I would say that there's -- we're starting to
7  come back to that, we've come back to that over
8  the last year, but for a long period of time
9  there were lots of chaos in the markets.
10    Q.   Would a distressed price be one that
11  arises out of an orderly exit?
12        MR. THOMAS:  Objection.  Form.
13    A.   What do you mean by "distressed
14  price"?
15    Q.   If I put a gun to your head and said I
16  need you to sell this in an hour.
17    A.   Well, that would be a forced seller.
18    Q.   And would that be reflective of an
19  orderly exit price?
20        MR. THOMAS:  Objection to form.
21    Q.   The price that willing (sic) was
22  willing to purchase at?
23    A.   That would be considered a data point,
24  but that doesn't mean that that would be, you
25  know, the determining factor of a trade of a

Page 84

HIGHLY CONFIDENTIAL - Landreman
1
2  bond.
3    Q.   But would that be an orderly exit
4  price if you were a forced seller?
5    A.   Your definition contradicts itself.
6        An orderly sale and a forced seller
7  cannot be in the same.
8    Q.   When did you first become aware of the
9  possibility of a transaction with Lehman?
10        MR. THOMAS:  Objection to form.
11    A.   I was on vacation and I saw the news
12  article on CNBC.
13    Q.   And when was that?
14    A.   I'm sorry?
15    Q.   And when was that?
16    A.   The day it happened.  I was in Hawaii
17  on vacation.  I think it was the 19th or the
18  18th.
19        I'm sorry, it may have been Saturday.
20  The exact day that the bankruptcy happened,
21  though, was --
22    Q.   So if I represent to you that the
23  bankruptcy filing of the holding company was
24  September 15, is it fair to say that's when you
25  first learned about it?

Page 85

HIGHLY CONFIDENTIAL - Landreman
1
2    A.   Yes.
3        MR. THOMAS:  Objection to the form on
4  the last question.
5        (Exhibit 808B, a document bearing
6  Bates Nos. BCI-EX-(S)201329 through 201331,
7  marked for identification, as of this date.)
8    Q.   Mr. Landreman, you have before you
9  what has been marked as Deposition Exhibit 808B.
10  If you could turn your attention to the second
11  page, the e-mail that begins on that page from
12  Mr. Teague to Paul Copson, CC-ing Marcus Morton,
13  Philip Nash, James Walker.
14    A.   I see that.
15    Q.   Have you seen this e-mail before?
16    A.   No, I have not.
17    Q.   If you will turn your attention to the
18  first sentence, where Mr. Teague writes, "Paul:
19  High level, we should be able to provide pricing
20  support on a T+1 for much of the fixed income
21  rates and fixed income Credit products.  ABS
22  will be a WIP," W-I-P.  Do you see that?
23    A.   Yes, I do.
24    Q.   And then if you turn your attention
25  down to Roman numeral II, "ABS Testing - (A)

1    HIGHLY CONFIDENTIAL - Landreman
2    Coverage." Roman (iii), "For Alt A positions,
3    an independent price via a matrix
4    developed by Landreman's group, which
5    incorporates recent trade levels by the Alt A
6    market making desk and loss curve based on home
7    equity roll rates." Do you see that?
8        A.   Yes, I do.
9        Q.   And this e-mail is dated on Monday,
10   September 15, do you see that?
11       A.   Yes.
12       Q.   Were we asked at or about this time
13   to work on providing pricing support for any of
14   the assets Lehman was -- Barclays was
15   contemplating purchasing from Lehman?
16       MR. THOMAS: Objection to form.
17       A.   As you notice, I wasn't on this
18   e-mail. This was actually Sean giving a
19   high-level overview to the executives in London.
20       Q.   I understand. I'm just asking whether
21   you --
22       A.   I was on vacation from the 12th
23   until -- I would have to confirm the dates, but
24   I thought I was gone like from the 12th of
25   September until that I was in Hawaii for the

1    HIGHLY CONFIDENTIAL - Landreman
2    week, and as soon as I got back, I was given
3    everything. My BlackBerry wasn't working in
4    Hawaii.
5        Q.   So until you returned from your trip,
6    you were not involved in any sort of pricing
7    support in connection with the transaction; is
8    that correct?
9        A.   Correct.
10       Q.   Do you know if members of your team
11   were involved with pricing support prior to your
12   return from vacation?
13       MR. THOMAS: Objection. Form.
14       A.   They would have been involved in
15   pricing these portfolios, yes.
16       Q.   Is it your understanding that your
17   team received CUSIP-level information at the
18   positions that Barclays was contemplating
19   purchasing in order to do that price testing?
20       MR. THOMAS: Objection to form.
21       A.   It's my understanding that all of the
22   collateral that was pledged at the Fed window
23   was going to be delivered to us for review.
24       Q.   Was that your understanding as early
25   as September 15?

1    HIGHLY CONFIDENTIAL - Landreman
2        A.   Again, I was not in the office on the
3    15th, so I would have to say what's -- the
4    earliest of my understanding is when I returned
5    from vacation.
6        Q.   Do you know when any members of your
7    team got started with price testing any
8    securities that Barclays was contemplating
9    purchasing?
10       A.   They would not have started until
11   there was a public announcement that we acquired
12   the firm, that we acquired or that we were --
13   there was a public announcement that we were
14   negotiating.
15       Q.   I believe you had said earlier that
16   you would expect that your team had been
17   involved with pricing support before your return
18   from vacation. Is that not accurate?
19       A.   They -- if my -- my team would have
20   been involved in pricing these assets once they
21   were delivered to us, assuming that we were
22   given a population. There's very good chance
23   that we would not have been given a population
24   for a couple days after the deal was announced.
25       Q.   So you're not aware of any pricing

1    HIGHLY CONFIDENTIAL - Landreman
2    support being given by your team prior to the
3    delivery of any securities simply to ascertain
4    whether Barclays wanted it or what price they
5    thought it was worth or anything of the sort?
6        MR. THOMAS: Objection to the form.
7        A.   I was not involved in the negotiation
8    of the transaction and we did not receive any of
9    the information in terms of what we were
10   receiving until the deal was made public.
11       Q.   And when you say "the deal was made
12   public," what do you mean by "the deal was made
13   public"?
14       A.   The announcement that Barclays was
15   negotiating a transaction.
16       Q.   So when it publicly announced in the
17   middle of the week that an Asset Purchase
18   Agreement had been signed, that's when your team
19   would have stepped in and started to provide
20   pricing support?
21       MR. THOMAS: Objection to form.
22       A.   Right. Correct. They would not have
23   been involved in any pre, pre-public
24   announcements. They would not have been
25   involved in any investment banking negotiations

23  (Pages 86 to 89)

Page 90

HIGHLY CONFIDENTIAL - Landreman
1
2  or acquisition or merger advisory capacity.
3     Q.   So turning back to Deposition Exhibit
4  808B, is it your testimony that you're not aware
5  of anyone the Monday of Mr. Teague's e-mail
6  providing the pricing support discussed in his
7  e-mail?
8        MR. THOMAS:  Objection to form.
9     A.   The e-mail dated Monday, September 22,
10 contains pricing support for assets that would
11 have come from Sean's area of expertise.
12 There's nothing in here that would have come
13 from my group.
14    Q.   My question is simply, around the time
15 that Mr. Teague's e-mail goes out September 15,
16 whether you're aware if your team also got
17 involved in the process of pricing support
18 related to the Lehman transaction?
19       MR. THOMAS:  Objection. Form.
20    A.   Once we were informed that there would
21 be securities for us to price, we would have
22 been involved in pricing those securities.
23    Q.   So that could have been as early as
24 September 15; is that correct?
25    A.   If we knew what we were getting.  I

Page 91

HIGHLY CONFIDENTIAL - Landreman
1
2  don't know when we knew what we were getting.
3        (Exhibit 809B, a document bearing
4     Bates Nos. BCI-EX-(S)201104, marked for
5     identification, as of this date.)
6     A.   Okay.
7     Q.   Mr. Landreman, do you see that this is
8  an e-mail from Mr. Teague to yourself CC-ing
9  Joseph Kaczka, dated September 19; is that
10 correct?
11    A.   Correct.
12    Q.   And do you see in the body of the
13 e-mail Mr. Teague writes, "Rich, Marcus wanted
14 the different price testing team pitch in to get
15 an idea of how the Lehman positions are priced
16 as of 15 September.  Can you ask your team to
17 perform some independent pricing on the
18 following spreadsheet?"
19    A.   I see that.
20    Q.   Do you recall if this was positions
21 that had already been transferred to Barclays
22 that you were being asked to pitch in and help
23 with price testing?
24    A.   I don't recall what was in these
25 files, but I'm sure if I saw what was in

Page 92

HIGHLY CONFIDENTIAL - Landreman
1
2  there...
3     Q.   Do you recall being involved in the
4  valuation of the securities that were
5  transferred over in the Lehman/Barclays repo the
6  evening of September 18 either on that Friday,
7  the 19th, or Thursday itself?
8     A.   I do not recall being involved in the
9  Lehman/Barclays repo pricing or the information
10 from that as of that date.
11    Q.   In your mind, was the exercise that
12 you and your team was asked to undertake related
13 to the Lehman transaction and the securities
14 that Barclays was acquiring as opposed to any
15 specific repo transaction?
16       MR. THOMAS:  Objection to form.
17    A.   My understanding was that the assets
18 that were pledged to secure a repo line of
19 credit were being brought onto our balance sheet
20 and needed to be assigned a fair value on our
21 balance sheet as of the date that they were
22 going to be effectively put on our balance
23 sheet.
24    Q.   And do you recall being immersed in
25 that process from the moment that the positions

Page 93

HIGHLY CONFIDENTIAL - Landreman
1
2  were transferred over?
3        MR. THOMAS:  Objection to form.
4     A.   I was immersed in that process for
5  months.
6     Q.   I'm trying to get a feel for when it
7  began.  Did the process begin two days before
8  delivery of the assets or did it begin
9  immediately upon transfer of the assets?
10       MR. THOMAS:  Objection to form.
11    A.   I don't know when all of the assets
12 were officially delivered.  That would be an
13 operations question.  I know that I was given
14 lists to price and to review at various points
15 in time and there would be different updates to
16 those lists at points in time because certain
17 securities may or may not have been delivered.
18    Q.   Were you involved in the
19 reconciliation of what was delivered and what
20 wasn't, or would that be Operations?
21    A.   That would be Operations and line
22 controller functions.
23    Q.   And were you involved in the creation
24 of any of the schedules related to the
25 transaction documentation?

24  (Pages 90 to 93)

Page 94

1    HIGHLY CONFIDENTIAL - Landreman
2        MR. THOMAS:  Objection.
3        A.   I would not have been.
4        Q.    Did you have any contact with the
5    Finance people that were putting together the
6    acquisition balance sheet?
7        A.    Only to the extent that I would be
8    delivering work from my team to support their
9    work.
10        Q.    Did you receive any instructions from
11    the people preparing the acquisition balance
12    sheet that was out of the ordinary from what you
13    might do on a day-to-day basis outside of a
14    transaction like this?
15        MR. THOMAS:  Objection.  Form.
16        A.    Could you clarify what you mean?
17        Q.    Let me rephrase that one.
18            Did you and your team perform any
19    functions in connection with the Lehman
20    transaction that were outside of the normal
21    scope of what you and your team would undertake?
22        A.    We -- we did everything we could to
23    maintain our normal process, to be consistent in
24    how we valued the securities, how we reviewed
25    the securities in a normal course of business.

Page 95

1    HIGHLY CONFIDENTIAL - Landreman
2        You know, not having a trader's price
3    to benchmark, we would have, you know, valued
4    the securities consistently with how we normally
5    would apply our policy and our procedure as to
6    how we priced and valued these securities.
7        Q.    But it was not an ordinary situation
8    because normally for this quantity of CUSIPs you
9    would have a trader's mark; is that correct?
10        A.    A combination of factors.  I think a
11    portfolio of this size usually doesn't transfer
12    every day.  The portfolio itself was of such
13    inferior quality to everything we had in our
14    books and records that it required a much more
15    exhaustive review as to how to ascribe fair
16    value to these positions because of the low
17    levels of quality within that portfolio.
18        Q.    Were you told prior to valuing any of
19    the asset classes that were transferred over in
20    the Lehman transaction how much the trading
21    desks wanted to write down certain asset classes
22    by?
23        A.    Explain what you mean by "write down."
24        Q.    Prior to undertaking any sort of
25    valuation process for individual CUSIPs, were

Page 96

1    HIGHLY CONFIDENTIAL - Landreman
2    you given a target number by which anyone at
3    Barclays wanted to write down assets from the
4    price at which they had been held on Lehman's
5    books for?
6        MR. THOMAS:  Objection.  Form.
7        A.    We had no idea where these positions
8    were held on Lehman's books.
9        Q.    You never reviewed any of Lehman's
10    marks for any of the positions for which you
11    valued?
12        A.    I would not have had that data.
13        Q.    Are you aware that during the week
14    preceding the closing, that lists of CUSIPs were
15    exchanged that held marks corresponding to what
16    Lehman had it on its books for?
17        MR. THOMAS:  Objection to form.
18        A.    I don't recall seeing any list of
19    CUSIPs that may have had a Lehman mark or would
20    I have given consideration to where another firm
21    would have marked the position.
22        Q.    To you, the mark of another firm would
23    not be another data point that's worth
24    consideration?
25        A.    It would be a data point.

Page 97

1    HIGHLY CONFIDENTIAL - Landreman
2        Q.    But it is not a data point that
3    Barclays considered in valuing the securities
4    that your group was responsible for; is that
5    correct?
6        MR. THOMAS:  Objection to form.
7        A.    I don't believe I had that data
8    available to me at the time we were valuing this
9    portfolio.
10        Q.    Did your group use as a data point the
11    price at which JPM or BoNY had marked any of the
12    securities within your group?
13        A.    We did look at that data as a data
14    point within our process.
15        Q.    And how was that used as a data point
16    within your process?
17        A.    In many cases, if there was no data
18    available or we were unable to model a position,
19    we may have defaulted to a BoNY price.  We did
20    review the prices that we derived using our own
21    proprietary methodologies to value these bonds
22    and compared that to the levels that we saw from
23    BoNY or JPMorgan or IDC or other vendors that
24    provide indicative pricing data for these types
25    of transactions, and we used all of that data to

Page 98

1      HIGHLY CONFIDENTIAL - Landreman
2    measure pricing dispersion from the various
3    sources to measure our liquidity discounts as
4    one point to support the liquidity discount from
5    the pricing dispersion amongst all of the
6    sources that were around at that time.
7            (Exhibit 810B, a document bearing
8        Bates Nos. BCI-EX-(S)52667 through 52668,
9        with attachment, marked for identification,
10       as of this date.)
11       A.   Okay.
12       Q.   Mr. Landreman, you have before you
13   what has been marked as Deposition Exhibit 810B.
14   Have you had an opportunity to read it?
15       A.   Yes, I have.
16       Q.   This is an e-mail that I'll represent
17   to you is from Gary Romain to Rich Ricci, among
18   others, and if you will -- and it's dated
19   September 22.  If you'll turn your attention to
20   the body of the e-mail, the line that reads,
21   "The $2.83 billion valuation adjustment is S.
22   King's first cut only."  Do you see that?
23       A.   Yes, I do.
24       Q.   And do you know who S. King is?
25       A.   I believe that would be Stephen King.

Page 99

1      HIGHLY CONFIDENTIAL - Landreman
2       Q.   And what was Stephen King's position
3    at Barclays?
4       A.   Stephen King was the head of the
5    Proprietary Mortgage Trading Group -- Principal
6    Mortgage Trading Group, PMTG.
7       Q.   And so your group was responsible for
8    price testing securities that would fall under
9    Stephen King's group; is that correct?
10      A.   If they would have been securitized
11   products, yes.
12      Q.   Are you aware that, as of September
13   22, there was already a determination that there
14   would be a valuation adjustment to securities
15   that had transferred to Barclays?
16          MR. THOMAS:  Objection to form.
17      A.   I know by September 22 we had started
18   to review the data that we had received, and I
19   know that there was a lot of surprise about the
20   poor quality of the assets that were delivered
21   to us and the uncertainty around the ability of
22   certain assets to actually be considered real
23   securities or to be delivered.
24          In terms of Stephen King's valuation
25   adjustment, I don't know how he derived that

Page 100

1      HIGHLY CONFIDENTIAL - Landreman
2    number or where he was ascribing that valuation
3    adjustment because that was a global number
4    because Stephen King managed the entire
5    portfolio of assets that was coming over, and I
6    only saw the securitized products portion of
7    that.
8       Q.   Did you or your group supply any
9    information to Stephen King or his group that
10   you feel would have been used to support a $2.83
11   billion valuation as of September 22?
12          MR. THOMAS:  Objection.  Form.
13      A.   Stephen King had his own team that was
14   able to make their own recommendations and look
15   at these assets on their own and to determine
16   what sort of adjustment or even valuation issues
17   needed to be addressed.
18      Q.   Would it be your expectation that, as
19   of September 22, Stephen King and his group had
20   decided how much an internal sales, a reasonable
21   internal sales price would be to them for the
22   securities that were being transferred from
23   Lehman?
24          MR. THOMAS:  Objection to form.
25      A.   I don't know that.

Page 101

1      HIGHLY CONFIDENTIAL - Landreman
2           (Discussion off the record.)
3       Q.   Prior to closing, were you involved in
4    any processes or communications that resulted in
5    a demand for additional collateral by Barclays
6    from Lehman?
7       A.   I'm not sure I understand the
8    question.
9       Q.   Are you aware on Friday, prior to the
10   closing of the Lehman transaction, that
11   additional securities were requested for
12   delivery from Lehman to Barclays?
13      A.   I wasn't involved in the negotiation
14   or the settlement of the deal or the structure.
15          MR. THOMAS:  Objection.  Form.
16      Q.   Were you providing any valuations that
17   would support that Barclays was getting less or
18   more consideration prior to closing that would
19   be used in any negotiations of the deal?
20          MR. THOMAS:  Objection to form.
21      A.   When I came into the data, I was told
22   that these were the securities that would be
23   delivered to us and that we were to value those
24   securities.  We would not have been involved in
25   the negotiations or any requests for additional

Page 102

```
 1         HIGHLY CONFIDENTIAL - Landreman
 2    collateral.
 3        Q.   So, as far as you know, none of the
 4    valuations that you or your team were working on
 5    were being used in connection with the
 6    negotiations of the transaction; is that
 7    correct?
 8        A.   Not that I'm aware of.
 9        Q.   Are you aware of the price at which
10    Barclays booked the securities transferred to it
11    on day one?
12        MR. THOMAS:  Objection to form.
13        A.   I am not aware of the price that was
14    booked in the general ledger.
15        Q.   Is it your understanding that the
16    positions were booked at one price on day one,
17    and then subsequently amended for purposes of
18    acquisition accounting once Barclays had
19    concluded its valuation of the securities
20    transferred to it?
21        MR. THOMAS:  Objection to form.
22        A.   I'm not that involved with the
23    accounting aspects of how things get booked or
24    the operations aspect of how things get booked
25    and accounted for.  I know I was asked to
```

Page 103

```
 1         HIGHLY CONFIDENTIAL - Landreman
 2    provide valuations on securities for specific
 3    dates, and we did that.
 4        Q.   And when did you and your team finish
 5    valuing the securities it was asked to value?
 6        A.   I don't recall the date that it was.
 7        Q.   If you could ballpark it for me.  Was
 8    it September 22?
 9        A.   No.
10        Q.   Was it --
11        A.   I would have -- I thought --
12        Q.   Weeks after the transaction?  A month
13    after the transaction?
14        A.   It was -- it was definitely several
15    weeks.  It took some time to get everything, you
16    know, finalized.  There were some preliminary
17    numbers that came up within a couple weeks, but,
18    you know, the final numbers and the final review
19    ended up taking several weeks.
20        Q.   And is it your understanding that
21    prices were changed based off the results of
22    your valuation that didn't conclude until at
23    least weeks after the transaction closed?
24        MR. THOMAS:  Objection to form.
25        A.   I don't recall that.  It's possible
```

Page 104

```
 1         HIGHLY CONFIDENTIAL - Landreman
 2    that there may have been some price adjustments
 3    both up or down based upon what we saw as we
 4    reviewed certain assets in more detail as more
 5    data became available.
 6        Q.   For purposes of valuing the
 7    securities, were you and your team initially
 8    valuing those securities as the date of receipt
 9    or some other date?
10        A.   We were instructed to provide values
11    as of specific dates, whether it was the 19th,
12    the 22nd, or a number of days in between.  So
13    whenever we were asked to provide valuations as
14    of effective dates, we provided the valuation as
15    of the dates that we were requested.
16        Q.   And by whom were you requested to
17    provide valuations as of a specific date?
18        A.   I don't recall specifically who asked,
19    but I know that we've been asked on multiple
20    occasions by different senior management to
21    provide valuations as of specific dates.
22        Q.   And were you told or did you have an
23    understanding at any point what the basis for
24    using the close of business on September 19 was
25    initially?
```

Page 105

```
 1         HIGHLY CONFIDENTIAL - Landreman
 2        A.   I was --
 3        MR. THOMAS:  Objection to form.
 4        A.   I was ambivalent.  To me, I was being
 5    asked to value as of a certain day.  I valued as
 6    of a certain date.
 7        Q.   And so did you and your group never
 8    opined as to what would be a more appropriate
 9    measurement date for a security based off of a
10    point in time?
11        A.   That would be a dialogue with
12    Technical Accounting and Price -- PwC.  They
13    would be the experts that would opine on the
14    effective date of the transaction.
15        Q.   Most of the securities that your group
16    was responsible for valuing were received
17    through the repo; is that correct?
18        MR. THOMAS:  Objection to form.
19        A.   I believe so.
20        Q.   And those positions, most of them, had
21    been received as of Friday, September 19; is
22    that correct?
23        MR. THOMAS:  Objection to form.
24        A.   I don't know when we physically
25    received the securities.
```

Page 106

1          HIGHLY CONFIDENTIAL - Landreman
2      Q.   On some of the spreadsheets and
3   throughout the matter, we've been referring to
4   the securities that arrived on September 19
5   through the repo as the initial inventory.
6          Are you familiar with that term?
7      A.   Vaguely.
8      Q.   Do you have a ballpark figure of the
9   number of CUSIPs that your team was responsible
10  for that would be considered initial inventory
11  securities?
12          MR. THOMAS:  Objection to form.
13      A.   I don't recall that, that -- I know it
14  was a large number, but I don't know what the --
15  what the count of securities was.
16      Q.   But there was a significant number of
17  CUSIPs that your team valued that came over as
18  part of the initial inventory; is that correct?
19          MR. THOMAS:  Objection to form.
20      A.   There was a large file of securities,
21  yes.
22      Q.   As part of the initial inventory, as
23  opposed to later securities transferred; is that
24  correct?
25          MR. THOMAS:  Objection to form.

Page 107

1          HIGHLY CONFIDENTIAL - Landreman
2      A.   Again, I don't know your definition of
3   the "initial inventory" because it was really
4   irrelevant to us.  We were given a list of
5   positions to price as of effective specific
6   days, and that's what we did.
7      Q.   I'm handing you what's previously been
8   marked as Deposition Exhibit 86B, and I will
9   also hand you what's previously been marked as
10  Deposition Exhibit 87B.
11          Have you previously seen either of
12  these two documents?
13      A.   I don't recall seeing these documents
14  before.
15      Q.   Have you seen a variation of this
16  document before?
17      A.   I could have seen a variation of a
18  document like this before.
19      Q.   I ask because I have numerous,
20  numerous ones I can possibly show, so I just
21  want to shortcut this in the sense of, would a
22  document like this have been put together by
23  someone in PCG?  Let's start there.
24          MR. THOMAS:  Objection to form.
25      A.   This document would appear to be

Page 108

1          HIGHLY CONFIDENTIAL - Landreman
2   created by somebody potentially in PCG or in
3   Financial Control.
4      Q.   I'm going to give you what's
5   previously been marked as Deposition Exhibit
6   641A.  We have tabbed a couple of pages.  You
7   don't need to turn to them yet, but just for
8   convenience.
9          Just let me know when you're ready.
10          (Document review.)
11      A.   I think I'm ready.
12      Q.   Okay.  Deposition Exhibit 641A was
13  produced to us and appears to be at least
14  substantially similar in parts to Deposition
15  Exhibit 86B and 87B, and perhaps, in its full
16  glory, it might be easier to question you based
17  off of 641A.
18          MR. THOMAS:  Do you want to direct him
19      to the parts that you think are
20      substantially similar?
21      Q.   Yes.  Why don't we start out with the
22  first page that we have tabbed, which is what
23  we'll use in lieu of 86B, which is one Excel tab
24  of a much larger Excel workbook, and the Excel
25  workbook is at BCI-EX-(S)-00213995 and it is the

Page 109

1          HIGHLY CONFIDENTIAL - Landreman
2   summary tab, and the other tabs of that Excel
3   workbook are broken out by asset category that
4   at least roughly match up with those in the
5   summary tab.
6          Have you seen this workbook before?
7      A.   Not that I recall.
8      Q.   Do you believe that you or anyone on
9   your team was responsible for creating it?
10          MR. THOMAS:  Objection to form.
11      A.   I believe that we contributed data to
12  Sean, who would have put this together.  I think
13  it would be Sean or somebody in the Financial
14  Control side.
15      Q.   If you'll turn to the fourth column,
16  fourth column, which is titled "PCG Value"?
17      A.   Uh-huh.
18      Q.   Would you expect that the values in
19  that column would reflect the valuations of your
20  group, where applicable?
21          MR. THOMAS:  Objection.  Foundation.
22      A.   I would say that those would have been
23  close to being the values that we derived, or
24  the values as they were calculated, without any
25  liquidity adjustments.

Page 110

HIGHLY CONFIDENTIAL - Landreman

1

2   Q.   In terms of price testing, how is the
3   process broken up between testing of value as
4   opposed to testing of liquidity adjustment?
5   A.   Normally, in the securitized products
6   world, there's a -- the liquidity adjustment
7   would not -- we would have a trader's mark, and
8   the difference between PCG price and the
9   trader's mark, or the variance, we would expect
10  it to be a conservative variance.
11  Q.   If you'll turn your attention to the
12  two rows titled "PMTG" and "PMTG II."  Your
13  group was responsible for valuing certain of the
14  securities within PMTG and PMTG II, correct?
15  A.   Correct.
16  Q.   Would you expect that for those assets
17  that your group was responsible for within PMTG
18  and PMTG II, that there would be any
19  contribution to the numbers within the column
20  "MV - 9-22 with Bid - Offer," which appears to
21  be the liquidity adjustment?
22       MR. THOMAS:  Objection.  Form.
23  A.   I don't know if that's what that
24  means.  I don't know --
25  Q.   I'm just trying to understand your

Page 111

HIGHLY CONFIDENTIAL - Landreman

1

2   earlier answer about the asset class that you
3   cover and that you wouldn't expect there to be
4   much of a liquidity adjustment for those assets,
5   and I just want to know, does that mean that
6   there is no liquidity adjustment for any of the
7   assets that your group was responsible for
8   valuing?
9        MR. THOMAS:  Objection to form.
10  A.   No, there were liquidity adjustments
11  for the assets that my group valued.
12  Q.   And would there be specific asset
13  classes for which there would be liquidity
14  adjustments?
15  A.   Yes.
16  Q.   And which would those be?
17  A.   We listed all of the assets that we
18  provided liquidity adjustments for and the
19  amount of the adjustment by the asset category.
20  Q.   Let's turn to the second tab, which is
21  also within the Excel workbook Bates-stamped
22  BCI-EX-(S)00213995 and is what is found within
23  the tab of that Excel workbook titled
24  "Liquidity."
25       Have you seen this document before?

