# Exhibit H

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT

2      FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

   In re:                )
5                         ) Chapter 11
   LEHMAN BROTHERS         ) Case No. 08-13555(JMP)
6  HOLDINGS, INC., et al, ) (Jointly Administered)
                           )
7           Debtors.       )
   -----------------------)

8

9

10

11

12           30(b)(6) DEPOSITION OF

13     CLEARY GOTTLIEB STEEN & HAMILTON LLP

14                   by

15           VICTOR I. LEWKOW

16           New York, New York

17       Wednesday, February 10, 2010

18

19

20

21

22

23  Reported by:

24  MAYLEEN CINTRON, RMR, CRR

25  JOB NO. 28226

---

Page 10

```
1                -Lewkow-
2   seller. There was a -- there was a provision
3   that said that on a certain pool of positions,
4   that we would be -- that Barclays would be
5   acquiring as at the closing, that if, as I
6   recall -- and you know, without having the
7   Agreement in front of me to look at the words,
8   I always defer to what's in the contract.
9        But my recollection is that the --
10  there was a provision that if within some
11  period, I think it was a year, to the extent
12  that Barclays actually sold positions -- not
13  what their value was on a given date or the
14  like, not as audit, not if they held
15  positions, even if those positions increased
16  enormously in value or if they went down in
17  value.
18       But if with respect to some pool --
19  and I don't remember the details of how it
20  worked because that provision was later
21  dropped, as you know.  There was a provision
22  that if -- with respect to some of those
23  assets, if we -- if Barclays sold them during,
24  I think, the first year, there would be some
25  sharing of the -- of the profit compared to
```

TSG Reporting - Worldwide     877-702-9580

---

Page 11

```
1                -Lewkow-
2   what -- I forget what the base was exactly, as
3   to what date the assumed valuation was.
4        So there was a provision for
5   additional consideration potentially to flow
6   to the seller.
7        Q.  I'll show you the Asset Purchase
8   Agreement in a minute and we'll spend some
9   time with it today.
10       But is the provision that you
11  described, is that fairly described as a
12  post-closing purchase price adjustment
13  provision?
14       MR. MORAG:  Objection.  Asked and
15  answered.
16       A.  Yeah, I have nothing more to say
17  other than what I said on that subject.
18       Q.  I'm not sure I have an answer to
19  the question as to whether it is -- the
20  provision you described is what you would
21  describe, and I'm referring to Paragraph 4 of
22  your affidavit, as a "post-closing purchase
23  price adjustment provision"?
24       A.  Well, with due respect, if you read
25  my declaration, it says, "...a pre-closing
```

TSG Reporting - Worldwide     877-702-9580

---

Page 12

```
1                -Lewkow-
2   and/or post-closing purchase price adjustment
3   provision relating to the valuation of the
4   transferred assets and liabilities".  This was
5   not such a provision.
6        Q.  So to qualify as a balance sheet
7   transaction, in your view, the pre or post
8   closing purchase price adjustment provision
9   would have to relate to a valuation of the
10  assets and liabilities?  It's that last piece,
11  "valuation of the assets and liabilities" that
12  defines it as a purchase price adjustment
13  provision as you meant it in your Declaration?
14       MR. MORAG:  Object to form.
15       A.  As I said earlier, to me a balance
16  sheet transaction is when you later prepare --
17  I'm not sure that the word -- I would say do a
18  valuation from an accounting standpoint.  As a
19  balance sheet, normally you would prepare a
20  balance sheet based on generally accepted
21  accounting principles, have it audited and
22  adjust the purchase price based on that.
23       Q.  Is there a reason such a mechanism
24  was not included in the transaction at issue
25  here?
```

TSG Reporting - Worldwide     877-702-9580

---

Page 13

```
1                -Lewkow-
2        A.  You know, I would -- I don't recall
3   whether at any point in time, whether Lehman
4   or its advisors requested such a provision.  I
5   just don't recall.  Certainly if they did, it
6   came and went very quickly in the discussions
7   of the concept of the Asset Purchase
8   Agreement.  But I don't recall there ever
9   being such a provision.
10       I would note that we were -- as
11  everybody knew then and knows now, it was an
12  incredibly volatile couple of days.  The Asset
13  Purchase Agreement was being negotiated on
14  that Monday and Tuesday after Lehman had filed
15  for Chapter 11 late Sunday night, early Monday
16  morning.
17       And I think the idea that anyone
18  had a wonderfully exact knowledge as to what
19  the value of portfolio assets in particular
20  were at that point in time, it would be
21  amazing because there was a very uncertain
22  value at that point in time.
23       Q.  Did Cleary Gottlieb play any role
24  in the negotiation of the transaction with
25  regard to arriving at a valuation of the
```

TSG Reporting - Worldwide     877-702-9580

---

## Page 14

```
 1              -Lewkow-
 2    assets to be transferred?
 3         MR. MORAG:  Object to the form.
 4    Vague.
 5         A.  No.
 6         Q.  Were there negotiations between the
 7    parties concerning the value of the assets to
 8    be transferred?
 9         A.  As described in my declaration,
10    there were discussions, I would not -- I don't
11    believe there was a negotiation, as I heard it
12    described.  And I want to stay away from
13    privileged communications, although I'm not
14    sure I have any in particular in mind now.
15    But obviously, I assume none of -- you're not
16    asking me at any point -- if you are, I assume
17    I'll be telling you not, that I won't, or one
18    of the lawyers here will tell me not to.
19         But it was my understanding that
20    Lehman -- that Barclays -- let me step back a
21    second.
22         Even before the bankruptcy, even
23    before that Friday morning when -- the Friday
24    before the 15th, the 12th I guess when
25    Barclays had first retained us certainly, they
```

## Page 15

```
 1              -Lewkow-
 2    may have gotten involved a little bit the day
 3    before or something.  But even before Barclays
 4    had started thinking about, as far as I know,
 5    Lehman, there had been stories in the press
 6    about suggesting that Lehman had been slow to
 7    revalue assets, and that they had inflated
 8    values in their portfolio.
 9         But beyond that in the very limited
10    time, as I understood it, that Barclays had
11    been provided with some information about the
12    portfolio that we were -- that Barclays was
13    being asked to -- that it be acquiring as part
14    of its acquisition of basically the entire
15    business with certain exceptions and the
16    assumption of very substantial certain
17    specified liabilities, when their people,
18    financial people, trading people, whoever it
19    was -- and I'm not sure I knew all the people
20    involved.  It was a new client in the
21    United -- I don't know the name of all the
22    people who were going -- who were around and
23    in the different rooms that we were -- that
24    meetings were taking place on that Monday and
25    Tuesday up at Lehman Brothers on the -- on the
```

## Page 16

```
 1              -Lewkow-
 2    big conference and dining floor.
 3         But it was my understanding that
 4    Barclays people had reviewed certain
 5    information about the assets and liabilities
 6    and had thought that the -- there were
 7    large -- certain category types of assets and
 8    the like that had, as last marked by Lehman,
 9    were substantially overstated.  Whether they
10    had been overstated as of the date they
11    originally been marked or were overstated
12    because of the passage of a couple of days, I
13    believe they would not have been marked for a
14    couple of days.  It's my recollection.  I
15    could be wrong on that.
16         But one way or another, or a
17    combination of the two, that the Barclays
18    people had concluded that the Lehman marks
19    were substantially overstated.
20         Q.  When was Cleary first retained in
21    connection with this transaction?
22         A.  We were retained on Friday.  Not on
23    this transaction, we were retained on the
24    Friday before the bankruptcy on the 12th,
25    early that morning, to assist Barclays in
```

## Page 17

```
 1              -Lewkow-
 2    looking at a potential much larger transaction
 3    to buy not just a substantial part of the U.S.
 4    and Canadian broker-dealer investment banking
 5    business, but a much larger portion of Lehman
 6    Brothers.
 7         I don't know whether initially -- I
 8    can't recall whether initially it might have
 9    been all of Lehman.  I think very early it
10    became clear it was not quite everything but
11    it was a larger universe than what we ended up
12    trying to do in doing, starting with the
13    Monday filing the Chapter 11.
14         Q.  In the interest of everyone's time,
15    we've taken a lot of depositions in this case.
16    Some time over the weekend, the concept of
17    that larger transaction came to an end, those
18    negotiations?
19         A.  Correct.  Sunday around midday.
20         Q.  And around some point, negotiations
21    resumed with respect of the smaller
22    transaction that was ultimately concluded,
23    correct?
24         A.  I don't know if it matters.  But I
25    would use the word "resume."
```

Page 18

-Lewkow-

1
2    **Q.  Okay.**
3       A.   As far as I can tell, they stopped
4  on Sunday, people went home and saw their
5  families.  And I got a call Monday morning,
6  "Well, can you come up to Lehman Brothers?
7  We're going to see if we can do a deal.  If
8  they did file as they said they would" -- we
9  thought they would -- "they filed in
10 Chapter 11 and now want to see whether or not
11 there's something we can do to purchase" --
12 you know, I don't remember how it was
13 described to me in that initial call.
14       But, "Can you come up to Lehman
15 Brothers?"
16       MR. MORAG:  Mr. Lewkow, let me
17 caution you on privilege.  I think you
18 just said the gist to the conversation,
19 which is sufficient for these purposes.
20    **Q.  You came back?**
21       A.   I went up to Lehman Brothers.
22    **Q.  Let's just talk about the period**
23 **when you came back.  In the negotiations that**
24 **began then, what steps, if any, were taken to**
25 **accommodate Barclays' view that the Lehman**

TSG Reporting - Worldwide    877-702-9580

Page 19

-Lewkow-

1
2  **marks were substantially overstated, to use**
3  **your term?**
4       MR. MORAG:  Objection.  Vague.
5       A.   Yeah.  I guess -- I don't know what
6  you mean by "accommodate."  And the word --
7  you also used the word "the view."  I think
8  that view -- I did mention the newspaper.
9       MR. MORAG:  I think we need a
10 break.
11       (Whereupon, a recess was taken
12 from 10:22 a.m. to 10:25 a.m.)
13 BY MR. GAFFEY:
14    **Q.  In the negotiations that took place**
15 **in connection with the transaction that's**
16 **brought us here today, Mr. Lewkow, were there**
17 **discussions, to your knowledge, between the**
18 **folks at Barclays and the folks at Lehman**
19 **about Barclays' view that the assets of Lehman**
20 **were overstated on its books?**
21       MR. MORAG:  Object to the form.
22       A.   Yes.  As to certain assets.
23    **Q.  Can you tell me what you know with**
24 **regard to those discussions?**
25       A.   As I stated in my declaration,

TSG Reporting - Worldwide    877-702-9580

Page 20

-Lewkow-

1
2  Barclays, was my understanding, that Barclays'
3  trading and/or financial folks had been
4  provided certain information about the trading
5  positions; that it was contemplated that
6  Barclays would assume as part of an
7  acquisition of the business of substantially
8  all of the business.
9       And in the course of that, Barclays
10 had -- Barclays people had reached the view
11 that there were very significant -- that the
12 aggregate carrying value that they had been
13 furnished by Lehman was substantially higher
14 than Barclays believed was appropriate that
15 Monday or Tuesday.
16    **Q.  And by "aggregate carrying value",**
17 **do you mean Lehman's book value?**
18       A.   It's my -- I'm not an accountant,
19 as you know.  I'm a lawyer.  It is my
20 understanding that for an entity such as
21 Lehman, they are supposed to -- under
22 regulatory accounting principles, maybe
23 generally accepted accounting principles, I
24 don't know.  But as a general matter,
25 broker-dealers mark their portfolio to market

TSG Reporting - Worldwide    877-702-9580

Page 21

-Lewkow-

1
2  on a daily basis.  And I believe that means
3  their book value is effectively adjusted each
4  day.  To the extent that a balance sheet is
5  prepared, the balance sheet is prepared based
6  on those marks.
7     **Q.  So when you use the phrase**
8  **"aggregate carrying value," were you referring**
9  **to Lehman's books marked to market in that**
10 **manner?**
11       MR. MORAG:  Object to the form.
12       MR. HUME:  Objection, asked and
13 answered.
14       A.   I think I've got nothing more to
15 say on that.
16    **Q.  What did you mean to say when you**
17 **said "aggregate carrying value"?**
18       A.   The value -- what I hear people
19 refer to as "the marks."  What they were being
20 marked at on the books of Lehman by Lehman.
21    **Q.  And in the negotiations of the**
22 **transaction, were any steps taken to address**
23 **Barclays' concern that the aggregate carrying**
24 **value was substantially higher than it should**
25 **have been?**

TSG Reporting - Worldwide    877-702-9580

-Lewkow-

1
2          MR. HUME:  Objection.  Vague.
3          MR. MORAG:  Objection.  Asked and
4  answered.
5          A.  I have -- I've told you -- I have
6  nothing to add to my answer.
7          Q.  Well, I'm afraid that's not going
8  to work, so I do need an answer to the
9  question.
10         A.  Your question asked in the
11 negotiations.  I don't -- I don't -- if you
12 mean in the negotiations of the transaction, I
13 think my answer would be no, as I have said in
14 my declaration and in my statement.
15         Barclays was furnished information
16 which led it to believe that Lehman's marks
17 were not correct and overstated the value of
18 assets, and was -- Barclays was not prepared
19 to do a deal with -- where they were
20 overstated marks on the Lehman books of large
21 amounts.
22         Q.  So if Barclays was not prepared to
23 do a deal where there were overstatements on
24 Lehman's books of large amounts, what did
25 Barclays do to address that concern in order

-Lewkow-

1
2  to conclude a transaction?
3          A.  Barclays made -- made its
4  position -- made its view of the marks, that
5  they were overstated substantially, clear to
6  Lehman people and urged -- my understanding,
7  they urged Lehman to take a fresh look at the
8  values that they were carrying them on on
9  their books because it was at a crazy world,
10 and it was something that Lehman should take a
11 fresh look at to -- to both deal with the
12 passage of time and information.
13         I don't know what -- you know, in
14 my declaration, I mention an example that was
15 mentioned in a broad public -- "public" is the
16 wrong statement.  With both sides present,
17 including lawyers, including me -- of the
18 example of a particular position where
19 Barclays had a junior position of -- junior
20 tranche position from the same issuer, same
21 type of security, and was carrying it --
22 I'm sorry.  Barclays had a senior
23 position and was carrying it at a bigger
24 discount to par than Lehman was carrying the
25 junior position.  And those are -- you know,

-Lewkow-

1
2  I'm sure there were other examples.  That was
3  the one that was easy to explain to us lawyers
4  as evidencing why Barclays believed Lehman
5  needed to take a fresh look at what it -- how
6  it was carrying certain portions of the
7  portfolio on its books and whether or not they
8  needed to revise their marks.
9          Q.  Did the level at which Lehman was
10 carrying its assets on the books affect the
11 price which Barclays was willing to pay on the
12 transaction?
13         MR. MORAG:  Object to form.
14         A.  I think it affected their
15 willingness to do the deal.  The price was
16 what was in the Agreement where we acquired
17 certain assets, acquired certain liabilities,
18 agreed to make certain payments, assumed a
19 certain level of obligations.
20         We were buying a business as a
21 whole; the purchase price was the whole
22 transaction.  We were not -- no one from
23 Barclays went into this to buy a portfolio; it
24 was to buy substantially all the assets of a
25 business.

-Lewkow-

1
2          Q.  Describe for me, if you would, the
3  price that Barclays paid in that purchase.
4          A.  At what time, sir?
5          Q.  Good point.  Describe for me the
6  price that Barclays agreed to pay for that
7  business on September 16, 2008?
8          MR. HUME:  I'm going to just object
9  to the extent that it calls for
10 interpretation of the contract which he
11 hasn't been shown.
12         (Discussion off the record.)
13         Q.  I think the question on the table,
14 Mr. Lewkow, is:  Will you describe for me the
15 price that Barclays agreed to pay for that
16 business on September 16, 2008?
17         MR. MORAG:  Objection.  To the
18 extent it calls for a legal
19 interpretation of the contract.  If you
20 recall generally the terms.
21         A.  Look, I think the contract is the
22 contract.  Without having it in front of me, I
23 may omit certain things.  But in general
24 terms, my recollection is that under the Asset
25 Purchase Agreement as signed late on the 16th

## Page 34

-Lewkow-

1
2    MR. MORAG:  Objection to form.
3    MR. HUME:  Objection.  Vague.
4    A.  As I mentioned, there is a
5  provision in the compensation section that
6  refers to this piece of paper or some version
7  of it, yes.
8    **Q.  Was it your understanding that the**
9  **one-page piece of paper Mr. Berkenfeld signed**
10 **also guided the transaction to the extent the**
11 **value of portfolio of assets was concerned?**
12   MR. MORAG:  Mr. Gaffey, I'm going
13 to object.  You keep using the word
14 "signed," he keeps using the word
15 "initialled."
16   MR. GAFFEY:  We are big boys.  We
17 both know it means he wrote on the
18 document.  Do you want me to say
19 "initialled"?
20   MR. MORAG:  If you could.
21   MR. GAFFEY:  Sure.  Can you read
22 the question back?
23   (Record read as follows:
24 "Question:  Was it your understanding
25 that the one-page piece of paper

TSG Reporting - Worldwide     877-702-9580

## Page 35

-Lewkow-

1
2  Mr. Berkenfeld signed also guided the
3  transaction to the extent the value of
4  portfolio of assets was concerned?"
5    **Q.  Can you answer that question as if**
6  **I said "initialled"?**
7    A.  I need to hear it again.  I'm
8  sorry.
9    **Q.  Let me rephrase it.**
10   **The one-page piece of paper that**
11 **Mr. Berkenfeld initialled, what role, if any,**
12 **did that play in the transaction?  Withdrawn.**
13   **Did the one-page piece of paper**
14 **that Mr. Berkenfeld initialled guide the**
15 **transaction with regard to the value of the**
16 **portfolio of assets transferred?**
17   MR. MORAG:  Object to the form.
18   A.  I would not -- I don't know what
19 you mean by "guide."
20   **Q.  Was it meant to instruct the drafts**
21 **people of the Asset Purchase Agreement as to**
22 **the value of the long position that was**
23 **transferred?**
24   A.  The drafts people had already
25 drafted the Agreement.  I don't remember

TSG Reporting - Worldwide     877-702-9580

## Page 36

-Lewkow-

1
2  exactly what the status was at the precise
3  time.  This was brought in.  I don't think it
4  influenced the drafting.  If by the draftsmen
5  you mean the lawyers from both sides who were
6  involved in preparation of the document, the
7  Asset Purchase Agreement, I don't believe this
8  guided the drafting of the Agreement, no.
9    **Q.  Did anyone from Cleary Gottlieb**
10 **play any role in the preparation of this**
11 **document?**
12   A.  No.  To the best of my knowledge,
13 no.
14   **Q.  Did anyone from Cleary Gottlieb**
15 **play any role in determining the values that**
16 **are shown on this document?**
17   A.  No.
18   **Q.  Did anyone from Barclays**
19 **participate in the preparation of this**
20 **document?**
21   A.  I don't believe, not to my
22 knowledge.
23   **Q.  Did anyone from Barclays play any**
24 **role in determining the values shown on this**
25 **document?**

TSG Reporting - Worldwide     877-702-9580

## Page 37

-Lewkow-

1
2    A.  I don't -- I don't know what that
3  means.  Other than as I testified previously
4  and is set forth in my declaration, you can
5  characterize that in any way you want.  But
6  other than that, I don't know of anything
7  relative to the question.
8    **Q.  Would you take a look at**
9  **Paragraph 9 of your Declaration?**
10   A.  Sure.
11   **Q.  Take the time you need to review**
12 **the paragraph to refresh yourself of its**
13 **contents.**
14   **But my question is going to go to**
15 **the portion that begins -- seven lines down --**
16 **"While I was not present for the actual**
17 **discussions between Barclays and Lehman**
18 **Brothers traders..."**
19   A.  Let me just reread it.
20   **Q.  Sure.**
21   **(Witness reviewing document.)**
22   A.  Yes?
23   **Q.  Now, to your knowledge, was the**
24 **document I have before you marked as**
25 **Exhibit 19, a product of the discussions**

TSG Reporting - Worldwide     877-702-9580

Page 38

```
1            -Lewkow-
2  between Barclays and Lehman traders that
3  you're referring to in Paragraph 9 of your
4  Declaration?
5       MR. MORAG:  Object to the form.
6       A.  No.  I -- I wouldn't -- I mean,
7  I -- this was a Lehman Brothers document.  I
8  assume that as --
9            To the extent that Lehman Brothers,
10 having listened to Barclays' views as to
11 valuation may have changed their marks, as I
12 believe they did, it may have reflected those
13 judgments by Lehman as to the proper marking
14 of assets or liabilities.  But that's all.
15      Q.  Did you come to an understanding
16 that Lehman changed its marks in response to
17 Barclays' expression of concern that they were
18 too high?
19      A.  It was my understanding that they
20 had determined that they would change their
21 marks.
22      MR. MORAG:  By that, who are you
23 referring to?
24      THE WITNESS:  Lehman.  The only one
25 that was making marks was Lehman.  It
```

TSG Reporting - Worldwide      877-702-9580

Page 39

```
1            -Lewkow-
2  was it balance sheet.
3       Q.  From whom did you obtain that
4  understanding?  Can I just caution you, if it
5  is a Barclays person, just tell me their name?
6  I don't want to know the substance of the
7  conversation.
8       A.  No, I understand that.
9       Q.  Yes.
10      A.  I don't remember the name.  I have
11 a recollection of someone being involved in
12 those discussions coming into the room.  I
13 believe it was -- where lawyers and other
14 folks from the other side were in the room and
15 reported what I had characterized in my
16 testimony a minute or two ago.  But I don't
17 remember the name of the individual from
18 Barclays.
19      Q.  Do you know if Lehman did, in fact,
20 change its marks?
21      A.  I have no way of knowing that.
22      Q.  Did you or anyone else from Cleary
23 ever ask that question in the week
24 beginning -- well, from Tuesday, September
25 16th through the closing of the transaction on
```

TSG Reporting - Worldwide      877-702-9580

Page 40

```
1            -Lewkow-
2  the 22nd?
3       A.  No.
4       Q.  Actually, will you turn to, in the
5  Asset Purchase Agreement, which is Exhibit 1.
6  If I can ask you, please, Mr. Lewkow, to turn
7  to page 6, which contains the definition of
8  "Purchased Assets."
9            And in particular, if you would
10 take a look at subsection (d) of that
11 definition.
12      A.  Yup.
13      Q.  Do you see there's a reference
14 there to various categories of securities.
15 Let met read it.  "Government securities,
16 commercial paper, corporate debt, corporate
17 equity, exchange-traded derivatives and
18 collateralized short-term agreements with a
19 book value as of the date hereof of
20 approximately $70 billion (collectively 'long
21 positions')."  Do you see that?
22      A.  I do.
23      Q.  Where did the $70 billion come from
24 that was put into subsection (d) of the
25 definition of "Purchased Assets"?
```

TSG Reporting - Worldwide      877-702-9580

Page 41

```
1            -Lewkow-
2       A.  From Lehman.
3       Q.  Was it Barclays' understanding at
4  the time that that was an accurate estimation
5  of the book value of the described assets?
6       MR. MORAG:  Objection to form.
7       A.  To my knowledge, it was Barclays'
8  understanding that it represented what Lehman
9  Brothers -- having considered the discussions
10 I described earlier in terms of what they
11 concluded, after hearing Barclays, was the
12 proper mark to take on its balance sheet.
13 That it reflected Lehman's conclusions.
14      Q.  Was the term "book value" used for
15 a reason in subsection (d) in the definition
16 of "Purchased Assets"?
17      MR. HUME:  Objection.  Vague.
18      A.  Who's -- yeah, whose reason?
19      Q.  Well, was it supposed to say
20 "market value"?
21      A.  Not all assets on the balance sheet
22 have a market value.  There are -- it is my
23 understanding.  Again, I'm not an expert, a
24 broker-dealer expert or a market expert or a
25 valuation expert, but it is my understanding
```

TSG Reporting - Worldwide      877-702-9580

-Lewkow-

1
2  that for some positions where there is no
3  active market, that other -- other things go
4  into how a broker-dealer is supposed to mark
5  their -- their valuation from an accounting
6  standpoint.
7       **Q.  Was it a considered choice of the**
8  **people who drafted the Asset Purchase**
9  **Agreement to use the phrase "book value"**
10 **instead of some other phrase such as "market**
11 **value"?**
12      MR. HUME:  Objection.  Vague and
13 lacks foundation.
14      A.  Can I have the question read back,
15 please?
16      (Record read.)
17      A.  I don't know how to answer that
18 question, final question.
19      Every -- we tried as a group, Weil
20 Gotshal, Simpson Thacher, Sullivan & Cromwell,
21 Cleary Gottlieb, tried to do the best we could
22 in drafting this Agreement under
23 extraordinarily unusual, difficult
24 circumstances.
25      I do recall that, that this was one

-Lewkow-

1
2  of those final changes that was added in
3  handwriting, if I had the other version of the
4  Agreement.  And somebody, I believe on
5  Lehman's side of the table said, suggested we
6  add in words such as -- to categorize that
7  what we were talking about were, you know, a
8  disfunction of assets.  And it was for that
9  purpose that it was referenced.
10      And I believe that it was first
11 suggested -- and again, I don't know from
12 whom, it might have been a Lehman person.  It
13 might have been one of their lawyers.  Said,
14 let's say, with a -- you know, with a
15 marking -- with marks of 70 billion, or some
16 words of that sort.
17      And some lawyer -- again, I don't
18 know on which side.  Because this was all
19 being done in group session issue -- said,
20 "Well, should we use the word" -- "from a
21 legal, instead of saying 'marks', should we
22 use the word 'book value'?"
23      And that's the word that went in.
24 But I don't think people were trying to draw a
25 distinction between book value and marks, at

-Lewkow-

1
2  least from what this lawyer believed, the
3  lawyer from Weil, understood "book value" to
4  mean in the context of financial assets held
5  by a broker-dealer.
6       **Q.  Did anyone from the Barclays side**
7  **of the table -- by that I'm including Barclays**
8  **personnel or Cleary, ask for or get any**
9  **information to indicate whether the value of**
10 **$70 billion described in subsection (d) was an**
11 **accurate description of Lehman's book value**
12 **for those classes of securities?**
13      MR. MORAG:  Object to the form.
14      A.  As I told you, as I believe I
15 testified, I believe we were in a group told
16 that Lehman was going to remark certain
17 portfolio assets to reduce them.  I assumed
18 that Lehman had done -- it never occurred to
19 me, when they talked about "marks", I assumed
20 that it reflected whatever Lehman had,
21 therefore, done.  And therefore, book value
22 likewise.
23      **Q.  So from what we talked about so**
24 **far, would it be fair to say that the**
25 **understanding was that Lehman negotiated to**

-Lewkow-

1
2  reduce its marks?
3       MR. MORAG:  Object to the form.
4       A.  I'm not going to characterize.  I
5  have -- you're trying to characterize what I
6  testified to.  I stand by the accuracy of my
7  testimony.  But I would not -- I would not --
8  I would not call that "negotiated."  It is
9  what it is.
10      **Q.  Mr. Lewkow, don't get me wrong.**
11 **I'm not suggesting any lack of credibility of**
12 **your testimony.  What I'm looking for is your**
13 **best memory of what people talked about at the**
14 **time?**
15      A.  I've given you my best.
16      **Q.  Do you remember anything else in**
17 **terms of discussions concerning the use of the**
18 **phrase "book value" in subsection (d)?**
19      A.  No.
20      **Q.  Let me show you what's previously**
21 **been marked as Exhibit 518.  Take a look at**
22 **the document.  My questions will go to the**
23 **notations on page 7.**
24      MR. HUME:  Page which?
25      MR. MORAG:  7.  Of the document

## Page 46

1       -Lewkow-
2    itself, not the Bates number.
3       A.  Yup?
4       Q.  And you referred a few moments ago,
5    Mr. Lewkow, to the addition of the phrase
6    "book value" in a handwritten note, in a
7    handwritten annotation.  Is this the document
8    that you were remembering?
9       A.  It appears to be, yes.
10      Q.  At least I wasn't clear as to
11   whether you have a memory as to which side of
12   the negotiations added that phrase.  Do you
13   recall whether it was Lehman or Barclays, or
14   do you not recall either side?
15      A.  As I testified, it was a suggestion
16   of someone on the Lehman side that words of
17   that nature be added, yes.
18      Q.  Do you recall who on the Lehman
19   side?
20      A.  No.  I believe it was not one of
21   their outside lawyers.  I believe it was
22   somebody from Lehman itself, but I have no
23   recollection who.
24      Q.  If you can turn back.  Actually, I
25   created kind of a document mess in front of

TSG Reporting - Worldwide     877-702-9580

## Page 47

1       -Lewkow-
2    you.
3       A.  It is all right.
4       Q.  Why don't you fold those up?  And
5    let go back to your Declaration for a minute.
6       A.  Sure.
7       (Witness complying.)
8       Q.  Actually, just before we go back to
9    your Declaration?
10      MR. GAFFEY:  Bridgett, can I have
11   25, please?
12      Q.  Mr. Lewkow, I put before you a copy
13   of what previously has been marked as
14   Exhibit 25.
15      You referred a few moments ago to a
16   Clarification Letter.  Is that the
17   Clarification Letter to which you were
18   referring?
19      A.  Yes.  It appears to be.
20      Q.  What was the purpose of the
21   Clarification Letter?
22      A.  The Clarification Letter was, as
23   set forth in the opening paragraph, "To
24   clarify the intent of the parties with respect
25   to certain provisions of the Asset Purchase

TSG Reporting - Worldwide     877-702-9580

## Page 48

1       -Lewkow-
2    Agreement, supplement in certain respects the
3    agreements of the parties stated therein, and
4    amend the Asset Purchase Agreement in certain
5    respects."
6       Q.  Now, are there particular portions
7    of the Agreement that were amended or are
8    there particular portions that were
9    supplemented or are there particular portions
10   that were clarified?
11      MR. MORAG:  Objection to the form.
12      MR. HUME:  Objection to the form
13   and that it calls for an intersection
14   of the agreement.  And generally
15   Barclays will object to the extent you
16   ask the witness to give legal
17   interpretations of the contract as
18   revealing privilege.
19      A.  The answer is -- the document is
20   the document.  No one ever tried to say, all
21   right, this clause is a supplement; this
22   clause is an amendment; this clause is -- they
23   are what they are.  Certain -- certain things
24   did clarify; certain things amended.  No
25   one -- there was no reason -- there was no

TSG Reporting - Worldwide     877-702-9580

## Page 49

1       -Lewkow-
2    effort to allocate into buckets in this
3    document.
4       Q.  Do you recall if the use of the
5    word "amend" was a deliberate drafting choice?
6       MR. MORAG:  Objection.
7       MR. GAFFEY:  That's a bad question.
8    Let me withdraw that question.
9       Q.  Do you recall if the word "amend"
10   was added at some point during exchanging
11   drafts of the Clarification Letter?
12      A.  I would need to see all the drafts
13   to be sure.  But my recollection is yes.
14      Q.  Okay.  I'm going to show you the
15   draft, so I'm not going to ask you to
16   speculate and pinpoint.
17      Do you recall any discussions
18   between the party, that is between Lehman and
19   Barclays or their representatives, about
20   adding the word "amend" to the Clarification
21   Letter?
22      A.  I have a vague recollection that
23   with the very first draft of the Clarification
24   Letter, which was prepared very quickly by
25   someone -- and I don't know which side --

TSG Reporting - Worldwide     877-702-9580

Page 50

```
1              -Lewkow-
2    after the Asset Purchase Agreement had been
3    signed and filed with the Court on Wednesday
4    morning, that the original first draft was a
5    page or two and it clearly was truly nothing
6    other than clarification.  And so that the
7    first draft did not use the word "amendment."
8         At some later point, as things got
9    more complicated and things were happening, it
10   became -- there was discussion that we should
11   add the word "amend."  That is my
12   question.
13        Q.  Do you recall who was involved in
14   those discussions?
15        A.  People from Cleary Gottlieb and
16   people from Weil Gotshal, and probably Simpson
17   Thacher.
18        Q.  Do you have a more specific memory
19   of which people?  I know it was a pretty
20   tumultuous week.  But do you recall who in
21   particular was involved in those discussions?
22        A.  It was more in the direct
23   conversations between -- I think most of the
24   conversations on the Clarification Letter were
25   on Barclays side between some combination,
```

TSG Reporting - Worldwide    877-702-9580

Page 51

```
1              -Lewkow-
2    Duane McLaughlin, David Leinwand; Robert
3    Davis; some cases me, but not primarily me;
4    and various people from Weil Gotshal which I
5    believe included Robert Messineo, I may be
6    mispronouncing his name, David Murgio, maybe
7    Tom Roberts and I'm not sure who else.
8         Q.  Do you know if Harvey Miller was
9    involved in those discussions?
10        A.  Which discussions?  You started --
11   I probably went too far in answering your
12   question.
13        Q.  I don't know who led who astray
14   there.
15        The question, the issue is what you
16   talked about a minute ago --
17        A.  The word "amendment"?
18        Q.  Yes.  That it became more complex
19   and I decided to add the word "amendment,"
20   whether Mr. Harvey Miller was involved in
21   those discussions.
22        A.  I don't think -- I don't know what
23   Mr. Miller was doing talking internally with
24   his colleagues or with his clients.  Did he
25   participate in the exact wording of that?  I
```

TSG Reporting - Worldwide    877-702-9580

Page 52

```
1              -Lewkow-
2    don't know.  I do have a distinct recollection
3    of him describing to the Court at the sale
4    hearing that Friday evening that there were
5    major changes in the deal.
6         So I can't imagine -- I don't want
7    to speculate.  I do not recall specifically
8    whether he was involved in adding the word
9    "amend" in that clause.
10        Q.  Was the Clarification Letter meant
11   to memorialize those major changes in the
12   deal?
13        MR. MORAG:  Object to form.
14        A.  I'm picking up the Clarification
15   Letter.  It was made to both supplement,
16   clarify and amend the Asset Purchase
17   Agreement.  And it was intended to be
18   consistent with what the Court had been told
19   this Friday evening.
20        Q.  Were you yourself present in court
21   on the sale hearing on the 19th?
22        A.  I was.
23        MR. MORAG:  Yes.
24        MR. GAFFEY:  Yes.  Okay.
25        Q.  The Clarification Letter,
```

TSG Reporting - Worldwide    877-702-9580

Page 53

```
1              -Lewkow-
2    Exhibit 25, sets forth certain changes in the
3    definition of "Purchased Assets" from the
4    original Asset Purchase Agreement; is that
5    correct?
6         MR. HUME:  Object to the form.
7    A.  Can I look at --
8    Q.  Sure.
9    A.  -- both at the Clarification Letter
10   and the Asset Purchase Agreement?
11        Q.  Look at whatever you need to look
12   at.
13        A.  Thank you.
14        (Witness reviewing document.)
15        A.  Yes.
16        Q.  While you were present in court,
17   was Judge Peck told about the changes in the
18   definition of "Purchased Assets"?
19        MR. MORAG:  Object to the form.
20        A.  You can read the transcript as well
21   as I can, and I think it speaks for itself.
22        I think that what the judge was
23   told was about the substantive changes in the
24   deal, major changes in the deal that had been
25   orally agreed to, is my understanding, by
```

TSG Reporting - Worldwide    877-702-9580

Page 54

-Lewkow-

1
2  representatives of Lehman and Barclays in a
3  couple of hours preceding the beginning of the
4  court hearing.
5       So it does not mean that -- as the
6  Court was well aware and as the Court noted,
7  that he did not have the document.  The
8  document did not yet exist but, you know,
9  major changes were described by Mr. Miller and
10 Ms. Fife to the Court.
11      Q.  And in Cleary Gottlieb's view at
12 the time, were the changes as described by
13 Mr. Miller and Ms. Fife to the Court at the
14 hearing, accurate and complete?
15      MR. MORAG:  Object to the form.
16      A.  Yes.
17      Q.  Were any changes to the transaction
18 discussed or agreed upon after the sale had
19 been concluded, that were incorporated in the
20 Clarification Letter?
21      MR. MORAG:  Object to the form.
22      A.  Well, one -- one thing that was
23 changed that I recall related to the
24 residential mortgages, the so-called RESIs.
25      The original Asset Purchase

TSG Reporting - Worldwide    877-702-9580

Page 55

-Lewkow-

1
2  Agreement had -- contained a provision that
3  treated the residential mortgages differently
4  than any other category of assets and
5  provided -- can I look at the Agreement?
6       Q.  Sure.  I think you might be looking
7  for 1(e) in the definition of "Purchased
8  Assets"?
9       A.  He knows where all the clauses are
10 here.
11      Q.  Page 6.
12      (Witness reviewing document.)
13      A.  Right.  So the original Asset
14 Purchase Agreement provided that the Purchased
15 Assets that Barclays was acquiring
16 included a 50 percent interest in the
17 positions in the residential mortgage
18 securities.
19      At some point on Thursday, late
20 Thursday or early Friday -- I have no
21 recollection of when it was precisely -- an
22 amendment No. 1 to the Asset Purchase
23 Agreement was executed by the parties that was
24 addressed -- was done to address a problem.
25      There was real uncertainty as to

TSG Reporting - Worldwide    877-702-9580

Page 56

-Lewkow-

1
2  whether the deal could be completed because of
3  issues that DTC wanted assurances that it was
4  being -- it would be protected in certain
5  respects, the details of which I have -- was
6  not involved in, and that I don't recall great
7  detail.
8       But the amendment instead provided
9  that the 50 percent interest that Lehman was
10 going to keep, as I recall, was instead going
11 to be delivered -- and I don't remember the --
12 I have to look at amendment No. 1, but it was
13 going to be delivered instead to DTC.  And if
14 at the end of some period and the like it
15 turned out that to secure up to, I believe,
16 250 million.  But again, I would need to look
17 at amendment No. 1.
18      But that to the extent that there
19 was some excess available, it would go back to
20 Lehman.  So that Lehman still might end up
21 having some interest in the RESIs to the
22 extent that DTC did not need them to protect
23 it in connection with the Lehman positions.
24      The Court was, as I recall in the
25 court hearing, Mr. Miller and Ms. Fife made

TSG Reporting - Worldwide    877-702-9580

Page 57

-Lewkow-

1
2  reference to this provision.
3       It turned out that the parties
4  learned at some point, Friday or Saturday, I
5  believe, that, in fact, the so-called
6  residential real estate mortgage securities or
7  RESIs, that Lehman didn't have such positions
8  available to transfer to Barclays in the first
9  place.  So there were no such -- and the
10 reasons were -- and I really don't recall.  I
11 don't know if I ever knew in detail.
12      Some of those positions had already
13 been traded; they no longer owned them; some,
14 they may have been pledged to third parties;
15 some would have involved, to the extent there
16 were separate double counting with other
17 securities that were getting outside this
18 provision.  And accordingly, there were no
19 RESIs of the sort that the Court had been told
20 about by Mr. Miller or Ms. Fife in the sale
21 hearing.  So that provision was eliminated in
22 the Clarification Letter which basically
23 amended the agreement to unwind amendment No.
24 1.
25      Q.  Just so I'm clear we don't have a

TSG Reporting - Worldwide    877-702-9580

Page 62

```
1              -Lewkow-
2   the Wednesday hearing and the Friday hearing,
3   I don't recall any changes to the deal after
4   that, you know, at this -- at this -- at this
5   time.
6           Q.  Take a look, if you would,
7   Mr. Lewkow at Paragraph 1, and tell me if
8   there are changes to the definition of
9   "Purchased Assets" affected by the
10  Clarification Letter, changes to the
11  definition from the Asset Purchase Agreement?
12          MR. MORAG:  You're asking him --
13          A.  Yes.
14          MR. MORAG:  -- the Clarification
15  Letter?
16          A.  Yes.
17          MR. MORAG:  The last thing --
18          A.  The answer is yes.  There was a
19  change in the definition, that's correct.
20          Q.  Do you know if the change in the
21  definition of "Purchased Assets" was brought
22  to the Court's attention?
23          A.  There was --
24          MR. MORAG:  Object to the form.
25          A.  The Court was told about the
```

TSG Reporting - Worldwide    877-702-9580

Page 63

```
1              -Lewkow-
2   substance of the deal.  The Court was not told
3   about clause, actual clause Y or clause Z and
4   the like.  So I can't answer that question
5   other than to say, you know, you can read the
6   transcript and I do not believe the words
7   anyone said, and so such and such a clause or
8   such and such a definition will be
9   appropriately changed.  That's not the way the
10  hearing went.
11          Q.  So, for example, no one, to your
12  knowledge, told the Court that the definition
13  of "Purchased Assets" would be changed to now
14  include securities owned by LBI and
15  transferred to Purchaser or its affiliates
16  under the Barclays Repurchase Agreement?  I'm
17  referring to Paragraph 1A, subsection (ii).
18          MR. MORAG:  Objection to form.
19          A.  To the extent that -- a couple of
20  things.  First of all, that was not -- I do
21  not believe that was a change in the deal.
22  Barclays had agreed, with certain specified
23  exception, to acquire all of the assets used
24  in the business.  Who financed those assets at
25  a given point in time I don't think is
```

TSG Reporting - Worldwide    877-702-9580

Page 64

```
1              -Lewkow-
2   relevant to that question.
3           At the time the Asset Purchase
4   Agreement was signed, it's my understanding
5   that, you know, a lot of the assets were in
6   the form -- were being financed overnight by
7   the Federal Reserve pursuant to a repo.
8           At some point, Thursday or the
9   like, Barclays had taken the fed out of the
10  repo and provided the financing.  But it was
11  the same -- or it should have been, if the
12  assets had been there as had been thought.
13  But those assets, the fact that we added a
14  reference to "repo" doesn't change whether the
15  substance of the transaction changed.
16          Q.  Was there a reason that
17  particular phrase was added to the
18  Clarification Letter then?
19          MR. MORAG:  Objection.  What
20  particular phrase?
21          A.  I think you're going to have to be
22  more specific.
23          Q.  Well, was there discussion back and
24  forth between the parties about putting that
25  language in the Clarification Letter,
```

TSG Reporting - Worldwide    877-702-9580

Page 65

```
1              -Lewkow-
2   referring to the repo assets?
3           A.  Can you point me to the exact
4   language, please?
5           Q.  Paragraph 1(a)(ii)(A), "The
6   securities owned by LBI and transferred to
7   Purchaser or its affiliates under the Barclays
8   Repurchase Agreement, as defined below, as
9   specified on Schedule A previously delivered
10  by Seller and accepted by Purchaser."  That
11  language.
12          A.  There were, as you know, a number
13  of drafts that were circulated of the
14  Clarification Letter.  And my recollection is
15  that at some point, as lawyers working on the
16  Clarification Letter first learned and then
17  focused on the fact that a lot, most but not
18  all of the assets had been in the -- referred
19  to in the definition of, I believe, "Long
20  positions" in the Asset Purchase Agreement,
21  were now -- had been financed by Barclays at
22  the Feds' request and were in the repo, some
23  lawyer -- and I don't remember whether it was
24  initially from Weil Gotshal or Cleary
25  Gottlieb, but there was agreement that it made
```

TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  sense to refer to the repo in this context.
3       Q.  Do you recall when it was that the
4  lawyers first learned that assets that had
5  been originally described in the long
6  positions were, in fact, in the repo?  When
7  did that happen?
8       MR. MORAG:  Object to the form.
9       A.  Yeah, I think -- first of all, I
10  can't answer for all lawyers.  That would
11  include the Weil Gotshal lawyers and other
12  lawyers on behalf of...
13       As to Cleary Gottlieb, at some
14  point I believe, at least one of my colleagues
15  that Thursday had heard that there had been --
16  that Barclays had extend -- provided repo
17  financing to Barclays.  I'm not sure.  It is
18  my understanding none of the details, we had
19  not been involved in that at all.  But it was
20  mentioned, and we learned more about it on
21  Friday and over the weekend.
22       But even as -- even as of the Court
23  hearing we knew very little about it.
24       Q.  Did there come a time when you
25  learned that the Repurchase Agreement had been
    TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  terminated by Barclays?
3       MR. MORAG:  Object to the form.
4       A.  There came a time when I learned --
5  when I -- when I learned that -- I'm not sure
6  how I can answer, whether I can answer this
7  without talking about a privileged
8  conversation.  Can I have...
9       Q.  Absolutely.  Just before you talk
10  to your lawyers, I'm focusing on the timing
11  here.  When did you learn it?  We will tread
12  carefully so that --
13       A.  When did I learn it requires -- I
14  have to deal with your characterization.  Can
15  I hear the question again?
16       Q.  Let me put a question, and then if
17  you need to consult, you can do that.
18       A.  Sure.
19       Q.  The question is:  Did there come a
20  time when you learned that the Repurchase
21  Agreement had been terminated by Barclays?
22       A.  There came --
23       MR. MORAG:  Objection to form.
24       MR. HUME:  I will object and
25  instruct you not to answer to the
    TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  extent it would reveal a privilege from
3  Barclays.
4       MR. GAFFEY:  As to when?
5       MR. HUME:  Well, you assumed
6  when --
7       MR. GAFFEY:  It is attorney --
8       MR. HUME:  It was terminated.  What
9  does terminated mean?
10       MR. GAFFEY:  It means ended.
11       A.  It's a legal... If you want to ask
12  the question -- can I talk to counsel for
13  Barclays and my counsel?
14       Q.  Sure.  Absolutely.
15       (Whereupon, a recess was taken
16  from 11:49 a.m. to 11:52 a.m.)
17       A.  Before the break you asked me a
18  question about did there come a time of
19  learning about the termination of the repo.
20       Of course, the repo did terminate,
21  as I understand it, when we closed on Monday,
22  but I assume that's not what you're asking.
23       Q.  It is not.
24       A.  There did come a time over the
25  weekend, I don't recall whether it was
    TSG Reporting - Worldwide    877-702-9580

1    -Lewkow-
2  Saturday or Sunday, where we did learn -- I
3  think I was reminded in preparing for the
4  deposition, that it was -- we initially
5  learned it when we were copied, or not copied
6  and then forwarded on an e-mail from Sullivan
7  & Cromwell who was co-counsel with us for
8  Barclays, and/or to -- to Weil, that there had
9  been an inadvertent notice given to Barclays
10  by folks in the -- I don't know who, but
11  someone at Barclays had sent a notice of
12  termination of the repo at some point, I
13  believe late Friday, and that that was done in
14  error and should be undone.
15       So if that's what you're asking
16  about, you've heard what my recollection is.
17       Q.  It is.  Let me show you what's
18  previously been marked as Exhibit 27.
19       Have you seen that document before,
20  sir?
21       (Witness reviewing document.)
22       A.  No, I don't believe I have.
23       Q.  You learned about the inadvertent
24  termination of the repo over the weekend; is
25  that right?
    TSG Reporting - Worldwide    877-702-9580

Page 70

```
1              -Lewkow-
2       A.  Yes.
3       Q.  Was it the Saturday or the Sunday?
4       A.  I don't know.
5       Q.  Were you involved in any
6   discussion, you or anyone else from Cleary or
7   Barclays, involved in any discussions from the
8   Lehman folks or Weil Gotshal about the
9   inadvertent termination of the repo?
10      A.  It is my -- I don't think I
11  personally was, but here as a
12  30(b)(6) witness --
13      Q.  You are Cleary Gottlieb, sir.
14      A.  -- internally.  I was perfectly
15  happy not knowing in my life.
16          It is my understanding that
17  following up on the e-mail from Sullivan &
18  Cromwell and the like, that the -- that there
19  may have been some discussions about, you
20  know, implementing this and getting it right
21  to -- to -- because it was, as I -- as I was
22  told at the time and we were told at the time,
23  and as I testified to, it was sent in error.
24  But I don't recall any other discussion.
25          I'm not aware of any other
```

TSG Reporting - Worldwide    877-702-9580

Page 71

```
1              -Lewkow-
2   discussion that Cleary Gottlieb was aware of
3   with the other side on, on this subject.
4       Q.  That's sort of where I'm leading.
5   Let me rephrase the question so you'll know
6   what it is I'm looking for here.
7           What knowledge does Cleary Gottlieb
8   have that Weil Gotshal or Lehman knew about
9   the termination of the repo, that it had been
10  terminated?
11      A.  I believe, as I testified a minute
12  ago, that there was an e-mail that Sullivan &
13  Cromwell on behalf of Barclays sent to Weil
14  Gotshal.  And I believe there were some
15  follow-up conversations referencing the fact
16  that there had been an inadvertent notice that
17  had been sent on this subject.  Can I look at
18  the Clarification Letter?
19      Q.  Sure.  Paragraph 13 is probably
20  where you want to go.
21      A.  Fine.
22      Q.  The language in Paragraph 13 was
23  supplied by Sullivan & Cromwell, correct?
24      A.  I would have to look at this and
25  compare it to the words in the e-mail.  I
```

TSG Reporting - Worldwide    877-702-9580

Page 72

```
1              -Lewkow-
2   don't know the answer to that.
3       Q.  There is a reference in Paragraph
4   13 to the Notice of Termination, do you see
5   that?
6       A.  Yes.
7       Q.  Is the notice of termination that
8   is referred to in Paragraph 13 of the
9   Clarification Letter, the notice that we've
10  marked as Exhibit 27?
11      A.  Well, it says it is a notice of
12  termination in Paragraph 13 dated
13  September 19.  Exhibit 27 that you've shown
14  me, that as I testified I do not believe I've
15  ever seen, it is dated September 19th.  It is
16  from Barclays, it is to Lehman, and it says it
17  is a notice of termination.  So it appears to
18  be it is, but that's all I can tell you.
19      Q.  Was there any discussion between
20  the folks on the Barclays side of the table,
21  including Cleary, and the folks on the Lehman
22  side of the table including Weil Gotshal,
23  about whether there were implications under
24  the Bankruptcy Code to the fact that the repo
25  had been terminated?
```

TSG Reporting - Worldwide    877-702-9580

Page 73

```
1              -Lewkow-
2       A.  It is my understanding that to the
3   best of Cleary Gottlieb's knowledge, no.
4       Q.  Did Cleary Gottlieb have
5   communications with any other person or entity
6   outside of your client, outside of Barclays
7   and Cleary, about Section 559 of the
8   Bankruptcy Code in connection with the
9   termination of the repo?
10      MR. HUME:  Outside of any
11  privilege.
12      MR. GAFFEY:  Outside of any
13  privilege, yes.
14      A.  To the best of my knowledge, no,
15  subject to this caveat.  You will be taking my
16  partner's Ed Rosen's deposition.  He was
17  involved in the discussions with DTC and other
18  clearance -- clearing entities.  And since he
19  was going to be the 30(b)(6) witness on those
20  discussions, I have not consulted him.  So as
21  to whether or not there was anything on that
22  point, I do not know the answer on behalf of
23  Cleary Gottlieb.  Subject to that, the answer
24  is no.
25      Q.  Were there discussions about 559
```

TSG Reporting - Worldwide    877-702-9580

Page 74

-Lewkow-

1
2 with any other self-regulating organizations
3 or governmental agency concerning Section 559
4 of the Bankruptcy Code.
5     A.  Not to my knowledge.
6     Q.  Mr. Lewkow, I'm going to show
7 you --
8     A.  This is starting to look like my
9 desk at the office.
10    Q.  I'm trying to make you feel at
11 home.  Let me add this to the pile there and
12 show you what previously was marked as Exhibit
13 579B, a Declaration of Alan Kaplan, deputy
14 general counsel of Barclays, that's been
15 submitted in Barclays's opposition papers on
16 Rule 60.  Have you seen this before?
17    A.  I can't remember if someone showed
18 me this in the last few days or not.
19    Q.  Take a minute if you would --
20    A.  I wouldn't swear that I haven't.
21 But if so, I didn't read it very careful.
22    Q.  There's a statement that Mr. Kaplan
23 makes that I want to see if you had any
24 knowledge about.  And it's in Paragraph 4 of
25 his declaration.  He is referring to the

TSG Reporting - Worldwide    877-702-9580

Page 75

-Lewkow-

1
2 notice going out erroneously, I'm
3 paraphrasing.  Then he says, "The parties
4 corrected that error in Paragraph 13 of the
5 Clarification Letter."  Do you see that?
6     A.  Yes, let me read all of
7 Paragraph 4, if I may?
8     Q.  Sure.
9        (Witness reviewing document.)
10    A.  Remind me of the question?
11    Q.  I think the question was:  Do you
12 see that?  But --
13    A.  I do.
14    Q.  Okay.  When Mr. Kaplan says "the
15 parties", plural, "The parties corrected the
16 problem with Paragraph 13", I show you that to
17 see if it refreshes your recollection in any
18 way whether there were any discussions between
19 the parties, that is between Barclays and its
20 representatives and Lehman and its
21 representative, about the problem created by
22 the termination of the repo?
23        MR. MORAG:  Objection to the form.
24    A.  I don't know what you mean by the
25 "problem created."  But I believe it was

TSG Reporting - Worldwide    877-702-9580

Page 76

-Lewkow-

1
2 discussed between the fact that this change
3 needed to be made, that it was sent in error.
4 It was discussed at least briefly between the
5 Barclays side, including Cleary and Sullivan &
6 Cromwell, and the Lehman side including Weil,
7 yes.
8     Q.  Again, does it refresh your
9 recollection, where you read Mr. Kaplan
10 talking about "correcting an error," does it
11 refresh your recollection about whether there
12 were any discussions between the Barclays side
13 of the table including Cleary, and the Lehman
14 side of the table including Weil, about
15 implications into the Bankruptcy Code from the
16 termination?
17    A.  I answered that question.  To the
18 best of my knowledge, there were no such
19 discussions.
20    Q.  If I could ask you to restrict your
21 answer, sir, to yes or no to the question I'm
22 about to ask you.
23        Were there any discussions between
24 Barclays and Cleary concerning implications
25 under the Bankruptcy Code of the termination

TSG Reporting - Worldwide    877-702-9580

Page 77

-Lewkow-

1
2 of the repo?  Yes or no?
3        MR. HUME:  Objection to the extent
4 it calls for privileged communications.
5        MR. GAFFEY:  I'm not sure yes or no
6 does.  And I think I'm entitled to that
7 information under local Rule 26.
8        MR. HUME:  Well, what's your basis
9 for saying --
10       MR. GAFFEY:  Local Rule 26 provides
11 that if privilege is asserted at a
12 deposition, I'm entitled to the same
13 information that would be included on a
14 privilege log, which would be the
15 author, recipient, subject matter of
16 the communication, of the otherwise
17 privileged communication.
18       That's why I'm restricting it to a
19 yes or no.
20       MR. MORAG:  The issue here though
21 is you did not just ask about the
22 subject matter of the termination
23 notice being the subject of the
24 conversation, you asked for yes or no
25 as to the specific advice, whether it

TSG Reporting - Worldwide    877-702-9580

Page 78

1        -Lewkow-
2   was discussed.
3        MR. GAFFEY:  Actually, no.  I --
4        MR. MORAG:  You asked for the
5   specific advice.
6        MR. GAFFEY:  It is phrased quite
7   carefully not to.  That's the point.
8   That's the topic that would be on the
9   privilege log.
10       MR. MORAG:  No, I believe it would
11  be the Notice of Termination.
12       MR. GAFFEY:  Let me get a yes or no
13  to that.  Because I want to see where
14  the instruction not to answer is
15  framed.
16  BY MR. GAFFEY:
17       Q.  Were there discussions between
18  Cleary and Barclays concerning the termination
19  of the repo?  Yes or no.
20       A.  Yes.
21       Q.  When did those discussions take
22  place?
23       A.  Some point over Saturday or Sunday.
24       Q.  Were there discussions between
25  Barclays and Cleary Gottlieb about
        TSG Reporting - Worldwide    877-702-9580

Page 79

1        -Lewkow-
2   implications under the Bankruptcy Code in
3   connection with the termination of the repo?
4   Again, yes or no, please.
5   DI      MR. HUME:  Again, objection.  I
6       instruct the witness not to answer.
7          I don't believe the privilege log
8       subject matter would have to reveal the
9       specific nature of the communication,
10      request for advice under Section Y, Y,
11      Z.  I mean --
12         MR. GAFFEY:  I understand you are
13      going to assert it.  I don't want to
14      take time with the colloquy.
15         MR. MORAG:  Hold on one second.
16         THE WITNESS:  Can we talk outside?
17      Is that all right?
18         (Whereupon, a recess was taken
19      from 12:07 p.m. to 12:09 p.m.)
20         MR. MORAG:  Subject to your
21      agreement that whatever Mr. Lewkow
22      responds will not constitute any waiver
23      of the attorney/client privilege, which
24      you said it wouldn't, but if you
25      confirm that, Mr. Lewkow is prepared to
        TSG Reporting - Worldwide    877-702-9580

Page 80

1        -Lewkow-
2   answer the question.
3        MR. GAFFEY:  Okay.
4        THE WITNESS:  Can I hear the
5   question?
6        MR. MORAG:  The one that you were
7   prepared to answer.
8        MR. GAFFEY:  I rephrased it.  But
9   let's read it back.
10       THE WITNESS:  Let's hear the last
11  question.
12       (Record read as follows:
13  "Question: Were there discussions
14  between Barclays and Cleary Gottlieb
15  about implications under the Bankruptcy
16  Code in connection with the termination
17  of the repo?  Again, yes or no,
18  please.")
19       A.  To the best of my knowledge, no.
20       Q.  What needed to be corrected, then,
21  in connection with the termination of the
22  repo?  Do you know?
23       A.  That it was in error.  It wasn't
24  supposed to be terminated.  I think I was told
25  that it would create a monstrous obligation to
        TSG Reporting - Worldwide    877-702-9580

Page 81

1        -Lewkow-
2   give notices and so forth and so forth to
3   everyone who was on -- to various party,
4   etcetera.  That's all I remember.
5        Q.  Did you or anyone else at Cleary
6   Gottlieb have an understanding that upon
7   termination of the repo in financing haircut
8   over and above the amount advanced would need
9   to be repaid into the estate of LBI?
10       MR. MORAG:  Objection.  I think you
11      are asking for a legal opinion from
12      this witness.
13       MR. GAFFEY:  You are right.  Let me
14      withdraw that.
15       Q.  Was there any discussion with
16  anyone outside of the circle of Cleary and
17  Barclays to the effect that the Bankruptcy
18  Code would require the financing haircut in
19  the repo to be paid back into the estate over
20  and above the amount that Barclays had
21  advanced in the Repurchase Agreement?
22       A.  Not to my knowledge.
23       MR. MORAG:  Objection to
24      characterization.
25       Q.  Do you know if anyone at Cleary had
        TSG Reporting - Worldwide    877-702-9580

Page 82

1        -Lewkow-
2    communications with anyone outside of
3    privilege, that is anyone outside of
4    communications with your client concerning
5    whether anyone would seek to stay the
6    application of 559 of the Bankruptcy Code in
7    connection with the termination of the repo?
8        A.  Not to my knowledge.
9        Q.  In your capacity as a 30(b)(6)
10   witness, have you inquired about that topic?
11       A.  Yes.
12       Q.  Is there a reason, Mr. Lewkow, that
13   Sullivan & Cromwell was given the
14   responsibility for drafting the language in
15   Paragraph 13 as opposed to Cleary?
16       MR. MORAG:  Objection.
17       MR. HUME:  Objection.  Calls for
18   privilege.
19       MR. MORAG:  Yes, I mean --
20       THE WITNESS:  I think I can give
21   some factual information, if you want
22   me to.
23       MR. GAFFEY:  I do.
24       THE WITNESS:  Let him ask the
25   question.
    TSG Reporting - Worldwide    877-702-9580

Page 83

1        -Lewkow-
2        MR. MORAG:  I would ask you to
3    first pose the foundational question of
4    whether he knows there is a reason.
5        Q.  Do you know whether there's a
6    reason Sullivan & Cromwell drafted the
7    language in Paragraph 13?
8        MR. HUME:  I instructed the witness
9    not to answer that.  To the extent it
10   reveals privilege, I don't know how you
11   can answer it otherwise.
12       THE WITNESS:  I actually think I
13   can.
14       MR. HUME:  If you can, go ahead.
15       A.  We had, as I testified earlier,
16   basically nothing to do with the creation, the
17   documentation, the implementation of the repo.
18   I don't know whether Sullivan & Cromwell did
19   or not, but we had not.  And so I'm not
20   surprised that we had nothing to do with
21   follow-ups with regard to that.
22       Q.  Let's clean up the pile again and
23   go back to the Lewkow declaration, which is
24   the first thing I showed you.  I forget the
25   exhibit number.
    TSG Reporting - Worldwide    877-702-9580

Page 84

1        -Lewkow-
2        In Paragraph 4, again, Mr. Lewkow,
3    you say, this is the last sentence, "Further,
4    I do not recall anyone involved in the
5    transaction ever suggesting that the deal was
6    supposed to be a 'wash' with the value of
7    assets acquired equal to the value of
8    liabilities assumed."
9        Did you or anyone else from Cleary
10   Gottlieb ever have conversations with Bart
11   McDade about his understanding of the
12   transaction?
13       A.  Bart McDade was -- about his
14   understanding of the transaction, he was in
15   the room at the time the Asset Purchase
16   Agreement -- at times when the Asset Purchase
17   Agreement was being negotiated.  So in that
18   context, I had -- we sort of had conversations
19   with him.  I don't recall any other
20   conversations with him.
21       Q.  Were any of the conversations with
22   him addressed to the topic of whether or not
23   it was a transaction in which the assets and
24   liabilities were supposed to roughly match?
25       MR. MORAG:  Object to the form.
    TSG Reporting - Worldwide    877-702-9580

Page 85

1        -Lewkow-
2        A.  I have included in my declaration
3    that I do not recall anyone involved in a
4    transaction ever suggesting that.  And so that
5    is my recollection.  And Bart McDade comes
6    within the term of "anyone."
7        Q.  I'm asking for a slightly different
8    question.
9        Was the topic ever discussed with
10   Mr. McDade?
11       A.  Not to my knowledge.
12       Q.  Was the topic ever discussed with
13   anyone --
14       MR. HUME:  Objection.  Go ahead.
15       A.  I don't know what the topic is.
16       Q.  -- whether --
17       A.  The deal was the deal, okay.  The
18   agreement is reflected in the Asset Purchase
19   Agreement as originally entered into and then
20   as supplemented, clarified and amended by the
21   Clarification Letter.
22       Q.  I'm assuming, sir -- and correct me
23   if I'm wrong -- that there must have been some
24   discussions between the parties beyond the
25   level of well, the deal is the deal and it is
    TSG Reporting - Worldwide    877-702-9580

Page 102

1           -Lewkow-
2       A.  So it does.
3       Q.  And the reference to Paragraph 10
4   is to a balance sheet printed at 11:18 a.m. on
5   9/16/08?
6       A.  Yes, it is.
7       Q.  Does that refresh your recollection
8   in any way?
9       A.  It seems to be.
10      Q.  Does any of this refresh your
11  recollection as to whether there were
12  discussions during the course of the week
13  after the APA had been signed about that
14  balance sheet marked as Exhibit 19?
15      A.  My recollection, and I don't recall
16  whether we knew this was going to be in the
17  draft or not, but my recollection is that this
18  showed up and we didn't think it was
19  appropriate to start dealing with that
20  document, which we had not intended to and had
21  not included as an exhibit to the Asset
22  Purchase Agreement.  And so this did not stay
23  in the Clarification Letter.
24      Q.  Were there any discussions between
25  Barclays and Cleary Gottlieb on the one hand

TSG Reporting - Worldwide    877-702-9580

Page 103

1           -Lewkow-
2   and Lehman and Weil Gotshal on the other about
3   whether or not to include that sheet as an
4   exhibit to the Asset Purchase Agreement?
5       A.  I believe that during the -- at
6   some point at the very end of the finalization
7   of the Asset Purchase Agreement, and it may
8   have been -- you know, it was a final meeting
9   at which people tried to finalize the Asset
10  Purchase Agreement, and that is the meeting at
11  which a Simpson Thacher associate sat between
12  me and John Findley of Simpson Thacher and
13  tried to act as scribner as the combined group
14  of people around a very large rectangular
15  table, square table reached agreement on final
16  changes.  And then she entered in handwritten
17  form, which we have looked at previously or I
18  testified about earlier today.
19      I believe, I'm not sure, but I
20  believe it was in that context that someone on
21  the Lehman side would have raised the idea,
22  would it make sense to attach this document,
23  Exhibit 19, or some variant thereof to the
24  Asset Purchase Agreement.  And a decision was
25  made collectively not to do so.

TSG Reporting - Worldwide    877-702-9580

Page 104

1           -Lewkow-
2       Q.  What was the basis for the decision
3   made collectively not to do so?
4       A.  The agreement --
5       Q.  I withdraw "basis."
6       What was the reason it decided
7   not to do that?
8       A.  My recollection is that the piece
9   of paper had been prepared by Lehman and shown
10  to us and the like, and that there was one
11  reference to it that was going into the Asset
12  Purchase Agreement, but that it did not -- the
13  agreement in the deal was to be embodied in
14  the Asset Purchase Agreement, and we had not
15  spent any specific time looking at Exhibit 19
16  or any variant of it with a view towards
17  having legal significance and what it might
18  mean and how it might modify the Asset
19  Purchase Agreement.
20      The Asset Purchase Agreement was
21  intended to stand on its own two feet.
22      Q.  Let me ask you to put before you
23  Exhibit 35.  It is included in the packet of
24  documents that I gave you.
25      A.  Sure.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 105

1           -Lewkow-
2       Q.  And Exhibit 35, the first page, has
3   an e-mail from David Murgio at 9:15 p.m. GMT,
4   September 19, 2008 to among others you.  And
5   it attaches this, another draft of the
6   Clarification Letter?
7       A.  Correct.
8       Q.  If you would, again, sir, please
9   turn within the document to the blackline
10  section which begins at page 10279864.
11      A.  Yup.
12      Q.  And within the definition of
13  "Purchased Assets," "Excluded Assets" on the
14  first page of that blackline --
15      A.  On the first page?  First what?
16      Q.  On the first page of the blackline.
17  Okay?  Paragraph 1 of the blackline.
18      A.  Okay.  You referred -- I didn't
19  realize 64 was on all the pages.
20      Q.  It is.  It is the first page marked
21  64.
22      A.  Okay.
23      Q.  And it is Paragraph 1, "Purchased
24  Assets."
25      The underscored language in that

TSG Reporting - Worldwide    877-702-9580

Page 114

1           -Lewkow-
2    they ended.  I don't know if they were in
3    person or over the phone -- between not the
4    lawyers, between representatives of Barclays
5    and representatives of Lehman.  And that was
6    going on until very shortly before the Court
7    hearing began.
8           So while it had been contemplated
9    the day before that we would try to have a
10   proposed form of, or maybe an actual form, I
11   don't recall which, of Clarification Letter to
12   provide to the Court, that events made that
13   impossible.
14        **Q.   Now, I take it that between the**
15   **time of this draft marked as Exhibit 35 and**
16   **the finalizing of the Clarification Letter on**
17   **Monday, the signing of the Clarification**
18   **Letter on Monday, other changes are made.  We**
19   **will get to those, but I just want to**
20   **establish the fact that changes were made over**
21   **the weekend, correct?**
22        MR. HUME:  Objection, vague.
23        Changes to what?
24        MR. GAFFEY:  To the Clarification
25   Letter.
     TSG Reporting - Worldwide    877-702-9580

Page 115

1           -Lewkow-
2        A.   Changes to the draft Clarification
3    Letter were made that are reflected in the
4    final Clarification Letter that was signed,
5    yes.
6        **Q.   And some of those changes were made**
7    **over the weekend, Saturday the 20th and Sunday**
8    **the 21st, correct?**
9        A.   New drafts were being prepared and
10   changes to the prior draft were therefore
11   made, correct.
12       **Q.   Now, the discussions that you**
13   **learned had taken place on Friday morning**
14   **between non-lawyers for Lehman and Barclays**
15   **that you referred to a moment ago --**
16       A.   Morning or early afternoon, I'm
17   not sure which.
18       **Q.   Was it your understanding that**
19   **those discussions were to include assets in**
20   **the deal, to make up for assets that Lehman**
21   **had not been able to deliver?**
22       MR. MORAG:  Objection to form.
23       A.   Let me -- I think, I was told --
24   and now I want to carefully describe how I was
25   told it.  But I was told it twice about the
     TSG Reporting - Worldwide    877-702-9580

Page 116

1           -Lewkow-
2    conversation.  I'm doing this and I'm looking
3    at my counsel and Barclays counsel, so they'll
4    caution me, I think.
5           But I was told substantially the
6    same.  And to the extent there's differences,
7    I don't remember which and what was
8    the difference.  I was told twice about the
9    results of the conversations that I just
10   alluded to that took place between Barclays
11   representatives and Lehman representatives
12   during the day Friday before the Court
13   hearing.
14          I arrived at the courthouse shortly
15   before the Court was supposed to convene for
16   this case.  And while I was still outside the
17   courtroom, having arrived -- while I was still
18   outside -- not outside the courtroom, outside
19   the courthouse.  While I was still outside the
20   Customs House, another car arrived, or taxi
21   and out came several Barclays representatives,
22   including Michael Klein.
23          Michael Klein, I may have said,
24   what's going on or what happened or something
25   like that --
     TSG Reporting - Worldwide    877-702-9580

Page 117

1           -Lewkow-
2        MR. HUME:  Why don't I interject.
3        THE WITNESS:  Okay.  I don't have
4    to stay with that.
5        MR. HUME:  To the extent --
6        THE WITNESS:  Let me jump ahead.
7    Let me just jump ahead.  Go ahead.
8        MR. HUME:  Just so the record is
9    clear, to the extent Barclays
10   representatives communicated to you in
11   a privileged setting facts that they
12   later communicated in a way that is not
13   privileged, you should disclose --
14       THE WITNESS:  The latter.
15       MR. HUME:  Be careful, but disclose
16   only what was not privileged.
17   BY MR. GAFFEY:
18       **Q.   On that point, I want you to go**
19   **back to what was next in a minute.  But Klein**
20   **is there.  Who else was there?  Anybody non**
21   **Barclays was there?**
22       A.   Not downstairs, no.
23       **Q.   So it was Barclays people and you?**
24       A.   I had a conversation, and he
25   summarized the results of the conversation.
     TSG Reporting - Worldwide    877-702-9580

## Page 118

-Lewkow-

1
2          We then all went to the courtroom,
3  which was a zoo, if I can use that technical
4  term.  And I was near the front of the
5  courtroom near the well.
6          I was sitting on -- I managed to
7  get a seat which not many of us did -- on the
8  side.  I can't remember if there was a jury
9  box in that courtroom or not.  If so, I was
10 just in the chairs just inside what would have
11 been a jury box and next to the table at which
12 Weil Gotshal as debtor's counsel was sitting.
13         And there was a conversation that
14 took place that -- of, you know, somewhere
15 between four and eight people, I can't -- I
16 think it was at least five people, six people,
17 including Michael Klein, myself, Lori Fife,
18 and a few other people.  And it may -- among
19 those other people may have been -- I don't
20 think Harvey Miller was one of them.  I'm not
21 100 percent certain.  I believe that one of
22 them may have included, one or more of them
23 may have been Lehman Brothers business folks
24 or representatives, or Lazard representatives.
25 I'm not sure.  I don't remember.

TSG Reporting - Worldwide   877-702-9580

## Page 119

-Lewkow-

1
2          The only three people I am sure of
3  were present were Michael Klein, Lori Fife and
4  me.  There may have been somebody else from
5  Barclays there as well, like Archie Cox.  I
6  just don't remember.
7          And Michael repeated it enough --
8  as I said in the beginning, I don't recall
9  which conversation is which.  And they were in
10 all, to the extent I can recall, they covered
11 the same topic and were consistent with each
12 other and I'm sure he used different words and
13 the like.  But he repeated what he had told me
14 outside 30 or 40 or 50 minutes earlier, or 15
15 or 10 or whatever.
16    Q.  What did he say?
17    A.  I thought you'd ask that.
18         He reported -- and I had -- he
19 reported that it turned out that Lehman and
20 Barclays had both -- officials had both
21 learned in the prior 24 hours that a number of
22 categories of assets that Lehman had told
23 Barclays and agreed before the Asset Purchase
24 Agreement had been signed and were covered by
25 the Asset Purchase Agreement, as to categories

TSG Reporting - Worldwide   877-702-9580

## Page 120

-Lewkow-

1
2  -- specifically specified categories.
3          And of course, as you know,
4  Barclays was to get under the Asset Purchase
5  Agreement, except for specified excluded
6  assets, we were supposed to get all assets
7  used in the business.  But there were certain
8  assets, including financial assets that were
9  included within that universe but were also --
10 and so that Barclays had been led to believe
11 were going to be delivered.  That would be
12 true whether or not they were also articulated
13 as within the including language that follows
14 in the definition of "Purchased Assets."
15         But -- so it's the same universe
16 either way.  But certain of those assets,
17 which we have been told were among the assets
18 that Barclays would be getting would not --
19 were not available to be transferred to us.
20 That they either did not own or they had
21 double counted or they were subject to liens
22 in favor of third parties and they could not
23 be delivered.  And so he reported that.
24         And he said that this was -- and
25 again, I believe there may have been a Lehman

TSG Reporting - Worldwide   877-702-9580

## Page 121

-Lewkow-

1
2  person standing there, but I can't tell you
3  who, or a Lazard person, and that he had
4  created real issues as to whether the deal
5  could be due -- doable.
6          He went on to describe a number of
7  things that had come out as further
8  investigation as to facts as well as further
9  discussions and negotiations as to what to do,
10 as to whether this deal could be saved and
11 whether there would be no deal and there would
12 be no one to purchase the assets and to
13 purchase the business and leave the creditors
14 to a liquidation scenario.
15         But he reported on a number of
16 things.  First of all, that two category of
17 assets should have been identified that could
18 have been included in assets that Lehman used
19 in the business and, therefore, should be
20 coming to Barclays pursuant to the Asset
21 Purchase Agreement, which had not been
22 specifically ever mentioned or focused on by
23 Barclays.  And that those helped to some
24 extent mitigate the shortfall that I just
25 described based on what we had known.

TSG Reporting - Worldwide   877-702-9580

1           -Lewkow-
2           So, we had learned things that
3    reduced the pool of assets that were worth --
4    substantially all the assets that we were
5    getting.  But that there were two categories
6    of assets that were within what we were
7    getting that we had not focused on and that
8    Lehman had not told us about were within the
9    pool of assets that Lehman had available for
10   transfer, that they could transfer and would
11   transfer pursuant to the deal.
12           And those, those two categories
13   were the 15c3-3 reserve account or something
14   like that.  I'm not sure "reserve" is the
15   right account.  And where I was told -- I
16   remember often this one being told the precise
17   number, but I don't remember what number it
18   is.  But it was slightly over a billion-seven
19   in -- and I believe he said in security, but
20   he may -- he may not have been that specific.
21           And the second was assets in what I
22   was told was something called the clearance
23   box about -- again, I may have given a
24   more specific number but this one is less
25   vivid in my mind, of approximately two billion

1           -Lewkow-
2    of assets, and that these assets were
3    available and would be transferred by Lehman
4    as part of the transfer of essentially all the
5    assets that they were going to be giving us.
6           I was also told of some discussions
7    of changes that needed to be made to the deal
8    because that didn't -- the identification of
9    those assets, of additional -- those assets
10   that would be transferred as part of the deal
11   didn't solve by any means the entirety of the
12   problem that had been learned by both sides as
13   to other assets that could not be transferred.
14           And that certain changes to the
15   deal were going to be made.
16           One was -- and that first, another
17   negative change in the deal from Barclays's
18   perspective in that there was a -- there was
19   in the Asset Purchase Agreement a concept
20   of -- I forget what the word was.  "Retained
21   cash."  It was a very strangely drafted
22   clause.  Because retained cash was Lehman's
23   cash that Barclays would get and in a sense it
24   was retained because it would be retained for
25   use in the business that we were effectively

1           -Lewkow-
2    purchasing all the assets of, and certain --
3    and assuming certain specified liabilities.
4           And so I was told that the fact
5    that Lehman would receive the -- Lehman would
6    transfer the so-called retained cash was
7    dropping away and that Barclays would not get
8    that cash.  I believe -- I believe I was told
9    that they just didn't have free cash sitting
10   around, but I don't remember precisely what
11   words were used.  I don't remember precisely
12   what the words were on any, any of these.
13   This is my recollection and paraphrase of what
14   he told the group in the well in the courtroom
15   before the hearing started with a half a dozen
16   or so people.
17           He also talked about a favorite
18   topic, the RESIs, and that it turned out --
19   wait a second.  Hold on a second.  -- no.  I
20   don't think -- I withdraw that.  I don't think
21   there is anything about the RESIs.
22           He reported that another change
23   that needed to be made that the parties had
24   agreed to orally was to eliminate the
25   provision that I testified about earlier in

1           -Lewkow-
2    response to some -- some of your questions
3    that provided that if Barclays sold certain of
4    the financial positions within one year and
5    made a profit, that certain amounts of
6    additional consideration or compensation would
7    be paid to -- to Lehman, that that provision
8    had also -- would be deleted.
9           That -- let me just think if there
10   was anything else that I can recall.  That's
11   my recollection.
12           MR. GAFFEY:  Do you want to take a
13   lunch break?
14           MR. MORAG:  Yes.  I believe it's
15   available.
16
17   (Luncheon recess taken at 1:10 p.m.)
18
19              - - -
20
21
22
23
24
25

Page 126

```
 1              -Lewkow-
 2      A F T E R N O O N   S E S S I O N
 3          (Time noted: 1:53 p.m.)
 4  V I C T O R  I.  L E W K E W, resumed as a
 5  witness and testified as follows:
 6  CONTINUED EXAMINATION BY
 7  MR. GAFFEY:
 8      Q.  Mr. Lewkow, before the break you
 9  were telling us about a conversation between
10  Michael Klein, Lori Fife, yourself and some
11  others, about discussions that had taken place
12  in the morning before the sale hearing.
13          Was there any discussion between
14  Barclays and its representatives on the one
15  hand, and Lehman and its representatives on
16  the other about what, if anything, of those
17  facts should be told to the judge in the sale
18  hearing?
19      A.  First of all, when you say -- you
20  said "morning," I was very careful.  I believe
21  it continued until shortly before the hearing
22  started at one o'clock, so I was not limited
23  to the morning.  The answer to your question
24  is, no.
25      Q.  As you sat through the sale hearing
```

TSG Reporting - Worldwide    877-702-9580

Page 127

```
 1              -Lewkow-
 2  and heard the presentations to the Court from
 3  the various lawyers who spoke to the judge,
 4  was Cleary and Barclays's comfortable that the
 5  aspect of the deal that had been discussed in
 6  that session prior to the sale hearing were
 7  accurately disclosed to the judge?
 8      MR. MORAG:  Object to the form.
 9  Certainly you speak to Cleary.  As to
10  Barclays, I'm not sure if that calls
11  for a privilege conversation.
12      MR. GAFFEY:  Let me just ask as to
13  Cleary.  That's a good point.
14      A.  As was my understanding was,
15  typical the debtor's counsel on a sale would
16  normally be the ones who take the -- make the
17  presentation to the Court.
18      THE REPORTER:  Can I ask you to
19  please speak up?  Thank you.
20      THE WITNESS:  I'll try.
21      A.  As typical, Weil as counsel for the
22  debtor was making the presentation.  Maybe in
23  other context people would have seen a draft
24  of what Lori Fife was going to say or the
25  like.  But certainly, since it was such a
```

TSG Reporting - Worldwide    877-702-9580

Page 128

```
 1              -Lewkow-
 2  moving target we had, as I told you in your
 3  last question, really hadn't had any
 4  consultation as to what exactly she and
 5  Mr. Miller were going to tell the Court.
 6          That having been said, as I sat
 7  there, I am, as a member of the Bar, I am -- I
 8  do have obligations and certainly if I had
 9  thought that I heard something that was
10  inconsistent with my understanding of the deal
11  or omitted information that was obvious that
12  should have been -- would make the description
13  of what the judge heard -- and by "description
14  of what the judge heard," I include everything
15  that he heard Wednesday and everything that
16  was in the Asset Purchase Agreement that he
17  had heard before.
18          If I thought he was being misled, I
19  obviously would have, as was Mr. Granfield who
20  was my partner who I was sitting next to, we
21  would have either, you know, addressed the
22  Court directly or would have talked to Weil
23  Gotshal and asked them to make appropriate
24  other statements to the Court.
25      Q.  As I understand the events and
```

TSG Reporting - Worldwide    877-702-9580

Page 129

```
 1              -Lewkow-
 2  discussions that Mr. Klein described to you,
 3  essentially because Lehman was unable to
 4  deliver certain assets within the
 5  contemplation of the Asset Purchase Agreement,
 6  other assets were substituted for them?
 7      MR. MORAG:  Objection to form.
 8      A.  No.  I totally -- that is not a
 9  correct characterization.
10      Q.  What is the correct
11  characterization?
12      A.  What I testified.
13      Q.  Is it your testimony that the two
14  categories of assets you discussed, 15c3 and
15  the contents of the box, were covered by the
16  original language of the Asset Purchase
17  Agreement?
18      A.  I don't want to give you legal
19  advice.  But I will point you to the words of
20  the Asset Purchase Agreement that basically
21  says all assets used in the business, other
22  than Excluded Assets, which is a defined term.
23      Q.  At the time that you had the
24  conversation with Mr. Klein and Ms. Fife, was
25  it at that point still within the
```

TSG Reporting - Worldwide    877-702-9580

Page 130

-Lewkow-

contemplation of the parties that the Clarification Letter would be submitted to the Court?

A.  Well, we -- I don't -- the -- it had been the contemplation on Wednesday and Thursday, and the goal had been to, as I testified earlier, to give the Court, to give -- to have that ready to give the judge. It was also the intention at that stage to try to close Friday evening.

And on that sort of scenario, if, in fact, you went there, it would have been probably possible, one would have hoped to have had a Clarification Letter that one could have given to the Court.

It was clear to me, but I don't recall given what had changed and given that there was a draft that had been served up while we were in court, that -- given that it showed up when it did, I was dubious even before I saw it and before I talked to my colleagues as to whether it did or didn't reflect those discussions given the timing of it.

TSG Reporting - Worldwide    877-702-9580

Page 131

-Lewkow-

So to me, it was, it would have been shocking if before the Court could have approved it, whether we would have had a final Clarification Letter that we could have provided the Court.

Q.  By the end of the sale hearing, no Clarification Letter had been finalized and everybody let to continue their work over the weekend.  Was there a point during the weekend when there were conversations between Barclays on the one hand and Lehman on the other including their representatives, about bringing the Clarification Letter to the judge?

MR. MORAG:  Objection to the form. You can answer.

A.  What I recall, and to me the Clarification Letter was -- it was getting close to being signed.  I have a vague recollection, I do have a recollection of sitting in the room -- I did a lot of sitting in the rooms -- with a number of Weil Gotshal lawyers, including Harvey Miller, including one or more of his corporate colleagues in

TSG Reporting - Worldwide    877-702-9580

Page 132

-Lewkow-

which -- and this would have been late Sunday night, early hours of Monday morning.  I don't know.  But it was very late, very late in the game.  It might have even been Monday.

In fact, it might have been Monday morning, you know, 5:00, 6:00, 7:00, just shortly before we closed as I think about it. I don't know when it was.  But it was late. It wasn't Saturday.  It wasn't Sunday morning. It wasn't even Sunday afternoon.  And we were very close to, you know, finish.  The big issues that people were dealing with were DTC and J.P. Morgan and those sorts of issues were really the big issues that people were facing.

But very late in the process, Harvey Miller saying to a group of -- you know, again, I don't know how many other -- it was a very fluid group of people who would be sitting in what room at what time that weekend.  But there were a number of other Weil people and Harvey Miller and me.  I don't remember whether any of my colleagues were in the room with me.

And Harvey looked at the assembled

TSG Reporting - Worldwide    877-702-9580

Page 133

-Lewkow-

group and said something like, Does anyone think that we have done anything inconsistent with what we've told the Court and have to bring this -- go back to court?  Or something like that.  I don't remember the words.  I'm totally paraphrasing.

My recollection is, I've read Mr. Miller's deposition transcript, and he does not mention who -- he mentions a conversation which is, I think, more or less consistent with my recollection, but he doesn't mention that anyone from Cleary Gottlieb, like me, was there.

But -- and he may have had more than one, so I have no way of knowing if it's the same conversation.

But I do recall that.  And he looked around the room and nobody said anything.  It was mostly people on his side. So that's the one that -- you know, in connection with the finalization of the Clarification Letter, that conversation took place.

Q.  Were any of your bankruptcy

TSG Reporting - Worldwide    877-702-9580

Page 134

```
 1              -Lewkow-
 2    partners present during this conversation?
 3         A.  I do not believe so.
 4         Q.  Have you read any other
 5    depositions?
 6         A.  Yes.  I've read parts or all of
 7    Mr. Miller's deposition, Mr. Hughes deposition
 8    and Mr. Ridings' deposition.  I believe that's
 9    all.
10         Q.  Did you read both days of
11    Mr. Hughes deposition?
12         A.  Yes.  Skimming, yes.
13         Q.  Did you review any briefs or
14    pleadings to prepare for your deposition?
15         A.  No.
16         Q.  Have you read the Rule 60 filed by
17    the debtor or the Trustee or the Creditors
18    Committee?
19         A.  No.
20         Q.  Have you had them summarized for
21    you?
22         MR. HUME:  Objection.  I think that
23    calls for privileged conversations.
24 DI      MR. MORAG:  Same objection.  I
25    instruct you not to answer.
   TSG Reporting - Worldwide    877-702-9580
```

Page 135

```
 1              -Lewkow-
 2         Q.  Was there a time, was there not,
 3    where it was contemplated that the
 4    Clarification Letter would be styled as an
 5    amendment to the APA, as a contractual
 6    amendment to the APA.  Do you recall that?
 7         MR. MORAG:  Objection to form.
 8         A.  Contemplated by whom?
 9         MR. GAFFEY:  Can I have this marked
10    as 614A?
11         (Deposition Exhibit 614A, Letter
12    from S&C, CGSH 00020701-20714, marked
13    for identification, as of this date.)
14         Q.  You have before you, Mr. Lewkow,
15    what we marked as Exhibit 614A, a document
16    bearing Bates numbers CGSH 00020701 through
17    20714.  Have you seen that document before?
18         A.  Yes.
19         Q.  I'm sorry.  I didn't hear you.
20         A.  Yes.
21         Q.  Did you see it at or around the
22    time that it's dated, September 19, 2009?
23         A.  I think that around that time, I
24    either saw the cover letter, cover e-mail, or
25    saw a cover e-mail from one of my colleagues,
   TSG Reporting - Worldwide    877-702-9580
```

Page 136

```
 1              -Lewkow-
 2    basically dismissing it.
 3         Q.  Why was it dismissed?
 4         A.  Because it was not consistent, best
 5    I can recall.  This was sent by someone at
 6    Sullivan & Cromwell who had not been involved
 7    directly in any of the discussions with --
 8    regarding the Clarification Letter.  We didn't
 9    know where this had come from.  Hold on a
10    second.  Wait a second.
11         (Witness reviewing document.)
12         A.  I think.  I think a couple of
13    things.  Shortly after this -- this came on,
14    what date is this?
15         (Witness reviewing document.)
16         A.  Friday?  May I look at amendment
17    No. 1?
18         Q.  Sure.  Absolutely.
19         A.  That you had given me earlier.
20         Q.  That's Exhibit 27, right, for the
21    record?
22         A.  24.
23         Q.  I beg your pardon.  24.  You're
24    right.
25         MR. HUME:  Can I just interject?
   TSG Reporting - Worldwide    877-702-9580
```

Page 137

```
 1              -Lewkow-
 2    To the extent that the question that's
 3    pending, I think --
 4         THE WITNESS:  I'm not sure.
 5         MR. HUME:  -- is why was it
 6    dismissed, to the extent to answer that
 7    question requires you to divulge any
 8    privileged conversations within Cleary
 9    or Cleary and Barclays, I instruct you
10    not to answer.  Otherwise you can
11    answer.
12         A.  The answer is I'm not sure -- I've
13    seen the e-mail from one of my colleagues, I
14    think it was Dave Wyman.  But it was also, and
15    I don't know the precise timing.  One of the
16    elements that I see is, and maybe the key
17    element, was this rider that Ms. Summers had
18    sent with this e-mail to deal with what was
19    called -- a new section called a holdback to
20    deal with the DTC problem.
21         In fact, later that day, Sullivan &
22    Cromwell did, in fact, prepare a First
23    Amendment to the Asset Purchase Agreement to
24    try to address based on what -- what people
25    understood at the time were the -- were the
   TSG Reporting - Worldwide    877-702-9580
```

Page 138

```
 1            -Lewkow-
 2  facts relating to the residential real estate
 3  mortgage securities which were later learned
 4  were not the facts.
 5            And in fact, amendment No. 1 was
 6  signed.
 7       Q.  The Asset Purchase Agreement --
 8       A.  More accurately, first amendment
 9  was signed.
10       Q.  And the Asset Purchase Agreement
11  and the first amendment of the Asset Purchase
12  Agreement, both were submitted to Judge Peck
13  at the sale hearing.  Do you recall that?
14       A.  They were both described.  I
15  assume -- I know the Asset Purchase Agreement
16  had been submitted in a technical sense,
17  whether the first amendment was or not, I
18  assume it was, but I don't know for sure.
19       Q.  I'll go back to a question I asked
20  you a few moments ago.
21            Given that the Clarification Letter
22  recites that it amends the Asset Purchase
23  Agreement, was one of the three verbs that we
24  talked about, that it "amends" the Asset
25  Purchase Agreement.
```

TSG Reporting - Worldwide     877-702-9580

Page 139

```
 1            -Lewkow-
 2            When Mr. Miller asked whoever was
 3  assembled in that room as to whether anyone
 4  thought it was different than what had been
 5  described to the Court, was there any part of
 6  that discussion that noted that this was an
 7  amendment to the agreement that had been
 8  submitted to the judge?
 9            MR. MORAG:  Objection to the form
10  and to the characterization of his
11  testimony regarding Mr. Miller's
12  statement.
13       A.  I don't recall.  I would note that
14  Mr. Miller couldn't have been more clear on
15  Friday to the Court that there were major
16  changes in the deal.  And so the fact that in
17  part this was to some extent an amendment of
18  certain aspects of the Asset Purchase
19  Agreement, I think it was entirely consistent
20  with what Weil Gotshal told the Court on
21  Friday.
22            And the Court carefully considered
23  as I recall the comments made by I think a few
24  of the creditors and/or the Committee or
25  somebody, I don't remember who, arguing that
```

TSG Reporting - Worldwide     877-702-9580

Page 140

```
 1            -Lewkow-
 2  he should wait until he had the final document
 3  before he approved the sale.  And he discussed
 4  that subject in his statements from the bench
 5  and concluded that he did not need to wait for
 6  a written document.
 7       Q.  Was it Cleary's understanding
 8  coming out of the sale hearing that there were
 9  any limitations on what could be included in
10  the clarification agreement and still be
11  within the terms of the Sale Order?
12            MR. MORAG:  Objection.  I think
13  that's work product and privilege.
14  Cleary's understanding?  He can't
15  answer it.
16            MR. GAFFEY:  What's the privilege?
17            MR. MORAG:  The mental impressions
18  of a lawyer of what they couldn't --
19            MR. GAFFEY:  I just want you to
20  identify the privilege.
21            MR. MORAG:  I said work product and
22  attorney/client privilege.
23            MR. GAFFEY:  Okay.
24            MR. MORAG:  To the extent they were
25  discussed with attorneys.
```

TSG Reporting - Worldwide     877-702-9580

Page 141

```
 1            -Lewkow-
 2       Q.  Do you recall any colloquy with the
 3  Court that you witnessed on Friday concerning
 4  any limitations placed on the Clarification
 5  Letter?
 6       A.  No.  None other than what I
 7  testified to earlier.
 8       Q.  Do you recall any restrictions in
 9  the Sale Order itself placing restrictions on
10  the Clarification Letter?
11            MR. HUME:  Same objection, I
12  believe.
13            MR. MORAG:  I think --
14            MR. HUME:  It calls for a legal
15  interpretation of the Sale Order.  That
16  is a matter in the litigation and
17  you're asking a lawyer how to interpret
18  it for you.  So I think it's asking for
19  work product.
20       Q.  Were there any discussions between
21  Barclays on the one hand including its
22  representatives, and Lehman on the other
23  including its representatives, as to whether
24  there were any limitations in the sail order
25  as to what could be included in the
```

TSG Reporting - Worldwide     877-702-9580

Page 142

```
1              -Lewkow-
2    Clarification Letter?
3         A.   Yes.  Two conversations.  One I
4    testified to already, the late Sunday night or
5    late Monday morning conversation with
6    Mr. Miller.  Earlier, I believe it was Sunday,
7    it was a crazy weekend, I believe it was
8    Sunday, there was a conversation in the
9    hallway where the subject of whether certain
10   circumstances, if we did certain things, would
11   lead to a change of -- that would require
12   going back to the Court.
13        Q.   Can you --
14        A.   I may have mischaracterized that.
15   Go ahead.  Ask your next question.
16        Q.   Okay.  My obvious question is:  How
17   did you mischaracterize it?
18             But tell me what you remember about
19   that conversation.  Who said what to whom?
20        A.   So, as I testified earlier on
21   Friday, one of the things that Lehman Brothers
22   and Barclays had discovered that among the
23   Purchased Assets that Barclays was going to
24   receive in the -- pursuant to its purchase of
25   substantially all of the assets used in the
```

TSG Reporting - Worldwide    877-702-9580

Page 143

```
1              -Lewkow-
2    business, other than Excluded Assets, that
3    although there had been very substantial
4    reductions in what Lehman could deliver, they
5    also had realized and ascertained that there
6    were assets that were part of their assets
7    used in the business that had not previously
8    been sort of focused on specifically by the
9    parties, although they were assets of Lehman
10   used in the business.
11             And I mentioned two -- two
12   categories of such assets.  One was the
13   so-called 15c3-3 account.  And I think I
14   testified -- I'm not sure, it's been a long
15   day so far.  Maybe not.  I may not have
16   mentioned this.  But one of things that
17   Michael Klein had reported in describing that
18   was that he had been told by someone on behalf
19   of Lehman that there was some e-mail around in
20   which the -- pursuant to which referencing
21   that someone in the division of market
22   regulation at the SEC had confirmed that the
23   15c3-3, the assets in the 15c3-3 could, in
24   fact, be transferred by Lehman and at some
25   point, I believe Saturday morning or at some
```

TSG Reporting - Worldwide    877-702-9580

Page 144

```
1              -Lewkow-
2    point Saturday, we asked Weil to see that
3    agreement.
4             At some later point, I believe on
5    Sunday, but I couldn't swear to it at this
6    stage -- at some point, as I was walking in
7    the hallway of Weil Gotshal, we were in
8    meetings spread out over a large portion of
9    Weil Gotshal that was full of purely -- I
10   believe purely a conference space.  There were
11   lots of meetings going on by different people.
12   There were people working on the Transition
13   Services Agreement, there were people dealing
14   with DTC, there were people just getting ready
15   to do a closing.  Because all of the work had
16   to be done to be prepared to close, even while
17   other work was going on.  Discussions with
18   JPMorgan Chase.
19             Anyway, we were with Weil Gotshal
20   on that floor.  And as I was walking down the
21   floor, there were a number of the Weil
22   partners standing at this big desk which I
23   assume was the reception desk, although it
24   wasn't near the elevators where there was a
25   big reception desk.  But I don't know.  It
```

TSG Reporting - Worldwide    877-702-9580

Page 145

```
1              -Lewkow-
2    wasn't clear.  Maybe it was for if you needed
3    secretaries during the conference room.  I
4    don't remember what it was since I had never
5    been there during a working day, only on
6    weekend.
7             But standing around this desk were
8    a number of Weil lawyers.  There may have well
9    been somebody from Lehman or Lazard there as
10   well, I don't recall.  I believe Harvey Miller
11   was one of the people among the group that was
12   there for Weil, and they said we have -- you
13   asked for and we now have, it gave me the
14   impression they had just received it in the,
15   you know, minutes or the last hour or two, and
16   certainly not before then was the impression.
17   I'm not sure whether they said that or not.
18   That we now have the e-mail relating to the
19   15c3-3 account.  And they showed it to me.
20   And I looked at it.
21             And they said that -- first
22   thing -- well, I noticed and commented on, I
23   believe I commented on, that it was not as I
24   had thought from the SEC but merely an
25   internal Lehman e-mail referencing a
```

TSG Reporting - Worldwide    877-702-9580

Page 146

```
1              -Lewkow-
2    conversation with the SEC, with someone on
3    staff of the SEC.
4              And somebody from Lehman, somebody,
5    I'm sorry, from Weil said -- and it may have
6    been Mr. Miller but I don't know.  But
7    somebody from Weil said something like, We
8    didn't realize that some -- that the account
9    was not entirely securities but included a
10   bank account that -- with cash.  It was a
11   major bank.  It was one of the things on that
12   e-mail.  So it was -- and as I recall, it was
13   a million dollars in the bank account that
14   Lehman maintained with a third party bank.
15   And 700-plus, 760 odd million of securities
16   were in that account.
17             And in the course of that, one of
18   the Lehman people, again, I believe it was
19   Mr. Miller, but I'm not sure, said, the
20   question is, does anyone remember exactly what
21   Ms. Fife -- I don't think Ms. Fife was there
22   at the time -- told the Court, when she was
23   discussing the fact that you retain the cash
24   provision in the Asset Purchase Agreement was
25   being eliminated, did she say anything that
```

TSG Reporting - Worldwide    877-702-9580

Page 147

```
1              -Lewkow-
2    would be inconsistent with us transferring as
3    part of all the assets of the business, the
4    15c3-3 account which we now know includes a
5    bank account.
6              There then followed some further
7    discussions on a number of -- let me just go
8    through them.
9              MR. MORAG:  If you like.
10        A.   Go ahead, ask another question.
11        Q.   Tell me about the further
12   discussions.
13        A.   So -- and I don't remember in
14   quite -- again, this was a weekend that was
15   very -- at the end of the week that had been a
16   very complex and difficult and weak -- not
17   just from the financial markets but from
18   everyone on both sides of this deal who were
19   trying to see if this deal could get done.  So
20   I don't remember how quickly it got done,
21   whether it was dragged out over two hours or
22   only over half an hour.
23             But there were some follow-up
24   conversations and one of the things -- it may
25   have even dragged on longer than two hours.
```

TSG Reporting - Worldwide    877-702-9580

Page 148

```
1              -Lewkow-
2    Because one of things we asked, or someone
3    asked is -- I don't know who asked it.  Is it
4    possible, can we get a transcript, can we find
5    out exactly what Ms. Fife said to the Court to
6    see whether or not she said something that
7    would be or might appear to be inconsistent
8    now that we knew that the 15c3-3 account
9    included a bank account.
10             All of this is paraphrase.  I do
11   not remember precisely.  All of my testimony
12   where I say what people say is paraphrase.  I
13   don't recall specific words.
14             So some time clearly passed while
15   that -- but I don't remember how long, while
16   people investigated that issue.  And we were
17   told at some point -- again, I don't know by
18   whom -- that it would not be possible to get a
19   transcript, that no transcript had been
20   prepared, and that in effect the -- there had
21   not been a court reporter, shockingly, but it
22   had been -- there was a tape of the Court
23   hearing, and that tape, we learned, was locked
24   up in the courtroom.  This was Sunday.  I'm
25   sure it was Sunday.  That tape was locked up
```

TSG Reporting - Worldwide    877-702-9580

Page 149

```
1              -Lewkow-
2    in the courtroom, in the courthouse, there was
3    no way to get access to it, and so there would
4    be no way to obtain a transcript.
5              There was some further discussion;
6    at different points different people joined
7    the discussion.  Still in the hallway.  All of
8    this took place in the hallway.  It may have
9    been a return to the hallway, but it again
10   happened in the hallway.
11             And among those who joined the
12   discussion, and there was more -- in fact, the
13   original discussion there may have been four
14   or five or six people, by then there were 10
15   or 12 people.  And included in the further
16   discussions were from the Barclays side, both
17   Michael Klein, I believe Archie Cox, I'm not
18   hundred percent sure and my partner Ed Rosen.
19             By then -- by some -- you know, was
20   it a second conversation or a third
21   conversation?  I cannot recall.  But at some
22   point we had -- "we" being the Barclays side
23   talked about --
24        Q.   You shouldn't tell me about that
25   conversation.
```

TSG Reporting - Worldwide    877-702-9580

Page 150

1      -Lewkow-
2      A.  I'm trying to figure out --
3          MR. MORAG:  There was a
4      communication.
5      A.   There was a communication about
6      what we had heard from Harvey Miller and/or
7      others from Weil Gotshal that I described in
8      my testimony, and that was discussed.
9          And putting aside the conversation
10     that I had with the Barclays representatives,
11     when we got back and the discussion that I'm
12     testifying to resumed with the other side, we
13     said, look, if there's no transcript, nobody
14     remembers precisely what he said.
15         And so until we can get a
16     transcript -- because she clearly had talked
17     about cash and there was, you know --  the
18     retained amount was not, was sort of cash that
19     was free and available and not tied up in
20     positions.  It was just cash that we had been
21     led to believe at the time of the Asset
22     Purchase Agreement was totally free cash that
23     they had somewhere, and that they were going
24     to transfer as part of the Purchased Assets.
25         And nobody knew precisely how

TSG Reporting - Worldwide     877-702-9580

Page 151

1      -Lewkow-
2      Ms. Fife had, in describing the changes from
3      the deal as reflected in the Asset Purchase
4      Agreement, how precisely she had put it in
5      describing those changes.  And she had clearly
6      indicated that that cash wasn't in -- wasn't
7      going to be in the deal but again, nobody knew
8      precisely what it was.
9          And so the alternative, since
10     nobody wanted to -- neither Weil Gotshal nor
11     Lehman nor Barclays nor the lawyers wanted to
12     do anything inconsistent with what the Court
13     had been told, there were two choices
14     available, which was to wait until Monday, get
15     a transcript and see what, in fact, she had
16     been told.  And then, if necessary, go back to
17     the Court.
18         There were three choices.  Just go
19     back to the Court Monday morning or find
20     another solution.  And the other solution was
21     the one that Barclays put on the table of
22     saying, okay, we will take just the securities
23     portion, 760-some-odd million in securities.
24     And in the course of that discussion, Michael
25     Klein said that if -- if for some reason you

TSG Reporting - Worldwide     877-702-9580

Page 152

1      -Lewkow-
2      can't --
3          And there was some conversation by
4      someone at Weil about do we -- do we need SEC
5      approval.  And Ed Rosen said no.  And they
6      said well -- they wanted to add language that
7      we had no problem with, something saying
8      "subject to applicable law," or something to
9      that nature that ended up in the Clarification
10     Letter.
11         And then Klein said, Look, if we --
12     you know, we're giving up this billion dollars
13     that we thought we were getting as of Friday
14     afternoon and we want to make sure we're
15     getting this 769 million in securities, and so
16     we want to add language that says -- again,
17     I'm paraphrasing, that if we can't get that,
18     you'll get us 769 million of securities of
19     some other securities.  That is my
20     recollection.
21     Q.  By the time of the conversation
22     with Mr. Miller on either Sunday night or
23     Monday morning concerning whether anyone
24     thought there were any aspects of the
25     Clarification Letter that required going back

TSG Reporting - Worldwide     877-702-9580

Page 153

1      -Lewkow-
2      to the Court, had anybody seen a transcript by
3      then?
4      A.  No.
5      Q.  Had anybody heard the tape by then?
6      A.  No.
7      Q.  Was there any discussion on Monday
8      before the closing concluded of getting the
9      transcript or the tape to make sure the
10     Clarification Letter was consistent with the
11     Court's limitations or instructions?
12         MR. MORAG:  Object to the form.
13     A.   There was no -- to my recollection,
14     there was no discussion of that.  There was a
15     belief by all of the people that's discussed
16     that it was really important to get this deal
17     closed and announced before the market opened
18     Monday morning.  There was -- the market --
19     there had been press announcements that came
20     out after midnight Friday night that had been,
21     I believe, in the Saturday papers or Sunday
22     papers or both, that the Court had approved
23     the sale.
24         And both Lehman and Barclays
25     believed it was really important both from the

TSG Reporting - Worldwide     877-702-9580

## Page 154

1       -Lewkow-
2 financial markets perspective and from the
3 perspective of Barclays of keeping the Lehman
4 employees -- and I want to come back to the
5 Lehman employees in a second -- comfortable,
6 that they should hang around and that there
7 really was a deal. That there had been a real
8 hope -- you know, there had been -- I think
9 some of the press reports might have picked up
10 the concept from this.
11       I'm not sure of this, but I believe
12 at least some of the press reports from people
13 who had been in the courtroom had indicated
14 that the deal might close over the weekend or
15 would -- was expected to close over the
16 weekend.
17       And so there was great concern that
18 if, in fact, the markets opened Monday morning
19 and we had not announced a sale, that people
20 would have thought the deal was falling apart
21 or had fallen apart, was never going to
22 happen, or what the heck is the problem out
23 there. And in the markets that we lived in,
24 this was in the course of the days when the
25 papers were full of information talking about

TSG Reporting - Worldwide    877-702-9580

## Page 155

1       -Lewkow-
2 whether Morgan Stanley will go under? Will
3 Goldman Sachs go under? Will we be in a Great
4 Depression? That was the context in which
5 this conversation took place.
6       And there was a belief, as I said,
7 that the employees -- that this would be a
8 major problem if we didn't announce the deal
9 that we had closed by Monday morning before
10 the market opened.
11       I mentioned the employees. The
12 employees were very important to this deal.
13 Barclays was not -- you know, all of this
14 discussion we've had and this testimony has
15 been -- and I understand that, has been about
16 the financial assets. Barclays was not doing
17 this deal to buy a portfolio of financial
18 assets. Barclays was doing this deal because
19 it wanted to buy a broker-dealer investment
20 banking business in the United States and was
21 prepared to take very substantial risks in
22 their view in doing that.
23       And I say "very substantial risks"
24 not focusing particularly on the financial
25 assets but because of the fact that when

TSG Reporting - Worldwide    877-702-9580

## Page 156

1       -Lewkow-
2 people have bought investment banking firms in
3 the United States, they have often worked out
4 very badly.
5       Because it is not only what you pay
6 day one but it's can you make it work? Can
7 you get the employees to stay? Can you get
8 them integrated? Can you keep them happy so
9 as to create value for your shareholders? And
10 that's true in the best of days.
11       And I think of General Electric,
12 pretty savvy acquirers as people would think.
13 They had bought Kidder Peabody, spent a great
14 deal of money and then spent a lot more money
15 over the next X years trying to make it work
16 and had lost a zillion bucks. A zillion is --
17 I don't know. But they lost a lot of money.
18 And not just the money they invested but the
19 money they later put in to try to make it
20 work.
21       And that's what Barclays was
22 committing itself to do. So the reaction of
23 the employees and keeping the employees, in
24 particular the key employees comfortable that
25 they assumed -- and I think rightfully so, and

TSG Reporting - Worldwide    877-702-9580

## Page 157

1       -Lewkow-
2 they may have known it as a fact, I don't
3 know, but they assumed that really the
4 Barclays -- the best Barclays [sic] people,
5 the ones you most wanted to keep were getting
6 other inquiries from competitors during the
7 the days, during Monday, during the prior week
8 over that weekend, etcetera, and it was
9 important that we keep -- that Barclays be
10 able to keep the people together.
11       All of that went to the point that
12 the parties believed, both parties, that it
13 was really important to try to get this deal
14 announced before the beginning of the market
15 opening on Monday morning.
16    **Q. Was the concern about announcing**
17 **the closing of the deal before the opening of**
18 **the market on Monday morning, a factor in the**
19 **decision of the group as to whether or not to**
20 **bring the Clarification Letter back to the**
21 **judge?**
22    A. No.
23       MR. MORAG: Object to the form.
24    A. The question was, the Court had
25 approved the the Sale Order without the

TSG Reporting - Worldwide    877-702-9580

Page 158

```
1              -Lewkow-
2    Clarification Letter.  He knew he didn't have
3    the Clarification Letter.
4              So the only question that I
5    believed that Mr. -- the reason Mr. Miller
6    asked the question, I believe as I described,
7    was, Okay, what we're doing -- what we are
8    doing here in the Clarification Letter, is
9    it -- are we being consistent with what the
10   Court had approved?  Which turned on what the
11   Court had heard, and heard again on Wednesday,
12   on Friday in -- in the Asset Purchase
13   Agreement and the other information that the
14   Court had, and were we doing anything that was
15   inconsistent with that.
16             And this was why the question --
17   so, the question was, the Court clearly knew
18   that he didn't have to see the Clarification
19   Letter.  The question is had something
20   happened that was inconsistent with what he
21   had been told that would change that plan.  He
22   expected us to close over the weekend.  That
23   was what was talked about on Friday.
24             So the only reason we would have to
25   go back is if something had changed that made
```

TSG Reporting - Worldwide   877-702-9580

Page 159

```
1              -Lewkow-
2    it not be -- made a change that was
3    inconsistent with what he had been told.  It
4    was for that reason in the prior conversation
5    that there was uncertainty because we weren't
6    sure what he had said about that to the extent
7    it might or might not affect the ability to
8    deliver the cash in that bank account that I
9    mentioned that was part of the assets of the
10   15c3-3 account, that since we weren't sure on
11   that issue, that would have raised the problem
12   that I testified about.
13             But that was the only time that
14   there was any discussion of going back.  And
15   even there, the concept was, how do we --
16   Barclays gave up in its mind a billion dollars
17   because it was important to get the deal
18   closed on Monday morning.
19             MR. GAFFEY:  I don't have anything
20   further.
21             Thanks.  Thanks for your time,
22   Mr. Lewkow.
23             THE WITNESS:  Can we take a break?
24             (Whereupon, a recess was taken
25   from 2:41 p.m. to 2:52 p.m. )
```

TSG Reporting - Worldwide   877-702-9580

Page 160

```
1              -Lewkow-
2    EXAMINATION BY
3    MR. MAGUIRE:
4        Q.  Mr. Lewkow, as you know, my name is
5    Bill Maguire, I represent the SIPA Trustee.
6    Before we start with questions, your counsel
7    is going to put on the record the topics you
8    have been designated as representative today.
9             MR. MORAG:  As I think we confirmed
10   to you separately, Mr. Lewkow and
11   Mr. Rosen together are responding to
12   the 30(b)(6) deposition notice served
13   on Cleary Gottlieb and they have
14   separately been subpoenaed for their
15   own personal deposition, which you now
16   have agreed to complete Mr. Lewkow's
17   personal deposition along with his
18   share of the 30(b)(6).
19             With respect to 30(b)(6), the
20   easiest way for me to explain it is
21   that Mr. Rosen is addressing issues
22   relating to the DTC, OCC, and the terms
23   of the Clarification Letter relating to
24   exchange-traded derivatives.
25             To the extent there may be overlap
```

TSG Reporting - Worldwide   877-702-9580

Page 161

```
1              -Lewkow-
2    with respect to the 15c3-3 issue, then
3    they're both designated.
4             I think you know from the
5    declaration, Mr. Rosen is a market
6    regulation person and Vic is the
7    mergers and acquisition.
8             That may not be the precise answer,
9    but if you have any question, you
10   should certainly ask them of
11   Mr. Lewkow.  If it's Ed, he will tell
12   you.
13             MR. MAGUIRE:  Thank you.
14   BY MR. MAGUIRE:
15       Q.  Sir, you have seen in the course of
16   today a number of drafts of the deal document,
17   many of them with the black lining or red
18   lining convention.
19             What was the practice in terms of
20   the Cleary team dealing with the Weil team and
21   the other parties in the course of negotiating
22   first the APA and then exchanging drafts in
23   connection with the Clarification Letter?
24             MR. MORAG:  Objection to form.
25   Vague as to "practice".
```

TSG Reporting - Worldwide   877-702-9580

1         -Lewkow-
2 protection that the rule is aimed at doing.
3      I don't know if I would use the
4 word you used, but I recognized that there
5 were regulatory implications about the ability
6 to take the money out that were tied to the
7 accounts of the customers who were being
8 directly or indirectly -- I'm not sure the
9 details of how it works -- to provide some
10 level of effort to the customers and clients.
11     Q.  Was there a discussion of the
12 regulatory constraints on Lehman in releasing
13 funds from its c3 account?
14     A.  As I testified this morning, I
15 believe that when the discussion took place,
16 somebody from Weil -- none of the Weil people
17 were experts at all on 15c3-3 accounts as they
18 all said at the time.  One of them made that
19 point.  And on our side, we did have someone
20 who did have real expertise, Ed Rosen, who was
21 participating at least by the latter stages in
22 discussions.  So somebody from Weil had raised
23 the question of, "Gee, as far as we at Weil
24 know, maybe we need approval from the SEC to
25 do this.  And Rosen said, "You don't need

1         -Lewkow-
2 approval to do it, there is no approval
3 requirement."
4     And they said, "Well, this is an
5 account that we gather -- you know, we know is
6 required as a regulatory matter.  Let's at
7 least say --" they may have proposed saying,
8 you know, "subject to SEC approval," I don't
9 remember if they used those words.
10     And Ed said, "No, that's wrong
11 because there is no need for SEC approval."
12 And they said, "Can we say something like
13 'subject to applicable law'?"  Or something
14 like that.  And since we tried to comply with
15 the SEC laws and rules, Ed did not object to
16 that, and language to that effect went into
17 the document.
18     Q.  Did anyone explain that only an
19 amount in excess of a c3 calculation is
20 permitted to be removed from such a restricted
21 account?
22     MR. MORAG:  Objection to form.
23     Answer with respect to anything you
24 were told from the Lehman side.
25     A.  I believe that 15 -- as I

1         -Lewkow-
2 understood 15c3-3 with total non-expertise, it
3 is a requirement that you maintain certain
4 reserves in a segregated account to protect
5 the interest of customers.  And I don't
6 recall -- I was aware certainly that basically
7 Barclays was assuming the accounts.  So I'm
8 not sure whether there was a difference
9 between an excess and a non-excess given that
10 I don't think Lehman, as a broker-dealer, was
11 going to continue to have customer accounts.
12 But that's all I can say on that subject.
13     Q.  In that hallway conversation,
14 Mr. Rosen did not say that only the excess
15 could be transferred?
16     MR. MORAG:  Is that a question?
17     MR. MAGUIRE:  Yes.
18     A.  I don't remember the word "excess."
19 You'll have to ask Mr. Rosen.
20     Q.  Did Mr. Rosen say anything about a
21 deficiency in the c3 account?
22     A.  There was no discussion of
23 deficiency of the c3 account.  Lehman Brothers
24 on Friday -- I was told that Lehman Brothers
25 on Friday had identified this account as

1         -Lewkow-
2 assets that consistent with the Asset Purchase
3 Agreement that required the delivery of all
4 assets used in the business other than
5 specifically excluded assets.  But they
6 identified this account for the first time on
7 Friday as assets that were Lehman, that Lehman
8 could deliver to Barclays as the purchaser.
9 And therefore, certainly no one had a
10 discussion of the deficiency.
11     Q.  Did anyone have any discussion
12 about a shortfall in customer property?
13     A.  I don't know what you mean by
14 "shortfall" as opposed to "deficiency."  To me
15 it sounds the same.  I don't -- no.
16     Q.  Did anyone discuss where Lehman
17 would get the property to pay Barclays if it
18 was unable, could not get approval, to remove
19 the funds from the c3 account?
20     A.  I think --
21     MR. MORAG:  Object to the form of
22 the question, to the word "funds."  I
23 think there has been testimony what was
24 agreed to be transferred was
25 securities.

Page 202

```
 1              -Lewkow-
 2      A.  As I testified earlier, in the
 3  course of this discussion, Mr. Klein said in
 4  words or in substance that, okay, we will take
 5  the billion dollars that are sitting in a bank
 6  in cash, deposited with the bank but we want
 7  to get the 760-odd million.  And if you can't
 8  get it there, we want to get it some other
 9  way.  And that's my recollection of the
10  discussion.
11      Q.  In the middle of Paragraph 20 of
12  your Declaration, page 10, after you referred
13  to Mr. Klein, you say, "This was agreed to by
14  representatives of Lehman."  Do you see that?
15      A.  Yes.
16      Q.  What do you mean by "this"?
17      A.  That if the lead -- if there were
18  legal constraints preventing transfer of the
19  rule 15c3-3 account assets, Barclays would
20  receive substitute assets.
21      Q.  And who were the Lehman
22  representatives who agreed to that?
23      A.  At a minimum, it included the Weil
24  group that was standing there.  I don't know
25  what authority they had.  As I said, this took
```
TSG Reporting - Worldwide    877-702-9580

Page 203

```
 1              -Lewkow-
 2  place over a couple of conversations, I think.
 3  At a minimum, it included them.
 4      I actually believed that somebody
 5  from Lehman may have been with them during
 6  this discussion, but I don't have a distinct
 7  recollection of that.  As I said, the group
 8  had gotten larger during the course of these
 9  two or three hallway conversations.  But I --
10  you know, certainly I leave it to Weil
11  Gotshal.
12      You know, I have enormous respect
13  for Mr. Miller and Mr. Roberts and Ms. Fife
14  and the other lawyers, and Mr. Masaneo, and
15  the other lawyers who were there doing their
16  best to represent their clients.  They know
17  what things they need to go back to and not go
18  back to.
19      So if there was no one from Lehman
20  Brothers there -- I just don't recall if
21  someone from Lehman was there at that moment
22  or not.  But Lehman -- Lehman's counsel -- and
23  there may have been somebody from Simpson
24  Thacher there as well.  May well have been.
25      Lehman's counsel agreed to it.  And
```
TSG Reporting - Worldwide    877-702-9580

Page 204

```
 1              -Lewkow-
 2  then it went -- later in the day it got into a
 3  draft.  So certainly I don't know what
 4  kind -- if Lehman people were not present at
 5  that moment, I assume Weil either had
 6  authority or obtained authority to include
 7  that in.  But you'll have to ask them.
 8      Q.  How did Mr. Miller signify his
 9  agreement to this?
10      A.  He said -- somebody from Weil said,
11  okay, or yes, or that's not a problem.  I
12  don't know what words he used.
13      Q.  Who was the person from Weil who
14  said one of those variety of comments?
15      A.  I don't -- I don't remember.
16      Q.  And did you understand that person
17  from Weil to be agreeing that Barclays would
18  get $769 million unconditionally as part of
19  the sale as opposed to simply agreeing to the
20  inclusion of the language proposed "to the
21  extent permitted by applicable law"?
22      A.  No, I think the phrase -- my
23  understanding at the time and I think what we
24  were all talking about was my understanding
25  was the reason "to the extent permitted by
```
TSG Reporting - Worldwide    877-702-9580

Page 205

```
 1              -Lewkow-
 2  applicable law" or words of that nature were
 3  going to get added to the language was because
 4  of the technical rules governing 15c3-3 that
 5  the Weil lawyers had conceded they were not
 6  experts on.
 7      I had absolutely no expectation,
 8  and it was never suggested, to my
 9  recollection, that the limitation "to the
10  extent permitted by applicable law" was a
11  limitation on the broader statement: if we
12  can't transfer that, we will transfer
13  something else.  That was not my
14  understanding.
15      Q.  Did you do anything to confirm your
16  understanding that when Weil, somebody at Weil
17  said "okay" or "yes," they were agreeing to
18  make this obligation unconditional as opposed
19  to simply agreeing to the inclusion of the
20  language proposed "to the extent permitted by
21  applicable law"?
22      A.  The language was drafted to reflect
23  the conversation that took place in the
24  hallway and was included in the Clarification
25  Letter.  I believe there is nothing else to
```
TSG Reporting - Worldwide    877-702-9580

Page 206

```
 1              -Lewkow-
 2   say.  People agreed to a principle, it got
 3   reflected in the Clarification Letter.
 4        Q.  A couple of lines down in your
 5   Declaration, you refer to some other language,
 6   it's the phrase you referred to "are
 7   securities of substantially the same nature
 8   and value."  Do you see that?
 9        A.  Yes.
10        Q.  Who proposed that language?
11        A.  I described the agreement, the oral
12   agreement that was reached in the hallway.  It
13   was then left to the folks focusing on pushing
14   the paper forward on the Clarification Letter,
15   which included both Cleary folks and Weil
16   folks and there were others involved, or at
17   least in the room at some time during that
18   conversation.
19           And I believe that somebody did a
20   first version of it that referred to -- of the
21   same nature and didn't include "and value."
22   And then someone on the Barclays' team said,
23   "Well, that doesn't work because that
24   wouldn't -- what does that mean?"  So the
25   words "and value" got put in.
```

TSG Reporting - Worldwide   877-702-9580

Page 207

```
 1              -Lewkow-
 2        Q.  Did anyone at Barclays go back and
 3   ask anyone at Weil what that meant?
 4        A.  What what meant, sorry?
 5        Q.  The words "are securities of
 6   substantially the same nature"; what was meant
 7   by that language?
 8        A.  With all due respect, when people
 9   are trying to write a document and trying to
10   get a deal done under incredibly difficult
11   circumstances and somebody writes a language
12   that on its face does not work to solve the
13   problem that had been discussed and agreed to
14   on all matters by people to solve a problem,
15   and it was obvious that to say "the same
16   nature" could mean one dollar worth of
17   securities, that would have been an idiotic
18   remark.
19           We had no reason to believe that
20   Weil was trying to sabotage the deal that
21   their colleagues had agreed to.  And so to my
22   understanding, someone said, "You got to add
23   the word 'and value'," and they said "Of
24   course," and it happened.
25        Q.  From whom did you get that
```

TSG Reporting - Worldwide   877-702-9580

Page 208

```
 1              -Lewkow-
 2   understanding?
 3        A.  From my colleagues, Mr. Davis,
 4   Mr. McLaughlin and Mr. Leinwand and one or
 5   more of that group.
 6           MR. HUME:  Can we take a short
 7   break?
 8           THE WITNESS:  Yes, I can use a
 9   bathroom break.  Thank you.
10           (Whereupon, a recess was taken
11   from 3:58 p.m. to 4:24 p.m.)
12   BY MR. MAGUIRE:
13        Q.  Sir, over the course of the weekend
14   prior to closing, did you participate in any
15   meetings with the Creditors Committee?
16        A.  No.  Let me add to that.  That
17   isn't to say that one or more members of the
18   Creditors Committee may have been present when
19   meetings took place.  But I certainly did not
20   have any -- to my knowledge, any particular
21   meetings with the Creditors Committee.
22        Q.  Let me show you a document that's
23   previously been marked as Exhibit 451.
24        A.  I got it.
25        Q.  Do you recognize that document,
```

TSG Reporting - Worldwide   877-702-9580

Page 209

```
 1              -Lewkow-
 2   sir?
 3        A.  Yes.
 4        Q.  What is it?
 5        A.  This looks like, and this is the
 6   document, I'm quite sure, that I was shown and
 7   you asked me about before.  This is the
 8   letter -- the internal Lehman Brothers' e-mail
 9   that I was shown that Sunday by Weil Gotshal
10   with respect to the 15c3-3 reserve account.
11        Q.  And you mentioned that a bank had a
12   billion dollars of cash.  Are you referring to
13   the cash with Wells Fargo?
14        A.  Yes.  On deposit with Wells Fargo.
15        Q.  So you understand this was, taking
16   the billion dollars in cash out of the
17   transaction left $769 million in qualified
18   securities?
19        A.  Yes.
20        Q.  And that was in the subject of the
21   provision that was put in the Clarification
22   Letter?
23        A.  Yes.
24        Q.  You'll see the reference here to
25   Mike Macchiaroli?
```

TSG Reporting - Worldwide   877-702-9580

## Page 226

```
 1            -Lewkow-
 2   recall anyone suggesting that.
 3            MR. HUME:  Do you want to take a
 4       short break?
 5            MR. MAGUIRE:  Sure.
 6            (Whereupon, a recess was taken
 7       from 4:50 p.m. to 5:01 p.m.)
 8            MR. MAGUIRE:  Sir, I have no
 9       further questions, thank you.
10   EXAMINATION BY
11   MR. HUME:
12       Q.  Mr. Lewkow, I'm Hamish Hume and I'm
13   here representing Barclays, as you know.  I
14   just wanted to make sure one thing on the
15   record is clear.
16       On page 197 of the rough transcript
17   we are looking at, you were asked a question
18   by counsel for the Trustee.  This was
19   referring to the conversation you testified to
20   with Weil Gotshal about the $769 million in
21   securities.
22       The question was: "And did you
23   understand that person from Weil to be
24   agreeing that Barclays would get $769 million
25   unconditionally as part of the sale as opposed
```
TSG Reporting - Worldwide    877-702-9580

## Page 227

```
 1            -Lewkow-
 2   to simply agreeing to the inclusion of the
 3   language proposed 'to the extent permitted by
 4   applicable law'?"
 5       Your answer was "No," and then you
 6   went on with an explanation.
 7       Let me just make sure the record is
 8   clear in terms of the "yes" and the "no" of
 9   that question.
10       Was it your understanding from your
11   conversation with Weil Gotshal that you
12   referenced relating to the $769 million in
13   securities, that Barclays did have an
14   unconditional right to receive those assets?
15       A.  Yes.  The question, with all due
16   respect, was ambiguous, because I was offered
17   a choice, was I agreeing -- was the Lehman
18   person agreeing unconditionally to pay or
19   agreeing -- "simply agreeing," was your term,
20   to the inclusion of language "to the extent
21   permitted by applicable law."  That was a
22   choice.  And I started with "no."  My "no" was
23   addressed to the end of your question, that it
24   was not merely "to the extent permitted by
25   applicable law."
```
TSG Reporting - Worldwide    877-702-9580

## Page 228

```
 1            -Lewkow-
 2       It was, as I explained in the rest
 3   of my answer, the discussion of "the
 4   applicable law," as I understood what the
 5   individual was saying on behalf of Lehman, was
 6   merely to 15c3-3 and not to the concept that
 7   if that were not payable, there would be an
 8   unconditional obligation to deliver the
 9   securities some other way.
10       MR. HUME:  I have no other
11   questions.
12       MR. MAGUIRE:  Nothing further.
13       (Time noted:  5:05 p.m.)
14
15
16       _____
17
18       VICTOR I. LEWKOW
19
20
21   Subscribed and sworn to before me,
22   this _____ day _____ of 2010.
23
24   _____
25       Notary Public
```
TSG Reporting - Worldwide    877-702-9580

## Page 229

```
 1   ------------------I N D E X------------------
 2   WITNESS        EXAMINATION BY        PAGE
 3   V. LEWKOW       MR. GAFFEY           5
 4                   MR. MAGUIRE        160
 5                   MR. HUME           226
 6
 7   DIRECTIONS: PAGE  79, 134, 185
 8   MOTIONS:   [None]
 9   REQUEST:   [None]
10
11   ----------------EXHIBITS--------------------
12   EXHIBIT                 FOR I.D.
13   Exhibit 613A            6
14   Declaration of Victor Lewkow
15
16   Exhibit 614A            135
17   Letter from S&C, CGSH
18   00020701-20714
19
20   Exhibit, 615A           195
21   2PP 9/18/08 e-mail from J.
22   Potenciano to distribution re:
23   Preliminary 15c3-3 reserve lock-up
24   as of 9/17/08
25
```
TSG Reporting - Worldwide    877-702-9580

Page 1

1

2         UNITED STATES BANKRUPTCY COURT

3         SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

                   Debtors.

10

     ----------------------x

11

12

13

14         DEPOSITION OF MARTY MALLOY

15            New York, New York

16            March 1, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 28684

## Page 6

M. Malloy

1  prefer, if there's a question pending, that we
2  get an answer to the question before we take the
3  break.  But beyond that, just speak right up if
4  you want to take break.
5        I have a habit of speaking quickly,
6  and if I start to speed up too much, and that
7  refers to rule number 1, if you don't understand
8  a question, if our friend, the court reporter,
9  doesn't tell me, you should.
10     A.   Okay.
11     Q.   Okay?
12         You are employed as a managing
13  director at Barclays Capital, Inc.; is that
14  correct?
15     A.   That is correct.
16     Q.   Can you give me a more specific
17  explanation of your duties and responsibilities?
18     A.   I'm the Global Head of Prime
19  Brokerage Group at Barclays, which cuts across
20  Equities, Fixed Income and FX.
21     Q.   And briefly, sir, could you describe
22  for me what your -- what are your duties and
23  responsibilities in that job?
24     A.   I'm responsible for the delivery of

## Page 7

M. Malloy

1  the overall platform and the products that we
2  use within Prime Services, and I'm responsible
3  for the client servicing aspects of the
4  business.  So everything essentially after the
5  trade.
6      Q.   And does anything within the scope of
7  your duties and responsibilities as Global Head
8  of Prime Brokerage require you to analyze or
9  apply values to securities?
10         MR. GREEN:  Object to the form.
11         You may answer.
12     A.   Not directly.  Not directly in this
13  role.
14     Q.   Indirectly?
15     A.   Indirectly.
16     Q.   Okay.  And how does that come across
17  your screen indirectly?
18     A.   If, within the Client Service Group,
19  if there is a dispute with a margin call, we
20  could get involved in working with the different
21  departments on a valuation.
22     Q.   And when you say "working with the
23  different departments," do I understand
24  correctly you would essentially -- you might be

## Page 8

M. Malloy

1  the customer interface, but you would go to
2  another department within Barclays to get the
3  valuations done?
4          MR. GREEN:  Objection to the form.
5      A.   That's correct.  The trading desk.
6      Q.   Okay.  And how long have you held the
7  post of Global Head of Prime Brokerage at
8  Barclays?
9      A.   Since spring of 2008.
10     Q.   How long have you worked at Barclays?
11     A.   Eleven years.
12     Q.   Now, I've premarked as Exhibit 658C a
13  copy of a declaration that has been submitted in
14  this action by Barclays.  Do you recognize the
15  document, sir?
16     A.   I do.
17     Q.   I take it that's your signature at the
18  end of the declaration?
19     A.   It is.
20     Q.   And you have reviewed the declaration
21  before you signed it?
22     A.   Yes.
23     Q.   And to your knowledge, the contents of
24  the declaration are true and correct?

## Page 9

M. Malloy

1      A.   Yes.
2      Q.   Did you participate in the drafting of
3  it, the writing of it?
4      A.   The formation of it, yes.
5      Q.   The actual words in the declaration?
6      A.   I reviewed the words in the sentences,
7  yes.
8      Q.   But a draft was prepared for you, you
9  reviewed it for accuracy, and you'll stand
10  behind the accuracy of your declaration?
11     A.   Yes.
12     Q.   Now, the declaration recites that you
13  had read paragraph 92 of a certain motion, the
14  Debtors' Motion For An Order, et cetera, et
15  cetera, correct?
16     A.   (Witness nods.)  Yes.
17     Q.   That was the other instruction I
18  should have given you.  You have to give your
19  answers out loud, please.
20         Did you review anything in the motion
21  papers other than paragraph 92?
22         MR. GREEN:  Object to the form.
23     A.   No.
24     Q.   And paragraph 92 of your declaration

Page 10

M. Malloy

1  recites, refers to a particular document
2  previously marked as Exhibit 144A.  Do you see
3  that?
4       MR. GREEN:  Do you understand the
5  question?
6    Q.  Take a look at paragraph 2 of your
7  declaration.
8       MR. GREEN:  You might want him to
9  restate the question so you understand.
10   A.  Can I just see the Exhibit 144A?
11   Q.  Sure.  I'm about to hand it to you.
12 Let's do it that way.
13       I'm giving you a copy of what's
14 previously been marked as Deposition Exhibit
15 144A.
16      MR. GREEN:  Thank you, Bob.
17   Q.  My question, Mr. Malloy, is that
18 document 144A the same document that's referred
19 to in paragraph 2 of your declaration?
20   A.  Yes, it is.
21   Q.  Okay.  And Deposition Exhibit 144A
22 contains an e-mail from you to, among others,
23 Gerard LaRocca.  Do you see that?
24   A.  Yes, I do.

Page 11

M. Malloy

1    Q.  Can you explain for me, Mr. Malloy,
2  the circumstances under which you came to draft
3  the e-mail that is marked as Exhibit 144A?
4       MR. GREEN:  Object to the form.
5    A.  Sure.  I was involved in the
6  collateral transfer of the Fed repo the previous
7  day on that Thursday, and on Friday morning,
8  essentially all the collateral did not move that
9  Thursday night, so we were trying to ascertain
10 essentially midday what additional potential
11 collateral actually moved over because we were
12 short $7 billion that particular night.
13      So this e-mail was an estimate based
14 on the only information that we had available at
15 the time, which was the Bank of New York
16 statements, but the collateral itself was not
17 reconciled until several days later and the
18 valuations of the collateral weren't verified
19 until several days later as well.
20   Q.  Well, who asked you to put the e-mail
21 together?
22   A.  I recollect Gerard.
23   Q.  And was it Gerard LaRocca who had put
24 you in charge of that task that you just

Page 12

M. Malloy

1  described?
2       MR. GREEN:  Object to the form.
3    A.  Not necessarily in charge.  I got
4  my -- I understand how some of these things work
5  and I got involved in trying to help because of
6  the, quite frankly, unique nature of this
7  particular transfer.  So I got involved as far
8  as helping to get some of this collateral moved.
9    Q.  Who asked you to get involved?
10   A.  No one specifically.  No one
11 specifically asked me to get involved.  Just my
12 background in these matters, I was a useful
13 resource to the group.
14   Q.  And you referred to some Bank of New
15 York statements that you had when you prepared
16 Exhibit 144A?
17   A.  Yes.  I did not have those statements.
18 I got that information from our Securities
19 Operations Group.
20   Q.  Who in the Securities Operations Group
21 sent you that information?
22       MR. GREEN:  Object to the form.
23   A.  I believe it was Keith.  His surname
24 alludes me.  Keith in Collateral Management.

Page 13

M. Malloy

1
2  INFORMATION TO BE PROVIDED: _____
3    Q.  If at some point Keith's last name
4  comes to you during the deposition, let me know.
5  And we'll leave a blank in the transcript to be
6  filled in, if that's okay.
7    A.  Understood.
8    Q.  Did Keith send you Bank of New York
9  statements?
10   A.  During the course of that week, yes,
11 at different times as we tried to reconcile
12 things.
13   Q.  Okay.  Can you describe those
14 statements to me?  What did they look like?
15   A.  The statements normally come out in
16 kind of a bulk form.  It has the name of the
17 security, the Cusip, the nominal amount and the
18 price are the normal key pieces of information.
19   Q.  Do you know if the Bank of New York
20 statements that you had access to when you
21 prepared 144A are still in existence?
22       MR. GREEN:  Object to the form of the
23 question.
24   A.  I don't know offhand.
25   Q.  When was the last time you saw them?

Page 18

M. Malloy

1            M. Malloy
2   Group.
3        Q.   And was that Keith who gave you the
4   verbal notionals?
5        A.   As I recall, yes.
6        Q.   And was he present with you when he
7   gave you the verbal notionals, or was it by
8   phone?
9        A.   It was by phone.
10        Q.   Do you recall if he sent you any
11   e-mails or any other written communication
12   concerning the notionals?
13        A.   To produce this statement?
14        Q.   Yes.
15        A.   No, as I recall, it was all by phone
16   because it was -- it was a very tight timeframe.
17   I think the e-mail went out in the midmorning or
18   early afternoon.
19        Q.   Now, in paragraph 3 of your
20   declaration, would you take a look -- why don't
21   you take a minute and read through that
22   paragraph to yourself.
23            (Document review.)
24        Q.   Have you had a chance to do that?
25        A.   Yes.

Page 19

M. Malloy

1            M. Malloy
2        Q.   You say in paragraph 3, "Rather, I was
3   simply reporting to Mr. LaRocca the nominal
4   value BONY had assigned to the collateral it had
5   received in connection with the September 18,
6   2008 repo transaction."
7            Do you see that sentence?
8        A.   I do.
9        Q.   I know everybody was busy that week,
10   but was that the purpose of your task in
11   preparing 144A, to give that information to Mr.
12   LaRocca?
13            MR. GREEN:  Object to the form.
14        A.   Yes, it was.  The purpose of this was
15   to see how much additional collateral we got in
16   that Friday morning because of the shortfall the
17   Thursday night.  That was the purpose of the
18   e-mail.
19        Q.   And in the next sentence of paragraph
20   3, you say you were "referring to a BONY
21   document" that you had received "shortly
22   before."  Do you see that?
23        A.   Yes.
24        Q.   What was the BONY document you were
25   referring to in your declaration?

Page 20

M. Malloy

1            M. Malloy
2        A.   We had received BONY documents during
3   that previous day in order to look at the
4   valuations, and then I called the collateral
5   operations managers those Fridays to get the
6   latest information.
7        Q.   So when you prepared 144A, you
8   extracted figures from the BONY document, as you
9   say in your declaration, but also you extracted
10   relevant figures from your verbal communications
11   with others?
12            MR. GREEN:  Object.
13        Q.   Correct?
14        A.   Correct.
15            MR. GREEN:  Object to the form.
16        Q.   And the verbal communication that you
17   had with others, did they give you information
18   that was different from that available to you in
19   the BONY document you referring to in your
20   declaration?
21            MR. GREEN:  Object to the form.
22            Do you remember?
23            THE WITNESS:  Well, yes, because the
24   collateral had changed.  We got additional
25   collateral in on that Friday.

Page 21

M. Malloy

1            M. Malloy
2        Q.   So in paragraph 3 of your declaration
3   where you say, "Referring to a BONY document I
4   had received shortly before, I extracted the
5   relevant figures and performed some mathematical
6   calculations adding up the numbers provided by
7   BONY and subtracting the $45 million that
8   Barclays had advanced," in addition to what you
9   described there, the calculations you did were
10   also dependent on other information; is that
11   right?
12            MR. GREEN:  Object to the form.
13        A.   Specifically, I started with the
14   valuations from the Thursday night.
15        Q.   Yes.
16        A.   And then updated it with the Friday's
17   figures, the BONY statements from the Thursday
18   night which we had received, which was a day
19   old, and then the Friday valuations.
20        Q.   And the Friday valuations you
21   understood also to be derived from BONY
22   valuations, correct?
23        A.   Yes.
24        Q.   They were not the result of any
25   internal valuation done by Barclays personnel?

M. Malloy

1
2    A.   No.
3    Q.   So the calculations that you prepared
4  in Exhibit 144A derive entirely from BONY's
5  marks, correct?
6    A.   That is correct.
7    Q.   And you took the information you had
8  about the BONY marks and you put together a
9  calculation of what you describe in your e-mail
10 as excess collateral; is that right?
11       MR. GREEN:  Object to the form.
12   A.   In the e-mail, yes.
13   Q.   And the excess collateral, the number
14 on paragraph 144A is 7.19; that's billions,
15 correct?
16   A.   That number is in billions.
17   Q.   And so the calculations that you
18 performed or the calculations you put together
19 based on the BONY marks indicated there was
20 excess collateral of 7.19 billion in the repo,
21 correct?
22       MR. GREEN:  Object to the form.
23   A.   Based on the BONY marks, but the other
24 issue that we had is none of this collateral was
25 reconciled, so this was the best estimate that

M. Malloy

1
2  we had at that point in time.
3    Q.   I would be grateful if I could just
4  have an answer to the question I actually asked,
5  which is the calculations that you put in
6  Exhibit 144A were based solely on BONY marks,
7  correct?
8    A.   Correct.
9    Q.   And the calculations you did in 144A
10 based solely on BONY markets indicated excess
11 collateral of 7.19 billion, correct?
12       MR. GREEN:  Object to the form.
13   A.   Yes.
14   Q.   And you transmitted that information
15 about excess collateral of 7.19 billion,
16 according to the BONY marks, to Messieurs
17 LaRocca and King, correct?
18   A.   Yes.
19   Q.   And you refer in your e-mail to a
20 spreadsheet, "I will send Jackie a spreadsheet
21 as well for Gerard," do you see that?
22   A.   I do.
23   Q.   Did you prepare such a spreadsheet?
24   A.   As I recall, yes.
25   Q.   Do you know if it still exists?

M. Malloy

1
2    A.   I don't know.
3    Q.   Okay.  When was the last time you saw
4  that spreadsheet?
5    A.   That Friday.
6    Q.   Did you transmit that spreadsheet by
7  e-mail or by some other mechanism?
8    A.   I believe by e-mail.
9    Q.   And who was the Jackie you refer to in
10 that sentence?
11   A.   It was the -- Jackie Stanley.
12   Q.   And what was Jackie Stanley's job?
13   A.   She's an administrative assistant.
14   Q.   And do you know if Jackie has a copy
15 of the spreadsheet that you refer to here?
16       MR. GREEN:  Object to the form.
17   A.   I don't know.
18       MR. GAFFEY:  Again, Chris, I don't
19 think that spreadsheet has been produced, so
20 I would make the same request for its
21 production.
22   Q.   Now, do you know if the -- well, you
23 performed no independent valuation of the
24 collateral in the repo at this point, correct?
25   A.   That's correct.

M. Malloy

1
2    Q.   Were you involved thereafter in any
3  independent valuation of the collateral in the
4  repo?
5    A.   No.
6    Q.   Do you know if at some point after you
7  prepared your e-mail there was an independent
8  valuation of the collateral in the repo
9  performed?
10   A.   I don't know firsthand, but as a -- as
11 a business issue, you get independent marks for
12 your collateral.
13   Q.   So when you take collateral in, after
14 you've got it, after you own it, you figure out
15 what it's worth, right?
16   A.   Yes.
17   Q.   When you take the collateral in out of
18 a repo, do you take it in at those marks and
19 then figure out an independent valuation later?
20       MR. GREEN:  Object to the form.
21   A.   No, because when you -- when you book
22 the collateral, you have your own pricing
23 mechanism.  You don't use the Bank of New York
24 marks.
25   Q.   Do you know when Barclays booked the

M. Malloy

1  valuation of the collateral is it comes in
2  marked by the collateral agent, correct?
3         MR. GREEN:  Object to the form.
4      A.   No.
5      Q.   Why does BONY put marks on it at all?
6      A.   Because you need some reference to say
7  what they show is the value of the overall
8  collateral, you need some piece, but when we
9  book it in our systems, you have a separate
10 process that goes through what that valuation
11 is.
12     Q.   Describe that process to me, please.
13     A.   It would change depending upon the
14 different trading desks.  So, once you book the
15 collateral, there's different hierarchy
16 processes that you use to validate a position.
17 You can get different pricing fees versus
18 different traders that would be marking it.
19     Q.   And again, forgive me if I'm going
20 over some old ground, but I want some clarity.
21 When you say "once you book the collateral," I
22 want to go back to something I asked you a
23 moment ago.  When the collateral arrives, is it
24 booked?

M. Malloy

1      A.   No.
2         MR. GREEN:  Object to the form.
3      Q.   So does the valuation take place
4  before or after you book the collateral?
5      A.   The valuation --
6         MR. GREEN:  Object to the form.
7      A.   -- takes place after you book the
8  collateral.
9      Q.   And this independent valuation, tell
10 me what happens.  Do they look at the BONY marks
11 and determine whether they're right or wrong, or
12 is it a from-the-ground-up valuation?
13        MR. GREEN:  Object to the form.
14     A.   It's normally done as a ground-up
15 within your individual systems because the marks
16 that you use for your collateral is similar to
17 all the positions that you have at the firm.
18     Q.   And when Barclays is engaged in
19 Repurchase Agreements and BONY is the custodial
20 agent, one of BONY's tasks, one its jobs is to
21 apply a value to the assets in the repo,
22 correct?
23        MR. GREEN:  Object to the form.
24     A.   On the BONY systems, yes.

M. Malloy

1      Q.   Okay.  That's a service that BONY
2  provides to Barclays as its collateral agent,
3  correct?
4      A.   As I understand the process, we don't
5  use the BONY pricings in our collateral
6  valuation processes.  We use independent.
7      Q.   Who within Barclays is the person with
8  direct knowledge of that topic?
9         MR. GREEN:  Object to the form.
10     Q.   I just take note you qualified by
11 saying "as I understand it."  So I'll give you a
12 chance to shorten your deposition.  Who would
13 you ask that question of?
14        MR. GREEN:  What is the question?  I'm
15 sorry.
16     Q.   Who would you ask?
17        MR. GREEN:  Ask what?
18     A.   The valuations?
19     Q.   Yes.
20     A.   It depends on each one of the trading
21 desks because each product is a little bit
22 different.  So, for example, if you're working
23 with equities, it's a lot simpler because you
24 can look at a closing price on an exchange.  If

M. Malloy

1  you're looking at more esoteric bonds and credit
2  bonds, each process is different because
3  different people use different pricing sources
4  and then ultimately trader marks, if need be,
5  because their price is one thing, but the
6  liquidity is another, meaning if it's a larger
7  bond or a smaller bond.  So I'm not trying to
8  avoid the question.
9      Q.   No, I know.
10     A.   It's different people depending on the
11 asset class.
12     Q.   In that sort of latter category where
13 it's a little more complicated to figure out,
14 that takes some period of time, right?
15        MR. GREEN:  Object to form.
16     A.   Depending upon the collateral.
17     Q.   And during the time it takes to
18 perform that collateral valuation, how is the
19 collateral shown on Barclays' books?
20        MR. GREEN:  Object to the form.
21     A.   It will come -- it'll have a hierarchy
22 within Barclays.  It will assign a price in
23 there associated with the systematic process,
24 but it doesn't take into consideration, you

Page 34

M. Malloy

1
2  know, like I said, size or potential sale
3  prices.
4      Q.    And again, my question -- I think we
5  might be missing each other here.  It takes a
6  period of time, be it two days, three days, a
7  week, it takes a period of time for some
8  securities to be valued according to Barclays,
9  under Barclays' systems and procedures, correct?
10     A.    Yes.
11     Q.    That could take, for example, three
12 days, just -- yes?
13     A.    For a security, it's possible it could
14 take three days.
15     Q.    With that kind of security, when it
16 comes in the house, when it comes to Barclays
17 and it takes three days to value it, at what
18 value is it held on Barclays' books in that
19 three days?
20         MR. GREEN:  Object to the form.
21     A.    There will be a price in the system in
22 which to value that.  That price will be based
23 on Barclays' protocol of how the pricing regime
24 would work.
25     Q.    And does that pricing regime take into

Page 35

M. Malloy

1
2  account the marks applied by the collateral
3  agent?
4      A.    Typically, no.
5      Q.    Where is the initial price derived at?
6      A.    You get a number of different pricing
7  feeds, so you have some feeds that are more
8  focused on that particular asset class so some
9  feeds are better than others.  You know, some
10 securities it's not difficult because --
11 exchange-traded, for example.  So you'd using
12 the closing exchange price.
13     Q.    You get a hundred shares of Verizon,
14 you can check the price, right?
15     A.    Right.  The only thing you'd have to
16 look at that is if the position was large, you
17 might have to look at the particular price
18 because you couldn't liquidate such a larger
19 position, as an example.
20     Q.    Let me move from the general to the
21 specific.
22         With respect to the collateral that
23 was in this repo that we're talking about, that
24 is, the September 18 repo, do you know one way
25 or the other what the source was of the values

Page 36

M. Malloy

1
2  at which the collateral was initially posted to
3  Barclays' books?
4         MR. GREEN:  Object to the form.
5      A.    I don't.  I didn't book the
6  collateral.
7      Q.    Now, are you comfortable, sir, again,
8  with reference to Exhibit 144A -- not your
9  declaration, the other exhibit.
10     A.    Yes.
11     Q.    Are you comfortable that your e-mail
12 accurately depicts the values that were drawn
13 from the BONY information that you had?
14         MR. GREEN:  Object to the form.
15     Q.    You know what, that question is just
16 way too complicated.
17         Were you comfortable that your e-mail
18 was accurate when you sent it?
19         MR. GREEN:  Object to the form.
20     A.    As accurate as this e-mail could be at
21 12 o'clock on that Friday with collateral
22 moving, yes.
23     Q.    Now, if you go back to your
24 declaration, if you don't mind, and turn the
25 page to paragraph 4, you say in paragraph 4, "In

Page 37

M. Malloy

1
2  preparing that e-mail, I conducted no
3  independent valuation and made no effort to
4  validate BONY's numbers, which in any event I
5  believed to be a preliminary list."  Do you see
6  that sentence?
7      A.    I do.
8      Q.    Did anyone else at the time that you
9  prepared the e-mail, or in connection with
10 preparing the e-mail, had anyone else done an
11 independent valuation?
12     A.    I don't see how we could because all
13 of the collateral wasn't booked.
14     Q.    And in the next sentence of that
15 paragraph, you say that "many of the securities
16 to which BONY assigned nominal values were
17 highly illiquid and would have required
18 substantial analytical work to value
19 accurately."  Do you see that portion of the
20 sentence?
21     A.    I do.
22     Q.    Did you have any discussions with Mr.
23 LaRocca or Mr. King about that topic at the time
24 that you sent this e-mail?
25     A.    I remember discussing with Mr. LaRocca

Page 38

M. Malloy

1
2  as the securities came through that there was
3  corporate bond inventory in there, and corporate
4  bond valuations were very subject at that point,
5  they were very liquid.
6      Q.  Did you have any discussions with Mr.
7  LaRocca about any of the buckets of securities
8  that come over being large positions that would
9  have required some sort of liquidity discount?
10     MR. GREEN:  Object to the form.
11     A.  In the Fed transfer, not specifically,
12 no, not that I can recall.
13     Q.  Were there any particular corporate
14 bonds that you discussed with Mr. LaRocca that
15 would require closer analysis to arrive at a
16 valuation?
17     MR. GREEN:  Object to the form.
18     A.  No, it was more that asset class at
19 that point in time was under tremendous stress.
20     Q.  In any of --
21     A.  Unlike equities, which are more
22 liquid.
23     Q.  In any of your conversations with Mr.
24 LaRocca, did you talk about any particular, by
25 name, any particular of the securities in the

Page 39

M. Malloy

1
2  repo as opposed to talking about them by asset
3  class?
4      MR. GREEN:  Object to the form.
5      A.  In the Fed repo, not that I recall,
6  no.
7      Q.  Now, further into that sentence in
8  paragraph 4, that is, the second -- I'm sorry,
9  the third sentence in paragraph 4, you refer to
10 substantial analytical work and you say that was
11 "work that BONY had simply not had time to do."
12     What's the basis of that statement?
13 How do you know BONY didn't have time to do it?
14     A.  That was really more referring to the
15 getting us the accurate statements of everything
16 that was in there.  The only reason I know it
17 wasn't able to do was we didn't shut the whole
18 process till I think it was like 2 o'clock in
19 the morning, so all of the reporting didn't come
20 out -- until I think it was a couple hours out
21 of the normal end-of-day business.  It was two
22 hours delayed.
23     Q.  So when you refer in your declaration
24 to "work that BONY simply had not had time to
25 do," we should understand you to be referring to

Page 40

M. Malloy

1
2  the work of getting you the documents, getting
3  you the information?
4      MR. GREEN:  Object to the form.
5      Q.  As opposed to time to perform
6  valuations that were contained in that
7  information?
8      A.  Well, they're related.  If you don't
9  have all of the collateral in there, your
10 valuation is off.
11     Q.  Well, in that sentence you, again, in
12 the whole sentence, and I don't mean to break it
13 up, but -- let me read the whole thing into the
14 record:  "To the contrary, given that many of
15 the securities to which BONY assigned nominal
16 values were highly illiquid and have
17 required substantial analytical work to value
18 accurately -- work that BONY had simply not had
19 time to do -- I did not believe that the BONY
20 numbers represented an accurate assessment of
21 what the collateral was worth."
22     Do you see that?
23     A.  Yes.
24     Q.  When you put this in your declaration,
25 was that meant to be a statement about the

Page 41

M. Malloy

1
2  values that BONY assigned or, as I think you
3  have just described, BONY hadn't had time to get
4  you full collateral lists?
5      MR. GREEN:  Object to the form.  You
6  mischaracterized his testimony.
7      A.  This piece, when I was assigning the
8  nominal values -- it's twofold.  So number one
9  is all the collateral so that these high-level
10 numbers which is what I was looking at, right --
11     Q.  Yes.
12     A.  -- is what's representative.  And
13 that's in two forms:  One, the overall
14 collateral that you're going to be getting in,
15 and yes, the valuation that they were applying.
16     So it's twofold, number one, it's all
17 the collateral that actually came in and then
18 updating all those prices on the Bank of New
19 York component, because we were running two
20 hours late, I had no knowledge of even those
21 valuation numbers, which we don't use in our
22 systems, were -- were refreshed due to the late
23 nature of the process.  I couldn't tell if they
24 had updated all their prices or other collateral
25 came in.

M. Malloy

1
2    Q.    To go back to the sentence that's in
3 your declaration, are you describing in that
4 sentence the process of updating the prices, or
5 are you saying that BONY didn't have time to get
6 you an accurate -- a complete collateral list?
7         MR. GREEN:  Object to the form.
8    A.    In this statement, in this particular
9 sentence, the price.
10    Q.    How do you know that BONY had not had
11 time to do the pricing?
12    A.    As I stated earlier, based on the fact
13 that everything was backed up, I could not rely
14 upon the fact that everything was accurate.
15    Q.    Did you have any conversations with
16 anyone at BONY about whether they had time to do
17 the pricing at the time that you prepared
18 Exhibit 144A?
19    A.    Not that I recall.
20    Q.    Did you talk to anyone who had talked
21 to BONY about whether they had time to do the
22 pricing?
23         MR. GREEN:  Object to the form of the
24 question.
25    A.    Not specifically, not pricing that I

M. Malloy

1
2 recall.
3    Q.    So could you tell me what is the basis
4 for your statement in your declaration that BONY
5 did not have time to do the pricing?  What's the
6 information source that gave you the ability to
7 swear to the truth of that?
8    A.    The fact that we could not have
9 verified all that information.
10    Q.    That's a different question, sir.  The
11 question is how did you know, how were you able
12 to say in your declaration that BONY did not
13 have time to do valuations?
14         MR. GREEN:  I think he's answered.
15    Q.    What's the source of that information?
16         MR. GREEN:  I think he's answered your
17 question, Bob.
18         MR. GAFFEY:  I don't think he has.
19         MR. GREEN:  I think he has.
20    Q.    You can answer the question.
21         MR. GREEN:  Object to the form.
22    A.    In relating to this specific e-mail,
23 right, what I was referring to in this statement
24 is the fact that analytical work could not have
25 been done based on the late nature that we

M. Malloy

1
2 actually put in place that following morning.
3 That's what I was referring to in that
4 statement.
5    Q.    You've explained to me how it would
6 take Barclays some time to do its analytical
7 work to arrive at pricing that it wanted.  I'm
8 asking a different question.  I'm asking you,
9 what's the basis of your statement that BONY
10 simply had not had time to do that?  How do you
11 know that that's true?
12         MR. GREEN:  Object to the form.  Asked
13 and answered.
14    Q.    The answers are about Barclays.  I'm
15 asking about BONY.  How do you know BONY didn't
16 have time to do it?
17         MR. GREEN:  The statement is they did
18 not have the time to do the work accurately.
19         MR. GAFFEY:  The statement says what
20 it says.  You don't have to explain it to
21 him.  What I want is the basis of this
22 information in this statement, under penalty
23 of perjury, that BONY did not have time.
24         MR. GREEN:  You don't need to hammer
25 on about "under penalty of perjury."  He

M. Malloy

1
2 understands he signed the declaration under
3 penalty of perjury.
4    Q.    So what's the basis of your knowledge,
5 sir, that BONY did not have time to do
6 valuations?
7         MR. GREEN:  He has given that to you,
8 Bob.
9    A.    At the time I wrote this e-mail, we
10 did not have all of the relevant information
11 from Bank of New York.  I was simply referring
12 to the timing delay in which to get all of the
13 information from Bank of New York.  It was not
14 to complete, as I understood it, talking to
15 the -- talking to the collateral people coming
16 back for when I put this in place.
17    Q.    And when you got the information from
18 BONY, it had BONY's pricing on it, correct?
19         MR. GREEN:  Object to the form.
20    A.    That Friday?
21    Q.    Whenever it came in on the Thursday or
22 Friday, it came in with pricing, yes?
23    A.    Yes.
24    Q.    And the pricing was pricing assigned
25 to it by BONY, correct?

Page 46

M. Malloy

1
2      A.   Yes.
3      Q.   So it's fair to say that, at least by
4   the time BONY got you the information, BONY had
5   time to arrive at its own version of the pricing
6   of the collateral, correct?
7          MR. GREEN:  Object to the form of the
8      question.
9      A.   They produced statements.  I don't
10  know how accurate -- I was suspect of the
11  accuracy at that time given, again, the delay
12  that we had in the processing.
13     Q.   Did you get any information from BONY
14  that did not contain pricing, that only had
15  nominals?
16     A.   I don't know because I did not receive
17  those statements on that Friday.
18     Q.   Did you ask anybody if that was so?
19  Do you know one way or the other?
20         MR. GREEN:  Object to the form of the
21     question.
22     A.   No.
23     Q.   When you referred in paragraph 4 to
24  securities that were "highly illiquid," did you
25  have any particular securities in mind?

Page 47

M. Malloy

1
2      A.   No, just more of the corporate bonds
3   that were under stress at the time.
4      Q.   Again, that's more by asset class than
5   by any particular issue, any particular bond,
6   yes?
7      A.   For the Fed repo, that's correct.
8      Q.   To your knowledge, sir, was -- I may
9   have touched on this before.  I just want to ask
10  this to set the topic for the next few
11  questions.
12         After Barclays got the collateral, did
13  it conduct a valuation of its own?
14         MR. GREEN:  Object to the form.  Asked
15     and answered.
16     A.   As the normal course of business,
17  Barclays does make a valuation of the
18  collateral.
19     Q.   Do you know if with respect to the
20  particular collateral in the repo we've been
21  talking about it followed that normal course of
22  business, it did that?
23         MR. GREEN:  Object to the form.  Asked
24     and answered.
25     A.   I do not know because I did not book

Page 48

M. Malloy

1
2   the collateral.
3      Q.   So if I were to ask you how long it
4   took to prepare valuations for the repo
5   collateral, would you know?
6          MR. GREEN:  Object to the form.
7      A.   No.
8      Q.   Were you involved in that process at
9   all?
10     A.   No, other than just getting, you know,
11  the data, you know, to the appropriate folks.
12     Q.   So you sent the data out.  I'm at the
13  other end.  Are you at any point where you get
14  the valuations back?
15     A.   No.
16     Q.   Have you ever spoken to anyone at
17  Barclays about that topic outside the presence
18  of your lawyers?
19     A.   No.
20     Q.   Do you have any knowledge as to how,
21  if at all, the Barclays valuations differed from
22  the BONY valuations?
23     A.   I don't know.
24     Q.   Do you know if they did?
25     A.   I knew we had a lot of reconciliation

Page 49

M. Malloy

1
2   differences between what we expected to get and
3   what we got in.  That piece of the valuation,
4   not pricing.
5      Q.   And let me just go back.  Again, for
6   clarity, because I had those questions about
7   reconciliation before, are you talking about
8   reconciling the values or reconciling the actual
9   identity of the collateral?
10         MR. GREEN:  Object to the form.
11     A.   The latter.  The identity of the
12  collateral.
13         (Continued on the next page to include
14     the jurat.)

Page 1

1

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      -------------------------------x

       In Re:                        Chapter 11

5      LEHMAN BROTHERS                Case No. 08-13555 (JMP)

       HOLDINGS, INC., et al.,       (Jointly Administered)

6      ------------------------------)

7

8           * * * HIGHLY CONFIDENTIAL * * *

9            DEPOSITION OF BRYAN MARSAL

10             New York, New York

11          Tuesday, December 22, 2009

12

13

14

15

16

17

18

19

20     Reported by:

       FRANCIS X. FREDERICK, CSR, RPR, RMR

21     JOB NO. 26534

22

23

24

25

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2    Marsal.
 3        Q.    Okay.  And you've been deposed
 4    before?
 5        A.    Yes.
 6        Q.    If at any point you don't
 7    understand any of my questions, please ask me
 8    to rephrase and I will.
 9            When did you or Alvarez & Marsal,
10    to your knowledge, first do any work for
11    Lehman?
12        A.    We started -- received a call
13    September 14th, 2008.  We came to the office
14    September 15th, 2008.
15        Q.    Prior to that engagement had you
16    or, to your knowledge, Alvarez & Marsal worked
17    for any of the Lehman entities previously?
18        A.    Only in a capacity of them being a
19    creditor in various cases that we've had over
20    the last 20 years.  I don't know about those
21    cases but I'm sure there must have been some
22    overlap but not in a direct capacity.
23        Q.    And who did you receive that call
24    from?
25        A.    The call was received from
```

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2    Mark Shapiro of Lehman Brothers.
 3        Q.    And can you describe the substance
 4    of that call, basically?
 5        A.    The call was placed on the night
 6    of September 14th around 10:30 p.m.
 7    Mark Shapiro was calling on behalf of the
 8    board of directors of Lehman, Lehman Holdings.
 9    They asked about my availability to lead an
10    assignment at Lehman Brothers the next --
11    beginning as soon as possible.
12        Q.    And can you describe what that
13    assignment was, please.
14        A.    That assignment was to serve as
15    the chief restructuring officer of Lehman
16    Brothers at the outset, probably leading to a
17    chief executive officer responsible for the
18    management of the company during a Chapter 11
19    proceeding.
20        Q.    And --
21        A.    The company being Lehman Brothers
22    and various subsidiaries.
23        Q.    And what are the primary duties
24    and responsibilities of the chief
25    restructuring officer?
```

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2        A.    The chief restructuring officer is
 3    really the head of the company during the
 4    period of the crisis.  At the end of the
 5    crisis normally what would happen is the
 6    chief executive officer would replace the CRO.
 7    But during the period of the crisis the CRO is
 8    really the head officer of the company.  The
 9    CRO title would not be appropriate under
10    normal circumstances.  It would be under
11    crisis circumstances.
12        Q.    And so when did you actually
13    become the CRO or chief restructuring officer?
14        A.    Well, the night of the 14th they
15    asked me would I take the position and I said
16    yes.  Then they -- so we agreed that subject
17    to the contract, finalizing a contract of our
18    employment, that I would become the CRO as
19    soon as possible.
20        Q.    And when did that happen?
21        A.    I believe it happened -- we came
22    to work the next day.  So we were -- we came
23    to work to start to be debriefed on what the
24    issues were the morning of September 15th,
25    2008.  I believe we were hired -- the contract
```

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2    was focused on on Thursday of that week.  So I
 3    believe we were hired officially on Thursday
 4    of that week.
 5        Q.    If the official hire was Thursday,
 6    when did you actually start acting as the CRO?
 7    Would it have been earlier than that?
 8        A.    I would say Friday when I really
 9    was acting in the capacity of trying to find
10    out what was going on with respect to the
11    other assets of the company.
12        Q.    And as of that Thursday or Friday
13    were you also effectively acting as the CEO of
14    Lehman?
15        A.    I was effectively --
16            MR. GAFFEY:  Object to the form.
17        A.    Yes, I was effectively serving as
18    the CRO in trying to explain to the board of
19    directors and to the CEO what that meant.  And
20    basically that meant that there would be no --
21    there would be no outflow of cash that was not
22    approved by me.  And from there the roles
23    became expanded.  But when you address it that
24    way, it's pretty evident to everybody there
25    will be no cash paid to anyone that's not
```

Page 10

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  going to receive my blessing and my approval.
3      Q.   Is it fair to say that there would
4  be no significant decisions made by the
5  company without your approval as of that time?
6      MR. GAFFEY:  Object to the form.
7  You can answer.
8      A.   There was a carveout of two
9  transactions at the time.  There was a
10  carveout of the week of the 15th, the senior
11  management was focusing their efforts on the
12  sale of Lehman to Barclays.  Sold certain of
13  the businesses to Barclays.  And that specific
14  activity was carved out from our purview.  My
15  concern about that transaction, though, was
16  that it did have an implication to -- while it
17  was carved out, there was an implication,
18  namely we needed the supply of the books and
19  the records and the accounting material that
20  would in turn be transferred as part of what
21  we will refer to in the future as the TSA, the
22  Transition Services Agreement, which was
23  really access to information.
24          So the focus was without
25  information, the rest of the estate had

Page 11

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  troubles.  So we needed the books and the
3  records.
4      Q.   And how was your concern resolved,
5  if it was?
6      A.   My concern was resolved because of
7  the TSA, which was -- the TSA -- once the
8  sale -- the terms of sale were negotiated by
9  the management team, the only insertion that
10  Alvarez & Marsal made was to make sure that we
11  had access to the information and we were
12  assured that information access would be
13  captured in what's called the TSA.
14      Q.   Were you -- during that week of
15  the 15th were you kept up to date about the
16  sale negotiations and efforts?
17      A.   No.  No.  I was -- toward the end
18  of the week I was briefed on what the sale
19  meant by -- in fact, people did not attend --
20  I mean, I had appointments with various
21  players who were not able to attend those
22  appointments that week because they were tied
23  up in the negotiations with Barclays.
24          And I got a briefing from
25  Steven -- Steven Belden -- I forget Steven's

Page 12

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  last name now.  I'm at a loss.  But the chief
3  administrative officer.  He gave me a briefing
4  Thursday -- I believe Thursday or Friday of
5  that week on what the transaction looked like.
6      Q.   And -- is it Berkenfeld?
7      A.   Berkenfeld.  Excuse me.  Yes.
8  Steven Berkenfeld.
9      Q.   And that was on Thursday or Friday
10  of that week?
11      A.   Yeah.  Yes.
12      Q.   And did he go through the assets
13  that were being sold and the liabilities being
14  assumed?
15      A.   Really, no.  He went through a
16  very -- very much an overview, which was the
17  company was assuming -- Barclays was assuming
18  liabilities consisting of debt that it --
19  secured debt.  Unsecured payables and
20  unsecured bonus accrual liability.  In
21  exchange for that there was going to be an
22  exchange of an equal amount -- equal value of
23  assets.  I think they referred to the
24  transaction as a push.  It was the assets
25  would equal the liabilities.

Page 13

B. MARSAL - HIGHLY CONFIDENTIAL

1
2      Q.   At any point did you review any of
3  the sale contract documents?
4      A.   No.
5      Q.   Are you aware of any requirement
6  in the sale agreement for the deal to somehow
7  be, as you say, a push?
8      MR. GAFFEY:  Excuse me one second.
9  (Pause on the record.)
10      MR. GAFFEY:  Object to the form.
11  Can you put a time period on that, Todd,
12  so I can know whether I have a privilege
13  I have to assert.
14      MR. THOMAS:  Well, I just want to
15  ask it as a factual question.
16      MR. GAFFEY:  That's not a time
17  period.  I need a -- we have a privilege
18  waiver agreement that goes up to
19  September 30, as you know.  If it's
20  anything he learned after that, I'm
21  going to instruct him not to answer on
22  the grounds of privilege.  If it's
23  before that, that's within our waiver
24  and I'll let him answer.
25      MR. THOMAS:  If it's just a fact

Page 14

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    of whether he believes there's something
3    in the contract that requires it to be a
4    push, you're not going to let him answer
5    that?
6         MR. GAFFEY:  I'm not going to let
7    him answer anything he's learned from
8    conversations with counsel after
9    September 30th.  If you put a time
10   period on it before September 30, we
11   don't have any problem here.  And then
12   you can follow up and I can make a more
13   focused privilege assertion if I need
14   to.
15        MR. THOMAS:  Sure.  Well, we'll
16   break it down.
17        MR. GAFFEY:  Okay.  Thanks.
18   BY MR. THOMAS:
19        Q.   Before September 30th, did you
20   have any knowledge as to whether there was any
21   requirement for a push that was in the sale
22   documents?
23        A.   The only conversation that I can
24   recall was with Steven Berkenfeld.  And that
25   discussion was his description of the

Page 15

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    transaction as assets equaling liabilities.
3    And my concern, again, about the whole
4    transaction, since we were excluded from its
5    review, was making sure we had access to
6    the -- you know, to the technology base that
7    was also being transferred.  And my focus was
8    5 percent about the transaction and 95 percent
9    about the access to the technology -- I mean,
10   to the information base.
11        Q.   So you specifically recall in that
12   conversation Mr. Berkenfeld saying that the
13   assets were going to equal liabilities?
14        A.   Yes.
15        Q.   Okay.  What else do you
16   specifically recall about his description of
17   the deal?
18        A.   It was, like I said, it was very
19   brief.  That was not our purview so we were
20   specifically excluded from those negotiations
21   when -- and people who were having those
22   negotiations missed appointments to debrief us
23   on their areas of involvement.
24        Q.   Can you recall anything else
25   specific about the conversation with

Page 16

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Mr. Berkenfeld other than that assets were
3    supposed to equal liabilities?
4        A.   The assurances that there would be
5    access to the technology and the information
6    through a TSA.  And that in order to -- in
7    order to ensure that that access was made, I
8    should assign one of my people to make sure
9    that the TSA was done in such a way as to
10   provide that access.
11       Q.   Um-hum.  Did Mr. Berkenfeld
12   provide you with any description of the assets
13   that were being transferred?
14       A.   No.
15       Q.   Wouldn't that be relevant to what
16   you needed to know?
17            MR. GAFFEY:  Object to the form.
18   You can answer.
19       A.   Well, again, the -- we were not
20   involved with the negotiation of the
21   transaction.  My assumption was that this
22   transaction involved securities because of the
23   cash position of the company, we were told
24   that the cash position of the company was
25   pretty low, pretty desperate.

Page 17

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        So my conclusion was that the
3    value that was being given was not in the form
4    of cash.  So the only other alternative would
5    have been securities or property.
6        Q.   You said that there was a carveout
7    for a couple of transactions, one of which was
8    the sale to Barclays in which Alvarez & Marsal
9    was not involved; is that right?
10       A.   Yes.
11       Q.   And can you describe what you mean
12   by --
13       A.   Well, the other carveout was the
14   Newburger Burnham transaction which was being
15   pursued at the time.  There was an active
16   auction taking place, and so for us to intrude
17   in that auction was not deemed to be sensible
18   either.
19       Q.   Was that carveout with respect to
20   the Barclays sale in writing somewhere?
21       A.   I don't know if it was in writing.
22   I don't know if it was in writing.  We were
23   told that that is -- those two transactions
24   are going forward and that really you need to
25   focus on -- you need to focus on the wind-down

## Page 18

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  of the company exclusive of those two
3  transactions because the plan was to go
4  forward with both transactions as soon as
5  possible.
6      Q.   And who told you that?
7      A.   Steve Berkenfeld.
8      Q.   Anyone other than Steve Berkenfeld
9  say anything that you took as a carveout
10  for --
11      A.   Well, the others didn't make the
12  meetings that we had with them.  So he was the
13  only one that made the meetings.
14      Q.   Okay.  So when you refer to a
15  carveout, you're referring to something that
16  Steve Berkenfeld told to you personally?
17      A.   Yes.  Steve Berkenfeld said these
18  are two areas that you should not focus your
19  attention on.  These are transactions which
20  are going forward.  You should focus on the
21  company post these two transactions happening.
22      Q.   Did he ever say it in terms of you
23  must not be involved in those or was it just
24  that shouldn't be your focus?
25      A.   No.  Should not be your focus.

## Page 19

B. MARSAL - HIGHLY CONFIDENTIAL

1
2      Q.   Okay.  And when did he tell you
3  that?
4      A.   In the -- only -- during the week
5  of -- back to the 15th.  During that week the
6  only one we had contact with was Steve
7  Berkenfeld that was on the negotiating team.
8      Q.   Do you know which day of the week
9  that was?  Was that part of your Thursday or
10  Friday conversation?
11      A.   I would suspect it was Wednesday
12  or Thursday-ish.
13      Q.   Okay.  And what was your reaction
14  to him saying that you don't need to focus on
15  that because those deals are going forward?
16      A.   It was described as a transaction
17  that was happening and that it was well along
18  and that it was not something that we should
19  focus our attention on.  Focus on the assets
20  that are remaining.
21      Q.   Did that seem reasonable to you?
22      A.   Yes.
23      Q.   Did he explain why the transaction
24  was going forward or needed to go forward?
25      A.   Well, both transactions were going

## Page 20

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  to be receiving bankruptcy court approval and
3  review.  And both transactions were actually
4  being discussed within the court that week
5  before we'd actually been hired.  So this was
6  not -- this was not a surprise to anybody.
7      Q.   Did he explain from a business
8  standpoint why the transaction with Barclays
9  needed to go forward?
10      A.   No, he did not.
11      Q.   When you showed up on that -- the
12  first day, Monday, can you just generally
13  describe what you did that Monday for Lehman?
14      A.   Well, the first day on the job
15  was -- there was total chaos taking place at
16  Lehman.  The people were actually walking out
17  of the building with boxes.  Employees were
18  walking out of the building with personal
19  effects.  The TV people were trying to
20  interview anybody going in and out and if you
21  happened to have a suit on, you were a prime
22  target.
23          We got in there and security was
24  obviously pretty heightened.  It took us a
25  long time to get through security.  And then

## Page 21

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  when we went upstairs, we basically sat in the
3  conference room for five hours pretty much by
4  ourselves.
5          We were given the form of the
6  company's 10-K and told to look at it.  So we
7  spent the first day really looking at the 10-K
8  because everybody else was busy.  Part of the
9  team was busy working on the transactions,
10  either the Barclays or the Newburger Burnham,
11  and the other part of the team was pretty much
12  paralyzed.  They were just in a state of shock
13  that this had happened.
14          And so the first couple of days,
15  you know, there was very little productivity.
16  It was mostly getting up to speed on the
17  businesses and trying to talk to HR and
18  getting an organization chart.
19          But people didn't really have time
20  for us that first week.  They were all busy
21  trying to transfer -- HR was trying to
22  transfer people.  You know, what will the
23  Barclays transaction look like, how will we
24  transfer those people over to Barclays.  So
25  that was their focus.  So getting them to give

Page 22

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2   us org charts was not possible.
 3          The financial team did not make
 4   themselves available I think until Thursday or
 5   Friday of that week, and that was like -- they
 6   were so exhausted that they really couldn't
 7   provide us much in the way of support.
 8   Everything was we'll do it after the fact.
 9   We're just too tired right now to help answer
10   any questions.
11          So the first week was -- Monday
12   through Thursday was pretty much a wash, a
13   wash-out.  I mean, there was just not people
14   available.
15      Q.   When you showed up at Lehman that
16   week, at that point in time how did Lehman
17   mark the value of the securities that they
18   held?
19      A.   Didn't have a clue.  We didn't
20   have information so we did not have a clue.
21   That was what the technology -- our interest
22   in the technology was.  If you knew -- we had
23   to capture the transactions.  We had to
24   capture the assets.  We had to try and capture
25   the most recent marks.  There was no further
```

Page 23

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2   updating of the marks after the filing.  So we
 3   were pretty much in limbo.  That was exactly
 4   what we were concerned about.
 5      Q.   And when you say no further
 6   updating of the marks, were the last values
 7   that you had for the securities held by, for
 8   example, LBI, would they have been from the
 9   week before filing for bankruptcy?
10          MR. GAFFEY:  Objection to form.
11      A.   No.  The values were mostly -- I
12   mean, some of the transactions are marked
13   every day.  So you had some transactions that
14   would eventually be available from the 12th of
15   September, but most of the assets were really
16   as of quarter end.  Some of them were June
17   30th, 2008 and some of them were August, and
18   those would have been the -- I mean, they were
19   all over the map.
20          And, again, that's part of the
21   problem.  We did not have an updated asset
22   list.  We didn't even know what we owned.  We
23   didn't know what we owned and we didn't
24   know -- we didn't know what the value was of
25   it and we couldn't find a -- we didn't have an
```

Page 24

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2   information system where we could have access
 3   to that, which was the biggest concern.  Which
 4   is, again, that's really what the concern was
 5   as it relates to this transaction.
 6      Q.   So, for LBI's assets, some of
 7   their assets you may have had -- the most
 8   recent marks you would have had or that Lehman
 9   would have had would have been as of September
10   12 and some of the most recent -- for other
11   assets the marks would be not as recent as
12   September 12; is that right?
13          MR. GAFFEY:  Object to the form.
14   You can answer.
15      A.   Well, again, we're talking about
16   LBHI and the 19 subsidiaries that filed
17   bankruptcy.  LBI was in a state of chaos.  So
18   I don't have a clue what was going on at LBI
19   but that, as you know, was not even -- that
20   wasn't even our purview.  That's the
21   broker/dealer, LBI.
22      Q.   Was it your purview before the
23   receivership, the trusteeship --
24      A.   No.
25      Q.   -- of LBI?
```

Page 25

```
 1          B. MARSAL - HIGHLY CONFIDENTIAL
 2      A.   No.  It was always -- the
 3   broker/dealer was going to be governed by the
 4   SIPA trustee.  There was going to be a
 5   different receiver for that.  And, in essence,
 6   we were going to be receiver for everything
 7   else other than that.
 8          And there was negotiations going
 9   on.  As you know, assets and subsidiaries
10   moved out of the LBI broker/dealer into the
11   realm of LBHI in conjunction, working together
12   to maximize the recovery value of the assets.
13   That's why that was all going on.
14          So we were fully anticipating that
15   LBI was going to be seeking bankruptcy at some time
16   in the near future, and that's what the game
17   plan was in terms of Weil Gotshal working with
18   counsel.
19      Q.   And the -- are you familiar --
20   you're aware that part of the Barclays
21   transaction involved the sale of certain long
22   positions, securities, correct?
23      A.   I'm -- like I said, depending on
24   when.  I mean, today I understand a lot about
25   the transaction.  At the time my knowledge of
```

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  the transaction was really two-fold.  It was
3  this transaction assets -- asset values are
4  going to cover liabilities.  We will be no
5  worse off, no better off.  It's a push.  And
6  you will have access to -- even though you're
7  selling the data centers and you're
8  transferring all of the software and all of
9  the access to those systems, you will have a
10 TSA in place which will permit you to take an
11 inventory of your assets, to value your assets
12 on a real-time basis so that you can know what
13 you got.
14      Those were the two focuses of the
15 Barclays transaction.  The actual securities
16 wasn't -- that wasn't on my radar screen.
17      Q.  Let me go ahead and show you a
18 document that we'll mark as 482.
19      (Deposition Exhibit 482, January
20 29, 2009 341 Meeting of Creditors
21 transcript, marked for identification as
22 of this date.)
23 BY MR. THOMAS:
24      Q.  And let me ask you to turn to page
25 18, please.

1      B. MARSAL - HIGHLY CONFIDENTIAL
2      (Pause on the record.)
3      A.  Eighteen.
4      (Document review.)
5      Q.  And the second full paragraph
6  there it says -- let me just back up.
7      I believe this is you speaking but
8  if you'd like to review the front of the
9  document, it's dated -- it's the January 29th,
10 341 meeting of creditors --
11     A.  Yes.
12     Q.  -- from the transcript here.  And
13 the second full paragraph you're stating, "The
14 chaos that we walked into the next morning at
15 9:15, there was a series of issues with many
16 of the, what we call 'melting assets.'  Those
17 are assets that are very much time sensitive,
18 very much people related.  If those people
19 walk out, the asset values walk out."
20     Do you remember making --
21     A.  Yes.
22     Q.  -- comments along those lines?
23     And is that some of the chaos that
24 you described a few minutes ago?
25     A.  Yes.

1      B. MARSAL - HIGHLY CONFIDENTIAL
2      Q.  Would you describe in a little
3  more detail what you mean by melting assets
4  and when the people walk out, the asset values
5  walk out?
6      A.  Well, the melting assets resulted
7  in a series of emergency hearings, and those
8  emergency hearings for the bankruptcy court
9  for Judge Peck to address.  So if you wanted a
10 complete list of those melting assets, you
11 just need to dig out the transcripts during
12 this period.
13     But mostly they were a series of
14 investments which if we did not address those
15 assets, then the residual value of our --
16 either put them into safe hands, the residual
17 value would have diminished dramatically.  And
18 the melting assets were not -- the melting
19 assets did not include the Barclays
20 transaction, if that would be the question.
21     And it really didn't include the
22 Newburger Burnham matter.  This was related to
23 most of the proprietary portfolio investments
24 we had to agency positions that we had as a
25 bank lender where we had to get out of our

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  agency position.
3      And really, again, there's a
4  complete list of these in all the emergency
5  hearings which took place in the first 60 to
6  90 days.  Of course, this was also a source of
7  a lot of consternation for Judge Peck because
8  of the -- it was like a constant stream of
9  melting asset hearings.
10     Q.  And when you say if the people
11 walk out, the asset values walk out, could you
12 just explain what you meant there?
13     A.  Well, I mean, if -- I mean, what
14 was important was the -- what we needed to
15 have was some institutional knowledge.  We
16 needed to have some institutional knowledge of
17 these people and what the assets were that we
18 were looking at.  And if you recall, what
19 happened here is that shortly after the
20 transaction occurred, 10,000 employees moved
21 across the street to work at Barclays, in
22 essence, and I was left with a very -- I was
23 left with a squad of legal department, a
24 compliance department and some tax people.
25 And we had to rebuild out of those ashes and

## Page 30

1     B. MARSAL - HIGHLY CONFIDENTIAL
2  what I was trying to do was to -- the people
3  we would be talking about would be the
4  institutional knowledge that various players
5  had.  And I mean, as part of the TSA we got an
6  informal understanding that those people would
7  be available on a reasonable basis.
8      Q.   In terms of the people walking
9  out, are those -- are some of these are the
10  people that went over to Barclays?
11     A.   Yeah.  But I mean, what happened
12  with Barclays is that the likelihood that we
13  were going to get institutional cooperation --
14  if you're familiar with what happens on
15  Wall Street, the people on Wall Street do not
16  look retrospectively.  It is all
17  prospectively.  And what was becoming clear is
18  with the passage of time, it was very
19  difficult to get them to come back and focus
20  on issues that they -- I mean, this is
21  institutional knowledge.  I mean, today we
22  don't have a shot at getting them to come back
23  and help us on these things.
24     Q.   But in terms of the people you
25  were concerned about losing, it would be a lot

## Page 31

1     B. MARSAL - HIGHLY CONFIDENTIAL
2  of the people that went over to Barclays as
3  part of the 10,000?
4      A.   The people -- the people -- the
5  people who had the institutional knowledge,
6  which would be the people who were at
7  Barclays, yes.
8          I mean, how -- but the concern
9  that I would have here is -- my concern is the
10  passage of time was going to reduce the
11  willingness of those people to cooperate with
12  us to provide institutional knowledge on these
13  assets.  So disposing of these assets sooner
14  rather than later was very important before
15  people -- people and information goes to the
16  wind.
17     Q.   And are you -- when you're
18  referring to assets, you're referring to
19  assets that would be assets of both LBI and of
20  LBHI?
21     A.   No.  Assets of the estates that I
22  was receiver for.
23     Q.   Okay.  So you're drawing a
24  distinction between --
25     A.   The 20 estates.

## Page 32

1     B. MARSAL - HIGHLY CONFIDENTIAL
2      Q.   -- assets of the LBHI estate and
3  LBI's assets?
4      A.   Yes.  Yes.  I mean, that would be
5  what would be meant by that.  The 20 estates
6  under my receivership and those estates which
7  hadn't filed yet, which hadn't filed I should
8  say bankruptcy but were under our receivership
9  or our control.
10     Q.   And the people that went over to
11  Barclays that you were concerned about here,
12  were they the employees of LBHI or LBI?
13         MR. GAFFEY:  Object to the form.
14  You can answer.
15     A.   The people that went over to
16  Barclays were by and large I believe most
17  entirely LBI employees.  They were on LBI's
18  payroll performing services for LBHI and all
19  the various subsidiaries.
20     Q.   So they were LBI -- they're LBI
21  employees but they were impacting the value of
22  LBHI?
23     A.   They managed the LBHI assets.
24  That's correct.
25     Q.   Okay.  And the -- are you familiar

## Page 33

1     B. MARSAL - HIGHLY CONFIDENTIAL
2  with the assets that were -- that was -- that
3  were ultimately sold as part of the Barclays
4  transaction, by and large?
5      A.   After September 30th, yes.
6      Q.   Yes.  I'll try to -- if I want to
7  focus on your knowledge back then, I'll try to
8  make that clear.  So I'm just asking you now
9  are you familiar with the assets that went
10  over?
11     A.   I'm familiar --
12         MR. GAFFEY:  Are you familiar with
13  that, yes or no.
14     A.   Yes.
15     Q.   Okay.  And who -- and that would
16  include the long positions that were -- went
17  over as part of the sales transaction?
18     A.   Yes.
19     Q.   Okay.  And is it your testimony
20  that when you refer to melting assets, you're
21  not referring to any of the assets that went
22  over as part of the Barclays sale?
23         MR. GAFFEY:  Object to the form of
24  the question.
25     A.   That's correct.

Page 34

B. MARSAL - HIGHLY CONFIDENTIAL

2  Q.   Okay.  The securities that went
3  over as part of the Barclays sale, the long
4  positions, who were responsible for marking
5  the value of those securities prior to the
6  Barclays sale?
7  A.   Various traders and people within
8  the old Lehman organization.  Primarily LBI
9  payroll type people.
10  Q.   Okay.  And can you describe how
11  that process would work based on your
12  knowledge today in terms of how the securities
13  would get marked?
14  A.   Well, it varied.  Are you asking
15  about the securities or assets?
16  Q.   How the securities, long
17  positions.
18  A.   I don't know specifically how they
19  would get marked.  I wasn't -- that really
20  wasn't my area but...
21  Q.   Do you know if they would get --
22  at least prior to the bankruptcy filing, would
23  they get marked each day?
24  A.   I was told they were -- it would
25  be -- the trading securities, the trading

Page 35

B. MARSAL - HIGHLY CONFIDENTIAL

2  assets would be marked every day or at least
3  weekly.
4  Q.   And would those marks be
5  accounting entries?
6  A.   I do not know.  I assume they
7  would be.
8  Q.   You continue on at the bottom of
9  page 18.  You say, "We had a complete loss of
10  all accounting systems beginning Monday
11  morning."
12  Do you see that?
13  A.   Yes.
14  Q.   And then the last sentence in that
15  paragraph says, "So the coordination or
16  consolidation of any financials became
17  impossible beginning the morning of the 15th.
18  All accounting entries stopped the morning of
19  the 15th.  People were worried about whether
20  or not they should get their possessions and
21  move out of the building as opposed to
22  accounting."
23  Do you believe that was an
24  accurate statement of the situation the week
25  of the 15th?

Page 36

B. MARSAL - HIGHLY CONFIDENTIAL

2  A.   Yes.
3  Q.   Okay.  And would that situation
4  apply not just to the holding company but also
5  to the subsidiaries like LBI?
6  A.   Yes.
7  Q.   In terms of the long positions
8  that were conveyed as part of the Barclays
9  sale, when -- do you believe there was any
10  effort to update those marks during the week
11  of the 15th?
12  A.   I do not know.  I do not know.
13  Q.   Okay.  Would that have been
14  possible, to mark those the week of the 15th
15  given the situations you've described here?
16  MR. GAFFEY:  Object to the form.
17  A.   Not with these -- not without the
18  accounting systems being up and running.  If
19  there was marking done, it might have been
20  done on an individual basis by various
21  managers who are attempting to mark them based
22  on whatever, I don't know.  I was not involved
23  with the marking process or my people were not
24  involved with any marking of the assets.
25  Q.   And you're not aware of any

Page 37

B. MARSAL - HIGHLY CONFIDENTIAL

2  marking that went on the week of the 15th?
3  A.   I'm not aware of any marking that
4  was done through this -- through accounting
5  entries, if that's the question.
6  Q.   Okay.  Are you aware of any other
7  marking that was done?
8  A.   I have heard that there was an --
9  there was valuations that were being attempted
10  by various managers during that week.  I don't
11  know -- I don't know beyond that.
12  Q.   Do you know -- can you provide a
13  little more detail with what you heard?  Was
14  that in connection with the Barclays sale
15  negotiations?
16  A.   Some type of -- in trying to value
17  a portfolio of securities that were not
18  readily -- that did not have a ready mark
19  value.
20  But, again, this is something
21  after that fact now.  This is not during the
22  time period.  This was not a focus of my
23  attention during this time period.  This
24  transaction was really a focus of my attention
25  in the first quarter of 2009.  My focus during

Page 38

B. MARSAL - HIGHLY CONFIDENTIAL

1  the first quarter of 2008 -- excuse me --
2  fourth quarter of 2008 was the TSA agreement
3  as it relates to Barclays.
4        And, I mean, the support for that,
5  if you look into the logs of Jonathan, the
6  general counsel, and Ricci, and the amount of
7  meetings we had with Barclays and the
8  discussions we had with Barclays, it related
9  exclusively to the TSA, which was the access
10 to technology and fact base and systems.
11     Q.   So your understanding is that
12 there may have been some -- other than --
13 well, strike that.
14       So there may have been some
15 efforts of Barclays and Lehman to do some
16 valuations the week of the 15th for purposes
17 of valuing difficult to value assets, but
18 other than that, you're not aware of any
19 efforts at Lehmans to systematically mark
20 values of assets?
21     A.   No accounting system was up.  So
22 unless an accounting system was up and there
23 could be a remarking of the assets, I don't
24 know how it was accomplished.


Page 38

B. MARSAL - HIGHLY CONFIDENTIAL

1        B. MARSAL - HIGHLY CONFIDENTIAL
2  the first quarter of 2008 -- excuse me --
3  fourth quarter of 2008 was the TSA agreement
4  as it relates to Barclays.
5        And, I mean, the support for that,
6  if you look into the logs of Jonathan, the
7  general counsel, and Ricci, and the amount of
8  meetings we had with Barclays and the
9  discussions we had with Barclays, it related
10 exclusively to the TSA, which was the access
11 to technology and fact base and systems.
12     Q.   So your understanding is that
13 there may have been some -- other than --
14 well, strike that.
15       So there may have been some
16 efforts of Barclays and Lehman to do some
17 valuations the week of the 15th for purposes
18 of valuing difficult to value assets, but
19 other than that, you're not aware of any
20 efforts at Lehmans to systematically mark
21 values of assets?
22     A.   No accounting system was up.  So
23 unless an accounting system was up and there
24 could be a remarking of the assets, I don't
25 know how it was accomplished.

Page 39

1        B. MARSAL - HIGHLY CONFIDENTIAL
2     Q.   Okay.  Are you aware -- okay.
3  Strike that.
4        MR. THOMAS:  Let me go ahead and
5  mark a document that's -- well, actually
6  it's been previously marked as
7  Exhibit 1.
8        (Document review.)
9     Q.   Have you seen this document
10 before?
11    A.   No.
12    Q.   Never had a chance to review --
13    A.   No.
14    Q.   Let me go ahead and show you a
15 document that's been marked Exhibit 25.
16    A.   Do you want this one -- continue
17 with this?
18    Q.   No, you can leave that.  We're
19 probably going to come back to that at some
20 point.  And if at any point you want to refer
21 to that, you're welcome to.
22    A.   Okay.
23    Q.   Have you seen this document
24 before?
25    A.   No.

Page 40

1        B. MARSAL - HIGHLY CONFIDENTIAL
2     Q.   Have you -- so you haven't had
3  occasion to review what's been referred to as
4  the Clarification Letter that's part of the
5  purchase agreement for the Barclays
6  transaction?
7     A.   I haven't reviewed this letter.
8     Q.   Okay.
9     A.   I don't know if -- I don't know --
10 I have -- again, this transaction was not
11 within our purview so I would have no reason
12 to look at that document.
13    Q.   Well, we may -- we'll probably
14 come back to them in a few minutes.
15    A.   Okay.
16       MR. THOMAS:  Let me go ahead and
17 mark a document as Exhibit 483.
18       (Deposition Exhibit 483, e-mail
19 dated Monday, September 15, 2008, marked
20 for identification as of this date.)
21 BY MR. THOMAS:
22    Q.   Do you recognize this document?
23    A.   No.  I believe it to be a document
24 that would come to my attention.
25    Q.   It appears to be an e-mail from

Page 41

1        B. MARSAL - HIGHLY CONFIDENTIAL
2  Alex Kirk to yourself dated Monday, September
3  15th.
4     A.   Um-hum.  Yes.
5     Q.   In the body of the e-mail he says,
6  "Bryan, please come by and see me tomorrow
7  when you can so I can give you a proper
8  download."
9        Do you see that?
10    A.   Yes.
11    Q.   Is Alex Kirk someone you knew
12 prior to this engagement?
13    A.   No.
14    Q.   And I was wondering why he was
15 reaching out to you and telling you to come
16 by.  Did you meet him during the day of the
17 15th?
18       MR. GAFFEY:  Objection to form.
19    A.   I doubt if it was the 15th.  It
20 was the week of the 15th.  I don't believe it
21 was the 15th.
22    Q.   Okay.
23    A.   That first day was a complete
24 wash-out.
25    Q.   Okay.  But he's -- I mean, he's

| Page 54 |
| --- |

B. MARSAL - HIGHLY CONFIDENTIAL
1  those numbers cause you any concern about the
2  deal that was being negotiated?
3      A.   No.  No, what caused me concern
4  was the first point, which is the TSA.  To the
5  extent that I have access to the information
6  and the transaction information, I can
7  reinstruct whatever has happened.  That's my
8  focus at this point in the crisis.
9      Q.   The last bullet point on the page,
10  he writes, Mr. Fogarty writes, "Well said.
11  Daniel Golden of Akin Gump.  Clients holding
12  about 9 billion in bonds.  'We believe this
13  was a flawed sales process.  It benefits
14  Barclays and the federal government but not
15  the creditors of this estate'."
16      Did that -- reading that did you
17  have any reaction to that or being concerned
18  about not benefiting the creditors of the
19  estate?
20      A.   Did I have a reaction to Danny
21  Golden's representing a client saying this
22  client doesn't think he's getting paid enough
23  money for something?  Yeah, my reaction is
24  I -- that's pretty typical of what Danny

| Page 55 |
| --- |

B. MARSAL - HIGHLY CONFIDENTIAL
1  Golden would say.
2      Q.   Well, it's also Mr. Fogarty saying
3  well said.  This is Mr. Fogarty's comment on
4  this.
5      A.   Yeah.
6      Q.   Did that cause you to question --
7      A.   You know, my concern was not that
8  this -- this transaction was done for a whole
9  host of reasons and those reasons were done --
10  were obviously in the minds of the people who
11  were negotiating it at the time.  It wasn't
12  for me to question whether Barclays got a good
13  deal or didn't get a good deal.  What was was
14  I wanted to make sure that we would have
15  access to the information, to the technology
16  to reconstruct the transactions surrounding
17  this estate.  The actual transaction with
18  Barclays was really not -- that was not,
19  again, under my purview.  Interesting to know,
20  but not relevant.  The first item is the
21  relevant item to me.
22      Q.   So even if Barclays was getting a
23  good deal, that wouldn't be relevant to you at
24  this time?

| Page 56 |
| --- |

B. MARSAL - HIGHLY CONFIDENTIAL
1      A.   No.  Barclays getting a good deal,
2  I mean, it's all in the eyes of the beholder.
3  I mean, because Danny Golden or Jim Fogarty
4  don't believe it's a good deal, I mean, I'm
5  not negotiating the deal.  I don't know the
6  pros and cons, the pluses and minuses, nor do
7  they.  What I knew is I could not manage this
8  estate unless I had the fact base and the
9  information and the TSA.
10      Q.   You mentioned the deal was done
11  for a host of reasons.  Could you describe
12  what those reasons were?
13      A.   Well, it was described in court.
14  I mean, you had a national emergency, is what
15  was described I think by Harvey Miller when he
16  presented this to the judge, a national
17  economic crisis going on.  You had employee
18  jobs trying to be retained.  You had customer
19  custodial accounts that you were trying to be
20  responsible to those people who would have
21  been locked down had they not been able to get
22  their cash out of this company.
23      Those were the reasons that were
24  given in the court.  I was aware of those

| Page 57 |
| --- |

B. MARSAL - HIGHLY CONFIDENTIAL
1  reasons.
2      Q.   And do you think those are
3  legitimate reasons, good reasons for a sale
4  going forward?
5      MR. GAFFEY:  Objection to the
6  form.  Do you want his opinion?
7      MR. THOMAS:  Yes.
8      MR. GAFFEY:  Objection.  You can
9  answer.
10      A.   I know my opinion of the
11  transaction was I wasn't living it.  I
12  didn't -- I wasn't in the negotiations at the
13  time.  I think that Barry Ridings said it the
14  best.  There were no options set for us at
15  that time.  There was no other sale options
16  for us.  And if we wanted to preserve -- if we
17  wanted to preserve the jobs and the value, we
18  needed to go forward with the transaction,
19  which was involving the assumption of
20  liabilities for an equal amount of assets and
21  live with it.  And I believe Barry Ridings was
22  telling us his view based on his review of the
23  transaction.
24      By the way, he was there before I

Page 58

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  got there.  So Barry had -- he had the
3  opportunity to assess the situation.  He knew
4  whether there were other buyers out there.
5      Q.    Did you know Barry Ridings before
6  this?
7      A.    Yes.
8      Q.    Did you have --
9      A.    Barry Ridings is very active in
10 the restructuring community.  So he would be
11 an investment banker like any number of six --
12 five or six other major investment banks that
13 would be called in to give valuation or
14 fairness opinions on transactions like this.
15     Q.    Do you have a positive
16 professional opinion of Mr. Ridings?
17     A.    Yes, I do.
18     Q.    Do you disagree with any of the
19 points that Mr. Miller made to the court or
20 that Mr. Ridings made concerning the need for
21 the transaction?
22         MR. GAFFEY:  Object to the form.
23 At the time?
24     A.    I mean --
25         MR. GAFFEY:  Wait, wait.  I may

Page 59

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  have a privilege issue.
3         MR. THOMAS:  I'm asking his
4  opinion.
5      Q.    Do you currently?
6      A.    Do I currently believe -- I'm
7  sorry.  I'm not sure I understand the
8  question.
9      Q.    Do you disagree with any of the
10 points that Mr. Miller made to the court or
11 Mr. Ridings made in terms of why the deal
12 needed to go forward?
13     A.    As to the points that I just -- as
14 to the points that I just outlined?  I haven't
15 read their transcript so I'm not sure what
16 else was said.
17         But as to the points, I believe
18 that Harvey believed in his own mind that the
19 jobs -- it was important to try to save those
20 jobs.  I believe that we were experiencing a
21 massive economic crisis at the time.  I
22 believe that the -- having customer accounts
23 frozen would have had an adverse effect
24 deepening that situation.  I believe all of
25 that. I also believe that when Barry Ridings

Page 60

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  said there was no other interested party, I
3  believe that to be true.
4      Q.    And you believe those points that
5  were cited as reasons for going forward with
6  the deal are legitimate, reasonable points for
7  going forward with the deal?
8         MR. GAFFEY:  Objection to form.
9      A.    At the time I believed that to be
10 reasonable.  Today I don't think I would have
11 done this transaction, no.
12     Q.    And putting aside whether you
13 would have done the transaction, do you
14 believe that those are reasonable
15 considerations?
16     A.    Yes, I believe those are
17 reasonable considerations.
18         MR. GAFFEY:  Todd, let me know
19 when you get to a natural breaking
20 point.  No hurry.
21         MR. THOMAS:  Okay.
22         (Deposition Exhibit 486, document
23 bearing production numbers AM 000864
24 through AM 000869 and AM 000935, marked
25 for identification as of this date.)

Page 61

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  BY MR. THOMAS:
3      Q.    Let me go ahead and show you a
4  document we marked as 486.  There you go.
5      A.    Um-hum.
6      Q.    Let me ask you first, do you
7  recognize this document?
8      A.    No.
9      Q.    Okay.  And I'm not going to ask
10 you to read the whole thing, but it appears to
11 be an e-mail from someone at Weil Gotshal.  Do
12 you understand that to be Lehman's outside
13 counsel for purposes of the Barclays
14 transactions, among other things?
15     A.    Yes.
16     Q.    And it's sent to a number of
17 people at Alvarez & Marsal.
18         Do you see that?
19     A.    Yes.
20     Q.    Dated Sunday, September 21st,
21 2008.
22         And the e-mail message says,
23 "Although this is not what you are ask for..."
24 I assume that's a typo "...what you asked for,
25 it might be helpful if you reviewed the

Page 70

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  company to that point in time.
3     Q.  Okay.  Well, I'm just going to ask
4  you about a section on page 3.
5     A.  Okay.
6     Q.  And just see if this triggers any
7  memories.
8        The second paragraph says,
9  "Mr. Roberts..." who I believe is an attorney
10  at Weil Gotshal "...resumed by describing that
11  it is a condition to the transaction that
12  eight specific firm employees enter into
13  employment agreements with Barclays.  He
14  stated that Mr. McGee was one of those
15  employees.  So interested firm employees were
16  involved in the transaction negotiations on
17  behalf of the firm."
18        Do you recall whether --
19     A.  I don't know who Mr. McGee is.
20     Q.  Okay.  Skip McGee you don't know?
21     A.  No.  Never met him.  Never worked
22  with him.  I'm not sure what area he had
23  responsibility for.
24     Q.  Right.  And do you know the other
25  eight -- did you know that the transaction

Page 71

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  actually required eight specific firm
3  employees?
4     A.  No, I did not.
5     Q.  -- to enter into employment
6  contracts?
7     A.  I subsequently found out that
8  there were contracts.  I don't know about
9  eight, but I subsequently have found out about
10  it, yes.
11     Q.  Did you know that the board had
12  been apprised of that on the 16th?
13        MR. GAFFEY:  Time period?  Excuse
14  me.  Did he know --
15        MR. THOMAS:  You can't cover
16  facts.  If he knows something, just
17  because he learned it from you doesn't
18  make it privileged.
19        MR. GAFFEY:  You can answer that
20  yes or no.
21     Q.  Did you know the board was
22  apprised of the fact that interested firm
23  employees were involved in a transaction
24  negotiation on behalf of the firm and that the
25  transaction actually required a certain number

Page 72

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  of specific firm employees to enter employment
3  agreements?
4     A.  I suspect I would, but I do not
5  recall.  I do not recall.  I suspect I would
6  if that was, in fact, the case.
7     Q.  Okay.
8     A.  If I attended this meeting.  I
9  don't know if I attended this meeting.  Does
10  it say whether I did or not?
11     Q.  I'm not sure whether you did or
12  not.  I don't believe you're listed.  But I
13  was -- whether you did or not, I was just
14  wondering whether you were aware of that.
15  Because you had mentioned earlier you thought
16  you had heard rumors to that effect during
17  this week, and I was just wondering if this
18  refreshed your recollection about whether you
19  knew that for sure or not.
20        MR. GAFFEY:  Object to the form.
21  He's not expressed a failure of
22  recollection.  You can answer.
23     A.  No.  I'm not really sure -- I'm
24  not really sure what the question is you're
25  asking.  What I told you is -- why don't you

Page 73

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  ask the question again.  Excuse me.
3     Q.  Sure.  Okay.
4        Does this refresh your
5  recollection that you were aware that
6  supposedly interested firm employees were
7  involved in the Barclays sale negotiation?  By
8  interested, meaning employees that were
9  negotiating or entering employment contracts
10  with Barclays.
11        MR. GAFFEY:  Same objection.  You
12  can answer.
13     A.  I eventually became aware of the
14  fact that employees who were negotiating the
15  Barclays transaction, some of those employees
16  I'd been led to believe, but it wasn't -- I
17  haven't got specific knowledge of that, also
18  were offered contracts.  Some of them may have
19  signed those contracts.
20        I know Alex Kirk had indicated to
21  me that something like that was going to be
22  happening and he wasn't going to join.  So on
23  that score I did know that there was some kind
24  of conversations taking place.
25     Q.  And to the best of your

Page 74

B. MARSAL - HIGHLY CONFIDENTIAL

1   B. MARSAL - HIGHLY CONFIDENTIAL
2   recollection you were aware of that sometime
3   that week?
4       A.   Sometime -- well, I was aware of
5   what?  I was aware of the fact that there were
6   discussions.  Who was involved, who was
7   getting contracts, no, I was not aware of
8   that.  I was aware that there were contracts
9   going to be offered to senior employees, which
10  would be standard, by the way, which would be
11  fairly typical in most M&A transactions.  You
12  wouldn't want to lose your senior management
13  team.
14      Q.   My next question was going to be
15  just that; did that fact cause you any concern
16  to the extent you learned of that before?
17      A.   It did not cause me -- it caused
18  me -- I did not know who was receiving those
19  contracts.  My assumption was that there was
20  somebody watching this transaction, that there
21  was somebody who was not conflicted that was
22  reviewing the transaction that was recusing
23  themselves from it.
24      Q.   And at any point did you
25  investigate that issue prior to the sale

Page 75

1   B. MARSAL - HIGHLY CONFIDENTIAL
2   closing?
3       A.   No, no.
4       Q.   Do you believe that Mr. Kirk or
5   the other senior employees at Lehman who were
6   involved in the sale negotiations were
7   breaching their fiduciary duty to Lehman?
8           MR. GAFFEY:  Objection to form.
9   Calls for a legal conclusion.  Do you
10  want a legal opinion?
11      A.   I had no -- I had no basis to
12  reach any conclusion like that.  What I knew
13  was Alex Kirk told me he was not going with
14  the Barclays transaction and thus he was
15  looking for -- was I interested in hiring he
16  and a team to go work the proprietary asset
17  portfolio in the wind-down.  That was the
18  conversation with Kirk.
19      Q.   And as you sit here today do you
20  believe Mr. Kirk breached his fiduciary duties
21  to Lehman in any way?
22          MR. GAFFEY:  Objection to the
23  form.  Calls for a legal conclusion.
24      A.   I don't know what Mr. Kirk did or
25  didn't do.  I have no reason to -- I have no

Page 76

1   B. MARSAL - HIGHLY CONFIDENTIAL
2   basis to reach a conclusion today on that
3   score.  I would have -- I mean, I -- I mean,
4   Alex Kirk did not go with Barclays.
5       Q.   Do you have any reason to believe
6   that --
7       A.   I don't know.  Did Alex Kirk
8   receive any compensation from Barclays?
9       Q.   Do you have any reason to believe
10  that any of the Lehman executives involved in
11  negotiating the Barclays deal breached their
12  fiduciary duty to Lehman?
13          MR. GAFFEY:  Objection to the
14  form.
15      A.   I don't have any evidence.  I
16  don't have any facts one way or the other.
17      Q.   Let me go ahead and show you the
18  next document which we'll mark as 490.
19          (Deposition Exhibit 490, document
20  bearing production numbers AM 001683
21  through AM 001685, marked for
22  identification as of this date.)
23          (Document review.)
24  A.   Okay.
25  Q.   Do you recognize the document?

Page 77

1   B. MARSAL - HIGHLY CONFIDENTIAL
2   A.   No.
3   Q.   Okay.
4       A.   And I have no reason to believe
5   that it isn't as represented, though.
6       Q.   Okay.  An e-mail from Jamie
7   Schwartz to you and a number of others at
8   Alvarez & Marsal concerning the Barclays sale
9   transaction?
10      A.   Yes.
11      Q.   And who is Jamie Schwartz?
12      A.   Jamie Schwartz is an analyst on
13  the wind-down team.
14      Q.   Okay.  Now, this is an e-mail with
15  attachments that appear specifically to be
16  addressing the Barclays transaction; is that
17  right?
18      A.   It says Excluded real estate
19  assets of Barclays transaction.  And then
20  Holdings Barclays deal Cliff notes
21  exclusion/inclusion of assets and liabilities
22  I assume.
23      Q.   All right.  It says "Jim had me
24  prepare the attached Cliff note summary of the
25  Barclays deal capturing excluded assets and

Page 78

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    liabilities, ours, and included assets and
3    assumed liabilities, theirs."
4            Do you see that?  On the e-mail?
5        A.    On e-mail?
6        Q.    Yeah.
7        A.    Yes, okay.  Yes, I see that.
8        Q.    Okay.  So this was an effort by --
9    excuse me -- someone at Alvarez to summarize
10   the Barclays transaction?
11           MR. GAFFEY:  Objection to form.
12   You can answer though.
13       A.    To summarize, yes.
14       Q.    And if you would, look, please --
15       A.    Not a very clear summary I might
16   add but a summary.
17       Q.    Okay.
18       A.    Jamie is also -- he's a junior
19   analyst.  Not surprising.  Did a good job but
20   not what you would normally have from Alvarez
21   & Marsal.
22       Q.    Okay.  On the last page of this
23   document --
24       A.    Um-hum.
25       Q.    -- where it's entitled Holding

Page 79

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    Barclays Deal Cliff Notes.
3        A.    Okay.
4        Q.    Do you see where it says "Included
5    assets, trading assets 47 billion long"?
6        A.    Yes.  I see that.
7        Q.    Are you aware that the number
8    47.4 billion was referenced by Weil's -- Weil
9    Gotshal in the sale hearing for the Barclays
10   transaction with respect to long assets?
11       A.    I'm not aware of it.  I was not
12   aware of it at the time.  I'm aware of it
13   today.
14       Q.    Okay.  When did you first become
15   aware of that figure that was mentioned to the
16   court?
17       A.    Oh, sometime probably -- probably
18   in the briefing of the last couple of weeks in
19   talking about this specific number.
20       Q.    Okay.  Do you have an
21   understanding of how that number was
22   derived --
23       A.    No, I do not.
24       Q.    Do you have an idea what it refers
25   to, what class of assets it refers to?

Page 80

1        B. MARSAL - HIGHLY CONFIDENTIAL
2        A.    I do not.
3        Q.    Okay.  Down at the last bullet
4    under Included Assets -- actually, under
5    Assumed Liabilities where it says Employee
6    Bonus/Severance Liability.
7            Do you see that?
8        A.    Employee Bonus -- yes, Employee
9    Liabilities.
10       Q.    Yes.
11       A.    Other than the 2.5 billion -- no.
12       Q.    Well, and then over to the right
13   it says Employee/Severance Liability.
14       A.    Right.  Yes.
15       Q.    Earlier in your testimony I
16   believe you -- in discussing the liabilities
17   that was going to be assumed you mentioned
18   something -- a liability with respect to
19   compensation.
20           Do you recall that?
21       A.    Yes.
22       Q.    Was it your understanding that
23   that number with respect to compensation was
24   for employee bonus and severance liability?
25       A.    Yes.

Page 81

1        B. MARSAL - HIGHLY CONFIDENTIAL
2        Q.    Let me go ahead and show you a
3    document we'll mark as 491.
4            (Deposition Exhibit 491, document
5    bearing production numbers WGM-LEHMAN-E
6    00011676 through WGM-LEHMAN-E 00011678,
7    marked for identification as of this
8    date.)
9    BY MR. THOMAS:
10       Q.    Please take a moment to review the
11   two-page e-mail.
12           (Document review.)
13       A.    Okay.
14       Q.    Okay.  The original in time e-mail
15   from James Fogarty -- well, first of all, do
16   you recognize this document?
17       A.    I do not.
18       Q.    Okay.
19       A.    But again I have reason to believe
20   it would be sent to me.
21       Q.    Okay.  The first in time e-mail
22   from James Fogarty on September 26 to --
23   copying yourself to a number of individuals
24   including some at Lehman -- I mean, excuse
25   me -- including some at Alvarez & Marsal

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  starts at the bottom of the page and contains
3  a description of the Barclays sales
4  transaction.
5        Do you see that?
6     A.  I'm sorry.  Which one are you
7  referring to?  Which memo are you --
8     Q.   The earliest e-mail in time which
9  begins at the bottom of the first page, that
10  is from Mr. Fogarty dated September 26.
11     A.  Yes.  This wasn't to me.  This was
12  to Jim Fogarty -- or was it -- did he e-mail
13  me?  Yeah, I guess I'm on circulation.
14        Okay.  I'm sorry.  What was your
15  question?
16     Q.  Okay.  I was just pointing your
17  attention.  Do you recognize this as an e-mail
18  to you from Jim Fogarty dated September 26?
19     A.  I do not but I have no reason to
20  believe it is not.
21     Q.  If you turn the page -- have you
22  had a chance to review this e-mail?
23     A.  Yes.  I just read it.
24     Q.  Okay.  And the e-mail is generally
25  describing the Barclays sales transaction; is

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  that correct?
3     A.  Yes.  Um-hum.
4     Q.  Okay.  For instance, on the second
5  page, near the top it says Schedule A, a list
6  of securities transferred under the Barclays
7  repo agreement and then it refers 44 billion
8  in collateral.
9        Do you see that?
10     A.  Yes.
11     Q.  And the discussion goes on and two
12  paragraphs down he writes, "Check my thinking
13  but the 44 billion is match booked through the
14  unwind of the repo."
15        Do you see that?
16     A.  Yes.
17     Q.  What is your understanding of what
18  he meant by that?
19     A.  I don't know what that means.
20        MR. GAFFEY:  Objection to the
21  form.  You can answer.
22     A.  I do not know what that means.
23     Q.  Okay.  "And thus we transferred
24  net long value of 2.3 billion plus whatever is
25  to be transferred Monday out of the agreed --

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  everything in the unencumbered box."
3        Did you then or do you now have an
4  understanding of what he's referring to?
5     A.  Do not know now and, I mean, I'm
6  hopeful of gaining through the information I'm
7  going to get eventually in this case to be
8  able to answer that question, yes.
9     Q.  And just specifically the
10  reference to net long value of 2.3 billion, do
11  you have an understanding of what he's saying
12  in terms of --
13     A.  No.
14     Q.  Do you recall if you -- when you
15  got this if you didn't understand it would you
16  have asked someone about it?
17     A.  No.  I mean, this was, again, a
18  pretty low priority item from my perspective.
19  I mean, the issues were not -- this was a
20  transaction which we were not -- this was not
21  within our purview.  It was a transaction
22  which would im -- to the extent that there
23  were problems with this transaction, as long
24  as we preserved the data, as long as we
25  understood what was transferred around, if

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  there were mistakes at the end of that day
3  that preservation of that data would permit us
4  to come back and to sit down and to talk about
5  this.
6        From my perspective, this was a
7  transaction that was a done deal.  What I
8  needed to focus on was the TSA.  I needed to
9  focus on access to information and once we got
10  that information we could reconstruct anything
11  we needed to reconstruct against any of the
12  clearing banks, against any transaction that
13  took place within the 90-day time period of
14  the bankruptcy filing.
15     Q.  Was that your view, that you could
16  basically just consider these issues up
17  through 90 days and figure out --
18     A.  No, back 90 days from the filing.
19     Q.  Okay.  Sorry.
20        Do you recall any follow-up with
21  Mr. Fogarty or anyone else concerning the
22  substance of what he's conveying to you here?
23     A.  Again, during the first period
24  following the proceeding, the most important
25  issues that we had to deal with was the

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  preservation of the data, was getting access
3  to the inventory of assets, dealing with those
4  key melting assets that we had.  And as you
5  may or may not recall, I don't know to what
6  extent you got to know the testimony, there
7  was just a slew of creditors who wanted
8  information.  Where's the status of my
9  transaction.  And the judge insisted upon
10 trying to help these people to the best of our
11 abilities to try and get the information that
12 they were requesting.
13         So we were in a period of -- that
14 period of this was followed by -- and, by the
15 way, during this period, just as an aside, the
16 only discussions we had with Barclays was not
17 about whether this transaction was good or bad
18 or whether they'd given us adequate securities
19 or whatever the issues you've raised earlier.
20 The issue was always in all the meetings we
21 had with Jonathan and others, of Barclays, was
22 relating to the TSA, relating to the
23 technology -- relating to the accounting
24 information.
25         And, in fact, it wasn't until

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  mid-November when we -- when Jonathan saw the
3  complaint that we had drafted that we were
4  going to bankruptcy court with it that we
5  caught the attention of senior management.
6  And senior management basically apologized for
7  the fact that there were parts of Barclays
8  which we're trying to protect the integrity of
9  their system but were indifferent to the
10 commitments that had been made by Barclays
11 senior management.
12         And Barclays in mid-November did a
13 complete turn-around.  They became very
14 cooperative with us following our threatening
15 to take them before Judge Peck for violation
16 of the TSA.  And then really -- until that
17 information started to flow, we didn't have
18 accounting information.  We didn't have
19 records.  We didn't have -- we didn't have a
20 lot of the information that we later got which
21 was in the -- which was really in the late
22 December, early January time frame which is
23 when we were able to shift gears to another
24 part of this which is to start to ask
25 questions about what had happened, what was

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  going on here, because the numbers were not
3  jiving with what -- the numbers that we had
4  been provided.
5     Q.  Mr. Fogarty goes on a little
6  further down under a few thoughts.  The first
7  bullet point and about mid way through that
8  bullet point -- well, the full bullet point,
9  "After you guys spend a little time with these
10 things we should probably arrange a call with
11 the Barclays guys, a/k/a former Lehman, the
12 guys at the table early Monday morning were
13 apparently Paolo and Alex Kirk and Weil, to
14 make sure we all understand these details and
15 make sure these are disseminated appropriately
16 through Barclays so there is no confusion
17 about what stuff be ours and to ensure
18 appropriate security controls which the TSA
19 requires they keep."
20         Was it important for you
21 operationally to make sure you understood as
22 soon as possible which assets had been
23 transferred to Barclays and which had stayed
24 with Lehman?
25         MR. GAFFEY:  Object to the form.

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     A.  It was important for us to get
3  access to the accounting information.  And
4  we -- and part of that account information we
5  would capture what assets were transferred or
6  not transferred.  It would be essential that
7  we capture that information.
8     Q.  Including the information about
9  what was transferred as part of the
10 transaction and what wasn't.
11    A.  Yes.  Yes.  Yes.
12    Q.  Okay.
13        (Deposition Exhibit 492, document
14 bearing production numbers
15 BCI-EX-(S)-00021769 through
16 BCI-EX-(S)-00021771, marked for
17 identification as of this date.)
18 BY MR. THOMAS:
19    Q.  Let me show you a document we'll
20 mark as 492.
21    A.  Um-hum.
22        (Document review.)
23    Q.  This appears to be an e-mail chain
24 dated September 28th, 2008.  And appears that
25 you're a recipient at least on the early

| Page 90 | Page 91 |
|---|---|

**Page 90**

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  e-mails although not the last most recent one
3  in time.
4         Do you see that?
5    A.  Yes.
6    Q.  And no reason to believe you
7  didn't get this e-mail.
8    A.  Correct.
9    Q.  The earliest in time is an e-mail
10 from Rod Miller to Jim Fogarty, yourself, and
11 a number of other people concerning the 15c3-3
12 account progress LBI funds.
13        Do you see that?
14   A.  Yes.
15   Q.  Mid way through this e-mail he
16 says -- asks, "Were you able to make a headway
17 on the 1 billion of the 15c3-3 cash at Wells
18 Fargo?"
19        Do you see that?
20   A.  Yes.
21   Q.  Do you recall what the issue was
22 there?
23   A.  No.
24   Q.  Do you recall that 15c3-3
25 securities were transferred to Barclays as

**Page 91**

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  part of the transaction?
3    A.  I didn't -- I have no -- I had no
4  idea at this time what 15c3-3 even meant.
5    Q.  Okay.
6         Do you recall any discussions
7  or -- discussions with Wells Fargo about
8  those --
9    A.  I didn't have any discussions with
10 them and I don't recall having discussions
11 with Wells Fargo with Steve Cohn.  Steve Cohn
12 is the treasurer.
13   Q.  Okay.  Let me show you another
14 document we'll mark as 493.
15        (Deposition Exhibit 493, document
16 bearing production numbers AM 001695
17 through AM 00167 with attachment, marked
18 for identification as of this date.)
19        MR. GAFFEY:  Todd, the first three
20 pages of this are Bates numbered but the
21 remainder are not.  Is there any reason
22 for that?
23        MR. KRISBERGH:  I believe because
24 they were produced in native format they
25 won't be Bates stamped but they are

| Page 92 | Page 93 |
|---|---|

**Page 92**

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  attachments.
3         MR. GAFFEY:  That's the attachment
4  to the native format.
5         MR. KRISBERGH:  Yeah.
6         MR. THOMAS:  I'm told those are
7  the attachments.  I think they're the
8  attachments.  I'm not going to ask about
9  the attachments though so...
10        MR. GAFFEY:  Okay.
11 BY MR. THOMAS:
12   Q.  Do you recognize this as a
13 September 29th, 2008 e-mail from Jim Fogarty
14 to a number of people at Alvarez including
15 yourself?
16   A.  I don't recall this document but I
17 believe it to be a document that was sent to
18 me.
19   Q.  Okay.  Mr. Fogarty writes, "I
20 believe this is the final securities
21 collateral file.  We discussed securities to
22 move on Monday.  Looks like another
23 .3 billion.  This is on top of the 2.3 billion
24 in prior files for a total of 2.6 billion in
25 addition to the unwind of the 44 billion repo

**Page 93**

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  with Barclays."
3         Do you see that?
4    A.  Yes.
5    Q.  Do you remember this issue that's
6  being discussed with respect to these
7  transfers?
8    A.  No.
9    Q.  Do you know why Mr. Fogarty was
10 following these issues?
11   A.  You'd have to ask Jim.  It would
12 be good order to try and gather this
13 information.  I mean, I would say he would try
14 to gather this information.  But this again
15 was not a priority at this point in time.
16        Gathering this information to act
17 upon it at another point in time would be I
18 think common sense but this was not his
19 priority.  His priority at this time was the
20 TSA and shortly thereafter the derivatives
21 booked.
22   Q.  But, again, even for operational
23 purposes it's important to know which assets
24 were transferred over to Barclays and which
25 weren't.

Page 94

B. MARSAL - HIGHLY CONFIDENTIAL

1
2    A.   Well, these were LBI assets.  As
3    you undoubtedly know, these were LBI assets
4    and these were not -- the LBI assets were not
5    under our purview.  So this was interesting to
6    know but this is for another day so that we
7    could sit back and find out what the heck
8    happened with this transaction.  As long as we
9    captured the data and captured the information
10   that was priority number one.  Acting upon it
11   was not priority one.
12       Q.   Well, putting aside acting on it,
13   when you try to -- there's a lot of e-mails
14   we've looked at, documents, discussing
15   assessing parts of the Barclays transaction.
16   The fact that it was -- involved LBI assets
17   that still had a big impact on the LBHI
18   estate, correct?  The transaction.
19       A.   It had an impact on the estate,
20   yes.
21       Q.   I mean, it was important to the
22   estate.
23       A.   I view LBI as ultimately an asset
24   of the -- any positives would flow up to the
25   holding company level, yes.

Page 95

B. MARSAL - HIGHLY CONFIDENTIAL

1
2    Q.   So even if there were LBI assets
3    that went over, it's still important for LBHI
4    holding company to understand what assets went
5    over?
6    A.   Ultimately -- yeah, ultimately we
7    intend to go through -- the same forensic
8    activity that we went through on LBH we intend
9    to go through on LBI.  So the preservation of
10   the data.  But the most immediate was -- the
11   most immediate problem was the preservation of
12   the data, not to take action; not to
13   second-guess what was going on on other fronts
14   but to save that data so that we could review
15   what happened on those other fronts.
16       Q.   But it was also to understand the
17   sales transaction and what assets and
18   liabilities went over and which stayed,
19   correct?
20       A.   Yes.  Yes.
21       Q.   Let me go ahead and show you the
22   next document which is 494.  Maybe.
23            (Pause on the record.)
24            MR. THOMAS:  Let's go off the
25   record for a moment, please.

Page 96

B. MARSAL - HIGHLY CONFIDENTIAL

1
2            THE VIDEOGRAPHER:  The time is
3    11:51.  We are going off the record.
4            THE CHAIRMAN:  The time is 11:59.
5    We are back on the record.
6    BY MR. THOMAS:
7        Q.   Let me show you a document that
8    we've previously marked as 464A.
9            (Document review.)
10       Q.   And this is an e-mail chain with
11   attachments from Bill Gordon at Alvarez to a
12   number of other folks at Alvarez dated
13   September 29th, 2008.  Does that appear to be
14   accurate to you?
15       A.   Yeah, I -- yes.  It wasn't
16   addressed to me, though.
17       Q.   Right.  I see that.
18            And would you remind me, what was
19   Bill Gordon working on at this --
20       A.   He was head of the TSA team.
21       Q.   Okay.  And the subject line of
22   this e-mail chain is Here is all we have at
23   the moment that makes an effort to describe
24   what Barclays got and didn't get.
25            And looking at this, do you

Page 97

B. MARSAL - HIGHLY CONFIDENTIAL

1
2    understand this -- well, first of all,
3    there's -- the original e-mail appears to be
4    from Glenn West on the second page.
5            Do you see that?
6        A.   Yeah.  Right.  On the first page
7    it says Glenn West to Weil Gotshal.
8        Q.   Weil Gotshal, right.
9        A.   Right.
10       Q.   And then you have Weil Gotshal --
11   Weil Gotshal sending the information to a
12   number of people at Alvarez & Marsal including
13   J. McCarthy --
14       A.   To Jack McCarthy, head of the
15   proprietary investments team and Daniel
16   Ehrmann, head of the international team.
17       Q.   Um-hum.  This is a description of
18   what Barclays got and didn't get as part of
19   the sale transaction provided to Alvarez &
20   Marsal from Weil Gotshal; is that right?
21            MR. GAFFEY:  Object to the form.
22   Foundation.
23       A.   Yes.
24       Q.   And if you would turn to the third
25   page, please, with the Bates stamp number

Page 110

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2   to property -- any property that may be held
 3   to security obligations under such derivative,
 4   just by reading that, is it -- do you
 5   understand that to be referring to the
 6   collateral associated with the exchange traded
 7   derivative?
 8        MR. GAFFEY:  Objection to form.
 9        A.   In reading that that's what I
10   would gather was the collateral.
11        Q.   And if you would flip, please, to
12   page 2296 -- or Bates number 2296.
13        A.   (Witness complies.)
14        Q.   The bullet point at the top says
15   Purchaser shall receive, and then (ii) is, to
16   the extent permitted by applicable law and as
17   soon as practicable after the closing 769
18   million of securities as held by or on behalf
19   of LBI on the date hereof pursuant to Rule
20   15c3-3 of the Securities Exchange Act of 1934
21   as amended or securities of substantially the
22   same nature and value.
23        Do you see that language?
24        A.   Yes.
25        Q.   Is that consistent or inconsistent
```

Page 111

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2   with your understanding that as part of the
 3   sales transaction Barclays was to receive
 4   those assets?
 5        A.   No idea.
 6        MR. GAFFEY:  Objection to form.
 7        Q.   No idea.
 8        A.   No idea.
 9        Q.   Can I ask you to turn to the APA,
10   please.  Which is one of the first documents I
11   showed you.
12        A.   (Witness complies.)
13        Q.   And if you would turn to page 6 of
14   that document, please.
15        A.   (Witness complies.)
16        Q.   To the definition of Purchased
17   Assets.
18        Do you see that?
19        A.   Yes.
20        Q.   Do you know or have an opinion as
21   to whether the exchange-traded derivatives --
22   well, strike that.
23        As to whether the 769 million in
24   15c3 securities or securities substantially of
25   that same nature and value were --
```

Page 112

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2        A.   Todd, I have no idea.  I didn't
 3   see this document and I didn't see the last
 4   one.  So my -- my ability to answer that
 5   question -- I don't know whether this 767 or
 6   whatever you're saying it is relates to some
 7   other 767.
 8        Q.   Okay.
 9        A.   This was -- again, this is not a
10   transaction which -- I feel a little like a
11   dope because, you know, what you've got to
12   understand here is this transaction was not
13   something that was in question during this
14   period of time.  This was only in -- this only
15   became to light into the early part of 2009.
16        So this whole period 2008, this
17   was not a -- this transaction would be a
18   transaction which one day would see the light
19   of day, one day would be analyzed, and there
20   would be a forensic activity to seeing what
21   happened here.
22        But from my perspective during
23   this critical period this was not a priority.
24   This was was not on my radar screen.
25        Q.   So your approach was to --
```

Page 113

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2        MR. GAFFEY:  For the record I
 3   object to you're asking him for an
 4   opinion which I didn't get to say a
 5   moment ago.  He's not here as an expert.
 6        Q.   So from your perspective
 7   addressing issues about which assets were
 8   transferred and not transferred and their
 9   values and whether it was a good deal or bad
10   deal was something that would be put off for a
11   later period of time to be --
12        A.   Not the subject of a good or bad
13   deal.  I didn't think that was my
14   responsibility to determine whether it was a
15   good deal or bad deal.  It would be my
16   responsibility to determine whether or not the
17   benefit of the bargain was realized by all
18   parties.  That's what I would put off to
19   another day.  I would never reopen the
20   transaction because it was a good or bad deal.
21   The court determined that based on a whole
22   host of factors that were reviewed at the
23   time.  No, that would not have been my -- that
24   would not have been my approach.
25        But to know what -- I mean,
```

Page 114

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  clearly, we wanted to know whether or not the
3  cash which was priming the operating pump
4  which was the sale of the headquarters
5  building, the sale of the data centers, that
6  cash was important to us.  That cash was
7  important to us as to what assets were
8  transferred.  Again, we were told that assets
9  were transferred equal to liabilities that
10 were transferred.  And we basically assumed
11 that was correct.  There was no issue to be --
12 to be challenged at that point in time.  And
13 never did I want to get into a situation where
14 was this a good or bad deal.
15     Q.   In terms of whether the parties
16 received the benefit of the bargain or not,
17 that would be based on the terms of the
18 agreement they entered, correct?
19     A.   The assets equalled the
20 liabilities.  That's what I had been
21 represented.  The assets were supposed to
22 be -- the asset value -- I shouldn't say
23 assets -- the asset value were supposed to
24 equal the liabilities being assumed.  That was
25 the benefit of the bargain that Berkenfeld had

Page 115

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  told me we had struck.
3     Q.   Well, when you say the parties
4  received the benefit of the bargain, shouldn't
5  it be -- shouldn't that benefit be measured
6  based upon the agreement they signed and
7  entered?
8         MR. GAFFEY:  Object to the form.
9     A.   Well, I didn't review the
10 agreement.  I didn't review the agreements.  I
11 mean, what I was told was this was an excluded
12 transaction, not for your purview.  The
13 transaction will have an impact, though, on
14 the rest of the estate and we're giving you
15 assurances that there will be a TSA prepared
16 which will provide you with the assurances you
17 need to access.
18         As to the transaction, itself,
19 what I was told was there'll be a -- there
20 will be -- assets will be left with the --
21 with Barclays equal to the liabilities being
22 assumed.
23     Q.   Now, when you say excluded
24 transaction, again you're just referring to
25 Mr. Berkenfeld's comment to you --

Page 116

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     A.   Correct.
3     Q.   -- that other things should be
4  your focus as opposed to --
5     A.   Well, no.  Yes, I mean, it was
6  Berkenfeld -- it was Berkenfeld on both of
7  those transactions.  He was the only one
8  available.  Bart McDade was not available
9  because they were all working on the
10 transaction.  My assumption was that
11 Berkenfeld who signed the agreement was
12 speaking for Bart McDade and others.
13     Q.   But did he ever say that?
14     A.   Berkenfeld said what I said, yeah.
15     Q.   But did he ever say that he was
16 speaking for Bart McDade?
17     A.   You know, he said he was speaking
18 for the company.  He was speaking for the
19 company as to what the -- for me to be -- I
20 mean, I was being hired to do -- to be
21 focusing on the wind-down of the estate
22 excluding those two transactions which were
23 under way and I was not to be -- I was not to
24 put myself in the middle of those transactions
25 because they were on the verge of closing.

Page 117

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  That's what he said.
3         And, I mean, he said that
4  everything else you should be focusing your
5  attention on the residual estate.
6     Q.   And you actually recall him saying
7  he was speaking on behalf of the company when
8  he said your focus should be elsewhere?
9     A.   No.  I don't recall whether he
10 said it was on behalf of the company but the
11 inference was since he was signing the
12 agreement to hire Alvarez & Marsal and myself
13 that he must be speaking for the company.
14     Q.   And no one else from the company
15 like Bart McDade or anyone else --
16     A.   I didn't meet with Bart McDade
17 until after the transaction had occurred.
18     Q.   But, in any event, no one other
19 than Mr. Berkenfeld indicated to you that your
20 focus should be elsewhere.
21     A.   No.  That's Berkenfeld.  Steve
22 Berkenfeld was the one who indicated.
23     Q.   Okay.  Now, in -- do you think the
24 parties should be held to the terms of the
25 agreement that they entered?

Page 118

1        B. MARSAL - HIGHLY CONFIDENTIAL
2            MR. GAFFEY: Object to the form.
3        A.   As a matter of -- again, I mean,
4    I'm not being controversial.  The deal -- the
5    benefit of the bargain which I was told about
6    is evidently very different than the deal
7    which was ultimately inked.
8        Q.   Well, Mr. Berkenfeld had told you
9    a different description according to your
10   testimony than the deal that was ultimately
11   inked.  But I'm asking in terms of the parties
12   being held to the benefit of the bargain,
13   shouldn't that be the contract that they
14   ultimately agreed to enter?
15           MR. GAFFEY:  Object to the form.
16   You can answer.
17       A.   I would say -- you know, as a
18   philosophical matter if you strike a bargain
19   you live by it, whatever that bargain was.  If
20   that bargain was -- you know, I mean, that's
21   the crux of this argument, though, was what
22   was this bargain.
23       Q.   And so the bargain -- what was
24   struck as the bargain is normally reflected in
25   the terms of the contract the two sides sign,

Page 119

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    correct?
3            MR. GAFFEY: Objection.
4        A.   I would -- I mean, my idea of a
5    bargain is whether there's a contract signed
6    or not.  If you and I have a deal, that's what
7    I'm going to live by.  It happens to be if
8    you're going to paper it, sure.  But, I mean,
9    that was -- you know, in the wild, wild west
10   they might shoot you if you say a bargain is
11   only a bargain if you have it signed up.
12           But my idea was this was -- the
13   idea was that this was a transaction which was
14   supposed to have assets equalling liabilities
15   assumed.  That's what I believe and as I
16   recall that's what Berkenfeld told me and
17   that's what my team I think believed.
18       Q.   Okay.  In this situation do you
19   think each party should just live with the
20   terms of the agreement that they signed and
21   entered?
22           MR. GAFFEY: Objection.
23       A.   If that agreement was -- if that
24   agreement was as I indicated, yes.  Because
25   then I think it would have been -- I would

Page 120

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    like to have known that that wasn't the
3    benefit of the bargain.  I would like to have
4    known what this transaction really was.  And I
5    think the bankruptcy court and the creditors
6    needed to know what this transaction was if it
7    wasn't as outlined.
8        Q.   If there was -- are you aware that
9    I guess each side has taken months to value
10   certain assets that were transferred as part
11   of the transaction?
12           MR. GAFFEY:  Object to the form.
13       A.   Yes.
14       Q.   And that's because some assets in
15   the transaction were extremely hard to value?
16           MR. GAFFEY:  Object to the form.
17       A.   I'm not sure.
18       Q.   Okay.  And are you aware that
19   certain liabilities wouldn't be set until
20   after the transaction?  Wouldn't be known
21   until after the transaction.  For example,
22   which contracts Barclays decided to assume.
23       A.   No.  What I'm assuming is that the
24   liabilities that were being assumed were the
25   book liabilities.  And that the bonus accrual

Page 121

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    and the severance accrual, that was being --
3    that was being assumed.  So I assume that that
4    liability was truly an exchange of values so
5    that Barclays would be no worse off.
6        Q.   So in terms of -- you didn't
7    understand in terms of cure liabilities or
8    trade payments being assumed that they would
9    only be assumed to the extent Barclays elected
10   to assume those contracts?
11           MR. GAFFEY: Objection.
12       A.   No.  That's correct.  But my
13   assumption was that there was going to be
14   value given in exchange for an exact equal
15   amount of liabilities picked up.
16       Q.   And can you tell me -- and you
17   never read the sale contract, correct?  The
18   purchase agreement.
19       A.   That's correct.
20       Q.   Now, you've said a number of times
21   that you thought assets would have to equal
22   liabilities.
23       A.   Value of assets.
24       Q.   Value of assets have to equal
25   value of liabilities.

Page 122

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     If some of the assets couldn't be
3  valued in real-time and were in flux and
4  changing, how would it even be possible to
5  enter a transaction that required assets to
6  ultimately end up equalling liabilities?
7     MR. GAFFEY:  Objection.  You can
8  answer.
9     A.   I don't know what assets -- I
10  don't know enough about the assets that were
11  not in flux to really know what -- to
12  understand what you're asking.  Nor do I know
13  what the value -- I mean, our people are
14  valuing those assets today.  I'm not sure why
15  there's all this complication.  We didn't
16  have -- we didn't seem to have the same kind
17  of difficulty.
18     Q.   Well, at the time the deal was
19  being negotiated, the week of September 15th,
20  as you've testified there was chaos at Lehman.
21     A.   Right.
22     Q.   I think also you've indicated that
23  some of these assets were difficult to value
24  because they weren't being traded.  So if
25  you --

Page 123

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     A.   If an asset wasn't being traded it
3  would be more difficult to value, yes.
4     Q.   Right.  I mean, you don't contest
5  that during that week it was difficult -- I
6  mean, to even determine which securities Lehman
7  had let alone what is the appropriate market
8  value of those securities.
9     A.   That's correct.  It was a very
10  difficult period of time for everybody.
11     Q.   Okay.  And if you couldn't say
12  definitively which securities you had and what
13  their value was, how could you possibly
14  structure a deal which was predicated on
15  assets ultimately equalling liabilities?
16     MR. GAFFEY:  Object to the form.
17     A.   My assumption is that just as you
18  were -- you know, you would give yourself some
19  kind of a decent cushion when you were looking
20  at those assets you could say what the market
21  value was and -- I mean, I think most of the
22  assets, though, had a pretty good handle on
23  what the market value was.  There was a group
24  of illiquid assets maybe in this portfolio.
25  I'm not sure whether -- what those assets

Page 124

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  were.  Maybe the Racer's portfolio.  I could
3  see how there would be complications there.
4  But as I understand, those assets since I have
5  them back were not transferred so...
6     Q.   Do you think it would be unre --
7  would it be unreasonable for Barclays in a
8  situation where assets were uncertain and
9  difficult to value, to seek a cushion as
10  protection and for LBHI to give them that
11  cushion in that situation?
12     MR. GAFFEY:  Object to the form.
13     A.   I mean, I can't go redo the deal.
14  I mean, the deal -- what would be appropriate
15  to me would be some kind of a hold-back.  And
16  the hold-back -- to the extent the hold-back
17  was needed then it would be utilized.  To the
18  extent it wasn't, it would be returned to the
19  company.  That would be the way most
20  transactions in the M&A side of the world is
21  dealt with.
22     Q.   And by hold-back you mean figuring
23  out what assets and liabilities were some time
24  after the deal and then having some kind of
25  true-up provision?

Page 125

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     A.   Yes.
3     Q.   Other than that contractual
4  device, in this situation in which you found
5  yourself the week of September 15th, would
6  there be any other possible way you could
7  think of to somehow make a deal that had to
8  turn out to be a push, as you say?
9     MR. GAFFEY:  Objection to the
10  form.  And it mischaracterizes much of
11  the testimony today.  He didn't find
12  himself in that situation on the 15th.
13  And I'm not sure if that's something you
14  put in the question deliberately, Todd,
15  or it's just the rhythm of the questions
16  you're asking.  But I've been pretty
17  patient about this but you're basically
18  engaging in a legal debate.
19     MR. THOMAS:  Speaking objection.
20     MR. GAFFEY:  Completely improper
21  question.  That's why.
22     MR. ROTHMAN:  The questions are
23  calling for speculation as well.  I
24  would object on that basis.
25     MR. THOMAS:  We have your

Page 126

1        B. MARSAL - HIGHLY CONFIDENTIAL
2   objection.
3        A.   Can you ask the question again?
4   I've lost track of what it was.
5        Q.   Sure.  Initially I'd asked whether
6   there was any way possible to make this a deal
7   that had to end up assets equalling
8   liabilities if not all the assets were known
9   and their values couldn't be determined.  And
10  you came up with the idea of a hold-back which
11  is a contractual device by valuing them later,
12  figuring it all out later, and then you have
13  some kind of true-up provision.
14        Other than that hold-back
15  contractual device which you identified, can
16  you see any way in which this deal could have
17  been structured so that assets equal
18  liabilities?
19        MR. GAFFEY:  Object to the form.
20        A.   I mean, I'd have to think about
21  other ways you might do it.  I mean, I don't
22  know.  I mean, I would say to you that in a --
23  you know, in a secured lending position you
24  would over-advance.  In a secured loan where
25  you'd over-advance, you'd liquidate your

Page 127

1        B. MARSAL - HIGHLY CONFIDENTIAL
2   position, and to the extent that you had an
3   over-advance you would apply it to your loan,
4   and to the extent there was excess, well, you
5   would return the excess to the estate or the
6   borrower.
7        But I'm not trying to redo the
8   deal.  What I believe -- what I'm saying to
9   you is that I was told that this is -- there
10  were assets going to be equalling liabilities
11  assumed and it wasn't until the first quarter
12  of 2009 when we said we don't think that
13  happened here.  We think there's a skunk in
14  the garden party.
15        Q.   We looked at a number of
16  descriptions this morning of assets by Weil
17  Gotshal -- a number of descriptions for the
18  assets that were going over, liabilities going
19  over, and those staying, including by Weil
20  Gotshal and people at Alvarez for whatever
21  purpose.
22        A.   Right.
23        Q.   And would you really haven't seen
24  anything that says that the deal was supposed
25  to be a push with assets somehow equalling

Page 128

1        B. MARSAL - HIGHLY CONFIDENTIAL
2   ultimate liabilities?
3        MR. GAFFEY:  Objection.
4        A.   No.  I don't say that at all.
5        MR. GAFFEY:  Excuse me.  Excuse
6   me.  Objection.  You mean of the
7   documents you've shown him today?
8        MR. THOMAS:  Yes.  That's what I
9   said.
10        MR. GAFFEY:  So, here.  Do you
11  want him to look through the documents
12  you've shown him?  Come on.
13        MR. THOMAS:  I don't really want
14  him.  We just have his testimony.  You
15  and I both know there's nothing in there
16  like that.  So if he can point me to
17  something I just want to know.
18        A.   No.  But all I can tell you -- all
19  I can tell you about this transaction which
20  was out of my purview is what I was told this
21  transaction was going to be.  All that -- that
22  is what I know.  And what you are citing me is
23  documents upon documents which suggests
24  otherwise.  Those documents I didn't review.
25  Nor did I participate in this negotiation.

Page 129

1        B. MARSAL - HIGHLY CONFIDENTIAL
2   People who did participate in the negotiation
3   have represented a different side of this.
4        Q.   And I believe you --
5        A.   I don't believe anyone's not
6   telling me the truth.  I believe everyone is
7   being honest about what their recollection
8   was.  It may be contrary to what the other guy
9   thinks but I believe people are telling me the
10  truth.
11        Q.   Who --
12        A.   There was chaos during this
13  period.
14        Q.   Other than Mr. Berkenfeld, who
15  else indicated to you that the transaction was
16  supposed to be a push with assets --
17        A.   I don't know whether it was before
18  or after the transaction closed but I think
19  Tom Roberts of Weil Gotshal indicated that.
20  Again, I don't know whether it was before or
21  after the transaction closed.
22        Q.   Anyone else?
23        A.   You know, I don't recall.  Maybe
24  Dick Fold had indicated it.  He's indicated
25  that was his understanding.  But, again, I do

Page 162

B. MARSAL - HIGHLY CONFIDENTIAL
1
2     Q.   Okay.  Has anyone at Alvarez ever
3  tried to value the collateral?
4     A.   Lehman -- Lehman has been
5  attempting to evaluate the collateral well
6  into the summer of 2009.  Not before then.
7     Q.   When did they start?
8     A.   I don't know.  Sometime after the
9  second quarter.  Thereabouts.
10     Q.   Why is it taking so long?
11        MR. GAFFEY:  Objection to the
12  form.
13     A.   You could probably answer that
14  better than I could.
15     Q.   I know.  I'm not allowed to,
16  though.
17     A.   I think the gathering of
18  information has been very difficult.  Trying
19  to understand the value and the basis by which
20  people value things.
21     Q.   All right.  Let's move on.  Let me
22  show you a document which has been previously
23  marked as 461A.
24     A.   It wasn't that long, by the way.
25  We're moving pretty good.

Page 163

B. MARSAL - HIGHLY CONFIDENTIAL
1
2     Q.   I know.
3     A.   No, but I mean gathering this fact
4  base.
5     Q.   Oh, okay.
6     A.   After one year.  This is a pretty
7  good fact base after one year.  Enron it took
8  them three years.
9     Q.   I take it they're not assets that
10  you could just look up on a database somewhere
11  and see what they are?
12     A.   Well, you got to have the database
13  first.  That's the biggest problem.
14     Q.   Are they -- are some of them
15  illiquid assets?
16     A.   There are liquid assets and
17  illiquid assets.  Not among this category.
18  Most of this is liquid stuff.  Most of the
19  other category is illiquid assets.  Real
20  estate and the like.
21     Q.   This is a Powerpoint approved by
22  Alvarez & Marsal.  It's dated October 8th,
23  2008 entitled Report to Unsecured Creditors
24  Committee.
25     A.   Um-hum.

Page 164

B. MARSAL - HIGHLY CONFIDENTIAL
1
2     Q.   Do you recall being involved in a
3  presentation to the Creditors Committee about
4  this time?
5     A.   Yes.  I presented it.
6     Q.   And did you present this actual
7  Powerpoint?
8     A.   I presented sections of the
9  Powerpoint.  As you see on page 2, the various
10  presenters of the various sections on page 2
11  of the presentation.
12     Q.   Was it -- so where did this
13  meeting take place?
14     A.   I don't recall but it would have
15  been either at Weil Gotshal or Milbank.  We
16  alternate meeting locations.
17     Q.   Other than Alvarez/Lehman people
18  and people from the Creditors Committee was
19  anyone else there?
20     A.   Professionals from the Creditors
21  Committee.  No one else.
22     Q.   And -- I mean, Creditors
23  Committee, that would be --
24     A.   The Unsecured Creditors Committee.
25     Q.   Houlihan, for example?

Page 165

B. MARSAL - HIGHLY CONFIDENTIAL
1
2     A.   Houlihan and FTI would be there.
3     Q.   Anybody from Weil there?
4     A.   Oh, yes.
5     Q.   Anybody from the trustee?
6     A.   No.
7     Q.   If you would turn to page 4531,
8  please, which is page 28 of the presentation.
9  And you see it's a description of the sale to
10  Barclays and it has a list of assets
11  purchased.  Was part of the presentation
12  designed to give -- convey what assets were
13  transferred as part of the sales transaction?
14     A.   Yeah.  The purpose of the
15  transaction was just to give a summary
16  overview of what had happened in the course of
17  two and a half weeks.
18     Q.   Um-hum.
19     A.   At which that was one of the
20  items, yeah.
21     Q.   Okay.  And under the assets
22  purchased -- and when it says Assets Purchased
23  that's purchased pursuant to Barclays'
24  purchase agreement, correct?
25     A.   I believe so, yes.

Page 166

B. MARSAL - HIGHLY CONFIDENTIAL

2  Q.  It has 1.9 billion unencumbered
3  box listed there.
4  A.  Um-hum.
5  Q.  Do you -- do you recall that that
6  was some of the assets that were transferred
7  as part of the deal?
8  A.  No, I do not know.  Jim Fogarty
9  presented this so he would -- he'd be the
10  right party to speak to this.
11  Q.  Okay.  The first bullet point says
12  "43.1 billion repo assets - book value per
13  Lehman stale marks negotiated a $5 billion
14  reduction."
15  Do you see that?
16  A.  Yes.
17  Q.  Okay.  There's -- in your motion,
18  your Rule 60 motion filed in this matter,
19  there's reference to a $5 billion discount.
20  Are you aware of that?
21  A.  Yes.
22  Q.  Okay.  Is this the $5 billion
23  discount that's referred to in your motion?
24  MR. GAFFEY:  Objection to the
25  form.  You can answer.

Page 167

B. MARSAL - HIGHLY CONFIDENTIAL

2  A.  I do not know -- I mean, I do not
3  know what the basis of this $5 billion
4  reduction is.  I believe that there are
5  separate...
6  Q.  What do you understand the
7  discount in your motion to be referring to?
8  A.  I'd have to look at the motion
9  again but -- as to what you're speaking about.
10  Q.  Okay.  Let me go ahead and mark
11  this as 495.
12  (Deposition Exhibit 495, Debtor's
13  Rule 60 Motion, marked for
14  identification as of this date.)
15  BY MR. THOMAS:
16  Q.  A copy of LBI's Rule 60 motion in
17  this matter.  And you're welcome to look at as
18  much or as little as you want but I'm going to
19  direct your attention to paragraph 91.
20  A.  91, okay.
21  (Document review.)
22  A.  Okay.  Would you like me to read
23  beyond 91?
24  Q.  Well, again, you're welcome to
25  read more but the sentence in here I want to

Page 168

B. MARSAL - HIGHLY CONFIDENTIAL

2  draw your attention to is, "Later that day,
3  pursuant to the repurchase agreement, Barclays
4  forwarded to LBI approximately $45 billion in
5  cash and LBI was to post collateral valued at
6  approximately $50 billion in securities
7  reflecting an approximate $5 billion discount
8  or haircut in the value of LBI's collateral."
9  And then in paragraph 100 there's
10  a reference to "The undisclosed decision to
11  use the repurchase agreement to deliver the
12  discount conveniently solved the problem."
13  Do you see that?
14  A.  Um-hum.
15  Q.  And then again on paragraph 104
16  there's testimony about -- excuse me.  It
17  reads, "Lowett was not the only witness to
18  concede that the repurchase agreement was
19  employed to ensure that Barclays got its extra
20  $5 billion."
21  Do you see that?
22  A.  Yes.
23  Q.  So is the $5 billion that Lehman
24  is concerned about, the discount that they're
25  concerned about in their motion, is that the

Page 169

B. MARSAL - HIGHLY CONFIDENTIAL

2  difference between what Lehman now believes to
3  be the correct value of the repo collateral
4  and the amount at which it was valued for
5  purposes of the deal?
6  MR. GAFFEY:  Objection to the
7  form.
8  A.  Well, I mean, again, if you're
9  asking me the question about this presentation
10  that was done in October when the words stale
11  marks -- if you're asking me what I -- the
12  interpretation that I draw from this
13  presentation, the presentation when it said
14  stale marks, that would tell me that the marks
15  were old.  The marks were out of date.  And
16  that the value of the collateral had actually
17  deteriorated $5 million that they were
18  receiving.  That's what I would have
19  interpreted this -- that's what I actually
20  interpreted this as which would have made
21  sense to me given the market conditions that
22  there had been a drop in the value of the
23  securities.
24  Q.  And by stale marks meaning that
25  after September 12th the marks were being

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  updated throughout that week of chaos and
3  so --
4      A.   Yes.
5      Q.   So the stale marks would refer to
6  the marks that were just on the books from the
7  preceding week before bankruptcy.
8      MR. GAFFEY:  Object to the form.
9  You can answer.
10     A.   Yes.
11     Q.   Okay.  And your understanding of
12 this was that the parties agreed that those
13 marks were stale and there needed to be some
14 type of updated valuation of those assets?
15     MR. GAFFEY:  Object to the form.
16 You can answer.
17     A.   Yes.  My understanding was -- is
18 that the parties had negotiated based on an
19 updated assessment, their assessment of the
20 value of the securities, and that that's what
21 this had represented, that there had been a
22 deterioration in the securities during this
23 period of time, during the market chaos.
24     Q.   And the parties had gotten
25 together, both sides, that week and sat down

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  and discussed how to value those assets.
3      A.   At this time that's what I
4  believed.  Yes.  As of October 8th that's what
5  I believed.
6      Q.   Okay.  And so isn't it -- what do
7  you believe differently now?
8      A.   I don't believe that's what
9  happened.  I believe that there was a built-in
10 gain in this transaction.  And I don't believe
11 a built-in gain means a push.
12     Q.   And do you still believe that the
13 marks were stale in the sense that the ones on
14 the books were from the preceding week?
15     A.   Yes.  I believe that if -- that
16 you would update the value of the securities.
17 And that in that kind of a market you would
18 have to update the securities and if the last
19 marks you had were based on Friday, the 12th,
20 my assumption would be that now the problem is
21 the market could have deteriorated in some
22 securities and improved in other securities.
23 For example, governments would go up in that
24 period and other securities might go down.
25     So that made sense to me that

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  there was a drop in the value of the overall
3  portfolio.
4      Q.   Couldn't some -- some could go up,
5  some could come down but it's likely the
6  overall portfolio value was --
7      A.   Was down by 5 billion.  Yes.
8  That's what interpreted by this.
9      Q.   Right.  And do you still believe
10 that the parties got together and tried to
11 address the stale mark problem by putting an
12 updated value on the securities that were --
13     A.   Yeah.
14     Q.   You do.
15     A.   I believe that they attempted to
16 do that.  That's what's been represented.
17     Q.   And do you believe that was a good
18 faith effort to try to update the value of
19 those securities?
20     MR. GAFFEY:  Objection to the
21 form.  You can answer.
22     A.   I don't know the definition of
23 good faith effort.  They attempted to put a
24 value on these securities.  And as I
25 indicated, I mean, what I'd like to do is to

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  inspect what was actually done.  I'd like to
3  understand the underpinnings of that before
4  anybody gets accused of any impropriety or any
5  breach of fiduciary.  I just don't have the
6  facts.  That's all I'm looking for.  I'm not
7  going to accuse anybody until I get the facts.
8      Q.   Okay.  Do you fault in any way the
9  way they went about trying to update those
10 stale marks in that environment of the time?
11 I mean, should they have done something they
12 didn't do?
13     A.   I mean, I would speculate as to
14 the -- I would have done it differently but
15 that's me.  I mean, that's my opinion and it's
16 worth nothing in this argument.
17     Q.   How would you have done it
18 differently?
19     MR. GAFFEY:  Object to the form.
20 You can answer.
21     A.   I would have attempted to -- I
22 would have attempted to identify what the
23 values were CUSIP by CUSIP that I was placing
24 on it.  And I would have attempted to provide
25 myself with some type of a reasonable cushion

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    until the transaction closed in which case
3    that cushion would have been released to the
4    company. Had I believed that I was really
5    giving -- here's the liabilities I'm assuming
6    and here are the assets I'm providing.
7        I do not think Barclays for the
8    benefit of their bargain should have been out
9    a dollar. I just don't think Barclays should
10   have made a dollar on this transaction in
11   terms of the actual transaction itself.
12       Q.   When you say provide a cushion,
13   you mean value -- can you explain what you
14   mean by that?
15       A.   Just as I would always provide a
16   modest cushion to loan-to-value relationship
17   I would try to do that and then I would
18   provide that cushion for protection.
19       Q.   So you'd have -- you'd have the --
20       A.   And a true-up at the end of the
21   process.
22       Q.   So you'd have the estimate of
23   assets you were getting being a little higher
24   than the estimate of liabilities you were
25   taking.

1        B. MARSAL - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   Okay. And then you said you'd put
4    into the contract that true-up provision if
5    that was the bargain between the parties.
6        A.   Yes.
7        Q.   Now, having been through all of
8    that, isn't this $5 billion reduction the same
9    thing as the discount that's being described
10   in the motion --
11       A.   No.
12       Q.   -- because it's a difference?
13       A.   No.
14       Q.   How is it different?
15       A.   Because I think this $5 billion
16   reduction was because of the value of the
17   securities -- it was believed that the value
18   of the securities had deteriorated during the
19   chaos of the week of the 15th. What was not
20   contemplated was that there was a built-in
21   gain.
22       Q.   So it's your belief that there was
23   some $5 billion reduction beyond the simple
24   updating of the security of the stale marks?
25           MR. GAFFEY: Object to the form.

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    You can answer.
3        A.   I'm sorry. What this -- which
4    question are you asking? With the 60 -- which
5    motion says what? This transaction -- the
6    October presentation is basically saying, hey,
7    the value of the securities has declined.
8    It's been reported that the value of those
9    securities has declined. People associated
10   with those securities have told us that the
11   value declined $5 billion. The inference
12   we're getting. And thus in order to do that
13   we're going to have to provide the
14   securities -- but we're still getting the
15   benefit of the bargain that the assets being
16   exchanged equal the liabilities being assumed.
17       What the 60B motion is suggesting
18   is something very different. There wasn't the
19   assets equalling the liabilities. In fact,
20   the assets did not equal the liabilities. The
21   assets were significantly in excess of the
22   liabilities.
23       Q.   And the $5 billion decline, that
24   was something measured prior to closing
25   between the -- when the two parties are

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    getting together and trying to update those
3    values, correct?
4            MR. GAFFEY: Objection to form.
5        A.   The $5 billion reduction?
6        Q.   Yes.
7        A.   You're talking about in the
8    October presentation?
9        Q.   Yes.
10       A.   The $5 billion -- I believe what
11   it was was that Fogarty would have been told
12   by whoever had valued these that the value of
13   the collateral, the value of the collateral
14   had gone down by $5 million -- $5 billion
15   during the chaos of the week.
16       Q.   Right. Okay. I just wanted to
17   confirm that it wasn't this -- this updated --
18   the updated valuing of the stale marks from
19   the pre-bankruptcy close was done between the
20   parties the week of the 15th and not like the
21   date of this presentation.
22       A.   No.
23       Q.   There wasn't some separate thing
24   done.
25       A.   No, no, no. That's correct.

Page 178

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2        Q.   I just want to make sure we're
 3  talking about the same thing.  Okay.
 4            And -- okay.
 5            I'll take one more stab at this.
 6  But to me that seems like that's the discount
 7  that's referred to in the sections I just
 8  showed you.  And I wanted to just understand,
 9  if you could, why you think that that's any
10  different when the complaint talks about the
11  delta between nominal value and the value put
12  on the assets as part of the process of the
13  parties trying to update those values.
14        MR. GAFFEY:  Object to the form.
15        A.   We go back over the October
16  presentation again.  What I said was the
17  October presentation to me by virtue of this
18  book value, not market value but the words
19  book value, per Lehman's stale marks.  So the
20  book value was the value that had been placed
21  on it as of the last time the accounting
22  system had marked these securities.
23            Stale meant they had to be
24  updated.  Updating it -- after updating the
25  market value was down by $5 million.  Market
```

Page 179

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2  value decline of $5 million has nothing to do
 3  with the word discount which is in here.  The
 4  world discount in here implies there was a
 5  built-in gain in the transaction.
 6            This implies -- the October
 7  presentation implies that there was a decline
 8  in the market value of the securities.  It
 9  does not have anything to do with the built-in
10  gain that is implied here.
11        Q.   But aren't those just different
12  words or characterizations referring to the
13  same delta?
14        A.   No, sir.  Very different.  The
15  numbers happen to be the only thing that you
16  have got that's similar.  It's very different.
17  This would be the value of the securities
18  which we all believed was worth -- let's just
19  use a number -- a hundred.  It was really not
20  worth a hundred.  It's really when you got
21  down to it an updated -- when you updated the
22  securities, you found out that it was really
23  only worth 95.  That's what was in the October
24  presentation.  That's why this did not trouble
25  anyone because the benefit of the bargain was
```

Page 180

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2  you get value for value.  You're assuming
 3  liabilities.  You get value in exchange for
 4  it.  That is what this October presentation
 5  assumed.  This is saying something different.
 6  This is saying that wasn't the benefit of the
 7  bargain.  We made a mistake.  What you're now
 8  telling us is that there was a built-in gain
 9  in this transaction.  That, in fact, it wasn't
10  a $5 billion -- it was a 105 that you got.
11  You took off 5 and you made a hundred when we
12  thought you were making 95.  That's a -- this
13  relates to the word reduction in market value.
14  This relates to built-in gain.  Too very, very
15  different concepts.
16        Q.   Well, but isn't this referring
17  to --
18        A.   At least you're asking me what I
19  thought.
20        Q.   Right.  The 43 billion and the
21  $5 billion reduction, that's referring to the
22  Fed repo collateral that came to Barclays.
23        A.   Whatever the collateral that came
24  to Barclays, yes.
25        Q.   All right.
```

Page 181

```
 1        B. MARSAL - HIGHLY CONFIDENTIAL
 2        A.   I don't know -- because it went
 3  through JPMorgan.  I don't know what the heck
 4  ended up coming in to you.
 5        Q.   Right.  But isn't that part of --
 6  is it part of LBHI's claim that that
 7  collateral, which is the subject of this
 8  updating of stale marks thing, was really
 9  worth its nominal value, whatever it was?
10        A.   Well, I think --
11        MR. GAFFEY:  Objection to the
12  form.  And to the extent -- the 30(b)(6)
13  is over so embedded in that objection is
14  I think it's an inappropriate question
15  for Mr. Marsal but he can answer the
16  question.
17        A.   Well, again, I just think, Todd,
18  that you got two completely different issues.
19  This page is addressing the fact that during
20  the craziness of the week of the 15th, that
21  there was securities which were held by
22  various parties.  And those securities had
23  dropped in value during that week that -- such
24  that at the time of the transaction the value,
25  the actual value being provided was down by
```

Page 182

B. MARSAL - HIGHLY CONFIDENTIAL

1  $5 billion.
2
3         This is saying something very
4  different.  This is saying that, yeah, that
5  happened.  And in addition there was built-in
6  gain which is very different than what's being
7  talked about here.  Because this concept which
8  didn't alert anybody to anything was saying,
9  hey, the benefit of the bargain was value for
10 value.  What this says is value plus 5 versus
11 value.  That's very different.  These two
12 pieces of paper are -- it's like comparing an
13 apple to an orange.  The only thing that's in
14 common is the number.
15     Q.  And the date -- the last date for
16 the stale marks I think you've already said
17 the last date would be September 12th.
18     A.  I think so.  I don't know for
19 sure.  But it would have been -- it would have
20 been August 30th or the 12th of September.
21     Q.  Okay.  Let me go ahead and show
22 you a document that we'll mark as 496.
23         (Deposition Exhibit 496, document
24 bearing production numbers WGM-LEHMAN-E
25 0001363 through WGM-LEHMAN-E 0001368,

Page 183

B. MARSAL - HIGHLY CONFIDENTIAL

1  marked for identification as of this
2  date.)
3
4  BY MR. THOMAS:
5     Q.  It's an e-mail from Harvey Miller
6  to yourself.
7         (Document review.)
8     A.  Yes.
9     Q.  Do you recall this e-mail dated
10 December 5th?
11     A.  I do, yes.
12     Q.  Okay.  In the second half of the
13 second paragraph Mr. Miller is saying, "JPM
14 believes that the settlement is an
15 advantageous settlement because the securities
16 which are being released to Barclays which is
17 in addition to the cash of 1 and a quarter
18 billion dollars does not have a value that
19 would equal an aggregate of $7 billion."
20         Do you recall the fact that the
21 securities that were supposed to go over to
22 Barclays that were part of the repo collateral
23 and were supposed to go over to Barclays, not
24 all of those securities, not all of that
25 collateral made it over to Barclays?

Page 184

B. MARSAL - HIGHLY CONFIDENTIAL

1     A.  Not at the time of this letter I
2  didn't know.
3     Q.  Do you know that now?
4     A.  I understand it to be the case
5  now.
6     Q.  And do you understand Harvey here
7  to be saying that the assets that we're going
8  to put in -- we're going to give -- as part of
9  the settlement Barclays is going to get some
10 cash and some securities and that JPM believed
11 it was a good settlement for Lehman because
12 the securities really weren't worth their
13 nominal value?
14     MR. GAFFEY:  Objection to the
15 form.
16     A.  I don't know about the nominal
17 value.
18     MR. GAFFEY:  Wait, wait.
19 Objection to the form and no foundation.
20 You can answer, Bryan.
21     A.  Just state your question again.
22 I'm sorry.
23     Q.  Sure.  Do you recall being
24 informed that JPM thought it would be a

Page 185

B. MARSAL - HIGHLY CONFIDENTIAL

1  favorable settlement, the one that was entered
2  with Barclays, over the -- we'll call it the
3  missing $7 billion?
4     A.  As represented by Hal Novakoff to
5  Harvey Miller, yes.  I didn't have any
6  conversations with him other than this from
7  Harvey.
8     Q.  Okay.  Let me step back.  I think
9  you mentioned earlier in your testimony about
10 how you may or may not have gone forward with
11 the deal had you known everything you know
12 today.  And I just wanted to pick up on that
13 and ask you if you were fully in charge of
14 Lehman as of September 12th, knowing
15 everything you know today, what would you have
16 done differently?
17     MR. GAFFEY:  Objection.  It's a
18 hypothetical.  You can answer.
19     A.  I would have expected the
20 transaction to, in fact, have been a push with
21 a hold-back and an appropriate true-up so that
22 the value that people -- if the decision was
23 made to give that as the purchase price which
24 I believe was the best -- was the best deal

Page 186

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  available under the circumstances, the
3  transaction as proposed between Barclays and
4  Lehman as approved by Lehman's board, I would
5  have handled the transaction very differently.
6  I would have tried to get the market value of
7  the securities. I would have left more
8  securities on the table for Barclays to do
9  that in an orderly fashion. At least
10  comfortable fashion. I would have had
11  Barclays be given the opportunity to decide
12  what liabilities they were going to assume or
13  not assume and to the extent they did not do
14  that I would have returned the proceeds,
15  whatever the net was.
16      Q.  So you would have bargained for --
17  tried to bargain for a push and a hold-back or
18  true-up provision that would allow that to
19  actually take place in an environment where
20  you couldn't really identify in value
21  real-time all of the assets?
22      A.  Until we get --
23      MR. GAFFEY:  Same objection.  You
24  can answer.
25      A.  As long as what we needed to do is

Page 187

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  we did not have a basis at that time, it seems
3  to me we did not have a basis to confirm what
4  the liabilities were that were being assumed.
5  We assumed it was going to be book value.  The
6  book value would have been global book value.
7  Barclays was originally talking about a global
8  acquisition.  They didn't make a global
9  acquisition.  They only made a North American
10  acquisition.  There was an accrual on the
11  bonuses.  What we would like to have done is
12  what happened in the first quarter is we
13  concluded that that accrual beared -- there
14  was no relationship to the numbers that were
15  used by the management team in the bonus
16  accrual and in the assumed liabilities.  There
17  was no relationship between those and reality.
18  We didn't understand that.  That's why the
19  preservation of the data and having the
20  information flow was so important.  That
21  information was just not available until the
22  first quarter and that's when the questions
23  came up and nobody wants to address those
24  questions.
25      Q.  Do you have an opinion as to

Page 188

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  whether the estate is better off having done
3  the deal that was actually done versus not
4  doing any deal?
5      MR. GAFFEY:  Objection to the
6  extent it calls for an opinion.  He's a
7  fact witness.
8      A.  I can't answer that.  I can't
9  answer.  In hindsight it was a very difficult
10  period.  It was a very difficult period.
11      Q.  If Barclays had not been willing
12  to take the Fed out do you have any sense of
13  what would have then happened going forward?
14      MR. GAFFEY:  Objection to the
15  form.  Calls -- it's a hypothetical.
16      A.  I don't know what would have
17  happened.  The jobs would have been
18  jeopardized.  The wind-down would have been
19  less smooth.  And it probably would have
20  precipitated even a deeper crisis, global
21  crisis, than what was already happening.
22      Q.  Do you know whether the Fed would
23  have insisted on unwinding its repo before
24  LBI's SIPC liquidation?
25      MR. GAFFEY:  Objection.

Page 189

B. MARSAL - HIGHLY CONFIDENTIAL

1
2      A.  No idea.
3      Q.  Did the -- did Lehman have any
4  other options for DIP financing?
5      MR. GAFFEY:  Objection.  You can
6  answer.
7      A.  I didn't participate in the DIP
8  discussions but I would assume yes.
9      Q.  Do you know who was going to offer
10  to provide DIP financing?
11      A.  I don't know who, but we would
12  have provided DIP financing, but it would have
13  just been at a very, very high
14  loan-to-collateral ratio and -- a
15  collateral-to-loan ratio and it would have
16  been very expensive.
17      Q.  But you think someone would have
18  been -- can you name any candidates that might
19  have been able to extend it in that situation
20  where the Fed gets -- unwinds its repo?
21      MR. GAFFEY:  Objection.
22      A.  It wouldn't have been the Fed's
23  repo though.
24      MR. GAFFEY:  Bryan, give me a
25  minute.

Page 190

B. MARSAL - HIGHLY CONFIDENTIAL
1
2    Objection.  You can answer the
3    question.
4    A.   Okay.  I mean, the DIP financing
5    was $200 million.  The value of the building
6    was $1 billion.
7    Q.   Did you say million or --
8    A.   It was 200 million.  200 million.
9    So the value of the building was $1 billion.
10   The question is would we have been able to
11   find a different DIP lender for $200 million
12   on a 5-to-1 ratio.  I think so.  Based on
13   being in that business I think so.  But it
14   would have probably been at 18 to 19 percent
15   cost of capital.
16   Q.   To what extent did LBHI have
17   guarantees on LBI's obligations?
18   A.   I would have to check with
19   counsel.  I mean, it's very confusing.  We
20   guarantee a lot of the subsidiaries.  Many of
21   the derivative subsidiaries are guaranteed by
22   the parent.  Whether there was reliance on
23   those guarantees is probably another issue.
24   But the -- I know on the derivative front.  I
25   don't recall what we guarantee of LBI's

Page 191

B. MARSAL - HIGHLY CONFIDENTIAL
1
2    obligations.
3    Q.   You're not aware of how much
4    exposure LBHI would have if LBI had just not
5    been able to do this -- do a deal and continue
6    on?  Would have had to just liquidate?
7    A.   I don't know what that exposure
8    would be.
9    Q.   Do you know if --
10   A.   I mean, I'm sure there are people
11   in our organization that would know what that
12   exposure would be.
13   Q.   Do you know if LBI would have been
14   able to open its door for business on
15   September 22nd if the deal had not gone
16   through?
17   A.   Would not have been able to.
18   Definitely would not have been able to do.
19   Q.   And the consequences of that --
20   there would have been consequences obviously
21   to the LBHI estate in terms of LBHI's
22   obligations.  But you're not sure of the order
23   of magnitude of those obligations?
24   A.   I don't know what the -- I don't
25   know what the guarantee story as it relates to

Page 192

B. MARSAL - HIGHLY CONFIDENTIAL
1
2    LBHI versus LBI.  Hadn't really been a focus.
3    But I know I have people who have focused on
4    that.  John Suckow would be the right guy to
5    get that information from.
6    Q.   You're aware that Barclays
7    provided DIP financing during the week of
8    September 15th?
9    A.   Yes.
10   Q.   You don't believe that Barclays
11   would have provided that if it weren't doing
12   the purchase, do you?
13   MR. GAFFEY:  Object to the form.
14   A.   I don't know.  It was a good
15   transaction for them.  They made a significant
16   amount of money for a very short DIP period.
17   I would have.
18   Q.   Absent DIP financing, how would
19   the LBHI and LBI estates have operated, hired
20   employees, managed the assets, and so forth?
21   A.   It would have had to get DIP
22   financing.
23   MR. GAFFEY:  Objection.
24   A.   It's just -- let me just finish
25   your answer.  It's just not DIP financing.  It

Page 193

B. MARSAL - HIGHLY CONFIDENTIAL
1
2    was also asset sale proceeds came in from
3    other unencumbered assets that were out there.
4    We would have had a delay, but there were
5    unencumbered asset sales that took place after
6    the proceeding that started to build cash.
7    Q.   Would LBI have defaulted on the
8    Fed repo if Barclays had not signed the APA
9    and assumed the Fed repo?
10   MR. GAFFEY:  Objection.
11   A.   I don't know.
12   Q.   Do you know -- if they had
13   defaulted, do you know if there's any
14   mechanism in place for the Fed to liquidate
15   the collateral beyond the repo agreement
16   itself?
17   A.   The repo agreement.
18   Q.   Yeah, okay.
19   Would LBHI have been on -- have
20   been the guarantor of LBI's repo obligation to
21   the Fed?
22   A.   I do not know but I don't think
23   so.
24   Q.   Could JPMC have asserted claims
25   against LBHI if LBI was not able to repay the

Page 194

```
1        B. MARSAL - HIGHLY CONFIDENTIAL
2    $7.4 billion locks loan?
3              MR. GAFFEY:  Objection.
4        A.   They would probably try.
5        Q.   Did you ever make a report to the
6    board that the LBHI bankruptcy was premature?
7        A.   Premature?
8        Q.   Yes.
9        A.   Premature.  I do not think I'd use
10   the word premature.  A bankruptcy isn't an
11   option if you run out of cash.  When the
12   liquidity runs out and obligations are due you
13   don't have the option of delaying if it ran
14   out of liquidity.
15       Q.   Did you ever offer any analysis to
16   the board of whether -- of something that
17   should have been done that wasn't done or vice
18   versa?
19       A.   Yes.  I explained to the board
20   that there should be an orderly wind-down with
21   liquidity being provided by the Fed.  As
22   opposed to a free-fall bankruptcy.  And had
23   that been done there would have been --
24   significant value would have been preserved
25   for the creditors.
```

Page 195

```
1        B. MARSAL - HIGHLY CONFIDENTIAL
2        Q.   And where did that fail to get
3    done?  Was it just something the Fed refused
4    to do?
5        A.   Yeah.  The Fed did not provide
6    liquidity.
7              MR. THOMAS:  I don't have a whole
8    lot more so why don't we take a short
9    break now and I'll just organize my
10   thoughts.  Thanks.
11             THE VIDEOGRAPHER:  The time is
12   2:22.  We are going off the record.
13             (Recess taken.)
14             THE VIDEOGRAPHER:  The time is
15   2:27.  We are back on the record.
16   BY MR. THOMAS:
17       Q.   I'll go ahead and show you a
18   document we'll mark as 497.
19             (Deposition Exhibit 497, facsimile
20   transmittal sheet dated 2/19/2009
21   covering letter dated February 19, 2009,
22   marked for identification as of this
23   date.)
24             MR. ROTHMAN:  Do we get to see it,
25   too?
```

Page 196

```
1        B. MARSAL - HIGHLY CONFIDENTIAL
2              MR. THOMAS:  Ah.
3              (Document review.)
4        A.   Yes.
5        Q.   You're familiar with this
6    document?
7        A.   I authored it, yes.
8        Q.   Okay.  It's a letter from you to
9    Barclays, February 19th, expressing concerns
10   about the deal?
11       A.   Yes.
12       Q.   And February 19th, this was maybe
13   approximately a week and a half after Barclays
14   had announced a gain on the transaction?
15       A.   I don't recall exactly when it was
16   but it was after the announcement, yes.
17       Q.   Yeah.  And you were aware of the
18   announcement when it was made by Barclays?
19       A.   Yes.
20       Q.   Okay.  My question is after the
21   announcement by Barclays that this was a gain
22   on the transaction and you're writing a letter
23   to them about the deal, and you ask about --
24   some details about bonus accrual and cure
25   amounts, why didn't you say anything to the
```

Page 197

```
1        B. MARSAL - HIGHLY CONFIDENTIAL
2    effect of I thought this deal was supposed to
3    be a push?
4              MR. GAFFEY:  Object to the form.
5        A.   In this letter?
6        Q.   Yes.
7        A.   Isn't that implied in this letter?
8        Q.   Is that -- where do you -- where
9    do you refer to your understanding that the
10   deal was supposed to be a push?
11       A.   Because if it wasn't it would be
12   completely irrelevant.
13       Q.   Well --
14       A.   If it wasn't, it would be
15   completely irrelevant which is what I think
16   the response I got from them was.  It's
17   irrelevant what these categories of assets are
18   or aren't.
19       Q.   Well, if -- you're talking about
20   separate liabilities in the contract.  Let's
21   say if Barclays had a contractual duty to pay
22   a certain amount in comp, even if there's no
23   push it's not necessarily irrelevant, right?
24   You'd say, hey, you know, you were supposed to
25   do this on comp or you were supposed to do
```

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  this on cure amounts.
3       A.   Yeah.
4       Q.   It wouldn't be irrelevant just
5  because there's no overarching push
6  requirement to the deal.
7          So why is there no reference to
8  the fact that they were making a gain in this
9  letter?
10      A.   This letter was an attempt --
11 again, our basis -- the basis upon which we
12 thought the transaction was structured was
13 that we were giving fair value for the
14 assumption of liabilities, unsecured
15 liabilities, and the secured debt.  There was
16 never -- we were not challenging the
17 securities as we challenged later on.  At this
18 stage it was -- the question came up was there
19 a gross mistake made, unwittingly made because
20 of the chaos associated with this transaction.
21 Was there a gross error made in the assumption
22 and thus an overpayment unwittingly made in
23 these two categories.  That was what -- that's
24 what this letter results in.
25         We set aside -- at that time there

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  was the belief that A equalled -- that the
3  assets set aside equalled the liabilities that
4  were being assumed.  There was never a -- we
5  did not at that point in time understand as we
6  did later that there was a further problem
7  with the transaction.
8          The first problem with the
9  transaction was we thought fair value had been
10 exchanged but the liabilities had been
11 unwittingly -- nobody's accusing anyone of
12 anything -- unwittingly overstated.  And if it
13 was overstated, you know, this is what we
14 read, that's what we thought was in their
15 first quarter results where they were
16 recognizing a gain from these two categories.
17 Among other things.  There was some purchase
18 accounting gains as well in that quarterly
19 report which doesn't relate to this and
20 because of purchase accounting we were not
21 challenging that.  We were challenging the
22 fact that this related to the cure
23 liabilities.  Did you have gain from that
24 because you didn't pay the money out as we had
25 anticipated.  Was there a mistake, a mutual

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  mistake made.  That was the purpose of this
3  letter.
4       Q.   So breaking that down, you
5  recognize that some of the gain announced by
6  Barclays was the result of purchase
7  accounting.
8       A.   Yes.
9       Q.   Not of a difference between assets
10 and liabilities but purchase accounting.
11      A.   Yes.
12      Q.   Okay.  And at any point did you
13 communicate in substance to Barclays, hey, how
14 could you be having a gain on this if this is
15 supposed to be a wash?
16      A.   No, but the issue was -- at this
17 point the issue was not about the wash.  The
18 issue was was there a mistake made in the
19 calculation of the liabilities that you were
20 assuming.  It was not a question of $100 over
21 here, $100 over there, we did not sense what
22 we later sensed in the 60B motion or whatever
23 that there was a mistake in the calculation of
24 this hundred dollars.  We thought this was
25 worth a hundred.  We thought this was worth a

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  hundred.  And that the question was was there
3  a mistake made by the accounting side of the
4  house when they were negotiating this deal to
5  the detriment of billions of dollars.  And was
6  there a gross miscalculation -- if this had
7  been a little bit of money there wouldn't have
8  been a call.  This was billions of dollars.
9  How could this be?  How could you assume that
10 this was the liability when in fact it's
11 turning out to be far, far less than that.  So
12 the issue wasn't about the wash.  That just
13 continued to be an assumption until later in
14 this situation where we said, wait a minute,
15 you know, what's going on with the next part
16 of this transaction which was the value of the
17 securities.
18         That's the second challenge that
19 occurred.  The first challenge was just
20 related to the liabilities.
21      Q.   But -- so the amount of the
22 liabilities that Barclays incurred didn't
23 factor into the wash question.
24      A.   No.  The liabilities -- the
25 liabilities that we were assuming, if you've

Page 202

1       B. MARSAL - HIGHLY CONFIDENTIAL
2  got -- 4 billion was over here was assumed to
3  be liabilities, if the liabilities turned out
4  to be 1, where did you get the 4 from?  And it
5  just so happens that the guys who provided you
6  the estimate of 4 are now on your payroll.
7  Shouldn't we find -- shouldn't we discover
8  what exactly from -- without going to court,
9  shouldn't we talk about this and get an
10 explanation.  And the reaction we got was read
11 your contract.  That's the reaction.  Read
12 your contract.
13      So, I mean, the point of it is we
14 weren't challenging the wash.  The wash was --
15 that was always the case in our mind.  A
16 hundred for a hundred.  That was the benefit
17 of the bargain.  Weren't not trying to undo
18 the transaction.  But where did you get this
19 number for $4 billion.
20      Q.   But was the amount -- the estimate
21 for liabilities that might be assumed or
22 potential exposure liabilities, was that part
23 of your equation for thinking it was a wash?
24 Meaning you're getting -- wouldn't that be
25 part of the equation?

Page 203

1       B. MARSAL - HIGHLY CONFIDENTIAL
2      A.   The equation is simple.  On the
3  left side you have a hundred billion of
4  securities.  Let's put the numbers for ease.
5  On the right side 4 billion of payables, 96
6  billion of secured debt.  For ease.  We said,
7  you know, that's the benefit of the bargain.
8  They got a good bargain.  So be it.  We live
9  with it.
10      Then we started looking at the --
11 when the financial accounting systems kicked
12 in and we started to be able to look at what
13 happened on the accounting, where did this 4
14 billion come from?  We can't reconcile this
15 number which is this letter.  How did we get 4
16 billion?
17      Q.   But under your scenario if the 4
18 billion in liabilities was actually -- was
19 less, you have to assume less, that would
20 implicate the wash.  It wouldn't be a wash,
21 right?
22      A.   It would be a gain.  There would
23 be a gain.  How would -- because the intention
24 of the parties was to set aside -- there was a
25 $4 billion real liability and there was a

Page 204

1       B. MARSAL - HIGHLY CONFIDENTIAL
2  $96 billion real liability.  In exchange for
3  that you're going to receive real value, not
4  stale book value, but real value of $100
5  billion.  So you're no worse off by doing this
6  transaction.  All right?
7      And what I'm saying is the 4 --
8  what this letter is saying, the $4 billion,
9  how did we get 4 billion?  We can't come up
10 with this number.  And, oh, by the way, the
11 guys who came up with this number are all on
12 your payroll.  We don't understand this.  Was
13 there a mistake made?  An honest mistake.
14 That was the purpose of this letter.  Was
15 there a bona fide mistake made.  Because we
16 don't get it.  We don't get where this
17 liability came from that we were using in this
18 hundred billion here, hundred billion there.
19 The accounting systems did not reflect that as
20 we got -- as we peel this onion back.
21      Q.   But the upshot -- in your view of
22 things, in your scenario you just laid out
23 where you're accounting a certain amount of
24 liabilities against assets, under your view,
25 if the liabilities were to be less, then it

Page 205

1       B. MARSAL - HIGHLY CONFIDENTIAL
2  would take it out of a push situation.
3      So my question to you is why
4  didn't you reference the fact that it's
5  supposed to be a push in connection with the
6  liabilities being less than you thought they
7  would be?
8      A.   Push was already -- I mean, the
9  underlying assumption was we did a
10 transaction -- we did a transaction involving
11 a hundred on one side, a hundred to fair value
12 on the other side, and the assumption of a
13 hundred billion dollars of liabilities.
14      The issue was not about the push.
15 The issue was about, hey, did we make an
16 honest mistake in what we were estimating.
17 Did that happen.  Did we just blow this thing
18 because of the craziness of the times.
19      And that separate and apart of
20 from that came the next question which was was
21 the hundred in assets really a hundred in
22 assets.  That's the second part of this thing.
23      I don't know if that's still
24 confusing but it just never came across our
25 mind that that wasn't the transaction.  That's

Page 206

B. MARSAL - HIGHLY CONFIDENTIAL

1
2   what we thought the transaction was.
3       Q.   But you never went and read the
4   transaction documents.
5       A.   Well, no.  Then we proceeded to go
6   and say to Weil Gotshal what happened here.
7   You got to talk to Harvey.  What happened
8   here?  How come this is not reflected -- how
9   come the board say one -- believes one thing,
10  the court believes one thing -- the same
11  thing, the creditors believe one thing and
12  suddenly there's documents that show up
13  something completely different.  We don't get
14  it.  So there must have been an honest mistake
15  made by people here.  And that's what this was
16  about.  And it never got anywhere because
17  instead what we got back was read your
18  documents.  That's at which point we hired
19  Jones Day.
20          We don't want to jump to -- trust
21  me, the last thing we want to do is attack
22  Barclays, the source of all our information.
23  The source of our transaction services
24  agreement.  The last thing we want to do is go
25  after Barclays.

Page 207

B. MARSAL - HIGHLY CONFIDENTIAL

1
2       Q.   I mean, can you see Barclays'
3   position where they've announced that it was
4   going to be a gain publicly and there's
5   nothing in a document about it being a push
6   and they --
7       A.   But we all know that there's a
8   purchase accounting gain in there.  We all
9   agree with that.  That wasn't -- we weren't
10  attacking the purchase accounting gain.  That
11  wasn't -- that's not -- that wasn't the part
12  of the gain that we questioned.
13      Q.   And what precisely is the part of
14  the gain that you question?
15          MR. GAFFEY:  Object to the form.
16      A.   Well, in this letter --
17          MR. GAFFEY:  You have to give me a
18  chance, Bryan.
19          THE WITNESS:  Excuse me.
20          MR. GAFFEY:  Object to the form.
21  You can answer.
22      A.   In this letter we addressed the
23  two parts of the gain which was the bonus
24  accrual.  Trying to understand did your gain
25  come out of bonus accrual?  Did your gain come

Page 208

B. MARSAL - HIGHLY CONFIDENTIAL

1
2   out of cure amounts?  Can you give us the
3   information and tell us what you actually
4   spent on these things?
5          And we basically got back, No, I
6   can't give you that information.
7       Q.   And is it your understanding --
8   your sense when you're writing this letter
9   about cure amounts, that under the terms of
10  the agreement that there was some amount of
11  cure that Barclays was obligated to pay?
12      A.   My belief was they had assumed the
13  current liabilities at the time of the
14  closing.  They had assumed the current
15  liabilities which were -- which was this cure
16  liability amount.  That if they didn't assume
17  those, if those liabilities turned out to be
18  inflated, then it was a mistake made by all
19  parties.  It was a windfall.  But you and I
20  didn't bargain for that.
21      Q.   Did you understand that Barclays
22  didn't have an obligation to assume any
23  contracts and that it would only be
24  responsible for cure amounts with respect to
25  contracts that it at its total discretion

Page 209

B. MARSAL - HIGHLY CONFIDENTIAL

1
2   elected to assume?
3          MR. GAFFEY:  Objection to the
4   form.  You can answer.
5       A.   I'm just telling you what we
6   believed the transaction was it was 2 plus
7   billion set aside for cure liabilities.  And
8   there was 2 plus billion set aside for
9   severance and bonuses.  And this letter asked
10  what did you spend.  And the response was it's
11  irrelevant.  There's no relevancy to that
12  question.  Because that isn't the transaction.
13          And what I'm telling you is that
14  was the transaction that some of us believed
15  we had done.  The board, the court, Harvey
16  Miller, me.  But yet the management didn't
17  sign that agreement.  But the management are
18  the same management that seems to have gone to
19  Barclays.  So curiously enough we are
20  confused.
21      Q.   And if it's a fact that the
22  contract, the agreements between the parties
23  could provide that Barclays has the discretion
24  to assume contracts and is not liable for cure
25  payments unless it assumes -- decides to

Page 210

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  assume contracts, and that the court was told
3  that this is potential exposure if the
4  contracts are assumed and so forth, would that
5  all be news to you as you sit here today?
6      A.   Yeah, it would be news to me at
7  the time -- not today, but it would have been
8  news to me at the time this transaction was
9  done.  Because what I knew about this
10 transaction was just as I told you.
11     Q.   When you wrote this letter did you
12 know that Barclays was not obligated to make
13 any --
14     A.   I disagree.  I think Barclays was
15 obligated.  I think that what happened -- what
16 the court approved and what the board of
17 directors approved is what -- the transaction
18 that all had approved.  I believe that that is
19 the transaction.  Now, what happened between
20 the management of Lehman, many of which who
21 were under contract to go to Barclays and what
22 they negotiated following the court hearing
23 and what actually was done was very different
24 than what was presented in front of Judge
25 Peck, what was presented to the Unsecured

Page 211

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  Creditors Committee, what was presented to the
3  board of directors.  Very different.
4      Q.   How do you know what was presented
5  to Judge Peck?
6      A.   Well, I was at the hearing.  I
7  read the transcript of the hearing.
8      Q.   So you attended --
9      A.   No, I attended -- I didn't attend
10 it all.  But I attended part of it.  But I
11 didn't -- I listened to -- it went on forever.
12 I had to get -- that was a Friday.
13     Q.   Did you attend the Wednesday
14 hearing?
15     A.   I didn't attend all the hearings,
16 no.  I didn't attend.  I attended the hearing
17 the night it was -- about half way through the
18 night it was approved.
19     Q.   So the first half of the hearing
20 you listened to.
21     A.   Part of it.  I listened to Bart
22 McDade's testimony and to Barry Ridings and
23 then I left after that.
24     Q.   Did you disagree with Mr. Ridings'
25 testimony in any way?

Page 212

B. MARSAL - HIGHLY CONFIDENTIAL

1
2      MR. GAFFEY:  Object to the form.
3      A.   That wasn't my job.  My job wasn't
4  to do -- his job was to run an auction.  He
5  said what he heard.  I respect Barry Ridings.
6      Q.   So -- and you're listening -- at
7  the hearing, the presentation, were you there
8  when Mr. Miller described that there was going
9  to be major -- had to be major changes to the
10 deal?
11     MR. GAFFEY:  Objection.  No
12 foundation.
13     A.   I don't remember that part of the
14 meeting, no.
15     Q.   Did you read the whole transcript
16 at some time subsequent?
17     A.   At some point I read the
18 transcript of that day, yeah.  At some point.
19 I don't know when I read that transcript, but
20 I eventually read that evening.  It wasn't --
21 it wasn't soon after the deal was done or
22 anything like that.
23     Q.   Were you aware that the parties
24 had reached agreement on some of the final
25 terms shortly before the hearing on Friday

Page 213

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  that you attended?
3      A.   Am I -- I know that the parties
4  reached agreement.  What the terms were, I
5  don't really know what the terms were.
6      Q.   Okay.
7      A.   Other than what I've outlined to
8  you.  Berkenfeld on Thursday told me what the
9  deal was.  Wednesday or Thursday.
10     Q.   Okay.  And it was your
11 understanding that, in any event, whatever the
12 terms were, the parties had reached agreement
13 as of that Friday hearing.
14     A.   Yeah.  And the hearing was a
15 little bit confusing.  But the hearing was
16 pretty much consistent with what Berkenfeld
17 told me.
18     Q.   Do you remember the -- do you
19 remember the numbers 47.4 billion and 45
20 billion?
21     A.   I don't remember the exact
22 numbers.  No.
23     Q.   Okay.
24     A.   They didn't mean anything to me at
25 that time.

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                              Chapter 11

7        LEHMAN BROTHERS        Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,   (Jointly Administered)

9                Debtors.

10       ------------------------x

11

12          DEPOSITION OF ROBERT A. MARTINI

13             New York, New York

14             June 24, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 31568

19

20

21

22

23

24

25

MARTINI

1
2      Q.   And does the capital treatment that
3   you have just testified to, the topic you
4   discussed with Mr. Burke, does that relate in
5   any way to the customer reserve calculation?
6      A.   No.
7      Q.   Have you had any discussions with
8   Mr. Burke in connection with the customer
9   reserve calculation, whether LBI or BCI?
10     A.   No.
11     Q.   Does the capital treatment which was
12  the topic of your conversation with Mr. Burke,
13  does that relate to the net capital rule?
14     A.   Net capital rule, yes.
15     Q.   That's a SEC rule, correct?
16     A.   Correct.
17     Q.   Is it your testimony, sir, it is
18  common within the industry for people in
19  positions such as yours to consult with their
20  peers about how these SEC rules are interpreted?
21     A.   Yes.
22          MS. NEUHARDT:  Objection to form.
23     Q.   And why do you do so, sir?
24     A.   Make sure that the treatment is
25  consistent across the industry.  Rules are

MARTINI

1
2   relatively in many cases hard to interpret
3   without getting a little sense of how everybody
4   interprets them.
5      Q.   Is it part of your responsibility at
6   Barclays, sir, to interpret the SEC rules?
7      A.   Yes.
8      Q.   And just so we are clear, it is part
9   of your responsibility at Barclays to interpret
10  SEC Rule 15c3-3, correct?
11     A.   Correct.
12     Q.   Was it also your responsibility to
13  interpret that same rule when you held the
14  positions in the various broker/dealers that you
15  have told me you worked in from 1983 onwards?
16          MS. NEUHARDT:  Objection to form.
17     A.   If you could break that up for me,
18  please.
19     Q.   Well, I can.  I'm not sure anybody
20  wants me to, but if you want me to, I am happy
21  to do so.
22          What I am trying to understand, sir,
23  is whether your role in interpreting Rule 15c3-3
24  is unique to your employment with Barclays or
25  whether you had a similar role in any other

MARTINI

1
2   broker/dealer which employed you prior to your
3   employment with Barclays.
4      A.   At Weiss, Peck & Greer, I would have
5   been responsible for interpreting 15c3-3 and
6   15c3.
7          At Nikko, I would have been
8   responsible for interpreting those rules as
9   well.  And at Yamiachi as well.
10     Q.   Now, you're not a lawyer, sir, are
11  you?
12     A.   No.
13     Q.   Do you have any training in law?
14     A.   No.
15     Q.   Can you tell me how it is that you
16  consider yourself qualified to interpret SEC
17  Rule 15c3-3?
18          MS. NEUHARDT:  Objection.
19     A.   From my extensive experience in the
20  industry, having -- in my roles throughout my
21  career, having managed SEC, New York Stock
22  Exchange examinations, through my role of
23  working with the business and all of these
24  companies.
25          These rules are financial operational

MARTINI

1
2   in nature.
3      Q.   Can you explain what you mean by the
4   last comment?
5          MS. NEUHARDT:  Objection, form.
6      A.   So the rules are related to the --
7   they are financial and operational in nature.
8   So the rules are not -- are about how you treat
9   things for reserve computation.  They are going
10  to be about operational issues or financial
11  issues or net capital or capital treatment
12  issues as opposed to nonfinancial or operational
13  issues, such as sales practice or things along
14  those lines.
15     Q.   Are you drawing a distinction, sir,
16  between the financial and operational nature of
17  these rules and the legal nature of these rules?
18     A.   I don't understand really.
19     Q.   You don't understand my question?
20     A.   No.
21     Q.   I can try another question.
22          In your extensive experience in the
23  industry, sir, are the individuals who are
24  responsible in broker/dealers in the U.S. for
25  interpreting SEC Rule 15c3-3 generally lawyers

Page 30

**MARTINI**

1
2  or legally qualified personnel or are they
3  people with a background such as yours?
4       MS. NEUHARDT: Objection to form.
5       A.   Backgrounds such as mine.
6       Q.   Does that answer apply to how Barclays
7  runs its regulatory reporting department today,
8  sir?
9       MS. NEUHARDT: Objection to form.
10      A.   Yes.
11      Q.   I would like to go back to where we
12 got a little distracted, or at least I did, and
13 go back to your conversation with
14 Mr. Potenciano.
15      Mr. Potenciano, you said he was in
16 charge of net capital at Barclays?
17      A.   Yes.
18      Q.   Does he have any responsibility for
19 calculating the customer reserve requirement at
20 Barclays?
21      A.   No.
22      Q.   Is it part of his role to have access
23 to LBI information that would be relevant to the
24 calculation of the 15c3-3 reserve requirement
25 that relates to LBI on September 19, 2008?

TSG Reporting - Worldwide    877-702-9580

Page 31

**MARTINI**

1
2       MS. NEUHARDT: Objection, form.
3       A.   My discussions with Mr. Potenciano, he
4  does not have access to the information, the
5  data contained in the systems to compute the LBI
6  reserve computation.
7       Q.   Would Mr. Potenciano have, in the
8  course of his duties at Barclays, any reason to
9  have access to that data, sir?
10      MS. NEUHARDT: Objection to form.
11      A.   I'm sorry, can you rephrase that for
12 me.
13      Q.   Sure.
14      Mr. Potenciano is responsible, he is
15 in charge of the net capital computation at
16 Barclays, correct?
17      A.   Correct.
18      Q.   He is not responsible for the 15c3-3
19 calculation at Barclays, correct?
20      A.   Correct.
21      Q.   Would there be any reason for
22 Mr. Potenciano on a day-to-day basis at Barclays
23 to have access to the information that he would
24 need to compute the 15c3-3 reserve calculation
25 for LBI back from September 19, 2008?

TSG Reporting - Worldwide    877-702-9580

Page 32

**MARTINI**

1
2       MS. NEUHARDT: Objection to form.
3       A.   The focus of that question for
4  Mr. Potenciano is regarding his interaction with
5  TSA and Bill Burke regarding several times when
6  he needed to work with them per the trustee's
7  instruction.
8       Q.   OK, we are going to have to break that
9  out a little more.
10      What interaction did Mr. Potenciano
11 have with the TSA and Bill Burke that was the
12 subject of the conversation that you had with
13 Mr. Potenciano?
14      A.   My discussions with Mr. Potenciano,
15 over time the trustee, as per the -- my
16 understanding of the TSA arrangement, who are
17 ring-fenced employees for the trustee, that at
18 times at the direction of the trustee,
19 Mr. Potenciano would be requested to assist
20 Mr. Burke in whatever he was working on.
21      When that occurred, I was alerted so
22 that I knew, number one, how long he would be
23 doing that, so I could make sure we had backup.
24 In other words, Mr. Potenciano was not able to
25 discuss information with me regarding what

TSG Reporting - Worldwide    877-702-9580

Page 33

MARTINI

1
2  occurred in his discussions with LBI, nor did he
3  speak to Mr. Burke about information about
4  Barclays Capital.
5       Q.   I see. So you're -- what you are
6  telling me is there was a wall -- withdrawn.
7  Let's back up.
8       Mr. Potenciano is employed by
9  Barclays, correct?
10      A.   Correct.
11      Q.   He is not part of the ring-fenced
12 group that works at the direction of the trustee
13 under the TSA, correct?
14      MS. NEUHARDT: You're talking about
15 today?
16      MR. OXFORD: That's a good
17 clarification, Amy.
18      Q.   Today does he work under the direction
19 of the trustee under the TSA?
20      A.   No. He works for me under Barclays
21 Capital, Inc., U.S. broker/dealer.
22      Q.   At any time, to your knowledge, has
23 Mr. Potenciano worked for the TSA under the
24 direction of the trustee?
25      A.   That I don't know, only because the

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  early days of the integration, I don't know who
3  worked for who.
4        Q.   Is it your testimony, sir, that there
5  is a wall in effect between the TSA employees
6  and the Barclays employees through which
7  information about the TSA activities and the
8  Barclays activities cannot pass?  May not, no
9  passing, wall.
10       A.   That is my understanding.
11             MS. NEUHARDT:  Object to the form of
12       that.
13       Q.   Have you ever seen the TSA, sir?
14       A.   The agreement?
15       Q.   Yes.
16       A.   No, sir, not read it.
17       Q.   What's the basis of your understanding
18  about what the TSA provides?
19       A.   Mainly because of my -- I have a
20  senior role in finance, so I interact with
21  senior management of the firm, so I have known
22  that the TSA, through my conversations with
23  senior management, what is in place to do.
24  Additionally, per my discussions with
25  Mr. Potenciano, his interactions with the TSA, I

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  have learned that.
3        Additionally, I have spoken to Alex
4  Crepeau, who is managing director in the
5  regulatory ops for Barclays Capital, Inc.
6  Mr. Crepeau was a TSA employee for some period
7  of time and has given me insight into
8  information that the TSA has and what they --
9  the purpose.
10       Q.   So I understand the basis of your
11  knowledge about the TSA, sir, it's based on
12  conversations with Mr. Potenciano, correct?
13       A.   Correct.
14       Q.   It is based on conversations with
15  Mr. Crepeau, correct?
16       A.   Correct.
17       Q.   Is it based on anything else, sir?
18       A.   And my knowledge of how the TSA
19  operates through my interactions with senior
20  members of Barclays Capital.
21       Q.   Who are they, sir?
22       A.   CFO of the firm, who may be gone at
23  the moment, T.J. Gavenda.  Terry Scott, who was
24  COO of the U.S. broker/dealer.
25        So in other words, when the TSA was in

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  place, we were told, whether it be e-mail
3  communication or verbal communication, that at
4  times some of our employees that work for me may
5  have to work with TSA employees on behalf of the
6  trustee.
7        Q.   So in addition to Mr. Crepeau and
8  Mr. Potenciano, your knowledge of the TSA is
9  based on conversations with -- did you say the
10  CFO?
11       A.   Yes.
12       Q.   Who may be gone at the moment?
13       A.   I'm saying conversations would have
14  been with regard to T.J. Gavenda, who was CFO
15  when this first came into play, as well as Terry
16  Scott, who would have been the COO of finance.
17       Q.   Other than these four people, sir, and
18  the conversations you had with them, is your
19  knowledge such as it is about the TSA based on
20  anything else?
21             MS. NEUHARDT:  Objection to form.
22       A.   Such as -- I don't interact, I am
23  not -- I have never been instructed to work with
24  the trustee or employees of the TSA, so that
25  would be the only interaction that I have.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2        Q.   Sir, so when in your declaration, you
3  refer to your personal knowledge of the TSA, you
4  were referring to conversations with these four
5  people, correct?
6             MS. NEUHARDT:  Objection, asked and
7        answered, and it mischaracterizes his
8        testimony.
9        Q.   You can answer, sir.
10       A.   Based on my personal knowledge of our
11  firm's business, and because of the
12  conversations I had with individuals in my firm
13  who have intimate knowledge of the TSA.  I mean,
14  there are not a lot of employees who interact
15  with the TSA, from my understanding.  And within
16  my team, I only have one individual that has, to
17  my knowledge, been asked to do that.
18       Q.   Who is that, sir?
19       A.   Joel Potenciano.
20       Q.   And he is one of those employees who
21  you just testified had intimate knowledge of the
22  workings of the TSA?
23       A.   Yes, he had -- he has had interactions
24  with the TSA.
25       Q.   Would you agree that each of those

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2 four employees have more knowledge about the TSA
3 than you do, sir?
4     MS. NEUHARDT:  Objection to form.
5     A.   I would say as far as the structure of
6 the TSA, I have the same knowledge as they do.
7 As far as what the TSA is working on, I have no
8 intimate knowledge of what they do.  They
9 would -- those individuals, at least Mr. Crepeau
10 and Mr. Potenciano, would have more insight.
11     Q.   What do you mean when you say
12 structure of the TSA, sir?
13     A.   That they are ring-fenced employees
14 and they are at the direction of the trustee and
15 not employees that -- for instance, they don't
16 work for me, they don't work for Barclays
17 Capital, Inc., U.S. broker/dealer.
18     Q.   Did you mean anything else when you
19 referenced structure of the TSA, sir?
20     A.   No.
21     Q.   What -- you also mentioned the -- your
22 knowledge of the TSA was based on your personal
23 knowledge of the firm's business.  Do you
24 remember telling me that a moment ago?
25     A.   Um-hm.

**MARTINI**

1
2     Q.   What do you mean by that, sir?
3     A.   Meaning my role as a senior member of
4 finance, that I interact with senior members of
5 the firm.  I know that the firm has -- while I
6 was not involved in the sale of Lehman,
7 certainly I am aware of the transaction, some of
8 the high-level components, and that the TSA was
9 put in place as a result of that acquisition or
10 transaction.
11     Q.   So your knowledge of the TSA that is
12 based on your personal knowledge of the firm's
13 business extends to the existence, your
14 knowledge about the existence of the TSA,
15 correct?
16     A.   Yes.
17     MS. NEUHARDT:  Objection, form.
18     Q.   Does it extend any further?
19     MS. NEUHARDT:  Objection to form.
20     A.   Like what -- I'm -- I don't
21 understand.  Any further than -- I don't
22 interact with the TSA.  I am not permitted and I
23 don't have access to them.
24     Q.   Sir, do you purport to have any
25 knowledge about what data --

**MARTINI**

1
2     MS. NEUHARDT:  About what data?
3     Q.   About what data Barclays is permitted
4 under the TSA to access?
5     A.   I know, based on the business that we
6 acquired, that we have access to acquired assets
7 or businesses that are on, for example, ADP224,
8 which is one of the main systems that we used to
9 perform a reserve calculation today on behalf of
10 the acquired businesses, that Barclays acquired.
11     How that works is that there is
12 ADP012, which happens to be the system that
13 houses or contains 100 percent of the LBI
14 business, and that is what our team does not
15 have access to.
16     Q.   My question is a little different,
17 sir.  I will read it again to you.
18     Do you purport to have any knowledge
19 about what data Barclays is permitted to access
20 under the TSA?
21     MS. NEUHARDT:  Objection to form.
22     A.   Through my -- I have not read the TSA
23 agreement.  I have spoken to Mr. Crepeau and
24 understand that we have access to the
25 businesses, assets only that we acquired, and I

**MARTINI**

1
2 confirmed that with my team as far as the access
3 that they had.
4     Q.   Did Mr. Crepeau tell you that this
5 access related in any way to the TSA?
6     A.   My interaction with Mr. Crepeau, who
7 was a TSA employee, explained that, through his
8 operational knowledge, that the information
9 relative to systems that contain LBI information
10 or information as contained -- as access of the
11 trustee -- excuse me, that the trustee has
12 access to.
13     Q.   And did he tell you whether or not --
14 withdrawn.
15     If I understand your testimony, sir,
16 Mr. Crepeau told you that Barclays has access to
17 only certain of the data relating to LBI's
18 broker/dealer, correct?
19     MS. NEUHARDT:  Objection to form.
20     A.   Mr. Potenciano, Mr. Crepeau, and
21 through my own knowledge, understand that we
22 have access only to the -- Barclays has access
23 only to the businesses or assets that it
24 acquired.  Those assets and businesses are
25 ring-fenced, if you will, in an ADP system

MARTINI

1  
2  called 224, which my team accesses on a weekly  
3  basis to do customer reserves.  
4          Speaking to my team as well, they  
5  don't have the ability to access any information  
6  that was contained in the other businesses of  
7  LBI.  
8      Q.   Which other businesses, sir?  
9      A.   Whatever was not acquired by Barclays  
10  Capital.  Otherwise, I was not involved in the  
11  sale or transaction, I can't speak to which  
12  assets were and were not, but I do know from my  
13  understanding of the transaction in the early  
14  days that Barclays did not acquire 100 percent.  
15  It was an asset purchase.  
16      Q.   Do you have any understanding, sir, of  
17  what parts of the LBI business Barclays did and  
18  did not acquire?  
19      A.   I would say that's not my area of  
20  expertise.  
21      Q.   OK.  With that caveat in mind, sir,  
22  can you answer my question?  
23      A.   I think the wealth business was  
24  acquired, but as far as any more intricate  
25  knowledge for specific businesses, I can't speak  

TSG Reporting - Worldwide     877-702-9580

MARTINI

1  
2  to.  
3      Q.   So the full extent of your knowledge  
4  about what Barclays did and did not acquire  
5  relating to LBI is Barclays acquired the wealth  
6  business, correct?  
7      MS. NEUHARDT:  Objection to form.  
8      A.   I think initially I have said that  
9  they have not -- they have not acquired 100  
10  percent of the business.  One of the major  
11  components of the businesses and assets we  
12  acquired was the wealth business.  And I'm  
13  speaking from a 15-3-3 perspective -- 15c3-3  
14  perspective.  
15      Q.   We can call it the customer reserve  
16  perspective, if that's easier.  
17      A.   That's easier.  
18      Q.   So I understand you're not an expert  
19  on it, sir, and I'm not trying to make you into  
20  an expert.  I am just trying to understand what  
21  it is you know and what you don't know.  
22      A.   OK.  
23      Q.   So it is your understanding, sir, that  
24  Barclays acquired the wealth business from LBI;  
25  is that correct?  

TSG Reporting - Worldwide     877-702-9580

MARTINI

1  
2      A.   That is my understanding.  
3      Q.   And was that also known as the PIM,  
4  P-I-M, business when it was at LBI?  Is that  
5  correct?  
6      MS. NEUHARDT:  Objection, form.  
7      A.   Correct.  
8      Q.   And other than that, you don't know  
9  one way or the other whether Barclays acquired  
10  any other part of LBI's business, correct?  
11      MS. NEUHARDT:  Objection, form.  
12      A.   I was not involved in the sale.  
13      Q.   That's fine, I understand that, sir, I  
14  just need an answer to my question.  
15      A.   Yeah, I don't know the intricate  
16  details of what was acquired and not acquired.  
17      Q.   I am not asking about the intricate  
18  details.  I am just asking you what you know  
19  about what Barclays acquired and what Barclays  
20  did not acquire from LBI.  
21      A.   I do not know the specific businesses  
22  that were acquired and not acquired.  
23      Q.   Do you know, sir, whether there were  
24  any businesses or data that Barclays did not  
25  acquire from LBI that would have fed into LBI's  

TSG Reporting - Worldwide     877-702-9580

MARTINI

1  
2  customer reserve calculation as of September 19,  
3  2008?  
4      MS. NEUHARDT:  Objection to form.  
5      A.   Yeah, I don't understand that  
6  question, sorry.  
7      Q.   Well, I'm -- we can look at your  
8  declaration, sir, but it is your testimony, is  
9  it not, sir, looking particularly in  
10  paragraph 7, that Barclays is not entitled to  
11  access all of the relevant information on LBI's  
12  systems as of on or about September 17, 2008, or  
13  September 19, 2008, with regard to the 15c3-3  
14  reserve calculations?  
15      MS. NEUHARDT:  There is no question.  
16  Oh, is it your testimony, OK.  
17      Q.   Is that your testimony, sir?  
18      A.   That is what I read.  
19      Q.   Do you believe that's accurate, sir?  
20      A.   Yes, I believe that's accurate.  
21      Q.   Can you tell me which information on  
22  LBI's systems Barclays doesn't have access to?  
23      MS. NEUHARDT:  Objection, form.  
24      Q.   That you referred to in this sentence?  
25  You said, "Barclays is not entitled to access  

TSG Reporting - Worldwide     877-702-9580

**MARTINI**

1
2  all of the relevant information on LBI's
3  systems," as of those two dates in September,
4  with regard to the 15c3-3 reserve calculations.
5  Do you see that?
6      A.   Yes.
7      Q.   When you say all the relevant
8  information that Barclays is not entitled to
9  access to, what are you talking about?
10     A.   So in order to do a 3-3 calculation,
11  we need information, all information for the
12  firm, not just the customer assets.  I know that
13  there were systems, three major systems that
14  went into the LBI reserve comp, ITS, MTS and
15  ADP.  From talking to my team and others, Alex
16  Crepeau, Barclays did not have access to the
17  data contained in those systems.
18     Q.   So you understand, sir, that you said
19  at the start of your declaration, "I make this
20  declaration on my personal knowledge," right?
21  What do you understand that to mean, sir?
22         MS. NEUHARDT:  Objection to form.
23     A.   Personal knowledge means that of my
24  position in the firm, understanding of the
25  business and my discussions with people on my

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  team and Alex Crepeau.
3      Q.   And your statement that Barclays is
4  not entitled to access all of the relevant
5  information on LBI's systems as of those two
6  dates with regard to the 15c3-3 reserve
7  calculations is based on your conversation with
8  Mr. Crepeau, correct?
9          MS. NEUHARDT:  Objection, form.
10     Q.   Yes?
11     A.   Yes.
12     Q.   What else is it based on?
13     A.   Conversations with Mr. Potenciano.
14     Q.   Anything else?
15     A.   And the fact that I know assets that
16  were acquired sit within ADP224, and that is
17  what my team that does a 3-3 calculation on a
18  weekly basis utilizes.  So I know that legacy
19  Barclays employees do not have access to
20  Lehman's systems, and that Mr. Potenciano, any
21  access that he had was at some point revoked by
22  the trustee.
23     Q.   Are you able to testify, sir, as to
24  the nature of the data that Barclays is not
25  entitled to access as you reference in this

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  sentence?
3          MS. NEUHARDT:  Objection.  You spent a
4  good half hour this morning going over his
5  experience on 15c3-3 calculations.  This has
6  been asked and answered and answered over
7  and over.
8          MR. OXFORD:  Do you have an objection
9  to form?
10         MS. NEUHARDT:  That too.  But also
11  asked and answered.
12     A.   So to do a reserve computation, I need
13  to look at the entire data in sub ledgers of the
14  broker/dealer to come up with the reserve
15  calculation.  We take all the population of
16  information; it is a population test.  The
17  population has to be correct for the calculation
18  to be correct.  You need the full population to
19  determine which assets belong in the customer
20  reserve account.
21     Q.   And you know, sir, that there is data
22  to which Barclays doesn't have access that it
23  would need to rerun the LBI c3 calculation, but
24  you don't know specifically what that data is;
25  is that correct?

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2          MS. NEUHARDT:  Objection, form.
3      A.   So the data would be what is contained
4  in ITS, MTS and ADP.  So that would include
5  customer receivable, payables, fail accounts,
6  stock records, subsidiary ledgers, anything that
7  represents the books and records of the
8  broker/dealer, on their books and records.
9      Q.   It is your testimony that there is
10  data within ITS and MTS that Barclays doesn't
11  have access to?
12     A.   Yes.
13     Q.   You mentioned Mr. Potenciano at one
14  point had access to some data and that access
15  was revoked by the trustee.  Do you remember
16  telling me that a minute ago?
17     A.   Yes.
18     Q.   Can you explain what you meant by
19  that?
20     A.   He was a Lehman employee, so he had
21  access at some point to those systems.
22     Q.   Right.  I understand that, sir.  I'm
23  not asking --
24         MS. NEUHARDT:  He is not done with his
25  answer.

TSG Reporting - Worldwide    877-702-9580

Page 50

MARTINI

1               MARTINI
2    Q.  I don't mean to interrupt you, but
3 just so we can clarify the question, I am not
4 asking about the time when Mr. Potenciano was
5 employed by Lehman.  Of course when he was
6 employed by Lehman he had access to the data.  I
7 am asking what you meant when you said that
8 Mr. Potenciano had access to certain LBI data
9 and that access was revoked.
10    A.  Mr. Potenciano had log-ins to the
11 systems that contained LBI data.  At some point
12 it was revoked.  I don't know that date when it
13 was revoked.
14    Q.  Do you know whether Mr. Potenciano had
15 those log-ins after September 22, 2008?
16    A.  I don't know for certain.
17    Q.  How is it that you know that those
18 log-ins were revoked, sir?
19    A.  I asked him.  I asked Mr. Potenciano,
20 "Do you have access to those systems, ADP, ITS,
21 MTS?"
22       He says, "No."
23       I said, "How do you know that?"
24       He says, "Because my log-ins were
25 revoked," and he doesn't remember when they were
    TSG Reporting - Worldwide    877-702-9580

Page 51

MARTINI

1 revoked.
2    Q.  Does he remember what year they were
3 revoked?
4    A.  I didn't ask him.  Would it be safe to
5 say that at some point they came over?  I would
6 say yes.  I could -- at some point through 2008,
7 did he have access?  I'm sure they didn't get
8 cut off immediately, but I don't know when it
9 was cut off.
10      MS. NEUHARDT:  When you get to a good
11 stopping point, I could use a break.
12      MR. OXFORD:  We can take a few minutes
13 now if you like.
14      MS. NEUHARDT:  Now?
15      MR. OXFORD:  Sure.
16      MS. NEUHARDT:  Great.
17      (Recess)
18 BY MR. OXFORD:
19    Q.  Mr. Martini, do you know whether or
20 not Mr. Potenciano has access to any -- at any
21 time after he began employment with Barclays,
22 did he have any access to any shared drives onto
23 which LBI data was downloaded?
24    A.  I don't know for certain.
25
    TSG Reporting - Worldwide    877-702-9580

Page 52

MARTINI

1               MARTINI
2    Q.  You qualified that last sentence "for
3 certain."  Do you have any idea one way or the
4 other?
5    A.  I don't know.
6    Q.  Have you exhausted your recollection of
7 the conversations you had with Mr. Potenciano in
8 connection with the preparation for this
9 deposition?
10    A.  Just I would have asked him what he
11 worked on with Mr. Burke.  So in other words,
12 not worked on but what was his interaction.
13    Q.  In what context were you asking --
14 withdrawn.
15      Were you asking him about his
16 interaction with Bill Burke in a particular time
17 frame?
18    A.  Just in general, when he was asked to
19 work for the trustee, my question was, what were
20 you being asked to do?  It was because he was a
21 mechanical type person, that he would do some of
22 the mechanical work for Mr. Burke.
23    Q.  Did you have any other discussions
24 with Mr. Potenciano in connection with either in
25 preparation for the deposition or your
    TSG Reporting - Worldwide    877-702-9580

Page 53

MARTINI

1 declaration?
2    A.  No.
3    Q.  What about Mr. Crepeau, have we
4 exhausted your recollection of the conversations
5 you had with Mr. Crepeau in connection with
6 either your deposition or your declaration?
7    A.  Yes.  Mr. Crepeau, the conversations
8 with him were, number one, what the TSA was
9 working on, working on reconciliations over a
10 two-year period; regarding access, did they have
11 access to all the information, and did he have
12 access to anything that was MTS, ITS or ADP.
13    Q.  Mr. Crepeau was or was not a TSA
14 employee?
15    A.  He was at one point.
16    Q.  Do you know the time frame under which
17 he was working for the TSA?
18    A.  No.  Originally he was with TSA.  He
19 came to Barclays at some point later.  I'm not
20 sure when.  It was at some point in '09.  I
21 don't know when exactly.
22    Q.  Mr. Crepeau told you, when you say
23 number one, what the TSA was working on?
24    A.  Number one, what was the nature of the
25
    TSG Reporting - Worldwide    877-702-9580

---

Page 54

MARTINI

1
2 TSA, was reconciliations of the books and
3 records. Access, confirming my understanding
4 that TSA had access to all the LBI data, and
5 then additionally, did he have access currently
6 to any of the ITS, MTS or ADP data that was LBI.
7 **Q. When did you have the conversation**
8 **with Mr. Crepeau?**
9 A. Before I -- in the time leading up to
10 the April 5 declaration.
11 **Q. Did you talk to him in preparation for**
12 **your deposition?**
13 A. I spoke to Mr. Crepeau, yes.
14 **Q. When did you talk to him?**
15 A. This morning.
16 **Q. Do you have any notes of the**
17 **conversations you had with any of the**
18 **individuals you spoke to in connection with**
19 **either your deposition or your declaration?**
20 A. No. I mean my conversations were
21 actually quite short. It was more of, you know,
22 confirmation of the information that I said
23 initially, my knowledge of the firm, what I
24 would have known. It was more along
25 confirmation as to access, things like that. So

TSG Reporting - Worldwide    877-702-9580

---

Page 55

MARTINI

1
2 my conversations were very short.
3 **Q. You mentioned that Mr. Crepeau told**
4 **you that something was a two-year project with**
5 **the TSA. Can you expand a little on that?**
6 A. So in the declaration which talks
7 about when Mr. McIsaac's affidavit about 3-3
8 calculations, I'm saying to run a 3-3
9 calculation, you need the data. Data needs to
10 be correct. The books and records,
11 understanding that the books and records had to
12 be reconciled, possibly third parties. I'm not
13 sure of all the details.
14 But number one, it's getting the
15 population correct, reconciled, getting the
16 system, access to the systems, and then finally
17 access to the appropriate people who have
18 knowledge of Lehman's business in order to do a
19 3-3 calculation.
20 **Q. Is it your testimony, sir, that the**
21 **TSA has undertaken all of the activities you**
22 **have just told me about?**
23 MS. NEUHARDT: Objection to form.
24 A. Meaning --
25 **Q. Your last answer, sir, when you said**

TSG Reporting - Worldwide    877-702-9580

---

Page 56

MARTINI

1
2 **that books and records need to be reconciled,**
3 **possibly with third-party data, and that access**
4 **to appropriate people who have knowledge of**
5 **Lehman's business would need to be obtained in**
6 **order to do a c3 calculation; is that what you**
7 **told me?**
8 A. My understanding and knowledge, that's
9 what TSA was doing, has been doing,
10 reconciliations, as well as they contain the one
11 most single most important person to perform a
12 3-3 calculation of LBI.
13 **Q. And who is that person, sir?**
14 A. Bill Burke.
15 **Q. How is it that you know that he is the**
16 **single most important person for doing a 3-3**
17 **calculation of LBI?**
18 A. I know Bill Burke's position in the
19 firm. I've known him through the industry for a
20 long period of time. The head of Lehman's reg.
21 team, Tony Stucchio, does not work at the firm
22 anymore, moved on.
23 Bill Burke ran the 3-3 calculation.
24 My discussions, knowledge with Mr. Potenciano
25 and my knowledge of how Lehman worked, my years,

TSG Reporting - Worldwide    877-702-9580

---

Page 57

MARTINI

1
2 the short period I worked at the Exchange,
3 interacted with him as well in that role, and
4 that my knowledge of Mr. Potenciano in terms of
5 his expertise in terms of 3-3.
6 **Q. You also had conversations, you said,**
7 **with T.J. Gavenda; is that correct?**
8 MS. NEUHARDT: Objection to form.
9 **Q. In preparation for your deposition or**
10 **your declaration?**
11 A. No.
12 **Q. You did not?**
13 A. No conversations, no. My, my comment
14 about Mr. Gavenda was that we talked about TSA
15 and what they did, as CFO at the time. I would
16 have gotten knowledge through him as to what the
17 role of the TSA was.
18 **Q. Is that also true of your**
19 **conversations with Mr. Scott, the COO?**
20 A. Ms., yeah.
21 **Q. Ms. Scott. Did you talk to her in**
22 **preparation for your deposition?**
23 A. No.
24 **Q. Did you talk to her in preparation for**
25 **your declaration?**

TSG Reporting - Worldwide    877-702-9580

---

Page 58

**MARTINI**

1
2    A.    No.
3    Q.    Did you talk to anybody else in
4  preparation for your -- either your deposition
5  or your declaration?
6    A.    No.
7    Q.    Have you ever -- withdrawn.
8        You mentioned that Bill Burke had a
9  certain reputation in the industry, correct?
10    A.    Yes.
11    Q.    Can you tell me again what the
12  reputation is?
13    A.    Someone who was seen as an expert in
14  SEC rules, 15c3-1, customer reserve and net
15  capital.  Excuse me.
16    Q.    Do you know who Daniel McIsaac is?
17    A.    Yes.
18    Q.    And before you reviewed his report,
19  were you familiar with Mr. McIsaac?
20    A.    Yes.
21    Q.    How is it you were familiar with
22  Mr. McIsaac?
23    A.    I know where he works, know his role
24  in past firms and know his role through the
25  SIFMA Capital Committee.  S-I-F-M-A.

TSG Reporting - Worldwide    877-702-9580

Page 59

**MARTINI**

1
2    Q.    Have you ever met Mr. McIsaac?
3    A.    Yes.
4        MR. OXFORD:  Off the record.
5        (Discussion held off the record)
6  BY MR. OXFORD:
7    Q.    You said you met Mr. McIsaac before
8  you read his affidavit?
9    A.    Yeah.  I have met him previously.  I
10  know him through the industry.
11    Q.    Mr. McIsaac is someone with
12  considerable experience in the industry; is that
13  correct?
14        MS. NEUHARDT:  Objection to form.
15    A.    There are many people with
16  considerable industry experience, including
17  myself.  Burke, yes, he is one of them as well.
18    Q.    Does Mr. McIsaac have a reputation in
19  the industry, sir?
20    A.    He does.
21    Q.    What is that reputation?
22    A.    I think his name is -- again, if you
23  are on the SIFMA Capital Committee, you are
24  running the reg. teams at a major broker/dealer.
25  So with that comes a reputation of you're

TSG Reporting - Worldwide    877-702-9580

Page 60

**MARTINI**

1
2  knowledgeable.
3    Q.    So you said Mr. Burke you considered
4  to be an expert in the industry and in
5  particular in SEC rules, including 15c3-3?  Do
6  you remember telling me that?
7    A.    Um-hm.
8    Q.    Would you also consider from your
9  experience in the industry that Mr. McIsaac was
10  similarly an expert in SEC Rule 15c3-3?
11        MS. NEUHARDT:  Object to the extent
12    that you are asking him for a legal
13    conclusion on whether or not either
14    Mr. Burke or Mr. McIsaac should be qualified
15    as experts in this litigation.
16        Otherwise, you can answer.
17    A.    First of all, Mr. McIsaac held a
18  higher position.  So I don't know -- he was a
19  CFO, if I am not mistaken.  So I don't know
20  whether he has as intimate knowledge as someone
21  like Bill Burke who manages the day-to-day 3-3
22  calculations.
23        I'm sure at some point in
24  Mr. McIsaac's career, he managed a 3-3
25  calculation.  I have nothing to base an opinion

TSG Reporting - Worldwide    877-702-9580

Page 61

**MARTINI**

1
2  that he does not have expertise in 3-3.
3    Q.    And before your counsel entered her
4  speaking objection, I had asked you a question
5  which was as follows:  Would you also consider
6  from your experience in the industry that
7  Mr. McIsaac is qualified as an expert in the
8  interpretation of Rule 15c3-3?
9        MS. NEUHARDT:  Same objection.
10    A.    I have not discussed ever a 15c3 issue
11  with Mr. McIsaac, but I know him in the
12  industry, know he holds that high position and
13  has run reg. teams most of his career, so I have
14  nothing that would make me believe he does not
15  have expertise in that area.
16    Q.    Have you ever spoken to a gentleman by
17  the name of Peter Vinella?
18    A.    No.
19    Q.    Do you understand that Mr. Vinella is
20  someone who has been retained by Barclays as an
21  expert in this litigation?
22        MS. NEUHARDT:  Objection to form.
23    A.    I know his name is involved in this
24  proceeding, yes.  I don't know what role he has.
25    Q.    Other than seeing his name referenced

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  in documents submitted by Mr. McIsaac, do you
3  have any awareness of Mr. Vinella's role in this
4  litigation?
5      A.  No.
6      Q.  When you joined Barclays, sir, you
7  were associate director on the regulatory
8  reporting team at Barclays Capital, correct?
9      A.  Correct.
10     Q.  And that was a position you held
11 between August 2007 and March 1, 2009, correct?
12     A.  Correct.
13     Q.  And in March 1, 2009, you were
14 promoted, correct?
15     A.  Correct.
16     Q.  You were promoted to director of the
17 regulatory reporting team at Barclays Capital?
18     A.  Correct.
19     Q.  That's the position you hold today,
20 correct?
21     A.  Correct.
22     Q.  When you were -- withdrawn.
23         You were associate director on the
24 reg. reporting team at the time that Barclays
25 acquired certain assets and/or businesses of

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  LBI, correct?
3      A.  Correct.
4      Q.  That was in September of 2008,
5  correct?
6      A.  Correct.
7      Q.  Did you have any responsibility in
8  September of 2008 for computing out -- sorry,
9  Barclays' 15c3-3 reserve requirement?
10     A.  September of 2008, my role was in
11 charge of reg. policy for Barclays Capital, Inc.
12 So I would be someone who faced off with the
13 business on new products, new businesses, to let
14 them know the impact from our net capital and
15 customer reserve perspective.
16         So I would have to be intimately
17 knowledgeable of Barclays' process for net
18 capital and customer reserve, but at that time,
19 I did not manage the calculations.
20     Q.  Who did manage the calculations, sir?
21     A.  At that time, Matthew Huey was in
22 charge of reg. for the U.S. for Barclays
23 Capital.
24     Q.  Does he hold the position you hold
25 today, sir?

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2      A.  The group has been restructured
3  subsequent, so his position is actually held by
4  someone named Anna Yu, and in the restructuring,
5  they then broke off the management of the
6  broker/dealer teams and the bank teams. I run
7  the broker/dealer team and somebody else runs
8  the bank team.
9      Q.  Do you have any knowledge about
10 Barclays' calculation of the -- its 15c3-3
11 reserve requirement in September of 2008 and in
12 October of 2008, after it had acquired certain
13 assets and businesses from LBI?
14         MS. NEUHARDT:  Objection to form.
15     A.  Can you explain "knowledge," what that
16 means?
17     Q.  Do you know anything about it?
18     A.  I mean I'm aware of the reserve
19 calculations. I just did not manage them or
20 supervise them.
21     Q.  How is it that you are aware of the
22 reserve calculations, sir?
23     A.  One is done every week, and as a
24 manager, senior manager within the team, I would
25 still see the reserve calculations.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2      Q.  Do you have any knowledge about how
3  that calculation was performed in that time
4  period, September, October, 2008?
5          MS. NEUHARDT:  Objection to form.
6      A.  My recollection for that period would
7  not be really specific as to how they'd do it
8  then. If it was as of today, for example, it
9  would be a different story.
10     Q.  Do you -- I take it from your last
11 answer, you're now directly responsible for the
12 computation of the c3 reserve calculation within
13 Barclays Capital?
14     A.  My current role, I am responsible for
15 a reg. policy team for the broker/dealer and for
16 all the SEC reporting for the U.S.
17 broker/dealer, CFTC reporting. So in that is a
18 3-3 calculation. That's one of the aspects. I
19 do not manage it. I have a VP who manages it
20 and reports to a director who reports to me.
21     Q.  So it is fair to say, sir, you have
22 indirect but managerial or supervisory
23 responsibility for Barclays Capital's
24 calculation of the customer reserve formula
25 today?

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

2   A.   I have managerial responsibility, but
3   I am intimately aware of our processes.
4   Barclays is a hands-on place, despite the size.
5       Q.   Do you know, sir, how Barclays --
6   withdrawn.
7           Barclays was a smaller broker/dealer
8   than LBI prior to September of 2008, correct?
9       MS. NEUHARDT:  Objection to form.
10      A.   Smaller in which way?
11      Q.   Any way, sir.
12      A.   In terms of balance sheet?
13      Q.   Any way, sir.
14      A.   Balance sheet may have been
15  comparable.  Smaller in terms of number of
16  people in the reg. team, yes.
17      Q.   Do you know one way or the other
18  whether the balance sheet of Barclays Capital
19  and LBI was comparable in the fall of 2008?
20      A.   I haven't looked at those for a long
21  time, but I believe they were comparable.
22      Q.   Do you have any understanding, sir, of
23  how Barclays Capital managed the integration of
24  the LBI customer accounts and assets --
25      MS. NEUHARDT:  Objection to form.

MARTINI

2       MR. OXFORD:  I hadn't finished.
3       MS. NEUHARDT:  Sorry.
4       Q.   -- that it acquired from LBI from a
5   15c3-3 reserve perspective?
6       MS. NEUHARDT:  It's objectionable.
7       A.   That I don't -- I don't understand the
8   question, I'm sorry.
9       Q.   You understand that Barclays acquired
10  certain customers and certain customer assets
11  from LBI, correct?
12      A.   Um-hm, yes.
13      Q.   You understand, sir, that those
14  customers and customer assets would have an
15  impact on Barclays' computation of the 15c3-3
16  reserve formula, yes?
17      A.   Correct.
18      Q.   Do you have any understanding of how
19  Barclays managed the integration of those
20  customers and customer assets into its
21  computation of the c3 formula?
22      MS. NEUHARDT:  Objection to form.
23      A.   So if -- are you asking how the assets
24  came over from LBI to Barclays?
25      Q.   No, no.

MARTINI

2       A.   You're asking how the computation is
3   now computed for Barclays Capital with the new
4   acquired assets?
5       Q.   I am asking, sir, whether you have any
6   information about what steps Barclays took in
7   order to manage its 15c3-3 calculations at a
8   time when Barclays had acquired a significant
9   amount of new customers and a significant amount
10  of assets along with those customers.
11      MS. NEUHARDT:  Objection, form.
12      Q.   Do you understand the question?
13      A.   Yeah.  So I'll -- the integration
14  date, there was many things occurring, so I,
15  myself, at that point in time was not managing,
16  as I mentioned, the 3-3 calculations.  So as far
17  as how they integrated everything initially, I
18  don't know how they ultimately got to those
19  points.
20          I do know the Friday after the
21  acquisition that we performed a 3-3 calculation
22  that would have contained those assets.
23      Q.   And do you know whether there were any
24  difficulties in performing that calculation?
25      A.   Don't recall the actual details.

MARTINI

2       Q.   Do you know what steps were taken to
3   insure that that calculation was correct?
4       MS. NEUHARDT:  Objection to form.
5       A.   I don't.
6       Q.   I meant to ask you about professional
7   associations, sir, when I was going through your
8   bio, but I forgot.  Are you a member of any
9   professional associations?
10      A.   I am a member of the SIFMA Capital
11  Committee, and on the Financial Management
12  Society Board of SIFMA.
13      Q.   Do you have a particular role on the
14  Capital Committee of SIFMA, sir?
15      A.   I represent Barclays Capital.
16      Q.   Other than that, sir, do you have any
17  particular role?
18      A.   No, nobody does.  I mean if issues
19  come up that will require separate committees, I
20  would be involved in that, but that's how the
21  committee works.
22      Q.   Does your work on the Capital
23  Committee of SIFMA relate to 15c3-3?
24      A.   I mean the SIFMA Capital Committee is
25  a lobbyist to the regulators, so, you know,

Page 74

**MARTINI**

1
2 **calculating or rerunning the calculation as you**
3 **meant it in that sentence?**
4     A.    What has to happen is first Barclays
5 Capital, someone on my team would need access to
6 the data.  Secondly, they would need a complete
7 population of reconciled books and records, so
8 that the information going in is accurate so
9 that the output can be accurate.
10         And then within the subset of that
11 data, and I'm talking of specifically the ADP,
12 MTS, ITS, stock records, trial balances,
13 subsidiary ledgers, whatever will be required to
14 perform a 15c3 calc.
15     Q.    Anything else, sir?
16     A.    In terms of --
17     Q.    In terms of rerunning the
18 calculations, what would be needed by Barclays?
19         MS. NEUHARDT:  Objection, form.
20     A.    Barclays would need a full picture of
21 the firm's books and records and access to their
22 stock record allocations and access to
23 individuals in operations, individuals'
24 knowledge of Lehman's business, so that we can
25 interpret the information properly for the

TSG Reporting - Worldwide     877-702-9580

Page 75

MARTINI

1
2 reserve computation to be done.
3     Q.    You mentioned that Barclays would need
4 a complete population, reconciled books and
5 records.  Do you remember telling me that a
6 minute ago?
7     A.    Yes.
8     Q.    What do you mean by reconciled books
9 and records?
10     A.    My understanding, I've not worked at
11 Lehman, but my understanding was that they may
12 have issues with their fail ledgers, bank loan
13 ledgers, things that would potentially give you
14 the impression that the information that feeds
15 into the allocation may not be entirely correct
16 or accurate.
17     Q.    What's the basis for that
18 understanding, sir?
19     A.    Discussions again with individuals
20 that have worked at Lehman Brothers.  Alex
21 Crepeau who is intimately aware of the firm as a
22 senior operations person.  And 15c3-3 is an
23 operational intensive calculation.
24     Q.    And any basis for the testimony you
25 have just given other than a conversation with

TSG Reporting - Worldwide     877-702-9580

Page 76

**MARTINI**

1
2 **Mr. Crepeau?**
3         MS. NEUHARDT:  Objection, form.
4     A.    I was not a legacy Lehman employee, so
5 I can't speak to the order of their books and
6 records.
7     Q.    OK, I understand that.  And I
8 appreciate that, sir.  I think I do have a
9 picture of what your role was.  I'm just seeking
10 to understand -- when you testify, I need to
11 understand how it is that you can testify.
12 **Can you turn to the McIsaac report,**
13 **Exhibit 693, please.  In particular,**
14 **paragraph 31.  Do you have that there, sir?**
15     **A.    Yes.**
16     **Q.    You should feel free of course to read**
17 **the whole thing.  I'm going to direct your**
18 **attention to the last three lines, sir.  Let me**
19 **know when you have had a chance to review that.**
20     **A.    OK.**
21     **Q.    Thank you.**
22     **Turning to the third last line that**
23 **begins, "the trustee's professionals."  Do you**
24 **have that, sir?**
25     **A.    Yes.**

TSG Reporting - Worldwide     877-702-9580

Page 77

MARTINI

1
2     **Q.    Mr. McIsaac writes, "The trustee's**
3 **professionals did not, as Mr. Vinella suggests,**
4 **perform an analysis of possible errors that**
5 **would have increased the reserve requirement and**
6 **deliberately failed to perform a similar**
7 **analysis of possible errors that would have**
8 **decreased the reserve requirement, nor were they**
9 **in a position to do so."**
10     **Do you see that?**
11     **A.    Yes.**
12     **Q.    He goes on to say, "Performing such**
13 **analysis would require the trustee's**
14 **professional to review and verify every line**
15 **item included in the reserve calculation,**
16 **correct any erroneous entries and then rerun the**
17 **reserve calculation to gauge the effect of each**
18 **correction.  As noted below, this would not as a**
19 **practical matter be cost effective or possible**
20 **to complete."**
21     **Do you see that?**
22     **A.    I do.**
23     **Q.    Do you agree with the last two**
24 **sentences of paragraph 31 of Mr. McIsaac's**
25 **report?**

TSG Reporting - Worldwide     877-702-9580

**MARTINI**

1
2    MS. NEUHARDT:  Objection.
3        A.    Yeah, I can't answer the --
4    performing -- you are saying performing such
5    analysis will require the trustee's
6    professionals to review, verify and rely on --
7        Q.    Um-hm.
8        A.    I agree with that.
9        Q.    So we have a clear record, you agree
10   with Mr. McIsaac's sentence which is the
11   penultimate sentence of paragraph 31, that
12   performing such an analysis would require the
13   trustee's professionals to review and verify
14   every line item included in the reserve
15   calculation, correct any erroneous entries and
16   then rerun the reserve calculation to gauge the
17   effect of each correction?
18       A.    Right.  In order to do a reserve
19   calculation, that's what you would have to do.
20       Q.    Is that analysis, including reviewing
21   and verifying every line item in the reserve
22   calculation, something that is done routinely in
23   the industry on a week-to-week basis when the
24   reserve calculation is computed?
25       A.    On a week --

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2    MS. NEUHARDT:  Objection, form.
3        A.    On a week-to-week basis, the reserve
4    team that does the calculation is dependent on
5    the internal controls of the firm's books and
6    records.  So if the books and records are
7    accurate, the firm would not do that.
8        If the firm felt it had something
9    incorrect systematic with its books and records,
10   then they would have to do that if they wanted
11   an accurate calculation, in my opinion.
12       Q.    Do you have any information one way or
13   the other, sir, as to whether or not LBI
14   believed that there was something systematically
15   incorrect with its books and records in the week
16   beginning September 15 of 2008?
17       MS. NEUHARDT:  Objection to form.
18       A.    Because I was not an employee, I can't
19   speak to the specifics, but my discussions with
20   Mr. Crepeau, my interactions with him tell me
21   that they had some issues, most notably bank
22   balances and fail balances.
23       Q.    And specifically what did Mr. Crepeau
24   tell you about those issues?
25       A.    He said that there was activity

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2    happening and that got the sense that the firm
3    lost control of the books and records.
4        Q.    When did the firm lose control of its
5    books and records according to what Mr. Crepeau
6    told you?
7        A.    It wasn't specific to a date.
8        Q.    Generally when did he say?
9        A.    In the week or so leading up to
10   bankruptcy.
11       Q.    Back to Mr. McIsaac's declaration.  In
12   paragraph 32, he says, "Even if the trustee had
13   unlimited access to LBI's systems and former" --
14       MS. NEUHARDT:  Where are you?  I am
15   sorry.
16       MR. OXFORD:  32.  Do you have it, Amy?
17       MS. NEUHARDT:  Um-hm.
18       Q.    Paragraph 32, Mr. McIsaac says, "Even
19   if the trustee had unlimited access to LBI's
20   systems and former LBI employees, rerunning the
21   reserve calculation as of September 19th would
22   be a substantial undertaking that would require
23   many months, significant funds and a large
24   number of knowledgeable personnel to complete."
25       Do you see that, sir?

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2        A.    Yes.
3        Q.    Do you agree with that sentence?
4        A.    Having not intimate knowledge of
5    Lehman's books and records, I can't disagree or
6    agree with that.  But I do know at least through
7    my discussions with Mr. Crepeau that my
8    understanding is that was what was occurring,
9    was over the last couple of years with the TSA,
10   it was reconciling books and records.
11       Q.    When did you have that conversation
12   with Mr. Crepeau?
13       A.    In the time leading up to my
14   declaration.
15       Q.    In the spring of 2010?
16       A.    Yeah, but additionally as a member of
17   Barclays Capital, I think there are many
18   employees that work at Lehman that are Barclays
19   Capital employees working for not TSA but
20   Barclays Capital, Inc., the U.S. broker/dealer.
21   It seems to have been common knowledge that
22   was happening in TSA and what was the state of
23   the books and records of Lehman Brothers.
24       Q.    And did Mr. Crepeau tell you that this
25   effort that he said was being undertaken by the

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  **TSA to reconcile the books and records of**
3  **Lehman, did he ever tell you that was complete?**
4      A.   He did not.
5      **Q.   Did he tell you it was a significant**
6  **undertaking?**
7          MS. NEUHARDT:  Objection to form.
8      A.   He didn't say that.  He just said -- I
9  do believe he said he is not sure that they are
10 done or something along those lines.
11     **Q.   Did he tell you that it was taking a**
12 **long time?**
13     A.   You could imply that from the
14 conversation, that it has been taking a long
15 time.
16     **Q.   I'm not asking if I can imply it, sir.**
17 **I am asking if you --**
18     A.   I would imply that from the
19 discussions.
20     **Q.   Did you also learn from Mr. Crepeau**
21 **that a substantial number of individuals are**
22 **involved in TSA's work to reconcile the books**
23 **and records of LBI?**
24         MS. NEUHARDT:  Objection to form.
25     A.   Never really spoke about number of

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  people.  I don't know.
3      Q.   This is part of the common knowledge
4  that you testified about earlier on, that there
5  are --
6          MS. NEUHARDT:  Objection to form.
7          MR. OXFORD:  Please, Amy.
8          MS. NEUHARDT:  I am objecting to form.
9  It is not a speaking objection.
10         MR. OXFORD:  I understand, but if you
11 can wait until I finish, then we will have a
12 clearer record.
13         MS. NEUHARDT:  OK.  I will still
14 object, though.
15     Q.   You remember you testified earlier,
16 sir, that there was common knowledge within
17 Barclays about some of the work that was being
18 conducted by the TSA, sir?  Do you remember
19 telling me that?
20     A.   Common knowledge about what the
21 trustee was doing, TSA was doing, working on
22 reconciliations of books and records for
23 whatever date, September 19, yes.
24     Q.   And was it also common knowledge that
25 there was a substantial number of people

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  involved in this effort?
3          MS. NEUHARDT:  Objection to form.
4      A.   I would say that there is -- I would
5  imply from the discussions that there were quite
6  a few people, I don't know how many, that were
7  involved in that effort.  I don't know how many
8  employees were working with the TSA.
9      **Q.   Continuing on with paragraph 32,**
10 **Mr. McIsaac says, "As a threshold matter, all of**
11 **LBI's books and records as of September 19, 2008**
12 **would have to be reviewed and reconciled, a**
13 **process that would itself take months to**
14 **accomplish."**
15         **Do you have any reason to agree or**
16 **disagree with Mr. McIsaac in that sentence?**
17         MS. NEUHARDT:  Objection to form.
18     A.   **I would have no reason to agree or**
19 **disagree.**
20     **Q.   Next sentence.  "At that point**
21 **personnel would need to modify the information**
22 **in the allocations in LBI's legacy systems**
23 **manually, or in the likely event that the legacy**
24 **system could not be modified manually,**
25 **reconstruct those systems, including all of the**

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1
2  **accounts, balances and codings from the ground**
3  **up."**
4          **Do you see that?**
5      **A.   Yes.**
6      **Q.   Do you have any reason to agree or**
7  **disagree with Mr. McIsaac there?**
8          MS. NEUHARDT:  Objection to form.
9      **A.   To my knowledge of 3-3 calculations,**
10 **if the data isn't correct, and you have**
11 **adjustments, you have to run those adjustments**
12 **through.  Whether that means manually or whether**
13 **you have the ability to do that systematically,**
14 **I don't know Lehman's process of how they would**
15 **do it.**
16     Q.   You don't know that LBI's legacy
17 systems don't allow a user to update stock
18 record information as of a date in the past?
19         MS. NEUHARDT:  Objection, form.
20     A.   I don't know intimately how their
21 allocation system works.  I can only speak how a
22 firm like Barclays works, is that we have the
23 ability to change our allocation for
24 adjustments.  We have an automated solution to
25 do that.  Most large firms have the ability to

TSG Reporting - Worldwide    877-702-9580

Page 86

MARTINI

1
2  do that.
3        Q.   But you don't know whether or not the
4  legacy Lehman systems have that ability?
5        A.   No.  I don't have intimate knowledge
6  of how that works.
7        Q.   Do you agree that if there is no
8  ability to update stock record information in
9  legacy LBI systems, it would be necessary to
10  construct a database that would mimic the stock
11  records in the legacy systems?
12        MS. NEUHARDT:  Objection, form.
13        A.   It seems logical that that would be
14  the case.
15        Q.   Given the size of LBI's business, that
16  would involve recreating the accounts, balances
17  and coding for tens of thousands of CUSIPs?
18        MS. NEUHARDT:  Objection to form.
19        A.   I'm not sure of that magnitude.  I
20  have no basis to comment on that.
21        Q.   You have no basis to think that that's
22  incorrect, do you, sir?
23        MS. NEUHARDT:  Objection, form.
24        A.   No.
25        Q.   Do you agree that recreating the

TSG Reporting - Worldwide    877-702-9580

Page 87

MARTINI

1
2  codings and balances for that many CUSIPs would
3  be a significant undertaking?
4        MS. NEUHARDT:  Objection, form.
5        A.   It sounds that way.  Sounds like it
6  would be significant.  If that is, in fact, what
7  the situation is.
8        Q.   Would you agree it could be
9  time-consuming?
10        MS. NEUHARDT:  Objection to form.
11        A.   It could.  Could be.
12        Q.   Do you agree that the stock record
13  information for each CUSIP would then have to be
14  reconciled against custodian records?
15        MS. NEUHARDT:  Objection to form.
16        A.   Again, it would depend on exactly, you
17  know, what is incorrect.  But normally, that is
18  the process that a broker/dealer has.  They have
19  that in their control process, the books and
20  records tie to third-party statements.
21        Q.   Do you also agree, Mr. Martini, that
22  in order to rerun the calculation, the
23  corrections and updates to the stock record
24  information would have to be entered manually?
25        MS. NEUHARDT:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 88

MARTINI

1
2        A.   If there is not an automated solution,
3  the manual is the only way to do it.
4        Q.   Assuming there were thousands of
5  adjustments to make, this process alone could
6  take many months, correct?
7        MS. NEUHARDT:  Objection to form.
8        A.   I mean I couldn't comment on the
9  length of time.
10        Q.   And in rerunning the calculation, sir,
11  for LBI's c3 calculation from September 19,
12  2008, once those stock records were corrected,
13  do you agree that codings in the allocation
14  program would need to be reviewed?
15        MS. NEUHARDT:  Objection to form.
16        A.   The first step in a 3-3 calculation is
17  population correctness, and without question
18  coding accounts is critical to having the right
19  output.
20        Q.   Is that a yes?
21        A.   Yes.
22        Q.   So the answer to my question is yes?
23        A.   Yes.
24        Q.   And as part of that process, documents
25  supporting the codings would need to be reviewed

TSG Reporting - Worldwide    877-702-9580

Page 89

MARTINI

1
2  to confirm that, correct?  Do you agree?
3        A.   I am sorry, repeat that, please.
4        Q.   As part of that process, documents
5  supporting the codings would need to be reviewed
6  to insure that they were correct?
7        MS. NEUHARDT:  Objection, form.
8        A.   Sorry, I don't understand.  What --
9  process documents?  Is that what you said?
10        Q.   As part of the process of reviewing
11  the codings in the allocation program, it would
12  be necessary to review documents supporting the
13  codings to confirm they were correct.  Do you
14  agree?
15        MS. NEUHARDT:  Objection, form.
16        A.   I don't know what that means.  Does
17  that mean going back to account setups, things
18  like that?
19        Q.   Let me ask it this way:  What would be
20  necessary, what steps would be involved in
21  reviewing the codings in the allocation program?
22        A.   Based on the nature of the account.
23  So LBI would have already coded their accounts.
24  They should have been -- I would think their
25  codings are correct.

TSG Reporting - Worldwide    877-702-9580

Page 90

MARTINI

1
2    Q.   So is it your testimony there would be
3    no need to review the codings in the accounts
4    because LBI had already coded them?
5        MS. NEUHARDT:  Objection, form.
6        A.   I don't know their -- I just don't
7    know their process.  So in other words, we
8    spend -- when I do a calculation, we spend a lot
9    of time on -- codes is the most important aspect
10   to the reserve formula.  If an account is not
11   coded properly, it will not go through the
12   system with the right output.
13       Q.   And how would you go about reviewing
14   the codings in the allocation program if that
15   were necessary?
16       A.   I think you would have to know the
17   business and understand what the accounts
18   represent and the nature of those accounts.
19       Q.   Would you also need, in order to rerun
20   the c3 calculation, to review and reconcile
21   money balances?
22       A.   I am sorry, I missed that.  One more
23   time.
24       Q.   Would you also need, in order to rerun
25   the c3 calculation of LBI, to review and

TSG Reporting - Worldwide    877-702-9580

Page 91

MARTINI

1
2    reconcile money balances?
3        A.   Yes.
4        Q.   What would the purpose of that review
5    and reconciliation be?
6        A.   To insure that the balances that drive
7    the formula are accurate, tie into the firm's
8    general ledger and books and records.
9        Q.   You have no basis to disagree with
10   Mr. McIsaac's conclusion that this undertaking
11   would require many months, significant funds and
12   a large number of knowledgeable personnel to
13   complete, do you?
14       MS. NEUHARDT:  Objection to form.
15       A.   Yeah, I can't say that that's
16   incorrect.  I don't have enough knowledge with
17   Lehman's system or that process or exactly what
18   they are trying to accomplish.
19       MS. NEUHARDT:  When you get to a
20   subject matter break, can we take a quick
21   lunch?
22       MR. OXFORD:  Yeah, we can take a quick
23   lunch right now.
24       (Recess)
25

TSG Reporting - Worldwide    877-702-9580

Page 92

MARTINI

1
2    Q.   Mr. Martini, can you have in front of
3    you Exhibit 828, your declaration, please.
4        A.   Yes.
5        Q.   Please turn to paragraph 3.  If you
6    look at the third bullet, you write that
7    "Mr. McIsaac asserts that the trustee cannot
8    rerun the reserve calculation to account for any
9    identified discrepancies."  Do you see that?
10       A.   Right, yes.
11       Q.   Could you explain to me what you meant
12   by identified discrepancies?
13       A.   Any problems with the underlying data.
14       Q.   Could you turn to Mr. McIsaac's report
15   which is Exhibit 693 and can you show me where
16   in Mr. McIsaac's report he says that?
17       WITNESS' ATTORNEY:  Objection to form.
18       A.   I don't see where that exact phrase is
19   stated.  It was --
20       Q.   I am sorry, I didn't mean to
21   interrupt.
22       A.   In total, the entire affidavit
23   regarding running the reserve calculation.
24       Q.   Is there a particular section of the
25   report that you are referring to, sir?

TSG Reporting - Worldwide    877-702-9580

Page 93

MARTINI

1
2    A.   Well, in paragraph 32, so the general
3    theme is that the trustee didn't have -- didn't
4    have the ability to rerun the reserve
5    calculation.  And paragraph 31.
6        Q.   Maybe we have a definitional issue.
7    When you refer to "identified discrepancy," sir,
8    that you say that McIsaac claims the trustee
9    can't rerun the reserve calculation to account
10   for, you are aware, sir, that the trustee has
11   identified particular discrepancies in the
12   reserve calculation from September 19, 2008,
13   correct?
14       WITNESS' ATTORNEY:  Objection to,
15   form.
16       Q.   Let me try this again.  Are you aware,
17   Mr. Martini, that Mr. McIsaac has identified
18   certain adjustments that need to be made to the
19   LBI customer reserve calculation as of
20   September 19, 2008?
21       WITNESS' ATTORNEY:  Objection to form.
22       A.   There are excerpts in the report that
23   I have seen where he talks about discrepancies,
24   correct.
25       Q.   And you're aware, sir, that

TSG Reporting - Worldwide    877-702-9580

Page 94

MARTINI

1  Mr. McIsaac's conclusion is that if those
2  adjustments were made to the September 19, 2008
3  reserve calculation, then there would be a
4  shortfall in the amount that should have been
5  set aside for customers?
6        WITNESS' ATTORNEY:  Objection to form.
7     A.   Yeah, so my view is a complete
8  calculation needs to be undertaken.
9     Q.   OK, and why is that, sir?
10    A.   To account for any discrepancies, all
11 discrepancies.
12    Q.   Are you aware of any discrepancies
13 that existed in the September 19, 2008 reserve
14 calculation that Mr. McIsaac didn't take account
15 of?
16        WITNESS' ATTORNEY:  Objection, he
17 never worked at LBI.
18    A.   I have no specifics, just it is the
19 nature of the process of doing a reserve comp,
20 the calculation of a reserve calculation, not
21 just some identified errors.  It is looking at
22 the entire calculation, scrubbing all the data.
23    Q.   OK, let's try this again.  Mr.
24 Martini, are you aware of a single discrepancy
25

TSG Reporting - Worldwide    877-702-9580

Page 95

MARTINI

1  that existed in LBI's 9/19/2008 15c3-3 reserve
2  computation that Mr. McIsaac did not take
3  account of in either his affidavits or reports
4  in this litigation?
5        WITNESS' ATTORNEY:  Same objection.
6     A.   Don't know the process that he
7  undertook.  In other words, does he have all of
8  the discrepancies, does he have all the errors.
9     Q.   OK, let me try this the third time.
10 Are you aware of a single discrepancy that
11 existed in LBI's 9/19/2008 15c3 reserve
12 computation that Mr. McIsaac did not take
13 account of in either of his affidavits or
14 reports in this litigation?
15        WITNESS' ATTORNEY:  Same objection,
16 plus asked and answered.
17    Q.   It is a yes or no question, sir.  Do
18 you know one way or the other?
19    A.   I did not know.  I did not work at
20 Lehman, so I don't know specifically.
21    Q.   And you haven't reviewed Mr. McIsaac's
22 original affidavit in this matter, have you?
23    A.   No.
24    Q.   And you haven't reviewed Mr. McIsaac's
25

TSG Reporting - Worldwide    877-702-9580

Page 96

MARTINI

1  testimony in this matter, have you?
2     A.   No.
3     Q.   Back to your affidavit, sir -- sorry,
4  your declaration.  The fourth bullet that you
5  say Mr. McIsaac asserts and is incorrect, is
6  that Barclays is able to rerun the reserve
7  calculation for the identified discrepancies.
8  Could you turn to Mr. McIsaac's report, Exhibit
9  693, and can you tell me where Mr. McIsaac says
10 that?
11        WITNESS' ATTORNEY:  You should look
12 over the entire declaration.
13    Q.   Take your time, sir.
14    A.   Sorry, I am on 29.  Paragraph 29, the
15 last sentence after the closing of a sale
16 transaction on September 22, 2008, Barclays took
17 control of LBI's system including the legacy
18 systems to store the information necessary to
19 rerun the reserve calculation of September 19.
20    Q.   OK, and is that the sum and substance
21 of your -- the basis for your assertion that
22 Mr. McIsaac says Barclays is able to rerun the
23 reserve calculation for identified
24 discrepancies?
25

TSG Reporting - Worldwide    877-702-9580

Page 97

MARTINI

1     A.   That, and in connection with 31 where
2  he says that the trustee cannot run the
3  calculation.  So saying that the information --
4  that Barclays has access to the information to
5  run the -- a 15c3-3 calculation and the trustee
6  did not have the time -- the significant
7  undertaking, so on and so forth.  That's where
8  that comment comes from.
9     Q.   Anything else?
10    A.   That's it.
11    Q.   Do you agree, sir, that Barclays could
12 adjust the September 19, 2008 reserve
13 calculation for LBI to account for identified
14 discrepancies?
15        WITNESS' ATTORNEY:  Object to form.
16    A.   Anybody could adjust the reserve
17 calculation, but to me, that's -- I can't say
18 that that's correct, you can't say that's full,
19 a full process.
20    Q.   You can't say it is a full process in
21 what respect, sir?
22    A.   To do a reserve calc. is -- a recalc.
23 to me means you start from the beginning.
24    Q.   And tell me again why it is your
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  opinion that a recalculation was necessary in
3  this case?
4          WITNESS' ATTORNEY:  Objection to form.
5      That mischaracterizes his testimony.
6      Q.    OK.  Well, let's deal with that.  Is
7  it your belief, sir, that in order to ascertain
8  what the reserve requirement was on
9  September 19, 2008, it was necessary for
10  someone, whether that be the trustee, his staff
11  or Barclays, to do a full recalculation of the
12  reserve requirement?
13          WITNESS' ATTORNEY:  Object to form.
14      A.    I am sorry, can you repeat that
15  question.
16      Q.    Sure, can you read it back.
17          (Record read)
18          WITNESS' ATTORNEY:  Same objection.
19      A.    I would say yes.
20      Q.    Why?
21      A.    Based on the nature of the
22  discrepancies outlined here.
23      Q.    Where is here, sir?  You're pointing
24  to your declaration, which discrepancies do you
25  outline in your declaration?

MARTINI

1
2          WITNESS' ATTORNEY:  Objection to form.
3      A.    There were discrepancies in paragraph
4  18,--
5      Q.    Paragraph 18 of what, sir?
6      A.    693.
7      Q.    Anything else, sir?
8          WITNESS' ATTORNEY:  Objection, form.
9      A.    He has them.  I have to go through
10  every paragraph.  He has them in paragraph 7 --
11      Q.    Well, maybe we can do it this way, is
12  it your belief, sir, that because of the
13  specified and identified discrepancies in
14  Mr. McIsaac's report and affidavit, it is
15  necessary to do a full recalculation of the 15c3
16  reserve calculation as of September 19, 2008?
17          WITNESS' ATTORNEY:  Objection to form.
18      A.    I would say the process to do the
19  recalculation would be to start from scratch.
20      Q.    I understand what the process is, sir.
21  I am asking you why it is your belief that that
22  process is necessary in order to come to a
23  determination of the 15c3-3 reserve requirement
24  as of September 19, 2008?
25      A.    The fact he has noted discrepancies,

MARTINI

1
2  as well as conversation that I have had as I
3  previously stated with individuals that have
4  said that there is a reconciliation being --
5  taking place by the TSA team.
6      Q.    I am handing you what has been marked
7  previously in these depositions as Exhibit 599.
8  You are welcome of course to look at the whole
9  document.  I am only going to ask you I think
10  about the e-mail.  But let me know when you have
11  had an opportunity to review that document and
12  then we can proceed.
13      A.    OK.
14      Q.    Have you seen this document before,
15  sir?
16      A.    I've seen this e-mail.
17      Q.    Have you seen the attachment to the
18  e-mail or just the e-mail?
19      A.    I have -- I'm not sure if I have seen
20  the attachment or all of these schedules.  I may
21  have.  I can't recall if I have seen the entire
22  schedule.  I've seen the e-mail though.
23      Q.    When did you see the e-mail?
24      A.    I think this goes back to some point
25  in early 2009 as there was identified an issue

MARTINI

1
2  with the ADP system that may have impacted
3  Barclays' calculation as well.  So in that
4  e-mail, there was -- something was identified as
5  being a problem within ADP's allocation.  Many
6  firms use ADP, so it was a street-wide issue so
7  that information was sent to me, sent to me
8  through Matt Huey.
9      Q.    Matt Huey sent you this e-mail, sir?
10      A.    Either sent me the e-mail or discussed
11  the issue with me.  Or maybe, maybe it came from
12  Joel, Joel could have done it as well.  I don't
13  know who I got the e-mail from.  Honestly, I
14  would have to go back and check, but I've seen
15  it.  I remember seeing this.
16      Q.    Do you remember seeing this e-mail at
17  about the time it was sent early January of
18  2009?
19      A.    I remember this as being an issue some
20  point in '09.
21      Q.    OK, did you see this document in
22  preparation for your deposition?
23      A.    I did.
24      Q.    We have talked about who Bill Burke
25  is?

1              **MARTINI**
2     A.   Um-hm, yes.
3        **Q.   Who is Daniram Sudarsan?  Apologies if**
4  **I am murdering that.**
5     A.   A individual who works for Alex
6  Crepeau.
7        **Q.   And he was an employee of Barclays in**
8  **January '09?**
9           WITNESS' ATTORNEY:  Objection, form.
10    A.   Yes, I believe so.
11       **Q.   Who is Kendall McLaughlin?**
12    A.   He was the predecessor to Alex
13 Crepeau.
14       **Q.   What was his title if you know in**
15 **January 2009?**
16    A.   I believe senior vice president or,
17 excuse me, director.
18       **Q.   What was he responsible for?**
19    A.   Regulatory operations.
20       **Q.   Is he with Barclays today, sir?**
21    A.   No.
22       **Q.   Do you know where he is employed?**
23    A.   Citigroup.
24       **Q.   When did he move to Citigroup if you**
25 **know?**

TSG Reporting - Worldwide     877-702-9580

1              **MARTINI**
2     A.   Some point in the summer of 2009, I
3  believe.
4        **Q.   Salvatore Buonocore?**
5     A.   He is somebody in operations.  I don't
6  really interact with him.  I don't know if he is
7  still here or not.
8        **Q.   He was, to your knowledge, a Barclays**
9  **employee?**
10    A.   Yup.
11       **Q.   In January of '09?**
12    A.   Yup.  Yes.
13       **Q.   Do you see the Sudarsan writes to**
14 **Mr. McLaughlin, "Kendall, we had a meeting where**
15 **Sal and myself discussed with Bill and Joel the**
16 **revised reserve formula as of 9/19/08 based on**
17 **the revised allocation of the books produced by**
18 **Broadridge.  The net effect was that the reserve**
19 **requirement increased by 213 ml, do you see**
20 **that?**
21    A.   Um-hm.  Yes.
22       **Q.   Can you, do you have an understanding**
23 **of what Mr. Sudarsan was talking about when he**
24 **sent that e-mail?**
25    A.   I understand what the issue is, yes.

TSG Reporting - Worldwide     877-702-9580

1              **MARTINI**
2        **Q.   Can you tell me what the issue is on**
3  **this?**
4     A.   He is saying he identified two issues
5  and a net impact of 213 million.  One impact
6  increased the requirement by 468 million due to
7  a double allocation and another issue resulted
8  in a benefit of 255 million.
9        Q.   Were you involved in contemporaneous
10 discussions with the individuals on this e-mail
11 about this subject?
12          WITNESS' ATTORNEY:  Objection, form.
13    A.   This issue was only raised to me as a
14 result of the ADP issue, the fact that there was
15 a double allocation of 097.  So make sure that
16 that was not an impact to Barclays Capital,
17 Barclays Capital ADP 293 allocation which is a
18 legacy system for Barclays.
19    Q.   This e-mail concerns Barclays'
20 employees revising the LBI reserve formula as of
21 September 19, 2008, do you agree?
22          WITNESS' ATTORNEY:  Objection,
23 mischaracterizes the document.
24    A.   Say that one more time, please.
25       **Q.   Do you agree, sir, that this e-mail**

TSG Reporting - Worldwide     877-702-9580

1              **MARTINI**
2  **concerns Barclays' employees calculating a**
3  **revised LBI reserve formula as of September**
4  **18 -- sorry, 19, 2008?**
5           WITNESS' ATTORNEY:  Same objection.
6     A.   I would say this is not a revised
7  reserve formula.  This is two issues that were
8  identified and someone is saying the net effect
9  of those two issues will have X amount of impact
10 to the reserve requirement.
11       **Q.   But not to the Barclays reserve**
12 **requirement, the LBI reserve requirement,**
13 **correct?**
14    A.   Correct.
15       **Q.   And with effect from or on the LBI**
16 **reserve formula as of September 19, 2008,**
17 **correct?**
18    A.   Correct.
19       **Q.   Do you know why they did that?**
20          WITNESS' ATTORNEY:  Objection to form.
21    A.   Why they did --
22       **Q.   Why they calculated the effect of**
23 **these adjustments on the LBI reserve requirement**
24 **as of September 19, 2008?**
25    A.   I don't know.  My understanding would

TSG Reporting - Worldwide     877-702-9580

Page 106

MARTINI

1
2  be having some understanding of this particular
3  issue that was happening was -- there was
4  questions from the SEC for, I believe, Kendall
5  McLaughlin to go back and ascertain customer
6  assets or location of customer assets that were
7  not segregated and through that review, two
8  issues came up, these two issues.
9      Q.   How is it you came to this
10 understanding, sir?
11     A.   Discussions with individuals at the
12 time.
13     Q.   And which individuals, sir?
14     A.   Kendall, Daniram would have been aware
15 that they were doing something like that.
16     Q.   Do you know, sir, whether the net
17 effect of these adjustments on the LBI reserve
18 formula as of September 19, 2008, this 213
19 million adjustment referenced in Exhibit 599 was
20 communicated by Barclays to the SEC?
21         WITNESS' ATTORNEY:  Objection to form.
22     A.   I don't know.
23     Q.   Do you agree that this e-mail reflects
24 an adjustment to the reserve requirement for LBI
25 as of September 19, 2008 on September 17, 2008?

TSG Reporting - Worldwide    877-702-9580

Page 107

MARTINI

1
2         WITNESS' ATTORNEY:  Objection to form.
3      A.   Based on this is what the document
4  says.  So it says as of 9/19.  I have no
5  knowledge what day they looked at it.
6      Q.   Do you agree, sir, that Barclays was
7  able to account for those identified
8  discrepancies that you have just testified to by
9  adjusting the reserve calculation to the tune of
10 213 million dollars?
11         WITNESS' ATTORNEY:  Objection to form.
12     A.   Sorry, if you can rephrase that for
13 me.
14         MR. OXFORD:  Sure, can you read it
15 back, please, Mary.
16         (Record read)
17     Q.   NOTE: 213)?
18         WITNESS' ATTORNEY:  Same objection.
19     A.   I don't know the answer to that
20 question.  You are saying is Barclays able to
21 adjust the reserve formula for this?
22     Q.   Yes.
23     A.   This one adjustment?  I suppose
24 somebody could say that you could put that as
25 one component or one adjustment to a number, to

TSG Reporting - Worldwide    877-702-9580

Page 108

MARTINI

1
2  the reserve calculation, yes.
3      Q.   Do you know whether Barclays reran the
4  LBI reserve formula as of September 19, 2008 --
5      A.   When we say --
6          WITNESS' ATTORNEY:  Objection to form.
7      A.   When you say Barclays, who do we mean?
8      Q.   I mean anybody employed by Barclays or
9  working at the direction of Barclays.
10         WITNESS' ATTORNEY:  Those are two
11 different things.
12     A.   So nobody at the direction -- working
13 for Barclays for Barclays Capital Inc. would
14 have performed any 15c3 calculation for LBI.
15     Q.   Why not?
16     A.   We weren't asked to.  Why would we?
17     Q.   Was Barclays asked to calculate the
18 net effect of the adjustments reflected in this
19 e-mail on the reserve formula for LBI as of
20 September 19, 2008?
21         WITNESS' ATTORNEY:  Objection to form.
22     A.   I was never instructed.  I did not --
23 first of all, the time of this e-mail, it would
24 have been Matthew Huey, and to my knowledge, he
25 was not instructed by the SEC or anyone to do a

TSG Reporting - Worldwide    877-702-9580

Page 109

MARTINI

1
2  calculation.
3      Q.   To your knowledge, sir, was anybody at
4  Barclays asked to calculate the net effect on
5  the reserve requirement for LBI as of
6  September 19th, 2008 as a consequence of the
7  errors that are identified in Exhibit 599?
8          WITNESS' ATTORNEY:  Objection to form.
9      A.   I have no knowledge of those
10 discussions, no knowledge of anybody who
11 instructed to change the reserve requirement as
12 of 9/19.
13     Q.   You have no knowledge whether Barclays
14 was asked to calculate the net effect on LBI's
15 reserve requirement?
16     A.   Not to my knowledge.
17         WITNESS' ATTORNEY:  Objection to form.
18     Q.   Back to your declaration, sir.
19 Keeping with paragraph 4, after you say that
20 Mr. McIsaac's statements are incorrect, you say,
21 "Although Barclays acquired LBI's systems, its
22 employees are entitled to access only the
23 information located on those systems that is
24 associated with the 'Business' acquired by
25 Barclays from Lehman pursuant to the asset

TSG Reporting - Worldwide    877-702-9580

Page 114

MARTINI

1
2      So I'm not a lawyer.  I was not
3   involved in the sale.  I could not tell you
4   specifically if you put all the assets on a
5   schedule which ones we acquired, which one we
6   didn't.  But I know, to my personal knowledge of
7   the firm, we did not acquire 100 percent of the
8   LBI assets and I can look at a record under the
9   control of my team and having access to the
10  records of what we have on our books and
11  records.
12     Q.   You mentioned, I believe it was this
13  morning, sir, that one of the things that
14  Barclays would need in order to rerun LBI's
15  reserve calculation as of September 19, 2008
16  would be certain key employees?
17     A.   Yes.
18     Q.   Of LBI?  Yes?
19     A.   Yes.
20     Q.   And I think you mentioned Bill Burke
21  as one of those key employees?
22     A.   Yes.
23     Q.   Is there anybody else who is on that
24  list of key employees?
25     A.   I don't know the full list.  I only

TSG Reporting - Worldwide    877-702-9580

Page 115

MARTINI

1
2   know that Bill Burke, to my knowledge, ran the
3   15c3 calculation for LBI.  So he is the point
4   person.  He is responsible for the calculation.
5   Are there other people in the firm?  Yes,
6   probably.
7      Q.   To your knowledge, sir, was Mr. Burke
8   involved in calculating the effect on the
9   reserve requirement of the -- of LBI as of
10  September 19, 2008 that was identified in
11  Exhibit 599?
12     WITNESS' ATTORNEY:  Objection to form.
13     A.   I don't know.  I don't know what his
14  role was.
15     Q.   Is it your testimony, sir, because
16  Mr. Burke worked for the TSA, he wouldn't be
17  available to Barclays to assist them with
18  rerunning LBI's 15c3 calculation as of
19  September 19, 2008?
20     A.   My understanding is Barclays doesn't
21  have access to Mr. Burke regarding the LBI
22  calculation unless the trustee instructs us.
23     Q.   Could you know whether request has
24  been made by Barclays at any time to the trustee
25  for Barclays to use the services of Mr. Burke

TSG Reporting - Worldwide    877-702-9580

Page 116

MARTINI

1
2   notwithstanding that he is primarily employed
3   under the TSA?
4      WITNESS' ATTORNEY:  You can answer
5   only to the extent that you don't reveal
6   matters that were discussed in
7   attorney/client conversations.
8      A.   Please rephrase that question.
9      Q.   Sure.  Do you know whether any request
10  has been made by Barclays at any time to the
11  trustee for Barclays to use the services of Mr.
12  Burke notwithstanding that he is primarily
13  employed by TSA?
14     WITNESS' ATTORNEY:  Same instruction.
15     A.   I'm not aware that Barclays has asked
16  the trustee to use Bill Burke.  I'm not aware of
17  that.
18     Q.   Was Mr. Potenciano involved in the
19  calculation of the 15c3-3 reserve formula when
20  he was employed by Lehman?
21     A.   Yes.
22     Q.   And he is now employed by Barclays,
23  correct?
24     A.   Yes.
25     Q.   And you have unfettered access to

TSG Reporting - Worldwide    877-702-9580

Page 117

MARTINI

1
2   Mr. Potenciano's services, right?
3      WITNESS' ATTORNEY:  Object to form.
4      A.   Yeah, Mr. Potenciano worked within my
5   team, yes.
6      Q.   And Mr. Sudarson is also employed on
7   your team, right?
8      A.   Not on my team.  He is operations.
9      Q.   He is part of the operations control
10  group?
11     A.   Yes.
12     Q.   And he is employed by Barclays,
13  correct?
14     A.   Yes.
15     Q.   And he used to be employed by Lehman,
16  correct?
17     A.   Yes.
18     Q.   And he was in Lehman's operations
19  control group, wasn't he?
20     A.   Yes, I believe regulatory operations.
21     Q.   And in that capacity, he was involved
22  in the calculations of Lehman's 15c3-3 reserve
23  formulas during his employment by Lehman?
24     A.   He would have -- the nature of that
25  role is he would have worked with Bill Burke

TSG Reporting - Worldwide    877-702-9580

## Page 118

MARTINI

2  team to analyze information.
3      Q.  So that's a yes?
4          WITNESS' ATTORNEY:  Objection form.
5      A.  The answer is, I am saying, he does
6  not compute the reserve requirement.  He is an
7  individual who may supply information to Bill
8  Burke or his team.
9      Q.  Do you know Kleber Rodriguez?
10     A.  I know of him.
11     Q.  Have you ever met him?
12     A.  I've met him.
13     Q.  Do you know what his position was at
14  Lehman in the fall of 2008?
15     A.  I don't know specifically what his
16  role was.
17     Q.  Do you know whether he had any
18  involvement in the computation of the Lehman's
19  15c3-3 reserve formula?
20     A.  I don't know specifically what his
21  involvement was.
22     Q.  Can you turn to paragraph 6 of your
23  declaration, please.
24     A.  OK.
25     Q.  You write, sir, that the trustee has

TSG Reporting - Worldwide    877-702-9580

## Page 119

MARTINI

2  or has access to the relevant information
3  necessary to rerun LBI's September 17, 2008 or
4  September 19, 2008 reserve calculations
5  including to account for any discrepancies that
6  may have to be identified later by the trustee
7  related to those calculations.  Do you see that?
8      A.  Yes.
9      Q.  What do you mean by "relevant
10  information," sir?
11     A.  I mean any adjustments that would be
12  needed to be incorporated, adjustments from
13  identified errors or reconciliation processes.
14     Q.  But you don't know one way or the
15  other whether any such errors have been
16  identified here, sir?
17         WITNESS' ATTORNEY:  Objection to form.
18     A.  To the trustee?
19     Q.  I think you said "by the trustee" not
20  "to the trustee" in your sentence here, sir.
21         WITNESS' ATTORNEY:  Objection, he
22  didn't say anything about the trustee in his
23  original answer.
24         MR. OXFORD:  I am not talking about
25  his original answer.  I'm talking about his

TSG Reporting - Worldwide    877-702-9580

## Page 120

MARTINI

2  declaration.
3      Q.  Let's start this again.  You said that
4  by relevant information, sir, in paragraph 6 of
5  your declaration, you made any adjustments that
6  would be needed to be incorporated from
7  identification errors or reconciliation
8  processes, correct?
9      A.  Yes, sir, any relevant information
10  meaning books and records of LBI.
11     Q.  But sitting here today, sir, you don't
12  know one way or the other whether or not there
13  are any adjustments that need to be incorporated
14  in the reserve formula calculation --
15         WITNESS' ATTORNEY:  Objection to form.
16     Q.  -- to take account of identified
17  errors through the reconciliation process, do
18  you?
19         WITNESS' ATTORNEY:  Same objection.
20     A.  I am sorry, that one you are going to
21  have to break up for me.  Sorry, I apologize.
22         MR. OXFORD:  Can you read it back
23  please, Mary.
24         (Record read)
25     A.  Yeah, I would say I don't work on the

TSG Reporting - Worldwide    877-702-9580

## Page 121

MARTINI

2  LBI calculation.  I was not a Lehman employee,
3  so I don't know the full scope of what they have
4  identified or not identified.
5      Q.  In fact, you don't know anything about
6  the scope of what has been identified, if
7  anything, do you, sir?
8          WITNESS' ATTORNEY:  Objection to form.
9      A.  As far as?
10     Q.  Errors that would need to be accounted
11  for in the rerunning of Lehman's 15c3-3
12  calculation as of September 19, 2008?
13         WITNESS' ATTORNEY:  Objection, form.
14     A.  I don't have knowledge of items except
15  for what's in here of an identifier that I have
16  been exposed to.
17     Q.  And just for the record, sir, do you
18  agree that when you said in here --
19     A.  Yes.
20     Q.  -- you were referring to the errors
21  identified and described in Exhibit 599?
22     A.  Yes.
23         MR. OXFORD:  We have been going about
24  an hour after lunch, if we want to take five
25  minutes.

TSG Reporting - Worldwide    877-702-9580

Page 122

MARTINI

1
2    (Recess)
3    Q.   Mr. Martini, do you agree that the
4    purpose of Rule 15c3-3 is to protect customers
5    or broker/dealers?
6        WITNESS' ATTORNEY:  Objection, form.
7    A.   The rule is put in place to protect
8    customers.  It is the customer protection rule,
9    that's the name of it.
10   Q.   Do you agree that Rule 15c3-3 is
11   intended to insure that fully paid customer
12   property and excess margin securities are
13   unconditionally available to satisfy customer
14   claims in the event of a broker deal
15   liquidation?
16       WITNESS' ATTORNEY:  Objection to form.
17   A.   The purpose of the capital rule,
18   reserve rule is that in a liquidation scenario,
19   the firm either has enough capital to support
20   its obligations or it would have enough funds in
21   a reserve account to unwind the broker/dealer in
22   an orderly fashion.
23   Q.   And to satisfy customer claims in that
24   scenario, sir, correct?
25       WITNESS' ATTORNEY:  Objection, form.

TSG Reporting - Worldwide    877-702-9580

Page 123

MARTINI

1
2    A.   Not being a SIPC attorney, I think
3    that's the theory of the rule.  The practice of
4    the rule, I'm not sure.
5    Q.   Have you ever heard of 15c3-3 reserve
6    funds being referred to as "margin"?
7    A.   I don't understand.
8    Q.   You understand that pursuant to Rule
9    15c3-3, a broker/dealer is required to do a
10   calculation on a weekly basis, correct?
11   A.   Yup, and a monthly basis, yeah.
12   Q.   And pursuant to that calculation, a
13   certain sum of money or other assets has to be
14   locked up in a reserve account, correct?
15   A.   Correct.
16   Q.   Have you ever heard of that reserve
17   account or the funds in that reserve account
18   being referred to as "margin," M-A-R-G-I-N?
19       WITNESS' ATTORNEY:  Object to form.
20   A.   No, I'm not sure of the context of
21   that.
22   Q.   Have you ever heard of them referred
23   to as "guarantee funds"?
24   A.   No.
25       WITNESS' ATTORNEY:  Object to form.

TSG Reporting - Worldwide    877-702-9580

Page 124

MARTINI

1
2    Q.   Could you have Exhibit 590 in front of
3    you please, sir?
4        WITNESS' ATTORNEY:  599?
5    Q.   590.  Do you have that, sir?
6    A.   Yes.
7    Q.   That's Mr. McIsaac's affidavit,
8    October 5, 2009.
9    A.   OK.
10   Q.   Could you take a look at paragraph 16.
11   It's on page 5.
12   A.   OK.
13   Q.   Do you agree with what Mr. McIsaac
14   says in paragraph 16.
15       WITNESS' ATTORNEY:  Object to form.
16   A.   So the first sentence, that a
17   broker/dealer -- the rule requires a
18   broker/dealer to have physical possession or
19   control of fully paid and excess margin
20   securities.  So that's right out of the rule?
21   Excess margin securities are --
22   Q.   Well, if you can just stop there.
23   It's -- do you agree with the first sentence
24   that Mr. McIsaac has in paragraph 16?
25       WITNESS' ATTORNEY:  Object to form.

TSG Reporting - Worldwide    877-702-9580

Page 125

MARTINI

1
2    A.   That is the purpose of the rule.  The
3    purpose of the rule is the possession or control
4    of fully paid and excess margin securities.
5    Q.   So that's a yes, you do agree?
6    A.   I agree that is the object of the
7    rule.
8    Q.   Can you tell me if you agree with the
9    second sentence?
10       WITNESS' ATTORNEY:  Object to form.
11   A.   Understand what excess margin
12   securities are, so they are above -- a
13   broker/dealer may hypothecate based on the
14   margin debit.
15   Q.   So is the answer to my question, do
16   you agree with what Mr. McIsaac writes in
17   sentence 2 of paragraph 16 yes?
18       WITNESS' ATTORNEY:  I object to form.
19   A.   It is accurate, accurate per the rule.
20   Q.   Do you agree with what Mr. McIsaac
21   writes in the third sentence of paragraph 16?
22       WITNESS' ATTORNEY:  Object to form.
23   A.   I'm not sure what he means there, so
24   what does it mean when he is saying he is not in
25   actual possession of a customer security?  I

TSG Reporting - Worldwide    877-702-9580

Page 126

MARTINI

```
1                    MARTINI
2   don't know what that means.
3        Q.   Well, do you know, sir, that
4   broker/dealers often have customer securities
5   custodied at third parties?
6        A.   Yes.
7        Q.   If that's what Mr. McIsaac means, do
8   you agree with his third sentence in paragraph
9   16?
10       WITNESS' ATTORNEY:  Object to form.
11       A.   OK, it seems accurate.
12       Q.   OK.  And I'm happy to do this line by
13   line or sentence by sentence or paragraph by
14   paragraph.
15       I am going to start with the paragraph
16   by paragraph and see if we can do it this way
17   for speed, but if we need to break it down, I am
18   happy to do so further.
19       Could you read paragraph 17 of
20   Mr. McIsaac's October 5 affidavit and tell me
21   whether you agree with it.
22       WITNESS' ATTORNEY:  Object to form.
23       A.   It seems accurate.
24       Q.   Same question for paragraph 18, can
25   you read that and tell me whether you agree with
```

TSG Reporting - Worldwide    877-702-9580

Page 127

MARTINI

```
1                    MARTINI
2   it?
3        WITNESS' ATTORNEY:  Object to form.
4        A.   That seems accurate.
5        Q.   Thank you.  Same question for
6   paragraph 19, do you agree with what Mr. McIsaac
7   writes in paragraph 19?
8        WITNESS' ATTORNEY:  Object to form.
9        A.   It comes out of the rule, it's
10   accurate.
11       Q.   Same question for paragraph 20, do you
12   agree with that?
13       WITNESS' ATTORNEY:  Object to form.
14       A.   Correct.
15       Q.   Correct, you agree that Mr. -- with
16   what Mr. McIsaac writes in paragraph 20?
17       A.   Yes.
18       Q.   Do you agree with what Mr. McIsaac
19   writes in paragraph 21?
20       WITNESS' ATTORNEY:  Object to form.
21       A.   Correct.
22       Q.   Do you agree with what Mr. McIsaac
23   writes in paragraph 21, yes?
24       WITNESS' ATTORNEY:  Object to form.
25       A.   Correct.
```

TSG Reporting - Worldwide    877-702-9580

Page 128

MARTINI

```
1                    MARTINI
2        Q.   And same question for paragraph 22, do
3   you agree with what Mr. McIsaac writes in
4   paragraph 22?
5        WITNESS' ATTORNEY:  Object to form.
6        A.   22, yes, 22 correct.
7        Q.   So you agree with everything that
8   Mr. McIsaac writes in paragraph 16 through 22?
9        WITNESS' ATTORNEY:  Object to form.
10       A.   The excerpts he has here are correctly
11   from the rule itself.
12       Q.   So that's a yes, Mr. Oxford, I agree
13   with Mr. McIsaac in everything he writes in
14   paragraphs 16 through 22?
15       WITNESS' ATTORNEY:  Object to form.
16       A.   Mr. McIsaac has the appropriate rule
17   references for those paragraphs.
18       Q.   And not just the appropriate rule
19   references.  To the extent he characterizes
20   those rules and the effect of those rules, you
21   agree with them, correct?
22       WITNESS' ATTORNEY:  Object to form.
23       A.   That is the essence, that is the
24   essence of the customer reserve rule.
25       Q.   Can you tell me what is a good control
```

TSG Reporting - Worldwide    877-702-9580

Page 129

MARTINI

```
1                    MARTINI
2   location in the context of Rule 15c3-3?
3        WITNESS' ATTORNEY:  Object to form.
4        A.   Control location are locations
5   approved by the SEC and specific locations per
6   the rule, possession or control is not required
7   to take over a certain period of time.  So I
8   really can't go through every scenario.  To be
9   honest, that is an actual function performed by
10   an operations team, not my team.
11       Q.   Do you know how the good control
12   requirements of 15c3-3 apply to securities
13   launched abroad?
14       WITNESS' ATTORNEY:  Object to form.
15       A.   Do you have an example?
16       Q.   I can give you a example, but before
17   we get to that, I wonder if you are able to tell
18   me in general terms how the good control
19   requirements of Rule 15c3-3 apply to the
20   securities that are launched outside of the
21   U.S.?
22       WITNESS' ATTORNEY:  Object to form.
23       A.   I have an understanding of that
24   process, that rule.
25       Q.   Can you tell me how they apply, how
```

TSG Reporting - Worldwide    877-702-9580

| Page 130 |
| --- |

**MARTINI**

1   the requirements of that rule apply to
2   securities launched outside of the U.S.?
3           **WITNESS' ATTORNEY:** Object to form.
4       A.   It applies to other locations, whether
5   those locations are considered a good control
6   locations per the SEC.
7       **Q.   So the SEC has to approve a location**
8   **as a good control location outside of the U.S.,**
9   **correct?**
10      A.   Correct.
11          WITNESS' ATTORNEY: Object to form.
12      **Q.   It is true also the securities must be**
13  **free of any lien or claim of any kind, correct?**
14          **WITNESS' ATTORNEY:** Object to form.
15      A.   Correct.
16      **Q.   It also true the securities must be**
17  **freely transferable?**
18          **WITNESS' ATTORNEY:** Object to form.
19      A.   Correct.
20      **Q.   Do you agree, sir, that, any property**
21  **that's not in a good control location must be**
22  **added to the c3 reserve calculation until such**
23  **time as it is placed in a good control location?**
24          **WITNESS' ATTORNEY:** Object to form.
25

TSG Reporting - Worldwide    877-702-9580

| Page 131 |
| --- |

**MARTINI**

1       A.   A location that doesn't meet the
2   definition of a good control location in a
3   specified time periods as allowed by the rule,
4   if something is in a location, it goes into the
5   reserve formula.
6       **Q.   I'm not sure I quite followed your**
7   **answer.  I think I did, but I want to make sure**
8   **we are understanding each other.**
9           **Is it your testimony, sir, that if**
10  **property that is required to be in a good**
11  **control location per Rule 15c3-3 is not in a**
12  **good control location, then it must be added to**
13  **the reserve formula calculation until such time**
14  **as it is placed in a good control location?**
15          **WITNESS' ATTORNEY:** Object to form.
16      **A.   Generally that is the case.**
17      **Q.   And you agree that the point at which**
18  **the property must be added to the reserve**
19  **calculation is the point at which the control**
20  **location is no longer good?**
21          **WITNESS' ATTORNEY:** Object to form.
22      **A.   Sounds correct.**
23      **Q.   Do you agree, sir, that an entity that**
24  **is in insolvency proceedings is not a good**
25

TSG Reporting - Worldwide    877-702-9580

| Page 132 |
| --- |

**MARTINI**

1
2   **control location?**
3           **WITNESS' ATTORNEY:** Object to form.
4       **A.   Having not looked at that issue**
5   **specifically, that would seem to make sense.**
6       **Q.   Would it also make sense to you, sir,**
7   **that customer property that is held in an entity**
8   **that becomes insolvent must be added to the**
9   **reserve calculation?**
10          **WITNESS' ATTORNEY:** Object to form.
11      A.   I'm not sure.  Can you rephrase that
12  or say that again, please.
13      **Q.   Sure.  Would it also make sense to you**
14  **that customer property that is held in an entity**
15  **that becomes insolvent must then be added to the**
16  **c3 reserve calculation?**
17          **WITNESS' ATTORNEY:** Object to form.
18      **A.   Yeah, I would say that that's correct.**
19      **Q.   Do you agree, sir, if customer cash is**
20  **being transferred from a broker/dealer to a**
21  **customer through an intermediary and the**
22  **intermediary does not pay the customer, the**
23  **broker/dealer will still owe the cash to the**
24  **customer?**
25          **WITNESS' ATTORNEY:** Object to form.

TSG Reporting - Worldwide    877-702-9580

| Page 133 |
| --- |

**MARTINI**

1
2       A.   Explain that to me slowly how that
3   works, please.
4       **Q.   If a broker/dealer whose customer --**
5   **owes the customer cash?**
6       **A.   The broker/dealer, sorry, owes the**
7   **customer cash?**
8       **Q.   Yes, and attempts to transfer that**
9   **cash to the customer through an intermediary,**
10  **but the intermediary does not pay the customer,**
11  **do you agree that the broker/dealer still owes**
12  **that cash to the customer?**
13          **WITNESS' ATTORNEY:** Object to form.
14      **A.   We are talking general or a**
15  bankruptcy?
16      **Q.   Yeah, in general terms.**
17      **A.   So the intermediary never gave the**
18  cash to the customer?  That sounds like
19  possession, a possession or control requirement
20  for the broker/dealer.
21      **Q.   And that means that that cash that is**
22  **owed to the customer should be accounted for in**
23  **the 15c3 reserve formula computation, correct?**
24          **WITNESS' ATTORNEY:** Object to form.
25      **A.   I have no basis to dispute that,**

TSG Reporting - Worldwide    877-702-9580

Page 134

MARTINI

1
2 without seeing specific examples. In general,
3 that makes sense, but of course, nothing is ever
4 simple in real terms.
5    Q.   Ain't that the truth.
6         Can we go off the record. I think I
7 may be done. Could you give us two minutes
8 and I can consult.
9         (Recess)
10    Q.   Mr. Martini, one more question. Could
11 you have your declaration in front of you.
12    A.   Yes.
13    Q.   Turn to paragraph 6.
14    A.   OK.
15    Q.   You see you reference two dates in
16 there, September 17 and September 19, 2008?
17    A.   Um-hm.
18    Q.   What was the reason you referenced
19 September 17, 2008, sir?
20    A.   Because those are the calculation
21 dates referenced in Issacson's affidavit -- I am
22 sorry, McIsaac's rebuttal.
23    Q.   I'll come back to that in just a
24 second, sir. I'm reminded that when I asked you
25 initially, sir, what documents you looked at in

TSG Reporting - Worldwide    877-702-9580

Page 135

MARTINI

1
2 preparation for your deposition, you mentioned
3 two documents, do you remember that? You
4 identified your declaration, sir, and you
5 identified the March 14 McIsaac report, right?
6    A.   McIsaac rebuttal.
7    Q.   Yes, the McIsaac rebuttal report --
8    A.   March 14.
9    Q.   Which is Exhibit 693, correct?
10    A.   Correct.
11    Q.   And then later on, during the course
12 of the deposition, you identified when I showed
13 you Exhibit 599, you said you had also seen that
14 in preparation for your deposition?
15    A.   OK, correct.
16    Q.   Are there any other documents that you
17 saw in preparation for your deposition?
18         WITNESS' ATTORNEY: Object to the
19 extent that the documents shown to you by
20 counsel did not refresh your recollection in
21 any way.
22         You can answer with that instruction.
23    Q.   Let's try this in stages, sir. You
24 have identified three documents that you saw in
25 preparation for your deposition so far?

TSG Reporting - Worldwide    877-702-9580

Page 136

MARTINI

1
2    A.   OK.
3    Q.   Did you see more than three documents,
4 sir? Just answer that yes or no?
5    A.   No.
6    Q.   No?
7    A.   No.
8    Q.   And turning to the rebuttal report,
9 sir, Exhibit 693, can you show me where
10 Mr. McIsaac references this September 17
11 calculation?
12         WITNESS' ATTORNEY: Objection to form.
13    A.   Identified that there was a reserve
14 calculation, paragraph 26.
15    Q.   Is it your understanding, sir, that in
16 order to determine whether or not there was a
17 excess or deficit in the reserve, customer
18 reserve account on September 17, 2008, the same
19 rerunning exercise that you have testified to
20 with respect to the September 19, 2008 date
21 would also need to be undertaken?
22         WITNESS' ATTORNEY: Object to form.
23    A.   It depends on the context of the -- or
24 I should say it depends on the status of the
25 books and records for that date.

TSG Reporting - Worldwide    877-702-9580

Page 137

MARTINI

1
2    Q.   Do you have any more information about
3 the status of the books and records as of the
4 17th of September of 2008 than you do the books
5 and records of LBI as of September 19, 2008?
6         WITNESS' ATTORNEY: Objection, form.
7    A.   No, no.
8         MR. OXFORD: I don't have any further
9 questions for you at this time, sir, but I
10 believe your counsel does.
11         WITNESS' ATTORNEY: I do, but -- off
12 the record.
13         (Recess)
14 EXAMINATION BY
15 MS. NEUHARDT:
16    Q.   Mr. Oxford asked you a number of
17 questions about your personal knowledge. Do you
18 have personal knowledge of what goes into a
19 15c3-3 calculation?
20    A.   Yes.
21         MR. OXFORD: Object to the form.
22    Q.   You need to give him a chance to
23 object now.
24    A.   Sorry.
25    Q.   And from where does that personal

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  knowledge come?
3       A.   From my 25 years of experience in the
4  industry.  I've worked at, as we went through my
5  background, I have done the 15c3 calculation in
6  some way, shape or form at several
7  broker/dealers.
8       Q.   Do you have personal knowledge of what
9  databases LBI used in putting together its
10  15c3-3 calculations?
11          WITNESS' ATTORNEY:  Object to form.
12       A.   I know that information from my
13  knowledge of having been at the exchange, I'm
14  aware of the systems that Lehman used as well as
15  discussions with my team who were legacy Lehman
16  employees.
17       Q.   Do you have personal knowledge of the
18  general structure of the TSA?
19          MR. OXFORD:  Object to form.
20       A.   Yeah.
21       Q.   Can you tell me from where you get
22  that -- first of all, when I say the general
23  structure of the TSA, maybe you can elaborate on
24  what your understanding of the TSA is.
25       A.   The TSA was a group of employees that

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  worked at the instruction and direction of the
3  trustee.  While they might be Barclays employees
4  in name and they're paid by Barclays, they were
5  not directed by Barclays Capital Inc., the
6  broker/dealer which is what I work for.  And
7  that these employees are ring-fenced and I don't
8  have access to them, and to the extent anybody
9  on my team is required to work with them, that
10  information is not to be shared.
11       Q.   Are all TSA employees ring-fenced?
12       A.   Not to my knowledge.
13       Q.   OK, are there any employees of
14  Barclays who at times work for the TSA and at
15  times for work Barclays?
16          MR. OXFORD:  Object to the form.
17       A.   Yes, yes.
18       Q.   OK, and now when employees work for
19  the TSA, who whom do they report to?
20       A.   My understanding is --
21          MR. OXFORD:  Object to form.
22       A.   My understanding is the trustee.
23       Q.   Do they report to anybody at Barclays
24  to your knowledge?
25       A.   Not to my knowledge.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2       Q.   You said Barclays pays their salary.
3  Do you know if Barclays gets reimbursed for
4  their salary?
5       A.   My understanding is they do.
6       Q.   And from whom do they get reimbursed?
7       A.   My understanding is from the trustee.
8       Q.   Now, from where do you get these
9  understandings of the TSA that we just
10  discussed?  We established that you said this
11  is -- that's a terrible question so you can --
12  withdrawn.
13          What we have just discussed about the
14  TSA is, are those answers based on personal
15  knowledge?
16          MR. OXFORD:  Objection, form.
17       A.   Personal knowledge from my knowledge
18  of the firm and my discussions with senior
19  people as to what the TSA's intent was.
20       Q.   OK, and Mr. Oxford asked you about
21  whether or not there was a, in effect, a wall
22  between people who had worked for the TSA and
23  now worked for Barclays or who did part, part --
24  whether there was a wall which they could not
25  discuss and I want you to answer it again

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  because I believe your answer was unclear.
3          So is there a wall, when an employee
4  works for both the TSA and for Barclays, either
5  at different parts in time or they are part-time
6  for both, is there a wall between their roles as
7  TSA and Barclays employees?
8       A.   Yes, that's my understanding and I
9  confirmed that with Joel Potenciano who worked
10  for me who has worked with TSA on several
11  occasions and has told me himself that there is
12  a wall there.
13       Q.   And you said you confirmed that with
14  Mr. Potenciano.  Do you have personal knowledge
15  otherwise of that wall?
16       A.   Just as I said, similar to the TSA
17  structure, is that those employees are not to be
18  sharing information across the lines between the
19  Barclays and the trustee.
20       Q.   And this is from your role as the head
21  of operations?
22          MR. OXFORD:  Object to the form.
23       Q.   What is the basis of your personal
24  knowledge?
25          MR. OXFORD:  Objection, form.

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2      A.    From my position of a senior position
3  in finance, run the regulatory reporting team
4  for the broker/dealer and interact with senior
5  management of the firm on a regular basis.
6      Q.    In your declaration, did you purport
7  to do a legal analysis of the TSA contract?
8          MR. OXFORD:  Objection to form.
9      A.    No.
10     Q.    In your declaration, did you purport
11 to do a legal analysis of the APA?
12         MR. OXFORD:  Objection to form.
13     A.    No.
14     Q.    In your declaration, did you purport
15 to do a legal analysis of the clarification
16 letter?
17         MR. OXFORD:  Objection to form.
18     A.    No.
19     Q.    Now, in your declaration and in your
20 discussions with Mr. Oxford today, you have
21 referred to who has access to the records of
22 LBI.  What do you mean by "access"?
23         MR. OXFORD:  Objection, form, which
24 records of LBI?
25     Q.    Can you answer the question?

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2      A.    Access to me means log on to the
3  systems, ability to get the information from
4  those systems.
5      Q.    Does Barclays control who can log on
6  to those systems?
7          MR. OXFORD:  Objection, form.
8      A.    No.
9      Q.    Just to make the record clear, which
10 systems are you referring to when you refer to
11 those systems?
12         MR. OXFORD:  Objection, form.
13     A.    ITS, MTS and ADP 012.
14     Q.    Do you know who does control the --
15 who can log on to MTS, ITS and ADP 012?
16     A.    My understanding is the trustee or the
17 people that work under his direction.
18     Q.    OK, is that understanding based on
19 your personal knowledge?
20     A.    Personal knowledge --
21         MR. OXFORD:  Objection, form.
22     A.    My discussions with Joel Potenciano
23 who has done work with the TSA and has told me
24 that his system access has been revoked.
25     Q.    Do you have access to MTS, ITS or ADP

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  012?
3      A.    No.
4      Q.    Do you know of any Barclays employee
5  who does have access?
6      A.    No.
7      Q.    Do you know whether the trustee has
8  access to those systems?
9          MR. OXFORD:  Objection, form, asked
10 and answered.
11     A.    My conversations with Alex Crepeau is
12 affirmative.
13     Q.    Right, and do you have personal
14 knowledge of that as well?
15     A.    Personal knowledge --
16     Q.    Of what the trustee can access or that
17 the trustee is able to access MTS, ITS and ADP
18 012?
19     A.    I know from my work with Barclays
20 Capital in the rate department, I know what we
21 have access to and it is specific to certain
22 records that we have acquired.  So the logic is
23 that the trustee has access to the rest
24 because -- through that logic.
25     Q.    And then you confirmed that

TSG Reporting - Worldwide    877-702-9580

MARTINI

1
2  understanding with other individuals, you said?
3      A.    Yes, I spoke to Alex Crepeau and Joel
4  as well.
5      Q.    You have you been designated as an
6  expert in this litigation?
7      A.    No.
8          MR. OXFORD:  Objection, form.
9          Can I hear that question back.
10         (Record read)
11     Q.    And you're not a lawyer, correct?
12     A.    Correct.
13     Q.    Earlier today, you testified that you
14 interpret Rule 15c3-3 in your position at
15 Barclays.  What did you mean by that?
16     A.    I mean that I am responsible for doing
17 customer reserve calculations and that I
18 interpret my role in practical application of
19 those calculations.
20     Q.    Do you do any legal interpretation of
21 the rules?
22     A.    No, I'm not an attorney.
23     Q.    Earlier today, you referred to, I
24 believe, Mr. Burke as an expert in 15c3-3.  What
25 did you mean by that?

TSG Reporting - Worldwide    877-702-9580

Page 146

MARTINI

1
2    A.    I mean, I know he has extensive
3    knowledge as well in the practical application
4    of customer reserve calculations.
5        Q.    Would you consider him to be a legal
6    expert?
7        A.    No.
8        Q.    And you were asked various questions
9    about Mr. McIsaac's reputation.  Do you have any
10   knowledge one way or the other about whether or
11   not he is a legal expert in 15c3-3?
12       A.    My understanding from Mr. McIsaac's
13   background is he is a financial employee like
14   myself and is not an attorney.
15       Q.    Mr. Oxford asked you various questions
16   about what you believed was or was not
17   transferred over as part of the business of LBI
18   and I believe he referred to paragraph 4 of the
19   declaration, if you could find that.
20       A.    OK.
21       Q.    And I believe you testified that you
22   knew that Barclays had acquired the wealth
23   portion of LBI's business but you weren't sure
24   as to other aspects of the business, is that
25   correct?

TSG Reporting - Worldwide    877-702-9580

Page 147

MARTINI

1
2    A.    Correct.
3        Q.    Do you know whether or not Barclays
4    acquired all of the customers of LBI?
5        A.    My understanding was no.
6        Q.    Does Barclays have the ability to
7    access records for customers that did not come
8    over to LBI?
9        A.    Barclays only has ability to access
10   customer assets that are on its books.  The
11   assets that are on its books are housed solely
12   in ADP 224.
13       Q.    Does ADP 224 include customers who did
14   not come over to Barclays?
15       A.    No.
16       Q.    For those customers who did come over
17   to Barclays, does ADP 224 include the history of
18   their accounts from prior to the acquisition?
19       A.    No.
20       Q.    Would you need -- for a reserve
21   calculation to be rerun, -- actually, you know
22   withdraw that.
23           Is there a difference between a
24   reserve calculation and a reserve requirement?
25       A.    It's the calculation -- the components

TSG Reporting - Worldwide    877-702-9580

Page 148

MARTINI

1
2    to the requirement and the requirement is the
3    net result.
4        Q.    In order to do -- in order to
5    determine what the reserve requirement should
6    be, would you need to have information relating
7    to -- should be as of September 19, 2008 for
8    LBI, would you need to have information relating
9    to customers that did not come to Barclays?
10       A.    I am sorry, can you could repeat that
11   for me.
12       Q.    Yeah, that's terrible.
13           In order to determine what the reserve
14   requirement for LBI should have been as of
15   September 19, 2008, would you need to have
16   access to information relating to customers that
17   did not go to Barclays?
18       A.    Yes.
19       Q.    Why is that?
20       A.    Because that would be the basis for
21   the reserve component.  It's going to be the
22   entire population, books of assets and
23   liabilities on the books of LBI, not just
24   customer assets.  Proprietary assets as well.
25       Q.    You said not just customer assets,

TSG Reporting - Worldwide    877-702-9580

Page 149

MARTINI

1
2    proprietary assets as well.  What did you mean
3    by "proprietary assets"?
4        A.    Entire books and records.  It means
5    fails, financial transactions, inventory
6    positions.  All those of those are components to
7    the reserve calculation.
8        Q.    Is Barclays able to access any of that
9    information for LBI prior to the acquisition?
10          MR. OXFORD:  Objection, form.
11       A.    No.  Barclays can only access ADP 224.
12       Q.    Would it also be -- would it also be
13   necessary to have access to records relating to
14   the customers that did go over to Barclays but
15   for activity in their accounts prior to the
16   acquisition in order to determine the reserve
17   requirement as of September 19, 2008 for LBI?
18       A.    Yes.
19       Q.    And why is that?
20       A.    Because as of September 19, 2008, LBI
21   was the legal entity that held the assets and
22   they belong to LBI, not to Barclays.
23       Q.    OK, I guess I don't really understand
24   how that affects -- how would the records for
25   customer who came over, but for a date prior to

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1    the acquisition, be relevant to the calculation
2    and then the ensuing requirement that would be
3    calculated under the 15c3?
4        Q.   I am sorry, if you can break that up
5    for me.
6        Q.   OK, September 19 -- September -- well,
7    the acquisition was September 22.
8        A.   OK.
9        Q.   How would pre-September 22, 2008
10   information for customers that did, in fact, go
11   over to Barclays be relevant to the reserve
12   calculation and then the ensuing reserve
13   requirement done for LBI on either September 17
14   or September 19, 2008?
15       MR. OXFORD:  Objection, form.
16       A.   It being -- because those were the
17   assets of that legal entity.
18       Q.   I think we are talking past each other
19   a little bit.  I'll come back to that.
20       MR. OXFORD:  I'm glad it is not just
21   me.
22       Q.   Mr. Oxford showed you Exhibit 599.  Do
23   you still have that in front of you?
24       A.   Yes.
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1        Q.   I believe you discussed who Bill Burke
2    is.  Do you consider him to be a Barclays
3    employee?
4        MR. OXFORD:  Objection, form.
5        A.   No.
6        Q.   Why is that?
7        A.   Because he does not work for Barclays
8    Capital Inc., the U.S. broker/dealer.  He is an
9    employee of TSA.  My team does not have access
10   to without the express permission of the
11   trustee.
12       Q.   Dan Sudarsan, do you know if he has
13   ever worked for the TSA?
14       A.   I don't know for certain, but I
15   understand that many Lehman employees work for
16   the TSA at some point but where those lines were
17   drawn is confusing.
18       Q.   So at the time of this e-mail, you
19   don't know whether or not Dan Sudarsan may have
20   worked for the TSA?
21       A.   I don't know.
22       Q.   Do you know whether Mr. McLaughlin may
23   have?
24       A.   I'm not certain.
25

TSG Reporting - Worldwide    877-702-9580

MARTINI

1        Q.   Do you know whether Mr. Buonocore may
2    have?
3        A.   Actually, I'm not familiar with him
4    personally.
5        Q.   Do you know whether Mr. Potenciano
6    ever did?
7        MR. OXFORD:  Objection to form.
8        A.   I'm not sure.
9        Q.   In this e-mail, there is a discussion
10   of a revised reserve formula.  Are you able to
11   determine from this e-mail who did the revised
12   reserve formula?
13       A.   No.
14       Q.   So you have no idea whether it was
15   done by Barclays or by TSA or by anyone else?
16       A.   Correct.  I mean, our team would do it
17   for Barclays and our team did not do the
18   calculation.
19       Q.   And then there is a sentence about
20   halfway down the first page by Mr. Sudarsan in
21   his e-mail to Mr. McLaughlin.  It says, "The net
22   effect was that the reserve requirement was
23   increased by 213 million."
24       Now, you said there is a difference
25

TSG Reporting - Worldwide    877-702-9580

**MARTINI**

1    between reserve calculation and reserve
2    requirement.  Do you agree that whenever there
3    is an adjustment to the reserve calculation,
4    there necessarily is an adjustment to the
5    reserve requirement?
6        A.   No, I think the reason for my past
7    comments is that you have to look at the
8    entirety of the reserve computation.  So these
9    net impacts would have affected individual lines
10   of the calculation, but you have to look at the
11   entire calculation.
12       Based on my experiences, having done
13   reserve calculations at many firms, there are
14   cushions and additional credits inherent within
15   the reserve computations.  Those could come
16   about from the result of just the fact that
17   firms are usually unable to get through all of
18   the data in the course of a reserve computation.
19   So there could be logical positions that the
20   firm just can't resolve so they take the credits
21   in.
22       Firms sometimes make management
23   decisions based on particular reserve
24   requirement -- determining how many operational
25

TSG Reporting - Worldwide    877-702-9580

Page 154

MARTINI

1
2  adjustments there were, how sloppy or clean that
3  particular calculation was, that they may feel
4  that they need to put additional credits in the
5  reserve.
6      Q.   So do you agree with Mr. Sudarsan's
7  statement that the net effect of the adjustment
8  to the calculation was that the reserve
9  requirement increased by 213 million?
10     A.   No, I don't believe that you can make
11 an affirmative statement that that is the impact
12 of the reserve requirement without doing a full
13 analysis.
14     Q.   OK.  Now, Mr. Oxford asked you
15 questions about access to various people.  He
16 referred to Mr. Potenciano.  And I believe you
17 testified that you're able to talk to
18 Mr. Potenciano, is that correct?
19     A.   Correct.
20     Q.   Are you able to talk to Mr. Potenciano
21 about work that you may have done for the TSA?
22     A.   No.
23     Q.   And why is that?
24     A.   That information was privy between
25 himself and the trustee or employee of the

TSG Reporting - Worldwide    877-702-9580

Page 155

MARTINI

1
2  trustee.
3      Q.   Is the same true for Mr. Sudarsan?
4  Are you able to talk to Mr. Sudarsan about work
5  that he may have done for the TSA?
6      A.   It depends.  I would not know
7  specifically Mr. Sudarsan's relationship to the
8  TSA.  I know Joel Potenciano has worked under
9  the express permission of the trustee, is in --
10 and in those particular cases, he has come to
11 me.  Mr. Sudarsan, I don't know.  He has not
12 come to me and I don't know.
13     Q.   If he worked for the TSA, though,
14 would you be able to discuss --
15     A.   No, if he was working in a similar
16 fashion as Mr. Potenciano, I would not be able
17 to discuss this issue.
18     Q.   Mr. Rodriguez, do you know if he
19 worked for the TSA?
20     A.   My understanding Mr. Rodriguez was a
21 TSA employee.
22     Q.   Would you be able to talk to
23 Mr. Rodriguez about work that he did for the
24 TSA?
25     A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 156

MARTINI

1
2      Q.   Now, even if you were able to talk to
3  these individuals about LBI's 15c3-3
4  calculations, would Barclays be able to rerun
5  LBI's reserve calculation as of September 19 or
6  September 17, 2008 without access to MTS, ITS
7  and I have forgotten the number of the ADP
8  system, but that system that you identified
9  earlier?
10     A.   Can't do it without systems access,
11 full populations data and interaction with the
12 key regulatory people from LBI who know the
13 underlying business and can interpret that data.
14     Q.   I believe Mr. Oxford established that
15 you're not familiar with SIPA, is that correct?
16     A.   I'm not an attorney and I do not know
17 how that rule works in practice.
18     Q.   So you don't know whether or not Rule
19 15c3-3 would apply after a SIPA liquidation?
20     A.   No.
21     Q.   In the ordinary course of business,
22 calculations are done once a week, correct?
23     A.   Correct.
24     Q.   If an event occurs after the
25 calculation for one week, let's say -- when are

TSG Reporting - Worldwide    877-702-9580

Page 157

MARTINI

1
2  they normally done?
3      Q.   Withdraw the prior question.  What day
4  of the week are the calculations normally done?
5      A.   They are normally done on Mondays.
6      Q.   And what date would that be as of?
7      A.   As of Friday.
8      Q.   And on what day -- then if there needs
9  to be an adjustment to the account as a result
10 of the calculation, when does that have to be
11 done by?
12     A.   Tuesday morning.
13          MR. OXFORD:  Object to form.
14     A.   Tuesday morning by 10 a.m.
15     Q.   So if there is an event that occurs on
16 a Wednesday, when -- that would result
17 ultimately in a necessary adjustment to the
18 reserve requirement, when would that adjustment
19 need to be made --
20          MR. OXFORD:  Object to form.
21     Q.   -- in the ordinary course of business?
22          MR. OXFORD:  Object to form,
23 incomplete hypothetical.
24     A.   That adjustment would roll to the next
25 Friday's calculation.

TSG Reporting - Worldwide    877-702-9580

Page 158

MARTINI

1
2  Q.   And when would, if --
3  A.   Or to the next calculation, I'm sorry.
4  Q.   The next calculation would be on
5  Monday?
6  A.   As of Friday.
7  Q.   And when would the money have to go
8  into the account?
9  A.   On the following Tuesday.
10  Q.   So if there had been an event that
11  occurred on a Wednesday and there had not yet
12  been any sort of adjustment in the reserve
13  account to account for that event, would the
14  broker/dealer ordinarily be out of compliance
15  with 15c3-3?
16       MR. OXFORD:  Objection, form.
17  A.   No.
18  Q.   Mr. Oxford asked you a bunch of
19  questions about why it would be necessary to do
20  a complete recalculation.  If there is an
21  error -- withdraw that.
22       If there is an error in one line item
23  of the reserve calculation, does that correlate
24  to a necessary -- to a change in the reserve
25  account?

TSG Reporting - Worldwide    877-702-9580

---

Page 159

MARTINI

1
2       MR. OXFORD:  Objection, form.
3  A.   I'm sorry, I can't understand that.
4  Q.   If it -- if there is a discrepancy
5  that requires an adjustment to the reserve
6  calculation in some form, does that necessarily
7  require an adjustment to the reserve account?
8       MR. OXFORD:  Objection.
9  A.   You wouldn't know that unless you
10  looked at, as I mentioned previously, the entire
11  calculation that was performed so you would have
12  to go back and scrub the rest of the data.
13  Q.   So to know what actually had to be in
14  a reserve account as of a particular day, you
15  would have to do a complete recalculation?
16  A.   You would need to have a complete
17  reserve formula.  So if I had any given formula
18  day, if I have an adjustment after the fact, I
19  would look to everything in that formula before
20  I did anything to the reserve account.
21  Q.   Mr. McIsaac asked you a number of
22  questions about the state of LBI's books in the
23  last week of -- the last week before it filed
24  for SIPA protection.
25       MR. OXFORD:  I know we are often

TSG Reporting - Worldwide    877-702-9580

---

Page 160

MARTINI

1
2  confused because we look alike, but I am
3  Mr. Oxford.
4       MS. NEUHARDT:  What did I call you?
5       MR. OXFORD:  Mr. McIsaac.
6       MS. NEUHARDT:  Sorry.  You don't look
7  a thing like Mr. McIsaac.
8  Q.   Mr. Oxford asked you a bunch of
9  questions about the state of LBI's books prior
10  to LBI's filing for SIPA protection.  Even if --
11  you were not an employee of Lehman Brothers,
12  right?
13  A.   Correct.
14  Q.   So you actually don't have personal
15  knowledge of whether or not the books were in
16  disarray prior to the SIPA proceeding, correct?
17  A.   I don't.
18  Q.   Is that relevant to your conclusion
19  that Barclays cannot rerun the calculation of
20  LBI's 15c3-3 calculation for September 19 or
21  September 17, 2008?
22  A.   No, the only reason that we can't run
23  the calculation for those dates is access to the
24  data and access to the people.
25  Q.   So, if the books were in disarray,

TSG Reporting - Worldwide    877-702-9580

---

Page 161

MARTINI

1
2  would you need access to any reconciliation of
3  those books?
4       MR. OXFORD:  Object to the form.
5  A.   Yes, if there is a systematic problem
6  of the data and there is a view that the data is
7  materially inaccurate, then yes.
8  Q.   But you couldn't rerun it regardless?
9       MR. OXFORD:  Objection.
10  A.   No, I couldn't rerun it.
11  Q.   When you did your declaration, were
12  you intending to respond to the entirety of
13  Mr. McIsaac's report?  I am sorry, declaration?
14  A.   No.
15  Q.   What portions of Mr. McIsaac's
16  affidavit which I think you have in front of you
17  as 693 were you intending to respond to?
18  A.   Paragraphs 18, 29 through 33.
19  Q.   So did you do any independent
20  investigation of the other matters raised in
21  Mr. McIsaac's rebuttal affidavit?
22  A.   No.
23       MS. NEUHARDT:  I may be done, just
24  give me one minute.
25       No further questions.

TSG Reporting - Worldwide    877-702-9580

Page 162

MARTINI

1    MARTINI
2  EXAMINATION BY
3  BY MR. OXFORD:
4      Q.   Mr. Martini, I have a few follow-up
5  questions.
6          I have -- this is a complete version
7  of Exhibit 590.  I have shown you previously,
8  sir, just the affidavit of Mr. McIsaac.  This is
9  the one with the exhibits.
10         MS. NEUHARDT:  Is this the original?
11         MR. OXFORD:  This has the exhibits to
12 it.
13     Q.   This is the October 5 affidavit.
14 Would you turn to tab 28 please, sir, Exhibit
15 28.
16     A.   OK.
17     Q.   Would you take a look at that document
18 and tell me if you have seen it before, please.
19     A.   I'm not sure if I have seen this
20 document, but I was made aware of this issue at
21 some point in 2009.
22     Q.   This is the same issue that you
23 testified to previously where there was a
24 problem in the allocation of certain LBI
25 securities that Mr. McLaughlin and Mr. Sudarsan

TSG Reporting - Worldwide    877-702-9580

Page 163

MARTINI

1    MARTINI
2  discovered in 2008, correct?
3          WITNESS' ATTORNEY:  Objection to form
4  and mischaracterizes his prior testimony.
5      A.   This document relates to the issue --
6  I am sorry, I apologize.  If you could restate
7  that, please.
8      Q.   Let me try it a better way.  This
9  document relates to the issue, the adjustment
10 that is the section of Exhibit 599A that's the
11 January e-mail that I believe we spent some time
12 looking at earlier.
13         MS. NEUHARDT:  599A or 599?
14         MR. OXFORD:  599.
15     A.   This represents one of the issues in
16 that document.
17     Q.   You are not sure whether you have seen
18 this document before?
19     A.   I'm not sure if I have seen it.  I
20 know the issue, but I'm not sure whether in the
21 past I have seen this document.
22     Q.   You see it was memo written to
23 Broadridge?
24     A.   Correct.
25     Q.   Who is that memo written by, sir?

TSG Reporting - Worldwide    877-702-9580

Page 164

MARTINI

1    MARTINI
2      A.   It says from Barclays Capital, Daniram
3  Sudarsan and Kendall McLaughlin.
4      Q.   Is that consistent with work that was
5  done by employees at the direction of the TSA?
6          WITNESS' ATTORNEY:  Objection to form.
7      A.   I honestly don't know how this work
8  was performed and by who.
9      Q.   But on the face of the document, there
10 is no indication, is there, that this work was
11 done by anybody other than Barclays, correct?
12         WITNESS' ATTORNEY:  Objection to form.
13     A.   It says Barclays Capital.  I can't
14 imply from the context what that means.
15     Q.   Sticking with Exhibit 599A --
16         WITNESS' ATTORNEY:  There is no A.
17         MR. OXFORD:  Sorry, 599.
18     Q.   Ms. Neuhardt asked you with respect to
19 599 if you agreed with Mr. Sudarsan's statement
20 that the net effect of the adjustment to the
21 calculation was that the reserve requirement
22 increased by 213 million.  Do you remember that
23 question?
24     A.   I remember that question.
25     Q.   Do you remember your answer is, "No, I

TSG Reporting - Worldwide    877-702-9580

Page 165

MARTINI

1    MARTINI
2  don't believe I could make an affirmative
3  statement that that is the impact of the reserve
4  requirement without doing a full analysis."  Do
5  you remember that answer?
6      A.   Yes.
7      Q.   Is that your testimony, sir?
8      A.   Yes.
9      Q.   Do you know what analysis Mr. Sudarson
10 did to reach his conclusion that the net effect
11 was the reserve requirement increased by 213
12 million?
13         WITNESS' ATTORNEY:  Objection to form.
14     A.   I don't.
15     Q.   Ms. Neuhardt also asked you a question
16 about where there is a discrepancy that requires
17 an adjustment to the reserve calculation in some
18 form and whether that necessarily requires an
19 adjustment to the reserve account.  Do you
20 remember her asking you that question?
21     A.   Um-hm.
22     Q.   And your answer is you wouldn't know
23 that unless you looked at the entire calculation
24 that was performed so you would have to go back
25 and scrub the rest of the data.

TSG Reporting - Worldwide    877-702-9580

Page 166

**MARTINI**

1
2  A.  Um-hm.
3  **Q.  Is that your answer, sir?**
4  A.  That was my --
5  **Q.  Is that accurate?**
6  A.  Please rephrase that or repeat the
7  question again.
8  **Q.  You said, "You wouldn't know that**
9  **unless you looked at, as I mentioned previously,**
10  **the entire calculation that was performed, so**
11  **you would have to go back and scrub the rest of**
12  **the data."**
13  A.  So my answer was that if there was
14  adjustment to the reserve computation, that we
15  would have to look at other aspects of the
16  reserve computation.
17  **Q.  OK.**
18  A.  The reserve requirement.
19  **Q.  Is that consistent with your practice**
20  **and the practice of your team at Barclays on a**
21  **week-to-week basis, sir?**
22  A.  So, for example, I mean, if I did a
23  reserve calculation on Monday for Friday and
24  Wednesday I found that there was an error, would
25  I go back and do a full calculation?

TSG Reporting - Worldwide    877-702-9580

Page 167

MARTINI

1
2  I would go back to determine the
3  materiality of the impact and make sure it was
4  material and I look at other areas where I could
5  have gotten benefit to make sure that I could
6  have mitigated it.
7  **Q.  You wouldn't rerun the whole**
8  **calculation would you, sir?**
9  A.  It would depend on the issue.  If the
10  issue was a systemic issue or it looked like
11  problems with the integrity of the data, you
12  would.
13  **Q.  And if there was no indication of a**
14  **systemic issue, sir, in the adjustment, would**
15  **you then rerun the whole calculation, sir?**
16  **WITNESS' ATTORNEY:  Objection to form.**
17  A.  If it was an isolated case, I would
18  look at the materiality of the adjustment and I
19  would go back in my reserve formula, scrub the
20  other numbers in there to look for other credits
21  that I could find, and if it wasn't something
22  that I believed to be an internal control issue
23  with the data, I would not go back and do an
24  entire new calculation.
25  MR. OXFORD:  No more questions, sir.

TSG Reporting - Worldwide    877-702-9580

Page 168

MARTINI

1
2  WITNESS' ATTORNEY:  No further
3  questions for me.
4  MR. DAKIS:  Nothing from the
5  committee.
6  MR. McMAHON:  Nothing from the debtor.
7
8  _____
   ROBERT A. MARTINI
9
10  Subscribed and sworn to
11  before me this    day
12  of _____, 2010.
13
14  _____
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 169

**MARTINI**
INDEX:

1
2
3  WITNESS    EXAM BY:    PAGE:
4  R. Martini    Mr. Oxford    5, 162
5    Ms. Neuhardt    137
6
7  EXHIBITS
8  Exhibit No.    Marked
9  Exhibit 828    Declaration    20
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 1

1        HIGHLY CONFIDENTIAL - B. McDADE

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF BART McDADE

14            New York, New York

15            September 2, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24045

1        HIGHLY CONFIDENTIAL - B. McDADE
2      A.   I would never see those documents, no.
3      Q.   Is it your understanding that Barclays
4  had wanted to ascribe even lower value to these
5  assets than is reflected on Exhibit 19?
6      A.   Very much so.
7      Q.   How much lower did they want to go?
8      A.   I wasn't part of the individual
9  conversations where the valuing was taking
10 place, so I can't give you a frame of reference.
11     Q.   Then where does your understanding
12 that very much so Barclays actually was trying
13 to get an even lower attribution of the value of
14 the assets than they were getting?
15     A.   It comes, one, from the, again, the
16 liaison that I had, Michael Gelband, in terms of
17 just general me getting a general update in
18 terms of how that process is going; and, two, it
19 just comes from my set of market experiences
20 knowing all of the markets had shut down.
21          So for an individual organization to
22 take on the risk of a balance sheet of this
23 size, intuitively, they would -- they would be
24 pushing for an efficient, translation, low
25 execution.

1        HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   Did Mike Gelband tell you that someone
3  at Barclays had said that they needed a change
4  because of what you just described, because of
5  the market shutdown?
6      A.   No.
7      Q.   Okay.  That was your understanding of
8  what logically might be taking place?
9      A.   Correct.
10     Q.   And you also mentioned that you
11 thought that, at some point I think you said --
12 let me just strike that.
13          Do you believe that Exhibit 19, the
14 values attributed to the assets, were the fair
15 market value of those assets at the time?
16     A.   At that time, yes, I do.
17     Q.   And so is it your belief that the
18 value of these assets had gone down $5 billion
19 from the Friday, September 12th, and September
20 16th?
21     A.   If the 5 billion represents where the
22 marks were, and I believe that we marked fairly
23 on Friday, yes, I believe we -- I believe we
24 marked fairly on -- the process came up with a
25 fair market valuation on Tuesday, and I believe

1        HIGHLY CONFIDENTIAL - B. McDADE
2  at the close of business on Friday we had marked
3  our books appropriately into the market.
4      Q.   When you say "we had marked our books
5  appropriately," what are you referring to?
6      A.   You asked me about the $5 billion
7  figure, I think, in your question.
8      Q.   Right.  Yes.
9      A.   I'm just saying that our
10 responsibility was to mark our books to market
11 each evening.
12     Q.   Right.
13     A.   On Friday, September 12, we had done
14 that.  You then pointed out that the price on
15 Exhibit 19 happens to be $5 billion difference.
16 I'm suggesting that we went through a thorough
17 process in terms of getting to the place on
18 September 16th where this reflected the fair
19 market value.  So, therefore, I viewed it to be
20 fair on Friday and fair on Tuesday, and so that
21 would reflect the 5 billion change in terms of
22 the process.
23     Q.   Is there any difference in your
24 understanding of fair market value and the price
25 that these would be marked on that day?

1        HIGHLY CONFIDENTIAL - B. McDADE
2      A.   There's a -- again, the ability to
3  value and transact in this type of size did not
4  exist in the marketplace.
5      Q.   So what do you mean when you say "fair
6  market value"?
7      A.   Ability to transact -- the ability to
8  transact securities of a normal lot size in the
9  marketplace is typically what's described as
10 fair market value.
11     Q.   And sorry, maybe I misunderstood your
12 answer, but is that then different between what
13 would be marked if they had marked the books on
14 what -- how they could sell those assets on that
15 day in the market; is that different than what
16 you're describing as fair market value?
17     A.   No financial institution marks its
18 books at the close of the evening, mutual funds,
19 to where they can liquidate that entire
20 portfolio that evening.
21     Q.   Is that what you're describing as fair
22 market value, is the amount to liquidate those
23 assets that evening?
24     A.   No, our transaction reflected the
25 ability to eliminate all of the assets over the

HIGHLY CONFIDENTIAL - B. McDADE

2  course of this transaction.
3     Q.   Looking in particular at the assets
4  listed on Exhibit 19, did the assets listed
5  there -- first of all, do you believe they all
6  went down in value from Friday, September 12th,
7  until the APA was signed on the 16th?
8     A.   There was -- there was a lot of
9  correlation in terms of the asset prices
10 changing and all heading down.  Do I believe
11 they all went down?  I would not make that
12 statement.
13    Q.   Do you know if the top one, which I
14 think is government and agencies, had gone down
15 in value?
16    A.   It definitely went down in value.
17    Q.   Do you have any idea of the amount of
18 the $5 billion difference that was attributable
19 to the change in value to the government and
20 agencies?
21    A.   I don't have the specific balance
22 sheet details in front of me.  From my
23 recollection, these were not T bills and
24 two-year notes in terms of governments and
25 agencies that's the bulk of the 40 billion

HIGHLY CONFIDENTIAL - B. McDADE

2  that's described here.  So there was a lot of
3  agency securities as a percentage of the total
4  which were definitely being affected by the
5  goings on with Fannie and Freddie all over the
6  market.
7        So I don't have the specifics to be
8  able to answer your question, but I think it's
9  fair to say that the majority of the portfolio
10 was being negatively affected, but not -- I
11 would not answer all.
12    Q.   Do you know how that $5 billion
13 difference was attributed among these different
14 asset classes?
15    A.   Specifically, no.  It was -- the
16 process, yes.  Specifically, I do not know the
17 answer.
18    Q.   I asked you if Barclays wanted to mark
19 these down even lower.  Let me ask the other
20 side.  Did Lehman say that these assets should
21 be marked even higher?
22    A.   I'm not sure what you mean by
23 "marked."  As it pertains to the deal?
24    Q.   As it pertains to the deal, did Lehman
25 believe that the value attributed to these

HIGHLY CONFIDENTIAL - B. McDADE

2  assets should be higher than is reflected on
3  Exhibit 19?
4     A.   Clearly we continued to push for what
5  we thought was appropriate valuation for all
6  these assets.
7     Q.   And what were the reasons that you
8  were conveying to Barclays that the asset values
9  reflected on Exhibit 19 were too low?
10    A.   I can only give you the general
11 answer, which is, in most cases, their deal team
12 would have had a small amount of time.  We might
13 have had more transparency and more -- we would
14 have had more transparency and more information
15 with respect to details.  Many of these
16 securities were illiquid and pretty specific in
17 terms of the characteristics of the securities.
18 So I think it would have been the knowledge of
19 the assets would have been part of what
20 obviously we would have been making arguments
21 about.
22       We would also have argued that in many
23 cases we had significant transparency in terms
24 of transacting of because we had been in the
25 business of selling assets over the course of

HIGHLY CONFIDENTIAL - B. McDADE

2  2008.  In some cases these assets were very
3  familiar to Barclays and their businesses.  In
4  some cases, some of these assets were businesses
5  that they were less-market-share significant in,
6  which is one of the reasons why they wanted to
7  buy the U.S. businesses.
8     Q.   Well, of the $5 billion difference
9  that you have described, how much was Lehman
10 saying was the appropriate difference for these
11 assets that are reflected on Exhibit 19?
12    A.   We went through a process, a
13 collective process, you know, between the two
14 organizations and between all the risk
15 operators.  So we obviously came to a conclusion
16 at the end of that process in terms of what we
17 viewed to be fair in terms of transacting.
18       I don't have the context.  I wasn't
19 sitting in the room for any of the beginning of
20 the dialogue to be able to give you any
21 specifics, where it started, where it ended,
22 none of that, unfortunately, I can't give you.
23    Q.   Well, did you ever discuss with anyone
24 at Lehman that the assets should be valued at
25 the last time they had been marked by Lehman?

Page 286

1   HIGHLY CONFIDENTIAL - B. McDADE
2   from Boies, Schiller & Flexner.
3        Just a couple of questions.  Earlier
4   in the day you were asked about the estimated
5   liability of $2 billion for compensation, do you
6   remember that?
7        A.   Yes, I do.
8        Q.   And you were asked about its
9   relationship to the Lehman accrual, do you
10  remember that?
11       A.   Yes, I do.
12       Q.   Am I correct that Lehman would
13  accrue -- let me withdraw that.  Am I correct
14  that Lehman would pay bonuses to its employees
15  through a mix of cash and equity?
16       A.   Yes, you're correct.
17       Q.   Am I correct that Lehman paid a
18  significant portion of its bonuses in equity?
19       A.   Yes, a very significant proportion.
20       Q.   Above average for Wall Street?
21       A.   Above average for Wall Street, and it
22  had changed in 2007 to a higher percentage of
23  equity.
24       Q.   Am I correct that the accrual on
25  Lehman's books for bonuses reflected only the

Page 287

1   HIGHLY CONFIDENTIAL - B. McDADE
2   cash component of the bonus?
3        MS. TAGGART:  Objection to form.
4        MR. GAFFEY:  Join.
5        A.   That's correct.
6        Q.   And so the accrual at Lehman was a
7   cash accrual -- was for the cash portion of the
8   bonus?
9        MS. TAGGART:  Objection to form.
10  Foundation.
11       A.   The 2008 accrual was the -- for
12  employees pay in 2008 was a cash accrual, and
13  then there was accrual for anything that might
14  have vested for previous awards over a period of
15  time.
16       Q.   If you wanted to compensate -- if
17  Barclays wanted to compensate all of the
18  transferred employees in a manner commensurate
19  with what their 2008 compensation would
20  otherwise have been, would it be appropriate for
21  them to increase, to add some portion to the
22  cash accrual to reflect the equity that they
23  would have received?
24       MR. GAFFEY:  Objection.
25       A.   Yes, it would.

Page 288

1   HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   You were also asked questions about
3   the cure estimate.  Do you remember that?
4        A.   Yes, I do.
5        Q.   You referenced, I think, in your
6   testimony an understanding that Barclays had 60
7   days under the agreement to determine which
8   contracts to assume or not?
9        A.   Yes.
10       Q.   Do you recall that?
11       A.   Yes, I do.
12       Q.   And we can look at the provision, but
13  it sounded like you remembered it.  Was it clear
14  in your head, in your understanding that it was
15  Barclays' decision, in its sole discretion, as
16  to which contracts to assume and which not to
17  assume?
18       A.   It's intuitive and it was very clear
19  from the outset, yes.
20       Q.   And that process would happen only
21  after the closing, correct?
22       A.   It couldn't happen before the closing,
23  right.
24       Q.   And therefore, it was not possible
25  before the closing to have a definitive number

Page 289

1   HIGHLY CONFIDENTIAL - B. McDADE
2   for the cure payments Barclays would have to
3   pay?
4        MR. GAFFEY:  Objection to form.
5        MS. TAGGART:  Objection.
6        Q.   Is that correct?
7        A.   That is correct.
8        Q.   Was it, therefore, in your mind always
9   just an estimate of what the cure payments might
10  be?
11       A.   From my seat, I could not make a
12  determination what Barclays' management would do
13  with the contracts.  The only determination I
14  could make was a list of the obligations that
15  were there.  Barclays' management team would
16  make those decisions.
17       Q.   You gave testimony earlier I think
18  during Ms. Taggart's questioning about how no
19  financial institution would mark to market the
20  assets on its books securities at the price at
21  which it could liquidate the entire portfolio.
22  Do you recall that?
23       A.   Yes.
24       Q.   I think you gave the example of a
25  mutual fund, for example, which marks to market,

Page 290

HIGHLY CONFIDENTIAL - B. McDADE

1
2 would not mark to market at the value that it
3 would sell the entire portfolio at once in a
4 bulk sale?
5     A.   Correct.
6     Q.   Would you elaborate upon what you
7 meant by that?
8     A.   I think it's -- the whole notion of
9 marking assets that need to be marked in
10 broker-dealer context around the world has been
11 challenged by what's happened in the credit
12 crisis, but it was our responsibility to mark on
13 every given night to the best of our abilities
14 and all the market inputs and all the individual
15 operators' ability to transact a significant
16 amount of those assets, but not in aggregate all
17 of those assets. None of the individual
18 collective balance sheets with the liquidity
19 characteristics of the market particularly in
20 2008 would allow for transactions of that
21 significant a size.
22     Q.   Let me make sure I understand that.
23 If Lehman Brothers were to look at its books,
24 even assuming that everything had been perfectly
25 marked to market as of a minute before they

Page 291

HIGHLY CONFIDENTIAL - B. McDADE

1
2 looked at the books, and Lehman then had to
3 decide that it was going to sell its entire
4 portfolio or some significant portion of the
5 portfolio, tens of billions of dollars, what
6 would the relationship be in your mind between
7 the price Lehman would be able to get for the
8 sale of the entire portfolio versus those marks?
9     MS. TAGGART:  Objection.
10     A.   Obviously depends on the time of the
11 day, the characteristics of the assets, but it
12 would be lower.
13         I would give an even simpler example.
14 If I tried to transact in IBM stock and I can
15 see on any self-directed ticker that the price
16 is 101 to 101 and one cent, if I tried to
17 transact a hundred shares, I'll get an
18 execution.  If I try to transact 10,000 shares
19 of IBM, I won't get a 101 execution.
20     Q.   You will get a lower execution?
21     A.   I'll get a lower execution.  So even
22 in the, quote, most liquid forms of assets.
23         Sorry.
24     Q.   And is that dynamic you just
25 explained, that relationship in the market value

Page 292

HIGHLY CONFIDENTIAL - B. McDADE

1
2 of a sale of a bulk portfolio and the marks,
3 does that -- is that relevant to understanding
4 the negotiations of the price that were
5 occurring between Lehman and Barclays?
6     A.   I think it's very relevant because
7 Barclays was taking a large amount of risk given
8 the size of the transaction relative to the
9 liquidity characteristics of all of the marks.
10 Barclays could easily have lost a significant
11 amount of money purchasing these assets.
12     Q.   And is that because when you buy the
13 long positions in a volatile market in a large
14 bulk, you can't liquidate them immediately --
15     A.   That's correct.
16     Q.   -- at a set price?  Instead, while you
17 hold them, the price may drop?
18     A.   That's correct.
19     Q.   You testified also that there was an
20 ongoing effort through the week to value the
21 assets, the changing potential list of assets
22 that would be in the deal, correct?
23     A.   Yes, that's correct.
24     Q.   And am I correct that there were --
25 that the process of debating the values of the

Page 293

HIGHLY CONFIDENTIAL - B. McDADE

1
2 bulk value of the assets, as you just described,
3 there was back and forth between Barclays and
4 Lehman?
5     A.   Yes, there was.
6     Q.   And was there room for reasonable
7 disagreement about the value of those assets?
8     A.   I was not in the room, but, yes, it's
9 my understanding, yes.
10     Q.   And is it relevant to that discussion
11 of the value of the assets that it was happening
12 in the context of a very difficult financial
13 market?
14     A.   I think the backdrop of the markets is
15 very relevant.
16     Q.   Do you believe there was some level of
17 uncertainty, therefore, in what the absolute
18 final asset values were, some level of
19 uncertainty?
20     A.   I'm not sure I understand the
21 specifics of your question.
22     Q.   Well, let me just ask it this way.
23 You've testified through the day that there was
24 a concept that the assets and liabilities should
25 roughly balance, correct?

Page 298

HIGHLY CONFIDENTIAL - B. McDADE
1
2      Q.   You could comment on whether it's an
3   accurate description of the assets, though,
4   couldn't you?
5      A.   It's an accurate description of the
6   Friday night -- I have gone through it -- the
7   Friday night, September 12, to the market value
8   process that we went through on September 16.
9      Q.   And whether you're looking at it on
10   the 12th or on whatever day the book value was
11   determined, it does not include this additional
12   haircut for a bulk transfer?
13      A.   For any financial institution, that's
14   correct.
15      Q.   Now, you have spoken a bit today about
16   Barclays purchasing the business, although we've
17   been talking about an asset transfer.  The idea
18   was Barclays would take in the franchise, the
19   people, the inventory, and have a running
20   business; is that right?
21      A.   Absolutely.
22      Q.   Okay.  And so, and in that concept,
23   Barclays would on day one, after the
24   transaction, be as close an approximation as it
25   could be of what Lehman had been in terms of

Page 299

HIGHLY CONFIDENTIAL - B. McDADE
1
2   people and inventory and businesses, correct?
3      A.   Correct.  Even more so with the
4   integration of their -- their infrastructure
5   that they had already built up.
6      Q.   Into the Lehman infrastructure they
7   took in?
8      A.   Yes.
9      Q.   And when those infrastructures were
10   combined and Barclays had now a substantial
11   broker-dealer presence in the United States,
12   that's not a transaction that contemplates
13   moving the bulk of inventory out the next day,
14   is it?  It's a -- that's the inventory for the
15   business to be run?
16      A.   I can't comment about how Barclays,
17   you know, was thinking about or working through
18   the assets.  They were buying the assets as part
19   of the combination to buy the businesses.
20      Q.   Okay.  Well, a lot of attention was
21   spent on the eight critical employees, yes?
22      A.   Absolutely.
23      Q.   And the top 200, yes?
24      A.   Yes.
25      Q.   And a percentage of the rest of the

Page 300

HIGHLY CONFIDENTIAL - B. McDADE
1
2   employee population, yes?
3      A.   Yes.
4      Q.   And taking over the buildings, yes?
5      A.   Yes.
6      Q.   And taking over the systems and the
7   hard assets necessary to run the business, yes?
8      A.   Yes, that's correct.
9      Q.   And the inventory of securities that
10   were necessary to operate the business, yes?
11      A.   No, the point that I was trying to
12   make just a minute ago is the goal of
13   Mr. Diamond and BarCap was to buy the
14   businesses.  They understood the responsibility
15   around the assets.  If they had their druthers,
16   I'm sure they would have not wanted to go
17   through the asset part of the process because
18   buying the business would have been far simpler
19   in terms of process given the market conditions
20   at that moment in time.
21      Q.   So they would have bought the business
22   without any inventory would have been their
23   preference, am I understanding that correctly?
24      A.   If you could buy a world-class client
25   franchise with no risk attached to the

Page 301

HIGHLY CONFIDENTIAL - B. McDADE
1
2   transaction, you would prefer to do that
3   transaction.
4      Q.   Did anything anybody from Barclays
5   said to you at all during the week indicate that
6   it was their intention to take the inventory and
7   move it out in a bulk trade shortly after the
8   transaction closed?
9      A.   I have no information in terms of,
10   during that week or anytime after, in terms of
11   what Barclays' intent was with the assets.
12      Q.   My question is a little broader than
13   that.  Did anything anybody said to you during
14   that week indicate to you that that might have
15   been Barclays plan?
16         (Continued on the next page to include
17   the jurat.)
18
19
20
21
22
23
24
25

Page 302

1        HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Nobody said to that to me.
3         MR. GAFFEY:  Thanks.  I have nothing
4    further.  Thank you for your time again.
5         THE WITNESS:  Thank you.
6         (Time Noted:  4:45 P.M.)
7              oOo
8
9
10
11
12
13
14
15
16
17
18
         _____
         BART McDADE
19
20   Subscribed and sworn to
     before me this     day
21   of        2009.
22
     _____
23
24
25

Page 303

1        HIGHLY CONFIDENTIAL - B. McDADE
2              CERTIFICATE
3    STATE OF NEW YORK )
                       :  ss
4    COUNTY OF NEW YORK)
5         I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9         That BART McDADE, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18        I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23        In witness whereof, I have hereunto
24   set my hand this 2nd day of September, 2009.
25        --------------------------------

Page 304

1        HIGHLY CONFIDENTIAL - B. McDADE
2              INDEX
3    WITNESS:         EXAMINATION BY         PAGE
4    B. McDADE        Mr. Gaffey        5, 296
5         Ms. Taggart          232
6         Mr. Maguire          271
7         Mr. Hume             285
8
9    EXHIBITS:                    PAGE
10   Exhibit 335, a document bearing Bates     196
11   Nos. BCI-EX-(S)-50261
12   Exhibit 336, handwritten calculation     205
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 305

1         HIGHLY CONFIDENTIAL - B. McDADE
2    NAME OF CASE:  In re Lehman  Brothers
3    DATE OF DEPOSITION:  September 2, 2009
4    NAME OF WITNESS:  Bart McDade
5    Reason Codes:
6       1. To clarify the record.
        2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____

     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
     Page _____ Line _____ Reason _____
17   From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
              _____
25            BART McDADE

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x

     In Re:                    Chapter 11

5    LEHMAN BROTHERS           Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,   (Jointly Administered)

6    ------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9            DEPOSITION OF HUGH McGEE

10              New York, New York

11           Monday, August 10, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 24038

22

23

24

25

1    PROCEEDINGS - HIGHLY CONFIDENTIAL
2    (Witness sworn.)
3    MR. STERN:  I'll just state on the
4    record our standing agreement concerning
5    confidentiality.  The transcript will be
6    marked as highly confidential and within
7    a week of receiving the transcript we
8    will make appropriate designations under
9    the confidentiality stipulation.
10    MR. GAFFEY:  And that's agreed.
11    * * *
12    H U G H   M c G E E,  called as a witness,
13    having been duly sworn by a Notary
14    Public, was examined and testified as
15    follows:
16    EXAMINATION BY
17    MR. GAFFEY:
18    **Q.   Good morning, Mr. McGee.  My name**
19    **is Bob Gaffey.  I'm with Jones Day.  And we're**
20    **special counsel to the estate of Lehman**
21    **Brothers Holdings, Inc.  We met briefly before**
22    **the deposition.**
23    **Can you give me an idea, Mr.**
24    **McGee, of your background at -- well, first**
25    **let me cover your educational background.**

1    H. McGEE - HIGHLY CONFIDENTIAL
2    **You're a graduate of Princeton; is**
3    **that correct?**
4    A.   That's correct.
5    **Q.   What year did you graduate?**
6    A.   1981.
7    **Q.   And you also graduated law school**
8    **from the University of Texas?**
9    A.   That's correct.
10    **Q.   When did you graduate from there?**
11    A.   1984.
12    **Q.   And do you keep an active license**
13    **to practice law in any jurisdiction?**
14    A.   No.
15    **Q.   Could you give briefly a**
16    **description of your employment after your**
17    **graduation from law school.**
18    A.   Sure.  I went to work in Houston,
19    Texas for the law firm Andrews & Kurth as an
20    associate in the corporate and securities
21    department working primarily on corporate
22    finance transactions, some M&A transactions,
23    with a client base that was largely
24    energy-based.  Had exposure to a number of
25    investment banks through the course of that

1    H. McGEE - HIGHLY CONFIDENTIAL
2    activity.  Was asked by First Boston to
3    consider a career change.  After the second
4    time that they asked, which was due to that
5    they had a young person leave, I moved to New
6    York City in late 1986, kind of beginning of
7    '87, and switched careers and became an
8    investment banker for First Boston in their
9    energy M&A department.  Stayed there until
10    June of 1989 at which time I left to join
11    Wasserstein Perella which was a split-off from
12    First Boston.  Stayed with Wasserstein Perella
13    through early 1993 when at such time the two
14    named partners of that firm were starting to
15    have some disagreements, and I joined Lehman
16    Brothers at that time as a senior vice
17    president heading up their Houston office
18    focused primarily on energy.
19    Over time built up the Houston
20    office, became a managing director, ran the
21    energy group, ran the energy and power group
22    globally, both of those.  Then in December of
23    '02 the then head of investment banking had
24    been promoted up within Lehman Brothers and
25    they asked me to assume the job of global head

1    H. McGEE - HIGHLY CONFIDENTIAL
2    of investment banking which I was in that role
3    through the end of Lehman Brothers.
4    **Q.   And who did you replace as head of**
5    **investment banking?**
6    A.   A guy by the name of Brad Jack.
7    **Q.   Okay.  I'd ask you, Mr. McGee,**
8    **just answer this question yes or no, please.**
9    **Did you review any documents to prepare for**
10    **your deposition testimony today?**
11    A.   I was shown some documents.
12    **Q.   Okay.  Did any of the documents**
13    **you were shown have the effect of refreshing**
14    **your recollection about the events of the week**
15    **of September 15th, 2008?**
16    A.   To a limited extent, yes.
17    **Q.   Could you tell me what those**
18    **documents were?**
19    A.   I was shown some e-mail and I
20    think that's all.  I was shown some e-mail
21    documents.
22    **Q.   Do you have a better recollection**
23    **of what the content of the e-mails was rather**
24    **than just e-mails?  What were they about, what**
25    **were their dates, what can you remember about**

Page 10

1    H. McGEE - HIGHLY CONFIDENTIAL
2    those?
3        A.   They were generally dated during
4    the period of time that you're referring to.
5        Q.   Okay.
6        A.   But I can't -- I mean, we looked
7    at different e-mails.  I can't recall.
8        Q.   Okay.
9        A.   I'd be happy to address any
10   particular ones.
11       Q.   Okay.  We'll be showing you some
12   e-mails as we go through the day.
13       A.   Okay.
14       Q.   Have you -- other than lawyers,
15   have you spoken to anyone to prepare for your
16   deposition today?
17       A.   No.
18       Q.   Have you spoken to anyone whose
19   deposition has been taken in connection with
20   this proceeding?  Mr. Berkenfeld, Shapiro, Mr.
21   Felder?
22       A.   Well, I speak with them in the
23   normal course of business but not about this
24   topic.
25       Q.   Okay.  Now, as you know, Mr.

Page 11

1    H. McGEE - HIGHLY CONFIDENTIAL
2    McGee, we're here to talk about the
3    transaction through which assets of Lehman
4    Brothers were sold to Barclays.  Give me, if
5    you would, a description of your role in the
6    negotiations of that transaction or other
7    activities connected to that transaction.
8        A.   Sure.  In connection with the
9    transaction that ultimately resulted in
10   Barclays buying the North American business of
11   Lehman Brothers I was involved as head of
12   investment banking in an ongoing effort to
13   explore a number of different transactions
14   throughout the course of the summer leading
15   into the final weekend.  And I was one of the
16   more senior Lehman people involved in the
17   activities that weekend.  I would not
18   characterize myself as the primary negotiator.
19   I would say that I was focused on trying to
20   facilitate the transaction with the particular
21   focus on trying to make sure that we delivered
22   the human capital side of the equation to that
23   franchise that we preserved it, were able to
24   then deliver it as part of the transportation.
25       Q.   Who would you describe as the

Page 12

1    H. McGEE - HIGHLY CONFIDENTIAL
2    primary negotiator or negotiators of the
3    transaction that was effected with Barclays?
4        A.   Well, Bart McDade was the
5    president of Lehman Brothers at the time.  He
6    was the senior Lehman executive involved.
7        Q.   And is he what you would describe
8    as the primary negotiator?
9        A.   Well, we had our head of M&A, Mark
10   Shafir, involved.  We had a full team.  We
11   were trying to get a lot done in 48 hours.
12       Q.   Sure.
13       A.   But anything that was a major
14   decision was taken to Bart.
15       Q.   And apart from Mr. McDade and Mr.
16   Shafir who were the other senior Lehman
17   executives you would describe as involved in
18   the negotiations?
19       A.   Alex Kirk was actively involved
20   around some of the balance sheet things I
21   think.
22       Q.   And anyone else?
23       A.   Mark Shapiro from our
24   restructuring team.  But he was more on the
25   basis of expertise as opposed to status as a

Page 13

1    H. McGEE - HIGHLY CONFIDENTIAL
2    senior Lehman executive.
3        Q.   Um-hum.  And anyone else?
4        A.   I'm not sure how far down the
5    chain you want to go.
6        Q.   Stay up at the top of the chain if
7    we could for a moment because I know there's a
8    lot of people who do something in connection
9    with it.  I'm looking at the senior activities
10   either at the table or near the table.  Who's
11   involved in getting the transaction done?
12       A.   Well, certainly Mike Gelband was
13   there as well.
14       Q.   Was Paolo Tonucci involved?
15       A.   Yes.
16       Q.   What was his role?
17       A.   Well, Paolo and Ian Lowitt were
18   both involved around some of the balance sheet
19   type items.
20       Q.   And when you say the balance sheet
21   type items, does that include putting a value
22   on the assets that were transferred?
23   Assessing the value?
24       A.   I'm not sure.
25       Q.   Did you have any role or

1    H. McGEE - HIGHLY CONFIDENTIAL
2    involvement in that process during the week?
3        A.   No.
4        Q.   I should say just for clarity when
5    we're talking about "the week" we're talking
6    about the week of September 15th, right?
7        A.   Correct.
8        Q.   You made a reference before to the
9    weekend and I just want to put some dates on
10   that.  You're talking about the week of
11   September 13th and 14th.
12       A.   Correct.
13       Q.   Holdings files its bankruptcy on
14   the 15th and what we're talking about is the
15   week that follows that.
16       A.   Correct.
17       Q.   Before that week, you mentioned
18   before that during the summer you were
19   exploring different options with respect to
20   Lehman.  Could you give me a general
21   description of the type of options that were
22   being explored and the negotiations that took
23   place.  Before the negotiations that led to
24   the transportation that occurred.
25       A.   Well, going all the way back to

1    H. McGEE - HIGHLY CONFIDENTIAL
2    the weekend in March when Bear Stearns went
3    down, Lehman Brothers and all financial
4    institutions were facing an increasingly
5    difficult and deteriorating market.  We looked
6    at a bunch of different financing
7    alternatives.  We looked at transaction
8    alternatives.  Some that we could control
9    ourselves.  Some that would involve
10   transactions with third parties.  Those that
11   we could do ourselves were transactions such
12   as the spin-off of our commercial real estate
13   business, the sale of a partial interest in
14   the investment management division.  The
15   transactions involving third parties ranged
16   from, you know, potential combinations to
17   strategic investments.  And they involved
18   parties from -- you know, all different parts
19   of the globe.
20       Q.   And in the week preceding the week
21   we've been talking about, were there
22   discussions with Barclays?
23       A.   The discussions with Barclays
24   really took place starting on Friday and then
25   through the course of the weekend.

1    H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   Before Friday, the 13th -- is that
3    correct?  The 13th?
4        MS. CRAWFORD:  The 14th -- I mean
5    the 12th.
6        MR. GAFFEY:  I have not come armed
7    with my calendar.
8        Q.   Okay.  Before Friday the 12th.
9        A.   Okay.
10       Q.   Isn't it so that there were
11   discussions with Barclays and Bank of America
12   about a global purchase of Lehman?
13       A.   Well, I need -- yes and no.  So,
14   yes in that there were discussions with Bank
15   of America and Barclays leading into that
16   final weekend.  Bank of America had a team
17   that showed up if I -- I may be a day off but
18   I think it was Thursday and I don't think the
19   Barclays team actually showed up until Friday,
20   kind of mid day Friday.  And then they went
21   through that night and then through Saturday.
22   BofA efforts were slightly ahead because their
23   team showed up first.  But it's an accurate
24   statement to say that discussions at some
25   point were going on contemporaneously with

1    H. McGEE - HIGHLY CONFIDENTIAL
2    both Bank of America and Barclays.
3        Q.   Did there come a point over the
4    weekend where the discussions with Bank of
5    America came to an end?
6        A.   There was a point on Saturday
7    where it became clear that the additional
8    request for follow-up due diligence evaporated
9    from Bank of America and our speculation was
10   that they were off doing something else.  We
11   were never formally told Bank of America is
12   discontinuing discussions.
13       Q.   So essentially the phone stops
14   ringing with Bank of America.  What happens
15   with Barclays?  Do the discussions with
16   Barclays that took place on the Friday and the
17   Saturday, do they at some point cease prior to
18   the bankruptcy filing?
19       A.   The discussions with Barclays
20   continued straight through to Sunday morning
21   where it appeared at one point in time that
22   there was a handshake deal for the entire
23   company in a structured transaction.
24       Q.   Now, in the interest of your time
25   and everybody's time today we can agree that

1    H. McGEE - HIGHLY CONFIDENTIAL
2  to you about the possibility of renewed
3  negotiations with Barclays?
4        A.   I can't recall specifically what
5  was said.
6        Q.   All right.  And did there come a
7  time when an agreement was reached with
8  Barclays about a transaction?
9        A.   Sure.  At some point over the next
10 two days, you know, agreement was reached and
11 an agreement was signed.  I don't recall
12 exactly what time it was.
13       Q.   And in the course of those
14 negotiations of that agreement, did you have
15 any involvement in negotiating with people
16 from Barclays?
17       A.   Yes.
18       Q.   Describe your role in those
19 negotiations.
20       A.   As I mentioned before I was
21 focused on preserving the franchise.  That
22 involved keeping the people and making sure
23 they were treated fairly.  So the place where
24 I was most directly involved was the
25 provisions of the agreement dealing with comp

1    H. McGEE - HIGHLY CONFIDENTIAL
2  and severance.
3        Q.   Did you have any role at all in
4  the negotiation of the terms of the agreement
5  regarding the purchase of assets?
6        A.   No.
7        Q.   Were you present while any of
8  those negotiations took place regarding the
9  purchase of assets?
10       A.   The answer is yes.  But I was
11 walking in and out of the room.
12       Q.   Okay.
13       A.   So I wasn't directly involved in
14 the -- you know, taking the ball all the way
15 down the field so to speak.  I was in and out
16 of the room.  I was trying to make sure the
17 overall -- that we were -- that we had an eye
18 on the different pieces of the transaction and
19 that they were all moving along so that we
20 didn't forget something since we had to get
21 the entire thing done in 48 hours.
22       Q.   When you say you were in and out
23 of the room, what room are you referring to?
24       A.   One of the conference rooms that
25 was the larger ones up on the 32nd floor of

1    H. McGEE - HIGHLY CONFIDENTIAL
2  Lehman Brothers where everyone was basically
3  situated.
4        Q.   And was there -- as I understand
5  it there's a lot of activity going on on the
6  32nd floor that day and that night.  Was there
7  one room where -- you would characterize as
8  the main table where the negotiations were
9  going on?
10       A.   There's a -- one of the larger
11 dining rooms had a large conference table in
12 it and that was a room where there was a lot
13 of meetings to discuss stuff with two sides
14 because there was more seating and there was
15 also kind of an anti-room next to that.
16       Q.   Is that the room where McDade is
17 negotiating?
18       A.   He was moving around as well is my
19 recollection.  But I wasn't keeping track of
20 his specific whereabouts all the time.
21       Q.   Do you know -- is there anyone you
22 would describe as the primary or main
23 negotiators for Barclays?
24       A.   Again, my participation in the
25 direct negotiations was somewhat limited but

1    H. McGEE - HIGHLY CONFIDENTIAL
2  in the times I was in the room Archie Cox was
3  in there a lot.
4        Q.   Anyone else from Barclays?
5        A.   Certainly Rich Richie was on the
6  scene.
7        Q.   And anyone else?
8        A.   Not that I saw in the room.
9        Q.   Do you know a man named Michael
10 Klein?
11       A.   Yes.
12       Q.   Was Michael Klein involved in the
13 negotiations?
14       A.   Yes.  But he was an advisor.
15       Q.   To whom?
16       A.   Barclays.
17       Q.   Do you know where Mr. Klein works
18 today?
19       A.   No.
20       Q.   Could you tell me what your
21 compensation was at Lehman Brothers during the
22 year 2007?
23            MR. STERN:  This is all designated
24       highly confidential.
25            THE WITNESS:  Okay.

1       H. McGEE - HIGHLY CONFIDENTIAL
2       A.    $23 million.
3       Q.    And what were the components of
4  that compensation?
5       A.    9 million cash, 14 million of
6  stock -- restricted stock.
7       Q.    And of the -- actually, of both
8  components, cash and stock, could you tell me
9  what was in the form of a bonus and what was
10 in the form of a base?
11      A.    Base was 450,000.  Everything else
12 was bonus.
13      Q.    And although I understand the year
14 came to a -- from the Lehman perspective kind
15 of came to a halt in September, can you
16 describe for me what your compensation was for
17 the year 2008 from Lehman?
18      A.    It would have been the pro rata
19 piece of that salary.
20      Q.    Well, prior to -- let me just put
21 some dates in place so we're clear where we
22 are in the week.  The asset purchase agreement
23 was signed on September 16th and the
24 transaction closed on Monday, the 22nd, so
25 with those two dates in mind a lot of my
        TSG Reporting - Worldwide  (877) 702-9580

1       H. McGEE - HIGHLY CONFIDENTIAL
2  questions will relate to that time period.
3            Prior to the closing of the
4  transaction on the 22nd of September, were you
5  engaged in any negotiations with Barclays
6  concerning your compensation as a Barclays
7  employee after the transaction?
8       A.    Yes.  I had a discussion with Bob
9  Diamond.
10      Q.    Just one discussion?
11      A.    Two discussions.
12      Q.    Okay.  Could you describe each of
13 them to me, when they took place and who said
14 what.
15      A.    Both discussions took place that
16 Monday evening.  Bob Diamond approached me and
17 told me what he was thinking about for '08
18 compensation.  He also indicated that it was
19 important that I joined Barclays and run
20 investment banking for Barclays.  And my
21 understanding is that there were a group of
22 people that were important to agree to join
23 and that I was one of those people.
24      Q.    Who else was in the group of
25 people for whom it was important to join?
        TSG Reporting - Worldwide  (877) 702-9580

1       H. McGEE - HIGHLY CONFIDENTIAL
2       A.    I assume Bart McDade and others.
3  You know, Jerry Donini.  People that ran
4  important businesses that were an important
5  part of delivering the actual franchise as
6  part of the transaction.
7       Q.    In addition to McDade and Donini,
8  do you remember specifically who any of those
9  people were?
10           MR. STERN:  Objection to the form.
11      I don't think he said that he
12      remembered.  He said he assumed.
13           MR. GAFFEY:  Okay.  That's fair.
14      Q.    But, do you have an idea, then,
15 sir, of who the other people were in addition
16 to McDade and Donini?
17           MR. STERN:  Same objection.
18      A.    Well, I assume -- I did not see --
19 there was discussion of seven.  I can
20 speculate who the seven were but no one told
21 me specifically who they were and I'm sure you
22 have that information.
23      Q.    When you were devoting some of
24 your energies to moving capital over to
25 Barclays and keep the franchise intact and all
        TSG Reporting - Worldwide  (877) 702-9580

1       H. McGEE - HIGHLY CONFIDENTIAL
2  of that, was there a group of about eight
3  senior executives that were deemed critical to
4  the transaction?
5       A.    I believe that's right.
6       Q.    Were you involved in any way in
7  the determination as to who those eight
8  critical executives were?
9       A.    No.
10      Q.    And was there a group of
11 approximately 200 Lehman personnel who were
12 deemed important and some percentage of them
13 had to go over to Barclays for the deal to
14 close?
15      A.    My understanding is that there was
16 such a designation.
17      Q.    Okay.  And were you involved in
18 putting together that group of 200 or so?
19      A.    Yes.  Insofar as it involved
20 investment bankers.
21      Q.    Now, you said you spoke to Mr.
22 Diamond on that Monday.  Again, for date
23 purposes are we on Monday, the 15th?
24      A.    Correct.
25      Q.    Okay.  And when you spoke -- and
        TSG Reporting - Worldwide  (877) 702-9580

1      H. McGEE - HIGHLY CONFIDENTIAL
2   that was one of two conversations you had with
3   Mr. Diamond.
4       A.   (Witness nods.)
5       Q.   When was the second one?
6       A.   Later that same evening.  Night.
7       Q.   And describe that conversation for
8   me; what did you say, what did he say?
9       A.   Well, in the first conversation I
10  expressed concern that a significant number of
11  our most highly valued employees already had
12  contracts in hand from competitors at numbers
13  that were flat to '07 and were two-year
14  transactions.  So I expressed concern about
15  making sure that we were able to actually
16  deliver a franchise because the franchise was
17  like a -- you know, an ice cube on the
18  pavement in the middle of the summer.  It was
19  melting quickly.  Very quickly.  Part of the
20  reason for that is that historical Lehman
21  compensation, a senior employee got more than
22  50 percent of their compensation in stock
23  which had a five-year vest.  So the senior
24  employees of Lehman Brothers had always been
25  somewhat untouchable to the street because

1      H. McGEE - HIGHLY CONFIDENTIAL
2   they all carrying around five years of
3   deferred restricted stock units that hadn't
4   vested.  Now, all of a sudden, all of these
5   senior employees at a minimum, had they sold
6   all of their stock every time it matured, they
7   had just lost two and a half years of
8   earnings, assuming 50 percent, five years.
9       They had never wanted to leave.
10  They had been very loyal.  So it was open
11  season for the senior employees of Lehman
12  Brothers.
13      So when Bob first came to me and
14  said I'm thinking about this kind of a deal
15  for you and for the Lehman people, and he said
16  one-year transaction at either -- I think
17  maybe he said down 30 percent from '07.
18      I said let me reflect on that and
19  I'll come back to you.  I thought about it for
20  a second -- oh, and I didn't say I'll come
21  back to you.  I said let me think about that.
22  And then I came back to him right there in
23  that sitting.  I said that feels a little bit
24  like relative to what I see as the bid away
25  for our top people.  Because I assumed his

1      H. McGEE - HIGHLY CONFIDENTIAL
2   discussion with me was a proxy for what was
3   going to happen for the division.
4       And do you want me to go to the
5   second conversation now?
6       Q.   Yes, please.
7       A.   So in the second conversation he
8   came back and said what about a down
9   20 percent one-year deal.  And I said I'm not
10  going to hold this deal up, I'm not going to
11  hold up saving 11,000 jobs, I'm fine, I'll
12  agree.  I'm in.  But I still think we're going
13  to have a harder time landing the plane with
14  the rest of the franchise at that kind of
15  level knowing as I did that I had entire
16  swaths of bankers that already had two-year
17  deals from Citi, from JPMorgan, whatever, and
18  I was going to have to try to keep those
19  people in the boat.
20      Q.   Now, when Mr. Diamond was talking
21  to you about the -- about your joining
22  Barclays after the transaction that Monday
23  night, did he make you a dollar offer?
24      A.   Well, he described it in terms of
25  down 20 percent.

1      H. McGEE - HIGHLY CONFIDENTIAL
2       Q.   And can you describe your
3   compensation for me at Barclays for the year
4   2009?
5       I shouldn't restrict it to year.
6   Just tell me what your compensation package
7   was with Barclays when you joined them.
8       A.   It was exactly as be described.
9   It was down the 20 percent.  So it was, you
10  know, 80 percent of the 23 number which is
11  something like 18 four.  I believe the salary
12  is the same.  It's the 450.  And the
13  difference is that the Barclays mix is
14  different from Lehman or at least it was for
15  this year, was 75 percent cash, 25 percent
16  equity.
17      Q.   And was that -- to your knowledge,
18  was the fact that Mr. Diamond had made an
19  employment offer to you during the
20  negotiations disclosed to the boards of Lehman
21  Brothers Holdings and Lehman Brothers, Inc.?
22      MR. STERN:  Objection to the form.
23      Q.   Do you know one way or the other?
24      A.   I have no idea.
25      Q.   And do you know if the discussions

Page 34

1    H. McGEE - HIGHLY CONFIDENTIAL
2  about employing other senior executives at
3  Lehman apart from yourself that you were
4  talking to Mr. Diamond about, were disclosed
5  to the board of either Lehman Brothers
6  Holdings or Lehman Brothers, Inc.?
7     A.   I have no idea.
8     Q.   Do you know if Mr. McDade was in
9  similar discussions with Barclays during the
10 week leading up to the closing on 22nd of
11 September?
12    A.   I have no idea.
13    Q.   You referred in one of your
14 answers a minute ago to the division.  When
15 you say that, are you referring to the
16 investment banking division?
17    A.   Yes.  The investment banking
18 division.
19    Q.   Now, there were portions -- and
20 I'll show it to you in a while.  We'll come
21 back to some more detail on this so I'm
22 looking for your general recollection at this
23 point.  But there were portions of the asset
24 purchase agreement that dealt with the issue
25 of compensation to transferred employees; that

TSG Reporting - Worldwide  (877) 702-9580

Page 35

1    H. McGEE - HIGHLY CONFIDENTIAL
2  is, employees that went from Lehman to
3  Barclays.
4        Do you have a general
5  understanding that that's so?
6     A.   Yes.
7     Q.   Okay.  Did you have any
8  involvement in the negotiation of the terms of
9  those provisions of the asset purchase
10 agreement?
11    A.   Yes, I did.
12    Q.   Okay.  And just as a general
13 matter, and again I'll show you the final at
14 some later point today, but did you look at
15 drafts of that provision?
16    A.   Yes.
17    Q.   Those provisions?
18    A.   Yes.
19    Q.   And did you engage in negotiations
20 about the terms of those provisions with
21 personnel from Barclays?
22    A.   Yes.
23    Q.   And with whom at Barclays did you
24 engage in those discussions?
25    A.   There were a number of people in

TSG Reporting - Worldwide  (877) 702-9580

Page 36

1    H. McGEE - HIGHLY CONFIDENTIAL
2  the room but I recall that Archie Cox was one
3  of the more senior people from Barclays in the
4  room.
5     Q.   And, again, for lack of a better
6  term, would it be fair to describe Archie Cox
7  as the principal negotiator from Barclays on
8  that issue?
9        MR. STERN:  Objection to form.
10    A.   Don't know.
11    Q.   Well, were you talking to anybody
12 from Barclays other than Archie Cox about
13 these matters?
14    A.   There were a bunch of people in
15 the room.  I didn't know all the people from
16 Barclays so I don't know who else -- who was
17 lawyers, inside lawyers, outside lawyers, who
18 was -- but Archie Cox is a name of a person
19 that I remember was in the room.
20    Q.   And apart from yourself, were
21 there others on the Lehman side of the table
22 engaged in discussions with Barclays about the
23 terms of compensation for transferred
24 employees?
25    A.   Mark Shafir who was head of M&A

TSG Reporting - Worldwide  (877) 702-9580

Page 37

1    H. McGEE - HIGHLY CONFIDENTIAL
2  was kind of very focused on all aspects of the
3  deal.
4     Q.   Anyone else?
5     A.   No.
6     Q.   What lawyers were involved in
7  drafting the provisions of the APA concerning
8  compensation?  For transferred employees.
9     A.   I don't know.
10       (Deposition Exhibit 98, document
11    bearing production number 10282956,
12    marked for identification as of this
13    date.)
14 BY MR. GAFFEY:
15    Q.   Mr. McGee, I've put before you
16 what we've marked as Deposition Exhibit 98, a
17 one-page document bearing number 10282956.
18       Have you seen that document
19 before?
20    A.   I don't recall.
21    Q.   Do you know what it is?  You'll
22 see that it appears to be an e-mail from Peter
23 Calistri to you.
24    A.   I see that it's an e-mail from
25 Peter Calistri to me.

TSG Reporting - Worldwide  (877) 702-9580

## Page 38

1       H. McGEE - HIGHLY CONFIDENTIAL
2    Q.   Okay.  Who's Peter Calistri?
3    A.   Peter Calistri is the CFO of the
4  investment banking division at Lehman
5  Brothers.
6    Q.   And the e-mail is entitled Exec
7  Comm Comp and Retention and lists the names of
8  six people.  Parker, Weiss, Stephenson,
9  Wieseneck, Gatto, Hash.
10      Do you see that?
11    A.   Yes.
12    Q.   Do you know who those people are?
13    A.   Yes.  I know who these people are.
14    Q.   Who are they?
15    A.   Those are the names of the
16  investment banking executive committee that
17  are from Lehman Brothers.
18    Q.   Now, when you referred a few
19  moments ago to a group of about eight -- when
20  we were talking a few moments ago about a
21  group of eight senior Lehman executives who
22  were critical to the transaction, are these
23  six people among those eight?
24    A.   No.  Not to my knowledge.
25    Q.   And forgive me.  I may have

## Page 39

1      H. McGEE - HIGHLY CONFIDENTIAL
2  forgotten if I asked you this and you answered
3  it.
4      Do you know who the eight were who
5  were the critical eight?
6    A.   I answered previously that I
7  assumed it was McDade, Jerry Donini, Eric
8  Felder.  Some people that ran some major
9  businesses that presumably BarCap would want
10  the business leaders who led the people to
11  come across, but I don't -- no one ever shared
12  that list with me.
13    Q.   Now, these people, Parker, Weiss,
14  Stephenson, Wieseneck, Gatto and Hash, did
15  they all work for you?
16    A.   They all worked for me in
17  investment banking.
18    Q.   And did you spend time during the
19  week leading up to the closing on the 22nd
20  addressing compensation for this group of six
21  people?
22    A.   Yes.  We talked about
23  compensation, what it might take to retain
24  some of these people.  But this is -- this is
25  just an e-mail somewhere along the way.  I

## Page 40

1      H. McGEE - HIGHLY CONFIDENTIAL
2  don't think any of these numbers were pinned
3  down at this point.
4    Q.   Did there come a point where
5  numbers were pinned down for people in the
6  investment banking division?
7    A.   Yes.  There did come a point when
8  numbers were pinned down for people.
9    Q.   When did that happen?
10    A.   It varied person by person and
11  group by group.  It was an iterative process
12  that took quite a while.
13    Q.   Okay.  Was it pinned down before
14  the transaction closed?
15    A.   Was what pinned down?
16    Q.   Compensation for the senior
17  executives within the investment banking
18  division.
19    A.   Specific numbers next to specific
20  names?
21    Q.   Yes.
22    A.   No.
23    Q.   When were there specific numbers
24  next to specific names?
25    A.   It would have been weeks and

## Page 41

1      H. McGEE - HIGHLY CONFIDENTIAL
2  almost a month later.
3    Q.   By later after the closing.
4    A.   Later after the closing, correct.
5    Q.   Okay.  On Exhibit 98 with respect
6  to Mr. Parker and Mr. Gatto, you'll notice
7  that there's a column for 2009.
8      Do you see that?
9    A.   Yes, I do.
10    Q.   As a general matter, without
11  reference to that particular document, as a
12  general matter were some of the investment
13  banking division personnel -- withdrawn.
14      With respect to some of the
15  investment banking division personnel were
16  there discussions about retention payments
17  that would be paid or guaranteed in connection
18  with 2009?  As opposed to 2008?
19    A.   The 2009 column next to Parker in
20  this particular e-mail refers to a guarantee
21  of compensation for the year 2009.  In other
22  words, a two-year agreement of compensation
23  for '08 and '09.
24      The retention amount was a
25  separate retention program that was being put

H. McGEE - HIGHLY CONFIDENTIAL

1
2 in by BarCap that was consistent with trying
3 to hold the franchise together and somewhat
4 make up for the wipe-out on the net worth of
5 all the senior Lehman people to -- the
6 retention program was structured such that it
7 vested over a couple of years.
8      Q.   And have you heard that retention
9 program referred to as a special cash award?
10      A.   No, I have not heard it referred
11 to as that.
12      Q.   Is that a term you've heard before
13 in connection with compensation?
14      A.   No.
15      Q.   Withdrawn.
16      I --
17      (Deposition Exhibit 99, document
18      bearing production number 10265851,
19      marked for identification as of this
20      date.)
21 BY MR. GAFFEY:
22      Q.   Mr. McGee, I've put before you
23 what we've marked as Deposition Exhibit 99 an
24 e-mail from Tim Sullivan sent Saturday,
25 September 20th, 8:27 p.m. Greenwich meantime

H. McGEE - HIGHLY CONFIDENTIAL

1
2 which would put it at about 4:27 p.m. eastern
3 time to you, a copy to Jennifer Becker.
4 Subject, Exec Comm Deals.
5      Have you seen this before?
6      A.   Yeah.  This is an e-mail to me
7 from Tim Sullivan.
8      Q.   Okay.  Who's Tim Sullivan?
9      A.   Tim Sullivan works for me in my
10 office.
11      Q.   Did he have a particular role or
12 function?  What I want to know is he an HR guy
13 or did he have some kind of line
14 responsibility?
15      A.   He is -- you might think of him as
16 almost a chief of staff for me.
17      Q.   And in that e-mail marked as
18 Deposition Exhibit 99 there are references
19 again to Weiss, Parker, Ros, who I believe
20 would be a reference to Stephenson; is that
21 right?
22      A.   That is correct.
23      Q.   Larry, that would be a reference
24 to Wieseneck; is that correct?
25      A.   That is correct.

H. McGEE - HIGHLY CONFIDENTIAL

1
2      Q.   Gatto and Hash.  Mr. Sullivan
3 writes to you here, "Barclays has drafted the
4 letters to IBD exec members but we want to
5 confirm the terms hadn't changed.  Below is
6 what we currently have on our sheets.  Any
7 changes we should post Barc on."
8      Were there -- now we're at
9 Saturday the 20th.  We're two days before the
10 closing.  Were you at that stage of the week
11 involved in the negotiations of what the
12 particular numbers would be for these six
13 people?
14      A.   Continuing to have discussions --
15 at that point on Saturday I had -- I had left
16 New York on Wednesday to fly to London to try
17 and see if there was an opportunity to put a
18 transaction together for the European business
19 of Lehman Brothers.  So this was all -- I'm
20 not sure when I received this e-mail, whether
21 I was on a plane, if I was in London at the
22 time or if I was flying back.  But there
23 was -- there were no letters that were signed
24 and I think the final numbers around all these
25 people changed even from these numbers.

H. McGEE - HIGHLY CONFIDENTIAL

1
2      Q.   Okay.  When you went to London,
3 was that at the request of Mr. Diamond?
4      A.   No.
5      Q.   Did there come a point where Bob
6 asked you to go to London?
7      A.   No.
8      Q.   During that week?
9      A.   No.
10      Q.   Were there discussions about the
11 European business with Barclays or with other
12 entities?
13      A.   I flew to London because I
14 personally felt horrible about the way the
15 transaction had played out for the people in
16 London.  And I was getting bombarded with
17 phone calls and e-mails, what are we to do,
18 are were in the transaction, is there a plan
19 for step 2.
20      So I flew over as much as anything
21 out of a feeling of personal obligation to all
22 those colleagues that I had hired and had
23 worked for me.  Spent time trying to figure
24 out whether there was the potential for a
25 transaction.  Jerry Del Missier also came to

Page 50

1    H. McGEE - HIGHLY CONFIDENTIAL
2  reference to eight.
3    **Q.   Um-hum.**
4    A.   But I -- Bob had mentioned to me
5  we're not going to do this deal if you're not
6  going to run investment banking.  I assumed
7  that I was.  But -- and that was the context
8  in which I took his statement that I was one
9  of that number.
10   **Q.   Who would you ask if you wanted to**
11 **know if you were one of the eight critical**
12 **people?**
13   A.   Who would I have asked?
14   **Q.   Who would you ask now?  I'd like**
15 **to put them over there and ask them.  So who**
16 **would you ask now?**
17   A.   I would ask the people who put
18 that list together which are the senior BarCap
19 people.
20   **Q.   Amongst the former Lehman people**
21 **who would you ask?**
22   A.   Bart McDade.
23      (Deposition Exhibit 101, document
24      with the first page bearing production
25      number 10322002, marked for

TSG Reporting - Worldwide  (877) 702-9580

Page 51

1    H. McGEE - HIGHLY CONFIDENTIAL
2  identification as of this date.)
3      MR. STERN:  Could we just go off
4  the record for a second.
5      (Discussion held off the record.)
6  BY MR. GAFFEY:
7    **Q.   Okay.  We're back on the record.**
8      **Mr. McGee, have you seen the**
9  **document that we've marked as Exhibit 101?**
10 **Have you seen that before?**
11   A.   No.  This is the first I've seen
12 of this.  It's not addressed to me.
13      MR. STERN:  I guess we should just
14   note on the record that which we stated
15   off the record which was a concern about
16   the non-sequential numbering of the
17   attachments to the exhibit and an open
18   question as to whether the attachments
19   are, in fact, attachments to the
20   original e-mail but subject to that
21   objection.
22 BY MR. GAFFEY:
23   **Q.   Mr. McDade, would you turn to the**
24 **sixth page.**
25      MR. STERN:  McGee.

TSG Reporting - Worldwide  (877) 702-9580

Page 52

1    H. McGEE - HIGHLY CONFIDENTIAL
2    **Q.   I beg your pardon.  There's too**
3  **many Mcs in here.  I meant that as a reference**
4  **to me, folks.  I'm sorry.**
5      **Mr. McGee, would you please turn**
6  **to the sixth page from the back of this**
7  **document.**
8    A.   I see it.
9    **Q.   And do you know, Mr. McGee,**
10 **whether an offer of employment was made to Mr**
11 **McDade during the week preceding the closing**
12 **on September 22nd?**
13   A.   I would have no way of knowing
14 that one way or the other.
15   **Q.   And if you would now turn to the**
16 **second page of the exhibit.  And I would**
17 **direct your attention to the three-page**
18 **unsigned letter that begins there.  Appears to**
19 **be addressed to Hugh E. McGee, III.  September**
20 **18th.  Ask you if you've seen those three**
21 **pages before.**
22   A.   This looks like a draft of the
23 agreement that Barclays -- that I signed with
24 Barclays.
25   **Q.   Did you see a draft written**

TSG Reporting - Worldwide  (877) 702-9580

Page 53

1    H. McGEE - HIGHLY CONFIDENTIAL
2  **employment agreement sometime on or around the**
3  **date this document bears, September 18th?**
4    A.   I'm not sure when I was actually
5  handed a draft of an agreement.
6    **Q.   Do you recall if you saw a draft**
7  **of a written agreement at any point prior to**
8  **the 22nd?**
9    A.   No.  I would not have because
10 draft agreements were not -- they didn't send
11 me an e-mail.  It would have been handed to
12 me.  And so it would have been after the
13 closing when I would have first seen the draft
14 of my agreement.
15   **Q.   I just want to follow up on that a**
16 **little bit because I think we're talking about**
17 **two issues and I want to separate them a**
18 **little bit.**
19      **When you did see draft agreements**
20 **they weren't sent to you by e-mail, they were**
21 **handed to you in hard copy; is that right?**
22   A.   Of my contract.  This Exhibit 101
23 that you have handed to me, they never would
24 have sent me contract terms for Bart McDade,
25 Eric Felder, Jerry Donini, who were either

TSG Reporting - Worldwide  (877) 702-9580

1      H. McGEE - HIGHLY CONFIDENTIAL
2    people at my level or above me.  I never would
3    have seen this information.
4         Q.   With respect to your contract
5    offer, your contract documents --
6         A.   They would have -- the practice
7    was to hand you a written agreement.  I was in
8    Europe.  I went to Texas for the weekend.
9    Came back.  So this -- my actual contract
10   caught up with me some sometime after the
11   fact.
12        Q.   After the 22nd.
13        A.   Yes.
14        Q.   Okay.
15           (Deposition Exhibit 102, document
16        bearing production number
17        BCI-EX-(S)-00003505, marked for
18        identification as of this date.)
19           (Deposition Exhibit 103, document
20        bearing production numbers
21        BCI-EX-00077338 through BCI-EX-00077340,
22        marked for identification as of this
23        date.)
24           MR. STERN:  After you get through
25        these maybe we'll take a short break.

1      H. McGEE - HIGHLY CONFIDENTIAL
2           MR. GAFFEY:  Yeah.  It would be
3        good to take a break.
4    BY MR. GAFFEY:
5         Q.   Mr. McGee, I put two documents
6    before you, one marked Exhibit 102, a one-page
7    e-mail bearing Bates number
8    BCI-EX-(S)-00003505, and the other a
9    three-page document bearing Bates number
10   BCI-EX 000077338 through -340 proving Mr.
11   Stern has a better Bates numbering system than
12   I do.
13           Have you seen either of those
14   documents before?
15        A.   The -- yes.  The item 103 is the
16   contract that I ultimately signed.
17        Q.   And that is your signature on the
18   last page?
19        A.   That is my signature on page 3.
20        Q.   And it appears to have been dated
21   on October 7th, 2008.  Did you put that date
22   in there when you signed it?
23        A.   Yes, I did.
24        Q.   Okay.  That's your handwriting?
25        A.   Yes, it is.

1      H. McGEE - HIGHLY CONFIDENTIAL
2         Q.   And does this document accurately
3    state your compensation agreement with
4    Barclays for employment that commenced on
5    September 2nd, 2008?  I'm making note of the
6    start date in the document.
7         A.   Yes, it does.
8         Q.   Now, if you would take a look at
9    Exhibit 102, Mr. McGee, that's an e-mail from
10   you to an address called Accept Barclays
11   Offer.
12           Do you recall sending this
13   document?
14        A.   I don't recall specifically but my
15   assumption is that there was a central
16   clearinghouse that you had to send an e-mail
17   into to basically say you're in or not.  I
18   didn't have my contract yet.  But I thought it
19   was important for me to be shown as in the --
20   you know, in the list of -- I didn't want to
21   continue showing up on the list of people who
22   were not "in."  I think that is my
23   recollection.
24        Q.   As I understand it, for the
25   transferred employees there was a sort of

1      H. McGEE - HIGHLY CONFIDENTIAL
2    default.  If you didn't say yes at a certain
3    point you would be deemed to say no.  So you
4    had to say yes to a website of some kind.
5         A.   There was some sort of an e-mail
6    that went into some sort of a central thing
7    and I still didn't have my contract because
8    obviously that wasn't signed until a couple of
9    weeks later.  But I had a handshake deal with
10   Bob Diamond.  I had no reason to not believe
11   that at some point the -- you know, a contract
12   in line with the handshake deal would come
13   forth.
14        Q.   When did you reach the handshake
15   deal?
16        A.   That night.
17        Q.   Was the handshake deal on the
18   numbers that are shown --
19        A.   The night that -- you know, that I
20   described earlier, the two conversations.  It
21   was the Monday night, whatever night that was.
22        Q.   That's Monday, the 15th?
23        A.   That would be Monday, the 15th.
24        Q.   Okay.  And were the numbers that
25   are reflected in Exhibit 103, were they agreed

1    H. McGEE - HIGHLY CONFIDENTIAL
2    upon as part of the handshake deal?
3        A.   Again, we discussed it in
4    percentage terms down from '07 to '08.  And a
5    one-year deal.  But, yes.
6        Q.   Okay.
7            MR. GAFFEY:  This is a good time
8    for a break.
9            MR. STERN:  Yeah.  Let's take a
10   short break.  Good.
11           (Recess taken.)
12   BY MR. GAFFEY:
13       Q.   Let's go back on the record.
14           Mr. McGee, if you would -- we're
15   still taking a look at Exhibit 103, your
16   signed employment agreement with Barclays.  I
17   just want to get some clarity on the numbers.
18   When we spoke earlier about your Lehman
19   compensation you were able to give me full
20   year for '07 of 23 million consisting of 9
21   cash and 14 restricted stock?
22       A.   That is correct.
23       Q.   And for '08 you told me what I
24   believe you described as a pro rata piece of
25   that year.  I may not have been clear in my

1    H. McGEE - HIGHLY CONFIDENTIAL
2    questioning.  Was your compensation supposed
3    to go up for '08 over '07?
4        A.   For Lehman?
5        Q.   Yes.
6        A.   It had not been determined.  I had
7    a base salary.
8        Q.   Okay.
9        A.   And you get paid I think
10   bimonthly -- or twice a month.
11       Q.   Um-hum.
12       A.   Maybe it's monthly.
13       Q.   So when you made the deal with Mr.
14   Diamond to be down 20 percent over one year
15   that was 20 percent of what?
16       A.   '07.
17       Q.   Off of '07.  All right.  So if you
18   would take a look at Exhibit 103 when you were
19   20 percent down off of '07, is that -- I take
20   it that's not including the item called
21   special cash award for $11,500,000?
22       A.   That's correct.
23       Q.   Okay.  So the calculation of 20
24   percent off for '08 would be in the first two
25   parts, guaranteed cash bonus and EPP

1    H. McGEE - HIGHLY CONFIDENTIAL
2    recommendation?
3        A.   That is correct.
4        Q.   And the EPP recommendation is
5    Barclays' version of a restricted stock
6    program, correct?
7        A.   Correct.
8        Q.   So what was the special cash award
9    for?
10       A.   The special cash award was a
11   retention program that BarCap put in place for
12   a number of the senior people to basically
13   induce them to stay longer than the term of
14   the contract and it was vested over two years
15   and you had to be there -- like a normal
16   retention award, you had to be there to
17   collect it.
18       Q.   And this has half on your first
19   anniversary and half on your second, right?
20       A.   That is correct.
21       Q.   Okay.  So was the special cash
22   award in any way compensation in respect of
23   your services to Lehman during 2008?
24       A.   No.  I don't believe so.
25       Q.   Okay.

1    H. McGEE - HIGHLY CONFIDENTIAL
2        A.   And the reason is because you had
3    to be here to collect it.
4        Q.   For the first year and then for
5    the second to get the second half, right?
6        A.   Right.
7        Q.   Okay.  Now, when you were involved
8    in the negotiations of the asset purchase
9    agreement, we spoke a while before the break
10   about aspects of that agreement that covered
11   compensation to transferred employees.
12           Do you recall that?
13       A.   Yes.
14       Q.   And that was a part of the
15   agreement that you were involved in, correct?
16       A.   Correct.
17       Q.   Okay.  And do you recall that
18   there was a pool set aside, an amount of money
19   set aside for Barclays to pay transferred
20   employees in respect of their '08 Lehman --
21           MR. STERN:  Objection to the form.
22       Q.   -- compensation?
23           MR. STERN:  Can I hear the
24   question again?
25           MR. GAFFEY:  I can rephrase it.

1      H. McGEE - HIGHLY CONFIDENTIAL
2      A.    Sure.
3      Q.    And you'll note that in the
4   left-hand column Barclays and Bank of America
5   are listed and described as the active current
6   discussions, correct?
7      A.    Correct.
8      Q.    Okay.  To the right of that
9   there's a series of other entities, CITIC,
10  Nomura, Korea, Inc., et cetera, et cetera.
11         To your knowledge, sir, were any
12  of these entities contacted about interest in
13  a potential transaction after the asset
14  purchase agreement with Barclays was signed on
15  the 16th?
16     A.    To my knowledge, I don't know.  I
17  would think that given the fact that through
18  the course of the summer we had been in
19  contact with almost -- because if you go to
20  the next page -- almost every financial
21  institution on the planet, that if one had
22  interest when one saw the transaction
23  announcement one could have -- we had already
24  contacted a very, very significant number of
25  people who for different reasons had not had

1      H. McGEE - HIGHLY CONFIDENTIAL
2   interest.  And -- but I don't know
3   specifically if additional outbound calls were
4   made.  I did not make any.  As I said, I got
5   on a plane to London trying to see if there
6   was a transaction to be done to put the rest
7   of Lehman Brothers back together.
8      Q.    I'm presuming that while you were
9   in London you were in contact with your office
10  by phone and by e-mail, right?
11     A.    Correct.
12     Q.    Were you in a position to know --
13  withdrawn.
14         Did you ever ask during the week
15  after the asset purchase agreement was signed
16  on September 16th whether the deal was being
17  shopped or offered to other parties?
18     A.    I did not specifically ask.  I
19  cannot believe that if anybody had any
20  interest why they would not have shown up.
21  And there was no one else there.  We had
22  canvassed the world.
23     Q.    When the asset purchase agreement
24  was signed, when it was agreed to, did you
25  have an understanding of the economics of the

1      H. McGEE - HIGHLY CONFIDENTIAL
2   transaction that was agreed with Barclays?
3      A.    You'll have to be more specific.
4   What do you mean by economics?
5      Q.    Who paid what for what?  What was
6   the price given to Barclays?
7      A.    In general, yes.  And I'll
8   describe that for you.  Specifically, no.
9          In general my understanding was
10  that Barclays was going to buy the building, a
11  couple of data centers, the people, which is
12  really the assets that had value, and, as I
13  stated previously, were evaporating under our
14  feet.
15         And some amount of balance sheet
16  assets which was determined by a separate
17  working group that I'm not familiar with
18  exactly was included in balance sheet items.
19     Q.    Who was the separate working group
20  that determined the balance sheet items?
21     A.    The balance sheet items were
22  focused on by Alex Kirk, by Bart McDade, by
23  Mike Gelband.  Certainly Ian and Paolo would
24  have been involved as well.
25     Q.    By Ian you mean Ian Lowitt?

1      H. McGEE - HIGHLY CONFIDENTIAL
2      A.    Even Lowitt.
3      Q.    And Paolo is Paolo Tonucci?
4      A.    Paolo Tonucci, yes.
5      Q.    Did you, during the course of --
6   excuse me -- during the course of the week
7   leading to the closing on the 22nd, did you
8   see any work product or analysis generated by
9   that working group or people under their
10  supervision?
11     A.    Not to my recollection.
12     Q.    Did you have a general
13  understanding or do you have one today about
14  that -- that's two questions.  Withdrawn.
15         Did you have a general
16  understanding at the time of the value, the
17  amount of balance sheet assets, that were
18  going to be transferred to Barclays?
19     A.    No.
20     Q.    I may have confused that by
21  interrupting myself.
22         Let me be clear on time period.
23  My question goes to at the time, sir.  At the
24  time did you have an understanding what
25  quantum of balance sheet assets was going to

1   H. McGEE - HIGHLY CONFIDENTIAL
2   be transferred over to Barclays?
3       A.   No, I did not.  My understanding
4   was that the structure of the transaction was
5   an asset purchase and there was still work
6   being done to agree on exactly what the assets
7   were to be purchased.
8       Q.   Do you know, sir, if there was any
9   discount off the book value of the assets
10  transferred, any agreed discount off the book
11  value?
12      A.   I was not involved in that process
13  so I have no idea.
14      Q.   Did you review the asset purchase
15  agreement when it was finalized and signed?
16      A.   No, I did not.
17      Q.   Have you reviewed it since?
18      A.   No, I have not.
19      Q.   Did anyone ask you to review it at
20  the time that it was signed?
21      A.   No.
22           With the exception of the
23  provision relating to compensation and
24  employees.
25      Q.   Okay.

1       H. McGEE - HIGHLY CONFIDENTIAL
2           (Pause on the record.)
3       Q.   Now, Mr. McGee, I've put before
4   you what we previously have marked as
5   Deposition Exhibit 1.
6           Do you recognize the document?
7       A.   Actually, I don't recognize it.
8   But I take it for what it's labeled to be.
9       Q.   Okay.  And that would be the asset
10  purchase agreement between Lehman Brothers
11  Holdings, Lehman Brothers, Inc., LB 745, LLC
12  and Barclays Capital, dated as of September
13  16th, 2008?
14      A.   That is what it says on the cover.
15  Yes, sir.
16      Q.   Prior to today, have you ever seen
17  this document that we've marked as Exhibit 1?
18      A.   No.  Have not.
19      Q.   Would you take a look, please,
20  at --
21      A.   Have not seen in it in its
22  entirety.  I have seen a provision
23  (indicating).
24      Q.   Okay.  You're pointing to a
25  provision.  Which one are you pointing to?

1       H. McGEE - HIGHLY CONFIDENTIAL
2   Page 34?
3       A.   Page 34.
4       Q.   Okay.
5       A.   That my counsel has helpfully
6   paged me to.
7       Q.   And page 34 is the beginning of
8   Article 9 entitled Employees and Employee
9   Benefits, correct?
10      A.   Correct.
11      Q.   And if you would take a look, sir,
12  please, through -- you'll note it has three
13  subsections, (a), (b), and (c), right?
14      A.   Yes.
15      Q.   Were you involved in the drafting
16  or the finalizing of the language in
17  Exhibit -- in Section 9.1 of the asset
18  purchase agreement?
19      A.   Yes, I was.
20      Q.   Describe for me as best -- with it
21  in front of you, describe for me as best you
22  remember exactly what your role was in
23  drafting or finalizing that language.
24      A.   Again, as I mentioned earlier, I
25  had very real-time and serious concerns about

1       H. McGEE - HIGHLY CONFIDENTIAL
2   the franchise of Lehman Brothers and
3   preserving some value in that franchise.
4   Headhunters were conducting very aggressive
5   campaigns to hire senior employees, groups of
6   employees, entire industry groups.  We had
7   very significant numbers of employees,
8   certainly in investment banking that already
9   had contracts in hand from competitors.  And I
10  was worried about the value of Lehman Brothers
11  was about to walk out the front door if this
12  wasn't handled the right way.
13          So I was involved in the
14  discussion of these provisions.  Two places
15  where I was the most involved had to do with
16  what would happen with employees who didn't
17  end up having a job, would they be treated
18  fairly and appropriately severed because there
19  was bound to be redundancies and I wanted to
20  make sure that the severance program was
21  consistent with the kind of severance program
22  that Lehman had historically utilized.
23          The second was to make sure that,
24  in fact, there was a bonus pool and bonuses
25  paid for employees because, as I mentioned

1    H. McGEE - HIGHLY CONFIDENTIAL
2    previously, if you're a senior employee you
3    work for a salary which is ultimately a
4    fraction of your compensation and it's about
5    the year-end bonus or year-end compensation.
6        And if we didn't have -- if we did
7    not have an adequate answer to this question I
8    worried about our ability to retain the
9    franchise represented by the employees.
10       Q.   Are you finished with your answer,
11   sir?
12       A.   Yes.
13       Q.   Okay.  Why were you worried about
14   Barclays' ability to retain employees after
15   the transaction?  Why was that a matter of
16   concern to you?
17       A.   Because if we couldn't represent
18   to the employees that there was a program to
19   take care of them they were going to leave.
20   They had offers away.
21       Q.   Okay.  And --
22       A.   And without employees the client
23   relationships, the -- there's no value to the
24   business.  At least that was my view.
25       Q.   Do you know if any part of the
TSG Reporting - Worldwide  (877) 702-9580

1        H. McGEE - HIGHLY CONFIDENTIAL
2    consideration paid in the asset purchase
3    agreement was consideration paid for the
4    franchise value of Lehman?
5        A.   My understanding was that there
6    was a "goodwill" number that was included in
7    the transaction.
8        Q.   Can you remember what the
9    "goodwill" number was?
10       A.   250 million was what I had heard.
11       Q.   And did you have a view at the
12   time as to whether the Lehman franchise was
13   worth $250 million?
14       MR. STERN:  Objection to the form.
15       A.   I would say that that's a very
16   difficult question to answer.  What I would
17   say was that that number was very rapidly
18   speeding to zero.  And the more employees --
19   the more key employees that left to go to
20   other firms, it was quite certainly going to
21   zero.
22       Q.   Now, when the agreement was being
23   negotiated prior -- the agreement being the
24   asset purchase agreement before it's signed --
25   what's contemplated, as I understand it, is a
TSG Reporting - Worldwide  (877) 702-9580

1        H. McGEE - HIGHLY CONFIDENTIAL
2    sale of assets; the building, the two data
3    centers, the balance sheet assets.
4        Can you describe for me what
5    interest Lehman Brothers Holdings or Lehman
6    Brothers, Inc. would have in the continued
7    viability of the franchise after Barclays
8    bought those assets?
9        THE WITNESS:  Could you repeat the
10   question.
11       (Record read.)
12       A.   Well, I can't speculate as to what
13   their interests are or should have been but I
14   would -- I would assume that one would be
15   interested in the franchise staying intact
16   through the transaction so that the purchaser
17   actually carried through with the transaction
18   and actually purchased.
19       If there was no franchise, if
20   there was no people and most of the key
21   employees had left to go do other things and
22   the only employees that were remaining were
23   those that generally couldn't find
24   opportunities elsewhere, I would think that
25   what was there for any potential purchaser was
TSG Reporting - Worldwide  (877) 702-9580

1        H. McGEE - HIGHLY CONFIDENTIAL
2    much less valuable and, therefore, what was
3    then realized in any transaction was much
4    lower.
5        Q.   So when you spoke about the
6    severance program before you said there were
7    two main topics that were of concern to you;
8    one was how severed, terminated employees
9    would be treated because there would be
10   redundancies; and the other was the
11   establishment of a bonus pool.
12       Let's talk about the first piece,
13   the severance piece.  Is the agreement
14   regarding severance that was reached the one
15   that's reflected in paragraph 9.1(b) of the
16   asset purchase agreement?
17       A.   I believe that to be true.  I
18   looked at drafts of just this article.
19       Q.   Um-hum.
20       A.   And worked on some of the
21   language.  I didn't reread the entire document
22   as signed.  But my understanding is that it
23   was -- that this is consistent.
24       Q.   You just said something that went
25   back to the question I asked a few moments ago
TSG Reporting - Worldwide  (877) 702-9580

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   which is actually what mechanically you were
 3   doing.  Were you marking up drafts as they
 4   came -- from time to time as they came through
 5   of this document?
 6        A.   I looked at a draft of this
 7   language along the way and got involved in
 8   some discussions to change some of provision
 9   (b) and some of provision (c).
10        Q.   Do you recall what provisions of
11   subparagraph (b) and subparagraph (c) were the
12   subject of changes?
13        A.   Specifically to say that the
14   severance was going to be no less favorable
15   than they would have been entitled to had they
16   been basically under Lehman's program to put
17   it in common language.
18        Q.   No pool was put together to fund
19   the severance obligations under 9.1(b); is
20   that correct?
21            MR. STERN:  Objection to the form.
22        A.   I have no idea.  I don't know the
23   answer to that.
24        Q.   When you were speaking before
25   about making sure there was a bonus pool tell
```

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   me what steps, if any, you took to make sure
 3   there was a bonus pool.
 4        A.   There was a calculation made, and
 5   I'm not sure by who, to come up with some
 6   amount which was a number to represent the
 7   accrued compensation liability for the North
 8   American business.  That was a complicated
 9   calculation because normally Lehman was
10   operated as a global business.  Investment
11   banking was global.  Equities was global.  I
12   never -- people never thought about the comp
13   pool as, you know, sub pieces of it.  You also
14   had, you know, comp always -- the "comp line"
15   always has other stuff in there besides pure
16   bonus.  There's -- severance probably flows
17   through there.  There's other benefits.  So
18   it's somewhat unclear.
19            But what was important was that
20   there was a defined number that was calculated
21   by somebody, I'm not sure who, that was based
22   on the historical Lehman accruals which I
23   guess were then pro rated through for the
24   balance of the year and to come up with a
25   number.
```

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2        Q.   Did you review any of the work
 3   that was done with respect to calculating that
 4   pool?
 5        A.   No.  No.
 6        Q.   And, again, I'm sorry if I'm
 7   repeating myself or asking you to answer again
 8   but do you know who was involved in -- you
 9   know, who signed off on a final number for
10   that pool?
11        A.   I don't know.  I'm not sure who
12   calculated it.
13        Q.   Would you take a look at paragraph
14   9.1(c).  It's at page 35 of Exhibit 1.
15        A.   Um-hum.
16        Q.   Let me know when you've had a
17   chance to read through the language of that
18   section.  You don't need to memorize it but I
19   want you to familiarize yourself with it
20   because I'm going to go to different pieces of
21   it.
22            (Document review.)
23        A.   Okay.
24        Q.   Now, there's a reference in
25   9.1(c), sir, to a financial schedule delivered
```

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   to purchaser on September 16th, 2008 and
 3   initialed by an officer of each of Holdings
 4   and purchaser defined as "The Accrued '08 FY
 5   Liability."
 6            Do you see that?
 7        A.   Yes.
 8        Q.   Have you ever seen that schedule?
 9        A.   No.
10        Q.   Well, do you know how much was --
11   do you know how much -- what the amount of the
12   accrued '08 FY liability was that was referred
13   in to paragraph 9.1(c)?
14        A.   I heard of number of 2 billion.
15        Q.   And who did you hear that number
16   from?
17        A.   I don't recall.
18        Q.   And did you hear it at or around
19   the time the asset purchase agreement was
20   being finalized and signed or at some
21   subsequent time?
22        A.   I'm not sure.  I think I heard it
23   at or -- I may have heard it at or about the
24   time but I'm not positive.
25        Q.   Well, when you were --
```

1      H. McGEE - HIGHLY CONFIDENTIAL
2         A.    And I'm not sure exactly what was
3    in the two.
4         Q.    When you were working on these two
5    pieces, you know, severance and bonus,
6    wouldn't you have -- I mean, once you got the
7    agreement in place to actually pay the
8    bonuses, wouldn't you have been concerned to
9    see that the bonus pool was enough?
10        A.    My understanding was based on how
11   the number was calculated that it took the
12   accrual year-to-date, grossed it up, reflected
13   the subset of the employees that were part of
14   this transaction, that it would be the right
15   number, but I didn't know how exactly what
16   was -- exactly was was included in all this
17   stuff.
18        Q.    And you don't remember who it was
19   that described that formula to you that gave
20   you comfort that it was based on the accrued
21   bonus -- the accrued liability for bonuses on
22   Lehman's books?
23            MR. STERN:  Objection to the form.
24        A.    No.  I don't recall.
25        Q.    I'm giving you a copy of a

1      H. McGEE - HIGHLY CONFIDENTIAL
2    document, Mr. McGee, that was marked as
3    Exhibit 19 at a prior deposition.  Have you
4    ever seen that document before?
5         A.    No.  Not to my recollection.
6         Q.    Would you be able to tell me one
7    way or the other whether this is the financial
8    schedule referred to in paragraph 9.1(c) of
9    the asset purchase agreement?
10        A.    I can't comment one way or the
11   other.
12        Q.    Do you know if in the process of
13   calculating the accrued liability for bonuses
14   on Lehman's books that number was overstated
15   in connection with the asset purchase
16   agreement?
17        A.    I have no way of knowing.
18        Q.    If you wanted an answer to that
19   question who would you ask amongst the former
20   Lehman employees?
21        A.    And the question being again?
22        Q.    Whether the accrual for bonus
23   liability that's referred to in paragraph
24   9.1(c) was inflated.
25        A.    And as reflected on Exhibit 19

1      H. McGEE - HIGHLY CONFIDENTIAL
2    from the prior deposition?
3         Q.    Actually, no.  Without reference
4    to that because you've told me you'd never
5    seen that before and you can't tell me if it
6    has anything to do with 9.1(c).  So I'm really
7    talking about what's referred to in paragraph
8    9.1(c).
9            Just for clarity, since -- I beg
10   your pardon.  Since you've asked for that
11   clarification, let me ask you both questions
12   again.
13        A.    Okay.
14        Q.    Solely with respect to the
15   language of 9.1(c), do you know if the '08
16   liability referred to in that section was
17   inflated for the purposes of September 16th,
18   2008 asset purchase agreement?
19        A.    When you say inflated, do you mean
20   to -- grossed up to reflect a full year or do
21   you --
22        Q.    No, I'm --
23        A.    Because I -- or do you mean
24   inflated as not reflective of the number that
25   was in the -- supposedly in the books and

1      H. McGEE - HIGHLY CONFIDENTIAL
2    records of Lehman Brothers?
3         Q.    The latter.
4         A.    I have no knowledge that --
5         Q.    And my second question was who
6    would ask you within the group of former
7    Lehman employees if you wanted an answer to
8    that question?
9         A.    People that were responsible for
10   accruals on the balance sheet starting with
11   Ian Lowitt and Paolo Tonucci.
12        Q.    Do you know Martin Kelly?
13        A.    Yes.
14        Q.    Who is Martin Kelly?
15        A.    He works in the finance and
16   accounting area for Lehman.
17        Q.    To whom did he report at Lehman?
18        A.    I'm not exactly sure.  Maybe Ian.
19   But I'm not positive.
20            (Pause on the record.)
21        Q.    Do you recall, sir, if you knew --
22   after the asset purchase agreement was signed
23   but before the deal was closed on the 22nd, if
24   you knew what the amount of the pool was that
25   we've been talking about established under

1  **H. McGEE - HIGHLY CONFIDENTIAL**
2  **Article 8 of the APA?**
3      A.   Define the pool for me.
4      **Q.   You made reference before to a**
5  **bonus pool.**
6      A.   Correct.
7      **Q.   Did you know at the time, even if**
8  **you don't remember now, what the amount was?**
9      A.   There's an accrual that's
10  referenced.  Unclear to me exactly what is
11  included in the accrual.
12      **Q.   Um-hum.**
13      A.   A portion of the accrual I assume
14  is a year-end bonus pool.  A portion of it is
15  an accrual for remaining salaries.  A portion
16  of it is accrual for other comp and benefits.
17  Probably a portion of it is an accrual for
18  estimated severance.  So unclear when you say
19  the pool, exactly which part of these accruals
20  that you're referring to.
21      MR. GAFFEY:  Mark that, please.
22      (Deposition Exhibit 105, document
23      bearing production number 10321888,
24      marked for identification as of this
25      date.)
    *TSG Reporting - Worldwide  (877) 702-9580*

1  H. McGEE - HIGHLY CONFIDENTIAL
2  BY MR. GAFFEY:
3      **Q.   We've marked as Deposition**
4  **Exhibit 105, Mr. McGee, a one-page document.**
5  **It appears to be an e-mail from you dated**
6  **September 18th, 2008 8:01 a.m. GMT to Anthony**
7  **Collerton.  Subject, Confidential.**
8      **Take a look at this document.**
9  **Tell me if you recall seeing it before.**
10      A.   It's an e-mail that I sent.  That
11  is correct.
12      MR. STERN:  Take a look at the
13      e-mails starting at the bottom.
14      (Document review.)
15      **Q.   Have you had a chance to look**
16  **through the document?**
17      A.   Um-hum.
18      **Q.   And the top e-mail is from you to**
19  **Anthony Collerton.  Who is Anthony Collerton?**
20      A.   He worked in HR for Lehman
21  Brothers.
22      **Q.   And in your e-mail to Mr.**
23  **Collerton you ask this question:  "Of the 2**
24  **billion number, what is share for IBD?"**
25      **Do you know what $2 billion number**
    *TSG Reporting - Worldwide  (877) 702-9580*

1      **H. McGEE - HIGHLY CONFIDENTIAL**
2  **you were referring to when you wrote that**
3  **e-mail to Mr. Collerton on September 18th?**
4      A.   I believe that to be the 2 billion
5  number that I had heard to be the accrual
6  number.
7      **Q.   Okay.  And you go on in the e-mail**
8  **to Mr. Collerton to ask, "Is that remaining**
9  **salary plus year-end bonus?"**
10      **Do you see that?**
11      A.   Yes.
12      **Q.   Did you get an answer to that**
13  **question?**
14      A.   No.
15      **Q.   Do you know the answer as you sit**
16  **here today?**
17      A.   No.
18      **Q.   And then you ask Mr. Collerton,**
19  **"Does it include the retention or is that**
20  **separate?"**
21      **Do you see that?**
22      A.   Yep.
23      **Q.   Did you get an answer to that**
24  **question?**
25      A.   Nope.
    *TSG Reporting - Worldwide  (877) 702-9580*

1  H. McGEE - HIGHLY CONFIDENTIAL
2      **Q.   Do you have an answer to that as**
3  **you sit here today?**
4      A.   No.
5      **Q.   Did you ever known the answer to**
6  **either -- any of those three questions?**
7      A.   No.
8      **Q.   So looking again at what was**
9  **marked as Exhibit 19, that's the financial**
10  **schedule that shows a $2 billion number for**
11  **comp, you have -- you can't tell us whether**
12  **that $2 billion is for bonuses only, for**
13  **bonuses and salary, or for bonuses and**
14  **severance, can you?**
15      A.   Cannot.
16      **Q.   Do you have any idea at all?**
17      A.   No.
18      (Deposition Exhibit 106, e-mail
19      dated 9/17/2008 2:21 p.m., marked for
20      identification as of this date.)
21  BY MR. GAFFEY:
22      **Q.   Mr. McGee, I've marked as**
23  **Exhibit 106 a one-page e-mail from Ajay Nagpal**
24  **to Bart McDade, Michael Gelband, Gerald**
25  **Donini, Thomas Humphrey, yourself, Eric Felder**
    *TSG Reporting - Worldwide  (877) 702-9580*

Page 90

1    H. McGEE - HIGHLY CONFIDENTIAL
2    and Hyung Lee.
3          Have you seen this e-mail before?
4        A.   I see that I'm listed as one of
5    the addressees.  I don't recall it.  I'm
6    reading it now.
7          (Document review.)
8        A.   Okay.  I've read it.
9        Q.   Having read through it does it
10   refresh your recollection as to whether you've
11   seen it prior to today?
12       A.   It appears I received this.  I
13   can't recall receiving this specific e-mail
14   but I get hundreds every day and there's lots
15   of days between now and then.
16       Q.   Okay.  You can put that e-mail
17   aside then.
18          (Pause on the record.)
19       Q.   Could you take from the pile in
20   front of you, please, Mr. McGee, Exhibit 103.
21   It's your signed --
22       A.   Contract.
23       Q.   -- contract.  And you also need in
24   front of you the asset purchase agreement.
25       A.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 91

1    H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   Now, having been involved in the
3    drafting of Article 9 of the asset purchase
4    agreement you would meet the definition, sir,
5    of a transferred employee as it's used in that
6    provision, correct?
7        A.   Correct.
8        Q.   Okay.  And with reference to your
9    employment agreement, could you tell us, sir,
10   of the four components of compensation, that
11   is your base salary, your 2008 guaranteed cash
12   bonus, your 2008 EPP recommendation, and your
13   special cash award, which, if any, of those
14   four elements fall within the provisions of
15   9.1(c)?
16       A.   Well, my understanding would be
17   that certainly the base salary, the guaranteed
18   cash bonus, and the stock piece of that would
19   fall under that.
20          I don't know about the retention.
21       Q.   By the retention you mean the
22   special cash award?
23       A.   That is correct.
24       Q.   You don't know whether the special
25   cash award is within the rubric of the

TSG Reporting - Worldwide  (877) 702-9580

Page 92

1    H. McGEE - HIGHLY CONFIDENTIAL
2    agreement you helped negotiate, 9.1(c)?
3        A.   I don't know.
4        Q.   Now, when the asset purchase
5    agreement was concluded on the 16th -- when it
6    was signed, the one in front of you was signed
7    on the 16th of September 2008 -- and taking
8    into account, sir, you're telling me that you
9    had a general idea of its terms but
10   specifically dealt only with this -- do you
11   have a general sense of whether the pricing of
12   it was such that it was to the net benefit of
13   Lehman, the net benefit of Barclays or a wash?
14       A.   As I've answered previously, I was
15   not involved in the discussions around
16   specific assets so I -- you know, I can't
17   comment.
18       Q.   Did you have a sense of that at
19   the time?  Whether it was a net benefit to
20   Lehman, a net benefit to Barclays, or a wash?
21       A.   No.
22       Q.   There were hearings in the
23   bankruptcy court during the week of the 15th.
24   There was one on the 17th, the Wednesday, and
25   then there was one -- actually, there was one

TSG Reporting - Worldwide  (877) 702-9580

Page 93

1    H. McGEE - HIGHLY CONFIDENTIAL
2    on the 16th, there was one on the 17th, and
3    then there was one on Friday, the 19th.
4        Did you attend any of those?
5        A.   No.
6        Q.   And remind me, when did you leave
7    for London?  Wednesday?
8        A.   Wednesday afternoon for Thursday
9    morning.
10       Q.   Okay.
11          Did you see any of the filings
12   made with the bankruptcy court that described
13   the transaction at any point?
14       A.   No.
15       Q.   During the week of September 15th
16   there came a point -- did you ever learn that
17   during the week of September 5th there came a
18   point where Barclays stepped into the shoes of
19   the Federal Reserve with respect to a certain
20   repurchase agreement concerning Lehman?
21          MR. STERN:  I'm sorry.  The
22   date --
23       Q.   Withdraw the question.
24          During the week before the
25   transaction closed did the existence of a

TSG Reporting - Worldwide  (877) 702-9580

1    H. McGEE - HIGHLY CONFIDENTIAL
2    repurchase agreement in connection with the
3    transaction come to your attention?
4        A.    No.
5        Q.    In any way whatsoever?
6        MR. STERN:    Objection to the form.
7        MR. CHEPIGA:    I don't know what it
8    means.
9        A.    No.  I mean, subsequently, I've
10   heard reference to it but at the time, no.
11   And I was out of the country.
12       Q.    Apart from counsel, what
13   references have you heard to it subsequently?
14       A.    Nothing more than that there was a
15   repurchase agreement that Barclays got
16   involved in.
17       Q.    Anything more than that?
18       A.    No.
19       Q.    Anybody ever talk to you about the
20   use of the repurchase agreement as a means of
21   transferring the assets over to Barclays?
22       A.    No.
23       Q.    Do you know if the deal that was
24   made on the 16th of September, the one that
25   was signed on Tuesday, the 16th of September,

1    H. McGEE - HIGHLY CONFIDENTIAL
2    was, in fact, the deal that was closed on
3    Monday, the 22nd of September that the terms
4    of the deal stayed the same?
5        A.    I don't know.
6        Q.    Do you know if the terms of the
7    deal changed between the 16th and the 22nd?
8        A.    I don't know.
9        Q.    Did you attend the closing?
10       A.    No.
11       Q.    Did you ever see any amendments to
12   the asset purchase agreement that's before you
13   marked as Exhibit 1?
14       A.    No.
15       Q.    Did it ever come to your attention
16   that there were any amendments to the asset
17   purchase agreement?
18       A.    Maybe after the fact.
19       Q.    By after the fact you mean after
20   the closing?
21       A.    Yes.
22       Q.    In what manner did that come to
23   your attention?
24       A.    It might have been around this
25   process.  I don't recall.  But I don't feel

1    H. McGEE - HIGHLY CONFIDENTIAL
2    like I can say I never heard that there were
3    any changes.
4        Q.    Yeah, and I appreciate that.  What
5    I want to do is focus on from the 22nd of
6    September and prior.
7        A.    Okay.  I had not.  No.  I had not.
8        Q.    Have you ever heard about the
9    execution of a clarification letter concerning
10   the asset purchase agreement?
11       A.    No.
12       Q.    So I take it you were not involved
13   in the negotiation of any such clarification
14   letter.
15       A.    That is correct.
16       Q.    And had you heard about the
17   existence or the drafting or the negotiation
18   of such a clarification letter in the week
19   prior to the closing on the 22nd?
20       A.    I had not.
21       Q.    Did it ever come to your
22   attention, Mr. McGee, that Barclays announced
23   a certain gain upon the acquisition of the
24   Lehman assets?
25       A.    That Barclays announced --

1    H. McGEE - HIGHLY CONFIDENTIAL
2        Q.    A gain on acquisition.
3        A.    When would such announcement have
4    been made?
5        Q.    I'll show you a document.
6        (Pause on the record.)
7        Q.    Mr. McGee, I've put in front of
8    you what was previously marked as Deposition
9    Exhibit 22 entitled Barclays PLC Results
10   Announcement Figures 2008.
11       Let me ask you first, have you
12   seen this before?
13       A.    I have -- I have seen it but I
14   haven't read all the footnotes.
15       Q.    Okay.  Well, let me show you --
16   I'm not going to ask you to read them all but
17   I am going to ask to you take a look at page
18   95.
19       A.    Okay.
20       Q.    There's a section -- there's a
21   note there entitled Acquisitions and in the
22   second-to-last paragraph do you see the phrase
23   "The excess of the fair value..."
24       A.    Yeah.
25       Q.    It says "The excess of the fair

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **value of net assets acquired over**
3    **consideration paid resulted in 2,262,000,000**
4    **pounds of gains on acquisition."**
5        **Do you see that?**
6    A.   Yes, I do.
7        **Q.    Did that announcement of a gain on**
8    **acquisition of the Lehman assets come to your**
9    **attention at or around the time Barclays made**
10   **this announcement?**
11       A.   I saw it in the -- I saw it picked
12   up by the press and other places, yes.
13       **Q.    And when you saw it picked up by**
14   **the press and in other places, did you have a**
15   **view as to whether it was consistent or**
16   **inconsistent with the terms of the transaction**
17   **in which you were involved in September of**
18   **2008?**
19       A.   My sense is it was consistent with
20   the environment in which the transaction was
21   consummated; that it was the absolute worst
22   financial crisis anyone had ever seen, the
23   fact that somebody bought assets, any assets
24   at the very bottom, they were probably going
25   to ultimately earn a return on having stepped

1    H. McGEE - HIGHLY CONFIDENTIAL
2    up.
3        **Q.    And when you say ultimately earn a**
4    **return, do you mean that over the longer term**
5    **make better use of those assets to return**
6    **profit?**
7        A.   Perhaps ultimately is a bad term.
8    It's not surprising to me that there was a
9    gain if that's what you're asking me.
10       **Q.    Would it be surprising to you that**
11   **there was a gain on acquisition?  At the point**
12   **of acquisition.**
13       A.   I'm not so sure that's what this
14   says.
15       Q.   Well, where it says there "on
16   acquisition" that's what I'm talking about.
17   Would it surprise you that there was a gain
18   "on acquisition"?
19       A.   I'm not sure I understand you.
20       MR. STERN:  If you don't
21   understand the question --
22       **Q.   Do you understand the question?**
23       A.   No, I don't.
24       **Q.   Okay.  Barclays purchases the**
25   **assets - as you put it, the franchise - gets**

1        **H. McGEE - HIGHLY CONFIDENTIAL**
2    **the people, gets the assets, on September**
3    **22nd, 2008.**
4        A.   Correct.
5        **Q.    As we sit here today Barclays has**
6    **had some opportunity to operate businesses**
7    **using those people and those assets and those**
8    **other facilities that were transferred to it,**
9    **correct?**
10       A.   Right.
11       **Q.    Barclays will have had over that**
12   **period of time as we sit here today some**
13   **degree of success or lack of success using**
14   **those assets and people and facilities, right?**
15       A.   Correct.
16       **Q.    My question has nothing to do with**
17   **any of that.  My question has to do with**
18   **whether or not Barclays made a gain at the**
19   **moment it acquired the assets.**
20       A.   Are these financial -- I thought
21   these financial estimates were as of December
22   31st.
23       **Q.    I'm just asking you, sir, whether**
24   **it was your understanding that Barclays would**
25   **make a gain at the moment it acquired the**

1        **H. McGEE - HIGHLY CONFIDENTIAL**
2    **assets.**
3        A.   As I said before, I was not
4    involved in the detail around the asset side
5    of the acquisition.
6        **Q.    You were involved in the bigger**
7    **picture of negotiation of the transaction,**
8    **correct?**
9        MR. STERN:  Objection to the form.
10       A.   I think that's a bit too broad.  I
11   was involved -- I was involved in trying to
12   facilitate the transaction to try and make
13   sure that we had 48 hours to try to put
14   something together that we didn't forget
15   something.  So I'd go around and say, you
16   know, are we buttoned up here, are we going to
17   need this approval, do we have to get these
18   guys.  So I was wandering in and out of the
19   rooms.  Anything material went to Bart McDade
20   for his sign-off.  And anything related to the
21   balance I just wasn't involved in.
22       **Q.   We've had more than one witness,**
23   **sir, prior to today describe you as one of the**
24   **principal negotiators of the transaction.  Is**
25   **that accurate?**

Page 122

H. McGEE - HIGHLY CONFIDENTIAL
1
2  who Tracy Binkley is?
3     A.   Tracy Binkley was the head of HR
4  at Lehman Brothers.
5     Q.   And Michael Evans, what's his role
6  at Barclays?
7     A.   He's the head of HR.
8     Q.   I should ask you have you seen
9  this e-mail exchange before?
10    A.   No.
11    Q.   You see in it, though, that
12 there's a reference to -- and I'm at the
13 bottom here.  "By the way, my HR person
14 covering investment banking tells me that Skip
15 McGee, head of IBD, was told that Barclays
16 would honor all guarantees of his group for $1
17 million or more.  I presume he has begun
18 communicating that but don't know.  Got this
19 info second hand."
20       And then further up just to sort
21 of relate these two things it says "As for
22 Skip saying he has that approval, I'm not
23 aware of it."
24       Any of this ringing any bells
25 about an area of confusion or any

TSG Reporting - Worldwide  (877) 702-9580

Page 123

H. McGEE - HIGHLY CONFIDENTIAL
1
2  conversations you may have had at around this
3  time?
4     A.   No.  It's not -- I've never seen
5  this before.  There was a concern by some
6  people that had guarantees going into the year
7  2008 with Lehman Brothers as to what was going
8  to be the status of those guarantees.
9     Q.   Once they went over to Barclays.
10    A.   Once they went over to Barclays.
11    Q.   And is that an area that you were
12 addressing that you were having conversations
13 about during the week?
14    A.   It would have been down the list
15 of priorities.  Because that was not a
16 significant population of people nor was it
17 the most significant people.
18    Q.   I'll take that back.  I just
19 marked that to show you I keep my promises.
20    A.   Okay.  Thanks.
21       (Deposition Exhibit 110, document
22    bearing production numbers 10279514,
23    marked for identification as of this
24    date.)
25

TSG Reporting - Worldwide  (877) 702-9580

Page 124

H. McGEE - HIGHLY CONFIDENTIAL
1
2  BY MR. GAFFEY:
3     Q.   What we've put in front of you,
4  Mr. McGee, is marked Exhibit 110.  And on its
5  top it appears to be an e-mail from you to
6  Roger Jenkins at Barclays Capital entitled
7  "Current Numbers."  And it's got an e-mail
8  chain within it.  And take a look at the
9  e-mail, please, from earliest to latest and
10 let me know when you've had a chance to do
11 that.
12       (Document review.)
13    A.   Okay.
14    Q.   I guess starting at the earliest
15 one, Mr. McGee -- well, do you have any
16 independent recollection of this e-mail chain?
17    A.   Generally, yes.
18    Q.   Okay.  Tell me what your best
19 recollection is about the issue that's
20 addressed in it and how it came up and how you
21 dealt with it.
22    A.   Well, this again relates to trying
23 to pin down the various groups or senior
24 individuals within investment banking and
25 trying to do so with some combination of a

TSG Reporting - Worldwide  (877) 702-9580

Page 125

H. McGEE - HIGHLY CONFIDENTIAL
1
2  await, perhaps retention, and hopefully not
3  '09 but in some instances '09 guarantees.
4        And Roger Jenkins was a member of
5  the BarCap Executive Committee who was
6  nominally watching over the process with
7  respect to investment banking.  And my
8  assumption is that there were similar
9  processes going on with other divisions.  And
10 this had to do with that process.
11    Q.   Was there a point -- there are
12 references on the e-mail to -- well, let me
13 direct your attention to the second most
14 recent e-mail.  It's on the first page from
15 Jenkins to you.
16    A.   Yes.
17    Q.   Saturday, September 20th, 15:40,
18 Re. Current Numbers.  It begins, "Skip, we got
19 to talk."
20    A.   Yes.
21    Q.   Okay.  Mr. Jenkins writes "Skip,
22 we got to talk.  We are over the pool and
23 don't have the money.  All comp stuff needs to
24 come through me for my sign-off.  We are
25 working to a clearly defined pool."

TSG Reporting - Worldwide  (877) 702-9580

1    H. McGEE - HIGHLY CONFIDENTIAL
2         Do you know what clearly defined
3    pool Mr. Jenkins was referring to when he
4    wrote to you on September 20th?
5         A.    No, I did not.
6         Q.    Did you know that on September
7    20th there was a clearly defined pool
8    available for compensation of investment
9    banking division personnel?
10        A.    My understanding was that there
11   was some pool.  I didn't know exactly what was
12   in it, how much was in investment banking, how
13   much was in equities.
14        Q.    Okay.
15        A.    And you can see that in the e-mail
16   that I was somewhat frustrated as to -- I
17   didn't really know what the pool was and I was
18   trying to manage this on the one hand with the
19   e-mail chain we just went through a minute ago
20   with all my direct reports who were saying,
21   you know, you got to -- you know, we got bids
22   away, people have two years, et cetera, et
23   cetera.  So it was -- there was a bit of
24   frustration in this e-mail chain.
25        Q.    And you ask 00 in your response to
         TSG Reporting - Worldwide  (877) 702-9580

1    H. McGEE - HIGHLY CONFIDENTIAL
2    that e-mail you ask Jenkins, "What is the
3    pool?"
4         Do you see that?
5         A.    Yes, I see that.
6         Q.    Did you get a response as to what
7    the pool was?
8         A.    No.
9         Q.    Now, in the next --
10        A.    Not that I recall.  I don't
11   recall.
12        Q.    Are you on your way back from
13   London at this point?
14        A.    I am -- yes.
15        Q.    Let me --
16        A.    I believe so.
17        (Deposition Exhibit 111, document
18   bearing production numbers 01279510,
19   marked for identification as of this
20   date.)
21   BY MR. GAFFEY:
22        Q.    Mr. McGee, I've put before you an
23   e-mail marked Deposition Exhibit 111.  It's
24   from you to Roger Jenkins, Saturday, September
25   20th, 2008, at 7:38 p.m. GMT.
         TSG Reporting - Worldwide  (877) 702-9580

1    H. McGEE - HIGHLY CONFIDENTIAL
2         A.    Um-hum.
3         Q.    And I show this to you -- well,
4    let me ask you the usual question.
5         Do you recall seeing that before?
6         A.    These are e-mails from my e-mail,
7    yes.
8         Q.    You're writing to Mr. Jenkins at
9    7:38 p.m.  "Yes.  Sorry.  Plane door shut.
10   Will call again in 45 minutes."
11        Are you getting on an airplane on
12   Saturday night?
13        A.    That would have been an
14   airplane -- yes, I was getting on an airplane.
15        Q.    Okay.  And is that your flight
16   from London back to New York?
17        A.    No.  I think that's a flight -- I
18   think I landed in New York and then was flying
19   on to Texas for the week.
20        Q.    Okay.  So you're back in the US on
21   Saturday, 7:38 p.m. GMT?
22        A.    I believe so, yes.
23        Q.    Now, if you could go back to
24   Exhibit 110.
25        A.    Okay.
         TSG Reporting - Worldwide  (877) 702-9580

1    H. McGEE - HIGHLY CONFIDENTIAL
2         Q.    And that e-mail's about a half
3    hour after that.
4         A.    Okay.
5         Q.    And, as you say, there is a degree
6    of frustration in this e-mail.  You don't know
7    what the pool is.  You're writing back to
8    Jenkins and you say this:  "Bob asked me to go
9    to London so I did.  I'm sorry this is so
10   disjointed.  Further complicated by the fact
11   that our plan keeps changing.  I have no idea
12   what authority I have or don't have and what
13   the boundaries are."
14        Do you see that?
15        A.    Um-hum.
16        Q.    Who's the Bob you're referring to
17   there?
18        A.    That would be Bob Diamond.
19        Q.    Had Bob Diamond asked you to go to
20   London?
21        A.    Well, I think you asked me that
22   earlier and maybe I said that he didn't.
23   Maybe he suggested that I go to London when I
24   was talking about the European piece of
25   Lehman.  There was no reason to go to London
         TSG Reporting - Worldwide  (877) 702-9580

1　　　H. McGEE - HIGHLY CONFIDENTIAL
2　　　Is that -- your primary focus
3　through the week is what you've called holding
4　the franchise together, dealing with the HR
5　side of things, the human capital side of
6　things.
7　　　You know the APA is signed -- the
8　asset purchase agreement is signed on the
9　16th. I asked you if you had any knowledge of
10　an amendment or a clarification letter and you
11　don't, right?
12　　　MR. STERN: Is this a question or
13　statement?
14　　　MR. GAFFEY: That's a question.
15　　　MR. STERN: So what is the --
16　　　A. I had no knowledge of the
17　amendment or clarification letter. My
18　involvement with the asset purchase
19　transaction effectively ended on Tuesday, you
20　know, when the thing was signed. I was not
21　involved in any of the follow-up hearings or
22　whatever else happened after that.
23　　　Q. Okay. That's a cleaner way to get
24　to where I was bumping along to, yes.
25　　　A. And so what I was focused on was

1　　　H. McGEE - HIGHLY CONFIDENTIAL
2　that we had employees again that were -- and I
3　know I keep repeating myself -- but that -- in
4　my business in particular people had lost
5　their entire net worth. They had all of a
6　sudden become vulnerable to being hired by
7　other firms. Other firms viewed this -- we're
8　still in the first part of the week so we
9　didn't yet have financial Armageddon when
10　things were still good and they were putting
11　very attractive proposals in front of our
12　people, I was afraid we were going to show up
13　at closing and we weren't going to have any
14　employees and there was going to be no closing
15　and there would be nothing left for the
16　creditors.
17　　　Q. During that week -- you know, from
18　the time the asset purchase agreement is
19　signed --
20　　　A. Yes.
21　　　Q. -- through when the closing
22　actually occurs, what if anything are you
23　doing to stay in touch with McDade or whoever
24　else is involved with the negotiation of the
25　deal and making sure that a closing occurs?

1　　　H. McGEE - HIGHLY CONFIDENTIAL
2　　　A. I was not in regular contact. I
3　just assumed that somebody would call me if
4　they needed me for something.
5　　　Q. So when you got back to the US on
6　Saturday and went home to Texas, did you check
7　in by phone when you got there with anybody to
8　say How's it looking, did we close, is the
9　deal going to close? Did you check in with
10　anybody along those lines?
11　　　A. I'm sure I did but I can't recall
12　specifically.
13　　　Q. And did you have a sense when you
14　got back of when the closing was going to
15　occur?
16　　　Well, withdrawn.
17　　　When you left for London did you
18　have an idea of when the deal was supposed to
19　close?
20　　　A. I had a sense that the time line
21　was that weekend but I don't know specifically
22　when.
23　　　Q. So when you got back on that
24　weekend did you ask anybody did the deal
25　close?

1　　　H. McGEE - HIGHLY CONFIDENTIAL
2　　　A. I'm sure I did because I remember
3　getting e-mails kind of play-by-play as to
4　what was going on in a hearing. And I can't
5　remember other than that.
6　　　Q. And did you find out when you got
7　back whether or not the deal had closed right
8　after the hearing? I don't mean to be --
9　　　A. I don't recall.
10　　　Q. Let me withdraw the question.
11　　　A. I don't recall.
12　　　Q. The closing doesn't happen till
13　the Monday. We know that, right?
14　　　A. Okay.
15　　　Q. Okay. When you get back on the
16　weekend are you surprised to find out it
17　hasn't closed yet?
18　　　A. No.
19　　　Q. Did you ask anybody when the
20　closing was going to be?
21　　　A. I'm sure I did but I can't recall.
22　　　Q. Any recollection of who you spoke
23　to?
24　　　A. No.
25　　　Q. And when you say you're sure you

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               ) (Jointly Administered)
7    HOLDINGS, INC., et al.,   )
                               )
8             Debtors.         )
     --------------------------)

9

10

11

12

13

14    HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF

15                 ROBERT MESSINEO

16              New York, New York

17            Thursday, April 1, 2010

18

19

20

21

22   Reported by:

23   KRISTIN KOCH, RPR, RMR, CRR, CLR

24   JOB NO. 29427

25

## Page 6

```
1
2          IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the
4    respective parties herein, that filing and
5    sealing be and the same are hereby waived.
6          IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10         IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn
12   to and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19
20              - oOo -
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 7

```
1
2          (Deposition Exhibit 682, Declaration
3    of Robert L. Messineo, marked for
4    identification.)
5              *    *    *
6          THE VIDEOGRAPHER:  This is the start
7    of tape number 1 of the videotaped
8    deposition of Robert Messineo in the matter
9    in re Lehman.
10         Today's date is April 1st, 2010 at
11   approximately 2:10 p.m.
12         Will the court reporter please swear
13   in the witness.
14   R O B E R T   M E S S I N E O,
15   called as a witness, having been duly sworn
16   by a Notary Public, was examined and
17   testified as follows:
18   EXAMINATION BY
19   MS. NEUHARDT:
20       Q.    Good afternoon, Mr. Messineo.  My
21   name is Amy Neuhardt.  I am with Boies,
22   Schiller & Flexner and I am representing
23   Barclays in this matter.
24       A.    Good afternoon.
25       Q.    Could you tell me where you are
```

TSG Reporting - Worldwide    877-702-9580

## Page 8

```
1          Messineo - Highly Confidential
2    employed?
3        A.    The law firm of Weil, Gotshal &
4    Manges.
5        Q.    And you are a partner there?
6        A.    Yes, I am.
7        Q.    And is that the same place you were
8    employed in September of 2008?
9        A.    Yes.
10       Q.    Okay.  And you were a partner at
11   that time as well?
12       A.    That's correct.
13       Q.    Have you ever been deposed before?
14       A.    Yes, I have.
15       Q.    Okay.  So you know then that if you
16   don't understand one of my questions, you can
17   ask me to clarify, or if you need a break, you
18   can let me know.
19       A.    I understand.
20       Q.    Okay.  In connection with your work
21   as a Weil partner in September of 2008, were
22   you involved in a transaction between Barclays
23   and Lehman Brothers?
24       A.    Yes, I was.
25       Q.    Okay.  And what was your role in
```

TSG Reporting - Worldwide    877-702-9580

## Page 9

```
1          Messineo - Highly Confidential
2    that transaction?
3        A.    I was involved in the negotiation
4    and the preparation of the documents that
5    were the Asset Purchase Agreement with regard
6    to the sale of the Lehman capital markets and
7    investment banking business.
8        Q.    Okay.  Which party were you
9    representing?
10       A.    I was representing Lehman.
11       Q.    Okay.  I am going to hand you or the
12   court reporter will hand you what's been marked
13   as Deposition Exhibit 682.  After you have had
14   a chance to look at it my question will be do
15   you recognize it?
16       A.    Yes, I do.
17       Q.    And on the last -- what is this
18   document?
19       A.    This is my declaration from a few
20   months ago.
21       Q.    Okay.  And on the last page is that
22   your signature?
23       A.    Yes, it is.
24       Q.    Okay.  You can take a moment to look
25   it over if you would like, but my question --
```

TSG Reporting - Worldwide    877-702-9580

Page 10

1    Messineo - Highly Confidential
2  my first question will be is there anything in
3  this declaration that you now consider
4  inaccurate?
5    A.   No.
6    Q.   Okay.  All right.  Paragraph 3 of
7  your declaration refers to an Exhibit A.  It's
8  a Clarification Letter.  I can tell you that
9  the version of this that was served to us did
10  not have an Exhibit A, so I am going to give
11  you what was previously marked as Deposition
12  Exhibit 25 (handing) and ask you whether or not
13  this document is the same as what you had
14  intended to attach to your declaration.
15    A.   This appears to be the final
16  Clarification Letter, yes.
17    Q.   Okay.  So let's look at paragraph 2
18  of your declaration.  The third sentence
19  begins:  "I was one of the Weil attorneys
20  responsible for drafting the letter agreement
21  dated September 20, 2008, which was executed on
22  September 22, 2008 by Barclays, LBHI, James W.
23  Giddens as the trustee for the SIPA liquidation
24  of LBI, and LB 745 LLC (the Clarification
25  Letter)."  Is that correct?

TSG Reporting - Worldwide    877-702-9580

Page 11

1    Messineo - Highly Confidential
2    A.   That's correct.
3    Q.   Okay.  Did you have responsibilities
4  in connection with the Clarification Letter
5  other than participating in the drafting?
6    A.   I don't -- I am not sure I
7  understand what you are asking.
8    Q.   Sure.  Were you one of the Weil
9  attorneys who would have been directly
10  interacting in negotiations with
11  representatives of Barclays?
12    A.   Yes.
13    Q.   Okay.  So you would have been
14  speaking to people from Barclays or Barclays'
15  attorneys in connection with the Clarification
16  Letter?
17    A.   Correct.
18    Q.   When I refer to representative of
19  Barclays throughout the deposition, actually I
20  will be intending to mean Barclays as well as
21  its agents, which would be Cleary Gottlieb,
22  Michael Klein, who is an independent financial
23  advisor.  So will you understand that to be the
24  meaning as I refer to representatives of
25  Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 12

1    Messineo - Highly Confidential
2    A.   Yes.
3    Q.   Okay, great.
4    Now, paragraph 4 of your
5  declaration, page 2, reads:  "I understood at
6  all times while the Clarification Letter was
7  being drafted that both securities and cash
8  were being held in accounts maintained by LBI
9  for the purpose of complying with Rule 15c3-3
10  for the benefit of and in order to protect the
11  interests of customers of LBI.  The accounts so
12  holding securities or cash pursuant to Rule
13  15c3-3 are herein after referred to as the
14  customer reserve accounts."
15    Is that an accurate statement?
16    A.   Yes, it is.
17    Q.   Okay.  Do you consider yourself an
18  expert in SEC Rule 15c3-3?
19    A.   No.
20    Q.   Okay.  Had you had any prior
21  dealings with that rule prior to the
22  Lehman/Barclays transaction?
23    A.   Only a very small degree.
24    Q.   Okay.  And do you consider yourself
25  to be an expert in the Securities Investment

TSG Reporting - Worldwide    877-702-9580

Page 13

1    Messineo - Highly Confidential
2  Protection Act known as SIPA?
3    A.   I do not.
4    Q.   Okay.  And had you had any prior
5  matters that involved interpretation of SIPA
6  prior to the Lehman/Barclays matter?
7    A.   Again, only in a small degree.
8    MS. NEUHARDT:  I am going to hand
9  you what will be marked as Deposition
10  Exhibit 683.
11    (Deposition Exhibit 683, Declaration
12  of Victor I. Lewkow, marked for
13  identification.)
14    Q.   Have you ever seen this document
15  before?
16    A.   Yes.
17    Q.   In what context have you seen it
18  before?
19    A.   I saw it recently in connection with
20  preparation for this deposition.
21    Q.   Okay.  Did you review any other
22  documents in connection with this deposition?
23    A.   I also looked at one of the
24  memoranda that had been submitted.
25    Q.   Oh, that was publicly filed in

TSG Reporting - Worldwide    877-702-9580

---

Page 14

1           **Messineo - Highly Confidential**
2    this --
3        A.   Yes.
4        Q.   Okay.  Okay.  Do you know
5    Mr. Lewkow?
6        A.   Yes, I do.
7        Q.   Okay.  Who is he?
8        A.   He is a partner at Cleary Gottlieb
9    and he was the lead partner in the negotiation
10   of the acquisition of the Barclays agreement.
11       Q.   Okay.  Do you have any reason to
12   doubt Mr. Lewkow's honesty or integrity?
13       A.   No.
14       Q.   Okay.  Would you take a moment and
15   read paragraphs 18 to 20 of his declaration.
16           (Document review.)
17       A.   18 and 20, yes.
18       Q.   18 through 20.  Sorry.
19           (Document review.)
20       A.   Okay.
21       Q.   So those paragraphs recount
22   Mr. Lewkow's recollection of a conversation
23   that occurred in the hallway of Weil Gotshal on
24   either the late night of September 21st, 2008
25   or early morning of September 22nd, 2008;

TSG Reporting - Worldwide    877-702-9580

---

Page 15

1           **Messineo - Highly Confidential**
2    correct?
3        A.   That's what they describe.
4        Q.   Okay.  Do you recall participating
5    in a conversation in the hallway such as
6    described by Mr. Lewkow?
7        A.   I don't recollect this specific
8    conversation that he is describing.
9        Q.   Okay.  Do you have any reason to
10   believe that that conversation did not occur as
11   described by Mr. Lewkow?
12           MR. WOOD:  Objection to form.
13       A.   Well, I can only say that in
14   conversations that I had with people and in the
15   course of the drafting that I was involved
16   with, there was never any question raised to
17   this effect that if securities could not come
18   out of the custodial accounts, that they would
19   be made available otherwise by Lehman.
20       Q.   But do you have any reason to doubt
21   that Mr. Lewkow is telling the truth about his
22   version of that hallway conversation in his
23   declaration?
24           MR. WOOD:  Objection to the form.
25       A.   It's not something that I can

TSG Reporting - Worldwide    877-702-9580

---

Page 16

1           Messineo - Highly Confidential
2    correspond with.
3        Q.   So you have no personal knowledge of
4    it one way or the other?
5        A.   I did not have this conversation
6    with Mr. Lewkow.
7        Q.   Okay.  All right.  Let's look back
8    at your declaration, paragraph 8.
9           Paragraph 8:  "I understood the
10   phrase "or securities of substantially the same
11   nature and value" was included at the end of
12   the second sentence of paragraph 8 of the
13   Clarification Letter to take account of the
14   potential for there to be a change in the
15   specific securities held in the customer
16   reserve accounts between September 22nd and the
17   date when it became permissible to withdraw
18   securities from the customer reserve accounts."
19   Is that correct?
20       A.   Correct.
21       Q.   Okay.  Did you personally draft that
22   clause, "or securities of substantially the
23   same nature and value"?
24       A.   I can't recollect whether I
25   specifically drafted it.  It's possible that I

TSG Reporting - Worldwide    877-702-9580

---

Page 17

1           Messineo - Highly Confidential
2    did.
3        Q.   Okay.
4        A.   I think the clause was originally
5    somewhat different, but I just can't say for
6    sure whether I drafted it.  I might have.
7        Q.   Okay.  Did you get your
8    understanding of the meaning of that phrase as
9    set forth in paragraph 8 of your declaration
10   from any representative of Barclays?
11       A.   I can't recollect specific
12   conversation with specific persons, but my
13   understanding of that phrase grew out of my
14   participation in the discussions and in the
15   negotiations that were going on that night.
16       Q.   So you can't recall discussing this
17   with anybody from Barclays?
18       A.   I don't have specific recollection
19   of discussing this phrase.
20       Q.   Okay.  After you drafted the phrase
21   did you communicate your understanding of that
22   phrase to any representative of Barclays?
23       A.   I don't recollect a specific
24   conversation.
25       Q.   Do you recollect generally having

TSG Reporting - Worldwide    877-702-9580

Page 18

1    **Messineo - Highly Confidential**
2    had a conversation to that effect?
3        A.    I recollect generally this phrase
4    coming into the agreement and this being in the
5    context of the fact that there were securities
6    in this account and that the way the phrase --
7    the way the related phrase had been drafted is
8    it referred to the specific securities on that
9    date and so it was necessary to have this
10   phrase in order to properly present the thing.
11            THE COURT REPORTER:  I'm sorry?
12       A.    Properly present the matter.
13       Q.    Can you look at the Clarification
14   Letter, Exhibit 25, and show me where you are
15   referring to securities as of a specific date?
16       A.    Did you say it was paragraph 25?
17       Q.    Sorry, it's Deposition Exhibit 25.
18   It is paragraph 8, which is on page 4.
19       A.    Okay.  Yes, because it says
20   securities -- 769 million of securities is held
21   by or on behalf of LBI on the date hereof
22   pursuant to Rule 15c3-3.
23       Q.    Okay.  And was it your understanding
24   that there was only 769 million of securities
25   in that account?

TSG Reporting - Worldwide    877-702-9580

Page 19

1    **Messineo - Highly Confidential**
2        A.    That was the current amount or value
3    that we were told was in the account.
4        Q.    Who told you that?
5        A.    Again, I can't recollect who
6    specifically.  The information would have come
7    from someone at Lehman.
8        Q.    And it was your understanding that
9    that was the total amount of securities in the
10   account or the total amount that was in excess
11   in the account or that was believed to be in
12   excess in the account?
13            MR. WOOD:  Objection to form.
14       A.    I'm sorry, was in excess of what?
15       Q.    Let me back up.
16            What did you understand the 769
17   million to represent?
18       A.    To be securities, I believe mostly
19   government securities or primarily government
20   securities, that were held in this account, or
21   may have been more than one actual account, for
22   customer protection purposes.
23       Q.    Did you understand there to be an
24   excess in that account that could be
25   transferred?

TSG Reporting - Worldwide    877-702-9580

Page 20

1    **Messineo - Highly Confidential**
2        A.    I understood there to be cash as
3    well as securities in the account, and so the
4    total value of the account -- and, again, this
5    may have been more than one account.  The total
6    value of them I understood to be substantially
7    more than 769 million, but the portion of it
8    that was represented by securities I understood
9    to be 769 million, or at least that's what had
10   been reported by the Lazard people for purposes
11   of negotiation of this issue which had come up
12   that evening.
13       Q.    And you did not understand that to
14   only be 769 million in the excess as opposed to
15   the entirety of the account?
16       A.    No, I don't -- I'm not sure what you
17   mean, excess of what.
18       Q.    Excess of the amount required by SEC
19   Rule 15c3-3.
20       A.    Oh, oh, oh.  Okay.  I see what you
21   are saying.  I'm not sure that people knew at
22   this point how much in this account was what
23   was required to be in the account.  My
24   understanding is that this is something that
25   requires approval of the SEC and the

TSG Reporting - Worldwide    877-702-9580

Page 21

1    Messineo - Highly Confidential
2    calculations are fairly complicated and there
3    might be excess funds as of that date or there
4    might not be excess funds as of that date and
5    as of some future date it would be different
6    depending on what happened with customers and
7    customer positions, and so there might be funds
8    that were excess, but whether all or part of
9    these were excess on that day I don't know.
10       Q.    Okay.  Well, do you understand now,
11   though, what I am asking whether or not it was
12   believed that the 769 was in the excess or if
13   it was 769 in the entirety of the account?
14       A.    I believe the general understanding
15   is that this was the entire account, the cash
16   and the securities, and that some part of it
17   would ultimately turn out to be excess and might
18   ultimately turn out to be excess.
19       Q.    Okay.  All right.
20            Let's go back to -- we were talking
21   about paragraph 8 of your declaration and your
22   understanding of the meaning of the clause "or
23   securities of substantially the same nature and
24   value," and I believe you had testified that
25   you did not have a specific recollection of

TSG Reporting - Worldwide    877-702-9580

## Page 22

Messineo - Highly Confidential

1    communicating your understanding of that phrase
2    to any representative of Barclays; is that
3    correct?
4        A.    Correct.
5        Q.    And then I asked if you had any
6    general recollection and I do not believe your
7    answer was quite answering the question.
8            So I will ask you again, do you
9    recall generally meeting -- representing your
10   understanding of that phrase to anybody who was
11   a representative of Barclays?
12       MR. WOOD:  Objection to form.
13       MR. HINE:  Objection to form.
14       MR. POLKES:  You can answer.
15       A.    I don't recollect a specific
16   conversation regarding this phrase with anyone
17   at Barclays.
18       Q.    Okay.  Who is Harvey Miller?
19       A.    Harvey Miller is a senior partner
20   here.
21       Q.    Okay.  And did you communicate your
22   understanding of that phrase to Mr. Miller?
23       A.    At the time that this was written or
24   ever?

TSG Reporting - Worldwide    877-702-9580

## Page 23

Messineo - Highly Confidential

1        Q.    Well, prior to the closing of the
2    transaction.
3        A.    I don't know that I had a specific
4    conversation with Mr. Miller about this phrase.
5        Q.    To your knowledge, was a provision
6    regarding maturing securities required in any
7    way by a statute or regulation?
8        A.    Was a provision regarding maturing
9    securities required?
10       Q.    That's how I am characterizing what
11   you described the meaning of the phrase to be,
12   but was -- is there any statute or regulation
13   that requires provision to be made for maturing
14   securities such as in this situation?
15       A.    I don't know of a regulation that
16   requires a provision to be made.  My
17   understanding is that the securities in the
18   account would mature and would need to be
19   reinvested.
20       Q.    Okay.  Was there any list by CUSIP
21   or otherwise of the 769 million that were to be
22   transferred over to Barclays?
23       A.    There was not one that I was aware
24   existed at that time.

TSG Reporting - Worldwide    877-702-9580

## Page 24

Messineo - Highly Confidential

1        Q.    So do I understand your testimony to
2    believe that -- to be that you believed that
3    the provision was necessary because there may
4    have only been $769 million in securities in
5    that customer reserve account on the date of
6    the agreement?
7            MR. WOOD:  Objection to the form.
8        A.    I wouldn't say it that way.
9    There -- what was described was that Barclays
10   was to get 769 million of particular securities
11   that existed in particular accounts on a
12   particular day and then it went on, as it
13   needed to in order to make sense, to say that
14   it could get substantially the same securities
15   since those particular securities that were
16   there on that day may not be there on the day
17   when it talked about the account being
18   accessed, which is going to be at some time in
19   the future when regulatory conditions were
20   satisfied.
21       Q.    If there were more than 769 million
22   of securities in that account, would there have
23   been any particular 769 that had to be used to
24   pay this out in the absence of the provision

TSG Reporting - Worldwide    877-702-9580

## Page 25

Messineo - Highly Confidential

1    that you added?
2            MR. HINE:  Objection to form.
3        A.    I think the understanding was that
4    the 769 million was all the securities that
5    were in the account.
6        Q.    Okay.  So if that were not correct,
7    then it would not have been necessary to have
8    this phrase?
9            MR. WOOD:  Objection to form.
10       A.    No, it would still have been
11   necessary to have the phrase.
12       Q.    Okay.  That's what I am trying to
13   understand.
14           Why would it have been necessary to
15   have that phrase if Barclays was not being
16   given a claim to a particular 769 million, but
17   just 769 million in securities in that account
18   of which there may have been significantly more
19   than 769 million?
20       MR. HINE:  Object to form.
21       MR. WOOD:  Object to the form.
22       A.    I'm not quite sure I am capturing
23   the point that you are trying to make here.
24   There were particular securities in the

TSG Reporting - Worldwide    877-702-9580

Page 26

Messineo - Highly Confidential

1
2  account.  There were believed to be particular
3  securities in the account.  There wasn't a list
4  of them, but whatever they were they were, and
5  they were in the account -- they were believed
6  to be worth 769 million.  I guess if there was
7  a lot more, then they would only receive 769
8  million.
9      Q.    Right, well, that's my point.  If it
10 was not correct that there was only 769 million
11 in the account, if that was actually only in
12 excess but there was actually substantially
13 more in the account as a whole, would it have
14 been necessary to have this clause?
15         MR. HINE:  Objection to form.
16         MR. WOOD:  Objection to form.
17     A.    It would have still been necessary
18 to have the clause because the securities could
19 change.  Whether there were 769 or 770, the
20 securities could still have changed over the
21 time that was going to go by before it was
22 possible for them to be withdrawn.
23     Q.    Do you know if anybody from Lehman
24 discussed that interpretation of the clause
25 with anybody from Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 27

Messineo - Highly Confidential

1
2         MR. WOOD:  Objection to form.
3         MR. POLKES:  I'm sorry, what
4  interpretation?
5         MS. NEUHARDT:  Excuse me?
6         MR. POLKES:  What interpretation?
7         MS. NEUHARDT:  The interpretation
8  that is set forth in paragraph 8 of your
9  declaration.
10     A.    I do not know if anyone discussed
11 it.
12     Q.    I am going to hand you what has been
13 marked as Deposition Exhibit 1 in prior
14 depositions.  My first question will be do you
15 recognize this document?
16     A.    Yes.  This appears to be the Asset
17 Purchase Agreement.
18     Q.    Okay.  And did you participate in
19 the drafting or negotiation of this document?
20     A.    I did.
21     Q.    Okay.  If you could turn to page 6,
22 please, and look at the definition of purchased
23 assets.  I am not going to force you to read
24 all the subdivisions, but the intro to that
25 definition says:  "Purchased assets means all

TSG Reporting - Worldwide    877-702-9580

Page 28

Messineo - Highly Confidential

1
2  of the assets of seller and its subsidiaries
3  used in connection with the business (excluding
4  the excluded assets) including," and then it
5  lists out A through S of specified assets.  Is
6  that correct?
7      A.    That's correct.
8      Q.    Okay.  Did you understand the list
9  of A through S to be an exclusive list?
10     A.    No, I wouldn't say exclusive.
11 Primary, but not exclusive.
12     Q.    Okay.  And what did you, in general,
13 understand the meaning of the phrase "all of
14 the assets of seller and its subsidiaries used
15 in connection with the business" to mean?
16     A.    Well, there was -- what was being
17 sold was an operating business and it was being
18 done through the form of an asset transfer.
19     Q.    Okay.
20     A.    So basically it was the assets that
21 were used in the business other than things
22 that were being excluded.
23     Q.    Okay.  And if you look at page 2 at
24 the definition of business, it says:  "The
25 business means the U.S. and Canadian investment

TSG Reporting - Worldwide    877-702-9580

Page 29

Messineo - Highly Confidential

1
2  banking and capital markets businesses of
3  seller, including the fixed income and equities
4  cash trading, brokerage, dealing, trading and
5  advisory businesses, investment banking
6  operations and LBI's business as a futures
7  commission merchant."
8         In your role in negotiating and
9  drafting that -- this agreement, what was your
10 understanding of this definition to mean?
11        MR. HINE:  Objection to form.
12     A.    Again, without simply repeating the
13 words, the business as a whole was being sold.
14 Basically the capital markets and investment
15 banking business of Lehman as an operating unit
16 were being sold as a whole.
17     Q.    Okay.  Now, when -- now, the
18 Clarification Letter was drafted after this
19 document; correct?
20     A.    That's correct.
21     Q.    Okay.  When you were drafting the
22 Clarification Letter and based on your
23 understanding of the definitions of purchased
24 assets and business and the APA as a whole, did
25 you understand the securities to be contained

TSG Reporting - Worldwide    877-702-9580

Messineo - Highly Confidential

1
2  in LBI's customer reserve account to be part of
3  the assets primarily used in the business?
4        MR. WOOD: Objection to the form.
5        MR. POLKES: I'm sorry, if you could
6  just clarify whether you are asking him to
7  sort of give an opinion about that now or
8  if he had thought about it back when he was
9  drafting the Clarification Letter, I would
10 appreciate that.
11       MS. NEUHARDT: It's the time of the
12 Clarification Letter that matters, so...
13       MR. POLKES: Had you thought about
14 it then one way or the other?
15       A.  Well, at the time of the
16 Clarification Letter as opposed to the time of
17 the Asset Purchase Agreement are different
18 things. Yes, at the time of the Clarification
19 Letter, yes.
20       Q.  Okay. So you considered it at that
21 time to be part of the purchased assets, "at
22 that time" being the time of the Clarification
23 Letter?
24       A.  Well, the Clarification Letter, I
25 think, makes it clear that they are part of the

TSG Reporting - Worldwide      877-702-9580

Messineo - Highly Confidential

1
2  purchased assets.
3        Q.  Okay. And that's because it was --
4  they were part of the assets used in the
5  business that was being acquired by Barclays?
6        MR. HINE: Objection to form.
7        MR. KAY: Objection to form.
8        A.  Well, it's because it's specifically
9  referred to. I am not quite sure what you are
10 asking. We just read the -- we just looked at
11 the sentence that specifically says that those
12 assets come along.
13       Q.  I understand, but I am asking
14 whether or not you believed that regardless of
15 whether they was specified in the clarification
16 letter, they nonetheless were assets that were
17 used in the business?
18       A.  Oh, I don't think it would have been
19 clear one way or another without the
20 specification in the clarification letter how
21 you would have treated those assets.
22       Q.  So you don't -- you wouldn't have
23 had an opinion one way or the other whether
24 they would have been an asset under the Asset
25 Purchase Agreement that was being transferred?

TSG Reporting - Worldwide      877-702-9580

Messineo - Highly Confidential

1
2        A.  Oh --
3        MR. WOOD: Objection to the form.
4        A.  Opinion one way or another, I would
5  say probably the better reading of things
6  absent the Clarification Letter would be that
7  they would not have been included, because my
8  understanding is that they were basically cash
9  and government securities and those weren't
10 within the category of things that was intended
11 generally to transfer.
12       Q.  It's your understanding that an
13 account that was used particularly for the
14 business of maintaining a reserve for customers
15 would not have been used in the business, would
16 not have been an asset used in the business?
17       MR. HINE: Objection to form.
18       MR. WOOD: Objection to form.
19       A.  It's not a question being used in
20 the business or not being used in the business.
21 The question is was it intended to go as part
22 of what was being transferred or not, and in
23 general the terms of the agreement, as you
24 know, I think was understandable for this type
25 of situation, did not involve transfer of cash

TSG Reporting - Worldwide      877-702-9580

Messineo - Highly Confidential

1
2  or highly liquid securities. That was just --
3  the buyer would have to pay for something that
4  would just be round-tripped. It wouldn't make
5  any sense particularly. So those assets would
6  generally be excused even though they would
7  otherwise might be considered part of the
8  assets used in the business. Obviously there
9  is always some cash used in the conduct of any
10 business.
11       Q.  Okay. And is your view of that any
12 different today?
13       A.  No.
14       MS. NEUHARDT: If we can take a
15 short break, I am probably through, but I
16 just want to --
17       MR. POLKES: Okay. That's fine.
18       THE VIDEOGRAPHER: The time is 2:37.
19 We are going off the record.
20       (Recess was taken from 2:37 to
21 2:45.)
22       THE VIDEOGRAPHER: The time is 2:45.
23 We are back on the record.
24 BY MS. NEUHARDT:
25       Q.  Mr. Messineo, I just want to go back

TSG Reporting - Worldwide      877-702-9580

Page 34

1    **Messineo - Highly Confidential**
2    **to the last discussion we were having.**
3           **In the APA do I correctly understand**
4    **you to say that you believe the APA was**
5    **essentially ambiguous on whether or not the**
6    **customer reserve account would have been a**
7    **purchased asset?**
8           MR. WOOD:  Objection to the form.
9           A.    Yes, before the Clarification Letter
10   the APA, I think it was an issue that people
11   could have debated.
12          (Continued on next page to include
13   jurat.)
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 35

1    Messineo - Highly Confidential
2           **Q.    Okay.  And the Clarification Letter**
3    **then would have been resolving any ambiguity?**
4           A.    It did.
5           MS. NEUHARDT:  Okay.  I have no
6    further questions.
7           MR. WOOD:  I have nothing.
8           MR. HINE:  No questions.
9           MR. KAY:  No questions.
10          THE VIDEOGRAPHER:  The time is 2:46.
11   We are going off the record.
12          (Time noted:  2:46 p.m.)
13
14
15          ---------------------
16          ROBERT MESSINEO
17
18   Subscribed and sworn to before me
19   this       day of            2010.
20
21   --------------------------------------
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 36

1
2           C E R T I F I C A T E
3
4    STATE OF NEW YORK   )
5                       ) ss.:
6    COUNTY OF NASSAU    )
7
8           I, KRISTIN KOCH, a Notary Public
9    within and for the State of New York, do
10   hereby certify:
11          That ROBERT MESSINEO, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that such
14   deposition is a true record of the
15   testimony given by such witness.
16          I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of
20   this matter.
21          IN WITNESS WHEREOF, I have hereunto
22   set my hand this 1st day of April, 2010.
23          ------------------------
24          KRISTIN KOCH, RPR, RMR, CRR, CLR
25

TSG Reporting - Worldwide    877-702-9580

Page 37

1
2    -------------------I N D E X-----------------
3
4    WITNESS          EXAMINATION BY      PAGE
5    ROBERT MESSINEO   MS. NEUHARDT        7
6
7    ------------------EXHIBITS------------------
8    DEPOSITION              PAGE LINE
9
10   Exhibit 682
     Declaration of Robert L. Messineo.... 7  2
11   Exhibit 683
     Declaration of Victor I. Lewkow...... 13  11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 1

1          H. MILLER

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4   ----------------------x

5   In Re:

6                        Chapter 11

7   LEHMAN BROTHERS         Case No. 08-13555(JMP)

8   HOLDINGS, INC., et al.,    (Jointly Administered)

9

             Debtors.

10

    ----------------------x

11

12

13

14    VIDEOTAPED DEPOSITION OF HARVEY R. MILLER

15              New York, New York

16              January 7, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 26535

H. MILLER

1
2       THE VIDEOGRAPHER:  This is the start
3   of the tape labeled number 1 of the
4   videotaped deposition of Harvey R. Miller in
5   the matter of In re:  Lehman Brothers, Inc.
6   The date is January 7, 2010.  The time is
7   now 9:43 A.M.
8       Will the court reporter please swear
9   in the witness.
10              * * *
11  HARVEY R. MILLER, called as a
12      witness, having been duly sworn by a Notary
13      Public, was examined and testified as
14      follows:
15  EXAMINATION BY
16  MR. BOIES:
17  Q.   Good morning, Mr. Miller.
18  A.   Good morning, Mr. Boies.
19  Q.   I'd like to begin by taking you back
20  to September of 2008, and I'd like you to just
21  summarize briefly what was happening the week of
22  September 16 through September 22.  September 16
23  was a Tuesday.  September 22 was the following
24  Monday.
25  A.   Yes.  Starting with September 16,

H. MILLER

1
2   there had been negotiations all of the prior day
3   in connection with the Lehman bankruptcy case
4   which had been filed at about 2 A.M. on the
5   morning of the 15th, and starting on that
6   morning, there were meetings at the Lehman
7   headquarters on Seventh Avenue in connection
8   with a, I guess an offer or a consideration of
9   an offer by Barclays to purchase the North
10  American Capital Markets business of Lehman,
11  which started, my recollection is, probably
12  someplace around 7 A.M. in the morning.  And
13  those negotiations continued throughout that day
14  and through most of the night.
15      I think you have to, to put it in the
16  perspective, it was -- the filing of the Lehman
17  Chapter 11 petition was cataclasmic.  There
18  was -- there were hundreds of people milling
19  around in the Lehman headquarters as these
20  negotiations were going on, and at some point, I
21  can't tell you exactly, I don't recall, an
22  agreement in principle was reached, an Asset
23  Purchase Agreement was being drafted, and the
24  big issue was how could you consummate the sale.
25  From the standpoint of Barclays, time was of the

H. MILLER

1
2   essence.
3       The volatility in the marketplace, the
4   ramifications from the filing were already
5   beginning to set in, and the reaction to the
6   filing was fairly negative.  And the big issue
7   was, how could you do this when most of the
8   business was in Lehman Brothers, Inc., which was
9   a registered broker-dealer.
10      So the issue was how could we
11  structure a deal that would accommodate the
12  needs of Barclays as to speed to consummate the
13  transaction without a tremendous erosion in the
14  values of the assets that would be purchased.
15  And the -- the conundrum, if you want to call it
16  that, was that LBI, Lehman Brothers, Inc., as a
17  registered broker-dealer, was not qualified to
18  file a Chapter 11 petition.
19      Its alternatives were either a Chapter
20  7 liquidation proceeding under the Bankruptcy
21  Code or a SIPA proceeding under the Securities
22  Investor Protection Act, and since LBI had
23  customers, public customers, the likelihood,
24  almost mandatory, is it would have to be a SIPA
25  proceeding.  That's S-I-P-A.

H. MILLER

1
2       And we came up with a structure
3   whereby, if there was an agreement, there would
4   be a Sale Hearing in the Bankruptcy Court as
5   early as possible and we would try to convince
6   the Securities Investor Protection Corporation
7   to file a proceeding under the SIPA statute in
8   the morning or several hours before any hearing
9   on the sale.
10      A SIPA proceeding goes to the United
11  States District Court, and it normally will be
12  referred to a bankruptcy judge, and the concept
13  was that the -- we would ask the district court
14  judge to refer the SIPA proceeding to the same
15  bankruptcy judge who had the Lehman Chapter 11
16  case, and then, in connection with the Sale
17  Hearing, have a joint hearing both in the SIPA
18  proceeding and in the Chapter 11 case; and if
19  the judge approved the sale, there would be an
20  order entered in each proceeding.  And it was
21  necessary because, essentially, you were selling
22  the LBI business.
23      So we had to convince the Securities
24  Investor Protection Corporation that this was an
25  appropriate procedure to follow, that it would

Page 10

H. MILLER

1
2  be beneficial and protect the public customers
3  of LBI. We had to convince the Securities and
4  Exchange Commission that this was appropriate.
5          And those discussions took place.
6  They started on the 15th during I think the
7  afternoon. The S.E.C. had some people on-site
8  at Lehman. I can't remember his name, Mike
9  Macchiaroli, or something like that, who was
10 very negative that this could be done, and I
11 called Steve Harbeck, who was the -- who is the
12 president and CEO of Securities Investor
13 Protection Corporation, explained to him what we
14 contemplated doing. He thought it was a good
15 idea, and the suggestion was that SIPC,
16 that's -- SIPC, select the person who would be
17 the SIPC trustee informally so that he could
18 participate in the week's activities.
19         And I don't know whether it was within
20 an hour or so it was clear that it was going to
21 be James Giddens from Hughes Hubbard who had a
22 lot of experience in SIPA proceedings. So
23 that -- this is sort of a seamless timeframe.
24 Not many people got much sleep during -- the
25 15th sort of morphed into the 16th.

Page 11

H. MILLER

1
2          And there was a substantial discussion
3  about the timing and how fast could we get this
4  done, and I don't remember how it came out, but
5  Friday seemed to be a deadline, from Barclays'
6  standpoint. So what was happening -- you have
7  to remember there were multi-functional things
8  going on. My function was getting ready to go
9  to court. Other groups were negotiating the
10 provisions of the Asset Purchase Agreement, and
11 there were huge discussions going on.
12         And we had to arrange for a hearing in
13 the Bankruptcy Court to approve the sale
14 procedures, so we had to draft a motion to
15 approve the sale and to set the sale procedures
16 and the bidding procedures. And sometime during
17 the 16th, we contacted the Court about having a
18 hearing to approve the sale procedures and to
19 approve a debtor-in-possession financing.
20         At the time, it appeared that Lehman
21 would be totally illiquid. The only access to
22 funds was through LBI and the PDCF window at the
23 Fed, I think that's Primary Dealers Credit
24 Facility, which was a window that was set up by
25 the Fed sometime months before that to assist

Page 12

H. MILLER

1
2  the investment banking community, which Lehman
3  had never used before, and the Fed, the Federal
4  Reserve Bank of New York, had said the window
5  would be open for LBI for a period I think of
6  four days or five days provided the appropriate
7  collateral was given to the Federal Reserve
8  Bank.
9          So, to get financing for Lehman
10 Brothers Holdings, Inc., a negotiation went on
11 with Barclays to do a debtor-in-possession
12 financing under the Bankruptcy Code, and that
13 was being negotiated concurrently with
14 everything else in this very tumultuous
15 atmosphere.
16         And originally it was supposed to be a
17 $500 million DIP facility. It was ultimately
18 negotiated to be $450 million. $250 million was
19 going to be a term loan and 200 million was
20 going to be a revolving credit. And we needed
21 to get a hearing on that also.
22         And I don't recall, there may have
23 been a procedural hearing in the Bankruptcy
24 Court on Tuesday on some, some matter, but I
25 don't recall. What -- what was finalized was

Page 13

H. MILLER

1
2  that there would be a hearing in the court in
3  the Bankruptcy Court before Judge Peck, who was
4  the bankruptcy judge assigned to the case, on
5  Wednesday afternoon to consider the motion to
6  approve the sale procedures, the breakup fee and
7  all of the related matters to the sale, and also
8  to consider the approval of the DIP financing on
9  an interim basis.
10         And during most of Tuesday, I was
11 involved in that while other meetings were going
12 on to try and finalize the Asset Purchase
13 Agreement, and that morphed into Wednesday. And
14 this was a -- I think I described it at some
15 point in time as a very fluid situation. Things
16 continued to change.
17         The market reaction, as I said before,
18 was terrible and Wednesday was even worse.
19 Wednesday was, I think, a traumatic day for the
20 market. Commercial paper market seized up.
21 Values were being diminished. The word around
22 was that there were massive fails in the
23 brokerage community. It was a very tumultuous
24 time.
25         We finally finalized the papers for

Page 14

H. MILLER

1
2 the court.  I think the hearing was supposed to
3 be around 2 or 3 o'clock in the afternoon, and a
4 Creditor Committee was appointed on Tuesday, the
5 16th.  The U.S. Trustee had accelerated all of
6 the processes for the appointment of a Committee
7 because of the urgency of the situation, and the
8 Committee in the morning of Wednesday, the 17th,
9 hired Milbank Tweed as its counsel.
10        And I first learned that on the way
11 down to the courthouse when I received a phone
12 call from a partner at Milbank, Luc Despins.  I
13 think I'm pronouncing his name correctly, who
14 said -- who informed me that Milbank had been
15 engaged and Milbank hadn't had a real
16 opportunity to review everything and was
17 considering asking for an adjournment of the
18 hearing.
19        I told Luc that that was virtually
20 impossible, that time was working against us, if
21 we were going to preserve any value, we had to
22 go forward, and that the hearing insofar as the
23 sale was concerned was essentially a procedural
24 hearing and that there wasn't any substantive
25 relief being requested.

Page 15

H. MILLER

1
2        And I was about five minutes from the
3 courthouse when I received the call, and I said
4 if you want to, I'll meet you in the courthouse
5 and we can discuss it.  And while I was on that
6 mission, other people were still back at 745
7 Seventh Avenue working on a transaction.
8        You want me to continue?
9    Q.   Yes.
10    A.   We got to the courthouse.  I'm trying
11 to remember who was with me.  I actually don't
12 recall who was with me anymore.  In any event, I
13 met Luc, and he said -- he asked if it was all
14 right if we had a chambers conference to discuss
15 the possibility of an adjournment, and I said I
16 had no objection to that, but I would oppose any
17 adjournment and had a very short discussion with
18 him about how urgent the situation is in terms
19 of potential erosion in the value of the assets.
20        Judge Peck agreed to see us not in
21 chambers.  There is a conference room adjacent
22 to the courtroom, and he came in and basically
23 said that he did not want to have any chambers
24 conferences in this case, it was such an
25 important case that he wanted everything on the

Page 16

H. MILLER

1
2 record, and that if the Committee wanted to
3 request an adjournment, it should do it on the
4 record.
5        But he understood the gravity of the
6 situation and he understood the -- that time was
7 of the essence, and as I recall, he said to Luc,
8 "I want you to consider those issues as to how
9 critical this case is."
10        And then we went into the courtroom
11 and I explained to the Court what was being
12 done.  I can't recall how long the hearing went
13 on.  It went on for a long period of time.
14        There were -- notwithstanding it was
15 only the third day, the courtroom was packed.  I
16 think even there was an overflow into another
17 courtroom, and lawyers being lawyers, everybody
18 had to say something.  So it went on for hours.
19 And there were a substantial number of
20 objections.
21        Basically, Judge Peck came down and
22 said that he agreed it was essentially a
23 procedural matter that was before the Court,
24 there wasn't any real substantive relief as to
25 the sale, I'm talking about, and he -- he

Page 17

H. MILLER

1
2 thought we were entitled to a hearing on Friday
3 to consider approval of the sale.
4        And he noted -- I think he noted on
5 the record, I haven't gone back to look at it --
6 that the Creditors Committee was essentially
7 silent at that point.  It did not support and it
8 did not object.  He then someplace during that
9 four or five hours, we had the hearing on the
10 debtor-in-possession financing, which he
11 approved, and my recollection is Lehman drew
12 down immediately $200 million.
13        And he set a hearing for Friday
14 afternoon to approve the sale transaction, it
15 was either -- I think it was probably for 2
16 o'clock in the afternoon on Friday, and he said
17 that he would allow objections orally and in
18 writing and right up to the time of the
19 commencement of the hearing.
20        And the way it actually worked out,
21 objections continued all during the hearing
22 coming in.  So that ended it was -- I think it
23 was about 8, 8 P.M., sometime in the evening,
24 and we returned to 745 Seventh Avenue, reported
25 we had told the Court at that time that it was a

Page 18

H. MILLER

1
2  very fluid transaction; the values -- I think I
3  used the word "values" -- were changing all the
4  time because of the market.  I knew that we were
5  having -- not we, Lehman was having substantial
6  problems with the Chicago Mercantile Exchange.
7  People were closing out Lehman positions.  It
8  was a very volatile period, as I said before,
9  tumultuous.  So we knew we had the hearing set
10 for Friday afternoon and we started preparing
11 for the hearing.
12      Lehman had engaged Lazard as a
13 financial advisor in connection with the
14 transaction, and we basically had Thursday and a
15 bit of Friday morning to respond to objections
16 and to prepare for the hearing.  And as I said
17 before, this was a multi-functional operation.
18 There were lots of things going on.  There were
19 sort of, if you were up on, I forget, the 31st
20 or 32nd floor at 745, there were hundreds of
21 people, mostly attorneys and financial advisors,
22 roaming around.  At one point I said, "Is there
23 any security up here?"  I think The Wall Street
24 Journal might have been on the floor.  It was a
25 very tumultuous period.

Page 19

H. MILLER

1
2      So Thursday was preparing for the
3  hearing, from my perspective; that's what I was
4  doing.  Mr. Bart McDade was going to be our
5  primary witness.  Things were so hectic over at
6  745 that I either brought or I asked Mr. McDade
7  to come here so we could go over the preparation
8  for the hearing.  And he did, and we spent most
9  of Thursday afternoon into the evening with -- I
10 did, with Mr. McDade and with Barry Ridings, who
11 was the officer from Lazard whose testimony was
12 going to be proffered.
13      And that continued through the evening
14 into the late night into the morning.  Things
15 were, unfortunately, in terms of the
16 marketplace, deteriorating.  There was a lot of
17 issues coming up about the transaction in terms
18 of the value -- I wasn't directly involved in
19 that -- about Lehman's marks, the mark to
20 markets were too aggressive, but I wasn't
21 directly involved in that.
22      We were not ready at 2 o'clock, so we
23 had asked the court to put the hearing off one
24 hour to 3 P.M.  And we went down to court.
25 Again, it was an extremely crowded courtroom,

Page 20

H. MILLER

1
2  with overflows.  There was a Clarification
3  Letter which was being worked on, and we were
4  hoping that the Clarification Letter would get
5  to the courthouse sometime at the beginning of
6  the commencement of the hearing or during the
7  hearing.
8      So my partner Lori Fife was at 745
9  Seventh Avenue.  She was involved in those
10 discussions, and she got down to the courthouse
11 probably around 3, a little bit after 3.  The
12 Clarification Letter was not completed, and what
13 we proposed was that we would orally present to
14 the assemblage the essence of the Clarification
15 Letter.  And Judge Peck agreed, and he went into
16 his chambers and Ms. Fife spoke to the
17 assemblage in the courtroom and described what I
18 believe were the essentials of the Clarification
19 Letter.  And that went on, I don't know, half
20 hour, 35 minutes, 40 minutes.  And my best
21 recollection is the hearing must have started
22 around 4 P.M., and it went from 4 P.M. to about
23 12:01 A.M. on the 20th.
24      I guess that Judge Peck announced his
25 decision just about midnight, and somehow the

Page 21

H. MILLER

1
2  order of approval got dated September 19th,
3  although I always thought it was two or three
4  minutes after midnight.  He heard all the
5  objections.  Mr. McDade testified.  There were
6  proffers of the direct testimony of Mr. McDade
7  and Mr. Ridings and both of them were subjected
8  to cross-examination.
9      And Judge Peck orally delivered his
10 opinion and approved the sale, and basically he
11 said words to the effect that he did not see any
12 other alternative, this was a way of preserving
13 10,000 jobs, approximately 10,000 jobs, and to
14 realize a value that otherwise would
15 substantially erode.
16      So the closing, once the sale -- I
17 don't think the order was entered till about --
18 well, let me go back.  After he issued his
19 order, he got up, he got off the bench, as I
20 recall, and for the first time in my history as
21 a practicing lawyer, I never saw this happen
22 before, the entire audience in the courtroom got
23 up and started applauding.
24      And as I remember, he sort of blushed,
25 but in any event, he said that if we wanted to,

Page 22

H. MILLER

1
2  he would stay around for an hour or two and
3  enter the order because there were modifications
4  being made to the order and to accommodate
5  objections that had been made.  And that took
6  about an hour, an hour and a half.  So,
7  actually, the order wasn't finalized and
8  submitted to chambers until around 1:30 A.M. or
9  something like that.
10       And the arrangements were made to
11 start the closing the following morning --
12 not the following, that morning.  I don't know
13 what time it started in the morning.  It
14 probably started around 9 A.M. is my guess.  I
15 wasn't here Saturday morning or until late in
16 the afternoon.
17       And the hearing was going on.  Some of
18 it I think was in this room.  This entire floor
19 was devoted to the Lehman closing, and that
20 closing went from starting whatever time they
21 started on Saturday.  I have learned in 50 years
22 of practice if you give time to lawyers, they
23 will fill the time, and basically it was to
24 close and consummate before the opening of the
25 market Monday morning.

Page 23

H. MILLER

1
2       And the process was very difficult.
3  There were many people here from Lehman and from
4  Barclays and I think DTCC was represented.  We
5  invited the representatives of the Creditors
6  Committee to be at the closing and to
7  participate fully in the closing, and Luc was
8  here and I think other people from Milbank
9  Tweed.
10       The Committee had hired FTI as a
11 financial advisor and Houlihan Lokey as
12 financial advisors, and their representatives
13 were here throughout the weekend.
14       The closing got -- transaction got
15 very difficult on Sunday because of a dispute
16 between Barclays and JPMorgan in connection with
17 the clearing account and transactions between
18 Barclays and JPM, and as a consequence of that,
19 the Federal Reserve Bank got involved, I think
20 the S.E.C. was involved, and I think it had to
21 do with $7 billion, something equal to $7
22 billion.
23       And finally, I think with the help of
24 the Federal Reserve, a delegation from Chase --
25 or, from JPM came to the closing.  My

Page 24

H. MILLER

1
2  recollection is it was Steve Cutler, who was
3  general counsel of JPM, a group from the
4  whatever division handled the clearing account,
5  the tri-party loan transactions, Hal Novikoff
6  from Wachtell Lipton.  He wasn't here, he was on
7  the phone.  Heidi Miller, who I think was the
8  CFO or a very senior officer at JPM was on the
9  phone, and there were people from the Fed.
10       There were a lot of people from
11 Washington that were on the phone.  And there
12 was an open conference line, I can't remember,
13 it may have been in this room and it may have
14 been down the hall, to find out what the issue
15 was, what was going to hold up this transaction.
16       It had actually been surfaced either
17 Friday or Wednesday, and during the court
18 hearing when the attorney for JPM said there
19 were outstanding issues with Barclays that
20 hadn't been resolved and would have to be
21 resolved if JPM was going to open up on Monday,
22 the 22nd, for clearing accounts and transfers.
23       So we all congregated in this room
24 with 18 people, I think there were 18 people on
25 the conference line, to try and find out what

Page 25

H. MILLER

1
2  the issue was, and there was a dialogue between
3  Mr. Cutler and I think it was Ricci, Rich Ricci
4  from Barclays, who was on the phone, about what
5  the nature of the dispute was or who was -- who
6  failed to call each other.
7       It went on for a little bit, and
8  finally, my recollection is Steve Cutler said,
9  "We're not going to make any progress the way
10 we're going," and his recommendation was that
11 Barclays and JPM should retire to another
12 conference room and caucus among themselves and
13 see if they could resolve their differences.
14       And they left and they were gone for
15 quite a long period of time.  I can't remember
16 what time they came back, it was late in the
17 evening, and meanwhile, the other mechanics of
18 the closing were going forward.  There was a
19 room set up where people had huge piles of
20 papers going over securities about the marks.
21       My recollection was that Barclays was
22 of the opinion that the marks were too
23 aggressive, and there was a team of Lehman
24 people and a team of Barclays people going
25 through the securities I think

H. MILLER

1
2  CUSIP-number-by-CUSIP-number, which was a huge
3  task.
4        Whenever it was that Steve Cutler and
5  Barclays came back and they announced that they
6  had reached an accommodation, and as I recall,
7  it was that Barclays was -- I'm sorry, JPM was
8  going to release certain securities to Barclays
9  which had a value of $7 billion, and that was a
10 big stumbling block.
11       I remember the person who was from the
12 Fed who had been on his phone for, I don't know
13 how many hours this was, said something to the
14 effect, "Now I can go home."  And we thought
15 everything was going well at that point, and
16 people proceeded all night working on finalizing
17 the sale, the closing.
18       And there were people sleeping all the
19 over the place here on the floor, and I think it
20 must have been around 5 or 6 A.M. when Archie
21 Cox, who was I guess the senior officer of
22 Barclays, who had been here the whole weekend,
23 came into one of the conference rooms and said
24 there's no deal, and I think that shocked
25 everybody.

H. MILLER

1
2        And when he was pressed why, he said
3  because -- and he had a piece of paper in his
4  hand -- the securities that JPM was going to
5  release to Barclays in his view were simply not
6  worth $7 billion.  And he particularly alluded
7  to one security called the Racers, R-A-C-E-R-S,
8  which had an attributed value of $5 billion,
9  which he said wasn't worth anything close to $5
10 billion.
11       And Steve Cutler was -- I don't know
12 whether he had left and come back, but he was
13 here, and there was some dialogue.  It went on
14 for relatively short period of time, and Steve
15 Cutler said, "Okay, let's stop.  We're not
16 making any progress.  I'll tell you what we'll
17 do.  Barclays" -- I mean, "JPM will keep the
18 securities and give Barclays $7 billion in
19 cash."  And that was like the last major hurdle.
20       The last remaining thing from my
21 perspective was that Barclays did not want to
22 formally close until they got official
23 notification from the title company that the
24 deed to 745 Seventh Avenue had been filed in the
25 appropriate recording office, so we were all

H. MILLER

1
2  waiting in the conference room for a phone call
3  from the title company.
4        And that came in I think just before
5  the market opened.  And that was the closing.
6  And then people collapsed and the clean-up crews
7  started coming in to clean up because there was
8  another transaction starting right then to sell
9  the Neuberger Berman assets.
10       And I went home and went to sleep.
11  Q.   Thank you.  At the time that the
12 Clarification Letter was finally completed --
13 and let me ask, when was that time?
14  A.   Over the weekend.
15  Q.   Over the weekend.
16  A.   I can't say precisely.  There was a
17 Clarification Letter that was -- I wouldn't say
18 completed -- drafted that actually got to the
19 courthouse, but my partner Tom Roberts reviewed
20 it and said that it wasn't correct.  So it was
21 over the weekend.  It was -- it was signed on
22 the 22nd, I think.
23  Q.   The Clarification Letter, when you say
24 it was gotten to the courthouse, you mean gotten
25 to the courthouse on Friday during that hearing,

H. MILLER

1
2  during that long hearing?
3  A.   I think a box came down late in the
4  hearing.
5  Q.   Who got copies of the Clarification
6  Letter that weekend?
7  A.   I believe, and I don't have personal
8  knowledge of it, everybody who was at the
9  closing.
10  Q.   And that included members of the
11 Creditors Committee and their representatives?
12  A.   They -- the members -- well, the
13 representatives of the Creditors Committee, let
14 me put it that way.  I don't remember if there
15 was an actual member here.  Were here throughout
16 the closing till about, I may be off by an hour
17 or so, until about 4, 3 to -- someplace between
18 3 A.M. and 5 A.M.
19       Houlihan Lokey, and I believe it was
20 Sol Burian and Mike Fazio and FTI -- his first
21 name is Michael -- were all here, and at some
22 point between 3 and 5 A.M., they basically said
23 that they were leaving and said, "Everything's
24 fine, and going forward, if it's okay with you,
25 it's okay with us."

H. MILLER

1
2      It was right after a somewhat heated
3  discussion about the 15c3-3 account which took
4  place in the hallway down the -- down, halfway
5  down the floor here.
6      Q.    And what was that discussion?
7      A.    Barclays took the position that the
8  15c3-3 account, which is a collateral account
9  for the benefit of customers that is subject to
10  oversight or supervision by the S.E.C., goes
11  with the customer accounts; that if you're
12  buying all the customer accounts, you get the
13  15c3 account.
14      Our position was that wasn't
15  necessarily true, that wasn't the custom in the
16  industry, and it wasn't entitled to 15c3
17  account, which was collateral for customers and
18  couldn't be moved anyway without S.E.C.
19  approval.
20      And there was a discussion about that.
21  I think Michael Klein, who was advising
22  Barclays, got into that discussion.  We were
23  standing out by the reception down the hallway,
24  and Sol Burian, Mike Fazio and I think Michael
25  from FTI was also there, in which we were

H. MILLER

1
2  arguing over this.  And this was, you know, this
3  was pretty close to closing time.
4      Q.    On what day?
5      A.    This was the morning of the 2 --
6  Monday morning.
7      Q.    This is -- this is Sunday night/Monday
8  morning, after midnight?
9      A.    Oh, this was I'm saying 3, 4 A.M.
10  Monday morning.  I think at that point in time
11  almost everything else had been cleared up and
12  the resolution was -- like all major closings,
13  you have some adjustments -- there was a letter
14  which had been obtained or approved by the
15  S.E.C. in connection with what was thought to be
16  another transaction before the September 12th to
17  release the 15c3-3 account.  And I think it was
18  in connection with possibly a sale of all of
19  Lehman without any bankruptcy or anything, and
20  in that letter a list of what was in the
21  account.  And in the account was cash, PAIB
22  securities, which I can't -- at the time I knew
23  what the acronym meant, but I don't know what it
24  means now, of some 400 million, odd million
25  dollars, PAIB securities and other securities.

H. MILLER

1
2      And the agreement was that, okay, we
3  will resolve this issue by Lehman -- I'm using
4  "Lehman" broadly -- would retain the cash and
5  the PAIB securities, which was about a billion,
6  a billion-four or something like that, and the
7  other securities would go to Barclays, I think
8  it was 700 odd million dollars, but all subject
9  to S.E.C. approval and that the S.E.C. may
10  never -- well, I shouldn't say that.  It was
11  collateral to satisfy customers, and you could
12  not get your hands, so to speak, on those assets
13  without the S.E.C. approval.
14      So there was a question as to if and
15  when that would ever be released, and it
16  certainly would be something that the LBI
17  trustee would have a major interest in.
18      Q.    And was the agreement with respect to
19  the 153c-3 (sic) issue incorporated into the
20  final Clarification Letter?
21      A.    As I understand, it was.
22      Q.    And that final Clarification Letter
23  was not kept secret; it was made available to
24  everybody who was at the closing, correct?
25      A.    That's my understanding.

H. MILLER

1
2      Q.    And was there any discussion as to
3  whether or not it was necessary or desirable to
4  go back to court to have the Court approve the
5  Clarification Letter after it had been
6  finalized?
7      A.    No, there wasn't.
8      Q.    The -- was there any -- was there any
9  discussion Sunday afternoon or evening about the
10  possibility of going back to the court for any
11  further approval?
12      A.    Neither on Sunday or Monday was there
13  any discussion.  The transaction that was being
14  pursued was the transaction that we believe we
15  presented to the Court.
16      Q.    So that the transaction that was
17  reflected in the final written Clarification
18  Letter was, in your view, the transaction that
19  you had already received approval from the Court
20  to proceed with?
21      A.    That's correct, with the -- let me
22  just say that, insofar as any of the figures
23  were concerned, we -- all those figures were
24  supplied by Lehman.
25      Q.    And by "figures," you're referring to

Page 34

H. MILLER

1
2  what?
3       A.   References to the value of the assets,
4  the assumption of liabilities, all the
5  liabilities.
6       Q.   Did you have an understanding one way
7  or the other as to whether there were any
8  reliable estimates of the actual value of the
9  assets or liabilities that were involved here?
10      A.   I don't quite know what you mean by
11 "reliable." As I said, the -- it was fluid.
12 The markets were in terrible shape. There was a
13 persistent theme that -- and this was a theme
14 that predated this transaction -- that Lehman
15 was always aggressive on its marks.
16      So, from my perspective, and I think
17 my team's perspective, Lehman and Barclays were
18 trying to work that out in this room that had
19 this huge computer printouts and stuff that went
20 on for hours and hours and hours.
21      Q.   Were you, and by "you" I mean Weil
22 Gotshal, not you necessarily you personally, but
23 were you, in the context of Weil Gotshal, aware
24 that both Barclays and Lehman had a variety of
25 estimates of values of these assets?

Page 35

H. MILLER

1
2       A.   Yes.
3       Q.   And that those estimates varied
4  widely?
5       A.   "Widely" is a relative term, but I
6  mean, we -- I think we started Monday or Tuesday
7  with estimates of potentially 70 odd billion
8  dollars in assets and $64 billion in
9  liabilities. By Wednesday evening, or sometime
10 around that time, it had gone down to 45 billion
11 in assets, and I don't remember the figure on
12 the liabilities, but 42, 43, something like
13 that.
14      Q.   In terms of the assets.
15      Now, when you refer to the assets,
16 what assets are you referring to there?
17      A.   I can't -- I really can't itemize
18 them, but those were the figures that I heard.
19      Q.   Were you aware of assets that were
20 referred to as the repo assets?
21      A.   There were the outstanding -- there
22 was an outstanding repo with the Fed.
23      Q.   And that outstanding repo with the
24 Fed, there were certain assets that were the
25 collateral for the loan from the Fed, correct?

Page 36

H. MILLER

1
2       A.   Well, as I said, when we had the
3  meeting with the Federal Reserve Bank on Sunday,
4  the 14th, in the course of those discussions,
5  when the Fed and the S.E.C. and the Treasury
6  Department insisted -- maybe "insisted" is too
7  strong a word -- that Lehman file a bankruptcy
8  petition and the discussions about the effect
9  that it would have on customers of LBI, which
10 had the biggest presence, the Fed said that they
11 would keep the PDCF window open for four days,
12 about four or five days, provided that LBI
13 complied with the collateral requirements.
14      So there wasn't one repo; there was a
15 repo on Monday and I guess there was a repo on
16 Tuesday. It was like an overnight loan. And I
17 can't recall the figure on Monday, but it was
18 maybe close to $90 billion.
19      Q.   And that Monday, which Monday is that?
20      A.   That's the 15th.
21      Q.   That's the 15th.
22      By the end of that week, there was
23 still a repo outstanding with the Fed, correct?
24      A.   There was a repo outstanding, but the
25 character of it had changed in terms of who was

Page 37

H. MILLER

1
2  the lender, let me call it. I think starting on
3  Tuesday there was pressure on Barclays to step
4  into the process. If I recall correctly, I
5  think Barclays made a first loan on Tuesday, may
6  have been around $7 billion, then there was a
7  $15.8 billion loan, and then the Fed I think put
8  a lot of pressure on Barclays to take over the
9  Fed's position. And that repo, I think it was
10 45 billion.
11      Q.   And Barclays did take over the Fed's
12 position?
13      A.   My -- my understanding was Barclays
14 stepped into the shoes of the Fed.
15      Q.   And at that point there were certain
16 assets, and you said about $45 billion, that
17 were collateral that was backing up that loan
18 that had first been made by the Fed and then --
19      A.   Should have been more than 45 billion.
20 Generally, you need an excess, some
21 loan-to-value kind of a concept. My own
22 impression is the Fed was getting very nervous
23 about the deterioration in the value of the
24 collateral and certainly did not want to end up
25 as an undersecured creditor.

Page 38

H. MILLER

1
2    Q.   Let me see if I understand what you're
3    saying.  The Fed had a repo and had collateral
4    for the loan that started out in excess of value
5    of the loan, correct?
6    A.   That's correct.
7    Q.   But what the Fed was concerned about
8    was because of the deterioration of the value of
9    the assets, the actual value might turn out to
10   be less than the value of the loan and they
11   might be undersecured?
12       MR. MAGUIRE:  Objection to form.
13       MR. GAFFEY:  Join the objection.
14   Q.   Is that correct?
15   A.   That's my construction of what was
16   happening.  I don't have any personal knowledge
17   of anybody at the Fed saying that, but looking
18   at the marketplace and looking at what was
19   happening to the value of securities during that
20   market, and having been told -- may have been
21   hearsay -- that the Fed was pressuring Barclays
22   to take over that position, I would assume that
23   the value of the excess collateral, if you want
24   to call it that, or that the collateral package
25   was eroding, and since Barclays was going to

Page 39

H. MILLER

1
2    acquire the business of LBI, I imagine, okay,
3    that the Fed was saying to Barclays, "Step up to
4    the plate.  Put your money where your mouth is."
5    Q.   Uh-huh.  And in the sale transaction
6    was it clear that Barclays was, among other
7    things, going to get the entire repo collateral,
8    whatever that was worth?
9    A.   I don't know what you mean by "clear."
10   Barclays assumed the position of the lender.  It
11   had certain rights as the lender.  If the --
12   let's say -- let me hypothesize that if the LBI
13   failed to pay, Barclays would have had remedial
14   rights to that collateral.
15   Q.   This was at what point in time?
16   A.   Whenever there was a failure to pay.
17   Q.   As of the closing --
18   A.   Yeah.
19   Q.   -- Barclays had actually purchased
20   those assets, correct?
21   A.   As I understand it, what happened was,
22   as between the Lehman reps and Barclays, the
23   process was basically to terminate the repo, and
24   Barclays -- and the collateral would be part of
25   the assets that were acquired.  Essentially,

Page 40

H. MILLER

1
2    this was being -- I mean, this was the purchase
3    of really the LBI business.
4    Q.   You said a number of times this was
5    the purchase of the LBI business.  Why was it
6    the purchase of the business as opposed to a
7    balance sheet transaction?
8    A.   Well, we never had a, what I would
9    call an accurate balance sheet, and it was never
10   a balance sheet transaction from my perspective.
11   It was always in the -- it was always
12   characterized as the purchase of the North
13   American business, which was basically the LBI
14   business, and the 10,000 employees, I think the
15   estimate was 10 to 12,000 employees who were
16   involved in the transaction, which Barclays
17   wanted, were all LBI -- basically all LBI
18   employees.
19   Q.   In the transaction that was closed,
20   there was an identification of certain purchased
21   assets, correct?
22   A.   Yes.
23   Q.   And a part of those purchased assets
24   were what had been the repo collateral before
25   the repo was terminated, correct?

Page 41

H. MILLER

1
2    A.   I can't recall if there was a specific
3    description of that.  The concept was the
4    securities at LBI would be going over to
5    Barclays.
6    Q.   Whatever those securities were?
7    A.   Yes.
8    Q.   Now, in addition to those securities,
9    there were certain assets, sometimes referred to
10   as additional assets, correct?
11   A.   Some characterization of that type.
12   Q.   And those assets included, I think you
13   already identified, the 153c-3 (sic)?
14   A.   15c3-3, yes.
15   Q.   Those assets.  And there were
16   additional assets, correct?
17   A.   Well, there was the real estate.
18   Q.   There was the real estate.
19   A.   Which was 745 Seventh Avenue and
20   two -- two properties in New Jersey, I think
21   they were.
22   Q.   Uh-huh.
23   A.   Data centers.
24   Q.   And were there additional assets?
25   A.   I can't specify.  They were sort of

H. MILLER

2 grouped by characterizations, like the Fixed
3 Income Group and PIM and things like that.
4    Q.   Do you recall a Schedule B to the
5 transaction?
6    A.   Yes.  Schedule B I think was supposed
7 to be the schedule of securities.
8    Q.   And who prepared that Schedule B?
9    A.   I don't have personal knowledge of
10 that.  I think it was prepared by Lehman, and
11 that was reviewed by Barclays.
12    Q.   Let me show you an exhibit that I hope
13 has been premarked.
14       MR. HUME:  It's been premarked.
15       (Exhibit 508, a document bearing Bates
16 Nos. WGM-LEHMAN-E 00015980 through 82 with
17 attachment, marked for identification, as of
18 this date.)
19    Q.   It's been premarked as Exhibit 508,
20 and while copies are being given out -- while
21 copies of that are being given out, are you --
22 do you know about what are referred to as
23 clearance box assets?
24    A.   I've heard the term.  I know there was
25 a lot of discussion about clearance box assets

H. MILLER

2 which involved DTCC, who was also here, and
3 there was a point in the closing when there was
4 an issue of the values had eroded to such a
5 point that Lehman was talking about the need to
6 find additional assets.
7    Q.   And those were additional assets that
8 would be transferred to Barclays, correct?
9    A.   Correct.
10    Q.   And was one category of those
11 additional assets the so-called clearance box
12 assets?
13    A.   I can't specifically say that, but I
14 would -- my impression is yes.
15    Q.   Let me ask you to look at Exhibit 508,
16 and this is materials that were sent to Lori
17 Fife.  Do you see that at the top?
18    A.   On which page?
19    Q.   The very top of the page.
20    A.   Oh, yes, from Rod Miller to Lori Fife,
21 yes.
22    Q.   And there's a discussion here of the
23 clearance box assets and the Schedule B,
24 correct?
25    A.   It looks that way, yes.

H. MILLER

2    Q.   And do you have any reason to doubt
3 the accuracy of what is set forth here?
4       MR. GAFFEY:  Object to the form.
5    A.   What specifically are you referring
6 to, Mr. Boies?
7    Q.   In terms of what the market value is
8 of the clearance box assets that are referred
9 to.
10    A.   I would have no basis to dispute that.
11 As I said before, all of the figures came from
12 Lehman.
13    Q.   And the -- and the figures that came
14 from Lehman included the valuation of the
15 clearance box assets; is that correct?
16    A.   As Lehman marked it, I assume.
17    Q.   And did Weil Gotshal make any effort,
18 not necessarily you personally, but did Weil
19 Gotshal make any effort to review the accuracy
20 or procedures by which those marks were arrived
21 at?
22    A.   I don't have any personal knowledge,
23 as you pointed out.  I don't believe that we
24 undertook that at all.
25    Q.   Now, there was Lazard who had been

H. MILLER

2 hired --
3    A.   Yes.
4    Q.   -- as an investment banker; is that
5 correct?
6    A.   That's correct.
7    Q.   And who did Lazard represent?
8    A.   Lazard was engaged by Lehman Brothers,
9 Inc. pursuant to a court order.
10    Q.   And do you know if Lazard reviewed the
11 accuracy of the marks that were made or how that
12 was -- how those marks were determined?
13    A.   No, I don't know.
14    Q.   Did you ever -- did you or anyone at
15 Weil Gotshal, since you're a 30(b)(6) witness to
16    A.   Yes.
17    Q.   -- ever have any discussions with
18 Lehman about the marks?
19    A.   With Lehman or with Lazard?
20    Q.   With Lazard.  I'm sorry.
21    A.   I'm not sure.  I don't -- I don't
22 believe so.
23    Q.   Now, you were aware that some of the
24 people at Lehman who were working on these marks
25 were people that would ultimately end up at

Page 46

H. MILLER

2  Barclays since Barclays was buying the business,
3  correct?
4      A.   Correct.
5      Q.   So they had at least a potential
6  conflict of interest since they were both doing
7  marks and they were going to end up at the
8  buyer, correct?
9      A.   You could say that, but I'm not sure,
10  I don't know -- well, certainly Mr. McDade was
11  here most of the time, and Mr. McDade had taken
12  the position that he would not agree to being
13  employed by Barclays.  In fact, he said to me he
14  was here to -- he was going to be the
15  independent officer in connection with this
16  transaction and would not even consider any
17  discussions about employment by Barclays.
18          I don't remember whether Alex Kirk,
19  who was involved in some of this, actually was
20  employed by Barclays at any point in time, but
21  there was that issue, yes.
22      Q.   Did you believe that the information
23  that you were getting from Barclays was
24  information that you could rely on in making
25  representations to the Court?

Page 47

H. MILLER

2      A.   Barclays or from Lehman?
3      Q.   I'm sorry.
4      A.   Okay.
5      Q.   Did you believe that the information
6  that you were receiving from Lehman was
7  information that you could rely on in making
8  your representations to the Court?
9      A.   I assumed that the people at Lehman
10  were operating in good faith and I had no reason
11  to doubt them.
12      Q.   Have you ever had any reason to doubt
13  it based on anything that you have come across
14  since September of 2008?
15      A.   No.
16      MR. GAFFEY:  Objection to the form.
17      Q.   Have you ever had any reason to doubt
18  the good faith of Mr. McDade?
19      A.   No, I've never had any reason to doubt
20  the good faith of Mr. McDade.
21      Q.   Let me --
22      MR. GAFFEY:  Mr. Boies, could I
23  interrupt you?  When you get to a convenient
24  point for a break, if we could take ten
25  minutes.

Page 48

H. MILLER

2      MR. BOISE:  Sure.  We can break now.
3  Absolutely.
4      THE VIDEOGRAPHER:  The time is now
5  10:42 A.M.  We're now off the record.
6      (Recess.)
7      THE VIDEOGRAPHER:  This is the start
8  of tape number 2.  The time is now 11:03
9  A.M.  We're now back on the record.
10  BY MR. BOISE:
11      Q.   Mr. Miller --
12      A.   I remembered Michael's last name.
13  It's Eisenband from FTI.
14      Q.   Thank you.
15      Mr. Miller, I've handed you a copy of
16  Exhibit 25.  Is this the Clarification Letter
17  that we had talked about?
18      A.   Yes.
19      Q.   And did this Clarification Letter
20  represent, in substance, the deal that the Court
21  had approved Friday night or early Saturday
22  morning?
23      A.   In my view, yes.
24      Q.   And is that why you and Weil Gotshal
25  concluded that it was not necessary to take this

Page 49

H. MILLER

2  specific letter back to the Court for further
3  approval?
4      A.   Yes.  I was reminded, as a 30(b)(6)
5  witness, I did not recall that there was
6  actually a discussion about going back to Court
7  in connection with the Clarification Letter.
8  That occurred sometime during either Sunday
9  evening or Monday morning, in which there was a
10  discussion and the conclusion of that discussion
11  was it wasn't necessary.
12      Q.   And the reason it wasn't necessary was
13  what?
14      A.   It did not change the deal that was
15  presented to the Court.
16      Q.   Let me ask you to look at the first
17  page, and at the bottom half it talks about what
18  the purchased assets are.  Do you see that?
19      A.   Yes.
20      Q.   And subparagraph 1(A)(ii) lists
21  certain additional purchased assets, correct?
22      A.   Yes.
23      Q.   And (A) is, or are, the securities
24  that we referred to as the so-called repo
25  securities, correct?

Page 50

H. MILLER

1
2    A.    They would be in that, in that
3    characterization.
4         Q.    And Category (B) are the securities
5    and other assets held in LBI's clearance boxes,
6    correct?
7         A.    That's what it says.
8         Q.    And Category (C) are the
9    exchange-traded derivatives and any property
10   that may be held to secure obligations under
11   such derivatives and collateralized short-term
12   agreements, correct?
13        A.    That's what it says.
14        Q.    And as you understood it, were all of
15   those assets included as purchased assets that
16   Barclays was acquiring?
17        A.    Correct.
18        Q.    Now, in this agreement there are no
19   values specified for any of the assets that are
20   being transferred or the liabilities that are
21   being assumed, correct?
22        A.    I believe that's correct.
23        Q.    Why is that?
24        A.    It was a purchase of the business and
25   the assets that went with that business, to the

Page 51

H. MILLER

1
2    extent not excluded.
3         Q.    And those -- and those assets that
4    were being purchased were being purchased
5    irrespective of what their value was, correct?
6         A.    Essentially, yes.
7         Q.    Now, let me ask you to look at Exhibit
8    506.
9         MR. POLKES:  Which is 506?  I'm sorry.
10        MR. BOISE:  It's coming.
11        (Exhibit 506, a document bearing Bates
12   Nos. WGM-LEHMAN-E 0006125 through 127 with
13   attachment, marked for identification, as of
14   this date.)
15        Q.    Exhibit 506 is an e-mail chain dated
16   September 20, 2008, correct?
17        A.    That's what it says.
18        Q.    And this was an e-mail chain that Weil
19   Gotshal had as of September 20, 2008, correct?
20        A.    It appears, yes.  Yes, the answer is
21   yes.
22        Q.    And this represented an estimate of
23   the value of the so-called repo assets, correct;
24   that is, the Barclays collateral that was
25   collateralizing the repo loan?

Page 52

H. MILLER

1
2    MR. GAFFEY:  Object to form.
3         MR. POLKES:  Are you referring to the
4    first page that's a chart that's attached to
5    the exhibit that says "Market Value" at the
6    top?
7         MR. BOISE:  Yes.
8         A.    That's what it appears to be.
9         Q.    And that shows the market value of the
10   so-called repo assets at $49.9 billion, correct?
11        A.    In round figures, yes.
12        Q.    Now, were you aware of the fact that
13   there were other estimates of the value of the
14   repo assets other than this $49.9 billion
15   estimate?
16        A.    I was aware that the values were
17   fluctuating all the time.
18        Q.    Let me, let me ask you to look at
19   Exhibit 510.
20        (Exhibit 510, a document bearing Bates
21   Nos. WGM-LEHMAN-E 00021381 and 21409, marked
22   for identification, as of this date.)
23        A.    Yes, sir.
24        Q.    Exhibit 510 is, or purports to be, an
25   excerpt from a report to Unsecured Creditors

Page 53

H. MILLER

1
2    Committee of Lehman Brothers Holdings dated
3    October 8, 2008.
4         Have you ever seen this exhibit
5    before?
6         A.    I don't have a present recollection
7    other than in connection with this deposition.
8         Q.    This was a document that Weil Gotshal
9    had, correct?
10        A.    Yeah.
11        Q.    Now, on the second page of the exhibit
12   when it talks about the assets purchased by
13   Barclays, it refers to the assets, the repo
14   assets, as 4.31 billion and says that there had
15   been a negotiated 5 billion reduction from what
16   are referred to as Lehman "stale" marks, do you
17   see that?
18        A.    I see that.
19        Q.    Were you aware that there was, during
20   the time leading up to the closing of the
21   transaction, a negotiation between Lehman and
22   Barclays as to what the appropriate marks should
23   be?
24        A.    I was aware that there were
25   discussions between Lehman and Barclays as to

H. MILLER

1
2  the marks, which I think I referred to before
3  was a -- an extensive discussion during that
4  weekend, mostly on Sunday and Monday.
5      Q.   And the assets that are purchased that
6  are listed here include the repo assets, include
7  1.9 billion that was referred to as the
8  unencumbered box.  Do you know what that refers
9  to?
10     A.   Clearance box, I believe it refers to.
11     Q.   And it refers to a 1.5 billion
12 building and data centers and then it refers to
13 $800 million of 15c3-3 securities?
14     A.   Yes.
15     Q.   And it says any excess will accrue to
16 Lehman Brothers, Inc., do you see that?
17     A.   I see that.
18     Q.   And that is any excess above the $8
19 billion, is that correct -- the .8 billion
20 dollars?
21        MR. MAGUIRE:  Objection to form.
22        MR. GAFFEY:  Join in the objection.
23     Q.   The .8 billion dollars?
24     A.   I don't know what the scrivener of
25 this document meant by "excess."

H. MILLER

1
2      Q.   Okay.
3      A.   As I said before, the securities in
4  the 15c3-3 account, to the extent that the
5  S.E.C. would agree to release them, would go to
6  Lehman -- I mean, would go to Barclays, and that
7  was it.
8      Q.   Is there anything in this Exhibit 510
9  that, in your view, is inconsistent with any of
10 the representations that you made to the Court
11 in connection with the approval of the sale?
12        MR. GAFFEY:  Objection to form.
13        MR. TECCE:  Same objection.
14        MR. MAGUIRE:  Same objection.
15     A.   As I believe I testified, I think this
16 is part of a report that the financial advisors
17 to the Creditors Committee gave to the Creditors
18 Committee at the meeting that was held on
19 October 8, 2008, and generally, the Creditors
20 Committee met in executive session before
21 representatives of the Debtors appeared.
22        And I'm -- I don't recall this
23 presentation.  I'm not sure I was at the October
24 8 meeting, but I don't really know what is meant
25 by "book value per Lehman's stale marks

H. MILLER

1
2  negotiated a $5 billion reduction" meant.
3  Otherwise, it's accurate.
4      Q.   Now, you're aware that a Rule 60
5  motion has been filed in this matter?
6      A.   Yes, I am.
7      Q.   And have you reviewed that Rule 60
8  motion?
9      A.   I have read it.
10     Q.   And is there anything in that Rule 60
11 motion that Weil Gotshal was not aware of at the
12 time of the approval of the transaction?
13        MR. POLKES:  Objection to form.
14        Go ahead.  You can answer.
15        MR. GAFFEY:  Join.
16        MR. TECCE:  Join in the objection.
17        MR. MAGUIRE:  Objection.
18     Q.   Let me break it down then.
19     A.   Okay.
20        MR. BOISE:  And the objection is it's
21 just too broad?
22        MR. POLKES:  Yes.
23     Q.   You were aware, were you not, at the
24 time that the transaction was approved that
25 there were a number of different estimates to

H. MILLER

1
2  value the assets that were being acquired?
3      A.   As I said before, the values were
4  fluctuating all the time.
5      Q.   And there were no representations or
6  warranties with respect to what the values were
7  in the final documentation, including the
8  Clarification Letter, correct?
9        MR. GAFFEY:  Form objection.
10     A.   That's correct.
11     Q.   And why is that?
12     A.   Because the values were fluctuating.
13 The figures were, I would say, not reliable, and
14 it was a deal to buy the business, not a balance
15 sheet deal, and as a consequence, there were no
16 representations or warranties or any true-up in
17 the Asset Purchase Agreement.
18     Q.   And -- and Weil Gotshal had told the
19 Court on September 19 that the deal had changed
20 and that there was no true-up; is that correct?
21     A.   I don't know if we used those words,
22 but I am sure I used the words that it was a
23 very fluid transaction where values were
24 changing all the time.
25     Q.   Let me give you, just to refresh your

Page 58

H. MILLER

1
2  recollection, Exhibit 442.  This is the hearing
3  transcript.
4      A.   What page?
5      Q.   47.  And this is Ms. Fife from Weil
6  Gotshal.
7      A.   Yes.
8      Q.   And she says at lines --
9          MR. GAFFEY:  Which day, the 17th or
10  the 19th?
11         MR. BOISE:  Page 47 --
12         MR. GAFFEY:  Which transcript?
13         MR. BOISE:  I'm sorry.  It's the 19th.
14     Q.   Exhibit 442 is the transcript of the
15  hearing before the Court on September 19,
16  beginning at 4:36 P.M., correct?
17         MR. POLKES:  Harvey, he's just asking
18     if this is in fact the transcript of the
19     19th.
20     A.   I'm sorry.  It appears to be so.
21     Q.   And if you go to page 47.
22     A.   Yes.
23     Q.   Ms. Fife, beginning at line 7, says,
24  "There was an upside sharing in the original
25  transaction, there is going to be a true-up 12

Page 59

H. MILLER

1
2  months later on, and that has been eliminated
3  from this transaction."  Do you see that?
4      A.   I see that.
5      Q.   And as you understand it, was that an
6  accurate statement?
7      A.   I believe so.
8      Q.   Let me ask you to look at Exhibit 489.
9  This is a copy of minutes of the board of
10  directors of Lehman Brothers Holdings dated
11  September 16, 2008.  My questions to you are in
12  your capacity as a 30(b)(6) witness at Weil
13  Gotshal.
14         Representatives of Weil Gotshal
15  attended this meeting, correct?
16     A.   Correct.
17     Q.   All right.  That's all I have on that.
18         Based on everything that you know as
19  of today, do you believe that your presentation
20  to the Court on September 19 was fair and
21  accurate and appropriate?
22     A.   I believe that it was fair, accurate
23  and appropriate based upon the information which
24  we were given and the assumption that everybody
25  at Lehman was operating in good faith.

Page 60

H. MILLER

1
2      Q.   And have you found anything since then
3  that has led you to believe that the information
4  that you were given was inaccurate or that the
5  people at Lehman were not operating in good
6  faith?
7      A.   No.
8          MR. GAFFEY:  Objection to form.
9          MR. TECCE:  Join in the objection.
10         MR. MAGUIRE:  Same objection.
11         MR. BOISE:  May I have just a moment?
12     Q.   Did Weil Gotshal ever tell the Court
13  or represent to the Court, directly or
14  indirectly, that the deal was going to be a
15  wash?
16     A.   I don't believe so.  I did not,
17  certainly.
18     Q.   Did you in fact believe that the deal
19  was going to be a wash?
20     A.   I hadn't -- I did not hear the
21  expression "wash" until very recently.
22     Q.   Again, in your capacity as a
23  representative, as a 30(b)(6) representative of
24  Weil Gotshal, Weil Gotshal received information
25  contemporaneous with the negotiations that took

Page 61

H. MILLER

1
2  place leading up to the closing on September 20
3  that Barclays expected to record a gain as a
4  result of the transaction, correct?
5      A.   Could you pinpoint time?
6      Q.   Sure.  Let me -- let me give you first
7  Exhibit 505 and, with it, Exhibit 344A.
8          (Exhibit 505, a document bearing Bates
9  Nos. LAZ-C-00045462 through 463, marked for
10  identification, as of this date.)
11     Q.   First, Exhibit 34A?
12         MR. GAFFEY:  I'm sorry to interrupt.
13  We don't have the exhibit yet.
14         MR. BOISE:  I'm sorry.
15     Q.   Let me also, just so we have a
16  complete set, give you Exhibit 343A.
17         MR. MAGUIRE:  Could I ask that we have
18  a set of the premarked exhibits so we can keep
19  up?
20         MR. BOISE:  I think that would be much
21  more efficient.
22         Let me finish with these particular
23  exhibits and then we'll take a short break
24  and we'll get you a copy of all the
25  premarked exhibits.

Page 62

```
 1              H. MILLER
 2      MR. MAGUIRE:  Thanks.
 3      MR. BOISE:  I agree that would be a
 4  much more efficient way to do it.
 5      Do you have the exhibits?
 6      (No response.)
 7      MR. BOISE:  Okay, I'll take that as a
 8  yes.
 9   Q.   Mr. Miller, let me ask you to look
10  first at Exhibit 344A.
11   A.   Yes.
12   Q.   This is a -- an e-mail that attaches a
13  Barclays press release dated September 17, 2008?
14   A.   Yes.
15   Q.   And without asking you to read the
16  whole thing, if you go to the last sentence of
17  the third paragraph, it says, "The proposed
18  transaction with Lehman Brothers and the
19  additional equity would result in an enhancement
20  of Barclays' earnings and capital ratios."  Do
21  you see that?
22   A.   Yes, I do.
23   Q.   And let me ask you to look next at
24  Exhibit 343A.
25   A.   I have it.
```

Page 63

```
 1              H. MILLER
 2   Q.   Which is also -- which is also dated
 3  September 17, 2008, correct?
 4   A.   Correct.
 5   Q.   And this is a transcript of an analyst
 6  and investor conference call that Barclays had
 7  at that time, correct?
 8   A.   It appears to be so.
 9   Q.   And if you go to the second page, the
10  fifth paragraph?
11   A.   Yes.  I would just note this exhibit
12  is highlighted.
13   Q.   Oh, it is?
14   A.   Yes.  On the second page.
15   Q.   They gave you probably my copy.  Or
16  maybe they decided that was a good way to do it,
17  I don't know.  But we don't generally highlight
18  the witness's copy.
19      (Document handed to the witness.)
20   A.   Okay.
21   Q.   Paragraph 5 of Exhibit 343A says that
22  the transaction with Lehman is "capital ratio
23  accretive without additional equity issuance.
24  And the source of that accretion is the negative
25  goodwill from the transaction, which amounts to
```

Page 64

```
 1              H. MILLER
 2  about 2 billion U.S. dollars post tax."  Do you
 3  see that?
 4   A.   Yes, I do.
 5   Q.   And both of these exhibits were
 6  exhibits that Weil Gotshal had available to it
 7  on or about September 17, 2008, correct?
 8      MR. GAFFEY:  Objection.
 9   A.   As to 344A, I'm certain that that was
10  in the possession of Weil Gotshal, because 505
11  would appear to have been -- there's an
12  attachment of the -- of a press release.  It
13  says the "Lehman Press Release."  The press
14  release itself is not attached, but it's from --
15  I think it's from -- to Lori Fife.  Who is it
16  from?  It's from Lazard, and I'm not sure which
17  press release was attached to it because it's
18  not attached, whether it was a Lehman release or
19  it was a Barclays release.
20   Q.   Was there -- or, I guess I should say
21  is there anything that is in these releases that
22  I've just showed you that is in any way
23  inconsistent with your understanding as of
24  September 19?
25      MR. GAFFEY:  Object to the form.
```

Page 65

```
 1              H. MILLER
 2      MR. MAGUIRE:  Object to the form.
 3      MR. TECCE:  Form objection.
 4   A.   No, I assume that Barclays was not
 5  making this acquisition for the purpose of
 6  taking a loss.
 7      MR. BOISE:  Let's take just a brief
 8  break, and what we'll do is we'll get all of
 9  the exhibits that are premarked out so that
10  we don't have discontinuity that we've had
11  trying to distribute them.
12      THE VIDEOGRAPHER:  The time is 11:30
13  A.M.  We're now off the record.
14      (Recess.)
15      THE VIDEOGRAPHER:  The time is now
16  11:42 A.M.  We are now back on the record.
17  BY MR. BOISE:
18   Q.   Mr. Miller, let me give you copies of
19  documents that have been premarked as
20  pre-distributed.
21      MR. MAGUIRE:  Just so you are aware,
22  David, they have been remarked, but they
23  have not been pre-distributed.
24      MR. BOISE:  You still don't have them?
25      MR. MAGUIRE:  We don't have the
```

Page 66

H. MILLER

1
2  exhibits, no.  I know that was the purpose
3  of the break.
4       MR. BOISE:  That was.
5       MR. MAGUIRE:  At least I don't have
6  any.
7       MR. BOISE:  Let's be sure that
8  everybody over there has copies of the
9  exhibits.  I know there are a lot of people,
10  but let's be sure everybody's got copies,
11  particularly the people who are sitting
12  right across from me.
13       MR. GAFFEY:  I'm happy to report I
14  have 514.
15       MR. BOISE:  Okay.  514 or 513?
16       MR. GAFFEY:  513.
17       MR. MAGUIRE:  514 and 507.
18       MR. GAFFEY:  You want to go off for
19  one more with the promise no one leaves
20  the room?
21       MR. BOISE:  Yes.  Everybody stay in
22  place.
23       THE VIDEOGRAPHER:  The time is 11:43
24  A.M.  We're now off the record.
25       (Recess.)

Page 67

H. MILLER

1
2       THE VIDEOGRAPHER:  The time is now
3  11:47 A.M.  We are now back on the record.
4  BY MR. BOISE:
5    Q.   Now that everybody has Exhibits 513,
6  467B and 477B, Mr. Miller, let me ask you some
7  questions about them.
8       (Exhibit 513, an e-mail dated
9  September 17, 2008 at 13:08, marked for
10  identification, as of this date.)
11    Q.   First, let me start with 513, which is
12  an e-mail dated September 17, 208 -- 2008 at
13  13:08, and it's sent to a number of people.
14       First, this e-mail attempts to
15  summarize the Barclays conference call that we
16  referred to earlier, correct?
17    A.   It appears to be.
18    Q.   And if you look on the second page
19  under "Capital Requirements," do you see the
20  statement, "This transaction, due to $2 billion
21  in after-tax negative goodwill, is accretive to
22  capital ratios immediately."  Do you see that?
23    A.   Yes, I do.
24    Q.   Now, I'd like you to look at the
25  people who received this and ask you to identify

Page 68

H. MILLER

1
2  those that you know.  There may be a number of
3  people you do not recognize, but those that you
4  can recognize I'd like you to identify who they
5  are.
6    A.   Okay.  Bart McDade.  That is about it.
7    Q.   The other people are people that
8  you -- whose names you do not recognize?
9    A.   I do not recognize the other names.
10    Q.   Let me ask you to look next at Exhibit
11  467B.
12    A.   Yes, sir.
13    Q.   Which is also dated September 17, 2008
14  at 7:42 P.M., and if you look at the second
15  page, the seventh paragraph says, "The deal
16  would also lift Barclays' capital ratio, even
17  before the bank completes a planned capital
18  injection alongside the deal, because of a
19  negative goodwill adjustment from the deal
20  amounting to about $2 billion after tax."  Do
21  you see that?
22    A.   That's what it says.
23    Q.   And this was an e-mail from and to Ann
24  Marie Miller.  Can you identify who she is?
25    A.   From the e-mail, I would assume that

Page 69

H. MILLER

1
2  she is an employee of Houlihan Lokey, which was
3  the -- is the financial advisor -- one of the
4  financial advisors for the Creditors Committee.
5    Q.   Let me ask you to look at next Exhibit
6  477B.
7    A.   Yes.
8    Q.   And this is two e-mails, and the last
9  line on the exhibit talks about a Barclays
10  investor call transcript from Wednesday where
11  they described how great the Lehman buy is and
12  that there would be a $2 billion goodwill
13  after-tax benefit.  Do you see that?
14    A.   Yes, I do.
15    Q.   And can you identify any of the
16  recipients of this or these e-mails?
17    A.   Only Chris Flowers.
18    Q.   And who is Chris Flowers?
19    A.   Chris Flowers is an investor
20  particularly active in the distressed debt
21  market in the commodities area who has been
22  involved in cases like Refco, and I think at one
23  point in time may have been interested in
24  Lehman, but --
25    Q.   I'm sorry.

Page 70

H. MILLER

1    H. MILLER
2        A.    But specifically in connection with
3    this e-mail, I mean, I just know Chris Flowers.
4        Q.    Was Mr. Flowers involved in the Lehman
5    bankruptcy at all?
6        A.    Not to my knowledge.
7        Q.    Do you know who Edward Gilbert is?
8        A.    No, sir.  No.
9        Q.    Is there anything in the Exhibits 513,
10   467B or 477B that I have referred you to that is
11   in any way inconsistent with any of the
12   representations that you made to the Court?
13       A.    I don't believe so.
14           MR. TECCE:  Objection to form.
15           MR. GAFFEY:  Join in the objection.
16           MR. MAGUIRE:  Objection.
17       A.    I don't believe so.
18           MR. BOISE:  I have no more questions.
19           MR. GAFFEY:  I hate to ask you for a
20   break so quickly, but I think I could
21   shorten significantly if we could take ten
22   or fifteen minutes to throw some stuff out.
23           Is that okay with you?
24           THE WITNESS:  Sure.
25           THE VIDEOGRAPHER:  The time is now

Page 71

H. MILLER

1    H. MILLER
2    11:53 A.M.  We are now off the record.
3        (Recess.)
4           THE VIDEOGRAPHER:  The time is now
5    12:09 P.M.  We are now back on the record.
6    EXAMINATION BY
7    MR. GAFFEY:
8        Q.    Good afternoon, Mr. Miller.  I'm
9    Robert Gaffey from Jones Day, as you know.
10       A.    Good afternoon.
11       Q.    I have put before you three documents,
12   sir, and I have several lines of questioning
13   about each of them, but just for convenience, do
14   you have them there?
15           The first one I would ask you to focus
16   on is Exhibit 517, entitled "Transaction
17   Summary."
18           (Exhibit 517, a document entitled
19           Transaction Summary, marked for
20           identification, as of this date.)
21       A.    Yes, sir.
22       Q.    It's a one-page document bearing a
23   Weil Gotshal Bates number.
24           And I apologize to those assembled
25   that it's cut off.  We'll supply a better copy,

Page 72

H. MILLER

1    H. MILLER
2    if you like, after.
3           Do you recognize the document, sir?
4        A.    I've seen the document in connection
5    with the preparation for this deposition.
6        Q.    Okay.  At the -- at the hearing on
7    September 19, sir, there was some testimony
8    earlier today about a description that Ms. Fife
9    gave with regard to changes in the transaction
10   that had occurred since the Wednesday, do you
11   recall that?
12       A.    Yes.
13       Q.    I can show you the transcript if you
14   like, but there's a portion where you say, "We
15   have a document, but it's better to go orally,"
16   or words to that effect.
17           Do you recall there being a document
18   available to Ms. Fife from which she could
19   deliver the summary of changes?
20       A.    I don't recall the specific document,
21   no.
22       Q.    Okay.  Do you know who prepared
23   document 517?
24       A.    No.  I would assume that it's a Lehman
25   Brothers production because it has the

Page 73

H. MILLER

1    H. MILLER
2    identification of Lehman Brothers.  There was a
3    lot going on in the courtroom, as you might
4    imagine, at that time.
5        Q.    Sure.
6        A.    In speaking with Ms. Fife, somebody
7    may have handed this to her.
8        Q.    I just want to press on that a little
9    bit because of the 30(b)(6) nature of your -- of
10   your deposition, sir.
11           Do you know if anyone at Weil Gotshal
12   knows whether this document that we've marked as
13   517 was the basis for Ms. Fife's presentation at
14   the September 19 hearing regarding changes in
15   the transaction?
16       A.    I don't believe so.
17       Q.    Do you know if she had a document from
18   which she was -- to which she was referring when
19   she gave the oral presentation to the judge
20   about the changes in the deal?
21       A.    My recollection is that it was
22   primarily oral, and she may have had some notes
23   on a yellow -- on a legal pad.
24       Q.    During the portion of the hearing on
25   the 19th, that's the Friday hearing, when the

Page 74

H. MILLER

1
2  judge was off the bench and the discussion was
3  had with those present --
4      A.   Yes.
5      Q.   -- in this piece of the hearing, sir,
6  who was it who spoke to the assemblage of those
7  present about the changes in the deal?
8      A.   Ms. Fife.
9      Q.   Ms. Fife.  And when Ms. Fife spoke to
10 that assembly of people in the courtroom,
11 approximately how many people were there?
12     A.   If you refer back to The Wall Street
13 Journal or one of the papers, it was standing
14 room only.
15     Q.   That's what it sounded like.
16     A.   There were two other courtrooms in
17 which they were either piping in what was going
18 on -- I'm not sure they had television monitors
19 or not.
20     Q.   Was she at the podium?
21     A.   She -- she was at the podium.
22     Q.   And to your knowledge, sir, did she --
23 did she have any kind of document other than the
24 yellow pad you think you may recall having seen
25 when she went through the changes?

Page 75

H. MILLER

1
2      A.   I don't believe so.
3      Q.   Was anything distributed to the
4  assembly of people during the -- for lack of a
5  better term, sir, I'll call it the
6  off-the-record session when the judge was off
7  the bench -- was anything distributed to the
8  assembled people?
9      A.   No, but it was opened up for a
10 question and answer period.
11     Q.   Were there questions?
12     A.   There were a lot of questions.
13     Q.   Do you know anybody in particular who
14 asked questions?
15     A.   It's -- I may be in error.  There were
16 attorneys from Akin Gump.  There were attorneys
17 from Kasowitz Bennett.  There were attorneys
18 representing the Administrative in the United
19 Kingdom.  I think there were some
20 representatives of the Creditors Committee that
21 asked questions.  There were quite a few
22 questions.
23     Q.   And the sum total, as I understand it,
24 of the description of the changes, then, if
25 there's no document distributed, is Ms. Fife's

Page 76

H. MILLER

1
2  conversation or presentation to the assemblage
3  while the judge was off the bench and then her
4  recitation of the changes once the Court went
5  back on the record and Judge Peck rejoined the
6  assembly, correct?
7          MR. BOISE:  Object to the form.
8      A.   Basically, yes.
9      Q.   To your knowledge, was there any
10 difference between what Ms. Fife said in the
11 period -- in the off-the-record session as
12 opposed to the on-the-record session?
13     A.   I don't believe there was any major
14 difference.
15     Q.   Would you take a look at the document
16 before you that has previously been marked as
17 Deposition Exhibit 20, sir.
18     A.   20?
19     Q.   20, yes.
20     A.   Yes.  Yes, I have it.
21     Q.   And directing -- well, let me ask you
22 first, sir, have you seen this document before?
23     A.   Only in connection with the
24 preparation for this deposition.
25     Q.   You'll note, sir, the bottom e-mail in

Page 77

H. MILLER

1
2  the chain on Exhibit 20 is an e-mail from Martin
3  Kelly to Ian Lowitt, copied to Paolo Tonucci,
4  dated September 16 at 5:10 A.M., do you see
5  that, sir?
6      A.   Yes, I do.
7      Q.   Did you have conversations with Mr.
8  Kelly in that period you described to us before
9  the break of the 15th overnight into the 16th
10 while the negotiations were going on?
11     A.   I never met Mr. Kelly.
12     Q.   As a general matter, as I understand
13 your testimony this morning, the negotiation of
14 the economic terms of the deal were done by the
15 businesspeople, not by the lawyers; is that
16 right?
17     A.   That's correct.
18     Q.   And the economic terms that were
19 negotiated by the businesspeople were
20 communicated to the Weil Gotshal lawyers who
21 were responsible for drafting the Asset Purchase
22 Agreement, correct?
23     A.   Essentially, yes.
24     Q.   And the economic terms that the
25 businesspeople negotiated were communicated, as

Page 78

H. MILLER

1
2  necessary, to you or Ms. Fife as the principal
3  Weil Gotshal lawyer standing up at the hearings
4  on the 17th and the 19th, is that correct?
5        MR. BOISE:  Object to the form.
6     A.   I would say it was broader than that.
7  Communicated to the people who were working on
8  the Asset Purchase Agreement and then probably,
9  in turn, to us.
10    Q.   And none of Weil Gotshal's activities
11 on the 15th -- for the week of the 15th through
12 the 19th included any independent assessment of
13 the values being discussed with respect to the
14 assets being transferred; is that correct?
15       MR. BOISE:  Objection.
16    A.   That is correct.
17    Q.   Directing your attention back to
18 Exhibit 20, Mr. Miller.
19    A.   Yes.
20    Q.   You see that it -- let me read it,
21 portions of it, into the record:  "Well, it took
22 all night and lots of back and forth, but the
23 deal is done and ready for the board.  Final
24 price did not change meaningfully - approx a 5b
25 all in economic loss versus our marks and 3.6

Page 79

H. MILLER

1
2  billion of resi assets left behind."
3        Do you see that portion of the --
4     A.   I do.
5     Q.   And were you or anyone else at Weil
6  Gotshal privy to any discussions concerning a
7  negotiated -- a negotiation of an overall $5
8  billion loss versus Lehman's marks?
9     A.   I don't believe so.
10    Q.   Were you or anyone else at Weil
11 Gotshal involved in any discussions concerning a
12 negotiated discount that Lehman on the one hand
13 agreed to give to Barclays on the other from
14 Lehman's book values?
15       MR. BOISE:  Objection.
16    A.   No, I never heard the expression
17 "discount."  I did sit in a room listening to
18 groups talk about the marks and the different
19 opinions on the marks.
20    Q.   Did it come to your attention in any
21 way, sir, prior to the time that you described
22 the transaction to Judge Peck on the 17th, one
23 way or the other, that there was a negotiated
24 agreement for Lehman to give Barclays a $5
25 billion discount from Lehman's marks as part of

Page 80

H. MILLER

1
2  this transaction?
3        MR. BOISE:  Objection.
4     A.   No.
5     Q.   If you could turn your attention,
6  please, Mr. Miller, to Exhibit 21.
7     A.   Yes.
8     Q.   Actually, I beg your pardon.  Could
9  you go back to 20 for just one second.
10    A.   Sure.
11    Q.   Thank you.  Also, in 20, Mr. Miller,
12 there is a -- let me read another sentence from
13 Mr. Kelly's e-mail:  "Also, an extra 1 billion
14 of comp beyond our accrual and assumption of all
15 trade payables in LBI and LBHI."  Do you see
16 that, sir?
17    A.   I do.
18    Q.   Did you -- was it communicated to you
19 or anyone else at Weil Gotshal, sir, prior to
20 the time you described the transaction to Judge
21 Peck on the 17th, that there had been a write-up
22 of the amounts shown on Lehman's books accrued
23 for compensation for the purposes of the
24 transaction?
25       MR. BOISE:  Objection.

Page 81

H. MILLER

1
2     A.   You're using the expression a
3  "write-up"?
4     Q.   Yes, sir.
5     A.   No, I never heard of anybody talking
6  about a write-up.  The figures on comp and also
7  the figure on the assumption of executory
8  contracts was always a very contingent figure.
9  Thus, nobody knew what contracts were going to
10 be assumed and how many employees Barclays would
11 ultimately keep.
12    Q.   The estimates were made in the first
13 instance by Lehman personnel, correct?
14    A.   That's correct.
15    Q.   Do you know who within Lehman made
16 those estimates?
17    A.   No, I do not.
18    Q.   Did you ever speak to Mr. Kelly at or
19 around -- at or before the time you described
20 the transaction to Judge Peck?
21    A.   I don't believe I've ever spoken with
22 Mr. Kelly.
23    Q.   Okay.  Did you -- when you -- the
24 estimates that we're talking about for
25 compensation --

Page 82

H. MILLER

1
2    A.   Yes.
3    Q.   -- and for assumption of contracts
4  were part of the -- an answer you gave to Judge
5  Peck in response to a question about the breakup
6  fee, do you recall that?
7    A.   Vaguely.
8    Q.   And they also were referred to in the
9  Sale Motion?
10   A.   Yes.
11   Q.   As part of the terms of the
12 transaction?
13   A.   As part of the transaction.
14   Q.   When they were included in the Sale
15 Motion or when they were discussed with Judge
16 Peck, did anyone from Weil Gotshal have any, any
17 reason to believe that people within Lehman had
18 inflated those numbers?
19      MR. BOISE:  Objection.
20   A.   I don't believe so.
21   Q.   Now, if you would, Mr. Miller, would
22 you turn back to Exhibit 21.
23   A.   Yes, sir.
24   Q.   Thank you.  If I asked this a moment
25 ago, forgive me, I've confused myself in my

Page 83

H. MILLER

1
2  order here.  Have you seen this document before?
3    A.   Only in connection with the
4  preparation for this deposition.
5    Q.   I would direct your attention, Mr.
6  Miller, to paragraph 3 in the bottom of the
7  e-mails, which is an e-mail from Gerard Reilly
8  to Ian Lowitt, Michael Gelband, copy, Paolo
9  Tonucci, Martin Kelly?
10   A.   Yes.
11   Q.   Prior to describing the transaction
12 for the first -- in that first hearing on the
13 17th, had you had any discussions with Mr.
14 Lowitt?
15   A.   About the motion to approve?
16   Q.   About the transaction, yeah.
17   A.   No.
18   Q.   And you had some testimony, we talked
19 a bit this morning about the Repurchase
20 Agreement --
21   A.   Yes.
22   Q.   -- that was, for lack of a better
23 term, part of the events of that week.
24      Weil Gotshal played no role in
25 negotiating that Repurchase Agreement; is that

Page 84

H. MILLER

1
2  correct?
3    A.   That's correct.
4    Q.   And Weil Gotshal played no role in
5  structuring that Repurchase Agreement in any
6  way; is that correct?
7    A.   I don't believe so.
8    Q.   And Weil Gotshal had no role as to
9  determining the value of the collateral that was
10 put in that repo; is that correct?
11      MR. BOISE:  Objection.
12   A.   Absolutely not.
13   Q.   I would direct your attention to
14 paragraph 3 in the lower e-mail in Exhibit 21,
15 which says as follows:  "Not clear on the amount
16 of block discount or how we make it happen.
17 Defaulting on repo could be the best, as
18 discount could be taken from haircut.  If not
19 that, then we need to give business an
20 allocation of block discount so they can mark
21 down the books tonight.  Does that create a
22 problem as it could tip the broker early?  Would
23 we rather have that be in the sale price
24 tomorrow?"
25      I want to ask you a few questions

Page 85

H. MILLER

1
2  about each of those sentences.  Was Weil
3  Gotshal -- and I ask that in the 30(b)(6) sense,
4  Mr. Miller --
5    A.   Yeah.
6    Q.   -- was Weil Gotshal privy to any
7  conversations with anyone at Lehman about using
8  an intentional default on the repo as a means of
9  delivering a pre-agreed block discount to
10 Barclays?
11   A.   I don't believe so.
12   Q.   And there's a reference in Mr.
13 Reilly's e-mail -- rather than a reference, let
14 me reread the sentence:  "If not that, then we
15 need to give business an allocation of block
16 discount so they can mark down the books
17 tonight."
18      Was Weil Gotshal privy to any
19 discussions with anyone at Lehman about a plan
20 to mark down the books to reflect an agreed
21 block discount that had been given to Barclays?
22      MR. BOISE:  Objection.
23   A.   I do not believe so.
24   Q.   Mr. Miller, I've put before you what
25 we've marked as Exhibit 518, bearing Bates

Page 86

```
1              H. MILLER
2    numbers WGM-LEHMAN-E 00000355 through 403.
3         (Exhibit 518, a document bearing Bates
4    Nos. WGM-LEHMAN-E 00000355 through 403,
5    marked for identification, as of this date.)
6    Q.   Have you seen this document before,
7    Mr. Miller?
8    A.   Only in connection with the
9    preparation for this deposition.
10   Q.   Do you recall, Mr. Miller, that when
11   the sale motion was filed, the motion papers
12   regarding approval of sale procedures --
13   A.   Yes.
14   Q.   -- on the 17th, that attached to it
15   was a copy of an Asset Purchase Agreement with
16   handwritten --
17   A.   Yes.
18   Q.   -- annotations on it?
19   A.   Yes.
20   Q.   The evidence, I guess, of the speed
21   with which things were getting done.
22        Do you know whose handwritten
23   annotations they were?
24   A.   No, I do not.
25   Q.   Would you turn within -- would you
```

Page 87

```
1              H. MILLER
2    turn within Exhibit 518, Mr. Miller, to page 7.
3         Actually, for context, why don't you
4    take a look first at page 6.  Where we are here
5    is in this -- this version of an Asset Purchase
6    Agreement in the definition of "purchased
7    assets."  You with me?
8    A.   On page 6?
9    Q.   Yes, starting at page 6.
10   A.   Yes.
11   Q.   And within that definition of
12   "purchased assets," overleaf on page 7, in
13   subsection D, the typewritten portion says
14   "government securities, commercial paper,
15   mortgage loans, corporate debt, corporate
16   equity, exchange-traded derivatives and
17   collateralized short-term agreements" and then
18   there are some handwritten annotations to that
19   block.  Do you see that?
20   A.   Yes, I do.
21   Q.   And the handwritten annotation on page
22   7 includes the insertion of the phrase "with a
23   book value as of the date hereof of
24   approximately 70 billion, collectively, long
25   positions"?
```

Page 88

```
1              H. MILLER
2    A.   Yes.
3    Q.   You with me in the document?
4    A.   Uh-huh.
5    Q.   Do you or does anyone at Weil Gotshal,
6    sir, know whose requirement that was in the
7    negotiations to put that language into the
8    agreement?
9         MR. BOISE:  Objection.
10   A.   I don't know.
11   Q.   Do you recall any discussion -- do you
12   or does anyone else at Weil Gotshal recall any
13   discussions with Weil Gotshal about the use of
14   the term "book value" in this insertion into
15   that draft Asset Purchase Agreement?
16   A.   I know that the figure $70 million was
17   on the 16th -- 15th and 16th was a figure that
18   was thrown around with great frequency.  Other
19   than that, I don't know.
20   Q.   Do you know -- do you know where the
21   $70 billion that was going around with great
22   frequency, what the source of that was, who
23   calculated it?
24   A.   From Lehman.
25   Q.   And do you know if it was taken -- but
```

Page 89

```
1              H. MILLER
2    beyond knowing that the $70 billion, the dollar
3    number that was being talked about came from
4    Lehman, do you know who within Lehman?
5    A.   There were so many people involved.
6    There was a room full of people trying to work
7    up figures.  I don't recall whether it was Mr.
8    Berkenfeld.  Probably Paolo Tonucci was
9    involved.
10   Q.   Do you have a recollection of Mr.
11   Berkenfeld coming into a room with a sheet of
12   paper saying "here are the numbers"?
13   A.   No.
14   Q.   And in any event, with respect to this
15   handwritten insertion on page 7, neither you
16   nor, to your knowledge, anyone else at Weil
17   Gotshal knows who -- who's the author, the
18   proposer of this insertion; is that right?
19        MR. BOISE:  Objection.
20   A.   That's correct.
21        MR. GAFFEY:  I have nothing further.
22   Thank you, Mr. Miller.
23        THE WITNESS:  Thank you.
24        THE VIDEOGRAPHER:  The time is 12:28
25   P.M.  We are now off the record.
```

H. MILLER

1
2    (Pause in the proceedings.)
3    THE VIDEOGRAPHER:  The time is 12:28
4  P.M.  We are now back on the record.
5  EXAMINATION BY
6  MR. MAGUIRE:
7    Q.  Mr. Miller, again, my name is Bill
8  Maguire.  I'm from Hughes, Hubbard & Reed, and I
9  represent the SIPA Trustee, James Giddens.
10    Sir, I believe you have one of the
11  exhibits before you that Mr. Boies covered
12  fairly early in your deposition, Exhibit 25,
13  which is the final Clarification Letter.
14    A.  Yes, sir.
15    Q.  If you turn, sir, to page 4, there's a
16  section there, Section 8, concerning transfer of
17  customer accounts.  Do you see that?
18    A.  Yes, I do.
19    Q.  And if you look at Section 8(ii)?
20    A.  Yes.
21    Q.  There's a provision that says, "to the
22  extent permitted by applicable law, and as soon
23  as practicable after the Closing, $769 million
24  of securities, as held by or on behalf of LBI on
25  the date hereof pursuant to Rule 15c3-3 of the

H. MILLER

1
2  Securities Exchange Act of 1934, as amended, or
3  securities of substantially the same nature and
4  value."
5    You see that provision, sir?
6    A.  Yes.
7    Q.  Was that the provision that you were
8  referring to in your earlier testimony
9  concerning the need for approval from the
10  regulators, specifically, the S.E.C., for any
11  such transfer to Barclays?
12    A.  Generally --
13    MR. BOISE:  Objection.
14    A.  I'm sorry.  Generally, yes.
15    Q.  And do you have an understanding, sir,
16  that the securities that are held on a
17  particular date and the reference here "on the
18  date hereof," I believe that's to the date of
19  the Clarification Letter which was as of
20  September 20, 2008; is that correct?
21    A.  Yes.
22    Q.  Did you understand that the securities
23  in the c3 account had, at least some of them,
24  had maturities?
25    A.  Yes.

H. MILLER

1
2    Q.  And that the composition, therefore,
3  of the account may change from time to time?
4    A.  Generally, yes.
5    Q.  Can you tell us, sir, what the purpose
6  of the words "or securities of substantially the
7  same nature and value" meant?
8    MR. BOISE:  Objection.
9    A.  I was not the scrivener of those
10  words, but I assume that there might be
11  exchanged securities, I mean securities that
12  were exchanged for some reason or other.  But,
13  essentially, it was the securities that were
14  there at that particular time.
15    Q.  And if those securities matured or
16  changed as of the date of September 20, 2008,
17  then assuming there was an excess, and the
18  regulators gave approval for a transfer, LBI
19  would have the option of either taking what
20  securities were in the account as of the closing
21  date, or as of September 20, or they would have
22  had the option of substituting alternative
23  securities?
24    MR. BOISE:  Objection.
25    A.  You said LBI?

H. MILLER

1
2    Q.  I'm sorry.  The estate.
3    MR. BOISE:  Objection.
4    Q.  The transfer, the person who's making
5  the transfers?
6    A.  These securities -- let me just -- one
7  minute.
8    These securities were to go to
9  Barclays.
10    Q.  I'm sorry?
11    A.  These securities were to go to
12  Barclays.
13    Q.  Right.
14    A.  The division was the cash and the PAIB
15  securities were to be retained by Lehman and the
16  769 was to go to Barclays, the securities.
17    Q.  And in the event that there was an
18  excess and there was approval from the
19  regulators to transfer up to as much as 769, in
20  the event that took some time, and by the
21  time that approval was obtained, the securities
22  that were in the account as of September 20 were
23  no longer in the same form --
24    A.  Uh-huh.
25    Q.  -- let's take a T bill had matured --

H. MILLER

1
2      MR. BOISE:  I don't know if that's a
3  question, but I object to anything asking
4  him to interpret the contract.
5      Q.   In that event, was it your
6  understanding, and I ask you this now as a Weil
7  30(b)(6) witness.
8      A.   Yes.
9      Q.   Was it your understanding that if the
10  LBI or the estate was no longer in a position of
11  transferring the specific security because it
12  had matured, it would have the ability to
13  transfer an alternative similar security of the
14  same value?
15      MR. BOISE:  Objection.
16      A.   I don't think that was contemplated at
17  the time that this was drafted.
18      Q.   Do you know who the scrivener of this
19  particular document was?
20      A.   No.
21      Q.   Do you know whether Mr. Messineo was
22  the person who drafted the words "or securities
23  of substantially the same nature and value"?
24      A.   It --
25      MR. POLKES:  It's pronounced Messineo.

H. MILLER

1
2      MR. MAGUIRE:  Messineo.  I apologize.
3      MR. BOISE:  Objection.
4      A.   I think he was involved.  Whether he
5  actually drafted those words I can't tell you.
6      Q.   At any time in the course of -- any
7  time prior to closing, did you or anyone at Weil
8  agree with anyone at Barclays that, under any
9  circumstances, Barclays would get $769 million
10  unconditionally, and even without the approval
11  of regulators, pursuant to Section 8(ii) of the
12  Clarification Letter?
13      MR. BOISE:  Objection.
14      A.   No.  It was always the regulatory --
15  the S.E.C. was always -- the question, in fact,
16  the discussion was you may never get authority
17  from the S.E.C. to release these on the premise
18  that this was really collateral for customer
19  accounts.
20      Q.   And when you say that was always the
21  discussion, with whom did you have that
22  discussion?
23      A.   Mr. Klein, in the presence of probably
24  Sol Burian and Mike Fazio and maybe Luc was
25  there, I don't remember.  I think Luc was there.

H. MILLER

1
2      Q.   And specifically with respect to
3  Barclays, who else participated on behalf of
4  Barclays in the discussions that you had?
5      A.   It was primarily Michael Klein.
6  Barclays people -- there was a conference room
7  that was set up called the Barclays Room, and
8  Mr. Klein was shuttling back and forth into that
9  room, and in that room was Archie Cox, who I
10  think probably made the decision.
11      Q.   Did you personally have any
12  discussions with anyone at Barclays about
13  Lehman's margin?
14      MR. BOISE:  Objection.
15      Q.   And when I say "margin," I mean margin
16  that Lehman maintained either at the OCC, the
17  Options Clearing Corporation, or at any other
18  derivatives exchange?
19      A.   I did not.
20      Q.   As a 30(b)(6) witness, are you aware
21  of any discussions that Weil had with anyone at
22  Barclays concerning LBI margin?
23      A.   I haven't been able to find anybody
24  that did have that discussion.
25      Q.   Sir, you mentioned, I believe, you

H. MILLER

1
2  made some references to DTC or DTCC?
3      A.   Yes.
4      Q.   The Depository Trust Corporation or
5  Clearing Corporation.  Are you aware, sir,
6  whether anyone from DTC or DTCC was physically
7  present in your offices at any time over the
8  weekend of the closing?
9      A.   Yes.
10      Q.   And who was present?
11      A.   An attorney from Proskauer.  What's
12  his name?  Sheldon -- I forget his last name,
13  and I think there were some actual employees of
14  DTCC.
15      Q.   And do you know at what times they
16  were present?
17      A.   Well, there were so many people here
18  it was hard to tell who was with whom.  But I
19  saw Sheldon periodically during the weekend,
20  particularly on Sunday and into Monday morning.
21      Q.   Did there come a time, sir, when you
22  became aware that there was a separate letter
23  agreement between Barclays, the Lehman trustee,
24  and DTC?
25      MR. BOISE:  Objection.

Page 98

H. MILLER

1
2      A.    Very much like the, if you want to
3    call them negotiations, discussions between JPM,
4    JPMorgan, and Barclays, there were discussions
5    going on with representatives of DTCC.  There
6    were representatives of the LBI trustee here for
7    a good portion of the weekend also.
8      Q.    Did you participate in the
9    negotiations of the DTCC letter?
10     A.    No.
11           MR. BOISE:  By "you," do you mean him
12    personally or Weil Gotshal?
13     Q.    You personally.
14     A.    No.
15     Q.    Are you aware of whether anyone from
16    Weil Gotshal personally participated in any of
17    the negotiations from the DTCC letter?
18     A.    Not to any great extent.
19     Q.    Did you see the DTCC letter anytime
20    prior to the closing?
21     A.    It was -- I don't recall seeing a
22    document.  It was sort of described --
23    periodically there were sort of -- everybody,
24    everybody got together in one room and there was
25    sort of an overall report on what was happening,

Page 99

H. MILLER

1
2    but I don't recall ever seeing a document.
3      Q.    When you say "an overall report," what
4    do you recall of the overall report that you
5    obtained?
6      A.    A status report.  Are we making
7    progress?  Are we going to be able to close?
8      Q.    And did you ultimately understand that
9    progress was being made?
10     A.    The reports were progress was being
11    made.  As I said before, the big hurdle was JPM
12    and Barclays, and when that was resolved, things
13    started really moving towards a closing.
14     Q.    And beyond understanding the progress
15    ultimately -- at different times was or was not
16    made, and ultimately was made, did you have any
17    further or deeper or other participation in any
18    of the negotiations with the DTCC letter?
19           MR. BOISE:  Objection.
20     A.    No.
21     Q.    And the same, I assume, is your answer
22    with respect to as a Weil 30(b)(6) witness?
23     A.    Correct.
24           MR. MAGUIRE:  Thank you, sir.  I have
25    no further questions.

Page 100

H. MILLER

1
2    EXAMINATION BY
3    MR. TECCE:
4      Q.    Good afternoon, Mr. Miller.
5      A.    Good afternoon.
6      Q.    My name is James Tecce.  I'm an
7    attorney at Quinn Emanuel.  We are special
8    counsel to the Creditors Committee.  I'll be
9    very brief, sir.  I just have a few questions
10    for you.
11           The closing of the sale transaction
12    took place over the weekend of September 20 to
13    21; is that correct?
14     A.    Saturday, Sunday and Monday morning,
15    yes.
16     Q.    And the closing took place at Weil
17    Gotshal; is that correct?
18     A.    That is correct.
19     Q.    Okay.  And was the closing a single
20    meeting or was it a series of meetings that were
21    taking place simultaneously?
22     A.    A series of meetings.  This entire
23    floor was consumed with meetings.
24     Q.    And do you have an understanding, sir,
25    as to whether or not Creditors Committee

Page 101

H. MILLER

1
2    representatives were allowed to participate in
3    all the meetings that were taking place in
4    connection with the closing?
5      A.    To the best of my knowledge, they were
6    allowed to participate in every meeting.
7      Q.    Do you know whether there were any
8    meetings that they were not allowed to
9    participate?
10     A.    I'm not aware of any meetings -- oh,
11    yeah.  They probably weren't allowed into the
12    Barclays Room.
13     Q.    The -- early in the morning of Sunday,
14    September 21, I believe you mentioned that you
15    were present when the Creditors Committee
16    representatives left; is that correct?
17     A.    That was the morning -- Monday
18    morning, not Sunday morning.
19     Q.    Monday morning, I'm sorry.
20           And I believe that you said that one
21    of them said to you, "If it's okay with you,
22    it's okay with us"; is that correct?
23     A.    Yes.
24     Q.    And who was it that said that to you?
25     A.    I believe it was Sol Burian, and it

Page 102

H. MILLER

1   H. MILLER
2   was later affirmed by Luc Despins.
3   Q.   And what did Mr. Despins say to you?
4   A.   "If you guys are satisfied with it,
5   we're satisfied."
6   MR. TECCE:  Okay.  I have no further
7   questions.  Thank you.
8   MR. BOISE:  I have a few questions,
9   but maybe it would be useful just to take a
10  quick break, like about ten minutes.  I
11  think my questions will be no longer than
12  ten minutes.
13  THE VIDEOGRAPHER:  The time is now
14  12:41 P.M.  We are now off the record.
15  (Recess.)
16  THE VIDEOGRAPHER:  The time is now
17  12:53 P.M.  We are now back on the record.
18  FURTHER EXAMINATION BY
19  MR. BOISE:
20  Q.   Mr. Miller, let me ask you to look at
21  Exhibit 20, 21 and 517, which were the exhibits
22  that counsel used with you in their
23  cross-examination.
24  A.   Just give me one minute.
25  20, 21?

Page 103

H. MILLER

1   H. MILLER
2   Q.   20, 21 and 517.  517 is the
3   Transaction Summary.
4   A.   Okay.
5   Q.   Is there anything in Exhibits 20, 21
6   or 517 that is inconsistent with your
7   understanding at the time that you made the
8   representations that you did to the Court and
9   the motion that you made to the Court on
10  September 19?
11  A.   No.
12  MR. GAFFEY:  Objection to the form.
13  MR. TECCE:  Join in the objection.
14  MR. MAGUIRE:  Objection to form.
15  Q.   Let me direct your attention to
16  Exhibit 444.
17  A.   Yes.
18  Q.   Which is a declaration of Ms. Shari
19  Leventhal, and in particular, let me direct your
20  attention to paragraph 12.
21  A.   Yes.
22  Q.   Where it says that, "In connection
23  with the repo agreement, LBI was to provide
24  Barclays with approximately 49.7 billion in
25  securities in return for the $45 billion in cash

Page 104

H. MILLER

1   H. MILLER
2   funded by Barclays.  This ratio was consistent
3   with the ratio of cash to securities used in the
4   New York Fed's Repurchase Agreement with LBI on
5   the night of September 17."  Do you see that?
6   A.   I do.
7   Q.   And was that consistent with your
8   understanding on September 19, 2008?
9   A.   It is.
10  Q.   Let me ask you next to look at Exhibit
11  460A.
12  A.   460A.  Yes.
13  Q.   And this document in the middle of the
14  first page indicates it was first sent to an
15  Arthur Bruhmuller and that Mr. Bruhmuller then
16  forwarded it on to a number of people.  Do you
17  see that?
18  A.   Yes, I do.
19  Q.   Can you identify for the record who
20  Mr. Bruhmuller was?
21  A.   Only from the e-mail, that he is with
22  Lazard.  Mr. Flores is with Lehman, and -- I
23  don't know how to pronounce his name --
24  Descoteaux was with Lazard.
25  Q.   And Lazard was the advisors to the

Page 105

H. MILLER

1   H. MILLER
2   Creditors Committee; is that correct?
3   A.   No, Lazard was the advisor to Lehman.
4   Q.   Lazard was the advisor to Lehman.
5   And if you look at the bottom of the
6   first page, the e-mail that is then forwarded on
7   to everybody, it's from Gerald -- Gerard Reilly,
8   do you see that?
9   A.   Yes, I do.
10  Q.   And he says, "The first question is
11  very difficult.  My understanding of the deal is
12  that they will purchase our assets that remain
13  in LBI on the closing date which will not be the
14  same as the assets on the 12th.  That purchase
15  will be at a fixed discount on the assets that
16  remain to reflect the bulk size of the
17  purchase."  Do you see that?
18  A.   I do.
19  Q.   Let me ask you next to look at Exhibit
20  507.
21  (Exhibit 507, an e-mail from Marie
22  Stewart to Emma Bailey dated September 24,
23  2008, marked for identification, as of this
24  date.)
25  A.   Yes.

Page 106

H. MILLER

1
2    Q.    And in particular, the first
3  substantive paragraph of this e-mail, which is
4  from Marie Stewart, and she says, "I spoke to
5  David Murgio of Weil re the Barclays Repurchase
6  Agreement and got his view on how it works
7  (which is we sold assets and repo is terminated
8  and there are no settle-up payments to be
9  made)." Do you see that?
10    A.    I do.
11    Q.    And is that consistent with your
12  understanding of how the transaction would work
13  as of September 19, 2008?
14    A.    Well, the e-mail is dated September
15  24, and this was after the closing, and as I
16  read it, Marie -- whoever was asking the
17  question was talking to David Murgio
18  post-closing, and I believe David was explaining
19  what happened, how it actually functioned.
20    Q.    And what I'm asking, I guess, is, I
21  understand this is a few days after the closing?
22    A.    Yeah.
23    Q.    But is what Mr. Murgio of Weil is
24  saying here, is that consistent with your
25  understanding of how it would work when you were

Page 107

H. MILLER

1
2  actually doing the transaction?
3    A.    Well, it developed over that weekend
4  as to how the repo was resolved, and as I
5  testified before, essentially, it was, in
6  effect, terminated.
7    Q.    And indeed, Ms. Fife had told the
8  Court on the 19th that there would be no true-up
9  or settlement payments, correct?
10    A.    Well, I don't know what Ms. Fife meant
11  by the word "true-up." There was never a
12  true-up in the context of a balance sheet
13  transaction. The true-up I think she was
14  referring to was there was some discussion as to
15  certain securities, if they appreciated in
16  value, there was going to be some sort of a
17  sharing arrangement.
18    Q.    And that's what was eliminated?
19    A.    Yeah.
20    Q.    So, in terms of the assets that were
21  acquired, there was never going to be a true-up?
22    A.    Never going to be a true-up.
23    Q.    Because it was not a balance sheet
24  transaction?
25    A.    Victor Lewkow, I think that was his

Page 108

H. MILLER

1
2  name, said absolutely not right from the
3  beginning. He's from Cleary Gottlieb, by the
4  way.
5    Q.    Let me show you Exhibit 509.
6        (Exhibit 509, an e-mail dated
7  September 18, 2008 at 23:02 from Martin
8  Kelly to Richard Krasnow, marked for
9  identification, as of this date.)
10    Q.    This is an e-mail dated September 18,
11  2008 from Martin Kelly to Richard Krasnow of
12  Weil?
13    A.    Yes.
14    Q.    And in your capacity as a 30(b)(6)
15  witness, did Weil Gotshal receive this on or
16  about September 18?
17    A.    Clearly this was in our files. It's
18  an e-mail from Martin Kelly to Richard Krasnow
19  at 11, 11:02 that Thursday, September 18. Mr.
20  Krasnow, who is a partner in the firm, was not
21  heavily involved in the transaction. This
22  document was in our files, but I'm not sure that
23  anybody beside Richard Krasnow saw it.
24    Q.    The -- if you look at the third page
25  of the exhibit under the heading "Liabilities."

Page 109

H. MILLER

1
2    A.    Third page, yes.
3    Q.    It says -- do you see the listing
4  about a third of the way down that says
5  "Payables"?
6    A.    Yes.
7    Q.    And under that it's "Compensation
8  Payables"?
9    A.    Right.
10    Q.    And it shows a number of 360 as of
11  August 31, '08 and 520 as of September 17, '08,
12  do you see that?
13    A.    I do see it.
14    Q.    And then it talks about transaction
15  adjustments of a thousand. And these numbers
16  are all in millions, correct?
17    A.    Right.
18    Q.    So when it talks about a thousand
19  there, that's actually a billion dollars; is
20  that correct?
21    A.    Uh-huh.
22    Q.    And then it shows the balance sheet
23  transferred at 1.52 billion, that is, the 520
24  million as of September 17 and the transaction
25  adjustment of a billion, correct?

Page 110

```
1                H. MILLER
2       A.   That's what the document reflects,
3  yes.
4       Q.   Let me ask you to look next at Exhibit
5  516.
6            (Exhibit 516, a document bearing Bates
7       Nos. MTHM0000139 through 147 with
8       attachment, marked for identification, as of
9       this date.)
10      A.   Yes.
11      Q.   And this is an e-mail from David
12 Murgio to Brian Kelly?
13      A.   Correct.
14      Q.   Dated September 21, 2008, correct?
15      A.   That's correct.
16      Q.   And you've already identified, I
17 think, David Murgio as being at Weil; is that
18 correct?
19      A.   That is correct.
20      Q.   And Brian Kelly was at Milbank; is
21 that correct?
22      A.   That's correct.
23      Q.   And Milbank was representing the
24 Creditors Committee; is that correct?
25      A.   He was the attorney.  And the other
```

Page 111

```
1                H. MILLER
2  party to the e-mail was Mike Fazio, who was at
3  Houlihan Lokey.
4       Q.   And if you look at the second page,
5  you see a smaller version of the chart that we
6  looked at earlier showing the market value --
7       A.   Yes.
8       Q.   -- of the repo collateral at $49.9
9  billion, correct?
10      A.   That seems to be identical to the
11 earlier exhibit that you showed me this morning.
12      Q.   Now, is there anything that I've shown
13 you in Exhibit 516, 509, 507 or 460A that is in
14 any way inconsistent with the understanding that
15 you had at the time that Weil Gotshal made the
16 motion to approve the sale on September 19,
17 2008?
18           MR. TECCE:  Objection to the form of
19      the question.
20           MR. GAFFEY:  Join the objection.
21      A.   And that's -- just could you repeat
22 the exhibit numbers, please?
23      Q.   Sure.  Exhibit 516, 507, 509 --
24           MR. POLKES:  Let's do this, I'm sorry,
25      one at a time here.
```

Page 112

```
1                H. MILLER
2       A.   507, okay.
3       Q.   509.
4       A.   Okay.
5       Q.   516.
6       A.   Okay.
7       Q.   And 460A.
8       A.   The only reservation I would have is
9  if we were apprized of a, quote, discount,
10 whatever that means, in 50 -- 460A, would have
11 brought that to the attention of the court.
12      Q.   And this is the bulk discount that
13 you're referring to?
14      A.   Yes.  I'm not sure what it means, but
15 if there was a discount, we would have to know
16 more about it.
17      Q.   Did you understand at the time that
18 there were discussions between Barclays and
19 Lazard that the marks on the securities that
20 were involved were uncertain and different
21 people had different views as to them?
22      A.   I wouldn't call that a discount.
23      Q.   If the Lehman marks were reduced
24 because Barclays thought either that they were
25 stale or that conditions had changed, would you
```

Page 113

```
1                H. MILLER
2  call that a discount?
3       A.   No.
4       Q.   If the Lehman marks were reduced
5  because Barclays prevailed in its view that the
6  number should be lower, would you consider that
7  a discount?
8            (Continued on the next page to include
9       the jurat.)
```

## Page 114

H. MILLER

2  A.  No.
3       MR. BOISE:  I have no more questions.
4       MR. GAFFEY:  Nothing further.
5       MR. MAGUIRE:  Nothing further.  Thank
6  you.
7       MR. TECCE:  Nothing further.  Thank
8  you.
9       THE WITNESS:  Thank you all.
10      THE VIDEOGRAPHER:  That concludes the
11 video record for today.  The time is now
12 1:07 P.M.  We are now off the record.
13                oOo

16 _____

   HARVEY R. MILLER

18 Subscribed and sworn to
   before me this      day
19 of      2010.

   _____

## Page 115

H. MILLER
2            CERTIFICATE
3  STATE OF NEW YORK )
                     : ss
4  COUNTY OF NEW YORK)
5       I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
   certify:
9       That HARVEY R. MILLER, the witness
10 whose deposition is herein before set forth,
11 was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by such witness.
14      I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18      I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23      In witness whereof, I have hereunto
24 set my hand this 7th day of January, 2010.
25      -------------------------------

## Page 116

H. MILLER
2               INDEX

3  WITNESS:        EXAMINATION BY          PAGE
4  H. MILLER       Mr. Boies        5, 102
5                  Mr. Gaffey       71
6                  Mr. Maguire      90
7                  Mr. Tecce        100
8  EXHIBITS:                        PAGE
9  Exhibit 505, a document bearing Bates Nos.    61
10 LAZ-C-00045462 through 463
11 Exhibit 506, a document bearing Bates Nos.    51
12 WGM-LEHMAN-E 0006125 through 127 with
13 attachment
14 Exhibit 507, an e-mail from Marie Stewart to  105
15 Emma Bailey dated September 24, 2008
16 Exhibit 508, a document bearing Bates Nos.    42
17 WGM-LEHMAN-E 00015980 through 82 with
18 attachment
19 Exhibit 509, an e-mail dated September 18,    108
20 2008 at 23:02 from Martin Kelly to Richard
21 Krasnow
22 Exhibit 510, a document bearing Bates Nos.    52
23 WGM-LEHMAN-E 00021381 and 21409
24 (Exhibit 511, marked but not used.)
25 (Exhibit 512, marked but not used.)

## Page 117

H. MILLER
2            INDEX (Cont'd.)

3  EXHIBITS:                        PAGE
4  Exhibit 513, an e-mail dated September 17,    67
5  2008 at 13:08
6  (Exhibit 514, marked but not used.)
7  (Exhibit 515, marked but not used.)
8  Exhibit 516, a document bearing Bates Nos.    110
9  MTHM0000139 through 147 with attachment
10 Exhibit 517, a document entitled "Transaction 71
11 Summary"
12 Exhibit 518, a document bearing Bates Nos.    86
13 WGM-LEHMAN-E 00000355 through 403