# Exhibit I

Page 1

1                     D. O'DONNELL

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                          Debtors.

10

     ----------------------x

11

12    VIDEOTAPED DEPOSITION OF DENNIS C. O'DONNELL

13              New York, New York

14              January 6, 2010

15

16

17

18

19

20   Reported by:

21   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

22   JOB NO. 26649

23

24

25

D. O'DONNELL

1
2    30(b)(6) subpoena recipient Milbank Tweed
3    Hadley & McCloy and the witness, Dennis
4    O'Donnell.
5        MR. TECCE:  James Tecce of Quinn
6    Emanuel on behalf of the Official Committee
7    of Unsecured Creditors.
8        MR. MILLS:  Carl Mills of Hughes,
9    Hubbard & Reed on behalf of the trustee,
10    James W. Giddens.
11        MR. HINE:  William Hine of Jones Day
12    on behalf of Lehman Brothers Holdings, Inc.
13        MS. BEVERLY:  Constance Beverly from
14    Milbank Tweed Hadley & McCloy on behalf of
15    Milbank Tweed Hadley & McCloy.
16        MS. NOCIOLO:  Julie Niciolo from
17    Boies, Schiller & Flexner on behalf of
18    Barclays Capital.
19        THE VIDEOGRAPHER:  Will the court
20    reporter please swear in the witness.
21            *  *  *
22    DENNIS C. O'DONNELL, called as a
23        witness, having been duly sworn by a Notary
24        Public, was examined and testified as
25        follows:

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2    EXAMINATION BY
3    MR. STERN:
4        Q.  Good morning, Mr. O'Donnell.
5        A.  Good morning.
6        Q.  We've marked as our first exhibit the
7    deposition notice for today.  We've marked it as
8    Exhibit 498 and I have placed that in front of
9    you.
10        I have also placed in front of you for
11    ease of reference a blank calendar for the month
12    of September 2008 because we're going to be
13    focusing largely on that period of time today.
14        Did you have an opportunity to review
15    the deposition notice that we've marked as
16    Exhibit 498 before today?
17        A.  I am reviewing it as we speak, and the
18    answer to your question is yes, I have reviewed
19    this deposition notice prior to today.
20        Q.  What did you do to prepare for today's
21    position to?
22        A.  That falls into a couple of
23    categories.  I have been involved in this matter
24    for some time and was involved with the prior
25    document subpoena so, in that context, did

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2    review documents that were ultimately produced
3    prior to their production.
4        Subsequent to receipt of the 30(b)(6)
5    subpoena, I have reviewed additional documents,
6    spoken with counsel, and spent time with counsel
7    and others at Milbank reviewing the relevant
8    facts.
9        Q.  Did you have an opportunity to speak
10    with Mr. Despins?
11        A.  I have not.
12        Q.  Did you review any of Milbank's time
13    entries from the September 2008 time period?
14        A.  At what point in time does your
15    question --
16        Q.  In preparation for this deposition.
17        A.  Not in preparation for this
18    deposition, no.
19        Q.  As you know, the deposition notice
20    focuses largely on Milbank's knowledge and
21    understanding of the sale transaction and
22    elements of the sale transaction as of various
23    points in time, and I'd like to start today with
24    the point in time before the Sale Approval
25    Hearing on September 19, 2008.

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2        You recall attending the Sale Approval
3    Hearing?
4        A.  Yes, I attended the sale hearing.
5        Q.  Who else from Milbank attended that
6    hearing, if you recall?
7        A.  A number of Milbank partners and
8    associates, including Luc Despins, Dennis Dunn,
9    Paul Aronzon, Crayton Bell, myself and Evan
10    Fleck.
11        Q.  I'd like to focus on the day of the
12    Approval Hearing, start in the morning, and ask
13    whether Milbank received any briefings
14    concerning the status of the sale transaction on
15    that day.
16        A.  Since the appointment of the
17    commitment -- retention of Milbank by the
18    Committee on Wednesday, the 17th, there were a
19    number of discussions between or among Milbank
20    and the Debtors' advisors.  Whether any took --
21    whether I can segregate the ones that took place
22    on the morning of the 19th I cannot tell you
23    definitively at this point.
24        Q.  Describe for me, if you would, the
25    briefings or conversations that Milbank had

TSG Reporting - Worldwide    877-702-9580

### D. O'DONNELL

1
2  concerning the elements of the sale transaction
3  in the period from Milbank's retention through
4  to the beginning of the Sale Approval Hearing.
5        MR. COHEN:  Does that relate to
6  briefings by the Debtors?
7        MR. STERN:  It would include briefings
8  by the Debtors, that would be Lehman, Weil
9  and Lazard, or if there were any
10  conversations with Barclays or anybody
11  acting on behalf of Barclays.
12        MR. COHEN:  But not internal
13  conferences.
14        THE WITNESS:  Understood.
15        There were two significant briefings
16  that I recall.  The first, there was a
17  meeting for all Creditors or all interested
18  parties at Lehman on the morning of the 18th
19  where attorneys from Weil and advisors to
20  the Debtors, including, I believe, people
21  from Lazard and A&M answered questions for
22  attorneys from Milbank and its -- and the
23  Committee's advisors, Houlihan and FTI, as
24  well as questions answered of a number of
25  other interested third parties.  That was

### D. O'DONNELL

1
2  the first such briefing.
3        After that meeting ended, there was a
4  meeting at which only Milbank, Houlihan and
5  FTI participated with, again, Weil, I
6  believe people from A&M, and Lazard.
7  Q.    Where did that second meeting take
8  place?
9  A.    At the offices of Weil Gotshal.
10  Q.    Where did the first meeting take
11  place?
12  A.    At the offices of Weil Gotshal.
13  Q.    Were those meetings both on September
14  18?
15  A.    Yes, they were.
16  Q.    Did Milbank receive any further
17  briefings or receive any further information
18  concerning the transaction before the sale
19  hearing began on the afternoon of September 19?
20  A.    To repeat my testimony from earlier,
21  from -- from the moment of our retention through
22  the hearing, there were ongoing discussions
23  between Milbank attorneys and attorneys at Weil
24  regarding elements of the transaction or ...
25  Q.    As of the start of the Sale Approval

### D. O'DONNELL

1
2  Hearing, had Milbank been told that the
3  transaction had changed in any way from the
4  transaction that had originally been explained
5  to Milbank?
6  A.    The transaction from Milbank's
7  perspective was a moving target through that
8  period.  There were changes that were publicly
9  disclosed and were also disclosed to Milbank
10  prior to the hearing, including those
11  memorialized in the First Amendment to the APA.
12  Q.    Before the hearing began, what did
13  Milbank understand or what had Milbank been told
14  concerning the Fed financing of Lehman Brothers,
15  Inc. and Barclays' replacement of that
16  financing?
17  A.    Events during this period, between
18  Wednesday and Friday, moved at a very rapid
19  pace.  Disclosures regarding the changes were
20  made to Milbank and made to others, sometimes at
21  the same time, sometimes simultaneously.
22        Whether Milbank was told anything
23  specifically about that issue prior to the
24  hearing I cannot tell you.
25  Q.    You don't recall?

### D. O'DONNELL

1
2  A.    I don't know whether -- is the
3  question whether Milbank alone was told
4  something or whether Milbank as part of a group
5  of Creditors asking questions was told
6  something?
7  Q.    The question really is whether Milbank
8  understood or knew a fact regardless of how it
9  was learned.
10  A.    And the fact that they learned is what
11  again?
12  Q.    Anything having to do with Barclays'
13  replacement of the Fed Repurchase Agreement with
14  LBI.
15  A.    As I sit here, I don't know whether we
16  learned about that prior to the hearing or
17  during the hearing or during the period leading
18  up to the hearing, bearing in mind that the
19  hearing was scheduled to start at 4 P.M. and did
20  not start until sometime later as events
21  continued to unfold and additional changes were
22  disclosed to Milbank and the Court.
23  Q.    By the end of the Sale Approval
24  Hearing, did Milbank have any understanding
25  concerning Barclays' replacement of the Fed

Page 14

D. O'DONNELL

1
2 repo?
3     A.    Milbank knew at that point what was
4 disclosed to the Court by Weil during the
5 hearing.
6     Q.    Did Milbank have any additional
7 information beyond that?
8     A.    Again, there were ongoing discussions
9 or efforts to have discussions between Milbank
10 and Weil.  There were people in court that day.
11 There were people in the office that day seeking
12 to communicate with Weil regarding the status of
13 the transaction.
14         At what point in time we learned of
15 the role -- of the changes with respect to the
16 repo is not something I can pinpoint with
17 accuracy.
18     Q.    Okay.  At some point before the end of
19 the Sale Approval Hearing, did Milbank have an
20 understanding concerning the amount of the repo
21 loan that Barclays assumed?
22     A.    Before the end of the hearing, we --
23 we understood what I believe it was Mr. Miller
24 or Ms. Fife told the Court about the amount of
25 that loan.

TSG Reporting - Worldwide      877-702-9580

Page 15

D. O'DONNELL

1
2     Q.    Aside from what Mr. Miller and Ms.
3 Fife told the Court, did Milbank receive any
4 information in separate off-the-record
5 discussions?
6     A.    To the best of my knowledge, no.
7     Q.    By the end of the Sale Approval
8 Hearing, what understanding or knowledge did
9 Milbank have concerning the amount of securities
10 transferred to Barclays in connection with
11 replacing the Fed repo?
12     A.    Again, I think our knowledge would
13 have been limited to what was represented on the
14 record at the hearing.
15     Q.    Is it your testimony that Milbank was
16 not told anything about that other than what was
17 said on the record?
18     A.    Yes.
19     Q.    Now, during the course of the hearing,
20 do you recall that there was a recess?
21     A.    I recall that there were a number of
22 recesses.
23     Q.    Do you recall that there was a recess
24 towards the beginning of the hearing at which
25 lawyers from Weil explained changes in the

TSG Reporting - Worldwide      877-702-9580

Page 16

D. O'DONNELL

1
2 transaction?
3     A.    Yes, I recall that recess.
4     Q.    What occurred during that recess?
5         MR. COHEN:  Objection.  Vague.
6     Q.    You can answer.
7         MR. TECCE:  For the record, I just
8 wanted the record to be clear that we're
9 joining in Mr. Cohen's objections, and
10 without doing it every time that he does it,
11 to avoid clarity on the record.
12         MR. STERN:  Sure.
13     Q.    Let me rephrase the question.  What
14 was Milbank told during that first recess?
15         MR. COHEN:  Objection.  Vague.
16     A.    Milbank was told during that first
17 recess what everyone else was told during that
18 first recess.  My recollection is that, again,
19 it was Ms. Fife or Mr. Miller summarized for the
20 parties-in-interest in the courtroom
21 developments, ongoing developments, in the
22 transaction, attempting to present a summary of
23 where the deal stood at that moment in time.
24     Q.    Do you recall whether Ms. Fife made
25 the presentation or Mr. Miller made the

TSG Reporting - Worldwide      877-702-9580

Page 17

D. O'DONNELL

1
2 presentation?
3     A.    To the best of my recollection, it was
4 Ms. Fife who made the presentation.
5     Q.    During that recess period, did anybody
6 else address developments in the transaction?
7     A.    It was, to the best of my
8 recollection, an interactive process.  There
9 were -- I believe Lazard may also have been in
10 the courtroom.  It may have been there
11 addressing issues.  And there were others from
12 Weil on the corporate side who may have been
13 assisting Ms. Fife in making the presentation.
14     Q.    In talking about developments in the
15 transaction, did anyone on behalf of Lehman
16 discuss Barclays' replacement of the Fed repo?
17     A.    I do not remember that being the focal
18 point of any discussion during that recess.
19     Q.    Is it possible that that issue was
20 discussed?
21         MR. COHEN:  Objection.  Calls for
22 speculation.
23     A.    My recollection is that Mr. Miller had
24 told the Court, had represented to the Court,
25 and I'm not sure whether it was before or after

TSG Reporting - Worldwide      877-702-9580

Page 18

D. O'DONNELL

1
2  that recess, that Barclays was -- had taken out
3  the Fed or had replaced the Fed with respect to
4  that repo, but I don't recall whether there were
5  further statements made during that recess or
6  questions asked during that recess on that
7  point.
8      Q.   So you don't recall?
9      A.   I don't recall.
10     Q.   And do you recall whether Mr. Miller
11  or Ms. Fife or anybody from Lazard during that
12  recess discussed the amount of collateral or
13  securities Barclays was receiving in exchange
14  for taking out the Fed's financing?
15     A.   Again, in the context of that recess,
16  I don't remember that being a specific issue of
17  discussion or questioning.
18     Q.   It may have been, but you just don't
19  recall?
20        MR. COHEN:  Objection.  Calls for
21  speculation.
22     A.   I don't recall.
23     Q.   Do you recall whether during that
24  recess there was any discussion concerning
25  whether Barclays would receive as a part of the

TSG Reporting - Worldwide    877-702-9580

Page 19

D. O'DONNELL

1
2  transaction certain clearance box assets or
3  unencumbered assets?
4      A.   I also do not recall whether that
5  issue was discussed during the recess.
6      Q.   Do you recall during that recess any
7  person from Lehman referring to a category of
8  additional assets estimated by Lehman to be
9  worth $1.9 billion?
10     A.   Again, no recollection of that that
11  was discussed during that recess.
12     Q.   Is that a category of assets or was
13  the transfer of that category of assets
14  something Milbank knew going into the Approval
15  Hearing?
16     A.   It was an evolving process.  The
17  Approval Hearing lasted eight hours.  Whether --
18  I do not believe that Milbank knew about the
19  clearance box securities during the hearing.
20     Q.   When you say you don't believe, do you
21  have a firm recollection that Milbank was not
22  told about that category of assets, or is it
23  that you don't recall?
24     A.   I don't -- I believe that Milbank was
25  not told about that category of assets prior to

TSG Reporting - Worldwide    877-702-9580

Page 20

D. O'DONNELL

1
2  the hearing.
3      Q.   Okay.  Did Milbank learn about that
4  category of assets during the hearing?
5      A.   They -- I -- they did not, to the best
6  of my knowledge, learn about that category of
7  assets during the hearing.
8      Q.   Did Milbank participate in any
9  discussions either before the hearing or during
10  the hearing concerning a category of assets
11  described as being worth $1.9 billion?
12     A.   To the best of my recollection, no.
13     Q.   Did anybody from Milbank take any
14  notes of any of the discussions on September 19
15  with Weil, Lazard or others concerning the
16  developments in the transaction?
17     A.   If any -- I did not, and I'm not aware
18  of anyone who did.
19     Q.   Did you participate in any discussions
20  with Weil concerning whether -- withdraw that.
21        When Milbank was at court on September
22  19 for the hearing, were there any discussions
23  or meetings that Milbank participated in in
24  which anyone complained to Weil or others about
25  developments in the transaction?

TSG Reporting - Worldwide    877-702-9580

Page 21

D. O'DONNELL

1
2        MR. COHEN:  Is that anyone from
3  Milbank or anyone?
4      Q.   Anyone.
5      A.   The courtroom was full.  There were
6  two overflow courtrooms.  There were many
7  Creditors and parties in interest there with
8  views about the transaction and the current
9  state of the transaction.  Milbank I'm certain
10  heard from some of those Creditors about their
11  views.
12     Q.   Do you recall anyone complaining about
13  a transfer of assets estimated to be worth 1.9
14  billion?
15     A.   No specific -- I have no specific
16  recollection of anyone making that specific a
17  complaint.
18     Q.   Is it possible that somebody made that
19  complaint?
20        MR. COHEN:  Objection.  Calls for
21  speculation.
22     Q.   And that you just don't recall?
23        MR. COHEN:  Same objection.
24     A.   I have no specific recollection of
25  such complaint.

TSG Reporting - Worldwide    877-702-9580

Page 22

D. O'DONNELL

1
2      Q.   Do you recall that there -- do you
3  have a firm recollection that there were never
4  any such complaints?
5      A.   I don't have a firm recollection to
6  that effect either.
7      Q.   Okay.  So you don't have a firm
8  recollection one way or the other?
9      A.   Correct.
10     Q.   Okay.  What discussions, if any, did
11  Milbank participate in relating to developments
12  in the transaction -- withdrawn.
13        In the discussions leading up to and
14  at the sale hearing concerning developments in
15  the transaction, did Milbank learn anything
16  concerning the treatment of 15c3 assets or
17  regulatory capital in connection with the
18  transaction?
19     A.   To the best of my knowledge, no.
20     Q.   Do you recall whether there were any
21  discussions on that subject?
22     A.   I have no recollection or no knowledge
23  of any discussions on that topic prior to the
24  conclusion of the sale hearing.
25     Q.   When did Milbank first learn, to the

TSG Reporting - Worldwide    877-702-9580

Page 23

D. O'DONNELL

1
2  best of your recollection, that 15c3 assets or
3  regulatory capital were being considered as a
4  part of the transaction?
5      A.   To the best of my knowledge, over the
6  course of the weekend that followed the sale
7  hearing.
8      Q.   Do you have a firm recollection that
9  Milbank did not know that before the end of the
10  sale hearing?
11     A.   I have a firm recollection to that
12  effect, yes.
13     Q.   What is your best recollection
14  concerning when Milbank first learned the terms
15  of Barclays' replacement of the Fed financing?
16        MR. COHEN:  Objection.  Vague.
17     A.   I'm not certain that we -- that
18  Milbank ever learned definitively the terms of
19  that transaction.
20     Q.   At some point before the closing,
21  Milbank understood that Barclays had replaced
22  the Fed's financing, correct?
23     A.   Correct.
24     Q.   Okay.  And when did Milbank first
25  develop that understanding?

TSG Reporting - Worldwide    877-702-9580

Page 24

D. O'DONNELL

1
2      A.   Over the course of the weekend
3  following the closing.
4      Q.   Not before the end of the sale
5  hearing?
6      A.   Well, as I previously testified, I
7  believe Mr. Miller did tell the Court that in
8  fact Barclays had replaced the Fed financing, so
9  we knew that it had happened.
10        If the question is did we know the
11  terms of it, we began to understand the terms of
12  it over the course of the weekend, but I never
13  received answers to all of our questions about
14  those terms.
15     Q.   As of the Sale Approval Hearing, did
16  Milbank know that Barclays had announced
17  publicly that Barclays anticipated realizing a
18  gain on the acquisition of $2 billion after tax?
19     A.   Timeframe again?
20     Q.   As of the start of the sale hearing.
21     A.   As of the start of the sale hearing, I
22  do not believe that Milbank knew of that
23  announcement.
24     Q.   Milbank learned of that after the sale
25  hearing?

TSG Reporting - Worldwide    877-702-9580

Page 25

D. O'DONNELL

1
2      A.   I believe Milbank learned of that over
3  the course of the weekend.
4      Q.   Going into the sale hearing, did
5  Milbank know that certain bondholders believed
6  that Barclays would receive a windfall discount
7  on the transaction?
8      A.   As I previously testified, there were
9  many Creditors with many complaints about the
10  transaction.  As counsel to the Committee, we --
11  we heard from a number of those Creditors about
12  their complaints.
13     Q.   Did Milbank hear specifically from Dan
14  Golden about his analysis of the transaction and
15  the analysis of the transaction that Goldman
16  Sachs had done on his behalf?
17        MR. COHEN:  Objection.  Foundation.
18     A.   Milbank did receive from Mr. Golden an
19  e-mail forwarding an e-mail from someone at
20  Goldman Sachs raising issues of that
21  description.
22     Q.   And what do you recall those issues
23  were?
24     A.   I don't have a specific recollection
25  of the precise terms of the issues raised, but I

TSG Reporting - Worldwide    877-702-9580

## Page 26

D. O'DONNELL

1  think they raised -- there were a number of
2  issues raised.  They were issues relating to
3  precisely what Barclays was -- what assets
4  Barclays was buying and what it was giving up to
5  get them.
6     Q.  Do you recall that Mr. Golden and
7  Goldman Sachs had concluded that Barclays would
8  receive a windfall discount of billions of
9  dollars?
10     MR. COHEN: Objection.  Foundation.
11     A.  I don't have a specific recollection
12  that that terminology specifically was used.
13     Q.  Did Milbank do anything to assess the
14  points that Mr. Golden was making?
15     A.  Throughout this period Milbank was
16  conducting diligence on an expedited timetable
17  seeking to understand the transaction.  The
18  e-mail received from Mr. Golden was -- was part
19  of that, that overall mix.  It was taken into
20  account and was part of the reason that we were
21  seeking fuller answers about the terms of the
22  transaction.
23     Q.  You referred to two meetings at Weil
24  on the 18th.  Starting with the first meeting,

## Page 27

D. O'DONNELL

1  can you tell me in general what Milbank learned
2  at that meeting concerning the transaction?
3     A.  The first meeting was a, a meeting
4  generally open to all Creditors.  Milbank did
5  not take the lead with respect to asking
6  questions or obtaining information at that
7  meeting.  To the best of my recollection, there
8  was a -- there were a whole range of questions
9  asked about many aspects of the transaction.
10  Beyond that, I can't be more specific.
11     Q.  And then you referred to a second
12  meeting.  What was discussed in that meeting?
13     A.  The second meeting, which took place
14  following the first meeting, was a -- was the
15  first sit-down meeting between the Debtors and
16  Milbank and the Committee's advisors, and it
17  covered a range of topics, including the
18  transaction.  I can't, as I sit here, I can't
19  tell you specifically what issues were raised or
20  discussed that relate to the Barclays
21  transaction, but I'm -- I can't tell you with
22  any specificity what issues were discussed.
23     Q.  I take it that, before the Sale
24  Approval Hearing, Milbank had reviewed the

## Page 28

D. O'DONNELL

1  original Asset Purchase Agreement?
2     A.  It had.
3     Q.  And Milbank had reviewed the First
4  Amendment?
5     A.  It had.
6     Q.  In connection with the APA, did
7  Milbank have an understanding going into the
8  sale hearing concerning the total value of the
9  purchased assets to be transferred under the
10  original APA?
11     A.  Milbank itself did not have a specific
12  understanding or opinion with respect to the
13  value issues here.  Houlihan Lokey was the
14  Committee's financial advisor and was charged
15  with understanding and evaluating the value
16  components of the transaction.
17     Q.  Do you know whether Houlihan ever
18  developed an understanding concerning the total
19  value of the purchased assets under the APA?
20     MR. COHEN:  Objection.  Vague.
21     A.  Houlihan focused on that issue and
22  asked questions about that issue prior to and
23  after the sale hearing.
24     Q.  Did Houlihan ever provide Milbank with

## Page 29

D. O'DONNELL

1  a figure representing the total value of all
2  purchased assets being transferred to Barclays
3  under the APA?
4     MR. TECCE:  I'm going to object.
5     MR. COHEN:  You can answer that yes or
6  no.  That goes into privilege and work
7  product.
8     A.  Yes.
9     Q.  It's your testimony that Houlihan had
10  a calculation representing the total value of
11  all purchased assets in the aggregate; is that
12  your testimony?
13     A.  Let me clarify.  All purchased assets,
14  including all components of the "purchased
15  asset" definition?
16     Q.  Yes.
17     A.  As I sit here I don't have a
18  recollection that Houlihan ever provided a total
19  number with respect to all purchased assets.
20     Q.  Did Milbank understand that the
21  consideration that Barclays would pay included
22  the assumption of certain liabilities?
23     MR. COHEN:  Objection.  Vague.  Under
24  which document?

TSG Reporting - Worldwide     877-702-9580

Page 30

D. O'DONNELL
1
2    Q.    Under the APA.
3          MR. COHEN:  The original?
4    A.    The original?
5    Q.    Yes.
6    A.    Under the terms of the original APA,
7    yes, we -- Milbank understood that part of the
8    consideration would be the assumption of certain
9    liabilities.
10   Q.    Okay.  And going into the sale
11   hearing, did Milbank have a calculation for the
12   total value of all assumed liabilities under the
13   APA?
14   A.    Going into the sale hearing, Milbank
15   did not have a calculation provided by Houlihan
16   of the total value of all assumed liabilities,
17   no.
18   Q.    Did it have a calculation of the total
19   value of all assumed liabilities from any
20   source?
21   A.    Going into the sale hearing, Milbank
22   had what the Debtors represented to the Court
23   was the total value of the assumed liabilities.
24   Q.    Is it your testimony that the Debtors
25   made a representation to the Court concerning

TSG Reporting - Worldwide     877-702-9580

Page 31

D. O'DONNELL
1
2    the total value of all assumed liabilities under
3    the APA?
4          MR. COHEN:  Objection.  Vague.
5          We're talking about September 19 and
6    the original APA?
7          MR. STERN:  Yes.
8    A.    To the best of my recollection, the
9    Debtors made representations to the Court
10   regarding the cure and compensation components
11   of the assumed liabilities.
12   Q.    You understand that under the APA
13   there was a list of assumed liabilities,
14   correct?
15   A.    Correct.
16   Q.    You understand that under the APA
17   there were provisions relating to the assumption
18   of cure payments by Barclays?
19   A.    Correct.
20   Q.    And you understand that under the APA
21   there was a provision relating to compensation
22   payments by Barclays?
23   A.    Correct.
24   Q.    My question is whether at any time
25   Weil or Lehman made a representation to Milbank

TSG Reporting - Worldwide     877-702-9580

Page 32

D. O'DONNELL
1
2    concerning the total value of all assumed
3    liabilities under the APA, including the list of
4    assumed liabilities listed in the APA and cure
5    and compensation?
6    A.    The timeframe is prior to the hearing?
7    Q.    Prior to the hearing.
8    A.    To the best of my knowledge, no.
9    Q.    So, going into the hearing, Milbank
10   did not have a total figure for all purchased
11   assets and it did not have a total figure for
12   the value of all assumed liabilities; is that
13   correct?
14   A.    Correct.
15   Q.    Did Milbank at any time prior to the
16   Sale Approval Hearing suggest to Weil Gotshal
17   that the purchase agreement should include
18   valuation conditions with respect to purchased
19   assets and assumed liabilities?
20         MR. COHEN:  Objection.  Vague.
21   A.    To the best of my knowledge, Milbank
22   did not make any such suggestion prior to the
23   hearing.
24   Q.    Prior to the hearing did Milbank
25   lawyers ever suggest to Weil Gotshal that the

TSG Reporting - Worldwide     877-702-9580

Page 33

D. O'DONNELL
1
2    purchase agreement should include
3    representations and warranties concerning the
4    total value of purchased assets and the total
5    value of assumed liabilities?
6          MR. COHEN:  Objection.  Vague.
7    A.    In a limited context, in the timeframe
8    in the context of the access we had at the time,
9    no.
10   Q.    So, prior to the hearing, Milbank
11   never suggested to Weil that the purchase
12   agreement should include representations and
13   warranties concerning the total value of
14   purchased assets and the total value of assumed
15   liabilities; is that correct?
16   A.    That's correct.
17         MR. COHEN:  Objection.  Vague.
18         By "purchase agreement," are you
19   talking about the APA?
20         MR. STERN:  Yes.
21   Q.    Let me rephrase the question.  So,
22   prior to the hearing, Milbank never suggested to
23   Weil that the APA should include representations
24   and warranties concerning the total value of
25   purchased assets and the total value of assumed

TSG Reporting - Worldwide     877-702-9580

Page 34

D. O'DONNELL

1
2    liabilities; is that correct?
3        A.    That is correct.
4        Q.    Did Milbank ever suggest to Weil
5    before the Sale Approval Hearing that the APA
6    should include true-up provisions with respect
7    to the value of purchased assets or assumed
8    liabilities?
9        A.    To the best of my knowledge, no.
10       Q.    Did Milbank understand that the
11   original APA included a purchase price
12   adjustment provision?
13       A.    Yes.
14       Q.    Did Milbank understand as of the sale
15   hearing that that provision had been deleted?
16       A.    No.
17            Strike that.  I --
18       Q.    Let me rephrase the question.  Did
19   Milbank understand as of the Sale Approval
20   Hearing that that purchase price adjustment
21   provision -- withdrawn.
22            Did Milbank understand as of the Sale
23   Approval Hearing that the parties had agreed
24   that they would delete that purchase price
25   agreement -- purchase price adjustment provision

TSG Reporting - Worldwide    877-702-9580

Page 35

D. O'DONNELL

1
2    from the Final Agreement?
3            MR. COHEN:  Objection.  Vague.
4        A.    Based on representations made during
5    the hearing, Milbank did understand that the
6    purchase price adjustment had been removed from
7    the deal, yes.
8        Q.    Did anyone from Houlihan at any time
9    ever communicate with Milbank -- withdrawn.
10            When Milbank learned that Barclays had
11   announced that it anticipated a $2 billion
12   after-tax gain on the transaction, what was
13   Milbank's reaction?
14            MR. COHEN:  I'm going to caution the
15   witness to not discuss either client
16   communications or internal communications.
17       A.    Over the course of the weekend,
18   Milbank did receive a copy of the announcement.
19   It reviewed it and ultimately forwarded it to
20   Houlihan to review as well.
21       Q.    Was that announcement by Barclays at
22   all inconsistent with Milbank's understanding of
23   the transaction?
24       A.    The announcement was made on September
25   17 and related to a version of the transaction

TSG Reporting - Worldwide    877-702-9580

Page 36

D. O'DONNELL

1
2    that was not the version of the transaction
3    approved by the Court or under discussion over
4    the weekend, so we didn't -- Milbank did not
5    attempt to draw any comparisons between what was
6    discussed in that announcement and what was
7    approved by the Court or was under discussion
8    over the weekend.
9        Q.    Did Milbank believe that the earlier
10   transaction was irrelevant at the time of the
11   Court's approval?
12            MR. COHEN:  You can answer that yes or
13   no, but don't get into the thought process
14   or work product behind that.
15       A.    No.
16       Q.    Milbank understood that Barclays'
17   announcement related to the transaction as it
18   stood on September 17, correct?
19       A.    Based on the date on the announcement,
20   yes.
21       Q.    Okay.  Did Milbank believe the
22   Barclays announcement remained relevant as of
23   the time of the sale hearing?
24       A.    Milbank --
25            MR. COHEN:  You can answer that yes or

TSG Reporting - Worldwide    877-702-9580

Page 37

D. O'DONNELL

1
2    no.
3        Q.    Withdrawn.  Did Milbank believe that
4    Barclays' September 17 announcement remained
5    relevant at any time prior to the closing?
6            MR. COHEN:  Yes or no.
7        A.    Yes.
8        Q.    So the Barclays announcement was
9    relevant?
10       A.    Prior to closing, yes.
11       Q.    Was that announcement of an
12   anticipated gain considered by Milbank to be at
13   all inconsistent with the terms of the
14   transaction as Milbank understood the
15   transaction prior to closing?
16            MR. COHEN:  You can answer that yes or
17   no.
18       A.    Can you repeat the question?
19       Q.    Sure.  Was the announcement by
20   Barclays of an anticipated acquisition gain
21   inconsistent with Milbank's understanding of the
22   transaction?
23       A.    Yes.
24       Q.    What did Milbank do to address that
25   inconsistency?

TSG Reporting - Worldwide    877-702-9580

Page 38

## D. O'DONNELL

1
2    A.    It forwarded the announcement to
3    Houlihan, who was charged with evaluating the
4    value components of the transaction.
5    Q.    Did Milbank do anything other than
6    that?
7        MR. COHEN:  You can answer yes or no.
8    A.    No.
9    Q.    As to Barclays' announcement of an
10   anticipated $2 billion after-tax acquisition
11   gain, did Milbank ever raise any concerns with
12   Weil or Lazard or anyone from Lehman about that
13   announcement?
14   A.    Timeframe, please?
15   Q.    At any time.  At any time through
16   September 22.
17   A.    Through closing.
18       Over the course of the weekend, we
19   were seeking answers to many questions about the
20   transaction.  I cannot tell you that -- that
21   that announcement was not brought to Weil's
22   attention.
23   Q.    Do you have a recollection of Milbank
24   discussing that announcement with Weil?
25   A.    I don't have a specific recollection

TSG Reporting - Worldwide    877-702-9580

Page 39

## D. O'DONNELL

1
2    to that effect, no.
3    Q.    Did Milbank make -- withdrawn.  Prior
4    to the closing, did Milbank have any
5    communications with anybody from Barclays or
6    representing Barclays?
7    A.    Yes.
8    Q.    Who?
9    A.    One communication of which I am aware
10   is one with Mark Shapiro of Barclays.
11   Q.    This is prior to closing.  Mark
12   Shapiro was with Lehman.
13   A.    All right.
14   Q.    And my question goes to --
15   A.    Yeah, you're correct.
16   Q.    -- Barclays -- we'll come back to Mark
17   Shapiro, but my question goes to Barclays
18   executives or Barclays lawyers or financial
19   advisors.
20   A.    Over the course of the weekend,
21   representatives of Barclays were at Weil, and
22   Milbank did have some limited contact with
23   Barclays representatives during that period.
24   Q.    Did Milbank ever raise any concern
25   with the Barclays people concerning Barclays'

TSG Reporting - Worldwide    877-702-9580

Page 40

## D. O'DONNELL

1
2    announcement of an anticipated $2 billion
3    after-tax acquisition gain?
4    A.    To the best of my knowledge, no.
5    Q.    Why not?
6    A.    As I've previously testified, we were
7    looking at many issues, had many unanswered
8    questions.  That announcement was one element of
9    the facts of which we were aware of that weekend
10   that we had questions about, but we did not ask
11   Barclays about it.
12   Q.    Did Milbank not consider it
13   significant enough to raise with Barclays?
14       MR. COHEN:  Objection.  Vague.
15   A.    The, again, the announcement spoke of
16   a $2 billion gain of some sorts, but it was
17   couched in accounting jargon that we at Milbank
18   did not definitively have an understanding of.
19   We forwarded it to Houlihan to investigate
20   further and tell us what they thought the
21   announcement meant.
22   Q.    Did Milbank ever ask whether Barclays
23   still anticipated an acquisition gain on the
24   transaction in light of the further developments
25   in the transaction leading up to closing?

TSG Reporting - Worldwide    877-702-9580

Page 41

## D. O'DONNELL

1
2        MR. COHEN:  Did they ask Barclays that
3    question?
4        MR. STERN:  Anyone.
5    A.    Timeframe again?
6    Q.    Anytime leading up to closing.
7    A.    And did we ask anyone?
8    Q.    Yes.
9    A.    I have no specific recollection that
10   we asked anyone that question.
11   Q.    Can you explain why Milbank would not
12   have asked that question?
13       MR. COHEN:  Objection.  I will
14   instruct the witness not to answer.  That's
15   work product.
16   Q.    Now, you referred to a conversation
17   with Mark Shapiro.  What do you remember about
18   that conversation?
19   A.    My recollection relates to an e-mail
20   from Mark Shapiro in which Mark Shapiro told
21   Milbank and Houlihan and FTI who at Lehman they
22   should speak to about various issues.
23   Q.    Do you recall approximately when that
24   e-mail was sent?
25   A.    I believe that e-mail was sent on the

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  18th of September.
3      Q.   After the sale hearing and before the
4  closing, what was Milbank's role in connection
5  with the transaction?
6          MR. COHEN:  Objection.  Vague.
7      A.   Milbank's role as counsel to the
8  Committee was to seek to undertake the diligence
9  with respect to the transaction that it had not
10  been able to undertake prior to the sale hearing
11  and desire to undertake, you know, complete
12  before closing.
13     Q.   Did Milbank understand that there was
14  a provision of the Sale Order concerning
15  Committee consent to possible changes in the
16  purchase agreement?
17         MR. COHEN:  You can answer yes or no.
18     A.   Yes.
19     Q.   Is that a provision that Milbank
20  negotiated with Weil?
21         MR. COHEN:  You can answer yes or no.
22     A.   Yes.
23     Q.   Tell me about Milbank's negotiations
24  with Weil concerning that provision of the Sale
25  Order.

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2      A.   That provision of the Sale Order was
3  one of several that were -- was discussed during
4  the sale hearing and after the sale -- after the
5  Court had actually approved the hearing --
6  approved the sale and prior to entry of the
7  order.  It was anticipated that changes might be
8  made, the Debtors had represented that to the
9  Court, and the Committee wanted to ensure that
10  it had the ability to consent to any such
11  changes.
12     Q.   Who from Milbank negotiated that
13  provision?
14     A.   There were a number of Milbank
15  partners in the courtroom that day and night.  I
16  can't tell you as I sit here who took
17  responsibility for that specific provision, but
18  it was one of several Milbank partners.
19     Q.   Over the weekend leading to the
20  closing, did Milbank have any discussions with
21  Weil concerning whether the Committee's consent
22  would be required?
23     A.   Yes.
24     Q.   What were those discussions?
25     A.   The order stated that if there were

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  material modifications made to the transaction,
3  the -- both the consent of the Committee and
4  approval of the Court would be required.  As we
5  evaluated the transaction over the weekend, the
6  issue of whether any of the proposed changes
7  were material was something that came up with
8  Weil.
9      Q.   And who discussed that?
10     A.   To the best of my recollection, these
11  discussions were between Luc Despins and Harvey
12  Miller.
13     Q.   And do you know what they discussed?
14     A.   I don't believe the discussions were
15  conclusive.  It was -- the Committee was, as I
16  previously testified, conducting diligence over
17  the weekend, had questions that had not yet been
18  answered, and the issue was whether if these
19  questions could not be answered, whether any of
20  the open issues were material enough to require
21  Court approval.
22     Q.   Aside from the discussion between Mr.
23  Despins and Mr. Miller, were there any other
24  discussions between Milbank and Weil concerning
25  that issue?

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2      A.   No.
3      Q.   And how did you learn what Mr. Despins
4  and Mr. Miller discussed?
5      A.   Through discussions with others at
6  Milbank.
7      Q.   Who?
8      A.   Crayton Bell.
9      Q.   Anybody else?
10     A.   No.
11     Q.   What did Mr. Bell tell you?
12     A.   Mr. Bell was present in the room when
13  these discussions took place.
14     Q.   And what did he tell you about the
15  discussions?
16     A.   That they were largely hypothetical;
17  that the question came up in the context of, if
18  these -- if the questions that remained
19  unanswered yielded certain types of answers,
20  would Court approval be required.
21     Q.   Did Mr. Bell tell you what Mr. Despins
22  said in that conversation?
23     A.   Not verbatim, no.
24     Q.   In general?
25     A.   I've already testified as to my

TSG Reporting - Worldwide    877-702-9580

Page 46

D. O'DONNELL

1
2  general understanding of what the discussion
3  entailed.
4      Q.  Did Mr. Despins or anybody from
5  Milbank ever tell Weil that Milbank believed
6  Committee consent would be required?
7      A.  If it was definitively established
8  that there were material changes to the
9  transaction, yes.
10      Q.  When did Milbank make that assertion
11  to Weil?
12      A.  I don't have a verbatim account of the
13  discussion, but the general thrust of the
14  discussion I just recounted covered that point
15  as well.
16      Q.  And any material changes would have to
17  be reflected in the final written agreement; is
18  that right?
19      A.  Correct.
20      Q.  Was Milbank ever provided the final
21  written agreements, the Final Purchase
22  Agreement?
23          MR. COHEN:  Objection.  Vague.
24      A.  Can you be more specific as to which
25  document you're talking about?

TSG Reporting - Worldwide    877-702-9580

Page 47

D. O'DONNELL

1
2      Q.  After the closing, did Milbank ever
3  receive the Final Purchase Agreement?
4      A.  The purchase agreement --
5      Q.  Let me define the Final Purchase
6  Agreement.
7      A.  It would be helpful, yes.
8      Q.  Because it's defined in the Sale Order
9  and then it was defined again when Milbank filed
10  these papers.
11          The final purchase --
12          MR. COHEN:  Which papers?
13          MR. STERN:  The Final Purchase
14  Agreement papers.
15          MR. COHEN:  When Milbank filed the
16  final --
17          MR. STERN:  Did I say Milbank?
18          MR. COHEN:  Yes.
19          MR. STERN:  I misspoke.  I meant Weil.
20      Q.  When Weil filed the final agreements,
21  the Final Purchase Agreement was defined as,
22  number one, the original APA; number two, the
23  First Amendment to the APA; and, number three,
24  the Clarifying Letter?
25      A.  Okay.

TSG Reporting - Worldwide    877-702-9580

Page 48

D. O'DONNELL

1
2      Q.  That's the Final Purchase Agreement.
3  So my question is, after the closing, did
4  Milbank receive a copy of the Final Purchase
5  Agreement?
6      A.  Yes.
7      Q.  Okay.  Based on the review of that
8  Final Purchase Agreement, did Milbank have any
9  discussions with Weil concerning whether
10  Committee consent would be required?
11          MR. COHEN:  Object to the form.
12      A.  Yes.
13      Q.  What were those discussions?
14      A.  Milbank had ongoing discussions with
15  Weil after the closing about questions it had
16  about the financial components of the
17  transaction.
18      Q.  Focusing on the Final Purchase
19  Agreement, including the final Clarification
20  Letter --
21          MR. COHEN:  And the schedules?
22      Q.  Focusing on the Final Purchase
23  Agreement, including the Clarification Letter,
24  the material that Milbank had as of September
25  22, did Milbank have discussions with Weil

TSG Reporting - Worldwide    877-702-9580

Page 49

D. O'DONNELL

1
2  concerning whether, based on the material that
3  Milbank had on September 22, there would be a
4  need for Committee consent?
5      A.  As of September 22, Milbank did not
6  have the schedules, so the substance of the
7  discussions at that point were regarding
8  Milbank's need to see the final schedules.
9      Q.  Putting aside the schedules, based on
10  the terms that were in the agreements that
11  Milbank had, did Milbank ever express to Weil on
12  September 22 that Committee consent was
13  necessary?
14      A.  No, we had no reason to because at
15  that point in time we didn't have the
16  information necessary to reach a conclusion as
17  to whether Committee consent would be required.
18      Q.  In other words, based on the face of
19  the Clarification Letter, Milbank did not
20  identify any material changes requiring
21  Committee consent?
22          MR. TECCE:  Objection to the form of
23  the question to the extent it calls for work
24  product or privileged information.
25      A.  Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 50

D. O'DONNELL

1
2  Q.   When Milbank received the final
3  Clarification Letter, did Milbank conclude based
4  on the face of the Clarification Letter alone
5  that there were material changes requiring
6  Committee consent?
7        MR. COHEN:  Objection.
8        MR. TECCE:  Same objection.
9        MR. COHEN:  Calls for privilege and
10 work product.  Instruct the witness not to
11 answer.
12 Q.   After Milbank received the final
13 Clarification Letter, did Milbank communicate
14 with Weil that Committee consent would be
15 required based on the terms of the Final
16 Clarification Letter?
17 A.   No.
18     MR. COHEN:  Objection.  Vague.
19     Are you using Final Clarification
20 Letter and the September 22 documents that
21 were provided without the schedules
22 interchangeably?
23     The Clarification Letter has
24 schedules.  The witness has testified that
25 on September 22, we didn't get schedules.  I

Page 51

D. O'DONNELL

1
2  have no idea what you mean by final
3  Clarification Letter.
4  Q.   On September 22, Milbank received the
5  text of the Clarification Letter, correct?
6  A.   Correct.
7  Q.   Based on the text of the Clarification
8  Letter, did Milbank ever tell Weil that there
9  were material changes requiring Committee
10 consent?
11 A.   No.
12 Q.   Over the weekend before the closing,
13 was Milbank provided information relating to
14 what would become Schedule A of the
15 Clarification Letter?
16 A.   Yes.
17 Q.   What information was Milbank given?
18 A.   Milbank was provided with drafts of
19 Schedule A.
20     MR. COHEN:  Jack, is this a good time
21 for a break?  I'm having a technical
22 difficulty here.
23     MR. STERN:  Sure.  Sure.  Let's take a
24 break.
25     THE VIDEOGRAPHER:  That is the end of

Page 52

D. O'DONNELL

1
2  tape number 1.  The time is 10:42 A.M.
3  We're now off the record.
4        (Recess.)
5        THE VIDEOGRAPHER:  This is the start
6  of tape number 2.  The time is now 10:55
7  A.M.  We are now back on the record.
8  BY MR. STERN:
9  Q.   Mr. O'Donnell, I have placed in front
10 of you a thick document that we previously
11 marked as Exhibit 461B.  I'll ask you to review
12 that and then, if you can, tell me what you
13 understand that to be.
14 A.   Based on my review of the document, it
15 appears to be the copy of Schedule A that was
16 provided to Milbank on September 21, 2008.
17 Q.   That's over the weekend before the
18 closing?
19 A.   Correct.
20 Q.   Were there other schedules made
21 available to Milbank and Houlihan over that
22 weekend?
23     MR. COHEN:  Objection.  Vague.
24 A.   Other copies of Schedule A?
25 Q.   Or any schedules of purchased assets.

Page 53

D. O'DONNELL

1
2  A.   No.
3  Q.   461B -- your testimony is that 461B is
4  the only spreadsheet or schedule that was made
5  available to Milbank and Houlihan over the
6  weekend?
7  A.   Yes.
8  Q.   And when Milbank received this, did
9  Milbank have any questions concerning the
10 information here?
11     MR. COHEN:  You can answer yes or no.
12 A.   Yes.
13 Q.   And what questions did Milbank have?
14     MR. COHEN:  Objection.  Calls for work
15 product.  If you're asking for questions
16 that it had to people, not in a privileged
17 environment, like the Debtors or Barclays,
18 you can answer that, but internal
19 conversations or conversations with the
20 Committee's financial advisors I'll instruct
21 you not to answer.
22 Q.   What questions did Milbank have of
23 either Lehman or Barclays' representatives
24 concerning the information contained in Exhibit
25 461B?

Page 54

### D. O'DONNELL

1

2  A.  Milbank did not raise any questions
3  with any of the debtor representatives
4  concerning Exhibit 461B.
5  Q.  Is that because that was Houlihan's
6  responsibility?
7  A.  Correct.
8  Q.  Over the weekend before the closing,
9  did Milbank have an understanding concerning the
10  amount of financing that Barclays had assumed in
11  stepping into the Fed's shoes?
12  A.  As I previously testified, only to the
13  extent that that information was provided at the
14  hearing on the 19th.
15  Q.  Milbank had no further discussion
16  concerning that issue over the weekend?
17  A.  Correct.
18  MR. COHEN:  Again, only to the extent
19  that it was with people outside of the
20  privilege.
21  A.  Over the course of the weekend,
22  Milbank was seeking information about a variety
23  of topics and had directed Houlihan to do the
24  same.  So questions were being raised about
25  issues that included the amount of the Barclays

TSG Reporting - Worldwide    877-702-9580

Page 55

### D. O'DONNELL

1

2  repo.
3  Q.  Okay.  What information did Milbank
4  receive from Lehman or Barclays' representatives
5  concerning the terms of the Barclays repo?
6  A.  Timeframe?
7  Q.  Over the weekend before the closing.
8  A.  At some point on Sunday, I believe,
9  late on Sunday, Milbank was provided with an
10  explanation, or proffered explanation, of the
11  relevant numbers.
12  Q.  Who provided that explanation?
13  A.  I believe it was provided by Michael
14  Klein.
15  Q.  And when Mr. Klein provided that
16  explanation, who else was present?
17  A.  Representatives of Houlihan and
18  Milbank.
19  Q.  Do you recall approximately what time
20  of day that took place?
21  A.  I believe it was very late in the
22  evening of Sunday, the 21st, and potentially
23  early in the morning of Monday, the 22nd.
24  Q.  And what did Milbank learn through
25  that explanation?

TSG Reporting - Worldwide    877-702-9580

Page 56

### D. O'DONNELL

1

2  A.  That it had further questions to ask
3  and directed Houlihan to continue to investigate
4  the issues.
5  Q.  Did Milbank tell Mr. Klein that
6  Milbank had further questions?
7  A.  To the best of my recollection, the
8  conversation was one in which the
9  explanation was -- the explanation was proffered
10  and questions were asked until he left the room.
11  Q.  What questions were asked?
12  A.  Questions relating to the specific
13  numbers that were disclosed to Milbank and
14  Houlihan in this context.
15  Q.  What were those numbers?
16  A.  I don't have a specific recollection
17  of the numbers, and it was Houlihan that was
18  charged with evaluating and understanding those
19  numbers.
20  Q.  In that discussion with Mr. Klein, did
21  anyone other than Mr. Klein provide any
22  explanation?
23  MR. COHEN:  Objection.  Vague.
24  A.  Anyone?
25  Q.  For example, did Mr. Miller or anybody

TSG Reporting - Worldwide    877-702-9580

Page 57

### D. O'DONNELL

1

2  from Weil or Lazard participate in providing an
3  explanation?
4  A.  To the best of my recollection, no.
5  Q.  Over that weekend between the end of
6  the Sale Approval Hearing and the closing, were
7  Milbank lawyers present at Weil Gotshal?
8  A.  Yes.
9  Q.  Which Milbank lawyers?
10  A.  Crayton Bell, Luc Despins, David
11  Eastlake.
12  Q.  Anybody else?  Yourself?
13  A.  I was not present, no.
14  Q.  Were you present at any time over that
15  weekend?
16  A.  I was not, no.
17  Q.  What was -- what was Mr. Bell's role
18  over that weekend?
19  A.  Mr. Bell is a corporate partner at
20  Milbank who was there with a hope of reviewing
21  the documents as they were revised.
22  Q.  And do you know whether he was
23  provided drafts of the documents?
24  A.  He spent a lot of time sitting and
25  waiting, but was ultimately provided with a

TSG Reporting - Worldwide    877-702-9580

## Page 58

D. O'DONNELL

1
2    draft of the Clarification Letter, yes.
3        Q.    Do you know whether he was provided
4    more than one draft of the Clarification Letter?
5        A.    Timeframe?
6        Q.    Over the weekend between the Sale
7    Approval Hearing and the closing.
8        A.    He was provided with a draft of the
9    clarification sometime on the afternoon of
10   Saturday, the 20th, and may have seen other
11   drafts towards the end of the process on Sunday
12   night, Monday morning, but primarily he had
13   access to only the draft provided on Saturday.
14       Q.    You say he may have been provided
15   drafts on Sunday.  Do you know whether he was?
16       A.    I don't know definitively that he was
17   provided with a draft subsequent to the one that
18   he saw on Saturday.
19       Q.    You don't know one way or the other?
20       A.    I don't know one way or the other.
21       Q.    Do you know whether over that weekend
22   on Saturday and Sunday certain drafts of the
23   agreements were distributed in hard copy at
24   Weil?
25       A.    There were many people meeting at Weil

TSG Reporting - Worldwide    877-702-9580

## Page 59

D. O'DONNELL

1
2    over that weekend.  It's possible that there
3    were hard copy drafts distributed to others.
4    The only draft that we received was the one
5    referenced on Saturday.
6        Q.    You don't know, however, whether Mr.
7    Bell received hard copy subsequent drafts?
8        A.    Correct.
9        Q.    So it's possible that Mr. Bell
10   received in hard copy subsequent interim drafts
11   of the Clarification Letter between Saturday and
12   the closing?
13       A.    It is --
14           MR. COHEN:  Objection.  Calls for
15   speculation.
16           You can answer.
17       A.    I don't have any specific knowledge
18   whether he did or not.
19       Q.    You can't exclude the possibility,
20   however, that Mr. Bell, while at Weil, while
21   physically present at Weil, received hard copy
22   interim drafts of the Clarification Letter,
23   correct?
24       A.    My general understanding of the course
25   of dealing that weekend was that Mr. Bell spent

TSG Reporting - Worldwide    877-702-9580

## Page 60

D. O'DONNELL

1
2    a long time waiting and not receiving what he
3    needed to receive to do what he wanted to do
4    there.
5        Q.    I understand your testimony about
6    waiting, but my question is whether you know one
7    way or the other if Mr. Bell, while at Weil on
8    Sunday going into the closing, received in hard
9    copy subsequent drafts of the Clarification
10   Letter?
11           MR. COHEN:  Objection.  Asked and
12   answered.
13       Q.    Do you know that one way or the other?
14           MR. COHEN:  Same objection.
15       A.    I have no specific knowledge of that.
16       Q.    So it's possible that he did?
17           MR. COHEN:  Objection.  Calls for
18   speculation.
19       Q.    Correct?
20           MR. COHEN:  Asked and answered.
21       Q.    So it's possible that he did, correct?
22           MR. COHEN:  Same objections.
23       A.    Yes.
24       Q.    Do you know how much time Mr. Bell
25   spent at Weil over that weekend leading to the

TSG Reporting - Worldwide    877-702-9580

## Page 61

D. O'DONNELL

1
2    closing?
3        A.    He was there most of Saturday and most
4    of Sunday into Monday morning.
5        Q.    And the closing was Monday morning?
6        A.    Correct.
7        Q.    Do you know how much time Mr. Despins
8    spent at Weil over that weekend leading to the
9    closing?
10       A.    He was also there most of Saturday and
11   most of Sunday into Monday morning.
12       Q.    And Mr. Eastlake?
13       A.    He was there for a period of time on
14   Sunday afternoon into -- into Monday morning.
15       Q.    Did anybody from Milbank attend the
16   closing?
17       A.    No.
18       Q.    Why not?
19       A.    The closing was electronic.  It took
20   place on the morning of the 22nd.  There was no
21   need for us to be there.
22       Q.    Was Milbank invited to attend the
23   closing?
24       A.    Yes.
25       Q.    Do you know whether certain schedules

TSG Reporting - Worldwide    877-702-9580

Page 62

D. O'DONNELL

1
2  or draft schedules were reviewed at the closing?
3      A.  No.
4      Q.  You don't know?
5      A.  Correct.
6      Q.  While Mr. Bell, Mr. Despins and Mr.
7  Eastlake were at Weil over the weekend before
8  the closing, what meetings did they participate
9  in, putting aside meetings with the Committee or
10  Houlihan?
11      A.  To reiterate my testimony, they spent
12  a lot of time waiting around, but I believe on
13  Saturday they participated in a meeting that
14  included a number of the key parties, including
15  Weil and representatives of Barclays, and
16  participated in a similar meeting late in the
17  day on Sunday.
18      Q.  Did they participate in any meetings
19  in which representatives of JPMorgan Chase were
20  present?
21      A.  I believe representatives of JPMorgan
22  Chase were present at at least one of those
23  meetings.
24      Q.  Did they participate in any meetings
25  at which representatives of the DTCC were

TSG Reporting - Worldwide    877-702-9580

Page 63

D. O'DONNELL

1
2  present?
3      A.  I don't have specific recollection of
4  all of the parties in these meetings, but they
5  have been described as meetings including all
6  the key parties, so I'm assuming -- I won't
7  assume.  I don't know.
8      Q.  Describe for me, if you would, the
9  Saturday meeting.
10      A.  Our role was peripheral.  It occurred
11  I believe shortly after us being provided with
12  the draft of the Clarification Letter.  We had
13  many questions about the Clarification Letter
14  and were not in a position to participate
15  productively in the meeting.
16      Q.  Did the Milbank lawyers observe the
17  meeting?
18      A.  Yes.
19      Q.  Do you know how long it lasted?
20      A.  Not precisely, no.
21      Q.  Roughly?
22      A.  An hour or so.
23      Q.  And what were the topics discussed in
24  that Saturday meeting?
25      A.  The ongoing negotiations over the open

TSG Reporting - Worldwide    877-702-9580

Page 64

D. O'DONNELL

1
2  issues relating to the transaction.
3      Q.  Do you know whether there were any
4  discussions in that meeting concerning the
5  treatment of the Barclays repo?
6      A.  To the extent that that is an issue
7  reflected in the Clarification Letter, yes.
8      Q.  Do you know whether there were any
9  discussions in that meeting concerning the
10  treatment of the clearance box assets?
11      A.  Same answer.
12      Q.  Do you know whether there were any
13  discussions in that meeting concerning the
14  treatment of the 15c3 assets?
15      A.  Same answer.
16      Q.  Do you know whether there were any
17  discussions in that meeting concerning the
18  treatment of exchange-traded derivatives?
19      A.  The same answer, with the
20  qualification that my level of familiarity with
21  the meeting is not a verbatim account, but my
22  general understanding is that it related to the
23  open issues, including the Clarification Letter.
24      Q.  Turning to the late Sunday meeting,
25  can you tell me what the topics of that meeting

TSG Reporting - Worldwide    877-702-9580

Page 65

D. O'DONNELL

1
2  were?
3      A.  A continuation of the Saturday
4  meeting.
5      Q.  Do you know what, if any, discussions
6  took place at the late Sunday meeting concerning
7  the treatment of the Barclays repo?
8      A.  Not specifically, no.
9      Q.  Do you know whether there were any
10  discussions at the late Sunday meeting
11  concerning how LBI and JPMorgan would handle a
12  shortfall in delivery of securities under the
13  Barclays repo?
14      A.  Again, that was one of the issues
15  under discussion over the weekend.  Whether it
16  was specifically discussed in the Sunday or
17  Saturday meeting I cannot tell you.
18      Q.  It may have been, in other words?
19      A.  Your guess is --
20          MR. COHEN:  Objection.  Calls for
21  speculation.
22      Q.  Let me just -- is it your testimony
23  that that subject would have been discussed over
24  the weekend?
25      A.  It was -- it should have been

TSG Reporting - Worldwide    877-702-9580

Page 70

**D. O'DONNELL**

1
2   A.   Are you referring to the meeting with
3   Mr. Klein?
4        Q.   No, I'm referring to the meeting with
5   a number of parties, including JPMorgan.
6        A.   I believe that meeting took place
7   shortly before the meeting with Mr. Klein.
8        Q.   So late in the evening or early
9   morning?
10       A.   Correct.
11       Q.   And do you know who attended that
12  meeting?
13       A.   Again, it's been described to me as a
14  meeting with all the key parties.  I can't tell
15  you with specificity who was there.
16       Q.   And what discussion was there at that
17  meeting concerning the treatment of clearance
18  box assets?
19       A.   The meeting was a continuation of the
20  ongoing discussions, and based on my
21  understanding of what transpired there, that
22  issue may have been discussed, but I don't have
23  a specific recollection that it was.
24       Q.   Was the value of the clearance box
25  assets described to Milbank at any time over

TSG Reporting - Worldwide     877-702-9580

Page 71

**D. O'DONNELL**

1
2   that weekend?
3        A.   No.
4        Q.   Milbank was never given an estimate by
5   Lehman of the value of those assets?
6        A.   It was Houlihan who was asking those
7   questions, so if anyone received that
8   information, it was Houlihan.
9        Q.   And at the Sunday, this Sunday meeting
10  with all the key parties, was there any
11  discussion concerning the value of the
12  securities Barclays was receiving under the
13  Barclays Repurchase Agreement?
14       A.   I don't have any specific knowledge
15  that that issue was discussed specifically at
16  that meeting.
17       Q.   Was there any discussion concerning
18  how those securities would be treated under the
19  Clarification Letter?
20       MR. COHEN:  Objection.  Vague.
21       A.   No specific knowledge as to whether
22  that issue was discussed at that meeting.
23       Q.   Was there any discussion at that
24  meeting concerning the treatment of
25  exchange-traded derivatives?

TSG Reporting - Worldwide     877-702-9580

Page 72

**D. O'DONNELL**

1
2   A.   Same answer.
3        Q.   You don't know one way or the other?
4        A.   I have -- I don't have specific
5   knowledge that that issue was discussed at that
6   meeting.
7        Q.   It may have been, but you just don't
8   know, is that correct?
9        A.   Correct.
10       Q.   And was there any discussion at that
11  Sunday meeting concerning the treatment of the
12  15c3 assets?
13       A.   Same answer.
14       Q.   There may have been, but you don't
15  know?
16       A.   Correct.
17       Q.   When Mr. Bell reviewed whatever drafts
18  of the Clarification Letter he received, did he
19  ever communicate any comments to Lehman or
20  Barclays lawyers?
21       A.   He posed questions to Lehman and
22  Barclays lawyers.
23       Q.   Did he ever make any comments or
24  suggestions on the drafts?
25       A.   No.

TSG Reporting - Worldwide     877-702-9580

Page 73

**D. O'DONNELL**

1
2        Q.   What questions did he pose?
3        A.   A variety of questions about the
4   evolving draft.
5        Q.   Can you be more specific?
6        A.   Questions relating to the key issues
7   that had changed since the execution of the
8   original APA.
9        Q.   And what were those?
10       A.   The primary issue related to the
11  change, the changes in the definition of
12  "purchased assets."
13       Q.   Specifically, what were those changes
14  that he raised questions about?
15       A.   Without the document in front of me,
16  it's hard to be specific about precisely the
17  questions, what questions were asked.
18       Q.   Okay.  Let's turn, then, to Exhibit
19  26.  We can put 461 to the side, just to get it
20  out of your way.
21       MR. COHEN:  Are we done with it?
22       MR. STERN:  I think so.
23       Q.   Exhibit 26 is a document that was
24  marked in a previous deposition.  It is a Notice
25  of Filing of Purchase Agreement, et cetera, and

TSG Reporting - Worldwide     877-702-9580

Page 74

D. O'DONNELL

1
2    it includes at Exhibit A, Asset Purchase
3    Agreement, dated September 16, 2008; Exhibit B,
4    First Amendment to the Asset Purchase Agreement
5    dated September 19, 2008; and Exhibit C,
6    Executed Clarification Letter Agreement, dated
7    September 20, 2008.
8        Let's turn to Exhibit C.
9        MR. COHEN:  I think the record
10   misstated Exhibit A.  It's dated September
11   16, 2008.
12       MR. STERN:  I meant to say September
13   16.
14    Q.   Let's turn to Exhibit C.  Do you
15   recognize this document?
16    A.   Yes.
17    Q.   Is this -- is this a document that
18   Milbank received on September 22, 2008?
19    A.   Yes.
20    Q.   When Milbank received this document,
21   did Milbank identify anything in the document
22   that was inconsistent with what the Court had
23   been told at the Approval Hearing on September
24   19 and did Milbank communicate that to Weil
25   Gotshal?

TSG Reporting - Worldwide    877-702-9580

Page 75

D. O'DONNELL

1
2        MR. COHEN:  I would object to the
3    extent the question calls for anything other
4    than a communication to Weil Gotshal.  And
5    it's compound.
6    Q.   Let me ask it this way, because you're
7    right, it is compound.
8        After Milbank received the
9    Clarification Letter on September 22, did
10   Milbank communicate to Weil Gotshal anything
11   that Milbank had identified as being
12   inconsistent with what the Court had been told
13   at the Sale Approval Hearing?
14    A.   No.
15    Q.   After Milbank received the
16   Clarification Letter on September 22, did
17   Milbank communicate to Weil that Milbank
18   believed that Committee consent would be
19   required?
20    A.   No.
21    Q.   Now, looking at the first page of the
22   Clarification Letter under the heading Purchased
23   Assets; Excluded Assets, I'm going to turn to
24   Section 1(a)(ii), and it reads:  "with respect
25   to clauses (a), (d) and (e) of the definition of

TSG Reporting - Worldwide    877-702-9580

Page 76

D. O'DONNELL

1
2    'Purchased Assets' in the Original Agreement,
3    instead of the items referred to in such
4    clauses, (A) the securities owned by LBI and
5    transferred to Purchaser or its Affiliates under
6    the Barclays Repurchase Agreement (as defined
7    below) as specified on Schedule A previously
8    delivered by Seller and accepted by Purchaser;
9    (B) such securities and other assets held in
10   LBI's 'clearance boxes' as of the time of the
11   Closing, which at the close of business on
12   September 21, 2008 were as specified on Schedule
13   B previously delivered by Seller and accepted by
14   Purchaser (provided, however, that Purchaser in
15   its discretion may elect within 60 days after
16   the Closing to return any such securities to
17   LBI); provided, that no securities owned by LBHI
18   or any Subsidiary of LBHI (other than LBI and
19   other than as specified in the Agreement and
20   clause (iii) below) are Purchased Assets,"
21   capital P, capital A, "and (C) exchange-traded
22   derivatives (and any property that may be held
23   to secure obligations under such derivatives)
24   and collateralized short-term agreements."
25       With that section that I just read in

TSG Reporting - Worldwide    877-702-9580

Page 77

D. O'DONNELL

1
2    mind, can you tell me whether any of the issues
3    reflected here were discussed at the late Sunday
4    meeting among the key parties at Weil Gotshal?
5        MR. COHEN:  Objection.  Vague.
6    A.   No, I cannot tell you specifically
7    that this specific paragraph of the
8    Clarification Letter was discussed at that
9    meeting.
10    Q.   You don't know one way or the other?
11    A.   Correct.
12    Q.   Okay.  It may have been, but you
13   simply don't know, correct?
14    A.   Correct.
15    Q.   The paragraph I read has three
16   subsections, A, B and C, describing different
17   categories of assets.  With respect to the first
18   category, Category A, the securities transferred
19   under the Barclays repo, did Milbank have as of
20   September 22 an estimate of the value of those
21   securities?
22       MR. COHEN:  You can answer that yes or
23   no.
24    A.   Yes.
25    Q.   And what was the -- what was that

TSG Reporting - Worldwide    877-702-9580

Page 78

### D. O'DONNELL

1
2  estimate?
3        MR. COHEN: To the extent that that
4  estimate came from the Committee's financial
5  advisors, do not disclose that. If the
6  estimate came from the Debtors or Barclays
7  or some public source, you can disclose it.
8        A.   As of September 22, Milbank had the
9  draft Schedule A that had been provided over the
10 weekend, and Houlihan had been diligencing that
11 schedule but had not reached conclusions as to
12 the validity of the numbers in that schedule.
13       Q.   That's Schedule 461?
14       A.   Correct.
15       Q.   That's Exhibit 461B?
16       A.   Correct.
17       Q.   With respect to Category B, the
18 clearance box assets, did Milbank as of
19 September 22 have an estimate of the value of
20 those assets?
21       MR. COHEN: You can answer that yes or
22 no.
23       A.   Yes.
24       Q.   What was that estimate?
25       MR. COHEN: Same caveat. To the

TSG Reporting - Worldwide    877-702-9580

Page 79

### D. O'DONNELL

1
2  extent it came from the Debtors, Barclays or
3  some non-privileged source, you can disclose
4  it. To the extent it came from Houlihan or
5  one of the Committee's financial advisors,
6  I'll instruct you not to answer.
7        A.   It was $1.9 billion.
8        Q.   And with respect to Category C,
9  exchange-traded derivatives and any property
10 that may be held to secure obligations under
11 such derivatives, as of September 22, did
12 Milbank have an estimate of the value of those
13 assets?
14       MR. COHEN: You can answer that yes or
15 no.
16       A.   Yes.
17       Q.   And what was that estimate?
18       MR. COHEN: To the extent that it came
19 from a privileged source, I'll instruct you
20 not to answer. If it came from a
21 non-privileged source, you can answer.
22       A.   I don't have a specific recollection
23 of what that number was.
24       Q.   Do you know whether either Barclays or
25 Lehman did provide an estimate concerning the

TSG Reporting - Worldwide    877-702-9580

Page 80

### D. O'DONNELL

1
2  value of exchange-traded derivatives and any
3  property held to secure those derivatives as of
4  September 22?
5        A.   Yes, I believe they did.
6        Q.   Do you have any recollection of the
7  rough order of magnitude that you were given?
8        A.   I don't have a specific recollection
9  at this point.
10       Q.   Do you have a -- do you have a
11 recollection of whether it was in excess of $1
12 billion?
13       A.   My vague recollection is that it was
14 less than that.
15       Q.   Do you remember whether it was less
16 than a billion, or are you not sure?
17       A.   I'm not sure.
18       Q.   And do you know who gave you that
19 estimate? Withdrawn.
20            Do you know who gave Milbank that
21 estimate?
22       A.   Lehman.
23       Q.   Lehman. Do you know who from Lehman?
24       A.   No.
25       Q.   Do you know whether that estimate was

TSG Reporting - Worldwide    877-702-9580

Page 81

### D. O'DONNELL

1
2  given to Barclays?
3        A.   I don't know.
4        Q.   Looking at page 4 under paragraph 8.
5        MR. COHEN: This is Tab C to Exhibit
6  26?
7        MR. STERN: Correct.
8        Q.   On page 4, paragraph 8 is labeled
9  Transfer of Customer Accounts. Do you see that?
10       A.   Yes, I do.
11       Q.   Okay. And I'll read it into the
12 record: "All customer accounts of LBI other
13 than customers who are affiliates of LBI shall
14 be transferred to purchaser. In connection
15 therewith, purchaser shall receive (1) for the
16 account of the customer any and all property of
17 any customer, including any held by or on behalf
18 of LBI, to secure the obligations of any
19 customer whose accounts are being transferred to
20 purchaser as part of the business and (2) to the
21 extent permitted by applicable law, and as soon
22 as practicable after the closing, $769 million
23 of securities as held by or on behalf of LBI on
24 the date hereof pursuant to Rule 15c3-3 of the
25 Securities Exchange Act of 1934, as amended, or

TSG Reporting - Worldwide    877-702-9580

Page 82

1          **D. O'DONNELL**
2    **securities of substantially the same nature and**
3    **value. Liabilities arising under seller's**
4    **arrangements with DTC and its affiliated**
5    **clearing organizations shall be excluded**
6    **liabilities."**
7          **Now, with respect to the $769 million**
8    **figure in that paragraph, were there any**
9    **discussions concerning that amount --**
10         MR. STERN: Let's go off the record
11   for a second.
12         (Discussion off the record.)
13   **Q.   With respect to the $769 million**
14   **figure in that paragraph, were there any**
15   **discussions concerning that amount over the**
16   **weekend prior to the closing?**
17         MR. COHEN: You can answer that yes or
18   no.
19   A.   Yes.
20   **Q.   And what were those discussions?**
21         MR. COHEN: You can answer that to the
22   extent that there were discussions with
23   people outside the privilege, meaning the
24   Committee, its professionals and advisors,
25   but to the extent that there were

TSG Reporting - Worldwide     877-702-9580

Page 83

1          D. O'DONNELL
2    discussions among that group, I'll instruct
3    you not to answer.
4    A.   Yes, there were discussions with the
5    Debtors concerning that issue over the weekend.
6    Q.   Okay. And what were those
7    discussions?
8    A.   To the best of my recollection, they
9    related to what portion of that $769 million
10   would go to Barclays and what portion would stay
11   with LBI.
12   Q.   Who participated in those discussions?
13   A.   I'm aware of discussions on that topic
14   between Luc Despins and Harvey Miller.
15   Q.   And in those discussions was there any
16   reference to the total amount of 15c3 assets
17   available for transfer?
18   A.   I don't have any specific recollection
19   as to that issue.
20   Q.   Do you know whether the amount of 15c3
21   assets believed at the time to be available for
22   transfer was greater than $769 million?
23         MR. COHEN: You can answer that yes or
24   no.
25   A.   I think I should qualify my last

TSG Reporting - Worldwide     877-702-9580

Page 84

1          D. O'DONNELL
2    answer and this answer by saying that I know the
3    issue of the amount of the 15c3 deposits and how
4    they would be divvied up was discussed. I'm not
5    sure of the precise numbers at issue. I don't
6    know whether the 769 is the total number or the
7    number that was allocated to Barclays.
8    **Q.   Okay. But there were discussions**
9    **between Mr. Despins and Mr. Miller concerning**
10   **that issue?**
11   A.   Correct.
12   Q.   And do you know what was discussed
13   in -- between Mr. Despins and Mr. Miller on that
14   subject?
15   A.   That it was an open issue, subject to
16   ongoing negotiation, and Mr. Despins asked Mr.
17   Miller for a report as to the outcome of those
18   negotiations.
19   **Q.   Going back to page 2 at the top, we**
20   **referred to that Category C, exchange-traded**
21   **derivatives and any property that may be held to**
22   **secure obligations under such derivatives, is**
23   **it -- is it your recollection that, separate and**
24   **apart from the 15c3 assets, you had an**
25   **estimate -- Milbank received an estimate from**

TSG Reporting - Worldwide     877-702-9580

Page 85

1          D. O'DONNELL
2    **Lehman of the value of the exchange-traded**
3    **derivatives and any property that may be held to**
4    **secure those derivatives?**
5          MR. COHEN: Objection. Vague.
6    A.   An estimate from whom?
7    Q.   From Lehman.
8    A.   I don't have a clear recollection one
9    way or the other. The numbers in this paragraph
10   overlap in my recollection, so I can't
11   definitively tell you that we did receive an
12   estimate as to Category C prior to the closing.
13   Q.   So the value of Category C may have
14   been, may have been uncertain as of that time?
15   A.   Much --
16         MR. COHEN: Objection. Calls for
17   speculation.
18   A.   Much was uncertain as of this time
19   from our perspective and from Houlihan's
20   perspective.
21   Q.   And do you know whether much was
22   uncertain from Barclays' perspective?
23         MR. COHEN: Objection. Calls for
24   speculation.
25   A.   I have no idea what was in Barclays'

TSG Reporting - Worldwide     877-702-9580

---

Page 86

D. O'DONNELL

1  mind.
2      Q.   Did Barclays ever express to you that
3  much was uncertain to Barclays?
4      A.   Our dealings with Barclays that
5  weekend were very limited, and in that context,
6  no.
7      Q.   So staying with this paragraph that
8  runs from page 1 to page 2, Category A, I
9  believe you told me that the estimate that you
10 had for that category is the amount reflected on
11 Exhibit 461B, correct?
12         MR. COHEN:  Objection.
13     A.   Correct.
14         MR. COHEN:  I think that misstates the
15 testimony.
16     Q.   Let me ask my question again.
17 With respect to Category A, am I
18 correct that you told me that the estimate that
19 Milbank had for that category is the amount
20 reflected on Exhibit 461B; is that correct?
21     A.   The estimate that Milbank had was that
22 provided in the draft of Schedule A circulated
23 on Sunday, the 21st.
24     Q.   And that's Exhibit 461B?

TSG Reporting - Worldwide    877-702-9580

---

Page 87

D. O'DONNELL

1      A.   That appears to be the case, yes.
2      Q.   And if you look at the third page of
3  Exhibit 461B, you see that lists a total figure
4  of $49.9 billion?
5      A.   Correct.
6      Q.   Okay.  And for Category B, looking
7  back to the Clarification Letter on page 1,
8  Category B, I believe you indicated the estimate
9  that Milbank had as of the closing was 1.9
10 billion; is that correct?
11     A.   Correct.
12     Q.   And for Category C, exchange-traded
13 derivatives and any property held to secure
14 those derivatives, that amount was uncertain, to
15 the best of your recollection; is that correct?
16     A.   Correct.
17         MR. STERN:  Let's take a short break.
18         THE VIDEOGRAPHER:  The time is now
19 11:48 A.M.  We're now off the record.
20         (Recess.)
21         THE VIDEOGRAPHER:  The time is now
22 12:04 P.M.  We are now back on the record.
23 BY MR. STERN:
24     Q.   Let's look back at Exhibit 26, Tab C,

TSG Reporting - Worldwide    877-702-9580

---

Page 88

D. O'DONNELL

1  page 5, please.  Do you see on page 5 a
2  paragraph 13 labeled Barclays Repurchase
3  Agreement?
4      A.   Yes, I see that paragraph.
5      Q.   Going back to the meetings over the
6  weekend at Weil among the key parties, do you
7  know whether the subject matter of this
8  paragraph was discussed in those meetings that
9  Milbank attended?
10         MR. COHEN:  The non-privileged
11 meetings?
12         MR. STERN:  Yes.
13     A.   As previously testified, with respect
14 to other parts of this letter, no, I don't know,
15 whether this specific paragraph was discussed in
16 those meetings.
17     Q.   Do you have any reason to believe that
18 it was not discussed at those meetings?
19     A.   I have no reason to believe that it
20 was not discussed.
21         (Exhibit 499, a document bearing Bates
22 Nos. WGM-LEHMAN-E 00002746 through 2766,
23 marked for identification, as of this date.)
24     Q.   We've handed you a document that we've

TSG Reporting - Worldwide    877-702-9580

---

Page 89

D. O'DONNELL

1  marked as Exhibit 499, and I'll ask you to take
2  a look at it and identify it for us, if you
3  would.
4      (Document review.)?
5      A.   I've reviewed the document.
6      Q.   Can you tell us what it is?
7      A.   It appears to be an e-mail forwarding
8  to Crayton Bell a draft of the Clarification
9  Letter on 9/19/2008.
10     Q.   Let me mark another document as the
11 next exhibit, and I'll ask you to review that
12 and identify that for me as well.
13     (Exhibit 500, a document bearing
14 HLHZ0020162 through 182, marked for
15 identification, as of this date.)
16         MR. COHEN:  Is this Exhibit 500?
17         MR. STERN:  Yes.
18         MR. COHEN:  I'll note for the record
19 Exhibit 500 appears to be three documents
20 clipped together.
21         MR. STERN:  They should be stapled
22 together.  It's all a part of one document.
23 We'll staple the exhibit.
24     (Document review.)

TSG Reporting - Worldwide    877-702-9580

Page 90

D. O'DONNELL

1     A.  I've reviewed the document.
2     Q.  **What is it?**
3     A.  It appears to be another draft of the
4  Clarification Letter forwarded to Crayton Bell
5  on Saturday afternoon, September 20.
6     (Exhibit 501, a document bearing Bates
7  Nos. WGM-LEHMAN-E 00013962 through 13982,
8  marked for identification, as of this date.)
9     Q.  **We're marking another exhibit Exhibit**
10 **501, and I'll ask you the same question after**
11 **you have a chance to review it.**
12    (Document review.)
13    A.  I've reviewed the document.
14    Q.  **Do you know what it is?**
15    A.  It appears to be an e-mail attaching
16 yet another draft of the Clarification Letter
17 forwarded by Bob Messineo to David Murgio on
18 Sunday -- on Sunday, September 21, at 12:39 P.M.
19    Q.  **Okay.  At the top, there's an**
20 **instruction from David Murgio to Ann Peterson at**
21 **Weil:  "Please print and copy 15 of each of**
22 **these and hold by your desk.  Thanks."**
23    **Do you know whether, while Mr. Bell**
24 **was at Weil on September 21, he received a copy**

TSG Reporting - Worldwide    877-702-9580

Page 91

D. O'DONNELL

1  **of the drafts that we marked as Exhibit 501?**
2     A.  I do not know whether Mr. Bell
3  received a copy of this draft.
4     Q.  **He may have, but you simply don't**
5  **know?**
6     A.  Correct.
7     Q.  **Okay.**
8     (Exhibit 502, a document bearing Bates
9  Nos. WGM-LEHMAN-E 00013889 through 13899,
10 marked for identification, as of this date.)
11    Q.  **We've marked another document as**
12 **Exhibit 502.  I'll ask you to take a look at it**
13 **and then I'll ask you to identify it.**
14    (Document review.)
15    A.  I've reviewed the document.
16    Q.  **Can you identify it?**
17    A.  It appears to be an e-mail from David
18 Leinwand at Cleary Gottlieb circulating another
19 draft of the Clarification Letter at 9:23 A.M.
20 on September 21.
21    Q.  **And at the top, there's an instruction**
22 **again from David Murgio to Ann Peterson:**
23 **"Please print and staple ten of these."**
24    **Do you know whether, while Mr. Bell**

TSG Reporting - Worldwide    877-702-9580

Page 92

D. O'DONNELL

1  **was present at Weil on September 21, he received**
2  **a copy of this material that we've marked as**
3  **Exhibit 502?**
4     A.  I do not know.
5     Q.  **You don't know one way or the other?**
6     A.  Correct.
7     Q.  **So it's possible that he did, but you**
8  **don't know?**
9     A.  Correct.
10    (Exhibit 503, a document bearing
11 Bates Nos. HLHZ0019919 through 19930, marked
12 for identification, as of this date.)
13    Q.  **We've marked another document as**
14 **Exhibit 503, and I'll ask you to review this and**
15 **identify it for us.**
16    (Document review.)
17    A.  I've reviewed the document.
18    Q.  **And what is it?**
19    A.  It appears to be an e-mail from David
20 Murgio attaching, I believe, though it's hard to
21 tell from the form of e-mail, the -- the -- a
22 copy of what purports to be the final version of
23 the Clarification Letter.
24    Q.  **Before the closing on September 22,**

TSG Reporting - Worldwide    877-702-9580

Page 93

D. O'DONNELL

1  **did Mr. Bell or anybody from Milbank suggest to**
2  **Weil that the final agreements should include**
3  **valuation conditions for the purchased assets**
4  **and assumed liabilities?**
5     A.  No.
6     Q.  **Before the closing on September 2,**
7  **did -- I'm sorry, before the closing on**
8  **September 22, did Mr. Bell or anyone from**
9  **Milbank suggest to Weil that the final agreement**
10 **should include a cap on the value of purchased**
11 **assets?**
12    A.  No.
13    Q.  **Before the closing on September 22,**
14 **did Mr. Bell or anybody else from Milbank**
15 **suggest to Weil that the final agreement should**
16 **include a floor or limit or cap on the value of**
17 **assumed liabilities?**
18    A.  No.
19    Q.  **Before the closing on September 22,**
20 **did Mr. Bell or anybody else from Milbank**
21 **suggest to Weil that the final agreement -- the**
22 **final agreement should include representations**
23 **and warranties concerning the value of purchased**
24 **assets and the value of the consideration under**

TSG Reporting - Worldwide    877-702-9580

---

Page 94

D. O'DONNELL

1
2     the final agreement?
3         A.    No.
4         Q.    And before the closing on September
5     22, did Mr. Bell or anybody else from Milbank
6     suggest to Weil that the final agreement should
7     include true-up provisions with respect to the
8     value of the purchased assets or the value of
9     the consideration under the final agreement?
10        A.    No.
11        Q.    Now, when Weil made a motion for
12    approval of the sale, did Milbank review the
13    Weil Gotshal motion?
14        A.    Can you be more specific about the
15    motion you're referring to?
16        Q.    I'll hand you what has previously been
17    marked as Exhibit 440.  I've handed you what has
18    previously been marked as Exhibit 440, and this
19    is Debtors' Motion to (A) Schedule a Sale
20    Hearing; (B) Establish Sales Procedures; (C)
21    Approve a Breakup Fee; and (D) Approve the Sale
22    of the Purchased Assets and the Assumption and
23    Assignment of Contracts Relating to the
24    Purchased Assets.  Do you see that?
25        A.    Yes, I do.

TSG Reporting - Worldwide    877-702-9580

---

Page 95

D. O'DONNELL

1
2         Q.    Did Milbank review these papers at the
3     time they were served?
4         A.    Yes, it did.
5         Q.    What understanding did Milbank have at
6     the time concerning the extent of Barclays'
7     obligation under the original APA to make cure
8     payments?
9             MR. TECCE:  Objection.
10            MR. COHEN:  I object to the extent
11    that the question calls for legal advice,
12    privileged communications and attorney work
13    product, and instruct Mr. O'Donnell not to
14    answer with respect to those areas.
15            If you have an understanding from a
16    non-privileged source, you can speak to
17    that.
18        A.    Based on the representations made by
19    the Debtors at both the bidding procedures and
20    the Sale Hearing, we understood that the APA
21    required Barclays to make certain cure and
22    compensation payments.
23        Q.    Was it Milbank's understanding that
24    Barclays had the right, but not the obligation,
25    to take assignment of contracts and leases which

TSG Reporting - Worldwide    877-702-9580

---

Page 96

D. O'DONNELL

1
2     are -- were designated for assumption and
3     assignment by the -- by Barclays?
4             MR. COHEN:  I'll instruct Mr.
5     O'Donnell to limit his answer to
6     non-privileged sources and not reveal
7     privileged communications or attorney work
8     product in his response.
9         A.    Based on representations at the
10    hearing on the 19th and the terms of the Sale
11    Order itself, yes, that was our understanding.
12        Q.    Did Milbank understand that there
13    would be certain filings made in connection with
14    cure amounts for what were labeled Closing Date
15    Contracts?
16            MR. COHEN:  Hold for a second.
17            Give the same limitation.  Mr.
18    O'Donnell can reveal understandings that
19    Milbank may have received from
20    non-privileged sources, but internal
21    communications and attorney work product
22    should not be revealed in your answer.
23        A.    Yes, I believe that there was a
24    procedure originally prescribed in the motion
25    that was superseded by discussions amongst

TSG Reporting - Worldwide    877-702-9580

---

Page 97

D. O'DONNELL

1
2     parties on the 19th as disclosed to the Court by
3     Mr. Miller or Ms. Fife.
4         Q.    Do you know whether -- withdrawn.  Did
5     Milbank review the filing that was made with
6     respect to closing date contracts when that
7     filing was made?
8             MR. COHEN:  You can answer that yes or
9     no.
10        A.    I need clarification as to what
11    specific filing you're referring to.
12        Q.    Do you know whether a filing was made
13    before the Sale Approval Hearing identifying
14    Closing Date Contracts that Barclays would
15    assume?
16        A.    Yes, I believe that there was one.
17        Q.    Did Milbank review that filing?
18            MR. COHEN:  You can answer that yes or
19    no.
20        A.    Yes.
21        Q.    Okay.  Did that filing list cure
22    amounts for the Closing Date Contracts?
23            MR. COHEN:  Objection.  The document
24    speaks for itself.  If you have a
25    recollection as to what was in that

TSG Reporting - Worldwide    877-702-9580

Page 98

D. O'DONNELL

1
2  document, you can answer yes or no.
3  A.  Yes, it did list cure amounts.
4  Q.  Did Milbank add up those amounts?
5  MR. COHEN:  Instruct the witness not
6  to answer. It's attorney work product.
7  Q.  Was Milbank aware of the total amount
8  of those listed cure amounts?
9  MR. TECCE:  Same objection. To the
10  extent that it comes from a non-privileged
11  source, you can answer.
12  A.  Based upon representations made at the
13  hearing by Mr. Miller, yes.
14  Q.  Do you recall the total amount of the
15  cure payments for the Closing Date Contracts
16  that were listed on the filing that was made
17  before the Sale Approval Hearing?
18  MR. COHEN:  So the question is do you
19  remember the number in a publicly filed
20  motion?
21  MR. STERN:  Yes.
22  MR. COHEN:  Object to the form.
23  A.  I don't remember, one, whether there
24  was a total number listed; and, if there was, I
25  don't remember what it was.

Page 99

D. O'DONNELL

1
2  Q.  Assuming that there was no total
3  number listed, did Milbank do anything to add up
4  the amounts that were listed?
5  MR. COHEN:  Instruct the witness not
6  to answer on the basis of work product.
7  Q.  Is that something Milbank could have
8  done at the time?
9  MR. COHEN:  You can answer that yes or
10  no.
11  A.  Yes.
12  Q.  Did Milbank have an understanding
13  that, within 60 days of the closing, there would
14  be a further filing with respect to designated
15  contracts and proposed cure amounts for those
16  contracts?
17  MR. COHEN:  I instruct the witness to
18  limit his response as to Milbank's
19  understanding to any understanding it
20  received from non-privileged sources.
21  A.  Yes.
22  Q.  And did Milbank review that filing
23  when it was made?
24  MR. COHEN:  You can answer yes or no.
25  A.  Yes.

Page 100

D. O'DONNELL

1
2  Q.  And did Milbank total the cure amounts
3  that were listed in that filing?
4  MR. COHEN:  I instruct the witness not
5  to answer on the basis of attorney work
6  product.
7  Q.  Is that something Milbank could have
8  done?
9  MR. COHEN:  You can answer yes or no.
10  A.  Yes.
11  Q.  As of the Sale Hearing, did Milbank
12  understand that Barclays was assuming certain
13  obligations to pay certain employee benefits and
14  compensation?
15  MR. COHEN:  Instruct the witness to
16  limit his response as to Milbank's
17  understanding to any understanding it
18  received from non-privileged sources.
19  A.  Yes.
20  Q.  Based on Milbank's review of the
21  original APA, did Milbank understand that the
22  amount of Barclays' compensation obligation
23  would depend on the number of transferred
24  employees taking employment with Barclays?
25  MR. COHEN:  I instruct the witness not

Page 101

D. O'DONNELL

1
2  to answer on the basis of attorney work
3  product.
4  Q.  After the closing on September 22, was
5  Milbank aware of the deadline by which the
6  Committee would need to make any motion for
7  reconsideration of the Sale Order?
8  MR. COHEN:  Objection. Calls for a
9  legal conclusion.
10  A.  Yes.
11  Q.  And what was that deadline?
12  MR. COHEN:  Objection. Calls for a
13  legal conclusion.
14  A.  Pursuant to the rules, it would have
15  been ten days after entry of the order.
16  Q.  Was Milbank aware after the closing or
17  did Milbank monitor what the final deadline
18  would be for appealing the Sale Order?
19  MR. COHEN:  Objection. I instruct the
20  witness not to answer on the basis of
21  attorney work product.
22  Q.  Was Milbank aware that a motion for
23  reconsideration of the Sale Order had been made?
24  MR. COHEN:  You can answer yes or no.
25  A.  Yes.

Page 102

1      D. O'DONNELL
2      **Q.   And was Milbank aware of how that**
3  **affected the time by which parties would have to**
4  **appeal the Sale Order?**
5      MR. COHEN:  I instruct the witness not
6  to answer on the basis of attorney work
7  product.
8      **Q.   Am I correct that the Committee did**
9  **not object to approval of the sale transaction**
10 **at the September 19 Sale Approval Hearing?**
11     MR. COHEN:  You can answer yes or no.
12     A.   Yes.
13     **Q.   What factors did the Committee**
14 **consider in deciding not to object?**
15     MR. COHEN:  I instruct the witness not
16 to answer on the basis of attorney-client
17 privilege and attorney work product.
18     **Q.   Am I correct that the Committee did**
19 **not make a motion for reconsideration of the**
20 **Sale Approval Order?**
21     MR. COHEN:  You can answer yes or no.
22     A.   Yes.
23     **Q.   What factors did the Committee take**
24 **into consideration in determining whether or not**
25 **to make such a motion?**

TSG Reporting - Worldwide    877-702-9580

Page 103

1      **D. O'DONNELL**
2      MR. COHEN:  I instruct the witness not
3  to answer on the basis of attorney-client
4  privilege and attorney work product.
5      **Q.   Am I correct that the Committee did**
6  **not appeal the Sale Approval Order?**
7      MR. COHEN:  You can answer yes or no.
8      A.   Yes.
9      **Q.   What factors did the Committee take**
10 **into consideration in deciding not to appeal the**
11 **Sale Approval Order?**
12     MR. COHEN:  I instruct the witness not
13 to answer on the basis of attorney-client
14 privilege and attorney work product.
15     (Discussion off the record.)
16     THE VIDEOGRAPHER:  That is the end of
17 tape number 2.  The time is 12:34 P.M.
18 We're now off the record.
19     (Luncheon recess.)
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 104

1      D. O'DONNELL
2      AFTERNOON SESSION
3      THE VIDEOGRAPHER:  This is the start
4  of tape number 3.  The time is now 1:20 P.M.
5  We are now back on the record.
6  DENNIS C. O'DONNELL, resumed and
7      testified as follows:
8  EXAMINATION BY (Cont'd.)
9  BY MR. STERN:
10     **Q.   I'd like to go back to September 22**
11 **after Milbank had received the Final Purchase**
12 **Agreement.**
13     **At that point did Milbank have any**
14 **certainty concerning the value of the purchased**
15 **assets in the Final Purchase Agreement?**
16     A.   No.
17     MR. TECCE:  Objection to the form of
18 the question to the extent that it asks him
19 to reveal privileged information or work
20 product.
21     **Q.   At that point, did Milbank have any**
22 **certainty concerning the value of the**
23 **consideration, including assumed liabilities, in**
24 **the Final Purchase Agreement?**
25     A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 105

1      D. O'DONNELL
2      **Q.   At that point did Milbank have any**
3  **certainty concerning whether the value of the**
4  **consideration, including purchased assets, was**
5  **perfectly balanced with or a wash with the value**
6  **of purchased assets?**
7      A.   No.
8      **Q.   Did Milbank believe at that point,**
9  that is, September 22, after receiving the Final
10 Purchase Agreement, that there was a certain cap
11 on the value of the purchased assets in the
12 Final Purchase Agreement?
13     MR. COHEN:  Objection.  I instruct the
14 witness not to answer.  Calls for legal
15 advice and attorney work product.
16     **Q.   Did Milbank believe upon receiving the**
17 Final Purchase Agreement that there was a $47.4
18 billion cap on the value of purchased assets in
19 the Final Purchase Agreement?
20     MR. COHEN:  Instruct the witness not
21 to answer.  Calls for privileged
22 communications and attorney work product.
23     **Q.   When Milbank received the Final**
24 Purchase Agreement on September 22, did Milbank
25 have any concern that the agreement had not been

TSG Reporting - Worldwide    877-702-9580

Page 106

1          D. O'DONNELL
2   authorized by the Court?
3          MR. COHEN:  Instruct the witness not
4   answer.  Calls for privileged communications
5   and attorney work product.
6       Q.   Did Milbank ever express to Weil after
7   receiving the Final Purchase Agreement on
8   September 22 a concern that the Final Purchase
9   Agreement had not been authorized by the Court?
10      A.   In what time period?
11      Q.   In the period September 22 through
12  September 30.
13      A.   No.
14      Q.   And on September 22 itself, upon
15  receiving the Final Purchase Agreement, Milbank
16  did not express any concern to Weil that the
17  Final Purchase Agreement had not been authorized
18  by the Court; is that right?
19      A.   Correct.
20      Q.   As of receiving the Final Purchase --
21  withdrawn.  As of September 22, upon receiving
22  the Final Purchase Agreement, did Milbank ever
23  express any concern to Weil that the transaction
24  as reflected in the Final Purchase Agreement was
25  not a wash?
              TSG Reporting - Worldwide    877-702-9580

Page 107

1          D. O'DONNELL
2       A.   Milbank repeated requests for access
3   to the final schedules to address that amongst
4   other issues.
5       Q.   The final schedules are those for
6   Schedule A and Schedule B?
7       A.   Correct.
8       Q.   Based on the estimated values that
9   Milbank had as of that time, as of September 22,
10  for Schedule A and Schedule B assets, based on
11  that information, did Milbank ever say to Weil
12  that Milbank was concerned that the transaction
13  was not a wash?
14          MR. COHEN:  Objection.  Vague as to
15  "estimated values."
16      A.   Houlihan continued to review the
17  schedules, had raised questions about the
18  schedules.  We had passed on to Weil our
19  concerns and questions about the schedules.
20      Q.   Did anybody from Milbank ever say to
21  anybody at Weil on September 22 that Milbank was
22  concerned that the Final Purchase Agreement did
23  not reflect a balanced transaction or a wash?
24          MR. COHEN:  Object to the form.
25      A.   Milbank had questions and raised those
              TSG Reporting - Worldwide    877-702-9580

Page 108

1          D. O'DONNELL
2   questions with Weil.
3       Q.   Did anybody from Milbank ever say to
4   anybody at Weil on September 22 that Milbank was
5   concerned that the Final Purchase Agreement did
6   not reflect a balanced transaction or a wash?
7          MR. COHEN:  Objection.  Asked and
8   answered.  Object to the form.
9       A.   As previously testified, Milbank had
10  concerns and was asking questions about, amongst
11  others, those issues.
12      Q.   Who expressed those concerns on behalf
13  of Milbank?
14      A.   Timeframe?
15      Q.   September 22.
16      A.   On September 22, Crayton Bell
17  specifically asked for the final schedules.
18      Q.   Aside from asking for the final
19  schedules, did Crayton Bell or anybody else from
20  Milbank express to Weil a concern that the Final
21  Purchase Agreement did not reflect a balanced
22  transaction or a wash?
23      A.   Are we talking about after the closing
24  or prior to the closing?
25      Q.   On September 22.
              TSG Reporting - Worldwide    877-702-9580

Page 109

1          D. O'DONNELL
2       A.   The discussions with Weil on the
3   morning of the 22nd that arose out of the review
4   of the schedules may have alluded to that
5   concern.
6       Q.   Do you know whether they did?
7       A.   Not in the precise terms that you've
8   framed the question.
9       Q.   Did Milbank believe as of September 22
10  that the final transaction was supposed to be a
11  balanced transaction or a wash between purchased
12  assets and consideration?
13          MR. COHEN:  You can answer that to the
14  extent you have a non-privileged source that
15  would reflect Milbank's belief or would have
16  informed Milbank's belief.
17      A.   Yes.
18      Q.   What steps did Milbank take before the
19  closing to assure that the Final Purchase
20  Agreement would actually reflect a balanced
21  transaction between purchased assets and
22  consideration?
23          MR. COHEN:  Instruct the witness not
24  to answer on the basis of attorney-client
25  privilege and attorney work product.
              TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2    Q.   What steps did Milbank take in
3    communicating with Weil Gotshal to assure that
4    the Final Purchase Agreement would actually
5    reflect a balanced transaction?
6    A.   As previously testified, Milbank, in
7    conjunction with Houlihan, requested information
8    relating to Schedule A.
9    Q.   Aside from requesting information, did
10   Milbank ever do anything to suggest that the
11   Final Purchase Agreement reflect a balanced
12   transaction?
13   MR. COHEN:  I'll instruct the witness
14   to limit his response to non-privileged
15   communications or actions.
16   A.   Milbank reported to Weil that Houlihan
17   could not get comfortable with the numbers as
18   reflected in the draft of the Schedule A that
19   they had reviewed.
20   Q.   What does that have to do with Milbank
21   suggesting changes to the Final Purchase
22   Agreement to assure that it would be a balanced
23   transaction?
24   MR. COHEN:  Object to the form.
25   A.   Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2    Q.   Did Milbank ever make any suggestions
3    to Weil concerning the need for representations
4    and warranties or valuation conditions for the
5    Final Purchase Agreement?
6    MR. COHEN:  Objection.  Asked and
7    answered.
8    A.   And the answer is no.
9    Q.   In the absence of those contractual
10   conditions, how could Milbank be assured that
11   the Final Purchase Agreement would provide for a
12   balanced transaction?
13   MR. COHEN:  Hold on for a second.
14   MR. TECCE:  I'm going to object to the
15   extent that his answer involves work product
16   or attorney-client communications.
17   MR. COHEN:  I'll join that objection
18   and add it calls for speculation.
19   A.   By recourse to Houlihan and the
20   evaluation of the numbers that Houlihan was
21   undertaking.
22   Q.   But I thought you told me those
23   figures were all uncertain at the time, isn't
24   that right?
25   A.   They were, yes.  Correct.

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2    Q.   There was uncertainty concerning the
3    value of the purchased assets, correct?
4    A.   Correct.
5    Q.   There was uncertainty concerning the
6    value of the assumed liabilities, correct?
7    A.   Correct.
8    Q.   And Milbank had a transactional
9    lawyer, Crayton Bell, present at Weil before the
10   closing, correct?
11   A.   Correct.
12   Q.   And Mr. Bell was available to comment
13   on the Final Purchase Agreement, correct?
14   A.   Correct.
15   Q.   Mr. Bell knew that, in order to have a
16   balanced transaction, it is customary to provide
17   for representations and warranties and valuation
18   conditions, isn't that right?
19   MR. COHEN:  Objection.  Calls for
20   speculation.
21   A.   And I don't know what Mr. Bell knew in
22   that context.
23   Q.   He's a highly qualified transactional
24   lawyer, correct?
25   A.   He is, yes.

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2    Q.   He's experienced, correct?
3    A.   Correct.
4    Q.   Do you know whether he's ever prepared
5    a purchase agreement providing for a balanced
6    transaction or a balance sheet transaction?
7    MR. TECCE:  Objection to the form of
8    the question.
9    A.   The answer is I don't know
10   specifically, but I assume that's the case, yes.
11   Q.   And do you know in those circumstances
12   whether Mr. Bell would know that representations
13   and warranties and valuation conditions were
14   essential in order to provide for a
15   contractually enforceable balanced transaction?
16   MR. COHEN:  Objection.  Calls for
17   legal conclusion and calls for speculation.
18   A.   And nothing about this transaction was
19   traditional or customary.  From the word go, it
20   was different.  So whatever his experience, you
21   know, his expectations or experiences were with
22   respect to other transactions would not
23   necessarily be applicable to this situation.
24   Q.   I see.  So it's your testimony that if
25   Mr. Bell knew from prior transactions that

TSG Reporting - Worldwide    877-702-9580

Page 114

### D. O'DONNELL

1
2  representations and warranties and valuation
3  conditions were essential to create a balanced
4  transaction, he would not apply that experience
5  to this transaction?
6        MR. COHEN:  Objection.  Calls for a
7  hypothetical and speculation.
8    Q.   Is that your testimony?
9    A.   He might try.
10   Q.   Did he try?
11   A.   If given the opportunity, he might
12  have tried, yes.
13   Q.   Well, did he try?
14   A.   I don't know specifically whether he
15  raised those specific -- I think I've actually
16  already testified that he did not, he did not
17  make those suggestions.
18   Q.   And was the Committee concerned that
19  the transaction be a balanced transaction?
20        MR. TECCE:  Objection to the form of
21   the question.  I'll instruct the witness not
22   to answer on the grounds that it will
23   disclose attorney-client communications and
24   attorney work product.
25   Q.   Well, if the Committee genuinely

TSG Reporting - Worldwide    877-702-9580

Page 115

### D. O'DONNELL

1
2  believed at the time that the transaction was to
3  be a balanced transaction, wouldn't Mr. Bell
4  have made those suggestions?
5        MR. COHEN:  Objection.  Calls for
6   speculation.
7    A.   If given the opportunity, he might
8  have.
9    Q.   When you say "given the opportunity,"
10  what do you mean?
11   A.   As previously testified, we, over the
12  course -- Milbank over the course of that
13  weekend spent a great deal of time waiting
14  around and seeking to participate in discussions
15  that were going on around us.  We did not have
16  the opportunity to participate fully in the
17  negotiations that weekend.
18   Q.   Well, Mr. Bell did receive drafts of
19  the Clarification Letter, correct?
20   A.   We know that he received a draft on
21  Saturday afternoon, yes.
22   Q.   And he may have also received drafts
23  on Sunday?
24        MR. COHEN:  Objection.  Calls for
25   speculation.

TSG Reporting - Worldwide    877-702-9580

Page 116

### D. O'DONNELL

1
2    Q.   Correct?
3    A.   It's possible that he received drafts
4  on Sunday afternoon, yes.
5    Q.   Didn't Mr. Bell have an opportunity to
6  make his suggestions directly to the Weil
7  lawyers?
8    A.   He engaged them in discussions, or
9  attempted to engage them in discussions, but
10 since we were not fully engaged in the
11 negotiation, it was difficult for us to comment
12 effectively on the document.
13   Q.   Was it essential to the Committee's
14 decision not to object to the transaction that
15 the transaction be a wash?
16        MR. COHEN:  I instruct the witness not
17   to answer on the basis of attorney-client
18   privilege and attorney work product.
19   Q.   From September 22 through September
20 30, did anybody from Milbank ever discuss with
21 anybody from Weil whether it would be necessary
22 to return to Judge Peck to address any aspects
23 of the transaction?
24   A.   No.
25   Q.   Why not?

TSG Reporting - Worldwide    877-702-9580

Page 117

### D. O'DONNELL

1
2        MR. COHEN:  I instruct the witness not
3   to answer on the basis of attorney-client
4   privilege and attorney work product.
5    Q.   I'd like to turn back to Exhibit 26,
6  and I believe that you testified earlier that
7  much was uncertain concerning the value of
8  purchased assets; is that correct?
9    A.   Correct.
10   Q.   And to be more precise about that,
11 let's look at the APA, the original APA, under
12 Tab A, and specifically page 6.  And on page 6
13 you see there's a definition of "purchased
14 assets"?
15   A.   I see that definition.
16   Q.   And it says, "'Purchased Assets' means
17 all of the assets of Seller and its Subsidiaries
18 used in connection with the Business (excluding
19 the Excluded Assets), including," and then it
20 lists Categories (a) through (s).  Do you see
21 that?
22   A.   Yes, I see that.
23   Q.   Did Milbank understand at the time
24 that the purchased assets could include assets
25 other than those specifically enumerated in

TSG Reporting - Worldwide    877-702-9580

Page 118

D. O'DONNELL

1
2  items (a) through (s)?
3       MR. COHEN:  You can testify to the
4  extent that that understanding came from
5  non-privileged sources or means.  To the
6  extent it comes from privileged sources or
7  analysis, I instruct you not to answer.
8       A.  Yes.
9       Q.  Let's go through these items (a)
10  through (s).  Item (a), the retained cash, as of
11  the Sale Hearing, did Milbank have any
12  understanding as to what the amount of that
13  would be?
14       MR. COHEN:  With respect to this line
15  of questioning, (a) through (s), I'll have a
16  standing instruction that you can testify as
17  to non-privileged sources of that
18  understanding, but privileged analysis or
19  sources I'll instruct you not to answer.
20       MR. STERN:  Yeah, and the questions --
21       MR. COHEN:  And that will apply
22  through (a) through (s).
23       Q.  Right, and the questions are intended
24  to ask about information derived from Lehman or
25  Barclays or from some other source other than a

TSG Reporting - Worldwide     877-702-9580

Page 119

D. O'DONNELL

1
2  privileged communication.
3       A.  Based on the terms of the document
4  itself, the answer is yes.
5       Q.  And what was that understanding?
6       A.  Retained cash is defined in the
7  document as an amount that is -- on page 2 of
8  the document, under Excluded Assets, to be all
9  cash, cash equivalents, bank deposits or similar
10  cash items of LBI and its subsidiaries other
11  than the $1.3 billion in cash, cash equivalents,
12  bank deposits.
13       Q.  So, as of the Sale Approval Hearing,
14  Milbank understood that the retained cash amount
15  was 1.3 billion?
16       A.  No, that's not my testimony.
17       Q.  Okay.  What is your testimony?
18       A.  It's all cash other than 1.3 billion.
19       Q.  I see.  And was this provision
20  ultimately removed in the Final Purchase
21  Agreement?
22       A.  Based on the terms of the
23  Clarification Letter, yes.
24       Q.  And that's something that Milbank
25  understood before the closing?

TSG Reporting - Worldwide     877-702-9580

Page 120

D. O'DONNELL

1
2       A.  Based on its review of the
3  Clarification Letter, yes.
4       Q.  Looking --
5       MR. COHEN:  Be careful in your
6  answers.  You should be revealing
7  non-privileged sources, not Milbank's
8  analysis of the documents and its work
9  product.
10       Q.  Okay.  Category (b), all deposits, et
11  cetera.  As of the closing, did Milbank have any
12  estimate of the value of this category of
13  purchased assets?
14       MR. COHEN:  You can testify to the
15  extent a non-privileged source provided
16  Milbank with an estimate.
17       A.  No.
18       Q.  So that was uncertain?
19       A.  Correct.
20       Q.  With respect to Category (c), the
21  transferred real property leases, did Milbank
22  receive from non-privileged sources an estimate
23  of the value of that category?
24       A.  No.
25       Q.  So that was uncertain as well?

TSG Reporting - Worldwide     877-702-9580

Page 121

D. O'DONNELL

1
2       A.  Correct.
3       Q.  Now, Category (d), was that ultimately
4  replaced in the Clarification Letter?
5       And we can look to the Clarification
6  Letter if you want, Tab (c), page 1.
7       MR. COHEN:  The documents are going to
8  speak for themselves.  The witness should
9  not be here interpreting the contracts on
10  the fly.
11       If you have an understanding from a
12  non-privileged source where a non-privileged
13  source told you that, you can repeat that
14  information.
15       The internal Milbank analysis I'll
16  instruct you not to answer, and you should
17  not be giving your own analysis here on the
18  record in real-time.
19       Q.  Let me see if I can simplify it.  Did,
20  upon receiving the Clarification Letter, Tab C,
21  did Milbank understand, based on Section
22  1(a)(ii) that clause (D) of the definition of
23  "purchased assets" was being replaced?
24       MR. COHEN:  Same instruction.
25       Do you understand the limitations?

TSG Reporting - Worldwide     877-702-9580

D. O'DONNELL

1
2    A.   Other than as a result of privileged
3  communication or work product, no.
4        Q.   Okay.  Let's turn to Category (e).  As
5  of the Sale Hearing -- I'm sorry, let me turn
6  you back to Tab A, page 6.  Tab A, page 6, item
7  (e), "50 percent of each position in the
8  residential real estate mortgage securities."
9  As of the Sale Approval Hearing, did Milbank
10  have an estimate of the value of that category
11  of purchased assets?
12       A.   Yes.
13       Q.   And what was that estimate?
14       A.   I believe it was $6 billion.
15       Q.   $6 billion in total or 50 --
16       A.   I believe it was $6 billion in total.
17       Q.   And so 50 percent would be 3 billion?
18       A.   Yes, based on representations made at
19  the hearing on the 19th.
20       Q.   Category (f), the furniture and
21  equipment, did Milbank have an estimated value
22  for that category?
23       A.   No.
24       Q.   (g), the purchased intellectual
25  property, did Milbank have an estimate of the

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  value of that category of purchased asset?
3       A.   No.
4       Q.   (h), the purchased contracts, did
5  Milbank have an estimate of the value of that
6  category of purchased asset?
7       A.   No.
8       Q.   Looking at item (q) on the next page,
9  all past and present goodwill and other
10  intangible assets, did Milbank have an estimate
11  of the value of that purchased asset?
12       A.   Yes.
13       Q.   And what was the estimate that Milbank
14  had of that?
15       A.   Based on representations made at the
16  hearing, Lehman was attributing a value of $250
17  million to the goodwill of LBI.
18       Q.   As to the intangible assets, did
19  Milbank ever receive an estimate of the value of
20  intangible assets?
21       A.   No.
22       Q.   So that was uncertain?
23       A.   Correct.
24       Q.   Let's turn to page 11 of the original
25  APA, and specifically on page 11, Section 2.3 on

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2  assumption of liabilities, do you see that?
3       A.   Yes, I do.
4       Q.   It says, "On the terms and subject to
5  the conditions set forth in this Agreement, at
6  the Closing, Purchaser shall assume, effective
7  as of the closing, and shall timely perform and
8  discharge in accordance with their respective
9  terms, the following Liabilities of Seller and
10  its Subsidiaries (collectively, the 'Assumed
11  Liabilities')."
12            Looking at Category (a), "all
13  Liabilities of Seller incurred, after the
14  Closing, in connection with the Business," did
15  Milbank have an estimate of the amount of that
16  liability?
17            MR. COHEN:  With respect to these
18       items, and if we go through all of the items
19       under 2.3, my instruction will be the same:
20       You can testify as to estimates
21       received from non-privileged sources, but
22       attorney work product or the Committee's
23       financial advisors, I will instruct you not
24       to answer as to their analysis and
25       information.

TSG Reporting - Worldwide    877-702-9580

D. O'DONNELL

1
2       Q.   So as to category (a), did Lehman or
3  Barclays ever give you an estimate of that
4  category?
5       A.   No.
6       Q.   Okay.  As to Category (b), "all
7  Liabilities of Seller under the Purchased
8  Contracts arising after...the date on which such
9  entity commenced a voluntary case or cases under
10  Chapter 11 or Chapter 7," did Lehman or Barclays
11  ever give you an estimate of the value of that
12  assumed liability?
13       A.   No.
14       Q.   Turning to item (d), "accounts payable
15  in the Ordinary Course of Business," et cetera,
16  did Lehman or Barclays ever give you an estimate
17  of the value of that assumed liability?
18       A.   No.
19       Q.   Okay.  So that was uncertain?
20       A.   Correct.
21       Q.   Category (f), "all other Liabilities
22  to the extent related to the Business," et
23  cetera, did Lehman or Barclays ever give you an
24  estimate of that category of assumed liability?
25       A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 126

D. O'DONNELL

1
2  Q.  To your knowledge, did Houlihan do any
3  work to estimate the value of the assumed
4  liabilities we just went over?
5      A.  You're referring to (a), (b) and (d)?
6  Q.  (a), (b) --
7      A.  (d).
8  Q.  -- (d), (f), (h).
9          MR. TECCE:  Caution the witness not to
10  reveal any attorney-client communications or
11  any attorney work product.
12      A.  No.
13  Q.  And going back to page 6, the
14  purchased assets, did Houlihan do any work, to
15  your knowledge, to estimate the value of the
16  purchased assets described in categories (b),
17  (c), (f), (g), (h) and (q)?
18          MR. TECCE:  Same instruction.
19      A.  Other than based on privileged
20  communications, I don't know.
21  Q.  Now, at some point after the closing,
22  am I right that Milbank did receive the final
23  versions of Schedule A and Schedule B?
24      A.  Yes, you're correct.
25  Q.  And did Milbank raise any concerns

TSG Reporting - Worldwide     877-702-9580

Page 127

D. O'DONNELL

1
2  about those schedules with Weil or with Barclays
3  representatives?
4      A.  Timeframe?
5  Q.  After the closing.
6      A.  Yes, Milbank did receive what
7  purported to be final versions of the schedules
8  on or about the 25th of September, forwarded
9  them to Barclays -- I mean to Houlihan, and
10  asked Houlihan to continue its diligence on
11  those documents, those schedules.
12  Q.  Do you know whether the Schedule A
13  that Milbank received on September 25 was
14  different from the spreadsheet that Milbank had
15  received over the weekend before the closing?
16          MR. COHEN:  Object to the form.
17  Q.  Or is that something that Houlihan
18  analyzed?
19      A.  That's something that Houlihan would
20  have analyzed.
21  Q.  Did Milbank ever express any concern
22  to Weil that the final schedules were different
23  from what had been described to Milbank over the
24  weekend before the closing?
25          MR. COHEN:  Objection.  Vague.

TSG Reporting - Worldwide     877-702-9580

Page 128

D. O'DONNELL

1
2      A.  Milbank did ultimately raise concerns
3  with Weil about the schedules and whether the
4  numbers accorded with their understanding of the
5  deal as presented over the weekend, yes.
6  Q.  Okay.  And what did Milbank say to
7  Weil in that regard?  What were the specific
8  concerns?
9      A.  Milbank ultimately conveyed to Weil's
10  the concerns that had emerged from Houlihan's
11  analysis of the schedules.
12  Q.  And what were those concerns?
13      A.  That the numbers did not add up.
14  Q.  What numbers did not add up?
15      A.  That the amount of purchased assets
16  appeared to be larger than the amount
17  represented to the Committee and to the Court in
18  connection with approval of the transaction.
19  Q.  And did the schedules, the final
20  Schedules A and B, reflect values?
21      A.  Can you clarify your question?
22  Q.  Well, did the final Schedule A and the
23  final Schedule B contain -- reflect values for
24  the assets listed on those schedules?
25      A.  Can we refer to the -- strike that.

TSG Reporting - Worldwide     877-702-9580

Page 129

D. O'DONNELL

1
2  Q.  Do you know whether the final Schedule
3  A and final Schedule B had any type of value,
4  par value or otherwise?
5      A.  I believe it did have a par value
6  associated with each of the schedules.
7  Q.  Was Houlihan looking at the par value
8  when it raised its concern about the value of
9  the assets reflected on Schedules A and B?
10          MR. COHEN:  If you know.  It's beyond
11  the scope of the 30(b)(6).
12          MR. TECCE:  I'll also object to the
13  extent that it calls for work product.
14      A.  Houlihan had been directed to evaluate
15  the schedules, and Milbank was not apprized of
16  the specific methodology they were using to do
17  so.
18  Q.  Okay.  So when it comes to Houlihan's
19  analysis of the schedule, Milbank has no
20  non-privileged knowledge concerning that
21  analysis; is that right?
22      A.  That's correct.
23  Q.  I'll hand you what has previously been
24  marked as Exhibit 463B.  I'll ask you to take a
25  look at this, but my question will be whether

TSG Reporting - Worldwide     877-702-9580

Page 130

D. O'DONNELL

1
2  this is a document that Milbank ever received.
3      MR. COHEN:  Is there a Bates-numbered
4  version of this document?  What is the
5  source of it?  It's not from our production.
6      MR. STERN:  It's a -- it's a document
7  that was sent to certain Lehman people, so
8  it comes out of their e-mail, and it's also
9  a document we expect FTI to produce.
10     MR. COHEN:  So does that mean it came
11 from the Lehman production?
12     MR. STERN:  Off the record.
13     (Discussion off the record.)
14     MR. STERN:  Let's go back on the
15 record.
16     MR. COHEN:  Would you repeat your
17 question, please, or have the reporter read
18 it back?
19     MR. STERN:  I don't think I've asked
20 it yet.
21     THE WITNESS:  I'm still reviewing the
22 document.
23 Q.   After you review it, I just want to
24 ask you whether this is something Milbank ever
25 received.

TSG Reporting - Worldwide    877-702-9580

Page 131

D. O'DONNELL

1
2      MR. COHEN:  I think that was the
3  question.
4      (Document review.)
5  A.  I have reviewed the document, and I
6  don't believe it is an e-mail that Milbank ever
7  received.
8  Q.  Do you know whether Milbank ever
9  received any part of this document?
10 A.  I believe that Milbank may have
11 received page 2 of the attachment.
12 Q.  The Footnote A?
13 A.  Correct.
14 Q.  Did Milbank have an understanding of
15 what that page represented?
16     MR. TECCE:  Objection to the form of
17 the question.
18 Q.  Or would that have been Houlihan's
19 responsibility or FTI's responsibility?
20 A.  It would have been Houlihan or FTI's
21 responsibility.
22 Q.  At some point in October 2008, did
23 Milbank lawyers attend a presentation by Alvarez
24 & Marsal?
25 A.  You need to be more specific.

TSG Reporting - Worldwide    877-702-9580

Page 132

D. O'DONNELL

1
2  Q.  Let me give you a copy of a document
3  we've marked previously as Exhibit 464B.  These
4  are pages from a presentation that Alvarez gave
5  to the Creditors Committee on October 8, 2008.
6      I'll ask you -- it includes a list of
7  subjects and then it includes certain pages from
8  the presentation, and after you review it, I
9  just want to ask if that is a presentation that
10 Milbank attended.
11     MR. COHEN:  Is the exhibit the
12 truncated version of this document?
13     MR. STERN:  Yes.
14     MR. COHEN:  Do you have a copy of the
15 complete document if the witness needs to
16 see it?
17     MR. STERN:  I don't know if we have
18 one in the room, but we can get one if you
19 want.
20     MR. COHEN:  Let's see if he needs it.
21 This appears to be excerpts from a larger
22 presentation.
23     MR. STERN:  Yes, it is.
24     (Document review.)
25 A.  Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 133

D. O'DONNELL

1
2  Q.  The question is whether Milbank
3  lawyers attended the presentation by Alvarez &
4  Marsal on October 8?
5  A.  Yes.
6  Q.  And who from Milbank attended that?
7  A.  This was the first of a series of
8  monthly in-person meetings with Alvarez & Marsal
9  over the course of the case.  It was likely a
10 long list of Milbank attorneys involved in
11 various aspects of the case.  I assume Dennis
12 Dunn, Luc Despins, potentially Paul Aronzon were
13 there.
14 Q.  Let's look at the fourth page of the
15 exhibit.  It has a heading at the top
16 Significant Transactions.  Do you see that?
17 A.  Yes.
18 Q.  And then item A, it says, "Sale of
19 Lehman Brothers, Inc., broker-dealers to
20 Barclays (Fogarty)," do you see that?
21 A.  I do.
22 Q.  Did Milbank lawyers attend this part
23 of the presentation?
24 A.  To the best of my recollection,
25 Milbank attorneys were present throughout the

TSG Reporting - Worldwide    877-702-9580

Page 134

D. O'DONNELL

1
2  presentation.
3      Q.  Did you personally attend?
4      A.  I did, yes.
5      Q.  Do you have any recollection
6  personally of this part of the presentation?
7      A.  I don't have any personal recollection
8  of this part of the presentation being discussed
9  at any length.
10     Q.  Under "Assets Purchased" it lists
11 "43.1 billion repo assets - book value per
12 Lehman's stale marks; negotiated a $5 billion
13 reduction." Do you see that?
14     A.  I do.
15     Q.  At the time did Milbank have an
16 understanding or was there any discussion at
17 this presentation concerning the statement "book
18 value per Lehman's stale marks; negotiated a $5
19 billion reduction"?
20         MR. COHEN:  Objection to the form.
21 Compound.
22         To the extent you're going to answer
23 the portion of the question that deals with
24 an understanding, then it needs to be coming
25 from a non-privileged source as opposed to

TSG Reporting - Worldwide    877-702-9580

Page 135

D. O'DONNELL

1
2  one of the Committee's financial advisors,
3  which may be the second part of the
4  question, which was, was there any
5  discussion at the presentation.
6          But again, I'll object to the form of
7  the question as vague.
8      Q.  So let me try to simplify it.
9          At this presentation did Alvarez
10 explain what was meant by the phrase "book value
11 per Lehman's stale marks"?
12     A.  Alvarez made a presentation.  Various
13 members of the Alvarez team presented on various
14 topics.  I don't have a specific recollection of
15 their presentation as to this topic, but
16 presumably they would have walked through this
17 slide, which probably would have been up on a
18 screen during the course of the presentation.
19     Q.  Do you have any recollection
20 concerning what Alvarez may have explained
21 concerning that phrase, "book value per Lehman's
22 stale marks"?
23     A.  No specific recollection, no.
24     Q.  Any general recollection?
25     A.  As I've previously testified, the

TSG Reporting - Worldwide    877-702-9580

Page 136

D. O'DONNELL

1
2  issue of the valuation of the assets and the
3  liabilities was an issue that we had questions
4  and concerns about.  Houlihan was taking the
5  lead in that regard, and if anyone focused on
6  this issue during the meeting, it would have
7  been Houlihan.
8      Q.  Do you recall whether Houlihan did ask
9  questions concerning that phrase "book value per
10 Lehman's stale marks"?
11         MR. COHEN:  At the meeting?
12     Q.  At the meeting.
13     A.  No recollection as to whether they
14 raised questions at the meeting.
15     Q.  Okay.  Did anyone at the meeting raise
16 any questions concerning what was meant by the
17 phrase "negotiated a $5 billion reduction"?
18     A.  I have no recollection of that
19 specific phrase being discussed.
20     Q.  Do you have any recollection as to
21 whether that phrase caused any concern on the
22 part of Milbank or Houlihan?
23         MR. COHEN:  Instruct the witness not
24 to answer on the basis of attorney work
25 product.

TSG Reporting - Worldwide    877-702-9580

Page 137

D. O'DONNELL

1
2      Q.  At the meeting with Alvarez, did
3  either Houlihan or Milbank express any concern
4  relating to that phrase "negotiated a $5 billion
5  reduction"?
6      A.  Express to whom?
7      Q.  To Alvarez.
8      A.  To my recollection, no.
9      Q.  Sitting here today do you know what
10 that phrase refers to?
11         MR. COHEN:  Objection.  Beyond the
12 scope of the 30(b)(6).
13     Q.  Go ahead.
14     A.  It's highly ambiguous from my
15 perspective sitting here today.  It could mean
16 one of many things.
17     Q.  What are the things it could be?
18         MR. COHEN:  Objection.  Calls for
19 speculation.
20     A.  And I don't think it's my role here to
21 speculate.
22     Q.  Well, I'm asking you to.
23         MR. COHEN:  You should not speculate.
24 If you know, you should answer.  If you
25 don't know, you should answer you don't

TSG Reporting - Worldwide    877-702-9580

## Page 138

D. O'DONNELL

1
2  know.
3  Q.   Sitting here today what, as you read
4  this phrase, "negotiated a $5 billion
5  reduction," what are your possible
6  interpretations of that phrase as you sit here
7  today?
8        MR. COHEN: Objection. Calls for
9  speculation. If you know what that means,
10  you can answer. If you don't know, answer
11  you don't know.
12  A.   This presentation was drafted by
13  Alvarez. I don't know what they meant by that
14  phrase.
15  Q.   Aside from this presentation by
16  Alvarez, have you heard that phrase before in
17  connection with the sale transaction?
18        MR. COHEN: Objection. Vague as to
19  time.
20  A.   What timeframe are you talking about?
21  Q.   At any time.
22        MR. COHEN: Objection. Overbroad.
23  A.   After Quinn assumed responsibility for
24  Barclays matters --
25        MR. TECCE: I would also like to

TSG Reporting - Worldwide    877-702-9580

## Page 139

D. O'DONNELL

1
2  caution him not to reveal the content of any
3  attorney-client communications or other work
4  product.
5  A.   Based on my reading of the 60(B)
6  Motion after the fact, yes.
7  Q.   What is your understanding of the
8  meaning of this phrase "negotiated a $5 billion
9  reduction" based on reading the Rule 60(B)
10  Motion?
11        MR. COHEN: Objection. Vague.
12  A.   Based on my after-the-fact reading of
13  the 60(B) Motion, without any independent
14  knowledge of the full investigation conducted by
15  Quinn, one of the allegation in the 60(B) Motion
16  is that there was a secretly negotiated $5
17  billion reduction in the purchase price of the
18  assets.
19  Q.   At the time that this phrase was
20  presented by Alvarez in their October 8
21  presentation, do you recall anybody in
22  attendance expressing any concern or alarm based
23  on this phrase?
24        MR. COHEN: I'll caution the witness
25  to answer as to only non-privileged

TSG Reporting - Worldwide    877-702-9580

## Page 140

D. O'DONNELL

1
2  expressions of concern or alarm. Privileged
3  communications and analysis are beyond the
4  scope of this deposition. I would instruct
5  you not to answer.
6  Q.   This is at the meeting with Alvarez.
7  A.   Based on other than privileged
8  communications, no.
9  Q.   After the presentation by Alvarez, did
10  Milbank or Houlihan, to your knowledge, have any
11  discussions with anybody acting on behalf of
12  either Lehman or Barclays concerning this
13  reference to negotiated a $5 billion reduction?
14  A.   Can you repeat the question?
15        (Record read.)
16  A.   I need the question repeated again.
17  I'm sorry.
18        (Record read.)
19  A.   As to Milbank, I don't have any
20  knowledge that this specific phrase from this
21  specific document was discussed with anyone at
22  Barclays -- at Lehman or Weil.
23  Q.   Okay. Putting aside this specific
24  phrase, and focusing on the general concept of a
25  negotiated $5 billion reduction, however you

TSG Reporting - Worldwide    877-702-9580

## Page 141

D. O'DONNELL

1
2  want to phrase that, was there ever any
3  discussion between Milbank or Houlihan on the
4  one hand, to your knowledge, and representatives
5  of Lehman or Barclays on the other hand?
6  A.   As a general matter, the discussions
7  between Milbank and Weil regarding the schedules
8  related, generally speaking, to an approximate
9  $5 billion discrepancy, yes.
10  Q.   And how was that?
11        Withdrawn. Explain that to me.
12        MR. COHEN: Objection. Vague.
13  Q.   Explain to me how the discussions
14  concerning the schedules related to a $5 billion
15  discrepancy.
16  A.   Houlihan's analysis of the schedules
17  to date or up until the point -- during the time
18  when Milbank was still involved with the matter
19  suggested that there was a mismatch between
20  assets and liabilities of approximately $5
21  billion.
22  Q.   And when did those discussions between
23  Houlihan and Weil concerning that discrepancy or
24  mismatch begin?
25  A.   In mid October 2008.

TSG Reporting - Worldwide    877-702-9580

Page 142

D. O'DONNELL

1
2  Q.  **And this reference in the Alvarez**
3  **presentation to negotiated $5 billion reduction,**
4  **is that the same concept for the same $5 billion**
5  **reduction referenced in the Committee's Rule 60**
6  **motion?**
7      MR. COHEN:  Objection.  Beyond the
8  scope of the 30(b)(6) --
9  Q.  **If you know.**
10     MR. COHEN:  -- notice.
11     The witness is not testifying on
12 behalf of the firm on this.  The firm does
13 not represent the Committee in connection
14 with the 60(B) Motion.
15     MR. STERN:  So are you instructing him
16 not to answer?
17     MR. COHEN:  No, I'm telling you he's
18 not testifying on behalf of the firm.  You
19 can answer the question, but it's of no
20 evidentiary value for purposes of your
21 subpoena.
22     MR. TECCE:  Also, just with respect to
23 the form of the question, you're referring
24 to the presentation that was prepared by
25 A&M.

TSG Reporting - Worldwide    877-702-9580

---

Page 143

D. O'DONNELL

1
2  A.  As I previously testified, I have no
3  idea what A&M intended precisely by the phrase
4  in question, so I can't tell you whether it is
5  exactly the same issue that appeared later in
6  the 60(B) Motion.
7  Q.  **It may be, but you don't know?**
8  A.  No basis to determine.
9  Q.  **One way or the other?**
10 A.  Correct.
11     MR. STERN:  Let's take a short break.
12     THE VIDEOGRAPHER:  The time is now
13 2:17 P.M.  We're now off the record.
14     (Recess.)
15     (Exhibit 504, a document bearing Bates
16 Nos. MTHM0012869 through 12871, marked for
17 identification, as of this date.)
18     THE VIDEOGRAPHER:  This is the start
19 of tape number 4.  The time is now 2:24 P.M.
20 We are now back on the record.
21 BY MR. STERN:
22 Q.  **I've handed you a document that we've**
23 **marked as Exhibit 504, and I'd ask you to take a**
24 **look at it.  It may make sense to read the**
25 **e-mail string from the back, and then I'll have**

TSG Reporting - Worldwide    877-702-9580

---

Page 144

D. O'DONNELL

1
2  **some questions.**
3      **I want to focus I think primarily on**
4  **the e-mail at the bottom of the first page, the**
5  **Luc Despins e-mail, 10/13, 3:47 P.M., but why**
6  **don't you read the whole thing.**
7      **(Document review.)**
8  A.  **I've reviewed the e-mail.**
9  Q.  **Okay.  Let's focus on the Luc Despins**
10 **e-mail October 13, 2008, 3:47 P.M. on the first**
11 **page, and he writes to Ms. Fife, "Lori, this is**
12 **not in connection with sealing motion (although**
13 **I want to know more about the schedules before**
14 **that issue is up before the Court), but rather**
15 **our concern is with respect to the securities**
16 **which were transferred.  Houlihan has reviewed**
17 **them and cannot even come close to the amount**
18 **which was announced in court (I think it was**
19 **$47.4 billion) and there is also a discrepancy**
20 **on the liability side (although it could be --**
21 **it could but much smaller than the issue on the**
22 **asset side).  Houlihan's view would indicate**
23 **that the securities transferred could be worth**
24 **billions more than $47.4 billion.  There may**
25 **very well be a logical explanation for all of**

TSG Reporting - Worldwide    877-702-9580

---

Page 145

D. O'DONNELL

1
2  **this, which is why the first meeting is just to**
3  **explore the issues."**
4      **Was there a meeting that followed up**
5  **from this e-mail?**
6  A.  **Yes.**
7  Q.  **And who attended that meeting?**
8  A.  **From Milbank, Matthew Barr and Evan**
9  **Fleck.**
10 Q.  **And who else?**
11 A.  **People from Houlihan, I believe Sol**
12 **Burian and/or Mike Fazio.**
13 Q.  **And who else attended?**
14 A.  **From Weil, Harvey Miller and Lori**
15 **Fife.**
16 Q.  **Who else attended the meeting, if**
17 **anybody?**
18 A.  **I think that's it.**
19 Q.  **And what was discussed at the meeting**
20 **concerning the schedules and the values in the**
21 **schedules?**
22 A.  **Mr. Despins' e-mail I think summarizes**
23 the agenda for the meeting and that was the
24 substance of the discussion at the meeting.
25 Q.  **Okay.  And at the meeting did Houlihan**

TSG Reporting - Worldwide    877-702-9580

Page 146

### D. O'DONNELL

1
2  outline its analysis of the securities and why
3  it was concerned that the securities transferred
4  could be worth billions more than the $47.4
5  billion?
6      A.   I need to qualify my last answer to
7  suggest that I'm not sure if Houlihan was at the
8  initial meeting to which I am referring.  It may
9  have been lawyers only.
10     Q.   Was there any discussion at that
11 meeting concerning the analysis that Houlihan
12 had done?
13     A.   The whole point of the meeting as
14 outlined in Mr. Despins' e-mail was to discuss
15 Houlihan's analysis, yes.
16     Q.   And what was said about Houlihan's
17 analysis?
18     A.   In substance, what is presented in the
19 e-mail; that there was a disconnect between the
20 numbers presented at the final hearing, the
21 hearing approving the sale, and the numbers
22 disclosed in the final schedules.
23     Q.   At the meeting did anybody explain the
24 basis of Houlihan's analysis and point out what
25 the disconnection was?

TSG Reporting - Worldwide    877-702-9580

Page 147

### D. O'DONNELL

1
2      MR. COHEN:  Objection.  Vague as to
3  basis.
4      MR. STERN:  I don't understand the
5  objection.
6      MR. COHEN:  Do you mean what Houlihan
7  did, the work they did, the details of their
8  work?
9      MR. STERN:  Yeah.
10     MR. COHEN:  I don't understand what
11 "basis of analysis" is.
12     MR. STERN:  That's a much better
13 question.
14     MR. COHEN:  Try it.  It's --
15     Q.   That's a much better question.  I'll
16 adopt that question.
17     A.   Not in excruciating detail, but yes,
18 that Houlihan had evaluated the schedules and
19 could not reconcile the numbers to the numbers
20 they understood to be the numbers approved by
21 the Court.
22     Q.   And what was said about the work that
23 Houlihan did and the details of their work?
24     A.   Again, since I don't believe Houlihan
25 was in attendance, it was limited to a lawyer's

TSG Reporting - Worldwide    877-702-9580

Page 148

### D. O'DONNELL

1
2  summary of their understanding of Houlihan's
3  findings to date.
4      Q.   Did Houlihan reflect those findings in
5  writing?
6      A.   Not for purposes of this meeting, no.
7      Q.   So nothing in writing was presented at
8  that meeting?
9      A.   Correct.
10     Q.   And what was the -- what was the work
11 that Houlihan had done that was discussed?
12     A.   They had reviewed the schedules, which
13 are hundreds of pages long, and had conducted
14 an, essentially, a evaluation analysis of the
15 schedules to determine what the real value of
16 the assets transferred was.
17     Q.   In doing that did they -- did Houlihan
18 reference certain pricing sources for the
19 assets?
20     MR. COHEN:  I would instruct the
21 witness not to get into the details of what
22 Houlihan did.  That's work product that has
23 not been shared.
24     Q.   Well, did anybody at this meeting
25 explain the work that Houlihan had done in terms

TSG Reporting - Worldwide    877-702-9580

Page 149

### D. O'DONNELL

1
2  of pricing the assets?
3      A.   I don't believe so, and the meeting
4  was intended to, as indicated in Mr. Despins'
5  e-mail, to be an initial meeting to explore the
6  issues.  It was not intended to be a full
7  working session.  If that had been the case, it
8  would have involved financial advisors from both
9  sides.
10     Q.   Okay.  Was there a subsequent -- was
11 there a follow-up meeting to this initial
12 meeting to address those issues?
13     A.   Not prior to Milbank's withdrawal from
14 involvement in these issues.
15     Q.   And when was that?
16     A.   That was in late November.
17     Q.   Late November Milbank withdrew?
18     A.   Milbank, over the course of a period
19 of time in October and November, gradually
20 transitioned responsibility for this matter to
21 Quinn.
22     Q.   And why was that?
23     A.   Out of an abundance of caution over
24 concerns that their initial questions and
25 concerns might ultimately yield a reason to

TSG Reporting - Worldwide    877-702-9580

Page 150

D. O'DONNELL

1
2    bring litigation with respect to the matter.  No
3    decisions or conclusions had been reached in
4    that regard, but given Milbank's representation
5    of Barclays in other contexts, we deemed it
6    prudent to involve conflicts counsel as we
7    proceeded down this path.
8        Q.   Do you know whether there was -- does
9    Milbank know whether subsequent to this initial
10   meeting in October, whether there was a
11   subsequent meeting that Milbank did not attend
12   to address these issues?
13       A.   Once Milbank withdrew from
14   representation of the Committee with respect to
15   these issues, we did not participate in any
16   meetings, were not apprized of meetings, were
17   not -- were not in the loop on those
18   discussions.  So the answer is no.
19       Q.   Before Milbank withdrew from handling
20   these issues, did Milbank have any other
21   communications with Lehman representatives
22   concerning these issues?
23           MR. COHEN:  Objection.  Vague.
24           Other than this one e-mail and this
25   meeting?

TSG Reporting - Worldwide    877-702-9580

Page 151

D. O'DONNELL

1
2           MR. STERN:  Correct.
3       A.   There was an ongoing course of
4    discussions.  There were, I believe, follow-up
5    telephone calls and e-mails.
6       Q.   And at the October meeting that you
7    described, the meeting attended by Mr. Barr and
8    Mr. Fleck and Mr. Miller and Ms. Fife, what did
9    Mr. Miller and Ms. Fife say at that meeting?
10      A.   Point of clarification.  The meeting
11   I'm -- I referred to did not take place in
12   October.
13      Q.   Ah.  When did that take place?
14      A.   It took place on November 21, 2008.
15      Q.   When did Milbank withdraw?
16      A.   Quinn was fully in place as counsel on
17   this matter by the first week of December 2008.
18      Q.   Well, thanks for the clarification.
19           So Luc Despins, the meeting to follow
20   up on Luc Despins' October 13 e-mail, takes
21   place on November 21; is that right?
22      A.   Correct.
23      Q.   Okay.  And your best recollection or
24   your best understanding is that it was attended
25   by Mr. Barr, Mr. Fleck, Mr. Miller and Ms. Fife?

TSG Reporting - Worldwide    877-702-9580

Page 152

D. O'DONNELL

1
2       A.   Correct.
3       Q.   And do you know if Houlihan was
4    present, or you just don't know?
5       A.   The best of my recollection is that
6    they were not.
7       Q.   Okay.  Were there any discussions on
8    these issues between Milbank on the one hand and
9    Weil on the other hand at any time between Mr.
10   Despins' October 13 e-mail and that November 21
11   meeting?
12          MR. COHEN:  Well, there's -- Exhibit
13   504 has an October 15 e-mail as well.
14      A.   Obviously, there was -- the e-mail in
15   question concerns a back and forth between
16   October 13 and October 15, but beyond that, yes,
17   there were additional discussions between
18   Milbank and Weil between October 15 and November
19   21.
20      Q.   And what were those discussions?
21      A.   The discussions took place between --
22   discussions took place between Mr. Barr and Ms.
23   Fife.  There were e-mail exchanges and phone
24   calls.
25      Q.   And what did they discuss in their

TSG Reporting - Worldwide    877-702-9580

Page 153

D. O'DONNELL

1
2    e-mails and phone calls?
3       A.   Further elaboration on the issues that
4    had been raised by Mr. Despins and further
5    efforts to schedule the in-person meeting
6    suggested by Mr. Despins.
7       Q.   And in the further elaboration on the
8    issues that had been raised by Mr. Despins, what
9    did Mr. Barr tell Ms. Fife?
10      A.   Well, obviously based on Ms. Fife's
11   response on Exhibit 504, specifically, the
12   response on October 13, 2008 at 11:50 P.M., she
13   was not initially receptive to our concerns, and
14   what ensued was a process to convince Weil that
15   these concerns appear to have some basis and
16   that they needed to be investigated further.
17      Q.   And what did Mr. Barr say concerning
18   the basis for the concerns?
19      A.   In the course of telephone calls
20   and -- primarily telephone calls, reiteration of
21   the basic facts here.
22      Q.   Did he describe to Ms. Fife the
23   analysis that Houlihan had done?
24      A.   Again, lawyers don't necessarily do a
25   good job of summarizing what financial advisors

TSG Reporting - Worldwide    877-702-9580

Page 154

D. O'DONNELL

1
2  do to other lawyers. Houlihan had concerns, had
3  issues, and we communicated that fact to Weil.
4      Q.   Mr. Barr I assume had access to
5  whatever analysis Houlihan had done?
6      A.   That assumes that there was a written
7  work product. I don't know if there was.
8      Q.   And what was Ms. Fife's response in
9  these subsequent discussions?
10     A.   The initial character of her response
11 is disclosed in the e-mail to which I referred.
12 She did not think it was a productive use of the
13 Committee or the Debtors' time to investigate
14 these issues further.
15     Q.   Did, at the time in October, did
16 Milbank consider contacting Barclays' counsel
17 about these issues?
18     MR. COHEN: Objection. I'll instruct
19 the witness not to answer on the basis of
20 work product.
21     Q.   Well, at the time did Milbank do
22 anything to contact Barclays' counsel about
23 these issues?
24     A.   No.
25     Q.   At any point while Milbank was still

TSG Reporting - Worldwide    877-702-9580

Page 155

D. O'DONNELL

1
2  responsible for these matters, did anybody from
3  Milbank contact anybody acting on behalf of
4  Barclays to discuss these issues?
5      A.   Yes.
6      Q.   And when was that?
7      A.   I believe there were discussions
8  between Mr. Despins and Ms. Grandfield.
9      Q.   And when did those discussions take
10 place?
11     A.   Sometime in October.
12     Q.   And what was the substance of those
13 discussions?
14     A.   That we had concerns and unanswered
15 questions about the transaction.
16     Q.   And did Mr. Despins identify for Ms.
17 Grandfield what those concerns and unanswered
18 questions were?
19     A.   I don't know the level of detail
20 presented to Ms. Grandfield in these
21 discussions, no.
22     Q.   Did any of those concerns or
23 unanswered questions relate to a negotiated $5
24 billion reduction as referenced in the Alvarez
25 presentation?

TSG Reporting - Worldwide    877-702-9580

Page 156

D. O'DONNELL

1
2      MR. COHEN: Object to the form.
3      A.   As previously testified, the $5
4  billion number and the mismatch was the overall
5  theme of our concern, so it's likely that that
6  number came up in those conversations.
7      Q.   And that overall theme of your concern
8  is what was expressed by Mr. Barr to Ms. Fife in
9  his discussions with her and at the November 21,
10 2008, to the best of your knowledge?
11     A.   Yes, as I previously testified, that
12 is -- that is the central thesis of our concern
13 and would have been communicated in some
14 fashion.
15     Q.   Can you pinpoint for me in time when
16 the $5 billion mismatch, the overall theme of
17 your concerns, was identified by Houlihan or
18 Milbank?
19     MR. COHEN: Objection.
20     MR. TECCE: Object to the form of the
21 question and to the extent that it seeks
22 attorney-client communication or attorney
23 work product.
24     A.   Based on --
25     Q.   I'm just asking for a date.

TSG Reporting - Worldwide    877-702-9580

Page 157

D. O'DONNELL

1
2      A.   Again, based on other than privileged
3  communications, no, I cannot.
4      Q.   When is the first point in time that
5  Milbank or Houlihan communicated to Weil this
6  concern about a $5 billion mismatch?
7      MR. COHEN: Precisely $5 billion?
8      A.   On September 22 or at the end --
9  Sunday and Monday, the 21st and 22nd, and back
10 in that period, Houlihan communicated to Weil
11 that they could not get comfortable with the
12 numbers as presented in the draft schedule and
13 had, at that stage, concerns about a
14 mismatch.
15     Q.   Okay. So this overall theme of the $5
16 billion mismatch was addressed between Milbank
17 and Houlihan on the one hand and Weil on the
18 other hand before the closing; is that correct?
19     MR. TECCE: Objection to the form of
20 the question.
21     A.   Whether it was $5 billion or another
22 number I cannot tell you. It was a mismatch.
23 It was in the billions. Approximately $5
24 billion is as close as I can get.
25     Q.   After the November 21 meeting between

TSG Reporting - Worldwide    877-702-9580

**D. O'DONNELL**

1
2 **Mr. Barr and Mr. Fleck and Ms. Fife and Mr.**
3 **Miller, did Milbank have any further involvement**
4 **in the discussion of these issues?**
5     A.    During the period between November 21
6 and the first week of December, Milbank remained
7 involved and may have had further conversations
8 with Weil on these issues.
9     Q.    Do you recall what those conversations
10 were?
11     A.    I don't have any specific
12 recollections of conversations during that
13 period.
14     Q.    At any point did Milbank or Houlihan
15 provide anything in writing to Weil on these
16 issues?
17     A.    Other than Mr. Despins' e-mail of
18 October 13, I'm not aware of anything else in
19 writing.
20     Q.    Now, his e-mail of October 13 also
21 makes reference to a discrepancy on the
22 liability side.  What was that?
23     A.    That's the liability number disclosed
24 to the Court.
25         Strike that.  As I sit here, I

D. O'DONNELL

1
2 can't -- I can't describe with any precision
3 what the liability issue was at that point in
4 time.
5     Q.    Okay.  And when he says "Houlihan's
6 review would indicate that the securities
7 transferred could be worth billions more than
8 47.4 billion," how many billions more than 47.4?
9     A.    And the question is?
10     Q.    Well, he -- Mr. Despins refers to
11 Houlihan's review and he says it "would indicate
12 that the securities transferred could be worth
13 billions more than the 47.4 billion," and my
14 question is did Houlihan or Milbank ever
15 communicate to Weil how many billions of dollars
16 more than the 47.4 billion?
17     A.    Well, that was the question.  I mean,
18 they -- they knew -- their review to date
19 suggested that there was a mismatch in the
20 billions, but they needed access to additional
21 information, which they needed to obtain through
22 the Debtors to refine that further.
23     Q.    And what was the additional
24 information that Houlihan needed from the
25 Debtors?

**D. O'DONNELL**

1
2     A.    Again, that was information that
3 Houlihan needed.  I can't be very specific as to
4 what they needed to satisfy their own
5 methodologies, but I assume it relates to marks
6 that were available internally at Lehman.
7     Q.    Do you know if that information was
8 ever provided by Lehman to Houlihan?
9     A.    Can you repeat the question?
10     Q.    Do you know if that information was
11 ever provided by Lehman to Houlihan?
12     A.    There were discussions between
13 Houlihan and Lehman.
14         Strike that.  No, I don't.
15     Q.    The analysis that Mr. Despins refers
16 to, is that an analysis with respect to Schedule
17 A, only, or was it analysis with respect to both
18 Schedule A and Schedule B?
19     A.    I think the Committee had concerns
20 about both schedules, but I believe the
21 reference here is to Schedule A.
22     Q.    Was there ever any follow-up
23 discussion between Houlihan and Milbank on the
24 one hand and Weil or Lehman on the other hand
25 concerning Schedule B?

D. O'DONNELL

1
2     A.    Not that I have specific knowledge of.
3     Q.    And am I correct that at no time
4 between the closing and the first week of
5 December, when Quinn Emanuel took over this
6 matter, did Milbank or Houlihan make an effort
7 to get pricing information from Barclays; is
8 that right?
9     A.    Not directly, in large part because at
10 that point in time the dynamic between Barclays
11 and the Debtors was not optimal.  There were
12 ongoing disputes about access to information
13 generally which the Debtors were embroiled in,
14 and part of the reasons for obtaining
15 information at this point was difficult was the
16 fact that Barclays had control over access to
17 most of the information we needed.
18     Q.    So you mentioned Mr. Despins'
19 conversation with Ms. Grandfield.  I believe
20 that was in October, am I right about that?
21     A.    Correct.
22     Q.    And did he ask Ms. Grandfield to
23 arrange for Barclays to provide certain
24 information?
25     A.    Not to my knowledge.

Page 162

D. O'DONNELL

1
2  Q.   Did anybody from Milbank or Houlihan
3  or the Debtors in this period up to the first
4  week of December ask Barclays to provide
5  information on these issues?
6  A.   Can you repeat the question?
7  (Record read.)
8  A.   As to Milbank, no.  As to Houlihan and
9  the Debtors, I cannot speak.
10  Q.   You don't know?
11  A.   I don't know.
12  Q.   Did Milbank consider it important to
13  get this information from Barclays?
14  MR. COHEN:  Objection.  I'll instruct
15  the witness not to answer on the basis of
16  attorney-client privilege and work product.
17  Q.   If Milbank had considered it important
18  to obtain this information at the time, that is,
19  before the first week of December 2008, what
20  options did Milbank have available to it in
21  order to obtain that information from Barclays?
22  MR. COHEN:  Objection.  This calls for
23  speculation, it's beyond the scope of the
24  30(b)(6) subpoena, and the witness is not
25  authorized to testify on behalf of the firm

TSG Reporting - Worldwide    877-702-9580

Page 163

D. O'DONNELL

1
2  as to the subject of that question.
3  Q.   Well, you say that Milbank had
4  questions concerning the value of certain
5  purchased assets.  I think that's clearly within
6  the scope of the subpoena.
7  Now, did Milbank ever send a letter to
8  anybody at Barclays or representing Barclays
9  requesting further information on that subject
10  before December 1 when Milbank withdrew?
11  A.   No.
12  Q.   Okay.  And Milbank never sought the
13  Court's assistance in seeking that information,
14  am I right about that?
15  A.   Correct.
16  Q.   As of the time that Milbank withdrew
17  and Quinn Emanuel took over, was there a
18  timeline in place for obtaining this information
19  and resolving these questions?
20  MR. COHEN:  Objection.  I'll instruct
21  the witness not to answer.  Calls for
22  privileged information and disclosure
23  protected by the Attorney Work Product
24  Doctrine.
25  Q.   Did Milbank ever express to Weil --

TSG Reporting - Worldwide    877-702-9580

Page 164

D. O'DONNELL

1
2  did Houlihan or Milbank ever express to Weil a
3  desire to resolve these issues within a
4  specified period of time?
5  A.   Yes.
6  Q.   And what did -- what was expressed to
7  Weil?
8  A.   As soon as possible.
9  Q.   And what was the reaction?
10  A.   It was an iterative process with Weil.
11  As previously -- as I previously testified, they
12  were not initially receptive obtaining their
13  cooperation and then obtaining what we needed
14  from them took time, took longer than we would
15  have wanted.
16  Q.   You say it was an iterative process,
17  but did you have in mind some sense of time
18  pressure, some date by which you wanted to try
19  to have these issues resolved?
20  MR. COHEN:  I'll instruct the witness
21  not to answer.  It's legal advice,
22  privileged, and attorney work product.
23  Q.   While it was an iterative --
24  withdrawn.
25  While it was an iterative process with

TSG Reporting - Worldwide    877-702-9580

Page 165

D. O'DONNELL

1
2  Weil, is it fair to say that, at least as early
3  as October 2008, Houlihan and/or Milbank had
4  brought to Weil's attention their concern about
5  this overall theme of a $5 billion mismatch?
6  A.   Yes.
7  MR. STERN:  I have no further
8  questions.
9  EXAMINATION BY
10  MR. COHEN:
11  Q.   Mr. O'Donnell, I have just a couple of
12  questions.
13  After lunch, you fielded a number of
14  questions that went to the value of certain
15  items, including assets and liabilities in
16  connection with the sale to Barclays.  Do you
17  recall those questions?
18  A.   Yes.
19  Q.   And you testified that the value of
20  certain assets and liabilities was uncertain.
21  Do you recall that testimony?
22  A.   Yes.
23  Q.   Would it be more accurate for you to
24  say that those values were uncertain to Milbank
25  and Houlihan?

TSG Reporting - Worldwide    877-702-9580

Page 166

D. O'DONNELL

1
2    A.   Yes.
3    Q.   Did you mean to imply by your answers
4    that the values of those assets and liabilities
5    were uncertain to anyone other than Milbank
6    and/or Houlihan?
7    A.   No, I did not.
8         MR. COHEN:  I have no further
9    questions.
10        MR. STERN:  Okay.  Thank you.
11        THE WITNESS:  Thank you.
12        THE VIDEOGRAPHER:  That concludes the
13   video record for today.  The time is now
14   2:57 P.M.  We are now off the record.
15            oOo
16
17
18        _____
19        DENNIS C. O'DONNELL
20   Subscribed and sworn to
     before me this    day
21   of       2010.
22
23   _____
24
25
     TSG Reporting - Worldwide    877-702-9580

---

Page 167

D. O'DONNELL

1         CERTIFICATE
2
3    STATE OF NEW YORK )
              : ss
4    COUNTY OF NEW YORK)
5         I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9         That DENNIS C. O'DONNELL, the witness
10   whose deposition is herein before set forth,
11   was duly sworn by me and that such
12   deposition is a true record of the testimony
13   given by such witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18        I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23        In witness whereof, I have hereunto
24   set my hand this 6th day of December, 2010.
25   ------------------------------
     TSG Reporting - Worldwide    877-702-9580

---

Page 168

D. O'DONNELL

1
2         INDEX
3    TESTIMONY OF D. O'DONNELL:       PAGE
4    Examination by Mr. Stern ...................   7
5    Examination by Mr. Cohen ................. 164
6
7    EXHIBITS:              PAGE
8    Exhibit 498, Notice of Deposition Pursuant    5
9    to Rule 30(b)(6)
10   Exhibit 499, a document bearing Bates Nos.    88
11   WGM-LEHMAN-E 00002746 through 2766
12   Exhibit 500, a document bearing HLHZ0020162   89
13   through 182
14   Exhibit 501, a document bearing Bates Nos.    90
15   WGM-LEHMAN-E 00013962 through 13982
16   Exhibit 502, a document bearing Bates Nos.    91
17   WGM-LEHMAN-E 00013889 through 13899
18   Exhibit 503, a document bearing  Bates Nos.   92
19   HLHZ0019919 through 19930
20   Exhibit 504, a document bearing Bates Nos.   143
21   MTHM0012869 through 12871
22
23
24
25
     TSG Reporting - Worldwide    877-702-9580

---

Page 169

D. O'DONNELL

1
2    NAME OF CASE:  In re Lehman Brothers, Inc.
3    DATE OF DEPOSITION:  January 6, 2010
4    NAME OF WITNESS:  Dennis C. O'Donnell
5    Reason Codes:
6      1. To clarify the record.
       2. To conform to the facts.
7      3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25   _____
     TSG Reporting - Worldwide    877-702-9580

Page 1

1          HIGHLY CONFIDENTIAL - D. PETRIE

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

10              Debtors.

     ----------------------x

11

12       * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF DAVID PETRIE

14          New York, New York

15           August 26, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24293



Page 6

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    MR. O'BRIEN:  On the phone is Tom
3    O'Brien from Quinn Emanuel representing the
4    Creditors Committee.
5 BY MR. TAMBE:
6    Q.   Mr. Petrie, have you ever given a
7    deposition before?
8    A.   No, I have not.
9    Q.   Okay.  Basic rules:  I'm going to ask
10 you a series of questions about the
11 Lehman/Barclays transaction and what role, if
12 any, you may have played in that transaction.
13       If you have any trouble understanding
14 my question, let me know.  I'll rephrase it.
15 You have to give your answers vocally, no nods
16 of the head, et cetera.  She's writing down
17 everything you say, so yeses, nos.  I'm happy to
18 clarify any question.
19       By whom are you currently employed?
20    A.   Barclays Capital.
21    Q.   And how long have you been with
22 BarCap?
23    A.   Been with Barclays Capital since
24 January 1998.
25    Q.   Before that by whom were you employed?

TSG Reporting - Worldwide (877) 702-9580

Page 7

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    A.   I was employed by AIG Trading Group,
3    Fischer, Frances, Trees & Watts, and Progressive
4    Insurance Company.
5    Q.   At Barclays Capital, if you could just
6    describe, starting in '98 to the present,
7    broadly what your positions have been, what your
8    duties have been?
9    A.   Sure.  I began working at Barclays
10 Capital in a junior role in the repo desk.  That
11 role over several years grew into a repo trading
12 position as well as a risk management position
13 for the repo desk.
14       From the repo desk, as you said,
15 broadly, the end of 2005, 2006, I joined the
16 Barclays Bank, PLC Portfolio Group, and my
17 responsibilities were to run the dollar
18 portfolio; and in the beginning of 2008, I
19 returned to the repo desk to run the repo desk
20 for Barclays Capital in the U.S.
21    Q.   So, starting in January 2008, what was
22 your title or position at Barclays Capital?
23    A.   Specifically in January, I was still
24 working for the Barclays Bank portfolio.  I did
25 not take my responsibilities as the head of the

TSG Reporting - Worldwide (877) 702-9580

Page 8

HIGHLY CONFIDENTIAL - D. PETRIE
1
2 desk until roughly April.
3    Q.   And in April when you took your
4 responsibilities for the repo desk at Barclays
5 Capital, what was your position or title?
6    A.   My title was director.
7    Q.   And was that the title you held
8 throughout 2008?
9    A.   Yes.
10    Q.   Focusing on that position, starting in
11 April 2008 as a director --
12       And you were the head of the repo desk
13 for Barclays Capital in the U.S.; is that right?
14    A.   That's correct, for certain products.
15    Q.   Okay.
16    A.   Those products included Treasuries,
17 agencies, and mortgages.
18       MR. SHAW:  Do you mind if I ask a
19 question to make the record clear?
20       MR. TAMBE:  Sure.  Go ahead.
21       MR. SHAW:  Are you currently the head
22 of the Barclays repo desk?
23       THE WITNESS:  No, I am not.
24    Q.   What's your current position?
25    A.   I currently run the short-term

TSG Reporting - Worldwide (877) 702-9580

Page 9

HIGHLY CONFIDENTIAL - D. PETRIE
1
2 interest rate desk for Barclays Capital.
3    Q.   And how long have you had that
4 position?
5    A.   Since approximately October of last
6 year.
7    Q.   So it's fair to say shortly after the
8 Lehman/Barclays transaction you took on this new
9 position running the short-term interest rate
10 desk?
11    A.   Yes.
12    Q.   And maybe we can cut through some of
13 the questions.  Starting last October, October
14 2008, did you continue to have any involvement
15 in the Lehman/Barclays transaction, the
16 aftermath of that transaction?
17    A.   Yes.
18    Q.   If you could just briefly describe,
19 after October 2008 what has been the nature of
20 your involvement in the Lehman/Barclays
21 transaction?
22    A.   Assisting in the integration of the
23 two companies, specifically to the desk.
24    Q.   When you say "specifically to the
25 desk," what desk are you referring to in the

TSG Reporting - Worldwide (877) 702-9580

Page 10

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2    post October 2008 time period?
3        A.   The repo desk.
4        Q.   And is that something that you're
5    still involved in in helping with the
6    integration of the two companies?
7        A.   No.
8        Q.   Was there a period of time when you
9    were involved in that and then that process
10   ceased when you were no longer involved in that
11   integration process?
12       A.   Yes.
13       Q.   Describe that time period for me.
14   From when to when?
15       A.   I would say by approximately
16   November/December that process ended.
17       Q.   Are you aware of a settlement
18   agreement that was entered into in or about
19   December 2008 concerning the Lehman/Barclays
20   transaction?
21       A.   What settlement agreement are you
22   speaking of?
23       Q.   Are you aware of any kind of
24   settlement agreement between Barclays, JPMorgan,
25   Lehman Brothers, Inc., the trustee for Lehman
```

TSG Reporting - Worldwide (877) 702-9580

Page 11

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2    Brothers, Inc., in or about December 2008 having
3    to do with the transfer of collateral from
4    Lehman through JPMorgan to Barclays?
5        A.   As you describe it, no.
6        Q.   Okay.  We'll come back to that.  I'm
7    just trying to get a sense of where you fit into
8    the various pieces of the Lehman/Barclays
9    transaction as a whole.
10            So let's go back to the front end.  So
11   let's go back to April 2008.  You are on the
12   repo desk at Barclays Capital, correct?
13       A.   That is correct.
14       Q.   Just describe that desk for me in
15   terms of who you report to, who reports to you.
16   I'm just trying to get a sense of who the
17   individuals are who are involved with that desk.
18       A.   Sure.
19            MR. SHAW:  As of April 2008?
20       Q.   As of April 2008.
21       A.   I ran the U.S. dollar repo desk.  I
22   reported to Mark Dearlove, and --
23            Do you want me to go further as to who
24   Mark reported to?
25       Q.   Sure.
```

TSG Reporting - Worldwide (877) 702-9580

Page 12

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2        A.   Mark Dearlove at the time reported to
3    Alastair Hodge, if I remember correctly.
4        Q.   And just in terms of titles or
5    positions, what was Mr. Dearlove's position?
6        A.   Managing director.
7        Q.   At Barclays Capital?
8        A.   Yes.
9        Q.   And he was based here in New York?
10       A.   No.
11       Q.   He was based overseas?
12       A.   Mark Dearlove was based in London.
13       Q.   How about Mr. Alastair Hodges, what
14   was his position or title?
15       A.   Alastair Hodge at the time was a
16   managing director in charge of Prime Services, I
17   believe.
18       Q.   And where was he based?
19       A.   London.
20       Q.   Other than being managing director,
21   did Mr. Dearlove and Mr. Hodge have any other
22   functionary titles, chief operating officer,
23   chief financial officer, things like that, those
24   types of titles?
25       A.   No.
```

TSG Reporting - Worldwide (877) 702-9580

Page 13

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   And was there any particular
3    department or group or unit that Mr. Dearlove
4    and Mr. Hodge were in?
5        A.   Prime Services.
6        Q.   And were you a member of that group as
7    well, the Prime Services Group?
8        A.   During that period, yes.
9        Q.   Yeah, I'm talking about the April 2008
10   period.  Is that still the case in September of
11   2008, that you're in the Prime Services Unit?
12       A.   Yes.
13       Q.   And are you still reporting in
14   September 2008 to Mr. Dearlove?
15       A.   Yes.
16       Q.   During this time period, April 2008
17   through September 2008, who is reporting to you?
18       A.   That would be my team at the time.
19            May I ask again for you to clarify,
20   clarify the dates again?
21       Q.   Yes.  This is April 2008 through
22   September 2008, so the months leading up to the
23   transaction.
24       A.   Multiple repo traders.
25       Q.   How many?
```

TSG Reporting - Worldwide (877) 702-9580

4

Page 18

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2    as part of Barclays Capital's business?  What
 3    did this desk do?
 4        A.   Between April and September?
 5        Q.   Yes.
 6        A.   The number one function of a repo desk
 7    is to finance the firm's inventory.  Also, a
 8    repo desk would engage in borrowing and lending
 9    of securities with counterparties.
10        Q.   Anything else?
11        A.   Those are the main functions of a repo
12    desk.
13        Q.   And when you referred to engaging in
14    borrowing and lending of securities with
15    counterparties, is that also sometimes referred
16    to as the matched book?
17        A.   Yes.
18        Q.   What's your recollection of your
19    earliest involvement in what eventually became
20    the Lehman/Barclays transaction?
21        A.   My earliest involvement would have
22    been the Saturday, which I believe is September
23    12th, before the announcement of bankruptcy.
24        Q.   Okay.  That's Saturday, September 13.
25        A.   Okay, September 13.
```

TSG Reporting - Worldwide (877) 702-9580

Page 19

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2        Q.   And what is it that you remember about
 3    your earliest involvement?
 4        A.   My memory is I received a phone call
 5    from my manager to please go into the office,
 6    Barclays Capital, and once you get there, to
 7    give him a call.
 8        Q.   And who was your manager?
 9        A.   As noted before, Mark Dearlove.
10        Q.   Let's take it chronologically from
11    that Saturday.  What I would like to do is spend
12    a little bit of time just placing you wherever
13    you were and whatever role you were playing in
14    the course of the next ten days or so, September
15    13 through the 22nd, 23rd of September.
16        So you get the call on the 13th.  You
17    go into the office.  Describe for me what you
18    were doing on the 13th.
19        A.   On the 13th?
20        Q.   In connection with the transaction.
21        A.   Yeah, on the 13th, I believe I arrived
22    at the office later in the afternoon and was
23    tasked with determining what value, if any,
24    there was to the Lehman Brothers repo desk.
25        Q.   Now, when you were called into the
```

TSG Reporting - Worldwide (877) 702-9580

Page 20

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2    office, are you told what this was about?
 3        A.   No.  I was given a task and I did my
 4    best to perform that task.
 5        Q.   Let me ask it a different way.  You
 6    were called into the office on a Saturday.  Are
 7    you told this is about a possible transaction
 8    with Lehman?
 9        A.   I don't remember specifically being
10    told that this was a possible transaction with
11    Lehman.
12        Q.   You show up in the office on Saturday
13    and you were asked to determine if there is any
14    value in the Lehman Brothers repo desk, correct?
15        A.   Correct.
16        Q.   Did you ask why you were being asked
17    to do that?
18        A.   I don't remember.
19        Q.   Prior to Saturday, had you heard any
20    discussions in the office about Barclays
21    possibly buying Lehman?
22        A.   There was speculation across Wall
23    Street as to potential bidders for Lehman, so it
24    was reasonable for me to come to the conclusion
25    that perhaps that was what was going on in
```

TSG Reporting - Worldwide (877) 702-9580

Page 21

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2    regards to my task on that Saturday.
 3        Q.   Did you ask anyone on Saturday what's
 4    going on, why am I being asked to do this?
 5        MR. SHAW:  Asked and answered.
 6        A.   He's going to object from time to
 7    time.  I'm going to ask you to answer the
 8    question.
 9        A.   I do not remember asking anyone why I
10    was being asked to do this task.
11        Q.   All right.  You're asked to do the
12    task and you start doing it, correct?
13        A.   Yes.
14        Q.   Are you given some spreadsheets or
15    information about the repo desk at Lehman?
16        A.   Yes.
17        Q.   What are you given?
18        A.   I'm given matched book positions; a
19    broad overview of collateral that's held by
20    Lehman at the time.
21        Q.   Who gives you these documents or this
22    information?
23        A.   I don't recall exactly who gave me
24    those documents.
25        Q.   As you describe them, what I'm
```

TSG Reporting - Worldwide (877) 702-9580

Page 22

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    picturing is you got some spreadsheets or some
3    reports of some kind handed to you?
4        A.  Yes.
5        Q.  And in valuing those spreadsheets or
6    documents, were you working alone or were you
7    working with someone else?
8        A.  I had called in some team members, my
9    team members.
10       Q.  And who had you called in?
11       A.  I recall Bill Lent, Nate Hartley, and
12   perhaps Oscar Huettner.
13       Q.  And you and your team begin valuing
14   this portfolio on the Saturday, correct?
15       A.  That is correct.
16       Q.  Let's advance the story now.  I'll
17   come back to your valuing and how you went about
18   valuing the portfolio.  What else did you do on
19   Saturday?
20       A.  That was my sole task.
21       Q.  Did that task continue into Sunday?
22       A.  I'm not sure exactly what time that
23   task ended.
24       Q.  Do you recall it being running late
25   into the night?
```
TSG Reporting - Worldwide (877) 702-9580

Page 23

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2        A.  Yes.
3        Q.  What was the conclusion of that task?
4        A.  My conclusion of the task of valuing
5    Lehman's repo book was that it had zero value
6    and that it didn't present -- didn't present
7    value to the firm.
8        Q.  The documents or spreadsheets that you
9    had been provided, did those have valuations on
10   them?
11       A.  I don't recall.
12       Q.  Do you recall part of your exercise
13   that Saturday into late Saturday night
14   consisting of disagreeing with the values that
15   had been placed on the repo desk or the repo
16   assets with Lehman Brothers by others?
17       A.  Can you repeat the question?
18       (Record read.)
19       A.  Yes.
20       Q.  And what was the source of those other
21   values that you were disagreeing with?
22       A.  A repo desk can measure -- let's say a
23   typical repo desk can measure value for term
24   trades on what's called a net present value, and
25   the net present value that I determined from the
```
TSG Reporting - Worldwide (877) 702-9580

Page 24

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    information I was provided with was
3    approximately zero and, to your question, there
4    was a suggestion that it was greater than zero.
5        Q.  And who was making the suggestion that
6    it was greater than zero?
7        A.  Representatives from Lehman Brothers.
8        Q.  And do you have a recollection of how
9    much greater than zero was being suggested as
10   the value for that desk?
11       A.  I believe they suggested it was
12   between 5 and 10 million dollars.
13       Q.  5 and 10 billion or million?
14       A.  Million.
15       Q.  Do you recall any of the
16   representatives of Lehman who were making the
17   suggestion?
18       A.  No.
19       Q.  Did you have conversations with people
20   from Lehman on that Saturday?
21       A.  Yes.
22       Q.  You were in a conference call with
23   some people?
24       A.  I was not on a conference call with
25   people.
```
TSG Reporting - Worldwide (877) 702-9580

Page 25

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.  These were face-to-face meetings with
3    Lehman people?
4        A.  They were phone calls.
5        Q.  Phone calls.  And do you remember any
6    of the people with whom you had those -- any of
7    the Lehman people with whom you had those phone
8    calls on that Saturday?
9        A.  Yes.
10       Q.  Who?
11       A.  Mike Webb, David Lohuis.  I believe
12   that's it.
13       Q.  Did you ever speak with Paolo Tonucci
14   that Saturday?
15       A.  Yes, I believe so.
16       Q.  Did you speak with Ian Lowitt that
17   Saturday?
18       A.  No.
19       Q.  You know who those two people are,
20   correct?
21       A.  Yes.
22       Q.  And you did deal with them at some
23   point in connection with the transaction,
24   correct?
25       A.  Yes.  Well, let's clarify.  Your
```
TSG Reporting - Worldwide (877) 702-9580

7

## Page 30

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       A.   No.
3            (Exhibit 265, a document bearing Bates
4       Nos. BCI-EX-(S)-37172 through 173, marked
5       for identification, as of this date.)
6       Q.   I have placed before you a two-page
7       document marked Exhibit 265.  It's an e-mail
8       exchange.  Take a moment to look at it.  Let me
9       know when you're done looking at it.
10           (Document review.)
11      A.   I've finished reading it.
12      Q.   Starting from the first e-mail on the
13      first page, actually on the first page of
14      Exhibit 265, the very top of the page, there's
15      an e-mail from you to Mr. Bommensath.  Do you
16      see that?
17      A.   I do see it.
18      Q.   Okay.  And you state in that e-mail,
19      "I'm going to get everything I want it sounds
20      like."  Do you see that?
21      A.   I can read it, yes.
22      Q.   And is it consistent with your
23      recollection that the information that you had
24      requested had been provided to you or was going
25      to be provided to you by Lehman?

TSG Reporting - Worldwide (877) 702-9580

## Page 31

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       A.   Yes.
3       Q.   And you state later on in your e-mail
4       you spoke to Paolo and indirectly Ian, do you
5       see that?
6       A.   Yes, I see it.
7       Q.   Do you have any understanding what you
8       meant by you had spoken indirectly with Ian?
9       A.   No.
10      Q.   The Saturday into Sunday, the 13th and
11      14th of September, did you have any
12      understanding of what the nature of the
13      contemplated transaction between Lehman and
14      Barclays was?
15      A.   No.
16      Q.   Did you have any understanding that a
17      transaction was not going to happen that
18      weekend?
19      A.   At what time?
20      Q.   At any point in Saturday/Sunday.
21      A.   Very late Sunday, it appeared to me
22      that there would not be a transaction.
23      Q.   And how did you get that
24      understanding?
25      A.   I believe I came to that conclusion

TSG Reporting - Worldwide (877) 702-9580

## Page 32

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       independently when I was told to go home.
3       Q.   Did you ask anyone about the status of
4       the transaction?
5       A.   I may have, but I don't remember who.
6       I certainly didn't get an answer.
7            (Exhibit 266, a document bearing Bates
8       Nos. BCI-EX-(S)-37192 through 194, marked
9       for identification, as of this date.)
10      Q.   Sir, I have placed before you a
11      three-page document marked Exhibit 266.  The
12      last page is entirely blank.  Take a moment to
13      look at that exhibit.  Let me know when you're
14      done.
15           (Document review.)
16      A.   Okay.
17      Q.   Do you recognize this Exhibit 266 as
18      an e-mail that you sent to Mr. Dearlove and
19      others on or about Sunday, the 14th of
20      September, 2008?
21      A.   I don't remember this specific e-mail.
22      Q.   No reason to believe you didn't
23      prepare this e-mail, correct?
24      A.   That's correct.
25      Q.   We talked earlier about your having

TSG Reporting - Worldwide (877) 702-9580

## Page 33

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       summarized your conclusions in an e-mail or some
3       kind of report.  Do you remember that
4       discussion?
5       A.   Yes.
6       Q.   Okay.  Is this e-mail Exhibit 262 a
7       summary of your conclusions about the valuation
8       exercise that you did on Saturday and Sunday,
9       September 13th and 14th, 2008?
10      A.   My page here says 266.
11      Q.   Yes, Exhibit 266.
12           MR. SHAW:  You misspoke.  You said
13      262.
14      Q.   Okay.  266.
15      A.   Yes.
16      Q.   The dollar values that appear in this
17      e-mail, are these the dollar values that you
18      ascribed to the relevant positions?
19      A.   Yes.
20      Q.   Turn to page 2 of this exhibit 266.
21      At the top of the page, there's a paragraph that
22      begins, "Their risking and NPV methodology is
23      sound and similar to what we do," do you see
24      that?
25      A.   I see it.

TSG Reporting - Worldwide (877) 702-9580

## Page 34

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2     Q.   What did you mean by the phrase
 3  "risking and NPV methodology"?
 4     A.   "NPV" stands for net present value,
 5  and when a repo desk has engaged in term trades,
 6  there is an assigned rate to those term trades
 7  at the point of the initiation of said trade.
 8  As you move away from day one of that execution
 9  of the trade, prevailing rates will change over
10  time, and as they change, one calculates net
11  present value at those prevailing rates.
12     Q.   From your statement in this paragraph
13  that we were just reading, "Their risking and
14  NPV methodology is sound and similar to what we
15  do," were you indicating that you approved of
16  the way they risked -- they did their risking
17  and NPV methodology?
18          MR. SHAW:  Objection to form.  Vague
19  as to what you're -- the scope of his
20  approval of any methodology.
21     A.   Can you repeat the question?
22     Q.   Sure.
23          MR. TAMBE:  Can you read it back,
24  please?
25          (Record read.)
TSG Reporting - Worldwide (877) 702-9580
```

## Page 35

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2     A.   No.
 3     Q.   What did you mean by your statement,
 4  then?
 5     A.   In general, repo desks should employ a
 6  way to risk their books.  It appeared over the
 7  very short amount of time that I've had the
 8  opportunity to look at their repo balances that
 9  they employed, at the very least, NPV
10  valuations.
11     Q.   And was the methodology used by Lehman
12  similar to the one used by Barclays?
13     A.   The way -- the very fact that they had
14  an NPV by nature of calculating an NPV would, by
15  nature, be similar to Barclays.
16     Q.   And what did you mean by your phrase
17  "the methodology is sound"?  What did you mean
18  by that?
19     A.   The math in calculating the net
20  present value of a term trade did not seem
21  flawed at the time I was looking at their books.
22     Q.   You say beyond that paragraph, "The
23  specials book is reflected at zero."  You see
24  that?
25     A.   I see it.
TSG Reporting - Worldwide (877) 702-9580
```

## Page 36

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2     Q.   What did you mean by that?
 3     A.   They had wound down their specials
 4  book to have very little exposure.
 5     Q.   At the bottom of page 2 of Exhibit
 6  266, the paragraph with the word "Summary" above
 7  it, do you see that paragraph?
 8     A.   I see it.
 9     Q.   You have a sentence in the middle of
10  that paragraph that reads, "The repo desk's
11  methodology on trading and with whom appears
12  robust in its risk controls and management," do
13  you see that?
14     A.   Yes.
15     Q.   Okay.  And what did you mean by
16  "appears robust in its risk controls and
17  management"?
18     A.   It appeared to me during the short
19  period of me looking at those -- their books
20  that they understood the risks that they were
21  writing in repo.
22          (Exhibit 267, a document bearing Bates
23  Nos. BCI-EX-(S)-37195 through 197, marked
24  for identification, as of this date.)
25     Q.   Sir, I have placed before you a
TSG Reporting - Worldwide (877) 702-9580
```

## Page 37

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2  three-page document marked Exhibit 267.  Take a
 3  moment to review this exhibit.  Let me know when
 4  you're done.
 5          (Document review.)
 6     A.   Okay.
 7     Q.   Do you recognize Exhibit 267 as a
 8  further piece of the analysis that was done by
 9  you and your team that weekend of September 13
10  and 14 of 2008?
11     A.   I don't remember this specific e-mail.
12     Q.   Having reviewed it now, do you
13  recognize it as part of that analysis?
14     A.   Yes.
15     Q.   This e-mail was prepared by
16  Mr. Hartley, correct?
17     A.   Yes.
18     Q.   Do you recall having a discussion with
19  Mr. Hartley about his conclusions and his
20  conclusions and his calculations in this e-mail?
21     A.   No.
22     Q.   One of the addressees on the e-mail is
23  Brian Rozen, R-O-Z-E-N.  Who is Mr. Rozen?
24     A.   Brian Rozen at the time was equal in
25  my, you could say in my title.  His
TSG Reporting - Worldwide (877) 702-9580
```



Page 38

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2   responsibilities were he was based in London and
3   was responsible for the financing of corporate
4   bond positions.  His team was responsible for
5   the corporate bond positions.
6        Q.   On the weekend of the 13th and 14th,
7   were you engaged in an exercise to identify
8   assets that Barclays would not wish to purchase
9   from Lehman if there were -- if there was a
10  transaction?
11       A.   No.
12       Q.   At any time during that ten-day
13  period, starting on the 13th through the 23rd,
14  were you involved in such an exercise?
15       A.   No.
16       Q.   We'll come to an e-mail, an e-mail
17  which makes reference to a spreadsheet of
18  excluded assets.  Does that have any meaning to
19  you?
20       A.   Yes.
21       Q.   Okay.  What is your understanding of
22  the phrase "excluded assets" in this context?
23       A.   In the context of the timeframe, which
24  I believe you said from the 10th to the --
25       Q.   From the 13th to the 23rd.
```
TSG Reporting - Worldwide (877) 702-9580

Page 39

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2        A.   -- 13th to the 23rd, as we move into a
3   few days into that week, my sole responsibility
4   was to facilitate removing the Fed's funding of
5   Lehman Brothers and replace it with Barclays
6   funding Lehman Brothers.  To accomplish that
7   would mean simply we would just take the assets
8   that the Fed was funding.
9        Q.   And the phrase "excluded assets," what
10  meaning does that phrase have in the context of
11  your answer?
12       MR. SHAW:  Had you finished your
13  answer?
14       A.   No, I wasn't finished.
15       Q.   Go ahead and finish.
16       A.   To accomplish the task of only
17  receiving the collateral that the Fed had been
18  financing for Lehman would, by nature, include
19  assets that weren't being financed by the Fed,
20  which would be excluded assets.
21       Q.   You completely lost me with the last
22  part of your answer, so let me try again.
23       Later on in the week, you're involved
24  in the process of replacing the Fed financing
25  with the Barclays financing, is that fair to
```
TSG Reporting - Worldwide (877) 702-9580

Page 40

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2   say?
3        A.   Yes.
4        Q.   There are assets that are securing the
5   Fed financing, correct?
6        A.   Yes.
7        Q.   Are those same assets then used to
8   secure the Barclays financing?
9        A.   The intent was for Barclays to finance
10  the assets that the Fed had been financing on
11  Thursday of that week.
12       Q.   And in connection with Barclays
13  financing the assets that the Fed had been
14  financing, what role, if any, did excluded
15  assets play in that financing?
16       A.   Since Lehman Brothers was financing
17  assets outside of the Fed facility, and my only
18  purpose that week was to remove the Fed from
19  financing of the assets from that Thursday would
20  imply that there were -- not just imply, there
21  were other assets that would be excluded from
22  the Fed replacement trade, as I would call it.
23       Q.   So your understanding is the excluded
24  assets were those assets that in fact were not
25  securing the Fed financing?
```
TSG Reporting - Worldwide (877) 702-9580

Page 41

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2        A.   Yes.
3        (Exhibit 268, a document bearing Bates
4   Nos. BCI-EX-(S)-37199 through 200, marked
5   for identification, as of this date.)
6        (Discussion off the record.)
7        (Recess; Time Noted:  10:35 A.M.)
8        (Time Noted:  10:47 A.M.)
9   BY MR. TAMBE:
10       Q.   I think before we took the break, sir,
11  we placed in front of you a document Exhibit
12  268.  Have you looked at that?
13       A.   No, I have not.
14       Q.   Why don't you take a look at that and
15  let me know when you're done.
16       (Document review.)
17       A.   Okay.  I've read it.
18       Q.   On the first page of Exhibit 268,
19  that's an e-mail from Mr. Rozen to you
20  forwarding a set of e-mails.  Do you see that?
21       A.   Yes.
22       Q.   And is it fair to say that this
23  collection of e-mails on pages 1 and 2 of
24  Exhibit 268 have to do with Barclays' existing
25  exposure to Lehman on the 14th, the Sunday, 14th
```
TSG Reporting - Worldwide (877) 702-9580

Page 46

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2      marked for identification, as of this date.)
3      Q.  Sir, I have placed before you a
4    three-page document marked Exhibit 270.  Take a
5    look at it and let me know when you're done.
6      A.  May I ask, is this document different
7    than the previous document?
8      Q.  I think the attachment on both exhibit
9    269 and 270, at least to my eye, looks to be
10   similar, but you can confirm that for yourself.
11        Why don't we hold 270 aside.  I just
12   want to make sure we've got the right attachment
13   to it, because these are native files that were
14   attached to that cover e-mail.  So put 270
15   aside.  We'll come back to it.
16        (Exhibit 271, a document bearing Bates
17      Nos. BCI-EX-(S)-37270, marked for
18      identification, as of this date.)
19      Q.  I have placed before you a one-page
20   document marked Exhibit 271.  Take a moment to
21   review it and let me know when you're done.
22        (Document review.)
23      A.  I've read it.
24      Q.  And you recognize this as an e-mail
25   that you sent to your team and others at
TSG Reporting - Worldwide (877) 702-9580
```

Page 47

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    Barclays, correct?
3      A.  I don't remember this e-mail in
4    particular.
5      Q.  Okay.  No reason to believe you didn't
6    send this e-mail, right?
7      A.  Correct.
8      Q.  And just briefly, is it fair to say
9    that this e-mail is a set of instructions that
10   you gave your team on dealing with Lehman the
11   day of the Lehman bankruptcy filing?
12      A.  You've actually asked a two-part
13   question.
14      Q.  I have?
15      A.  Well, in my head you have.
16        So, first, I recognize this as a plan
17   of action for trading on Monday morning.  No, I
18   don't believe it was at all related to me
19   thinking that there was going to be a pending
20   bankruptcy filing.  It was me being cautious, as
21   I would be on any other volatile day, in regards
22   to how we would approach the market in trading.
23      Q.  Prior to September 15th, 2008, had
24   there been other days on which you had
25   instructed your team not to face Lehman?
TSG Reporting - Worldwide (877) 702-9580
```

Page 48

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2      A.  Yes, I believe so.
3      Q.  How many other days were there where
4    you had instructed your traders, your team not
5    to face Lehman?
6      A.  I don't know exactly.
7      Q.  Dozens of days?
8      A.  Perhaps.
9      Q.  In item number 7 of your e-mail you
10   state, "We need to monitor throughout the day
11   our settlements with Lehman and alert me to any
12   pending fails that may be related to Lehman."
13        What did you mean by that?
14      A.  Given the volatility in the
15   marketplace around the name Lehman, I was being
16   an encouraging prudence in regards to our
17   settlements with Lehman.
18      Q.  Is it fair to say that your
19   instruction in item number 1, "Do not face
20   Lehman," was an instruction not to put on new
21   trades with Lehman?
22      A.  Yes.
23        (Exhibit 272, a document bearing Bates
24      Nos. BCI-EX-115847 through 5876, marked for
25      identification, as of this date.)
TSG Reporting - Worldwide (877) 702-9580
```

Page 49

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2      Q.  Mr. Petrie, I have placed before you a
3    multi-page document marked Exhibit 272, and
4    before I ask you to sort of go through the
5    entire document, because it's a collection of
6    handwritten notes and other documents, I'm just
7    going to ask you some general questions about
8    different parts of this exhibit, okay?
9      A.  Would you like me to answer those
10   questions before reviewing the document?
11      Q.  Yes.  And then as we get to different
12   stages, I'll let you review parts of the
13   document.
14        First of all, there's some handwriting
15   on the first several pages of this exhibit, do
16   you see that?
17      A.  Yes, there is.
18      Q.  Is that your handwriting?
19      A.  Without going through it in detail, it
20   appears mostly to be my handwriting.
21      Q.  And is it your understanding in the
22   last couple of days you produced for copying and
23   production a set of your handwritten notes
24   related to the Lehman/Barclays transaction?
25      A.  Yes.
TSG Reporting - Worldwide (877) 702-9580
```



Page 50

```
1              HIGHLY CONFIDENTIAL - D. PETRIE
2       Q.   Okay.  And it appears from these
3   photocopies that these are pages of a notebook
4   or a calendar, do you see that?  Do you see the
5   spiral binding down the side?
6       A.   Yes.
7       Q.   Do you in fact have a notebook that
8   has these notes in it?
9       A.   Yes.
10      Q.   Okay.  And was it your practice in or
11  about September 2008 to have daily notes of the
12  tasks that you were working on?
13      A.   Yes.
14      Q.   We're going to circle back to some of
15  the specific pages, but I want to turn your
16  attention in this exhibit all the way down to
17  page 115873.  And pages 873, 874 and 875 are
18  what appear to be a printout of a spreadsheet
19  with some handwritten notations on them.  Do you
20  see that?
21      A.   Yes.
22      Q.   And do you recognize that as your
23  handwriting that appears on those pages?
24      A.   In part.
25          MR. SHAW:  Just so we're clear, it
```
TSG Reporting - Worldwide (877) 702-9580

Page 51

```
1              HIGHLY CONFIDENTIAL - D. PETRIE
2   appears there's a duplicate page.  The
3   handwriting's different, but 873 and 874
4   appear to be the same page.
5       Q.   So we'll circle back and talk a little
6   bit more about that.  876, the very last page of
7   this exhibit, do you recognize that page?
8       A.   Yes.
9       Q.   Is that your handwriting?
10      A.   No.
11      Q.   What do you recognize that page as?
12      A.   I recognize this page as a relatively
13  broad attempt at a timeline.
14      Q.   And you said it was not your
15  handwriting, correct?
16      A.   That is correct.
17      Q.   Do you know whose handwriting it is?
18      A.   Yes.
19      Q.   Whose?
20      A.   Gerard LaRocca.
21      Q.   Do you know if this document, this
22  last page, was something that you
23  found in your files or your notes?
24      A.   Yes.
25      Q.   Okay.  Tell me about it.  How did
```
TSG Reporting - Worldwide (877) 702-9580

Page 52

```
1              HIGHLY CONFIDENTIAL - D. PETRIE
2   Mr. LaRocca's handwritten rough outline show up
3   in your notes?
4       A.   Gerard LaRocca and I at different
5   times throughout that week had spoken, and I
6   don't remember the exact timing of when this was
7   written.
8       Q.   And it's your understanding that this
9   page, page 876, the last page of this exhibit,
10  was a document prepared by Mr. LaRocca in or
11  about that week that we've been talking about,
12  the week of September 15th through 22nd of 2008?
13      A.   Yes.
14      Q.   If I just understand what's being
15  described here, there are basically two types of
16  financing being described here, correct?
17          MR. SHAW:  Objection.  Foundation.
18      A.   It appears, yes, to have two types of
19  financing being discussed.
20      Q.   And it describes day-by-day in the
21  columns the status of each of those types of
22  financing, correct?
23          MR. SHAW:  Objection.  Foundation.
24      A.   I don't believe "status" is perhaps
25  the right word.
```
TSG Reporting - Worldwide (877) 702-9580

Page 53

```
1              HIGHLY CONFIDENTIAL - D. PETRIE
2       Q.   What's the word you'd use?
3       A.   Tuesday, we meet with the Fed and
4   we're asked -- Barclays is being asked to take
5   the Fed out of the Lehman financing.  It says a
6   "status" on the bottom, meaning where -- what
7   we're being requested to do by the Fed, being
8   told what to do by the Fed.
9          Wednesday, Barclays prepares to
10  execute on that request by the Fed.  Thursday,
11  we begin on that execution that was requested by
12  the Fed.
13      Q.   And there's dollar amounts associated
14  with the Thursday entries, do you see that?
15      A.   Yes, I see several dollar amounts.
16      Q.   And the items that you were describing
17  appear on the same line or row as the heading
18  "Fed Facility" in the left-hand side, do you see
19  that?
20      A.   Yes.
21      Q.   Above that there's another row, which
22  is titled "Barclays Tries to Assist LB by
23  Providing Liquidity Through Collateralized
24  Repo," do you see that?
25      A.   I see it.
```
TSG Reporting - Worldwide (877) 702-9580

Page 54

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   Q.   And then under Monday, Tuesday,
3   Wednesday and Thursday, there are numbers that
4   appear there, do you see that?
5       A.   Yes.
6       Q.   And do you understand that as being
7   the amount of the tri-party repo that Barclays
8   had on with Lehman during the first four days of
9   that week, the week of September 15th?
10      A.   You said four days.
11      Q.   Monday, Tuesday, Wednesday, Thursday.
12      A.   There's only three days noted here.
13      Q.   Okay.  There's a Thursday there, is
14  there not?
15      A.   Okay, the number being zero.
16      Q.   Right.
17      A.   Yes, so four days.
18      Q.   So you have my question in mind?
19      A.   Can you repeat it?
20      Q.   Before we talk about the number of
21  days out of question.
22      (Record read.)
23      A.   These numbers seem to be accurate as
24  to the tri-party between Barclays and Lehman.
25      Q.   And if I understand the information

TSG Reporting - Worldwide (877) 702-9580

Page 55

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   contained in that row that we've been looking
3   at, that tri-party repo is reduced to zero by
4   Thursday, correct?
5       A.   This document says zero, that's
6   correct.
7       Q.   And that's your recollection of what
8   happened, right?
9       A.   Yes.
10      Q.   And on Thursday, it's also the day
11  that Barclays funds the replacement for the Fed
12  repo, correct?
13      A.   May I clarify --
14      Q.   Sure.
15      A.   -- your statement?
16          Thursday is the day that we were
17  executing at the behest of the Fed to remove
18  them from the funding of Lehman Brothers.
19      Q.   And you do so by funding a repo that
20  replaces the Fed repo, correct?
21      A.   That was the intention, correct.
22      Q.   On this last page of Exhibit 272, in
23  the "Fed Facility" row under "Thursday" there
24  are three items that appear, do you see that?
25      A.   Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 56

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   Q.   The first item states, "Barclays wires
3   45 billion," correct?
4       A.   Yes.
5       Q.   That's the financing that Barclays
6   provided to Lehman on that Thursday, September
7   18th, correct?
8       A.   Yes.
9       Q.   Okay.  The next item that appears
10  under the "Thursday" heading is, "Expected to
11  receive 49.6 in securities," do you see that?
12          MR. SHAW:  Objection.
13  Mischaracterizes the document.  It's
14  "expects," not "expected."
15      Q.   Okay.  "Expects to receive 49.6 in
16  securities," do you see that?
17      A.   Yes.
18      Q.   And that's a reference to 49.6
19  billion, correct?
20      A.   Yes.
21      Q.   The next entry under the "Thursday"
22  column reads, "Actually receives 7B cash secured
23  in tri-party account at JPM.  43.3 in
24  securities," correct?
25          MR. SHAW:  Is your question whether

TSG Reporting - Worldwide (877) 702-9580

Page 57

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   that's what appears on the sheet?
3           MR. TAMBE:  Yes.
4           MR. SHAW:  Or is that what happened?
5       Q.   Is that what appears on the sheet?
6       A.   Yes.
7       Q.   That's your understanding --
8       A.   That appears on the sheet.  It states,
9   "7 billion cash secured in tri-party account at
10  JPM," and below that it says, "43.3 in
11  securities."
12      Q.   Okay.  And the 43.3 is 43.3 billion,
13  correct?
14      A.   Billion.
15      Q.   Okay.  And these are notes prepared by
16  Mr. LaRocca, correct?
17      A.   Yes.
18      Q.   All right.  Let's go back to your --
19  the beginning of this exhibit, Exhibit 272.
20          Let me ask you, do you have the
21  original of this notebook here?
22          MR. SHAW:  Here, no.
23          MR. TAMBE:  We would like to take a
24  look at the original because of the
25  photocopy of handwritten notes, and I think

TSG Reporting - Worldwide (877) 702-9580

Page 58

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   there's probably features on some of these
 3   pages that we can't make out because of the
 4   photocopying.  So whenever you get a chance,
 5   we would like to inspect the original.
 6        MR. SHAW:  We'll look into it.  I
 7   mean --
 8        MR. TAMBE:  Okay.  It might make this
 9   examination easier, so it's unfortunate that
10   we don't have the original here.
11        Q.  We've put together these pages in
12   Bates number order.  Can you flip through these
13   pages and see, is this the order in which these
14   pages appear in your notebook.
15        (Document review.)
16        A.  It seems that they're in the order
17   they would be in my notebook.  I would make a
18   couple clarifications.
19        Q.  Sure.  Go ahead.
20        A.  Some of the dates on the pages are
21   incorrect.  It seems that the dates are one day
22   ahead of perhaps what those dates were actually
23   when the notes were taken.  That's human error,
24   had the wrong date.  And it's possible, as I was
25   going through a volatile week, that I could be
```
TSG Reporting - Worldwide (877) 702-9580

Page 59

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   jumping from pages forward or backward as I
 3   would be making notes in a hurry.  So they may
 4   not necessarily be in perfect chronological
 5   order.
 6        Q.  Okay.  If I understand your answer,
 7   you seem to have confirmed that at least the
 8   sequence in which these pages appear is the same
 9   sequence in which they appear in your physical
10   notebook.
11        A.  They appear to be, yes.
12        Q.  Okay.  But it may be that when you
13   were keeping those notes, you were jumping
14   around pages, given everything that was going on
15   that week?
16        A.  Correct.
17        Q.  Okay.
18        A.  And that the dates may be inconsistent
19   with the actual date on the top.
20        Q.  Okay.  And your sense that the date
21   may be incorrect is based on the content of the
22   words versus the date that appears; is that
23   right?
24        A.  Yes.
25        Q.  And you generally remember -- okay.
```
TSG Reporting - Worldwide (877) 702-9580

Page 60

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   Let's go through some of the these pages and we
 3   can see if that's an issue that we need to drill
 4   down on more.
 5        Let's start with the first page.
 6   What's your best understanding of the notations
 7   that appear on that first page?  What's being
 8   described there?
 9        A.  It appears to be me thinking out loud
10   about financing of positions.
11        Q.  There's no date, as far as I can tell,
12   that appears on that first page.  Do you see
13   that?
14        A.  Yes.
15        Q.  The next page of the exhibit has a
16   date of 9/17/08 at the top.  See that?
17        A.  Yes.
18        Q.  Does that at all help you in terms of
19   dating that first page, when it is that you were
20   making these notes?
21        A.  It doesn't.
22        Q.  You've got -- there's one date that
23   appears in a comment at the bottom of the page.
24   I'm going to need your help understanding.  This
25   is on page 1 of the exhibit, the page that ends
```
TSG Reporting - Worldwide (877) 702-9580

Page 61

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   in 847.
 3        At the bottom of the page you've got a
 4   "9/16."  Do you see that?
 5        A.  I see that.
 6        Q.  If you can help us just understand
 7   that comment that's appearing at the bottom
 8   there.  What is that comment?  It's a
 9   handwriting question.
10        A.  It appears to say, "10 and a half
11   billion versus equity, September 16."
12        Q.  And then below that?
13        A.  "Intraday cash needed to facilitate
14   settlements."
15        Q.  Does that help you date this page at
16   all?
17        A.  May I ask what day of the week
18   September 16th was?
19        Q.  It's a Tuesday, I believe.  The 15th
20   was a Monday.
21        A.  Given that I made improper dates on
22   pages after these, I can't be certain if I meant
23   Monday or Tuesday.
24        Q.  At the top of this first page, there
25   appear to be items for treasuries, agencies and
```
TSG Reporting - Worldwide (877) 702-9580

Page 62

1           HIGHLY CONFIDENTIAL - D. PETRIE
2    mortgages, do you see that?
3        A.   Yes.
4        Q.   And the numbers that appear after each
5    of those, what are those numbers?
6        A.   Do you want me to give my best guess?
7        Q.   Your best guess, yes.
8            MR. SHAW:  Objection.  Calls for
9    speculation.
10       A.   Those numbers, 25 cents, 2.75 and
11   2.90, were probably reflective of current market
12   rates for repo transactions.
13       Q.   And are those references to haircuts
14   for those types of assets; is that what you're
15   referring to?
16       A.   No.
17       Q.   Okay.  When you say they're current
18   market rates, how are those market rates being
19   expressed?
20       A.   A repo transaction has two parties,
21   normally, one party that's lending collateral
22   and another party that's lending cash.  The
23   party lending cash will receive an interest rate
24   on that cash for the term of that loan.  These
25   appear to be rates that would be attached to
TSG Reporting - Worldwide (877) 702-9580

Page 63

1           HIGHLY CONFIDENTIAL - D. PETRIE
2    those types of loans.
3        Q.   Further down on that first page 847,
4    there's a reference that appears to be the
5    number 100 followed by some words.  You see
6    that?
7        A.   Yes.
8        Q.   Can you decipher that for me, please?
9        A.   "100 billion to Barclays" is what it
10   appears to be.
11       Q.   And do you have an understanding as to
12   what that entry means, "100 billion to
13   Barclays"?
14       A.   No.
15       Q.   At any time during that week, the week
16   of the 15th through the 22nd of September, did
17   you ever discuss with anyone the overall
18   economics of the transaction between Lehman and
19   Barclays?
20       A.   No.
21           MR. SHAW:  Objection.
22       Q.   Do you know whether the transaction,
23   the acquisition of these assets by Barclays from
24   Lehman, resulted in a gain to Barclays?
25       A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 64

1           HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   Did anyone tell you about a discount
3    in the sale of assets from Lehman to Barclays?
4        A.   No.
5        Q.   Were you ever part of any
6    conversations or discussions about marking down
7    the Lehman assets that were being purchased by
8    Barclays?
9        A.   No.
10       Q.   Have you ever reviewed to this day the
11   Asset Purchase Agreement between Lehman and
12   Barclays?
13       A.   No.
14       Q.   Ever seen it?
15       A.   I've seen parts of it on the Internet.
16       Q.   When did you see parts of it on the
17   Internet?
18       A.   Approximately a month, couple months
19   ago maybe.
20       Q.   And for what purpose were you on the
21   Internet looking at parts of the APA?
22       A.   Curiosity.
23       Q.   Was it in connection with your
24   potential deposition in this case?
25       A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 65

1           HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   Other than looking at parts of the
3    APA -- let me withdraw that.  What were you
4    curious about?
5        A.   I was curious about the enormity of
6    the times, so it wasn't just me looking at the
7    Lehman Brothers information.  It would also be
8    looking at overall economically where we had
9    come from September 2000 -- September 2008 to
10   where we are now.
11       Q.   Were there other documents that you
12   were looking up on the Internet when you
13   happened across the APA?
14       A.   No.
15       Q.   Let me ask you the other way.  Did you
16   go looking for the APA to see what the deal was?
17       A.   No.
18       Q.   And what is it that you remember about
19   the parts of the APA that you saw during your
20   Internet search?
21       A.   Simply that it was available on the
22   Internet.
23       Q.   Okay.  Have you talked to anyone about
24   any of the terms of the APA?
25       A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 66

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    Q.    Are you aware of something called the
3    Clarification Letter?
4        A.    No.
5        Q.    Does that phrase have any meaning to
6    you?
7        A.    No.
8        Q.    Let's go back to this exhibit, Exhibit
9    272. The second page of the exhibit ends in
10   848. Do you see that?
11       A.    Yes.
12       Q.    If I'm reading this correctly, you
13   have a question that's sort of diagonally
14   written on this page, "When is Chapter 7
15   happening?" Is that what you have written
16   there?
17       A.    Yes.
18       Q.    And you had an understanding that the
19   Chapter 7 was the Chapter 7 filing by LBI, the
20   broker-dealer, correct?
21       A.    Can you ask the question again?
22       (Record read.)
23       A.    No.
24       Q.    Above that sentence we were just
25   discussing you have a star and then it reads,

TSG Reporting - Worldwide (877) 702-9580

Page 67

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    "We need to own assets." Did I read that
3    correctly?
4        A.    Yes.
5        Q.    And what was that a reference to?
6        A.    I don't remember.
7        Q.    Then you have two points at the middle
8    of the page numbered 1 and 2, do you see that?
9        A.    Yes.
10       Q.    Can you just help decipher those for
11   me?
12       A.    1 reads "Fed legal." 2, "Trading with
13   Lehman legal/PNL."
14       Q.    And what did you mean by those
15   entries?
16       A.    I don't remember.
17       Q.    Was it your concern during that week
18   that you felt like the Fed was pressuring
19   Barclays to provide financing to Lehman?
20       A.    No.
21       Q.    I believe earlier when you described
22   that week, you said you -- Barclays was told by
23   the Fed to provide replacement financing. Do
24   you remember saying that?
25       A.    Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 68

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    Q.    What did you mean by that?
3        A.    The Fed asked/told -- the Fed
4    requested that Barclays replace them, being the
5    Fed, in the funding for the assets that the Fed
6    had been currently funding for Lehman as of
7    Thursday of that week.
8        Q.    Was it your sense that Barclays had
9    the option of saying no to the Fed?
10       MR. SHAW: Objection. Foundation.
11       A.    I don't know.
12       Q.    Was it your sense, based on what you
13   were doing at the company, that Barclays felt it
14   was under pressure to agree with the Fed's
15   request?
16       A.    I don't know.
17       Q.    Anyone ever say that to you?
18       A.    No.
19       Q.    Was your comment on page 2, Exhibit
20   272, did you have concerns about whether what
21   the Fed was doing was legal?
22       MR. SHAW: Objection. Asked and
23   answered.
24       A.    I never had that.
25       Q.    And your second point, "Trading with

TSG Reporting - Worldwide (877) 702-9580

Page 69

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    Lehman legal," were you concerned about the
3    legality of trading with Lehman?
4        MR. SHAW: Objection. Asked and
5    answered.
6        A.    What is your question?
7        Q.    That statement there, "Trading with
8    Lehman legal/PNL," did you have a concern when
9    you wrote that note about the legality of
10   trading with Lehman?
11       MR. SHAW: Objection. Asked and
12   answered.
13       A.    No.
14       Q.    What's the reference to PNL? What
15   does that mean?
16       A.    I don't know.
17       Q.    No idea what that means?
18       A.    No.
19       Q.    Does that abbreviation have any
20   meaning in your business?
21       A.    No.
22       Q.    I mean, P/L is profit/loss, correct?
23       A.    PNL is profit and loss.
24       Q.    PN. So these three letters, "PNL,"
25   ordinarily stand for profit and loss?

TSG Reporting - Worldwide (877) 702-9580

---

Page 70

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2      A.   Yes.
 3      Q.   The page numbered 850 at the bottom,
 4  can you just read those notes to yourself.  Let
 5  me know when you're done.
 6          (Document review.)
 7      A.   Okay.
 8      Q.   Just help me understand this.  Do you
 9  recognize this as a set of notes related to --
10  that were made on or about the same time?
11      A.   If you mean the same time as during
12  that week, the answer is yes.
13      Q.   No, and the items that appear on this
14  page, are these all thoughts related to one set
15  of events?
16      A.   I would say, looking at my
17  handwriting, until the last two points, it
18  appears to be one sitting, and to the bottom two
19  points, I appear to be -- have a little bit of
20  better handwriting, so maybe it's two separate
21  events. I'm not certain.
22      Q.   So just putting aside the bottom two
23  points, the rest of the text or the handwriting
24  that appears on this page, what is that, what
25  event or events is that handwriting capturing?
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 71

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2      A.   It appears to be capturing a broad
 3  overview of the Fed -- of what the Fed had been
 4  funding, touches on the type of collateral that
 5  the Fed had been funding for Lehman Brothers,
 6  and notes the -- at least two programs that the
 7  Fed had been using to provide liquidity to
 8  Lehman.
 9          However, I should note that those two
10  acronyms, the TSLF and OMO, were not unique to
11  just Lehman, meaning those programs were used
12  Fed-wide. I'm sorry. Three, including the
13  PDCF.
14      Q.   There's a series of names that appear
15  at the top of the page. The first name I
16  recognize, at least the handwriting, is Scott
17  Leckner, do you see that?
18      A.   I do see that.
19      Q.   And who was Mr. Leckner?
20      A.   I don't know.
21      Q.   Do you recognize any of the other
22  names? I just can't read the handwriting.
23      A.   Below that appears to be John Feraca,
24  and then two below that, I see Paolo and then
25  Ian. And I don't recognize the other name.
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 72

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2      Q.   Is it your sense that this captures a
 3  conference call, a discussion that you had with
 4  these individuals?
 5      A.   No.
 6      Q.   Right in the middle of page you've got
 7  a statement that reads, "Legal opinion on repo."
 8  Do you see that?
 9      A.   Yes.
10      Q.   Do you recall discussing with anyone
11  at Lehman obtaining a legal opinion on the repo?
12      A.   No.
13      Q.   Do you recall having a discussion with
14  anyone about the subject of obtaining a legal
15  opinion on the repo?
16          THE WITNESS: Does that infringe upon
17  my diary --
18          MR. SHAW: I will ask you not to
19  divulge the content of any discussions you
20  may have had with counsel for Barclays at
21  any point, but if you can answer the
22  question without divulging communications
23  you had with counsel for Barclays, go ahead.
24          THE WITNESS: Is that the content of
25  (inaudible) --
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 73

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2          MR. SHAW: Why don't we step outside
 3  in the hall for a little bit.
 4          (The witness and Mr. Shaw leave the
 5  room to confer.)
 6          (Time Noted: 11:45 A.M.)
 7          (Time Noted: 11:48 A.M.)
 8          (Record paused.)
 9          MR. SHAW: I will instruct you not to
10  reveal any communications you had with
11  Barclays, but if you had a discussion with
12  anyone other than counsel for Barclays about
13  that, you may answer.
14      A.   I did not have any discussions outside
15  of Barclays in regards to legal matters.
16      Q.   Any idea what you meant by this entry
17  on your diary, "Legal Opinion on Repo"?
18      A.   Making certain that I understood with
19  internal counsel --
20          MR. SHAW: We're not going to get into
21  your discussions with internal counsel.
22          MR. TAMBE: We're not talking about
23  internal discussions with counsel. He's
24  telling me what he was thinking.
25      Q.   What were you thinking?
```
TSG Reporting - Worldwide (877) 702-9580

Page 74

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    A.    I don't know.  "Legal Opinion on
3    repo," right, thinking out loud.
4    Q.    Right below the "Legal Opinion on
5    Repo" you have an entry that says, I believe,
6    "SIPIC waiver," do you see that?  S-I-P-I-C
7    waiver, do you see that?
8    A.    Yes.
9    Q.    And there's a name next to that, Ray
10   Dorato?
11   A.    Yes.
12   Q.    At BONY, correct?
13   A.    The page says "BONY" after Ray Dorato.
14   Q.    Do you know Mr. Dorato as the general
15   counsel of BONY?
16   A.    I don't recognize the name.
17   Q.    It states, below "SIPIC waiver," "Is
18   Asset Purchase Agreement effective after
19   bankruptcy?"  Do you see that?  Or effect --
20        Did I read that correctly?
21   A.    You read it correctly.
22   Q.    What's that a reference to?
23   A.    I don't know.
24   Q.    Did you have a concern that there
25   would be a default on the repo if LBI went into

TSG Reporting - Worldwide (877) 702-9580

Page 75

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    bankruptcy?
3    A.    In any repo transaction, whether it be
4    small or large, my job in running the repo desk
5    would be to continually be concerned about
6    events of default.
7    Q.    So your best guess is you in fact were
8    concerned about a potential default on the repo
9    that was being contemplated with Lehman,
10   correct?
11   A.    That is correct.  However, I would
12   like for the record to show that I was concerned
13   about that for an event of default with any
14   transaction that we did, and in fact, during the
15   year 2008 and the end of 2007, there was
16   heightened concern across Wall Street in regards
17   to events of default.  And repo desks across the
18   street were plagued with events of default that
19   did cause considerable losses across Wall
20   Street, and my job was -- part of my job was to
21   be wary of those events.
22   Q.    Had you experienced any defaults on
23   your repo desk?
24   A.    Yes, the Barclays repo desk
25   experienced defaults, most of them, if not all,

TSG Reporting - Worldwide (877) 702-9580

Page 76

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    prior to me joining the desk, meaning me running
3    the desk in 2008.
4    Q.    I mean, if Barclays had lent money and
5    received collateral to secure that lending,
6    Barclays would be protected, right?
7    A.    The question you're asking is actually
8    the answer is no.  You do your best, in running
9    a repo desk to protect
10   itself in the event of default of their
11   counterparties, and to the extent that there is
12   a default, lessons were learned quite quickly
13   that the depth of markets for certain types of
14   assets were quite shallow and oftentimes
15   resulted in losses.
16   Q.    And would you try and protect yourself
17   from a risk of default by asking for a greater
18   haircut on the collateral that was being
19   pledged?
20   A.    As Wall Street progressed through
21   2006, 2007, 2008, haircut issues were addressed
22   almost daily across all of Wall Street,
23   including Barclays.
24   Q.    And you increased the haircuts to try
25   and give yourself more protection, correct?

TSG Reporting - Worldwide (877) 702-9580

Page 77

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    A.    Sometimes haircuts were increased.
3    Sometimes haircuts were decreased.
4    Q.    And if you had concerns about the
5    liquidity of a particular piece of collateral
6    that was being pledged to you, you would ask for
7    a greater haircut, correct?
8    A.    If a repo desk endeavors to borrow a
9    particular asset, it will make a determination
10   at the time of borrowing that asset as to what
11   is the correct haircut, period.
12   Q.    And just cutting to the chase on the
13   Fed repo that ultimately got replaced by the
14   Barclays financing, Barclays provided, what, $45
15   billion of financing to Lehman; is that right?
16   A.    In connection with the Barclays taking
17   the Fed out of the funding of Lehman, and at the
18   request of the Fed, we provided funding for $45
19   billion for the Fed collateral for Thursday.
20   Q.    And that Fed collateral had a value
21   greater than $45 billion, correct?
22   A.    Yes.
23   Q.    A value of approximately $50 billion,
24   correct?
25   A.    I would put it below that, but yes.

TSG Reporting - Worldwide (877) 702-9580



Page 78

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2     Q.   That was the haircut, correct?
 3     A.   The haircut would reflect the
 4   difference between the cash that's loaned and
 5   the value of the collateral at the time of the
 6   trade being executed.
 7     Q.   And was it your understanding that if
 8   there had been a default on the repo, that
 9   Barclays would simply keep the collateral?
10     A.   In the event of a default, if an event
11   of default has occurred, it is normal practice
12   for the collateral that had been collateralizing
13   the loan to then revert to the lender of cash.
14     Q.   Just so I understand what you mean by
15   that, if Barclays is the lender and Barclays
16   has, say, 50 billion of collateral, and Lehman
17   defaults, Barclays gets to keep the collateral;
18   is that what you're saying?
19     A.   Yes.
20     Q.   Were you concerned at all that if
21   Lehman's default was the result of a bankruptcy,
22   Barclays may not be able to keep all of the
23   collateral?
24     A.   No.
25     Q.   Do you remember discussing that with
```

TSG Reporting - Worldwide (877) 702-9580

Page 79

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2   anyone during that week?
 3          MR. SHAW:  Again, I'll --
 4     Q.   Other than lawyers?
 5     A.   No.
 6     Q.   Next page, 851, towards the bottom
 7   third of the page you have a line that begins
 8   "excluded asset," do you see that?
 9     A.   Yes.
10     Q.   And the calculation that appears
11   there, do you see that?
12     A.   Yes.
13     Q.   Can you, one, decipher that language
14   and, two, explain what you mean by that?
15     A.   May I take a moment to read the whole
16   page, please?
17     Q.   Sure.  Absolutely.  Let me know when
18   you're done.
19     A.   Okay.  Your question again, please?
20     (Record read.)
21     A.   Excluded asset says 71 billion; 10
22   something funded, meaning I can't read that,
23   that word; 61 billion balance, and I don't know
24   what that math is pertaining to.
25     Q.   Flip down a couple more pages to page
```

TSG Reporting - Worldwide (877) 702-9580

Page 80

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2   853.  There are details of notes on page 853,
 3   854 over onto 855.  I'm not sure if they all go
 4   together, but if you could look at those three
 5   pages and just read those notes to yourself.
 6   Let me know when you're done and I'll ask you
 7   some questions.
 8     (Document review.)
 9     A.   I've looked them over.
10     Q.   One, do these three pages, should they
11   be read together as a set of notes about a
12   particular meeting or event?
13     A.   Yes.  The date's incorrect, it
14   appears.
15     Q.   And the date that appears on page 853
16   is 9/17/08, which was the Wednesday?
17     A.   Right.  This meeting occurred on
18   Tuesday.
19     Q.   And this meeting that you're referring
20   to is a meeting with the Fed; is that right?
21     A.   Yes.  It's physically at the Fed.
22     Q.   And you attended that meeting?
23     A.   Yes.
24     Q.   How long did the meeting last?
25     A.   Approximately two hours.
```

TSG Reporting - Worldwide (877) 702-9580

Page 81

```
 1            HIGHLY CONFIDENTIAL - D. PETRIE
 2     Q.   And just -- let's step away from the
 3   notes for a second.  Just describe generally
 4   what was discussed in the meeting.
 5     A.   The Fed had asked Barclays to step
 6   into the funding of Lehman and to take the Fed
 7   out of the funding of Lehman.  That was the sole
 8   purpose of the meeting.
 9     Q.   And if I could just run down your
10   notes in terms of who attended that meeting.  I
11   think you have a list of names at the top of
12   page 853.  I can't read any of those names.
13     A.   Ian, Gerard, Elena.
14     Q.   Let me stop there for a second.  Ian
15   and Gerard, that would be Ian Lowitt and Gerard
16   Reilly from Lehman?
17     A.   Gerard LaRocca.
18     Q.   Oh, Gerard LaRocca.  And Ian?
19     A.   Ian Lowitt.
20     Q.   Elena, who is Elena?
21     A.   Matrullo.
22     Q.   From?
23     A.   Our Credit Department.
24          Do you want me to continue?
25     Q.   Yes, please.
```

TSG Reporting - Worldwide (877) 702-9580

21

Page 82

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   Ian, Alan, Art Citassamo.
3     Q.   Who are those three individuals?
4     A.   Ian Pryor, also from Credit; Alan
5  Kaplan from Barclays Legal; Art Citassamo, a
6  senior representative from Bank of New York.
7     Q.   And then the names that appear down
8  the -- I don't know, I'm not sure if they're
9  columns or descriptions.  If you move over from
10  those names, there's another set of entries.
11  What are those?
12     A.   Lucinda.
13     Q.   Lucinda who?
14     A.   Brickler I believe is how you
15  pronounce her last name.
16     Q.   From Barclays?
17     A.   No, Lucinda -- these are now
18  individuals representatives attending the
19  meeting from the Fed.
20         So Lucinda.  Next to her name is
21  "payments."  Andrew, I can't decipher his last
22  name, but it says next to it "CCR."
23     Q.   And what does "CCR" stand for?
24     A.   I don't know.
25     Q.   Okay.

TSG Reporting - Worldwide (877) 702-9580

Page 83

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   Then I read Donna from the Markets
3  Group.  And it appears to be Jan Byce, as best I
4  can read my writing, and then Aaron Klein, but
5  next to both of their names I have counsel.
6         Rick -- I can't pronounce his last
7  name.  I can't read his last name.
8     Q.   Okay.
9     A.   Next to his name I have "credit," and
10  then below that is the name Chris Burke, in
11  parentheses, "coming."
12     Q.   And who is Chris Burke?
13     A.   Chris Burke is a senior person that
14  works at the Fed.
15     Q.   You have a series of items below.  If
16  you could just decipher those.
17     A.   Number 1, "Explain our undertaking of
18  Fed's" -- I can't read that next word -- "on
19  replacing LBI with BCI to assume 47 billion."
20         I'm sorry, I do know what that word
21  says.
22     Q.   Okay.
23     A.   Number 1, "Explain our undertaking of
24  Fed's focus on replacing LBI with BCI to assume
25  47 billion."

TSG Reporting - Worldwide (877) 702-9580

Page 84

HIGHLY CONFIDENTIAL - D. PETRIE

1
2         Number 2, "Half collateral DTC
3  eligible/half Fed wire" -- I can't make out that
4  word.
5     Q.   Next item?
6     A.   Number 3, "Intention tomorrow to
7  reverse all collateral."
8     Q.   Let me just ask you about that entry
9  and your statement about the date when this
10  meeting took place.  The meeting took place on
11  Tuesday.  Was there an intention to reverse all
12  the collateral on the Wednesday?
13     A.   No.
14     Q.   The reversal of the collateral took
15  place on Thursday, right?
16     A.   That's correct.
17     Q.   Okay.
18     A.   Number 4, "Offering of day loan."
19  Number 5, "We take all collateral to PDCF."
20  Number 6, "Over two-week period put to street."
21     Q.   So those last two items, 5, "We take
22  all collateral to PDCF," what did you mean by
23  that?
24     A.   In the undertaking/at the behest of
25  the Fed, Barclays' funding Lehman Brothers for

TSG Reporting - Worldwide (877) 702-9580

Page 85

HIGHLY CONFIDENTIAL - D. PETRIE

1
2  the collateral that the Fed was funding on
3  Thursday.  Barclays received assurances from the
4  Fed that we would be able to take that
5  collateral and fund it through the PDCF, the
6  Primary Dealer Credit Facility, which is what
7  addresses point number 5.
8     Q.   And just to drill down that further,
9  whether or not that collateral otherwise
10  satisfied PDCF eligibility, Barclays was seeking
11  from the Fed an understanding that all of this
12  collateral would in fact be PDCF-eligible, is
13  that fair?
14     A.   Yes.
15     Q.   Okay.  The next point?
16     A.   Number 6, "Over two-week period put to
17  street."
18     Q.   What do you mean by that?
19     A.   That Barclays, upon completion of what
20  I call the Fed trade, would make every effort to
21  self-finance the received collateral without the
22  assistance of the Fed facilities.
23     Q.   Just so I understand how 5 and 6 may
24  relate to each other, for a period of two weeks,
25  for up to a period of two weeks, you could use

TSG Reporting - Worldwide (877) 702-9580



Page 86

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   the PDCF as a financing facility with this
 3   collateral.  After that two-week period, you
 4   would start getting financing for that
 5   collateral from the street or otherwise dispose
 6   of that collateral, is that fair?
 7        A.   No.
 8        Q.   Okay.  How do 5 and 6 work together,
 9   if at all?
10        A.   To be precise, on day one, upon
11   receiving the collateral, we had assurances from
12   the Fed that, should we need to fund the
13   collateral, we could do so through the PDCF, all
14   the while working towards self-financing.
15        Q.   What's the two-week period?  Is that a
16   limitation or a requirement that you become
17   self-financing with respect to that collateral
18   in two weeks?
19        A.   The discussion at the Fed was a
20   two-way discussion, and I felt comfortable that
21   I told the Fed that within a couple of weeks we
22   could finance this collateral.  It was not a
23   directive of the Fed.  It was my estimation that
24   I explained to the Fed.
25        Q.   Did Barclays in fact finance that
```
TSG Reporting - Worldwide (877) 702-9580

Page 87

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   collateral to the street after the transaction,
 3   so on and after the 22nd of September?
 4        A.   Is your question the entire amount of
 5   collateral or portions of the collateral?
 6        Q.   Portions of it.
 7        A.   On day one of receiving the
 8   collateral, we started financing parts of that
 9   collateral with the street.
10        Q.   Do you know of any efforts to sell the
11   collateral?
12        A.   No.
13        Q.   Do you know if there have been any
14   sales of the collateral?
15        A.   No.
16        Q.   If you look at the -- I'm sorry, let's
17   go on, items 7, 8 and 9 that appear on page 853.
18   So let's carry on.  If you could carry on
19   deciphering what your words are --
20        A.   Oh, just read it?
21        Q.   -- and then we can talk about what you
22   meant by some of these entries.
23        A.   Sure.  Number 7, "Discussing reserve
24   impact of" something -- I can't decipher the
25   word at this point -- "TSLF adding 20 billion
```
TSG Reporting - Worldwide (877) 702-9580

Page 88

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   total."
 3          Number 8, "Debit cap is 54 billion
 4   according to Lucinda."  Below that in
 5   parentheses, "13 billion," question mark,
 6   question mark, "with Gerard."  9, "JPM"
 7   something "pledge."
 8        Q.   Okay.  If you can roll over to page
 9   856, and looking at 856 and 857 together, if you
10   could first confirm for me whether those two
11   sets of notes all relate to the same event or
12   meeting?
13        A.   Yes, they appear to be.
14        Q.   And they reference a DTC meeting; is
15   that right?
16        A.   That's correct.
17        Q.   And when did the DTC meeting take
18   place?
19        A.   Upon leaving the Federal Reserve on
20   Tuesday evening, several of us walked directly
21   to the DTC to meet with them.
22        Q.   And what was the purpose of that
23   meeting?
24        A.   Given that the Fed had requested
25   Barclays to step into the funding of Lehman
```
TSG Reporting - Worldwide (877) 702-9580

Page 89

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2   Brothers, and it being a sizable trade, assets
 3   move over or assets -- assets move over the DTC
 4   wire.  So we were engaging DTC to let them know
 5   what we were planning at the behest of the Fed
 6   and to come up with a plan as to how to best
 7   accomplish that.
 8        Q.   How long did that meeting last?
 9        A.   Approximately one hour.
10        Q.   And you identified on page 856 at the
11   top, you've got the I guess the two DTC people
12   you met with, Donald Donahue and Grace Montal?
13        A.   Isaac, I believe.
14        Q.   Isaac Montal.
15          Next section down, there appear to
16   be -- well, why don't you decipher what the next
17   three lines are.  It begins at "250MM" on the
18   left-hand side?
19        A.   Would you like me to read them to you?
20        Q.   If you could just first read them and
21   then tell me what you mean by those entries.
22        A.   It says, "250 million, 10,000
23   employees, licenses, 75 billion in assets.  1.
24   Corporate Headquarters; 2.  Data centers and
25   more real estate.  60 billion in assets.  47
```
TSG Reporting - Worldwide (877) 702-9580

## Page 90

HIGHLY CONFIDENTIAL - D. PETRIE

1
2  billion pledges to Fed."
3      Q.   And what is the import or meaning of
4  those items?
5      A.   When the meeting started, this would
6  appear to be a review given by one of the
7  Barclays representatives to DTC reflecting what
8  had already become released publicly.
9      Q.   So this is your understanding of --
10 these are your notes about a description about
11 the transaction that was given by Barclays to
12 DTC at that meeting?
13     A.   Well, it's a reflection of someone at
14 Barclays giving a description of, in broad
15 terms, of what was released I believe that same
16 morning publicly.
17     Q.   Released about what?  About the
18 transaction, right?
19     A.   Well, what transaction?  The
20 transaction --
21     Q.   The Lehman/Barclays transaction.
22         MR. SHAW:  You mean as of that time?
23         MR. TAMBE:  Yes, as of that time.
24     Q.   I'm sure they weren't trying to tell
25 the future on that day, so ...

TSG Reporting - Worldwide (877) 702-9580

## Page 91

HIGHLY CONFIDENTIAL - D. PETRIE

1
2      A.   Yeah, this would be a, as I noted
3  before, a broad description as to what had been
4  released that same morning publicly by Barclays.
5      Q.   About the transaction?  I mean,
6  released by Barclays about what?  About the
7  transaction with Lehman, correct?
8      A.   About the broad transaction with
9  Lehman.
10     Q.   Okay.  And the 60 billion in assets
11 and 47 pledged to Fed that appears on the
12 right-hand side, was it your understanding that
13 those were the liabilities that were being
14 assumed by Barclays?
15     A.   I don't know.
16     Q.   Because you've got two items for
17 assets.  You've got 75 billion in assets and
18 you've got a writing that says 60 billion in
19 assets, do you see that?
20     A.   I see it.
21     Q.   Do you have any understanding as to
22 why you have those two different items for
23 assets?
24     A.   No.
25     Q.   On the next page, page 857, at the top

TSG Reporting - Worldwide (877) 702-9580

## Page 92

HIGHLY CONFIDENTIAL - D. PETRIE

1
2  of the page, if you could just decipher what
3  those first two lines that begin "JPM"?
4      A.   "JPM," dollar sign, "needs cash and
5  then release to LBI buckets."
6      Q.   And was that your understanding, that
7  JPM had to be paid to satisfy the Fed repo
8  before it would release the collateral to LBI?
9      A.   I would explain it in this way.
10     Q.   Okay.
11     A.   To complete the Fed trade where
12 Barclays would receive only the Fed collateral,
13 given that JPMorgan was the custodian for Lehman
14 Brothers, Barclays would send the cash first to
15 JPMorgan on behalf of Lehman and then JPMorgan
16 would receive the assets from the Federal
17 Reserve that would then come to Barclays, i.e.,
18 the Fed transaction.
19     Q.   Okay.  Two lines below where you were
20 just reading, it says, "2 percent for 9/30," do
21 you see that?
22     A.   I see it.
23     Q.   What does that mean?
24     A.   It's discussing the terms as in rate
25 and termination date for the repo trade.

TSG Reporting - Worldwide (877) 702-9580

## Page 93

HIGHLY CONFIDENTIAL - D. PETRIE

1
2      Q.   And the next line below that?
3      A.   The next line below that reads,
4  "Haircut charged will be implied."
5      Q.   What does that mean?
6      A.   Given that the Fed had extended
7  funding for Lehman assets, the Fed employed its
8  own haircut schedule for those assets.  Given
9  that Barclays had been asked by the Fed and we
10 were undertaking taking the Fed out of their
11 lending of money to Lehman Brothers for those
12 specific assets, when we would receive those
13 assets versus the cash that we were lending to
14 Lehman, the collateral that we would receive,
15 which would be at this point identical to what
16 the Fed had been funding on that Thursday, the
17 haircuts would be implied because they had
18 already been applied to the Lehman loans.
19     Q.   Were there assets that the Fed was
20 funding against that Barclays did not want to
21 acquire?
22         MR. SHAW:  Objection.  Foundation.
23     A.   No.
24     Q.   All right.  Then you got four items at
25 the bottom of page -- the middle of page 857

TSG Reporting - Worldwide (877) 702-9580

## Page 94

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  numbered 1 through 4.  Could you just describe
3  those for me and tell me what you were capturing
4  by those four points?
5    A.   Would you like me to just read them
6  first to you?
7    Q.   Sure, you can read them first.
8    A.   Number 1, "Lehman to 855.  Program
9  tonight/test 8 A.M.  No later."
10    Q.   What does that mean?
11    A.   855 is a, you could call it a
12  depository or an account, sorry, that was opened
13  up at JPMorgan for Barclays, meaning Barclays'
14  account number 855.
15    Q.   All right.  Next item?
16    A.   Number 2, "Money goes whenever people
17  ready," meaning --
18    Q.   Okay, next item?
19    A.   3, "Goal 11 A.M. completion."
20    Q.   Next line?
21    A.   "47 billion versus 54 billion cap," in
22  parentheses, "Spike was 7 billion."
23    Q.   What does that mean?
24    A.   Every institution on Wall Street has a
25  cap, an intraday cap, as to how much they can be

TSG Reporting - Worldwide (877) 702-9580

## Page 95

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  exposed without being properly collateralized.
3    During the normal course of business,
4  an institution will be expecting collateral in
5  to satisfy the loans that it's made out.  So
6  ones custodian has exposure during that period
7  of time in between receiving collateral and
8  sending out money, and the Fed had agreed to
9  increase that intraday cap to facilitate the
10  trade that they had asked us to do.
11    Q.   So the 47 billion was what?
12    A.   This line in my notes of "47
13  billion//54 billion cap" is referring to the cap
14  being raised so that we could complete the trade
15  with the Fed.
16    Q.   47 was what was Barclays' cap, is that
17  what you're saying?
18    A.   I don't know what the cap was at the
19  time when they raised it.
20    Q.   And was it your sense that it was
21  raised to 54 billion?
22    A.   Yes.
23    Q.   And the last item says --
24    A.   You should also --
25    Q.   Go ahead.

TSG Reporting - Worldwide (877) 702-9580

## Page 96

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    A.   -- clarify that, once again, as I just
3  stated, that there's a normal cap in place.
4  During a normal course of business, an
5  institution needs that cap to operate in the
6  most normal of conditions.
7    Q.   And what's the reference to the spike
8  in parentheses, "spike was 7 billion"?
9    A.   I take it as meaning the raise in the
10  cap that the Fed had agreed to.
11    Q.   Okay.  All right, let's move to the
12  next set of notes, page 858.
13    MR. SHAW: Is this a good time to take
14  a lunch break?
15    MR. TAMBE:  We can take a break now if
16  you want, that's fine.  It's as good a time
17  as any.
18    (Luncheon recess; time noted: 12:33
19  P.M.)
20
21
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

## Page 97

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    AFTERNOON SESSION
3    (Time Noted:  1:12 P.M.)
4  DAVID PETRIE, resumed and
5    testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. TAMBE:
8    Q.   Mr. Petrie, if you have before you
9  Exhibit 272, these are the handwritten notes.  I
10  just want to pick up where we left off, page
11  858.
12    Again, if you could just help describe
13  what you have down on 858.
14    A.   Sure.  Let me just read through it
15  here.
16    (Document review.)
17    A.   This page -- well, do you want to go
18  line-by-line?
19    Q.   Why don't you just give me an overview
20  of what the page is.
21    A.   This page appears to be an attempt to
22  get an idea of what the different asset classes
23  are being held at Lehman.
24    Q.   And the valuations that appear on this
25  page against those asset classes, where would

TSG Reporting - Worldwide (877) 702-9580

Page 98

```
1         HIGHLY CONFIDENTIAL - D. PETRIE
2    those valuations have come from?
3        A.   I don't know.
4        Q.   Were you using a custodian report as a
5    source of values for the Fed collateral?
6        A.   Were we using a custodian report?
7        Q.   Yeah.
8        A.   In regards to this page, like I said,
9    I don't know where I got these valuations from.
10       Q.   If you can move forward to page 861
11   and 8 -- 861 and 862.  First question is whether
12   those two pages should be read together or are
13   those two separate events that have been
14   captured there?
15       A.   They appear to be separate.
16       Q.   Then let's just take page 861, and if
17   you can take a look at the entries you have on
18   861 and then briefly describe for me what's
19   being -- what you have written about there.
20       A.   Okay.  I have, "Issue raised.  DTC,
21   FINRA, Chase's attorneys, what happens with
22   transfer of accounts."
23       Q.   That's a reference to customer
24   accounts being transferred?
25       A.   I don't recall what specifically that
```

TSG Reporting - Worldwide (877) 702-9580

Page 99

```
1         HIGHLY CONFIDENTIAL - D. PETRIE
2    issue, that entry is for here.  I don't know.
3        Q.   Are you reading through the rest of
4    the document?
5        A.   Yeah, I'm reading through the rest of
6    it.
7             At the bottom of the page -- well, the
8    middle of the page appears to me to be a, where
9    we're talking about James Walker, Teri Scott, TJ
10   Gavenda, Matt Hughey, Scott Wadlow, I believe I
11   received a phone call from them wanting to get
12   insight into the Fed trade where they hadn't
13   been privy to what exactly was going on in
14   regards to the Fed trade previously.
15       Q.   And this would have been on the
16   Thursday, the 18th?
17       A.   I think -- was Thursday the 18th?
18       Q.   Thursday was the 18th.
19       A.   Okay.  Yeah, that would make sense if
20   it was Thursday, the 18th.
21       Q.   And then at the bottom of the page you
22   have three numbered points?
23       A.   Yes.
24       Q.   If you could go into those, please.
25       A.   Number one, "Operation problem at DTC
```

TSG Reporting - Worldwide (877) 702-9580

Page 100

```
1         HIGHLY CONFIDENTIAL - D. PETRIE
2    because of Lehman box being fixed," and then in
3    parentheses, "was delivering right back to
4    Chase."
5        Q.   And what does that mean?
6        A.   I believe what this references is
7    that, when Barclays initially transferred $5
8    billion for the Fed repo transaction the
9    Thursday morning, there were significant issues
10   in us, meaning Barclays, getting collateral back
11   in return for that $5 billion, and point one is
12   an attempt by operations to explain why that
13   occurred, why it was such a slow process.  And
14   the explanation in parentheses, "was delivering
15   right back to Chase," means that, to me, that
16   when the collateral was released by the Fed that
17   was meant to come to Barclays, went elsewhere.
18       Q.   The next point?
19       A.   Number 2, "Confusion around NewCo
20   concerns on" -- "on" something "to make the" --
21   "this account on the fly."
22       Q.   Based on --
23            Go ahead.
24       A.   They had denoted that, by Operations,
25   that given how quickly they were preparing an
```

TSG Reporting - Worldwide (877) 702-9580

Page 101

```
1         HIGHLY CONFIDENTIAL - D. PETRIE
2    account on behalf of Barclays, that they may
3    have made an error on JPMorgan's side.
4        Q.   And then the next item, item number 3?
5        A.   Number 3, "JPMorgan not releasing
6    because margin on account," and beneath that I
7    have the name Heidi Miller.
8        Q.   And what's that a reference to?
9        A.   That is in reference to when the
10   collateral on Thursday was released by the Fed,
11   it was almost immediately recognized that other
12   deliveries were being made rather than the Fed
13   trade, meaning collateral coming to Barclays,
14   and presuming that other obligations were being
15   made rather than completing the Fed trade.
16       Q.   Just trying to understand what you're
17   saying here.  Are you saying that after Barclays
18   wired the money, instead of getting the
19   collateral that was under the Fed trade, it
20   seemed to be getting collateral from -- that was
21   covering other obligations?
22       A.   Initially, we may have been getting
23   Fed collateral, but since that collateral was
24   not coming to Barclays swiftly, it was apparent
25   that collateral from the Fed trade was going
```

TSG Reporting - Worldwide (877) 702-9580

Page 102

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2    elsewhere.
3        Q.   The collateral wasn't moving itself.
4    Someone was making the collateral move
5    elsewhere.  Who was that?
6        A.   When it comes to operational issues
7    and how it got to where it was going, I don't
8    know.
9        Q.   But the collateral would have been
10   with the custodian, with Lehman's custodian,
11   right, JPM?
12       A.   When the Fed released the collateral,
13   it would have been released to JPM.
14       Q.   Right.  Is it your understanding that
15   it was JPM that was directing it to the
16   incorrect place?
17       A.   I don't know.
18       Q.   Well, if it wasn't JPM, who else could
19   be moving the collateral?
20       A.   I think your conclusion that JPM was
21   obviously sending it somewhere other than
22   Barclays is correct.  How that process occurs
23   I'm ignorant of.
24       Q.   And in your earlier answer were you
25   also suggesting that JPM was switching the
```

Page 103

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2    collateral so the collateral it was sending on
3    to Barclays may have been different from the
4    collateral that was being released by the Fed?
5        A.   It became very clear during the day
6    during Thursday that since collateral that had
7    been released to JPM had gone elsewhere, that to
8    collateralize the loan that we had extended to
9    Lehman to take the Fed out of the trade, that
10   collateral would have to come from elsewhere.
11       Q.   And these notes at the bottom of page
12   861, can you tell us when in the process, in the
13   mechanics of the repo, you made those notes?
14       A.   Not with certainty, no.
15       Q.   Putting the notes aside, what's your
16   general recollection of how events unfolded with
17   respect to the repo on the Thursday, the 18th?
18       A.   Arrived at the Lehman office early
19   morning on Thursday.  There were several Lehman
20   representatives physically at the office.  There
21   was multiple people that had dialed into that
22   office from both Barclays, JPMorgan and Lehman
23   operations.
24            We at some point in that morning,
25   early morning, had sent over $5 billion and
```

Page 104

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2    expected to receive collateral against that $5
3    billion.  We did not receive collateral in a
4    timely fashion, and that's when it became quite
5    apparent that collateral had gone elsewhere.
6            And for the next several hours, we
7    waited, Barclays waited to determine how we
8    would proceed and also work towards getting a
9    resolution to collateralizing that first $5
10   billion loan.  Subsequently, Barclays later on
11   that day sent an additional $40 billion in what
12   amounts to one lump sum, but in four different
13   wires, I believe it was four different wires,
14   and at that point, now $45 billion in total had
15   been sent and we were intent on completing the
16   Fed transaction.
17           Throughout the day, the collateral
18   coming to Barclays was quite slow and tedious.
19   As we reached critical times in the day that
20   have to do with when wires typically go down on
21   a trading day, Barclays and the Fed,
22   effectively, and DTC had extended the hours that
23   were permissible to trade for the street and
24   Operations area did their best to collateralize
25   that loan.
```

Page 105

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2            At the end of the day, we'll call the
3    end of the day when the wires were officially
4    shut, Barclays was not fully collateralized and
5    to the tune of approximately $7 billion.  There
6    was some time in between the wires going down
7    and JPMorgan reengaging the group on the phone
8    call to agree to wire on Barclays behalf into
9    our account $7 billion cash to, in essence,
10   fully collateralize the $45 billion loan.
11           (Exhibit 273, a document bearing Bates
12   Nos. BCI-EX-(S)-37621, marked for
13   identification, as of this date.)
14       Q.   I've handed you a one-page document
15   marked Exhibit 273.  Please take a look at that
16   document and let me know when you're done.
17       A.   Okay.
18       Q.   Do you recognize this as a
19   collection -- as a series of e-mails between
20   yourself and Mr. Dearlove and others?
21       A.   I don't remember it specifically.
22       Q.   Do you recognize it as such having
23   read it here?
24       A.   I recognize that I wrote the e-mails.
25       Q.   You are just describing some of the
```

## Page 106

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  mechanics of the Barclays repo transaction that
3  was done on the 18th; is that right?
4      A.  Yes, some of the mechanics, that's
5  correct.
6      Q.  The first e-mail at the top of the
7  page is an e-mail from Mark Dearlove to you with
8  copies to others.  Do you see that?
9      A.  Yes.
10     Q.  Okay.  And in the body of the e-mail,
11  Mr. Dearlove states at the end, "Without this,
12  the Lehman transaction would have failed."  Do
13  you see that?
14     A.  Yes, I see it.
15     Q.  Did you understand what he was
16  referring to?
17     A.  I, no, I don't particularly.  I took
18  it as the repo transaction.
19     Q.  So you took that as a reference to the
20  repo transaction, not the overall asset purchase
21  transaction between Lehman and Barclays; is that
22  what you're saying?
23     A.  Yes, that's fair.
24     Q.  I'm handing you a document that was
25  previously marked as Exhibit 143B.  Take a
TSG Reporting - Worldwide (877) 702-9580

## Page 107

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  moment to look at the document.  There's a
3  spreadsheet attached to it.  Let me know when
4  you're done.  I'll ask you some questions.
5      (Document review.)
6      A.  Okay.  I've read through it.
7      Q.  This e-mail chain which begins at the
8  bottom of page 2 of this exhibit is from Stephen
9  King to you.  Do you see that?
10     A.  Yes, he I see it.
11     Q.  And attaches a file which is entitled
12  "Excluded Mortgage Assets, 9/17/2008.xls," do
13  you see that?
14     A.  Yes, I see it.
15     Q.  If you pull up to the front, that
16  e-mail gets forwarded on to various people, and
17  then if you get to the first -- the second
18  e-mail on the first page, it's from David Aronow
19  to Rick Policke and others, do you see that?
20     A.  Yes.
21     Q.  And there's a CC to someone at Bank of
22  New York Mellon, do you see that?
23     A.  Yes.
24     Q.  In the body of the e-mail it states,
25  "Attached to the Cusips associated with the book
TSG Reporting - Worldwide (877) 702-9580

## Page 108

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  that we were told on the call will be excluded
3  from the movements tomorrow.  These Cusips
4  should not be part of the pledge to BONY
5  according to our earlier conversation."  Do you
6  see that?
7      A.  I see that.
8      Q.  And this is an e-mail dated September
9  17, 2008, do you see that?
10     A.  I see that.
11     Q.  The movements tomorrow that were
12  referenced in that e-mail were the Fed repo
13  associated movements, correct?
14        MR. SHAW:  Objection.  Foundation.
15     A.  I wouldn't know.
16     Q.  You wouldn't know.  Were you aware of
17  any Cusips being excluded from the pledge to
18  Bank of New York under the Barclays repo
19  transaction?
20     A.  I was solely aware that we were to
21  take Fed collateral that was Lehman's collateral
22  that was being funded on Thursday, and by nature
23  of only wanting and being asked by the Fed to
24  take that collateral, by nature there would be
25  assets that we wouldn't be taking.
TSG Reporting - Worldwide (877) 702-9580

## Page 109

1    HIGHLY CONFIDENTIAL - D. PETRIE
2      Q.  Were you aware of having identified to
3  Lehman what assets should be pledged to the Fed
4  so that those would then be the only assets that
5  would be pledged to you?
6      A.  No.
7      Q.  What was your understanding of the
8  file that you were receiving from Stephen King,
9  "Excluded Mortgage Assets," what was that a file
10  of?
11     A.  I don't know.
12     Q.  Well, you received that file from
13  Stephen King.  This is still on page 2 of this
14  exhibit.  You then forward that to Kevin Caffrey
15  at BONY Mellon, right?
16     A.  Yes.
17     Q.  Why are you forwarding that to Bank of
18  New York Mellon?
19     A.  It's a file that's been identified by
20  someone else of assets that aren't part of the
21  Fed repo is what I took it as.
22     Q.  Did you have any discussions with
23  Stephen King about the process by which these
24  assets were identified?
25     A.  No.
TSG Reporting - Worldwide (877) 702-9580

Page 110

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2    Q.   Do you have an understanding as to how
 3 these excluded mortgage assets were identified?
 4    A.   No.
 5        (Exhibit 274, a document bearing Bates
 6 Nos. BCI-EX-(S)-38010 through 38013, marked
 7 for identification, as of this date.)
 8    Q.   I've handed you a four-page document
 9 marked Exhibit 274.  Please take a moment to go
10 through the document and I'll ask you about it,
11 starting with the last e-mail, which is on page
12 2 over to 3 over to 4.
13        (Document review.)
14    A.   I've read the last e-mail in the
15 string.
16    Q.   It's an e-mail from Teri Scott to
17 Jonathan Stone and several other people.  You're
18 CC'd on that e-mail, do you see that?
19    A.   Yes.
20    Q.   Do you recognize this as a summary of
21 the transactions that were done on the 18th of
22 September?
23    A.   I recognize it as Teri Scott's
24 summary, yes.
25    Q.   And you read his summary, correct, or
```

TSG Reporting - Worldwide (877) 702-9580

Page 111

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2 her summary.
 3    A.   I've just now read it.
 4    Q.   And is it consistent with your
 5 recollection of those transactions?
 6    A.   It is consistent with my recollection,
 7 although parts of it I wasn't privy to previous
 8 to receiving this e-mail.
 9    Q.   What parts of it were you not privy to
10 prior to receiving this e-mail?
11    A.   On paragraph 1, in regards to the
12 tri-party and rehypothecation issues.
13    Q.   Anything else?
14    A.   In bold, the, "A list of Cusips to be
15 excluded has been provided to ensure collateral
16 we are not purchasing is excluded in this
17 matter" is something I'd be ignorant of.
18    Q.   And just so I understand your answer,
19 you were not aware until you saw this e-mail
20 that a list of Cusips to be excluded had been
21 provided to ensure the collateral that Barclays
22 was not purchasing was excluded from the
23 transfer, correct?
24    A.   Well, as noted before, we only wanted
25 to take the Fed collateral, and the way that she
```

TSG Reporting - Worldwide (877) 702-9580

Page 112

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2 writes this is worded a bit differently than my
 3 understanding, but I can't speak for Teri Scott
 4 and how -- what she meant by that statement.
 5    Q.   Go to the next substantive e-mail in
 6 this chain.  It's the e-mail that begins at the
 7 bottom of page 1 over to page 2 from John Haley
 8 to Teri Scott and others.  Have you had a chance
 9 to look at that e-mail?
10    A.   I'll read it right now.
11    Q.   Okay.
12        (Document review.)
13    A.   Okay.
14    Q.   You'll see in John Haley's e-mail, the
15 description that begins on page 1, carries over
16 on to page 2.  Do you see that, the various
17 items that are listed there?
18    A.   Yes, I do.
19    Q.   Is it your understanding that,
20 following the repo on the 18th, on the morning
21 of the 19th, that was in fact the position of
22 the collateral and cash held by Barclays on the
23 Barclays repo?
24    A.   I can see that John Haley has produced
25 an e-mail to attempt to break down the types of
```

TSG Reporting - Worldwide (877) 702-9580

Page 113

```
 1        HIGHLY CONFIDENTIAL - D. PETRIE
 2 collateral that we received.
 3    Q.   Is that consistent with your
 4 recollection of what happened that evening into
 5 the Friday?
 6    A.   My recollection is in dollar terms.
 7 We received 42.7-ish billion dollars worth of
 8 collateral and got $7 billion in cash to
 9 complete the Fed repo trade.  This breakdown
10 from John Haley is something I wouldn't be able
11 to comment on.  I don't know if it's correct or
12 not.
13    Q.   The very first e-mail at the top of
14 page 1, the short e-mail, I don't know if you've
15 read it.  Have you?
16    A.   Not yet.
17    Q.   Just read it and let me know when
18 you're done.
19        (Document review.)
20    A.   I've read it.
21    Q.   That's another e-mail from Teri Scott,
22 do you see that?
23    A.   Yes.
24    Q.   In the middle of her e-mail, she
25 writes, "Ops. had to pull all the collateral
```

TSG Reporting - Worldwide (877) 702-9580

29

## Page 114

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2    allocated to London, and we're therefore over
 3    our unsecured limit by $1.9 billion."  Do you
 4    see that?
 5        A.  I see that.
 6        Q.  Do you have an understanding as to
 7    what that means?
 8        A.  No.
 9        Q.  Do you have any understanding as to
10    what the phrase "collateral allocated to London"
11    means?
12        A.  No.
13        Q.  The next sentence reads, "Part of this
14    overage can also be attributed to EFG, as they
15    were unsecured by 1 billion."  Do you see that?
16        A.  Yes.
17        Q.  What does EFG mean?
18        A.  Equity Finance Group.
19        Q.  And do you have an understanding as to
20    what this sentence means?
21        A.  Yes.  During the normal course of
22    business, there can be, especially during this
23    volatile time period in September, there can be
24    large valuations intraday in regards to the
25    value of collateral, and I take this sentence as
```
TSG Reporting - Worldwide (877) 702-9580

## Page 115

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2    to meaning that, due to there being a valuation
 3    change in collateral normally held by EFG, that
 4    they needed additional billion-dollar loan from
 5    PLC, which wouldn't have come from, as assets
 6        Q.  When we were talking earlier about
 7    John Haley's e-mail at the bottom of page 1 over
 8    to page 2, you said that you thought about the
 9    repo in some dollar terms, and you said $42
10    billion and change in collateral, do you
11    remember that?
12        A.  Yes.
13        Q.  Okay.  That $42 billion in change in
14    collateral value, what is your --
15        A.  You said 42 billion change?
16        Q.  $42 billion and change.  It's 42 point
17    something, right?
18        A.  Oh, okay.  Yes.
19        Q.  Where did that value come from, the
20    value that you have in your mind?
21        A.  The value of 42.7, approximately,
22    $42.7 billion would have come from, as assets
23    moved from JPMorgan to the Bank of New York
24    during the Fed trade, the valuations would come
25    from the Bank of New York.
```
TSG Reporting - Worldwide (877) 702-9580

## Page 116

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2        Q.  So when you think of this $42.7
 3    billion number, you're thinking of a Bank of New
 4    York valuation number?
 5        A.  Yes, and also thinking of it in terms
 6    of, like I just mentioned, that there's a
 7    volatile -- we were in volatile markets, so the
 8    approximate value of 42.7 is a snapshot in time
 9    that could go up or down, you know, minute by
10    minute as markets changed.
11        Q.  I assume when this repo was done on
12    the 18th, at some point on the 19th Barclays
13    received a report from BONY as to the value of
14    the collateral; is that correct?
15        MR. SHAW:  Objection.  Foundation.
16        A.  You're asking me, once again, am I
17    assuming that there was a report?
18        Q.  No, I'm asking you do you know whether
19    there was a report?
20        A.  There were attempts of reports to be
21    sent by Bank of New York to Barclays for
22    valuations of securities, but as mentioned,
23    those values would be during very volatile
24    markets and pricings could have been going up or
25    down during minutes and hours post-transaction.
```
TSG Reporting - Worldwide (877) 702-9580

## Page 117

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2        Q.  I handed you a document that was
 3    previously marked as Exhibit 157A, a two-page
 4    document.  Let me know when you're done
 5    reviewing it.
 6        (Document review.)
 7        A.  I've read it.
 8        Q.  You're not shown as a recipient or a
 9    sender of any of these e-mails.  I want to ask
10    you about the e-mail on the first page from
11    David Aronow to Paolo Tonucci, 19th of
12    September, 12:47.  Do you see that?
13        A.  Yes, I see it.
14        Q.  David Aronow states in that e-mail,
15    "Barclays' Operations Team has recalculated the
16    value of the collateral that they received from
17    us last night and they are more than fully
18    collateralized, including the haircuts applied."
19        Do you see that?
20        A.  I read that.
21        Q.  Did you have any discussions with
22    David Aronow about recalculating the value of
23    the collateral Barclays received from BONY?
24        A.  No.
25        Q.  Had you expressed any views to David
```
TSG Reporting - Worldwide (877) 702-9580

Page 118

HIGHLY CONFIDENTIAL - D. PETRIE

1
2 Aronow or to anyone else at Lehman about whether
3 you believed that Barclays was fully
4 collateralized as of Friday, the 19th of
5 September?
6    A.  No.
7    Q.  Was that your understanding, that you
8 were fully collateralized on the 19th of
9 September?
10    A.  I believed that we were, including the
11 $7 billion.
12    Q.  And did you have any discussions with
13 anyone at Lehman about standing down with the
14 transfer of any further movements of collateral
15 on that Friday, the 19th of September?
16    A.  I do not understand what he means by
17 "stand down."
18    Q.  Putting aside the collateral that
19 moved over on the 18th in connection with the
20 Barclays repo, were you aware of any movements
21 of collateral that were taking place on Friday,
22 the 19th?
23    A.  I was aware there were movements of
24 collateral, but for what purposes I'm not aware.
25    Q.  Did anyone say to you on the 19th of

TSG Reporting - Worldwide (877) 702-9580

Page 119

HIGHLY CONFIDENTIAL - D. PETRIE

1
2 September or over the weekend of the 20th or
3 21st that, other than the Fed repo collateral,
4 other collateral had to be identified and moved
5 into Barclays by Lehman?
6    A.  No.
7    Q.  And did you ever have a view on the
8 19th and thereafter that the collateral that
9 Barclays received from the Fed repo was not the
10 collateral that Barclays intended to purchase
11 from Lehman?
12    MR. SHAW:  Objection.  Vague as to
13 time.
14    You say "intended to purchase from
15 Lehman."
16    A.  Can you repeat the question, please?
17    (Record read.)
18    A.  I wasn't part of that -- party to the
19 Asset Purchase Agreement.  I was only tasked
20 with one purpose, which was to receive the Fed
21 collateral to take the Fed out of the repo
22 trade, and it was clear that we did not receive
23 in its entirety the repo that had been at the
24 Fed from Lehman Brothers and given the
25 difficulties we have discussed already.  So it

TSG Reporting - Worldwide (877) 702-9580

Page 120

HIGHLY CONFIDENTIAL - D. PETRIE

1
2 was clear to me that we had received collateral
3 to collateralize our loan that would have
4 included assets that were not part of the
5 original Fed trade on Thursday.
6    Q.  Are you aware of any effort to try and
7 transfer to Barclays that collateral which was
8 part of the Fed repo but which wasn't
9 transferred to Barclays?
10    A.  I know I went into the office on
11 Friday morning expecting to try to complete the
12 Fed repo transfer and that there was collateral
13 that had moved, but for what that collateral was
14 satisfying, I don't know.
15    Q.  Let's go back to the notes, 272.  Page
16 862, which is the next page after the one we had
17 last discussed, if you could help us decipher
18 what the words that appear on that page.  If you
19 could just read them out and we can talk about
20 what you're writing about.
21    A.  It says, number 1, "PBN customer
22 finance."  Below that says, "Racers are RV with
23 LCPI," and the name James Walker on the same
24 line.  Below that says, "Trust structures.  LCPI
25 repo'd LBI.  LBI repo'd to street.  PDCF 20

TSG Reporting - Worldwide (877) 702-9580

Page 121

HIGHLY CONFIDENTIAL - D. PETRIE

1
2 percent on racers.  Loans are still on LCPI.
3 Trust is funded by ABCP."  Then the name Martin
4 Kelly.
5    Q.  Okay.  So let's start unpackaging the
6 that.  The "PBN customer finance" that appears
7 in the first line, "PB" is prime brokerage or
8 prime brokering?
9    A.  That would seem reasonable.
10    Q.  Okay.  And racers, the reference to
11 racers, what are racers?
12    A.  I believe racers are a
13 securitized-type product that had been issued
14 off of another entity, not LBI, so Lehman
15 Brothers entity.
16    Q.  Is not the LCPI Lehman Commercial
17 Paper, Inc.?
18    A.  To be honest with you, LCPI, you've
19 just told me what it is.  I wouldn't have been
20 able to explain that to you.
21    Q.  Okay.  And so these are some kind of
22 structured security, and you say the "racers are
23 RV with LCPI."  What did you mean by that?
24    A.  Racers RV stands for reverse repo.
25    Q.  Okay.

TSG Reporting - Worldwide (877) 702-9580

---

Page 138

1          HIGHLY CONFIDENTIAL - D. PETRIE
2          (Document review.)
3     A.   Okay, I've read it.
4     Q.   Can you help us understand what you
5  have written down here?
6     A.   I have the name John Rodefeld with the
7  phone number 646-541-8046.
8     Q.   Who is John Rodefeld?
9     A.   The head of Operations at Barclays.
10  John Haley, who also works in
11  Operations at Barclays, and I have Ed Lane, who
12  worked for me.
13     Q.   The next set of text that appears
14  below there?
15     A.   "Friday morning, John Haley," I
16  believe it says "Cusips and quantify everything
17  from Lehman." The number 8500. "That is what
18  settled. More items later today. Guess a few
19  hundred. 1.040 billion mid value."
20     Q.   And do you know what that was a
21  reference to?
22     A.   Other than collateral coming into
23  Barclays, I wouldn't know what it's satisfying,
24  so no.
25     Q.   Turning to page 871, carries the date

---

Page 139

1          HIGHLY CONFIDENTIAL - D. PETRIE
2  of 9/21/08, do you see that?
3     A.   Yes, I see it.
4     Q.   That's the Sunday? I believe it is
5  Sunday.
6     A.   Yeah, okay.
7     Q.   Do you recall being involved in
8  collateral movement or collateral
9  movement-related issues on that Sunday, the
10  21st?
11     A.   Just give me a moment, please, to read
12  through it.
13     Q.   Sure.
14     (Document review.)
15     A.   I vaguely remember a phone call that
16  day.
17     Q.   And your notes concern that call?
18     A.   Yes.
19     Q.   And can you help us decipher your
20  notes and tell us a little bit what that call
21  was about?
22     A.   It appears that DTC is trying to work
23  out some operational issues regarding transfer
24  of collateral, that would be the limit of my
25  knowledge, and giving some sort of timeframe as

---

Page 140

1          HIGHLY CONFIDENTIAL - D. PETRIE
2  to how long that should take.
3     Q.   Are you aware of any understanding or
4  agreement that was reached with DTC either that
5  weekend or shortly thereafter?
6     A.   Only to the extent as to what is noted
7  here in my notes.
8     Q.   If you go further down in this exhibit
9  to page 873, 874 and 875, they appear to be
10  spreadsheets. Can you tell what those documents
11  are?
12     A.   The first two pages I believe are
13  identical. The document appears to be a list of
14  securities that were not part of the Fed repo
15  trade.
16     Q.   How do you know they were not part of
17  the Fed repo trade?
18     A.   I believe these securities represent
19  what was funded outside of the Fed repo trade
20  that occurred on Thursday, and this list was
21  provided to me I believe the Monday after the
22  transaction occurred.
23     Q.   How can you tell all that just by
24  looking at these sheets of paper? How do you
25  know all that?

---

Page 141

1          HIGHLY CONFIDENTIAL - D. PETRIE
2     A.   On Monday morning, which would be the
3  22nd, I believe, is that correct?
4     Q.   Yes, 22nd.
5     A.   I was called in to an office around
6  3:30, between 3 and 3:30 in the morning to
7  discuss the $7 billion that JPMorgan had
8  originally given or pledged to Barclays in cash,
9  and there was an attempt to reach a settlement
10  of that $7 billion.
11     Part of that settlement JPMorgan had
12  attempted to include securities that were not
13  part of the Fed trade, and by nature of the
14  funding that we know that occurred that week,
15  there were assets that were being funded outside
16  of the Fed trade that included collateral that
17  would not be acceptable collateral to Barclays,
18  and one piece of that collateral is noted here
19  in this schedule that you have presented in
20  front of me.
21     Q.   And you're looking at page 874, the
22  item that reads "racer"; is that the one you're
23  referring to?
24     A.   Yes.
25     Q.   On the next page, 875, that's your

Page 142

1          HIGHLY CONFIDENTIAL - D. PETRIE
2    handwriting on that page, right?
3        A.   The writing that says, "We need sent
4    to SK" is my handwriting.  Below that is not my
5    handwriting.
6        Q.   Okay.  And who's SK?
7        A.   Stephen King.
8        Q.   And the notation that appears below
9    that handwriting, "7.4 for 8.55," do you have
10   any understanding of what that means?
11       A.   No.
12       Q.   And any understanding whose
13   handwriting that is?
14       A.   No.
15       Q.   The table that appears on that page of
16   875 has a total sum of collateral value, at
17   least in the "Grand Total" column, of 15.8
18   billion.  Do you see that?
19       A.   Yes.
20       Q.   Do you have any understanding as to
21   what that number means?
22       A.   Collateral that was left funded by
23   other means outside of the Fed repo trade that
24   we had executed, Barclays executed with Lehman
25   at the behest of the Fed.
TSG Reporting - Worldwide (877) 702-9580

Page 143

1          HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   On the Wednesday, the 17th, the amount
3    of the funding that was done through the
4    tri-party repo was about $15.8 billion, correct?
5        A.   Yes.
6        Q.   Is there any connection between that
7    15.8 and this 15.8 on this page, page 875,
8    Exhibit 272?
9        A.   I believe there could be a reasonable
10   connection.
11       Q.   What is that reasonable connection?
12       A.   If Lehman's only means of funding
13   itself was with the Fed and JPMorgan prior to
14   that week beginning, and there had been a
15   tri-party outside of the Fed trade that we were
16   stepping into, then this number could reflect
17   the number that was being funded outside of the
18   Federal Reserve funding.
19       Q.   Okay.  I've handed you, sir, a
20   two-page document previously marked Exhibit 133.
21   Take a look at it and let me know when you're
22   done.
23          (Document review.)
24       A.   Okay.
25       Q.   Turning to the second page of this
TSG Reporting - Worldwide (877) 702-9580

Page 144

1          HIGHLY CONFIDENTIAL - D. PETRIE
2    Exhibit 133, there's a small spreadsheet that
3    appears there, do you see that?
4        A.   I see it.
5        Q.   Do you have an understanding as to
6    what information is contained on that
7    spreadsheet?
8        A.   I've never seen this spreadsheet.
9          (Exhibit 275, a document bearing Bates
10   Nos. BCI-EX-81015 through 81016, marked for
11   identification, as of this date.)
12       Q.   I handed you a two-page document
13   marked Exhibit 275.  Take a moment to look at
14   it.  Let me know when you're done.
15          (Document review.)
16       A.   I have looked it over.
17       Q.   Have you seen this e-mail before
18   today?
19       A.   No, I haven't.
20       Q.   You'll see this is an e-mail from
21   Jasen Yang to Archie Cox of Barclays, do you see
22   that?
23       A.   I do.
24       Q.   Who is Jasen Yang?
25       A.   Jasen Yang worked for Stephen King.
TSG Reporting - Worldwide (877) 702-9580

Page 145

1          HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   And who is Archie Cox?
3        A.   Archie Cox is a chairman of North
4    America for Barclays.
5        Q.   And do you see this is a valuation of
6    collateral as provided for by BONY?
7        A.   I wouldn't be able to comment.  I
8    don't know.
9        Q.   Did you receive any valuations from
10   BONY on and after the 19th for the Fed repo
11   collateral?
12       A.   No.
13       Q.   We talked earlier about a 42.6 or 42.7
14   billion dollar number as a number you associated
15   with the value of the collateral transferred on
16   the night of the 18th, correct?
17       A.   Yes.
18       Q.   Okay.  Are you aware of a BONY
19   valuation of that collateral of about $45
20   billion?
21       A.   I'm aware that there were, like I said
22   earlier in my testimony, it was a highly
23   volatile market and that having a discrepancy in
24   valuations or movement, I should say, in
25   valuations was to be expected.
TSG Reporting - Worldwide (877) 702-9580

37

Page 146

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2       Q.   Were you aware of a BONY valuation for
3   that collateral as of Thursday night, the values
4   as of Thursday night, of $45 billion?
5       A.   No.
6       Q.   Are you aware of any valuations by
7   BONY, any specific valuations by BONY for that
8   Fed repo collateral?
9       A.   Am I aware of any specific
10  valuations --
11      Q.   By BONY.
12      A.   -- by BONY?
13           BONY, as our custodian, is the one
14  that values the collateral.
15      Q.   Are you aware of any specific values
16  put by BONY on the Fed repo collateral that was
17  transferred over on the 18th?
18      A.   No.
19      Q.   Would that information not have
20  crossed your desk on the 19th, the 20th, the
21  21st?
22      A.   Your question said "specific
23  valuations."  My desk, as mentioned in the very
24  beginning of the testimony, like any other repo
25  desk on Wall Street, is to finance the firm.
```

TSG Reporting - Worldwide (877) 702-9580

Page 147

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2   So, as collateral enters Barclays, my group and
3   myself's number one job is to finance it.
4           So, to the extent that the value of
5   the collateral held by Barclays Capital went up,
6   I would then raise, or my group would raise,
7   cash to meet that obligation in financing it.
8       Q.   I've handed you a multi-page document
9   previously marked as Exhibit 83B.  Take a moment
10  to look at the document and the spreadsheet
11  attached in the document.  Let me know when
12  you're done.
13           (Document read.)
14      A.   I've read it.
15      Q.   Have you seen this document before
16  today?
17      A.   No.
18      Q.   Do you have any understanding of the
19  information that's contained in the spreadsheet
20  attached to this Exhibit 83B?
21      A.   Yes, I have some understanding.
22      Q.   What's your understanding of what that
23  spreadsheet is?
24      A.   Given that Barclays Capital had
25  received many different asset classes of
```

TSG Reporting - Worldwide (877) 702-9580

Page 148

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2   securities from Lehman Brothers in taking the
3   Fed out of its trade, there was an attempt by
4   Stephen Sell to have those securities under the
5   watchful eye of the relevant trading desks to
6   manage the risk associated with those different
7   asset classes would be -- you asked my opinion.
8           I can't speak for Stephen Sell, but --
9   I haven't seen the document, but that's my
10  opinion.
11      Q.   Do you see the two bullet points on
12  the first page of the exhibit, Exhibit 83B, the
13  first bullet point reads, "We should book all
14  positions from the Lehman financing facility to
15  BCI (45 billion securities - see attached
16  file)."
17           Do you see that?
18           MR. SHAW:  Objection.
19  Mischaracterizes the document.
20      Q.   Do you see that bullet point?
21           MR. SHAW:  Objection.
22  Mischaracterizes the document.
23           MR. TAMBE:  Whether he sees the
24  document?
25           MR. SHAW:  The document you described
```

TSG Reporting - Worldwide (877) 702-9580

Page 149

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2   does not exist because you left out a
3   critical piece of information.
4       Q.   The first bullet point on page 1 of
5   Exhibit 83B, do you see that first bullet point?
6       A.   I see the first bullet point.
7       Q.   This parentheses it "45 billion
8   securities - see attached file," do you see
9   that?
10           MR. SHAW:  Objection.
11  Mischaracterizes the document.
12           MR. TAMBE:  How does that
13  mischaracterize the document?
14           MR. SHAW:  You have left out the
15  little mark that generally indicates --
16  well, I know what it generally indicates to
17  me and what I understand it is
18  approximately.
19      Q.   Okay.  "Approximately $45 billion in
20  securities," do you see that?
21      A.   Yes, I see that --
22      Q.   The squiggly line?
23      A.   I would read it, "We should book all
24  positions from the Lehman financing facility to
25  BCI (approximately 45 billion securities - see
```

TSG Reporting - Worldwide (877) 702-9580

## Page 150

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2    attached file)."
 3         Q.   That's the file we were talking about
 4    before, the spreadsheet that's attached to the
 5    cover sheet?
 6         A.   The file that you said -- yes, the
 7    spreadsheet that I haven't seen before until
 8    now, and if it adds up to 45, approximately 45
 9    billion, then, okay, then that's the file we
10    were talking about.
11         Q.   And the next bullet point states, "We
12    should book based on the price within the BONY
13    file, at least for Day 1."  Do you see that?
14         A.   I see that statement.
15         Q.   And taking those two bullet points
16    together, do you understand that as Mr. Sell
17    saying that the BONY prices were used for
18    booking these trades into the Barclays system,
19    at least for Day 1?
20         MR. SHAW:  Objection.
21         Mischaracterizes the document.
22         A.   I don't know what Stephen Sell was
23    trying -- what he was saying here.
24         Q.   What do you understand those two
25    bullet points to mean there?
```

## Page 151

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2         A.   In Barclays' books and records, you
 3    have to characterize these assets being held in
 4    a price that is a starting price from whence you
 5    held them.
 6         Q.   Okay.  And you understand this e-mail
 7    as saying that those prices should be the BONY
 8    prices, correct?
 9         A.   I can't speak for Stephen Sell.
10         Q.   That's what the e-mail said.  Do you
11    read that?  Do you understand the e-mail as
12    saying that?
13         A.   It appears that's what he's saying.
14         Q.   And do you know, based on how these
15    trades were booked to the Barclays system,
16    whether they in fact were booked to the BONY
17    prices on day one?
18         A.   I don't know.
19         Q.   Who would know that?
20         A.   I would suggest speaking to Stephen
21    Sell.
22         Q.   You said many, many times today that
23    there was a lot of volatility that week.  If it
24    was up to you, what -- what day's prices should
25    have been used to book these assets when they
```

## Page 152

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2    were booked in Barclays' books?
 3         MR. SHAW:  Objection to form.
 4         A.   If it was up to me, at what prices
 5    should the assets that came over from the Fed
 6    repo trade been booked at; am I characterizing
 7    your question correctly?
 8         Q.   Not quite.  What day's prices would
 9    you have used?
10         MR. SHAW:  Objection to form.
11         Q.   Thursday's prices?  Friday's prices?
12    Monday's price?
13         MR. SHAW:  Objection to form.
14         A.   I'm not an accountant, so I wouldn't
15    know what day to use.
16         Q.   But you run the repo desk, right?
17         A.   Right, for financing --
18         Q.   You need to know what you have on your
19    assets so you know what you financed, right?
20    You need to have some sense of what prices
21    you're going to use?
22         A.   For financing the positions, it would
23    be current market value.
24         Q.   So you'd use the prices of the day you
25    got the assets into your books?
```

## Page 153

```
 1          HIGHLY CONFIDENTIAL - D. PETRIE
 2         MR. SHAW:  Objection to form.
 3         A.   Buying a security and financing a
 4    security, the price that you paid for the
 5    security versus where you finance that security
 6    can differ to the extent of market volatility.
 7         Q.   A lot of things can differ, okay?  Do
 8    you have any procedures or rules that you follow
 9    when you get securities and you lend money?  Are
10    you required to follow any particular pricing
11    convention or methodology?
12         MR. SHAW:  Objection to form,
13    foundation, and vague as to who the "you" is
14    in that question.
15         Q.   You, Mr. Petrie.  Is there a problem
16    with "you"?  Is it unclear to you as to who the
17    "you" is in my question?
18         A.   I'm glad you clarified it, meaning my
19    attorney.
20         In running a repo desk, every day you
21    come into a new day where the market has moved
22    up or down, and you use, you can only use,
23    whatever market value of the securities that are
24    within Barclays Capital to raise cash.
25         Q.   And where Barclays is using a
```

39

Page 154

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    tri-party arrangement and there's a custodian
3    and the custodian has assigned prices to those
4    securities, are you required to use those
5    prices?
6           MR. SHAW:  Objection to form.
7    Foundation.
8        A.   Bank of New York, being our custodian,
9    prices our securities, and when we lend those
10   securities, the value that we lend those
11   securities at is the money that we're able to
12   borrow to finance the firm.
13       Q.   And whose values do you use, Bank of
14   New York's values or your values?
15       A.   Bank of New York's.
16       Q.   Thank you.  I have placed before you a
17   two-page document previously marked Exhibit
18   147A.  Take a moment to review the document.
19   Let me know when you're done.
20       (Document review.)
21       A.   Okay.  I've finished it.
22       Q.   Have you seen this document before
23   today?
24       A.   No.
25       Q.   There's a reference in the first
```
TSG Reporting - Worldwide (877) 702-9580

Page 155

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    e-mail at the top of page 1 to $1.9 billion of
3    additional collateral.  Do you see that?
4        A.   Yes, I see it.
5        Q.   Do you recall having any discussions
6    with anyone on or after the 19th of September
7    about $1.9 billion of additional collateral?
8        A.   No.
9        Q.   I have handed you a document marked
10   144A.  Take a moment to look at that document.
11   Let me know when you're done.
12       A.   I'm finished.
13       Q.   There's a forward of an e-mail on this
14   exhibit, and the e-mail is from Marty Malloy to
15   Gerard LaRocca and others.  Do you see that?
16       A.   Yes.
17       Q.   Okay.  Who's Marty Malloy?
18       A.   Marty Malloy is a managing director in
19   the Collateralized Finance Group.
20       Q.   And in terms of seniority, how does he
21   fit in with Mr. Dearlove and others we have
22   discussed?
23       A.   He's a senior member of the Barclays
24   team, so relatively on par.
25       Q.   There's a CC shown on his e-mail,
```
TSG Reporting - Worldwide (877) 702-9580

Page 156

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    Jacqui Stanley-Johns.  Do you see that?
3        A.   I see that.
4        Q.   Is that a name you're familiar with?
5        A.   No.
6        Q.   And you see the subject line of this
7    e-mail, "Totals For the Fed Facility
8    Collateral," do you see that?
9        A.   I see that.
10       Q.   And are you familiar with this
11   calculation that appears below in his e-mail?
12       A.   No.
13       Q.   You haven't seen that before today?
14       A.   No, I have not.
15          MR. TAMBE:  Let me take a short break.
16       (Recess; Time Noted:  3:22 P.M.)
17       (Time Noted:  3:31 P.M.)
18   BY MR. TAMBE:
19       Q.   Mr. Petrie, were you involved at all
20   in helping Barclays' auditors account for the
21   value of the securities that were purchased in
22   the Lehman/Barclays transaction?
23       A.   No.
24       Q.   I'm showing you what's previously been
25   marked as Exhibit 86B.  Just take a look at it
```
TSG Reporting - Worldwide (877) 702-9580

Page 157

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    and tell me if you've ever seen that document
3    before.
4        (Document review.)
5        A.   No, I have not.
6        Q.   There's a column on page 1 of Exhibit
7    86B, column F, titled "PCG Liquidity Value."  Do
8    you see that?
9        A.   Yes, I see it.
10       Q.   And do those words have any meaning to
11   you?
12       A.   Yes.
13       Q.   What is your understanding of what
14   those words mean?
15       A.   Product Control Group liquidity value.
16       Q.   And do you have an understanding as to
17   the calculations that are being done in that
18   column on page 1 of 86B?
19       A.   No, I do not.
20       Q.   I've handed you a one-page document
21   previously marked as 87B.  Have you seen this
22   document before today?
23       A.   No.
24       Q.   There's a column F on this document
25   87B entitled "MV w Liquidity," do you see that?
```
TSG Reporting - Worldwide (877) 702-9580

1                    N. PURCELL

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.
10    ----------------------x

11

12

13

14       VIDEOTAPED DEPOSITION OF NOEL PURCELL

15              New York, New York

16             January 13, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 27089

Page 6

```
1              N. PURCELL
2      Q.   And do you understand that the topics
3   that we plan to cover relate to the sale
4   transaction involving Lehman and Barclays --
5      A.   I do.
6      Q.   -- from September 2008?
7      A.   Yes.
8      Q.   And you understand that the topics
9   relate to the Committee's understanding and
10  evaluation of that transaction?
11     A.   I do.
12     Q.   When was the Committee first formed,
13  to the best of your recollection?
14     A.   "When formed," you mean?
15     Q.   When did the Committee first start to
16  conduct business?
17     A.   The Committee was formed on September
18  17, 2008, with our first meeting that morning to
19  begin to select the professionals.
20     Q.   I placed in front of you a blank
21  calendar for the month of September 2008 because
22  we'll be focusing largely on that time period.
23          Do you understand that on September
24  19, there was a hearing in the Bankruptcy Court
25  concerning approval of the sale transaction?
```

Page 7

```
1              N. PURCELL
2      A.   I do.
3      Q.   Can you tell me from the period when
4   the Committee was formed through the time of
5   that Approval Hearing what the Committee did in
6   order to understand and evaluate the sale
7   transaction?
8      MR. SZYFER:  Objection to form.
9      A.   On September 17, the Committee took
10  most of the day to put together a professional
11  team.  So for most of that day and that evening
12  up until about 11:30 that night, there really
13  wasn't much discussion about the business
14  aspects of Lehman Brothers.  It was more putting
15  together the administrative function of the
16  team.
17          Late that evening, there was a
18  discussion amongst the team, which included the
19  Milbank lawyers and the U.C.C. who were there at
20  the time, some of their representatives and the
21  U.C.C., including Stroock & Stroock & Lavan and
22  the attorneys for some of the other parties on
23  the U.C.C., about some of the urgent natures
24  within Lehman Brothers' estate.
25          That included a number of different
```

Page 8

```
1              N. PURCELL
2   aspects of the estate, funding issues, liquidity
3   issues, and that included things like sale of
4   certain assets, but we went into no detail that
5   evening.  We didn't have much detail to discuss.
6          Over the next two days, there was
7   several calls back and forth, I don't believe we
8   got together directly, to discuss a whole host
9   of issues within the estate.  One of those
10  issues was the Barclays transaction and what it
11  was that we knew about the Barclays transaction
12  at that point in time.
13     Q.   In this period from the 17th through
14  the 19th, did the Committee members themselves
15  have any direct contact with the parties to the
16  sale transaction?
17     A.   Can you define "parties"?
18     Q.   Yes.  Lehman on the one hand and
19  Barclays on the other hand and their respective
20  lawyers and financial advisors.  So that would
21  mean, basically, you know, Lehman executives,
22  Barclays executives, Weil Gotshal, Lazard.
23     A.   No.
24     Q.   And my --
25     A.   I'm sorry.
```

Page 9

```
1              N. PURCELL
2      Q.   I'm sorry.  And my question goes to
3   whether the Committee members themselves had any
4   direct contact with those parties.
5      A.   No.
6      Q.   The Committee's contact with those
7   parties was through its professionals; is that
8   right?
9      A.   Yes, it was.
10     Q.   Would the same be true for the period
11  from the 19th through the closing of the sale
12  transaction on September 22?
13     MS. TAGGART:  Object to form.
14     MR. SZYFER:  And when you say "the
15  same," you're talking about the Committee's
16  contact was through its professionals with
17  those parties that you listed in the
18  question before?
19     MR. STERN:  Sure.  Yes.
20     Q.   Let me spell it out so that the record
    is clear.
22          Did the Committee in the period from
23  the 19th through the closing of the sale
24  transaction on September 22 have any direct
25  contact with the parties to the sale
```

Page 10

N. PURCELL

1
2  transaction?
3      A.   No.
4      Q.   All the Committee's contacts were done
5  through its professionals?
6      A.   Yes.
7      Q.   And in the period from the 17th
8  through to the closing to the 22nd, when the
9  Committee sought to raise questions or express
10  its views concerning the transaction, am I
11  correct that that was also done through the
12  Committee's professionals?
13      A.   Yes.
14      Q.   In the period from the 17th through
15  the closing on the 22nd, was there any
16  information concerning the sale transaction that
17  the Committee got independent of what it learned
18  from its professionals?
19      MS. TAGGART:  Object to form.
20      Q.   To the best of your recollection.
21      A.   No.
22      Q.   So, in the period from the 17th
23  through the 22nd, to the best of your
24  recollection, the Committee did not receive
25  information concerning the sale transaction

Page 11

N. PURCELL

1
2  independent of what it learned from its
3  professionals; is that correct?
4      MS. TAGGART:  Object to form.
5      A.   Yes.
6      Q.   Now, after the closing -- now, after
7  the closing on September 22, 2008, and going
8  into the end of September and the month of
9  October, did the Committee have any direct
10  contact with Alvarez & Marsal concerning the
11  transaction?
12      A.   Yes.
13      Q.   And what was that contact?
14      A.   In early October, if I remember
15  correctly, there was a meeting of the Unsecured
16  Creditors Committee together with various
17  representatives of the estate, Alvarez & Marsal,
18  Brian Marsal and some of his team to discuss all
19  the urgent factors that were going on in the
20  estate and what they knew at that time.
21      Q.   Do you recall who attended that
22  presentation from the Creditors Committee?
23      MR. SZYFER:  Object to the form.
24      A.   I believe all of the standing
25  Unsecured Creditor Committee members were there.

Page 12

N. PURCELL

1
2  I think that's it.  Yeah.
3      Q.   Do you recall who else was at that
4  presentation outside of Creditors Committee
5  members?
6      And I'm just asking for your best
7  recollection.  I realize it as was a long time
8  ago.
9      A.   Sure.  I think various counsel
10  representing members of the U.C.C. directly.
11  For my benefit, Mark Speiser from Stroock &
12  Stroock & Lavan was there.  I believe Michael
13  Hawkins from Covington & Burling was there
14  representing Julie Becker.  I believe, and I
15  can't remember who specifically from Houlihan,
16  but I believe Houlihan & Lokey representatives
17  were there.  FTI representatives were there,
18  together with Milbank counsel.
19      Q.   Do you recall whether anybody from
20  Weil Gotshal attended that presentation?
21      A.   I don't recall.
22      Q.   One way or the other?
23      A.   One way or the other.
24      Q.   Do you recall whether anybody from
25  Lazard attended that presentation?

Page 13

N. PURCELL

1
2      A.   I don't recall one way or the other.
3      Q.   Other than the Alvarez presentation in
4  early October, in this period after the closing
5  on September 22 through the end of October 2008,
6  to the best of your recollection, did the
7  Committee members have any direct contact with
8  any of the parties to the transaction or their
9  professionals?
10      A.   By "direct," can you define "direct"
11  for me?
12      Q.   By "direct," I mean a situation like
13  the Alvarez presentation, where the Committee
14  was speaking directly or was hearing directly
15  from Alvarez as opposed to communicating through
16  its counsel or financial professionals.  Does
17  that help?
18      A.   Yes.
19      Q.   Okay.
20      A.   No, I do not believe so.
21      Q.   So, other than the Alvarez
22  presentation in early October, in this period
23  from September 22 through the end of October
24  2008, to the best of your recollection, the
25  Committee did not have direct contact with the

Page 14

N. PURCELL

1
2      parties to the transaction or their
3      representatives; is that your best recollection?
4          A.   Yes.
5             MR. SZYFER:  Just to be clear, Mr.
6      Stern, are you counting Alvarez & Marsal as
7      a representative of one of the parties since
8      Alvarez & Marsal is, in a sense, working for
9      Lehman?
10            MR. STERN:  Yes.
11            MR. SZYFER:  Okay.  I just want to
12     make sure that you understand that
13     clarification.
14         A.   Can you restate the question with that
15     clarification, please?
16         Q.   Sure.  So, other than the Alvarez
17     presentation in early October, in this period
18     from September 22, 2008, through the end of
19     October 2008, to the best of your recollection,
20     is it correct that the Committee did not have
21     direct communications with the parties to the
22     transaction or their representatives?
23         A.   Yes.
24            (Exhibit 519B, a document bearing
25     Bates Nos. CMTE0007889 through 8244, marked

Page 15

N. PURCELL

1
2      for identification, as of this date.)
3             (Discussion off the record.)
4             THE VIDEOGRAPHER:  The time is now
5      9:49 A.M.  We are now back on the record.
6      BY MR. STERN:
7          Q.   Mr. Purcell, looking at Exhibit 519B,
8      if you could review this document which was
9      produced to us by the Committee and tell me if
10     you understand what it is or if you recall what
11     it is.
12         A.   Looks to be a series of e-mails
13     between members of the Committee and Committee
14     counsel, regarding exactly what I don't know --
15     portions of it are redacted -- referencing
16     certain calls, including the Neuberger Committee
17     call at 9:30 on 10/16.
18         Q.   And after the series of e-mails, there
19     is a page that in the upper left says DTC074.
20     Do you see that?
21         A.   I do.
22         Q.   Do you know what this page is?
23         A.   I do not.
24            MR. STERN:  Let me mark this as the
25     next exhibit.

Page 16

N. PURCELL

1
2             (Exhibit 520B, a document bearing
3      Bates Nos. CMTE0001047 through 1049, marked
4      for identification, as of this date.)
5          Q.   I'll ask you to please read through
6      that and then I'll have some questions for you
7      about it.
8             (Document review.)
9          A.   Okay, Mr. Stern.
10         Q.   Have you ever seen Exhibit 520B before
11     today?
12         A.   No, I have not.
13         Q.   Did you review it in preparing for
14     today's deposition?
15         A.   No, I did not.
16         Q.   Before I get to the specifics of 520B,
17     let me ask you a general question.  In the
18     period from September 17 through the closing of
19     the sale transaction on September 22, what
20     factors did the Committee consider in evaluating
21     whether to object to the sale transaction?
22            MR. SZYFER:  Object to the form.
23            MS. TAGGART:  I'm going to object to
24     the form and I'm also going to instruct not
25     to answer on privilege on that basis, on

Page 17

N. PURCELL

1
2      work product and attorney-client.
3          Q.   Turning to Exhibit 520B, if you look
4      on the page that bears the Bates number ending
5      1048 in the bottom half of that page, there's an
6      e-mail from -- and I'm not sure I'm going to
7      pronounce this correctly -- Nitin Bajpai.  Do
8      you see that?
9          A.   I do.  I don't know how to pronounce
10     his name either.
11         Q.   Do you know who that is, Bajpai?
12         A.   I do not.
13         Q.   Was Shinsei International at any point
14     a member of the Creditors Committee?
15         A.   I don't know Shinsei's -- the exact
16     entity that Shinsei represented within its
17     organization of the Committee.  I don't know the
18     exact term.  I do not believe Shinsei
19     International is that entity.
20         Q.   Was there any Shinsei entity -- and
21     that's S-H-I-N-S-E-I -- was there any Shinsei
22     entity that at any time was a member of the
23     Creditors Committee?
24         A.   Yes.
25         Q.   Did Shinsei at some point cease to

Page 18

N. PURCELL

1    N. PURCELL
2  become a member of the Creditors Committee?
3       MR. SZYFER:  And are you now -- are
4  you referring to the Shinsei entity that Mr.
5  Purcell has mentioned or are you just
6  discussing Shinsei International or any
7  generic Shinsei entity?
8    Q.   Well, what is the Shinsei entity, to
9  the best of your knowledge, that is a member of
10  the Creditors Committee?
11    A.   I only know it as Shinsei.
12    Q.   Okay.  Did Shinsei ever cease to
13  become a member of the Creditors Committee?
14    A.   Yes.
15    Q.   And when did that happen?
16    A.   I believe Shinsei resigned from the
17  Committee in early December 2009.
18    Q.   Shinsei was a member of the Creditors
19  Committee in September 2008, correct?
20    A.   Yes.
21       MS. TAGGART:  Object to form.
22    Q.   Do you know who Nitin Bajpai is?
23    A.   I do not.
24    Q.   Do you know who Sally Rocker is?
25    A.   I do not.

Page 19

N. PURCELL

1       N. PURCELL
2    Q.   Who -- do you know who Ed Gilbert is?
3    A.   Yes, I do.
4    Q.   And who is he?
5    A.   Mr. Gilbert was the representative for
6  Shinsei who interacted with the U.C.C.
7    Q.   Turning to the page that ends with the
8  Bates number 1048, and the e-mail that's
9  reflected here is being sent Saturday, September
10  20, 2008, 12:32 A.M.  It states in the second
11  paragraph towards the middle, "The current
12  stance of the U.C.C. is not to object, as there
13  does not appear to be a viable option, and the
14  judge seems determined to move the process along
15  and to approve the sale, even while he
16  acknowledges that there is insufficient
17  information, but cites the necessity to preserve
18  financial stability as an overriding concern."
19       Do you see that?
20    A.   I do.
21    Q.   To your knowledge, at any time between
22  September 17 and the closing on September 22 did
23  the Committee take into consideration in
24  evaluating the sale transaction whether there
25  was a viable option?

Page 20

N. PURCELL

1       N. PURCELL
2       MR. SZYFER:  Objection to the form.
3    A.   The Committee looked at the entire
4  transaction and the lack of data supporting all
5  facts of the transaction as a problem.  Options
6  and who else might be a possible buyer was also
7  a concern, as all other assets -- all other
8  aspects of this transaction were.
9    Q.   In considering the lack of data
10  supporting all facts of the transaction to be a
11  problem, did the Committee consider whether it
12  should object on that basis?
13       MS. TAGGART:  Object on form,
14  privilege, and I'm going to instruct not to
15  answer on attorney-client and work product
16  privileges.
17    Q.   Did the Committee ever object to the
18  sale transaction based on what you referred to
19  as the lack of data?
20    A.   Object?  Can you define "object"?
21    Q.   Did the Committee ever tell Judge Peck
22  that it objected to the transaction because of
23  the lack of data?
24       MS. TAGGART:  Object to form.
25    A.   And when you mean "Committee," you

Page 21

N. PURCELL

1       N. PURCELL
2  mean the direct Committee members or you mean
3  the Committee advisors?
4    Q.   The Committee in whatever way it
5  communicated with the Court.
6    A.   I believe the Committee indicated to
7  Judge Peck on a number of occasions that we were
8  troubled with the fact that we didn't have all
9  the details of the transaction.  If you consider
10  that an objection from your defined term, then
11  we objected.
12    Q.   Did the Committee, to your knowledge,
13  ever object to the sale transaction before Judge
14  Peck?
15       MS. TAGGART:  Object to form.
16    A.   Again, the "Committee" meaning its
17  advisors or the Committee?
18    Q.   The Committee appeared before Judge
19  Peck through its counsel, correct?
20    A.   Yes.
21    Q.   Okay.  To your knowledge, did the
22  Committee's counsel ever indicate to the Court
23  that the Committee objected to the sale
24  transaction?
25    A.   I do not believe the Committee

6  (Pages 18 to 21)

Page 22

N. PURCELL

1
2  formally objected to the transaction.  The
3  Committee certainly expressed its concerns about
4  the details of the transaction and the lack
5  thereof.
6      Q.    But the Committee did not object; is
7  that right?
8          MS. TAGGART:  Objection.  Asked and
9  answered.
10     A.    Formally, no.
11     Q.    And in light of the concerns that you
12 just described, why did the Committee not
13 object?
14         MS. TAGGART:  Objection --
15         MR. SZYFER:  Objection.
16         MS. TAGGART:  -- to form and to
17 privilege, and I'm going to instruct not to
18 answer on attorney-client and work product
19 privileges.
20     Q.    In deciding not to object, despite the
21 Committee's concerns about lack of information,
22 did the Committee take into consideration the
23 lack of a viable option?
24         MS. TAGGART:  Same objections and same
25 instructions.  So I'm instructing not to

Page 23

N. PURCELL

1
2  answer on privileges.
3      Q.    In deciding not to object, despite the
4  Committee's concerns about lack of information,
5  did the Committee take into consideration any
6  concerns about preserving financial stability?
7          MS. TAGGART:  Same objections and same
8  instruction.
9      Q.    Before the transaction closed on
10 September 22, did the Committee ever consider
11 taking any action to block the closing?
12         MS. TAGGART:  I'm going to -- same
13 objections and instruction.  So I'm going to
14 instruct you not to answer on privileges.
15     Q.    In deciding not to object to the
16 transaction, did the Committee ever take into
17 consideration the effect on the
18 debtor-in-possession financing for Lehman if the
19 transaction did not go through?
20         MS. TAGGART:  Same objections and
21 instruction.
22     Q.    In deciding not to object to the sale
23 transaction, did the Committee ever take into
24 consideration the views of various government
25 agencies?

Page 24

N. PURCELL

1
2          MS. TAGGART:  I'm going to object and
3  instruct on that basis.  If you want to ask
4  questions about what input they had about
5  various government agencies, there may be
6  information we would allow.
7      Q.    What did the Committee know about the
8  views of various government agencies concerning
9  the sale transaction?
10         MS. TAGGART:  And let me explain our
11 position on this.  We are willing to have
12 him testify about the Committee's
13 understanding on this issue, but not the
14 communications to the extent it came from
15 counsel, but I would ask an agreement that
16 that not be a waiver to any privilege to the
17 extent that that issue was discussed among
18 counsel.
19         So if I can have that agreement, then
20 he can answer that question.
21         MR. STERN:  I'm not going to engage in
22 this kind of a negotiation on the record.
23 I'm just going to ask my questions and you
24 can either instruct him not to answer,
25 object, or let him answer.

Page 25

N. PURCELL

1
2      Q.    What did the Committee know about the
3  views of various government agencies concerning
4  the sale transaction?
5          MS. TAGGART:  Okay.  Then I'm going to
6  object and give this instruction, which is,
7  in light of the fact that counsel for
8  Barclays will not agree to say that it's not
9  a waiver, and I understand that some of the
10 information came to you through counsel, why
11 don't you only say if you received any
12 information that was not from your
13 professionals and not from counsel that was
14 about the issue of the views of various
15 government agencies concerning the sale
16 transaction.
17         So if you received information about
18 the views of various government agencies
19 concerning the sale transaction from someone
20 other than your professionals and your
21 counsel, you should answer.
22     A.    We did not receive any information
23 about various government agencies and their
24 views on this transaction from counsel or from
25 any other -- any other position.

7 (Pages 22 to 25)

N. PURCELL

1             N. PURCELL
2 him or not answer -- you will allow him to
3 answer?
4     MS. TAGGART: Yes. And to be clear,
5 if you say what was the Committee's
6 understanding at certain times and on
7 certain issues, he can testify about the
8 Committee's understanding that came from all
9 sources so long as you don't -- agree that
10 that's not a waiver as to the
11 communications, yes, we would allow those
12 questions.
13     MR. STERN: I'll agree on that limited
14 basis and then ask my questions.
15     Do you need to take a break?
16     MS. TAGGART: Yeah.
17     MR. STERN: Okay.
18     MS. TAGGART: Thank you.
19     THE VIDEOGRAPHER: The time is now
20 10:20 A.M. We are now off the record.
21     (Recess.)
22     THE VIDEOGRAPHER: The time is now
23 10:26 A.M. We are now back on the record.
24 BY MR. STERN:
25     Q. Picking up from the last colloquy and

1             N. PURCELL
2 going back to Exhibit 520B, at the top of the
3 first page of 520B, the first e-mail, which
4 appears to be sent Saturday, September 20, 6:03
5 A.M., says that if the sale was not approved,
6 the DIP would have been due, and if someone
7 hadn't provided a new DIP, the entire stake of
8 the Asset Management Unit could have been
9 foreclosed on. Then it goes on and says "no
10 other DIP lender was forthcoming."
11     What facts was the Committee aware of
12 before closing of the sale transaction
13 concerning what would happen to the DIP
14 financing if the sale transaction was not
15 completed?
16     MS. TAGGART: I'm going to object and
17 instruct not to answer. I understand, given
18 our previous discussion, I should probably
19 explain.
20     He can describe his understanding of
21 the sales transaction regarding facts. Your
22 question I think is going to what might
23 happen in the future, which is analysis, not
24 just facts, such as what is the DIP
25 financing right now. So I am still

1             N. PURCELL
2 instructing not to answer on attorney-client
3 and work product to that question.
4     Q. What facts did the Committee know
5 about the DIP financing before the sale
6 transaction closed?
7     MS. TAGGART: Object to form. I will
8 allow you to answer. Please don't disclose
9 any communications that happened with
10 counsel, but you can testify to any facts,
11 if any, that the Committee had on that
12 question, which is about DIP financing
13 before the sale transaction closed.
14     A. I don't believe the Committee had any
15 official understanding of the DIP facility
16 transaction.
17     Q. Did the Committee have any
18 understanding of the facts concerning the
19 positions of various government agencies with
20 respect to the sale transaction?
21     MS. TAGGART: Object to form, but you
22 can answer, to the extent you understand it,
23 with that same instruction: Don't reveal
24 communications with counsel.
25     A. I don't believe the Committee had any

1             N. PURCELL
2 official facts regarding the government
3 agencies' position.
4     Q. Did the Committee have any
5 understanding of the facts concerning whether
6 any bidder other than Barclays had submitted a
7 bid?
8     MS. TAGGART: You can answer.
9     A. I don't believe the Committee had any
10 official knowledge of any other bidders, either
11 positively or negatively.
12     Q. Did the Committee have any knowledge
13 of facts concerning whether the Court was
14 determined to move the process along and approve
15 the sale?
16     MS. TAGGART: Objection. And I'm
17 going to instruct not to answer on
18 privilege. I don't think that that's a
19 fact; that's more asking for analysis.
20     Q. Well, you saw in Exhibit 520B that
21 Shinsei made reference to that, correct?
22     MS. TAGGART: Object to form.
23     A. I see that someone from Shinsei
24 indicated that, yes.
25     Q. Okay. And did you see that Shinsei

Page 34

N. PURCELL

1
2  noted that the Court was concerned with the
3  necessity to preserve financial stability as an
4  overriding concern?
5         MS. TAGGART:  Object to form.
6      A.  Can you point me, counsel, in the
7  e-mail to where it says that?
8      Q.  Sure.  Do you see at the bottom of the
9  second page of Exhibit 520B that Shinsei states
10 as follows:  "The current stance of the U.C.C.
11 is not to object, as there does not appear to be
12 a viable option, and the judge seems determined
13 to move the process along and to approve the
14 sale, even while he acknowledges that there is
15 insufficient information, but cites the
16 necessity to preserve financial stability as an
17 overriding concern"?
18         MS. TAGGART:  Is the question --
19         MR. SZYFER:  Objection.
20         MS. TAGGART:  -- just does he see it?
21         MR. SZYFER:  Objection to the form.
22     Q.  Do you see that statement by Shinsei?
23     A.  I do see that statement from Nitin
24 Bajpai of Shinsei, yes, Shinsei International.
25     Q.  Do you recall any discussions within

Page 35

N. PURCELL

1
2  the Committee, not involving counsel, concerning
3  those points?
4         MR. SZYFER:  Which points?
5         MR. STERN:  The points we just read
6  from this e-mail.
7         MS. TAGGART:  Okay.  So you can answer
8  so long -- was there a discussion with the
9  Committee that didn't involve any counsel on
10 that subject, and for now just answer yes or
11 no to that.
12         MR. SZYFER:  And are you just
13 referring to the sentence you just read or
14 other questions that you have asked
15 regarding this e-mail, Mr. Stern?
16         MR. STERN:  I think it's clear.
17         MS. TAGGART:  Then object to form.
18         MR. SZYFER:  Yeah, I don't think it
19 is.  Object to form.
20     A.  No.
21     Q.  To the best of your knowledge, at any
22 point before the closing did the Committee
23 consider that it should not object to the sale
24 because, as the Shinsei e-mail states, there
25 does not appear to be a viable option and the

Page 36

N. PURCELL

1
2  judge seems determined to move the process along
3  and to approve the sale, even while he
4  acknowledges that there is insufficient
5  information, but cites the necessity to preserve
6  financial stability as an overriding concern?
7         MS. TAGGART:  Object to form and
8  instruct not to answer on attorney-client
9  and work product privileges.
10     Q.  At any point before the closing, did
11 the Committee consider that it should not object
12 to the sale because, as the Shinsei e-mail
13 states, no other bidder submitted a bid, and
14 even if the U.C.C. had objected, all indications
15 were that the judge would have ruled against it
16 and executed the transaction?
17         MS. TAGGART:  Object to form and
18 instruct not to answer on privilege.  And
19 really I think this is a standing objection
20 about why the Committee made the decision
21 that it did.  That position, that legal
22 position, is now on the record both to the
23 Court and in our motions.
24         What was the considerations behind
25 that is privileged, and I do think it's a

Page 37

N. PURCELL

1
2  waste of the time to keep asking that same
3  question.
4      Q.  At any point before the closing, did
5  the Committee consider that it should not object
6  to the sale because, as the Shinsei e-mail
7  states, if the sale was not approved, the DIP
8  would have been due, and if someone hadn't
9  provided a new DIP, the entire stake of the
10 Asset Management Unit could have been
11 foreclosed?
12         MS. TAGGART:  Same objection.  Same
13 instruction.
14         (Exhibit 521B, a document bearing
15 Bates Nos. CMTE0000577 through 580, marked
16 for identification, as of this date.)
17     Q.  Before we turn to 521B, and I'll give
18 you a chance to review it, let me ask this:  In
19 deciding whether to object to the sale
20 transaction, did the Creditors Committee take
21 into consideration any information or any
22 factors that the Committee obtained through any
23 source other than its counsel and its financial
24 advisors?
25         MS. TAGGART:  I'm going to object as

10 (Pages 34 to 37)

Page 38

N. PURCELL

1
2  worded considering the preface about what
3  went into the determination to object to the
4  sale.
5       If you, Mr. Stern, would like to ask
6  whether the Creditors Committee had
7  information from any source other than its
8  counsel or its financial advisors, I would
9  allow that question.
10      MR. STERN:  Ms. Taggart, I think you
11  know that the rules do not allow this type
12  of speaking objection.  If you have an
13  objection to the form, please state it, but
14  these kinds of speaking objections are
15  really inappropriate.
16      Can you repeat the question?
17      (Record read.)
18      MS. TAGGART:  I'm going to object to
19  form and instruct not to answer as worded
20  for the reasons I stated before.
21  Q.   In deciding whether to object to the
22  sale transaction, did the Creditors Committee
23  have information from any source other than its
24  counsel or its financial advisors?
25      MS. TAGGART:  I have to give the same

Page 39

N. PURCELL

1
2  instruction and objection, but it's really
3  to the preface.  I do think that there's
4  information that you could get if you
5  dropped that preface.  That's obviously up
6  to you.  To that question I'm instructing
7  not to answer.
8  Q.   In relation to the sale transaction,
9  did the Committee have information from any
10  source other than its counsel or its financial
11  advisors?
12      MS. TAGGART:  I'm going to object to
13  form for vagueness, but you can answer that.
14  A.   Can you repeat the question, please?
15  Q.   In relation to the sale transaction,
16  did the Committee have information from any
17  source other than its counsel or its financial
18  advisors?
19  A.   No.
20  Q.   Why don't you take a moment to read
21  what we have marked as Exhibit 521B.
22      (Document review.)
23  A.   I've read it, Mr. Stern.
24  Q.   Can you identify this document for us?
25  A.   Yes, I can.

Page 40

N. PURCELL

1
2  Q.   What is it?
3  A.   It's an e-mail I sent to Committee
4  members on Friday, September 26, 2008, at 10:42
5  A.M.
6  Q.   Aside from your own counsel at
7  Stroock, did you copy any other counsel?
8  A.   I don't believe I did.
9  Q.   And what was the purpose of this
10  communication?
11  A.   To express to the Committee members
12  directly my personal frustration with the lack
13  of information that the Committee had in making
14  decisions within the estate.
15  Q.   Okay.  You write that, "During the
16  past week, Lehman and its related entities,
17  together with their advisors, have engaged in a
18  fire sale disposition of several assets,
19  representing billions of dollars of value to the
20  Creditors of the Debtor entity.  We were told by
21  all parties involved that the sale of the
22  following entities had to be consummated
23  immediately or risk losing some or all of the
24  value of the assets for the Creditors."
25      And do you see that you list various

Page 41

N. PURCELL

1
2  entities below that, including the
3  broker-dealer?
4  A.   I do.
5  Q.   And when you refer to the
6  broker-dealer, are you referring to the sales
7  transaction involving Barclays that the Court
8  approved?
9  A.   I am.
10  Q.   And what, to the best of your
11  recollection, were you told as to why the sale
12  of the broker-dealer had to be consummated
13  immediately or risk losing some or all of the
14  value of that asset?
15      MS. TAGGART:  I'm going to object and
16  give the following instruction:  Please do
17  not reveal anything that you were told by
18  your financial advisors or your counsel.  If
19  you were told or passed on information about
20  what was told through parties such as Lehman
21  or Barclays or other public sources, you can
22  reveal that.
23  A.   There were no other sources of
24  information I had other than our advisors on
25  those issues.

11 (Pages 38 to 41)

N. PURCELL

1        A.   I don't recall reviewing this, no.
2        Q.   I'm not going to take you through
3   every aspect of the attachment, but I do want to
4   ask you some specific questions relating to some
5   of the information on the second page of the
6   transcript, which is the Bates number ending
7   9128.
8            Do you see that page?
9        A.   I do.
10       Q.   Look at the third paragraph.  I'll
11  just read it.  It states, and this is Mr. Varley
12  speaking:  "The acquisition of the core of old
13  Lehman's based around the U.S. broker-dealer
14  operations, we have acquired the associated
15  infrastructure.  We will be taking on about
16  10,000 employees.  We are acquiring trading
17  assets with a current statemented value of $72
18  billion in trading liabilities with the current
19  estimated value of $68 billion, for a cash
20  consideration of $250 million."
21           Do you see that?
22       A.   Yes, I do.
23       Q.   Do you know whether the Committee
24  considered the $72 billion figure and the $68

N. PURCELL

1   billion figure to be relevant to the final
2   transaction that was closed on September 22?
3            MS. TAGGART:  Object to form.  I would
4   instruct -- instruct not to answer on
5   privilege as currently worded.
6        Q.   Did the Committee know, as of the
7   closing of the sale transaction, whether the
8   final transaction involved the acquisition of
9   trading assets with a current estimated value of
10  $72 billion?
11           MS. TAGGART:  You can answer.
12           MR. SZYFER:  Object to the form.
13       A.   The Committee understood, or believed
14  we understood, certain aspects of the
15  transaction.  Whether it was $72 billion or not
16  at that point I don't recall.
17       Q.   So you don't recall one way or the
18  other?
19       A.   I don't recall whether $72 billion was
20  the number used at that time.  The numbers have
21  moved substantially throughout the case.
22       Q.   What do you recall about how the
23  numbers moved substantially?
24           MS. TAGGART:  Objection and a limited

N. PURCELL

1   instruction on privilege.  You can explain
2   your answer, just don't reveal any
3   communications.  But if you want to explain
4   the facts known over time, to the extent you
5   understand the question, you should answer.
6        A.   What numbers are you speaking of?
7        Q.   Well, did you have an understanding
8   that, with respect to the trading assets that
9   Barclays would acquire, the numbers had moved
10  substantially from September 17 through the time
11  of closing on September 22?
12           MS. TAGGART:  Object to form.
13       A.   I believe -- and let me ask, when you
14  say "you," you mean the Committee, correct?
15       Q.   You and the Committee.
16       A.   I believe the Committee understood
17  that there was questions regarding the asset
18  value, the liability value, what was made up of
19  those various positions, and that the numbers
20  were being quoted differently at different times
21  leading up to the closing of the sale.
22       Q.   Did the Committee understand that,
23  between September 17 and September 22, there had
24  been changes in the trading assets that Lehman

N. PURCELL

1   had available to transfer to Barclays?
2            MS. TAGGART:  Object to form.
3        A.   Can you repeat the question?
4            (Record read.)
5        A.   I would say the Committee understood
6   aspects of the sale were moving.  Whether we
7   understood at the time details specifically as
8   to the trading assets or any other aspect of the
9   transaction, I would say no, we didn't.
10       Q.   And despite that lack of
11  understanding, the Committee decided to abstain
12  or not object to the sale transaction; is that
13  correct?
14           MS. TAGGART:  Object to form and
15  instruct not to answer on privilege.
16       Q.   Did the Committee understand that the
17  figures that Lehman had presented earlier in the
18  week concerning trading assets available to
19  transfer to Barclays had changed by the time of
20  the Approval Hearing?
21           MS. TAGGART:  Object to form, but you
22  can answer.
23       A.   The Committee did not understand the
24  value of those assets, who determined the

14 (Pages 50 to 53)

Page 54

N. PURCELL

1         N. PURCELL
2  number, as you quoted, of those assets, and why,
3  if in fact they did change, they did change.
4         Q.    Did the Committee understand that
5  Lehman had indicated that the value of the
6  trading assets available to transfer to Barclays
7  had changed in the period from September 16 to
8  the time of the Approval Hearing on September
9  19?
10         MS. TAGGART:  Object to form.
11         A.    I do not recall at the time who was
12  quoted as using the value of those assets.
13         Q.    So you don't recall one way or
14  other whether, as of the Approval Hearing, the
15  Committee understood that Lehman had indicated
16  the value of the trading assets available to
17  transfer to Barclays had changed?
18         MS. TAGGART:  Object to form.
19         Q.    Is that your testimony?
20         A.    I don't recall whether the Committee
21  understood it was Lehman quoting values for the
22  assets or what was available for trading at that
23  time.
24         Q.    Do you recall whether the Committee
25  understood that, between September 16 and

Page 55

N. PURCELL

1         N. PURCELL
2  September 19, there was a change in the value of
3  trading assets available to transfer to
4  Barclays?
5         MS. TAGGART:  Object to form.
6         A.    The Committee wasn't formed on the
7  16th, so it couldn't have been for the 16th.  If
8  you mean between the 17th, when we were formed,
9  and the 19th, during that period of time, again,
10  the facts available to the Committee were
11  minimal on the transaction.  So I don't know if
12  the Committee understood at that point
13  specifically who was making the statement that
14  these assets were available for transfer,
15  whether it be Lehman or someone else.
16         Q.    Staying with the same page of this
17  Exhibit 476B, below the paragraph we just read,
18  skipping the next paragraph, it states, "We also
19  mentioned in our announcement," do you see that?
20         A.    Yes, I do.
21         Q.    "We also mentioned in our announcement
22  today that certain of our shareholders have
23  expressed support for the transaction and an
24  interest in increasing their shareholdings in
25  Barclays.  In fact, the transaction is capital

Page 56

N. PURCELL

1         N. PURCELL
2  ratio accretive without additional equity
3  issuance.  And the source of that accretion is
4  the negative goodwill from the transaction,
5  which amounts to about $2 billion -- 2 billion
6  U.S. dollars post tax."  Do you see that?
7         A.    I do.
8         Q.    Before the Committee decided to
9  abstain or not object to the sale transaction,
10  was the Committee aware of this announcement by
11  Barclays?
12         A.    I see that Ed Gilbert sent this
13  announcement by e-mail to the Committee members.
14  I'm not sure if any Committee member read this
15  prior to it, so therefore, I'm not sure whether
16  we were aware of this announcement prior to the
17  sale closing.
18         Q.    Did any Committee member express any
19  concern about the fact that Barclays had
20  announced that it anticipated to realize a $2
21  billion after-tax acquisition gain?
22         MS. TAGGART:  I'm going to object and
23  instruct you should only answer if there was
24  some communication that was outside of
25  counsel and the Committee deliberations it

Page 57

N. PURCELL

1         N. PURCELL
2  had with counsel and its professionals.  But
3  if there was some outside communication on
4  that topic, you should testify about it.
5         A.    Based upon that instruction, I do not
6  believe there was any outside discussion outside
7  of counsel on this issue.
8         THE VIDEOGRAPHER:  The time is now
9  11:10 A.M.  We are now off the record.
10         (Recess.)
11         THE VIDEOGRAPHER:  This is the start
12  of tape number 2.  The time is now 11:22
13  A.M.  We are now back on the record.
14  BY MR. STERN:
15         Q.    Let me show you a document we
16  previously marked as Exhibit 478B.
17         A.    Mr. Stern, are we done with 476B?
18         Q.    For the time being.
19         A.    Okay.
20         MR. SZYFER:  Do you have any
21  additional copies, Mr. Stern?
22         MR. STERN:  I'm sorry?
23         (Document handed to Mr. Szyfer.)
24         MR. SZYFER:  Great.  Thanks.
25         Q.    Okay.  If you would look at Exhibit

15  (Pages 54 to 57)

Page 74

N. PURCELL

1
2  of the transaction Barclays would step into the
3  Fed's funding role.
4     Q.   And did the Committee understand that,
5  in general, in such repos the value of the
6  securities transferred would generally exceed
7  the value of the cash provided for those
8  securities?
9     MS. TAGGART:  Object to form.
10    A.   I don't believe I remember exactly
11  whether the Committee understood that point.
12    Q.   What facts did the Committee have
13  before the closing of the sale transaction
14  concerning the market value of the securities
15  transferred to Barclays in connection with that
16  repo replacement?
17    MS. TAGGART:  Object to form.
18    A.   Again, I don't remember the specific
19  facts.
20    Q.   Do you remember generally the facts?
21    A.   Can you repeat your question?
22    Q.   What facts did the Committee have
23  before the closing concerning the market value
24  of the securities transferred to Barclays under
25  the repo?

Page 75

N. PURCELL

1
2     A.   What general facts?
3     Q.   Yes.
4     A.   I believe the Committee understood
5  that the transaction itself included the sale of
6  some real estate, some securities, the transfer
7  of certain individuals in return for
8  liabilities.  What those liabilities were I
9  can't recall.
10    Q.   Did the Committee, as of the closing,
11  have any certainty concerning the value of the
12  assets Barclays was acquiring?
13    A.   No.
14    Q.   As of the closing, did the Committee
15  have any certainty concerning the value of the
16  consideration, including assumed liabilities,
17  that Barclays was providing?
18         (Continued on the next page to include
19  the jurat.)
20
21
22
23
24
25

Page 76

N. PURCELL

1
2     MS. TAGGART:  Object to form.
3     A.   No.
4     MR. STERN:  I have no further
5  questions.
6     MS. TAGGART:  I have no questions.
7  Okay.
8     MR. STERN:  Off the record.
9     THE VIDEOGRAPHER:  That concludes the
10  video record for today.  The time is 11:51 A.M.
11
12         oOo
13
14
15
16
17
18
19         _____
           NOEL PURCELL
20
21  Subscribed and sworn to
   before me this    day
22  of      2010.
23
   _____
24
25

Page 77

N. PURCELL

1
2  CERTIFICATE
3  STATE OF NEW YORK )
                     : ss
4  COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9     That NOEL PURCELL, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14    I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18    I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23    In witness whereof, I have hereunto
24  set my hand this 13th day of January, 2010.
25         -------------------------------

20  (Pages 74 to 77)

Page 1

1

2                    BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

        --------------------------X

5

    In Re:

6                                 Chapter 11

7    LEHMAN BROTHERS            Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

10               Debtors.

        --------------------------X

11

12

13                    RULE 30(b)(6)

14            VIDEOTAPED DEPOSITION

15                      OF

16            BARRY W. RIDINGS

17            New York, New York

18         Friday, January 15, 2010

19

20

21

22

23

    Reported by:

24   ANNETTE ARLEQUIN, CCR, RPR

    JOB NO. 27090

25

Page 6

```
1              Ridings
2         (Deposition Exhibit 561A, Document
3   Bates stamped LAZ-A-00004543 through 4549,
4   marked for identification, as of this
5   date.)
6         (Deposition Exhibit 562A, Email dated
7   9/18/08 from Creswell to Distribution at
8   Lazard NYC, Bates stamped LAZ-C-00049033 to
9   49041, marked for identification, as of
10  this date.)
11        (Deposition Exhibit 563A, Email dated
12  9/18/08 from Descoteaux to Ridings, Bates
13  stamped LAZ-C-00049400 through 49405,
14  marked for identification, as of this
15  date.)
16        (Deposition Exhibit 564A, Email dated
17  10/8/08 from Descoteaux to Ridings and
18  Whiting with attachment, Bates stamped
19  LAZ-C-00063724 through 63817, marked for
20  identification, as of this date.)
21        *    *    *
22        THE VIDEOGRAPHER:  This is the start
23  of tape labeled No. 1 of the videotaped
24  deposition of Barry W. Ridings in the
25  matter In Re:  Lehman Brothers Holdings
```

TSG Reporting - Worldwide     877-702-9580

Page 7

```
1              Ridings
2   Inc.
3         This deposition is being held at 575
4   Lexington Avenue, New York, New York on
5   January 15th, 2010 at approximately 9:12
6   a.m.
7         My name is Carlos Lopez from TSG
8   Reporting, Inc. and I am the legal video
9   specialist.
10        The court reporter is Annette
11  Arlequin in association with TSG Reporting.
12  Will the court reporter please swear
13  in the witness.
14        *    *    *
15  B A R R Y   W.   R I D I N G S, called as a
16      witness, having been duly sworn by a
17      Notary Public, was examined and testified
18      as follows:
19  EXAMINATION BY
20  MR. SCHILLER:
21      Q.   Good morning, Mr. Ridings.
22      A.   Good morning.
23      Q.   My name is Jonathan Schiller and I
24  represent Barclays in this matter.
25          Would you please state for the record
```

TSG Reporting - Worldwide     877-702-9580

Page 8

```
1              Ridings
2   your name and your position at Lazard?
3        A.   Barry Ridings, R-i-d-i-n-g-s.
4   I'm vice chairman of investment
5   banking at Lazard.
6        I'm a managing director of the firm
7   and I co-head our global restructuring group.
8        I'm also chairman of Lazard Capital
9   Markets, which is our securities business and I
10  am also chairman of Lazard Middle Markets, which
11  is our middle market M&A practice.
12       Q.   Let's begin with the week
13  September 15th through September 19th, 2008 if
14  we can.
15       And do you recall appearing in court
16  before Judge Peck with Harvey Miller and
17  Mr. McDade on the 19th at the sale approval
18  hearing?
19       A.   Yes.
20       Q.   Can you describe the engagement of
21  Lazard in the week preceding that hearing?
22       A.   Yes.  On that Monday we got a phone
23  call from, I think it was Weil, Gotshal, asking
24  if we could come over for an hour or two, and I
25  arrived at Lehman's building kind of
```

TSG Reporting - Worldwide     877-702-9580

Page 9

```
1              Ridings
2   mid-afternoon and I don't think I left Lehman's
3   building for about 48 hours.  It turned out to
4   be longer than an hour or two.
5        And what we were asked to do is to
6   get re-engaged by Lehman, now in bankruptcy, to
7   act as their financial advisor.  That's a broad
8   description of our assignment.
9        Q.   Thank you.
10       During the course of that period
11  September 15th through September 19th, did you
12  reach a view whether there was a realistic
13  opportunity to sell the Lehman North American
14  business to any entity other than the Barclays?
15       MR. DAKIS:  Objection to form.
16       MR. CARDEN:  Objection.
17       A.   Again, to put things in context, that
18  was, and again, I've been doing this for
19  35 years, we were in unprecedented times and the
20  fact that an entity like Lehman Brothers could
21  actually file bankruptcy was unbelievable.
22       At the same point you had Bear
23  Stearns having just melted and been sold to
24  JPMorgan.
25       You had the problems at AIG and you
```

TSG Reporting - Worldwide     877-702-9580

## Page 10

Ridings

1
2  also had problems at Merrill Lynch, Morgan
3  Stanley, Goldman Sachs, and the securities
4  markets were probably in the worst condition
5  ever that one could imagine.
6        And so there had been efforts made
7  before the bankruptcy to do a transaction with a
8  number of parties.  None of those came to
9  fruition.  Lehman files bankruptcy.  They're
10 reapproached by Barclays to do a transaction.
11       In my mind I don't think there was an
12 alternative transaction available that could
13 have been done on any timely basis and the
14 passage of time was so critical given the
15 pressures on the market that this was not a
16 situation where you could take months or even
17 weeks to do a transaction.
18       Q.   Let me just try to understand the
19 last part of what you said.
20            By September 19th, 2008, had you
21 concluded that there was no alternative
22 transaction to the proposed sale to Barclays?
23            MR. CARDEN:  Objection to form.
24            MR. DAKIS:  Same objection.
25       A.   That's correct.

TSG Reporting - Worldwide    877-702-9580

## Page 11

Ridings

1
2       Q.   By September 19th, 2008, did you have
3  a view if the sale were not approved by Judge
4  Peck pursuant to Weil, Gotshal's motion that the
5  liquidation of the Lehman North American
6  business would pose enormous risks?
7            MR. CARDEN:  To whom?
8            Objection.
9            MR. DAKIS:  Same objection.
10           MR. SCHILLER:  Let me rephrase that.
11 BY MR. SCHILLER:
12      Q.   If there were no sale approved to
13 Barclays on September 9th, did you have a view
14 whether there would be the risk of enormous loss
15 to Lehman?
16      A.   That is my view, and more so if this
17 transaction didn't happen, I think the
18 repercussions in the financial market would have
19 been catastrophic to a number of other financial
20 institutions.
21           So the reverberation of a Lehman
22 liquidation would have had a major negative
23 impact on the U.S. capital markets.
24      Q.   You had past experience with Drexel
25 Burnham and the failure of that investment bank;

TSG Reporting - Worldwide    877-702-9580

## Page 12

Ridings

1
2  is that correct?
3       A.   Unfortunately, yes, I was a managing
4  director at Drexel when it also went bankrupt.
5       Q.   And did your experience there help
6  inform the views that you held on September 19th
7  as you've just described?
8       A.   Yes.
9       Q.   Was it possible to calculate the
10 potential losses to Lehman of a liquidation as
11 of September 19th with any certainty?
12      A.   I don't think you could have done it
13 with certainty because you would have been
14 making assumptions.
15           But in a financial meltdown of this
16 magnitude, the prices of securities would have
17 dropped by enormous amounts.
18      Q.   And it was your view on September 9th
19 that a sale to Barclays was superior to any
20 liquidation by Lehman?
21           MR. DAKIS:  Object to the form.
22      A.   Yes.
23      Q.   Since September 19th, have you
24 learned anything that would cause you to change
25 that conclusion?

TSG Reporting - Worldwide    877-702-9580

## Page 13

Ridings

1
2       A.   No.  I believe today that there was
3  no other alternative; that that was the best
4  alternative at the time.
5       Q.   Let me ask you to look at the Asset
6  Purchase Agreement, which is Exhibit 1 in this
7  proceeding, and I'm not going to ask you to
8  review it, I just want you to have it in mind.
9            You've seen the APA before, have you
10 not?
11      A.   Yes.
12      Q.   Did the APA provide for the purchase
13 of a business and its employees?
14           MR. CARDEN:  Objection.
15           MR. DAKIS:  Same objection.
16           MR. ROTHMAN:  Same objection.
17      A.   In -- the Asset Purchase Agreement
18 provides whatever it says it provides for.  In
19 my mind, Barclays did buy a business and it was
20 described in the Asset Purchase Agreement.
21      Q.   Was the sale to Barclays a precise
22 exchange of equal values of assets and
23 liabilities?
24           MR. DAKIS:  Objection to form.
25      A.   It was not a precise exchange.

TSG Reporting - Worldwide    877-702-9580

Ridings

1
2  Again, Barclays, in my mind, bought a business
3  and they paid certain cash, they assumed certain
4  liabilities and that's the value that they paid
5  the estate, and for that they got certain assets
6  and they got certain fixed assets and intangible
7  assets and people.
8      Q.    Let me ask you to look at the second
9  exhibit that I've placed in front of you,
10 Exhibit 25 in this proceeding, which is a
11 clarification letter between Lehman and
12 Barclays.
13          Do you see that?
14     A.    Yes.
15     Q.    When you were in court on
16 September 19th, at the time of your proffer to
17 Judge Peck, did you understand that the sale
18 documentation that Judge Peck was being asked to
19 approve included a Clarification Agreement that
20 was to be completed between the parties?
21     A.    I believe that's correct.
22     Q.    Let me ask you to look at the first
23 page of the Clarification Agreement, Exhibit 25,
24 and direct your attention to paragraph 1 (ii)
25 under "Purchased Assets."

Ridings

1
2  Do you see that?
3      A.    Yes.
4      Q.    And in that paragraph which addresses
5  the definition of purchased assets, the parties
6  identify assets that are going to be transferred
7  to Barclays, including, as you see under letter
8  A, the securities that are subject to the
9  Barclays Repurchase Agreement.
10         Do you see that?
11     A.    Yes.
12     Q.    And under paragraph B, Barclays is to
13 receive such securities and other assets held in
14 LBI's clearance boxes at the time of the
15 closing.
16         Do you see that?
17     A.    Yes.
18     Q.    And if I may ask you just to turn the
19 page and to note paragraph C which provides a
20 transfer to Barclays of exchange-traded
21 derivatives and any property that may be held to
22 secure obligations under such derivatives and
23 collateralized short-term agreements.
24         Do you see that?
25     A.    Yes.

Ridings

1
2      Q.    Do you also see that there are no
3  values given for these purchased assets in the
4  Clarification Agreement?
5      A.    That's correct.
6      Q.    The sale to Barclays was the purchase
7  of a business and the assets that went with the
8  business to the extent they were not excluded,
9  irrespective of what their value was, correct?
10         MR. DAKIS:  Objection to form.
11         MR. CARDEN:  Objection to form.
12         MR. ROTHMAN:  Objection.
13     A.    Again, my understanding is that
14 Barclays bought a business and in buying that
15 business they paid a certain amount of cash and
16 assumed certain liabilities, and for that they
17 got the assets in that business.
18         So I'm not sure if I answered your
19 question, but that is my understanding of the
20 transaction.
21     Q.    And values, specific values
22 associated with those assets, whether estimated
23 or otherwise, were not provided for in the APA
24 or the clarification letter, correct?
25         MR. CARDEN:  Objection to form.

Ridings

1
2      MR. DAKIS:  Same objection.
3      MR. ROTHMAN:  Same objection.
4      A.    That's correct.
5      Q.    Was this deal structured to be a
6  precise wash, Mr. Ridings?
7          MR. CARDEN:  Objection to form.
8          MR. DAKIS:  Objection.
9      A.    I do not think it was structured that
10 way.
11     Q.    Do you know whether there was
12 disagreement between Barclays and Lehman over
13 the actual values of assets or liabilities
14 involved in the transaction?
15         MR. CARDEN:  Objection to form.
16         MR. DAKIS:  Same objection.
17         MR. ROTHMAN:  Join in the objection.
18     A.    Yes.
19     Q.    What was your understanding generally
20 of such disagreement?
21     A.    My understanding is that, to put it
22 in context, we had a tumultuous week where the
23 market was extremely volatile and generally on a
24 down trend, and that throughout that week
25 Barclays had made the point that Lehman's marks

## Page 18

Ridings

1  Ridings
2  were not market or stale and that there was a
3  disagreement as to what the market value of
4  those securities actually were.
5      Q.   To your knowledge, was there
6  uncertainty that week over the values of the
7  assets or liabilities that were involved in the
8  transaction?
9          MR. CARDEN:  Objection to form.
10         MR. DAKIS:  Same objection.
11     A.   Absolutely.
12     Q.   Do you recall that the agreement
13 between the parties provided for no
14 representations or warranties concerning the
15 values of the assets and the liabilities in the
16 transaction?
17     A.   I think that's generally correct.
18     Q.   Was it also your understanding that
19 the purchase agreement, Exhibit 1 before you,
20 contained, as of September 19th, contained no
21 true-up or profit sharing mechanism?
22     A.   In this document, in the APA that was
23 signed, that's correct.
24     Q.   And as a result of that, is it fair
25 to say that the parties provided no contractual

TSG Reporting - Worldwide      877-702-9580

## Page 19

Ridings

1  Ridings
2  mechanism to make sure that the assets and the
3  liabilities involved in the transaction
4  ultimately matched?
5          MR. CARDEN:  Objection to form.
6          MR. DAKIS:  Objection to form.
7          MR. ROTHMAN:  Same objection.
8      A.   I don't think it was part of the
9  transaction that there was to be a match.
10     Q.   Thank you.
11         Let me ask you to turn to the next
12 exhibit that we placed before you, 561A.
13     A.   Yes.
14     Q.   561A are six pages of documents,
15 various schedules and time lines produced from
16 Lazard's records, Mr. Ridings, and let me ask
17 you to look first at the first page of the
18 exhibit, page 4543.
19         Do you see the part of this schedule
20 referred to as "Assets"?
21     A.   Yes.
22     Q.   And do you see the date on the top
23 right corner of 9/18/08?
24     A.   Yes.
25     Q.   Do you know who wrote that date there

TSG Reporting - Worldwide      877-702-9580

## Page 20

Ridings

1          Ridings
2  by any chance?
3      A.   Yes.
4      Q.   Who did?
5      A.   I did.
6      Q.   All right.  Does this reflect that
7  you received this schedule on 9/18?
8      A.   Yes.
9      Q.   If you look at the assets listed
10 there on the left side of the schedule, it
11 provides for none of the intangible assets
12 associated with the business sold to Barclays,
13 does it?
14     A.   No.
15     Q.   If you compare the totals for those
16 assets on page 4543 to the next page, 4544,
17 which is dated 9/16/08 at the top on the right
18 side.
19         Do you see that?
20     A.   Yes.
21     Q.   You see there is a change in the
22 estimate of the assets from $62.7 billion on the
23 9/18 balance sheet to $57.9 billion on the
24 September 18th draft balance sheet, correct?
25         MR. CARDEN:  Objection to form.

TSG Reporting - Worldwide      877-702-9580

## Page 21

Ridings

1          Ridings
2          MR. DAKIS:  Same objection.
3      A.   Yes.
4      Q.   Does this change reflect the downward
5  values that you were referring to earlier in
6  your testimony?
7          MR. CARDEN:  Objection to form.
8          MR. DAKIS:  Join in the objection.
9      A.   Just to be clear, the second page,
10 544, again, there's a date on the upper right
11 corner, but it appears to be set up roughly
12 similar to the first page that had my notes on
13 it.
14         There's one or two very slight
15 variations and obviously there are no headers
16 and it has a different date on it, and I believe
17 that SB is Steve Berkenfield's initials.
18     Q.   Right.
19     A.   But again, you can get the same point
20 that you're making on the first page, that in
21 those couple of days there was dramatic
22 decreases in the price of securities.
23     Q.   Turning again to what is not on page
24 4543 under "Assets," I asked you whether there
25 were intangible assets associated with the

TSG Reporting - Worldwide      877-702-9580

Page 22

1            Ridings
2   business that was being sold to Barclays that
3   are not reflected there and I believe you said
4   that is correct.
5         A.    Yes.
6         Q.    And to explore that briefly, there's
7   no reflection of purchased fixtures, fittings or
8   software listed among the assets there, correct?
9         A.    That's correct.
10        Q.    There are no transferred properties
11  leases listed there; isn't that right?
12        A.    Correct.  There are no fixed assets
13  either.
14        Q.    There are no fixed assets either.
15        A bit later on I'm going to take you
16  to a larger balance sheet and return to this
17  subject.
18        On the question of a wash, which I
19  mentioned a few minutes ago, did Lazard proffer
20  to the court at any time that this transaction
21  was to be a wash?
22        A.    No.
23        Q.    Did you in fact believe on
24  September 19th that this transaction was going
25  to be a wash?

TSG Reporting - Worldwide    877-702-9580

Page 23

1            Ridings
2         A.    Again, just to be clear what you mean
3   by wash, because that's not a term I've been
4   using, but that everything sold equals
5   everything purchased.
6         Q.    That's right.
7         A.    No.
8         Q.    Let me ask you to turn to the next
9   exhibit, I'm going to hold this one off because
10  we're going to return to this, which is 562A, a
11  six-page set of news articles distributed in
12  Lazard on September 18, 2008.
13        Do you see that?
14        A.    Yes.
15        Q.    And I'm just going to ask you about
16  the last page.
17        A.    The very last page?
18        Q.    The very last page of that exhibit,
19  which is part of a Reuters report.
20        You will see that by turning the page
21  before just to understand the context of what
22  I'm going to ask you to look at.
23        And this is a report on the impending
24  sale.  The second full paragraph on the last
25  page of 5628 says, "The deal would also lift

TSG Reporting - Worldwide    877-702-9580

Page 24

1            Ridings
2   Barclays' capital ratio even before the bank
3   completes a planned capital injection alongside
4   the deal because of a negative goodwill
5   adjustment from the deal amounting to about
6   $2 billion after tax."
7         Do you see that?
8         A.    Yes.
9         Q.    Does Barclays' statement on
10  September 17th as reported here by Reuters that
11  it expected to record a multibillion dollar
12  acquisition gain on the transaction, is that
13  statement inconsistent in any way with your
14  proffer in testimony to the court on
15  September 19th?
16        MR. CARDEN:  Objection to form.
17        MR. DAKIS:  Same objection.
18        MR. ROTHMAN:  Join in the objection.
19        A.    Again, my proffer didn't speak to how
20  Barclays is going to account for a transaction
21  and I don't know how Barclays accounted for the
22  transaction.
23        But my proffer was that this was the
24  highest and best alternative that we had.  In
25  fact the only alternative that we had.

TSG Reporting - Worldwide    877-702-9580

Page 25

1            Ridings
2         Q.    As the Reuters article reports,
3   Barclays made an announcement of this gain,
4   anticipated gain, two days before the hearing.
5         Is that a surprise to you that
6   Barclays anticipated a gain on this acquisition?
7         MR. DAKIS:  Objection to the form.
8   BY MR. SCHILLER:
9         Q.    As of September 19th.
10        MR. CARDEN:  Objection to form.
11        MR. DAKIS:  Objection.
12        MR. ROTHMAN:  Objection.
13        A.    It's not a surprise to me, but it's
14  Barclays' accounting, so again, I'm not going to
15  put a lot of relevance on the U.K. accounting
16  for this.
17        Q.    To your knowledge, there was no
18  limitation on whether Barclays could profit from
19  this trade, correct?
20        MR. CARDEN:  Objection to form.
21        MR. DAKIS:  Same objection.
22        MR. ROTHMAN:  Join in the objection.
23        A.    That's correct.
24        Just to be clear, if Barclays lost
25  money on this transaction, it would have been

TSG Reporting - Worldwide    877-702-9580

## Page 26

1          Ridings
2  the end of the U.S. capital markets.
3      Q.   Let me ask you to turn to the next
4  exhibit, 377A, which is Barclays' disclosed
5  acquisition gain on this transaction.  The
6  document was generated in February of 2009.
7          If you look at page 5844, you see the
8  valuation by Barclays of the financial assets
9  that it had purchased on September 22nd
10  amounting to $50 billion?
11     A.   Yes.
12     Q.   .160?
13          And it goes on below that to list
14  some of the other assets, some of which we
15  discussed earlier; intangibles, real estate,
16  fixtures, fittings and software.
17          Do you see that?
18     A.   Yes.
19     Q.   And that leaves a total of
20  $53,540,000,000 of assets acquired in the
21  transaction, correct?
22     A.   Yes.
23     Q.   And then if you return to the first
24  page of Exhibit 377A and you address line 39,
25  the gain on acquisition, you see that Barclays

TSG Reporting - Worldwide      877-702-9580

## Page 27

1          Ridings
2  recognized a gain of approximately $4.2 billion
3  on the acquisition, correct?
4      A.   Yes.
5      Q.   And is the gain that was recognized
6  as reported here inconsistent in any way with
7  your understanding of the sale on which you
8  proffered testimony on September 19, 2008?
9          MR. CARDEN:  Objection.
10          MR. DAKIS:  Objection.
11          MR. ROTHMAN:  Objection to the form.
12     A.   I don't think it's inconsistent.
13  It's just something different, the way Barclays
14  accounts for this.
15     Q.   Are you generally familiar with the
16  Rule 60 motion that was filed by Lehman in this
17  proceeding?
18     A.   In a very high-level fashion, yes.
19     Q.   And in terms of your high-level
20  review of the motion, you understand that it was
21  not filed by Weil, Gotshal, correct?
22     A.   That's right.
23     Q.   Based on everything that you know as
24  of today, do you believe your proffer in
25  testimony to the court on September 19th was

TSG Reporting - Worldwide      877-702-9580

## Page 28

1          Ridings
2  accurate and fair and appropriate?
3      A.   I do.
4      Q.   During the week of September 19,
5  2008, did you have an understanding whether
6  Barclays and Lehman were engaged in discussions
7  concerning Lehman's marks?
8      A.   They were.
9      Q.   And did Lehman exercise diligence
10  regarding that process?
11          MR. CARDEN:  Objection to form.
12          MR. DAKIS:  Same objection.
13     A.   Can you clarify the question, please?
14     Q.   You were familiar with discussions
15  between Barclays and Lehman concerning Lehman's
16  marks.
17     A.   Yes.
18     Q.   And did your diligence address those
19  discussions in any way?
20          MR. CARDEN:  His diligence?
21          MR. SCHILLER:  Lazard's diligence.
22          MR. CARDEN:  Objection to form.
23          MR. DAKIS:  Same objection.
24  BY MR. SCHILLER:
25     Q.   Did Lazard exercise a level of

TSG Reporting - Worldwide      877-702-9580

## Page 29

1          Ridings
2  diligence in reaching its opinions as to why
3  this transaction should be approved by the
4  court?
5          MR. CARDEN:  Objection to form.
6          MR. DAKIS:  Same objection.
7      A.   We did due diligence during the week
8  and that supported our conclusions at court.
9      Q.   And in the course of doing that
10  diligence, did you become aware of the process
11  in which Barclays and Lehman were engaged
12  concerning Lehman's marks?
13          MR. CARDEN:  Objection to form.
14          MR. DAKIS:  Same objection.
15     A.   Again, it was my understanding that
16  throughout the week Barclays had said that the
17  marks were not appropriate; that they were too
18  high because they were no longer market or
19  stale.
20          I nor anyone on my team were in any
21  meetings where people were talking about
22  specific securities and what the marks should
23  be.
24     Q.   In the proffer of your testimony on
25  September 19th, Mr. Miller said that you would

TSG Reporting - Worldwide      877-702-9580

Page 30

```
1              Ridings
2      testify that the parties exchanged numerous bids
3      and asks and turn countless drafts.
4              Do you recall that?
5         A.   Yes.
6         Q.   In terms of exchanging numerous bids
7      and asks, does that include this process of
8      discussing Lehman's marks?
9              MR. CARDEN:  Objection to form.
10        A.   It included everything that was being
11     discussed.
12        Q.   And including the exchange between
13     the parties concerning Lehman's marks.
14        A.   My understanding is that there was
15     significant discussions on what the appropriate
16     marks for various securities were.
17        Q.   Let me ask you to look at the next
18     exhibit I've put before you, 563A, which is an
19     email from Mr. Descoteaux to you on
20     September 18, 2008 transmitting prior email,
21     including an email from Gerard Reilly dated
22     September 17, 2008 regarding diligence items.
23             Do you see that?
24        A.   Yes.
25        Q.   Would you identify Mr. Descoteaux,
```

TSG Reporting - Worldwide    877-702-9580

Page 31

```
1              Ridings
2      please?
3         A.   David is a managing director in the
4      restructuring group at Lazard and worked with me
5      and for me on this transaction.
6         Q.   And would you identify Mr. Bruhmuller
7      as well.
8         A.   Arthur is -- I believe Arthur is
9      either a VP or director at Lazard.
10        Q.   Mr. Miller advised Judge Peck that
11     you, sir, were intimately involved in the
12     negotiations between Barclays and Lehman that
13     week of September 15th, correct?
14        A.   Yes, although I was not in every
15     single meeting because there literally were
16     multiple meetings going on at the same time.
17        Q.   Who was negotiating with Barclays on
18     behalf of Lehman, to your knowledge, during that
19     period?
20             MR. ROTHMAN:  Objection to form.
21             MR. DAKIS:  Same objection.
22        A.   My recollection is that Mark
23     Schaeffer, Bart McDade, and that's my direct
24     knowledge.  I'm sure there were other people
25     that were involved.
```

TSG Reporting - Worldwide    877-702-9580

Page 32

```
1              Ridings
2         Q.   Did you learn that week who Gerard
3      Reilly was by any chance?
4         A.   No, I do not know who he is.
5         Q.   As far as you know, did you
6      participate in any meetings with Gerard Reilly?
7         A.   I don't think so.
8         Q.   Mr. Reilly writes to Mr. Kelly on
9      September 17th, page 49402 of Exhibit 563A,
10     Mr. Ridings.
11        A.   I'm not sure I know who Martin Kelly
12     is either.
13             I do know Dan Flores.
14        Q.   Can you identify Mr. Flores for the
15     record, please?
16        A.   I don't know his exact title, but he
17     worked at Lehman Brothers.
18        Q.   All right.  Reilly's email to these
19     gentlemen says, "The first question is very
20     difficult.  My understanding of the deal is that
21     they will purchase our assets that remain in LBI
22     on the closing date, which will not be the same
23     as the assets on the 12th.  That purchase will
24     be at a fixed discount on the assets that remain
25     to reflect the bulk side of the purchase.  We
```

TSG Reporting - Worldwide    877-702-9580

Page 33

```
1              Ridings
2      can track our PL by assets category which gives
3      some indication of how much we have moved the
4      marks.  We can also provide assets as of the
5      16th with marks so they can get some
6      prospective.  Let me know what we need."
7              Do you see that?
8         A.   Yes.
9         Q.   That then is sent to Mr. Flores, as
10     we've noted, and he sends it on to your
11     colleague, Mr. Bruhmuller, who is asked, "What
12     are your thoughts on this?"
13             Do you see that?
14        A.   Yes.
15        Q.   And then Mr. Bruhmuller writes, "We
16     are trying to get a sense for how marks have
17     evolved since Friday.  I think the first
18     priority would be to see the inventory of what's
19     being sold, how the marks have evolved and info
20     on the buyer discount."
21             Would a discount as set forth in this
22     exhibit change in any way your support for this
23     transaction on September 19th?
24             MR. CARDEN:  Objection to form.
25             MR. DAKIS:  Same objection.
```

TSG Reporting - Worldwide    877-702-9580

## Page 34

Ridings

1
2  A.  My understanding was that there was
3  not a built-in discount, but given the fact that
4  we did not have a viable alternative, this --
5  the rationale he sets is a reasonable rationale;
6  that one would get a discount for a bulk
7  purchase, but that was not my understanding of
8  what the deal was.
9  Q.  If there had been a bulk purchase as
10  you understand that expression, would that have
11  concerned you in any way as of September 19th,
12  2008?
13  MR. CARDEN:  Objection.
14  MR. ROTHMAN:  Objection to form.
15  MR. DAKIS:  Same objection.
16  A.  Could you just clarify what you mean
17  by "concern"?
18  Q.  Would it have changed in any way your
19  proffer to the court on September 19th?
20  MR. ROTHMAN:  Same objection.
21  MR. CARDEN:  Same objection.
22  MR. DAKIS:  Same objection.
23  A.  I don't think so.  If you're telling
24  me someone wants a 90 percent discount, yes,
25  that doesn't make a lot of sense to me.

TSG Reporting - Worldwide    877-702-9580

## Page 35

Ridings

1
2  If you're telling me someone wants a
3  five or ten percent discount, that's not going
4  to change my proffer to the court in terms of we
5  still have the highest and best alternative and
6  it's better than liquidation.
7  Q.  So if Lazard provided Barclays with a
8  five percent or a ten percent discount in the
9  transaction before the court on September 19th,
10  that would not have changed your proffer to the
11  court in favor of the sale.
12  MR. DAKIS:  Objection to form.
13  MR. RAFFERTY:  Jonathan, you mean if
14  Lehman had provided?  You said if
15  Barclays --
16  MR. SCHILLER:  Let me rephrase the
17  question.
18  BY MR. SCHILLER:
19  Q.  If Barclays received a five or
20  ten percent discount off of Lehman's marks at
21  the time, that would not have changed your
22  recommendation to the court to approve the sale,
23  correct?
24  MR. CARDEN:  Objection.
25  MR. ROTHMAN:  Objection.

TSG Reporting - Worldwide    877-702-9580

## Page 36

Ridings

1
2  MR. DAKIS:  Join.
3  A.  Just a couple of comments.  To answer
4  your question, you need to put it in context of
5  the week that we're in, the markets are
6  extraordinarily volatile, things are changing
7  literally by the minute and generally things
8  were trending down, not up.
9  There was continued disagreement
10  between Barclays and Lehman as to what the
11  appropriate marks were and if you're saying a
12  five or ten percent discount off of the Lehman
13  marks, which is what Barclays has always said,
14  they didn't use percentages but they said your
15  marks are stale and they're not reflective of
16  what's happening in the market, the order of
17  magnitude that you've just discussed with me,
18  that would not change my opinion that this was
19  better than liquidation and it's the highest and
20  best and only alternative we had.
21  Q.  What order of magnitude would have
22  affected you?
23  MR. CARDEN:  Objection to form.
24  MR. DAKIS:  Same objection.
25  MR. ROTHMAN:  Join in the objection.

TSG Reporting - Worldwide    877-702-9580

## Page 37

Ridings

1
2  A.  Let me try and describe it this way:
3  What these securities were, some of them, were
4  very illiquid securities, so if we go to some
5  financial literature, for example, like Shannon
6  Pratt, who's a well-known author who writes
7  about valuing securities and illiquidity
8  discounts, what he writes is that illiquidity
9  discounts on securities, and that means
10  securities that cannot readily be sold, averages
11  35 to 40 percent.
12  Now again, everything is fact
13  specific but what you and I just discussed isn't
14  close to -- I don't think it's close to 35 or
15  40 percent, sort of illiquidity discount.
16  Q.  Did you have any understanding during
17  this period September 15th to September 19th
18  that any discount as discussed in the Reilly
19  email was a secret that Lehman was to not share
20  with anybody?
21  MR. CARDEN:  Objection to form.
22  MR. ROTHMAN:  Same objection.
23  MR. DAKIS:  Join in the objection.
24  A.  I'm sorry.  Can you rephrase that?
25  Q.  Sure.

TSG Reporting - Worldwide    877-702-9580

Page 38

Ridings

1
2   A.   The objections... I lost track.
3   Q.   The Reilly email which goes to Arthur
4   and then to Descoteaux refers to a discount of
5   some sort, does it not?
6   A.   I think it says a bulk market
7   discount.
8   Q.   Did Lazard have any understanding
9   that such a discount was a secret not to be
10  shared outside of Lazard?
11       MR. CARDEN:  Objection to form.
12       MR. DAKIS:  Same objection.
13  A.   I have no knowledge of that.
14  Q.   At any point that week in the
15  negotiations between Barclays and Lehman in
16  which you participated, were there closed or
17  secret discussions of any kind as far as you
18  could tell?
19       MR. CARDEN:  Objection to form.
20       MR. DAKIS:  Same objection.
21  A.   There were no secret discussions.  By
22  closed, the door was closed.  I'm not sure what
23  you mean by closed.
24  Q.   Well, I think you've answered my
25  question.

TSG Reporting - Worldwide     877-702-9580

Page 39

Ridings

1
2   A.   I mean things that were discussed in
3   the meetings, I reported back to the parties at
4   Lehman and if appropriate, counsel.
5   And generally I'm trying to think of
6   a meeting that I was at where there was not a
7   Lehman person with me and none -- the week kind
8   of runs together, but I actually can't think of
9   any meetings that I was in a room with Barclays
10  without a Lehman person with me.
11  Q.   So as far as you recall, there was
12  nothing secret about Barclays' assertion that
13  the Lehman marks were stale and too high.
14       MR. DAKIS:  Objection to form.
15  Mischaracterizes his testimony.
16  A.   They said that all the time.  There's
17  nothing secret about that.
18  Q.   Let me ask you to look at the next
19  exhibit, Exhibit 20, which is a Lehman email
20  dated September 16th from Mr. Tonucci to
21  Mr. Lowitt.
22  Do you see that?
23  A.   Yes.
24  Q.   And this email chain below is an
25  email from Mr. Kelly to Lowitt early in the

TSG Reporting - Worldwide     877-702-9580

Page 40

Ridings

1
2   morning of September 16th --
3   A.   Yes.
4   Q.   -- saying, "Well, it took all night
5   and lots of back and forth, but the deal was
6   done and ready for the board.  Final price did
7   not change meaningfully.  Approximately a
8   $5 billion all-in economic loss versus our marks
9   and $3.6 billion of residential assets left
10  behind."
11  Do you see that?
12  A.   Yes.
13  Q.   Do you have an understanding whether
14  the "$5 billion all-in economic loss versus our
15  marks" refers to the difference between what
16  Barclays thought the assets were worth versus
17  the Lehman marks?
18       MR. CARDEN:  Objection to form.
19       MR. DAKIS:  Objection to form.
20       MR. ROTHMAN:  Objection to form.
21  A.   I believe that's true, but again, I
22  didn't write this and I'm not familiar with it.
23  Q.   Is this document and what it purports
24  consistent with your understandings of the
25  discussions between the parties that week?

TSG Reporting - Worldwide     877-702-9580

Page 41

Ridings

1
2       MR. CARDEN:  Objection to form.
3       MR. DAKIS:  Objection to form.
4       MR. ROTHMAN:  Objection to form.
5   A.   It's not inconsistent.  The
6   discussion that week are the market was falling
7   rapidly and the marks were not current and they
8   were stale.
9   But again, my understanding of the
10  transaction is they were buying a business and
11  in buying a business, they got assets and
12  liabilities.
13  Q.   Is there anything inconsistent in
14  this exhibit with your proffer in testimony
15  before the court on September 19th in support of
16  the sale?
17       MR. ROTHMAN:  Objection to the form.
18       MR. CARDEN:  Objection to the form.
19       MR. DAKIS:  Objection to the form.
20  A.   I don't think so.
21  Q.   Let me ask you to look at the next
22  exhibit, Exhibit 21, sir, which is another
23  internal email, this one dated September 18,
24  2008 from Mr. Kirk to Mr. Reilly in response to
25  a previous email from Reilly that is also set

TSG Reporting - Worldwide     877-702-9580

| Page 42 | Page 43 |

**Page 42**

Ridings

1
2  forth on page 9627.
3        Do you see that?
4    A.  Yes.
5    Q.  And in Mr. Reilly's email that begins
6  this particular chain on this page, there is a
7  reference to "open issues on the deal" and he
8  writes, "I need some help resolving these
9  issues."
10       And then at paragraph 3 Mr. Reilly
11  wrote, "Not clear on the amount of block
12  discount or how we make it happen.  Defaulting
13  on repo could be the best as discount could be
14  taken from haircut.  If not, then we need to
15  give business an allocation of block discount so
16  they can mark down the books tonight.  Does that
17  create a problem as it could tip the broker
18  early?  Would we rather have that be in the sale
19  price tomorrow?"
20       Do you see that?
21    A.  Yes.
22    Q.  Is there anything in Exhibit 21 that
23  is inconsistent with your support for the sale
24  on September 19, 2008?
25       MR. CARDEN:  Objection to the form.

TSG Reporting - Worldwide    877-702-9580

**Page 43**

Ridings

1
2       MR. DAKIS:  Objection to the form.
3       MR. ROTHMAN:  Objection to the form.
4    A.  There are things in here I actually
5  don't understand.  This is not a document I'm
6  familiar with, but I don't understand what he
7  says could create a problem as it could tip the
8  broker early.  I just don't know what that
9  means.
10       And again, my understanding is that
11  this is essentially what we talked about.  I
12  don't recall negotiations where people said I
13  want a block bulk sale discount.
14       But there's nothing here with those
15  provisos that would cause my testimony to the
16  court to be different.  This was the only
17  alternative we had.  It is better than
18  liquidation.
19    Q.  By September 19, 2008, did you
20  determine that the transaction which had first
21  taken form on September 16th and 17 had been
22  completely restructured?
23    A.  Yes.
24    Q.  Can you describe that restructuring
25  generally?

TSG Reporting - Worldwide    877-702-9580

**Page 44**

Ridings

1
2    A.  My understanding is that, and again,
3  this is top level, that Lehman had gone to the
4  Fed and pled certain securities and the Fed had
5  lent Lehman money, and the Fed said, for
6  whatever reasons, they said, This is not going
7  to work for us, Barclays.  We essentially need
8  you to step into our shoes."  So Barclays
9  stepped into the shoes of the Fed.
10       And so the securities that were
11  originally going to go to Barclays and the
12  original deal Lehman didn't have anymore, so
13  Barclays stepped into the shoes of the Fed and
14  the transaction was restructured around that.
15    Q.  You mentioned securities that Lehman
16  did not have anymore.
17       Could you describe what you meant by
18  that?
19    A.  Again, my general understanding, that
20  again, Lehman had to fund its business every
21  day.  If it didn't have funding, it would have
22  to liquidate.  And in order to get funding, they
23  would pledge securities with the Fed and they
24  would get overnight loans against that.  And
25  without the liquidity, they couldn't open for

TSG Reporting - Worldwide    877-702-9580

**Page 45**

Ridings

1
2  business and we would have been in liquidation.
3       For whatever reason the Fed at some
4  point said, "This doesn't work for me where I'm
5  your bank, Barclays.  If you're going to buy
6  this company, you're going to buy me out of my
7  position right now."
8       Again, this is generalization.  I'm
9  sure there's a lot of legal specifics that I'm
10  glossing over.
11    Q.  At that time of the discussions
12  concerning the Fed repo, do you know whether
13  counterparties had been seizing Lehman
14  securities that week?
15    A.  My understanding is they had been.
16  The one that comes to mind is the commodity
17  exchange, but that's all I recall actually.
18    Q.  So were there Lehman securities that
19  had been available to Barclays on September 16th
20  or 17th that were no longer available to Lehman
21  by the 18th and the 19th?
22    A.  I think that's correct.
23    Q.  Let me ask you to go back to
24  Exhibit 561A, which is a series of schedules and
25  balance sheets that I went over with you

TSG Reporting - Worldwide    877-702-9580

## Page 46

Ridings

1
2  earlier, and ask that you turn to the second to
3  the last page, 4548, which has the word
4  "Timeline" at the top.
5      Do you see that?
6  A.   Yes.
7  Q.   Do you know who prepared this
8  document?
9  A.   I don't know who prepared it.
10     I do know that it's not a Lazard
11 template so we did not prepare it.
12 Q.   Did you understand that there was a
13 Fed -- that there was a haircut in the Fed repo
14 of approximately $4.7 billion?
15 A.   I wouldn't characterize it that way.
16     I would characterize it that when
17 people go to the Fed to borrower money, the Fed
18 does not lend you dollar for dollar.  They're
19 going to lend you less than the collateral that
20 you give them.
21 Q.   And did you understand that the
22 difference between what the Fed was loaning and
23 the collateral it was pledged was approximately
24 $4.7 billion?
25 A.   I don't know the specifics, but I

TSG Reporting - Worldwide    877-702-9580

## Page 47

Ridings

1
2  that's order of magnitude correct.
3  Q.   And did you also understand that when
4  Barclays stood in the shoes of Fed with respect
5  to the repo, the ratio of the loan to the
6  pledged collateral was consistent with that Fed
7  ratio?
8      MR. CARDEN:  Objection to form.
9      MR. DAKIS:  Same objection.
10 A.   I'm not sure I know the answer to
11 that question.
12 Q.   If you look at the exhibit I've
13 placed in front of you where it provides under
14 "Thursday," a reference to the "the Fed
15 facility" and it's written, "Barclays wires $45
16 billion in cash to JPMorgan, expects to receive
17 $49.6 billion in securities," do you understand
18 that to be a reference to the Fed repo we've
19 been discussing in which Barclays stood in the
20 Fed's shoes?
21 A.   I think that's correct.
22 Q.   I've seen an email in which you
23 mentioned that during the day on Thursday you
24 were talking to creditors, you were in a meeting
25 with creditors.

TSG Reporting - Worldwide    877-702-9580

## Page 48

Ridings

1
2  Do you recall meeting with creditors
3  on Thursday?
4      MR. CARDEN:  Objection to form.
5      MR. DAKIS:  Same objection.
6  A.   My recollection is that we had a
7  meeting at Weil, Gotshal on Thursday with some
8  of the creditors.
9  Q.   Was there a discussion of this
10 substantial change in the transaction in terms
11 of the role of the Fed repo?
12 A.   I actually don't recall specifically.
13 I would have thought it would have been
14 discussed, but I don't recall.
15 Q.   Before Judge Peck, Harvey Miller
16 proffered your testimony and when he did, he
17 offered to the court your testimony that the
18 negotiations between Lehman and Barclays that
19 week were, quote, arm's length, difficult and
20 aggressively negotiated by the parties.
21     Was that accurate?
22 A.   Yes.
23 Q.   Mr. Miller also proffered as your
24 testimony that the sales agreement between
25 Lehman and Barclays that was before the court

TSG Reporting - Worldwide    877-702-9580

## Page 49

Ridings

1
2  was, quote, the result of good faith
3  negotiations.
4      Did you believe that at the time?
5  A.   Yes.
6  Q.   Based on everything that you know
7  today, was this proffer of your testimony to the
8  court on September 19th fair and accurate?
9  A.   I'm struggling with fair.
10     It certainly was accurate and I
11 attempted to be accurate, and I believe today I
12 was accurate.
13 Q.   Have you become aware of anything
14 since that hearing that has led you to believe
15 that the information you received from Lehman
16 was inaccurate in any way?
17 A.   I do not believe that Lehman gave me
18 inaccurate information.  They -- in an
19 unbelievable stressful period, they gave us
20 whatever information they had.  Remember, things
21 were changing by the second.
22 Q.   Do you have any reason to believe
23 that those at Lehman who were dealing with
24 Barclays that week were not acting in good
25 faith?

TSG Reporting - Worldwide    877-702-9580

## Page 50

Ridings

1  Ridings
2      A.   I have no reason to believe that to
3  be the case.
4      Q.   Let me include in that question
5  Mr. McDade, Mr. Tonucci, Mr. Kirk and
6  Mr. Lowitt.
7          Do you have any reason to believe any
8  of them did not act in good faith in their
9  dealings with Barclays leading up to
10  September 19th?
11      A.   I think they all acted in good faith.
12  I feel very comfortable in making
13  that statement with respect to Bart, since I got
14  to know him so well.
15          And I would say for Ian, he's an
16  officer of a company.  He had fiduciary duties
17  that he has.
18          I believe it to be the case for the
19  other two, although I had only met them one or
20  two times.
21      Q.   Do you recall whether the contractual
22  documentation between the parties required as a
23  closing condition that a number of officers of
24  Lehman go to Barclays?
25      A.   Yes.

TSG Reporting - Worldwide    877-702-9580

## Page 51

Ridings

1  Ridings
2      Q.   The individuals I've just named,
3  McDade, Tonucci, Kirk, Lowitt, were they
4  included in that conditions?
5          MR. CARDEN:  Objection to form.
6          MR. DAKIS:  Objection to form.
7      A.   I'm not sure about Kirk.
8  Certainly the other three.
9      Q.   You may have answered this already
10  but I want to be clear.
11          Did you have an understanding from
12  your interactions with these gentlemen that they
13  knew they had a fiduciary duty to Lehman that
14  week?
15      A.   I had no discussion on that point
16  with Kirk or Tonucci, or Lowitt for that case,
17  but Lowitt is an officer.  I mean he has a
18  fiduciary duty.
19          With respect to Bart, I think it was
20  clear that Bart knew he had to be the honest
21  broker.
22      Q.   As a general matter, was it your
23  understanding that week that Lehman's financial
24  inventory was uncertain and changing constantly?
25          MR. CARDEN:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

## Page 52

Ridings

1  Ridings
2      A.   I'm going to ask you to clarify
3  "uncertain."
4      Q.   Let me ask only about the value of
5  the Lehman inventory.  You've talked previously
6  about the downward pressures, the tumultuous
7  market conditions.
8          Let me ask you whether you understood
9  that the value of Lazard's financial inventory
10  was uncertain.
11      A.   Of Lehman.
12      Q.   Lehman's financial inventory.
13      A.   We have no financial inventory.
14      Q.   Let me start again.
15          During that week of September 15th
16  through September 19th, was it your view that
17  the value of Lehman's financial inventory was
18  uncertain and changing constantly?
19          MR. CARDEN:  Objection to form.
20          MR. DAKIS:  Objection.
21          MR. ROTHMAN:  Objection to form.
22      A.   It was certainly changing constantly,
23  you know, by the hour and the markets were under
24  incredible stress and the general trend of that
25  during the week was downward.

TSG Reporting - Worldwide    877-702-9580

## Page 53

Ridings

1  Ridings
2      Q.   In your proffer to Judge Peck, you
3  are quoted as stating, "The sale of LBI must be
4  immediately consummated or there will be little
5  or nothing left to sell."
6          Is that accurate?
7      A.   I think that's what he said, yes.  I
8  think he said about what I would say, yes.
9      Q.   And you agree with that proffer.
10      A.   Yes.
11      Q.   Let me ask you a couple more
12  questions about Exhibit 561A, which I have --
13  which you have before you.
14          I'm going to ask you to turn to page
15  4545, which is another balance sheet.
16          When you were in court with
17  Mr. Miller on September 19th, do you recall his
18  statement to Judge Peck that there would be
19  "$2 billion of exposure to transfer employees"
20  for Barclays?
21      A.   I think that's generally correct.
22      Q.   And as regards cure payments, do you
23  recall that Mr. Miller said to the court that
24  there was $1.2 billion potential exposure to
25  Barclays for contracts and leases that Barclays

TSG Reporting - Worldwide    877-702-9580



Page 54

Ridings

1
2 may assume?
3        MR. CARDEN:  Objection to the form.
4        MR. DAKIS:  Objection to the form.
5        MR. ROTHMAN:  Objection to the form.
6    A.   I think that's what he said, yes.
7    Q.   Did you have an understanding that
8 these were rough Lehman estimates that
9 Mr. Miller was describing?
10        MR. CARDEN:  Objection to form.
11        MR. DAKIS:  Same objection.
12        MR. ROTHMAN:  Objection.
13    A.   Yes.  I don't think there was any
14 specific number for all the employees.  The year
15 hadn't been finished yet, so that was an
16 estimate of what -- it was an upward estimate.
17 If they were going to keep the employees, they
18 were going to have to pay them to keep them.
19        The other one, my understanding is it
20 was an estimate and actually the number had
21 started out higher and had come down.  It was an
22 estimate.
23    Q.   And in terms of a compensation, would
24 those payments be contingent upon how many
25 people actually transferred to Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 55

Ridings

1
2        MR. CARDEN:  Objection to form.
3        MR. ROTHMAN:  Same objection.
4        MR. DAKIS:  Same objection.
5    A.   That's certainly one of the factors,
6 yes, and you can't force people to work for
7 Barclays.
8    Q.   So at the page I mentioned earlier,
9 4545 of 561A, on the left side of the balance
10 sheet there are accrued amounts for payables,
11 including compensation and trade liabilities.
12        Do you see that?
13    A.   Yes.
14    Q.   And those accruals there as adjusted
15 are less than the numbers that Mr. Miller gave
16 the court Friday night, correct?
17        MR. CARDEN:  Objection to form.
18    A.   Correct.
19    Q.   Is there any information on page 4545
20 that is inconsistent with your proffer in
21 testimony in support of the sale on
22 September 19th?
23        MR. CARDEN:  The whole page?
24 Objection to form.
25        MR. DAKIS:  Same objection.

TSG Reporting - Worldwide    877-702-9580

Page 56

Ridings

1
2    A.   Well, with respect to those two line
3 items we've been talking about, it does not
4 change my proffer.
5        We'd have to talk about the other
6 line items otherwise.
7        MR. SCHILLER:  Okay.  Why don't we
8 take a short break and I'll just have a
9 little bit more.
10        THE VIDEOGRAPHER:  The time is 10:16
11 a.m.  We're going off the record.
12        (Recess is taken.)
13        THE VIDEOGRAPHER:  The time is 10:39
14 a.m.  We're back on the record, video
15 No. 2.
16 BY MR. SCHILLER:
17    Q.   Mr. Ridings, let me ask you to look
18 at the last exhibit that I've put in your pile,
19 564A.
20    A.   Yes.
21    Q.   And this is a Lazard -- an Alvarez &
22 Marsal presentation to the Creditors Committee
23 that was sent to David Descoteaux and copy to
24 you on October 8, 2008, correct?
25    A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 57

Ridings

1
2        MR. CARDEN:  Objection to the form.
3        MR. DAKIS:  Same objection.
4 BY MR. SCHILLER:
5    Q.   And may I ask you to turn to the next
6 to last page, 63753, please, where Alvarez &
7 Marsal make reference to the, quote, sale of
8 Lehman Brothers to Barclays.
9        Do you see that?
10    A.   Let me make sure we're on the same
11 page.  That was kind of the middle of my deck,
12 so it's page 28 on the bottom left?
13    Q.   Yes, sir.
14    A.   Okay.  Thank you.
15    Q.   You made mention earlier in your
16 testimony to Lehman stale marks.
17        Do you recall that?
18    A.   Yes.
19    Q.   Let me point you to the first bullet
20 under "Assets Purchased," which reads,
21 "43.1 billion Repo Assets.  Book value per
22 Lehman stale marks; negotiated a $5. billion
23 reduction."
24        Do you see that?
25    A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 58

Ridings

1
2    Q.   If this $5 billion reduction is what
3    Mr. Reilly meant in his email that we've looked
4    at concerning bulk discount or block discount,
5    then this was information known to Lazard,
6    correct?
7            MR. CARDEN:  Objection.
8            MR. DAKIS:  Objection to form.
9            MR. ROTHMAN:  Objection.
10   A.   Can you restate that, please.
11   Q.   Sure.
12        We looked at Mr. Reilly's email that
13   Mr. Descoteaux and Arthur received.
14   A.   Yes.
15   Q.   And he made reference to a bulk
16   discount there.
17        Do you recall that?
18   A.   He had a reference to, yes.
19   Q.   And you've also testified to Lazard's
20   knowledge of the negotiation between Barclays
21   and Lehman over Lehman's stale marks, correct?
22   A.   Yes.
23   Q.   And if the reference by Reilly to a
24   discount was a reference to a negotiated
25   $5 billion reduction as written by Alvarez &

TSG Reporting - Worldwide    877-702-9580

Page 59

Ridings

1
2    Marsal here, then that was something that Lazard
3    had knowledge of, correct?
4            MR. DAKIS:  Objection to the form.
5            MR. ROTHMAN:  Objection to the form.
6    A.   Again, my knowledge is I don't recall
7    any discussions where people talked about bulk
8    discounts in the negotiation.
9         I do recall that Barclays
10   consistently said the marks are not current.
11        What this says, I don't know if it's
12   related to what Reilly said at all, but Barclays
13   clearly thought the assets they were getting
14   were not worth what Lehman had them on their
15   books for.
16        And again, remember, they bought a
17   business and the business was conveyed by some
18   assets.  This page clearly doesn't list all the
19   things, the gives and takes of the business.
20   This only has a couple of them.
21   Q.   I direct your attention back to
22   Exhibit 561A for a moment, and on the second
23   page, 4544, on the balance sheet, there is a
24   spread between the estimated long positions of
25   $72,650,000,000 and the short positions of

TSG Reporting - Worldwide    877-702-9580

Page 60

Ridings

1
2    $68.400 million, correct?
3            MR. CARDEN:  Objection to form.
4            MR. DAKIS:  Same objection.
5    A.   There is a difference, yes.
6    Q.   And if that is what Reilly meant when
7    he referenced discount, this was also a
8    difference known to Lazard as of September 16th,
9    correct?
10           MR. CARDEN:  Objection to form.
11           MR. DAKIS:  Objection to the form.
12           MR. ROTHMAN:  Objection to the form.
13   A.   Again, I don't know what Reilly
14   meant.  I had seen this schedule, it came out of
15   our files and I obviously know what the schedule
16   says, and there is a difference between total
17   adjusted assets and total liabilities.
18   Q.   And what is that difference, roughly?
19   A.   It's about $4 billion.
20   Q.   Let me ask you to look at the first
21   exhibit again, the APA, and return again to page
22   6, the definition of "Purchased Assets,"
23   Mr. Ridings, please.
24   A.   Yes.
25   Q.   And you see at subparagraph D there

TSG Reporting - Worldwide    877-702-9580

Page 61

Ridings

1
2    is a reference to government securities,
3    commercial paper, corporate debt, corporate
4    equity exchange, traded derivatives and
5    collateralized short-term agreements with a book
6    value as of the date here of approximately $70
7    billion long positions?
8    A.   Yes.
9    Q.   Do you recall when you were in court
10   on September 19th that one of Weil, Gotshal's
11   partners, Lori Fife, explained to the court that
12   Lehman was originally selling long positions of
13   approximately $70 billion, but today,
14   September 19th, was selling assets with a value
15   of $47.4 billion.
16        Do you remember that?
17   A.   I think that's what she said, yes.
18   Q.   Do you know how that $47.4 billion
19   number was derived?
20   A.   I'm not sure how it was derived.
21   Q.   And if you look at the purchased
22   assets as defined here, there were a number of
23   assets purchased by Barclays in addition to the
24   long positions, correct?
25           MR. CARDEN:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 62

```
 1              Ridings
 2        MR. DAKIS:  Same objection.
 3     A.   If you're asking did they buy more
 4  than what is in paragraph D, the answer is yes.
 5  There are lots of letters here, co-signs for
 6  3 pages, what they bought.
 7        Q.   And did those other categories that
 8  you're looking at there, including the
 9  intangibles, furniture and equipment, the
10  residential real estate, mortgages, provide
11  potentially substantial but unquantified values
12  to Barclays?
13        MR. ROTHMAN:  Objection to form.
14        MR. DAKIS:  Same objection.
15     A.   I'm not sure I understand the
16  question.
17        Q.   In addition to the $70 billion long,
18  these other assets listed there are not
19  quantified, but they provide substantial but
20  unquantified value in the sale, don't they?
21        MR. DAKIS:  Objection to form.
22        MR. ROTHMAN:  Same objection.
23     A.   Let me see if I can understand.
24        Again, I think Barclays bought a
25  business and the form of the transaction is
```

TSG Reporting - Worldwide    877-702-9580

Page 63

```
 1              Ridings
 2  identified in assets and there's a laundry list
 3  of running up to letter S of the various things
 4  they bought.  And again, some of these include
 5  goodwill and software and things of that like,
 6  and then you also have people.  I mean that's
 7  not -- you can't convey people but that's
 8  something else that Barclays got.
 9        So I think that's the answer.  I mean
10  the only number here I think is the approximate
11  number of $70 billion for subsection D.
12        Q.   When you appeared before the court on
13  September 19th, did you have any certainty as to
14  the value of all purchased assets that were to
15  be conveyed to Barclays?
16        MR. CARDEN:  Objection to form.
17        MR. ROTHMAN:  Objection to form.
18     A.   By "certainty" you mean did I know
19  exactly what they were worth that day.
20        Q.   Let me ask it again.
21        Did you have any understanding when
22  you testified before the court on September
23  19th, what the value that day was of the assets,
24  all the purchased assets that were to be
25  conveyed to Barclays?
```

TSG Reporting - Worldwide    877-702-9580

Page 64

```
 1              Ridings
 2     A.   If you recall, the hearing went till
 3  sometime Saturday morning.  No one in the
 4  courtroom had closing marks for Friday during
 5  the hearing, so I think the answer is I didn't
 6  know with certainty what the dollar number was
 7  of the assets conveyed.
 8        Q.   And is it also your testimony that in
 9  your view no one could have known?
10        MR. ROTHMAN:  Objection to form.
11        MR. DAKIS:  Same objection.
12     A.   Again, we were selling a business.
13  They were buying a business and they agreed to
14  assume certain liabilities and they paid a
15  certain amount of cash.  They were taking --
16  they were getting these assets.
17        Once they owned it, it was their
18  risk.  When the markets opened Monday, the
19  markets could have gone up or down and that was
20  their risk.  I guess it's really Tuesday.
21  Whenever the deal closed.
22        But at 1:00 a.m. Saturday morning, I
23  don't think any of us had a piece of paper that
24  said the closing marks on these securities are
25  X.  And even if there were, those were the
```

TSG Reporting - Worldwide    877-702-9580

Page 65

```
 1              Ridings
 2  Lehman numbers.  Those may or may not be what
 3  Barclays thought they were worth.
 4        Q.   So you didn't rely on any precise
 5  valuation of assets and liabilities when you
 6  recommended approval of the sale to the court on
 7  September 19th.
 8        MR. CARDEN:  Objection to form.
 9        MR. DAKIS:  Same objection.
10     A.   Again, my testimony was that it was
11  the highest and best alternative that we had,
12  and the alternative was liquidation.  I was
13  confident and remain confident that this
14  transaction was better than a liquidation would
15  have been.
16        Q.   Earlier in your testimony you made
17  reference to consequences of any loss on the
18  part of Barclays as a result of its purchase of
19  this business.
20        Can you describe for me what you
21  meant in your response earlier?
22     A.   Sure.
23        That didn't go into the consideration
24  of whether I thought this was a good or bad
25  deal.  Barclays was taking a risk.
```

TSG Reporting - Worldwide    877-702-9580

Page 66

```
 1                    Ridings
 2        I was making a comment kind of as a
 3    U.S. citizen.  If Barclays had expended this
 4    money and the capital markets continued to fall,
 5    there was a chance Barclays would then
 6    subsequently fail, which would have meant that
 7    Goldman, Morgan Stanley, the list goes on and on
 8    of firms that may fail.  It -- literally we were
 9    talking about the end of the capital markets as
10    we knew them that week.  It was that bad.
11        A year-and-a-half later you may say
12    uh, you're overreating, but I've done this for
13    35 years.  I can't stress to you the
14    unbelievable nature of that week.
15        So Barclays took a huge risk and if
16    this transaction failed for Barclays, it was a
17    bet the ranch transaction for Barclays.
18        But that had nothing to do with my
19    opinion as to whether this was the best price
20    and deal for Lehman.
21        Q.   And it was your opinion that it was,
22    correct?
23        A.   What I said in my proffer and on the
24    stand, this was the highest and best that we had
25    and it was clearly better than liquidation.
```

TSG Reporting - Worldwide    877-702-9580

Page 67

```
 1                    Ridings
 2        MR. SCHILLER:  Thank you,
 3    Mr. Ridings.
 4        MR. CARDEN:  Take a break?  Take a
 5    short break.
 6        MR. SCHILLER:  Sure.
 7        THE VIDEOGRAPHER:  The time is 10:55
 8    a.m.  We're going off the record.
 9        (Recess is taken.)
10        MR. CARDEN:  We don't have any
11    questions.
12        (Time noted:  10:57 a.m.)
13
14
15    _____
16        BARRY W. RIDINGS
17
18
19    Subscribed and sworn to before me
20    this      day of      2010.
21
22    _____
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 68

```
 1
 2            C E R T I F I C A T E
 3
 4    STATE OF NEW YORK   )
 5                        ) ss.:
 6    COUNTY OF QUEENS    )
 7
 8        I, ANNETTE ARLEQUIN, a Notary Public
 9    within and for the State of New York, do
10    hereby certify:
11        That BARRY W. RIDINGS, the witness
12    whose deposition is hereinbefore set forth,
13    was duly sworn by me and that such
14    deposition is a true record of the
15    testimony given by such witness.
16        I further certify that I am not
17    related to any of the parties to this
18    action by blood or marriage; and that I am
19    in no way interested in the outcome of this
20    matter.
21        IN WITNESS WHEREOF, I have hereunto
22    set my hand this 15th day of January, 2010.
23
24    ----------------------------------
25        ANNETTE ARLEQUIN, CCR, RPR
```

TSG Reporting - Worldwide    877-702-9580

Page 69

```
 1
 2                I N D E X
 3
 4    Witness                    Page
 5    BARRY W. RIDINGS
 6        MR. SCHILLER              7
 7
 8        I N D E X  O F  E X H I B I T S
 9    Description                 Page
10
      Deposition Exhibit 561A, Document Bates      6
11    stamped LAZ-A-00004543 through 4549
12
      Deposition Exhibit 562A, Email dated         6
13    9/18/08 from Creswell to Distribution
      at Lazard NYC, Bates stamped
14    LAZ-C-00049033 to 49041,
15
      Deposition Exhibit 563A, Email dated         6
16    9/18/08 from Descoteaux to Ridings,
      Bates stamped LAZ-C-00049400 through
17    49405
18
      Deposition Exhibit 564A, Email dated         6
19    10/8/08 from Descoteaux to Ridings and
      Whiting with attachment, Bates stamped
20    LAZ-C-00063724 through 63817
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 1

1          HIGHLY CONFIDENTIAL - J. RODEFELD

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF JOHN RODEFELD

14            New York, New York

15            August 27, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24294

Page 6

HIGHLY CONFIDENTIAL - J. RODEFELD

1       HIGHLY CONFIDENTIAL - J. RODEFELD
2    Schiller & Flexner on behalf of Barclays.
3       MR. TAMBE:  And we have counsel on the
4    phone as well?
5       MR. O'BRIEN:  This is Tom O'Brien at
6    Quinn Emanuel in Los Angeles on behalf of
7    the Creditors Committee.
8    BY MR. TAMBE:
9       Q.   Mr. Rodefeld, I'm going to ask you
10   some questions about the Lehman/Barclays
11   transaction and what role, if any, you may have
12   played in connection with that transaction.  And
13   the time period I'm going to be focused on is
14   really sort of September 2008, and to the extent
15   you had an involvement after September 2008,
16   we'll ask you some questions about that.  Okay?
17      A.   Fine.
18      Q.   You're employed by Barclays Capital
19   now?
20      A.   That's correct.
21      Q.   How long have you been at Barclays
22   Capital?
23      A.   Since January 1999.  Ten and a half
24   years.
25      Q.   And prior to Barclays Capital, by whom

Page 7

1       HIGHLY CONFIDENTIAL - J. RODEFELD
2    were you employed?
3       A.   Salomon Brothers, Inc.
4       Q.   And how long had you been at Salomon?
5       A.   16-plus years.
6       Q.   Starting in January '99 to the
7    present, if you could just give us a brief
8    overview of your career at Barclays Capital,
9    what departments, positions, et cetera.
10      A.   Okay.  I was hired out of the UK.  I
11   was an expat at Salomon Brothers.  Came over
12   back to the U.S. as a senior operations manager,
13   various line management responsibilities over a
14   number of different functional areas, through
15   the years taking on more responsibilities.
16      I believe it was in early, mid 2007
17   when I took over all of U.S. operations, which I
18   managed until the Lehman integration, at which
19   point I was -- I took on more global
20   responsibilities and various line management
21   responsibilities in the U.S.
22      Q.   And what's your current title and
23   position at Barclays?
24      A.   I'm a managing director in charge of
25   various operations, global and regional.

Page 8

1       HIGHLY CONFIDENTIAL - J. RODEFELD
2       Q.   Within sort of the various divisions
3    or working groups at Barclays Capital, is there
4    a particular group that you head up?
5       A.   There's a number of groups I head up.
6       Q.   If you could describe those?
7       A.   On a global basis, I'm responsible for
8    all the global reference data, which is all the
9    accounts and the instrument.
10      Q.   Okay.
11      A.   Globally, I'm also responsible for the
12   collateral -- within those groups, there's a
13   couple hundred, 300 people or so -- mostly
14   responsible globally for the Collateral
15   Management Unit.  Regionally, I'm responsible or
16   mostly responsible for the Mexico and the Brazil
17   offices of operations, and then locally here in
18   the U.S. I'm responsible for all the OTC
19   derivative operations, emerging market
20   operations, commodities, securitized products,
21   and some other various aspects.
22      Q.   Is it fair to say that throughout your
23   tenure at Barclays Capital you have been
24   involved in managing operations?  The scope of
25   the operations you manage may have changed, but

Page 9

1       HIGHLY CONFIDENTIAL - J. RODEFELD
2    you effectively have been managing operations in
3    one form or the other?
4       A.   That's correct.  That's for my whole
5    career.
6       Q.   And if you could give us a description
7    of what it means to manage operations, what's
8    included in that?
9       A.   Making sure that all the aspects of
10   confirmations, settlements, reconciliations,
11   balancing, general ledger reconciliation and so
12   forth, anything post-trade.
13      Q.   And does your job encompass making
14   sure there are systems in place to make sure
15   those things happen, but are you also checking
16   the actual results of those operations?
17      Do you understand the question?
18      A.   I think so.
19      Q.   Okay.
20      A.   My job is to manage people that manage
21   most of the line functions.  I do look at some
22   of the MIS that's produced out of those
23   functional areas to make sure that, you know,
24   anything that looks out of place, I might review
25   it and discuss it with them.  But by and large,

3  (Pages 6 to 9)

Page 22

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  that something you would have been involved in?
3      A.   Probably not.  As long as I knew we
4  had an agreement in place, I was going -- I
5  would settle it.
6      Q.   So that's the Monday.  Let's go down
7  the week.  What's your recollection of what your
8  involvement was with the Lehman/Barclays
9  transaction the next day?
10      A.   I believe on Tuesday we increased the
11  tri-party, and I forget if it went from 2 to 5
12  or 2 to 10, I just don't remember that, and it
13  was at that point, I believe it was on Tuesday
14  afternoon that we found out that we might have
15  to take over the funding for the discount window
16  for taking the Lehman and Chase out and putting
17  Barclays and BONY in place.
18      Q.   And you'd be taking over the discount
19  window from the Fed financing that was being
20  provided?
21      A.   Correct.  So that was the first, I
22  believe it was on Tuesday that that was raised
23  as that had to happen by Thursday.
24      Q.   And there was a much larger repo
25  financing transaction done by Barclays on

Page 23

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  Thursday, correct?
3      A.   That's correct.
4      Q.   Is that the $45 billion?
5      A.   Correct.
6      Q.   Between the Tuesday and the Thursday,
7  what role, if any, did you play in anticipation
8  of that $45 billion funding?
9      A.   In terms of the role that I played, it
10  was more of coordination, working with the likes
11  of the settlements folks, both at Lehman and at
12  Barclays, to rationalize how we were going to
13  unwind one, take it over, and get it all
14  done in the same day.  So it was more of
15  operational aspects of how to get it done based
16  on a defined population.
17      Q.   We've heard about a couple of
18  meetings.  One meeting at the Fed, one meeting
19  at the DTCC.
20          Do you recall being at any such
21  meeting in connection with that?
22      A.   I wasn't -- no, I didn't attend any of
23  those meetings.
24      Q.   And again, your focus in discussing
25  all of this was from the operations side to make

Page 24

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  sure it ran smoothly; is that correct?
3      A.   That's correct.
4      Q.   Okay.  It's my understanding that the
5  collateral that had been pledged to the Fed was
6  going to be transferred either via Fed wire or
7  DTC; is that correct?
8      A.   Yes.
9      Q.   Were there also any physical
10  securities that would need to be transferred?
11      A.   We weren't sure at the time.  We just
12  didn't have the full population at the time.
13      Q.   Going into Thursday, did you play any
14  role in drawing up lists or reviewing lists of
15  collateral that would be transferred over?
16      A.   On the -- we had gotten a list I
17  believe it was either Tuesday or Wednesday of
18  the population that was provided to us.
19      Q.   And this is a list you got from
20  Lehman?
21      A.   I think it came from Lehman.  I'm -- I
22  just don't recall, but I'm assuming it either
23  came from Lehman or in-house.  Somebody gave it
24  to us.
25      Q.   Did the list that you received on this

Page 25

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  Tuesday or Wednesday timeframe have any
3  valuation for the collateral?
4      A.   I don't recall.  I don't know.  I
5  really did not focus on the list per se other
6  than the fact that it was a list out there.
7      Q.   And again, in this time period,
8  Monday, Tuesday, Wednesday of that week of the
9  15th, had anyone described to you generally what
10  the overall Lehman/Barclays transaction was
11  about?
12      A.   I don't believe so.  I believe at the
13  time I was just told that we were doing a large
14  financing trade because that there was some type
15  of an acquisition was going to take place.
16          Having been involved in a due
17  diligence the prior weekend, I knew that we were
18  looking at Lehman, various aspects, you know, so
19  I knew that that was out there, but didn't know
20  what we were looking to buy, what we were
21  looking to sell, other than the fact I knew I
22  had to process whatever came down.
23      Q.   In connection with the Lehman/Barclays
24  transaction, there's a contract called the Asset
25  Purchase Agreement.  Is that a contract that

| | |
|---|---|
| Page 26 | Page 27 |

**Page 26**

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  you've ever seen?
3      A.   Yes.
4      Q.   Okay.
5      A.   Yeah, I believe I saw that in December
6  when we were looking at the Chase settlement.  I
7  think that might be the first time I saw that.
8      Q.   There's another document that's
9  referred to as a clarification letter.  Are you
10  familiar with that phrase?
11      A.   I'm familiar with the phrase.  I don't
12  believe I saw a clarification letter.
13      Q.   Do you have any understanding of a
14  clarification letter and what role, if any, it
15  may have played in the Lehman/Barclays
16  transaction?
17      A.   No.
18      Q.   And just filling in some blanks in my
19  mind from your answer about the Asset Purchase
20  Agreement, is it fair to say that you had no
21  role in the negotiation of the Asset Purchase
22  Agreement in any way?
23      A.   That's correct, I had no role at all
24  in that.
25      Q.   You were just shown the agreement for

**Page 27**

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  the first time sometime in December?
3      A.   Yes.
4      Q.   In September, in the week of September
5  15th, did anyone describe to you orally,
6  broadly, the economics of the deal?
7      A.   I'm sorry, when was this?
8      Q.   The week of September 15th.
9      A.   No.
10      Q.   Thereafter, after the week of
11  September 15, has anyone ever described to you
12  broadly the economics of the deal?
13      A.   No.
14      Q.   Do you have any understanding one way
15  or the other whether Barclays recognized a gain
16  on the acquisition of the Lehman assets that it
17  purchased?
18      A.   No.
19      Q.   Going into Thursday of that week, it's
20  the 18th, describe for me generally what you
21  were doing on the 18th?  That's the day of the
22  big repo.
23      A.   Okay.  Starting on Wednesday, we had a
24  plan put in place between the two organizations
25  on how we were going to process the work on

| | |
|---|---|
| Page 28 | Page 29 |

**Page 28**

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  Thursday.  So we have to start there.
3          So we came in with a plan on Thursday
4  to process the reverse repo, and the kick-off
5  was to send them funds, piece of the funds, and
6  then taking collateral back, and then we would
7  repeat that exercise until we got up to the 45
8  billion that was necessary to complete the
9  transaction.  So I was sitting at 200 Park
10  Avenue.  Most of the action would have been done
11  in our Whippany office because that's where our
12  processing hub was.
13          So, on the phone with the folks in
14  Whippany, sent over the first 5 billion sometime
15  in the morning, and it was taking quite a long
16  time to get the collateral back to settle the
17  first tranche.  Recognizing that we had a long
18  way to go, recognizing that the market
19  facilities have closing times, the Fed, DTC, and
20  not getting enough of the answers, I took a cab
21  over to the Lehman offices at 745 Seventh
22  Avenue.
23          It was there I met with David Aronow
24  and some other folks, possibly Alastair,
25  possibly others, I just don't remember who was

**Page 29**

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  there on that morning, and we discussed why it
3  was taking so long to get the rest of the
4  collateral on the first lot of 5 billion.
5          From that point on, there were lots of
6  discussions, and at some point in the early
7  afternoon, we were told to send the bulk of the
8  money over, that there was commitment to send
9  collateral to us, okay?  So I instructed our
10  payments group to make the rest of the 40
11  billion.
12          We took in the rest of the collateral.
13  We worked to take in the rest of the collateral.
14  The market facilities, the Fed wire and DTC,
15  extended their closing time late into the
16  evening, and we worked to get the collateral in
17  the door to satisfy the reverse repo.
18      Q.   And when all the action stopped, the
19  transfers stopped Thursday night, what was the
20  status of the collateral movement?  How much had
21  moved over?
22      A.   On the securities or the cash?
23      Q.   On the securities.
24      A.   On the securities, what Bank of New
25  York had told us at the point in time from their

Page 30

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   records that they had felt that there was I
3   believe 42-point-something billion of market
4   value that had come in.
5       Q.    And how about on the cash side?
6       A.    On the cash side, we had taken in a
7   piece of -- well, 300 million, originally, which
8   was part of DTC because one of the securities
9   had matured, so they paid us the cash rather
10  than the securities as the collateral.  And then
11  we then went into, we were short collateral, and
12  we did a tri-party for the difference of the 7
13  billion.
14      Q.    So there was a 7 billion cash
15  component and a 42-and-change billion dollar
16  securities component?
17      A.    Based on BONY's marks, yes.  We had no
18  line of sight to those marks.
19      Q.    What do you mean by that?
20      A.    I didn't see them personally.
21      Q.    Later on, in subsequent days, Friday,
22  Saturday of that week, the 19th, the 20th, did
23  anyone express to you any concerns about the
24  BONY marks?
25      A.    I'm sorry, what dates?

Page 31

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2       Q.    The Friday, Saturday, the subsequent
3   days.
4       A.    Not -- no, I don't believe -- no, I
5   don't recall the discussions on anybody raising
6   issues to me on the marks themselves.
7       Q.    Were there any issues raised on the
8   Friday, Saturday, Sunday, so again the days
9   after this collateral movement took place, about
10  the Cusips that had been transferred over?
11      A.    The -- well, by and large, we didn't
12  have many of the Cusips in our systems because
13  we didn't trade the products.  So a large
14  percentage of the assets that we took in we had
15  not in our systems to begin with.  So the
16  question -- we didn't have questions because we
17  didn't even have the trades.  The securities, we
18  didn't trade some of the securities, so it
19  wouldn't -- there was no questions, it was just
20  that we took them and we put them into Bank of
21  New York as a lockup place.
22      Q.    Were you involved in any discussions
23  or any activities on the Friday, Saturday,
24  Sunday after there was collateral movement to
25  try and reconcile pieces of collateral, to

Page 32

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   reconcile values, anything of that nature?
3       A.    No.
4       Q.    Were you aware of other people doing
5   that at Barclays?
6       A.    Not directly aware.  I assumed other
7   people were looking at it, but I don't know
8   specifically, you know, that anybody on an
9   individual basis was looking at them.
10      Q.    Putting aside the collateral that
11  moved on Thursday, the 18th, were you involved
12  in any collateral movements that were initiated
13  on Friday, the 19th?
14      A.    I'm sorry, say that again.
15      Q.    Were you involved in any collateral
16  movements from Lehman to Barclays that were
17  initiated on Friday, the 19th?
18      A.    Yes.
19      Q.    Okay.  Describe those, please.
20      A.    On Friday morning, Lehman delivered us
21  a population of securities, I believe it was a
22  billion and change, to our Bank of New York
23  account and I took those securities in.
24      Q.    When you say "a billion and change,"
25  does 1.9 sound about right?

Page 33

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2       A.    It could have been.  I just -- I know
3   it was over a billion.
4       Q.    And do you know why Lehman was
5   delivering these securities on Friday?
6       A.    Not particularly.
7       Q.    Have you heard anything about it?
8       A.    I knew it was coming, but I wasn't
9   aware if it was collateral or anything else.
10  They just came, so I took them in.
11      Q.    Were there any transfers of cash from
12  Lehman to Barclays that you were aware of on
13  Friday?
14      A.    No.
15      Q.    After that weekend of the 20th/21st of
16  September -- actually, withdraw that.  At any
17  time in connection with the Lehman/Barclays
18  transaction were you involved in any discussions
19  concerning OCC margin?
20      MR. SHAW:  And let me just caution you
21  not to discuss -- not to disclose any
22  discussions you had with counsel for
23  Barclays about that issue.
24      THE WITNESS:  Okay.
25      There were discussions with counsel on

HIGHLY CONFIDENTIAL - J. RODEFELD

1 
2 collateral to be moved?
3     A.   No, I was given a list.
4     Q.   Who gave you a list?
5     A.   I don't recall if it was Chase or if
6 somebody internally had sent it to me, but I did
7 get the list.
8     Q.   And how long was your involvement?
9 How many days were you involved in this December
10 exercise?
11     A.   Right through the settlement, and any
12 reconciliations that would have taken place
13 after the movement of the securities and the
14 cash, there were -- there was a protracted
15 reconciliation going on on the physical
16 securities that we received that took probably
17 the better part of a month to reregister them
18 out of the name of the previous holders into
19 Barclays' name.  So, from a mechanics point of
20 view, I was involved in that probably into
21 January.
22         MR. TAMBE:  Let's just take a short
23     break.  We'll get some exhibits together and
24     carry on.
25         (Recess; Time Noted:  10:26 A.M.)

HIGHLY CONFIDENTIAL - J. RODEFELD

1 
2         (Time Noted:  10:33 A.M.)
3         (Exhibit 280A, a document bearing
4     Bates Nos. BCI-EX-(S)-47647 through 47648,
5     marked for identification, as of this date.)
6 BY MR. TAMBE:
7     Q.   Sir, I have placed before you a
8 two-page document marked 280A.  Take a moment to
9 look at it.  I'll ask you a couple of questions.
10         (Document review.)
11     A.   Okay.
12     Q.   Focusing on the e-mail at the top of
13 page 1 from John Haley to you and others, do you
14 see that?
15     A.   Yes.
16     Q.   Mr. Haley makes a comment in his
17 e-mail, second sentence, "There is some Fed
18 collateral that is not eligible for GCF
19 transaction."  Do you understand what he meant
20 by that?
21     A.   No.
22     Q.   What is a GCF transaction?
23     A.   I don't know.  I'm not a -- it's -- I
24 assume it's some type of cash management
25 tri-party something, but I just don't -- I'm not

HIGHLY CONFIDENTIAL - J. RODEFELD

1 
2 a guru on the GCF stuff.
3     Q.   On the second page, there's one
4 particular bullet point I want to ask you about.
5 There's a bullet point where John Haley writes,
6 "Lehman pledges to BONY Account 855."
7         Do you see that?
8     A.   Yes.
9     Q.   Do you have any understanding about
10 that account, the 855 account at BONY?
11     A.   Limited.  I know it's an account that
12 Barclays has that we take in collateral to.
13     Q.   Was that account specifically set up
14 for purposes of this transaction?
15     A.   I don't recall.  I don't believe so.
16 It may have been open prior to that, but I don't
17 know that for certain.
18     Q.   I have placed before you a document
19 previously marked Exhibit 124.  If you take a
20 moment to look at it, let me know when you're
21 done and I'll ask you a few questions.
22     A.   Okay.
23         (Document review.)
24     A.   Okay.
25     Q.   Just drawing your attention to the

HIGHLY CONFIDENTIAL - J. RODEFELD

1 
2 e-mail that starts on page 1 over onto page 2,
3 which is an overview of the mechanics of the
4 trade that was done on Thursday, did you play
5 any role in developing those mechanics?
6     A.   I'm sure I participated in some of
7 those conversations but was part in most of
8 those discussions on Tuesday and Wednesday as we
9 prepped for it.  Much of the discussion I
10 believe was John Haley discussing it, the actual
11 aspects of the deliveries and the receipts as a
12 settlement protocol with his colleagues at
13 Lehman.
14     Q.   Was it your understanding that all of
15 the collateral pledged by Lehman to the Fed was
16 going to be transferred to Barclays?
17     A.   I was aware that we were -- we had a
18 list that was going to be transferred to us.
19 Whether that list had all Fed stuff in it or
20 other stuff I wasn't privy to.  So whatever was
21 on the list is what I knew we were taking.  That
22 may or may not have been discount window.
23 Assumption probably was a good piece of it was,
24 but if it was in total, I didn't have access to
25 that information.

Page 50

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  Q.   Did you have any understanding that
3  there were assets pledged to the Fed that
4  Barclays had specifically said would be excluded
5  from the transfer?
6  A.   No.
7  Q.   Are you aware generally of any list of
8  excluded assets that was transmitted by Barclays
9  to Lehman in connection with this transaction?
10  A.   There was a list, and I don't know if
11  it was transmitted to them or if we had a list,
12  that there was concern that we did not want any
13  substitutions from the list.  So we were given a
14  list, and I don't remember if I saw the list or
15  if it went to the Whippany office or whatever,
16  but I recognized that there was a list of assets
17  that we weren't going to take in case there had
18  to be substitutions for whatever reason.
19  Q.   And just so we understand, generally
20  why would there be reasons for substitution in
21  the context of a repo?
22  A.   Well, typically there wouldn't be,
23  right?  But typically you repo one for one, one
24  trade, one repo, not one trade, multiple
25  securities.

Page 51

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  Q.   Was this trade any different where
3  there was a concern that there might be
4  substitutions?
5  A.   No, we were working off of the
6  assumption that we were going to get what was on
7  the list.
8       (Exhibit 281A, a document bearing
9  Bates Nos. BCI-EX-(S)-47924 through 47926,
10  marked for identification, as of this date.)
11  Q.   Sir, I have placed a three-page
12  document before you marked Exhibit 281A.  Take a
13  moment to look at that and I'll ask you some
14  questions.
15  A.   Okay.
16       (Document review.)
17  A.   Okay.
18  Q.   I'll focus on the first e-mail on page
19  1, over onto page 2.  It's from John Haley to
20  several people, including you.  Do you see that?
21  A.   Yes.
22  Q.   Judging from the time and date stamp,
23  this is appears to be late Thursday night in --
24  A.   Yeah.
25  Q.   -- New York, right?

Page 52

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  A.   Early Friday morning, actually.
3  Q.   Early Friday morning.
4  A.   It's actually late, yeah, it's GMT
5  time.  So it's probably 12 o'clock.  I don't
6  know what time it is.
7       MR. SHAW:  It's daylight savings, so
8  probably about 1 in the morning.
9       THE WITNESS:  Okay.
10  Q.   So we have in the e-mail from
11  Mr. Haley to you and others sort of a recap of
12  the transaction, correct?
13  A.   Yes.
14  Q.   The values that appear in his e-mail,
15  do you know where those values come from?
16  A.   Bank of New York.
17  Q.   Just generally from the operations
18  perspective, if you have collateral that's
19  coming to you from a custodian for a tri-party
20  arrangement, do the values ascribed by the
21  tri-party custodian travel with that collateral?
22  That wasn't a good question.
23       From an operations perspective, if you
24  have collateral going back and forth in a
25  tri-party repo arrangement?

Page 53

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  A.   Right.
3  Q.   Is it your understanding that the
4  custodian for that tri-party repo agreement
5  assigns values for that collateral?
6  A.   Typically, they will assign values
7  because they are the ones that are going to
8  allocate it into the third party to secure the
9  overnight loan, but we have our own systems that
10  also value that collateral.  So we'll
11  sanity-check what the third party tri-party
12  agent puts on to make sure we're getting
13  efficient use of our collateral versus the cash
14  we're borrowing.
15       So, in essence, they put the values
16  on, which is the rules of the road, but we can
17  challenge it, and we do if we don't think that
18  they're putting accurate values on that what our
19  systems are telling us.
20  Q.   And in connection with the
21  Lehman/Barclays repo, are you aware of any
22  challenges made by Barclays to the BONY
23  evaluations?
24  A.   No, to the extent that we didn't
25  have -- typically, we would own the securities,

Page 54

HIGHLY CONFIDENTIAL - J. RODEFELD

2  so we would know what the values are from our
3  own systems.  This was an unusual circumstance.
4  We didn't have the trades in our system, so we
5  didn't have the ability to challenge from a
6  systems perspective.
7            (Exhibit 282A, a document bearing
8       Bates Nos. BCI-EX-(S)-47942 through 47944,
9       marked for identification, as of this date.)
10       Q.  Sir, I have placed before you a
11  document marked Exhibit 282A.  Take a moment to
12  look at that document and let me know when
13  you're done.  I'll ask you a couple questions.
14       A.  Okay.
15       Q.  This e-mail chain in Exhibit 282A on
16  the first page has an e-mail from you to Teri
17  Scott and several other people at Barclays, do
18  you see that?
19       A.  Yes.
20       Q.  And just looking at the names and the
21  e-mail addresses, looks like a lot of these
22  folks are in the Finance Department at Barclays,
23  is that fair?
24       A.  Yeah, ops. and finance, yes.
25       Q.  And you were providing a report in

Page 55

HIGHLY CONFIDENTIAL - J. RODEFELD

2  this e-mail describing the close-out of the
3  tri-party for 15.8 billion, correct?
4       A.  Yes.
5       Q.  And you're describing broadly the
6  Barclays/Lehman repo which took out the Fed,
7  correct?
8       A.  Correct.
9       Q.  I want to understand for what purpose
10  are you providing the summary to the finance
11  people?
12       A.  Just as a form of completeness, I
13  think.  There was probably no motivation other
14  than just keeping everybody in the loop of where
15  we were.
16       Q.  And further up in that e-mail chain,
17  there's a response to your e-mail from someone
18  in the Treasury Department, Mr. Garcha, do you
19  see that?
20       A.  Yes.
21       Q.  And he says, "Scott Wadlow has some
22  questions for you," see that?
23       A.  Yes.
24       Q.  Who is Scott Wadlow?
25       A.  I don't know.  I assume it was

Page 56

HIGHLY CONFIDENTIAL - J. RODEFELD

1  somebody in Treasury or somebody.  I don't know
2  the -- the name vaguely looks familiar, but I
3  don't know who he is.
4       Q.  Let me go way out on a limb here.  Do
5  you remember speaking with Mr. Wadlow?
6       A.  No.
7       Q.  Do you remember speaking with anyone
8  from Treasury on or about February -- sorry, on
9  or about Friday, the 19th of September, about
10  this transaction?
11       A.  I very well could have.  I don't
12  recall specific conversations.  I worked right
13  through the night through till the next day, so
14  there would, you know, there could have been
15  conversations and I'm just not remembering them,
16  nothing in particular.
17       Q.  Were you involved at all in working
18  with Barclays' auditors to prepare the account
19  statements for Barclays concerning this
20  acquisition?
21       A.  Peripherally, yes.  They had asked me
22  some questions and sat down with me, but I don't
23  remember specific working with them on it at
24  all.

Page 57

HIGHLY CONFIDENTIAL - J. RODEFELD

2       Q.  Do you remember any of the topics on
3  which they asked you questions?
4       A.  Sure.  They asked about the
5  transaction itself and just general what would
6  happen over those two days and how we accounted
7  for the securities and how we booked and
8  rebooked the trades and what was the
9  reconciliation process and so forth and so
10  forth, more mechanical in nature, making sure
11  all the trades got into the system, did we
12  reconcile to the depots and so forth and so
13  forth.  So I'm sure there were conversations of
14  that nature regarding the transaction.
15       Q.  Do you recall having any discussions
16  with anyone about where, what legal entity the
17  trades would be booked in for tax purposes?
18       A.  Related to the September --
19       Q.  Related to the Lehman/Barclays
20  transaction either in September or any transfers
21  that were made in December.
22       A.  In December there were discussions
23  about legal entities related to the Chase
24  settlement.
25       Q.  Okay.  And with whom did you have

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2     A.    She is an operations manager that ran
3  the Cash Management Team at Barclays Capital.
4     Q.    Do you recall receiving this e-mail
5  from Ms. Turner?
6     A.    Not particularly, no.
7     Q.    At the bottom of the string, she
8  forwards an announcement from Citibank, CLS
9  Services, do you see that?
10    A.    Yes.
11    Q.    What are the CLS Services?
12    A.    That is the FX netting that gets done
13 by a facility called CLS, which is continuous
14 link settlement, where it's a market facility
15 that takes the -- all the FX trades with the
16 dealers and nets them down and all the
17 participants within it and creates a net amount
18 per currency that each dealer has to settle upon
19 as opposed to moving hundreds and thousands of
20 payments individually.
21    Q.    And "FX" refers to foreign exchange?
22    A.    That's correct.
23    Q.    Did Barclays have a foreign exchange
24 business?
25    A.    Yes, it did.

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2     Q.    And were you involved --
3     A.    Not Barclays Capital, no.  Barclays,
4  PLC.
5     Q.    Were you involved in that business at
6  all?  This is now prior to the sale transaction
7  with Lehman.
8     A.    Very, very limited.  Most of the
9  processing and the operations for all our FX
10 business was in London and Singapore.  So only
11 to the extent there might be some support people
12 on the desk that would come in to me.
13    Q.    Okay.  You write back to Ms. Turner,
14 "We are not taking the FX business from Lehman."
15    A.    Correct.
16    Q.    How did you know that?
17    A.    I don't recall, other than the fact
18 that I must have asked somewhere along the line
19 to say, you know, are we taking any position in
20 the FX, long and -- that's what I'm surmising
21 from this.  I don't remember, you know, why I
22 asked.  I'm sure I asked it about all the
23 product asset classes that would have been out
24 there on the Lehman entities.
25    Q.    And you think that because it relates

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  to the job you were doing in operations?
3     A.    Oh, I'm sure it would have been
4  related to do we need to worry about any
5  processing of the FX support.
6     Q.    Did anybody at Barclays give you a
7  rundown or a summary of which businesses you
8  were taking from Lehman and which you were not?
9     A.    Nothing on a -- I have not received
10 anything formally from anybody.
11    Q.    You didn't read anything?
12    A.    I don't recall like a list that says
13 we're taking this, not taking this, nothing like
14 that.
15    Q.    So you don't really know --
16    A.    I don't know what context I was
17 sending this other than the fact that, you know,
18 she was passing on information related to CLS,
19 and because we weren't taking the FX business, I
20 was communicating to her that it shouldn't be an
21 issue, that they're not -- that CLS is shutting
22 down on the Lehman side because we weren't doing
23 their FX business.
24    Q.    But you don't recall how it is you
25 learned that Barclays was not taking the FX

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  business from Lehman?
3     A.    No, I don't recall that.
4     Q.    The second sentence of your e-mail,
5  you say, you write, "Suspect we will cherrypick
6  the better sales and traders."  Are you
7  referring there to the FX business?
8     A.    I'm sure I must have been, just
9  thinking along those -- just from reading it at
10 face value, that's what I would have probably
11 just surmised.  No fact or based on fact, just
12 chatter.
13    Q.    Put that exhibit aside.  Let's go back
14 to a new topic now -- actually, an old topic,
15 the repo transaction that you testified about
16 this morning that took place on Thursday where
17 Barclays replaced the Fed.
18    A.    Right.
19    Q.    And I think by Friday you said that
20 you had received certain collateral had come in
21 to the Bank of New York; is that right?
22    A.    On Friday, you're saying, or Thursday?
23    Q.    That Thursday night into Friday
24 morning, but by Friday morning you had received
25 certain collateral?

## Page 70

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2 A. Correct.
3 Q. So you had approximately $42 billion
4 in securities?
5 A. Based on Bank of New York's marks.
6 Q. Right.  And you had 7 billion in cash?
7 A. Correct.
8 Q. And then there was another 1.1 billion
9 you said that came in on Friday, but you weren't
10 sure if that related to the repo or not, is that
11 fair?
12 A. That's accurate.
13 Q. Okay.  How are you mechanically
14 getting this information?  Is there a system
15 that you look at?  Do you get a report from the
16 Bank of New York?
17 A. I don't get a report.  There may be a
18 report that's driven.  I don't know enough about
19 the mechanics of the 855 account at DTC whether
20 they produce something.  Typically, I wouldn't
21 care because I would have my own books and
22 records to rely on.
23 So what happens at the 855 reporting
24 through Bank of New York, I don't know what they
25 do, if they -- how they handle that account.  I

## Page 71

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2 just don't know enough about that account.
3 Q. How do you learn that there's $42
4 billion in securities that have made their way
5 to the Bank of New York account?
6 A. It was all verbal over the box coming
7 from Bank of New York as assets were coming into
8 the account.
9 Q. Okay.  And is your group then
10 responsible for determining where those assets
11 go next?
12 A. Yes.  Yeah.
13 Q. Okay.  And do you know what happened
14 to that 42 billion in securities?
15 A. Yes.
16 Q. What happened to it?
17 A. We executed trades against them,
18 actual outright trades, and then we moved them
19 out of that location into our proprietary
20 accounts since we purchased them outright.  So
21 they would go into our normal DTC or Fed BAU
22 accounts.
23 Q. When you say you purchased them
24 outright, what are you referring to?
25 A. We purchased those assets, a series of

## Page 72

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2 assets.  The location of those assets were
3 sitting at -- in my 855 account, which was a
4 location just to put those securities.  We then
5 took them out of the 855 DTC account at Bank of
6 New York to our proprietary Barclays accounts at
7 DTC.
8 Q. Okay.
9 A. Because they become -- once we
10 purchase them outright, they became part of our
11 normal box positions.
12 Q. When you say you purchased them
13 outright, are you referring to the sale
14 transaction with Lehman?
15 A. The -- I don't know the terminology
16 you're using.  What I do know is we booked
17 transactions to buy those securities from
18 Lehman.  Those trades that were booked in our
19 systems had securities that were in the 855
20 account.
21 Mechanically, I have a trade in my
22 system saying you have purchased securities from
23 Lehman.  You have a location at 855.  From a
24 mechanical point of view, I just move the
25 securities from the 855 account into my

## Page 73

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2 propriety account to settle that transaction
3 since we have purchased them outright from
4 Lehman.
5 Q. What's the basis of your understanding
6 that you have purchased them outright from
7 Lehman?  Did somebody tell you?  Did you read it
8 somewhere?
9 A. No, transactions are booked in our
10 trade capture systems by traders.
11 Q. So you can tell from the system?
12 A. The front office system feeds our
13 settlement system, which says, okay, we've done
14 a purchase of securities and we knew that the
15 securities that we were purchasing from Lehman,
16 we knew where the location was because the day
17 before they were all put into that account, or
18 two days before, whatever the date they actually
19 came in.
20 Q. Okay.  Now, are you also tracking the
21 $7 billion in cash collateral?
22 A. Yes.
23 Q. And what happens to that $7 billion in
24 cash?
25 A. First, we requested that 7 billion on

## Page 74

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  Friday through our normal course of business.
3  We asked Chase to put it into our -- I believe
4  into our DDA account at Chase.  That didn't
5  happen.  We got a statement that day showing
6  that we had the tri-party outstanding, so we
7  were comfortable.
8       Monday we got another statement from
9  Chase saying the 7 billion is still in the
10 tri-party account.  We were comfortable.  We
11 asked them again to move it out to Barclays'
12 account, and then sometime after that it became
13 evident that Chase wasn't releasing that 7
14 billion back to us immediately, and that's when
15 we escalated it up the ranks to the management
16 line.
17      Q.    Is Barclays purchasing the 7 billion
18 in cash the same way it's purchasing the 42
19 billion in securities?
20      MR. SHAW:  Objection to form.
21      You can answer.
22      Q.    You can answer, if you understand.
23      A.    I don't know what the assets they were
24 purchasing.
25      Q.    Okay.  But with respect to the cash,

## Page 75

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  do you also see in your system whether it's been
3  purchased or not?
4       A.    No.  It sits out there as a tri-party
5  trade.  So it's a financing trade, but for
6  technical purposes, that's the only way it goes
7  into the system as tri-party.
8       Q.    How about the $1.1 billion in
9  securities that you told us was transferred on
10 Friday?
11      A.    Right.
12      Q.    Did you know what happened to those
13 securities?
14      A.    They got -- they were commingled with
15 all the other securities into the 855 account
16 and they just sat there and became part of that
17 portfolio that we took in from Thursday and
18 Friday.
19      Q.    And did your system show that Barclays
20 had purchased those securities?
21      A.    At some point later on, yes, when they
22 booked the trades into the system showing that
23 they bought them outright.
24      Q.    When did that occur?
25      A.    That occurred over a, probably a

## Page 76

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  three- or four-week period from September 22nd,
3  I believe, through the three or four weeks.
4       The reason it took so long to book all
5  those trades, normally you would do that pretty
6  quickly, but we didn't have a lot of those
7  instruments set up in our databases since we
8  weren't trading them.  So the back-end process
9  of getting the instruments set up in the system,
10 making sure you can process trades for them,
11 making sure you have all the information you
12 need to set up the instrument, probably 70
13 percent of those instruments were easily set up
14 in our security database.  Then there were other
15 instruments that just took longer.
16      So, until you get that instrument,
17 that's the starting point.  It has to be in our
18 instrument database so you can book a trade
19 against it.  So there was a lag time between the
20 9/22 until we finally finished booking all the
21 trades.
22      Q.    When you say "all the trades," you're
23 including both the securities that made up the
24 42 billion in securities that transferred on
25 Thursday and also the 1.1 billion that

## Page 77

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  transferred on Friday, is that fair?
3       A.    It was the full population that was in
4  the 855 account, correct.
5       Q.    And is it fair that -- just so I
6  understand what you're telling me, you see in
7  your system that it's been purchased and that's
8  the basis for why you say Barclays bought these
9  outright, but you don't have any independent
10 understanding based on any of the deal documents
11 or --
12      A.    I wasn't part of any -- the
13 negotiations or any part of the deal at all
14 other than the settlement aspects.
15      Q.    I'm going to mark as 285, Exhibit
16 285A, an e-mail from you to Gerard LaRocca.
17 It's Bates-stamped 49066.
18      (Exhibit 285A, a document bearing
19 Bates Nos. BCI-EX-(S)-49066, marked for
20 identification, as of this date.)
21      (Document review.)
22      A.    Okay.
23      Q.    This e-mail is an e-mail that you send
24 to Mr. LaRocca on Wednesday, September 24,
25 correct?

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   A.   Uh-huh.
3   Q.   You need to answer out loud.
4   A.   Oh, sorry.  Yes.
5   Q.   So this is now in the middle of the
6   next week after --
7   A.   Correct.
8   Q.   -- the repo transaction?
9      MR. SHAW:  Actually, I would point out
10  that this appears to be sent Tuesday night.
11  We've got that GMT problem.
12     MR. ROTHMAN:  Fair enough.
13  Q.   Do you recall sending this e-mail to
14  Mr. LaRocca?
15  A.   Not particularly.
16  Q.   You write, "Rich was looking for the
17  market value and confirmation of the securities
18  we received on Friday from Lehman as part of the
19  1.9 billion they were going to post."
20     Who is Rich?
21  A.   I don't know, but it could be Rich
22  Ricci or it could be another Rich.  I just don't
23  remember.
24  Q.   And you write, "On Friday we received
25  collateral worth 1.077 million."

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   A.   Correct.
3   Q.   Is that the 1.1 million we've been
4   talking about?
5   A.   That was received on the Friday.
6   Q.   Correct.
7   A.   Correct.
8   Q.   That's the same --
9   A.   I -- yes, if it's on Friday we
10  received the collateral worth, that would be the
11  same collateral.  That was the only collateral
12  we received on that Friday.
13  Q.   Okay.  And then you refer to a
14  schedule with a list of another 990 unique
15  issues?
16  A.   Uh-huh.
17  Q.   What does that mean, "unique issues"?
18  A.   Individual issues.  We had a schedule
19  that Lehman had sent us saying they were going
20  to deliver us these securities, but we didn't
21  get them all.  So this is -- I'm just
22  referencing the fact that we didn't get
23  everything that was on the schedule.
24  Q.   So you were supposed to get another
25  990 individual securities with a market value of

HIGHLY CONFIDENTIAL - J. RODEFELD

1   862 million?
2
3   A.   That's what I would recollect based on
4   this e-mail, yes.
5   Q.   Okay.  And then you say that the
6   reason is because DTC put the block on the
7   account?
8   A.   Correct.
9   Q.   What happened with respect to that?
10  A.   Friday morning, the market opens up.
11  DTC has accounts that are open at -- Lehman has
12  accounts that have opened at DTC at that point
13  in time, so they started delivering me assets.
14  I took those assets, and then a point in time
15  came where DTC stopped allowing Lehman to use
16  that account so they put a block on it, whatever
17  terminology.  I don't know if that's the formal
18  terminology, but they basically were not
19  allowing Lehman to move any more collateral out
20  of that account.
21  Q.   Did you know why DTC was doing that?
22  A.   I had no idea at that point what was
23  causing that.
24  Q.   Did you find out later?
25  A.   Later I found out that they declared

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   bankruptcy, I think it was on that Friday, but
3   I'm not a hundred percent sure.  But that's
4   probably what I recollected happened at the
5   time, but I'm not a hundred percent certain.
6   But I would assume that would have been the
7   reason why the DTC stopped them.
8   Q.   Did you hear from anybody that that
9   was the reason?
10  A.   I don't remember.
11  Q.   Did you read any --
12  A.   I don't know the reason other than the
13  fact that I remember that there was a bankruptcy
14  that day, and it would have seemed logical sense
15  that DTC would have put a stop on it until they
16  could figure out where they were at.  That would
17  have been my best guess of what I...
18  Q.   Okay.  So, as of that Friday, Barclays
19  has collateral now of 49, approximately $49
20  billion, consisting of the 42 billion in
21  securities and the 7 billion in cash; is that
22  right.
23  A.   Based on Bank of New York's
24  valuations.
25  Q.   Right.

Page 82

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2     A.    Yes.
3     Q.    Why is Lehman posting an additional
4  1.9 billion on Friday or intending to post an
5  additional 1.9 billion on Friday?  Do you know?
6         MR. SHAW:  Objection.  Foundation.
7     A.    I don't know why they posted it at
8  that point in time on Friday morning.  I just
9  took the collateral.
10    Q.    Okay.  But your understanding was that
11 Barclays was supposed to have approximately $49
12 billion in collateral, correct?
13    A.    Barclays was supposed to have
14 approximately 49-point-something billion dollars
15 worth of collateral.  We had no way to validate
16 what the real valuation was of that collateral
17 other than what Bank of New York was telling us.
18    Q.    Do you know whether the 1.9 billion
19 was intended to replace some of the cash?
20    A.    At that point in time, I had no idea
21 what it was going to replace, the cash or what
22 the -- I was just told take it in.
23    Q.    Did at some later point in time you
24 gain an understanding as to what that 1.9
25 billion was supposed to do?

Page 83

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2     A.    Much later on.  Not up until during
3  the period that we were purchasing the assets.
4  Somewhere subsequent to that, I was never really
5  sure whether it was related to the collateral on
6  the repo or the purchase of the unencumbered
7  assets.  Because to me it was a block of assets.
8  I didn't distinguish between the repo versus the
9  unencumbered assets for my purposes because it
10 didn't matter to me.
11    Q.    You said much later in time.  Are you
12 thinking about a particular conversation that
13 you had with someone?
14    A.    No, I just know that somewhere down
15 months later when we just, you know, probably
16 had general conversations on it, that's when it
17 probably came out.  I can't say on a particular
18 time or date or anything like that.  I just know
19 later on, you know, there was discussions about
20 it.
21    Q.    Do you recall who you had those
22 discussions with?
23    A.    No, just general conversations with
24 somebody.  I just don't know.  I just know
25 that -- I recollect that there were

Page 84

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  conversations on it.
3     Q.    Conversations with people at Barclays?
4     A.    Could have been Barclays or Lehman.  I
5  don't remember, to be honest.  It could have
6  been just rehashing it with Lehman people for --
7  I just don't remember.  I just know that
8  somewhere I had a conversation on it.
9     Q.    When you say "Lehman people," are you
10 talking about --
11    A.    Ex-Lehman legacy people from the -- it
12 could have easily been any one of them.  I just
13 don't recall.
14    Q.    Can you recall about when you had
15 these discussions?
16    A.    I just know it was probably much later
17 on, you know, only to the fact that I really
18 wasn't focused on the population as much in
19 terms of, you know, the reasons as to making
20 accounting for it, making sure the trades were
21 booked, the trades were settled, securities were
22 moved.  That was my focus.
23    Q.    When you say "much later on," do you
24 think this was a couple of weeks later or a
25 couple of months later?

Page 85

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2     A.    It was probably more months later.
3     Q.    The e-mail, just to clarify one thing
4  in the e-mail, you write that, "On Friday, we
5  received collateral worth 1.0077 million."  Did
6  you mean billion when you wrote that?
7     A.    Yeah.  I was getting a little punchy,
8  I guess.  Yeah, it was clearly a billion.
9     Q.    And why are you passing this
10 information along to Mr. LaRocca?  Do you
11 recall?
12    A.    Not particularly, no.
13    Q.    I'm going to mark 286A, another
14 e-mail.  This one is double-sided,
15 Bates-numbered 49165 to 49166.
16        (Exhibit 286A, a document bearing
17    Bates Nos. 49165 through 49166, marked for
18    identification, as of this date.)
19        (Document review.)
20    A.    Okay.
21    Q.    The top e-mail is from you to a
22 Stephen Sell?
23    A.    Right.
24    Q.    Who is Mr. Sell?
25    A.    Stephen is a business manager for the

---

### Page 90

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    Q.   Were you talking to John Haley over
3  that weekend?
4    A.   I'm certain I was.  John and I spent a
5  lot of time back and forth together.
6    Q.   Do you know if he had gone to the
7  DTCC?
8    A.   I don't know that to be fact.  He
9  could have, but I just don't know that.  You
10 know, he might have.  I just can't recall that,
11 to be honest.
12   Q.   Did you hear anything over that
13 weekend about whether Barclays was going to be
14 purchasing unencumbered securities in the Lehman
15 DTC accounts?
16   A.   Not over that weekend, no.
17   Q.   Did you hear that at a later point in
18 time?
19   A.   Months later.  This goes back to that
20 earlier discussion we had where, you know, when
21 they asked about the securities that came in on
22 the 19th as unencumbered securities, somewhere
23 along those lines months later, that's where I
24 became aware that we were buying those actual
25 securities.

---

### Page 91

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    Q.   You told me before that the DTCC put a
3  hold on the trading from the Lehman box that
4  Friday?
5    A.   Yeah.  Not trading from it, movements
6  from it.
7    Q.   Thank you.
8         Was that hold ever lifted, do you
9  know?
10        MR. SHAW:  Objection.  Foundation.
11   A.   I don't know to be certain, no, I
12 don't know.
13   Q.   Do you know if Barclays had to take
14 any actions to get that hold lifted?
15   A.   No, I don't know.  There must have
16 been.  Well, let me qualify -- just restate that
17 again.  We received assets on the 29th and the
18 30th.  They may have come through that account,
19 so they may have been under the control of
20 either SIPC or DTC or some other body to release
21 those securities to us.
22        So I do know that at some point they
23 may not have taken the block off, but they
24 allowed securities to move through there because
25 I do believe on the 29th and 30th they came to

---

### Page 92

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2  those accounts.  So there must have been either
3  an unblocking or some mechanism that allowed us
4  to get those securities through there.
5    Q.   Do you know why Barclays was receiving
6  securities from there on the 29th and the 30th?
7    A.   No, I don't.
8    Q.   Do you know whether those securities
9  were part of the repo collateral?
10   A.   I don't know that.  I didn't think
11 about it in those terms.
12   Q.   Does your systems show -- would your
13 systems show whether that was the case or not?
14   A.   No.  Well, the only thing our systems
15 will show is that we purchased securities.  We
16 didn't book any trades as financing trades on an
17 individual basis.  So we wouldn't reflect that.
18 All you'd reflect is in the depot that you
19 received collateral from Lehman.
20        Once the trades were booked as
21 outright trades, that's when we knew that,
22 formal books and records, that we had trades and
23 that we were looking for that collateral as
24 proprietary positions now since we bought them
25 outright.

---

### Page 93

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    Q.   Okay.  Let's go back to the weekend of
3  September 20th and 21st.  Did you hear anything
4  about an agreement over that weekend involving
5  Barclays, LBI and the DTCC?
6    A.   I don't understand the question.
7    Q.   Do you know if there was an agreement
8  reached over that weekend between Barclays,
9  Lehman Brothers and the DTCC?
10   A.   I don't know if there was agreements
11 reached.  There was dialogue about the clearing
12 of the outstanding trades.  I remember those --
13 that dialogue, but I don't know if that was --
14 there was -- I wasn't party to any agreement
15 that was taking place at DTC or anything of that
16 nature.
17   Q.   Were you involved in those dialogues?
18   A.   Yeah.
19   Q.   Where did they take place?
20   A.   They would have taken place at 745
21 Seventh Avenue.
22   Q.   And who participated in these
23 dialogues with you?
24   A.   I don't remember, but I -- I just
25 don't remember.  I would assume people in legal

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2  or somebody of that nature.
3      Q.    There was people there from --
4      A.    Barclays.  Barclays Capital.
5      Q.    Is this just legal people at Barclays?
6      A.    Barclays Capital.  At this point, it
7  was Barclays legal people.
8      Q.    Were there people from LBI or from the
9  Trustee?
10     A.    There were LBI people on the floor.
11 Whether they were in those conversations, I
12 don't believe so.
13     Q.    Are there people in those
14 conversations from the DTCC?
15     A.    There were DTC folks on the calls,
16 right?  And so there were discussions about, you
17 know, were we going to clear the trades on
18 behalf of LBI, the outstanding trades that
19 hadn't settled yet at the depositories.  So
20 there were discussions, you know, and we were
21 saying we're not settling those trades, they're
22 not our trades.
23         That's the extent of what I remember
24 about that.  I don't think there was any formal
25 agreements, though, other than the fact that we

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2  stated a position.
3      Q.    What is it, when you say you weren't
4  going to settle the trades, what do you mean by
5  that?
6      A.    So if Lehman sold securities to a
7  client and needed to make a delivery, we were
8  telling DTC we're not taking ownership of that
9  settlement process, that's Lehman's process.  We
10 didn't -- we hadn't bought LBI at that point.
11 So, for our purposes, it's that why would we
12 take ownership of the settlement when we hadn't
13 taken ownership of those -- of the entity.
14     Q.    Did DTCC express any concerns about
15 those settlements?
16     A.    I don't know if they expressed
17 concern.  They were looking for facts, right,
18 what we were doing.
19     Q.    What happens if the settlement fails?
20     A.    The trade doesn't just settle in the
21 system.  The cash doesn't go one way.  The
22 securities don't go another way.
23     Q.    Does the DTCC guarantee the settlement
24 of those trades?
25     A.    I don't know.  I don't know enough

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2  about DTCC bylaws when there's a default of any
3  sort.
4      Q.    Is the DTC exposed, mechanically
5  exposed if a trade doesn't settle?
6      A.    DTC is participant-owned.  So DTC just
7  represents all the other participants.  So, in
8  theory, if there's a loss at DTC, that is shared
9  amongst all the participants of DTC.
10         So, you know, if there is going to be
11 a, like in any kind of a corporate action where
12 DTC is involved in it, if there's a loss, it's
13 distributed out to all its members.
14     Q.    Okay.  So --
15     A.    I'm not an expert on DTC bylaws, on
16 closeouts or bankruptcy or anything else like
17 that.  I'm not an expert at all.
18     Q.    So over the weekend of the 20th and
19 the 21st, you are, at least for some of the
20 time, up at the Lehman headquarters at 745
21 Seventh Avenue?
22     A.    Correct.
23     Q.    Why are you up there?
24     A.    On the weekend of the 21st -- well, we
25 should start when I started going to the Lehman

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2  offices, right?  And I started taking up camp
3  there because I went up there on that Thursday
4  when there was started to be a lot of confusion
5  in the morning, late morning hours about that
6  first lot that we were sending over in cash and
7  the collateral, so I decided to go to the Lehman
8  offices to make sure I was closer to talking to
9  the folks that I needed to get a hold of rather
10 than by phone.
11         And so at that point there, once I had
12 taken an office on the 31st floor, it was just a
13 matter of convenience a lot of times just going
14 back and forth between the Seventh Avenue office
15 and the 200 Park Avenue office of mine, so I
16 just needed a place to have a PC and work from
17 both place, no more, no less.
18     Q.    So at some point over the weekend
19 these discussions involving the DTCC people
20 begin.  How do you get brought into those
21 discussions.
22     A.    I don't remember how I was brought
23 into the discussions, but I just know that I was
24 part of the discussions when there was queries
25 about the outstanding trades that Lehman had

Page 102

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    Q.  Have you ever seen Exhibit 52 before?
3    A.  Yes.
4    Q.  When did you see it?
5    A.  I'm sure I saw it at the period of
6    time in September or October -- September, I
7    guess, only because it's to my attention, and I,
8    you know, vaguely remember something about this,
9    but nothing in particular.  It just looks
10   familiar, to be honest with you.  I don't know
11   why, it just looks familiar.
12   Q.  What, if anything, do you remember
13   about it?
14   A.  Nothing.  Absolutely zero.
15   Q.  Were you involved in negotiating this
16   letter agreement?
17   A.  No.  I don't even understand enough
18   about it, to be honest, what it even means.
19   Q.  Did you attend any meetings where this
20   letter agreement was discussed?
21   A.  Unless this was part of the meetings
22   that we had over that weekend where there were
23   discussions about, you know, the clearing of the
24   securities, I may have participated in those
25   meetings, and if that translated into this

Page 103

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    document, you know, then -- then I was party to
3    some of those meetings, yes.
4    The fact that they put it to my
5    attention, you know, because I was part of those
6    meetings or because I was the head of ops., I
7    don't recall, but it could have been one of
8    those two reasons.
9    Q.  You don't know why it's to your
10   attention?
11   A.  No, other than the fact that, as the
12   head of ops., and as being party to those
13   discussions with a number of these people at
14   DTCC on that weekend, that's the only thing I
15   can think of is why they put it to my attention.
16   Q.  Who at the DTCC did you talk to?
17   A.  Specifically, I didn't talk to
18   anybody, you know, that I can recollect, but I
19   know on the call was Larry Thompson, and I
20   believe Don Donahue was probably on those calls
21   as well.  And there might have been other people
22   in the room from DTCC.  Those are the two names,
23   you know, that I remember.
24   Q.  When you were on those calls, was
25   there any consensus reached or resolution

Page 104

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    reached as to how the trades were going to be
3    cleared?
4    A.  Not on the calls that I participated
5    in, there was no agreements.  There were
6    discussions about the MBSCC, how we -- the
7    governments and so forth, but there was no
8    resolution, I don't believe, that I was on that
9    says, okay, we're going to go in this direction
10   and that's the formal agreement or anything like
11   that.  I don't recall that.
12   Q.  Is it fair to say that the only thing
13   you do recall is what you told me before, is
14   that Barclays was not going to be responsible
15   for settling those trades?
16   A.  Right, that was the only thing that I
17   remember that sticks out in my mind from those
18   conversations.  Because it was such a prominent
19   point to DTCC and there was more than one
20   conversation on that subject, so that's why I
21   remember.
22   I don't know if there were other
23   reasons why we were on the call that might have
24   been minor issues.  There could have been.  I
25   just don't recollect.  That was the only major

Page 105

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    issue I remember, being who's going to own the
3    future settlements of the outstanding trades.
4    Q.  Do you recall any discussions about
5    whether Barclays would purchase any of the
6    assets that were --
7    A.  No, nothing along those lines.
8    Q.  Did you hear any discussion about --
9    A.  It was more -- it was all operational
10   in nature.  Settlement purposes, not execution
11   purposes.
12   Q.  Did you have an understanding that
13   there were other discussions or meetings with
14   the DTCC going on that you were not involved in?
15   A.  There may have been, yeah.  I would
16   assume that there were other discussions going
17   on that I wasn't party to.  I just don't know
18   specifically what they were or anything.
19   Q.  If you take a look at the paragraph of
20   the letter that's numbered number 1 that's in
21   bold, "Winding Down of Accounts"?
22   A.  Yes.
23   Q.  The letter reads, "Barclays has
24   indicated, and hereby agrees, that all of the
25   accounts of LBI maintained at the clearing

Page 1

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x

      In Re:                      Chapter 11

5     LEHMAN BROTHERS              Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,     (Jointly Administered)

6     ------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF GARY ROMAIN

10           New York, New York

11        Thursday, September 10, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24298

22

23

24

25

```
1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    are broadly three areas in which you are the
3    30(b)(6) witness.  One is to do with the OCC
4    margin and values.  The other has to do with
5    what we refer to as Schedule A and Schedule B
6    on the Asset Purchase Agreement, correct?
7        A.   Yeah.
8        Q.   And a third category were certain
9    documents or spreadsheets that were prepared
10   for Barclays auditors, right?
11       A.   Sure.
12       Q.   On the Schedule A, Schedule B
13   issues who did you speak with to get ready for
14   your 30(b)(6) deposition?
15       A.   The most significant conversations
16   I had in preparation were with -- let me go
17   through it -- with Sean Teague.  With Stephen
18   Callick.  With Jerry Shi.  With Lee Bowell.
19   With Ian Cooper.
20       MR. SHAW:  Let me just ask to
21   clarify the question.  Mr. Tambe's
22   question involves specifically the
23   subject of the Schedule A and Schedule
24   B.  Were your conversations you
25   described on that subject or on other
```

```
1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    subjects?
3        THE WITNESS:  In terms of just the
4    Schedule A and Schedule B that would be
5    the -- discussion I've had on Schedule A
6    and Schedule B.  I have to give this
7    some thought.
8        (Pause on the record.)
9        A.   Actually, those five.  Schedule A
10   and Schedule B would be just Sean Teague.  The
11   other four would relate to the third item, the
12   OCC.
13       Q.   And on the auditor spreadsheets
14   who did you speak to if anyone to get ready to
15   testify on those topics?
16       A.   The auditor spreadsheets I didn't
17   speak to anybody in particular because the --
18   the two documents -- the two main documents,
19   one of which was put together by myself so
20   very little refreshing of memory was required.
21       The other one I worked with
22   consistently over the period.  So, again, very
23   little refreshing of my memory was required.
24       Q.   Did you read any deposition
25   testimony that's been given in this matter to
```

```
1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    get ready for your deposition?
3        A.   I read the deposition testimony of
4    Patrick Clackson.
5        Q.   And did you speak with Mr.
6    Clackson about his deposition testimony?
7        A.   No.
8        Q.   Did you speak with anyone else
9    about Mr. Clackson's deposition testimony
10   other than counsel?
11       A.   No.
12       Q.   You're currently employed by
13   Barclays, correct?
14       A.   That's correct.
15       Q.   And in what position?
16       A.   I'm head of technical accounting
17   and private equity finance for Barclays
18   Capital.
19       Q.   And how long have you been at
20   Barclays?
21       A.   Just over five years.
22       Q.   And before that where were you?
23       A.   I was at Deloitte for nine years
24   prior to that.
25       Q.   And do you hold any professional
```

```
1           G. ROMAIN - HIGHLY CONFIDENTIAL
2    certifications from any accounting bodies
3    anywhere in the world?
4        A.   I'm an ICA so the English and
5    Welsh Institutional Chartered Accountant.
6        Q.   Last September 2008, did you have
7    the same position that you have now?
8        A.   I did, yes.
9        Q.   Describe generally for me in the
10   time period of, say, August, through December
11   of 2008, broadly, what role you played in
12   connection with the Lehman acquisition.
13       A.   Sure.
14       Q.   So starting in August.
15       A.   Yeah.  In August I was involved in
16   an exercise placed on the published financial
17   information for Lehman to try to come up with
18   a picture of what the accounts of combined
19   Barclays and Lehman might look like.  Barclays
20   and Lehman use different sets of accounting
21   rules so the primary purpose of my involvement
22   was to try to eliminate those differences.  I
23   was then involved -- well, let's give a time
24   line.  So Friday the 13th of September --
25       Q.   It's the 12th of September.
```

1              G. ROMAIN - HIGHLY CONFIDENTIAL
2          A.   Friday, the 12th of September. I
3    became aware that some people were heading
4    over to New York in relation to a potential
5    deal with Lehman. I was called onto a
6    conference call in the early hours of Saturday
7    the 13th of September with Marie Stewart who
8    was my equivalent at Lehman, Lehman Brothers.
9    So the head of their technical accounting
10   department. Really to try to augment my
11   understanding. Because obviously during
12   August we only had access to published
13   financial information. So to augment my
14   understanding by talking to somebody who had a
15   greater understanding of their accounting
16   policies and how they feed into their
17   financial statements.
18          I then flew to New York on the
19   afternoon of Saturday, the 13th. When I
20   arrived it would have been early evening and I
21   was advised that the deal which was being
22   considered was no longer proceeding. A few
23   hours later I was called into the office by
24   Patrick Clackson. He had a few questions in
25   relation to a deal which may be resurrected at

1              G. ROMAIN - HIGHLY CONFIDENTIAL
2    that time. I didn't have any details of the
3    transaction that we were looking at but he had
4    a couple of accounting questions which I
5    answered for him.
6          The next time that I had
7    involvement was -- it would have been
8    mid-morning on Monday, the 15th, when I and a
9    number of others headed across to the Lehman
10   headquarters at -- on Seventh Avenue with the
11   understanding that there was a deal which was
12   now being pursued. And I spent the next 24 to
13   30 hours I guess over there. I can't remember
14   exactly when I left but it would have been
15   probably early afternoon Tuesday. During that
16   period I was providing support to -- well, to
17   Patrick Clackson and through him to a number
18   of individuals were involved in the
19   negotiations at that time. That assistance
20   was -- some of it was administrative, just
21   pulling together documents, copying them, and
22   providing them to them. Other was liaising
23   with a number of Lehman staff to try to get a
24   number of information that they were asking --
25   Barclays executives were asking for.

1              G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.   Let me stop you there.
3    A.   Sure.
4    Q.   So you're on the Monday/Tuesday of
5    the week of the bankruptcy.
6    A.   That's right.
7    Q.   You've described some of the
8    support you were providing Mr. Clackson and
9    others those two days.
10          Is it fair that on that
11   Monday/Tuesday you were not involved in
12   negotiating any aspect of the transaction?
13          A.   That's correct. I wasn't involved
14   in any of the negotiations.
15          Q.   Were you doing any valuation
16   exercises of Lehman's assets on the
17   Monday/Tuesday?
18          A.   No, I was not.
19          Q.   Were you aware that there were
20   valuation discussions taking place between
21   Barclays and Lehman on that Monday/Tuesday?
22          A.   I was aware that valuation was an
23   element of the conversations which were going
24   on. But I wasn't involved in discussions
25   themselves.

1              G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.   What if anything do you recall
3    about the nature of the valuation discussions
4    that you understood were taking place?
5    A.   I don't really have any
6    understanding of the nature.
7    Q.   All right. So let's carry on back
8    with the time line. You were talking about
9    Monday/Tuesday. Carry on.
10          A.   Sure. So from that period onwards
11   the main task which was given to me was to
12   look towards our accounting treatment and
13   eventual disclosure of the transaction. So
14   over the next period of -- well, from then
15   right through till shortly before our
16   financial statements were published in
17   February I had and maintained the acquisition
18   balance sheets which was -- until just before
19   it was published was in the form of an Excel
20   spreadsheet which was summarizing the balance
21   sheet which needs to be disclosed in our
22   financial statements in the 6-K. That was a
23   working document through that period of the
24   time line.
25          Q.   Okay. On that Monday/Tuesday of

Page 18

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  that week, the week of the 15th, were you
3  involved in reviewing or preparing any
4  materials for the board of directors of
5  Barclays?
6      A.   I was not involved in reviewing or
7  preparing any.
8      Q.   Okay.  Did you -- okay.
9      We're just going to pull an
10 exhibit and I'll discuss that with you.
11     A.   Sure.
12     (Pause on the record.)
13     Q.   Sir, I've placed before you a
14 document that's previously marked as
15 Exhibit 377A.
16     A.   Um-hum.
17     Q.   It has the Bates numbers
18 BCI-EX-115843 through -846.
19     A.   Um-hum.
20     Q.   Is that the final Excel version of
21 the acquisition balance sheet, sir?
22     A.   Yes.  That's correct.  It's --
23 sheets 844 and 845 are the final Excel --
24 well, 845, 845 and 846 are the final Excel
25 versions of the acquisition balance sheet.

Page 19

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  843 was and is the same information which is
3  put into a form appropriate for disclosure
4  because Barclays' balance sheet have a
5  prescribed format and the items in the
6  acquisition balance sheet needed to be
7  appropriately allocated amongst those balance
8  sheet categories for disclosure.
9      Q.   And so the acquisition balance
10 sheet, the Excel version, the -44, -45 and
11 -46, that's the document you were describing
12 before which was an evolving document which
13 finally rolled up to the disclosure document
14 which is the first page of the exhibit; is
15 that fair?
16     A.   It's fair.  To expand, when you
17 say final, it was final in that it was the
18 version which was disclosed in our 2008
19 financial statements.  Under the regulatory
20 accounting standards you have until twelve
21 months after the acquisition to finalize your
22 initial accounting for an acquisition.  That
23 anniversary hasn't quite passed yet and,
24 therefore, this is not final until we declare
25 our accounting disclosed.

Page 20

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2      Q.   And as you sit here, are you aware
3  of any adjustments or changes you expect to
4  make on the one-year anniversary?
5      A.   We don't expect to make any
6  changes.
7      Q.   And we'll come back to 377A later
8  in the examination.
9      A.   Sure.
10     (Deposition Exhibit 388A, document
11     bearing production number
12     BCI-EX-(S)-000520127 with attachment,
13     marked for identification as of this
14     date.)
15 BY MR. TAMBE:
16     Q.   Sir, I've placed before you a
17 document marked as 388A.  It's a cover e-mail
18 and what looks like a Powerpoint document
19 attached to it.  Please take a moment to
20 review it and let me know when you're done and
21 I'll ask you some questions.
22     (Document review.)
23     Q.   Sir, have you had a chance to
24 review it, sir?
25     A.   I have, yes.

Page 21

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2      Q.   Okay.  And you'll see the cover
3  e-mail is an e-mail from Marie Stewart and you
4  referred to her earlier, correct?
5      A.   That's right.
6      Q.   She was your counterpart at
7  Lehman.
8      A.   That's correct.
9      Q.   And this is a cover e-mail
10 addressed to you and looks like others at
11 Barclays; is that correct?
12     A.   Yes.  That's correct.
13     Q.   Who's Chris Weidler and Charles
14 Utley?
15     A.   Chris Weidler, he works in finance
16 based in London.  His title is head of
17 financial reporting.  European head of
18 financial reporting.  Charles Utley is the US
19 regional head of technical accounting based in
20 New York.
21     Q.   And the document that's attached
22 to this e-mail from Marie Stewart to you, was
23 that a document you had requested that she
24 provide you?
25     A.   I don't recall receiving this

Page 22

G. ROMAIN - HIGHLY CONFIDENTIAL

1   document.  I do recall Marie Stewart sending a
2   number of documents to me during the process
3   from Saturday on for the next couple weeks.  I
4   don't recall requesting or subsequently using
5   this document.
6        Q.   And having skimmed through the
7   document, do you have an understanding of what
8   the document is?
9        A.   I have an understanding that it
10  is -- it is the sum -- it's the summary of
11  some exercise to fair value elements of the
12  Lehman Brothers business.  That's what it
13  seems to be.
14       Q.   The e-mail from Marie Stewart is
15  dated the 13th of September.  The Saturday,
16  correct?
17       A.   Yeah.
18       Q.   And that's the day you flew over
19  from London to New York to join your
20  colleagues here.
21       A.   Yeah.
22       Q.   The transaction that was being
23  contemplated over that weekend, was that an
24  acquisition of the entirety of Lehman's

Page 23

G. ROMAIN - HIGHLY CONFIDENTIAL

1   business?
2        A.   The transaction that -- my
3   understanding of the transaction which I was
4   informed had not been proceeded with when I
5   left on Saturday was an acquisition of the
6   Lehman business.  That was my understanding.
7   But I wasn't involved in those discussions so
8   it's only an understanding.
9        Q.   And was it your understanding --
10  do you have an understanding what this e-mail
11  from Marie Stewart to you was in connection
12  with that contemplated transaction?
13       A.   No, I don't.
14       Q.   Do you recall using the attachment
15  to that e-mail for any purpose?
16       A.   No.
17            (Deposition Exhibit 389A, document
18       bearing production number
19       BCI-EX-(S)-00052084, marked for
20       identification as of this date.)
21  BY MR. TAMBE:
22       Q.   Sir, I've placed before you a
23  one-page document marked Exhibit 389A.  Take a
24  moment to review it and let me know when

Page 24

G. ROMAIN - HIGHLY CONFIDENTIAL

1   you're done.
2        A.   Sure.  Yeah.
3        Q.   You'll recognize this as an e-mail
4   from Mr. Clackson to you and many other folks
5   at Barclays.
6            Do you see that?
7        A.   Yeah.
8        Q.   Is Mr. Clackson someone you report
9   to directly?
10       A.   No, I report -- well, are you
11  asking now or at that time?
12       Q.   Let's ask back then.
13       A.   Back then I was reporting to Hugh
14  Shields who reported to Patrick Clackson.
15       Q.   And now?
16       A.   And now I report to Mark Merson
17  who reports to Patrick Clackson.
18       Q.   You'll see in Mr. Clackson's
19  e-mail, the second paragraph states, "We
20  nearly got there and the value created by the
21  deal would have been an incredible
22  $25 billion."
23            Do you see that?
24       A.   I do, yeah.

Page 25

G. ROMAIN - HIGHLY CONFIDENTIAL

1        Q.   Did you have any discussions with
2   anyone over that weekend about the value of
3   Lehman transaction, the deal that was being
4   contemplated?
5        A.   No, I didn't.
6        Q.   And just in orders of magnitude
7   the value of $25 billion, do you have any idea
8   how that compares to the value of the Lehman
9   operations that were contemplated being
10  acquired that weekend?
11       A.   No, I don't know.
12       Q.   You told us that on Monday, the
13  15th, you learned that a potential transaction
14  with Lehman possibly was back in
15  consideration, correct?
16       A.   That's correct.
17       Q.   And who did you hear that from?
18       A.   I heard that from James Walker who
19  was the CFO of the Americas at the time.
20       Q.   At Barclays.
21       A.   At Barclays Capital.
22       Q.   And what were you told about the
23  nature of the contemplated transaction on
24  Monday, the 15th?

Page 26

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2    A.   At that time very little.  I was
3    essentially providing support to a group of
4    people that were negotiating to make a deal.
5    But I wasn't involved in the negotiation of
6    the deal directly.  So my involvement was much
7    more limited to the information I was
8    providing at that time.
9        Q.   Was it your understanding either
10   on Monday or in the subsequent days that the
11   transaction that was being contemplated was a
12   purchase of select assets from Lehman
13   Brothers?
14       A.   Yes.
15       Q.   Did you have an understanding as
16   to whether Barclays was negotiating the value
17   at which it would be purchasing those assets
18   from Lehman Brothers?
19       A.   I didn't have an understanding of
20   the negotiations as involves those terms, no.
21       Q.   At any time, has it been your
22   understanding that Barclays purchased assets
23   from Lehman at a value other than the book
24   value at which those assets were being carried
25   by Lehman?

Page 27

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2    A.   Sorry.  I'm not sure I understand
3    the question.
4        Q.   Lehman had a series of assets that
5    it carried at some value on its books,
6    correct?
7        A.   Yeah.
8        Q.   Is it your understanding -- has it
9    ever been your understanding, that Barclays
10   purchased some selection of those assets at
11   values other than the book values at which
12   Lehman carried those assets?
13       A.   I didn't have an understanding of
14   a transaction whereby we were purchasing
15   certain assets at a particular value.  I had
16   an understanding of the assets that were being
17   purchased which grew over time and I have an
18   understanding of the amount of consideration
19   which was being paid as being elements of the
20   deal.  But in terms of the relationship
21   between the two, I wasn't involved in the
22   discussions as to how those terms were arrived
23   at.
24       Q.   In connection with the Lehman
25   transaction, did anyone ever use the phrase

Page 28

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2    "block discount"?
3        A.   I don't recall anybody using the
4    phrase.
5            (Deposition Exhibit 390A, document
6        bearing production numbers
7        BCI-EX-(S)-00023761 through
8        BCI-EX-(S)-00023762 with attachment,
9        marked for identification as of this
10       date.)
11   BY MR. TAMBE:
12       Q.   Sir, I've placed before you a
13   multi-page document marked Exhibit 390A.  Take
14   a moment to review the document.  It's a cover
15   e-mail, a placeholder sheet, and then a small
16   spreadsheet.  Let me know when you're done.
17           (Document review.)
18       A.   Okay, yeah.
19       Q.   All right.  The cover e-mail, at
20   least the e-mail address block states it's
21   from Tom McCosker to several people at
22   Barclays but you recognize this as an e-mail
23   that you sent, correct?
24       A.   That's right.
25       Q.   You were sending it from Tom's

Page 29

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2    e-mail box.
3        A.   Absolutely.
4        Q.   The spreadsheet that's attached to
5    the cover e-mail, could you tell us what that
6    is?
7        A.   Well, that is -- that was a very
8    preliminary summary of assets and liabilities
9    which was put together into a balance sheet
10   format and I was asked to send to the people
11   in the "to" box there.
12           At the time I sent the e-mail I
13   was at the -- I was on the 31st floor of 745
14   providing support to Patrick and the
15   negotiators.  I was provided with these
16   numbers as being numbers to put into that
17   format and sent.
18       Q.   In your cover e-mail you'll see a
19   reference to the PC used was installed with an
20   updated version of Excel.
21           Do you see that?
22       A.   Yeah.
23       Q.   Was that a Lehman PC that you were
24   using to create this?
25       A.   No.  It was a Barclays laptop that

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    we'd taken across.
3          Q.    On your acquisition summary, the
4    third page of the exhibit, the calculation
5    there begins with the line item that states
6    Inventory Carrying Amount.
7              Do you see that?  64 billion?
8          A.    I do, yes.
9          Q.    Where did that number and the
10   other numbers on the sheet come from?
11         A.    I don't recall who provided them
12   to me.  At that stage I wouldn't have been
13   involved in any of the underlying work so I
14   was provided with those numbers to send and at
15   that time, the 16th of September, would have
16   obviously been very preliminary numbers.
17         Q.    And the next line item on that
18   page, the third page of 390A, is Inventory
19   Valuation Adjustment.
20              Do you see that?
21              And that's a negative $3.5 billion
22   number.
23         A.    Yeah.
24         Q.    Right.  Do you know what that's a
25   reference to?

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          A.    I don't, no.
3          Q.    If you look on your cover e-mail
4    that you sent you refer to that $3.5 billion
5    adjustment as a writedown.
6              Do you see that?
7          A.    I do, yeah.
8          Q.    Was it your understanding that the
9    carrying value of these assets was being
10   written down by Barclays in calculating this
11   acquisition summary?
12         A.    At that time I didn't have enough
13   information to have a real sense.
14         Q.    You had on the liability section a
15   bonus accrual item of 1.3 billion.
16              Do you see that?
17         A.    Yeah.
18         Q.    And, again, do you know the source
19   of that number?
20         A.    I don't, no.
21         Q.    I'm sorry if I've already asked
22   you this.  Who was providing you with these
23   numbers?
24         A.    I don't recall who provided me
25   with those numbers precisely.  It would have

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    been somebody that was involved in the process
3    but I couldn't pinpoint to it an individual.
4          Q.    And, again, I'm just trying to
5    understand the exercise that was going on when
6    this sheet was prepared.
7          A.    Sure.
8          Q.    You had an Excel spreadsheet
9    opened and someone was giving you assets and
10   liabilities to put into a balance sheet, a
11   rudimentary balance sheet; is that right?
12         A.    That's correct.
13         Q.    Sir, I've handed you a document
14   that was previously marked as Exhibit 378.
15   It's a covering e-mail, a placeholder sheet,
16   and then a Powerpoint presentation.  Take a
17   moment to review the document and please let
18   me know when you're done.
19              (Document review.)
20         A.    Okay.
21         Q.    The attachment to the cover
22   e-mail, the Powerpoint document, have you seen
23   that document before today, sir?
24         A.    I've seen it in preparation for
25   the deposition.  If it's -- or if not this

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    one, something which looks very similar to it.
3          Q.    Just keep that document in front
4    of you.  I'm marking another exhibit.
5          A.    Um-hum.
6              (Deposition Exhibit 391A, document
7              bearing production numbers
8              BCI-EX-001766522 through
9              BCI-EX-001766536, marked for
10             identification as of this date.)
11   BY MR. TAMBE:
12         Q.    Sir, I've had placed before you a
13   document marked 391A.  Please take a look at
14   it.  It's also a Powerpoint presentation with
15   a similar title to Exhibit 378.
16              Is that the document you reviewed
17   in preparation for the deposition?
18              MR. SHAW:  I note that there
19   appear to be multiple documents here.
20         A.    Are these identical?
21              Oh, no.  This one has some
22   scribbles on it.
23              They look very, very similar so
24   I'm not sure.
25         Q.    And just as a housekeeping matter,

Page 34

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   the last three pages of the exhibit, I think
 3   we can just extract.  It's a different form of
 4   document.  It look like a memo.
 5        A.   Oh, okay.
 6        Q.   You can just pull those right off.
 7        A.   Sure.
 8        Q.   So the exhibit will just be the
 9   Powerpoint presentation.
10        A.   Okay.
11        Q.   So looking at the Powerpoint
12   presentation it appears to be on a quick
13   summary similar to the document that's
14   attached to Exhibit 378 except for some
15   handwritten scribbles; is that right?
16        A.   It appears to be, yes.
17        Q.   Are those your handwritten
18   scribbles there?
19        A.   No.  That's not my handwriting.
20        MR. TAMBE:  I could ask counsel.
21   We received this collection of documents
22   I believe yesterday.  Is that right,
23   Terry?
24        MR. McMAHON:  Right.
25        MR. TAMBE:  Whose files did these
```

Page 35

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   documents come from?
 3        MR. SHAW:  If it's what I think it
 4   is, then this was from a collection of
 5   hard copy documents that Mr. Romain had.
 6        MR. TAMBE:  Okay.
 7   BY MR. TAMBE:
 8        Q.   Is that fair, Mr. Romain?  Was
 9   that a collection of hard copy documents that
10   you turned over to your counsel.
11        A.   Yes, that's true.
12        Q.   And it's possible that in that
13   collection of hard copy documents were
14   documents with other people's handwriting on
15   them?
16        A.   Yes.
17        Q.   And you wouldn't know whose
18   handwriting this is on Exhibit 391A; is that
19   fair?
20        A.   No, no.
21        Q.   Do you understand the nature of
22   the handwriting?  I believe you're looking at
23   page 5 of the Powerpoint.
24        A.   I'm looking at page 5.  No, I'm
25   not aware of what the amendments were there
```

Page 36

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2   for.
 3        Q.   If you look at that column that
 4   states New Transaction Included Gross, do you
 5   see that column?
 6        A.   I do, yes.
 7        Q.   That column totaled up to
 8   75.3 billion?
 9        Do you see that?
10        A.   I do, yeah.
11        Q.   And the heading on this Powerpoint
12   page states total assets and new transaction
13   are 75 billion.
14        Do you see that?
15        A.   I do.
16        Q.   Any understanding as to where that
17   number comes from, the $75 billion number?
18        A.   No, I don't.  There were multiple
19   spreadsheets circulating around that time as
20   the nature of the deal and information changed
21   around that time and subsequently.  So I
22   wouldn't know -- I wouldn't know what set of
23   numbers these were drawn from.  But given the
24   date they would certainly have been very
25   preliminary numbers.
```

Page 37

```
 1        G. ROMAIN - HIGHLY CONFIDENTIAL
 2        Q.   And looking at this exhibit,
 3   Exhibit 391A, if you turn to the second page
 4   of the exhibit -- yeah, that's the one.
 5        It states Project Long Island
 6   Board Discussion Materials.
 7        Do you see that?
 8        A.   I do.
 9        Q.   And do you understand these were
10   materials prepared for discussion at a board
11   of directors meeting at Barclays?
12        A.   I don't know that.
13        Q.   Well, if you turn to the next
14   page, page 2 of the presentation, the very
15   last point on that page states, "We are
16   seeking board approval for the transaction and
17   to issue 612 million Barclay shares."
18        Do you see that?
19        A.   I do.
20        Q.   Does that help your understanding
21   that this was prepared for the board of
22   directors meeting for Barclays?
23        A.   I don't know that.
24        Q.   Did the $75 billion number we were
25   talking about a few minutes ago, are you aware
```

G. ROMAIN - HIGHLY CONFIDENTIAL

2 of any other description of the assets to be
3 purchased being provided to the board of
4 directors on or around the 16th of September?
5        A.   I wasn't involved in the provision
6 of materials to the board.
7            (Deposition Exhibit 392A, document
8        bearing production numbers
9        BCI-EX-(S)-00023813 through
10       BCI-EX-(S)-0023814, marked for
11       identification as of this date.)
12 BY MR. TAMBE:
13       Q.   Sir, I've handed you a two-page
14 document marked 392A. It's an e-mail chain.
15 Take a moment to review it and let me know
16 when you're done.
17           (Document review.)
18       A.   Okay.
19       Q.   You'll see the cover e-mail, the
20 first e-mail at the top of the page, the first
21 page of Exhibit 392A, is someone from called
22 Vivek Syal?
23       A.   Um-hum.
24       Q.   To you and then c.c.'d to others.
25           Do you see that?

G. ROMAIN - HIGHLY CONFIDENTIAL

2        A.   Yes.
3        Q.   Who is Vivek Syal?
4        A.   He works for Barclays Capital but
5 are you asking for what role he would have
6 been performing at that time?
7        Q.   If you know, yeah.
8        A.   I can't recall the exact title.
9 He was -- he was a member -- a function which
10 I would describe as similar to investor
11 relations, but Barclays Capital rather than
12 Barclays Group.
13       Q.   And you'll see that Vivek is
14 forwarding you an e-mail which has a
15 calculation in it.
16           Do you see that?
17       A.   Yes.
18       Q.   And the e-mail that's being
19 forwarded to you, and you were a c.c. on that
20 original e-mail as well, begins with the
21 following phrase:  "Following the numerous
22 e-mails on people trying to reconcile the
23 75.3 billion pound in the board dec and in
24 particular wanting to understand the
25 19.9 billion in the board dec..." and then it

G. ROMAIN - HIGHLY CONFIDENTIAL

2 goes on.
3            Do you recall on or about the 16th
4 being involved in any discussions about
5 reconciling numbers in the board dec?
6        A.   I recall this e-mail, certainly.
7        Q.   Okay.  So what do you recall about
8 this e-mail?
9        A.   I recall that Bill was trying to
10 reconcile a set of numbers he had and we had a
11 conversation.  I don't recall the entire
12 content of that conversation.  But essentially
13 during that period the numbers -- people's
14 understanding of the numbers on the 16th and
15 subsequent to that, was changing over time.
16 And I was trying to help Bill to track down
17 where the number that he was referring to may
18 have come from.
19           In terms of the source of the
20 information which is included here, I don't
21 know where -- I don't know where those numbers
22 would have come from.
23       Q.   And what you're referring to are
24 the numbers in Bill Castell's e-mail, the
25 asset and liability numbers, the other

G. ROMAIN - HIGHLY CONFIDENTIAL

2 calculations, correct?
3        A.   Precisely.
4        Q.   Were you ever able to answer his
5 question as to reconciling the 75.3 billion
6 number?
7        A.   I don't recall.
8        Q.   Did you ever conclude that that
9 was an incorrect number?
10       A.   The numbers which were circulated
11 for a variety of purposes between a number of
12 people during that period were based on
13 preliminary estimates and people's best
14 understanding of numbers.  So I wouldn't use
15 the word incorrect.  I would say that the
16 numbers -- the appropriate numbers for the
17 deal changed over time for a variety of
18 reasons until we ended up with the numbers
19 that were disclosed in our annual report.
20       Q.   Were you involved at all in
21 calculating any of the numbers that were
22 disclosed to the Street in the analyst call
23 that was held on the 17th of September?
24       A.   I don't recall any direct
25 involvement.  I may have answered questions

Page 42

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     from people who were involved in that. But it
3     would be difficult to say more than that.
4          Q.   And certainly when Barclays was
5     speaking to the Street on the 17th, Barclays
6     would have made an effort to be accurate in
7     its description of the transaction, correct?
8          A.   Because I wasn't involved in the
9     conversation, I think I probably -- I don't
10    have a great understanding of what the form
11    and requirements are for those type of
12    announcements. So I wouldn't want to comment
13    inaccurately.
14         Q.   Okay. Well, I would expect
15    accuracy to be one of the requirements,
16    correct?
17         A.   I would expect that -- I would
18    expect faithful representation. Accuracy is a
19    term which is difficult to find when -- based
20    on provisional information.
21         Q.   Do you have any understanding of
22    the headings Gross and Net as they're used in
23    that calculation that's provided by Mr.
24    Castell to you and others?
25         A.   No. I -- no, I don't know what

Page 43

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     those columns specifically represented, no.
3          Q.   But if you just follow the math,
4     it appears that on a line-by-line basis there
5     is a gross number, there's a parenthetical
6     which appears to be a deduction, and then a
7     net number.
8              Do you see that?
9          A.   I do.
10         Q.   Okay. And this is all in the
11    section titled FV Inventory.
12         A.   Yes.
13         Q.   And you recognize that as fair
14    value inventory?
15         A.   Yes.
16         Q.   Do you have any understanding as
17    to why, on or about the 16th of September,
18    these adjustments were being made to the gross
19    valuation numbers?
20         A.   No, because I don't have a sense
21    of what the gross column represents. I don't
22    have a sense of what might be deducted or why.
23         Q.   If you flip over to the next page,
24    at the top of the page there's two lines. One
25    line simply means minus and there's a negative

Page 44

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     1.5 number.
3              Do you see that?
4          A.   I do.
5          Q.   And then there's a little asterisk
6     that states Unallocated Deduction. Not
7     assigned to a specific asset class.
8              Do you see that?
9          A.   Yeah.
10         Q.   And, again, were you aware on or
11    around the 16th of a roving unallocated
12    deduction to fair value?
13         A.   No.
14         Q.   This calculation rolls up to a
15    negative goodwill number of 3 -- I presume
16    billion -- pretax.
17              Do you see that?
18         A.   Yeah.
19         Q.   What is negative goodwill?
20         A.   Goodwill, positive or negative, is
21    an accounting concept which is calculated as
22    the difference between net assets acquired and
23    consideration paid in an acquisition.
24         Q.   So if you were going to calculate
25    a gain on acquisition you would need to

Page 45

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     calculate the negative goodwill; is that
3     correct?
4          A.   If you were to put together the
5     accounting for an acquisition you would
6     calculate -- you would calculate goodwill, and
7     depending on whether the goodwill is positive
8     or negative, the treatment would differ. If
9     goodwill is negative it would be included in
10    the income statements as a profit.
11             (Deposition Exhibit 393A, document
12         bearing production numbers
13         BCI-EX-(S)-00052197 through
14         BCI-EX-(S)-00052198, marked for
15         identification as of this date.)
16    BY MR. TAMBE:
17         Q.   Sir, just before we go on to the
18    exhibit that's been placed before you I just
19    want to make sure I understood your last
20    answer.
21         A.   Sure.
22         Q.   I believe you said if goodwill is
23    negative it would be included in the income
24    statement as a profit; is that right?
25         A.   For accounting purposes; that is

```
1         G. ROMAIN - HIGHLY CONFIDENTIAL
2    correct, yes.
3        Q.   All right.
4            Sir, I've placed before you a
5    two-page document marked 393A.  It's a cover
6    e-mail and a spreadsheet.  Have you had a
7    chance to review the document?
8        A.   I have, yes.
9        Q.   The attachment, do you have an
10   understanding of what that attachment is?
11       A.   It's a schedule which I did see at
12   the time which was produced by Lehman, I
13   believe.  Yeah.
14       Q.   If you'd have Exhibit 392A in
15   front of you.  If you turn to page 2 of
16   Exhibit 392A, that's the calculation from Bill
17   Castell that we were looking at a few minutes
18   ago.  That has a total asset number of 72.05.
19           Do you see that?
20       A.   Yeah.
21       Q.   And the spreadsheet in
22   Exhibit 393A has an Adj. total assets of
23   72.65.
24           Do you see that?
25       A.   I do.
```

```
1         G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   Do you have any understanding in
3    Exhibit 393A what the nature of the adjustment
4    is that's referred to in Adj. total assets?
5        A.   No, I don't.
6        Q.   And in Exhibit 393A which is the
7    Lehman-prepared document you testified about,
8    the Pure Payment and Comp Payment under
9    Liabilities, did you have an understanding on
10   the 16th what the source of those numbers was?
11       A.   No, I didn't.
12       Q.   As you sit here, do you know where
13   those numbers came from on the 16th?
14       A.   No, I don't.
15       Q.   Was it your understanding that
16   those numbers were inserted there to balance
17   out this balance sheet?
18       A.   No.  I don't have any
19   understanding of the source of any of the
20   numbers on the spreadsheet.
21           (Deposition Exhibit 394A, document
22   bearing production numbers
23   BCI-EX-(S)-00052200 through
24   BCI-EX-(S)-00052201, marked for
25   identification as of this date.)
```

```
1         G. ROMAIN - HIGHLY CONFIDENTIAL
2    BY MR. TAMBE:
3        Q.   Sir, I've placed before you a
4    two-page document marked Exhibit 394A.  Take a
5    moment to review it and let me know when
6    you're done.
7            (Document review.)
8        A.   Okay.
9        Q.   And you'll recognize at the top of
10   this exhibit, there's an e-mail exchange at
11   the top, the first page, and the top e-mail is
12   from James Walker to you and others.
13           Do you see that?
14       A.   Yes.
15       Q.   And the attachment is a marked-up
16   portion of what appears to be a balance sheet.
17           Do you see that?
18       A.   Yes.
19       Q.   Do you have an understanding as to
20   what this document is and what the handwritten
21   notations are?
22       A.   My understanding is that this was
23   another version of a representation of assets
24   and liabilities based on information at the
25   time.  It's clear that we were trying to tie
```

```
1         G. ROMAIN - HIGHLY CONFIDENTIAL
2    this out to some other document.  During that
3    week there were many exercises of this nature
4    as understanding of the transaction and its
5    component parts changed.
6            So that was part of that ongoing
7    process.
8        Q.   Any idea as to what you're trying
9    to tie this spreadsheet out to?
10       A.   No.
11       Q.   And is this your handwriting on
12   the second page of the exhibit?
13       A.   No.
14       Q.   394A?
15       A.   No.
16       Q.   Do you know whose handwriting it
17   is?
18       A.   I don't know.
19           (Deposition Exhibit 395A, document
20   bearing production numbers
21   BCI-EX-(S)-00052268 through
22   BCI-EX-(S)-00052270, marked for
23   identification as of this date.)
24   BY MR. TAMBE:
25       Q.   Sir, I've placed before you a
```

---

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    three-page document marked Exhibit 395A.  Take
3    a moment to review it and let me know when
4    you're done.
5            (Document review.)
6        A.   Okay.
7        Q.   Now, this is an e-mail you'll see
8    from Bill Castell to several folks at Barclays
9    and other places.
10           Do you know what the purpose of
11   that this e-mail was?  I see addresses here
12   for db.com.  I assume that's deutschebank.com?
13       A.   I don't know the people but db.com
14   is the standard e-mail ending for Deutsche
15   Bank, yes.
16           I don't have an understanding as
17   to the purpose for this.
18       Q.   Okay.
19       A.   It implies that there was a call
20   so...
21       Q.   And there's a reference to an 0745
22   DD call.  Does that have any meaning to you?
23       A.   No.  DD could mean a number of
24   things.  I'm not sure.
25       Q.   Okay.  And this e-mail from Bill

---

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    Castell has another calculation of total
3    assets, total liabilities.
4        A.   Um-hum.
5        Q.   Do you know where these numbers
6    come from?
7        A.   No.  No, I don't know where he got
8    them from.
9        Q.   Were you ever a participant in
10   discussions with analysts about this
11   transaction?  External analysts about the
12   Lehman Barclays transaction?
13       A.   No.
14       Q.   In the week of the 15th, do you
15   recall discussions about how and where the
16   assets that were being acquired were going to
17   be booked?  And by where I mean what entity.
18   What legal entity.
19       A.   During that week I don't recall
20   any discussions along those lines, no.
21       Q.   Okay.  Subsequent to that week, do
22   you recall any discussions about how and where
23   the assets were going to be booked?
24       A.   Yes.  Yes, there were numerous
25   discussions around entity allocations within

---

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    Barclays group, over the next period of time.
3    I'm not sure exactly how long.
4        Q.   And what you refer to as entity
5    allocations, what drove the decision as to
6    what entity was selected for allocating
7    particular assets?
8        A.   I don't think there was a single
9    determining factor.  As with any decision of
10   that nature you'd be considering a number of
11   things like infrastructure that was present in
12   the various entities.  Capital.  The normal
13   activities of the entities.  These are issues
14   of a type which I would expect to feed into
15   it.  But at a time which I recall being raised
16   at one time or another.
17       Q.   How about tax considerations?
18       A.   Tax considerations as well, yes.
19       Q.   So that would be a fourth.  It
20   wasn't included in one of the three you
21   mentioned.
22       A.   They were examples.
23       Q.   So let's make sure we covered all
24   the possible reasons why you might choose to
25   allocate in one entity versus another.  You

---

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    mentioned infrastructure.  You mentioned
3    capital, by which I assume you mean regulatory
4    capital requirements?
5        A.   Primarily.  Yeah, it would seem to
6    be encapsulated in regulatory capital.
7        Q.   Then you talked about normal
8    activities.  So I guess you were allocating
9    the assets to entities that's consistent with
10   their normal activities.  Is that what you
11   mean?
12       A.   Yes.
13       Q.   And then another consideration
14   would be tax.
15       A.   Yes.
16       Q.   You want to minimize the tax
17   burden on the enterprise as a whole; is that
18   right?
19       A.   Well, I don't work in the tax
20   department so I wouldn't be able to say the
21   tax minimization is always the primary reason.
22   But tax considerations I would expect to be
23   considered -- I wouldn't be able to represent
24   that list of four generic categories as an
25   exhaustive list clearly.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.   In connection with the
3     Lehman/Barclays transaction and the
4     allocations of assets to particular Barclays
5     entities, can you identify any other reason
6     for the allocation other than these four that
7     we've discussed?
8          A.   Not off the top of my head, no.
9          MR. TAMBE:  Let's just take a
10     short break and we'll continue.
11          THE WITNESS:  Sure.
12          (Recess taken.)
13     BY MR. TAMBE:
14          Q.   Sir, I've placed before you a
15     document that was previously marked as
16     Exhibit 283A.  It's a somewhat longer e-mail
17     chain.  So if you want to start from the back
18     and read your way up to the front, let me know
19     when you're done and I'll ask you some
20     questions.
21          (Document review.)
22          A.   Okay.
23          Q.   This e-mail chain, Exhibit 283A,
24     starts off with an e-mail from you at the top
25     to Caroline Owen and others.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Do you see that?
3          A.   Yeah.
4          Q.   And you're asking for a
5     coordinated approach on how assets are brought
6     onto the Barclays balance sheet, correct?
7          A.   Yeah.
8          Q.   In your second paragraph of your
9     e-mail you state, the second sentence, "I've
10     heard nothing about an SPV plan and generation
11     of gain in PLC..."
12          And then the sentence goes on.
13          A.   Yeah.
14          Q.   One, what did you mean by SPV
15     plan?
16          A.   There's a reference in Mark
17     Rudduck's e-mail two down about potential sale
18     to an SPV which is responding to a reference
19     in Beatrice Montaudy's preceding e-mail of a
20     plan to acquire assets through an SPV of
21     Barclays.
22          Q.   Do you recall --
23          A.   At all times -- what I was saying
24     there was that I hadn't heard about it and
25     that if there were discussions on it that the

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     broader finance needs to be involved.
3          Q.   Do you recall having had
4     discussions with any of these people who are
5     on this e-mail chain about an SPV plan?
6          A.   No, I'm not sure what plan
7     Beatrice would have been talking about at that
8     time.
9          Q.   And the other phrase you use in
10     your e-mail was generation of gain in PLC.
11          Do you see that?  It's in your
12     e-mail, the first e-mail.
13          A.   Yeah.
14          Q.   And when you refer to PLC you're
15     talking about Barclays Bank PLC, correct?
16          A.   Yeah.  I'm referring back to
17     Beatrice's e-mail where she identifies the
18     plan as being to acquire through SPV of BBPLC
19     and sell to BCSl to recognize a gain in BBPLC.
20     So I was -- I was saying I didn't know
21     anything about such a plan.
22          Q.   Just so I get through the
23     abbreviations, BBPLC is just Barclays Bank
24     PLC, right?
25          A.   That's correct.

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          Q.   And BCSL is?
3          A.   It's Barclays Capital Securities,
4     Ltd.  I'm 99 percent sure that's the name of
5     it.
6          Q.   Okay.  And both the PLC and the
7     limited company are non-US companies, correct?
8          A.   They are both UK companies.
9          Q.   Okay.  And your reference or the
10     reference to recognition of gain --
11          A.   They're both UK companies.  That's
12     not to say that US operations and assets are
13     not owned by those.  So, for example, BBPLC
14     does have a New York branch.
15          Q.   And apart from those two entities,
16     you also have a US broker/dealer entity,
17     correct?
18          A.   That's correct.
19          Q.   And what's the name of that
20     entity?
21          A.   Barclays Capital, Inc. I think
22     is -- BCI is its normal reference.
23          Q.   And if you go to the third page of
24     Exhibit 283A, that's an e-mail from Beatrice
25     Montaudy, Mark Rudduck, and Jasen Yang.

Page 58

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2            Do you see that?
3        A.    Yes.
4        Q.    And she makes a reference in there
5    to the 46 percent marginal tax rate applicable
6    to BCI.
7            Do you see that?
8        A.    Yes.
9        Q.    And so that's the US tax rate
10    applicable to the US broker/dealer, correct?
11        A.    That's how I'd read the sentence.
12    I don't have a particular detailed knowledge
13    of the tax regimen.
14        Q.    In that same sentence, earlier in
15    that sentence she makes a reference to the
16    following:  "It was essential to the valuation
17    calculation that the 'discount' between the
18    value of the assets acquired and the purchase
19    price not be subject to the 46 percent
20    marginal US tax rate applicable to BCI."
21            Do you see that?
22        A.    I do.
23        Q.    Do you have any understanding as
24    to what she meant by that?
25        A.    No, I don't know.

Page 59

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    And the use of the word "discount"
3    in her sentence, was it your understanding
4    that the differential in the value of the
5    assets acquired versus the purchase price paid
6    was a discount?
7            MR. SHAW:  Objection to form.
8        A.    I don't recall reading the e-mail
9    chain down that far.  My response as I read
10    and recollect it was a response to the e-mail
11    from Caroline suggesting that I get involved.
12    So this is certainly the first time I recall
13    seeing the sentence and I don't have any sense
14    as to what Beatrice meant by it.
15        Q.    And other than this e-mail chain,
16    did you hear anyone else at Barclays refer to
17    that differential to mean the value of the
18    assets acquired and the purchase price as a
19    discount?
20        A.    No.
21        Q.    What is Beatrice Montaudy's
22    position?
23        A.    She works in the tax department in
24    New York.
25        Q.    And what's her position within the

Page 60

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    tax department?
3        A.    I'm not sure.  At the time she
4    reported to Susan Grbic.  She was the US head
5    of tax.
6        Q.    And do you know what her position
7    is now, Beatrice Montaudy's, if she's still
8    with the bank?
9        A.    She's still in the US tax
10    department, yes.
11        Q.    And her position?
12        A.    I don't know.
13        Q.    As the week goes on, Tuesday,
14    Wednesday, Thursday, that week of the 15th of
15    September, was it your understanding that the
16    nature of the transaction was changing?
17        A.    I don't recall precisely what day
18    I became aware of that but certainly by the
19    Monday when a deal had been executed I was
20    aware that the form of the deal was different
21    than that envisaged previously.
22        Q.    So you're comparing Monday, the
23    15th, to the weekend.
24        A.    Yes.
25        Q.    Now moving further in the week,

Page 61

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    was it your understanding that the deal that
3    was discussed and the deal that was the
4    subject of the acquisition sheets we were
5    looking at before, the Monday/Tuesday
6    transaction, did that change during the course
7    of the week?
8        A.    So from when to when?
9        Q.    So starting Monday, the 15th, the
10    day that Lehman declares bankruptcy, you go
11    back, you reengage in discussions with Lehman
12    on the 15th.
13        A.    Yeah.
14        Q.    That deal that evolves from those
15    discussions, does that change during the
16    course of the week as far as you know?
17        A.    Sorry.  That was the question I
18    was responding to previously.  I must have
19    misunderstood the question.
20            Yes.  It was -- so over the week
21    from the 15th to Monday, the 22nd when the
22    deal was executed, I understood that the form
23    of the deal changed.
24        Q.    As you sit her, what's your
25    understanding of the how the form of the deal

G. ROMAIN - HIGHLY CONFIDENTIAL

2  changed from the 15th to the 22nd?
3      So not what you knew at the time
4  but what you know now with the benefit of
5  everything that's happened.
6      A.   The main thing I know is that the
7  deal that was executed finally there may have
8  been changes in the form which I was not
9  specifically aware of.  The change in the form
10  I was aware of was that we were entering into
11  a repo type transaction involving the Fed but
12  that was the principal difference that I was
13  aware of.
14      Q.   Now, going back to the week of the
15  15th, did you become aware of this change to a
16  repo type transaction during that week?
17      A.   I can't recall precisely when I
18  became aware of that because I know I was
19  definitely aware of it by the 22nd.  It's
20  possible I was aware of that sometime before
21  then, but I can't recall accurately whether
22  that was the case or not.
23      Q.   Do you recall what role you played
24  on Thursday, the 18th, Friday the 19th, over
25  the weekend, onto the 22nd?  What were you

G. ROMAIN - HIGHLY CONFIDENTIAL

2  doing during that time frame?
3      A.   I don't accurately recall.  I was
4  involved in discussions around the balance
5  sheet I was maintaining so including lofty
6  placeholder numbers at that stage obviously
7  and speaking to people to try to improve
8  those.  But beyond that general level I don't
9  recall specific involvements during those
10  days.
11      Q.   Do you have any understanding of
12  any efforts made by Lehman and Barclays to
13  identify additional assets to be delivered by
14  Lehman to Barclays on Friday, the 19th, and
15  then the weekend that followed?
16      A.   No.
17      Q.   Was it your -- is it your
18  understanding that all of the assets acquired
19  by Barclays from Lehman, the deal that was
20  finally executed, are also assets that came
21  over as a result of the repo?
22      A.   My understanding was that the repo
23  transaction was involved but to my
24  understanding the assets that were acquired or
25  the liabilities that were incurred were

G. ROMAIN - HIGHLY CONFIDENTIAL

2  from -- I was less involved and interested in
3  how things developed during the week because I
4  wasn't particularly involved in that.
5      What I was interested in was the
6  deal which ended up getting done.  So it was
7  based on the deal documents and conversations
8  with those who understood elements of any one
9  asset class.  Rather than -- rather than any
10  sort of development or other sets of
11  discussions.
12      Q.   In terms of working with the
13  balance sheet which was a document that you
14  said was an iterative document that you were
15  working with, how did you obtain information
16  that you put into your work-in-progress
17  balance sheet?
18      A.   It was principally a process of
19  liaison and discussion across finance and with
20  others.  So I was speaking with many people
21  over the course of months to at first get an
22  understanding of the nature of the transaction
23  and the assets and liabilities that had been
24  acquired.  And then later at a more granular
25  level to get an accurate representation for

G. ROMAIN - HIGHLY CONFIDENTIAL

2  our books and records and annual report.
3      So it was a project size involving
4  a huge number of people in the back.
5      Q.   And did you actually sit down with
6  the Asset Purchase Agreement and use that as a
7  guide to helping you create the balance sheet?
8      A.   The Asset Purchase Agreement was
9  one of the documents which I looked at, yes.
10      Q.   And did you actually annotate the
11  Asset Purchase Agreement against the changes
12  that were made in the clarification letter?
13      A.   I made no annotations that I can
14  recall, no.
15      Q.   Okay.
16      A.   I -- no.
17      Q.   Were you aware of changes to the
18  Asset Purchase Agreement that were made via
19  the clarification letter?
20      A.   I wasn't aware of changes.  I
21  was -- the best way of putting it would be
22  that I looked at the Asset Purchase Agreement,
23  the amendment to the Asset Purchase Agreement,
24  and the clarification letter as a
25  representation of the transaction.  I wasn't

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  differentiating between the two.  I had to
3  look at all of them to get a sense of the
4  transaction that was done.
5      Q.    When's the first time you recall
6  seeing the Asset Purchase Agreement?
7      A.    I definitely saw -- I'd definitely
8  seen it by the 18th.  It's possible I may have
9  seen a draft a day or two before that.  I say
10  a draft.  A version or a copy.  I definitely
11  have an e-mail which indicates that I had it
12  on the 18th because I looked for that in
13  preparing for this deposition.
14      Q.    Do you recall what the event or
15  circumstance was that makes you so sure that
16  you had it by the 18th?  You saw an e-mail?
17      A.    I saw an e-mail.
18      Q.    Sorry.  Do you know why you were
19  provided with a copy on the 18th?
20      A.    Because I was responsible for
21  putting together the acquisition balance
22  sheets and it was important I had a sense of
23  the transaction so I was seeking to get copies
24  of relevant deal documentation.
25      Q.    When's the first that you saw the

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  clarification letter?
3      A.    Again, in preparing for the
4  deposition I had looked at my e-mails and I
5  definitely have an e-mail on the 22nd which
6  had the clarification letter attached to it.
7      Q.    Did you find any indication in
8  preparing for your deposition that you
9  received a copy of the clarification letter
10  prior to the 22nd?
11      A.    No.
12      Q.    And in terms of the process you
13  followed in putting together the balance sheet
14  you actually sat down with the operative legal
15  documents to help you prepare the balance
16  sheet?
17      A.    I referred to them, yes.  Yes.
18          (Deposition Exhibit 396A,
19      three-page document bearing production
20      numbers 464242, marked for
21      identification as of this date.)
22  BY MR. TAMBE:
23      Q.    Sir, I've placed before you a
24  three-page document marked Exhibit 396A.  Take
25  a moment to review it and tell me when you're

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  done.
3          MR. SHAW:  I'll note that there
4  appears to be an erroneous or additional
5  unknown date on this at the very top.
6  I'm not sure if it's just an artifact of
7  the document production.
8          MR. TAMBE:  Yeah.  The first two
9  lines on page 1 are an artifact of the
10  document production.  As is the date
11  that appears in the bottom left-hand
12  corner.
13          (Document review.)
14      A.    Okay.
15      Q.    And you'll see your cover e-mail
16  is an e-mail from you to Martin Kelly at
17  Lehman.
18          Do you see that?
19      A.    Yes.
20      Q.    And others.
21      A.    Yes.
22      Q.    And who is Martin Kelly?
23      A.    At that time?
24      Q.    Yeah, at that time.
25      A.    Martin was -- I'm not sure

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  precisely what his position was but he was a
3  senior member of finance for Lehman.
4      Q.    Okay.  And what role does he have
5  now?
6      A.    He's now the CFO of the Americas
7  for Barclays Capital.
8      Q.    And if you follow this e-mail
9  chain it starts with a request from Patrick
10  Clackson to James Walker trying to acquire --
11  trying to obtain a balance sheet.
12          Do you see that?
13      A.    Yeah.
14      Q.    And then James sends that request
15  on to Martin Kelly.
16          Do you see that?
17      A.    Yeah.
18      Q.    And there's an e-mail then from
19  Martin to James Walker and to you with some of
20  the numbers on the balance sheet.
21          Do you see that?
22      A.    I see the e-mail, yes.
23      Q.    Just in terms of process, let me
24  ask you why was Barclays reaching out to
25  Lehman for an opening balance sheet?

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2         MR. SHAW:  Objection, foundation.
3         Q.   If you know.
4         A.   I don't know why James
5    specifically sent it to Martin.  During the
6    period we were speaking with Lehman employees
7    who had familiarity with some of the acquired
8    assets for some information.  But I
9    wouldn't -- I wouldn't know precisely why
10   James at that time thought that Martin was the
11   best source of information for the numbers at
12   that stage.
13        Q.   And as you developed your balance
14   sheet, the one that you worked on --
15        A.   Yeah.
16        Q.   -- did you work off of the Lehman
17   prepared balance sheet or did you create a new
18   balance sheet from scratch?
19        A.   I created a new balance sheet from
20   scratch.
21        Q.   Did you compare your balance sheet
22   to the Lehman balance sheet?
23        A.   There wasn't any Lehman balance
24   sheet as such that I was aware of.
25        Q.   And what I mean by the Lehman

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    balance sheet, the Lehman-prepared balance
3    sheet.
4         A.   Apart from this list here I'm not
5    aware of a parallel Lehman balance sheet
6    existing.
7         (Deposition Exhibit 397A, document
8         bearing production numbers
9         BCI-EX-(S)-00013605 through
10        BCI-EX-(S)-00013606 with attachment,
11        marked for identification as of this
12        date.)
13   BY MR. TAMBE:
14        Q.   Sir, I've handed you a document
15   marked Exhibit 397A.  It's a cover e-mail, a
16   placeholder sheet, and a spreadsheet.  Take a
17   moment to review it and let me know when
18   you're done.
19        (Document review.)
20        A.   Sure.
21        Q.   Have you had a chance to review
22   it?
23        A.   Yeah.
24        Q.   If you look at the cover e-mail,
25   the second e-mail on the first page is an

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    e-mail from Robert Azerad to you, James
3    Walker, and others.
4         Do you see that?
5         A.   Yeah.
6         Q.   And it attaches a document that's
7    titled Copy of Opening Balance Sheet.  There's
8    some more notations after that.
9         A.   Sure.
10        Q.   And the attachment appears to be a
11   spreadsheet.
12        Do you see that?
13        A.   Yeah.
14        Q.   And you'll see that several of the
15   items on that spreadsheet tie into the numbers
16   on the other exhibit we were looking at,
17   Exhibit 396A.
18        Do you see that?
19        A.   Yes.
20        Q.   Does this refresh your
21   recollection at all that you received a
22   spreadsheet from Lehman setting out the
23   opening balance sheet?
24        A.   Well, I clearly received this
25   spreadsheet, yes.

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2         Q.   Did you have any discussions with
3    Lehman about the valuation of the total assets
4    that's reflected on Exhibit 397A?
5         A.   No.  No.
6         Q.   And did you have an understanding
7    as to the source of that information?
8         A.   No, I don't have any understanding
9    as to the source.
10        (Deposition Exhibit 398A, two-page
11        document bearing production number
12        44230, marked for identification as of
13        this date.)
14   BY MR. TAMBE:
15        Q.   Sir, I've handed you a two-page
16   document marked Exhibit 397A.  Take a moment
17   to review that and let me know when you're
18   done.
19        (Document review.)
20        Q.   Oh, I'm sorry.  398A.
21        A.   Okay.
22        Q.   And in Exhibit 398A in the
23   middle -- towards the bottom of the first page
24   there's an e-mail from you to Martin Kelly.
25        Do you see that?

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      A.    Yes.
3      Q.    And you're in particular asking
4  him about his $44.88 billion number.
5         Do you see that?
6      A.    Yes.
7      Q.    And you ask him whether the
8  additional 1.9 billion of assets separate to
9  the 15(c)(3) is part of that 44.88 number.
10        Do you see that?
11     A.    I see that, yeah.
12     Q.    What's your understanding of what
13  the 1.9 billion of additional assets is a
14  reference to?
15     A.    The 1.9 is a reference there to
16  securities which were due to Barclays clearing
17  process.  And the purpose of my mail was
18  essentially to ensure that we weren't double
19  counting when trying to identify the assets
20  that needed to be valued.
21     Q.    And you see the response from
22  Martin Kelly to you where he says, "Includes
23  the 1.9B."
24        Do you see that?
25     A.    Yes.

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.    Do you recall further discussions
3  on this topic as to whether the 44.88 included
4  the 1.9?
5      A.    Yes.
6      Q.    And do you recall that ultimately
7  you resolved the 1.9 was not included as part
8  of the 44.88?
9      A.    Well, if we're using shorthand for
10  the 1.9 and the 44.88 to refer to assets from
11  the clearance box and assets which came across
12  the repo, then the conclusion of those
13  discussions was that not all of the assets
14  from the clearance boxes had come across.  And
15  there was some which were still to be
16  received.  The 1.9, 2.9, and 44.88 were not --
17  did not end up being represented as Barclays'
18  view of the fair value of the assets which is
19  the numbers that are represented in that
20  financial statement.
21        I'm not sure what the source of
22  those two numbers themselves and the values
23  was.
24     Q.    And it's your understanding that
25  the assets in the clearance boxes is what

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  ultimately became Schedule B; is that right?
3      A.    I don't have enough of an
4  understanding about the precise composition of
5  Schedule B as it relates to understanding
6  there.  My understanding was that Barclays was
7  o due to receive the assets from the clearing
8  box and we received some but not others at
9  that time.
10     Q.    Putting on your 30(b)(6) hat now
11  for a moment.
12     A.    Yeah.
13     Q.    What is your understanding of
14  Schedule A to the Asset Purchase Agreement?
15     A.    My understanding of Schedule A was
16  that it was the representation of the assets
17  which were coming across to Barclays against
18  the reverse repo.
19     Q.    So your understanding is that all
20  of the assets that are listed on Schedule A
21  were assets that had been pledged to the Fed
22  and were transferred to Barclays.
23        MR. SHAW:  Objection.
24        Mischaracterizes the prior testimony.
25        Foundation.

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.    You can answer if you understand
3  the question.
4      A.    I was aware that there was a
5  reconciliation process which was required of
6  Schedule A at the detailed CUSIP level but
7  it's my understanding that was what Schedule A
8  was intended to represent, yes.
9      Q.    Just so we're clear, every CUSIP
10  that appears on Schedule A it is your
11  understanding as the 30(b)(6) witness for
12  Barclays that every one of those CUSIPs was a
13  CUSIP that had been pledged to the Fed.
14     A.    No.  That's not my understanding.
15        MR. SHAW:  And I'm going to object
16  this witness has been offered only with
17  respect to the Schedule A and Schedule B
18  issues to talk about the Barclays effort
19  to value the securities that appear on
20  Schedule A and Schedule B.
21        MR. TAMBE:  Okay.  So let's just
22  mark the 30(b)(6) and maybe it's already
23  been marked.  Has it already been
24  marked?
25        MR. McMAHON:  This one I think has

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    not been.
3        MR. TAMBE:  Okay.  So then let's
4    mark it.  We'll just mark the 30(b)(6)
5    notice so we have some precision as to
6    what he's being offered for and what
7    he's not being offered for.
8        MR. SHAW:  Okay.
9        (Pause on the record.)
10   BY MR. TAMBE:
11       Q.   Sir, I've placed before you a
12   document that's been marked 81B.
13       MR. TAMBE:  My first question is
14   really a point of clarification for your
15   counsel.  On items 1 and 2 of Schedule A
16   of this 30(b)(6) notice for what -- for
17   what subjects or topics is Mr. Romain
18   the 30(b)(6) witness for Barclays?
19       MR. SHAW:  Mr. Romain is a
20   30(b)(6) witness on the issue of
21   Barclays' efforts to value the
22   securities that were on Schedule A and
23   Schedule B.
24   BY MR. TAMBE:
25       Q.   Taking off your 30(b)(6) hat, do

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    you have any understanding as to how the
3    assets that came to be listed on Schedule A
4    and Schedule B were selected?
5        A.   No, I don't.  No.
6        Q.   And taking off your 30(b)(6) hat,
7    do you have any understanding as to how the
8    assets on Schedule A and Schedule B were
9    transferred to Barclays?
10       A.   No, I don't.  No.
11       Q.   Do you have an understanding as to
12   whether the assets on Schedule A and Schedule
13   B have, in fact, been transferred to Barclays?
14       A.   In terms of -- at the CUSIP level
15   I was aware there was a reconciliation process
16   so my understanding is that is not a -- that's
17   not a perfectly accurate statement was my
18   understanding.  My involvement with the
19   Schedule A and Schedule B assets was in
20   relation to ensuring that the assets that were
21   received by Barclays were the properly
22   recorded value.  The process by which they
23   came to be transferred to Barclays is an area
24   which I don't have particular insight into.
25       (Pause on the record.)

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   Sir, I've placed before you a
3    document marked previously as Exhibit 86B.
4    Would you take a moment to look at this
5    spreadsheet and let me know when you're done.
6        (Document review.)
7        A.   Okay.
8        Q.   When you talked about the
9    valuation of the Schedule A and Schedule B
10   assets, does this document, Exhibit B, relate
11   to that process in any way?
12       A.   It does, yes.
13       Q.   Is 86B the summary level valuation
14   of the Schedule A assets?
15       A.   Yeah.  It's the summary level
16   valuation for -- yeah, for those assets.
17       Q.   So now with your 30(b)(6) hat
18   firmly on I'm going to ask you to explain to
19   me at the summary level from Exhibit 86B what
20   is the information that's in 86B.  And you can
21   start with the spreadsheet and go by rows or
22   columns.  Describe this collection of
23   information.
24       MR. SHAW:  Before we do, can we
25   just confirm that the witness believes

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    this was the final version of that?
3        MR. TAMBE:  Sure.
4        Q.   Is it the final version?
5        A.   It looks like the final version.
6    To be definitive I would need to compare -- to
7    be definitive sitting here right now I would
8    need to compare the numbers with those on the
9    acquisition balance sheet.
10       Q.   And we had earlier this morning
11   looked at what you believed to be the final
12   version of the acquisition balance sheet.
13       A.   Yeah.
14       Q.   Let me see if I can locate that.
15   Which is Exhibit 377A.
16       A.   Yeah.
17       Q.   Are you doing that comparison now,
18   sir?
19       A.   I am, yes.
20       Yes.  This is the final version.
21   There were some immaterial off-line
22   adjustments made just to tidy up right before
23   the financial statements were published but
24   the differences were very minor.
25       Q.   So keep before you the final

Page 82

G. ROMAIN - HIGHLY CONFIDENTIAL

1    acquisition balance sheet which is 377. Also
2    keep in front of you 86B. I'm going to add
3    one more document to your pile for now and
4    that's a document previously marked as
5    Exhibit 87B and if you could confirm that that
6    is the valuation of the Schedule B assets.
7        A.    Sorry. I think there's been --
8    there's confusion there.
9        Q.    Okay.
10        A.    Exhibit 86B is the valuation of
11    the assets which were received by Barclays,
12    whether Schedule A or Schedule B.
13        Q.    All right.
14        A.    The Exhibit 87B is the valuation
15    of the -- of securities which were received on
16    or around the 22nd of September from JPMorgan
17    Chase.
18        Q.    Okay. No, you're absolutely
19    right. Okay. So going back to 86B, 86B
20    includes both Schedule A and Schedule B.
21        A.    Yeah. It includes all of the
22    Schedule A and Schedule B assets that were
23    received around -- well, around the time of
24    the deal. So yes.

Page 83

G. ROMAIN - HIGHLY CONFIDENTIAL

1        Q.    All right. So looking at -- and
2    87B, is that a final schedule as well, if you
3    can confirm that?
4        A.    It is, yes.
5        Q.    Let's start with 87B which is the
6    JPM -- it has the title JPM assets.
7        Do you see that?
8        A.    Yes.
9        Q.    And putting on your 30(b)(6) hat
10    which should remain firmly on this whole
11    series of questions.
12        A.    Sure.
13        Q.    Describe for me what this
14    spreadsheet is.
15        A.    This spreadsheet is a summary of a
16    valuation of those assets designed for
17    inclusion in our books and records and in our
18    financial statement disclosures.
19        Q.    And going across the columns,
20    column A of this spreadsheet lists -- these
21    are the top third asset categories.
22        Do you see that?
23        A.    Yes.
24        Q.    There's a phrase there, Portfolio

Page 84

G. ROMAIN - HIGHLY CONFIDENTIAL

1    3. Does that have any meeting to you, sir?
2        A.    Portfolio 3 was the term used to
3    refer to the JPMorgan assets.
4        Q.    And then you have several asset
5    categories. Lines 13 and 14 have the initials
6    PMTG and PMTG unknown.
7        Do you see that?
8        A.    Yes.
9        Q.    What is PMTG?
10        A.    PMTG is a group within the firm.
11    It's a business line. It relates -- let me
12    get this correct. Principal mortgage trading
13    group I think is the full name.
14        Q.    There's a separate line item, line
15    6, which states Agency Mortgage.
16        A.    Yeah.
17        Q.    Okay. Do you know if any agency
18    mortgages are included within PMTG?
19        A.    Well, the line for PMTG is not
20    supposed to indicate that these were all
21    assets of a PMTG type. That group wouldn't
22    typically trade in some of these items. The
23    significance here is that PMTG were the group
24    that were taking responsibility for

Page 85

G. ROMAIN - HIGHLY CONFIDENTIAL

1    coordinating the valuation of the acquired
2    assets from a business perspective.
3        So what happened was that
4    initially assets were taken into a central
5    pot, if you like, such that they could be
6    considered, you know, as part of the
7    acquisition.
8        Subsequent to that assets were
9    transferred to the appropriate group that
10    would trade in those asset classes as a data
11    matter also in the Street or whatever decision
12    was made with those assets subsequent to
13    acquisition. But PMTG were responsible until
14    that happened from a business perspective.
15        Q.    So assets that would have come
16    over from JPMorgan obviously would not have
17    had a PMTG tag on them. They would have been
18    agency mortgages, corporates, munies, et
19    cetera, right?
20        A.    All asset classes.
21        Q.    If you look behind the line 13
22    PMTG does it break out into separate asset
23    classes?
24        A.    The breakout of the asset classes

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    is rows 6 to 10.
3         Oh, in terms of the PMTG item.
4    Q.    Yes.
5    A.    Right.  I may have misunderstood
6    the question then.
7         The PMTG -- the non-PMTG items are
8    principally the ones in 6 to 10.  The items in
9    row 13 would have been the ones which, by
10   nature, were more relevant to PMTG as a group.
11   But PMTG were responsible for all of them
12   until they were transferred out of this sort
13   in effect pool which the assets were initially
14   transferred into.  As a matter of practice
15   they were our single point liaison for the
16   Lehman acquisition.
17   Q.    All right.  Column B is titled
18   Notional.  And what's your understanding of
19   what that means?
20   A.    The contractual notional of the
21   underlying assets.
22   Q.    Column C is -- well, before we go
23   to C, when you say contractual notional that
24   is the principal amount owing on those
25   securities?

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.    Yes.  The principal value, yes.
3    Q.    Column C is FO value.  Does that
4    mean front office value?
5    A.    It does, yes.
6    Q.    And whose front office?
7    A.    Our front office.
8    Q.    What --
9    A.    Barclays, sorry.
10   Q.    What is the significance of a
11   front office value?
12       MR. SHAW:  Objection.
13   Q.    What does it mean?
14   A.    The process by which assets are
15   valued within Barclays is that first off the
16   front office would value.  The second line of
17   consideration is that price testing will occur
18   within the product control group within
19   finance.  So the initial marking of any book
20   including this book would be done by the front
21   office.
22   Q.    And does the front office include
23   the traders who trade these products?
24   A.    Yes.  The front office would be
25   the traders.

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.    Column D is JP value.
3    A.    Yes.
4    Q.    And that's the value -- well, what
5    is that?
6    A.    That's the value that JPMorgan
7    were contributing to the securities on the
8    30th of September.
9    Q.    So both column C and column D are
10   30th of September values.
11   A.    That's correct.
12   Q.    Do you know when this particular
13   sheet, 87B, was prepared?
14   A.    There were -- again, there were
15   multiple versions of this as our understanding
16   of the assets developed.  The -- until a final
17   version was produced which was shortly before
18   the annual report was produced.
19   Q.    When was the earliest version of
20   this document prepared, 87B?
21   A.    The earliest version in that form
22   would have been shortly after the 22nd of
23   December.  Because we weren't able to -- the
24   appropriate value for us to include in our
25   books and records was the value of the

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    inventory on the day we received the items,
3    being the 22nd of December.
4         Prior to that there were -- there
5    were understandings of what assets we were
6    expecting to receive and therefore preliminary
7    versions.  But nothing which had data which
8    was struck to a date which would have been
9    appropriate for inclusion could have existed
10   before the 22nd of December.
11   Q.    The column C and column D are
12   values as of the 30th of September, right?
13   A.    Yeah.
14   Q.    Why was that date picked?
15   A.    It was picked largely for
16   practical reasons.  It was a month-end.  It
17   didn't have any significance for books and
18   records.  Which was the primary purpose of
19   this spreadsheet.
20   Q.    Was there any discussion within
21   Barclays at valuing both doing a front office
22   value and a JP value of these JPM assets as of
23   the 22nd of September 2008?
24   A.    Sorry.  I don't understand the --
25   Q.    Was there any discussion of doing

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  the valuation as of the 22nd of September as
3  opposed to the 30th of September?
4      A.   There was discussion with auditors
5  as to what the appropriate date to include in
6  our books and records was for these. The two
7  dates -- the two relevant dates were the 22nd
8  of December and the 22nd of September.
9  Because you've got the transaction date and
10 you've got the date you receive the assets and
11 there's two different ways of viewing the
12 transaction from an accounting perspective
13 purely the decision which was reached was to
14 use the 22nd of December.
15     Q.   How did Barclays calculate its
16 front office values as of the 30th of
17 September for these assets which it did not
18 receive until the 22nd of December?
19     A.   I can talk to the general process
20 of valuation as at the date. In terms of how
21 the front office went about its -- how it went
22 about it in a historical sense, the processes
23 would have been the same and were the same.
24 But struck at a different date. We had the
25 items -- we had the identity of the items. So

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  it's a case of valuing as at based off market
3  data which is relevant as of that date. So
4  I'm not sure if I'm understanding the
5  question.
6      Q.   I think towards the end of your
7  answer you answered it. So let me see if I
8  understand it.
9      A.   Yeah.
10     Q.   For the items that you received
11 from JPMorgan Chase on December 22nd, on or
12 about December 22nd, your traders went back to
13 market data to try to value those assets as of
14 the 30th of September; is that right?
15     A.   There had been previously drafts
16 of expected values which predated the 22nd of
17 December. And the 30th of September was a
18 date which was looked at on a consistent basis
19 as the understanding as to the identity of the
20 assets that we would receive changed. And
21 then when we reached the 22nd of December, the
22 22nd of -- the valuation as of the date the
23 items were received were updated and were
24 focused upon. There was not a great deal of
25 focus on the 30th of September values at that

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  time because their significance at that time
3  was marginal.
4      Q.   Again, just so I understand what
5  you're telling me, are you saying that you
6  knew as early as the 30th of September the
7  list of assets that you eventually received on
8  December 22nd?
9      A.   No.
10     Q.   No. When did you first know what
11 specific assets you would be receiving from
12 JPMorgan Chase?
13     A.   I'm not sure what date that that
14 was absolutely finalized.
15     Q.   So, again, I'm going back to this
16 process that was followed in coming up the
17 with the column C values which is the front
18 office values. Was it a process where your
19 traders in December, sometime in December got
20 a list of the JPMorgan Chase assets by CUSIP
21 number and went back to historical pricing
22 data to try and price those as of the 30th of
23 September.
24     A.   That's correct.
25     Q.   Okay. And just focusing on that

G. ROMAIN - HIGHLY CONFIDENTIAL

1
2  exercise, why didn't they price them as of the
3  22nd of September? For that column, column C.
4      A.   That exercise wasn't done for the
5  first time until the 22nd of December. The
6  understanding as to the items would have
7  changed as understanding as to what items
8  would be received changed in the days and
9  weeks preceding the 22nd of December. So it
10 wasn't a new process, let's value them on the
11 30th of September, on the 22nd of December.
12 That wasn't the first time where people were
13 looking at that. Over the period -- over the
14 period from the acquisition date up until the
15 22nd of December there was an ongoing process
16 to try and get a handle on what value - what
17 assets and what value of assets we would end
18 up receiving. And that was again an iterative
19 process. This just represents a part of that
20 being two month-end values and the actual
21 value that we received.
22     Q.   Let me try it another way.
23         Was September 30th the month end
24 picked because there was better or more
25 complete pricing data available as of the 30th

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    of September as opposed to the 22nd of
3    September?
4          A.   I'm not sure.
5          Q.   And do you have any sense
6    generally whether this collection of assets
7    you received from JPMorgan Chase increased in
8    value or decreased in value from the 22nd of
9    September to the 30th of September?
10          A.   I don't have a great sense of the
11    sense which is created by the summary.  The
12    values for the 30th of September were not
13    items that I particularly focused on because
14    from the point of view of the process of
15    valuing being -- the point of view of valuing
16    the portfolio, the important number was the
17    most up to date number.
18          If you're looking at previous
19    month ends, say the 31st of October or the
20    30th of November, as time was progressing,
21    then at that time it was -- the interesting
22    thing would be based on our assessment of what
23    assets we expect to receive, what they'd be
24    worth at that time, at the point in time we're
25    setting because we didn't know when we

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    received them so the 22nd of December wasn't a
3    date which had any significance for us earlier
4    than that.  So we were constantly updating our
5    best estimate of the value we expected to
6    receive.
7          So there were values done of this
8    portfolio or our best estimate of this
9    portfolio on a number of dates preceding that
10    as time progressed.  And this was the last one
11    because this was the one that corresponded
12    with the date that we received them.
13          Q.   Just help me trace your -- trace
14    the connection between 87B and 377A.  You
15    could use line items or page numbers.
16          A.   Sure.
17          Q.   I just want to see where the
18    numbers, if they do, from 87B track onto the
19    spreadsheet that's 377A.
20          A.   The tracking is the cell E-18 from
21    37B.
22          Q.   So that's 3.9 billion and change.
23          A.   Yeah.
24          Q.   All right.
25          A.   That feeds through to -- the

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    easiest one to look at is actually the one
3    which is numbered 844.  That feeds through to
4    cell C-8.  And then cell G-18 is a component
5    of cell C-12.
6          MR. SHAW:  Just so we're clear,
7      when you said G-18 you were talking
8      about on 87B and when you were talking
9      about C-12 you were talking on the
10      second page of 377A?
11          THE WITNESS:  That's correct.
12          Q.   Okay.  So the -- looking at 87B,
13    the cell you pointed me to was E-18.
14          A.   Yes.
15          Q.   That's the column dated 22
16    December 2008 BCG value, correct?
17          A.   Yes.
18          Q.   And the total number is 3.916
19    billion and change, right?
20          A.   (Witness nods.)
21          Q.   And when you go over to the
22    acquisition balance sheet which is
23    Exhibit 377A on the second page in column --
24    in cell C-8, the number of 3.92 is just a
25    rounded up 3.916, correct?

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          A.   That is correct.
3          Q.   There is in the acquisition
4    balance sheet a line item for valuation
5    adjustment which is a negative $2.09 billion
6    number, correct?
7          A.   Yes.
8          Q.   And what you have also told me is
9    for the JPMorgan Chase assets there is an item
10    number which is G-18 which is $176 million.
11          A.   Yeah.
12          Q.   That is also part of the 2.09
13    valuation adjustment.
14          A.   That's correct.
15          Q.   All right.  Okay.  So on your
16    acquisition balance sheet, the JPM inventory
17    which is line 8, that is being valued as of
18    December 12th, 2008, correct?
19          A.   December 22nd.
20          Q.   Sorry.  December 22nd, 2008.
21          A.   That's correct.
22          Q.   You're right, yeah.
23          The line item which is 7 on your
24    acquisition balance sheet which states Initial
25    Inventory, that is being valued as of the 22nd

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   of September, 2008, correct?
3        A.   Yes.
4        Q.   And those valuations and the other
5   items on your acquisition balance sheet roll
6   up to the negative goodwill item of
7   4.7 billion, correct?
8        A.   Those items are part of the net
9   assets which contribute towards the negative
10  goodwill calculation, yes.
11       Q.   And if I go to the first page of
12  Exhibit 337A, which is a form of the
13  acquisition balance sheet, that was used for
14  disclosure purposes, correct?
15       A.   Yeah.
16       Q.   On that first page of
17  Exhibit 377A, the values for the assets are as
18  of those different dates that we've talked
19  about.  Some of those assets are valued as of
20  the 22nd of December and some of them are
21  being valued as of the 22nd of September.
22       A.   That's correct.
23       Q.   All right.  Other than those two
24  dates, are there any other dates as of which
25  assets were valued for purposes of your

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   acquisition balance sheet?
3        A.   No.
4        Q.   Let's take a look at 86B which --
5   I'm sorry.  Let's stay with 87B for a minute.
6   A few other items here.
7             Column E on 87B which is BCG
8   value, what's that?  The product control
9   group?
10       A.   Yes.  That's correct.
11       Q.   And what is that?  An internal
12  independent price valuation group of some
13  type?
14       A.   Yes.  That's the mid price value
15  that resulted from the process of product
16  control price testing front office values.  So
17  that was the end agreed Barclays value.  The
18  mid price.
19       Q.   And just to be clear, what that
20  process was, the obtaining of the BCG value,
21  could you describe how just mechanically the
22  process that's followed within Barclays to
23  come up with those BCG values.  Go from the FO
24  values, the front office values, to the BCG
25  values.

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   Yeah.  So the front office will
3   mark their assets -- the traders who trade the
4   assets and are closest to it for that purpose,
5   that's the same process that we followed on a
6   business as usual basis for all assets, all
7   trading assets which are held by Barclays
8   Capital.
9             Those valuations would then be
10  considered by price testing group which
11  resides within product control.  They would
12  test those prices by reference to observe for
13  market data and indices and close proxies and
14  broker quotes and other sources of independent
15  information which will differ according to
16  asset class and security type.
17            The difference between those two
18  values would be assessed and discussed and a
19  consensus value will be included on the
20  balance sheet.
21       Q.   The next column over, F, is MV
22  with liquidity which is market value with
23  liquidity; is that right?
24       A.   Yes.  That's the market value
25  stated at bid price.  So under accounting

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   standards we're required to measure assets at
3   bid so our best estimate of exit price.  And
4   that's what column F is.  And that's the net
5   number which feeds into the acquisition
6   balance sheet and therefore the negative
7   goodwill calculation and financial statement
8   disclosures.
9        Q.   At the bottom section of this
10  spreadsheet, 87B, is titled Entity Level
11  Breakdown.
12            Do you see that?
13       A.   Yeah.
14       Q.   Could you describe briefly what
15  information is being shown in that section of
16  the spreadsheet.
17       A.   Yeah.  That's the allocation of
18  the items between two legal entities.
19       Q.   Okay.  What are those two legal
20  entities?
21       A.   LMBR is BBPLC is part of a branch
22  of that.  And LIICT is a separate entity whose
23  full name -- I can't recall its full name off
24  the top of my head.  It was another
25  wholly-owned subsidiary of the Barclays group.

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    I can't recall the full name.
3        Q.   Okay.  If you look at 337A which
4    is the acquisition balance sheet --
5        A.   Yeah.
6        Q.   -- and if you look at the second
7    page, line 8 which is the JPM inventory, we
8    earlier looked at cell C-8 which is the BCG
9    value number, the 3.92, correct?
10       A.   Yes.
11       Q.   And if you read across that line,
12   that 3.92 number is allocated between BCI,
13   right?  .69 is allocated to BCI.
14       A.   I have misspoke.  The LMBR relates
15   to BCI not to BBPLC.
16       Q.   All right.  And the remainder,
17   3.23 billion, is allocated to column N as in
18   Nancy, 3.23.
19       Do you see that?
20       A.   Yes.
21       Q.   And that's a Cayman -- that's
22   Cayco is what it's called?
23       A.   Yeah.  That was a shorthand.  That
24   wasn't its full name.  That's the main reason
25   why I can't recall the full name of it because

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    I was used to referring to it in shorthand as
3    Cayco.
4        Q.   What can you tell us about what
5    Cayco is?
6        A.   It's a subsidiary of Barclays
7    Group.
8        Q.   Is it a Cayman Islands company?
9        A.   It was certainly going to be set
10   up in the Caymans which is why it was referred
11   to as Cayco.  My recollection is that's --
12   yeah, my recollection is that is what happened
13   here.
14       Q.   And just to be clear, the BCI
15   where .69 of the 3.9 billion is allocated,
16   that's the US broker/dealer, correct?
17       A.   That's correct, yes.
18       Q.   Let's turn to 86B.
19       86B is Schedule A and Schedule B,
20   correct?
21       A.   86B is -- yeah, it's the inventory
22   which was received -- it's the inventory which
23   was received the weekend of the 21st and the
24   days preceding that.
25       Q.   Does 86B include any inventory

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    that you expected to receive but have yet not
3    received?
4        A.   No.  This spreadsheet is the
5    valuation of the inventory we did receive.
6        Q.   And I apologize if I've asked you
7    this before.  Other than 86B and 87B, are you
8    aware of any other inventory that you're
9    expecting to receive that you haven't yet
10   received?
11       A.   In addition to 86B and 87B?
12       Q.   Yes.
13       A.   Yes, I am.
14       Q.   Okay.  And what is that other
15   inventory?
16       A.   Items from the LBI clearance boxes
17   which has not yet been transferred to
18   Barclays.
19       Q.   And so those items have not been
20   included in your calculations in 86B and 87B;
21   is that correct?
22       A.   That's correct.
23       Q.   And, therefore, they haven't --
24   well, maybe not therefore.  And they have not
25   been included in your acquisition balance

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    sheet, Exhibit 377A?
3        A.   That's not correct.
4        Q.   Okay.  So where on 87 -- on 377A
5    have you provided for items that you expect to
6    receive but, in fact, have not yet received?
7        A.   To the extent that they have been
8    recognized they are included in cell C-11.
9        Q.   And that's an item of about 700
10   million, correct?
11       A.   Yes.
12       Q.   And it's titled Additional
13   Unencumbered Assets?
14       A.   Yes.
15       Q.   And now setting those aside, what
16   else is there in terms of collateral that you
17   expect to receive, have not yet received, and
18   haven't accounted for in your acquisition
19   balance sheet?
20       A.   And haven't accounted for.
21       Q.   Have not accounted for.
22       A.   There are further unencumbered
23   assets which we commonly refer to as list B-2
24   and C which were not included in cell C-11 of
25   the second page of 377A in terms of other

Page 106

```
 1          G. ROMAIN - HIGHLY CONFIDENTIAL
 2   assets that have not been recognized.
 3          There is also collateral raised
 4   futures positions held in Lehman affiliates
 5   which has not been recognized.  There is --
 6   actually, would it be possible to refer to
 7   those notes?  I'm sure there are two smaller
 8   items -- there are four items which I -- I'm
 9   aware there are four items.  That's two of
10   them.  There are two other items which I can't
11   immediately recall.
12          Q.  And the notes that you're
13   referring to are the notes that were handed
14   over to us this morning.
15          A.  Yes.
16          Q.  Is it your handwritten notes?
17          A.  Yes.
18          (Deposition Exhibit 399A,
19   handwritten notes, marked for
20   identification as of this date.)
21          A.  Oh, yes.  So the principal and
22   interest on --
23          Q.  Hold on one second.  Let's just
24   get --
25          A.  Sure.
```

Page 107

```
 1          G. ROMAIN - HIGHLY CONFIDENTIAL
 2          Q.  I've handed you an exhibit which
 3   has been marked as 399A.  Are those the notes
 4   that you were referring to?
 5          A.  They are.
 6          Q.  Okay.  And if you could state for
 7   the record what the other items are.  The
 8   other two items are.
 9          A.  The other two items are principal
10   and interest on the unencumbered assets which
11   are summarized in cell C-11 of Exhibit 377A.
12   And also -- and also collateral against
13   customer positions which held in the form of
14   letters of credit were not recognized for
15   accounting purposes.
16          Q.  Just on your notes, where in your
17   notes are you?  This is page 1 of your notes,
18   right?
19          A.  Yes.  It's the second -- it's the
20   second bullet.  So I've just been through the
21   four subbullets of the second bullet.
22          Q.  And the second bullet just to be
23   clear is titled Assets Not Received Not on
24   Balance Sheet, Not on BS.
25          A.  Yes.
```

Page 108

```
 1          G. ROMAIN - HIGHLY CONFIDENTIAL
 2          Q.  That's it.
 3          A.  Yes.
 4          Q.  And your estimate of the value of
 5   those four items is 765 million and then you
 6   have a provision, correct?
 7          A.  The provision is against those
 8   items.  They're two separate items.
 9          Q.  Okay.  So the valuation then -- or
10   your estimate of the valuation of those four
11   items is 765 million?
12          A.  Yes.
13          Q.  And, again, just to be clear,
14   those do not appear -- that item, 765 million,
15   is not included on your acquisition balance
16   sheet, Exhibit 377A, correct?
17          A.  Correct.
18          Q.  And it's not part of 86B and 87B.
19          A.  That's correct.
20          Q.  Okay.
21          All right.  86B.  There are two
22   parts of the first page of Exhibit 86B that I
23   want to draw your attention to.  There appears
24   to be a valuation and calculation as of the
25   22nd of September which goes from line 1
```

Page 109

```
 1          G. ROMAIN - HIGHLY CONFIDENTIAL
 2   through line 30; is that right?
 3          (Document review.)
 4          A.  Yes.
 5          Q.  And then starting on line 32 down
 6   to line 45, if I'm reading this correctly,
 7   this appears to be a valuation or a
 8   calculation as of 9 January, '09; is that
 9   correct?
10          A.  No.  It's a valuation as at 22nd
11   of September but they're two slightly
12   differing versions.  One is between rows 3 and
13   14 and the other is between 32 and 44.  There
14   were a couple of individual adjustments which
15   needed to be made which are summarized in
16   those 27 to 30.
17          But the valuations are -- for
18   financial reporting purposes that net
19   difference which is 57 million from cell E-30
20   is not particularly material.
21          Q.  And in connecting 86B and 377A,
22   which cells on 86B roll up into the second
23   page of 377A?
24          A.  So the ones in row 14.
25          Q.  And so those would be D-14 and
```

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   F-14?
3        A.   That's correct.  As I said, there
4   were some immaterial adjustments but if you
5   were to -- there were some immaterial
6   adjustments which were made at the last minute
7   but at a material level the cells D-14 and
8   F-14 are the ones which roll up in the
9   acquisition accounting in our financial
10  statements.
11       Q.   The differential between the
12  values in the -- in column D, BCG value, and
13  the column E, Market Value 9/22, that's again
14  pricing at the bid.  Is that the reason for
15  the differential?
16       A.   Yes.  It's the bid/offer
17  differential, yes.
18       Q.   The differential between column C
19  and column D, do you know why there's a
20  differential there?
21       A.   The column C values don't feed
22  into our financial reporting.  They were
23  values which were ascribed to the securities
24  by the custodian whereas we are required to
25  value them by asset class according to

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   relevant accounting standards and in line with
3   valuation methodology used for other similar
4   assets already owned by the bank.  So the
5   important numbers from our financial reporting
6   perspective are those between D and F rather
7   than what the custodian may have attributed to
8   them.
9        Q.   You told us earlier that this
10  document, 86B, you confirmed that this was the
11  final version that rolled up into your
12  disclosure document, correct?
13       A.   Yes.
14       Q.   When was the first version of 86B
15  created?
16       A.   The form of it changed and evolved
17  over time.  So this is the final
18  representation of valuation process which was
19  ongoing from the time of the acquisition.  The
20  spreadsheet in which that process was embodied
21  may have been simpler or different at various
22  stages through that time.  But it was an
23  evolution.
24       Q.   And if I understand the way this
25  spreadsheet works, 86B, there is in fact CUSIP

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   level valuation data that rolls up into each
3   of these categories, line 3, line 4, line 5,
4   et cetera; is that correct?
5        A.   That's correct.
6        Q.   Now, some of the collateral that
7   was transferred over to Barclays on the 18th,
8   19th and that time period of September 2008,
9   some of that's been sold, correct, by
10  Barclays?
11       A.   Some of it, yes.
12       Q.   Okay.  How, if at all, has the
13  value at which assets were sold been reflected
14  in this spreadsheet?
15       Let me just rephrase that.
16       Is the price obtained by Barclays
17  on the sale of assets that were acquired from
18  Lehman, is that reflected on this spreadsheet?
19       A.   Not directly.  What I would say is
20  that there are various levels of liquidity
21  embodied in the various underlying assets.  So
22  you've got very liquid and frequently traded
23  positions whereby they could be valued in a
24  straightforward manner by reference to
25  observed for market data for the 22nd of

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   September.
3        And then there are less liquid
4   assets which trade very infrequently and for
5   which is there not much market data for those
6   assets.
7        In order to arrive at a 22nd of
8   September valuation you'll be looking at a
9   number of things, transactions in similar
10  assets, recent transactions in assets, et
11  cetera.  And for those -- assets of those
12  types, the price at which assets were sold
13  shortly after may be a factor which would be
14  taken into account because it may be
15  additional evidence as to what the appropriate
16  mark was for the 22nd of September.
17       But if those prices are used, then
18  they are used only as evidence to try to
19  improve the estimate of value on the 22nd of
20  September.  And, therefore, would be adjusted
21  for any changes in circumstances or market
22  conditions between the 22nd of September and
23  the dates of sale.
24       So the simplest answer is, no,
25  they're not reflected at all directly.  But

Page 114

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    the more -- the more accurate answer is that
3    for illiquid assets sales may factor into the
4    valuations as one part of the consideration of
5    the right price.
6        Q.   Okay.  They may factor in and, in
7    fact, were factored in for certain CUSIPs.
8        A.   I don't have a sense of to what
9    extent those sales did feed in because that's
10   getting down to a more CUSIP-by-CUSIP
11   level consideration.
12       In terms of the general process,
13   for the more liquid securities to the extent
14   they were sold, yes, they would have been
15   taken into account.  But to get an accurate
16   sense of whether that occurred in any material
17   sense it would be necessary to talk to the
18   relevant asset class experts.
19       Q.   The liquidity value column, column
20   F, BCG Liquidity Value, in effect the numbers
21   that appear there are basically column D minus
22   column E, correct?
23       A.   Yes.  That's the bid/offer
24   adjustment.
25       Q.   But if I understand your last --
```

Page 115

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    your prior answers, that's not just the
3    bid/offer adjustment, correct?
4        A.   No.  That is just the bid/offer
5    adjustment.
6        Q.   Okay.  So any adjustments that are
7    made on account of sales and price discovery
8    through sales of assets, are they not
9    reflected in column F?
10       A.   They would be reflected.  Any
11   adjustments to mid price that are required to
12   get to bid are included in that column for
13   whatever reason based on whatever evidence.
14       Q.   So you would reflect the bid/offer
15   adjustment where you didn't transact but where
16   you had a bid and offer you would price it at
17   the bid, correct?
18       A.   All of the securities included
19   there are priced at the bid.
20       Q.   And in those instances where you
21   actually had a transaction in the weeks
22   subsequent to acquiring the assets, and you
23   sold the asset, you actually executed at a
24   particular price, you would use that as the
25   price or at least that would factor into your
```

Page 116

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    analysis of the appropriate price?
3        A.   It may do.  Depending on other
4    evidence which is available in order to get to
5    the right bid price.
6        Q.   Do you have any understanding as
7    to why the PCG values in column D were
8    different from the BoNY values in column C?
9        A.   No.
10       MR. TAMBE:  We could break for
11   lunch.
12       MR. SHAW:  Forty-five minutes?
13       MR. TAMBE:  Forty-five minutes.
14       (Luncheon recess taken at 12:28
15   p.m.)
16
17
18
19
20
21
22
23
24
25
```

Page 117

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2          A F T E R N O O N   S E S S I O N
3          (Time noted:       1:22 p.m.)
4    G A R Y   R O M A I N,   resumed and
5        testified as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. TAMBE:
8        Q.   I understand, Mr. Romain, you
9    wanted to clarify or add to one of your
10   answers before the lunch break?
11       A.   Oh, yes.  That's correct.  When we
12   were talking about the securities which come
13   across, I was asked about whether any which
14   have not been received by Barclays were
15   included on the acquisition balance sheet and
16   I directed you towards the additional
17   unencumbered assets on to which is cell C-11
18   in the second page of Exhibit 377A.
19       I want to clarify, that is not the
20   only asset on the acquisition balance sheet
21   which had not been received by Barclays.
22   There's four types of which that is one.  But
23   the four -- they're actually -- they're
24   summarized in the four bullets on the top of
25   the first page of Exhibit 399A.  So there's
```

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    futures collateral held from brokers. There's
3    the OCC collateral largely in the form of
4    government securities. There's the
5    unencumbered assets item. And there's also
6    the amount of $769 million receivable from
7    15(c)(3) or equivalent tax. So to be
8    complete, that's the sum of the assets
9    included on the acquisition balance sheet
10   which are not in physical possession of
11   Barclays.
12       Q.   Okay. And other than C-11, where
13   else would you find on this acquisition
14   balance sheet, which is the second page of
15   377A, those items?
16       A.   So the first item, the futures
17   collateral is included in item C-17.
18       Q.   Futures customer balances.
19       A.   That's right.
20            The second item, OCC collateral,
21   is included in item C-18. The unencumbered
22   assets we talked about as being item C-11.
23   And the 15(c)(3) or equivalent is item C-15.
24       Q.   In your handwritten notes,
25   Exhibit 399A, you have a bracket and the words

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    app 3 billion.
3            Do you see that?
4        A.   Yes.
5        Q.   So approximately $3 billion of
6    asset value on the acquisition balance sheet
7    is attributable to these four categories of
8    assets not received.
9        A.   That's correct.
10       Q.   All right. And if you look at the
11   line items on 377A, C-11 is -- is the entirety
12   of that cell comprised of assets not yet
13   received?
14       A.   Yes.
15       Q.   How about the 15(c)(3) assets?
16       A.   Yes.
17       Q.   So none of that has been received
18   by Barclays as yet.
19       A.   That's correct.
20       Q.   The futures customer balances?
21       A.   That's a mixture. Some of that
22   has been received and some of that has not.
23       Q.   Okay. And then the OCC customers
24   on clearing margin?
25       A.   That item's actually easier to see

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    on the following page where it's shown gross
3    because that item is the net of the collateral
4    balances and the fair value of the derivative
5    positions.
6            The collateral balance is item
7    F-16 and item F-26. There's no distinction
8    between those two lines items other than
9    historically I had one number and then I added
10   another number until I realized quite shortly
11   into the process that I was actually looking
12   at a single number.
13           So the total of 2.29 is partly
14   received and partly not received.
15       Q.   Okay. Just so I follow through
16   then on that, on the acquisition balance sheet
17   on page 2 of Exhibit 377 for OCC customer and
18   clearing margin you have an amount of .98.
19       A.   Yes. .98 directly feeds through
20   from cell F-26.
21       Q.   On the next page.
22       A.   Yes.
23       Q.   Page 845?
24       A.   Whereas the item, 0.21 is the net
25   of item F-16 and item F -- E-42. Sorry.

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   And where does that show up on the
3    acquisition balance sheet? Is that C-14?
4        A.   The net of F-16 and E-42 on the
5    third page shows up in item C-14.
6        Q.   Exchange traded options.
7        A.   Yes.
8        Q.   And C-14, that's an amount
9    actually received by Barclays.
10       A.   The -- C-14 is the net of two
11   items from the point of view of the gross
12   balance sheet. It's split up principally into
13   a valuation because qualitatively it's a
14   different process to value the open exchange
15   derivative positions as opposed to valuing the
16   cash and securities which represent the margin
17   against those positions.
18           So the item really to look at --
19   or the items to look at are F-16 and F-26.
20   The total of that is the total of the customer
21   margin against OCC positions and some of that
22   total, 2.29, has been received and some has
23   not.
24       Q.   And how much has not been
25   received?

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   It's approximately a billion
3    dollars.
4            (Deposition Exhibit 400A, document
5        bearing production numbers
6        BCI-EX-(S)-00024451 through
7        BCI-EX-(S)-00024455, marked for
8        identification as of this date.)
9    BY MR. TAMBE:
10        Q.   Mr. Romain, we're back to a
11    non-30(b)(6) topic.  I've placed before you
12    Exhibit 400A.  Take a moment to review and it
13    let me know when you're done.
14            (Document review.)
15        A.   Okay.
16        Q.   And you'll see there's a cover
17    e-mail from Patrick Clackson to you.
18        A.   Um-hum.
19        Q.   Which is forwarding the attachment
20    to this document, Exhibit 400A.
21            Do you see that?
22        A.   Yes.
23        Q.   And is the attachment a document
24    you're familiar with?
25        A.   It's a document I remember seeing,

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    yes.
3        Q.   And the last page of this exhibit
4    which is titled Appendix B, Preliminary
5    Balance Sheet, is that a document that you
6    prepared?
7        A.   I can't tell if there's been any
8    amendment to it but it is essentially a
9    document I prepared, yes.
10        Q.   And this is an e-mail dated
11    September 22nd, 2008.  Both the e-mails on the
12    first page are as of that date.
13            Do you see that?
14        A.   Yes.
15        Q.   The 22nd was the Monday following
16    the Lehman bankruptcy filing.  On that day
17    what was your source of information for the
18    items that appear on this last page of
19    Exhibit 400A?
20        A.   I don't recall the source at that
21    time.  This was another version of the
22    iterative balance sheet that was developing
23    over the period.  The iteration at any given
24    date was based on the best information I had
25    available at the time.

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   Does the valuation adjustment line
3    if you see up in the asset allocation -- do
4    you see it?
5        A.   Yes.
6        Q.   That's a negative $2.83 billion
7    number?
8        A.   Yes.
9        Q.   On the 22nd of September your BCG
10    group had not gone through and done any kind
11    of valuation adjustment, correct?
12        A.   I can't recall if it's accurate to
13    say they had done nothing.  It's fair to say
14    that the detailed valuation work that was
15    required to get to the end valuations had not
16    yet occurred.
17        Q.   Do you have any understanding as
18    to how that adjustment number of 2.83 billion
19    was arrived at on Monday the 22nd of
20    September?
21        A.   No.
22        Q.   I understand from other e-mails
23    that Stephen King may have been the source of
24    that number.  Is that your understanding?
25        A.   I don't recall if that number was

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    sourced from Stephen or otherwise.
3        Q.   You know Stephen, correct?
4        A.   I do, yes.
5        Q.   And what role did he play at
6    Barclays at this point in September of '08?
7        A.   So he was a senior trader within
8    the PMCG group and was one of the people in
9    the front office that was most involved with
10    the -- with the acquisition from a business
11    perspective and he was one of my main contacts
12    from a business perspective during the entire
13    process.
14        Q.   And did you have any discussions
15    with Stephen as early as the 22nd about
16    valuation adjustments to the inventory that
17    had come over?
18        A.   I don't recall precise dates of
19    conversations I had with him.  I was certainly
20    having conversations with him throughout the
21    process to work on ensuring that the
22    acquisition balance sheet I would be treating
23    it at any time was as accurate as I could make
24    it.
25        Q.   We could probably move to the side



1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  for now 87B, your handwritten notes, and the
3  other stuff.  But keep 400A, the document we
4  were just looking at handy.  And especially
5  the last page of 400A.
6          (Pause on the record.)
7          (Deposition Exhibit 401A, document
8      bearing production numbers
9      BCI-EX-(S)-00052667 through
10     BCI-EX-(S)-00052668 with attachment,
11     marked for identification as of this
12     date.)
13 BY MR. TAMBE:
14     Q.   I've handed you a three-page
15 document marked Exhibit 401A.  Take a moment
16 to look at it and let me know when you are
17 done.
18          (Document review.)
19     A.   Okay.
20     Q.   And this is an e-mail from you to
21 Rich Ricci and others.  Do you see it?
22     A.   Yes.
23     Q.   And you're attaching another
24 iteration of the acquisition balance sheet,
25 correct?

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      A.   Yes.
3      Q.   And you state in your e-mail "The
4  $2.83 valuation adjustment is S. King's first
5  cut only."
6          Do you see that?
7      A.   Yes.
8      Q.   If you could turn to the balance
9  sheet which is the last page of Exhibit 401A.
10     A.   (Witness complies.)
11     Q.   And if we compare it to the
12 balance sheet we were looking at in 405, in
13 400A, both of these are -- the cover e-mails
14 are 22nd September 2008.  It looks like
15 Exhibit 401 is a little bit later in the day
16 than Exhibit 400.  You could confirm that for
17 yourself.
18     A.   Yeah.  They're both on the same
19 date and, yes, they're the e-mails from
20 slightly different times during the day, yes.
21     Q.   Right.  And 401 is after 400,
22 correct?
23     A.   Yes.
24     Q.   There's a couple of changes that I
25 want to bring to your attention.  One is on

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  Exhibit 401A, you have a line item now for
3  Friday P&L approximately.
4          Do you see that?
5      A.   Yes.
6      Q.   And so that's reflecting a Friday
7  profit and loss number?
8      A.   That's what Friday P&L stands for,
9  yes.
10     Q.   And that's a number of about
11 $200 million.
12     A.   Yes.
13     Q.   What is your understanding of what
14 that entry referred to?
15     A.   I don't recall putting together
16 this precise version.  The item is included as
17 part of the calculation of fair value based on
18 best information at the time.  But in terms of
19 how precisely it fit into that calculation I
20 don't have a clear recollection.
21     Q.   The valuation adjustment number
22 is the same as before, the 2.83 billion
23 negative.
24          Do you see that?
25     A.   Yes.

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.   And there's a note associated with
3  that adjustment, note 5.
4      A.   Yes.
5      Q.   And in Exhibit 401A note 5 states
6  Trades are initially booked at BoNY prices.
7  2.83 billion is initial estimate of the
8  adjustment Barclays' marks.
9          Do you see that?
10     A.   Yes.
11     Q.   And, again, do you know what
12 process was followed in coming up with this
13 $2.83 billion number on the 22nd?
14     A.   That would have been -- or was an
15 early estimate of the adjustment that would be
16 required to get the inventory to the 42.55
17 number which would have been the best
18 estimates of the prior bid price at that time.
19 As talked about, these numbers were moving
20 frequently during this period as additional
21 information was acquired.
22          But that's what the 2.83 -- that's
23 the purpose of the 2.83 was fulfilling in that
24 calculation there at that time.
25     Q.   Okay.  And I could see

Page 130

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  mathematically how the 2.83 sort of gets
3  subtracted from the 45.18 but what's the
4  process that yields the 2.83? Is it CUSIP by
5  CUSIP? Is it by asset category? Is it an
6  estimate of the entire portfolio? How is that
7  done? Back at that point in time.
8      A.   Back at that point in time I don't
9  have clear understanding of the process that
10  Stephen went through to get that initial cut.
11  It was understood at that time that we were
12  working on provisional numbers and a
13  provisional understanding of the assets. And
14  that a great deal of work involving Stephen
15  King and front office but also finance price
16  testing and discussion with PwC, our auditors,
17  would be required before we got to a number
18  which was sufficiently verified to be included
19  in our financial statements.
20      Q.   I understand, Mr. Romain, that you
21  probably went through a lot of additional
22  steps before you put anything in your reported
23  financial statement. I really am focusing on
24  that date, the 22nd of September, the
25  transaction has closed that morning. I just

Page 131

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  want to know if you know what process was
3  followed in arriving at that estimate that
4  morning.
5      A.   I don't know, no.
6      Q.   If you'd look down in
7  Exhibit 4012A, below the net asset calculation
8  there are line items -- I'm sorry -- below the
9  total asset calculation, there are line items
10  for repo liability, cure, retention, bonus.
11      Do you see that?
12      A.   Yes.
13      Q.   And if you compare the entries for
14  cure and bonus accrual on Exhibit 401A to
15  those same items on 400A you'll see different
16  entries, right?
17      A.   Yes, yes.
18      Q.   So the cure payment which was
19  reflected at 2.25 in Exhibit 400A in
20  Exhibit 401A is .8 billion.
21      Do you see that?
22      A.   Yes.
23      Q.   And do you know a reason for why
24  that number changed on the 22nd of September?
25      A.   Well, at that time when I was

Page 132

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  putting together the acquisition balance
3  sheets, I didn't have an understanding as to
4  what cure payment was or what the nature of
5  our obligation was. So there were initial
6  placeholder numbers included for that as well
7  as a number of other items. The source of
8  those numbers I don't recall precisely now but
9  I do recall that they were moving quickly as I
10  had discussions with people who had an
11  understanding of the terms of the
12  acquisition -- the terms of the acquisition in
13  that regard and better understood the
14  appropriate item -- the appropriate quantum to
15  be included.
16          The cure in particular had two
17  sources of uncertainty which persisted for
18  some time. The first was uncertainty as to
19  amount which was an exercise by which we
20  needed to identify which contracts we'd be
21  accepting and therefore which cure payments
22  would be paid.
23          And the second was a question of
24  accounting treatment under appropriate
25  accounting standards because in acquisition

Page 133

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  accounting you're required to include only
3  obligations that you take on. And there is a
4  way of viewing the cure payments which
5  would -- and which would imply that we should
6  not recognize any cure payments as an accrual
7  in the acquisition balance sheet because we
8  had no obligation to accept any contracts.
9          That was an issue which was
10  discussed for some time with PwC. That
11  discussion was running parallel with the
12  separate consideration of how much cure we
13  thought we'd end up paying. The end
14  resolution of that was that we felt that the
15  appropriate interpretation of accounting
16  standards would require us to include our best
17  estimate for cure payments in the acquisition
18  balance sheet and that's what we ended up
19  doing.
20      Q.   And by the time you end up
21  disclosing your financial statements for the
22  acquisition, did you ultimately use the
23  financial number that was actually paid out by
24  Barclays for cure?
25      A.   By the time we -- by the time we

## Page 134

G. ROMAIN - HIGHLY CONFIDENTIAL

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2 published our financial statements the process
3 was not quite complete but very substantially
4 complete.  So the amount we included as an
5 accrual was $224 million.  My recollection is
6 that by the time we reached financial
7 statements we paid very close to that amount
8 and there was a small amount which we were
9 intending still to pay.  And when I revisited
10 it in the middle of this year the difference
11 between what we paid and what we recognized in
12 our financial statements was very small.  A
13 quantum of less than a million dollars as I
14 recall.
15     Q.   Okay.  And as you compared 400A
16 and 401A, the net asset number in 401A is
17 $4.52 billion, correct?
18     A.   Yes.
19     Q.   And that's up from 3.67 billion in
20 Exhibit 400A.
21     A.   Yes.
22     Q.   I've handed you, sir, a document
23 previously marked as Exhibit 361A.  Take a
24 moment to review it and let me know when
25 you're done.

## Page 135

G. ROMAIN - HIGHLY CONFIDENTIAL

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2     (Document review.)
3     MR. WOOD:  Can I just note on the
4 record that I think this same document
5 has also been marked as Exhibit 384 in
6 another deposition.
7     (Document review continuing.)
8     A.   Okay.
9     Q.   And sir, do you recognize this as
10 a forward of your e-mail that we were just
11 looking at, Exhibit 401A, by Mr. Clackson to
12 Rich Ricci and so on?
13     Do you see that?
14     A.   Yes.
15     Q.   And you can confirm this for me
16 but it appears to me that the attachment to
17 Exhibit 361A, the acquisition summary,
18 although the printout is a little different I
19 believe it's the same spreadsheet as 401A but
20 correct me if I'm wrong.
21     A.   Yes.  Yes, it is.
22     Q.   Now, if you focus on Mr.
23 Clackson's e-mail to Rich Ricci forwarding
24 this draft balance sheet, he states, "So some
25 things we have to keep working on to squeeze

## Page 136

G. ROMAIN - HIGHLY CONFIDENTIAL

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2 out what we can, but looks more like 3 to 3.5
3 rather than 4 plus."
4     Do you see that?
5     A.   Yes.
6     Q.   What's he referring to with the 3
7 to 3.5 rather than the 4 plus?
8     MR. SHAW:  Objection, foundation.
9     A.   I don't know.
10     Q.   Was it your understanding that
11 there was a target negative goodwill number
12 that you were looking to achieve?
13     A.   No.
14     Q.   That wasn't your understanding.
15     A.   No, that wasn't my understanding.
16     Q.   Did you have an understanding as
17 to any target goodwill number?
18     A.   No.
19     Q.   Rich Ricci responds to Patrick
20 Clackson by saying, "What have we told Group?"
21     Do you see that?
22     A.   Yes.
23     Q.   Do you understand what the
24 reference to "group" there is?
25     A.   I don't -- I don't know what he

## Page 137

G. ROMAIN - HIGHLY CONFIDENTIAL

1         G. ROMAIN - HIGHLY CONFIDENTIAL
2 means.  Typically when we refer to group we
3 mean Barclays Group.
4     Q.   Putting this exhibit aside, at
5 this time period, early the week of the 22nd,
6 were you party to any discussions about trying
7 to achieve a negative goodwill number that
8 coincided with the negative goodwill number
9 that had been set out in the Barclays board
10 presentations the prior week?
11     A.   No.
12     Q.   Was there any concern about not
13 achieving the negative goodwill number that
14 had been disclosed to the board?
15     MR. SHAW:  Objection, foundation.
16     A.   Not that I was aware of.
17     Q.   Sir, I've handed you what's been
18 previously marked as Exhibit 385.  If you
19 could take a moment to review that e-mail
20 chain and let me know when you're done.
21     (Document review.)
22     A.   Okay.
23     Q.   You'll see this e-mail chain
24 begins again on page 2 with the cover e-mail
25 to Exhibit 401A which is your e-mail to the

G. ROMAIN - HIGHLY CONFIDENTIAL

1   group.

2       Do you see that?

3       Q.   And I want to draw your attention
4   to the first page of Exhibit 385 which is the
5   third e-mail down which is from Rich Ricci to
6   Patrick Clackson.

7       Do you see that?

8       A.   Yes.

9       Q.   It says, "Need to get to 4 or no
10  write-down capacity."

11      Write-down is misspelled but it
12  says write-down capacity.

13      Do you see that?

14      A.   Yes.

15      Q.   Do you know what that was a
16  reference to?

17      A.   No, I don't.

18      (Deposition Exhibit 402A, document
19      bearing production number
20      BCI-EX-(S)-00052678, marked for
21      identification as of this date.)

22  BY MR. TAMBE:

23      Q.   Sir, I've handed you a one-page

G. ROMAIN - HIGHLY CONFIDENTIAL

1   document marked Exhibit 402A.  Take a moment
2   to review it and let me know when you're done.

3       (Document review.)

4       A.   Okay.

5       Q.   And you'll see the bottom e-mail
6   on this page, Exhibit 402A, is an e-mail from
7   you to Jasen Yang copied to others.

8       Do you see that?

9       A.   Yes.

10      Q.   Okay.  Who is Jasen?

11      A.   Jasen is another trader in the
12  PMGT group.  I believe he reports to Stephen
13  King.

14      Q.   You state in your second
15  paragraph, "What we're ultimately trying to
16  get to is a valuation for the total portfolio
17  (including the 1.9 billion from the box) for
18  inclusion in the acquisition balance sheet -
19  Friday close so not including any
20  Monday/Tuesday gain/losses which should remain
21  in trading P&L."

22      Do you see that?

23      A.   Yeah.

24      Q.   Were you stating in that sentence

G. ROMAIN - HIGHLY CONFIDENTIAL

1   that you were trying to value the total
2   portfolio as of Friday close of business
3   prices?

4       A.   Yeah.  That point in time --
5   that's the direction I'm giving to Jasen at
6   that point in time, yes.

7       Q.   I understand from your testimony
8   this morning that for the collateral that was
9   transferred over, the Thursday, Friday, the
10  weekend, the valuation date that was picked
11  was September 22nd, the Monday, right?

12      A.   That's true.

13      Q.   Why the change?  Why was that the
14  ultimate decision?

15      A.   At that point in time the deal had
16  only just been done and my understanding of
17  what happened when and other terms and what
18  had been received when was incomplete and
19  evolving.  And over time discussions of
20  various aspects occurred and one of which was
21  the appropriate valuation date and the
22  appropriate valuation date was determined to
23  be the 22nd of September.

24      Q.   In Exhibit 401A you have a line

G. ROMAIN - HIGHLY CONFIDENTIAL

1   item there for Friday P&L.

2       Do you see that?

3       A.   Yes.

4       Q.   Can you tell from that version of
5   the acquisition summary balance sheet as of
6   what date you were valuing the inventory?

7       A.   I can't, no.  And to be clear I
8   wasn't valuing the inventory.

9       Q.   Or Barclays was valuing the
10  inventory.

11      A.   Yeah.

12      Q.   Because the line right above the
13  Friday P&L line in Exhibit 401A reads
14  Inventory Thursday Close.

15      Do you see that?

16      A.   Yes.

17      Q.   And Thursday is when the Fed repo
18  assets were transferred over to Barclays,
19  correct?

20      A.   I don't have full information of
21  exactly what was transferred precisely when.

22      Q.   Do you know who would have
23  provided you with the Friday P&L number that
24  appears in Exhibit 401A?

Page 142

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   No.
3        Q.   When the valuation was done as of
4    Monday the 22nd of September were the prices
5    used close of business prices on Monday the
6    22nd?
7        A.   I'm not sure.  I'm not the
8    valuation expert.  I'm not sure what the
9    CUSIP-by-CUSIP approach that was taken was.
10   And, you know, what market convention is for
11   valuing the various security types which were
12   involved.
13       Q.   Okay.  Who would know the answer
14   to that?
15       A.   It would the price testing group
16   within product control.
17       Q.   And just so I understand, just
18   using 401A as the example, if the decision was
19   made -- and the decision was made -- to price
20   the inventory as of Monday, September 22nd,
21   having done that, would you take into account
22   in valuing the assets any P&L on Friday?
23       A.   I'm not sure I quite understand
24   the question.  Sorry.  Take into account in
25   what way?

Page 143

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   As you do in Exhibit 401A.
3            In Exhibit 401A, if I understand
4    what's going on there, there's a valuation --
5    at least it appears to be, inventory Thursday
6    close.  And then the gain that is earned by
7    Barclays during the day on Friday is reflected
8    as additive to the asset value.
9            Do you see that?
10       A.   Yes.
11       Q.   If the decision was made that you
12   weren't going to value the inventory as of
13   Thursday, you were going to value the
14   inventory as of Monday, would that eliminate
15   the need to record a P&L gain for Friday?
16       A.   You'd be valuing it by reference
17   to the Monday price.  So that would be the sum
18   of what you'd need to do.
19       Q.   But this P&L gain that's reflected
20   on Exhibit 401A, that would be categorized as
21   the trading P&L, correct?
22       A.   I don't know what that item
23   particularly was.
24           (Deposition Exhibit 403A, document
25   bearing production numbers

Page 144

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    BCI-EX-(S)-00024689 through
3    BCI-EX-(S)-00024690 with attachment,
4    marked for identification as of this
5    date.)
6    BY MR. TAMBE:
7        Q.   Sir, I've handed you a three-page
8    document marked Exhibit 403A.  A cover e-mail,
9    a placeholder page, and then a spreadsheet.
10   Let me know when you're done reviewing it.
11           (Document review.)
12       A.   Okay.
13       Q.   And the last page of Exhibit 403A,
14   if you can confirm that that's another version
15   of the acquisition balance sheet, correct?
16       A.   It is, yes.
17       Q.   And it's a cover e-mail from you
18   to Patrick Clackson and that's dated September
19   24th, correct?
20       A.   Yes.
21       Q.   Now, if you compare Exhibit 403A,
22   the acquisition balance sheet in Exhibit 403A,
23   with Exhibit 401A, you'll see that the net
24   asset number has $6.01 billion.
25           Do you see that?

Page 145

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   And at least one of the drivers of
4    that change is the valuation adjustment
5    number.  And you'll see it's down from 2.83 to
6    1.38.
7        A.   Sorry.  You changed my reference
8    to which version?
9        Q.   Sure.  The two documents you
10   should be looking at are Exhibit 401A and
11   403A.
12       A.   Yes.  One of the differences is
13   that.
14       Q.   Okay.  Now, that's roughly a
15   $1.5 billion difference, correct?  In the
16   valuation adjustment.
17       A.   Well, it's -- in terms of the
18   adjustment that's made to the 45.18 to get to
19   a net number the difference is slightly less.
20       Q.   Right.
21       A.   Because there's no 0.2.
22       Q.   The P&L, the Friday P&L number is
23   no longer --
24       A.   Yes.
25       Q.   But looking at just the valuation

Page 146

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2  adjustment line you've gone from a 2.83
3  negative to a 1.38 negative adjustment,
4  correct?
5     A.   My concern there is whether we're
6  comparing like with like. I don't know enough
7  about the 0.2 to know whether that was rolled
8  into the 1.38 or not.
9     Q.   And do you have any understanding
10  as to the reason for the change from 2.83 to
11  the 1.38 putting aside the 0.2?
12     A.   No.
13     Q.   Both in 401A and 403A on -- for
14  the inventory pricing there's a note that
15  reads, "Trades are initially booked at BoNY
16  prices."
17     Do you see that?
18     A.   Yes.
19     Q.   Do you know what the convention is
20  in pricing securities that are used for repo
21  trading?
22     A.   I don't know.
23     Q.   And do you know whether the Bank
24  of New York was Barclays' agent for that repo
25  transaction?

Page 147

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2     A.   I'm not sure of the precise
3  relationships in that regard, no.
4     MR. TAMBE: Let's take a short
5  break.
6     (Recess taken.)
7  BY MR. TAMBE:
8     Q.   Mr. Romain, we talked this morning
9  about some of the assets acquired by Barclays
10  having been sold.
11     Do you remember that?
12     A.   Once the assets were acquired a
13  number of things happened to them. Some would
14  have been sold relatively shortly. Some were
15  transferred into ongoing trading books to be
16  managed by the relevant traders. Once that
17  happens they're commingled with assets which
18  were acquired in other ways so there would
19  have been some which had been elected and
20  there would have been some which were held for
21  a long period.
22     We had a brief discussion about
23  whether prices at which the assets were sold
24  factored into the valuation analysis in some
25  way.

Page 148

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2  Do you recall that discussion?
3     A.   Yeah.
4     Q.   Okay. Would transfers of assets
5  within the Barclays Group be treated as sales
6  and factored into that calculation?
7     A.   In terms of the measurement
8  objective being an external fair value, those
9  prices would not factor -- those prices in and
10  of themselves would not factor into the
11  valuations.
12     However, the price at which
13  something is transferred into may well be a
14  representation of what our best estimate of
15  the market price is at that time in which case
16  they may well be the same number.
17     But in terms of the considerations
18  which feed into the price that assets were
19  transferred internally within Barclays I don't
20  have a great deal of insight into how that
21  works in practice.
22     Q.   And just so I understand your
23  answer, at least for some of the assets
24  acquired from Lehman there were transfers of
25  those assets within Barclays, correct?

Page 149

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2     A.   Yes.
3     Q.   And there were values ascribed to
4  those assets when those assets were
5  transferred internally, correct?
6     A.   Yes.
7     Q.   And on some occasions you have
8  taken into account the values at which those
9  internal transfers were done for purposes of
10  valuing those assets for the acquisition
11  balance sheet; is that correct?
12     A.   No.
13     Q.   Okay. Is it the case that
14  internal transfers and internal transfer
15  values were disregarded in doing your
16  acquisition balance sheet valuation?
17     A.   I was not directly involved in the
18  valuation. I did not factor into the
19  acquisition balance sheet transfers. What I
20  factored into the acquisition balance sheets
21  was Barclays' best estimate of the bid price
22  for those securities which was determined in
23  accordance with Barclays' ongoing valuation
24  policies and applicable accounting standards.
25     Q.   Okay. And when you took into

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   account Barclays' best estimate would
3   Barclays' best estimate include bids provided
4   by Barclays' own internal traders?
5        A.    The process for valuation is
6   dependent on the asset type.  And for less
7   liquid assets it's more judgmental than it is
8   for more liquid assets.  However, the maximum
9   possible use is always made of external data.
10  So the views of traders as to the appropriate
11  valuation of an asset being their best
12  estimate of an external bid price for that
13  asset is a part of the valuation process which
14  is supplemented by external market data and
15  price testing -- and price testing procedures.
16  The precise balance between those depends on
17  the asset but external market data to the
18  extent it is available is typically the best
19  evidence of the appropriate fair value.  So
20  that's the concept.  When you get down to
21  individual security level, that's where my
22  sort of level of knowledge ends.
23       Q.    The spreadsheets that roll up into
24  the summary sheets -- we looked at 87B and 86B
25  which were the summary level sheets that then

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   rolled up into the acquisition balance sheet.
3   Do you remember that?
4        A.    Yes.
5        Q.    Okay.  The CUSIP level
6   spreadsheets, do those indicate what
7   particular methodology or process was used on
8   a CUSIP-by-CUSIP basis for determining the
9   value?
10       A.    Not to my recollection.  That's
11  the result of the process.  But for the less
12  liquid and more complex instruments, the
13  methodology is not something which were
14  typically captured in the Excel spreadsheets.
15  There are extensive valuation procedures and
16  policies within the bank which are used as a
17  reference point for how to value these assets.
18  And the approach, the value of these assets
19  was in mind in those policies both internally
20  and in the opinion of the our outside
21  auditors.
22       Q.    In terms of orders of magnitude
23  can you ascribe any percentage to the
24  percentage of this portfolio, the percentage
25  of the inventory that you believe is the fault

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   of this less liquid more complex difficult to
3   value type of security.
4        A.    There's no dividing line really.
5   It's a spectrum.
6        Q.    I just want to make sure I have
7   one point covered.  It's my understanding that
8   at least some of the assets acquired from
9   Lehman were subject to internal sales within
10  Barclays from one desk to another desk.  Is
11  that your understanding as well?
12       A.    Yes.
13       Q.    Okay.  Were the prices at which
14  those assets sold within Barclays ever counted
15  by you as a sale price that was used in the
16  valuation?
17       A.    No.  I was -- I had no awareness
18  of the price at which securities were sold.
19  What I asked for and received was the fair
20  values of the assets.
21       Q.    So a trader reporting a fair value
22  of an asset to you may have factored in an
23  internal sale price but you wouldn't know
24  that.
25       A.    The trader wasn't reporting

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   valuations to me.
3        Q.    Who was?
4        A.    The numbers that fed into those
5   were the numbers which had been through the
6   process which we discussed earlier which
7   involved input from traders, price testing
8   within finance, and auditor review.
9        So those are the numbers which I
10  took, the numbers which had passed through
11  those processes and were then viewed as the
12  agreed appropriate fair value for the
13  instruments.
14       Q.    Okay.  And so the processes that
15  yield the numbers that you then used, those
16  processes could have included prices at which
17  assets sold within Barclays; is that correct?
18       MR. SHAW:  Objection.  That calls
19  for spec --
20       A.    I wouldn't want to speculate on
21  that.  All I can say which is not a response
22  to your question, but it's pertinent to it, is
23  that the values which came out of that process
24  were Barclays' view of the appropriate fair
25  value for those instruments, irrespective of

G. ROMAIN - HIGHLY CONFIDENTIAL

1 whether transfers had occurred in those
2 instruments or not subsequent to the
3 transaction date. That was the measurement
4 objective and that's what -- and that is the
5 basis on which those numbers were considered.
6       Q. I'm not quarrelling with you, sir,
7 as to whether Barclays Capital believed those
8 to be the fair values. All I'm trying to
9 understand is the mechanical point which is --
10 and maybe you don't know the answer to this.
11       In arriving at Barclays' best
12 estimate of the fair values of those assets
13 did the processes which you referred to take
14 into account the prices at which assets were
15 transferred within Barclays?
16       A. They took into account the
17 traders' view of the value of the securities
18 based on their experience and available market
19 data.
20       Q. And do you know whether the
21 traders' views about valuation included prices
22 at which securities were transferred within
23 Barclays?
24       A. No, I don't know that.
25

G. ROMAIN - HIGHLY CONFIDENTIAL

1       Q. Okay. Thank you.
2       MR. TAMBE: I pass the witness.
3       * * *
4 EXAMINATION BY
5 MR. WOOD:
6       Q. Good afternoon, Mr. Romain.
7 Again, I'm John Wood. I'm from Hughes,
8 Hubbard & Reed. I represent the SIPA trustee.
9       And just to start off I'm going to
10 ask you some questions in your capacity as a
11 30(b)(6) witness regarding margin held secure
12 exchange rate derivatives and just to speed
13 things along why don't you go ahead and take a
14 look at your handwritten notes, Exhibit 399A.
15       A. (Witness complies.)
16       Q. On the second page, sort of the
17 middle of the page, you've got an entry
18 that's margin posted by LBI at OCC (23/9).
19       Do you see that?
20       A. Yes.
21       Q. Is that margin posted by LBI at
22 the OCC on September 23rd?
23       A. It's from the 23rd of September
24 statement. My understanding is that there's a
25

G. ROMAIN - HIGHLY CONFIDENTIAL

1 day lag in the statement. So it's intended to
2 represent the 22nd of September.
3       Q. And it looks like you have three
4 entries, cash, governments, and LOC; is
5 that correct?
6       A. Yes.
7       Q. And LOC is letters of credit?
8       A. That's correct.
9       Q. What are letters of credit?
10       A. Well, they're essentially
11 facilities which are drawn down, the account
12 party being third-party banks but they take
13 various forms.
14       Q. So in writing this are you
15 counting that as an asset?
16       A. We have not included that in our
17 acquisition balance sheets at the current
18 time. But we're not distinguishing between
19 those three items in terms of the nature of
20 our claim and entitlement. These are viewed
21 as -- all the three are viewed as margin which
22 is related to the positions that were taken
23 on. But it's margin which is held in one of
24 three forms.
25

G. ROMAIN - HIGHLY CONFIDENTIAL

1       Q. Now, when you say your claim and
2 entitlement, does that mean a claim and
3 entitlement from the estate?
4       A. I'm not sure in terms of the -- in
5 what way we make a claim at all or against
6 who. It's my understanding that these items
7 we are entitled to receive under the service
8 of the acquisition.
9       Q. And so why were they not included
10 in the acquisition balance sheet?
11       A. The letters of credit?
12       Q. Yes.
13       A. I'm not directly involved in the
14 proceedings but I understand there are
15 discussions with the counterparties to those
16 letters of credit which we don't believe has a
17 bearing on our entitlement from a legal
18 perspective. But when preparing financial
19 statements we tend to be conservative and
20 prudent in the way we do so. So if there are
21 ongoing conversations or just more potentially
22 disputes we would bear that in mind whether or
23 not to include them in that balance sheet.
24       Q. Are the disputes you're referring
25