# Exhibit J

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4  ------------------------x

5  In Re:

6                           Chapter 11

7  LEHMAN BROTHERS         Case No. 08-13555(JMP)

8  HOLDINGS, INC., et al,   (Jointly Administered)

9          Debtors.

10 ------------------------x

11

12          DEPOSITION OF EDWARD J. ROSEN

13              New York, New York

14              February 19, 2010

15

16 Reported by:

17 MARY F. BOWMAN, RPR, CRR

18 JOB NO. 28461

19

20

21

22

23

24

25

ROSEN

1     ROSEN
2         (Exhibit 622, declaration of Edward J.
3     Rosen marked for identification, as of this
4     date.)
5     EDWARD J. ROSEN,
6         called as a witness by the parties,
7         having been duly sworn, testified as follows:
8     EXAMINATION BY
9     MR. MAGUIRE:
10    Q.    As you know, my name is Bill Maguire
11    with Hughes, Hubbard & Reed.  I am here with my
12    colleague Amina Hassan.  We represent James
13    Giddens, the SIPA trustee.
14        We are going to ask you some
15    questions.  If any questions are unclear, let me
16    know.  If you need to take a break at any time,
17    just let me know.
18        I will show you a document we have
19    marked as Exhibit 622.  If you can tell me what
20    that document is, sir.
21    A.    It looks like my declaration, pursuant
22    to Rule 30(b)(6).
23    Q.    You have mentioned in the second
24    paragraph that you specialize in derivatives.
25    Do you see that?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1     ROSEN
2     A.    Yes.
3     Q.    Can you tell me what -- the
4     derivatives that Barclays acquired in the
5     transaction that's the subject of this, did that
6     include any futures contracts?
7         MR. MORAG:  Object to the form.
8     A.    It did, it did include the acquisition
9     of the futures business.
10    Q.    And did that futures business include
11    any positions?
12    A.    I don't know.  I don't know what
13    positions were actually on.  We didn't handle
14    the futures side of the arrangements.  Those
15    were handled by S&C, by and large.
16    Q.    Did you have an understanding whether
17    any futures contracts were included in the
18    acquisition by Barclays?
19        MR. MORAG:  Object to the form.
20    A.    Yes.  I believe, my understanding was
21    that there were futures positions and listed
22    options positions.
23    Q.    And what kinds of futures and options
24    contracts did you understand Barclays to be
25    acquiring in this transaction?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1     ROSEN
2     A.    I'm not sure I understand the
3     question, what type of futures options.
4     Q.    Were they exchange-traded or over the
5     counter?
6     A.    Yes, yes, listed.  Not over the
7     counter.  My understanding was the
8     over-the-counter business was excluded.
9     Q.    Did you have an understanding how
10    Lehman organized its derivatives business?
11    A.    No.
12    Q.    When did you become involved in the
13    transaction?
14    A.    My recollection was sometime around
15    the 15th of September, maybe the 14th of
16    September.
17    Q.    And what was your role?
18        MR. MORAG:  Time frame?  At the start?
19    Q.    Starting on the 15th.
20    A.    On the 15th, going forward, I was both
21    dealing with certain of the deal issues relating
22    to the regulated character of the transaction,
23    and also dealing with certain regulators on
24    issues that needed to be addressed if the deal
25    was going to be closed.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1     ROSEN
2         That's primarily what I was doing, but
3     also the clearinghouse issues that arose and the
4     JP Morgan issues that arose, I had some
5     involvement in, as events unfolded between then
6     and the 22nd.
7     Q.    When you say the clearinghouse, are
8     you referring to DTCC?
9     A.    And OCC.
10    Q.    What regulators did you deal with?
11    A.    I spoke with the SEC.  I did have one
12    or two conversations with staff at FINRA, and I
13    had a couple of conversations with folks at the
14    Federal Reserve.
15    Q.    With whom did you deal at the SEC?
16    A.    I had conversations with Mike
17    Macchiaroli, Randall Roy, and Dan Gallagher.
18    Q.    What were the subject of your
19    conversations with Mike Macchiaroli?
20    A.    There were a couple of issues.  The
21    principal issue related to the fact that Lehman
22    operated under a different -- was registered
23    under a different broker dealer regulatory
24    regime with different capital requirements than
25    Barclays, and there were questions about how

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2     A.   Talking about the 30(b)(6) issues and
3  discussing our recollection of them.
4     Q.   Can you tell me when that happened?
5     MR. HUME:  I am just going to object,
6  because I think the record is unclear
7  whether your question is about recollections
8  reflected in the affidavit versus 30(b)(6)
9  prep.
10    Q.   Did you distinguish between preparing,
11 getting your recollections for your declaration
12 and your recollections for your deposition, or
13 was that all part of the same process where you
14 were preparing to testify either by way of
15 declaration or by way of deposition?
16    A.   Well, obviously the discussions were
17 held earlier with respect to the declaration,
18 sometime during the week leading up to the
19 completion of the declaration.  I don't recall
20 whether Duane McLaughlin or Dana Fleischman
21 participated in those earlier discussions.
22    Q.   They did, however, participate in
23 another round of similar discussions --
24    A.   After the declaration.
25    Q.   -- after the declaration.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2     And when was that?  Was that just in
3  the last week?
4     A.   The week before, primarily.  And
5  yesterday, but only a small subset.
6     Q.   And how did you actually get the
7  recollection from the partners?  How did you
8  find out what they remembered?
9     A.   I'm not quite sure I understand the
10 question.  We talked amongst ourselves about the
11 events and our recollections of them covered by
12 the 30(b)(6).
13    Q.   Did any of your partners remember
14 things that you did not remember?
15    A.   I would say yes, we all had different
16 recollections.
17    Q.   Now, you note in your declaration,
18 paragraph 3, you say, "Where indicated, the
19 recollection of my partners."  Do you see that?
20 It's on the second line of paragraph 3.
21    A.   Um-hm.  I do see that.
22    Q.   Is there any recollection that any of
23 your partners gave you that you did not set
24 forth in this declaration?
25    MR. MORAG:  Objection to form and

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  objection on the attorney/client privilege
3  and work product.
4     MR. MAGUIRE:  Are you objecting or
5  directing the witness not to answer?
6     MR. MORAG:  If I understand your
7  question correctly, I'm directing him not to
8  answer.
9     Q.   In paragraph 4, sir, you refer to the
10 removal of certain language.  Do you see that?
11    A.   Yes.
12    Q.   And you note specifically the draft
13 that it was removed from.
14    A.   I am sorry.
15    Q.   You refer to language -- you refer to
16 a draft that contained that language?
17    A.   Yes.
18    Q.   And the draft language that you are
19 referring to, you set that forth in paragraph 5;
20 is that correct?
21    A.   I am sorry, in paragraph 4, I don't
22 see a reference to paragraph 5.
23    Q.   That's correct.  In paragraph 4, you
24 refer to the removal of certain language.
25    A.   Yes.  I am sorry.  You are referring

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  to paragraph 5 of the declaration, not
3  paragraph -- OK, could you repeat the question.
4     Q.   I just want to make sure we are on the
5  same page here.  You're -- when you talk about
6  the certain language in paragraph 4, you are
7  referring to the language that you set forth in
8  quotes in paragraph 5 of your declaration?
9     A.   Yes.  This is a reference to the
10 language in 1D.
11    MR. MORAG:  Let me note for the record
12 that the quoted language in paragraph 5 does
13 have ellipses and was not intended to be a
14 full quote.
15    Q.   As a matter of reference, we are
16 talking about the same language?
17    A.   Yes.
18    Q.   At the end of paragraph 4, you say
19 that the trustee's position is incorrect, and
20 you say, "There was to my or my partners'
21 knowledge never any such agreement or
22 discussion."  Do you see that?
23    A.   Yes.
24    Q.   Sir, was there any discussion, to your
25 knowledge, or to the knowledge of your partners,

TSG Reporting - Worldwide    877-702-9580

Page 26

ROSEN

1
2  with anyone, about the removal of the language
3  that you discuss in paragraphs 4 and 5 of your
4  declaration?
5      MR. MORAG:  Object to the form, and to
6  the extent -- you can answer to the extent
7  you're going to talk about discussion with
8  anyone on the Lehman side.
9      THE WITNESS:  Yeah, I know, it's fine.
10     A.   The only -- I -- the answer is, I
11 don't recall the specific content of the
12 discussion.  But in response to that language,
13 there was -- there was additional language that
14 we drafted that was provided and identified to
15 Lehman's attorneys explaining that this language
16 was needed in light of the changes that had been
17 made to 1D.
18     Q.   And is that, sir, your recollection or
19 the recollection of one of your partners?
20     A.   Well, we gave -- it is our collective
21 recollection that we drafted the additional
22 language, and it was our recollection that we
23 provided that in the form of a handwritten
24 markup, and I don't recall, and I'm not sure any
25 of my partners specifically recall, who actually

TSG Reporting - Worldwide    877-702-9580

Page 27

ROSEN

1
2  handed the markup over to the Lehman side, but
3  it was provided to the Lehman side in the form
4  of handwritten comments.
5      Q.   And the handwritten comments, are
6  those the ones that included the parenthetical
7  "property held to secure"?
8      A.   Yes, yes.
9      Q.   Have you seen those handwritten
10 comments?
11     MR. MORAG:  Time frame?
12     Q.   At any time?
13     A.   You mean including at the time that
14 they were drafted?
15     Q.   Yes.
16     A.   The recollection of the group was that
17 I drafted them.
18     Q.   Do you recall actually what you did
19 with those handwritten notes?
20     A.   I would have given them to one of my
21 partners.
22     Q.   Have you seen them since the weekend
23 when those notes were prepared?
24     A.   No, no, I have not.
25     Q.   Do you know whether they exist today?

TSG Reporting - Worldwide    877-702-9580

Page 28

ROSEN

1
2      A.   I don't know.
3      Q.   Do you know whether, in fact, you did
4  give them to somebody or what you did with those
5  handwritten notes?
6      A.   My recollection is that I handed them
7  to one of my partners.
8      Q.   Do you know which partner you handed
9  them to?
10     A.   I don't recall specifically.
11     Q.   Do you have a general recollection?
12     A.   I have a general recollection, it
13 would have been Bob Davis or Duane McLaughlin or
14 David Leinwand.  It would have been one of those
15 three.
16     Q.   Have you asked your partners for that
17 draft?
18     A.   No, I haven't.
19     Q.   Do you know whether anyone has
20 attempted to locate that draft?
21     A.   I don't know.
22     Q.   Did you talk to anyone on the Lehman
23 side concerning the insertion of the
24 parenthetical that you were proposing in that
25 draft?

TSG Reporting - Worldwide    877-702-9580

Page 29

ROSEN

1
2      A.   Did I personally speak to anyone on
3  the Lehman side?  Well, it depends upon -- I am
4  sorry, I personally did not speak to anyone on
5  the Lehman side.
6      Q.   Do you know whether any of your
7  partners spoke to anyone on the Lehman side
8  about including that parenthetical in the
9  clarification letter?
10     A.   Our understanding, our recollection,
11 Cleary's recollection, is that it would have
12 been -- it would have been identified as a
13 change to be made to the agreement, to the --
14 whoever the lawyer was on the -- representing
15 Lehman that was handling the document.
16     Q.   And do you know who the lawyer on the
17 Lehman side was to whom it was handed?
18     A.   I don't know.  I don't know.
19     Q.   And the draft that was handed to that
20 Lehman lawyer, did it have any other handwritten
21 changes?
22     A.   I'm trying to remember.  There were
23 two other changes that I recall, and you will
24 have to forgive me for being a little bit
25 unclear about the timing or the sequencing, but

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    I believe there were two other changes.
2        One, there was language -- let me back
3    up and ask you this question and get
4    clarification.  Are you asking me just about the
5    language that's described in 1D, or are you
6    asking about other changes to the clarification
7    letter?
8        Q.    Let's get our time frame and context
9    together first.  I'm talking to you specifically
10   about the draft that I understand from your
11   testimony in which you, in handwriting, inserted
12   the parenthetical that includes the words "and
13   property held to secure."
14       A.    Yes.
15       Q.    And the question is whether that draft
16   included any other proposed changes.
17       A.    I'd have to go back and look at the
18   sequence of the drafts.  There were two other
19   changes that may or may not have been
20   simultaneous.  I don't know.  They may have been
21   given sequentially but have been processed by
22   the other side as part of one turn.  I don't, I
23   don't recall.
24       But there was a change in the

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    clarification of language concerning 15c3-3,
2    provision to add the word "or value" at the end
3    of a sentence, and there was a sentence to
4    clarify what had been agreed as part of the
5    resolution of issues with DTC, that the
6    liabilities to DTC associated with Lehman were
7    excluded liabilities under the APA.
8        Q.    I am going to ask you again
9    specifically about the draft in which you
10   inserted that parenthetical "property held to
11   secure."
12       With respect to that draft, can you
13   tell me what, if anything, was said about anyone
14   on the Barclays side or the Cleary side to the
15   person on the Lehman side who received that
16   draft?
17       A.    No, I can't give you verbatim what
18   would have been said, but what would ordinarily
19   happen in that circumstance is that the changes
20   would be identified to the other side so they
21   could understand what was being provided to
22   them.
23       Q.    And when you say the changes would be
24   identified, the other side would be shown what

TSG Reporting - Worldwide    877-702-9580

ROSEN

1    the proposed language was?
2        A.    Yes.  We did not control the
3    documents, so Cleary did not input those
4    changes.  Those changes were put into whatever
5    revised draft emerged in whatever time it
6    emerged by the Lehman's counsel.
7        Q.    Other than pointing out the changed
8    language, do you know what, if anything, was
9    said to Lehman about the addition of that
10   parenthetical?
11       A.    No.  Not at that time.
12       Q.    When you say not at that time, is
13   there some other time that there was a
14   discussion --
15       A.    Not about that specific parenthetical
16   but about the subject, there were a lot of --
17   there were exchanges of a number of
18   communications and documents that I think were
19   addressed to the same issue that were exchanged.
20       Q.    I would like to go through some of
21   them, and the first one I'd like to take is the
22   one that you refer to in paragraph 4.  And
23   that's the draft language that you have put
24   forth in quotes in paragraph 5.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1        And if we get our sequence right,
2    there was a draft that included this language
3    which has an express reference to margin, and
4    that's the language you have set forth in
5    paragraph 5, right?
6        A.    I am sorry, could you repeat the
7    question about this language.
8        Q.    Yes.  Let's get our context right
9    first.
10       I invite you to look at paragraph 5
11   and look at the draft language that you have,
12   starting with the quotes, "any and all
13   property."
14       A.    I am sorry, where are you in
15   paragraph 5?
16       Q.    About midway down, the second full
17   sentence:  "The draft language accomplished this
18   by making clear that the definition of excluded
19   assets did not include 'any and all property,'"
20   and it continues.
21       A.    Correct.
22       Q.    So for my next couple of questions, I
23   am going to be asking you specifically about
24   that language and the draft in which that

TSG Reporting - Worldwide    877-702-9580

Page 34

ROSEN

1
2  language was deleted or crossed out.  Are you
3  with me?
4      A.  Yes.
5      Q.  Did you see the draft in which that
6  language was crossed out?
7          MR. MORAG:  Object to the form.  I
8  also object to the representation that all
9  of the language was crossed out.  If you
10  want to show him the actual draft, it may be
11  more appropriate.
12      A.  I saw a draft which included a number
13  of changes in which language was moved to other
14  sections and modifications were made, and those
15  modifications included modifications to this
16  language.  Yes, I did.
17      Q.   And you refer to this as the removal
18  of certain language in paragraph 4?
19      A.   Well, I would -- without mincing
20  words, I would say that there was a draft
21  prepared that dealt with some of these issues in
22  other ways, in other provisions of the
23  agreement.
24      Q.  Did you see the draft in which the
25  language you quote in paragraph 5 was removed?

TSG Reporting - Worldwide    877-702-9580

Page 35

ROSEN

1
2      A.   Yes.  Well, subject to the caveat as
3  to what you mean by remove.
4      Q.   What I mean by removed is the language
5  that you quote was deleted, it was marked as
6  deleted?
7          MR. MORAG:  Object to the form.
8      Q.  Did you see such a draft?
9      A.   I saw a draft in which this language
10  did not appear in this form.
11      Q.   Did this language appear in any other
12  form in that draft?
13      A.   Some of it did and obviously some of
14  it didn't.
15      Q.   And what part of it did not?
16      A.   I'd have to -- I would have to look at
17  the particular draft of the agreement to answer
18  that question.  I can't recall accurate --
19  with accuracy what the other changes were that
20  were made at the same time as this change was
21  made.
22      Q.   Once you saw that draft, did you
23  personally have any discussions with anyone on
24  the Lehman side concerning the removal of any of
25  this language?

TSG Reporting - Worldwide    877-702-9580

Page 36

ROSEN

1
2      A.   As I said earlier, we prepared
3  language, I prepared language, and that language
4  was provided to Lehman, and they would have
5  identified to Lehman that this language was now
6  necessary.
7      Q.   Yes.  And I understand that testimony.
8  I was just asking whether there was any other
9  conversation that you recalled.
10      A.   No, not that I was -- not that I am
11  aware of.
12      Q.   Are you aware of any discussion
13  involving any of your partners and anyone on the
14  Lehman side --
15      A.   Actually, hang on just a second.  Hang
16  on just a second.
17          I need to see the clarification
18  agreement in which this language appears,
19  because this language deals with a number of
20  issues that were in flux at the time, some of
21  which were the subject of discussions.
22          There was language that addresses
23  15c3-3, as I said earlier, that also addressed
24  the DTC situation which had changed.  And so --
25  and there were conversations obviously among the

TSG Reporting - Worldwide    877-702-9580

Page 37

ROSEN

1
2  parties about a number of issues that are
3  addressed in this language.
4          But as I said, with respect
5  specifically to the language that was added in
6  response in section 1(a)(ii)(C), the
7  conversation would have been in connection with
8  the transmittal of that language to the Lehman
9  side.
10      Q.   And you don't recall any other
11  communication with the Lehman side concerning
12  the removal of this language beyond what you
13  have told us?
14          MR. HUME:  Object to the form.
15          MR. MORAG:  Same objection.
16      A.   I think the -- other than the language
17  itself, other than the changes that were
18  proffered by Cleary having received a revised
19  draft and discussions that I suspect we are
20  going to cover relating to 15c3-3, and the
21  discussions relating to DTCC, there were no
22  specific conversations that we had and none that
23  we thought were necessary, because this was part
24  of the deal.
25      Q.   Did you have any discussions with

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1
2    anyone on the Lehman side concerning margin?
3             MR. MORAG:  Time frame?
4         Q.  Over the weekend prior to the closing?
5             MR. MORAG:  Objection to the form.
6    Objection to the term "margin."
7         A.  Well, there were conversations --
8    there were e-mail communications in which I was
9    copied and Lehman's people were copied about
10   what was going to happen to the margin at OCC.
11   Not just the margin but the property associated
12   with those accounts, yes, in which OCC said,
13   consistent with the order in their -- what was
14   then the draft TAA that they had prepared, was
15   going to be transferred to Barclays.
16       Q.  Any discussions about margin with
17   anyone on the Lehman side other than in
18   connection with the OCC?
19            MR. MORAG:  Objection to the form.
20       A.  There was an e-mail to me copying
21   Lehman, I believe, about the transfer of a
22   certain amount of margin -- I can't remember
23   exactly what it was -- in which Lehman was
24   copied.  I think that e-mail was from Jim
25   McDaniel.  I think the trustee's representatives

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1
2    were also copied on that.
3         Q.  And that's in connection --
4    Mr. McDaniel represented the OCC?
5         A.  The OCC.
6         Q.  Yes.
7             Other than with respect to the OCC,
8    any discussions that you had concerning margin?
9         A.  Well, verbal discussions?
10        Q.  Yes.
11        A.  I believe that there were conference
12   calls about the clearinghouses.  I think they
13   may have been scheduled for Saturday or Sunday,
14   and the arrangements that were going to be made
15   and the transfers, and I believe that
16   representatives from Lehman were on those calls.
17   I cannot recall specifically, either the
18   specific discussions or exactly when they
19   occurred.
20            And it would have -- I think it
21   probably included discussions about how things
22   were going to be done in the transfer of margin
23   and the like.
24        Q.  What clearinghouses are you referring
25   to?

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1
2         A.  DTC and OCC.
3         Q.  Do you recall any discussion
4    concerning margin at DTCC?
5         A.  Discussing margin at DTCC?  Well,
6    there were discussions about the DTC accounts
7    and how they were going to be handled, and those
8    accounts would have included both proprietary
9    positions, customers' positions, positions that
10   may have been margined, and so indirectly, all
11   of those discussions with DTC potentially
12   included discussions about margin, to the extent
13   that that was relevant.
14        Q.  Any express reference to margin?
15   Margin coming up in any express way in any
16   conversation with DTC that you remember?
17        A.  Well, in the sense that to the extent
18   that anything constituted margin that was in
19   there and the discussions covered those
20   accounts, yes.  But I don't remember us
21   specifically singling out margin as a topic.
22        Q.  Do you recall any discussions about
23   margin at any foreign exchanges or
24   clearinghouses?
25        A.  Again, I don't recall conversations

TSG Reporting - Worldwide    877-702-9580

**ROSEN**

1
2    with foreign clearinghouses, but to the extent
3    that we discussed the accounts that were going
4    over and the credit support for them, to the
5    extent that as part of the business that was
6    being transferred, there were positions in those
7    accounts, they would have been covered by the
8    conversations.
9         Q.  And do you recall any specific such
10   conversations?
11        A.  Well, there were negotiations between
12   the parties about the business, so if you're
13   saying that I'm taking the FCM business and if
14   that business includes positions that are traded
15   on foreign markets, then by definition you're
16   talking about them as part of the same thing.
17   If you are taking that business and customer and
18   other deposits associated with them and assets
19   associated with that business, then yes, you are
20   talking about the margin indirectly, although
21   you may not be specifically singling it out.
22        Q.  That's what I want to do.  I want to
23   single it out.
24            Do you recall a specific singling out,
25   a specific mention of either margin or guarantee

TSG Reporting - Worldwide    877-702-9580

Page 42

```
 1              ROSEN
 2    fund deposit in any conversations other than in
 3    connection with the OCC?
 4         MR. HUME:  Objection, asked and
 5    answered.
 6         A.   I think I would say that the
 7    discussions about the assets that were being
 8    transferred in connection with the business and
 9    any deposits is a discussion about guarantee
10    fund deposits and margin at those clearing
11    organizations.
12         Q.   I understand that testimony.  The
13    question is, do you have a recollection or have
14    you heard from any of your partners their
15    hearing that somebody specifically referred,
16    specifically to margin or guarantee fund deposit
17    in any of those discussions?
18         A.   I think that the answer to your
19    question is that in the documents, that is
20    covered.  And I'm confident that there may have
21    been -- I shouldn't say that.
22              I don't recall the specific
23    conversations that we had with the clearing
24    organizations and other lawyers who may have
25    been involved.  We may have or may not have
```
TSG Reporting - Worldwide    877-702-9580

Page 43

```
 1              ROSEN
 2    specifically referred to the word "margin" on
 3    those calls.
 4              But we did repeatedly exchange
 5    communications regarding the various forms of
 6    assets that would be coming over, for example,
 7    under the TAA.
 8         Q.   We have been talking now about the
 9    time period over the weekend prior to the
10    closing.  I would like to just ask you if I have
11    missed anything, if we go back to the work that
12    you were doing from the 15th on, anytime up to
13    that weekend.  During that period, do you recall
14    any discussions specifically in which margin or
15    guarantee fund deposit were mentioned?
16         A.   Again, I would say in the deal
17    documentation relating to the transfer of assets
18    associated with those businesses that were being
19    transferred and the agreements as to the
20    inclusion of deposits, including customer
21    deposits, yes, they were the subject of
22    communications in that form.
23         Q.   And what discussion do you remember in
24    which anyone specifically referred to margin?
25         A.   As I say, I don't recall specifically
```
TSG Reporting - Worldwide    877-702-9580

Page 44

```
 1              ROSEN
 2    the content of specific conversations that I may
 3    have had at that time.
 4         Q.   Is there any conversation that you're
 5    aware of where anyone on the Barclays or Cleary
 6    side had specifically discussed guarantee funds
 7    deposit?
 8         MR. MORAG:  You can answer to the
 9    extent it involves someone on the Lehman or
10    OCC or DTC side as well.
11         A.   It was never raised as an issue for
12    discussion, because it was assumed by all
13    parties, I think, that it was part of the
14    business.  And certainly nobody on the Lehman
15    side ever suggested or raised the question as to
16    its needing to be singled out from the language
17    that otherwise covered it.
18         Q.   Now, when you saw that the draft
19    language referring to margin and guarantee fund
20    deposit had been removed from the draft, did
21    that suggest to you that there needed to be a
22    discussion about this or that someone on the
23    Lehman side was suggesting that they had
24    different assumptions or different
25    understandings from what you had?
```
TSG Reporting - Worldwide    877-702-9580

Page 45

```
 1              ROSEN
 2         MR. MORAG:  Objection to form.
 3    Compound.
 4         A.   As I mentioned, the language that came
 5    out was actually not specific to OTC -- to
 6    listed derivatives or listed derivatives
 7    customers.  It was language that sort of
 8    addressed a variety of issues.
 9              And so I would not have drawn any
10    necessary inference as to what specifically the
11    concerns were that, from the Lehman side, were
12    being addressed.  There were changes to the deal
13    that needed to be addressed in that language.
14    There were changes in the agreements that
15    related to the handling of -- I'm sorry.  There
16    were changes in the language that was
17    documenting, for lack of a better reference, the
18    15c3-3 treatment, and indeed the fact that the
19    DTC arrangement had essentially changed.
20              So it was clear that the language that
21    was modified needed to be modified.  As to
22    whether or not that modification signaled a
23    specific view about the treatment of credit
24    support for exchange-traded derivatives, you
25    would never know until you clarified it with
```
TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  your own language, and to my knowledge, nobody
3  on the Lehman side, when presented with that
4  language, expressed any surprise or objection.
5        So I think the clear inference is that
6  it was not a surprise to them, and therefore, we
7  inferred that there was no intent to communicate
8  to us that they didn't think it was part of the
9  deal, or anybody else who had the opportunity to
10 see those changes, which would have been all the
11 signatories.
12       Q.   So you didn't feel there was any need
13 to go up and have a specific discussion with the
14 folks on the Lehman side about the removal of
15 the language?
16       A.   I didn't think that there was anything
17 more that needed to be done than to provide to
18 them the language that we thought was
19 appropriate in order to clarify what the deal's
20 agreement was with respect to the treatment of
21 that credit support, that property.  That is the
22 way we ordinarily communicate in a transaction
23 of this type.
24       Q.   In the beginning of the, of your
25 paragraph 5, you note that the draft language at

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  issue was an attempt to accurately document the
3  business deal.  Do you see that?
4        A.   Yes.
5        Q.   What is the business deal that you are
6  referring to there?
7        A.   Here, that Barclays was acquiring the
8  exchange-traded businesses, exchange-traded
9  derivatives businesses of Lehman and the assets
10 and customer deposits and other deposits that
11 were part of that business.
12       Q.   Are you aware of whether there was any
13 business discussion between the Barclays and
14 Lehman folks concerning specifically the
15 acquisition of either margin or clearing fund,
16 guarantee fund deposit?
17       MR. HUME:  Objection, asked and
18 answered.
19       MR. MORAG:  Objection, form.
20       A.   I don't know whether there were or
21 weren't.  I assume as part of the negotiation of
22 the deal leading up to the description, the
23 documentation of it, that it was implicit in
24 those discussions.
25       Q.   You go on to say that the draft

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  language accomplished this, the beginning of the
3  next sentence.  Do you see that, sir?
4        A.   Um-hm.
5        Q.   Can you tell me, what did the draft
6  language accomplish?
7        A.   What did the -- in relation to the
8  exchange-traded derivatives, that it -- what
9  it -- what this -- I am sorry, let me see.
10       It included language that, as I said,
11 covered a wide variety of things, but also would
12 have provided -- I am sorry, included language
13 that clarified that the property of any kind
14 that was basically held by any of these or in
15 any of these forms, was not an excluded asset
16 under the terms of the deal documentation.
17       Q.   And in the quotes, you have "any and
18 all property," and then you have square
19 parenthesis, "including cash."  Do you see that?
20       A.   Um-hm.
21       Q.   Why did you include those square
22 brackets around the words "including cash"?
23       A.   Just as a clarification.  It's not
24 necessary, but just for the sake of -- for the
25 avoidance of any lack of clarity.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2        Q.   Why did you not include those words in
3  the handwritten parenthetical that you provided?
4        A.   The answer to that question -- I'm
5  going to try to answer this without going into
6  attorney/client privileges, but the answer to
7  that question is because we also came to believe
8  that this was not the best location for
9  clarifying this, because this got caught up in
10 provisions dealing with, you know, what the
11 parties understood to be an exception to the
12 excluded assets, and excluded assets included
13 cash.  So we wanted to make sure in this
14 provision that it was relevant.
15       But on the other hand, we realized
16 that providing this clarification in an
17 exclusion to the -- to an exclusion was not the
18 clearest way to do it and, therefore, we decided
19 in response, rather than go back into this
20 provision and start wordsmithing, which we
21 didn't have the time to do, we would just make
22 it abundantly clear, in as concise words as we
23 could, what the purchased assets included in
24 relation to that business.
25       Q.   And you made it abundantly clear by

TSG Reporting - Worldwide    877-702-9580

Page 50

```
1              ROSEN
2    putting the parenthetical that made clear it
3    included property held to secure?
4         A.   Yes.
5         Q.   And my question is, why did you not
6    include, beside "property," the words "including
7    cash"?
8         A.   Didn't think it was necessary.  At
9    this point in time, it was 5 or 6 o'clock in the
10   morning.  We were extremely concerned about
11   whether we were going to run out of time in
12   terms of the objective of having this deal
13   signed in time to be announced early in the
14   morning, so as to avoid any negative sort of
15   market reaction to the deal not being announced.
16        And we were trying in as concise a
17   form as possible and as clear a form as possible
18   to get it down and not to get embroiled in
19   parsing words.
20        So, I, I mean did I have -- would I
21   have preferred to have had hours to have sat
22   down and drafted it and perfected it?  I
23   certainly would.  But I thought it was
24   absolutely clear that if we said "any property,"
25   that it would include cash, noncash, securities,
```

TSG Reporting - Worldwide   877-702-9580

Page 51

```
1              ROSEN
2    nonsecurities, whether or not it was held by
3    Lehman, by a clearing organization, wherever it
4    was, and whoever was holding it and whatever its
5    character might be.
6         I think for the purpose of clarifying
7    what might have been a subject of dispute in
8    light of the deletion of that language, we
9    didn't think it was actually necessary to
10   include the language, but we were concerned
11   about the sort of negative inferences that could
12   arise, and so we thought because it was an
13   important point for the deal that we would make
14   it as clear as we could, as concisely as we
15   could.
16        Q.   You had had a discussion, and we will
17   get to this a little bit later, on the subject
18   of whether cash in the 15c3 account could be
19   transferred to Barclays.  You recall that?
20        A.   Yes.
21        Q.   And in connection with that, some of
22   the Lehman people at least took the position
23   that cash could not be properly transferred?
24        A.   I wouldn't describe what they said as
25   that.  I would say, this was part of the purpose
```

TSG Reporting - Worldwide   877-702-9580

Page 52

```
1              ROSEN
2    of the clarification letter.  There were
3    provisions about deposits, customer deposits.
4    There were provisions in the excluded assets
5    provisions of the APA regarding bank accounts.
6    And I think it was clear to us that the 15c3-3
7    assets were assets of the business that we were
8    buying.
9         I would describe what I heard at least
10   as being an expression of concern as to whether
11   in light of what had been said to the court
12   about bank deposits, whether or not if we were
13   going to include cash in bank deposits -- that
14   would be in bank deposits, whether some
15   additional steps might need to be taken, which
16   would have been inconsistent with completing the
17   deal and being able to announce it.
18        But I don't recall anybody saying that
19   it couldn't be done or that it wasn't part of
20   the deal or that it wouldn't be permitted or
21   that it wasn't part of the sale order.  There
22   was, I have said, a decision taken to
23   avoid the issue by limiting the account assets.
24        MR. HUME:  We have been going for
25   about an hour.  Can we have a break?
```

TSG Reporting - Worldwide   877-702-9580

Page 53

```
1              ROSEN
2         MR. MAGUIRE:  Sure.  If we can just
3    wrap up this.  It might take a couple of
4    minutes.
5         Q.   Were you at the sale hearing?
6         A.   Only during the, for lack of a better
7    word, the intermission.  It went into recess and
8    I was there.  I was not actually there at the
9    time that it was --
10        Q.   Do you know whether the court was told
11   anything about bank deposits as opposed to cash?
12        A.   No, I don't know.  I just know that
13   the issue about it was raised, and under the
14   circumstances, people were willing to eliminate
15   the issue, rather than -- because I think the
16   feeling was that if we didn't close before the
17   Monday open, there may have been greater
18   jeopardy to the deal.
19        Q.   In order to avoid the issue, Barclays
20   agreed that it would not take any of the cash in
21   the Wells Fargo account that was part of the
22   15c3 account?
23        MR. MORAG:  Objection to the form.
24        A.   I would say Barclays agreed to include
25   language in the clarification letter that only
```

TSG Reporting - Worldwide   877-702-9580

Page 54

```
1              ROSEN
2   called out the transfer of a certain amount of
3   securities associated with the 15c3 account, or
4   if those weren't available, other securities of
5   similar value.
6       Q.   And did not call out the 1 billion
7   dollars in cash that was at Wells Fargo?
8       A.   Not in the clarification provision,
9   correct.
10      Q.   Now, given those discussions, and the
11  decision by everyone to avoid the cash issue,
12  did it occur to you that the words "including
13  cash" should be included in the parenthetical
14  when you described property held to secure?
15      A.   No.  No, because I thought there was a
16  clear distinction between deposits and customer
17  deposits and LBI cash in its bank accounts.
18      MR. MAGUIRE:  This is a good time for
19  a break.
20      (Recess)
21      MR. MORAG:  I should just put on the
22  record, to the extent, Mr. Maguire, you're
23  curious, Cleary did search for all
24  documents, including any handwritten notes,
25  and our production does not include them
```
TSG Reporting - Worldwide    877-702-9580

Page 55

```
1              ROSEN
2   because we were not able to find the markup
3   that you asked about in your examination.
4       MR. MAGUIRE:  I appreciate that.
5       MR. HUME:  I should also state we have
6   looked for it in the Weil production, have
7   not found it.  I'm double checking.
8       THE WITNESS:  Which would have been
9   consistent with our handing it to Weil to
10  deal with the document.
11  BY MR. MAGUIRE:
12      Q.   Sir, before the break, we were in
13  paragraph 5 of your declaration and we were
14  talking about the -- what you referred to as the
15  business deal in the first and second lines of
16  that declaration.
17           Was it your understanding that the
18  business deal was documented in the asset
19  purchase agreement?
20      A.   It was my understanding that the deal
21  was documented in the asset purchase agreement,
22  the first amendment in the clarification letter.
23      Q.   The language that we have been talking
24  about in the quotes at the bottom of page 2 of
25  your declaration, starting with "any and all
```
TSG Reporting - Worldwide    877-702-9580

Page 56

```
1              ROSEN
2   property," did you draft that language?
3       A.   I'm sorry, could you --
4       MR. MORAG:  Starting here.
5       Q.   Paragraph 5 on page 2 and starting
6   with the language we have been talking about
7   that starts with the quotation "any and all
8   property."
9       A.   I was involved in its drafting, but I
10  think it was, like many things, a bit of a group
11  process.
12      Q.   So who were the members of this group?
13      A.   The members of the group on the Cleary
14  side would have been me, Dana Fleischman, Bob
15  Davis, Duane McLaughlin, possibly David
16  Leinwand.  Whether -- the extent to which any of
17  one of them was specifically involved in
18  particular language, I don't recall.
19      Q.   So this was a collective, this
20  language was a collective drafting effort of a
21  number of Cleary lawyers?
22      A.   Yes, although I would say probably
23  principally me.
24      Q.   When it was proposed to the Lehman
25  side, your understanding was that this language
```
TSG Reporting - Worldwide    877-702-9580

Page 57

```
1              ROSEN
2   accurately reflected the business deal?
3       A.   Yes.
4       Q.   Did you ever ask anyone to identify
5   who had negotiated this specific part of the
6   business deal?
7       MR. MORAG:  Object to the form.
8   I will let you answer if it is -- as
9   to the yes or no, but if it involves a
10  privileged communication, do not go into the
11  substance of the communication.
12      A.   I assume it was negotiated by the
13  principals who negotiated the deal that was
14  ultimately documented in the APA and these
15  documents.  I was not privy to those specific
16  negotiations.
17      Q.   Do you know the names of the
18  individuals who negotiated the deal specifically
19  on this point?
20      A.   I don't know who participated in each
21  discussion.  I know that Archibald Cox and
22  Michael Klein and Jonathan Hughes and Rich Ricci
23  were involved in the negotiations, but I did
24  not -- I don't have personal knowledge of those
25  exchanges.
```
TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2    Q.  Do you know who was involved on the
3  Lehman side specifically with respect to the
4  business deal that's -- that you describe in --
5     A.  Whoever was in those conversations,
6  and I wasn't present, so I couldn't identify
7  them.
8     Q.  Did the business deal ever change?
9  I'm talking now specifically about that part of
10 the business deal that's the subject of the
11 language you and your group drafted and that you
12 put forth in paragraph 5 of your declaration.
13 Did that part of the business deal change
14 anytime after the discussion of the asset
15 purchase agreement?
16     MR. MORAG:  Object to the form.
17     You can answer.
18     A.  I would say that the only respect in
19 which it changed was reflected in the 3-3
20 provisions in which Barclays agreed in essence
21 to relinquish the claims specifically in the
22 clarification letter to the -- the non-769
23 million or whatever it was of securities in the
24 15c3-3 account.
25     There were aspects in which the deal

ROSEN

1
2  was evolving as it contemplated it would at the
3  sale hearing in relation to the DTC
4  arrangements.  That is all that comes to mind.
5     Q.  And specifically with respect to
6  assets that were related to derivatives, margin
7  or clearing funds deposit, did the deal change
8  anytime after -- the business deal change at any
9  time after the execution of the asset purchase
10 agreement?
11     A.  I'm not aware that it ever changed,
12 only that it was clarified.
13     Q.  You refer, at the bottom of page 2 and
14 top of page 3 of your declaration, to the
15 obligations of LBI or any other person.  To whom
16 are you referring with the words "any other
17 person"?
18     A.  It could be -- well, without
19 limitation on what it might include, the two
20 obvious inclusions would have been the
21 obligations of LBI or any affiliate or any
22 customer who was involved as part of these
23 transactions or part of the business that was
24 being transferred.
25     Q.  Then you say, "in an account

ROSEN

1
2  maintained by or on behalf of."  Can you tell me
3  what is the distinction here between an account
4  maintained by as opposed to an account
5  maintained on behalf of LBI?
6     A.  Well, Lehman, when Lehman conducts --
7  when a broker dealer conducts business with a
8  customer or on behalf of an affiliate or for its
9  own proprietary account, it will reflect, it
10 will be required to reflect on its own books and
11 records accounts which are its accounts.  Those
12 assets may be held by custodian banks, other
13 banks, clearing agencies, clearing
14 organizations.
15     So this is meant to not be limited to
16 those specific alternatives to the account as it
17 is described on the books of the carrying
18 broker, to carry anything, wherever it may be,
19 if it was to secure obligations in essence for
20 which BCI was going to become responsible.
21     Q.  And you go on to say, "for which
22 Barclays shall become responsible as of the
23 closing."  What were you referring to there?
24     A.  At this point, I believe it was
25 unclear how the DTCC accounts were going to be

ROSEN

1
2  handled, but it was clear that, for example, to
3  the extent that Barclays was a clearing, either
4  a clearing member of a clearing organization
5  which carried accounts, or was a clearing broker
6  carrying positions with other clearing brokers
7  who were clearing members of other exchanges on
8  which positions may have been carried in or out
9  of the United States, whatever the form, that
10 would have been covered.
11     The point was that if there was credit
12 support available and Barclays was on the hook
13 and potentially subject to liabilities
14 associated with that, that all of those assets
15 would be available.
16     Q.  And were Barclays -- in the case of a
17 foreign account, where Barclays was not
18 taking -- stepping into the shoes of Lehman and
19 taking over from Lehman, the obligations to a
20 foreign exchange or clearing corporation, it
21 would get the exchange-traded derivatives but
22 not the associated assets?
23     MR. MORAG:  Object to form.
24     A.  Not at all.  Not at all.  That's not
25 what I am saying at all.

Page 62

ROSEN

1
2      In fact, if BCI was going to be in the
3  chain of financial responsibility for those
4  positions, whether it was because they were
5  taking the account or they were carrying the
6  account or they were carrying the account with a
7  foreign clearinghouse or another broker who was
8  in the clearinghouse, that that would be
9  included.
10      Q.   And that's what I am trying to
11  understand.  Where the flip side of that
12  happens, where Barclays was not taking the
13  account, did you consider what happens when
14  Barclays does not take the account at a foreign
15  exchange?
16      A.   I think that language is dealt with
17  elsewhere.  And I need the clarification letter
18  to --
19      Q.   So you believe there is a separate
20  provision that deals with when Barclays takes
21  exchange-traded derivatives --
22      A.   I don't recall the specific language.
23  I would prefer to --
24      MR. MORAG:  You have to --
25      A.   I am sorry, I prefer to look at the

Page 63

ROSEN

1
2  clarification letter.
3      Q.   Well, we will certainly get to the
4  clarification letter, but your understanding is
5  that that's not covered by this language; is
6  that correct?
7      A.   Well, there are ellipses in here.
8  This is a very long provision, and I'm not
9  prepared to summarize all the things that it
10  does or does not cover in this abbreviated form.
11  So if you want me to tell you what it covers,
12  you are going to have to give me the provisions
13  so that I can look at them.
14      Q.   Sounds fair.  I think it is Exhibit
15  25.
16      MR. MORAG:  Mr. Maguire, if I recall
17  correctly, Exhibit 25 is the executed
18  clarification letter.  You have been asking
19  him questions about language which was not
20  included in the executed clarification
21  letter.  So I'm not sure that's going to be
22  responsive to his request.
23      Q.   That may be fair.  Maybe we should go
24  through the drafts.
25      A.   I think we should look at the draft

Page 64

ROSEN

1
2  that has this --
3      MR. MORAG:  Only if you have questions
4  about the draft.  If you have questions
5  about the final, show him the final.
6      Q.   Why don't we do that.  We will go
7  through the drafts and then we will take a look
8  at the final.
9      Before we do that, let me ask you to
10  scroll down to the end of that paragraph, the
11  bottom of paragraph 5.  You refer there to,
12  "which is consistent with the discussions of the
13  lawyers from both sides."
14      Do you see that reference to those
15  discussions?
16      A.   Um-hm.
17      Q.   Can you tell me what discussions you
18  are referring to there?
19      A.   The discussions negotiating the terms
20  of the deal, which were that Lehman sold the
21  exchange-traded derivatives business and all
22  assets associated with it and all deposits and
23  customer deposits.  But basically it is
24  consistent with the treatment in the
25  documentation and therefore the negotiation of

Page 65

ROSEN

1
2  the documentation relating to what it was that
3  Barclays was getting.
4      Q.   Is there any specific conversation
5  among any two or more lawyers that you were
6  intending to refer to in that last sentence of
7  paragraph 5?
8      A.   I was not present in the negotiations
9  of the original provisions in the APA that this
10  clarifies.
11      Q.   And you're not aware of any
12  conversations that your partners have told you
13  they remember from the negotiation of the
14  original deal?
15      What I am trying to clarify is just,
16  did you have in mind when you wrote this
17  reference to discussions something either that
18  you remembered or something that one of your
19  partners told you about?
20      A.   No.  I'm referring to what would have
21  had to have been discussed if the parties were
22  to come to the terms on which they signed the
23  APA.
24      Q.   I am going to show you a document that
25  has previously been marked as Exhibit 30.  Do

**ROSEN**

1
2  know when you're ready.
3          And my first question is going to be,
4  have you seen this draft before?
5      A.   I've seen before an e-mail transmittal
6  from Michael Mazzuchi passing on a draft of the
7  clarification letter to DTCC and its counsel at
8  their request, there being a draft of the
9  clarification letter attached to it that was
10  provided to us by Weil.
11          But as to whether this is exactly the
12  same draft, I can't say.  I would have to
13  verify.
14      Q.   You will see at the bottom of page 1
15  of the draft is a reference to LBI's clearance
16  boxes.
17      A.   I see that.
18      Q.   Do you know why the word DTC was not
19  included there?
20      A.   My understanding is that it was not
21  included because there were clearance box assets
22  held at locations other than DTCC.  So DTCC was
23  not the exclusive depository of clearance boxes,
24  is my recollection.
25      Q.   And what were the other depositories?

**ROSEN**

1
2      A.   I don't remember knowing the details.
3      Q.   Did anyone consider saying DTC and
4  other clearance boxes?
5          MR. MORAG:  Object to the form.
6      A.   I wouldn't speculate as to whether
7  somebody did or didn't.  They may have.
8      Q.   In a prior draft, there had been a
9  reference to the box 074, which I understand was
10  the DTC box.  Do you have any knowledge as to
11  why that reference was dropped?
12      A.   I am not certain, but I have a
13  recollection that it was because 074 may not
14  have included all of the clearance box assets,
15  that they may not have been confined to the
16  account 074.  But I'm not 100 percent certain.
17  I have a recollection of something along those
18  lines.
19      Q.   If you look at the bottom of page 1,
20  you will see there is a parenthetical that says,
21  "provided, however, that purchaser in its
22  discretion may elect within 60 days after the
23  closing to return any such securities to LBI."
24          Do you see that?
25      A.   Yeah.

**ROSEN**

1
2      Q.   And can you tell me what was the
3  purpose of that?
4      A.   I'm not sure that we were the source
5  of that language.  I think that on its face, it
6  seemed to have contemplated that there may be
7  things that, in the clearance box, that Barclays
8  might not have wanted.
9      Q.   And do you have any understanding as
10  to what kinds of assets Barclays would not want
11  from the clearance box?
12          MR. HUME:  Objection, calls for
13  speculation.
14      A.   As I say, I'm not sure that this was
15  motivated by Barclays, and I'm not sure that
16  this wasn't an option that was being provided to
17  Barclays that Barclays didn't see any reason to
18  negotiate, since it gave them the ability to do
19  something but not an obligation to do it.
20      Q.   But you don't have knowledge as to
21  what prompted this?
22      A.   No, I don't.  Or I should say I don't
23  recall.
24      Q.   If you turn to page 4, and see the
25  paragraph 8, transfer of customer accounts.  And

**ROSEN**

1
2  towards the end of that, you will see a
3  reference to 15c3.
4      A.   Yes.
5      Q.   And at the end of that sentence, it
6  refers to the phrase, "or securities of
7  substantially the same nature and value."
8      A.   Yes.
9      Q.   Can you tell me how did those words
10  get to be inserted in the clarification letter?
11          MR. MORAG:  Which words?  All of them?
12      Q.   The words "or securities of
13  substantially the same nature and value."
14      A.   My recollection of the events for
15  that, following on the discussion which led to
16  the limiting of this provision to 769 million of
17  securities, that Harvey Miller raised the
18  question whether or not it was clear that we
19  could agree to this.
20          And I told him that I was not aware of
21  a limitation, particularly to the extent as had
22  been represented, that the 769 million dollars
23  was excess to the level that Lehman was required
24  to reserve under 3-3 as of that date, and in
25  response to the question can we do it, I

ROSEN

1
2  suggested that if there was a concern along
3  those lines, which we didn't share -- and I'll
4  say only, my recollection is there was a
5  question raised about it -- that we say to the
6  extent permitted by applicable law and as soon
7  as practicable after the closing.
8       And because the provision by its terms
9  then raised a question about whether or not this
10 value was going to be conveyed, because the
11 reason this was in here and was the subject of
12 discussion was that there was a significant
13 erosion or concern about the erosion of value
14 and assets that were contemplated to be
15 delivered initially but were not available to be
16 delivered, and that Lehman identified this as a
17 source of value, and so we wanted to make sure
18 that that value was conveyed.
19      And so as a result of this language,
20 it made us think, well, fine, if you can't give
21 us these 769 million of securities, give us
22 those other securities of a similar nature and
23 value.
24      That's my recollection of the origins
25 of this provision.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2      Q.  I'll show you a document we have
3  previously marked as Exhibit 451.  Have you seen
4  that before, sir?
5      A.  I don't recall that I necessarily saw
6  precisely this.  I do recall that there was a
7  representation made that the SEC had approved as
8  excess a certain level of value and that there
9  was an e-mail.  We thought that we were going to
10 see an e-mail saying that.  Instead, there was
11 an e-mail, I recall, but which didn't involve --
12 didn't come from the SEC, but reported that it
13 was approved.
14      I don't think I have seen this
15 particular document, and I can't say that I
16 recall with precision the numbers for the
17 allocations between cash and securities.
18      Q.  Did you ever discuss Lehman's 15c3
19 account with Mike Macchiaroli?
20      A.  I don't recall being able -- at the
21 time that I sort of first saw this, which I
22 believe was on a -- or not this -- I was made
23 aware of the e-mail and shown something, I do
24 not believe that I spoke to Mike Macchiaroli,
25 but as I mentioned at the outset of this, I had

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  earlier had a conversations with Mike which,
3  while we didn't discuss specifically the 3-3
4  reserve account or the amount that was excess, I
5  came away with the impression that he was
6  optimistic that there was going to be sufficient
7  assets.
8       So I did not have a -- I did not have
9  a -- I did not have a confirmation from him.  I
10 didn't have a concern that there would be a
11 deficiency, but I did not have an opportunity to
12 actually go over this with him.
13      Q.  So in your earlier conversation with
14 Mr. Macchiaroli, he was optimistic that there
15 would be sufficient assets available to pay all
16 customer claims; is that correct?
17      A.  Yeah.  That -- well, I don't think he
18 would have -- I don't think he would have -- I
19 don't mean to put words in his mouth that he
20 would have made a representation to those
21 effects, but I came away with an impression that
22 he was optimistic that there wouldn't be a
23 shortfall.
24      Q.  And you took from that conversation
25 that there wouldn't be a shortfall in customer

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  property?
3      A.  Yes.
4      Q.  And you, therefore, expected --
5      A.  Well, I took away that at that point,
6  knowing what he knew, that it looked as though
7  there wouldn't be.  I wouldn't say -- I wouldn't
8  characterize it beyond that.
9      Q.  And he didn't tell you to what extent
10 there would be any excess?
11      A.  We didn't discuss any quantification.
12      Q.  Did you have any discussions with
13 anyone at the SEC concerning the reserve account
14 or any excess in the reserve account?
15      MR. MORAG:  Objection, asked and
16 answered.
17      A.  I don't recall.
18      Q.  Now, you were responding to a Weil
19 question.  Was it Harvey Miller who said can we
20 do it?
21      A.  I believe it was Harvey Miller, yes.
22      Q.  What he was referring to is the
23 transfer from the 3-3 account?
24      A.  Yes.  He was, he was raising the
25 question as to whether there might be a

TSG Reporting - Worldwide    877-702-9580

Page 102

```
1              ROSEN
2      Q.   And leaving aside the whole construct
3  and whole premise, my only question is, you were
4  not aware of any limitation, even in the
5  event --
6      A.   I wasn't, I wasn't thinking about all
7  of the -- parsing all of the scenarios.  There
8  was nothing on the face of this agreement that
9  to my mind couldn't be accomplished, and from my
10 perspective, caveating it with the language "the
11 extent permitted by applicable law," even though
12 you could argue that that's implicit, was a
13 concession that we could readily make in order
14 to complete the deal.
15     Q.   So given that concession, you didn't
16 think through what would happen if the transfer
17 left unavailable property for customers?
18     MR. MORAG:  Object to the form.
19     A.   No, I reject that characterization.
20 It was not necessarily the case that there would
21 have been any deficit for customers as a result.
22 And as a result, because I didn't have the
23 information available to evaluate it, I did not
24 engage in a hypothetical conjecture as to
25 whether -- under what circumstances or set of
```

TSG Reporting - Worldwide     877-702-9580

Page 103

```
1              ROSEN
2  facts there would be a problem.
3      But from my perspective, but for the
4  concern, which was really a procedural concern
5  as a matter of caution, as I understood it from
6  Harvey Miller, I believed that these assets
7  arguably were intended to be transferred, were
8  intended to be transferred as part of the assets
9  of the business.
10     Q.   In any event, you and the Barclays
11 side of the house agreed to set aside the cash
12 issue by taking the billion dollars in cash out
13 of the deal, correct?
14     A.   By taking the billion dollars out of
15 the deal?
16     Q.   Yeah.  The 1 billion dollars in the
17 bank account was not being transferred as part
18 of the reserve account?
19     A.   Let me say this.  This provision, this
20 provision doesn't call for the transfer of that.
21 I will leave it to the lawyers to argue what the
22 implications of that might be.
23     Q.   And as to the remaining issue as
24 raised by Mr. Miller about can we do it with
25 respect to the government securities, somebody
```

TSG Reporting - Worldwide     877-702-9580

Page 104

```
1              ROSEN
2  proposed that that issue would be resolved by
3  inserting the words "to the extent permissible
4  by law"?
5      A.   My recollection is that that was me.
6      Q.   Now, did all this happen in a hallway
7  conversation?
8      A.   Yes.
9      Q.   Who was present?
10     A.   I don't have a clear recollection
11 other than Harvey Miller was there, Vic Lewkow
12 was there.  I think Dana Fleischman may have
13 been there at least for some portion of it.  And
14 there were others huddling around, but I don't
15 have a clear recollection, and to be perfectly
16 candid, because I wasn't involved in the
17 negotiation of this transaction from the very
18 beginning, I was not as -- and I was mostly
19 troubleshooting specific issues, particularly
20 those relating to the clearing arrangements, I
21 was not as familiar with the lawyers from the
22 other side, so I could not have readily, as
23 readily identified them.
24     Q.   How long did the, did this hallway
25 huddling session last?
```

TSG Reporting - Worldwide     877-702-9580

Page 105

```
1              ROSEN
2      A.   I honestly don't know.  More than a
3  couple of minutes, less than a couple of hours.
4      Q.   And can you tell me what you recall
5  being said in the course of this hallway
6  conversation?
7      A.   Pretty much what I have just described
8  to you, that there was a group already there
9  when I arrived.  I guess some predecessor
10 language to this was being reviewed, and Harvey
11 Miller, as I said, raised the question whether
12 there might be limits under applicable law, and
13 I said that I wasn't aware of any, but to the
14 extent that they exist, and it would address
15 your concern, we can provide that the transfer
16 be to the extent permitted by applicable law.
17 But if there was such a constraint, that that
18 basically 769 million dollars in securities
19 would come from somewhere else.
20     And can I remember exactly what was
21 said, whether it was a grunt or a nod or a
22 smile, I don't remember, but I remember coming
23 away from the conversation feeling that we had
24 sort of resolved the point.
25     Q.   Who was the person who gave the --
```

TSG Reporting - Worldwide     877-702-9580

Page 106

ROSEN

1
2  manifested assent with the grunt or nod or
3  smile?
4      A.  I could be wrong, my recollection was
5  that it was Harvey Miller, but I could be wrong.
6      Q.  Did Mr. Miller agree to your proposal
7  that "to the extent permitted by applicable law"
8  would be inserted into the --
9      A.  That was my understanding, yes.
10     Q.  Did he also agree to avoid the cash
11 issue by having this provision not call for the
12 transfer of a billion dollars in cash?
13     A.  I believe he did.
14     Q.  And did that also happen in this
15 hallway conversation?
16     A.  It may have been two different
17 conversations or it may have been a continuing
18 conversation.  Again, I was called out to deal
19 with other issues constantly, issues that were
20 being dealt with in different rooms and on
21 different floors, so I don't have a clear
22 recollection of precisely what the progress, the
23 progression of discussions were.
24        The cash conversation clearly preceded
25 this.  And there may have been a break before

TSG Reporting - Worldwide    877-702-9580

Page 107

ROSEN

1
2  this issue, it may have been that drafts were
3  prepared and exchanged to reflect the first
4  issue, and then the second issue was raised.  I
5  just don't have a clear recollection of it.
6      Q.  We seem to have the cash issue, you
7  say maybe came up first, and then we have a
8  second issue, is can we do it, as in
9  transferring the 769, and that gets resolved
10 with your proposed language "to the extent
11 permissible by applicable law," right?
12        MR. HUME:  Objection, mischaracterizes
13 his testimony.
14     A.  Do you want to repeat the question?
15     Q.  If the first issue is the cash issue,
16 the second issue is the can we do it question
17 that Mr. Miller raised?
18     A.  Transfer, there was a discussion about
19 the transfer of securities.
20     Q.  Which gets resolved with your proposed
21 language?
22     A.  Yes.  And the documentation of it gets
23 resolved.
24     Q.  Do I understand you to be saying there
25 was also a third issue in that somebody said if

TSG Reporting - Worldwide    877-702-9580

Page 108

ROSEN

1
2  for any reason it is not permissible to transfer
3  the government securities from the reserve
4  account, Lehman has to make that up to Barclays
5  with securities of some other value?
6      A.  I'm not sure I would describe it as a
7  third issue, but as an adjunct to the second
8  issue, that if the securities, these 769 million
9  were not available, some other 769 million
10 dollars of securities would be made available.
11     Q.  How did that, whatever you want to
12 call it, an adjunct to the second issue or a
13 third issue, how did that issue get raised?
14     A.  How did it get raised?
15        MR. HUME:  Objection, asked and
16 answered.
17     A.  Someone on our side, maybe me, maybe
18 somebody else who was there, I don't have a
19 clear recollection on the second point, but
20 said, well, if there is any contingency to the
21 769 from the 3-3, we get them from somewhere.
22        The whole purpose of this, again, was
23 to say -- we were identifying a source of value
24 that was in the deal in the light of other
25 evaporating value, and so it was important to

TSG Reporting - Worldwide    877-702-9580

Page 109

ROSEN

1
2  the Lehman side -- I am sorry, it was important
3  to the Barclays side that if this wasn't
4  available, some other asset would be available.
5      Q.  Was there any discussion about the
6  implications for customer property claims --
7      A.  No, there was no discussion about
8  customer property claims.
9      Q.  And there was no discussion of the
10 implications on customers of transferring 769
11 million --
12     A.  None of us, none of us on the Barclays
13 side had anything like the information that
14 would have been necessary to evaluate that, to
15 even raise questions about it.  That information
16 was not available, and there was no way for it
17 to become available and to be discussed and
18 analyzed in a time frame that would have enabled
19 the deal to close.
20        MR. MORAG:  Let him finish the
21 questions.
22     Q.  Can you tell me -- you came away from
23 this meeting with an understanding that Harvey
24 Miller or someone on the Weil side had
25 manifested assent to the proposition that if the

TSG Reporting - Worldwide    877-702-9580

| | |
|---|---|
| Page 110 | Page 111 |

**Page 110**

ROSEN

1
2 government securities in the reserve account
3 weren't available, some alternative similar
4 securities would be provided.
5       Can you tell me, how are you -- how do
6 you know that Mr. Miller or his colleague was
7 agreeing to that unconditional transfer as
8 opposed to his nod, his grunt, his smile,
9 whatever you recall, meaning nothing more than
10 this conversation is at an end or that we agree
11 to your proposed language "to the extent
12 permitted by applicable law"?
13       MR. MORAG:  Object to the form.
14       A.   I don't think I have more to add, more
15 than what I have already said, except to say
16 that a draft was provided to us by Weil that
17 reflected that agreement.
18       Q.   You got a draft from Weil which
19 provided that Barclays -- that Lehman would
20 transfer to Barclays 769 million from the
21 reserve account or securities of a substantially
22 similar nature.  Are you aware of that?
23       A.   I recall that.
24       Q.   What was the reaction on the Barclays'
25 side when you got that draft?

TSG Reporting - Worldwide     877-702-9580

**Page 111**

ROSEN

1
2       A.   We didn't know what "or nature" meant
3 and whether it was clear that it meant that they
4 would be of equivalent value.  So we added the
5 words "or value."  I believe I may have made
6 that change.
7       Q.   Did you have any discussion with
8 anyone at Weil to find out what they meant by
9 adding the words "substantially similar,"
10 without the words "in value"?
11       MR. MORAG:  Objection, foundation.
12 You have not established that Weil added
13 these words as opposed to mistyped or didn't
14 type the Cleary proposal.
15       Q.   Well, let me back up.  I thought you
16 said you were provided with a draft from Weil
17 that included the words "substantially similar
18 nature"?
19       A.   I believe I was shown a draft that
20 included that language, an interim draft that
21 included that language.
22       Q.   Do you know who provided you that
23 draft?
24       A.   I don't have a clear recollection, but
25 my assumption is it was Weil.  That's my

TSG Reporting - Worldwide     877-702-9580

**Page 112**

ROSEN

1
2 assumption.
3       Q.   Did you have any discussion with Weil
4 about that draft and specifically about those
5 words in that draft?
6       A.   Yes, in the sense that we provided a
7 markup of it with the words "or value," and that
8 seems to have been accepted as an appropriate
9 clarification of the agreement that we had
10 reached earlier and reflected in the next
11 turnover of documents.
12       Q.   Any communication between the Cleary
13 and the Weil folk, other than --
14       A.   Yes.  The language "or value," which I
15 think speaks for itself.
16       Q.   I'm just saying, anything beyond that?
17       A.   I don't think there needed to be
18 anything beyond that.
19       Q.   And have you heard from your partners
20 whether they are aware of anything beyond that?
21       A.   I don't have a recollection of
22 discussing it.
23       MR. HUME:  Are you going to finish
24 before lunch or should we take a break for
25 lunch or take another break?  Either way I

TSG Reporting - Worldwide     877-702-9580

**Page 113**

ROSEN

1
2 think we can use another break.  We have
3 been going for an hour and a half.
4       MR. MAGUIRE:  Why don't we take a
5 break, and if lunch is ready, this is a fine
6 time for lunch.  I certainly will continue
7 after lunch.
8       MR. HUME:  You will.
9       MR. MAGUIRE:  Yes.  I still have quite
10 a bit to go.
11       (Recess)
12 BY MR. MAGUIRE:
13       Q.   Sir, before the break, you were
14 describing the hallway conversation at Weil
15 Gotshal's offices concerning the 3-3 account,
16 and I note that is a subject of paragraph 7 of
17 your declaration; is that correct?
18       A.   Yes.
19       Q.   In paragraph 7, and you don't refer to
20 the contingency that you described in your
21 testimony earlier today concerning what would
22 happen if Barclays did not get or Lehman could
23 not transfer government securities from the 3-3
24 account.  Do you see that?
25       A.   Um-hm.

TSG Reporting - Worldwide     877-702-9580

Page 114

ROSEN

1
2    Q.   Can you tell me why you did not refer
3    to that contingency in your declaration?
4        A.   No.
5        Q.   Earlier in your declaration, in
6    paragraph 5, you refer both to the removed
7    language that we have discussed earlier, the
8    language that starts, "any and all property" --
9    you remember that? -- and also to the
10   parenthetical that ultimately ends up being
11   inserted in the clarification letter, that's a
12   parenthetical that reads, "and any property that
13   may be held to secure obligations under such
14   derivatives."
15       A.   Correct.
16       Q.   Can you tell me why when you posed the
17   parenthetical, you didn't simply put the earlier
18   language in the parenthetical?
19       A.   The only reason is that it was -- the
20   original language had been obviously subject to
21   modification, and I didn't want to get
22   embroiled -- we didn't have time to get
23   embroiled in sending back language and having
24   extensive negotiations.
25            So the purpose of doing it this way

TSG Reporting - Worldwide    877-702-9580

---

Page 115

ROSEN

1
2    was to do it as simply and clearly as possible
3    and not resurrect language that might have
4    been -- for other reasons raised issues in
5    people's minds for reasons unrelated to the
6    point that was intended to be conveyed here,
7    clarified here.
8        Q.   By inserting the parenthetical, did
9    you mean anything different from what you say in
10   your declaration, paragraph 5 was documenting
11   the business deal?
12           MR. MORAG:  Object to the form.
13       Q.   In other words, did you mean anything
14   different in the language in the parenthetical
15   from the earlier language that had been removed?
16           MR. HUME:  Objection, I think you are
17   really calling for him to interpret the
18   contract now.
19           MR. MAGUIRE:  No, no, I am asking what
20   he meant at the time.
21       A.   What I will say is that I meant to
22   express the thought reflected in the markup, but
23   I didn't parse, because I didn't have time to
24   parse the differences in the wording.  And this
25   was intended to pick up everything in a shorter

TSG Reporting - Worldwide    877-702-9580

---

Page 116

ROSEN

1
2    and more concise formulation.
3        Q.   Do you know how much in value terms
4    this parenthetical picked up?
5            MR. MORAG:  Objection to the form.
6        Q.   In other words, do you know how much
7    property there actually was that was held to
8    secure obligations under such derivatives?
9            MR. HUME:  The question is whether he
10   knows today?
11       Q.   Did you know at the time what the
12   dollar amount of that was?
13           MR. MORAG:  And I object, lack of
14   foundation.
15           Go ahead.
16       A.   I did not know the precise number, no.
17       Q.   Did you have a general understanding?
18       A.   I would have assumed it was a
19   significant amount of, significant amount of
20   money.  Lehman was a very significant, one of
21   the largest investment banks.  They had a very
22   significant business, and I would have assumed
23   that with a significant business would come
24   significant customer property to margin the
25   proprietary and customer activities that were

TSG Reporting - Worldwide    877-702-9580

---

Page 117

ROSEN

1
2    going on.
3            So the bigger it was, the more
4    concerned I was about it.
5        Q.   Did you understand that the customer
6    margin was in the billions of dollars?
7        A.   I didn't have specific knowledge of
8    it, but it wouldn't surprise me to hear that.  I
9    expected it to be a large number.
10       Q.   Did you understand what the
11   proprietary margin was that was in the billions
12   of dollars?
13       A.   I would have expected it to be of that
14   kind of magnitude, but I didn't know exactly
15   what it was.
16       Q.   Do you know whether the folks at Weil
17   had an understanding as to how much property was
18   picked up by the parenthetical?
19           MR. MORAG:  Object to the form and
20   foundation.
21       A.   All I'll say about that is that they
22   had more ready access to that information
23   through their client than we had.
24       Q.   What about the trustee, do you know
25   whether the trustee had any knowledge about the

TSG Reporting - Worldwide    877-702-9580

## Page 118

ROSEN

1
2    amount of the property that was the subject of
3    that parenthetical?
4        A.   I can't speak to the state of mind of
5    the trustee, but I assume that as part of this,
6    the trustee was looking at what was there.
7        Q.   Is your answer the same with respect
8    to the creditors committee?
9        A.   I've had no direct interaction with
10    them, the creditors committee, such that I can
11    recall.
12        MR. MAGUIRE:  We will mark as
13    Exhibit 623 a document dated September 19,
14    2008, Bates stamped GCGSH0002699 through
15    700.
16        (Exhibit 623, document Bates stamped
17    CGSH0002699 through 700 marked for
18    identification, as of this date.)
19        A.   Can I back up a second to your
20    previous question?  In terms of what the trustee
21    and Weil knew about the amount of the margin,
22    they would have known -- they were copied on
23    e-mails which -- from OCC just in the context of
24    OCC that suggested that just the pays and
25    collects from -- for the Monday would have been

TSG Reporting - Worldwide    877-702-9580

## Page 119

ROSEN

1
2    on the order of several hundreds of millions of
3    dollars, which would have suggested an
4    extraordinarily large amount of positions and
5    therefore margin because of that.
6        So they could have inferred that it
7    would have been an extremely significant amount of
8    margin.
9        Q.   When you refer to the pays and
10    collects, what are you referring to?
11        A.   The accounts are marked on a periodic
12    basis by the clearinghouse, and it was sort of
13    what additional flows are coming in or going out
14    between the clearinghouse and the clearing
15    member as a result of the changes in the marks
16    or the exercises of contracts or whatever other
17    activity is being conducted in the account.
18        Q.   And what's a pay?
19        A.   Well, it depends on what your
20    perspective is, but some amounts are paid by the
21    clearinghouse to the clearing member, and there
22    are amounts that are paid, so if you are
23    receiving the funds, you are the collect, and if
24    you are paying the funds, you are the pay.
25        Q.   Do you know whether the trustee or

TSG Reporting - Worldwide    877-702-9580

## Page 120

ROSEN

1
2    Weil actually received any information
3    concerning pays or collects at the OCC prior to
4    the closing?
5        A.   I believe they were copied on e-mail
6    correspondence from the OCC, but that may be a
7    misrecollection, but I believe there was a lot
8    of correspondence including another e-mail that
9    referred to a billion dollars and that confirmed
10    that OCC was going to transfer all of that to
11    Barclays, as we would have all expected.
12        Q.   And did you receive any response to
13    Exhibit 623?
14        A.   I don't have a clear recollection of a
15    specific response to this except that the SEC,
16    after this interim exchange of communications
17    regarding DTCC, stepped up to support the
18    transaction, so presumably if they had had a
19    problem, they would have raised it in connection
20    with their support of the transaction.
21        Q.   We will mark as Exhibit 624 a document
22    Bates stamped DTCC 00126 through 00198.
23        (Exhibit 624, document Bates stamped
24    DTCC 00126 through 00198 marked for
25    identification, as of this date.)

TSG Reporting - Worldwide    877-702-9580

## Page 121

ROSEN

1
2        Q.   Is this an e-mail you received from
3    DTCC on or about September 20, 2008?
4        A.   Appears so.
5        Q.   It is a lengthy document.  I am really
6    going to ask you only about one of the
7    attachments, the contents.
8        MR. MORAG:  Just for the record, there
9    do appear to be other e-mails starting at
10    page 180 that may or may not be part of
11    this.  Since they are dated later, I don't
12    know that they could have been part of the
13    original e-mail.
14        Q.   I'm not going to ask you about
15    anything after 178.  But if you could take a
16    look at the pages that begin 175.
17        A.   Um-hm.
18        Q.   You will see on page 176, the first
19    paragraph concerns assumption of accounts.
20        A.   Right.
21        Q.   Was there at one point in time a
22    discussion whereby Barclays was assuming the
23    DTC -- the Lehman accounts at DTCC?
24        MR. MORAG:  Object to the form.
25        MR. HUME:  Object to the form.

TSG Reporting - Worldwide    877-702-9580

Page 130

**ROSEN**

1
2  A.   He conveyed Barclays' reluctance to
3  assume the obligation to provide any form of
4  guarantee beyond the 250 million dollars
5  representing the holdback of that payment that
6  would otherwise have been made to Lehman under
7  the APA, and there would have been -- there was
8  a call -- there was a point at which he said, he
9  conveyed to DTCC that because Barclays was not
10 willing to accept more liability than that, they
11 would not be accepting the transfer of those
12 accounts.
13     **Q.   Anything else you remember Mr. Cox**
14 **saying in any of the Sunday night calls?**
15     A.   I really don't recall specifics.
16 There was undoubtedly a lot more discussed and a
17 lot more give and take, but candidly, I cannot
18 remember the specifics of the dialogues.  There
19 would have been conversations about, gee, does
20 DTCC really need all the credit support that it
21 is asking for, can't it get comfortable, it has
22 better access to the information than Barclays
23 does.  It would have been of that nature, but I
24 just, sitting here now, can't recall the
25 conversations.

TSG Reporting - Worldwide    877-702-9580

Page 131

ROSEN

1
2     **Q.   Anything you recall Jonathan Hughes**
3 **saying?**
4     A.   Not really.  I don't have a specific
5 recollection.  I think -- I'm sure that he
6 reiterated or articulated many of the same
7 themes as Archie Cox, because the Barclays view
8 was, at that point, pretty well settled that
9 they were not prepared to assume additional
10 potentially substantial liabilities.
11     **Q.   Anything you recall Mr. Hughes saying**
12 **beyond what you said?**
13     A.   Not specific words, no.
14     **Q.   Anything you recall Michael Klein**
15 **saying?**
16     A.   No.
17     **Q.   Anything you recall Mr. Larocca**
18 **saying?**
19     A.   Well, there were a lot of
20 conversations also about sort of the pipes and
21 the plumbing and sort of the operational aspects
22 of what was going to be the mechanism for DTC to
23 effect the transfers of securities that needed
24 to be effected as part of the transactions, what
25 accountant are they going to go to or through,

TSG Reporting - Worldwide    877-702-9580

Page 132

ROSEN

1
2  or how that was going to be hooked up or
3  handled, but I was not focused on those because
4  I regarded them as essentially operational
5  matters.
6     **Q.   Was that an issue that was in**
7 **Mr. Larocca's purview?**
8     A.   Yes, I think so -- yes.
9     **Q.   Did he speak to that?**
10    A.   He did, and he may have delegated some
11 of the details of it to people who reported to
12 him.
13    **Q.   Do you recall Mr. Larocca saying in**
14 **any call on Sunday night or early Monday morning**
15 **we are not taking anything?**
16    A.   I do not recall Gerard Larocca saying
17 that or anyone else saying that, because it
18 was -- the whole purpose of the DTC endeavor was
19 to resolve their concerns in a manner that would
20 enable them to effect the transfers of assets
21 that were necessary to consummate the deal.  So
22 it would have been a ludicrous thing for anyone
23 to have said, because otherwise, why did we need
24 to be dealing with DTCC?
25    **Q.   Was anyone from DTCC present for any**

TSG Reporting - Worldwide    877-702-9580

Page 133

**ROSEN**

1
2  of these discussions?
3     A.   These -- they were on the phone.
4  There was nobody from DTCC in the room at Weil's
5  offices.
6     **Q.   Who did you understand was**
7 **participating from DTCC?**
8     A.   My understanding was that it was Larry
9  Thompson, the general counsel; his deputy, Isaac
10 Montal, Shelly Hirshon, their outside counsel,
11 and Don Donahue, the chairman of DTCC, at least
12 at some -- at least in some portions of the
13 conversation.
14    **Q.   And who was the person who did most of**
15 **the talking for DTCC?**
16    A.   My recollection was that it was Larry
17 Thompson.
18    **Q.   Did you understand at some point, DTCC**
19 **was considering issuing a cease to act with**
20 **respect to Lehman?**
21        MR. MORAG:  Object to the form.
22    A.   After Barclays had conveyed to DTCC
23 that Barclays was not going to accept a transfer
24 of the accounts, I believe Larry Thompson
25 indicated -- and I don't recall exactly when

TSG Reporting - Worldwide    877-702-9580

## Page 134

ROSEN

1  
2  this was -- that they would issue a cease to
3  act, which meant that once the pipeline and
4  these transactions were transferred, DTCC would
5  be liquidating positions and closing out the
6  account and not accepting any other
7  transactions.
8      And I received a call from Don Donahue
9  to say, you know, if we could avoid doing that,
10 they would prefer to do that, because they
11 hadn't done it before, and which I told him I
12 would convey to the client.
13     Q.   Do you have an understanding of what
14 the consequences would be for the transaction if
15 the DTC were to issue a cease to act notice?
16     MR. MORAG:  Objection to form.
17     A.   My understanding is that it wouldn't
18 have affected the transaction.
19     Q.   Did you have any discussion with
20 anyone as to whether Barclays could or would
21 close the transaction if DTCC issued a cease to
22 act notice?
23     MR. MORAG:  Again, Mr. Rosen, if your
24 discussions are with anybody outside of
25 Barclays, you can answer.  Not -- if not,

TSG Reporting - Worldwide    877-702-9580

## Page 135

ROSEN

1  
2  say you are not able to answer.
3      A.   Would you mind repeating the question.
4      Q.   Yes.  The question is whether you had
5  any discussion, any conversation with anyone
6  about whether Barclays could or would close the
7  transaction if DTCC were to issue a cease to
8  act.
9      MR. MORAG:  Do you have a time frame
10 on when the issuance was supposed to be?
11     A.   It really --
12     Q.   Yes, the Sunday.
13     A.   Can I just -- let me just say this.
14 It really depends.  Your question presupposes
15 with respect to what point in time the cease to
16 act would take effect.
17     If -- I did have a conversation with
18 Shari Leventhal at the Fed, which the substance
19 of which was that I expressed my concern that we
20 were not making rapid progress in the
21 negotiations with DTCC toward a resolution in
22 which they would accept a much more limited
23 amount of credit support, and I was worried that
24 we were running out of time, and we thought that
25 it might be helpful to let the Fed know, that we

TSG Reporting - Worldwide    877-702-9580

## Page 136

ROSEN

1  
2  didn't want the Fed to find out at the last
3  minute that this thing was falling apart for
4  reasons unrelated to, you know, the actual
5  negotiation of the deal, that because of a
6  problem with DTCC.
7      So I spoke to Shari Leventhal and
8  said, if we can't reach a resolution with DTCC
9  and DTCC does not agree to process the
10 transactions, absent other arrangements, we are
11 not going to be able to close this, at least in
12 the manner in which we had contemplated.
13     And I did have that conversation with
14 her.
15     Q.   Can you help me out and explain,
16 because I thought you had told us that a cease
17 to act from DTCC would not have affected the
18 transaction, but I thought you also told us --
19     A.   I also told you it depends at what
20 point they are ceasing to act.  And if they
21 cease to act following the processing of the
22 transaction and the transactions that are in
23 their pipeline, we would have been able to close
24 the transaction.  If they said as of Saturday,
25 we are ceasing to act and we are not going to

TSG Reporting - Worldwide    877-702-9580

## Page 137

ROSEN

1  
2  accept any other instructions on Monday to
3  transfer customer or proprietary agents, that
4  would have been a very different result than the
5  one which ultimately obtained.
6      Q.   And when you told us earlier that
7  after Barclays had made clear it was not
8  accepting the transfer of accounts and Larry
9  Thompson responded that DTCC would issue a cease
10 to act, what did you understand the timing of
11 that notice that he was talking about to be?
12     A.   My understanding was that DTCC was
13 going to issue a cease to act after processing
14 trades in the pipeline, including the transfers
15 that were necessary to implement the deal, and
16 that there had been operational calls, my
17 understanding was to sort of discuss the
18 plumbing and how you accomplish that.
19     Q.   So Mr. Thompson was simply telling you
20 that they would issue a cease to act after
21 clearing all the pipelines, all the uncleared
22 trades after the closing?
23     A.   Yeah, I didn't think -- I did not
24 understand him to be saying -- well, I'm going
25 to add some clarification to this.  There was a

TSG Reporting - Worldwide    877-702-9580

Page 138

ROSEN

1
2  point at which we were not, we did not have a
3  meeting of the minds with DTC about what, in
4  addition to 250, Barclays might make available,
5  and DTC, DTCC was not, had not yet agreed to
6  accept only the 250 million, so you had two
7  parties who were -- who lacked a meeting of the
8  minds.
9       In that context, Larry Thompson may
10 well have said basically, you know, if we don't
11 get what we want, we are just going to cease to
12 act and you are going to have to figure things
13 out for yourself.  That was some of the need to
14 deal with that issue, so we could close
15 expeditiously and not have to create some kind
16 of a work-around, was precisely why we continued
17 the negotiations until DTCC would be willing to
18 process the transactions that were in the
19 pipeline and transactions that are associated
20 with this deal.
21     Q.   Was that comment by Mr. Thompson about
22 what they would do if they didn't get what they
23 wanted, was that in response to hearing from
24 Barclays that Barclays was not accepting
25 transfer of the accounts?

TSG Reporting - Worldwide     877-702-9580

Page 139

ROSEN

1
2      A.   Again, you have got to focus on the
3  time.  I think at some point it was made clear
4  that not having the credit support meant that
5  after the cease to act, when a meeting of the --
6  when DTCC agreed that on the understanding that
7  it was going to get the 250 million in credit
8  support but no more, the fact that they would
9  have to cease to act was never presented by him
10 as, you know, something that would have
11 precluded the very reason that we were having
12 the negotiations, in order to enable the
13 transaction to close by processing and making
14 the transfers.
15     Q.   Let me try --
16     A.   You couldn't accept a transfer of
17 customer accounts and get that business if the
18 accounts couldn't be -- and the assets in them
19 couldn't be transferred by DTCC.  Everybody
20 realized that they had to agree to do that and
21 not shut the pipes down.
22     Q.   Yeah, I'm not interested in what would
23 or could have happened.  I want to get the
24 sequence of your recollection down right.
25      I understand that on Sunday night at

TSG Reporting - Worldwide     877-702-9580

Page 140

ROSEN

1
2  some point, Archie Cox described to DTCC
3  Barclays' reluctance to assume the accounts and
4  made plain that Barclays was not accepting the
5  transfer of the accounts of DTCC?
6      A.   Yes.
7      Q.   That's correct?
8      Now, what was -- in response to that,
9  did Mr. Thompson say in words or substance if
10 DTCC can't get happy, it will issue a cease to
11 act?
12     A.   I don't recall it being specifically
13 in response to the -- you know, the articulation
14 of the final position or whether it occurred in
15 the course of earlier assertions of the
16 position.  But it was clear in their minds that
17 if they didn't have a -- if they did not have
18 adequate credit support or a viable creditworthy
19 clearing member, that they were not going to
20 take the risk of just carrying the accounts open
21 and continuing to accept positions.  They would
22 have to go through the process that they
23 described as ceasing to act.
24     Q.   And they made that clear to Barclays?
25     A.   Yes.

TSG Reporting - Worldwide     877-702-9580

Page 141

ROSEN

1
2      Q.   Can you tell me, what happened or what
3  was the event that triggered the decision by
4  Barclays that it would not accept a transfer of
5  accounts at DTCC?
6      MR. MORAG:  I caution you from
7  disclosing any privileged communications.
8      A.   Can I consult on the privilege
9  question?
10     Q.   Sure.
11     (Recess)
12     Q.   Would you like the question, sir?  Can
13 you tell me what happened or what was the event
14 that triggered the decision by Barclays that it
15 would not accept a transfer of accounts at DTCC?
16     A.   After the report from the operations
17 team, of the operations team to their principal,
18 their principals, Archie Cox, the decision was
19 made that they would not -- they would not
20 accept the possibility of liabilities in excess
21 of 250 million dollars, and they confirmed to
22 DTCC that they were firm on their position they
23 weren't going to accept the accounts.
24     Q.   When was the report of the operations
25 team received?

TSG Reporting - Worldwide     877-702-9580

Page 142

ROSEN

1
2    A.    Other than that it was earlier in the
3    evening on Sunday, but possibly late, I don't
4    have a specific recollection.
5        Q.    Do you have any sense of the timing as
6    to when a decision was made by Barclays that it
7    would not accept any liabilities beyond the 250
8    million?
9        A.    Well, I think internally they had
10    reached that position -- we were trying in good
11    faith to see whether they could get enough
12    information to make them comfortable, but it was
13    finally communicated that they were firm on the
14    250 and not accepting the accounts, maybe like
15    11 o'clock, something like -- it was quite late
16    on Sunday night.
17        Q.    And was that Mr. Cox who conveyed that
18    to DTCC?
19        A.    I believe so, I believe so.
20        Q.    Was Larry Thompson on the call in
21    which --
22        A.    I believe so.
23        Q.    He was?
24        A.    I believe so.
25        Q.    Did Mr. Thompson make a reference to

TSG Reporting - Worldwide    877-702-9580

Page 143

ROSEN

1
2    issuing a cease to act on that call?
3        A.    I don't recall him specifically making
4    a reference at that time in response to it.  But
5    to be clear, the understanding was that the
6    cease to act was not in respect of the
7    processing of any of the transactions that --
8    any of the -- processing any of the transfers
9    that were part of the transaction.
10        Q.    Now, when did you have the call with
11    Shari Leventhal?
12        A.    Earlier in the evening.  Whether it
13    was at 5 o'clock or 8 o'clock or 9 o'clock, I
14    don't honestly recall.
15        Q.    Did you have any follow-up call with
16    her?
17        A.    I don't recall that I had a follow-on,
18    one-on-one call with Shari.  It's possible that
19    I did, but they were on the open line which was
20    established for the purpose of reporting to all
21    people who needed to know simultaneously,
22    because we were under a very tight time frame,
23    sort of what was open and what was being agreed.
24        There was an open line with the Fed
25    and the SEC and other interested parties, and I

TSG Reporting - Worldwide    877-702-9580

Page 144

ROSEN

1
2    believe that at least at some point, she was on
3    to hear the results of the negotiations.  She
4    may have gotten information from DTCC, I just
5    don't recall specifically.
6        Q.    Can you tell me what else you recall
7    Larry Thompson saying in the various
8    conversations on Sunday night?
9        A.    For the most part, I recall him
10    justifying their need for collateral in excess
11    of the 250 million dollars.  That was the point
12    at which they were willing to go forward on that
13    basis.
14        Q.    How did he justify that?
15        A.    That they were -- his team, you know,
16    were concerned about the risks.
17        Q.    Do you recall anything specifically
18    said about the risks?
19        A.    Mostly my recollection is, you know,
20    there is uncertainty, there is a lot in there to
21    do, it would take time, we can't know exactly
22    what the results of the liquidations will be.  I
23    mean they are a clearinghouse, they are a
24    conservative organization, and they viewed the
25    risk conservatively.

TSG Reporting - Worldwide    877-702-9580

Page 145

ROSEN

1
2        Q.    Do you recall him saying anything
3    further about a cease to act other than what you
4    have told us?
5        A.    Nothing beyond what I told you.
6        Q.    Do you recall saying, addressing
7    specifically the subject of whether the -- of
8    when the cease to act would take effect and the
9    impact that it would have on the transaction or
10    on the unsettled trades that were at DTCC?
11        MR. MORAG:  Objection, asked and
12    answered.
13        A.    He never suggested that there would be
14    any impact as the transaction was resolved.  The
15    purpose of the resolution was that there would
16    be no impact.
17        Q.    Did he ever address whether the cease
18    to act would have an impact on outstanding
19    unsettled trades?
20        A.    Mostly what I recall him focusing on
21    was they don't like to cease to act because it
22    means that other participants in the marketplace
23    aren't going to receive the benefit of the
24    processing that they would otherwise do when
25    those transactions came in, and hadn't had to do

TSG Reporting - Worldwide    877-702-9580

Page 146

ROSEN

1  it in the past.
2       My impression was that they were more
3  concerned about the public relations
4  implications of a clearing corporation doing
5  that than they were focused on any impact on us,
6  because it was a mutual premise that the purpose
7  of this was to enable us to close and process
8  the transactions.
9       Q.  Did he ever say anything to indicate
10  that his references to cease to act related
11  exclusively to a notice that would come into
12  effect after the closing and after all of the
13  unprocessed, unsettled trades of Lehman had been
14  cleared by DTCC?
15       MR. MORAG:  Object to the form.
16       A.  I think in going over the terms of the
17  arrangements it was clear that the transactions
18  that were the subject of the acquisition, those
19  transfers were going to be made, and I don't
20  think there was any implication of any kind, it
21  would have been absurd for there to have been an
22  implication that we reached an agreement with
23  DTC and by the way, they were going to not
24  process the transactions.
25

TSG Reporting - Worldwide    877-702-9580

Page 147

ROSEN

1       Q.  Let me ask you about the time period
2  prior to reaching a meeting of the minds with
3  DTCC.  At any time before that, did he give any
4  representation or assurance to Barclays that
5  while DTCC might issue a cease to act, it would
6  not affect the transaction, and that they would
7  honor and process all unsettled trades?  Did he
8  say that in words or substance?
9       A.  I am sorry, can you repeat that.
10       Q.  Yes.  At any time prior to the meeting
11  of the minds between Barclays and DTCC, did
12  Larry Thompson in words or substance say, we may
13  have to issue a cease to act, but it will not
14  affect the transaction, and notwithstanding our
15  cease to act, we will make sure that it takes
16  effect only after all unsettled trades have been
17  cleared?
18       A.  No.  I think that if the -- if we
19  hadn't reached an agreement with DTCC, then we
20  had, we had the prospect of having to figure out
21  another way of consummating the transaction if
22  they were not going to process trades, and
23  basically what DTCC was saying was that if they
24  were going to continue to process trades and act
25

TSG Reporting - Worldwide    877-702-9580

Page 148

ROSEN

1  for these accounts, then they wanted more credit
2  support than they would have if they were left
3  to look only to the assets of LBI.
4       Q.  Is there anything further you recall
5  Larry Thompson saying on the Sunday night other
6  than what you have told us?
7       A.  I'm sure there is a lot more that
8  could be said.  I just don't have a specific
9  recollection of that.
10       Q.  And all my questions are just to your
11  recollection.
12       What about Mr. Montal?  Do you recall
13  anything that Mr. Montal said in any of the
14  conversations on Sunday night or early Monday
15  morning?
16       A.  He was not a prominent speaker, at
17  least while I was in the room.
18       Q.  Anything that you recall?
19       A.  I don't have a specific recollection
20  of what he might have said.
21       Q.  What about Shelly Hirshon?
22       A.  I don't remember Shelly Hirshon
23  speaking of it.
24       Q.  You did tell us about Don Donahue
25

TSG Reporting - Worldwide    877-702-9580

Page 149

ROSEN

1  making a call to you.  Anything else that you
2  recall hearing from Dan Donahue on the Sunday
3  night?
4       A.  No.  No more than that conversation.
5       Q.  I have been asking you now about the
6  conversations with DTC for some time limited to
7  the Sunday night, and I know that there were
8  conversations that may have spilled over into
9  the wee hours of early morning.  So if we
10  include Monday morning, are there any
11  conversations by any of the participants that
12  you recall that you haven't told us about?
13       A.  I have a vague recollection that there
14  may have been continuing discussions on the
15  operations side in anticipation of the closing
16  of the transaction, and the balance of the
17  exchanges were between the lawyers trying to
18  reflect what had been agreed in I think what's
19  become or been referred to as the DTCC letter.
20       Q.  And anything else, if you recall?
21       A.  Not that I specifically recall,
22  sitting here.
23       Q.  We will mark as Exhibit 625 a document
24  Bates stamped DTCC 00359 through 361.
25

TSG Reporting - Worldwide    877-702-9580

Page 150

ROSEN

1
2        **(Exhibit 625, document Bates stamped**
3    **DTCC 00359 through 361 marked for**
4    **identification, as of this date.)**
5        A.    I recall this.
6        **Q.    If you look at the e-mail at the top,**
7    **the first page, sir.  Can you tell me what you**
8    **meant when you said, "The obligations and**
9    **entitlements in relation to the funds run**
10   **between DTC and the LBI estate, not between**
11   **Barclays and DTC"?**
12       A.    Because the credit support was going
13   to be limited to the 250 million dollar cash
14   payment, we thought that since we could direct
15   that payment, I thought that since it was
16   possible to direct that payment on Lehman's
17   behalf, so that the DTC got hold of it, it
18   was -- as far as the transaction was concerned,
19   that was an asset of -- that would otherwise
20   have been an asset of the estate that was being
21   made available to provide credit support, and
22   since it would otherwise have been an asset,
23   that the arrangements relating to that were
24   between Lehman and DTC and didn't need to be
25   between Barclays.

TSG Reporting - Worldwide    877-702-9580

Page 151

ROSEN

1
2        So my feeling was that to keep things
3    simple, we didn't really need to have a separate
4    agreement.
5        **Q.    Let me show you a document that's**
6    **previously been marked as Exhibit 606.**
7        **While we are waiting for that, sir,**
8    **how did the impasse between Barclays and DTC get**
9    **resolved?  How did the parties reach a meeting**
10   **of the minds?**
11       A.    There were conversations staking out
12   positions.  The parties would go off.  There was
13   due diligence being done on both sides, because
14   both sides wanted to know what the risks were,
15   and they would get back on the telephone, and at
16   some point, DTC decided that the position that
17   had been articulated by Barclays was acceptable
18   to it.
19       **Q.    So DTC had previously refused to**
20   **accept Barclays' position of limiting the**
21   **recourse to 250 million, but it changed its mind**
22   **at some point on the Sunday or early Monday?**
23       A.    Until late on Sunday night, DTC had
24   not signaled its agreement to go forward based
25   on the 250 million dollars.

TSG Reporting - Worldwide    877-702-9580

Page 152

ROSEN

1
2        **Q.    How did DTCC signal its agreement?**
3        A.    On a conference call, it -- Larry
4    Thompson said, we are willing to go forward on
5    this basis.
6        **Q.    And what was the specific thing he**
7    **said with respect to the basis?**
8        A.    That Barclays would not be assuming
9    the accounts and that the credit support that
10   would be made available would be limited to the
11   250 million dollar holdback on the purchase, on
12   the 250 million dollars.
13       **Q.    Is that something that you recall**
14   **Larry Thompson specifically saying?**
15       A.    I could be wrong, but that's my
16   recollection.  My recollection is that Larry was
17   largely the spokesperson for DTC.
18       **Q.    And did Larry explain what prompted**
19   **DTCC to change its position?**
20       A.    No.  I don't recall -- I don't recall
21   having an explanation from him.
22       **Q.    Did you have any understanding as to**
23   **what prompted DTCC to change its position?**
24       A.    I assume that -- all I can say is that
25   I assumed with more time, they got a better

TSG Reporting - Worldwide    877-702-9580

Page 153

ROSEN

1
2    understanding of what the assets and the risks
3    were, and assumed that they decided that would
4    be acceptable for them, to take the liquidation
5    risk with the assets that they had in the
6    250 million.
7        But he didn't give us a
8    quantitative -- he didn't share his quantitative
9    analysis of their evaluation of that risk, nor
10   did we expect them to.
11       **Q.    When did this meeting of the minds**
12   **conversation happen?**
13       A.    It was very late on Sunday night.
14   Sometime before midnight, I think.
15       **Q.    Do you know whether it was before**
16   **midnight or after midnight?**
17       A.    I would have to refresh my
18   recollection.
19       **Q.    How would you do that?**
20       A.    I would look at the e-mail traffic.
21       **Q.    Anything else?**
22       A.    I think that is all that I would have
23   available to me today to help.
24       **Q.    I show you a document previously**
25   **marked as Exhibit 606.  Sir, you received this**

TSG Reporting - Worldwide    877-702-9580

Page 154

ROSEN

1   **ROSEN**
2   e-mail?
3   A.   Yes.
4   Q.   Does it -- do you see the reference to
5   "earlier this evening," the first line?  Does
6   that refresh your recollection as to -- the
7   first line of the e-mail, cover e-mail, does
8   that refresh your recollection as to when the
9   agreement was reached?
10  A.   Well, I know it was before 3:43 a.m.
11  How much before -- I remember we felt that we
12  tended to wait a long time to get drafts back
13  from the other side, but I don't recall.
14  Q.   Who prepared this draft?
15  A.   This was -- it appears to have been
16  prepared by DTC or its counsel, but I don't know
17  specifically.
18  Q.   Did you have any discussions with DTCC
19  or its counsel anytime after receiving this
20  e-mail?
21  A.   Most of the direct negotiations
22  regarding this were conducted by my partner Mike
23  Mazzuchi.  I did exchange e-mails including, I
24  guess it was slightly earlier in the evening,
25  with Sheldon Hirshon.  There may have been later

TSG Reporting - Worldwide     877-702-9580

Page 155

1   ROSEN
2   e-mails exchanges, I don't recall.
3   Q.   Leaving aside e-mails, do you know
4   whether Mike Mazzuchi had discussions with
5   anyone at DTCC after circulating or the
6   circulation of this draft that has been marked
7   as Exhibit 606?
8   A.   Well, with their counsel, certainly.
9   I don't recall whether or not he was, he had
10  conversations that included individuals from
11  DTCC.
12  Q.   Do you know what conversations he had
13  with their counsel?
14  A.   Other than to discuss changes to this
15  document prior to its finalization, I don't.
16  Q.   And do you know whether there were in
17  fact discussions as opposed to e-mail exchanges?
18  A.   I don't -- I think it was principally
19  exchanges of drafts.  It was very late and
20  people were very tired.
21  Q.   If you turn to paragraph 1, sir, the
22  winding down of accounts.  Did you review this
23  at the time?
24  A.   I don't recall specifically whether I
25  looked at this draft or a subsequent draft.

TSG Reporting - Worldwide     877-702-9580

Page 156

1   ROSEN
2   Q.   Did you understand that, at the time
3   this draft was received, that there was an
4   agreement, a meeting of the minds between
5   Barclays and DTC whereby all of the assets in
6   the Lehman accounts at DTC were going to go to
7   Barclays and the accounts themselves were going
8   to stay at DTCC?
9   MR. MORAG:  Object to the form.
10  A.   Could you repeat the question.
11  Q.   Did you have an understanding at the
12  time you received this e-mail that there had --
13  there was an agreement, a meeting of the minds
14  between Barclays and DTCC?
15  MR. MORAG:  That's the only question?
16  MR. MAGUIRE:  Yes.
17  A.   Yes.
18  Q.   And did you understand that that
19  agreement involved the accounts, the Lehman
20  accounts staying at Lehman and at DTC?
21  A.   Yes.
22  Q.   Did you understand what was happening
23  to the assets in those accounts?
24  A.   Insofar as Barclays was concerned, our
25  understanding was that the assets, whether they

TSG Reporting - Worldwide     877-702-9580

Page 157

1   ROSEN
2   were proprietary assets or customer assets that
3   under the deal terms were to be transferred,
4   would be processed.
5   Q.   And once those transactions were all
6   processed, who owned the assets in the Lehman
7   accounts at DTCC?
8   A.   The residual assets that were not to
9   be -- whatever we didn't -- whatever Barclays
10  didn't buy or acquire was part of the Lehman
11  estate.
12  Q.   Did you have an understanding as to
13  whether Barclays was acquiring all of the assets
14  at the -- in the DTCC clearance boxes?
15  A.   Yes.  Yes, my understanding is that
16  they were acquiring those assets.
17  Q.   And so that at the closing, those
18  assets would then belong to Barclays?
19  A.   Contractually, yes, at the closing
20  there would have been an agreement to transfer
21  them to Barclays, an understanding that those
22  transactions would be processed by DTCC and not
23  be subject to a cease to act.
24  Q.   And was that explained to the DTCC,
25  that the assets in the Lehman accounts would

TSG Reporting - Worldwide     877-702-9580

ROSEN

1
2  contractually belong to Barclays at closing?
3      A.   The DTCC was provided at their request
4  a draft of the agreement that reflected the --
5  what do you call it? -- that reflected the
6  agreements to transfer the clearance box assets
7  as part of the deal.
8      Q.   A draft of the clarification letter?
9      A.   A draft of the letter, right.
10     Q.   Other than providing the DTCC with a
11 draft of the clarification letter, did anyone on
12 the Barclays side explain to DTCC that the
13 assets --
14     A.   I believe that that was the subject of
15 discussions on an operational level, because
16 they wanted to impose a cease to act at some
17 point, and they had to figure out a way to
18 effect the transfers and do whatever else that
19 they wanted to do under their rules.
20     Q.   Did you participate in any of the
21 operations conversations in which anyone from
22 the Barclays side explained to anyone on the
23 DTCC side that all of the assets at, in the
24 Lehman accounts at DTCC were being acquired by
25 Barclays?

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2      A.   No, I don't think that I said that all
3  of the assets in those accounts were being
4  acquired.  There are some assets that were being
5  acquired, some assets that were not being
6  acquired.  There were customer accounts that
7  were being transferred and presumably other
8  customer accounts that were not part of the
9  deal.  I mean customer securities.
10          That was dealt with in the
11 clarification letter.  What Lehman was and was
12 not selling to Barclays was not the subject of
13 the DTCC letter.  The DTCC letter from the
14 beginning was about financial responsibilities
15 to DTCC for the liabilities associated with
16 those accounts.
17     Q.   And did anyone explain to DTCC that
18 Barclays understood there to be a distinction
19 between the accounts and the assets in the
20 accounts?
21     A.   It would have been an absurd
22 conversation to have with a clearing
23 corporation, because a clearing corporation is
24 basically structured fundamentally on the
25 premise that there is a difference between legal

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  ownership and responsibility for accounts and
3  beneficial ownership and entitlement to the
4  assets in the accounts.
5          Without that distinction, every person
6  who owns a security in the United States in
7  order to own it would have to be a clearing
8  member of a clearing corporation, which is not
9  how we would realize our financial markets.
10     Q.   You are not aware of any conversation
11 between anyone at Barclays, working for
12 Barclays, and anyone at DTCC concerning any
13 distinction between the Lehman accounts and the
14 assets in the Lehman accounts at DTCC?
15          MR. HUME:  Objection, asked and
16 answered.
17     A.   I don't have anything to add.
18     Q.   Did it come to your attention that
19 DTCC was of the understanding that the assets in
20 the Lehman account were remaining with the
21 estate?
22     A.   It is impossible for me to understand
23 how they could have formed that view or that
24 they -- and I am unaware that they did form that
25 view.

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2      Q.   If you look, sir, at paragraph 1 of
3  the draft before you marked as Exhibit 606, you
4  will see the second part of that section 1, same
5  paragraph really of that section 1, says, "As
6  part of this closeout process, the trustee
7  hereby authorizes DTC to accept and act upon
8  instructions from NSCC to deliver securities
9  from the DTC LBI account to NSCC's account," and
10 it goes on.  Do you see that sentence?
11     A.   I do.
12     Q.   Can you explain why the parties were
13 providing for the trustee to exercise authority
14 over assets in the Lehman account if those
15 assets contractually were understood all along
16 to belong to Barclays?
17          MR. MORAG:  Objection,
18 mischaracterizes his testimony.  For the
19 third time.
20     A.   And I think you're asking me to
21 interpret what the import of this is, because I
22 don't accept your characterization of what this
23 does or -- what this provision does or says.
24     Q.   So you would --
25     A.   I think I would decline to answer on

TSG Reporting - Worldwide    877-702-9580

Page 162

ROSEN

1
2   the grounds that I think my interpretation of
3   this provision would be privileged.
4      Q.   At the time that this draft was
5   received, did you understand that Barclays was
6   taking -- was cherry picking or at least taking
7   certain assets from the clearance box and not
8   other assets, or at least that it had that
9   option?
10     MR. MORAG:  Objection, compound.
11     A.   Why don't you ask the first question.
12     Q.   Sure.  What I am trying to understand
13  is, at the time that this draft is circulated,
14  what is your understanding of the business deal
15  between Barclays and the estate?
16     A.   I was not -- I was not aware -- I
17  don't know it to be the case, sitting here
18  today, that there were clearance box assets that
19  Barclays had decided they didn't want.
20     Q.   Did you understand that Barclays had
21  the ability to either return or not take certain
22  clearance box assets?
23     A.   I'm not sure at that time that I had
24  focused on the language that you showed me
25  earlier today.

TSG Reporting - Worldwide    877-702-9580

Page 163

ROSEN

1
2      Q.   Did you raise any question with DTCC
3   or anyone else as to why there was not any
4   mechanism here for separating out the assets
5   that were being taken by Barclays and the assets
6   that Barclays did not choose to take from the
7   DTC clearance boxes?
8      A.   No, because at that point, I was under
9   the impression that Barclays was taking all of
10  the clearance box assets, which it was their
11  ability to do or not do, as they decided at any
12  time.  I think there was a lack of -- I don't
13  know how clearly it was understood what all of
14  those assets were.
15     Q.   I'll show you next a document that has
16  been marked as Exhibit 607.
17     MR. HUME:  How much more do you have?
18  And would it make sense to take a break at
19  some point afternoon then finish?
20     MR. MAGUIRE:  I can finish this in
21  five minutes and that might be a better time
22  to take a break.
23     Q.   This is an e-mail that your colleague,
24  Mr. Mazzuchi circulated?
25     A.   Um-hm.

TSG Reporting - Worldwide    877-702-9580

Page 164

ROSEN

1
2      Q.   I note in this draft and the prior
3   draft, there is a signature line for James B.
4   Giddens as trustee for the liquidation of Lehman
5   Brothers.  And the signature line is for James
6   B. Kobak, Jr.  Do you see that?
7      A.   Um-hm.
8      Q.   Did you have any discussions with
9   Mr. Kobak concerning this agreement?
10     A.   I did not have a verbal conversation
11  with James Kobak about this agreement, but he
12  was provided the various drafts that were
13  exchanged.
14     Q.   And made comments?
15     A.   As far as I'm aware, yes.
16     Q.   You see Mr. Mazzuchi's cover e-mail
17  says, "Further to Ed Rosen's discussion with
18  Sheldon, attached is a revised draft of the
19  recourse arrangement for the 250 million dollar
20  purchase price.  This also reflects comments
21  from Lehman."
22     Did you understand that to be a
23  reference to comments from the trustee's
24  representatives?
25     A.   I don't know.

TSG Reporting - Worldwide    877-702-9580

Page 165

ROSEN

1
2      Q.   Do you know whether this agreement was
3   discussed with anyone from Weil Gotshal?
4      WITNESS' ATTORNEY:  Are you referring
5   to the DTC letter in general or this draft
6   in particular?
7      Q.   The DTC letter in general.
8      A.   I do not recall.
9      Q.   Do you know whether Weil was provided
10  with any draft of the DTC letter agreement?
11     A.   Yes, it would have been on the closing
12  table and it may have been provided separately
13  by Shelly Hirshorn.
14     Q.   Other than it being on the closing
15  table and whether Mr. Hirshorn did or did not
16  provide it, do you though whether anyone
17  otherwise provided either the final agreement or
18  a draft of the DTC later agreement to anyone at
19  Weil?
20     A.   I don't have a recollection.  They may
21  well have been in the room.  The rooms weren't
22  closed off.  They may have participated in
23  reviewing the exchanges of draft.  I just don't
24  have a specific recollection.  Again, at this
25  time, I was in and out of the documentation,

TSG Reporting - Worldwide    877-702-9580

Page 166

```
 1                    ROSEN
 2   also working on other problems.
 3       Q.   In which room was the DTC letter
 4   agreement put together -- speaking now to Cleary
 5   and the Barclays representatives -- which room
 6   at Weil were you working in?
 7            WITNESS' ATTORNEY:  Objection,
 8   compound.  It is two different questions.
 9       A.   Yeah, I don't know how to describe,
10   there was a room on a floor and I was not
11   located in a particular room.  I jockeyed
12   between several rooms.
13       Q.   Where was the, speaking specifically
14   now to the DTCC negotiations, telephone calls
15   and the drafting, in which room did that happen?
16       A.   That happened in a room on a different
17   floor.
18       Q.   Do you know what floor?
19       A.   I believe it was the floor below the
20   floor where the other meetings were taking
21   place.
22       Q.   Were there any other Lehman-related
23   conference rooms in use on that lower floor?
24       A.   I don't, I don't recall.
25       Q.   Did anyone from Cleary instruct anyone
             TSG Reporting - Worldwide    877-702-9580
```

Page 167

```
 1                    ROSEN
 2   from Weil that they were not permitted into that
 3   room?
 4       A.   No, not that I am aware.
 5       Q.   Have you -- at the beginning of
 6   Mr. Mazzuchi's e-mail, he says, "Further to Ed
 7   Rosen's discussion with Sheldon," do you know
 8   what that discussion refers to?
 9       A.   I think it refers to the same issue
10   that's reflected in the earlier exchange of
11   e-mail in which we were taking the view that
12   this was a limited recourse form of credit
13   support and not a guarantee of Barclays.  This
14   was an asset that would otherwise have been paid
15   to the estate as part of the transaction that
16   was being made available to secure additional
17   credit support to DTCC and its related
18   affiliates, and I thought that describing it as
19   a guarantee by Barclays was not entirely
20   accurate.
21       Q.   OK.
22            MR. MAGUIRE:  This is probably a good
23   time to take a break.
24            (Recess)
25       Q.   I will show you a document we have
             TSG Reporting - Worldwide    877-702-9580
```

Page 168

```
 1                    ROSEN
 2   previously marked as Exhibit 563C.  Have you
 3   ever seen that letter before?
 4       A.   Again, yes, without verifying how
 5   closely it tracks the actual agreement.
 6       Q.   If you turn, sir, to page 4, there is
 7   a sentence beginning at the first full paragraph
 8   that starts, "By Sunday night, September 21."
 9   Do you see that sentence?
10       A.   Um-hm, yes.
11       Q.   I give that to you as background.  My
12   question is whether on any of the Sunday night
13   or Monday morning conversations anyone from DTCC
14   said in words, substance that they believed that
15   DTCC's exposure to Lehman from processing the
16   remaining transactions was substantially less
17   than it originally feared?
18       A.   I think implicitly by them saying they
19   had become comfortable with the internal review
20   that they were doing, they would be willing to
21   close the transaction with 250 million.
22       Q.   So the fact that there was a meeting
23   of the minds suggests that DTCC had become more
24   comfortable with its exposure?
25       A.   They may have said that we have
             TSG Reporting - Worldwide    877-702-9580
```

Page 169

```
 1                    ROSEN
 2   continued to review this and we have gotten to
 3   that point based on the review.  I don't recall
 4   specifically.
 5       Q.   Do you have any recollection of that?
 6            MR. HUME:  Objection, asked and
 7   answered.
 8       Q.   The reason I ask is because you say
 9   specifically.
10       A.   I have an impression that that was
11   what was conveyed, that they had gotten
12   comfortable with the risk.  But I don't have a
13   specific recollection of a specific articulation
14   from the calls.
15       Q.   I'll show you a document that has
16   previously been marked as Exhibit 156B.  It is
17   actually not entirely clear, but it is a letter
18   from Cleary Gottlieb dated March 6, 2009.  Do
19   you know whether you have ever seen that letter
20   before, sir?
21       A.   I may have seen a draft of this
22   letter.  I don't have a specific recollection.
23       Q.   My only questions, sir, are with
24   respect to page 3 of this letter, the second
25   full sentence on page 3, starts, "Nothing in
             TSG Reporting - Worldwide    877-702-9580
```

1           **ROSEN**
2  **this letter or in Exhibit B should be construed**
3  **to suggest."**
4           **Do you see that?**
5      A.  Yes.
6      **Q.  Do you have an understanding, sir, as**
7  **to what that sentence means, of Mr. Kobak's**
8  **letter?**
9      A.  To be honest with you, I would have to
10 look at -- I would have to read the entire
11 letter in order to put that sentence in context.
12          WITNESS ATTORNEY:  Maybe we could
13      discuss this off the record and I could
14      explain it to you.
15     **Q.  Sure, that would be helpful.  Let me**
16 **just ask you then if you have an understanding**
17 **that the securities in the Lehman -- that**
18 **Barclays acquired the securities in the Lehman**
19 **clearance boxes at the time of closing**
20 **regardless of whether any customers had long**
21 **positions in those securities?**
22          MR. HUME:  I think you're asking the
23      witness to interpret the contract when you
24      ask that question.  If you want to ask him a
25      factual question about a discussion, that's

TSG Reporting - Worldwide    877-702-9580

1           ROSEN
2  fine, but to interpret precisely which
3  securities are covered by the clearance box
4  provision of the clarification letter just
5  seems like you're asking him a legal
6  interpretation question.
7      **Q.  You can answer.**
8          MR. HUME:  Well, you can't answer to
9      the extent it would reveal attorney work
10     product analysis that we have done and I
11     think beyond that --
12     A.  I think answering the question would
13 call for me to interpret the contractual
14 documents.
15     **Q.  Let me leave aside the contractual**
16 **documents.  Just as a matter of the business**
17 **deal that was negotiated, did you understand the**
18 **business agreement between the parties was that**
19 **Barclays was getting the assets in the clearance**
20 **boxes that were not owned by customers or did**
21 **you understand that Barclays was getting the**
22 **assets in the clearance boxes notwithstanding**
23 **whether any customer had had a long position?**
24     A.  My understanding was that they were
25 getting what was in the clearance boxes.

TSG Reporting - Worldwide    877-702-9580

1           ROSEN
2      **Q.  And that's regardless of what**
3  **customers had long positions in those**
4  **securities?**
5      **A.  It is based on there being lien-free**
6  **securities.**
7      **Q.  So the fact that customers had long**
8  **positions did not affect Barclays' rights?**
9      A.  I think you're asking me to interpret
10 the implications of those provisions in the
11 clearance box, relating to the clearance box.
12     **Q.  I'm just asking you to tell me what**
13 **you just told me?**
14     A.  You're asking me to interpret whether
15 the reference to the clearance box, the extent
16 to which it covered certain kinds of assets and
17 that's asking me to interpret a term of the
18 agreement.
19     **Q.  Leaving aside the agreement, just the**
20 **business deal, just the business deal between**
21 **the parties, did you understand --**
22     A.  The business deal, as far as I was
23 aware, did not include a limitation on the
24 clearance box assets that Barclays was getting
25 as far as I recall.

TSG Reporting - Worldwide    877-702-9580

1           ROSEN
2          MR. MAGUIRE:  We will mark as Exhibit
3      626 a document Bates stamped BCI-CG 0024097
4      through 99.
5          (Exhibit 626, document Bates stamped
6      BCI-CG 00024097 through 99 marked for
7      identification, as of this date.)
8      **Q.  Had you received this e-mail chain**
9  **from Mr. McDaniel, sir?**
10     A.  I did.
11     **Q.  And you had learned at some point that**
12 **there was 1 billion dollars in cash margin at**
13 **the OCC?**
14     A.  Could you repeat your question.
15     **Q.  Yes, you learned at some point there**
16 **was 1 billion dollars in cash that the OCC was**
17 **holding for the accounts of LBI?**
18     A.  That is in here, yes.
19     **Q.  And that was in addition to government**
20 **securities that were being held at JP Morgan**
21 **Chase?**
22     A.  It presumably is additional to any
23 other collateral that would have been noncash.
24     **Q.  And you asked Jim for more information**
25 **about the 1 billion dollars?**

TSG Reporting - Worldwide    877-702-9580

```
1              ROSEN
2   both 30(b)(6) and your individual deposition.
3   My questions go to your personal knowledge.  I
4   have sort of reversed the rules a little bit.
5       A.  I am sorry, could you repeat the
6   question.
7       Q.  Do you have any knowledge of whether
8   anyone on the Barclays' side of the table,
9   Barclays or its representatives, spoke to anyone
10  on the Lehman side of the table, Lehman or its
11  representatives, about provisions that needed to
12  be included in the clarification letter
13  regarding the termination of the repo?
14          MR. HUME:  Object to the form.
15      A.  I am sorry?
16          MR. HUME:  I object to the form.
17      Q.  I think you can answer.
18      A.  I believe that there may have been
19  conversations between the lawyers, maybe Alan
20  Kaplan at Barclays, but I don't have personal
21  knowledge because I was not involved in the
22  events leading up to the notice and the
23  clarification that was made in the clarification
24  letter.
25          But I assume that -- it is obvious
```

TSG Reporting - Worldwide    877-702-9580

```
1              ROSEN
2   that since the provisions were ultimately
3   included in the clarification letter, that it
4   was conveyed in the form of the amendments to
5   the clarification letter that reflected those
6   provisions.
7       Q.  OK.  I would like to show you -- let's
8   mark this as our next exhibit.
9           (Exhibit 631, document Bates stamped
10          BCI-EX(S) 201894 through 95 marked for
11          identification, as of this date.)
12      Q.  The document I have put before you
13  Mr. Rosen marked as Exhibit 631 bears Bates
14  number BCI-EX(S) 00201894 through 895.
15          Have you seen the document before?
16      A.  Again, not parsing every word, but it
17  looks like an e-mail that I sent.
18      Q.  And you'll see it is an e-mail from
19  you to Josephine Wang?
20      A.  Yes.
21      Q.  I can't --
22      A.  This is what I was referring to --
23      Q.  It is?
24      A.  -- earlier in terms of the sort of the
25  clarification of the language included in the
```

TSG Reporting - Worldwide    877-702-9580

```
1              ROSEN
2   order, and then we asked SIPC and, I guess it
3   was Mike Macchiaroli now that I see this, to
4   confirm that they wouldn't seek such a stay.
5       Q.  I can't tell from the e-mail address
6   with whom or what is Josephine Wang affiliated.
7       A.  You can't tell that.  I think she is
8   in the legal department at SIPC.
9       Q.  And you say in this e-mail to
10  Josephine Wang and Steven Sharbeck, Mike
11  Macchiaroli, "Below is the language we believe
12  to be necessary to ensure that the order is
13  sufficiently broad to cover the relevant
14  Barclays Capital transactions."
15          Do you see that?
16      A.  Yes.
17      Q.  And below that is some proposed
18  language and below that is a note that says,
19  "Mike, I am trying to place us in the document,
20  are you with me?"
21          Where did the particular language set
22  off in italics come from, beginning, "Exercise
23  of any rights," and ending "September 24, 2008"?
24      A.  Probably from my colleague, Sandra
25  Rocks.
```

TSG Reporting - Worldwide    877-702-9580

```
1              ROSEN
2       Q.  And was this particular language shown
3   to or discussed with, to your knowledge, anybody
4   on the Lehman side of the table, including its
5   business people or representatives?
6       A.  I think that certainly they would have
7   seen the order in the private sale -- the sale
8   order.
9       Q.  Well, you are a bit ahead of me.  I
10  guess I should have asked that.  The order that
11  you refer to, is that the sale order?
12      A.  Yes.
13      Q.  Do you know if this language wound up
14  in the sale order?
15      A.  I would have to check.  I believe so,
16  but I would have to check to confirm.
17      Q.  And in the language that you proposed
18  in this e-mail, there is a reference to section
19  559 of the Bankruptcy Code.  Do you see that?
20      A.  Yes.
21      Q.  Were you familiar with the terms of
22  Section 559 of the Bankruptcy Code when you
23  proposed this language to the Section and SIPC?
24      A.  No, I was the transmitter.
25      Q.  Do you know if anyone at -- on the
```

TSG Reporting - Worldwide    877-702-9580

ROSEN

1
2  Barclays side of the table, including its
3  representatives, spoke to anyone on the Lehman
4  side of the table, including its representatives
5  about Section 559 of the Bankruptcy Code?
6      A.   I don't have a specific recollection
7  of that.
8          WITNESS' ATTORNEY:  Mr. Gaffey, let me
9  state for the record, for what it's worth,
10 the language, the italicized language says,
11 "The order that the stays set forth above
12 shall not apply to," and I just am not sure
13 whether or not that really is referring to
14 the sale order as opposed to some other
15 order.
16         MR. GAFFEY:  Neither am I.  That's why
17 I asked the question.
18     Q.   Does what your counsel has to say
19 refresh your recollection?
20         MR. HUME:  I think it is the SIPC
21 order.
22     A.   Hang on a second.  You know what, I
23 think you're right.  This predated the sale
24 order.  This is Wednesday -- this is the 17th of
25 September, so there was a stay put into place

ROSEN

1
2  and I guess this was to seek clarification of
3  that.
4      Q.   This refers to the SIPC order, the
5  SIPA order?
6          THE WITNESS:  Is that the only order?
7          MR. GAFFEY:  Let's go off the record
8  for a minute.
9          (Recess)
10         MR. GAFFEY:  Back on the record.
11     Q.   Mr. Rosen, do you know one way or the
12 other what order is being referred to?  I mean
13 from memory, do you know one way or the other
14 what order is being referred to in the document
15 we have marked as 631, your e-mail?
16     A.   I believe it was in anticipation of
17 the sale order, but I'm not 100 percent
18 confident.
19     Q.   And how much time -- I know it was a
20 busy week -- but how much time did you devote to
21 conversations with the SEC about this assurance
22 language that's set out in Exhibit 631, this
23 issue?
24     A.   I really don't have a clear
25 recollection.  We sent it down to them and I had

ROSEN

1
2  a conversation and asked them to focus on it and
3  then come back.  I think there was -- they
4  understood what the import of it was.  And then
5  they came back and confirmed that they
6  wouldn't -- you know, that they agreed they
7  wouldn't exercise that right to seek a stay.
8  But it didn't take a lot of to'ing and fro'ing
9  on the telephone to get there.  Their people are
10 I think quite familiar with their rights.
11     Q.   Did there come a point that it came to
12 your attention that the repurchase agreement
13 was, in fact, terminated?
14     A.   Well, it came to my attention that the
15 clarification letter provided for a collapse
16 instead of unwinding the repurchase agreement
17 and then separately transferring to basically
18 collapse that into one step.  And it was part
19 of -- the collateral that had been under that
20 agreement was part of the securities that were
21 being sold.
22     Q.   My question is a little different.  It
23 goes to the timing point more than anything
24 else, but did there come a time when you learned
25 that the prepurchase agreement had been

ROSEN

1
2  terminated?  And if so, when did you find that
3  out?
4      A.   Well, with a consummation of the
5  transaction, it was terminated.
6      Q.   Do you know when the repurchase
7  agreement was terminated?
8          MR. HUME:  Objection, asked and
9  answered.
10     A.   My recollection is that the agreement
11 was terminated as part of the consummation of
12 the sale transaction.
13     Q.   That would be at the closing on the
14 22nd?
15     A.   Which would be at the closing.
16     Q.   Did it come to your attention at any
17 point prior to the closing that Barclays issued
18 a notice of termination to Lehman?
19     A.   At some point, I did see e-mail
20 traffic indicating that a notice had been sent
21 in error and then my recollection is that there
22 was an effort to document that in the
23 clarification letter.
24     Q.   When did the fact of the notice come
25 to your attention?

Page 218

**ROSEN**

1  A.  I honestly don't recall.
2  Q.  Was it after the sale hearing?
3  A.  I honestly don't recall when I became
4  aware of it to be honest with you.  There is
5  probably an e-mail somewhere about it.  I don't
6  have a date on it.
7  MR. GAFFEY:  OK.  Let's mark this
8  document as Exhibit 632.
9  (Exhibit 632, document Bates stamped
10  CGSH 163813 through 815 marked for
11  identification, as of this date.)
12  Q.  I have put before you, Mr. Rosen, what
13  has been marked as Exhibit 632 document bearing
14  Bates number CGSH 00163813 through 815.  Take a
15  look at the document, please, sufficient to tell
16  me whether you have seen it before.
17  A.  Yes, it looks like the e-mail
18  correspondence to which I was a party.
19  Q.  Does this e-mail constitute the
20  assurance that had been requested from the SEC?
21  A.  Yeah, I believe this is.
22  Q.  And had you spoken with Alastaire
23  Bambach about the topic?
24  A.  I don't recall.  It is possible that
25  TSG Reporting - Worldwide    877-702-9580

Page 219

**ROSEN**

1  he -- that I did or that he was on the phone
2  when I spoke to someone regarding it.  I
3  honestly don't have a clear recollection.  There
4  was so many conversations with the SEC.
5  Q.  And you asked Alastaire in the e-mail
6  at the top of the chain, an e-mail dated
7  September 18, 2008 at the time of 4:01 p.m. -- I
8  beg your pardon, the time of 3:59 p.m.
9  Alastaire, "Is this comfort something that we
10  may share with others who may have an interest."
11  Do you see that?
12  A.  Yes.
13  Q.  Who were the others you are referring
14  to?
15  A.  I'm looking at that and I don't recall
16  specifically whether this was sort of just a
17  general, abstract question or whether I had
18  somebody in mind.  I honestly don't recall
19  sitting here today.
20  Q.  And did you share this comfort with
21  others?
22  A.  I think I probably shared it with the
23  client certainly.
24  Q.  Did you share it with anybody at Weil
25  TSG Reporting - Worldwide    877-702-9580

Page 220

**ROSEN**

1  Gotshal?
2  A.  I don't recall providing it directly
3  to Weil Gotshal.
4  Q.  Do you know if it was provided
5  indirectly to Weil Gotshal?
6  A.  I don't have a recollection about
7  that.  It may have been.  I do not.  It may have
8  been that I did this because the client at
9  Barclays wanted to forward it on and they asked
10  me whether they could.  But I just -- but
11  honestly, this is not a keen recollection.
12  Q.  Do you have any knowledge, direct or
13  indirect, as to whether this comfort language
14  was shared with Lehman or Weil Gotshal?
15  A.  I really don't recall.
16  Q.  You referred a few times today in
17  various contexts to -- you can put the document
18  aside.  To various circumstances where -- and
19  this is, again, not a quote, but you talked
20  about jeopardy to the deal closing by Monday the
21  22nd, that's a prospect that you have talked
22  about a few times today.  Was there a drop-dead
23  date for closing?
24  A.  No, there was just a perception that
25  TSG Reporting - Worldwide    877-702-9580

Page 221

**ROSEN**

1  if it didn't close by Monday, there could be
2  developments in the marketplace which might have
3  complicated or prevented the deal from getting
4  done.  I don't think it was an ultimatum.
5  I think people wanted to get the deal
6  done, but I think there was a concern that
7  letting another business cycle go by was just --
8  because we didn't know what was going to happen.
9  I think this was the weekend where we had
10  learned very late Sunday night that, you know,
11  Morgan Stanley and Goldman Sachs had quite
12  expeditiously become banks and people were
13  worried and the hurry to do that was no doubt in
14  part due to concerns.
15  So I wouldn't say that it was a drop
16  dead or an ultimatum or anything like that.  It
17  was that people realized it became more
18  complicated and there was more noise that could
19  interfere with the transaction more time
20  that elapsed.  So we all, I think internally at
21  Cleary regarded it as, put it this way, if the
22  deal wasn't ready to close on Monday, we didn't
23  want to be the ones responsible for it not being
24  ready to close on Monday morning, so we took it
25  TSG Reporting - Worldwide    877-702-9580

Page 222

```
1              ROSEN
2   seriously.
3       Q.   That issue aside, the deal could have
4   closed on Tuesday?
5       A.   Theoretically, it could have closed on
6   Tuesday if things hadn't intervened.  It was
7   more the risks that were associated with not
8   closing expeditiously that were the concerns.
9   You had to remember, the markets were very
10  volatile and there were assets whose valuation
11  was the source of considerable uncertainty and
12  concern.
13      MR. GAFFEY:  I don't have anything
14  further.  Thank you for your time.
15      MR. DAKIS:  The committee has no
16  questions.
17      THE WITNESS:  Thank you.
18      (Time Noted:  4:35 p.m.)
19
20      _____
        EDWARD J. ROSEN
21
22  Subscribed and sworn to
    before me this EDWARD J. ROSEN  day
23  of February, 2010.
24
25      _____
```

TSG Reporting - Worldwide    877-702-9580

Page 223

```
1              ROSEN
2   INDEX:
3   WITNESS        EXAM BY:           PAGE:
4   E. Rosen        Mr. Maguire          6
5                   Mr. Gaffey        202
6              EXHIBITS
7   Exhibit No.                    Marked
8   Exhibit 622 declaration of Edward J. Rosen    8
9   Exhibit 623 document Bates stamped    120
10     CGSH0002699 through 700
11  Exhibit 624 document Bates stamped DTCC    122
12     00126 through 00198
13  Exhibit 625 document Bates stamped DTCC    152
14     00359 through 361
15  Exhibit 626 document Bates stamped BCI-CG    175
16     00024097 through 99
17  Exhibit 627 document Bates stamped CGSH    181
18     0034491 through 92
19  Exhibit 628 document Bates stamped    183
20     OCC36408 through 409
21  Exhibit 629 document Bates stamped OCC    186
22     0036472 through 36473
23  Exhibit 630 document Bates stamped OCC    195
24     0036482 through 483
25
```

TSG Reporting - Worldwide    877-702-9580

Page 224

```
1              ROSEN
2             EXHIBITS
3   Exhibit No.                    Marked
4   Exhibit 631 document Bates stamped    213
5     BCI-EX(S) 201894 through 95
6   Exhibit 632 document Bates stamped CGSH    220
7     163813 through 815
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 225

```
1              ROSEN
2            CERTIFICATE
3   STATE OF NEW YORK )
4              )ss:
5   COUNTY OF NEW YORK)
6       I, MARY F. BOWMAN, a Registered
7   Professional Reporter, Certified Realtime
8   Reporter, and Notary Public within and for
9   the State of New York, do hereby certify:
10      That EDWARD J. ROSEN, the witness
11  whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such
13  deposition is a true record of the testimony
14  given by such witness.
15      I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage and that I am in no way
18  interested in the outcome of this matter.
19      In witness whereof, I have hereunto
20  set my hand this 19th day of February, 2010.
21
22      _____
23      MARY F. BOWMAN, RPR, CRR
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

            Debtors.

10   ----------------------x

11

12

13

14          DEPOSITION OF SEAN TEAGUE

15             New York, New York

16              June 30, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 31617

Page 6

Teague

1
2      also is Elizabeth Davis and Marc Vellrath
3      from FSG.
4      BY MR. TAMBE:
5          Q.   Mr. Teague, you're currently employed
6      by Barclays, is that right?
7          A.   That's correct.
8          Q.   Which Barclays entity employs you?
9          A.   Barclays Capital.
10         Q.   How long have you been with Barclays
11     Capital?
12         A.   Approximately five years.
13         Q.   Back to 2005?
14         A.   Yes.
15         Q.   And what's your current position with
16     Barclays Capital?
17         A.   I perform independent valuations.
18         Q.   You perform valuations?
19         A.   Correct.  So I perform independent
20     valuations.  Part of the IVC team.
21         Q.   And do you have a title?
22         A.   Not specifically.  I manage the Fixed
23     Income and Credit Price testing for the
24     Americas.
25         Q.   If you could just keep your voice up

Page 7

Teague

1
2      because I'm having some trouble hearing you and
3      I know the court reporter might have some
4      trouble hearing you as well.  And there's folks
5      all the way at the end of the table, so it would
6      help all of us.
7          I've seen this documents which
8      identify you as a director of Fixed Income and
9      Credit Price Testing.  Is that also -- is that
10     an accurate description of your title?
11         A.   Yes.
12         Q.   And you were, in 2008 and 2009, you
13     had the same position?
14         A.   That's correct.
15         Q.   Before you got to Barclays in 2005, if
16     you could briefly describe your employment
17     background.  Where else did you work?
18         A.   Previous to Barclays, I worked for
19     three years at Commerce Bank.  I had multiple
20     roles at the firm.  I worked in the middle
21     office function for approximately a year, I
22     worked in the trading function for approximately
23     a year, and also in what's called Alternative
24     Investment Strategies, performing due diligence
25     on hedge funds for approximately a year.

Page 8

Teague

1
2          Q.   When you were performing the trading
3      function for approximately a year, what types of
4      products did you trade?  What markets did you
5      trade in?
6          A.   Credit correlation.
7          Q.   Credit correlation.
8          Any other type of trading while at
9      Commerce Bank?
10         A.   No, just hedging for the credit
11     correlation portfolio.
12         Q.   Prior to Commerce Bank, where did you
13     work?
14         A.   I worked at Deutsche Bank/Bankers
15     Trust for approximately seven years, performing
16     various roles, including the majority, probably
17     five of those seven years were in Product
18     Control for Fixed Income Credit products, and
19     two of those years were performing documentation
20     for trades.  So trade -- trade docs.
21         Q.   And the documentation for trades, what
22     types of products were you providing
23     documentation for?
24         A.   Majority would be rates and credit.
25         Q.   Rates and credit.  And prior to

Page 9

Teague

1
2      Deutsche Bank?
3          A.   Short period of time consulting at
4      HSBC as a rates analyst as well as ISDA
5      documentation, and a short stint as a consultant
6      at Barclays Capital, also in documentation.  But
7      that was not working for the firm.  I was a
8      Consultant.
9          Q.   And when you were consulting, who were
10     you employed by?
11         A.   I can't recollect.  I do not
12     recollect.  It was ten years ago.
13         Q.   If you could maybe go back to your
14     educational background.  College, when did you
15     graduate?
16         A.   I graduated in '94.
17         Q.   From where?
18         A.   Binghamton University.
19         Q.   What degree?
20         A.   A B.A.
21         Q.   In?
22         A.   Political science and a minor in
23     economics.
24         Q.   I haven't done all the math in terms
25     of your prior experience, but when you finished

3 (Pages 6 to 9)

Teague

1
2  your BA is when you began your consulting work,
3  or did you have further education?
4      A.   Shortly after finishing is when I
5  began the consulting work.
6      Q.   And fair to say that you don't have
7  any postgraduate degrees?
8      A.   It's fair to say that.
9      Q.   So the B.A. was your last degree?
10     A.   Correct.
11     Q.   At any time have you held any
12 registrations or licenses in the securities
13 industry?
14     A.   Yes, Series 7 and 63.
15     Q.   63?
16     A.   Yes.
17     Q.   Anything else?
18     A.   I have the -- pause for a moment.  The
19 FRM, which is Financial Risk Manager Certificate
20 as well.
21     Q.   Are you current in your Series 7 and
22 63?
23     A.   Yes.
24     Q.   Going back to the beginning of your
25 work at Barclays, starting in 2005, what

Teague

1
2  department or group in Barclays did you join in
3  2005?
4      A.   I joined the same team, the IVC, and
5  at the time I was managing secondary ABS
6  valuations.
7      Q.   And starting in the summer of 2008, so
8  prior to the Lehman bankruptcy, July/August of
9  2008, what was your role at Barclays?
10     A.   Same as today.
11     Q.   So you were part of the IVC team.  You
12 were responsible for fixed income and credit; is
13 that right?
14     A.   Prior to the acquisition, I had the
15 same role as I have today, fixed income and
16 credit.
17     Q.   If you could just describe for me
18 briefly, as of the summer of 2008, what the
19 organizational structure was for the IVC group.
20 To whom did you report?  Who report arid to you?
21 If you could just describe the team.
22     A.   I reported to Marcus Morton.  My team
23 at the time, I can't recollect all the team
24 members, approximately four people on the rates
25 side. I'll just do it in my head.  Five people

Teague

1
2  on the rates side reporting in to me, and on the
3  credit side approximately, approximately five
4  people on the credit side -- six people, I
5  believe, actually, on the credit side.
6      Q.   I have placed before you a document
7  that was previously identified as Exhibit 799.
8  If you would just take a moment to review that
9  document.  Let me know when you're done.  I'll
10 ask you some questions about it.
11     A.   Certainly.
12     (Document review.)
13     A.   Okay.
14     Q.   Have you seen this document before
15 today?
16     A.   Yes, I have.
17     Q.   Were you involved in preparing this
18 document?
19     A.   Yes, I was.
20     Q.   What role did you play in the
21 preparation of this document?
22     A.   I helped provide supporting
23 information for my team.
24     Q.   And what is your understanding as to
25 why this document had been prepared?

Teague

1
2      A.   I don't recollect.
3      Q.   Well, is it your understanding you
4  were asked to prepare this document or to
5  provide information to prepare this document for
6  purposes of this litigation?
7      A.   I believe -- I had drafted this at one
8  point in time for the head of Fixed Income for
9  my portion.  So I don't recollect if that data
10 was then provided specifically for the purposes
11 of this litigation.
12     Q.   And you said the head of Fixed Income.
13 Who are you referring to?
14     A.   Eric Bommensath.
15     Q.   And is this a document that, as far as
16 you know, is used in the day-to-day business of
17 Barclays?
18     A.   No, it is not.
19     Q.   It is not used?
20     A.   Not in the day-to-day business of the
21 firm.
22     Q.   Okay.  Now, going back to your
23 description of the people who reported to you,
24 if you could look through this and help me
25 identify the people you were referring to.  You

Page 14

                    Teague
1
2   say four people in rates, five people maybe on
3   credit.
4           Are those people listed in this
5   document, Exhibit 799?
6       A.   If we go to the document with "FI
7   Rates" on the top.
8       Q.   Third page in.  Okay.
9       A.   Grant Rusk at the time was overseeing
10  the fixed income rates valuations.  Alessandra
11  Riccardi oversaw the fixed income options
12  portion, the fixed income rates world.  Elly Po,
13  as stated here, was involved in the RMBS
14  Treasuries and agencies as well as the munis.
15  Kevin McAndrew was involved in the rates as well
16  as some of the agency valuation.
17          Pavan was not involved in the Lehman
18  opening balance sheet.  He was an ex-Lehman
19  employee who joined with Barclays after the
20  acquisition.  Neither was Rob or Qiron.
21      Q.   And other than Grant, Alessandra, Elly
22  and Kevin, were there any other folks back at
23  the time and during the time of the acquisition
24  who were in this Fixed Income/Rates division?
25      A.   There was Mark Hollander, who was no

Page 15

                    Teague
1
2   longer with the firm shortly thereafter.  He was
3   not involved.  And another individual Sam, I
4   can't recollect his last name offhand, who was
5   not involved in the Lehman acquisition, who is
6   no longer with the firm shortly after the
7   acquisition.
8       Q.   Okay.  And then moving on to Fixed
9   Income Credit at the bottom of that third page
10  over onto the fourth page, how many of those --
11  which of those folks were involved in the Lehman
12  acquisition back in the fall of 2008 onwards?
13      A.   Kevin Jhea is how you state his name,
14  was managing FI Credit at the time of the Lehman
15  acquisition.  David Wei, managed the correlation
16  aspects of the FI Credit world.  Heidi Su's main
17  role was Emerging Market Independent Valuations
18  at the time.  Amine came on through the Lehman
19  acquisition.  He was not part of the overall
20  analysis of the IVC of the opening balance
21  sheet.
22          Ilya Riskin was a member of the team,
23  still is, but was not involved in the Lehman
24  acquisition.  Mohemmed Khan was involved in
25  valuations of the corporates for the Lehman

Page 16

                    Teague
1
2   acquisition.
3           Ethan Zheng, analyst, he was not
4   involved in the Lehman opening balance sheet
5   valuation, and Kartik Kothari was in the credit
6   area, mainly focusing on CDS and corporate
7   bonds.  He was not involved in the Lehman
8   opening balance sheet valuation.
9       Q.   There's one name over on the last page
10  of this exhibit, Dara Mao?
11      A.   Oh, apologies.  Dara came on through
12  Lehman.  She was not involved in the
13  acquisition.
14      Q.   In preparing this document or
15  providing information for the preparation of
16  this document, Exhibit 799, do you recall
17  whether it was sometime this year that you
18  provided that information or was it prior to
19  this year?
20      A.   I believe it would be prior to this
21  year.  Again, this is based on information that
22  I provided much earlier to senior management and
23  on a very unrelated note.  It was just something
24  I provided to the head of the business on the
25  trading side who wanted to understand better the

Page 17

                    Teague
1
2   people within my team, and that was what I used
3   to update this document.  But this document to
4   me must have been done last year.  I don't
5   recall when this was done.
6       Q.   Going back to the week of September
7   15, 2008, if you could briefly describe the role
8   or the duties that you played, and I want to
9   just focus on the time period the 15th of
10  September through the 22nd of September, so that
11  first week, roughly, what was -- what role, if
12  any, did you play in connection with the Lehman
13  transaction or the contemplated, the one that
14  was finally executed, what were you doing in
15  connection with Lehman that week?
16          MR. HUME:  Object to the form of the
17  question.
18      Q.   Do you understand my question?
19      A.   I guess what was my specific role in
20  regards to the Lehman transaction?
21      Q.   Yes, during that week.
22      A.   I guess the 15th was the -- was that
23  the weekend before?
24      Q.   15th was the day that Lehman filed for
25  bankruptcy.  It was a Monday.

Page 18

Teague

1
2    A.   That was a Monday.  So my role that
3    week, after they had -- after Monday, the first
4    objective was to perform independent valuations
5    for any derivative transactions we had with the
6    firm.  Barclays was at risk in any derivative
7    transactions that we had.  We had to make sure
8    that they were valued correctly.
9         So we were focusing in interest rate
10   swaps and credit derivatives within my team
11   where Lehman would have been the counterparty.
12   I was consolidating that data, and then, by the
13   end of the week, my function turned more into
14   focus on working with Operations to determine
15   the assets which were going to be brought
16   onboard I believe we had the Friday and then the
17   Monday.
18   Q.   In the first part of your answer you
19   talked about providing some support in
20   connection with derivatives positions where
21   Lehman was the counterparty.  Those were not
22   transactions or assets that were being acquired
23   as part of the transaction; those were deals on
24   with Lehman, existing deals?
25   A.   That is correct.

Page 19

Teague

1
2    Q.   The second part of your answer in
3    terms of your role, where you got involved with
4    Operations to provide some support around the
5    assets that were coming over from Lehman as part
6    of the purchase transaction, describe for me who
7    it was that got you involved in that.  Who asked
8    you to become involved?  Who from Operations?
9    A.   Marcus Morton and James Walker within
10   Product Control asked me to get a better
11   understanding of what was happening from an
12   operations perspective.
13   Q.   Now, Mr. Walker, where does he fit
14   into the Product Control or Independent
15   Valuation Division or structure of the bank?
16   A.   I believe at the time he was CFO.  I
17   can't remember his exact title.
18   Q.   So he would be someone that Mr. Morton
19   would report up to?
20   A.   Yes.
21   Q.   Were the others from Product Control
22   and from Independent Valuation who would be
23   working with you, were you leading that effort
24   on the part -- on the side of Product Control
25   and Independent Valuation?

Page 20

Teague

1
2    A.   I was involved in mainly in what I
3    would consider reconciliation view, trying to
4    understand what data we would be receiving.  The
5    Operations team would be coordinating with the
6    Lehman team from the Lehman's Operations team to
7    determine what is -- what was expected to be
8    delivered, and I was working with them as well
9    as certain members of Product Control, for
10   instance, Steve Calick, who would have been
11   working from an equities perspective to see what
12   assets would be moving over to Barclays.
13        So the majority of the analysis, of
14   course, was within the Operations function.  Our
15   role was just to try to get, gain a deeper
16   understanding of what was happening.
17   Q.   And this role about getting a deeper
18   understanding of what was happening, was there a
19   point in time where sort of that role ended and
20   you reverted to a Product Control price,
21   independent price verification role?
22   A.   In certain aspects it was just
23   intertwined.  If you didn't know what you were
24   supposed to value, you couldn't really perform a
25   valuation.  So that's why I was involved, was to

Page 21

Teague

1
2    ensure I understood, you know, what paper, what
3    securities were being delivered so we could
4    value them.
5    Q.   And was it your understanding that
6    your role would be initially to sort of identify
7    what's coming over, and ultimately you would be
8    part of the team that would be valuing what had
9    come over?
10   A.   Yes.
11   Q.   You said Mr. Calick played a role with
12   respect to equities.  Other than you and Mr.
13   Calick, were there other people from Price
14   Control or IVC who had other asset classes that
15   they were responsible for cracking and
16   reconciling?
17   A.   Well, to clarify, Steve Calick was in
18   Product Control outside of IVC.  His function
19   was just more so to, again, gain an
20   understanding of what was coming on in
21   discussions with Operations.
22        Within IVC, you know, I can't
23   recollect if Rich Landreman was heavily
24   involved, but he was aware that, you know, we
25   were getting assets delivered.

Page 22

Teague

1
2     Q.   And how would you sort of describe
3  where Mr. Landreman fits into the hierarchy
4  within Product Control and IVC?
5     A.   Mr. Landreman works in Independent
6  Valuation Control.  He also reports in to Marcus
7  Morton and his function, as per here, is to
8  review the -- to perform independent valuations
9  for securitized products.
10    Q.   I just want to be clear on sort of the
11 distinction between Product Control and IVC.
12    A.   Certainly.
13    Q.   Can you just describe what the
14 distinction is and how those two divisions or
15 teams work together or separately?
16    A.   Independent Valuation and Control is
17 essentially a subset of the Product Control
18 world.  Product Control, which I'm referring to
19 a separate team, would be considered the daily
20 P&L function for the firm.  They would perform
21 the P&L analysis of the books and records of the
22 firm, of the marked to market assets for the
23 books that I would be overseeing.  They would,
24 you know, determine what the -- what mark to
25 market happened on a daily basis and how that

Page 23

Teague

1
2  P&L explain works for the firm's earnings and
3  losses.
4     Q.   All right.  So you described what the
5  P&L -- what the Product Control Group function
6  is.  And what is it that you do differently or
7  what is it that IVC does differently from
8  Product Control Group?
9     A.   IVC's function is more so to
10 independently value those assets that are on the
11 books and records to ensure that positions are
12 properly marked to market.
13    Q.   Well, are you doing something more or
14 differently than what the Product Control Group
15 does?
16    A.   To clarify, we would be analyzing the
17 pricing of assets, cash and derivatives, while
18 they would be -- function more of an accounting
19 role of reporting the daily P&L related to those
20 assets.
21    Q.   When we get to the acquisition balance
22 sheet that was prepared by Barclays for the
23 Lehman transaction, the valuations that appear
24 there for the trading portfolio that was
25 acquired, what role did PCG, Product Control

Page 24

Teague

1
2  Group, play in determining those values?
3     A.   They would not have played a role in
4  that valuation aspect.
5     Q.   Who would have determined those values
6  or who did determine those values on the
7  acquisition balance sheet?
8     A.   That was chairmanned by the Independent
9  Valuation Group.  Some of the marks were
10 chairmanned by the trading desk.  It's all
11 product-specific.
12    Q.   And you're familiar with the
13 acquisition balance sheet, correct?
14    A.   Yes, I am.
15    Q.   And you helped prepare it?
16    A.   Yes, I have.
17    Q.   And you could, by looking at the
18 acquisition balance sheet and the underlying
19 data, identify where prices were provided by
20 trading desks, where prices were the result of
21 independent price testing, et cetera?  Could you
22 do that?
23         MR. HUME:  Object to the form.
24    Q.   Do you understand the question?  Do
25 you want it read back?

Page 25

Teague

1
2     A.   I can answer for the products that I
3  covered.
4     Q.   Okay.  What products did you cover?
5     A.   The rates and credit products within
6  the Lehman opening balance sheet, which would be
7  corporates, emerging markets, munis, and
8  agencies as well as some of the securitized
9  products.
10    Q.   So you covered Pine, correct?
11    A.   That's correct.
12    Q.   You covered Giants Stadium?
13    A.   That's correct.
14    Q.   When you say agencies, what types of
15 securities would you include -- are included
16 within the agencies that you covered?
17    A.   It would be the agency corps.
18    Q.   Just roughly, by dollar value or
19 percentage, what percentage of the trading
20 portfolio acquired by Barclays is covered by you
21 and your analysis?
22    A.   Approximately a quarter.
23    Q.   One-quarter by CUSIP or by value?
24    A.   I believe by market value.
25    Q.   When you say market value, you mean

7 (Pages 22 to 25)

## Page 26

Teague

1
2    the value ascribed by Barclays to those assets?
3        A.    That is correct.
4        Q.    So you got a quarter by market value.
5    Who is covered -- who else has covered the rest
6    of it?
7        A.    It would be Rich Landreman.
8        Q.    And what would he have covered?
9        A.    The ABS valuations, all agencies
10    outside of the agency corporates, and for the
11    equity side, that would be Mark Washtell.
12        Q.    Any other asset classes that were
13    covered by others other than the three of you,
14    you, Rich and Mark?
15        A.    And for any valuations where the
16    trading data was utilized and reviewed by PwC, I
17    don't recollect who the proper contact would be.
18        Q.    For those valuations where trading
19    data was utilized and you say reviewed by PwC,
20    what types of assets were those?
21        A.    I believe those were the CDOs.
22        Q.    Do you have any particular CDO name by
23    way of example that comes to mind, any
24    particular names?
25        A.    No, I do not.

## Page 27

Teague

1
2        Q.    By dollar volume or CUSIPs, any sense
3    of the magnitude of the number of the valuations
4    that fall into this bucket where trading data
5    was used?
6        A.    No, I do not.
7        Q.    The assets that were -- that are
8    identified in some documents as PMTG assets, who
9    covered those?
10        A.    I believe that the majority of it
11    would have been Rich Landreman.
12        MR. HUME:  Can I just ask, Jay, this
13    document you showed earlier, 799B?
14        MR. TAMBE:  Yes.
15        MR. HUME:  That's a deposition exhibit
16    number?
17        MR. TAMBE:  That's a deposition
18    exhibit number.
19        MR. HUME:  So it came in in a prior
20    deposition?
21        MR. TAMBE:  Yes.
22        Q.    Sir, I've had placed before you a
23    document marked Exhibit 133.  We'll refer to it
24    at least here as Exhibit 133.  It also carries a
25    movants trial exhibit number.  It's a two-page

## Page 28

Teague

1
2    document.  My question to you is simply is do
3    you recognize this document?
4        A.    No, I do not.
5        Q.    Turning to the first page of the
6    document, Exhibit 133, you'll see there's a
7    couple e-mails there.  The one at the bottom is
8    from Jasen Yang to Patrick Clackson, do you see
9    that?
10        A.    Yes.
11        Q.    Do you know Mr. Yang?
12        A.    He works on the trading side.
13        Q.    Is Mr. Yang someone that you had
14    interactions with in connection with the Lehman
15    acquisition?
16        A.    Yes.
17        MR. HUME:  Objection to the form.
18        Q.    And what was the nature of your
19    interaction with Mr. Yang on the Lehman
20    acquisition?
21        MR. HUME:  Object to the form.
22        A.    Mr. Yang reviewed the portfolio from
23    the perspective of the trading desk of what was
24    going to be acquired, and his team was involved
25    in the CDO valuation.

## Page 29

Teague

1
2        Q.    And when you say the "CDO valuation,"
3    is that again those trader valuations that you
4    referenced earlier that were provided to PwC and
5    reviewed by PwC?
6        A.    Yes.
7        Q.    You also see in Mr. Yang's e-mail,
8    that's an e-mail to Patrick Clackson.  Who is
9    Mr. Clackson?
10        A.    Patrick I believe is the CFO.
11        Q.    Is Mr. Clackson someone that you
12    interacted with in connection with the Lehman
13    acquisition?
14        MR. HUME:  Objection.  Vague and
15    ambiguous.
16        A.    Any involvement with Patrick was, the
17    majority of it was really with Marcus Morton.
18        Q.    So you would not have been directly
19    dealing with Mr. Clackson; is that right?
20        A.    No.
21        Q.    How about Stephen King, was that
22    someone that you dealt with directly in
23    connection with the Lehman acquisition?
24        A.    No.  I've been on phone calls with
25    Stephen King, but I did not deal with him

Teague

1              Teague
2   directly.
3       Q.   And were you on phone calls with
4   Stephen King with respect to the Lehman
5   acquisition?
6       A.   I have been on phone calls with him
7   regarding the Lehman acquisition, but I have not
8   had any, you know, direct phone calls with
9   Stephen King where Stephen and I, you know,
10  would discuss the Lehman acquisition.  It was
11  more conference calls where we were both on the
12  same phone.
13      Q.   Describe for me briefly the kind of
14  calls you have been on with Stephen King in
15  connection with the Lehman acquisition.
16      A.   Just discussions on what -- what
17  valuations we were assigning and getting --
18  trying to get an understanding as well as how
19  the CDO valuations performed by the desk.  We
20  ran our own independent valuations which were
21  also provided to Product -- to PwC.
22           So mostly an understanding of if there
23  are aspects of structured deals where we needed
24  more information such that if they had any
25  Trustee reports, things of that nature.

1              Teague
2       Q.   Did you have any conversations with
3   Mr. King in or around the time of the
4   acquisition about the valuation of specific
5   assets that were being acquired from Lehman?
6       A.   No.
7           MR. HUME:  Objection.  Vague.
8       A.   No, I did not.
9       Q.   Do you recall any interactions with
10  Mr. King in the time period immediately after
11  the acquisition, so late September, early
12  October 2008?
13      A.   Yes.  The majority of the
14  conversations were in regard to the acquisition
15  itself and what had settled and any issues that
16  were outstanding mostly from an operational
17  perspective.
18      Q.   In one your previous answers you said
19  that there was some discussion about valuations.
20  That was a topic discussed in these conference
21  calls where you were involved and Mr. King was
22  involved.
23           Who else was involved in those
24  conversations?
25      A.   I don't recollect.  Marcus Morton,

1              Teague
2   James Walker, and just Jasen Yang, potentially.
3   But again, those conversations were on the
4   assets that were coming onboard.
5       Q.   The assets coming onboard from Lehman?
6       A.   Correct.
7       Q.   And certain numbers of those assets
8   were being assigned to trading desks, correct?
9       A.   Yes, at the time.
10      Q.   And those trading desks would have
11  been run by people like Stephen King and others?
12      A.   Yes.
13      Q.   He was the trader, correct?
14      A.   Correct.
15      Q.   Do you recall any conversations where
16  Mr. King expressed a different point of view on
17  valuations than the one that you and your team
18  were expressing?
19           MR. HUME:  Objection.  Lacks
20  foundation.  He said they didn't discuss
21  valuations.
22      A.   The context of what was discussed was
23  mostly, again, in the context not of the
24  valuations, it was really in the context of the
25  positions themselves and how they were going to

1              Teague
2   get booked onto the balance sheet, not the
3   valuations of the assets coming onboard.
4       Q.   Were there any discussions, as you
5   recall, with Mr. King where Mr. King expressed
6   disagreement with the valuations that were
7   prepared by you and your team?
8       A.   Any discussions of that nature were
9   more to deal with getting a deeper understanding
10  of the assets themselves, again such as the CDOs
11  to obtain better market data.
12      Q.   Okay.  I guess I want to get a better
13  understanding of what you mean by that.  There
14  were discussions where Mr. King expressed a
15  disagreement over the value being ascribed by
16  you and your team to an asset or classes of
17  assets?
18      A.   More specifically, to an asset.  If an
19  asset valuation was performed where we didn't
20  have full market data, there was times where the
21  trading desk would provide us additional
22  information, such as if there were aspects of a,
23  you know, of a security that they had a better
24  understanding of.
25           So that was, again, going back to the

Page 34

Teague

1
2    CDOs, more so the CDOs were valued by the desk.
3    We performed a secondary analysis, which PwC
4    also incorporated into their overall view.  In
5    performing that analysis, Stephen King and Jasen
6    would provide us information if we didn't know
7    fully every aspect of the waterfall of the CDO.
8       Q.   I want to make sure I'm not
9    misunderstanding your answer.
10      A.   Okay.
11      Q.   I understand and appreciate your
12   telling me that when you needed information to
13   understand how to value a particular product,
14   you might have asked Mr. Yang and Mr. King to
15   provide information.
16      My question is a very specific one:
17   Do you recall any conversations on these
18   conference calls where Mr. King participated and
19   you were on these conference calls where Mr.
20   King expressed disagreement with a value that
21   you and your team were placing on any asset --
22      MR. HUME:  Objection.
23      Q.   -- in connection with the Lehman
24   acquisition?
25      MR. HUME:  Objection.  Asked and

Page 35

Teague

1
2    answered and vague and ambiguous.
3       A.   The desk had their view of what the
4    portfolio was worth.  Independent Valuations had
5    their view of what the portfolio was worth.
6       Q.   So you had different views as to the
7    valuation; is that correct?
8       A.   From a high level perspective,
9    everyone will have a different methodology.
10      Q.   Again, I'm not talking about everyone.
11   I'm talking about Mr. King specifically and Mr.
12   Yang.  He was working with Mr. King on this.
13      If I understand your last answer, Mr.
14   King expressed a different view on valuation
15   than that being expressed by you and your team
16   with respect to at least some of the assets that
17   you were valuing in the Lehman acquisition; is
18   that correct?
19      A.   Yes, that can happen.
20      Q.   These weren't pleasant conversations
21   with Mr. King, were they, sir?  These were
22   heated conversations you had with Mr. King?
23      MR. HUME:  Objection.  Vague and
24   ambiguous.
25      A.   I wouldn't say that.  I wouldn't agree

Page 36

Teague

1
2    with that.
3       Q.   The value that you put on these assets
4    or that the bank puts on these assets, they
5    ultimately would affect the P&L from Mr. King
6    and his desk, correct?
7       A.   I wouldn't know the specifics of how
8    that aspect of the firm works, sir.
9       Q.   But the decisions that you make on
10   valuation can have an impact on the trader's
11   P&L, correct?
12      A.   I wouldn't have known the specifics of
13   how the trader's P&L was going to drive their
14   earnings.
15      Q.   I'm not asking for the specifics.  I'm
16   asking for the general -- there is a connection
17   between what you do and what happens to the
18   amount of money the trader takes home, correct?
19      A.   Correct.  But conceptually, this was
20   an acquisition more so than a trading book that
21   was managed by a trader that they had acquired
22   through the regular course of actions.  I
23   wouldn't know how the trader's income was going
24   to be derived through this acquisition.
25      Q.   Well, was that a topic of discussion,

Page 37

Teague

1
2    as to how the trader's income would be derived
3    with respect to the assets acquired through the
4    acquisition?
5       A.   I would not have been involved in
6    anything at that level.
7       Q.   Were you aware that that was a topic
8    of discussion?
9       A.   No, I was not.
10      Q.   Given the nature of how these assets
11   were acquired through an acquisition as opposed
12   to through the course of trading, did that
13   affect the way that you went about doing your
14   price-testing analysis and price-verification
15   analysis?
16      MR. HUME:  Objection.  Vague and
17   ambiguous.
18      A.   No, it did not.
19      Q.   You applied exactly the same policies,
20   procedures, methodologies that you applied to a
21   trading book?
22      A.   Yes.  There were some differences in
23   the respect that, from a trading book
24   perspective, the analysis would be based on the
25   desk marking to bid and the analysis would be

Page 38

Teague

1
2  then performed based on that bid price.  For
3  this portfolio we did not have the assets
4  already marked to bid.  The assets were not
5  already marked to bid or being held at bid by
6  the firm.  That would have been the difference.
7       Q.   So you had to take an additional step
8  with respect to these assets and mark them to a
9  bid or an ask before you did your price
10 verification; is that right?
11      A.   Correct.
12      Q.   Sir, I have placed before you a
13 document that was previously marked as
14 Deposition Exhibit 817.  If you could take a
15 moment to review it.  Let me know when you're
16 done.  I'll ask you a couple of questions about
17 it.
18           (Document review.)
19      A.   Yes.
20      Q.   I want to start with the e-mail chain
21 that begins on page 2 of this exhibit and work
22 our way to page 1.  You'll see the first e-mail
23 in the chain appears to be an e-mail from
24 someone called Brendan Davis to Clement Bernard.
25 Do you see that?

Page 39

Teague

1
2       A.   Clement, yes.
3       Q.   Clement.  And then the next e-mail up
4  is from Clement to James Walker, Marcus Morton,
5  Jasen Yang, Steven King.  Do you see that?
6       A.   Yes.
7       Q.   That shows Clement as with an e-mail
8  address of clementbernard@lehman.com; is that
9  correct?
10      A.   Yes.
11      Q.   Is Clement someone who eventually
12 joined Barclays as part of the acquisition?
13      A.   No, he is not.
14      Q.   Is he someone that you dealt with in
15 connection with the acquisition?
16      A.   To a very small degree.
17      Q.   What was the extent of your
18 interaction with Mr. Clement?
19      A.   The majority of my interaction with
20 Mr. Clement was through e-mails such as this.
21      Q.   Now, you will see that the e-mail
22 chain begins on page 2 on the evening of
23 Wednesday, September 17, 6:19 P.M.; do you see
24 that?
25      A.   Yes.

Page 40

Teague

1
2       Q.   And it's attaching a series of zip
3  files, do you see that?
4       A.   Yes.
5       Q.   And as you follow that e-mail chain up
6  to page 1 of the Exhibit 817, you will see the
7  most recent e-mail in the chain, which is the
8  top of page 1.  It's from Mark Washtell to you,
9  do you see that?
10      A.   Yes.
11      Q.   And he's basically talking about the
12 three files, and the three files that are
13 referenced are the three files on the second
14 page, do you see that?
15      A.   Yes.
16      Q.   During that week of the 15th of
17 September and over into the week of the 22nd,
18 did you at any time analyze the valuation of a
19 portfolio of assets other than what are
20 referenced in various documents as the Fed repo
21 assets or the assets that came over to Barclays
22 as part of the Fed repo?  Did you analyze any
23 other portfolios of assets for the Lehman
24 acquisition?
25           MR. HUME:  Objection to the form.

Page 41

Teague

1
2  Vague and ambiguous.
3       A.   Can you restate the question?
4       Q.   Let me ask it a different way.  And
5  here's the reason I'm asking it.  The files that
6  are being analyzed or that are subject of this
7  e-mail --
8       A.   Uh-huh.
9       Q.   -- begin with these attachments in an
10 e-mail Wednesday, September 17, do you see that?
11      A.   Yes.
12      Q.   You know that, by the end of the week,
13 the transaction took a shape and a form where
14 assets that had been pledged to the Fed were
15 then transferred over to Barclays, you
16 understand that, correct?
17      A.   Yes.
18      Q.   Do you have any understanding of what
19 the connection is, if any, between these files
20 that are being transferred over on Wednesday,
21 September 17, and the Fed repo assets that
22 ultimately become part of the Barclays/Lehman
23 transaction?  The same stuff?  Different stuff?
24      A.   In all honesty, I've never done a
25 reconciliation.  I would assume these -- these

11 (Pages 38 to 41)

Page 42

Teague

1
2 were the same assets that would have eventually
3 be part of the acquisition.
4    Q.    And certainly by Friday, September 19,
5 Barclays had already received some, but not all,
6 of the repo assets, correct?
7    A.    I have no idea what percentage, but
8 yes, I believe there was potentially certain
9 aspects, yes, were announced by Friday.
10    Q.    And things had been transferred over
11 Thursday night, correct?
12    MR. HUME:    Objection.    Lacks
13 foundation.
14    A.    I didn't work in Operations.    I
15 couldn't speak to that subject.
16    Q.    But the role that you were playing in
17 reconciling what was coming over, you knew
18 things had come -- securities had come over
19 Thursday night?
20    MR. HUME:    Objection.    Lacks
21 foundation.
22    Q.    Did you not, sir?
23    A.    I did not perform that role.    That
24 role was within Operations.
25    Q.    I'm not talking about role.    I'm

Page 43

Teague

1
2 talking about your understanding based on where
3 you were in the process.
4    A.    My review was essentially, just say
5 from these -- from these files, I was provided a
6 summary file and it didn't reconcile to these
7 files.    I was trying to understand (A) how to
8 value based on the underlying and why it didn't
9 make sense through the summary file I was
10 provided.    I didn't look at it from a "what has
11 come on balance sheet" perspective.    I was being
12 told what would come on balance sheet, and it
13 didn't reconcile from two different files that
14 they provided me.
15    Q.    I have placed before you a document
16 marked Exhibit 860, which is a cover -- two
17 pages are cover e-mails, and then a spreadsheet
18 that's been printed out or a series of
19 spreadsheets that have been printed out from
20 native files.    Take a look at the document and
21 let me know when you're done.
22    (Document review.)
23    MR. HUME:    Sorry.    Jay, was this
24 produced as a single document?    Can you just
25 say again what --

Page 44

Teague

1
2    MR. TAMBE:    Yes.    That's my
3 understanding, is that what has been printed
4 out and attached is what was produced as a
5 single document as part of --
6    MR. HUME:    As the attachment?
7    MR. TAMBE:    As the attachment to this
8 e-mail.
9    A.    Yes, I have reviewed this document.
10    MR. HUME:    There's a different e-mail
11 on page 954 with an additional attachment or
12 additional attachments and another e-mail at
13 963.
14    MR. TAMBE:    Yes, and I think all the
15 printouts are printouts off the files that
16 are attached to each of those e-mails.
17 That's what this exhibit is.
18    MR. HUME:    I'm just noting for the
19 record there are a number of e-mails within
20 the document that are followed by other
21 spreadsheets.
22    MR. TAMBE:    And my understanding is
23 all of that is what gets sent by Mr. Marcus
24 Morton to Sean Teague on Thursday, September
25 18, 2008.    That's the way the e-mail chain

Page 45

Teague

1
2 reads.    It's a series of e-mails being
3 forwarded by Mr. Morton to Mr. Teague.
4    Q.    Do you see those?
5    A.    Yes, I do.
6    Q.    If you turn to the second page of the
7 exhibit, it's literally page 2, the second page
8 of this bound exhibit, you'll see another e-mail
9 from Clement Bernard to James Walker, Marcus
10 Morton and others, and has a subject line
11 "Details of 9/16 inventory."    Do you see that?
12    A.    Yes.
13    Q.    Did you ever perform any kind of
14 independent price verification or analysis of
15 the securities that were in Lehman's -- on
16 Lehman's balance sheet as of 9/16?
17    A.    State it again.    You're saying have I
18 on any date performed an analysis of their 9/16
19 data?
20    Q.    Yes.
21    A.    We did a, which would have been on
22 Thursday or Friday, an initial analysis to see
23 if we could -- what percentage of these
24 portfolios could be independently valued to get
25 an idea of the assets that were going to be

12 (Pages 42 to 45)

---

Teague

1 delivered.
2
3    Q.   Okay.  Just so I understand your
4 answer, then, at some point around the Thursday
5 or Friday of that week, the 18th or the 19th of
6 September, you looked at spreadsheets of Lehman
7 inventory to see what percentage of that
8 inventory could be independently valued from
9 third-party sources, is that fair?
10   A.   Correct.
11   Q.   And did you prepare any reports or any
12 e-mails that set forth your conclusions about
13 that analysis?
14   A.   Well, the first stumbling block on
15 that was, again, of these eight files that were
16 provided, they did not match off to the summary
17 file provided by Lehman.  As to what the final
18 results of what could and could not be valued, I
19 do not believe anything was fully consolidated
20 by myself to that nature.
21       There were probably some e-mails from
22 this original file that were provided as
23 feedback to be it Marcus Morton or James Walker
24 on what -- to provide color on what we could
25 value, but that would have been the extent of

---

Teague

1 it, to my knowledge.
2
3       As per your earlier document, there
4 was work done by Mark Washtell to show, you
5 know, what data could or could not be valued
6 from third-party data.
7    Q.   And the earlier document you were
8 referring to was Exhibit 817; is that right?
9    A.   Correct.
10   Q.   During the week of the 15th, were you
11 part of any efforts to value portfolios of the
12 Lehman securities to account for any alleged
13 failures by Lehman to update their marks from
14 the 12th of September to the 15th of September?
15 Was that a project that you were involved in at
16 all?
17   A.   No, it was not.
18   Q.   Did you hear any conversations or
19 comments during the week of the 15th about
20 Lehman having failed to update its marks from
21 the 12th of September?
22   A.   This is the first I've heard of it.
23   Q.   So, up until this morning sitting in
24 this conference room, that's not something
25 you've heard of?

---

Teague

1
2    A.   No.
3    Q.   During the week of the 15th of
4 September, 2008, or thereafter, have you had any
5 conversations or communications with anyone from
6 the Bank of New York about valuing the Lehman --
7 the securities that were transferred over as
8 part of the Lehman acquisition?
9    A.   No, I have not.
10   Q.   Do you know whether anyone at Barclays
11 has spoken with anyone at BoNY about that topic?
12   A.   Not that I'm aware of.
13   Q.   You are aware, are you not, that the
14 Bank of New York had ascribed certain values to
15 some of the securities that were transferred to
16 Barclays as part of the Lehman acquisition?
17   A.   Yes.
18   Q.   Have you conducted any analyses of the
19 Bank of New York valuations to determine if
20 they're accurate, inaccurate, or to what extent?
21   A.   We did a review from an independent
22 valuation perspective of what those prices were.
23 They were (A) stale.  They were not reflective
24 of the date of acquisition.
25       In addition, the problem with the BoNY

---

Teague

1
2 marks, in a very, very volatile marketplace,
3 they were not reflective of -- I believe the
4 last date for the BoNY's was a few days before
5 the acquisition -- they were not reflective of
6 for more illiquid assets of the data that we
7 were seeing.
8    Q.   So you rejected all the BoNY values?
9    A.   It was used as a last resort.
10   Q.   What was the criteria that you used to
11 determine that the BoNY marks were the last
12 resort?
13   A.   Well, upon initial review, we found
14 some discrepancies where we didn't think the
15 BoNY valuations were strong.  The BoNY
16 valuations were most likely derived strictly
17 from third-party data and it was outdated
18 third-party data, vendor data.
19       If -- I have not worked at BoNY or
20 with BoNY to have a deep understanding of how
21 their prices are attributed, but it was
22 determined instead of doing a full-on analysis
23 of what was wrong with BoNY, it's best to start
24 fresh and perform an independent valuation and
25 just step aside and only use BoNY pricing when

Page 50

Teague

1
2  and if no other pricing was available.
3      Q.   So that was the rule, that you would
4  only use BoNY when no other pricing was
5  available?
6      A.   Essentially, yes, that was the
7  hierarchy.  We tried to perform independent
8  valuations, and when we couldn't find other
9  pricing, we used the BoNY prices.
10     Q.   So anytime I go through the
11 acquisition balance sheet and see a BoNY price
12 used by Barclays, what you're telling me is that
13 means that you have satisfied yourself that
14 there are no other sources of pricing available
15 for that security and that's why you used the
16 BoNY price?
17     A.   To the best of my knowledge, yes.
18     Q.   Do you know whether other people on
19 your team used the same hierarchy or approach to
20 using or not using BoNY prices?
21     A.   That was the overall view for, to
22 clarify, for any assets such as securitized
23 products where there may not have been
24 third-party vendor data, i.e., CDOs or ABS
25 products, the BoNY prices would have just been

Page 51

Teague

1
2  thrown out even if there is no other price data
3  available and independent analysis would have
4  been performed using research data.
5      Q.   So, in some cases where there was no
6  other price data available, you would not have
7  used BoNY, right?
8      A.   For illiquid assets, BoNY would not be
9  reliable.
10     Q.   But where BoNY was used, you used it
11 because there was no other data available?
12     A.   Correct.
13     Q.   Sir, I've handed you a document marked
14 as Deposition Exhibit 83B.
15     A.   Uh-huh.
16     Q.   It's a cover e-mail and has some
17 spreadsheet pages attached to it.  Take a moment
18 to review it.  Let me know when you're done.
19         (Document review.)
20     A.   Okay.
21     Q.   You'll see the front page of this
22 exhibit is an e-mail from Stephen Sell to
23 various people.  Do you see that?
24     A.   Yes.
25     Q.   Do you know Mr. Sell?

Page 52

Teague

1
2      A.   Yes.
3      Q.   And where does he fit into the
4  Barclays structure?
5      A.   I believe at the time he was COO for
6  Stephen King.
7      Q.   So, again, I'm just trying to figure
8  out where people fit in the structure.  Is he a
9  trader?
10     A.   No, he would be the business manager,
11 in a sense, for Stephen King's desk.
12     Q.   And you'll see his e-mail is sent
13 Sunday, September 21, do you see that?
14     A.   Yes.
15     Q.   And the e-mail is CC'd to people like
16 Marcus Morton, James Walker, Stephen King and
17 others.  Do you see that?
18     A.   Yes.
19     Q.   In his e-mail, Steve Sell states, "I
20 have received agreement/consensus from Stephen
21 King and James Walker.  We should progress down
22 the following path," and he sets out some bullet
23 points, do you see that?
24     A.   Yes.
25     Q.   Do you have an understanding or

Page 53

Teague

1
2  knowledge about what this agreement or consensus
3  was that Mr. Sell was referring to in his
4  e-mail?
5      A.   Is my name on this?
6         MR. HUME:  Objection.  Lacks
7  foundation.
8      A.   Is my --
9      Q.   I didn't hear what you said.
10     A.   Apologies.  Is my name on this e-mail?
11     Q.   Your name is not on this e-mail, no.
12     A.   Yeah, I've never seen this e-mail.  So
13 what was the question again?
14     Q.   Do you have an understanding or
15 knowledge about what this agreement or consensus
16 was that Mr. Sell was referring to in his
17 e-mail?
18     A.   No.  From reading the e-mail, I
19 believe it looks as though they're talking about
20 how to book these assets onto Barclays' system.
21     Q.   And in your view or your
22 understanding, booking the phrase "onto the
23 system" is different from doing an independent
24 valuation of those trades; is that right?
25     A.   That's correct.

14 (Pages 50 to 53)

```
 1                Teague
 2        Q.   And your understanding was there was a
 3   two-stage process:  The trades were booked into
 4   Barclays, and then you and your team went about
 5   ascribing a value to those transactions or
 6   trades; is that right?
 7        A.   Yes.
 8        Q.   So, going to his bullet points on his
 9   e-mail where he says, "We should book all
10   positions from the Lehman financing facility to
11   BCI," he's got a parenthetical there, was that
12   done?  Were all trades booked to BCI?
13             MR. HUME:  Objection.  Lacks
14   foundation.
15        A.   Again, I was looking at it more from
16   an independent valuation perspective.  I can't
17   speak to the -- how the accounting was
18   originally performed and how the booking was
19   handled by Operations.
20        Q.   The next bullet point says, "We should
21   book based on the price within the BoNY file, at
22   least for day one."  Do you see that?
23        A.   Yes.
24        Q.   Do you know whether that was done?
25             MR. HUME:  Objection.  Lacks
```

```
 1                Teague
 2   foundation.
 3        A.   Again, I wasn't -- it was outside of
 4   my role.
 5        Q.   So you don't know whether it was done
 6   or wasn't done?
 7        A.   Correct.  I couldn't -- couldn't
 8   opine.
 9        Q.   Were you involved at all in the
10   process or the decision as to how the securities
11   that were being taken on as part of the Lehman
12   acquisition, how those would be allocated or
13   placed with different trading desks?
14        A.   It was placed, from a very, very high
15   level, it was placed as a means to whatever
16   systems were managed by whatever trading desks
17   could handle these assets.  So you wouldn't book
18   it to a trading desk where they were unable to
19   properly book those assets, which is why it was
20   split between different trading desks.
21             So Stephen King oversaw the, you know,
22   what came on the balance sheet, but because we
23   don't have one system to handle all products, it
24   was booked to different areas.
25        Q.   So, taking Mr. King as an example,
```

```
 1                Teague
 2   what types of assets would have been booked to
 3   his trading desk?
 4        A.   The structured or securitized
 5   products.
 6        Q.   Including mortgage products?
 7        A.   I can't say if it was all underneath
 8   him or not, but yes.
 9        Q.   So securitized and structured products
10   would be placed with Mr. King?
11        A.   Again, speaking very high level,
12   that's how it would work.
13        Q.   And when those transactions or trades
14   were allocated to Mr. King's desk, they would be
15   allocated at a certain value, correct?
16        A.   Again, whatever price they used to put
17   it onto the systems was just a function of
18   bringing it onto the systems.
19        Q.   Once they were onto the systems, at
20   some point, either subsequent days and weeks,
21   you and your team would go -- did go through and
22   revalue those securities; is that right?
23        A.   For the purposes of opening balance
24   sheet, correct.
25        Q.   Again, I just want to understand the
```

```
 1                Teague
 2   mechanics of this process.  Say a security had
 3   been taken onto Mr. King's books at $100, and
 4   you came by two weeks later and said, well, that
 5   should really only be $90, what impact would
 6   that adjustment of valuation of that security
 7   have on Mr. King's P&L, if any?
 8             MR. HUME:  Objection.  Lacks
 9   foundation.
10        A.   You would have to talk to the Product
11   Control area to go into the nuances of how the
12   accounting aspects were performed.  I'm really
13   not privy to the specifics of that because it
14   was more so done on a portfolio, the overall
15   valuation, so that was most likely not how the
16   prices were updated in the system, as you're
17   suggesting.
18        Q.   I don't understand, I guess, the
19   answer.
20        A.   It would be most likely a portfolio
21   adjustment.  We wouldn't go CUSIP-by-CUSIP and
22   change prices in the system.
23        Q.   Okay.  Just so --
24        A.   Because time moves on.
25        Q.   Right.
```

Page 58

Teague

1
2   A.   So a price today will not be the price
3   tomorrow.  So I wouldn't -- by the time the
4   analysis was done, it would not be a number that
5   would then be ascribed to a position for a
6   previous date.  So, after that point in time, it
7   would be a desk's responsibility to mark that
8   position on a going forward basis to ensure it's
9   in line with the market, and any adjustment
10  would be what would, you know, would be on a
11  portfolio basis against all of the assets.
12  Q.   If you can just stick with the
13  example.  Assume there's a security that's been
14  allocated or transferred to Mr. King's desk at
15  100, initially.  It's now on the systems of
16  Barclays at 100.
17  A.   Yes.
18  Q.   Correct?  Two weeks later, you come
19  through and say, well, it shouldn't have been
20  put on at 100, the right value as of the right
21  measurement date was actually 90.
22  A.   Yes.
23  Q.   In that example, would there be any
24  impact, forget about the specific impact, would
25  there be any impact on the P&L for Mr. King's

Page 59

Teague

1
2   trading desk?
3           MR. HUME:  Objection.  Lacks
4   foundation.
5   A.   From a more high-level perspective, it
6   would be more so, taking it from 9/22 to 12/31,
7   it would be at whatever value we attributed to
8   the portfolio for 9/22 and the value at to say
9   year-end, you could just look at the difference
10  between the portfolio value.  Again, I don't
11  think trying to bring it to the security level
12  value probably reflects the way any P&L would
13  have been performed.
14  Q.   Maybe to simplify it, assume that the
15  only security that was transferred to Mr. King's
16  desk was the one security with $100 value,
17  initially.  You came by later and said, well
18  that should have been 90, not 100, and at the
19  end of the year, at 12/31, when you do your
20  valuation for that security again for year-end
21  purposes, you say it's got a value of 120.
22          Just looking at that security, based
23  on your valuations, there's been a $30
24  appreciation in the value of that security.
25  Based on the initial $100 valuation of that

Page 60

Teague

1
2   security, there's only been a $20 appreciation
3   in that security.  Which value would be used by
4   Mr. King's desk for their P&L purpose, 20 or 30?
5   A.   Whatever price we attributed is the
6   opening price.  The price that the desk
7   attributed for year-end would essentially be the
8   closing price, and any analysis on that price
9   would be performed by Independent Valuations at
10  year-end; and if we thought that price was out
11  of line, we would raise it to senior management
12  to ensure adjustments were made to that price.
13          So, just in short, opening price would
14  be determined within the Valuations, and the
15  price at year-end would be determined by the
16  desk, and that's essentially how the P&L aspect
17  would work, would be IVC assign a price for the
18  opening balance sheet, and from that date
19  forward, it would be the desk's responsibility
20  to mark and manage the positions within the
21  portfolio.
22  Q.   Let's take a concrete example.  Let's
23  look at the Giants Stadium Bonds.  For
24  acquisition balance sheet purposes, you assign
25  values of $10 or $40 per hundred for those

Page 61

Teague

1
2   securities, correct?
3   A.   We used the prices that were
4   provided --
5   Q.   By BoNY?
6   A.   -- from BoNY.
7   Q.   So that's an example where you used
8   BoNY because you had nothing else?
9   A.   That's correct.
10  Q.   All right.  So let's use that example.
11          Independent Valuation Group says the
12  Giants Bonds as of the acquisition date are
13  worth either $10 per hundred or $40 per hundred,
14  correct?  Right?
15  A.   Correct.
16  Q.   That's what you did?
17  A.   Yes.
18  Q.   Right?  And the Giants Bonds by 12/31
19  had been valued by Barclays at 100 cents on the
20  collar, correct?
21  A.   That's correct.
22  Q.   So on those valuations of those Giants
23  Bonds, the difference from $10 per hundred to
24  $100 per hundred would be a gain on that
25  position for whatever desk held those Giants

Teague

1
2 Stadium Bonds, correct?
3     A.   That's correct.
4     Q.   And the same for the Giants Stadium
5 bonds that were valued by the Independent
6 Valuation Group at 40, and at 12/31 or by 12/31
7 were marked up to hundred percent.  There would
8 be a gain from the 40 per hundred to a hundred
9 per hundred, correct?
10     A.   That's correct.  Market conditions had
11 changed over that time period.
12     Q.   Is that what happened with Giants
13 Stadium, the market conditions change?
14     A.   A combination of market conditions and
15 legal aspects of the Giants themselves, of the
16 auction rate notes themselves.
17     Q.   What happened?
18     A.   As of the acquisition, using the
19 dataset that we knew at the time of the
20 acquisition, we were looking at a handful of
21 auction rate notes which had not been brought to
22 auction since March of 2008.  The last time one
23 was brought to auction in March of 2008, it had
24 failed auction, and it would appear Lehman made
25 no attempt to bring them to auction again.  And

Teague

1
2 at such time of the acquisition, there was still
3 no means to value these, as they had not been
4 auctioned at that point in time for six months,
5 and a full process would have to be put in place
6 for the firm to be able to bring them to auction
7 and we had no knowledge if these would fail
8 auction again as they had failed auction the
9 last time they were brought.
10     Q.   Had the Giants been paying a default
11 rate of interest on the bonds as of the
12 acquisition date?
13     A.   Yes.
14     Q.   So the auction that had failed back in
15 March of 2008 had resulted in a default rate
16 being applied, correct?
17     A.   That specific default rate for the
18 asset that had failed auction was I believe
19 approximately 22 percent.  As Lehman never
20 brought it to auction again, it was paying
21 somewhere in the neighborhood of Libor plus 25
22 or Libor plus 50 after that.
23     Q.   Other than looking to see whether
24 there had been failed auctions or no auctions,
25 did you do any other analysis to determine what

Teague

1
2 value should be ascribed to the Giants Stadium
3 Bonds as of the acquisition date?
4     A.   The reinsurer that wrapped the
5 Barclays -- the Barclays positions, the Giants
6 notes were being held by a double C I believe
7 rated reinsurance.  Due to that fact, you could
8 not compare those to any other assets that would
9 be out there and wrapped by a much better
10 reinsurance firm, and munis do not trade
11 actively without a strong wrap in that market
12 for auction rate notes.  So, again, it brought
13 into question if -- if these would actually
14 succeed if brought back to auction.
15     Q.   You said munis do not trade actively.
16 Do you consider the Giants Stadium issuance to
17 be a muni issuance?
18     A.   It's an auction rate note, in
19 actuality.  But auction rates notes had been
20 having issues since October of 2007, and the
21 market completely shut down for auction rate
22 notes in March 2008.
23         So we had really limited -- there was
24 actually no data from March on, and just as
25 an -- as a product group, auction rate notes

Teague

1
2 were limping along for over a year at that point
3 in time.
4     Q.   Was it the case that any other auction
5 rate securities held by Barclays were marked at
6 10 cents on the dollar or 40 cents on the
7 dollar, was that the case?
8     A.   I don't recollect without having the
9 dataset in front of me, but any auction rate
10 notes in this situation were marked to BoNY
11 because we had no other available data, and
12 doing a cursory analysis, there was limited
13 information to, you know, to price it in any
14 other way.
15     Q.   That's what I'm trying to figure out.
16 Was your analysis detailed or cursory when you
17 ascribed a value to the Giants Stadium Bonds for
18 purposes of the acquisition balance sheet?
19         MR. HUME:  Objection.  Vague and
20 ambiguous.
21     Q.   Your word, "cursory."  What do you
22 mean by "cursory"?
23     A.   The overall view of the book was that
24 if we didn't have a price, then we would ascribe
25 the price provided by BoNY.

Page 66

Teague

1
2    I had not performed a large amount of
3  auction rate note analysis in the past because
4  we as a firm did not have an auction rate desk
5  like Lehman had.  We were not bringing positions
6  to market.
7         At that point in time, there was the
8  issue of breaking the dollar, as they stated,
9  where some firms were having issues,
10 specifically, money market funds, because their
11 assets had been worth less than a dollar, so
12 there was no auction rate market.
13        Looking at it from that perspective,
14 and here is an asset that hadn't traded for six
15 months, we put our, you know, our understanding
16 was, well, if BoNY was able to ascribe a price
17 to this, they, you know, must have additional
18 detailed information, so let's work with the
19 BoNY price because we have no other market data
20 out there, there's no, again, for an asset that
21 hasn't traded in six months, you're not going to
22 have additional market data to ascribe to it
23 directly from the marketplace.
24    Q.   Just so I understand your answer, you
25 guessed that BoNY may have had some additional

Page 67

Teague

1
2  information about these securities and that's
3  why you felt comfortable taking the BoNY price;
4  is that right?
5         MR. HUME:  Objection to the form.
6    A.   I can't speak to how BoNY performed
7  any of their valuations.
8    Q.   You have no idea, right?  You had no
9  idea whether they had any special insights into
10 this security versus any of the others?
11   A.   No, I would not have known how
12 specific -- any of the specifics of any of the
13 BoNY valuations.
14   Q.   And in general, you thought that their
15 valuations were riddled with stale information,
16 improper third-party marks, all sorts of
17 problems?
18   A.   Which is why we used them as the
19 last -- that was our last resort in the
20 hierarchy.
21   Q.   Going back to the monoline wrapper you
22 talked about --
23   A.   Again, going with no other data
24 available, you have to take what data is
25 available to you.

Page 68

Teague

1
2    Q.   Did you look at values at which other
3  corporate auction rate securities had been
4  trading, if they had traded in the past week, in
5  the past month?
6    A.   That's illogical.  Why would you take
7  an asset --
8    Q.   Did you do that?  I understand you
9  think it's illogical.  Did you do that?
10   A.   It's illogical.
11   Q.   So you didn't do it?
12   A.   If you were going to look at something
13 that was selling versus something that's not
14 selling, it doesn't work.
15   Q.   So you didn't do it?
16   A.   No.  Nothing with a double C was about
17 to trade on the street.  If I were to do that, I
18 would be looking at something that's triple A.
19 That would not reflect these assets.
20   Q.   What was the credit rating for the
21 Giants -- the issuer itself?
22   A.   That I do not recollect.
23   Q.   Had there been any default on the
24 payment of any interest by the Giants Stadium
25 issuing authority that had issued the bonds?

Page 69

Teague

1
2  Had they failed to make interest payments?
3    A.   Not that I'm aware.
4    Q.   As far as you know, at any point had
5  the Giants Stadium issuer failed to make
6  interest payments on any of these bonds?
7    A.   Not that I'm aware of.
8    Q.   The wrap, the monoline --
9    A.   There would have been no reason for
10 them to at that point as well because the rates
11 were set artificially low by Lehman if they were
12 not bringing it to market.  So if you were not
13 paying the market rate, then there was limited
14 reason for you to not pay your coupon.  If we
15 were to bring it back to auction, it's very
16 difficult to say if that would be the same
17 scenario.
18   Q.   Well, when you did bring it back to
19 auction, did the Giants default on the interest
20 obligations?
21   A.   No, they did not.
22   Q.   And when you brought it back to
23 auction, the rate was what, 16 percent?
24   A.   Yes, it was 16, 17 percent.
25   Q.   And they paid that?

18  (Pages 66 to 69)

Page 70

Teague

1
2     A.    Yes.
3     Q.    As part of trying to do whatever
4   analysis you did on the Giants Stadium Bonds
5   when you got them for acquisition balance sheet
6   purposes, did you talk to any of the Lehman
7   traders that had traded auction rate securities?
8     A.    No, I did not.
9     Q.    Did none of them come over to
10  Barclays?
11    A.    I couldn't speak to that.
12    Q.    You don't know one way or the other?
13    A.    No.  If -- I mean, in all honesty, I
14  think many traders came over at first, and I
15  don't know if they ended up staying, so I
16  couldn't speak to that.
17    Q.    Did you look to see how Lehman had
18  marked the Giants Stadium Bonds on Lehman's
19  books?
20    A.    I honestly would imagine they marked
21  everything to par, which wouldn't probably make
22  any sense if nothing was passing, but no I did
23  not.
24    Q.    You didn't check to see?
25    A.    No.

Page 71

Teague

1
2     Q.    When you say you imagined they marked
3   everything to par, you're just guessing?
4     A.    I'm just guessing because I think
5   there was a small issue in the marketplace at
6   that point in time where there was potential
7   issues where, you know, there was no market
8   color.
9         MR. HUME:  Jay, would now be a good
10  time for a break?
11        MR. TAMBE:  If you could just wait for
12  five or ten minutes.  I'm going on to
13  another document on Giants Stadium.  Is that
14  okay with you?
15        THE WITNESS:  Sure.
16        (Deposition Exhibit 864, a document
17  bearing Bates Nos. PwC-BarCap00046054
18  through 056, marked for identification, as
19  of this date.)
20    Q.    Sir, I have handed you a three-page
21  document.  It's an e-mail chain that's been
22  marked as Exhibit 864.  If you take a moment to
23  review this e-mail chain.  Let me know when
24  you're done.  My question at least for this pass
25  through are going to be limited to the Giants

Page 72

Teague

1
2   Stadium issue.  We'll come back and talk about
3   the Pine issue, which is also in this e-mail
4   traffic.
5         (Document review.)
6     A.    Okay.  I'm done.
7     Q.    This e-mail chain begins, the oldest
8   e-mail I believe is on the third page of this
9   exhibit.  It's from Paul Cobson to you.  Do you
10  see that?
11    A.    Yes.
12    Q.    And who is Mr. Copson?
13    A.    Mr. Copson is the head of Product
14  Control for Barclays Capital.
15    Q.    So, again, in terms of hierarchy?
16    A.    He reports in to Patrick Clackson.
17    Q.    So it's Marcus Morton to Copson to --
18    A.    At that point in time, it was Marcus
19  Morton in to James Walker.
20    Q.    Okay.
21    A.    And James Walker in New York would
22  have reported in to -- I'm not quite sure.  It
23  was either Paul Copson or directly in to Patrick
24  Clackson.  I think it was in to Paul Copson.  So
25  the --

Page 73

Teague

1
2     Q.    Marcus to Walker to Copson?
3     A.    Correct.
4     Q.    Sean to Marcus?
5     A.    Correct.
6     Q.    And on up the chain.  Okay.
7         So the boss had some questions about
8   the markups in the Giants Stadium, correct?
9     A.    Correct.
10    Q.    And you provide your analysis, you
11  provide an answer on the second page, and then
12  some more detail in the first and second page.
13        When you were providing this
14  explanation to Mr. Copson, you were trying to be
15  complete and accurate, correct?
16    A.    Correct.
17    Q.    And you believed you were complete and
18  accurate in describing the reasons and the
19  rationale for why you had marked the Giants
20  Stadium bonds the way you had and then why they
21  was subsequently marked up, correct?
22    A.    Correct.
23        MR. HUME:  Objection.  Vague and
24  ambiguous.
25    Q.    Was it your understanding that this

Page 74

Teague

1    Teague
2  information that you were providing Mr. Copson
3  was going to be provided to outside auditors for
4  the bank as well?
5    A.   At that moment, no.
6    Q.   Other than this e-mail traffic, did
7  you have any face-to-face meetings or telephonic
8  discussions with Mr. Copson about the Giants
9  Stadium valuation?
10    A.   Not that I recollect.  I believe this
11  e-mail at the time, he was -- he found it
12  sufficient.
13    Q.   Subsequent to this e-mail traffic, at
14  any point since the time you worked on the
15  acquisition balance sheet, have you had
16  face-to-face or telephonic discussions with Mr.
17  Copson about the Giants Stadium valuation?
18    A.   I kept him aware of any other
19  improvements in the pricing of Giants Stadium.
20    Q.   So my understanding is, subsequent to
21  this e-mail chain, which looks like it's in
22  November of 2008?
23    A.   Yes.
24    Q.   There would have been a further
25  revaluation or marking up of the Giants Stadium

Page 75

Teague

1    Teague
2  bonds before year-end, correct?
3    A.   As course of regular action, we were
4  price-testing the portfolio at month-end as well
5  as the opening balance sheet.  So, yes, through
6  the month-end independent price testing, we were
7  also reviewing where the desks were marked and
8  where we thought assets were marked for this
9  portfolio.
10    Q.   So for the Giants Stadium bonds in
11  particular, by the end of the year, those marks
12  were at 100 percent?
13    A.   That's correct.
14    Q.   And you would have kept Mr. Copson
15  advised of that?
16    A.   Yes, I would have sent him e-mails as
17  far as improvements in the pricing of Giants.
18    Q.   Other than Giants Stadium bonds and
19  the Pine CLO that's referenced in this e-mail
20  chain, were there any other particular positions
21  that you had e-mail traffic with Mr. Copson on?
22    A.   Not that I recollect.
23    Q.   And other than specific e-mails on
24  Pine and Giants Stadium, were you providing any
25  general reports to Mr. Copson via e-mail about

Page 76

Teague

1    Teague
2  price improvements in the portfolio?
3    A.   Upon request, if he had any specific,
4  I don't know, CUSIP level questions or anything
5  of that nature, then I would reply, but there
6  was nothing, there was nothing formalized.
7    MR. TAMBE:  Let's take a break now.
8    (Recess; Time Noted:  11:12 A.M.)
9    (Time Noted:  11:34 A.M.)
10  BY MR. TAMBE:
11    Q.   Mr. Teague, I want to go back to the
12  desk allocation issue just to understand a few
13  of the mechanics a little bit more.
14      Ordinarily when a desk acquired a
15  security through a transaction, they would have
16  to take money out of one of their accounts or
17  their funds and go buy the security, correct?
18    A.   Yes.
19    Q.   In this case, did the desks have to
20  buy the securities that were being allocated to
21  them?
22    A.   I couldn't speak to that aspect of it.
23  I was just looking at the valuations of the
24  underlying assets.
25    Q.   Were there any type of charges

Page 77

Teague

1    Teague
2  assessed to the desks when they were allocated
3  securities?
4    A.   Again, I only focused on the valuation
5  of the assets to determine market value.  I
6  couldn't speak to the, you know, that aspect of
7  the deal.
8    Q.   So you know nothing about it?
9    A.   No.  That would be more of a P&L
10  question.  If you spoke with the Product
11  Control, not IVC, Product Control could provide
12  you more clarity.
13    Q.   Who should I speak to to get clarity
14  on that issue?
15    MR. HUME:  The answer should be given
16  without prejudice to the fact that discovery
17  is over.  A hypothetical question.
18    A.   Yeah, I guess the individual who is no
19  longer with the firm who oversaw the specifics
20  of the Product Control would have been Tom --
21    Q.   McCosker?
22    A.   Yes.  Thanks.
23    Q.   Do you know where Tom is?
24    A.   C12.
25    Q.   What's C12?

Page 78

Teague

1
2    A.    It's a -- he's still --
3    Q.    It's not sub-basement 12 or something
4    like that?
5    A.    No, he's with Stephen King.
6    Q.    Oh, okay.
7    A.    A separate hedge fund.
8    Q.    All right.
9    A.    Carbon.
10    Q.    Do you have any understanding as to
11    any capital charges that are assessed to the
12    desks against positions that they're holding?
13    MR. HUME:  Objection.  Asked and
14    answered.
15    A.    That's outside of my scope.
16    Q.    Once securities were allocated to
17    particular trading desks following the
18    acquisition, you do understand that there would
19    be in certain situations capital charges that
20    would be assessed to desks for the regulatory
21    capital that the bank has to carry against those
22    assets; is that right?
23    A.    Yes.  Conceptually, yes, that's how it
24    works.
25    Q.    And the charges that are assessed

Page 79

Teague

1
2    against the desks would be driven in part by the
3    values at which those securities are being
4    carried on the books of Barclays, correct?
5    A.    Yes.
6    Q.    And the value that's used for those
7    capital charge purposes is the value that is
8    derived by your group, not by the traders,
9    correct?
10    A.    Sorry, you're saying as of day one or
11    as of day two?
12    Q.    As soon as you have done your
13    valuation, as soon as you completed your
14    valuation.
15    A.    I don't believe -- I can't speak
16    freely to that, but I believe, you know, as the
17    world keeps moving forward, again, I don't think
18    anyone after the day of the acquisition would be
19    looking at the opening balance sheet price.  It
20    would be wherever the desk is marking it, so
21    it's really the desk price.
22    Q.    And at month-end when you come in and
23    do an independent valuation on the desk prices,
24    those levels would be adjusted based on what
25    your view was of an independent valuation of

Page 80

Teague

1
2    those positions, correct?
3    A.    So if we found a potential issue with
4    a mark at month-end, if it's done and if we --
5    if we perform a remark within the first just say
6    four business days of the month, that price will
7    be adjusted for month-end.  If for more illiquid
8    assets or assets where we don't have the market
9    data in that short a time period, the remarks
10    will take place within the following month.
11    Q.    Sir, I have handed you a three-page
12    document previously marked as Deposition Exhibit
13    801B.  Take a moment to look at it and let me
14    know when you're done and I'll ask you some
15    questions about it.
16    (Document review.)
17    A.    Okay.
18    Q.    The attachment to this e-mail chain,
19    which is the table that appears on the last page
20    of the exhibit, is it a document that you're
21    familiar with?  Have you seen that before today?
22    A.    I've seen, yes, I remember this
23    e-mail.
24    Q.    And does this e-mail relate to the
25    process you described earlier about the

Page 81

Teague

1
2    reconciliation of what was coming over and where
3    it was being placed?
4    A.    This would be, yes, so from an
5    operational perspective, when Operations would
6    speak to -- the Lehman Operations would be in
7    discussions with Barclays' Operations on what
8    was coming over, and they would make sure
9    nothing was what they call in the industry DKed,
10    where essentially it was kicked back because of
11    any potential issues.  When they were bringing
12    these onboard, Operations needed to make sure
13    they were putting it in the proper placeholders,
14    and in that sense, because there was assets of
15    many different types, they all would not
16    usually land on one trading desk because of
17    systems issues.
18    So this was Phil Nash, who was head of
19    Product Control for the Americas, still is
20    Product Control head of the Americas, was
21    helping coordinate the data for settlement to
22    ensure that the individual Mike Goldstein in the
23    e-mail, as you see on the first page, managed
24    projects for Product Control, and Mike Goldstein
25    was trying to coordinate to ensure the product

21 (Pages 78 to 81)

Page 82

Teague

1
2 controllers update the attached file so it would
3 basically be a means to capture where everything
4 is going to settle, who the contacts are and,
5 you know, what systems it'll be located in by
6 asset class.
7      Q.    The second page of the e-mail at the
8 bottom at the page is from Michael Goldstein to
9 James Walker, Marcus Morton and Phil Nash, do
10 you see that?
11      A.    Yes.
12      Q.    And he's got a few points, enumerated
13 points, do you see that?
14      A.    Yes.
15      Q.    The first point is, "Agreed to have
16 trade date of September 22."  Do you see that?
17      A.    Yes.
18      Q.    Do you have an understanding as to
19 what he was referring to, "Agreed to have trade
20 date of September 22"?  Agreed with whom?
21      A.    I can't -- I can't say with whom.  As
22 far as Mike I think was trying to confirm with
23 management what the proper settlement date
24 should be for the system.
25      Q.    Is it your understanding that there

Page 83

Teague

1
2 was a discussion and agreement internally at
3 Barclays as to what the trade date would be for
4 pricing, valuation, allocation purposes?
5      A.    There was some confusion as to what
6 the trade date would be, as there was a lot of
7 moving pieces going on at that point in time.
8      Q.    And the discussion of the moving
9 pieces you're talking about, those are
10 discussions within Barclays, or are you talking
11 about discussions between Barclays and Lehman?
12      A.    Just in speaking with different
13 managers, I wasn't quite sure what the proper
14 date was.  It was just everyone aligning to
15 what, you know, what date would be the -- the
16 date for the transfer.
17            The assets themselves, there was
18 questions over what was coming over, how much
19 was coming over, what the settlement date was,
20 how to do this.  I mean, as a firm, we had never
21 been through an acquisition of a firm probably
22 four times our size before, so there was quite a
23 few questions that were coming up as -- as the
24 acquisition was taking place.
25      Q.    When you say an acquisition of a firm

Page 84

Teague

1
2 four times your size, what are you comparing,
3 are you comparing Barclays Capital to Lehman
4 Brothers, Inc.?
5      A.    Just Capital, yeah, not all of
6 Barclays.  But, you know, this was a large
7 undertaking.
8      Q.    Because the acquisition was a fraction
9 of the size of Barclays, PLC, correct?
10      A.    Barclays, PLC is much larger than
11 Barclays Capital, yes.
12      Q.    Have you seen updated versions of this
13 spreadsheet, the third page of Exhibit 801B,
14 where the boxes have been filled in?
15      A.    Not that I'm aware.
16      Q.    I've handed you a document previously
17 marked as Deposition Exhibit 808B.  Take a
18 moment to look at these three pages.  Let me
19 know when you're done.  I'll ask you some
20 questions.
21            (Document review.)
22      A.    Okay.
23      Q.    If you look at the e-mail chain, it
24 starts on the third page with an e-mail dated
25 Monday, September 15.  Do you see that?

Page 85

Teague

1
2      A.    Uh-huh.
3      Q.    And the most recent e-mail is on the
4 first page dated September 23.  See that?
5      A.    Yes.
6      Q.    Going to the oldest e-mail, the last
7 page, it's the e-mail from Paul Copson to
8 several people and he's inquiring about
9 additional price testing procedures.  Do you see
10 that?
11      A.    Yes.
12      Q.    And you understand that e-mail to be
13 independent of the Lehman acquisition; this is
14 just -- that was an e-mail that you sent in
15 light of market conditions; is that right?
16      A.    Correct.  This is in light of
17 potential, yeah, disruption in the markets.
18      Q.    And then on the 15th itself, you
19 respond to Copson, Morton, Nash and others about
20 price testing procedures, correct?
21      A.    Yes, so what we were -- I believe at
22 this point in time it was expected anytime --
23 anytime a potential bankruptcy is expected, be
24 it Lehman, be it Bear Stearns, be it WaMu, what
25 we do is this analysis to clarify was on any

Page 86

Teague

1 derivatives transactions that we have.
2        So we didn't do a specific to Lehman
3 in this analysis.  This was an overall analysis
4 of the price testing results as of midmonth to
5 see where we were marked.  So this was not --
6 these results were not specific to Lehman.
7 These were the results of the overall books as
8 of the 15th of September since the markets were
9 entering a free-fall.
10     Q.   And then when you turn to the first
11 page of the exhibit, there's a reference,
12 there's an e-mail from you in the middle of the
13 page with a file embedded it, "Lehman
14 Exposures/Status Tracking," do you see that?
15     A.   Yes.
16     Q.   So, again, these would be -- this is a
17 list of exposures where Lehman is the
18 counterparty to Barclays on transactions; is
19 that what's being captured here?
20     A.   Yes.  So this was to -- this was to
21 determine if, again, in the case of bankruptcy,
22 we do this every time there is a counterparty
23 which is a potential risk of not, you know,
24 paying as far as the -- any derivative

Page 87

Teague

1 transactions that you have if you're going to
2 lose that counterparty and if you do analysis on
3 your overall exposure.
4     Q.   All right.  So this is not related to
5 the valuation of the inventory that came over
6 from Lehman to Barclays as part of the
7 acquisition?
8     A.   Specific to any derivatives we had on
9 the firm that were facing Lehman as a
10 counterparty.
11        (Deposition Exhibit 865, a document
12        bearing Bates Nos. BCI-EX-(S)-00201234
13        through 241, marked for identification, as
14        of this date.)
15     Q.   Sir, I have placed before you a
16 multi-page document marked Exhibit 865.  It's a
17 long e-mail chain.  If you want to take a moment
18 to review it and I'll ask you a few questions
19 about it.
20        (Document review.)
21     A.   Okay.
22     Q.   Starting with the back of the e-mail
23 chain in Exhibit 865, that last e-mail is a
24 Stephen Sell e-mail that we had seen as a

Page 88

Teague

1 stand-alone previously, correct?
2     A.   Yes.
3     Q.   So, moving forward in time from that
4 e-mail, if you'll turn to the page that has at
5 the bottom the last four digits 1238, you there?
6     A.   Yes.
7     Q.   Top of the page there's an e-mail from
8 Stephen Sell, Sunday, September 21, 2008, 9:08
9 P.M.
10     A.   Yes, I see this.
11     Q.   He's providing an update and he's got
12 two bullet points in that e-mail.  Do you see
13 those?
14     A.   Uh-huh.
15     Q.   Yes?
16        You have to answer aloud.
17     A.   Yes, I see this.
18     Q.   In the second bullet point he says,
19 "We have determined we have looks like
20 approximately 3100 securities/CUSIPs not set up
21 within our systems."  Do you see that?
22     A.   Yes.
23     Q.   Do you understand that to mean that
24 out of the total number of CUSIPs that were

Page 89

Teague

1 coming over, there were 3,100 securities and
2 CUSIPs that were not already set up within the
3 Barclays systems?
4     A.   Yes, that's how I interpret that.
5     Q.   So the rest of the securities and
6 CUSIPs had some match on the Barclays system,
7 that is, you already had a position with that
8 CUSIP or security?
9     A.   Not a position.
10     Q.   Okay.
11     A.   The ability to book that asset.  For
12 equities, we were unable to book an asset if we
13 didn't have the proper data in a system for it
14 to understand the asset that was coming on.  So
15 it's not that we were holding these positions.
16     Q.   Was an analysis done of how many
17 positions Barclays was holding that matched up
18 with positions that it was acquiring?
19     A.   I can't speak to that.
20     Q.   Well, when you did your independent
21 valuation of the securities that had come over,
22 and in the case of many securities you made
23 liquidity adjustments and other adjustments to
24 come up with a valuation, did you look to see if

## Page 90

Teague

1
2  Barclays had other similar securities in its
3  inventory that would also need to be valued
4  consistently with the approach you were taking
5  with the Lehman securities?
6      A.   Well, in situations where --
7          Can you ask that question one more
8  time?
9          (Record read.)
10      A.   I did not.  I would not have looked
11  specifically at any securities that we had on
12  where, especially as market-maker, we may have
13  been marking assets to mid.  If we had
14  market-maker status in those situations, that
15  would be different than whatever price you would
16  be acquiring it at.
17          Again, the analysis here was where
18  something -- we were looking at the transaction
19  in that stress marketplace to determine what the
20  market value was.
21      Q.   Well, I need to understand that answer
22  a little better then.  The way the transaction
23  occurred, you hadn't actually -- there hadn't
24  been an auction of these securities in the open
25  market, correct?

## Page 91

Teague

1
2      A.   Correct.
3      Q.   These securities were purchased as
4  part of Barclays stepping into the shoes of the
5  Fed on the Fed repo, correct?
6          MR. HUME:  Objection.  Calls for
7  speculation.
8      Q.   Is that your understanding of how
9  these securities came over?
10      A.   Can you restate the question?
11      Q.   What is your understanding of how
12  these securities came from Lehman to Barclays?
13      A.   In the acquisition of the repo
14  collateral.
15      Q.   And it was repo collateral that had
16  previously been pledged by Lehman to the Fed,
17  correct?
18          MR. HUME:  Objection.  Lacks
19  foundation.
20      A.   Yes, it was the data -- it was the
21  positions held in that DTC account.
22      Q.   As far as you know, there wasn't a
23  CUSIP-by-CUSIP valuation that was done between
24  Barclays and Lehman as part of the sale
25  transaction, where they sat down and said I want

## Page 92

Teague

1
2  to buy this CUSIP for this much and this CUSIP
3  for so much, right?
4      A.   No, not that I'm aware of.
5          MR. HUME:  Objection.  Lacks
6  foundation.
7      Q.   Not that you're aware of?
8      A.   Not that I'm aware of.
9      Q.   So you have to allocate values to the
10  securities that have come over because there
11  wasn't a trading ticket or a confirmation saying
12  Barclays paid X dollars to buy the security,
13  correct?
14      A.   That's correct.
15      Q.   In your valuation process were you
16  effectively trying to recreate, given the market
17  conditions of that week, what the price would
18  have been if there had been an individual
19  transaction on that security?
20      A.   We were trying to reflect the
21  market -- we were reflecting the market bid.  We
22  were looking at it to reflect the market in a
23  stressed scenario, which was the 22nd of
24  September, correct.
25      Q.   So, in doing your valuation, you were

## Page 93

Teague

1
2  trying to capture for those securities the
3  stressful market conditions that existed on the
4  22nd, correct?
5      A.   Trying to mark it to a market bid as
6  of the 22nd of September.
7      Q.   And did you make any adjustments for
8  the size of the positions?
9      A.   The majority of the haircuts were
10  performed on a portfolio level, so I don't --
11  apologies, I don't believe we had any specifics
12  on the CUSIP level.
13      Q.   So you decided to, on a liquidity -- a
14  liquidity adjustment that you would apply to an
15  entire portfolio of similar securities?
16          MR. HUME:  Objection.  Vague and
17  ambiguous.
18      Q.   Is that right?
19      A.   The bid/offer was applied at a product
20  level.
21      Q.   Not an individual CUSIP level?
22          MR. HUME:  Objection.  Vague and
23  ambiguous.
24      A.   No.  For corporates, we priced them
25  slightly differently, where they were to the

Page 94

Teague

1
2  minimum of the available prices available from
3  third-party vendors because we had a larger
4  dataset of information.
5      Q.   And when you did this valuation
6  exercise, you didn't look to see if you had
7  other similar securities already in your
8  inventory that you had valued at the last
9  month-end, August 31, or that the traders had
10  valued during the month of September?
11     A.   No, not that I recollect.
12     Q.   Was there a decision made not to look
13  at that data?
14     A.   Not that I recollect.
15     Q.   Sitting here today do you have any
16  idea as to what percentage or number of the
17  CUSIPs that were acquired through the Lehman
18  acquisition were CUSIPs for which Barclays
19  already had positions preexisting in its
20  inventory?
21     A.   I wouldn't know that information.
22     Q.   And then by dollar value of the
23  securities, do you have that information?
24     A.   No, I wouldn't know that information.
25     Q.   Not something you have looked at all?

Page 95

Teague

1
2      A.   Not that I'm aware of.
3      Q.   There were instances with some of
4  these securities where you took a mid price and
5  you made a mid to bid adjustment by applying a
6  liquidity discount or a liquidity factor of some
7  type, correct?
8      A.   That's correct.
9      Q.   Once you had determined what the
10  appropriate liquidity factor should be for that
11  product type, did you make any effort to apply a
12  similar liquidity factor to other securities of
13  a similar type that were in the Barclays
14  inventory?
15     A.   Independent valuations was performed
16  at month-end.  We didn't do an independent
17  valuation of the Barclays books as of September
18  22.  This analysis was done for a specific date
19  underneath specific market conditions.
20     Q.   September 30 was month-end, correct?
21     A.   That's correct.
22     Q.   When you did the independent valuation
23  for the entire Barclays inventory, both the
24  Lehman-acquired inventory and the preexisting
25  Barclays inventory, did you apply a similar

Page 96

Teague

1
2  methodology to do a liquidity adjustment
3  product-type-by-product-type?
4      A.   No, we did not perform that analysis.
5  The dataset at that point in time was being
6  marked to bid by the desks as opposed to taking
7  in mid marks from vendor pricing, so the desk
8  would be marking to bid.
9          We would be looking at our own
10  independent analysis of where the desk is
11  marking to bid, and if deemed appropriate, we
12  would take remarks.  By the 30th, the market had
13  started functioning again.  It was hard to say
14  if it was fully functioning, but as of the 22nd
15  of September, the market was essentially frozen,
16  as the Dow had dropped I believe something like
17  800 points that day.
18     Q.   On the 22nd?
19     A.   Yes, something on or around the 22nd
20  was a, quite a large market dislocation day,
21  versus September 30, where there was more
22  information from just say the government was now
23  considering to help support the markets.  As of
24  that date, it was just basically essentially a
25  market free-fall.

Page 97

Teague

1
2      Q.   The market free-fall on the 22nd, did
3  that get captured in the end-of-day pricing for
4  the 22nd?
5      A.   I guess it depends on the asset type.
6  Some assets may have improved as a flight to
7  safety.  Other assets may have gone down.  Very
8  illiquid assets would probably not have been
9  dramatically affected, as they were already very
10  illiquid assets.
11     Q.   So but pricing securities at the end
12  of day on the 22nd would capture whatever effect
13  market movements on the 22nd during the day on
14  the 22nd had on the various markets, correct?
15     A.   Again, but it depends on the asset
16  type.  So it can go in either direction.
17     Q.   You just described as a day of huge
18  dislocation and free-fall.  So there were asset
19  classes that were negatively impacted by price
20  movements on the 22nd, correct?
21     A.   Yes.
22     Q.   But there were others that were
23  positively impacted?
24     A.   Potentially, yes.
25     Q.   In all of the analyses that you have

25  (Pages 94 to 97)

Page 98

Teague

1
2    done at Barclays with respect to the Lehman
3    valuation, are you aware of any valuations that
4    were done by Barclays for the open of business
5    on the 22nd as opposed to the end-of-day on the
6    22nd?
7        A.   No, I am not aware of any, any attempt
8    to perform analysis for open.
9        Q.   As part of the independent valuation
10   work that you did, there were certain values
11   that you and your team arrived at based on
12   end-of-the-day 22nd values, correct?
13       A.   Yes.
14       Q.   There were other values that you
15   arrived at based on September 30 values,
16   correct?
17       A.   Yes.
18       Q.   And where you used September 30
19   values, that would -- your valuation would
20   incorporate movements in the price of a security
21   in the functioning of the markets between the
22   22nd and the 30th, correct?
23       MR. HUME:  Objection.  Vague and
24   ambiguous.
25       A.   I believe any analysis supported by

Page 99

Teague

1
2    PwC of positions valued closer to month-end were
3    for positions where there was essentially no
4    markets whatsoever and the dataset was in order
5    to obtain I guess additional pricing discovery,
6    if any.
7        Q.   Well --
8        A.   I believe, I mean, you can tell me, I
9    mean, what asset classes was it again?
10       Q.   Any asset classes.  I know there's
11   some asset classes, I don't have them memorized,
12   where -- you do know that there were some asset
13   classes that were priced as of 30th of
14   September, correct?
15       MR. HUME:  You mean on the final
16   acquisition balance sheet?  I don't think
17   the question is clear.
18       Q.   On the final acquisition balance
19   sheet, yes.
20       A.   Yes, I would have to look at the -- I
21   would have to look at the asset classes.  It
22   was -- it is broken out in -- I did send out a
23   memo discussing the valuations of the opening
24   balance sheet.  I would have to review that to
25   see and speak to that.

Page 100

Teague

1
2        Q.   And other than the end of day 22nd,
3    September 30th, there was also a set of
4    securities that were acquired by Barclays in
5    connection with the Lehman acquisition that were
6    valued as of December 22, correct?
7        A.   Yes.
8        Q.   Other than those data points, are
9    there any other data points -- date points that
10   were used for valuation purposes for the opening
11   day acquisition balance sheet?
12       A.   Initial analysis for munis were
13   performed as of the, I believe the 19th as,
14   again, going back to there was confusion over
15   what was the proper date to perform the
16   analysis, and in the end, it was determined and
17   agreed that it would have immaterial effect on
18   the overall valuation results.
19           PwC opined that they didn't really
20   consider it affecting the pricing, as there
21   hadn't been really an active market between the
22   two dates.
23       Q.   On all securities or just the munis?
24       A.   On the munis, as that had been
25   performed as of the 19th, that analysis.

Page 101

Teague

1
2        Q.   Was it PwC that told Barclays as of
3    what date to value these securities or was it
4    Barclays telling PwC what its views were as to
5    when these things should be valued?
6        MR. HUME:  Objection.  Lack of
7    foundation.
8        A.   Any decisions of that nature were
9    outside of anything I was involved in.  I mean,
10   to be honest, I'm sure you have a chain of
11   e-mails, I didn't quite know what date at first.
12   There was a lot of uncertainty from my
13   perspective.  And then the final resulting date
14   was the 22nd.
15       Q.   But I'm not saying you made the
16   decision, but given --
17       A.   I understand.
18       Q.   -- where you were in the organization,
19   who made the decision as to what date to pick,
20   PwC or Barclays?
21       MR. HUME:  Objection.  Lacks
22   foundation.
23       A.   Again, I can't state because I
24   wouldn't have been involved in those
25   conversations to be able to speak to who -- who

26 (Pages 98 to 101)

Page 102

Teague

1
2  made the decision and how it was finally
3  determined the 22nd.
4      Q.   You're not saying that PwC directed
5  you to pick the 22nd, are you, sir?
6      A.   I would not say that, no.  I mean, as
7  you can see, there's e-mails where people are
8  stating we should use the 22nd.  Based on that
9  e-mail traffic, I would have used the 22nd.
10     Q.   I've seen e-mail traffic between you
11 and PwC on various issues.  Other than the
12 Lehman acquisition, have you routinely
13 corresponded with PwC on other valuation issues?
14     A.   PwC is the auditor for the firm, so I
15 do deal with PwC for any of the, say,
16 semiannual, annual reporting.
17     Q.   And in connection with the Lehman
18 acquisition, other than the e-mail traffic, were
19 there any face-to-face meetings that you had
20 with anyone from PwC?
21     A.   Yes, I would have walked through some
22 of the analysis performed with members of PwC
23 working for Rob MacGoey at the time.
24     Q.   Who were the key PwC individuals that
25 you had sit-down meetings with?

Page 103

Teague

1
2      A.   I can't recollect their name, but one
3  of Rob MacGoey's directs was assigned as one of
4  the go-to's that I dealt with.
5      Q.   Other than that direct report to Rob
6  MacGoey, any other people in particular that
7  were your main points of contact at PwC in
8  connection with the Lehman acquisition account?
9      A.   Postally would probably have been Rob
10 MacGoey.
11     Q.   The announcement of the acquisition
12 accounting was done in February of 2009,
13 correct?
14     A.   I'm not quite sure.  That makes sense.
15     Q.   Just using that roughly as the period
16 in time, have you had any discussions with PwC
17 about the valuation and accounting for the
18 Lehman acquisition anytime since February 2009
19 to the present?
20     A.   Not that I can recollect, no.
21     Q.   Have you spoken with an individual by
22 the name of Professor Pfleiderer?
23     A.   I believe there's been -- apologies.
24 One moment.  He's the -- can you refresh me as
25 to who he is?  I know he's done the -- I know he

Page 104

Teague

1
2  was a part of the depositions, correct?
3      Q.   Well, you tell me.  What does that
4  name mean to you?
5      A.   I'm trying to think.  If I've had --
6  I've had -- I believe there's been e-mails
7  involving the professor.  I just don't think
8  I've ever had any -- much in the way of
9  conversation with him.
10     Q.   Do you remember as you sit here today
11 a single conversation with Professor Pfleiderer?
12         THE WITNESS:  Can we take a break?
13     Q.   No, it's not a good time to take a
14 break.  I would like you to answer the question.
15     A.   If anything, it's just me trying to
16 piece it all together.  I may have been on calls
17 with the professor, but I think any
18 conversations have been more -- if there was any
19 e-mail traffic where he may have been in the
20 background, but no, I'm not quite sure, to be
21 honest.
22     Q.   Just to get the best of your
23 recollection as you sit here, you don't have a
24 specific recollection of any e-mail traffic with
25 Professor Pfleiderer, do you, sir?

Page 105

Teague

1
2      A.   No, I do not.
3      Q.   And do you have specific recollections
4  of a conversation you've had with Professor
5  Pfleiderer?
6      A.   No, I do not.
7      Q.   The two individuals that are sitting
8  on your side of your table, do you know who they
9  are?
10     A.   Yes.  You mean Marc?
11     Q.   Marc?
12     A.   Yes.  I've had quite a few
13 conversations with Marc.
14     Q.   Okay.  When was the first time you had
15 a conversation with Marc Vellrath?
16     A.   Quite some time ago.  Sometime last
17 year, I take it.
18     Q.   And I take it from your answer you've
19 had face-to-face meetings with Mr. Vellrath?
20     A.   Yes, I've met -- I've discussed and
21 we've -- yes, we've met in the past.
22     Q.   Okay.  And approximately how many
23 meetings have you had with Mr. Vellrath?
24     A.   I couldn't say, to be honest.  Less
25 than a handful.

27 (Pages 102 to 105)

Page 106

Teague

1
2      Q.   Less than six meetings?
3      A.   Yes.  We've been on phone calls, but
4    face-to-face, just handful times.
5      Q.   And have you discussed documents with
6    Mr. Vellrath?
7      A.   Yes.
8      Q.   And you've discussed your analyses and
9    your valuations with Mr. Vellrath?
10     A.   Yes, I've provided replies to requests
11   from the movants or questions that came out of
12   the movants.
13     Q.   I'm not sure I follow the last answer.
14   You provided --
15     A.   Is it the movants?  Is that the
16   proper way to say it?
17         MR. HUME:  Movants.
18     Q.   Movants.
19     A.   Apologies.  To the movants.
20     Q.   So you have looked at documents filed
21   by the movants and you have discussed responses
22   with Mr. Vellrath?
23     A.   Yes.
24     Q.   Have you drafted documents for Mr.
25   Vellrath, answers, descriptions?

Page 107

Teague

1
2      A.   I've given a summary from my
3    perspective of, you know, how I would -- how I
4    saw the question at hand and, you know, if it
5    was relevant at all from my viewpoint.  I think
6    there is, of course, going to be some issues
7    between how we're valuing something or how the
8    movants would be valuing something and help
9    provide additional clarity.
10     Q.   When you provided your responses or
11   input to Mr. Vellrath, did you do that orally or
12   by e-mail?
13     A.   A combination thereof.
14     Q.   So there will be some amount of e-mail
15   traffic where you provided that information?
16     A.   Yes.
17     Q.   Have you drafted any affidavits,
18   declarations, things like that?
19     A.   No.
20     Q.   Have you reviewed drafts of affidavits
21   and declarations?
22     A.   Not that I'm aware of.
23     Q.   Other than Mr. Vellrath, have you
24   spoken with members of his staff that you
25   recall?

Page 108

Teague

1
2      A.   Not that I recall.  Could have been on
3    conference calls, but not that I recall.
4      Q.   And other than Mr. Vellrath and maybe
5    some of his staff who may have been on
6    conference calls, what other people -- were
7    there any other people who attended those
8    conference calls?
9      A.   Just members of the legal team, if at
10   all.
11     Q.   In preparation for your deposition,
12   did you review deposition transcripts provided
13   by anyone else in this case?
14     A.   The only depositions I reviewed were
15   the ones for the movants.
16     Q.   Do you remember any of the names of
17   the people or descriptions of their titles?
18     A.   The professor was one of them.
19     Q.   Professor Pfleiderer?
20     A.   Yes.
21     Q.   He's actually on your side.
22     A.   He's on my side, I know, but I don't
23   think I've ever spoken to him.  And the policies
24   and for the asset classes that I covered, I
25   reviewed the -- you know, the replies from the

Page 109

Teague

1
2    movants on how we performed our analysis.
3      Q.   Did you review depositions or expert
4    reports that were submitted by the movants
5    valuing the securities that your group had
6    valued?
7      A.   Yes.  And I provided replies to those,
8    yes.
9      Q.   When you say you provided replies to
10   those, were those in e-mail form?
11     A.   Combination thereof.  E-mail and phone
12   call.
13         MR. TAMBE:  I don't think any e-mails
14   have been produced authored by this witness
15   on any of those topics, so we would request
16   that those documents be produced.  They
17   would have been called for by our
18   outstanding discovery requests.
19         MR. HUME:  First, I don't think it's
20   called for by your discovery requests, but
21   more importantly, I think it's all work
22   product.
23         MR. TAMBE:  I would disagree on that,
24   but we'll have our request, our request
25   outstanding.

Page 110

Teague

1
2    Q.   Did you meet with Mr. Vellrath to
3  prepare for your deposition?
4    A.   Say again?
5    Q.   Did you meet with Mr. Vellrath to
6  prepare for your deposition?
7    A.   No, I have not.
8    Q.   Now, there were other members of
9  Barclays' PCG group who have been deposed in the
10 last couple of weeks?
11   A.   Yes.
12   Q.   Mr. Landreman.  Mr. Washtell.
13   A.   Yes.
14   Q.   Have you spoken with them about their
15 depositions?
16   A.   Only to the point of they said "good
17 luck."
18   Q.   But you didn't discuss substance,
19 either of what they were going to testify to or
20 had testified to or what you would be testifying
21 to; is that right?
22   A.   No, I hadn't.
23   Q.   In your work on the Lehman acquisition
24 and the reconciliation of the valuation, did you
25 keep any kind of a notebook?

Page 111

Teague

1
2    A.   No.
3    Q.   You don't keep notebooks as part of
4  your day-to-day work at Barclays?
5    A.   No, I mean, if anything, a notebook is
6  just my to-do list.  I don't have anything as
7  far as detailed notes.
8    Q.   Did you look through your file for
9  notes relating to the Lehman acquisition?
10   A.   Essentially, it's, if anything, it was
11 just looking at e-mails if there was anything.
12   Q.   As far as you know, other than your
13 e-mails, you don't have any other notes
14 specifically relating to the Lehman
15 acquisition --
16   A.   No, I do not.
17   Q.   -- or valuation?
18   A.   No, I do not.
19      (Deposition Exhibit 866, a document
20 bearing Bates Nos. LBHI 017959 through 964,
21 with attachment, marked for identification,
22 as of this date.)
23   A.   Is there a specific page?
24   Q.   I have placed before you a document we
25 have marked as 866.  It's an e-mail chain and

Page 112

Teague

1
2  there's a spreadsheet attached to it.  I just
3  want to draw your attention to the e-mail
4  traffic.  You're welcome to look at the
5  spreadsheet as well.  Let me know when you're
6  done.
7      (Document review.)
8    A.   Yes.
9    Q.   Starting with the e-mail chain with
10 your e-mail on the second page of the exhibit,
11 it carries over onto the third page of the
12 exhibit, that's your e-mail to Clement Bernard,
13 do you see that?
14   A.   Yes.
15   Q.   And you are raising with him some of
16 the issues that you had run into into
17 reconciling those eight backup spreadsheets that
18 we discussed earlier, do you see that?
19   A.   Yes.
20   Q.   And Clement asked you to speak with
21 either Kevin Horan or Mike McGarvey, do you see
22 that?
23   A.   Yes.
24   Q.   And then on the first page of the
25 exhibit you provide them with a phone number.

Page 113

Teague

1
2  Did you ever speak to Kevin or Mike on those
3  issues that you had identified?
4    A.   On the weekend, no.
5    Q.   You did not?
6    A.   No.
7    Q.   Subsequent to that weekend, did you
8  end up speaking to them?
9    A.   Yes.  I don't recollect how this was
10 resolved.  I think we ended up moving forward on
11 to the next step.  Most of this, again, was just
12 trying to get a better understanding of the
13 assets that were coming on, and I'm -- at a
14 future date, we moved past this on to a
15 different set of spreadsheets that were
16 considered I believe it was Schedule A and
17 Schedule B, so then a lot of the work done here
18 was kind of pushed aside to Schedule A and
19 Schedule B, which is a new set of spreadsheets.
20   Q.   Did you do any work to compare
21 Schedule A and Schedule B to these
22 spreadsheets --
23   A.   Not --
24   Q.   -- or reference to 866?
25   A.   Not that I can recollect.  It was, due

29 (Pages 110 to 113)

Teague

1
2    to the ever-changing environment of different
3    people getting involved, it was more a, you
4    know, let's move on to this, you know, this new
5    spreadsheet.
6        Q.    In your e-mail to Kevin Horan and Mike
7    McGarvey at the bottom of page 1, you state, "I
8    believe the idea is to value the portfolio as of
9    15 September since that is the legal close
10   date." Do you see that?
11       A.    Yes.
12       Q.    What was the basis for your
13   understanding that September 15 was the legal
14   close date?
15       A.    As per the e-mail, I said "I believe
16   the idea" because I wasn't quite sure. So,
17   again, any reference to that being the legal
18   close date, I wasn't quite sure what the legal
19   close date would have been.
20            I think the 15th was when Lehman
21   initially -- the initial analysis was done for
22   Lehman on the 15th for the derivatives, so I
23   thought that might be the same date.
24       Q.    Okay.  And you'll see in the two
25   e-mails on page 1 in your e-mail to Kevin Horan

Teague

1
2    and Michael McGarvey, the subject line reads
3    "LBI Inventory 9-16-08."  Do you see that?
4        A.    Yes.
5        Q.    And then on top of the page, you've
6    got a different subject line, "LBI Inventory
7    9-19-08 (repo)," do you see that?
8        A.    Yes.
9        Q.    And again, do you have a recollection
10   of having done any kind of a valuation or
11   reconciliation analysis on two different
12   populations of transactions during that week,
13   the 9/16 inventory and the 9/19 inventory?
14       A.    No, I do not.
15       Q.    And are you aware of anyone else at
16   Barclays having done any such analysis?
17       A.    Not that I'm aware of.
18            Apologies.  There is no -- it appears
19   there would be no -- there's no attachment for
20   the first e-mail.  That attachment would be all
21   the way down in the later e-mails the way I'm
22   looking at it.  Appears so.
23       Q.    You're looking for a spreadsheet of
24   the 9/19 inventory, is that what you're looking
25   for?

Teague

1
2        A.    Yes, I didn't know if there was
3    multiple attachments.
4        Q.    Okay.
5            (Deposition Exhibit 867, a document
6        bearing Bates Nos. BCI-EX-(S)-00201262
7        through 263, with attachment, marked for
8        identification, as of this date.)
9        Q.    I've handed you an exhibit marked
10   Deposition Exhibit 867.  It's a cover e-mail and
11   then an attached spreadsheet.  If you could take
12   a look at that, let me know when you're done,
13   and I'll ask you some questions.
14            (Document review.)
15       A.    Yes. Yes.
16       Q.    At the bottom of the e-mail, you send
17   a spreadsheet to an address that's listed as
18   GFNY Price Test, do you see that?
19       A.    Yes.
20       Q.    What does the "GFNY" stand for?
21       A.    Global Finance New York Price Testing.
22       Q.    So that would be part of -- that's
23   part of the Product Control group?
24       A.    That's part of IVC.
25       Q.    That's part of IVC, okay.

Teague

1
2        And you get a response back from Kevin
3    Jhea asking you what date, and you respond in
4    your e-mail, "As per Phil Nash, assets were
5    acquired using BoNY prices which I have heard on
6    Thursday close, as well as being generally
7    inaccurate.  We need to test against our
8    acquisition date which is first thing Monday
9    which equals to Friday close (test the execution
10   price reasonableness as of Friday close)."  Do
11   you see that?
12       A.    Uh-huh.
13       Q.    Yes?
14       A.    Yes.
15       Q.    You did do an analysis of the
16   valuation as of the Friday close, correct?
17       A.    Correct.
18       Q.    And at some subsequent date, you did
19   another analysis of the Monday close,
20   correct?
21       A.    Correct.
22       Q.    Did you prepare a comparison table or
23   a spreadsheet that set out all of your
24   calculations as of the Friday close and compare
25   it to your calculations as of the Monday close?

Page 122

Teague

1         Teague
2    Q.   Yes, and it says Liquidity tab.
3    A.   Mine says, "Sheet 2."
4    Q.   You should find one that says
5  Liquidity tab.  It's a tab with a spreadsheet
6  that's located at that number.  We'll put up the
7  spreadsheet.  That may be the easiest way of
8  doing it.  It's about 20 pages past where you
9  were.
10   A.   Okay.
11        MR. HUME:  It's 996?
12        MR. TAMBE:  It's 996.  It's 213996,
13   Liquidity tab.  There's a series of tabs in
14   that spreadsheet.  This is the printout of
15   the Liquidity tab.
16   Q.   The question is a basic one.  The
17 Liquidity tab that appears in these
18 spreadsheets, that's used as a grid or that's a
19 cross-reference for purposes of making liquidity
20 adjustments by product type; is that right?
21   A.   Yes.
22   Q.   And the "Liquidity Haircut" column
23 that is shown on this tab, the individual
24 liquidity haircuts there are expressed as a
25 percentage, 1 being 100 percent and anything

Page 123

Teague

1         Teague
2  less than 1 being less than 100 percent, right?
3    A.   Correct.
4    Q.   There was a methodology or an approach
5  you followed to determine what the liquidity
6  haircut would be for each product type; is that
7  right?
8    A.   That's correct.
9    Q.   And which of these liquidity haircuts
10 were you personally responsible for developing
11 or deriving?
12   A.   I would have been involved in the --
13 for the Rates, say Treasuries, agencies, munis,
14 corps.  The next piece I think was all Rich
15 Landreman:  Sovereigns, corporate credit, EM
16 Corp., EM.  And then from there down would be
17 Mark Washtell for the Equities, and PMTG would
18 have been Rich Landreman.  And I may have, but I
19 don't recollect, for the CDO mezz and CDO
20 senior.
21   Q.   So we've pulled up on the screen --
22   A.   CLS.
23   Q.   We have pulled up on the screen that
24 tab.
25   A.   Yes.

Page 124

Teague

1         Teague
2    Q.   Just for purposes of the record, we
3  can just read in the row numbers.
4    A.   Certainly.
5    Q.   So if we can just scroll down the rows
6  until we get to Rates, if they're there.
7    A.   You have to scroll back up.
8    Q.   So, starting with row 35, it says
9  Rates, Treasuries.  That would have been
10 something you covered?
11   A.   Yes, I would have been involved in row
12 35, 36, 37, 38 and then jump down to 44, 45, 46,
13 47.
14   Q.   Are there any other liquidity haircuts
15 that you calculated that don't appear on this
16 table?
17   A.   On the PMTG tab?
18   Q.   Yes.
19   A.   I may have been involved in the -- you
20 have to scroll down a bit -- the 62 and 63.
21   Q.   So 62 is PMTG and then CDO Mezz and
22 CDO Senior?
23   A.   Yes.
24   Q.   Those two lines?
25   A.   And 66 and 67, which would be CLO Mezz

Page 125

Teague

1         Teague
2  and CLO Senior.
3    Q.   So, going back up into the Rates rows,
4  38 was one of the first ones, just so we
5  understand, row 35, this table says it's for
6  Rates, Treasuries, the liquidity haircut, the
7  entry is .999.  So that's one-tenth of 1
8  percent, that's the liquidity haircut?
9    A.   Correct.
10   Q.   And then for Rates, Agencies, there's
11 a 5 percent liquidity haircut?
12   A.   That's correct.
13   Q.   And that's applied across the board to
14 all products, all individual CUSIPs that are
15 classified as Rates, Agencies; Is that right?
16   A.   Yes.
17   Q.   That methodology of deriving a
18 liquidity haircut and applying it across all
19 CUSIPs in a particular product type, have you
20 ever done that before in your work at Barclays?
21   A.   Basically, the analysis was performed
22 looking at third-party data, looking at yields.
23 For the Treasuries what we did was, as a means
24 in this marketplace, again, what we're looking
25 at is a very distressed marketplace that was

## Page 126

Teague

1
2  outside of the normal market environment that
3  one usually receives -- one usually sees this,
4  you know, potential once-in-a-lifetime event,
5  hopefully, resulted in us having to determine,
6  using vendor data, what -- what type of haircut
7  would be appropriate for marking all of the
8  assets to bid.
9      Q.   Have you ever used that kind of a
10  process before in your work at Barclays?
11      A.   I haven't been through a market
12  environment of this in my life.
13      Q.   Putting aside the market environment,
14  have you taken those kinds of liquidity haircuts
15  and applied them across an entire class of
16  securities?
17      MR. HUME:  Objection.  Asked and
18  answered.
19      A.   No, I have not.  There would not have
20  been a need.  And again, this was -- this
21  haircut was taken on vendor data, not on
22  traders' marks.  So it would be marked to bid.
23  So that would be a mid to bid, not looking at a
24  bid already marked by the traders.
25      Q.   For Rates, Corporate, you have a

## Page 127

Teague

1
2  comment that reads, "Lowest third-party price
3  utilized in place of V-O."  Do you see that?
4      A.   Yes.
5      Q.   And so there you did not do a
6  liquidity adjustment, but if you had multiple
7  third-party prices, you'd pick the lowest price
8  as the price you would apply, correct?
9      A.   That's correct.
10      Q.   Is that an approach that you have used
11  previously in your work at Barclays?
12      A.   No, I have not used that approach
13  before.
14      Q.   When you go down to rows 45 and 46,
15  there, too, you have comments, a similar
16  comment, "Minimum third-party price utilized in
17  place of V-O."  Do you see that?
18      A.   Yes.
19      Q.   And again, there you didn't apply a
20  percentage liquidity haircut; you took the
21  lowest third-party price that you had obtained;
22  is that right?
23      A.   Yes, that was the methodology we chose
24  to use.
25      Q.   And that's not a methodology that you

## Page 128

Teague

1
2  have used previously at Barclays, correct?
3      A.   No.  Based on the market environment
4  that we were looking at, Corporates as an asset
5  class have quite a few vendor sources.  Some
6  other asset classes may not have as robust
7  third-party data.
8      The question with the Corporates was,
9  in looking at all this vendor data, how much of
10  this vendor data is stale as the market was
11  dropping considerably day over day.  So the
12  overall theme is, in short, whoever is marked
13  the lowest is the best reflection of the
14  marketplace.
15      If the majority of the positions are
16  going in one direction, why would you take an
17  average and take a bid/offer against the
18  average?  Because we have, again, for this asset
19  class, we have multiple vendors.  So now we have
20  a lot of data points to look at and with a lot,
21  you know, the issue with the vendors is a lot of
22  times the vendors call up, will talk to say a
23  broker, a dealer and ask where something is
24  priced and that's where they'll mark it.
25      It's an indicative price.  It's not a

## Page 129

Teague

1
2  clearing price.  If the trader is not seeing any
3  transactions, that trader may actually refer
4  back to just say the vendor with the same price
5  they had yesterday, the day before, the day
6  before that in a free-falling market.  So
7  whichever vendor has the best data is most
8  likely the vendor with the lowest price because
9  that means they're actually getting updated
10  information.
11      Q.   Did you actually do that?  When you
12  had multiple prices from vendors, did you go
13  back to the vendors and say what's this based
14  on?  Do you have more current data?  Why are you
15  using this price?  Or did you simply look at the
16  price quoted and pick the lowest one?
17      A.   We went with the lowest price because
18  I know how the vendors operate.  I know how
19  they're -- they're pricing.  They're obtaining
20  their pricing.  If they're obtaining their
21  pricing through -- they either price by calling
22  and getting information or through -- they can
23  also price through a model, but in a
24  free-falling market, what you end up having is a
25  lot of very stale prices, prices that reflect

Page 130

Teague

1
2    what the price was two, three, five days ago,
3    ten days ago.
4        Q.    Did you do that, where you had say
5    three prices and one is at -- say the three
6    prices are 10, 5 and 1.  Under your test for
7    corporate rates, you would have used 1 as the
8    lowest of the three prices, correct?
9        A.    Yes.
10       Q.    Okay.  You would not have gone back to
11   the vendor who quoted the 5 and seen what that
12   vendor had quoted yesterday or the day before or
13   the day before that, correct?  You assumed that
14   it was a stale price?
15       A.    Yes, I assumed it was a stale price
16   based on the fact that there was quite a few
17   stale prices in the marketplace without having
18   to --
19       Q.    And you wouldn't have had --
20           MR. HUME:  Object to form.
21       A.    -- without going into the specifics, I
22   have the 19th and I have the 22nd's, you know,
23   third-party data.
24       Q.    Did you do that?  Did you, for
25   purposes of applying this test, lowest

Page 131

Teague

1
2    third-party price utilized, look at how the same
3    vendor had quoted a particular security on the
4    19th and then on the 22nd, and based on that
5    make a determination, well, this is clearly a
6    stale price versus here's another price that has
7    been updated, therefore, it must be superior?
8    Did you do that analysis?
9           MR. HUME:  Objection.  Objection,
10   vague.  Are you asking whether he did it on
11   every security?
12       Q.    On any of them.
13       A.    No, it wasn't done on a security
14   basis.
15       Q.    Was it done on any basis?
16       A.    We did a review to see if, you know,
17   what price movement.  There wasn't a dramatic
18   price movement between the two dates, and we
19   went with the lowest price that was available.
20       Q.    So if corporate rates in general as a
21   category had moved, you went for the lowest
22   price; is that what you're telling me?
23       A.    Yes.  As a category, there was
24   dramatic free-fall in the corporates that, you
25   know, we're not seeing reflected as a -- so we

Page 132

Teague

1
2    went with the lowest prices out there because
3    that being the logic that that would be the best
4    reflection of the marketplace if you were
5    looking for a bid price.
6        Q.    You did the same thing on corporate
7    credits and corporates; is that right?
8        A.    Yes.  They're all essentially
9    corporates.  It just had different titles for
10   some reason.
11           Keeping in mind most the vendor prices
12   are mid, that's the other aspect of it, so a
13   vendor price may not provide you a reflection of
14   where the bid would be.  It's an indicative
15   level.  It's a market level.  It does not
16   actively reflect it being a bid level.
17           So taking that doesn't make us overly
18   conservative.  What we could be looking at there
19   could even be an ask, that lowest price.
20       Q.    On any of these categories where you
21   applied this rule, which is the lowest third
22   price -- third-party price was the one utilized,
23   did you look to see if Barclays traders had
24   transacted on any similar securities on the 19th
25   or the 22nd; and, if so, at what prices?

Page 133

Teague

1
2        A.    I did not.  I don't believe there was
3    any trading activity going on really at that
4    point in time.
5        Q.    Well, did you do something to
6    determine whether or not there was trading
7    activity on any of these CUSIPs at that point in
8    time?
9        A.    Not that I recollect.
10       Q.    If there had been trading activity on
11   the 19th and 22nd in these CUSIPs by Barclays
12   traders or other traders, that would be a
13   relevant data point, correct?
14       A.    Correct.
15       Q.    It would be actual trade data,
16   correct?
17       A.    If we look back at the valuations that
18   was performed on 12/22, the TRACE data is -- is
19   the overriding prior to any other third party,
20   and the TRACE data did line up pretty well with
21   all the lowest prices that we were looking at
22   from the vendors.
23       Q.    So your last answer refers to the
24   valuation you did on what you refer to as the
25   JPM portfolio, correct?

34 (Pages 130 to 133)

Page 138

Teague

1           Teague
2   a look at it.  Let me know when you're done.
3   I'll ask you a couple of questions.
4           (Document review.)
5       A.   Yes.
6       Q.   And you recognize this as an e-mail
7   chain that was discussing setting up some kind
8   of a shared drive for exchanging information
9   with people, do you see that?
10      A.   Yes.
11      Q.   Was that in fact done?  Was there a
12  shared drive for exchanging information?
13      A.   I don't recollect.  I take it --
14  there's a good chance, apologies, but no, I
15  don't remember.
16      Q.   In your e-mail to Tom, it looks like
17  Shashaty, which is on the first page?
18      A.   Yeah.
19      Q.   Do you see that?  In your e-mail to
20  Tom, you identify people from the Barclays side
21  who would need access to the Lehman data, and
22  then you make some recommendation as to who
23  should be included from the Lehman side, do you
24  see that?
25      A.   Yes.

Page 139

Teague

1           Teague
2       Q.   Do you have any reason to believe that
3   this shared drive or information-sharing process
4   was not set up?
5       A.   No, no reason to believe it was not
6   set up in the system.  No reason to believe it
7   did not happen.  I just don't recollect the
8   shared drive being set up.
9       Q.   The subject line on the e-mails on the
10  first page read, Price testing -
11  Converts/Equity/Preference"; is that right?
12      A.   It would be preferred eqs.
13      Q.   Any reason to believe that this shared
14  drive was limited to price testing on just those
15  products or whether this was a broader shared
16  drive?
17      A.   If it were to have happened, I take it
18  it would have been a broader shared drive.
19      Q.   I'd asked some specific questions
20  about interactions with former Lehman as part of
21  your work.  Let me ask you a broader question.
22           In general, did you have any
23  conversations with Lehman traders in the course
24  of your independent price valuation work for the
25  acquisition balance sheet?

Page 140

Teague

1           Teague
2       A.   We might have touched base with a
3   couple of traders just to get some
4   understanding, but I believe that was far enough
5   outside of the spectrum of when the analysis was
6   done.  If, like for this aspect, these were the,
7   you know, this was the Barclays valuations that
8   we were trying to reach out to I think the
9   Lehman valuations individuals who -- that's
10  Neeraj was on the Lehman valuations team -- to
11  start working together.
12      Q.   And was Neeraj someone who had come
13  over from Lehman to Barclays?
14      A.   As of that date, everyone had come
15  over, as of the 26th of September.  Neeraj was
16  no -- by the end of 2008, I don't know what date
17  Neeraj was no longer with the firm.
18      Q.   And do you know whether people like
19  Neeraj, who were formerly with the Lehman
20  valuation team, played any role in the
21  valuations that Barclays came up with for the
22  acquisition balance sheet?
23      A.   No, Neeraj didn't -- didn't play a
24  role in the valuations process.
25      Q.   Did any other former Lehman valuation

Page 141

Teague

1           Teague
2   professionals play a role in that acquisition
3   balance sheet valuation?
4       A.   No.
5       Q.   No?
6       A.   No.
7       Q.   So let's go into a document that's
8   been marked previously.  And I'll pull it up on
9   the screen as well.  I'm handing you the hard
10  copy.  I'm handing you what has been marked as
11  Exhibit 86B.  It's a printout from a
12  spreadsheet.  It's not the entire spreadsheet.
13  And what I have pulled up on the screen is the
14  native version of that document, that same
15  spreadsheet.
16      A.   Okay.
17      Q.   Which has been marked as Movants'
18  Trial Exhibit 102N, "N" for native.
19           Looking at the hard copy, the paper
20  document Exhibit 86B, is that a document you are
21  generally familiar with?
22      A.   Yes, I am.
23      Q.   And do you recognize that as the
24  valuation of the non-JPM assets?
25      A.   This would be the 9/22.  So, yes,

Page 142

Teague

1
2 these were the non-JPM assets.
3    Q.   What I'm going to do, if I'm able to
4 navigate my way around the spreadsheet, is pull
5 up in the native format what is the electronic
6 version of that first page of the hard copy
7 document which you're looking at.
8        Can you just look at the numbers and
9 confirm that that is in fact the same document?
10    A.   Yes, it appears to be the same
11 document.
12    Q.   And just so we understand, then, your
13 knowledge about the various columns starting
14 with column B, that's the -- the dollar amounts
15 that appear there, those are the notional
16 amounts off the securities?
17    A.   Yes.
18    Q.   And what does that mean when you say
19 they are the notional amounts of those
20 securities?
21    A.   That would be the face value amounts
22 of the securities themselves.  So the notional
23 times price times factor would come up with your
24 market value.
25    Q.   The next column C, which is BoNY

Page 143

Teague

1
2 Value, what is that a reference to?
3    A.   That's the Bank of New York value that
4 they attributed to the assets.
5    Q.   When you move over to column D, it
6 says at the top "22-September" and then it says
7 "PCG Value."  What is that column?
8    A.   That's the independent valuation that
9 was determined by Product Control.
10    Q.   And the 22 September indicates that
11 that's a valuation as of end of day September
12 22; is that right?
13    A.   That correct, that would be the
14 valuation used for September 22.
15    Q.   Would that include certain -- for
16 certain securities valuations that were done as
17 of September 30?
18    A.   As it was deemed there was no true
19 difference between the 30th and 22nd, then there
20 was still, yes, there would be a 30th in there,
21 but there was no discernible material difference
22 between the two valuations.  So it was deemed
23 appropriate still from December -- I mean,
24 sorry, for September 22.
25    Q.   But my question was a very basic one,

Page 144

Teague

1
2 which is, even though it says September 22,
3 included in that column for certain CUSIPs are
4 values that were actually calculated on
5 September 30th.  Your additional explanation is,
6 well, those September 30th values are not that
7 different from September 22.  Is that fair?
8        MR. HUME:  Object to the form of the
9 question, and objection, asked and answered.
10        You may answer the question.
11    Q.   Is that a fair way of capturing what
12 you just said?  I'm just trying to understand
13 what you said.
14    A.   We could go back and look at the
15 Independent Valuation document where I
16 summarized how the valuation was performed, but
17 the data in there that was for September 30th,
18 it was deemed to be no -- it wasn't deemed to be
19 materially different than the 22nd because the
20 markets for those illiquid assets hadn't really
21 moved.
22    Q.   You said you had a summary of the
23 methodology, and you're referring to the bound
24 document Exhibit 641A.
25    A.   641.

Page 145

Teague

1
2    Q.   You're referring to that two-page,
3 three-page memo at the front of that document;
4 is that correct?
5    A.   That's correct.
6    Q.   What in particular were you referring
7 to when you were talking about September 30th
8 versus September 22?
9    A.   That would only cover, based on this,
10 the last bullet point on 0213991 for the PMTG
11 assets.
12    Q.   Okay.  So and if I -- I just want to
13 understand what it is that you are summarizing
14 there on that last bullet point on the page that
15 ends 991 in Exhibit 641A.
16        This is an explanation that appears
17 under the Illiquid Assets section of that memo,
18 correct?
19    A.   That is correct.
20    Q.   And this particular bullet point
21 reads, "Haircut due to liquidity issues.
22 Following logic was devised to best capture
23 market price," and then there are two
24 sub-bullets, correct?  Right?
25    A.   Correct.

37 (Pages 142 to 145)

Page 146

Teague

1      Q.   The first of the sub-bullet states,
2  "Lehman assets which were sold (auctioned by the
3  PMTG) prior to month-end are considered trades
4  and therefore the traded price was applied with
5  no haircut."
6      In that sub-bullet, when you refer to
7  assets which were sold, are you differentiating
8  between assets that were sold outside of
9  Barclays from assets that were sold internally
10 within Barclays, or does that include assets
11 which were sold both inside and outside?
12     A.   That includes -- this specifically was
13 for assets that, in this case, were sold
14 internally to another desk within Barclays.  So
15 the assets here were sold out to the PMTG desk.
16     I believe, as you can see here, so the
17 marks were used for where they were sold, the
18 traded price, and if the security was not
19 auctioned by September 30, the desk mark was
20 used.
21     Q.   All right.  And the sales, the
22 internal sales that occurred, would have
23 occurred after the 22nd of September, correct?
24     A.   That's correct.

Page 147

Teague

1      Q.   So, nonetheless, the value for those
2  securities that were sold after 22nd of
3  September, internally sold within Barclays,
4  would be captured and those trade prices would
5  be reflected in column D on the spreadsheet
6  we're looking at on 86B, correct?
7      A.   That is correct.  And clarified by the
8  Lehman opening balance sheet document would take
9  those along with.
10     Q.   Is it the case that every time you
11 have an internal sale of a security to a trading
12 desk within Barclays you used the traded price
13 as the acquisition date price for that asset?
14     A.   The only assets it was done for were
15 the illiquid assets in the PMTG desk.  Any
16 trading activity that happened for the other
17 assets post-acquisition was not part of the
18 opening balance sheet price.
19     Q.   So but within the illiquid PMTG assets
20 where you did follow this methodology, it was
21 the case that every time there was an internal
22 sale, that is the price you used, you used the
23 internal sale price, or did you use some other
24 price, even though there was an internal sale of

Page 148

Teague

1  an illiquid PMTG asset?
2      A.   To the best of my knowledge, the sheet
3  is broken out to show any trading activity, and
4  that trading activity is then utilized in the --
5  in the final value as represented on this page,
6  summary page of the Excel spreadsheet.
7      Q.   As you sit here are you aware of any
8  instances where IPV assigned a value to an asset
9  that was sold internally by PMTG, assigned a
10 value that was lower than the traded price?
11     A.   Can you restate the question?
12     Q.   Sure.
13     (Record read.)
14     A.   I couldn't say off the top of my head.
15     Q.   Would you expect that to have
16 happened, given your methodology?
17     MR. HUME:  Objection to the form.
18     A.   Without reviewing the numbers, I
19 wouldn't care to guess.  I'm not quite sure --
20 I'm not quite sure where -- apologies -- where
21 the question is going.  I don't have the data in
22 front of me to review it.
23     Q.   Well, if you go over to the PMTG tab
24 in Exhibit 86B, that should capture

Page 149

Teague

1  CUSIP-by-CUSIP the valuation for each of those
2  securities, correct?
3      A.   Correct.
4      Q.   And to the extent that any of the
5  securities there were sold internally, that
6  spreadsheet or that tab would indicate what
7  price you had used for valuation purposes,
8  correct?
9      A.   Correct.
10     Q.   Because those tabs all roll up into
11 the Summary tab, correct?
12     A.   That's the case, yes.
13     Q.   So, I mean, at the risk of seeing if
14 this works, let's try that.  So I have gone into
15 the PMTG tab of the same spreadsheet, 86B, which
16 is Movants' 102 native.
17     Where would it be indicated whether or
18 not there was an internal sale of that security,
19 taking any one of these lines?
20     A.   That column that you're in now.
21     Q.   Column AF?
22     A.   Yes.
23     Q.   It says "Market Value Sales"?
24     A.   Correct.

38  (Pages 146 to 149)

Page 150

Teague

1
2     Q.   The fact that a number appears in that
3   column, does that indicate to you that that's a
4   security for which there has been a trade?
5     A.   Yes.
6     Q.   And what it indicates to you is that
7   trade was an internal trade?
8     A.   It doesn't necessarily indicate that
9   it was an internal trade.  It indicates that it
10   was a trade.
11     Q.   Okay.  Is there some other part of
12   this spreadsheet or another tab in this
13   spreadsheet that differentiates internal trades
14   from external trades?
15     A.   I do not have that information in this
16   spreadsheet.
17     Q.   Do you know that from any other
18   spreadsheet, whether there's a document that
19   differentiates internal and external sales?
20     A.   I do not know.
21     Q.   Is it fair to say that for purposes of
22   your analysis you treated internal and external
23   sales, at least within this category, the PMTG
24   category, as the same?
25     MR. HUME:  Objection.  Lacks

Page 151

Teague

1
2   foundation.  Isn't this -- well, go ahead.
3     A.   I mean, this is, you know, as per this
4   spreadsheet, basically the thought process was
5   we're looking at the most illiquid assets.  Any
6   trading activity was deemed to be the best
7   indication of where an asset would clear, most
8   important thing, right, when trying to determine
9   a market price is to have a market, as the
10   majority of the assets in this pool have no
11   market, no discernible market, no discernible
12   market data because the trade data -- I'm sorry,
13   the trade's prior price was used as the level
14   for which we independently valued the assets.
15     Q.   And following that methodology, you
16   did not differentiate between internal sales
17   within Barclays from external sales that were
18   sales by Barclays to a third party?
19     MR. HUME:  Objection.  Lacks
20   foundation.  These are Rich Landreman's
21   assets, if I understand correctly, from the
22   prior testimony.
23     A.   Yes.
24     MR. HUME:  I'm objecting as lack of
25   foundation on that basis.

Page 152

Teague

1
2     MR. TAMBE:  I would prefer if you just
3   kept your objection to a legal basis as
4   opposed to signaling to the witness what he
5   might say in his answer.
6     MR. HUME:  I'm suggesting to you that
7   your question lacks foundation.
8     MR. TAMBE:  If you want to explain
9   something to me, you can do it outside the
10   earshot of the witness, which would be more
11   appropriate.
12     Q.   The next question I have is, is there
13   any way for you to tell from looking at this
14   spreadsheet whether the price that was
15   ultimately used by Barclays IPV to value one of
16   these CUSIPs is different from the price that
17   was -- that appears in the "MV Sales" column or
18   that is implied by the "MV Sales" column?
19     A.   If you go to your left, I could see.
20     Q.   Just tell me when to stop.
21     A.   You can stop there.
22     Q.   You're comparing column AA to column
23   AE?
24     A.   Just one moment.
25     So column AA will equal column AE.

Page 153

Teague

1
2   Column X was the original --
3     Can you go to your left?  Keep going.
4   9/19.  Pardon me.  So column X was the market
5   value originally put on those assets by Product
6   control as a cross-reference to the pricing at
7   which it was sold.
8     Q.   Okay.  And so let's just look at the
9   row that we're looking at right now, which is
10   row 6 in the PMTG tab of 86B, and column T for
11   that CUSIP row, which is row number 6, has a
12   BoNY price of 73.04, correct?
13     A.   Yes.
14     Q.   Has a PCG price of 19.16?
15     A.   Yes.
16     Q.   Right?
17     A.   Correct.
18     Q.   Do you know where that PCG price is
19   derived from?
20     A.   I would not be the proper person to
21   question.  That would be definitely Rich
22   Landreman.
23     Q.   Column W is "BoNY Market Value, 9/19."
24   Do you see that?
25     A.   Yes.

Page 154

Teague

1
2    Q.   And then that's simply using the BoNY
3  price times the quantity?
4    A.   Yes.
5    Q.   Times a factor, if there's a factor?
6    A.   Correct.
7    Q.   Column X is the PCG market value using
8  PCG price from column U, correct?
9    A.   Correct.
10    Q.   Then you have column Z, which does not
11  have a heading.
12        Column AA, which has a PMTG PX?
13    A.   Yes.
14    Q.   9/30, correct?
15    A.   Correct.
16    Q.   For this particular row, that carries
17  a value of 72, and if we go over to column AE,
18  "Sale Price," that has a value of 72 for that
19  particular security?
20    A.   Yes.
21    Q.   So, in that instance, would you say
22  that what this calculation is showing is that
23  the sale price is the price that was used for
24  determining the value that rolls up into the
25  acquisition balance sheet?

Page 155

Teague

1
2    A.   That's correct.  So the higher price
3  assigned by the desk would have been the price
4  assigned for the opening balance sheet.
5    Q.   Okay.  And the question is, are you
6  aware of any instances where a lower price was
7  assigned, a price lower than the desk price, the
8  traded price was used?
9    A.   The desk price would have been the
10  price utilized for the opening balance sheet I
11  believe in all situations.
12    Q.   Would it have been wrong to use a
13  lower price than the desk price?
14    A.   I don't see why we would have.  I
15  mean, that's not how the spreadsheet is set up.
16  The spreadsheet is set up to take the desk price
17  for 9/30.
18    Q.   All right.  Going back to 86B, the
19  Summary tab, you've got PCG value of 42 -- I'm
20  looking at row 14, column D.  You've got a PCG
21  value of 42.578 billion, do you see that?
22    A.   Yes.
23    Q.   But that number gets adjusted further,
24  correct?  To come up with the acquisition value
25  for those assets?

Page 156

Teague

1
2    A.   Yes.
3    Q.   And the further adjustment you make is
4  you apply the liquidity calculation from column
5  F; is that right?
6    A.   That's correct.
7    Q.   And so the final values that you
8  derive for the non-JPM assets are row 14, column
9  E, which is $40.7 billion, correct?
10    A.   That's correct.
11    Q.   The liquidity value adjustments that
12  are reflected on the summary sheet of 86B, just
13  to confirm, those are derived by applying those
14  liquidity factors that we had talked about in
15  the morning?
16    A.   So each of the experts by the --
17  within Independent Valuations, based on the
18  asset class, would have performed analysis to
19  determine appropriate bid/offer for which to
20  capture bid for the market value for each of the
21  asset classes.
22    Q.   What experts?
23    A.   So each of the IVC individuals, like,
24  for instance, for my world, people within my
25  team would have performed analysis for

Page 157

Teague

1
2  corporates, somebody would have performed
3  analysis for munis, somebody would have
4  performed analysis for agencies, and that would
5  be data that, yes, we utilized then to calculate
6  a bid/offer.
7        For Rich's team, within his team, that
8  would be how it would have worked for the
9  securitized products.
10    Q.   And the net result of this, with
11  respect to non-JPM assets, was that assets that
12  were valued by the Bank of New York at 45
13  billion were valued by Barclays at 40.69
14  billion; is that right?
15    A.   Yes, but there was a time period of
16  difference there between the two dates.
17    Q.   And the time period difference that
18  you're alluding to is the BoNY values were as of
19  what date, sir?
20        MR. HUME:  Objection.  Lacks
21  foundation.
22    A.   I'm not quite sure.  I believe it was,
23  if we go back to one of the other tabs --
24    Q.   Pick any tab?
25    A.   Try the Rates tab, I guess.

Page 158

Teague

1
2    Q.   Because you would be familiar with the
3    Rates tab, right?
4    A.   Yes.  I don't know whether it would be
5    on that tab.
6        If you go to the right.  Sorry.  Keep
7    going to your left, actually.
8        I take it it was 9/19 or 9/18 based on
9    the dataset on the top, where it says cell F2 on
10   that tab.
11   Q.   Cell F2, okay.  So I'm on cell 2.  So
12   you see that as an indication that those are the
13   BoNY prices as of 9/19?
14   A.   That's correct.
15   Q.   Okay.  So the BoNY prices are as of
16   9/19, and you said that your prices, the
17   Barclays prices are as of end of day 9/22, as
18   further explained by your memo on methodology
19   followed?
20   A.   Yes.
21   Q.   Sir, I've now handed you a one-page
22   document previously marked as Deposition Exhibit
23   87B.  I have pulled up on the screen the native
24   version of that document, which is marked as
25   Movants' Trial Exhibit 103N, for native.

Page 159

Teague

1
2    Looking first at the hard copy
3    document, Exhibit 87B, do you recognize that as
4    a summary of the valuation of the JPM Chase
5    assets?
6    A.   Yes, I do.
7    Q.   And maybe you should read on the
8    screen, do you recognize the summary sheet that
9    appears there as the same summary in electronic
10   format?
11   A.   Yes.
12   Q.   And again, to confirm, column D, line
13   18, the $5.9 billion number?
14   A.   Yes.
15   Q.   Is your understanding that that is the
16   value of the JPM assets as of September 30?
17   A.   Yes.  I'd have to go back to the other
18   sheets, but yes, that appears to be the case.
19   Q.   And that the same assets are valued by
20   Barclays as of December 22 at $3.739 billion,
21   which is column F, line 18; is that right?
22   A.   Yes.
23   Q.   What role did you play in the
24   valuation of these assets, the JPM Chase assets?
25   A.   I would have been involved in

Page 160

Teague

1
2    coordinating the assets for the spreadsheet,
3    specifically for row 6 through rows 10.  Rich
4    Landreman's team would have handled rows 13 and
5    14 labeled "PMTG."
6    Q.   In terms of liquidity adjustments that
7    are reflected in column G for these JPM assets?
8    A.   Uh-huh.
9    Q.   What was the approach taken by you
10   with respect to the assets that you valued to
11   make liquidity adjustments?  Was it the same as
12   you had done with the other assets?  Was there a
13   different approach with these assets?
14   A.   I'd have to go back again to the
15   Lehman opening balance sheet, Barclays Capital
16   Valuation Methodology document.
17   Q.   So if you have it before you, that's
18   the bound document, and where specifically in
19   that?  How do you address this issue?
20   A.   Page 0213992.
21   Q.   And for the assets that you valued,
22   what part of this page refers to the liquidity
23   approach that you took?
24   A.   Just a moment.  I would have been
25   involved again in the, what would be considered

Page 161

Teague

1
2    the more liquid assets portion, and Rich
3    Landreman would have been involved in anything
4    regarding PMTG for the illiquid assets.
5    Q.   Can I stop you there for a second?  Do
6    you generally bucket it that way, that the PMTG
7    assets, in your view, were generally the
8    illiquid assets, or are there liquid and
9    illiquid assets within PMTG?
10   A.   There could be some.  I mean, again,
11   it goes down to the -- the analysis would be the
12   Haircut tab on -- where it breaks down the
13   specific bid/offers by product.  So it can be
14   cross-referenced to what bid/offer was applied
15   to which product would help give an insight.
16   Q.   Okay.  Again, just looking at the PMTG
17   rows in this spreadsheet, 87B, Movants' 103
18   Native, is it your understanding that for the
19   PMTG securities covered by this spreadsheet,
20   that it's Mr. Landreman who would have been
21   responsible for determining what the liquidity
22   haircuts were for these securities?
23   A.   Yes.
24   Q.   And that you would have been
25   responsible for determining the liquidity

41  (Pages 158 to 161)

Page 162

Teague

1
2 haircuts for rows 6 through 10?
3     A.   Yes, my team would have -- would have
4 performed the analysis, each of the individuals
5 who has the expertise in each of the product
6 classes.
7     Q.   And the approach that you took on rows
8 6 through 10, the liquidity approach, liquidity
9 adjustment approach you took with respect to
10 these assets, was it a different approach than
11 the one you had taken with respect to the
12 initial inventory?
13     A.   There was some slight differences.  We
14 would have to go and look at the Liquidity tab.
15 Just one moment.
16     Q.   The Liquidity tab in this spreadsheet?
17 We can go there?
18     A.   Yes, I believe that might --
19     Q.   So we're now on the Liquidity tab
20 which has the liquidity haircuts expressed as
21 percentages, do you see that?
22     A.   Yes.  Yes, I do.  So this is -- these
23 are the -- these are the bid/offer adjustments
24 that were again applied by product type.
25     Q.   And for the products that you valued,

Page 163

Teague

1
2 what did you do to ensure that the bid/offer
3 adjustments or the liquidity adjustments that
4 you were applying as of December 22 were
5 consistent with the liquidity adjustments that
6 you had applied as of September 22?
7     MR. HUME:  Objection to the form of
8 the question.
9     A.   So some of the differences were for
10 corporates, as per this page.  The majority or
11 much of the data was from TRACE.  So we were
12 using pricing data for what was clearing, which
13 was either minimum of third party or TRACE.
14 Much of the data was actually TRACE.
15     And for munis, there was no bid/offer
16 applied for the 12/22 assets if you look at the
17 second page.
18     Q.   So for the munis you say no bid/offer
19 adjustment was applied.  Why was that?
20     A.   For the muni market, the market itself
21 had showed signs of stability, and there was
22 also not -- I don't believe there was a, as far
23 as acquisition one for the second piece, I don't
24 believe there was many munis, either.  But for
25 the most part, it was the dataset itself was

Page 164

Teague

1
2 deemed much more stable.
3     Q.   In your memo, which is in Exhibit 641,
4 you say for munis, "No bid/offer FTID and
5 research pricing data applied to valued
6 product."  Do you see that?
7     A.   Yes.
8     Q.   And FTID is a reference to what?
9     A.   FTID is a vendor.
10     Q.   And it's a vendor that you used to
11 obtain prices from?
12     A.   Correct.
13     Q.   And you believed those to be reliable
14 prices?
15     A.   So the 12/22 utilized that along with
16 research data.  So --
17     Q.   And the question was you believe FTID
18 to be a reliable source of data?
19     A.   It can be when the markets are stable,
20 yes.
21     Q.   So on December 22, it was reliable?
22     A.   On December 22, for the munis at
23 products, munis were deemed to be stable, so IDC
24 was deemed appropriate.
25     Q.   Did you use similar data for September

Page 165

Teague

1
2 19 and September 22?
3     A.   For munis?
4     Q.   For munis.
5     A.   For munis, the IDC price was not
6 deemed reliable.  A different analysis was
7 performed for the munis based on the markets.
8     Q.   What did you do to determine that IDC
9 was not reliable September 19 to September 22?
10     A.   We looked at the market information
11 that we had.  We also spoke with the trading
12 desk, the traders for -- if you go back to
13 this -- the trader for munis was saying that
14 there was, you know, he placed little faith in
15 the, you know, numbers coming out of FTID at the
16 time, and working with the desk, that's where
17 the marks for 9/22 came from.
18     We did a haircut based on the market
19 analysis of how much market prices were moving
20 in the munis market because the underlying
21 prices were stale.
22     Q.   Maybe I missed this in your answer.
23 So for the 9/19, 9/22 timeframe, what prices
24 were you using for munis?
25     A.   For munis, it was a -- the trader

Page 166

Teague

1
2    mark, essentially, which was a haircut to the --
3    our own front office trader view as well as
4    Independent Valuation view of where the market
5    was for 9/22 looking at the haircut that we
6    applied.  So the overall haircut was I believe 5
7    to 8 percent based on the drop in the munis.
8    That is a separate document, I believe, where
9    there's -- that goes through the analysis on the
10   munis.
11      Q.   Are you aware that certain munis were
12   priced in that time period, 9/19-9/22, by you at
13   .0001?
14      A.   I believe there was a position that we
15   had no external data on that, yes, I believe
16   that did happen.
17      Q.   So you basically priced it at close to
18   zero?
19      A.   As a placeholder we didn't know the --
20   we didn't have any data at all on the document.
21      Q.   And if it was meant to be a
22   placeholder, what were your plans for updating
23   that placeholder?
24      A.   I believe that was -- I don't have
25   that in front of me.  That was one of the assets

Page 167

Teague

1
2    that was brought up by the previous deposition.
3    I believe that was just an oversight on our
4    side.
5       Q.   I'm sorry, what was an oversight?
6    Pricing it at .0001 was an oversight?
7       A.   Yes, I believe that was an oversight
8    on our part.  We had no data to mark those
9    assets.
10      Q.   What have you done to correct that
11   oversight?
12      A.   The oversight itself was brought up
13   after the opening balance sheet was closed.
14      Q.   How was it brought up?  Who brought it
15   up?
16      A.   The oversight -- I only became aware
17   of it recently.
18      Q.   Well, you became aware of it because
19   of the testimony that was provided in this case,
20   right?
21      A.   Correct.
22      Q.   So we brought it to your attention?
23      A.   That's correct.
24      Q.   And so now that we brought it to your
25   attention, what have you done about it?

Page 168

Teague

1
2       A.   From a valuation perspective, I have
3    not reopened the opening balance sheet.  I think
4    that's really more something from the accounting
5    perspective or if the firm has any opinion on
6    that.
7       Q.   Have you spoken with anyone about
8    going back and restating the acquisition balance
9    sheet to correct this oversight that's been
10   brought to your attention?
11      A.   No, I have not.
12      Q.   Do you know whether others within
13   Barclays have had that discussion?
14      A.   No, I do not know if that discussion
15   has occurred.
16      Q.   Putting aside this particular example
17   about the .0001 pricing, are there other
18   oversights that we have brought to your
19   attention?
20      A.   Not that I can recall.  I believe the
21   munis were a, out of the 12,000 securities that
22   we reviewed, there was an oversight on my part
23   or on my team's part for less than a handful of
24   muni positions.
25        I think those positions also were,

Page 169

Teague

1
2    correct me if I'm wrong, I believe they were all
3    auction rate.  So there was no data outstanding.
4       Q.   On the point of no other data
5    outstanding, at least some of the muni bonds at
6    issue that were valued at .00001 by your group
7    were obligations of the State of Massachusetts,
8    does that ring a bell?
9       A.   Yes.
10      Q.   Did you --
11      A.   I think it was one.  I don't think it
12   was some.
13      Q.   So one.  The one obligation that you
14   recall being a State of Massachusetts
15   obligation, did you look to see how
16   Massachusetts' general obligation bonds were
17   trading, for example?
18      A.   Again, the handful of securities out
19   of the 12,000 securities that you are
20   referencing, that was an oversight on our side.
21   The volume of assets that we were going through
22   at that moment, we did have an oversight on
23   munis where there was assets that we had no
24   market data on that were marked all the way
25   down.

43  (Pages 166 to 169)

Teague

1
2   Q.   Again, I'm not sure how that -- maybe
3   you have answered my question, but it's not
4   clear to me.  Did you look to see how other
5   Massachusetts obligations were trading?
6   A.   Again, out of the 5 positions you're
7   talking to versus 12,000 assets that came into
8   the firm, there was an oversight on our part.
9   Q.   So the answer to my question is you
10  didn't look at other pricing data for other
11  bonds issued by the State of Massachusetts?
12  A.   No, we did not at that moment look at
13  State of Massachusetts for 5 positions out of
14  12,000 securities that we priced.
15  Q.   And it would not have been improper
16  for you to have looked at those, you just didn't
17  do it, correct?
18  A.   If we performed that analysis, it
19  would have been something above the, you know,
20  work that had been performed, and that analysis
21  was not performed.
22  Q.   Coming back to Exhibit 87B, the
23  summary, the Summary tab on the electronic
24  document, which is the hard copy document in
25  front of you, the decision to value the JPM

Teague

1
2   Chase assets as of December 22, 2008, that was a
3   decision made by Barclays, correct?
4        MR. HUME:  Objection.  Lacks
5   foundation.
6   A.   I can't speak to the date and the
7   decision for the date.
8   Q.   So, just so I understand what your
9   knowledge or understanding is, then, you were
10  simply told to value those as of December 22?
11  A.   That's correct.  I believe that's when
12  they came -- when the delivery, or I believe
13  that's when they were delivered.  I'm not quite
14  sure.
15  Q.   And who directed you to value those as
16  of December 22?
17  A.   That would have been Marcus Morton.
18  Q.   Do you recall having any discussions
19  with Mr. Morton about whether it was appropriate
20  to value these assets as of the 22 of December?
21  A.   Versus?
22  Q.   Versus the 22nd of September.
23  A.   If they hadn't come in, I don't think
24  we would have valued them.  No, I didn't really
25  have any specific conversations of that nature.

Teague

1
2   Q.   Did you have any discussions or
3   conversations with Price Waterhouse on that
4   topic?
5   A.   No.  The analysis we show the JP
6   assets as of that date, but the valuations were
7   performed as of September 22.
8   Q.   And is it your understanding that
9   these JPM assets which were valued as of
10  December 22 were assets received in lieu of the
11  $7 billion in cash that was being reflected in
12  certain accounting documents as of September 22,
13  2008?
14  A.   Yes.  The assets were to be delivered
15  in place of cash, which made me very upset,
16  because I prefer cash because I don't have to do
17  any further valuations.
18  Q.   And in fact, in some of your early
19  work you had a placeholder for $7 billion of
20  cash?
21  A.   Yes.
22  Q.   Did you have any discussions with
23  Marcus Morton or anyone else within Barclays as
24  to how the decision was made to accept these
25  securities in lieu of the $7 billion of cash?

Teague

1
2   A.   I think that was something above and
3   beyond, as far as I was concerned.  It was more
4   so somehow JPMorgan had managed to provide us
5   with assets that they potentially no longer
6   wanted and, in place, they took $7,000 in cash.
7   Q.   You mean $7 billion in cash.
8   A.   $7 billion in cash, yes.
9   Q.   My question was did you have any
10  discussions with Marcus Morton or anyone else
11  within Barclays on that topic?
12  A.   Why we received this instead of $7
13  billion?
14  Q.   Yes.
15  A.   I think the overall view is, as I
16  stated, that, well, this is what ended up
17  happening at the end of the day.  This is what
18  ended up being delivered as opposed to cash.
19  Gary Romain would probably be best able to speak
20  to why we received this versus why we received
21  cash.
22  Q.   The name you mentioned was Gary
23  Romain?
24  A.   Yes.
25  Q.   Explain to me what your interaction or

Page 174

Teague

1
2  level of interaction was with Gary Romain
3  through this process.  What were you doing?
4  What's he doing?  How did the two of you
5  interact on the acquisition balance sheet?
6      A.   I would -- Gary oversaw, I take it,
7  the whole -- I'm trying to think of the right
8  wording for it.  My part was just the -- I was
9  consolidating the assets themselves, the
10  valuations, and that was provided to Gary to
11  include in all of his data since his scope was
12  much larger.
13      Q.   Is it your understanding that Gary was
14  doing any independent valuation of the assets
15  other than what the IPV group was doing?
16      A.   Yeah, no, Gary wouldn't have been
17  involved in that aspect.
18      Q.   So Gary would take, when he needed to
19  plug in the value of the assets, he would take
20  your output?
21      A.   Yes, that's the case.
22      Q.   We talked this morning about
23  conversations, conference calls that Stephen
24  King was on, you were on, others may have been
25  on.

Page 175

Teague

1
2      Do you recall Gary Romain being a
3  party to any of those conference calls?
4      A.   Yes, Gary would have been on some of
5  the conference calls.
6      Q.   And I apologize if I have asked you
7  this in terms of the timing of those calls.  Do
8  you recall any of those conference calls taking
9  place the week of the 15th of September, 2008,
10  the week of the 22nd of September 2008?
11      MR. HUME:  Objection to form.
12      A.   I don't recollect.
13      Q.   So it might have been, you just don't
14  remember?
15      A.   Potentially.  I would tend to believe
16  it was later on in the process, but I don't
17  recollect.
18      Q.   In terms of the decision-making
19  process, the IPV group does its analysis, comes
20  up with values for these assets, you collect
21  those values and then you handed those over to
22  Gary Romain; is that right?
23      A.   Yes.
24      Q.   Were there any values that were
25  proposed by IPV that Gary did not accept or

Page 176

Teague

1
2  others objected to?
3      A.   No, that wasn't Gary's role in the
4  process.
5      Q.   Was this process of valuing at least
6  the initial inventory, putting aside the JPM
7  assets, the initial inventory, was it an
8  iterative process?  Did you have initial
9  valuations that were then refined and updated
10  through the course of October and November,
11  December?
12      A.   Yes, the numbers had changed between,
13  say, I don't know, September 22nd, 23rd and
14  later on.  Much of it had to do also with the --
15  in confirming the delivered assets themselves,
16  scrubbing data, ensuring you had the right
17  ISINs, ensuring you had the right market
18  information as far as not even just saying third
19  party, but the dataset required for the
20  structured products, things of that nature, that
21  you -- it took some time to scrub out of the
22  12,000 assets.
23      Q.   In the time period, the 22nd of
24  September through the end of September, do you
25  recall there being uncertainty or confusion

Page 177

Teague

1
2  about the actual assets that had been
3  transferred, CUSIPs, reconciling lists, things
4  like that?
5      A.   I believe Operations were continually
6  updating reconciliations for quite some time,
7  specifically on the equity side.
8      Q.   Other than reconciliation issues and
9  the issues you described with respect to the
10  structured products, were there any approach or
11  method changes or policy changes that were
12  responsible for the changing valuations as you
13  moved through October, November and into
14  December?
15      A.   Just refinements.
16      Q.   What kinds of refinements?
17      A.   Just in the -- in the data itself,
18  more putting a structure around the data, such
19  as the Lehman opening balance sheet valuation
20  methodology, trying to document the thought
21  process of the -- of how the spreadsheets were
22  oriented; try to, you know, where possible,
23  ensure consistency.
24      Just basically show the robustness of
25  the process that was performed in such a manner

Page 178

Teague

1
2  where it would be -- I didn't know it would be
3  me, but it would be something where a person
4  would be able to speak to it one day.
5          And that's basically, you know, had a
6  lot -- a lot of the data that was done at that
7  time was also helpful in the discussions with
8  PwC.
9      Q.  Was any of the data or any of the
10 analysis prepared specifically to respond to
11 questions raised by PwC?
12     A.  I'd say a lot of it was a -- a
13 continual discussion more so than a creation of
14 information for PwC.  It was they were basically
15 working closely with Barclays from time to time
16 with the valuation team to get a deeper
17 understanding of the process and the analysis
18 that was being performed.
19     Q.  Well, they would have questions about
20 why you did what you did, correct?
21     A.  That's correct.
22     Q.  They would ask you to support why you
23 did what you did, correct?
24     A.  Yes, there would have been e-mails
25 back and forth to -- and they would have sat

Page 179

Teague

1
2  down with us.  So there was -- there was
3  in-depth conversations that would have occurred.
4      Q.  And you would provide the information
5  they were looking for?  You would provide the
6  backup or the data to answer their questions; is
7  that right?
8      A.  Correct.  And then most of that data
9  would then be consolidated in one place, for
10 instance, the Liquidity tab or something of that
11 nature, to help provide more clarity going
12 forward.
13     Q.  And just to be clear, PwC wasn't
14 telling you what liquidity adjustments to make,
15 correct?  They were asking you to explain what
16 you had done?
17     A.  That's correct.  They were --
18     Q.  Similarly, PwC wasn't telling you what
19 valuation dates to use for particular assets;
20 they were asking you to explain why you had
21 picked the ones that you had?
22         MR. HUME:  Objection.  Lacks
23 foundation.
24     A.  I couldn't talk to that.  Again, I
25 received no direction from that aspect.

Page 180

Teague

1
2      Q.  Were you party to communications with
3  PwC in which that was a topic of discussion, the
4  picking of dates for valuation of assets?
5      A.  No.
6      Q.  Where they basically said to you
7  that's not their job, that's your job?
8      A.  That's -- any discussions of that
9  nature would not happen at my level, to be
10 honest.  I was performing the independent
11 valuations.
12         (Deposition Exhibit 869, a document
13         bearing Bates Nos. BCI-EX-(S)-00207919
14         through 920, with attachment, marked for
15         identification, as of this date.)
16     Q.  I've had placed before you, sir, a
17 document marked Exhibit 869.  It's an e-mail
18 exchange that you are involved in.  It has a
19 spreadsheet attached to it which has been
20 printed out from the native format.  Take a
21 minute to look at it.  I'll ask you some
22 questions about it.
23         (Document review.)
24     A.  This is a piggyback of a front office
25 view versus the sheets you were looking at were

Page 181

Teague

1
2  my view.  I don't think -- at the time, I think
3  there was changes made, being made to this
4  document, but then over the coming weeks, you
5  see this format, which is our document.
6      Q.  Okay.  Let me ask you some questions
7  about it.
8      A.  Sure.
9      Q.  So the cover e-mail, e-mails, are as
10 of October 10, 2008.  Do you see that?
11     A.  Yes.
12     Q.  And what you were just saying is this
13 is a work in progress that evolves over time and
14 takes on the format that we see in 86B and 87B,
15 right?
16     A.  Yes.
17     Q.  What I want to draw your attention to
18 is the last page of this exhibit, which is the
19 printout of the Summary tab from the
20 spreadsheet.  There's a little footer you will
21 see that says "Summary."
22     A.  Okay.
23     Q.  Can you read that?
24     A.  Yes.  Yes.
25     Q.  And if you'll look all the way over

46  (Pages 178 to 181)

Page 194

Teague

1          Teague
2 What did you mean by "overrides"?
3     A.   Well, for -- so the rows 12, 14 and
4 18, 14 doesn't look like there's anything there,
5 to be honest, and 18 looks like there's nothing
6 there. So I'm not quite sure. I guess it means
7 this page, but again, looking up at the
8 spreadsheet, row 12 has PMTG positions in there,
9 and then -- sorry, rows 14 and 18, those cells
10 for column F are blank. So I can't provide any
11 clarity since two of the three are blank.
12     Q.   Well, let's see if it refers to some
13 other sheet -- tab in the spreadsheet. I just
14 want to get an understanding of what you meant
15 by "overrides for PMTG."
16         What is it that PMTG is overriding?
17 The books and records or some other entity?
18     A.   It would have been, I take it, their
19 pricing that they are putting in for September
20 30th. Again, the analysis is regarding the, if
21 you look at the next section, it's just a desk
22 marking values for September 30. I take it, as
23 all of assets had not been booked yet, they
24 potentially just put in marks.
25         So, apologies. The logic here would

Page 195

Teague

1          Teague
2 just be I don't think this is to clarify
3 anything to do with the opening balance sheet,
4 per se, as much as we were trying to get the
5 desk values for September 30th. I mean, they're
6 sheets of both, but the commentary is regarding
7 the September 30th numbers.
8     Q.   Okay. And at some point you end up
9 taking those September 30th numbers for purposes
10 of the acquisition balance sheet, correct?
11     A.   For, yes, for PMTG, it would be
12 their -- the desk would be marking those assets
13 that are listed on the Lehman opening balance
14 sheet, Barclays Capital Valuation Methodology
15 document.
16     Q.   On the next bullet point in your cover
17 e-mail, you state, "Corporate marks represent
18 mid marks as supplied by corporate desk," and
19 then (traders are no longer with the firm)." Do
20 you see that?
21     A.   They were all let go. All the
22 Barclays traders were let go post Lehman
23 acquisition and they, specifically, in the
24 Corporate Investment Grade and High-Yield Desks,
25 we -- the firm took on the high-yield traders

Page 196

Teague

1          Teague
2 and --
3     Q.   From Lehman?
4     A.   -- and investment grade traders from
5 Lehman. So the individuals responsible for
6 marking those positions were no longer with the
7 firm or were no longer responsible for marking
8 the books.
9     Q.   But you had, as part of the
10 acquisition, taken over the traders, the
11 high-yield traders from Lehman, correct?
12     A.   Correct.
13     Q.   Why were they not a resource to ask
14 questions of with respect to the marking of the
15 corporate bonds?
16     A.   I think the biggest thing for the firm
17 as far as time well spent was to ensure that
18 individuals were properly hedging any of the
19 risk that the firm already had on its books and
20 records, so the breakdown was mostly we were
21 working -- you know, we weren't working alone,
22 we reached out to other people to get additional
23 information where necessary, but the reliance
24 was not on the desk to perform the valuations
25 because the desk was busy hedging the books and

Page 197

Teague

1          Teague
2 records that they have already acquired.
3         So day one is day one. They were
4 making sure day two, day three, day four, the
5 firm weren't losing a lot of money and the
6 positions already on our balance sheet be it
7 through the Lehman acquisition or positions we
8 already had. From the Lehman's traders'
9 perspective, they were all given brand-new
10 books, if you look at it that way, so they had
11 to determine how to value their own books and
12 how to hedge their own positions.
13     Q.   I'm trying to understand then your
14 next observation on that same bullet point. "No
15 asset level marks received to substantiate PMTG
16 Corp. MV." Do you see that?
17     A.   So at that moment we didn't have the,
18 I take it, in that much earlier question of what
19 positions we would have had on the books, we
20 wouldn't have had no asset level marks received
21 to substantiate the PMTG corporate market value.
22 We didn't have any levels from the desk for
23 those positions. So we had --
24     Q.   So if you had no level from the desk
25 for those positions, what would you use?

Page 198

Teague

1
2   A.   The trading desk essentially wouldn't
3   have had the positions in the PMTG portfolio, so
4   the corporate desk wouldn't be able to
5   substantiate.  That's from what I -- what I see
6   reading this bullet point.
7   Q.   And then in the spreadsheet, is there
8   a particular section of the spreadsheet that
9   that comment is directed to?
10  A.   One moment.  Can you do me one favor
11  and go to PMTG and PMTG Not Yet Settled?
12  Q.   So I have pulled up the PMTG Not Yet
13  Booked tab in the native format of 807.
14  A.   Thank you.  Can you scroll down?  If
15  you could do the same for the PMTG tab.
16  Q.   The PMTG tab.  Scroll down?
17  A.   Can you shrink it a tad and then go
18  home?  Can you hit "home" or just go back to
19  cell A-1?  Can you page down?  Keep going,
20  please.  Keep going.  Thank you.
21      I don't recall.  I was looking to see
22  if there was corporates in the PMTG tab, but I
23  don't see any.
24  Q.   And using your handy reference before,
25  I'm going to the hot pink Corporates tab and see

Page 199

Teague

1
2   if that has the information you're looking for.
3   A.   Apologies.  I'm not quite sure --
4   Q.   You don't know what that comment in
5   your e-mail refers to, what particular section
6   of the spreadsheet?
7   A.   Apologies.  It's been some time and it
8   doesn't stand out at the moment to have any
9   meaning.
10  Q.   Okay.  Sir, I've handed you what has
11  been marked as Deposition Exhibit 800B.  If you
12  could take a moment to review it.  Cover e-mail
13  with an attached spreadsheet.  Let me know when
14  you're done.
15      (Document review.)
16  A.   Yes.  Any particular page?
17  Q.   Let's start with the e-mail chain.
18  Let's start with the oldest e-mail and work
19  forward.  The oldest e-mail is on the page that
20  ends 967.
21  A.   Okay.
22  Q.   And it's an e-mail from Robert MacGoey
23  to Marcus Morton, you see that?
24  A.   Yes.
25  Q.   And it's an e-mail dated October 17,

Page 200

Teague

1
2   2008, and Mr. MacGoey from PwC is asking for
3   documentation concerning the opening balance
4   sheet, do you see that?
5   A.   Yes.
6   Q.   And you respond to that e-mail on page
7   966, where you provide him with a breakdown and
8   I assume with other data, the spreadsheet,
9   correct?
10  A.   Yes.
11  Q.   Is it safe to say that October 17 --
12  your e-mail is actually dated October 22.  Was
13  that the first set of documents that you had
14  provided PwC in connection with the valuation?
15  A.   I don't recall.
16  Q.   And the document that was provided,
17  the spreadsheet that you have provided Mr.
18  MacGoey, do you recognize that document?
19      It's printed out behind the e-mails.
20  A.   Yes, it looks similar to the other
21  documents that -- the document style that was
22  being used at the time, yes.
23  Q.   Then you'll see in the rest of the
24  e-mail chain as you work your way to the front
25  of the document, Mr. MacGoey asks for backup,

Page 201

Teague

1
2   correct?  Sources of the prices use by PCG,
3   correct?
4   A.   Yes.
5   Q.   And you, in turn, send that request
6   along to other folks within the Independent --
7   within the IPD group to pull that data and
8   provide it to you to be provided to PwC,
9   correct?
10  A.   Yes.
11  Q.   In the data that you provided PwC,
12  both in this e-mail and through the -- through
13  your -- through this process of finalizing the
14  acquisition balance sheet, did you provide PwC
15  with access to any models that you had prepared
16  for valuing securities?
17  A.   Rich Landreman may have walked them
18  through models.  That would be outside of my
19  scope.
20  Q.   As far as you're concerned for any of
21  the securities that you valued, you did not --
22  you did not use any models to value the
23  securities?
24  A.   I would have -- it would have been
25  actually a member of Rich's team.  The only

Page 202

Teague

1
2  thing I helped in some of the coordination were
3  for the CDOs, but those values again would have
4  been something within Rich Landreman's team.
5      Q.    And who within Rich Landreman's team?
6      A.    It would be potentially Imran Ansari,
7  but Rich would have been overseeing a lot of
8  that analysis, and that would have been nothing
9  regarding models, just inputs to cash flow
10  analysis is what PwC would have asked for.
11      Q.    Okay.  And you would have provided
12  those inputs to PwC?
13      A.    Yes.
14      Q.    Do you know one way or the other
15  whether such inputs were requested and were
16  provided PwC?
17      A.    Yes, data was provided to PwC.  Be it
18  from myself or Rich, I don't recollect, but data
19  was provided to PwC as backup to support the
20  spreads, the research data, which was used to
21  calculate the prices, taking into account
22  discount margin, prepayment, severity, all of
23  the data was provided.
24      Q.    And in terms of any of the specific
25  models that were used by Rich Landreman's team,

Page 203

Teague

1
2  do you know what those models were?  Were they
3  proprietary models?  Off-the-shelf models?
4      A.    Intex would have been the main model.
5  Intex is a vendor model, you know, any
6  investment bank can purchase, essentially.
7      Q.    And that's a model that Barclays did
8  use for valuing certain of the Lehman assets?
9      A.    For cash flow analysis, yes, Intex
10  would have been utilized.
11      Q.    Any other model?
12      A.    I can't speak for anything outside of
13  my team outside of that.
14      Q.    And do you know if the inputs that
15  were used for the Intex model have been provided
16  to the movants in this case?
17      A.    Outside of my scope.  I wouldn't know.
18      Q.    You don't know one way or the other?
19      A.    No.
20      Q.    If you had to locate the inputs that
21  were provided to PwC, is that something that you
22  could do readily?
23      A.    Again, Rich Landreman would be best to
24  talk to on that.  That would be outside of my
25  scope.

Page 204

Teague

1
2      Q.    Did you, for example, for the work
3  that you did with PwC, keep a record of the
4  information that you had provided PwC?
5      A.    I would have whatever data I provided
6  them.
7      Q.    Any reason to believe Mr. Landreman
8  wouldn't have similar data if he provided to it
9  PwC?
10      MR. HUME:  Objection.  Lacks
11  foundation.
12      A.    I can't really talk on his behalf.
13      Q.    I'm handing you what has been
14  previously marked as Exhibit 812B.  Again, it's
15  a cover e-mail from you and an attached
16  spreadsheet.  Take a moment to look at the
17  document and let me know when you're done.
18      A.    Okay.
19      Q.    In your cover e-mail, which is dated
20  Friday, November 14, to Kevin Jhea, Elly Pu and
21  others, titled "Haircut" or subject "Haircut,"
22  do you see that?
23      A.    Uh-huh.
24      Q.    Yes?
25      A.    Yes.

Page 205

Teague

1
2      Q.    And you are asking them to provide
3  data to support the bid/offer assumptions on the
4  Liquidity tab for agencies.  Do you see that?
5      A.    Yes, for all of the tabs they
6  provided the independent analysis of agencies
7  was Kevin, corporates was Kevin Jhea, Elly did
8  munis, and Heidi Su handled the emerging
9  markets.
10      Q.    I'm sorry, I misread that.  You're
11  absolutely right.  So you're asking for data to
12  support bid/offer assumptions for agencies,
13  corporates, munis, and emerging markets?
14      A.    Yes.
15      Q.    And is that because PwC has made that
16  request of you to get that backup data?
17      A.    I don't recall.
18      Q.    Now, further down in your e-mail you
19  state, "Suggestions: Base it off real market
20  data if available."  Do you see that?  What did
21  you mean by that?
22      A.    The initial analysis we knew that
23  there would be -- there was very limited broker
24  quotes or true market information as far as
25  market activities involving -- for instance, for

52 (Pages 202 to 205)

Page 206

Teague

1
2 emerging markets, we did have runs which we were
3 able to see through Bloomberg where brokers were
4 sending out runs for that data and that data was
5 then used as part of the analysis for EM on how
6 the bid/offer would be viewed.
7       We didn't really have such data for
8 other asset classes.  So for other asset classes
9 when the data was not ready available, we relied
10 more on vendor data versus broker data or, you
11 know, other dealer runs.
12     Q.   I guess what I'm trying to understand
13 from the cover e-mail is, did you have bid/offer
14 assumptions in the Liquidity tab already in
15 place by November 14 and you were looking for a
16 backup for those assumptions, or were you
17 looking to come up with a bid/offer assumptions
18 to be included in the Liquidity tab?
19     A.   I think it was we had -- sorry, could
20 you restate the question?
21     Q.   I'm trying to understand what your
22 suggestion is directed to.  Maybe if we can pull
23 up the native version of this document.
24       As of this point in time, November 14,
25 2008, did you already have assumptions in your

Page 207

Teague

1
2 Liquidity tab and what you were suggesting is
3 ways to back up those assumptions, or are you
4 suggesting ways to come up with assumptions to
5 be included in the Liquidity tab?
6     A.   I don't believe, and we can look at
7 the file, I don't believe --
8     Q.   We just pulled up the Liquidity tab of
9 the attached spreadsheet.
10     A.   And this is as of what date?
11     Q.   Well, this is from the file that
12 you're looking at, so this is --
13     A.   This is November 14.
14     Q.   A native version of 812B and that is
15 as of November 14, 2008.  And the Liquidity tab
16 has entries for the Liquidity Percentage column?
17     A.   Okay.
18     Q.   Do you see that?
19     A.   Yes.
20     Q.   And turning your attention back to the
21 suggestions that you're making to the team, are
22 you asking for backup for those percentages, or
23 are you asking them to go do work to add
24 additional bid/offer assumptions on the
25 liquidity table?

Page 208

Teague

1
2     A.   This analysis had been performed at
3 that time.  I think we're just looking for -- I
4 think we're just looking for something to refine
5 the process of what was in place.
6     Q.   Okay.  So I understand, then, that you
7 already had your bid/offer assumptions; you were
8 going back and looking for support for those
9 assumptions?
10     A.   I believe some of the assumptions
11 changed based on further analysis, but yes.
12     Q.   Do you know that, or are you just
13 guessing that the assumptions changed based on
14 further analysis?
15     A.   It was -- it was part of the overall
16 process.  We just, you know, to substantiate the
17 initial bid/offer that was summarized on this
18 page was to ensure that, you know, the dataset,
19 you know, we had the dataset to support this
20 file.  So that was really what the request was
21 for.  And if there was any issues on how the
22 initial dataset was derived, it should, you
23 know, they should follow it following logical
24 hierarchy to ensure that they have proper
25 dataset.

Page 209

Teague

1
2     Q.   Well, that's what I'm trying to
3 understand is the process question.  If you had
4 a dataset here where you had bid/offer
5 assumptions, you had based those assumptions on
6 data, correct?
7     A.   Yes, there was -- there was some data
8 out there already.  For instance, I know on
9 corporates we had some data and it was -- it was
10 essentially already in place.  I can't speak for
11 the other asset types, but ...
12     Q.   Well, was your direction to the team
13 or your suggestion to the team to go back and
14 try and find real market data to support the
15 assumptions that you had already made?
16     A.   No, it was really more the -- his
17 dataset, there was already -- there was already
18 assumptions being made.  They weren't just made.
19 They were made out of, you know, be it consensus
20 data or market data, but this was a means to get
21 people to actually put some -- pull all their
22 ideas together.
23       At this moment when they gave me their
24 names, a lot of the numbers I had received from
25 people was more just a haircut number.  I didn't

Page 210

Teague

1
2  have any supporting documentation for where the
3  individuals had done any analysis.  So this was
4  a means to ask everybody to come up with
5  something that supports what they were providing
6  me.
7          In general, keep in mind people within
8  the team have a view of the market because they
9  perform independent analysis, but having a view
10 did not mean they have supporting documentation
11 to provide me.  So any documentation that they
12 may have used was thin, so I needed actual
13 supportable documentation.
14      Q.   Okay.  So you asked them to go back
15 and substantiate their view of their respective
16 markets by getting supporting documentation, is
17 that --
18          MR. HUME:  Objection.
19      Q.   Is that what you're doing with the
20 suggestion that you're making to them?
21          MR. HUME:  Objection.
22 Mischaracterizes the testimony.
23      A.   Can you ask the question again?
24          (Record read.)
25      A.   I'm asking them to support the

Page 211

Teague

1
2  bid/offer assumptions that were being utilized.
3  The bid/offer assumptions would have been
4  directed from the individuals within the team.
5      Q.   Once you had these bid/offer
6  assumptions and you had obtained supporting data
7  and information from the various team members,
8  do you recall being part of any process where
9  those assumptions were tested against particular
10 CUSIPs to which they were being applied to see
11 if it made sense?
12      A.   The analysis for the bid/offer was
13 performed at the asset level utilizing
14 supporting documentation of, again, datasets
15 that was readily available, be it market data or
16 vendor pricing data, and that data was used to
17 derive what the bid would be, looking at it from
18 an asset type because there was a limited amount
19 of data to do a full-on analysis any lower than
20 that.
21          So if we had readily available data,
22 it was a properly functioning marketplace.  That
23 would be much easier to go down a road where
24 you're looking at readily available market data
25 but really in a market where that type of data

Page 212

Teague

1
2  wasn't readily available.
3      Q.   Having done that, having decided to do
4  this on an asset class or product class basis,
5  did you then go and see how the application of
6  that type of an asset-wide approach affected the
7  valuation of the particular CUSIPs?
8      A.   On CUSIP level you may see swings,
9  wherein at one CUSIP it would overvalue and
10 another CUSIP it would undervalue that
11 bid/offer.  But again, this was performed on an
12 asset level, so by going down to the CUSIP level
13 may only confuse the conversation further at
14 times because you could cherrypick one and not
15 look at the other side of the picture.
16      Q.   Just so I understand your answer,
17 then, if we are looking at particular CUSIPs
18 then, your view is that your liquidity
19 adjustment may over-correct or under-correct the
20 value of any particular CUSIP, because your view
21 is, taken together as an asset class, those
22 differences even out?
23      A.   They should even out.  There should
24 not be any significant issues because it's done
25 on the asset class level and these are quite

Page 213

Teague

1
2  large portfolios or quite large -- apologies --
3  it's a quite large population.
4          So in that sense it would be easy to,
5  again, cherrypick a specific CUSIP in a large
6  number of CUSIPs and say, well, it doesn't work
7  for here without performing a full analysis that
8  has it performed everywhere.
9      Q.   Did you do that type of analysis,
10 where you looked to see, okay, now that we have
11 picked an adjustment for an asset class or
12 product type, let's see what impact it actually
13 has on the particular CUSIPs that we have that
14 we are valuing?
15      A.   By going the CUSIP level, again, I
16 don't think it may tell you the full set of
17 information.  Why -- what may work at a higher
18 level may not work at the CUSIP level.
19      Q.   I understand it may or may not work at
20 a CUSIP level, but did you do any analysis to
21 determine that it did not work at the CUSIP
22 level?
23      A.   That analysis will reveal different
24 results based on your sample set, which is why
25 I'm stating it has to be more high level.

Page 218

Teague

1    Teague
2        So all of this became cleared up from
3    my perspective or more so from the, you know,
4    legal perspective of what, you know, what the
5    firm could potentially be on the hook for after
6    the event of default trigger.
7        Basically, put the 367 million, I
8    believe, in the -- would be accessible or would
9    be pledged, I guess, to the super senior holder,
10    meaning Barclays would have access to that money
11    at a super senior holder; and it basically
12    terminated, from my understanding, the
13    requirement of the CDO to provide funding,
14    revolving funding to any of the underlying
15    assets within the portfolio.
16    Q.    What was the EOD trigger?
17    A.    The event of default trigger was
18    sometime in October, where I think Lehman --
19    Lehman missed a payment period. I'm not quite
20    sure.
21    Q.    Was the bankruptcy of Lehman an EOD
22    trigger?
23    A.    In and of itself, no, I don't believe
24    it was.
25    Q.    Do you know that one way or the other?

Page 219

Teague

1    Teague
2    A.    As the EOD didn't happen until
3    October, I believe that would not have been the
4    trigger because the EOD didn't happen until time
5    in October.
6    Q.    So the EOD you're talking about
7    happened in October, but you don't know one way
8    or the other if the deal documents have an EOD
9    trigger of the Lehman bankruptcy?
10    A.    If the deal documents had that, then I
11    would imagine that in and of itself would have
12    been the EOD trigger, not the October event.
13    But again, yes, I do not know the specifics of
14    that aspect to comment.
15    Q.    At the time the initial decision was
16    made to have the Pine CLO valued at a value
17    placed on it, which was roughly the 50s,
18    correct?
19    A.    That's correct.
20    Q.    As of the acquisition date, that
21    decision was made on the basis of your analysis
22    of deal documents? Did you study the deal
23    documents to do that?
24    A.    There was three different -- the front
25    office spent more time working on the deal

Page 220

Teague

1    Teague
2    document aspect. That was Jasen Yang.
3        My analysis was performed mostly based
4    on the underlying assets themselves and
5    reviewing if there was any potential
6    repercussions if the deal does not continue to
7    perform as expected. The part of my analysis,
8    which is, you know, where I could see that there
9    must be some, you know, legal risk out there,
10    was post -- post Lehman's default. You know,
11    the Pine went from highly rated to double C.
12        So at that point in time, you know,
13    Standard & Poors was of the view that, due to
14    the bankruptcy, there's definitely a lot of
15    unknowns in this deal which would result again
16    in a, you know, in a pricing haircut to a deal
17    where you priced the underlying, all the
18    underlying that's outstanding is (A) lumpy and
19    (B) the prices are usually coming from a
20    consensus pricing service. The only pricing
21    provider for said consensus pricing service is
22    possibly Lehman.
23        So you're relying on Lehman to tell
24    you the price of the underlying and you're
25    relying on S&P to tell you now that this is

Page 221

Teague

1    Teague
2    double C, there's also a huge legal aspects on
3    top of the pricing aspects you're already
4    worried about.
5    Q.    All of these questions and
6    uncertainties you had about Pine, those all --
7    you got more information about that as time went
8    on, correct?
9    A.    Yes.
10    Q.    And by the time you reported the final
11    acquisition balance sheet in February 2009, the
12    value of Pine had already been written up on the
13    books of Barclays, correct?
14    A.    Yes, that's the case.
15    Q.    Had written up to what value?
16    A.    I can't say for --
17    Q.    Was it written back up to par?
18    A.    No.
19    Q.    What was it written back up to?
20    A.    It was I believe in the 70s by end of
21    the year.
22    Q.    Was there any discussion within the
23    IPV as to whether, given all you knew about the
24    Pine CLO, whether it was still appropriate to
25    list for acquisition date purposes a value that

56 (Pages 218 to 221)

Page 226

Teague

1
2    the analysis and thought process you went
3    through in deciding what value to ascribe to
4    Pine as of the acquisition date; is that
5    correct?
6        A.   That is correct.  That is part of the
7    analysis we did.
8        Q.   And who did that analysis?  Was that
9    you?  Was that someone else?
10       A.   For Pine there was three different
11   analyses performed.  There was one within IVC.
12   Jasen Yang performed the analysis from the front
13   office perspective, which I believe you already
14   would have.  And there was an analysis performed
15   by DPWC in reference to the analysis that was
16   performed by IVC as well as the analysis
17   performed by Jasen Yang.
18       Q.   When you say the analysis performed by
19   PwC?
20       A.   They just did an overall -- I wouldn't
21   saw cursory -- an overall review of the pricing
22   that was independent pricing as well as the
23   front office pricing and opined that it seemed
24   to be reasonable.
25       Q.   They basically looked to see what work

Page 227

Teague

1
2    you had done and what work Jasen Yang had done?
3        A.   Yes.
4        Q.   They didn't do an independent
5    analysis, correct?
6        A.   Yeah, I couldn't say.  It was more a
7    review to state that if the analysis was
8    appropriate.
9        Q.   Did you also discuss with PwC the fact
10   that you got later written up the value of Pine,
11   of the Pine CLO on Barclays' books?
12       A.   Any subsequent write-ups, PwC would
13   have been privy to that as far as the opening
14   balance sheet and they would have, you know, I'm
15   sure there was a couple e-mails and follow-up
16   conversations to better understand the trigger
17   event.  And I believe that was in their final
18   review of the Pine assets.
19       Q.   Was there any Day 1 P&L recorded by
20   Barclays in connection with any of the assets
21   acquired from Lehman?
22            MR. HUME:  Objection.  Vague and
23   ambiguous.
24       A.   That is more of a Product Control
25   question.  I couldn't speak to that.

Page 228

Teague

1
2        Q.   One of the documents that's been
3    produced in this case is a Barclays Capital
4    Provisioning Policy Statement.  Are you familiar
5    with that?
6        A.   Yes.
7        Q.   And there's a reference in that
8    statement to "Day 1 P&L."  Are you familiar with
9    that?
10       A.   Yes, I am.  Usually applied for
11   derivatives, trading derivatives.
12       Q.   Are you aware of it applying to
13   trading instruments other than derivatives?
14       A.   It can apply to other instruments.
15       Q.   I misspoke.  The policy is called
16   Marking Illiquid & Unobservable Prices.  That's
17   the title of the policy.  I'll show you a copy
18   of it and we can talk about it.
19            (Deposition Exhibit 871, a document
20        bearing Bates Nos. BCI-EX-(S)-00180042
21        through 80063, marked for identification, as
22        of this date.)
23       Q.   I have placed before you a document
24   marked Exhibit 871.  It's titled Marking
25   Illiquid & Unobservable Prices (Day 1 P&L

Page 229

Teague

1
2    Recognition)."  The date on the front page is
3    July 2007.  Do you see that?
4        A.   Yes.
5        Q.   And generally, are you familiar with
6    this document?
7        A.   Yes.
8        Q.   And was this a document that featured
9    in any way in the independent valuation work
10   that you did in connection with the Lehman
11   acquisition?
12            MR. HUME:  Object to the form of the
13   question.
14       A.   I'm sorry, can you ask the question
15   again?  I'm just trying to review it.
16       Q.   Why don't you finish reviewing it and
17   I'll ask the question again.  Let me know when
18   you're done.
19            (Document review.)
20       A.   Sorry, what was the question again?
21            (Record read.)
22       A.   Not that I'm aware of.  Not for the
23   work that I overlooked.
24       Q.   I guess the next question was, are you
25   aware of whether this policy and procedure was

Page 230

                    Teague
1
2  used by any of the other folks doing independent
3  price valuations?
4      A.   I cannot speak on their behalf.
5      Q.   And just so I can get some clarity on
6  it, is the reason that this was not something
7  relevant to your work is because there was no
8  Day 1 P&L that resulted from the valuation that
9  you did, or was it for some other reason?
10     A.   There is no Day 1 P&L that I'm aware
11 of for the Lehman opening day balance sheet.
12     Q.   If there had been Day 1 P&L for the
13 Lehman opening day balance sheet, would this
14 policy and procedure have been applicable?
15     A.   I can't speak to that.
16     MR. HUME:  Objection.  Lacks
17 foundation.
18     A.   I can't speak to that.
19     Q.   Do you know under what circumstances
20 this policy and procedure would have been
21 applicable?
22     A.   This policy and procedure is
23 applicable when we do a new trade.  Again, the
24 majority of it is derivatives, and there are a
25 lot of -- where there's unobservable data for

Page 231

                    Teague
1
2  the purposes of inputs to the deal, so input
3  pricing parameters, reflect input pricing
4  parameters for the Lehman opening balance sheet.
5      Q.   I missed the end of your answer.
6      A.   We can show input pricing parameters
7  for the Lehman opening balance sheet.
8      Q.   Okay.  So you offered that as a reason
9  why this policy would not be applicable to the
10 Lehman opening day balance sheet?
11     A.   For the assets I reviewed, this would
12 not be applicable.
13     Q.   For the assets you reviewed.
14         (Recess; Time Noted:  4:40 P.M.)
15         (Time Noted:  5:04 P.M.)
16         (Deposition Exhibit 872, a document
17 bearing Bates Nos. BCI-EX-(S)-00176591
18 through 591, with attachment, marked for
19 identification, as of this date.)
20         (Deposition Exhibit 873, a document
21 bearing Bates Nos. PwC-BarCap00008679
22 through 80, marked for identification, as of
23 this date.)
24 BY MR. TAMBE:
25     Q.   Sir, I'm handing you a document that's

Page 232

                    Teague
1
2  been marked Exhibit 873.  It's a two-page
3  document.  If you could take a moment to review
4  it.  Let me know when you're done.
5         (Document review.)
6      A.   Oh, okay.  Okay.
7      Q.   Drawing your attention to the oldest
8  e-mail in the chain, do you recognize that as an
9  e-mail from Marcus Morton to you on or about
10 December 19, 2008?
11     A.   Okay.  I didn't look at the other
12 page.  Apologies.  One moment.
13         (Document review.)
14     A.   Okay.
15     Q.   Do you have my question in mind?
16         (Record read.)
17     A.   Yes.
18     Q.   And was this the earliest point in
19 time that someone from Barclays was suggesting
20 valuing the portfolio assets the 22nd as opposed
21 to the 19th, sir?
22         MR. HUME:  Objection.  Lacks
23 foundation.
24     A.   I can't recall.  I believe in some of
25 the older documentation the 22nd was part of the

Page 233

                    Teague
1
2  discussion, but I can't recall.
3      Q.   It had been part of the discussions,
4  but then you had prepared valuations and you
5  were preparing spreadsheets that we had looked
6  at before which had 9/19 values on them,
7  correct?
8      A.   Yes.
9      Q.   Do you have an explanation as to why
10 Mr. Morton, in or about December 2008, was
11 asking and raising the question about doing the
12 valuation as of 9/22?
13     A.   Appears there was more clarity on the
14 valuation date in question.  There was
15 originally quite a bit of confusion.  As of this
16 date, there was additional clarity, which I take
17 it was why I replied to Robert MacGoey to ask
18 additional questions to, again, gain further
19 clarity.
20     Q.   Do you know what it was that happened
21 in December that gave additional clarity on the
22 acquisition date?
23     A.   That I can't speak to.
24     Q.   Did you ask Mr. Morton that?
25     A.   No, I believe it was -- I really can't

Page 234

Teague

1
2  speak to specifics.  It was just that was the --
3  9/22 was the final date.  So, from my
4  perspective, it seemed logical that 9/22 was the
5  date for which to value the assets, but I'm not
6  the best person to speak to on this question
7  because I wasn't really involved in the thought
8  process of why 9/22 versus 9/19.
9      Q.   Who would be the best person to speak
10  to on this?
11      A.   I guess being based on this e-mail
12  would be possibly Marcus Morton or Robert
13  MacGoey could provide better clarity.
14      Q.   Was the decision to pick 9/22 as
15  opposed to 9/19 valuations, was that made at the
16  Patrick Clackson level or higher levels of the
17  bank?  Where was that decision made?
18          MR. HUME:  Objection.  Lacks
19  foundation.
20      A.   I don't have the ability to speak to
21  that.  Again, I would say, from my perspective,
22  it was just more, you know, the information that
23  was brought to my attention.  It was not
24  something I was involved in the discussions.
25      Q.   And that's not something you asked Mr.

Page 235

Teague

1
2  Morton, where this direction comes from?
3      A.   Again, based on the e-mail, the
4  follow-up e-mail, it's more me reaching out to
5  Robert MacGoey to get more clarity.  That was my
6  attempt to gain more clarity.
7      Q.   So are you telling me that, other than
8  sending on this e-mail to Robert MacGoey, you
9  did not respond to Mr. Morton by asking him why
10  the change, what's the rationale behind the 9/22
11  move?
12      A.   Again, I believe the rationale had
13  more to do with, if it was as of September 22,
14  looking at the earlier e-mails, then the best
15  reflection of the valuation would be as of
16  September 22 because the acquisition was as of
17  the morning, I believe, of the 22nd.
18      Q.   Prior to the open of the 22nd.
19      A.   Yes, and there's really no way to
20  easily -- the Friday value would not be
21  reflective of any additional market movements
22  that could have happened over the weekend, be
23  it, you know, Asia is open and Europe is open
24  before the U.S. is open.  So any snapshot you
25  would try to take as of Monday morning, no one

Page 236

Teague

1
2  really provides that type of data from the
3  vendors.  So the thought process is you could
4  use the end of day data to reflect 9/22.
5      Q.   In responding to Marcus Morton, did
6  you try to collect any data over the weekend or
7  any preopening data from the morning of the
8  22nd?
9      A.   In all honesty, there's no such data
10  available from the vendors.  No data -- no
11  vendor runs a morning opening price.  That's not
12  something that you can readily get from the
13  vendors.  They run the end of day price.
14      Q.   So that's not something you tried to
15  obtain; is that right?
16      A.   It's not something that could be
17  obtained.  It's not a question of tried to
18  obtain.  One is unable to obtain opening vendor
19  level.
20      Q.   Turning to the first page of the
21  exhibit, which is Robert MacGoey's e-mail to
22  you, did you have any discussions with Robert
23  MacGoey in response to this e-mail?  Did you
24  call him up, talk to him about any of the points
25  that he had raised in this e-mail?

Page 237

Teague

1
2      A.   One moment.
3          (Document review.)
4      A.   I think any discussions to the effect
5  was more so a review of the, as stated here, the
6  bid/offer analysis that we had performed.  At
7  this point in time, we had used the, for
8  instance, for the corporates, there was a, I
9  believe a standard deviation of pricing vendors
10  that was reviewed in light of the commentary of
11  PwC.
12      Q.   And after you reviewed it in light of
13  commentary from PwC, what did you do?
14      A.   We reviewed in place of a standard
15  deviation of movings to capture the bid price to
16  utilize the lowest price available from the
17  vendors, as the market was again falling between
18  the original date and the 9/22 date.
19      Q.   Just so I understand your answer, in
20  response to this commentary from PwC, you moved
21  from taking the lowest price to -- you moved to
22  taking the lowest price from using the standard
23  deviation approach?
24      A.   That is correct.
25          MR. TAMBE:  Thank you.  I have no

Page 278

```
              Teague
 1
 2   like it was something that was going on between
 3   Operations, the head of Operations and Marcus,
 4   and I was just trying to get clarity as to what
 5   the -- what the date was and he was saying,
 6   "Please see the below e-mail."  So I was just, I
 7   guess, getting into the process rather late to
 8   provide some clarity, if I could get any
 9   clarity, from PwC.
10       Q.   And do you recall getting any clarity
11   from PwC, sir?
12       A.   I do not.  Much of the involvement I
13   performed on the equities was because Mark
14   Washtell is located in London, so I was just
15   working to help coordinate some of these
16   aspects.
17            MR. OXFORD:  I don't have any further
18   questions for you, Mr. Teague.  Thank you.
19            MR. HUME:  You have no questions?
20            MR. KAY:  No questions.
21            MR. HUME:  I have a few questions for
22   the witness and then we can finish up.
23   EXAMINATION BY
24   MR. HUME:
25       Q.   Mr. Teague, as you know, I'm Hamish
```

Page 279

```
              Teague
 1
 2   Hume, representing Barclays.
 3       Q.   You understand your testimony in this
 4   deposition is part of a court proceeding and may
 5   potentially be considered by the Court in this
 6   case?
 7       A.   Yes.
 8       Q.   And you've been asked a lot of
 9   questions about the valuation of certain assets
10   that Barclays acquired from Lehman pursuant to
11   the September 2008 sale transaction, correct?
12       A.   Yes.
13       Q.   Can you just state again for the
14   record which of those assets you and your
15   specific group in Independent Valuation Control
16   were responsible for valuing?
17       A.   That would be the fixed income rates
18   and corporate assets.
19       Q.   And did the valuations that you and
20   the members of your group arrived at for those
21   assets flow up into Barclays' acquisition
22   balance sheet that was publicly reported in
23   early 2009?
24       A.   Yes, that was the case.
25       Q.   And in all of the work that you did to
```

Page 280

```
              Teague
 1
 2   determine values to ascribe to those assets,
 3   what was the goal of your valuation efforts?
 4            MR. TAMBE:  Objection to the form of
 5   the question.
 6       A.   The goal was to ensure that we were
 7   appropriately marking the assets to a bid price
 8   and the market as of 9/22.
 9       Q.   And when you say "at bid price," was
10   that -- what relationship does that have to a
11   fair market value for those assets?
12       A.   We were looking to use a fair market
13   value at which these assets could be -- could be
14   valued in light of the market conditions.  We
15   were trying to derive or obtain the proper
16   market values as of 9/22 for the assets in the
17   Lehman portfolio.
18       Q.   And was the direction that you were
19   given, to the extent you were given any
20   direction by anyone internally at Barclays,
21   consistent with the overall goal of determining
22   an accurate fair market value for the assets you
23   were responsible for valuing?
24       A.   Yes.
25       Q.   And looking back at all of your
```

Page 281

```
              Teague
 1
 2   efforts in the course of this deposition and
 3   preparing for it, do you believe that at all
 4   times during your work you attempted to fairly
 5   and reasonably determine the fair market value
 6   for all of those assets?
 7       A.   Yes, I believe that is the case.
 8       Q.   Do you have any recollection of anyone
 9   at Barclays at any time suggesting to you that
10   you should do anything other than attempt to
11   calculate and determine the appropriate fair
12   market value of the assets you were responsible
13   for valuing?
14       A.   No, I do not.
15       Q.   Did anyone ever say to you, in form or
16   substance, that a result other than fair market
17   value at an appropriate bid price was the
18   desired goal or should be what you aim to
19   achieve?
20       A.   No.
21       Q.   Did anyone ever indicate to you or
22   anyone else working for you, to your knowledge,
23   that you should attempt to understate the fair
24   market value of the assets that had been
25   acquired, to state values that were below that
```

Page 282

Teague

1
2    fair market value?
3        A.    No.
4        Q.    And do you believe the valuations you
5    ultimately reached for the assets you and your
6    team were responsible for valuing reflect the
7    fair market value as of September 22, 2008?
8        A.    Yes, I do.
9        Q.    And you have been asked some questions
10   about PwC during this deposition.  Did you
11   interact with PwC professionals during your work
12   in valuing the assets that had been acquired by
13   Barclays?
14       A.    Yes.
15       Q.    Were they involved before the
16   acquisition balance sheet was finalized?
17       A.    Yes.
18       Q.    And did PwC look closely at the
19   different methodologies that were used to value
20   the different types of assets that you were
21   responsible for valuing?
22       MR. TAMBE:  Objection to the form of
23   the question.
24       A.    Yes, PwC did an analysis of the
25   independent valuations and reviewed different

Page 283

Teague

1
2    methodologies that were utilized in their
3    oversight of the Lehman opening balance sheet.
4        Q.    And was PwC, to your knowledge, aware
5    of the valuation date that Barclays was using to
6    arrive at these fair market values?
7        A.    Yes.
8        Q.    And to your knowledge, did PwC agree
9    that that valuation date was a reasonable
10   valuation date?
11       A.    Yes.
12       Q.    And to your knowledge and
13   understanding, did PwC ultimately conclude that
14   Barclays' valuations of the securities acquired
15   in the Lehman sale transaction were fairly
16   stated in all material respects?
17       A.    Yes.
18       Q.    You were asked some questions earlier
19   in the deposition about work that you may have
20   done during the week of September 15, 2008, do
21   you recall that?
22       A.    Yes.
23       Q.    You were asked some questions about
24   reconciliation efforts you may have done that
25   week on some of the assets that might have been

Page 284

Teague

1
2    involved in the transaction, do you recall that?
3        A.    Yes.
4        Q.    You were asked some questions about
5    specifically Lehman's marks on some of those
6    assets, do you recall that?
7        A.    Yes.
8        Q.    Let me ask you, in the work that you
9    did that week, do you have any recollection of
10   ever at any time relying on any of the Lehman
11   marks on any of the securities that you looked
12   at?
13       A.    No, I don't even believe I had the
14   Lehman marks available to me.
15       Q.    Were you ever asked by anyone to
16   assess the accuracy or potential staleness of
17   those Lehman marks?
18       A.    No.
19       Q.    And are you sure one way or the other
20   whether you even saw the Lehman marks on those
21   securities?
22       A.    I do not believe I have seen the marks
23   on those securities.
24       Q.    Would it surprise you if someone told
25   you that the Lehman marks on some of the

Page 285

Teague

1
2    securities acquired by Barclays were stale by
3    the week of September 15, 2008 after Lehman
4    Holding Company filed bankruptcy?
5        MR. TAMBE:  Object to the form.  Lack
6    of foundation.
7        MR. KAY:  Same objection.
8        MR. TAMBE:  Objection.  Calls for
9    speculation.
10       A.    Based on conversations after the
11   acquisition, I would not be surprised if marks
12   were not being updated from the Lehman side.
13       Q.    You also were asked some questions
14   about which assets were going to be included in
15   the transaction and whether assets from one of
16   the exhibits you were shown were the assets that
17   were to be transferred to Barclays, do you
18   recall that?
19       A.    Yes.
20       Q.    Did you have any involvement at all in
21   the negotiations over the terms of the sale
22   transaction?
23       A.    No, I did not.
24       Q.    Were you closely involved in any
25   indirect way with the negotiations in the sale

Page 286

Teague

1
2  transaction?
3     A.   No, I was not.
4     Q.   Do you think you would have a clear
5  and good understanding at any given point in
6  time during the week of September 15, 2008 of
7  the specific assets that were supposed to be
8  included in the sale transaction?
9        MR. OXFORD:  Object to the form.
10    Q.   Would you know what was being
11  negotiated in terms of which securities were
12  going to be included or not?
13    A.   From a negotiation perspective, no, I
14  would not know that.
15    Q.   You testified earlier in the
16  deposition about the market free-fall that was
17  going on in September 2008, and you made a
18  reference at one point to September 22.
19        Do you have any specific recollection
20  of whether September 22 in particular was a date
21  of market free-fall, or were you testifying
22  generally about the time period around the
23  Lehman bankruptcy?
24        MR. TAMBE:  Objection to form.
25        Objection to the extent it seeks to

Page 287

Teague

1
2  recharacterize prior testimony or suggests
3  an answer to the witness.
4     Q.   The testimony is what it is.  I just
5  want to know what it is that you recall
6  specifically about September 22 as opposed to
7  generally around the time of the Lehman
8  bankruptcy.
9     A.   Generally around the time, it was in
10  market free-fall.  The number I was referring to
11  earlier was actually the Monday prior, where the
12  market had fallen dramatically that day.  The
13  market on the 22nd, while volatile, was not
14  the -- was not the day that I was speaking to
15  when the market fell by 800.  The market I
16  believe only fell about 3 or 400 that day.
17    Q.   You were asked about whether or not
18  you ever attempted to determine the value of
19  assets or securities acquired by Barclays as of
20  the open of business on September 22 as opposed
21  to other times on September 22.  Do you recall
22  that?
23    A.   Yes.
24    Q.   Can you explain why it is -- well, let
25  me ask this question first.  In the typical

Page 288

Teague

1
2  course of business, does Barclays ever have to
3  determine the value of its securities as of a
4  particular time of day?
5     A.   We would have no ability to value
6  something as of a particular time of day.  Only
7  if something maybe potentially on
8  exchange-traded.
9     Q.   Does Barclays attempt to value
10  securities as of a particular date on a daily
11  basis?
12    A.   On a -- the regular IVC process that's
13  performed on a month-end basis.  Any pricing
14  that is performed on a daily basis, either by
15  the desk or using external data, has to be close
16  of business.  That's the only place for the data
17  to be readily available.
18    Q.   And when Barclays attempts to value
19  assets as of a particular date, whether it's the
20  front office or IVC, what is the data that is
21  available for market activity as of any
22  particular date?  Is it the data from the
23  beginning of business or the end of business?
24    A.   All data available from the vendors is
25  the data for the end of business.

Page 289

Teague

1
2     Q.   Is there any data that could have been
3  used to value securities as of the open of
4  business on September 22?
5     A.   Not that I'm aware of.
6     Q.   You were asked some questions in this
7  deposition about liquidity haircuts and whether
8  they were taken on a CUSIP-by-CUSIP basis or
9  portfolio basis.  Do you recall that?
10    A.   Yes, I do.
11    Q.   Can you first explain what it is in
12  the context of your valuation work in this case
13  is meant by the phrase "liquidity haircut"?
14    A.   "Liquidity haircut" was a reference to
15  a means to mark the vendor data, which is mid
16  price to a bid price to reflect fair value.
17    Q.   When you talked about liquidity
18  haircuts on a portfolio basis, did that in any
19  way reflect any judgments about what would
20  happen if that entire portfolio was going to be
21  liquidated?
22    A.   No, that number was not derived in
23  that light.
24    Q.   Were the liquidity haircuts an effort
25  to determine the correct fair market value for

73 (Pages 286 to 289)

## Page 290

```
                    Teague
 1
 2  the specific CUSIPs within the portfolio on a
 3  CUSIP-by-CUSIP basis?
 4          MR. TAMBE:  Objection to the form of
 5      the question.
 6      Q.   Let me rephrase the question.  Were
 7  the liquidity haircuts an effort to determine
 8  the fair market value at which you could sell
 9  each CUSIP as opposed to what you would get for
10  liquidating the entire portfolio?
11          MR. TAMBE:  Objection to the form of
12      the question.
13      A.   The liquidity haircut or bid/offer
14  which was performed at the product level was
15  done in a way to capture what it would -- what
16  pricing it would take essentially to sell the
17  underlying, but in no way to sell them all at
18  the same time.  It was a haircut based on
19  utilizing data from other CUSIPs as a means to
20  determine what a high-level bid/offer would be
21  for those assets.
22      Q.   You were asked a question about one
23  spreadsheet that showed a column for notional
24  value as opposed to market value.  Do you recall
25  that?
```

## Page 291

```
                    Teague
 1
 2      A.   Yes, I do.
 3      Q.   Does notional value bear any necessary
 4  relationship to fair market value when you're
 5  talking about the types of securities that were
 6  acquired in this transaction?
 7      A.   No, notional value would be the size
 8  of a position based on the price.  The notional
 9  of -- a very large notional can end up having a
10  very small market value.
11      Q.   You were asked some questions about
12  the Pine collateralized loan obligation.  Do you
13  recall that?
14      A.   Yes.
15      Q.   And I believe you testified there were
16  different valuations performed by the front
17  office traders and by IVC; is that correct?
18      A.   That is correct.
19      Q.   You were asked some questions about
20  the funding risk and the relevance of funding
21  risk to the valuations performed by IVC -- well,
22  to the valuations performed by Barclays.  Do you
23  recall those questions?
24      A.   Yes.
25      Q.   Did funding risk have any relevance to
```

## Page 292

```
                    Teague
 1
 2  the valuation work you performed in IVC?
 3      A.   No.  Funding risk, from our
 4  perspective, was more so an aspect of the
 5  overall legal risk.
 6      Q.   You gave some testimony about an
 7  analogy to SIVs.  Was that an analogy based upon
 8  funding risks or something else?
 9      A.   That was an analogy based on a legal
10  risk where an event of default, when triggered,
11  one is never certain of what the outcome will
12  be.  In that scenario the firm had to take large
13  writedowns due to the judgment that occurred
14  based on EOD triggers, and that's where the
15  legal risk can result in large writedowns.
16      Q.   In your work in IVC in valuing Pine,
17  did you make any specific judgment one way or
18  the other as to whether Barclays specifically
19  might have to contribute additional money into
20  Pine in the future based on borrower calls on
21  the underlying revolver and credits?
22      A.   No.
23      Q.   The movants have said in this case or
24  their expert has said that Barclays' valuation
25  of Pine was based on an incorrect reading of the
```

## Page 293

```
                    Teague
 1
 2  underlying contract or indenture because the
 3  contract says that Barclays, as the owner of the
 4  Senior Tranche A participation interest, had no
 5  obligation to contribute funding to Pine.
 6          Do you believe that the Barclays
 7  valuation of Pine was incorrectly based on an
 8  assumption that Barclays might have a funding
 9  risk contrary to the terms of that contract?
10      A.   No, I do not.
11      Q.   Do you recall that the front office in
12  its valuation of Pine did review a variety of
13  scenarios, at least one of which might have a
14  risk of future funding?
15      A.   Yes.
16      Q.   Did you understand that the funding
17  risk that the front office was concerned about
18  was, in the first instance, that the CLO itself,
19  the Pine entity as opposed to the tranche
20  holders like Barclays, would be called upon to
21  contribute the money it held as cash in eligible
22  investments to the borrowers?
23          MR. TAMBE:  Objection to the form of
24      the question.
25      A.   Yes, that was my understanding.
```

Page 294

Teague

1
2   That --
3       Q.   So could there be a funding risk
4   relevant to valuing Pine that had nothing to do
5   with Barclays having to contribute money?
6       A.   Yes.
7       Q.   Can you explain that?
8       A.   If the money, that $367 million, is
9   used to provide future funding for the
10  revolvers, that is money that would no longer be
11  going to the senior tranche.  In the event of
12  default, if that were an event -- if an event of
13  default were to occur, as it did, and the ending
14  result was that money would be allocated to the
15  super senior holder, then that's money that can
16  be applied towards our valuation.
17          If we are unable to utilize that money
18  and that money can then, instead of going to a
19  super senior holder, could then go to provide
20  funding to all the underlying revolvers, that
21  would money we wouldn't have, in a sense money
22  that would be removed from the valuation of the
23  super senior.
24      Q.   And as of the time you were trying to
25  value Pine, as of September 22, Barclays would

Page 295

Teague

1
2   not have known whether or not that money in the
3   CLO would be dispersed to Barclays and the other
4   tranche holders or, instead, be required to fund
5   future borrowing calls by the borrowers,
6   correct?
7       A.   That's correct.
8           MR. TAMBE:  Objection to form.
9       Q.   Do you recall how much money that was
10  that was held by the CLO?
11      A.   That I do not.  I believe somewhere in
12  the neighborhood of $200 million at the end of
13  the year.
14      Q.   Do you know whether, to this day,
15  almost two years after Barclays acquired Pine,
16  Barclays is yet to receive even one dollar in
17  distribution payment to the tranche holder?
18      A.   No, we have never received any money,
19  to my knowledge.
20      Q.   As far as you know, does Pine continue
21  to hold eligible investments that it has refused
22  to distribute to Barclays?
23      A.   Yes.
24      Q.   Is that consistent with some of the
25  skepticism that was implicit in your valuation

Page 296

Teague

1
2   of Pine on the acquisition balance sheet?
3           MR. TAMBE:  Objection to form.
4           MR. KAY:  Same objection.
5       A.   Yes.
6       Q.   In addition to the funding risk of
7   Pine using its eligible investments to
8   contribute to borrowers and fund borrower calls
9   rather than distribute to tranche holders, was
10  there also a funding risk that, irrespective of
11  what the contract might require, the borrowers
12  might need funding in order to keep their
13  businesses operating?
14      A.   Yes.
15          MR. TAMBE:  Objection to form.
16      A.   It would not be a contractual
17  obligation, but it would be logical, as the
18  owner of the noteholder, to ensure that you not
19  hurt the underlying firms in a way that it would
20  negatively affect the value of the CLO that
21  you're holding.
22      Q.   So even if the contract clearly stated
23  that the senior tranche holder did not have an
24  obligation under the contract to fund money, is
25  it your view, given your familiarity with these

Page 297

Teague

1
2   assets, that there might be a risk of needing to
3   fund in order to keep the underlying borrowers
4   healthy enough to repay -- to operate their
5   businesses through the crisis and pay off the
6   debts in the future?
7       A.   Yes, and it's an unknown and that's
8   why there was legal risk.
9       Q.   In terms of the funding risk of the
10  CLO itself, Pine, contributing its eligible
11  investments to fund borrower calls rather than
12  to pay out to tranche holders, is it your
13  understanding that that risk was eliminated by
14  the event of default in October 2008?
15      A.   Yes, that's my understanding.
16      Q.   And why was that information from
17  October 2008 not used in valuing Pine as of
18  September 22, 2008?
19      A.   Until such time it was an unknown and
20  there was a valuation perspective from the front
21  office to run different scenarios to what the
22  outcome would be, but there was no means of
23  seeing into the future.  The valuation was
24  performed as of 9/22 based on the data available
25  as of 9/22.

75  (Pages 294 to 297)

Page 298

Teague

1   
2     Q.   You were asked questions about the
3   extent to which Barclays used internal auctions
4   to value some of the assets acquired in the
5   Lehman transaction.  Do you recall those
6   questions?
7     A.   Yes.
8     Q.   And you gave testimony about PMTG
9   illiquid assets sometimes being valued based
10  upon those internal auctions.  Do you recall
11  that?
12    A.   Yes.
13    Q.   Do you know with any certainty the
14  volume of assets and the precise population of
15  assets for which internal auctions were used to
16  value the assets as valued on the acquisition
17  balance sheet?
18    A.   I don't recollect.
19    Q.   Would that information be available in
20  the spreadsheets that have been produced in this
21  case?
22    A.   Yes, they would.
23    Q.   You were asked in one of exhibits you
24  were shown by Mr. Oxford -- maybe we can just
25  look at Exhibit 873.

Page 299

Teague

1   
2     Do you have that in front of you?
3     A.   Yes.
4     Q.   This was a PwC e-mail from Mr. MacGoey
5   where he lists out a number of points, one of
6   which relates to the mid to bid adjustment, the
7   point that begins "as it relates."  Do you see
8   that point?
9     A.   Yes.
10    Q.   It says, "As it relates to the
11  adjustments from mid to bid, we have not
12  received any documentation to support why the
13  standard deviation of the pricing vendors is
14  reasonable."  And when you were shown that
15  earlier, you said, in response, you recalled
16  moving to a system where you would use the
17  lowest vendor price.  Do you recall that?
18    A.   Yes.
19    Q.   Did you use the lowest vendor price
20  for every single category of assets that you
21  were involved with or only for those where there
22  were multiple vendor sources that were
23  well-developed?
24    A.   Only for corporate bonds where we had
25  multiple vendor sources that were

Page 300

Teague

1   
2   well-developed.
3     Q.   Can you explain the difference between
4   the nature of the vendor, third-party vendors
5   with pricing data for corporate debt and for
6   other asset classes such as agency rates or
7   other securities?
8     A.   For the corporate debt, there are
9   quite a number of vendors that provide
10  independent values, indicative values on a daily
11  or monthly basis.  This is due to the fact that,
12  as an asset class, there is quite a bit of noise
13  as far as pricing goes and it creates the
14  foundation for more vendors to be able to get
15  into that space, and historically that's why
16  there is more pricing vendors for corporate
17  bonds than for sometimes more liquid assets.
18    Q.   As a general matter, was PwC familiar
19  with the methodologies used, ultimately used by
20  you and your group to adjust to bid prices, fair
21  market values and bid prices?
22         MR. TAMBE:  Objection.  Foundation.
23    A.   Yes.
24    Q.   And to your knowledge and
25  recollection, did they raise any material

Page 301

Teague

1   
2   concerns with any of those methodologies that --
3   did they have any disagreement with your
4   methodologies that resulted in material
5   differences in valuations?
6     A.   No, not that I can recollect.
7         MR. HUME:  I have no more questions.
8         MR. TAMBE:  Thank you.  No questions.
9         MR. OXFORD:  No more.  Thank you, Mr.
10  Teague.
11        THE WITNESS:  You're welcome.
12        (Time Noted:  6:34 P.M.)
13              oOo
14  
15  
16  
17  
18  
              _____
              SEAN TEAGUE
19  
20  Subscribed and sworn to
    before me this     day
21  of        2010.
22  
              _____
23  
24  
25

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    1

2               UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - - - - - -

5     In Re:

                      Chapter 11

6

7     LEHMAN BROTHERS   Case No. 08-13555(JMP)

      HOLDINGS, INC. et al., (Jointly Administered)

8

9                     Debtors.

10    - - - - - - - - - - - - - - - - - - - - - -

11               HIGHLY CONFIDENTIAL

12          DEPOSITION OF PAOLO TONUCCI

13             Friday 14 August 2009

14               At:  7:00 am

15               Taken at:

16               Jones Day

               21 Tudor Street

17                 London

               United Kingdom

18

19    Reported by: AILSA WILLIAMS

      Certified LiveNote Reporter

20

21

22

23

24

25

## Page 6

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI   6
2  Schiller & Flexner representing Barclays.
3      MR. TAMBE:  Erica, can you hear us?
4      MS TAGGART:  Yes, thank you.
5      MR. TAMBE:  Morning, Mr. Tonucci.  By
6  whom are you currently employed?
7     A.  Barclays.
8     Q.  In what capacity?
9     A.  I work in the treasury area.
10    Q.  What is your position?
11    A.  Head of group balance sheet.
12    Q.  And is that head of group balance sheet
13  for global operations?
14    A.  That is right, for global operations.
15    Q.  How long have you held that position?
16    A.  Since February of this year.
17    Q.  How long have you been employed by
18  Barclays?
19    A.  Since September, 26 September 2008.
20    Q.  What was your position at Barclays when
21  you first joined Barclays in September 2008?
22    A.  US treasurer for Barclays Capital.
23    Q.  If you could describe for us briefly
24  what your duties have been since you joined
25  Barclays, both as US treasurer and now as global

## Page 7

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI   7
2  treasurer?
3     A.  I am not the global treasurer.
4     Q.  Okay.
5     A.  Head of global balance sheet.  The US
6  treasurer role was focused on liquidity and
7  capital management for the US Barclays Capital
8  operations and the role with group treasury, the
9  global balance sheet role is responsible for
10  funding and hedging for the group's balance sheet
11  globally.
12    Q.  Before joining Barclays
13  in September 2008 you were employed by Lehman
14  Brothers, correct?
15    A.  That is correct.
16    Q.  And what Lehman Brothers entities were
17  you employed by?
18    A.  LBHI and LBI.
19    Q.  Collectively for the Lehman entities
20  when did you first begin working for the Lehman
21  entities?
22    A.  December 1996.
23    Q.  If you can give us a brief overview of
24  your career at Lehman, the positions you held, the
25  time periods that you held them for?

## Page 8

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI   8
2     A.  Yes.  I joined Lehman as head of or
3  manager for the fixed income derivatives product
4  control team from 96 to 98.
5     From 98 to 2000 I was manager of fixed income
6  liquid markets product control.
7     From 2000 to 2002 I was head of asset and
8  liability management for Europe within the treasury area.
9     From 2002 until 2005 I was head of assets and
10  liability management for the group globally in New York.
11  From 2005, or in 2005 I was international treasurer and then
12  also through 2005 to 2000 onwards I was global treasurer.
13    Q.  And in your capacity as global treasurer
14  for the Lehman entities, could you briefly
15  describe what your duties were?
16    A.  Responsible for funding liquidity and
17  capital management for the group.
18    Q.  And to whom did you directly report in
19  that capacity?
20    A.  To the CFO.
21    Q.  In the time period, say, in 2008, who
22  were your direct reports at Lehman?
23    A.  Most recently in 2008, Robert Azerad,
24  Dan Fleming, Janet Birney.
25    Q.  The last name?

## Page 9

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI   9
2     A.  B-I-R-N-E-Y.  Julie Boyle, B-O-Y-L-E.
3  Jackie F-R-O-M-M-E-R and Kevin Thatcher.
4     Q.  Mr. Azerad, what was his position and
5  role at Lehman?
6     A.  He was responsible for liquidity
7  management.
8     Q.  And Mr. Fleming?
9     A.  For cash management.
10    Q.  And when you use the phrase "liquidity
11  management", what do you mean by that?
12    A.  I mean for the tracking, reporting, and
13  execution of liquidity oversight.
14    Q.  Does liquidity management include
15  arranging for repurchase agreements and other
16  forms of financing for the Lehman entities?
17    A.  Generally not.
18    Q.  Who within Lehman would have been
19  responsible for repurchase agreements and
20  liquidity, financing of that nature?
21    A.  Secured financing was managed within the
22  prime brokerage team and overseen by John Coghlan.
23    Q.  And John was not one of your direct
24  reports, is that correct?
25    A.  He was not, no.

Page 14

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                14

1  repos was greater than would typically have been

2  the case for a much larger set of repos.

3      Q.  And your personal involvement in those

4  particular repos was much greater than your

5  involvement had been on prior repos.  Is that

6  correct?

7      MR. HUME:  Object to the form of the

8  question and to the lack of foundation.  I think

9  if you have e-mails you should show him to

10  characterize what you are asking.

11      MR. TAMBE:  Do you have my question in

12  mind?

13      A.  I am not sure, this point about much

14  more involved, it is difficult for me to respond

15  to.  I would say that there was slightly more

16  involvement than there would have been in a normal

17  day's repo activity but I would not say that I was

18  much more involved, no.

19      Q.  Let's see what you were involved in

20  during that week broadly.  I am going to start in

21  this period beginning September 12, Friday

22  through September 22, the Monday.  Start at the

23  beginning, September 12, and just generally tell

24  me what your involvement was in the events of that

Page 15

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                15

1  weekend, in terms of possibly doing transactions

2  with buyers, the filing of the bankruptcy, your

3  role in the sale of assets to Barclays and finally

4  the closing of the transaction on September 22,

5  and we will take it in pieces but I want to get an

6  overview of your recollection of your involvement

7  during that ten day period.  Okay?

8      A.  Okay.

9      Q.  Let's start with the weekend before the

10  filing of the bankruptcy.  What were you involved

11  in starting on Friday, September 12?

12      A.  Friday was a trading day and so the

13  range of activity included overseeing our

14  financing position that day and our financing --

15  our liquidity forecasting, which I would

16  characterize as regular daily activity, regular

17  daily oversight.

18      There was due diligence, specifically

19  with Bank of America for much of that day, and

20  there was towards the end of the day discussion

21  with Barclays directly and with the due diligence

22  teams at one other potential buyer.

23      Q.  What other potential buyer?

24      A.  Nomura, but I didn't speak to them

Page 16

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                16

1  directly.

2      Q.  And I gather from your answer then you

3  were speaking directly with the due diligence

4  teams from Bank of America?

5      A.  Yes.

6      Q.  And you had direct discussions with

7  Barclays towards the end of the day on the 12th?

8      A.  Yes, in the capacity of due diligence,

9  not negotiations.

10      Q.  And when you mean in capacity of due

11  diligence you were providing information?

12      A.  That is right.

13      Q.  In terms of liquidity management on the

14  12th, were there any particular constraints on

15  Lehman or challenges for Lehman in terms of

16  managing its liquidity for operations on the 12th?

17      A.  Yes.

18      Q.  Can you describe what those constraints

19  were?

20      A.  There was a large cash request from

21  JP Morgan, which was for $5 billion in cash, and

22  that was a significant challenge.  There were

23  changes being made to secured funding haircuts and

24  collateral agreements and there were margin

Page 17

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                17

1  requests from a variety of clients.  So overall

2  I would characterize it as extremely busy and

3  complicated.

4      Q.  You used a phrase, "There were changes

5  in secured funding haircuts", is that right?  I

6  want to understand what you mean by "haircuts"?

7      A.  The difference between the market value

8  and the cash received is known as the haircut in

9  a secured funding arrangement, the market value of

10  the securities I should say.

11      Q.  So is it fair to say that the haircut

12  allows you to determine how much cash you can

13  borrow against a given market value of securities?

14      A.  That is correct.

15      Q.  And what were the changes in haircuts on

16  the 12th, generally?

17      A.  Generally, they were that the haircuts

18  were widening, but I don't have any specifics.  I

19  don't recall any specifics.

20      Q.  We go into the weekend of 13 and 14

21  September.  Describe for me what you were --

22  describe for me what your duties were that weekend

23  and what you were doing that weekend?

24      A.  Due diligence continued.  Discussion

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    18

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    18
2    with the internal team on potential outcomes and
3    the management of potential purchases.  Some
4    discussion with external lawyers acting for the
5    Board in terms of fairness opinions.
6        Q.  Generally, when you are talking about
7    interactions you had with external counsel for
8    Lehman Brothers during that time period, you can
9    identify that you had those contacts but I would
10   urge you not to disclose the substance of your
11   conversations with external counsel for Lehman.
12   Understood?
13       A.  Yes.
14       Q.  I mean when my question is requesting an
15   answer of that type, just alert me if you think
16   you are going to have to tell me about
17   conversations with external counsel.  Fair?
18       A.  Yes.
19       Q.  In terms of who the potential purchasers
20   being discussed were over the weekend
21   of September 13 and 14, you had BFA, correct?
22       A.  Correct.
23       Q.  Barclays was still a potential
24   purchaser?
25       A.  Barclays was the most likely purchaser.

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    19
2        Q.  Nomura, was that still a potential
3    purchaser?
4        A.  Not that I was aware of.
5        Q.  Other than those three were any other
6    potential purchasers discussed that weekend?
7        A.  Not that I am aware of.
8        Q.  When you say you had discussions with
9    the internal team, who was the internal team that
10   you were having discussions with?
11       A.  Largely with Ian Lowitt but with other
12   members of Lehman's senior management.
13       Q.  Do you recall any of the other members
14   of senior management that you had discussions with
15   that weekend?
16       A.  Bart McDade, Tom Russo, Stephen
17   Berkenfeld, Alex Kirk.
18       Q.  Any others?
19       A.  I can't recall.
20       Q.  When did you first learn that Lehman
21   Brothers Holdings Inc was contemplating
22   a bankruptcy filing?
23       A.  I believe first contemplated on
24   Saturday.
25       Q.  Were you asked to perform any tasks

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    20
2    specifically in connection with contemplated
3    filing of the bankruptcy?
4        A.  Only one comes to mind, which was to
5    make a payment to Weil Gotshal.
6        Q.  We go ahead with the bankruptcy filing
7    on September 15.  Describe for me the kinds of
8    things you were doing on September 15.  What was
9    your day like?
10       A.  So the filing happened in the early
11   hours of the morning and there was great confusion
12   about the consequences of that, so much of the day
13   was spent fielding telephone calls from various
14   parts of the organization within Lehman, some from
15   external counterparties seeking clarification as
16   to the position, which entities may have filed and
17   the position of the remaining entities, and trying
18   to oversee the position and funding for LBI, the
19   US broker dealer.
20       Q.  Describe for me what actions you took
21   and conversations you had in connection with the
22   funding for LBI, the US broker dealer on the 15th?
23       A.  We had been instructed that the Fed
24   would be providing secured financing and that
25   other secured financing arrangements would be

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    21
2    maturing, so the discussion to the extent that
3    there was any was really just about executing that
4    transaction.
5        Q.  When you say "that transaction", the Fed
6    transaction?
7        A.  With the Fed, yes.
8        Q.  Were you involved in executing the
9    transaction with the Fed?
10       A.  Not executing it, no.
11       Q.  Were you involved with negotiating the
12   transaction with the Fed?
13       A.  No.
14       Q.  What was your involvement with the Fed
15   transaction?
16       A.  Only overseeing the collateral, the
17   collateral allocation and the cash received
18   afterwards.
19       Q.  When you say "overseeing collateral
20   allocation", what was your role in overseeing?
21   What specifically did you do to oversee collateral
22   allocation on the Fed repo?
23       A.  I reviewed the collateral that had been
24   allocated and the cash that had been received
25   against that collateral.  My role was largely

Page 22

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    22

2  analytical and much of the liquidity oversight is
3  an analytical function.  It is explaining the
4  changes in the liquidity position and explaining
5  the financing arrangements in the context of the
6  overall financial picture and balance sheet of the
7  entity.  So I don't know -- my group did not book
8  the transactions or the allocations, but clearly
9  it was important to understand the substance of
10  the transaction and detail of the transaction that
11  was executed to get a clear picture of the
12  financial position of the entity.
13      Q.  Who booked the transaction?
14      A.  The secured funding area.
15      Q.  Mr. Coghlan's group?
16      A.  Yes.
17      Q.  Did you have conversations with
18  Mr. Coghlan about the Fed funding on the 15th?
19      A.  I don't recall.
20      Q.  You said you reviewed the collateral.
21  What were you reviewing the collateral allocated
22  for.  Let me restate that.  You stated earlier you
23  reviewed the collateral allocated.  For what
24  purpose were you reviewing the collateral
25  allocated?

---

Page 23

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    23

2      A.  I have already explained that, to
3  understand the financial position of the entity.
4  It is obviously pertinent to the financial
5  position of the entity to understand the
6  collateral that has been transferred and the value
7  received for that.
8      Q.  So your review includes what specific
9  pieces of collateral that have been allocated, is
10  that right?
11      A.  That is right.
12      Q.  And you also did a review of what values
13  had been ascribed to that collateral?
14      A.  That is right.
15      Q.  Let's talk about the values ascribed to
16  the collateral allocated.  Who determines the
17  values of the collateral, the market value of the
18  collateral that is being allocated for financing?
19      A.  The tri-party provider in the case of
20  a tri-party repo transaction.
21      Q.  And was the Fed funding a tri-party
22  funding?
23      A.  It was.
24      Q.  Who was the third party?
25      A.  JP Morgan and Chase.

---

Page 24

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    24

2      Q.  So would it be correct to say that
3  JP Morgan and Chase would determine the values for
4  the collateral allocated by Lehman for the Fed
5  funding on September 15, is that correct?
6      A.  Yes.
7      Q.  And the applicable haircuts would then
8  be applied to the JP Morgan valuation, is that
9  correct?
10      A.  That is correct.
11      Q.  Now, Lehman would have its own values
12  for the collateral that was allocated to this
13  funding, correct?
14      A.  That is correct.
15      Q.  Was part of your review to see how the
16  JP Morgan values differed from the Lehman values
17  for the same collateral?
18      A.  It was.
19      Q.  Do you recall generally if the JP Morgan
20  values were higher, lower or the same?
21      A.  I don't recall.
22      Q.  Do you recall there being any
23  significant discrepancy at any time with the
24  JP Morgan prices for the collateral during that
25  week, September 15?

---

Page 25

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    25

2      MR. HUME:  Object to the form of the
3  question.  Any time during the week?
4      MR. TAMBE:  Yes.
5      A.  I don't recall.
6      Q.  Generally, as a matter of mechanics,
7  when the tri-party provider had done a valuation
8  of collateral and that valuation was significantly
9  lower than the Lehman valuation, that would affect
10  how much money you could borrow, correct?
11      A.  That is correct.
12      Q.  So you would probably disagree with the
13  valuation done by the third tri-party provider,
14  correct?
15      MR. HUME:  Object to the form of the
16  question.
17      A.  No.
18      Q.  You had no ability to disagree?
19      A.  We had no ability to disagree, nor do we
20  have an ability to negotiate the haircuts provided
21  by the Fed or by other lenders.
22      Q.  I am not talking about the haircut, I am
23  talking about the market value of the collateral
24  before you apply the haircuts?
25      A.  We had no ability to object.

## Page 26

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                26

1
2    I certainly did not.
3        Q.   Do you recall what the term was of the
4    Fed funding that was put in place on 15 September?
5        A.   I believe it was overnight.
6        Q.   Moving to the 16th, was that facility
7    rolled over on the 16th?
8        A.   The majority of the facility was rolled
9    over.  Barclays provided some financing as well so
10   the amount of the facility with the Fed reduced.
11       Q.   Before we get to the 16th, on the 15th,
12   other than dealing with the Fed funding, were you
13   also involved in any discussions about a possible
14   acquisition of the North American assets by
15   Barclays?
16       A.   I was not, no.
17       Q.   Were you aware that Barclays had
18   returned to Lehman to engage Lehman in discussions
19   about that?
20       A.   I was aware, yes.
21       Q.   How did you become aware of that?
22       A.   I can't remember who advised me but
23   someone, one of the senior members of the firm had
24   advised me that was the case.
25       Q.   On the 15th through the morning of the

## Page 27

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                27

1
2    16th were you involved in any negotiations with
3    Barclays about the purchase by Barclays of
4    Lehman's North American assets?
5        A.   I was not.
6        Q.   But you were aware those negotiations
7    were taking place, correct?
8        A.   I was.
9        Q.   Did you provide any due diligence
10   information in that time period?
11       A.   I don't believe so.
12       Q.   What was your understanding of what
13   transaction was being contemplated on the 15th
14   over into the 16th between Lehman and Barclays?
15       A.   I understood that it was the purchase of
16   the business and assets, some selection of assets
17   of the North American Lehman Brothers business.
18       Q.   And either on the 15th or 16th did you
19   have any understanding of what the economics of
20   that deal were?
21           MR. HUME:  Objection, lacks foundation.
22       A.   Not really.  I mean, I was aware of the
23   balance sheet that was being agreed at a very
24   summary level and, as I am sure you know, Martin
25   Kelly sent me a note advising me of some of the

## Page 28

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                28

1
2    details, so I had a very general sense of the
3    substance of the transaction, but to say that
4    I understood the economics would be, you know,
5    would not be accurate.
6        Q.   The Martin Kelly e-mail that you are
7    referring to, is that the one that talks about the
8    5 billion-dollar loss?
9        A.   That is right.
10       Q.   Let's take a look at that e-mail.  It is
11   136A.
12           (Exhibit 136A marked for identification)
13           MR. HUME:  Is that a new number?
14           MR. TAMBE:  Yes.
15           MR. HUME:  Has this document not been
16   made an exhibit yet?
17           MR. TAMBE:  I just do not know if it has
18   been.  Wherever possible we are trying to avoid
19   re-marking exhibits.  My guess is this one has
20   been.  We could not figure out what the number
21   was.
22           Mr. Tonucci, I have placed before you
23   a document marked Exhibit 136A.  Is that the
24   e-mail that you were referring to?
25       A.   That is correct.

## Page 29

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                29

1
2        Q.   That is an e-mail from Martin Kelly, you
3    are cc'd on that e-mail at the bottom.  Do you see
4    that?
5        A.   Yes.
6        Q.   There is a reference in there to a
7    "$5 billion all in economic loss versus our
8    marks".  Do you see that?
9        A.   I do.
10       Q.   What was your understanding of that
11   phrase?  What did that mean?
12       A.   I read that to mean that there would be
13   a discount to the marks at that time on the
14   assets.
15       Q.   And this notion of a discount on the
16   marks on the assets, was that a feature of the
17   transaction that ultimately persisted with the
18   transaction as it unfolded?
19           MR. HUME:  Objection, calls for
20   speculation and lacks foundation.
21       A.   Can you repeat?
22       Q.   Let me rephrase.  You understood the
23   5 billion dollars all in economic loss versus our
24   marks to be a reference to a discount off the
25   marks, correct?

## Page 30

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          30

2    A.  Yes.

3    Q.  The deal that was ultimately done and

4    closed on September 22, that too included

5    a discount off of Lehman's marks, correct?

6    A.  That is correct.

7    Q.  Okay, and the amount of that discount

8    off of Lehman's marks was about $5 billion, is

9    that right?

10    MR. HUME:  Objection, lacks foundation.

11    A.  It is uncertain, because obviously there

12    were a lot of valuation movements and so

13    I couldn't say with certainty, but certainly what

14    I can say is versus the valuations that I recall

15    seeing from our analysis it was about that number.

16    Q.  About $5 billion?

17    A.  About $5 billion.

18    Q.  Was it your understanding that about

19    a $5 billion discount was a negotiated amount of

20    discount?

21    MR. HUME:  Objection, lacks foundation.

22    A.  Only insofar as what I can read in this

23    e-mail.

24    Q.  Here is what I am getting at.  This

25    e-mail, 136A, is sent to you on

## Page 31

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          31

2    early September 16, correct?  The deal that is

3    contemplated on the 16th changes in many ways by

4    the 22nd, correct?

5    A.  Yes.

6    Q.  The amount of the discount in this

7    e-mail, the $5 billion you are telling me was

8    about the discount when all was said and done at

9    the end of the day, is that correct?

10    A.  That is correct.

11    Q.  Is it your understanding that the

12    $5 billion amount was the agreed upon discount for

13    the transaction?

14    MR. HUME:  Objection, the witness has

15    said he did not participate in the negotiations

16    and so the question lacks foundation.

17    A.  Only as I said from what I read here.  I

18    didn't have any further discussions about the

19    discount that I can recall.

20    Q.  Do you have an understanding of how the

21    discount was effected, how was the discount made

22    available to Barclays?

23    MR. HUME:  Objection, vague and

24    ambiguous.

25    Q.  Do you want to reword that?

## Page 32

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          32

2    Q.  Do you have trouble with the question?

3    A.  Not sure what you mean.

4    Q.  How did Barclays get the

5    5 billion-dollar discount?

6    A.  Right.  I think what was contemplated in

7    the negotiation, and what was executed in terms of

8    the settlement probably differed slightly, you

9    know, and involved over the week the settlement of

10    the transaction, meaning the actual transfer of

11    securities and cash was through the repo

12    agreements, and essentially the termination of

13    those repo agreements.

14    Q.  Was the discount given to Barclays by

15    defaulting on the repo?

16    MR. HUME:  Objection.  You are asking

17    the witness very general questions about

18    a complicated transaction without walking him

19    through any of the details of that transaction.  I

20    think the line of questioning lacks foundation.

21    MR. TAMBE:  You have an objection to

22    form, right, Hamish?  So noted.  Answer the

23    question, please.

24    MR. HUME:  I think the line of

25    questioning is calling for speculation and lacks

## Page 33

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          33

2    foundation.

3    MR. TAMBE:  Do you remember my question?

4    Probably not.  Do you want it read back?

5    A.  Yes, please.

6    (Read back)

7    A.  Yes, I would say that was the way in

8    which the transaction was settled, so that is

9    fair.

10    Q.  Would it also be fair to say, therefore,

11    that the discount was embedded in the haircut on

12    the repo transaction?

13    MR. HUME:  Objection, what discount?

14    MR. TAMBE:  The 5 billion-dollar

15    discount.

16    MR. HUME:  What 5 billion-dollar

17    discount?  You have not established or laid any

18    record of foundation.

19    MR. TAMBE:  Hamish, make objection to

20    form, move on.  Don't make speaking objections.

21    MR. HUME:  The objection is this is

22    a deliberately ambiguous and misleading line of

23    questioning.

24    MR. TAMBE:  Do you have my question in

25    mind?

## Page 34

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    34

2      A.  Could you repeat it please or read it
3   back.
4                (Read back)
5      A.  In a repo transaction there is haircut,
6   a difference between the market value and the cash
7   value received.  You could view that as
8   a discount.  I think in this case it is fair to
9   say that that was the settlement mechanics and
10  therefore the way that the difference between
11  market value and cash paid was accomplished.
12  There was in that sense a discount.
13     Q.  So I understand your last answer, there
14  was a 5 billion-dollar differential, roughly,
15  between the cash paid by Barclays and the market
16  value of the collateral they received, correct?
17     A.  That was when I looked at our analysis,
18  that was about the size of the number.
19     Q.  Let's go back to the week of the 16th.
20  You get the e-mail from Martin Kelly telling you
21  about at least an agreement in principle, correct?
22     A.  That is correct.
23     Q.  Let's move forward from there.  You have
24  got on the 16th a Fed funding facility in place,
25  correct.  Right?

## Page 35

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    35

2      A.  That is correct.
3      Q.  And you have got a repo from Barclays as
4   well, correct?
5      A.  Yes.
6      Q.  And there was a pre-existing master
7   repurchase agreement with Barclays, correct?
8      A.  I believe so.
9      Q.  That was amended on Monday September 15?
10     A.  I believe so.
11     Q.  Were you involved in the amendment to
12  that?
13     A.  I was not.
14     Q.  Who was?
15     A.  I don't know.
16     Q.  Do you have an under standing of what
17  the terms were of the Barclays -- the amended
18  Barclays repurchase agreement?
19     A.  I don't really recall, no.
20     Q.  Am I right to believe that there are
21  haircut schedules associated with repo agreements?
22     A.  Correct.
23     Q.  There was such a haircut schedule in
24  connection with the Fed repo, correct?
25     A.  There was.

## Page 36

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    36

2      Q.  And there was a haircut schedule on the
3   Barclays repo, correct?
4      A.  I believe so, yes.
5      Q.  Do you recall there being any
6   significant difference between the haircuts on the
7   Fed repo and the haircuts on the Barclays repo?
8          MR. HUME:  Objection.
9      A.  There were certainly differences, I
10  can't recall how significant.
11     Q.  Do you remember if there were particular
12  asset classes in which there were differences?
13     A.  I don't, no.
14     Q.  The Fed repo was an overnight repo,
15  right?
16     A.  Correct.
17     Q.  So it rolled over from the 15th to the
18  16th?
19     A.  Correct.
20     Q.  And rolled over again from the 16th to
21  the 17th?
22     A.  Not the same size, no.
23     Q.  Tell me briefly what the changes were,
24  if any, in the size of the Fed repo from Monday to
25  Tuesday to later in the week?

## Page 37

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    37

2      A.  I can't recall the exact details.  I
3   recall that the Barclays repo on the -- again, I
4   am not certain about this but the Barclays repo on
5   the 16th, I believe, was for $5 billion.  On the
6   17th I believe it was for $8 billion and then on
7   the Thursday there was obviously a much bigger
8   transaction and so that changed the Fed repo,
9   which became zero.
10     Q.  Let's talk about that bigger transaction
11  on Thursday, okay.  Describe for me how the Fed
12  repo went to zero and what happened with the
13  Barclays repo on Thursday?
14     A.  It is difficult for me to talk about the
15  mechanics because I am not that close to the
16  operational mechanics of the repo being unwound,
17  but my understanding was that the repo unwound on
18  the Thursday morning, which would be typical in
19  a tri-party repo, that an overnight repo would
20  unwind, you would return the collateral and the
21  cash and the transactions would then settle with
22  that collateral that was released, and at the end
23  of the day a new financing transaction would be
24  settled.
25          In this instance there was complexity because

## Page 38

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    38

2  JP Morgan was the tri-party agent for Lehman and had been
3  the tri-party agent in the transaction with the Fed.  BONY
4  was the tri-party agent for Barclays and so there was a need
5  to transfer collateral from JP Morgan to Bank of New York
6  tri-party system, and I am not sure about the mechanics
7  involved in that transfer but it was clearly a more
8  complicated transaction than if the financing had just been
9  through the JP Morgan tri-party system.
10      Q.  Is it your understanding that on
11  Thursday, in this bigger transaction on Thursday,
12  Barclays effectively replaced the Fed and the Fed
13  funding transaction?
14      A.  I was not involved in the discussions
15  with Barclays or with the Fed on the removal or
16  replacement of the Fed in that transaction, so I
17  can't really talk to the specifics, but my
18  understanding was that the Fed transaction was
19  going to mature on the Thursday and they were not
20  really providing any financing subsequently.
21      Q.  Wednesday night into Thursday, do you
22  recall the size of the Fed funding being
23  approximately $45 billion?
24      A.  Yes, that sounds about right.
25      Q.  And the Fed was holding approximately

## Page 39

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    39

2  $50 billion in collateral against that financing?
3      A.  That sounds right.
4      Q.  And the big transaction that you
5  described on Thursday effectively had Barclays
6  coming in and putting in $45 billion to pay off
7  the Fed repo, correct?
8      A.  I understood that they were going to be
9  putting in 45, that it was going to be
10  a 45 billion-dollar transaction, yes.
11      Q.  And all the collateral that was being
12  held by the Fed was then going to be transferred
13  to Barclays, correct?
14      MR. HUME:  Objection, asked and
15  answered.  He has already explained.
16      A.  To be honest, I was not close enough to
17  the actual transaction that was being booked to
18  know exactly where all the collateral was going to
19  end up, nor was I close enough to any agreements
20  with Barclays or with the Fed as to where all of
21  the collateral was going to end up.
22      Q.  So effectively on Thursday the Fed
23  funding goes down to zero, correct?
24      A.  That is correct.
25      Q.  And they exit the financing picture at

## Page 40

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    40

2  that point?
3      A.  That is correct.
4      Q.  And what you have left is the Barclays
5  repo, correct?
6      A.  That is correct.
7      Q.  Describe for me what happens with the
8  Barclays repo over the next few business dates?
9  We are now into Thursday on to Friday the 19th.
10      MR. HUME:  Again, objection to the form
11  of the question and the lack of foundation.
12      A.  That transaction happened on Thursday.
13  That was essentially the last of that transaction
14  in the way that I think about it.  It was executed
15  on Thursday night and settled Thursday night into
16  Friday morning and that was the end of that
17  transaction.  After that it was just a matter of
18  that transaction terminating and the collateral
19  being rebooked as a purchase by Barclays and as
20  a sale by Lehman.
21      Q.  Do you recall if the Barclays repo was
22  terminated on Friday?
23      A.  I don't.
24      Q.  The legal documentation for the
25  Lehman/Barclays transaction, are you generally

## Page 41

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    41

2  familiar with that documentation?
3      A.  With parts of it.
4      Q.  What do you understand the operative
5  legal documentation to be for that transaction?
6      MR. HUME:  I am going to object again.
7  You are asking -- he said he is not a negotiator.
8  You have shown him their documents and you keep
9  asking him to speculate about the entire
10  transaction.  I will counsel the witness not to
11  speculate.
12      A.  I am not a lawyer but I believe that the
13  asset purchase agreement is the document that you
14  are referring to.
15      Q.  Is that a document that you -- when is
16  the first time you saw the asset purchase
17  agreement?
18      A.  Not until a long time after the
19  transaction closed.
20      Q.  Is it fair to say during the week of the
21  15th to the 22nd you did not see the asset
22  purchase agreement?
23      A.  I didn't, no.
24      Q.  Did you see something called
25  a clarification letter?

## Page 42

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   42

1
2    A. Not until long after the close.
3    Q. You know what I mean by "clarification
4  letter"?
5    A. I know what you mean when you say the
6  clarification letter in relation to this
7  transaction, yes.
8    Q. I am sorry, I cut you off. What is your
9  understanding of the clarification letter?
10    MR. HUME: Objection. Same objection.
11  You are asking someone who was not a negotiator,
12  who is not a lawyer to speculate as to the meaning
13  of these documents that you are not even showing
14  him.
15    A. Only that it was a clarification to the
16  purchase agreement.
17    Q. Do you know when it was negotiated?
18    A. I believe on the -- prior to closing on
19  the -- I don't remember. Actually, I don't know
20  when it was negotiated.
21    Q. Did anyone ever tell you why
22  a clarification letter was needed?
23    A. No.
24    Q. Did you review any drafts of
25  a clarification letter?

## Page 43

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   43

1
2    MR. HUME: Objection, asked and
3  answered.
4    A. No.
5    Q. During the week of September 15, so from
6  the 15th through the 19th, were you aware of any
7  mark downs on the Lehman assets on Lehman's own
8  books?
9    MR. HUME: Objection, vague and
10  ambiguous.
11    A. There was a great deal of volatility in
12  prices over that week so I can't really sort of
13  answer whether there were any specific mark downs.
14  I was not part of the process of re-marking those
15  books or re-marking the assets, but there was
16  a great deal of price volatility and so I would
17  certainly expect that there would be asset price
18  movements and I would expect most of them to be
19  down.
20    Q. Were you aware of a general mark down
21  process in connection with Lehman's assets during
22  that week?
23    A. No.
24    Q. Going back to Thursday and the closing
25  out of the Fed facility, and then the Barclays

## Page 44

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   44

1
2  repo, you said the Bank of New York was
3  a tri-party provider for the Barclays repo, is
4  that right?
5    A. That is right.
6    Q. So they would have played a similar role
7  to the role played by JP Morgan on the Fed
8  facility, correct?
9    A. That is correct.
10    Q. And therefore Bank of New York would
11  have had prepared valuations of the collateral
12  that was being posted on the Barclays repo,
13  correct?
14    A. Correct.
15    Q. And they did that, correct?
16    A. I believe so, yes.
17    Q. Are you familiar generally with the Bank
18  of New York valuations of the collateral posted by
19  Lehman?
20    A. Generally, yes.
21    Q. Are you aware of any discrepancies
22  between the Bank of New York valuations for the
23  collateral and Lehman valuations of that same
24  collateral?
25    MR. HUME: Objection to form, what

## Page 45

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   45

1
2  collateral?
3    Q. The Barclays collateral.
4    A. There was certainly a very comprehensive
5  reconciliation required because of the number of
6  securities that were moving, and some of those
7  securities were quite complicated in terms of not
8  just the valuation but the actual amounts. These
9  are mortgage securities, mortgage pass throughs,
10  so there was a very big reconciliation required
11  and there were differences identified in the
12  details of the securities. There were differences
13  in the valuations and for certain there were
14  differences in the valuations.
15    Q. And this reconciliation process that you
16  just described, when did that take place?
17    A. I think the reconciliation that I
18  remember sort of in detail was after the closing.
19  I think we tried to do a reconciliation on the
20  Friday. When I say "we", it was within the
21  operations team, and certainly after the 22nd or
22  on the 22nd, and after there were more detailed
23  reconciliations produced.
24    Q. When you got to Barclays were you
25  involved in dealing with Barclays' accountants in

## Page 46

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        46

1 accounting for the economics of the acquisition of
2 Lehman by Barclays?
3     A.   We were asked to contribute to the
4 initial balance sheet, the preparation of an
5 initial balance sheet, but I would say that my
6 involvement with the accountants was as an
7 information provider and was sporadic.  I was not
8 involved in -- after the initial balance sheet,
9 components of the initial balance sheet were
10 provided, our balance sheet commitment, I don't
11 think I did very much in terms of the accounting
12 for the transaction.
13     Q.   In addition to helping with the
14 preparation of the initial balance sheet, did you
15 play any role in reviewing the valuation of the
16 acquisition in connection with the year-end
17 results for Barclays?
18     A.   I saw the balance sheet, the acquisition
19 balance sheet a number of times, and as I say I
20 was peripherally involved.  The accounting for
21 this was quite complicated because of the
22 different entities that were involved, and so yes
23 I saw some details but the overall economics
24 I would say was not really clear to me.  I was not

## Page 47

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        47

1 sort of involved at that level.
2     Q.   You are generally aware that Barclays
3 has reported a gain on the acquisition, correct?
4     A.   Yes.  I mean, I am aware of what was
5 publicly disclosed.  I have not seen the details
6 of the calculation of that.
7     Q.   What is your general understanding of
8 the magnitude of the gain reported by Barclays for
9 the year-end 2008 from the Lehman acquisition?
10    A.   That a gain on acquisition was reported
11 of over 2 billion pounds.
12    Q.   Over 2 billion pounds?
13    A.   Yes.
14    Q.   Is it your understanding that there may
15 well be additional gains from the acquisition that
16 have not yet been reported by Barclays?
17       MR. HUME:  Objection.
18    A.   I am not aware of that.
19    Q.   You don't know one way or the other?
20    A.   I don't.
21    Q.   Did you ever talk to anyone as to why
22 Barclays was getting a 5 billion-dollar discount
23 on this transaction?
24    A.   I don't think I did, no.

## Page 48

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        48

1     Q.   You told us that you reviewed the asset
2 purchase agreement and the clarification letter at
3 some time after the closing of the transaction?
4     A.   No, I didn't say I reviewed them.
5 I said I was shown parts of the asset purchase
6 agreement and the clarification letter.
7     Q.   Even better.  Do you recall whether the
8 asset purchase agreement or the clarification
9 letter reflect a 5 billion-dollar discount?
10      MR. HUME:  Objection to the form of the
11 question.  What do you mean by "reflect"?
12    Q.   Do you have my question in mind?
13    A.   Could you repeat it, please?
14       (Read back)
15      MR. HUME:  Again I am going to object to
16 the question since you have not shown him the
17 agreements, he is not a lawyer and he was not
18 a negotiator.
19    Q.   You were shown parts of the agreements,
20 right, that is what you said?
21    A.   I just don't know.
22    Q.   Let me ask you the question.  You were
23 shown parts of these agreements, the asset
24 purchase agreement and the clarification letter,

## Page 49

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        49

1 right?
2     A.   Yes.
3     Q.   The parts that you were shown, did they
4 show a 5 billion-dollar discount?
5       MR. HUME:  Do you recall is the
6 question.
7     A.   I don't recall, no.
8     Q.   What parts of the agreement do you
9 recall being shown?
10    A.   I don't know.  I don't know.  I didn't
11 see the whole agreement so -- I don't think I saw
12 the whole agreement.  I saw components of it
13 related to the various schedules of assets that
14 were being transferred and to some of the other
15 assets that were included in the agreement.
16    Q.   Was there a particular task or event in
17 connection with which you were shown these pieces
18 or parts of the transaction documents?
19    A.   Yes, in the preparation I would say of
20 revisions to Schedule B to the agreement and in
21 the analysis of the 15c3 receivables.
22    Q.   And what role did you play in connection
23 with the revisions to Schedule B?
24    A.   Providing some analytical support to the

## Page 50

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          50

1
2  determination of available collateral.
3     Q.   Does that mean you determined what
4  collateral was available to be included in
5  Schedule B?
6     A.   No.
7     Q.   What do you mean by "analytical
8  support"?
9     A.   It means that I helped coordinate the
10  process of reviewing collateral that may be
11  available that was being extracted from various
12  systems that you would typically use, whether it
13  was the operations systems or some of the
14  databases which aggregate that information and
15  provide a different cut of analysis.  So my work,
16  my involvement, was in reviewing that to ensure
17  that it was being appropriately queried and
18  analyzed and understood, validated.
19     Q.   Who else was involved in this process?
20     A.   The operations team were really the
21  experts in the operating systems and therefore in
22  understanding the availability of collateral.
23     Q.   Who was the operations team?
24     A.   Alastair --
25     Q.   Who was the operations team doing this?

## Page 51

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          51

1
2     A.   Alastair Blackwell manages that team.
3  I would say that Jim Hraska was the person most
4  involved.
5     Q.   And this event that you are describe,
6  the revisions to Schedule B, this is post-closing,
7  correct?
8     A.   That is correct.
9     Q.   And in the weeks immediately after the
10  closing of the transaction?
11     A.   Pre-closing there was an analysis
12  performed to determine the unencumbered
13  collateral, as I am sure you are aware, which was
14  the basis for the original Schedule B.  The
15  subsequent analysis I would say was to correct for
16  errors that may have been made in the initial
17  aggregation of information in the initial
18  analysis, and to reflect some of the breaks in the
19  different systems that were used, stock record
20  breaks for example.  That exercise continued
21  sporadically through the remaining three months of
22  2008.
23     Q.   Again, just talking about the revisions
24  to Schedule B, I want to talk about the
25  post-closing revisions to Schedule B.  The errors

## Page 52

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          52

1
2  you are talking about, is it errors about
3  identifying particular pieces of collateral?  Is
4  that the nature?
5     A.   That is correct.
6     Q.   When you said "stock record breaks",
7  what do you mean by "stock record breaks"?
8     A.   These are breaks between the internal
9  accounting records and the external depository
10  statements.
11     Q.   In terms of ownership of particular
12  securities, is that what you mean?
13     A.   In terms of possession.
14     Q.   Did these revisions to Schedule B that
15  took place post-close affect the value of the
16  collateral that was listed on Schedule B, the
17  total value?
18     MR. HUME:  Objection.  The revisions to
19  Schedule B are being referred to -- I believe the
20  record is unclear whether you mean revisions to
21  the schedule filed a week after the closing or any
22  subsequent work after that.  For the line of
23  questioning to be clear that needs to be made
24  clear in the questions.
25     MR. TAMBE:  I am talking about the

## Page 53

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          53

1
2  revisions to Schedule B that you talked about,
3  Mr. Tonucci.
4     MR. HUME:  There have been a number of
5  answers that he has provided so I still think the
6  question is unclear.
7     MR. TAMBE:  So the revisions to Schedule
8  B that you were talking about, did those revisions
9  affect the total value of the Schedule B?
10     A.   I am referring to the revisions that
11  happened in the period after the initial filing of
12  Schedule B and I am not sure when and if the --
13  you know, when and if revisions were actually
14  lodged with the court.  I am not a lawyer and I am
15  not sure what the legal process was but certainly
16  the internal calculations of unencumbered
17  collateral is what I am referring to as the
18  revisions to Schedule B that happened essentially
19  after the initial filing of Schedule B in
20  late September, and those revisions changed the
21  collateral detail significantly.  So the values
22  clearly changed along with the composition of the
23  assets.
24     Q.   Did they change up, increasing value, or
25  did they change down?

## Page 54

HIGHLY CONFIDENTIAL - PAOLO TONUCCI       54

2  A.  I believe they changed in both
3  directions.
4  Q.  As an aggregate?
5  A.  I don't know.
6  Q.  Do you have an understanding as to the
7  origination of Schedule B?
8  A.  I do.
9  Q.  What is your understanding about the
10  origination of Schedule B?
11  A.  The origination of Schedule B was to
12  list the unencumbered collateral that was to be
13  included within the sale and purchase agreement.
14  Q.  So this was unencumbered collateral
15  other than the collateral that had already been
16  posted to Barclays under the Barclays repo,
17  correct?
18  A.  That is correct.
19  Q.  And is it your recollection that the
20  origination of Schedule B goes back to Friday,
21  19 September?
22  MR. HUME:  Objection, lacks foundation.
23  A.  That is correct.
24  Q.  And do you recall there being an effort
25  on September 19 to find additional collateral for

## Page 55

HIGHLY CONFIDENTIAL - PAOLO TONUCCI       55

2  Barclays?
3  A.  I do.
4  Q.  What can you tell us about the efforts
5  to find additional collateral for Barclays?
6  A.  That we were asked on the morning of the
7  19th to find if there was additional collateral to
8  include in the transaction.
9  Q.  Asked by whom?
10  A.  I believe I was asked by Ian Lowitt.
11  Q.  Did Ian Lowitt tell you why he was
12  asking you to find additional collateral?
13  A.  He said that it was necessary for the
14  transaction to close and he reiterated that
15  through the day.
16  Q.  In addition to Schedule B, were there
17  other collections of assets that were put together
18  to provide additional collateral for Barclays?
19  A.  There were receivables in the form of
20  the 15c3 reserve, which were reviewed, and through
21  the course of the Friday there were other
22  receivables that were also reviewed to determine
23  if they could be included as assets or collateral
24  in the sales agreement.
25  Q.  What other receivables?

## Page 56

HIGHLY CONFIDENTIAL - PAOLO TONUCCI       56

2  A.  We reviewed derivative receivables and
3  margin balances, FX receivables, that is foreign
4  exchange.  I should add actually we also reviewed
5  some bank receivables, because there had been cash
6  posted with some of the clearing banks, so that
7  was also reviewed.
8  Q.  Safe to say you looked in every corner
9  for assets and receivables that you could deliver
10  to Barclays?
11  MR. HUME:  Objection, vague and
12  ambiguous.
13  A.  We reviewed the balance sheet to see
14  where there might be additional assets.
15  Q.  You looked everywhere, right?
16  A.  We looked across the whole balance
17  sheet.
18  Q.  And this was a directive from Mr. Lowitt
19  to find these assets, correct?
20  A.  That is correct.
21  Q.  And you found a bunch of unencumbered
22  assets and put them in Schedule B?
23  A.  That is correct.
24  Q.  And then you found these 15c3
25  receivables, is that right?

## Page 57

HIGHLY CONFIDENTIAL - PAOLO TONUCCI       57

2  A.  I would say we identified the 15c3
3  receivables as an asset that could be transferred.
4  Q.  Who is the "we" who identified those
5  receivables?
6  A.  It was again overseen by Ian but it was
7  myself, Martin Kelly, Robert Azerad.
8  Q.  What was approximately the value of the
9  15c3 receivables that you identified?
10  A.  There was uncertainty, a great deal of
11  uncertainty about the excess, but there was
12  certainty about the actual deposits that had been
13  made for 15c3, which included a cash deposit with
14  Wells Fargo for a billion dollars and securities
15  which in the calculation had been valued at, I
16  believe, $769 million.
17  Q.  And so that is about what, $1.7 billion
18  total?
19  A.  That is correct.  There may have been
20  other balances.  I think that there were other
21  securities balances also that were on deposit but
22  I recall specifically those two.
23  Q.  On the Friday the 19th, is it your
24  recollection that the 15c3 receivables were
25  identified as assets or receivables that in fact

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          58

2  could be transferred to Barclays?
3      MR. HUME:  Objection to the lack of
4  foundation.
5      A.  That is correct, that is my
6  understanding.
7      Q.  From your earlier answer it seems that
8  there were receivables that you identified that
9  maybe you concluded could not be transferred to
10  Barclays, is that fair?
11      A.  That is correct.
12      Q.  The 15c3's could be transferred to
13  Barclays, right?
14      MR. HUME:  Objection to the vagueness of
15  the question.  What do you mean by "could"?
16      A.  I mean, I would try and clarify this --
17      Q.  Sure.
18      A.  The thinking was that there was
19  a surplus, in that calculation that although it
20  was uncertain as to both the amount of the surplus
21  and the requirement, these represented assets
22  which were transferable and, you know,
23  identifiable and transferable.  I would say that
24  the distinction with some of the other receivables
25  was that it was much more difficult, given our

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          59

2  information, our sort of accounting position at
3  that time, our transactional detail at that time,
4  it was much more difficult to identify specific
5  receivables that could have been transferred.  So
6  it was more a matter of that these were much more
7  easily identifiable, but yes, we did believe that
8  they were transferable, or would become
9  transferable.  It was always understood that there
10  was a regulatory approval that would be required
11  but that they would become transferable.
12      Q.  Did you have any discussions with
13  Mr. Lowitt as to whether transferring those
14  receivables was part of the deal with Barclays?
15      MR. HUME:  Objection, what receivables?
16      Q.  The 15c3 receivables?
17      A.  I do recall talking to him about that,
18  yes.
19      Q.  What did he tell you?
20      A.  We were looking for potential other
21  assets and so we were going to include this in the
22  agreement.
23      Q.  Do you know one way or the other whether
24  the 15c3 receivables were part of the asset
25  purchase agreement?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          60

2      A.  I can't recall if they were part of the
3  asset purchase agreement or some clarification
4  letter.
5      Q.  The parts of the asset purchase
6  agreement or the clarification letter that were
7  shown to you, do you recall whether they had any
8  reference to the 15c3 assets?
9      A.  I don't recall.  I don't recall which.
10  I do recall that there was in one or other of
11  those documents a reference to that, to those
12  assets.
13      Q.  The other receivables you mentioned, the
14  derivatives receivables, could you describe what
15  you mean by derivative receivables?
16      A.  Yes.  Particularly for LBI there were
17  substantial margins posted at the exchanges, which
18  were accounted for, essentially accounted for as
19  receivables, and those are what I refer to as
20  derivative receivables.
21      Q.  Would an example of derivative
22  receivables be these types of receivables that
23  were posted with the OCC?
24      MR. HUME:  Objection to the form of the
25  question.  These type?  Which type of receivables?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          61

2      Q.  Derivative receivables?
3      A.  I would say that would be consistent
4  with my understanding.
5      Q.  And the OCC is the Options Clearing
6  Corp?
7      A.  That is correct.
8      Q.  Do you recall in the bits and pieces of
9  the asset purchase agreement, the APA and the
10  clarification letter that was shown to you whether
11  those documents provided for derivatives
12  receivables to be transferred to Barclays?
13      MR. HUME:  Objection.  You are asking
14  this witness to give an opinion on a legal
15  document that you have not shown him.  He is not
16  a lawyer and he said he was not a negotiator of
17  the deal.
18      MR. TAMBE:  You have an objection to
19  foundation and form.
20      MR. HUME:  I am not just objecting to
21  foundation.  It is an inappropriate, misleading
22  question.
23      MR. TAMBE:  Don't make speaking
24  objections.  Object to form, move on, we will get
25  through this faster.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                62

1
2    MR. HUME:  It is not just an objection
3 to form.
4    MR. TAMBE:  Are you instructing him not
5 to answer?
6    MR. HUME:  I am objecting to
7 a misleading line of questioning.
8    MR. TAMBE:  Thank you.
9    Mr. Tonucci, do you have my question in
10 mind?
11    (Read back)
12    A.  I don't recall.
13    **Q.  Another type of receivable you described**
14 **before were FX receivables?**
15    A.  Um hum.
16    **Q.  Did you identify any foreign exchange**
17 **receivables that could be transferred to Barclays?**
18    A.  There was a receivable balance for
19 forward settling foreign exchange on the LBI
20 balance sheet.
21    **Q.  And the determination was that those**
22 **receivables could be transferred to Barclays, is**
23 **that right?**
24    MR. HUME:  Objection to the form,
25 objection to the vagueness of the word --

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                63

1
2    A.  There was insufficient detail to be able
3 to confirm that, that that still existed at that
4 point in time.
5    **Q.  At some subsequent point in time was**
6 **a determination made as to those FX receivables?**
7    A.  I don't know.
8    **Q.  Another category of receivables you**
9 **identified were bank receivables?**
10    A.  Yes.
11    **Q.  Again, the same series of questions on**
12 **the bank receivables; was a determination made on**
13 **the 19th that those were transferable to Barclays?**
14    A.  On the 19th there was a determination
15 made that it was too complicated and too uncertain
16 to be able to say whether those were transferable.
17    **Q.  And on some subsequent date after the**
18 **19th was a determination made as to whether those**
19 **could be transferred?**
20    A.  I don't know.
21    **Q.  You were in New York during this week,**
22 **correct?**
23    A.  That is correct.
24    **Q.  Do you recall accepting your offer of**
25 **employment at Barclays?**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                64

1
2    A.  I do.
3    **Q.  When did you do that?**
4    A.  I believe it was 26 September.
5    **Q.  You sent an e-mail on the morning of the**
6 **22nd accepting your offer, right?**
7    MR. HUME:  Objection, lacks foundation.
8    A.  I can't remember.
9    **Q.  Do you recall about an hour after the**
10 **ink dried on the clarification letter you sent an**
11 **e-mail?**
12    MR. HUME:  Objection to form.
13    A.  I don't remember.
14    **Q.  Let me show it to you.**
15    **(Exhibit 137A marked for identification)**
16    **I have handed you a one page document**
17 **marked Exhibit 137A.  Do you have that before you?**
18    A.  I do.
19    **Q.  Do you recognize this as an e-mail that**
20 **you sent to an e-mail box called "Accept Barclays**
21 **offer at Lehman.com"?**
22    A.  Yes.
23    **Q.  And the subject simply says: "I accept".**
24 **Correct?**
25    A.  Yes.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                65

1
2    **Q.  You were accepting an offer of**
3 **employment for Barclays, right?**
4    A.  Yes.
5    **Q.  What offer were you accepting on**
6 **Monday September 22 at 1:04 pm GMT?**
7    A.  I can't recall the details at that point
8 but I believe that the offers went out over the
9 weekend, but I don't recall the exact details of
10 it at that point.  I recall the hard copy in more
11 detail.  I am not too sure when that was sent out.
12    **Q.  If I understand your answer, at some**
13 **point over the weekend of the 20th/21st you**
14 **received a soft copy of the offer?**
15    A.  Yes.
16    **Q.  And at some point during the week of the**
17 **22nd you actually signed a hard copy?**
18    A.  That is correct.
19    **Q.  But you knew before the 20th that you**
20 **would be offered employment by Barclays, correct?**
21    MR. HUME:  Objection.
22    A.  I knew on the evening of the 19th that
23 I would receive an offer from Barclays.
24    **Q.  Had you had any discussions with anyone**
25 **prior to September 19 about receiving an offer**

## Page 66

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        66

2  from Barclays?

3      A.  No.

4      Q.  What was the communication you received

5  on the evening of September 19 about an offer from

6  Barclays?

7      A.  After the Lehman and the Barclays and

8  the other teams had gone to the bankruptcy court,

9  after the day's work had been completed and I was

10  going to head home, and I had been up all night so

11  I was exhausted, and so I am not too sure, I am

12  not too sure of the exact time, before departing

13  for the day Ian Lowitt advised me that I would

14  receive an offer, and he gave me the general terms

15  that I would likely be offered.

16      Q.  When you say "the general terms", the

17  general economic terms of the offer?

18      A.  The general economic terms, but I was

19  not sure of the position at that point.

20      Q.  Prior to that September 19, had you had

21  discussions with Ian about what your future held

22  for you?

23      A.  No.

24      Q.  No discussions?

25      A.  No.

## Page 67

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        67

2      Q.  Did you try to get any assurance from

3  him or anyone else about whether there was a place

4  for you at Barclays?

5      A.  No.

6      Q.  You knew he would be heading to

7  Barclays, right?

8      A.  I didn't, no.

9      Q.  Did you know whether any of the folks

10  that you were working with at Lehman that week

11  were going to be headed to Barclays?

12      A.  I expected that there would be some that

13  were heading to Barclays but I was not sure of

14  exactly whom.

15      Q.  Barclays was buying the North American

16  operations, correct?

17      A.  Correct.

18      Q.  And they needed people to run those

19  operations?

20      A.  Correct.

21      Q.  So your expectation was that some

22  significant number of Lehman folks would in fact

23  get offers from Barclays?

24      A.  That is correct.

25      Q.  And you certainly hoped to be included

## Page 68

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        68

2  in that group?

3      A.  Yes, I think it is fair to say I hoped

4  to be included.

5      Q.  Your compensation at Lehman for the

6  calendar year 2007, the full calendar year, could

7  you briefly describe what your total Lehman

8  compensation was?

9      A.  I was on an ex-pat arrangement, so I

10  will leave that aside.  The basic components of

11  compensation, total compensation of $2 million.

12      Q.  And was that broken out into cash and

13  non-cash?

14      A.  Yes.  Salary was around -- I think it

15  was $250,000.  The cash was around, I would say

16  around a million dollars total cash, cash bonus

17  and then stock was the remainder.

18      Q.  And the stock component that you

19  received, your 2007 compensation, that was

20  immediately vested stock?

21      A.  No, that vested in the regular schedule,

22  which is 5 years for Lehman.

23          (Exhibit 138A marked for identification)

24      Q.  Sir, I have placed before you a 3-page

25  document marked exhibit 138A.  Is that a copy of

## Page 69

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        69

2  the offer of employment you received from Barclays

3  Capital over the weekend of September 20/21?

4      A.  Yes.

5      Q.  It carries a date of September 22 on the

6  first page, right?

7      A.  Correct.

8      Q.  And that is your signature on the last

9  page?

10      A.  That is correct.

11      Q.  Looking at the first page of

12  Exhibit 138A, the economic terms of your

13  employment are as set forth up there, correct?

14      A.  That is correct.

15      Q.  You have a compensation of 268,336 per

16  annum?

17      A.  That is right.

18      Q.  There is a guaranteed cash bonus for

19  2008, do you see that?

20      A.  I do.

21      Q.  That is in the amount of 1.185 million?

22      A.  Correct.

23      MR. HUME:  Sorry, I am unsure.  We are

24  going to designate obviously any portion of the

25  transcript that relates to compensation highly

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                70

2   confidential.  Is it understood we can do that
3   after the deposition?
4        MR. TAMBE:  Yes, and I think the
5   agreement that was reached at the Felder
6   deposition we assume carries for all depositions.
7        MR. HUME:  For all designations we can
8   do it later rather than during.
9        MR. TAMBE:  You can do it later.  Let's
10  just follow the Felder rule.  I think it was that
11  we were going to treat the entire transcript as
12  highly confidential.
13       MR. MAGUIRE:  Treating the entire
14  transcript as highly confidential for a week and
15  make the designations within the week.
16       MR. TAMBE :  Going back to the
17  guaranteed cash bonus of 1.185 million, did you
18  receive that in February 2009?
19       A.  I am not sure if it was February
20  or March but it was received in 2009.
21       Q.  And was that the amount of the cash
22  bonus you received in February or March 2009?
23       A.  That is correct.
24       Q.  Did you also receive the next item, the
25  2008 EPP recommendation.  Do you see that?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                71

2        A.  I do.
3        Q.  And did you?
4        A.  I did.
5        Q.  Was it roughly that amount?
6        A.  Yes.
7        Q.  The next category, "special cash award",
8   do you see that?
9        A.  Yes.
10       Q.  That is a special cash award of 700,000,
11  do you see that?
12       A.  That is right, yes.
13       Q.  Do you have an understanding as to why
14  you were receiving a special cash award?
15       A.  I assumed that it was -- I assumed that
16  it was being awarded to a group of senior
17  employees that Barclays felt were going to be of
18  future value to the organization.
19       Q.  Have you received any portion of the
20  special cash award as of today?
21       A.  No.
22       Q.  You had a change in position you said
23  early on in February or March 09?
24       A.  That is right.
25       Q.  Has your compensation increased as

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                72

2   a result of that change in position?
3        A.  My basic salary I would say is
4   consistent and I am not sure of my bonus.
5        Q.  Do you have any guaranteed cash bonus
6   component in your new position?
7        A.  No.
8        Q.  Do you have any guaranteed EPP?
9        A.  No.
10       Q.  Any special cash awards?
11       A.  No.
12       (Exhibit 139A marked for identification.)
13       Q.  I have placed before you a 2-page
14  document marked Exhibit 139A.  Let me know when
15  you have had a chance to review it.
16       A.  I have reviewed it, yes.
17       Q.  A couple of questions about some of the
18  names that appear on this e-mail chain.  Some you
19  have mentioned this morning but a couple of others
20  I want to ask you about.  David Aronow, what
21  position did Mr. Aronow have?
22       A.  He is within the operations team.
23       Q.  At Lehman?
24       A.  At Lehman.
25       Q.  And he made the move to Barclays as

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                73

2   well?
3        A.  Yes.
4        Q.  John Palchynsky, what position did he
5   have at Lehman?
6        A.  He was in the operations team.
7        Q.  Did he make the move to Barclays?
8        A.  Yes.
9        Q.  John Feraca.  Was he in the operations
10  team at Lehman as well?
11       A.  He was in the prime services team.
12       Q.  Did he make the move to Barclays?
13       A.  Yes.
14       Q.  Monty Forrest, what was his position at
15  Lehman?
16       A.  He was in the prime services team.
17       Q.  Did he make the move to Barclays?
18       A.  He did.
19       Q.  Neil Ullman, what was his position at
20  Lehman?
21       A.  He was in the operations team.
22       Q.  Did he make the move to Barclays?
23       A.  He did.
24       Q.  Dan Fleming, you have mentioned before.
25  Did he make the move to Barclays?

## Page 74

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          74

1
2    A. He did.
3    Q. Just a question about the e-mail address
4    for Mr. Fleming. It has in parentheses "TSY"
5    after it. Do you see that?
6    A. Yes.
7    Q. Any understanding what that means?
8    A. Treasury.
9    Q. And that was a designation used within
10   Lehman?
11   A. I don't know. I think that the TSY
12   designation is used where there may be more than
13   one person, just to identify which one it is.
14   Q. Craig Jones, what was his position
15   within Lehman?
16   A. He was in treasury.
17   Q. Did he make it over to Barclays?
18   A. He did.
19   Q. Look at the top half of Exhibit 139A.
20   There is a message there from Mr. Palchynsky to
21   several people, including you. Do you see that?
22   A. I do.
23   Q. He says in there: "Anyway, see you all
24   at BarCap". Do you see that?
25   A. I do.

## Page 75

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          75

1
2    Q. There is an e-mail dated September 19,
3    2008. Do you see that?
4    A. I do.
5    Q. Around 6:28 pm, right?
6    A. Yes.
7    Q. So was this the first that you had heard
8    about your employment at Barclays?
9    A. I believe that I had heard perhaps an
10   hour before that.
11   Q. Was this the first that you had heard
12   that all these other people were also going to be
13   going to Barclays?
14   A. This is a relatively junior person in an
15   operations area, who could have been speculating.
16   It was not clear to me that all of these people
17   were going to be moving over.
18   Q. This chain of e-mails has a subject line
19   that says: "Urgent, tri unwind". Do you see that?
20   A. I do.
21   Q. And what was the "Urgent tri unwind"
22   about, if you recall?
23   A. It was to do with the cash balance that
24   was placed with JP Morgan on the night by Barclays
25   on the night of the 18th, and was part of the

## Page 76

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          76

1
2    tri-party arrangement, and it was being unwound.
3    Q. And the collection of people on these
4    e-mails were involved in assisting with that
5    unwind?
6    A. They were involved in the repo
7    operations.
8    Q. So they would have dealt with that
9    unwind and other aspects of the repo?
10   A. Yes.
11   MR. TAMBE : Thank you. We will take
12   a short break now.
13        (Break from 8:55 to 9:14 am.)
14   Q. I am showing you a document previously
15   marked as Exhibit 19. Have you seen this document
16   before today, sir?
17   A. I have.
18   Q. What do you understand it to be?
19   MR. HUME: Objection to the form.
20   A. It was the balance sheet that was I
21   believe, you know, part of the negotiation for the
22   sale to Barclays, so the estimated balance sheet.
23   Q. And the estimated balance sheet for what
24   entity?
25   A. For the part of LBI that was being sold.

## Page 77

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          77

1
2    Q. Do you recall if this is a document that
3    you saw during that week, the week
4    of September 15, 2008?
5    A. Yes, I believe I saw it on the 16th.
6    Q. Do you know in connection with what
7    event or action did you see this document?
8    A. In relation to the Barclays contemplated
9    purchase.
10   Q. Who showed it to you?
11   A. I think it was Ian Lowitt.
12   Q. Did you play any role in the preparation
13   of this document, Exhibit 19?
14   A. I did not.
15   Q. We had earlier talked about the
16   $5 billion discount. Do you know if the
17   $5 billion discount was reflected in this
18   document, Exhibit 19?
19   MR. HUME: Objection, lacks foundation.
20   A. I do not know.
21   Q. If you look under the "liabilities"
22   column, last two entries above the total are
23   titled "Cure PMT" and "Comp". Do you see that?
24   A. I do.
25   Q. And there is a total of about four and

Page 86

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        86

1
2     A.  No.
3     Q.  Any idea what that means?
4         MR. HUME:  Objection, calls for
5  speculation.
6     A.  No, not really.
7         MR. HUME:  He is asking you to
8  speculate.
9     Q.  Just in broad dollar terms, was it your
10  understanding that the amount of the Fed facility
11  on or about September 18, 2008, was a funding of
12  about $44 billion or $45 billion against a market
13  value of collateral of about $50 billion?
14     A.  Yes, that sounds right.
15        (Exhibit 140A marked for identification)
16     Q.  I have had placed before you a document
17  marked Exhibit 140A, a 3-page document.  Take
18  a moment to look at it, let me know when you are
19  done.  You done?
20     A.  I have read through it.
21     Q.  Do you recognize that document?
22     A.  Actually, I can't recall going through
23  this, no.
24     Q.  Do you see the cover e-mail is an e-mail
25  from Mr. Robert Azerad?

Page 87

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        87

1
2     A.  Yes.
3     Q.  Martin Kelly?
4     A.  Yes.
5     Q.  You are shown as a cc on that?
6     A.  Yes.
7     Q.  Do you understand the information that
8  is contained on page 2 of Exhibit 140A?
9     A.  Not entirely sure I do.
10     Q.  Do you recall there being a discussion
11  or an analysis during that week of September 15
12  about assets available to be transferred by LBI to
13  Barclays?
14     A.  I do, yes.
15     Q.  What do you recall about that analysis
16  or discussion?
17     A.  That obviously we were trying to be as
18  specific as possible about not just the assets
19  that were on the balance sheet but actually what
20  was going to be available for transfer.  The
21  difference between the balance sheet from a sort
22  of accounting or GAPP perspective from a funding
23  perspective, was really one of granularity, in
24  terms of what has settled and exactly where the
25  securities that are in the repo agreements or

Page 88

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        88

1
2  reverse repo agreements.  So the effort was to try
3  and establish what was exactly available for
4  transfer.
5     Q.  Is it your understanding that the assets
6  that were listed on the LBI balance sheet, not all
7  of those ultimately were transferable to Barclays?
8     A.  Yes.
9     Q.  We had seen earlier in Exhibit 19, which
10  I think is still before you, if you can just turn
11  to that --
12     A.  Yes.
13     Q.  This is a balance sheet I think you told
14  us of LBI as of September 16, 2008, correct?
15     A.  Yes 15th, I think, I assume.
16     Q.  And that has a total adjusted assets or
17  adjusted total assets of 72.6 billion.  Do you see
18  that?
19        MR. HUME:  Objection.  Did you ask
20  whether this Exhibit 19 was a balance sheet for
21  LBI.
22        MR. TAMBE:  Yes?
23        MR. HUME:  Was that the question?
24        MR. TAMBE:  That was not the question,
25  no.  The question was whether it as had a total

Page 89

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        89

1
2  adjusted assets of 72.6 billion.
3        MR. HUME:  Before you asked if it was
4  a balance sheet of LBI.
5        MR. TAMBE:  The record is what it is.
6  You have an objection to make, make it, let's move
7  on.
8        MR. HUME:  I think the record is
9  misleading now.  You asked a question that the
10  witness did not understand.
11        MR. TAMBE:  Unless you are challenging
12  the witness I am not sure what that objection is
13  all about.
14        Let's go back to the Exhibit 19, LBI
15  balance sheet adjusted total assets 72.65 billion.
16  Correct.
17     A.  I can see that, yes.
18     Q.  And is it your recollection that over
19  some -- over the course of that week, the week
20  of September 15, the assets of LBI available for
21  transfer were less than 72.65 billion?
22     A.  Yes.
23     Q.  It went down to a number of about
24  50 billion, correct?
25     A.  I am not sure it ever went as low as

## Page 90

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                90

2  that, but anyway it certainly went down.

3     Q.  How low did it go in your recollection?

4     A.  Somewhere between 50 and 60 billion.

5     Q.  And part of the reason for that change

6  from 72 to the 50 to 60 billion range is assets

7  that could not be transferred to Barclays,

8  correct?

9        MR. HUME:  Objection, lacks foundation.

10     A.  Yes, that is right.  I mean, insofar as

11  they were transactions that were being settled

12  elsewhere, and so the securities would not be

13  available for transfer to Barclays.

14     Q.  Going back to Exhibit 140A, the 3-pager,

15  on the third page of that exhibit, there is an

16  analysis set forth.  Do you see that?

17     A.  I do.

18     Q.  Do you have an understanding of what

19  that analysis is?

20     A.  General, yes.

21     Q.  Generally, could you tell us what that

22  analysis is?

23     A.  It is a summarization of the inventory

24  which has been reversed in from other entities or

25  repo'd out.  The LBI proprietary matched book is

## Page 91

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                91

2  a representation of the inventory which is both

3  reversed in and repo'd out.

4     Q.  If you can just explain what a matched

5  book is?  It is a phrase I have seen in some of

6  the e-mails.  I want to get a better understanding

7  of what that is.

8     A.  The matched book is a financing business

9  where securities are financed on behalf of

10  customers and the matching that is on the other

11  side, they are financed to the street or with

12  other customers, so it is an activity where the

13  financing should be matched.

14     Q.  And presumably Lehman are in some spread

15  in the course of this matched activity?

16     A.  It should, yes.

17     Q.  During the course of this week

18  of September 15 was the matched book reduced down

19  effectively to zero?

20     A.  As close as possible to zero.

21     Q.  Were you involved during this time

22  period, September 18, September 19, in identifying

23  or helping to identify those assets of LBI that

24  would be available for transfer to Barclays?

25     A.  Yes, particularly in the sort of

## Page 92

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                92

2  18th/19th period.

3     Q.  And Mr. Azerad was involved in that

4  process as well?

5     A.  Yes.

6     Q.  Was Mr. Martin Kelly involved in that as

7  well?

8     A.  Yes.

9     Q.  What was Mr. Kelly's position?

10     A.  Martin was the financial controller so

11  he was the accounting -- he was essentially the

12  accountant for the group, chief accountant for the

13  group.

14     Q.  Your co-equal or your subordinate?

15     A.  We were both direct reports to the CFO.

16     Q.  Gerry Reilly, Gerard Reilly, what was

17  his position?

18     A.  He was the product controller, the head

19  of products control, which is really the business

20  CFO, business units' CFO.

21     Q.  Which business units?

22     A.  He actually oversaw all of the business

23  units.

24     Q.  Give me a description of what you would

25  consider a business unit?

## Page 93

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                93

2     A.  Just any of the fixed income for

3  example, any of the trading businesses.

4     Q.  So fixed income was a business unit that

5  he would oversee?

6     A.  Right.  I would think of Gerry as being

7  the management accountant and Martin being the

8  entity accountant, if that makes any sense.

9     Q.  Not entirely, but that is fine.  We will

10  move on.  Francis Pearn, P-E-A-R-N?

11     A.  Yes.

12     Q.  Who was Francis?

13     A.  He worked for Gerry.

14     Q.  Were Gerry and Francis involved in this

15  process we talked about, identifying the assets of

16  LBI that were in fact transferable to Barclays?

17     A.  They were, yes.

18        (Exhibit 141A marked for identification)

19     Q.  I have handed you an exhibit marked

20  Exhibit 141A, which is a cover e-mail with

21  a spreadsheet attached to it.  If you could

22  generally look at the cover e-mail and the

23  spreadsheet attached, I will ask you some general

24  questions and then maybe some specific ones about

25  the spreadsheet.  Just let me know when you are

## Page 114

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    114

2    So given that the -- you have to understand that

3    this is a transaction where the actual assets being

4    transferred over is really only being finalized on that

5    morning, and is still being reviewed, and so we were trying

6    to provide support and assistance insofar as, you know,

7    determining the securities and a potential value for those.

8    But this is not something which had already been reviewed

9    and values confirmed by Barclays, and the BONY system could

10   also have had problems with valuing some of these

11   securities.

12       Q.  The one large position you were talking

13   about, that is Pine?

14       A.  Yes.

15       Q.  What was Pine?

16       A.  Pine was a CLO, which is

17   a collateralized loan obligation.

18       Q.  I have handed you a document that was

19   previously marked as Exhibit 47.  It is about

20   3 pages of cover e-mails, 4 pages of cover

21   e-mails, and a large spreadsheet.  If you can

22   review the e-mails and take a look at the

23   spreadsheet, let me know when you are done, and I

24   will ask you some questions about them.

25       MR. HUME:  The binding of this exhibit

## Page 115

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    115

2    was obviously done for ease of presentation,

3    right?  It was not presented like this originally.

4        A.  Yes.

5        Q.  Reviewing this chain of e-mails,

6    starting with the earliest e-mail, which is an

7    e-mail from you to various people, the subject

8    line is: "Delivering other assets to Barclays".

9    Do you see that?

10       A.  Yes.

11       Q.  And is that a reference to this process

12   we talked about, the assets over and above the

13   repo assets?

14       A.  That is correct.

15       Q.  Take a look at the first page of this

16   exhibit, the e-mail, page 1, Exhibit 47.  At the

17   top of the page there is an e-mail from David

18   Murgio at Weil to two additional people, V Lewkow

19   and R Davis.  Do you see that?

20       A.  I do.

21       Q.  Was it your understanding that

22   spreadsheet information about the collateral was

23   provided by lawyers for the estate to the lawyers

24   for Barclays?

25       A.  Yes.

## Page 116

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    116

2        Q.  There is a reference to BarCap

3    collateral.xls.  Do you see that file?

4        A.  I do.

5        Q.  That was the same file that you had sent

6    over earlier, right, Exhibit 143A?

7        A.  Yes.

8        Q.  If you turn to the fifth page, Bates

9    number 5138 are the last four digits, do you see

10   that calculation up there?

11       A.  I do, yes.

12       Q.  And it is a total of 49.9 billion.  Do

13   you see that?

14       A.  I do.

15       Q.  And that is in the market value column?

16       A.  I see that.

17       Q.  And there is four components to that

18   total.  Do you see that?

19       A.  I do.

20       Q.  The first is Fed collateral?

21       A.  Yes.

22       Q.  Do you have an understanding of what

23   that item is?

24       A.  Yes.

25       Q.  What is it?

## Page 117

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    117

2        A.  It is Fed wirable collateral that was

3    transferred over, Fed wire being the market

4    settlement system for this type of collateral.

5        Q.  The next line item is DTC074.  Do you

6    see that?

7        A.  I do.

8        Q.  Is that an account or a box at DTC?

9        A.  That is I think an account at DTC.

10       Q.  A Lehman account?

11       A.  Yes.

12       Q.  The next item is DTC636.  Do you see

13   that?

14       A.  I do.

15       Q.  What is your understanding of what that

16   is?

17       A.  That is a different type of DTC account.

18       Q.  And in the last line item is "TP

19   cashed".  What does that stand for?

20       A.  That is the tri-party cash.

21       Q.  Was it your understanding on

22   Friday September 19 that there was 7 billion

23   dollars in cash to be delivered to Barclays?

24       A.  I understood that $7 billion of cash had

25   been given by -- had been deposited by Barclays

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          118

2  with JP Morgan and that it was being held by
3  JP Morgan.
4       Q.   Was it your understanding of -- I guess
5  these e-mails are all dated September 20, so was
6  it your understanding on September 20, 2008, that
7  the total value of the collateral on the cash in
8  the transaction was 49.9 billion?
9       MR. HUME:  Objection, vague and
10  ambiguous as to the value.
11       A.   This was my view of the repo transaction
12  on the Thursday night, and it was limited to that,
13  just to the repo transaction.
14       Q.   So the 15c3 cash, for example, would be
15  in addition to this?
16       A.   That is correct, yes, as well as the
17  other unencumbered collateral, as well as other
18  components to the agreement.
19       Q.   The other unencumbered collateral, that
20  would be the Schedule B collateral?
21       A.   That is what became Schedule B
22  collateral, that is right.
23       Q.   So that would be added to these items
24  here?
25       A.   That is right.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          119

2       Q.   If you go down to page 5139, do you see
3  that?
4       A.   I do.
5       Q.   There is a column titled "Market value"?
6       A.   Yes.
7       Q.   Do you know what the source of that
8  market value information was in this spreadsheet?
9       A.   I believe that this was the Lehman price
10  market value.
11       (Exhibit 144A marked for identification)
12       Q.   I have handed you a one page document
13  entitled Exhibit 144A.  Take a moment to look at
14  that and let me know when you are done.
15       A.   Yes.
16       Q.   Have you seen this document before
17  today?
18       A.   I have not, no.
19       Q.   Do you remember the information that is
20  contained in this document?
21       A.   I do.
22       Q.   If you can just go through the
23  components, the components I want to talk to you
24  about are the component that add up to the total
25  securities cash received item.  Do you see that?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          120

2       A.   Okay, yes.
3       Q.   If you start with the Fed wire
4  securities, that is similar to the Fed collateral
5  entry we were discussing earlier, correct?
6       A.   Correct.
7       Q.   And the next item is "DTC cash".  Do you
8  see that?
9       A.   I do.
10       Q.   Do you have an understanding as to what
11  that is?
12       A.   DTC securities.
13       Q.   The next item down "DTC cash .3".
14  I assume these are billions?
15       A.   Yes.
16       Q.   Do you have an understanding of what
17  that line item is?
18       A.   I assume it is more DTC securities.
19       Q.   The reference to "Repo cash, 7 billion".
20  Do you see that?
21       A.   Yes.
22       Q.   We have discussed that before?
23       A.   That is correct.
24       Q.   And then it says "Today DTC collateral".
25  Do you see that?

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          121

2       A.   I do.
3       Q.   And that is 390 million.  This is an
4  e-mail dated as of September 19, 2008.  Do you
5  have an understanding as to what that means?
6       A.   I don't know the specifics.
7       Q.   And that rolled up into 52.19 billion
8  total.  Do you see that?
9       A.   Yes.
10       Q.   Again, this does not include, as far as
11  you know, the 15c3 cash, correct?
12       A.   That is correct.
13       Q.   Do you know whether this includes
14  Schedule B?
15       A.   I would presume that the "Today DTC
16  collateral" includes some of what became the
17  Schedule B collateral.
18       Q.   When you look below the total securities
19  cash received there is a repo cash amount.  Do you
20  see that?
21       A.   Yes.
22       Q.   And that is 45 billion?
23       A.   Yes.
24       Q.   So the differential between the value of
25  the securities and cash received and the repo cash

Page 122

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    122

2  amount is listed as excess collateral there,
3  right?
4      A.  That is right.
5      Q.  That is $7 billion?
6      A.  Yes.
7      Q.  So that is the excess of market value
8  over cash paid for the repo?
9      A.  That is, you know, what it looks like.
10     Q.  And this, as far as you can tell, the
11  folks who have sent this e-mail around are all
12  Barclays folks, right?
13     A.  That is right.
14     Q.  Not former Lehman people, is that right?
15     A.  No.
16     Q.  And are they also still at Barclays?
17     A.  I have no idea.
18     Q.  Do you know any of these names, Gerry
19  LaRocca?
20     A.  I do.
21     Q.  Does Gerry work with you?
22     A.  No.
23     Q.  Not in your department or group?
24     A.  No.
25     Q.  Stephen King?

Page 123

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    123

2      A.  I know Stephen, yes.
3      Q.  Is he in your group?
4      A.  No.
5      Q.  Back in the last quarter of 2008, did
6  you work with Gerry or Stephen?
7      A.  Yes, intermittently.  I mean we were not
8  in the same group but we worked together on a few
9  things, you know.
10     (Exhibit 145A marked for identification)
11     Q.  I have had placed before you a 3-page
12  document marked Exhibit 145A.
13     A.  Yes.
14     Q.  If you take a moment to look at that
15  e-mail chain and let me know when you are done.
16     A.  Yes.
17     Q.  You will see the subject line of the
18  series of e-mails is "Opening balance sheet".  Do
19  you see that?
20     A.  I do.
21     Q.  This is part of the effort that you had
22  testified about before, which was preparing the
23  initial opening balance sheet?
24     A.  That is correct.
25     Q.  It starts off with an e-mail from Martin

Page 124

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    124

2  Kelly to Robert Azerad, Blackwell and Beldner,
3  right.  Who was Brett Beldner?
4      A.  He is an accountant who worked for
5  Martin Kelly.
6      Q.  He was at Lehman, right?
7      A.  He was.
8      Q.  Is he now at Barclays?
9      A.  I don't know.
10     Q.  You are copied on that e-mail at the
11  bottom of page 2, right?
12     A.  Yes.
13     Q.  If you go over to page 1 of this
14  Exhibit 145A, it is the e-mail at the bottom of
15  the page which is an e-mail from you to a group of
16  people.  Do you see that?
17     A.  Yes.
18     Q.  And you have got sort of two items in
19  your e-mail, correct?
20     MR. HUME:  Which e-mail?
21     Q.  The bottom of page 1.  Are you with me,
22  Mr. Tonucci?
23     A.  What are the two items?
24     Q.  The first item is "I think they have
25  ..." and you correct yourself, "42.9 billion of

Page 125

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    125

2  assets and paid net 38 billion of cash." You
3  see that?
4      A.  Yes.
5      Q.  That is one item in your e-mail,
6  correct?
7      A.  Correct.
8      Q.  And that is your recap of the repo
9  situation?
10     A.  That is correct.
11     Q.  You have a second item: "Their opening
12  balance sheet should also include 1.9 billion of
13  box assets".  Correct?
14     A.  Correct.
15     Q.  What is that a reference to?
16     A.  The unencumbered collateral.
17     Q.  Schedule B?
18     A.  Which became Schedule B.
19     Q.  I guess there is a third item then, "and
20  one billion of cash receivable from the release of
21  lock ups."  Correct?
22     A.  That is correct.
23     Q.  And that is the 15c3?
24     A.  That is correct.
25     Q.  And at least on the morning

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                126

2  of September 20 those were the sort of three
3  components you were thinking of as comprising the
4  balance sheet.  Correct?
5      MR. HUME:  Objection, lacks foundation.
6      A.  Those were the components that I was
7  aware of, so I was not the accountant and I was
8  not on the negotiation team and I was not aware of
9  any other entries that may be being made for
10  example on the liability side or for other assets
11  over and above these.
12      Q.  Just on a net basis, the three
13  components that you identified at the bottom of
14  page 1, there is a net of 4 billion on the repo
15  piece, correct?
16      A.  If you are calculating the 42.9 minus
17  the 38.
18      Q.  Yes.
19      A.  That is the calculation you are doing?
20      Q.  That is the calculation.  It is actually
21  4.9.
22      A.  That is correct.
23      Q.  You add to that the 1.9 of boxed assets?
24      A.  Yes.
25      Q.  With no offsetting liability against

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                127

2  that 1.9?
3      MR. HUME:  Objection, lacks foundation.
4      A.  That is not clear to me. I can only
5  tell you the asset side that I was aware of.
6      Q.  So the asset side you have net assets on
7  the repo of 4.9, 1.9 on the box assets and then
8  a billion on the cash receivable?
9      MR. HUME:  Objection, vagueness, vague
10  and ambiguous.
11      MR. TAMBE:  Right?
12      A.  You can read it.
13      Q.  And that is a total of what, about
14  7.9 billion?
15      MR. HUME:  Objection, lacks foundation.
16  You are just asking him to do the maths?
17      A.  You are just asking me to add up?
18      Q.  7.8 billion --
19      A.  Yes.
20      Q.  Were you aware of any liabilities that
21  offset that 7.8 billion dollars of net assets
22  delivered to Barclays?
23      A.  I knew there were some liabilities.
24      Q.  What magnitude?
25      A.  I was not sure but I knew that there

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                128

2  were liabilities for compensation and for other
3  payments, services and so on that, you know, were
4  not part of the numbers that I was putting
5  together.
6      (Exhibit 146A marked for identification)
7      Q.  I have handed you a 3-page document
8  marked Exhibit 146A, an e-mail chain.  Let me know
9  when you are done reviewing it.
10      A.  Yes.
11      Q.  Do you recognize this as a series of
12  e-mails between folks at Lehman about a transfer
13  of collateral to BarCap?
14      A.  Yes.
15      Q.  And this is a series of e-mails
16  dated September 22, 2008.  Correct?
17      A.  Yes.
18      Q.  And it is early in the morning, right,
19  6:00 or 7:00 am?
20      A.  Yes.
21      Q.  And is that before the clarification
22  letter is signed?
23      MR. HUME:  Objection, lacks foundation.
24  The witness has testified he didn't review it that
25  week.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                129

2      A.  I can't say.
3      Q.  Do you recall there being some urgency
4  on the morning of September 22 to getting answers
5  to this question, "queuing up delivery to BarCap"?
6      MR. HUME:  Objection, vague.
7      A.  I don't really know but, you know,
8  I would say that everyone was focused on doing
9  their job.
10      Q.  And what was your job that morning?
11      A.  Well, we were trying to close the
12  transaction in an orderly way.
13      Q.  There is an e-mail at the bottom of page
14  1 over to page 2 from Monty Forrest to you and
15  Robert Azerad.  Do you see that e-mail?
16      A.  Yes.
17      Q.  And his first numbered point, which is
18  at the bottom of page 1 over on to page 2 states:
19      "What was the final agreed upon list (our
20  version or the version after Robert took out and
21  re-marked Lehman paper.)"
22      Do you see that?
23      A.  Yes.
24      Q.  Do you understand the reference to
25  re-marked Lehman paper?

## Page 130

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        130

1
2     A.  Well, just I think it is more relevant
3     that he just removed the Lehman paper.  There was
4     some -- in the original unencumbered list there
5     was some securities which were Lehman issued.
6         Q.  It is not your understanding that there
7     was a mark down of Lehman paper by Robert in that
8     list?
9         A.  That is not what it refers to.
10        (Exhibit 147A marked for identification)
11        Q.  I have handed you a 2-page document
12    marked Exhibit 147A, an e-mail chain.  Please
13    review it and let me know when you are done.
14        A.  Yes.
15        Q.  And you recognize this as a series of
16    e-mails, again dated September 22, 2008?
17        A.  Yes.
18        Q.  And these are additional e-mails about
19    the financing facility?
20        A.  Additional e-mails about the securities
21    that were transferred over and confirmation of
22    those securities.
23        Q.  On page 2 of this exhibit, the body of
24    the e-mail from Jasen Yang to Robert Azerad and
25    James Hraska.  Do you see that?

## Page 131

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        131

1
2     A.  Yes.
3         Q.  And you are seen as a copy on that
4     e-mail?
5         A.  Yes.
6         Q.  It appears from that e-mail that he is
7     sending over to you the BONY valuation of the
8     collateral, is that right?
9         A.  Sending over the BONY file, which
10    includes the valuation, but it obviously also
11    includes the details around nominal and
12    securities.
13        Q.  There is a reference to BONY market
14    value of approximately 45MM.  Do you see that?
15        A.  Yes.
16        Q.  He was referring to a 45 billion-dollar
17    value, correct?
18        A.  I assume so.
19        Q.  You will see on page 1 of the e-mail
20    a reference to "fast reconciliation".  Do you see
21    that?
22        A.  I do.
23        Q.  Was that sort of the beginning of the
24    reconciliation process you talked about before?
25        A.  We had tried to do an initial

## Page 132

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        132

1
2     reconciliation on the Friday.  This was
3     a subsequent reconciliation and at a more detailed
4     level.  Jasen had identified what he saw as some
5     discrepancies, and we were trying to resolve
6     whether those discrepancies existed, principally
7     in the securities that were transferred over and
8     the nominal value of those securities.
9         (Break from 10:37 to 10:55 am.)
10        MR. TAMBE:  Mr. Tonucci, I have placed
11    before you a document marked Exhibit 126.  Can you
12    take a moment to look at the e-mail chain and let
13    me know when you are done.
14        A.  Yes.
15        Q.  Starting with the e-mail at the bottom
16    of the page, it is from Gerry Reilly to Ian Lowitt
17    and Michael Gelband.  You are copied on it.  Do
18    you see that?
19        A.  I do.
20        Q.  There are three numbered items in that
21    e-mail.  Do you see that?
22        A.  Yes.
23        Q.  The third item reads: "Not clear on the
24    amount of blocked discount or how we make it
25    happen." Do you see that?

## Page 133

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        133

1
2     A.  Yes.
3         Q.  And you understand that to be
4     a reference to the 5 billion-dollar discount that
5     we talked about earlier?
6         MR. HUME:  Objection, lacks foundation.
7         A.  I understand it to be a reference to the
8     discount on purchase, so I would have linked it to
9     that $5 billion.
10        Q.  Then the next sentence reads:
11        "Defaulting on repo could be the best as
12    discounts could be taken from the haircut."
13        Do you see that?
14        A.  Yes.
15        Q.  Do you remember discussing with anyone
16    at Lehman defaulting on the repo as a way of
17    providing the discount to Barclays?
18        A.  Yes.
19        Q.  With whom did you discuss that?
20        A.  I think it was with Ian and with Gerry,
21    perhaps Martin Kelly as well.
22        Q.  And then in Gerry's e-mail at the bottom
23    of this e-mail chain on exhibit 126 he says:
24        "If not that then we need to give business an
25    allocation of block discount so they can mark down the

## Page 134

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          134

2  books tonight."
3      Do you see that?
4      A.  Yes.
5      Q.  Do you recall if that ever happened,
6  whether there was an allocation of a block
7  discount?
8      A.  I don't know.
9      Q.  Does the phrase "block discount" have
10  any meaning to you?
11      A.  Not really.
12      Q.  Other than what we have talked about
13  here?
14      A.  Other than in this context.
15      Q.  The next e-mail up, from Ian Lowitt to
16  Gerry Reilly and Michael Gelband talks about
17  "shrinking down matched book".  Do you see that?
18      A.  I do.
19      Q.  Do you understand that to be a reference
20  to what we talked about before, about the matched
21  book being shrunk down to zero?
22      A.  Yes.
23      Q.  The first bullet point in Gerry Reilly's
24  e-mail at the bottom of the page talks about the
25  option rate book.  Do you see that?

## Page 135

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          135

2      A.  Yes.
3      Q.  Was it your understanding during this
4  week of 15 September that there were assets that
5  Barclays was picking and choosing as to which
6  assets it was prepared to purchase?
7      A.  That is right.
8      MR. HUME:  Objection.
9      A.  That was my understanding.
10      Q.  And from whom did you get that
11  understanding?
12      A.  I can't recall but I understood that
13  they were not going to be buying all the assets.
14      Q.  Was it your understanding that there was
15  a change or an evolution in the transaction where
16  it went from being all assets to only some assets?
17      A.  No, I understood that it was never all
18  assets.
19      Q.  Did you have an understanding as to who
20  was making the decisions as to which assets it
21  would be?
22      A.  It was -- I think it was the negotiation
23  team, Barclays and Lehman negotiation team.
24      Q.  Was it your understanding that it was
25  Barclays making the decisions?

## Page 136

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          136

2      A.  Well, they were the buyers so they would
3  by extension have the final decision on what
4  assets are bought.
5      Q.  I have placed before you a document
6  marked Exhibit 127.  It is another branch in the
7  e-mail chain that we were looking at before in
8  126.  Let me know when you are done with the
9  document.
10      A.  Yes.
11      Q.  So it starts with the same Gerry Reilly
12  e-mail at the bottom but there is a different
13  e-mail at the top. At the top of the document
14  there is an e-mail from Eric Felder to various
15  e-mail at Lehman.  Do you see that?
16      A.  Yes.
17      Q.  And Eric says:
18      "The Barclays guys chose the assets.  We did not
19  have anything to do with it."
20      Do you see that?
21      A.  Yes.
22      Q.  And that was consistent with your
23  understanding of how the assets were picked --
24      MR. HUME:  Objection to the lack of
25  foundation.  Mr. Tonucci is not on that e-mail.

## Page 137

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          137

2      A.  I mean, I have only seen this e-mail in
3  the deposition process and I have not spoken to
4  Eric and I was not part of the negotiation team.
5  I am not sure what Eric was seeing.  Eric was also
6  not -- you know, he was running the credit book so
7  I don't know if he would have seen all parts of
8  this process.
9      Q.  Basically, one way or the other, you
10  don't know whether what Eric says here is right?
11      A.  That is right.
12      (Exhibit 148A marked for identification)
13      Q.  I have handed you a 2-page document
14  marked Exhibit 148A.  Let me know when you are
15  done with it.
16      A.  Okay.
17      Q.  In the top e-mail on this chain of
18  e-mails from Gerry Reilly to Martin Kelly and
19  Daniel Flores, I want you to focus on that e-mail.
20  Do you have it there?
21      A.  I do.
22      Q.  You are not shown as a copy on any of
23  these e-mails.  Can I ask you about a phrase that
24  is used in this e-mail.  The third sentence of
25  that e-mail, Gerry Reilly's e-mail states that:

## Page 138

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                 138

2  "Purchase will be at a fixed discount on the
3  assets that remain to reflect the bulk size of the
4  purchase".
5          Do you see that?
6      A.  I do.
7      Q.  Did anyone ever describe for you the
8  reason for the discount being the bulk size of the
9  purchase?
10     A.  I don't recall that, no.
11     Q.  Does that phrase have any meaning to
12 you?
13     A.  I have not seen it before.
14     Q.  Then the next sentence in Gerry Reilly's
15 e-mail starts off by saying: "We can track our
16 PL..."  Is that profit and loss?
17     A.  Yes.
18     Q.  "... by assets category, which gives
19 some indication of how much we have moved the
20 marks".  Do you see that?
21     A.  Yes.
22     Q.  Do you understand the reference to
23 "moving the marks"?
24     A.  Yes.  Can I give you just a bit of
25 context, because I think that you are sort of

## Page 139

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                 139

2  misunderstanding some of this.  Post Lehman, even
3  pre the Lehman filing on the weekend of
4  12/13/14th, there was a tremendous amount of price
5  volatility and tremendous amount of uncertainty in
6  sort of the traded price of a lot of securities,
7  even those which were exchange traded, and
8  therefore there was more visibility on -- we were
9  experiencing a huge amount of volatility.  The
10 process of re-marking, that was something that
11 would typically be conducted on a daily basis and
12 was conducted by thousands of traders, so it was
13 not as though there was one person with a giant
14 brain sat at the centre of this re-marking process
15 who had understanding or an ability to re-mark all
16 of these assets.  It really was a very distributed
17 process which involved many, many people, because
18 they were responsible for their trading books and
19 for the risks on those trading books, and had the
20 best understanding of the securities.
21         So on any given day there was going to
22 be a lot of price volatility and the movement in
23 the marks was often just a function of market
24 price volatility.  It may also be a function of
25 actual trading activity, but I would say that in

## Page 140

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                 140

2  this week the amount of trading activity for these
3  particular securities and for these traders was
4  limited, so really it is a matter of sort of
5  interpretation of where the market is.
6          You have to add to that the fact that
7  the holding company had filed and so the coverage
8  of the desks was also impaired.  I don't think
9  that there would be every trader turning up and
10 re-marking his book.  So there was great
11 difficulty in just creating the P&L and in being
12 able to track the movements.  So that sort of
13 added to the complexity here.
14         So my interpretation here is that the
15 amount that we have moved the marks is really just
16 a reference to the traders re-marking their books
17 because of this, because of what is being observed
18 in the market, and it probably was the most
19 volatile week in the market in the last nearly
20 100 years.  So very, very difficult, very
21 difficult process, and we were not getting good
22 P&L's on a daily basis as a result.  It was much
23 more complicated than was typically the case, and
24 on a typical day the process was complicated, so
25 this was really extraordinarily difficult to

## Page 141

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                 141

2  track, to track assets, the asset position and to
3  track valuations.
4      Q.  In the week of September 15 you did not
5  do any of the marking of the prices, right?
6      A.  Absolutely not.
7      Q.  That is not something you do?
8      A.  No.
9      Q.  You don't know specifically what traders
10 marked down what prices for what reason, correct?
11     A.  No.
12     Q.  You don't know if the marking down was
13 pursuant to price movements in the market or
14 because they were allocated a block discount?
15     A.  I don't know with certainty, but you did
16 ask me for my interpretation of this and my
17 interpretation is that it is going to be
18 predominantly because of the volatility in
19 valuations in the market.
20     Q.  Okay, and you don't know whether that is
21 because they were allocated a block discount to
22 mark down their books?
23     A.  I am saying that it is not because of
24 the allocation of a block discount.  My
25 interpretation of this is that it was because of

## Page 142

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          142

2  the market price movements.

3      Q.  I have handed you a document marked as

4  Exhibit 71B.  It is an e-mail exchange between

5  yourself and Alastair Blackwell.  Do you see that?

6      A.  Yes.

7      Q.  It is on Friday, September 19, 2008.  Do

8  you see that?

9      A.  Yes.

10      Q.  At the top of the e-mail Alastair asks

11  you: "Putting the repo into default is my

12  conversion?" Do you see that?

13      A.  Um hum.

14      Q.  Do you have a recollection of having

15  a discussion with Alastair about putting the repo

16  into default on Friday, September 19?

17      A.  I don't, no.

18      Q.  Any understanding of the phrase "my

19  conversion", what he meant by that?

20      A.  My interpretation would be that his area

21  would have to rebook the repo, convert the repo

22  into a sale transaction.

23      Q.  And your understanding was that

24  a default on the repo really converted what was a

25  two-leg transaction; the repurchase leg would go

## Page 143

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          143

2  away and there would effectively be a sale of the

3  asset?

4      MR. HUME:  Objection.

5      A.  That is correct.  It would become

6  a sale.

7      (Exhibit 149A marked for identification)

8      Q.  I have handed you a 2-page document

9  marked Exhibit 149A.  Let me know when you are

10  done reviewing that document.

11      A.  Yes.

12      Q.  Have you ever seen this document before

13  today?

14      A.  No.

15      Q.  You know who Bob Diamond is, right?

16      A.  Yes.

17      Q.  Who is he?

18      A.  He is the President of Barclays.

19      Q.  Do you know who Michael Klein is?

20      A.  Yes.

21      Q.  Who is Michael Klein?

22      A.  He is someone who was involved in the

23  transaction.

24      Q.  Is he someone that you dealt with during

25  that week of September 15?

## Page 144

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          144

2      A.  Yes, I spoke to him.  I dealt with him

3  you know, just through that week.  I don't think I

4  have seen him since then.

5      Q.  Describe your interactions with

6  Mr. Klein during that week.  What were you

7  speaking with him about?

8      A.  Predominantly it was clarification of

9  the assets, so Michael was asking for various

10  points, just details of the sort of asset

11  schedules and some of the other transfers.  That

12  is all I can really recall.

13      Q.  Was he part of the conversations on

14  Friday, September 19, about locating additional

15  assets and value for Barclays?

16      A.  I didn't speak to him on that, sorry, I

17  don't know.

18      Q.  In his e-mail to Bob Diamond on

19  Saturday, September 20, 2008, Mike says: "Great

20  day.  We clawed back 3 billion more of value of

21  the transaction".  Do you see that?

22      A.  I do see that.

23      Q.  Any understanding as to what he is

24  referring to in the 3 billion more of value?

25      MR. HUME:  Objection, calls for

## Page 145

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          145

2  speculation.

3      A.  I don't know what would go into that

4  specifically.

5      Q.  Was it your understanding on Friday or

6  Saturday of that week that Lehman had provided an

7  additional $3 billion of value to Barclays?

8      MR. HUME:  Objection, lacks foundation.

9  Witness has testified he was not negotiating the

10  economics of the deal.

11      A.  I can't really answer that, I don't

12  know.

13      Q.  But we have talked about a couple of

14  items of additional value on Friday, September 19,

15  right?

16      A.  We have, but we have also talked about

17  the price volatility and the lack of certainty

18  around the actual assets that were being

19  transferred, and just the difficulty in

20  establishing values.  So I mean I wouldn't sort

21  of, you know, I wouldn't sort of describe this as

22  just additive to the original transaction.  It was

23  clearly changing.

24      Q.  And among the items that were added was

25  1.9 billion in Schedule B, is that right?

## Page 190

HIGHLY CONFIDENTIAL - PAOLO TONUCCI 190

1
2     MR. HUME: He is not qualified to
3 articulate what is legal advice and it is
4 privileged.
5     Q. Fine. Let me ask you, did you obtain
6 any advice from Mr. Willoughby?
7     MR. HUME: Objection. Don't answer.
8     Q. I am not asking for the substance of any
9 advice I just want to know did Mr. Willoughby
10 respond and provide you with any advice following
11 that discussion that you had?
12     MR. HUME: Object to the
13 characterization of whether there was
14 a communication. You can ask whether there was
15 a communication from Mr. Willoughby.
16     A. I don't recall.
17     Q. You don't recall receiving any
18 communication from Mr. Willoughby in response to
19 the discussion that you had in late September?
20     A. That is right.
21     Q. And you don't recall following up with
22 Mr. Willoughby concerning that communication?
23     A. That is right.
24     Q. So as far as you recall, you have never
25 touched this subject since that one discussion you

## Page 191

HIGHLY CONFIDENTIAL - PAOLO TONUCCI 191

1 had with Mr. Willoughby in late September, 2008?
2
3     A. Certainly not that -- I don't recall
4 speaking to Scott Willoughby and I would say that
5 my involvement in this transaction subsequent to
6 that was minimal.
7     Q. And you don't recall discussing this,
8 this I mean in the OCC positions and Barclays'
9 entitlement since September 2008 with anyone?
10     A. No, I don't believe I have discussed
11 with anyone.
12     Q. You testified earlier about unencumbered
13 assets, and specifically I want to ask you about
14 Schedule B that you mentioned. Where were the
15 assets that are listed on Schedule B physically
16 located?
17     A. There were very many versions of
18 Schedule B so you are going to have to be more
19 specific.
20     Q. I am just now looking only for your
21 understanding as to where they were physically
22 custodied. If it is more than one place or
23 changed over time, let me know?
24     A. That is what I am saying, it was more
25 than one place and it changed over time.

## Page 192

HIGHLY CONFIDENTIAL - PAOLO TONUCCI 192

1
2     Q. What were the different places where
3 those assets were --
4     A. DTCC, JP Morgan, Euroclear. I can't
5 remember the name of the Canadian depository, so
6 those are the ones that I remember.
7     Q. At any time was Schedule B limited to
8 the unencumbered assets at DTC?
9     A. Not that I am aware of.
10     Q. I will show you a document we will mark
11 as 164A.
12     (Exhibit 164A marked for identification.)
13     If we start at the bottom, you will see there is
14 an e-mail that then gets sent to you on 18 September, and
15 then you forward to Mr. Azerad. Do you see that?
16     A. I do.
17     Q. And the chain starts with what is called
18 a box summary. Can you tell me what the box
19 summary is?
20     A. Yes, it is the securities in possession,
21 in the clearance box.
22     Q. When you say "clearance box", is that
23 the clearance box at DTC?
24     A. No, it could mean any number of
25 custodial or depository arrangements.

## Page 193

HIGHLY CONFIDENTIAL - PAOLO TONUCCI 193

1
2     Q. Then you will see Mr. Azerad's e-mail
3 says: "FYI, 3.2 billion at risk." Can you explain
4 what "3.2 billion at risk" means?
5     A. I don't think I can.
6     Q. Did you have an understanding at the
7 time that you received this e-mail?
8     A. I am assuming the 3.2 billion is the
9 "stays at LBI" position. I am not too sure what
10 the "at risk" means.
11     MR. HUME: Don't speculate.
12     Q. In your e-mail you say: "That seems very
13 high. What are the assets they need to sell?"
14 Does that help you to understand what you were
15 hearing here and what you were following up with?
16     A. Not really. I mean, there was a lot
17 going on, and I am sure you have seen that there
18 were a lot of e-mails that I was getting, so
19 responses like that could be quite open, just
20 because I don't really know what was going on and
21 I was trying to get information from others.
22     Q. What was the Sparrow report?
23     A. Charlie Sparrow was the mortgage trader,
24 he was the head of the mortgage desk, so I think
25 it was his report of positions.

## Page 202

2  the 800 million that had been transferred on the

3  Friday?

4      A.  I don't.  I would assume so.

5          MR. HUME:  Don't assume.  Don't

6  speculate.

7      Q.  The next is:  "We have 746 million in

8  074."  Do you recognize that as a DTC box?

9      A.  I do.

10     Q.  You will see number 4 says:  "We have

11 identified another 300 million of mortgages in

12 636."  Do you know what 636 is a reference to?

13     A.  Another DTC box or account.

14     Q.  And Mr. Forrest says:  "That is a total

15 of 2.181 billion."  Do you see that, sir?

16     A.  Yes.

17     Q.  Was there a specific target that people

18 were shooting for, a specific total people were

19 trying to get to?

20     A.  Not really.

21     Q.  So people were kind of keeping score of

22 what they found but there was not any number that

23 you had in mind as a target that you needed to get

24 to?

25         MR. HUME:  Objection to the form.

## Page 203

2      A.  Not really.  I mean I think, as Ian

3  says, it is more important just to be accurate.

4      Q.  You had mentioned that you had heard I

5  believe on the Friday that there was a need for

6  additional collateral in order for the transaction

7  to close; that was something that Mr. Lowitt told

8  you?

9      A.  Um hum.

10     Q.  And he reiterated that a number of times

11 during the day?

12     A.  Yes.

13     Q.  Did he tell you how much additional

14 collateral would be needed to make the transaction

15 close?

16     A.  I thought -- no, I don't remember the

17 total.  It was more than 2 billion.

18     Q.  Was there a number that he gave you and

19 you don't remember what that is now?

20     A.  I don't remember what it was.  I don't

21 remember if he gave me a number and I don't

22 remember what it was.

23     Q.  Over the course of the next couple of

24 days, the Saturday and the Sunday, did you hear of

25 a target, a number that was needed in order to

## Page 204

2  close the transaction?

3      A.  I think we had gone to the bankruptcy

4  court on Friday with the unencumbered collateral

5  at 1.9 billion, so that was our initial estimate,

6  and then a further billion or so in the 15c3

7  reserve account, so that would give nearly

8  $3 billion.  I think that that is what everyone

9  was expecting the value of the unencumbered

10 collateral plus the 15c3 to be.

11     Q.  When you say "we went to the bankruptcy

12 court", you are describing what everybody's

13 expectation was at the time everybody went down to

14 the bankruptcy court hearing?

15         MR. HUME:  Objection to the form,

16 calling for speculation about what other people's

17 expectations were.

18     Q.  That certainly was your understanding?

19     A.  It was my understanding.

20     Q.  Did you attend the hearing before the

21 bankruptcy court?

22     A.  I did not.

23     Q.  Did you hear from anybody who did

24 attend?

25     A.  Yes.

## Page 205

2      Q.  Who did you hear from?

3      A.  From Chris O'Meara.

4      Q.  Who was Chris O'Meara?

5      A.  He was at Lehman Brothers.  He had been

6  head of risk.

7      Q.  What did Chris O'Meara tell you about

8  the hearing?

9      A.  That it was long and seemed to have gone

10 well, and that the court had approved the sale.

11     Q.  Did he tell you anything else?

12     A.  No.

13     Q.  Did he tell you anything about any

14 proceedings that had happened in the course of the

15 hearing?

16     A.  No, he kept it to a minimum.

17     Q.  Did you hear from anyone else other than

18 Chris O'Meara about the hearing?

19     A.  I did not.

20     Q.  I will show you a document we will mark

21 as Exhibit 169A.

22         (Exhibit 169A marked for identification.)

23         The subject of these e-mails is "PL on 9/18".  Do

24 you have an understanding what "PL" refers to?

25     A.  I am not sure here.  I am not

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4 ------------------------x

5 In Re:

6                   Chapter 11

7 LEHMAN BROTHERS       Case No. 08-13555(JMP)

8 HOLDINGS, INC., et al,   (Jointly Administered)

9           Debtors.

10 ------------------------x

11

12         DEPOSITION OF CONOR P. TULLY

13            New York, New York

14            February 10, 2010

15

16 Reported by:

17 MARY F. BOWMAN, RPR, CRR

18 JOB NO. 27496

19

20

21

22

23

24

25

```
 1              TULLY
 2         THE VIDEOGRAPHER:  This begins tape
 3  labeled number one of the videotape
 4  deposition of Conor Tully in the matter in
 5  In re: Lehman Brothers Holdings
 6  Incorporated, et al., in the United States
 7  Bankruptcy Court for the Southern District
 8  of New York, case number 0813555.
 9         This deposition is being held at 575
10  Lexington Avenue in New York, New York on
11  February 10, 2010 at approximately 9:37 a.m.
12         My name is Matthew Smith for TSG
13  Reporting Incorporated and I am the legal
14  video specialist.  The court reporter is
15  Mary Bowman in association with TSG
16  Reporting.
17         Will counsel please introduce yourself
18  for the record.
19         MR. STERN:  Jack Stern of Boies,
20  Schiller & Flexner for Barclays Capital and
21  with me today is Camille Oberkampf.
22         MS. TAGGART:  Erica Taggart for the
23  committee and the witness with Quinn,
24  Emanuel, Urquhart, Oliver & Hedges, and I
25  have Tyler Whitmore with me.
```

TSG Reporting - Worldwide    877-702-9580

```
 1              TULLY
 2         MS. TABATABAI:  Fara Tabatabai from
 3  Hughes, Hubbard & Reed.
 4         MS. DEL MEDICO:  Jennifer Del Medico,
 5  Jones Day, appearing for Lehman.
 6  CONOR TULLY,
 7    called as a witness by the parties,
 8    having been duly sworn, testified as follows:
 9  EXAMINATION BY
10  BY MR. STERN:
11      Q.   Good morning, Mr. Tully.
12      A.   Good morning.
13      Q.   Thanks for joining us in the midst of
14  a blizzard.  We appreciate that.
15           To start, can you summarize for us
16  your educational background starting with
17  college.
18      A.   Sure.  I graduated from Manhattan
19  College with a bachelors degree in accountancy.
20  I don't have a master's in business.
21      Q.   Could you camirize for us your
22  professional experience after college?
23      A.   Certainly.  After college, I started
24  with the audit practice of Ernst & Young LLP in
25  New York, worked in that practice for
```

TSG Reporting - Worldwide    877-702-9580

```
 1              TULLY
 2  approximately four years auditing multinational
 3  corporations.  At that time, I made, moved to
 4  the restructuring group of Ernst & Young,
 5  various names, restructuring, financial advisory
 6  services, et cetera.  I spent up until 2004 in
 7  that group, so approximately six years.  At
 8  which time I moved to FTI Consulting, my current
 9  employer, which I have been with for about five
10  years, five and a half years.
11      Q.   And what is your position at FTI?
12      A.   I am a senior managing director.
13      Q.   Is that the position that you held in
14  September of 2008 at the time that the Lehman
15  bankruptcy cases began?
16      A.   No.  I was a managing director at that
17  point.
18      Q.   And when did you become a senior
19  managing director?
20      A.   About 13 months ago.
21      Q.   What is FTI's role in connection with
22  the Lehman bankruptcy case?
23      A.   We are the financial advisor to the
24  official committee of unsecured creditors in
25  LBHI.
```

TSG Reporting - Worldwide    877-702-9580

```
 1              TULLY
 2      Q.   When was FTI first engaged for that
 3  assignment?
 4      A.   We were engaged I believe it was
 5  Wednesday, September 17, 2008.
 6      Q.   Can you tell me the primary people at
 7  FTI who have worked on this assignment?
 8      A.   Sure.  Michael Eisenband who is the
 9  leader of my group.  I work in the creditor
10  rights group.  He is involved.  Sam -- he is a
11  senior managing director.  Samuel Star, also in
12  my group, senior managing director.  Rob
13  Darefsky, he does more financial services type
14  work, but restructuring as well and he is a
15  senior managing director.
16         John Sirus, he is a managing director
17  specializes in derivative contracts, financial
18  institutions.  Christopher Dean, he is a
19  director, he works on our field work, basically
20  works under my direction Sam Star's direction.
21         There are people in our technology
22  group that are involved, I'm not too involved
23  with what they do.  But there is a number of
24  people.  There is many others in the engagement.
25  I don't know how many more you would like me to
```

TSG Reporting - Worldwide    877-702-9580

```
 1                    TULLY
 2   add.
 3        Q.   That's fine.  That's fine.
 4             I have handed you a document that we
 5   previously marked as Exhibit 463B.  Do you have
 6   that in front of you?
 7        A.   I do.
 8        Q.   Are you familiar with this document?
 9        A.   I am.
10        Q.   Is this a document that you reviewed
11   in preparing for today's deposition?
12        A.   Yes.
13        Q.   Can you tell us what this is?
14        A.   This is an e-mail written to the
15   people at Lehman Brothers and as well as I guess
16   copied to Bill Fox of Alvarez & Marsal seeking
17   to confirm and I guess enhance my understanding
18   of a conversation that we had on October 3,
19   Friday October 3, 2008 concerning my
20   understanding of the JP Morgan Chase
21   transaction, transactions.
22        Q.   Prior to writing this e-mail, on how
23   many occasions had you met with people from
24   Alvarez or Lehman concerning either the Barclays
25   sale transaction or matters involving JPM Chase?
```

TSG Reporting - Worldwide     877-702-9580

```
 1                    TULLY
 2        A.   I'd say a handful of times.  It is
 3   hard to tell you the exact number.  If I had to
 4   venture a guess, I'd say four, maybe four
 5   inclusive of the 3rd.
 6        Q.   Four inclusive of the October 3
 7   meeting?
 8        A.   Yeah, that's my recollection.
 9        Q.   What subjects did you discuss with
10   Alvarez and Lehman in those various meetings to
11   the best of your recollection?
12        A.   In the first meeting, as would be
13   typical, we kind of, in an introduction to
14   Alvarez, gained an understanding of their role,
15   their knowledge, their game plan, their work
16   streams, the staffing of the engagement, just a
17   general understanding of what they had to work
18   with, and figure out how to, we could work
19   together in this case to a common goal of
20   maximizing the value for the unsecured
21   creditors.
22        Q.   Do you recall whether that initial
23   meeting with Alvarez occurred before or after
24   the closing of Barclays sale transaction on
25   September 22?
```

TSG Reporting - Worldwide     877-702-9580

```
 1                    TULLY
 2        A.   It was after the initial one that I
 3   was participating in.  It was, I believe, the
 4   24th.
 5        Q.   September 24?
 6        A.   Correct.
 7        Q.   And who participated in that September
 8   24 meeting to the best of your recollection?
 9        A.   John Suckow was the person we met with
10   from A&M.  There may have been one or two other
11   people from A&M.  I can't really recall exactly.
12             On our side from FTI, I believe it was
13   myself, Sam Star, perhaps Michael Eisenband, I
14   don't recall, and maybe one or two other more
15   junior staff.  I don't particularly recall right
16   now.
17             From Houlihan's side, I know Ann
18   Miller was there, and maybe someone more senior
19   than her, I don't recall.  I think it was
20   probably Michael Fazio.  Maybe one other person
21   from Houlihan, I don't know.  Maybe -- oh, it
22   was Michael Livanos, Mike Livanos was there.
23        Q.   Aside from the general introduction,
24   what subjects were discussed or identified for
25   follow up at that initial meeting?
```

TSG Reporting - Worldwide     877-702-9580

```
 1                    TULLY
 2        A.   One of the burning platforms they had
 3   on their hands was the fact that they had just a
 4   handful of legacy Lehman people left.  My
 5   understanding of the transaction was, in North
 6   America anyhow, essentially all of the legacy
 7   Lehman Brothers employees were retained by
 8   Barclays as part of the transaction.
 9             The people that were left were the
10   former management who I guess they were probably
11   not destined to be with this legacy Lehman
12   Brothers wind-down entity long term.  There were
13   people that operated the aircraft.  There were
14   people who were in charge of the services,
15   building services that kind of thing, coffee
16   and --
17        Q.   Let me see if I can abbreviate this a
18   bit.  Was there anything discussed at that
19   initial meeting relating to the components of
20   the Barclays sale transaction; and by that I
21   mean, assets that were purchased, liabilities
22   that were assumed, or any other aspect of the
23   sale transaction?
24        A.   I don't believe we directly spoke
25   about the sale transaction.  Really, the thrust
```

TSG Reporting - Worldwide     877-702-9580

TULLY

1
2  of Alvarez's function was really to kind of
3  figure out what was left, how to monetize that.
4  So you could say indirectly, it was more what
5  was left, not what was sold that was the focus
6  of the meeting.  It wasn't -- to my knowledge, I
7  don't think that John Suchow was very involved
8  in the transaction, if at all.
9      Q.   After initial meeting, at some point
10 did you have a meeting with Alvarez or people
11 from Lehman in which there was a discussion
12 concerning aspects of the sale transaction?
13     A.   It is hard to say.  I mean, the sale
14 transaction, just so you -- we didn't really get
15 into the role of Houlihan and the role of FTI,
16 but they were very bifurcated.
17         Our role was kind of the operations
18 wind-down, the IT, looking at the retention
19 plan, sort of bankruptcy administration type
20 roles, and then we also got, were getting
21 involved -- got involved in certain work streams
22 like real estate and derivatives, et cetera.
23         Houlihan's role was transactions,
24 anything and everything transactions.  So they
25 were charged with reviewing the Barclays

TSG Reporting - Worldwide    877-702-9580

TULLY

1  transaction or involved to some degree, you
2  know, reviewing certain major asset sales.
3  There was something called R3 that was being
4  sold around that time.  The transaction may have
5  been in the works previously and they were
6  vetting it from the committee's perspective to
7  figure out if it still made sense.
8          So to answer your question, I mean
9  maybe there were certain discussions that, you
10 know, where we had some talk of the transaction.
11 But at that time, the transaction was the
12 transaction and it didn't really matter to me
13 what it was.
14     Q.   At some point after this initial
15 meeting, did you have any discussions with
16 Alvarez or former Lehman executives concerning
17 Barclays' replacement of the Fed repo?
18     A.   Yes, I believe that was the subject of
19 this e-mail.  That came up in the context of
20 trying to understand JP Morgan's role in this
21 whole situation.  There was some discussion of
22 the fact that, it was said in this e-mail, that
23 there was a Fed repo that Barclays stepped into
24 or partially repaid.  I don't really know the

TSG Reporting - Worldwide    877-702-9580

TULLY

1
2  exact specifics of it.  But those -- that
3  meeting on October 3, that topic certainly came
4  up.
5      Q.   Do you recall whether that topic was
6  discussed in any prior meeting, either on
7  October 1 or any earlier date?
8      A.   I can't really say.  I don't believe
9  so.
10     Q.   You don't recall?
11     A.   I don't recall.
12     Q.   For what reason were you inquiring
13 about matters involving JP Morgan Chase?
14         WITNESS' ATTORNEY:  Objection to form.
15     It is OK, you can answer.
16     A.   We were trying -- well, one piece of
17 my role, a very significant piece, I don't know
18 that I mentioned it, was we were doing cash
19 management.  So we were trying to -- in any
20 bankruptcy case, cash, understanding your cash
21 position on the day of filing and what it is
22 going to be going forward is imperative.
23         So JP Morgan Chase was their bank,
24 obviously.  You know, I was somewhat shocked at
25 the fact that the moment I walked in there, I

TSG Reporting - Worldwide    877-702-9580

TULLY

1
2  couldn't get a cash balance, what is your total
3  cash.  That question was a question that
4  probably took a week or two to answer.
5      Q.   And why did it take so long to answer?
6  Were you given an explanation as to why it took
7  so long to answer?
8      A.   Yes.
9      Q.   What was the explanation?
10     A.   That Chase had, quote/unquote, shut
11 down the systems, turned off the screens, things
12 like that.
13     Q.   Were you told when that first
14 occurred?
15     A.   I don't recall exactly, but I think it
16 was a few days after the bankruptcy.  I don't
17 have a perfect recollection of the timing.
18     Q.   Did you participate in any discussions
19 with Alvarez or Lehman executives concerning the
20 estimate of cure payments that Lehman had
21 presented in connection with the sale
22 transaction?
23     A.   Yes.  I believe that was a -- in any
24 bankruptcy scenario where there is a sale and
25 there is an assumption and assignment of

TSG Reporting - Worldwide    877-702-9580

TULLY

1
2  contracts, we want to make sure that's a
3  controlled process and people are tracking it.
4  Lehman, being such a big entity, the fact that
5  there was an LBHI Chapter 11 proceeding, as well
6  as an LBI proceeding seemed to complicate that
7  matter.  We wanted to -- the conversations I had
8  I recall were that we wanted to make sure we
9  were staying on top of the people who were
10  trying, supposed to be monitoring that process,
11  that LBHI had a process in place that two years
12  later and we don't have a situation where a
13  contract was assumed by Barclays and paid,
14  presumably, and then this party files a claim in
15  the bankruptcy.
16          So that was the context.  And there
17  were discussions and we had a meeting on it.  I
18  think that was probably mid October or
19  something.  I don't know.
20      Q.   What was FTI's focus with respect to
21  cure payments?
22          WITNESS' ATTORNEY:  Object to form.
23      A.   The focus was, as I said, to insure
24  that claims weren't actually double counted.
25      Q.   Did FTI do anything or ask any

TULLY

1
2  questions relating to the cure estimate that
3  Lehman had provided in connection with the sale
4  transaction?
5          WITNESS' ATTORNEY:  Object to form and
6  foundation.
7      A.   I don't recall asking for -- maybe we
8  did ask for, you know, substantiation of that
9  where did you get such -- the cure number,
10  whatever that cure number was that was stated.
11  But I don't recall ever getting into any depth
12  on it or receiving any sort of information that
13  would have led me to believe that's a good or
14  bad number.
15      Q.   What work did FTI do to analyze the
16  actual cure payments that were being made in
17  connection with the Lehman bankruptcy?
18          WITNESS' ATTORNEY:  I am going to
19  object and -- on attorney/client and work
20  product privilege.
21          You can describe in a general way what
22  FTI was doing, but don't get into the
23  substance of any communications that you
24  gave the committee or specifics with FTI.
25          You can say what the general project was

TULLY

1
2  related to cure payments if you know at FTI.
3      A.   OK.  I think our work was principally,
4  as I mentioned before, trying to understand
5  whether or not there was a process in place
6  whereby Barclays, LBI and LBHI were all somehow
7  communicating so that we didn't have the
8  situation I mentioned before of creditors coming
9  in -- I think the bar date was 12 or 13 months
10  later.  The claims bar date was obviously much
11  later and we wanted to, as I mentioned, insure
12  that there wasn't a situation where there was no
13  control over the payments being made such that
14  creditors could assert a claim while they were
15  already paid.
16      Q.   Did FTI do anything to review the
17  public filings concerning cure payments relating
18  to closing date contracts or designated
19  contracts?
20          WITNESS' ATTORNEY:  You can answer
21  that yes or no.  We will take it from there.
22          THE WITNESS:  OK.
23      A.   Yes.
24      Q.   And that information was available on
25  the Epiq website, is that correct?

TULLY

1
2      A.   Yes.
3      Q.   Did FTI do anything to total the cure
4  payments for closing date contracts?
5          WITNESS' ATTORNEY:  I am going to
6  object on privilege and I would like to take
7  a break to discuss -- just so I can resolve
8  some privilege issues for this kind of
9  questioning.
10          Step outside just for a second.
11          THE VIDEOGRAPHER:  The time is 9:58,
12  we are now off the record.
13          (Recess)
14          THE VIDEOGRAPHER:  The time is 10
15  a.m., we are now on the record.
16      Q.   Now that we are back on the record.
17  I'll just repeat my last question.  Did FTI, to
18  your knowledge, do anything to total or add up
19  the cure payment amounts for closing date
20  contracts that were posted on the Epiq website?
21      A.   I don't know.
22      Q.   Did FTI do anything to compare any of
23  the cure payment amounts posted on the Epiq
24  website with the cure estimate that Lehman had
25  provided in connection with the sale

**TULLY**

1
2 transaction?
3    A.   I don't know.
4    Q.   You don't know one way or the other?
5    A.   No.
6    Q.   Now, you have told me about a meeting
7 shortly after the closing, I believe your
8 recollection is that it was September 24 or
9 thereabouts.  Is that right?
10   A.   Yes.
11   Q.   And you have described the general
12 substance of that meeting.  When did you next
13 meet with people from Alvarez or Lehman?
14   A.   I don't perfectly remember, but I'm
15 thinking it may have been like Friday, the 26th.
16   Q.   Do you recall what the substance of
17 that discussion was?
18   A.   Similar as I discussed before, we were
19 trying to understand the cash balances, so it
20 was really a meeting to figure out where Alvarez
21 & Marsal stood in terms of trying to get better
22 clarity into their cash position.
23   Q.   When was the next time you met with
24 either Alvarez or former Lehman people?
25   A.   I don't know for sure, but I think it

TULLY

1
2 is sometime the next week.
3    Q.   And what was the subject of that next
4 meeting?
5    A.   Again, I think probably cash
6 management and employee retention, you know,
7 there was discussions of we need to make sure
8 that there is, there are people here to wind
9 down the estate.
10   Q.   At some point that week of September
11 29th through October 3rd, did you have a meeting
12 with Alvarez or Lehman in which there was a
13 discussion concerning the Barclays' replacement
14 of the Fed repo?
15   A.   I'm not sure.
16   Q.   Do you recall at some point having
17 such a discussion?
18   A.   I recall the Friday the 3rd
19 discussion.  I honestly, I don't know if there
20 were previous discussions.
21   Q.   So you recall the October 3
22 discussion, but you're just not sure if there
23 were previous discussions on that subject?
24   A.   That's correct.
25   Q.   Looking at Exhibit 463B, this reflects

**TULLY**

1
2 the meeting you described as having occurred on
3 October 3, is that right?
4    A.   Yes.
5    Q.   Who participated in that October 3
6 meeting?
7    A.   There were, there were a number of
8 meetings.  We spent the entire day in Jersey
9 City.  This particular portion of the meeting,
10 the three people shown on the top of the e-mail
11 participated, Dan Fleming, Mr. Jones, I don't
12 recall if his name is Cliff, I think it may have
13 been.  Tamir Shafer as well as Bill Fox from
14 Alvarez & Marsal.  I think Christopher Kelly
15 from Alvarez & Marsal may have been there.
16       I was in attendance obviously.  Ben
17 Kream from my office and Houlihan Lokey had Mike
18 Livanos there.  Michael Fazio was on site at the
19 Jersey City during that day.  I don't recall if
20 he was in this meeting.  I'm fairly certain he
21 wasn't actually.
22   Q.   Starting at the top of your e-mail, it
23 states, "Gentlemen, I tried to summarize the
24 discussion regarding the JP Morgan Chase
25 collateral position as best I could based on the

**TULLY**

1
2 discussion we had on Friday.  Please let me know
3 if the following is accurate in your view,
4 understanding that much of our discussion on
5 Friday was based on incomplete and missing
6 information.  If we can set another call to
7 discuss your comments and/or changes regarding
8 this summary, I would appreciate it."
9    Q.   Did you ever receive a response to
10 that request?
11   A.   No.
12   Q.   Did you ever attempt to follow up on
13 that request?
14   A.   I don't recall 100 percent, but I
15 imagine I may have sent Bill Fox follow-up
16 e-mails.
17   Q.   Did it concern you that you did not
18 receive a response to that request?
19       WITNESS' ATTORNEY:  Object to form.
20   A.   Somewhat, I suppose.
21   Q.   And what did you do about that
22 concern?
23   A.   Discussed it with Sam Star, who I was
24 reporting to at the time.
25   Q.   And why was that a concern of yours?

**TULLY**

1
2     A.   I just thought understanding this was
3  an important thing to understand.
4     Q.   Important in relation to what?
5        WITNESS' ATTORNEY:  Object to form.
6     A.   Well, we believed that there could be
7  potential causes of action against JP Morgan
8  Chase and kind of nailing down the facts at some
9  point seemed to me to be important.
10        That said, we did address these
11  concerns with Alvarez & Marsal.  My recollection
12  is they said we have a team working on it and a
13  forensic accounting team.  We are going to do a
14  full investigation, understanding what happened
15  the week before the bankruptcy, the week of the
16  bankruptcy, the week of -- initial week of the
17  bankruptcy filing and the subsequent week and we
18  will keep you posted on our findings and
19  understanding.  They involved us in that process
20  to a certain degree and others at FTI were more
21  involved than I was.
22     Q.   Moving down the e-mail, there is a
23  heading that reads LBI repo transactions.  Do
24  you see that?
25     A.   Yes.

TSG Reporting - Worldwide     877-702-9580

TULLY

1
2     Q.   Underneath that heading, it states,
3  "Close of business, Wednesday, September 17,
4  Lehman had a 45 billion dollar repo with the Fed
5  Primary Dealer Credit Facility, PDCF, against
6  collateral with a market value of 49.7 billion
7  dollars."
8        Focusing on that statement, do you
9  recall who provided you with that information?
10     A.   Yes.
11     Q.   Who?
12     A.   Dan Fleming did most of the talking
13  during this meeting and I'm quite certain it was
14  him that made that statement.
15     Q.   Did he explain the basis for the
16  market value figure that he provided?
17     A.   He did not.
18     Q.   Did Mr. Livanos raise any questions
19  about that at the meeting?
20     A.   It's hard to recall.  I don't know.
21     Q.   Moving to the next paragraph, it
22  states, "Close of business on Thursday, the Fed
23  wanted out of the repo and required Barclays to
24  step into the trade."
25        Do you recall who told you that?

TSG Reporting - Worldwide     877-702-9580

**TULLY**

1
2     A.   Yes, again I believe it was Dan
3  Fleming.
4     Q.   Did he explain why the Fed wanted out
5  of the repo?
6     A.   No.
7     Q.   Was there any discussion of that
8  subject?
9     A.   No.
10     Q.   Then you write, "I am not totally
11  clear on how this worked or if Barclays agreed
12  to this, but I believe as part of the Barclays
13  transaction.  They settled up with the Fed on
14  Friday, (See the attached summary I received
15  from A&M Jim Fogarty's group)."
16        The summary that you're referencing is
17  the summary that appears after the first two
18  pages of this document?
19     A.   I believe that's correct.
20     Q.   Can you explain the circumstances in
21  which Mr. -- withdrawn.
22        Who provided you with that summary?
23     A.   Judging by the e-mail, I believe it
24  was someone either -- someone at A&M, either Jim
25  Fogarty or someone who who worked for him.

TSG Reporting - Worldwide     877-702-9580

TULLY

1
2     Q.   When did they provide you that
3  summary?
4     A.   I believe it was probably the week of
5  September 29th. I don't recall the day.
6     Q.   What was the reason that they provided
7  that summary to you?
8        WITNESS' ATTORNEY:  Object to form,
9  foundation.  Again, I'm not even 100 percent
10  clear if it was provided to me directly or
11  someone else within FTI.
12     Q.   Fair enough.  Do you know why it was
13  provided to FTI?
14     A.   I believe it was to gain an
15  understanding -- gain an initial understanding
16  of what A&M's understanding of the transaction
17  was.
18     Q.   That is the Barclays Lehman
19  transaction?
20     A.   The Barclays -- yes, yes.
21     Q.   Do you know whether A&M gave the same
22  information to Houlihan?
23        WITNESS' ATTORNEY:  Object to form,
24  foundation.
25     A.   I believe we were probably both

TSG Reporting - Worldwide     877-702-9580

## Page 30

TULLY

1
2  present.  A lot of times, like the meeting on
3  the 3rd, we were present on a lot of the
4  meetings of A&M, jointly, Houlihan and FTI were
5  present at a lot of those meetings.
6      Q.   Do you know whether the summary was
7  provided by A&M to FTI and Houlihan at a meeting
8  that both FTI and Houlihan attended?
9      A.   That, I believe that that may have
10 been the case.  I can't tell you for sure.
11     Q.   And when A&M, when Alvarez provided
12 the summary, did they explain any of its
13 contents?
14     A.   I don't recall them explaining the
15 contents.
16     Q.   Did anybody from -- did anybody from
17 Houlihan or from FTI ask Alvarez to explain the
18 contents of this summary?
19         WITNESS' ATTORNEY:  Objection,
20     foundation.
21     A.   I'm not sure.  My recollection is this
22 was a very preliminary summary and perhaps the
23 people at  Fogarty -- Fogarty didn't put it
24 together himself, I didn't think.  I believe it
25 was probably someone working for him.  I don't

TSG Reporting - Worldwide    877-702-9580

## Page 31

TULLY

1
2  know how much probing went on with regard to
3  this.  I do recall it being very preliminary and
4  that they were still trying to themselves,
5  A&M -- again, I don't know.  They weren't
6  present, I don't think at the -- didn't have a
7  lot to do with the transaction.  So I think A&M
8  as a firm were trying to understand the
9  transaction and this was a tool they were using
10 to try to figure out what happened.
11     Q.   And you believe the information
12 reflected on this summary is information that
13 Alvarez obtained from other individuals with
14 more direct knowledge?
15         WITNESS' ATTORNEY:  Objection, lack of
16     foundation.
17         MS. DEL MEDICO:  Objection.
18     A.   That's my belief.
19     Q.   Staying with your e-mail on the first
20 page and moving further down, this paragraph
21 that begins on Thursday night, it's the third
22 paragraph from the bottom.  Do you see that?
23     A.   Yes.
24     Q.   Let me move to the what I think is the
25 third sentence, it says, "Discussed 7 billion

TSG Reporting - Worldwide    877-702-9580

## Page 32

TULLY

1
2  dollars of collateral missing."  Do you see
3  where I am?
4      A.   Yes.
5      Q.   It states, "Discussed 7 billion
6  dollars of collateral 'missing.'  But I believe
7  this just means everything didn't clear, so
8  Chase ended up doing a 7 billion dollar box
9  loan."
10         What do you recall being told at that
11 time about 7 billion dollars of collateral
12 missing?
13     A.   I recall a discussion of how
14 unprecedented a transaction this large would
15 have been, that the DTC and people from Chase
16 and Lehman spent all night trying to reconcile a
17 trade that large.  I recall it inferred that it
18 was just physically impossible to get all that
19 work done and that a certain amount of
20 collateral didn't get cleared if you will.  And
21 therefore, it was, quote/unquote, missing.  And
22 it forced Chase to make a loan against that
23 collateral that it believed it held in the box
24 but just didn't clear.
25     Q.   What were you told about the Chase

TSG Reporting - Worldwide    877-702-9580

## Page 33

TULLY

1
2  loan if you remember?
3      A.   I don't recall, it's -- a more
4  specific question, I don't know what --
5      Q.   Sure, sure.  Do you recall being told
6  anything about how that 7 billion dollars of
7  missing collateral was handled as between
8  Barclays on the one hand and Lehman and Chase on
9  the other hand?
10     A.   I don't recall an exact conversation
11 on that.
12     Q.   You recall being told something about
13 a Chase loan that resulted from this situation?
14     A.   Yes, that you could draw a conclusion
15 from that that Chase paid off, made a payment of
16 cash and gave a loan to Lehman.  But I don't
17 know that we were getting so specific in the
18 discussion.
19     Q.   You refer to the term "box loan" in
20 quotes.  What is your understanding of what a
21 box loan is?
22     A.   It is a loan that a bank would make
23 against securities that the bank had custody of
24 and held in a box.
25     Q.   The box being an account?

TSG Reporting - Worldwide    877-702-9580

**TULLY**

1
2      A.   Yeah.  I think it is an old term that,
3   I guess, there were physical securities at one
4   point in time and there were boxes that were
5   held and it is just a term of art now in
6   banking.
7      Q.   You go on to say there were also
8   issues with collateral getting stuck at DTC, the
9   guestimated amount is 800 million dollars.  What
10  do you recall being told about issues with
11  collateral getting stuck at DTC?
12     A.   Not a lot really, I just remember that
13  being stated.  I don't recall truly
14  understanding the back office machinations that
15  would have caused such an event.
16     Q.   Did you have an understanding that
17  that was something that had occurred in
18  connection with the mechanics of Barclays
19  replacing the Fed repo?
20         WITNESS' ATTORNEY:  Object to form.
21         MS. TABATABAI:  Join in the objection.
22     A.   I'm not sure which piece it referred
23  to.
24     Q.   I want to move to the second page of
25  the e-mail.  At the top of the page, fourth line

**TULLY**

1
2   down, it states, "We had a brief discussion of
3   the quality of collateral pledged under the
4   repos and it seems that some of it was far from
5   high quality securities.  Do you recall who told
6   you that?
7      A.   I believe Dan Fleming and I don't know
8   that he said it that definitively.  I think he
9   described some of the collateral and it just
10  occurred to me that it wasn't U.S. Treasuries,
11  most of the things, but something less, less
12  liquid.
13     Q.   Then it goes on to say, "We briefly
14  discussed an amount, I think it was 5 billion
15  dollars, was related to Lehman commercial paper
16  or some other instrument credit-linked to Lehman
17  CP."
18         What do you recall being discussed on
19  that subject?
20     A.   That was pretty much the extent of it.
21  I don't know anything further.
22     Q.   Is that a reference to an amount of
23  certain securities that were included as repo
24  collateral?
25     A.   Yes.

**TULLY**

1
2         WITNESS' ATTORNEY:  I am going to
3   object to form and put in for clarification
4   that there are multiple repos that are being
5   discussed in this document if it is possible
6   for you to clarify when you say repo
7   collateral.
8      Q.   Do you recall whether that reference
9   to Lehman commercial paper or some other
10  instrument credit linked to Lehman CP was a
11  reference to collateral that had been
12  transferred to Barclays when Barclays replaced
13  the Fed repo?
14     A.   I don't recall completely, but I think
15  it was the opposite.  I think it was the
16  collateral under the repo that Chase stepped
17  into.  Again, I'm sort of speculating here.  I
18  don't recall completely.
19     Q.   So you're not sure?
20     A.   That's fair, I'm -- I --
21     Q.   It could have been a reference to the
22  collateral for the 15.8 billion dollar repo or
23  could have been a reference to collateral in
24  connection with the Barclays replacement of the
25  Fed repo?

**TULLY**

1
2      A.   Yes, but I'm more certain that it was
3   the 15.8 in this context where it sits in the
4   paragraph and I could reread the paragraph and
5   maybe refresh my memory, but --
6         WITNESS' ATTORNEY:  I am sorry, did
7   you finish your sentence?
8      A.   No, I was, you know, I think we could
9   clarify it by reading this e-mail.  If you would
10  like, I can do that and respond.
11     Q.   Sure.
12     A.   I'm fairly certain that this
13  collateral was related to the 15.8 billion.
14  This whole discussion is really more of the
15  thrust of what my review of this situation was
16  which is trying to understand JP Morgan Chase.
17  It seems like this paragraph is trying to get
18  into gaining a better understanding of how over
19  or under-collateralized Chase was.
20     Q.   Was there any discussion concerning
21  whether Chase would transfer any of this
22  collateral that it held to Barclays in
23  replacement of the 7 billion dollar missing
24  collateral?
25         WITNESS' ATTORNEY:  Object to form.

---

Page 38

TULLY

1
2      A.  I didn't think the 7 billion dollars
3   of missing collateral had implications on the
4   Barclays repo that was mentioned above.  I don't
5   know if there was any transfer of collateral.  I
6   don't know.
7      Q.  Do you have any understanding that the
8   7 billion dollars of collateral missing related
9   to the replacement by Barclays of the Fed repo?
10     WITNESS' ATTORNEY:  Object to form.
11     A.  Again, I thought that was in relation
12  to the 15.8 -- well, actually, I don't know is
13  your answer.  I'm not sure.
14     Q.  Looking at the next line, you say, "In
15  trying to tie this together to the Barclays
16  transaction, I noted that the attached summary
17  reflects a line called extinguish liability to
18  Fed, 38 billion dollars.  Is the 45 billion
19  Fed repo reduced for the 7 billion dollar box
20  loan."
21     Do you see that?
22     A.  Yes.
23     Q.  Did you ever get an answer to that
24  question from anyone?
25     A.  No.

TSG Reporting - Worldwide     877-702-9580

---

Page 39

TULLY

1
2      Q.  Did you ever follow up on that
3   question with anyone?
4      A.  I think as I answered before, I
5   believe I followed up with Bill Fox, but I don't
6   recall ever getting an answer.  And again, there
7   was another team of FTI people, Alvarez & Marsal
8   people who were looking to fully understand this
9   situation.
10     Q.  Did you have any discussions with that
11  team concerning this question?
12     WITNESS' ATTORNEY:  Just answer yes or
13  no to that.
14     A.  I don't recall.
15     Q.  You may have, but you don't recall?
16     A.  Yes.
17     Q.  Now, you say "In trying to tie this
18  together to the Barclays transaction, I noted
19  that the attached summary reflects a line called
20  'extinguish liability to Fed, 38 billion
21  dollars.'"
22     Let's turn to the next page.  Is this
23  the page that you were referring to in that
24  portion of your e-mail?
25     A.  Yes.

TSG Reporting - Worldwide     877-702-9580

---

Page 40

TULLY

1
2      Q.  And in the upper right side, under
3   liabilities, it has a line that states
4   "Extinguish liability to Fed, 38 billion
5   dollars."  IS that the line that you were
6   referring to in your e-mail?
7      A.  Yes.
8      Q.  On the left side of this summary,
9   there is a line that states, repo assets, 38.07.
10  Did you have an understanding as to what that
11  meant?
12     A.  Not perfectly.
13     Q.  What was your general understanding?
14     A.  Generally it seemed like they were
15  assets related to the repo.
16     Q.  The Fed repo that Barclays replaced?
17     A.  Yes.
18     Q.  And then below that, "Negotiated mark
19  haircut 5 billion," do you see that?
20     A.  Yes.
21     Q.  What was your understanding concerning
22  what that meant?
23     A.  Well, in any lending transaction,
24  which is what a repo essentially is, there is
25  not 100 percent lending on collateral.  Just

TSG Reporting - Worldwide     877-702-9580

---

Page 41

TULLY

1
2   like a mortgage situation, if you are buying a
3   house, the bank doesn't finance 100 percent of
4   your house.  They require a down payment.  So
5   haircut in the repo context is akin to that down
6   payment.  It is the equity cushion, if you will.
7      Q.  Is that something that you understood
8   based on your own knowledge or is that something
9   that was discussed with Alvarez or others?
10     A.  My own knowledge.
11     Q.  Was there any discussion with Alvarez
12  or others including Houlihan concerning this
13  line labeled "negotiated mark haircut"?
14     A.  I don't recall being part of any
15  discussions on that.
16     Q.  And then the next line states, "Assets
17  transferred under repo, stale marks."  Do you
18  see that?
19     A.  Yes, yes.
20     Q.  What is your understanding of the
21  reference to stale marks here?
22     A.  I don't really have a good
23  understanding of it.
24     Q.  Did you ever participate in any
25  discussion concerning that phrase at or around

TSG Reporting - Worldwide     877-702-9580

TULLY

1
2   the time of receiving this summary?
3       A.   I don't think so.  I don't recall.
4       Q.   You don't recall one way or the other?
5       A.   No.
6       Q.   Below that, this refers to
7   unencumbered box, 1.9.  Do you know what that is
8   a reference to?
9       A.   Not really.  I can guess, but I don't
10  know.
11      Q.   At the time, do you think you knew
12  what that was?
13      A.   At the time --
14      Q.   At the time you received this summary?
15      A.   Not really.
16      Q.   At the time you received this summary
17  that's attached to your e-mail, did you have any
18  discussion with Houlihan concerning the contents
19  of the summary?
20      A.   I don't recall.
21      Q.   You may have, but you don't recall?
22      A.   Yeah, that's correct.
23      Q.   At the time that you received this
24  summary, did you have any discussions concerning
25  the summary with either former Lehman executives

TSG Reporting - Worldwide    877-702-9580

TULLY

1
2   or anyone from Alvarez concerning the contents
3   of the summary?
4       A.   No, I don't think so.
5       Q.   And what was the reason you attached
6   the summary to this e-mail?
7       A.   I believe it was to try to piece
8   together the question you were asking about
9   before, bridging from the 45, which was my
10  understanding based on the discussion of that
11  was the balance of the loan to the Fed and the
12  fact that this page showed 38.
13      Q.   So you were trying to piece together
14  an explanation on that issue?
15      A.   Yes.  And in the context, again, of
16  what Chase may have been owed or what Chase
17  believed its net, net position vis-a-vis Lehman
18  was.
19      Q.   Aside from the issues that are
20  reflected in your e-mail, were there any other
21  topics discussed at the October 3 meeting?
22      A.   Yes.
23      Q.   What were those topics?
24      A.   There was a discussion with the, I
25  guess accounting operations group on

TSG Reporting - Worldwide    877-702-9580

TULLY

1
2   understanding how Lehman accounted for their
3   payroll and whether or not there was payroll at
4   every single Lehman entity or whether or not
5   they did it in a consolidated manner.  Same
6   question with respect to -- same discussion with
7   respect to how they disbursed accounts payable,
8   how they managed their accounts payable process.
9           I'm trying to think, there is probably
10  discussions on cash management more generally,
11  trying to understand, you know, where cash was,
12  understanding that JP Morgan cash was difficult
13  to get visibility into.  Other banks, you could
14  tell how much the cash balances were, like
15  Citibank.
16          I'm trying to think if there were
17  other more general discussions with Bill Fox as
18  to how he was staffing his team and how he was
19  going to manage the process, how he was going to
20  bring -- you know, what size team he thought he
21  needed to supplement his Alvarez & Marsal
22  professionals.  He would obviously need to bring
23  in certain Lehman people.  I recall talking
24  about the tax group in particular.
25          This was a monstrous sized

TSG Reporting - Worldwide    877-702-9580

TULLY

1
2   organization with thousands of tax returns and
3   compliance that needed to be taken care of.  So
4   he was working on staffing that up.  I remember
5   talking, you know, particulars as to how big the
6   tax team was and who he wanted to make offers
7   to.  And whether or not those people would be
8   available.  I think there was a thought that
9   these people would be available because they
10  would be somewhat redundant to the staff that
11  Barclays already had in place.
12      Q.   Let me ask this, was there any further
13  discussion at the October 3 meeting concerning
14  any other topic relating to the Barclays sale
15  transaction?
16      A.   No, I don't believe so.
17      Q.   Before the closing of the Barclays
18  sale transaction on September 22, 2008, to the
19  best of your knowledge, what interactions did
20  FTI have with Lehman concerning the Barclays
21  sale transaction?
22          WITNESS' ATTORNEY:  Objection,
23  foundation.
24          MS. DEL MEDICO:  Objection to form.
25      A.   My understanding is FTI had no

TSG Reporting - Worldwide    877-702-9580

Page 46

```
 1                TULLY
 2    discussions with Lehman or Barclays about the
 3    Barclays transactions.  As stated, that was
 4    firmly in Houlihan's court.  You know, we were
 5    joint financial advisors.  We were very careful
 6    especially at the outset not to double up, if
 7    you will, to draw the ire of the U.S. trustee
 8    and not get paid for our work.
 9        Q.    Did Mr. Eisenband attend any meetings
10    over the weekend before the closing?
11        A.    No, he did not.
12        Q.    So Mr. Eisenband was not at Weil
13    Gotshal over the weekend before the closing?
14             WITNESS' ATTORNEY:  Objection, lack of
15    foundation.
16        Q.    If you know?
17        A.    He was not.
18        Q.    Was anybody from FTI to your knowledge
19    at Weil Gotshal over that preclosing weekend?
20             WITNESS' ATTORNEY:  Objection,
21    foundation.
22        A.    No one from FTI was there.
23        Q.    Did anyone from FTI attend the sale
24    approval hearing on September 19?
25             WITNESS' ATTORNEY:  Objection,
```

TSG Reporting - Worldwide    877-702-9580

Page 47

```
 1                TULLY
 2    foundation.
 3        Q.    If you know.
 4        A.    I don't believe so.  My strong
 5    inclination is no but I can't state that with
 6    100 percent certainty.
 7        Q.    So from September 17 through September
 8    19, what was FTI's focus?
 9             WITNESS' ATTORNEY:  Objection to form,
10    foundation.
11        A.    Understanding the capital structure,
12    what the total amount of debt outstanding was at
13    Lehman, where that debt sat within the different
14    legal entities, understanding of the legal
15    entity org charts.  That was my particular
16    charge, those two items, trying to begin to get
17    a handle on cash balances, although I think it
18    was not possible at that time.
19             We were involved in the TSA,
20    transition services agreement.  I dealt with the
21    gentleman who we have had primary, you know,
22    focus on that and asked him specific questions
23    about what his attendance was at these meetings
24    and closings and he confirmed for me through his
25    time records and his recollection that he was
```

TSG Reporting - Worldwide    877-702-9580

Page 48

```
 1                TULLY
 2    not there at any of those meetings.  I believe
 3    he read the transition service agreement and
 4    gave the lawyers from Milbank comments on the
 5    document, things to include trying to get
 6    extended time periods and additional services
 7    added to that transition service agreement.
 8             So that was the extent of FTI's
 9    involvement in the Barclays transaction.
10        Q.    Do you know --
11             WITNESS' ATTORNEY:  Hold on.
12        A.    The only other thing I could think of
13    is we were, Alvarez & Marsal was starting to
14    think about, you know, how the IT backbone of
15    this surviving entity would work and we were
16    starting to find resources that could help them
17    transition and back up information.  That's the
18    extent of our involvement as I recall.
19        Q.    Do you know whether John Sirus had any
20    discussions with anybody from Lehman or Barclays
21    or any of their professionals concerning how
22    derivatives would be treated in the sale
23    transaction?
24             WITNESS' ATTORNEY:  Objection, lack of
25    foundation.
```

TSG Reporting - Worldwide    877-702-9580

Page 49

```
 1                TULLY
 2             MS. TABATABAI:  Join in the objection.
 3        A.    I don't have direct knowledge one way
 4    or the other.  I know he dealt with derivatives.
 5    I don't know.
 6             WITNESS' ATTORNEY:  If this is a good
 7    time for a break.
 8             MR. STERN:  Sure, sure, we can take a
 9    break now if you want.
10             THE VIDEOGRAPHER:  This concludes tape
11    number one in the videotape deposition of
12    Conor Tully.  The time is 10:40 a.m., we are
13    now off the record.
14             (Recess)
15             THE VIDEOGRAPHER:  This begins tape
16    number 2 in the videotape deposition of
17    Conor Tully.  The time is 10:50 a.m., we are
18    now on the record.
19        Q.    Mr. Tully, I have given a document we
20    previously marked as Exhibit 580A.  Do you have
21    that in front of you?
22        A.    I do.
23        Q.    If you would look at the second page
24    of this document, actually bottom of the first
25    page, there is an e-mail Mary Korycki to Steven
```

TSG Reporting - Worldwide    877-702-9580

**TULLY**

1
2  that transaction?
3      MS. DEL MEDICO:  Objection.
4      A.   I don't believe I was present at such
5  a meeting.
6      **Q.   And just to be clear, you don't**
7  **recognize the document that was marked as 613B?**
8      A.   Not at all.
9          MR. STERN:  Let's mark this as the
10  next document.
11          (Exhibit 614B, document Bates stamped
12  FTI 00001 through 94 marked for
13  identification, as of this date.)
14      **Q.   Mr. Tully, I have given a document**
15  **that we have marked as Exhibit 614B.  I would**
16  **like for you to take your time to review the**
17  **cover e-mail and to glance at the attachment and**
18  **let me know if you can tell me what this is.**
19      A.   This appears to be the first, probably
20  the first report that Alvarez & Marsal issued to
21  the committee on I presume a meeting that
22  occurred on October 8 with the debtors and the
23  committee.
24      **Q.   Did you personally attend that**
25  **meeting?**

**TULLY**

1
2      A.   I believe I did.
3      **Q.   Do you recall who else from FTI**
4  **attended that meeting?**
5      A.   It was the first meeting, so I think
6  we had a large group in attendance.  I believe I
7  was there, Sam Star, Mike Eisenband, Bob
8  Darefsky, potentially John Sirus.  There may
9  have even been a real estate expert there from
10  FTI's real estate team.  I don't know.  Maybe a
11  couple others.
12      **Q.   Do you recall who attended from**
13  **Houlihan?**
14      A.   I believe it was their core team,
15  senior people.  Again, I -- I don't have perfect
16  recollection, but if I had to guess, I would
17  probably say Saul was there, Fazio, Brad Gear.
18      **Q.   Were any of the creditors committee**
19  **members in attendance?**
20      A.   Yeah, I believe substantially all of
21  them would have been there.
22      **Q.   Did anybody from Weil Gotshal to your**
23  **knowledge attend?**
24      A.   Certainly.
25      **Q.   Did anybody from Milbank or Quinn**

**TULLY**

1
2  **Emanuel attend this meeting?**
3      A.   I would say yes to both.
4      **Q.   Do you recall who from Quinn Emanuel**
5  **attended this meeting?**
6      A.   It is an assumption that
7  they were there.  I don't know for a fact that
8  they were.  I would say more -- with almost
9  complete certainty that Milbank was there and I
10  would say that Quinn most likely was there but I
11  don't recall that.
12      **Q.   I would like to turn your attention to**
13  **the page that is numbered at the bottom FTI 30**
14  **the bottom right.  I am sorry, yes, FTI**
15  **00000030.  Do you have that page?**
16      A.   I have it.
17      **Q.   And do you see at the top of the page**
18  **it is labeled "III, significant transactions"?**
19      A.   Yes.
20      **Q.   And below that, it has, "A, Sale of**
21  **Lehman Brothers Inc./broker/dealer to Barclays**
22  **(Fogarty)."  Do you recall being present for**
23  **this part of the presentation?**
24      A.   Not particularly.  But I imagine I
25  was.

**TULLY**

1
2      **Q.   Below that heading, there is a line**
3  **that says, "assets purchased," and then below**
4  **that, it has a line that states, "43.1 billion**
5  **repo assets, book value per Lehman stale marks,**
6  **negotiated a 5 billion dollar reduction."**
7      **Do you see that statement?**
8      A.   Yes.
9      **Q.   Do you recall whether there was any**
10  **discussion at that meeting concerning the**
11  **information in that line?**
12      A.   I don't recall.
13      **Q.   Do you recall whether anyone from**
14  **Houlihan said anything about the information in**
15  **that line?**
16      A.   I don't recall.
17      **Q.   Do you recall whether anyone from**
18  **Houlihan raised any questions at that meeting**
19  **concerning the reference to stale marks or the**
20  **reference to negotiated a 5 billion dollar**
21  **reduction?**
22      A.   No.
23      **Q.   You just don't recall?**
24      A.   I don't.
25      **Q.   So just to be clear, it's possible but**

```
 1              TULLY
 2   you simply don't recall?
 3      A.   I don't.
 4      Q.   Looking at this page, this part of the
 5   presentation, do you recall anything that was
 6   discussed concerning any element of this page of
 7   the presentation at that meeting?
 8      A.   No.
 9      Q.   Let me show you a document we
10   previously marked as Exhibit 582A.  I would like
11   you to take your time and review these e-mails
12   and then I will have some questions for you
13   about certain parts of the e-mails.
14      A.   OK.
15      Q.   Have you had a chance to glance at
16   this?
17      A.   Yeah, I'm --
18      Q.   We will go through it more slowly.
19      A.   Sure.
20      Q.   Let's start on the second page of the
21   document, at the bottom of that page, there is
22   an e-mail from Mary Korycki to you on October 14
23   and she asks you if a particular time would work
24   for a conference call regarding the assumption
25   of vendor contracts.  Do you see that?
```

TSG Reporting - Worldwide    877-702-9580

```
 1              TULLY
 2      A.   Yes.
 3      Q.   What was the issue concerning
 4   assumption of vendor contracts that you were
 5   planning to discuss with Alvarez at that time?
 6      A.   Again, I think this came up
 7   previously, we wanted to try to understand what
 8   contracts were being assumed, what were being
 9   rejected, how to go through the claims process,
10   that kind of thing.
11      Q.   And then above that, there are some
12   further e-mail exchanges on scheduling and then
13   on the first page, you write an e-mail to Mary
14   Korycki on October 15 and you copy Ken Gross,
15   Sam Star and Bill Gordon.  Is Ken Gross an
16   Alvarez person?
17      A.   No, Kenny Gross worked for me on this
18   piece of the engagement.
19      Q.   Sam Star is with FTI?
20      A.   Yes.
21      Q.   Bill Gordon?
22      A.   He is with Alvarez.
23      Q.   And you write, "OK, can we try to set
24   it up for tomorrow.  I want to confirm who is
25   going to participate.  I think it was Larry
```

TSG Reporting - Worldwide    877-702-9580

```
 1              TULLY
 2   Bortstein, Patrick Coster and A&M."
 3          Who is Larry Bortstein?
 4      A.   Larry was an internal counsel at
 5   Lehman who remained at Lehman.  He was, I think,
 6   one of the big responsibilities was contracting
 7   with vendors.
 8      Q.   Did you ever end up having a
 9   discussion with him?
10      A.   I did.
11      Q.   What did you discuss with him?
12      A.   Their process for assumption of
13   contracts and vetting through all the contracts
14   that Lehman had, trying to figure out which ones
15   they needed to continue to maintain and which
16   ones should be rejected promptly to save
17   administrative expense.
18      Q.   Did you have any discussion with him
19   concerning Lehman's estimate of cure payments?
20      A.   No.
21      Q.   Did he provide with you any written
22   information?
23      A.   I don't believe so.
24      Q.   Did you ever meet -- who is Patrick
25   Coster?
```

TSG Reporting - Worldwide    877-702-9580

```
 1              TULLY
 2      A.   I can't recall.
 3      Q.   Did you ever meet him?
 4      A.   I don't think so.
 5      Q.   And then you write, "After giving it
 6   some more thought, it may make sense to have
 7   someone from Epiq join also."  Did you ever have
 8   a meeting with Epiq on this subject?
 9      A.   No.
10      Q.   Why were you suggesting that perhaps
11   Epiq should join the meeting?
12      A.   Because I wanted to understand what
13   they were intending to do with respect to all
14   the contracts and how to keep track of them and
15   satisfy myself that they were going to be sort
16   of the person in the middle conducting traffic
17   between LBHI, LBI, Barclays and anyone else,
18   even the foreign administrators to understand
19   the contracts that were needed which were
20   assumed and which were rejected, which would be
21   rejected.  Just make sure that there was a
22   control in place to keep track of all this.
23      Q.   And over time, did you receive that
24   information?
25      A.   I don't recall receiving anything
```

TSG Reporting - Worldwide    877-702-9580

Page 62

```
 1              TULLY
 2    substantive on it.
 3        Q.   Was that information available
 4    publicly?
 5        A.   I think some of that information was
 6    on the Epiq website as you mentioned previously.
 7        Q.   Then you go on to write, "In
 8    discussing this with Bill Gordon, I know A&M's
 9    goals are as follows:  One, understand what is
10    being assumed and cured; two, understand what is
11    not being assumed to determine if contract may
12    be needed by legacy Lehman.  We may also find
13    situations where the contracts are advantageous
14    and could be assumed and sent to other parties;
15    and three, get a general understanding of the
16    contract universe to help further develop our
17    understanding and define the services to be
18    provided under the TSA."
19              Did you ever obtain information that
20    helped you get a general understanding of the
21    contract universe?
22        A.   I don't believe so.
23        Q.   Do you know whether A&M did?
24              WITNESS' ATTORNEY:  Objection, lack of
25    foundation.
```

TSG Reporting - Worldwide    877-702-9580

Page 63

```
 1              TULLY
 2        A.   I presume that they did, I don't know.
 3        Q.   Then at the bottom of the first page
 4    of this exhibit, you write, "In addition, I
 5    would like to get a better understanding of how
 6    the transaction dealt with executory contracts
 7    in general; one, I understand that cure costs
 8    are the obligation of Barclays; two, our
 9    committee has inquired numerously regarding the
10    estimated 2 billion in cure costs.  I believe
11    that statement was made on the record in court.
12    We want to understand if that number has a
13    basis.  Also the committee is interested in
14    understanding the total cost to cure contracts
15    under the Barclays transaction."
16              Now, with respect to your first point
17    here, "I understand that cure costs are the
18    obligation of Barclays," what was the purpose
19    for that statement?
20        A.   I think general discussions and the
21    purpose for putting it in the e-mail was try to
22    confirm if that was, in fact, a correct
23    assumption.  I hadn't read the contract and
24    wasn't involved in the transaction.
25        Q.   Then with respect to your second point
```

TSG Reporting - Worldwide    877-702-9580

Page 64

```
 1              TULLY
 2    concerning the estimate, what was the reason you
 3    were raising this question at this time?
 4              WITNESS' ATTORNEY:  Object to form.
 5        A.   Again, I was not very close to the
 6    transaction, I had received, you know, I guess
 7    calls or e-mails or heard of the committee
 8    wanting to understand the overall consideration
 9    of the transaction better.  I, you know,
10    followed up with who I thought at A&M would be
11    the appropriate person who may be able to
12    provide a detailed listing of the estimated cure
13    payment.
14        Q.   Did A&M ever respond to that request?
15        A.   I don't believe so.
16        Q.   Was there any follow-up on that
17    request by FTI?
18              WITNESS' ATTORNEY:  Objection, lack of
19    foundation.
20        A.   I believe we did follow up and ask,
21    but I don't recall ever getting satisfaction on
22    it.
23        Q.   What did FTI do to follow up?
24              WITNESS' ATTORNEY:  Objection, lack of
25    foundation.
```

TSG Reporting - Worldwide    877-702-9580

Page 65

```
 1              TULLY
 2        A.   I don't recall particularly, but maybe
 3    forwarded this e-mail, maybe mentioned it in
 4    passing to Bill Gordon and to Mary Korycki.
 5        Q.   And there was no response?
 6        A.   Not that I can recall.
 7        Q.   Was that of concern to FTI?
 8              WITNESS' ATTORNEY:  Objection, lack of
 9    foundation.
10        A.   Somewhat.  I would say somewhat
11    concerning.  I guess we never provided that
12    information to our committee and we wanted to be
13    able to provide this information.
14        Q.   What do you mean when you say it was
15    somewhat concerning?
16              WITNESS' ATTORNEY:  Objection to form.
17        A.   I was concerned the A&M people may not
18    have had a good handle on whether or not that
19    was a good number.
20        Q.   And given that concern, what steps did
21    you consider taking in order to address that
22    question?
23              WITNESS' ATTORNEY:  I am going to
24    object on attorney/client and work product
25    privilege.  You can talk about any steps
```

TSG Reporting - Worldwide    877-702-9580

## Page 66

TULLY

1
2  that you took regarding communicating with
3  someone other than internally at FTI or the
4  committee.
5      A.   OK.  Again, I believe we followed up
6  with people who we sent this e-mail to.
7      Q.   Beyond that, did you do anything?
8          WITNESS' ATTORNEY:  Same objection and
9  instruction.  So if you have other steps,
10  that you contacted someone other than
11  internally at FTI or the committee, you
12  should describe them.
13     A.   I don't recall.
14         (Exhibit 615B, document Bates stamped
15  FTI429 through 431 marked for
16  identification, as of this date.)
17     Q.   Before we look at this document, let
18  me ask you if you know what estimate Lehman
19  presented to the court in connection with
20  anticipated cure payments?  Is that something
21  you know?
22     A.   I wasn't in attendance.  I think based
23  on this e-mail, I just read it may have been in
24  the 2 million -- 2 billion dollar neighborhood.
25     Q.   Do you know if that was the amount?

## Page 67

TULLY

1
2      A.   No.
3      Q.   Did you ever find out anything from
4  Alvarez or any former Lehman person concerning
5  how that estimate was arrived at?
6      A.   I don't think so.
7      Q.   You're not sure?
8      A.   Not 100 percent, but I don't recall
9  seeing anything with a massive listing of
10  vendors, cure payments in sum due 2 billion.  I
11  certainly don't recall seeing something like
12  that.
13     Q.   Do you recall ever receiving any
14  explanation, whether orally or in writing from
15  Lehman or Alvarez concerning how that estimate
16  was arrived at?
17     A.   I don't recall.
18     Q.   You may have but you don't recall?
19     A.   That's right.
20     Q.   Can you tell me all of the individuals
21  at Lehman and Alvarez with whom you discussed
22  that issue, either through e-mail or in person?
23         WITNESS' ATTORNEY:  Object to form.
24     A.   Yes, at Lehman, it was Bill Gordon,
25  Mary Korycki, a gentleman who worked for Bill

## Page 68

TULLY

1
2  who was an IT person who was trying to build a
3  database to keep track of this information.  I
4  don't recall his name.
5          From Lehman, it was the Bortstein
6  gentleman.  There was a woman, I think her name
7  may have been Patricia.  That's kind of a guess.
8  I met her once.  There may have been one other
9  person in the room.  I don't recall if it was an
10  A&M person or a Lehman person.
11     Q.   What did you learn about how Lehman
12  had gone about preparing the cure payment
13  estimate?
14     A.   Nothing that I can recall.
15     Q.   Mr. Bortstein didn't have any insight
16  on that?
17     A.   I don't think so.
18     Q.   And the woman whose name you think was
19  Patricia didn't have any insight on that?
20     A.   No, the conversation was definitely
21  focused on keeping track of information going
22  forward and understanding the universe of
23  contracts and what systems those contracts were
24  tracked in and resided in and which contracts
25  Barclays expressed a desire to continue to have

## Page 69

TULLY

1
2  and cure and which ones they didn't, which ones
3  they needed to facilitate the transition service
4  agreement and continuing to provide services to
5  Lehman brokers.
6      Q.   So the focus --
7      A.   Which ones may have been involved with
8  their, in some way implicate the Nomura
9  transaction.  It was all -- it was in that vein,
10  not trying to understand whether or not 2
11  billion or whatever the number was
12  substantiated.
13     Q.   So the focus was on the actual
14  assumption of contracts and actual cure payments
15  rather than the estimate, is that fair?
16         WITNESS' ATTORNEY:  Object to form,
17  asked and answered.
18         MS. DEL MEDICO:  Join in the
19  objection.
20         MS. TABATABAI:  Join in the objection.
21     A.   That's fair.
22     Q.   Did you ever compare the actual cure
23  payment information with the estimate that you
24  knew about?
25         WITNESS' ATTORNEY:  You should just

---

Page 70

```
1                    TULLY
2    answer yes or no to that.
3         A.   No.
4         Q.   Do you know whether the actual cure
5    payments were below the estimate?
6         A.   I don't.
7         Q.   Back in October 2008, did you have a
8    general idea of what the cure payment estimate
9    had been?
10        A.   Not sure.
11        Q.   Beyond what we have reviewed in your
12   e-mails, you don't recall having any idea what
13   that estimate was?
14        A.   No.
15        Q.   And you don't recall -- well,
16   withdrawn.
17             Did you at some point in October of
18   2008 have an understanding concerning the total
19   amount of actual cure payments Barclays would be
20   making?
21        A.   Did I have a concern?
22        Q.   No, did you have an understanding as
23   of October of 2008 concerning the actual cure
24   payments as of that time?
25             WITNESS' ATTORNEY:  Object to form.
```
TSG Reporting - Worldwide    877-702-9580

---

Page 71

```
1                    TULLY
2         A.   I don't recall perfectly.  I don't
3    recall exactly what was reported on the Epiq
4    website, if there were actual amounts even in
5    there or if it was just a vendor taking that
6    contract or curing it.
7         Q.   If there were actual amounts, is that
8    information that you would have reviewed?
9              WITNESS' ATTORNEY:  Object to form.
10        A.   Potentially.
11        Q.   Looking at the document that I just
12   placed in front of you, Exhibit 615B, this
13   appears to be a series of e-mails and starting
14   from the bottom e-mail on the second page, there
15   is an e-mail from Patrick Coster dated Friday,
16   October 17, 2008, to Bill Gordon with a cc to
17   Terrance Berland.  And then it appears above
18   that that Mr. Gordon forwards that to you.  Do
19   you see those e-mails?
20        A.   Yes.
21        Q.   And it refers to, the first e-mail
22   refers to a listing of suppliers that Lehman
23   will be assigning to BarCap.  Do you recall
24   receiving such a list?
25        A.   I don't recall particularly.
```
TSG Reporting - Worldwide    877-702-9580

---

Page 72

```
1                    TULLY
2         Q.   Do you recall requesting such a list?
3         A.   Yes.
4         Q.   Why did you request such a list?
5         A.   I think the request was made in a
6    previous e-mail and described the concerns of
7    understanding, tracking the amounts of the
8    cures, understanding the overall universe,
9    things like that.
10             MR. STERN:  Let's mark these as the
11   next exhibit.
12             (Exhibit 616B, document Bates stamped
13   FTI 1152 through 1166 marked for
14   identification, as of this date.)
15             MR. STERN:  We have originals of
16   these?
17             MR. WHITMORE:  We do.
18             MR. STERN:  Do these have anything
19   privileged in them.
20             MR. WHITMORE:  I have tried to cover
21   up.
22             MR. STERN:  Well, let me see if I can
23   work from the copy.  I don't want to invade
24   the privilege here and I may be able to work
25   from the copy.
```
TSG Reporting - Worldwide    877-702-9580

---

Page 73

```
1                    TULLY
2         The copy that we have is not terrific
3    and I think I would like to get a better
4    copy.
5              MR. WHITMORE:  OK.
6         Q.   We have marked as 616B what appear to
7    be a set of notes.  Can you look at this
8    document and tell us what these are?
9         Q.   If you need to refer to your original,
10   your counsel has that.
11        A.   That's fine.  I believe these were the
12   notes that were taken during the meeting held on
13   October 3, that Friday with Dan Fleming and
14   other people we mentioned previously.
15        Q.   So is it your recollection that this
16   entire set of notes marked as 616B relate to a
17   single meeting or series of meetings on
18   October 3?
19        A.   It was a series of meetings, not just
20   that one meeting we talked about.  There were
21   other meetings -- where we talked about the
22   other items like the infrastructure and accounts
23   payable and how to handle that kind of stuff.
24        Q.   But your recollection is that these
25   notes were all taken on October 3?
```
TSG Reporting - Worldwide    877-702-9580

Page 74

**TULLY**

2   A.   Yes.
3      Q.   I'm just going to turn to certain
4   pages and ask you to explain certain notes to
5   me.  If you could turn to the page that has the
6   Bates number ending with the numbers 158. FTI
7   0001158.
8      A.   Yes.
9      Q.   Do you have that, it says "Chase" in
10  the upper left?
11     A.   Yes.
12     Q.   About a quarter of the way down, there
13  is a line that appears to read the 18th, can you
14  just read what it says next to the 18th?  It
15  looks like Thursday night?
16     A.   Yeah, it says, "Thursday night,' it is
17  tough to make out this number but it looks like
18  it is 59 billion, maybe 39 billion, I'm not
19  sure.
20     Q.   Below that, "Friday night"?
21     A.   Friday night is 39 billion, seems more
22  legible, and then this looks like it says
23  current night, 20 billion.  I'm not sure though.
24     WITNESS' ATTORNEY:  To be helpful, why
25  don't you look at the original just to get

TSG Reporting - Worldwide     877-702-9580

Page 75

**TULLY**

2   those numbers right.
3      A.   Yes, the original seems more legible
4   that the Thursday night says 59 billion and then
5   it does look like it says current, 20 billion.
6      Q.   What did these figures relate to, to
7   the best of your recollection?
8      A.   I would think loan balances
9   outstanding.
10     Q.   Loan balances outstanding between
11  Lehman and who?
12     A.   Other counterparties.
13     Q.   Now, below those figures there is a
14  line that seems to say "details," why don't you
15  read to me what that says?
16     A.   I think it says details of entries or
17  maybe it says entities, I don't know.
18     Q.   If you to read the note below that.
19     A.   James Giddens, SIPA trustee, Jamie
20  Dimon -- Federal Reserve, BoNY, enforcement at
21  SEC, at the SEC --
22     Q.   And then below that?
23     A.   15d3.
24     Q.   Do you know what the reference to the
25  15d3 is?

TSG Reporting - Worldwide     877-702-9580

Page 76

**TULLY**

2      A.   Not really.  I'm not a securities
3   expert, but I think it might be 15c3-3, I think
4   that would be my guess.  I don't think -- at the
5   time, I don't think it meant very much to me.
6      Q.   Do you know what was discussed on that
7   subject at this meeting?
8      A.   No, not particularly.
9      Q.   Moving below, there is a reference to
10  what looks like Steve Green and then there is
11  another line and then there is an arrow.  Can
12  you read what it says next to the arrow?
13     A.   "Dan thinks 23 billion."
14     Q.   Do you know what that is a reference
15  to?
16     A.   My guess is the Chase overdraft,
17  quote/unquote overdraft that Chase alleged.
18     Q.   And the Dan is Dan Fleming?
19     A.   Yes.
20     Q.   What was the Chase overdraft?
21     A.   I believe it relates to the Chase repo
22  and the box loan and things of that nature that
23  we discussed earlier in that e-mail.
24     Q.   Moving to the bottom of the page, it
25  appears to say -- there is a word that says H

TSG Reporting - Worldwide     877-702-9580

Page 77

**TULLY**

2   something and then it says cash.  Can you read
3   that line?
4      A.   Hemorrhage cash, retail customers.
5      Q.   Does it say hemorrhage cash, refund
6   customer?
7      A.   Retail customers I think it says.
8      Q.   It says retail, not refund?
9      A.   R-E-T-A-I-L, yeah.
10     Q.   Do you know what that line related to?
11     A.   It may have related to the time around
12  the filing when Lehman was likely hemorrhaging
13  cash due to retail customer withdrawals, prime
14  broker withdrawals, and "could still fund ops,"
15  I guess means they were still able to fund their
16  operations.  I don't recall this detail.
17     Q.   If you could turn to the next page and
18  just read into the record the notes on the next
19  page.
20     A.   "During the week, the Fed said PDCF,
21  45 billion of repo, 15.8 billion repo with Fed,
22  47 billion in collateral."
23     Q.   Is that what it says, 47?
24     A.   I am sorry, "49.7 billion of
25  collateral.  Chase sits in the middle as

TSG Reporting - Worldwide     877-702-9580

TULLY

1
2  custodian.  Decision made to take 45 billion,
3  close of business Wednesday night, expect to
4  have 60.8 billion on with Barclays, 49 market
5  value, 45 of cash.  To happen on Thursday,
6  planned for on Wednesday night.  Fed and DTC
7  kept open till midnight, assets, missing 7.0
8  billion of collateral, missing lost 15.8 of
9  funding."
10      Q.   OK.  Now, the reference at the top to
11  PDCF, 45 billion of repo, do you recall what
12  that relates to?
13      A.   Can I refer back to the e-mail?
14      Q.   Sure, sure.
15      A.   This seems to be directly -- the
16  e-mail is the transaction of this page, it
17  appears.
18      Q.   Sure.  So we are looking at Exhibit
19  463B, that's the e-mail you're talking about?
20      A.   Correct.
21      Q.   OK, sure.
22      A.   The question was explaining the 45
23  billion of repo?
24      Q.   Well, let me ask you this, are these
25  notes that you just read into the record, the

TULLY

1
2  notes of the conversation that you then
3  summarized in your e-mail that we marked as
4  Exhibit 463B?
5      A.   Yes.
6      Q.   Turning to the next page, are these
7  also notes that relate to points that you
8  summarized in your e-mail that we marked as
9  Exhibit 463B?
10      A.   Yes.
11      (Exhibit 617B, handwritten notes dated
12  7/23/08, four pages, marked for
13  identification, as of this date.)
14      Q.   Looking at Exhibit 617B, can you tell
15  me what this is?
16      A.   This appears to be the initial meeting
17  that we had held with John Suckow that we
18  discussed at the beginning of this discussion.
19      Q.   This is the meeting -- in the upper,
20  right-hand corner, it says 9/23/08.  Does that
21  refresh your recollection concerning when the
22  meeting occurred?
23      A.   Yes.  I believe that that would have
24  been the date it occurred.  I think I may have
25  said the 4th earlier.

TULLY

1
2      Q.   Yes.
3      A.   I'll correct that then.  It seems that
4  it would have occurred on the 23rd.
5      Q.   But these are notes of that meeting?
6      A.   Correct.
7      MR. STERN:  Let's take a short break.
8      THE VIDEOGRAPHER:  The time is 11:39
9  a.m.  We are now off the record.
10      (Recess)
11      THE VIDEOGRAPHER:  The time is 11:45
12  a.m.  We are now on the record.
13      Q.   Earlier we looked at material relating
14  to an October 8, 2008 presentation by Alvarez to
15  the creditors committee.  When you attended that
16  presentation, did you take any notes?
17      A.   I don't recall off the top of my head.
18      Q.   If you have those notes, would you --
19      A.   I brought my marked copy of the
20  presentation and I didn't write anything
21  essentially in there except circled one number
22  on a page, maybe page 15, negative balance for
23  the Chase account that drew my interest
24  obviously because that was cash.
25      MR. STERN:  Is this a document that

TULLY

1
2  has been produced, what he has been
3  referring to, the marked copy?
4      MR. WHITMORE:  That's the thing we
5  made a copy of.
6      Q.   Can you, I'm not going to --
7      A.   I guessed 15, but it was somewhere in
8  that vicinity, I don't recall.  I can find it
9  for you.
10      WITNESS' ATTORNEY:  It is on 15, the
11  presentation.
12      Q.   Aside from that notation, you're not
13  aware that you have any other notes of this
14  presentation?
15      (Continued on next page for jurat)
16
17
18
19
20
21
22
23
24
25

Page 1

1              HIGHLY CONFIDENTIAL

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5   In Re:

6                             Chapter 11

7   LEHMAN BROTHERS          Case No. 08-13555(JMP)

8   HOLDINGS, INC., et al.,   (Jointly Administered)

9

              Debtors.

10

       ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF MARK WASHTELL

14              New York, New York

15                June 17, 2010

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 31054

Page 2

1   HIGHLY CONFIDENTIAL
2   June 17, 2010
3   9:45 A.M.
4
5   Deposition of MARK WASHTELL,
6   held at the law offices of Jones Day, LLP,
7   222 East 41st Street, New York, New York,
8   before Kathy S. Klepfer, a Registered
9   Professional Reporter, Registered Merit
10   Reporter, Certified Realtime Reporter,
11   Certified Livenote Reporter, and Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
TSG Reporting - Worldwide   877-702-9580

Page 3

1   HIGHLY CONFIDENTIAL
2
3   A P P E A R A N C E S :
4
5   JONES DAY, LLP
6   Attorneys for Lehman Brothers, Inc.
7   222 East 41st Street
8   New York, New York  10017-6702
9   BY:  KELLY A. CARRERO, ESQ.
10   MICHAEL DAILEY, ESQ.
11   JOSH BROMBERG (Summer Associate)
12
13   BOIES, SCHILLER & FLEXNER, LLP
14   Attorneys for Barclays
15   401 East Las Olas Boulevard
16   Suite 1200
17   Fort Lauderdale, Florida  33301
18   BY:  TODD THOMAS, ESQ.
19
20
21
22
23
24
25
TSG Reporting - Worldwide   877-702-9580

Page 4

1   HIGHLY CONFIDENTIAL
2   A P P E A R A N C E S :  (Cont'd.)
3
4   QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
5   Attorneys for the Creditors Committee
6   51 Madison Avenue
7   22nd Floor
8   New York, New York  10010
9   BY:  ERIC M. KAY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13   One Battery Park Plaza
14   New York, New York  10004
15   BY:  NEIL J. OXFORD, ESQ.
16
17
18
19   ALSO PRESENT:
20   MARC VELLRATH, FSG
21
22
23
24
25
TSG Reporting - Worldwide   877-702-9580

Page 5

1   HIGHLY CONFIDENTIAL - Washtell
2   MARK WASHTELL, called as a
3   witness, having been duly sworn by a Notary
4   Public, was examined and testified as
5   follows:
6   EXAMINATION BY
7   MS. CARRERO:
8   Q.   Good morning, Mr. Washtell.  My name
9   is Kelly Carrero.  I'm with the law firm of
10   Jones Day.  We represent Lehman Brothers
11   Holdings, Inc. in this matter.  I have with me
12   my colleague Michael Dailey and one of our
13   summer associates, Josh Bromberg.
14   And I'll let the other counsel around
15   the table introduce themselves.
16   MR. KAY:  Sure.  Eric Kay from Quinn
17   Emanuel for the Official Creditors
18   Committee.
19   MR. THOMAS:  Todd Thomas from Boies,
20   Schiller & Flexner on behalf of Barclays and
21   the witness.
22   BY MS. CARRERO:
23   Q.   Mr. Washtell, can you tell us what
24   your position, responsibilities, duties are at
25   Barclays?
TSG Reporting - Worldwide   877-702-9580

## Page 6

HIGHLY CONFIDENTIAL - Washtell

A.   Sure.  I'm a director.  I work within the Independent Valuation Control Group.  I am currently responsible for the global equities asset class, in addition to the global FX and European emerging markets business.

Q.   And was that your same title and responsibilities as of September 2008 at the time of the Lehman transaction?

A.   As of September 2008, I was vice president in charge of, again, working with the Independent Valuation Control, responsible for the global equity derivative business for Barclays Capital.

Q.   And when did the change in title and responsibilities take place?

A.   At the start of 2009, I was promoted from vice president to director, and at some point in the end of Q1 '09, I took the additional asset class responsibilities.

Q.   And who had responsibility for the other asset classes prior to your taking those on at the end of quarter 1 of 2009?

A.   I don't recall exactly who, but I'm part of a management team, so the Global

TSG Reporting - Worldwide     877-702-9580

## Page 7

HIGHLY CONFIDENTIAL - Washtell

Independent Valuation Control Group is a team of approximately 100 individuals globally.  Within that there are different directors responsible for different asset classes.

Q.   Do you know if anyone had direct responsibility for global equities, for instance?

A.   Well, that was, at the time -- at what time?  Sorry.

Q.   In September of 2008.

A.   September 2008, Barclays did not have what we call global equities.  We had a Global Equity Derivatives Group or business, and I was responsible for that.

Q.   And why in September 2008 was there no global equities in existence?

A.   That was not a business that we had at that time.

Q.   Is that a business --

A.   It's just the structure of the company was such we had a global equity derivatives group rather than a global equities business, which is what we have now.

Q.   And was that change a consequence of

TSG Reporting - Worldwide     877-702-9580

## Page 8

HIGHLY CONFIDENTIAL - Washtell

the Lehman transaction?

MR. THOMAS:  Objection to form.

A.   That change was the consequence of a decision on the part of senior management of the bank, so ...

Q.   But is it a change in what types of positions that Barclays held in 2008 as opposed to subsequent to then?

MR. THOMAS:  Objection to form.

A.   We have a different business, different equities business now than we had in September 2008, if that's what you mean.

Q.   And how has that equities business changed between September 2008 and now?

A.   I'm not best qualified to answer, that would be someone in the business, but in general terms, it's a much more global business.  It now covers much more on the cash equity side than previously, when it was very focused on derivatives.

Q.   And in 2008, how many people were within the Global Equities Derivatives Group?

A.   I don't know.

Q.   Besides yourself?

TSG Reporting - Worldwide     877-702-9580

## Page 9

HIGHLY CONFIDENTIAL - Washtell

A.   You mean, by Global Equity Derivatives Group, what do you mean?

Q.   I mean within the independent valuation function.

MR. THOMAS:  Objection to form.

A.   Within the Independent Valuation Group, specifically focused on equity derivatives working for me, I think approximately five.

Q.   And did the Equity Derivatives PT Group, if we can agree that "PT" refers to your group, would that be an acceptable --

A.   You could call it PT if you want.  We would call it Independent Valuation Control, so IVC.

Q.   IVC.  Okay.  We'll use IVC then.  So within your IVC Group that had five or so people in September of 2008, were you the leader of that group?

A.   Yes.

Q.   And who did you report to?

A.   At that time, and still, Marcus Morton.

Q.   And is Marcus Morton located in London

TSG Reporting - Worldwide     877-702-9580

**HIGHLY CONFIDENTIAL - Washtell**

1    or in New York?

2       A.    At that time, he was located in New

3    York.  He's now located in London.

4       Q.    And is there an equities counterpart

5    of yours in the New York office?

6       A.    At that time in 2008?

7       Q.    At that time in 2008, yes.

8       A.    No.

9       Q.    We should also establish that you are

10   located in London; is that correct?

11      A.    That's correct.

12      Q.    And you were located in London in

13   2008, correct?

14      A.    That's correct.

15      Q.    And to what size has the Equities IVC

16   Group grown since September 2008?

17      A.    We now have six full-time personnel in

18   London and five full-time personnel in New York.

19      Q.    And is that growth a consequence of

20   significant growth within Barclays' equities

21   business?

22      A.    That's a contributing factor, yes.

23      Q.    Were, in 2008, were any of the members

24   of the Equities IVC Group located in New York?

**HIGHLY CONFIDENTIAL - Washtell**

1       A.    No, at that time, they were not.

2       Q.    Mr. Washtell, I'm handing you what was

3    previously marked as Deposition Exhibit 799B.

4       A.    Uh-huh.

5       Q.    Just take a moment to look it over.

6          (Document review.)

7       Q.    I will represent to you that this is a

8    document that was an exhibit to a brief

9    submitted by Barclays' counsel in connection

10   with the motion in limine to exclude one of

11   Barclays' experts retained in this matter, and

12   if you would turn to the second page titled

13   "Global Independent Valuation."  Do you see

14   that?

15      A.    I do.

16      Q.    Have you seen this document before?

17      A.    Not this specific document, from my

18   recollection, but I've seen similar documents.

19      Q.    And you would agree that your name

20   does not appear on this document; is that

21   correct?

22      A.    I haven't read it completely, but it

23   doesn't stand out in bold like most of the other

24   names.  So I'm happy to accept it probably does

**HIGHLY CONFIDENTIAL - Washtell**

1    not.

2       Q.    If you would turn to the last page of

3    the document and look at the names listed under

4    "U.S. Equities Valuations"?

5       A.    Yes.

6       Q.    If your name were to appear on this

7    list, would you expect it to appear among the

8    names of the Equities IVC members?

9       A.    Were there a section for the Global

10   Equities IVC team, then yes.  This seems very

11   specific to U.S. equity valuations.

12      Q.    So the names listed on Exhibit 799B

13   are the members of Equities IVC that are located

14   in the U.S.; is that correct?

15      A.    This looks correct as of a point in

16   time.

17      Q.    And what point in time would this be

18   correct as of?

19      A.    This looks correct to me as of the end

20   of 2008.

21      Q.    And how has it changed since the end

22   of 2008?

23      A.    Jerry Shi has left the firm, Katharine

24   Gee has moved to a different asset class, the

**HIGHLY CONFIDENTIAL - Washtell**

1    two executives both being promoted to assistant

2    vice presidents, but it's still within the U.S.

3    Equity Valuation Team.

4       Q.    And what asset class has Katharine Gee

5    moved on to?

6       A.    She works in a sort of cross-asset

7    client valuation role within the Independent

8    Valuation Control Group.

9       Q.    Is it still related to equities

10   whatsoever?

11      A.    Only in the sense that it is related

12   to every other asset class.  It's a cross-asset

13   class client valuation group.  She's not engaged

14   in any day-to-day work in looking at the equity

15   portfolio specifically from a valuation control

16   perspective.

17      Q.    And were all four of the Equities IVC

18   individuals listed on 799B part of that group as

19   of September 2008?

20      A.    None of them were.

21         MR. THOMAS:  Objection.

22      Q.    Do you know as of what date they

23   became part of the Equities IVC Group?

24      A.    I guess when you say -- could you say

Page 18

**HIGHLY CONFIDENTIAL - Washtell**

1  **HIGHLY CONFIDENTIAL - Washtell**
2  any of the equities positions?
3      A.   Not as far as I recall, no.
4      Q.   I just ask -- we didn't really go over
5  the housekeeping rules, which maybe we should.
6  I should have asked you, have you ever been
7  deposed before?
8      A.   What's post?
9      Q.   Deposed in a deposition?
10     A.   I'm sorry, I thought you said have I
11  ever been to post.
12     No, I have never been deposed before.
13     Q.   So one thing that will help make
14  things go smoother is that if you just let me
15  finish asking a question before you offer an
16  answer, and I'll try to do same.  I'll wait for
17  you to complete your answer --
18     A.   Okay.
19     Q.   -- before starting a new question.
20     And if you need a break, I would just
21  ask that you finish up answering whatever
22  pending question might be in existence and --
23     A.   Okay.
24     Q.   -- then, if it's a good time to break,
25  we will.

TSG Reporting - Worldwide    877-702-9580

Page 19

1  **HIGHLY CONFIDENTIAL - Washtell**
2      I believe where we had left off was
3  that Yu Zhou, you don't recollect whether he was
4  involved in valuing any of the positions
5  acquired from Lehman other than perhaps going
6  out and gathering some datasets?
7      A.   Yes, that's correct.
8      Q.   And the same thing holds true for
9  Kunal Kunde?
10     A.   Yes.
11     Q.   Were any other members of the Equities
12  IVC Group involved in valuing any of the
13  equities acquired from Lehman?
14     A.   Members of my team in London at that
15  time were involved at my direction in obtaining
16  data which was used in determining the
17  valuation.
18     Q.   And who are the members of the team in
19  London?
20     A.   At that time, Jaspreet Bhatiwal.
21     Q.   I think you're going to need to spell
22  these for the court reporter.
23     A.   J-A-S-P-R-E-E-T.  The surname is
24  B-H-A-T-I-W-A-L.  He's a member of the London
25  Equity Independent Valuation Team, and has been

TSG Reporting - Worldwide    877-702-9580

Page 20

1      **HIGHLY CONFIDENTIAL - Washtell**
2  since 2006.
3      He was the person principally involved
4  in the data collection.
5      Q.   And who else within the London IVC
6  Group was involved?
7      A.   No one extensively.
8      Q.   Could you just name the individuals,
9  the other individuals of the Equities IVC Group
10  that were located in London?
11     A.   Ana Acuna.  Ana, as in A-N-A.  Acuna,
12  as is A-C-U-N-A.  Guillaume Froidure.
13  Guillaume, as in G-U-I-L-L-A-U-M-E for
14  Guillaume.  And Froidure, as in F-R-O-I-D-U-R-E.
15  That's better.
16     Polykarpos Pappadopolous -- can I
17  write this down?
18     Q.   There is not one easy name here.
19     A.   There's not.
20     P-O-L-Y-K-A-R-P-O-S, Polykarpos.
21     Can I have a pen to spell
22  Pappadopolous so I get it right?
23     Q.   Just your best guess.
24     A.   P-A-P-P-A-D-O-P-O-L-O-U-S.
25     Q.   Great.  Thank you.

TSG Reporting - Worldwide    877-702-9580

Page 21

1      **HIGHLY CONFIDENTIAL - Washtell**
2      Were members of IVC that covered other
3  asset classes involved to any extent with the
4  valuation of equity positions acquired from
5  Lehman in the transaction?
6      A.   Not to my knowledge.
7      Q.   So would the individuals that we've
8  discussed be an exhaustive list of the people
9  within Barclays IVG (sic) that were involved
10  with the valuation of equity positions?
11     A.   Was involved with IVC, yes.  The
12  individuals I have mentioned would be, to my
13  recollection now, the list of individuals I
14  would have used or consulted on in performing
15  the analysis of the equity portfolio.
16     Q.   And did you have primary
17  responsibility for valuing the equities that
18  were transferred over in connection with the
19  Lehman transaction?
20     A.   For the purposes of the opening
21  balance sheet?
22     Q.   Yes.
23     A.   Then, yes, I was principally
24  responsible for arriving at the fair value used
25  for the equity portfolio.

TSG Reporting - Worldwide    877-702-9580

| Page 22 | Page 23 |
|---|---|

**Page 22**

1       HIGHLY CONFIDENTIAL - Washtell
2       Q.   Did you have primary responsibility
3   for the valuation of any other types of
4   securities that were acquired from Lehman for
5   purposes of the opening balance sheet?
6       A.   No.  It was purely what we called the
7   equity portfolio, which included stocks,
8   preferred stocks and convertible bonds.
9       Q.   What about equity options?
10      A.   There were no OTC equity options, and
11  I was not involved in looking at the listed
12  option valuation.  That was, as I said before, I
13  believe Jerry Shi.
14      Q.   And did Jerry Shi report to you upon
15  joining the Barclays IVC Group?
16      A.   No.
17      Q.   Who did he report to?
18      A.   Marcus Morton.
19      Q.   Were you involved in the valuation of
20  any securities other than securities within the
21  equities portfolio with respect to securities
22  acquired from Lehman for purposes of valuing
23  them on the opening balance sheet?
24      A.   No, I was not.
25      Q.   Is there a specific part of the
        TSG Reporting - Worldwide    877-702-9580

**Page 23**

1       HIGHLY CONFIDENTIAL - Washtell
2   business that the Equities IVC Group supports?
3       A.   Now?
4       Q.   Why don't we start back in September
5   of -- prior to the Lehman acquisition.
6       A.   So we supported, if you want to call
7   it that, or primarily responsible for the Equity
8   Derivatives Group.  The IVC Group is part of the
9   Product Control function.
10      Q.   And just to follow up on that, the IVC
11  Group is one of a number of subgroups within
12  PCG; is that correct?
13      A.   That's correct.
14      Q.   And how many subgroups are there
15  within PCG?
16      A.   I don't know off the top of my head.
17      Q.   And who is the head of PCG?
18      A.   Paul Capson.
19      Q.   And would Marcus Morton, who you
20  report to, report directly to Paul Capson?
21      A.   Correct.
22      Q.   If we can just go back to, so prior to
23  the Lehman acquisition, your group had primary
24  responsibility for the Equities Derivatives
25  Desk; is that correct?
        TSG Reporting - Worldwide    877-702-9580

| Page 24 | Page 25 |
|---|---|

**Page 24**

1       HIGHLY CONFIDENTIAL - Washtell
2       A.   That's correct.
3       Q.   And following the Lehman acquisition,
4   what desks does your group have primary
5   responsibility for?
6       A.   Now?
7       Q.   I'd only make the distinction if it's
8   changed between immediately after the
9   acquisition to present day.  So if we need to,
10  why don't we start with immediately after the
11  acquisition.
12      A.   Immediately after the acquisition,
13  Jerry Shi, with the team that you see here, was
14  primarily responsible for the U.S. equities
15  business.  I was then primarily responsible for
16  the Europe and Asia equities business.
17           Following, just to clarify what I mean
18  by equities business as opposed to equity
19  derivatives business, following the acquisition
20  on the effective relaunch, if you will, of the
21  equities business, it was rebranded from equity
22  derivatives to global equities.
23      Q.   And could you tell me what desks would
24  fall under the U.S. equities business?
25      A.   That would be all desks trading cash
        TSG Reporting - Worldwide    877-702-9580

**Page 25**

1       HIGHLY CONFIDENTIAL - Washtell
2   equities or equity derivatives or equity-related
3   products, so convertible bonds, for instance.
4       Q.   And would the same hold true for the
5   Europe and Asia equities business, the types of
6   desks that would fall under that?
7       A.   The types of desks, yes.
8       Q.   You had described your group as having
9   primary responsibility for, prior to the
10  acquisition, the Equities Derivatives Desk.
11           Could you explain what you mean by
12  "primary responsibility"?
13      A.   That means I was responsible for all
14  Independent Valuation Control work in relation
15  to the Global Equity Derivatives Desk.  It means
16  I would meet with the global head of the Equity
17  Derivatives Desk on a monthly basis, for
18  example, to discuss our analysis of the
19  valuation of that portfolio.
20      Q.   Could you explain what "independent
21  valuation work" means?
22      A.   In simple terms, it means, on a
23  regular basis, generally, at a minimum, monthly,
24  that we will independently assess the valuation
25  of the firm's trading positions to ensure that
        TSG Reporting - Worldwide    877-702-9580

## Page 26

HIGHLY CONFIDENTIAL - Washtell

1  HIGHLY CONFIDENTIAL - Washtell
2  they're marked at what we deem an appropriate
3  fair value as defined by the accounting
4  standards under which we operate.
5      Q.   And which accounting standards do you
6  turn to for definition of "fair value"?
7      A.   IS 39.
8      Q.   And what does the independent
9  assessment that you've described entail?
10     A.   Again, very generally, high level, it
11 entails us getting a complete population of all
12 trading book positions, looking at the valuation
13 in the trading systems of the firm, then going
14 externally to source independent data for all of
15 those positions to arrive at, effectively, an
16 independent valuation for the trading book
17 positions.
18     Q.   And at the time that this independent
19 assessment takes place, you would be starting
20 with what a trader has independently valued a
21 position at; is that correct?
22     MR. THOMAS:  Objection to form.
23     A.   We would start with the marks or the
24 valuations in the trading systems of the firm
25 which feed the subledgers, the balance sheet and

TSG Reporting - Worldwide    877-702-9580

## Page 27

1  HIGHLY CONFIDENTIAL - Washtell
2  the financial systems, ultimately.  That's
3  the valuation that Barclays has at month-end for
4  trading positions.  We would then look to
5  independently assess the valuation of those
6  positions.
7      Q.   And could you tell me the names of the
8  different systems that feed -- the trading
9  systems, for instance, that would feed into the
10 subledger that would then feed into the general
11 ledger, et cetera?
12     A.   For equities?
13     Q.   For equities, yes.
14     A.   At that time, in 2008?
15     Q.   Why don't we start with, has it
16 changed since the acquisition?
17     A.   There are additional systems now.
18     Q.   Were those additional systems in
19 existence at the time that you were undertaking
20 the valuation of the assets acquired from
21 Lehman?
22     A.   Not within Barclays, no.
23     Q.   So if we can talk about the systems
24 that were in place at the time that the
25 valuation of the securities that were

TSG Reporting - Worldwide    877-702-9580

## Page 28

1  HIGHLY CONFIDENTIAL - Washtell
2  acquired --
3      A.   Sure.
4      Q.   -- were being undertaken for purposes
5  of the opening balance sheet.
6      A.   The principal trading system was
7  called SOPHIS.  It still is called SOPHIS.  The
8  subledger I believe is called FISS, F-I-S-S.
9          What was the rest of the question?
10     Q.   And would FISS feed into --
11     A.   The general ledger.
12     Q.   -- a general ledger?
13     A.   SAP.
14     Q.   SAP.
15         And that would be the system from
16 which financial statements would be generated;
17 is that correct?
18     A.   That's correct.
19     Q.   And is there a specific system that
20 your group is looking at when they begin the
21 price testing process on a monthly basis?
22     A.   We would look at SOPHIS, for example,
23 to obtain a position listing.  The desk's risk
24 position.
25     Q.   And would --

TSG Reporting - Worldwide    877-702-9580

## Page 29

1  HIGHLY CONFIDENTIAL - Washtell
2      A.   And the desk's valuations, obviously.
3      Q.   And that was going to be my next
4  question.  So SOPHIS would contain whatever the
5  current mark was for each position?
6      A.   Yes.  Yes.
7      Q.   And if your group had any -- if after
8  the price testing process there was a difference
9  found between the value that your group had
10 arrived at versus what was in SOPHIS, what would
11 be the next step?
12     A.   The first step is we would discuss
13 that valuation difference with the trader
14 concerned who owns that position and who marks
15 that position.  We would then, based on his
16 feedback, potentially take into account any
17 additional information that he's willing to
18 provide to try and reach agreement between us on
19 what is the appropriate valuation.
20         If we cannot reach agreement on that,
21 then subject to our policies and procedures of
22 the firm and materiality thresholds that are
23 defined therein, we would take adjustments to
24 the valuations to ensure that they're in line
25 with our independent valuations.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1
2    Q.   And what sort of record would be
3 generated to document that there was a
4 disagreement as to price?
5    A.   All of these positions that are
6 tested, as well as any positions that are not
7 tested, with all variances are reported on a
8 monthly basis to the traders concerned, to the
9 heads of Trading Management, to Product Control,
10 Finance, Market Risk Management, and ultimately
11 this is all discussed with our auditors as well
12 as the regulators.
13    Q.   And do these variance reports have a
14 specific name?
15    A.   Price Testing Reports, so,
16 generically.
17    Q.   Do you know if any Price Testing
18 Reports were generated in connection with any of
19 the securities that were acquired from Lehman
20 and price tested by your group?
21    A.   We produced a valuation, obviously, in
22 the same way that we would perform our normal
23 price testing process.  That is, the list of
24 assets we had, we went out to obtain the
25 independent market data that we would normally

HIGHLY CONFIDENTIAL - Washtell

1
2 do as part of that process to arrive at our
3 independent valuation.
4    Q.   In the process of going through that
5 independent valuation, would any differences
6 between a price that was in SOPHIS at the time
7 have been generated?
8    A.   In this case, this is different to our
9 normal process because these were not positions
10 on our books at the time that had a trader
11 marking them, these were positions that we were
12 effectively receiving in a spreadsheet and being
13 asked to value.  So I did not have a system
14 valuation or a trader valuation at that point in
15 time.
16    Q.   So there --
17    A.   So do I have a variance report?  Not
18 that I recall.
19    Q.   So there would be no marks in SOPHIS
20 at the time that your group began the
21 independent valuation process; is that correct?
22    A.   To the extent these positions were not
23 booked in SOPHIS, SOPHIS would not have had a
24 valuation for this position.  That doesn't mean
25 that if there were a stock in this portfolio,

HIGHLY CONFIDENTIAL - Washtell

1
2 let's take, for example, IBM, that we would not
3 have had a stock price for IBM in SOPHIS,
4 because we would have had that.
5         But this particular position I'm
6 saying is part of a spreadsheet that we're
7 assessing, a spreadsheet population, shall I
8 say, that we're assessing the valuation of.
9    Q.   To the extent that Barclays had in
10 SOPHIS already a position with the same CUSIP as
11 what was being acquired from Lehman, would your
12 independent valuation have resulted in the same
13 price as what that same position was marked for
14 in SOPHIS as of the same date?
15    A.   The pricing source we used is the
16 same.  It would be using SOPHIS.  So, yes.
17    Q.   I'm not asking just if it's the same
18 pricing source.  I'm asking would it be the same
19 price?
20         MR. THOMAS:  Objection to form.
21    A.   Because we're using the same pricing
22 source, it should be the same price.
23    Q.   I'm asking --
24    A.   Now, did we reconcile to see where we
25 had positions in SOPHIS with where we had

HIGHLY CONFIDENTIAL - Washtell

1
2 positions in this file?  No.  We didn't need to
3 because, what we needed to do was obtain
4 independent valuation data for the position in
5 this file and we have established sources of
6 information for doing that, and that's what we
7 used.  I did not go to SOPHIS to source that
8 price.
9    Q.   So the equity positions were valued
10 using a close of day September 22 price
11 ultimately for purposes of the opening balance
12 sheet, correct?
13         MR. THOMAS:  Objection to form.
14    A.   Say that again.
15    Q.   Is it correct that the equity
16 positions for purposes of Barclays' opening
17 balance sheet were valued using September 22
18 close of day price?
19         MR. THOMAS:  Objection to form.
20    A.   That's correct, we used the closing
21 price date of September 22.
22    Q.   So taking your example of IBM, if
23 Lehman acquired IBM stock -- sorry, if Barclays
24 acquired IBM stock from Lehman, if Barclays
25 already owned IBM stock with the exact CUSIP,

## Page 34

HIGHLY CONFIDENTIAL - Washtell

1
2  would the September 22 valuation price be the
3  same for the same position on Barclays' books
4  and records?
5        MR. THOMAS:  Objection to form.
6        A.   Yes, given it's using the same data
7  sources.
8        Q.   So if --
9        A.   Now, if I should, just to clarify, most
10 of the positions we received and assessed the
11 value of would not, would not have been held in
12 Barclays' trading systems at that time because
13 the majority of the positions, or a large part
14 of them, they were all U.S. stocks, and a lot of
15 them were illiquid and names that we just would
16 not have been trading at that time.
17        In addition, we didn't have
18 significant cash eq. or we didn't have a cash
19 equity business at that time.  We had an equity
20 derivative business.  By definition, we would
21 have been trading the more liquid names, IBM
22 being an example.
23        Q.   There were a number of positions
24 already in SOPHIS; is that correct?  I'm not
25 asking percentage-wise.  There were, there were

TSG Reporting - Worldwide    877-702-9580

## Page 35

HIGHLY CONFIDENTIAL - Washtell

1
2  some, correct?
3        A.   Did we hold stock positions in SOPHIS?
4  Yes.
5        Q.   Prior to the acquisition?
6        A.   Yes.  For the purposes principally of
7  hedging, delta hedging our equity derivative
8  portfolio.
9        Q.   So my question is really as simple as,
10 for those positions already in SOPHIS, was the
11 same price applied for purposes of valuing those
12 securities that were acquired from Lehman?
13        MR. THOMAS:  Objection to form.
14        A.   Yes, the same last price at exchange
15 close.
16        Q.   And was the same bid/offer applied?
17        MR. THOMAS:  Objection to form.
18        A.   At the time, as I said before -- well,
19 firstly, all positions within the firm are
20 assessed for bid/offer, and our definition of
21 "fair value" within the firm, in line with the
22 accounting standards, is that we need to mark
23 long positions to a bid value.
24        Given at that time we did not have a
25 cash equity business and all stock positions

TSG Reporting - Worldwide    877-702-9580

## Page 36

HIGHLY CONFIDENTIAL - Washtell

1
2  would have been used to delta hedge our equity
3  derivative portfolio, that is, to effectively
4  flatten our equity exposure so we have a zero
5  sensitivity to the stock price, we wouldn't have
6  been taking explicit bid/offer provision on
7  equities; we would have been applying bid/offer
8  to the derivative portfolio based on the
9  derivative risk factors.
10        Q.   A price for an existing position
11 within SOPHIS could have a different price than
12 what it was priced for for purposes of the
13 acquisition accounting of the Lehman
14 transaction; is that correct?
15        MR. THOMAS:  Objection to form.
16        A.   What I'm saying is that we would not
17 have been holding the position in SOPHIS as an
18 outright position.  Any positions held in SOPHIS
19 would have been held as part of a derivative
20 portfolio to delta hedge that portfolio.  So, in
21 considering the valuation of those positions,
22 you need to consider the valuation of that
23 derivative portfolio.
24        If I delta hedge a derivative book
25 with stock, ultimately it doesn't matter where

TSG Reporting - Worldwide    877-702-9580

## Page 37

HIGHLY CONFIDENTIAL - Washtell

1
2  I'm valuing that stock because I'm delta neutral
3  to the valuation of that stock.  So whether I
4  value a range of prices ultimately, the purpose
5  of holding that stock position is to delta hedge
6  the book.  There's not going to be a valuation
7  impact.
8        Q.   Can you say definitively that there
9  are no overlapping equities that were not held
10 by Barclays at the time of the acquisition that
11 was not acting as a hedge?
12        MR. THOMAS:  Objection to form.
13        A.   I can't talk definitively to, now,
14 to the characteristics of the whole portfolio.
15 What I can tell you is we did not have a cash
16 equity business at that point in time, and I've
17 been quite clear about that.  We have what we
18 called the equity derivatives business.
19        That means we were not principally
20 engaged in trading cash equities.  We were
21 principally engaged in trading equity
22 derivatives, and any cash equity positions on
23 our books would have been there specifically to
24 hedge the delta risk on the book.
25        Can I tell you what that list of

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1
2  positions is or the composition of the
3  portfolio?  No.
4       Q.   No process was undertaken at any point
5  to determine whether the price that was being
6  used for purposes of the opening balance sheet
7  acquisition did or did not match the price that
8  was being used for any existing positions; is
9  that correct?
10       MR. THOMAS:  Objection to form.
11       A.   We applied the same policy framework
12  in which we operate.  We applied the same
13  principles.  We used the same data sources which
14  we would use to value our equity derivatives
15  portfolio.
16       Did we explicitly reconcile any
17  positions between what we were currently holding
18  and what was in this portfolio?  No, but from a
19  policy and a framework perspective, as I said,
20  fair value requires that we mark everything to a
21  bid price.  That's what we do within the firm.
22  That's what we were doing within the firm from
23  an equity derivatives perspective at that time.
24       You just, the way that you do it,
25  would do it for an equity derivative business is

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1
2  not to split your positions out into individual
3  trades.  It would be to look, at a portfolio
4  level, what are your portfolio risks that you
5  need to apply a bid/offer to, and that's the way
6  it would be assessed, which is slightly
7  different to here's an outright long cash equity
8  portfolio which clearly also, in line with our
9  policies, needs to be assessed for bid/offer.
10       So the framework in which we operate,
11  the policy which we apply, the reasoning and the
12  way we arrived at this price is consistent.  All
13  I'm saying is, where we had an equity derivative
14  business rather than a cash equity business, the
15  way that you arrive at the appropriate fair
16  value for your portfolio is going to be
17  necessarily different.
18       Q.   If Barclays had no existing cash
19  equity business prior to the acquisition, under
20  what policies and procedures and guidelines did
21  your group go about independently valuing the
22  cash equity positions that were being acquired?
23       MR. THOMAS:  Objection.
24       A.   We have a global --
25       MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1
2       Just pause a minute so I can get my
3  objection in.
4       A.   The firm has a global price testing
5  policy, has a global provisioning policy.  This
6  is the framework in which we operate across all
7  desks, across all asset classes, and it means
8  all positions within the firm, all trading
9  positions within the firm are assessed in the
10  same way.
11       Q.   And in addition to a global price
12  testing policy and a global provisioning policy,
13  are there other policies and procedures specific
14  to the Equities IVC Group in place?
15       A.   Yes.
16       Q.   And could you identify the names of
17  those other existing policies and procedures?
18       A.   There is a global equities policy
19  application document for price testing.
20       Q.   And are there any others?
21       A.   There would be other procedural
22  methodology documents.  I don't have the
23  specific names, but it would be more detailed in
24  terms of how procedures are performed,
25  calculations are done.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1
2       Q.   And the global equities policy that
3  you refer to, was that in existence at the time
4  of the acquisition?
5       A.   We certainly had a policy application
6  in place at the time.  It's clearly been revised
7  since or reviewed and updated and things change.
8       Q.   And the policies and procedures that
9  would have been in place at the time of the
10  acquisition would have been reflective of the
11  prior name of your group, the --
12       A.   Equity Derivatives.
13       Q.   -- Equity Derivatives Group?
14       A.   Yes.
15       Q.   And those policies and procedures
16  would have been specific to equity derivatives;
17  is that correct?
18       A.   That's correct.
19       Q.   And were there any policies and
20  procedures in place at that time specific to the
21  cash equities?
22       A.   To the extent we did not have a cash
23  equity business, we did not have a policy
24  document for a cash equity business.
25       Q.   And --

TSG Reporting - Worldwide    877-702-9580

1    **HIGHLY CONFIDENTIAL - Washtell**
2        A.    We had a policy document for the
3    equity derivative business.
4        **Q.    And how about -- I should ask, when**
5    **you say "cash equities," what would that**
6    **include?**
7        A.    That business would principally be
8    involved in trading equities securities.  That's
9    listed equities.  That could be preferred stock,
10   that could be ADRs, depository receipts, that
11   could be convertible bonds.
12       **Q.    Would it include equity-linked notes**
13   **and warrants?**
14       A.    I wouldn't classify those specifically
15   as cash equity products, necessarily.
16       **Q.    And what would you classify**
17   **equity-linked notes and warrants as?**
18       A.    Equity-linked notes is more of a
19   derivative.
20       **Q.    Did --**
21       A.    It's clearly a security the way that
22   an equity is a security, but it has a derivative
23   component normally, as a warrant has a
24   derivative component.  It's an option block.
25       **Q.    And prior to the Lehman transaction,**
TSG Reporting - Worldwide    877-702-9580

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **did Barclays own equity-linked notes and**
3    **warrants for purposes other than hedging?**
4        A.    We certainly have an equity-linked
5    note issuance program, so we issue equity-linked
6    notes, yes.  Warrants, I'm not sure.
7        (Recess; Time Noted: 10:44 A.M.)
8        (Time Noted: 10:57 A.M.)
9    BY MS. CARRERO:
10       **Q.    Earlier, you were telling me that you**
11   **were involved with the valuation of the equity**
12   **portfolio acquired from Lehman.  When did the**
13   **valuation process begin for you?**
14       MR. THOMAS:  Objection to form.
15       A.    We first started looking at assets
16   positions, securities in relation to this around
17   the time of 9/22.  I don't remember the exact
18   date.  The process of trying to achieve an
19   opening balance sheet value was started at some
20   point after that time and lasted for a period of
21   months.
22       **Q.    Do you know who ultimately decided the**
23   **value that would be used for purposes of the**
24   **opening balance sheet?**
25       MR. THOMAS:  Objection to form.
TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - Washtell
2        A.    Do you mean valuation in relation to
3    equity assets?
4        **Q.    I mean in relation to equity assets.**
5        A.    It's my understanding that the fair
6    values that we used for the opening balance
7    sheet calculation were those that we arrived at
8    following ongoing internal discussion, review
9    within valuations, as well as an extensive
10   review process with PwC, our external auditors.
11       **Q.    It's your understanding that the**
12   **values that your group calculated are the values**
13   **that ultimately roll up to the opening balance**
14   **sheet; is that correct?**
15       A.    That's my understanding.
16       **Q.    And were you involved in the valuation**
17   **of any of the assets contemplated to be**
18   **purchased from Lehman the week before the**
19   **closing?**
20       MR. THOMAS:  Objection to form.
21       A.    Could you repeat the question?
22       **Q.    Were you involved in any way with the**
23   **valuation of assets to be purchased from Lehman**
24   **prior to the closing of the transaction?**
25       MR. THOMAS:  Objection to form.
TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - Washtell
2        A.    I was not involved in any work prior
3    to the closing of that transaction in relation
4    to that transaction, to my knowledge.
5        **Q.    Are you aware that a significant**
6    **portion of the assets were transferred to**
7    **Barclays on September 18 as part of a Repurchase**
8    **Agreement?**
9        MR. THOMAS:  Objection to form.
10       A.    I'm not aware of the specifics of what
11   was transferred and when or as to specifics of
12   the deal.  I was not involved.
13       (Exhibit 817, a document bearing Bates
14   Nos. BCI-EX-(S)-176597 through 176599, with
15   attachment, marked for identification, as of
16   this date.)
17       **Q.    Mr. Washtell, you have before you what**
18   **has been marked Deposition Exhibit 817.**
19       A.    Yes.
20       **Q.    Would you take a moment and read it**
21   **over.**
22       A.    Sure.
23       (Document review.)
24       A.    Okay.
25       **Q.    If you'll turn your attention to the**
TSG Reporting - Worldwide    877-702-9580

---

Page 54

1        **HIGHLY CONFIDENTIAL - Washtell**
2    correct?
3        MR. THOMAS:  Objection to form.
4        A.   As of that time -- sorry.  As of that
5    time, I don't recall, that's correct.
6        **Q.   Any repurchase transaction, not just**
7    **the Lehman/Barclays one; is that correct?**
8        MR. THOMAS:  Objection.
9        A.   I don't recall at that point in time
10   being asked to review anything in relation to a
11   repurchase transaction.
12       **Q.   When your group began the process of**
13   **valuing the equity portfolio that had been**
14   **transferred from Lehman to Barclays, did your**
15   **group have access to the marks at which those**
16   **positions were being held on Lehman's books at**
17   **the time?**
18       **A.   No.**
19       MR. THOMAS:  Objection to form.
20   Sorry.
21       A.   I don't recall having access to data
22   Lehman Brothers' systems or books.
23       **Q.   At the time that your group began its**
24   **valuation of the equity portfolio transferred**
25   **from Lehman to Barclays, did your group have**

TSG Reporting - Worldwide     877-702-9580

---

Page 55

1        **HIGHLY CONFIDENTIAL - Washtell**
2    **access to the marks that Barclays' custodian had**
3    **ascribed to those positions in connection with**
4    **the Lehman/Barclays repurchase transaction on**
5    **September 18?**
6        A.   I recall from the files that we
7    received and the data that we analyzed, we were
8    given a price source which was identified as
9    BoNY, to the extent BoNY was a custodian of the
10   repo.
11       **Q.   And what did your group do with those**
12   **BoNY prices?**
13       A.   Not a great deal.  We were asked to
14   independently assess or price test the value of
15   the listing of securities, not to independently
16   assess whether a BoNY price was correct, but to
17   assess the fair value of a list of securities.
18   We would have done that by obtaining independent
19   sources as part of our normal practice.
20       **Q.   Would a Lehman price or a BoNY price**
21   **be an example of another available price point**
22   **that could be used in a valuation of the**
23   **securities?**
24       MR. THOMAS:  Objection to form.
25       **A.   The reason I would not use a BoNY**

TSG Reporting - Worldwide     877-702-9580

---

Page 56

1        HIGHLY CONFIDENTIAL - Washtell
2    price from a file in assessing an independent
3    valuation of something is our job is to assess
4    it independently.  In order to do that, I need
5    to understand what independent external data
6    sources I'm using, where they come from, and
7    what they represent.
8        Now, a price in a file that says this
9    is the value BoNY has in a system, I have no
10   understanding of what that price represents.  I
11   have no understanding of how BoNY derives that
12   price.  I could say the same of Lehman Brothers.
13   I have no visibility on what that data is, so I
14   would not use it in making an independent
15   assessment.
16       **Q.   Is it your understanding that no**
17   **securities are kept on Barclays' books at a**
18   **price that has been ascribed by its custodian,**
19   **BoNY?**
20       MR. THOMAS:  Objection to form.
21       A.   I'm not aware of anywhere that happens
22   within my agreement, within what I know of the
23   business.  In our day-to-day monthly work, we
24   don't look at custodian values as part of our
25   price testing analysis.

TSG Reporting - Worldwide     877-702-9580

---

Page 57

1        HIGHLY CONFIDENTIAL - Washtell
2        **Q.   Earlier you had mentioned that there**
3    **were some illiquid equity positions within the**
4    **portfolio transferred; is that correct?**
5        A.   Illiquid?
6        **Q.   Yes.**
7        A.   Correct.
8        **Q.   For any illiquid equity securities**
9    **within the equity portfolio, where did your**
10   **group look to gather data for purposes of**
11   **marking those securities?**
12       A.   We used the standard sources that we
13   would use within the firm to mark equities.  So
14   we went principally to Reuters, being our main
15   source, looked for an exchange closing or last
16   price.  In some cases, we may have referenced
17   Bloomberg.  Potentially there are other sources.
18   I don't recall the full list.
19       **Q.   For an illiquid equity security, it**
20   **didn't seem to make sense to look at the price**
21   **at which a trader familiar with the product who**
22   **had held it on his books had marked it at prior**
23   **to its transfer to Barclays?**
24       MR. THOMAS:  Objection to form.
25       **A.   I couldn't ascribe any level of**

TSG Reporting - Worldwide     877-702-9580

| Page 58 | Page 59 |
|---|---|

**Page 58**

1    HIGHLY CONFIDENTIAL - Washtell
2    independence to that price.
3        Q.    But you didn't consider it at all?
4        A.    No.
5        MR. THOMAS:  Objection to form.
6        A.    No.
7        Q.    Do you know if a number of the
8    illiquid equity securities that may have been
9    part of the equity portfolio transferred were
10   ultimately -- ultimately ended up on a trading
11   book at Barclays -- scratch that.  Bad question.
12        Do you know if any former Lehman
13   traders that went over to Barclays after the
14   sale ended up with positions on their books that
15   they had previously owned while at Lehman prior
16   to the sale?
17        A.    I don't know.
18        Q.    But you would expect that there would
19   be former Lehman traders that went over to
20   Barclays and ran a book with similar positions
21   to what they had had on their books at Lehman;
22   is that correct?
23        MR. THOMAS:  Objection.  Foundation.
24   Asked and answered.
25        THE WITNESS:  Do I need to answer
         TSG Reporting - Worldwide    877-702-9580

**Page 59**

1    HIGHLY CONFIDENTIAL - Washtell
2    that?
3        MR. THOMAS:  Yes, if you can.
4        A.    What was the question again?  Sorry.
5        Q.    You would expect that some of the
6    former Lehman traders that went over to Barclays
7    would end up with some of these positions that
8    had been transferred over on their book once
9    they arrive at Barclays; is that correct?
10       MR. THOMAS:  Objection.  Foundation.
11   Asked and answered.
12       A.    It's not necessarily a
13   straightforward, reasonable assumption to make.
14   The positions would be risk-managed by the
15   business in the way they see fit, and I was not
16   privy to that information or that decision.
17       Q.    I'm not asking about whether they were
18   risk-managed, and so maybe it's just a matter
19   of terminology.
20       A.    Well, you're asking me where they were
21   booked.
22       MR. THOMAS:  Let her finish.
23       Q.    I'm asking whether a desk might have
24   on it some former Lehman employees that had
25   previously had primary responsibility for the
         TSG Reporting - Worldwide    877-702-9580

| Page 60 | Page 61 |
|---|---|

**Page 60**

1    HIGHLY CONFIDENTIAL - Washtell
2    assets while at Lehman and now again primary
3    responsibility for trading those assets while at
4    Barclays?
5        MR. THOMAS:  Same objection.
6        A.    Sorry.  Could you just repeat that
7    again?
8        (Record read.)
9        A.    There's nothing that I can confirm.  I
10   don't know what was the case.  I don't know what
11   role traders had at Lehman relative to what role
12   they now have at Barclays or what trading books
13   those assets have been booked in post the
14   acquisition.  I could conjecture whether or not
15   that would be a reasonable thing.
16       Q.    To the extent that Barclays, prior to
17   the acquisition, as you said before, did not
18   have a cash equity business, would you expect
19   that the people, immediately upon the
20   acquisition of those assets that would be
21   trading those assets, were coming over from
22   Lehman?
23       MR. THOMAS:  Objection to form.
24       A.    A group of traders, trading staff,
25   moved from Lehman to Barclays.  It's my
         TSG Reporting - Worldwide    877-702-9580

**Page 61**

1    HIGHLY CONFIDENTIAL - Washtell
2    understanding not all staff did.  I don't know
3    who did, who didn't, what their responsibilities
4    were before relative to after.  It's not
5    something I'm aware of or was involved in.
6        Q.    You had said before that in the
7    ordinary course of price testing, you would have
8    communication with the traders about pricing.
9        Is that not a source that you would
10   consult in the process of price testing?
11       MR. THOMAS:  Objection to form.
12       A.    As part of our normal process, as I
13   described, we would discuss our analysis with
14   the trading desk.
15       Q.    And so --
16       A.    I recall --
17       MR. THOMAS:  Let him finish.
18       MS. CARRERO:  I will.  I thought he
19   was done.
20       A.    I recall we may have had discussions
21   with the Barclays trading desk in London.  I
22   don't recall having discussions with anyone from
23   Lehman trading in New York.
24       Q.    What about any Lehman counterparts
25   at -- and their equivalent of IVC?
         TSG Reporting - Worldwide    877-702-9580

| Page 62 | Page 63 |
|---|---|

**Page 62**

**HIGHLY CONFIDENTIAL - Washtell**

1
2  A.   As I said previously, some staff were
3  engaged in obtaining data at my direction, but
4  that was very much an operational thing, them
5  responding to a request from me to obtain
6  certain information.
7      Q.   And do you know what sort of data was
8  being requested?
9      A.   Price data.
10     Q.   So price data was being requested but
11 then not being used, is that correct?
12     MR. THOMAS:  Objection to form.
13     A.   No, I'm not saying it wasn't being
14 used.  I'm saying I may have asked staff from
15 the U.S. IVC team who were listed in the
16 document you showed me earlier to source
17 independent data.  For example, Go and source me
18 these prices from Bloomberg for this date,
19 please," and that would have been done from an
20 operational perspective to share the work
21 amongst the global team at that point rather
22 than me asking someone in London to do it.  I
23 would not have been asking for anything from a
24 Lehman system.  I don't recall ever asking for
25 any information from Lehman's system.

TSG Reporting - Worldwide    877-702-9580

**Page 63**

**HIGHLY CONFIDENTIAL - Washtell**

1
2      Q.   So you're not familiar with a system
3  called GFS?
4      MR. THOMAS:  Objection to form.
5      A.   Not in anything other than I've heard
6  GFS before.  I have no idea specifically what it
7  does or is used for.
8      Q.   Same question as with respect to the
9  Bank of New York marks.  With respect to the JPM
10 marks that were available in connection with a
11 September 17 repurchase agreement between Lehman
12 and the Fed, were the JPM marks used in any way
13 in equity IC -- IVC's valuation of the equity
14 portfolio?
15     MR. THOMAS:  Objection to form.
16     A.   I don't recall using any JPMorgan
17 marks in our analysis.
18     Q.   Do you recall seeing those marks?
19     A.   I don't recall seeing those marks.
20     Q.   Mr. Washtell, I'm putting before you
21 what has been marked as Deposition Exhibit 806B.
22     Have you seen this document before?
23     A.   Yes, I believe so.
24     Q.   And you see it says, "Product Control,
25 Price Testing Policy, date:  May 2009"; is that

TSG Reporting - Worldwide    877-702-9580

| Page 64 | Page 65 |
|---|---|

**Page 64**

**HIGHLY CONFIDENTIAL - Washtell**

1
2  correct?
3      A.   That's what it says.
4      Q.   Is this a policy that was put in place
5  after the Lehman transaction?
6      A.   The firm had a process and policy
7  prior to the Lehman transaction.  The date of
8  this document suggests the version you have is
9  after the transaction.
10     Q.   But to your knowledge, there was a
11 written policy in place dated at the time of the
12 transaction; is that correct?
13     A.   That's correct, and I assume you have
14 the version controlling here somewhere.  I'm not
15 sure where, but ...
16     It doesn't help because it doesn't
17 have a date.  Yes, we had a process and policy
18 in place prior to the Lehman transaction.
19     Q.   And in this policy is a Central Price
20 Testing guidance, correct?
21     A.   It's a global, firm-wide policy.
22     Q.   As opposed to a policy that is
23 specific to just the Equity IVC Group, correct?
24     A.   Any equity-specific documentation
25 would be consistent with this policy, but this

TSG Reporting - Worldwide    877-702-9580

**Page 65**

**HIGHLY CONFIDENTIAL - Washtell**

1
2  is a global, firm-wide cross-asset policy.
3      Q.   You can put that one aside, and I'm
4  going to give you what has been marked as
5  Deposition Exhibit 805B.
6      Have you seen this document before?
7      A.   Yes.
8      Q.   And you see it says "Barclays Capital
9  Provisioning Policy Statement, December 2008,
10 Product Control"; is that correct?
11     A.   That's what it says.
12     Q.   And this policy is dated after the
13 Lehman acquisition; is that correct?
14     A.   That's correct.
15     Q.   Was there a provisioning policy, a
16 written provision policy statement in place at
17 the time of the Lehman acquisition?
18     A.   Yes.
19     Q.   Do you know if it differs at all from
20 this document?
21     A.   I don't know that specifically.
22     Q.   Were the bid/offer adjustments taken
23 to any equity products taken pursuant to this
24 policy in front of you which has been marked as
25 Deposition Exhibit 805B?

TSG Reporting - Worldwide    877-702-9580

Page 66

**HIGHLY CONFIDENTIAL - Washtell**

1
2    A.    Any bid/offer adjustments that were
3    taken would have been taken in line with this
4    policy.  This is the policy within which we
5    operate within the firm.
6    Q.    Do you know if the policy that existed
7    prior to this was at all different and, if so,
8    whether adjustments were taken with respect to
9    this policy or an earlier policy?
10    A.    At what time?
11    Q.    For purposes of the acquisition
12    balance sheet.
13    A.    For purposes of --
14    Q.    Which policy was followed, this
15    December 2008 policy or its predecessor policy,
16    if any policy at all?
17    A.    The policy that was followed was the
18    policy that would have been in place at the time
19    of the acquisition.
20    Q.    Could you turn to page 5.  Would the
21    bid/offer adjustments that were taken on any of
22    the equity positions acquired for purposes of
23    acquisition accounting been taken under 5,
24    Bid/Offer Adjustments (Level 1:  Price
25    Testing)"?

TSG Reporting - Worldwide    877-702-9580

Page 67

**HIGHLY CONFIDENTIAL - Washtell**

1
2    A.    That's my understanding, yes, they
3    would.
4    Q.    You can put that aside.
5    Do you know if any of the equity
6    positions that were transferred to Barclays on
7    September 18 were hedged prior to the closing of
8    the transaction?
9    MR. THOMAS:  Objection to form.
10    A.    I'm not aware of that.  I have no
11    knowledge of that.
12    Q.    If any of the positions had been
13    hedged prior to the closing of the transaction,
14    would a bid/offer adjustment have been taken for
15    any of those cash equity positions?
16    MR. THOMAS:  Objection to form.
17    A.    Could you repeat the question?
18    Q.    If any of the positions that had been
19    hedged prior to the closing of the transaction,
20    would it be proper in those instances to take a
21    bid/offer adjustment on those cash equity
22    positions?
23    MR. THOMAS:  Objection to form.
24    A.    For what purposes?  For the purposes
25    of the opening balance sheet?

TSG Reporting - Worldwide    877-702-9580

Page 68

**HIGHLY CONFIDENTIAL - Washtell**

1
2    Q.    Let's start there, for the purposes of
3    the opening balance sheet.
4    A.    It's my understanding for the opening
5    balance sheet we had, and I was provided, a
6    position listing of securities which I was asked
7    to arrive at a fair value.  There was nothing in
8    relation to positions that were hedged or not
9    hedged or any other positions.  They were just a
10    position listing, a portfolio of securities for
11    which we needed to derive an appropriate fair
12    value.
13    Q.    For other purposes, I guess for the
14    next day's mark of those securities, if there
15    had been a hedge for that security, would a
16    bid/offer adjustment be applied to a cash equity
17    position?
18    MR. THOMAS:  Objection to form.
19    A.    Are we talking about in the normal
20    course of business?
21    Q.    In the normal course of business.
22    A.    And depends what we mean by "hedge."
23    You have a cash equity position.  By
24    "hedge" do you mean sell the position and you no
25    longer have a position, or do you mean "hedge"

TSG Reporting - Worldwide    877-702-9580

Page 69

**HIGHLY CONFIDENTIAL - Washtell**

1
2    by using some other financial instruments, be
3    they futures, forwards, on indices or on stocks?
4    It would --
5    Q.    I mean --
6    A.    -- depend.
7    Q.    -- for example, how you earlier said a
8    number of the cash equity positions that would
9    have been in SOPHIS prior to the acquisition
10    would not have had a bid/offer adjustment to
11    them because they were hedging another position?
12    A.    A derivative book, yes.
13    Q.    A derivative book in that instance.
14    If any of the equity portfolio
15    positions acquired from Lehman were hedged prior
16    to the closing of the transaction, would they,
17    for purposes of SOPHIS, have a bid/offer
18    adjustment embedded in the mark?
19    MR. THOMAS:  Objection to form.
20    A.    Just to clarify, first of all, I don't
21    have any knowledge of whether anything was
22    traded to hedge anything over that time period.
23    If a position was put into SOPHIS to act as a
24    derivative hedge to some positions, it would be
25    included in our standard procedures processes

TSG Reporting - Worldwide    877-702-9580

## Page 70

HIGHLY CONFIDENTIAL - Washtell

1  for assessing bid/offer.
2
3      Q.    I'm trying to understand what those
4  standard procedures are.  Are those standard
5  procedures that if a cash equity is acting as a
6  hedge to, for instance, a derivatives portfolio,
7  no bid/offer adjustment would be taken in those
8  instances?
9      A.    As I said previously, our cash equity
10  positions prior to the transaction were all
11  acting as hedges for the derivative portfolio,
12  in which case the application of fair value and
13  bid/offer adjustments for all that derivative
14  portfolio would be done on a portfolio level on
15  a risk-parameter basis.  Stocks would not be
16  looked at in isolation.  They would be looked at
17  as part of that portfolio.
18      Q.    If it is an equity position that has
19  an observable market price on Bloomberg and
20  Reuters and it's acting as a hedge to a
21  derivatives portfolio, would there be a
22  bid/offer adjustment to that equity position or
23  not if you looked that CUSIP up in SOPHIS?
24      MR. THOMAS:  Objection to form.
25      A.    As I said, we would apply bid/offer

TSG Reporting - Worldwide    877-702-9580

## Page 71

HIGHLY CONFIDENTIAL - Washtell

1  provisions to the portfolio while looking at the
2  portfolio risk factors as a whole.  To the
3  extent the stock position is there to delta
4  hedge the derivative portfolio, there would be a
5  zero or small residual delta risk position.
6
7      The principal risk factors through
8  which we would take a bid/offer adjustment would
9  be things like volatility or Vega exposure,
10  Epsilon or dividend exposure.  This is the
11  standard practice the way we would assess fair
12  value and assess bid/offer provisions for a
13  derivative book.
14      Q.    But you did not look at whether or not
15  the equity positions that were transferred from
16  Lehman to Barclays were hedged at the time that
17  you were -- that you undertook the valuation of
18  the securities; is that correct?
19      MR. THOMAS:  Objection to form.
20      A.    I did not look at whether the
21  portfolio was hedged in our analysis.
22      Q.    Do you know, for purposes of what the
23  mark would have been in SOPHIS for any of the
24  equity positions on September 23, how those
25  marks were arrived at?

TSG Reporting - Worldwide    877-702-9580

## Page 72

HIGHLY CONFIDENTIAL - Washtell

1
2      MR. THOMAS:  Objection to form.
3      A.    What positions are we talking about?
4      Q.    We're talking about the equity
5  positions that were transferred from Lehman to
6  Barclays.  As I understand it, your group worked
7  on valuations for the opening day balance sheet;
8  is that correct?
9      A.    That is correct.
10      Q.    With respect to SOPHIS and the values
11  that would be entered in SOPHIS on September 22
12  or September 23, take your pick --
13      A.    Uh-huh.
14      Q.    -- where do those values come from?
15      A.    One point to clarify is I'm not sure
16  those positions were booked in SOPHIS on
17  September 22 or 23 or 24.  It took a period of
18  time just to book the population into our
19  systems, and that was not -- it wasn't a short
20  period of time.  It took some time because of
21  the difficulties of things like establishing
22  standard data, et cetera.
23      To the extent the positions were
24  booked in SOPHIS, they would be valued using
25  standard pricing feeds which SOPHIS receives on

TSG Reporting - Worldwide    877-702-9580

## Page 73

HIGHLY CONFIDENTIAL - Washtell

1  a daily basis, for example, from Reuters.
2
3      Q.    And what sort of bid/offer adjustment
4  would be taken on the positions once they do get
5  booked into SOPHIS?
6      MR. THOMAS:  Objection.
7      A.    Bid/offer adjustments are something
8  that are assessed generally outside of the
9  trading systems on a periodic basis, be that
10  monthly, be that quarterly.  It's an off-line,
11  separate calculation.
12      So on the day that you book a position
13  into a trading book, you don't book a bid/offer
14  reserve into the trading system with that
15  position.  It's something that necessarily,
16  because of the way things operate, is done
17  separately.
18      Q.    And what determines whether that
19  bid/offer reserve is booked on a monthly versus
20  a quarterly basis, for instance?
21      A.    I think, generally, it would be done
22  on a monthly basis.
23      Q.    For purposes of generating
24  month-end --
25      A.    Exactly.

TSG Reporting - Worldwide    877-702-9580

| Page 74 | Page 75 |
|---|---|

**Page 74**

1    HIGHLY CONFIDENTIAL - Washtell
2      Q.  -- balance sheet?
3        And who generally determines what the
4    appropriate bid/offer reserve to be booked is?
5    Would that be your group?
6      A.   We would certainly be involved, yes,
7    along with the Product Control Group, along with
8    the trading desk.
9      Q.   When you say Product Control Group,
10   you're distinguishing the IVC function of PCG
11   from which other area of PCG?
12     A.   For example, the Equities Product
13   Control Team, who would be principally engaged
14   in profit and loss reporting, for instance.
15     Q.   And was it also the Equities Product
16   Control Team's responsibility to generate any
17   month-end equity-related balance sheets?
18     A.   Depending for what purpose that
19   information was needed, they may be involved.
20     Q.   And for purposes of calculating the
21   bid/offer reserve calculation for any of the
22   assets, the equity assets purchased from Lehman,
23   were the businesses or the Product Control Group
24   involved in calculating the bid/offer reserves?
25     A.   For the opening balance sheet?
     TSG Reporting - Worldwide    877-702-9580

**Page 75**

1    HIGHLY CONFIDENTIAL - Washtell
2      Q.   For the opening balance sheet.
3      A.   No, from my recollection, they were
4    not involved.
5      Q.   Was it your team alone, then, that was
6    involved in calculating the bid/offer reserves
7    taken for purposes of the opening balance sheet?
8      A.   It was our team in conjunction with
9    extensive discussion and review with
10   PricewaterhouseCoopers, the external auditors.
11     Q.   Does PricewaterhouseCoopers usually
12   determine what Barclays' bid/offer reserve will
13   be for equity positions?
14     A.   No, but they review and audit all of
15   our calculations, methodology assumptions and
16   analysis and review all of those numbers as part
17   of their normal course of business.
18     Q.   And do they review all of the
19   positions or do they just take a sample set of
20   positions?
21     A.   Depends what they are reviewing.  They
22   would review numbers, generally, in total.  So
23   they would look at totality of the balance
24   bid/offer reserves.
25     Q.   But here do you know whether they
     TSG Reporting - Worldwide    877-702-9580

| Page 76 | Page 77 |
|---|---|

**Page 76**

1      HIGHLY CONFIDENTIAL - Washtell
2    reviewed a sample set of the equity positions or
3    if they reviewed all of them?
4      A.   They were provided the data for all
5    positions.  I know they definitely did in-depth
6    sample-based analysis as well.
7      Q.   So you know of only a sample-based
8    analysis, not an analysis of its entirety?
9      A.   No, I said they were provided with all
10   of the information for all positions.  What they
11   did with that specifically I'm sure is
12   documented in their work papers.
13     Q.   Do you know if any of the equity
14   positions that were transferred from Lehman to
15   Barclays were originally booked into Barclays'
16   systems at the prices that its custodian, BoNY,
17   had marked them at for purposes of the
18   Lehman/Barclays repo?
19     A.   I'm not aware of what prices they were
20   booked into the system at.  I don't recall.
21     Q.   Do you have any reason to believe, if
22   Barclays receives the equities on September 18
23   in connection with the repurchase transaction,
24   that they would not have been free to trade
25   those securities upon receipt?
     TSG Reporting - Worldwide    877-702-9580

**Page 77**

1      HIGHLY CONFIDENTIAL - Washtell
2      MR. THOMAS:  Objection.  Form.
3      A.   I don't have any knowledge of that.  I
4    don't know.
5      Q.   Do you know when Barclays was able to
6    transfer -- sorry.  Do you know when Barclays
7    was able to trade any of the securities that
8    were transferred to it from Lehman?
9      A.   No, I'm not aware of that.
10     Q.   So the tradability of the securities
11   did not dictate the valuation date that you used
12   for purposes of valuing the securities; is that
13   correct?
14     MR. THOMAS:  Objection to form.
15     A.   It was not a consideration in my use
16   of that date.
17     Q.   And the cash equity positions were
18   originally valued by your group using a
19   valuation date of September 19; is that correct?
20     A.   In the analysis, we --
21     MR. THOMAS:  I'm sorry.  Objection to
22   form.
23     A.   The analysis we performed on its
24   opening balance sheet, as I said, occurred over
25   a period of time, significant period of time,
     TSG Reporting - Worldwide    877-702-9580

## Page 78

HIGHLY CONFIDENTIAL - Washtell

1
2  running to a few months.  For those purposes, we
3  obtained prices for various dates.
4        We definitely had price data for 9/19
5  as well as 9/22 as well as other dates.
6    Q.   Ultimately, the price used for
7  purposes of acquisition accounting for the cash
8  equity positions is a 9/22 close date, is that
9  correct?
10   A.   That's correct.
11   Q.   Do you know at what point a change was
12 made from using a September 19 close date to a
13 September 22 close date?
14      MR. THOMAS:  Objection to form.
15 Assumes facts not in evidence.
16   Q.   Go ahead and answer.
17   A.   I'm not sure what change you're
18 talking about in terms of we initially did
19 something.  You're suggesting we did something
20 on the 19th and then made a decision to change
21 on the 22nd.
22      In relation to the opening balance
23 sheet, it's my understanding the transaction
24 closed on the morning of September 22.  We were
25 asked to value the portfolio as of the

TSG Reporting - Worldwide    877-702-9580

## Page 79

HIGHLY CONFIDENTIAL - Washtell

1
2  opening -- the opening balance sheet at the
3  closing of the transaction.
4        Given my understanding that it closed
5  on the morning of September 22, the most
6  reasonable time to assess the valuation of the
7  portfolio would be the close of business on
8  September 22.
9    Q.   It's your understanding that the
10 closing happened before the UK opened, correct?
11   A.   I don't know the exact time.
12   Q.   You understand it to be prior to the
13 close, correct, on September 22?
14      MR. THOMAS:  Objection to form.
15      The closing happened prior to the
16 close?
17   Q.   The close of the market.  I'm sorry.
18   A.   The closing of the transaction, it's
19 my understanding, happened prior to the close of
20 the market on September 22.
21   Q.   And is your understanding that the
22 close of the transaction happened before the
23 open of the market in the U.S.?
24      MR. THOMAS:  Objection to form.
25 Foundation.

TSG Reporting - Worldwide    877-702-9580

## Page 80

HIGHLY CONFIDENTIAL - Washtell

1
2    A.   That's not my understanding, and I
3  don't recall being told a specific time that the
4  close happened.  I do recall that we had the
5  objective of trying to value a portfolio of
6  assets as at the open on September 22.
7        Now, the way that we would do that,
8  and the only reasonable way to do that, is to
9  look at the closing price information for
10 September 22 because you don't have reliable
11 opening information September 22.
12   Q.   Did you and your group undertake to
13 analyze the movement in the market, if any, from
14 close of business on September 19 to open of the
15 market on September 22?
16   A.   Could you just repeat that, sorry,
17 just so I have the dates?
18   Q.   Did you and your group undertake to
19 analyze the movement in the market, if any, from
20 the close of business on September 19 to the
21 open of business on September 22?
22      MR. THOMAS:  Objection to form.
23   A.   In the market generally?
24   Q.   In the equities market.
25   A.   Do I recall specific analysis on that?

TSG Reporting - Worldwide    877-702-9580

## Page 81

HIGHLY CONFIDENTIAL - Washtell

1
2  No.
3    Q.   Did you or your group undertake an
4  analysis of what movement would have occurred
5  from September 22 open to the September 22 close
6  of business to determine what sort of market
7  movement there was and how that would affect the
8  price valuation exercise?
9      MR. THOMAS:  Objection to form.
10   A.   To answer your second point, it
11 wouldn't have any effect on the analysis we did
12 or the valuation we arrived at, and the reason
13 for that is when we're being asked, which we
14 regularly are, to value positions at a certain
15 point in a day, it doesn't matter to us what
16 point of time during the day that transaction
17 happened because the only time we have reliable
18 information is the close of business.  We don't
19 have reliable information at the open of
20 business.
21      So if I'm asked as part of my normal
22 course of work practice to value a position on a
23 given day, I'm going to default by looking at
24 the closing price information.
25   Q.   For months, though, you and your group

TSG Reporting - Worldwide    877-702-9580

Page 82

**HIGHLY CONFIDENTIAL - Washtell**

1  **HIGHLY CONFIDENTIAL - Washtell**
2  were valuing it using a close of business
3  September 19th date; is that correct?
4      MR. THOMAS:  Objection to form.
5      A.  As I said before, I know we analyzed
6  various days' data.  I don't recall.
7      **Q.  And do you recall who made the**
8  **decision to ultimately use a September 22 close**
9  **date as opposed to a September 19 closing date?**
10     A.  I don't recall a specific person
11 making a specific decision.  I recall that we
12 were instructed, for want of a better word, that
13 we should be trying to obtain a valuation for
14 the open of September 22.
15     As I say, I think the most reasonable
16 data point to look at for that is the close of
17 business September 22.  I know -- my belief this
18 is something that was discussed extensively with
19 our auditors, which is something which they
20 supported and agreed was the appropriate, most
21 reasonable thing to do.
22     **Q.  Are you aware that the closing date is**
23 **defined within the Asset Purchase Agreement**
24 **governing the transaction as 12:01 A.M. on**
25 **September 22?**

TSG Reporting - Worldwide    877-702-9580

Page 83

1  **HIGHLY CONFIDENTIAL - Washtell**
2      MR. THOMAS:  Objection to form.
3      **A.  I was not aware of that and I haven't**
4  **read that particular document.  As I said, I**
5  **don't recall at the time being told of any**
6  **specific point in time other than the open.  I**
7  **don't mean a -- I mean a time of day I don't**
8  **recall.**
9      **Q.  In the ordinary course, would you use**
10 **pricing information from after the valuation**
11 **date for purposes of valuing a security?**
12     MR. THOMAS:  Objection to form.
13     A.  After the valuation date?  So give me
14 a for example.
15     **Q.  For example, if you were valuing a**
16 **security in a different time zone where the**
17 **valuation date would be -- let's pick September**
18 **30th, and you would have no or little**
19 **information other than from markets that**
20 **opened -- an opening price on October 1, let's**
21 **say.**
22     **Would you use that kind of ex post**
23 **information in a valuation exercise?**
24     MR. THOMAS:  Objection to form.
25     A.  We would otherwise consider the

TSG Reporting - Worldwide    877-702-9580

Page 84

1      HIGHLY CONFIDENTIAL - Washtell
2  available information.  I'm not sure I quite
3  understand you're saying if a trade happened on
4  September 30th, would we use the opening price
5  on October 1 then?
6      **Q.  Let's go with a different example.  If**
7  **you are fair-valuing a position?**
8      **A.  Uh-huh.**
9      **Q.  Which is a willing buyer, a willing**
10 **seller concept; is that correct?**
11     **A.  Yes.  Yes.**
12     **Q.  Do you consider that concept to have**
13 **embedded in it a concept that that willing buyer**
14 **and willing seller at that point in time have**
15 **certain information available to it that drives**
16 **the value that they are willing to buy and sell?**
17     MR. THOMAS:  Objection to form.
18     **A.  Okay.  Market participants have**
19 **information which will influence the level at**
20 **which they're willing to buy and sell at a given**
21 **point in time.**
22     Q.  Does a willing buyer or seller have
23 access to information that's not available until
24 after that time, that point in time?
25     MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 85

1      HIGHLY CONFIDENTIAL - Washtell
2      A.  Does someone have available
3  information -- sorry.  Does someone have
4  availability to information that's not available
5  at that point in time I think is your question?
6      **Q.  Let's rephrase that to say if a**
7  **willing buyer or seller does not have**
8  **availability to information at the time, is it**
9  **fair to say that that would not be information**
10 **that they would be taking into consideration in**
11 **connection with the transaction?**
12     MR. THOMAS:  Objection to form.
13     **A.  Yes, I think you've said the same**
14 **thing.  The parties have access to information**
15 **that is available at a point in time.  They**
16 **don't have access to information that's**
17 **available or for something that's going to**
18 **happen in two hours' time, so ...**
19     **Q.  So a willing buyer and seller at 12:01**
20 **A.M. on September 22nd would not have access to**
21 **information about what the closing price would**
22 **be on September 22; is that correct?**
23     MR. THOMAS:  Objection to form.
24     **A.  Is it correct at 12:01 that a market**
25 **participant would not know the closing price for**

TSG Reporting - Worldwide    877-702-9580

Page 86

1       HIGHLY CONFIDENTIAL - Washtell
2   the close of business that day?  That's your
3   question?
4       Q.   Yes.
5       A.   I think that's correct.
6           (Exhibit 818, a document bearing Bates
7   Nos. PwC-BarCap71528 through 71531, marked
8   for identification, as of this date.)
9           THE WITNESS:  Can we take for about
10  two minutes?
11          (Recess; Time Noted: 12:16 P.M.
12          (Time Noted: 12:22 P.M.)
13  BY MS. CARRERO:
14      Q.   Mr. Washtell, are you aware of what
15  the difference is in a valuation of the equity
16  portfolio using a September 19 date as opposed
17  to a September 22 date?
18      A.   From a monetary perspective?
19      Q.   From a monetary perspective, yes.
20      A.   I'm not aware of the exact number.  I
21  can't recall.
22      Q.   Can you ballpark it for me?
23          MR. THOMAS:  Objection to form.
24      A.   Not reasonably.
25      Q.   If I told you it was around 700
        TSG Reporting - Worldwide    877-702-9580

Page 87

1       HIGHLY CONFIDENTIAL - Washtell
2   million, would that sound about right?
3           MR. THOMAS:  Objection to form.
4       A.   Sounds a little high.
5           (Exhibit 819, a document bearing Bates
6   Nos. BCI-EX-(S)-218502 through 218503,
7   marked for identification, as of this date.)
8           (Document review.)
9       A.   Okay.
10      Q.   Mr. Washtell, have you had an
11  opportunity to read over Deposition Exhibit 819?
12      A.   Yes.
13      Q.   And you see that it is an e-mail from
14  your boss, Marcus Morton, dated December 12 to
15  PwC related to the valuation of the equity
16  portfolio; is that correct?
17      A.   It looks to be an e-mail from Marcus
18  Morton to John Holloway tied to the Lehman
19  equity portfolio.
20      Q.   And do you see where Mr. Morton
21  writes, "The legal deal closed on 9/19"?
22      A.   Yes.
23      Q.   Do you see where he then says, "The
24  first Lehman equity portfolio was received by
25  Barclays on September 22, to settle same day"?
        TSG Reporting - Worldwide    877-702-9580

Page 88

1       HIGHLY CONFIDENTIAL - Washtell
2       A.   Yes, I see that.
3       Q.   Do you have any reason to believe that
4   the equity positions in the Lehman/Barclays repo
5   were not delivered prior to September 22?
6           MR. THOMAS:  Objection to form.
7       A.   I have no knowledge of the delivery
8   specifics.
9       Q.   So you have no knowledge whether they
10  were delivered on September 18 as opposed to
11  September 22?
12          MR. THOMAS:  Objection to form.
13      A.   I have no knowledge of the specific
14  delivery date.
15      Q.   Do you see, if you turn to the second
16  page, the paragraph starting "combining these
17  together would reach an adjustment of at least
18  $667 million at the least conservative
19  assumption, or $799 million, using the full bid
20  to offer.  This compares with our original
21  estimate of $808 million"?
22      A.   I see that, yes.
23      Q.   Do you know what that refers to?
24          MR. THOMAS:  Objection to form.  Lack
25  of foundation.
        TSG Reporting - Worldwide    877-702-9580

Page 89

1       HIGHLY CONFIDENTIAL - Washtell
2       A.   I don't recall what this refers to.  I
3   wasn't on the e-mail, so I don't recall.
4           (Exhibit 820, a document bearing Bates
5   Nos. PwC-BarCapWP_00021953 through 22931,
6   marked for identification, as of this date.)
7       Q.   Mr. Washtell, you have before you what
8   has been marked Deposition Exhibit 820?
9       A.   Okay.
10      Q.   Do you see that?
11      A.   I do see it, yes.
12      Q.   It's a big document, and it is titled
13  "[BoNY] PV of equity financial assets (UK)."  Do
14  you see that?
15      A.   I see that, yes.
16      Q.   And do you see under "Tailored
17  Procedures" it says, "The PwC Barclays team in
18  the UK has been instructed to price test the
19  equity securities that were purchased from
20  Lehman as they have been engaged in the past to
21  price test the legacy Barclays equity
22  securities"?
23      A.   I see that, yes.
24      Q.   And do you see that this is a document
25  that has been produced by PwC based off of a tag
        TSG Reporting - Worldwide    877-702-9580

Page 90

1      **HIGHLY CONFIDENTIAL - Washtell**
2   at the bottom?
3          MR. THOMAS:  Objection to form.
4      **Q.   I will just for the record say it's**
5   **been produced by PwC, and the starting Bates**
6   **number is PwC-BarCapWP_00021953.**
7          **If I could have you turn to the page**
8   **that is Bates-stamped 0021960.  Actually, if you**
9   **could start two pages before that at the page**
10  **ending 958, and --**
11     A.   And 960?  Do you want me to read also?
12     **Q.   Just if you could look over those**
13  **three pages.**
14         **(Document review.)**
15     A.   Okay.
16     **Q.   Do you see on the page ending 958,**
17  **number 1, which is written in an e-mail dated**
18  **January 7, 2009, and says, "Prices for equities**
19  **are to be revised from those of 9/19 to 9/22"?**
20     A.   Yes, I see that.
21     **Q.   And then do you see on the page of the**
22  **document ending 960, a chart that bottom line**
23  **says, "Net Increase/(Decrease)" which totals a**
24  **decrease of $685,736,298?**
25     A.   Yes, I see that.

      TSG Reporting - Worldwide     877-702-9580

Page 91

1         HIGHLY CONFIDENTIAL - Washtell
2      **Q.   Could you explain to me what this**
3   **chart is totaling?**
4          MR. THOMAS:  Objection.  Form.
5   Foundation.
6      A.   From looking at this, this looks like
7   an analysis of the valuation of the equity
8   portfolio at various points in time explaining
9   the movement from 9/19 to 9/22.
10     **Q.   And how much of a movement was there**
11  **from 9/19 to 9/22 based off of this analysis?**
12         MR. THOMAS:  Objection to form.
13  Foundation.
14     A.   I see 274,242,335 plus 29,318,981,
15  makes about 314.
16     **Q.   So a total of --**
17     A.   Just reading from this report.
18     **Q.   Approximately 314 million would be a**
19  **move from using 9/19 mid prices to the use of a**
20  **9/22 mid price at close of business for both**
21  **days; is that correct?**
22         MR. THOMAS:  Objection to form.  Lack
23  of foundation.
24     A.   This report seems to be saying that
25  market value changed equities 09/19 to 09/22,

      TSG Reporting - Worldwide     877-702-9580

Page 92

1         HIGHLY CONFIDENTIAL - Washtell
2   which I believe would be based on the last price
3   because you have a bid/offer calculation below.
4   That shows that that market value change for
5   equities was 274 million, and that same market
6   value change for converts was 29 million.
7      **Q.   And where does the remainder of the**
8   **decrease of approximately 685 million come from**
9   **in addition to moving the valuation date from**
10  **September 19 to September 22?**
11         MR. THOMAS:  Objection to form.
12  Foundation.
13     A.   I'm not sure because I can't see
14  numbers that cast to 685 on this schedule.
15     **Q.   Looking again at the line titled "Net**
16  **Increase/(Decrease)"?**
17     A.   Uh-huh.
18     **Q.   Does that not --**
19     A.   That seems to be comparing, what, 7993
20  to 7611, but it's not quite doing that, is it?
21         No, it's comparing 7611 with 8297, I
22  guess.
23     **Q.   Is it --**
24     A.   It would appear to add in the 382
25  under the "Bid/Offer Equities" line.

      TSG Reporting - Worldwide     877-702-9580

Page 93

1         HIGHLY CONFIDENTIAL - Washtell
2      **Q.   And what change is being made to the**
3   **"Bid/Offer" line as a consequence of a change in**
4   **valuation date from 9/19 close of business to**
5   **9/22 close of business?**
6          MR. THOMAS:  Objection to form.
7   Foundation.
8      A.   I don't believe there is a change.
9   That's just stating that that's the bid/offer
10  for the equities as calculated, I'm assuming,
11  for 9/22.
12     **Q.   So the change in valuation date has no**
13  **impact on the bid/offer adjustment that's being**
14  **taken; is that correct?**
15         MR. THOMAS:  Objection to form.  Vague
16  and foundation.
17     A.   When you say "change in valuation
18  date," I don't recall assessing a bid/offer
19  adjustment for 9/19.
20     **Q.   Okay.**
21     A.   I recall assessing the appropriate
22  fair value of a bid/offer adjustment for 9/22.
23  If you were to do that for 9/19, I don't know
24  how different it would be.
25     **Q.   Would you expect that --**

      TSG Reporting - Worldwide     877-702-9580

## Page 94

**HIGHLY CONFIDENTIAL - Washtell**

1
2      A.   If it would be different materially at
3  all, I don't know.
4      **Q.   You don't know whether it would or**
5  **would not be different if you were to calculate**
6  **the bid/offer as of September 19 as opposed to**
7  **as of September 22 close of business; is that**
8  **correct?**
9      A.   It's not something that we looked at
10  or considered, so I don't know.
11      **Q.   Would you expect it to be different if**
12  **different dates were being used to calculate the**
13  **bid/offer adjustment?**
14      A.   Potentially, but a lot of factors
15  would go into determining that.
16      **Q.   Could you identify what factors would**
17  **go into identifying if the date would play a**
18  **role in affecting the bid/offer adjustment to be**
19  **taken?**
20      A.   Well, given the position is the same,
21  and that's going to be the largest driver of the
22  bid/offer is the position on the book, and the
23  only change would be how you interpret or
24  calculate a bid/offer spread.
25      If you were to use a query data for

TSG Reporting - Worldwide    877-702-9580

## Page 95

HIGHLY CONFIDENTIAL - Washtell

1
2  9/19, could lead you to slightly different
3  spread calculations than you observed on 9/22?
4  Potentially.
5      **Q.   Do you know if the market -- based on**
6  **of the decrease in value from September 19 close**
7  **to September 22 close, is it your understanding**
8  **that the market was up on September 19?**
9      MR. THOMAS:  Objection.  Form.
10      A.   I don't know where the market is on
11  September 19 and I don't know you can infer
12  anything from this to suggest what the market
13  did on September 19.
14      **Q.   You don't understand that the midpoint**
15  **values calculated by your group for September 19**
16  **is approximately 300 -- I think you had added**
17  **this as 314, but I think it might be actually**
18  **304 million, if you would take a look again at**
19  **the --**
20      A.   You're correct.  My arithmetic is out
21  slightly.
22      **Q.   I can't take all the credit, but...**
23      **Wouldn't this chart suggest that the**
24  **midpoint valuations that your group had**
25  **calculated for the equity portfolio as of close**

TSG Reporting - Worldwide    877-702-9580

## Page 96

**HIGHLY CONFIDENTIAL - Washtell**

1
2  **of business 9/19 is approximately $304 million**
3  **higher than it was at close of business**
4  **September 22?**
5      MR. THOMAS:  Objection.  Form.
6      A.   This suggests, based on the closing
7  last price information that we had available,
8  that the movement in the value of the positions
9  between 9/19 and 9/22 was $304 million.
10      **Q.   And so based off of a move of $304**
11  **million, would you not say that the market for**
12  **those positions you were valuing was up on**
13  **September 19 as opposed to where it was by the**
14  **close of business on September 22?**
15      MR. THOMAS:  Objection to form.
16      That's a different question.
17      A.   I still think this number has no
18  bearing on whether the market was up or down on
19  September 19.  It says nothing about where the
20  market was on that day.
21      **Q.   For those positions?**
22      A.   Other than relative to 9/22.  It
23  doesn't tell you when the market is up or down
24  on September 19, and that is how I understand
25  your question.  And your initial question was

TSG Reporting - Worldwide    877-702-9580

## Page 97

HIGHLY CONFIDENTIAL - Washtell

1
2  does this suggest the market is up on 9/19.
3      MR. THOMAS:  And this is irrelevant to
4  that?
5      THE WITNESS:  Yes, and that's my
6  point.
7      **Q.   I'm asking simply the price for these**
8  **positions based on the mid value -- the midpoint**
9  **values that your group came up with for 9/19**
10  **indicates that the price was better for those**
11  **positions on 9/19 than they were by close of**
12  **business September 22?**
13      MR. THOMAS:  That's not the question
14  you asked.  That's a different question.
15      A.   Define "better."  I mean --
16      **Q.   $304 million better, higher on Friday,**
17  **September 19; is that correct?**
18      MR. THOMAS:  Objection to form.
19      A.   What this suggests to me, I'll
20  paraphrase into my words maybe to clarify, is
21  the valuation based on closing last prices on
22  9/19 was higher than the closing valuation based
23  on closing last prices on 9/22 by $304 million.
24  Does that answer what ...
25      **Q.   Were you one of the principal or the**

TSG Reporting - Worldwide    877-702-9580

Page 98

**HIGHLY CONFIDENTIAL - Washtell**
1    **principal liaison with PwC with respect to the**
2    **equity portfolio acquired by Barclays from**
3    **Lehman?**
4        A.   In terms of discussing the detailed
5    analysis that they did, yes.  The people they
6    had -- Polly I think was the principal contact,
7    Polly Ng, listed in the front of this document,
8    and I was principally engaged with her, helping
9    them in their assessment of the work we did in
10   relation to the equity portfolio.
11       **Q.   Do you have any reason to believe that**
12   **this chart that we were looking at on page**
13   **Bates-stamped 1 -- sorry, Bates-stamped ending**
14   **960 does not accurately reflect the data that**
15   **you had provided to PwC?**
16           MR. THOMAS:  Objection to form.
17       A.   If this is an official work document
18   from PwC, I have no reason to suggest it's
19   incorrect in any way, but I have not seen this
20   document before, so -- as in this PwC work
21   paper.
22       **Q.   And if you turn to the page ending 57,**
23   **which is starting at the page before that at 56,**
24   **that's where the e-mail starts, there is an**

TSG Reporting - Worldwide    877-702-9580

Page 99

**HIGHLY CONFIDENTIAL - Washtell**
1    **e-mail from Polly Ng dated January 8, 2009 to**
2    **other individuals at PwC.  Do you see that?**
3        A.   Halfway down page 56, that one?
4        **Q.   Yes.**
5        A.   Yes.
6        **Q.   Do you want to take a moment and read**
7    **that e-mail?**
8        A.   Sure.
9           (Document review.)
10       A.   Okay.
11       **Q.   Do you see the first line where it**
12   **says, "Lynsey refers your request re Lehman**
13   **equities valuation to me and I have briefly**
14   **discussed with Mark"?**
15       A.   Yes.
16       **Q.   Do you expect that that reference to**
17   **"Mark" is you?**
18           MR. THOMAS:  Object to form.
19       A.   It's reasonable.  I mean, I can't say
20   for certain, but it's an assumption, reasonable
21   assumption.
22       **Q.   And underneath it says, "Basically, as**
23   **you mentioned, the valuation date of these**
24   **Lehman equities had moved from 19th to 22nd**

TSG Reporting - Worldwide    877-702-9580

Page 100

**HIGHLY CONFIDENTIAL - Washtell**
1    **September.  There are around $700 million fall**
2    **in the value when comparing with 19th September**
3    **due to two reasons:  1) MtM goes down for around**
4    **$300 million and 2) bid/offer reserve of $400**
5    **million."**
6        **Do you see that?**
7        A.   Yes, I see that.
8        **Q.   Does that comport with your**
9    **understanding of the movement when using a**
10   **September 19 close of business day price as**
11   **opposed to a September 22 close of business day**
12   **price?**
13           MR. THOMAS:  Objection to form.
14       A.   No, I think it's -- it's a confused
15   point.  I think it's saying there's a movement
16   from September 19 to 22, and then there's the
17   application of a bid/offer reserve.  I think
18   it's confusing those two points.
19       **Q.   But you have no reason to believe that**
20   **the numbers are inaccurate, that the mark to**
21   **market goes down for around $300 million when**
22   **using the 9/19 close of day prices as opposed to**
23   **the 9/22 close of day prices; is that correct?**
24           MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 101

HIGHLY CONFIDENTIAL - Washtell
1        A.   I think the inverse of what you said,
2    but I have no reason to believe this $304
3    million number that's referenced here is
4    incorrect.
5        **Q.   And when your group sought midpoint**
6    **prices for September 19, what sources were used?**
7        A.   From my recollection, sources used to
8    obtain closing or last price information for
9    9/19 would have been the same as those used for
10   9/22.
11       **Q.   And do you recall what those sources**
12   **were?**
13       A.   I believe our principal source would
14   be Reuters.  The reason for that is it's the
15   principal source of equity pricing information
16   within Barclays Capital.  In addition, we may
17   have used Bloomberg, for instance, we may have
18   used that, or other sources that were available
19   to us.  I don't recall specifically, but I
20   expect the majority were Reuters.
21       **Q.   And do you know what Asset Control is?**
22       A.   So Asset Control is an internal market
23   data warehouse within Barclays Capital which
24   stores information that's obtained by the firm

TSG Reporting - Worldwide    877-702-9580

| Page 110 | Page 111 |
|---|---|

**Page 110**

1        HIGHLY CONFIDENTIAL - Washtell
2    depend which files we're looking at.
3        Q.   Mr. Washtell, I'm handing you what has
4    been previously marked as Deposition Exhibit
5    641A.  We've flagged some pages to make it
6    easier for you to turn to.  I have also flagged
7    counsel's copy.
8        MR. THOMAS:  That's so thoughtful.
9        Q.   Mr. Washtell, you can turn to the --
10   why don't we start at the first page.  Do you
11   see that the first page is an e-mail from Mr.
12   Teague to Tal Litvin dated February 12, 2009,
13   "Subject:  Acquisition balance sheet"?
14       A.   Yes.
15       Q.   And do you see where it says, "The
16   Lehman opening balance sheet is broken out into
17   four distinct portfolios.  The Lehman portfolio
18   1 asset settled on 9/22.  While the JPM
19   Portfolio 3 assets legal settlement date was
20   12/22.  The following winzip contains List A and
21   List B assets valued as of year-end that are
22   expected to settle shortly.  Here is the
23   valuation methodology"?
24       A.   Yes, I see that.
25       Q.   **Behind the e-mail are Excel**
         TSG Reporting - Worldwide    877-702-9580

**Page 111**

1        HIGHLY CONFIDENTIAL - Washtell
2    **spreadsheets that were produced to us in a**
3    **native version, and we have attempted to print**
4    **them out and for purposes of questioning, but**
5    **since they are lengthy, if you could turn to the**
6    **first flagged page within, and this is a tab of**
7    **an Excel workbook that was Bates-stamped**
8    **BCI-EX-(S)-00213995, and the summary tab, if you**
9    **just take a look at the summary tab.**
10       A.   Okay.
11       (Document review.)
12       Q.   **Do you understand this summary to**
13   **reflect the valuations undertaken by IVC in**
14   **connection with putting together the opening**
15   **balance sheet to reflect the Lehman transaction?**
16       MR. THOMAS:  Objection to form.  Lack
17   of foundation.
18       A.   **I don't recall this specific schedule.**
19   **There's clearly a line on here for equities.**
20   **There's clearly a PCG value, market value 9/22.**
21       Q.   **So you and your team didn't put**
22   **together the equities portion, at least, of this**
23   **spreadsheet?**
24       A.   I believe we may --
25       MR. THOMAS:  Objection to form.
         TSG Reporting - Worldwide    877-702-9580

**Page 112**

1        HIGHLY CONFIDENTIAL - Washtell
2        A.   **I believe we may have done, but I**
3    **didn't put together this file.  This appears to**
4    **be a summary file of all positions.**
5        Q.   Do you know if the positions that your
6    team was responsible for valuing would fall both
7    in the row titled "Equities" as well as perhaps
8    some in "PMTG," "PMTG II"?
9        MR. THOMAS:  Objection.  Lack of
10   foundation.
11       A.   I would interpret this as being the
12   positions my team looked at were purely in the
13   line "Equities."
14       Q.   **And if you could turn to the next flag**
15   **within the document, which should be another**
16   **Excel tab within BCI-EX-(S)-00213995 titled**
17   **"EQ2(2)."  Take a moment to review and then let**
18   **me know when you have finished.**
19       **(Document review.)**
20       A.   **Okay.**
21       Q.   **Have you seen this document before?**
22       A.   **I have seen a schedule like this**
23   **before.**
24       MR. THOMAS:  Do you mean this one page
25   as opposed to the whole exhibit?
         TSG Reporting - Worldwide    877-702-9580

**Page 113**

1        HIGHLY CONFIDENTIAL - Washtell
2        MS. CARRERO:  I do mean this tab of
3    the Excel workbook relating to the EQ2(2).
4        Q.   **Can you tell me what the "PCG Value**
5    **September 9" column totaling $10,016,000,000**
6    **reflects?**
7        MR. THOMAS:  Objection to form.
8        A.   **I believe that reflects the valuation**
9    **of these positions based on closing price data**
10   **that would have been obtained by my team for**
11   **September 19.**
12       Q.   And can you tell me what the "PCG
13   Value September 22" column totaling
14   $9,725,000,000 reflects?
15       MR. THOMAS:  Objection to form.
16       A.   Is that the column next to it?
17   Because I can't see anything on this.
18       MS. CARRERO:  We can go off the record
19   for a second.
20       (Pause in the proceedings.)
21   BY MS. CARRERO:
22       Q.   **Looking at the column labeled "PCG**
23   **Value September 22," can you tell me what that**
24   **column totaling $9,725,000,000 reflects?**
25       MR. THOMAS:  Objection to form.
         TSG Reporting - Worldwide    877-702-9580

Page 114

HIGHLY CONFIDENTIAL - Washtell

1
2    A.   I don't see 9,725,000,000.  Sorry.
3    Q.   In the column next to "PCG Value
4  September 19," next to the total of
5  10,016,000,000, what number --
6    A.   9712.
7    Q.   What does that number reflect?
8        MR. THOMAS:  Objection to form.
9    A.   I believe that number would reflect
10  the comparable value as of September 22, that
11  is, using closing price from September 22.
12    Q.   And what does the column titled "PCG
13  B/O of September 22" totaling $382 million
14  reflect?
15    A.   That would appear to reflect the
16  bid/offer that was applied to the equity
17  portfolio as of 9/22.
18    Q.   And what does "bid/offer" mean?
19    A.   In a general sense?  Bid/offer spread.
20    Q.   In the sense of how it is used here.
21        MR. THOMAS:  Objection to form.
22    A.   "Bid/offer," as it is used here,
23  represents an adjustment to get us to the
24  appropriate fair market value, which in the case
25  of a long equity portfolio is the bid value.

TSG Reporting - Worldwide    877-702-9580

Page 115

HIGHLY CONFIDENTIAL - Washtell

1
2  That's quite clearly as defined in the
3  accounting standards.
4    Q.   How is that bid/offer adjustment
5  calculated to arrive at the $382 million figure?
6        MR. THOMAS:  Objection to form.
7  Foundation.
8    A.   Would you like a detailed explanation?
9  It's -- it's a detailed calculation.
10    Q.   Before we get there, I just want to
11  ask, it was your group that calculated the
12  bid/offer adjustment that totaled $382 million,
13  correct?
14    A.   That's correct.
15    Q.   Now, if you could go on and tell me
16  how that bid/offer adjustment was calculated to
17  arrive at $382 million?
18        MR. THOMAS:  Objection to form.
19    A.   Due to the lack of available data, we
20  calculated a portfolio level bid/offer spread to
21  apply to the entire portfolio.  Ideally, if you
22  had position level data available for all
23  positions, you would do this calculation on a
24  position level, but given we were looking at
25  this after the fact, some time after the fact,

TSG Reporting - Worldwide    877-702-9580

Page 116

HIGHLY CONFIDENTIAL - Washtell

1
2  we did not have that data available.
3        The first step was to attempt to query
4  bid/offer spread information for the portfolio
5  as of 9/22.  In doing that, using Reuters, which
6  is our principal data source which we use within
7  Barclays, we had coverage of something like 450
8  to 500 names of a portfolio here which is
9  something like 3500 names.
10        The thing to know about that sample
11  and why that sample is not representative of the
12  portfolio and why you would not just, for
13  instance, take an average of that sample, is
14  that that spread information would have been
15  available for the more liquid names within the
16  portfolio.
17        What that means is that spread
18  information would have been much lower for those
19  names than for the names that we could not
20  observe at that time, so any average based on
21  that level would be substantially lower than the
22  true bid/offer that was applicable to the
23  portfolio as of that date.
24        Now, to adjust for that, we at some
25  point in December have looked at a live market

TSG Reporting - Worldwide    877-702-9580

Page 117

HIGHLY CONFIDENTIAL - Washtell

1
2  bid/offer data where we have a much better
3  coverage, and I think in that sample we were
4  able to get something like 2,000, 2100 names,
5  something like that, I don't know the exact
6  number, but it covered a much larger proportion
7  of the population.  So from a market value
8  perspective, it covered something like 80
9  percent of the outstanding market value of the
10  portfolio.
11        That is a much better average because
12  it covers much more of the portfolio, but then
13  you have the issue that you're looking at an
14  average of market data from December as opposed
15  to September.  So we've gone through a process
16  to calculate, effectively, a rebasing or a
17  benchmarking or a basis-type adjustment to
18  understand how the markets moved between
19  September 22 and I believe December 22 when we
20  queried the larger population of data.
21        On that basis, we come up with a ratio
22  to reflect how the market generally has become
23  more or less liquid, and in this case, it
24  reflected the fact that spreads had become
25  narrower in December as opposed to September.

TSG Reporting - Worldwide    877-702-9580

Page 118

HIGHLY CONFIDENTIAL - Washtell

1    HIGHLY CONFIDENTIAL - Washtell
2    I think the factor we looked at was a
3    little over 2, something like 2.2, that is to
4    say the spreads that we observed for a specific
5    position in September, where we had data also
6    observable for those positions in December, the
7    spreads we observed in September were larger by
8    a factor of, on average, about 2.2.
9        So we used that factor to then take
10   our December average and estimate a rescale, a
11   rebenchmarked, rebased average to apply to the
12   portfolio in September. Having done that, we
13   have arrived at the appropriate bid/offer spread
14   to apply to the portfolio in September.
15       Q.   And when did this methodology come
16   about? Was it in December at the time that you
17   queried for the December live sample?
18       MR. THOMAS: Objection to form.
19       A.   We were doing work on this before
20   then, but it was very much an iterative process.
21   So, as I said, as a first step, we looked to get
22   as much information as we could from September
23   and what average did that imply for us, and that
24   was a first cut at the number.
25       Q.   And what --
     TSG Reporting - Worldwide   877-702-9580

Page 119

1    HIGHLY CONFIDENTIAL - Washtell
2        A.   It soon became apparent that, well,
3    no, if we think about this, this isn't the most
4    appropriate number because look at the stocks
5    that are in our sample. It's the S&P 500 names
6    or whatever that have been extremely liquid that
7    have much tighter spreads. The sample where we
8    don't have data is clearly the less liquid
9    stuff, and if you go and look at live market
10   spreads now, yes, there are much wider spreads.
11   So it was an evolving process.
12       Q.   And between the acquisition date in
13   September and December when you changed your
14   bid/offer methodology, what were you seeing as
15   the number to be taken as a bid/offer
16   adjustment?
17       MR. THOMAS: Objection to form.
18       A.   I'm not sure what you mean by the
19   question in terms of what changed. I'm not --
20       Q.   I'm asking the percentage bid/offer
21   adjustment, how did it compare to the one
22   ultimately employed using the December live
23   sample that was not generated until December or
24   later when that data was obtained?
25       MR. THOMAS: Objection.
     TSG Reporting - Worldwide   877-702-9580

Page 120

1    HIGHLY CONFIDENTIAL - Washtell
2        A.   How did what compare to that? Sorry.
3        Q.   How did whatever methodology you were
4    using to calculate the bid/offer adjustment
5    prior to December differ from that which was
6    ultimately used employing December data?
7        MR. THOMAS: Objection to form.
8        A.   I don't recall at any point that we
9    were using a different methodology. We did not
10   calculate the bid/offer adjustment as of -- as
11   of on the 22nd of September, we did not go and
12   calculate a bid/offer adjustment and then at a
13   later date revise that. That's not the way this
14   happened.
15       Q.   But you're not telling me you waited
16   until December to calculate a bid/offer
17   adjustment, right?
18       A.   I'm saying the valuation, the opening
19   balance sheet valuation, the work to come up
20   with a fair value that was appropriate was
21   undertaken over a period of time. That period
22   of time was a few months.
23       Q.   But the data that was ultimately used
24   is data that was obtained months after the
25   acquisition; is that correct?
     TSG Reporting - Worldwide   877-702-9580

Page 121

1    HIGHLY CONFIDENTIAL - Washtell
2        MR. THOMAS: Objection to form.
3        A.   To take into account the liquidity,
4    the relative availability of data, the
5    composition of the portfolio, we used all data
6    available to us. That included referencing data
7    where we could from September. It also included
8    referencing data from December to come up with,
9    as I've said, an effective benchmark or basis
10   adjustment between those two dates.
11       We could not query live data for
12   September 22 because it was after the fact that
13   we were trying to do this.
14       Q.   But the only available live data is
15   data almost three months after the acquisition?
16       MR. THOMAS: Objection to form.
17       A.   No, I'm saying there was a lot going
18   on at this particular point in time, and
19   clearly, you know, the sole responsibility of
20   our group and what we were doing in that
21   intervening period was not to calculate a
22   bid/offer adjustment.
23       Q.   And so the calculation of a bid/offer
24   adjustment was not something that was undertaken
25   until December, at which point the only
     TSG Reporting - Worldwide   877-702-9580

Page 122

HIGHLY CONFIDENTIAL - Washtell
2  available live data was December data; is that
3  what you're saying?
4        MR. THOMAS:  Objection.  Form.
5        A.  I'm not sure exactly at what point we
6  first started calculating a bid/offer
7  adjustment.  The first point or the point at
8  which we clearly decided we needed to
9  rebenchmark it to get a better estimate I
10  believe was sometime in December, and I recall
11  there were a couple of different sampling dates
12  in December that we used.
13        Q.  How long is live data available for
14  after the live event?
15        A.  Well, it's not -- it's a point in
16  time.
17        Q.  So it's available only -- it must be
18  collected contemporaneously with its happening?
19        A.  What --
20        MR. THOMAS:  Objection.
21        A.  What I would consider the definition
22  of "live data" is we go to Reuters during
23  trading hours and take a live snap of current
24  bid/offer in the market.  30 seconds later, you
25  can have a slightly different bid/offer and a

TSG Reporting - Worldwide    877-702-9580

Page 123

HIGHLY CONFIDENTIAL - Washtell
2  slightly different set of live data.  It's live.
3  It's ticking constantly.  That's the definition
4  of it.
5        By doing that, you ensure the data
6  that you get represents a true bid/offer that's
7  quoted in the market at a particular time.  So a
8  simultaneous bid and offer that's out there in
9  the market at one point in time rather than a
10  bid and offer that potentially, you know, are
11  being quoted at different times, which wouldn't
12  represent a true spread in the --
13        Q.  But how is a bid/offer in the market
14  three months after the Lehman acquisition more
15  representative of a true bid/offer than the data
16  that was available at the time of the actual
17  sale transaction?
18        MR. THOMAS:  Objection.  Form.
19        A.  I think the distinction to make is the
20  data that was available at the time of the
21  transaction, if you could go and snap live
22  market data on September 22, you would do that
23  and that would be more representative, but
24  that's not something we were able to do because
25  we were looking at this after the fact.

TSG Reporting - Worldwide    877-702-9580

Page 124

HIGHLY CONFIDENTIAL - Washtell
2        So the only information for 9/22 that
3  you could get is the closing bid-ask data, and
4  that's not available for a very wide proportion
5  of stocks.  It was only available for I think I
6  said 450 or so stocks, and that population of
7  450 stocks represents serious selection bias if
8  you're trying to use that as a sample to be an
9  indicator for the spread you should apply to
10  your population because it represents the most
11  liquid names within the sample.
12        So it would lead to a significant
13  understatement of any bid/offer spread that
14  would apply to the portfolio.  The only
15  reasonable way to get around that was to look at
16  live market data that we had available and try
17  to do some sort of rebasing between the dates.
18        Q.  Do you have any idea how the December
19  snapshot of live data would compare to what a
20  live snapshot would have looked like in
21  September?
22        A.  We have estimated based on the data
23  that we had available.  So anywhere we had, for
24  the sample of positions where we had a closing
25  spread for 9/22, we compared that spread to the

TSG Reporting - Worldwide    877-702-9580

Page 125

HIGHLY CONFIDENTIAL - Washtell
2  live spread we had in December.  So we're
3  comparing like for like the same name, and we're
4  saying for this stock what was the bid/offer
5  spread in September, what was the bid/offer
6  spread in December, and on that basis we can
7  calculate ratio of how spreads on average have
8  moved between the two dates.  And that gives us
9  this ratio of this factor of something like 2.2.
10  That is to say they were narrower by that factor
11  in December than they were in September.
12        Q.  Putting before you what has been
13  marked as Deposition Exhibit 824.
14        (Exhibit 824, a document bearing Bates
15  Nos. BCI-EX-00255172, with attachment,
16  marked for identification, as of this date.)
17        Q.  Have you had a chance to look it over?
18        A.  Yes.  Quite helpfully describes what I
19  just said.
20        Q.  So Deposition Exhibit 824, which is
21  Bates-stamped BCI-EX-00255172, the first page,
22  is an Excel spreadsheet that we have printed
23  out, and if you would turn to the summary page,
24  and look at that "Implied Provision" line
25  totaling $382,174,982, do you see that?

TSG Reporting - Worldwide    877-702-9580

Page 126

1      HIGHLY CONFIDENTIAL - Washtell
2      A.   Yes.
3      Q.   Does that tie out to the previous
4  document we were looking at, Deposition 641, the
5  bid/offer, the PCG B/O September 22 total of 382
6  million?
7      A.   Yes, it would appear to be the same
8  number.
9      Q.   And does the 8,852,000,000 number
10 listed as total asset value reflect the total of
11 tested and untested equities?
12     MR. THOMAS:  Objection to form.
13     A.   I would assume so.
14     Q.   And the use of December 18 live data
15 as opposed to any other date in December is
16 because that's the date the decision was made to
17 go out and take a snapshot of live data; is that
18 correct?
19     A.   I believe we took a snapshot on a few
20 different days in December.  They were all
21 broadly representative and similar.  So December
22 18 was the day that we chose.  I don't recall
23 exactly why that day was chosen.
24     Q.   Do you recall what other dates live
25 snapshots were taken?

TSG Reporting - Worldwide    877-702-9580

Page 127

1      HIGHLY CONFIDENTIAL - Washtell
2      A.   No, not specifically.
3      Q.   Were live snapshots taken at different
4  times of the day?
5      A.   I believe they would have been.
6      Q.   And who ultimately made the decision
7  as to which live snapshot to use for the
8  bid/offer calculation?
9      A.   That would have been taken by myself
10 in conjunction with other people, other members
11 of the team.
12     Q.   If you turn to the page behind that's
13 reflective of the Excel tab titled all data.
14     A.   Okay.
15     Q.   Can you explain why only approximately
16 400 CUSIPs have a reported bid-ask spread on
17 September 22 and approximately 2000 have a
18 reported bid-ask spread on December 18, or tell
19 me that that's what you have already explained?
20     A.   Okay.  That's kind of what I've
21 explained, I guess.  It's not the last data that
22 we had for 9/22.
23     Q.   And could you explain the process
24 again of how the data from December was
25 backdated to the September date?

TSG Reporting - Worldwide    877-702-9580

Page 128

1      HIGHLY CONFIDENTIAL - Washtell
2      MR. THOMAS:  Objection to form.
3      A.   For the population of positions where
4  we had spread data available on both observation
5  dates, we calculated a ratio for a relative
6  change I believe as it's defined on the
7  spreadsheet.  We then looked at the average of
8  those changes across that sample of 400 or so
9  names where data was available for both, and we
10 have used that as an indication of how market
11 bid/offer spreads have changed between those two
12 dates.
13     Q.   And has this methodology of backdating
14 a bid/offer adjustment ever been employed by
15 Barclays before?
16     MR. THOMAS:  Objection to the form.
17 Misstates the testimony.
18     A.   We apply bid/offer provisions to the
19 portfolio.  We applied similar techniques of
20 averaging to calculate spreads that are
21 applicable for those bid/offer adjustments, and
22 we do that as part of our ongoing function in
23 our role.
24     Q.   Does the provisioning policy that was
25 in place at the time specifically provide for

TSG Reporting - Worldwide    877-702-9580

Page 129

1      HIGHLY CONFIDENTIAL - Washtell
2  calculating bid/offer adjustments based on
3  future data and then backdating it to a date
4  prior?
5      MR. THOMAS:  Objection.  Form.
6  Mischaracterizes the testimony.
7      A.   I don't believe, to answer your
8  question, the bid/offer -- sorry, the
9  provisioning policy mentions anything in
10 relation to backdating.
11     What we did in this example is the
12 most reasonable thing to do to achieve an
13 appropriate estimate of the bid/offer provision
14 on the portfolio as of that point in time.
15     Using the information we had
16 available, it would have been inappropriate to
17 rely purely on the September spread information
18 because it represented a biased sample, a
19 non-representative sample.  It would have
20 significantly understated the true bid/offer on
21 the portfolio at that time.
22     So it would have been incorrect to
23 either not calculate a bid/offer because we
24 didn't have the data or to calculate based on a
25 sample of data which is not representative

TSG Reporting - Worldwide    877-702-9580

Page 130

HIGHLY CONFIDENTIAL - Washtell
1  the population.  We needed to make reasonable
2  judgments to get to an appropriate bid/offer
3  spread based on available data we had at the
4  time that we were doing this, and that's what we
5  did.
6
7        And we believe that gets us to the
8  best estimate, the most reasonable estimate of
9  the appropriate fair value.
10     Q.   Why did it take three months from the
11 sale transaction to determine that what had
12 previously been pulled was inadequate?
13     MR. THOMAS:  Objection to form.
14     A.   As I said before, we didn't spend
15 three months looking at the bid/offer
16 calculation.  We did not -- or, I did not start
17 actively calculating an opening balance sheet
18 value as of 9/22 and then spend three months.
19 There was a lot of other stuff happening at this
20 point in time.
21       So it's not a case of, you know, we
22 spent three months and it took us three months
23 to determine that this was the appropriate
24 course of action.
25     Q.   This bid/offer methodology totaled
TSG Reporting - Worldwide    877-702-9580

Page 131

HIGHLY CONFIDENTIAL - Washtell
1  almost $400 million, which you would agree is
2  not inconsequential, correct?
3     A.   It's definitely not inconsequential.
4     Q.   And do you recall what amount of the
5  previous data using the 400 or so observable
6  data points for September would have yielded?
7        MR. THOMAS:  Objection to form of the
8  question.  Vague.
9     A.   I don't recall the exact number, no.
10    Q.   And do you recall what the average --
11 let me rephrase the question.
12       Looking at the numbers on the summary
13 page again --
14    A.   Yes.
15    Q.   -- if you could walk me through where
16 it says average spread from December 18 data,
17 1.93 percent?
18    A.   Yes.
19    Q.   And what is that 1.93 percent
20 reflective of?
21    A.   It's reflective of the average spread
22 from December 19 data, so the live data that we
23 created for bid-ask spreads as of December 18.
24 That's the average.  It's described above how
25
TSG Reporting - Worldwide    877-702-9580

Page 132

HIGHLY CONFIDENTIAL - Washtell
1  it's calculated, excluding data above 50 percent
2  spread.
3     Q.   What is the 2.3 next to average ratio
4  of spreads, September to December?
5     A.   2.23?
6     Q.   Sorry, 2.23, yes.
7     A.   Is for the 400 observations, 400 or so
8  observations where we had data for both dates.
9  As I've described, that represents the relative
10 change or ratio on those positions between those
11 two dates.
12    Q.   So 2.23 is the ratio that was
13 calculated?
14    A.   Yes.
15    Q.   And can you tell me what the 4.32
16 percent number next to "Applied Sep. Average
17 Spread" is?
18    A.   I believe that's just the
19 multiplication of the previous two numbers, so
20 that represents the December spread, which
21 covers most of the population, rescaled based on
22 the ratio, to give us an approximate September
23 spread.
24    Q.   So is the 4.32 percent number what is
TSG Reporting - Worldwide    877-702-9580

Page 133

HIGHLY CONFIDENTIAL - Washtell
1  applied in order to generate the $382 million
2  number?
3     A.   That's correct.
4     Q.   And it's applied to which universe of
5  equities within the equity portfolio that you
6  covered?
7     A.   Everything that's not a convertible
8  bond, I believe, would have been included.
9     Q.   So even for the 400 CUSIPs for which
10 you did have data as of September, the
11 backdating from December/September calculated
12 spread was applied; is that correct?
13    MR. THOMAS:  Objection to form.
14 Mischaracterizes the testimony.
15    A.   This spread was applied to all of the
16 positions, including those positions where we
17 had a spread observable from September.  The
18 reason for that is that we're applying an
19 average methodology here.  The reason we're
20 applying an average methodology is for a
21 significant portion of the portfolio we just did
22 not have spread information available.
23       So for, I think reading from this,
24 approximately 14 percent of the portfolio, which
TSG Reporting - Worldwide    877-702-9580

Page 142

**HIGHLY CONFIDENTIAL - Washtell**

1   value to remove the impact of market activity
2   during the day on September 22?
3       A.   Can you say that again?
4       Q.   Was any attempt made to adjust the
5   value to remove the impact of market activity
6   over the course of the day on September 22?
7       A.   What do you mean by "market activity"
8   in that sense?
9       Q.   Market movements to any of the CUSIPs
10  that were within the portfolio being valued in
11  the "Total Equities and Convertibles" row using
12  a 9/22 close price.
13      A.   No, I believe this represents the
14  closing market value as of 9/22.
15      Q.   And this would be the number that
16  would roll into Barclays' acquisition balance
17  sheet; is that correct?
18      A.   I believe the number that would roll
19  into Barclays' acquisition balance sheet would
20  also reflect the bid/offer, which is in the
21  column next to it.
22      Q.   And what's the total of that?
23      A.   So I think that the second "PCG Value
24  Sep. 22" column.

Page 143

HIGHLY CONFIDENTIAL - Washtell

1       Q.   And what would the total be that would
2   roll into the acquisition balance sheet for the
3   equities and convertibles?
4           MR. THOMAS:  Objection to form.
5       A.   Taking as read from this, because I
6   can't remember the numbers, I'm not familiar
7   with the actual final document, 9.33 billion is
8   the number here.
9       Q.   Did you or your group at your
10  direction seek to obtain any market information
11  from the foreign markets and indices that would
12  have been available between close of business on
13  September 19 and the September 22 opening of the
14  market?
15      A.   Just to clarify, you're saying in
16  relation to the U.S. close from Sep. 19 to the
17  U.S. Open on Sep. 22 did we look at what you
18  call foreign markets?  You mean non-U.S., is
19  that --
20      Q.   Non-U.S. would be one way of looking
21  at it, but we could also say from UK close to UK
22  open on the 19th to the 22nd.
23      A.   Okay.
24      Q.   Were any, any data points collected

Page 144

**HIGHLY CONFIDENTIAL - Washtell**

1   and analyzed in determining the move in the
2   market from September 19 to September 22?
3       A.   From my recollection, they were not.
4       Q.   Your group was also responsible for
5   valuing convertibles, correct?
6       A.   That's correct.
7       Q.   And what would be included in the
8   convertibles category?
9       A.   This would principally be convertible
10  bonds.  I believe it may have included some
11  convertible preferred securities as well.
12      Q.   And do you know what the distinction
13  is between tested and untested convertibles?
14      A.   "Tested" would imply where we can
15  obtain an independent market data quote.
16  "Untested" would imply that we could not do
17  that.
18      Q.   And why would there be no bid/offer
19  adjustment for convertible securities?
20      A.   The price information that we obtained
21  for convertible securities would be in a
22  slightly different format, so we would
23  automatically get a bid and an ask and so we
24  would mark to the bid.  Therefore, no need to

Page 145

HIGHLY CONFIDENTIAL - Washtell

1   take an adjustment just because of the data that
2   we get.
3       Q.   And where does that data come from?
4       A.   I believe most of the convertible bond
5   data would have been sourced through Bloomberg
6   and would represent broker quotes, market
7   quotes, indications from interdealer brokers,
8   which would be in line with our standard
9   practice for how we value convertible bonds and
10  price test convertible bonds on an ongoing
11  basis.
12      Q.   Was your group responsible for valuing
13  equity-linked notes and warrants?
14      A.   Yes.  As listed on here, yes.
15      Q.   And what would fall under the category
16  "Untested Lehman Issued ELNs"?
17          MR. THOMAS:  Objection to form.
18      A.   I can't recall exactly what's in each
19  of these categories, but two categories here,
20  Lehman issued ELNs and warrants would both
21  represent some form of Lehman paper.
22      Q.   And "untested," does it have a similar
23  meaning as with the convertible bonds, meaning
24  that there would be no observable market price?

## Page 146

HIGHLY CONFIDENTIAL - Washtell

1
2    A.   That would be correct, yes.
3    Q.   When valuing the Lehman-issued ELNs or
4    the Lehman-issued warrants, did you or your
5    group look at the marks in existence from Bank
6    of New York or JPM or Lehman?
7    A.   I don't recall looking at them in any
8    detail.
9    Q.   Do you know what the column labeled
10   "BoNY September 18" references?
11   A.   I believe that would reference the
12   valuation as of the BoNY prices for September
13   18, just reading the column.
14   Q.   And so the BoNY price for the untested
15   Lehman-issued warrants would have been $178
16   million; is that correct?
17   A.   That's how I read this, yes.
18   Q.   And the BoNY price for the untested
19   Lehman-issued ELNs, $25 million?
20       MR. THOMAS:  Objection to form.
21   Foundation.
22   A.   Again, that's how I would read this,
23   yes.
24   Q.   And do you know why no value is
25   attributed to the Lehman-issued ELNs or the

TSG Reporting - Worldwide    877-702-9580

## Page 147

HIGHLY CONFIDENTIAL - Washtell

1    Lehman-issued warrants by Barclays?
2
3       MR. THOMAS:  Are we still talking
4    about Movants' Trial Exhibit 143?
5       MS. CARRERO:  We're talking about
6    Deposition Exhibit 641A.
7       MR. THOMAS:  Yes.
8       MS. CARRERO:  Which is --
9       MR. THOMAS:  Which?  The version you
10   gave us is Movants 143.  So objection.
11      MS. CARRERO:  It's the official marked
12   deposition exhibit that is in front of the
13   witness right now.
14      MR. THOMAS:  641A?
15      MS. CARRERO:  641A.
16      MR. THOMAS:  Yes.  I'm just confirming
17   that the question is, again, about this
18   document.  So, objection, lack of
19   foundation.
20      MS. CARRERO:  If you'd like, I can
21   pull out the correspondence from your
22   colleagues that describes exactly what this
23   document is and has been represented to us
24   as the document that's --
25      MR. THOMAS:  The objection is just

TSG Reporting - Worldwide    877-702-9580

## Page 148

HIGHLY CONFIDENTIAL - Washtell

1
2    based on what this witness -- you're asking
3    this witness to say what this document says,
4    and he's, I think, been carefully answering
5    that, as he reads this, that's what he
6    thinks it says, but I don't think he
7    actually prepared this document and I don't
8    think you have established a foundation for
9    him knowing exactly what these figures are.
10   But that's just the objection I'm reserving.
11   BY MS. CARRERO:
12   Q.   If your group was responsible for
13   valuing the equity portfolio, would anybody else
14   have been able to supply the data that populated
15   this table, if not your group?
16   A.   I don't believe they would for the
17   columns that say "PCG Market Value," but I
18   certainly didn't prepare this schedule.
19   Q.   And that's fine.  Was it your group
20   who valued the untested Lehman-issued ELNs and
21   the untested Lehman-issued warrants at no value
22   as reflected on this chart, whether or not you
23   prepared it or not?
24      MR. THOMAS:  Objection to form.
25   A.   Yes, that's correct.

TSG Reporting - Worldwide    877-702-9580

## Page 149

HIGHLY CONFIDENTIAL - Washtell

1
2    Q.   And what was the basis for the
3    decision to value the untested Lehman-issued
4    ELNs and untested Lehman-issued warrants at
5    zero?
6    A.   The warrants, a warrant, by
7    definition, is just an option in stock.  It's a
8    Lehman-issued warrant.  That means it's an
9    option on Lehman's stock.  At this point in
10   time, I don't believe Lehman's stock had any
11   value.  So ascribing any value other than zero
12   to these warrants would have been the incorrect,
13   nonsensical thing to do.
14      Likewise, the Lehman-issued ELNs
15   represent some equity-linked Lehman-issued
16   paper.  For similar reasons given, what was
17   happening in the Lehman bankruptcy at the time,
18   we -- and the fact we could not obviously source
19   any market data for these things, we deemed it
20   most appropriate to value them at zero.
21   Q.   And is that based off an assumption
22   that the notes and the warrants would end up
23   being unenforceable?
24   A.   I don't think it's based on an
25   assumption they would be unenforceable, but if a

TSG Reporting - Worldwide    877-702-9580

| Page 150 | Page 151 |
|---|---|

**Page 150**

HIGHLY CONFIDENTIAL - Washtell

1  warrant is issued by Lehman Brothers on its own
2  stock, and you enforce exercise of that warrant,
3  what do you actually receive if Lehman's stock
4  is now worthless and it doesn't exist?  I'm not
5  sure what you would achieve from that.  I'm not
6  sure you would ever ascribe any value to that or
7  get any value from that.
8      Q.    And do you know if ultimately Barclays
9  has received any value from the Lehman-issued
10  ELNs or the Lehman-issued warrants?
11     A.    I'm not aware of that, no.
12     Q.    And where would you go if you wanted
13  to determine whether or not the Lehman-issued
14  ELNs or the Lehman-issued warrants had been
15  marked up later or redeemed in some way for
16  value?
17     A.    Sorry, where would I go?  What --
18     Q.    Where --
19     A.    Who would I ask?
20     Q.    Who would you ask?
21     A.    At this point, I don't know.  I don't
22  know if the position is -- I don't know the
23  answer to that.
24     Q.    What system within Barclays or report

TSG Reporting - Worldwide    877-702-9580

**Page 151**

HIGHLY CONFIDENTIAL - Washtell

1  that is generated would have information on a
2  CUSIP and what ends up happening on a day-to-day
3  basis to the mark?
4      A.    In these cases, where we valued them
5  at zero, I don't know what system they would
6  have been booked in and whether they would still
7  be in a system somewhere.  I don't know the
8  answer to that.
9      Q.    Assuming they're in a system with
10  other equity securities that were booked into
11  the system?
12     A.    At this point in time now?
13     Q.    At this point in time now.  If you
14  wanted to query whether Barclays still held the
15  position and if Barclays had sold it, at what
16  point it was sold, or if Barclays had redeemed
17  it and the value it redeemed it --
18     A.    Uh-huh.
19     Q.    -- where would you look?
20     A.    I would look, I guess, in whatever
21  settlement system is most appropriate, and where
22  this was actually booked, where it would have
23  settled, and where any corporate actions or
24  otherwise would have taken place and been

TSG Reporting - Worldwide    877-702-9580

**Page 152**

HIGHLY CONFIDENTIAL - Washtell

1  recognized, if any cash was received.  I'm not
2  aware of that happening, as I said.
3      Q.    So there are a number of settlement
4  systems within Barclays, depending on the type
5  of security, and that system would allow you to
6  see what sort of corporate actions have taken
7  place with respect to that CUSIP?
8      A.    I would assume that information would
9  be available from our systems.  I've never gone
10  in and asked to query that information, but if
11  you're asking how I would solve the problem,
12  should I have to solve it, to find out some
13  information, I would start there.
14     Q.    Above the untested Lehman-issued ELNs
15  row, there's a row for untested warrants, which
16  is also valued at zero.  Do you know why those
17  warrants were valued at zero?
18     A.    Given we deem the BoNY information
19  unreliable for the Lehman-issued warrants and
20  the ELNs, as we've just discussed, and I think
21  given if you look at the line above that where
22  it says "untested equities," where we have shown
23  the BoNY value to be significantly wrong, so 9
24  million of equities per the BoNY files were

TSG Reporting - Worldwide    877-702-9580

**Page 153**

HIGHLY CONFIDENTIAL - Washtell

1  actually only worth 1 million per our
2  independent data sources.  We have arrived at a
3  reasonable conclusion, which is that we don't
4  want to rely on the values in the BoNY file.  We
5  don't think they're reasonable.  As you can see,
6  the 9 million goes down to almost 1.  So, in the
7  absence of data, rather than go with the BoNY
8  value, we have ascribed them a zero value.
9      Q.    And for the tested -- sorry, returning
10  to the untested equities?
11     A.    Yes.
12     Q.    So they gave it 9 million, you say
13  it's 1 million?
14     A.    Yes.
15     Q.    And do you know what -- is it within
16  that "Untested Equities" line?
17     A.    No, I don't recall specifically what's
18  in there.  It would have been illiquid equities.
19     Q.    And --
20     A.    Generally, where we have classified it
21  as untested and are unable to through our, you
22  know, normal course of business extensive
23  sourcing external data were unable to source a
24  data point, I would be very wary of considering

TSG Reporting - Worldwide    877-702-9580

## Page 154

HIGHLY CONFIDENTIAL - Washtell

1
2 the, you know, a data point from a bank like
3 BoNY to be reliable. Because if I cannot source
4 external data reliably, I don't see why BoNY
5 should be able to source external data reliably.
6 Q. But in the ordinary course with an
7 illiquid security, you would, generally
8 speaking, start with a trader mark when you
9 would undertake price testing of that illiquid
10 security; is that correct?
11 A. That's correct, in our normal course
12 of business.
13 Q. And here you told us earlier that you
14 spoke to no one at Lehman and never looked at
15 the Lehman price in valuing the securities
16 within the equity portfolio; is that correct?
17 MR. THOMAS: Objection to form.
18 A. Say that again. I --
19 Q. Earlier we had discussed whether or
20 not you had access to Lehman data related to
21 illiquid positions and whether you had looked at
22 that and considered it in your valuation or
23 whether you had spoken to any former Lehman
24 traders that have come over to Barclays who had
25 familiarity with positions, and you said no; is

TSG Reporting - Worldwide    877-702-9580

## Page 155

HIGHLY CONFIDENTIAL - Washtell

1
2 that correct?
3 A. That's correct. We did not discuss
4 with ex-Lehman traders, and I do not recall that
5 we looked at prices in the Lehman systems.
6 Q. And so for illiquid securities where I
7 take it you're considering them illiquid because
8 there's not as much observable market data out
9 there as other securities; is that correct?
10 A. Yes, illiquid, by illiquid, we would
11 say there's either little or, in some cases, no
12 market data available.
13 Q. Your group doesn't take into
14 consideration either -- two available data
15 points, the Lehman data or the BoNY data; is
16 that correct?
17 MR. THOMAS: Objection to form.
18 A. The BoNY data, as you can see, for
19 Lehman-issued ELNs and Lehman-issued warrants is
20 clearly wrong.
21 Q. It's not clearly wrong, necessarily;
22 it's just not used by you; is that correct?
23 MR. THOMAS: Objection to form.
24 A. I don't -- I don't think anyone at
25 that point in time would say $178 million is the

TSG Reporting - Worldwide    877-702-9580

## Page 156

HIGHLY CONFIDENTIAL - Washtell

1
2 appropriate valuation for Lehman-issued
3 warrants, for an option on Lehman's stock, which
4 is now worthless because the company has gone
5 bankrupt.
6 It's not like a, you know, a creditor
7 claim or a bond or -- it's stock, which I
8 believe when a company goes bankrupt becomes
9 worthless. If you price an option and put a
10 zero stock price into it, you're going to get a
11 zero price.
12 So those warrants, which are just
13 options on Lehman's stock, don't have any value.
14 I don't see how they can have any value. I
15 don't see how anyone could reasonably argue they
16 have value. I definitely don't see how Bank of
17 New York could argue they're worth $178 million.
18 That suggests to me they have some kind of stale
19 data price feeds.
20 This price feed from September 18,
21 which is, what, three days after Lehman declared
22 bankruptcy, still has $178 million of value
23 ascribed to positions which, by definition of
24 what they are and what's happened in the market
25 that week three days earlier, cannot have any

TSG Reporting - Worldwide    877-702-9580

## Page 157

HIGHLY CONFIDENTIAL - Washtell

1
2 value at that point.
3 That to me suggests, as a data source,
4 BoNY is highly questionable for anything that's
5 illiquid. It suggests to me they're not doing
6 any data integrity checks before sending this
7 information out.
8 Q. Does Barclays still use BoNY as its
9 custodian bank?
10 MR. THOMAS: Objection to form.
11 A. I don't know.
12 Q. You're not aware of Barclays switching
13 custodian banks since the Lehman transaction,
14 are you?
15 A. I'm not aware, but I wouldn't be aware
16 of that. I have no reason to be aware of that.
17 Q. Are you aware that Bank of New York is
18 one of the largest, if not the largest,
19 tri-party repo custodian in the country?
20 A. If you tell me they are, I would
21 believe you.
22 Q. And are you aware that they value
23 trillions of dollars worth of securities daily
24 in connection with their function as tri-party
25 repo custodians?

TSG Reporting - Worldwide    877-702-9580

Page 158

HIGHLY CONFIDENTIAL - Washtell

1
2      MR. THOMAS: Objection to form.
3      A.   Again, if you tell me that's what they
4   do, then I wouldn't disagree with you. I would
5   question what those valuations mean and what
6   they're for, but ...
7      Q.   Do you have any role in calculating
8   the performance of any of the securities that
9   were transferred through the Lehman sale?
10     A.   The performance? What do you mean by
11  the "performance"?
12     Q.   The performance of any of the assets
13  subsequent to the transfer from Lehman to
14  Barclays.
15     A.   No, that's not something I was
16  involved in.
17     Q.   The P&L function would be handled
18  through another part of PCG; is that correct?
19     A.   That's correct.
20     Q.   In December of 2008, there was a
21  settlement with JPMorgan, and another set of
22  securities were transferred which are referenced
23  as the JPM inventory.
24         If you're okay with that terminology,
25  we'll go with the "JPM inventory" for the

TSG Reporting - Worldwide    877-702-9580

Page 159

HIGHLY CONFIDENTIAL - Washtell

1
2   securities transferred in December 2008. Is
3   that okay?
4      A.   That's fine with me.
5      Q.   Okay. Did you have any role in
6   valuing securities that were transferred from
7   Lehman or from -- I'm sorry, from JPM to
8   Barclays in December of 2008?
9      A.   I don't recall specifically. It's
10  quite possible that we did, but I don't recall
11  the specific details.
12     Q.   My question for you really is whether
13  or not there were any equities that your group
14  had responsibility for valuing that came over
15  through the settlement in December of 2008?
16     A.   I can't recall any specifically. I
17  can't say unequivocally no, but I can't recall
18  any.
19     Q.   If you would turn to -- I think it
20  will be the third flag in Deposition Exhibit
21  641A. Do you see where it says "Equity 9/30" --
22     A.   What's the reference, sorry, just so I
23  know I'm looking at the right thing for this?
24     Q.   It is the liquidity tab of the Excel
25  workbook Bates-stamped BCI-EX-(S)-00213995.

TSG Reporting - Worldwide    877-702-9580

Page 160

HIGHLY CONFIDENTIAL - Washtell

1
2         Have you ever seen this document
3   before?
4      A.   Yes. It looks very similar to
5   something you showed me earlier from the PwC
6   work paper.
7      Q.   And is this the liquidity haircuts
8   that were taken by Barclays by asset class and
9   subtype with respect to the --
10     A.   I think I'm looking at the wrong thing
11  here. Or my answer would be no, it's not that.
12         Is this what I should be looking at or
13  not (indicating)?
14     Q.   No, go to --
15     A.   Shall I go to the other document?
16  This document, yes? Which is still 641A. I
17  still have the same thing.
18         (Document handed.)
19         MR. THOMAS: Where have we gone to? I
20  was at the same place as the witness.
21         MS. CARRERO: It is -- what I had read
22  out was BCI-EX-(S)-00213995, Liquidity tab.
23  Is that what the page before you --
24     A.   I guess it's the same reference
25  because it says "Equity 9/22 tab." Okay.

TSG Reporting - Worldwide    877-702-9580

Page 161

HIGHLY CONFIDENTIAL - Washtell

1
2   "Liquidity" tab.
3      MR. THOMAS: It is the fourth flag.
4      MS. CARRERO: I'm sorry, I didn't flag
5   my own as diligently as I flagged yours.
6      A.   Okay.
7      Q.   Have you seen this document before?
8      A.   No, not to my recollection.
9      Q.   And if you would look at the two
10  "Equity 930" references about three-quarters of
11  the way down the page.
12     A.   Okay.
13     Q.   Does that reflect the liquidity
14  haircut being taken on any of the positions for
15  which you and your team had responsibility for
16  valuing?
17     A.   I don't know what this is. I could
18  conjecture what I think it says, but I'm not
19  really aware -- we did not take a liquidity
20  haircut for any of the positions that we
21  assessed.
22         We assess the fair market value,
23  which, as we've discussed previously, included
24  an element of bid/offer provision or bid/offer
25  adjustment, I should say. But at no point did

TSG Reporting - Worldwide    877-702-9580

Page 162

HIGHLY CONFIDENTIAL - Washtell

1        HIGHLY CONFIDENTIAL - Washtell
2  we discuss a liquidity haircut.
3        This file looks like it has a factor
4  of 1 anyway, which would imply a liquidity
5  haircut is zero for the equity in convertible
6  bond positions, but that's just me interpreting
7  what I see in front of me on the spreadsheet.
8        (Discussion off the record.)
9        (Recess; Time Noted:  3:37 P.M.)
10       (Time Noted:  3:59 P.M.)
11      THE WITNESS:  Before we start, can I
12  just make a clarification on that last, one
13  of the last points we were talking about?
14       So when we were talking about the
15  Lehman-issued warrants in particular, I
16  think I made the point that, I think I may
17  have said they were all issued on Lehman's
18  stock, which I think may not be the case.
19  There may be some that were issued by Lehman
20  but on a different stock or a different
21  underlying.
22       I don't recall the facts exactly now,
23  but just to clarify.  I still think the
24  point remains that, you know, they are still
25  warrants issued by a bankrupt counterparty,

TSG Reporting - Worldwide    877-702-9580

Page 163

1        HIGHLY CONFIDENTIAL - Washtell
2  Lehman Brothers, which is an equivalent to
3  having Lehman Brothers as a derivative
4  counterparty.  And therefore, I think the
5  valuation of zero is still correct, but just
6  to clarify the wording that I used on that.
7       I just don't recall specifically now
8  whether that was the case.
9  BY MS. CARRERO:
10    Q.  Do you know, subsequent to the
11  valuation for purposes of acquisition
12  accounting, whether Barclays marked those same
13  positions to?
14       MR. THOMAS:  Objection to form.
15    A.  I don't recall.
16    Q.  Is it possible that they were marked
17  to a higher value than zero subsequent to --
18    A.  I don't believe that was -- that was
19  the case, but as I say, I don't recall
20  specifically.  You know, it's not something --
21  information that I have at hand.  I don't
22  believe it would be the case.
23    Q.  Do you know if they were sold for any
24  value?
25    A.  Again, I don't believe that would be

TSG Reporting - Worldwide    877-702-9580

Page 164

1        HIGHLY CONFIDENTIAL - Washtell
2  the case, but I can't answer for definite.
3    Q.  If that were the case anytime between
4  the acquisition date and the publishing of the
5  acquisition balance sheet, would your team have
6  taken that into consideration in marking the
7  positions to zero simply because they were
8  issued by a bankrupt entity?
9       MR. THOMAS:  Objection.  Form.
10    A.  If I had information before the
11  finalization of the opening balance sheet that
12  these positions had been sold for some value,
13  then we would have taken that into consideration
14  in determining a non-zero value, but I did not
15  have that information.  I'm not aware of any
16  such information.
17    Q.  Where would you go if you wanted to
18  determine what happened to these positions
19  subsequent to the transfer from Lehman to
20  Barclays?
21    A.  As I said previously, I would start by
22  looking at the settlement systems that they were
23  booked in.
24    Q.  But you and your team never did that
25  in connection with valuing these securities; is

TSG Reporting - Worldwide    877-702-9580

Page 165

1        HIGHLY CONFIDENTIAL - Washtell
2  that what you're saying?
3       MR. THOMAS:  Objection to form.
4    A.  I'm saying that's not something we
5  didn't actively go look in the settlement system
6  to see if, on the day we finalized the opening
7  balance sheet, these positions were still booked
8  there or what had happened to them or any of the
9  other positions.
10    Q.  At any time after the transfer of the
11  positions from Lehman to Barclays, did you or
12  your team attempt to ascertain whether or not
13  Barclays was able to sell the position for any
14  value?
15    A.  No, but I don't believe that would
16  be -- as I said before, given that whether they
17  were warrants issued over Lehman's stock or
18  warrants issued over some other underlying this,
19  they're still warrants issued by Lehman
20  Brothers, which is now a bankrupt counterparty.
21    Q.  Did you look to see if any warrants or
22  ELNs issued by Lehman were trading for any value
23  in the market at that point in time?
24    A.  We looked for price information on
25  these securities, we looked for trading

TSG Reporting - Worldwide    877-702-9580

## Page 166

HIGHLY CONFIDENTIAL - Washtell

1    information on these securities, but we could
2    not find any.
3    Q.    Did you look for any Lehman-issued
4    notes pricing information given that the premise
5    for valuing it at zero was that they were issued
6    by a bankrupt entity?
7    A.    I don't recall specifically.
8    Q.    Would that be relevant in valuing the
9    securities at zero if priced at that value
10   simply because issued by a bankrupt entity?
11   MR. THOMAS:  Objection to form.
12   A.    Could you repeat the question?
13   (Record read.)
14   A.    When we say "would that be relevant,"
15   we mean?
16   Q.    Whether or not any Lehman-issued
17   instruments were trading for value in spite of
18   their being a bankrupt entity at that point in
19   time?
20   A.    I don't think we would change our
21   valuation. I think the valuation that we
22   ascribed to them as zero is appropriate.
23   Q.    But you agree it would be a relevant
24   piece of information if Lehman instruments were
25

TSG Reporting - Worldwide    877-702-9580

## Page 167

HIGHLY CONFIDENTIAL - Washtell

1    trading for a value after the filing for
2    bankruptcy?
3    A.    It could be a factor, yes.
4    Q.    If you could turn to a previously
5    marked deposition exhibit, 819, as well as
6    Deposition Exhibit 824, which should also be in
7    front of you.
8    If you turn first to 819, the second
9    page under the heading "Bid/Offer Spread," and
10   turn to the line that provides, "Based on an
11   analysis of the securities, we were able to
12   obtain bid/offer spreads for about 2100 of the
13   3700 securities, which had an average bid/offer
14   of 2.64 percent."  Do you see that?
15   A.    Yes.
16   Q.    Earlier when we were discussing the
17   bid/offer spread, I believe you approximated the
18   number of bid/offer spreads available as of
19   September 22 as somewhere in the neighborhood of
20   450 to 500; is that correct?
21   A.    Yes, that is correct.
22   Q.    Do you know to what Mr. Morton is
23   referring to when he says that "we were able to
24   obtain bid/offer spreads for about 2100 of the
25

TSG Reporting - Worldwide    877-702-9580

## Page 168

HIGHLY CONFIDENTIAL - Washtell

1    3700 securities"?
2    MR. THOMAS:  Objection to form.
3    A.    I obviously wasn't on the e-mail and I
4    didn't write it, but looking at the number, 2100
5    seems consistent with the population for which
6    we were able to obtain spreads in December.
7    Q.    Have you read any of the expert
8    reports that were submitted by Movants in this
9    matter?
10   A.    Yes.
11   Q.    Can you name those reports that you
12   have read?
13   A.    I believe one by Zmijewski, if that's
14   how you say it. Zmijewski.
15   Q.    Don't ask me to say it either.
16   MR. THOMAS:  Zmijeski.
17   MS. CARRERO:  You have learned since
18   the deposition.
19   MR. THOMAS:  Well, I went to school in
20   Poland and speak Polish.
21   A.    I think another one was Garvey. There
22   were -- there are other names. Slattery was
23   another one.
24   Q.    And do you recall in Mr. Zmijewski's

TSG Reporting - Worldwide    877-702-9580

## Page 169

HIGHLY CONFIDENTIAL - Washtell

1    report that he had come up with a number close
2    to 2100 of available bid/offer spreads on
3    September 19?
4    A.    Yes, I recall reading that in the
5    document.
6    Q.    I'm trying to understand the lack of
7    availability on September 22 -- scratch that.
8    The 2100 number in Mr. Zmijewski's
9    report for September 19 is similar to the 2100
10   number that you say was available in December,
11   correct?
12   A.    2100 in December. 2100 in the report.
13   The two numbers are the same. Similar.
14   Q.    Why is it that Barclays was able to
15   only come up with 450 as of September 22?
16   A.    The data source I believe that's used
17   by Zmijewski in that report is Bloomberg. I
18   believe, having looked at the data that's
19   available from Bloomberg, that it is flawed,
20   that there are problems with data integrity.
21   I believe these are highlighted by
22   Zmijewski in his report when he discusses the
23   fact that, in certain circumstances, he gets
24   negative prices which he has to exclude. In
25

TSG Reporting - Worldwide    877-702-9580

```
 1        HIGHLY CONFIDENTIAL - Washtell
 2   certain other circumstances, he gets negative
 3   bid/offer spreads, which he also has to exclude.
 4          Now, the existence of negative
 5   bid/offer spreads in particular would lead me to
 6   have concerns about whether the data that's
 7   available in Bloomberg represents a true
 8   bid/offer, executable bid/offer that is
 9   available in the market at a point in time
10   because you could not have a negative bid/offer
11   in the market.  It doesn't exist.  Couldn't
12   exist.
13      Q.   And --
14      A.   So the use of the Bloomberg data I
15   think is flawed.  I think this doesn't just
16   apply to the illiquid stocks.
17          We had a look at this, I had a look at
18   this after I read the Zmijewski paper, and for
19   some of the more liquid stocks in the portfolio,
20   I think we looked at -- looking at the largest
21   15 positions, just glanced at Bloomberg data for
22   a random sample of data, and can clearly see
23   zero bid/offer spreads and negative bid/offer
24   spreads based on closing price information.  So
25   I would question the integrity of that data of
```
TSG Reporting - Worldwide    877-702-9580

```
 1        HIGHLY CONFIDENTIAL - Washtell
 2   Bloomberg.
 3          Now, the reason we used Reuters is not
 4   because I didn't trust Bloomberg data in
 5   September 2008, but we used Reuters data because
 6   that's our principal data provider within the
 7   bank for equities data.  Now, when we queried
 8   information, we were able to obtain it for, as I
 9   say, 450, 500 names, something like that.
10          We didn't observe examples of negative
11   spreads.  We didn't observe anything that led us
12   to think there was any problem with the data
13   that we were using, any issues over the
14   integrity of that data.  We just accepted that,
15   okay, it's after the fact here.  The
16   availability of good closing bid-ask data is
17   going to be limited for this population after
18   the fact because it's not the same as getting
19   live bid-ask data.
20          So, coincidental to the fact that he
21   could query a similar number that we could query
22   in December, I can't really talk to that, but I
23   can say I think there are significant flawed
24   assumptions in what he's doing, and by excluding
25   certain data and just ignoring it and carrying
```
TSG Reporting - Worldwide    877-702-9580

```
 1        HIGHLY CONFIDENTIAL - Washtell
 2   on with the data that's there, that doesn't seem
 3   like a reasonable thing to do to me to arrive at
 4   an appropriate number.
 5      Q.   In turning back to 819, where the 2100
 6   of the 3700 securities had an average bid/offer
 7   of 2.64 percent?
 8      A.   Yes.
 9      Q.   Do you see that?
10      A.   Yes, I do.
11      Q.   How does that, if you then turn to
12   824, Deposition Exhibit 824, where the average
13   spread for December 18 data is listed as only
14   1.93 percent --
15      A.   Yes.
16      Q.   -- do you, from the difference of 2.64
17   percent to 1.93 percent, think that Mr. Morton's
18   e-mail is referencing the availability of
19   bid/offer spread information on Bloomberg as
20   opposed to the December spread information that
21   was ultimately used?
22      A.   No, I don't think he's doing that.  I
23   think what you see in that e-mail, which is
24   dated December 12, which is clearly before
25   December 18, which is in the second file, would
```
TSG Reporting - Worldwide    877-702-9580

```
 1        HIGHLY CONFIDENTIAL - Washtell
 2   be based on Reuters data.  Because we were not
 3   querying, as far as I recall, bid/offer data
 4   from Bloomberg.
 5          I believe one potential reason for the
 6   difference, and again, I didn't write the e-mail
 7   and I can't recall exactly the details, this is
 8   conjecture, but potentially it was that it was
 9   one of the sample days that we looked at earlier
10   in December, as I said earlier, hence a slightly
11   different number.
12          It may also have been because in his
13   final dataset we excluded spreads that were
14   wider than 50 percent, and I'm not sure if that
15   is represented in this 2.64 which is being
16   referenced by Marcus.  I definitely don't
17   believe it was because Marcus is looking at
18   Bloomberg.
19      Q.   Again, looking at 824, and the
20   population covered by spread data is 86.1
21   percent; is that correct?
22      A.   That's what I read from the summary
23   page.
24      Q.   Yet, 2100 divided by 3700 securities
25   would be substantially lower than a 86.1 percent
```
TSG Reporting - Worldwide    877-702-9580

| Page 174 |
| --- |

**HIGHLY CONFIDENTIAL - Washtell**

1    figure; isn't that correct?
2        A.    What is correct is that 86.1 percent
3    figure represents the percentage of market value
4    that's covered within those 2100 stocks. So
5    it's not 2100 divided by 3700, it's 7.6 billion
6    divided by 8.85 billion.
7        So, in terms of number of securities,
8    yes, it's a lower percentage. In terms of what
9    this number represents, it doesn't represent
10   that. It represents the proportion of the
11   market value, which is the more relevant
12   statistic.
13       Q.    Mr. Washtell, I'm putting before you
14   what has been marked as Deposition Exhibit 832.
15       (Exhibit 822, a document bearing Bates
16   Nos. BCI-EX-(S)-00176765 through 176767,
17   marked for identification, as of this date.)
18       Q.    So, Mr. Washtell, I stand corrected.
19   You have before you Deposition Exhibit 822.
20       A.    Okay.
21       Q.    Looking at the e-mail at the top
22   from --
23       A.    Can I just read it?
24       Q.    If you want to read the whole thing,

TSG Reporting - Worldwide    877-702-9580

| Page 175 |
| --- |

**HIGHLY CONFIDENTIAL - Washtell**

1    sure.
2        A.    If you don't mind.
3        (Document review.)
4        A.    Okay.
5        Q.    Looking at the e-mail at the top from
6    you to Steven Calick and Eric Clark dated
7    September 24, do you see that?
8        A.    Yes.
9        Q.    And the subject is "Update: LBI
10   Positions Rec and IPV analysis." Do you see
11   that?
12       A.    Yes.
13       Q.    And do you know what "IPV analysis"
14   refers to?
15       A.    Independent price verification. It's
16   another terminology for price testing, i.e., the
17   core function of our valuations team, price
18   testing.
19       Q.    And do you see where you write, "Kate
20   and I have just spoken to Nick Leyhane on this.
21   He is happy in principle with what we have done
22   (based on the closing positions from yesterday)
23   and agrees we should be seeing approximately
24   $400 million increase in value between 18th and

TSG Reporting - Worldwide    877-702-9580

| Page 176 |
| --- |

**HIGHLY CONFIDENTIAL - Washtell**

1    19th"?
2        A.    I see that, yes.
3        Q.    Who is Nick Leyhane?
4        A.    At the time, he was the head of the
5    Arbitrage Trading Desk at Barclays, Equity
6    Arbitrage Trading Desk.
7        Q.    And why was Nick Leyhane happy about
8    $400 million increase in value between the 18th
9    and the 19th?
10       MR. THOMAS: Objection to form.
11       A.    You're slightly misreading or
12   misinterpreting the sentence. From my reading
13   of this, and albeit I don't recall writing this
14   because it was 18 months ago, it says "he is
15   happy in principle with what we have done." I
16   don't think it says he's happy with a $400
17   million increase. I think it says he agrees we
18   should be seeing a $400 million increase.
19       Q.    And why would he be involved in the
20   calculation?
21       A.    I believe at this time, as we were
22   reviewing positions to effectively perform a
23   price test, as you can see from the title of the
24   e-mail, this is very much us trying to perform

TSG Reporting - Worldwide    877-702-9580

| Page 177 |
| --- |

HIGHLY CONFIDENTIAL - Washtell

1    an IPV analysis on a set of positions we
2    received.
3        We have reviewed that with someone in
4    the business. I believe I mentioned earlier
5    that we discussed with the traders on a regular
6    basis. Nick Leyhane, as a senior member of
7    trading management within London, we have
8    reviewed our analysis and our views on this
9    portfolio with him.
10       Q.    And so does that mean that your group,
11   in valuing the securities within the equity
12   portfolio that came over from Lehman, did so in
13   conjunction with the trading desks or business
14   side of Barclays?
15       A.    No, I don't think this is saying we
16   did something in conjunction with them. I think
17   this is saying we discussed some analysis we
18   have performed with them to ask them for their
19   opinion.
20       Q.    And when you write, "He agrees we
21   should be seeing approximately $400 million
22   increase in value between 18th and 19th," you're
23   saying he agrees with the analysis that your
24   team had run, is that correct, as opposed to his

TSG Reporting - Worldwide    877-702-9580

Page 178

**HIGHLY CONFIDENTIAL - Washtell**

1
2 own --
3    A.   Yes.
4    Q.   -- valuation?
5    A.   I believe that's what he's saying,
6 based on his expectation and his understanding
7 of what had happened in the market, I guess.
8    Q.   Was anyone else on the business side
9 or any Barclays traders reviewing the valuations
10 that your team was working on?
11    A.   From reading this, it says at the
12 bottom, "We did not manage to catch Andrea." I
13 believe that's a reference to Andrea DeCarolis,
14 who is the global head of Convertible Bond
15 Trading at Barclays Capital.
16    It looks like at that time we would
17 have been discussing the valuation of the
18 convertible bond part of the portfolio and the
19 analysis we had done on that with him.  Again, I
20 don't recall specific conversations, but from
21 reading this e-mail, it would appear to be.
22    Q.   And is there anyone else you recall
23 other than Nick and Andrea?
24    A.   No, not that I recall.
25    Q.   And if there were increases to the

TSG Reporting - Worldwide    877-702-9580

Page 179

**HIGHLY CONFIDENTIAL - Washtell**

1
2 value of positions from the 18th to 19th, would
3 that flow onto the P&L of any specific desk or
4 business side of Barclays?
5    MR. THOMAS:  Objection to form.
6    A.   I don't believe anything we were doing
7 here would have had an impact on P&L.  It would
8 have been flowing downstream anyway.
9    As I said, this is me discussing an
10 analysis on a list of positions we received in
11 the spreadsheet with Nick Leyhane.  It's not
12 driving any management accounting profit and
13 loss report.
14    Q.   Would you agree with me that if a
15 position were to be marked subsequent to the
16 opening balance sheet at a price higher than
17 what it had been accounted for on the opening
18 balance sheet, that would trigger a P&L event
19 and reflect a higher profit for Barclays' desk?
20    MR. THOMAS:  Objection to form.
21    A.   If I understand the question, if we
22 originally booked something at a value and the
23 price goes up and we're long that position,
24 would we recognize a profit?  Yes.
25    Q.   And do you see the e-mail below from

TSG Reporting - Worldwide    877-702-9580

Page 180

**HIGHLY CONFIDENTIAL - Washtell**

1
2 Stephen Calick to you and others dated September
3 24 immediately below?
4    A.   Right.  Okay.
5    Q.   Do you see the last line where it
6 says, "The valuation date is the 19th"?
7    A.   I do.
8    Q.   Do you recall being told that by
9 Stephen Calick?
10    MR. THOMAS:  Objection to form.
11    A.   I don't recall the discussions, but
12 clearly this is an e-mail addressed to me.  I
13 guess I would clarify that this is based -- this
14 is some IPV analysis, as you can see, as the
15 e-mail is titled.  This is regarding a position
16 reconciliation, an IPV analysis on some
17 positions, which it appears Steve has requested
18 or specified should be done as of a certain
19 date.
20    Q.   You believe that valuation or IPV
21 analysis is related to the positions that were
22 transferred from Lehman as part of the sale
23 transaction; is that right?
24    MR. THOMAS:  Objection to form.
25    A.   I believe, looking at this now, this

TSG Reporting - Worldwide    877-702-9580

Page 181

**HIGHLY CONFIDENTIAL - Washtell**

1
2 would have related to that population of
3 positions, but at this time, just to clarify, I
4 don't believe we would have been looking at
5 putting together an opening balance sheet
6 calculation in relation to any transaction.
7    We were, as this says, engaged in
8 performing a position reconciliation and an IPV
9 analysis for a set of positions that we had
10 received as of a date that we had been
11 instructed to do that.  So it's slightly
12 different, I guess, is what I'm saying.
13    Q.   Back up to your e-mail above, in the
14 last paragraph you write, "We did not manage to
15 catch Andrea today so we will grab him tomorrow
16 morning.  This will be a more interesting
17 discussion, as we have limited coverage on the
18 converts, and I know he has expressed views that
19 the positions needed to be written down from the
20 BoNY values."  See that?
21    A.   I do see that.
22    Q.   Do you recall receiving commentary
23 from the business side of Barclays that the
24 positions needed to be written down?
25    MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

## Page 182

HIGHLY CONFIDENTIAL - Washtell

1
2      A.   No, I don't recall receiving that
3   commentary, as you put it.  Clearly, from my
4   e-mail here, it suggests I've been made aware
5   that Andrea has expressed concerns over the BoNY
6   values, concerns that I guess they may not be
7   appropriate and may reflect inflated prices for
8   these securities.
9      Q.   And did that expression by the
10  Barclays traders impact the valuation that you
11  and your group undertook of those positions?
12     A.   No, because we still independently
13  assessed the fair value.  We still sourced the
14  data that we used to arrive at that fair value
15  independently.  We didn't rely on the trading
16  desk for any valuations of those securities.
17     Q.   But the trading desks were reviewing
18  and commenting on what they felt should be done
19  with the positions, according to this e-mail; is
20  that correct?
21     A.   According to this e-mail, it sounds
22  like the trading desks are commenting that they
23  think the BoNY values are not correct.  It also
24  sounds like at the time I wrote this e-mail we
25  did not have complete coverage of the

TSG Reporting - Worldwide    877-702-9580

## Page 183

HIGHLY CONFIDENTIAL - Washtell

1
2   convertible population from the data that we had
3   sampled at that point in time.
4      So it sounds like we had incomplete
5   information.  The trading desk had expressed
6   their view, but that would not have had any
7   bearing on ultimately the valuations that we
8   used because they were based on independent data
9   which we, as I say, obtained independently and
10  independently from the trading desk.
11     Q.   Mr. Washtell, I'm putting before you
12  what has been marked as Deposition Exhibit 823.
13        (Exhibit 823, a document bearing Bates
14     Nos. BCI-EX-(S)-179808 through 179821,
15     marked for identification, as of this date.)
16     A.   Do I need to read all of this?
17     Q.   If you will start at the top e-mail
18  from Jerry Shi to yourself and dated September
19  25, subject:  "Price testing -
20  Converts/Eqty/Preference," and read over that
21  e-mail as well as the attached, if you want to
22  turn to the attachment.
23     A.   So read all of it, yeah?
24     Q.   Well, that e-mail is what attaches the
25  document at the back.

TSG Reporting - Worldwide    877-702-9580

## Page 184

HIGHLY CONFIDENTIAL - Washtell

1
2      (Document review.)
3      A.   You wanted me to read all of this
4   attachment?
5      Q.   Just if you want to take a look at the
6   front --
7      A.   I can read it.  It'll just take me
8   five minutes.  Are you going to focus on a
9   specific part?
10     Q.   Yes.  You don't have to read the whole
11  attachment.  Let's just start with the e-mail.
12  And do you see where Mr. Shi writes, "Most of
13  the cash equity products have observable market
14  prices"?
15     A.   Yes.
16     Q.   Would you agree with that statement?
17        MR. THOMAS:  Objection to form.
18     A.   I don't recall specifics, but if Jerry
19  is saying for most cash equity products we have
20  observable market prices, and I believe from the
21  analysis we have been through today, for most of
22  the positions we were able to obtain data.  So
23  that doesn't sound like an unreasonable
24  statement.
25     Q.   And is what Mr. Shi has attached for

TSG Reporting - Worldwide    877-702-9580

## Page 185

HIGHLY CONFIDENTIAL - Washtell

1
2   you in this e-mail Lehman's convertibles
3   Americas price testing policy?
4      A.   That is certainly what it appears to
5   be.
6      Q.   And is he attaching that for you
7   because Barclays did not at the time have one of
8   its own price testing policies for converts,
9   equities and preferreds?
10     A.   No, I don't believe that's the reason.
11  Because we did have convertible bonds, for
12  instance, and a process and policy around that.
13     Q.   And so --
14     A.   I've -- I guess he's just -- I can't
15  say specifically why he's attaching it.  I
16  assume he's attaching it to provide some
17  information as to what his team does.
18     Q.   Do you see the e-mail below where you
19  write to Mr. Shi on September 15 -- I'm sorry,
20  September 25, introducing yourself, and then in
21  the second-to-last -- no, I'm sorry, the last
22  paragraph, you write, "Could you please send
23  over whatever analysis you have most recently
24  done for these positions?  And if you do have
25  anything on the cash equity side would be very

TSG Reporting - Worldwide    877-702-9580

Page 186

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **interested to see it for comparison to what we**
3    **have sourced"?**
4        A.    Yes, I see that.
5        Q.    **And Mr. Shi at the time was**
6    **transitioning from Lehman to Barclays; is that**
7    **correct?**
8        A.    That's correct.
9        Q.    **And so when you ask him if he has**
10   **anything, are you asking him if Lehman has**
11   **analysis on these positions?**
12       A.    I believe I'm asking him in his role
13   as independent valuation controller for Lehman
14   Brothers for equities whether he has analysis on
15   the -- independent valuation analysis on their
16   population of convertible bonds.
17       Q.    **And do you recall how that information**
18   **was used?**
19       A.    I don't recall.  If you look at the
20   date of the file, the zip file, it says 08/29,
21   so it looks like he's provided the August
22   month-end price testing results for convertible
23   bonds along with the price testing policy.
24       I know we did not use any August price
25   data in our analysis, so I don't know

TSG Reporting - Worldwide    877-702-9580

Page 187

1    HIGHLY CONFIDENTIAL - Washtell
2    specifically how that was used.
3        Q.    **And was Mr. Shi involved in the**
4    **valuation of any of the converts, equity or --**
5    **is that preference?**
6        A.    Preference shares.  Yes, preference
7    shares.
8        Q.    **Preference shares?**
9        A.    Preference shares.
10       Q.    **Preference shares.**
11       A.    Sorry.  My accent.  End of the day.
12       Yes.
13       Sorry.  The question is, was Mr. Shi
14   involved?  As I said earlier, certainly members
15   of his team were involved in obtaining data for
16   me for the analysis.
17       Q.    **And from the appearance of this**
18   **e-mail, it appears that data includes Lehman**
19   **data; is that correct?**
20       A.    In this e-mail, he looks to have
21   provided some data and some analysis from Lehman
22   Brothers.  I don't believe any of the data, or I
23   don't recall that any of the data that we
24   sourced from his team for the valuation was
25   based on the Lehman Brothers' data.

TSG Reporting - Worldwide    877-702-9580

Page 188

1    HIGHLY CONFIDENTIAL - Washtell
2        From my recollection, members of his
3    team were principally involved, for example, in
4    querying data for me from Bloomberg or from IDC
5    or other external data vendors that they would
6    have access to.
7        Q.    **Mr. Washtell, do you know who**
8    **Professor Paul Pfleiderer is?**
9        A.    I'm aware of him, yes.
10       Q.    **Can you tell me what your awareness is**
11   **of him?**
12       A.    My awareness is that he's working on
13   behalf of our legal team as in the capacity as
14   some kind of expert.
15       Q.    **And have you had any conversations**
16   **with Professor Pfleiderer?**
17       A.    I don't believe I've had direct
18   conversations with him.  I've certainly been on
19   various conference calls with the legal team and
20   representatives from whatever financial
21   consultants, et cetera, are part of that team.
22   He may have been on those calls.  I don't know.
23       Q.    **Were those all conference calls or**
24   **were they in-person meetings as well?**
25       A.    Everything was a conference call prior

TSG Reporting - Worldwide    877-702-9580

Page 189

1    HIGHLY CONFIDENTIAL - Washtell
2    to meeting with the lawyers in preparation for
3    this day.  So everything prior to this week
4    was in conference call.
5        Q.    **Have you read Professor Pfleiderer's**
6    **report?**
7        A.    Not in full, in detail.
8        Q.    **When did you review his report?**
9        A.    I said I haven't read it in full, in
10   detail.  I've seen it.
11       Q.    **And that's why I used the word --**
12       A.    Review.
13       Q.    -- **"review" as opposed to "read."**
14       **When did you receive a copy of**
15   **Professor Pfleiderer's report?**
16       A.    I don't recall specifically.
17       Q.    **Do you recall if it was a month or**
18   **less ago?**
19       A.    It was more than that.
20       Q.    **Was it three months ago?**
21       A.    I don't know.  More than a month.  I
22   don't know beyond that.  It's ...
23       Q.    **Was it in the winter?**
24       A.    Was it this year or last year?  I
25   don't recall.  It may have been the start of

TSG Reporting - Worldwide    877-702-9580

Page 190

HIGHLY CONFIDENTIAL - Washtell

1    this year. It may have been the end of last
2    year. It may have been two months ago, four
3    months ago. We've been looking at an awful lot
4    of documents.
5    **Q. Had the report been finalized at the**
6    **point that you saw it?**
7        MR. THOMAS: Objection to form.
8    A. I don't know. I don't recall if it
9    said final version. I don't recall being told
10   if it was final version or draft. I don't ...
11   **Q. Were you asked to comment on it?**
12   A. No.
13   **Q. And prior to the submission of the**
14   **report, do you recall how many conversations you**
15   **had in connection with the preparation with it?**
16       MR. THOMAS: Objection to form.
17   A. I don't recall having any
18   conversations in relation to the preparation of
19   the document.
20   **Q. And did you sit down with the -- did**
21   **you have conference calls with the Financial**
22   **Scholars Group prior to the submission of**
23   **Professor Pfleiderer's report?**
24       MR. THOMAS: Objection to form.
25

TSG Reporting - Worldwide    877-702-9580

Page 191

HIGHLY CONFIDENTIAL - Washtell

1    A. I don't know when it was submitted. I
2    don't know when it was prepared. I've been on
3    conference calls with representatives from the
4    legal team which may or may not have included
5    representatives from FSG. I don't know
6    specifically who was on those calls and what the
7    output of those meetings was going towards.
8    **Q. Do you recall if you had any calls**
9    **with the legal team or the Financial Scholars**
10   **Group prior to January 8 of this year in**
11   **connection with the preparation of Professor**
12   **Pfleiderer's report?**
13       MR. THOMAS: Objection to the form.
14   Among other things, asked and answered and
15   assumes facts not in evidence.
16   A. It sounds like I answered it already,
17   no?
18       MR. THOMAS: Well, you can go ahead
19   and respond.
20   A. What was the question?
21       (Record read.)
22   **A. I don't recall. I don't recall having**
23   **any specific conversations in preparation --**
24   **with the purpose of preparation of a report, and**
25

TSG Reporting - Worldwide    877-702-9580

Page 192

HIGHLY CONFIDENTIAL - Washtell

1    **I don't recall the timing of the conference**
2    **calls that I have been involved in with these**
3    **guys.**
4    **Q. So you don't recall explaining to the**
5    **Financial Scholars Group or anyone else working**
6    **under Professor Pfleiderer's direction the**
7    **policies and procedures that were followed in**
8    **pricing the equities or the outcome of the**
9    **equity valuation; is that correct?**
10       MR. THOMAS: You're going into the
11   content of calls with his attorneys. The
12   only calls he remembers were with his
13   attorneys. He doesn't even know if FSG was
14   on them and you're going into the content of
15   those calls, so I'm going to instruct the
16   witness not to answer based on privilege.
17       MS. CARRERO: To the extent that
18   they're all an original source of
19   information that was used in any report
20   prepared by a Barclays' expert and any
21   testifying expert material, I'm not sure
22   that I agree that it would be subject to
23   privilege, but if those conversations didn't
24   happen and feed into a testifying expert's

TSG Reporting - Worldwide    877-702-9580

Page 193

HIGHLY CONFIDENTIAL - Washtell

1    report, then just that's fine and you can
2    just tell me to back off and end the
3    inquiry. I just want to know whether or not
4    there were any conversations --
5        MR. THOMAS: I'm not going to tell you
6    what the purposes of our privileged
7    conversations were with our client. I'm
8    going to instruct the witness not to answer.
9    BY MS. CARRERO:
10   **Q. Did you have any conversations with**
11   **the Financial Scholars Group or anyone working**
12   **at the direction of Barclays' testifying expert,**
13   **Professor Pfleiderer?**
14       MR. THOMAS: Objection. Asked and
15   answered.
16   A. Exactly what I said previously. All
17   calls, discussions I've had on this have been
18   conference calls with the lawyers. Who else was
19   on those calls I don't recall.
20   **Q. And can you recall how many**
21   **conversations you've had with the lawyers prior**
22   **to January of 2008 -- I'm sorry, prior to**
23   **January of 2010?**
24       MR. THOMAS: Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 214

HIGHLY CONFIDENTIAL - Washtell

1       HIGHLY CONFIDENTIAL - Washtell
2    **Q.**  **Was that your understanding when you**
3  **wrote your part of the chain to Eric Clark?**
4    A.  Again, I don't recall the e-mail, but
5  it looks like my concern at the time is how
6  we're going to risk manage these positions, how
7  we're going to value these positions, how do we
8  ensure from a valuation control perspective that
9  these positions are covered. That looks and I
10  would guess is what my primary concern is at
11  that point in time.
12    **Q.**  **And your understanding that the**
13  **positions that you're writing about here, sir,**
14  **are the same listed equity positions that you**
15  **gave me you mentioned in your answer a moment**
16  **ago, correct?**
17      MR. THOMAS: Objection to form.
18    A.  Which answer? Sorry.
19    **Q.**  **Let me try it this way. You write at**
20  **5:03 A.M. to Mr. Clark, "Thanks, Eric. Per your**
21  **understanding, then, are these positions going**
22  **to remain in the Lehman systems to be**
23  **risk-managed going forward?" You see that?**
24    A.  Yes.
25    **Q.**  **When you wrote the words "these**

TSG Reporting - Worldwide    877-702-9580

---

Page 215

1      **HIGHLY CONFIDENTIAL - Washtell**
2  **positions," what did you mean?**
3    A.  I assume I meant the listed option
4  positions that were part of the transaction, but
5  there's not a lot of information in this e-mail,
6  so it's -- it's, you know, OCC position.
7      My principal concern in this would
8  have been, as I say, there's a portfolio of
9  positions. Our New York head of Equity
10  Derivatives Trading is saying he's macro-hedging
11  these. They're booked in a system. Let's
12  figure out how we risk-manage them. My
13  principal concern is this is something we need
14  to look at from a valuation perspective.
15    **Q.**  **Was it your understanding, sir, that**
16  **the positions referenced in this e-mail, the OCC**
17  **positions, were at the time of this e-mail, the**
18  **25th of September, still in OCC systems --**
19  **sorry, still in LBI's systems?**
20    A.  From the e-mail I have written here, I
21  don't recall, again, I don't recall, but from
22  the e-mail here, I'm asking a question of
23  whether these positions are going to remain in
24  Lehman's systems, which implies they are
25  currently in Lehman's systems at this point in

TSG Reporting - Worldwide    877-702-9580

---

Page 216

1      HIGHLY CONFIDENTIAL - Washtell
2  time.
3    **Q.**  **Did you ever come to learn that the**
4  **positions were moved from Lehman's systems, sir?**
5    A.  Not to my recollection.
6    **Q.**  **Did you ever hear that Lehman's**
7  **systems were switched off after the closing**
8  **which necessitated a transfer of listed option**
9  **positions to Barclays?**
10    A.  I don't recall hearing that, no.
11    **Q.**  **That would be inconsistent, at least**
12  **as of the date of this e-mail, that would be**
13  **inconsistent with your understanding of the**
14  **position as reflected in the words you wrote on**
15  **this document, correct?**
16      MR. THOMAS: Objection to form.
17    A.  Again, not recalling specifics at the
18  time, from what I've written in this e-mail
19  about the positions remaining in the Lehman
20  system, implies at that time my knowledge was
21  that they were booked in the Lehman's system.
22      MR. OXFORD: Thank you, sir. I have
23  no more questions for you.
24      MR. KAY: No questions from the
25  Committee.

TSG Reporting - Worldwide    877-702-9580

---

Page 217

1      HIGHLY CONFIDENTIAL - Washtell
2      MR. THOMAS: Okay. I just have a
3  handful of questions.
4  EXAMINATION BY
5  MR. THOMAS:
6    **Q.**  **Do you recall being asked if market**
7  **participants that conducted transactions would**
8  **take into consideration information about events**
9  **that had not yet happened?**
10    A.  Yes.
11    **Q.**  **Does the fact that a market**
12  **participant transacting something cannot take**
13  **into account future events which it doesn't**
14  **know, does it necessarily follow, does it**
15  **necessarily follow that, in estimating the fair**
16  **value of securities at a particular point in**
17  **time, you should ignore or exclude all**
18  **information about market conditions immediately**
19  **after that point in time?**
20    A.  No, it does not follow. I would say,
21  on the contrary, as I was just mentioning, in
22  assessing fair value as of a point in time, I
23  would generally consider all information that we
24  have both on a particular day, but also in the
25  time period leading up to that day and the time

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1 period after that day.
2     So if we are assessing as part of our
3 monthly processing process, for example, the
4 valuations as of September 30, would we consider
5 market information, market trades and quotes
6 that are available on the 1st, 2nd, 3rd of
7 October, then yes, we would as part of our
8 normal practice.
9     Q.   Would it make any sense to you if you
10 were trying to measure, for example, an illiquid
11 security at a particular point in time, let's
12 say 12 noon, that in doing so, you would ignore
13 a trade in that security that occurred an hour
14 later?
15     A.   No, it would not make any sense to do
16 that.  You would definitely consider that piece
17 of information as is quite key to assessing the
18 fair value, I would say.
19     Q.   Is considering market information
20 after a particular valuation point in time
21 something that is consistent with Barclays'
22 valuation practices and procedures?
23     A.   Absolutely, yes, it's consistent with
24 how we perform our monthly processing process.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1 It's documented in our processing policy
2 application guidelines.  It's something that we
3 have regularly discussed with our auditors.
4 Additionally, it's something I have discussed
5 with our regulators.
6     Q.   So your auditors and regulators are
7 aware of that approach and take no exception to
8 it?
9     A.   That's correct.
10     Q.   Earlier when you were being asked
11 about your use of data from December as part of
12 an analysis and calculating the fair value of
13 certain equities as of September 22, 2008,
14 counsel repeatedly described that in counsel's
15 questioning as, quote, backdating.  Would you
16 consider that to be backdating in any way?
17     A.   No, I would not consider that to be
18 backdating in any way.  I would say as part of
19 our job we're always assessing the fair value of
20 something at a point in time after the fact by
21 definition of what we do.  In no way is that
22 backdating.
23     Q.   And again, your auditors were fully
24 aware of the processes and procedures by which

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1 you calculated fair value for the equities?
2     A.   Absolutely.  For this, our normal
3 practices specifically for this balance sheet
4 calculation, our auditors were fully aware of
5 the methodology we used.  They were supportive
6 of it.  They were in agreement with it.
7     Q.   You understand that your testimony
8 today is part of a court proceeding and may be
9 considered by the Court; is that correct?
10     A.   That's correct.
11     Q.   Were you asked to value a portion of
12 the assets Barclays received from Lehman
13 pursuant to the sale transaction between Lehman
14 and Barclays in September of 2008?
15     A.   Yes.
16     Q.   Will you please describe the group of
17 assets that you were asked to value?
18     A.   I would describe those assets as the
19 equity assets, including convertible bonds.
20     Q.   What was the goal of your valuation
21 effort?
22     A.   The goal of our valuation effort was
23 to assess the fair value of that portfolio of
24 securities.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1     By "fair value," we mean in accordance
2 with the accounting guidelines, specifically, IS
3 39, under which we operate.
4     Q.   Were all directions given to you by
5 Barclays consistent with the goal you just
6 stated of calculating an accurate fair value?
7     A.   Yes.
8     Q.   Did you at all times during your work
9 attempt to fairly and reasonably value the
10 assets?
11     A.   Yes.
12     Q.   When you made decisions concerning how
13 to calculate bid adjustments in accord with the
14 governing accounting standards, for example,
15 were you influenced by any desire to achieve a
16 lower valuation or any result other than an
17 accurate statement of fair value?
18     A.   No.
19     Q.   Were the decisions you made with
20 respect to calculating a fair value of the
21 equities as of September 22, 2008 governed
22 strictly by the goal of accurately stating fair
23 value?
24     A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 222

1          HIGHLY CONFIDENTIAL - Washtell
2     Q.   At any time did anyone ever suggest to
3  you that you should do anything other than
4  attempt to calculate an accurate fair value of
5  the assets?
6     A.   No.
7     Q.   Did anyone ever say to you, in form or
8  substance, that a result other than the fair
9  value of the assets was desired or should be
10 achieved?
11    A.   No.
12    Q.   Did anyone ever indicate to you or, to
13 your knowledge, anyone else working on the
14 valuation of the Lehman assets, that you should
15 attempt to understate the fair value of the
16 assets in any way or to value them lower than
17 you otherwise would?
18    A.   No.
19    Q.   Would you please describe your
20 professional background and experience with
21 respect to valuing such assets?
22    A.   My professional qualifications are I'm
23 a chartered accountant.  I'm a member of the
24 Association of Chartered Management Accountants
25 and have been since 2003.  I have worked at

TSG Reporting - Worldwide     877-702-9580

Page 223

1          HIGHLY CONFIDENTIAL - Washtell
2  Barclays for nine years in total, within the
3  Finance function for all of that time, but in
4  various different roles within the Product
5  Control team.
6          For the last four and a half years,
7  I've specifically worked in the Independent
8  Valuation Control Group, and for all of that
9  time I've been responsible for the valuation of
10 equity derivatives and equity products.
11    Q.   Do you believe the valuation you
12 ultimately reached for those assets that you
13 valued reflect their fair value as of September
14 22, 2008?
15    A.   Yes.
16    Q.   Did you attempt to value the Lehman
17 assets in a manner consistent with Barclays'
18 practices and policies?
19    A.   Yes.
20    Q.   Did you interact with PwC, your
21 auditors, during their review of the valuation
22 you performed?
23    A.   Yes, quite extensively.
24    Q.   Would you please describe that
25 interaction and their efforts with respect to

TSG Reporting - Worldwide     877-702-9580

Page 224

1          HIGHLY CONFIDENTIAL - Washtell
2  the valuation?
3     A.   Yes.  That interaction, from memory,
4  lasted a number of weeks, if not a couple of
5  months.  I was engaged with one or two members
6  of their team on a regular basis.  From
7  recollection, that was at least weekly that I
8  would be having meetings or discussing with
9  them.
10         They looked at all of the data that we
11 used for the valuation.  They did extensive
12 sampling analysis.  They questioned all the
13 assumptions.  They questioned the methodologies.
14 They effectively performed an audit of our, call
15 it a detailed audit of our methodology, as they
16 normally would as part of their sort of year-end
17 audit work, for example.
18    Q.   At the end of all that work, did they
19 accept your valuation and procedures?
20    A.   Yes, to my understanding, they did.
21         MR. THOMAS:  Thank you, I have nothing
22 further.
23         MS. CARRERO:  I just have one
24 follow-up question.
25 FURTHER EXAMINATION BY

TSG Reporting - Worldwide     877-702-9580

Page 225

1          HIGHLY CONFIDENTIAL - Washtell
2  MS. CARRERO:
3     Q.   In connection with any monthly price
4  testing work that your group does as of the end
5  of the month, when would the results of that
6  price testing be available?
7     A.   Our deadlines for reporting, final
8  reporting on global price testing results are
9  working day 12 after month-end.  In a period up
10 to working day 12, all results as they become
11 available would be discussed with the relevant
12 traders, trading desk heads, regional business
13 heads.  And we have a detailed timeline of
14 deadlines, what's available when, what reports
15 are produced when in our price testing policies.
16         MR. THOMAS:  Thank you very much.
17         THE WITNESS:  Okay.
18         (Time Noted:  5:43 P.M.)
             oOo

19         _____
           MARK WASHTELL

20

21 Subscribed and sworn to
   before me this      day
22 of       2010.

23

24 _____

25

TSG Reporting - Worldwide     877-702-9580

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------x

     In Re:                        Chapter 11

5    LEHMAN BROTHERS                Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,        (Jointly Administered)

6    ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9           DEPOSITION OF JASEN YANG

10             New York, New York

11         Friday, September 4, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 24621

22

23

24

25

## Page 2

September 4, 2009
9:36 a.m.

         HIGHLY CONFIDENTIAL deposition of
JASEN YANG, held at the offices of Jones
Day, 222 East 41st Street, New York, New
York, pursuant to Notice, before Francis
X. Frederick, a Certified Shorthand
Reporter, Registered Merit Reporter and
Notary Public of the States of New York
and New Jersey.

## Page 3

APPEARANCES:

    JONES DAY, LLP
    Attorneys for Lehman Brothers, Inc.
        222 East 41st Street
        New York, New York 10017-6702
    BY:  WILLIAM J. HINE, ESQ.
        GEORGE E. SPENCER, ESQ.

    BOIES SCHILLER & FLEXNER, LLP
    Attorneys for Barclays Capital
        575 Lexington Avenue - 7th Floor
        New York, New York 10022
    BY:  JACK G. STERN, ESQ.

    HUGHES, HUBBARD & REED, LLP
    Attorneys for the SIPA Trustee
        One Battery Park Plaza
        New York, New York 10004-1482
    BY:  SAMUEL C. McCOUBREY, ESQ.

ALSO PRESENT:
    INGRID M. CHRISTIAN, Alvarez & Marsal

## Page 4

          J. YANG - HIGHLY CONFIDENTIAL
J A S E N   Y A N G,  called as a witness,
    having been duly sworn by a Notary
    Public, was examined and testified as
    follows:
EXAMINATION BY
MR. HINE:
    Q.   Good morning, Mr. Yang.
    A.   Good morning.
    Q.   My name is -- we met off the
record but my name is Bill Hine and I'm with
the firm of Jones Day and we are special
counsel to the Creditors Committee -- I'm
sorry, to the estate of Lehman Brothers
Holdings, Inc. in connection with this
bankruptcy proceeding so we're taking some
discovery with respect to that.  And this
deposition here is what's called a 30(b)(6)
deposition and you've been designated by
Barclays as a deponent for a couple select
topics which we'll go over in a little bit.
    A.   Um-hum.
    Q.   Have you ever been deposed before?
    A.   No, I have not.
    Q.   Okay.  So I'm sure your counsel

## Page 5

          J. YANG - HIGHLY CONFIDENTIAL
has advised you of the ground rules but
basically I'm going to ask you some questions.
You're going to give me some answers to the
best you can.  My one request is that sometime
during the deposition I will undoubtedly ask a
misleading question or use a word improperly
or one of your technical terms that you folks
use.  Please correct me, ask me to clarify it.
I want to ask you clear questions so you can
give me clear answers.  So if we can agree on
that we can probably get started.
          MR. STERN:  Yes.  I'll just note
    for the record that the two topics are
    first topic 4 which is a person with
    knowledge of the calculations shown on
    the e-mail of BCI 000580; and topic 5,
    the marking process to take place the
    afternoon of Friday, September 19th,
    2008, referenced in BCI 000878 and
    BCI-EX-00012161.
BY MR. HINE:
    Q.   And I will be asking you questions
about those topics but also some general
questions around those topics.

Page 6

```
 1            J. YANG - HIGHLY CONFIDENTIAL
 2            MR. HINE:  So we do reserve our
 3     rights to conduct the deposition of Mr.
 4     Yang in his personal capacity if the
 5     need ever arises.
 6            But in that vein why don't we
 7     enter as the first exhibit the
 8     deposition notice.
 9            MR. SPENCER:  Previously marked.
10     BY MR. HINE:
11       Q.   Okay.  Mr. Yang, I'm handing you a
12     copy of a document previously marked as
13     Exhibit 81B from which your counsel was
14     reading, I believe.  I just wanted to point
15     out to you topics 4 and 5 on page 3.
16       A.   Um-hum.
17       Q.   Do you see them?
18       A.   Yes, I do.
19       Q.   You understand that you've been
20     designated by Barclays as the witness to speak
21     on those topics?
22       A.   Yes.
23       Q.   Okay.  Did you prepare for your
24     deposition at all today?
25       A.   Maybe.
```

Page 7

```
 1            J. YANG - HIGHLY CONFIDENTIAL
 2       Q.   What does that mean?
 3            MR. STERN:  Yes.  He met --
 4       A.   Yes.  The short answer is yes.  I
 5     didn't know if the question was today or...
 6       Q.   Okay.  Fair enough.
 7            Did you conduct any investigations
 8     or factual reviews in preparation for your
 9     deposition on those two topics?
10       A.   Yeah.  I took a look at some of
11     the e-mails that came across my desk around
12     that time.
13       Q.   Okay.  Anything else?
14       A.   No.  Just review of personal -- of
15     my e-mails.
16       Q.   Okay.  Did you meet with counsel
17     in preparation for today's deposition?
18       A.   Yes, I did.
19       Q.   Okay.  Did you review any
20     documents with counsel?
21       A.   Yes, I did.
22       Q.   Did any of those documents refresh
23     your recollection about either of these two
24     topics?
25       A.   Yes.
```

Page 8

```
 1            J. YANG - HIGHLY CONFIDENTIAL
 2       Q.   What documents are they?
 3       A.   In particular, I think two e-mails
 4     that were related to topic 4.  I believe topic
 5     4 is an e-mail with a series of numbers that I
 6     did to get some schedules sort of backing up a
 7     couple of those numbers.
 8       Q.   Okay.  And those e-mails were with
 9     who?
10       A.   I received them, you know, that
11     morning.  Their times are clear in my head.
12     At 1:01 a.m. and 9:45 a.m. on the 19th.
13       Q.   Okay.
14       A.   But...
15       Q.   And do you recall who the e-mails
16     were with?
17       A.   I don't remember exactly.  I think
18     someone in operations.
19       Q.   Okay.  And do you know what the
20     topics of the e-mails were?
21       A.   Yeah.  The two numbers that I'm
22     referencing are just Fed Wire -- sort of a
23     block of Fed Wire settled securities
24     referenced in topic 4 and a block of DTC
25     settled securities in topic 4.  And they were
```

Page 9

```
 1            J. YANG - HIGHLY CONFIDENTIAL
 2     just lists of the securities that were
 3     purportedly sort of making up those
 4     populations of securities.
 5       Q.   Okay.  Anything else on those
 6     e-mails that you recall?
 7       A.   Well, it was a list of the
 8     securities and just sort of miscellaneous
 9     information about them.
10       Q.   Okay.
11       A.   Including sort of, you know,
12     amounts and coupons and I think BoNY's marks
13     on them.
14       Q.   And when you say BoNY you're
15     referring to Bank of New York, correct?
16       A.   Yes.
17       Q.   All right.  So if we during this
18     deposition we use the phrase BoNY we'll both
19     understand it to mean Bank of New York; is
20     that right?
21       A.   Yes.
22       Q.   All right.  Before I get to the
23     documents in question, could you just give me
24     a brief description of your job at Barclays?
25       A.   Yes.  I was a member of a group
```

Page 10

J. YANG - HIGHLY CONFIDENTIAL

1
2      called the Principal Mortgage Trading Group
3      where I -- sort of a proprietary trading and
4      portfolio management function using the bank's
5      capital.
6          Q.   And when you say "was," are you
7      talking about the period of time --
8          A.   I'm talking about the period of
9      time.  I guess I still am.
10         Q.   Okay.  Let's just be specific
11     here.
12         A.   Yes.
13         Q.   On the week of September 15th,
14     2008, this was your job?
15         A.   Yes.  That was my job.
16         Q.   And what was your job title?
17         A.   Director.
18         Q.   Okay.  And is that still your job?
19         A.   Yes.
20         Q.   Okay.  So since then -- from
21     September 2008 until today you've held that
22     same job?
23         A.   Yes.
24         Q.   Okay.  And when I see on the
25     e-mails after people's names, the designation

Page 11

J. YANG - HIGHLY CONFIDENTIAL

1
2      markets --
3          A.   Um-hum.
4          Q.   -- is that the Principal Mortgage
5      Trading Group you're talking about?
6          A.   We are a subset I think of that
7      designation.  I don't think that actually is a
8      very precise designation but it's just
9      attached to our e-mail system.
10         Q.   Okay.  In your position and in the
11     position you held in September of 2008 who did
12     you report to?
13         A.   Stephen King.
14         Q.   Okay.  And what's his title?
15         A.   He was a managing director in the
16     Principal Mortgage Trading Group.
17         Q.   Did you report to anyone else?
18         A.   No.
19         Q.   And who reported to you?
20         A.   Let's see.  At the time Daniel
21     Long did.  I think he may have been my only
22     direct report at the time.
23         Q.   Okay.  And could you just describe
24     for me your duties in that capacity?  And,
25     again, I'm talking about the week of September

Page 12

J. YANG - HIGHLY CONFIDENTIAL

1
2      15th, 2008 up to the present.
3          A.   You know, my job encompasses a
4      variety of roles.
5          Q.   Sure.
6          A.   Including trading of certain types
7      of securities including CDOs and other --
8      primarily fixed income securities.  As well
9      as, you know, I perform sort of a structuring
10     function inside the group.  So -- which really
11     means either analyzing or executing sort of
12     more complicated structured transactions.
13         Q.   Okay.
14         A.   You know, rather than simple
15     buying and selling.
16         Q.   Okay.  And are you involved with
17     pricing within that group?
18         A.   Yes.  For certain securities.
19     Certain securities held by the PMTG group I'm
20     involved in pricing securities, yes.
21         Q.   Okay.  And, again, before we get
22     into these documents, did you have any role in
23     the negotiations between Barclays and Lehman
24     during the week of September 15th in
25     connection with the sale transaction?

Page 13

J. YANG - HIGHLY CONFIDENTIAL

1
2          A.   No.  All my interactions were
3      purely internal.
4          Q.   Okay.  And, again, I just want to
5      get a general scope of your involvement --
6          A.   To be clear, there was no
7      negotiations.  Occasionally there were
8      e-mails, you know, requesting information from
9      people at Lehman.
10         Q.   Okay.  And information relating to
11     what?
12         A.   Let's see.  Either populations of
13     securities that I was sort of assigned to be
14     analyze.
15         Q.   Okay.
16         A.   Or -- well, I guess, generally
17     about populations of securities I was assigned
18     to analyze.
19         Q.   Okay.  We've had many depositions
20     before so I just want to see if I can get you
21     into different areas that we've all talked
22     about at many depositions.
23              Are you familiar with what we've
24     been calling the September 18th repurchase
25     transaction?

Page 14

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2      A.   Yes.
 3      Q.   Okay.  And if I use that term
 4  you'll know what that means?
 5      A.   When you say that you're referring
 6  to the transaction that Barclays entered into
 7  on September 18th.
 8      Q.   Correct.
 9      A.   Yes.
10      Q.   Do you have any understanding what
11  that transaction involved?
12      A.   I think fundamentally I do.  You
13  know, it's what I call sort of Barclays'
14  assumed repo where fundamentally obviously
15  they took possession of, you know, a large
16  portfolio of securities and provided funding
17  in exchange.
18      Q.   Okay.  And when you say took, took
19  from Lehman Brothers?
20      A.   Yes.
21      Q.   Okay.  And I believe that's the
22  transaction that we're going to get to when we
23  get to the documents that you've been
24  designated.
25           Were you involved in any other
```

Page 15

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2  pools of securities that came to Barclays as a
 3  result of the Lehman Brothers transaction?
 4      A.   Yes.  You know, I've reviewed I
 5  suppose any number of portfolios of
 6  securities, some of which I think -- not of
 7  all of which were -- I suppose ended up being
 8  transferred as portfolios themselves.  But I
 9  did review additional securities that were
10  delivered to Barclays subsequent to this
11  transaction as well as, you know, any number
12  of other portfolios.
13      Q.   Okay.  Have you heard the term
14  unencumbered assets that were transferred to
15  Barclays as a result of the Lehman
16  transaction?
17      A.   Yes.
18      Q.   And so were you involved -- and,
19  again, tell me if I'm wrong -- correct me if
20  I'm wrong, but I would consider that separate
21  and distinct from the pool of securities that
22  came over to Barclays as a result of the
23  September 18th repo, correct?
24      A.   Yeah.  They could be separated.
25      Q.   Okay.  And could you describe for
```

Page 16

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2  me your role in connection with those
 3  unencumbered assets.
 4      A.   In general, just to review the
 5  portfolio.  Understand what it encompassed.
 6  Think about how Barclays might value it.
 7      Q.   Okay.  And were you involved in
 8  booking these various pools of securities into
 9  Barclays' system?
10      A.   Yes.  I was involved in
11  coordinating that process.
12      Q.   Okay.  Anyone else involved in
13  that process?
14      A.   Frankly, a very long number of
15  people were because the securities were booked
16  by -- you know, there were many different
17  types of securities that had to be booked into
18  many different kind of systems, many different
19  trading assistants and traders.
20      Q.   Is it fair to say the booking of
21  these securities into Barclays' system was
22  principally done within Mr. King's department?
23      A.   I believe PMTG played a central
24  role in coordinating them but it was actually
25  booked by -- PMTG had access to certain types
```

Page 17

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2  of systems and to the extent other groups had
 3  to be involved they were.
 4      Q.   Okay.  Was PMTG the principal
 5  entity within Barclays Capital that was
 6  involved in valuing or pricing these
 7  securities?
 8      A.   I would say it was -- PMTG played
 9  a coordinating role.  And by that I mean -- I
10  think we took the first cut at the portfolios
11  and then requested additional -- the
12  assistance of additional expertise inside the
13  firm as we needed it.
14      Q.   Okay.  And from what departments
15  would that expertise come?
16      A.   It might have come from either,
17  say, the credit trading desk, the emerging
18  markets desk, the equities division, the rates
19  desk.  By rates I mean the desk that trades
20  treasury and agency securities.
21      Q.   So am I correct to say it would
22  come from different departments depending upon
23  the nature of the securities involved?
24      A.   Right.
25      Q.   Okay.
```

## Page 18

J. YANG - HIGHLY CONFIDENTIAL

1
2      Mr. Yang, I'm going to hand you a
3  copy of what's previously marked as
4  Exhibit 144 which is one of the documents
5  referenced in the notice -- 30(b)(6) notice.
6      A.   Um-hum.
7      Q.   If you would mind taking a minute
8  and let me know when you've had a chance to
9  look at the document.
10      A.   Yeah.  I'm ready.
11      Q.   You're ready?  Okay.
12          Have you ever seen this document
13  before?
14      A.   Yes, I have.
15      Q.   What is it?
16      A.   Well, it's an e-mail from Marty
17  Malloy who was sort of the senior member in
18  the repo group at Barclays to Gerard and
19  Stephen.  And it is I suppose -- keeping in
20  mind that Marty is not a trader of securities
21  and that's not what's done inside the repo
22  area or operations area, obviously, I think
23  this is his interpretation of the state of
24  that I guess what we're calling the September
25  18th repo transaction.

## Page 19

J. YANG - HIGHLY CONFIDENTIAL

1
2      Q.   Before you continue, let me just
3  ask a couple questions.  Who is Marty Malloy?
4      A.   He was a senior member of the repo
5  business at Barclays.
6      Q.   That's separate and distinct from
7  PMTG?
8      A.   Yes.
9      Q.   Okay.  And his duties generally
10  involve repo transactions.
11      A.   Right.  Right.
12      Q.   And then when you said
13  Gerry you're talking about Gerard LaRocco?
14      A.   Right.
15      Q.   And his role at Barclays is what?
16      A.   I believe he was and is the chief
17  administrative officer of the Americas.
18      Q.   Okay.  And do you know why he
19  would be interested in this type of analysis?
20      A.   I believe -- I believe that
21  operations has some reporting role into him
22  and this data would have come from the
23  operations side of things.
24      Q.   Okay.
25      A.   But I'm not fully familiar with

## Page 20

J. YANG - HIGHLY CONFIDENTIAL

1
2  his role in the transaction.
3      Q.   And operations is also separate
4  and distinct from PMTG?
5      A.   Yes, it is.
6      Q.   And you said Stephen, you meant
7  Mr. King?
8      A.   Yes.
9      Q.   Who is Jacqui Stanley-Johns who is
10  a c.c. on this e-mail?
11      A.   I actually do not know.
12      Q.   Okay.  You never heard of her
13  before?
14      A.   I don't know who he or she is.
15      Q.   Okay.  You'll see above that
16  e-mail heading is another e-mail.  I guess
17  that means that this was forwarded to someone
18  else?
19      A.   Oh, yes.
20      Q.   Am I correct to say that Mr.
21  LaRocco forwarded it to Mr. Keegan?
22      A.   That's what it looks like, yes.
23      Q.   And who is Mike Keegan?
24      A.   Mike Keegan ran a number of
25  principal investing businesses at Barclays.

## Page 21

J. YANG - HIGHLY CONFIDENTIAL

1
2  Although, not including PMTG.
3      Q.   So he's a trader?
4      A.   Yeah.  Yeah.  Or rather I think
5  he's a -- supervised traders.
6      Q.   Okay.  And he supervises traders
7  in an area of the business separate from PMTG?
8      A.   Yes.
9      Q.   Okay.  And his area is what?
10      A.   I believe they're a number of
11  principal investing businesses.  What I mean
12  is our businesses that deploy the bank's
13  capital to make investments.  I don't know all
14  of them.  But I know...
15      Q.   I don't see your name on this
16  e-mail.  How is it that you're familiar with
17  this e-mail?
18      A.   I believe this was subsequently
19  forwarded to me.  I can't remember by who.
20  Since I know, you know, obviously a number of
21  these folks.
22      Q.   Okay.  Do you recall when it was
23  forwarded to you?
24      A.   Not precisely.  I would expect
25  sometime not long after this.



**Page 22**

J. YANG - HIGHLY CONFIDENTIAL

Q.    Okay.  Do you know why it was forwarded to you?

A.    Because I was tasked, you know, as one of the actual front office personnel which is to say traders who would start actually looking at these securities and trying to understand what the portfolio was.  And then, you know, as a result attempt to value it from Barclays' perspective as well risk manage it.

Q.    Okay.  So just to understand what I think you said, they're forwarding -- someone forwarded this to tell you the pools of securities that were going to be coming from Barclays' system from the Lehman transaction; is that right?

A.    I suppose it would have happened already at this point.  But, yeah.  I think to at least apprise me of what other representations were being made about this portfolio.

Q.    Okay.

A.    For this transaction inside the firm.

Q.    Okay.  So you were not involved in

**Page 23**

J. YANG - HIGHLY CONFIDENTIAL

preparing this list or analysis?

A.    No, I was not.

Q.    Okay.  Do you know who was?

A.    I don't.  I can only assume Marty was.

Q.    Okay.  And you're just assuming that based on --

A.    I'm assuming that because he sent the e-mail and I don't see any other forwards.

Q.    Do you know why he prepared this type of analysis?

A.    Not precisely.  I assume because -- I suppose because this is the way he was thinking about the transaction.

Q.    Okay.  Other than that, do you have any understanding of why he prepared this analysis?

A.    It's a very general question.  I mean, I could -- he was involved -- because he was in the repo -- on the repo side I think the actual execution of the transaction would have -- you know, the legal form of this transaction was something that he routinely did.  So I think he was probably looked to as

**Page 24**

J. YANG - HIGHLY CONFIDENTIAL

sort of, you know, one of the bank's resources and in sort of evaluating the actual execution of the transaction.

Q.    Okay.  You're surmising this based on his position in this e-mail; is that right?

A.    Right.  Right.

Q.    Okay.  You don't have any specific knowledge about why he might have been preparing this analysis?

A.    I don't know who asked him for this or what question this is in response to, no.

Q.    Okay.  Do you recall any discussions within Barclays about this analysis presented on this e-mail?

A.    Certainly -- certainly we did discuss it.  You know, I mean --

Q.    Who did you discuss it with?

A.    Probably primarily Stephen King.

Q.    Okay.  I assume you discussed it after you received a copy of it.

A.    Right.

Q.    And so are we talking about the weekend of the 20th and 21st?

**Page 25**

J. YANG - HIGHLY CONFIDENTIAL

A.    Probably the same day.

Q.    Okay.  And do you recall your discussions with Mr. King about this e-mail?

MR. STERN:  Excuse me.  The same day being the 19th of September?

A.    The same day being the 19th.

I don't recall specifically what we would have -- to what end we were discussing it.

Q.    Do you recall generally?

A.    I would imagine that we were looking at the numbers and, you know, our -- I guess we were looking at the numbers.  We would probably have been trying to evaluate sort of critically which of these numbers were reliable and whether or not, you know, the transaction looked like matched what we expected it to be.

Q.    And what did you conclude based on that?

A.    I don't know that we ever came up with a specific conclusion.  Besides that we -- obviously to validate any of this we need to see, you know, what the assets



**Page 26**

J. YANG - HIGHLY CONFIDENTIAL

1
2    actually were and perform a valuation
3    ourselves.
4        Q.   Okay.  Any other recollection
5    about your discussions with Mr. King about
6    this e-mail other than what you just told me?
7        A.   Not specifically.
8        Q.   Okay.  Did you have any
9    discussions about this with anyone else?
10       A.   I don't think I would have
11   particularly.
12       Q.   You don't recall?
13       A.   I don't recall though.
14       Q.   Okay.  Do you have an
15   understanding -- was any action taken within
16   Barclays as a result of this e-mail being
17   sent?
18       A.   Not to my knowledge.
19       Q.   Okay.  Just so I break that down a
20   little bit, you don't know whether Mr. LaRocco
21   or Mr. Keegan did anything as a result of this
22   e-mail exchange?
23       A.   Yeah, I don't know if they did
24   anything.  They might have.  They might not
25   have.

**Page 27**

J. YANG - HIGHLY CONFIDENTIAL

1
2        Q.   Okay.  And you don't know whether
3    Mr. Malloy, Mr. LaRocco, did anything as a
4    result of this e-mail exchange?
5        A.   I wouldn't have knowledge of that.
6        Q.   Okay.  Would you know whether Mr.
7    King took any action or had the PMTG group
8    take any action as a result of this e-mail?
9        A.   I wouldn't necessarily know but
10   not to my knowledge.
11       Q.   Okay.  Could we just take a minute
12   and look at some of these numbers.
13       A.   Um-hum.
14       Q.   So what is your understanding of
15   what these numbers represent just as a group?
16           MR. STERN:  You want to take them
17       as a group or line by line?
18       Q.   Whatever is easiest for you.
19       A.   I would say the first five lines
20   from Fed Wire Securities down through Today
21   DTC Collateral reflects a number of, you know,
22   general groupings of assets that Barclays
23   either would have had custody of or would have
24   expected to receive custody of.  And the
25   numbers would reflect some measure of the size

**Page 28**

J. YANG - HIGHLY CONFIDENTIAL

1
2    of those populations of assets.
3        Q.   Size meaning the value of those
4    assets?
5            MR. STERN:  Objection to the form.
6        Q.   Well, let me be clear.  I mean,
7    it's not the number of CUSIPS or the number of
8    securities, right?
9        A.   No, I don't think so.  It would
10   be -- it would be some representation of
11   somebody's marks but certainly not Barclays'
12   because we had just received -- we were in the
13   process of figuring out what these actual
14   portfolios were.
15       Q.   So you understand these to be
16   dollar figures in billions of dollars, right?
17       A.   Yes.  Dollars in billions.
18       Q.   And do you know whose -- well,
19   before we get to that do you see where it
20   says, "Collateral received from Lehman on Fed
21   facility"?
22       A.   Um-hum.
23       Q.   What did you understand that to
24   mean?
25       A.   Well, I suppose -- and I have to

**Page 29**

J. YANG - HIGHLY CONFIDENTIAL

1
2    say I don't agree necessarily with what Marty
3    wrote there.
4        Q.   Sure.
5        A.   I think he intended it to mean
6    that these are assets that would then secure
7    the 45 billion of lending that Barclays was
8    doing.  But I don't agree with him necessarily
9    because some of these items I'm not sure were
10   actually part of the repo transaction.
11       Q.   Well, let me just --
12       A.   But I don't necessarily have...
13       Q.   When you talked about the 45
14   billion in lending you were talking about the
15   September 18th repo transaction?
16       A.   Yes.  That's what I think the line
17   that says repo cash amount represents.
18       Q.   Okay.  That's --
19       A.   Towards the bottom.
20       Q.   So that's $45 billion, right?
21       A.   Yes.
22       Q.   And that's the amount that
23   Barclays effectively paid Lehman through the
24   September 18th repo transaction, right?
25       A.   Right.

Page 30

1          J. YANG - HIGHLY CONFIDENTIAL
2          Q.   And the Total Securities/Cash
3    Received, do you see that line, which is 52.19
4    billion?
5          A.   Um-hum.
6          Q.   What does that represent?
7          A.   That's the sum of the numbers
8    attributed to the five -- the five blocks of
9    assets that Barclays received or expected to
10   receive.
11         Q.   Okay.  So that's the value of the
12   collateral that was posted in support of
13   Barclays paying $45 billion, right?
14              MR. STERN:  Objection to the form.
15   Could you repeat the question, Francis?
16         (Record read.)
17              MR. STERN:  You can answer.
18         A.   I wouldn't say that.  We, at that
19   point, hadn't had a chance to look at the
20   securities; so therefore had -- you know,
21   couldn't really put a value on it, per se.
22              So these numbers -- I think that
23   number is a proxy but subject to -- a proxy
24   for value, but subject to quite a bit of
25   needed due diligence.

Page 31

1          J. YANG - HIGHLY CONFIDENTIAL
2          Q.   Well, who put this value on it,
3    the 52.19?
4          A.   I don't -- for -- I think the
5    first two line items were tied -- those
6    numbers tied to schedules that I referred to
7    earlier.  The e-mails -- the two e-mails that
8    I received at 1:01 a.m. and 9:45 a.m.
9          Q.   Just so we have a clean record
10   you're referring to the Fed Wire securities
11   valued at 28.6 billion and DTC cash at
12   15.9 billion?
13         A.   Those are the two lines I'm
14   referring to.
15         Q.   Okay.
16         A.   And in those schedules were marks
17   that I understood to be from the custodian
18   function at Barclays -- not at Barclays -- at
19   BoNY, that totaled to those numbers.
20         Q.   All right.  So those -- the 28.6
21   and the 15.9 are valuations placed on these
22   securities by BoNY?
23              MR. STERN:  Objection to the form.
24   You can answer.
25         Q.   That means you can -- you can

Page 32

1          J. YANG - HIGHLY CONFIDENTIAL
2    still answer.
3          A.   Oh.  As I just said, I don't want
4    to use the word value because, you know,
5    BoNY's function in this thing, they're a
6    custodian.  They're not in the business of
7    trading securities.  They're not even really
8    in the business of valuing securities.  They
9    just hold assets.  And they have
10   infrastructure that attempts to estimate, if
11   you will, you know, the value of securities.
12              But I think it's considered --
13   especially in a market like this, it's
14   considered -- it would be hard to -- there was
15   certainly no assumption at Barclays that
16   BoNY's marks were anywhere close to the
17   realizable value of securities, necessarily.
18         Q.   Okay.  Well, BoNY's the custodian
19   for the September 18th repo transaction,
20   right?
21         A.   Right.
22              MR. STERN:  Objection to the form
23         Q.   And is it normal course that the
24   custodian in a repo places a value on the
25   securities?

Page 33

1          J. YANG - HIGHLY CONFIDENTIAL
2              MR. STERN:  Objection to the form.
3    You can answer if you know.
4          A.   I don't necessarily know what's
5    customary in repo.
6          Q.   Okay.  Have you ever been involved
7    in any other repo transactions before?
8          A.   Yes.
9          Q.   And did the custodians place a
10   value on it?
11              MR. STERN:  Objection to the form.
12         A.   The repos I would have been
13   involved in were probably -- were for liquid
14   securities.  So we would never have looked to
15   a custodian for values.
16         Q.   Okay.  The reason I'm asking is
17   I've been told that it's normal course for a
18   custodian to place a value on the securities
19   that are the subject of a repurchase
20   transaction.
21         A.   Um-hum.
22   DI  Q.   Do you have any reason to suspect
23   that's not the normal course of business?
24              MR. STERN:  Hold on.  Hold on.  I
25   think this really does go beyond the

Page 42

1          J. YANG - HIGHLY CONFIDENTIAL
2  equity securities.  Corporate refers to
3  corporate debt.
4          Q.   Okay.
5          A.   And, in fact, it was comprised of
6  quite a number of other types of securities as
7  well.
8          Q.   Now, is the composition of that
9  15.9 entry different than the composition of
10 the .3 entry for DTC cash?
11         A.   Those populations were made up
12 of -- the compositions were different.
13         Q.   In what way?
14         A.   But they were --
15         Q.   In what way?
16         A.   Just in -- you know, I don't think
17 there was any effort made to preserve, you
18 know, exact consistent percentages of equities
19 versus corporate debt versus mortgages versus
20 other types -- asset classes represented.
21         Q.   Well, I guess my question is do
22 you know why there's two separate entries for
23 DTC cash, one with -- why didn't they just
24 combine them into one entry?
25         A.   Well, I would assume that it's

Page 43

1          J. YANG - HIGHLY CONFIDENTIAL
2  because the last one is today.  So -- it's
3  marked today.  So presumably it represented
4  securities -- I am assuming that it
5  represented securities that were received on
6  that Friday.
7          MR. STERN:  I think he's asking
8      why there are two lines for DTC cash,
9      one 15.9 and one .3.
10         Q.   It was a bad question.  Let me
11 just restate the question.
12         You'll see one with a 15.9 mark
13 and one with a .3 mark, right?
14         A.   Yes.  Yes.
15         Q.   Why are there two separate entries
16 fore DTC cash?
17         A.   Right.  The 15.9 is made up of
18 securities.  The .3 I never saw a security
19 list for.  So it may have been cash cash.
20         Q.   Okay.  You don't know.
21         A.   I don't know.
22         Q.   Okay.
23         Now, when you look down at the
24 bottom -- oh, okay.  Let's go to the right
25 again.  You'll see an entry -- I assume it's

Page 44

1          J. YANG - HIGHLY CONFIDENTIAL
2  to the right of the repo cash --
3          A.   Um-hum.
4          Q.   -- column.
5          It says 1.7 of this was posted to
6  BoNY --
7          Do you see that?
8          A.   Yep, I see that.
9          Q.   What does that mean?
10         A.   I have no idea what that refers
11 to.
12         Q.   Okay.  Now, further down I think
13 it's on the line that's entitled Today DTC
14 Collateral, it also says Equity/Corp.
15         Do you see that?
16         A.   Yep.
17         Q.   So that's just describing the
18 composition of that pool of collateral?
19         A.   Right.  The fact that those were
20 made up securities.
21         Q.   Okay.  Now, at the bottom it says
22 Total securities/cash received, 52.19 billion.
23         Do you see that?
24         A.   Um-hum, yep.
25         Q.   So am I understanding you correct

Page 45

1          J. YANG - HIGHLY CONFIDENTIAL
2  to say that you don't know if that was, in
3  fact, received even though this entry says
4  received?
5          A.   Well, in fact, I know that some of
6  it wasn't because that 7 billion repo cash
7  wasn't in the long -- you know, eventually.  I
8  don't know what people knew at the time.
9          Q.   Okay.  But over that weekend or on
10 Friday the 19th, the 7 billion had not been
11 received?
12         MR. STERN:  Objection to the form.
13         A.   I don't know.
14         Q.   Don't know?  Okay.
15         And do you have any understanding
16 of whether the rest of it was received?
17         MR. STERN:  Objection to the form.
18         A.   Yeah.  I think we already
19 discussed why it's hard for me to say if I
20 agree or not because --
21         Q.   So you don't know.
22         A.   I don't know.
23         Q.   Okay.  When -- you see the line
24 Excess Collateral, 7.9?
25         A.   Yes.

1        J. YANG - HIGHLY CONFIDENTIAL
2        Q.   And I assume that's the difference
3    between 52.19 and 45 billion, correct?
4        A.   Yep.
5        Q.   Is that what you under -- do you
6    understand under -- is that what you
7    understood to be the haircut associated with
8    the September 18th repo?
9        MR. STERN:  Objection to the form.
10        A.   I don't think haircut is a very
11    precise term.
12        Q.   Okay.
13        A.   But -- I don't think it's a very
14    precise term.  But I do agree that it's sort
15    of the excess of this sort of number, 52.19,
16    which is a proxy for some measure of what was
17    received over the loan amount.
18        Q.   I appreciate haircut's kind of a
19    colloquial term.  We've heard it in all these
20    depositions.  So is it fair to say -- and I am
21    trying to take into account your statements
22    previously about valuation, that the 7.19 is
23    the excess of the total securities in cash
24    received as collateral -- I'm sorry.  Let me
25    rephrase it.

1        J. YANG - HIGHLY CONFIDENTIAL
2        Is the 7.19 the excess of the
3    collateral that was posted in support of the
4    September 18th transaction over and above the
5    amount that Barclays paid?  Taking into
6    account that those numbers are BoNY values,
7    not necessarily Barclays' values?
8        MR. STERN:  Objection to the form.
9    Let me hear the question again.
10        You're just totally ignoring his
11    responses and using your terminology
12    despite his testimony.
13        MR. HINE:  No, I'm not, Jack.
14        MR. STERN:  Yes, you are.
15        MR. HINE:  No, I'm not.
16        MR. STERN:  It's very misleading
17    and the record will reflect that --
18        MR. HINE:  And you can stop
19    coaching the witness.
20        MR. STERN:  I'm not coaching the
21    witness.
22        MR. HINE:  If you have an
23    objection to form, put it on the record.
24        MR. STERN:  I am not coaching the
25    witness.  I've been silent throughout

1        J. YANG - HIGHLY CONFIDENTIAL
2    this.  But, you know, it just goes too
3    far.
4        MR. HINE:  Let's read the
5    question.
6        MR. STERN:  It just goes too far.
7        MR. HINE:  Read the question.
8        MR. STERN:  You know what you're
9    doing.  You know very well what you're
10    doing and it's highly misleading.
11        MR. HINE:  And you're coaching the
12    witness, Jack, so put an objection to
13    form on the record and that's it.
14        MR. STERN:  This witness does not
15    need to be coached, okay?
16        MR. HINE:  I'm not trying to
17    mislead him.  I'm trying to ask a
18    question.  So you stated your objection.
19    Fine.  Let's move on.
20        MR. STERN:  You really should
21    relax.  You really should relax.  I want
22    the question reread.  And you really
23    should stop asking misleading questions.
24        MR. HINE:  Please read the
25    question back.

1        J. YANG - HIGHLY CONFIDENTIAL
2        (Record read.)
3        A.   I wouldn't characterize them as
4    excess.  The reason is because I've already
5    stated my -- the fact that I don't think 52.19
6    is a value and obviously we've also discussed
7    the fact that the 7 billion repo cash wasn't
8    eventually received.
9        So then the problem is the 45 of
10    course is just a dollar number.  It's an
11    amount of cash that Barclays provided whereas
12    52.9 isn't an equivalent.  It's a proxy.
13        So I don't think colloquially --
14    you know, it says excess collateral here.  But
15    it's not really excess in the sense that you
16    have more.  It's just the mathematical
17    difference obviously.  And that's meant to --
18    you know, that's meant to do all kinds of
19    things including adjust for uncertainty about
20    what the actual value of the securities is.
21        Q.   So you take issue with Mr.
22    Malloy's use of excess collateral in this
23    document; is that right?
24        MR. STERN:  Objection to the form.
25    Take issue.  You can answer.



Page 50

```
1              J. YANG - HIGHLY CONFIDENTIAL
2        A.    I think if -- everyone knows what
3    he means but I think it's not very precise
4    terminology, no.
5        Q.    Okay.  And what do you understand
6    the Margin Percentage entry to entail?
7        A.    I guess he's just expressing as a
8    percentage that 7.19 number of -- I can't
9    tell -- one of the other -- one of the two
10   numbers above it.  Probably the 7.19 divided
11   by 52.19.
12       Q.    Okay.  So that's how it's
13   calculated but what it does mean?
14       A.    He's just expressing as a
15   percentage the same concept he's expressing
16   with the 7.19.
17       Q.    Do you have an understanding of
18   what the term "margin" means in connection
19   with a repo transaction?
20       A.    Margin is a very commonly used --
21   margin has a lot of different meanings,
22   actually, in finance.  So I don't know why he
23   chose that in particular.  Very often when I
24   hear margin I actually think of an interest
25   rate but that's obviously not how it's being
```

Page 51

```
1              J. YANG - HIGHLY CONFIDENTIAL
2    used.
3        Q.    Well, but how do you think it's
4    being used in this document?
5        A.    I think I would just refer to, you
6    know, the conversation we had about the 7.19
7    number.  I don't think it's in -- it's not in
8    excess in the sense again, you know, more than
9    the 4.45.  But it's just a measure of -- it's
10   just -- it's just a measure of to what extent
11   the proxy for the asset side of the balance
12   sheet exceeds the 45 million.
13       Q.    You don't really know what Mr.
14   Malloy meant by the use of the term margin; is
15   that what you're saying?
16           MR. STERN:  Objection to the form.
17       A.    I guess I know what I just said.
18   Why he chose margin instead of just
19   percentage, I don't know.
20       Q.    Well, is it also possible that he
21   was referring to amount of return Barclays was
22   going to get on its investment of $45 billion?
23           MR. STERN:  Objection to the form.
24       A.    I don't think so.
25       Q.    Why not?
```

Page 52

```
1              J. YANG - HIGHLY CONFIDENTIAL
2        A.    It would just not have occurred to
3    me to read it that way.
4        Q.    Okay.  Do you know what Mr. Malloy
5    meant when he wrote it?
6        A.    I think what he meant was that
7    is -- that is -- I guess I don't.
8        Q.    Okay.
9           (Deposition Exhibit 349B, document
10          bearing production numbers
11          BCI-EX-00070958 through BCI-EX-00070961,
12          marked for identification as of this
13          date.)
14   BY MR. HINE:
15       Q.    Mr. Yang, I'm handing you a copy
16   of a document marked Exhibit 349B which is
17   admittedly a cut-off version of a spreadsheet
18   because I didn't want to enter a huge number
19   but my questions are really going to be
20   about --
21           MR. STERN:  Is this part of the
22   30(b)(6)?  I don't think this is listed
23   in the 30(b)(6).
24           MR. HINE:  The questions will
25   relate to the 30(b)(6) topic, Jack.
```

Page 53

```
1              J. YANG - HIGHLY CONFIDENTIAL
2           MR. STERN:  No, no, no.  We're
3    going to limit this deposition,
4    particularly given the misleading nature
5    of the questions, to the documents that
6    are listed in topics 4 and 5.
7           MR. HINE:  Okay.  I'm going to ask
8    him about --
9           MR. STERN:  And I'm going to
10   instruct the witness not to answer any
11   other questions.
12           MR. HINE:  All right.  So you're
13   not going to -- you're going to instruct
14   the witness to answer no questions about
15   any other document --
16           MR. STERN:  I am limiting --
17           MR. HINE:  Just let me get it on
18   the record, Jack.  All right?
19           MR. STERN:  I'll tell you what I'm
20   doing.  I'm limiting this deposition to
21   the topics that are noticed as topics 4
22   and 5, period.
23           MR. HINE:  My question is I have
24   documents to ask him about that relate
25   to those topics.  Are you going to
```

Page 54

J. YANG - HIGHLY CONFIDENTIAL

1
2 instruct the witness not to answer
3 questions about any document other than
4 the three mentioned on the notice?
5         MR. STERN:  Yes.
6         MR. HINE:  Okay.
7         MR. STERN:  And I dispute your
8 characterization of other documents.  I
9 have no idea whether what you intend to
10 do here is directly related.
11         MR. HINE:  We'll never know
12 because you're not going to permit him
13 to answer, right?
14         MR. STERN:  We're going to limit
15 it to the documents in the notice.
16         MR. HINE:  I'm going to ask a
17 question and you can instruct him not to
18 answer.
19         MR. STERN:  That is ridiculous.
20 That's a waste of time.  And we're going
21 to leave here unless you focus on the
22 topics --
23         MR. HINE:  Jack, I'm just going to
24 make a record.
25         MR. STERN:  Listen, we're going to

Page 55

J. YANG - HIGHLY CONFIDENTIAL

1
2 leave this deposition -- I'm putting you
3 on notice.  We're going to leave this
4 deposition if you don't proceed to ask
5 about the topics 4 and 5.
6         MR. HINE:  I'm going to ask a
7 question.  It is about topics 4 and 5.
8         MR. STERN:  It is not --
9         MR. HINE:  Just let me finish,
10 will you?  I let you finish.
11         MR. STERN:  No.  If you have the
12 documents that are listed in topic 5,
13 ask about those documents.  Otherwise we
14 are leaving this deposition, sir.
15         MR. HINE:  I am going to do that.
16 But I just want to make a clear record
17 that you're instructing him not to
18 answer about any other topics; is that
19 right?
20         MR. STERN:  If you don't move on
21 to topic 5 we are leaving now.  It's
22 your choice.  It is your choice.  Mark
23 the documents listed in 5 or we leave
24 this deposition now.
25         MR. HINE:  Just answer my

Page 56

J. YANG - HIGHLY CONFIDENTIAL

1
2 question.
3         MR. STERN:  It is your choice,
4 Bill.
5         MR. HINE:  I just want to make --
6 Jack, I just want to make clear record.
7 I understand your objection.
8         MR. STERN:  I am making a clear
9 record.  And I am telling you if you do
10 not mark and move on to topic 5 we are
11 leaving.  We're not going to put up with
12 this nonsense.
13         MR. HINE:  All right.  So you're
14 going to leave if I mark any exhibit
15 other than the ones listed in topic 5?
16         MR. STERN:  Correct.  Move on to
17 topic 5.
18 BY MR. HINE:
19     Q.   I'm still on the first exhibit,
20 topic 4, Mr. Yang.
21     A.   Um-hum.
22         MR. STERN:  Bill, I think this
23 deposition is over.
24         MR. HINE:  Jack, I'm not finished
25 with topic 4.

Page 57

J. YANG - HIGHLY CONFIDENTIAL

1
2         MR. STERN:  Okay.  You're on which
3 exhibit?
4         MR. HINE:  I'm still on the
5 exhibit we were talking about.
6         MR. STERN:  Which is -- you had
7 marked an exhibit --
8         MR. HINE:  Which is Exhibit 144A.
9         MR. STERN:  Okay.  So let's put
10 aside 349B.
11         MR. HINE:  I am back on
12 Exhibit 144A which is the exhibit listed
13 in topic 4 of the notice.
14         MR. STERN:  I thought you had
15 finished that.
16         MR. HINE:  I'm not.
17         MR. STERN:  Go ahead.
18         MR. HINE:  The document I was
19 attempting to introduce relates to.
20 BY MR. HINE:
21     Q.   My question for you, Mr. Yang, is
22 have you had any discussions with -- well, let
23 me take a step back and just ask a general
24 question.
25         We talked about the $52.19 billion

Page 58

```
1              J. YANG - HIGHLY CONFIDENTIAL
2    number on this chart, right?
3         A.   Um-hum.
4         Q.   And if you take away the 7 billion
5    in cash you're left with about $45 billion,
6    correct?
7         A.   Um-hum.
8              MR. STERN:  Objection to the form.
9         Q.   52 minus 7 is 45; is that right,
10   Mr. Yang?
11        A.   Yes.
12        Q.   Was there ever any discussions at
13   Barclays about whether, in fact, the assets
14   delivered to Barclays as part of the September
15   18th repo were properly valued by BoNY at
16   about $45 million?  And, again, I'm talking
17   about the securities, not the cash component.
18        A.   Um-hum.  I actually think that the
19   broad assumption is -- maybe I'll take a step
20   back.
21             The securities reflected here that
22   comprise this portfolio, you know, obviously
23   September was a time when, you know, markets
24   were generally illiquid.  And many of these
25   securities were securities that even in normal
```

Page 59

```
1              J. YANG - HIGHLY CONFIDENTIAL
2    times could be considered illiquid securities.
3              So our presumption was that BoNY's
4    marks would not have been accurate.
5         Q.   When you say illiquid you mean
6    what?
7         A.   First of all, that pricing
8    information isn't easily available.  In many
9    cases these were securities that would not
10   transact in the market -- well, first of all,
11   would be bilateral transactions and -- with no
12   pricing posted to a general market, sort of
13   group exchange or listing.  And so unless you
14   were one of the two parties to the transaction
15   you wouldn't know where it traded.  And,
16   moreover, some of these securities traded very
17   infrequently.
18        Q.   Okay.  And so because they're
19   illiquid in that sense it was tough to put a
20   price on them?  Is that what you're saying?
21        A.   Exactly.  And because BoNY wasn't
22   in that business we assumed they would just
23   have the wrong prices.
24        Q.   Okay.  So did you ever hear people
25   from Lehman saying that they valued that pool
```

Page 60

```
1              J. YANG - HIGHLY CONFIDENTIAL
2    of securities at about 42.9 billion?
3         A.   I generally didn't have
4    conversations with Lehman people.
5         Q.   Okay.  Did you ever hear any
6    mention of the notion that that pool of
7    securities -- and, again, I'm putting aside
8    the cash just so we're clear.
9         A.   Um-hum.  We're talking about the
10   first two.
11        Q.   I'm putting aside the 7 billion in
12   cash.
13        A.   Right.
14        Q.   Okay.  Did you ever hear any
15   discussion during the week of September 15th
16   or even thereafter that Lehman placed a value
17   on that pool of securities at 42.9 or
18   thereabouts?
19        A.   I can't really recall.
20        Q.   Okay.  Do you recall any
21   discussions or meetings between Barclays folks
22   and Lehman folks about how to value that pool
23   of securities?
24        A.   Not as a whole or in general.  I
25   do know that there were occasional exchanges
```

Page 61

```
1              J. YANG - HIGHLY CONFIDENTIAL
2    at different points in time about, you know,
3    at least getting Lehman's impression of
4    certain positions.
5         Q.   Okay.  And was it your impression
6    that Lehman's valuation of these securities
7    was less than the BoNY values?
8         A.   It is my impression that it was
9    less than the BoNY values.
10        Q.   Do you know why?
11        A.   Our general assumption was -- when
12   I say BoNY's prices were wrong, they were
13   probably wrong in the sense that they were out
14   of date especially for illiquid securities.
15   In a falling market that means you end up with
16   an overestimate of marks.
17        Q.   So your impression or working
18   assumption during that week was that BoNY's
19   marks were overvalued?
20        A.   Right.
21        Q.   And how about Lehman's marks; do
22   you have any impression about whether their
23   marks were accurate?
24        A.   This is by know means
25   representative of the entire portfolio but on
```

Page 62

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2    some of the most illiquid positions in the
 3    discussions we had with them, you know, and
 4    this is not in general, these are specific
 5    incidents -- you know, specific securities, so
 6    it may not mean anything, but I do know I
 7    found that their prices were higher than I
 8    would have assigned to them.
 9         Q.   So in the end did Barclays assign
10    a value to this pool of securities that's
11    represented by the BoNY mark of 45 billion?
12         A.   Well, as I said, that 15.9
13    population ended up not being exactly accurate
14    because I said some securities did disappear.
15    Or, you know, we just eventually didn't
16    receive.
17              But eventually all of the
18    securities that we did receive, we did value
19    at because -- but I don't know what that
20    number would have come out to.
21         Q.   You don't know the value that
22    Barclays placed on that pool of securities?
23         A.   Right.  Because of the process.
24    What we did is we booked everything in and
25    then, you know, obviously different desks had
```

Page 63

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2    responsibility for different types of assets.
 3    And then everyone marks it in their systems
 4    and that flows upstream.
 5         Q.   So when you first booked them in
 6    did you book them in at the BoNY marks?
 7         A.   I don't recall what price we used
 8    for booking.  It wouldn't have been ours
 9    because we didn't have them yet.
10         Q.   Ours meaning Barclays?
11         A.   Barclays.  Because we hadn't
12    calculated them yet.
13         Q.   I think I understood you what just
14    said but let me see if I --
15              MR. STERN:  I think this is now
16    going beyond the scope of this
17    deposition.  I think Barclays' booking
18    and marking of the security positions
19    that it received in this transaction is
20    beyond the scope of this deposition.
21              MR. HINE:  So are you instructing
22    him not to answer?
23              MR. STERN:  Yes.
24              MR. HINE:  All right.
25              (Pause on the record.)
```

Page 64

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2              MR. HINE:  I'm going to get to the
 3    two documents listed in deposition
 4    notice item number 5 but I want to state
 5    on the record our objection to the
 6    restricting the scope of this
 7    deposition unduly and we are reserving
 8    our rights to recall Mr. Yang either as
 9    a 30(b)(6) or somebody else as a
10    30(b)(6) and to recall Mr. Yang in his
11    personal capacity.  I just want to put
12    it on the record so I will follow your
13    objection and I'm going to stick to the
14    three documents that are in that notice.
15              MR. STERN:  Fine.  You've never
16    noticed Mr. Yang's deposition
17    personally.  He's a 30(b)(6) witness.
18    There are many, many, many documents
19    relating to categories of securities and
20    you could go on for days and days.  But
21    this is a limited 30(b)(6) deposition.
22    You will have other witnesses as you
23    know currently on the schedule who will
24    be able to address many of the questions
25    you have sought to ask here.
```

Page 65

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2              MR. HINE:  Okay.
 3              MR. STERN:  Okay.
 4              MR. HINE:  You done?
 5              MR. STERN:  Yes.
 6              MR. HINE:  Okay.  I'm just noting
 7    our objection to your undue restriction
 8    to the scope of this deposition and we
 9    reserve our rights.  So with that said
10    let me introduce the next exhibit.
11    Would you mark that.
12              (Deposition Exhibit 350B, document
13    bearing production numbers
14    BCI-EX-00012161 through BCI-EX-00012162,
15    marked for identification as of this
16    date.)
17    BY MR. HINE:
18         Q.   Mr. Yang, I'm handing you a copy
19    of a document marked as Exhibit 350B.
20         A.   Um-hum.
21         Q.   When you've had a moment to look
22    at it please let me know.
23              (Document review.)
24         A.   Okay.  I'm ready.
25         Q.   You've had a chance to look at it?
```

J. YANG - HIGHLY CONFIDENTIAL
1
2      A.   Yeah.
3      Q.   Okay.  Have you ever seen this
4   document before?
5      A.   Yes.
6      Q.   Could you tell me what it is?
7      A.   It's an e-mail from Dan Long, who
8   is someone who worked for me, to Marty Malloy,
9   Kevin Walker, and myself.  I believe Kevin
10  Walker worked with Marty on sort of the repo
11  business.
12     Q.   Okay.  And what's the purpose of
13  this e-mail?
14     A.   So this is early Friday afternoon.
15  As I previously referenced, we had received --
16  I had received those two e-mails listing --
17  listing the securities that corresponded to
18  the 28.6 and the 15.9 that we just discussed.
19  What I had asked Dan to do -- at this point we
20  understood our objective to start the process
21  of actually trying to ascribe value to this
22  very large portfolio.
23          What I'd asked Dan to do was to
24  compile those securities simply by CUSIP and
25  quantity, whether that be notional amount or

J. YANG - HIGHLY CONFIDENTIAL
1
2   number of shares, into sort of a master list
3   that we could work off of.
4      Q.   Okay.  So the two previous e-mails
5   you referenced, did they include lists?
6      A.   Yes.
7      Q.   So is it correct to say that he
8   took those two lists and compiled them into
9   one?  Is that what's going on here?
10     A.   That's exactly right.
11     Q.   And is that one entitled Master --
12  do you see this icon on the upper left-hand
13  corner?
14     A.   Yes.
15     Q.   Is that the compilation that
16  you're talking about?
17     A.   That was what Dan produced.  There
18  were some issues with that file.  It's purely
19  technical ones.  But the goal was to be a list
20  of CUSIPS and the quantities.
21     Q.   And I forget the times you
22  mentioned but you mentioned two e-mails
23  previously.
24     A.   Right.
25     Q.   Are they the e-mails lower down on

J. YANG - HIGHLY CONFIDENTIAL
1
2   this page?
3      A.   No, no.  They were other e-mails.
4      Q.   Okay.  So this is -- if you turn
5   to the second page of this document --
6      A.   Um-hum.
7      Q.   -- it says -- it's an e-mail from
8   Dan Long.
9      A.   Um-hum.
10     Q.   It says, "Please find attached the
11  compiled master list of the DTC and Fed Wire
12  from Lehman on 9/18."
13          Do you see that?
14     A.   Um-hum.
15     Q.   Now, that, to your understanding,
16  corresponds to the entries on the Exhibit 144A
17  for Fed Wire securities and DTC cash marked at
18  15.9 billion?
19          MR. STERN:  Could I hear that
20  again.
21          (Record read.)
22          MR. STERN:  Objection to the form.
23  You can answer.
24     A.   The file was intended to
25  correspond to those.

J. YANG - HIGHLY CONFIDENTIAL
1
2      Q.   I guess -- let me ask a clarifying
3   question.
4      A.   Yeah.
5      Q.   You see on Exhibit 144A, the
6   previous exhibit we talked about, there's
7   three different entries that say DTC, right?
8      A.   Right.
9      Q.   Two for cash and one says Today
10  DTC Collateral.
11          Do you see that?
12     A.   Um-hum.
13     Q.   So when Mr. Long on the second
14  exhibit, 350B, is referring to DTC, do you
15  understand him to be including all three of
16  those pools of securities?
17     A.   No.  The intent would have been to
18  just capture the -- well, the Fed Wire
19  securities and then the first -- the DTC line
20  item.
21     Q.   The one marked as 15.9?
22     A.   Right.
23     Q.   Okay.  Now, before we get to the
24  attachment at the top he writes, "Thanks,
25  Jasen, for your blessing on this master list."

Page 70

```
 1         J. YANG - HIGHLY CONFIDENTIAL
 2         So does that mean you reviewed it?
 3         A.   I did review it.  It was a very
 4   large list.  So it wasn't a question of line
 5   by line.  But you'll see that this e-mail --
 6   you know, this is the third e-mail from Dan
 7   and each time he had actually attached a file
 8   where I found a problem.  Just a technical
 9   issue with the compilation.  And I asked him
10   to revise it.  And so at this point, you know,
11   I knew the file still had issues but it was
12   usable.
13         Q.   Usable.  What do you mean by that?
14         A.   Well, simply that the technical
15   issues that I identified previously, he had
16   resolved.
17         Q.   The technical issues have to do
18   with just the listing of individual securities
19   or --
20         A.   Yeah, yeah.  The first technical
21   issue was simply that a certain security might
22   show up multiple times in the list.
23         Q.   Okay.
24         A.   I asked him to add those up.  And
25   then one other issue he had was just that some
```

Page 71

```
 1         J. YANG - HIGHLY CONFIDENTIAL
 2   of the CUSIPS in the process of being moved
 3   around got corrupted.
 4         Q.   Okay.  I've been told in some
 5   other depositions that there was a
 6   reconciliation process that went on between
 7   Lehman and Barclays as to the list of CUSIPS
 8   that came over in connection with the
 9   September 18th transaction.
10         Are you referring to that process
11   in your last answer?
12         A.   No, no.
13         Q.   Okay.  So this is --
14         A.   Purely just copying CUSIPS and
15   amounts out of one -- you know, a number of
16   files all into one big file.
17         Q.   Okay.  So the correction of the
18   technical issues that you mentioned did not
19   involve meetings with Lehman and reconciling
20   lists of securities; is that right?
21         A.   No, no.
22         Q.   No, they did not?
23         A.   No, they did not.
24         Q.   Okay.
25         MR. HINE:  Let's mark this.
```

Page 72

```
 1         J. YANG - HIGHLY CONFIDENTIAL
 2         (Deposition Exhibit 351B, document
 3         bearing production numbers BCI 000878
 4         through BCI 000879 with attachment,
 5         marked for identification as of this
 6         date.)
 7   BY MR. HINE:
 8         Q.   Mr. Yang, I'm handing you a copy
 9   of exhibit marked as Exhibit 351B.
10         A.   Um-hum.
11         Q.   Which is the same e-mail only it
12   contains an attachment as you'll see.
13         A.   Right.  Yes, I see that.
14         Q.   And then I don't expect you to go
15   line by line through this thing but is that
16   your understanding of what was the master list
17   assembled by Mr. Long?
18         A.   Yes.
19         Q.   Okay.  Now, at this point in time
20   there are no -- well, maybe let me ask another
21   question.
22         You'll see on that list there's
23   two columns.
24         A.   Um-hum.
25         Q.   One is CUSIP, correct?
```

Page 73

```
 1         J. YANG - HIGHLY CONFIDENTIAL
 2         A.   Um-hum.
 3         Q.   And the other says Par Notionals.
 4         Do you see that?
 5         A.   Yes.
 6         Q.   What does that mean?
 7         A.   He's using shorthand -- a large
 8   number of different types of securities
 9   represented on this list including, you know,
10   shares of stock, as well as bonds, and
11   preferred stock and things like that.  So
12   he's -- by par/notionals he's using shorthand
13   for whatever the appropriate convention is for
14   the number -- for a quantity for that CUSIP
15   type.
16         So by -- for example, for common
17   stock he was -- used number of shares even
18   though his heading doesn't reflect that.  And
19   for bonds he generally used notional amounts.
20   I suppose those are the two large categories.
21         Q.   So just referring back to the
22   opening e-mail where you say summing -- or
23   he -- sorry.  Mr. Long says, "Summing to 88
24   some-odd billion."
25         Do you see that?
```

Page 74

1           J. YANG - HIGHLY CONFIDENTIAL
2       A.   Yes.
3       Q.   Notional?
4       A.   Yeah.
5       Q.   So he's referring to the sum of
6  this column on the spreadsheet?
7       A.   Right.  Yes.  He's referring to
8  the sum.
9       Q.   And did I understand you correctly
10 that some of the entries are in dollars and
11 some are in shares?
12      A.   Right.  So as a result the sum
13 itself is a meaningless number.  It's simply a
14 checksum.  So that, you know, if we had
15 another list we could -- and it added up to
16 the exact same number, it would be an
17 incredible coincidence if they weren't the
18 same list.
19      Q.   Okay.  So you're not using it for
20 any purpose other than to verify that you have
21 all the entries on this.
22      A.   Yeah.
23      Q.   Okay.  So it's -- all right.  I
24 think you answered my question.  It's a
25 meaningless sum in the sense that it's not

Page 75

1           J. YANG - HIGHLY CONFIDENTIAL
2  dollars and cents or it's not shares.  It's
3  just your method of tracking whether he has
4  all the entries correct?
5       A.   Yes.
6       Q.   And did he end up having all the
7  entries correct?
8       A.   Well, this was Friday afternoon.
9  And the short answer is that he -- we got a
10 revised list on Saturday, and as I sort of
11 previously referenced, some of the things --
12 the securities in this list didn't show up in
13 sort of the revised list that we got from
14 operations.  There was never an explanation
15 for that.
16      Q.   Was that the result of a
17 reconciliation between Lehman and Barclays at
18 all?
19      A.   I don't know.  I don't know how --
20 what caused operations to refresh.
21      Q.   I guess I misunderstood you.  Mr.
22 Long works for you, correct?
23      A.   Yes.
24      Q.   He's not in operations, is he?
25      A.   No.  But -- I should clarify.  The

Page 76

1           J. YANG - HIGHLY CONFIDENTIAL
2  two e-mails that we were compiling this list
3  from, I don't know if we sent them to me but I
4  could see -- but my understanding was they
5  were produced by our operations department.
6       Q.   Oh, okay.
7       Is it fair to say that if there
8  was some kind of reconciliation going on
9  between Barclays and Lehman that the
10 operations department probably would have done
11 that?
12      A.   It seems quite likely.
13      Q.   Okay.
14      A.   I don't know.  I wouldn't have
15 direct knowledge of that.
16      Q.   Okay.  You yourself or your
17 department -- let me just ask it differently.
18      A.   Yeah.
19      Q.   Do you know whether your
20 department participated in any kind of
21 reconciliation of CUSIP lists between Lehman
22 and Barclays?
23      A.   We didn't do that.
24      Q.   Okay.  So am I correct in
25 understanding that you were sent two e-mails

Page 77

1           J. YANG - HIGHLY CONFIDENTIAL
2  with lists of securities as you previously
3  described --
4       A.   Um-hum.
5       Q.   -- and that all Mr. Long did was
6  put them in a single file?
7       A.   Right.
8       Q.   Okay.  And for what purpose?
9       A.   The idea was to -- well, let's
10 see.  The idea was to put them all in one
11 place.  And then sort them into different
12 types of securities so that we could figure
13 out who we should go to to analyze value and
14 risk manage those securities.
15      That was the premise.
16      The other thing that we intended
17 to do with that was compare it to the list of
18 securities that we sort of expected to
19 receive.
20      Q.   And did you do that?
21      A.   We did over the course of the
22 afternoon.  And found that it wasn't what at
23 least Dan and I were expecting.
24      Q.   In what way?
25      A.   Just that it was a different large

Page 78

J. YANG - HIGHLY CONFIDENTIAL

portfolio of securities.  We had been told to expect another list.

Q.    What were you told to expect?

A.    We had been given another file that we understood to represent the securities that were held -- that were financed in another facility the day before not provided by Barclays.  Provided by the Fed.  And we were told to expect that we would have -- get substantially the same collateral.  As it turned out we didn't.

Q.    I think I understand that.  Are you referring to a Fed facility where the Fed provided funding to Lehman over the course of the week of the 15th?

A.    Right.

Q.    So you were given a list by who?

A.    I actually -- I was given the list -- I mean, Stephen King forwarded it to me but I don't remember where it came from.

Q.    Okay.  And that list was the securities that you understood to be in support of the Fed financing from earlier that week?

---

Page 79

J. YANG - HIGHLY CONFIDENTIAL

A.    Right.

Q.    And so that list ended up being -- again, I'm just trying to understand your testimony.  When you compared that list to this list prepared by Mr. Long they were different lists of securities?

A.    Yes.  They were different lists.

Q.    Radically different or just a couple?

A.    Very substantial --

MR. STERN:  Objection to the form.

A.    Okay.

Q.    You can answer.

A.    Substantially different.

Q.    Okay.  And so what did you do to try to figure out what happened?

A.    In a certain sense that wasn't part of my task.

Q.    Okay.

A.    You know, the task was to -- after that was noted, our task was to value the securities that we did have and risk manage them.

Q.    Okay.  And did you eventually

---

Page 80

J. YANG - HIGHLY CONFIDENTIAL

value the securities that are on this list?

A.    There was what I would think of as an updated version of this that was provided to us over the weekend which, you know, as I say, was eventually booked into all of the Barclays -- various Barclays systems and valued by the appropriate trading desk.

Q.    And that was provided by the ops people at Barclays?

A.    Yes.

Q.    So your department didn't create that second list?

A.    No, we didn't create that second list.

Q.    Okay.  Can you read on the covering e-mail it says -- again, this is from Mr. Long.  He says, "If you guys are comfortable with this list then let's send to Lehman for marks."

A.    Um-hum.

Q.    What was he referring to there?

A.    Well, as I said, at this point our task was to start assigning a value to this.  And since we understood that the securities

---

Page 81

J. YANG - HIGHLY CONFIDENTIAL

came from Lehman, we thought it would be -- it wouldn't hurt to ask them for their valuations on these assets.

Q.    And did they send them to you?

A.    They -- I think I -- I don't -- I think the short answer is no.  I received a number of files from them that had their marks on certain securities.  But -- and there was some overlap with this but it wasn't in the sense that they gave us their values on the securities.

Q.    So what did they give you?

A.    Just files that contained their valuations for certain securities but not -- but it wasn't necessarily, you know -- they weren't necessarily the securities on this, in this file, nor were they necessarily all of the securities that we were interested in.

Q.    So it was an incomplete list as compared to your list.

A.    Incomplete and sort of -- it was just a different -- different set of securities that they had marks for.

Q.    So was there a marking process

---

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2   that took place on -- at or about this time to
 3   reconcile your list with the Lehman marks?
 4        A.   No.  Because what I'm trying to
 5   say is that I don't think that I ever got
 6   Lehman's marks on this population of
 7   securities.  I got their marks on another
 8   population of securities which had some
 9   overlap with this.
10        Q.   And did you make any use of those
11   marks?
12        A.   No.
13        Q.   Because it was not -- because it
14   was hard to reconcile the two lists?
15        A.   I think we ended up being -- this
16   afternoon we were most concerned with just
17   reconciling the lists.
18        MR. STERN:  This afternoon is what
19   date?
20        THE WITNESS:  The afternoon of
21   Friday, September 19th.
22        A.   So there wasn't actually a
23   valuation process that occurred that Friday.
24   At least by myself.
25        Q.   Okay.  Could you describe for me
```

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2   what you mean by reconciling in that sense?
 3        A.   Well, it was that comparison with
 4   the Fed facility list.  You know, just the
 5   simple task of telling whether or not this
 6   list was -- how similar or different this list
 7   was from the Fed facility list.  Just that
 8   simple task was what we focused on that
 9   afternoon.
10        Q.   And were you able to reconcile
11   those two lists?
12        A.   Well, I think we just concluded
13   that they were very different lists.
14        Q.   And when you say reconcile, are
15   you talking about reconciling within Barclays
16   or are you reconciling with Lehman?
17        A.   No.  Purely within Barclays.
18        Q.   So you just -- when you say
19   reconciling in that sense are you just saying
20   you're comparing the two lists?
21        A.   Yes.
22        Q.   Okay.  And was any action taken as
23   a result of the fact that the lists were
24   different?
25        A.   I don't know.
```

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2        Q.   Is it fair to say that if there
 3   was, it was someone else doing it?
 4        A.   Right.
 5        Q.   Okay.  And is that a function that
 6   was probably undertaken by the ops people?
 7        A.   Well, in terms of -- the
 8   comparison we were making was between what we
 9   were expecting to receive and what was
10   provided to us.  So that actually would have
11   been more of a commercial point that I assume
12   would have been handled by, you know, the team
13   negotiating the transaction.
14        Q.   Okay.  So you didn't -- you
15   weren't involved in that?
16        A.   No.
17        Q.   Okay.  You mentioned that later on
18   sometime during that weekend there was an
19   updated version of this document produced,
20   correct?  Again, I'm referring to the master
21   file.
22        A.   The master.  Yes.  There was
23   another file that served as the master file.
24        Q.   And it was still titled Master
25   File?
```

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2        A.   I don't recall what it was titled.
 3   I think it would -- it probably -- it
 4   wasn't -- it didn't have the same name because
 5   it was produced --
 6        Q.   Well, can I show you a document to
 7   see if it is, in fact, the list you're talking
 8   about?
 9        A.   Sure.
10        Q.   Let me just mark it first.
11        (Deposition Exhibit 352B, document
12   bearing production numbers
13   BCI-EX-00013019 through BCI-EX-00013186,
14   marked for identification as of this
15   date.)
16   BY MR. HINE:
17        Q.   Mr. Yang, I'm handing you a copy
18   of a document marked as Exhibit 352B.
19        A.   Um-hum.
20        Q.   Which is Bates stamped
21   BCI-EX-00013019 through -13020.
22        And my first -- again, I'm not
23   going to ask you detailed questions about the
24   whole thing.  I just want to see if you
25   recognize this document.
```

Page 86

J. YANG - HIGHLY CONFIDENTIAL

1
2       A.    This -- I do.  This isn't the
3   revised master list that I was referring to
4   that superseded the one we were just about.
5       Q.    Okay.
6       A.    It's basically the same list.  But
7   this actually has the comparison that I was
8   just referring to what we were told to expect.
9       Q.    Oh, so this is not the revised
10  list that you said you received from ops later
11  on that weekend?
12      A.    No.  This is basically the same
13  list.
14      Q.    Okay.  But this is the -- this is
15  a document reflecting the reconciliation that
16  you just testified about?
17      A.    Yes.
18      Q.    And could you just explain to me
19  how it's doing that?
20      A.    So the columns A and B are the
21  same as the other file.
22      Q.    Okay.  The other file meaning
23  Exhibit 351B?
24      A.    Yes.
25      Q.    Okay.

Page 87

J. YANG - HIGHLY CONFIDENTIAL

1
2       A.    Or ought to be.
3       And then columns E and F show the
4   quantities of that security that we were told
5   to expect.
6       Q.    Told to -- meaning the Fed --
7       A.    The Fed.
8       Q.    -- program?
9       A.    Yes.
10      Q.    Okay.  What's the difference
11  between column E and column F?
12      A.    Simply whether that particular
13  security was settled via the DTC or was
14  settled via Fed Wire.
15      Q.    Oh, so E is DTC and F is Fed Wire.
16      A.    Right.
17      Q.    Could you explain to me column D
18  where it looks like yes and no or Y and N?
19      A.    Right.  It's titled Changed Item.
20  But I don't -- I don't know what -- I don't
21  know actually what it's doing.
22      Q.    Okay.  And I interrupted you.  So
23  how about G and H?
24      A.    G is then the sum of E and F.  So
25  G is the column that should be comparable to

Page 88

J. YANG - HIGHLY CONFIDENTIAL

1
2   column B.  And then H is just the difference
3   between the two.
4       Q.    All right.  So just so I
5   understand, in the line numbered 8136, the
6   entry in column H, 129 some odd thousand is
7   the difference between B and G?
8       A.    Yes.
9       Q.    So column H is telling you what?
10      A.    The quantity of the difference
11  between what we've actually received of the
12  security and what we were expecting.
13      Q.    Okay.  And when you say quantity,
14  are we talking share numbers or price?
15      A.    It would be either share numbers
16  for equities or notional amounts for bonds.
17      Q.    And there's no way to tell that
18  from this chart, right?
19      A.    No.
20      Q.    Unless you had the CUSIP number
21  you would look up the type of security?
22      A.    That's right.
23      Q.    Okay.  And so what did this
24  analysis tell you?
25      A.    We can see that column H is -- if

Page 89

J. YANG - HIGHLY CONFIDENTIAL

1
2   column H were all zeroes then we would
3   conclude we had the same portfolio.  You'll
4   see that in many cases it's zero which means
5   that we got the same amount of that security
6   but in many, many cases it's also not zero.
7       Q.    Okay.  And the entries in column H
8   reflect where there's a difference between the
9   Fed program securities and the securities that
10  you guys received on Friday, the 19th.
11      A.    Yes.
12      Q.    All right.  And what did you do
13  with this analysis in the end?
14      A.    I think I conveyed to Stephen King
15  and Marty Malloy that the populations were
16  very different.  I don't know what they did
17  with that information.  And then, you know,
18  eventually we focused on valuing and risk
19  managing the portfolio.  The corrected
20  portfolio that we received.
21      Q.    Okay.
22      MR. HINE:  And am I correct, Jack,
23  that you're not going to let him testify
24  about how he priced the portfolio?
25      MR. STERN:  Well, that's not a



**Page 90**

J. YANG - HIGHLY CONFIDENTIAL
1
2    subject of this deposition. I believe
3    you have other witnesses on the calendar
4    who can discuss that.
5         MR. HINE: I understand. But for
6    this purpose, for this forum --
7         MR. STERN: But otherwise your
8    presumption is correct.
9         MR. HINE: Okay. Could we just
10   take a little break and let me see if I
11   have anything else?
12        MR. STERN: Sure.
13        (Recess taken.)
14   BY MR. HINE:
15   Q.   Back on the record.
16        Mr. Yang, I had a couple follow-up
17   questions about some issues we talked about
18   earlier.
19   A.   Um-hum.
20   Q.   If you refer back to Exhibit 144A.
21   A.   Yes.
22   Q.   I think you mentioned in the
23   course of your testimony you talked about
24   illiquid securities.
25        Do you recall?

**Page 91**

J. YANG - HIGHLY CONFIDENTIAL
1
2    A.   Yes.
3    Q.   And the difficulty associated with
4    putting a price on them.
5         Do you recall that?
6    A.   Yes.
7    Q.   When you look at this entry on
8    Exhibit 144A for Fed Wire Securities, are
9    they -- is it fair to say that those are
10   typically liquid securities?
11   A.   More so, yes.
12   Q.   Okay. What types of securities
13   are embodied in what you folks call Fed Wire
14   securities?
15   A.   Fed Wire securities are
16   essentially treasury securities. So bonds,
17   bills, notes.
18   Q.   Okay.
19   A.   And agency, which by that I mean
20   Fannie Mae and Freddie Mac securities. Now,
21   those are -- you know -- in the grand scheme
22   of things those are more liquid. Illiquid
23   Fanny and Freddy securities do exist because
24   they can include CMOs.
25   Q.   Okay. I understand.

**Page 92**

J. YANG - HIGHLY CONFIDENTIAL
1
2    A.   But they're generally more liquid,
3    yeah.
4    Q.   Is it fair to say as a general
5    rule that Barclays would have little dispute
6    with the BoNY values ascribed to those type of
7    Fed securities?
8         MR. STERN: Objection to the form.
9    Q.   Let me rephrase it. You
10   previously said you had -- I think you said
11   you had -- the presumption that there would be
12   some problems with the BoNY values listed on
13   this document, right?
14        MR. STERN: Objection to the form.
15   Q.   I'm just -- I'm not trying to
16   restate what you said. I'm just trying to
17   bring you back to your testimony.
18        MR. STERN: Except he used the
19   term "marks" so...
20        MR. HINE: Okay. Fair enough.
21   Q.   Do you recall saying something
22   about the fact that you -- Barclays had some
23   kind of presumption or assumption that the
24   BoNY marks might not be accurate in this
25   context, correct?

**Page 93**

J. YANG - HIGHLY CONFIDENTIAL
1
2    A.   Right.
3    Q.   Does that assumption apply equally
4    to the marks for Fed Wire securities, do you
5    think?
6    A.   It's reasonable to say that we
7    would expect the differences to be bigger for
8    some of the DTC type securities than Fed Wire.
9    But I wouldn't say that -- I wouldn't say that
10   we would expect no disagreement on Fed Wire
11   securities.
12   Q.   Fair enough. When you say bigger,
13   you mean -- do I understand you correctly to
14   be saying that the DTC securities would be
15   more illiquid than the Fed Wire securities?
16   A.   To be very -- to be precise, the
17   most illiquid securities are all DTC settled.
18   Of course, there are also some liquid
19   securities that are settled via DTC.
20   Q.   Okay. But looking at it as a pool
21   there's probably more illiquid securities in
22   the DTC entries here than in the Fed Wire
23   entry?
24   A.   Yes.
25   Q.   Okay. So, to your recollection,

Page 94

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2    did Barclays end up having the most concerns,
 3    if you will, about the pricing -- or about the
 4    marks BoNY had placed on the DTC securities?
 5        A.   Yes.
 6        Q.   Could I refer you back to
 7    Exhibit 351B.  And I just wanted to ask you a
 8    question about -- well, let me just ask a
 9    lead-up question.
10          Have you ever heard the term
11    Schedule A used in connection with the
12    Barclays/Lehman transaction?
13        A.   Yes.
14        Q.   And what did you understand
15    Schedule A to be?
16        A.   Schedule A was meant to be the
17    securities that were acquired on -- that were
18    received on September 18th as part of this
19    assumed repo transaction.
20        Q.   Okay.  And who prepared Schedule
21    A?
22        A.   Like all things, it was a
23    collaborative process.  But I was involved in
24    preparing part of it.  But, in fact, the
25    primary data source was Lehman.  I believe we
```

Page 95

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2    reviewed what they gave us and reformatted it.
 3    But the data basically came from Lehman.
 4        Q.   Okay.  I guess my question is this
 5    master list that we talked about,
 6    Exhibit 351B, is that in any way an early
 7    version of Schedule A or a precursor to
 8    Schedule A?
 9        A.   Conceptually this master list
10    should have been similar.  You know, it
11    conceptually should have been Schedule A
12    except we know that there are some issues with
13    this list.
14        Q.   So did you -- when you eventually
15    did receive Schedule A or a version of
16    Schedule A, did you try to reconcile it
17    against this master list?
18        A.   Well, this was -- master list was
19    superseded by, you know, another list, another
20    similar list.  We did do a comparison.  We did
21    do a comparison but didn't have time to check
22    it line by line.
23        Q.   You did a comparison between what
24    and what?
25        A.   Between what Lehman provided as
```

Page 96

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2    the draft Schedule A and what -- and successor
 3    to this master list that we had.
 4        Q.   And by the successor you're
 5    talking about the one that the ops people
 6    provided you?
 7        A.   Right.  What I should clarify is
 8    when I -- the successor list is the list we
 9    actually worked off of.  The terms of
10    assign -- booking trades and assigning them to
11    different desks for valuations or valuing it
12    ourselves.
13          That list did not distinguish
14    between securities received on Thursday as
15    part of the repo and securities received
16    subsequently.  So including on Friday, the
17    19th.
18          So when we did the comparison
19    between what Lehman provided us as the draft
20    Schedule A, that list, of course they were
21    different because they were meant to be
22    different but we did do a comparison to see
23    that -- you know, it seemed approximately
24    correct.
25        Q.   Okay.  Just so I understand what
```

Page 97

```
 1          J. YANG - HIGHLY CONFIDENTIAL
 2    you're talking about, the successor list that
 3    you've been referring to was prepared by
 4    the ops folks included more than just the
 5    securities that were transferred from the
 6    September 18th repo; is that right?
 7        A.   Right.
 8        Q.   Okay.  And then so did it
 9    include -- I believe we've previously
10    discussed unencumbered assets that were
11    transferred to Barclays.  Was that included on
12    that successor list, do you know?
13        A.   Yes.  Yes.
14        Q.   And does the number 1.9 billion in
15    securities ring a bell with you in that
16    regard?
17        A.   Yes.  It does.  But unfortunately
18    it's not -- I believe -- what it means to me
19    is the number that was suggested for the
20    eventual total amount of unencumbered
21    securities that Barclays might receive.
22        Q.   Oh, okay.
23          And Barclays didn't receive it?
24        A.   Not to my knowledge.
25        Q.   Are you saying they received some
```

Page 98

J. YANG - HIGHLY CONFIDENTIAL

1  but not all?
2      A.   Yes.
3      Q.   Okay.  And -- but that suggested
4  number, is that the difference -- is the
5  inclusion of that pool of securities the
6  difference between Master List, Exhibit 351B,
7  and the successor list you've been talking
8  about?
9
10     A.   No.  The successor list I don't
11 think included all of the 1.9 billion.  It
12 was -- you know, if I received the successor
13 list on Saturday it only included anything
14 that we would have received that Friday.
15     Q.   Okay.  So it was a report in time
16 as to what Barclays had actually received by
17 that Saturday.
18     A.   Exactly.
19     Q.   Okay.  And were there subsequent
20 versions of that list developed later in the
21 week or later in the month?
22     A.   We kept adding securities to that
23 list as we received them.
24     Q.   Okay.  So that list was meant to
25 embody the securities that actually made it to

Page 99

J. YANG - HIGHLY CONFIDENTIAL

1
2  Barclays.  Not necessarily what might have
3  encompassed a 1.9 list of unencumbered assets?
4      A.   No.  Yeah, that's exactly right.
5      Q.   Okay.  Okay.
6           All right.  So we were talking
7  about Schedule A, am I correct to say that
8  this list, 351B, became superseded and no
9  longer useful in the analysis leading to the
10 development of Schedule A?
11     A.   Yes.
12     Q.   But that successor list you're
13 talking about might have been involved in that
14 analysis?
15     A.   It was.
16     Q.   Okay.
17     A.   It was simply the thing against
18 which the Lehman Schedule A list was compared.
19     Q.   Okay.  And were you involved in
20 that comparison?
21     A.   Yes.
22     Q.   And I previously had asked you
23 about a reconciliation process between
24 Barclays and Lehman Brothers.
25     A.   Um-hum.

Page 100

J. YANG - HIGHLY CONFIDENTIAL

1
2      Q.   Is that -- is your effort involved
3  in that process, do you know?
4      A.   I didn't think of it that way.  I
5  had a very short time frame to compare what
6  Lehman had drafted as the Schedule A to the
7  securities that we had received.  And my main
8  goal was to -- pretty much all I could do was
9  determine that they superficially looked
10 similar.
11     Q.   And you were doing that at whose
12 request?
13     A.   Stephen -- Stephen King and
14 probably Barclays' legal department.
15     Q.   Okay.  Fair enough.  Thank you.
16     I want to direct your attention
17 back on Exhibit 351B.
18     A.   Um-hum.
19     Q.   To the last sentence of the e-mail
20 which we talked about earlier about, "Let's
21 send to Lehman for marks."
22     Do you recall that?
23     A.   Yes.
24          (Deposition Exhibit 353B, document
25 bearing production numbers

Page 101

J. YANG - HIGHLY CONFIDENTIAL

1
2  BCI-EX-(S)-00055573 through
3  BCI-EX-(S)-00055574, marked for
4  identification as of this date.)
5  BY MR. HINE:
6      Q.   I'm handing you a copy of a
7  document marked as Exhibit 353B which is a
8  document Bates stamped BCI-EX-(S)-00055573
9  through -74.
10     A.   Um-hum.
11     Q.   It's an e-mail on which you are a
12 c.c.  And I want to direct your attention to
13 the subject line of the e-mail which says,
14 "Barclays' teams are on the way over to meet
15 with us on our positions and marks.  Obviously
16 critical."
17          Do you see that?
18     A.   Um-hum.
19     Q.   And this is --
20          MR. STERN:  Take your time to read
21 the whole document.
22     Q.   Sure.
23     A.   I see that.
24          (Document review.)
25     A.   Okay.

Page 102

1      J. YANG - HIGHLY CONFIDENTIAL
2      Q.   Do you recall this e-mail?
3      A.   Not in great detail, but, yes.
4      Q.   Well, my question is do you recall
5  any meetings on that Friday between the
6  Barclays team -- or I guess the Barclays team
7  was on their way over to the Lehman facility.
8      Do you recall that at all on that
9  Friday?
10     A.   Well, I wasn't involved in any of
11 those meetings.  I was just privy to e-mails
12 like this that suggested those were happening.
13     Q.   Okay.  Do you have any
14 understanding what took place at those
15 meetings?
16     MR. STERN:  I guess -- I don't
17     mind you asking if this process
18     reflected in 353B relates to the process
19     referenced in 351B.
20     MR. HINE:  Well, the notice
21     says --
22     MR. STERN:  Well, the notice
23     refers to the process referenced in
24     those documents.
25     MR. HINE:  The marking process

Page 103

1      J. YANG - HIGHLY CONFIDENTIAL
2  that took place on Friday.
3      MR. STERN:  So what I'm -- and as
4      referenced in those documents.  So what
5      I'm saying is I don't have a problem if
6      you ask him what -- whether the 353B
7      relates to the process referenced in
8      351B.
9      MR. HINE:  Okay.  Well, that's
10     what I'm trying to do.
11     MR. STERN:  Well, I don't know
12     that that's your question.
13     MR. HINE:  Let me rephrase the
14     question, Mr. Yang.
15 BY MR. HINE:
16     Q.   Do you have any understanding of a
17 marking process that took place on Friday, the
18 19th?
19     A.   I should -- I think the thing to
20 focus on is the time line.  At 1:14 we were
21 just struggling to compile the securities that
22 we had received in.  I knew that during the
23 day Friday traders at Barclays were talking to
24 traders at Lehman.  The problem is nobody else
25 had this list of securities.  So I should --

Page 104

1      J. YANG - HIGHLY CONFIDENTIAL
2  so the short -- so really I think this is a
3  huge generalization but in general the
4  conversations that were happening with
5  Barclays' traders getting Lehman's traders'
6  impressions on positions -- on positions that
7  had no particular relationship to the list of
8  securities that we actually got.
9      Q.   Were you involved in those
10 conversations?
11     A.   No.  I just knew that they were
12 happening.
13     Q.   And what did you understand was
14 taking place in that regard?
15     A.   I don't recall exactly what
16 positions they were talking about.  I was
17 focused on the positions we actually received.
18     Q.   Okay.  Let me just -- I just want
19 to try to distinguish between these two
20 documents.  I think when you mentioned
21 1:14 p.m. you were referring to the time for
22 the Exhibit 341B e-mail?
23     A.   Right.  And we were still trying
24 to get our hands around what positions we had
25 received.

Page 105

1      J. YANG - HIGHLY CONFIDENTIAL
2      Q.   Okay.  And in that e-mail it says,
3  "Let's send to Lehman for marks," right?
4      A.   Um-hum.
5      Q.   What did you understand that to
6  involve?
7      A.   The idea was that we -- so we did
8  know that there were ongoing conversations
9  between Barclays and Lehman traders about
10 marks on positions in general.
11     So one idea that we had was it
12 would not hurt to ask -- to send this to
13 people at Lehman and have them try to mark
14 this list of positions as well.
15     Q.   All right.  So you were going to
16 send this list to Lehman in the hopes that it
17 somehow would assist or get involved in that
18 ongoing discussion between the traders that
19 you talked about?
20     A.   Rather the opposite.  Hoping that
21 the Lehman traders would be able to assist us
22 or at least, you know, give us one more
23 reference point on this list of securities.
24     Q.   And when you say "this list"
25 you're talking about 351B.

Page 106

1        J. YANG - HIGHLY CONFIDENTIAL
2       A.   Right.  And -- or conceptually,
3   rather, the securities that we had received on
4   Thursday, September 18th.
5       Q.   All right.  So now is that effort,
6   the sending it over to Lehman to get their
7   assistance as you just described, is that
8   different from a marking process that was
9   taking place on the Friday between Lehman and
10  Barclays?
11      A.   I think so.  I don't know what
12  marking process means, per se.
13      Q.   Okay.
14      A.   In a certain sense I don't know
15  what positions these traders were talking
16  about.
17      Q.   Okay.
18      A.   So we were the only people who
19  knew -- we were the only traders at Barclays
20  who had possession of a list of the positions
21  we actually got.
22      Q.   Well, okay.  I think I understand.
23  When you talked about these traders I believe
24  you pointed to Exhibit --
25      A.   353B.

Page 107

1        J. YANG - HIGHLY CONFIDENTIAL
2       Q.   -- 353B.
3           Is Mr. Martin a trader?
4       A.   Yes, he is.
5       Q.   Okay.  And so Mr. Martin is
6   sending you the e-mail -- or copying you the
7   e-mail in 353B why?
8       A.   To let me know who on the Barclays
9   side was -- which traders were talking to each
10  other.
11      Q.   Okay.  So you were involved in
12  that process?
13      A.   It was helpful for me to know
14  since I was the sort of -- I was tasked with
15  coordinating the process of eventually getting
16  marks on -- or eventually evaluating and
17  processing the securities that we were
18  actually receiving.
19      Q.   Okay.  So in connection with
20  the -- and I want to talk about the e-mail on
21  353B where it says --
22          MR. STERN:  Well, I guess --
23          MR. HINE:  Let me just ask my
24  question, Jack.
25          MR. STERN:  No, no, no.  Because I

Page 108

1        J. YANG - HIGHLY CONFIDENTIAL
2   think this goes to the scope of the
3   deposition.  Again, I don't know that
4   you've asked with respect to 351B if the
5   list was sent to Lehman for marks and if
6   Lehman provided those marks.  I mean, it
7   seems to me that is within the scope of
8   the deposition.
9           MR. HINE:  I did ask that and he
10  answered that earlier.
11          MR. STERN:  Oh.  So if you've
12  asked that and it's been answered then I
13  don't know --
14          MR. HINE:  That process is
15  definitely related to the marking
16  process that's going on between the
17  traders.
18          MR. STERN:  And you've established
19  that?
20          MR. HINE:  Yes.  He just testified
21  about that.
22          MR. STERN:  I don't know about
23  that.
24          MR. HINE:  Well, then, you can
25  review the transcript but I'm going to

Page 109

1        J. YANG - HIGHLY CONFIDENTIAL
2   ask him about this e-mail which is
3   marked as 353B.
4           MR. STERN:  So let me hear your
5   question.
6           MR. HINE:  All right.
7   BY MR. HINE:
8       Q.   Do you see the e-mail where Mr.
9   Martin copies you on February 19th?
10      A.   Um-hum.
11      Q.   Do you see that e-mail, Mr. Yang?
12      A.   Yeah.
13      Q.   Well, first of all, half way down
14  the e-mail it refers to someone named -- I
15  believe it's someone named Kashik.
16          Do you see that?
17      A.   I do.
18      Q.   Do you know who that is?
19      A.   The name's familiar but I don't
20  recall what role he had.
21      Q.   Do you know if he's a Barclays
22  employee or a Lehman employee?
23      A.   He was a Lehman employee.  I
24  believe he's one of the addressees in the
25  e-mail from Ian Lowitt.

## Page 110

J. YANG - HIGHLY CONFIDENTIAL
1    Q.   I see.  Oh, you're right.  Okay.
2         So just to lead up to the
3    question, Mr. King asks, "I assume you're
4    talking to Kashik."
5         Do you see that?
6    A.   Um-hum.
7    Q.   And then Mr. Martin's e-mail is a
8    response to that and he talks about some
9    conversations he had with the derivative and
10   CMO guys.
11        Do you know who that is?
12   A.   I don't exactly.  He would have
13   been referring in general to certain groups of
14   Lehman traders.
15   Q.   Okay.  So those are Lehman guys.
16   A.   Yes.
17   Q.   Okay.  And then he continues, "The
18   derivative guy said a lot of positions did
19   indeed look like repo ones in the file I
20   sent."
21        Do you see that?
22   A.   I do see that.
23   Q.   Do you know what that's referring
24   to?

## Page 111

J. YANG - HIGHLY CONFIDENTIAL
1    A.   I don't know what file David would
2    have been referring to.  Although I can say
3    that it would not have been an extract from my
4    master list.
5    Q.   Okay.  Fair enough.
6         MR. STERN:  That is 351B.
7         THE WITNESS:  351B.
8    Q.   All right.  Then it continues,
9    "Told them to mark them consistent with his
10   inventory.  Appeared he got the message from
11   above to remark positions."
12        Do you see that?
13   A.   Um-hum, yeah.
14   Q.   Do you know what that's referring
15   to?
16   A.   No.  The first -- well, let me be
17   specific.  The first clause I would take to
18   read that David's asking for his impressions
19   on certain positions.  He's asking him to mark
20   them as he would his own inventory.
21        The second part I don't understand
22   what's being said.
23   Q.   Okay.  So I'm just trying to
24   understand what you said.  The first clause

## Page 112

J. YANG - HIGHLY CONFIDENTIAL
1    where he talks about mark them consistent with
2    his inventory --
3    A.   Um-hum.
4    Q.   -- "his" meaning the trader at
5    Lehman?
6    A.   I think so.
7    Q.   So you understand this to be Mr.
8    Martin saying that he told the derivative guy
9    at Lehman, whoever that is, to mark their
10   position consistent with how they mark their
11   own inventory?
12        MR. STERN:  Objection to the form.
13   Don't speculate.
14   A.   I don't -- I don't know.
15   Q.   Okay.  Do you have any
16   understanding of what he was discussing with
17   this guy?
18        MR. STERN:  Objection to the form.
19   A.   No, I don't.
20   Q.   Do you have any understanding of
21   what -- you talked earlier about a process
22   between the traders going on at -- between
23   Lehman and Barclays on this Friday.
24        Do you have an understanding of

## Page 113

J. YANG - HIGHLY CONFIDENTIAL
1    what actually -- what they were discussing?
2    A.   No.  It's not clear to me.
3    Q.   Do you have any general
4    understanding of what they were discussing?
5         MR. STERN:  Objection to the form.
6    Don't speculate.
7    A.   Yeah.  The general question.
8    Like, I mean -- if by general understanding
9    you mean they were talking about positions, I
10   assume so.  But I keep saying I don't know
11   what positions they were talking about because
12   I was the only one who had a list of
13   positions.
14   Q.   Okay.  They were talking about how
15   to price different positions?
16        MR. STERN:  Objection.
17   A.   Possibly.  I don't know.
18   Q.   Or -- okay.
19        Here's my -- the basis for my
20   question, Mr. Yang.  You've been designated as
21   a 30(b)(6) witness about a process -- a
22   marking process taking place on that Friday.
23        MR. STERN:  No, no, no.
24        MR. HINE:  Just let me ask the

Page 114

J. YANG - HIGHLY CONFIDENTIAL

1
2  question, Jack.
3         MR. STERN:  No, you're misquoting
4  the notice.  It says the marking process
5  to take place the afternoon of Friday,
6  September 19th, 2008, referenced in BCI
7  0087 and BCI-EX-0012161.  12161 you've
8  marked.  You've marked 0087 as 351B.
9  And 351B says, "If you guys are
10  comfortable with this list then let's
11  send to Lehman for marks."
12         That is the scope of this
13  deposition.  You've already asked about
14  that and you've gotten answers so I
15  don't know what your speech is about.
16         MR. HINE:  That process is related
17  to the discussions between the traders
18  and I just want to ask a question to --
19         MR. STERN:  No, no, no, no.  I
20  don't think that that's established.
21         MR. HINE:  Jack, fine.  You have
22  your objection.  Here's my question.
23         MR. STERN:  I not only have my
24  objection but I'm going to instruct him
25  not to answer to the extent it goes

Page 115

J. YANG - HIGHLY CONFIDENTIAL

1
2  beyond the scope.
3         MR. HINE:  You haven't even heard
4  my question.
5         MR. STERN:  I'm just telling you.
6         MR. HINE:  Can you just hear my
7  question before you instruct him not to
8  answer?
9         MR. STERN:  I'm waiting.  I'm
10  waiting.  Go ahead.  Ask your question.
11  BY MR. HINE:
12     Q.    You've talked about some
13  discussions between the traders going on that
14  Friday between Lehman and Barclays folks,
15  correct?
16         MR. STERN: Objection.  Objection.
17         MR. HINE:  I'm just trying to --
18         MR. STERN:  Look, he told you he
19  didn't -- you have the transcript saying
20  he didn't know --
21         MR. HINE:  Jack, can I ask the
22  question before you coach him anymore.
23         MR. STERN:  So I don't know why
24  you're trying to get the witness to
25  speculate.

Page 116

J. YANG - HIGHLY CONFIDENTIAL

1
2         MR. HINE:  I want him to say
3  whether he has any understanding --
4         MR. STERN:  You want him to say
5  what you want him to say but he's told
6  you he doesn't know.  He doesn't know.
7         MR. HINE:  Let me ask the
8  question, I'll get him to say that, and
9  we'll move on.
10  BY MR. HINE:
11     Q.    Do you know what was being
12  discussed between the Barclays and Lehman
13  traders on Friday that afternoon of the 19th?
14         MR. STERN:  Objection.  Asked and
15  answered.
16     A.    No.
17     Q.    No.
18     A.    No.
19         MR. STERN:  Are we done?
20     Q.    Do you know anything further than
21  what you've just told me about a marking
22  process that took place on Friday, September
23  19th?
24         MR. STERN:  Objection.  You can
25  answer if you know anything further

Page 117

J. YANG - HIGHLY CONFIDENTIAL

1
2  about the process referenced in 351B.
3         THE WITNESS:  Um-hum.
4     Q.    Now that your counsel has coached
5  you do you have an answer?
6         MR. STERN:  You can answer that
7  question.  You can answer the question
8  if you know anything further about the
9  process that's referenced in 351B.
10     A.    Nothing that we haven't discussed
11  already.
12     Q.    Do you have any knowledge of any
13  marking process on the afternoon of Friday,
14  the 19th, beyond what was referenced in 351B?
15     A.    No.
16         MR. HINE:  Fair enough.  I'm done
17  because basically -- and I want to state
18  again I think you've unduly restricted
19  the scope of this deposition but given
20  those restrictions you've placed I'm
21  done.  But I think Hughes Hubbard might
22  have a question or too.
23         MR. STERN:  Okay.  Well, we can
24  agree to disagree.
25         MR. HINE:  Fine.