Hearing Date and Time: December 15, 2010 at 10:00 a.m.
Objection Date and Time: December 8, 2010 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)
James Heiser (JH-3660)

-and-

CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York 10017-5010
Telephone: (212) 655-6000
Craig M. Price

Attorneys for U.S. Bank National Association, as Trustee

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | CASE NO. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MICHAEL TRICKEY IN SUPPORT OF THE MOTION PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR APPROVAL OF THE TERMINATION AND SETTLEMENT OF CERTAIN PREPETITION DERIVATIVES CONTRACTS WITH TRUSTS FOR WHICH U.S. BANK NATIONAL ASSOCIATION SERVES AS INDENTURE TRUSTEE AND RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to 28 U.S.C. § 1746, I, Michael Trickey, declare as follows:

2909756.01.03.doc

1. I am Managing Director of both Berkshire Group LP and its wholly owned subsidiary Berkshire Advisors LLC, in its Lake Zurich, Illinois offices. Except as noted below, if called upon to testify in this case, I could competently testify to the following facts on personal knowledge.

2. Berkshire Group LP and Berkshire Advisors LLC (collectively "Berkshire") is a management consulting firm providing services to companies in and related to the consumer and commercial lending industries. Through its experienced consultants and close strategic alliance relationships, Berkshire provides risk based analysis and valuation of consumer and commercial loans, mortgage servicing rights, and related securities. Berkshire's staff has decades of experience buying, selling, securitizing and servicing loan assets. Berkshire provides fundamentally derived, risk-adjusted collateral, servicing, and bond cash flow projections and valuations, and can deliver, *inter alia*, loss mitigation strategies, loss reserve analysis, mark-to-market assessments, and stress test analyses. Berkshire can also provide valuation analysis with respect to swap transactions that form a part of securitization transactions.

3. I graduated from The Ohio State University in 1980, Summa Cum Laude, with a degree in accounting. I also have an MBA in Finance from the University of Chicago which I received in 1985. I have been Chief Financial Officer for Household Financial Services, Inc., AMRESCO Residential Capital Markets, Inc., and on an interim basis, at United Companies Financial Corporation. These firms collectively have originated, securitized or serviced in excess of $20 billion of home equity, Alt-A and subprime loans.

4. I have been with Berkshire for the last eleven years. I have extensive experience in the mortgage loan securitization industry, having been involved in the prime mortgage, home equity, Alt-A, and subprime mortgage markets since 1982. My focus has been in residential mortgage valuation, acquisitions, sales, and finance; capital markets transactions and the

structuring of transactions; loan origination and servicing operations, and strategically planning and accounting for residential mortgage-related business activities. Many of these capital markets transactions included interest rate swap or cap derivative agreements as a component.

5.  It is my understanding that U.S. Bank National Association serves as Indenture Trustee under the terms of Indentures for a number of securitization trusts that are party to cap agreements with one or more of the Debtors as a counterparty or guarantor. We were engaged by U.S. Bank to independently value certain cap agreements that were entered into in connection with a number of securitization transactions. The cap agreements are listed on the attached Exhibit A. These cap agreements document two basic forms of derivative transactions: those with a single interest rate cap and those involving two interest rate caps (referred to as interest rate corridors), as described below.

6.  An interest-rate cap is a derivative contract that protects a counterparty from rises in short-term interest rates by requiring the "risk" counterparty to make a payment to a "protection" counterparty when an underlying interest rate (the "index" or "reference" interest rate) exceeds a specified strike rate (the "cap rate"). Each period, the payment is determined by comparing the current level of the index interest rate with the cap rate. If the index rate exceeds the cap rate, the payment is based upon the difference between the two rates, the length of the period, and the contract's notional amount.

7.  An interest rate corridor is likewise a derivative contract that is in essence the combination of two cap agreements. It is composed of a long interest rate cap position and a short interest rate cap position. The buyer of the protection purchases a cap with a lower strike rate while concurrently selling a second cap with a higher strike rate. The premium earned on the second cap then reduces the cost of the structure as a whole. The buyer of the corridor is

protected from rates rising above the first cap's strike, but is exposed if they rise past the second cap's strike.

8. As is typical for cap and corridor transactions, the trusts paid the "premium" for its protection to a Debtor counterparty upfront, and therefore none of the Debtor entities will receive any future payments on any of the transactions listed on the attached Exhibit A.

