Hearing Date and Time:  December 15, 2010 at 10:00 a.m.
Objection Date and Time:  December 8, 2010 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000
Facsimile:  (312) 701-2361
James E. Spiotto (admitted pro hac vice)
Ann E. Acker (admitted pro hac vice)
Franklin H. Top, III (admitted pro hac vice)

CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York  10017-5010
Telephone:  (212) 655-6000
Craig M. Price

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE | CHAPTER 11 CASE NO.  08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., ET AL., | |
| Debtors. | (Jointly Administered) |

### OBJECTION OF U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE TO THE DEBTORS' MOTION PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND GENERAL ORDER M-390 FOR AUTHORIZATION TO IMPLEMENT ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR AFFIRMATIVE CLAIMS OF DEBTORS UNDER DERIVATIVE CONTRACTS WITH SPECIAL PURPOSE COUNTERPARTIES

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES U.S. Bank National Association, and to the extent appropriate, U.S. Bank Trust National Association, not individually but in their capacity(ies) as Trustee under a variety of trusts (*"U.S. Bank"* or the *"Trustee"*), by and through its counsel, Chapman and Cutler LLP, to object to the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-390 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts With Special Purpose Counterparties (the "*Motion*" and U.S. Bank's objection thereto, the "*Objection*").  In support of its Objection, U.S. Bank states as follows:

## SUMMARY OF OBJECTIONS

This Motion relates to transactions which were created, sponsored and/or marketed by one or more of the Debtors and/or Lehman Brothers Inc. ("*LBI*").  Each of the transactions involves one or more special purpose vehicles (the "*SPV Counterparty*") (some of which are formed under the laws of the Cayman Islands) who hold assets, entered into derivative contracts, and issued notes or certificates to investors under the terms of an Indenture or Trust Agreement. These transactions were sponsored or marketed by a Lehman entity.  U.S. Bank serves as Trustee, Owner Trustee, Indenture Trustee and/or Administrative Agent for a large number of transactions involving special purpose vehicles which are the subject of the Motion.  With no monetary interest in the transaction itself (with the exception of fees, costs and expenses in connection with its service under the relative documents), U.S. Bank relies upon directions, instructions, indemnities and in some cases funding from the beneficial holders of the interests in the trusts with respect to actions it takes in connection with such trusts.

The Debtors are a counterparty with the SPV Counterparty in each of these transactions and have asserted claims against the SPV Counterparties for, among other things,  a termination payment that the various Debtors believe is due them under the relevant swap transactions.  The

Debtors have asserted these claims notwithstanding the provisions of the swap transaction documents and the applicable Trust Agreement or Indenture, which hold that the termination payment is payable after payments due on the Certificates or Notes where the Debtors are the defaulting party. The Debtors are now seeking to settle these and other issues with the SPV Counterparties.

Given the complexity of the transactions (including the fact that many transactions involve multiple tranches of securities), the inability to accurately identify the beneficial holders of the relevant securities, and the uncertainty of the status of the law, it is understandably difficult for the Debtors and other parties to the transactions to resolve these issues. This is made all the more difficult given the significant limitations placed upon the SPV Trustees and the SPV Counterparties under the terms of the relevant transaction documents as to the actions they can take without investor approval or the limitations with respect to incurring certain types of fees and expenses. Through their Motion, and without any regard to the costs and expenses that the SPV Counterparties or the SPV Trustee may have to bear (for which there may or may not be funds to reimburse them) to comply with the terms of the Proposed Order, the Debtors seek to place all of the burdens of these problems - entirely created by the Debtors - upon the SPV Counterparties and the Trustee. The Trustee has a number of specific objections to the Motion which include:

A.    *Adequacy of Notice.* Given the importance of the Motion and the complexity and the nature of the transactions involved, and the fact that most if not all holders are not known, more rather than less notice should have been provided of the Objection Deadline and of the Hearing so that notices could have been sent to holders pursuant to the methods established in the various governing documents.

B.    *Identification of Beneficial Holders May be Difficult or Impossible in Many Transactions*.  Most of the Certificates or Notes are held through the Depository Trust Company, who is the registered holder of the securities - the SPV Trustee and an SPV Counterparty only know the beneficial holders in a transaction to the extent such holders choose to identify themselves to the SPV Counterparty or Trustee.  Because many of these securities are freely tradeable, any information the Trustee may have may be inaccurate or out of date.

C.    *Inappropriateness of Identifying One Authorized Party in Some Transactions*. The Motion seeks to appoint one representative for each transaction.  However, because some of these transactions are tranched transactions giving different holders different rights to proceeds, and because in some cases not all holders will be paid in full depending on the outcome of any litigation, to avoid conflicts, every tranche needs appropriate representation in any mediation.

D.    *Financial Advisor to the Trust*.  In the event an SPV Trustee or an SPV Counterparty becomes the Authorized Designee in the mediation, the relevant SPV Trustee or SPV Counterparty needs an independent Financial Advisor to value the swap transactions and provide input to the SPV Trustee or the SPV Counterparty with respect to a resolution that is fair to all holders of securities, regardless of tranche.  Because many documents appear to limit the ability of the SPV Trustee or the SPV Counterparty to incur "extraordinary" fees and expenses, such as the cost of a Financial Advisor, and because the SPV Trustee or the SPV Counterparty otherwise lack assets to pay any such expenses, the Debtors should agree and the Proposed Order should provide, that the Debtors shall pay the reasonable fees and expenses of a Financial Advisor.

