WHITE MARLIN CDO 2007-1, LTD.,
Issuer


and


WHITE MARLIN CDO 2007-1, CORP.,
Co-Issuer


and


U.S. BANK NATIONAL ASSOCIATION,
Trustee


INDENTURE


Dated as of June 22, 2007


COLLATERALIZED DEBT OBLIGATIONS

# TABLE OF CONTENTS

**Page**

ARTICLE I

DEFINITIONS...................................................................................................3

Section 1.1    Definitions.................................................................................3
Section 1.2    Assumptions as to the Underlying Asset. ...............................51
Section 1.3    Rules of Construction. ............................................................52

ARTICLE II

THE NOTES....................................................................................................52

Section 2.1    Forms Generally......................................................................52
Section 2.2    Forms of Notes and Certificate of Authentication.................52
Section 2.3    Authorized Amount; Note Interest Rate; Stated Maturity;
              Denominations. ....................................................................56
Section 2.4    Execution, Authentication, Delivery and Dating....................57
Section 2.5    Registration, Registration of Transfer and Exchange. ...........58
Section 2.6    Mutilated, Destroyed, Lost or Stolen Notes............................72
Section 2.7    Payment of Principal and Interest; Principal and Interest Rights
              Preserved..............................................................................73
Section 2.8    Persons Deemed Owners. .......................................................80
Section 2.9    Cancellation. ..........................................................................80
Section 2.10   Global Notes; Temporary Notes. ...........................................80
Section 2.11   Deduction or Withholding from Payments on Notes..............82
Section 2.12   Notes Beneficially Owned by Persons Not QIB/QPs. ...........82

ARTICLE III

CONDITIONS PRECEDENT; CERTAIN PROVISIONS
RELATING TO COLLATERAL .....................................................................83

Section 3.1    General Provisions..................................................................83
Section 3.2    Security for the Notes. ...........................................................86
Section 3.3    Reserved.................................................................................87
Section 3.4    Investment at the Direction of the Credit Swap Counterparty and
              Delivery of the Underlying Asset and Eligible Investments. ..............87
Section 3.5    Reserved.................................................................................89
Section 3.6    Representations Regarding Collateral.....................................89

# TABLE OF CONTENTS
(continued)

Page

ARTICLE IV

SATISFACTION AND DISCHARGE................................................................91

Section 4.1    Satisfaction and Discharge of Indenture. ................................................91
Section 4.2    Application of Trust Money.....................................................................92
Section 4.3    Repayment of Monies Held by Paying Agent. ......................................92

ARTICLE V

REMEDIES....................................................................................................92

Section 5.1    Events of Default. ...................................................................................92
Section 5.2    Acceleration of Maturity; Rescission and Annulment............................94
Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee.........96
Section 5.4    Remedies.................................................................................................97
Section 5.5    Optional Preservation of Collateral. .......................................................99
Section 5.6    Trustee May Enforce Claims Without Possession of Notes. ................101
Section 5.7    Application of Money Collected.............................................................101
Section 5.8    Limitation on Suits.................................................................................101
Section 5.9    Unconditional Rights of Noteholders to Receive Principal,
               Interest and Commitment Fees. .........................................................102
Section 5.10   Restoration of Rights and Remedies......................................................102
Section 5.11   Rights and Remedies Cumulative...........................................................103
Section 5.12   Delay or Omission Not Waiver..............................................................103
Section 5.13   Control by Holders of Notes..................................................................103
Section 5.14   Waiver of Past Defaults. .......................................................................103
Section 5.15   Undertaking for Costs. ...........................................................................104
Section 5.16   Waiver of Stay or Extension Laws. .......................................................104
Section 5.17   Sale of Collateral....................................................................................104
Section 5.18   Action on the Notes. ..............................................................................105

ARTICLE VI

THE TRUSTEE .............................................................................................105

Section 6.1    Certain Duties and Responsibilities. ......................................................105
Section 6.2    Notice of Default....................................................................................107
Section 6.3    Certain Rights of Trustee. ......................................................................107
Section 6.4    Not Responsible for Recitals or Issuance of Notes................................109
Section 6.5    May Hold Notes. ....................................................................................109
Section 6.6    Money Held in Trust..............................................................................109

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| Section 6.7 | Compensation and Reimbursement. | 109 |
| Section 6.8 | Corporate Trustee Required; Eligibility. | 111 |
| Section 6.9 | Resignation and Removal; Appointment of Successor. | 111 |
| Section 6.10 | Acceptance of Appointment by Successor. | 113 |
| Section 6.11 | Merger, Conversion, Consolidation or Succession to Business of Trustee. | 113 |
| Section 6.12 | Co Trustees and Separate Trustee. | 113 |
| Section 6.13 | Certain Duties of Trustee Related to Delayed Payment of Proceeds. | 117 |
| Section 6.14 | Representations and Warranties of the Trustee. | 117 |
| Section 6.15 | Authenticating Agents. | 118 |
| Section 6.16 | Fiduciary for Holders of Notes Only, Agent for Other Secured Parties. | 118 |
| Section 6.17 | Withholding. | 119 |

ARTICLE VII

COVENANTS ................................................................119

| | | |
|---|---|---|
| Section 7.1 | Payment of Principal and Interest. | 119 |
| Section 7.2 | Compliance With Laws. | 119 |
| Section 7.3 | Maintenance of Books and Records. | 119 |
| Section 7.4 | Maintenance of Office or Agency. | 119 |
| Section 7.5 | Money for Note Payments to be Held in Trust. | 120 |
| Section 7.6 | Existence of Co-Issuers. | 122 |
| Section 7.7 | Protection of Collateral. | 123 |
| Section 7.8 | Opinions as to Collateral. | 124 |
| Section 7.9 | Performance of Obligations. | 124 |
| Section 7.10 | Negative Covenants. | 125 |
| Section 7.11 | Statement as to Compliance. | 128 |
| Section 7.12 | Co-Issuers May Not Consolidate. | 128 |
| Section 7.13 | Reserved. | 128 |
| Section 7.14 | No Other Business. | 128 |
| Section 7.15 | Reserved. | 129 |
| Section 7.16 | Confirmation of Rating; Annual Rating Review. | 129 |
| Section 7.17 | Reporting. | 129 |
| Section 7.18 | Calculation Agent. | 130 |
| Section 7.19 | Certain Tax Matters. | 131 |
| Section 7.20 | Reserved. | 131 |
| Section 7.21 | CUSIP Numbers. | 131 |
| Section 7.22 | Bloomberg and Other Third-Party Vendor Screens. | 131 |
| Section 7.23 | Tax Forms. | 132 |

TABLE OF CONTENTS
(continued)

Page

Section 7.24    Intended Tax Treatment. ........................................................................133
Section 7.25    Preparation of Tax Statements. ..............................................................133

ARTICLE VIII

SUPPLEMENTAL INDENTURES ................................................................134

Section 8.1    Supplemental Indentures without Consent of Holders. ........................134
Section 8.2    Supplemental Indentures with Consent of Holders. ............................136
Section 8.3    Execution of Supplemental Indentures. ................................................139
Section 8.4    Effect of Supplemental Indentures........................................................139
Section 8.5    Reference in Notes to Supplemental Indentures...................................140
Section 8.6    Effect on the Portfolio Manager. ..........................................................140

ARTICLE IX

REDEMPTION OF NOTES...........................................................................140

Section 9.1    Optional Redemption. ...........................................................................140
Section 9.2    Notice to Trustee of Optional Redemption...........................................142
Section 9.3    Notice of Optional Redemption or Maturity by the Co-Issuers...........142
Section 9.4    Notes Payable on Redemption Date. ....................................................143
Section 9.5    Certain Other Redemptions...................................................................143

ARTICLE X

ACCOUNTS, ACCOUNTINGS AND RELEASES ......................................144

Section 10.1    Collection of Money. ...........................................................................144
Section 10.2    Collection Accounts; Custodial Account...............................................144
Section 10.3    Payment Account. .................................................................................147
Section 10.4    Contingent Class A Funding Account; Class A CDS Reserve
                Account; Contingent Class B-1 Funding Account; Class B-1
                CDS Reserve Account; Contingent Class E Funding Account;
                Class E CDS Reserve Account; Credit Swap Issuer Account;
                Specific Investment Proceeds Account; Maturity Date
                Account. ................................................................................................147
Section 10.5    Reports by Trustee. ...............................................................................159
Section 10.6    Accountings. ..........................................................................................159
Section 10.7    Custodianship and Release of Collateral. .............................................165
Section 10.8    Reports by Independent Accountants. ...................................................166
Section 10.9    No Event of Default. ..............................................................................167

TABLE OF CONTENTS
(continued)

Page

Section 10.10    Procedures Relating to the Establishment of Issuer Accounts
Controlled by the Trustee...................................................................167
Section 10.11    Notices to the Noteholders...................................................................167

ARTICLE XI

APPLICATION OF MONIES .........................................................168

Section 11.1    Disbursements of Monies from Payment Account. ............................168

ARTICLE XII

CHANGES TO THE REFERENCE PORTFOLIO.........................177

Section 12.1    Guidelines. ........................................................................................177

ARTICLE XIII

NOTEHOLDERS' RELATIONS ....................................................177

Section 13.1    Subordination.....................................................................................177
Section 13.2    Standard of Conduct. .........................................................................179

ARTICLE XIV

MISCELLANEOUS ......................................................................180

Section 14.1    Form of Documents Delivered to Trustee. ...........................................180
Section 14.2    Acts of Noteholders. ..........................................................................180
Section 14.3    Notices. .............................................................................................181
Section 14.4    Notices to Holders; Waiver..................................................................182
Section 14.5    Effect of Headings and Table of Contents............................................183
Section 14.6    Successors and Assigns.......................................................................183
Section 14.7    Severability........................................................................................183
Section 14.8    Benefits of Indenture...........................................................................183
Section 14.9    Governing Law. .................................................................................183
Section 14.10    Submission to Jurisdiction. .................................................................183
Section 14.11    Counterparts.......................................................................................184
Section 14.12    Waiver of Jury Trial............................................................................184
Section 14.13    Limited Recourse................................................................................184
Section 14.14    Liability of Co-Issuers. ......................................................................184
Section 14.15    Deferral and Waiver of Portfolio Management Fees............................185

## TABLE OF CONTENTS
(continued)

Page

Section 14.16    Legal Holidays. ....................................................................................185

EXHIBITS AND SCHEDULES

Exhibit A-1R        Form of Certificated Class A Note – Rule 144A
Exhibit A-1S        Form of Certificated Class A Note – Regulation S
Exhibit A-2         Form of Class A Note Purchase Agreement
Exhibit B-1-1R      Form of Certificated Class B-1 Note – Rule 144A
Exhibit B-1-1S      Form of Certificated Class B-1 Note – Regulation S
Exhibit B-1-2       Form of Class B-1 Note Purchase Agreement
Exhibit B-2-1       Form of Rule 144A Global Class B-2 Note
Exhibit B-2-2       Form of Regulation S Global Class B-2 Note
Exhibit B-2-3       Form of Certificated Class B-2 Note
Exhibit C-1-1       Form of Rule 144A Global Class C-1 Note
Exhibit C-1-2       Form of Regulation S Global Class C-1 Note
Exhibit C-1-3       Form of Certificated Class C-1 Note
Exhibit C-2-1       Form of Rule 144A Global Class C-2 Note
Exhibit C-2-2       Form of Regulation S Global Class C-2 Note
Exhibit C-2-3       Form of Certificated Class C-2 Note
Exhibit D-1         Form of Rule 144A Global Class D Note
Exhibit D-2         Form of Regulation S Global Class D Note
Exhibit D-3         Form of Certificated Class D Note
Exhibit E-1R        Form of Certificated Class E Note – Rule 144A
Exhibit E-1S        Form of Certificated Class E Note – Regulation S
Exhibit E-2         Form of Class E Note Purchase Agreement
Exhibit F           [Reserved]
Exhibit G           Form of Transfer Certificate for Transfers of Interests in Regulation S
                    Global Notes to Persons Taking Delivery in the Form of an Interest in a
                    Rule 144A Global Note
Exhibit H           Form of Transfer Certificate for Transfers of Interests in Rule 144A
                    Global Notes to Interests in Regulation S Global Notes
Exhibit I-1         Form of Transfer Certificate for Transfers of Interests in Certificated Class
                    A Notes, Certificated Class B-1 Notes and Certificated Class E Notes
Exhibit I-2         Form of Transfer Certificate for Transfers of Interests in Certificated Class
                    B-2 Notes, Certificated Class C Notes or Certificated Class D Notes
Exhibit I-3         Form of Transfer Certificate for Transfers of Interests in Certificated Class
                    B-2 Notes, Certificated Class C Notes or Certificated Class D Notes to
                    Persons Taking Delivery in the Form of Interests in Rule 144A Global
                    Notes or Interests in Regulation S Global Notes
Exhibit I-4         Form of Transfer Certificate for Transfers of Interests in Rule 144A
                    Global Notes or Regulation S Global Notes to Persons Taking Delivery in
                    the Form of Certificated Class Certificated Class B-2 Notes, Certificated
                    Class C Notes or Certificated Class D Notes
Exhibit J           Form of Note Owner Certificate
Exhibit K           Form of DTC Notice
Exhibit L           Form of Opinions of Cadwalader, Wickersham & Taft LLP
Exhibit M           Form of Opinion of Maples and Calder
Exhibit N           Trading Guidelines; Portfolio Limitations; Definitions

| | |
|---|---|
| Schedule A | ISDA Master Agreement, Schedule and Confirmation |
| Schedule B | Moody's Industry Category List |
| Schedule C | Determination of LIBOR Formula |
| Schedule D | S&P Industry Classification Groups |

INDENTURE, dated as of June 22, 2007, among White Marlin CDO 2007-1, Ltd., an exempted company incorporated under the laws of the Cayman Islands (the "Issuer"), White Marlin CDO 2007-1, Corp., a corporation organized under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, a national banking association, as Trustee (the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the terms of this Indenture have been done.

## GRANTING CLAUSE

The Issuer hereby Grants to the Trustee for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all securities, loans, investments and investment property, instruments, financial assets, general intangibles, payment intangibles, accounts, including, without limitation, deposit accounts, agreements and all other property (other than the Excepted Property) and assets of any type or nature in which the Issuer has an interest including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, including, without limitation,

(a)     the Underlying Asset listed as of the Closing Date in Schedule A to this Indenture and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder, including any part of any such Underlying Asset which consists of general intangibles (as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, and all Underlying Asset including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date, and all payments made or to be made thereon or with respect thereto;

(b)     the Issuer Accounts and any other accounts or subaccounts of the Issuer (other than the Preference Share Distribution Account), the Specific Investment Instrument, Eligible Investments purchased with funds on deposit therein and all funds or Financial Assets now or hereafter deposited therein and income from the investment of funds therein, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto;

(c)    the Portfolio Management Agreement, the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement, the Class E Note Purchase Agreement and the Securities Account Control Agreement, all payments thereunder and the Issuer's rights under each such agreement;

(d)    all money (as defined in the UCC) delivered to the Trustee (or its bailee); and

(e)    all Proceeds of any of the foregoing;

but excluding, in each case, (i) the Preference Share Distribution Account, Eligible Investments purchased with funds on deposit in or credited to such account, and all funds deposited in, Financial Assets and investment property credited to, and income from, the investment of funds in such accounts, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto, (ii) the Administration Agreement and the Issuer's rights thereunder and (iii) the Excepted Property, including the account maintained by the Issuer in the Cayman Islands for the deposit of the paid up share capital of the Issuer's ordinary shares and amounts on deposit therein (clauses (a) through (e) above, with the exclusion of (i) through (iii) above, the "Collateral").

Such Grants are made, in trust, to secure the Secured Obligations equally and ratably without prejudice, priority or distinction between the Secured Obligations by reason of difference in time of issuance or incurrence or otherwise, except as expressly provided in this Indenture (including Section 2.7, Article XI and Article XIII), and to secure (i) the payment of all amounts due on the Secured Obligations in accordance with their terms and (ii) compliance with the provisions of this Indenture and each related document, all as provided herein and therein.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein, for the benefit of the Secured Parties. Upon the occurrence of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other Instruments included in the Collateral held, subject to Section 6.16 hereof, for the benefit and security of the Secured Parties or otherwise available at law or in equity but subject to the terms hereof, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law and the terms of this Indenture, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public and private sale.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein in accordance with the provisions hereof such that, subject to Section 6.16 hereof, the interests of the Secured Parties may be adequately and effectively protected.

The Issuer hereby authorizes the filing of financing or continuation statements, and amendments thereto, in all jurisdictions and with all filing offices as the Trustee may determine, in its sole discretion, are necessary or advisable to perfect the security interests granted to the Trustee in connection herewith.  Such financing statements may describe the collateral in the same manner as described in any security agreement or pledge agreement entered into by the parties in connection herewith or may contain an indication or description of collateral that describes such property in any other manner as the Trustee may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interests in the Collateral granted to the Trustee in connection herewith, including, without limitation, describing such property as "all assets" or "all personal property."  Nothing herein shall be construed as imposing a duty upon the Trustee to determine whether any financing statement or continuation statement is needed or advisable, the jurisdictions or filing offices in which such filings should be made or to make such filings.

# ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  Whenever any reference is made to an amount the determination or calculation of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of determination or calculation is expressly specified in the particular provision.

"Account":  The meaning specified in Section 9-102(a)(2) of the UCC.

"Accountants' Certificate":  A certificate of a firm of Independent certified public accountants of national reputation appointed by the Issuer pursuant to Section 10.8(a).

"accredited investor":  The meaning specified under Rule 501(a) of Regulation D under the Securities Act.

"Act":  The meaning specified in Section 14.2.

"Actionable Quotation":  The meaning specified in Exhibit N to this Indenture.

"Additional Payment":  The meaning specified in the Credit Swap Agreement.

"Adjustment Amount":  The meaning specified in Section 2.7(k).

"Adjustment Reference Entity":  The meaning specified in Section 2.7(k).

"<u>Administration Agreement</u>":  An agreement dated as of the Closing Date, by and between the Issuer and the Administrator relating to the administration of the Issuer, as the same may be amended or modified.

"<u>Administrative Expenses</u>":  In the following order of priority, (i) amounts (including indemnities) due or accrued to the Trustee pursuant to <u>Section 6.7</u> hereunder; (ii) amounts due or accrued to the Collateral Administrator under the Collateral Administration Agreement; (iii) amounts due or accrued to the Class A Note Agent under the Class A Note Purchase Agreement; (iv) amounts due or accrued to the Class B-1 Note Agent under the Class B-1 Note Purchase Agreement; (v) amounts due or accrued to the Class E Note Agent under the Class E Note Purchase Agreement; (vi) amounts due or accrued to the Shares Paying Agent hereunder or under the Shares Paying Agency Agreement; (vii) fees and expenses due or accrued by the Independent accountants, agents and counsel of the Issuer; (viii) fees and expenses due or accrued by each of the Rating Agencies for amendments, credit estimates and surveillance in connection with any rating of the Notes, the Reference Entities or the Underlying Asset; (ix) fees and expenses due or accrued by any other Person in respect of any governmental fee (including all filing, registration and annual return fees payable to the Cayman Islands government and registered office fees), charge or tax (other than withholding taxes); (x) fees, expenses and amounts incurred by and indemnities due to the Portfolio Manager under the Indenture and the Portfolio Management Agreement; and (xi) fees and expenses due or accrued by any other Person as permitted under this Indenture (including any fees and expenses owed to the Administrator under the Administration Agreement and registered office fees) (the amounts referred in clauses (i) through (xi) above are collectively referred herein as "<u>Fees and Expenses</u>").

"<u>Administrative Expense Cap</u>":  (A) On any Payment Date (other than the three Payment Dates immediately following the Closing Date), an amount not to exceed the sum of (i) $80,000 per annum minus amounts applied in respect of Fees and Expenses during the immediately preceding Due Period for each of the three prior Payment Dates preceding such Payment Date and (ii) 0.00375% per annum (calculated on the basis of a year with 360 days consisting of twelve 30-day months) on the Aggregate Outstanding Reference Entity Calculation Amount, and (B) in the case of the three Payment Dates immediately following the Closing Date, an amount not to exceed $20,000.

"<u>Administrator</u>":  Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands.

"<u>Advances</u>":  The meaning specified in the Class A Note Purchase Agreement, the Class B Note Purchase Agreement or the Class E Notes Purchase Agreement, as applicable.

"<u>Affiliate</u>" or "<u>Affiliated</u>":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, member, officer, employee or general partner (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of any such Person or (ii) to direct or cause the direction of the

4

management and policies of such Person whether by contract or otherwise. This definition shall exclude any other Special Purpose Vehicle to which the Administrator is or will be providing administrative services.

"Agent Members": Members of, or participants in, the Depositary.

"Aggregate Outstanding Amount": When used with respect to (i) any or all of the Notes, except the Class A Notes, the Class B-1 Notes and the Class E Notes, the aggregate principal amount of such Notes Outstanding on the date of determination; and (ii) any Preference Shares, the aggregate number of Preference Shares Outstanding on the date of determination. When used with respect to (x) the Class A Notes, the aggregate amount of draw downs made by the Class A Noteholders to the Issuer since the Closing Date, which draw downs remain unpaid on the relevant date of determination; (y) the Class B-1 Notes, the aggregate amount of draw downs made by the Class B-1 Noteholders to the Issuer since the Closing Date, which draw downs remain unpaid on the relevant date of determination and (z) the Class E Notes, the aggregate amount of draw downs made by the Class E Noteholders to the Issuer since the Closing Date, which draw downs remain unpaid on the relevant date of determination; provided that, for purposes of calculating the Overcollateralization Ratios and determining whether Class A Noteholders, Class B-1 Noteholders or Class E Noteholders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder (except for a request, demand, authorization, direction, notice, consent or waiver after the Maturity Date), the Aggregate Outstanding Amount of the Class A Notes, Class B-1 Notes or Class E Notes, as applicable, shall be deemed to be the aggregate amount of the Class A Commitments, Class B-1 Commitments or Class E Commitments, in each case whether funded or unfunded. Except as otherwise provided herein, the Aggregate Outstanding Amount of the Class D Notes and Class E Notes shall include, respectively, all Class D Deferred Interest, Class E Deferred Interest or Class E Deferred Commitment Fees (as applicable) attributed thereto; provided, further, that, when use in respect of the definition of Redemption Price, the Aggregate Outstanding Amount of the Class A Notes, Class B-1 Notes or Class E Notes, as applicable, shall deemed to be the aggregate amount of the Class A Commitments, Class B-1 Commitments or Class E Commitments, in each case whether funded or unfunded.

"Aggregate Outstanding Reference Entity Calculation Amount": An amount equal to the sum of the Reference Entity Calculation Amounts for each Reference Entity in the Reference Registry or, if specified as applying to a specific group of Reference Entities, the sum of the Reference Entity Calculation Amount for each Reference Entity in such group.

"Aggregate Principal Amount": When used with respect to (i) any or all of the Pledged Underlying Assets, Eligible Investments or Cash, the aggregate of the principal balances of such Pledged Underlying Assets, Eligible Investments or Cash on the date of determination or (ii) to the Underlying Asset, the aggregate Reference Entity Calculation Amount of all the Reference Entities as of the date of determination.

"Annual Report": The meaning specified in Section 10.11(b).

"Applicable Recovery Rate":  With respect to any Reference Entity, the lower of Weighted Average Recovery Rate (Moody's) and Weighted Average Recovery Rate (S&P) for such Reference Entity.

"Assigned Moody's Rating":  The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"Assumed Reinvestment Rate":  With respect to any account or fund securing Notes as of any date of determination, the greater of (a) zero and (b) LIBOR determined as of the most recent LIBOR Determination Date minus 0.1% per annum.

"Authenticating Agent":  With respect to the Notes or a Class of Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to Section 6.15.

"Authorized Officer":  With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer.  With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. With respect to the Class A Note Agent, Class B-1 Note Agent or Class E Note Agent, any officer, employee or agent of such Class A Note Agent, Class B-1 Note Agent or Class E Note Agent who is authorized to act for such Class A Note Agent, Class B-1 Note Agent or Class E Note Agent in matters relating to, and binding upon, such Class A Note Agent, Class B-1 Note Agent or Class E Note Agent with respect to the subject matter of the request, certificate or order in question.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Availability Amount":  The positive amount, if any, by which the Maximum Portfolio Size exceeds the Aggregate Outstanding Reference Entity Calculation Amount.

"Average Expected Loss Percentage":  The meaning specified in Exhibit N to this Indenture.

"Balance":  On any date, with respect to Cash or Eligible Investments in any account, the aggregate of (i) the current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) the principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) the purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank":  U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee.

"Bankruptcy Code":  The United States bankruptcy code, as set forth in Title 11 of the United States Code, as amended, and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands.

"Benefit Plan Investor":  Any (i) "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (ii) "plan" (as described in Section 4975(e)(1) of the Code and including, without limitation, an individual retirement account or a Keogh plan) that is subject to Section 4975 of the Code, (iii) entity whose underlying assets include plan assets by reason of such employee benefit plan's or plan's investment in such entity, or (iv) entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA, including but not limited to, an insurance company general account, an insurance company separate account and a collective investment fund which holds assets of such a benefit plan investor.

"Board of Directors":  With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or otherwise duly appointed from time to time and with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the stockholders of the Co-Issuer; provided, that, with respect to each of the Issuer and the Co-Issuer, there shall at all times be one director who is not Affiliated with any of the Managers.

"Board Resolution":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer and with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"Business Day":  Any day on which commercial banks and foreign exchange markets settle payments in (i) each of New York City, New York, Boston, Massachusetts, the Cayman Islands (in relation only to any payments to be made to or through the Cayman Islands) and any other city in which the principal corporate trust office of the Trustee may from time to time be located, and (ii)(a) in the case of the final payment or distribution on any Note, the place of presentation of such Note, and (b) in the case of the final distribution on any Preference Shares, the place of presentation of such Preference Shares.

"Calculation Agent":  The meaning specified in Section 7.18(a).

"Cash":  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"Cash Settlement Amount":  The meaning specified in the Credit Swap Agreement.

"Certificate of Authentication":  The Trustee's or Authenticating Agent's certificate of authentication on any Note.

"Certificated Class A Note":  The meaning set forth in Section 2.2(a)(iii).

"Certificated Class B-1 Note":  The meaning set forth in Section 2.2(a)(iv).

"Certificated Class B-2 Note":  The meaning set forth in Section 2.2(a)(v).

"Certificated Class B-2 Note Subscription Agreement":  An agreement among the Issuer and each Investor in the Certificated Class B-2 Notes, as the same may be amended or supplemented and in effect from time to time.

"Certificated Class C Note Subscription Agreement":  Collectively, the Certificated Class C-1 Note Subscription Agreement and the Certificated Class C-2 Note Subscription Agreement.

"Certificated Class C-1 Note":  The meaning set forth in Section 2.2(a)(vi).

"Certificated Class C-1 Note Subscription Agreement":  An agreement among the Issuer and each Investor in the Certificated Class C-1 Notes, as the same may be amended or supplemented and in effect from time to time.

"Certificated Class C-2 Note":  The meaning set forth in Section 2.2(a)(vii).

"Certificated Class C-2 Note Subscription Agreement":  An agreement among the Issuer and each Investor in the Certificated Class C-2 Notes, as the same may be amended or supplemented and in effect from time to time.

"Certificated Class D Note"  The meaning set forth in Section 2.2(a)(viii).

"Certificated Class D Note Subscription Agreement":  An agreement among the Issuer and each Investor in the Certificated Class D Notes, as the same may be amended or supplemented and in effect from time to time.

"Certificated Class E Note"  The meaning set forth in Section 2.2(a)(ix).

"Certificated Notes"  Each of the Certificated Class A Notes, Certificated Class B-1 Notes, Certificated Class B-2 Notes, Certificated Class C Notes, Certificated Class D Notes and Certificated Class E Notes.

"Certificated Security":  The meaning specified in Section 8-102(a)(4) of the UCC.

"Chattel Paper":  "Tangible Chattel Paper" and "Electronic Chattel Paper" as those terms are defined in the UCC.

"Class":  Each of the Class A Notes, the Class B-1 Notes, the Class B-2 Notes, the Class C-1 Notes, the Class C-2 Notes, the Class D Notes, the Class E Notes and the Preference Shares; *provided*, that: (i) whenever reference is made to Class B Notes (including, without limitation, in the definition of Controlling Class), the Class B-1 Notes and Class B-2 Notes shall constitute one single Class; provided, further, that with respect to any vote regarding a supplemental indenture, the Class B-1 Notes and Class B-2 Notes will be treated as one single Class unless such proposed supplemental indenture affects the rights of Class B-1 Noteholders in a materially different manner from the manner in which it affects the rights of the Class B-2 Noteholders, in which case the Class B-1 Notes and Class B-2 Notes shall be treated as separate classes; and (ii) whenever reference is made to Class C Notes (including, without limitation, in

the definition of Controlling Class), the Class C-1 Notes and Class C-2 Notes shall constitute one single Class; provided, further, that with respect to any vote regarding a supplemental indenture, the Class C-1 Notes and Class C-2 Notes will be treated as one single Class unless such proposed supplemental indenture affects the rights of Class C-1 Noteholders in a materially different manner from the manner in which it affects the rights of the Class C-2 Noteholders, in which case the Class C-1 Notes and Class C-2 Notes shall be treated as separate classes.

"Class A Break-Even Default Rate":  On any date of determination, the maximum portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) of the Current Portfolio or the Proposed Portfolio, as applicable, that can experience credit events, through application of the applicable Standard & Poor's CDO Monitor Test, and that, after giving effect to Standard & Poor's assumptions on recoveries on credit events and timing of such recoveries and to the Priority of Payments, will result in sufficient funds remaining for the payment of the Class A Notes in full by their Stated Maturity and the timely payment of interest on the Class A Notes.

"Class A CDS Reserve Account":  The meaning specified in Section 10.4(b).

"Class A Commitments":  The meaning assigned to such term in the Class A Note Purchase Agreement.

"Class A Commitment Fee":  The commitment fee that accrues on that portion of the Class A Commitments that are undrawn as of the close of each Business Day (or, in the case of any day that is not a Business Day, on the preceding Business Day) at a rate per annum equal to 0.08% on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360 from and including the Closing Date until Maturity Date.

"Class A Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)      the aggregate amount of interest accrued at the Class A Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class A Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class A Notes or any prepayment thereof on any preceding Payment Date), and

(ii)     any Defaulted Interest in respect of the Class A Notes and accrued and unpaid interest on such Defaulted Interest;

provided that, from the Maturity Date to the Deferred Maturity Date, the funded portion of the Class A Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class A Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the funded Class A Notes accrued at a rate of LIBOR.

"Class A Loss Differential": At any time, the rate calculated by subtracting the Class A Scenario Default Rate at such time from the Class A Break-Even Default Rate at such time.

"Class A Note Agent":   U.S. Bank National Association, a national banking association, as agent on behalf of the Holders of the Class A Notes under the Class A Note Purchase Agreement.

"Class A Note Interest Rate":  The interest rate for the Class A Notes as set forth in Section 2.3.

"Class A Note Purchase Agreement":  An agreement dated as of the Closing Date, among the Issuer, Co-Issuer, Class A Note Agent and the Holders of the Class A Notes, as the same may be amended or supplemented and in effect from time to time.

"Class A Note Register":   The register maintained by the Class A Note Agent with respect to the Class A Notes pursuant to Section 2.5.

"Class A Notes":  The Class A Contingent Funding Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class A Scenario Default Rate":   At any time, an estimate (determined by application of the applicable Standard & Poor's CDO Monitor Test at such time) of the portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) that has experienced a credit event for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class A Notes by Standard & Poor's.

"Class A Trustee":  The meaning specified in Section 6.12.

"Class B Break-Even Default Rate"  On any date of determination, the maximum portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) of the Current Portfolio or the Proposed Portfolio, as applicable, that can experience credit events, through application of the applicable Standard & Poor's CDO Monitor Test, and that, after giving effect to Standard & Poor's assumptions on recoveries on credit events and timing of such recoveries and to the Priority of Payments, will result in sufficient funds remaining for the payment of the Class B Notes in full by their Stated Maturity and the timely payment of interest on the Class B Notes.

"Class B Loss Differential": At any time, the rate calculated by subtracting the Class B Scenario Default Rate at such time from the Class B Break-Even Default Rate at such time.

"Class B Note Interest Rate":  The interest rate for the Class B Notes specified in Section 2.3.

"Class B Notes":  Collectively, the Class B-1 Notes and the Class B-2 Notes.

"Class B Scenario Default Rate":  At any time, an estimate (determined by application of the applicable Standard & Poor's CDO Monitor Test at such time) of the portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) that has experienced a credit event for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class B Notes by Standard & Poor's.

"Class B Trustee":  The meaning specified in Section 6.12.

"Class B-1 CDS Reserve Account":  The meaning specified in Section 10.4(c).

"Class B-1 Commitments":  The meaning assigned to such term in the Class B-1 Note Purchase Agreement.

"Class B-1 Commitment Fee":  The commitment fee that accrues on that portion of the Class B-1 Commitments that are undrawn as of the close of each Business Day (or, in the case of any day that is not a Business Day, on the preceding Business Day) at a rate per annum equal to 0.67% on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360 from and including the Closing Date until Maturity Date.

"Class B-1 Interest Distribution Amount":  With respect to any Payment Date, the sum of:

> (i)    the aggregate amount of interest accrued at the Class B-1 Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class B-1 Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class B-1 Notes or any prepayment thereof on any preceding Payment Date), and

> (ii)   any Defaulted Interest in respect of the Class B-1 Notes and accrued and unpaid interest on such Defaulted Interest.

provided that, from the Maturity Date to the Deferred Maturity Date, the funded portion of the Class B-1 Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class B-1 Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the funded Class B-1 Notes accrued at a rate of LIBOR.

"Class B-1 Note Agent":  U.S. Bank National Association, a national banking association, as agent on behalf of the Holders of the Class B-1 Notes under the Class B-1 Note Purchase Agreement.

"Class B-1 Note Purchase Agreement":  An agreement dated as of the Closing Date, among the Issuer, Co-Issuer, Class B-1 Note Agent and the Holders of the Class B-1 Notes, as the same may be amended or supplemented and in effect from time to time.

"<u>Class B-1 Note Register</u>":  The register maintained by the Class B-1 Note Agent with respect to the Class B-1 Notes pursuant to <u>Section 2.5</u>.

"<u>Class B-1 Notes</u>":  The Class B-1 Contingent Funding Notes having the applicable Note Interest Rate and Stated Maturity as set forth in <u>Section 2.3</u>.

"<u>Class B-2 Amount</u>": The funded outstanding principal balance of the Class B-2 Notes, after taking into account all previous payments made in reduction of such balance.

"<u>Class B-2/B-1 Portion</u>": At the time of any determination, the product of (i) a fraction, the numerator of which is the funded portion of the Class B-1 Commitments and the denominator of which is the aggregate of the funded and unfunded Class B-1 Commitments  (in each case, based upon the amount of Class B-1 Commitments immediately prior to such determination) and (ii) $44,800,000 minus the aggregate amount of all principal payments made with respect to the Class B-2 Notes immediately prior to such determination.

"<u>Class B-2 Interest Distribution Amount</u>":  With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class B-2 Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class B-2 Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class B-2 Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Defaulted Interest in respect of the Class B-2 Notes and accrued and unpaid interest on such Defaulted Interest.

<u>provided</u> that, from the Maturity Date to the Deferred Maturity Date, the Class B-2 Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is Aggregate Outstanding Amount of the Class B-2 Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class B-2 Notes accrued at a rate of LIBOR.

"<u>Class B-2 Notes</u>":  The Class B-2 Floating Rate Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3

"<u>Class B-2 Outstanding Portion Amount</u>":  The funded outstanding principal balance of the Class B-2 Notes minus the Class B-2/B-1 Portion.

"<u>Class C Amount</u>": The sum of the funded outstanding principal balances of the Class C-1 Notes and the Class C-2 Notes after taking all previous payments made in reduction of such balances.

"<u>Class C Break-Even Default Rate</u>":  On any date of determination, the maximum portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a

percentage) of the Current Portfolio or the Proposed Portfolio, as applicable, that can experience credit events, through application of the applicable Standard & Poor's CDO Monitor Test, and that, after giving effect to Standard & Poor's assumptions on recoveries on credit events and timing of such recoveries and to the Priority of Payments, will result in sufficient funds remaining for the payment of the Class C Notes in full by their Stated Maturity and the timely payment of interest on the Class C Notes.

"Class C Coverage Tests":  The Class C Overcollateralization Ratio Test and the Class C Interest Coverage Ratio Test.

"Class C Interest Coverage Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(i)    the Net Collateral Interest Proceeds; by

(ii)    with respect to the current Due Period, the sum of (a) scheduled interest on the Class A Notes, the accrued and unpaid Class A Commitment Fee, scheduled interest on the Class B Notes, the accrued and unpaid Class B-1 Commitment Fee and scheduled interest on the Class C Notes with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the immediately succeeding Payment Date) and (b) any Defaulted Interest on the Class A Notes, any Defaulted Interest on the Class B Notes, any Defaulted Interest on the Class C Notes, any Defaulted Commitment Fees, and in each case, accrued and unpaid interest on such Defaulted Interest and Defaulted Commitment Fees.

"Class C Interest Coverage Ratio Test":  For so long as any Class C Notes remain Outstanding, a test that will be satisfied on any Measurement Date, if the Class C Interest Coverage Ratio is equal to or greater than 125.00%.

"Class C Loss Differential"  At any time, the rate calculated by subtracting the Class C Scenario Default Rate at such time from the Class C Break-Even Default Rate at such time.

"Class C Notes":  Collectively, the Class C-1 Notes and the Class C-2 Notes.

"Class C Overcollateralization Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(a)    the Net Collateral Principal Balance as of such Measurement Date; by

(b)    the Aggregate Outstanding Amount of the Class A Notes and the Class B Notes (calculated using the aggregate amount of the Class A Commitments and the Class B-1 Commitments, whether funded or unfunded) and the Class C Notes as of such Measurement Date.

"Class C Overcollateralization Ratio Test":  A test that will be satisfied as of any Measurement Date if the Class C Overcollateralization Ratio is equal to or greater than 102.50%.

13

"Class C Scenario Default Rate":  At any time, an estimate (determined by application of the applicable Standard & Poor's CDO Monitor at such time) of the portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) that has experienced a credit event for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AA" rating of the Class C Notes by Standard & Poor's.

"Class C Trustee":  The meaning specified in Section 6.12.

"Class C-1 Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class C-1 Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class C-1 Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class C-1 Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Defaulted Interest in respect of the Class C-1 Notes and accrued and unpaid interest on such Defaulted Interest.

provided that, from the Maturity Date to the Deferred Maturity Date, the Class C-1 Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the Aggregate Outstanding Amount of the Class C-1 Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class C-1 Notes accrued at a rate of LIBOR.

"Class C-1 Note Interest Rate":  The interest rate for the Class C-1 Notes specified in Section 2.3.

"Class C-1 Notes":  The Class C-1 Floating Rate Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class C-2 Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class C-2 Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class C-2 Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class C-2 Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Defaulted Interest in respect of the Class C-2 Notes and accrued and unpaid interest on such Defaulted Interest.

provided that, from the Maturity Date to the Deferred Maturity Date, the Class C-2 Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments

in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the Aggregate Outstanding Amount of the Class C-2 Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class C-2 Notes accrued at a rate of LIBOR.

"Class C-2 Note Interest Rate":  The interest rate for the Class C-2 Notes specified in Section 2.3.

"Class C-2 Notes":  The Class C-2 Fixed Rate Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class D Amount":  The funded outstanding principal balance of the Class D Notes, after taking into account all previous payments made in reduction of such balance.

"Class D Break-Even Default Rate"  On any date of determination, the maximum portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) of the Current Portfolio or the Proposed Portfolio, as applicable, that can experience credit events, through application of the applicable Standard & Poor's CDO Monitor Test, and that, after giving effect to Standard & Poor's assumptions on recoveries on credit events and timing of such recoveries and to the Priority of Payments, will result in sufficient funds remaining for the payment of the Class D Notes in full by their Stated Maturity and the timely payment of interest on the Class D Notes.

"Class D Coverage Tests":  The Class D Overcollateralization Ratio Test and the Class D Interest Coverage Ratio Test.

"Class D Deferred Interest":  The meaning specified in Section 2.7(a).

"Class D Interest Coverage Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(i)    the Net Collateral Interest Proceeds; by

(ii)    with respect to the current Due Period, the sum of (a) scheduled interest on the Class A Notes, the accrued and unpaid Class A Commitment Fee, scheduled interest on the Class B Notes, the accrued and unpaid Class B-1 Commitment Fee, scheduled interest on the Class C Notes and scheduled interest on the Class D Notes (not including Class D Deferred Interest from previous Payment Dates, but including interest on such Class D Deferred Interest) with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the immediately succeeding Payment Date) and (b) any Defaulted Interest on the Class A Notes, any Defaulted Interest on the Class B Notes, any Defaulted Interest on the Class C Notes, any Defaulted Interest on the Class D Notes, any Defaulted Commitment Fees and, in each case, accrued and unpaid interest on such Defaulted Interest and Defaulted Commitments Fees.

"Class D Interest Coverage Ratio Test":  For so long as any Class D Notes remain Outstanding, a test that will be satisfied on any Measurement Date, if the Class D Interest Coverage Ratio is equal to or greater than 120.00%.

"Class D Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class D Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class D Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class D Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Class D Deferred Interest and, in the event that the Class A Notes, the Class B Notes and the Class C Notes are no longer Outstanding, any Defaulted Interest in respect of the Class D Notes and accrued and unpaid interest on such Defaulted Interest.

provided that, from the Maturity Date to the Deferred Maturity Date, the Class D Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is Aggregate Outstanding Amount of the Class D Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class D Notes accrued at a rate of LIBOR.

"Class D Loss Differential"  At any time, the rate calculated by subtracting the Class D Scenario Default Rate at such time from the Class D Break-Even Default Rate at such time.

"Class D Note Interest Rate":  The interest rate for the Class D Notes specified in Section 2.3.

"Class D Notes":  The Class D Floating Rate Deferrable Notes, having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class D Overcollateralization Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(a)    the Net Collateral Principal Balance as of such Measurement Date, by

(b)    the Aggregate Outstanding Amount of the Class A Notes and the Class B Notes (calculated using the aggregate amount of the Class A Commitments and the Class B-1 Commitments whether funded or unfunded), the Class C Notes and the Class D Notes (including any Class D Deferred Interest), in each case as of such Measurement Date.

"Class D Overcollateralization Ratio Test":  A test that will be satisfied as of any subsequent Measurement Date if the Class D Overcollateralization Ratio is equal to or greater than 101.75%.

"Class D Scenario Default Rate":  At any time, an estimate (determined by application of the applicable Standard & Poor's CDO Monitor at such time) of the portion of the Aggregate Outstanding Reference Entity Calculation Amount (expressed as a percentage) that has experienced a credit event for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "A" rating of the Class D Notes by Standard & Poor's.

"Class D Trustee":  The meaning specified in Section 6.12.

"Class E CDS Reserve Account":  The meaning specified in Section 10.4(e).

"Class E Commitments":  The meaning assigned to such term in the Class E Note Purchase Agreement.

"Class E Commitment Fee":  The commitment fee that accrues on that portion of the Class E Commitments that are undrawn as of the close of each Business Day (or, in the case of any day that is not a Business Day, on the preceding Business Day) at a rate per annum equal to 4.50% on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360 from and including the Closing Date until Maturity Date.

"Class E Coverage Tests":  The Class E Overcollateralization Ratio Test and the Class E Interest Coverage Ratio Test.

"Class E Deferred Commitment Fee":  The meaning specified in Section 2.7(a).

"Class E Deferred Interest":  The meaning specified in Section 2.7(a).

"Class E Note Agent":  U.S. Bank National Association, a national banking association, as agent on behalf of the Holders of the Class E Notes under the Class E Note Purchase Agreement.

"Class E Interest Coverage Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(a)  the Net Collateral Interest Proceeds; by

(b)  with respect to the current Due Period, the sum of (a) scheduled interest on the Class A Notes, the accrued and unpaid Class A Commitment Fee, scheduled interest on the Class B Notes, the accrued and unpaid Class B-1 Commitment Fee, scheduled interest on the Class C Notes, scheduled interest on the Class D Notes (not including Class D Deferred Interest from previous Payment Dates, but including interest on such Class D Deferred Interest), and scheduled interest on the Class E Notes and the accrued and unpaid Class E Commitment Fee (not including Class E Deferred Interest or Class E Deferred Commitment Fees from previous Payment Dates, but including interest on such

17

Class E Deferred Interest or Class E Deferred Commitment Fees), each with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the immediately succeeding Payment Date) and (b) any Defaulted Interest on the Class A Notes, any Defaulted Interest on the Class B Notes, any Defaulted Interest on the Class C Notes, any Defaulted Interest on the Class D Notes, any Defaulted Interest on the Class E Notes, and Defaulted Commitment Fees and, in each case, accrued and unpaid interest on such Defaulted Interest and Defaulted Commitment Fees.

"Class E Interest Coverage Ratio Test":  For so long as any Class E Notes remain Outstanding, a test that will be satisfied on any Measurement Date, if the Class E Interest Coverage Ratio is equal to or greater than 110.00%.

"Class E Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(a)  the aggregate amount of interest accrued at the Class E Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class E Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class E Notes or any prepayment thereof on any preceding Payment Date), and

(b)  any Class E Deferred Interest and any Class E Deferred Commitment Fees and, in the event that the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes are no longer Outstanding, any Defaulted Interest in respect of the Class E Notes and accrued and unpaid interest on such Defaulted Interest;

provided that, from the Maturity Date to the Deferred Maturity Date, the Class E Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is Aggregate Outstanding Amount of the Class E Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class E Notes accrued at a rate of LIBOR.

"Class E Note Interest Rate":  The interest rate for the Class E Notes specified in Section 2.3.

"Class E Note Purchase Agreement":  An agreement dated as of the Closing Date, among the Issuer, Co-Issuer, Class E Note Agent and the Holders of the Class E Notes, as the same may be amended or supplemented and in effect from time to time.

"Class E Note Register":  The register maintained by the Class E Note Agent with respect to the Class E Notes pursuant to Section 2.5.

18

"Class E Notes":  The Class E Contingent Funding Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class E Overcollateralization Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(i)      the Net Collateral Principal Balance as of such Measurement Date; by

(ii)     the Aggregate Outstanding Amount of the Class A Notes and the Class B Notes (calculated using the aggregate amount of the Class A Commitments and the Class B-1 Commitments whether funded or unfunded), the Class C Notes, the Class D Notes (including any Class D Deferred Interest) and the Class E Notes (including the Class E Commitments whether funded or unfunded, any Class E Deferred Interest and any Class E Deferred Commitment Fee), in each case as of such Measurement Date.

"Class E Overcollateralization Ratio Test":  A test that will be satisfied as of any subsequent Measurement Date if the Class E Overcollateralization Ratio is equal to or greater than 100.75%.

"Class E Trustee":  The meaning specified in Section 6.12.

"Clearing Agency":  An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation":  The meaning specified in Section 8-102(a)(5) of the UCC.

"Clearing Corporation Securities":  Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"Clearstream":  Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date":  June 22, 2007.

"Closing Date Underlying Asset":  The Underlying Asset acquired by the Issuer on the Closing Date and set forth in Schedule A hereto.

"Co-Issued Notes":  Collectively, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"Co-Issuer":  White Marlin CDO 2007-1, Corp., a corporation organized under the laws of the State of Delaware, unless and until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Code":  The United States Internal Revenue Code of 1986, as amended.

"Collateral":  As defined in the Granting Clause hereof.

"Collateral Administration Agreement":  An agreement dated as of the Closing Date, among the Issuer and the Collateral Administrator, as the same may be amended or supplemented and in effect from time to time.

"Collateral Administrator":  U.S. Bank National Association, a national banking association, in its capacity as such under the Collateral Administration Agreement, unless a successor Person shall have become the Collateral Administrator pursuant to the applicable provisions of the Collateral Administration Agreement, and thereafter "Collateral Administrator" shall mean such successor Person.

"Collateral Quality Tests":  The Trading Model Test, the Weighted Average Spread Test and the S&P CDO Monitor Test.

"Collection Accounts":  Collectively, the Principal Collection Account and the Interest Collection Account.

"Company Announcements Office":  The Company Announcements Office of the Irish Stock Exchange.

"Contingency Amount":  An amount equal to the sum of (i) the Contingency Cash Settlement Amount (if any) and (ii) the Adjustment Amount(s) (if any).

"Contingency Cash Settlement Amount":  An amount determined by the Credit Swap Calculation Agent in accordance with the terms of the Credit Swap Agreement as being equal to the Cash Settlement Amounts that would be payable by the Issuer in respect of two (2) additional Reference Entities having the largest Reference Entity Calculation Amount as of the Maturity Date, assuming that (i) a Credit Event had occurred with respect to each such Reference Entity, the Conditions to Settlement had been satisfied on or prior to the Maturity Date, and (ii) the Final Price with respect to each such Reference Entity were zero.

"Contingent Class A Funding Account":  The trust account designated as the "Contingent Class A Funding Account" and established pursuant to Section 10.4.

"Contingent Class B-1 Funding Account":  The trust account designated as the "Contingent Class B-1 Funding Account" and established pursuant to Section 10.4.

"Contingent Class E Funding Account":  The trust account designated as the "Contingent Class E Funding Account" and established pursuant to Section 10.4.

"Controlling Class":  The Class A Notes, so long as any Class A Notes are Outstanding, and, after the Class A Notes are no longer Outstanding, the Class B Notes, so long as any Class B Notes are Outstanding and, after the Class A Notes and the Class B Notes are no

longer Outstanding, the Class C Notes, so long as any Class C Notes are Outstanding and, after the Class A Notes, the Class B Notes and the Class C Notes are no longer Outstanding, the Class D Notes, so long as any Class D Notes are Outstanding and, after the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes are no longer Outstanding, the Class E Notes, so long as any Class E Notes are Outstanding.

"Controlling Class Trustee":  The meaning specified in Section 6.12.

"Corporate Family Rating":  The corporate family rating as published from time to time by Moody's.

"Corporate Trust Office":  The principal corporate trust office of the Trustee, currently located at One Federal Street, Boston, Massachusetts 02110, Attention:  CDO Unit – White Marlin CDO 2007-1, Ltd., or such other address as the Trustee may designate from time to time by notice to the Noteholders and the Issuer or the principal corporate trust office of any successor Trustee.

"Coverage Tests":  The Class C Overcollateralization Ratio Test, the Class C Interest Coverage Ratio Test, the Class D Overcollateralization Ratio Test, the Class D Interest Coverage Ratio Test, the Class E Overcollateralization Ratio Test and the Class E Interest Coverage Ratio Test.  For purposes of the Coverage Tests, the calculation of any Coverage Test on any Measurement Date shall be made by giving effect to all payments payable pursuant to the Priority of Payments on the Payment Date immediately following such Measurement Date.

"Credit Event":  The meaning specified in the Credit Swap Agreement.

"Credit Risk Reference Entity":  The meaning specified in Exhibit N to this Indenture.

"Credit Swap Agreement":  The 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated the Closing Date, between the Issuer and the Credit Swap Counterparty including the schedule thereto and the confirmation thereunder.

"Credit Swap Calculation Agent":  Lehman Brothers Special Financing Inc., as calculation agent under the Credit Swap Agreement.

"Credit Swap Counterparty":  Lehman Brothers Special Financing Inc., a wholly-owned and guaranteed subsidiary of Lehman Brothers Holdings Inc.

"Credit Swap Issuer Account":  The trust account designated the "Credit Swap Issuer Account" and established by the Trustee pursuant to Section 10.4(g).

"Credit Swap Posted Amount":  The meaning specified in the Credit Swap Agreement.

"Current Portfolio":  The current Reference Portfolio plus the Availability Amount.

"Custodial Account":  The trust account designated the "Custodial Account" and established pursuant to Section 10.2(b).

"Custodian":  The meaning specified in Section 10.7.

"Default":  Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Default Timing Vectors Table":  The meaning specified in Exhibit N to this Indenture.

"Defaulted Commitment Fee":  Any commitment fee (other than any Class E Deferred Commitment Fee), accruing at the applicable Note Interest Rate, that is due and payable in respect of any Class A Note, Class B-1 Note or Class E Note (as applicable) that is not punctually paid or duly provided for on the applicable Payment Date or at the Maturity Date and remains unpaid and, to the extent not duplicative in any context in which the term "Defaulted Commitment Fee" is used, any interest on such amounts.

"Defaulted Interest":  Any interest (other than Deferred Interest), accruing at the applicable Note Interest Rate, that is due and payable in respect of any Note that is not punctually paid or duly provided for on the applicable Payment Date or at Maturity Date and remains unpaid and, to the extent not duplicative in any context in which the term "Defaulted Interest" is used, any interest on such amounts; provided, that for so long as any Class A Notes, Class A Commitments, Class B Notes, Class B-1 Commitments or Class C Notes are outstanding, any interest payable in respect of the Class D Notes that is not punctually paid or duly provided for on the applicable Payment Date will become Class D Deferred Interest rather than Defaulted Interest; provided, further, that for so long as any Class A Notes, Class A Commitments, Class B Notes, Class B-1 Commitments, Class C Notes or Class D Notes are Outstanding, any interest payable in respect of the Class E Notes or Class E Commitment Fee (as applicable) that is not punctually paid or duly provided for on the applicable Payment Date will become Class E Deferred Interest or Class E Deferred Commitment Fees rather than Defaulted Interest or a Defaulted Commitment Fee in respect of the Class E Notes.

"Deferred Interest":  Collectively, the Class D Deferred Interest and the Class E Deferred Interest.

"Deferred Maturity Date":  December 22, 2014, or if such day is not a Business Day, the next Business Day.

"Deferred Portfolio Management Fees":  The Deferred Senior Management Fee together with the Deferred Subordinated Management Fee.

"Deferred Senior Management Fees":  On any Payment Date, the dollar value of the Senior Portfolio Management Fees that are deferred to future Payment Dates in accordance with the terms of Section 14.15 (including, for the avoidance of doubt, the amount of any Senior Management Fee deferred on a prior Payment Date); provided that the Portfolio Manager may elect, in its sole discretion, to Waive all or any portion of such fees pursuant to Section 14.15.

"<u>Deferred Subordinated Management Fees</u>":  On any Payment Date, the dollar value of the Subordinated Management Fees that are deferred to future Payment Dates in accordance with the terms of <u>Section 14.15</u> (including, for the avoidance of doubt, the amount of any Subordinated Management Fee deferred on a prior Payment Date); <u>provided</u> that the Portfolio Manager may elect, in its sole discretion, to Waive all or any portion of such fees pursuant to <u>Section 14.15</u>.

"<u>Deposit</u>":  Any Cash deposited with the Trustee by the Issuer on the Closing Date for inclusion as Collateral and deposited by the Trustee in the Collection Accounts on the Closing Date.

"<u>Depositary</u>":  With respect to the Securities in a global form, The Depository Trust Company, its nominees, and their respective successors.

"<u>Determination Date</u>":  The last day of each Due Period except if such day falls on the Deferred Maturity Date.

"<u>Disposition Proceeds</u>":  Any proceeds received with respect to termination of the Underlying Asset and Eligible Investments, in each case, net of out-of-pocket expenses and disposition costs in connection with such sales.

"<u>Distribution</u>":  Any payment of principal or interest or any dividend, premium or fee payment made on, or any other distribution in respect of, a security or obligation.

"<u>Dollar</u>" or "<u>$</u>":  A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"<u>Downgrade Draw</u>":  The meaning specified in the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement and the Class E Note Purchase Agreement, as applicable.

"<u>Draw Period</u>":  The meaning specified in the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement and the Class E Note Purchase Agreement, as applicable.

"<u>DTC List</u>":  The meaning specified in <u>Section 2.2(d)</u>.

"<u>DTC Notice</u>":  The meaning specified in <u>Section 2.2(d)</u>.

"<u>Due Date</u>":  Each date on which a Distribution is due on a Pledged Underlying Asset.

"<u>Due Period</u>":  With respect to any Payment Date, the period commencing on (and including) the day immediately following one Business Day prior to the preceding Payment Date (or on the Closing Date, in the case of the Due Period relating to the first Payment Date) and ending on one Business Day prior to such Payment Date (or, in the case of the Due Period that is applicable to the final Payment Date, ending on such Payment Date).

"Early Termination Date": The meaning specified in the Credit Swap Agreement

"Eligible Investment":  Any Dollar denominated investment that, at the time it, or evidence of it, is delivered to the Trustee or the Custodian in accordance with Section 3.4, is one or more of the following obligations or securities including, without limitation, investments for which the Trustee or an Affiliate of the Trustee provides services:

(i)   Cash;

(ii)   direct Registered debt obligations of, and Registered debt obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the United States of America or any full faith and credit agency or instrumentality thereof;

(iii)   demand and time deposits in, trust accounts of, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by any United States federal or state depository institution or trust company, the commercial paper and/or debt obligations of which (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have been assigned a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P, in the case of long-term debt obligations, or "P-1" by Moody's and "A-1+" by S&P, in the case of commercial paper and short-term obligations; provided, that in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(iv)   unleveraged repurchase obligations with respect to (a) any security described in clause (ii) above or (b) any other security issued or guaranteed by an agency or instrumentality of the United States of America (in each case without regard to the stated maturity of such security), in either case entered into with a United States federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is "Aaa" by Moody's and "AAA" by S&P and whose short-term credit rating is not less than "P-1" by Moody's and "A-1+" by S&P at the time of such investment or contractual commitment providing for such investment; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(v)   Registered debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof and which has a credit rating of "Aaa" by Moody's and "AAA" by S&P at all times;

(vi)   commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance having at the time of such investment or contractual commitment providing for such investment a credit rating of not less than

"P-1" by Moody's and "A-1+" by S&P; <u>provided</u>, that if such security has a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(vii)   Reinvestment Agreements (so long as payments under any such Reinvestment Agreement are not subject to withholding taxes) issued by any bank (if treated as a deposit by such bank) or Reinvestment Agreements issued in registered form (for purposes of the Code) after July 18, 1984 by any insurance company or other corporation or entity organized under the laws of the United States of America or any state thereof that has a credit rating at the time of such investment or contractual commitment providing for such investment of not less than "P-1" by Moody's and "A-1+" by S&P; <u>provided</u>, that if such security has a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(viii)   any securities issued by any offshore money market fund or similar investment vehicle having at all times a long-term credit rating of "AAA," "AAAf", "AAAm" or "AAAm-G" by S&P and a long-term credit rating of "Aaa" by Moody's at all times;

(ix)   any other new category of investment <u>provided</u> that each Rating Agency has published guidance that such category qualifies as an eligible investment in CDOs and such category has not subsequently been reclassified; and

(x)   the Initial Specific Investment Instrument;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs; <u>provided</u>, that Eligible Investments shall not include (a) any interest-only security, any security purchased at a price in excess of 100% of the par value thereof or any security whose repayment is subject to substantial non-credit related risk as determined in the sole judgment of the Credit Swap Calculation Agent on behalf of the Issuer, (b) any security whose rating assigned by S&P includes the subscript "p," "pi," "q," "r" or "t," (c) any security that is subject to an Offer, or (d) any mortgage-backed security; <u>provided</u>, <u>further</u>, each Eligible Investment must satisfy the following requirements:  (a) such Eligible Investments either shall be (i) cash, (ii) treated as indebtedness that is not a United States real property interest for U.S. federal income tax purposes, (iii) treated as equity in a corporation that is not a United States real property holding corporation for U.S. federal income tax purposes or (iv) the Issuer has received advice from Cadwalader, Wickersham & Taft LLP, Sidley Austin LLP or an opinion of another nationally recognized U.S. tax counsel experienced in such matters that the acquisition, ownership or disposition of such investment shall not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise cause the Issuer to be subject to U.S. federal, state or local income or franchise tax on a net income tax basis and (b) such Eligible Investments shall not be subject to deduction or withholding for or on account of any withholding or similar tax, unless the payor is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the

full amount that the Issuer would have received had no such deduction or withholding been required.  To the extent that any Eligible Investment does not meet its rating requirement, the Trustee shall, at the direction of the Credit Swap Counterparty, cause such Eligible Investment to be replaced.  With respect to clause (vii) of this definition, the Issuer shall not enter into any Reinvestment Agreement without obtaining Rating Agency Confirmation from S&P.

The Eligible Investments may include one or more of the following:  Lehman Brothers Prime Money Market Fund, the Lehman Brothers ABS Enhanced LIBOR Fund and Lehman Brothers Enhance Cash Fund (the "Funds"); provided that the Funds must satisfy the requirements of the definition of "Eligible Investments" at all times.

"Eligibility Criteria":  The meaning specified in Exhibit N to the Indenture.

"Entitlement Order":  The meaning specified in Section 8-102(a)(8) of the UCC.

"ERISA":  The United States Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Euroclear":  Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"Event Determination Date":  The meaning specified in the Credit Swap Agreement.

"Event of Default":  The meaning specified in Section 5.1.

"Excepted Property":  Means, with respect to the Issuer, the accounts established and maintained by the Issuer in the Cayman Islands into which (a) the $250 capital contributed to the Issuer in respect of the Issuer Ordinary Shares in accordance with the Issuer Charter, and (b) the $250 fee paid to the Issuer for agreeing to issue the Securities are deposited.

"Exchange Act":  The United States Securities Exchange Act of 1934, as amended.

"Exercise Amount":  The meaning specified in the Credit Swap Agreement.

"Expected Loss Percentage":  The meaning specified in Exhibit N to this Indenture.

"Final Price":  The meaning specified in the Credit Swap Agreement.

"Financial Asset":  The meaning specified in Section 8-102(a)(9) of the UCC.

"Fixed Amount":  The meaning specified in the Credit Swap Agreement.

"funded outstanding principal balance":  With respect to the Class A Notes, Class B-1 Notes and Class E Notes, the outstanding principal balance thereof (and does not include undrawn Class A Commitments, Class B-1 Commitments or Class E Commitments).

"funded portion":  With respect to the Class A Notes, Class B-1 Notes and Class E Notes, the funded outstanding principal balance thereof, and with respect to the Class A Commitments, Class B-1 Commitments or Class E Commitments, means the portion of the funded outstanding principal balance equal to the amount of the Class A Commitments, Class B-1 Commitments or Class E Commitments, as applicable, that have been drawn.

"Funding Entity":  The meaning specified in the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement and the Class E Note Purchase Agreement, as applicable.

"General Intangibles":  The meaning specified in Section 9-102(a)(42) of the UCC.

"Global Notes":  Notes issued in global form.

"Global Securities Legend":  The legend set forth on any Global Note.

"Grant":  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over or confirm.  A Grant of the Collateral, or of any other Instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Collateral, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Guarantor":  The meaning specified in the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement or the Class E Note Purchase Agreement, as applicable.

"Holder" or "Noteholder":  With respect to any Note, the Person in whose name such Note is registered in the Note Register.  "Holder" with respect to any Preference Share shall mean the Person in whose name such Preference Share is registered in the Share Register.

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent":  As to any Person, any other Person (including a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions and (iii) is not Affiliated with a firm that fails to satisfy the criteria set forth in (i) and (ii).  "Independent" when used with respect to any accountant may include an accountant who audits the books of any Person if in addition to satisfying the criteria set forth above the accountant is

independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Initial Rating":  (i) with respect to the Class A Notes, "Aaa" by Moody's and "AAA" by S&P; (ii) with respect to the Class B Notes, "Aaa" by Moody's and "AAA" by S&P; (iii) with respect to the Class C Notes, "Aa2" by Moody's and "AA" by S&P; (iv) with respect to the Class D Notes, "A2" by Moody's and "A" by S&P; and (v) with respect to the Class E Notes, "Baa2" by Moody's.

"Instruments":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Collection Account":  The trust account designated the "Interest Collection Account" and established pursuant to Section 10.2(a).

"Interest Distribution Amount":  With respect to any Payment Date, the sum of the Class A Interest Distribution Amount, the Class B-1 Interest Distribution Amount, the Class B-2 Interest Distribution Amount, the Class C-1 Interest Distribution Amount, the Class C-2 Interest Distribution Amount, the Class D Interest Distribution Amount for such Payment Date and the Class E Interest Distribution Amount for such Payment Date.

"Interest Period":  With respect to the Notes (other than the Class A Notes, the Class B-1 Notes or the Class E Notes) (i) in the case of the initial Interest Period, the period from, and including, the Closing Date to, but excluding, the first Payment Date; (ii) after the initial Interest Period, the period from, and including, the preceding Payment Date to, but excluding, the next succeeding Payment Date (or, in the case of the interest payment to be made on the Maturity Date of the Notes to but excluding the Maturity Date of the Notes) and (iii) thereafter, the period from, and including, Maturity Date to, but excluding, the Deferred Maturity Date.

With respect to the Class A Notes, Class B-1 Notes and Class E Notes:

(a)    in the case of each initial Interest Period, the period from, and including, the first day, if any, on which any amounts are drawn under the Class A Notes, Class B-1 Notes or Class E Notes, as applicable, to, but excluding, the next following Payment Date;

(b)    after the initial Interest Period, the period from, and including, the preceding Payment Date to, but excluding, the next succeeding Payment Date (or, in the case of the interest payment to be made on the Maturity Date of the Class A Notes, Class B-1 Notes and Class E Notes to, but excluding, the Maturity Date of the Class A Notes, Class B-1 Notes or the Class E Notes, as applicable); and

(c)    thereafter, the period from, and including, Maturity Date to, but excluding, the Deferred Maturity Date.

"Interest Proceeds":  With respect to any Payment Date, include the following amounts (without duplication and excluding the Excepted Property and any proceeds thereof) to the extent received during the related Due Period:  (a) all payments of interest and dividends received in Cash by the Issuer during the related Due Period on the Eligible Investments (including the Specific Investment Instrument); and (b) with respect to the Underlying Asset, the Fixed Amounts received by the Issuer thereunder.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"Irish Paying Agent":  Any Person authorized by the Co-Issuers to act in such capacity pursuant to the second paragraph of Section 7.4.

"Issuer":  White Marlin CDO 2007-1, Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands, unless and until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Accounts":  The Payment Account, the Collection Accounts, the Custodial Account, the Specific Investment Proceeds Account, the Maturity Date Account, the Contingent Class A Funding Account, the Contingent Class B-1 Funding Account, the Contingent Class E Funding Account, the Class A CDS Reserve Account, the Class B-1 CDS Reserve Account, the Class E CDS Reserve Account and the Credit Swap Issuer Account.

"Issuer Charter":  The Amended and Restated Memorandum and Articles of Association, adopted by the Issuer on June 21, 2007, of the Issuer, as the same may be further amended, supplemented or otherwise modified and in effect.

"Issuer Order" and "Issuer Request":  A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer.

"Issuer Ordinary Shares":  The ordinary shares, par value U.S.$1.00 per share, of the Issuer which have been issued by the Issuer and are outstanding from time to time.

"Issuer Removed Reference Entity":  The definition specified in Section 10.4(h).

"Issuer's Agent":  U.S. Bank National Association, a national banking association.

"LIBOR":  The meaning set forth in Schedule C attached hereto.

"LIBOR Determination Date":  The meaning set forth in Schedule C attached hereto.

"Majority":  With respect to the Notes or any Class thereof or the Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of such Notes of such Class or the Preference Shares.

"Managers":  Lehman Brothers Inc. and Lehman Brothers International (Europe).

"Maturity Date":  With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether on the Stated Maturity (determined without regard to the proviso) or by declaration of acceleration, call for redemption or otherwise.

"Maturity Date Account":  The meaning specified in Section 10.4(i).

"Maturity Date Amount":  With respect to all Notes, the sum of (i) any Cash Settlement Amounts that have been determined but not yet paid and (ii) the Contingency Amount.

"Maximum Portfolio Size":  An amount equal to the sum of (i) the amount in the Specific Investment Instrument, (ii) the amount in the Specific Investment Proceeds Account (for the avoidance of doubt, (iii) exclusive of the Specific Investment Instrument), (iv) the amounts in the Class A CDS Reserve Account and the amount of the undrawn Class A Commitments, (v) the amounts in the Class B-1 CDS Reserve Account and the amount of the undrawn Class B-1 Commitments, (vi) the amounts in the Class E CDS Reserve Account and (vii) the amount of the undrawn Class E Commitments; provided, that for purposes of this definition, the Class A Commitments, the Class B-1 Commitments and the Class E Commitments, if any, that are drawn as a result of a Downgrade Draw shall be deemed undrawn.

"Measurement Date":  Any of the following:  (i) the Closing Date and (ii) each Determination Date on or after the Closing Date; provided, that if any such date would fall on a day that is not a Business Day, the relevant Measurement Date will be the first following day that is a Business Day and (iii) with not less than two Business Days' written notice to each of the Co-Issuers and the Trustee, any other Business Day that any Rating Agency requests to be a Measurement Date.

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report":  The monthly report provided to the Trustee pursuant to Section 10.7(a).

"Moody's":  Moody's Investors Service, Inc. and any successor or successors thereto.

"Moody's Idealised Expected Loss Percentage Hurdles Table":  The meaning specified in Exhibit N to this Indenture.

"Moody's CDOROM™ Recovery Rate Mean":  With respect to each Reference Entity in the Reference Registry and for any Addition of a Reference Entity, the product of (a) the variable recovery rate as provided by reading in conjunction table 4a "Corporate Recovery Rate Means" and the relevant country tier group as given in Table 1 in the RefData spreadsheet of the Moody's CDOROM™ Model and (b) 1 minus the value read opposite to the reference entity name in the column BK entitled "Total RR Haircuts (CE, Extra)" in the "portfolio" spreadsheet of the Moody's CDOROM™ Model.

"Moody's CDOROM™ Model":  The licensed Moody's CDOROM™ v2.3 model version CDOROM™ v2.3 in the form provided by Moody's, and as it may be updated by Moody's from time to time and notified to the Trustee and the Portfolio Manager for use in connection with the Indenture.

"Moody's Correlated Binomial Calculator":  The licensed Moody's Correlated Binomial Calculator (v15) in the form provided by Moody's, and as it may be updated by Moody's from time to time and notified to the Portfolio Manager for use in connection with the Indenture.

"Moody's Equivalent Senior Unsecured Rating":  With respect to any Reference Entity as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    if the Reference Entity has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)    if the preceding clause does not apply, the Moody's "Issuer Rating" for the Reference Entity;

(c)    if the preceding clauses do not apply, but the Reference Entity has a subordinated obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than the Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the Assigned Moody's Rating;

(d)    if the preceding clauses do not apply, but the Reference Entity has a senior secured obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)    if the preceding clauses do not apply, but such Reference Entity has a Corporate Family Rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such Corporate Family Rating;

31

(f)      if the preceding clauses do not apply, but the Reference Entity has a senior unsecured obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)      one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher, or

(ii)     two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower;

(g)      if the preceding clauses do not apply, but the Reference Entity has a subordinated obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the rating assigned by Moody's shall be deemed to be:

(i)      one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher; or

(ii)     two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower,

and, in either case, the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above;

(h)      if the preceding clauses do not apply, but the Reference Entity has a senior secured obligation with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the rating assigned by Moody's shall be deemed to be:

(i)      one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher; or

(ii)     two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower,

and, in either case, the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above;

(i)      if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating shall be "Caa1":

(i)      neither the Reference Entity nor any of its Affiliates is subject to reorganization or bankruptcy proceedings;

(ii)     no debt securities or obligations of the Reference Entity are in default;

(iii)     neither the Reference Entity nor any of its Affiliates has defaulted on any debt during the preceding two years;

(iv)     the Reference Entity has been in existence for the preceding five years;

(v)     the Reference Entity is current on any cumulative dividends;

(vi)     the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter;

(vii)     the Reference Entity had a net profit before tax in the past fiscal year and the most recent quarter; and

(viii)     the annual financial statements of such Reference Entity are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer.

Notwithstanding the foregoing, the aggregate of the Reference Entity Calculation Amount of the Reference Entities that may be deemed to have a Moody's Equivalent Senior Unsecured Rating based on clauses (f), (g) and (h) above may not exceed 10%.

"Moody's Idealised Expected Loss Percentage Hurdles Table":  The meaning specified in Exhibit N to this Indenture.

"Moody's Rating":  With respect to any Reference Entity, as of any date of determination, the ratings determined in accordance with the following in the following order of priority:

(1)     if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such rating; and

(2)     if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating of the Reference Entity, as applicable.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"Net Collateral Interest Proceeds":  With respect to any Measurement Date, without duplication, the sum of (i) the interest payments received or scheduled to be received in Cash on any Eligible Investments (including the Specific Investment Instrument) held in the Collection Accounts during the related Due Period, (ii) Fixed Amounts received under the Credit

Swap Agreement, (iii) any fees actually received by the Issuer during the related Due Period, as of such Measurement Date, that constitute Interest Proceeds, and (iv) amounts designated as Interest Proceeds pursuant to clause (c) of such definition and on deposit in the Interest Collection Account as of such Measurement Date; minus amounts payable pursuant to Section 11.1(a)(A)(i) through (iv) (to the extent not already deducted pursuant to any other clause of this definition).

"Net Collateral Principal Balance":    On any Measurement Date, without duplication, an amount equal to:

(i)    the sum of the Reference Entity Calculation Amount for every Reference Entity as to which no Credit Event has occurred; plus

(ii)    for any Reference Entity with respect to which an Event Determination Date has occurred but for which a Final Price has not been determined, the amount that is the Applicable Recovery Rate multiplied by the Reference Entity Calculation Amount immediately before giving effect to an Event Determination Date; provided, that for any Reference Entity with respect to which a Restructuring Credit Event has occurred, if the Exercise Amount is less than the Reference Entity Calculation Amount immediately before giving effect to such exercise and the Final Price with respect to such Exercise Amount has not been determined, the amount instead shall be the amount that is the product of (x) the Applicable Recovery Rate multiplied by (y) the Exercise Amount; provided, that, with respect to the remaining Reference Entity Calculation Amount, such Reference Entity shall be treated as if no Credit Event had occurred; minus

(iii)    with respect to each Reference Entity other than a Reference Entity for which a Credit Event has occurred and a Final Price has been determined, (a) the sum of the Reference Entity Calculation Amount (provided, that, in case of a Reference Entity for which a Credit Event has occurred and no Final Price has been determined, the Reference Entity Calculation Amount will be determined immediately before giving effect to the Event Determination Date for such Credit Event; provided, further, for avoidance of doubt, in the case of a Reference Entity for which a Restructuring Credit Event has occurred and a Final Price has been determined with respect to an Exercise Amount that is less than the Reference Entity Calculation Amount prior to the Event Determination Date for such Credit Event the Reference Entity Calculation Amount used will be equal to the Reference Entity Calculation Amount prior to the Event Determination Date for such Credit Event minus the Exercise Amount) minus (b)(i) the sum of the unfunded portion of the Class A Commitments, the Class B-1 Commitments and the Class E Commitments plus (ii) the Notes Sources, the Class A CDS Reserve Account, Class B-1 CDS Reserve Account, Class E CDS Reserve Account and the Contingent Class A Funding Account, the Contingent Class B-1 Funding Account and the Contingent Class E Funding Account. For the avoidance of doubt, if the amount determined by this subclause (iii) is a negative number, the

absolute value of such number will be added to the sum of the amounts determined in subclauses (i) and (ii) of this definition.

For purposes of clarification, in determining the "Net Collateral Principal Balance," the Underlying Asset as to which the Issuer has not granted the Trustee a first priority, perfected security interest will be deemed to have a principal balance of zero. For purposes of this calculation, once a Final Price has been determined with respect to a Reference Entity, its Reference Entity Calculation Amount shall be zero, provided that, in the case of a Reference Entity with respect to which a Restructuring Credit Event has occurred and the Exercise Price is less than the Reference Entity Calculation Amount, once the Final Price for such Exercise Amount has been determined, the Reference Entity Calculation Amount for such Reference Entity shall be the remaining Reference Entity Calculation Amount and such Reference Entity will be treated as if no Credit Event has occurred with respect thereto until such time as a future Credit Event Notice is delivered with respect thereto.

"Non-Permitted Holder": The meaning specified in Section 2.12(b).

"Note Interest Rate": With respect to the Notes of any Class, the annual rate at which interest accrues on the Notes of such Class, as specified in Section 2.3 and in such Notes.

"Note Owner Certificate": A certificate to be signed by the beneficial Holder of a Note, in the form attached hereto as Exhibit J.

"Note Purchase Agreements": Collectively, the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement and the Class E Note Purchase Agreement.

"Note Register": The register maintained by the Trustee or any Note Registrar with respect to the Notes pursuant to Section 2.5.

"Note Registrar": The meaning specified in Section 2.5(a).

"Note Subscription Agreements": Collectively, the Certificated Class B-2 Note Subscription Agreement, the Certificated Class C-1 Note Subscription Agreement, the Certificated Class C-2 Note Subscription Agreement and the Certificated Class D Note Subscription Agreement.

"Noteholder": The meaning specified in the definition of "Holders."

"Notes": Collectively, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes authenticated and delivered under this Indenture.

"Notes Sources": Collectively, but without duplication, the Specific Investment Instrument and the Specific Investment Proceeds Account.

"Offer": With respect to any security or debt obligation, (i) any offer by the issuer of such security or borrower with respect to such debt obligation or by any other Person made to all of the holders of such security or debt obligation to purchase or otherwise acquire such security or debt obligation (other than pursuant to any redemption in accordance with the

terms of any related Reference Instrument or for the purpose of registering the security or debt obligation) or to exchange such security or debt obligation for any other security, debt obligation, Cash or other property or (ii) any solicitation by the issuer of such security or borrower with respect to such debt obligation or any other Person to amend, modify or waive any provision of such security or debt obligation or any related Reference Instrument.

"Offering Memorandum":  The offering memorandum dated as of June 20, 2007 relating to the Securities.

"Officer":  With respect to the Issuer, the Co-Issuer or any other corporation, the Chairman of the Board of Directors, any Director, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; with respect to any partnership, any general partner thereof; and with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"Officer's Certificate":  With respect to any Person, a certificate signed by an Authorized Officer of such Person.

"Operative Agreements":  This Indenture, the Credit Swap Agreement, the Portfolio Management Agreement, the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement and the Class E Note Purchase Agreement.

"Opinion of Counsel":  A written opinion addressed to the Trustee, the Portfolio Manager and each of the Rating Agencies, in form and substance reasonably satisfactory to the Trustee, the Portfolio Manager and each of the Rating Agencies, of an attorney at law, which is reasonably experienced and knowledgeable in the subject matter of the opinion in question and admitted to practice (or a law firm with one or more partners admitted to practice) in the state of the United States of America or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands) the laws of which state or other jurisdiction govern the subject matter in respect of which the opinion is being solicited (provided, that if the State of Delaware has such jurisdiction, such attorney may be admitted to practice in any state of the United States of America or the District of Columbia), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer and which attorney shall be reasonably satisfactory to the Trustee.  Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee, and each of the Rating Agencies or shall state that the Trustee, the Portfolio Manager and each of the Rating Agencies shall be entitled to rely thereon.

"Optional Redemption":  The meaning specified in Section 9.1(a).

"Outstanding":  With respect to a Class of Notes, all of the Notes or the Preference Shares, as of any date of determination, all of such Class of Notes, all of the Notes or all of the Preference Shares, as the case may be, theretofore authenticated and delivered under this Indenture or delivered under the Shares Paying Agency Agreement and then issued and registered in the Share Register of the Issuer as Outstanding, as the case may be, except:

(i)     Notes or Preference Shares theretofore cancelled by the Note Registrar or Share Registrar, as applicable, or delivered to the Note Registrar or Share Registrar, as applicable, for cancellation;

(ii)    Notes or Preference Shares or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent or deposited with the Share Registrar or Shares Paying Agent, as applicable, in trust for the Holders of such Notes or Preference Shares; provided, that, if such Notes or Preference Shares or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture and provision therefor reasonably satisfactory to the Trustee or Share Registrar, as applicable, has been made;

(iii)   Notes or Preference Shares in exchange for or in lieu of which other Notes or Preference Shares have been issued and, in the case of the Notes, authenticated and delivered pursuant to this Indenture and, in the case of the Preference Shares, delivered pursuant to the Shares Paying Agency Agreement, as the case may be, unless proof reasonably satisfactory to the Trustee or Share Registrar is presented that any such original Notes or the Preference Shares, respectively, are held by a Holder in due course; and

(iv)    Notes or Preference Shares alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes or Preference Shares have been issued as provided in Section 2.6 and in the Shares Paying Agency Agreement;

provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes and Preference Shares owned by the Issuer or the Co-Issuer shall be disregarded and deemed not to be Outstanding; provided, further, that, for the avoidance of doubt, the Class A Notes shall be deemed to be Outstanding unless and until the undrawn Class A Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class A Notes), the Class B-1 Notes shall be deemed to be Outstanding unless and until the undrawn Class B-1 Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class B-1 Notes) and the Class E Notes shall be deemed to be Outstanding unless and until the undrawn Class E Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class E Notes).

"Overcollateralization Ratio Tests": Collectively, the Class C Overcollateralization Ratio Test, the Class D Overcollateralization Ratio Test and the Class E Overcollateralization Ratio Test.

"Overcollateralization Ratios": Collectively, the Class C Overcollateralization Ratio, the Class D Overcollateralization Ratio and the Class E Overcollateralization Ratio.

"P-1 Preference Shares": As of any date of determination, the P-1 Preference Shares, par value U.S.$0.01 per share with a liquidation preference of U.S.$1,000 per share, issued by the Issuer and paid for as of such date.

"P-2 Preference Shares":  As of any date of determination, the P-2 Preference Shares, par value U.S.$0.01 per share with a liquidation preference of U.S.$1,000 per share, issued by the Issuer and paid for as of such date.

"Paying Agent":  Any Person authorized by the Co-Issuers to pay the principal of or interest on any Notes on behalf of the Co-Issuers, as specified in Section 7.4.

"Payment Account":  The trust account established pursuant to Section 10.3.

"Payment Date":  The 22nd day of each March, June, September and December of each year (or if any such date is not a Business Day, the immediately following Business Day), commencing on the Payment Date in September 2007.

"Payment Date Report":  The meaning specified in Section 10.6(b).

"Payment Default":  Any Event of Default specified in clauses (a), (b), (c), (g) or (h) of Section 5.1.

"Periodic Realized Principal Loss":  The meaning specified in the Credit Swap Agreement.

"Person":  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof or any other entity of similar nature.

"Placement Agreement":  An agreement dated as of the Closing Date, among the Issuer, Lehman Brothers Inc. and Lehman Brothers International (Europe) as initial purchasers, as the same may be amended or supplemented and in effect from time to time.

"Plan":  Any of the following:  (a) employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, (b) plan described in Section 4975(e)(1) of the Code, including individual retirement accounts or Keogh plans, subject to Section 4975 of the Code or (c) entity whose underlying assets include assets of an employee benefit plan or plan described in clause (a) or (b) by reason of such plan's investment in such entity.

"Plan Asset Regulation":  The United States Department of Labor Regulation 29 C.F.R. Section 2510.3-101.

"Pledged Underlying Assets":  On any date of determination, the Underlying Asset identified on Schedule A to this Indenture as of such date of determination and the Eligible Investments (including the Specific Investment Instrument) owned by the Issuer that have been Granted to the Trustee.

"Points Upfront Payment":  For any Reference Entity, the initial payment, if any, made from the Credit Swap Counterparty to the Issuer in connection with the Addition of such Reference Entity or Increase of the Reference Entity Calculation Amount of such Reference Entity.

"Portfolio Management Agreement":  The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and Sailfish Structured Investment Management (G4), LLC, as the same may be amended or modified.

"Portfolio Management Fees":  Collectively, the Senior Management Fee, the Deferred Senior Management Fee, the Subordinated Management Fee and the Deferred Subordinated Management Fee.

"Portfolio Manager":  The meaning specified in the Portfolio Management Agreement.

"Preference Share Distribution Account":  The trust account designated as the "Preference Share Distribution Account" established by the Shares Paying Agent pursuant to the Shares Paying Agency Agreement.

"Preference Share Documents":  The Issuer Charter, certain resolutions adopted by the Issuer's Board of Directors prior to the Closing Date and the Shares Paying Agency Agreement.

"Preference Share Redemption Date":  The date on which the Preference Shares are actually redeemed (whether such redemption occurs on a Redemption Date, the Scheduled Preference Share Redemption Date or any other date).

"Preference Share Redemption Price":  A Preference Share's pro rata allocation of any amounts remaining in the Preference Share Distribution Account on the Preference Share Redemption Date in accordance with the Priority of Payments.

"Preference Shares":  Collectively, the P-1 Preference Shares and the P-2 Preference Shares.

"Principal Collection Account":  The trust account designated the "Principal Collection Account" and established pursuant to Section 10.2(a).

"Principal Proceeds":  The following amounts (without duplication and excluding Excepted Property and any proceeds thereof) to the extent received in Cash during the related Due Period:  (a) all payments of principal received in Cash by the Issuer during the related Due Period on the Eligible Investments and any termination fee paid by the Credit Swap Counterparty upon an early termination of the Underlying Asset; (b) any amounts remaining in the Specific Investment Proceeds Account, the Contingent Class A Funding Account, the Contingent Class B-1 Funding Account, the Contingent Class E Funding Account, the Class A CDS Reserve Account, the Class B-1 CDS Reserve Account and the Class E CDS Reserve Account that are transferred to the Payment Account for application as Principal Proceeds as described in Sections 10.4(a), (b), (i) and (k); (c) any Additional Payment by the Credit Swap Counterparty to the Issuer in respect of a Periodic Realized Principal Loss; (d) on each Determination Date, any Removal Fees paid to the Issuer during the related Due Period that have not been reinvested by the Portfolio Manager in the Specific Investment Instrument prior to such Determination Date; and (e) on the Deferred Maturity Date, all amounts in the Maturity Date Account that are applied

as "Principal Proceeds"; and (f) all other amounts received by the Issuer during the related Due Period which are not included in the definition of "Interest Proceeds".

"Priority of Payments": The meaning specified in Section 11.1(a).

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds": (i) Any property (including but not limited to Cash and securities) received as a Distribution on the Collateral or any portion thereof, (ii) any property (including but not limited to Cash and securities) received in connection with the sale, liquidation, exchange or other disposition of the Collateral, or any portion thereof and (iii) all proceeds (as such term is defined in Section 9-102(a)(64) of the UCC) of the Collateral, or any portion thereof.

"Proposed Portfolio": The current Reference Portfolio after giving effect to any change proposed by the Portfolio Manager to the Reference Portfolio.

"Protected Purchaser": The meaning specified in Section 8-303 of the UCC.

"Purchase Agreement": The Purchase Agreement, dated as of the Closing Date, among the Co-Issuers and the Managers.

"QIB": A qualified institutional buyer as defined in Rule 144A.

"QIB/QP": Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes, is both a QIB and a QP.

"QP" or "Qualified Purchaser": Any of (i) a "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act, (ii) a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (iii) a company owned by one or more "qualified purchasers" and/or "knowledgeable employees" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act.

"Rating Agencies": Moody's and any successor or successors thereto and S&P and any successor or successors thereto, or, with respect to Underlying Asset generally, if at any time Moody's or any such successor or S&P or any such successor ceases to provide rating services generally, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of the Controlling Class. In the event that at any time the Rating Agencies do not include Moody's or S&P, references to rating categories of Moody's or S&P in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's or S&P published ratings for the type of security in respect of which such alternative rating agency is used. References to Rating Agencies with respect to a Class of Notes shall apply only to Rating Agencies that assigned a rating (public or confidential) to such Class of Notes on the Closing Date.

"Rating Agency Confirmation":  With respect to any action contemplated by the Issuer, receipt by the Issuer of written confirmation from each of the Rating Agencies (which must be in writing and, with respect to Moody's, signed by an officer of Moody's) that the then-current rating assigned by such Rating Agency to any of the Notes will not, at that time, be reduced or withdrawn as a result of the taking of such action.

"Rating Criteria":  Has the meaning assigned to such term in each Note Purchase Agreement.

"Recovery Amount":  With respect to a Reference Entity, the Reference Entity Calculation Amount for such Reference Entity minus the Cash Settlement Amount for such Reference Entity.  In the case of a Reference Entity with respect to which a Restructuring Credit Event has occurred and the Exercise Amount is less than the Reference Entity Calculation Amount, the Exercise Amount shall be used in place of the Reference Entity Calculation Amount for such Reference Entity.

"Record Date":  The date as of which the Holders of Notes entitled to receive a payment of principal or interest on the succeeding Payment Date (including a payment of a Redemption Price on the applicable Redemption Date) are determined, such date as to any Payment Date being the fifteenth day (whether or not a Business Day) preceding such Payment Date.

"Redemption Date":  Any date specified for a redemption of Notes pursuant to Section 9.1 or if such date is not a Business Day, the next following Business Day.

"Redemption Date Statement":  The meaning specified in Section 10.7(d).

"Redemption Price":  When used with respect to the Class A Notes to be redeemed pursuant to Section 9.1 in the case of any redemption of outstanding principal, an amount equal to the sum of (i) the Aggregate Outstanding Amount of such Note to be redeemed, (ii) accrued and unpaid interest on such Note (including Defaulted Interest and interest on Defaulted Interest, if any) accrued to the Redemption Date, (iii) accrued and unpaid Class A Commitment Fees (including Defaulted Commitment Fees and interest on Defaulted Commitment Fees, if any) accrued to the Redemption Date, and (iv) if such redemption is an Optional Redemption, the present value of all future payments that would be due on funded outstanding principal balance of the Class A Notes as of the Redemption Date and the unfunded portion of the Class A Commitments as of the Redemption Date, assuming that the Optional Redemption had not occurred and that there are no additional credit events, discounted at the forward LIBOR curve at the time of the Optional Redemption, which will be determined by the Calculation Agent in its reasonable discretion. For the avoidance of doubt, if a funding of the Class A Notes has occurred for any reason other than to pay a Cash Settlement Amount under the Credit Swap Agreement, the funded outstanding principal balance of the Class A Notes as of the Redemption Date shall be reduced by the aggregate amount of all such fundings.

When used with respect to the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes to be redeemed pursuant to Section 9.1 of the Indenture in the case of any redemption of outstanding principal, an amount equal to the sum of (i) the Aggregate

Outstanding Amount of such Note to be redeemed (including, with respect to the Class D Notes and the Class E Notes, any Deferred Interest and any Deferred Commitment Fees), (ii) accrued and unpaid interest on such Note (including Defaulted Interest and interest on Defaulted Interest, if any or, with respect to the Class D Notes and the Class E Notes, interest on the Deferred Interest, if any) accrued to the Redemption Date, and (iii) accrued and unpaid Commitment Fees (including Defaulted Commitment Fees and interest on Defaulted Commitment Fees, if any or, with respect to the Class E Notes, interest on Deferred Commitment Fees) accrued to the Redemption Date.

"Reference Banks":  The meaning specified in Schedule C attached hereto.

"Reference Entity":  The meaning specified in the Credit Swap Agreement.

"Reference Entity Calculation Amount":  The meaning specified in the Credit Swap Agreement.

"Reference Entity Removal Events":  The meaning specified in the Credit Swap Agreement.

"Reference Entity Market Value":  For any Reference Entity, (i) the integer one minus (ii)(a) an Actionable Quotation of a Removal Fee for such Reference Entity divided by (b) the Reference Entity Calculation Amount of such Reference Entity.

"Reference Maturity":  With respect to each Reference Entity, the date on which the credit protection provided with respect to such Reference Entity under the Credit Swap Agreement terminates, as specified opposite such Reference Entity in the Reference Registry.

"Reference Instrument":  The indenture, credit agreement or other agreement pursuant to which a security or debt obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such security or debt obligation or of which the holders of such security or debt obligation are the beneficiaries.

"Reference Portfolio":  The meaning specified in the Credit Swap Agreement.

"Reference Registry":  The registry maintained by the Credit Swap Counterparty pursuant to the Credit Swap Agreement.

"Reference Spread":  The meaning specified in the Credit Swap Agreement.

"Reference Obligation":  The meaning specified in the Credit Swap Agreement.

"Registered":  A debt obligation that is issued after July 18, 1984 and that is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code; provided, that a debt obligation that constitutes an interest in a grantor trust shall be considered "Registered" only if such interest is in registered form for purposes of the Code and each of the debt obligations or securities held by such grantor trust was issued after July 18, 1984.

"Registered Form":  When used with respect to a Certificated Security, means a form in which:  (a) the Security Certificate specifies a Person entitled to the Certificated Security; and (b) a transfer of the Certificated Security may be registered upon books maintained for that purpose by or on behalf of the issuer of such Certificated Security, or the Security Certificate so states.

"Regulation D":  Regulation D under the Securities Act.

"Regulation S":  Regulation S under the Securities Act.

"Regulation S Global Notes":  One or more permanent global notes for the Notes offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents pursuant to Regulation S and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Regulation S Legend" added to the form of the Notes as set forth in the applicable Exhibits hereto.

"Regulation S Legend":  The legend set forth on any Regulation S Global Note.

"Regulation U":  Regulation U issued by the Board of Governors of the Federal Reserve System.

"Reinvestment Agreement":  A guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity; provided, however, that such agreement provides that it is terminable by the purchaser, without penalty, in the event that the rating assigned to such agreement by Moody's and S&P is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

"Reinvestment Period":  The meaning specified Exhibit N to this Indenture.

"Removal Fee":  The meaning specified in Exhibit N to this Indenture.

"Removal Period":  The meaning specified in Exhibit N to this Indenture.

"Reserve Accounts":  Collectively, the Class A CDS Reserve Account, the Class B-1 CDS Reserve Account and the Class E CDS Reserve Account.

"Restructuring Credit Event":  The meaning specified in the Credit Swap Agreement.

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Global Notes":  One or more permanent global notes for the Notes, in definitive, fully registered form in the form of, and with the applicable legends set forth in, Exhibits B-2-1, C-1-1, C-2-1 and D-1.

"Rule 144A Information":  Such information as is specified pursuant to Section (d)(4) of Rule 144A (or any successor provision thereto).

"Rule 144A Securities Legend": The legend set forth on any Rule 144A Global Note.

"S&P": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor or successors thereto.

"S&P CDO Monitor Test": A test that will be satisfied if, after giving effect to the increase or addition, or removal or reduction of a Reference Entity, as the case may be, (i) the Class A Loss Differential, the Class B Loss Differential, the Class C Loss Differential or the Class D Loss Differential, as the case may be, of the Proposed Portfolio is positive or (ii) the Class A Loss Differential, the Class B Loss Differential, the Class C Loss Differential or the Class D Loss Differential, as the case may be, of the Proposed Portfolio is greater than or equal to the Class A Loss Differential, the Class B Loss Differential, the Class C Loss Differential or the Class D Loss Differential, as the case may be, of the Current Portfolio. For the purpose of the Standard & Poor's CDO Monitor Test, a Reference Entity will be included as a collateral debt obligation (a "Collateral Debt Obligation") having the S&P Rating of such Reference Entity and the industry code of the Reference Entity and the Reference Maturity Date as a final maturity date and the Reference Entity Calculation Amount as outstanding principal balance.

Standard & Poor's analysis includes the application of the dynamic, analytical computer model developed by it (the "Standard & Poor's CDO Monitor"), which is used to determine the credit risk of a portfolio of Collateral Debt Obligations, and provided to the Issuer and/or its designee and the Collateral Administrator (together with all assumptions and instructions required for running such model) on or before the Effective Date, as it may be modified by Standard & Poor's from time to time.

"S&P Industry Classification Group": Any of the industry categories set forth in Schedule D hereto, including any such modifications that may be made thereto or such additional categories that may be subsequently established by S&P and provided by S&P to the Trustee.

"S&P Rating": The "S&P Rating" of a Reference Entity will be determined as follows:

(a) if a long-term issuer credit rating has been assigned by S&P to such Reference Entity, then the S&P Rating of such Reference Entity shall be such long term issuer credit rating; otherwise

(b) if the S&P Rating cannot be determined by applying (a) above, but an insurer financial strength rating has been assigned by S&P to such Reference Entity, then the S&P Rating of such Reference Entity shall be such insurer financial strength rating; otherwise

(c) if the S&P Rating cannot be determined by applying (a) and (b) above, but there is at least one security or obligation issued (or unconditionally, irrevocably and wholly guaranteed) by the Reference Entity and identified by the Credit Swap Calculation Agent has been assigned a rating by S&P, then the S&P Rating of such Reference Entity shall be determined as follows:

(i)    if such security or obligation has been assigned a senior unsecured rating by S&P, then the S&P Rating of such Reference Entity shall be such senior unsecured rating;

(ii)    if such security or obligation has been assigned a senior secured rating by S&P, then the S&P Rating of such Reference Entity shall be one subcategory below such senior secured rating; and

(iii)    if such security or obligation has been assigned a subordinated rating by S&P, then the S&P Rating of such Reference Entity shall be one subcategory above such subordinated rating if such rating is higher than "BB+", and shall be two subcategories above such rating if such rating is "BB+" or lower; otherwise.

(d)    if the S&P Rating cannot be determined by applying (a) through (c) above, but (1) if such Reference Entity is publicly rated by Moody's, then the S&P Rating of such Reference Entity shall be one subcategory below the S&P equivalent of the public rating assigned by Moody's if such Reference Entity is rated "Baa3" or higher by Moody's; and two subcategories below the S&P equivalent of the public rating assigned by Moody's if such Reference Entity is rated "Ba1" or lower by Moody's; provided, that, the aggregate of the Reference Entity Calculation Amount of the Reference Entities that may be deemed to have an S&P Rating based on this clause (d) may not exceed 20%; and (2) if such Reference Entity is not publicly rated by Moody's but at least one security or obligation issued (or unconditionally, irrevocably and wholly guaranteed) by the Reference Entity and identified by the Issuer has been assigned a senior secured or senior unsecured or subordinated rating by Moody's, then the S&P equivalent of the public rating assigned to such obligation by Moody's, after taking into account the methodology set forth in subclause (c) and this subclause (d) shall be the S&P Rating of such Reference Entity; otherwise

(e)    if the S&P Rating cannot be determined by applying (a) through (d) above, then the Issuer may apply to S&P for a corporate credit estimate, which shall be its S&P Rating which shall be valid for 12 months from the date of issue and for which the Issuer needs to apply prior to or upon each anniversary of the issuance of such credit estimate; provided, that, pending receipt from S&P of such estimate, such Reference Entity shall have an S&P Rating of "CCC-" if the Credit Swap Calculation Agent believes that such estimate will be at least "CCC-"; provided, that the Reference Entity Calculation Amount in respect of the Reference Entities that may be deemed to have a S&P Rating based on this clause (e) shall not exceed 5% of the aggregate of the Reference Entity Calculation Amounts in respect of all Reference Entities.

Notwithstanding the foregoing, if the S&P rating or the Moody's rating used to determine the S&P Rating above is on watch for downgrade or upgrade by the respective Rating Agency, the S&P Rating will be determined by adjusting such rating down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

For purposes of determining the S&P Rating, the issuer credit rating of Reference Entities not incorporated in the U.S. shall be the long term foreign issuer credit rating.

"Schedule of the Reference Entities": The Reference Portfolio attached as Annex B to the Credit Swap Agreement (attached hereto as Schedule A).

"Scheduled Distribution": With respect to any Pledged Underlying Asset, for each Due Date, the Distribution scheduled on such Due Date, determined in accordance with the assumptions specified in Section 1.2 hereof.

"Scheduled Preference Share Redemption Date": September 22, 2014, or if such day is not a Business Day, the next Business Day.

"Scheduled Termination Date": The meaning specified in the Credit Swap Agreement.

"SEC": The United States Securities and Exchange Commission.

"Secured Obligations": Collectively, all of the indebtedness, liabilities and obligations owed from time to time by the Issuer to any of the Secured Parties whether for principal, interest, fees, costs, expenses or otherwise (including all amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code and the operation of Sections 502(b) and 506(b) thereof or any analogous provisions of any similar laws).

"Secured Parties": The Trustee, the Credit Swap Counterparty, the Portfolio Manager and the Holders of the Notes.

"Securities": Collectively, the Notes and the Preference Shares.

"Securities Account Control Agreement": An agreement dated the Closing Date by and among the Issuer, the Trustee and the Custodian.

"Securities Act": The U.S. Securities Act of 1933, as amended.

"Securities Intermediary": The Bank, acting in the capacity as a "securities intermediary," as defined in Section 8-102(a)(14) of the UCC.

"Security Certificate": A certificate representing a security.

"Security Entitlement": The meaning specified in Section 8-102(a)(17) of the UCC.

"senior": When used with respect to one or more Classes of Notes (treating the Class B Notes as one Class and the Class C Notes as one Class), the Class with the earlier letter of the alphabet in its name, such that Class A Notes are senior to Class B Notes, Class B Notes are senior to Class C Notes, Class C Notes are senior to Class D Notes and Class D Notes are senior to Class E Notes.

"Senior Management Fee":  The fee, payable in arrears to the Portfolio Manager, equal to an aggregate 0.025% per annum of the Aggregate Outstanding Reference Entity Calculation Amount as of the first day of the related Due Period pursuant to the Portfolio Management Agreement; provided that the Portfolio Manager may elect, in its sole discretion, to Waive all or any portion of such fees pursuant to Section 14.15.

"Share Register":  The meaning ascribed to such term in the Shares Paying Agency Agreement.

"Share Registrar":  The meaning ascribed to such term in the Shares Paying Agency Agreement.

"Shares Paying Agency Agreement":  The Shares Paying Agency Agreement, dated as of the Closing Date, between the Issuer and U.S. Bank National Association, as Shares Paying Agent with respect to the Preference Shares.

"Shares Paying Agent":  U.S. Bank National Association, in its capacity as paying agent with respect to the Preference Shares under the Shares Paying Agency Agreement, and any successors in such capacity thereto.

"Similar Law":  Any foreign, local, state or other federal law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"Special Amortization Amount":  The meaning specified in Section 10.4(i).

"Special Purpose Vehicle":  Any special purpose vehicle organized under the laws of a sovereign jurisdiction that is commonly used as the place of organization of special purpose vehicles (including, by way of example, the Cayman Islands, Bermuda, the Netherlands Antilles and the Channel Islands).

"Specific Investment Instrument":  Means the Lehman Brothers ABS Enhanced LIBOR Fund (the "Initial Specific Investment Instrument") and any subsequent additions and/or replacements thereto purchased from Specific Investment Proceeds.  Any such instrument other than the Initial Specific Investment Instrument must (1) qualify as an Eligible Investment and (2) be consented to by a Majority of the Preference Shares with the consent of (x) a Majority of each Class of Notes voting separately and (y) the Credit Swap Counterparty; provided, that the Portfolio Manager may replace the Specific Investment Instrument without obtaining consent from any party during the 90-day period immediately following the Closing Date.

"Specific Investment Proceeds":  Mean the net proceeds received from the issuance of all the Securities and all Removal Fees received by the Issuer and directed by the Portfolio Manager to be reinvested in the Specific Investment Instrument pursuant to Section 10.4(h).

"Specific Investment Proceeds Account":  Means the trust account designated as the "Specific Investment Proceeds Account" and established pursuant to Section 10.4(h).

"Standard & Poor's Excel Default Model Input File":  An electronic spreadsheet file to be provided to S&P, which file shall include the following information (to the extent such information is not confidential) with respect to each Reference Obligation:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Reference Obligation, (c) the par value of such Reference Obligation, (d) the type of issue (including, by way of example, whether such Reference Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Reference Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in case of a Reference Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Reference Obligation which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Reference Obligation, (h) the stated maturity date of such Reference Obligation, (i) the S&P Rating of such Reference Obligation or the issuer thereof, as applicable, and the Credit Swap Counterparty (j) the priority category assigned by S&P to such Reference Obligation, if available, (k) such other information as the Trustee may determine to include in such file and (l) the principal balance in Cash and Eligible Investments.

"Stated Maturity":  With respect to any security or debt obligation, including a Security, the date specified in such security or debt obligation as the fixed date on which the final payment of principal or final distribution, as the case may be, of such security or debt obligation is due and payable or, if such date is not a Business Day, the next following Business Day; provided, however, with respect to the Notes, to the extent that the date of payment for a portion of the principal of the Notes is deferred to the Deferred Maturity Date in accordance with the provisions herein, the "Stated Maturity" of such deferred portion shall be the Deferred Maturity Date.

"Subordinate Interests":  The rights of the Holders of the Class B Notes (in relation to the rights of the Class A Notes), the rights of the Holders of the Class C Notes (in relation to the rights of the Class A Notes and the Class B Notes), the rights of the Holders of the Class D Notes (in relation to the rights of the Class A Notes, the Class B Notes and the Class C Notes), the rights of the Holders of the Class E Notes (in relation to the rights of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes) and of the Issuer in and to the Collateral.

"Subordinated Management Fee":  The fee, payable to the Portfolio Manager, equal to an aggregate 0.025% per annum of the Aggregate Outstanding Reference Entity Calculation Amount as of the first day of the related Due Period pursuant to the Portfolio Management Agreement; provided that the Portfolio Manager may elect, in its sole discretion, to Waive all or any portion of such fees pursuant to Section 14.15.

"Supermajority":  With respect to the Notes, the Controlling Class or any other Class thereof or the Preference Shares, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Notes, the Controlling Class or of such Class, as the case may be.

"Tax Event":  Will occur on any Payment Date, if as a result of any change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the

Underlying Asset are reduced as a result of the imposition of withholding tax or the Issuer is otherwise subjected to tax such that the after tax income of the Issuer is reduced in an amount in excess of U.S. $1,000,000 within any twelve (12) month period, which is also determined by a Majority of the Preference Shares to be material.

"Total Redemption Amount": The meaning specified in Section 9.1(b)(i).

"Trading Model Test": A test which will be satisfied if, with respect to each Class of Notes, after running the Moody's CDOROM™ Model, the Moody's Correlated Binomial Calculator and the White Marlin CDO 2007-1, Limited Cashflow Model, the Average Expected Loss Percentage for such Class of Notes is either (x) after giving effect to such proposed trade, no higher than the geometric mean of (A) the Expected Loss Percentage Hurdle (as defined in Exhibit N to this Indenture) for the then-current rating for such Class of Notes and (B) the Expected Loss Percentage Hurdle corresponding to a rating one notch below the then current rating for such Class of Notes, in each case (A) and (B), for the interpolated average life of such Class of Notes based on the average life computed in a Cashflow Scenario (as such term is used in Annex C to Exhibit N to this Indenture) with a "0 sigma" Interest Rate Stress (as defined in Exhibit N to this Indenture) and zero future credit events or (y) after giving effect to such proposed trade, the same or lower than it was based on the Reference Portfolio in effect immediately prior to giving effect to such proposed trade.

"Transfer Agent": The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Treasury": The U.S. Department of Treasury.

"Treasury Regulations": means the U.S. Treasury regulations promulgated under the Code.

"Trust Officer": When used with respect to the Trustee, the Shares Paying Agent and the Custodian, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, associate, or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"Trustee": U.S. Bank National Association, a national banking association, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee": Amounts due and payable to the Trustee on each Payment Date in accordance with Section 6.7(a).

"UCC": The Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"<u>Uncertificated Security</u>":  A security that is not represented by a certificate.

"<u>Underlying Asset</u>":  The Credit Swap Agreement attached hereto as Schedule A.

"<u>Underlying Instruments</u>":  The indenture and any credit agreement, assignment agreement, participation agreement, pooling and servicing agreement, trust agreement, instrument or other agreement pursuant to which a Pledged Underlying Asset has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Underlying Asset, or of which the Holders of such Pledged Underlying Asset are the beneficiaries, and any Instrument evidencing or constituting such Pledged Underlying Asset (in the case of any Pledged Underlying Asset evidenced by or in the form of an Instrument).

"<u>Unregistered Securities</u>":  Securities or debt obligations issued without registration under the Securities Act.

"<u>U.S. Person</u>":  The meaning specified under Regulation S.

"<u>U.S. Resident</u>":  A U.S. resident (as determined for purposes of the Investment Company Act).

"<u>Waive</u>":  With respect to any Portfolio Management Fees, the Portfolio Manager may elect on any Payment Date to waive all or a portion of the Portfolio Management Fees (including any Deferred Portfolio Management Fees) in accordance with the terms of the Portfolio Management Agreement.  If the Portfolio Manager elects to waive any such fees, Interest Proceeds in an amount equal to the Interest Proceeds (if any) that were available to pay such amounts and that would, absent the waiver, have been applied to pay such amounts shall be applied as Principal Proceeds in accordance with the Priority of Payments.  For the avoidance of doubt, any Portfolio Management Fees waived under this definition shall no longer be due and payable.

"<u>Weighted Average Recovery Rate (Moody's)</u>":  The number obtained by (a) multiplying the Reference Entity Calculation Amount of each Reference Entity as to which a Credit Event has not occurred by its Moody's CDOROM™ Recovery Rate Mean; (b) summing the products obtained in clause (a) for all such Reference Entities; (c) dividing the sum obtained in clause (b) by the aggregate Reference Entity Calculation Amount on such Measurement Date of all Reference Entities as to which a Credit Event has not occurred; and (d) rounding the result to 0.1%.

"<u>Weighted Average Recovery Rate (S&P)</u>":  With respect to the Reference Portfolio, 33.0%.

"<u>Weighted Average Spread</u>":  The number obtained by (a) multiplying the Reference Entity Calculation Amount of each Reference Entity as to which a Credit Event has not occurred by its Reference Spread on any Measurement Date; (b) summing the products obtained in clause (a) for all such Reference Entities; (c) dividing the sum obtained in clause (b) by the aggregate Reference Entity Calculation Amount on such Measurement Date of all

Reference Entities as to which a Credit Event has not occurred; and (d) rounding the result to 0.00001%.

"Weighted Average Spread Test":  A test that is satisfied if the Weighted Average Spread as of the relevant Measurement Date is equal to or greater than 0.765%.

"White Marlin CDO 2007-1, Limited Cashflow Model":  A cashflow model constructed based upon the procedures and assumptions detailed in the Annexes to Exhibit N to this Indenture and used to generate Average Expected Loss Percentages for each Class of Notes for purposes of applying the Trading Model Test.

Section 1.2    Assumptions as to the Underlying Asset.  (a) In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Underlying Assets, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such assets and on any other amounts that may be received for deposit in the Collection Accounts, the provisions set forth in this Section 1.2 shall be applied.

(b)    All calculations with respect to Scheduled Distributions on the Pledged Underlying Assets shall be made on the basis of information as to the terms of each such Pledged Underlying Asset and upon report of payments, if any, received on such Pledged Underlying Asset that are furnished by or on behalf of the issuer of or obligor with respect to such Pledged Underlying Asset and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

For each Due Period, the Scheduled Distribution on any Pledged Underlying Asset shall be the minimum amount, including coupon payments, accrued interest, scheduled principal payments, if any, by way of sinking fund payments which are assumed to be on a pro rata basis or other scheduled amortization of principal, return of principal, and redemption premium, if any, assuming that any index applicable to any payments on a Pledged Underlying Asset, that is subject to change is not changed, that, if paid as scheduled, will be available in the Collection Accounts at the end of the Due Period net of withholding or similar taxes to be withheld from such payments (but taking into account gross up payments in respect of such taxes).

(c)    Subject to the preceding sentence, each Scheduled Distribution receivable with respect to a Pledged Underlying Asset shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Interest Collection Account or the Principal Collection Account, as applicable, and, except as otherwise specified, to earn interest at the Assumed Reinvestment Rate.  All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Accounts for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.

(d)    On any Measurement Date, for purposes of calculating the Class C Interest Coverage Ratio, the Class D Interest Coverage Ratio and the Class E Interest Coverage Ratio, the expected collateral interest income on the floating rate Eligible Investments and the expected

interest payable on each Class of Notes will be calculated using the then-current interest rates applicable thereto as of such date.

(e)    If any of the Overcollateralization Ratio Tests is not met on any Payment Date, in calculating the amount of Interest Proceeds that will be applied pursuant to the Priority of Payments to cause such Overcollateralization Ratio Test to be satisfied, it is assumed that Interest Proceeds that are used to redeem Notes (or make deposits that reduce the Class A Commitments, the Class B-1 Commitments and the Class E Commitments) reduce the denominator of the ratios used in the Overcollateralization Ratio Test(s) and have no impact on the numerator of such ratios; however, in calculating the amount of Principal Proceeds that will be applied pursuant to the Priority of Payments to cause such Overcollateralization Ratio Test to be satisfied, it is assumed that Principal Proceeds that are used to redeem Notes (or make deposits that reduce the Class A Commitments, the Class B-1 Commitments or the Class E Commitments, as applicable) reduce both the numerator (*i.e.*, the Net Collateral Principal Balance) and the denominator of the ratios used in such Overcollateralization Ratio Tests.

Section 1.3    Rules of Construction.    All references in this instrument to designated "Articles," "Sections," "subsections" and other subdivisions are to the designated Articles, Sections, subsections and other subdivisions of this instrument as originally executed. The words "herein," "hereof," "hereunder," and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, subsection or other subdivision. The term "including" shall mean "including without limitation."

## ARTICLE II

## THE NOTES

Section 2.1    Forms Generally.    The Notes and the Certificates of Authentication shall be in substantially the forms required by this Article II, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes (or in the case of the Class E Notes, the Issuer) as evidenced by their execution of such Notes and Authorized Officer of the Issuer in the case of Class E Notes.    Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2    Forms of Notes and Certificate of Authentication.    (a) The forms of the Notes, including the Certificate of Authentication, shall be as set forth in Exhibits A-1R, A-1S, B-1-1R, B-1-1S, B-1-1, B-1-2, B-1-3, C-1-1, C-1-2, C-1-3, C-2-1, C-2-2, C-2-3, D-1, D-2, D-3, E-1R, E-1S and E-2 hereto, as applicable.

(i)    Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and Class E Notes, as applicable) offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued in the

form of Regulation S Global Notes, which shall be deposited with the Trustee, as custodian for the Depositary and registered in the name of the Depositary or the nominee of such Depositary for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers (or in the case of Class E Notes only, the Issuer) and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Regulation S Global Notes of a Class may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(ii)    Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and Class E Notes, as applicable) offered and sold to Persons that are both (x) QIBs in reliance on Rule 144A and (y) Qualified Purchasers shall be issued initially in the form of a Rule 144A Global Note, which shall be deposited with the Trustee, as custodian for and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Co-Issuers (or in the case of the Class E Notes only, the Issuer) and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Rule 144A Global Notes of a Class may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(iii)    <u>Certificated Class A Notes</u>.  The Class A Notes offered and sold to Persons that are (1) both Qualified Purchasers and QIBs in reliance on Rule 144A shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit A-1R</u> attached hereto or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit A-1S</u> attached hereto (together, the "<u>Certificated Class A Notes</u>").

(iv)    <u>Certificated Class B-1 Notes</u>.  The Class B-1 Notes offered and sold to Persons that are (1) both Qualified Purchasers and QIBs in reliance on Rule 144A shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit B-1-1R</u> attached hereto or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit B-1-1S</u> attached hereto (together, the "<u>Certificated Class B-1 Notes</u>").

(v)    <u>Certificated Class B-2 Notes</u>.  The Class B-2 Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit B-2-3</u> attached hereto (the "<u>Certificated Class B-2 Notes</u>") and such Certificated Class B-2 Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x) "accredited investors" in reliance on Regulation D

under the Securities Act or (y) QIBs in reliance on Rule 144A or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(vi)     Certificated Class C-1 Notes.  The Class C-1 Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in Exhibit C-1-3 attached hereto (the "Certificated Class C-1 Notes") and such Certificated Class C-1 Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x) "accredited investors" in reliance on Regulation D under the Securities Act or (y) QIBs in reliance on Rule 144A or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(vii)     Certificated Class C-2 Notes.  The Class C-2 Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in Exhibit C-2-3 attached hereto (the "Certificated Class C-2 Notes") and such Certificated Class C-2 Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x) "accredited investors" in reliance on Regulation D under the Securities Act or (y) QIBs in reliance on Rule 144A or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(viii)     Certificated Class D Notes.  The Class D Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in Exhibit D-3 attached hereto (the "Certificated Class D Notes") and such Certificated Class D Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x) "accredited investors" in reliance on Regulation D under the Securities Act or (y) QIBs in reliance on Rule 144A or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(ix)     Certificated Class E Notes.  The Class E Notes offered and sold to Persons that are (1) both Qualified Purchasers and QIBs in reliance on Rule 144A shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in Exhibit E-1R attached hereto or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in Exhibit E-1S attached hereto (together, the "Certificated Class E Notes").

(b)     This Section 2.2(b) shall apply only to Global Notes deposited with or on behalf of the Depositary.

The Co-Issuers (or in the case of Class E Notes only, the Issuer) shall execute and the Trustee shall, in accordance with this Section 2.2(b), authenticate and deliver initially one or more Global Notes per Class that (i) shall be registered in the name of the Depositary for such Global Note or Global Notes or the nominee of such Depositary and (ii) shall be delivered by the

Trustee to such Depositary or pursuant to such Depositary's instructions or held by the Trustee, as custodian for the Depositary.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary or under the Global Note, and the Depositary may be treated by the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee, and any agent of the Co-Issuers (or in the case of Class E Notes only, the Issuer) or the Trustee as the absolute owner of such Global Note for all purposes whatsoever (except to the extent otherwise provided herein).  Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee, or any agent of the Co-Issuers (or in the case of Class E Notes only, the Issuer) or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(c)     Except as provided in <u>Section 2.10</u> and <u>Section 2.5(e)(iv)</u> hereof, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of certificated notes.

(d)     The Issuer shall (i) request the Depositary to cause, and cooperate with the Depositary in causing, the Depositary's security description and delivery order to include a "3(c)(7) marker" and the Depositary's user manual to contain an accurate description of the restrictions on the holding and transfer of the Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and Class E Notes, as applicable) due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the Investment Company Act, (ii) request that the Depositary send, and cooperate with the Depositary in causing the Depositary to send, to its Agent Members in connection with the initial offering of the Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and Class E Notes, as applicable) a notice substantially in the form attached as <u>Exhibit K</u> hereto (the "<u>DTC Notice</u>"), (iii) request that the Depositary cause, and cooperate with the Depositary in causing, the Depositary's Reference Directory to include each Class of Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and Class E Notes, as applicable) (and the applicable CUSIP numbers for such Notes) in the listing of 3(c)(7) issues together with an attached description of the limitations as to the distribution, purchase, sale and holding of the Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and Class E Notes, as applicable) and (iv) at least five Business Days prior to the date upon which the Annual Report shall be delivered by the Issuer, the Issuer shall obtain from DTC a list (the "<u>DTC List</u>") of all Agent Members that are holding an interest in the Notes (other than Class A Notes, Class B-1 Notes, any Class B-2 Notes issued in the form of Certificated Class B-2 Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes

issued in the form of Certificated Class D Notes and Class E Notes, as applicable) as of such date.

Section 2.3    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations.  (a) Subject to the provisions set forth in this Section, the Aggregate Outstanding Amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$1,168,800,000, except for (i) Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.5, 2.6 or 8.5 of this Indenture, (ii) Class D Deferred Interest, (iii) Class E Deferred Interest and (iv) Class E Deferred Commitment Fees.

(b)    Such Notes shall be divided into seven (7) classes having designations, initial aggregate principal amounts, Note Interest Rates and Stated Maturities as follows:

| Designation | Initial Aggregate Principal Amount | Note Interest Rate* | Stated Maturity | Deferred Maturity Date***** |
|---|---|---|---|---|
| Class A Notes | $0*** | LIBOR +0.08%**** | September 22, 2014** | December 22, 2014** |
| Class B-1 Notes | $0*** | LIBOR +0.67%**** | September 22, 2014** | December 22, 2014** |
| Class B-2 Notes | $44,800,000 | LIBOR +0.67% | September 22, 2014** | December 22, 2014** |
| Class C-1 Notes | $8,000,000 | LIBOR +0.90% | September 22, 2014** | December 22, 2014** |
| Class C-2 Notes | $10,000,000 | 6.57% | September 22, 2014** | December 22, 2014** |
| Class D Notes | $18,000,000 | LIBOR +2.05% | September 22, 2014** | December 22, 2014** |
| Class E Notes | $0*** | LIBOR +4.50%**** | September 22, 2014** | December 22, 2014** |

*    LIBOR refers to LIBOR calculated for the applicable Interest Period.

**    If September 22, 2014 or December 22, 2014 is not a Business Day, the Stated Maturity of the Notes will be the next succeeding Business Day.

***    The initial aggregate principal amount of the Class A Notes, the Class B-1 Notes and the Class E Notes represents the amounts drawn by the Issuer on the Class A Commitments, the Class B-1 Commitments and the Class E Commitments, as applicable, on the Closing Date.

****    The interest rates of the Class A Notes, Class B-1 Notes and Class E Notes represent the interest rate applicable to the funded amount of the Class A Notes, Class B-1 Notes or Class E Notes, as applicable, and any portion of the Class A Commitment Fee, Class B-1 Commitments Fee or Class E Commitment Fee that is not paid when due.  Each draw will earn interest in accordance with the Class A Note Purchase Agreement, Class B-1 Note Purchase Agreement or Class E Note Purchase Agreement, as applicable.  So long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the portion of the Class A Notes, Class B-1 Notes or Class E Notes, as applicable, that were funded as a result of the Downgrade Draw in an amount equal to the amount of earnings on the Eligible Investments which are held in the related sub-account of the Contingent Class A Funding Account, the related sub-account of the Contingent Class B-1 Funding Account on the related sub-account of the Contingent Class E Funding Account, as applicable, in connection with a Downgrade Draw plus (i) 0.08%, in the case of the Class A Notes, (ii) 0.67%, in the case of the Class B-1 Notes or (iii) 4.50%, in the case of the Class E Notes.

A commitment fee will accrue (i) on the unfunded portion of the Class A Commitments at 0.08% per annum, (ii) on the unfunded portion of the Class B-1 Commitments at 0.67% per annum and (ii) on the unfunded portion of the Class E Commitments at 4.50% per annum.

***** During the Interest Period from the Maturity date to the Deferred Maturity Date, all the Notes (including the funded portion of the Class A Notes, Class B-1 Notes or Class E Notes, as applicable) outstanding shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding amount of the relevant Class of Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on such Class of Notes accrued at a rate of LIBOR. Any Class A Notes, Class B-1 Notes or Class E Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest during such Interest Period as provided above.

(c)     The Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$1,000 in excess thereof. Any Note or beneficial interests therein in excess of the applicable minimum denomination may, after the issuance thereof, cease or fail to be an integral multiple of the specified amount in excess thereof as a result of the repayment of principal pursuant to Section 11.1 or Section 11.2, including due to the addition to the principal amount thereof of Deferred Interest.

(d)     On the Closing Date, 21,200 P-1 Preference Shares and 10,000 P-2 Preference Shares will be issued pursuant to the Shares Paying Agency Agreement.

Section 2.4     Execution, Authentication, Delivery and Dating. (a) The Notes (other than Class E Notes) shall be executed on behalf of the Co-Issuers by one of the Authorized Officers of the Co-Issuers and the Class E Notes shall be executed on behalf of the Issuer by one of the Authorized Officers of the Issuer. The signature of such Authorized Officer, as applicable, on the Notes may be manual or facsimile.

(b)     Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, as applicable, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Issuer and the Co-Issuer to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)     Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)     Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations (as set forth in Section 2.3(c)) reflecting the original

Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced.  In the event that any Note is divided into more than one Note in accordance with this <u>Article II</u>, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original Aggregate Outstanding Amount of such subsequently issued Notes.

(f)     No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.5     <u>Registration, Registration of Transfer and Exchange</u>.   (a) (i) The Issuer shall cause to be kept the "Note Register" in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes.  The Trustee is hereby initially appointed as agent of the Issuer to act as "Note Registrar" for the purpose of registering and recording in the Note Register the Notes and transfers of such Notes as herein provided.  Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor.  The Note Registrar shall, upon request, provide any information it has concerning the Holders of the Class A Notes, Class B-1 Notes or Class E Notes to the Class A Note Agent, Class B-1 Note Agent or Class E Note Agent, as applicable.

(ii)     If a Person other than the Trustee is appointed by the Issuer as Note Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Note Registrar and of the location, and any change in the location, of the Note Registrar, and the Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon an Officer's Certificate executed on behalf of the Note Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal amounts and numbers of such Notes.

(iii)     Subject to this <u>Section 2.5</u>, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers (or in the case of Class E Notes only, the Issuer) to be maintained as provided in Section 7.4, the surrendered Notes shall be canceled in accordance with the Trustee's standard policy and the Co-Issuers (or in the case of Class E Notes only, the Issuer) shall execute, and the Trustee or the Authenticating Agent, as the case may be, shall authenticate and deliver in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like Aggregate Outstanding Amount.

(iv)     The Issuer will notify the Trustee in writing of any Note beneficially owned by or pledged to the Issuer or the Co-Issuer or any of their respective Affiliates promptly upon its knowledge of the acquisition thereof or the creation of such pledge.

(v)     At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like Aggregate Outstanding Amount, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Note is surrendered for exchange, the Co-Issuers (or in the case of Class E Notes only, the Issuer) shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

(vi)     All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers (or in the case of Class E Notes only, the Issuer) evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

(vii)     A Note and the rights to payments evidenced thereby may be assigned or otherwise transferred in whole or in part pursuant to the terms of this Section 2.5 only by the registration of such assignment and transfer of such Note on the Note Register (and each Note shall so expressly provide).  Any assignment or transfer of all or part of such Note shall be registered on the Note Register only upon presentment or surrender for registration of transfer or exchange of the Note duly endorsed, or, in the case of the Notes, be accompanied by a written instrument of transfer in form satisfactory to, and as may be required by, the Note Registrar and the Co-Issuers (or in the case of Class E Notes only, the Issuer), duly executed by the Holder thereof or his attorney duly authorized in writing.

(viii)     No service charge shall be made to a Holder for any exchange of Notes, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any exchange of Notes.

(ix)     The Issuer and the Co-Issuer shall not be required (i) to issue, register the transfer of or exchange any Note during a period beginning at the opening of business 15 days before any selection of Notes to be redeemed and ending at the close of business on the day of the first publication in the Company Announcements Office of the relevant notice of redemption or, if there is no publication, the mailing of the relevant notice of redemption, or (ii) to register the transfer of or exchange any Note so selected for redemption.

(b)     No Note may be sold or transferred (including by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws.

(c)     For so long as any of the Notes are Outstanding, the Issuer shall not permit the transfer of any Issuer Ordinary Shares and the Co-Issuer shall not transfer any shares of the Co-Issuer to U.S. Persons, and shall not permit the transfer of any such shares to any Person other than a Person which is a resident of the Cayman Islands if (i) such transfer is disadvantageous in any material respect to the Holders of the Notes, (ii) the Issuer fails to give written notice of such transfer to the Trustee, the Holders of the Notes or each of the Rating Agencies at least 20 Business Days prior to such transfer, or (iii) on or prior to the 15th Business

Day following such notice the Trustee shall have received written notice from a Majority of the Controlling Class objecting to such transfer.

(d)    Upon final payment due on the Maturity Date of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust office or at the office of any Paying Agent (outside the United States if then required by applicable law in the case of a definitive Note issued in exchange for a beneficial interest in a Regulation S Global Note pursuant to Section 2.10) on or prior to such Maturity; provided, that if there is delivered to the Co-Issuers (or in the case of Class E Notes only, the Issuer) and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Co-Issuers (or in the case of Class E Notes only, the Issuer) or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

(e)    Notwithstanding any provision to the contrary herein, so long as a Global Note remains Outstanding and is held by or on behalf of the Depositary, transfers of a Global Note, in whole or in part, shall only be made in accordance with Section 2.2(b) and this Section 2.5(e).

(i)    Transfers of Global Notes Generally.  Subject to clauses (ii) through (iv) of this Section 2.5(e), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(ii)    Rule 144A Global Note to Regulation S Global Note.  If a Holder of a beneficial interest in a Rule 144A Global Note representing Class B-2 Notes, Class C Notes or Class D Notes and deposited with the Depositary wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Regulation S Global Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Note, such Holder, provided such Holder or, in the case of a transfer to another Person, such Person is not a U.S. Person or a U.S. Resident, may, subject to the immediately succeeding sentence and the rules and procedures of the Depositary, exchange or transfer or cause the exchange or transfer of such interest for an equivalent beneficial interest in the Regulation S Global Note.  Upon receipt by the Trustee, as Note Registrar, of (A) instructions given in accordance with the Depositary's procedures from an Agent Member directing the Trustee to cause to be credited a beneficial interest in the Regulation S Global Note in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, but not less than the minimum denomination applicable to the relevant Notes held through Regulation S Global Notes, (B) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of a transfer or exchange pursuant to and in accordance with Regulation S, the Euroclear and Clearstream account to be credited with such increase and (C) a certificate in the form of Exhibit H attached hereto, given by the Holder of such beneficial interest (in the case of an exchange) or the transferee of such beneficial interest (in the case of a transfer) stating that the exchange or transfer of such interest has been made in compliance with the

transfer restrictions applicable to the Global Notes, including in accordance with Rule 903 or 904 of Regulation S, the Trustee, as Note Registrar, shall instruct the Depositary to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note.

(iii)    <u>Regulation S Global Note to Rule 144A Global Note</u>.  If a Holder of a beneficial interest in a Regulation S Global Note representing Class B-2 Notes, Class C Notes or Class D Notes and deposited with the Depositary wishes at any time to exchange its interest in such Regulation S Global Note for an interest in a corresponding Rule 144A Global Note or to transfer its interest in such Regulation S Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such Holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear and Clearstream or the Depositary, as the case may be, cause the exchange or transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Note.  To the extent that the Trustee, as Note Registrar, has received (A) instructions from Euroclear and Clearstream or the Depositary, as the case may be, directing the Trustee, as Note Registrar, to cause to be credited a beneficial interest in the Rule 144A Global Note equal to the beneficial interest in the Regulation S Global Note to be exchanged or transferred but not less than the minimum denomination applicable to the relevant Notes held through Rule 144A Global Notes, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase, and (B) a certificate in the form of <u>Exhibit G</u> attached hereto given by the Holder of such beneficial interest and stating that, in the case of a transfer, the Person transferring such interest in the Regulation S Global Notes reasonably believes that the Person acquiring such interest in the Rule 144A Global Note is a QIB/QP and is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction, or that, in the case of an exchange, the Holder is a QIB/QP, then Euroclear or Clearstream or the Trustee, as Note Registrar, as the case may be, will instruct the Depositary to reduce the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or exchanged, and the Trustee, as Note Registrar, shall instruct the Depositary, concurrently with such reduction, to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

(iv)    <u>Exchange or Transfer of Interests in Rule 144A Global Notes or Regulation S Global Notes for Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes</u>.  If a Holder of a beneficial interest in a Rule 144A Global Note or Regulation S Global Note representing Class B-2, Notes, Class C Notes or Class D Notes and deposited with the Depositary wishes at any time to exchange its interest in such Rule 144A Global Note or Regulation S Global Note for a Certificated Class B-2

Note, Certificated Class C Note or Certificated Class D Note, as applicable, such Holder may exchange or transfer its beneficial interest in a Rule 144A Global Note or Regulation S Global Note representing Class B-2 Notes, Class C Notes or Class D Notes for a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, as applicable, as provided below.   Upon receipt by the Trustee, as Note Registrar of (A) instructions from Euroclear and Clearstream or the Depositary or an Agent Member, as the case may be, directing the Trustee, as Note Registrar, to reduce the principal amount of the beneficial interest in the Rule 144A Global Note or Regulation S Global Note, as applicable, such instructions to contain information regarding the participant account with Euroclear and Clearstream or the Depositary and (B) a transfer certificate in the form of <u>Exhibit I-4</u> attached hereto delivered by the proposed transferee of the Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, as applicable, containing certifications as to certain Securities Act, Investment Company Act, U.S. tax and ERISA matters, stating, among other things, that the exchange of such interest has been made in compliance with the transfer restrictions applicable to the Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, as applicable, including that the transfer or exchange is being made in a transaction meeting the requirements of Rule 144A, Section 4(2) of the Securities Act or Regulation S, as applicable, and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction and that the beneficial owner (in the case of an exchange) or the transferee of such beneficial interest (in case of a transfer) is (A) both (1) a Qualified Purchaser and (2) either a QIB or an "accredited investor" or (B) neither a U.S. Person nor a U.S. Resident, as applicable, the Trustee, as Note Registrar shall, in accordance with <u>Section 2.9</u>, record the transfer in the Note Register in accordance with <u>Section 2.5(a)</u> and, upon execution by the Issuer, deliver one or more Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, in the number of the Notes designated by the transferee (the aggregate of such principal amount of the Notes being equal to the reduction in the principal amount of the Rule 144A Global Note or Regulation S Global Note, as applicable, being transferred). Any purported transfer in violation of the foregoing requirements shall be null and void <u>ab initio</u>, and the Trustee shall not register any such purported transfer and shall not deliver such Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, as applicable.

(f)        So long as the Certificated Notes corresponding to the relevant Class of Notes remain Outstanding, transfers of such Certificated Notes shall only be made in accordance with this <u>Section 2.5(f)</u>.

(i)        <u>Transfer of Certificated Notes</u>.  If a Holder of Certificated Notes wishes at any time to transfer such Certificated Note such Holder may transfer or cause the transfer of such interest for an equivalent amount of a Certificated Note of the same Class of Notes, in one or more Certificated Notes of the same Class of Notes, as provided below. Upon receipt by the Trustee, as Note Registrar of (A) such Holder's Certificated Note, properly endorsed for assignment to the transferee and (B) a transfer certificate in the form of <u>Exhibit I-1</u> attached hereto delivered by the proposed transferee of such Certificated Class A Notes, Certificated Class B-1 Notes or Certificated Class E Notes, as applicable, or a transfer certificate in the form of <u>Exhibit I-2</u> attached hereto delivered by

the proposed transferee of Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, in each case, containing certifications as to certain Securities Act, Investment Company Act, U.S. tax and ERISA matters, stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to Certificated Notes of the relevant Class of Notes, including that the transfer or exchange is being made in a transaction meeting the requirements of Rule 144A, or Regulation S (or, solely in the case of transfers or exchanges of Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, Regulation S, Rule 144A or Section 4(2) of the Securities Act), as applicable, and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction and that the beneficial owner (in the case of an exchange) or the transferee of such beneficial interest (in case of a transfer) is (A) both (1) a Qualified Purchaser and (2) a QIB (or, in the case of Exhibit I-2 relating to the Certificated Class B-2 Notes, Certificated Class C Note or Certificated Class D Note, as applicable, a QIB or an "accredited investor") or (B) neither a U.S. Person nor a U.S. Resident, as applicable, the Trustee, as Note Registrar shall cancel such Certificated Note corresponding to the relevant Class of Notes, in accordance with Section 2.9, record the transfer in the Note Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Certificated Notes of the relevant Class of Notes in the number of the Notes designated by the transferee (the aggregate of such principal amount of the Notes being equal to the principal amount of the Notes represented by the corresponding Certificated Note being transferred). Any purported transfer in violation of the foregoing requirements shall be null and void ab initio, and the Trustee shall not register any such purported transfer and shall not cancel such corresponding Certificated Note.

(ii)    Exchange of Certificated Notes. If a Holder of Certificated Notes, wishes at any time to exchange such Certificated Notes, for one or more Certificated Notes of the same Class of Notes, representing different stated principal amounts of such Notes, such Holder may exchange or cause the exchange of such Certificated Notes of the same Class of Notes, for corresponding Certificated Notes, bearing the same designation as the Certificated Notes, endorsed for exchange as provided below. Upon receipt by the Trustee, as Note Registrar of (A) such Holder's Certificated Notes, properly endorsed for such exchange and (B) written instructions from such Holder designating the portion of the Aggregate Outstanding Amount of the Notes to be exchanged, then the Trustee, as Note Registrar shall cancel such Certificated Notes, in accordance with Section 2.9, record the exchange in the Note Register in accordance with Section 2.5(a) and upon execution by the Issuer, deliver one or more Certificated Notes of the same Class of Notes, bearing the same designation as the Certificated Notes as applicable, endorsed for exchange, registered in the same names as the Certificated Notes, surrendered by such Holder, in different principal amount of the Certificated Notes, designated by such Holder

(iii)    Exchange or Transfer of Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note for Interests in Rule 144A Global Notes or Regulation S Global Notes. If a Holder of Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes wishes at any time to exchange such Certificated Class B-2

Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, for interests in either Rule 144A Global Notes or Regulation S Global Notes, or to transfer its interests in such Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, to a Person who wishes to take delivery thereof in the form of interests in either Rule 144A Global Notes or Regulation S Global Notes, such Holder may exchange or transfer such Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, for interests in either Rule 144A Global Notes or Regulation S Global Notes, or transfer such Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, to such Person, as provided below. Upon receipt by the Trustee, as Note Registrar, of (A) such Holder's Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, (B) instructions given in accordance with the Depositary's procedures from an Agent Member or instructions from Euroclear and Clearstream or the Depositary, as the case may be, in each case directing the Trustee to cause to be credited a beneficial interest in the Regulation S Global Note or Rule 144A Global Note, as applicable, (C) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of a transfer or exchange pursuant to and in accordance with Regulation S, the Euroclear and Clearstream account to be credited with such increase, (D) written instructions from such Holder designating the portion of the Aggregate Outstanding Amount of the Notes to be exchanged or transferred, and (E) a transfer certificate in the form of <u>Exhibit I-3</u> attached hereto delivered by the proposed transferee of the Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, the Trustee, as Note Registrar, shall cancel such Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, in accordance with Section 2.9, record the exchange in the Note Register in accordance with Section 2.5(a) and, upon execution by the Issuer, instruct the Depositary to increase the principal amount of the Rule 144A Global Note or the Regulation S Global Note, as applicable, by the aggregate principal amount of the Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, to be exchanged or transferred. Any purported transfer in violation of the foregoing requirements shall be null and void <u>ab initio</u>, and the Trustee shall not register any such purported transfer and shall not cancel such Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable.

(g)   <u>Other Exchanges</u>. In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons, pursuant to <u>Section 2.10</u> hereof, such Notes may be exchanged for one another only in accordance with such procedures and restrictions as are substantially consistent with the provisions above (including certification requirements intended to ensure that such transfers comply with Rule 144A or another exemption from the registration requirements of the Securities Act, or are to non-U.S. Persons and non-U.S. Residents, or otherwise comply with Regulation S, as the case may be) and as may be from time to time adopted by the Co-Issuers and the Trustee.

(h)   <u>Transfer of Interests in the Global Notes</u>. Notwithstanding anything herein to the contrary, transfers of interests in a Global Note may be made (a) by book-entry transfer of beneficial interests within the relevant Clearing Agency or (b)(i) in the case of transfers of interests in a Rule 144A Global Note, in accordance with <u>Sections 2.5(e)(ii)</u>, <u>(e)(iii)</u>,

(e)(iv) or (f)(iii) hereof or (ii) in the case of transfers of interests in a Regulation S Global Note, in accordance with Sections 2.5(e)(ii), (e)(iii), (e)(iv) or (f)(iii) hereof; provided, that, in the case of any such transfer of interests pursuant to clause (a) or (b) above, such transfer is made in accordance with subsection (i) below.

(i)      Restrictions on Transfers.  (A) Transfers of interests in a Regulation S Global Note to a U.S. Person or a U.S. Resident (other than transfers or exchanges to persons taking delivery in the form of Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes pursuant to Section 2.5(e)(iv)) shall be made by delivery of an interest in a Rule 144A Global Note and shall be limited to transfers made pursuant to the provisions of Section 2.5(e) or (f), as applicable.  Beneficial interests in a Regulation S Global Note may only be held through Euroclear and Clearstream.

(B)      Any transfer of an interest in a Rule 144A Global Note to a U.S. Person or a U.S. Resident that is not a QIB/QP, shall be null and void ab initio and shall not be given effect for any purpose hereunder, and the Trustee shall hold any funds conveyed by the intended transferee of such interest in such Rule 144A Global Note in trust for the transferor and shall promptly re-convey such funds to such Person in accordance with the written instructions thereof delivered to the Trustee at its address listed in Section 14.3.

(j)      Each owner of a Note (other than a Class A Note, Class B-1 Note or a Class E Note) in the form of a beneficial interest in a Rule 144A Global Note will be deemed to have represented and agreed with the Issuer, as follows:

(i)      The Holder is purchasing the Note for its own account or one or more accounts with respect to which it exercises sole investment discretion, in minimum denominations of U.S.$250,000 and in integral multiples of U.S.$1,000 in excess thereof, and both it and each such account (if any) (A) is a QIB/QP, (B) is not a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than U.S.$25,000,000 in securities of issuers that are not Affiliated to it, (C) is not a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan, (D) was not formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial holder of the Holder is a QP) and (E) shall provide written notice to any transferee that any transferee taking delivery of the Note in the form of an interest in a Rule 144A Global Note must satisfy the foregoing qualifications.

(ii)      The Holder agrees on its own behalf and on behalf of any account for which it is holding the Note to offer, sell or otherwise transfer such Note (or a beneficial interest therein) only (A) in the required minimum denomination, and (B) (1) in the United States, only in the form of an interest in a Rule 144A Global Note to a QP that the Holder reasonably believes is a QIB, purchasing for its own account or one or more accounts, each of which is a QP that the Holder reasonably believes is a QIB, in accordance with Rule 144A, and none of which are (x) a dealer of the type described in

paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than U.S.$25,000,000 in securities of issuers that are not Affiliated to it, (y) a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan or (z) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial Holder is a QP) or (2) outside the United States in the form of an interest in a Regulation S Global Note to a Person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act.  The Holder understands and agrees that neither a U.S. Person nor a U.S. Resident may hold an interest in a Note in the form of a Regulation S Global Note at any time.  The Holder agrees to provide notice of such transfer restrictions to any subsequent transferee.

(iii)    The Holder understands that any Holder of Notes who is a U.S. Person or a U.S. Resident who is determined not to have been a QIB/QP at the time of acquisition of the Note (or interest therein) is required to sell such interest to a Person that is a QIB/QP or to a Person that is neither a U.S. Person nor a U.S. Resident in a transaction meeting the requirements of Regulation S.

(iv)    The Holder understands that the Notes have not been approved or disapproved by the SEC or any other governmental authority or agency of any jurisdiction, nor has the SEC or any other governmental authority or agency passed upon the accuracy or adequacy of the Offering Memorandum.  Any representation to the contrary is a criminal offense.

(v)    The Holder agrees that no Class B-2 Note, Class C Note or Class D Note or any interest therein may be sold, pledged or otherwise transferred in a denomination of less than U.S.$250,000, and in integral multiples of U.S.$1,000 in excess thereof.

(vi)    The Holder (A) has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Notes, (B) is financially able to bear such risk, (C) in making such investment is not relying on the advice or recommendations of the Managers, the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee or any of their respective Affiliates (or any representative of any of the foregoing), (D) has determined that an investment in the Notes is suitable and appropriate for it, (E) has received, and has had an adequate opportunity to review the contents of, the Offering Memorandum and (F) has had access to such financial and other information concerning the Co-Issuers (or in the case of Class E Notes only, the Issuer) and the Notes as it has deemed necessary to make its own independent decision to purchase such Notes, including the opportunity, at a reasonable time prior to its purchase of such Notes, to ask questions and receive answers concerning the Co-Issuers (or in the case of Class E Notes only, the Issuer) and the terms and conditions of the offering of the Notes.

(vii)     The Holder understands that there is no market for the Notes and that no assurance can be given as to the liquidity of any trading market for the Notes and that it is unlikely that a trading market for the Notes will develop.  It further understands that, although the Managers may from time to time make a market in the Notes, the Managers are under no obligation to do so and, following the commencement of any market-making, may discontinue the same at any time.  Accordingly, the Holder must be prepared to hold the Notes for an indefinite period of time or until their maturity.

(viii)    The Holder agrees that no sale, pledge or other transfer of a Note (or any interest therein) may be made if such transfer would have the effect of requiring either of the Co-Issuers or the pool of assets owned by the Issuer to register as an investment company under the Investment Company Act.

(ix)     The Holder represents and warrants that, in the case of any Notes held, either (A) it is not, and is not acquiring and holding such Notes on behalf of a Plan or a governmental, foreign or church plan that is subject to any Similar Law or (B) its acquisition and holding of such Notes will not constitute or otherwise result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, a violation of any Similar Law).  The Holder of Notes shall further indemnify and hold harmless the Issuer, the Trustee and the Managers and their respective affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements in this paragraph (ix).  Any purported transfer of Notes to a purchaser that does not comply with the requirements of this paragraph (ix) shall be null and void ab initio.  The Holder of Notes makes the representations and warranties in this paragraph (ix) on each day that it holds Notes.

(x)     The Holder agrees that (A) any sale, pledge or other transfer of a Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture, or made based upon any false or inaccurate representation made by the Holder or a transferee to the Co-Issuers (or in the case of Class E Notes only, the Issuer), will be void and of no force or effect and (B) none of the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(xi)     The Holder is not a member of the public in the Cayman Islands.

(xii)    The Rule 144A Global Notes will bear the applicable legends set forth in Exhibits B-2-1, C-1-1, C-2-1 and D-1 hereto.

(xiii)   If the Holder is not a natural Person, the Holder has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the Holder in connection with its purchase of Notes and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the Person signing any such documents on behalf of the Holder has been duly authorized to

67

execute and deliver such documents and each other document required to be executed and delivered by the Holder in connection with its purchase of Notes.  If the Holder is an individual, the Holder has all requisite legal capacity to acquire and hold the Notes and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Holder in connection with the subscription for the Notes. Such execution, delivery and compliance by the Holder does not conflict with, or constitute a default under, any instruments governing the Holder, any applicable law, regulation or order, or any material agreement to which the Holder is a party or by which the Holder is bound.

(xiv)     If the Holder's permanent address is located in the United States, the Holder was offered the Notes in the state of such Holder's permanent address and intends that the securities law of that state govern the Holder's subscription for the Notes.

(xv)     The Holder shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as IRS Form W-8BEN (Certification of Foreign Status as Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments. The Holder agrees to provide any certification or information that is reasonably requested by the Issuer or its agents (a) to permit the Issuer or its agents to make payments to it without, or at a reduced rate of, withholding, (b) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets, or (c) to enable the Issuer or its agents (including without limitation the Trustee and the Share Paying Agent) to determine and/or satisfy their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Securities or the Holder of such Securities under any present or future law or regulation of the Cayman Islands or the United States of any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any law or regulation.

(xvi)     The Holder hereby agrees that, for purposes of U.S. federal, state and local income and franchise tax and any other income taxes, (i) the Issuer will be treated as a corporation, (ii) the Notes will be treated as indebtedness solely of the Issuer, and (iii) the Preference Shares will be treated as equity in the Issuer; the Holder agrees to such treatment and agrees to take no action inconsistent with such treatment, unless required by law. The Holder agrees to treat the Notes as described in the "—Certain U.S. Federal Income Tax Considerations" section of the Offering Memorandum for all U.S. federal income tax purposes and shall take no action inconsistent with such treatment unless required by law.

(xvii)     The Holder acknowledges that the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Managers, the Trustee, the Share Paying Agent and others

will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Notes are no longer accurate, the Holder will promptly notify the Co-Issuers (or in the case of Class E Notes only, the Issuer), and the Managers.

(k)     Each Holder of a beneficial interest in a Regulation S Global Note representing any Note will be deemed to have represented and agreed with the Issuer as set forth in subclauses (ii) through (iv), subclauses (vi) through (xi) and subclauses (xiii) through (xvii) in clause (j) above, except that Holders of the Class E Notes will be deemed to have made the representation in subclause (v) of this clause (k) instead of the representation in subclause (ix) of clause (j) above.  Each Holder of a beneficial interest in a Regulation S Global Note will also be deemed or required (as applicable) to represent, warrant and agree as follows:

(i)     The Holder is neither a U.S. Person nor a U.S. Resident purchasing for its own account or one or more accounts, each of which is neither a U.S. Person nor a U.S. Resident, and as to each of which the Holder exercises sole investment discretion, and is aware that the sale of the Notes to it is being made in reliance on the exemption from registration provided by Regulation S.

(ii)     The Holder agrees that no Regulation S Global Note (or any interest therein) may be sold, pledged or otherwise transferred in a denomination of less than U.S.$250,000, and in integral multiples of U.S.$1,000 in excess thereof.

(iii)     The Regulation S Global Notes will bear the legends set forth in the applicable form of note contained in Exhibits B-2-2, C-1-2, C-2-2 and D-2, hereto.

(iv)     The Holder understands and agrees that before a Note in the form of an interest in a Regulation S Global Note may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of a Rule 144A Global Note, the transferee shall be required to provide the Trustee with a transfer certificate in the form attached hereto as Exhibit G to the effect that the transferee is a QIB/QP, which is acquiring the interest in the Note in the form of a Rule 144A Global Note in a transaction meeting the requirements of Rule 144A, and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction.

(v)     The Holder of a beneficial interest in a Class E Note is not a Benefit Plan Investor and, if the Holder is a governmental, foreign or church plan subject to Similar Law, its acquisition and holding of the Class E Notes will not result in a violation of any Similar Law.

(l)     Each initial purchaser and transferee of a Class A Note, a Class B-1 Note or a Class E Note, or of a Class B-2 Note, Class C Note or Class D Note issued in the form of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, as applicable, will represent and agree that:

(i)     Each (A) initial purchaser of a Class A Note, Class B-1 Note or Class E Note, as applicable, will be required to deliver a Class A Note Purchase Agreement,

Class B-1 Note Purchase Agreement or Class E Note Purchase Agreement, (B) initial purchaser of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note will be required to deliver a Certificated Class C Note Subscription Agreement or Certificated Class D Note Subscription Agreement, as applicable, (C) subsequent transferee of a Class A Note, Class B-1 Note or Class E Note, as applicable, will be required to deliver to the Issuer a certificate substantially in the form of Exhibit I-1 hereto, and (D) subsequent transferee of a Class B-2 Note, Class C Note or Class D Note issued in the form of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, as applicable, will be required to deliver to the Issuer a certificate substantially in the form of Exhibit I-2 hereto, certifying, in each case, that such initial purchaser or transferee, as applicable, (i) is either (x) both a Qualified Institutional Buyer (or, solely in the case of a purchaser or transferee of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, either a Qualified Institutional Buyer or an "accredited investor") and a Qualified Purchaser, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is both a Qualified Institutional Buyer (or, solely in the case of a purchaser or transferee of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, either a Qualified Institutional Buyer or an "accredited investor") and a Qualified Purchaser, pursuant to and in accordance with Rule 144A or (y) neither a U.S. Person nor a U.S. Resident, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is neither a U.S. Person nor a U.S. Resident, in an offshore transaction in accordance with Regulation S and (ii) is in compliance with all applicable securities laws, ERISA restrictions and tax laws. With respect to any initial purchaser of a Class A Note, Class B-1 Note or Class E Note, the related Guarantor or Funding Entity, if any, will also be required to satisfy the related Rating Criteria. Any transfer of a Class A Note, Class B-1 Note or Class E Note during the related Draw Period will require that (i) the transferee, the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria and (ii) the initial purchaser and each transferee executes and delivers a Class A Note Purchase Agreement, Class B-1 Note Purchase Agreement or Class E Note Purchase Agreement, as applicable.

(ii)     Each initial purchaser or transferee of a Certificated Note must provide, if requested, any additional information that may be required to substantiate its status as (i) a Qualified Institutional Buyer (or, solely in the case of a purchaser or transferee of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, either a Qualified Institutional Buyer or an "accredited investor") and as a Qualified Purchaser or (ii) neither a U.S. Person nor a U.S. Resident, as applicable, and to determine compliance with ERISA or to otherwise determine its eligibility to purchase a Certificated Note of the relevant Class of Notes; and

(iii)     Any transfer of the Certificated Notes corresponding to the relevant Class of Notes in violation of the foregoing restrictions will be void ab initio and will be disregarded by the Trustee.

(m)     Each Person who becomes a Holder of a Certificated Note other than a Class E Note corresponding to the relevant Class of Notes (whether pursuant to Section 2.5(f) or

otherwise) will be required to represent and warrant (in the transfer certificate in the form of Exhibit I-1, Exhibit I-2 or Exhibit I-3 attached hereto, as applicable) that either (A) it is not, and is not acquiring and holding the Certificated Note, on behalf of a Plan or a governmental, foreign or church plan that is subject to any Similar Law or (B) its acquisition and holding of the Certificated Note will not constitute or otherwise result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, a violation of any Similar Law). The Holder of a Class E Note will be required to represent and warrant that (X) it is not a Benefit Plan Investor and (Y) if the Holder is a governmental, foreign or church plan subject to Similar Law, its acquisition and holding of the Class E Notes will not result in a violation of any Similar Law. The Holder of each Certificated Note, shall further indemnify and hold harmless the Issuer, the Trustee, the Class A Note Agent, the Class B-1 Note Agent or the Class E Note Agent, as applicable, and the Managers and their respective affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements in this paragraph (m). Any purported transfer of Certificated Note to a purchaser that does not comply with the requirements of this paragraph (m) shall be null and void ab initio. The Holder of the each Certificated Note, makes the representations and warranties in this paragraph (m) on each day that it holds any such Certificated Note.

(n)     Notwithstanding a request made to remove the Rule 144A Securities Legend or Regulation S Legend from any of the Notes, such Notes shall bear the applicable legend, and the applicable legend shall not be removed unless there is delivered to the Co-Issuers (or in the case of Class E Notes only, the Issuer) and the Trustee such satisfactory evidence, which may include an Opinion of Counsel satisfactory to the Co-Issuers (or in the case of Class E Notes only, the Issuer), as may be reasonably required by the Co-Issuers (or in the case of Class E Notes only, the Issuer) to the effect that neither the applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A, Regulation S or Section 4(2) of the Securities Act, as applicable, and the Investment Company Act. Upon provision of such satisfactory evidence, the Trustee, at the direction of the Co-Issuers (or in the case of Class E Notes only, the Issuer), shall authenticate and deliver such Notes that do not bear such legend.

(o)     Any purported transfer of a Note not in accordance with this Section 2.5 shall be null and void ab initio, shall be disregarded by the Trustee and shall not be given effect for any purpose hereunder.

(p)     Nothing in this Section 2.5 shall be construed to limit any contractual restrictions on transfers of Notes or interests therein that may apply to any Person.

(q)     Notwithstanding anything contained in this Indenture to the contrary, neither the Trustee, the Class A Note Agent, the Class B-1 Note Agent, the Class E Note Agent nor the Note Registrar (nor any other Transfer Agent) shall be responsible or liable for compliance with applicable federal or state securities law (including, without limitation, the Securities Act or Rule 144A or Regulation S promulgated thereunder), the Investment Company Act, ERISA or the Code (or any applicable regulations thereunder); provided, however, that if a specified transfer certificate or Opinion of Counsel is required by the express terms of this Section 2.5 to be delivered to the Trustee or Note Registrar prior to registration of transfer of a

Security, the Trustee and/or Note Registrar, as applicable, shall be under a duty to receive such certificate or Opinion of Counsel and to examine the same to determine whether it conforms on its face to the requirements hereof (and the Trustee or Note Registrar, as the case may be, shall promptly notify the party delivering the same if it determines that such certificate or Opinion of Counsel does not so conform).

Section 2.6    <u>Mutilated, Destroyed, Lost or Stolen Notes</u>.  If (i) any mutilated Note is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them and any agent of any of them harmless, then, in the absence of notice to the Co-Issuers (or in the case of Class E Notes only, the Issuer), the Trustee or such Transfer Agent that such Note has been acquired by a Protected Purchaser, the Co-Issuers (or in the case of Class E Notes only, the Issuer) shall execute and, upon Issuer Request, the Trustee shall authenticate and deliver, in lieu of any such mutilated, destroyed, lost or stolen Note, a new Note of same tenor and principal amount and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a Protected Purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Issuer, the Co-Issuer, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer, the Co-Issuer, the Trustee and the Transfer Agent in connection therewith.

In case any such mutilated, destroyed, lost or stolen Note has become due and payable, the Co-Issuers (or in the case of Class E Notes only, the Issuer) in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this <u>Section 2.6</u>, the Issuer, the Co-Issuer, the Trustee or a Transfer Agent may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this <u>Section 2.6</u> in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Co-Issuers (or in the case of Class E Notes only, the Issuer), and such new Note shall be entitled, subject to the second paragraph of this <u>Section 2.6</u>, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this <u>Section 2.6</u> are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.7    Payment of Principal and Interest; Principal and Interest Rights Preserved.  (a) Each Class of Notes shall accrue interest during each Interest Period at the applicable Note Interest Rate specified in Section 2.3 on the Aggregate Outstanding Amount of such Class of Notes (determined in each case, other than with respect to the Class A Notes, the Class B-1 Notes or the Class E Notes, as of the first day of each Interest Period and after giving effect to any payment of principal or deferral of interest occurring on such day) from the Closing Date. Interest on each Class of Notes will be computed in the manner set forth in Section 2.7(f). Interest on the Notes shall be due and payable on each Payment Date (commencing on the Payment Date in September 2007) immediately following the related Interest Period and on the Stated Maturity of the Notes.  Interest shall accrue on the Aggregate Outstanding Amount of the Class A Notes, Class B-1 Notes and Class E Notes (determined on a weighted daily average basis for each Interest Period after giving effect to any payment of principal or any draw downs made with respect to the Class A Noteholders, Class B-1 Noteholders or Class E Noteholders, as applicable, on any day during the Interest Period), which represents the funded portion of the Class A Commitments, Class B-1 Commitments or Class E Commitments, as applicable.  The Class A Commitments, the Class B-1 Commitments and the Class E Commitments shall be funded in accordance with Section 2.7(l).  The Class A Commitment Fee, Class B-1 Commitment Fee and the Class E Commitment Fee shall accrue on the unfunded portion of the Class A Commitments, the Class B-1 Commitments or the Class E Commitments, as applicable (determined on a weighted daily average basis for each Interest Period after giving effect to any payment of principal or any draw downs made with respect to the Class A Noteholders, Class B-1 Noteholders or Class E Noteholders, as applicable, on any day during the Interest Period).  The Class A Commitment Fee, the Class B-1 Commitment Fee and the Class E Commitment Fee shall be payable in arrears on each Payment Date and, if not so paid, interest shall accrue on the unpaid portion of the Class A Commitment Fee at the Class A Note Interest Rate, the unpaid portion of the Class B-1 Commitment Fee at the Class B Note Interest Rate and the unpaid portion of the Class E Commitment Fee at the Class E Note Interest Rate; provided, however, that:

(i)    Failure to pay (x) interest accrued on the Class A Notes or (y) the Class A Commitment Fee in each case on any Payment Date, will result in an Event of Default, as specified in Section 5.1 hereof.  Additional interest will accrue on any Defaulted Interest with respect to the Class A Notes, including the Class A Commitment Fee, at the Class A Note Interest Rate (including any interest on such Defaulted Interest).

(ii)    Payment of interest on the Class B Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), Class A Commitment Fee (including any Defaulted Commitment Fee on the Class A Notes and interest on such Defaulted Commitment Fee) and other amounts in accordance with the Priority of Payments.  Failure to pay (x) interest accrued on the Class B-1 Notes, (y) the Class B-1 Commitment Fee or (z) interest accrued on the Class B-2 Notes, in each case, on any Payment Date, will result in an Event of Default, as specified in Section 5.1 hereof. Additional interest will accrue on any Defaulted Interest with respect to the Class B Notes, any Defaulted Commitment Fee on the Class B Notes at the Class B Note Interest Rate.

(iii)     Payment of interest on the Class C Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class A Commitment Fee (including any Defaulted Commitment Fee on the Class A Notes), the interest due and payable on the Class B Notes (including Defaulted Interest, if any and interest on all such Defaulted Interest), the Class B-1 Commitment Fee (including any Defaulted Commitment Fee on the Class B-1 Notes) and other amounts in accordance with the Priority of Payments.  Failure to pay interest accrued on the Class C Notes, on any Payment Date, will result in an Event of Default, as specified in Section 5.1 hereof. Additional interest will accrue on any Defaulted Interest with respect to the Class C Notes at the Class C Note Interest Rate (including any interest on such Defaulted Interest).

(iv)     Payment of interest on the Class D Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class A Commitment Fee (including any Defaulted Commitment Fee on the Class A Notes), the interest due and payable on the Class B Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class B-1 Commitment Fee (including any Defaulted Commitment Fee on the Class B-1 Notes), the interest due and payable on the Class C Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest) and other amounts in accordance with the Priority of Payments.  So long as any Class A Notes, Class B Notes or Class C Notes are Outstanding or any Class A Commitment Fee or Class B-1 Commitment Fee remains unpaid, any interest due and accrued on the Class D Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date (such interest, including as of any date interest accrued as provided in the next sentence on such interest not paid on prior Payment Dates, "Class D Deferred Interest") shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available and permitted to be used for payment of such interest in accordance with the Priority of Payments.  Class D Deferred Interest accrued to any Payment Date shall bear interest at the Class D Note Interest Rate, as applicable, and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.

(v)     Payment of interest on the Class E Notes and the Class E Commitment Fee is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class A Commitment Fee (including any Defaulted Commitment Fee on the Class A Notes), the interest due and payable on the Class B Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class B-1 Commitment Fee (including any Defaulted Commitment Fee on the Class B-1 Notes), the interest due and payable on the Class C Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the interest due and payable on the Class D Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest and Class D Deferred Interest, if any, and interest on such Class D Deferred Interest) and other amounts in accordance with the Priority of Payments.  So long as any Class A Notes, Class B Notes,

Class C Notes or Class D Notes are Outstanding or any Class A Commitment Fee or Class B-1 Commitment Fee remains unpaid, any interest due and accrued on the Class E Notes or any due and unpaid Class E Commitment Fee which is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date (such interest, including as of any date interest accrued as provided in the next sentence on such interest not paid on prior Payment Dates, "Class E Deferred Interest" and "Class E Deferred Commitment Fee") shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available and permitted to be used for payment of such interest  or Class E Commitment Fee in accordance with the Priority of Payments.  Class E Deferred Interest or Class E Deferred Commitment Fees accrued to any Payment Date shall bear interest at the Class E Note Interest Rate, as applicable, and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.

(b)    The principal of each Note shall be due and payable on the Stated Maturity thereof, as applicable, unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption, failure of the Coverage Tests or otherwise; provided, however, that unless otherwise provided herein with respect to redemptions:

(i)    the payments of principal of the Class B Notes may only occur on or after the date that the principal of the Class A Notes have been paid in full and the Class A Commitments have been reduced to zero, and is subordinated to the payment on each Payment Date of the principal due and payable on the Class A Notes, the Class A Commitment Fee and the interest due and payable on the Class A Notes, and other amounts in accordance with the Priority of Payments (and the failure to pay the principal of the Class B Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default);

(ii)    the payments of principal of the Class C Notes may only occur on or after the date that the principal of the Class A Notes and the Class B Notes has been paid in full and both the Class A Commitments and the Class B-1 Commitments have been reduced to zero, and is subordinated to the payment on each Payment Date of the principal due and payable on the Class A Notes and the Class B Notes, the interest due and payable on the Class A Notes, the Class B Notes, the Class A Commitment Fee and the Class B-1 Commitment Fee and other amounts in accordance with the Priority of Payments (and the failure to pay the principal of the Class C Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default);

(iii)    the payment of principal of the Class D Notes may only occur on or after the date that the principal of the Class A Notes, the Class B Notes and the Class C Notes has been paid in full and both the Class A Commitments and the Class B-1 Commitments have been reduced to zero, and is subordinated, other than with respect to the payment of Class D Deferred Interest out of Interest Proceeds, to the payment on each Payment Date of the principal due and payable on the Class A Notes, the Class B Notes and the Class C

Notes, the interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes, the Class A Commitment Fee and the Class B-1 Commitment Fee and other amounts in accordance with the Priority of Payments (and the failure to pay the principal amount of the Class D Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default); and

(iv)    the payment of principal of the Class E Notes may only occur on or after the date that the principal of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes has been paid in full and both the Class A Commitments and the Class B-1 Commitments have been reduced to zero, and is subordinated, other than with respect to the payment of Class E Deferred Interest out of Interest Proceeds, to the payment on each Payment Date of the principal due and payable on the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, the interest due and payable on the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, the Class A Commitment Fee and the Class B-1 Commitment Fee and other amounts in accordance with the Priority of Payments (and the failure to pay the principal amount of the Class E Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default).

(c)    Interest due on any Payment Date on the Notes, the Class A Commitment Fee, the Class B-1 Commitment Fee, the Class E Commitment Fee and principal paid on any Payment Date on the Notes (including any Redemption Price paid on the applicable Redemption Date) shall be payable by the Paying Agent by Dollar check drawn on a bank in the United States of America or by wire transfer in immediately available funds and, if individual definitive Notes are issued, and so long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange shall so require the Co-Issuers will have a paying agent for such Notes that are so listed in Ireland and payments on such Notes may be effected through such Irish Paying Agent. In the event that the Irish Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Company Announcements Office. In the case of a check, such check shall be mailed to the Person entitled thereto at his address as it appears on the Note Register and, in the case of a wire transfer, such wire transfer shall be sent in accordance with written instructions provided by such Person. Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office or at the office of any Paying Agent (outside of the United States if then required by applicable law in the case of a definitive Note issued in exchange for a beneficial interest in the Regulation S Global Note) on or prior to such Maturity; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender. In the case where any final payment of principal and interest is to be made on any Note (other than on the Stated Maturity thereof) the Co-Issuers or, upon Issuer Request, the Trustee, in the name and at the expense of the Co-Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail to the Persons entitled thereto at their addresses appearing on the Note Register, a notice which shall state the date on which

such payment will be made, the amount of such payment per U.S.$100,000 principal amount of Notes and shall specify the place where such Notes may be presented and surrendered for such payment.

(d)    Subject to the provisions of Sections 2.7(a) and (b) and Section 13.1 hereof, the Holders of Notes as of the Record Date in respect of a Payment Date shall be entitled to the interest accrued and payable in accordance with the Priority of Payments and principal payable in accordance with the Priority of Payments on such Payment Date.  All such payments that are mailed or wired and returned to the Corporate Trust Office of the Trustee or at the office of any Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.4.

(e)    Interest on any Note which is payable, and is punctually paid or duly provided for, on any Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest.  Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(f)    Interest on the Notes (other than the Class C-2 Notes) and interest on any Defaulted Interest and Deferred Interest in respect thereof, shall be computed on the basis of the actual number of days elapsed during the applicable Interest Period (including any adjustment to the number of days in an Interest Period as a result of the related Payment Date and/or the preceding Payment Date being moved from a day that is not a Business Day to the immediately succeeding Business Day) divided by 360.  Interest on the Class C-2 Notes and on any Defaulted Interest in respect thereof will be computed on the basis of a 360-day year consisting of twelve 30-day months.  The Class A Commitment Fee, the Class B-1 Commitment Fee and the Class E Commitment Fee will be calculated on the basis of a 360-day year and the actual number of days elapsed during each Interest Period, including any adjustment to the number of days in an Interest Period as a result of the related Payment Date and/or the preceding Payment Date being moved from a day that is not a Business Day to the immediately succeeding Business Day; *provided* that, in the event that the date of any Payment Date or Redemption Date shall not be a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on such date, but may be made on the next succeeding Business Day and with respect to the Class A Commitment Fee, the Class B-1 Commitment and the Class E Commitment Fee, the actual number of days elapsed during the Interest Period for such Notes shall be adjusted to take into account the number of days elapsed as a result of the Payment Date being adjusted to the next succeeding Business Day.

(g)    All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date, Redemption Date or any other date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(h)    The Notes and all obligations owed to the Trustee hereunder will be limited recourse debt obligations of the Issuer and the Co-Issued Notes will be non-recourse debt obligations of the Co-Issuer, in each case secured as described herein.  Once the Collateral have been realized and the proceeds thereof applied in accordance with the Priority of Payments, the Co-Issuers shall have no further obligations hereunder and any outstanding obligations shall be extinguished.  No recourse shall be had for the payment of any amount owing in respect of the Notes or under this Indenture against any officer, director, employee, shareholder or incorporator of the Co-Issuers or any successors or assigns thereof for any amounts payable under the Notes or this Indenture.  It is understood that the foregoing provisions of this paragraph (h) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture, and the same shall continue until paid or discharged.  It is further understood that the foregoing provisions of this paragraph (h) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person.

(i)    Subject to the foregoing provisions of this Section 2.7, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal that were carried by such other Note.

(j)    Notwithstanding any of the foregoing provisions (except for Section 2.7(h)) with respect to payments of principal of and interest on the Notes, if the Notes have become or been declared due and payable following an Event of Default and such acceleration of Maturity and its consequences have not been rescinded and annulled and the provisions of Section 5.5 are not applicable, then payments of principal of and interest on all of such Notes shall be made as specified in Section 13.1.

(k)    With respect to the Maturity Date, in the event that (without duplication), (a)(1) an Event Determination Date has occurred with respect to a Reference Entity included in the Reference Portfolio for the Credit Swap Agreement on or prior to the Maturity Date but the relevant Final Price in respect of such Reference Entity has not been determined under the Credit Swap Agreement on or prior to the Maturity Date; and/or (2) a Potential Failure to Pay has occurred with respect to a Reference Entity included in the Reference Portfolio for the Credit Swap Agreement on or prior to the Maturity Date and such Potential Failure to Pay has not been cured on or prior to the Maturity Date (each Reference Entity referred to in sub paragraphs (a)(1) and (a)(2) an "Adjustment Reference Entity") then an Adjustment Amount shall be determined by the Credit Swap Calculation Agent as of the applicable Event Determination Date or the date upon which the Potential Failure to Pay is determined to have occurred by calculating in accordance with the terms of the Credit Swap Agreement (i) a hypothetical Reference Entity Loss Amount for the relevant Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Cash Settlement Amount for such Adjustment Reference Entity.  The "Adjustment Amount" on the applicable Event Determination Date or the date upon which the Potential Failure to Pay is determined, shall be an amount equal to the greater of (i) such hypothetical Cash Settlement Amount, and (ii) zero.

(l)    Other than in respect of a Class A Downgrade Draw, Class B-1 Downgrade Draw, or Class E Downgrade Draw, draw downs on the Class A Notes, Class B-1 Notes, and Class E Notes and withdrawals from the accounts and Notes Sources will be made in the following order:

first, the Notes Sources until the amount in the Notes Sources is no more than the sum of (x) the Class B-2 Amount, (y) the Class C Amount and (z) the Class D Amount,

second, the Class E CDS Reserve Account, until no funds remain in such account,

third, the Class E Notes up to the full undrawn amount of the Class E Commitments,

fourth, the Notes Sources until the amount in the Notes Sources is no more than the Class B-2 Amount,

fifth, the Class B-1 CDS Reserve Account pro rata with an amount from the Notes Sources that is equal to a) the Class B-2 principal balance as of the Closing Date *multiplied by* b) the Class B-1 CDS Reserve (for the avoidance of doubt, prior to the withdrawals stipulated by this clause) and *divided by* c) the Class B-1 commitment balance as of the Closing Date, until no funds remain in the Class B-1 CDS Reserve Account,

sixth, the Class B-1 Notes up to the full undrawn amount of the Class B-1 Commitments pro rata with the Notes Sources,

seventh, the Class A CDS Reserve Account, until no funds remain in such account,

eighth, the Class A Notes up to the full undrawn amount of the Class A Commitments,

*provided* that, to the extent any of the Class A Notes, Class B-1 Notes or the Class E Notes are drawn down as a result of a Downgrade Draw, and draw downs are to be made on any such Note, the amount of such draw down shall be withdrawn from the related sub-accounts of the Contingent Class A Funding Account, Contingent Class B-1 Funding Account or Contingent Class E Funding Accounts, as applicable.

The Class A Notes may be drawn down in respect of a Class A Downgrade Draw at any time the conditions for such a Class A Downgrade Draw have been satisfied as described in "Description of the Securities—Draws and Payments on the Class A Notes, Class B-1 Notes and Class E Notes—Draws on the Class A Notes".

The Class B-1 Notes may be drawn down in respect of a Class B-1 Downgrade Draw at any time the conditions for such a Class B-1 Downgrade Draw have been satisfied as described in "Description of the Securities—Draws and Payments on the Class A Notes, Class B-1 Notes, and Class E Notes—Draws on the Class B-1 Notes".

The Class E Notes may be drawn down in respect of a Class E Downgrade Draw at any time the conditions for such a Class E Downgrade Draw have been satisfied as described in "Description of the Securities—Draws and Payments on the Class A Notes, Class B-1 Notes, and Class E Notes—Draws on the Class E Notes".

(m)    As a condition to the payment of principal of and interest and commitment fees on any Note without the imposition of U.S. withholding tax, any Co-Issuer, Trustee or Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, any Co-Issuer, Trustee or Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Holder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

Section 2.8    <u>Persons Deemed Owners</u>.  The Issuer, the Co-Issuer, the Trustee and any agent of the Co-Issuers (or in the case of Class E Notes only, the Issuer) or the Trustee may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal and interest on such Note and on any other date for all other purposes whatsoever (whether or not such payment is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Co-Issuers or the Trustee shall be affected by notice to the contrary; <u>provided</u>, <u>further</u>, that the Depositary, or its nominee, shall be deemed the owner of the Global Notes, and owners of beneficial interests in Global Notes will not be considered the owners of any Notes for the purpose of receiving notices.

Section 2.9    <u>Cancellation</u>.  All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 2.9, except as expressly permitted by this Indenture. All cancelled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Issuer and the Co-Issuer shall direct by an Issuer Order that they are returned to the Issuer as notified to the Trustee prior to such Note's cancellation and/or destruction.

Section 2.10   <u>Global Notes; Temporary Notes</u>.  (a) A Global Note deposited with the Depositary pursuant to <u>Section 2.2</u> shall be transferred to the beneficial Holders thereof only

if such transfer complies with Section 2.5 of this Indenture and either (i) the Depositary notifies the Co-Issuers (or in the case of Class E Notes only, the Issuer) that it is unwilling or unable to continue as Depositary for such Global Note or if at any time such Depositary ceases to be a Clearing Agency and a successor depositary is not appointed by the Co-Issuers (or in the case of Class E Notes only, the Issuer) within 90 days of such notice, or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or any Paying Agent obtains actual knowledge that it is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required if the Notes were in definitive form.

(b)     Any Global Note that is transferable to the beneficial Holders thereof pursuant to this Section 2.10 shall be surrendered by the Depositary to the Corporate Trust Office or its office or agent located in the Borough of Manhattan, The City of New York, to be so transferred, in whole or from time to time in part, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Notes of authorized denominations. Any portion of a Rule 144A Global Note or a Regulation S Global Note transferred pursuant to this Section 2.10 shall be executed, authenticated and delivered in denominations of U.S.$250,000 and any integral multiple of U.S.$1,000 in excess thereof, registered in such names as the Depositary shall direct. Any Note delivered by the Trustee or its agent in exchange for an interest in a Rule 144A Global Note shall, except as otherwise provided by Section 2.5(k), bear the Rule 144A Securities Legend set forth in the applicable Exhibit. Any Note delivered in exchange for an interest in a Regulation S Global Note shall, except as otherwise provided by Section 2.5(k), bear the Regulation S Legend set forth in the applicable Exhibit.

(c)     Subject to the provisions of paragraph (b) of this Section 2.10, the registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)     Upon receipt of notice from the Depositary of the occurrence of either of the events specified in paragraph (a) of this Section 2.10, the Issuer shall use its best efforts to make arrangements with the Depositary for the exchange of interests in the Global Notes for individual definitive Notes and cause the requested individual definitive Notes to be executed and delivered to the Note Registrar in sufficient quantities and authenticated by or on behalf of the Trustee for delivery to Noteholders.

(e)     Pending the preparation of definitive certificates for such Class of Notes pursuant to this Section 2.10, the Co-Issuers (or in the case of Class E Notes only, the Issuer) may execute, and upon Issuer Order the Trustee shall authenticate and deliver, temporary certificates for such Class of Notes that are printed, lithographed, typewritten, mimeographed or otherwise reproduced, in any authorized denomination, substantially of the tenor of the definitive certificates in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the Officers executing such temporary certificates may determine, as conclusively evidenced by their execution of such certificates.

81

(f)     If temporary certificates for a Class of Notes are issued, the Co-Issuers (or in the case of Class E Notes only, the Issuer) will cause such Notes to be prepared without unreasonable delay.  The definitive certificates shall be printed, lithographed or engraved, or provided by any combination thereof, or in any other manner permitted by the rules and regulations of any applicable securities exchange, all as determined by the Officers executing such definitive certificates.  After the preparation of definitive certificates, the temporary certificates shall be exchangeable for definitive certificates upon surrender of the temporary certificates at the office or agency maintained by the Co-Issuers (or in the case of Class E Notes only, the Issuer) for such purpose, without charge to the Holder.  Upon surrender for cancellation of any one or more temporary certificates, the Co-Issuers (or in the case of Class E Notes only, the Issuer) shall execute, and the Trustee shall authenticate and deliver, in exchange therefor the same aggregate principal amount of definitive certificates of authorized denominations.  Until so exchanged, the temporary certificates shall in all respects be entitled to the same benefits under this Indenture as definitive certificates.

(g)     Persons exchanging interests in a Global Note for individual definitive Notes will be required to provide to the Trustee, through the Depositary, (i) written instructions and other information required by the Issuer and the Trustee to complete, execute and deliver such individual definitive Notes, (ii) in the case of an exchange of an interest in a Rule 144A Global Note, such certification as to QIB/QP status as the Issuer shall require, and (iii) in the case of an exchange of an interest in a Regulation S Global Note, such certification as to non-U.S. Person and non-U.S. Resident status as the Issuer shall require.  In all cases, individual definitive Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by the Depositary.

Section 2.11   <u>Deduction or Withholding from Payments on Notes</u>.  If the Issuer becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, payments to any Holder for any present or future tax, duty, assessment, or governmental charge, then (i) the Issuer shall give prompt written notice of the requirement to the Trustee and the Holders (which shall include certification of the amount so deducted, withheld, charged, or assessed) and (ii) the Trustee or other Paying Agent, as applicable, shall reduce the amount payable in respect of the Notes by the amount required to be deducted, withheld, charged, or assessed from payments on the Notes on any Payment Date.  Without limiting the generality of the foregoing, the Issuer may withhold any amount that it or any advisor retained by the Issuer on its behalf determines is required to be withheld from any amounts otherwise distributable to any holder of a Note.  The Issuer shall not be obligated to pay any additional amounts to the Holders as a result of any such deduction, withholding, charge, or assessment.

Section 2.12   <u>Notes Beneficially Owned by Persons Not QIB/QPs</u>. (a) Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any Notes to a Person that is either a U.S. Person or a U.S. Resident and that is not a QIB/QP (or, solely in the case of the Class B-2 Notes, Class C Notes and Class D Notes issued in the form of Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, both a Qualified Purchaser and an "accredited investor"), shall be null and void <u>ab initio</u> and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)    If any Person that is either a U.S. Person or a U.S. Resident that is not a QIB/QP (or, solely in the case of the Class B-2 Notes, Class C Notes and Class D Notes issued in the form of Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes, as applicable, both a Qualified Purchaser and an "accredited investor") at the time it acquires a Note or a beneficial interest therein shall become the beneficial holder of any Note (any such person, a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such Person is a Non-Permitted Holder by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice.  If such Non-Permitted Holder fails to transfer its Notes or interest therein, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Notes or interest in Notes to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose.  The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes to the highest such bidder.  However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion.  The Holder of each Note, the Non-Permitted Holder and each other Person in the chain of title from the Holder to the Non-Permitted Holder, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and neither the Issuer nor the Trustee shall be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

## ARTICLE III

### CONDITIONS PRECEDENT; CERTAIN PROVISIONS
### RELATING TO COLLATERAL

Section 3.1    General Provisions.  The Notes to be issued on the Closing Date may be executed by the Co-Issuers (or in the case of Class E Notes only, the Issuer), and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Request, upon compliance with Section 3.2 and upon receipt by the Trustee of the following:

(a)    (i) an Officer's Certificate of the Issuer evidencing the authorization of the execution and delivery of, among other documents, this Indenture, the Credit Swap Agreement, the Shares Paying Agency Agreement, the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement, the Class E Note Purchase Agreement, the Portfolio Management Agreement, the Placement Agreement, the Administration Agreement, Collateral Administration Agreement, the Securities Account Control Agreement, the Purchase Agreement and the execution, authentication and delivery of the Notes and the execution and delivery of the Preference Shares, and specifying the Stated Maturity, the principal amount and Note Interest Rate of each Class to be authenticated and delivered; and

(ii)    an Officer's Certificate of the Co-Issuer (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Purchase Agreement, the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement, the Class E Note Purchase Agreement and the execution, authentication and delivery of the Notes (other than the Class E Notes), and specifying the Stated Maturity, the principal amount and Note Interest Rate, as applicable, of the Notes (other than the Class E Notes), to be authenticated and delivered; and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    (i) either (A) an Officer's Certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares or (B) an Opinion of Counsel of the Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes and Preference Shares except as may have been given for the purposes of the foregoing; provided, that the opinions of Cadwalader, Wickersham & Taft LLP attached as Exhibit L hereto and Maples and Calder attached as Exhibit M hereto in respect of such matters shall satisfy this clause (i)(B); and

(ii)    either (A) an Officer's Certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes (other than the Class E Notes), or (B) an Opinion of Counsel of the Co-Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes (other than the Class E Notes) except as may have been given for the purposes of the foregoing; provided, that the opinion of Cadwalader, Wickersham & Taft LLP attached as Exhibit L hereto in respect of such matters shall satisfy this clause (ii)(B);

(c)    opinions of Cadwalader, Wickersham & Taft LLP, counsel to the Co-Issuers, dated the Closing Date, substantially in the form of Exhibit L;

(d)    an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit M;

(e)    an Officer's Certificate stating that the Issuer is not in default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Preference Share Documents, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be

subject; and that all conditions precedent provided in this Indenture and the Preference Share Documents relating to the authentication and delivery of the Notes and the issuance of the Preference Shares applied for have been complied with;

(f)    an Officer's Certificate stating that the Co-Issuer is not in default under this Indenture and that the issuance of the Notes (other than the Class E Notes) will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Certificate of Incorporation of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes (other than the Class E Notes) applied for have been complied with;

(g)    an Accountants' Certificate satisfactory to the Issuer (i) confirming the information with respect to each Reference Entity set forth on the Schedule of the Reference Entities attached hereto as Schedule A; (ii) confirming that the initial Reference Portfolio complies with the Portfolio Limitations set forth in Exhibit N to this Indenture, (iii) specifying the Reference Entity Calculation Amount with respect to each Reference Entity in the Reference Registry the Issuer has purchased or has entered into binding commitments to purchase as of the Closing Date, (iv) confirming that the Reference Entities in the Reference Registry comply with clauses (a), (b), (d) and (e) (except with respect to the S&P CDO Monitor Test) of the Eligibility Criteria set forth in Exhibit N attached hereto and (v) confirming that the Aggregate Outstanding Reference Entity Calculation Amount does not exceed the Maximum Portfolio Size.

(h)    true and correct copies of letters signed by each of the Rating Agencies confirming that the Class A Notes have been rated at least "Aaa" by Moody's and at least "AAA" by S&P, and that the Class B Notes have been rated at least "Aaa" by Moody's and at least "AAA" by S&P, and that the Class C Notes have been rated at least "Aa2" by Moody's and at least "AA" by S&P, and that the Class D Notes have been rated at least "A2" by Moody's and at least "A" by S&P, and that the Class E Notes have been rated at least "Baa2" by Moody's and that such ratings are in full force and effect on the Closing Date;

(i)    an executed copy of the Shares Paying Agency Agreement;

(j)    an executed copy of the Class A Note Purchase Agreement;

(k)    an executed copy of the Class B-1 Note Purchase Agreement;

(l)    an executed copy of the Certificated Class B-2 Note Subscription Agreement;

(m)    an executed copy of the Certificated Class C-1 Note Subscription Agreement;

(n)    an executed copy of the Certificated Class C-2 Note Subscription Agreement;

(o)    an executed copy of the Certificated Class D Note Subscription Agreement;

(p)    an executed copy of the Class E Note Purchase Agreement;

(q)    an executed copy of the Securities Account Control Agreement;

(r)    an executed copy of the Administration Agreement;

(s)    an executed copy of the Purchase Agreement;

(t)    an executed copy of the Portfolio Management Agreement

(u)    an executed copy of the Collateral Administration Agreement;

(v)    an executed copy of the Placement Agreement;

(w)    a certificate from the Cayman Islands Government stating that the Issuer will be exempt from certain Cayman Islands taxes, in form and substance reasonably satisfactory to the Trustee; and

(x)    such other documents as the Trustee may reasonably require (<u>provided</u>, that nothing in this clause shall imply or impose a duty on the Trustee to so require).

Section 3.2    <u>Security for the Notes</u>.  Notes to be issued on the Closing Date may be executed by the Co-Issuers (or in the case of Class E Notes only, the Issuer) and delivered to the Trustee for authentication, and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon delivery by the Issuer to the Trustee, and receipt by the Trustee, of the following:

(a)    <u>Grant of the Underlying Asset</u>.  Fully executed copies of this Indenture, and copies of each other instrument or document, fully executed (as applicable), necessary to consummate and perfect the Grant set forth in the Granting Clauses of this Indenture.

(b)    <u>Certificate of the Issuer</u>.  The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, with respect to the assets pledged to the Trustee for inclusion in the Collateral on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such asset free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture;

(ii)    the Issuer has acquired its ownership in such asset in good faith, and in the exercise of the Issuer's judgment, without notice of any adverse claim (as such term is defined in UCC Section 8-102(a)(1)), except as described in paragraph (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such asset (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the information set forth with respect to such Underlying Asset in the Schedule of the Reference Entities is correct;

(v)    the Underlying Asset included on Schedule A satisfy the requirements of the definition of Underlying Asset and, together with any Deposit, Section 3.2(a);

(vi)    the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such asset to the Trustee; and

(vii)    upon the effectiveness of the Grant by the Issuer to the Trustee pursuant to the Granting Clauses of this Indenture, the Trustee has a first priority perfected security interest in the Collateral.

(c)    Issuer Accounts.  Evidence of the establishment of the Issuer Accounts.

(d)    Issuer Order.  An Issuer Order or Issuer Request directing the Trustee to authenticate the Notes and a written request from the Co-Issuer directing the Trustee to authenticate the Notes, in both cases in the amounts and registered in the names set forth therein.

(e)    Rating Letters.  An Officer's Certificate of the Issuer to the effect that attached thereto are true and correct copies of letters signed by Moody's and S&P and confirming that the Class A Notes have been rated at least "Aaa" and "AAA" by Moody's and S&P, respectively, and that the Class B Notes have been rated at least "Aaa" and "AAA" by Moody's and S&P, respectively, and that the Class C Notes have been rated at least "Aa2" and "AA" by Moody's and S&P, respectively, and that the Class D Notes have been rated at least "A2" and "A" by Moody's and S&P, respectively and that the Class E Notes have been rated at least "Baa2" by Moody's.

Section 3.3    Reserved.

Section 3.4    Investment at the Direction of the Credit Swap Counterparty and Delivery of the Underlying Asset and Eligible Investments.  (a) (i) The Trustee shall hold all Certificated Securities and Instruments in physical form at the office of a custodian appointed by the Trustee in the State of New York (together with any successor, the "Custodian"), subject to its right to relocate such jurisdiction pursuant to and in accordance with Section 7.7(b).  The Custodian shall be appointed to act as a Securities Intermediary with respect to the Issuer Accounts.  The Custodian, and any successor Custodian, shall satisfy the criteria set forth in Section 10.7.

(ii)    The Trustee shall in accordance with the instructions given to the Trustee by the Credit Swap Counterparty cause amounts on deposit in the Accounts to be invested in Eligible Investments.  Each time that the Trustee shall cause the acquisition of any Eligible Investments, the Trustee shall cause the transfer of such Eligible Investments to the Custodian to be held in the Issuer Accounts for the benefit of the Trustee in

accordance with the terms of this Indenture.  Notwithstanding the foregoing, the Trustee may cause any Eligible Investment to be transferred to the Custodian for the benefit of the Trustee or to the Trustee by such other method for which an Opinion of Counsel specifies will result in a valid, perfected, first priority security interest in favor of the Trustee in each Eligible Investment.  The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest of the Trustee shall nevertheless come into existence and continue in the Eligible Investments so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Eligible Investments.  The Issuer shall also take any and all other actions necessary to create in favor of the Trustee a valid, perfected, first priority security interest in each Eligible Investments Granted to the Trustee under laws and regulations (including Articles 8 and 9 of the UCC) in effect from time to time.

(b)     Except as provided in paragraph (a) above, in the case of any Underlying Asset or Eligible Investment, to be transferred to the Securities Intermediary for the benefit of the Trustee, the Issuer shall deliver such Underlying Asset or Eligible Investment in accordance with one ore more of the following clauses as applicable:

(i)     in the case of a Security Entitlement that is held through a Securities Intermediary and as to which the Entitlement Holder is the Issuer, obtaining the agreement of such Securities Intermediary that it will comply with Entitlement Orders originated by the Trustee without further consent by the Issuer and taking no action to cause such agreement to cease to be effective and (2) in the case of any other Security Entitlement, directing the Trustee to become the Entitlement Holder of such Security Entitlement;

(ii)     in the case of an Uncertificated Security registered in the name of the Issuer, obtaining the agreement of the issuer of such Uncertificated Security that such issuer will comply with Instructions originated by the Trustee without further consent by the Issuer and causing such agreement to remain in effect or (2) in the case of any other Uncertificated Security, directing the Trustee to become the registered owner of such Uncertificated Security in accordance with the law of the jurisdiction of organization of the issuer thereof and causing such registration to remain effective;

(iii)     in the case of an Instrument or a Certificated Security represented by a Security Certificate in Registered Form specially indorsed to the Trustee by an effective indorsement, delivering such Instrument or Security Certificate to the Custodian in the State of New York and causing the Custodian to maintain (on behalf of the Trustee) continuous possession of such Instrument or Security Certificate in the State of New York; and

(iv)     in the case of general intangibles by filing a financing statement in the District of Columbia describing all assets of the Issuer, or all general intangibles of the Issuer or such general intangible.

(c)     with respect to any item of Collateral, such other actions that the opinion described in Exhibit L pertaining to security interest matters describes as effective to perfect a security interest in such item of Collateral.

(d)     The Issuer shall cause a UCC financing statement describing the Collateral by use of the words "all personal property" and naming the Issuer as debtor and the Trustee as secured party to be filed by or on behalf of the Issuer in the applicable jurisdiction, which is the District of Columbia, within ten (10) Business Days of the Closing Date. The Issuer shall take all actions necessary to maintain the effectiveness of such financing statement and shall notify the Trustee in writing 30 days prior to any change in the Issuer's name, identity, corporate structure, jurisdiction of incorporation or jurisdiction of its chief executive office. The Issuer hereby authorizes the Trustee to, and the Trustee shall, file any other financing statement, amendment, assignment or continuation statement that the Trustee shall have been specifically advised in writing by an Opinion of Counsel delivered pursuant to Section 7.8 is necessary or advisable in connection with the security interest granted hereunder, including without limitation, financing statements describing the Collateral as "all personal property." The Issuer shall not authorize the filing of any financing statements naming it as debtor other than financing statements in favor of the Trustee.

(e)     In addition to those steps specified in paragraphs (b), (c) and (d) above, the Issuer shall take all steps necessary or advisable under the laws of the Cayman Islands to protect the security interest of the Trustee including the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands.

Section 3.5     Reserved.

Section 3.6     Representations Regarding Collateral. The Issuer, as of the date hereof (and, as of the date of each purchase of an Underlying Asset or Eligible Investment, only with respect to such Underlying Asset or Eligible Investment), represents and warrants to the following:

(a)     This Indenture creates a valid and continuing security interest (as defined in the UCC) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

(b)     The Issuer owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.

(c)     The Issuer has caused or will have caused, within ten days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Collateral granted to the Trustee hereunder.

(d)     Other than the security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the

Trustee hereunder or that has been terminated.  The Issuer is not aware of any judgment, pension benefit guaranty or tax lien filings against the Issuer.

(e)     All original executed copies of each mortgage note, promissory note or other writing constituting an "instrument" (as defined in the UCC) that constitute or evidence the Collateral have been delivered to the Custodian.

(f)     None of the "instruments" (as defined in the UCC) that constitute or evidence the Collateral has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

(g)     The Issuer has received all consents and approvals required by the terms of the Collateral to the transfer to the Trustee of its interest and rights in the Collateral hereunder.

(h)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the Securities Intermediary has agreed to comply with all instructions originated by the Trustee relating to the Issuer Accounts without further consent by the Issuer.

(i)     No Issuer Account is in the name of any Person other than the Issuer.  The Issuer has not consented to the Securities Intermediary of any Issuer Account to comply with entitlement orders or other instructions of any Person other than the Trustee.

(j)     All of the Collateral consisting of "security entitlements" (within the meaning of the UCC) has been credited to an Issuer Account.  The Securities Intermediary for each of the Issuer Accounts has agreed to treat all assets credited to the Issuer Accounts as "financial assets" (within the meaning of the UCC).

(k)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary has agreed to comply with all entitlement orders and other instructions originated by the Trustee relating to the Issuer Accounts without further consent by the Issuer.

(l)     Each of the Issuer Accounts is a "securities account" (within the meaning of the UCC).

(m)     The Collateral consists of (i) securities entitlements, (ii) securities accounts, (iii) promissory notes or other writings constituting "instruments" (within the meaning of the UCC), (iv) "accounts" (within the meaning of the UCC) or (v) "general intangibles" (within the meaning of the UCC).

(n)     Each of the foregoing representations shall, as applicable, be deemed repeated each time new assets become part of the Collateral.

(o)     The security interest of the Trustee in the Collateral shall, until payment in full of the indebtedness secured hereunder and termination of this Indenture, be a first-priority perfected security interest.

(p)      Notwithstanding any other provision of this Indenture or any other related transaction document, the representations in this Section 3.6 (i) shall be continuing, and remain in full force and effect until such time as all obligations under this Indenture and the Notes have been finally and fully paid and performed, and (ii) may not be amended or waived without receipt of Rating Agency Confirmation from S&P.

## ARTICLE IV

### SATISFACTION AND DISCHARGE

Section 4.1    <u>Satisfaction and Discharge of Indenture</u>.    This Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Holders to receive payments of principal thereof and interest thereon as provided herein, (iv) the rights, indemnities and immunities of the Trustee hereunder, and (v) the rights of Holders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them, and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)      either

(i)      (x) all Notes theretofore authenticated and delivered (other than (A) Notes which have been mutilated, destroyed, lost or stolen and which have been replaced or paid as provided in <u>Section 2.6</u> and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust as provided in <u>Section 7.5</u>) and (y) all Preference Shares have been redeemed; or

(ii)      all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year or (C) are to be called for redemption (together with any Preference Shares Outstanding) within one year pursuant to <u>Section 9.1</u> under an arrangement reasonably satisfactory to the Trustee and there has been given notice of redemption by the Issuer and the Co-Issuer pursuant to <u>Section 9.3</u> and, in the case of (A), (B) or (C) the Issuer or the Co-Issuer has irrevocably deposited or caused to be deposited with the Trustee in an account which account shall be maintained for the benefit of the Holders of the Notes, in trust for such purpose, Cash or non-callable direct obligations of the United States of America, <u>provided</u>, that (x) the obligations are Eligible Investments, in an amount sufficient, as verified by a firm of certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of Notes which have become due and payable), or to the Stated Maturity or the Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority, free of any adverse claim or legal equivalent thereof, as applicable, and shall have furnished an Opinion of Counsel with respect thereto and (y) the obligations constitute all of the Eligible Investments owned by the Issuer, the Issuer owns no

Underlying Asset and all such obligations mature no later than the date on which the Preference Shares are to be redeemed; provided, further, that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

(b)    the Co-Issuers have paid or caused to be paid all other sums payable hereunder by the Co-Issuers;

(c)    the Co-Issuers have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent relating to the satisfaction and discharge of this Indenture have been complied with; and

(d)    (i) the conditions of clauses (a), (b) and (c) have been met as to the Notes;

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee and, if applicable, the Holders, as the case may be, under Sections 2.5, 2.6, 2.7, 4.2, 5.4(d), 5.9, 5.18, 6.1, 6.3, 6.4, 6.6, 6.7, 6.8, 7.1, 7.4 and 7.5, Article XIII and Article XIV hereof shall survive the satisfaction and discharge of this Indenture.

Section 4.2    Application of Trust Money.    All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including the Priority of Payments and Section 11.2, to the payment of the principal, interest and either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the principal and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required herein or required by law.

Section 4.3    Repayment of Monies Held by Paying Agent.    In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.5 hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

## ARTICLE V

## REMEDIES

Section 5.1    Events of Default.    "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment, when due and payable, of the Class A Commitment Fee, interest in respect of the Class A Notes, the Class B-1 Commitment Fee, interest in respect of the Class B Notes, interest in respect of the Class C Notes or, if there are no

Class A Commitments, Class B-1 Commitments, Class B Notes, or Class C Notes Outstanding, a default in the payment, when due and payable, of interest in respect of the Class D Notes or, if there are no Class A Commitments, Class B-1 Commitments, Class B Notes, Class C Notes, or Class D Notes Outstanding, the Class E Notes or the Class E Commitment Fee and, in each such case, the continuation of such default for three (3) or more Business Days (or, if such default results solely from an administrative error, five (5) or more Business Days);

(b)      a default in the payment of principal of any Note at its Stated Maturity or on any Redemption Date;

(c)      failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments or <u>Section 11.2</u> (other than as specified in <u>Section 5.1(a)</u> or <u>(b)</u>) and continuation of such failure for a period of (3) three or more Business Days (or in the case of a payment default resulting solely from an administrative error or omission by the Trustee, the Administrator or a Paying Agent, seven (7) or more Business Days, as evidenced by an Officer's Certificate of the Issuer);

(d)      if on any Measurement Date the ratio (expressed as a percentage) obtained by dividing the Net Collateral Principal Balance as of such Measurement Date, by the aggregate outstanding principal amount of the Class A Notes as of such Measurement Date, is less than 102.0%;

(e)      a circumstance in which either of the Co-Issuers or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(f)      a default in the performance, or breach, of any other covenant or other agreement of the Issuer or the Co-Issuer under this Indenture, or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or writing delivered pursuant thereto or in connection therewith failing to be correct in any material respect when made, which default, breach or failure could have a material adverse effect on the Holders of the Notes, and the continuation of such default, breach or failure for a period of 30 or more days after any of the Issuer and the Co-Issuer has actual knowledge thereof or after written notice thereof to the Issuer by the Trustee or to the Issuer and the Trustee by a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(g)      the entry of a decree or order by a court having competent jurisdiction adjudging either of the Co-Issuers as bankrupt or insolvent or granting an order for relief or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or ordering the winding up or liquidation of its affairs; or an involuntary case or Proceeding shall be commenced against either of the Co-Issuers seeking any of the foregoing and such case or Proceeding shall continue in effect for a period of 60 consecutive days;

(h)    the institution by either of the Co-Issuers of Proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency Proceedings against it, or the filing by either of the Co-Issuers of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code, the bankruptcy and insolvency laws of the Cayman Islands or any other applicable law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, Trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action;

(i)    one or more final judgments being rendered against the Issuer or the Co-Issuer which exceed, in the aggregate, U.S.$10,000,000 (after excluding any portion of the judgment that is payable by a party other than the Issuer or Co-Issuer pursuant to an insurance policy or other agreement) and which remain unstayed, undischarged and unsatisfied for 30 or more days after such judgment(s) becomes nonappealable, unless adequate funds have been reserved or set aside for the payment thereof; or

(j)    the occurrence of an Early Termination Date under the Credit Swap Agreement.

Upon the occurrence of or knowledge of the occurrence of an Event of Default, each of (i) the Co-Issuers, (ii) the Trustee and (iii) the Credit Swap Counterparty shall notify each other, and the Trustee on behalf of the Co-Issuers shall promptly notify the Noteholders, each Paying Agent, the Shares Paying Agent, the Depositary and each of the Rating Agencies in writing.

Section 5.2    Acceleration of Maturity; Rescission and Annulment.    (a) If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(g) or 5.1(h)), (i) a Supermajority of the Controlling Class or (ii) the Trustee may, and at the written direction of such Holders, shall, by notice to the Issuer, the Credit Swap Counterparty and, in the case of notice by such Holders, also to the Trustee (which shall provide notice to the Holders of all of the Outstanding Notes) declare the principal of all the Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable.  If an Event of Default specified in Section 5.1(g) or 5.1(h) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Holder of Notes.

(b)    At any time after such a declaration of acceleration of Maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article V, a Supermajority of the Controlling Class, by written notice to the Co-Issuers and the Trustee, may rescind and annul such declaration and its consequences if:

(i)      the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay, and shall pay (in each case, other than amounts due solely as a result of such declaration):

(A)      all overdue installments of interest and commitment fees on and principal of the Notes;

(B)      with respect to the Class D Notes, to the extent that payment of such interest is lawful, interest upon any Class D Deferred Interest;

(C)      with respect to the Class E Notes, to the extent that payment of such interest is lawful, interest upon any Class E Deferred Interest or Class E Deferred Commitment Fees, as applicable;

(D)      to the extent that payment of such interest is lawful, interest upon Defaulted Interest on the Notes at the applicable Note Interest Rate;

(E)      all accrued and unpaid taxes, government fees and charges and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

(F)      all amounts then due and payable to the Credit Swap Counterparty;

(ii)      the Credit Swap Agreement has not been terminated; provided however, the Credit Swap Agreement may not be terminated as long as the declaration of acceleration can be rescinded; and

(iii)      the Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of Notes that have become due solely by such acceleration, have been cured and a Supermajority of the Controlling Class, by written notice to the Trustee, has agreed with such determination or waived as provided in Section 5.14.

At any such time as the Trustee shall rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5; provided, however, that if such preservation of the Collateral is rescinded pursuant to Section 5.5, the Notes may be accelerated pursuant to the first paragraph of this Section 5.2, notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this paragraph.

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee. The Co-Issuers covenant that if a Default shall occur in respect of the payment of any principal of any Class A Note, or the payment of principal of any Class B Note (but only after the Class A Notes and all interest and commitment fees accrued thereon have been paid in full), or the payment of principal of any Class C Note (but only after the Class A Notes and Class B Notes and all interest and commitment fees accrued thereon have been paid in full), or the payment of principal of any Class D Note (but only after the Class A Notes, the Class B Notes and the Class C Notes and all interest accrued thereon have been paid in full), or the payment of principal of any Class E Note (but only after the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and all interest and commitment fees accrued thereon have been paid in full), or the payment of interest on any Note, the Co-Issuers will, upon demand of the Trustee or any affected Holder of Notes, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount then due and payable on such Note for principal and interest, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Holder of Notes and their respective agents and counsel.

If the Co-Issuers fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as Trustee of an express trust, may after written notice to the Holders of the Notes and shall upon the written direction of a Supermajority of the Controlling Class institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Co-Issuers and collect the monies adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may in its discretion after written notice to the Holders of the Notes and shall upon the written direction of a Supermajority of the Controlling Class (subject to Section 6.3(e)) proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings, in its own name as Trustee of an express trust, as the Trustee shall deem most effectual (if no direction by a Supermajority of the Controlling Class is received by the Trustee) or as the Trustee may be directed in writing by a Supermajority of the Controlling Class to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer or the Co-Issuer, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have

made any demand pursuant to the provisions of this <u>Section 5.3</u>, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of each of the Notes and to file such other papers or documents and take such other action (including sitting on a committee of creditors) as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and the Holders of Notes allowed in any Proceedings relative to the Issuer or the Co-Issuer or to the creditors or property of the Issuer or the Co-Issuer;

(b)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or a Person performing similar functions in comparable Proceedings; and

(c)     to collect and receive any monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Holders of Notes and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Holders of Notes to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders of Notes, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of its negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

In any Proceedings brought by the Trustee on behalf of the Holders of Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of Notes.

Section 5.4     <u>Remedies</u>.  (a) If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may (and shall, upon written direction by a Supermajority of the Controlling Class, subject to Section 6.3(e)), to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)     institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral monies adjudged due;

(ii)     sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 hereof;

(iii)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)     exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)     to the extent not inconsistent with clauses (i) through (iv), exercise any other rights and remedies that may be available at law or in equity;

provided, however, that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 unless either of the conditions specified in Section 5.5(a) is met or the preservation of the Collateral by the Trustee is prohibited by applicable law.

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the Proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal and interest on any Class of Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)     If an Event of Default as described in Section 5.1(f) hereof shall have occurred and be continuing the Trustee may, and, at the written direction of not less than a Supermajority of the Controlling Class shall (subject to Section 6.3(e)), institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from such Proceeding.

(c)     Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, any Secured Party may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability; and any purchaser at any such sale may, in paying the purchase money, turn in any of the Notes in lieu of Cash equal to the amount which shall, upon distribution of the net proceeds of such sale, be payable on the Notes so turned in by such Holder (taking into account the Class of such Notes, the Priority of Payments and Article XIII). Said Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after proper notation has been made thereon to show partial payment.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee and the Secured Parties, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, the Trustee, in its own capacity, or on behalf of any Holder of Notes, may not, prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws.  Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day (or longer) period in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

Section 5.5    Optional Preservation of Collateral.    (a) If an Event of Default shall have occurred and be continuing and an acceleration has been declared, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts hereunder and release funds and make deposits thereto in accordance with the provisions of Article X, Article XI and Article XIII unless:

(i)    the Trustee determines in accordance with paragraph (c) below that the anticipated net proceeds of a sale or liquidation of the Collateral (after deducting the expenses of such sale or liquidation including reasonable expenses of the Trustee incurred in connection therewith) would be sufficient to pay in full the sum of (A) the principal and accrued interest (including any Defaulted Interest and Defaulted Commitment Fees and, with respect to the Class D Notes and the Class E Notes, Deferred Interest and the Deferred Commitment Fees) with respect to all the Outstanding Notes and all Administrative Expenses; and (B) Cash Settlement Amounts, if any, and other amounts owed to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty upon a termination of the Credit Swap Agreement); and a Supermajority of the Controlling Class, agree with such determination; or

(ii)    (x) a Supermajority of the Aggregate Outstanding Amount of each Class of Notes voting as separate Classes or (y) in the case of an Event of Default described in clause (a) or clause (b) in Section 5.1 a Supermajority of the Controlling Class (and, in each case, the Credit Swap Counterparty, unless the Credit Swap Counterparty will be paid in full the amounts due and unpaid to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty upon a termination of the Credit Swap Agreement)) direct the Trustee to sell the Collateral subject to the terms and conditions set forth below.

The Trustee shall give written notice of its determination not to retain the Collateral to the Issuer with a copy to the Co-Issuer.  So long as such Event of Default is continuing, any such determination may be made at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions set forth in Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral if prohibited by applicable law or if the Trustee is directed to liquidate the Collateral pursuant to Section 5.5(a)(ii).

(c)    In determining whether the condition specified in Section 5.5(a)(i) is satisfied, the Trustee will request a quotation from the Credit Swap Counterparty for the price to be paid by or to the Issuer upon termination of the Credit Swap Agreement and may solicit quotations from potential transferees of the Credit Swap Agreement.  Any amount to be paid by the Issuer will be expressed as a negative number and any amount to be paid to the Issuer will be expressed as a positive number.  The Credit Swap Agreement may only be transferred with the consent of the Credit Swap Counterparty.

(d)    The Trustee shall promptly deliver to the Holders of the Notes a report stating the results of any determination required pursuant to Section 5.5(a)(i).  The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the written request of a Supermajority of the Controlling Class and the Credit Swap Counterparty at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i) provided, however, that if any such request is made more frequently than once per fiscal quarter, the requesting party shall be responsible for payment of any associated expenses incurred by the Trustee.  In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant of national reputation confirming the mathematical accuracy of the computations of the Trustee. In determining whether the Holders of the requisite Aggregate Outstanding Amount of any Class of Notes have given any direction or notice pursuant to Section 5.5(a), a Holder of Notes of any Class that is also a Holder of Notes of any other Class, or any Affiliate of any such Holder of another Class of Notes shall be counted as a Holder of each of such Classes of Notes for all purposes.

(e)    Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which such sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant thereto (such last permitted date being determined based upon the

anticipated proceeds of such sale or liquidation, as described in <u>Section 5.5(a)(i)</u>), unless a new determination is made in accordance with such <u>Section 5.5(a)(i)</u> and the Collateral are sold or liquidated prior to the last sale date permitted in accordance with such new determination.

Section 5.6    <u>Trustee May Enforce Claims Without Possession of Notes</u>.    All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as Trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements in compensation of the Trustee, each predecessor Trustee and its agents and attorneys in counsel, shall be applied as set forth in <u>Section 5.7</u> hereof.

Section 5.7    <u>Application of Money Collected</u>.    The application of any money collected by the Trustee pursuant to this <u>Article V</u> and any money that may then be held or thereafter received by the Trustee hereunder shall be applied subject to, and in accordance with, <u>Section 11.1</u>, <u>Section 11.2</u> and <u>Section 13.1</u>.

Section 5.8    <u>Limitation on Suits</u>.    No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or Trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b)    except as otherwise provided in <u>Section 5.9</u>, the Holders of at least 25% of the Aggregate Outstanding Amount of any Class of Notes have made a written request upon the Trustee to institute such proceedings in its own name as Trustee and have offered the Trustee indemnity reasonably satisfactory to it;

(c)    such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(e)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Supermajority of the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class, or to obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class.  In addition, any action taken by any one or more Holders of Notes shall be subject to the restrictions of <u>Sections 2.7(h)</u> and <u>5.4(d)</u>.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity pursuant to this Section from two or more groups of Holders of the Controlling Class, each representing less than a Supermajority or Majority, as applicable, the Trustee shall take the action requested by the Holders of the largest percentage of the Controlling Class, subject to Article VI hereof.

Section 5.9    Unconditional Rights of Noteholders to Receive Principal, Interest and Commitment Fees.  (a) Notwithstanding any other provision in this Indenture (other than Section 2.7(h) or Section 5.4(d)), the Holders of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest and Class A Commitment Fee on such Class A Note, as such principal and interest and commitment fee becomes due and payable in accordance with the Priority of Payments or Section 13.1 and, subject to the provisions of Section 5.8, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b)    Notwithstanding any other provision in this Indenture (other than Section 2.7(h) or Section 5.4(d)), the Holder of any Class B Note, Class C Note, Class D Note and Class E Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class B Note, Class C Note, Class D Note and Class E Note, as the case may be, and in the case of the Class B-1 Notes, the Class B-1 Commitment Fee, and in the case of the Class E Notes, the Class E Commitment Fee, as such principal, interest and commitment fee become due and payable in accordance with Section 13.1 and the Priority of Payments.  Holders of Class B Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.  Holders of Class C Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note or Class B Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.  Holders of Class D Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note Class B Note or Class C Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.  Holders of Class E Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note, Class B Note, Class C Note or Class D Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.

Section 5.10    Restoration of Rights and Remedies.  If the Trustee or any Holder of Notes has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder of Notes, then and in every such case the Co-Issuers, the Trustee and the Holder of Notes shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Holder of Notes shall continue as though no such Proceeding had been instituted.

Section 5.11  <u>Rights and Remedies Cumulative</u>.  No right or remedy herein conferred upon or reserved to the Trustee or to any Holder of Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12  <u>Delay or Omission Not Waiver</u>.  No delay or omission of the Trustee or of any Holder of Notes to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this <u>Article V</u> or by law to the Trustee or to the Holders of Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of Notes.

Section 5.13  <u>Control by Holders of Notes</u>.  A Supermajority of (x) each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, voting as separate Classes or (y) in the case of an Event of Default described in subclause 5.1(a) or (b) above, the Controlling Class will have the right to direct the Trustee in the conduct of any proceedings for any remedy available to the Trustee; <u>provided</u>, that:

(a)  such direction shall not be in conflict with any rule of law or with this Indenture;

(b)  the Trustee may take any other action deemed proper by it that is not inconsistent with such direction; <u>provided</u>, <u>however</u>, that, subject to <u>Section 6.1</u>, it need not take any action that it determines might involve it in liability;

(c)  the Trustee shall have been provided with indemnity satisfactory to it; and

(d)  any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Notes secured thereby representing the percentage of the Aggregate Outstanding Amount of such Notes specified in <u>Section 5.4</u> or <u>5.5</u>, as applicable.

Section 5.14  <u>Waiver of Past Defaults</u>.  Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this <u>Article V</u>, a Supermajority of the Controlling Class may on behalf of the Holders of all the Notes waive any past Default and its consequences, except a Default:

(a)  constituting a Payment Default (except any such default consisting of non-payment of amounts that have become due and payable solely by virtue of an acceleration that has been rescinded or defaults that have subsequently been remedied by the payment of principal and/or interest); or

(b)  in respect of a covenant or provision hereof that under <u>Section 8.2</u> cannot be modified or amended without the consent of the Holder of each Outstanding Note materially adversely affected thereby; or

(c)    an Event of Default specified in <u>Section 5.1(g)</u> or <u>5.1(h)</u>.

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give notice of any such waiver to the Credit Swap Counterparty and to each of the Rating Agencies.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15    <u>Undertaking for Costs</u>.    All parties to this Indenture agree, and each Holder of any Notes by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this <u>Section 5.15</u> shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder of Notes, or group of Holders of Notes, holding in the aggregate more than 10% of the Aggregate Outstanding Amount of the Controlling Class or, if the Class A Notes are Outstanding, holding in the aggregate either 10% of the Aggregate Outstanding Amount of the Class A Notes or 10% of the Aggregate Outstanding Amount of the next-most senior Class of Notes, or to any suit instituted by any Holder of Notes for the enforcement of the payment of the principal of or interest on any Class A Notes or Class B Notes (or after the Class B Notes have been paid in full, any Class C Note; or after the Class C Notes have been paid in full, any Class D Note; or after the Class D Notes have been paid in full, any Class E Note) on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16    <u>Waiver of Stay or Extension Laws</u>.    The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17    <u>Sale of Collateral</u>.    (a) The power to effect any sale of any portion of the Collateral pursuant to <u>Sections 5.4</u> and <u>5.5</u> shall not be exhausted by any one or more sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired (subject to <u>Section 5.5(e)</u> in the case of sales pursuant to <u>Section 5.5</u>) until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid.  The Trustee may upon

notice to the Noteholders, and shall, upon direction of a Supermajority of the Controlling Class, from time to time postpone any sale by public announcement made at the time and place of such sale.  The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any sale; <u>provided</u>, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such sale from the proceeds thereof notwithstanding the provisions of <u>Section 6.7</u> hereof.

(b)    The Trustee may bid for and acquire any portion of the Collateral in connection with a public sale thereof.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral consists of Unregistered Securities, the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of a Supermajority of the Controlling Class, seek a no-action position from the SEC or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities.

(d)    The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale.  No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority to inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.18    <u>Action on the Notes</u>.  The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Holders of the Notes shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer.

## ARTICLE VI

## THE TRUSTEE

Section 6.1    <u>Certain Duties and Responsibilities</u>.    (a) Except during the continuance of an Event of Default known to the Trustee:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture (including those set forth in Exhibit N to this Indenture), and no implied covenants or obligations shall be read into this Indenture (or Exhibit N to this Indenture) against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; <u>provided</u>, <u>further</u>, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate or opinion does not conform.  If a corrected form shall not have been delivered to the Trustee within fifteen (15) days after such notice from the Trustee, the Trustee shall so notify the Holders of Notes and the Shares Paying Agent.

(b)     In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Supermajority of the Controlling Class (or, as permitted under this Indenture, by the Issuer, including, without limitation, pursuant to <u>Sections 7.9</u> and <u>10.9</u> hereof), exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this subsection shall not be construed to limit the effect of <u>subsection (a)</u> of this <u>Section 6.1</u>;

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Co-Issuers or the Credit Swap Counterparty and/or a Majority (or such larger percentage as may be required by the terms hereof) of the Controlling Class or any other required Classes relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability or expenses in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk, liability or expenses is not reasonably assured to it unless such risk, liability or expenses relates to its ordinary services, including giving notices under <u>Article V</u>, under this Indenture.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in <u>Section 5.1(d)</u> through <u>5.1(i)</u>, or any Default described in <u>Sections 5.1(e)</u> through <u>5.1(i)</u> unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Collateral or this Indenture.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this <u>Section 6.1</u>.

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this <u>Section 6.1</u> and <u>Section 6.3</u>.

Section 6.2    <u>Notice of Default</u>.  Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to <u>Section 5.2</u>, the Trustee shall transmit by mail to each of the Rating Agencies, for so long as any Notes are Outstanding, to the Portfolio Manager, to the Credit Swap Counterparty, to the Shares Paying Agent and to all Holders of Notes, as their names and addresses appear on the Note Register and, upon written request therefor in the form of <u>Exhibit J</u> attached hereto certifying that it is a holder of a beneficial interest in any Global Note, to such holder (or its designee), notice of all Defaults hereunder actually known to a Trust Officer of the Trustee, unless such Default shall have been cured or waived, in which case notice that a Default has occurred and that it has been cured or waived shall be promptly provided to the Portfolio Manager, the Credit Swap Counterparty and each Rating Agency.  Notwithstanding the foregoing, the Trustee may withhold from Holders notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal, premium, if any, or interest) if the Trustee determines that withholding notice is in the interest of the Holders.

Section 6.3    <u>Certain Rights of Trustee</u>.  Except as otherwise provided in <u>Section 6.1</u>:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, including the Payment Date Report, reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine

the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee security or indemnity satisfactory to it against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of the Controlling Class and the Credit Swap Counterparty, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed and on reasonable prior notice to the Co-Issuers, to examine the books and records relating to the Notes and the Collateral and the premises of the Co-Issuers personally or by agent or attorney during the Co-Issuers' normal business hours; provided, that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory or administrative authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder; provided, further, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder;

(g)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys, provided, that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent appointed or attorney appointed, with due care by it hereunder;

(h)    the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of an Event of Default subject to Section 6.1(b) hereof, prudently believes to be authorized or within its rights or powers hereunder;

(i)    the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(j)    the Trustee shall not be responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depositary, any Transfer Agent (other than the

Bank acting in that capacity), Securities Intermediary (other than the Bank acting in such capacity), Clearstream, Euroclear, any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Bank acting in that capacity);

(k)       in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a sub-agent of the Trustee or for any third Person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder; and

(l)       in the event that the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary hereunder, the rights, protections, immunities and indemnities afforded to the Trustee pursuant to this Article VI shall also be afforded to the Bank acting in such capacities.

Section 6.4      Not Responsible for Recitals or Issuance of Notes.  The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon with respect to the Trustee, shall be taken as the statements of the Issuer and the Co-Issuer, as applicable, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers or the Proceeds thereof or any money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5      May Hold Notes.  The Trustee, any Paying Agent, any Note Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, any Note Registrar or such other agent.

In order to comply with its duties under, and to the extent required by, the USA Patriot Act of 2001, the Trustee shall obtain and verify certain information and documentation from the other parties to this Indenture including, but not limited to, each such party's name, address and other identifying information.

Section 6.6      Money Held in Trust.  Money held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

Section 6.7      Compensation and Reimbursement.   (a) The Issuer agrees (in accordance with the Priority of Payments hereunder):

(i)       to pay the Trustee on the Closing Date reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any

provision of law in regard to the compensation of a Trustee of an express trust) and thereafter the Trustee shall receive no further compensation for its services hereunder;

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 5.17 or 10.10, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) and expenses related to the maintenance and administration of the Collateral;

(iii)    to indemnify the Trustee and its officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense (including reasonable attorney's fees and expenses) incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.13 hereof.

This subsection 6.7(a) shall survive the termination of this Indenture and the earlier removal or resignation of the Trustee.

(b)    The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from moneys on deposit in the Payment Account for the Notes pursuant to Section 11.1.

(c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day (or, if longer, the applicable preference period) after the payment in full of all of the Notes issued under this Indenture.

(d)    The amounts payable to the Trustee on any Payment Date pursuant to Section 6.7(a) (if any) or which may be deducted by the Trustee pursuant to Section 6.7(b) shall only be made in accordance with the Priority of Payments.  For the avoidance of doubt, any amount payable to the Trustee pursuant to Section 6.7(a) and not paid on any Payment Date pursuant to this paragraph shall remain outstanding and shall be payable on the next Payment Date (subject to the limitations of this paragraph).

The fees payable to the Trustee shall be computed on the basis of the actual number of days elapsed in the applicable calculation period divided by 360, and fees applicable to periods shorter or longer than a calendar quarterly period shall be prorated based on the

number of days within such period.  The Trustee shall apply amounts pursuant to <u>Section 5.7</u> and <u>Section 11.1(a)(A)</u> or <u>(B)</u> only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default.  Subject to <u>Section 6.9</u>, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the filing of a petition in bankruptcy against the Co-Issuers for the non-payment to the Trustee of any amounts provided by this <u>Section 6.7</u> until at least one year and one day (or, if longer, the applicable preference period) after the payment in full of all Notes issued under this Indenture.  No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

If, on any date when a fee shall be payable to the Trustee pursuant to this Indenture, insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable, together with compensatory interest thereon (at a rate not to exceed the federal funds rate), on such later date on which a fee shall be payable and sufficient funds are available therefor.

(e)    The Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments.  Such compensation is not payable or reimbursable under <u>Section 6.7</u> of this Indenture.

Section 6.8    <u>Corporate Trustee Required; Eligibility</u>.  There shall at all times be a Trustee hereunder which shall be a corporation, banking association or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000 and a rating assigned by Moody's of at least "Baa1" (and, if rated "Baa1", not on credit watch for downgrade) and a rating assigned by S&P of at least "BBB" and having an office within the United States.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this <u>Section 6.8</u>, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this <u>Section 6.8</u>, it shall resign immediately in the manner and with the effect hereinafter specified in this <u>Article VI</u>.

Section 6.9    <u>Resignation and Removal; Appointment of Successor</u>.    (a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this <u>Article VI</u> shall become effective until the acceptance of appointment by the successor Trustee under <u>Section 6.10</u>.  The indemnification in favor of the Trustee in <u>Section 6.7</u> hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b)    The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Co-Issuers, the Noteholders, the Shares Paying Agent, the Portfolio Manager, the Credit Swap Counterparty and each of the Rating Agencies.

(c)    The Trustee may be removed at any time by Act of a Majority of the Notes voting together as a single class, or may be removed at any time when an Event of Default shall have occurred and be continuing, by Act of a Majority of the Controlling Class, delivered to the Trustee, the Credit Swap Counterparty and to the Co-Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.8 and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to Section 6.9(a)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to Section 5.15, any Holder may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    Upon (i) receiving any notice of resignation of the Trustee, (ii) any determination that the Trustee be removed, or (iii) any vacancy in the position of Trustee, then the Co-Issuers shall promptly appoint a successor Trustee or Trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer or Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, the Portfolio Manager and the Credit Swap Counterparty, provided, that such successor Trustee shall be appointed only upon the prior written consent of a Majority of the Controlling Class and Credit Swap Counterparty.  If the Co-Issuers shall fail to appoint a successor Trustee within 30 days after such notice of resignation, determination of removal or the occurrence of a vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class and upon receipt of the Credit Swap Counterparty's consent.  If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 60 days after the giving of such notice of resignation, determination of removal or the occurrence of a vacancy, then the Trustee to be replaced, or any Noteholder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.  Notwithstanding the foregoing, at any time that an Event of Default shall have occurred and be continuing, a Majority of the Controlling Class shall have, in lieu of the Co-Issuers, the Co-Issuers' rights to appoint a successor Trustee, such rights to be exercised by notice delivered to the Issuer and the retiring Trustee.  Any successor Trustee shall, forthwith upon its acceptance of such appointment in accordance with Section 6.10, become the successor Trustee and supersede any retiring Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to each of the Rating Agencies, the Shares Paying Agent, the Credit Swap Counterparty, the Portfolio Manager and the Noteholders as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail any such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.10   <u>Acceptance of Appointment by Successor</u>.   Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment.   Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers, the Credit Swap Counterparty, the Portfolio Manager or a Majority of the Controlling Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in <u>Section 6.7(d)</u>.   Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Section 6.11   <u>Merger, Conversion, Consolidation or Succession to Business of Trustee</u>.  Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee (which for purposes of this <u>Section 6.11</u> shall be deemed to be the Trustee) shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, <u>provided</u> such corporation shall be otherwise qualified and eligible under this <u>Article VI</u>, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12   <u>Co Trustees and Separate Trustee</u>.  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee (which for purposes of this <u>Section 6.12</u> shall be deemed to be the Trustee) shall have power to appoint a co-Trustee, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.4</u> and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this <u>Section 6.12</u>. In addition, (a) a Majority of the Class A Notes shall have the power upon written notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (a), a "<u>Class A Trustee</u>") jointly with the

Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.4</u> herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this <u>Section 6.12</u>; <u>provided</u>, <u>however</u>, that in cases of appointment of a Class A Trustee, the Trustee (referred to herein as the "<u>Controlling Class Trustee</u>" in such case) shall have possession of the Collateral in accordance with this Indenture; (b) in cases of conflicts between the Class A Notes on the one hand and the Class B Notes on the other hand, as determined by a Majority of the Class B Notes, a Majority of the Class B Notes shall have the power upon written notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (b), a "<u>Class B Trustee</u>") jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.4</u> herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this <u>Section 6.12</u>; <u>provided</u>, <u>however</u>, that in cases of appointment of a Class B Trustee, the Trustee (referred to herein as the "<u>Controlling Class Trustee</u>" in such case) shall have possession of the Collateral in accordance with this Indenture; or (c) in cases of conflicts between the Class A Notes and Class B Notes on the one hand and the Class C Notes on the other hand, as determined by a Majority of the Class C Notes, a Majority of the Class C Notes shall have the power upon written notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (c), a "<u>Class C Trustee</u>"), jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.4</u> herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this <u>Section 6.12</u>; <u>provided</u>, <u>however</u>, that in cases of appointment of a Class C Trustee, the Trustee (referred to herein as the "<u>Controlling Class Trustee</u>" in such case) shall have possession of the Collateral in accordance with this Indenture; (d) in cases of conflicts between the Class A Notes, Class B Notes and Class C Notes on the one hand and the Class D Notes on the other hand, as determined by a Majority of the Class D Notes, a Majority of the Class D Notes shall have the power upon written notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (d), a "<u>Class D Trustee</u>"), jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.4</u> herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this <u>Section 6.12</u>; <u>provided</u>, <u>however</u>, that in cases of appointment of a Class D Trustee, the Trustee (referred to herein as the "<u>Controlling Class Trustee</u>" in such case) shall have possession of the Collateral in accordance with this Indenture; or (e) in cases of conflicts between the Class A Notes, Class B Notes, the Class C Notes and Class D Notes on the one hand and the Class E Notes on the other hand, as determined by a Majority of the Class E Notes, a Majority of the Class E Notes shall have the power upon written notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (e), a "<u>Class E Trustee</u>"), jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.4</u> herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves

114

may have the right to do, subject to the other provisions of this Section 6.12; provided, however, that in cases of appointment of a Class E Trustee, the Trustee (referred to herein as the "Controlling Class Trustee" in such case) shall have possession of the Collateral in accordance with this Indenture.

The Co-Issuers shall (to the maximum extent permitted by law) join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-Trustee, Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee, as the case may be.  If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee or, in case an Event of Default has occurred and is continuing and a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee is to be appointed, a Majority of the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes, as applicable, shall have power to make such appointment.  The Trustee shall provide S&P with notice of any such appointment.

Should any written instrument from the Co-Issuers be required by any co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee so appointed for more fully confirming to such co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay (but only from and to the extent of the Collateral, after payment in full of the amounts payable pursuant to clauses (i) through (xvi) of Section 11.1(a)(A)) for any reasonable fees and expenses in connection with such appointment.

Every co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(i)     the Notes shall be authenticated and delivered by, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by, the Trustee (or the Controlling Class Trustee, as the case may be);

(ii)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee shall be conferred or imposed upon and exercised or performed (A) by the Trustee or by the Trustee and such co-Trustee jointly in the case of the appointment of a co-Trustee and (B) by the Controlling Class Trustee in the case of the appointment of a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee as shall be provided in the instrument appointing such co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Controlling Class Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-Trustee;

115

(iii)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-Trustee (except a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee) appointed under this Section 6.12, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-Trustee (except a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee) without the concurrence of the Co-Issuers.  In the case of a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee, a Majority of the Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes, respectively, shall have power to accept the resignation of or remove any such Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee.  Upon the written request of a Majority of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes, as the case may be, the Co-Issuers and the Trustee shall join with a Majority of such Notes in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal.  A successor to any co-Trustee, Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee so resigned or removed may be appointed in the manner provided in this Section 6.12.  On the date on which the Class A Notes have been paid in full, any Class A Trustee that has been appointed and is then serving pursuant to this Section 6.12 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class A Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class A Notes.  On the date on which the Class B Notes have been paid in full, any Class B Trustee that has been appointed and is then serving pursuant to this Section 6.12 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class B Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class B Notes.  On the date on which the Class C Notes have been paid in full, any Class C Trustee that has been appointed and is then serving pursuant to this Section 6.12 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class C Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class C Notes.  On the date on which the Class D Notes have been paid in full, any Class D Trustee that has been appointed and is then serving pursuant to this Section 6.12 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class D Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class D Notes.  On the date on which the Class E Notes have been paid in full, any Class E Trustee that has been appointed and is then serving pursuant to this Section 6.12 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class E Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class E Notes;

(iv)    no co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any Controlling Class Trustee hereunder;

(v)    the Trustee or the Controlling Class Trustee, as the case may be, shall not be liable by reason of any act or omission of a co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee; and

(vi)    except in the case of conflicts between Classes, any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-Trustee and Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee and Class E Trustee. In the case of conflicts between Classes, any Act of Noteholders delivered to the Controlling Class Trustee shall be effective upon such delivery in accordance with this Indenture.  The Controlling Class Trustee shall mail a copy thereof to any Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee and Class E Trustee appointed pursuant to this Section 6.12.

Section 6.13    Certain Duties of Trustee Related to Delayed Payment of Proceeds. In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Underlying Asset on its Due Date, (a) the Trustee shall promptly notify the Issuer in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, or the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2), shall have made provision for such payment reasonably satisfactory to the Trustee in accordance with Section 10.2, the Trustee shall request the issuer of such Pledged Underlying Asset, the trustee under the related Reference Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of Section 6.1(c), shall take such action as the Issuer shall reasonably direct in writing.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture.  In no event shall the Trustee be required to advance its own funds.  Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Underlying Asset received after the Due Date thereof to the extent the Issuer previously made provisions for such payment reasonably satisfactory to the Trustee in accordance with this Section 6.13 and such payment shall not be deemed part of the Collateral.

Section 6.14    Representations and Warranties of the Trustee.   The Trustee represents and warrants that:  (a) the Trustee is a national banking association with trust powers, duly and validly existing under the laws of the United States of America, with corporate power and authority to execute, deliver and perform its obligations under this Indenture, and is duly eligible and qualified to act as Trustee under this Indenture; (b) this Indenture has been duly authorized, executed and delivered by the Trustee and constitutes the valid and binding obligation of the Trustee, enforceable against it in accordance with its terms except (i) as limited by bankruptcy, fraudulent conveyance, fraudulent transfer, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general equitable principles, regardless of whether considered in a proceeding in equity or at law, and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; and (c) neither the execution or delivery by the Trustee of this Indenture nor performance by the Trustee of its

117

obligations under this Indenture requires the consent or approval of, the giving notice to or the registration or filing with, any governmental authority or agency under any existing law of the State of New York governing the banking or trust powers of the Trustee; (d) there is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Trustee, threatened that, if determined adversely to the Trustee, would have a material adverse effect upon the performance by the Trustee of its duties under, or on the validity or enforceability of, this Indenture; and (e) the Trustee is not in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Trustee, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Indenture or the performance by the Trustee of its duties hereunder.

Section 6.15   <u>Authenticating Agents</u>.   Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuances, transfers and exchanges under <u>Sections 2.4</u>, <u>2.5</u> and <u>2.6</u>, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes.   For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this <u>Section 6.15</u> shall be deemed to be the authentication of Notes by the Trustee.

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any paper or any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Co-Issuers.   The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.   Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers if the resigning or terminated Authenticating Agent was originally appointed at the request of the Issuer or Co-Issuer.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto as an Administrative Expense, subject to and in accordance with <u>Section 11.1</u>.   The provisions of <u>Sections 2.9</u>, <u>6.4</u> and <u>6.5</u> shall be applicable to any Authenticating Agent.

Section 6.16   <u>Fiduciary for Holders of Notes Only, Agent for Other Secured Parties</u>.   With respect to the security interests created hereunder, the pledge of any item of Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties; in furtherance of the foregoing, the possession by the Trustee of any item

of Collateral or other assets of the Issuer, the endorsement to or registration of any item of Collateral or other assets of the Issuer and the control by the Trustee (including control over Financial Assets held in the Issuer Accounts) are all undertaken by the Trustee in its capacity as representative of such Holders and agent for the other Secured Parties, and the Trustee shall have no fiduciary duty to the other Secured Parties; provided, that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

Section 6.17    Withholding.  If any amount is required to be deducted or withheld from any payment to any Noteholder, such amount shall reduce the amount otherwise distributable to such Noteholder.  The Trustee is hereby authorized to withhold or deduct from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally required to be withheld or deducted (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and legally withholding payment of such tax, pending the outcome of such proceeding).  The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to such Noteholder at the time it is deducted or withheld by the Issuer or the Trustee, as applicable, and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.17.  If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred.  Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

## ARTICLE VII

## COVENANTS

Section 7.1    Payment of Principal and Interest.  The Co-Issuers (or in the case of Class E Notes only, the Issuer) will duly and punctually pay the principal of and interest on such Notes in accordance with the terms thereof and this Indenture.

Section 7.2    Compliance With Laws.  The Co-Issuers will comply in all material respects with applicable laws, rules, regulations, writs, judgments, injunctions, decrees, awards and orders with respect to them, their business and their properties.

Section 7.3    Maintenance of Books and Records.  The Co-Issuers shall maintain and implement administrative and operating procedures reasonably necessary in the performance of their obligations hereunder and the Issuer shall keep and maintain at all times, or cause to be kept and maintained at all times in its registered office in the Cayman Islands, all documents, books, records, accounts and other information as are required under the laws of the Cayman Islands.

Section 7.4    Maintenance of Office or Agency.  The Co-Issuers hereby appoint the Trustee as a Paying Agent for the payment of principal and interest on the Notes and the Co-Issuers hereby appoint U.S. Bank National Association, Corporate Trust Services, One

Federal Street, Boston, MA 02110, Attention: CDO Unit – White Marlin CDO 2007-1, Ltd., as the Co-Issuer's Agent where notices and demands to or upon the Co-Issuers in respect of the Notes or this Indenture may be delivered.  Notes may be surrendered for registration of transfer or exchange.

The Issuer may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; provided, however, that the Issuer will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served and subject to any laws or regulations applicable thereto; provided, further, that no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax; provided, further, that so long as any Notes are listed on the Irish Stock Exchange and such stock exchange shall so require, the Co-Issuers shall maintain a Paying Agent in Ireland.  In the event that the Irish Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Company Announcements Office of the Irish Stock Exchange.  The Co-Issuers shall at all times maintain a Note Register.  The Co-Issuers shall give prompt written notice to the Trustee, each of the Rating Agencies, the Portfolio Manager and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the appropriate Paying Agent at its designated office and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands.

Section 7.5    Money for Note Payments to be Held in Trust.  All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Co-Issuers.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act.  Any moneys deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay

the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article X.

The initial Paying Agents shall be as set forth in <u>Section 7.4</u>.  Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; <u>provided</u>, <u>however</u>, that such additional or successor Paying Agent must either (i) have a rating of at least "Aa2" or its equivalent by Moody's and at least "AA" by S&P, (ii) agree not to hold any funds pursuant to this Indenture overnight, or (iii) be an entity the appointment of which as Paying Agent will not, at that time, result in a downgrade, withdrawal or qualification of the ratings on the Notes.  The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities.  The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this <u>Section 7.5</u>, that such Paying Agent will:

    (A)    allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the applicable report or statement in accordance herewith, in each case to the extent permitted by applicable law;

    (B)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

    (C)    if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment; and

    (D)    if such Paying Agent is not the Trustee, at any time during the continuance of any Event of Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the

Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Any money deposited with a Paying Agent and not previously returned that remains unclaimed for twenty Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-Issuers and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer, and all liability of the Trustee or such Paying Agent with respect to such trust money (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.6    Existence of Co-Issuers.  (a) Each of the Issuer and the Co-Issuer shall (to the maximum extent permitted by law) take all reasonable steps to maintain its identity as a separate legal entity from that of its stockholders. Each of the Issuer and the Co-Issuer shall keep its principal place of business at the address specified in Section 14.3.  Each of the Issuer and the Co-Issuer shall keep separate books and records and will not commingle its respective funds with those of any other Person.  The Issuer and the Co-Issuer shall keep in full force and effect their rights and franchises as a company incorporated under the laws of the Cayman Islands and a corporation organized under the laws of the State of Delaware, respectively, shall comply with the provisions of their respective organizational documents, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Collateral; provided, however, that, subject to Cayman Islands law, the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer and approved by the holder of the Issuer Ordinary Shares so long as (a) the Issuer determines that such change is not disadvantageous in any material respect to the Issuer or Holders of Notes or Preference Shares, (b) written notice of such change shall have been given by the Co-Issuers to the Trustee, the Holders, the Shares Paying Agent, the Credit Swap Counterparty, the Portfolio Manager and each of the Rating Agencies at least 30 Business Days prior to such change of jurisdiction and (c) on or prior to the 15th Business Day following such notice the Trustee shall not have received written notice from a Majority of the Controlling Class objecting to such change.

(b)    The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and stockholders', or other similar, meetings) are followed.  Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting

the foregoing, (i) the Issuer shall not have any subsidiaries other than the Co-Issuer, (ii) the Co-Issuer shall not have any subsidiaries and (iii) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective directors), (B) engage in any transaction with any shareholder (other than the issuance of the Preference Shares) that would constitute a conflict of interest (provided, that the Administration Agreement and Collateral Administration Agreement shall not be deemed to be such a transaction that would constitute a conflict of interest) or (C) pay dividends other than in accordance with the provisions of this Indenture.

Section 7.7    Protection of Collateral.  (a) The Issuer shall execute and deliver from time to time all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    Grant more effectively all or any portion of the Collateral;

(ii)    maintain or preserve the lien (and the priority thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iv)    enforce any of the Pledged Underlying Assets or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Trustee and the Secured Parties in the Collateral against the claims of all Persons and parties; or

(vi)    (A) pay or cause to be paid any and all taxes levied or assessed upon the Issuer or in respect of all or any part of the Collateral and timely file all tax returns and information statements as required and to provide to each beneficial owner of Notes any information that the beneficial owner reasonably requests in order for the beneficial owner to comply with its federal, state, or local tax and information returns and reporting obligations, and (B) if required to prevent the withholding or imposition of United States income tax, deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form or other appropriate United States tax forms as may be required, to each issuer, counterparty or paying agent with respect to (as applicable) an item included in the Collateral at the time such item included in the Collateral is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

The Issuer hereby designates the Trustee as its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required pursuant to this Section 7.7 provided that such appointment shall not impose upon the Trustee any of the obligations of the Issuer under this Section 7.7.  The Trustee may, from time to time, and shall, at the written direction of the Issuer, execute, and the Issuer shall cause to be filed financing statements and continuation statements (it being understood that the Trustee shall be entitled to

rely upon an Opinion of Counsel, including without limitation an Opinion of Counsel delivered in accordance with Sections 3.1(c) and 7.8, as to the need to file such financing statements and continuation statements, the dates by which such filings are required to be made and the jurisdictions in which such filings are required to be made).

(b)     The Trustee shall not (i) except in accordance with Section 10.8(b), (c) or (d), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.8 hereof (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.8 hereof) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

Section 7.8     Opinions as to Collateral.  On or before the Payment Date in June of each calendar year, commencing in June 2008, the Issuer shall furnish or cause to be delivered to the Trustee, the Credit Swap Counterparty, the Portfolio Manager and each of the Rating Agencies, an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains in effect and that no further action (other than as specified in such opinion) needs to be taken (under then current law) to ensure the continued effectiveness and perfection of such lien over the next year.

Section 7.9     Performance of Obligations.   (a) If an Event of Default or a Default shall have occurred, the Co-Issuers shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any Reference Instrument.

(b)     The Co-Issuers may contract with other Persons, including the Trustee and the Collateral Administrator, for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons.   Notwithstanding any such arrangement, the Co-Issuers shall remain primarily liable with respect thereto.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Co-Issuers; and the Co-Issuers will punctually perform, and use their best efforts to cause such Persons to perform all of their obligations and agreements.

(c)     The Co-Issuers agree to comply in all material respects with all requirements applicable to them set forth in any Opinion of Counsel obtained pursuant to any provision of this Indenture including satisfaction of any event identified in any Opinion of Counsel as a prerequisite for the obtaining or maintaining by the Trustee of a perfected security

interest in any Underlying Asset, Eligible Investment or other Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable.

Section 7.10   Negative Covenants.  (a) The Issuer will not:

(i)      sell, transfer, assign, participate, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (by security interest, lien (statutory or otherwise), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise) (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(ii)      claim any credit on, or make any deduction from, the principal, interest or other amounts payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)      incur or assume or guarantee any indebtedness or any contingent obligations, other than the Notes, this Indenture and the other agreements and transactions expressly contemplated hereby and thereby;

(iv)      (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise, other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral, or any part thereof, any interest therein or the Proceeds thereof except as may be expressly permitted hereby, or (C) take any action that would cause the lien of this Indenture not to constitute a valid perfected security interest in the Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable, except as may be expressly permitted hereby (or in connection with a disposition of Collateral required hereby);

(v)      make or incur any capital expenditures, except as reasonably required to perform its functions in accordance with the terms of this Indenture;

(vi)      become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends with respect to the Issuer Ordinary Shares;

(vii)      enter into any transaction with any Affiliate or any Holder of a Note or a Preference Share other than (A) the transactions contemplated by the Collateral Administration Agreement, (B) relating to the offering and sale of the Notes or the Preference Shares, or (C) transactions on terms no less favorable than those obtainable in an arm's-length transaction with a wholly unaffiliated Person;

(viii)    maintain any bank accounts other than the Issuer Accounts and the Issuer's bank account in the Cayman Islands;

(ix)    (A) change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the Trustee's lien or the interest hereunder of the Secured Parties or the Trustee or (B) conduct business under an assumed name;

(x)    have any subsidiaries other than the Co-Issuer and any subsidiaries necessitated by a change of jurisdiction pursuant to Section 7.6;

(xi)    permit the transfer of any of its ordinary shares to a U.S. Person or a U.S. Resident;

(xii)    establish a branch, agency, office or place of business in the United States, or take any action or engage in any activity (directly or through any other agent) which would subject it to United States federal, state, or local income tax;

(xiii)    fail to pay any tax, assessment, charge or fee with respect to the Collateral, or fail to defend any action, if such failure to pay or defend may adversely affect the priority or enforceability of the lien over the Collateral created by this Indenture;

(xiv)    solicit, advertise or publish the Issuer's ability to enter into credit derivatives;

(xv)    register as or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as a bank, insurance company or finance company;

(xvi)    be treated as a bank, insurance company or finance company for purposes of: (i) any tax, securities law or other filing or submission made to any governmental authority, (ii) any application made to a rating agency or (iii) qualification for any exemption from tax, securities law or any other legal requirements;

(xvii)    hold itself out to the public as a bank, insurance company or finance company;

(xviii)    elect to be treated as other than a corporation for U.S federal income tax purposes;

(xix)    issue and sell additional Preference Shares;

(xx)    enter into any agreements unless such agreements contain "non-petition" and "limited recourse" provisions, except that the Issuer may enter into any agreements involving the purchase and sale of the Underlying Asset having customary purchase or sale terms and documented with customary loan trading documentation not containing such provisions (provided that, for the avoidance of doubt, any synthetic securities entered into by the Issuer must contain such provisions);

(xxi)    amend the "limited recourse" or "non-petition" provisions in any agreement to which the Issuer is a party without obtaining a Rating Agency Confirmation with respect to such amendment or enter into any waiver in respect of any of the foregoing agreements without providing prior written notice to each Rating Agency, the Credit Swap Counterparty and the Trustee;

(xxii)    fail to maintain at least one Independent director (independent from the Credit Swap Counterparty); or

(xxiii)    amend its constitutional documents without Rating Agency Confirmation.

(b)    The Co-Issuer will not:

(i)    claim any credit on, or make any deduction from, the principal or interest payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(ii)    (A) incur, assume or guarantee or become directly or indirectly liable with respect to any indebtedness or any contingent obligations (including swap agreements, cap agreements, reimbursement obligations, repurchase obligations or the like), other than pursuant to the Notes, this Indenture and the other agreements and transactions expressly contemplated hereby and thereby, (B) issue any additional securities or (C) issue any additional shares of stock;

(iii)    make or incur any capital expenditures;

(iv)    become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its stockholders;

(v)    enter into any transaction with any Affiliate or any Holder of a Note other than the transactions relating to the offering and sale of the Notes;

(vi)    maintain any bank accounts; other than any account established in the Cayman Islands pursuant to the Administration Agreement;

(vii)    have any subsidiaries;

(viii)    amend its constitutional documents without Rating Agency Confirmation; or

(ix)    permit the transfer of any of its shares of capital stock to a U.S. Person or a U.S. Resident.

(c)    Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted or required by this Indenture.

Section 7.11    <u>Statement as to Compliance</u>.  On or before five (5) Business Days after the Payment Date in June of each year beginning in June 2008, the Issuer shall deliver to the Trustee (to be forwarded to each of the Rating Agencies) an Officer's Certificate stating, as to each signer thereof, that having made reasonable inquiries of the Credit Swap Calculation Agent, to the best of the knowledge, information and belief of the Issuer, there did not exist, as at a date not more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (if any), any Default or, if such Default did then exist or had existed, specifying the same and the nature and status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture or, if such is not the case, specifying those obligations with which it has not complied.  Within two (2) Business Days of the Issuer obtaining actual knowledge of the occurrence of a Default under this Indenture, the Issuer shall deliver to the Managers, the Credit Swap Counterparty and the Trustee (to be forwarded to the Rating Agencies), notice of such Default.

Section 7.12    <u>Co-Issuers May Not Consolidate</u>.  The Co-Issuers shall not consolidate or merge with or into any other Person or convey or transfer their properties and assets substantially as an entirety to any Person.

Section 7.13    <u>Reserved</u>.

Section 7.14    <u>No Other Business</u>.  The Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture, issuing and selling the Preference Shares pursuant to the Issuer Charter, entering into the Shares Paying Agency Agreement, the Administration Agreement, the Portfolio Management Agreement, the Class A Note Purchase Agreement, the Class B-1 Note Purchase Agreement, the Class B-2 Note Subscription Agreement(s) (if any), the Class C Note Subscription Agreement(s) (if any), the Class D Note Subscription Agreement(s) (if any), the Class E Note Purchase Agreement, the Purchase Agreement, the Placement Agreement, the Securities Account Control Agreement and the Credit Swap Agreement and acquiring, owning, holding, selling, pledging, contracting for the management of and otherwise dealing with the Underlying Asset and other Collateral in connection therewith, entering into any financing arrangement with respect to Closing Date Underlying Asset and such other activities which are necessary, required or advisable to accomplish the foregoing, <u>provided</u>, <u>however</u>, that the Issuer shall be permitted to enter into any additional agreements other than agreements incidental to this Indenture not expressly prohibited by <u>Section 7.10(a)</u> and to enter into any amendment, modification, or waiver of existing agreements or such additional agreements, in each case without the consent of any one or more Classes of Holders, the Credit Swap Counterparty and Rating Agency Confirmation; <u>provided</u>, that the Issuer determines that such amendment, modification or waiver would not, upon or after becoming effective, materially adversely affect the rights or interests of such Class or Classes of Holders.  In addition to the foregoing, the Issuer and the Credit Swap Counterparty may at any time amend, modify or waive provisions of the Credit Swap Agreement, such existing agreements and such additional agreements upon receipt of Rating Agency Confirmation from

the Rating Agencies with respect to any amendments, modifications or waivers. The Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and such other activities which are necessary, required or advisable to accomplish the foregoing. The Issuer and the Co-Issuer will not amend their Memorandum and Articles of Association or Certificate of Incorporation, respectively, without Rating Agency Confirmation and the prior written consent of the Credit Swap Counterparty and a Supermajority of the Controlling Class if such amendment would result in the rating of the Class A Notes or Class B Notes being reduced or withdrawn, a Supermajority of the Class C Notes if such amendment would result in the rating of any of the Notes being reduced or withdrawn, a Supermajority of the Class D Notes if such amendment would result in the rating of any of the Notes being reduced or withdrawn and a Supermajority of the Class E Notes if such amendment would result in the rating of any of the Notes being reduced or withdrawn, and will not otherwise amend their Memorandum and Articles of Association or Certificate of Incorporation, respectively, without the consent of any one or more Classes of Noteholders unless (i) the Issuer determines that such amendment would not, upon or after becoming effective, materially adversely affect the rights or interests of such Class or Classes of Noteholders, (ii) the Issuer gives ten (10) days' prior written notice to the Noteholders of such amendment, and (iii) with respect to any such Class of Notes, a Majority of such Class do not provide written notice to the Issuer that, notwithstanding the determination of the Issuer, the Persons providing notice have reasonably determined that such amendment would, upon or after becoming effective, materially adversely affect such Class (the failure of any such Majority to provide such notice to the Issuer within ten (10) days of receipt of notice of such amendment from the Issuer being conclusively deemed to constitute hereunder consent to and approval of such amendment).

Section 7.15    Reserved.

Section 7.16    Confirmation of Rating; Annual Rating Review. So long as any of the Notes remain Outstanding, on or before the Payment Date in June, in each year commencing in June 2008, the Co-Issuers shall obtain and pay for an annual review of the rating of such Notes from each of the Rating Agencies and request updates on any estimated ratings of Underlying Asset assigned pursuant to the definition of Moody's Rating and clause (e) of the definition of S&P Rating. Such estimated ratings shall not be disclosed by the Co-Issuers to any third party other than the Trustee, it being understood that the Trustee may provide such estimated ratings to the Collateral Administrator or Credit Swap Counterparty and the Issuer's accountants, in each case, in their capacity as the agent of the Issuer, subject to the Trustee receiving the undertaking of such parties that they shall treat such estimated ratings confidentially and not distribute any such estimated ratings to any third party without the express written consent of Moody's. The Co-Issuers shall promptly notify the Credit Swap Counterparty and the Trustee in writing (which shall promptly notify the Noteholders) if at any time the rating of any of such Classes of Notes has been, or it is known by the Co-Issuers that such a rating will be, changed or withdrawn.

Section 7.17    Reporting. At any time when either of the Co-Issuers is not subject to Section 13 or 15(d) of the Exchange Act and is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder of or a holder of a beneficial interest in, a Note, the Co-Issuers (or in the case of Class E Notes only, the Issuer) shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or

beneficial holder, to a prospective purchaser of such Note designated by such Holder or beneficial holder, to another designee of such Holder or beneficial holder or to the Trustee for delivery to such Holder or beneficial holder or a prospective purchaser designated by such Holder or beneficial holder or such other designee of such beneficial holder, as the case may be, in order to permit compliance by such Holder or beneficial holder with Rule 144A in connection with the resale of such Note by such Holder or beneficial holder.

Section 7.18   Calculation Agent.   (a) The Co-Issuers hereby agree that for so long as any of the Notes remain Outstanding there will at all times be a calculation agent appointed to calculate LIBOR in respect of each Interest Period in accordance with the terms of Schedule C hereto (the "Calculation Agent").   The Calculation Agent appointed by the Co-Issuers must be a leading bank engaged in transactions in Eurodollar deposits in the international Eurodollar market which bank does not control, is not controlled by and is not under common control with, the Co-Issuers or any of their respective Affiliates and which bank, or Affiliate of such bank, has an established place of business in London, England.   The Calculation Agent may be removed by the Co-Issuers at any time.   If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, or if the Calculation Agent fails to determine any of the information required to be communicated, as described in subsection (b), in respect of any Interest Period, the Co-Issuers will promptly appoint the London or Ireland office of another leading bank meeting the qualifications set forth above to act as Calculation Agent.   The Calculation Agent may not resign its duties without a successor having been duly appointed.   The Co-Issuers have initially appointed the Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Period.   For so long as any of the Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, the Issuer will publish notice of the appointment, termination or change in the office of such Calculation Agent to the Company Announcements Office.

(b)   The Calculation Agent shall be required to agree that, as soon as practicable after 11:00 a.m., London time, on each LIBOR Determination Date (as defined in Schedule C hereto), but in no event later than 11:00 a.m., London time, on the Business Day immediately following such LIBOR Determination Date, the Calculation Agent will calculate the interest rate applicable to each Class of Notes for the following Interest Period, and will as soon as practicable but in no event later than 11:00 a.m., London time, on the day following such LIBOR Determination Date, communicate such rates, and the amount of interest payable on the next Payment Date in respect of each Class of Notes, with a principal amount of U.S.$1,000 (rounded to the nearest cent, with half a cent being rounded upwards), to the Co-Issuers, the Portfolio Manager, the Credit Swap Counterparty, the Trustee, Euroclear, Clearstream, the Managers, DTC and each Paying Agent.   For so long as any of the Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, such information will be given to the Company Announcements Office as soon as practicable, but in no event later than the fourth Business Day following such LIBOR Determination Date.   In the absence of manifest error, the LIBOR Determination by the Calculation Agent shall be binding upon all parties.

(c)   The Calculation Agent shall be required to specify to the Co-Issuers the quotations upon which each Note Interest Rate is based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 p.m. (New York City time) on each LIBOR Determination Date that either:   (i) it has determined or is in the process of determining each of

the Note Interest Rates and the amount of interest payable in respect of each Class of Notes for the related Interest Period or (ii) it has not determined and is not in the process of determining each of the Note Interest Rates and the amount of interest payable in respect of each Class of Notes for the related Interest Period, together with its reasons therefor.

Section 7.19   Certain Tax Matters.  (a)  If required to prevent the withholding or imposition of United States income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to any Underlying Asset at the time such Underlying Asset is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

(b)     The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Cadwalader, Wickersham & Taft LLP, Sidley Austin LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(c)     Notwithstanding anything to the contrary contained in this Indenture, all persons may disclose to any and all persons, without limitation of any kind, the U.S. federal, state and local tax treatment of the Securities and the Issuer, any fact that may be relevant to understanding the U.S. federal, state and local tax treatment of the Securities and the Issuer, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state and local tax treatment and that may be relevant to understanding such tax treatment.

(d)     The Issuer and each Holder of, and each holder of a beneficial interest in, Notes agree to treat such Notes as indebtedness solely of the Issuer for U.S. federal, state and local income tax purposes and further agree not to take any action inconsistent with such treatment.

Section 7.20   Reserved.

Section 7.21   CUSIP Numbers.  The Issuer shall (i) request of S&P, and shall cooperate with S&P to ensure that all CUSIP numbers identifying the Notes shall have a "fixed field" attached thereto that contains "3c7" and "144A" indicators and (ii) take steps to cause the underwriters to require that all "confirms" of trades of the Securities contain CUSIP numbers with such "fixed field" identifiers.

Section 7.22   Bloomberg and Other Third-Party Vendor Screens.  The Issuer shall cause the Bloomberg screen or screens containing information about the Securities to include the following language:  (i) the "Note Box" on the bottom of "Security Display" page describing the Securities shall state:  "Placed Under 144A/3(c)(7)," (ii) the "Security Display" page shall have the flashing red indicator "See Other Available Information," and (iii) the indicator shall link to the "Additional Security Information" page, which shall state that the securities "are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act") to Persons who are both (x) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and

(y) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act of 1940)." The Issuer shall require that any other third-party vendor screens containing information about the Securities include substantially similar language to clauses (i) through (iii) above. For so long as the Rule 144A Global Notes are registered in the name of DTC or its nominee, the Co-Issuers (or in the case of Class E Notes only, the Issuer) will instruct DTC to take these or similar steps with respect to the Rule 144A Global Notes:  (i) the DTC 20-character security descriptor and 48-character additional descriptor will indicate with marker "3c7" that sales are limited to QIBs and Qualified Purchasers; (ii) where the DTC deliver order ticket sent to purchasers by DTC after settlement is physical, will have the 20-character security descriptor printed on it, and where the DTC deliver order ticket is electronic, it will have a "3c7" indicator and a related user manual for participants, which will contain a description of the relevant restriction; and (iii) DTC will send an "Important Notice" outlining the 3(c)(7) restrictions applicable to the Rule 144A Global Notes to all DTC participants in connection with the initial offering of Notes by the Co-Issuers (or in the case of Class E Notes only, the Issuer).

Section 7.23  Tax Forms.  (a) Each Holder shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as IRS Form W-8BEN (Certification of Foreign Status as Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) (or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments. Each Holder agrees to provide any certification or information that is reasonably requested by the Issuer (a) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding, (b) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets, or (c) to enable the Issuer or its agents to satisfy reporting and other obligations under the Code and Treasury Regulations.

(b)  As a condition to the payment of principal of and interest on any Note without, or at a reduced rate of, withholding or backup withholding tax in any jurisdiction, the Trustee and/or any Paying Agent shall require any certification reasonably acceptable to the Trustee or such Share Paying Agent, respectively, for the Issuer to determine its duties and liabilities (and the Trustee may require any certification it reasonably may need to determine any duties or liabilities it may have) with respect to any taxes or other charges that the Issuer may be required to pay, deduct or withhold from payments in respect of such Note or the holder of such Note under any present or future law or regulation of the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification shall include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). The Trustee may also require any certification reasonably acceptable to the Issuer (as instructed in writing by or on behalf of the Issuer) which is necessary for the Issuer to

qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  Each Holder agrees to provide any certification requested pursuant to this paragraph within a reasonable time period after such request is initially made and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(c)    The Trustee hereby provides notice to each Holder that the failure of such Holder to provide the Trustee with appropriate tax certifications will result in amounts being withheld from payments to such Holder under the Indenture (provided that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer).

Section 7.24    Intended Tax Treatment.  The Issuer intends, and each beneficial owner of Notes hereby agrees to treat the Notes as described in the "—Certain U.S. Federal Income Tax Considerations" section of the Offering Memorandum for all U.S. federal income tax purposes and shall take no action inconsistent with such treatment unless required by law.

Section 7.25    Preparation of Tax Statements.    (a) The Issuer shall hire accountants and the accountants shall cause to be prepared and filed (and, where applicable, delivered to Holders) for each taxable year of the Issuer the federal, state and local income tax returns and reports as required under the Code and Treasury Regulations, if any, which the Issuer is required to file (and, where applicable, deliver), and copies of which returns and reports shall be available for inspection and examination by each Holder and their respective representatives and shall provide to each beneficial owner of Notes any information that the beneficial owner reasonably requests in order for the beneficial owner to comply with its federal state, or local tax and information returns and reporting obligations.

(b)    The Issuer shall provide to any Holder, upon written request (i) all information that a U.S. shareholder making a "qualified electing fund" ("QEF") election (as defined in the Code) is required to obtain for U.S. federal income tax purposes, (ii) if applicable, a "PFIC Annual Information Statement" as described in Treasury Regulation § 1.1295-1(g) (or any successor Treasury Regulation or IRS release or notice), including all representations and statements required by such statement, and shall take any other steps necessary to facilitate a QEF election by such U.S. shareholder, (iii) if applicable, at the expense of the requesting Holder, any information that such Holder reasonably requests to assist such Holder with regard to any filing requirements such Holder may have as a result of the Issuer being classified as a "controlled foreign corporation" for U.S. federal income tax purposes and (iv) all other information reasonable requested by a Holder to satisfy its U.S. tax information and reporting obligations.

(c)    The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Cadwalader, Wickersham & Taft LLP, Sidley Austin LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

# ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1    <u>Supplemental Indentures without Consent of Holders</u>.  Without the consent of the Noteholders, the Portfolio Manager or the Holders of the Preference Shares but only with the prior written consent of the Credit Swap Counterparty, the Co-Issuers, with respect to the Notes, and the Issuer, with respect to the Preference Shares, and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Trustee (x) if such supplemental indenture would have no material adverse effect on any of the Holders of the Notes or the Preference Shares (as evidenced by an Opinion of Counsel, which may be based on an Officers' Certificate of the Issuer or Co-Issuers, as applicable regarding the material adverse affect of such supplemental indenture on any Holder of the Notes or the Preference Shares), or (y) for any of the following purposes:

(a)    to evidence the succession of another Person to the Issuer or the Co-Issuer, and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes;

(b)    to add to the covenants of the Co-Issuers or the Trustee, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Issuer or the Co-Issuer;

(c)    to convey, transfer, assign, mortgage or pledge any additional property to or with the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Notes;

(d)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of <u>Section 6.9</u>, <u>6.10</u> or <u>6.12</u> hereof;

(e)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to correct, amplify or otherwise improve any pledge, assignment or conveyance to the Trustee of any property subject or required to be subjected to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations), or to cause any additional property to be subject to the lien of this Indenture;

(f)    to take any action necessary or helpful to prevent the Issuer, the Noteholders, the Preference Shareholders or the Trustee from being subject to withholding or other taxes, fees or assessments or to prevent the Issuer from being treated as engaged in a United States trade or business for U.S. federal income tax purposes or otherwise subject to U.S. federal, state, local or foreign income or franchise tax on a net income tax basis;

(g)    to enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification or waiver if the Issuer determines that such amendment, modification or waiver would not, upon or after becoming effective, materially and

adversely affect the rights or interests of Holders of any Class of Notes or the Holders of the Preference Shares;

(h)  to modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(i)  to correct any defect or ambiguity or clarify any provision in this Indenture or resolve any inconsistency between the provisions of the Offering Memorandum or any other Transaction Document and this Indenture;

(j)  to accommodate the settlement of the Notes in book entry form through the facilities of DTC, Euroclear or Clearstream or otherwise;

(k)  to make amendments required pursuant to applicable law;

(l)  to avoid the Issuer or Co-Issuer or the Collateral being required to register as an investment company under the Investment Company Act; or

(m)  to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes required or advisable in connection with the listing of any Class of Notes (other than the Class A Notes, the Class B-1 Notes or the Class E Notes) on the Irish Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes in connection therewith.

Notwithstanding the foregoing, the Co-Issuers and the Trustee may also enter into supplemental indentures without obtaining the consent of the Noteholders, the Credit Swap Counterparty, the Portfolio Manager or any other party in order to conform the Indenture to any amendments, modifications or supplements to the Class A Note Purchase Agreement, Class B-1 Note Purchase Agreement or Class E Note Purchase Agreement with respect to the posting of collateral and other arrangements to be made in the event of the downgrade of any Class A Noteholder, Class B-1 Noteholder or Class E Noteholder, as applicable, subject in each case to the consent of a majority of the P-1 Preference Shares and receipt by the Issuer of a Rating Agency Confirmation.

The Issuer and the Trustee shall not amend the Indenture or enter into any supplemental indenture, whether with or without the consent of Noteholders, unless the Trustee has received advice from Cadwalader, Wickersham & Taft LLP, Sidley Austin LLP or an opinion of another nationally recognized U.S. tax counsel experienced in such matters that the proposed supplemental indenture would not cause the Issuer to be engaged in a U.S. trade or business or otherwise subject to U.S. federal income tax on a net income basis and would not adversely affect the tax treatment of the Issuer or the tax consequences to the holders of any Class of Notes as described in the Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations" to any material extent or otherwise cause any of the

statements described in the Offering Memorandum under the heading, "Certain U.S. Federal Income Tax Considerations" inaccurate or incorrect to any material extent.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall, for so long as any Class of Notes are Outstanding and rated by the Rating Agencies, mail to each of the Rating Agencies, a copy of such proposed supplemental indenture.  No such proposed supplemental indenture may be executed without obtaining a Rating Agency Confirmation from S&P with respect to such supplemental indenture.

Not later than 10 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall mail to each Noteholder and each Preference Shareholder, the Portfolio Manager, the Credit Swap Counterparty and the Shares Paying Agent a copy of any proposed supplemental indenture and written notice reciting in substance the following provisions:  unless within 10 Business Days after such mailing the Trustee shall have received written notice from Holders representing a Majority of a Class or from any Preference Shareholder or the Credit Swap Counterparty stating that such Holders or the Credit Swap Counterparty, as the case may be, reasonably consider their interests to be materially adversely affected by the proposed supplemental indenture, the Holders of any Notes or Preference Shares or the or the Credit Swap Counterparty, as applicable, will be deemed to not be materially adversely affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes or Preference Shares, and the Credit Swap Counterparty whether theretofore or thereafter authenticated and delivered; the Trustee shall not be liable for any determination that such persons shall not be materially adversely affected by the proposed supplemental indenture and shall be entitled to conclusively rely upon an Opinion of Counsel delivered to the Trustee as described in Sections 8.2 and 8.3 hereof.

So long as any of the Notes are listed on the Irish Stock Exchange, the Trustee shall notify the Irish Stock Exchange of any supplemental indenture adopted pursuant to this Section 8.1.

Section 8.2    Supplemental Indentures with Consent of Holders.  With the consent of the Holders of not less than a Majority of each Class of Notes materially and adversely affected thereby and the consent of the Credit Swap Counterparty, the Trustee, the Portfolio Manager and the Co-Issuers may enter into a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes of such Class, provided, that pursuant to the Preference Share Documents, the Issuer has agreed that it will not enter into any supplemental indenture that materially and adversely affects the Holders of the Preference Shares without the consent of a Majority of the Holders of the P-1 Preference Shares.  The Trustee may exclusively

rely on an Opinion of Counsel (which opinion may be based on an Officer's Certificate of the Co-Issuers, as applicable, regarding the material adverse affect of such supplemental indenture on any Holders of the Notes or Preference Shares) as to whether or not any Class of Securities would be materially and adversely affected by such change.  Such determination shall be conclusive and binding on all present and future Holders of the Securities.

Notwithstanding the foregoing, the Trustee may not enter into any supplemental indenture without the written consent of each of the Portfolio Manager, the Credit Swap Counterparty and the Holders of each Outstanding Note of each Class materially and adversely affected thereby and the Issuer may not enter into any such supplemental indenture without the consent of the Holders of each Outstanding Preference Share materially and adversely affected thereby if such supplemental indenture:

(a)      changes the Stated Maturity of or the due date of any installment of interest on any Note the date on which any dividend or any final distribution on the Preference Shares is payable, reduces the principal amount of any Note or the rate of interest thereon, or the rate at which interest accrues or the manner in which deferred interest accrues, or the redemption price with respect thereto, or changes the earliest date on which any Note may be redeemed, changes the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Note or to the payment of dividends or any final distribution on the Preference Shares or change any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon is payable or where the payment of dividends or any final distribution on the Preference Shares is payable, or impairs the right to institute suit for the enforcement of any such payment on any Note on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)      (1) reduces the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults thereunder or their consequences or (2) reduces the percentage of the Preference Shares the Holders of which are required to consent to the authorization of any such supplemental indenture or for any waiver of compliance with the provisions of this Indenture of which such waiver is permitted by the Holders of the Preference Shares or any other action under this Indenture that requires the consent of the Holders of the Preference Shares;

(c)      permits the creation of any lien ranking prior to or on parity with the lien of this Indenture with respect to any part of the Collateral or terminates the lien of this Indenture on any property at any time subject hereto or deprive any Secured Party of the security afforded by the lien of this Indenture;

(d)      reduces the percentage of the Aggregate Outstanding Amount, the consent of the Holders of which is required to request that the Trustee preserve the Collateral or to rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(e)      modifies any of the provisions of this Section 8.2, except to increase the percentage of Outstanding Notes or Preference Shares whose Holders' consent is required for

any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note or Preference Share adversely affected thereby;

(f)        modifies the Priority of Payments;

(g)        modifies any of the provisions of this Indenture or the Preference Share Documents in such a manner as to affect the calculation of the amount of any payment of interest or principal due on any Note or any amount payable to the Shares Paying Agent for payment to the Holders of the Preference Shares on any Payment Date or on the Preference Share Redemption Date, or to affect the right of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained in this Indenture or to affect the rights of the Holders of the Preference Shares to the benefit of any provisions for the redemption of the Preference Shares contained in the Shares Paying Agency Agreement or to affect the rights of the Secured Parties to the benefit of any provisions for the redemption of such Notes contained herein, or changes the extent to which any such payments are received by;

(h)        amends any provision of this Indenture or any other agreement entered into by the Issuer with respect to the transactions contemplated hereby relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization, arrangement, moratorium or liquidation proceedings, or other proceedings under the Bankruptcy Code or any similar laws, or the consent of the Issuer or the Co-Issuer to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or any substantial part of its property, respectively; or

(i)        amends any provision of this Indenture or any other agreement entered into by the Issuer with respect to the transactions contemplated hereby that provides that the obligations of the Co-Issuers or the Issuer, as the case may be, are limited recourse obligations of the Co-Issuers or the Issuer, respectively, payable solely from the Collateral in accordance with the terms of this Indenture.

Not later than 10 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall, for so long as the Notes are Outstanding and rated by the Rating Agencies, mail to each of the Rating Agencies, the Credit Swap Counterparty, the Portfolio Manager, the Noteholders and the Shares Paying Agent (for distribution to the Preference Shareholders) a copy of such proposed supplemental indenture. Unless the Trustee receives consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class whose rating would be materially adversely affected, the Trustee shall receive a Rating Agency Confirmation regarding the rating of each Class of Notes prior to entering into any supplemental indenture.

It shall not be necessary for any Act of Noteholders or Holders of P-1 Preference Shares under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

If (i) each holder of a Class of Notes or each holder of P-1 Preference Share is required to consent to the execution of a supplemental indenture, (ii) any entity certifies in writing to the Trustee and the Issuer that it is prohibited from delivering such consent (the Trustee and Issuer shall be fully protected in relying on such certification), (iii) all other holders of such Class of Notes or all other holders of P-1 Preference Shares (as applicable) consent to the execution of such supplemental indenture, and (iv) such entity indicates to the Trustee and the Issuer that it does not object to the execution of such supplemental indenture, then for purposes of this Indenture such entity shall be deemed to have consented to the execution of such supplemental indenture.

Notice of any such supplemental indenture adopted hereunder will be provided to each Rating Agency, the Credit Swap Counterparty, the Portfolio Manager, the Irish Stock Exchange (for so long as any Notes are listed thereon), the Trustee and the Holders of the Securities (not less than ten (10) days prior to the effectiveness thereof).  Promptly after the execution by the Co-Issuers, the Class A Note Agent, the Class B-1 Note Agent, the Class E Note Agent and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes, the Credit Swap Counterparty, the Portfolio Manager, the Irish Stock Exchange, the Shares Paying Agent and, so long as the Notes are Outstanding and rated by the Rating Agencies, each of the Rating Agencies a copy thereof.  Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.3    Execution of Supplemental Indentures.  In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of such supplemental indenture is in compliance with this Indenture and that all conditions precedent thereto have been satisfied.  Any such Opinion of Counsel may be based on an Officer's Certificate of the Issuer or the Co-Issuer, as applicable, regarding the material adverse affect of such supplemental indenture on any Holder of the Notes or the Preference Shares.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.  Notwithstanding the foregoing, the Trustee may not enter into any supplemental indenture pursuant to this Article VIII without the prior written consent of the Credit Swap Counterparty, if the Credit Swap Counterparty has notified the Trustee upon receipt of a copy of the proposed supplemental indenture that the proposed amendment would have a material adverse effect on the Credit Swap Counterparty.  Such consent, if granted, shall be evidenced by a written consent of the Credit Swap Counterparty delivered to the Trustee no fewer than ten (10) Business Days following delivery of the supplemental indenture to the Credit Swap Counterparty.

Section 8.4    Effect of Supplemental Indentures.  Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder and every Holder of Preference Shares shall be bound thereby.

Section 8.5    <u>Reference in Notes to Supplemental Indentures</u>.    Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this <u>Article VIII</u> may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Co-Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

Section 8.6    <u>Effect on the Portfolio Manager</u>.  Unless the Portfolio Manager has been given prior written notice of such supplemental indenture or amendment and has consented thereto in writing, no supplemental indenture or amendment may (a) affect the obligations or rights of the Portfolio Manager including, without limitation, modifying the restrictions on and procedures for changing the Reference Portfolio or (b) affect the amount or priority of any fees or other amounts payable to the Portfolio Manager under the Portfolio Management Agreement and this Indenture.

# ARTICLE IX

# REDEMPTION OF NOTES

Section 9.1    <u>Optional Redemption</u>.  (a) On any Payment Date, (i) the Notes shall be redeemable in whole but not in part upon the occurrence of a Tax Event if the Issuer is so notified in writing by the Shares Paying Agent upon receipt by the Shares Paying Agent of written consent or written direction of a Majority of the P-1 Preference Shares pursuant to the Shares Paying Agency Agreement, and (ii) occurring on or after the December 2009 Payment Date, the Notes shall be redeemable in whole but not in part by the Co-Issuers if so directed by the Shares Paying Agent, at least 30 Business Days (or such later date as agreed upon by the Trustee and the Credit Swap Counterparty) prior to the scheduled Redemption Date, subject to the Credit Swap Agreement having been transferred or terminated and all payments having been made to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty or any payment that is owed or will be owed to a transferee of the Credit Swap Agreement, in each case, upon a termination or transfer of the Credit Swap Agreement), upon written direction of a Majority of the P-1 Preference Shares pursuant to the Shares Paying Agency Agreement.  For the avoidance of doubt, only the Holders of P-1 Preference Shares shall be able to direct the Issuer to redeem the Notes in connection with an optional redemption pursuant to this <u>Article IX</u> (an "<u>Optional Redemption</u>").  Amounts on deposit in the Preference Share Distribution Account will not be available to effect an Optional Redemption (although such amounts will continue to be payable to the Holders of the Preference Shares, as permitted by Cayman Islands law).  Notwithstanding the foregoing, payments of the applicable Redemption Price shall only be made in accordance with the Priority of Payments.

(b)    The Notes shall not be redeemed pursuant to <u>Section 9.1(a)</u> unless:

(i)    at least seven Business Days before the scheduled Redemption Date, the Issuer or the Credit Swap Calculation Agent, acting on behalf of the Issuer, shall have furnished to the Trustee evidence, in form reasonably satisfactory to the Trustee, that the

Issuer, has entered into a binding agreement or agreements (including a confirmation of sale) with a financial institution or institutions whose short-term unsecured debt obligations have a credit rating of "P-1" or at least "Aa3" from Moody's and at least "A-1" from S&P to purchase or, in the case of the Credit Swap Agreement, terminate, not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, all or part of the Underlying Asset at a price at least equal to an amount sufficient, together with the proceeds from the Eligible Investments maturing on or prior to the scheduled Redemption Date and (without duplication) any Cash to be applied to such redemption and (without duplication) the aggregate amount of the expected proceeds from the termination of the Underlying Asset and sale of the Eligible Investments not later than the Business Day immediately preceding the scheduled Redemption Date with respect to which the Issuer or the Credit Swap Calculation Agent, acting on behalf of the Issuer, has provided the certification to the Trustee described in clause (ii) below, to pay all administrative and other fees and expenses payable under the Priority of Payments prior to the payment in full of the Notes (including fees and expenses incurred by the Trustee in connection with such sale of the Underlying Asset and Eligible Investments), to pay all amounts owed to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty or any payments that is owed or will be owed to a transferee of the Credit Swap Agreement, in each case, upon a termination or transfer of the Credit Swap Agreement) and to redeem such Notes on the scheduled Redemption Date at the applicable Redemption Price (the aggregate amount required to make all such payments and to effect such redemption, the "Total Redemption Amount"); or

(ii)     at least ten Business Days prior to the scheduled Redemption Date and prior to selling any Underlying Asset and/or Eligible Investments, the Issuer shall have certified to the Trustee, the Credit Swap Counterparty and to each of the Rating Agencies that the expected proceeds from such sale (calculated as provided in the next succeeding sentence) together with any other amounts available to be used for such Optional Redemption will be delivered to the Trustee not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, and will equal or exceed the Total Redemption Amount.

The Trustee may request a quotation from the Credit Swap Counterparty for the price paid by or to the Issuer upon termination of the Credit Swap Agreement and may solicit quotations from potential transferees of the Credit Swap Agreement. Any amount paid by the Issuer will be expressed as a negative number and any amount to be paid to the Issuer will be expressed as a positive number.

(c)     In connection with an Optional Redemption pursuant to Section 9.1(a), the Trustee, acting on behalf of the Issuer and upon receipt of a notice referred to in Section 9.2, shall notify the Issuer and the Credit Swap Counterparty of such Optional Redemption and the Issuer, shall direct the Trustee in writing to terminate or transfer to another party, and the Trustee shall terminate or transfer to another party in the manner directed by the Issuer in writing, the Credit Swap Agreement and shall notify the Trustee of such Optional Redemption in accordance with Section 9.2 and upon any such sale the Trustee shall release such Underlying Asset pursuant to Section 10.8.

(d)     The Issuer shall set the Redemption Date and the Record Date with respect to such Redemption Date and give notice thereof to the Issuer and the Trustee pursuant to <u>Section 9.2</u>. Installments of interest and principal due on or prior to a Redemption Date which shall not have been paid or duly provided for shall be payable to the Holders of the Notes as of the relevant Record Dates. Upon receipt of the direction of the Holders of the applicable percentage of P-1 Preference Shares with respect to the redemption of the Notes pursuant to <u>Section 9.1(a)</u>, the Co-Issuers shall deliver an Issuer Order to the Trustee directing the Trustee to make the payment to the Paying Agent of the applicable Redemption Price of all of the Notes to be redeemed from funds in the Issuer Accounts in accordance with the Priority of Payments. The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption in the Payment Account on or before the Business Day prior to the Redemption Date.

Section 9.2     <u>Notice to Trustee of Optional Redemption</u>. In the event of any redemption pursuant to Section 9.1, the Issuer shall, at least 30 days (but not more than 90 days) prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee and the Trustee shall notify the Credit Swap Counterparty, the Portfolio Manager and each Rating Agency of such Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Redemption Date and the Redemption Price of such Notes in accordance with <u>Section 9.1</u>.

Section 9.3     <u>Notice of Optional Redemption or Maturity by the Co-Issuers</u>. Notice of redemption pursuant to <u>Section 9.1</u> or the Maturity of any Class of Notes shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than ten (10) Business Days prior to the applicable Redemption Date or Maturity Date to each Rating Agency, to the Credit Swap Counterparty, to the Portfolio Manager and to each Holder of Notes to be redeemed pursuant to <u>Section 9.1</u>, at such Holder's address in the Note Register.

All notices of redemption shall state:

(a)     the applicable Redemption Date and Record Date with respect thereto (which shall be a date after the date on which such notice is deemed to be given pursuant to <u>Section 14.4</u>);

(b)     the Redemption Price for each Class of Notes;

(c)     that all the Notes of the relevant Class are being paid in full and that interest on such Notes shall cease to accrue on the date specified in the notice;

(d)     the place or places where such Notes to be redeemed, are to be surrendered for payment of the Redemption Price which shall be the office or agency of the Issuer to be maintained as provided in <u>Section 7.4</u>; and

(e)     the latest possible date upon which such notice of redemption may be withdrawn.

The Co-Issuers shall have the option to withdraw the notice of redemption on or prior to the fourth Business Day prior to the scheduled Redemption Date by written notice to the Trustee, the Rating Agencies, the Credit Swap Counterparty, the Portfolio Manager and (in the

case of a simultaneous redemption of the Preference Shares) the Shares Paying Agent only if (i) the Issuer shall be unable to deliver such sale agreement or agreements or certifications, as the case may be, in the form required under Section 9.1 of this Indenture or (ii) the Issuer receives written direction from a Majority of the P-1 Preference Shares to withdraw the notice of redemption; provided, that the Issuer shall not permit the Credit Swap Agreement to be terminated until such period for withdrawal has expired.  Notice of any such withdrawal shall be given by the Trustee to each Holder of Notes to be redeemed at such Holder's address appearing in the Note Register by overnight courier or if the address provided in the Note Register is insufficient for much purpose, by first-class mail), sent not later than the third Business Day prior to the scheduled Redemption Date.  In addition, if and for so long as any Class of Notes is listed on the Irish Stock Exchange, the Trustee will send notice of any withdrawal of such notice to the Company Announcements Office not less than the third Business Day prior to such Redemption Date.

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of Notes selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

Section 9.4    Notes Payable on Redemption Date.  Notice of redemption having been given as aforesaid, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless a default is made in the payment of the Redemption Price) such Notes (or the portion thereof to be redeemed) shall cease to bear interest.  Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of written notice to the Co-Issuers and the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

If any Note called for Optional Redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding.

Section 9.5    Certain Other Redemptions.  On any Payment Date on which the Coverage Tests were not met on the immediately preceding Determination Date, principal payments of the Notes will be made as set forth in Section 11.1.  The Redemption Price for each Note in any redemption of the Notes pursuant to this Section 9.5 will be equal to the Aggregate Outstanding Amount of such Note plus accrued interest thereon (including any Defaulted Interest and interest on Defaulted Interest, Defaulted Commitment Fees and interest on Defaulted Commitment Fees or, with respect to the Class D Notes and the Class E Notes, any Deferred Interest or Deferred Commitment Fees, as applicable).

If the principal and interest of any Class of Notes has been paid in full, if the Class A Commitments have been reduced to zero (and there is no funded outstanding principal

balance on the Class A Notes) or if the Class B-1 Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class B-1 Notes or the Class B-2 Notes) or if the Class E Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class E Notes) on any Payment Date as a result of the application of funds in accordance with this Section 9.5 or as otherwise provided herein, the Trustee shall send written notice within five (5) business days to each Rating Agency that such Class of Notes is no longer Outstanding.

## ARTICLE X

## ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    Collection of Money.    (a) Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Underlying Assets in accordance with the terms and conditions of such Pledged Underlying Assets.  The Trustee shall segregate and hold all such Money and property received by it in trust pursuant to the Granting Clauses, for the Secured Parties.

(b)        In addition, any Account may include any number of subaccounts deemed necessary or appropriate by the Trustee for convenience in administering the Accounts.  Each of the parties hereto hereby agrees that (i) each Account shall be deemed to be a "Securities Account" (as defined in Section 8-501 of the UCC), (ii) except as otherwise expressly provided herein, the Trustee will be exclusively entitled to exercise the rights that comprise each Financial Asset held in each Account, and (iii) the Trustee shall be permitted to establish any number of sub-accounts deemed necessary by the Trustee for convenience in administering each Issuer Account.  Each of the parties hereto hereby agrees to cause the Securities Intermediary to agree with the parties hereto that (x) subject to Section 10.11(c), the Cash and other property is to be treated as a Financial Asset under Article 8 of the UCC and (y) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York.  In no event may any Financial Asset held in any Issuer Account be registered in the name of, payable to the order of, or specially indorsed to, the Issuer unless such Financial Asset has also been indorsed in blank or to the Securities Intermediary that holds such Financial Asset in such Issuer Account.

Section 10.2    Collection Accounts; Custodial Account.

(a)        Collection Accounts.    (i) The Trustee shall, on or prior to the Closing Date, establish at the Custodian two segregated, non-interest bearing trust accounts in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Interest Collection Account and the Principal Collection Account, which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  The Trustee shall from time to time deposit (i) all Principal Proceeds of any Underlying Asset into the Principal Collection Account and (ii) all Interest Proceeds on any Underlying Asset into the Interest Collection Account.  All monies deposited from time to time in the Principal Collection Account and Interest Collection Account

pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided in subclauses (A) and (B) of Section 11.1(a) hereof.  The Custodian, acting on behalf of the Trustee, shall give the Issuer prompt notice if a Trust Officer has actual knowledge that the Principal Collection Account or the Interest Collection Account or any funds on deposit in such Accounts, or otherwise to the credit of such Accounts, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Principal Collection Account or the Interest Collection Account other than in accordance with the Priority of Payments.  At all times, the Principal Collection Account and the Interest Collection Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000.

(ii)     Except as otherwise expressly provided herein, the Trustee shall have no obligation to invest or reinvest any funds held in any accounts under this Article 10 in the absence of timely written direction and shall not be liable for the selection of investments or for investment losses incurred thereon.

(iii)    The Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such Monies in the Collection Accounts as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Monies are to be treated as Principal Proceeds or Interest Proceeds hereunder at its discretion.  All Monies deposited from time to time in the Collection Accounts pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided.

(iv)    All Distributions, any deposit required pursuant to Section 10.2(a)(iii) and any net proceeds from the sale or other disposition of an Eligible Investment received by the Trustee shall be immediately deposited into the applicable Collection Account subject to Sections 10.2(a)(i) and (ii).  By Issuer Order, the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Collection Accounts, as so directed in Eligible Investments having stated maturities no later than the Business Day immediately preceding the next Payment Date.

(v)     If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(a)(iv), the Trustee shall seek instructions from the Credit Swap Counterparty within three (3) Business Days after transfer of such funds to the Collection Accounts.  If the Trustee does not thereupon receive written instructions from the Credit Swap Counterparty within five (5) Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (iii) of the definition thereof maturing no later than the Business Day immediately preceding the next Payment Date.  After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Monies as fully as practicable in Eligible Investments of the type described in clause (iii)

145

of the definition thereof maturing not later than the earlier of (i) 30 days after the date of such investment and (ii) the Business Day immediately preceding the next Payment Date. All interest and other income from such investments shall be deposited in the Collection Accounts, any gain realized from such investments shall be credited to the Collection Accounts, and any loss resulting from such investments shall be charged to the Collection Accounts.  The Trustee shall not in any way be held liable by reason of any insufficiency of the Collection Accounts resulting from any loss relating to any such investment.

(vi)    The Trustee shall transfer to the Payment Account for application pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Payment Date Report prepared by the Issuer pursuant to Section 10.6(b), on or prior to the Business Day prior to each Payment Date, any amounts then held in the Collection Accounts.

(b)    Custodial Account.  The Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated, non-interest bearing trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Custodial Account, which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal and into which the Trustee shall from time to time deposit Collateral.  At all times, the Custodial Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000.  All Collateral deposited from time to time in the Custodial Account pursuant to this Indenture shall be held in trust by the Trustee and shall be applied to the purposes provided herein.  The Custodian, acting on behalf of the Trustee, agrees to give the Issuer prompt notice if a Trust Officer has actual knowledge that the Custodial Account or any Collateral on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.

(c)    The Trustee shall, at the direction of the Issuer, apply Interest Proceeds on dates other than Payment Dates to pay Administrative Expenses of the Co-Issuers, subject to the Administrative Expense Cap, if sufficient Interest Proceeds have theretofore been received to cover such payments.  The Trustee shall also, at the written direction of the Issuer, apply Principal Proceeds on dates, whether or not such dates are Payment Dates, including proceeds of the liquidation of the Specific Investment, and once the Specific Investment Instrument has been liquidated, amounts on deposit in the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B-1 Funding Account, the Class B-1 CDS Reserve Account, the Contingent Class E Funding Account, the Class E CDS Reserve Account and the amount of any draw downs on the Class A Notes, the Class B-1 Notes or the Class E Notes, to make payments required to be made to the Credit Swap Counterparty or to fund the Maturity Date Account with the Maturity Date Amount.  Withdrawals from the following accounts and draw downs on the Class A Notes, the Class B-1 Notes and the Class E Notes, as applicable, shall be made in order set forth in Section 10.4(k).

Section 10.3   Payment Account.  The Trustee shall, on or prior to the Closing Date, establish at the Custodian a single segregated, non-interest bearing trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Payment Account, which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  At all times, the Payment Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000.  Except as provided in Section 11.1, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes and make distributions on the Preference Shares, in each case in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified therein, each in accordance with the Priority of Payments.  Monies on deposit in the Payment Account shall remain uninvested.  All monies deposited from time to time in the Payment Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein.  The Custodian, acting on behalf of the Trustee agrees to give the Issuer prompt notice if a Trust Officer has actual knowledge that the Payment Account or any funds on deposit therein, or otherwise to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

Section 10.4   Contingent Class A Funding Account; Class A CDS Reserve Account; Contingent Class B-1 Funding Account; Class B-1 CDS Reserve Account; Contingent Class E Funding Account; Class E CDS Reserve Account; Credit Swap Issuer Account; Specific Investment Proceeds Account; Maturity Date Account.  (a) (i) The Issuer shall, on or prior to the Closing Date, establish at the Custodian a single segregated non-interest bearing trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Contingent Class A Funding Account and shall be held by the Custodian in accordance with the Securities Account Control Agreement, and into which the Issuer shall from time to time make such deposits and withdrawals as are required pursuant to this Section 10.4.  The Trustee shall establish sub-accounts as required for each purchaser of the Class A Notes.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Contingent Class A Funding Account shall be held in trust by the Trustee for the benefit of the Secured Parties.  Funds on deposit in, or otherwise to the credit of, the Contingent Class A Funding Account will be invested in Eligible Investments at the written direction of the related Class A Noteholder pending the application of such funds to cover draws on the applicable unfunded Class A Commitments.  All interest and other income from such investments shall be deposited in the appropriate Collection Account.  Any gain realized from such investments shall be credited to the appropriate Collection Account, and any loss resulting from such investments shall be charged to the appropriate Collection Account.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Contingent Class A Funding Account shall be pursuant to this Section 10.4.  At all times, the Contingent Class A Funding Account shall remain at an institution with a combined capital and surplus in excess of U.S.$200,000,000; provided, that such institution shall have a rating assigned by Moody's of no less than "Baa1" and a rating assigned by S&P of no less than "BBB"; provided, further, that if such institution is rated "Baa1" by Moody's, such institution shall not be on credit watch for possible downgrade by Moody's.  The Trustee agrees

147

to give the Co-Issuers prompt notice if a Trust Officer has actual knowledge that the Contingent Class A Funding Account or any funds on deposit therein, or otherwise to the credit of the Contingent Class A Funding Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Contingent Class A Funding Account other than in accordance with the provisions of this Indenture and the Securities Account Control Agreement.

(ii)     The required deposits into the Contingent Class A Funding Account are as follows:  On any day on which a Downgrade Draw occurs pursuant to the Class A Note Purchase Agreement, the Class A Note Agent shall deposit proceeds from the Downgrade Draw to a related sub account of the Contingent Class A Funding Account all in accordance with the Class A Note Purchase Agreement.  For so long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the funded portion of the Class A Notes (if such funding is a result of a Downgrade Draw) in an amount equal to the amount of earning on the Eligible Investments which is held in the related sub account of the Contingent Class A Funding Account in connection with a Downgrade Draw plus 0.08%; provided, however, that interest shall accrue on the portion of the Class A Notes that were funded other than as a result of the Downgrade Draw at a rate per annum equal to LIBOR plus 0.08%.  Any Class A Notes that remain Outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest on the funded portion of the Class A Notes in an amount equal to the lesser of (a) actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class A Notes and the denominator of which is the aggregate outstanding amount of all Classes of Notes and (b) the interest amount on the funded Class A Notes accrued at a rate of LIBOR.  Funds shall be withdrawn and applied from the Contingent Class A Funding Account as provided in Section 10.4(j) below.  Any funds deposited by a Class A Noteholder to the Contingent Class A Funding Account will be released to the Class A Noteholder upon the earliest to occur of (i) the assignment by the Class A Noteholder of its Class A Commitments to one or more eligible assignees and (ii) the date on which the Class A Noteholder or the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria, but only to the extent that such funds are not required to be applied pursuant to Section 10.4(j) below.

(iii)    On the Maturity Date, all remaining amounts (after any withdrawals provided for in Section 10.4(j) below) in the Contingent Class A Funding Account shall be transferred to the Payment Account for application as Principal Proceeds.

(b)     The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Class A CDS Reserve Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  At all times, the Class A CDS Reserve Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus

148

in excess of U.S.$200,000,000. Amounts will be deposited into the Class A CDS Reserve Account (i) subject to and in accordance with the Priority of Payments upon the failure of any Coverage Test (as provided in Section 11.1) and (ii) to the extent of any excess proceeds with respect to any Advances made in respect of the Class A Notes, such excess proceeds shall be deposited into the Class A CDS Reserve Account. Amounts on deposit from time to time in the Class A CDS Reserve Account will be invested in the Specific Investment Instrument. Interest earnings on amounts on deposit in the Class A CDS Reserve Account will constitute Interest Proceeds and will be withdrawn and deposited into the Interest Collection Account. Deposits to the Class A CDS Reserve Account will permanently reduce the undrawn Class A Commitments by the amount of such deposit. The amounts on deposit in the Class A CDS Reserve Account shall be withdrawn and applied as required under Section 10.4(j) below. On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(j) below) in the Class A CDS Reserve Account shall be transferred to the Payment Account for application as Principal Proceeds.

(c)      (i) The Issuer shall, on or prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Contingent Class B-1 Funding Account and shall be held by the Custodian in accordance with the Securities Account Control Agreement, and into which the Issuer shall from time to time make such deposits and withdrawals as are required pursuant to this Section 10.4. The Trustee shall establish sub-accounts as required for each purchaser of the Class B-1 Notes. Any and all funds at any time on deposit in, or otherwise to the credit of, the Contingent Class B-1 Funding Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Funds on deposit in, or otherwise to the credit of, the Contingent Class B-1 Funding Account will be invested in Eligible Investments at the written direction of the related Class B Noteholder pending the application of such funds to cover draws on the applicable unfunded Class B-1 Commitments. All interest and other income from such investments shall be deposited in the appropriate Collection Account. Any gain realized from such investments shall be credited to the appropriate Collection Account, and any loss resulting from such investments shall be charged to the appropriate Collection Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Contingent Class B-1 Funding Account shall be pursuant to this Section 10.4. At all times, the Contingent Class B-1 Funding Account shall remain at an institution with a combined capital and surplus in excess of U.S.$200,000,000; provided, that such institution shall have a rating assigned by Moody's of no less than "Baa1" and a rating assigned by S&P of no less than "BBB"; provided, further, that if such institution is rated "Baa1" by Moody's, such institution shall not be on credit watch for possible downgrade by Moody's. The Trustee agrees to give the Co-Issuers prompt notice if a Trust Officer has actual knowledge that the Contingent Class B-1 Funding Account or any funds on deposit therein, or otherwise to the credit of the Contingent Class B-1 Funding Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Contingent Class B-1 Funding Account other than in accordance with the provisions of this Indenture and the Securities Account Control Agreement.

(ii)      The required deposits into the Contingent Class B-1 Funding Account are as follows: On any day on which a Downgrade Draw occurs pursuant to the Class B-1 Note Purchase Agreement, the Class B-1 Note Agent shall deposit proceeds from the

Downgrade Draw to a related sub account of the Contingent Class B-1 Funding Account all in accordance with the Class B-1 Note Purchase Agreement. For so long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the funded portion of the Class B-1 Notes (if such funding is a result of a Downgrade Draw) in an amount equal to the actual amount of earnings on the Eligible Investments in the related sub account of the Contingent Class B-1 Funding Account in connection with a Downgrade Draw plus 0.67% of such funded portion per annum; provided, however, that interest shall accrue on the portion of the Class B-1 Notes that were funded other than as a result of the Downgrade Draw at a rate per annum equal to LIBOR plus 0.67%. Any Class B-1 Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest on the funded portion of the Class B-1 Notes in an amount equal to the lesser of (a) actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class B-1 Notes and the denominator of which is the aggregate outstanding amount of all Classes of Notes and (b) the interest amount on the funded Class B-1 Notes accrued at a rate per annum of LIBOR. Funds shall be withdrawn and applied from the Contingent Class B-1 Funding Account as provided in Section 10.4(j) below. Any funds deposited by a Class B-1 Noteholder to the Contingent Class B-1 Funding Account will be released to the Class B-1 Noteholder upon the earliest to occur of (i) the assignment by the Class B-1 Noteholder of its Class B-1 Commitment to one or more eligible assignees and (ii) the date on which the Class B-1 Noteholder or the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria (in either case, as evidenced to the Trustee by a certificate of such Class B-1 Noteholder, on which the Trustee may rely), but only to the extent that such funds are not required to be applied pursuant to Section 10.4(j) below.

(iii)    On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(j) below) in the Contingent Class B-1 Funding Account shall be transferred to the Payment Account for application as Principal Proceeds.

(d)    The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Class B-1 CDS Reserve Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. At all times, the Class B-1 CDS Reserve Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000. Amounts will be deposited into the Class B-1 CDS Reserve Account (i) subject to and in accordance with the Priority of Payments upon the failure of any Coverage Test (as provided in Section 11.1) and (ii) to the extent of any excess proceeds (as identified and instructed to the Trustee by Issuer Order) with respect to any Advances made in respect of the Class B-1 Notes, such excess proceeds shall be deposited into the Class B-1 CDS Reserve Account. Amounts on deposit from time to time in the Class B-1 CDS Reserve Account will be invested in the Specific Investment Instrument. Interest earnings on amounts on deposit in the Class B-1 CDS Reserve Account will constitute Interest Proceeds and will be withdrawn

150

and deposited into the Interest Collection Account. Deposits to the Class B-1 CDS Reserve Account will permanently reduce the Class B-1 CDS Commitments by the amount of such deposit. The amounts on deposit Class B-1 CDS Reserve Account shall be withdrawn and applied as required under Section 10.4(j) below. On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(j) below) in the Class B-1 CDS Reserve Account shall be transferred to the Payment Account for application as Principal Proceeds.

(e)    The Issuer shall, on or prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Contingent Class E Funding Account and shall be held by the Custodian in accordance with the Securities Account Control Agreement, and into which the Issuer shall from time to time make such deposits and withdrawals as are required pursuant to this Section 10.4. The Trustee shall establish sub-accounts as required for each purchaser of the Class E Notes. Any and all funds at any time on deposit in, or otherwise to the credit of, the Contingent Class E Funding Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Funds on deposit in, or otherwise to the credit of, the Contingent Class E Funding Account will be invested in Eligible Investments at the written direction of the related Class E Noteholder pending the application of such funds to cover draws on the applicable unfunded Class E Commitments. All interest and other income from such investments shall be deposited in the appropriate Collection Account. Any gain realized from such investments shall be credited to the appropriate Collection Account, and any loss resulting from such investments shall be charged to the appropriate Collection Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Contingent Class E Funding Account shall be pursuant to this Section 10.4. At all times, the Contingent Class E Funding Account shall remain at an institution with a combined capital and surplus in excess of U.S.$200,000,000; provided, that such institution shall have a rating assigned by Moody's of no less than "Baa1" and a rating assigned by S&P of no less than "BBB"; provided, further, that if such institution is rated "Baa1" by Moody's, such institution shall not be on credit watch for possible downgrade by Moody's. The Trustee agrees to give the Co-Issuers prompt notice if a Trust Officer has actual knowledge that the Contingent Class E Funding Account or any funds on deposit therein, or otherwise to the credit of the Contingent Class E Funding Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Contingent Class B-1 Funding Account other than in accordance with the provisions of this Indenture and the Securities Account Control Agreement.

(i)    The required deposits into the Contingent Class E Funding Account are as follows: On any day on which a Downgrade Draw occurs pursuant to the Class E Note Purchase Agreement, the Class E Note Agent shall deposit proceeds from the Downgrade Draw to a related sub account of the Contingent Class E Funding Account all in accordance with the Class E Note Purchase Agreement. For so long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the funded portion of the Class E Notes (if such funding is a result of a Downgrade Draw) in an amount equal to the actual amount of earnings on the Eligible Investments in the related sub account of the Contingent Class E Funding Account in connection with a Downgrade Draw plus 4.50% of such funded portion per annum; provided, however, that interest shall accrue on the portion of the Class E Notes that were funded other than as a result of

the Downgrade Draw at a rate per annum equal to LIBOR plus 4.50%.  Any Class E Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest on the funded portion of the Class E Notes in an amount equal to the lesser of (a) actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class E Notes and the denominator of which is the aggregate outstanding amount of all Classes of Notes and (b) the interest amount on the funded Class E Notes accrued at a rate per annum of LIBOR.  Funds shall be withdrawn and applied from the Contingent Class E Funding Account as provided in <u>Section 10.4(j)</u> below.  Any funds deposited by a Class E Noteholder to the Contingent Class E Funding Account will be released to the Class E Noteholder upon the earliest to occur of (i) the assignment by the Class E Noteholder of its Class E Commitment to one or more eligible assignees and (ii) the date on which the Class E Noteholder or the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria (in either case, as evidenced to the Trustee by a certificate of such Class E Noteholder, on which the Trustee may rely), but only to the extent that such funds are not required to be applied pursuant to <u>Section 10.4(j)</u> below.

(ii)     On the Maturity Date, all remaining amounts (after any withdrawals provided for <u>Section 10.4(j)</u> below) in the Contingent Class E Funding Account shall be transferred to the Payment Account for application as Principal Proceeds.

(f)     The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Class E CDS Reserve Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  At all times, the Class E CDS Reserve Account shall remain at an institution with a long-term unsecured debt rating of at least "<u>Baa1</u>" by Moody's and "<u>BBB</u>" by S&P and with combined capital and surplus in excess of U.S.$200,000,000.  Amounts will be deposited into the Class E CDS Reserve Account (i) subject to and in accordance with the Priority of Payments upon the failure of any Coverage Test (as provided in Section 11.1) and (ii) to the extent of any excess proceeds (as identified and instructed to the Trustee by Issuer Order) with respect to any Advances made in respect of the Class E Notes, such excess proceeds shall be deposited into the Class E CDS Reserve Account.  Amounts on deposit from time to time in the Class E CDS Reserve Account will be invested in the Specific Investment Instrument.  Interest earnings on amounts on deposit in the Class E CDS Reserve Account will constitute Interest Proceeds and will be withdrawn and deposited into the Interest Collection Account.  Deposits to the Class E CDS Reserve Account will permanently reduce the Class E Commitments by the amount of such deposit.  The amounts on deposit Class E CDS Reserve Account shall be withdrawn and applied as required under <u>Section 10.4(j)</u> below.  On the Maturity Date, all remaining amounts (after any withdrawals provided for <u>Section 10.4(j)</u> below) in the Class E CDS Reserve Account shall be transferred to the Payment Account for application as Principal Proceeds.

(g)    The Trustee shall establish a single, segregated trust account in the name "White Marlin CDO 2007-1, Ltd." which shall be designated as the Credit Swap Issuer Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal in accordance with the Credit Swap Agreement. At all times, the Credit Swap Issuer Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000. The Credit Swap Posted Amount posted by the Credit Swap Counterparty shall be deposited into this account and any withdrawals from or deposits to this account shall be made in accordance with the Credit Swap Agreement. Amounts in the Credit Swap Issuer Account shall only be invested in (i) cash and (ii) any securities issued by any offshore money market fund or similar investment vehicle having at all times a long-term credit rating of "AAA," "AAAf," "AAAm" or "AAAm-G" by S&P and a long-term credit rating of "Aaa" by Moody's at all times, as directed by the Portfolio Manager.

(h)    (i) The Trustee shall establish at the Custodian a single, segregated trust account in the name "White Marlin CDO 2007-1, Ltd." which shall be designated as the Specific Investment Proceeds Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. At all times, the Specific Investment Proceeds Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000. Proceeds of the Specific Investment Instrument received by the Trustee from time to time shall be deposited in the Specific Investment Proceeds Account. The Trustee shall make withdrawals at any time to make payments due to the Credit Swap Counterparty under the Credit Swap Agreement, as provided in this Section 10.4(h).

(ii)    Upon the occurrence of a Credit Event with respect to a Reference Entity, as determined and notified to the Trustee by the Portfolio Manager or the Credit Swap Calculation Agent,

first, the excess or residual proceeds of the Specific Investment Instrument held in the Specific Investment Proceeds Account that are not invested in the Specific Investment Instrument shall be used to pay the Credit Swap Counterparty the Cash Settlement Amount,

second, if the amount so generated in the foregoing clause is insufficient to pay such Cash Settlement Amount in full to the Credit Swap Counterparty and if the Class E Notes have not been previously drawn down, then the Specific Investment Instrument shall be liquidated to the extent necessary to pay the remainder of the Cash Settlement Amount, provided that the amount liquidated shall not be greater than the difference of (a) the Specific Investment Instrument balance prior to the liquidation and (b) the sum of the Class B-2 Amount, the Class C Amount and the Class D Amount,

third, if the amounts so generated in the foregoing two clauses are insufficient to pay such Cash Settlement Amount in full to the Credit Swap Counterparty, then withdrawals from the account and draw down on the Class E Notes shall be made in

153

accordance with Section 10.4(j) of the Indenture to the extent necessary to pay the remainder of the Cash Settlement Amount,

fourth, if the amounts so generated in the foregoing three clauses are insufficient to pay such Cash Settlement Amount in full to the Credit Swap Counterparty, then the Specific Investment Instrument shall be liquidated to the extent necessary to pay the remainder of the Cash Settlement Amount, provided that the amount liquidated shall not be greater than the difference of (a) the Specific Investment Instrument balance prior to the liquidation and (b) the Class B-2 Amount,

fifth, if the amounts so generated in the foregoing four clauses are insufficient to pay such Cash Settlement Amount in full to the Credit Swap Counterparty, then withdrawals from the account and draw down on the Class B-1 Notes shall be made in accordance with Section 10.4(j) of the Indenture and pro rata with liquidation of the Notes Sources to the extent necessary to pay the remainder of the Cash Settlement Amount, and

sixth, if the amounts so generated in the foregoing five clauses are insufficient to pay such Cash Settlement Amount in full to the Credit Swap Counterparty, then withdrawals from the account and draw down on the Class A Notes shall be made in accordance with Section 10.4(j) of the Indenture to the extent necessary to pay the remainder of the Cash Settlement Amount.

(iii)     On or following the payment of the Cash Settlement Amount in full to the Credit Swap Counterparty, the related Recovery Amount shall be applied in accordance with the following priority,

first, the funded outstanding principal balance of the Class A Notes shall be reduced by liquidating the Notes Sources and transferring such amounts to the Payment Account for application on the next Payment Date as Principal Proceeds,

second, the undrawn Class A Commitments shall be reduced,

third, the funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion shall be reduced pro rata by liquidating the Notes Sources and transferring such amounts to the Payment Account for application on the next Payment Date as Principal Proceeds,

fourth, the undrawn Class B-1 Commitments and the Class B-2 Outstanding Portion Amount shall be reduced pro rata (for the avoidance of doubt, the Class B-2 Outstanding Portion Amount shall be reduced by liquidating the Notes Sources and transferring such amounts to the Payment Account for application on the next Payment Date as Principal Proceeds while the Class B-1 Commitments will be reduced),

fifth, the Class C-1 and Class C-2 outstanding principal balances shall be reduced pro rata by liquidating the Notes Sources and transferring such amounts to the Payment Account for application on the next Payment Date as Principal Proceeds,

<u>sixth</u>, the Class D outstanding principal balance shall be reduced by liquidating the Notes Sources and transferring such amounts to the Payment Account for application on the next Payment Date as Principal Proceeds,

<u>seventh</u>, the funded outstanding principal balance of the Class E Notes shall be reduced by liquidating the Notes Sources and transferring such amounts to the Payment Account for application on the next Payment Date as Principal Proceeds,

<u>eighth</u>, the undrawn Class E Commitments shall be reduced, and

<u>ninth</u>, any remaining Recovery Amount shall be deposited to the Preference Share Distribution Account for distribution to the Preference Share holders;

*provided*, that to the extent that any Class A Commitments, Class B-1 Commitments or Class E Commitments that are being reduced have previously been funded as a result of a Downgrade Draw, the amount of such reduction shall be withdrawn from the applicable sub-account of the Contingent Class A Funding Account, the applicable sub-account of the Contingent Class B-1 Funding Account or the applicable sub-account of the Contingent Class E Funding Account and paid to the holders of the Class A Notes, Class B-1 Notes or Class E Notes, as applicable.  For the avoidance of doubt, note principal and commitment balances mentioned in each of clause (ii) above and this clause (iii) shall be fully reduced before note principal and commitment balances mentioned in subsequent clauses will be reduced by the Recovery Amount.

(iv)    On any Business Day during the Reinvestment Period, the Portfolio Manager may, at its sole discretion, direct any amount up to but not exceeding the aggregate amount of Removal Fees received by the Issuer to be reinvested in the Specific Investment Instrument in order to enable the Issuer at any time during the Reinvestment Period (at the direction of the Portfolio Manager) to increase the aggregate Reference Entity Calculation Amount by adding Reference Entities and/or increasing the Reference Entity Calculation Amount of Reference Entities currently present in the Reference Portfolio; if Removal Fees are received by the Issuer, pending such direction, the Trustee shall (pursuant to the direction of the Portfolio Manager) invest such Removal Fees in Eligible Investments selected by the Portfolio Manager.  Except as provided in the preceding sentence, the Trustee shall not be under any obligation to invest (or otherwise pay interest on) amounts held in the Specific Investment Proceeds Account from time to time awaiting disbursement.

(v)    Upon removal of a Reference Entity with respect to which a Credit Event has not occurred from the Reference Portfolio by the Portfolio Manager on behalf of the Issuer (any such Reference Entity, an "Issuer Removed Reference Entity"), if the Issuer is required to pay a Removal Fee to the Credit Swap Counterparty,

<u>first</u>, the excess or residual proceeds of the Specific Investment Instrument held in the Specific Investment Proceeds Account that are not invested in the Specific Investment Instrument shall be used to pay the Credit Swap Counterparty the Removal Fee,

second, if the amount so generated in the foregoing clause is insufficient to pay such Removal Fee in full to the Credit Swap Counterparty and if the Class E Notes have not been previously drawn down, then the Specific Investment Instrument shall be liquidated to the extent necessary to pay the remainder of the Removal Fee, provided that the amount liquidated shall not be greater than the difference of (a) the Specific Investment Instrument balance prior to the liquidation and (b) the sum of the Class B-2 Amount, the Class C Amount and the Class D Amount,

third, if the amounts so generated in the foregoing two clauses are insufficient to pay such Removal Fee in full to the Credit Swap Counterparty, then withdrawals from the account and draw down on the Class E Notes shall be made in accordance with Section 10.4(j) of the Indenture to the extent necessary to pay the remainder of the Removal Fee,

fourth, if the amounts so generated in the foregoing three clauses are insufficient to pay such Removal Fee in full to the Credit Swap Counterparty, then the Specific Investment Instrument shall be liquidated to the extent necessary to pay the remainder of the Removal Fee, provided that the amount liquidated shall not be greater than the difference of (a) the Specific Investment Instrument balance prior to the liquidation and (b) the Class B-2 Amount,

fifth, if the amounts so generated in the foregoing four clauses are insufficient to pay such Removal Fee in full to the Credit Swap Counterparty, then withdrawals from the account and draw down on the Class B-1 Notes shall be made in accordance with Section 10.4(j) of the Indenture and pro rata with liquidation of the Notes Sources to the extent necessary to pay the remainder of the Removal Fee, and

sixth, if the amounts so generated in the foregoing five clauses are insufficient to pay such Removal Fee in full to the Credit Swap Counterparty, then withdrawals from the account and draw down on the Class A Notes shall be made in accordance with Section 10.4(j) of the Indenture to the extent necessary to pay the remainder of the Removal Fee.

(vi)      Upon the occurrence of the Maturity Date, the Specific Investment Instrument shall be liquidated and its proceeds (together with any other proceeds on the Specific Investment Proceeds Account but, for the avoidance of doubt, after application required under clause (ii) above) shall be transferred to the Maturity Account to the extent needed to fund the Maturity Date Amount, if any, and thereafter to the Payment Account for application as Principal Proceeds.

(vii)     The Trustee shall be entitled to receive and rely upon notices and directions from the Credit Swap Calculation Agent, Credit Swap Counterparty and/or the Portfolio Manager, as applicable, with respect to matters arising under and amounts due and payable under the Credit Swap Agreement, from time to time, for all purposes of this Section 10.4(h).

(i)    The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "White Marlin CDO 2007-1, Ltd.," which shall be designated as the Maturity Date Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  At all times, the Maturity Date Account shall remain at an institution with a long-term unsecured debt rating of at least "Baa1" by Moody's and "BBB" by S&P and with combined capital and surplus in excess of U.S.$200,000,000.  Funds on deposit in, or otherwise to the credit of, the Maturity Date Account will be invested in Eligible Investments at the written direction of the Credit Swap Calculation Agent.  The Maturity Date Amount shall be deposited on the first Payment Date on or after the Maturity Date pursuant to Section 11.1(a)(B)(i).  Such Maturity Date Amount shall be taken from Principal Proceeds (including proceeds of the liquidation of the Specific Investment Instrument), and, to the extent that Principal Proceeds are not sufficient to make deposits into the Maturity Date Account, the Issuer will make withdrawals or draw downs, as applicable, as provided in Section 10.4(h), in each case to the extent necessary to fund the Maturity Date Account with the Maturity Date Amount and deposit the proceeds of such Principal Proceeds, withdrawals and/or draw downs in the Maturity Date Account.  Withdrawals from the Maturity Date Account shall be made to make payments pursuant to Section 11.1(a)(C) and Section 11.1(a)(D) as applicable.

(j)    Other than in respect of a Class A Downgrade Draw, Class B-1 Downgrade Draw, or Class E Downgrade Draw, draw downs on the Class A Notes, Class B-1 Notes, and Class E Notes and withdrawals from the accounts and Notes Sources will be made in the following order:

first, the Notes Sources until the amount in the Notes Sources is no more than the sum of (x) the Class B-2 Amount, (y) the Class C Amount and (z) the Class D Amount,

second, the Class E CDS Reserve Account, until no funds remain in such account,

third, the Class E Notes up to the full undrawn amount of the Class E Commitments,

fourth, the Notes Sources until the amount in the Notes Sources is no more than the Class B-2 Amount,

fifth, the Class B-1 CDS Reserve Account pro rata with an amount from the Notes Sources that is equal to a) the Class B-2 principal balance as of the Closing Date *multiplied by* b) the Class B-1 CDS Reserve (for the avoidance of doubt, prior to the withdrawals stipulated by this clause) and *divided by* c) the Class B-1 commitment balance as of the Closing Date, until no funds remain in the Class B-1 CDS Reserve Account,

sixth, the Class B-1 Notes up to the full undrawn amount of the Class B-1 Commitments pro rata with the Notes Sources,

seventh, the Class A CDS Reserve Account, until no funds remain in such account,

eighth, the Class A Notes up to the full undrawn amount of the Class A Commitments,

provided that, to the extent any of the Class A Notes, Class B-1 Notes or the Class E Notes are drawn down as a result of a Downgrade Draw, and draw downs are to be made on any such Note, the amount of such draw down shall be withdrawn from the related sub-accounts of the Contingent Class A Funding Account, Contingent Class B-1 Funding Account or Contingent Class E Funding Accounts, as applicable.

The Class A Notes may be drawn down in respect of a Class A Downgrade Draw at any time the conditions for such a Class A Downgrade Draw have been satisfied as described in "Description of the Securities—Draws and Payments on the Class A Notes, Class B-1 Notes and Class E Notes—Draws on the Class A Notes".

The Class B-1 Notes may be drawn down in respect of a Class B-1 Downgrade Draw at any time the conditions for such a Class B-1 Downgrade Draw have been satisfied as described in "Description of the Securities—Draws and Payments on the Class A Notes, Class B-1 Notes, and Class E Notes—Draws on the Class B-1 Notes".

The Class E Notes may be drawn down in respect of a Class E Downgrade Draw at any time the conditions for such a Class E Downgrade Draw have been satisfied as described in "Description of the Securities—Draws and Payments on the Class A Notes, Class B-1 Notes, and Class E Notes—Draws on the Class E Notes".

(k)    On any Payment Date, the Portfolio Manager, at its sole discretion, may direct any amount, up to but not exceeding the Availability Amount on such Payment Date (such amount, the "Special Amortization Amount"), to be applied in the following manner (and order of priority):

first, to the payment of principal of the Class A Notes in accordance with the funded outstanding principal balance of the Class A Notes until the funded outstanding principal balance of the Class A Notes is reduced to zero,

second, in accordance with the unfunded Class A Commitments, to make a deposit to the Class A CDS Reserve Account in an amount sufficient to reduce the Class A Commitments to zero,

third, to the payment of principal of the Class B-1 Notes and the Class B-2/B-1 Portion pro rata until the funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion is reduced to zero,

fourth, pro rata, in accordance with the unfunded Class B-1 Commitments and outstanding principal balance of the Class B-2 Notes, to make a deposit to the Class B-1 CDS Reserve Account and to pay the principal of the Class B-2 Notes in an amount sufficient to reduce the Class B-1 Commitments and the principal balance of the Class B-2 Notes to zero,

fifth, to pay the principal of the Class C Notes *pro rata* between the Class C-1 Notes and the Class C-2 Notes until the outstanding principal balance of the Class C Notes is reduced to zero,

sixth, to pay the principal of the Class D Notes until the outstanding principal balance of the Class D Notes is reduced to zero,

seventh, to the payment of principal of the Class E Notes until the funded outstanding principal balance of the Class E Notes is reduced to zero, and

eighth, in accordance with the unfunded Class E Commitments, to make a deposit to the Class E CDS Reserve Account in an amount sufficient to reduce the Class E Commitments to zero.

Section 10.5    Reports by Trustee.  The Trustee shall supply in a timely fashion to the Issuer, S&P, Moody's, the Credit Swap Counterparty, the Portfolio Manager and the Shares Paying Agent any information regularly maintained by the Trustee that the Issuer or the Shares Paying Agent may from time to time request with respect to the Pledged Underlying Assets, the applicable Collection Account, the Payment Account, the Credit Swap Issuer Account, the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B-1 Funding Account, the Class B-1 CDS Reserve Account, the Contingent Class E Funding Account, the Class E CDS Reserve Account, the Custodial Account, the Maturity Date Account and the Specific Investment Proceeds Account reasonably needed to complete the Payment Date Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.6 or to permit the Shares Paying Agent to perform its obligations under the Shares Paying Agency Agreement.   The Trustee shall forward to the Credit Swap Counterparty, the Shares Paying Agent, the Portfolio Manager and to any Holder of a Note shown on the Note Register upon request therefor, copies of notices and other writings received by it from the issuer of any Underlying Asset or from any Clearing Agency with respect to any Underlying Asset advising the Holders of such security of any rights that the Holders might have with respect thereto (including, without limitation, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.6    Accountings.

(a)    Monthly Report.   Not later than the thirteenth Business Day of each month, excluding any month in which a Payment Date falls, commencing in July 2007, the Trustee shall compile and make available to each Rating Agency, the Portfolio Manager, the Managers, the Trustee, the Shares Paying Agent, the Credit Swap Counterparty, and, upon written request therefor in substantially the form attached hereto as Exhibit J, any beneficial holder of an interest in a Global Note, a monthly report (the "Monthly Report").  The Monthly Report shall contain the following information and instructions with respect to the Collateral, determined as of the fifth Business Day of such calendar month:

(1)    the aggregate Reference Entity Calculation Amount of all Reference Entities as to which a Credit Event has not occurred;

(2)     the Balance of all Eligible Investments and Cash in each of the Collection Accounts, the Payment Account, the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B-1 Funding Account, the Class B-1 CDS Reserve Account, the Contingent Class E Funding Account, the Class E CDS Reserve Account, the Specific Investment Proceeds Account, the Credit Swap Issuer Account, the Custodial Account, the Maturity Date Account and the Preference Share Distribution Account;

(3)     the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds, Principal Proceeds and Disposition Proceeds, received since the date of determination of the last Monthly Report;

(4)     with respect to each Reference Entity, the Reference Spread, annual interest rate of the Benchmark Obligation, Maturity Date of the Benchmark Obligation, Reference Maturity, Reference Entity domicile, whether Restructuring is applicable, Moody's Rating (for the avoidance of doubt, those Reference Entities for which the Default Probability Rating is determined pursuant to subclause (i) of the Moody's Equivalent Senior Unsecured Rating shall be deemed to have a rating of "NR" for purposes of the Monthly Report), S&P Rating, Moody's CDOROM™ Recovery Rate Mean, Moody's industry and industry code of each Reference Entity and S&P industry and industry code of each Reference Entity and Eligible Investment purchased with funds from the Collection Accounts;

(5)     a calculation in reasonable detail necessary to determine compliance with each Coverage Test and the levels required for each such test pursuant to this Indenture;

(6)     a calculation in reasonable detail necessary to determine compliance with each of the S&P CDO Monitor Test and the Trading Model Test;

(7)     an independent verification of the inputs of "Moody's Rating" used to run the Trading Model Test obtained from reputable public sources, including, without limitation, "Bloomberg.com" and "Moody's Investor Services";

(8)     the occurrence of any redemption of any or all Classes of Notes, if applicable, draw downs on the Class A Notes, the Class A Note Commitment, draw downs on the Class B-1 Notes, the Class B-1 Note Commitment, draw downs on the Class E Notes, the Class E Note Commitment and the Outstanding Amount of each Class of Notes;

(9)     the breach of any covenant, representation or warranty by any party to any Operative Agreement since the last report, as to which the Issuer has been notified in writing;

(10)     the termination or change of any party to any Operative Agreement, as to which the Issuer has been notified in writing;

(11)    the amendment or waiver of any Operative Agreement, as to which the Issuer has been notified in writing;

(12)    with respect to Credit Swap Agreement, any change in the notional balance thereof;

(13)    the Moody's Rating and S&P Rating for each Reference Entity;

(14)    with respect to the Reference Entities, separately stated, the aggregate Reference Entity Calculation Amount of all such Reference Entities divided by the aggregate Reference Entity Calculation Amount of all Reference Entities with a Moody's Rating of "Aaa," "Aa1," "Aa2," "Aa3," "A1," "A2," "A3," "Baa1," "Baa2," "Baa3," "Ba1," "Ba2," "Ba3," "B1," "B2," "B3," "Caa1," "Caa2," "Caa3," "Ca" and "C" and Moody's Ratings actions since the last report and action date;

(15)    with respect to the Reference Entities, separately stated, the aggregate Reference Entity Calculation Amount of all such Reference Entities divided by the aggregate Reference Entity Calculation Amount of all Reference Entities with a S&P Rating of "AAA," "AA+," "AA," "AA-," "A+," "A," "A-," "BBB+," "BBB," "BBB-," "BB+," "BB," "BB-," "B+," "B," "B-," "CCC+," "CCC," "CCC-," and "D" and S&P's Ratings actions since the last report and action date;

(16)    copies of all Credit Event Notices delivered during such month and a list of all Cash Settlement Amounts, Recovery Amounts and Final Prices paid during such month for Moody's industry classification;

(17)    copies of all Credit Event Notices delivered during such month and a list of all Cash Settlement Amounts, Recovery Amounts and Final Prices paid during such month for S&P's industry classification;

(18)    a list of all Reference Entities effectively added or increased by the Issuer during such month, the Trade Effective Date of each addition or increase, a list of all Reference Spreads determined for each addition or increase and the resulting Reference Entity Calculation Amount for each such Reference Entity after such addition or increase; and

(19)    a list of all Reference Entities effectively removed or reduced by the Issuer during such month, the Trade Effective Date of each removal or reduction, a list of all Removal Fees paid (for each such fee specifying whether it was paid to the Credit Swap Counterparty or whether it was paid to the Issuer) for each removal or reduction and the resulting Reference Entity Calculation Amount after each reduction and whether such Reference Entity was a Credit Risk Reference Entity or Credit Improved Reference Entity.

In each Monthly Report, the non-public/implied S&P ratings shall be represented by an asterisk (*). The means by which any such non-public/implied rating was derived will not be disclosed in such report.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained therein to the information contained in its records with respect to the Collateral, the Trading Model Test and the Moody's Rating and shall, within three (3) Business Days after receipt of such Monthly Report, notify the Issuer, the Credit Swap Counterparty, the Portfolio Manager and the Rating Agencies (or, with respect to discrepancies related to the Trading Model Test and the Moody's Rating notify Moody's only) if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, Trading Model Test and the Moody's Rating. In the event that any discrepancy exists, the Trustee and the Issuer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five (5) Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

(b)     Payment Date Accountings. The Trustee shall render an accounting ("Payment Date Report"), determined as of each Determination Date, and make such Payment Date Report available to each Rating Agency, the Credit Swap Counterparty, the Portfolio Manager, the Managers, the Trustee, the Shares Paying Agent, and, upon written request therefor in substantially the form attached hereto as Exhibit J, any beneficial holder of a Global Note or Certificated Note not later than the Business Day preceding the related Payment Date. The Payment Date Report shall contain the following information determined, unless otherwise specified below, as of the related Determination Date:

(1)     (A) the Aggregate Outstanding Amount of the Notes of each Class and sub-Class, including as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the Closing Date, (B) the amount of principal payments to be made on the Notes of each Class on the related Payment Date, (C) the amount of any Class D Deferred Interest, Class E Deferred Interest and any Class E Deferred Commitment Fees and (D) the amount of Class A Commitments, Class B-1 Commitments and Class E Commitments (in each case, whether funded or unfunded) which remain outstanding;

(2)     the Interest Distribution Amount, if any, to be paid on related Payment Date in the aggregate and separately for the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes and the Class A Commitments, the Class B-1 Commitments and the Class E Commitments accrued with respect to the related Payment Date;

(3)     (u) the Administrative Expenses payable on the next Payment Date on an itemized basis and (y) the Portfolio Management Fees payable on the next Payment Date;

162

(4)    the amounts deposited in the Class A CDS Reserve Account, the Class B-1 Reserve Account and the Class E CDS Reserve Account;

(5)    for the Collection Accounts:

(A)    the Balance on deposit in the Collection Accounts at the end of the related Due Period;

(B)    the amounts payable from the Collection Accounts pursuant to Sections 11.1(a)(A) and 11.1(a)(B) on the next Payment Date; and

(C)    the Balance remaining in the Collection Accounts immediately after all payments and deposits to be made on such Payment Date;

(6)    the Balance on deposit in the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B-1 Funding Account, the Class B-1 CDS Reserve Account, the Contingent Class E Funding Account, the Class E CDS Reserve Account, the Custodial Account, the Maturity Date Account, the Specific Proceeds Investment Account and the Credit Swap Issuer Account on such Payment Date;

(7)    the information required under Section 10.6(a) for such Determination Date;

(8)    the Class A Note Interest Rate, the Class B Note Interest Rate, the Class C Note Interest Rate, the Class D Note Interest Rate and the Class E Note Interest Rate, in each case for the Interest Period preceding the next Payment Date;

(9)    the amounts expected to be distributed from the Preference Share Distribution Account to the Holders of the Preference Shares;

(10)    whether the Collateral Quality Tests are satisfied;

(11)    a list of all Reference Entities with respect to which Credit Event Notices have been delivered during such month and a list of all Cash Settlement Amounts, Recovery Amounts and Final Prices paid during such month in connection with each Reference Entity;

(12)    a list of all Reference Entities effectively added or increased by the Issuer during such month, the effective date of each addition or increase, a list of all Reference Spreads determined for each addition or increase, the resulting Reference Entity Calculation Amount for each such Reference Entity after such addition or increase and the Reference Maturity for each effectively added Reference Entity; and

(13)    a list of all Reference Entities effectively removed or reduced by the Issuer during such month, the effective date of each removal or reduction, a list of all Removal Fees paid (for each such fee specifying whether it was paid to the Credit Swap Counterparty or whether it was paid to the Issuer) for each removal or reduction and the resulting Reference Entity Calculation Amount after each reduction and whether such Reference Entity was a Credit Risk Reference Entity or Credit Improved Reference Entity; and

(14)    confirmation that the Portfolio Manager has, with respect to the White Marlin CDO 2007-1, Limited Cashflow Model:  (a) updated the dates in such model to reflect that a Payment Date has passed; (b) updated the notional amounts of the Notes used in such model to reflect any changes to the Outstanding amounts of such Notes, (c) updated the Moody's Default Timing Vectors and the Moody's Idealised Expected Loss Percentage Hurdles Table, when applicable, and (d) made any additional changes deemed necessary by each of the Trustee and the Portfolio Manager to ensure that such model is kept current with respect to the rest of the transaction.

Each Payment Date Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established in, Section 11.1(a).

The Payment Date Report shall state that it is for informational purposes only; that certain information included in the report is estimated, approximated or projected; and that the report is provided without any representations or warranties as to accuracy or completeness and none of the Issuer, the Co-Issuer, the Collateral Administrator, the Credit Swap Counterparty, the Portfolio Manager, the Managers or the Trustee shall have any liability for or arising out of the use of such estimates, approximations or projections.

(c)    Annual Notice to Holders of Interests in Rule 144A Global Notes.  On or prior to the Payment Date occurring in December of each year (but not more than 10 Business Days prior to such Payment Date), commencing with the Payment Date occurring in December 2007, the Issuer shall deliver a notice in the form of Exhibit C to Exhibit K to each Agent Member holding a beneficial interest in any Rule 144A Global Note.

(d)    Redemption Date Instructions.  Not less than five (5) Business Days after receiving an Issuer Request requesting information regarding a redemption of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer and the Issuer shall compute the following information and provide such information in a statement (the "Redemption Date Statement") delivered to the Trustee and the Issuer:

(i)    the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii)     the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date; and

(iii)     the amount in the Collection Accounts available for application to the redemption of such Notes.

(e)     The Trustee shall deliver or cause to be delivered to S&P as promptly as possible after the Closing Date the S&P Electronic Default Model Input File and an electronic file containing an amended Schedule of Reference Entities, in each case prepared as of such date (with a copy of such Schedule of the Reference Entities to Moody's), which schedule shall include, with respect to each Underlying Asset, the name of the Reference Entity, the CUSIP number, loan identification number or similar identifier (to the extent available), the S&P Rating, the S&P Priority Category and the Reference Entity Calculation Amount.  In addition, the Issuer shall deliver or cause to be delivered to S&P (via email) on the same date as each Monthly Report is delivered, the S&P Electronic Default Model Input File and an electronic file containing an amended Schedule of Reference Entities, in each case prepared as of the date of such Monthly Report; provided, however, that if a Payment Date occurs during the month in which such Monthly Report is delivered, such files shall be prepared as of the Determination Date applicable to such Payment Date and shall be delivered the Business Day prior to such Payment Date.

(f)     If the Trustee shall not have received any accounting provided for in this Section 10.6 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date.  To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Collateral Administrator on behalf of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be paid as an Administrative Expense pursuant to Section 11.1.

(g)     The Trustee shall deliver or cause to be delivered to the Credit Swap Counterparty, at the expense of the Issuer, copies of any reports or information received from the Portfolio Manager.

Section 10.7     Custodianship and Release of Collateral.   (a) The Trustee shall hold all Certificated Securities that are not Clearing Corporation Securities and other Underlying Asset existing in physical form at the office of the Custodian.  Initially, such Custodian shall be the Bank.  Any successor custodian shall be a state or national bank or trust company or an Affiliate of the Issuer, have capital and surplus of at least U.S.$200,000,000 and carry a rating of at least "BBB" or higher by S&P and at least "Baa1" by Moody's.  All Clearing Corporation Securities shall be held by the Depositary for the account of the Bank, as Trustee.

(b)     The Trustee shall deposit all distributions on (i) the Underlying Asset and any proceeds received from the disposition of the Underlying Asset and any amounts payable to the Issuer by Credit Swap Counterparty under the Credit Swap Agreement, to the extent that such distributions, proceeds or amounts constitute Interest Proceeds from the Underlying Asset,

to the Interest Collection Account; and (ii) the Underlying Asset and any proceeds received from the disposition of any Underlying Asset, to the extent that such distributions or proceeds constitute Principal Proceeds from an Underlying Asset, to the Principal Collection Account (unless, in any of the foregoing cases, simultaneously reinvested in Eligible Investments or in the case of Principal Proceeds to make payments to the Credit Swap Counterparty).

(c)    The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

Section 10.8    <u>Reports by Independent Accountants</u>.  (a) At the Closing Date the Issuer shall appoint a firm of Independent certified public accountants of national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture.  Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee, the Portfolio Manager and each of the Rating Agencies a successor thereto that shall also be a firm of Independent certified public accountants of recognized international reputation.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee and the Rating Agencies of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer, as an Administrative Expense subject to <u>Section 11.1</u>.

(b)    On or before one Business Day prior to each Payment Date, the Issuer shall cause to be delivered to the Trustee, the Credit Swap Counterparty and each of the Rating Agencies a statement from a firm of Independent certified public accountants indicating (i) that such firm has reviewed the Payment Date Report for the upcoming Payment Date and, commencing with respect to the Payment Date occurring in September 2007, any Redemption Date Statements received since the last review and applicable information from the Trustee, (ii) that the calculations within those Payment Date Reports and Redemption Date Statements have been performed in accordance with the applicable provisions of this Indenture, (iii) the Aggregate Principal Amount of the Pledged Underlying Assets as of the immediately preceding Payment Date and (iv) whether the remaining Scheduled Distributions on the Underlying Asset and Eligible Investments constituting Principal Proceeds will be sufficient to pay the principal of the Notes by their Stated Maturity together with interest due thereon at the applicable Note Interest Rate;  <u>provided</u>, <u>however</u>, that in the event of a conflict between such firm of Independent certified public accountants and the Issuer with respect to any matter in this <u>Section 10.8</u>, the determination by such firm of Independent certified public accountants shall be conclusive.  In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Issuer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Issuer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

(c)    Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee to the Shares Paying Agent and to any beneficial holder of a Global Note upon written request therefor in the form of Exhibit J, or to any Holder of Notes upon request therefor.

(d)    In addition to the information and reports specifically required to be provided to each of the Rating Agencies pursuant to the terms of this Indenture, the Issuer (at its expense) shall compile and provide to each of the Rating Agencies, all information or reports delivered to the Trustee hereunder, and such additional information as either of the Rating Agencies may from time to time reasonably request and the Issuer shall reasonably determine may be obtained and provided without unreasonable burden or expense.  The Issuer or the Trustee, on behalf of the Issuer, shall notify S&P of any amendment, termination or modification of the Operative Agreements or party thereto.

Section 10.9    No Event of Default.  For so long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, on or before the Payment Date occurring in June of each year (commencing with the June 2008 Payment Date), the Issuer shall cause to be delivered to the Trustee a written statement confirming that no Event of Default has occurred during the preceding twelve-month period ending on the Business Day as of which such statement is delivered, or, if an Event of Default has occurred during such period, specifying such default.

Section 10.10  Procedures Relating to the Establishment of Issuer Accounts Controlled by the Trustee.  (a) Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Issuer Accounts, it will require each Securities Intermediary establishing such Issuer Accounts to enter into an agreement whereby each such Securities Intermediary agrees that it will (i) comply with orders directing the transfer or redemption of any Financial Assets credited to such Issuer Accounts ("Entitlement Orders") relating to such Issuer Account issued by the Trustee without further consent by the Issuer; (ii) credit all the Underlying Asset or Eligible Investments to the applicable Issuer Account; (iii) treat each item of property credited to such Issuer Account as a Financial Asset subject to Section 10.11(c); (iv) not enter into any agreement with any other Person relating to any Issuer Account pursuant to which agreement it has agreed to comply with Entitlement Orders made by such Person; (v) not accept for credit to any Issuer Account any Underlying Asset or Eligible Investment which is registered in the name of, or payable to the order of, or specially indorsed to, any Person other than the Securities Intermediary unless it has been indorsed to such Securities Intermediary or is indorsed in blank; and (vi) waive any right of set-off unrelated to its fees for such Issuer Account.

(b)    The Issuer Accounts shall remain at all times with the Custodian or with a financial institution having a long-term debt rating of at least "Baa1" from Moody's and a short-term debt rating of "A-1+" from S&P provided such financial institution has executed an agreement as identified in Section 10.11(a).

Section 10.11  Notices to the Noteholders.  (a) Each Monthly Report and each Payment Date Report sent to any Holder or beneficial Holder of a Note shall contain, or be accompanied by, the following notice:

167

The Notes may be beneficially owned only by Persons that (a)(i) are not U.S. Persons (within the meaning of Regulation S under the United States Securities Act of 1933, as amended (the "Securities Act")) or U.S. Residents (within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act")) and (ii) are U.S. Persons or U.S. Residents that are also (x) qualified purchasers (for purposes of Section 3(c)(7) of the Investment Company Act), and (y) qualified institutional buyers within the meaning of Rule 144A under the Securities Act (or, solely in the case of Holders of a Certificated Class B-2 Note, Certificated Class C Note or Certificated Class D Note, either qualified institutional buyers within the meaning of Rule 144A under the Securities Act or "accredited investors" within the meaning of Rule 501(a) of Regulation D under the Securities Act) and (b) can make the representations set forth in Section 2.5(j), (k), (l) or (m), as applicable, of this Indenture and the legends of the applicable Notes. Beneficial ownership interest in the Rule 144A Global Notes or Certificated Notes may be transferred only to a Person that, in the case of a transfer of Certificated Class A Notes, Certificated Class B-1 Notes or Certificated Class E Notes, meets the qualifications set forth in clause (a)(i) or (a)(ii) of the preceding sentence or, in the case of a transfer of Rule 144A Global Notes, Certificated Class B-2 Notes, Certificated Class C Notes or Certificated Class D Notes meets the qualifications set forth in clause (a)(ii) of the preceding sentence (or (a)(i) in the case of a Certificated Note) and, in each case, as applicable, that can make the representations referred to in clause (b) of the preceding sentence. The Issuer has the right to compel any beneficial Holder of an interest in Rule 144A Global Notes or any Holder of a Certificated Note that does not meet the qualifications set forth in such clauses to sell its interest in such Notes, or may sell such interest on behalf of such owner, pursuant to Section 2.12 of this Indenture.

(b)      The Issuer shall deliver the Payment Date Report with respect to the Payment Date occurring in June of each year, commencing in June 2208, containing the foregoing notice (the "Annual Report") to each Agent Member appearing on the DTC List and shall request that such Agent Members deliver a copy of the Annual Report to each beneficial Holder of the Notes.

# ARTICLE XI

# APPLICATION OF MONIES

Section 11.1    Disbursements    of    Monies    from    Payment    Account. (a) Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and Section 13.1, on each Payment Date, the Trustee shall disburse amounts transferred to the Payment Account from the Interest Collection Account and to the extent permitted hereunder, from the Principal Collection Account pursuant to Section 10.2, Section 10.4, in accordance with the following priorities (collectively, the "Priority of Payments"):

(A)      On each Payment Date, Interest Proceeds received during the related Due Period shall be applied as follows:

(i)      to the payment of taxes and registration and filing fees, if any, of the Co-Issuers;

(ii)     to the Administrative Expenses due and payable (if any) to the following parties in the following order:  <u>first</u>, the Trustee pursuant to the Indenture; <u>second</u>, the Collateral Administrator pursuant to the Collateral Administration Agreement; <u>third</u>, the Class A Note Agent pursuant to the Class A Note Purchase Agreement; <u>fourth</u>, the Class B-1 Note Agent pursuant to the Class B-1 Note Purchase Agreement; <u>fifth</u>, the Class E Note Agent pursuant to the Class E Note Purchase Agreement; <u>sixth</u>, the Shares Paying Agent pursuant to the Shares Paying Agency Agreement; and <u>seventh</u>, the Portfolio Manager pursuant to the Portfolio Management Agreement to reimburse it for the payment of fees and expenses (other than the Portfolio Management Fees), in each case, including any payments made in the period between Payment Dates; in an aggregate principal amount not to exceed the Administrative Expense Cap;

(iii)     to the payment or reimbursement of the accrued and unpaid Fees and Expenses of the Issuer in the order set forth in the definition of Administrative Expenses, in an amount up to the excess of (a) the Administrative Expense Cap, over (b) the amount paid pursuant to subclause (ii) of this <u>Section 11.1(a)(A)</u> above;

(iv)     to the payment of <u>first</u> (a) the Portfolio Manager of the current Senior Management Fee for such Payment Date and <u>second</u> (b) the Portfolio Manager of all Deferred Senior Management Fees; in each case, less any such fee the Portfolio Manager elects to Waive;

(v)     to the payment <u>pro rata</u> of (x) accrued and unpaid interest on the Class A Notes (including Defaulted Interest on the Class A Notes, if any, and interest on any such Defaulted Interest) in accordance with amounts then due and payable and (y) accrued and unpaid Class A Commitment Fees (including Defaulted Commitment Fees on the Class A Notes, if any, and interest on any such Defaulted Commitment Fees) in accordance with amounts then due and payable;

(vi)     to the payment <u>pro rata</u> of (x) accrued and unpaid interest on the Class B-1 Notes (including Defaulted Interest on the Class B-1 Notes, if any, and interest on any such Defaulted Interest) in accordance with amounts then due and payable, (y) accrued and unpaid Class B-1 Commitment Fees (including Defaulted Commitment Fees on the Class B-1 Notes, if any, and interest on any such Defaulted Commitment Fees) in accordance with amounts then due and payable and (z) accrued and unpaid interest on the Class B-2 Notes (including Defaulted Interest on the

Class B-2 Notes, if any, and interest on any such Defaulted Interest) in accordance with amounts then due and payable;

(vii)   to the payment of accrued and unpaid interest on the Class C Notes (including Defaulted Interest on the Class C Notes, if any and interest on any such Defaulted Interest) *pro rata* between the Class C-1 Notes and the Class C-2 Notes;

(viii)   if either of the Class C Coverage Tests is not satisfied on the related Determination Date, <u>first</u>, to the payment of principal of the Class A Notes in accordance with the funded outstanding principal balance of the Class A Notes until the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class A Notes is reduced to zero), <u>second</u>, in accordance with the unfunded Class A Commitments to make a deposit to the Class A CDS Reserve Account in an amount such that the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class A Commitments to zero), <u>third</u>, to the payment of principal of the Class B-1 Notes and the Class B-2/B-1 Portion *pro rata* until the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion are reduced to zero), <u>fourth</u>, *pro rata*, in accordance with the unfunded Class B-1 Commitments and the outstanding principal balance of the Class B-2 Notes to make a deposit to the Class B-1 CDS Reserve Account and to pay the principal of the Class B-2 Notes in an amount such that the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class B-1 Commitments and the outstanding principal balance of the Class B-2 Notes to zero) and <u>fifth</u>, to pay the principal of the Class C Notes *pro rata* between the Class C-1 Notes and the Class C-2 Notes in an amount such that the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal of the Class C Notes to zero);

(ix)   to the payment of accrued and unpaid interest on the Class D Notes (including Defaulted Interest on the Class D Notes, if any, interest on any such Defaulted Interest and accrued and unpaid interest on Class D Deferred Interest, but excluding any such Class D Deferred Interest);

(x)   to the payment of accrued and unpaid Class D Deferred Interest, if any;

(xi)     if either of the Class D Coverage Tests is not satisfied on the related Determination Date, first, to the payment of principal of the Class A Notes in accordance with the funded outstanding principal balance of the Class A Notes until the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class A Notes is reduced to zero), second, in accordance with the unfunded Class A Commitments to make a deposit to the Class A CDS Reserve Account in an amount such that the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class A Commitments to zero), third, to the payment of principal of the Class B-1 Notes and the Class B-2/B-1 Portion *pro rata* until the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion is reduced to zero), fourth, *pro rata*, in accordance with the unfunded Class B-1 Commitments and the outstanding principal balance of the Class B-2 Notes to make a deposit to the Class B-1 CDS Reserve Account and to pay the principal of the Class B-2 Notes in an amount such that the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class B-1 Commitments and the outstanding principal balance of the Class B-2 Notes to zero), fifth, to pay the principal of the Class C Notes *pro rata* between the Class C-1 Notes and the Class C-2 Notes in an amount such that the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal balance of the Class C Notes to zero) and sixth, to pay the principal of the Class D Notes in an amount such that the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal balance of the Class D Notes to zero);

(xii)    to the payment pro rata of (x) accrued and unpaid interest on the Class E Notes (including Defaulted Interest on the Class E Notes, if any, interest on any such Defaulted Interest and accrued and unpaid interest on Class E Deferred Interest with respect to the Class E Notes, but excluding any such Class E Deferred Interest) in accordance with amounts then due and payable and (y) accrued and unpaid Class E Commitment Fees (including Defaulted Commitment Fees on the Class E Notes, if any, interest on any such Defaulted Commitment Fees on the Class E Notes and accrued and unpaid interest on Class E Deferred Commitment Fees, but excluding any such Class E Deferred

171

Commitment Fees) in accordance with amounts then due and payable;

(xiii)   to the payment of accrued and unpaid Class E Deferred Interest or Class E Deferred Commitment Fee, if any;

(xiv)   if either of the Class E Coverage Tests is not satisfied on the related Determination Date, <u>first</u>, to the payment of principal of the Class A Notes in accordance with the funded outstanding principal balance of the Class A Notes until the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class A Notes is reduced to zero), <u>second</u>, in accordance with the unfunded Class A Commitments, to make a deposit to the Class A CDS Reserve Account in an amount such that the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class A Commitments to zero), <u>third</u>, to the payment of principal of the Class B-1 Notes and the Class B-2/B-1 Portion *pro rata* until the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion is reduced to zero), <u>fourth</u>, *pro rata*, in accordance with the unfunded Class B-1 Commitments and outstanding principal balance of the Class B-2 Notes, to make a deposit to the Class B-1 CDS Reserve Account and to pay the principal of the Class B-2 Notes in an amount such that the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class B-1 Commitments and the principal balance of the Class B-2 Notes to zero), <u>fifth</u>, to pay the principal of the Class C Notes *pro rata* between the Class C-1 Notes and the Class C-2 Notes in an amount such that the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal balance of the Class C Notes to zero), <u>sixth</u>, to pay the principal of the Class D Notes in an amount such that the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal balance of the Class D Notes to zero), <u>seventh</u>, to the payment of principal of the Class E Notes in accordance with the funded outstanding principal balance of the Class E Notes until the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class E Notes is reduced to zero), and <u>eighth</u>, in accordance with the unfunded Class E Commitments, to make a deposit to the Class E CDS Reserve Account in an amount such that the Class E Coverage Tests are satisfied on the related Determination Date (or, if sooner,

172

up to the amount sufficient to reduce the Class E Commitments to zero);

(xv)   to the payment of any remaining Administrative Expenses of the Co-Issuers (without regard to the Administrative Expense Cap), in the order and to the extent not paid under subclause (i), (ii) or (iii) as a result of the Administrative Expense Cap or otherwise;

(xvi)   to the payment of <u>first</u> (a) to the Portfolio Manager of the current Subordinated Management Fee for such Payment Date; and <u>second</u> (b) to the Portfolio Manager of all Deferred Subordinated Management Fees; in each case, less any such fee the Portfolio Manager elects to Waive; and

(xvii)   all remaining Interest Proceeds for deposit to the Preference Share Distribution Account for distribution to the holders of the Preference Shares to be allocated <u>pro</u> <u>rata</u> between the P-1 Preference Shares and the P-2 Preference Shares based on the aggregate outstanding number of P-1 Preference Shares and P-2 Preference Shares as a dividend thereon or as a final distribution in redemption thereof, as applicable.

(B)   On each Payment Date and upon an acceleration following an Event of Default, Principal Proceeds shall be applied in the following order of priority:

(i)   <u>first</u>, to pay the Credit Swap Counterparty any Cash Settlement Amounts owed by the Issuer (if any) under the Credit Swap Agreement on the Scheduled Termination Date, <u>second</u>, on or after the Maturity Date, to make a deposit of the Maturity Date Amount into the Maturity Date Account (to the extent that Principal Proceeds are not sufficient to make deposits into the Maturity Date Account, such deposits will be made in accordance with <u>Section 10.4(j)</u>) and <u>third</u>, unless the Credit Swap Counterparty is the sole affected party or a party causing the Event of Default (the "<u>Defaulting Party</u>"), to pay any termination payments owed to Credit Swap Counterparty;

(ii)   to the payment of the amounts specified in subclauses (i) through (ix) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(iii)   to the payment of the amounts specified in subclauses (xi) through (xii) of clause (A) above (and in the same

173

manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(iv)    to the payment of the amounts specified in subclause (xiv) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(v)    (a) if the Notes are to be redeemed on such Payment Date in connection with a Tax Event or an Optional Redemption, to the payment of the Total Redemption Amount (as defined herein), including the Redemption Price (without duplication of any payments received by any Class of Notes pursuant to clause (A) above or subclause (ii) of this clause (B)) payable with respect to each Class of Notes, or (b) on any Payment Date on or after the Notes have been paid in full, if the Preference Shares are to be redeemed on such Payment Date in connection with an Optional Redemption, the remaining funds after payment of all amounts payable prior to the Preference Shares in accordance with the Priority of Payments will be deposited to the Preference Share Distribution Account for distribution to the Holders of the Preference Shares to be allocated *pro rata* between the P-1 Preference Shares and the P-2 Preference Shares based on the aggregate outstanding number of P-1 Preference Shares and P-2 Preference Shares in redemption thereof;

(vi)    on any Payment Date prior to the final Payment Date, an amount, determined at the sole discretion of the Portfolio Manager, up to but not exceeding the aggregate amount of Removal Fees received by the Issuer during the related Due Period and not previously reinvested by the Portfolio Manager in the Specific Investment Instrument to be reinvested in the Specific Investment Instrument in order to enable the Issuer at any time during the Reinvestment Period (at the direction of the Portfolio Manager) to increase the aggregate Reference Entity Calculation Amount of all Reference Entities in the Reference Portfolio (through addition of new Reference Entities and/or by increasing the Reference Entity Calculation Amount of Reference Entities currently present in the Reference Portfolio); if Removal Fees are received by the Issuer, pending such direction, the Trustee shall (pursuant to the direction of the Portfolio Manager) invest such Removal Fees in Eligible Investments, selected by the Portfolio Manager;

(vii)    <u>first</u>, to the payment of principal of the Class A Notes in accordance with the aggregate funded outstanding principal balance of the Class A Notes until the funded outstanding

principal balance of the Class A Notes have been paid in full and second, to make a deposit to the Class A CDS Reserve Account up to the amount sufficient to reduce the Class A Commitments to zero;

(viii)    first, to the payment of principal of the Class B-1 Notes and the Class B-2 Notes, *pro rata*, in accordance with the aggregate funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion, until the funded outstanding principal balance of the Class B-1 Notes and the Class B-2/B-1 Portion have been paid in full and second, *pro rata*, in accordance with the unfunded Class B-1 Commitments and outstanding principal balance of the Class B-2 Notes, to make a deposit to the Class B-1 CDS Reserve Account and to pay the principal of the Class B-2 Notes up to the amount sufficient to reduce the Class B-1 Commitments and the outstanding principal balance of the Class B-2 Notes to zero;

(ix)    to the payment of principal of the Class C Notes *pro rata* between the Class C-1 Notes and the Class C-2 Notes until the aggregate outstanding principal amount of the Class C Notes has been reduced to zero;

(x)    to the payment of the amounts specified in subclause (x) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(xi)    to the payment of principal of the Class D Notes until the aggregate outstanding principal amount of the Class D Notes has been reduced to zero;

(xii)    to the payment of the amounts specified in subclause (xiii) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(xiii)    to the payment of principal of the Class E Notes until the aggregate outstanding principal amount of the Class E Notes has been reduced to zero;

(xiv)    first, to the payment of the amounts specified in subclause (xv) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder; and second, to the payment of any termination payments to the Credit

175

Swap Counterparty if it is the sole affected party or a Defaulting Party;

(xv)    to the payment of the amounts specified in subclause (xvi) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder; and

(xvi)    all remaining Principal Proceeds for deposit to the Preference Share Distribution Account for distribution to the holders of the Preference Shares allocated <u>pro rata</u> between the P-1 Preference Shares and the P-2 Preference Shares based on the aggregate outstanding number of P-1 Preference Shares and P-2 Preference Shares as a dividend thereon or as a final distribution in redemption thereof, as applicable.

For the avoidance of doubt, no Principal Proceeds will be applied to any Class of Notes in accordance with the Priority of Payments on any Payment Date if, after giving effect to such payment, any Overcollateralization Ratio Test of a more senior Class of Notes would have failed.

(C)    On the Maturity Date, after calculation of the Maturity Date Amount, in order to determine which Classes of Notes have a Deferred Maturity Date, the following comparison is required where Principal Proceeds are applied:  (X) assuming that the Maturity Date Amount is equal to the actual Maturity Date Amount, and (Y) assuming that the Maturity Date Amount is equal to zero.  After a comparison of (X) and (Y), to the extent that certain Classes of Notes would remain due and unpaid under scenario (X) but would be paid in full or to a greater extent under scenario (Y), such Classes of Notes shall have a Deferred Maturity Date.  The Deferred Maturity Date shall only apply to the portion of the principal balance that would be paid under scenario (Y) but would not be paid under scenario (X).

(D)    On the Deferred Maturity Date, any remaining amounts in the Maturity Date Account, will be applied in the following order:

(i)    to pay any amounts owed to the Credit Swap Counterparty to the extent not paid under subclause (i) of clause (B) above;

(ii)    to pay interest and principal on any Class of Notes in order of seniority but only to the extent not paid in full after the application of Principal Proceeds under subclauses (ii), (iii), (iv), (vii), (viii), (ix), (x), (xi), (xii) and (xiii) of clause (B) above;

176

(iii)    to the payment of the amounts specified in subclauses (xiv) and (xv) of clause (B) above (and in the same manner and order of priority); and

(iv)    all remaining amounts in the Maturity Date Account for deposit to the Preference Share Distribution Account for distribution to the holders of the Preference Shares allocated pro rata between the P-1 Preference Shares and the P-2 Preference Shares based on the aggregate outstanding number of P-1 Preference Shares and P-2 Preference Shares as a final distribution in redemption thereof.

Trust Accounts.    All Monies held by, or deposited with, the Trustee in the Collection Accounts or the Payment Account pursuant to the provisions of this Indenture and not invested in the Underlying Asset or Eligible Investments as herein provided, shall be deposited with the trust department of a financial institution with a combined capital and surplus of at least U.S.$200,000,000, to be held in trust for the benefit of the Secured Parties, and whose long-term rating is at least "Baa1" by Moody's and at least "BBB" by S&P, provided, that any successor to such financial institution with which Monies are deposited by the Trustee shall have a long-term rating of at least "Baa1" by Moody's and at least "BBB" by S&P (unless a Rating Agency Confirmation has been obtained with respect to any financial institution whose ratings are lower), and to the extent Monies deposited in a trust account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States of America, such excess shall be invested in Eligible Investments as directed by the Issuer.

## ARTICLE XII

## CHANGES TO THE REFERENCE PORTFOLIO

Section 12.1    Guidelines.    Any change to the Reference Portfolio shall be effected by the Portfolio Manager on behalf of the Issuer pursuant to the limitations and procedures set forth in Exhibit N to this Indenture.

## ARTICLE XIII

## NOTEHOLDERS' RELATIONS

Section 13.1    Subordination.    (a) Anything in this Indenture or the Notes to the contrary notwithstanding, the Co-Issuers and the Holders of the Class B Notes agree for the benefit of the Holders of the Class A Notes that the rights of the Holders of the Class B Notes to payment by the Co-Issuers and in and to the Collateral, including to any payment from the Proceeds of Collateral, shall be subordinate and junior to the Class A Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided.    If any Event of Default (other than an Event of Default arising pursuant to

Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee with respect to, as applicable, the Class A Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class B Notes.  The Holders of the Class B Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest (if any) on the Class A Notes.

(b)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Co-Issuers and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and Class B Notes that the rights of the Holders of the Class C Notes to payment by the Co-Issuers and in and to the Collateral including any payment from the Proceeds of Collateral, shall be subordinate and junior to the Class A Notes and Class B Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee with respect to, as applicable, the Class A Notes and Class B Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class C Notes.  The Holders of the Class C Notes agree, for the benefit of the Holders of the Class A Notes and Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest (if any) on the Class A Notes and Class B Notes.

(c)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes agree for the benefit of the Holders of the Class A Notes, Class B Notes and Class C Notes that the rights of the Holders of the Class D Notes to payment by the Issuer and in and to the Collateral, including any payment from Proceeds of Collateral, shall be subordinate and junior to the Class A Notes, Class B Notes and Class C Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee (if any) with respect to, as applicable, the Class A Notes, Class B Notes and Class C Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class D Notes.  The Holders of the Class D Notes agree, for the benefit of the Holders of the Class A Notes, Class B Notes and Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class D Notes or hereunder prior to the date which

178

is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest on the Class A Notes, Class B Notes and Class C Notes.

(d)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class E Notes agree for the benefit of the Holders of the Class A Notes, Class B Notes, Class C Notes and Class D Notes that the rights of the Holders of the Class E Notes to payment by the Issuer and in and to the Collateral, including any payment from Proceeds of Collateral, shall be subordinate and junior to the Class A Notes, Class B Notes, Class C Notes and Class D Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee (if any) with respect to, as applicable, the Class A Notes, Class B Notes, Class C Notes and Class D Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class E Notes.  The Holders of the Class E Notes agree, for the benefit of the Holders of the Class A Notes, Class B Notes, Class C Notes and Class D Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class E Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest on the Class A Notes, Class B Notes, Class C Notes and Class D Notes.

(e)    In the event that notwithstanding the provisions of this Indenture, any Holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until any of (v) the Class A Notes, (w) the Class B Notes, (x) the Class C Notes, (y) the Class D Notes or (z) the Class E Notes, as the case may be, shall have been paid in full in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Noteholders, in accordance with this Indenture; provided, however, that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(f)    The Issuer agrees with all Holders of Notes that the Issuer shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this Section 13.1.  Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2    Standard of Conduct.  In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including Section 5.9, a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Noteholder,

the Co-Issuers, or any other Person, except for any liability to which such Noteholder may be subject to the extent the same results from such Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

## ARTICLE XIV

## MISCELLANEOUS

Section 14.1    <u>Form of Documents Delivered to Trustee</u>.    In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate of an Authorized Officer of the Issuer or the Co-Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer or the Co-Issuer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate of, or representations by, the Issuer, the Co-Issuer, or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer of the Issuer or the Co-Issuer or such counsel knows that the certificate or representations with respect to such matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate of, or representations by, an Authorized Officer of the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer, unless such counsel knows that the certificate or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is <u>provided</u> that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuer's or the Co-Issuer's rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in <u>Section 6.1(d)</u>.

Section 14.2    <u>Acts of Noteholders</u>.    (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken

by Holders of Notes or Preference Shares may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders or Holders of Preference Shares in person or by an agent duly appointed in writing, and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Shares Paying Agent, in the case of the Holders of the Preference Shares), and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders or Holders of Preference Shares signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 14.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register and the number of Preference Shares and registered numbers of Preference Shares shall be proved by consultation with the Shares Paying Agent with respect to the information contained on the Share Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes or Preference Shares shall bind the Holder (and any transferee thereof) of such Note or Preference Share and of every Note or Preference Share issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee, or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note or Preference Share.

Section 14.3    Notices.    Except as otherwise expressly provided herein, any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with any of the parties indicated below shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form at the following addresses:

(a)    to the Trustee at U.S. Bank National Association, Corporate Trust Services, One Federal Street, Boston, MA 02110, Attention: WHITE MARLIN CDO 2007-1, Ltd, or at any other address previously furnished in writing by the Trustee, telephone no. (617) 603-6500/6517;

(b)    to the Issuer c/o Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, telephone no. (345) 945-7100, Attention:  Directors, or at any other address previously furnished in writing by the Issuer with a copy to Maples and Calder, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 949-8080, Attn:  Dale Crowley;

(c)    to the Co-Issuer at 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention:  Donald J. Puglisi, or at any other address previously furnished in writing by the Co-Issuer;

(d)    to the Credit Swap Counterparty at Lehman Brothers Special Financing Inc., Transaction Management Group, 745 Seventh Avenue, New York, New York 10019, telephone no. (212) 526-7187, telecopy no. (212) 526-7672, Attention:  Erez Biala/James Lee, or at any other address previously furnished in writing by the Credit Swap Counterparty;

(e)    to the Portfolio Manager at Sailfish Structured Investment Management (G4), LLC, 225 High Ridge Road, West Building – 2nd Floor, Stamford, CT 06905, telephone no. (203) 614-3668, telecopy no. (203) 841-1462, Attention: Tony Barkan, or at any other address previously furnished in writing by the Portfolio Manager;

(f)    to Moody's at Moody's Investors Service, 99 Church Street, New York, New York 10007, telecopy No. (212) 553-0355, Attention:  Structured Finance Group, CBO/CLO Monitoring – White Marlin CDO 2007-1, Ltd., or at any other address previously furnished in writing by Moody's (and with a copy via e-mail to "cdomonitoring@moodys.com"); and

(g)    to S&P at Standard & Poor's Ratings Services, 55 Water Street, 41st Floor, New York, New York 10041-0003, telephone No. 212-438-2506, facsimile No. 212-438-2664, Attention:  Structured Finance Ratings, Asset-Backed Securities CBO/CLO Surveillance (and with a copy via e-mail to "cdo_surveillance@sandp.com").

Notwithstanding any provision to the contrary contained herein or in any agreement or instrument related hereto, any report, statement or other information required to be provided by the Trustee may be provided by providing access to the Trustee's website containing such information.

Section 14.4    <u>Notices to Holders; Waiver</u>.    Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of Notes or the Shares Paying Agent (for delivery to the Holders of the Preference Shares) of any event,

(a)    such notice shall be sufficiently given to Holders of Notes or the Shares Paying Agent if in writing and mailed, first-class postage prepaid, to each Holder of a Note and the Shares Paying Agent affected by such event, at the address of such Holder as it appears in the Note Register or at the address of the Shares Paying Agent supplied by the Shares Paying Agent to the Trustee, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)    such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Holders of the Notes any information or notice requested to be so delivered by at least 25% of the Holders of any Class of Notes and will deliver

to the Shares Paying Agent any information or notice which the Shares Paying Agent certifies was requested to be so delivered by at least 25% of the Holders of the P-1 Preference Shares.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note or the Shares Paying Agent shall affect the sufficiency of such notice with respect to other Holders of Notes or Preference Shares. In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification to Holders of Notes or the Shares Paying Agent as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders or the Shares Paying Agent for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders or the Shares Paying Agent shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

If and for so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange so require, notices to the Holders thereof shall also be given to the Company Announcements Office.

Section 14.5    <u>Effect of Headings and Table of Contents</u>.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6    <u>Successors and Assigns</u>.    All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7    <u>Severability</u>.    In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8    <u>Benefits of Indenture</u>.    Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person (other than the Shares Paying Agent and the Holders of the Preference Shares, who shall be express third party beneficiaries of this Indenture), other than the parties hereto and their successors hereunder, the Credit Swap Counterparty, the Portfolio Manager and the Noteholders any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9    <u>Governing Law</u>.    THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 14.10    <u>Submission to Jurisdiction</u>.    THE CO-ISSUERS AND THE TRUSTEE    HEREBY    IRREVOCABLY    SUBMIT    TO    THE    NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR

PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, AND THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH FEDERAL OR NEW YORK STATE COURT. THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. THE CO-ISSUERS AND THE TRUSTEE IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO IT AT THE OFFICE OF THE ISSUER'S AGENT SET FORTH IN SECTION 7.4. THE CO-ISSUERS AND THE TRUSTEE AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

Section 14.11 <u>Counterparts</u>. This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.12 <u>Waiver of Jury Trial</u>. THE TRUSTEE, THE NOTEHOLDERS AND EACH ISSUER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS INDENTURE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE PARTIES HERETO. EACH OF THE CO-ISSUERS, THE TRUSTEE, AND THE NOTEHOLDERS ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUCH PARTIES ENTERING INTO THIS INDENTURE.

Section 14.13 <u>Limited Recourse</u>. Notwithstanding anything in this Indenture to the contrary, all amounts owed by the Issuer on, under or in respect of its obligations and liabilities under this Indenture shall be recoverable only from and to the extent of the Collateral in accordance with <u>Section 11.1</u> hereof and upon final realization of the Proceeds in accordance with <u>Section 11.1</u> hereof, the Issuer shall have no further liability and all claims in respect of any amounts owed but still unpaid shall be extinguished. This <u>Section 14.13</u> shall survive the termination of this Indenture for any reason.

Section 14.14 <u>Liability of Co-Issuers</u>. Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, <u>inter alia</u>, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers. In particular, neither of the Co-Issuers shall be entitled to or take any other steps for the winding up or bankruptcy of the

184

other of the Co-Issuers or shall have any claim in respect of any assets of the other of the Co-Issuers.

Section 14.15  Deferral and Waiver of Portfolio Management Fees.  (a) If there are insufficient funds to pay the Senior Management Fee in full on any Payment Date, the amount due and unpaid shall be deferred without interest and shall be payable on such later Payment Date on which funds are available therefor, in accordance with the Priority of Payments (the "Deferred Senior Management Fee").  If there are insufficient funds to pay the Subordinated Management Fee in full on any Payment Date, the lesser of the amount due and unpaid shall be deferred without interest and shall be payable on such later Payment Date on which funds are available therefor, in accordance with the Priority of Payments (the "Deferred Subordinated Management Fee" and, together with the Deferred Senior Management Fee, the "Deferred Portfolio Management Fees").

(b)     The Portfolio Manager may elect in its sole discretion to defer payment of all or a portion of the Portfolio Management Fees on any Payment Date by providing written notice thereof to the Trustee of such election at least five Business Days prior to such Payment Date.  The Portfolio Manager may elect to receive payment of all or any portion of the Deferred Portfolio Management Fee in accordance with the Priority of Payments on any Payment Date by providing notice to the Trustee of such election and the amount of such fees to be paid at least five Business Days preceding such Payment Date, provided that the payment of Deferred Portfolio Management Fee will not cause an Event of Default to occur (in which case the payment of the Deferred Portfolio Management Fee would be deferred to the next Payment Date on which (i) the Portfolio Manager elects to receive payment and (ii) such payment would not cause an Event of Default to occur).  For the avoidance of doubt, any or all of the Subordinated Management Fee may be deferred under this clause (b) and such deferral is not subject to the limitation contained in clause (a) above.

(c)     Without limitation of clause (b) above, the Portfolio Manager may in its sole discretion also elect to Waive payment of all or a portion of the Portfolio Management Fees (including any Deferred Portfolio Management Fees) that are due and payable in accordance with the Priority of Payments on any Payment Date by providing written notice to the Trustee of such election at least five Business Days prior to such Payment Date.  If the Portfolio Manager waives all or a portion of the Portfolio Management Fees (including any Deferred Portfolio Management Fees) that are due and payable in accordance with the Priority of Payments on any Payment Date, the Interest Proceeds that would otherwise have been applied to pay such amounts shall be applied as Principal Proceeds in accordance with the Priority of Payments on such Payment Date.

Section 14.16  Legal Holidays.  In the event that the date of any Payment Date or Redemption Date shall not be a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on such date, but may be made on the next succeeding Business Day and with respect to the Notes (other than the Class C-2 Notes), the Class A Commitment Fee, the Class B-1 Commitment and the Class E Commitment Fee, the actual number of days elapsed during the Interest Period for such Notes shall be adjusted to take into account the number of days elapsed as a result of the Payment Date being adjusted to the next succeeding Business Day.

185

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

WHITE MARLIN CDO 2007-1, LTD.,
    as Issuer

By: _____
    Name: Donald J. Puglisi
    Title: Attorney-In-Fact

WHITE MARLIN CDO 2007-1, CORP.,
    as Co-Issuer

By: _____
    Name: Donald J. Puglisi
    Title: President

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By: _____
    Name:
    Title:

Indenture

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

WHITE MARLIN CDO 2007-1, LTD.,
   as Issuer

By:_____
   Name:
   Title:

WHITE MARLIN CDO 2007-1, CORP.,
   as Co-Issuer

By:_____
   Name:
   Title:

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee

By:_____
   Name:
   Title:
      Jonathan E. DeMarco
      Assistant Vice President

SCHEDULE A

[Master ISDA, Schedule and Confirmation to be attached]

SCHEDULE B**

<u>Moody's Industry Category List</u>

1.      Aerospace and Defense
2.      Automobile
3.      Banking
4.      Beverage, Food and Tobacco
5.      Buildings and Real Estate
6.      Chemicals, Plastics and Rubber
7.      Containers, Packaging and Glass
8.      Personal and Non-Durable Consumer Products (Manufacturing Only)
9.      Diversified/Conglomerate Manufacturing
10.     Diversified/Conglomerate Service
11.     Diversified Natural Resources, Precious Metals and Minerals
12.     Ecological
13.     Electronics
14.     Finance
15.     Farming and Agriculture
16.     Grocery
17.     Healthcare, Education and Childcare
18.     Home and Office Furnishings, Housewares and Durable Consumer Products
19.     Hotels, Motels, Inns and Gaming
20.     Insurance
21.     Leisure and Amusement
22.     Machinery (Non-Agriculture, Non-Construction and Non-Electronic)
23.     Mining, Steel, Iron and Non-Precious Metals
24.     Oil and Gas
25.     Personal, Food and Miscellaneous Services
26.     Printing and Publishing
27.     Cargo Transport
28.     Retail Store
29.     Telecommunications
30.     Textiles and Leather
31.     Personal Transportation
32.     Utilities
33.     Broadcasting and Entertainment
34.     Sovereign and Supranational

** This list may be modified from time to time subject to Rating Agency Confirmation by Moody's.

SCHEDULE C

Determination of LIBOR Formula

With respect to each Interest Period, "LIBOR" for purposes of calculating the Note Interest Rate for each Class of Notes for such Interest Period will be obtained by the Calculation Agent in accordance with the following provisions:

(i)    LIBOR for any Interest Period (including the initial Interest Period) shall equal the offered rate, as obtained by the Calculation Agent, for U.S. Dollar deposits of the Designated Maturity which appears on Reuters Screen LIBOR01 Page (or such other page as may replace such Reuters Screen LIBOR01 Page for the purpose of displaying comparable rates) as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date as reported by Bloomberg Financial Markets Commodities News.  "LIBOR Determination Date" means, with respect to any Interest Period (other than the initial Interest Period), the second London Banking Day prior to the first day of such Interest Period.

(ii)    If, on any LIBOR Determination Date, such rate does not appear on Reuters Screen LIBOR01 Page (or such other page as may replace such Reuters Screen LIBOR01 Page for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for U.S. Dollar deposits of the Designated Maturity, by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks.  If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean.  If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent are quoting on the relevant LIBOR Determination Date for U.S. Dollar deposits for the Designated Maturity, to the principal London offices of leading banks in the London interbank market.

(iii)    If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

For purposes of clause (i) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.  For the purposes of clauses (ii) and (iii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

As used herein:

"Base Rate" means a fluctuating rate of interest determined by the Calculation Agent as being the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for U.S. Dollar loans.

Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"<u>Base Rate Reference Bank</u>" means JPMorgan Chase Bank, National Association, or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for U.S. Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"<u>Designated Maturity</u>" means three (3) months; provided, that with respect to the initial Interest Period "Designated Maturity" means the period from and including the Closing Date to but excluding the Payment Date occurring in September 2007.

"<u>London Banking Day</u>" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"<u>Reference Banks</u>" means four (4) major banks in the London interbank market selected by the Calculation Agent.

## SCHEDULE D

## <u>Standard & Poor's Industry Classification Groups</u>**

1. Aerospace and defense Aircraft manufacturer /components Arms and ammunition

2. Air transport

3. Automotive Manufacturers Parts and equipment Tire and rubber

4. Beverage and tobacco

5. Broadcast radio and television

6. Brokerages/securities dealers/investment houses

7. Building and development; Builders Land development/real estate; Mobile homes

8. Business equipment and services; Graphic arts Office equipment/computers Data processing service bureaus Computer software

9. Cable television

10. Chemical/plastics Coatings/paints/varnishes

11. Clothing/textiles

12. Conglomerates

13. Containers and glass products

14. Cosmetics/toiletries

15. Drugs

16. Ecological services and equipment Waste disposal services and equipment

17. Electronics/electric Equipment; Component

18. Equipment leasing; Auto leasing/Rentals; Equipment leasing Data processing equipment Service/leasing

19. Farming/agriculture Agricultural products and equipment; Fertilizers

20. Financial intermediaries Banking; Finance companies

21. Food/drug retailers

22. Food products

23. Food service Food service/restaurants Vending

24. Forest products Building materials Paper products and containers

25. Health care; Medical equipment/supply; Hospital management

26. Home furnishings; Appliances Furniture, fixtures; Housewares

27. Hotels/motels/inns and casinos

28. Industrial equipment; Machinery; Manufacturing/industrial Specialty instruments

29. Insurance

30. Leisure; Leisure goods; Leisure activities/motion pictures

31. Nonferrous metals/minerals Aluminum producers Other metal/mineral producers Mining (including coal)

32. Oil and gas Producers/refiners Gas pipelines

33. Publishing

34. Rail industries Railroads Rail equipment

35. Retailers (other than food/drug)

36. Steel

37. Surface transport Shipping/shipbuilding Trucking

38. Telecommunications/cellular communications

39. Utilities; Electric Local gas; Water

55. REITs and REOCs.

** This list may be modified from time to time subject to Rating Agency Confirmation by Standard & Poor's.