**E Ó D    MAR 1 4 2003**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| Conseco, Inc., *et al.*,[1] | ) | Case No. 02 B-49672 |
| | ) | (Jointly Administered) |
| Debtors. | ) | Honorable Judge Carol A. Doyle |
| | ) | |
| | ) | |

FINAL ORDER APPROVING SERVICING ARRANGEMENT FOR
MANUFACTURED HOUSING SECURITIZATION TRUSTS

This matter coming to be heard upon the Joint Motion of U.S. Bank National

Association, not in its individual capacity, but as trustee of certain securitization trusts (the

*"Trustee"*) and Conseco Finance Corp. (*"CFC"*) filed with this Court on December 17, 2002

seeking, *inter alia*, directions and instructions to the Trustee, pursuant to Court Order, with

respect to changes to those certain Pooling and Servicing Agreements entered into between CFC

and the Trustees (as defined herein) with respect to manufactured housing contracts (the

*"Servicing Agreements"*) with respect to the amount and priority of the fee (the *"Servicing Fee"*)

paid to the servicer thereunder (the *"Servicer"*) in order to preserve the assets of the trusts

created under the terms of the Servicing Agreements (the *"Securitization Trusts"*) (the

*"Motion"*). Wells Fargo opted into the Order entered by this Court on December 18 and 20 with

respect to interim servicing arrangements (the *"Interim Order"*) by Stipulation approved by this

---

[1]    The Debtors are the following entities: Conseco, Inc., CHIC, Incorporated, CTHIC, Inc., Partners Health
Group Inc., Conseco Finance Corp., Conseco Finance Servicing Corp., Green Tree Residual Finance Corp.
I, Green Tree Finance Corp.-Five, Conseco Finance Net Interest Margin Finance Corp. I and Conseco
Finance Net Interest Margin Finance Corp. II.

1987

Court and entered on January 29, 2003. Wells Fargo and the Trustee shall be referred to herein as the *"Trustees"*.

**Upon the testimony and/or evidence presented by the Trustees and other matters of record in this proceeding, The Court Hereby Finds That:**

A.      The stated purpose of the Joint Motion is to preserve for the mutual benefit of CFC, the Trustees and the holders of certificates issued pursuant to the Servicing Agreements (the "Certificateholders"), the servicing platform and the continued servicing of certain manufactured housing contracts.

B.      On December 17, 2002 (the *"Petition Date"*), CFC, CFSC and certain affiliates filed voluntary Chapter 11 petitions under Title 11, 28 U.S.C. §101 *et seq.* (the *"Bankruptcy Code"*).

C.      Since the Petition Date, CFC and its subsidiaries have continued to operate their businesses and manage their property as debtors in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner.

D.      CFC (formerly Green Tree Financial Corporation prior to its name change in November 1999) is a financial services holding company that originates, securitizes and services manufactured housing, home equity, home improvement, retail credit and floor plan extension contracts throughout the United States. With nationwide operations, CFC, itself or through its subsidiaries, is one of America's largest consumer finance companies managing finance receivables of $43,000,000,000 (at December 31, 2001) with leading market positions in retail home equity mortgages, home improvement contracts, private label credit cards and manufactured housing credit. CFC "securitized" the loan contracts it originated or acquired as more fully described hereinafter.

E.   Prior to the Petition Date, CFC (directly or through a subsidiary, Conseco Finance Securitization Corp. ("Securitization Corp.")) caused manufactured housing loan contracts it owned or originated to be transferred, for value, to trusts created under certain pooling and servicing agreements (as outlined below) which thereafter owned such loan contracts. The trusts purchased the loan contracts from CFC, either directly or through Securitization Corp.,[2] using proceeds from the sales of certain certificates (collectively, the "Certificates") issued pursuant to pooling and servicing agreements entered into among CFC, the Trustees, where applicable, Securitization Corp., and other parties in connection with complex, sophisticated securitization transactions (each, a "Securitization" and, collectively, the "Securitizations"). The Certificates are "pass through" securities backed by the assets in the respective Securitization Trusts; meaning that generally payments of principal and interest on the contracts in each Securitization Trust constitute the primary, and frequently sole, source of payment for amounts due to holders of the Certificates.

F.   The Certificates were issued in multiple tranches, each with different rights of payment and different priorities of payment relative to the proceeds collected from the loan contracts held in each trust. The higher rated tranches of the Certificates (the Class A Certificates, for example) are generally entitled to be paid prior to lower rated tranches of Certificates. Under certain trusts, certain Class B Certificates (generally the B-2 Certificates) have a guarantee from CFC, limited in amount to shortfalls in distributions on such Class B-2 Certificates.

G.   CFC acts as Servicer under the terms of the Servicing Agreements. CFC is by far the largest servicer of manufactured housing contracts in the United States, servicing approximately $23,400,000,000 in manufactured housing contracts; approximately 55% of the

---

[2]   Securitization Corp. in turn purchased the contracts from CFC using the proceeds it received from the trusts.

entire market. It services more than three times the number of manufactured housing contracts of its nearest competitor. Under each Servicing Agreement, the Servicer has "the sole obligation to manage, administer, service and make collections on the Contracts (as defined below) and perform or cause to be performed all contractual and customary undertakings of the holder of the Contracts to the Obligor."[3] Sample Servicing Agreement at §5.06. *"Contracts"* is defined under the Servicing Agreements to mean manufactured housing installment sales contracts and installment loan agreements described in the List of Contracts (as defined in the respective Servicing Agreement) and includes all related security interests and any and all rights to receive payments. The Servicer has the right to sue to enforce and collect upon such Contracts, including the right to foreclose upon the collateral for such Contracts. CFC advances certain costs to the Securitization Trusts, including the costs involved in repossessing the collateral for the Contracts.

H.    CFC is entitled to receive a monthly fee for its services as Servicer under each Servicing Agreement (the *"Servicing Fee"*). The Servicing Agreements generally provide for a 50 basis point per annum Servicing Fee as follows:

> *"Monthly Servicing Fee"* means as of any Remittance Date, one-twelfth of the product of 0.50% and the Pool Scheduled Principal Balance for the immediately preceding Remittance Date (or, with respect to the first Remittance Date, the Cutoff Date Pool Principal Balance as of the Closing Date).

Sample Servicing Agreement at p. 33. The Servicing Fee is payable monthly at the same time as payments are made on the Certificates. So long as CFC is the Servicer, payment of the Servicing Fee on each monthly payment date under the Servicing Agreements (prior to the Interim Order) was generally very low in priority, and only paid from remaining funds after the fees of the

---

3    Manufactured Housing Contract Senior/Subordinate Pass-Through Certificates, Series 2000-2 Pooling and Servicing Agreement dated as of May 1, 2000 among Conseco Finance Securitizations Corp., as Seller, Conseco Finance Corp., as Originator, and Servicer and US. Bank, National Association, not in its individual capacity but solely as Trustee (the *"Sample Servicing Agreement"*).

Trustees and all payments owing on such date on all debt securities issued by the Securitization Trusts have been paid. Prior to the entry of the Interim Order, if the monies held by a Securitization Trust for distribution on any payment date after making all more senior payments were insufficient to pay the entire Servicing Fee, the Servicer received only a portion of the Servicing Fee or nothing at all. Amounts not paid to the Servicer in any month do not accrue for payment in future months. Prior to the entry of the Interim Order, of the 50 basis points to which CFC was entitled, CFC was receiving less than 12 basis points per annum, on average, across all Securitization Trusts for servicing the manufactured housing contract portfolios owned by the Securitization Trusts.

I.    The Securitization Trusts collectively hold more than 700,000 manufactured home contracts. CFC repossessed more than 30,000 manufactured homes on behalf of the Securitization Trusts in 2002. CFC has advanced nearly $100,000,000 to cover the costs of repossessing, marketing and selling repossessed manufactured homes. While it is hoped that these advances will ultimately be recovered through dispositions of the repossessed manufactured homes, advancing these costs imposes a very costly outlay of capital and requires a significant source of financing. Because of the large number of repossessed manufactured homes nationally, the resale of these homes will likely take significantly longer and recovery percentages will be significantly lower than general prior experience.

J.    Recent experience reflects that monthly payments on manufactured housing contracts were late on up to 35%, or $8,500,000,000, of the manufactured home contracts, requiring CFC as Servicer to expend significant amounts of time and money reminding borrowers of their obligations and monitoring these contracts.

K.    The terms *"Servicing Agreements"* and *"Securitization Trusts"* shall have the meaning ascribed to each in the Motion and shall also include the Pooling and Servicing

Agreements for the 2002-1 and 2002-2 Series Manufactured Housing Contract Senior/Subordinate Pass-Through Certificates.

L.    CFC and its Subsidiaries have advised the Trustees that unless the Servicing Fee and its priority are enhanced, they will seek to reject the Servicing Agreements. CFC has withdrawn a motion to reject the Servicing Agreements and re-filed it as of March 3, 2003. If the Servicing Agreements are rejected, it will be difficult for the Trustees to timely replace CFC as the Servicer, and it would be impossible for the Trustees to replace the Servicer at the current contractual rate and priority for the servicing fee.

M.    Although the Servicing Agreements generally provide for an improved priority for the Monthly Servicing Fee where the Servicer is other than CFC or a wholly owned subsidiary of CFC, the maximum amount of the Servicing Fee under the Servicing Agreements would remain at 50 basis points. The contractual servicing fee is no longer a market rate and would subject a successor to significant losses. A successor servicer would have to be willing to voluntarily agree to assume the role of servicer with the result of operating at a substantial deficit.

N.    Unless the resolution of the servicing issues is approved, the Securitization Trusts will suffer irreparable injury.

O.    If the Servicing Agreements were rejected, the Trustees would face considerable logistical hurdles in any attempt to replace the servicing platform and transfer the voluminous documents and records relating to the assets held by the Securitization Trusts. These logistical issues include:

- Transferring the millions of documents and records relating to the Contracts and other assets contained in the Securitization Trusts;

- Transferring or making arrangement for payment mechanisms (lockboxes, ACH direct pay, checks, wires and other mechanisms) with respect to payments made on the Contracts and other assets;

- Evaluation of the status of each individual Contract in the Securitization Trusts;

- Reconciliation of accounts relating to the Contracts;

- Notifications to contract debtors with respect to new mailing addresses and telephone numbers;

- Intellectual property issues relating to the use of the software and/or equipment used to service the Contracts;

- Identification and analysis with respect to pending litigation involving the Contracts; and

- Loss of servicing employees with knowledge of all of the systems.

Even if a replacement servicer could be identified to perform the services at the contractual rate and priority, the gaps in the attention to the individual loan or contract files are likely to encourage many obligors to refrain from or defer making payments on the underlying contracts. Repossessions and resales of repossessed manufactured homes would be delayed, delaying the receipt of liquidation proceeds, and potentially reducing the amount of liquidation proceeds received for each repossessed home.

