1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP) and 08-01420(JMP)(SIPA)

Adv. Case Nos. 09-01177 and 09-01178

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS HOLDINGS, INC./

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

        -against-

LIBRA CDO, LTD.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x

(cont'd. on next page)

2

1              U.S. Bankruptcy Court

2              One Bowling Green

3              New York, New York

4

5              August 26, 2009

6              10:04 a.m.

7

8     B E F O R E:

9     HON. JAMES M. PECK

10    U.S. BANKRUPTCY JUDGE

11

12    CASE CONFERENCE

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    HEARING re Debtors' Motion to Engage Citadel Solutions LLC on

3    an Interim Basis [Docket No. 4717]

4

5    HEARING re Motion of Lehman Brothers Holdings Inc., et al. for

6    Authorization and Approval of Settlement with Lehman Re Ltd.

7    [Docket No. 4716]

8

9    HEARING re Debtors' Motion for Authorization to Implement

10   Alternative Dispute Resolution Procedures for Affirmative

11   Claims of Debtors Under Derivative Contracts [Docket No. 4453]

12

13   HEARING re Debtors' Motion for an Order Enforcing the Automatic

14   Stay and Holding Shinsei Bank in Contempt for Violating the

15   Automatic Stay [Docket No. 4764]

16

17   RE: SIPC PROCEEDINGS:

18   HEARING re Second Application of Hughes Hubbard & Reed LLP for

19   Allowance of Interim Professional Compensation for Services

20   Rendered and Reimbursement of Actual and Necessary Expenses

21   Incurred from February 1, 2009 through May 31, 2009 [Docket No.

22   1292]

23

24

25

29

1    the motion and given the fact that there were no objections, we

2    would request that the Court approve the settlement and enter

3    the order as modified.

4        THE COURT:  The settlement is approved.  And I will

5    enter the order in its modified form.

6        MR. KRASNOW:  Thank you, Your Honor.  Your Honor, we

7    now turn to the reason why this courtroom is crowded today.

8    We'll do the contested matters.  The first matter on the

9    calendar, contested matter, relates to the proposed alternative

10   dispute resolution procedures proposed by the debtors.  And I

11   turn the rostrum over to my partner, Mr. Gruenberger.

12       MR. GRUENBERGER:  Good morning, Your Honor.  Peter

13   Gruenberger, Weil, Gotshal & Manges, for the debtors.

14       THE COURT:  Good morning.

15       MR. GRUENBERGER:  Our motion requests the Court to

16   order implementation of a set of alternate dispute resolution

17   procedures, including mediation, governing derivatives

18   contracts in the money to the debtors.  No one can seriously

19   question, Your Honor, that dealing with the vast number and

20   considerable complexity of the derivatives contracts here

21   presents a challenge, a challenge for all the important

22   constituents in these cases:  the debtors, all derivatives

23   counterparties, indenture trustees, the unsecured creditors'

24   committee, and above all, the Court.

25       The challenge is to come up with a workable process

30

1    apart from the filing and prosecution of hundreds of adversary

2    proceedings, one that offers a reasonable alternative for

3    resolution of disputes that surely will impact many of the

4    6,000 or more derivatives contracts under which the debtors had

5    more than 900,000 transactions with hundreds of different

6    counterparties.

7         We believe that in conjunction with the creditors'

8    committee, we have succeeded in presenting a feasible and fair

9    ADR process.  It goes without saying, Your Honor, that debtors

10   have a fiduciary duty to maximize the value of their assets

11   embodied in the derivatives contracts in a manner that promotes

12   expedition, avoids unnecessary costs and waste of resources,

13   and at the same time, reduces burdens on an already burdened

14   Court.  Reliance wholly on adversary proceedings virtually

15   guarantees such draconian outcomes.

16        Our proposed ADR procedures do just the opposite.  One

17   may ask, will our mediation proposal eliminate all adversary

18   proceedings?  No.  It will not.  But these ADR procedures

19   demonstrably fall within the acceptable range of

20   reasonableness, a path that promises to reduce the number and

21   variety of adversary proceedings that are certain to swamp this

22   Court's calendar for years to come, in the absence of an ADR

23   process.  Are debtors' ADR procedures including mediation a

24   perfect fix, where one size fits all?  No.  They are not

25   perfect, because there are just too many and too diverse a

1    population of complex transactions, contracts and issues that

2    would permit a perfection.

