# EXHIBIT 1

Dated 20 March 2007

ZIRCON FINANCE LIMITED

and

BNY CORPORATE TRUSTEE SERVICES LIMITED
(FORMERLY KNOWN AS
J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED)

and

JPMORGAN CHASE BANK, N.A.

and

BTA INSTITUTIONAL SERVICES AUSTRALIA LIMITED

and

LEHMAN BROTHERS SPECIAL FINANCING INC.

and

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

# SUPPLEMENTAL TRUST DEED AND DRAWDOWN AGREEMENT

in respect of

Zircon Finance Limited Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014
issued pursuant to the
Multi-Issuer Secured Obligation Programme

arranged by
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

10th Floor, Alexandra House
Chater Road
Hong Kong

Telephone (852) 2842 4888
Facsimile (852) 2810 8133/2810 1695

Ref ACM/KKYI/L-132805

This Deed is made on 20 March 2007 **between:**

(1)  **ZIRCON FINANCE LIMITED** (the "**Issuer**");

(2)  **BNY CORPORATE TRUSTEE SERVICES LIMITED (FORMERLY KNOWN AS J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED)** (the "**Trustee**");

(3)  **JPMORGAN CHASE BANK, N.A.** (in its capacity as issuing and paying agent, the "**Issuing and Paying Agent**" and in its capacity as custodian, the "**Custodian**");

(4)  **BTA INSTITUTIONAL SERVICES AUSTRALIA LIMITED** (in its capacity as Australian paying agent, the "**Australian Paying Agent**" and in its capacity as registrar, the "**Registrar**");

(5)  **LEHMAN BROTHERS SPECIAL FINANCING INC.** (in its capacity as swap counterparty, the "**Swap Counterparty**"); and

(6)  **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (in its capacity as calculation agent, the "**Calculation Agent**", in its capacity as disposal agent, the "**Disposal Agent**" and, in its capacity as dealer under the Programme, the "**Dealer**").

**Whereas:**

(A)  Dante Finance Public Limited Company ("**Dante**") and the Trustee are parties to a principal trust deed dated 10 October 2002, as amended and restated on 21 July 2006, to which the Issuer has acceded pursuant to a Deed of Accession dated 20 March 2007 (the "**Accession Deed**") establishing a programme for the issuance from time to time of secured notes (the principal trust deed dated 10 October 2002, as amended and restated on 21 July 2006, as acceded to by the Issuer pursuant to the Accession Deed, the "**Principal Trust Deed**").

(B)  Pursuant to Clause 2.7 of the Principal Trust Deed, the Issuer has authorised and determined to issue its Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 (the "**Notes**") to be constituted and secured as set out below.

(C)  The parties hereto have each resolved to enter into this Deed for the purposes set out below. For the avoidance of doubt each party's obligation is several.

**Now this deed witnesses and it is hereby declared** as follows:

## SECTION I: DETAILS OF THE TRANSACTION

### 1    The Drawdown

**1.1**  **Description of the Notes:**

| | |
|---|---|
| The Notes: | Series 2007-1 Tranche B Synthetic Portfolio Notes |
| Principal Amount: | AUD28,600,000 |

**1.2**  **Process Agent Appointment Information:**

| | |
|---|---|
| Relevant Agreements: | This Deed |
| | The Swap Agreement |
| | The Agency and Registry Agreement |

**1.3**  **Details of Swap Agreement:**

|  |  |
|---|---|
| Counterparties: | Issuer, Swap Counterparty |
| Master Agreement: | ISDA Master Agreement dated 10 October 2002, as amended and restated on 21 July 2006, between Dante and the Swap Counterparty |
| Transaction Type: | Credit Default Swap Transaction |
| Effective Date | 20 March 2007 |

### 1.4 Collateral:

|  |  |
|---|---|
| The Collateral: | Qualifying Assets in principal amount equal to the Principal Amount of the Notes. |
| | The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD28,600,000, to be credited into the Collection Account on or about the Issue Date (excluding any accrued interest) (the "**Cash Collateral**"). |
| | On or about 23 March 2007, the Issuer shall use the Cash Collateral to purchase a principal amount of AUD28,600,000 Floating Rate Notes due 20 September 2014 to be issued by GE Capital Australia Funding Pty. Ltd. and guaranteed by General Electric Capital Corporation (the "**GECA Notes**"). |
| | Upon completion of the purchase of the GECA Notes by the Issuer and the GECA Notes being credited into the Custodian Account, the GECA Notes will constitute the Collateral in respect of the Notes. |
| | For the avoidance of doubt, the GECA Notes may be exchanged for Qualifying Assets but subject to Fitch's rating confirmation as set out in the Conditions. |
| Custodian Account for the transfer of the Collateral: | JPMorgan Chase Bank, N.A. Euroclear account number 22066 |

