The Notes are issued in bearer form ("**Bearer Notes**", which expression includes Notes that are specified to be Exchangeable Bearer Notes), in registered form ("**Registered Notes**") or in bearer form exchangeable for Registered Notes ("**Exchangeable Bearer Notes**") in each case in the denomination(s) shown thereon provided that in the case of any Notes which are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require the publication of a prospectus under the Prospectus Directive (Directive 2003/71/EC), the minimum denomination shall be €50,000 (or its equivalent in any other currency as at the date of issue of those Notes).

All Registered Notes shall have the same denomination. Where Exchangeable Bearer Notes are issued, the Registered Notes for which they are exchangeable shall have the same denomination as the lowest denomination of Exchangeable Bearer Notes.

Bearer Notes are serially numbered and are issued with Coupons (and, where appropriate, a Talon) attached, save in the case of Notes that do not bear interest in which case references to interest (other than in relation to interest due after the Maturity Date (as defined in the relevant Final Terms )), Coupons and Talons in these Conditions are not applicable. Any Bearer Note the principal amount of which is redeemable in instalments is issued with one or more Receipts attached.

Registered Notes are represented by registered certificates ("**Certificates**") and, save as provided in Condition 2(c), each Certificate shall represent the entire holding of Registered Notes by the same holder.

Title to the Bearer Notes and the Receipts, Coupons and Talons shall pass by delivery. Title to the Registered Notes shall pass by registration in the register that the Issuer shall procure to be kept by the Registrar in accordance with the provisions of the Agency Agreement (the "**Register**"). Except as ordered by a court of competent jurisdiction or as required by law, the holder (as defined below) of any Note, Receipt, Coupon or Talon shall be deemed to be and may be treated as its absolute owner for all purposes whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it (or on the Certificate representing it) or its theft or loss (or that of the related Certificate) and no person shall be liable for so treating the holder.

In these Conditions, "**Noteholder**" means the bearer of any Bearer Note and the Receipts relating to it or the person in whose name a Registered Note is registered (as the case may be), "**holder**" (in relation to a Note, Receipt, Coupon or Talon) means the bearer of the Bearer Note, Receipt, Coupon or Talon or the person in whose name a Registered Note is registered (as the case may be) and capitalised

terms have the meanings given to them herein, the absence of any such meaning
indicating that such term is not applicable to the Notes.

2    **Exchanges of Exchangeable Bearer Notes and Transfers of Registered Notes**

    (a)    *Exchange of Exchangeable Bearer Notes*

        Subject as provided in Condition 2(f), Exchangeable Bearer Notes may be
exchanged for the same principal amount of Registered Notes at the request
in writing of the relevant Noteholder and upon surrender of each
Exchangeable Bearer Note to be exchanged, together with all unmatured
Receipts, Coupons and Talons relating to it, at the specified office of any
Transfer Agent; provided, however, that where an Exchangeable Bearer Note
is surrendered for exchange after the Record Date (as defined in Condition
7(b)) for any payment of interest, the Coupon in respect of that payment of
interest need not be surrendered with it. Registered Notes may not be
exchanged for Bearer Notes. Bearer Notes of one denomination may not be
exchanged for Bearer Notes of another denomination. Bearer Notes that are
not Exchangeable Bearer Notes may not be exchanged for Registered Notes.

    (b)    *Transfer of Registered Notes*

        One or more Registered Notes may be transferred upon the surrender (at the
specified office of the Registrar or any Transfer Agent) of the Certificate
representing such Registered Notes to be transferred, together with the form
of transfer endorsed on such Certificate duly completed and executed and any
other evidence as the Registrar or Transfer Agent may reasonably require. In
the case of a transfer of part only of a holding of Registered Notes
represented by one Certificate, a new Certificate shall be issued to the
transferee in respect of the part transferred and a further new Certificate in
respect of the balance of the holding not transferred shall be issued to the
transferor. All transfers of Notes and entries on the Register will be made in
accordance with the detailed regulations concerning transfers of Notes
scheduled to the Agency Agreement. The regulations may be changed by the
Issuer, with the prior written approval of the Registrar and the Trustee. A
copy of the current regulations will be made available by the Registrar to any
Noteholder upon request.

    (c)    *Exercise of Options or Partial Redemption in Respect of Registered Notes*

        In the case of an exercise of an Issuer's option in respect of, or a partial
redemption of, a holding of Registered Notes represented by a single
Certificate, a new Certificate shall be issued to the holder to reflect the
exercise of such option or in respect of the balance of the holding not
redeemed. In the case of a partial exercise of an option resulting in Registered

Notes of the same holding having different terms, separate Certificates shall be issued in respect of those Notes of that holding that have the same terms. New Certificates shall only be issued against surrender of the existing Certificates to the Registrar or any Transfer Agent.

(d)    *Delivery of New Certificates*

Each new Certificate to be issued pursuant to Conditions 2(a), (b) or (c) shall be available for delivery within five business days of receipt of the request for exchange, form of transfer or Exercise Notice or surrender of the Certificate for exchange. Delivery of the new Certificate(s) shall be made at the specified office of the Registrar or of the Transfer Agent (as the case may be) to whom delivery or surrender of such request for exchange, form of transfer, Exercise Notice or Certificate shall have been made or, at the option of the holder making such delivery or surrender as aforesaid and as specified in the relevant request for exchange, form of transfer, Exercise Notice or otherwise in writing, be mailed by uninsured post at the risk of the holder entitled to the new Certificate to such address as may be so specified, unless such holder requests otherwise and pays in advance to the Registrar or Transfer Agent the costs of such other method of delivery and/or such insurance as it may specify. In this Condition 2(d), "business day" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the relevant Transfer Agent or the Registrar.

(e)    *Exchange Free of Charge*

Exchange and transfer of Notes and Certificates on registration, transfer, exercise of an option or partial redemption shall be effected without charge by or on behalf of the Issuer, the Registrar or the Transfer Agents, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Registrar or the relevant Transfer Agent may require).

(f)    *Closed Periods*

No Noteholder may require the transfer of a Registered Note to be registered or an Exchangeable Bearer Note to be exchanged for one or more Registered Note(s) (i) during the period of 15 days ending on the due date for redemption of, or payment of any Instalment Amount (as defined in the relevant Final Terms) in respect of, that Note, (ii) during the period of 15 days prior to any date on which Notes may be called for redemption by the Issuer at its option pursuant to Condition 6(e), (iii) after any such Note has been called for redemption or (iv) during the period of seven days ending on (and including) any Record Date. An Exchangeable Bearer Note called for

redemption may, however, be exchanged for one or more Registered Note(s) in respect of which the Certificate is simultaneously surrendered not later than the relevant Record Date.

**3    Status and Non applicability**

    *(a)    Status of Notes*

The Notes are secured, limited-recourse obligations of the Issuer, ranking pari passu without any preference or priority amongst themselves (except in the case of Notes with Related Notes in respect of which a Series of Notes may rank senior or junior for the purposes of rights over the Mortgaged Property). The Notes, which are secured in the manner described in Condition 4 and recourse in respect of the Notes is limited in the manner described in Condition 4(e) and Condition 11. In connection with the issue of the Notes there may be executed one or more derivative agreements (each a "**Swap Agreement**") between the Issuer and one or more swap counterparties (each a "**Swap Counterparty**") and one or more credit enhancement agreements (each a "**Credit Enhancement Agreement**") as further described in the relevant Supplemental Trust Deed.

In the case of Notes with Related Notes, details of the Notes' relationship with the relevant Related Notes will be set out in the relevant Final Terms or relevant Supplemental Trust Deed including (to the extent relevant in the context of the Notes), without limitation, in relation to the following issues: (i) the Mortgaged Property over which such Notes and Related Notes are secured, (ii) events of default, (iii) meetings of Noteholders, (iv) fungible issues, (v) conflicts between the interests of the Noteholders and the relevant Related Noteholders and the duties of the Trustee as Trustee for holders of the Notes and as Trustee for holders of the relevant Related Notes and (vi) realisation of the Mortgaged Property.

If so specified in the relevant Final Terms prior to the security over the Mortgaged Property becoming enforceable in accordance with the Trust Deed and the Conditions certain amounts received by the Issuer in connection with the Collateral and/or any Swap Agreement or otherwise will be applied in such manner and order of priority (if any) as may be specified in the relevant Final Terms.

For these purposes and unless otherwise provided:

"**Related Notes**" means the outstanding Notes of any other Series which shares the same Mortgaged Property as the Notes and which was issued as part of the same transaction.

"**Related Noteholders**" means the holders of Related Notes.

(b)    *Non applicability*

Where no reference is made in the relevant Supplemental Trust Deed to any
Swap Agreement or Credit Enhancement Agreement, references in these
Terms and Conditions to any such document or agreement and to any Swap
Counterparty, as the case may be, shall not be applicable.

4    **Mortgaged Property, Realisation of Mortgaged Property and Restrictions**

(a)    *Mortgaged Property*

The Notes will be secured pursuant to the relevant Supplemental Trust Deed.
The form of the Mortgaged Property may comprise some or all of the assets
and assignments set out below.

(b)    *Secured Assets*

The obligations of the Issuer under the Trust Deed, the Notes and the
Coupons are secured by a first fixed charge over certain bonds, warrants,
notes, receivables or equity securities of any form, denomination, type or
issuer, monoline guarantees, options, swaps, loans or any other financial
obligations assigned to or assumed by the Issuer or any other agreed assets
owned by the Issuer as specified in the relevant Supplemental Trust Deed (the
"Collateral") and a first fixed charge on all funds held from time to time by
the Custodian and/or the Account Bank and/or by the Issuing and Paying
Agent and/or the Registrar for payment of principal and interest on the Notes
or of amounts due under the Swap Agreement. If so specified in the relevant
Supplemental Trust Deed, the obligations of the Issuer under any Swap
Agreement are also secured by a first fixed charge over the Collateral. Unless
otherwise specified in the relevant Supplemental Trust Deed, the Collateral is
held by the Custodian or the Account Bank on behalf of the Issuer subject to
the charges set out in the Trust Deed. If so specified in the relevant
Supplemental Trust Deed, under the terms of the relevant Swap Agreement
the Swap Counterparty may require all or part of the Collateral to be
transferred to it as security for the performance of the Issuer's obligations to
the Swap Counterparty under the terms of the Swap Agreement on terms that
the Swap Counterparty will be required to return equivalent collateral or the
market value thereof to the Issuer on or before the termination of such Swap
Agreement (subject to any enforcement of such security). In such
circumstances the security over the Collateral in respect of the Issuer's
obligations under the Trust Deed, the Notes and the Coupons will be over the
Issuer's rights against the Swap Counterparty in relation to the Collateral as
aforesaid.

If so specified in the relevant Supplemental Trust Deed, the Issuer's
obligations under the Trust Deed, the Notes and the Coupons are also secured
by an assignment by way of security of the Issuer's rights under the Swap
Agreement and/or the Credit Enhancement Agreement in favour of the
Trustee for itself and for the benefit of the holders of the Notes, Coupons and
Receipts.

Additionally, the obligations of the Issuer may be secured pursuant to a
security document other than the Trust Deed (an "**Other Security
Document**") as specified in the relevant Supplemental Trust Deed.

The Trustee shall (subject to the provisions of the relevant Supplemental
Trust Deed and to sub-Clause 6.3 of the Principal Trust Deed) apply all
moneys received by it under the provisions of the Principal Trust Deed and
the relevant Supplemental Trust Deed in connection with the realisation or
enforcement of the security constituted thereby and by any relevant Other
Security Document:

(i)     *if "Swap Counterparty Priority" is specified in the relevant
        Supplemental Trust Deed:*

        (a)     first, in payment or satisfaction of the fees, costs, charges,
                expenses and liabilities incurred by the Trustee or any receiver
                in preparing and executing the trusts in the Trust Deed
                (including any taxes required to be paid, the costs of realising
                any security and the Trustee's remuneration);

        (b)     secondly, in meeting claims of the Paying Agents and/or the
                Custodian and/or the Account Bank and/or the Transfer
                Agents for reimbursement in respect of payments properly
                made to any person in discharge of an Obligation;

        (c)     thirdly, rateably in meeting the claims (if any) of the Swap
                Counterparty under the relevant Swap Agreement(s);

        (d)     fourthly, rateably in meeting the claims (if any) of the holders
                of Notes, Coupons and Receipts. If the moneys received by
                the Trustee are not enough to pay such amounts in full, the
                Trustee shall apply them pro rata on the basis of the amount
                due to each party entitled to such payment; and

        (e)     fifthly, in payment of the balance (if any) to the Issuer,

        provided that, if the "Swap Counterparty Priority" is expressed in the
        relevant Supplemental Trust Deed and Final Terms to be subject to
        adjustment on a Swap Counterparty default, and if and to the extent

that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii)    *if "Pari Passu Ranking" is specified in the relevant Supplemental Trust Deed:*

    (a)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

    (b)    secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Account Bank and/or the Transfer Agents for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

    (c)    thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s) and the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them pro rata on the basis of the amount due to each party entitled to such payment; and

    (d)    fourthly, in payment of the balance (if any) to the Issuer.

(iii)    *if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:*

    (a)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

    (b)    secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Account Bank and/or the Transfer Agents for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(c)    thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them pro rata on the basis of the amount due to each party entitled to such payment;

(d)    fourthly, in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s); and

(e)    fifthly, in payment of the balance (if any) to the Issuer.

(iv)    if "*Other Priority*" is specified in the relevant Supplemental Trust Deed and Final Terms, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby, as set out in the relevant Supplemental Trust Deed and Final Terms.

*The applicable priority and ranking provisions in respect of each Series of Notes will be disclosed in the Final Terms.*

*To the extent that a Swap Counterparty fails to make payments due to the Issuer under any relevant Swap Agreement, the Issuer would be unable to meet its obligations when due in respect of the Notes. In such event the Swap Agreement would be terminated and the Notes would become repayable together with interest accrued in accordance with Condition 10.*

(c)    Shareholdings

*Details of the issued shares and the shareholders of the Issuer are as set out in the Issuer Disclosure Annex.*

If specified in the relevant Supplemental Trust Deed, the Issuer has entered into one or more Swap Agreements with the Swap Counterparty under which:

(i)    the Issuer will (subject to the terms thereof) make payments to the Swap Counterparty, on receipt by the Issuer of sums receivable by the Issuer on the Mortgaged Property; and

(ii)    the Swap Counterparty will make payments towards or equal to the obligations of the Issuer in respect of amounts due on the Notes.

*The terms of each Swap Agreement will, if applicable, be set out in the relevant Final Terms.*

*Swap Agreements may provide that the Swap Counterparty may transfer its rights and obligations under a Swap Agreement, as described in the relevant Supplemental Trust Deed, provided that, in relation to Notes that are rated by*

*a rating agency, such transfer shall not adversely affect any existing rating of
the Notes of that Series as confirmed in writing by the appropriate rating
agency. The Trust Deed provides that, subject as provided therein, the Trustee
shall agree to a transfer of the Swap Counterparty's rights and obligations
under such Swap Agreement and shall agree to any amendment to such Swap
Agreement to allow such transfer in such circumstances.*

(d)   *Disposal Agent*

If so specified in the relevant Supplemental Trust Deed, the Disposal Agent
will act as disposal agent in relation to the disposal of the Collateral. Unless
otherwise provided in the relevant Supplemental Trust Deed, the Disposal
Agent may itself make an offer to purchase the Collateral.

(e)   *Realisation of the Mortgaged Property upon Enforcement*

For each Series, the security over the Mortgaged Property shall become
enforceable if (i) any amount due in respect of the Notes is not paid or
delivered when due or (ii) a Swap Agreement terminates with sums due to the
Swap Counterparty. In addition, if part of the principal amount of the Notes
of such Series is mandatorily redeemed under Condition 6(c), the security
created over that part of the Mortgaged Property which relates to such Notes
and with respect to any part of a Swap Agreement to that Series which
terminates as a result of such redemption shall become enforceable. In that
event references herein to the Trustee exercising powers of enforcement of
such security shall be read accordingly.

In the event of the security over the Mortgaged Property constituted under the
relevant Supplemental Trust Deed or by an Other Security Document
becoming enforceable either in whole or in part, the Trustee may at its
discretion and shall if so required in writing by the holders of at least one
fifth in aggregate principal amount of the Notes (or, in respect of a Series of
Notes where there are Related Notes, if so required in writing by the holders
of at least one fifth in aggregate principal amount of the Controlling Series)
then outstanding (as defined in the Trust Deed) or if so directed by an
Extraordinary Resolution (as defined in the Trust Deed) of the holders of the
Notes (or, in respect of a Series of Notes where there are Related Notes, a
direction by Extraordinary Resolution of the holders of the Controlling
Series), or, if sums are due to any Swap Counterparty (except in the case
where action may be taken against any Swap Counterparty), if so directed in
writing by any such Swap Counterparty, but without liability as to the
consequence of such action on individual holders of Notes, Receipts or
Coupons enforce the security. To do so it may, in its discretion, realise all or a
part of the Collateral in a proportion equal to the proportion of the principal

amount of the Notes which are subject to such acceleration, terminate any
Swap Agreement pro rata in accordance with its terms and exercise any rights
under a Credit Enhancement Agreement, provided that the Trustee shall not
be required to take any action that would involve the Trustee in personal
liability or expense unless indemnified to its satisfaction. On being so
directed by the Trustee, the Disposal Agent shall use its reasonable
endeavours to solicit offers from third parties to purchase the Collateral in
accordance with the terms of the relevant Supplemental Trust Deed.

For the purposes hereof, **"Controlling Series"** shall mean, in respect of any
Notes where there are Related Notes, the Series of Notes or other Obligations
identified as the Controlling Series in the relevant Supplemental Trust Deed
or failing that, the most senior ranking of the Notes, relevant Related Notes
and other Obligations secured on the same Mortgaged Property as the Notes.
References in these Conditions to the Controlling Series shall not be
applicable in the case of any Notes where there are no Related Notes.