Page 112

HIGHLY CONFIDENTIAL - Landreman

1

2   A.   Yes, I have.
3   Q.   Did you assist in its creation?
4   A.   Yes, I did.
5   Q.   Would you direct me to which of the
6   subtypes you and your group would have had
7   responsibility for?
8   A.   Might be easier if you just go by the
9   tabs.
10  Q.   Okay.  Let's go back to --
11  A.   I would have the RMBS.  That includes
12  all RMBS-Reperforming, U.S. agency CMOs, U.S.
13  agency pools, and the PMTG tab.
14  Q.   Everything within the PMTG tab?
15  A.   There will be certain corporate and
16  credit-related -- like the certificate of
17  deposits and the corporate credit senior was not
18  part of -- it's not familiar to me.
19  Q.   So it appears that there's a
20  significant number of securities within your
21  group that applied a liquidity haircut.  I'm
22  just trying to understand, reconcile it with
23  your earlier statement about your asset class
24  and liquidity adjustments.  So perhaps you can
25  just explain a little bit more for me in terms

Page 113

HIGHLY CONFIDENTIAL - Landreman

1

2   of --
3   A.   Within each asset category or asset
4   type, we reviewed all of the pricing data points
5   that we received for the various points in time,
6   and we looked at a dispersion of pricing,
7   assuming that each one of these indications was
8   considered to be a fair value measurement, to
9   show the variability amongst different opinions
10  as to what the values could be or the
11  uncertainty or the pricing dispersion, and
12  within each category, we calculated a generic
13  liquidity haircut based upon the pricing
14  dispersion that we saw within these positions.
15  Q.   But only for those securities that
16  were not priced based off of the internal sales
17  price; is that correct?
18       MR. THOMAS:  Objection to form.
19  A.   I would need to see if there were
20  traded prices that had liquidity adjustments.  I
21  didn't know if there would be or not.  I would
22  have to see.
23       (Luncheon Recess; Time Noted: 12:56
24  P.M.)
25

Page 114

HIGHLY CONFIDENTIAL - Landreman
1       HIGHLY CONFIDENTIAL - Landreman
2           AFTERNOON SESSION
3           (Time Noted: 1:42 P.M.)
4   RICHARD LANDREMAN, resumed and
5       testified further as follows:
6   EXAMINATION BY (Cont'd.)
7   MR. CARRERO:
8       Q.   Mr. Landreman, before the break, we
9   had left off looking at what has previously been
10  marked as Deposition Exhibit 641A.  If you could
11  put that in front of you as well as what we
12  marked earlier today as 800B.
13          Do you have it in front of you?
14      A.   Yes, I do.
15      Q.   Could you tell me a little bit about
16  the attachment to this e-mail from Mr. Teague to
17  you and others dated October 27, if you're
18  familiar with it.
19      A.   Where would you see the attachment?
20      Q.   Does your document not have -- I'm
21  sorry.  If you turn to what on my copy comes
22  after placeholder document Bates-stamped
23  BCI-EX-(S)-00207969 and then has what is an
24  Excel workbook printed out.
25      A.   Okay.

Page 115

HIGHLY CONFIDENTIAL - Landreman
1
2       Q.   Have you seen this document before?
3       A.   I don't recall this.
4       Q.   Do you recall providing data that was
5   used in its creation?
6       A.   I don't recall that.
7       Q.   Does that apply to each page of the
8   attachment or only to the first page?
9           MR. THOMAS:  Objection to form.
10      A.   I don't remember the data that went
11  into here, although it would have come from my
12  group, or pieces of it would have come from my
13  group.
14      Q.   Is the data that is within the
15  attachment to 800B an earlier point in time than
16  the data that ultimately feeds into Deposition
17  Exhibit 641A?
18          MR. THOMAS:  Objection to form.
19      A.   Which tab on 641A?
20      Q.   If you turn back to the first flag
21  that we have put on the document for you, that
22  summary page as well as all the supporting pages
23  that roll into that summary page.
24          Why don't we step back.  I'm just
25  trying to get an understanding of the process

Page 116

HIGHLY CONFIDENTIAL - Landreman
1       HIGHLY CONFIDENTIAL - Landreman
2   that was under way in the fall of 2008 in
3   valuing the securities that your group was
4   responsible for and how the outcome of that
5   analysis was subsequently disseminated and makes
6   its way into the acquisition balance sheet.
7           I've seen, and I can put a number --
8   I'm trying to make this as few documents as
9   possible, but I can put a number of documents in
10  front of you where we see correspondence
11  internally as well as with PwC.  Data is going
12  back and forth.  I want to understand your role
13  in that process of valuing the securities and
14  getting data into what are a number of
15  spreadsheets.
16          So with that said, were you personally
17  involved in the creation of any spreadsheets
18  that record the results of price testing by your
19  group?
20      A.   No.
21      Q.   Did you review a number of
22  spreadsheets that record the outcome of price
23  testing by your group?
24      A.   I would only have reviewed results as
25  it pertains to the asset categories that I price

Page 117

HIGHLY CONFIDENTIAL - Landreman
1       HIGHLY CONFIDENTIAL - Landreman
2   tested.
3       Q.   And could you describe for me what
4   those spreadsheets look like?  I've got so many
5   spreadsheets here.  I'm trying to shortcut it in
6   terms of what --
7       A.   The spreadsheets that I would have
8   reviewed would have been produced in my group
9   that showed that the assets that we were giving
10  to Sean to consolidate would have tied back to
11  the numbers of the population that we were given
12  in terms of number of securities and the
13  notional balances, and then we would have
14  provided market values and any adjustments that
15  would have been prescribed at the time.
16      Q.   So, turning back to 641A, if you go
17  back to the first page that's flagged, which is
18  a summary page, and that is within Excel
19  workbook Bates-stamped BCI-EX-00213995, in
20  addition to a summary tab in that Excel
21  spreadsheet, there are a number of tabs that
22  correspond to asset classes, including RMBS and
23  PMTG.
24          Would your group have created the
25  underlying CUSIP-by-CUSIP tabs of the

30 (Pages 114 to 117)

Page 126

HIGHLY CONFIDENTIAL - Landreman
1
2   A.   Sean would have.
3   Q.   Is it your understanding that the
4   September 30 date in this e-mail has no relation
5   to the date of any internal sales within
6   Barclays of assets acquired from Lehman?
7        MR. THOMAS:  Objection to form.
8   A.   I don't understand the question.
9   Q.   This September 30 date referenced in
10  this e-mail, does it relate at all to the
11  internal sale of assets within Barclays?
12  A.   I don't know that.
13  Q.   So looking first at what has been
14  previously marked as Deposition Exhibit 548A,
15  just take a quick look, and turning your
16  attention to the second page, there's a, at the
17  top, there's an e-mail from Marcus Morton dated
18  January 29 to you, among others.  Subject is
19  Opening BS Valuation Work, and it says, "Can you
20  please read and respond to the appropriate
21  points?"  Do you see that?
22  A.   Yes.
23  Q.   And then below there's an e-mail from
24  PwC to Morton, and it asks a series of
25  questions.  Do you see that?

Page 127

HIGHLY CONFIDENTIAL - Landreman
1
2   A.   Yes.
3   Q.   If you turn your attention to number
4   1, which says, "Bid/offer - The desk marks to
5   bid.  The valuation adjustment has been taken on
6   the desk price.  Therefore, this appears to be
7   double-counting.  From a consistency purpose,
8   the liquidity adjustment is not used at December
9   31."
10       Do you know what this is a reference
11  to?
12  A.   No, I do not.
13  Q.   Do you recall responding to PwC on
14  this point?
15  A.   Sean would have most likely responded
16  to question number 1.
17  Q.   And why would you expect that Sean
18  would have been the one to respond to question
19  number 1?
20  A.   The majority of the value
21  adjustment -- valuation adjustment dialogue and
22  discussion was managed by Sean.
23  Q.   And do you know why that was, that it
24  was managed by Sean?
25  A.   He was managing the majority of the

Page 128

HIGHLY CONFIDENTIAL - Landreman
1
2   consolidated reporting tasks for the portfolio.
3   Q.   And what were your roles with respect
4   to the consolidated reporting tasks?
5   A.   Responding to my segments to Sean.
6   Q.   Would any of the points raised below
7   have been points that fell within your area?
8   A.   Point 2.
9   Q.   Would that have been related to you
10  because it's to PMTG?
11  A.   The assets within PMTG, the majority
12  of which were securitized products, correct.
13  Q.   What about number 3?
14  A.   3 was more of a Sean Teague issue.
15  Q.   Did Mr. Teague have primary
16  responsibility for the valuation of Pine?
17  A.   I believe so.
18  Q.   If not Teague, is there anyone else
19  you would expect would have had primary
20  responsibility for the valuation of Pine?
21  A.   For the testing of it or for the --
22  Q.   Go ahead.
23  A.   That was a joint effort between the
24  business and the Product Control due to the
25  nature of the asset and the lack of available

Page 129

HIGHLY CONFIDENTIAL - Landreman
1
2   data for the specific structure and the fact
3   that this was a newly formed structure which was
4   really a bottom-of-the-barrel security which
5   really had no precedent in the market at that
6   time.
7   Q.   And who within the business would have
8   been involved in the valuation of Pine?
9   A.   Within Stephen King's world, there was
10  Jasen Yang and his team.
11  Q.   If you could turn to what has been
12  marked as Deposition Exhibit 813B.
13       (Exhibit 813B, a document bearing
14   Bates Nos. PwC-BarCap11225 through 11310,
15   marked for identification, as of this date.)
16       (Document review.)
17  A.   Okay.  I see this.
18  Q.   Okay.  Have you seen this document
19  before?
20  A.   No, I have not, or I don't recall.
21  Q.   Can you turn your attention to the
22  third page heading 10.2, "Positions prices using
23  other matrices, models or custodian price."  The
24  first sentence says, "The following portfolio
25  sub-portfolios were fair-valued as follows."  Do

33 (Pages 126 to 129)

Page 130

HIGHLY CONFIDENTIAL - Landreman
1
2   you see that?
3       A.   Yes, I see that.
4       Q.   Would you have been the person to
5   supply PwC with the information on how the PMTG
6   assets below were valued?
7           MR. THOMAS: Objection. Form.
8       A.   PwC would have come to my team and
9   received all of its supporting detail for
10  everything that we performed in the valuations,
11  and they had their experts review everything we
12  did and they documented that here.
13      Q.   So, taking a step back and discussing
14  the process by which you and your team would
15  have interacted with PwC, when did that process
16  start?
17      A.   It was, as far as I could recollect,
18  it was nearly instantaneous. They are always,
19  you know, conversing with my team about
20  different sources. So when they started this
21  particular analysis, I couldn't give you the
22  exact date, but I'm sure it was -- they were
23  asking for data while we were still pricing the
24  portfolio and they were watching everything we
25  were doing while we were valuing the portfolio.

Page 131

HIGHLY CONFIDENTIAL - Landreman
1
2       Q.   And were you yourself the primary
3   communicator for your asset classes, or did
4   someone else on your team play that role?
5       A.   I would have had the PwC auditors meet
6   with the analysts who performed the valuations.
7       Q.   If you would take a look at the
8   section labeled 8, "Bid/offer - JPM Portfolio."
9       A.   Where is that? Oh, Section 8?
10      Q.   Section 8. Sorry. And do you see
11  where it says, "Due to the fact that all
12  positions were priced by the FO at 12/31, no
13  bid/offer was required at 12/31 to adjust the
14  traders' prices (and all PMTG positions were in
15  PMTG trading desks at 12/31 and not the PMTG
16  management book) prove?"
17          Do you know if that is an accurate
18  statement?
19          MR. THOMAS: Objection to form.
20      A.   The physical movement from the
21  management book to the trading desk's books
22  would have been a line controller's function,
23  so...
24      Q.   I'm sorry, could you explain that a
25  little bit more in terms of the physical

Page 132

HIGHLY CONFIDENTIAL - Landreman
1
2   movement as opposed to the valuation of?
3       A.   Where the securities reside, in which
4   books or which legal entities or wherever they
5   are being managed, is a function of the line
6   controllers. The line controllers would give us
7   a list, a population of securities to value, and
8   we would value those securities and return the
9   results back to the line controllers and to the
10  business as well.
11      Q.   I guess my confusion lies with how
12  does the JPM portfolio differ from the initial
13  inventory with respect to the valuation process
14  that would have been undertaken by your group?
15      A.   Well, we priced it as of the dates
16  that we were told to price it as of. In terms
17  of the process, the securities which we received
18  from JPMorgan even worse than these things
19  we received from Lehman Brothers. So it was a
20  little more difficult to value these securities
21  just because of the nature of the assets.
22          However, it was a similar process that
23  we used to price both portfolios.
24      Q.   So in the section above 7, "Changes In
25  Measurement Dates - JPM Portfolio," do you see

Page 133

HIGHLY CONFIDENTIAL - Landreman
1
2   where it says, "PT priced the JPM securities as
3   of December 22. FO priced the PMTG portfolio at
4   12/31 and PT performed independent price
5   verification as of that date." Do you see that?
6       A.   Okay. Your question again was?
7       Q.   You see that?
8       A.   I see that, yes.
9       Q.   And what does "PT" stand for?
10          MR. THOMAS: Objection to form.
11      A.   Price testing.
12      Q.   And would PT be a reference to your
13  group?
14      A.   Right.
15          MR. THOMAS: Objection to form.
16      A.   Or our function within the firm.
17      Q.   And do you see the next line under 7
18  that says, "Management identified a significant
19  number of variances in the PMTG book between
20  December 22 and December 31"?
21      A.   Yes, I do.
22      Q.   Do you have an understanding of what
23  they mean by "management"?
24          MR. THOMAS: Object to the form.
25      A.   We identified significant variances

34 (Pages 130 to 133)

1        HIGHLY CONFIDENTIAL - Landreman
2   between the prices that we derived and Product
3   Control versus the prices that we did get on
4   12/31 from the business when the traders marked
5   the positions.
6        Q.   And what was done with that variance?
7        A.   We performed a detailed discussion and
8   a deep dive with the business in regards to the
9   individual assets just because these were --
10  were so bad.  These securities were 1998
11  manufactured housing bonds.  These were things
12  that nobody sees.
13       Q.   And in terms of Barclays' acquisition
14  accounting, is it your understanding that the PT
15  price as of December 22 is the one that was
16  used?
17       MR. THOMAS:  Objection to form.
18       A.   I don't know which price they used.
19       Q.   As a general matter, do you know which
20  prices, what prices were used for any CUSIP for
21  purposes of Barclays' acquisition accounting?
22       A.   Not with certainty.
23       Q.   Who made the decision of what price
24  would be used for purposes of Barclays'
25  acquisition accounting?

1        HIGHLY CONFIDENTIAL - Landreman
2        A.   That, I don't know the answer to that.
3        Q.   If you had to guess, who would make
4   that decision?
5        A.   I would assume that whoever is
6   responsible for publication of the financial
7   statements would have opined on which values
8   were to be used.
9        Q.   And when you say responsibility for
10  publication, who would that be?
11       A.   Whether that was the Technical
12  Accounting Group, which would be Gary Romain's
13  group for the financial reporting, or if it was
14  all the way to Patrick Clackson or James Walker
15  in the U.S., somebody who was, you know, whose
16  name is responsible on the financial statements.
17       At this point, it may have been James
18  Walker in the U.S.  I really don't know who
19  would have made that decision.
20       Q.   If you would take a look under 5,
21  "Changes in Measurement Dates - Lehman
22  Portfolio."  If you'll turn to the last
23  paragraph -- I'm sorry, second-to-last
24  paragraph, do you see where it says, "Barclays'
25  policies and procedures require the front office

1        HIGHLY CONFIDENTIAL - Landreman
2   FO or trader to value trades as the trading
3   experts and PT to independently verify FO marks.
4   Between September 22 and September 30, PMTG
5   transferred the majority of assets from the PMTG
6   management book to the PMTG trading desks
7   through an internal auction.
8        "As of September 30, front office
9   marked all positions and PT performed
10  independent price verification over the FO marks
11  in accordance with Barclays' policies and
12  procedures."
13       A.   I see that.
14       Q.   Is that an accurate statement?
15       A.   That would be accurate.
16       Q.   Earlier when we were discussing
17  internal sales prices, it was unclear whether or
18  not PT was valuing the securities independently
19  or were price testing the internal sales price.
20       Does this refresh your recollection?
21       A.   As of 9/30, we would have had a trader
22  mark on the book.  As of 9/22, we would not have
23  had a trader mark.
24       Q.   So, for purposes of the price of the
25  position on September 22, your group had come up

1        HIGHLY CONFIDENTIAL - Landreman
2   with its independent price through the process
3   that we discussed earlier?
4        A.   Uh-huh.
5        Q.   Is that correct?
6        A.   Correct.
7        Q.   And then later, come September 30,
8   there would be an internal sale within Barclays
9   that would generate a price which your group
10  subsequently price tested; is that correct?
11       MR. THOMAS:  Objection.
12       A.   I don't --
13       MR. THOMAS:  Objection to form.
14       A.   I don't know when the sale took place,
15  if it was any day in between there or if it was
16  September 30.  I don't know the official trade
17  date of any securities that were transferred off
18  the top of my head.
19       Q.   And do you know whether, for purposes
20  of Barclays' acquisition accounting, they
21  accounted for the majority, which is the way
22  that it is characterized here, the majority of
23  the PMTG assets acquired using the prices that
24  your group came up with with an earlier date in
25  September or if they accounted for it using the

Page 138

HIGHLY CONFIDENTIAL - Landreman

1
2   internal sales price as of September 30?
3       A.    You would need to check with the
4   accountants on that because I performed the
5   valuations that we performed, and how the
6   information we provided was used by the
7   accountants was really a function of the
8   accounting groups.
9       Q.    Would you agree that the value
10  potentially would be different as of an earlier
11  date in September that was over a week before
12  September 30?
13          MR. THOMAS:  Objection to form.
14      A.    It depends which assets you're
15  discussing.  There may have been no change in
16  value, depending upon the asset category, or
17  there could have been, depending upon what
18  happened in the markets during that time.
19      Q.    Was a process ever undertaken to
20  compare the prices that your group had come up
21  with as of the earlier date, the acquisition
22  date, versus the internal sales prices within
23  Barclays?
24      A.    I'm sorry, can you repeat that?
25      Q.    Was there a process by which the

Page 139

HIGHLY CONFIDENTIAL - Landreman

1
2   internal sales prices as of September 30 were
3   compared to the prices as of the acquisition
4   date before a determination was made as to which
5   to use for acquisition accounting?
6       A.    If you look at this attachment in
7   section 5, PwC did a full review of the 9/22
8   versus the 9/30 prices, as did we, and they
9   reviewed our work.
10      Q.    And were you involved in that process?
11      A.    I would have been involved in that
12  process for the review of the asset valuations.
13      Q.    But you were not involved in the
14  decision of whether to use the 9/19 estimates as
15  opposed to the 9/30 fair value estimates?
16      A.    I was not involved in the technical
17  accounting aspects.
18      Q.    Do you know if any of the securities
19  that were auctioned internally were offered to
20  third parties in the market before they were
21  acquired by Barclays' trading desks?
22      A.    I don't know that.
23      Q.    Do you know if the majority of assets
24  in PMTG were amortizing assets?
25      A.    The majority of the assets in PMTG

Page 140

HIGHLY CONFIDENTIAL - Landreman

1
2   were mortgage-related, so they would have been
3   amortizing, yes.
4       Q.    And do you know what a remittance
5   report is?
6       A.    Yes, I do.
7       Q.    Could you explain what one is?
8       A.    A remittance report is published by
9   the master trustee to present to the investors
10  the performance of the trust and also show any
11  cash inflows and outflows of the trust for that
12  period of time.  The remittance reports are
13  generally prepared on a monthly basis, but some
14  of the more esoteric assets may be produced on a
15  quarterly basis.
16      Q.    Do you know for the amortizing assets
17  the date of the remittance reports that would
18  have been used to value the assets acquired?
19      A.    Well, depending upon the structure,
20  the remittance reports may be issued on the 25th
21  or the 26th.  There are different dates that
22  remittance reports are issued, depending upon
23  the structure.
24      Q.    And do you know whether remittance
25  reports for September 25th as opposed to August

Page 141

HIGHLY CONFIDENTIAL - Landreman

1
2   25th were used for purposes of valuing the
3   securities as of September 19?
4       A.    We would have been using the publicly
5   available data as of the 22nd through the --
6   with backdating the analysis to the date in
7   question.  So it would have been using the
8   historical data, not the actual data from
9   September.
10      Q.    So you would have used the September
11  25th, but backdated it --
12      A.    When we opened the model, we would
13  have used the data that was available in the
14  model, but we would have asked the analysis to
15  be as of a specific date, which would have
16  ignored the updated information on the
17  remittance report.
18      Q.    If valuing a security as of September
19  19 and you had to enter a price on that day, and
20  a September 25 remittance report would not be
21  available, how do you account for that by
22  using -- scratch that.
23          Does the model, does making those
24  inputs within your model take into consideration
25  the fact that that information would not have

been available as of September 19, or does it simply just back out, you know, a week's time?

MR. THOMAS: Objection to form.

A. The key driver in a securitized product valuation is the spread information that you input as well as any assumptions as it relates to prepayments or defaults, and our assumptions on the prepayments and defaults would have been driven on more generalized market parameters as opposed to, you know, something we would have found specifically in that bond's remittance report at that month.

Q. So is it fair to say that the way it was done, the September 25th remittance report, to the extent it included any new pricing data, it really wouldn't have been used in the model?

MR. THOMAS: Objection to form.

A. We already owned a large portfolio of mortgage-backed securities, and we had been applying pricing and methodologies that were consistent with how we price our existing portfolio.

We also owned our own mortgage originator and our own mortgage servicer at the





time, and we had trend data that we used in the prediction or the estimation of the assumptions that we would use in our valuation.

The remittance reports generally were confirming our view of the trends that we were using in our valuations.

Q. So they were not inputs into your model, they were simply used to confirm the outputs that your model generated; is that correct?

A. Unless there was a material deviation from our expectations of the performance of a bond on any given basis, generally the updates of the remittance reports had minimal effects on our valuations.

Q. September 25th remittance reports were used and could have had some effect on your valuations, even if minimal, correct?

A. Within -- potentially.

Q. If I could have you also put in front of you what was previously marked 808B.

A. Okay. 808B.

Q. Turning your attention back to the e-mail we were looking at earlier from Sean





Teague dated September 15, Roman II, "ABS Testing," and reference to a matrix developed by your group for Alt A positions?

A. Okay.

Q. Was this matrix based on recent trade levels even where there was little trading activity?

Forgive me for being a layperson, I might be butchering the terminology here, but could you just tell me about the matrix being used for Alt A securities?

A. The prices that we observed for trades in the market was the market at the time. So there was limited trading, but there was trading. We did have a running trend of the trades so we were looking at what was happening pretty much every day for the prior six months, and every month we would calibrate these curves to the trades that we would see in the market.

So, based upon the product and the vintage and the performance of that specific bond, we would track all of the trades and use that in the process of creating these spread matrices that we would apply toward comparable





bonds.

Q. And the same matrix would have been used for ultimately price testing the internal sales price within Barclays for any Alt A securities acquired from Lehman?

A. For all securities.

Q. For all Alt A securities?

A. Yes.

Q. And the same matrix would have been used for purposes of pricing the securities as of the acquisition date for all Alt A securities acquired?

A. The prices derived in my group would have been derived using the models that we had internally.

Q. And the models would have been the matrix that is --

A. The data within the matrix would have been incorporated within the modeling of the bond.

Q. And how would the bond have been modeled? What would the next step be after you've got a matrix? Those are your inputs for your model; is that correct?

Page 146

```
1            HIGHLY CONFIDENTIAL - Landreman
2       A.   Right.
3       Q.   And what kind of model is it?
4       A.   Well, there are vendor models like
5   Intex or, you know, Polypaths was another
6   application that we used which was really a
7   wrapper into Intex, or Bloomberg.  There are a
8   number of vendored models that we were able --
9   we could use to price, for example, an Alt A
10  bond, we would take the spread assumption, the
11  discount rate that we would derive from our
12  observable trades because we had a number of
13  trades that traded at a specific spread, we
14  would have used that spread to -- or a
15  comparable spread to price this bond if they
16  were of comparable quality or of comparable
17  vintage and performance.
18           But we would look at all of the
19  parameters in the bond in a very detailed manner
20  to make sure that we were projecting what we
21  thought was going to be the real performance of
22  that bond going forward to derive a fair value.
23      Q.   And would that include testing the
24  fundamentals of the underlying loans?
25      A.   We would be looking at the performance
```

Page 147

```
1            HIGHLY CONFIDENTIAL - Landreman
2   of the bonds that composed the entire security.
3       Q.   And are you aware of any document that
4   contains all of the inputs used for modeling Alt
5   A securities?
6       A.   Yes, that would be part of our working
7   papers.
8       Q.   I'm going to hand you what has been
9   previously marked as Deposition Exhibit 635A.
10           (Document review.)
11      Q.   You ready?
12      A.   Sure.
13      Q.   This is an attachment behind a letter
14  from counsel that accompanied the production.
15           Have you seen the attachment before,
16  which is Bates-numbered 00302803?
17      A.   Yes, I have.
18      Q.   And can you tell me what it is?
19      A.   Each of these boxes represents a
20  spread matrix that we would apply towards a
21  different asset category.  So, for example, a
22  prime bond was, you know, the best quality
23  mortgages at the time.  The LCR would stand for
24  a loss coverage ratio, which we would calculate.
25           There was a formula to say how much
```

Page 148

```
1            HIGHLY CONFIDENTIAL - Landreman
2   credit supporting existed within the structure,
3   and that loss coverage ratio, the higher the
4   ratio meant there was more credit support within
5   the bond to protect that investor from losses,
6   and as your loss coverage ratio would go down,
7   these spreads with widen to account for the
8   higher risk.
9            We calculated these spreads based upon
10  observable trades, where we would take any bond
11  that traded, we would look at the spread, and
12  then we would then graph and point out where the
13  loss coverage ratio was for that specific bond.
14  So we would be able to draw a curve that would
15  show where the loss coverage ratio could be or
16  should be in our matrix.
17      Q.   Okay.  To break that down a little
18  bit, is this the Alt A matrix that's referenced
19  in the document we had previously reviewed,
20  Deposition Exhibit 808B?
21           MR. THOMAS:  Objection to form.
22      A.   The three matrices on the top of this
23  page are Alt A matrices.  So, prime, Alt A and
24  option ARMs are all considered, theoretically,
25  Alt A for -- in mortgage vernacular.
```

Page 149

```
1            HIGHLY CONFIDENTIAL - Landreman
2       Q.   And the numbers within this matrix
3   would then, in turn, have been put into a model;
4   is that correct?
5       A.   Correct.
6       Q.   Are there any other inputs into that
7   model besides what's within this matrix, which
8   is the first page of the attachment?
9       A.   Yes.  There would be a prepayment
10  speed assumption.
11      Q.   And would that input be somewhere
12  within this same document?
13      A.   It should be, however I'm not able to
14  read the attachments clearly in the handout you
15  have given me.
16      Q.   We can pull it up electronically,
17  which I would rather not, but provided that this
18  copy is not the best, does it look as though
19  it's the type that would contain that
20  information, or should I bring up --
21      A.   The spreadsheet should contain some of
22  the other assumptions that were used, but I
23  don't know if I see it in this version of the
24  spreadsheet.
25      Q.   It's my understanding, you know, and
```

Page 150

HIGHLY CONFIDENTIAL - Landreman
1
2  we can have this conversation off the record if
3  you prefer, that based on the production letter
4  and our conversations for this type of material,
5  that this is it, this is what's supposed to
6  include that information, it's the backup.
7       And we can pull up the e-mail that's
8  referenced in Boies Schiller's February 22
9  letter dated -- the e-mail dated February 18
10 that's referenced for further discussion about
11 it.  I just would like to know, if not in this
12 type of document, where would we find the other
13 assumptions that would have been used?
14      A.   I mean, this spreadsheet was a
15 presentation that was the discount margin
16 application and then the pricing results.  So if
17 you needed to see the prepayment assumptions
18 that were used, they could be provided.
19      That may have been a column that was
20 hidden in this spreadsheet that was hidden when
21 it was printed.  There was lots of data
22 underlying these models, so ...
23      Q.   In addition to the matrix and the
24 prepayment input, what other sorts of inputs
25 went into the model and are they captured within

Page 151

HIGHLY CONFIDENTIAL - Landreman
1
2  this document?
3       A.   I mean, there's a lot of information
4  that we used in the valuation of a security
5  which we boiled down to a, you know, loss
6  coverage ratio and a discount margin that I
7  would not -- that I don't see on this specific
8  spreadsheet.
9       Q.   And where would you keep that type of
10 information?
11      A.   Again, in the working files.  We
12 downloaded indicative data.  We download data
13 about the performance of the bonds in our
14 spreadsheets.  And the working files get so
15 large that, in order to print a report out that
16 would fit on a spreadsheet, you would make it
17 smaller for the printout and, depending upon who
18 requested the data, we would present that data
19 that they requested.  So ...
20      Q.   If you could just put that aside and
21 we put before you a document that's previously
22 been marked Deposition Exhibit 646A.
23      A.   Yes.
24      Q.   Have you ever seen this document
25 before?

Page 152

HIGHLY CONFIDENTIAL - Landreman
1
2       A.   No, I have not.
3       Q.   Will you turn to page 5 of this
4  document, actually, at the very bottom of page
5  4, and the chart has a row related to non-agency
6  mortgage-backed securities and then a column
7  about the procedures performed by PwC followed
8  by a column of the observations/conclusions PwC
9  reached.
10      Without asking you to sit here and
11 read all of it, similar to what we previously
12 marked as Deposition Exhibit 813B, which was a
13 PwC e-mail recording --
14      A.   813B, okay.
15      Q.   What, if any, role did you have in
16 supplying this information to PwC?
17      A.   We provided PwC with all of our
18 working documentation and all of the paperwork
19 that they requested to perform a full audit of
20 the fair value process that we performed.
21      Q.   If you look at page 5 of 646A, and you
22 see within the document are embedded
23 spreadsheets, including you can see an
24 attachment called Matrix Comparison Summary.xls,
25 and then below that, Matrix Comparison (#3).