9. From September 15, 2010 to the current date, the Lehman counterparties have not been required to make any payments to the trusts under the terms of the cap agreements. That is because the applicable LIBOR rate has been so low that none of the thresholds contained in any of the caps or corridors have been breached, and given the current interest rate environment, are unlikely to be breached in the near future. However, because some of these contracts mature many years from now, it is possible that these thresholds might be breached in the more distant future, and as a result the value of these contracts to the trust must take into consideration this possibility.

10. Berkshire valued each of the cap and corridors with what I believe to be reasonable assumptions relating to future interest rates. The value we assigned to the caps and corridors as of September 22, 2010 are listed on the attached Exhibit A. The amounts listed on Exhibit A do not include any fees or expenses that might be owed under the terms of the caps or corridors.

11. Each of the caps and corridors have periodic payment dates. In the context of a cap, the period from September 22, 2010 to each payment date is treated as an individual obligation or "caplet". The value of the cap is the sum of the values of the individual caplets. Each caplet is valued using an interest rate option model. The base valuation is a direct feed from Bloomberg, which is an industry standard. The model takes into consideration the time value of money, *i.e.*, the payment isn't due immediately. As set forth above, corridors are really

two caps put together. To value a corridor the caplet for each "cap" are valued and added together to arrive at a value.

12. I believe that these values reflect the value of these contracts to each trust. Of course, what actually occurs in the future may be different than what we have projected. It may be that if the contracts remained in place until maturity no payment would ever be due any of the trusts. Likewise the converse is true, that if these contracts were left in place and interest rates were to dramatically rise, large payments might be due the trusts. I believe, however, based on information available to Berkshire as of this time, that these values represent a fair value to the relevant trust.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2010

_____
Michael Trickey

Exhibit A

*Cap Termination Value to Trust – Group 1*

| Underlying Deal Name | Market Value |
|---|---|
| Lehman Mortgage Trust Series 2005-2 | 3,040.63 |
| SASC, Series 2005-RF4 | 29,252.69 |
| SASC, Series 2008-1 | 148,847.98 |
| SASC, Series 2005-RF6 | 17,625.11 |
| SASC Mortgage Loan Trust, Series 2007-RF2 | 82,347.94 |
| SASC, Series 2005-RF5 | 20,312.60 |
| SASC, Series 2005-RF7 | 10,102.47 |
| SARM, Series 2008-2 | 6,877.23 |
| **Total Cap Termination Value to Trust** | **318,406.65** |

*Cap Termination Value to Trust – Group II*

| Underlying Deal Name | Market Value |
|---|---|
| Lehman XS Trust 2006-12N - 2586660/2586662 | 0.05 |
| SASC, Series 2005-RF1 - 2127959/2127964 | 4,553.53 |
| **Total Cap Termination Value to Trust** | **4,553.58** |

*Corridor Termination Value to Trust*

| Deal Name | Corridor Value |
|---|---|
| CONSECO Finance Corp, Series 2001-4 - Lehman Brothers Financial Products, Inc. | 153,129.45 |
| CONSECO Finance Corp, Series 2002-1 - Lehman Brothers Financial Products Inc. | 106,628.98 |
| Lehman XS Trust, Series 2005-9N - Lehman Brothers Special Financing Inc. | 616.58 |
| Lehman XS Trust, Series 2005-9N - Lehman Brothers Special Financing Inc. | 3,383.94 |
| SASC, Series 2005-RF2 - Lehman Brothers Special Financing Inc. | 4,865.54 |
| SASC, Series 2005-RF3 - Lehman Brothers Special Financing Inc. | 24,059.68 |
| SASC, Series 2006-RF2 - Lehman Brothers Special Financing Inc. | 105,415.75 |
| SASC, Series 2006-RF4 - Lehman Brothers Special Financing Inc. | 68,243.59 |
| SASC, Series 2007-RF1 - Lehman Brothers Special Financing Inc. | 210,939.84 |
| SASC, Series 2007-4 - Lehman Brothers Special Financing, Inc. | 42,527.71 |
| SASC, Series 2007-4 - Lehman Brothers Special Financing, Inc. | 50,452.66 |
| SASC, Series 2007-4 - Lehman Brothers Special Financing, Inc. | 50,956.69 |
| SASC, Series 2007-4 - Lehman Brothers Special Financing, Inc. | 46,474.86 |
| *Total Corridor Termination Value to Trust* | 867,695.27 |