E.    *Fees and Expenses of the SPV Trustee*.  Whether or not the SPV Trustee is designated as the Authorized Designee, these transactions and the Proposed Order will require the SPV Trustee and/or the SPV Counterparty to incur significant expenses in connection with

- 4 -

any effort to resolve and unwind the transactions.  To the extent the Debtors want the SPV Trustee and the SPV Counterparty to meaningfully participate in the process, the Debtors should agree to pay the reasonable fees and expenses of the SPV Trustee and the SPV Counterparty and their respective counsel and advisors in connection with these transactions.

       F.    *Incidental Costs of the Proposed Order*.  The Proposed Order would require the SPV Trustee and/or the SPV Counterparty to incur fees and expenses it would not otherwise incur, including but not limited to costs of publication of notices in The Wall Street Journal and Financial Times, or managing the process of obtaining confidentiality agreements with holders, with no provision for the manner in which these fees and expenses will be paid.  The Debtors should agree, and the Proposed Order should provide, that the Debtors shall pay these fees and expenses.

       G.    *Protections for the SPV Trustee and/or the SPV Counterparty*.  Neither the SPV Trustee nor the SPV Counterparty have any economic interests in the transactions; to the extent that either may be required to be the Authorized Designee, each should be afforded protections to insulate the SPV Trustee from liability from investors unhappy with any resolution that is reached between the parties.  The Proposed Order ought to provide:

       (A)  a protocol for providing notice of any resolution reached prior to, at or after mediation to all of the securityholders in the transaction, and a procedure for seeking approval of any resolution pursuant to a Bankruptcy Rule 9019 Motion upon adequate notice to all interested parties of the proposed resolution, which notice would give the opportunity to securityholders to object to the resolution at the hearing thereon; and

       (B)  protections to the SPV Trustee so long as it follows the procedures agreed to in accordance with subsection (A) above, in the form of the order approving the

settlement, binding the Noteholders to the terms of the resolution and barring Noteholders from bringing any action against the relevant SPV Trustee and the SPV Counterparty.

H.    In addition, with respect to transactions in which SPV Trustees have distributed funds on or prior November 25, 2008,[1] the Order should provide that while the SPV Trustee and the SPV Counterparty shall cooperate with the Debtors in seeking to identify appropriate holders for purposes of identifying one or more Authorized Designees, neither the SPV Trustee nor the SPV Counterparty shall be required to be the Authorized Designee, and the relevant SPV Trustee not be personally liable for distributions made prior to November 25, 2008.

## BACKGROUND

U.S. Bank National Association serves as Trustee (or some other similar capacity) in over *eight hundred* transactions involving the Debtors in these proceedings.  Many of these transactions are currently the subject of one of the adversary proceedings recently filed by the Debtors in this case.  These transactions are generally sophisticated transactions in which the Debtors or an affiliate of the Debtors have multiple roles and responsibilities.  The transactions which are the subject of the adversary proceedings for which U.S. Bank serves as Trustee include Collateralized Loan Obligations and Collateralized Bond Obligations for which U.S. Bank serves as Trustee (some of which involve complicated credit default swaps), securitization transactions in which U.S. Bank serves as Trustee, and certain other structured finance transactions, primarily known as RACERs[2] transactions, for which U.S. Bank or an affiliate

---

[1]    November 25, 2008 is the date of a letter from Weil Gotshal & Manges LLP to the Trustees alleging that it believed certain provisions subordinating a termination payment due the Debtors as a result of their default under the terms of the swap agreement are unenforceable.

[2]    RACERs stands for either Restructured Asset Securities with Enhanced Returns or Restructured Asset Certificates with Enhanced Returns.  These transactions were marketed by touting the use of a swap

*Footnote continued.*

serves as Owner Trustee.  All of these transactions involve derivative contracts with one of the Debtors.

*Collateralized Debt Obligations/Collateralized Bond Obligations.*

In these types of transactions, loans and notes of third parties were sold to the Issuer who financed such purchase through the issuance of Notes and Certificates.  The loans and notes provide the return of interest and principal on the Notes or Certificates in accordance with the terms of a waterfall contained in the governing documents.  Some or all of the Notes "owned" by the Issuer or Trust are "synthetic", taking the form of a credit default swap with the Issuer as a counterparty with one of the Lehman entities.  The Issuer, a special purpose entity, may also have been a counterparty to other swap transactions, including but not limited to coupon swap agreements, interest rate swaps or total return swaps, with one of the Debtors a counterparty thereto.  The Trustee for the Notes issued by the Issuer either has a security interest in the swaps or has certain rights to act on behalf of the Issuer.

A Credit Default Swap Agreement is a form of insurance against certain "Credit Events" occurring with respect to a designated portfolio of unrelated notes or indebtedness, including high yield debt.  The "Credit Events" typically are bankruptcy of the "reference entity" (the obligor for which the "insurance" is being offered), failure to pay certain obligations by the reference entity, restructuring or certain defaults related to indebtedness of the reference entity.  In some transactions with mortgage backed securities serving as the reference portfolio these Credit Events include writedowns with respect to the relevant security.