P.    The Trustees estimate that if servicing were transferred to another servicing platform, the Securitization Trusts will suffer losses in excess of $600,000,000. Thus, unless CFC continues servicing or a purchaser of CFC's assets services the portfolio as successor servicer using the same portfolio, the Securitization Trusts will suffer irreparable harm.

Q.    The Trustees allege that they would assert significant rejection claims and other claims which they believe would dwarf other unsecured claims. These claims arise from (1) breaches of representations and warranties with respect to the manufactured housing contracts sold to the Securitization Trusts, (2) the increased servicing fees that the Securitization Trusts would be required to pay to a successor servicing fee and (3) damages to the Securitization Trusts arising from the transfer of the servicing to a new servicing platform. Currently the Trustees have an Adequate Protection Lien pursuant to the terms of the Interim Order in the amount capped at $35,000,000.

R.    The Trustees allege that certain representations and warranties with respect to the manufactured housing contracts sold to the Securitization Trusts have not been met as to all of the Contracts sold to the Securitization Trusts. As set forth in the Trustees' objections to the Cure Notice sent by the debtor with respect to the Servicing Agreements, the Trustees allege that at least $1,091,584,054 in original principal amount of the manufactured housing contracts do not meet the standards set forth in the representations in the Servicing Agreements and therefore constitute "Exceptions". If Exceptions remain uncured, the Trustees allege that CFC has the obligation to repurchase these contracts. Assumption of the Servicing Agreements by CFC and the assignment thereof to the Successful Bidder will limit these claims by permitting the Successful Bidder to resolve many of these "Exceptions".

S.    In addition, the Trustees allege they would assert a claim for the difference between the contractual servicing fee and the servicing fee the Securitization Trusts would be required to pay a third party successor servicer.

T.    The Trustees allege they would assert a claim for the failure of CFC to pay under the guarantees to holders of the Class B-2 Certificates issued under some or all of the Servicing Agreements (the "*Guarantee Claims*"). As of February 15, 2003, the Trustees allege that $108,956,482.12 in B-2 guarantee payments have been missed. The Trustees allege that the total B-2 Guarantee claim against Debtors would be in excess of $1,500,000,000.

U.    Finally, as detailed above, the Trustees allege that the Securitization Trusts will suffer damage in connection with the transition of servicing to a new servicing platform, estimated at over $600,000,000.

V.    In order to address the financial problems of CFC and its Subsidiaries and the problems that the rejection of the Servicing Agreements would cause to the Securitization Trusts, CFC entered into negotiations with the Trustees and other holders of certificates in order to

provide guidance to bidders with respect to an appropriate servicing fee. As a result of these negotiations guidelines, approved by each of Federal National Mortgage Association ("Fannie Mae") and the Ad Hoc Securitization Holders' Committee (the "Ad Hoc Committee"), for a servicing fee arrangement were set for bidders for the manufactured housing servicing business. These guidelines, 110 to 150 basis points per annum inclusive of incentives, exceed the contractual rate and priority set forth in the Servicing Agreements. The revised servicing fee and servicing protocol set forth in the Consent Agreement (the "*Consent Agreement*"), attached hereto as *Exhibit A*, is consistent with the guidelines approved by these certificateholders. Fannie Mae, the Ad Hoc Committee and the Official Creditors Committee have approved the Consent Agreement attached hereto. In addition, the Consent Agreement provides for the release of certain claims against the CFC Debtors as specifically provided for therein.

W.    Bidders submitted bids based upon these guidelines and other guidance of holders of certificates. The successful bidder for the manufactured housing servicing business has agreed to the terms of the Consent Agreement. The Consent Agreement is fair and reasonable.

X.    The Trustees have sought alternative servicing arrangements, and have researched potential successor servicers. The Trustees have been unable to identify a successor servicer willing to service CFC's entire manufactured housing servicing portfolio on more favorable terms and conditions.

Y.    The Trustees seek direction and instructions from this Court permitting the modification of the Servicing Agreements consistent with the terms of the Consent Agreement for the mutual benefit of the Certificateholders, the Securitization Trusts and the Debtors' estates. The Trustees believe that the damages which would accrue to the Certificateholders if the resolution were not approved are far greater than the increase in the amount and priority of the Servicing Fee. The Court finds the resolution of the servicing issues to be fair, reasonable

and in the best interests of the Certificateholders, the Securitization Trusts and the Estate. Having found the resolution to be fair and reasonable, the Court finds no bona fide basis for any actions or claims against the Trustees as a result of this Order and the terms hereof.

**Jurisdiction, Venue and Notice**

AA.    This Court has jurisdiction over these proceedings and the parties affected thereby pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b). Alternatively, this Court finds that the disputes with respect to the servicing fee and servicing protocol are "related to" CFC's pending bankruptcy proceeding, and therefore this Court has jurisdiction to over this matter pursuant to 28 U.S.C. §157(c). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409. This matter is brought to direct and instruct the Trustees with respect to the power and authority of the Trustees to resolve certain issues relating to the servicing of certain trusts related to the Debtors' estates, and to approve an enhanced servicing fee to the winning bidder, or the purchaser of the manufactured housing portfolio approved by the Trustees and the other Consultation Parties. Under laws of the state of Minnesota and New York applicable to the Securitization Trusts, this court has the ability to so direct and instruct a trustee pursuant to §501B16 of the Minnesota Statues Annotated and NY CPLR Section 7701, particularly where, as here, the deviation or modification of the Servicing Agreements are necessary to preserve the trust estates. In the absence of the modifications, the Trustees would be placed in an impossible situation.

BB.    The form and manner of notice of the hearing, given in accordance with the Order of this Court dated December 18, 2002 and February 21, 2003, constitute due and sufficient notice to Certificateholders under the circumstances pursuant to Bankruptcy Rule 2002, any and all other provisions of the Bankruptcy Code and Bankruptcy Rules governing notice, and any other applicable Federal or state law.

CC.    In addition to the written notice to the Certificateholders, the Trustee held conference calls open to all holders of certificates. These conference calls were held periodically between the Petition Date and the date of this hearing. Further the Trustee held meetings with significant holders of the Certificates, including Fannie Mae, members of the Ad Hoc Committee, and the Official Committee of Unsecured Creditors of CFC (the "*Official Committee*"). These meetings included meetings held on January 6, 2003, January 15, 2003, January 29, 2003, February 12, 2003, and February 19, 2003 and March 11, 2003. The purpose of these calls and meetings were to attempt to obtain a consensus among Certificateholders with respect to the issues relating to the amount and priority of the servicing fee.

DD.    Further certain Certificateholders met separately and alone with potential bidders in an effort to obtain a resolution of the amount and priority of the servicing fee.

EE.    As a result of the Consent Agreement, the objections of the Ad Hoc Committee, the Official Committee, Deutsche Asset Management and Federal National Mortgage Association to the Motion have been withdrawn. Given the Notice given to holders of Certificates, the withdrawal of the objections filed by Certificateholders, this Order and the Consent Agreement is deemed to be consented to by all holders of Certificates.

ACCORDINGLY THIS COURT ORDERS, ADJUDGES AND DECREES THAT:

### Direction and Instructions to the Trustee

1. *Directions and Instructions.* In light of the significant issues relating to the servicing of the manufactured housing loan portfolios owned by the Securitization Trusts and the impossibility of continuing the servicing of the manufactured housing contracts in the Securitization Trusts under the current contractual terms and conditions, the Trustees are directed and instructed to modify the Servicing Agreements in accordance with the Consent Agreement and this Order. The Trustees have the power and authority under applicable state law to seek a resolution of the issues relating to the servicing of the Securitization Trusts pursuant to §501B16 of the Minnesota Statues Annotated and NY CPLR Section 7701. This Court has jurisdiction and the power to direct and instruct the Trustees, approve the modifications to the Servicing Agreements set forth in the Consent Agreement and this Order, and exculpate the Trustees and bar actions against the Trustees as a result of following such instructions.

### The Resolution on Servicing Fees

2. *Continuation of Services.* CFC as Servicer, or the purchaser of the manufactured housing servicing business (the *"Purchaser"*), shall, except as modified herein, continue to service the manufactured housing contracts in the Securitization Trusts in at least the same manner set forth in the Servicing Agreements as modified by the Consent Agreement. Except as provided for and addressed in the Consent Agreement, any objection to the assumption and assignment of the portion of the Servicing Agreements related to Servicing is overruled. The Debtor is authorized and, subject to the applicable closing conditions set forth in the Purchase and Sale Agreement, directed: (a) to assume and assign the rights, duties and obligations of the Successor Servicer as set forth and defined in the Servicing Agreements and the cure obligations as set forth in the Consent Agreement (*"Assumed Servicing Agreements"*); and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and

transfer the Assumed Servicing Agreements to the Buyer. The Debtors' cure obligations shall be resolved in accordance with the Consent Agreement and the Letter Agreement. CFC and the Purchaser shall attempt in good faith to resolve any Exceptions that are verified in accordance with the terms of the relevant Pooling and Servicing Agreement with respect to the Contracts as soon as practicable; provided, that any post-closing costs incurred by CFC in curing "critical" Exceptions for borrowers or obligors in default, i.e. those Exceptions the existence of which impair the Purchaser's ability to enforce material obligations of borrowers or obligors, shall be paid from funds in the Reserve Account established in the Consent Agreement. CFC as Servicer, and the Purchaser, shall act in good faith in its exercise of control over the servicing platform for manufactured housing contracts, including, without limitation, as relates to the continuity of servicing of the manufactured housing contracts. CFC and/or the Purchaser shall comply with the transition of servicing protocol set forth in the Consent Agreement (the "*Transition of Servicing Protocol*"). CFC shall continue to maintain and operate the accounts holding proceeds from manufactured housing contracts or otherwise relating to the Securitization Trusts in the ordinary course of business and in a manner to prevent misappropriation and misapplication of such funds. CFC shall cooperate with the Trustees and the Purchaser to ensure an orderly transfer of such accounts to the successor servicer. The Successor Servicer shall be entitled to delegate its servicing duties under the Assumed Servicing Agreements to one or more affiliates (as defined in the Purchase and Sale Agreement), provided that any such delegation shall not relieve the Successor Servicer of any obligations under the relevant Assumed Servicing Agreements or otherwise be construed to effect an assignment of such Assumed Servicing Agreements by the Successor Servicer to any party.