3         One example only suffices to demonstrate the

4    schizophrenia exhibited by objectors in their attack on these

5    ADR procedures.  One segment of them argues that the Court

6    lacks power to order mediation in the absence of a pending

7    adversary proceeding, while another segment argues

8    simultaneously that the Court should refrain from ordering

9    mediation for any dispute that is or may become the subject of

10   an adversary proceeding.  No set of procedures, Your Honor,

11   could be crafted to satisfy such contradictory positions.

12        In an atmosphere where objectors clamor for a

13   personalized, hand-tailored process that takes into account

14   only their particular needs, nothing could make every party-in-

15   interest happy.  In this prevailing climate of NIMBY, not in my

16   back yard, no perfect fix is possible; and impossible, also,

17   where parties feel, without constraint, to file unauthorized

18   surreplies last night, as one did after 6 p.m., to place phone

19   calls later last night, and sending e-mails as late as this

20   morning, as three objectors did, still seeking exclusion from

21   the ADR procedures, for their own asserted special reasons.

22        One cannot create any system for these folks, much

23   less a perfect one.  But fortunately, Your Honor, perfection

24   for everyone is not and cannot be the standard.  In filing this

25   motion and the initial proposed orders, debtors tried their

32

1    best, in conjunction with the creditors' committee, to fashion,

2    from the outset, a reasonable set of procedures.  And

3    reasonableness not perfection is the test.

4         Starting promptly after we filed this motion on July

5    20th, debtors modified their initial proposed order that was

6    attached to our motion four separate times in order to

7    accommodate counterparties who took the time and made the

8    effort to contact us with helpful suggestions.  My declaration

9    and Exhibits A, B and C attached thereto, which accompanies

10   debtors' omnibus responses to the objections, details the

11   specific efforts debtors undertook that resulted in the twenty-

12   two or so negotiated modifications we made to the proposed

13   orders, with the help of the committee and its constituents,

14   reasonable counterparties.  Our joint efforts led to many

15   potential objectors to refrain from filing any objections and

16   caused several objectors eventually to withdraw all the

17   objections they filed.

18        These cumulative changes, Your Honor, are reflected in

19   the revised proposed order, which is attached to debtors'

20   omnibus response as Exhibit B.  Debtors and the creditors'

21   committee believe that this revised proposed order represents a

22   compromise in the form of a well-balanced and fair set of

23   procedures that does nothing to skew the ability of any party

24   to negotiate and mediate its disputes, evenhandedly, on a level

25   playing field with the debtors.

33

1    Mediation procedures similar to the ones we've

2  proposed, Your Honor, were ordered by Judge Gonzalez in Enron

3  and by Judge Gerber in Ames.  In Enron, for example, the

4  mediation of seventy-seven large derivatives contract disputes

5  resulted in a settlement rate of one hundred percent.  That

6  brought into the Enron debtors' estates over 600 million new

7  dollars, with respect to in-the-money claims, and resulted in

8  the expungement of some 2.5 billion claims against the Enron

9  debtors' estates.

10    So mediation really does work if, but only if, Your

11  Honor, parties approach it with open minds.  And we mean

12  mediation as we propose it here, which includes:  mandatory

13  good-faith participation, with nothing binding unless

14  settlement is reached voluntarily; utilization of respected

15  mediators, not connected to any party; preservation of the

16  rights and remedies of all parties which remain unaltered

17  before, during and after mediation, even if settlement is not

18  reached.  The same rules and requirements will apply equally to

19  all parties.  Confidentiality will be maintained throughout.

20  Mandatory attendance by principals with authority to settle

21  will be required, but video conference attendance may be had.

22  One hundred percent of mediators' fees will be borne by the

23  debtors.

24    The remaining objections, Your Honor, were filed by

25  about fifty counterparties.  They should be overruled in toto

34

1    as they lack merit for many reasons.  Debtors' omnibus response

2    attaches as Exhibit A thereto a table of objections and

3    rebuttals thereto in which we specifically rebut, one by one,

4    each of the remaining objections.  And our omnibus response

5    rebuts category by category, the remaining objections.

6         I trust that Your Honor does not wish me to cover here

7    each specific objection or even each category of objection and

8    our rebuttals thereto?  That could take days.

9         THE COURT:  You're right.  You're absolutely right.  I

10   don't want you to do that.

11        MR. GRUENBERGER:  Thank you.  And of course, I will

12   endeavor to answer any questions Your Honor may have.  But as

13   to these remaining objections, I would note briefly, the

14   objections contain certain fallacies, indeed, fatal flaws, that

15   debtor highlight starting at paragraph 12 of our omnibus

16   response.  The primary inherent fallacy results in the failure

17   of objectors to recognize that negotiation and mediation

18   presents an opportunity, an opportunity to achieve cost-

19   effective alternatives to litigation, which guarantees only

20   long delay, huge cost, and added burden for Your Honor.