## SECTION II: PROVISIONS SUPPLEMENTAL TO THE PRINCIPAL TRUST DEED AND THE AGENCY AGREEMENT

### 2 Definitions

**2.1 Principal Trust Deed:** Expressions defined in the Principal Trust Deed and the Conditions shall have the same meanings when used herein save to the extent supplemented or modified hereby.

2.2 **Additional Definitions:** The following expressions shall have the following meanings:

"**Agency Agreement**" means the agency agreement dated 10 October 2002, as amended and restated on 21 July 2006, between the Issuing and Paying Agent and others in respect of the Programme as further amended by this Deed;

"**Agency and Registry Agreement**" means the agreement dated 20 March 2007 between the Issuer, the Australian Paying Agent, the Registrar and the Trustee;

"**Collateral**" means the Collateral described in Section I of this Deed (together with, for the avoidance of doubt, any interest accrued thereon up to and including the Issue Date) to be transferred to the Collection Account or the Custodian Account, as the case may be, pursuant to this Deed upon such Collateral being transferred to the Custodian and held subject to the charges securing the Notes;

"**Collection Account**" means the interest bearing account in relation to the Notes established with the Custodian in the name of the Issuer;

"**Conditions**" means the terms and conditions of the Notes in the form set out in Schedule 2 Part C to the Principal Trust Deed, as supplemented by Schedule 2 to this Deed;

"**Custodian Account**" means the account described as such in Section I of this Deed;

"**Fitch**" means Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto;

"**Issue Date**" means the date (expected to be the date of this Deed) on which the Notes constituted hereby are issued by the Issuer;

"**Mortgaged Property**" means the assets and/or agreements from time to time charged in favour of the Trustee for the purpose of securing the Notes;

"**Notes**" means the Tranche B Notes of the Issuer described in Section I of this Deed, constituted and secured by this Deed or the amount of them for the time being outstanding;

"**Obligation**" means an obligation and duty of the Issuer under the Trust Deed, each Note, the Agency Agreement, the Agency and Registry Agreement and the Swap Agreement;

"**Portfolio Management Agreement**" means the portfolio management agreement dated 20 March 2007, between the Issuer, the Swap Counterparty, the Calculation Agent and the Portfolio Manager;

"**Portfolio Manager**" means Lion Capital Management Limited;

"**Principal Amount**" means the principal amount of the Notes as set out in Section I of this Deed;

"**Purchase Price**", in respect of the purchase of the GECA Notes, means such valuable consideration as is agreed between the Dealer and the Issuer;

"**Qualifying Assets**" means in respect of any exchange (subject to confirmation by Fitch that the rating of the Notes will remain unaffected) of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:

1. (a) having as of the date of transfer a credit rating assigned by Fitch equal to AAA;
   (b) maturing on or before the Scheduled Maturity Date;

(c) being AUD-denominated; and

(e) is not a structured finance product; or

2. any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3. AUD cash;

"**Series Prospectus**" means the Series Prospectus dated 20 March 2007 specifying the relevant issue details of the Notes; and

"**Swap Agreement**" means the ISDA Swap Agreement described in Section I of this Deed, comprising the Master Agreement (including the Schedule thereto) (the "**ISDA Master**"), a confirmation relating to the Notes with an effective date of the Effective Date and the guarantee of the obligations of the Swap Counterparty in respect of the Notes given by Lehman Brothers Holdings Inc. (the "**Swap Guarantee**").

**2.3** **Definitions in Principal Trust Deed**: References in the Principal Trust Deed to the "Securities" shall be construed as references to the Collateral.

**2.4** **Incorporation by Reference**: Except as otherwise provided herein, the terms of the Principal Trust Deed shall apply to this Deed as if they were set out herein and the Principal Trust Deed shall be read and construed, in relation to the Notes, as one document with this Deed. For the avoidance of doubt, the conditions set out in Schedule 2 Part C to the Principal Trust Deed, as supplemented by Schedule 2 to this Deed shall constitute the Conditions of the Notes.

## 3 Amount and Status of Notes

**3.1** **Amount:** The aggregate principal amount of the Notes is limited to AUD28,600,000.

**3.2** **Status:** The Notes constitute secured and limited recourse obligations of the Issuer, secured as provided below.