(f)     *Application of Proceeds*

The Trust Deed requires that the net proceeds of the security, after deduction
of the Trustee's expenses and remuneration and other amounts due to the
Trustee and the Paying Agents and/or the Custodian and/or the Transfer
Agents and/or the Account Bank and any taxes required to be paid prior to
any such application, be applied in meeting claims of any Swap Counterparty
and of the holders of the Notes, Receipts and Coupons as specified in the
relevant Supplemental Trust Deed.

(g)     *Shortfall after Application of Proceeds*

If the net proceeds of realisation of the Mortgaged Property becoming
enforceable under paragraph (f) above are not sufficient for the Issuer to
make all payments due in respect of the Notes and the Coupons and for the
Issuer to meet its obligations in respect of the termination of any relevant
Swap Agreement, the other assets of the Issuer will not be available for
payment of any shortfall arising therefrom. Any such shortfall shall be borne
by the holders of Notes, Coupons and Receipts and any Swap Counterparty
as specified in the relevant Supplemental Trust Deed. The Issuer will not be
obliged to make any further payment in excess of the net proceeds and
accordingly no debt shall be owed by the Issuer in respect of any such
shortfall remaining after realisation of the Mortgaged Property and
application of the proceeds in accordance with the Trust Deed. None of the
Trustee or any Swap Counterparty or any Noteholder may take any further
action to recover such shortfall.

Failure to make any payment in respect of any such shortfall shall in no circumstances constitute an Event of Default under Condition 10.

(h)  *Issuer's Rights as Holder of the Mortgaged Property*

The Issuer may, with the prior written consent of the Trustee or as directed by an Extraordinary Resolution of the Noteholders (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series), (i) take such action in relation to the Mortgaged Property as it thinks expedient and (ii) exercise the rights incidental to the ownership of the Mortgaged Property. In particular, the Issuer may exercise (without responsibility for such exercise) any voting rights in respect of such property and all rights to enforce it. The Issuer will not exercise any rights with respect to the Mortgaged Property unless it has the Trustee's consent or is directed by an Extraordinary Resolution of the holders of the Notes (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series) and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

(i)  *Restrictions on Further Issues and Transactions*

The Issuer shall be at liberty from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) to issue further bonds and notes (which may be consolidated and form a single series with the Notes if issued in accordance with paragraph (f) of this Condition) and to borrow under, buy, sell or enter into other secured Obligations in the form of Loans, Options, Schuldscheine or Swaps. Such further bonds, notes and other secured Obligations (other than those obligations that are not, in the opinion of the Trustee, material in the context thereof and in respect of which another party has made arrangements to discharge the Issuer from claims related thereto) must be secured (save in the case of (i) such further bonds or notes forming a single series with the Notes or other existing bonds, notes or other secured Obligations and (ii) Obligations which, at the time of their issue or effective date, provide that other Obligations may be secured upon the same assets as those on which such Obligations are secured) on assets of the Issuer other than the Mortgaged Property or the assets on which such other Obligations of the Issuer are secured or the Issuer's share capital and on terms in substantially the form contained in these Conditions and that provide for the extinction of all claims in respect of such bonds, notes and related Obligations after application of the proceeds of enforcement of the security over the assets on

which such further bonds, notes and related Obligations are secured (or arrangements have been entered into that, to the satisfaction of the Trustee, have a like result). In addition, where the Issuer has issued other bonds and/or notes which have been rated by a particular rating agency ("**Old Rated Securities**") and proposes to issue and further bonds and/or notes which are not to be rated by that rating agency ("**New Unrated Securities**") then, provided that such Old Rated Securities and their related ratings remain outstanding, then the ratings of the Old Rated Securities must not be adversely affected by the issue of the New Unrated Securities, as confirmed in writing by the appropriate rating agency. Any further securities forming a single series with the outstanding securities of any series (including the Notes) constituted and secured by the Trust Deed or any deed supplemental and/or any Other Security Document to it shall, and any other securities may (with the prior written consent of the Trustee), be constituted and secured by the Trust Deed and/or any Other Security Document. The Trust Deed contains provisions for convening a single meeting of the Noteholders and the holders of securities of other series where the Trustee so decides.

(j)    *Restrictions on Fungible Issues*

The Issuer, if permitted under the Conditions, may from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) issue further bonds and notes that have, when issued, the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest thereon and any amendments made pursuant to (iii) below) and that are consolidated and form a single series with the Notes; provided that (unless otherwise approved by an Extraordinary Resolution (as defined in the Trust Deed) of the Noteholders), (i) the Issuer provides additional security for such new bonds or notes that comprises assets that are fungible with, and have the same proportionate composition as, the Mortgaged Property in respect of the relevant existing Notes and that has an aggregate principal amount at least equal to the principal amount of such existing security multiplied by a fraction, the numerator of which is the aggregate principal amount of such new bonds or notes and the denominator of which is the aggregate principal amount of the existing Notes; (ii) the Issuer enters into an additional or supplemental swap agreement or credit enhancement agreement varying the terms of the Swap Agreement or, as applicable, the Credit Enhancement Agreement to take account of the new bonds or notes on terms no less favourable than those of the Swap Agreement or, as applicable, the Credit Enhancement Agreement; and, in relation to Notes which are rated by a rating agency, (iii) in the case of an issue of

portfolio credit linked notes, the Issuer amends the terms and conditions of
the Notes to preserve the economic effect of a holding of the Notes
(including, without limitation, by amending the Reference Entity Notional
Amount, the Subordination Amount and, where applicable, by amending any
Factor (howsoever such terms are defined in the relevant terms and
conditions)) in each case solely so as to preserve the economic effect of a
holding of the Notes, such amendments to be determined by the Calculation
Agent and notified to the Issuer and (iv) such further bonds and notes shall
not adversely affect any existing rating of the Notes as confirmed in writing
by the appropriate rating agency. Upon issue of such new bonds or notes, the
Notes and such new bonds or notes shall form a single series and be secured
on the Mortgaged Property relating to the Notes and such additional security.
Such further bonds or notes shall be constituted and secured by a further
relevant Supplemental Trust Deed. In the case of a Series of Notes where
there are Related Notes, the relevant Supplemental Trust Deed shall specify
such other conditions as it may be necessary to satisfy to issue such further
bonds or notes.

(k)    *Restrictions on Indebtedness*

Save as provided above, so long as any of the Notes remains outstanding, the
Issuer, without the prior written consent of the Trustee, shall not incur any
other indebtedness for borrowed moneys or engage in any other business
(other than acquiring and holding the Mortgaged Property in respect of each
Series, creating further Obligations, as provided for in this Condition 4,
entering into related transactions, subject to Condition 4(*i*) and performing
any act incidental to or necessary in connection with the foregoing), shall not
have any subsidiaries (except in connection with the substitution of the Issuer
as principal obligor under the Notes) and shall not dispose of the Mortgaged
Property or any part thereof or interest therein (other than in connection with
a substitution of the Swap Counterparty).

(l)    *Covenants*

The Issuer has covenanted in the Principal Trust Deed that it will not, without
the prior written consent of the Trustee, *inter alia*:

(i)    engage in any business whatsoever, other than acquiring and holding
Mortgaged Property, issuing Notes or issuing further bonds and notes
(which may be consolidated and form a single series with the Notes)
or creating other Obligations or entering into similar limited-recourse
transactions, entering into related agreements and transactions and
performing any act incidental to or necessary in connection with any
of the foregoing;

(ii)    dispose of the Mortgaged Property or any interest therein, or create
any mortgage, charge or other security interest or right of recourse in
respect thereof in favour of any person (other than (x) the security
referred to above or any similar limited-recourse transaction
(whether such limited-recourse transaction is by means of a debt
issue or by loan, option or swap) entered into by the Issuer in the
future with the consent of the Trustee and the Swap Counterparty as
provided below and (y) in connection with a transfer under the Swap
Agreement);

(iii)    cause or permit the Swap Agreements or Credit Enhancement
Agreements or the priority of the security interests created by the
Trust Deed to be amended, terminated or discharged (other than in
connection with a transfer under the Swap Agreement);

(iv)    release any party to the Swap Agreement (other than in connection
with a transfer under the Swap Agreement), any Credit Enhancement
Agreement, the Principal Trust Deed or any Supplemental Trust
Deed from any existing obligations thereunder;

(v)    have any subsidiaries (other than in connection with any substitution
of the obligor under the Notes and the Trust Deed);

(vi)    consent to any variation of, or exercise any powers or consent or
waiver pursuant to, the terms of the Swap Agreements, any Credit
Enhancement Agreement, the Conditions, the Principal Trust Deed,
any Supplemental Trust Deed or other agreement relating to the issue
of the Notes, any relevant documentation entered into in connection
with the creation of other Obligations or any related transactions;

(vii)    (to the extent the same is within the control of the Issuer) consolidate
or merge with any other person or convey or transfer its properties or
assets substantially as an entirety to any person;

(viii)    have any employees;

(ix)    (to the extent the same is within the control of the Issuer) pay any
dividends or make any distribution to its shareholders;

(x)    open or have any interest in any account whatsoever with any bank
or financial institution unless such account relates to the Notes or any
Mortgaged Property (as will be defined in the Trust Deed), any other
Obligation or any party thereto, save where such account or the
Issuer's interest therein is simultaneously charged in favour of the
Trustee so as to form part of the Mortgaged Property or save where
such account is opened in connection with the administration and

management of the Issuer and only moneys necessary to the
administration and management of the Issuer are credited to such
account; or

(xi)    (to the extent the same is within the control of the Issuer) issue or
allot shares to persons other than such shares as were in issue on the
date of the incorporation of the Issuer.

## 5    Interest and Other Calculations

### (a)    Interest Rate and Accrual

Each Note bears interest on its outstanding principal amount from the Interest
Commencement Date (as defined in the relevant Final Terms) at the rate per
annum (expressed as a percentage) equal to the Interest Rate, such interest
being payable in arrear on each Interest Payment Date.

Interest shall cease to accrue on each Note on the due date for redemption
unless, upon due presentation, payment of principal is improperly withheld or
refused, in which event interest shall continue to accrue (as well after as
before judgment) at the Interest Rate in the manner provided in this
Condition 5 to the Relevant Date. As used in these Conditions, "Relevant
Date" in respect of any Note, Receipt or Coupon means the date on which
payment in respect of it first becomes due or (if any amount of the money
payable is improperly withheld or refused) the date on which payment in full
of the amount outstanding is made or (if earlier) the date seven days after that
on which notice is duly given to the Noteholders that, upon further
presentation of the Note (or relative Certificate), Receipt, or Coupon being
made in accordance with the Conditions, such payment will be made,
provided that payment is in fact made upon such presentation.

### (b)    Business Day Convention

If any date referred to in these Conditions that is specified to be subject to
adjustment in accordance with a Business Day Convention would otherwise
fall on a day that is not a Business Day, then, if the Business Day Convention
specified is (i) the Floating Rate Business Day Convention, such date shall be
postponed to the next day that is a Business Day unless it would thereby fall
into the next calendar month, in which event (A) such date shall be brought
forward to the immediately preceding Business Day and (B) each subsequent
such date shall be the last Business Day of the month in which such date
would have fallen had it not been subject to adjustment, (ii) the Following
Business Day Convention, such date shall be postponed to the next day that is
a Business Day, (iii) the Modified Following Business Day Convention, such
date shall be postponed to the next day that is a Business Day unless it would

thereby fall into the next calendar month, in which event such date shall be
brought forward to the immediately preceding Business Day or (iv) the
Preceding Business Day Convention, such date shall be brought forward to
the immediately preceding Business Day.

(c)    *Interest Rate on Floating Rate Notes*

If the Interest Rate is specified as being Floating Rate, the Interest Rate for
each Interest Accrual Period shall be determined in the manner specified
hereon and the provisions below relating to either ISDA Determination or
Screen Rate Determination shall apply, depending upon which is specified
hereon:

(i)    ISDA Determination for Floating Rate Notes

Where ISDA Determination is specified hereon as the manner in
which the Interest Rate is to be determined, the Interest Rate for each
Interest Accrual Period shall be determined by the Calculation Agent
as a rate equal to the relevant ISDA Rate. For the purposes of this
sub-paragraph (i), "ISDA Rate" for an Interest Accrual Period means
a rate equal to the Floating Rate that would be determined by the
Calculation Agent under a Swap Transaction under the terms of an
agreement incorporating the ISDA Definitions and under which:

(a)    the Floating Rate Option is as specified hereon;

(b)    the Designated Maturity is a period specified hereon; and

(c)    the relevant Reset Date is the first day of that Interest Accrual
Period unless otherwise specified hereon.

For the purposes of this sub-paragraph (i), "Floating Rate",
"Calculation Agent", "Floating Rate Option", "Designated Maturity",
"Reset Date" and "Swap Transaction" have the meanings given to
those terms in the ISDA Definitions.

(ii)    Screen Rate Determination for Floating Rate Notes

(A)    Where Screen Rate Determination is specified hereon as the
manner in which the Interest Rate is to be determined, the
Interest Rate for each Interest Accrual Period will, subject as
provided below and to Condition 5(e) be either:

(1)    the offered quotation; or

(2)    the arithmetic mean of the offered quotations,

(expressed as a percentage rate per annum) for the Reference
Rate which appears or appear, as the case may be, on the

Relevant Screen Page as at either 11.00 a.m. (London time in
the case of LIBOR or Brussels time in the case of EURIBOR)
on the Interest Determination Date in question as determined
by the Calculation Agent. If five or more of such offered
quotations are available on the Relevant Screen Page, the
highest (or, if there is more than one such highest quotation,
one only of such quotations) and the lowest (or, if there is
more than one such lowest quotation, one only of such
quotations) shall be disregarded by the Calculation Agent for
the purpose of determining the arithmetic mean of such
offered quotations.

If the Reference Rate from time to time in respect of Floating
Rate Notes is specified hereon as being other than LIBOR or
EURIBOR, the Interest Rate in respect of such Notes will be
determined as provided hereon.

(B)  if the Relevant Screen Page is not available or if sub
paragraph (A)(1) above applies and no such offered quotation
appears on the Relevant Screen Page or if sub paragraph
(A)(2) above applies and fewer than three such offered
quotations appear on the Relevant Screen Page in each case as
at the time specified above, subject as provided below, the
Calculation Agent shall request, if the Reference Rate is
LIBOR, the principal London office of each of the Reference
Banks or, if the Reference Rate is EURIBOR, the principal
Euro-zone office of each of the Reference Banks, to provide
the Calculation Agent with its offered quotation (expressed as
a percentage rate per annum) for the Reference Rate if the
Reference Rate is LIBOR, at approximately 11.00 a.m.
(London time), or if the Reference Rate is EURIBOR, at
approximately 11.00 a.m. (Brussels time) on the Interest
Determination Date in question. If two or more of the
Reference Banks provide the Calculation Agent with such
offered quotations, the Interest Rate for such Interest Period
shall be the arithmetic mean of such offered quotations as
determined by the Calculation Agent; and

(C)  if paragraph (B) above applies and the Calculation Agent
determines that fewer than two Reference Banks are providing
offered quotations, subject as provided below, the Interest
Rate shall be the arithmetic mean of the rates per annum
(expressed as a percentage) as communicated to (and at the

request of) the Calculation Agent by the Reference Banks or
any two or more of them, at which such banks were offered, if
the Reference Rate is LIBOR, at approximately 11.00 a.m.
(London time) or, if the Reference Rate is EURIBOR, at
approximately 11.00 a.m. (Brussels time) on the relevant
Interest Determination Date, deposits in the Relevant
Currency for a period equal to that which would have been
used for the Reference Rate by leading banks in, if the
Reference Rate is LIBOR, the London inter-bank market or, if
the Reference Rate is EURIBOR, the Euro-zone inter-bank
market, as the case may be, or, if fewer than two of the
Reference Banks provide the Calculation Agent with such
offered rates, the offered rate for deposits in the Relevant
Currency for a period equal to that which would have been
used for the Reference Rate, or the arithmetic mean of the
offered rates for deposits in the Relevant Currency for a period
equal to that which would have been used for the Reference
Rate, at which, if the Reference Rate is LIBOR, at
approximately 11.00 a.m. (London time) or, if the Reference
Rate is EURIBOR, at approximately 11.00 a.m. (Brussels
time), on the relevant Interest Determination Date, any one or
more banks (which bank or banks is or are in the opinion of
the Trustee and the Issuer suitable for such purpose) informs
the Calculation Agent it is quoting to leading banks in, if the
Reference Rate is LIBOR, the London inter-bank market or, if
the Reference Rate is EURIBOR, the Euro-zone inter-bank
market, as the case may be, provided that, if the Interest Rate
cannot be determined in accordance with the foregoing
provisions of this paragraph, the Interest Rate shall be
determined as at the last preceding Interest Determination
Date (though substituting, where a different Margin or
Maximum or Minimum Interest Rate is to be applied to the
relevant Interest Accrual Period from that which applied to the
last preceding Interest Accrual Period, the Margin or
Maximum or Minimum Interest Rate relating to the relevant
Interest Accrual Period), in place of the Margin or Maximum
or Minimum Interest Rate relating to that last preceding
Interest Accrual Period.

(d)    *Interest Rate on Zero Coupon Notes*

Where a Note the Interest Rate of which is specified to be Zero Coupon is repayable prior to the Maturity Date and is not paid when due, the amount due and payable prior to the Maturity Date shall be the Redemption Amount (as defined in the relevant Final Terms) of such Note. As from the Maturity Date, the Interest Rate for any overdue principal of such a Note shall be a rate per annum (expressed as a percentage) equal to the Amortisation Yield (as set out in Condition 6(b)).

(e) *Margin, Maximum/Minimum Interest Rates, Instalment Amounts and Redemption Amounts and Rounding*

    (i)    If any Margin is specified hereon (either (x) generally, or (y) in relation to one or more Interest Accrual Periods), an adjustment shall be made to all Interest Rates, in the case of (x), or the Interest Rates for the specified Interest Accrual Periods, in the case of (y), calculated in accordance with (c) above by adding (if a positive number) or subtracting the absolute value (if a negative number) of such Margin, subject always to the next paragraph.

    (ii)    If any Maximum or Minimum Interest Rate, Instalment Amount or Redemption Amount is specified hereon, then any Interest Rate, Instalment Amount or Redemption Amount shall be subject to such maximum or minimum, as the case may be.