Page 153

HIGHLY CONFIDENTIAL - Landreman
1
2  Scratch that.
3       (Recess; Time Noted:  3:14 P.M.)
4       (Time Noted:  3:27 P.M.)
5       (Exhibit 814B, a document bearing
6  Bates Nos. PwC-BarCapWP_23318 through 23351,
7  marked for identification, as of this date.)
8  BY MS. CARRERO:
9       Q.   Mr. Landreman, I have put before you
10 what has been marked as Deposition Exhibit 814B.
11 If you could turn your attention to the third
12 page, there is an e-mail from Andrew Pickett to
13 you and Mr. Teague dated December 18, subject:
14 "Lehman Acquisition Prices."  Do you see that?
15      A.   Page 3, yes, I see that.
16      Q.   And do you see Mr. Pickett writes,
17 "Sean and Rich, we are trying to close out our
18 documentation of the positions acquired from
19 Lehman, and had two points of clarification to
20 run by you:
21      "1.  Is the 10 to 25 percent liquidity
22 haircut at 9/30 applied to call BarCap CDO/CLO
23 positions or the Lehman/JPM acquisition
24 positions?"
25      Do you see that?

Page 154

HIGHLY CONFIDENTIAL - Landreman

1
2      A.   I see that.
3      Q.   Are liquidity haircuts at September 30
4   applied to all of Barclays' CDO/CLO positions as
5   of that date, or is it only to the Lehman/JPM
6   positions that were acquired?
7      A.   You probably need to speak to Sean
8   about this specific question because, in terms
9   of the application of the liquidity haircuts as
10   of 9/30, I wasn't involved in the application of
11   that for the different portfolios.
12      Q.   Would the CDO/CLO positions be within
13   your group or Teague's group?
14      A.   The CDO/CLO positions for Barclays
15   would have been in my group.  They would not
16   have been applied on the Barclays' positions.
17   However, I don't know if at 9/30 they were being
18   applied to the Lehman/JPMorgan positions.
19      I thought we were pricing these as of
20   an acquisition date with the liquidity haircuts
21   and then the business would have priced this the
22   30th.  But Sean might be able to clarify that
23   for you.
24      Q.   Was your group, as of September 30,
25   applying liquidity haircuts in the range of 10

Page 155

HIGHLY CONFIDENTIAL - Landreman

1
2   to 25 percent on other CDO positions owned by
3   Barclays at that time?
4      A.   Not where we had trader prices.
5      Q.   Would the trader's price have included
6   a liquidity haircut of anywhere in the
7   neighborhood of 10 to 25 percent?
8      MR. THOMAS:  Objection to form.
9      A.   The trader's price would have been
10   reflective of fair value.
11      Q.   And would fair value include a
12   liquidity haircut of in the range of 10 to 25
13   percent?
14      MR. THOMAS:  Objection to form.
15      A.   I don't understand that question.
16      Q.   Isn't it your group's role to price
17   test the trader's mark?
18      A.   Correct.
19      Q.   If in that price testing you were to
20   determine that the trader's mark included a 10
21   to 25 percent liquidity haircut, would that
22   constitute a fair value mark?
23      A.   The trader would not be giving us a --
24   the trader would give us a single mark and we
25   would test that mark against data that we see in

Page 156

HIGHLY CONFIDENTIAL - Landreman

1
2   the market.
3      Q.   Do I understand that to mean that it
4   is PT, meaning your group, as opposed to the
5   front office that would be the one to apply a
6   liquidity haircut, if one was to be applied?
7      MR. THOMAS:  Objection to form.
8      A.   Well, the liquidity adjustments that
9   were made in the opening balance sheet were more
10   a function of, or at least my understanding is
11   that those were a function of not having trader
12   marks on those specific positions, and once
13   the traders marked those positions, the
14   liquidity adjustments would be removed.
15      Q.   So, in the ordinary course, if you had
16   a trader's mark, there would be no need for a
17   liquidity adjustment; it's only in the absence
18   of one that a liquidity adjustment would be
19   added?
20      MR. THOMAS:  Objection to form.
21      A.   I think it's dependent upon the intent
22   of the analysis and what the -- which portfolios
23   we were talking about, which positions
24   specifically.
25      Q.   I'm just trying to get an

Page 157

HIGHLY CONFIDENTIAL - Landreman

1
2   understanding.  It's month-end, it's September
3   30, and you have positions that are within your
4   group's responsibility which includes CDOs.
5      Are you applying liquidity haircuts to
6   all CDO positions that Barclays owns, or is it
7   only with respect to those acquired from Lehman?
8      MR. THOMAS:  Objection.
9      A.   It was my understanding that the
10   liquidity adjustments were really only applied
11   on the opening day balance sheet.  So the 9/30
12   valuation for the CDO/CLO positions that were
13   already on Barclays' balance sheets would not
14   have received liquidity adjustments.
15      Q.   And then what would happen the
16   following day, October 1?  What price would be
17   reflected for those same CDO positions that had
18   a 10 to 25 percent liquidity haircut as of
19   September 30?
20      A.   I never said there was a liquidity
21   haircut as of September 30.
22      Q.   When was there a liquidity haircut as
23   of?
24      A.   The opening balance sheet?  As of --
25   was that September 22 or --

Page 158

HIGHLY CONFIDENTIAL - Landreman
1
2     Q.    So the day after the acquisition
3  balance sheet, let's say, is there going to be a
4  liquidity haircut for any position --
5        MR. THOMAS:  Objection to form.
6     Q.    -- on Barclays' balance sheet?
7     A.    The traders would have marked the
8  positions to fair value.
9     Q.    Is there a system within Barclays that
10  enables one to pull up what the marks are for
11  each CUSIP as of the day after the acquisition?
12     A.    I don't know if all of these assets --
13  I don't know where daily pricing would have been
14  stored on some of these assets.  It depends on
15  which business they were in and which front
16  office system they were entered into.
17     Q.    But it would exist somewhere within
18  Barclays' information as to the mark on the day
19  after the acquisition --
20     A.    Potentially.
21     Q.    -- balance sheet date?
22     And any increases or decreases to the
23  value from the date of the acquisition balance
24  sheet would then be recorded as P&L; is that
25  correct?

Page 159

HIGHLY CONFIDENTIAL - Landreman
1
2        MR. THOMAS:  Objection to form.
3     A.    That would be my understanding, yes.
4     Q.    And would your group price test the
5  prices that were ascribed to each security on
6  the day after the acquisition balance sheet?
7     A.    No.  We would price test at the end of
8  the month.
9     Q.    There would be no price test of the
10  day after the acquisition; is that correct?
11     A.    That would be correct.
12        (Exhibit 815B, a document bearing
13     Bates Nos. PwC-BarCap 45782 through 45787,
14     marked for identification, as of this date.)
15     Q.    Mr. Landreman, you have before you
16  what has been marked Deposition Exhibit 815B.
17  If you could take a look at the e-mail at the
18  bottom of the first page, which is from Mr.
19  Teague to yourself, among others.  It's dated
20  January 28, and it says, "Chris, I put the
21  following overview together for PwC, as I will
22  be out of the office the remainder of the week.
23  Please contact Rich Landreman in my absence."
24        Do you see that?
25     A.    Yes.

Page 160

HIGHLY CONFIDENTIAL - Landreman
1
2     Q.    And then attached, do you see a
3  document titled "Lehman Open Balance Sheet,
4  Barclays Capital Valuation Methodology"?
5     A.    Yes.
6     Q.    Did you assist in the preparation of
7  this document?
8     A.    I don't recall.
9     Q.    If you'll look at the A(I)(ii),
10  illiquid asset category, the third bullet down,
11  "Haircut - due to liquidity issues, following
12  logic was devised to best capture market price.
13  Lehman assets which were sold (auctioned by the
14  PMTG) prior to month-end, are considered trades
15  and therefore the traded price was applied with
16  no haircut.  If a security was not auctioned by
17  September 30, the PMTG desk was utilized with
18  liquidity haircut applied to desk mark to bring
19  it to a fair value under the extenuating market
20  conditions."
21        Do you see that?
22     A.    I see that.
23     Q.    Where an internal sale price was used,
24  no haircut was applied; is that correct?
25        MR. THOMAS:  Object to the form.

Page 161

HIGHLY CONFIDENTIAL - Landreman
1
2     A.    Bullet 1, where Lehman assets were
3  sold, auctioned, prior to month-end are
4  considered trades and therefore trade prices
5  applied with no haircut, you know, I would agree
6  with that.
7     Q.    Do you know what happened to any
8  assets that were not auctioned to a desk within
9  Barclays?
10     A.    They stayed at PMTG.
11     Q.    PMTG is a desk within Barclays,
12  though, correct?
13     A.    Correct.
14     Q.    And are you simply distinguishing
15  between PMTG being the original receiver of the
16  assets as of the acquisition date and,
17  therefore, being the seller of those securities?
18        MR. THOMAS:  Objection to form.
19     A.    My understanding was that PMTG took
20  all of the assets into a high-level management
21  account and then distributed or auctioned off
22  all of the assets or moved all of the assets out
23  to trading desks, and whatever was left over was
24  left in the PMTG business, whether it was at the
25  high level at the management or if it was

41 (Pages 158 to 161)

Page 162

HIGHLY CONFIDENTIAL - Landreman

1
2  distributed to one of the PMTG trading desks.
3      Q.   Do you know if any of those desks to
4  which these securities were auctioned were then
5  being run by former Lehman individuals?
6      A.   I was not aware of any Lehman
7  individuals in PMTG.
8      Q.   The auction of these securities was to
9  desks beyond PMTG, correct?
10     A.   Correct.
11     Q.   So the desks purchasing the securities
12  from PMTG would presumably include desks then
13  being run by former Lehman individuals; is that
14  correct?
15         MR. THOMAS:  Objection to form.
16     A.   I'm not aware of any desks for the
17  products I cover that were being run by former
18  Lehman people.
19     Q.   At the point in time of the sale,
20  September 30, there were a number of former
21  Lehman employees that were at that point
22  employed by Barclays; is that correct?
23     A.   I believe so, yes.
24     Q.   And that would include former Lehman
25  individuals that were on desks in the front

Page 163

HIGHLY CONFIDENTIAL - Landreman

1
2  office that would be purchasing these securities
3  for their books; is that correct?
4         MR. THOMAS:  Objection to form.
5      A.   Yes.
6      Q.   And those individuals would be
7  familiar with those assets, having had exposure
8  to them while at Lehman; is that correct?
9         MR. THOMAS:  Objection to form.
10  Foundation.
11     A.   I don't know that.
12     Q.   Were former Lehman traders consulted
13  with respect to the valuation of the securities
14  within the internal auction process?
15         MR. THOMAS:  Objection to form.
16     A.   If there were internal -- if there
17  were Lehman, former Lehman employees involved in
18  the bidding process, they would have been people
19  that were in the flow of businesses, and as I
20  said, those businesses had been managed by
21  Barclays people, but they had brought in some
22  staff from Lehman in certain areas.  But the
23  management was always Barclays.
24     Q.   But former Lehman people who were
25  responsible for marking positions while they

Page 164

HIGHLY CONFIDENTIAL - Landreman

1
2  were at Lehman would potentially have been in a
3  position to buy back securities they had priced
4  at X while at Lehman for a lower price at
5  Barclays; is that correct?
6      A.   I wouldn't know because I don't know
7  where Lehman had these assets on their books.
8      Q.   Mr. Landreman, I have put before you
9  what has previously been marked as Deposition
10  Exhibit 643A.  Take a moment to take a look.
11         (Document review.)
12     A.   Yes, I see that.
13     Q.   And it was your group that had
14  responsibility for valuing the Agency RMBS,
15  correct?
16     A.   Correct.
17     Q.   And a 10 percent liquidity haircut was
18  applied to Agency RMBS, correct?
19     A.   A 10 percent liquidity adjustment was
20  applied towards agency CMOs, not the entire
21  portfolio of Agency RMBS.  Only a 1 percent
22  adjustment was applied towards the pools and the
23  pass-throughs.
24     Q.   And Deposition Exhibit 643A is a memo
25  from you to PwC dated February 2, 2009, subject

Page 165

HIGHLY CONFIDENTIAL - Landreman

1
2  line:  "RMBS Portfolio Acquired From Lehman -
3  bid/offer Reserve Agency CMOs," correct?
4      A.   Correct.
5      Q.   And this document provides the
6  methodology by which your team arrived at a 10
7  percent liquidity adjustment for agency CMOs; is
8  that correct?
9      A.   That's correct.
10     Q.   In your method 1, where did you take
11  your price observations from?
12     A.   From the data that we received from
13  the Bank of New York, from our pricing vendors,
14  and also from our own prices that we derive.  It
15  was really a dispersion analysis of pricing for
16  the different -- for the various products.
17     Q.   And do you know which pricing vendors
18  were used?
19     A.   IDC -- or, FTID.
20     Q.   Is that the only one?
21     A.   We also would have potentially used
22  Street software.  Street Analytics, I think it
23  is called.
24     Q.   Is that it?
25     A.   That would be it.

Page 166

HIGHLY CONFIDENTIAL - Landreman

1
2   Q.   And when you said "our prices," what
3   did you mean by that?
4   A.   The values that we derived using our
5   internal modeling methodologies for agency CMOs.
6   Q.   And what was your internal modeling
7   methodologies for CMOs, agency CMOs?
8   A.   We would use an internal OAS model,
9   which we would look at observable trades, when
10  available, and solve for option-adjusted spreads
11  for those specific asset categories and apply
12  that towards the portfolio by asset category.
13  Q.   And what definition of "bid/offer
14  spread" are you using within this methodology
15  for determining the liquidity adjustment?
16  A.   I mean, in terms of applying a
17  bid/offer, it's -- method 2 was really more of a
18  bid/offer analysis where we showed buys and
19  sells on the same day.  We showed which bonds we
20  bought and what we sold, and although it was not
21  an instantaneous buy and sell, these types of
22  transactions generally tend to be negotiated
23  ahead of time.  So you would only buy a position
24  like this if you had an outlet to distribute it,
25  so at least we had the observation that it went

Page 167

HIGHLY CONFIDENTIAL - Landreman

1
2   in and went out at the same day.  But again, to
3   say that it was instantaneous within the minute,
4   I can't prove that.
5      In terms of method 1, that was more of
6   a price dispersion amongst different points that
7   were available, and the largest dispersion
8   occurred in the categories where the majority of
9   the bonds were concentrated.  I think the last
10  paragraph where we said that we applied a 10
11  percent bid/offer as a proxy, subordinated by
12  both methods, 75 percent of the portfolio was
13  highly structured IO, PO and Z bonds, and the
14  majority of these bonds, you know, this supports
15  the use of an average, as the trade sample was
16  skewed by the high number of derivative trades
17  reflected in the trade sample.
18     So the trade sample had high levels of
19  derivatives which showed the bid/offer
20  adjustment in the 15 to 20 percent range, which,
21  again, when we did the original analysis on the
22  pricing dispersion, we saw that there was a high
23  level of dispersion amongst those derivative
24  assets which really comprised the bulk of the
25  portfolio.

Page 168

HIGHLY CONFIDENTIAL - Landreman

1
2   Q.   Are bid/offer spreads generally
3   simultaneous at a particular moment in time?
4      MR. THOMAS:  Objection to form.
5   A.   A bid/offer spread in its technical
6   sense for a product that trades regularly and
7   you have observability would be, you know, as
8   close as possible to a buy and sell
9   instantaneously.  In a market where positions
10  are traded randomly or as negotiated sales were
11  a buy and a sell will occur on the same day,
12  it's considered that these bid/offer spreads
13  would be indicative of a true, you know, almost
14  what a bid/offer should be.
15     But there's lots of -- in terms of
16  bid/offer spread on the agency CMO world, it's
17  less clear than, say, the Treasuries or agency
18  debentures, where there's more trading activity
19  and more observability.
20  Q.   Were these actual trading prices?
21  A.   The spreadsheet that we provided you
22  were actual trades with the trade date and the
23  amount of the trade.
24  Q.   So they're actual trades as opposed to
25  price indications?

Page 169

HIGHLY CONFIDENTIAL - Landreman

1
2   A.   Correct.
3   Q.   Okay.  And how was the sample size of
4   39 agencies CMO bonds assembled?
5   A.   For the timeframe that we selected,
6   these were all the trades where we had buys and
7   sells on the same date.
8   Q.   Is there a point at which the sample
9   size would not have been adequate in order to
10  derive a liquidity adjustment from the available
11  actual trades?
12     MR. THOMAS:  Objection to form.
13  A.   Again, this analysis was a secondary
14  analysis to support the concept of a liquidity
15  adjustment based upon the observability of
16  pricing dispersion, in addition to, you know, a
17  sample of bid/offer spreads at this time in the
18  market.  It was, in our opinion, although the
19  data may have been limited, it was the best
20  available data at the time.
21  Q.   In using this benchmark portfolio in
22  method 2, did you take into consideration
23  whether the positions within it were inverse IOs
24  as opposed to other types of agency CMOs?
25  A.   We put the collateral or the structure

43 (Pages 166 to 169)

Page 174

HIGHLY CONFIDENTIAL - Landreman

1   as part of the analysis.
2         MS. CARRERO:  We'll take a look to see
3   whether that has been, but if not, we would
4   ask that that sort of information be
5   provided.
6         MR. THOMAS:  Why don't you shoot us an
7   e-mail.
8         MS. CARRERO:  That's fine.  We can
9   discuss after.
10      Q.   What was the source of discount rates
11  used to discount cash flows?
12      A.   For which products?
13      Q.   Still related to the agency CMOs
14  and --
15      A.   That's what the option adjusted spread
16  would be.
17      Q.   And were these rates risk-free or did
18  think involve a measure of risk premium?
19      A.   Explain what you mean, please.
20      Q.   I'm unable to do that, so if that
21  term -- do you not -- are those not terms that
22  you're familiar with, "risk-free"?
23      A.   I'm familiar with "risk-free."  It's
24  just a context of the question being asked.  You

Page 175

HIGHLY CONFIDENTIAL - Landreman

1   know, it's not clear.
2      Q.   The inputs that were being inserted
3   into this model, were these rates, I mean, were
4   the discount rates that were inputs into the
5   model, were they risk-free, or did they involve
6   a measure of risk premium?
7         MR. THOMAS:  Objection to form.
8      A.   For the agency mortgage-backed
9   securities, the spreads would be based upon our
10  observable trade data, so that would imply some
11  level of a risk premium to that.
12      Q.   How many interest rate paths were
13  used?
14      A.   256.
15      Q.   Are you aware of any other firms that
16  use a static interest rate assumption for
17  mortgage analytics?
18      A.   We don't.
19      Q.   And what would be your definition of a
20  static interest rate assumption that --
21      A.   A single path.
22      Q.   And a single path is not what your
23  model is; is that what you're saying?
24      A.   Correct.

Page 176

HIGHLY CONFIDENTIAL - Landreman

1      Q.   And if not a single path, what is it?
2      A.   We ran 256 paths.
3      Q.   If you could turn back to 643A.  Were
4   any of the trades used in method 2 in the
5   benchmark portfolio trades between interested
6   parties?
7      A.   I'm sorry?
8      Q.   Were they trades between Lehman and
9   Barclays, for instance?
10        MR. THOMAS:  Objection to form.
11     A.   I don't know that.
12     Q.   Are they interdealer trades?
13     A.   I would have to look at the detail of
14  the trade data who the counterparty was.
15     Q.   Do you know if the trades were
16  brokered?
17     A.   Again, I would need to see who the
18  counterparty was.
19     Q.   Is there a file that would have that
20  information of who the counterparties are to
21  these trades in the benchmark portfolio?
22     A.   That would be, yes.
23        (Exhibit 816B, a document bearing
24  Bates Nos. PwC-BarCap 48233 through 48236,

Page 177

HIGHLY CONFIDENTIAL - Landreman

1   marked for identification, as of this date.)
2      Q.   Mr. Landreman, you have before you
3   what has been marked as Deposition Exhibit 816B.
4      A.   Yes.
5      Q.   Have you had a chance to review the
6   document?
7      A.   Not yet.
8      Q.   Let me actually shortcut this and turn
9   you to the third page -- I'm sorry, second page,
10  an e-mail from you to PwC dated February 3.
11     A.   Uh-huh.
12     Q.   If you would just -- and it's
13  questions on -- it's titled "Questions on
14  Barclays CMBS."  If you could just take a second
15  to read that e-mail?
16     A.   This piece I read.
17     Q.   For CUSIP 589929PT9?
18     A.   Uh-huh.
19     Q.   In your attempt to justify a price of
20  $5.52, part of your explanation involves the
21  fact that the CUSIP paid off in December 2008,
22  correct?
23     A.   I need to check and see if it was paid
24  off or if that was a loss allocated to wipe the

Page 182

```
1         HIGHLY CONFIDENTIAL - Landreman
2    that.  I don't recall that.
3        Q.   If I were to represent to you that a
4    significant number of CMBS securities acquired
5    were valued at the internal sales price, would
6    that surprise you?
7            MR. THOMAS:  Objection to form.
8        A.   No, it would not.
9        Q.   And similar to your earlier testimony,
10   for CMBS securities, does the same apply where
11   PT undertook valuation as of the acquisition
12   date separate from the internal sale price
13   ultimately recorded for acquisition accounting
14   purposes?
15       A.   We would have performed a similar
16   process where we valued our securities and
17   compared our values to BoNY prices, any vendor
18   prices, and if we were to receive a trader mark
19   or a trade price, we would have compared our
20   prices to that at different points in time
21   during the analysis.
22       Q.   And at different points in time, you
23   mean during your ordinary course price testing
24   at the end of the month, September 30; is that
25   correct?
```

Page 183

```
1         HIGHLY CONFIDENTIAL - Landreman
2        A.   Correct.
3        Q.   But that price testing would not
4    necessarily affect the acquisition accounting
5    price that was ultimately used, is that correct?
6            MR. THOMAS:  Objection to form.
7        A.   It depends upon the variance itself
8    and the dialogue that was around the price, if
9    there was a large discrepancy.
10       Q.   Internal sales prices, would they
11   normally be used as a fair value mark for a
12   security?
13           MR. THOMAS:  Objection to form.
14       A.   If the prices were reviewed and
15   determined to be fair value, yes.
16       Q.   Those trades wouldn't constitute an
17   arm's length transaction, though, would they?
18           MR. THOMAS:  Objection to form.
19       A.   Depends who the trades were between.
20       Q.   If the trade is between two desks
21   within Barclays, is that an arm's length
22   transaction?
23           MR. THOMAS:  Objection to form.
24       A.   It depends if they're part of the same
25   business or if it's the proprietary trading desk
```

Page 184

```
1         HIGHLY CONFIDENTIAL - Landreman
2    or another business function that is not related
3    to the flow trading desk.
4        Q.   Did you or your group have any
5    involvement in pricing the Giants Stadium Bonds
6    that were acquired through the Lehman
7    transaction?
8        A.   That was not priced in my group.
9        Q.   And do you know whose group did
10   undertake primary responsibility for valuing the
11   Giants Stadium Bonds?
12       A.   That work was performed primarily in
13   Sean's world under Corporate Credit.
14       Q.   And do you know if there was front
15   office involvement in the pricing of the Giants
16   Stadium Bonds as well?
17       A.   I don't have personal knowledge of
18   that.
19       Q.   If you were to guess who else might
20   have been involved in the pricing of Giants
21   Stadium Bonds, what would be your best guess?
22       A.   Based upon my understanding of the
23   complexity of that structure and the lack of
24   data and the type of securities that were
25   involved, the desk would have been involved in
```

Page 185

```
1         HIGHLY CONFIDENTIAL - Landreman
2    that.
3        Q.   And what desk would that be?
4        A.   Would have been the PMTG desk.
5        Q.   And that at the time would have been
6    run by Stephen King; is that correct?
7        A.   Yes.
8        Q.   Mr. Landreman, I have handed you what
9    has been previously marked as Deposition Exhibit
10   533A.  If you take a moment to take a look at
11   that.
12       A.   Okay.
13       Q.   Have you seen this document before?
14       A.   No.
15       Q.   Can you take a look at the second
16   page, where it says "PMTG $7.2 billion," do you
17   see that?
18       A.   Okay.
19       Q.   Do you know whether a process was
20   undertaken to ascertain what gains Barclays
21   realized on PMTG assets it had acquired from
22   Lehman as of December 31?
23       A.   I'm not aware of that.
24       Q.   Would that have involved you or your
25   group?
```

Page 186

1            HIGHLY CONFIDENTIAL - Landreman
2        A.   As of December 31, we would have price
3    tested the portfolio, and the line controllers
4    would have had to have performed any accounting
5    reconciliation for P&L that was incurred during
6    the quarter because there's a number of factors
7    that would contribute to a P&L number that are
8    not specific to marked to market accounting.
9        Q.   And is the price testing that's done
10   at your end any different than the monthly price
11   testing?
12       A.   It would be the same process.
13       Q.   And would it be the controllers that
14   would be the ones to monitor any hedging
15   activities with respect to the assets acquired
16   in the Lehman transaction?
17       A.   What do you mean, "monitoring the
18   hedging activity"?
19       Q.   In connection with the controller's
20   function of recording P&L, would that process
21   involve any hedges that were placed on any of
22   the acquired securities?
23       A.   I'm not a line controller, so my
24   understanding is that they will perform a P&L on
25   all of the books that are comprised of a

Page 187

1            HIGHLY CONFIDENTIAL - Landreman
2    business, and some of those books may contain
3    hedges.
4        Q.   In valuing any of the securities that
5    were transferred over from Lehman, did you or
6    your group take into consideration whether any
7    of the positions were hedged in your valuation?
8        A.   For my portfolios, the hedges would be
9    irrelevant and they would be valued
10   independently.  The cash positions are valued
11   independently and the hedges would be valued
12   independently.
13           MS. CARRERO:  You want to take a
14   five-minute break?
15           MR. THOMAS:  Sure.
16           (Recess; Time Noted:  4:35 P.M.)
17           (Time Noted:  4:43 P.M.
18   BY MS. CARRERO:
19       Q.   Mr. Landreman, do you know who
20   Professor Paul Pfleiderer is?
21       A.   I have heard the name.
22       Q.   Have you -- let me first ask, are you
23   aware that Barclays has retained him as an
24   expert in this matter?
25       A.   Yes, I am.

Page 188

1            HIGHLY CONFIDENTIAL - Landreman
2        Q.   And have you had any meetings or
3    conversations with him?
4        A.   I don't recall.  I've had numerous
5    conference calls with people.
6        Q.   So I guess there's no point in asking
7    how long the meeting was.
8            Are you aware of other people within
9    price testing that have met or communicated with
10   Professor Pfleiderer?
11       A.   I don't know that they have met or
12   communicated with Professor Pfleiderer, but I
13   have been in conference calls with my colleagues
14   who have been on the phone with lawyers and he
15   may have been in the calls, but I don't know.  I
16   don't recall.
17       Q.   Did you or any of your staff provide
18   documents to Professor Pfleiderer?
19       A.   I'm not aware of providing him with
20   anything directly.  Anything that I would have
21   provided to PwC or to the lawyers, you know, I
22   don't know if he was a recipient of that
23   information directly from us.
24       Q.   Did you have any meetings or
25   conversations with any of Professor Pfleiderer's

Page 189

1            HIGHLY CONFIDENTIAL - Landreman
2    staff?
3        A.   I think I did.  I don't know who they
4    were or the context of those calls.
5        Q.   And --
6        A.   I don't recall the calls themselves.
7        Q.   And when would these calls have taken
8    place?
9        A.   Anytime in the last year.  I'm not
10   sure when he was contracted or, you know, I'm
11   regularly on the phone with the lawyers and the
12   auditors for various reasons.
13       Q.   With respect to PwC's audit, how does
14   the price testing that they undertook differ
15   from that which your group undertook?
16       A.   My understanding of the PwC pricing
17   review process is a detailed examination of the
18   policies and procedures, the control points that
19   we claim we execute.  So they will go through
20   and replicate what we say we do and then confirm
21   that we actually do what we say we're doing.
22           So they go very in detailed and they
23   test a spread matrix application and ask us why
24   this bond didn't, you know, did or did not get
25   applied a spread that we said it would have, and

Page 190

HIGHLY CONFIDENTIAL - Landreman

1        HIGHLY CONFIDENTIAL - Landreman
2   then we explain why and then they look at that
3   and then they -- they review all of our data, in
4   addition to performing their own pricing, which
5   is all done internally at on their site, which
6   they don't share that with us.  And then they
7   come back with their opinions and any questions
8   they have around the results themselves and also
9   the process.
10      So they do look in detail at the
11   process that we perform and review that process
12   in addition to the actual values and results.
13     Q.   So would it be accurate to say that
14   they do not undertake independent valuation of
15   any of the securities at the price testing?
16     A.   I didn't say that.  They do perform an
17   independent test in their -- internally on their
18   own site and then produce that analysis, which
19   they do not share with us.  So they don't tell
20   us their values.  They just tell us if they
21   believe our values are reasonable.
22     Q.   Do they model securities themselves?
23     A.   They have that capability.
24     Q.   Do you know if that ordinarily is part
25   of the price testing that they undertake?