If a Credit Event occurs, the Issuer is required to pay the Debtor counterparty (through one of a number of different mechanisms) the amount of the loss on the indebtedness subject to

---

transaction (either a credit derivatives transaction, total return transaction or an interest rate swap) to "enhance" returns on an underlying security held by the relevant RACERs trust.

the Credit Event. The Issuer funds any obligations it may have to the Debtor counterparty from funds it receives through the issuance of Notes. The Notes are issued pursuant to an Indenture between the Issuer and U.S. Bank as Trustee. There are usually several tranches of Notes that are issued under the Indenture, with varying priorities and rights to payment.

In exchange for taking on the risk of Credit Events, the Issuer receives periodic payments from the Debtor. The Issuer uses these payments to make payments of interest on any issued Notes, or to pay commitment fees to those who have made a commitment to purchase notes. In some cases the Debtors failure to make these periodic payments has rendered the Issuer (generally, a nominal "shell" type entity with no employees of its own, and whose only assets consist of underlying securities held pursuant to the terms of the relevant trust agreement or Indenture) unable to make payments on the Notes, creating an Event of Default under the Indenture and changing, perhaps permanently, the relative rights of holders of different tranches of Notes under the Indenture.

As a result, although it may not be a counterparty to the Derivative Contract, the SPV Trustee and the Noteholders with respect to the relevant collateralized debt obligations or collateral loan obligations transactions have a significant interest in what happens to the relevant contract as a result of these bankruptcy proceedings.

*Securitization Transactions.*

U.S. Bank serves as Trustee for a large number of Lehman sponsored mortgage backed securitization transactions. In these transactions, a special purpose entity or trust issues various tranches of certificates to fund its purchase of mortgage loans from a Lehman related entity. Some of the tranches are supported by swap agreements, some of which have the applicable special purpose entity or trust and the Debtor as counterparties. In some cases these are interest rate swaps; in other cases these swaps take on the risk of non-payment of certain amounts due

and owing a particular tranche of Certificates.  Of course, the special purpose entity or the trust may have no real interest in the swap arrangement, rather it is the Trustee on behalf of the affected tranches of Certificateholders that have the real economic interest in connection with the swap agreement.

*RACERs Transactions*

U.S. Bank serves as Trustee for a number of RACERs transactions.  In these transactions the trust buys an underlying asset, and enhances the return from the underlying asset in some manner.  In some cases a derivative contract is used to "enhance" the returns.  One of the Debtors frequently serves as the counterparty to the trust in connection with the derivative contract.

## OBJECTIONS

### PROVISIONS OF THE GOVERNING DOCUMENTS LIMIT THE ABILITY OF THE SPV TRUSTEE OR THE SPV COUNTERPARTY TO SETTLE AND RESOLVE THE SWAP AGREEMENTS WITHOUT NOTEHOLDER CONSENT; FURTHER PROVISIONS OF THESE SAME DOCUMENTS OFTEN LIMIT THE ABILITY OF THE TRUSTEE TO INCUR COSTS WITHOUT THE APPROVAL OF A SUPER-MAJORITY OF INVESTORS

The chief dispute among the Debtors on the one hand, and the Noteholders, SPV Trustee and/or the SPV Counterparty on the other, centers on the priority of payment provisions contained in both the swap agreements and the Indentures.  Generally, the Indenture and the relevant swap agreement provides for a different priority of the termination payment in the event the relevant Lehman entity is the Affected Party or the defaulting party thereunder.    For example, the Indenture with respect to the White Marlin transaction provides, in part, that:

> (B)    On each Payment Date and upon acceleration following an Event of Default, Principal Proceeds shall be applied in the following order of priority:
>
> (i)    first, to pay the Credit Swap Counterparty any Cash Settlement Amounts owed by the Issuer (if any) under the Credit

Swap Agreement on the Scheduled Termination Date, second, on or after the Maturity Date, to make a deposit of the Maturity Date Amount into the Maturity Date Account (to the extent Principal Proceeds are not sufficient to make deposits into the maturity Date Account, such deposits will be made in accordance with Section 10.4(j)) and third, unless the Credit Swap Counterparty is the sole affected party or a party causing the Event of default (the "defaulting party"), to pay any termination payments owed to Credit Swap Counterparty;

\*    \*    \*    \*

[Thereafter to make up any Administrative Expenses, Fees and Expenses, certain management fees, and payments of interest on the Notes, certain other payments, then payments of principal on the Notes]

\*    \*    \*    \*

(xiv)    first, to the payment of the amounts specified in subclause (xv) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder; and second, to the payment of any termination payments to the Credit Swap Counterparty if it is the sole affected party or a Defaulting Party; . . .

Indenture (the "*White Marlin Indenture*") by and between White Marlin CDO 2007-1, Ltd., as Issuer, and White Marlin CDO 2007-1, Corp., as Co-Issuer and U.S. Bank National Association, as Trustee dated as of June 22, 2007, Section 11.1(B), p. 173-176 (attached hereto as *Exhibit A*).

This priority of payments is likewise reflected by reference in the Schedule to the Master Agreement which expressly provides:

If an early Termination Date is designated hereunder, Market Quotation and Second Method shall be used to calculate any termination payment owing by either party in respect of such early Termination date.  If an Early Termination Date is designated and any termination payment is owed by Party B, such termination payment shall be paid on the first Payment Date on or after the Early Termination Date in accordance with the Priority of Payments set forth in the Indenture.

Schedule, Part 1(c), p. 1 (attached hereto as *Exhibit B*).  Therefore the priority of the payment of any termination payment due the relevant Debtor is incorporated into and an integral part of the relevant swap agreement and the business arrangement of the parties.