3.    *Increase in Servicing Fee and Adjustment of Priority.* The monthly servicing fee payable to the Servicer under each Securitization Trust shall, upon Closing of the Purchase and

Sale Agreement be increased in accordance with the Consent Agreement, and shall be payable in the priority set forth in the Consent Agreement (except, in the case of Securitization Trusts for which P&I insurance is in force, in which cases the servicing fee will be paid in the highest priority that will not adversely affect the continuation in force of such insurance). The Trustees may deduct their reasonable fees and expenses from the servicing fee before remittance to the Servicer.

4.    *Fees of the Trustees.* For purposes of clarity and consistent with the modifications set forth in the Interim Order, the fees and expenses of the Trustees with respect to this resolution and the Securitization Trusts, including but not limited to any fees and expenses in connection with this resolution and any custodial fees of the Trustee, shall continue to be payable on a pro rata basis by the Securitization Trusts as part of the servicing fee. Such fees and expenses shall continue to be a first priority expense and/or distribution of the Securitization Trusts. The provisions of this paragraph 4 shall survive any termination of this Order.

5.    *Assumption of Custodial Agreements.* To the extent that CFC acts as custodian for CFC, the Successor Servicer shall retain U.S. Bank to serve as custodian under the same terms and conditions, and fee arrangements as U.S. Bank acted for CFC.

6.    *Power of Attorney.* CFC hereby appoints the Trustees and each of them its attorney-in-fact, with full power of substitution solely for the purpose of executing and/or endorsing in the name of CFC any and all documents with respect to the loans and contracts owned by a securitization trust solely to add CFC's signature where such addition is required to fulfill an obligation of CFC existing prior to the date of this Order to execute and/or endorse such documents. This appointment is coupled with an interest and is irrevocable.

7.    *Bar Against Asserting Certain Claims Against the Purchaser.* Except as set forth in the Consent Agreement (including, but not limited to the creation of a reserve for Exceptions and

the obligation to cooperate in good faith to cure Exceptions), the Certificateholders and the Trustees are barred, estopped and permanently enjoined from asserting against the Purchaser any breach or default under the Servicing Agreements, any claim of lack of consent or any other condition to the assignment of the Servicing Agreements, or any counterclaim, defense, setoff, right of recoupment or any other claim asserted or assertable against the Debtors arising under or related to the Servicing Agreements that exist as of the date hereof or arise by reason of the sale of the manufactured housing servicing business.

8.    *Reservation of Rights of Trustee, and Certificateholders.*  The Trustees, on behalf of themselves and the Securitization Trusts, HE/HI Trusts, CC Trusts and RECS Trusts and the relevant Certificateholders are limited to all rights, remedies, claims and causes of action against the Debtors that are available to them under the Servicing Agreements as to the B-2 Guarantees, the proceeds of sale and the administration of Securitization Trust funds the Trustees fees and custodial fees and expenses and both directly and derivatively and as to any and all funds in the Reserve Account as set forth in the Consent Agreement and the pooling and servicing agreements relating to the HE/HI Trusts, CC Trusts and RECS Trusts.

9.    *Compromise Approval on a Final Basis.*  The compromise embodied in this Order and the Consent Agreement is hereby approved as fair, adequate and reasonable under all of the circumstances, to the Securitization Trusts, the Debtors and their Estates.  The Consent Agreement and Letter Agreement are determined by this Court to be fair, prudent and reasonable result for all Certificateholders, and are in the best interest of all Certificateholders, the Securitization Trusts and the Debtors.  The Trustees have acted reasonably and prudently in seeking this Order.

10.    *Bar Against Asserting Claims Against Trustees.*  Certificateholders are bound by the terms of this Order and the Consent Agreement.  Having found, *inter alia*, the resolution to be

fair and reasonable, the Court finds no bona fide basis for any actions or claims against the Trustees, the Ad Hoc Committee, the Official Committee, the individual members of the Ad Hoc Committee, the individual members of the Official Committee, Fannie Mae and their respective officers, directors, agents and counsel as a result of this Order or the Consent Agreement and the terms hereof. The Trustees, the Ad Hoc Committee, the Official Committee, the individual members of the Ad Hoc Committee , the individual members of the Official Committee, Fannie Mae and their respective officers, directors, agents and counsel shall have no liability for any claims, demands, suits, actions or causes of action by reason of any facts, events, acts, conduct or omissions arising out of participation in the implementation of this Order or the Consent Agreement. Certificateholders shall be and are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Trustees, the Ad Hoc Committee, the Official Committee, the members of the Ad Hoc Committee, the members of the Official Committee, Fannie Mae their respective officers, directors, agents, and counsel property, their successors and assigns or their affiliates any claims relating in any way to the amount and priority of the servicing fee, any modifications to the servicing protocol, or any other matter which in any way is the subject of this Order or the Consent Agreement.

11.    *Release of Adequate Protection Lien.*  Immediately upon the closing of the sale the Adequate Protection Lien shall indefeasibly be released and terminated.

12.    *Retention of Jurisdiction.*  This Court retains jurisdiction with respect to any matter relating to or arising under this Order, including but not limited to the approval and implementation of modifications to the Servicing Agreements effected by the Consent Agreement.


SO ORDERED:

_____

United States Bankruptcy Judge

March 14, 2003

Execution Copy

## CONSENT AGREEMENT

THIS CONSENT AGREEMENT (this "Agreement"), dated as of March 14, 2003, by and among CONSECO FINANCE CORP., a corporation formed under the laws of Delaware, as debtor-in-possession ("CFC"), WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, in its capacity as trustee for the Wells Fargo Transactions, as defined below ("Wells Fargo"), U.S. BANK NATIONAL ASSOCIATION, in its capacity as trustee for the U.S. Bank Transactions, as defined below ("U.S. Bank"; together with Wells Fargo, the "Trustees"), FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Fannie Mae"), in its capacity as a Certificateholder with respect to certain of the Trusts, as defined below, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CONSECO FINANCE CORP., on behalf of its members, in their capacity as Certificateholders of certain of the Trusts, as defined below (the "Official Committee"), and the AD HOC SECURITIZATION HOLDERS' COMMITTEE, on behalf of its members, in their capacity as Certificateholders of certain of the Trusts, as defined below (the "Ad Hoc Committee"; together with the Official Committee, the "Committees"), and CFN INVESTMENT HOLDINGS LLC, a Delaware limited liability company (the "Purchaser"), recites and provides as follows:

## RECITALS

WHEREAS, CFC is the seller with respect to each of the CFC Mortgage Loan Asset-Backed Certificates securitization transactions (each, a "Transaction" and, together, the "Transactions") listed on Schedule 1 attached hereto;

WHEREAS, the trust (each, a "Trust") related to each Transaction has been established pursuant to the terms of a Pooling and Servicing Agreement and is serviced by CFC as servicer pursuant to each such Pooling and Servicing Agreement identified on Schedule 1 (each a "Pooling and Servicing Agreement" and, together, the "Pooling and Servicing Agreements");

WHEREAS, Wells Fargo serves as trustee with respect to each of the following two series of Transactions (together, the "Wells Fargo Transactions"): Series 1996-1 and Series 1996-2;

WHEREAS, U.S. Bank serves as trustee with respect to each of the other 66 series of Transactions (collectively, the "U.S. Bank Transactions");

WHEREAS, Fannie Mae, the members of the Official Committee, and/or the members of the Ad Hoc Committee directly or indirectly hold 25% or more in outstanding principal amount of one or more classes of the manufactured housing asset-backed certificates issued by most or all of the Trusts pursuant to the Pooling and Servicing Agreements ("Certificates");

WHEREAS, CFC, together with Conseco, Inc. and certain of its affiliates ("Conseco") commenced a case under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on December 17, 2002 (the "Chapter 11 Case"), in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court");

WHEREAS, pursuant to Sections 363 and 365 of the Bankruptcy Code, CFC has proposed to assume each of the contracts providing for the rights and obligations of the Servicer contained within the documents referred to as the Pooling and Servicing Agreements, as amended pursuant to this Agreement (the "Servicing Agreements"), and to enter into an Asset Purchase Agreement in substantially the form annexed hereto as Exhibit A (the "APA") with Purchaser for, among other things, the sale, conveyance and assignment of servicing rights and the related servicing platform to the Purchaser and the assumption of servicing responsibilities with respect to the Transactions by the Purchaser (such sale, assumption and assignment, the "Acquisition");

WHEREAS, (i) the Purchaser has required the consent of the Trustees, Fannie Mae and the Committees to the amendment and assumption of the Servicing Agreements by CFC, the assignment to and assumption of the servicing rights, as amended, by the Purchaser, and the execution and performance of the APA and the Acquisition and (ii) the Trustees, Fannie Mae and the Committees believe that such consents are a condition to the foregoing in any event;

WHEREAS, in the event that this Agreement is not approved by the Bankruptcy Court, nothing contained herein shall constitute or be construed as an admission of liability or be used for any purpose; and

WHEREAS, the parties hereto have agreed to resolve certain issues arising from the proposed amendment and assumption of the Servicing Agreements and the Acquisition upon the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.    **Definitions.** Except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Pooling and Servicing Agreements. In addition, the following terms shall have the following definitions:

"*Acquisition Order*" shall mean the order or orders, if more than one, of the Bankruptcy Court approving the Acquisition and the settlement contained in this Agreement.

"*Closing Date*" shall mean the date on which the Acquisition is closed.

"*Confirmation Order*" shall mean the order of the Bankruptcy Court confirming a plan of reorganization or liquidation of Conseco (or a plan of Conseco proposed by any other party), dismissing Conseco's bankruptcy case or converting Conseco's bankruptcy case to any other chapter of the Bankruptcy Code.

"*Eligible Investments*" shall have the meaning assigned to the term "Eligible Investments" in the Pooling and Servicing Agreement for Transaction Series 2000-1 (except that clause (vii) of such definition shall not apply).

"*Final Order*" shall mean an order or judgment entered by a court of competent jurisdiction, including without limitation the Bankruptcy Court, that (i) is effective, (ii) has not been reversed, stayed, modified or amended, (iii) is not the subject of a pending appeal or motion for review or reconsideration, (iv) has not been and may no longer be appealed from or otherwise reviewed or reconsidered, and (v) is final and non-appealable in accordance with applicable law, including without limitation Rule 8002 of the Federal Rules of Bankruptcy Procedure.

"*9019 Order*" shall mean the Final Order contemplated by the Order Approving (1) Interim Servicing Arrangement For Manufactured Housing Securitization Trusts, (2) Granting of Liens in Favor of U.S. Bank National Association and (3) Procedures and Notice for Final Hearing on Servicing Arrangements entered by the Bankruptcy Court on December 18 and 20, 2002 approving settlement of the servicing fee issues.