21        These flaws adhere in part on a misunderstanding of

22   the Court's power to order mediation, and that's due to

23   objectors' misreading of the standing mediation order, which is

24   Amended General Order M-143, which governs in this district.

25   Objectors also seem to be ignoring section 105(a) of the

35

1    Bankruptcy Code, which provides the Court with the inherent

2    power to issue any order necessary or appropriate to carry out

3    the provisions of Title 11, including control of its own docket

4    and to order sanctions after notice and hearing.  And we cite

5    cases at paragraphs 10, 21 and 22 of our omnibus response to

6    that effect.

7            In conjuring up every evil imaginable, some of these

8    objectors also misread the proposed order itself.  That order

9    prejudices no party.  No party's rights are adversely impacted

10    by participating in ADR.  No decisions are rendered by anyone.

11    No party wins or loses in mediation, and no party or the

12    mediator can force a settlement on any party.

13            Another underlying fallacy is the objectors' unfounded

14    presumptions that debtors will act in bad faith.  It is

15    illogical of them, however, to presume that debtors will misuse

16    mediation and thereby act contrary to their own best self-

17    interest by willfully forcing needless litigation.  No such bad

18    faith does or will exist.

19            Another flaw involves objectors' belief that their

20    views are infallible on questions of contract interpretation

21    and application of the Bankruptcy Code, including the safe

22    harbors.  These misapprehensions result in objectors

23    presumptuously placing on themselves the Court's robes, and in

24    that guise, rejecting even the possibility that a competing

25    interpretation of law or contract or a different view might

36

1    exist.

2            It is telling, Your Honor, that not one of these

3    fifty-some-odd objectors has come up with a single alternative

4    proposal for handling any of these complex matters other than

5    adversary proceedings.  So the objectors give Your Honor a

6    clear invitation for you to now engage in premature mini-trials

7    over every word in our ADR procedures.  This is not, Your

8    Honor, the proper time or place for hearing arguments and

9    holding mini-trials on questions dealing with issues such as in

10    personam jurisdiction, scope of the safe harbor, specific

11    contract interpretation, indenture trustee authorization to

12    settle and the like.

13            These issues should be mediated once the Court puts in

14    place ADR procedures.  Should debtors commence a mediation with

15    respect to a counterparty or an indenture trustee, such issues

16    should be raised in a response to an ADR notice which triggers

17    a mediation.  And if necessary, that party or trustee always

18    has recourse, ultimately, to seek withdrawal from mediation, by

19    application to the Court for cause shown, as permitted by the

20    standing order.  That is when issues of this sort would be ripe

21    for determination by the Court upon an adequate record.  That

22    record does not exist today, and at this juncture, this Court

23    should not hold mini-trials that these parties are demanding.

24            By the way, Your Honor, it's interesting to note that

25    only fifty objections in a case involving 6,000 contracts is a

37

1    very, very small number.  That I think reflects the reality

2    that the vast majority of counterparties has no problem with

3    these ADR procedures, as we propose them.

4         As to objectors' challenges to the participation

5    rights of the creditors' committee in the ADR process, we will

6    leave rebuttal on those matters to the committee, with whom we

7    agree, and at whose responses to the objections we join.

8         Finally, Your Honor, as to the matter of mediators.

9    Debtors are quite content to leave identification of specific

10   mediators to the Court in the exercise of its sound discretion.

11   Although we do suggest that the Court consider appointing three

12   or four mediators in number in order to accomplish the salutary

13   goals of our motion.  Thank you.

14        THE COURT:  I have a couple of --

15        MR. GRUENBERGER:  Yes, Your Honor.

16        THE COURT:  -- questions.

17        MR. GRUENBERGER:  Certainly.

18        THE COURT:  Obviously, the debtors and the creditors'

19   committee have been involved in an ambitious endeavor and in an

20   effort to come up with a set of procedures that will satisfy

21   the particular needs of this case which are, perhaps, unique.

22        MR. GRUENBERGER:  We agree, Your Honor.

23        THE COURT:  It seems to me that the claims to be

24   mediated are in a category that is, by most people's

25   estimation, complicated, sophisticated and challenging.  And I

38

1    certainly support the notion of the development of workable ADR

2    procedures for dealing with these claims.  That having been

3    said, I'm not sure I agree with you that fifty objections

4    represents a small number.  It may be a small number in

5    reference to the number of potential parties who might have

6    objected, but it creates something of a difficult case

7    management problem for right now.