## 4 Form of Notes

The Notes are issued in registered form evidenced by inscription in the register maintained by the Registrar and not represented by a certificate subject to and with the benefit of the Conditions set out in the Principal Trust Deed as modified by the Series Prospectus set out in Schedule 2 to this Deed.

## 5 Security and Covenants

**5.1** **Security:** The Issuer hereby creates security over the Mortgaged Property in accordance with the provisions of Clause 5 of the Principal Trust Deed.

**5.2** **The Mortgaged Property:** Without prejudice to the generality of sub-Clause 5.1, the Issuer as sole beneficial owner with full title guarantee and as continuing security in favour of the Trustee hereby:

5.2.1 charges by way of first fixed charge the Collateral;

5.2.2 assigns by way of security all the Issuer's rights, title and interest attaching to or relating to the Collateral and all sums derived therefrom including, without limitation, any right to delivery thereof or to an equivalent number or nominal value thereof which

arises in connection with any such assets being held in a clearing system or through a financial intermediary;

5.2.3 assigns by way of security all the Issuer's rights, title and interest against the Custodian, to the extent that they relate to the Collection Account, Collateral or any other assets held by the Custodian in relation to the Notes and/or the Swap Agreement;

5.2.4 assigns by way of security all the Issuer's rights, title and interest against the Disposal Agent, to the extent that they relate to any Collateral or the proceeds of sale or redemption of any such Collateral;

5.2.5 assigns by way of security all the Issuer's rights, title and interest under the Agency Agreement and the Agency and Registry Agreement (the Issuer's "**Agency Rights**"), to the extent that they relate to the Notes and all sums derived therefrom;

5.2.6 assigns by way of security all the Issuer's rights, title and interest under the Swap Agreement and the Swap Guarantee and in respect of any sums received thereunder (the Issuer's "**Swap Rights**");

5.2.7 assigns by way of security all the Issuer's rights, title and interest under the Portfolio Management Agreement and, to the extent that they relate to the Notes, in respect of any sums received thereunder (the Issuer's "**Portfolio Management Rights**"); and

5.2.8 charges by way of first fixed charge (a) all sums held by the Issuing and Paying Agent and/or the Custodian and/or the Registrar to meet payments due in respect of the obligations and duties of the Issuer under the Trust Deed, the Notes and the Swap Agreement (including, without limitation, all sums standing to the credit of the Collection Account) and (b) any sums received by the Issuing and Paying Agent and/or the Custodian and/or the Registrar under the Swap Agreement and under the Swap Guarantee (together with the Issuer's Agency Rights, Swap Rights and Portfolio Management Rights, its "**Note Rights**").

5.3 **Benefit of Security**: Clause 5.2 of the Principal Trust Deed is hereby amended in relation to the issue of the Notes so that the security created pursuant to Clauses 5.1 and 5.2 of this Deed is granted to the Trustee as trustee for itself and/or the holders of the Notes, and the Swap Counterparty, the Custodian, the Paying Agents and/or the Registrar as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement and (iii) for payment of all claims of the Custodian (for reimbursement in respect of payments properly made to any party of sums receivable in respect of the Collateral in discharge of an Obligation) and (iv) for the payment of all claims of the Paying Agents and/or the Registrar (for reimbursement in respect of payments properly made to any person in discharge of an Obligation).

None of the Swap Counterparty, the Custodian, the Registrar nor any of the Paying Agents shall benefit from the security in respect of which it is itself the party that owes an obligation to the Issuer pursuant to the Swap Agreement, the Agency Agreement or the Agency and Registry Agreement.

5.4 **Release of Mortgaged Property:** The Trustee shall release from such charges created pursuant to this Deed:

5.4.1 any part of the Mortgaged Property when the same becomes payable or deliverable to the extent that (i) payment or delivery of the same may be obtained and duly paid or delivered to the Swap Counterparty under the terms of the Swap Agreement and/or to the holders of the Notes or (ii) such part of the Mortgaged Property may be disposed of by the Disposal Agent on behalf of the Issuer in accordance with the terms of this Deed or (iii) for the purposes of purchasing the GECA Notes pursuant to Clause 8;

5.4.2 any part of the Mortgaged Property when the same becomes payable or deliverable to the extent that the Swap Counterparty exercises its rights under the Swap Agreement to exchange any Mortgaged Property pursuant to the terms of the Swap Agreement and the Swap Counterparty elects for such Mortgaged Property to be delivered to, or to the order of, the Swap Counterparty;

5.4.3 such sums as arise under the Issuer's Note Rights to the intent that payment of all sums due under the Trust Deed be duly made;

5.4.4 such sums as arise under the Issuer's Swap Rights to the intent that payment of all sums and delivery of all amounts under the Swap Agreement be duly made; and

5.4.5 such sums as arise under the Issuer's Portfolio Management Rights to the intent that payment of all sums due under the Portfolio Management Agreement be duly made.