    (iii)    For the purposes of any calculations required pursuant to these Conditions (unless otherwise specified), (x) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred thousandth of a percentage point (with halves being rounded up), (y) all figures shall be rounded to seven significant figures (with halves being rounded up) and (z) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with halves being rounded up), save in the case of yen, which shall be rounded down to the nearest yen, and in the case of euro, which shall be rounded down to the nearest €0.01. For these purposes "unit" means the lowest amount of such currency that is available as legal tender in the country(ies) of such currency.

(f) *Calculations*

The amount of interest payable in respect of any Note for any period shall be calculated by multiplying the product of the Interest Rate and the outstanding principal amount of such Note by the Day Count Fraction, unless an Interest Amount (or a formula for its calculation) is specified in respect of such period, in which case the amount of interest payable in respect of such Note for such period shall equal such Interest Amount (or be calculated in

accordance with such formula). Where any Interest Period comprises two or more Interest Accrual Periods, the amount of interest payable in respect of such Interest Period shall be the sum of the amounts of interest payable in respect of each of those Interest Accrual Periods.

(g)  *Determination and Publication of Interest Rates, Interest Amounts, Redemption Amounts and Instalment Amounts*

The Calculation Agent shall, as soon as practicable on each Interest Determination Date or such other time on such date as the Calculation Agent may be required to calculate any Redemption Amount or Instalment Amount, obtain any quote or make any determination or calculation, determine the Interest Rate and calculate the Interest Amounts in respect of each denomination of the Notes for the relevant Interest Accrual Period, calculate the Redemption Amount or Instalment Amount, obtain such quote or make such determination or calculation, as the case may be, and cause the Interest Rate and the Interest Amounts for each Interest Period and the relevant Interest Payment Date and, if required to be calculated, the Redemption Amount or any Instalment Amount to be notified to the Trustee, the Issuer, each of the Paying Agents, the Noteholders, any other Calculation Agent appointed in respect of the Notes that is to make a further calculation upon receipt of such information and, if the Notes are listed on a stock exchange and the rules of such exchange so require, such exchange as soon as possible after their determination but in no event later than (i) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of an Interest Rate and Interest Amount, or (ii) in all other cases, the fourth Business Day after such determination. Where any Interest Payment Date or Interest Period Date is subject to adjustment pursuant to Condition 5(b), the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements made with the consent of the Trustee by way of adjustment) without notice in the event of an extension or shortening of the Interest Period. If the Notes become due and payable under Condition 10, the accrued interest and the Interest Rate payable in respect of the Notes shall nevertheless continue to be calculated as previously in accordance with this Condition but no publication of the Interest Rate or the Interest Amount so calculated need be made unless the Trustee otherwise requires. The determination of each Interest Rate, Interest Amount, Redemption Amount and Instalment Amount, the obtaining of each quote and the making of each determination or calculation by the Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties. No Noteholders shall (in the absence aforesaid) be entitled to proceed against the Reference Banks,

the Calculation Agent, the Trustee or any of them in connection with the exercise or non exercise by them of their powers, duties and discretions under this Condition 5.

(h)    *Determination or Calculation by Trustee*

If the Calculation Agent does not at any time for any reason determine or calculate the Interest Rate for an Interest Period or any Interest Amount, Instalment Amount or Redemption Amount, the Trustee shall do so (or shall appoint an agent on its behalf to do so) and such determination or calculation shall be deemed to have been made by the Calculation Agent. In doing so, the Trustee shall apply the foregoing provisions of this Condition, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

(i)    *Definitions*

In these Conditions, unless the context otherwise requires, the following defined terms shall have the meanings set out below:

"Business Day" means:

(i)    in the case of a specified currency other than euro, a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in the principal financial centre for that currency; and/or

(ii)    in the case of euro, a day on which the TARGET system is open (a **"TARGET Business Day"**); and/or

(iii)    in the case of a specified currency and/or one or more specified financial centres, a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments in the specified currency or, if none is specified, generally in each of the financial centres so specified (which, in the case of Australian dollars, shall be Melbourne and Sydney).

"Day Count Fraction" means, in respect of the calculation of an amount of interest on any Note for any period of time (whether or not constituting an Interest Period, the **"Calculation Period"**):

(i)    if "Actual/Actual" or "Actual/Actual ISDA" is specified hereon, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual

number of days in that portion of the Calculation Period falling in a non leap year divided by 365; provided that no adjustment shall be made for any portion of a Calculation Period falling in a leap year in the case of Notes denominated in Japanese yen or any other currency specified hereon);

(ii)  if "Actual/365 (Fixed)" is specified hereon, the actual number of days in the Calculation Period divided by 365;

(iii)  if "Actual/360" is specified hereon, the actual number of days in the Calculation Period divided by 360;

(iv)  if "30/360", "360/360" or "Bond Basis" is specified hereon, the number of days in the Calculation Period divided by 360 calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case D1 will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31 and D1 is greater than 29, in which case D2 will be 30

(v)  if "30E/360" or "Eurobond Basis" is specified hereon, the number of days in the Calculation Period divided by 360 calculated on a formula basis as follows:

Day Count Fraction $=$
$$\frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case D1 will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31, in which case D2 will be 30

(vi)    if "30E/360 (ISDA)" is specified hereon, the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

Day Count Fraction $=$
$$\frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless (i) that day is the last day of February or (ii) such number would be 31, in which case D1 will be 30; and

(vii)    "$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless (i) that day is the last day of February but not the Maturity Date or (ii) such number would be 31, in which case D2 will be

(viii)   if "Actual/Actual ICMA" is specified hereon:

(a)   if the Calculation Period is equal to or shorter than the Determination Period during which it falls, the number of days in the Calculation Period divided by the product of (x) the number of days in such Determination Period and (y) the number of Determination Periods normally ending in any year; and

(b)   if the Calculation Period is longer than one Determination Period, the sum of:

(x)   the number of days in such Calculation Period falling in the Determination Period in which it begins divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year; and

(y)   the number of days in such Calculation Period falling in the next Determination Period divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year

where:

"Determination Date" means the date specified as such hereon or, if none is so specified, the Interest Payment Date.

"Determination Period" means the period from and including a Determination Date in any year to but excluding the next Determination Date.

"Euro zone" means the region comprised of Member States of the European Union that adopt the single currency in accordance with the Treaty

establishing the European Community, as amended by the Treaty on European Union.

"Interest" shall be deemed to include all Interest Amounts and all other amounts payable pursuant to Condition 5 or any amendment or supplement to it.

"Interest Accrual Period" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Period Date and each successive period beginning on (and including) an Interest Period Date and ending on (but excluding) the next succeeding Interest Period Date.

"Interest Amount" means the amount of interest payable in respect of each denomination of the Notes.

"Interest Commencement Date" means the Issue Date or such other date as may be specified herein.

"Interest Determination Date" means, with respect to an Interest Rate and Interest Accrual Period, the date specified as such hereon or, if none is so specified, (i) the first day of such Interest Accrual Period if the Relevant Currency is Sterling or (ii) the day failing two Business Days in London for the Relevant Currency prior to the first day of such Interest Accrual Period if the Relevant Currency is neither Sterling nor euro or (iii) the day falling two TARGET Business Days prior to the first day of such Interest Accrual Period if the Relevant Currency is euro.

"Interest Period" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Payment Date and each successive period beginning on (and including) an Interest Payment Date and ending on (but excluding) the next succeeding Interest Payment Date.

"Interest Period Date" means each Interest Payment Date unless otherwise specified hereon.

"Interest Rate" means the rate of interest payable from time to time in respect of this Note and that is either specified or calculated in accordance with the provisions hereon.

"ISDA Definitions" means the 2006 ISDA Definitions (as amended or supplemented from time to time) published by the International Swaps and Derivatives Association, Inc., unless otherwise specified hereon.

"Principal" shall be deemed to include any premium payable in respect of the Notes, all Instalment Amounts, Redemption Amounts, Amortised Face

Amounts and all other amounts in the nature of principal payable pursuant to
Condition 6 or any amendment or supplement to it.

"Reference Banks" means, in the case of a determination of LIBOR, the
principal London office of four major banks in the London inter-bank market
and, in the case of a determination of EURIBOR, the principal Euro-zone
office of four major banks in the Euro-zone inter-bank market, in each case
selected by the Calculation Agent or as specified hereon.

"Reference Rate" means the rate specified as such hereon.

"Relevant Currency" means the currency specified hereon or, if none is
specified, the currency in which the Notes are denominated.

"Relevant Screen Page" means such page, section, caption, column or other
part of a particular information service as may be specified hereon.

"TARGET System" means the Trans European Automated real-time Gross
Settlement Express Transfer (TARGET) System or any successor thereto.

(j)    *Calculation Agent*

The Issuer shall procure that there shall at all times be one or more
Calculation Agents if provision is made for them hereon and for so long as
any Note is outstanding (as defined in the Trust Deed). Where more than one
Calculation Agent is appointed in respect of the Notes, references in these
Conditions to the Calculation Agent shall be construed as each Calculation
Agent performing its respective duties under the Conditions. If the
Calculation Agent is unable or unwilling to act as such or if the Calculation
Agent fails duly to establish the Interest Rate for an Interest Period or Interest
Accrual Period or to calculate any Interest Amount, Instalment Amount or the
Redemption Amount or to comply with any other requirement, the Issuer
shall (with the prior written approval of the Trustee) appoint a leading bank
or investment banking firm engaged in the inter bank market (or, if
appropriate, money, swap or over-the-counter index options market) that is
most closely connected with the calculation or determination to be made by
the Calculation Agent (acting through its principal London office or any other
office actively involved in such market) to act as such in its place. The
Calculation Agent may not resign its duties without a successor having been
appointed as aforesaid.

6    **Redemption, Purchase and Options**

(a)    *Redemption by Instalments and Final Redemption*

(i)    Unless previously redeemed or purchased and cancelled as provided
in this Condition 6, each Note that provides for Instalment Dates and

Instalment Amounts shall be partially redeemed on each Instalment Date at the related Instalment Amount specified hereon. The outstanding principal amount of each such Note shall be reduced by the Instalment Amount (or, if such Instalment Amount is calculated by reference to a proportion of the principal amount of such Note, such proportion) for all purposes with effect from the related Instalment Date, unless payment of the Instalment Amount is improperly withheld or refused, in which case, such amount shall remain outstanding until the Relevant Date relating to such Instalment Amount.

(ii)    Unless previously redeemed, purchased and cancelled as provided below, each Note shall be finally redeemed on the Maturity Date specified hereon at its Redemption Amount (which, unless otherwise provided herein, is its principal amount) or, in the case of a Note falling within paragraph (i) above, its final Instalment Amount. Notes with no final maturity date will only be redeemable or repayable in accordance with the following provisions of this Condition 6 or Condition 10.

(b)    *Early Redemption of Zero Coupon Notes*

(i)    The Redemption Amount payable in respect of any Note that does not bear interest prior to the Maturity Date, the Redemption Amount of which is not linked to an index and/or a formula, upon redemption of such Note pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 shall be the Amortised Face Amount (calculated as provided below) of such Note.

(ii)    Subject to the provisions of sub paragraph (iii) below, the Amortised Face Amount of any such Note shall be the scheduled Redemption Amount of such Note on the Maturity Date discounted at a rate per annum (expressed as a percentage) equal to the Amortisation Yield (which, if none is shown hereon, shall be such rate as would produce an Amortised Face Amount equal to the issue price of the Notes if they were discounted back to their issue price on the Issue Date) compounded annually. Where such calculation is to be made for a period of less than one year, it shall be made on the basis of the Day Count Fraction shown hereon.

(iii)    If the Redemption Amount payable in respect of any such Note upon its redemption pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 is not paid when due, the Redemption Amount due and payable in respect of such Note shall

be the Amortised Face Amount of such Note as defined in sub
paragraph (ii) above, except that such sub-paragraph shall have effect
as though the reference therein to the date on which the Note
becomes due and payable were replaced by a reference to the
Relevant Date. The calculation of the Amortised Face Amount in
accordance with this sub paragraph shall continue to be made (as
well after as before judgment) until the Relevant Date, unless the
Relevant Date falls on or after the Maturity Date, in which case the
amount due and payable shall be the scheduled Redemption Amount
of such Note on the Maturity Date together with any interest that
may accrue in accordance with Condition 5(d).

(c)    *Mandatory Redemption*

Subject to the terms of the relevant Supplemental Trust Deed, if any of the
Collateral becomes repayable prior to its stated date of maturity for whatever
reason or (unless the Trustee otherwise agrees) there is a payment default
(after the expiry of any grace period specified in the terms and conditions of
the Collateral in existence as at the later of the Issue Date and the date on
which such Collateral was issued) in respect of any of the Collateral, a
proportion of the principal amount of the Notes outstanding equal to the
proportion of the Collateral comprised by the Collateral repaid or in respect
of which there is a default will become immediately repayable. The Issuer
shall forthwith give not more than 45 nor less than 30 Business Days' prior
notice (or such other notice period as indicated in the relevant Supplemental
Trust Deed) to the Trustee and the Noteholders (which notice shall be
irrevocable) and upon expiry of such notice the Issuer will redeem either, as
the case may be, all of the Notes at their Early Redemption Amount together
with accrued interest or, in the case of a redemption in part, either (x) some of
the Notes at their Early Redemption Amount together with accrued interest
(if redemption is to be effected in accordance with Partial Redemption
Method A (as specified in the relevant Supplemental Trust Deed)) or (y) all of
the Notes on a pro rata basis in an aggregate principal amount equal to that of
the Collateral repaid or in respect of which there is a default (if redemption is
to be effected in accordance with Partial Redemption    Method B (as
specified in the relevant Supplemental Trust Deed)), failing which all of the
Notes shall become repayable and the security constituted by the relevant
Supplemental Trust Deed and/or any Other Security Document shall become
enforceable and the Trustee will take such action as is provided in Condition
4. In this Condition "Business Day" means a day on which commercial banks
and foreign exchange markets are open in the cities specified in the relevant
Supplemental Trust Deed.

(d)    *Redemption for Taxation and Other Reasons*

(i)    If the Issuer, on the occasion of the next payment due in respect of
the Notes or Coupons, would be required by law to withhold or
account for tax or would suffer tax in respect of its income so that it
would be unable to make payment of the full amount due, the Issuer
shall so inform the Trustee, shall use its best endeavours to arrange
the substitution of a company incorporated in another jurisdiction
approved by the Trustee as the principal debtor (provided that, in
relation to Notes rated by a rating agency, the Issuer shall notify the
appropriate rating agency and that such substitution shall not
adversely affect any existing rating of the Notes as affirmed in
writing by the appropriate rating agency) or to change (to the
satisfaction of the Trustee (provided that in relation to Notes rated by
a rating agency, the Issuer shall notify the appropriate rating agency
and that such substitution shall not adversely affect any existing
rating of the Notes as affirmed in writing by the appropriate rating
agency)) its residence for taxation purposes to another jurisdiction
approved beforehand in writing by the Trustee and if it is unable to
arrange such substitution or change before the next payment is due in
respect of the Notes it shall forthwith give notice thereof to the
Trustee, the Noteholders, the appropriate rating agency (if any) and
the Swap Counterparty and upon the giving of such notice all but not
some only of the Notes shall become due for redemption on the date
specified in such notice at their Early Redemption Amount together
with interest accrued to the date fixed for redemption;

(ii)    If a Swap Agreement is terminated in whole for any reason then the
Issuer shall forthwith give not more than 45 nor less than 15 days'
notice (or such other notice period as indicated in the relevant
Supplemental Trust Deed) to the Trustee, the Noteholders and the
Swap Counterparty (which notice shall be irrevocable), and on the
expiry of such notice shall redeem all but not some only of the Notes
at their Early Redemption Amount together with any interest accrued
to the date fixed for redemption. Such notice shall be given promptly
upon the termination of the relevant Swap Agreement and such
redemption made, unless the Trustee shall certify to the Issuer that it
considers in its absolute discretion that it is in the best interests of the
holders of the Notes that such notice and redemption be delayed or
not given or made, as the case may be, or an Extraordinary
Resolution of the holders of the Notes shall otherwise direct; or

(iii)    If the Issuer (i) is or will be unable to receive any payment due in
respect of the Collateral forming part of the Mortgaged Property in
full on the due date therefor without deduction for or on account of
any withholding tax or other tax, duties or charges of whatsoever
nature imposed by any authority of the jurisdiction of the Collateral
Issuer or (ii) is required to comply with any reporting requirement of
any such authority (unless such reporting requirement does not
involve any material expense or is not unduly onerous), then the
Issuer shall so inform the Trustee, and shall use its best endeavours to
arrange the substitution of a company incorporated in another
jurisdiction approved beforehand in writing by the Trustee and the
Swap Counterparty (provided that in relation to Notes rated by a
rating agency, the Issuer shall notify the appropriate rating agency
and that such substitution shall not adversely affect any existing
rating of the Notes as affirmed in writing by the appropriate rating
agency) as the principal debtor in respect of the Notes and the Swap
Agreement or to change (to the satisfaction of the Trustee and the
Swap Counterparty (provided that in relation to Notes rated by a
rating agency, the Issuer shall notify the appropriate rating agency
and that such change shall not adversely affect any existing rating of
the Notes as affirmed in writing by the appropriate rating agency)) its
residence for taxation purposes to another jurisdiction approved
beforehand in writing by the Trustee and the Swap Counterparty and
if it is unable to arrange such substitution or change before the next
payment is due in respect of the Notes it shall forthwith give notice
thereof to the Trustee, the Noteholders, the appropriate rating agency
(if any) and the Swap Counterparty and upon the giving of such
notice all but not some only of the Notes shall become due for
redemption on the date specified in such notice at the Early
Redemption Amount together with interest accrued to the date fixed
for redemption.

Notwithstanding the foregoing, if any of the taxes referred to in paragraph
(d)(i) above arises by reason of any Noteholder's connection with the
jurisdiction of the Issuer otherwise than by reason only of the holding of any
Note or receiving or being entitled to any principal or interest in respect
thereof, then to the extent it is able to do so, the Issuer shall deduct such taxes
from the amounts payable to such Noteholder, all other Noteholders shall
receive the due amounts payable to them and the Notes shall not be redeemed
as provided in the previous provisions. Any such deduction shall not
constitute an Event of Default under Condition 10.