Page 191

1        HIGHLY CONFIDENTIAL - Landreman
2     MR. THOMAS:  Objection to form.
3     A.   As I said, they don't share any
4   results with us of their analyses.  So they do
5   have people who I know ask about the assumptions
6   and claim to model, but they don't show me the
7   results of their model and they don't show me
8   the detail of their work.
9     Q.   So you don't know whether they do or
10   they don't model securities; is that correct?
11     A.   I know they have the capacity to model
12   securities.  I cannot tell you that I -- for
13   certain that they modeled our pricing because
14   they don't show me those results.
15     Q.   And do you know whether Professor
16   Pfleiderer or his staff who were retained by
17   Barclays, whether they have independently sought
18   prices and modeled the securities?
19     A.   I don't know what Professor Pfleiderer
20   was tasked to perform.
21     Q.   And have you been shown his report and
22   had an opportunity to read it?
23     A.   I have read his report, yes.
24     Q.   And was that prior to the serving of
25   his report or was that in connection with your

Page 192

1        HIGHLY CONFIDENTIAL - Landreman
2   deposition today?
3     MR. THOMAS:  Objection to form.
4     A.   I don't know when his report was
5   served, so I couldn't tell you if it was before
6   it was being served.  I know that it was within
7   the last, you know, couple months that I have
8   seen his report in conjunction with other
9   reports related to this case.
10     Q.   Were you asked to comment on his
11   report and provide comments or edits in the
12   finalization process?
13     MR. THOMAS:  Well, I mean, you're
14   excluding conversations with lawyers, right?
15   I mean, if the attorneys had conversations
16   with you about any subject relating to
17   providing the legal advice for this case,
18   then that's going to be privileged.
19     MS. CARRERO:  Well, I guess we don't
20   need to get there.
21     Q.   I'm trying to understand whether you
22   had it in front of you and had the opportunity
23   to comment on it.
24     MR. THOMAS:  Well, he said he reviewed
25   it.  So, I mean --

Page 193

1        HIGHLY CONFIDENTIAL - Landreman
2     Q.   Within the last -- I'm trying to
3   understand, did he review it after the report
4   was final or did you review it and were part of
5   the editing process of it.
6     MR. THOMAS:  I think that's been asked
7   and answered.
8     A.   I don't recall being part of the
9   editing process of his work papers.
10     MS. CARRERO:  I think that's it.  If
11   you want to take five minutes.
12     MR. THOMAS:  I'm ready to go.  I just
13   have a few questions.
14     MS. CARRERO:  Does anyone else have
15   questions?
16     MR. McCOUBREY:  No questions.
17     MR. DAKIS:  I just have one follow-up
18   question.
19   EXAMINATION BY
20   MR. DAKIS:
21     Q.   Robert Dakis from Quinn Emanuel for
22   the Official Committee of Unsecured Creditors.
23     During the last line of questioning,
24   you were asked if you saw Professor Pfleiderer's
25   report, and you testified that you reviewed it

Page 194

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  in connection with reviewing a number other
 3  reports related to this case; is that correct?
 4        A.   Correct.
 5        Q.   Can you tell us if you remember what
 6  the other reports you reviewed are?
 7        A.   I mean, I was asked to respond to some
 8  of the --
 9           MR. THOMAS:  Well, if you're going to
10        go into conversations with attorneys,
11        counsel, in-house or outside counsel, then
12        I'm going to instruct you not to answer.
13           THE WITNESS:  Okay.
14           MR. THOMAS:  So let's exclude any
15        conversations with lawyers.
16        Q.   I'm not trying to get at conversations
17  that you had with counsel.  I guess let's start
18  with a yes or no.  Do you recall specifically
19  which other reports you reviewed?
20        A.   I think there were some follow-up
21  questions in terms of --
22           MR. THOMAS:  Don't get into the
23        substance of -- just answer his question,
24        which is, if you recall, if you can recall a
25        name of another report that you read, you
```

Page 195

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  can answer that question.
 3        A.   I mean, I can't recall the reports
 4  that I read, the name of the reports I could
 5  identify that specifically.
 6        Q.   We just ask one other follow-up.  And
 7  again, this is a yes or no question and I'm not
 8  trying to get at the substance of any
 9  conversations you had with counsel.
10           Do you know whether the reports that
11  you reviewed were prepared by experts for the
12  movants in this case, or were these reports
13  prepared by experts for Barclays?
14        A.   I think there -- the testimony of the
15  movants, of the expert witness.
16        Q.   Of the movants, correct?
17        A.   Yes.
18           MR. DAKIS:  Nothing further.  Thank
19        you.
20           MS. CARRERO:  Thank you.
21           MR. THOMAS:  I've got a few questions.
22  EXAMINATION BY
23  MR. THOMAS:
24        Q.   Mr. Landreman, you were asked about
25  Barclays' use of internal sales prices in
```

Page 196

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  certain circumstances.  Does Barclays take any
 3  steps to ensure the reasonableness of internal
 4  sales pricing?
 5        A.   A bond that goes through the price
 6  testing process would be valued independently of
 7  knowing what the sales price was.  We would then
 8  compare that sales price to see if that price is
 9  reasonable based upon our understanding of the
10  bond, and if there's a material difference
11  between the value that we derive and the value
12  that it was traded at, we would go back to the
13  trader and require that they document their
14  assumptions as to how they rationalized that
15  price.
16        Q.   So are they tested in a similar manner
17  as to other prices?
18        A.   Yes, they are.
19        Q.   For the Lehman positions that you
20  valued, you were asked something about bulk
21  discounts.
22           Did you reduce any values for the
23  Lehman positions you valued to reflect the large
24  size of a position?
25        A.   No, we did not.
```

Page 197

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2        Q.   Mr. Landreman, you understand that
 3  your testimony today is part of a court
 4  proceeding and may be considered by the Court;
 5  is that correct?
 6        A.   Correct.
 7        Q.   Were you asked to value a portion of
 8  the assets Barclays received from Lehman
 9  pursuant to the CL transaction between Lehman
10  and Barclays in September 2008?
11        A.   Yes.
12        Q.   Would you describe the group of assets
13  that you were asked to value?
14        A.   I was asked to value the agency
15  mortgage-backed securities, the agency CMOs, the
16  non-Agency RMBS collateral, which would include
17  Alt As, sub-prime, in addition to credit cards,
18  student loans, auto loans, and other securitized
19  products, including some CDOs and CLOs.
20        Q.   What was the goal of your valuation
21  effort?
22        A.   To provide a fair value for the
23  portfolio.
24        Q.   And was the direction given to you
25  from Barclays to state a fair value for those
```

1          HIGHLY CONFIDENTIAL - Landreman
2    assets?
3          A.   Yes.
4          Q.   And was that the direction that you
5    gave to members of your team that worked on the
6    valuation?
7          A.   Yes, it was.
8          Q.   Did you at all times during your work
9    attempt to fairly and reasonably value the
10   assets?
11         A.   Yes, we did.
12         Q.   At any time did anyone ever suggest to
13   you that you should do anything other than
14   attempt to calculate an appropriate fair value
15   of the assets?
16         A.   No.
17         Q.   Did anyone ever say to you, in form or
18   substance, that a result other than the fair
19   value of the assets was desired or should be
20   achieved?
21         A.   No.
22         Q.   Did anyone ever indicate to you or, to
23   your knowledge, anyone else working on the
24   valuation of the Lehman assets that you should
25   attempt to understate the fair value of the

1          HIGHLY CONFIDENTIAL - Landreman
2    assets in any way or to value them lower than
3    you otherwise would?
4          A.   No.
5          Q.   Would you please describe your
6    professional background and experience with
7    respect to valuing such assets?
8          A.   I've been valuing securities in a
9    professional form since approximately 1996.  I
10   started with the Federal Home Loan Bank of New
11   York.  I was a secondary marketing analyst for
12   the securities that were pledged to the Federal
13   Home Loan Bank of New York for their
14   advancements program to their member banks.
15         I worked for consulting firms,
16   including the Mortgage Industry Advisory
17   Corporation, doing mortgage servicing valuation,
18   home loan mortgage valuation, risk analytics and
19   hedging analytics for mortgage originators,
20   mortgage servicers.
21         I have also worked in a National
22   Securities Pricing Center for Deloitte & Touche.
23   I have managed the RMBS price testing functions
24   within Deloitte's National Securities Pricing
25   Center reviewing all, several -- all of

1          HIGHLY CONFIDENTIAL - Landreman
2    Deloitte's clients' RMBS assets for audit
3    purposes.
4          I was part of the implementation team
5    that was tasked with implementing a valuation
6    control process at Freddie Mac seven years ago
7    as part of their accounting and audit
8    restatement.  That task included over a trillion
9    dollars of assets.
10         I've been with Barclays for over six
11   years now.  I have built this department from
12   scratch.  We've been audited and reviewed by
13   every regulator in the country and in the UK.
14   We are regularly audited by PwC.  We are
15   active -- you know, we are constantly having
16   dialogue with our peers in the industry, our
17   competitors.
18         We have full transparency to the
19   trading desks within our firm.  We see what's
20   happening on a daily basis, and we believe that
21   our processes and procedures that we have
22   implemented are industry best practices and are
23   consistent with what our view is is that
24   provides fair value that allow the investors of
25   Barclays Capital to have comfort that the

1          HIGHLY CONFIDENTIAL - Landreman
2    balance sheet assets that are being reported for
3    financial disclosure purposes are reasonable and
4    accurate.
5          Q.   Do you believe the valuation you
6    ultimately reached for the Lehman assets that
7    you valued reflects their fair value as of
8    September 22, 2008?
9          A.   Yes, we do.
10         Q.   Did you attempt to value the Lehman
11   assets in a manner consistent with Barclays'
12   practices and policies?
13         A.   Yes.
14         Q.   Did you interact with PwC during the
15   review of their valuation you performed?
16         A.   Yes.
17         Q.   Would you please describe that
18   interaction and their efforts with respect to
19   the valuation?
20         A.   PwC was already very familiar with our
21   policies and our procedures and how we price
22   tested bonds.  They came in and did a full
23   detailed review of the opening balance sheet and
24   the assets on the balance sheet.
25         They did a full review of the

1          HIGHLY CONFIDENTIAL - Landreman
2    processes and the controls around how we
3    implement our policies or our price testing
4    processes.  They asked very detailed questions.
5    They went through this entire analysis with
6    very -- with high levels of scrutiny.
7              They sent out a large team to review
8    different asset categories.  They brought in
9    subject matter experts who were very
10   knowledgeable in the asset classes that were
11   presented to us, and they followed up and
12   produced high levels of documentation and
13   questioned everything that we did.
14       Q.   Did this work by PwC in reviewing
15   Barclays' valuation of these assets continue for
16   a period of months?
17       A.   For the opening balance sheet, they
18   produced their report on the date that was
19   presented for the opening balance sheet for the
20   financial release, and whatever date that was is
21   when they completed their analysis.
22       Q.   And had their work with respect to the
23   valuation of these assets been ongoing for
24   months prior?
25       A.   I guess they have been in my

1          HIGHLY CONFIDENTIAL - Landreman
2    department reviewing my policies and procedures
3    every -- every quarter, and they're very
4    familiar with our practices and what we do.  So,
5    in terms of the extra work that was performed
6    here, it was definitely a deep dive into this
7    portfolio.
8        Q.   And is it your understanding that at
9    the end of all this work by PwC, that they
10   accepted Barclays' valuation of these assets?
11       A.   Correct.
12           MR. THOMAS:  Thank you.  I have
13   nothing further.
14           MS. CARRERO:  A couple of follow-up
15   questions.  I'll be brief.
16   FURTHER EXAMINATION BY
17   MS. CARRERO:
18       Q.   I believe in response to one of Mr.
19   Thomas' questions you stated that there was no
20   reduction of values to reflect large sizes of
21   positions; is that correct?
22       A.   We did not take a block size discount
23   on large positions.
24       Q.   Would that include any liquidity
25   discounts that were taken by asset class --

1          HIGHLY CONFIDENTIAL - Landreman
2    strike that.  Would any liquidity discounts
3    taken by asset class reflect the size of any
4    individual position or size of that asset class
5    relative to the rest being acquired?
6            MR. THOMAS:  Objection to form.
7        A.   The calculation of the liquidity
8    adjustment was ambiguous to size.  It was really
9    a function of the pricing dispersion and it was
10   applied across asset categories.  It was not
11   applied across position size.
12       Q.   And you stated that you attempted to
13   fair value as of September 22, 2008; is that
14   correct?
15           MR. THOMAS:  Objection to form.
16       A.   We provided fair values as of
17   September 2008, September 22, 2008.
18       Q.   And that would be at what point in
19   time on September 22, 2008?
20           MR. THOMAS:  Objection to form.
21       A.   For the assets that we provided, that
22   would have been an end-of-day price.
23       Q.   And an end-of-day price would capture
24   any movement in the market throughout the day
25   September 22, 2008, correct?

1          HIGHLY CONFIDENTIAL - Landreman
2        A.   For the majority of the assets that I
3    value, there would not have been tremendous
4    movement on a day-to-day basis of the primary
5    assumptions that would be used to value those
6    securities because they are not highly
7    interest-rate sensitive.  They would be highly
8    credit-sensitive and the credit data is released
9    on a monthly basis.
10       Q.   And would it follow, then, that you
11   would not expect a lot of movement from
12   September 19 close to September 22 close for the
13   assets which your group covers; is that correct?
14           MR. THOMAS:  Objection to form.
15       A.   That would be, depending upon how the
16   interest rates moved month over month -- or, day
17   over day, that would have been the primary
18   movement of those values.
19       Q.   Just so I make sure that it's clear,
20   you mean primary movement would have been
21   month-to-month, correct?
22       A.   The primary movement between Friday to
23   Monday would have been a reflection of changes
24   in interest rates or the yield curve.
25       Q.   So did your group undertake to measure

Page 206

1    HIGHLY CONFIDENTIAL - Landreman
2  what the difference was between the end of day
3  September 19 and end of day September 22?
4      A.   We priced the positions of the 19th
5  and the 22nd, yes.
6      Q.   And do you know what the difference
7  was between the two?
8      A.   Not off the top of my head.
9      Q.   Do you remember if it was a large
10  difference or small?
11     A.   It, again, in my world, the
12  securitized products world, it would have been a
13  relatively small movement in pricing.
14      MS. CARRERO:  That's it.
15      MR. DAKIS:  No further questions.
16      (Time Noted:  5:08 P.M.)
17            oOo
18
19
          _____
20              RICHARD LANDREMAN
21   Subscribed and sworn to
     before me this    day
22   of      2010.
23   _____
24
25

Page 207

1    HIGHLY CONFIDENTIAL - Landreman
2           CERTIFICATE
3  STATE OF NEW YORK )
                      : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That RICHARD LANDREMAN, the witness
10  whose deposition is herein before set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the testimony
13  given by such witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 16th day of June, 2010.
25   -------------------------------

Page 208

1    HIGHLY CONFIDENTIAL - Landreman
2           INDEX
3  WITNESS:      EXAMINATION BY      PAGE
4  RICHARD LANDREMAN  Ms. Carrero    5, 203
5       Mr. Dakis          193
6       Mr. Thomas         195
7  EXHIBITS:              PAGE
8  Exhibit 799B, Exhibit C, described as Bio    12
9  for ABS
10  Exhibit 800B, a document bearing Bates Nos.   28
11  BCI-EX-(S)207964 through 207969, with attachment
12  Exhibit 801B, a document bearing Bates Nos.   33
13  BCI-EX-(S)201185 through 201187
14  Exhibit 802B, a document bearing Bates Nos.   37
15  BCI-EX-297092 through 297113
16  Exhibit 803B, a document bearing Bates Nos.   37
17  BCI-EX0297114 through 297134
18  Exhibit 807B, a document bearing Bates Nos.   37
19  PwC-BarCap45788 through 45792
20  Exhibit 804B, a document bearing Bates Nos.   45
21  PwC-BarCap15824 through 15843
22  Exhibit 805B, a document bearing Bates Nos.   60
23  PwC-BarCap46090 through 46102
24  Exhibit 806B, a document bearing Bates Nos.   60
25  BCI-EX-297183 through 297200

Page 209

1    HIGHLY CONFIDENTIAL - Landreman
2           INDEX (Cont'd.)
3  EXHIBITS:              PAGE
4  Exhibit 808B, a document bearing Bates Nos.   85
5  BCI-EX-(S)201329 through 201331
6  Exhibit 809B, a document bearing Bates Nos.   91
7  BCI-EX-(S)201104
8  Exhibit 810B, a document bearing Bates Nos.   98
9  BCI-EX-(S)52667 through 52668, with attachment
10  Exhibit 811B, a document bearing Bates Nos.   119
11  BCI-EX-(S)207849 through 7850, with attachment
12  Exhibit 812B, a document bearing Bates Nos.   123
13  BCI-EX-(S) 207979 through 7980, with attachment
14  Exhibit 813B, a document bearing Bates Nos.   130
15  PwC-BarCap11225 through 11310
16  Exhibit 814B, a document bearing Bates Nos.   153
17  PwC-BarCapWP_23318 through 23351
18  Exhibit 815B, a document bearing Bates Nos.   159
19  PwC-BarCap 45782 through 45787
20  Exhibit 816B, a document bearing Bates Nos.   176
21  PwC-BarCap 48233 through 48236
22
23
24
25

1        HIGHLY CONFIDENTIAL - G. LaROCCA

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                         Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                      Debtors.

10

     ----------------------x

11

12         * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF GERARD LaROCCA

14           New York, New York

15            August 19, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24292

Page 6

HIGHLY CONFIDENTIAL - G. LaROCCA

1  finance.
2
3      Q.   And do you hold any licenses,
4  professional licenses of any kind?
5      A.   Series 7 and Series 24.
6      Q.   CPA?
7      A.   No.
8      Q.   Did you ever practice as a public
9  accountant?
10     A.   No.
11     Q.   Do you keep your licenses current?
12     A.   Yes.
13     Q.   And give me an idea, if you would, of
14 your employment background.  I know you're
15 currently employed by Barclays, but if you
16 could -- how long have you been with Barclays?
17     A.   I've been with Barclays since November
18 of '98.  Prior to joining Barclays, I spent 16
19 years at Salomon Brothers from -- or, 15-plus
20 years at Salomon Brothers from '83 to '98.
21         The early part of my career from '83
22 to '91 was primarily in the Controller's Group
23 in the Financial Division at Salomon, and after
24 the Treasury auction scandal in August of '91, I
25 moved out of the controller's world and into

TSG Reporting - Worldwide (877) 702-9580

Page 7

HIGHLY CONFIDENTIAL - G. LaROCCA

1  Operations and eventually was running Sali's
2
3  U.S. operations.
4         In '96 I went over to run Salomon's
5  European operations and get the firm ready for
6  the introduction of the euro.
7         '9 -- back end of '97, Salomon got
8  taken over.  I hung around for a year and then
9  joined Barclays in November of '98.  So I've
10 been out of school since '79, been on Wall
11 Street since '79, and primarily on the back, on
12 the infrastructure side, so all in the back
13 office.
14     Q.   You also serve or have served as a
15 director of the Depository Trust Corporation?
16     A.   I am currently on the board of the
17 Depository Trust Company.
18     Q.   How long have you been a DTC board
19 member?
20     A.   I believe this is year three.
21 Certainly more than two.  I'm not sure if it's
22 three or four years now.
23     Q.   Is that a paid position?
24     A.   No, it's not.  DTC is a
25 not-for-profit, industry-owned utility.

TSG Reporting - Worldwide (877) 702-9580

Page 8

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2      Q.   And if you would, please, Mr. LaRocca,
3  give me a resumé of the positions that you have
4  held at Barclays since you joined in 1998
5  through today?
6      A.   1998, I was hired as the Global Head
7  of Operations and had that position from '98 to
8  2002, 2003.  I'm not exactly sure when that
9  transferred to my responsibilities.
10        In, I believe in 2000, in addition to
11 my operational responsibilities, I was the Chief
12 Financial Officer for Barclays Capital for
13 roughly a couple years, 2000 and 2001.  The CFO
14 had resigned and they had asked me to step into
15 that role.  And those jobs were based in London.
16        In February of 2002, I relocated back
17 to the United States.  At that point in time, I
18 relinquished my chief financial officer role and
19 retained the operations responsibilities
20 probably for another six to twelve months,
21 Global Head of Ops.
22        In addition to running Ops. globally
23 from New York for that period of time, I assumed
24 the role of Chief Administrative Officer for
25 Barclays Capital.

TSG Reporting - Worldwide (877) 702-9580

Page 9

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2      Q.   That's in about '02?
3      A.   Yes, when I relocated.
4         The chief administrative officer --
5  the way our organization is structured is people
6  have a regional boss and a functional boss, so I
7  had regional oversight of most of the
8  infrastructure groups and the primary oversight
9  initially for Operations, because I was also the
10 functional head, and I have retained those
11 positions -- I'm still the chief administrative
12 officer.  I no longer have primary oversight of
13 Operations, although, like I said, all the
14 infrastructure groups report in to me from a
15 regional perspective.
16        Those are kind of what I call my
17 business responsibilities as a result, I am also
18 an officer of many legal entities.
19     Q.   Within the BarCap?
20     A.   Within BarCap family of companies.  So
21 I'm the CEO of its U.S. broker-dealer.  I am the
22 branch manager for Barclays Bank, PLC, the New
23 York branch.  I sit on the board of its Mexican
24 affiliate and am an officer on several of its
25 companies.

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.    And, at least from time to time, have
3    to testify?
4    A.    Yeah, this is a first.
5    Q.    Now, at the moment, to whom do you
6    report?  Who is your --
7    A.    Rich Ricci.
8    Q.    You're Rich Ricci's direct report?
9    A.    Correct.  And have been for some time.
10    Q.    For our purposes, you were reporting
11    directly to Rich Ricci back in September of
12    2008?
13    A.    Correct.  Yes.
14    Q.    And how many direct reports do you
15    have?  That might be a hard question given these
16    two different regional and functional
17    responsibilities.
18    A.    Excluding administrative, secretarial
19    support, I believe it's four direct reports, and
20    that is -- there's a woman Theresa Fox, who is
21    the branch manager of our Miami office; there's
22    a woman Cristiano Pedote, who runs our Brazil
23    office; there's gentleman Mike Montgomery, who
24    is a BarCap employee who looks after our Homeq
25    and Equifirst.

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    You know, they have very little to do
3    with the investment banking activities in New
4    York, you know.
5    Q.    Uh-huh.
6    A.    And again, you know, I'm a senior guy
7    and I have regional oversight of all the
8    infrastructure groups, but, you know, I
9    wouldn't, while they report to me locally, you
10    know, I don't do their appraisals, I don't do
11    their comp.
12    Q.    What's sometimes called the dotted
13    line?
14    A.    Dotted line, correct.  Although I put
15    input into all of that.
16    Q.    Sure.
17    A.    There's one thing I failed to mention
18    in terms of talking about my background and my
19    role and responsibilities.  About a year ago I
20    was put on the board of Barclay Card Delaware.
21    So Barclay Card has a big UK card business and a
22    smaller U.S.-based business, and I've been put
23    on the board of Barclays Card Delaware.
24    Q.    And let me focus you back to September
25    of 2008.  You were reporting to Mr. Ricci at

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    that point.  Who were your direct reports in
3    September of 2008?  Was it any different from
4    what you have just described?
5    A.    No.
6    Q.    Now, you are familiar, obviously, with
7    the topic that brought us here today, the Asset
8    Purchase Agreement between Lehman and Barclays?
9    A.    Well, I know why you're here, and my
10    familiarity with the Asset Purchase Agreement,
11    you know, I guess we're going to talk about it,
12    because I wasn't part of the deal team, but
13    obviously privy to a lot of information at that
14    time and involved in elements of kind of what
15    went on at that point in time.
16    Q.    Okay.  We'll explore that during the
17    day.
18    A.    I'm sure.
19    Q.    If you would, if you could frame it
20    out for me, give me a general description of
21    what your activities or involvement were with
22    respect to the negotiation and conclusion of the
23    deal in that period in call it, you know,
24    September 12 through the closing on the 22nd.
25    You can keep that calendar with you

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    all day.
3    A.    My first involvement or the first time
4    I became aware of this transaction or a possible
5    acquisition of Lehman Brothers would have been
6    on late afternoon of September 11.  I would have
7    gotten a call from Rich Ricci, who indicated
8    that Barclays was thinking about acquiring
9    Lehman Brothers and that he was on his way to
10    New York with Bob.
11    He had given me a phone number of a
12    gentleman named Mark Fisher at Lehman Brothers.
13    MR. STERN:  Shafir?
14    THE WITNESS:  Mark Shafir.  I'm sorry.
15    Mark Shafir.
16    And said, call him up, find out what
17    you can and, you know, he was going to
18    arrive in New York at 3 A.M. and wanted to
19    meet at 3 A.M.
20    Q.    The "he" you're referring to is Bob is
21    going to arrive at 3 or Shafir?
22    A.    My conversation was with Rich.  I
23    was -- but Rich left me the impression -- I was
24    left with the impression that Bob was with him.
25    Q.    And the Bob you're referring to is Bob

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2    what he needed.
3        Q.   You don't know one way or the other?
4        A.   Don't know one way or the other.  The
5    only data that I saw was the real estate data,
6    okay?  Because I was involved with our real
7    estate people in terms of looking at the real
8    estate that they owned, where did Lehman have
9    offices, et cetera.
10       Q.   So, again, to use the HR example, if
11   someone on the HR team had developed a view or
12   some knowledge about --
13       A.   I wouldn't know.
14       Q.   -- global bonus accruals, that's not
15   something you would know?
16       A.   I wouldn't know.  Absolutely wouldn't
17   know.
18       Q.   All right.  So you haven't slept for a
19   couple of days.  It's Sunday.  That phase has
20   ended.  What happens next?
21       A.   What I don't recall, what I don't
22   remember is whether if I got calls Sunday night
23   or Monday morning, you know.  I mean, it was
24   all -- when I tell you I, you know, if I got 90
25   minutes' sleep that week, it was...