Given the amounts that would be required by the relevant trusts to (a) pay administrative fees and expenses, (b) make payments on the Notes, and (c) make termination payments on the swap agreement, it is highly unlikely that there will be sufficient funds to make a full payment on both the Notes and any termination payment determined to be due the Debtors.  The effectiveness of the payment waterfall in the circumstances of a default by the Lehman counterparty (by virtue of LBHI's voluntary petition and thereafter the voluntary petitions of other Debtors) may mean a large swing in the actual amount received with respect to  any termination payment due the Debtors in the event the Debtors prevail on their arguments and the amounts actually paid on the obligations due the Noteholders.

Many, if not all of the transaction documents severely limit the ability of the Trustee to resolve these disputes without the consent of all of the affected securityholders.  For example, the White Marlin Indenture provides, in part, that:

> Notwithstanding the foregoing, the Trustee may not enter into any supplemental indenture without the written consent of each of the Portfolio Manager, the Credit Swap Counterparty and the Holders of each Outstanding Note of each Class materially and adversely affected thereby and the Issuer may not enter into any such supplemental indenture without the consent of each Outstanding Preference Share materially and adversely affected thereby if such supplemental indenture:

> *    *    *    *

> (f)  modifies the Priority of Payments.

White Marlin Indenture, Section 8.2, p. 136-138 (attached as *Exhibit A* hereto).  Likewise, in a RACERs transaction a provision on amendments provides, in part, that:

(b) In the event the Trustee receives any other request for approval of any amendment or supplement of the Trust Agreement, the Trustee shall forthwith mail a notice thereof to the Depositor and to each Certificateholder of record as of such date and shall request from the Depositor and the Certificateholders instructions as to whether or not to execute such amendment or supplement. Upon the instructions of Certificateholders evidencing more than 66-2/3% fractional undivided interests in the Trust (excluding the interests of any Certificateholder who is Trustee, Depositor, Swap Counterparty or Swap Guarantor), the Trustee shall enter into such amendment or supplement of the Trust Agreement so long as such amendment so long as such amendment or supplement does not reduce in any manner the amount of, or accelerate or delay the timing of, distributions on any Certificate; provided, however, that subject to the conditions set forth in Section 6.01(c) herein, any amendment or supplement under this subsection 6.01 (b) to which 100% of the then outstanding Certificateholders have provided their written consent shall be valid, effective and binding upon the Certificateholders.

Standard Terms for Trust Agreements between Lehman Brothers Inc., as Depositor and U.S. Bank National Association, as Trustee for Restructured Asset Certificates with Enhanced Returns, Series A Certificates ("*RACERS 2006-15-A Trust Agreement*"), dated as of November 16, 2006, Section 6.01, p.41 (attached hereto as *Exhibit C*).

The relevant transaction documents also contain significant limitations on the ability of the Trustee to incur extraordinary expenses, such as those involved in connection with a resolution of the unwinding of a trust (the Trustee reserves on the enforceability of such provisions). Further, the relevant agreements provide that the Trustee is not required to use its own funds in connection with the administration of the various trusts. The Trustee is therefore left without any resources to resolve these transactions[3] - unwilling to risk its own funds without a meaningful mechanism of repayment, and arguably without the ability to use trust funds to pay fees and expenses. It is therefore impossible to meaningfully attempt to craft a solution.

---

[3]    The Trustee notes that the Trust Indenture Act specifically addressed issues as to the fees and expense of the Trustee in connection with Indentures subject to the TIA - it enables the Trustee to pay its reasonable fees and expenses in connection with defaulted issues.

The limitation on fees and expenses take a number of different forms.  In the RACERs transactions, the documentary prohibition is adamant:

> (e)  The Trustee shall not take any action, including appearing in, instituting or conducting any action or suit hereunder or in relation hereto which is not indemnifiable under Section 5.07 hereof, which, in the Trustee's opinion, would or might cause it to incur Extraordinary Expenses unless (i) the Trustee has been instructed to do so by Certificateholders representing not less than 100% of the Certificates the outstanding, and (ii) the Trustee is satisfied that it will have adequate security or indemnity in respect of such Extraordinary Expenses which are approved by the Certificateholders pursuant to clause (i).

RACERs 2006-15-A Trust Agreement, Section 5.12(e), p.40 (attached hereto as *Exhibit C*).  In other transactions, such as the White Marlin transaction referenced above, while the Trustee is entitled to the repayment of its fees and expenses from the Issuer, if the Issuer does not pay it (and it has no funds to do so), the Trustee may pay it from trust funds, subject however, to the priority of payment provisions of the waterfall which applies an Administrative Cap on fees and expenses generally.  As is typical for Indentures of this type, the Indenture provides:

> (c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:
>
> *    *    *    *
>
> (iv)  no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability or expenses in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, it it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk, liability or expenses is not reasonably assured to it unless such risk, liability or expenses relates to its ordinary services, including giving notices under Article V, under this Indenture.

White Marlin Indenture, Section 6.1(c)(iv), p. 106 (attached as *Exhibit A*).

- 13 -

### NOTICE OF THE MOTION WAS INADEQUATE PARTICULARLY GIVEN THE NATURE OF THE RELIEF REQUESTED

The Motion presents significant issues for the SPV Trustees, SPV Counterparties and the Noteholders and/or Certificateholders. Given the complexity and the nature of the transactions involved, the fact that most if not all holders are not known, and the significant effort required to contact all holders, more notice rather than less notice should have been provided of the Objection Deadline and of the Hearing.