2.    ***Assignment and Assumption of Servicing; Consent; Modification of Pooling and Servicing Agreements; Compliance with Service Transfer Provisions; etc.*** Subject to compliance with the conditions set forth in Section 4 of this Agreement (or waiver thereof as provided therein), each of U.S. Bank, Wells Fargo, Fannie Mae, the Official Committee and the Ad Hoc Committee, on behalf of its members (each such party to this Agreement acting severally and on its own behalf) (the "Consenting Parties" and, each, a "Consenting Party"), hereby consents to the assumption of the Servicing Agreements by CFC, the assignment to and amendment and assumption of servicing rights by the Purchaser, the execution and performance of the APA and the Acquisition. The parties shall amend the terms and conditions of the Pooling and Servicing Agreements, subject to the provisions of this Agreement, substantially as provided in this Agreement and permitted by the 9019 Order. All such modifications shall be set forth in documentation acceptable to the Trustees. The Purchaser shall assume prospectively all responsibilities of the "Servicer" with respect to all of the Transactions as set forth in the Pooling and Servicing Agreements, as amended. The assignment and assumption of servicing pursuant to this Agreement shall be a "Service Transfer" (or equivalent) under each Pooling and Servicing Agreement, and CFC shall comply substantially with all provisions relating to Service Transfers in the Pooling and Servicing Agreements, including without limitation all provisions relating to the transfer to the Trustee of all funds held by it with respect to the Contracts and the transfer to the Purchaser, as the successor Servicer, of all records relating to the Contracts. The Purchaser shall not be liable for any acts or omissions of CFC, as Servicer, occurring prior to the Service Transfer or for any breach by CFC, as Servicer, of any of its obligations contained in the Pooling and Servicing Agreement or in any related document or agreement.

3.    ***Releases***. CFC, on behalf of itself and the Conseco bankruptcy estate, and each of CFC's subsidiaries ~~and affiliates~~ hereby jointly and severally irrevocably and absolutely release, remise, acquit, and discharge each of the Trustees, Fannie Mae, the Official Committee and each of its members, the Ad Hoc Committee and each of its members, their respective affiliates, and each of their respective current and former officers, directors, trustees, employees, attorneys,

agents, consultants, shareholders, successors and assigns from and of any and all claims, demands, causes of action, actions, liabilities, damages, losses, expenses and costs, of any kind or nature whatsoever, including without limitation claims arising under Sections 544 through 553 of the Bankruptcy Code, absolute or contingent, matured or unmatured, liquidated or unliquidated, now known or subsequently discovered, that (i) arise out of or in any way relate to the settlement set forth herein and/or the transactions contemplated hereby (other than the performance by the parties hereto of any obligations hereunder) or (ii) relate to the Pooling and Servicing Agreements. CFC hereby represents and warrants that it is not currently aware of any other claims against the Trustees, Fannie Mae or the Committees or their respective members or agents.

4.    ***Conditions to Consent.*** The consent granted in Section 2 of this Agreement is subject to compliance, to the reasonable satisfaction of the Consenting Parties (as evidenced by an officer's certificate from each Consenting Party to such effect) (or waiver thereof in a writing signed by each Consenting Party), with each of the following conditions:

(a)    The Acquisition Order approves the terms hereof, is in form and substance acceptable to each of the Consenting Parties and the Purchaser in its reasonable discretion, and becomes a Final Order.

(b)    The 9019 Order is in form and substance acceptable to each of the Consenting Parties and the Purchaser in its reasonable discretion and becomes a Final Order.

(c)    The Purchaser and CFC have executed and delivered the APA.

(d)    The Pooling and Servicing Agreements shall have been amended with respect to the following matters, which amendments shall be in form and substance satisfactory to each of the Consenting Parties and the Purchaser and permitted by the 9019 Order:

(1)    *Servicing Standard and Protocols.* In lieu of the general servicing standard of care set forth in the first sentence of Section 5.02 of each of the Pooling and Servicing Agreements, the Purchaser shall agree to service the manufactured housing chattel paper and mortgage loans (collectively, the "Contracts") from and after the Closing Date substantially in accordance with all applicable laws, the servicing protocols described in Exhibit B hereto (the "Required Servicing Protocols"), to the fullest extent that the Required Servicing Protocols are consistent with such applicable laws, and the terms of this Agreement, and exercise the same degree of care, in its good faith business judgment, as that of consumer finance and mortgage banking institutions that service loans of the same type as the Contracts in the jurisdictions in which the related manufactured homes are located (to the extent that such practices do not conflict with the Required Servicing Protocols), with a view to reducing defaults on Contracts and maximizing recoveries on repossessed manufactured homes for holders of Certificates ("Certificateholders"). The Purchaser shall be permitted to

modify the interest rate, principal balance, or both, with respect to any Contract to the extent such modification is consistent with the Required Servicing Protocols, the Purchaser's loss mitigation strategies, the amended Pooling and Servicing Agreements and the requirements of applicable law. Such practices are subject to change based on modifications recommended by the Oversight Committee (as defined below) and consented to by the Purchaser, which consent shall not be unreasonably withheld. In addition, the Purchaser agrees:

(A)    To make such capital infusion as it deems reasonably necessary to conform the accounting system, queuing software, auto-dialer, call optimizer and required computer hardware and software necessary to satisfy the Required Servicing Protocols and to cause such information technology to be available and operational to such benchmarks, as may be established by the Purchaser in consultation with the Oversight Committee, concerning servicing.

(B)    That all behavioral score, adaptive control and migration tools will be updated and current under timetables established by the Purchaser in consultation with the Oversight Committee and will be used to optimize efficiency and effectiveness.

(C)    To employ at all times sufficient numbers of experienced collection and loss mitigation staff as the Purchaser, in consultation with the Oversight Committee, reasonably deems necessary to satisfy the Required Servicing Protocols.

(D)    In consultation with Fannie Mae and subject to approval of the Oversight Committee, to develop and implement a recovery model that will guide the Purchaser's recovery decisions, with any exceptions to be approved by senior management of the Purchaser (and such exceptions to be communicated to and reviewed periodically by the Oversight Committee).

(E)    As part of the Purchaser's defined loss mitigation strategies, to commence repossession and liquidation or other disposition of each manufactured home at such time as the related Contract becomes 120 days delinquent (but not prior to the time that it has employed to completion a loss mitigation strategy with respect to such Contract in accordance with Section 4(d)(3)).

(2)    *Servicing Advances.* The Purchaser must make, from its own funds, all advances for liquidation expenses, including loss mitigation expenses, insurance premiums, litigation expenses and charge-off expenses. The Purchaser shall be reimbursed for such liquidation expenses upon liquidation of the related Contract, but only from the liquidation proceeds of the related Contract. All such liquidation expenses shall be targeted to achieve the sale of repossessed

Move to
P-6

*Insert from p. 5?*

manufactured homes through wholesale and retail channels in the reasonable ratios developed by the Purchaser in consultation with the Oversight Committee. In addition, the Purchaser must make, from its own funds, all advances (each, a "Protective Advance") for expenses in connection with transfers of equity by the debtor ("DTOE"). The Purchaser shall be entitled to be reimbursed by the applicable Trust for Protective Advances 90 days after such expense is incurred. The Purchaser must maintain adequate records, including back-up documentation, to evidence all advances, including Protective Advances.

(3)     *Loss Mitigation.* The Purchaser must employ loss mitigation strategies that are consistent with and attempt to achieve the wholesale/retail ratios to be developed by the Purchaser in consultation with the Oversight Committee pursuant to Section 4(d)(2) of this Agreement and that otherwise have the objective of maximizing recovery on Contracts and the related manufactured homes for the benefit of Certificateholders, including without limitation: DTOEs, retail recoveries, origination of refinancing loans on repossessed manufactured homes commencing within 90 days following the Closing Date, willingness to work with third party vendors to sell repossessed units, and active pursuit of deficiencies after liquidation or other disposition of each manufactured home collateralizing a Contract.

(4)     *Servicing Fees; Calculation.* The Servicing Fee shall equal 125 basis points for the first twelve months following the Closing Date and shall equal 115 basis points thereafter, payable in the Pooling and Servicing Agreements' payment "waterfalls" with the priority described in Section 6.11(b) of the APA, after the payment of the Trustees reasonable fees and expenses, and related custodial fees and expenses. The Purchaser shall write off the principal balance of any Contract in respect of which Purchaser is required, pursuant to Section 4(d)(1)(E) hereof, to commence repossession, liquidation or other disposition, or in respect of which Purchaser modifies the principal balance as contemplated by Section 4(d)(1) hereof, in each case so that such principal balance written off will no longer be included in the calculation of the collateral balance of the related Trust. The fees and expenses of the Trustees shall be payable from the Servicing Fee, and the Trustees may deduct their fees and reasonable expenses from the Servicing Fee and fees and expenses for related custodial services and services to be provided pursuant to this Agreement before remittance of the Servicing Fee to the Servicer.

(5)     *Change of Control or Ownership.* The Events of Termination (or equivalent) under each Pooling and Servicing Agreement will be amended to provide that (A) change of control of the Purchaser (which shall be defined in a manner mutually agreeable to the Consenting Parties) as Servicer thereunder, (B) the sale, transfer or other disposition of all or a substantial portion of the assets of the Purchaser (with the servicing platform acquired as part of the Acquisition being deemed to constitute a substantial portion of the Purchaser's assets), or (C) the transfer or assignment of the Purchaser's rights as Servicer under the

Pooling and Servicing Agreements (other than in a transaction described in clauses (A) or (B) herein), shall constitute an Event of Termination (or equivalent) permitting the exercise of the remedies by the Trustee and the Certificateholders set forth in the Pooling and Servicing Agreement, provided, that no such event described in clauses (A) or (B) herein shall constitute an Event of Termination (or equivalent) unless, as a result thereof: (x) the Oversight Committee, acting reasonably, concludes that there will exist a substantial lack of continuity in the management personnel of the Purchaser or its affiliates having primary responsibility for the Purchaser's manufactured housing business and (y) the Oversight Committee, acting reasonably, concludes, after consultation with the personnel who will replace the Purchaser's personnel, that the Purchaser's performance under the Pooling and Servicing Agreements would be materially and adversely affected.

(6)    *Voluntary Termination or Resignation.* The Events of Termination (or equivalent) under each Pooling and Servicing Agreement will be amended to provide that the voluntary termination or resignation of the Purchaser as the Servicer under any Pooling and Servicing Agreement shall constitute an Event of Termination (or equivalent) under each of the Pooling and Servicing Agreements; provided nothing contained herein or in such amendment of the Pooling and Servicing Agreements shall permit the Successor Servicer to voluntarily terminate or resign the Pooling and Servicing Agreements.

(7)    *Required Servicing Protocols.* The Events of Termination (or equivalent) under each Pooling and Servicing Agreement will be amended to provide failure to comply in all material respects with the Required Servicing Protocols in respect of such Pooling and Servicing Agreement shall constitute an Event of Termination (or equivalent) under such Pooling and Servicing Agreement.