8         I have a couple of questions as a result.  One is,

9    given the progress that the debtors have made as described in

10   your omnibus response, and the various amendments that took

11   place to the proposed form of order and to the procedures, is

12   it your view that time's up at this point, and that today is

13   the day when an order in the form that you have now developed

14   it should be entered?  Or is there some value in spending a

15   little bit more time to try to accommodate some or all of the

16   remaining objections that have not yet been resolved?  That's a

17   fundamental question that I have.

18        MR. GRUENBERGER:  That is a fundamental and good

19   question, Your Honor.  And I would answer each of its parts as

20   follows.  Yes, I do think that time is up, only because of the

21   nature of many of the objections.  I do not think that I could

22   negotiate with parties who say Your Honor has no power to order

23   mediation.  I do not think I can negotiate with parties who say

24   Your Honor has no power to issue sanctions after notice and

25   hearing if a party does not participate in mediation in good

39

1   faith, according to a mediator.

2        THE COURT:  I can resolve those two points very

3   quickly.

4        MR. GRUENBERGER:  But that's only two, Your Honor.

5        THE COURT:  I know, but I can tell you right now, I

6   acknowledge that I:  a) have the power to order mediation; you

7   can do it, frankly, without an order.  I can just, on my own --

8   all of this process that you have initiated is all well and

9   good.  I could, on my own, create my own monstrosity.  I could

10  simply say there shall be mediation, and it will follow the

11  following format.  And it may be the subject of some

12  complaints, but I believe I have the power to do it.  And I

13  believe that General Order M-143 gives me that power on my own

14  motion.

15       MR. GRUENBERGER:  Agreed, Your Honor.

16       THE COURT:  I also believe that I have the power to

17  sanction.  So as it relates to those two issues that have been

18  bandied about, I can easily swat those down.

19       MR. GRUENBERGER:  That only scratches the surface,

20  Your Honor.  I don't think I could -- or anybody -- could

21  negotiate with people who say there's no dispute here.  There's

22  no dispute.  We believe that we've paid exactly what we owe.

23  So therefore, we're out of the ADR, right?  And my response to

24  that, as we put forth in our papers, is you're not infallible.

25  You might be wrong.  You might be right.  We haven't scrubbed

40

1   every single one of these 900,000 transactions.  Why don't you

2   wait to see whether or not we do commence a mediation with

3   respect to your contract, rather than carve you out without any

4   record or any basis?  The same for an indenture trustee who

5   says I don't have settlement authority.  Well, that may be

6   right, it may not.  I don't know, when there are hundreds of

7   indenture trusts here and one indenture trustee says as to all

8   of them, in a brief, there's no settlement authority.

9        Well, if that's so, the ADR process that we propose,

10  Your Honor, allows that response to be made, and if so, we will

11  investigate it.  But we can't, in advance, know everything and

12  rebut every one of these characterizations -- that's all they

13  are today.  And today certainly is not, and I repeat, and I

14  don't like to repeat what I've said before, today is not the

15  day to have mini-trials on all of these issues.

16       From in personam jurisdiction, no authority to settle,

17  sure, we might negotiate, as we did prior today.  Well, two

18  days' notice or four days' notice, yes.  But that's a small,

19  small, small tip of the iceberg.  The iceberg is huge because

20  the category of contracts is huge; the number of parties is

21  huge.  And rather than fight over every word in advance, when

22  we don't have the facts, and we're not going to have mini-

23  trials over these facts, as Your Honor's indicated, we're not

24  going to do that either, what do we do?  I don't believe the

25  nature of these allows for that kind of negotiation.

41

1          The creditors' committee and we, together, handled

2     scores of calls and e-mails.  We tried our best.  The nature of

3     the objections, as set forth in our table, indicates to Your

4     Honor great diversity of problem-raising.  It's very easy to

5     raise problems now, but I think it's much easier, rather than

6     try to resolve all of those in advance, to start the process.

7     Because we'll be here with the shape of the -- this is like

8     negotiating with foreign powers.  They will spend days, hours,

9     months, years, negotiating the shape of the table, and never

10    get to it.  Let's start lunch at the table.

11         THE COURT:  It's a little early for lunch, but I

12    understand --

13         MR. GRUENBERGER:  Your Honor, I've tried to answer

14    your question the best way I can.

15         THE COURT:  And you have.  I understand the point.

16    But what I was actually driving at in part is timing.  It's

17    August 26th --

18         MR. GRUENBERGER:  Yes.

19         THE COURT:  -- a time when civilized societies are at

20    the beach.