5.5 **Application of Moneys Received:** The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:

Subject to the amendment in Clauses 5.5.1 and 5.5.2 below, Swap Counterparty Priority shall apply unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or (ii) a Tax Event (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement), in which case Noteholder Priority shall apply,

and for the purpose of the Notes only:

5.5.1 Clause 6.2(i) of the Principal Trust Deed shall be deleted in its entirety and replaced by the following:

"if "**Swap Counterparty Priority**" is specified in the relevant Supplemental Trust Deed:

(a) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b) secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Registrar and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent and/or the Custodian;

(c) thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement;

(d) fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(e) fifthly, rateably in meeting the claims (if any) of the Portfolio Manager under the Portfolio Management Agreement; and

(f) sixthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the Portfolio Manager and before the claims of the Issuer in relation to the balance (if any)."

5.5.2 Clause 6.2(iii) of the Principal Trust Deed shall be deleted in its entirety and replaced by the following:

"if "**Noteholder Priority**" is specified in the relevant Supplemental Trust Deed:

(a) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b) secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Registrar and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c) thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(d) fourthly, rateably in meeting the claims (if any) of the Portfolio Manager under the Portfolio Management Agreement;

(e) fifthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(f) sixthly, in payment of the balance (if any) to the Issuer."

5.6 **Declaration of Trust**: For the purpose of the Notes only, Clause 6.1 of the Principal Trust Deed shall be amended such that the paragraph starting with "first, in payment of all costs..." and ending with "thirdly, in payment of any balance to the Issuer for itself." shall be deleted in its entirety and replaced by the following:

"first, in payment of all costs, charges, expenses and liabilities properly incurred by the Trustee (including remuneration payable to it) in carrying out its functions under the Trust Deed in relation to that Series;

secondly, in payment of any amounts owing to the Swap Counterparty for that Series, the Custodian or the Noteholders or Couponholders in respect of the Notes or Coupons for that Series *pari passu* and rateably;

thirdly, in payment of any amounts owing to the Portfolio Manager; and

fourthly, in payment of any balance to the Issuer for itself."

5.7 **Payments:** The Issuer and the Issuing and Paying Agent hereby agree in accordance with the provisions of Clause 4.1 of the Agency Agreement that payments in respect of the Notes shall be made on a "same-day" basis, and that the provisions of Clause 4.1.1 of the Agency Agreement apply so that the Issuer shall transfer the amounts required in respect of any particular payment on the date on which that payment in respect of the Notes becomes due.

5.8 **Collateral:** The Issuer confirms that it has made arrangements for the Cash Collateral to be credited into the Collection Account on or before the date hereof and the GECA Notes to be delivered to or to the order of the Custodian on or before the Purchase Date. The Custodian agrees to notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral.

5.9 **Covenant to pay:** The Trustee hereby agrees to hold the covenant set out in Clause 2.3 of the Principal Trust Deed on trust for the holders of the Notes according to their respective interests.

5.10 **Covenants:** The Swap Counterparty covenants with the Trustee in the terms of Clause 7.2 of the Principal Trust Deed and agrees to comply with and be subject to all other applicable provisions of the Principal Trust Deed.

5.11 **Additional Covenant:** The Issuer covenants with the Trustee that upon receipt of the draft transaction agreements it shall provide Fitch with such draft transaction agreements in respect of each subsequent Series of Notes prior to the issue date of such Series of Notes (whether or not the relevant Series of Notes is to be rated by Fitch).

5.12 **Notice and Acknowledgement:** The Trustee hereby gives notice and each of the Paying Agents, the Custodian, the Registrar, the Disposal Agent and the Swap Counterparty hereby acknowledges that it has notice of the assignments and security given by the Issuer pursuant to this Deed and each of the above parties together with the Trustee consent to any further assignments and security by the Issuer to any successor trustee under this Deed.

5.13 **Collection Monies:** The Issuer shall procure each payment received by it pursuant to the Swap Agreement is paid into the Collection Account upon receipt.