Notwithstanding the foregoing, if the requirement to withhold or account for tax set out in Condition 6(d)(i) arises as a result of:

(i)    a withholding or deduction imposed on a payment by or on behalf of the relevant Issuer to an individual required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive; or

(ii)    the presentation for payment of any Bearer Note, Receipt or Coupon by or on behalf of a holder who would have been able to avoid such withholding or deduction by presenting the relevant Bearer Note, Receipt or Coupon to another Paying Agent in a Member State of the European Union

then Condition 6(d)(i) shall not apply. The relevant Issuer shall deduct such taxes from the amounts payable to such Noteholder, all other Noteholders shall receive the due amounts payable to them and the Notes shall not be redeemed. Any such deduction shall not constitute an Event of Default under Condition 10.

(e)    *Redemption at the Option of the Issuer*

If so specified in the relevant Supplemental Trust Deed, the Issuer may, on giving not more than 45 nor less than 30 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Noteholders and the Trustee (which notice shall be irrevocable) redeem all or, if so provided in the relevant Supplemental Trust Deed, some of the Notes at the Early Redemption Amount on the Issuer's Optional Redemption Date or Dates so provided in the relevant Supplemental Trust Deed. Upon expiration of such notice, the Issuer shall be bound to redeem the Notes at their Early Redemption Amount, together, if appropriate, with interest accrued to, but excluding, such date or dates of redemption.

(f)    *Redemption at the Option of Noteholders*

If so specified in the relevant Supplemental Trust Deed, the Issuer shall, at the option of the holder of any Note, redeem such Note on the date or dates so provided at its Early Redemption Amount together with interest accrued to the date fixed for redemption.

To exercise such option the holder must deposit (in the case of Bearer Notes) such Note (together with all unmatured Receipts and Coupons and

unexchanged Talons) with any Paying Agent or (in the case of Registered
Notes) the Certificate representing such Note(s) with the Registrar or any
Transfer Agent at its specified office, together with a duly completed option
exercise notice ("**Exercise Notice**") in the form obtainable from any Paying
Agent, the Registrar or any Transfer Agent (as applicable) within the
Noteholders' Option Period as specified in the Final Terms. No Note or
Certificate so deposited and option exercised may be withdrawn (except as
provided in the Agency Agreement) without the prior consent of the Issuer.

(g)     *Early Redemption Amount*

Unless otherwise specified in the relevant Supplemental Trust Deed, the
Early Redemption Amount payable upon a redemption of any Note pursuant
to Condition 6 (c), (d), (e), (f) and (k) and Condition 10 shall be an amount,
determined by the Calculation Agent in its absolute discretion, equal to the
Recovery Fraction of the principal amount of the Note (or, if applicable, the
part of the Note) being redeemed (the "**Early Redemption Amount**").

Where:

"Counterparty" means each party (other than the Issuer) to a Credit
Enhancement Agreement.

"Credit Enhancement Termination Payment" means the total amount payable
to the Issuer by a Counterparty (being a positive number) on the termination
of (or as the case may be, the pro rata portion of) any related Credit
Enhancement Agreement.

"Recovery Amount" means the amount received by or on behalf of the Issuer
upon the sale of the Collateral (or, if applicable the pro rata portion of the
Collateral) after the deduction of all costs, fees, charges, taxes and expenses
of or incurred by the Issuer or, if applicable, the Disposal Agent in connection
with the sale of the relevant Collateral and the early redemption of the Notes
plus, if a positive number, the aggregate amount of, or minus, if a negative
number, the aggregate amount of the Swap Termination Payment and/or the
Credit Enhancement Termination Payment.

"Recovery Fraction" means a fraction of which the numerator is the
Recovery Amount and the denominator is the aggregate principal amount of
the Notes falling due for redemption.

"Swap Termination Payment" means the amount payable to the Issuer by the
Swap Counterparty (in which case, it shall be a positive number) or by the
Issuer to the Swap Counterparty (in which case, it shall be a negative
number) on the termination of (or, as the case may be, the pro rata portion of)
the related Swap Agreement.

(h)    *Notice of Redemption and Drawings*

All Notes in respect of which any notice of redemption is given under this Condition shall be redeemed on the date specified in such notice in accordance with this Condition. In the case of a partial redemption if the relevant Supplemental Trust Deed specifies "Partial Redemption    Method A", then the notice shall also contain the certificate numbers of the Notes to be redeemed, which shall have been drawn in such place as the Trustee may approve and in such manner as it deems appropriate, subject to compliance with any applicable laws and stock exchange requirements. If the relevant Supplemental Trust Deed specifies "Partial Redemption    Method B", then each Note will be redeemed on a pro rata basis.

(i)    *Purchases*

If the Issuer has satisfied the Trustee that it has made arrangements for the realisation of no more than the equivalent proportion of the Collateral for the reduction in the notional amount of any other Obligation and/or for the purchase of Notes and/or an equivalent proportion of any Related Notes, which transaction will leave the Issuer with no net liabilities in respect thereof, it may at any time purchase Notes (provided that they are purchased together with all unmatured Coupons and Talons related to them) in the open market or otherwise at any price.

(j)    *Cancellation*

The Issuer may, but shall not be obliged to, surrender for cancellation all Notes purchased by or on behalf of it, in the case of Bearer Notes, by surrendering each such Note together with all unmatured Receipts and Coupons and all unexchanged Talons to, or to the order of, the Issuing and Paying Agent and, in the case of Registered Notes, by surrendering the Certificate representing such Notes to the Registrar and, in each case, shall, together with all Notes redeemed by the Issuer, be cancelled forthwith (together with all unmatured Receipts and Coupons and unexchanged Talons attached thereto or surrendered therewith). Any Notes so surrendered for cancellation may not be reissued or resold and the obligations of the Issuer in respect of any such Notes shall be discharged.

(k)    *Exchange*

If so specified in the relevant Supplemental Trust Deed, any holder may at its option (subject to, if so specified in the Supplemental Trust Deed, the consent of each relevant Counterparty) exchange any or all of its Notes for (i) an amount (the **"Net Asset Amount"**) calculated by the Issuer, equal to the then market value of such proportion of the Collateral (the **"attributable**

Collateral") or, as the case may be, the Issuer's rights in respect thereof (the "attributable rights") or (ii) physical delivery ("Physical Delivery") of such proportion of the Collateral itself, in each case as equals the proportion (rounded down to the nearest whole number) which the Notes to be exchanged bears to the total principal amount outstanding of the Notes (less the costs of such valuation) adjusted as appropriate by the value realised or cost incurred, as the case may be, as a result of the termination of any Swap Agreement and/or Credit Enhancement Agreement, or part thereof in accordance with this Condition 6(k). To exercise such option, the holder shall, if the Notes are in bearer form, deposit the relevant Notes (together with all (if any) unmatured Coupons or Talons appertaining thereto) or, if the Notes are in registered form, deposit the Certificate representing the Notes at the office of Register, together with written notice that such option is to be exercised and (if the holder has elected for Physical Delivery, where available) a delivery instruction form (a "Delivery Instruction Form") substantially in the form set out in the Agency Agreement (and available upon request from the specified office of any Paying Agent or Transfer Agent during normal office hours). The Issuing and Paying Agent will forthwith notify the Issuer, each Counterparty, each Swap Counterparty, the Custodian, the Disposal Agent, the Registrar and the Trustee of receipt of such written notice. Each Counterparty and each Swap Counterparty shall forthwith notify the Issuer, the Trustee, the Custodian and the Issuing and Paying Agent (who shall then notify the relevant holder) of the net sum payable by such Counterparty and by, or, as the case may be, to such Swap Counterparty on termination of the relevant part of the relevant Credit Enhancement Agreement or Swap Agreement, as appropriate. The part of the relevant Credit Enhancement Agreement or, as the case may be, the relevant Swap Agreement to be terminated will be the pro rata amount thereof corresponding to that proportion of the Notes to be exchanged. The calculation of the Net Asset Amount in accordance with this Condition 6(k) shall be binding on the relevant holder(s) in the absence of manifest error. Any such Net Asset Amount shall be payable to the holder at the specified office of any Paying Agent or Transfer Agent at which the relevant Notes were deposited on the twentieth calendar day after such deposit (the "Delivery Date") or (if the holder has elected for Physical Delivery) (subject to receipt of a Delivery Instruction form) delivered on, or as soon as practicable after, the Settlement Date to the account at Euroclear Bank S.A./N.V. as operator of the Euroclear System ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream, Luxembourg" and, together with Euroclear and/or any alternative clearing system agreed by the Trustee, the "Clearing Systems") (or in such other manner as shall be provided in the

relevant Supplemental Trust Deed) as specified in the relevant Delivery
Instruction Form.

Notwithstanding the foregoing provisions of this Condition 6(k), the Issuer
may, at its discretion, elect to satisfy the obligations hereunder by delivery to
the relevant holder of the attributable Collateral or, as the case may be, by
assignment to the relevant holder of the attributable rights even though the
holder may not have elected for Physical Delivery. In any such case, the
Issuer will procure that, subject to any payment due from the holder to the
Swap Counterparty being made, the relevant attributable Collateral is
delivered to the holder (or to any other place or account specified in the
written notice referred to above) or, as the case may be, the relevant
attributable rights are assigned to the holder on the Delivery Date and shall
use all reasonable endeavours to procure that any payment being due from
the relevant Counterparty and/or relevant Swap Counterparty to the holder on
termination of the relevant Credit Enhancement Agreement and/or relevant
Swap Agreement or part thereof is duly made.

Accountholders at the Clearing Systems will be required to give an
irrevocable instruction to the relevant Clearing System, as the case may be, in
respect of such delivery in the form prescribed by the relevant Clearing
System (which may be in a form other than that set out in the Agency
Agreement), not later than 10.00 a.m. Brussels or Luxembourg time, as the
case may be (or, in the case of an instruction to Euroclear via EUCLID or
EUCLID 90, 11.00 a.m. Brussels time), on the Clearing Business Day prior
to the Delivery Date.

No interest will be payable with respect to Notes deposited for exchange
pursuant to this Condition in respect of the period from the date of issue of
the Notes (in the case of exchange prior to the first due date for the payment
of interest on the Note) or the previous date for the payment of interest on the
Note (in any other case) to the date of such exchange.

The relevant Supplemental Trust Deed will contain provisions for the release
of the relevant Mortgaged Property for which Notes have been exchanged
from the remaining charges upon them.

In these Conditions:

"Clearing Business Day" means a day on which Euroclear or Clearstream,
Luxembourg, as the case may be, is open for the acceptance and execution of
settlement instructions other than a day on which Euroclear or Clearstream,
Luxembourg, as the case may be, is scheduled to close prior to its regular
weekday closing time.

"delivered" means the satisfaction of any obligation of the Issuer to complete all matters necessary to transfer the relevant Net Asset Amount to the relevant Noteholder (or the first-named of joint holders) with full title guarantee. Accordingly, and for the avoidance of doubt, there shall be no obligation on the Issuer to concern itself with any formalities or requirements that shall be placed on the relevant Noteholder (or the first-named of joint holders) as the transferee of the relevant Net Asset Amount in connection with the acquisition by such Noteholder of the relevant Net Asset Amounts.

"Recovery Value" means the value, expressed as a percentage, of a claim against the obligor in respect of the relevant Collateral, as determined by the Swap Counterparty acting in good faith and in a commercially reasonable manner and by way of example but without limitation, the Swap Counterparty may in making this determination, take account of the mean of the market prices of all securities issued by the relevant obligor, disregarding any securities which have a market price which is at an artificially inflated level.

"Settlement Date" means the Delivery Date, except and to the extent that (i) a Settlement Disruption Event prevents delivery of the relevant Net Asset Amount on that day, (ii) pursuant to the terms of the relevant Swap Agreement and due to an event (the "**Impossibility Event**") beyond the control of the Swap Counterparty it is impossible (including due to market illiquidity) or illegal for the Swap Counterparty to deliver to the Issuer any Net Asset Amount, in which event the Settlement Date shall be postponed to the next following day after receipt by the Issuer of the relevant Net Asset Amount, provided that if by the 31st calendar day following the original Settlement Date the Impossibility Event is still continuing, the Notes shall become immediately repayable at their Early Redemption Amount and (iii) due to circumstances beyond the control of the Swap Counterparty the market price of any or all Net Asset Amount is at an artificially inflated level, in which event the Swap Counterparty may, in full satisfaction of its obligation to deliver the relevant Net Asset Amount, pay to the Issuer, on the Settlement Date, the True Value of the relevant Net Asset Amount. In the case of (ii) and to such extent, the Settlement Date will be the first succeeding day (if such day is after the Delivery Date) on which settlement of that Net Asset Amount can take place through Euroclear or Clearstream, Luxembourg unless a Settlement Disruption Event prevents delivery in accordance with the relevant Delivery Instruction form on each of the ten (10) Clearing Business Days immediately following that Delivery Date. In that case, (A) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount can be delivered in any other commercially reasonable

manner, then the Settlement Date will be the first day on which settlement of
a sale of the relevant Net Asset Amount executed on that tenth (10th)
Clearing Business Day customarily would take place using such other
commercially reasonable manner of delivery, and (B) to the extent, as
determined by the Calculation Agent, that the relevant Net Asset Amount
cannot be delivered in any other commercially reasonable manner, then the
Settlement Date will be postponed until such delivery can be effected through
Euroclear or Clearstream, Luxembourg or, as determined by the Calculation
Agent, in any other commercially reasonable manner. If a Settlement
Disruption Event applies to a part only of the relevant Net Asset Amount, the
Settlement Date shall be postponed, in accordance with the above provisions,
in respect of the affected part of the relevant Net Asset Amount only. No
additional amounts will be payable by the Issuer by virtue of any delay of the
Settlement Date by virtue of a Settlement Disruption Event. In the case of
(iii) the determination as to whether the market price of the Collateral is at an
"artificially inflated level" will be made by the Swap Counterparty acting in
good faith and in a commercially reasonable manner and, by way of example
but without limitation, such market price will be considered to be at an
artificially inflated level if due to a default or prospect of default by the
obligor in relation to the relevant Collateral, there is an increase in demand
for the Collateral caused principally by contractual obligations to deliver such
Net Asset Amount upon the occurrence of such a default or prospect of
default.

"Settlement Disruption Event" means an event beyond the control of the
Issuer as a result of which the Clearing Systems cannot, in the determination
of the Calculation Agent, deliver all or any part of the relevant Net Asset
Amount.

"True Value" means, in relation to any particular securities, an amount equal
to the product of the Recovery Value of the particular securities and the
aggregate principal amount of such securities.

7    **Payments and Talons**

(a)    *Bearer Notes*

Payments of principal and interest in respect of Bearer Notes shall, subject as
mentioned below, be made against presentation and surrender of the relevant
Receipts (in the case of payments of Instalment Amounts other than on the
due date for redemption and provided that the Receipt is presented for
payment together with its relative Note), Notes (in the case of all other
payments of principal and, in the case of interest, as specified in Condition
7(f)(vi)) or Coupons (in the case of interest, save as specified in Condition

7(f)(vi)), as the case may be, at the specified office of any Paying Agent by a cheque payable in the currency in which such payment is due drawn on, or, at the option of, and on three Business Days' notice from, the holder, by transfer to an account denominated in that currency with, a Bank. "Bank" means a bank in the principal financial centre for that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(b)    *Registered Notes*

(i)    Payments of principal (which for the purposes of this Condition 7(b) shall include final Instalment Amounts but not other Instalment Amounts) in respect of Registered Notes shall be made against presentation and surrender of the relevant Certificates at the specified office of any of the Registrar or of the Transfer Agents and in the manner provided in paragraph (ii) below.

(ii)    Interest (which for the purpose of this Condition 7(b) shall include all Instalment Amounts other than final Instalment Amounts) on Registered Notes shall be paid to the person shown on the Register at the close of business on the fifteenth day before the due date for payment thereof (the "Record Date"). Payments of interest on each Registered Note shall be made in the currency in which such payments are due by cheque drawn on a Bank and mailed to the holder (or to the first named of joint holders) of such Note at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar or any Transfer Agent before the Record Date, such payment of interest may be made by transfer to an account in the relevant currency maintained by the payee with a Bank.

(c)    *Payments in the United States*

Notwithstanding the foregoing, if any Bearer Notes are denominated in U.S. dollars, payments in respect thereof may be made at the specified office of any Paying Agent in New York City in the same manner as aforesaid if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States with the reasonable expectation that such Paying Agents would be able to make payment of the amounts on the Notes in the manner provided above when due, and payment in full of such amounts at all such offices is illegal or effectively precluded by exchange controls or other similar restrictions on payment or receipt of such amounts and (ii) such payment is then permitted by United States law, without involving, in the opinion of the Issuer, any adverse tax consequence to the Issuer.

(d)    *Payments Subject to Fiscal Laws*

All payments are subject in all cases to any applicable fiscal or other laws, regulations and directives, but without prejudice to the provisions of Condition 8. No commission or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

(e)     *Appointment of Agents*

The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent initially appointed by the Issuer and their respective specified offices are listed below. The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent act solely as agents of the Issuer and do not assume any obligation or relationship of agency or trust for or with any Noteholder or Couponholder. The Issuer reserves the right at any time with the prior written approval of the Trustee to vary or terminate the appointment of the Issuing and Paying Agent, any other Paying Agent, the Registrar, any Transfer Agent, the Calculation Agent or the Disposal Agent and to appoint additional or other Paying Agents or Transfer Agents, provided that the Issuer shall at all times maintain (i) an Issuing and Paying Agent, (ii) a Registrar in relation to Registered Notes, (iii) a Transfer Agent in relation to Registered Notes having its specified office in a major European city (which shall be Dublin ), (iv) one or more Calculation Agent(s) where the Conditions so require, (v) a Disposal Agent where the Conditions so require, (vi) a Paying Agent having its specified office in a major European city (which shall be Dublin so long as the Notes are listed on the Irish Stock Exchange) and (vii) such other agents as may be required by any other stock exchange on which the Notes may be listed, in each case as approved by the Trustee and (viii) a Paying Agent with a specified office in a European Union Member State that will not be obliged to withhold or deduct tax pursuant to any law implementing European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000.