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2        So I got a call either late Sunday
3    night or early A.M. on Monday morning and --
4        Q.   Just so we can have a clear record,
5    when you say Sunday night, you're on Sunday
6    night, the 14th?
7        A.   The 14th or the 15th.
8        Q.   Okay.
9        A.   And that possible that we may buy --
10   I'm trying to -- how I found out.  Someone would
11   have called me.  I don't recall who it was
12   called, said come back, you know, and was told
13   we may be buying the U.S. broker-dealer, that
14   the LBI hadn't declared bankruptcy.
15       And when I initially found out, I'm
16   thinking we're buying the U.S. broker-dealer.  I
17   don't know anything about an Asset Purchase
18   Agreement and, you know, I'm thinking we're
19   buying a U.S. broker-dealer.
20       Now, my role is kind of changed a
21   little bit now.  Now I'm no longer in a kind of
22   due diligence coordination role.  I get sent
23   over to Lehman Brothers and to sit with the ops.
24   guys and told try to be helpful to them, they're
25   dying, they're in -- they're in bad shape

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2    because, you know, JPMorgan had turned off the
3    pipes, banks were pulling lines, counterparties
4    were closing them out, walking away from trades.
5    And so I was told, you know, to go over to
6    Lehman Brothers and try to be helpful because
7    I'm an experienced ops. guy and would have --
8        You know, so that kind of consumed my
9    Monday, well, that kind of -- I was heavily
10   involved in that the whole week, and then on --
11   that would have been a big part of my Monday.
12   And Monday or late afternoon, I became aware
13   that from -- and I would have become aware from
14   Jonathan Hughes, who told me that the Fed had
15   reached out to him and had asked him to -- and
16   that -- so on Monday late afternoon, I believe,
17   I believe it was Monday, Jonathan had alerted me
18   that the Fed was financing Lehman Brothers and
19   they were looking for Barclays to help in some
20   kind of way.
21       At that point in time, it really
22   didn't resonate with me because, you know, I was
23   fighting a lot of fires and, you know, trying to
24   settle trades and leverage my relationships on
25   Wall Street to try to get, you know, banks to

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2    assist and cooperate, et cetera.
3        On the 16th, the Tuesday, Jonathan
4    came back to me again and said, you know, the
5    Fed wants to meet with us, they want us to -- I
6    don't remember the exact words -- they want us
7    to step into their trade with Lehman Brothers.
8    It might not have been the words he used, but
9    the tone of what he was very different than the
10   conversation I had with him on Monday.  I
11   remember it being very different because it got
12   my attention on the Tuesday a lot more than it
13   got on the Monday.
14       Q.   Can you give me a little more detail
15   on that?  How had his tone changed?  It was more
16   urgent?  It was angry?  It's loud?
17       A.   It was more urgent.
18       Q.   Okay.
19       A.   And said we needed to get on the phone
20   with the Fed, okay?  And Jonathan used words
21   like if the Fed is going to support this, you
22   know, if we want the Fed to work with us and to
23   support this transaction that we want to try to
24   do, that we're going to have to step into
25   that -- we're going to have to take the Fed out

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2    of my -- of their financing obligation with
3    Lehman Brothers.
4          I participated in a phone call with
5    the Fed on that Tuesday, and -- and you're going
6    to ask me who it was with, and I don't recall,
7    and after my phone call, the urgency was evident
8    to me and I dropped what I was doing and headed
9    down to the Fed and I met with -- now, I'm not
10   sure if I -- I don't know if I went down on the
11   Tuesday night.  I think so, I'm almost, I'm
12   almost positive it was Tuesday night early
13   evening and met with Lucinda Brickler and other
14   colleagues of hers from the Fed.
15         And Lucinda had explained to me that
16   the Fed was financing Lehman Brothers, had
17   provided roughly $45 billion in financing for
18   Lehman Brothers, and that they were using --
19   that Lehman was using three facilities to
20   finance collateral and the Fed had lent them $45
21   billion.
22         Q.    Do you know what the three facilities
23   were?
24         A.    If you say them, I'll -- one was Open
25   Market Operations, one is --

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2          Q.    OMO?
3          A.    OMO.  There was --
4          Q.    TLSF, yes?
5          A.    Treasury -- TLSF sounds right.  And
6    what's the third one?
7          Q.    PDCF?
8          A.    PDCF.  Those would be the three,
9    right?
10         And they had explained that Lehman had
11   put collateral into those three facilities and
12   the Fed had advanced them $45 billion, right?
13   And they wanted -- they didn't have -- the Fed
14   did not have a problem that if Barclays stepped
15   into that trade, that we could use the
16   facilities because it would take us -- they knew
17   it would take us time to find financing, you
18   know, financing with third parties.  It would
19   take some weeks to find financing.
20         So they left me with the impression
21   they didn't have a problem -- they had a problem
22   with Lehman being the counterparty to the Fed
23   and were more comfortable with Barclays being
24   the counterparty to the Fed, and them seeing a
25   way that Barclays had, over a couple of week

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2    period, would be able to put that collateral out
3    on the street.
4          So worked with Lucinda that night, and
5    the Fed replacement transaction was kind of
6    developed.  Told her that she was looking --
7    they were anxious, right?  Were hoping that we
8    could execute on Wednesday.  We told them that
9    we wouldn't be prepared.  We didn't have any
10   idea, you know, while we drew this up on the
11   blackboard, you know, I needed to go back and
12   figure out how it was going to work.
13         Q.    Right.
14         A.    And there was just so much uncertainty
15   about data, you know, didn't know the collateral
16   that the Fed was holding and, you know, needed
17   to talk to our ops. people.  And, you know, so
18   Wednesday would have been a day of preparation
19   in anticipation of beginning doing this
20   transaction on that Thursday.
21         Q.    So this Wednesday, the 17th --
22         I'm putting the days in so we have a
23   record by number as well.
24         A.    Yeah.  Yeah.
25         Q.    So you leave the Fed, you told them

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2    we'll do this, but I can't get it done today?
3          A.    We're going to do it on Thursday,
4    right?  And they seemed to be fine with that.
5    They were just, you know, they were expecting a
6    Friday closing and seemed to be okay that
7    Thursday was the day.
8          Q.    Were you expecting a Friday closing at
9    that point, too?  Was that the timeline people
10   were working on?
11         A.    You know what, I was expecting a
12   Friday closing.  It became -- and I don't know
13   why, I don't know where, you know, again, it
14   could have been chatter in the -- in our
15   facilities.  It became, you know, from my
16   personal experience, it became very evident that
17   if it had to go through another weekend, this is
18   personal experience, they were having a great
19   deal of difficulty, Lehman Brothers, just
20   getting through a day because they were flying
21   blind.
22         They had -- they didn't know the
23   status of their trades.  They hadn't reconciled
24   the bank accounts.  They hadn't reconciled their
25   stock record in several, several days in advance

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  of when -- even before I got in there. I mean,
3  when was the last time you reconciled your stock
4  record, I would ask, and they would say they
5  hadn't reconciled in weeks because JPMorgan was,
6  you know, shutting the -- not providing any --
7  not only did they not provide any intraday
8  liquidity, they denied them access to the
9  system.
10        So the quality of data was -- was
11  horrible.
12     Q.   Okay.
13     A.   Absolutely horrible.
14     Q.   I interrupted you.  Let me put you
15  back where we were, I think, in the timeline.
16  You had this conversation with Lucinda.  You
17  told her what you can get done and what you
18  can't get done on the Wednesday?
19     A.   We were going to try to do it on
20  Thursday.
21     Q.   Do you leave the Fed?
22     A.   Leave the Fed.
23     Q.   What happens then?
24     A.   Go back to the office, mobilize the
25  team, you know, tell them that we're going to

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  try to --
3     Q.   People must be really sick of seeing
4  you show up now.  You're mobilizing teams...
5     A.   Mobilizing teams, right?  And it's
6  very -- you know, in theory, it's a very simple
7  transaction, right?  So the Fed is going to
8  release collateral to Lehman Brothers, right?
9     Q.   Uh-huh.
10     A.   Barclays is going to wire $45 billion
11  in money to Lehman, and Lehman is supposed to
12  deliver to us the collateral that it had held at
13  the Fed, right?  That was supposed to be -- that
14  was the transaction which was agreed.
15     Q.   Okay.
16     A.   Okay?
17     Q.   What next?
18     A.   The Thursday we begin to move money
19  and assets start coming across.  We have all
20  kinds of operational difficulties.  We had
21  difficulties getting started, difficulties
22  coordinating with JPMorgan, and as you
23  undoubtedly know, that the transaction that
24  started in the middle of the afternoon didn't
25  get completed until -- well, never really got

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  completed, but we were moving securities into --
3  the transaction would have started sometime in
4  early afternoon, late morning on Thursday and it
5  didn't get -- we stopped moving securities at
6  Friday, would have been after 12 o'clock, that
7  the Fed had -- DTC had closed the securities
8  wire.
9     Q.   Let me clarify that a little bit
10  because I'm not sure I understand the timing.
11  You're into Friday.  When you say 12 o'clock,
12  are you at noon?
13     A.   So noon on Thursday, right?  On or
14  around noon on Thursday.  Could have been a
15  little before, a little after we moved cash over
16  to JPMorgan and securities started trickling
17  across, right?
18     Q.   The cash is how much?  45 billion?
19     A.   Originally, the -- we moved 5 billion
20  initially, and the securities did not move
21  across quickly, and as a matter of fact, we
22  actually didn't get $5 billion worth of
23  securities for the first $5 billion worth of
24  cash that moved across.
25        At that point in time, I alerted the

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  Fed, and I would have called, I'm not sure if it
3  was Lucinda Brickler or Stephanie Heller, that
4  we had agreed a transaction, we were having a
5  great deal of difficulty because JPMorgan was
6  not cooperating, and they had gone onto the --
7  they had gotten -- I was told that they were
8  going to reach out to JPMorgan.  I can't tell
9  you what they said.
10        They came back to me, the Fed, and
11  said that JPMorgan wanted to hold the excess
12  collateral in margin for the transactions to
13  satisfy, you know, their potential exposure to
14  Lehman Brothers, and I said that's a
15  non-starter, that's not the transaction that we
16  had agreed on the Wednesday.
17        We had agreed a transaction with the
18  Fed to take the Fed out of the transaction, not
19  for Barclays to satisfy or, you know, JPMorgan's
20  exposures to Lehman Brothers.  That was a lively
21  discussion with me and the Fed, and at that
22  point in time, I had escalated to Rich Ricci
23  that JPMorgan was -- I don't know the words I
24  would have used.  I don't know that --
25     Q.   Something colorful?

1    **HIGHLY CONFIDENTIAL - G. LaROCCA**
2       A.   Something colorful, right?  They
3    didn't play nice in the sandbox, okay?
4          And, you know, and several -- now
5    hours have passed, right?  And, you know, we
6    haven't done -- we haven't moved much cash and
7    much securities.
8       Q.   **Right.**
9       A.   I'm not sure of the -- what discussion
10   took place with the Fed, but the Fed came back
11   and said JPMorgan indicated that they were going
12   to cooperate.
13      Q.   **Okay.  When you say you're not sure**
14   **what discussion, the discussion between the Fed**
15   **and JPMorgan?**
16      A.   Fed and JPMorgan.  I'm not privy to
17   that conversation, right?  So, but the Fed came
18   back to me and had indicated that JPMorgan was
19   going to cooperate, right?
20      Q.   **Okay.  So what happened next?**
21      A.   And because of the now the Fed wire
22   and DTC, I mean, now we're past the deadline,
23   right?  And there was -- and we're wondering how
24   we're going about to get this transaction done.
25      Q.   **This transaction being the --**

1    **HIGHLY CONFIDENTIAL - G. LaROCCA**
2       A.   The Fed replacement transaction given
3    the we've already asked for extensions and the 5
4    billion took hours and it was trickling in and
5    the systems weren't working, right?
6       Q.   **Who do you have to ask for extensions?**
7       A.   The Fed, normally, in a normal course
8    of business, okay, the dealer community would
9    ask one of its two clearing banks, it would be
10   Bank of New York or JPMorgan, right, to keep the
11   securities wire open or the money wire open.
12         And it's done through a clearing bank,
13   so the dealers don't talk to the Fed, right?  On
14   occasion, 30 years of experience, when the
15   security wire or money wire is kept open for
16   prolonged periods of time, sometimes the Fed
17   will want to talk to the dealer or the
18   participant who's causing the extension.
19      Q.   **Okay.**
20      A.   In this instance, the Fed was party to
21   the transaction.  They were, you know --
22      Q.   **They're in it?**
23      A.   So I don't know that we asked.  They
24   were going to keep it open to, you know, to help
25   us.

1    **HIGHLY CONFIDENTIAL - G. LaROCCA**
2       Q.   **Got it.**
3       A.   Right?  And they -- but still
4    concerned about how this, you know, how this was
5    going to happen and get done on time.  We talked
6    about internally at Barclays -- who?  Me, Rich
7    Ricci -- about, you know, moving $40 billion in
8    one go.  And, you know, it's a lot of money and
9    that decision carried kind of great personal
10   risk for me and also tremendous risk for
11   Barclays, and while I was given assurances that
12   from the Fed that JPMorgan was going to play
13   ball or cooperate, my experience that week with
14   them grabbing collateral, them turning the pipes
15   off at Lehman Brothers, caused me great concern
16   and was very concerned that we would be exposed
17   that kind of money.
18         Rich kicked the decision up.  I don't
19   know exactly the conversation that he had with
20   Bob, but what came back to me was that Bob had
21   gotten assurances from Bill, I think it's Bill
22   Winters from JPMorgan, that all the collateral
23   would move across.
24         So we moved 40 billion in one go, I
25   don't recall the time, late afternoon or early

1    **HIGHLY CONFIDENTIAL - G. LaROCCA**
2    evening of Friday, and securities started to
3    come across in glacier-like speed, just -- and
4    I'm not sure why the systems were creaking.  I'm
5    not sure.  Just it took -- you know, there was
6    no rule book for what was happening.  These
7    aren't, you know, this is not, you know, this
8    transaction is not getting processed like a
9    normal transaction, you know, and securities
10   moved till well after midnight.
11         And Barclays is expecting, you know,
12   something greater than $45 billion worth of
13   securities or, you know, and the number we were
14   expecting were in the neighborhood of 49 to 50
15   billion dollars worth of securities, assuming
16   there were normal haircuts assign to the
17   collateral.
18         MR. STERN:  When you said "well after
19   midnight," are you sure of your recollection
20   on that?
21         THE WITNESS:  It was after midnight.
22   On or around midnight.  "Well after" maybe
23   is not the right, Jack --
24         MR. STERN:  I'm sorry, I just wanted
25   to be accurate.

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.   It's a good point, because let's --
3    A.   It was --
4    Q.   And just so I can further clarify
5  this, after midnight on the midnight from
6  Thursday over to Friday?
7    A.   Correct.
8    Q.   Okay.  Okay.  So at some point very,
9  very late on Thursday or early Friday?
10    A.   Right, the Fed and DTC closed the
11  securities wire.
12    Q.   Okay.
13    A.   Because they needed to be open for
14  business the next day.  And we found ourselves
15  short, didn't really know how short we were
16  because, you know, we didn't really have a lot
17  of time to -- we had no time to look at
18  collateral, valuations.  No time, right?  And
19  were relying on information that values that
20  were being assigned by the systems, okay, that
21  suggested that we had approximately $42 billion
22  worth of securities couldn't be absolutely sure,
23  you know, because we didn't -- didn't know what
24  we were -- what was coming across.
25         When it became evident that we were

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  short, our ops. guy got on the phone with a
3  JPMorgan guy.
4    Q.   Who is your ops. guy?
5    A.   John Rodefeld.
6         And I would have instructed him to get
7  some cash back, and JPMorgan at that point in
8  time wired $7 billion in cash.  So I left Friday
9  morning in the wee hours, you know, sometime
10  between 1 and 3, thinking that, you know, we got
11  roughly 49 to 50 billion in collateral, you
12  know, and thinking that we're going to have to
13  finish this transaction at a later date.
14    Q.   Okay.  You're thinking you got 42 plus
15  7.  What happens next?
16         Actually, can I withdraw that?  I want
17  to go back to something you just said.  You said
18  you looked at the collateral valuation, et
19  cetera, and you were relying on values assigned
20  by the system.  Could you tell me what you meant
21  by that?
22    A.   No.  You're probably better placed
23  talking to an Ops. guy, right?  Because somehow,
24  right, so I'm not -- I'm in 745 or 200 Park.
25  I'm in Manhattan.  Our ops. guys are in New

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  Jersey and somehow they were able to keep a
3  running total --
4    Q.   Of what's coming across?
5    A.   -- of what's come across, right?  And
6  I don't know how they did that, so I don't
7  know --
8    Q.   Let me just press that a little bit,
9  see if -- did anybody talk to you about the
10  values that were -- did the values you're being
11  informed about come from the Bank of New York
12  valuation, because they're like holding the
13  collateral?
14    A.   I don't really know the specifics.  I
15  would be speculating.  I really --
16    Q.   I don't want you to do that.
17    A.   I really don't know.  Based upon my
18  experience, right, you know, I would think that
19  the Bank of New York would have no difficulty
20  assigning values to wirable securities.
21    Q.   Hold them, right?
22    A.   Treasuries and mortgage-backed,
23  Ginnie, Fannie, Freddie, highly liquid markets
24  because that's what they do.  They're a
25  tri-party bank and they value the securities.  I

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  would imagine that they would have a great deal
3  of difficulty pricing non-wirable securities.
4  They would have no difficulty with wirable and
5  equities, listed stocks, and it would all be all
6  the non-investment grade, illiquid products that
7  they would have a great deal of --
8    Q.   Like give me some examples.
9         MR. STERN:  Let him finish.  You were
10  saying illiquid products would have a great
11  deal of?
12    A.   Difficulty pricing.  Actually, not
13  only would they have difficulty pricing, right,
14  but the market is in major meltdown mode, right?
15  So I know from our own books, right, you know,
16  there's no markets, prices are moving like -- we
17  didn't know what it was we were going to get.
18  We were hoping we were going to get something
19  more -- we would end up in a position that we
20  had something more than 45 billion in cash that
21  went across, but we couldn't be absolutely
22  certain.
23         We had, you know, thousands and
24  thousands and thousands of Cusips.  We didn't
25  know if we're getting, you know, AAA-rated

---

Page 46

HIGHLY CONFIDENTIAL - G. LaROCCA

1 corporates or wallpaper. You know, so it was a
2 lot of uncertainty, a lot of risk, and --
3      Q.   Okay.
4      A.   -- so there's a running total being
5 kept.
6      Q.   Yeah.
7      A.   Okay. That running total gets
8 communicated to me it's 42 billion, right, but
9 these guys aren't, you know, these are ops. guys
10 and they're not traders and they're not making
11 markets in the securities, right? There are
12 no -- you know, so, you know, we wanted 7
13 billion in cash.
14      They moved 7 billion in cash to our
15 account. I left, communicated to the Feds, said
16 we didn't do the transaction, all the collateral
17 didn't move across, we got what we think is
18 roughly 42 billion in collateral and 7 billion
19 in cash, and, you know, I'm -- I'm probably not
20 going home. I'm probably going to a hotel now.
21      Q.   You're at least getting some sleep
22 now, right?
23      A.   I don't know if I was getting -- I
24 didn't get sleep. I maybe was going for a

---

Page 47

HIGHLY CONFIDENTIAL - G. LaROCCA

1 shower, because I -- I had a hotel room, but it
2 wasn't to sleep in. It was to shower and to --
3 I really didn't sleep. It was, you know...
4      Q.   So what happens next?
5           MR. STERN: Where are we in time?
6      Q.   We are in the wee hours of Friday
7 morning. You've been told by the ops. guys that
8 42 billion plus 7 billion in cash has come
9 across.
10      A.   Right. Okay. I'm pausing. I just
11 want to remember. The closing is scheduled that
12 afternoon, right? On Friday, the 19th, right?
13 And I would have explained to Rich and Michael
14 Klein kind of what happened, right?
15      So they had that information, and it
16 becomes -- I'm not sure -- I'm not sure of the
17 timing of it, if someone said anything to me or
18 if it's a function of being in the room or, you
19 know, it's becoming evident to me that the
20 securities that came across in the -- from the
21 Fed are the securities that are going to be in
22 the -- now we're doing an Asset Purchase
23 Agreement, we're not buying the broker-dealer,
24 and the securities that we're going to purchase

---

Page 48

HIGHLY CONFIDENTIAL - G. LaROCCA

1 are going to be the ones that have come across
2 from the Fed. So somehow that lightbulb goes
3 off on Friday, right? For me.
4      I'm trying to recall. That's very,
5 very -- I remember going to the closing.
6           MR. STERN: You said something about
7 telling Rich and Klein.
8      A.   I told Ricci and Michael Klein that we
9 didn't get all our securities, we got cash, we
10 somehow have to complete the transaction, you
11 know, don't know what it is we got in the way of
12 collateral, you know, we need to get traders to
13 look in at it. I'm not sure that we got
14 collateral that was held by the Fed, I'm not
15 sure we got collateral that was held by
16 JPMorgan, I'm not sure about anything, right?
17 You know, I'm very, very concerned that, you
18 know, about what it was we had moved across.
19      Q.   Okay.
20      A.   Right? Someone explained to me, and I
21 didn't know this at the time, and I'm in a room
22 with a bunch of lawyers, that when, under repo
23 law, in a bankruptcy, right, the collateral --
24 we're not getting -- that's not a transaction

---

Page 49

HIGHLY CONFIDENTIAL - G. LaROCCA

1 that, the way we structured it, was a repo,
2 right, a reverse repo for Barclays, that, you
3 know, that's not going to unwind, that trade,
4 you know, the Fed is going to be left with cash
5 and we're going to be left with collateral and
6 we didn't know what it was we had.
7      We didn't know what it was we had, the
8 markets were tanking, the world was melting
9 down, and there was a great deal of concern
10 about what it was we -- what it was we had come
11 across, and so I would have alerted Michael that
12 we ended up with what we believed to be $42
13 billion, or what the system said, we needed to
14 get traders to look at it, and we got $7 billion
15 in cash.
16      Q.   Michael is Michael Klein?
17      A.   Michael Klein and Rich Ricci, okay?
18      And then I went to the, that
19 afternoon, I went to the bankruptcy proceeding,
20 you know. I was just fascinated. I hadn't
21 seen, you know, about what was transpiring in
22 the market, you know, what wasn't, you know,
23 sitting in the gallery and then --
24      Q.   In the main room or up on the other

Page 54

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.    Okay.  That makes some sense.  So now
3    we have the judge right after midnight on Friday
4    into Saturday, the hearing ends, right?  And
5    then you're aiming at a before-opening close on
6    Monday?
7    A.    Correct.
8    Q.    I'm doing this just so see if I can
9    refresh your recollection about what's happened
10   in these time segments, okay?
11   A.    Don't remember.
12   Q.    Are you busy with the deal in some
13   fashion or other on Saturday or Sunday?
14   A.    I was there that weekend because I
15   didn't go home.
16   Q.    Okay.
17        MR. STERN:  "There" being Weil Gotshal
18   or Barclays?
19        THE WITNESS:  I'm sorry?
20        MR. STERN:  Where is the "there"?
21   Q.    Where were you?
22        MR. STERN:  Where are you?
23   A.    At Barclays, I think at 200 Park.
24   Q.    I'm going to show you in a couple of
25   minutes, because I bet you thought this was over

TSG Reporting - Worldwide (877) 702-9580

Page 55

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    when you told me everything, but -- I'm kidding.
3    A.    You know, I --
4    Q.    This is very helpful.
5    A.    And then, and then Monday morning --
6    Q.    Can I go back to the weekend for a
7    second?  I'm going to show you in a couple of
8    minutes a clarification letter that you
9    signed --
10   A.    Okay.
11   Q.    -- that's being -- and maybe you're
12   not the one, but that's being negotiated during
13   that period.  Does that refresh your
14   recollection about what topics you were
15   addressing over the weekend?
16   A.    I'm a signator on every legal entity
17   for Barclays.  I think I alluded to that in my
18   background, right?  So I probably signed, you
19   know, so many documents that weekend, you know.
20   Q.    Are you involved over the weekend on
21   the Friday or the Saturday or the Sunday in any
22   back and forth about what this clarification
23   letter will contain?
24   A.    No.
25   Q.    Okay.

TSG Reporting - Worldwide (877) 702-9580

Page 56

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    A.    No.
3    Q.    Okay.  So tell me what you remember
4    next?
5    A.    Monday turning up at a law office, I
6    don't remember which one, if it was Cleary or
7    Weil Gotshal, I don't know where it was, walking
8    into a room, not unlike this, with about more
9    lawyers than, you know, a lot of lawyers, right?
10        And there was a discussion all of
11   about ten minutes about the $7 billion where we
12   talked about agreeing the collateral that would
13   come across for that $7 billion, right?  And
14   there was a -- it was a sheet of paper, to the
15   best of my recollection, put in front of me of
16   kind of collateral that JPMorgan wanted to give
17   us.
18        We said that was unacceptable because
19   we believed the collateral to be worth -- well,
20   I shouldn't say -- we believed the collateral to
21   be less, worth less than the cash and we were
22   expecting something more than $7 billion worth
23   of collateral because of the haircuts.
24        And JPMorgan said, how about you -- I
25   shouldn't say -- the lawyers for JPMorgan said

TSG Reporting - Worldwide (877) 702-9580

Page 57

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    how about you just keep the cash, and we said
3    okay because we wanted to facilitate the close.
4    I would have said okay.  I actually got
5    criticized for that decision because I should
6    have got $7 billion worth of the securities plus
7    the margin, something greater, right?
8        And then the deal team was going to go
9    away and make the amendments to reflect that
10   that Fed, you know, that the transaction had to
11   change or the asset purchase or whatever had to
12   change for now because we weren't going to
13   complete the transaction.
14        I hung around at the law offices and
15   executed documents and then I went home and got
16   much needed sleep.
17   Q.    Okay.  Now --
18        MR. STERN:  I think at some point
19   before 11 we should take a little short
20   break, whenever it's a convenient time.
21        MR. GAFFEY:  Two or three questions
22   and that's a very good breaking point.
23   Q.    Now, I just want to go back to the
24   documents you executed.  Do you know what you --
25   A.    I don't remember.

TSG Reporting - Worldwide (877) 702-9580

Page 58

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Did you know at the time, or is it a
3  lot of papers flying around?
4      A.   I presumed it was the deal closing
5  documents, you know, and --
6      Q.   Okay.
7          MR. GAFFEY:  Let's take a break now,
8  okay?
9          MR. STERN:  Yes.
10         (Recess; Time Noted:  10:44 A.M.)
11         (Time Noted:  10:53 A.M.)
12 BY MR. GAFFEY:
13     Q.   Mr. LaRocca, I want to go back to --
14 I'm going to go back over quite a bit of what
15 you told me, but I would like to go back for a
16 moment to, you said that on the Friday the
17 decision was there should you take the cash, and
18 you said --
19     A.   No, Monday morning.
20     Q.   I beg your pardon, Monday morning.
21 And you said okay and you were criticized for
22 that.  Who criticized you for that?
23     A.   A colleague of mine, a gentleman Mike
24 Keegan, indicated to me that, you know, you
25 should have got securities plus the margin so,
```

TSG Reporting - Worldwide (877) 702-9580

Page 59

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2  theoretically, we could have gotten some more
3  value.
4      Q.   And what's Keegan's job?
5      A.   He's a trader -- well, he manages a
6  trading unit of -- manages a trading -- manages
7  a trading unit of credit assets, right?  So an
8  illiquid trading book.
9      Q.   Tell me, just so I can frame this,
10 tell me what you remember about the conversation
11 with Keegan.  What did you say, what did he say,
12 as best you remember?
13     A.   I, what seemed like either that day or
14 the next day, that same day, I said, you know,
15 we got cash, right?  Thinking that cash is king
16 and we, you know, and instead of having illiquid
17 assets and given the market volatility.  And
18 Mike said, well, we should have got more than 7
19 billion.  We should have got securities worth 7
20 billion plus the haircut.  I don't know that
21 those were his words, you know, but ...
22     Q.   Did he express any concern about the
23 quality of the securities that came over?
24     A.   No.
25     Q.   No?  Did anybody express concern about
```

TSG Reporting - Worldwide (877) 702-9580

Page 60

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2  the quality of the securities that came over?
3      A.   No one -- no one would have expressed
4  concern to me, but I don't think anyone had time
5  to look, right?  You know.
6      Q.   So how is Keegan in this conversation?
7  I'm trying to get a sense of it.  This sounds
8  like anything that would range from he's --
9      A.   Mike is -- not certain of Mike's role
10 on the deal, right?  My impression of Mike's
11 role on the deal is he would have some
12 responsibility for figuring out what it is we
13 got in the way of collateral, right?  So he's
14 ultimately going to be responsible for managing
15 a subset or a piece of assets that have come
16 across.  So that would be his role.
17     Q.   And did Mike express any view about
18 any of the assets that came over, good assets,
19 bad assets?
20     A.   No.
21     Q.   Do you know if by the Monday anybody
22 had looked to see whether -- to make any
23 determination about the quality of the assets
24 that came over, quality of the securities that
25 came over?
```

TSG Reporting - Worldwide (877) 702-9580

Page 61

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2      A.   I would imagine -- I don't know that
3  definitively.  I would imagine that they had a
4  lot of traders looking at the assets that came
5  over.  I would imagine they were trying to sell
6  and trying to understand what -- I would imagine
7  traders are looking at assets, one, to try to
8  sell the assets and, two, to figure out who
9  would borrow those securities so we could
10 finance those positions.
11         The Fed was going to allow us to put
12 that collateral back to them into those three
13 facilities, but not for a prolonged period of
14 time.  They had an expectation that we would --
15 that they would be able to step out of the
16 trade.  They were able to, instead of finance
17 Lehman Brothers, now they were financing
18 Barclays, and they had an expectation that we
19 would get rid of those assets or finance them
20 through third parties.
21     Q.   So Mike, the view that Mike expressed
22 was you should have gotten the 42?
23     A.   Should have gotten -- the view that
24 Mike expressed was specifically was related to 7
25 billion in cash.
```

TSG Reporting - Worldwide (877) 702-9580

Page 62

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.    Okay.
3    A.    Right?  Because, theoretically, that 7
4    billion in cash should have attracted something
5    greater than $7 billion in collateral.
6    Q.    So, okay, so you have the 42 --
7    A.    Uh-huh.
8    Q.    -- of securities plus the 7 billion in
9    cash?
10    A.    Correct.
11    Q.    Mike's view is if you got 7 billion,
12    you should have gotten 7 billion more in
13    securities plus a haircut?
14    A.    Securities plus a haircut, correct.
15    Q.    And nothing he says in this
16    conversation expresses any view about the
17    quality of what you did get, the securities that
18    you did get?
19    A.    No.  I'm not a trader, so I'm not --
20    Q.    I'm just trying to find out what Mike
21    said.
22        (Exhibit 202, a document bearing Bates
23    Nos. ECI-EX-00000042 through 43, marked for
24    identification, as of this date.)
25    Q.    Mr. LaRocca, I've put before you what

TSG Reporting - Worldwide (877) 702-9580

Page 63

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    we've marked as Deposition Exhibit 202, a
3    two-page document bearing Bates number
4    BCI-EX-00000042 to 43.  Take a look through that
5    and let me know whether you've seen the document
6    before, and just let me direct your attention to
7    your name at the very end of that distribution
8    list.
9    A.    I see I'm on the distribution.
10        (Document review.)
11    A.    I don't recall seeing this, right?
12    I've read it, right?  And at a high level I
13    understand it, but I suspect this is probably
14    one of hundreds of documents that you'll have my
15    name on.
16    Q.    Okay.  Well, having looked through it,
17    and I understand you haven't had time to study
18    it, does it roughly lay out -- we're on
19    Thursday, September 18, shortly after midnight.
20    See the time and date on there up at the top?
21    A.    Yes, I see the time.  I'm trying to
22    put that in context.
23        MR. STERN:  Take your time to read it.
24    A.    All right.  So this is Thursday in the
25    early A.M. before we move the securities, right?