The various governing documents provide very specific notification requirements to the holders of the Notes and/or the Certificates. As pointed out herein, the beneficial holders are not known to the SPV Trustee. In order to provide Notice of the Motion, the SPV Trustees are therefore required to send out notice to The Depository Trust Company ("*DTC*"), who in turns sends such notice to the various DTC Participants, who deliver such notice to the potentially thousands of various beneficial holders. Given the number of parties involved, this process takes a significant period of time.

Even though the Debtors were aware of the long time period required to effectuate any meaningful notice to the various beneficial holders, the Debtors chose not only to give the minimum notice required, but to file the Motion the day before the Thanksgiving holiday, thus making providing adequate notice pursuant to the various governing documents even more difficult, if not impossible. Given the need to provide adequate notice to the various holders in accordance with the governing documents, more time, versus less, was required so that the holders could review the Motion and the Proposed Order, contact the various SPV Trustees and determine whether to object at the Hearing. Owing to the manner that notice was provided in this instance, it appears likely that the various holders will not have received any meaningful notice of the Motion, the relief requested therein, had time to contact the applicable trustee and/or prepare an objection to the Motion.

**THE MOTION SEEKS TO PUT THE ONUS OF DETERMINING WHO WILL SPEAK ON BEHALF OF THE TRUST ON THE TRUSTEE OR THE SPV COUNTERPARTY; THE TRUSTEE, HOWEVER, ONLY KNOWS THE BENEFICIAL HOLDERS OF SECURITIES TO THE EXTENT THAT SECURITYHOLDERS IDENTIFY THEMSELVES**

While the Trustee may have some insight into the holders of securities in some transactions, it generally does not know who all of the beneficial holders of the securities are, and in some transactions may not know the identity of any of the beneficial holders. In some cases beneficial ownership might be disputed[4]. In many cases the sole registered holder is DTC through its nominee Cede & Co. For purposes of the Indenture, a Noteholder is defined as "the Person in whose name such Note is registered in the Note Register". White Marlin Indenture, Definition Section, p. 27 (attached as *Exhibit A*). Section 2.8 of the same Indenture provides that each of the Issuer, the Co-Issuer and Trustee may treat the registered holder as the holder of such Notes for payments of principal and interest and "for all other purposes whatsoever." White Marlin Indenture, Section 2.8, p. 80. Beneficial holders of Notes and Certificates like to hold their positions through a nominee such as DTC in order to facilitate trading in the securities. The registration of the Note never changes although the beneficial ownership may. In any event the Registrar for the Notes does not maintain a list of beneficial holders - rather, it merely maintains a list of registered holders. The only way the Trustee or the Issuer knows of the beneficial ownership of a security is if the beneficial owner identifies itself to the Trustee. The Trustee and the SPV Counterparty, therefore, do not generally have information which is much better than that of the Debtor (in fact the Debtors may have better information through historical information on who the securities were originally sold to), and therefore the Motion and proposed procedures is a ploy to force the SPV Trustee or the SPV Counterparty to appoint themselves as the

---

[4]     In the Cash Synthetic Hybrid transactions, for example, two different entities claim ownership of the Class A unfunded securities.

Authorized Designee in the absence of better information and to avoid the possibility of onerous Sanctions. Neither the SPV Trustee, nor the SPV Counterparty has an economic stake in the transaction, nor do they have the authority under the documents to appoint themselves as the Authorized Designee or agree to settlements with the Debtors, and further, as will be set forth in greater detail below, neither currently has the tools or resources to adequately serve in the role as the Authorized Designee.

### In Some Transactions, One Authorized Designee May Be Insufficient to Reach a Fair Compromise of the Dispute

Many of these transactions involve multiple tranches of securities with different rights in terms of payment. For example, the White Marlin transaction involves five different classes of Notes (Classes A through E) and Preference Shares. These securities have different payment rights with respect to the payment of principal and interest as provided for in the Indenture. The Principal Payment waterfall set forth in the White Marlin Indenture is set forth in Section 11.1 of the Indenture attached hereto as *Exhibit A*. While perhaps a little oversimplified, if there is a termination payment due under the terms of the swap agreement, and the Lehman counterparties are not the defaulting parties, the Lehman counterparties receive any termination payment due them under the terms of the swap agreement. Thereafter, certain interest payments are made to the respective classes in accordance with their priority, and thereafter to principal payments on the Class A Notes until repaid, and thereafter on the Class B Notes until repaid, and so forth to the Class E Notes until they are repaid. Pursuant to the clear language of the Indenture, if the Lehman counterparty is the defaulting party, Lehman's termination payment drops below the repayment of the principal amounts due on the Class E Notes.

As the Court is aware, similar Indenture provisions have been the subject of litigation before this Court, before the English Courts, an appeal to the District Court, and a recent settlement between the Debtors and the Bank of New York, and will likely be the subject of

future litigation if mediation is unsuccessful.  If the clear language of the Indentures is ultimately upheld with respect to the priority of payment dispute, it is likely that the holders of the Class E Notes would be paid in full.  If the priority of payment provisions are not respected, it is unlikely that the Class E Notes will be paid in full if they receive any payment at all.  The dispute maybe an all or nothing proposition for the lower tranches.  As a result, a Class E Certificateholder has every incentive to fight the battle to the end, holding up the "higher" classes of securities.  At the same time, Class E Certificateholders may be entitled to full repayment, and therefore it would be unfair, then, for a Class A or B holder, who would receive some type of payment in any event, to craft a resolution which would leave the lower tranches out of any recovery giving the Class A Notes more.  This is a classic intercreditor dispute, and requires the input from and the consensus of all of the different tranches or classes of certificates for a resolution.