(8)    *Electronic Provision of Information to Certificateholders.*  The Pooling and Servicing Agreements shall be amended to provide that the Servicer shall maintain a system of electronic information dissemination that permits Certificateholders to obtain information with respect to the Trusts and Contracts on at least the same basis and level of accessibility as the system of electronic information dissemination maintained by CFC as of the date of this Agreement. Such system shall include, at a minimum, website and e-mail access to monthly reports, pool level data, Contract-level data (including, at a minimum, original Contract characteristics, updated Contract balances, and refreshed FICO scores) on a Trust-by-Trust basis, and other information with respect to the Trusts and Contracts that is made available to Certificateholders in such manner by CFC as of the date of this Agreement.

(9)    *Servicing Reports.* The Pooling and Servicing Agreements shall be amended to provide that the Servicer shall furnish to the Trustees, in both print and electronic formats, and shall post on the website that it maintains for the

benefit of Certificateholders pursuant to Section (8) of this Agreement, the following monthly reports for each Trust (in addition to other reports required to be furnished under the Pooling and Servicing Agreements):

(A)     *Collateral Liquidation Report.*  The Servicer shall prepare a report each month for each Trust (each a "Collateral Liquidation Report") containing the following information for each liquidated Contract: Contract number, Contract age, unit identification number, make, model, year manufactured, year refurbished, chattel or land home, state, original principal balance, unpaid principal balance, gross proceeds, advances (repossession expense, insurance, rent, other), refurbishment expense, sale expense, other expense, total expenses, and net proceeds.

(B)     *Inventory Report.*  The Servicer shall prepare a report each month for each Trust (each an "Inventory Report") containing the following information for each repossessed unit or REO property: Contract number, Contract age, unit identification number, make, model, year manufactured, year refurbished, chattel or land home, state, original principal balance, unpaid principal balance, estimated net recovery amount, and number of days since repossession/REO.

(C)     *Collateral Prepayment Report.*  The Servicer shall prepare a report each month for each Trust (each a "Collateral Prepayment Report") containing the following information for each Contract that was prepaid in full:  Contract number, Contract age, unit identification number, make, model, year manufactured, year refurbished, chattel or land home, state, original principal balance, unpaid principal balance, and payoff amount.

(D)     *Contract Modification Report.*  The Servicer shall prepare a report each month for each Trust (each a "Contract Modification Report") containing the following information for each Contract that was extended or otherwise modified:  Contract number, Contract age, unit identification number, make, model, year manufactured, year refurbished, chattel or land home, state, original principal balance, unpaid principal balance, and modified Contract terms (including, without limitation, interest rate, principal reduction, new principal balance, monthly payment and term).

(10)     *Access to Auctions.*  The Pooling and Servicing Agreements shall be amended to provide that Certificateholders and their agents and representatives will be permitted reasonable access to any wholesale auction at which collateral is to be liquidated.     The Servicer shall provide a representative to assist in coordination and scheduling of such access by Certificateholders.

(11)     *Agreed-Upon Procedures.*  The Pooling and Servicing Agreements shall be amended to provide that the Servicer shall arrange, at its expense, for a

firm of nationally recognized certified public accountants to perform agreed-upon procedures with respect to the Trusts on an annual basis. Such agreed-upon procedures, and the timing for the delivery of such accountants' annual report to the Trustees and the Certificateholders with respect to such procedures, shall be developed by the Oversight Committee (as defined below), shall be reasonably acceptable to the Ad Hoc Committee and shall include, at a minimum, the following: verification of Monthly Report information; verification of Certificateholders' remittance report information; verification of Collateral Liquidation Report information: verification of Inventory Report information; verification of Collateral Prepayment Report information; and verification of Contract Modification Report information.

(12)  *Financial Reporting.*  The Pooling and Servicing Agreements shall be amended to provide that, upon the request of any Certificateholder, the Servicer shall furnish, with reasonable promptness, any financial data, financial reports and other data relating to the Contracts as such Certificateholder may reasonably request to allow it to evaluate Servicer's performance under the Pooling and Servicing Agreements, as amended. If, in its reasonable judgment, the Servicer believes that any such financial data, report or other data that has been so requested would provide materially useful information to all Certificateholders generally, it will, at the time that it furnishes such data, report or other data to the requesting Certificateholder, post such data, report or other data on the website that it maintains for the benefit of Certificateholders pursuant to Section (8) of this Agreement.

(13)  *Inspection, Access, etc.*  The Pooling and Servicing Agreements shall be amended to provide that, upon the request of any Certificateholder, the Servicer shall permit such Certificateholder, or its authorized agent, at reasonable times and upon reasonable notice, to inspect the books and records of the Purchaser as they may relate to any Class of Certificates held by such Certificateholder, the Contracts and the Purchaser's obligations under the Pooling and Servicing Agreements, as amended, and to discuss matters relating to any Class of Certificates held by such Certificateholder, the Contracts or the Purchaser's obligations under the Pooling and Servicing Agreements, as amended, with an appropriate authorized officer of the Purchaser.

(14)  *Back-Up Servicer.*  Neither this Agreement nor the amendments to the Pooling and Servicing Agreements contemplated hereby shall affect any obligations of any "Back-up Servicer" under any of the Pooling and Servicing Agreements.

(15)  *Amendments to Implement Reserve Account.*  The Pooling and Servicing Agreements shall be amended to the extent necessary to implement the provisions of Section 4(j) of this Agreement.

(e)     The Purchaser shall consent to the formation of an oversight committee (the "Oversight Committee") consisting of one representative from the Purchaser and four representatives of the Certificateholders, which shall include (to the extent that representatives from the following categories can be recruited to so serve) (i) one representative from Fannie Mae, (ii) one representative from the Ad Hoc Committee, (iii) (A) so long as Fannie Mae owns in the aggregate more than $1 billion in outstanding principal amount of Certificates, a second representative from Fannie Mae and (B) otherwise, the representative of one Certificateholder that is not a member of the Ad Hoc Committee or the Official Committee and that holds, predominantly, Certificates that are senior in payment priority to the B-2 Certificates, and (iv) one representative from the B-2 Certificateholders. The Purchaser shall agree to work with the Oversight Committee to develop adequate reporting and consultation with regard to the Purchaser's servicing of the loans and units. The Oversight Committee shall have the same rights with respect to the direction of the Trustees under each Pooling and Servicing Agreement as a Certificateholder owning 25% in outstanding principal amount of each class of Certificates under a Pooling and Servicing Agreement; provided, that with respect to any class of Certificates issued under a Pooling and Servicing Agreement, if the Trustee receives conflicting directions from a Certificateholder owning 25% (or more) in outstanding principal amount of such class of Certificates, the Trustee shall instead follow the directions of such Certificateholder. Neither the Oversight Committee nor any member of the Oversight Committee shall owe any fiduciary duty to any Certificateholder.   No member of the Oversight Committee shall be liable to the Purchaser or any other person with respect to any action it takes or refrains from taking in the performance of its functions as a member of the Oversight Committee, other than with respect to its own gross negligence or willful misconduct.  The Purchaser shall reimburse each member of the Oversight Committee for the reasonable expenses incurred by its representative in performing its functions as a member of the Oversight Committee. The Trustees shall not be liable for the composition, utilization, formation or for any act or omission of the Oversight Committee and shall not be deemed to have knowledge of any information obtained by the Oversight Committee unless such information is provided to the Trustees in writing pursuant to the terms of the Pooling and Servicing Agreements.    Except as provided in Sections 4(d)(5), (6) and (7) hereof, nothing contained herein shall alter the specified Events of Termination (or equivalent) as set forth in the Pooling and Servicing Agreements. The Trustees may request, from time to time, a report from the Oversight Committee for distribution to all Certificateholders reporting on the proceedings of the Oversight Committee and may request copies of all information given to the Oversight Committee.

(f)     The Purchaser must have provided evidence satisfactory to Fannie Mae that the Purchaser has unrestricted funds owned by and available for use by it in the performance of its duties as Servicer hereunder and under the Pooling and Servicing Agreements in an amount not less than $100,000,000.

(g)     Within 90 days after the Closing Date, the Purchaser shall provide $100,000,000 and Fannie Mae shall provide $50,000,000 for investment in a repo-refinancing program to be developed by Fannie Mae, which program shall have

underwriting criteria reasonably acceptable to the Purchaser and Fannie Mae. Such funds provided by the Purchaser shall be available generally to refinance Contracts in all of the Trusts. In Fannie Mae's sole discretion, such funds provided by Fannie Mae shall be available to refinance only Contracts in Trusts that have issued Certificates that are held by Fannie Mae or generally to refinance Contracts in all of the Trusts.

(h)    The Purchaser shall (i) permit Fannie Mae's designated servicing consultants to monitor and review, and report to Fannie Mae with respect to, the Purchaser's servicing practices and procedures no more frequently than every 30 days, (ii) have its management meet with Fannie Mae to discuss servicing practices and procedures at regular intervals and no more frequently than every 60 days, and (iii) have the executive management of the Purchaser and Fannie Mae agree to meet to discuss servicing practices and procedures no less frequently than every six months.

(i)    The legal fees, expenses and costs of Fannie Mae and the Ad Hoc Committee and its members shall be paid on or before the Closing Date by CFC as a finally allowed substantial contribution claim from the proceeds of Acquisition or the $35 million adequate protection lien in favor of the Trustees.

(j)    *Establishment, Funding and Use of Reserve Account.*

(1)    The Reserve Account Trustee (as defined below) shall establish and maintain a trust account for the benefit of the respective Trusts, Trustees and Certificateholders (the "Reserve Account"). CFC shall, on or before the Closing Date, deposit the amount of $35 million dollars into the Reserve Account.

(2)    The Reserve Account shall be available to the respective Trusts and Trustees (a) to pay or reimburse the respective Trusts and Trustees for any claims that any Trust or Trustee may have against CFC or any affiliate thereof under a Pooling and Servicing Agreement or any other document related to the Trusts, or amounts owing or which would otherwise be owing thereunder, including, without limitation, claims based on CFC's failure to cure or repurchase any Contract for breaches of any representation or warranty in any Pooling and Servicing Agreement (respecting document exceptions or otherwise) or any failure or alleged failure of CFC or any affiliate thereof to properly originate or service any Contract and (b) to pay or reimburse the respective Trusts and Trustees for any other expense of any Trust; provided, however, that the aggregate amount that is paid or transferred to any Trust shall not exceed an amount equal to 2 times the amount determined by multiplying the $35 million deposited into the Reserve Account as provided herein by a fraction the numerator of which is the unpaid principal balance of the Certificates issued with respect to such Trust as of December 17, 2002 and the denominator of which is the unpaid principal balance of the Certificates issued with respect to all Trusts as of December 17, 2002.