21         MR. GRUENBERGER:  And the French as well as civilized

22    people.

23         THE COURT:  And we're here.  We're here in a

24    reasonably well-air conditioned room for a change.  And the

25    question that arises is why does this have to happen today?

42

1    Why does this have to happen before Labor Day?  The examiner

2    just gave a status report on timing.  He indicated he needs

3    more time.  It's a big job that he has and he looked for -- not

4    that I had a problem listening to it -- he looked for more time

5    to complete a herculean task.

6          In some respects this is a herculean task too, it's

7    just a different sort of task.  It's designing a structure that

8    will be flawed, that will include imperfections of one sort of

9    another, that will not satisfy everyone, and that can only

10   really be tested in practice.

11         MR. GRUENBERGER:  Agreed.

12         THE COURT:  The reason I ask the timing question is

13   that we achieved something of value in the context of the proof

14   of claim process that was highly litigated in this case as it

15   related to derivative questionnaires by encouraging parties to

16   meet and confer.  It happened in a relatively brief period of

17   time.  And various adjustments resulted from that which may

18   not, again, be perfect, but which I think resulted in a general

19   improvement in the overall content of the questionnaire and the

20   procedures applicable to it.

21         And so I have a lingering question as to whether there

22   would be any harm -- and I'm simply asking the question, I'm

23   not encouraging the result -- would there be any harm if this

24   matter were put off to the next omnibus hearing, not for

25   purposes of delaying the process of implementing ADR, as much

43

1    as for the process of improving the overall structure of the

2    ADR order?  And what I'm trying to get a sense of, and I

3    realize that you've answered the question for the debtors,

4    indicating that while there might be some tweaking around the

5    margins, as to the substance, you believe that the remaining

6    objectors are -- not your word, mine -- obdurate --

7          MR. GRUENBERGER:  I would say dug-in.

8          THE COURT:  -- dug-in.  Okay.  Both those terms apply.

9    That they're tenacious, and in your view, not particularly

10   well-reasoned.  And I'm not characterizing them.  I'm just

11   saying that that's -- you view that you're kind of narrowed

12   down to the stubborn, hardcore, that you can't move, and that

13   you're not going to accommodate any further anyway.  Is that

14   really where we are?  Or are we at a point where some of those

15   stubborn folks, having heard what I have to say, which is there

16   will be ADR, and it will look an awful lot like exactly what

17   you have come up with, if not be exactly that, but I'm willing

18   to give some people a chance to deal with their special

19   situations, so as to avoid mini-trials later.  Because,

20   candidly, it doesn't do me that much good to rubber stamp a set

21   of procedures that I know are going to be objected to in the

22   future, and end up with a whole bunch of litigation of parties

23   saying I opt out for the following reason, I opt out for

24   another reason.  And I have a docket which is crowded with ADR

25   opt-outs.  That's not good either.  And I don't know if that's

44

1    a realistic risk or not, but I'm concerned about it.

2        MR. GRUENBERGER:  Your Honor, I was not -- well maybe

3    I was born yesterday, but not late last night.  So I will

4    certainly not stand in front of the firing squad and say that

5    today is the magic day, no other day works.  Certainly there is

6    nothing magical inherent in today as opposed to September 15th,

7    which I think is the next omnibus date.

8        But I have a suggestion, Your Honor.  And that

9    involves, if Your Honor will bear with me for a moment, and

10   hearing from the committee, because I think their views are

11   important.  I've told you my views on behalf of the debtors.  I

12   think there are many objectors here.  If you're suggesting that

13   they come up and argue their position or you're suggesting they

14   come up -- and maybe you should just ask them whether they

15   think that their objections could be negotiated away in the

16   next two and a half weeks.  I'm not going anywhere on vacation,

17   so I'll be ready, willing and able to do it.  But I don't know

18   if they are.  And maybe you should ask them.

19       THE COURT:  Well, let's do the following.  Most of my

20   questions were rhetorical.  I'm interested in hearing from the

21   creditors' committee and to get the view of the committee as to

22   whether additional time might be useful.  If it is the

23   considered view of both the debtor and the committee that there

24   would be little purpose served in delay, then we won't delay,

25   unless there are parties-in-interest who represent objectors

45

1    who come forward and tell me in sufficient numbers that more

2    time could resolve their objections and lead to a better

3    result.

4         If the answer is that more time could lead to a better

5    result, we should take more time.  If the answer is that more

6    time is a waste of time, we should resolve it today.