5.14 **Agency Agreement:**

    5.14.1 The Agency Agreement is hereby amended by the addition of Clause 15.16 of the following: "The Custodian agrees to open and maintain in its books cash and securities accounts (including the Collection Account) for and on behalf of the Issuer to which amounts and securities transferred to the Issuer under the Swap Agreement will be credited and held subject to the Security in favour of the Trustee. The Issuer and the Trustee hereby authorise the Custodian and the Custodian hereby agrees to debit such

        accounts in accordance with the instructions of the Trustee except prior to any Event of Default or Potential Event of Default where they shall be debited in accordance with the instructions of the Issuer only".

    5.14.2    The Agency Agreement is hereby amended in relation to the issue of the Notes by the addition of Clause 15.17 of the following: "On redemption of the Collateral, the Custodian shall arrange for the deposit into the Collection Account of the redemption proceeds of such Collateral".

## 6    Limited Recourse and Non Petition

The parties to this Deed and the holders of the Notes shall have recourse only to sums derived from the Mortgaged Property, and the Trustee having realised the same, the parties to this Deed, the holders of the Notes, or anyone acting on behalf of any of them shall not be entitled to take any further steps against the Issuer to recover any sum still unpaid and all sums due but still unpaid shall be extinguished. In particular, neither the parties to this Deed nor any holder of any Note shall be entitled to petition or take any other step for the winding up of the Issuer, nor shall any of them have any claim in respect of any sum arising in respect of the Mortgaged Property for any other Series.

## SECTION III: PROVISIONS RELATING TO THE DRAWDOWN

## 7    Issue of and Subscription for the Notes

**7.1**    **Agreement to subscribe:** The Dealer agrees to subscribe and pay for the Notes in an amount equal to the Principal Amount and for a price equal to the issue price of the Notes in accordance with the terms of the Programme Agreement.

**7.2**    **Agreement to issue:** The Issuer confirms its agreement to issue the Notes to the Dealer.

## 8    Sale of Collateral

**8.1**    **Agreement to sell and purchase:** The Dealer agrees to sell with full title guarantee, and the Issuer agrees to purchase, the GECA Notes for the Purchase Price on or about 23 March 2007 (the "**Purchase Date**") by delivery of the GECA Notes to, or to the order of, the Custodian in consideration of the payment of the Purchase Price on the Purchase Date by the Issuer to, or to the order of, the Dealer. The Dealer and the Issuer acknowledge that it is their express intention that the transaction shall be a sale and it is not their intention that the sale and purchase of the GECA Notes shall be deemed to create in favour of the Issuer a mortgage, charge, pledge or any other security interest over such GECA Notes.

**8.2**    **Completion:** In respect of the sale and purchase of the GECA Notes, the Dealer and the Issuer confirm that completion of the sale and purchase shall take place on the Purchase Date by:

    8.2.1    the transfer of such GECA Notes from the Dealer to or to the order of the Custodian; and

    8.2.2    payment of the Purchase Price in respect of the GECA Notes to or to the order of the Dealer.

- 8.3 **Representations and Warranties**:

  - 8.3.1 The Dealer and the Issuer represent and warrant to each other on the Issue Date and the date of this Deed, and shall be deemed to represent and warrant to each other on the Purchase Date that,

    - (i) it is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation;

    - (ii) in respect of the GECA Notes sold or bought on the Purchase Date:

      - (a) it has the power to enter into the sale (in the case of the Dealer) or purchase (in the case of the Issuer) of such GECA Notes and has taken all necessary action to authorise such sale or (as the case may be) purchase; and

      - (b) its obligation to sell (in the case of the Dealer) or buy (in the case of the Issuer) such GECA Notes constitutes its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and, as to enforceability, subject to equitable principles of general application); and

  - 8.3.2 The Dealer and the Issuer represent and warrant to each other on the date of this Deed that:

    - (i) it has the power to enter into this Deed and to perform its obligations hereunder in accordance with the terms and conditions hereof and has taken all necessary action to authorise the execution, delivery and performance of this Deed; and

    - (ii) this Deed constitutes its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and, as to enforceability, subject to equitable principles of general application).