In addition, the Issuer shall forthwith appoint a Paying Agent in New York City in respect of any Bearer Notes denominated in U.S. dollars in the circumstances described in paragraph (c) above.

Notice of any such change or any change of any specified office shall promptly be given to the Unmatured Coupons and Receipts and Unexchanged Talons.

(f)     *Unmatured Coupons and Receipts and Unexchanged Talons*

(i)     Unless the Notes provide that the relative Coupons are to become void upon the due date for redemption of those Notes, Bearer Notes

should be surrendered for payment together with all unmatured Coupons (if any) appertaining thereto, failing which an amount equal to the face value of each missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon that the sum of principal so paid bears to the total principal due) shall be deducted from the Redemption Amount due for payment. Any amount so deducted shall be paid in the manner mentioned above against surrender of such missing Coupon within a period of 10 years from the Relevant Date for the payment of such principal (whether or not such Coupon has become void pursuant to Condition 9).

(ii)     If the Notes so provide, upon the due date for redemption of any Bearer Note, unmatured Coupons relating to such Note (whether or not attached) shall become void and no payment shall be made in respect of them.

(iii)    Upon the due date for redemption of any Bearer Note, any unexchanged Talon relating to such Note (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon.

(iv)     Upon the due date for redemption of any Bearer Note that is redeemable in instalments, all Receipts relating to such Note having an Instalment Date falling on or after such due date (whether or not attached) shall become void and no payment shall be made in respect of them.

(v)      Where any Bearer Note that provides that the relative unmatured Coupons are to become void upon the due date for redemption of those Notes is presented for redemption without all unmatured Coupons and any unexchanged Talon relating to it, and where any Bearer Note is presented for redemption without any unexchanged Talon relating to it, redemption shall be made only against the provision of such indemnity as the Issuer may require.

(vi)     If the due date for redemption of any Note is not a due date for payment of interest, interest accrued from the preceding due date for payment of interest or the Interest Commencement Date, as the case may be, shall only be payable against presentation (and surrender if appropriate) of the relevant Bearer Note or Certificate representing it, as the case may be. Interest accrued on a Note that only bears interest after its Maturity Date shall be payable on redemption of such Note

against presentation of the relevant Note or Certificate representing it, as the case may be.

(g)    *Talons*

On or after the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Bearer Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Issuing and Paying Agent or, as it may direct, in exchange for a further Coupon sheet (and, if necessary, another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 9).

(h)    *Non-Business Days*

If any date for payment in respect of any Note, Receipt or Coupon is not a business day, the holder shall not be entitled to payment until the next following business day nor to any interest or other sum in respect of such postponed payment. In this paragraph, "business day" means a day (other than a Saturday or a Sunday) on which banks and foreign exchange markets are open for business in the relevant place of presentation, in such jurisdictions as shall be specified as "Business Day Jurisdictions" hereon and:

(i)    (in the case of a payment in a currency other than euro) where payment is to be made by transfer to an account maintained with a bank in the relevant currency, on which foreign exchange transactions may be carried on in the relevant currency in the principal financial centre of the country of such currency; or

(ii)   (in the case of a payment in euro) which is a TARGET Business Day.

## 8    Taxation

All payments in respect of the Notes will be made without withholding or deduction for, or on account of, any present or future taxes, duties or charges of whatsoever nature unless the Issuer or the Registrar or any Transfer Agent or any Paying Agent is required by applicable law to make any such payment in respect of the Notes subject to any withholding or deduction for, or on account of, any present or future taxes, duties or charges of whatsoever nature. In that event the Issuer or such Paying Agent, Registrar or Transfer Agent (as the case may be) shall make such payment after such withholding or deduction has been made and shall account to the relevant authorities for the amount so required to be withheld or deducted. Neither the Issuer nor any Paying Agent, Registrar or Transfer Agent will be obliged to make any additional payments to holders of Notes in respect of such withholding or deduction.

## 9    Prescription

Claims against the Issuer for payment in respect of the Notes, Receipts and Coupons
(which, for this purpose, shall not include Talons) shall be prescribed and become
void unless made within 10 years (in the case of principal) or five years (in the case
of interest) from the appropriate Relevant Date in respect of them.

## 10    Events of Default

If any of the following events ("**Events of Default**") occurs, the Trustee at its
discretion may, and if so requested by holders of at least one fifth in principal
amount of the Notes then outstanding (or, if so specified in the relevant
Supplemental Trust Deed, in respect of a Series of Notes where there are Related
Notes, if so requested by holders of at least one fifth in aggregate principal amount
of the Controlling Series) or if so directed by an Extraordinary Resolution (or, if so
specified in the relevant Supplemental Trust Deed, in respect of a Series of Notes
where there are Related Notes, if so directed by an Extraordinary Resolution of the
Controlling Series) shall, give notice to the Issuer that the Notes are, and they shall
immediately become, due and payable at their Early Redemption Amount together
with accrued interest and the security constituted by the Trust Deed shall become
enforceable (as provided in the Trust Deed):

(a)    if default is made for a period of 14 days or more in the payment of any sum
due in respect of the Notes or any Related Notes or any of them; or

(b)    if the Issuer fails to perform or observe any of its other obligations under the
Notes, any Related Notes or the Trust Deed and such failure continues for a
period of 30 days (or such longer period as the Trustee may permit) next
following the service by the Trustee on the Issuer of notice requiring the
same to be remedied unless, in the opinion of the Trustee, incapable of
remedy, in which case no notice shall be required; or

(c)    if an administrator shall be appointed or any order shall be made by any
competent court or any resolution passed for the winding up or dissolution of
the Issuer or the appointment of an examiner, liquidator or similar official in
relation to the Issuer save for the purposes of amalgamation, merger,
consolidation, reorganisation or other similar arrangement on terms
previously approved by the Trustee or by an Extraordinary Resolution;

(d)    it is or will become unlawful for the Issuer to comply with any one or more
of its obligations under any of the Notes or any Related Notes; or

(e)    any event occurs which under the laws of any relevant jurisdiction has an
analogous effect to any of the events referred to in any of the foregoing
paragraphs.

The Issuer has undertaken in the Principal Trust Deed that, on each anniversary of
the date of the Principal Trust Deed and also within 14 days after any request by the

Trustee, it will send to the Trustee a certificate signed by two Directors of the Issuer
to the effect that, since the date of the Principal Trust Deed or, as the case may be,
the date of the last such certificate, no Event of Default, Potential Event of Default
or other matter required to be brought to the Trustee's attention has occurred.

11    Enforcement

At any time after the Notes become due and payable, the Trustee may, at its
discretion and without further notice, institute such proceedings against the Issuer as
it may think fit to enforce the terms of the Trust Deed, the Notes and Coupons, but it
need not take any proceedings unless (i) it shall have been so directed by an
Extraordinary Resolution (or, if so specified in the relevant Supplemental Trust
Deed, in respect of a Series of Notes where there are Related Notes, if so directed by
an Extraordinary Resolution of the Controlling Series)or so requested in writing by
Noteholders holding at least one fifth in principal amount of Notes outstanding, (or,
if so specified in the relevant Supplemental Trust Deed, in respect of a Series of
Notes where there are Related Notes, if so requested by holders of at least one fifth
in aggregate principal amount of the Controlling Series) and (ii) it shall have been
indemnified to its satisfaction.

Only the Trustee may pursue the remedies available under the Trust Deed to enforce
the rights of the Noteholders and Couponholders and no Noteholder or
Couponholder is entitled to proceed against the Issuer unless the Trustee, having
become bound to proceed in accordance with the terms of the Trust Deed, fails or
neglects to do so and such failure or neglect is continuing. Having realised the
security or, in the case of a partial redemption of Notes pursuant to Condition 6(c),
part of the security corresponding to the proportion of Notes redeemed, and
distributed the net proceeds in accordance with Condition 4, the Trustee may not
take any further steps against the Issuer to recover any sum still unpaid and the
Issuer will not be obliged to make any further payment in respect of any such sum
and accordingly no debt shall be owed by the Issuer in respect of any such sum.

12    Meeting of Noteholders, Modification, Waiver and Substitution

    (a)    *Meetings of Noteholders*

        The Trust Deed contains provisions for convening meetings of Noteholders to
        consider any matter affecting their interests, including the sanctioning by
        Extraordinary Resolution (as defined in the Trust Deed) of a modification of
        any of these Conditions or any provisions of the Trust Deed or the
        restructuring of the Notes. Such a meeting may be convened by Noteholders
        holding not less than 10 per cent. in principal amount of the Notes for the
        time being outstanding. The quorum for any meeting convened to consider an
        Extraordinary Resolution shall be two or more persons holding or
        representing a clear majority in principal amount of the Notes for the time

being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the principal amount of the Notes held or represented, unless the business of such meeting includes consideration of proposals, inter alia, (i) to amend the dates of maturity or redemption of the Notes, any Instalment Date or any date for payment of interest or Interest Amounts on the Notes, (ii) to reduce or cancel the nominal amount of, or any Instalment Amount of, or any premium payable on redemption of, the Notes, (iii) to reduce the rate or rates of interest in respect of the Notes or to vary the method or basis of calculating the rate or rates or amount of interest or the basis for calculating any Interest Amount in respect of the Notes, (iv) if a Minimum and/or a Maximum Rate of Interest, Instalment Amount or Redemption Amount is shown hereon to reduce any such Minimum and/or Maximum, (v) to vary any method of, or basis for, calculating the Redemption Amount or the Early Redemption Amount including the method of calculating the Amortised Face Amount, (vi) to vary the currency or currencies of payment or denomination of the Notes, (vii) to modify the provisions concerning the quorum required at any meeting of Noteholders or the majority required to pass an Extraordinary Resolution, (viii) to modify the provisions of the Trust Deed concerning this exception or (ix) to modify the Mortgaged Property, in which case the necessary quorum shall be two or more persons holding or representing not less than 75 per cent., or at any adjourned meeting not less than 25 per cent., in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on all Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders. A written resolution of the holders of not less than 90 per cent. in principal amount of the Notes for the time being outstanding shall take effect as an Extraordinary Resolution.

No Extraordinary Resolution to modify the terms of the Mortgaged Property or affecting terms concerning the amount, currency or the due dates of payment of the Notes, Receipts, Coupons or Talons relating thereto, which would in the opinion of the Trustee affect the corresponding terms of any Related Notes or adversely affect the interests of the holders of any Related Notes shall take effect, unless it has been sanctioned by an Extraordinary Resolution of the holders of any Related Notes.

The Conditions may be amended, modified or varied in relation to the Notes by the terms of the relevant Supplemental Trust Deed in relation to such Notes.

(b)    *Single and separate meetings for holders of Notes and holders of any Related Notes*

A single meeting of the holders of the Notes and the holders of any Related Notes may be convened if to do so would not, in the opinion of the Trustee, be materially prejudicial to the holders of the Notes and/or the Related Notes. In all other circumstances, separate meetings of the holders of the Notes and the holders of any Related Notes shall be convened.

(c)    *Modification of the Trust Deed*

The Trustee may agree, without the consent of the Noteholders or Couponholders, to (i) any modification of any of these Conditions or any of the provisions of the Trust Deed or any relevant Swap Agreement that is in its opinion of a formal, minor or technical nature or is made to correct a manifest error, and (ii) any other modification (except as mentioned in the Trust Deed), and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed that is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders. Any such modification, authorisation or waiver shall be binding on the Noteholders and the Couponholders and, if the Trustee so requires, such modification shall be notified to the Noteholders as soon as practicable. In relation to Notes which are rated by a rating agency, the Issuer shall notify the relevant rating agency of any modification made in accordance with this Condition 12(c).

(d)    *Substitution*

The Trust Deed contains provisions permitting the Trustee to agree, subject to such amendment of the Trust Deed and such other conditions as the Trustee may require including the transfer of the Mortgaged Property and subject to the consent of the relevant Swap Counterparty, but without the consent of the Noteholders or the Couponholders, to the substitution of any other company in place of the Issuer, or of any previous substituted company, as principal debtor under the Trust Deed and the Notes provided that, in relation only to Notes which are rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. In the case of such a substitution the Trustee may agree, without the consent of the Noteholders or the Couponholders, to a change of the law governing the Notes, the Receipts, the Coupons, the Talons and/or the Trust Deed provided that such change (i) would not in the opinion of the Trustee be materially prejudicial to the interests of the Noteholders and (ii) in relation only to Notes rated by a rating agency, shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Under the Trust Deed, the Trustee may agree or require the Issuer to procure the substitution as principal debtor under the Trust Deed of a company

incorporated in some other jurisdiction in the event of the Issuer becoming
subject to any form of tax on its income or payments in respect of the Notes.

*(e)    Entitlement of the Trustee*

In connection with the exercise of its functions (including but not limited to
those referred to in this Condition) the Trustee shall have regard to the
interests of each Series of Noteholders as a class subject to Condition 11 and
shall not have regard to the consequences of such exercise for individual
Noteholders or Couponholders and the Trustee shall not be entitled to require,
nor shall any Noteholder or Couponholder be entitled to claim, from the
Issuer any indemnification or payment in respect of any tax consequence of
any such exercise upon individual Noteholders or Couponholders.

Where, in the opinion of the Trustee, there is a conflict between the interests
of the holders of the Notes and those of any Related Notes and/or its duties as
Trustee for the holders of Notes and for the holders of any Related Notes, the
Trustee shall, unless otherwise specified in the relevant Supplemental Trust
Deed, act solely on behalf of the holders of the Controlling Series following
enforcement of the security over the Mortgaged Property and shall have
regard to their interests alone and shall not be responsible to the holders of
the Notes that do not comprise the Controlling Series for so doing.

*(f)    Retirement or Removal of the Trustee*

The Trust Deed contains detailed provisions for the appointment, retirement
and removal of the Trustee. The Issuer has the power of appointing new
trustees in respect of any Series of Notes with the approval of Noteholders by
Extraordinary Resolution (or in respect of a Series where there are Related
Notes, the approval of holders of the Controlling Series by Extraordinary
Resolution). Any trustee may retire by giving three months' written notice to
the Issuer and any trustee may be removed by Extraordinary Resolution (or in
respect of a Series of Notes where there are Related Notes by Extraordinary
Resolution of holders of the Controlling Series). However, if the Trustee is a
sole trust corporation then any such retirement or removal shall not be
effective until a successor Trustee is appointed.

13    **Replacement of Notes, Certificates, Receipts, Coupons and Talons**

If a Note, Certificate, Receipt, Coupon or Talon is lost, stolen, mutilated, defaced or
destroyed, it may be replaced, subject to applicable laws, regulations and stock
exchange regulations, at the specified office of the Paying Agent in the Republic of
Ireland (in the case of Bearer Notes, Receipts, Coupons or Talons) and of the
Registrar (in the case of Certificates) or such other Paying Agent, as the case may
be, as may from time to time be designated by the Issuer for the purpose and notice

of whose designation is given to Noteholders, in each case on payment by the
claimant of the fees and costs incurred in connection therewith and on such terms as
to evidence, security and indemnity (which may provide, inter alia, that if the
allegedly lost, stolen or destroyed Note, Certificate, Receipt, Coupon or Talon is
subsequently presented for payment or, as the case may be, for exchange for further
Coupons, there shall be paid to the Issuer on demand the amount payable by the
Issuer in respect of such Notes, Certificates, Receipts, Coupons or further Coupons)
and otherwise as the Issuer may require. Mutilated or defaced Notes, Certificates,
Receipts, Coupons or Talons must be surrendered before replacements will be
issued.

14    Notices

Notices to the holders of Registered Notes shall be mailed to them at their respective
addresses in the Register and deemed to have been given on the fourth weekday
(being a day other than a Saturday or a Sunday) after the date of mailing. Notices to
the holders of Bearer Notes shall be valid if published in a daily newspaper of
general circulation in London (which is expected to be the Financial Times) and (so
long as the Notes are listed on a stock exchange and the rules of that stock exchange
so require) in any such other newspaper in which publication is so required by the
rules of that stock exchange (which, in the case of Notes listed on the Irish Stock
Exchange, is expected to be the Irish Times). If in the opinion of the Trustee any
such publication is not practicable, notice shall be validly given if published in
another leading daily English language newspaper with general circulation in
Europe. Any such notice shall be deemed to have been given on the date of such
publication or, if published more than once or on different dates, on the first date on
which publication is made, as provided above.

Couponholders shall be deemed for all purposes to have notice of the contents of
any notice given to the holders of Bearer Notes in accordance with this Condition.

15    Indemnification and Obligations of the Trustee

The Trust Deed contains provisions for the indemnification of the Trustee and for its
relief from responsibility including for the exercise of any voting rights in respect of
the Mortgaged Property, for the validity, sufficiency and enforceability (which the
Trustee has not investigated) of the security created over the Mortgaged Property
and for taking proceedings to enforce repayment unless indemnified to its
satisfaction. The Trustee and any affiliate is entitled to enter into business
transactions with the Issuer, any issuer or guarantor (where applicable) of any of the
Mortgaged Property, any Swap Counterparty or any of their subsidiary, holding or
associated companies without accounting to the Noteholders for profit resulting
therefrom.

The Trustee is exempted from liability with respect to any loss or theft or reduction in value of the Mortgaged Property, from any obligation to insure or to procure the insuring of the Mortgaged Property and from any claim arising from the fact that the Mortgaged Property will be held in safe custody by the Custodian or other custodian approved in writing by the Trustee (in each case, if applicable).

The Trust Deed provides that in acting as Trustee under this Trust Deed the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) or any Credit Enhancement Provider and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders or Couponholders.

16    **Governing Law and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Receipts, the Coupons and the Talons are governed by, and shall be construed in accordance with, English law.

(b)    *Jurisdiction*

The Courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons and accordingly any legal action or proceedings arising out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons ("Proceedings") may be brought in such courts.