TSG Reporting - Worldwide (877) 702-9580

Page 64

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.    Well, that's what I'm going to ask
3    you.
4    A.    Okay.  Okay.
5    Q.    Having looked through it, I don't want
6    to spend a lot of time on this document, does it
7    roughly lay out what the plan was with respect
8    to --
9    A.    Yeah, roughly it does.  Right?  So
10    like I said, came back from the Fed on Wednesday
11    night, mobilized the team, and they're obviously
12    working through the night figuring out how we're
13    going to do this.
14    Q.    Now I'd like to move in time to --
15    A.    Do you want this back?
16    Q.    Just keep it over there because
17    sometimes we go back to the exhibits.
18        (Exhibit 203, a document bearing Bates
19    Nos. BCI-EX-00000080, marked for
20    identification, as of this date.)
21    Q.    Mr. LaRocca, you have in front of you
22    a one-page e-mail which we have marked as
23    Deposition Exhibit 203, bearing Bates No.
24    BCI-EX-00000080?
25    A.    Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 65

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.    Do you recall receiving this e-mail?
3    A.    Do not recall receiving this e-mail.
4    Q.    Who is Marty Malloy?
5    A.    Marty Malloy is a trader in our stock
6    loan area who would be responsible for trying to
7    finance some of this collateral with third
8    parties after it arrived.
9        MR. GAFFEY:  Can we go off the record
10    for one second?
11        (Discussion off the record.)
12    Q.    The e-mail is entitled "Totals for the
13    Fed Facility Collateral," and there's an
14    annotation on here that says, "Total securities
15    and cash received:  52.19."  I'm assuming these
16    numbers are in the billions, yes?  I can read
17    that as 52.19 billion?
18    A.    I would think so.
19    Q.    Okay.  And further up there, there's
20    an entry that says "Repo Cash:  7 billion"?
21    A.    Okay.
22    Q.    I'm trying to get this into a timing
23    context.  Does this reflect how much value
24    Barclays received -- well, thought it received
25    as of September 19 at 11?

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   A.   I have no idea.  Right?  I just have
3   no idea.  I don't know where Marty's getting
4   these numbers from.
5       Q.   Uh-huh.
6       A.   How he's describing, you know, he's,
7   you know, you know, he's reporting me some
8   numbers.  I'm on an e-mail where he's reporting
9   some numbers that suggests we got 52 billion.
10  This would have been 11:51 A.M., right?
11      Q.   Uh-huh.
12      A.   I just, I don't know how he -- I don't
13  know where he got the numbers from or how he
14  would have gotten the numbers from.
15      Q.   There's a phrase you used before,
16  "excess collateral," and there's an entry here
17  for excess collateral of 7.19.  What do you
18  understand Mr. Malloy to be reporting to you
19  there?
20      A.   I have no -- I just don't know what
21  that number is.
22      Q.   Well, you got the repo cash amount.
23          You know, actually, I'm not sure we've
24  used this term all morning, so let me -- apart
25  from the document for a moment, when you've been

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   talking about the Fed facility?
3       A.   Right.
4       Q.   And then the Barclays what you call
5   the replacement transaction?
6       A.   Fed replacement transaction, right.
7       Q.   These are repurchase agreements, yes?
8       A.   I hesitate because I -- I don't, you
9   know, I don't know how the, you know, I don't
10  know if there are documents associated with the
11  transaction and what the documents say, right?
12  From a processing point of view, okay, from a
13  processing point of view at a high level, I
14  think of it as a simple reverse repo where I
15  reverse in collateral and I pay cash.
16      Q.   Uh-huh.
17      A.   Now, the reality of that is, at a high
18  level, but the devil's in the details, right, so
19  the wirable securities are going to get
20  processed one way, equities are going to get
21  processed one way, corporates will get processed
22  a different way, they're going to settle
23  differently, how they're reflected in our
24  systems, whether it be, you know, you know, so
25  at the high level, I think like you think, you

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   know, it's a -- it's being -- I think of it as a
3   reverse repo.
4       Q.   Okay.
5       A.   I think of a Fed replacement
6   transaction as a reverse repo.
7       Q.   So the repo cash amount that's listed
8   here on Exhibit 203 --
9       A.   Right.
10      Q.   -- that would be -- that's the 45
11  billion that Barclays sent over, yes?
12      A.   I presume that's what it is, yes.
13      Q.   And the margin which is put at 14
14  percent here, right?  Is that what you have
15  referred to as the haircut?
16          MR. STERN:  Objection to the form.
17      A.   I just don't know where these numbers
18  are coming from or how Marty's derived it,
19  right?
20      Q.   Okay.
21      A.   My recollection is having 42 and being
22  short 7.
23      Q.   You know, I'm going to go back to
24  that.  It's one of the reasons I'm being quite
25  careful about -- as careful as I can be about

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   the dates I'm asking about.
3          This is the 19th at 11:14 A.M.  We'll
4   talk later about whether the 7 billion arrived
5   and ultimately when it did or didn't, but if you
6   could just sort of snapshot this for me at the
7   time that you're seeing that e-mail, that's the
8   frame I want to put around my questions, okay?
9          We have marked as --
10         Go ahead, sure.
11         MR. STERN:  Let him ask a question.
12  This is the next exhibit.
13         (Exhibit 204, a document bearing Bates
14  Nos. BCI-EX-00000081, marked for
15  identification, as of this date.)
16      Q.   Before you is Exhibit 204 bearing
17  Bates No. BCI-EX-00000081, a one-page e-mail
18  from you to Mike Keegan?
19      A.   Right.
20      Q.   And this appears to be you forwarding
21  to Keegan Malloy's e-mail to you.
22      A.   Yes.
23      Q.   Why did you send that on to Keegan?
24      A.   He would be Steven King's boss.  No
25  other reason than, you know, because Steven King

TSG Reporting - Worldwide (877) 702-9580

Page 70

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2   worked for Mike Keegan.
3       Q.   Okay.  Why would you send it on
4   instead of King sending it on?  Any reason?
5       A.   Maybe Stephen King did.  Maybe Stephen
6   King did send it on.  I don't know, right?  You
7   know, but Mike, like I said, Mike would be, as I
8   indicated earlier, Mike would have some
9   responsibility of managing a subset of this
10  collateral that comes across.  Stephen King
11  works for Mike, so I'm not managing the
12  collateral coming across.
13      Q.   Yeah.
14      A.   It would have been Marty Malloy who's
15  got to finance it.  Stephen King and Mike Keegan
16  who have to manage the risk.
17      Q.   In my own layman's terms, it sounds to
18  me like your job is to get it in the house and
19  somebody else's job to make money with it?
20      A.   Absolutely.  Absolutely.
21      Q.   All right.
22      A.   So Marty's got to worry about
23  financing the assets.  Mike Keegan and Stephen
24  King have to worry about hedging it, managing
25  the risk.  Right?

TSG Reporting - Worldwide (877) 702-9580

Page 71

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2       Q.   When we talked a moment ago about
3   Keegan being critical about accepting 7 billion
4   in cash?
5       A.   Uh-huh.
6       Q.   One of the reasons I have shown you
7   this document is to ask you whether it was this
8   reference to 7 billion repo cash that --
9       A.   No, would not, because Mike made the
10  comment on the Monday after we -- because, you
11  know, after we had taken the cash.
12      Q.   Okay.  Did you have any response from
13  Mike -- there's sort of a gap in the sequence we
14  talked about before over the weekend, and I just
15  want to see if this refreshes your recollection.
16      A.   No.
17      Q.   Any conversations over the weekend or
18  communications over the weekend with Mike about
19  the 7 billion cash?
20      A.   No.  The, again, the -- my job almost
21  kind of on Friday, it's kind of now with traders
22  who got to figure out how to hedge, manage risk,
23  and I'm not part of that -- it's not what I do.
24      Q.   Okay.  Was part of what you do,
25  though, to, you know, as I said, your job is to

TSG Reporting - Worldwide (877) 702-9580

Page 72

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2   get it in the house, other people's job to make
3   money with it.  Is this reporting, this is a
4   useful piece of information to you, yes?  This
5   is what somebody thinks arrived, yes?
6       A.   It's of no utility to me.  It's of
7   little utility to anyone.  Okay?  What's going
8   to be important is the detailed listing of the
9   thousands and thousands and thousands of Cusips,
10  the values that have been ascribed to each
11  Cusip, and then traders could begin to do their
12  work, right?  This is -- this isn't worth the
13  paper it's printed on.  Just, you know, the --
14      Q.   So, as you sit here today looking at
15  it, you don't know one way or the other whether
16  it's an accurate description?
17      A.   Correct.
18      Q.   Okay.  We're done with that for now.
19  Thanks.
20      A.   I don't even know, okay, if the
21  valuations, the running totals that I alluded to
22  earlier, if they're current prices, the day
23  before's close.  You know, securities are coming
24  across.  I alluded to the ops. guys are trying
25  to keep a running total, right?  You know,

TSG Reporting - Worldwide (877) 702-9580

Page 73

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2   relying on systems.
3       I mean, you got to remember the
4   markets are volatile, right?  And everyone at
5   Barclays is concerned that we're going to be
6   short, you know, and because the markets
7   movement, markets are moving, markets were very
8   volatile during that period of time.
9       Q.   Let's go back now into the chronology
10  we were talking about before.  When last we left
11  it, you went to the closing, some stuff got
12  signed, you went home and got some sleep.
13      You mentioned before Barclays was
14  concerned that it might be short.  Is there any
15  determination made after the closing about that?
16      A.   Again, I'm not privy to -- I'm just
17  not in that circle, right?  I mean...
18      Q.   Well, let me ask you this.  What are
19  your activities with respect to the transaction
20  starting on --
21      A.   On the Monday?
22      Q.   Yeah, after the closing.
23      A.   Starting to work on integration,
24  thinking about integrating -- let me pause.
25  Would have been thinking about integration would

TSG Reporting - Worldwide (877) 702-9580

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2     after that.  That gentleman's name is Jai
3     Westwood.  He's one of my direct reports and,
4     you know, he would have, again, been trying to
5     go figure out what needs to be done and be a
6     central point of contact.
7          Q.   And other than assigning him to it,
8     did you have any involvement in it?
9          A.   No.
10          I want to clarify.  There was the --
11     other than assigning him, I had nothing to do
12     with it, with the one exception being, and I'm
13     not sure if it's days or weeks after, there was
14     a debate or a dispute with American Express, and
15     I didn't have much to do with it other than I
16     knew there was some kind of disagreement between
17     Barclays and American Express as to whether, you
18     know, we should honor, step into that
19     commitment.
20          I don't know the details.  It was
21     brought to my attention by someone in Legal and
22     Jai Westwood, and I said just reach a
23     settlement.  So, other than that, I was not
24     involved -- not involved in that aspect of the
25     integration contracts.
          TSG Reporting - Worldwide (877) 702-9580

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2          Q.   Let's go back to the area that you
3     said was a huge area of focus.  That's the,
4     shortly after the closing, it was realized that
5     7 billion was not in your account?
6          A.   Yes.
7          Q.   Take me through the steps of that.
8     Who realizes it and what follows?
9          A.   After that Monday, after the closing,
10     we had -- we -- I had instructed our ops. guys
11     to move the $7 billion in cash out of our
12     account at JPMorgan into our account at the Bank
13     of New York.
14          Our ops. guys instructed JPMorgan to
15     move the cash.  JPMorgan did not act on those
16     instructions.  That would have been escalated to
17     me, their failure to act.  We would have
18     instructed again movement on Tuesday.  Tuesday I
19     believe I was alerted that the cash was no
20     longer in our account.
21          To the best of my recollection, that
22     was the timeline.  So Monday we believed the $7
23     billion was in our account.  I had seen a bank
24     statement to evidence its existence in our
25     account.  We tried to move the money out of our
          TSG Reporting - Worldwide (877) 702-9580

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2     account into our account at Bank of New York,
3     and I believe it was Tuesday that I was informed
4     that the cash was no longer in our account.
5          Q.   So what happened then?
6          A.   Would have escalated it to numerous
7     people.
8          Q.   Presumably Rich Ricci, right?
9          A.   Rich Ricci and Jonathan Hughes would
10     have been certainly two people.  Maybe more, but
11     certainly would have alerted our legal group and
12     Rich Ricci and would have also alerted the Fed.
13     It would have been most likely Stephanie Heller
14     at the Fed.
15          Q.   Why would it most likely be Stephanie
16     Heller at the Fed?  Was that someone you dealt
17     with?
18          A.   Stephanie would have -- I think during
19     the week I alluded to the fact that when we
20     started the replacement transaction and JPMorgan
21     wasn't moving the securities over in a timely
22     basis, they wanted to hold the margin, right, to
23     satisfy their liens against Lehman Brothers.
24     Stephanie would have been the person that became
25     my interface.
          TSG Reporting - Worldwide (877) 702-9580

1          HIGHLY CONFIDENTIAL - G. LaROCCA
2          Q.   Okay.
3          A.   Okay?  So Lucinda Brickler was the
4     person that we negotiated how the transaction
5     was going to work, and then regarding the
6     performance of JPMorgan during -- Stephanie
7     somehow emerges as my interface.
8          Q.   Okay.  All right.  So it's escalated
9     to Ricci, Hughes --
10          A.   And the Fed.
11          Q.   -- and the Fed.  What happens after
12     that?
13          A.   Then Jonathan Hughes becomes the
14     primary interface with JPMorgan.
15          Q.   Did you ever learn what happened to
16     the $7 billion?  It was in your account?
17          A.   It was in our account.
18          Q.   And now it's not in your account?
19          A.   Now not in our account.
20          Q.   Did you ever learn where it went?
21          A.   No.
22          Q.   Through today you've never learned
23     where the 7 billion went?
24          A.   No.
25          Q.   Do you know if Barclays got it back?
          TSG Reporting - Worldwide (877) 702-9580

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        A.    Well, I know we -- I know Barclays
3    reached a settlement with JPMorgan.  I was at
4    that settlement at the bankruptcy court and we
5    got something less than $7 billion.
6        Q.    Do you know how much you got?
7        A.    I can't be precise.  So if you want a
8    definitive, specific amount, no.  I think if you
9    want a range, my recollection might have been in
10   the 4 billion plus change, you know, 4 billion
11   plus -- again, I'm, you know --
12       Q.    Yeah.
13       A.    -- it's not my, you know.  If that was
14   my job, I would know the numbers like I would
15   know my phone number, but that wasn't --
16       Q.    What were the components of what you
17   received, cash and securities?
18       A.    Cash component and stock component or
19   cash and securities component.  I don't know if
20   the securities were equities, government, I just
21   don't know.
22       Q.    Do you have any recollection of how
23   much the cash component was?
24       A.    No.
25       Q.    And again, I'll ask you about the
       TSG Reporting - Worldwide (877) 702-9580

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    quality of the securities that Barclays got as
3    part of the JPM settlement.  Do you have any
4    knowledge about that?
5        A.    No.
6        Q.    So what I'm pressing on here a bit is
7    what you know or don't know about the basis for
8    saying you got -- that what Barclays got was
9    worth something less than 7 billion.  I'm just
10   looking for your personal knowledge about that.
11       Why do you say that?
12       A.    I was at the court proceedings and the
13   judge asked for a value to be ascribed, and
14   people testified that or, you know, that the
15   value was significantly less than the $7
16   billion, so it should be a -- it should be -- it
17   should be a court record.  So my knowledge is
18   what I've heard.
19       Q.    Okay.
20       (Exhibit 205, Motion Under 11 U.S.C.
21   Sections 105 and 363 and Fed. R. Bankr. P.
22   9019(a) for Entry of an Order Approving
23   Settlement Agreement, marked for
24   identification, as of this date.)
25       Q.    Mr. LaRocca, I have put before you
       TSG Reporting - Worldwide (877) 702-9580

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    what we have marked as Exhibit 205, a document
3    entitled Motion Under 11 U.S.C. Sections 105 and
4    363 and Federal Rule of Bankruptcy Procedure
5    9019(a) for Entry of an Order Approving
6    Settlement Agreement.
7        It's a fairly long document.  Take a
8    minute, you don't have to read the whole thing,
9    but just enough to familiarize yourself with
10   what's in there.
11       A.    Is this the document that got --
12   that's December that got presented or --
13       Q.    Yeah, I think so.
14       A.    December 22 --
15       MR. STERN:  Yes.
16       A.    Okay.
17       Q.    Just so you can put in your own head
18   where we are here, there's an affidavit by you
19   in here, which is the last document.  It's like
20   the last ten pages or so.
21       A.    The last ten pages?
22       Q.    Yeah.
23       MR. STERN:  Let me just show you.
24   There's a motion, right?  It's a legal
25   motion.  Then there's a settlement
       TSG Reporting - Worldwide (877) 702-9580

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    agreement, and then after the settlement
3    agreement, I think there are a couple of
4    declarations.  One is Shari Leventhal and
5    one is yours.
6        THE WITNESS:  Uh-huh.  Did I sign
7    this?
8        MR. STERN:  Your declaration is --
9        THE WITNESS:  I know I signed this.
10   Did I sign the settlement agreement?  Rich
11   did.  Looks like Rich signed it.  Okay.
12       MR. STERN:  So do you want him to
13   review his declaration.
14       Q.    Yeah, my question -- my first question
15   is have you seen all of this before, but then
16   we're going to ask about your declaration.
17       A.    I clearly have seen my declaration.  I
18   think I've seen Shari Leventhal's declaration.
19   I recall seeing Shari's declaration, although I
20   don't remember it and I would have to read it
21   again.
22       Q.    Okay.
23       A.    Regarding this -- the -- I don't
24   recall -- I don't recall receiving this
25   settlement agreement.
       TSG Reporting - Worldwide (877) 702-9580

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2   and, you know, that are going between Ops. and
3   salesmen or traders or Bank of New York or
4   JPMorgan.  I mean, but, you know, my job is not
5   to reconcile, sort those things, so if I got
6   this, I wouldn't have even opened the
7   attachment.
8        Q.   Okay.
9        A.   And if so, you know, not only -- so I
10  don't recall seeing it, and I just wouldn't have
11  been looking at spreadsheets and --
12       Q.   Okay.
13       A.   I don't have --
14       Q.   As I get it, at best, what your job is
15  is to make sure whoever needs to see that to
16  analyze it does, yes?
17       A.   So if someone sent me a document that
18  this is what JPMorgan, I would have hit forward,
19  you know, John Rodefeld, forward Marty Malloy,
20  and, sssht.
21       Q.   That's back to that air traffic
22  controller role we talked about before?
23       A.   Absolutely.  I mean ...
24       Q.   I'm going to give you three documents
25  at once here.  Now, I've placed before you,
        TSG Reporting - Worldwide (877) 702-9580

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2        Mr. LaRocca, what we have marked at previous
3   depositions as Exhibits 86B, 87B, and 88B, and
4   with respect to all three documents, I'll ask
5   you, have you seen them before?
6        A.   These specific documents, you know,
7   with absolute certainty, I don't recall.  I
8   would not be surprised, again, not unlike the
9   comments I made earlier where, you know, I'm
10  CC'd or of every e-mail.  These would be reports
11  prepared by our accounting group.
12       Q.   Okay.
13       A.   But I wouldn't do any -- you know,
14  again, very much like, you know, someone giving
15  me an FYI, this is kind of how it's broken out,
16  right?
17       Q.   Well, let me ask you this, and again,
18  with respect to all three, if I were to go
19  through the columns on these documents and ask
20  you what they mean and what this is meant to
21  show?
22       A.   I can speculate, but I couldn't tell
23  you with a hundred percent certainty.  Right?
24       Q.   Okay.  Do you know, as a general
25  matter, again, without regard to the documents
        TSG Reporting - Worldwide (877) 702-9580

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2   in your hand --
3        A.   Yeah.
4        Q.   -- just generally, do you know if any
5   work or any type of project was undertaken
6   within Barclays to value the securities received
7   in connection with the JPM settlement?
8        A.   In connection with?
9        Q.   With the settlement.  With the
10  discussion.
11       A.   The $7 billion?
12       Q.   Yes.
13       A.   I can't be certain.
14       Q.   Okay.
15       A.   I know that there was -- I believe, I
16  believe that there was a spreadsheet of
17  securities that would come across as part of the
18  settlement and I would think that our traders
19  put a value to, but I wouldn't have had sight of
20  that or --
21       Q.   Or involvement in it?
22       A.   Yeah, or involvement in it, but I
23  don't think we would agree to a settlement
24  without the -- without getting a look at the
25  collateral that was going to move.
        TSG Reporting - Worldwide (877) 702-9580

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2        Q.   Okay.  I want to go back to Exhibit
3   205.
4        MR. GAFFEY:  That's the motion papers,
5   please, Jack.
6        Q.   And I want to spend a little time,
7   Mr. LaRocca, on your declaration.  If you could
8   turn to that.
9        A.   Which is page?
10       Q.   The problem is I don't have page
11  numbers.  I believe it's the last six or seven
12  pages.  Actually, if you hand me the document,
13  I'm get you right there.
14       A.   I got it.
15       Q.   So we're at the Declaration of Gerard
16  LaRocca in Support of the Trustee's Motion For
17  Entry of Order Approving the Settlement
18  Agreement?
19       A.   Yes.
20       MR. STERN:  Have you read this in a
21  while?  He may need to read it.
22       THE WITNESS:  Not in a while.
23       Q.   Why don't you take a minute and read
24  it through because we're going to spend some
25  time on this.
        TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2      (Discussion off the record.)
3      (Document review.)
4    A.   Okay.
5    Q.   Okay?
6    A.   Yep.
7    Q.   As a general matter, at the time that
8  you signed this, you reviewed it and determined
9  that it was true?
10   A.   Uh-huh.  Correct.
11   Q.   And where you say in paragraph 1 of
12 the declaration that you have -- that, "Except
13 where stated otherwise, I have personal
14 knowledge of the facts set forth in this
15 declaration," that statement is true as well,
16 yes?
17   A.   Right.
18   Q.   Now, in your declaration, Mr. LaRocca,
19 you generally describe what you've been
20 referring to here as the replacement
21 transaction?
22   A.   Uh-huh.
23   Q.   That's when Barclays begins to supply
24 financing that the Fed previously had supplied,
25 yes?

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    A.   Correct.
3    Q.   And you say in paragraph 6 of your
4  declaration -- withdrawn.  Who drafted this
5  declaration for you to sign?
6    A.   Jonathan Hughes.  Now, Jonathan Hughes
7  would have drafted it.
8    Q.   And I don't want to know the substance
9  of your conversations with Mr. Hughes, but I'd
10 like a yes/no answer to this question.  Did it
11 go through more than one draft?
12   A.   Yes.
13   Q.   Did it go through more than one draft
14 so that you could be certain that what you were
15 saying in there was accurate?
16   A.   Correct.
17   Q.   And again, without the substance, just
18 yes or no please, did you make corrections to
19 drafts that you saw before a final was arrived
20 at, as opposed to others making corrections?
21   A.   Yes.
22   Q.   Okay.  If you could go back to
23 paragraph 6, you describe in there that -- I'm
24 at the second sentence:  "Thus, as Barclays and
25 LBI had agreed, Barclays transferred $45 billion

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  to LBI at a JPMorgan account that afternoon and
3  early evening," right?
4      Neither there nor anywhere else in the
5  declaration is there a reference to the
6  securities that LBI transferred to Barclays as
7  part of this repo.
8    A.   Okay.
9    Q.   Is there a reason for that?
10     MR. STERN:  Objection to the form.
11 You say "reference to the securities."
12 Well --
13   Q.   Actually, let me be a little more
14 precise.
15     MR. STERN:  Paragraph 6 --
16   Q.   In paragraph 5 there's a reference to
17 securities being pledged.  My question is
18 there's no reference to the amount, the value of
19 securities being sent over?
20   A.   There's no reference to the value,
21 correct.
22   Q.   Is there a reason for that?
23   A.   No particular reason at the time.  It
24 wasn't a conscious omission or anything, just,
25 you know, I wouldn't have known the value so I

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  couldn't make a declaration, right?
3    Q.   And you describe through paragraphs 6,
4  7, 8 and 9 what we've been talking about a bit
5  today?
6    A.   Uh-huh.
7    Q.   Which are the difficulties in
8  executing fully on the transaction and the story
9  about the 7 billion cash?
10   A.   Uh-huh.
11   Q.   Is that a fair summary?
12   A.   Correct.
13   Q.   In paragraph 9 refers to opening of
14 business on September 19.  You with me there?
15 It's the second sentence.
16   A.   Paragraph 9, yep.
17   Q.   What you're describing there -- let me
18 read the first two sentences:  "When the Fed,
19 Barclays and LBI originally agreed to engage in
20 the replacement transaction, the parties
21 intended for all of the Fed portfolio securities
22 to be delivered to Barclays under the
23 replacement transaction.  As that had not
24 happened as contemplated by the opening of
25 business on Friday, September 19, 2008, LBI and

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2 **Barclays discussed during the business day on**
3 **September 19 and into the weekend of September**
4 **20, 2008, the transfer to Barclays of the**
5 **portion of the federal portfolio securities that**
6 **had not yet been delivered as originally**
7 **contemplated."**
8     **I read you that again to put you at a**
9 **place and a time. We're on the morning of**
10 **September 19. Did at any time, sir, it come to**
11 **your attention, cross your screen in any way**
12 **that there would be an effort by Lehman to find**
13 **additional value to give to Barclays? By**
14 **"additional," I mean apart from what was**
15 **contemplated in the transfer of the Fed**
16 **portfolio over to Barclays.**
17     A. Not as it relates to the Fed
18 replacement transaction.
19     **Q. Okay. Do you have knowledge of that**
20 **as it relates to something else?**
21     A. The -- not specific detailed
22 knowledge.
23     **Q. Uh-huh.**
24     A. My -- the context is Barclays is,
25 again, being around, you know, I'm aware that,

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2 you know, Barclays is trying to derive value
3 from the transaction because we're acquiring
4 a firm, assets that we don't know the value of,
5 assets -- you know, so I'm aware that there's
6 discussion on how do we get value out of this
7 transaction, how do we make sure we don't
8 inherit a mess, don't get toxic assets, don't
9 lose money, you know, the view of management or
10 the people is that, you know, this is a very
11 risky transaction to Barclays and we're going to
12 end up with collateral from the repo transaction
13 that we're not sure what it's worth, you know,
14 the market, you know, so I'm -- you know, but
15 not -- I wasn't privy or part of the deal team
16 at all in terms of other elements of the
17 transaction.
18     Q. You were in court for a part of the
19 hearing on Friday, the 19th, part of the hearing
20 before Judge Peck on the 19th, correct?
21     A. Correct.
22     Q. Okay. We talked about that a bit
23 before.
24     A. Yeah.
25     Q. At any point during that hearing did

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2 you hear anyone tell the judge that the value of
3 the deal had dropped?
4     A. I don't recall.
5     **Q. Did you have an understanding by**
6 **Friday, the 19th, that the value of the deal had**
7 **decreased, had dropped?**
8     A. On Friday, the 19th?
9     Q. Yes.
10     A. From what point -- from what
11 perspective?
12     **Q. From the deal that had been**
13 **contemplated on Tuesday, the 16th, to the**
14 **situation as it existed on September -- on**
15 **Friday, the 19th?**
16     A. Not in a detailed way. I knew that
17 the deal had changed in some way, but no
18 specifics.
19     **Q. You mentioned a bit before, I think, I**
20 **may be wrong about this, I think you said it was**
21 **on the Thursday you used a phrase like the**
22 **lightbulb went on and you realized we're not**
23 **buying a broker-dealer at this point?**
24     A. Yeah.
25     Q. Now we're buying assets?