As such, one Authorized Designee is insufficient in these instances, and given the fact that the Trustee represents all of the Noteholders, it is therefore not appropriate for the Trustee to decide these intercreditor issues itself.  The Noteholders as a whole need to determine what a reasonable settlement to the Debtors might be, and thereafter how to allocate the remaining proceeds.  Where Noteholders of each Class can be identified, the Authorized Designee ought to consist of the entire group.

### IN ALL CASES THE REASONABLE FEES AND EXPENSES OF THE TRUSTEE IN ATTEMPTING TO SETTLE AND RESOLVE THE DISPUTE SHOULD BE BORNE BY THE DEBTORS

As set forth above, there are significant limitations on the ability of the SPV Trustee or the SPV Counterparty to use cash flow from the transaction to discharge their reasonable fees and expenses in connection with the resolution of this matter.  In many of the transactions, the Trustee lacks any funds in the Trust with which to discharge their fees and expenses in connection with any proposed mediation or other resolution of the dispute.  Further, even where

- 17 -

the Trustee has funds, there are often limitations on the ability to use those funds, particularly for "extraordinary actions" such as litigating or resolving a claim. The Trustee is not required to expend its own funds. As a result, if the Debtors want to resolve the disputes, and the Trustee is in favor of attempting to reach a resolution, the Debtors must commit to paying the fees and expenses of the Trustee, including the fees and expenses of its counsel.

**IN THE EVENT EITHER THE SPV TRUSTEE OR THE SPV COUNTERPARTY IS DESIGNATED AS THE AUTHORIZED DESIGNEE, THE SPV TRUSTEE AND THE SPV COUNTERPARTY OUGHT TO BE AFFORDED PROTECTIONS IN CONNECTION WITH RESOLVING THE VARIOUS ISSUES.**

To the extent that the SPV Trustee or the SPV Derivatives Counterparty are required to be the Authorized Designee, the SPV Trustee and the SPV Counterparty must be provided with certain protections in order to make the process productive. Neither the SPV Trustee nor the SPV Counterparty have any economic interest in the relevant transaction, and are not authorized under the terms of the documents to settle and resolve these fundamental trust issues. Therefore, each of the SPV Counterparty and the SPV Trustee need to be protected in acting against claims by the holders of the securities. Some of these protections are set forth below:

**A.     The SPV Trustee Must be Able to Retain a Third Party Valuation Agent For Purposes of Determining a Termination Payment at the Expense of the Estate**

There are two distinct parts to the chief dispute between the parties - one is the valuation of the termination payment and the second the priority enjoyed by the termination payment. Given the nature of this dispute and the cost of retaining a valuation agent for each transaction, U.S. Bank as Trustee has not previously obtained a valuation statement with respect to the termination payment that might be due the Lehman counterparty. Because the documents provide that the termination payment due Lehman is subordinated if they are the defaulting party under the terms of the swap agreement, a valuation by the Trustee was not required - the Trustee

will liquidate the collateral pay the Noteholders in full, with the remainder, if any, going to the Lehman counterparty in respect of the termination payment. It is unlikely that proceeds will be sufficient in any transaction to pay both the Noteholders and the Lehman counterparty in full.

Many of the Credit Derivative transactions involved are very complex. In some circumstances the credit derivative transaction involves 100 reference entities. Further, under some of the swaps, the Trust is not responsible for any Credit Events until the losses from such events reaches a particular threshold. After meeting the threshold the Trust is often obligated to make payments for all Credit Events up until a particular cap is reached. As a result, the evaluation of the swap is very complex and the SPV Trustee is not able (nor required) to produce a valuation of its own. In order for the Trustee to adequately and fairly discuss the merits of a settlement of the dispute, it will need to retain an independent third party valuation agent. Given that the Trustee is not required to expend its own funds for this purpose, and the fact that, in this context, the Debtors seek a resolution by requiring the SPV Trustee to act as Authorized Designee without the benefit of input from Noteholders, the Debtors should be required to bear this expense.

**B.      The Proposed Order Imposes Significant Costs Upon the SPV Trustee or the SPV Counterparty Which Must be Borne by the Estate**

The Proposed Order requires the SPV Counterparty and/or the SPV Trustee to publish notice of the receipt of the ADR Notice by the SPV Trustee or the SPV Counterparty. The Proposed Order would require three consecutive notices in two different financial newspapers of wide circulation. The cost of publishing such a notice in The Wall Street Journal and the Financial Times is significant. Further, there is no provision in the Indenture or Trust Agreement which requires that the Trustee provide notice in such manner or that would reimburse the SPV Trustee for such expense. In the case of the White Marlin transaction, for example, the payment date notice is merely required to be sent to those DTC Participants with a position in the

securities at DTC. It is the DTC Participants who are responsible for the further distribution of the Notice. There is no requirement for publication notice.