(3)     Each Trustee hereby appoints U.S. Bank National Association as reserve account trustee hereunder (in such capacity, the "Reserve Account Trustee") to own the Reserve Account on behalf of each Trust and the Reserve Account shall be held in the name of the Reserve Account Trustee. The Reserve Account Trustee shall have the sole authority to make withdrawals from the Reserve Account at the request of the Trustee of the respective Trust, subject to the terms of this Agreement. The terms and conditions of the trust agreement (or equivalent instrument) establishing the reserve account shall be mutually acceptable to the Trustees and the Oversight Committee.

(4)     The Reserve Account shall be a separate interest-bearing trust account. The Reserve Account Trustee shall invest all amounts on deposit in the Reserve Account in Eligible Investments. Earnings on amounts on deposit in the Reserve Account shall be retained in the Reserve Account until withdrawn pursuant to this Agreement.

(5)     On April 1, 2008 one-half of the remaining amount then on deposit in the Reserve Account shall be divided among each of the then existing Trusts, pro rata based on the unpaid principal balance of the Certificates issued with respect to each Trust as of April 1, 2008, and deposited by each Trustee into the related Certificate Account (or equivalent) under the related Pooling and Servicing Agreement, treated as collections respecting Contracts, and applied on the next Remittance Date (or equivalent) in accordance with the related payment "waterfall" under such Pooling and Servicing Agreement; provided, however, that in all cases such funds shall be used exclusively to pay principal of and interest on Certificates (other than Certificates that are beneficially owned directly or indirectly by CFC or any affiliate thereof).

(6)     On April 1, 2009 the remaining amount then on deposit in the Reserve Account shall be divided among each of the then existing Trusts, pro rata based on the unpaid principal balance of the Certificates issued with respect to each Trust as of April 1, 2009, and deposited by each Trustee into the related Certificate Account (or equivalent) under the related Pooling and Servicing Agreement, treated as collections respecting Contracts, and applied on the next Remittance Date (or equivalent) in accordance with the related payment "waterfall" under such Pooling and Servicing Agreement; provided, however, that in all cases such funds shall be used exclusively to pay principal of and interest on Certificates (other than Certificates that are beneficially owned directly or indirectly by CFC or any affiliate thereof).

(k)     In consideration of the Trustees' and the Committees' consent to the modifications of the Pooling and Servicing Agreements contained herein and the assignment to and assumption of servicing rights under the Pooling and Servicing Agreements by the Purchaser and the settlement of all cure claims, the Trustees shall have the rights specified in the Letter Agreement dated March 14, 2003, a copy of which is attached as Exhibit C hereto and the Trustees limit and reserve all rights, remedies,

*(handwritten annotations:)* and applicable law are limited to: (1) ... CFC ... the debtors both directly and derivatively (2) ... the Trustees (3) ... (4)

claims and causes of action against ~~CFC~~ that are available to ~~them~~ under the Servicing Agreements ~~as to~~ the Limited Guarantee with respect to the B-2 Certificates ~~and~~ the proceeds of sale and administration of the Trusts ~~and~~ Trustees fees and custodial fees and expenses ~~both directly and derivatively~~ and ~~as to~~ any and all funds in the Reserve Account as set forth in this Agreement.

5.  **Continuing Representations, Warranties and Covenants.**

    (a)     The Purchaser hereby represents, warrants and covenants to each of the Consenting Parties as follows:

    (i)     The Purchaser shall establish the "goals/metrics" identified in the Required Servicing Protocols in consultation with the Oversight Committee within 60 days after the Closing Date.

    (ii)    The Purchaser and the Trustees shall establish transition of servicing protocols in consultation with the Oversight Committee within 60 days after the Closing Date.

    (iii)   The Purchaser shall not sell, assign or encumber the servicing rights assigned to the Purchaser under the Pooling and Servicing Agreements except for transfers to affiliates without the express prior written approval of the Oversight Committee, which consent shall not be unreasonably withheld.

    (b)     Nothing in the Confirmation Order shall be inconsistent with this Agreement or the Acquisition Order.

6.  **Representations and Warranties.**

    (a)     Each of the parties to this Agreement hereby represents and warrants that each of the following statements is true and accurate as of the date hereof:

    (i)     This Agreement has been duly authorized and validly executed and delivered by such party and constitutes such party's legal, valid and binding obligation, enforceable against such party in accordance with its terms.

    (ii)    Subject, in the case of CFC, to the authority of the Bankruptcy Court, such party is not subject to any restriction, agreement or law, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority that, with or without the giving of notice, the passage of time or both, would prohibit, contravene, be violated by, or be inconsistent with the execution, delivery and performance by such party of this Agreement or the consummation of the transaction effected hereby or contemplated herein.

    (iii)   There is no action, suit or proceeding pending or, to the best of such party's knowledge and belief, threatened against such party that questions the validity of, in any way legally impairs, or seeks to enjoin or otherwise prevent

the execution, delivery and/or performance by such party of this Agreement or, if adversely determined, would have a material adverse effect on such party's ability to perform his or its, as the case may be, obligations hereunder.

(b)    The Official Committee hereby represents and warrants that, by resolution duly adopted, the members of the Official Committee duly authorized the execution of this Agreement on its behalf by the undersigned officer of the Official Committee.

(c)    The Ad Hoc Committee hereby represents and warrants that, by resolution duly adopted, the members of the Ad Hoc Committee duly authorized the execution of this Agreement on its behalf by the undersigned officer of the Ad Hoc Committee.

7.    *No Other Breaches*. CFC hereby represents and warrants to each of the Consenting Parties that CFC is not aware of any breach of any representation or warranty of CFC or any affiliate of CFC under any Pooling and Servicing Agreement other than the breaches resulting directly from CFC's bankruptcy, any breaches otherwise dealt with in this Agreement or any breaches that could obligate CFC to repurchase any Contracts under the Pooling and Servicing Agreements (as to which latter breaches, if any, CFC makes no representations or warranties herein). The Trustees represent that they have filed objections to cure notices which set forth their understanding of certain breaches under the Pooling and Servicing Agreements and potential damage claims. The Purchaser will cooperate in good faith with the Trustees to cure exceptions that could obligate CFC to repurchase any Contracts under the Pooling and Servicing Agreements.

8.    *Consent to Jurisdiction*. Each of the parties hereby agrees that all actions, suits or other proceedings arising out of or relating in any way to this Agreement may, but need not, be brought in the Bankruptcy Court. Each of the parties hereby knowingly, voluntarily, intelligently, absolutely and irrevocably waives and agrees not to assert in any such action, suit or proceeding that it is not subject to the personal jurisdiction of the Bankruptcy Court or that the action, suit or proceeding should be transferred to a different venue under *forum non conveniens* principles or statutes embodying such principles.

9.    *Amendment*. This Agreement may be amended from time to time with respect to matters specifically set forth herein by each of the parties hereto pursuant to a written agreement signed by each of the parties hereto. Following the execution and delivery of this Agreement and the execution and delivery of the amendments to the Pooling and Servicing Agreements contemplated by this Agreement, the Pooling and Servicing Agreement shall be amended only in accordance with the terms thereof.

10.    *GOVERNING LAW.* **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW).**

11.    *Notices*. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid, addressed as follows, or such other address as may be furnished by proper notice as described herein (facsimile numbers are provided below for convenience of communication and not as an alternative means of delivery of notice):

CFC:

Conseco Finance Corp.
1100 Landmark Towers
St. Paul, Minnesota 55102
Attention: Charles H. Cremens
Telecopy: (651) 293-5746

with a copy (which shall not constitute notice) to:

Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
Attention: James M. Sprayregen, P.C.
Telecopy: (312) 861-2200

Wells Fargo:

Wells Fargo Bank Minnesota, N.A.
Corporate Trust – Wells Fargo Center
Sixth Street & Marquette Avenue
Mail Station N9311-161
Minneapolis, MN 55479
Attention: Michael G. Luger
Telecopy: (612) 446-5755

with a copy (which shall not constitute notice) to:

Faegre & Benson LLP
2200 Wells Fargo Center
90 S. 7th St.
Minneapolis, MN 55402-3901
Attention: Stephen M. Mertz, Esq.
Telecopy: (612) 766-1600

Purchaser:

CFN Investments Holdings LLC
1251 Avenue of the Americas
New York, NY 10020
Attention: William Doniger
Telecopy : (212) 798-6070

with a copy (which shall not constitute notice) to:

notice) to:

Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099
Attention: Steven Wilamowsky, Esq.
Telecopy: (212) 728-8111

U.S. Bank:

U.S. Bank National Association
U.S. Bank Trust Center
180 East Fifth Street, 2nd Floor
St. Paul, Minnesota 55101
Attention: Jeffrey Kerr
Telecopy: (651) 244-4638

with a copy (which shall not constitute
notice) to:

Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603
Attention: James E. Spiotto, Esq.
Telecom. (312) 516-1900

Fannie Mac:

Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
Attention: Jeff Cravath
Telecopy (202) 752-5001

with a copy (which shall not constitute
notice) to:

Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Attention: Peter S. Partee, Esq.
Telecopy: (804) 788-8218

Official Committee:

The Official Committee of Unsecured Creditors of
Conseco Finance Corp.
c/o Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago IL 60601
Attention: Nancy A. Mitchell, Esq.

Telecopy:  (312) 456-8435

Ad Hoc Committee:      Ad Hoc Securitization Holders' Committee
c/o Day, Berry & Howard LLP
CityPlace I
Hartford, CT  06103-3499
Attention:  Richard J. Wasserman, Esq.
Telecopy:  (860) 275-0343

12.     ***Relationship of Parties***. Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto.

13.     ***Counterparts***. This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original and such counterparts, together, shall constitute one and the same agreement.

14.     ***Term***. The term of this Agreement shall extend until satisfaction of all obligations of the parties hereunder and until payment in full of any and all amounts required to be paid hereunder or under the terms of any Pooling and Servicing Agreement. This Agreement shall be of no force or effect unless approved by the Bankruptcy Court in a Final Order and, unless otherwise agreed to in writing by the Consenting Parties, shall cease to be of any force or effect if the closing with respect to the Acquisition shall not have occurred on or prior to September 1, 2003.

15.     ***Entire Agreement; Amendment***. This Agreement constitutes the entire agreement and understanding between the parties concerning the subject matter hereof and supersedes and terminates all prior written and oral agreements, proposals, promises and representations of the parties respecting the subject matter hereof. No representation or promise hereafter made, nor any modification or amendment of this Agreement, shall be binding upon any party, unless made in writing and signed by the parties hereto.