7         MR. GRUENBERGER:  I'm all right with that, Your Honor,

8    definitely.

9         THE COURT:  Let's hear from the committee.

10         MR. COHEN:  Good morning, Your Honor.  David Cohen

11   with Milbank, Tweed, Hadley & McCloy here, on behalf of the

12   committee.

13         To go directly to the Court's question as to whether

14   more time may help, we think that there may be some value on

15   the margins.  A lot of the objections go to the timing issue

16   and whether it should be twenty days or thirty days or seven

17   days or fourteen days.  And I think we could have further

18   discussions that may be productive and may resolve those

19   objections.

20         I think, as long as we have, from the Court -- what I

21   understand the Court to be saying is that there will be ADR in

22   some form; that the ADR will be mandatory; and that the Court

23   has the power to issue sanctions.  That gets us a long way in

24   moving forward with resolving some of these objections.

25         THE COURT:  I'm saying all those things.

46

1          MR. COHEN:  Correct.  The other issue that I think the

2    Court should address today, is that there's a role for the

3    committee to play.  There are certain objections that seek to

4    exclude the committee.  As part of the process of getting here,

5    we've worked with the debtors for months to come up with what

6    we think are fair and balanced procedures.  But reasonable

7    minds can differ.  But under the proposed order, there are

8    different ways that a resolution could be settled without

9    further involvement of the Court, one of which is the December

10   procedures order, another is the January procedures order, both

11   of which contemplate the committee's involvement.  If the

12   committee were excluded from the mediation process wholesale,

13   then there runs the issue of 9019s in the hundreds coming

14   before the Court.  We think that that undermines the goal of

15   minimizing the burden on the Court.

16          THE COURT:  Okay.  Thank you.

17          MR. COHEN:  Thank you.

18          THE COURT:  Now, we have a fairly crowded courtroom.

19   And this is not an open casting call.  This is rather a request

20   that if there are parties who have been active in this process

21   and who have objected who believe that it is not going to be

22   useful to provide some more time to try to accommodate, I'd

23   like to hear from only that subset, those who believe that the

24   objections that have been raised are objections that are so

25   fundamental that timing is not -- they can't be resolved with

47

1    some more time.

2         Fine.  I think there should be some more time.  And I

3    think that it -- I think it makes sense for this to be put over

4    either to the next omnibus hearing date, or alternatively, to

5    find a time prior to the next omnibus hearing date, or after

6    it -- I'm not wedded to September 15th, but prior to may be

7    desirable, just an afternoon when I may have some time

8    available -- for purposes of just bringing this matter to the

9    Court's attention.  That way, if there are ongoing resolved

10   objections, there will be, in effect, a pure ADR day in which

11   people who wish to be heard will have an opportunity to be

12   heard, and other matters on the omnibus list will not be

13   affected in the sense of having to wait while listening to

14   matters that they may not be concerned with.

15        So, I'm suggesting that we either put this off to the

16   15th or to some day, if I can find it on my calendar, right

17   before then, so that we can have a time that's just about ADR

18   issues.

19        MR. GRUENBERGER:  Your Honor, may I ask three

20   clarifying questions, please?

21        THE COURT:  Sure.

22        MR. GRUENBERGER:  Thank you.  Number one, Your Honor

23   used a phrase a little earlier, opt-out.  Our procedures do not

24   provide for an opt-out.  The mediation standing order does

25   provide for, after mediation starts, a party may for cause

48

1       shown ask to be withdrawn.  Yes, that is part of our approach.

2              THE COURT:  What I meant by opt-out was that -- and

3       I'm identifying the Reed Smith papers that were filed, I think

4       this morning --

5              MR. GRUENBERGER:  I think it was 7 o'clock last night.

6              THE COURT:  I saw them this morning.  And I believe

7       you made reference to those papers, at least obliquely, in your

8       opening remarks.

9              MR. GRUENBERGER:  Yes, I did.

10             THE COURT:  They argue that an indenture trustee lacks

11      the power to participate in a meaningful way in a mediation,

12      and that without guidance from real counterparties with

13      economics, that they are, in effect, being forced into a

14      wasteful process which they presumably will seek, even if these

15      procedures are approved over their objection, to opt out of.  I

16      presume they will do that by filing a motion seeking -- I'm not

17      proposing they do this, by the way, but I'm simply identifying

18      something that might be done -- filing a motion or some other

19      pleading that would say we can't participate in a meaningful

20      way in these procedures, and we ask that we not be bound by the

21      order, or we seek reconsideration of the order, or we seek

22      exclusion from the ambit of the order.