- 8.4 **Additional Representations and Warranties**: In respect of the sale of the GECA Notes by the Dealer on the Purchase Date, the Dealer hereby represents and warrants to the Issuer that:

  - 8.4.1 the Dealer sells all rights, title and interest therein free and clear of all mortgages, pledges, liens, charges, assignments, security interests, options, equities (including, without limitation, rights of set-off or counterclaim) or any other encumbrances of any nature whatsoever (other than any claims of the clearing system (or its operator) through which such GECA Notes is held);

  - 8.4.2 the Dealer is not, both prior to the sale of such GECA Notes nor will be as a result of such sale, unable to pay its debts as they fall due within the meaning of Section 123 of the Insolvency Act 1986;

  - 8.4.3 (i) the Dealer is entering into such sale of the GECA Notes in good faith and for the purpose of carrying on its business, (ii) the Dealer considers such sale to be in its best interests and (iii) the Dealer has not entered into such sale of the GECA Notes in order to defraud its creditors; and

8.4.4 the sale of such GECA Notes is not made below fair market value.

## 9 Disposal Agent

9.1 **Appointment**: The Issuer appoints the Disposal Agent as its agent for the purposes of arranging for the disposal or transfer of the Collateral or any part of it that is required to be disposed of or transferred pursuant to the Conditions or in order to meet its obligations under the Swap Agreement (the "**Affected Collateral**") on the following terms and conditions.

9.2 **Duties**: The Disposal Agent shall:

9.2.1 on any date (the "**Solicitation Date**") on which the Issuer becomes obliged under the Conditions or the Swap Agreement to sell the Affected Collateral, use its reasonable endeavours to solicit:

(i) offers from third parties (which, for the avoidance of doubt, may not include itself but may include an offer from the issuer of the Collateral to redeem the Collateral) ("**Offerors**") to purchase (or, in the case of an offer from the issuer of the Collateral, to redeem) the Affected Collateral for settlement on a date no later than 5 Business Days after the Solicitation Date (the "**Disposal Date**"); and

(ii) quotations from such Offerors of the price at which each would be prepared to purchase (or, as the case may be, redeem) the Affected Collateral on such terms;

9.2.2 as the Issuer's agent, arrange the sale of the Affected Collateral on the Issuer's behalf (the "**Sale**") for settlement on the Disposal Date to the Offeror which made the highest offer to purchase it (the "**Purchaser**"). The Issuer hereby authorises the Disposal Agent to give settlement instructions to the Custodian in connection with such Sale; and

9.2.3 as the Issuer's agent, arrange the transfer of the Affected Collateral on the Issuer's behalf (the "**Transfer**") for settlement on the Disposal Date to the Purchaser. The Issuer hereby authorises the Disposal Agent to give settlement instructions to the Custodian in connection with such Transfer.

If the Disposal Agent fails to take any action that it is required to take pursuant to this Deed, it shall forthwith notify the Issuer, Fitch, the Trustee and the Issuing and Paying Agent in writing.

For the avoidance of doubt, in the event that the Offeror which makes the highest offer is the issuer of the Collateral in respect of an offer to redeem the Collateral, an offer from the issuer of the Collateral to redeem the Collateral will, for the purposes of this provision, be deemed to be a Sale and the issuer of the Collateral will be deemed to be the Purchaser.

9.3 **Dealings in Collateral**: The Custodian may:

9.3.1 accept settlement instructions from the Disposal Agent in connection with the Sale or the Transfer;

9.3.2 upon the instruction of the Disposal Agent, accept delivery of the purchase moneys (if any) for the Affected Collateral from the Purchaser. Clause 15.8 of the Agency Agreement shall apply to such purchase moneys in payment to the Swap Counterparty in accordance with the terms of the Swap Agreement; and

9.3.3   deliver the Affected Collateral to, or for the account of, the recipient specified in the instruction of the Disposal Agent against, in the case of the sale of the Affected Collateral, such receipt of the purchase moneys.

The Swap Counterparty hereby agrees that, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or if a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement) and Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or redemption of the Collateral (1) first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

**9.4**   **General**: In acting under this Deed, the Disposal Agent:

9.4.1   may take such steps as it considers appropriate in order to effect an orderly sale of the Affected Collateral but may not delay arrangements of the sale beyond the Disposal Date in the hope of achieving a higher price and will not be liable to the Issuer or any party hereto merely because a higher price could have been obtained had the sale been delayed;

9.4.2   shall not be liable for any costs, charges, losses, damages, liabilities or expenses ("**Losses**") arising from or connected with the sale or from any act or omission in relation to the Affected Collateral or otherwise unless such Losses are caused by its own fraud, negligence, misconduct or wilful default;

9.4.3   shall not have any obligations towards or relationship of agency or trust with the Noteholders;