(c)    *Service of Process*

The Issuer has irrevocably appointed Lehman Brothers International (Europe) as its agent in England to receive, for it and on its behalf, service of process in any Proceedings in England.

17    **Contracts (Rights of Third Parties) Act 1999**

No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999 except to the extent (if any) that the Notes expressly provide for such Act to apply to any of their terms.

## Schedule 2
### Part D
### Form of Coupon

On the front:

**[SPECIFIED COMPANY]**

## MULTI-ISSUER SECURED OBLIGATION PROGRAMME

Series No. [          ]

[Title of issue]

Coupon for [[set out amount due, if known]/the amount] due on [the Interest Payment Date falling in]* [          ], [          ].

[Coupon relating to Note in the principal amount of [          ]]**

This Coupon is payable to bearer (subject to the Conditions endorsed on the Note to which this Coupon appertains, which shall be binding upon the holder of this Coupon whether or not it is for the time being attached to such Note) at the specified offices of the Issuing and Paying Agent and the Paying Agents set out on the reverse hereof (or any other Issuing and Paying Agent or further or other Paying Agents or specified offices duly appointed or nominated and notified to the Noteholders).

[If the Note to which this Coupon appertains shall have become due and payable before the Maturity Date of this Coupon, this Coupon shall become void and no payment shall be made in respect of it.]***

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

[Cp. No.        ]          [Denomination]          [ISIN]          [Series]
     [Certif. No.]

On the back:

**Issuing and Paying Agent**

[●]

**Paying Agent**

[●]
Attention: [●]

[*Only necessary where Interest Payment Dates are subject to adjustment in accordance with a Business Day Convention; otherwise the particular Interest Payment Date should be specified.]

[**Only required for Coupons relating to Floating Rate or Variable Coupon Amount Notes that are issued in more than one denomination.]

[***Delete if Coupons are not to become void upon early redemption of Note.]

Schedule 2
Part E
Form of Talon

On the front:

[SPECIFIED COMPANY]

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

Series No. [•]

[Title of issue]

Talon for further Coupons falling due on [the Interest Payment Dates falling in]*[
]{              }.

[Talon relating to Note in the principal amount of [              ]]**

After all the Coupons appertaining to the Note to which this Talon appertains have
matured, further Coupons (including if appropriate a Talon for further Coupons) shall be
issued at the specified office of the Issuing and Paying Agent set out on the reverse hereof
(or any other Issuing and Paying Agent or specified office duly appointed or nominated
and notified to the Noteholders) upon production and surrender of this Talon.

If the Note to which this Talon appertains shall have become due and payable before the
original due date for exchange of this Talon, this Talon shall become void and no exchange
shall be made in respect of it.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE
SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS,
INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF
THE INTERNAL REVENUE CODE.


[SPECIFIED COMPANY]

By:

[Talon No.]              [ISIN]              [Series]              [Certif.
No.]

On the back:

**Issuing and Paying Agent**

[●]

**Paying Agent**

[●]

[* The maturity dates of the relevant Coupons should be set out if known, otherwise reference should be made to the months and years in which the Interest Payment Dates fall due.]

[** Only required where the Series comprises Notes of more than one denomination.]

Schedule 2
Part F
Form of Receipt

## [SPECIFIED COMPANY]

## MULTI-ISSUER SECURED OBLIGATION PROGRAMME

Series No. [          ]

Receipt for the sum of [                    ] being the instalment of principal payable in accordance with the Terms and Conditions endorsed on the Note to which this Receipt appertains (the "Conditions") on [                ].

This Receipt is issued subject to and in accordance with the Conditions which shall be binding upon the holder of this Receipt (whether or not it is for the time being attached to such Note) and is payable at the specified office of any of the Paying Agents set out on the reverse of the Note to which this Receipt appertains (and/or any other or further Paying Agents and/or specified offices as may from time to time be duly appointed and notified to the Noteholders).

This Receipt must be presented for payment together with the Note to which it appertains. If the Note to which this Receipt appertains shall have become due and payable on or before the Maturity Date of this Receipt, this Receipt shall become void and no payment shall be made in respect of it. The Issuer shall have no obligation in respect of this Receipt if it is presented without the Note to which it appertains.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

## Schedule 3

### Provisions for Meetings of Noteholders

**Interpretation**

1    In this Schedule:

1.1    references to a meeting are to a meeting of Noteholders and include, unless the context otherwise requires, any adjournment;

1.2    "agent" means a holder of a voting certificate or a proxy for, or representative of, a Noteholder;

1.3    "block voting instruction" means an instruction issued in accordance with paragraphs 8 to 14;

1.4    "Extraordinary Resolution" means a resolution passed at a meeting duly convened and held in accordance with this Principal Trust Deed by a majority of at least 75 per cent of the votes cast;

1.5    "voting certificate" means a certificate issued in accordance with paragraphs 5, 6, 7 and 14;

1.6    references to persons representing a proportion of the Notes are to Noteholders or agents holding or representing in the aggregate at least that proportion in principal amount of the Notes for the time being outstanding.

**Powers of meetings**

2    A meeting shall, subject to the Conditions and without prejudice to any powers conferred on other persons by this Principal Trust Deed, have power by Extraordinary Resolution:

2.1    to sanction any proposal by the Issuer or the Trustee for any modification, abrogation, variation or compromise of, or arrangement in respect of, the rights of the Noteholders and/or the Couponholders against the Issuer, whether or not those rights arise under this Principal Trust Deed ;

2.2    to sanction the exchange or substitution for the Notes of, or the conversion of the Notes into, shares, bonds or other obligations or securities of the Issuer or any other entity;

2.3    to assent to any modification of the Trust Deed, the Notes, the Receipts, the Talons or the Coupons proposed by the Issuer or the Trustee;

2.4    to authorise anyone to concur in and do anything necessary to carry out and give effect to an Extraordinary Resolution;

2.5 to give any authority, direction or sanction required to be given by Extraordinary Resolution;

2.6 to appoint any persons (whether Noteholders or not) as a committee or committees to represent the Noteholders' interests and to confer on them any powers or discretions which the Noteholders could themselves exercise by Extraordinary Resolution;

2.7 to approve a proposed new Trustee and to remove a Trustee;

2.8 to approve the substitution of any entity for the Issuer (or any previous substitute) as principal debtor under the Trust Deed; and

2.9 to discharge or exonerate the Trustee from any liability in respect of any act or omission for which it may become responsible under the Trust Deed, the Notes, the Receipts, the Talons or the Coupons,

    (i) provided that the special quorum provisions in paragraph 19 shall apply to any Extraordinary Resolution (a "**special quorum resolution**") for the purpose of sub-paragraph 2.2 or 2.8, any of the proposals listed in Condition 12 or any amendment to this proviso..

A resolution in writing signed by or on behalf of the holders of not less than 90 per cent. in principal amount of the Notes who for the time being are entitled to receive notice of a meeting in accordance with the provisions herein contained shall for all purposes be as valid and effectual as an Extraordinary Resolution passed at a meeting of such Noteholders duly convened and held in accordance with the provisions herein contained. Such resolution in writing may be contained in one document or in several documents in like form each signed by or on behalf of one or more Noteholders.

3    Convening a meeting

The Issuer or the Trustee may at any time convene a meeting. If it receives a written request by Noteholders holding at least 10 per cent. in principal amount of the Notes for the time being outstanding and is indemnified to its satisfaction against all costs and expenses, the Trustee shall convene a meeting.

Every meeting shall be held at a time and place approved by the Trustee.

4    At least 21 days' notice (exclusive of the day on which the notice is given and of the day of the meeting) shall be given to the Noteholders.

A copy of the notice shall be given by the party convening the meeting to the other parties.

The notice shall specify the day, time and place of meeting and, unless the Trustee otherwise agrees, the nature of the resolutions to be proposed and shall explain how Noteholders may appoint proxies or representatives, obtain voting certificates and use block voting instructions and the details of the time limits applicable.

5    Arrangements for voting

If a holder of a Bearer Note wishes to obtain a voting certificate in respect of it for a meeting, he must deposit it for that purpose at least 48 hours before the time fixed for the meeting with a Paying Agent or to the order of a Paying Agent with a bank or other depositary nominated by the Paying Agent for the purpose. The Paying Agent shall then issue a voting certificate in respect of it.

6    A voting certificate shall:

    6.1    be a document in the English language;

    6.2    be dated;

    6.3    specify the meeting concerned and the serial numbers of the Notes deposited; and

    6.4    entitle, and state that it entitles, its bearer to attend and vote at that meeting in respect of those Notes.

7    Once a Paying Agent has issued a voting certificate for a meeting in respect of a Note, it shall not release the Note until either:

    7.1    the meeting has been concluded; or

    7.2    the voting certificate has been surrendered to the Paying Agent.

8    If a holder of a Bearer Note wishes the votes attributable to it to be included in a block voting instruction for a meeting, then, at least 48 hours before the time fixed for the meeting, (i) he must deposit the Note for that purpose with a Paying Agent or to the order of a Paying Agent with a bank or other depositary nominated by the Paying Agent for the purpose and (ii) he or a duly authorised person on his behalf must direct the Paying Agent how those votes are to be cast. The Paying Agent shall issue a block voting instruction in respect of the votes attributable to all Notes so deposited.

9    A block voting instruction shall:

    9.1    be a document in the English language;

    9.2    be dated;

    9.3    specify the meeting concerned;

9.4    list the total number and serial numbers of the Notes deposited, distinguishing with regard to each resolution between those voting for and those voting against it;

9.5    certify that such list is in accordance with Notes deposited and directions received as provided in paragraphs 8, 11 and 14; and

9.6    appoint a named person (a "proxy") to vote at that meeting in respect of those Notes and in accordance with that list. A proxy need not be a Noteholder.

10    Once a Paying Agent has issued a block voting instruction for a meeting in respect of the votes attributable to any Notes:

10.1    it shall not release the Notes, except as provided in paragraph 11, until the meeting has been concluded; and

10.2    the directions to which it gives effect may not be revoked or altered during the 48 hours before the time fixed for the meeting.

11    If the receipt for a Note deposited with a Paying Agent in accordance with paragraph 8 is surrendered to the Paying Agent at least 48 hours before the time fixed for the meeting, the Paying Agent shall release the Note and exclude the votes attributable to it from the block voting instruction.

12    Each block voting instruction shall be deposited at least 24 hours before the time fixed for the meeting at such place as the Trustee shall designate or approve, and in default it shall not be valid unless the chairman of the meeting decides otherwise before the meeting proceeds to business.

If the Trustee requires, a notarially certified copy of each block voting instruction shall be produced by the proxy at the meeting but the Trustee need not investigate or be concerned with the validity of the proxy's appointment.

13    A vote cast in accordance with a block voting instruction shall be valid even if it or any of the Noteholders' instructions pursuant to which it was executed has previously been revoked or amended, unless written intimation of such revocation or amendment is received from the relevant Paying Agent by the Issuer or the Trustee at its registered office or by the chairman of the meeting in each case at least 24 hours before the time fixed for the meeting.

14    No Note may be deposited with or to the order of a Paying Agent at the same time for the purposes of both paragraph 5 and paragraph 8 for the same meeting.

**Representations**

15    A holder of a Registered Note may, by an instrument in writing in the form available
from the specified office of a Transfer Agent in the English language executed by or
on behalf of the holder and delivered to the Transfer Agent at least 24 hours before
the time fixed for a meeting, appoint any person (a **"proxy"**) to act on his behalf in
connection with that meeting. A proxy need not be a Noteholder.

15.1    A corporation which holds a Registered Note may by delivering to a Transfer
Agent at least 24 hours before the time fixed for a meeting a certified copy of
a resolution of its directors or other governing body (with, if it is not in
English, a certified translation into English) authorise any person to act as its
representative (a **"representative"**) in connection with that meeting.

**Chairman**

16    The chairman of a meeting shall be such person as the Trustee may nominate in
writing, but if no such nomination is made or if the person nominated is not present
within 15 minutes after the time fixed for the meeting the Noteholders or agents
present shall choose one of their number to be chairman, failing which the Issuer
may appoint a chairman. The chairman need not be a Noteholder or agent. The
chairman of an adjourned meeting need not be the same person as the chairman of
the original meeting.

**Attendance**

17    The following may attend and speak at a meeting:

17.1    Noteholders and agents;

17.2    the chairman;

17.3    the Issuer and the Trustee (through their respective representatives) and their
respective financial and legal advisers;

17.4    the Dealers and their advisers.

No-one else may attend or speak.

**Quorum and Adjournment**

18    No business (except choosing a chairman) shall be transacted at a meeting unless a
quorum is present at the commencement of business. If a quorum is not present
within 15 minutes from the time initially fixed for the meeting, it shall, if convened
on the requisition of Noteholders or if the Issuer and the Trustee agree, be dissolved.

In any other case it shall be adjourned until such date, not less than 14 nor more than
42 days later, and time and place as the chairman may decide.

If a quorum is not present within 15 minutes from the time fixed for a meeting so adjourned, the meeting shall be dissolved.

19    Two or more Noteholders or agents present in person shall be a quorum:

19.1    in the cases marked "No minimum proportion" in the table below, whatever the proportion of the Notes which they represent;

19.2    in any other case, only if they represent the proportion of the Notes shown by the table below.

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| Purpose of meeting | Any meeting except one referred to in column 3 | Meeting previously adjourned though want of a quorum |
| | Required proportion | Required proportion |
| To pass a special quorum resolution | 75 per cent. | 25 per cent. |
| To pass any other Extraordinary Resolution | A clear majority | No minimum proportion |
| Any other purpose | 10 per cent. | No minimum proportion |

20    The chairman may with the consent of (and shall if directed by) a meeting adjourn the meeting from time to time and from place to place. Only business which could have been transacted at the original meeting may be transacted at a meeting adjourned in accordance with this paragraph or paragraph 18.

21    At least 10 days' notice of a meeting adjourned through want of a quorum shall be given in the same manner as for an original meeting and that notice shall state the quorum required at the adjourned meeting. No notice need, however, otherwise be given of an adjourned meeting.

Voting

22    Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Trustee or one or more persons representing 2 per cent. of the Notes.

23   Unless a poll is demanded a declaration by the chairman that a resolution has or has
     not been passed shall be conclusive evidence of the fact without proof of the number
     or proportion of the votes cast in favour of or against it.

24   If a poll is demanded, it shall be taken in such manner and (subject as provided
     below) either at once or after such adjournment as the chairman directs. The result of
     the poll shall be deemed to be the resolution of the meeting at which it was
     demanded as at the date it was taken. A demand for a poll shall not prevent the
     meeting continuing for the transaction of business other than the question on which
     it has been demanded.

25   A poll demanded on the election of a chairman or on a question of adjournment shall
     be taken at once.

26   On a show of hands every person who is present in person and who produces a
     Bearer Note, a Certificate of which he is the registered holder or a voting certificate
     or is a proxy or representative has one vote. On a poll every such person has one
     vote for each Note so produced or represented by the voting certificate so produced
     or for which he is a proxy or representative.

     Without prejudice to the obligations of proxies, a person entitled to more than one
     vote need not use them all or cast them all in the same way.

27   In case of equality of votes the chairman shall both on a show of hands and on a poll
     have a casting vote in addition to any other votes which he may have.

### Effect and Publication of an Extraordinary Resolution

28   An Extraordinary Resolution shall be binding on all the Noteholders, whether or not
     present at the meeting, and on all the Couponholders and each of them shall be
     bound to give effect to it accordingly. The passing of such a resolution shall be
     conclusive evidence that the circumstances justify its being passed. The Issuer shall
     give notice of the passing of an Extraordinary Resolution to Noteholders within 14
     days but failure to do so shall not invalidate the resolution.

### Minutes

29   Minutes shall be made of all resolutions and proceedings at every meeting and, if
     purporting to be signed by the chairman of that meeting or of the next succeeding
     meeting, shall be conclusive evidence of the matters in them. Until the contrary is
     proved every meeting for which minutes have been so made and signed shall be
     deemed to have been duly convened and held and all resolutions passed or
     proceedings transacted at it to have been duly passed and transacted.

**Trustee's Power to Prescribe Regulations**

30   Subject to all other provisions in this Trust Deed the Trustee may without the consent of the Noteholders prescribe such further regulations regarding the holding of meetings and attendance and voting at them as it in its sole discretion determines including (without limitation) such requirements as the Trustee thinks reasonable to satisfy itself that the persons who purport to make any requisition in accordance with this Trust Deed are entitled to do so and as to the form of voting certificates or block voting instructions so as to satisfy itself that persons who purport to attend or vote at a meeting are entitled to do so.

31   The holder of a Global Note or Global Certificate shall (unless such Global Note or Global Certificate represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders.

32   The foregoing provisions of this Schedule shall have effect subject to the following provisions:

32.1   meetings of Noteholders of separate Series will normally be held separately. A single meeting of the holders of the Notes and the holders of any Related Notes may be convened if to do so would not, in the opinion of the Trustee, be materially prejudicial to the holders of the Notes and/or the Related Notes. However, the Trustee may from time to time determine that meetings of Noteholders of separate Series shall be held together;

32.2   a resolution that in the opinion of the Trustee affects one Series alone shall be deemed to have been duly passed if passed at a separate meeting of the Noteholders of the Series concerned;

32.3   a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series but does not give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed if passed at a single meeting of the Noteholders of the relevant Series provided that for the purposes of determining the votes a Noteholder is entitled to cast pursuant to paragraph 26, each Noteholder shall have one vote in respect of each U.S.$1,000 principal amount of Notes held, converted, if such Notes are not denominated in U.S. dollars, in accordance with sub-Clause 9.12;

32.4   a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series and gives or may give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed only if it shall be duly passed at separate meetings of the Noteholders of the relevant Series;

32.5    to all such meetings as aforesaid all the preceding provisions of this Schedule shall *mutatis mutandis* apply as though references therein to Notes and to Noteholders were references to the Notes and Noteholders of the Series concerned.

32.6    No Extraordinary Resolution to modify the terms of the Mortgaged Property or affecting certain terms concerning the amount and currency and the due dates of payment of the Notes and the Receipts and Coupons relating thereto, which would in the opinion of the Trustee affect the corresponding terms of any Related Notes or adversely affect the interests of the holders of any Related Notes shall take effect, unless it has been sanctioned by an Extraordinary Resolution of the holders of the relevant Related Notes.