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2     A. Yes.
3     Q. Moving into the Friday morning --
4 actually, anytime during the Friday, did it ever
5 come to your attention that Barclays had
6 demanded from Lehman that additional sources of
7 value be found and turned over to Barclays,
8 other than the assets that were within the repo?
9     A. Yes, but no specifics, right? And I
10 would have -- so, yes, right? I was aware that
11 Barclays was looking to give value from the
12 transaction other than the repo, right? And my
13 experience with the repo, right, and the core
14 information that Lehman had provided to us
15 relative to kind of what they believed to be
16 held at the Fed, right, forced me to be cautious
17 about all information that we would have gotten
18 from Lehman.
19     So the -- would have alerted Rich,
20 Rich, you know, Lehman hasn't been able to
21 produce a position report, reconcile bank
22 accounts, reconcile stock record for weeks,
23 right, so you need to be very cautious about
24 value that they say exists.
25     I could give you a very specific

Page 102

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  example.
3    Q.    Okay.
4    A.    There was some foreign exchange.  You
5  can settle European currencies, what I call G7,
6  you know, in CLS.  It's kind of a riskless
7  settlement process, right?  So that's why I was
8  very comfortable for Barclays to provide some
9  intraday liquidity.  Settlement is certain,
10  right?
11      Lehman Brothers has foreign exchange
12  transactions that settled in local markets.
13  They settle outside CLS.  They believe that they
14  had a bunch of foreign exchange trades that, if
15  settled, right, would result in value to the
16  organization, to Lehman Brothers, right?  Their
17  information was two weeks old, right?
18      And I said, you know, Rich, I said,
19  those trades closed out weeks ago.  Those
20  counterparties walked away from those trade.  So
21  that was kind of the environment, right?  So, do
22  I believe Barclays was looking for value?  So I
23  believe Barclays was grasping at straws because
24  there was so much uncertainty, so much risk.
25    Q.    And specifically with reference to the

TSG Reporting - Worldwide (877) 702-9580

Page 103

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  Friday, the 19th, and looking for value, there's
3  two general --
4    A.    I can't tell --
5      MR. STERN:  Let him ask you a
6  question.
7    Q.    Let me frame it so you know what I'm
8  looking for.  We've got the assets that are
9  within the repo, right?
10    A.    Yeah.
11    Q.    And you mentioned before, and we'll
12  talk some more about this, how the deal became
13  moving those assets over to Barclays?
14    A.    Uh-huh.
15    Q.    My question goes to, outside that box,
16  are there other categories of assets that
17  Barclays told Lehman it wanted in order to close
18  the deal?
19      MR. STERN:  Objection.  I have to
20  object to the form of that.
21    Q.    You can answer it anyway, sir.  I'm
22  not too worried about admissibility.  I just
23  want to set a platform here.
24    A.    I can't give you any specifics.  I
25  wouldn't have been part of any of that.  You

TSG Reporting - Worldwide (877) 702-9580

Page 104

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  know, I wouldn't have been involved in any
3  detailed way.
4    Q.    Does the phrase "15c3 funds" ring a
5  bell?
6    A.    Yeah, absolutely.  Right?  Lehman
7  Brothers believed that there was an excess in
8  15c3 based upon a calculation they did two weeks
9  ago.  I would have alerted our deal team that,
10  you know, they can't substantiate any of this
11  data.
12    Q.    Do you know if the 15c3 excess was
13  transferred to Barclays as part of the
14  transaction?
15    A.    No idea.
16    Q.    Do you know anything about an effort
17  to find assets, unencumbered assets, in
18  clearance boxes?
19    A.    I don't know.  Can you ask the
20  question again?
21    Q.    You know what, I'm going to withdraw
22  that.  There's a letter I want to show you and
23  it's got some stuff in it.  It's probably more
24  focused if I give it to you that way.
25      Can we go back to your deposition --

TSG Reporting - Worldwide (877) 702-9580

Page 105

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  I'm sorry, your declaration for a minute?  You
3  describe in here, I'm at paragraph 10 --
4      You're going to need to go back into
5  that.
6    A.    Paragraph 10, yes.
7    Q.    We're at paragraph 10, and you're
8  describing how the replacement transaction was
9  structured as a reverse repurchase transaction?
10    A.    Uh-huh, yes.
11    Q.    And you say, "As part of the APA" --
12  that would be the Asset Purchase Agreement?
13    A.    Yeah.
14    Q.    "As part of the APA, however, Barclays
15  would be acquiring (without LBI having any
16  repurchase obligations) the very securities that
17  had been delivered under the Replacement
18  Transaction.  Thus, at the closing of the APA
19  transaction on Monday, September 22, 2008, the
20  Clarification Letter to the APA, dated as of
21  September 20, 2008 (the 'Clarification
22  Letter')," in paren, "simply terminated the
23  repurchase part of the Replacement Transaction
24  with respect to 'all securities and other assets
25  held by' Barclays 'under the September 18, 2008

TSG Reporting - Worldwide (877) 702-9580

Page 106

HIGHLY CONFIDENTIAL - G. LaROCCA

1  repurchase arrangement among' Barclays and LBI.
2  This termination meant that all of the
3  securities that were actually delivered on
4  September 18, 2008, and that were by then held
5  in a Barclays account at the Bank of New York
6  were 'deemed to constitute part of the Purchased
7  Assets' under the APA (and thus LBI would have
8  no further obligation to 'repurchase' those
9  securities and Barclays would not be obligated
10 to deliver such securities back to LBI)."
11     Now, I want to go through that a bit
12 and maybe decode it into some layman's terms,
13 but also, first, did you have -- when you signed
14 this declaration and it was referring to all the
15 all the securities and other assets held by Barclays,
16 that would be that would go to Barclays when the
17 replacement transaction was simply terminated,
18 when the repo was simply terminated, did you
19 have an idea what the value, what the quantum of
20 those securities were?
21     A.  No.
22     Q.  Do you know if they exceeded the $45
23 billion that Barclays had given Lehman?
24     A.  No.

TSG Reporting - Worldwide (877) 702-9580

Page 107

HIGHLY CONFIDENTIAL - G. LaROCCA

1     Q.  You talked a bit before about that --
2  you've used the term "excess collateral"?
3     A.  Uh-huh.
4     Q.  And you said you viewed this as,
5  essentially, a reverse repo?
6     A.  Yes.
7     Q.  Is it your understanding that in a
8  reverse repo there was a haircut?
9     A.  Correct.
10    Q.  There is protection of some kind?
11    A.  Yes.
12    Q.  So, and that protection is to be found
13 in the difference between the amount --
14    A.  Of cash.
15    Q.  -- funded --
16    A.  Correct.
17    Q.  -- by the purchaser?
18    A.  Uh-huh.
19    Q.  And the collateral pledged --
20    A.  Pledged.
21    Q.  -- by the seller --
22    A.  Uh-huh.
23    Q.  -- in the first leg of the repo,
24 right?

TSG Reporting - Worldwide (877) 702-9580

Page 108

HIGHLY CONFIDENTIAL - G. LaROCCA

1     A.  Correct.
2     Q.  And a repo as it normally is
3  conducted, the next day or whatever the term of
4  the repo is, yesterday's purchaser sells it
5  back?
6     A.  Correct.
7     Q.  And delivers back the excess
8  collateral less the implied interest rate,
9  right?
10    A.  Uh-huh.
11    Q.  Now, you mentioned a little while ago
12 that it came to your attention, it was described
13 to you somehow that in a bankruptcy that might
14 not be the way things go?
15    A.  The unwind would not, right.
16    Q.  Can you expand on that a little bit?
17 What did you learn about the difference between
18 what happens in the unwind on a bankruptcy and
19 an unwind in a non-bankruptcy situation?
20    A.  Nothing too interesting here.  Very
21 simple, right?  So when we agreed to step in for
22 the Fed as providing financing, and we agreed a
23 reverse repo, I would have talked to our lawyer,
24 Jonathan Hughes, our general counsel, and said

TSG Reporting - Worldwide (877) 702-9580

Page 109

HIGHLY CONFIDENTIAL - G. LaROCCA

1  we can't do the unwind, and Jonathan would have
2  said, under bankruptcy law, right, the repo,
3  you, you know, you don't do the unwind, the
4  assets don't get tied up, in bankruptcy
5  proceedings you own the collateral.  Nothing
6  more than that.
7     Q.  Any distinction between, in that
8  analysis, between the -- between the amount
9  financed and the excess collateral?  Let's use a
10 45 and 50 billion dollar example.  There's $45
11 billion advanced by the purchaser --
12    A.  Right.
13    Q.  -- here Barclays to Lehman, right?
14     And there's 50 billion in security
15 pledged by Lehman to Barclays?
16    A.  It's commonplace, right, if you're
17 going to close out a repo or close out a
18 counterparty, the margin is -- accrues to the
19 dealer, the person that's reversing the
20 collateral, to cover their risk associated with
21 a fire sale or collateral liquidation, right.
22    Q.  Okay.  So I want to deal with your
23 understanding of a default in a non-bankrupt
24 circumstance.  You may have just answered that,

TSG Reporting - Worldwide (877) 702-9580

28  (Pages 106 to 109)

Page 110

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  but I want to make my record as clear as I can.
3      Absent bankruptcy, there's no
4  bankruptcy, and there's a default on a
5  repurchase obligation?
6      A.   Right.
7      Q.   Then yesterday's purchaser --
8      A.   Yes.
9      Q.   -- is holding the collateral?
10     A.   Plus margin.
11     Q.   Plus margin, right?
12          What's your understanding of who gets
13 the margin in that circumstance?
14     A.   I believe the person that owns the
15 collateral.
16     Q.   Okay.  Gets to keep it all?
17     A.   Gets to keep it all.  Don't know that
18 definitively, but that's my understanding.
19     Q.   And in a bankruptcy situation, does
20 that change?
21     A.   I don't know definitively.
22     Q.   Okay.  Did you have, at the time of
23 the transaction, did you have an understanding
24 of what you thought happened in a bankruptcy
25 situation?

TSG Reporting - Worldwide (877) 702-9580

Page 111

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2      A.   My understanding is that we would be
3  left with the collateral, right?  And there was
4  hope that the collateral would be in excess of
5  the cash, right?
6      Q.   And in the bankruptcy, when there's a
7  bankruptcy in the picture, what was your
8  understanding as to who gets to keep the margin?
9      A.   The Barclays would keep the margin.
10     Q.   And you described in paragraph 10 of
11 your declaration that the repurchase was -- and
12 these are the words -- "simply terminated," end
13 paren, and you're referring to the clarification
14 letter.
15     A.   I'm sorry, where does it reference?
16     Q.   I'm in paragraph 10.
17     A.   "Simply" --
18     Q.   It's the third sentence of the
19 paragraph that begins "thus at the closing."
20     A.   Right.
21     Q.   Just read through that sentence in
22 full to yourself.
23     A.   Yes.  Okay.
24     Q.   I guess my question is, did you have
25 an understanding as to why in the clarification

TSG Reporting - Worldwide (877) 702-9580

Page 112

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  letter it was agreed to simply terminate the
3  repurchase?
4      A.   I'm sorry, I don't understand your
5  question, right?  You know, my --
6      Q.   Let me try and rephrase it, then,
7  because I don't want to be at cross purposes.
8          If it was your understanding that
9  you'd get to keep the margin anyway?
10     A.   Uh-huh.
11     Q.   Why would you have to terminate the
12 repurchase?
13          MR. STERN:  Objection to the form.
14     A.   I'm not sure I understand your
15 question.  Here, the declaration says the
16 termination of the repo, it facilitates that
17 those transactions become a part of the Asset
18 Purchase Agreement.  You know, the --- I'm not
19 trying to be difficult.
20     Q.   No, no, it's a difficult topic, and
21 I'm -- I don't think you're trying to be
22 difficult.
23     A.   Okay.
24     Q.   It's a complicated thing to ask
25 questions about and to get answers on, so we'll

TSG Reporting - Worldwide (877) 702-9580

Page 113

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  just have to work at it a little bit.
3          I'm going to show you what was marked
4  at a prior deposition, sir, as Exhibit 25.
5  That's a copy of the clarification letter that I
6  think you're referring to in paragraph 10.
7          Take a look through that, sir, and
8  tell me if you've seen it before and take note
9  of what appears to be your signature at the end.
10     A.   Actually, I don't recall seeing it
11 before.  Is my signature on a page?
12     Q.   Take a look at the --
13     A.   It wouldn't surprise me since I'm an
14 officer of BCI.
15          There it is, okay.
16     Q.   You got it there?
17     A.   Uh-huh.
18     Q.   That's your signature?
19     A.   Yeah, absolutely.
20     Q.   Okay.  And if you can --
21     A.   I see this one didn't have it.  That's
22 why --
23          MR. STERN:  It's different page.
24          THE WITNESS:  Is there a different
25 page?  There it is, okay.

TSG Reporting - Worldwide (877) 702-9580

Page 114

```
 1          HIGHLY CONFIDENTIAL - G. LaROCCA
 2      Q.   You see where your signature is?
 3      A.   Yes.
 4      Q.   Now, the signature pages are what are
 5  sometimes referred to as counterpart signature
 6  pages.  When you signed, do you recall if when
 7  you signed the document the signature page was
 8  attached to it?
 9      A.   I don't remember.
10      Q.   Do you have any recollection of just
11  signing signature pages?
12      A.   I wouldn't normally do that.  Right?
13      Q.   When you signed an agreement, you
14  would read through it before you signed it?
15      A.   One of two things.  I would either
16  read it myself, but I don't always read all the
17  documents, or I would want to know who has --
18  where the document comes from, who signed it,
19  who's authorized it, right?  Whether Legal has
20  seen it.
21      Q.   Do you have any recollection of what
22  process you went through with respect to --
23      A.   Don't even -- don't even remember the
24  document.
25      Q.   I need to just put a full question on
         TSG Reporting - Worldwide (877) 702-9580
```

Page 115

```
 1          HIGHLY CONFIDENTIAL - G. LaROCCA
 2  the record, okay?
 3      Q.   Do you have a recollection of what
 4  process you went through with respect to the
 5  clarification letter marked as Deposition
 6  Exhibit 25?
 7      A.   No.
 8      Q.   Okay.
 9      MR. GAFFEY:  Let's go off the record
10  for a second.
11      (Discussion off the record.)
12      (Luncheon Recess; Time Noted:  12:15
13  P.M.)
14
15
16
17
18
19
20
21
22
23
24
25
         TSG Reporting - Worldwide (877) 702-9580
```

Page 116

```
 1          HIGHLY CONFIDENTIAL - G. LaROCCA
 2              AFTERNOON SESSION
 3          (Time Noted:  12:58 P.M.)
 4  GERARD LaROCCA, resumed and
 5      testified further as follows:
 6  EXAMINATION BY (Cont'd.)
 7  MR. GAFFEY:
 8      Q.   I want to mark another set of
 9  documents so we can talk about them as a set.
10      Mr. LaRocca, I'm putting before you
11  what was marked at a previous deposition as
12  Exhibit 1 and Exhibit 24 and Exhibit 51.
13      Now, what I've put before with you,
14  Mr. LaRocca, Exhibit 1 is entitled Asset
15  Purchase Agreement, Exhibit 24 is a First
16  Amendment, Exhibit 51 is entitled Transfer and
17  Assumption Agreement, and then before the break,
18  I put in front of you Exhibit 25, which is the
19  clarification letter.
20      A.   Yes.
21      Q.   All right.  So for a while I want to
22  ask you some questions about this collection of
23  documents.
24      First, let me just ask you to take a
25  look at them sufficiently to tell me whether
         TSG Reporting - Worldwide (877) 702-9580
```

Page 117

```
 1          HIGHLY CONFIDENTIAL - G. LaROCCA
 2  you've seen each one before and whether each of
 3  them bears your signature.
 4      A.   They do bear my signature.
 5      Q.   Okay.
 6      MR. STERN:  Read them carefully now.
 7  I'm not sure they all do.
 8      A.   The Transfer and Assumption Agreement
 9  bears my signature.
10      Q.   Okay.
11      A.   And I believe the Asset Purchase
12  Agreement has my signature.  Yes.
13      Q.   And I think what Jack may be referring
14  to --
15      A.   The First Amendment does not bear my
16  signature.
17      Q.   Okay.  Do you recognize that to be the
18  signature of Archibald Cox?
19      A.   You know what, I'm not familiar with
20  his John Hancock --
21      Q.   All right.
22      A.   -- to definitively opine.
23      Q.   Put the First Amendment aside for the
24  moment.  What do you generally recognize these
25  documents to be?
         TSG Reporting - Worldwide (877) 702-9580
```

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2        A.   I would just categorize them as part
3    of the agreements and documentation associated
4    with the Barclays transaction with Lehman
5    Brothers.
6        Q.   Now, the first of these that I want to
7    ask you about is Exhibit 1, the Asset Purchase
8    Agreement.
9        A.   Uh-huh.
10       Q.   When we spoke before the lunch break,
11   you described your understanding of what was
12   going on in the early part of the week
13   post-bankruptcy.  I'm in that week starting the
14   15th, the Monday.
15            As purchasing a broker-dealer --
16       A.   Correct.
17       Q.   -- and later in the week, don't hold
18   me to the particular date, but I think you said
19   on the Thursday, on the 18th, you understood
20   that it was now to be an Asset Purchase
21   Agreement, that a lightbulb went on, and --
22       A.   Uh-huh.
23       Q.   Taking a look at Exhibit 1, which is
24   entitled "Asset Purchase Agreement," I want to
25   revisit that a little bit.

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2        A.   Uh-huh.
3        Q.   Did you understand it to be an Asset
4    Purchase Agreement at the outset?
5        A.   When you say "at the outset," we're
6    buying Lehman Brothers.  That transaction falls
7    apart.  Come in on Monday, it's kind of, you
8    know, I'm thinking now we're just buying the
9    broker-dealer, the piece that hadn't filed for
10   bankruptcy.  And then somewhere over the next
11   day or two or three, I don't recall when, you
12   know, I'm beginning to hear, we're not buying
13   LBI, LBI is going to declare bankruptcy, we're
14   going to take the employees and buy certain
15   assets.
16       Q.   Okay.
17       A.   Okay?
18       Q.   And you're going to buy --
19       A.   And maybe some real estate I think at
20   that time.
21       Q.   So I want to go back to the Monday and
22   the Tuesday.  You have said several times you're
23   not part of the deal team?
24       A.   Uh-huh.
25       Q.   Which I take it to mean is you're not

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2    involved in the negotiations of the business
3    terms?
4        A.   Correct.
5        Q.   The Asset Purchase Agreement that we
6    have marked as Exhibit 1 is dated as of --
7        A.   The 16th.
8        Q.   -- the 16th of September.  That's the
9    Tuesday.
10            Did you sign the agreement on the
11   Tuesday?
12       A.   I don't recall.
13       Q.   Do you recall anything about the
14   circumstances when you signed the agreement?
15       A.   I don't recall.
16       Q.   Okay.  Do you remember if the
17   signature page that you signed was attached to
18   the agreement when you signed it?
19       A.   I would think so because, like as a
20   rule of thumb, I don't sign --
21       Q.   Free-standing signature pages?
22       A.   -- free-standing signature pages.
23       Q.   And before the break I asked you, you
24   know, with regard to the clarification letter if
25   you read it before you signed it, and you told

1        HIGHLY CONFIDENTIAL - G. LaROCCA
2    me your practice is to either read something and
3    understand it before you sign it or, and I'm
4    paraphrasing you, have somebody --
5        A.   Take me through it.
6        Q.   -- take you through it and make you
7    understand what it is you're signing, yes?
8        A.   Correct.
9        Q.   Do you recall which of those two
10   practices you followed with regard to signing
11   the Asset Purchase Agreement dated September 16?
12       A.   I probably would have had -- I can't
13   say with certainty, but, you know what, as it
14   relates to the Asset Purchase Agreement, had I
15   read it, I would remember it.  So it probably
16   was a discussion with one of the lawyers on our
17   deal team.
18       Q.   By the Tuesday, the 16th, had anyone
19   described to you the economic terms of the
20   transaction?
21       A.   No.
22       Q.   Did you have an understanding as to
23   whether there was a discount being applied to
24   securities being purchased pursuant to the Asset
25   Purchase Agreement?

Page 122

HIGHLY CONFIDENTIAL - G. LaROCCA

2  A.  No.
3  Q.  Did you have an understanding as to
4  the total amount of securities that were being
5  transferred from Lehman to Barclays under the
6  first agreement you have there?
7  A.  No.
8  Q.  That is, Exhibit 1?
9  A.  No.
10  Q.  Did you have any knowledge of what the
11  components of the price to be paid by Barclays
12  were on September 16?
13  A.  No.
14  Q.  Did you ask anyone?
15  A.  No.
16  Q.  Would you take a look at the Transfer
17  and Assumption Agreement.  Now, that is -- it
18  says in its first line was executed on September
19  20, which would be the Saturday, right?  And do
20  you recall if you signed it on September 20?
21  A.  I don't recall when I signed it.
22  Definitely my signature.
23  Q.  Okay.  The last page appears to me as
24  if it may be a fax --
25  A.  It looks like it was.

TSG Reporting - Worldwide (877) 702-9580

Page 123

HIGHLY CONFIDENTIAL - G. LaROCCA

2  Q.  -- transmission as opposed to the
3  pages that precede it.  Compare that with the
4  rest of the document.  They don't have that line
5  across the top and across the bottom, you see
6  that?
7  A.  (Witness shrugs.)
8  Q.  Do you recall if you signed a
9  signature page without the rest of the
10  agreement?
11  A.  Just as a rule of thumb, I typically
12  don't sign the signature pages.
13  Q.  If you take a look at the lower
14  left-hand corner of the signature page, it's got
15  a document number on there?
16  A.  Uh-huh.
17  Q.  It says -- the number's a little
18  blurred, but it begins CHI --
19  A.  Uh-huh.
20  Q.  -- 4436673, Version 2, do you see
21  that?
22  A.  Yes.
23  Q.  Take a look at the two pages that
24  precede it and look at the lower left-hand
25  corner.  You see that it says Washington, D.C.

TSG Reporting - Worldwide (877) 702-9580

Page 124

HIGHLY CONFIDENTIAL - G. LaROCCA

1  Number 397038, Version 3?
2
3  A.  Uh-huh.
4  Q.  Does that suggest to you that the
5  signature page was prepared on a different word
6  processing system than the two pages that
7  precede it?
8  A.  I don't know what it suggests, you
9  know?
10  Q.  Okay.
11  A.  Would have never even noticed it had
12  you not pointed it out to me.
13  Q.  And does it refresh your recollection
14  one way or the other as to whether you signed --
15  A.  No.
16  Q.  -- a free-standing signature page for
17  the Transfer and Assumption Agreement?
18  A.  No, it doesn't.  It doesn't.
19  Q.  Do you know what the purpose of the
20  Transfer and Assumption Agreement was?
21  MR. STERN:  I don't think he's asking
22  you to read and interpret it today.
23  Q.  It's a yes or no.
24  MR. STERN:  Either you do or you don't
25  from memory.

TSG Reporting - Worldwide (877) 702-9580

Page 125

HIGHLY CONFIDENTIAL - G. LaROCCA

1  A.  Yes, vaguely.
2
3  Q.  Okay.
4  A.  At a high level.
5  Q.  Give me your understanding of what the
6  purpose of the Transfer and Assumption Agreement
7  was.
8  A.  That there were some assets that were
9  going to transfer -- some assets that Lehman
10  held at one of the exchanges that were going to
11  be moved over to Barclays.
12  Q.  And the exchange at issue here was the
13  Options Clearing Corporation, OCC?  Do you see
14  the reference to it in the agreement?
15  A.  Yes, I do.
16  Q.  And the "whereas" clauses of the
17  agreement in the second one says, "Lehman
18  maintains clearing fund and margin deposits with
19  OCC," do you see that?
20  A.  Yes.
21  Q.  Did you have an understanding of what
22  those two items were when you signed this?
23  A.  No.
24  Q.  Do you know if the transfer --
25  A.  I mean, I know what a clearing fund is

TSG Reporting - Worldwide (877) 702-9580

Page 126

HIGHLY CONFIDENTIAL - G. LaROCCA
1  
2 and I know what a margin deposit is, but I have
3 no idea what the value was at the time.
4    **Q.   Okay.  That's a good point.  Apart**
5 **from what it's worth, apart from the value, I**
6 **just want to know if you know its character,**
7 **what they are?**
8    A.   Yes.
9    **Q.   And do you know whether either of**
10 **those, a clearing fund or margin deposits, would**
11 **contain cash?**
12    A.   No idea.
13    **Q.   Do you know --**
14    A.   I'm sorry, let me answer.  I don't
15 know what was contained in it.
16    **Q.   Uh-huh.**
17    A.   Most margin deposits or clearing fund
18 deposits could be cash or securities, okay?
19 Most firms use securities.
20    **Q.   Do you know -- did you know when you**
21 **signed this agreement whether the clearing fund**
22 **or margin deposits that it addresses contained**
23 **cash or securities?**
24    A.   No idea.
25    **Q.   If you could turn your attention to**
TSG Reporting - Worldwide (877) 702-9580

Page 127

HIGHLY CONFIDENTIAL - G. LaROCCA
1 **the clarification letter, which I think is**
2 **Exhibit 25.  The clarification letter,**
3 **Mr. LaRocca, is dated as of September 20.  You**
4 **see that on the face of the document?**
5    A.   Yes.
6    **Q.   And the closing took place on Monday,**
7 **September 22?**
8    A.   Correct.
9    **Q.   Do you remember when you signed the**
10 **clarification document, the clarification**
11 **letter?**
12    A.   No.
13    **Q.   Do you recall signing documents at the**
14 **actual closing on --**
15    A.   Monday morning, yes, I do.
16    **Q.   Do you recall approximately how many**
17 **documents you signed?  I want to know if it was**
18 **a number greater than one.**
19    A.   Yes.
20    **Q.   Was it a dozen documents?  One**
21 **document?  Two documents.  Any recollection?**
22    A.   (Witness gestures.)
23    **Q.   No, you don't know?  You got to say it**
24 **out loud for the reporter.**
25 TSG Reporting - Worldwide (877) 702-9580

Page 128

HIGHLY CONFIDENTIAL - G. LaROCCA
1    A.   No, no recollection.  It was more than
2 one.
3    **Q.   Did you have an understanding when you**
4 **signed the clarification letter what the purpose**
5 **of the clarification letter was?**
6    MR. STERN:  Objection to the form.
7    Do you want to repeat the question?
8    (Record read.)
9    A.   I understand, you know, what the word
10 "clarification" means, right?  So there
11 obviously had to be -- there was revisions to
12 some earlier agreements.  Do I know the -- did
13 at the time or do I recall what the specific
14 points relative to the, you know, that had to be
15 clarified?  No.
16    **Q.   When you say you understood what the**
17 **word "clarification" means, did you understand**
18 **the clarification letter to be clarifying terms**
19 **of the Asset Purchase Agreement?**
20    MR. STERN:  Objection to the form.
21    A.   My -- I just -- the answer is I don't
22 know.  I don't know the answer to that, right?
23 So the answer is no, not specifically to the
24 Asset Purchase Agreement.
25 TSG Reporting - Worldwide (877) 702-9580

Page 129

HIGHLY CONFIDENTIAL - G. LaROCCA
1    **Q.   Did you understand the clarification**
2 **letter to be --**
3    A.   I wasn't surprised by a clarification
4 letter given that there was ongoing dialogue
5 through the weekend, right?  And specifically as
6 it related to the --
7    **Q.   To the repo?**
8    A.   -- the repo.
9    **Q.   Before you signed the clarification**
10 **letter, had you seen any drafts of the**
11 **clarification letter?**
12    A.   No.
13    **Q.   The first version of the clarification**
14 **letter that you saw was the one that you signed?**
15    A.   To the best of my knowledge, yes.
16    **Q.   Did you understand or were you given**
17 to understand by someone else that the
18 clarification letter was an amendment as opposed
19 to a clarification?
20    MR. STERN:  Objection to the form.
21    A.   I'm not sure that I could
22 differentiate with your question.
23    **Q.   That's good point.  One of the things**
24 in front of you, although you didn't sign it, is
25 TSG Reporting - Worldwide (877) 702-9580

---

Page 130

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   a document entitled First Amendment, you see
3   that?
4       A.   Yes.
5       Q.   First Amendment to Asset Purchase
6   Agreement.  And do you have an understanding, in
7   your view, is there a difference between an
8   amendment to an agreement and a clarification
9   letter, a clarification of the agreement?
10          MR. STERN:  Objection to the form.
11      Q.   I just want your view.
12      A.   No.
13      Q.   What was your understanding of how the
14  clarification letter addressed the repo?
15      A.   Don't recall.  Right?  You know, my
16  perception at the time, this was all very fluid
17  and evolving over the week's time, right?
18  People moving at -- things needing to happen
19  very fast because the markets are melting down
20  and -- and everyone wanting to effect a
21  transaction to try to save jobs and a Lehman
22  franchise and value for everybody, including
23  the, you know, the piece that was going to go to
24  the estate, right?
25      Q.   Also including the piece that was

TSG Reporting - Worldwide (877) 702-9580

---

Page 131

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   going to go to Barclays, right?
3       A.   Yeah, absolutely.
4       Q.   Did you have an understanding that the
5   clarification letter changed the definition of
6   the assets that were going to be purchased when
7   you signed the clarification letter?
8       A.   Not when I signed the clarification
9   letter.  Not at the time, okay?  Subsequent, you
10  know, we learned that the transaction as
11  originally envisioned in the beginning of the
12  week has changed a lot by the end of the week,
13  right?  Again, I can't give you specifics, but,
14  you know, things you think you're buying that
15  don't exist because the quality of the data or
16  the uncertainty.
17      Q.   But there came a point where you
18  understand that -- where you came to understand
19  that the clarification letter changed what was
20  purchased?
21      A.   Yes.
22      Q.   And that point came after, at some
23  point after you signed the clarification letter?
24      A.   Yes.
25      Q.   Was the fact that the clarification

TSG Reporting - Worldwide (877) 702-9580

---

Page 132

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   letter was changing what was going to be
3   purchased explained to you at the time that you
4   signed the clarification letter?
5       Let me withdraw that.  Let me ask a
6   more general question.  When you signed the
7   clarification letter, did anybody explain to you
8   what its purpose was in the transaction?
9       A.   At a high level that the terms of the
10  transaction had changed.
11      Q.   Was it described to you in any greater
12  detail than at that high level, that the terms
13  of the transaction had changed?
14      A.   No, not that I can recall.
15      Q.   Now, could you turn to paragraph 13 of
16  the -- actually, first, if you don't mind, turn,
17  please, to paragraph 9.
18      A.   Of which agreement?
19      Q.   Of the clarification letter.  Page 4.
20      A.   Did you say paragraph 9 or page 9?
21      Q.   It's paragraph 9 located on page 4 of
22  the clarification letter.  Take a minute and
23  read through that paragraph 9 to yourself, if
24  you don't mind.
25      A.   It's only one sentence.