The Trustee does not necessarily have an objection to publishing notice with respect to the receipt of an ADR Notice from the Debtors, but it does object to bearing the significant cost and expense of preparing, submitting and publishing such a notice. Although the cost of the notice is dependent upon the space it takes in the relevant publication, it is not inconceivable that publishing the notice in these publications would exceed $100,000 for each transaction. When multiplied by the number of transactions for which U.S. Bank serves as Trustee, the cost of complying with the order is substantial. Whether or not the amount is substantial, however, the Trustee is not obligated to expend its own funds in connection with publishing notice. To the extent that additional notice is desired by the Debtors, the Debtors should pay all costs associated with such notice.

**C.    Because It is Unlikely That the Debtors, the SPV Trustee and/or the SPV Counterparty Will be Able to Identify and Obtain the Approval of All Noteholders the Order Should Require That any Resolution Be Subject to a Bankruptcy Rule 9019 Motion and that any Order Entered be Binding upon all Noteholders.**

Notwithstanding the notice provisions contained in the Proposed Order, it is unlikely that all Noteholders in any particular transaction can be identified to obtain their respective consent to any resolution reached. As a result, the SPV Trustee and the SPV Counterparty must be protected against claims brought by disgruntled Noteholders after the settlement has been approved by the parties. The best method to effectuate such protections would be for the Debtors to file a motion to approve the resolution pursuant to bankruptcy Rule 9019. Notice of such Motion will be provided to all Noteholders with respect to the economic terms of the resolution, and each Noteholder will be directed to file any objection that they may have with the Court, and that they will have the opportunity to be heard with respect to any such objection.

The process ought to provide sufficient time for Noteholders to actually receive and consider the Notice given the fact that it takes time for such notices to get from the initial recipients, DTC and any known DTC Participant, to the ultimate beneficial holders.  So long as sufficient notice of the resolution is provided, the Trustee requests that any Order approving the resolution protect the SPV Trustees from any action brought by holders as a result, bind the holders to the resolution, and bar such holders from instituting any action against the Trustee.

A Bankruptcy Rule 9019 Motion is required not only to protect the SPV Trustee, but also because the various Indentures require more than the approval of some Noteholders or Trustee approval  in order to modify the terms of the Indenture to permit a resolution.  In many cases the consent of all Noteholders is required to effectuate such amendments or to enter into any settlement that would have the effect of changing the provisions of the Indenture.

 The bankruptcy court has jurisdiction to direct and instruct a Trustee to modify the terms of an Indenture or Trust Agreement pursuant to a Bankruptcy Rule 9019 Motion under 28 U.S.C. § 1334(b), 28 U.S.C. §157 and § 105(a) of the Bankruptcy Code.  See *In re A. H. Robbins*, 880 F. 2d 769 (4th Cir. 1989)(Matters relating to control and supervision of trusts were properly within the equity jurisdiction of the district court, as sections 157 and 1334 of chapter 28 of the U.S. Code authorize district courts to take certain actions in bankruptcy cases and section 105 of the Bankruptcy Code authorizes the court to issue any order process or judgment that is necessary or appropriate to carry out the provision of this title).  Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.  *Celotex v. Edwards*, 514 U.S. 300 (S. Ct. 1995).

As set forth below, applicable case law supports the principle that courts may use their equitable powers to permit deviation in a trust agreement where circumstances exist that would

defeat or substantially impair the accomplishment of the purposes of the trust. As such, the bankruptcy courts, as courts of equity, can exercise jurisdiction over a trust. Furthermore, section §105(a) of the Bankruptcy Code grants bankruptcy courts broad equitable powers which permit a court to approve a settlement modifying the terms of a trust. The opinions rendered in the case *In re Joint Eastern and Southern Districts Asbestos Litigation* have recognized that §105(a), which permits the court to "issue any order, process or judgment that is necessary or appropriate to carry out provisions of the Bankruptcy Code", allows the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment procedures under a trust. See *In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F. Supp. 473 (E.D.N.Y & S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y & S.D.N.Y. 1991).

"The primary function of the court in exercising jurisdiction over trusts is to preserve them and to secure their administration according to their terms." *In re Cosgrave's Will,* 31 N.W.2d 33 (Minn.1948). "Where an unanticipated situation arises preventing execution of the trust according to its terms, deviations permitted to preserve the corpus . . ." *Id* at 34. *See* also *Mayall v. Mayall*, 65 N.W. 942 (Minn. 1896). This general rule is in accord with the common law generally, *See e.g., In the Matter of The James C. Atkinson Clifford Trust*, 762 So.2d 775 (La.App. 2000); *Carnahan v. Johnson*, 711 N.W.2d 1093 (Ohio App. 1998) ("Under the doctrine of deviation, a court can direct or permit a deviation from the terms of the trust where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust"); *Daloia v. Franciscan Health Sys.*, 679 N.E.2d 1084 (Ohio 1997); *Matter of Pinkerton,* 630 N.Y.S. 2d 481 (Surr.N.Y.Co., 1995); *In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F.Supp. 473 (E.D.N.Y. and S.D.N.Y. 1995) aff'd in part, rev'd in part 78 F.2d 764 (2d Cir. 1996); *Connecticut Bank and Trust Company v. Dexter D. Coffin,*

563 A.2d 1323 (Conn. 1989). At the very least equitable deviation permits deviations in the trust to the extent necessary to preserve the purpose of the trust, and in some cases Court's have permitted significant substantive changes to protect the trust.