16.     ***Assignment; Binding Effect***. Except for transfers to affiliates, none of the parties hereto may assign its rights hereunder or delegate its duties and obligations hereunder without the express prior written consent of each of the other parties hereto, which consent shall not be unreasonably withheld. Subject to all terms and conditions hereof, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

17.     ***No Severability***. The terms and provisions of this Agreement are dependent upon the validity and enforceability of all of the terms and provisions hereof, and no term or provision shall be severable from this Agreement.

18.     ***Direction to Trustees; Indemnification***. Fannie Mae and the members of the Committees who are Certificateholders each hereby directs the Trustees to enter into and perform their obligations under this Agreement. Fannie Mae hereby agrees to indemnify, defend

41399853_13.DOC
March 14, 2003 1:15 PM

- 17 -

and hold harmless the Trustees, both in their corporate capacities and in their capacities as trustees of the Trusts, and their officers, directors, employees, agents and attorneys, from and against any and all claims, actions, damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, legal or accounting fees, court reporting expenses, expert witness fees, and all other fees or costs of any kind, penalties, fines, forfeitures and judgments (including, without limitation, fees and expenses incurred under Section 8 hereof) resulting from or arising out of or related to the Trustees' execution and delivery of this Agreement and perfomance of their obligations under this Agreement.

19.    ***Execution by Trustees.*** U.S. Bank and Wells Fargo are executing this Agreement solely in their capacities as Trustees of the respective Trusts.   Neither U.S. Bank nor Wells Fargo, in their individual capacity, nor their respective officers, directors, shareholders or agents shall be liable for any obligation or liability arising out of this Agreement.

**[Signature Page Follows]**

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer thereunto as of the day and year first above written.

**CONSECO FINANCE CORP.,** Debtor

**WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION,** as Trustee as aforesaid

By:_____
   Name:_____
   Title:_____

By:_____
   Name:_____
   Title:_____

**U.S. BANK, NATIONAL ASSOCIATION,** as Trustee as aforesaid

**FEDERAL NATIONAL MORTGAGE ASSOCIATION,** as a Certificatcholder

By:_____
   Name:_____
   Title:_____

By:_____
   Name:_____
   Title:_____

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CONSECO FINANCE CORP.,** on behalf of its members, each as a Certificateholder

**AD IIOC SECURITIZATION HOLDERS' COMMITTEE,** on behalf of its members, each as a Certificatcholder

By:_____
   Name:_____
   Title:_____

By:_____
   Name:_____
   Title:_____

**CFN INVESTMENT HOLDINGS LLC,** Purchaser

By:_____
   Name:_____
   Title:_____

# Exhibit A

## Asset Purchase Agreement

## Exhibit B

**Required Servicing Protocols**

## **Exhibit C**

### **Letter Agreement**

<u>**Schedule 1**</u>

**List of Transactions and
Related Pooling and Servicing Agreements**

1.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1992-1, dated as of September 1, 1992

2.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1992-2, dated as of December 1, 1992

3.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1993-1, dated as of March 1, 1993

4.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1993-2, dated as of June 1, 1993

5.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1993-3, dated as of September 1, 1993

6.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1993-4, dated as of December 1, 1993

7.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-1, dated as of March 1, 1994

8.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-2, dated as of May 1, 1994

9.  Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-3, dated as of June 1, 1994

10. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-4, dated as of July 1, 1994

11. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-5, dated as of August 1, 1994

12. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-6, dated as of September 1, 1994

13. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-7, dated as of November 1, 1994

14. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1994-8, dated as of December 1, 1994

15. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1995-1, dated as of February 1, 1995

16. Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, series 1995-2, dated as of March 1, 1995

17.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1995-3, dated as of May 1, 1995

18.     Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1995-4, dated as of June 1, 1995

19.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1995-5, dated as of July 1, 1995

20.     Pooling and Servicing Agreement between Green Tree Financial Corporation and First Bank National Association, Series 1995-6, dated as of August 1, 1995

21.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1995-7, dated as of September 1, 1995

22.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1995-8, dated as of October 1, 1995

23.     Pooling and Servicing Agreement between Green  Tree Financial Corporation and Firstar Trust Company, Series 1995-9, dated as of November 1, 1995

24.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1995-10, dated as of December 1, 1995

25.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Norwest Bank Minnesota, National Association, Series 1996-1, dated as of January 1, 1996

26.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Norwest Bank Minnesota, National Association, Series 1996-2, dated as of March 1, 1996

27.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-3, dated as of April 1, 1996

28.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-4, dated as of May 1, 1996

29.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-5, dated as of June 1, 1996

30.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-6, dated as of July 1, 1996

31.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-7, dated as of August 1, 1996

32.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-8, dated as of September 1, 1996

33.     Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-9, dated as of October 1, 1996

34.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1996-10, dated as of December 1, 1996

35.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1997-1, dated as of February 1, 1997

36.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1997-2, dated as of March 1, 1997

37.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1997-3, dated as of May 1, 1997

38.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1997-4, dated as of June 1, 1997

39.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1997-5, dated as of July 1, 1997

40.    Pooling and Servicing Agreement between Green Tree Financial Corporation and Firstar Trust Company, Series 1997-6, dated as of September 1, 1997

41.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1997-7, dated as of October 1, 1997

42.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1997-8, dated as of December 1, 1997

43.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-1, dated as of January 1, 1998

44.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-2, dated as of March 1, 1998

45.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-3, dated as of April 1, 1998

46.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-4, dated as of May 1, 1998

47.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-5, dated as of June 1, 1998

48.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-6, dated as of July 1, 1998

49.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-7, dated as of September 1, 1998

50.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1998-8, dated as of October 1, 1998

51.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1999-1, dated as of February 1, 1999

52.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1999-2, dated as of March 1, 1999

53.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1999-3, dated as of May 1, 1999

54.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1999-4, dated as of June 1, 1999

55.    Pooling and Servicing Agreement between Green Tree Financial Corporation and U.S. Bank National Association, Series 1999-5, dated as of September 1, 1999

56.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 1999-6, dated as of November 1, 1999

57.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2000-1, dated as of February 1, 2000

58.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2000-2, dated as of May 1, 2000

59.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2000-3, dated as of June 1, 2000

60.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2000-4, dated as of August 1, 2000

61.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2000-5, dated as of October 1, 2000

62.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2000-6, dated as of December 1, 2000

63.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2001-1, dated as of March 1, 2001

64.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2001-2, dated as of June 1, 2001

65.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2001-3, dated as of September 1, 2001

66.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp. and U.S. Bank National Association, Series 2001-4, dated as of December 1, 2001

67.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp., U.S. Bank National Association, as trustee, and Wells Fargo Bank Minnesota, National Association, as back-up servicer, Series 2002-1, dated as of April 1, 2002

68.    Pooling and Servicing Agreement between Conseco Finance Securitizations Corp., Conseco Finance Corp., U.S. Bank National Association, as trustee, and Wells Fargo Bank Minnesota, National Association, as back-up servicer, Series 2002-2, dated as of June 1, 2002

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer thereunto as of the day and year first above written.

**CONSECO FINANCE CORP.,** Debtor

By: _Chadf Gilmun_
Name: _____
Title: _President_

**WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION,** as Trustee as aforesaid

By: _____
Name: _Stephen M. Mutz_
Title: _It, Attorney_

**U.S. BANK, NATIONAL ASSOCIATION,** as Trustee as aforesaid

By: _____
Name: _Jeffery T. Kern_
Title: _Sr. Vice President_

**FEDERAL NATIONAL MORTGAGE ASSOCIATION,** as a Certificateholder

By: _____
Name: _Jeanne F. Kinney IV_
Title: _Vice President_

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CONSECO FINANCE CORP.,** on behalf of its members, each as a Certificateholder

By: _____
Name: _David D Cleary_
Title: _Counsel to UFC Creditor Comitte_

**AD HOC SECURITIZATION HOLDERS' COMMITTEE,** on behalf of its members, each as a Certificateholder

By: _____
Name: _John M. Cerra_
Title: _Chair_

**CFN INVESTMENT HOLDINGS LLC,** Purchaser

By: _____
Name: _William Dunger_
Title: _____

*Execution Copy*

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Collections* | | | |
| **0-29 Days Past Due** | a. Borrower Contact – All accounts that are greater than 1 (one) day past delinquent will be down loaded into an auto dialer and call tables set to begin dialing at 7AM EST. | a. Dial 100% of the down load each day with some accounts dialed more based on reasonable use of behavior scores and adaptive controls and call optimizer technology. (Behavior scoring must be up dated every 90 days based on credit migration and account performance.) All accounts will be called at least once a day until a right party contact makes a valid promise to pay | a. Delinquency - Achieve delinquency movement of less then .10% up to 30 days past due <br><br> Promise Rate – 55% <br><br> |
| | b. Minimum Collection Hours – Sunday 7AM to Noon; Monday through Friday 7AM to 11PM; Saturday 7AM to 5PM | b. | b. |
| | c. Staffing – 7AM to 10AM and 5PM to 10PM Monday through Friday; all scheduled hours Saturday and Sunday | c. Scheduled to accommodate peak collection times | c. Should accommodate a maximum of 1% inbound call abandonment rate and outbound coverage ratio 25% based above described borrower contact |
| | d. Collateral Inspection –Ordered after 45th day of delinquency | d. Verify occupancy and condition of collateral and park, if appropriate | d. |

---

[1] Pursuant to Section 5(a)(i) of the Consent Agreement, the Purchaser shall establish the "goals/metrics" identified in the **Required Servicing Protocols** in consultation with the Oversight Committee within 60 days after the Closing Date.