23             I'm using that simply as one example.  I am neither

24      highlighting that for purposes of emphasizing the value or the

25      strength of their argument, but simply to identify that it's

49

1    the most recent pleading I read on the subject, and so I'm

2    identifying it as something that may be an example of not only

3    what they have argued, but what others in a similar situation

4    might argue, or that others might argue related to in personam

5    jurisdiction.  So all I'm saying is this.  I think that there

6    is the risk that in coming up with an order which is

7    acknowledged to being imperfect by everyone involved, that we

8    run the risk of creating problems that could be avoided if we

9    spend some more time thinking about ways around those problems

10   in advance.

11          MR. GRUENBERGER:  Your Honor, I --

12          THE COURT:  That's the simple reason that I'm

13   suggesting some more time be spent.

14          MR. GRUENBERGER:  Certainly.  Just on that point, Your

15   Honor.  One of the three points I was going to make was, I

16   think there has to be a decision by Your Honor today that

17   enough is enough on filing papers.  I mean, filing

18   surreplies -- the BNY called it a reply, but this is our

19   motion.  We replied, they objected, we replied, they put in

20   another paper.  Now, if that's okay, everybody else is going to

21   put in more paper between now and whenever that date is.  And

22   that just makes an impossible burden for us as well as Your

23   Honor.  So I think you should put a hiatus on filing more

24   papers.  I really do.

25          THE COURT:  I'll discuss that point at the end of this

50

1    phase of the hearing.  But at some point, it may be desirable,

2    before the next hearing, that there be a status report

3    concerning progress made in the negotiations and discussions.

4    And so I would expect there would be some more papers, at least

5    papers from the debtors and the creditors' committee,

6    indicating what the next generation of the order looks like and

7    what the remaining durable objections still look like.

8           MR. GRUENBERGER:  Fair enough, Your Honor.  I was only

9    addressing more briefs in the nature of letters or briefs to

10   the Court.

11          My next point, Your Honor, was going to deal with

12   issues that have been raised by certain of the objectors, and

13   that is that some of the objectors say well, you know, we --

14   you alluded to it partially a little earlier -- we negotiated a

15   bar date order and a questionnaire after some hearings, and we,

16   the counterparties, have to give information in order to

17   support our claims against the debtors' estates.  And that came

18   after certain parties in that negotiation and hearing argued

19   that well, what's fair for the goose is fair for the gander,

20   and therefore the debtors ought to supply the same kind of

21   information to the counterparties.

22          That objection was not granted.  It was overruled,

23   dropped.  And now parties are trying to get in -- the

24   counterparties, through the back door of this ADR process the

25   same objection, that now we have to give to them what they gave

51

1    us in the bar date questionnaire.  The purpose of those two

2    different hearings and procedures are totally different.

3          We needed, as debtors, to figure out whether or not

4    the proofs of claim had validity, because if there's no

5    objection, as Your Honor clearly knows, there is presumptive

6    validity.  And so in order to object to that, we needed the

7    information.  This ADR process provides that we, in an ADR

8    notice, give a brief explanation of our reasons for a demand

9    for settlement.  The only burden the counterparty has is to

10   give the same quality of information to support either an

11   acceptance or rejection of that demand, nothing more, nothing

12   less.

13         But now, the delay -- and the delay is okay, it has a

14   good purpose -- is going to bump us up near the October 22 bar

15   date questionnaire date, which is October 22 or 23, I think.

16   But that's okay.  But I don't think that by this deferral, that

17   we are going to have to -- I hope not -- automatically default

18   to yes, we're going to give you the same kind of information

19   now, because we never believed that was going to be possible,

20   having Your Honor reject that the first time around.

21         So that's just the point I'm trying to make, is that

22   the burden on us is going to be incredible if parties believe

23   they can do that.

24         THE COURT:  Well, Mr. Gruenberger, you've moved into a

25   substantive point.  And my suggestion, and it's just that, is

52

1    that time be spent to try to accommodate parties who have

2    objections as to the form of the order or as to certain

3    procedures that might be adopted to make this less burdensome

4    on all parties.

5          MR. GRUENBERGER:  Okay.

6          THE COURT:  I certainly wasn't suggesting that the

7    time be used to reopen issues that may be antithetical to the

8    interests of the debtors, although that doesn't mean that

9    people may not ask you for that again.