9.4.4   may consult on any legal matter any legal adviser selected by it, who may be an employee of or adviser to the Issuer, and it shall not be liable in respect of anything done or omitted to be done relating to that matter in good faith in accordance with that adviser's opinion;

9.4.5   shall not be liable in respect of anything done or suffered by it in reliance on a document it reasonably believed to be genuine and to have been signed by the proper parties or on information to which it should properly have regard and which it reasonably believed to be genuine and to have been originated by the proper parties; and

9.4.6   may acquire, hold or dispose of any Notes or other security (or any interest therein) of the Issuer or any other person, may enter into or be interested in any contract or transaction with any such person and may act on, or as depository, trustee or agent for, any committee or body of holders of any securities of any such person in each case with the same rights as it would have had if the Disposal Agent were not the Disposal Agent, and need not account for any profit.

**9.5**   **Changes In Disposal Agent**

9.5.1   The Disposal Agent may resign its appointment hereunder at any time by giving prior written notice to the Issuer (which notice shall not expire less than 30 days before or after the Disposal Date). If the Disposal Agent is unable or unwilling or otherwise fails to act, the Issuer shall immediately appoint a leading bank or investment banking firm

to act as its successor. Resignation by the Disposal Agent shall not take effect, nor may the Disposal Agent be removed (save as set out herein), until the Issuer has appointed a replacement disposal agent upon substantially the same terms. The Issuer agrees with the Disposal Agent that if, 10 days before the expiry of any notice under this Clause, the Issuer has not appointed a replacement disposal agent, the Disposal Agent shall be entitled, on behalf of the Issuer, to appoint a disposal agent in its place meeting the requirements set out above to which the Issuer shall have no reasonable objection.

9.5.2   The Issuer may forthwith terminate the appointment of the Disposal Agent if (i) at any time the Disposal Agent becomes incapable of acting, or is adjudged bankrupt or insolvent, or files a voluntary petition in bankruptcy or makes an assignment for the benefit of its creditors or consents to the appointment of a receiver, administrator or other similar official of all or any substantial part of its property or admits in writing its inability to pay or to meet its debts as they mature or suspends payment thereof, or if a resolution is passed or an order made for its winding-up or dissolution, or if a receiver, administrator or other similar official of itself or all or any substantial part of its property is appointed, or if an order of any court is entered approving any petition filed by or against it under the provisions of any applicable bankruptcy or insolvency laws, or if any public officer takes charge or control of it or its property or affairs for the purpose of rehabilitation, conservation or liquidation; or (ii) it fails duly to perform any act required to be performed by it under this Deed and the Issuer gives it notice that it intends to appoint a replacement disposal agent.

9.5.3   In accordance with the Conditions the Issuer shall give the Noteholders, the Trustee, Fitch and the Issuing and Paying Agent at least 30 days' notice of any such proposed resignation or termination or, where the appointment is terminated forthwith in accordance with this Clause, shall give notice as soon as possible after such termination.

9.5.4   Any organisation into which the Disposal Agent may be merged or converted or with which the Disposal Agent may be consolidated or which results from any merger, conversion or consolidation ("**Merger**") to which the Disposal Agent shall be a party shall, to the extent permitted by applicable law, be the successor disposal agent under this Deed without any further formality. Notice of any such Merger shall forthwith be given to the parties hereto. In addition, the Disposal Agent may transfer all of its rights and obligations to any organisation to which the Disposal Agent transfers all or substantially all of the Disposal Agent's assets and business and that assumes such obligations. Upon any such transfer and assumption of obligations, the Disposal Agent shall be relieved of and fully discharged from all obligations under this Deed, whether such obligations arose before or after such transfer and assumption.

## 10   Appointment of Calculation Agent

**10.1**   The Issuer hereby appoints the Calculation Agent to act as calculation agent for the Notes on the terms of, and as if it were expressed to be a party (as Calculation Agent) to, the Agency Agreement. This appointment relates only to the Notes and not to other issues of other obligations under the Programme.

**10.2**   The Calculation Agent accepts its appointment as Calculation Agent on the terms set out herein.

10.3 The Trustee consents to the appointment of the Calculation Agent as Calculation Agent relating to the Notes.

10.4 Each Noteholder and the Issuing and Paying Agent may request that the Calculation Agent shall, as soon as practicable, deliver to or to the order of such Noteholder or the Issuing and Paying Agent, as the case may be, reasonable information as to the manner of, and the bases and assumptions upon which, amounts have been calculated pursuant to the Conditions.