32.7    If this Trust Deed specifies that a direction or an Extraordinary Resolution is to be given by the Controlling Series, then such direction or Extraordinary Resolution need only to be given or passed by the Controlling Series.

## Schedule 4

### Form of Supplemental Trust Deed

Dated [ISSUE DATE]

[SPECIFIED COMPANY]

- and -

[●]

- and -

[●]

- and -

[PAYING/TRANSFER AGENT]

[- and -]

[SWAP COUNTERPARTY]

[- and -]

[COUNTERPARTY]

### SUPPLEMENTAL TRUST DEED

in respect of

**[NEW ISSUER]**
**[SPECIFIED COMPANY]**
Series [●] [currency and amount]
[description of the Notes]
issued pursuant to the Multi-Issuer Secured Obligation Programme

arranged by
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

One Silk Street
London EC2Y 8HQ

Telephone (44-20) 7456 2000
Facsimile (44-20) 7456 2222

This Supplemental Trust Deed is made on [ISSUE DATE] between:

(1)     [SPECIFIED COMPANY] (the "Issuer");

(2)     [•] (the "Trustee", which expression shall, wherever the context so admits, include
        all persons for the time being the trustee or trustees of this Supplemental Trust
        Deed);

(3)     [•] as Issuing and Paying Agent and Custodian; [and]

(4)     [PAYING/TRANSFER AGENT] as Paying Agent and Transfer Agent[./;and]

(5)     [SWAP COUNTERPARTY] of [ADDRESS] (the "Swap Counterparty")[./;and]

(6)     [COUNTERPARTY] of [ADDRESS] (the "Counterparty")]

Whereas:

(A)     [The Issuer] and the Trustee are parties to a trust deed dated [•] (the "**Principal
        Trust Deed**") establishing a programme for the issuance from time to time of
        secured notes.

(B)     [Pursuant to sub-Clause 2.7 of the Principal Trust Deed, the] [The] Issuer has
        authorised and determined to issue Series [   ] [currency and amount] [description
        of the Notes] to be constituted and secured as set out below.]

(C)     The Issuing and Paying Agent[,/and] the Paying Agent [and the Swap
        Counterparty] have each resolved to enter into this Supplemental Trust Deed for
        the purposes set out below.

Now this deed witnesses and it is hereby declared as follows:

1       Definitions

        1.1     **Principal Trust Deed:** Expressions defined in the Principal Trust Deed shall
                have the same meanings when used herein save to the extent supplemented or
                modified hereby.

1.2   **Additional Definitions:** The following expressions shall have the following
meanings:

["**Credit Enhancement Agreement**" means the [guarantee] [specify other
document] dated [ISSUE DATE] [between] [of] [the provider of the credit
enhancement agreement] (the "**Credit Enhancement Provider**") [and the
Issuer]]

["**Custodian Account**": means the account of the Custodian with [details]
[(account number [   ] sub account [   ])];]

["**Custody Agreement**" means [complete if separate agreement to Agency
Agreement];]

["**Final Terms**" means the Final Terms dated [ISSUE DATE] specifying the
relevant issue details of the Notes, the form of which appears as the Schedule
hereto]

"**Mortgaged Property**" means the Collateral, the Agency Agreement, the
Custody Agreement, the Swap Agreement] and the other assets and/or
agreements from time to time charged in the manner set out herein and in
Clause 5 of the Principal Trust Deed;

"**Notes**" means the Series [     ] [currency and amount] [description of the
Notes] of the Issuer hereby constituted or the amount thereof for the time
being outstanding and includes the Global Note to be issued in respect
thereof;

"**Obligation**" means an obligation and duty of the Issuer under the Trust
Deed, each Note and the Swap Agreement;

["**Securities**" means [Securities in Schedule [•] hereto]]

["**Securities Agreement**" means the agreement with an effective date of
[ISSUE DATE] between the Issuer and the Counterparty under which the
Issuer has agreed to [DETAILS] [;/ and]

["**Series Prospectus**" means the prospectus dated [ISSUE DATE] specifying
the relevant issue details of the Notes, the form of which appears as the
Schedule hereto]

["**Swap Agreement**"] means the ISDA Master Agreement with an effective
date of [ISSUE DATE] between the Issuer and the Swap Counterparty under
which the Issuer has agreed to [DETAILS] against payment by the Swap
Counterparty of [DETAILS]]

2    **Incorporation by Reference**

Except as otherwise provided herein, the terms of the Principal Trust Deed shall
apply to this Supplemental Trust Deed as if they were set out herein and the
Principal Trust Deed shall be read and construed, in relation to the Notes, as one
document with this Supplemental Trust Deed.

3    **Amount and Status of Notes**

3.1    **Amount:** The aggregate principal amount of the Notes is limited to
[DETAILS].

3.2    **Status:** The Notes and Coupons constitute secured and limited recourse
obligations of the Issuer, secured as provided below.

4    **Form of the Notes**

The Notes will be [Bearer]/[Registered] Notes represented by the Global
[Note/Certificate issued in the principal amount of [DETAILS]. [The Global Note
will be exchangeable for Definitive Notes in the circumstances set out therein.]

5    **Security and Covenants**

5.1    **Security:** The Issuer hereby creates security over the Mortgaged Property
comprising the assets and agreements described in the Schedule hereto in
accordance with the provisions of Clause 5 of the Principal Trust Deed [in
addition to the [security interest] created under [other security document]].

5.2    **The Mortgaged Property:** Without prejudice to the generality of sub-Clause
5.1, the Issuer with full title guarantee and as continuing security for the
benefit of the holders of Notes, Coupons [and the Swap Counterparty]
hereby:

5.2.1    charges and assigns by way of first fixed charge in favour of the
Trustee, the Securities and all rights and sums and other property and
assets derived therefrom and all rights against the Custodian in
respect thereof;

5.2.2    assigns by way of security in favour of the Trustee all rights, title and
interest under the [Swap Agreement,] [Securities Agreement,] and
[Credit Enhancement Agreement] and any sums received thereunder;

5.2.3    charges by way of first fixed charge in favour of the Trustee (a) all
sums held by the Agent and/or the Custodian and/or the Registrar to
meet payments due in respect of the Notes and (b) any sums received

under the [Swap Agreement,] [Securities Agreement,] and [Credit Enhancement Agreement]; and

5.2.4    assigns by way of security in favour of the Trustee all rights, title and interest under the Agency Agreement and all sums derived therefrom in respect of the Notes, including all rights against the Custodian under the Custody Agreement in respect of the Securities.

5.3    **Benefit of Security**: The security created pursuant to sub-Clauses 5.1 and 5.2 is granted to the Trustee as trustee for itself and/or the holders of Notes, Coupons and the Swap Counterparty as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes and Coupons, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement, (iii) for the payment of all claims of the Custodian (for reimbursement in respect of payments properly made to any party of sums receivable in respect of the Securities in discharge of an Obligation) and (iv) for the payment of all claims of the Issuing and Paying Agent (for reimbursement in respect of payments properly made to any person in discharge of an Obligation).

None of the Swap Counterparty, the Issuing and Paying Agent or the Custodian shall benefit from the security in respect of which it is itself the party that owes an obligation to the Issuer pursuant to the Securities or the Swap Agreement.

5.4    **Covenants:**

5.4.1    [The Swap Counterparty covenants with the Trustee in the terms of sub-Clause 7.2 of the Principal Trust Deed and agrees to comply with and be subject to all other applicable provisions of the Principal Trust Deed.]

5.4.2    [The Issuer covenants with the Trustee to promptly give notice to the Credit Enhancement Provider of the assignment by way of security of the Issuer's rights under the Credit Enhancement Agreement and to use its reasonable endeavours to procure that the Credit Enhancement Provider acknowledges such notice.]

5.5    **Securities**: The Issuer confirms that it has, or there has been on its behalf, delivered to the Custodian Account on or before the date hereof, the Securities.

5.6    **Covenant to pay**: The Trustee hereby agrees to hold the covenant set out in sub-Clause 2.3 of the Principal Trust Deed on trust for the holders of the Notes[, the Coupons] [and the Receipts].

5.7    **Notice and Acknowledgement:** The Trustee hereby gives notice and each of the Agents, [Counterparty] [and the Swap Counterparty] hereby acknowledges that it has notice of the assignment by way of security by the Issuer of all of its rights under the Agency Agreement, [Securities Agreement,] [Custody Agreement,] [and Swap Agreement] and consents to any further assignment by way of security by the Issuer of such rights to any successor Trustee under this Supplemental Trust Deed.

5.8    **Application of Moneys Received:** The Trustee shall apply all moneys received by it under this Supplemental Trust Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: [DETAILS].

5.9    **Payments:** The Issuer and the Issuing and Paying Agent hereby agree in accordance with the provisions of sub-Clause 4.1 of the Agency Agreement that payments in respect of the Notes shall be made on a "prior-day" basis, and that the provisions of sub-Clause 4.1.2 of the Agency Agreement are amended so that the Issuer shall transfer the amounts required in respect of any particular payment at least • Business Day[s] prior to the date on which that payment in respect of the Notes becomes due.]

6    [OTHER PROVISIONS - EG SUBORDINATION]

7    **Communications**

Communications under this Supplemental Trust Deed shall be made in accordance with Clause 17 of the Principal Trust Deed.

The telephone number, fax number, address and person designated by the Issuer are set out below:

telephone: [  ]
telex:      [  ]
fax:        [  ]
address:    [  ]
attention:  [The Directors].

[The telephone number, fax number, address and person designated by the Swap Counterparty are set out below:

telephone:      [  ]
telex:    [  ]
fax: [  ]
address:        [  ]
attention:      [  ]]

The telephone number, fax number, address and person designated by the Trustee
are set out below:

telephone:      [●]
telex:    [●]
fax: [●]
    address:    [●]
attention:      [●]

The telephone number, fax number, address and person designated by the Custodian
are set out below:

telephone: [●]
telex:      [●]
fax:        [●]
address:    [●]
attention:  [●]

## 8    Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Supplemental Trust Deed has no right, whether
under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any
term of this Supplemental Trust Deed except that and to the extent (if any) that this
Supplemental Trust Deed expressly provides for that Act to apply to any of its terms.

## 9    Governing Law and Jurisdiction

9.1    **Governing Law**: This Supplemental Trust Deed shall be governed by and
construed in accordance with English Law.

9.2    **Jurisdiction**: The courts of England are to have jurisdiction to settle any
disputes which may arise out of or in connection with this Supplemental
Trust Deed, the Principal Trust Deed, the Notes, the Receipts, the Talons or
the Coupons and accordingly any legal action or proceedings arising out of or
in connection with this Supplemental Trust Deed, the Principal Trust Deed,
the Notes, the Receipts, the Talons or the Coupons ("**Proceedings**") may be
brought in such courts. [[The Issuer irrevocably submits to the jurisdiction of
such courts and waives any objection on the ground that the Proceedings
have been brought in an inconvenient forum.] [The Swap Counterparty
irrevocably submits to the jurisdiction of such courts and waives any
objections to Proceedings in such courts on the ground of venue or on the
ground that the Proceedings have been brought in an inconvenient forum.]
[This submission is] [These submissions are] for the benefit of each of the
other party[ies] to this Supplemental Trust Deed and the holders of Notes,

Coupons, Receipts and Talons and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).]

9.3    **Service of Process:** [The Issuer irrevocably appoints [    ] of [    ] as its agent to receive, for it and on its behalf, service of process in any Proceedings in England [and the][.]] [The Swap Counterparty irrevocably appoints [    ] of [    ] as its agent to receive, for it and on its behalf, service of process in any Proceedings in England.] Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason such process agent ceases to be able to act as such or no longer has an address in England the Swap Counterparty irrevocably agrees to appoint a substitute process agent acceptable to the Trustee, and to deliver to the Trustee a copy of the new agent's acceptance of that appointment, within 30 days. Nothing shall affect the right to serve process in any other manner permitted by law.]

## Schedule

### Form of Final Terms or Series Prospectus

[RELEVANT FINAL TERMS OR SERIES PROSPECTUS TO BE INSERTED]

In witness whereof this Supplemental Trust Deed has been executed as a deed as of the
date stated at the beginning.

[SPECIFIED COMPANY]

By:

[●]

By:

[PAYING/TRANSFER AGENT]

By:

[SWAP COUNTERPARTY]

By:

[COUNTERPARTY]

By:

## Schedule 5
## Memorandum of Supplemental Trust Deeds

| Date | Parties | Principal Amount of Series | Title of Series | Final Maturity Date |
|------|---------|---------------------------|-----------------|---------------------|

## Schedule 6
## Form of Deed of Accession

This Deed is made on [•] between:

(1)    [ISSUER] (the "Issuer");

(2)    BNY CORPORATE TRUSTEE SERVICES LIMITED (the "Trustee");

(3)    THE BANK OF NEW YORK, LONDON BRANCH (the "Issuing and Paying
       Agent");

(4)    BNY FINANCIAL SERVICES PLC (the "Paying Agent" and, together with the
       Issuing and Paying Agent, the "Agents");

(5)    LEHMAN BROTHERS SPECIAL FINANCING, INC. ("LBSF");

(6)    LEHMAN BROTHERS FINANCE S.A. ("LBF"); and

(7)    LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in its capacity as calculation
       agent, the "Calculation Agent" and, in its capacity as dealer under the Programme,
       the "Dealer").

Whereas:

Dante Finance Public Limited Company ("Dante") and the Trustee are parties to a trust
deed dated 10 October 2002 as amended and restated on 20 July 2007 (the "Principal
Trust Deed") establishing the Multi-Issuer Secured Obligation Programme (the
"Programme") for the issuance from time to time of secured notes to which the Issuer
wishes to accede as set out below.

Now this deed witnesses and it is hereby declared as follows:

1      Definitions

       "Agency Agreement" means the agency agreement dated 10 October 2002, between
       Dante, the Trustee and the Agents as amended and restated on 20 July 2007;

       "LBF Swap" means an ISDA Master Agreement (including the Schedule thereto)
       between Dante and LBF dated 10 October 2002, as amended and restated on 20 July
       2007; and

       "LBSF Swap" means an ISDA Master Agreement (including the Schedule thereto)
       between Dante and LBSF dated 10 October 2002, as amended and restated on 20
       July 2007

       "Master Documents" means the Agency Agreement, the Programme Agreement
       and the Principal Trust Deed; and

"Programme Agreement" means the programme agreement dated 10 October 2002, between Dante and the Dealer as amended and restated on 20 July 2007.

2    Accession

2.1    With effect from the date of this Deed, the Issuer hereby agrees to become and be treated as an "Issuer" for all purposes set out in the Master Documents and agrees to assume all rights, obligations and liabilities of an "Issuer" as set out in the Master Documents and each of the other parties to this Deed (in each capacity in which it is a party to one or more of the Master Documents) agrees to the Issuer becoming and being treated as an "Issuer" for such purposes and assuming the rights, obligations and liabilities of an "Issuer" as set out in the Master Documents.

2.2    With effect from the date of this Accession Deed, the Issuer hereby agrees to become and be treated as "Party B" for all purposes of the LBF Swap and the LBSF Swap and agrees to assume all rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap and LBF and LBSF (in the capacity in which it is a party to the LBF Swap and the LBSF Swap respectively) agrees to the Issuer becoming and being treated as "Party B" for such purposes and assuming the rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap.

3    Counterparts

This Deed of Accession may be executed in counterparts which when taken together shall constitute one and the same instrument.

4    Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Deed of Accession has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Deed of Accession.

5    Governing Law

This Deed of Accession shall be governed by and construed in accordance with English law.

**In witness whereof** this Deed has been executed as a deed as of the date stated at the beginning.

[ISSUER]

By:


By:



**BNY CORPORATE TRUSTEE SERVICES LIMITED**

By:



**THE BANK OF NEW YORK**

By:



SIGNED, SEALED AND DELIVERED

for and on behalf of **BNY FINANCIAL SERVICES PLC** by its lawfully appointed attorney


in the presence of:-



**LEHMAN BROTHERS SPECIAL FINANCING, INC.**

By:



**LEHMAN BROTHERS FINANCE S.A.**

By:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:

Schedule 7

Definitions

"**Account Bank**" means the person named as such in the Conditions or any Successor Account Bank in each case at its specified office

"**Agency Agreement**" means the agency agreement relating to the Programme dated 10 October 2002 as amended and restated on 20 July 2007 between the Issuer, the Trustee, JPMorgan Chase Bank, N.A. as initial Issuing and Paying Agent and the Paying Agent mentioned in it

"**Agents**" means the Issuing and Paying Agent, the other Paying Agents, the Calculation Agent, the Registrar, the other Transfer Agents, the Account Bank and the Custodian or any of them.

"**Arranger**" means Lehman Brothers International (Europe) and shall include any additional or replacement arranger appointed, and exclude any Arranger whose appointment has terminated, pursuant to Clause 14 of the Programme Agreement.

"**Base Prospectus**" means, the base prospectus relating to the Company and the Programme as from time to time amended, supplemented or replaced and which shall include those documents incorporated in it by reference (but shall not include any information or documents replaced or superceded by any information subsequently included or incorporated).

"**Bearer Note**" means a Note that is in bearer form, and includes any replacement Bearer Note issued pursuant to the Conditions and any Global Note.

"**Calculation Agent**" means any person named as such in the Conditions or any Successor Calculation Agent.

"**Certificate**" means a registered certificate representing one or more Registered Notes of the same Series and, save as provided in the Conditions, comprising the entire holding by a Noteholder of his Registered Notes of that Series and, save in the case of Global Certificates, being substantially in the form set out in Schedule 2 of the Principal Trust Deed.

"**Common Depositary**" means, in relation to a Series, a depositary common to Euroclear and Clearstream, Luxembourg.