TSG Reporting - Worldwide (877) 702-9580

---

Page 133

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2       Q.   And it's entitled "Deletion of
3   Purchase Price Adjustment Provisions" and it
4   says, "Section 3.3 of the original agreement is
5   hereby deleted in its entirety and shall be of
6   no effect ab initio."
7       A.   No frame of reference at all.
8       Q.   Did you have a frame of reference when
9   you signed the agreement for paragraph 9?
10      A.   No.
11      Q.   And would you take a look at paragraph
12  12, which is on page 5 of the agreement.  And
13  I'll read that into the record:  It's entitled
14  "Schedule 12.3," underscored, and it says,
15  "Following the closing, the parties shall
16  reasonably agree to an allocation of the
17  purchase price (including the assumed
18  liabilities) among the purchased assets for tax
19  purposes and set forth such allocation on a
20  Schedule 12.3 to be signed by the parties."  Do
21  you see that?
22      A.   Yes.
23      Q.   Do you know whether any such schedule
24  has ever been prepared?
25      A.   I have no idea.

TSG Reporting - Worldwide (877) 702-9580

Page 134

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   Q.   And would you take a look now at the
3   paragraph that follows, paragraph 13.  I'm not
4   going to read it into the record because it's
5   too long, but read through it yourself and let
6   me know when you've had a chance to do that.
7       (Document review.)
8   A.   Okay.  I've read it.
9   Q.   Now, when you signed the clarification
10  letter, did you have an understanding of the
11  purpose of paragraph 13?
12  A.   Don't recall.
13  Q.   When you signed the clarification
14  letter, had you seen a copy of the Notice of
15  Termination that's referred to in the last
16  sentence of paragraph 13?
17  A.   I don't believe so.
18  Q.   Did you have an understanding that a
19  Notice of Termination relating to the Barclays
20  Repurchase Agreement had been issued?
21  A.   No.  I had an understanding that the
22  repo would terminate, but didn't know if the
23  notice -- didn't understand the formal process
24  of how that takes place.
25  Q.   Did you have an understanding as to

TSG Reporting - Worldwide (877) 702-9580

---

Page 135

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   whether paragraph 13 was meant to address the
3   bankruptcy implications we talked about before
4   when there's a default on a repo and a
5   bankruptcy is involved?
6   A.   No.
7   Q.   No, you did not?
8   A.   No, I did not.
9   Q.   Do you recall if anyone explained to
10  you, even if you don't remember the content of
11  it -- actually, just answer this yes or no:  Do
12  you recall whether anyone explained to you the
13  implications under the Bankruptcy Code of
14  paragraph 13?
15  A.   "No" to your question.
16  Q.   Okay.  We talked before about getting
17  an explanation of the implications of the
18  Bankruptcy Code for the termination of the repo?
19  A.   Yes.
20  Q.   Yours is a good point.  Specifically
21  with respect to paragraph 13, did you get that
22  kind of explanation?
23  A.   No.
24  Q.   I'm putting before you, Mr. LaRocca, a
25  document that was previously marked as Exhibit

TSG Reporting - Worldwide (877) 702-9580

---

Page 136

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   27, and I'll ask you, sir, if you've seen that
3   document -- actually, this is the Notice of
4   Termination referred to and you told me you
5   didn't remember if you saw it.
6       Does this refresh your recollection?
7   A.   No, not at all.
8   Q.   Do you know the Michael Montgomery who
9   signed this?
10  A.   Yes.  Yes.
11  Q.   Who is Michael Montgomery?
12  A.   Michael Montgomery is a director with
13  Barclays Capital.  He was formerly the CFO of
14  Barclays Capital of the Americas, and because of
15  his previous role, he was on the board of
16  Barclays Capital, Inc., still remains on the
17  board of Barclays Capital, Inc., and is why he's
18  a signator.
19      But at the time of this transaction,
20  Mike's role would have been to be the BarCap
21  person on the ground responsible for overseeing
22  our investments in Homeq and Equifirst.
23  Q.   Did the investments in Homeq or
24  Equifirst have any relation to the --
25  A.   None whatsoever.

TSG Reporting - Worldwide (877) 702-9580

---

Page 137

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   Q.   Let me put the whole question so we
3   have a clear question and answer.
4       Do the investments in Homeq or
5   Equifirst have any relation to the Repurchase
6   Agreement we have talked about?
7   A.   None whatsoever.
8   Q.   Do you have any knowledge as to why it
9   would be Michael Montgomery signing this other
10  than the fact that he holds that title?
11  A.   No, I presume it's only because they
12  were looking for a signator.
13  Q.   Do you know who's the "they"?
14  A.   Alan Kaplan.  It probably would have
15  been Alan Kaplan or someone within Barclays
16  Capital Legal was looking for a BCI signator.
17  Q.   Without regard to the documents, and
18  I'll go back to them in a minute, but without
19  regard to the documents, was there a point in
20  the time sequence from the morning of the 19th
21  through to the closing on the 22nd where the
22  fact that a Notice of Termination of the repo
23  had been sent came to your attention?
24  A.   No.
25  Q.   Was the fact of a Notice of

TSG Reporting - Worldwide (877) 702-9580

Page 138

HIGHLY CONFIDENTIAL - G. LaROCCA

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   Termination being sent a topic of any
3   conversation in which you were involved at any
4   time?
5      A.   No, not that I'm aware of.  Not that I
6   recall.
7      Q.   When you signed the agreement, did you
8   have any understanding of why the Notice of
9   Termination needed to be rescinded and void ab
10  initio in all respects?
11     A.   I didn't sign the agreement.
12     Q.   I'm in the clarification letter at
13  paragraph 13 again.
14     A.   No.
15     Q.   Over the weekend of the 20th and the
16  21st and through the closing on the morning of
17  the 22nd, that's the time I'm talking about now,
18  during that period did you have discussions with
19  anyone as to whether the terms of the
20  clarification letter had been approved by the
21  bankruptcy court?
22     A.   No.
23     Q.   With respect to both the Asset
24  Purchase Agreement, the one dated the 16th, the
25  Tuesday, and the clarification letter, dated as

TSG Reporting - Worldwide (877) 702-9580

Page 139

HIGHLY CONFIDENTIAL - G. LaROCCA

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   of the 20th, did you have an understanding, sir,
3   of the amount -- did you have an understanding
4   that Barclays would be assuming certain
5   liabilities as part of its consideration in the
6   deal?
7         MR. STERN:  Objection to the form.
8      A.   Could you rephrase the question?
9      Q.   As part of the transaction, did you
10  understand Barclays would be assuming
11  liabilities?
12     A.   Yes.
13     Q.   What liabilities did you understand
14  Barclays would be assuming?
15     A.   I don't have a detailed understanding
16  or I don't recall being privy to, you know, a
17  detailed listing of all the liabilities that
18  Barclays would assume, right?  As a result of
19  being in the area, right, you know, there was
20  going to be severance packages that would need
21  to be paid to Lehman employees, there would be
22  compensation that would need to be paid to
23  Lehman employees that we would retain, right?
24  There would be cure payments that would have to
25  go to third parties.  You know, that's, you

TSG Reporting - Worldwide (877) 702-9580

Page 140

HIGHLY CONFIDENTIAL - G. LaROCCA

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   know, I couldn't tell you the amounts associated
3   with those, but knew that Barclays was going to
4   assume some liabilities.
5      Q.   But beyond knowing the fact of an
6   assumption of liabilities, you did not know the
7   amounts, correct?
8      A.   No, wouldn't have been privy to it,
9   wouldn't have been involved in that aspect of
10  it.
11     Q.   If you could go back to Exhibit 1,
12  sir, the Asset Purchase Agreement, and turn,
13  please, to page 35.
14     A.   Did you say page 35?
15     Q.   Yes, sir.  And the paragraph I'm
16  talking about is paragraph 9.1(C), which is at
17  the top of page 35.  If you could read through
18  that just sufficiently to tell us whether you've
19  seen or focused on that language before?
20     A.   No.
21     Q.   Do you see that it refers to a --
22  actually, let me read the portion I'm interested
23  in.  In paragraph 9.1(C) it refers to a
24  financial schedule delivered to purchaser on
25  September 16, 2008, and initialed by an officer

TSG Reporting - Worldwide (877) 702-9580

Page 141

HIGHLY CONFIDENTIAL - G. LaROCCA

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   of each of Holdings and purchaser.  You see
3   that?
4      A.   Yes.
5      Q.   Did you ever see that schedule?
6      A.   No.
7      Q.   Let me show you what's previously been
8   marked as Deposition Exhibit 19 and ask you if
9   you've ever seen that document before?
10     A.   No, I have not.
11     Q.   Down the asset side of that financial
12  schedule are certain classes of collateral and
13  numbers attributed to those assets, correct?
14     A.   Uh-huh.
15     Q.   When you were around -- you and I both
16  have used different phrases to this day.  When
17  you were around and picked up the buzz of what
18  was going on or you were nearby to what was
19  going on, did you come to any understanding as
20  to whether those amounts were negotiated with
21  between Barclays and Lehman?
22     A.   No, I -- no idea at all.
23     Q.   Did you ever --
24     A.   Being around, I had a high level.  I
25  knew that the size of the transaction had

TSG Reporting - Worldwide (877) 702-9580

Page 142

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  shrunk.
3      Q.   Okay.
4      A.   Other than that ...
5      Q.   When you say "the size," you're
6  talking about over the week?
7      A.   Over the week.
8      Q.   From the Tuesday to the Friday, right?
9      A.   Yeah.
10     Q.   Did you have any understanding as to
11 whether the price that Barclays paid for those
12 asset classes constituted a contract price that
13 was different from the amounts shown on Lehman's
14 books for those asset classes?
15     A.   No idea at all.
16     Q.   Did you have any understanding that
17 the $2.0 billion number attributed to comp on
18 the liability side was also a negotiated amount?
19     A.   No, I did not.
20     Q.   Why were you the guy to sign these
21 agreements?
22     A.   I'm the signator for Barclays Capital,
23 Inc.
24     Q.   Is Rich Ricci a signator for Barclays
25 Capital, Inc.?

TSG Reporting - Worldwide (877) 702-9580

Page 143

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2      A.   I don't know the answer to that.
3      Q.   What about Bob Diamond, is he a
4  signatory for Barclays Capital, Inc.?
5      A.   I don't believe so. I don't know what
6  his role as chief executive of Barclays Capital.
7  I presume that entitles him to -- maybe, I don't
8  know, I don't know if that entitles him to sign
9  any document in the firm, but he's, you know,
10 he's not an officer of Barclays Capital, Inc.
11 nor on the board of BCI, right, the U.S.
12 broker-dealer.
13     Q.   Okay.  You see why I'm asking.  Are
14 there other officers around who could have
15 signed instead of you?
16     A.   I'm the chief executive of the U.S.
17 broker-dealer, so I'm the likely -- Mike
18 Montgomery, obviously he's an officer of BCI.  I
19 didn't even realize he was in New York that
20 week.  Maybe he was, maybe he wasn't.
21     Q.   He might not have been.  Washington
22 and Chicago are at the bottom of the document.
23     A.   Okay.
24          (Exhibit 208, a document bearing Bates
25 Nos. BCI 006119 through 6646, marked for

TSG Reporting - Worldwide (877) 702-9580

Page 144

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  identification, as of this date.)
3      Q.   What I need you to look through on
4  Exhibit 208 -- well, look through the document
5  enough to tell me whether you've seen it before,
6  but in particular, Mr. LaRocca, I'm going to
7  have questions for you about the first couple of
8  pages running from BCI-00619 through 6121.
9      A.   I'm sorry, can you repeat that?
10     Q.   The first few -- Bates Nos. BCI000619,
11 which is the first page of the document, through
12 6121, which is the third page of the document,
13 front and back.  And you'll see that the cover
14 is an e-mail from Robert Azerad at Lehman --
15     A.   Yes.
16     Q.   -- to you, entitled "Detailed
17 information about the 1.9 billion of
18 unencumbered collateral."
19          Do you recall receiving this document?
20     A.   No.
21     Q.   We talked a little earlier about what
22 you would do if you got a document with a
23 schedule like this.
24     A.   A lot of the Lehman guys -- I was in
25 Ops.  I explained my role in terms of trying to

TSG Reporting - Worldwide (877) 702-9580

Page 145

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  be helpful.  And a lot of the Lehman employees,
3  maybe they presumed I was part of the deal team
4  and trying to give me docs and information and
5  the -- you know, this document, I don't even
6  recall what I would have done with it.
7      Q.   Okay.
8      A.   Actually, if I look below, it looks
9  like it was sent to Rich Ricci below me, right,
10 and then subsequently shared with me.  I
11 wouldn't have done a -- I might have filed it
12 under G.
13     Q.   Okay.
14     A.   You know what G stands for?
15     Q.   The e-mail at the bottom is from
16 Azerad to Ricci?
17     A.   Yeah.
18     Q.   And then there's some CCs, Tonucci,
19 Lowitt and Kelly?
20     A.   Those are all Lehman employees.
21     Q.   And then the top is Azerad himself.
22 This isn't being forwarded by Ricci to you.
23 This is from Azerad.
24     A.   I'm saying I would have seen that it
25 was sent to Rich.

TSG Reporting - Worldwide (877) 702-9580

## Page 146

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2     Q.    And therefore, you don't have to do
3  anything with it; it's where it needs to be?
4     A.    I don't know why it was being sent to
5  Rich or why it's not being sent to Rich.  Rich
6  wouldn't know what to do with a document like
7  this.
8     Q.    Do you have an understanding of what's
9  meant by "1.9 billion of unencumbered
10  collateral"?
11     A.    I understand what the term
12  "unencumbered" means, right?  Which means --
13  right?
14     Q.    I'm asking a slightly more specific
15  question.  In the context of the deal, was there
16  an issue --
17     A.    No.
18     Q.    -- concerning 1.9 billion of
19  unencumbered collateral that you know about?
20     A.    Not that I knew about.
21     Q.    I can tell you --
22     Q.    What did you want to tell me about the
23  document?
24     A.    What I was going to do would be
25  critical of the document in terms of, since
       TSG Reporting - Worldwide (877) 702-9580

## Page 147

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  Lehman hadn't been able to settle trades,
3  reconcile its positions in bank accounts for
4  several days, I don't think they would be in a
5  position to definitively know what was in the
6  box, let alone whether it was unencumbered or
7  not.
8     Q.    That's based on your impression going
9  back to even the week before --
10     A.    Absolutely.
11     Q.    -- about the state of the records?
12     A.    The state of recordkeeping was
13  horrific.
14     Q.    Beyond that impression, based on an
15  overall view of the state of their
16  recordkeeping, do you have any knowledge about
17  whether Lehman could accurately describe 1.9
18  billion as unencumbered, about 1.9 billion?
19     A.    I'm sorry, could you just repeat?  Do
20  I have an impression?
21     Q.    Let me rephrase the question.
22     MR. STERN:  He's asking if you know.
23     Q.    Your answer to me has been based on
24  your overall impression of Lehman's
25  recordkeeping.  My question is more specific
       TSG Reporting - Worldwide (877) 702-9580

## Page 148

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  now.  Do you know one way or the other whether
3  the description of 1.9 billion in unencumbered
4  assets in that exhibit is accurate or not?
5     A.    I do not know.
6     Q.    Could you go back to the clarification
7  letter, please, Exhibit 25, and I would direct
8  your attention to the first page of it,
9  paragraph 1, entitled "Purchased Assets;
10  Excluded Assets," and in particular, paragraph
11  1(A)(ii), which begins "with respect to causes
12  (a), (d) and (e)."
13     A.    I'm sorry.
14     Q.    It's that paragraph there, Roman
15  numeral ii.
16     (Document review.)
17     Q.    Okay.  Have you had a chance to read
18  that through?
19     A.    Uh-huh.
20     Q.    Section capital A of that paragraph
21  refers to "the securities owned by LBI and
22  transferred to purchaser or its affiliates under
23  the Barclays Repurchase Agreement (as defined
24  below) as specified on Schedule A previously
25  delivered by seller and accepted by purchaser."
       TSG Reporting - Worldwide (877) 702-9580

## Page 149

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  Do you see that piece?
3     A.    Yes.
4     Q.    At the time you signed the
5  clarification letter, had you seen that Schedule
6  A to which that portion refers?
7     A.    I don't recall.  I don't recall.
8     Q.    In the next section it refers to,
9  "Such securities and other assets held in LBI's
10  'clearance boxes' as of the time of the Closing,
11  which at the close of business on September 21,
12  2008 were as specified on Schedule B previously
13  delivered by seller and accepted by purchaser."
14     A.    I don't recall receiving that.
15     Q.    Schedule B?
16     A.    Yes.
17     Q.    And if you would turn to page 2 and go
18  to section capital C within that paragraph,
19  which says, "Exchange-traded derivatives (and
20  any property that may be held to secure
21  obligations under such derivatives) and
22  collateralized short-term agreements."
23     Do you have an understanding of what
24  that was describing?
25     A.    No.
       TSG Reporting - Worldwide (877) 702-9580

Page 162

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   asked you about?
3      A.   Uh-huh.
4      Q.   And I think you testified that you
5   never saw Schedule B?
6      A.   I don't recall.
7      Q.   Do you have any idea who at Barclays
8   would have been responsible for preparing
9   Schedule B?
10         MR. STERN:  Barclays?
11         I'm going to object to the form.
12      You're suggesting Barclays prepared Schedule
13      B?
14         MR. WOOD:  I'll clarify that.
15      Q.   Do you know who at Barclays would have
16   been involved in reviewing Schedule B?
17      A.   No idea.
18         MR. STERN:  Objection to the form.
19      Q.   I'm handing you what's already been
20   marked as Exhibit 52, which is a letter dated
21   September 22, 2008.
22         And for the record, at the top on the
23   letterhead it says the Depository Trust &
24   Clearing Corporation.  So I'll probably just
25   refer to this as the DTCC letter.

TSG Reporting - Worldwide (877) 702-9580

Page 163

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2         MR. STERN:  Well, take a look at it.
3         MR. WOOD:  Yeah, take your time.
4         MR. STERN:  Take time to review it.
5         (Document review.)
6      Q.   Ready?
7      A.   Yes.
8      Q.   If you look at the last page, is that
9   your signature on the document?
10      A.   Yes, it is.
11      Q.   Do you remember signing it?
12      A.   Do I remember signing this document?
13   No.  No.
14      Q.   It's dated September 22?
15      A.   Yeah.
16      Q.   Do you have any recollection of
17   whether this was among the group of documents
18   that you signed that day?
19      A.   I have a recollection of a payment
20   needing to be made to DTCC as part of the
21   agreement with the, you know, and the $250
22   million wire transfer seems to resonate with me.
23   I remember at the closing there was a payment
24   that had to be made to DTC.  That's my
25   recollection.

TSG Reporting - Worldwide (877) 702-9580

Page 164

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Do you recall whether you read the
3   document before you signed it?
4      A.   Don't recall if I read the document,
5   but as I indicated, I do recall that, as part of
6   the agreement of the -- as part of our
7   acquisition, there needed to be a payment made
8   to DTC.
9      Q.   Do you remember who told that you?
10      A.   Might have been our in-house counsel,
11   but not certain.
12      Q.   Do you recall whether anybody
13   explained to you the terms of this letter before
14   you signed it?
15      A.   I'm fairly certain our internal legal
16   team would have explained this letter to me.
17      Q.   Do you recall when you first learned
18   of the need to have a DTCC letter, as I'm
19   referring to it?
20         MR. STERN:  Objection to the form.
21      A.   Don't recall specifically when.  I
22   don't recall.
23      Q.   If you'll look at page 2 of this
24   letter, near the top of the page you'll see
25   number 1, "Winding Down of Accounts"?

TSG Reporting - Worldwide (877) 702-9580

Page 165

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      A.   Yeah.
3      Q.   And the first sentence there says,
4   "Barclays has indicated and hereby agrees that
5   all of the accounts of LBI maintained at the
6   clearing agency's subsidiaries (the accounts)
7   constitute 'excluded assets' within the meaning
8   of the APA."
9         MR. STERN:  Is there a question?
10         MR. WOOD:  I thought the witness was
11   reading, so I wanted to pause to give him a
12   moment to read it.
13         (Document review.)
14      A.   Yes.
15      Q.   Do you recall that language?
16      A.   No.
17      Q.   As you sit here today what is your
18   understanding of that?
19         MR. STERN:  Objection to the form.
20      A.   I'm not really sure.
21      Q.   Do you recall whether you were on a
22   telephone call with anyone from DTC on Sunday
23   night, September 21st?
24      A.   I don't recall being on a telephone
25   call with DTC on a Sunday.

TSG Reporting - Worldwide (877) 702-9580

Page 166

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2       Q.   And just in case this refreshes your
3    recollection, our understanding is there was a
4    telephone call involving Isaac Montel of DTC.
5    Does that ring a bell?
6          MR. STERN:  Objection to the form.
7       A.   Yes, it actually does ring a bell.
8       Q.   Just to be clear, the -- you remember
9    the call or just remember the name of the
10   individual?
11      A.   I remember a call with DTCC that
12   weekend, couldn't tell you if it was Saturday or
13   Sunday, with seemed like -- I seem to recall
14   that Isaac Montel was on the call.
15      Q.   Do you recall participating in the
16   call?  By that I mean speaking?
17      A.   No.  No, I don't think I spoke.
18      Q.   Do you remember what the purpose of
19   the call was?
20      A.   I believe DTC wanted Barclays to step
21   into Lehman's obligations at the Depository.
22      Q.   And what do you mean by "step into the
23   obligations"?
24      A.   Assume, assume the obligations of
25   Lehman Brothers.
        TSG Reporting - Worldwide (877) 702-9580
```

Page 167

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2       Q.   And do you remember whether anyone
3    from Barclays said whether or not Barclays would
4    do so?
5       A.   I think we were all apprehensive about
6    stepping into Lehman obligations and all the
7    uncertainty associated with it.
8       Q.   Do you remember whether anybody from
9    DTC expressed any apprehensions?
10         MR. STERN:  Objection to the form.
11      A.   About?
12      Q.   About the arrangement.
13         MR. STERN:  Objection to the form.
14      A.   Don't recall.
15      Q.   Do you recall any discussion about
16   whether residential mortgage securities would be
17   included in the assets that would be given to
18   DTC?
19      A.   Vaguely.
20      Q.   I'll ask a different question.
21      A.   Vaguely.  Yes.
22      Q.   Do you remember whether on that call
23   that we're discussing, whether anyone from DTC
24   expressed concern that residential mortgage
25   securities would not be included among the
        TSG Reporting - Worldwide (877) 702-9580
```

Page 168

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2    securities they would have access to?
3       A.   Just don't recall.
4       Q.   Again, looking at this Exhibit 52,
5    which is on the letterhead of the Depository
6    Trust & Clearing Corporation, do you know who
7    drafted that letter?
8       A.   No idea.  No idea.
9          (Exhibit 212, an e-mail string, the
10   first one in time from N. Reyda to ITD War
11   Room, dated September 19, 2008, marked for
12   identification, as of this date.)
13      Q.   Take a moment to read that over.
14         (Document review.)
15         (Exhibit 213, an e-mail string, the
16   first in time from G. LaRocca to A.
17   Blackwell, dated September 20, 2008, marked
18   for identification, as of this date.)
19      Q.   And I'm actually going to ask you
20   first about number 213.  The reason I want to
21   make sure you had 212 is you'll see at the
22   bottom of 213 it says "original message
23   truncated," so 212 gives you some context.
24      A.   213 is in front of me.  I've read it.
25      Q.   So I'm looking at 213.  The second
        TSG Reporting - Worldwide (877) 702-9580
```

Page 169

```
1          HIGHLY CONFIDENTIAL - G. LaROCCA
2    message from the top is the one that you wrote
3    on September 20th at 9:07 P.M.?
4       A.   Yes, I remember this.
5       Q.   Subject is "The Conversion," and you
6    write, "Deal team wants to see Lehman produce
7    some credible books and records which will
8    provide valuable information about Lehman's
9    inventory which remain in the box on Friday and
10   also the securities/assets that Lehman's
11   believed to have been seized," and then four
12   question marks.
13         MR. STERN:  Do you know where he is?
14         THE WITNESS:  I do now.  I was
15   starting below.
16      Q.   Take a second to read it.
17      A.   Okay.
18      Q.   What are the assets Lehman believed to
19   have been seized?
20      A.   I don't know the answer to that
21   question.  At this point in time, I remember
22   these two e-mails very clearly, right?  There
23   Lehman team making representations that there
24   were assets, right, but producing no credible
25   evidence, right, you know, and me telling them,
        TSG Reporting - Worldwide (877) 702-9580
```

Page 174

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2      MR. STERN:  Objection to the form.
3      A.   No.
4      Q.   You said earlier that -- and this
5  won't be your exact words, so correct me if this
6  is not your recollection -- that Lehman Brothers
7  believed there was an excess of assets beyond
8  the 15c3 requirement; does that sound correct?
9      A.   Lehman believed that the last time
10 they did the 15c3 calculation there was an
11 excess collateral over and above the
12 requirement.
13     Q.   Do you remember how you learned that?
14     A.   Lehman employees would have told me
15 that there was excess collateral in the 15c3
16 account.
17     Q.   Do you recall who told you that?
18     A.   Could have been one of -- one or all
19 of three employees:  Maybe Ian Lowitt, Paolo
20 Tonucci and Robert Azerad.  And my reaction was:
21 When was the last time you did a calculation?
22 And it hadn't been done in a while because
23 they --
24     Q.   And do you recall --
25     MR. STERN:  "Because they"?  I don't

TSG Reporting - Worldwide (877) 702-9580

Page 175

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2  think you finished your answer.  "Because
3  they"?
4      MR. WOOD:  Oh, I'm sorry.
5      A.   Because they didn't have systems.
6  JPMorgan had turned the systems off.  They
7  didn't know the status of their trades.  They
8  hadn't been able to reconcile bank accounts.
9  They hadn't been able to reconcile the stock
10 record.
11     So I found the information that was
12 conveyed to be not credible.  There was a
13 problem with everything that we got from Lehman
14 during that week.  The data was not credible.
15     Q.   When you said the calculation hadn't
16 been done in a while, do you recall how long it
17 had been since the calculation had been done?
18     A.   No.  At least a week.
19     Q.   Do you recall when you first learned
20 that excess assets beyond the 15c3-3 requirement
21 might be transferred to Barclays?
22     MR. STERN:  Objection to the form.
23     A.   Probably after the close.  You know,
24 after the closing.  I didn't know it was part of
25 the deal at the time.

TSG Reporting - Worldwide (877) 702-9580

Page 176

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   If you can take a look at Exhibit 212,
3  which is the one I handed you earlier but didn't
4  ask you any questions about, if you look at the
5  second page, your e-mail of September 20th in
6  the evening, you write, "I would pursue
7  calculating a more updated requirement and
8  excess."
9      A.   Uh-huh.
10     Q.   Why did you want to know the excess?
11 Actually, let me ask -- I'm sorry, let me
12 rephrase.  Why did you want to know the
13 requirement?
14     A.   Lehman indicated that there were
15 unencumbered assets in their 15c3 and excess.
16 If you go to the below that where they say "do
17 you know" -- they wanted me to call someone at
18 Wells Fargo and ask them to see if I knew
19 someone at Wells Fargo and can I get Wells Fargo
20 to release the money.
21     My response to them was:  One is I
22 don't know anyone at Wells Fargo; two, they're
23 not going to release money based upon a phone
24 call.  They're going to need demonstrative
25 evidence, right?  So that's what I'm asking the

TSG Reporting - Worldwide (877) 702-9580

Page 177

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2  team to produce.  Do a calculation.  Do a -- do
3  a rec.  The deal team will need it.  Lawyers
4  will need it.
5      If there are assets that belonged to
6  Lehman that need to be freed up, you need to
7  have demonstrable evidence, and they weren't
8  able to produce it.
9      Q.   Was it your understanding at that
10 time, meaning September 20th, that under the
11 deal that was being negotiated, the excess would
12 go to Barclays?
13     A.   I didn't know.  I wasn't part of the,
14 you know, the deal team.  What I do recall
15 telling Rich and where the conversations are
16 going on that you need to be very careful
17 because my experience in dealing with the Lehman
18 team at the time was that nothing, no
19 information they gave us was credible.
20     So I do recall that, you know, and
21 aware that, you know, that some of the deals
22 guys are having conversations with the Lehman
23 people working on the deal, and I would just be
24 very careful because the books and records and
25 what Lehman thought they had and what they

TSG Reporting - Worldwide (877) 702-9580