In *Jt. E. & So. Asbestos Lit.*, the Court considered problems with the Manville Personal Injury Settlement Trust. The Court framed the problem as follows:

> As a result of low estimates of potential claims, the Trust's assets immediately proved grossly inadequate. When the distribution plan was confirmed in 1986, it was estimated that the Trust would receive approximately 83,000 to 100,000 claims over the course of its life into the middle of the next century. To date, the Trust has received approximately 240,000 claims and it is expected to receive hundreds of thousands more. Moreover, the projected value of the claims was but a fraction of what has to be paid to each claimant.

*Id*. at 479. In short, unless the terms of the Trust were changed, some 400,000 claimants would receive no recovery at all. The Court, in an extensive discussion of equitable deviation permitted changes in the distributive scheme of the Trust so that most if not all claimants would receive a recovery.

In *Davison v. Duke University*, 194 S.E.2d 761 (N.C. 1973) the Court modified a trust agreement mandating the investment of the corpus of the trust in certain specified investments. The trust was limited to investments in the stock of Duke Power Company and certain governmental obligations. A change in tax laws occurred such that the trust, unless altered, would be subject to significant taxation. In order to avoid the taxes the trust would be required to sell the Duke Power Company stock and thereby be required to invest the proceeds in governmental obligations. If invested in governmental obligations, the corpus of the trust would suffer erosion in real value as a result of inflation. If the assets of the trust were permitted to be more diversified, and the trust were able to invest in other securities, both the tax problems and problems caused by inflation would be avoided. The Court permitted a modification of the trust

to diversify the permitted investments thereby avoiding tax liability and preserving the corpus of the trust from inflation.

In *Daloia*, the Court used the "doctrine of deviation" to change the beneficiary of the trust. The original beneficiary was a hospital that was sold, making it impossible to comply with the express terms of the trust. The Court permitted the trust to distribute funds to another hospital with a similar objective.

In the instant case the deviation principle would be used to permit the deviation of the Trust Agreement as it relates to the priority of payment provisions in potentially two respects: (1) to affirm a settlement which alters the priority of payment provision to permit a payment of the resolved termination payment at the top of the waterfall, and (2) to permit a distribution to lower Class tranches even though senior tranches have not been paid in full. Where Courts have directed such a deviation, these same Courts have provided appropriate bar orders against the Trustee, copies of Orders entered in the Conseco, Inc, bankruptcy proceedings, and the DVI, Inc. bankruptcy proceedings are attached as *Exhibits D and E,* respectively.

### WHERE FUNDS IN THE TRUSTS HAVE BEEN DISTRIBUTED TO NOTEHOLDERS, THE ORDER OUGHT TO PROVIDE THAT NEITHER THE SPV TRUSTEE NOR THE SPV DERIVATIVE COUNTERPARTY SHALL SERVE AS THE AUTHORIZED DESIGNEE

In reliance upon the terms of the relevant documents for certain transactions and upon the state of the law as known to Trustees and other derivative counterparties at the time, the Trustee liquidated the underlying asset in certain transactions and distributed the proceeds in accordance with the priority of payments provision contained in the Indenture. Upon receiving notice of the Debtor's position with respect to the priority of payment provision, a provision which is incorporated as well into the relevant swap agreements, the Trustee ceased all activity with respect to making distributions of underlying assets to Noteholders. Under the terms of the

relevant Indenture or the applicable Trust Agreement, the Trustee is not liable for actions taken in good faith:

> (h) the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence of an Event of Default, prudently believes to be authorized and within its powers hereunder.

Standard Terms for Indentures dated as of July 5, 2007 by and between Lakeview CDO SPC, for the account of the Series 2007-4 Segregated Portfolio, Lakeview CDO LLC and U.S Bank National Association (the "*Lakeview Indenture*"), Section 6.3(h), p. 44. Further, the Lakeview Indenture provides in an earlier Section:

> (iii) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer in accordance with this Indenture, the Controlling Class . . of the Notes relating to the time. method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

Lakeview Indenture, Section 6.1(c)(iii), p. 42. The Trustee was merely following the terms of the relevant documents in connection with complex transactions. Following directions of Noteholders, where appropriate, and acting upon advice of counsel (Lakeview Indenture, Section 6.3(d))(attached as *Exhibit F*), the Trustee can not be held accountable for the distribution.

The Trustee is willing to reasonably cooperate with the Debtors, however, in connection with any distribution determined to be inappropriate by providing to the Debtors the identity of the Noteholders that have identified themselves to the Trustee in accordance with the discovery protocol already approved by this Court. The Trustee requests, however, that the Order specifically provide that the SPV Trustee shall not be required to be the Authorized Designee under these circumstances.

- 25 -

**THE TRUSTEE HAS FURTHER COMMENTS TO THE ORDER AS SET FORTH IN THE ATTACHED EXHIBIT G.**

The Trustee also has identified certain other issues with the Order that it has incorporated directly into the form of the order, and attaches those comments hereto as *Exhibit G*.

WHEREFORE U.S. Bank National Association, as Trustee respectfully requests that this Court deny the relief requested in the Motion as it related to the Trustee, or, alternatively, modify terms of the Order in accordance with this Objection.

Respectfully submitted,

U.S. BANK NATIONAL ASSOCIATION, not
    individually but as Trustee

/s/ Ann Acker

By: _____
    One of Its Attorneys

James E. Spiotto
Ann Acker
Franklin H. Top, III
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois  60603
(312) 845-3000

- 26 -