EXHIBIT B

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Collections* | | | |
| **0-29 Days Past Due** (cont.) | e. <u>Mailings</u> – Bulk letters sent to all accounts that are:<br>- 15 days delinquent<br>- Have broken promise to pay<br>- Made a payment and are still delinquent | e. | e. |
| | f. <u>Payment Methods:</u><br>-Phone Pay<br>-Quick Collect<br>-ACH<br>-Lock Box | f. | f. NSF % <= 1% |
| | g. <u>Efficiency Metrics</u> | g. Maximize recoveries using stated metrics:<br><br>- Abandon Rate<br>- Connects per Hour<br>- Promise per Hour<br>- Kept per Hour<br>- % kept<br>- % Month End Delinquency | g.<br>- Abandon Rate: 1%<br>- Connects per Hr: 36.4<br>- Promise per Hr: 5.06<br>- Kept per Hr: 3177<br>- % kept: 71.8%<br>- % Month End Delinquency: <=12% |

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| **Collections** | | | |
| **30 – 59 Days Past Due** | a. Borrower Contact – Collectors: <br> -Queues manually assigned <br> -Dial all number on the account (work, home, relatives, etc.) <br> -Exercise skip trace | a. Same as 0-29 Days | a. Delinquency - Achieve delinquency movement of less then .10% up to 60 days past due and reduce 30 delinquency to less than 1.2% <br><br> Promise Rate – 50% |
| | b. Minimum Collection Hours – Same as 0-29 Days | b. | b. |
| | c. Staffing – Same as 0-29 Days | c. Same as 0-29 Days | c. Same as 0-29 Days |
| | d. Collateral Inspection – Same as 0-29 | d. Same as 0-29 Days | d. Same as 0-29 Days |
| | e. Mailings – Same as 0-29 | e. Same as 0-29 Days | e. Same as 0-29 Days |
| | f. Payment Methods– Same as 0-29 | f. Same as 0-29 Days | f. Same as 0-29 Days |
| | g. Recover tools – Same as 0-29 | | |

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | | Protocol | | Objective | | Goals / Metrics |
|---|---|---|---|---|---|---|
| *Collections* | | | | | | |
| **60+ Days Past Due** | a. | Borrower Contact – Utilize auto and manual dialing; assigning accounts to specific collectors that are directly responsible for the account until collected to loss mitigation<br><br>**All accounts 60-89 days past due must be referred to Loss Mitigation** | a. | Determine borrowers willingness to pay and ability to work out past position | a. | Delinquency - Achieve delinquency movement of less then .10% up to 90+ days past due and reduce 60+ delinquency to less than 1.75%<br><br>Overall Delinquency <=12% |
| | b. | Minimum Collection Hours – Same as 0-29 | b. | | b. | |
| | c. | Staffing – Same as 0-29 and collectors must have a minimum of 2 years MH collection experience | b. | Same as 0-29 Days | c. | Same as 0-29 Days |
| | d. | Collateral Inspection – Same as 0-29 | d. | Same as 0-29 Days | d. | |
| | e. | Mailings – Same as 0-29 | e. | Same as 0-29 Days | e. | Same as 0-29 Days |
| | f. | Payment Methods– Same as 0-29 | f. | Same as 0-29 Days | f. | Same as 0-29 Days |

*Page 4*

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals/Metrics |
|------|----------|-----------|---------------|
| *Collections* | | | |
| **90+ Days Past Due** | *Accounts greater than 90 days past due must have a loss mitigation plan or be referred for repo* | | |

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Loss Mitigation Tools* | a. Extensions – Granted based on the following restrictions:<br>- Account must be open a minimum of 12 months<br>- Maximum of one extension in 12 month period<br>- Maximum of five extension over life of loan<br>- Maximum of three extension in 5 year period<br>- Maximum extension of 60 days<br>- Account can not be greater than 90 day past due<br>- All exceptions will require senior management review and approval | a. Defer payment to a later date | a. Used when collection manager agrees with account analysis that it is best course of action |

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Loss Mitigation Tools (cont.)* | b. <u>Modifications</u> – Granted based on the following restrictions:<br>- Must be supported by evidence of change in income due to death, displacement, divorce or disability<br>- Senior management must review and approve all modifications | b. Change term of note | b. Used when collection manager agrees with account analysis that it is best course of action |
| | c. <u>Deferral / Forbearance</u> – See requirements for Modifications | c. | c. Used when collection manager agrees with account analysis that it is best course of action |
| | d. <u>Cash for Keys Program</u> – Offer cash to move borrower out of property when value of home warrants; must be accompanied by a field review | d. Reduce loss severity | d. |
| | e. <u>Bankruptcy Tracking</u> – Track bankruptcy performance and report delinquent account within 10 days | e. | e. 85% of post-petition bankrupt accounts should be current |

*Page 7*

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Inventory Control* | a. Inventory Control Options:<br>- Field Inspections: Every unit => 45 days past due. Condition of unit and park (if applicable) inspected<br>- Lock Changes: Every unit that is vacant, the repo is complete, and/or the park owner has evicted the owner<br>- Repair estimates with comparison to "standard costs".<br>- Follow-up inspections: Every 30 days<br>- Other field work: Performed if no contact after 45 days<br>- Follow Repo Process:<br>  g. Send 'Notice of Default' (NOD)<br>  h. Hold NOD until 30 day expiration<br>  i. Submit legal auction request<br>  j. Collection manager review if > 90 days delinquent.<br>  k. Loss mitigation manager reviews as a QC process | a. Functions to be performed by regional offices and/or agreed upon venders | a. Repo Incurs / Liquidation Ratio = 1:1 |

*Page 8*

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Asset Management* | a. Recovery decision – Based on a standard model that:<br>  - Evaluates and approves liquidations<br>  - Values collateral based on adjusted NADA; adjusting for market conditions in the area and collateral condition reports<br>  - Relies upon loss estimates<br>  - Reviews liquidation expense<br>  - Determine wholesale or retail recovery solution<br>  - Evaluates Park Rental (opportunities to rent collateral unit to park owners)<br><br>All decisions that drive severity greater than 70% must be approved by senior management<br><br>All exceptions to the modeled recovery decision must be reviewed and approved by senior management. | a. **Development of a model that can be co-managed by a third-party vendor that will provide 'retail' recovery services. All loans underlying FNM securities will be identified and flagged for retail 'pre-owned' financing. Both the servicer and vendor must agree on recoverability of unit before solution can be implemented**<br><br>**FNM recommends that XXX be the vendor to deliver the retail solution. The fee for transportation, refurbishment, set-up and re-transportation to the new home site is approximately $10,500** | a. Inventory Turn Time:<br>  - Wholesale <= 90 days<br>  - Retail < 120 days<br><br>Severity:<br>  - Wholesale <= 80%<br>  - Retail <= 40%<br><br>Recovery Blend:<br>  - Wholesale <= 60%<br>  - Retail <= 40%<br><br>Blended Severity = 60% |

*Page 9*

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|------|----------|-----------|-----------------|
| *Asset Management (cont.)* | | | |
| | b. Coordinate auctions and package sales | b. | b. |
| | c. Approve legal settlements | c. | c. |

# PROPOSED MH SERVICING PROTOCOLS FOR SUCCESSOR SERVICER

| Area | Protocol | Objective | Goals / Metrics |
|---|---|---|---|
| *Administration* | a. Perform:<br>  – Billing<br>  – Payment reconciliation<br>  – Resolve credit bureau disputes<br>  – Investigate and pursue collection of NSF checks | a. Process payments and payoffs and maintain lockboxes | a. |
| | b. Bond Payment reconciliation | b. Reconcile bond payments through use of automated system (i.e., Lutan) | b. Error free systems conversion & conversion required within 90 day max time frame |
| | c. Reporting | c. Conversion of report to track returned checks and start loss mitigation and default procedures | c. Reconciliation of delinquency including NSF with 7 days of month-end with/collection incentives based on reconciliations |
| | d. Lock Box | d. Manage lock box rejects | d. Reject rate <= 5% |

March 14, 2003

U.S. Bank National Association
U.S. Bank Trust Center
180 East Fifth Street, 2nd Floor
St. Paul, Minnesota 55101

Wells Fargo Bank Minnesota, N.A.
Corporate Trust   Wells Fargo Center
Sixth Street & Marquette Avenue
Mail Station N9311-161
Minneapolis, MN 55479

**Re:**     **In re Conseco, Inc., et al., Case No. 02 B 49672 (Jointly Administered)
(Bankr. N.D. Ill.)**[1]

Dear Gentlemen:

This letter agreement (the **"Letter Agreement"**) is entered into by the Official
Committee of Unsecured Creditors (the **"Committee"**) of the CFC Debtors in the above-
captioned chapter 11 cases (the **"CFC Cases"**), US Bank, National Association and Wells Fargo
Bank Minnesota  (collectively, the **"Trustees"**) and the CFC Debtors.  Except as provided
below, pursuant to this Letter Agreement, each of the Committee, the Trustees and the CFC
Debtors hereby agree that any plan of reorganization consummated in the CFC Cases shall
provide that fifty percent (50%) of any Net Proceeds (as defined below) exceeding $100 million
in the aggregate which are recovered from any litigation or other action against third parties (the
**"Third Party Actions"**)  shall be placed in the Reserve Account provided for in the Consent
Agreement, dated as of March 14, 2003 (the **"Consent Agreement"**).  The funds in such reserve
fund shall be administered as provided in the Consent Agreement.

Third Party Actions shall not include any of the following: (a) an action brought by the
CFC Debtors or the Committee pursuant to Chapter 5 of the Bankruptcy Code, (b) an action to
enforce a claim or any distribution on any intercompany claim of the CFC Debtors against the
Parent Company Debtors, and (c) an action to void and terminate the pledge of the shares of Mill
Creek Bank Inc.  "Net Proceeds" shall be defined as gross litigation proceeds less any costs and
expenses associated with such litigation.

---

[1]    The debtors in the above-captioned cases are the following entities: (i) Conseco, Inc., CIHC, Incorporated,
CTIHC, Inc., and Partners Health Group, Inc. (collectively, the **"Parent Company Debtors"**); (ii) Conseco Finance
Corp.; Conseco Finance Servicing Corp.; Conseco Finance Corp. – Alabama, Conseco Finance Credit Corp.,
Conseco Finance Credit Consumer Discount Company, Conseco Finance Canada Holding Company, Conseco
Finance Canada Company, Conseco Finance Loan Company, Rice Park Properties Corporation, Landmark
Manufactured Housing, Inc., Conseco Finance Net Interest Margin Finance Corp. I, Conseco Finance Net Interest
Margin Finance Corp. II, Green Tree Financial Corp. – Two, Conseco Agency of Nevada, Inc., Conseco Agency of
New York, Inc., Green Tree Floorplan Funding Corp., Conseco Agency, Inc., Conseco Agency of Alabama, Inc.,
Conseco Agency of Kentucky, Inc., and Crum-Reed General Agency, Inc. (collectively, the **"CFC Debtors"**).

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF THE CFC
DEBTORS

_____

One of its Attorneys

Keith J. Shapiro
David D. Cleary
Nancy A. Mitchell
GREENBERG TRAURIG, P.C.
77 West Wacker Drive, Suite 2400
Chicago, Illinois 60601


U.S. BANK, NATIONAL ASSOCIATION

_____

One of its Attorneys

James Spiotto
CHAPMAN & CUTLER
111 West Monroe Street
Chicago, Illinois 60603


WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

_____

One of its Attorneys

James Stephenson
Mike Stewart
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901

CONSECO FINANCE CORP. AND
CONSECO FINANCE SERVICING
CORP.

_____

One of its Attorneys

James M. Sprayregen
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601

Accepted and Agreed to by

AD HOC SECURITIZATION
NOTEHOLDERS COMMITTEE

_____

One of its Attorneys

James T. Tancredi
DAY, BERRY & HOWARD, LLP
Cityplace I
Hartford, Connecticut 06103

*168226*