10          MR. GRUENBERGER:  Right.

11          THE COURT:  I'm simply talking about something that's

12    very benign, or at least it seemed to me it was --

13          MR. GRUENBERGER:  Agreed, Your Honor, and understood.

14          THE COURT:  -- which is that maybe if we had a little

15    bit more time, some of the fifty objections would fall away or

16    would no longer be actively pressed, because we would end up

17    with a more perfect order.

18          MR. GRUENBERGER:  Your Honor, we will work the phones;

19    we will work the negotiations; we will work the meetings, as

20    best we can, as soon as we can.  I promise you that.

21          THE COURT:  Okay.

22          MR. GRUENBERGER:  Thank you.

23          THE COURT:  Fine.  Is there anyone else who wishes to

24    be heard at this point?

25          MR. WILLIAMS:  Your Honor, if I may?

53

1          THE COURT:  Okay.

2          MR. WILLIAMS:  Good morning, Your Honor.  Jeremy

3    Williams, of Kutak Rock on behalf of the Nebraska Investment

4    Finance Authority.  Your Honor, just briefly.  We do disagree,

5    and I apologize for not rising sooner, to the implementation of

6    the ADR procedures, because we believe that as a government

7    entity, we would be exempted from the ADR procedures.

8          THE COURT:  I don't know if that's true or not, but

9    I'm not hearing that today.  I read the response of the debtors

10   to your objection, which references your Web site as a "quasi-

11   governmental unit."  I also understand that -- I'm not really

12   ruling on your position now -- I also understand that you're

13   there for purposes unrelated to the police and regulatory

14   powers of the state, but that you provide what amounts to

15   economic facilitation for business within the state.

16         Whether or not you're covered or not, I don't know,

17   but I'm not going to decide that now.  And if I were to decide

18   it now, you would lose.

19         MR. WILLIAMS:  Yes, Your Honor.

20         THE COURT:  So, sometimes it's better just to stay

21   back.  Is there more for now?  Anybody else like to come up?

22   All kidding aside, anybody who does wish to be heard in

23   connection with the ADR procedures should feel free to express

24   a general position.  But it seems to me that our time today

25   might be better spent moving to other matters on the contested

54

1    agenda.   But I do think that we should establish when next this

2    will be heard.

3            MR. GRUENBERGER:   Exactly, Your Honor.

4            THE COURT:   My inclination is for this to be put over

5    to the September 15 omnibus date, unless I can confirm a time

6    on my calendar when it can be specially heard before that.   And

7    let's move on to other matters on the agenda.   But I'm going to

8    ask one of my law clerks to check with my courtroom deputy if I

9    have any available time.

10           One of the problems that I have in September is I

11   basically have no time.   I have a very, very full calendar.   So

12   it's going to be a question of squeezing it.   It may be that

13   for purposes of at least putting a pin in the calendar that we

14   should assume it's going to be the 15th.

15           MR. KRASNOW:   Richard Krasnow, Your Honor, for the

16   Chapter 11 debtors.   I was going to suggest that I had thought

17   most people in the courtroom really related to the matter that

18   Your Honor just considered.   Perhaps it would be less

19   disruptive if there was a recess.   But in light of Your Honor's

20   statement, we can turn --

21           THE COURT:   Well, why don't we do this.   Why don't I

22   go off the bench.   Why don't I find out if there's a time that

23   I can do this other than the 15th, because people who are here

24   may want to know what that date is.   And I'll come back.   And

25   when I come back, I'm going to give everybody time to clear,

55

1    and then we'll go to the next matter.

2          MR. KRASNOW:  Yes, Your Honor.

3       (Recess from 10:59 a.m. to 11:02 a.m.)

4          THE COURT:  Be seated.  I never should have even

5    thought about another date.  The 15th is really the only date

6    that works.  My courtroom deputy suggested if I want to start

7    sitting on a Saturday we could do it on a Saturday, but that's

8    not going to work for anybody I don't think.  So, the 15th on

9    the omnibus day and anybody who now wishes to be excused is

10   free to leave and then we can move onto the next set of

11   matters.

12         MR. KRASNOW:  Your Honor, should we wait a moment

13   and --

14         THE COURT:  Sure.

15      (Pause)

16         MR. KRASNOW:  Your Honor, bear with us for a moment.

17         THE COURT:  I've been bearing with you for almost a

18   year.

19      (Pause)

20         MR. KRASNOW:  Your Honor, I think we're ready.

21   Richard Krasnow, Weil, Gotshal and Manges on behalf of the

22   Chapter 11 debtors.

23         The next and final matter on today's calendar is the

24   debtors' motion for an order enforcing the automatic stay and

25   holding Shinsei Bank in contempt for violating that stay.  Your