10.5 Upon notification from the Custodian that there has been a material amendment to the terms and conditions of the Collateral, the Calculation Agent will notify Fitch of such material amendment.

## 11 Notices

All notices to be given in connection with the Notes shall be given or made by facsimile transmission or letter (by first class post) and shall be deemed to be delivered on receipt (when delivered in person), upon transmission (when made by facsimile transmission) and seven business days after the date of posting (if posted by first class post). The relevant addresses for notices are set out in Schedule 1.

## 12 Contracts (Rights of Third Parties) Act 1999

A person who is not party to this Deed has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Deed except that and to the extent (if any) that this Deed expressly provides for that Act to apply to any of its terms.

## 13 Governing Law and Jurisdiction

13.1 **Governing Law:** This Deed shall be governed by and construed in accordance with English law.

13.2 **Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Deed, the Principal Trust Deed or the Notes and accordingly any legal action or proceedings arising out of or in connection with this Deed, the Principal Trust Deed or the Notes ("**Proceedings**") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objection on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of each of the other parties to this Deed and the holders of Notes, and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

13.3 **Service of Process:** The Issuer irrevocably appoints Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE to receive, for it and on its behalf, service of process in any Proceedings in England. Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason its process agent ceases to be able to act as such or no longer has an address in England, the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the parties hereto, and to deliver to the parties hereto a copy of the new agent's acceptance of that appointment, within 30 days. Nothing shall affect the right to serve process in any other manner permitted by law.

**This deed is delivered the day and year first before written**

**EXECUTED AS A DEED BY:**

**ZIRCON FINANCE LIMITED**

by

its lawfully appointed attorney:


in the presence of:


Witness signature:


Address:


Occupation:



EXECUTED AS A DEED BY

**BNY CORPORATE TRUSTEE SERVICES LIMITED (FORMERLY KNOWN AS J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED)** (as Trustee)

acting by two of its lawful Attorneys

In the presence of:-


                      Attorney


In the presence of:-


                      Attorney



**JPMORGAN CHASE BANK, N.A.** (as Issuing and Paying Agent, and Custodian)

By:



**BTA INSTITUTIONAL SERVICES AUSTRALIA LIMITED** (as Australian Paying Agent and Registrar)

By:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (as Calculation Agent, Disposal Agent and Dealer)

By:

**LEHMAN BROTHERS SPECIAL FINANCING INC.** (as Swap Counterparty)

By:

## Schedule 1
## Addresses for Service and Notices

**Issuer:**  Zircon Finance Limited
c/o Walkers SPV Limited
Walker House
87 Mary Street
George Town
Grand Cayman KY1-9002
Cayman Islands
Tel:    (345) 945 3727
Fax:   (345) 945 4757
Attn:  The Directors

**Lehman Brothers International (Europe):**  25 Bank Street
London E14 5LE
Fax:   +44 20 7260 1266
Attn:  General Counsel

**Lehman Brothers Special Financing Inc.**  745 Seventh Avenue
New York
New York 10019
U.S.A.
Fax:   +1646 758 1670
Attn:  General Counsel

**Issuing and Paying Agent and Custodian:**  JPMorgan Chase Bank, N.A.
Trinity Tower
9 Thomas More Street
London E1W 1YT
Tel:    +44 1 202 347430
Telex: 8954681 CMB G
Fax:   +44 1 202 347438
Attn:  Manager, Institutional Trust Services

**Australian Paying Agent and Registrar:**  BTA Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 4
35 Clarence Street
Sydney
NSW 2000
Australia
Tel:    + 61 2 8295 8100
Fax:   +61 2 8295 8649
Attn:  Transaction Management Group

| | |
|---|---|
| **Trustee:** | BNY Corporate Trustee Services Limited |
| | (Formerly known as J.P. Morgan Corporate Trustee Services Limited) |
| | One Canada Square |
| | E14 5AL |
| | Fax:   + 44 (0) 20 7964 6399 |
| | Attn:  Manager, Trust Administration |
| **Process Agent:** | 25 Bank Street |
| | London E14 5LE |
| | Fax:   00 353 1 874 3050 |
| | Attn:  The Directors |
| **Fitch:** | Fitch |
| | Level 43, AMP Centre |
| | 50 Bridge Street |
| | Sydney NSW 2000 |
| | Tel:   612-82560300 |
| | Fax:   612-82560301 |
| | Email: Australia.Surveillance@fitchratings.com |
| | hongkong.cdosurveillance@fitchratings.com |