"**Conditions**" means in respect of the Notes of each Series the terms and conditions applicable thereto which shall be substantially in the form set out in Schedule 2 to the Principal Trust Deed as modified, with respect to any Notes represented by a Global Certificate or a Global Note, by the provisions of such Global Certificate or Global Note, shall incorporate any additional provisions forming part of such terms and conditions set out in the Final Terms or Series Prospectus(es) relating to the Notes of that Series and shall be endorsed on the Definitive Notes subject to amendment and completion as

referred to in the first paragraph of Schedule 2 Part C of the Principal Trust Deed and any reference to a particularly numbered Condition shall be construed accordingly.

"**Contracts**" means the Programme Agreement, the Agency Agreement and the Trust Deed in relation to any Syndicated Issue, the related Subscription Agreement and any further agreements entered into in relation to a Series.

"**Contractual Currency**" means, in relation to any payment obligation arising under any Note, the currency in which that payment obligation is expressed and, in relation to Clause 8 of the Principal Trust Deed, United States dollars or such other currency as may be agreed between the Issuer and the Trustee from time to time.

"**Controlling Series**" shall mean the Series of Notes or other Obligations identified as the Controlling Series in the relevant Supplemental Trust Deed or failing that, the most senior ranking of the Notes, relevant Related Notes and other Obligations secured on the same Mortgaged Property as the Notes.

"**Counterparty**" means the counterparty to any Securities Agreement as specified in the Supplemental Trust Deed.

"**Coupons**" means the bearer coupons relating to interest bearing Bearer Notes or, as the context may require, a specific number of them and includes any replacement coupons issued pursuant to the Conditions and, where the context may require, any Talons.

"**Credit Enhancement Agreement**" means the agreement or undertaking described as such in the Supplemental Trust Deed.

"**Credit Enhancement Provider**" means the person specified to be such in the relevant Supplemental Trust Deed.

"**Dealer**" means Lehman Brothers International (Europe) and includes each other person who has been, or, for the purposes of Clause 2 of the Programme Agreement, who is subsequently, appointed as a Dealer pursuant to Clause 14 of the Programme Agreement (but excludes each person who has ceased to be a Dealer pursuant to Clause 14 of the Programme Agreement or whose appointment has lapsed pursuant to its terms).

"**Deed of Accession**" means a deed of accession substantially in the form set out in Schedule 6 of the Principal Trust Deed between a Specified Company, the Trustee, the Issuing and Paying Agent, the Transfer Agent, the Custodian and the Calculation Agent pursuant to which the relevant Specified Company agrees to become bound by each of the Master Documents as an "Issuer" therein in respect of any Series issued by it.

"**Definitive Note**" means a Bearer Note in definitive form having, where appropriate, Coupons, Receipt(s) and/or a Talon attached on issue and, unless the context requires otherwise, means a Certificate (other than a Global Certificate) and includes any replacement Note or Certificate issued pursuant to the Conditions.

"**directive**" includes any present or future directive, regulation, request, requirement, rule or credit restraint programme of any relevant agency, authority, central bank, department, government, legislature, minister, ministry, official, public or statutory corporation, self-regulating organisation or stock exchange.

"**Disposal Agent**" means in relation to any Series, any person named as such in the Conditions or the relevant Supplemental Trust Deed.

"**Enforcement Proceedings**" means, in relation to action taken against any person, any distress, attachment, execution or other legal process levied, enforced or sued out on or against any part of the property, assets or revenues of that person, any action or petition for the winding up of that person, for an administration order in respect of that person or for the appointment by a court of any official or officer over or in respect of any part of the property, assets or revenues of that person or any other action that under the laws of any relevant jurisdiction has an analogous effect to any of the actions referred to above.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"**Event of Default**" means an event described in Condition 10.

"**Exchange Notice**" means the notice in the form or substantially in the form set out in Schedule 1 Part B of the Agency Agreement or such other form of notice referred to in or annexed to the relevant Supplemental Trust Deed.

"**Exchangeable Bearer Note**" means a Bearer Note that is exchangeable in accordance with its terms for a Registered Note.

"**Exercise Notice**" means the notice in or substantially in the form set out in Schedule 1 Part A of the Agency Agreement or such other form of notice referred to in or annexed to the relevant Supplemental Trust Deed.

"**Extraordinary Resolution**" in relation to the Noteholders, has the meaning set out in Schedule 3 of the Principal Trust Deed.

"**Final Terms**" means, in relation to a Series Tranche, the Final Terms issued specifying the relevant issue details of such Tranche, substantially in the form set out in the Base Prospectus and which in the case of Notes to be listed and admitted to trading on a regulated market constitute final terms of the Notes for the purpose of Article 5(4) of the Prospectus Directive.

"**Fitch**" means Fitch Ratings Ltd.

"**Global Certificate**" means a Certificate substantially in the form set out in Schedule 1 Part C of the Principal Trust Deed representing Registered Notes of one or more Tranches of the same Series that are registered in the name of a nominee for Euroclear, Clearstream, Luxembourg and/or any other clearing system

"**Global Note**" means a Temporary Global Note and/or a Permanent Global Note as the context may require

"**holder**" in relation to a Note, Receipt, Coupon or Talon, and "**Couponholder**" and "**Noteholder**" have the meanings given to them in the Conditions

"**Irish Stock Exchange**" means The Irish Stock Exchange Limited

"**Issue Date**" means, in relation to each Tranche, the date on which the Notes of that Tranche have been issued or, if not yet issued, the date agreed for their issue between the Issuer and the Relevant Dealer(s)

"**Issuer**" means Dante Finance Public Limited Company and any other Specified Company as the context requires as set out in sub-Clause 2.7

**Issuing and Paying Agent**" means the person named as such in the Conditions or any Successor Issuing and Paying Agent in each case at its specified office

"**Lead Manager**" means, in relation to a Syndicated Issue, the Relevant Dealer specified as such in the related Subscription Agreement

"**Listing Agent**" means McCann FitzGerald Listing Services Limited (or its replacement Irish Stock Exchange listing agent) and any other listing agent appointed in relation to any listing of Notes on any other Stock Exchange

"**Master Documents**" means the Programme Agreement, the Principal Trust Deed, and the Agency Agreement

"**Moody's**" means Moody's Investors Service Limited

"**Mortgaged Property**" means the assets and agreements comprising the mortgaged property on which the Notes of a Series are secured, all as specified in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus

"**Notes**" means the notes to be issued by the Issuer pursuant to the Programme Agreement, constituted by the Trust Deed and for the time being outstanding or, as the context may require, a specific number of them

"**outstanding**" means, in relation to the Notes of a Series, all the Notes issued except (a) those that have been redeemed in accordance with the Conditions, (b) those in respect of which the date for redemption has occurred and the redemption moneys (including all interest accrued on such Notes to the date for such redemption and any interest payable after such date) have been duly paid to the Trustee or to the Issuing and Paying Agent as provided in Clause 2 of the Principal Trust Deed and remain available for payment against presentation and surrender of Notes, Certificates, Receipts and/or Coupons, as the case may be, (c) those that have become void or in respect of which claims have become prescribed, (d) those that have been purchased and cancelled as provided in the Conditions, (e) those mutilated or defaced Bearer Notes that have been surrendered in

exchange for replacement Bearer Notes, (f) (for the purpose only of determining how
many Notes are outstanding and without prejudice to their status for any other purpose)
those Bearer Notes alleged to have been lost, stolen or destroyed and in respect of which
replacement Notes have been issued, (g) those Exchangeable Bearer Notes that have been
exchanged for Registered Notes, and (h) any Global Note to the extent that it shall have
been exchanged for one or more Definitive Notes, pursuant to its provisions; provided that
for the purposes of (1) ascertaining the right to attend and vote at any meeting of the
Noteholders, (2) the determination of how many Notes are outstanding for the purposes of
the Conditions and Schedule 3 of the Principal Trust Deed and (3) the exercise of any
discretion, power or authority that the Trustee is required, expressly or impliedly, to
exercise in or by reference to the interests of the Noteholders, those Notes that are
beneficially held by or on behalf of the Issuer and not cancelled shall (unless no longer so
held) be deemed not to remain outstanding

"**Paying Agents**" means the persons (including the Issuing and Paying Agent) referred to
as such in the Conditions or any Successor Paying Agents in each case at their respective
specified offices

"**Permanent Dealers**" means all Dealers other than those appointed as such solely in
respect of one or more specified Tranches

"**Permanent Global Note**" means a Global Note representing Bearer Notes of one or
more Tranches of the same Series, either on issue or upon exchange of a Temporary
Global Note, or part of it, and which shall be substantially in the form set out in Schedule
1, Part B

"**Potential Event of Default**" means an event or circumstance that could with the giving
of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement
provided for in Condition 10 become an Event of Default

"**Principal Trust Deed**" means this principal trust deed dated 10 October 2002 as
amended and restated on 20 July 2007 between the Issuer and the Trustee

"**Programme**" means the Multi Issuer Secured Obligation Programme arranged by
Lehman Brothers International (Europe)

"**Programme Agreement**" means the Programme Agreement relating to the Programme
dated 10 October 2002 as amended and restated on 20 July 2007 between the Issuer and
Lehman Brothers International (Europe)

"**Prospectus**" means, in the case of each Specified Company, the relevant Base Prospectus
and in relation to any Tranche, the Final Terms together with the relevant Base Prospectus
or, in relation to a Tranche in respect of which a Series Prospectus has been prepared, the
Series Prospectus, in each case including all supplements thereto or replacements therefor
and such documents as are from time to time incorporated therein by reference (but not

including any information or documents replaced or superceded by any information
subsequently included or incorporated)

"**Prospectus Directive**" means Directive 2003/71/EC

"**Purchase Information**" means, in relation to any Tranche that is not a Syndicated Issue,
the terms of such Notes and of their issue agreed between the Issuer and the Relevant
Dealer pursuant to this Agreement

"**Receipts**" means the receipts for the payment of instalments of principal in respect of
Bearer Notes of which the principal is repayable in instalments or, as the context may
require, a specific number of them and includes any replacement Receipts issued pursuant
to the Conditions

"**Redemption Amount**" has the meaning given to it in the Conditions

"**Register**" means the register maintained by the Registrar

"**Registered Note**" means a Note in registered form

"**Registrar**" means the person named as such in the Conditions or any Successor Registrar
in each case at its specified office

"**Related Agreement**" means any agreement entered into by the Issuer relating to a Series
which is referred to in, or contemplated by, this Trust Deed or any Supplemental Trust
Deed

"**Related Notes**" means the outstanding Notes of any other Series which shares the same
Mortgaged Property as the Notes and which is issued as part of the same transaction.

"**Relevant Dealer(s)**" means, in relation to any Tranche, the Dealer or Dealers with or
through whom an agreement to issue Notes has been concluded, or is being negotiated, by
the relevant Issuer

"**Relevant Transaction**" means Notes, any Related Notes and/or other Obligations that
are secured on the same Mortaged Property and issued as part of the same transaction

"**Securities**" means one or more transferable securities issued by or representing
obligations of one or more persons as specified in the Supplemental Trust Deed

"**Securities Act**" means the United States Securities Act of 1933

"**Securities Agreement**" has the meaning specified in the Supplemental Trust Deed

"**Series**" means a series of Notes comprising one or more Tranches, whether or not issued
on the same date, that (except in respect of the first payment of interest and their issue
price) have identical terms on issue and are expressed to have the same series number

"**Series Prospectus**" means any prospectus or offering document (whether or not
approved as a prospectus for the purposes of and in compliance with the Prospective

Directive) relating to a Specified Company and a Tranche (including, without limitation to
the generality of the foregoing, a prospectus or offering document which incorporates by
reference all or part of the relevant Base Prospectus) but excluding a prospectus consisting
of the relevant Base Prospectus and Final Terms

"**Specified Company**" means Dante Finance Public Limited Company and such other
company as has executed and delivered a Deed of Accession agreeing to be bound by each
of the Master Documents and any other document executed in accordance with a Master
Document;

"**specified office**" means, in relation to a Paying Agent, the Registrar or a Transfer Agent
the office identified with its name at the end of the Conditions or any other office
approved by the Trustee and notified to Noteholders pursuant to sub-Clause 7.1.10 of the
Principal Trust Deed

"**Standard & Poor's**" means Standard & Poor's Rating Services, a division of The
McGraw-Hill Companies, Inc.

"**Stock Exchanges**" means the Irish Stock Exchange and/or, subject as provided in sub-
Clause 6.1 of the Programme Agreement, such other stock exchange on which any Notes
may be listed or whose market on which the Notes may be admitted to trading

"**Subscription Agreement**" means an agreement between two or more Relevant Dealers
and the Issuer made pursuant to sub-Clause 2.2 of the Programme Agreement

"**Successor**" means, in relation to an Agent such other or further person as may from time
to time be appointed by the Issuer as such Agent with the written approval of, and on
terms approved in writing by, the Trustee and notice of whose appointment is given to
Noteholders pursuant to Clause 7.1.6 of the Principal Trust Deed

"**Supplemental Trust Deed**" means a supplemental trust deed dated the Issue Date
between the Issuer, the Trustee and (if applicable) the Swap Counterparty substantially in
the form set out in Schedule 4 of the Principal Trust Deed

"**Swap Agreement**" means, in relation to any Series, any interest rate and/or currency
exchange agreement entered into by the Issuer and a Swap Counterparty in relation to that
Series

"**Swap Counterparty**" means the counterparty to any Swap Agreement entered into by
the Issuer in relation to that Series as specified in the related Supplemental Trust Deed

"**Syndicated Issue**" means an issue of Notes pursuant to sub-Clause 2.2 of the Programme
Agreement

"**Talons**" mean talons for further Coupons or, as the context may require, a specific
number of them and includes any replacement Talons issued pursuant to the Conditions

"**TARGET System**" means the Trans-European Automated Real-Time Gross Settlement Express Transfer (TARGET) System or any successor thereto

"**Temporary Global Note**" means a Global Note representing Bearer Notes of one or more Tranches of the same Series on issue and which shall be substantially in the form set out in Schedule 1, Part A

"**Trade Date**" means each date on which the Issuer concludes an agreement with one or more Relevant Dealers for the issue and sale of Notes pursuant to Clause 2 of the Programme Agreement which, in the case of a Syndicated Issue, shall be the execution date of the relevant Subscription Agreement

"**Trade Time**" means the time on the Trade Date at which the agreement for the issue and sale of Notes is entered into

"**Tranche**" means in relation to a Series, those Notes of that Series which are issued on the same date

"**Transaction**" means any financial transaction entered into by the Issuer, not involving the issue of Notes and not involving the guarantee by it, or its becoming obligated for, the debts of any other person or entity, but including, without limitation, the incurring by the Issuer of indebtedness in forms other than the Notes, and swaps and options, where the obligations of the Issuer in respect thereof are limited to the proceeds of enforcement of the security over the assets of the Issuer on which such obligations are secured pursuant to a Supplemental Trust Deed

"**Transfer Agents**" means the persons (including the Registrar) referred to as such in the Conditions or any Successor Transfer Agents in each case at their specified offices

"**trust corporation**" means a trust corporation (as defined in the Law of Property Act 1925) or a corporation entitled to act as a trustee pursuant to applicable foreign legislation relating to trustees

"**Trust Deed**" means, in relation to a Tranche of Notes, this Principal Trust Deed and the relevant Supplemental Trust Deed constituting the Notes and any Other Security Document

"**Trustee**" means BNY Corporate Trustee Services Limited or any replacement appointed as trustee under the Trust Deed in relation to one or more Series

"**Warranty Date**" means each Trade Date, each Issue Date, each date of any Base Prospectus or Prospectus or on which any Base Prospectus or Prospectus or any of the Contracts is amended, supplemented or replaced.

In witness whereof this Trust Deed has been executed as a deed on the date stated at the beginning.

**SIGNED, SEALED AND DELIVERED for and on behalf of DANTE FINANCE PUBLIC LIMITED COMPANY by its lawfully appointed attorney**

in the presence of

Witness Signature:

Address:

Occupation:

**BNY CORPORATE TRUSTEE SERVICES LIMITED (as Trustee)**

By:

Authorised Signatory

Authorised Signatory

## TABLE OF CONTENTS

| 1 | Interpretation | 2 |
| 2 | Issue of Notes and Covenant to Pay | 2 |
| 3 | Form of the Notes | 6 |
| 4 | Stamp Duties and Taxes | 7 |
| 5 | Security | 7 |
| 6 | Application of Moneys received by the Trustee and Payments | 12 |
| 7 | Covenants | 16 |
| 8 | Remuneration and Indemnification of the Trustee | 23 |
| 9 | Provisions Supplemental to the Trustee Act 1925 and the Trustee Act 2000 | 24 |
| 10 | Trustee liable for Negligence | 29 |
| 11 | Waiver, Consents and Proof of Default | 29 |
| 12 | Trustee not precluded from entering into Contracts | 29 |
| 13 | Modification and Substitution | 30 |
| 14 | Appointment, Retirement and Removal of the Trustee | 33 |
| 15 | Notes held in Clearing Systems and Couponholders | 35 |
| 16 | Currency Indemnity | 35 |
| 17 | Communications | 36 |

18    Enforcement and Non-recourse ............................................................................ 37

19    Contracts (Rights of Third Parties) Act 1999 ..................................................... 37

20    Governing Law and Jurisdiction ......................................................................... 37

21    Counterparts......................................................................................................... 38

Schedule 1 Part A Form of Temporary Global Note ............................................ 39

Schedule 1 Part B Form of Permanent Global Note............................................. 47

Schedule 1 Part C Form of Global Certificate ..................................................... 58

Schedule 2 Part A Form of Bearer Note .............................................................. 64

Schedule 2 Part B Form of Certificate.................................................................. 67

Schedule 2 Part C TERMS AND CONDITIONS OF THE NOTES ................... 71

Schedule 2 Part D Form of Coupon ...................................................................... 121

Schedule 2 Part E Form of Talon .......................................................................... 123

Schedule 2 Part F Form of Receipt ....................................................................... 125

Schedule 3  Provisions for Meetings of Noteholders .......................................... 126

Schedule 4  Form of Supplemental Trust Deed .................................................... 135

Schedule 5 Memorandum of Supplemental Trust Deeds ...................................... 145

Schedule 6 Form of Deed of Accession................................................................. 146

Schedule 7 Definitions........................................................................................... 150