# EXHIBIT 5

SERIES PROSPECTUS

## ZIRCON FINANCE LIMITED
*(incorporated with limited liability in the Cayman Islands)*
### SERIES NO: 2007-1
### Tranche B AUD28,600,000
### SYNTHETIC PORTFOLIO NOTES DUE 2014 ("TRANCHE B NOTES" OR "NOTES")

Issue Price: 100 per cent.

issued pursuant to the
Multi-Issuer
Secured Obligation Programme
arranged by

## LEHMAN BROTHERS INTERNATIONAL (EUROPE)

Linklaters
ACM/KKYI

The date of this Series Prospectus is 20 March 2007.

Under the Multi-Issuer Secured Obligation Programme (the "Programme"), Zircon Finance Limited (the "Issuer") may from time to time issue Notes and other secured obligations on the terms set out in the Base Prospectus dated 21 July 2006 relating to the Programme, as supplemented by an Issuer Disclosure Annex dated 20 March 2007 in respect of the Issuer (together, the "Base Prospectus") as supplemented, in relation to each issue, by a Series Prospectus applicable to such issue. This Series Prospectus is the Series Prospectus applicable to the issue by the Issuer of its Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 (the "Tranche B Notes" or the "Notes"). Terms defined in the Base Prospectus have the same meaning in this Series Prospectus.

The obligations of the Issuer under the Notes will be secured as described in "Security Arrangements".

This Series Prospectus is supplemental to, and should be read in conjunction with, the Base Prospectus. Subject as set out below, the Issuer accepts responsibility for the information contained in this Series Prospectus. To the best of the knowledge and belief of the Issuer, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. The information on page 28 in relation to the Collateral (as defined herein), the information on page 53 in relation to the Reference Registry (as defined herein), the information on page 117 in relation to the Portfolio Manager and the information on page 116 in relation to the Swap Counterparty and the Swap Guarantor has, in each case, been accurately extracted from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Reference Registry, the Collateral, the Portfolio Manager, the Swap Counterparty and the Swap Guarantor, no facts have been omitted which would render the reproduced information misleading.

The Notes are expected on issue to be assigned a rating of "BBB" by Fitch, Inc., Fitch Ratings, Ltd. and their subsidiaries and any successor or successors thereto ("Fitch"), however there is no assurance that the Issuer will be able to obtain such a rating for the Notes as it is subject to Fitch's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. The occurrence of one or more Credit Events and/or a suspension, reduction or withdrawal of the rating assigned to any Reference Entity may result in a severe reduction of the rating assigned to the Notes.

**Purchasers of Notes should note that the Notes are credit-linked to the Reference Entities from time to time comprised in the Reference Registry and that the Reference Registry itself may be amended from time to time in accordance with the instructions of the Portfolio Manager pursuant to the Portfolio Management Agreement, the form of which is set out in Exhibit B to the Swap Agreement. The performance of any investment in the Notes will be dependent on the Reference Entities from time to time comprised in the Reference Registry, the composition of which will be subject to substitution in accordance with the terms of the Portfolio Management Agreement. Purchasers of the Notes should note that certain substitutions in accordance with the terms of the Portfolio Management Agreement may result in a downgrade of the rating assigned to the Notes. Purchasers of Notes should also note that the Reference Registry will become static upon the termination of the Portfolio Management Agreement. The Portfolio Manager is not an Affiliate (as defined in the 2003 ISDA Credit Derivatives Definitions) of the Swap Counterparty.**

In addition to the Notes being credit-linked to the Reference Entities, holders of the Notes will also have exposure to the Collateral. Impairment of the Collateral may result in a negative rating action on the Notes.

Purchasers of Notes should conduct such independent investigation and analysis regarding the Issuer, the Portfolio Management Agreement, the security arrangements and the Notes as they deem appropriate to

A0751739312.0/16 Mar 2007

1

evaluate the merits and risks of an investment in the Notes. In particular, purchasers should note that the credit risk of the Notes includes that of the Collateral, the Swap Counterparty and the Reference Entities and that the Notes allow a purchaser to obtain the stated coupon in exchange for assuming such credit risk. The coupon and Initial Principal Amount may be at risk if one or more Credit Events occur during the Credit Observation Period and in certain circumstances the Notes may redeem at zero. There is no active trading market for the Notes and it is highly unlikely that an active secondary market for the Notes will develop. Accordingly a lack of liquidity and price volatility may exist.

The Arranger makes no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Notes and accepts no responsibility or liability therefor.

The Notes will be issued on the terms set out in this Series Prospectus read together with the Base Prospectus.

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Notes or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.

In this Series Prospectus, references to "USD", "US$" and "U.S. dollars" are to United States dollars, and references to "AUD" and "A$" are to Australian dollars.

## Table of Contents

Page

TERMS AND CONDITIONS OF THE NOTES ............................................................................... 4

ANNEX 1 - USE OF PROCEEDS ............................................................................................. 27

ANNEX 2 - THE COLLATERAL............................................................................................... 28

ANNEX 3 – FORM OF SWAP CONFIRMATION ...................................................................... 30

Schedule A Annex 1 Reference Registry................................................................................. 53

Schedule B Additional Definitions........................................................................................... 57

Schedule C ............................................................................................................................... 74

Annex A PARAGRAPH 11 of the CREDIT SUPPORT ANNEX............................................... 88

Exhibit A GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC. .................................... 93

Exhibit B PORTFOLIO MANAGEMENT AGREEMENT........................................................... 95

Appendix A .............................................................................................................................. 111

ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR .......... 115

ANNEX 5 – DESCRIPTION OF THE PORTFOLIO MANAGER ............................................... 116

## TERMS AND CONDITIONS OF THE NOTES

The terms of the Tranche B Notes and additional provisions relating to their issue are as follows.

Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Swap Confirmation, the form of which is set out in Annex 3 hereto.

The Notes are credit-linked to the Reference Entities for the time being comprised in the Reference Registry maintained by the Calculation Agent in accordance with the Swap Confirmation.

The Reference Registry in effect as of the Issue Date is set out in Schedule A to the Swap Confirmation.

| | | |
|---|---|---|
| 1 | Issuer: | Zircon Finance Limited. |
| 2 | Series No: | 2007-1. |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN (N.B. see paragraph 55 below for Common Code): | AU3FN0002093. |
| | Note Reference: | ZCON02. |
| 5 | Currency: | Australian dollars ("AUD"). |
| 6 | Principal Amount of Tranche: | |

    (i)   Initial Principal Amount:    AUD28,600,000.

The Aggregate Outstanding Principal Amount (as defined below) of the Notes is subject to reduction from time to time in accordance with the provisions set out below.

    (ii)  Reduction of Principal Amount:

If, at any time, the Swap Counterparty under the Swap Agreement determines that one or more Credit Events has or have occurred during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or an Obligation of a Reference Entity and the Conditions to Settlement with respect to such Credit Event have been satisfied by the Swap Counterparty, the aggregate Outstanding Principal Amount of the Notes (the "Aggregate Outstanding Principal Amount" of the Notes) will be reset by the Calculation Agent with effect from the relevant Event Determination Date with respect to such Credit Event(s) so as to equal:

(i)   the Initial Principal Amount of the Notes, minus

(ii)  the amount (if any) by which the Cumulative Loss Amount (following calculation of the Cash Settlement Amount in respect of such Credit Event(s)) exceeds the Subordination Amount, subject to a minimum of zero.

The "Outstanding Principal Amount" means, with respect to each Note at any time, an amount in AUD (rounded to the nearest cent with one half cent being rounded up) equal to the Aggregate Outstanding Principal Amount of the Notes, divided by the total number of Notes outstanding as at such

time, as determined by the Calculation Agent in its sole discretion.

The Calculation Agent hereunder shall determine the amount by which the Aggregate Outstanding Principal Amount is reduced and the date of such reduction in accordance with the amounts notified to it by the Calculation Agent pursuant to the Swap Agreement, whereupon the Outstanding Principal Amount of each Note shall be reduced pro rata.

The Calculation Agent shall promptly notify the Issuer, the Trustee, the Principal Paying Agent, Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto ("Fitch") and the Swap Counterparty of any reduction of the Aggregate Outstanding Principal Amount of the Notes hereunder. Notwithstanding anything to the contrary contained in Condition 14, upon receipt of such notification from the Calculation Agent, the Principal Paying Agent shall promptly notify Noteholders of the same in accordance with the Conditions.

| 7 | Issue Date: | | 20 March 2007. |
|---|---|---|---|
| 8 | Form; | | |
| | (a) | Form of Notes | Registered. The Notes will be issued in registered uncertificated (or inscribed) form. They will be debt obligations of the Issuer which are constituted by, and owing under, the Trust Deed and take the form of entries on the Register to be maintained by the Registrar. |
| | (b) | Registrar | BTA Institutional Services Australia Limited (ABN 48 002 916 396) appointed as registrar pursuant to an Agency and Registry Agreement dated on or about 20 March 2007 entered into between the Issuer, the Trustee, the Registrar or any other person appointed by the Issuer to establish and maintain the Register on the Issuer's behalf from time to time. |
| | (c) | Title | Title to the Registered Notes shall pass by registration in the Register. |
| | | | No certificate or other evidence of title will be issued to holders of the Notes unless the Issuer determines that certificates should be available or it is required to do so pursuant to any applicable law or regulation. |
| | (d) | Payments and Record Date | Notwithstanding the provisions of Condition 7(b), payments in respect of the Notes will be made to the persons whose names are entered in the Register as at 5.00pm (Sydney time) on the relevant Record Date. |
| | | | Payments to persons who hold Notes through a Clearing System will be made by transfer to their relevant account in accordance with the rules and regulations of the relevant |

Clearing System.

If Notes are not lodged in a Clearing System, payments will be made to the account of the registered holder noted in the Register. If no account is notified, then payments will be made by cheque mailed on the Business Day immediately preceding the relevant payment date to the registered holder at its address appearing in the Register on the Record Date.

"Clearing System" means each of the settlement systems operated by Austraclear Limited (ABN 94 002 060 773) (the "Austraclear System"), Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking société anonyme ("Clearstream, Luxembourg"), as the case may be.

"Record Date" means the eighth calendar day before a payment date.

|  |  |  |
|---|---|---|
| (e) | Details of any other additions (*in relation to paragraphs 8(a) to 8(d) above*) | For the purpose of the Notes only: |

(i) The provisions of Conditions 1, 2 and 7 shall be amended and construed according to paragraphs 8(a) to 8(d) above. In case of any inconsistency between those Conditions and paragraphs 8(a) to 8(d) above, paragraphs 8(a) to 8(d) shall prevail.

(ii) Condition 2(f) concerning closed periods immediately preceding each Record Date, shall, for the purposes of the Notes, be deleted and no such closed periods shall apply to the Notes.

(iii) Notwithstanding Condition 12, the Conditions, the Trust Deed and the Agency Agreement may subsequently be amended by the Issuer without the consent of the Noteholders, to provide for the exchange of Notes in registered form for Notes in bearer form.

|  |  |  |
|---|---|---|
| 9 | Denomination: | AUD50,000. |
| 10 | Status: | Secured and limited recourse obligations, as described under "Security Arrangements" below. |
| 11 | Interest Commencement Date: | 20 March 2007. |
| 12 | Interest Rate (Including after Maturity Date): | Floating Rate. |
|  | (i) Interest Accrual: |  |

Notwithstanding anything to the contrary contained in Conditions 5(a) and 5(f) and subject to the Interest Accrual Adjustment provisions set out in sub-paragraph (ii) below, in respect of each Interest Accrual Period, each Note shall bear interest on its Weighted Average Outstanding Principal Amount in respect of such Interest Accrual Period at the rate per annum (expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date.

The amount of interest payable per Note in respect of any Interest Payment Date shall be calculated by the Calculation Agent on the relevant Interest Calculation Date by calculating the product of (a) the Interest Rate; (b) the Weighted Average Outstanding Principal Amount of such Note for the relevant Interest Accrual Period; and (c) the Day Count Fraction.

For the purposes hereof:

"**Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in Sydney, London, Tokyo and New York.

"**Interest Calculation Date**" means, in respect of each Interest Payment Date, the Business Day immediately preceding such Interest Payment Date; and

"**Weighted Average Outstanding Principal Amount**" means, in respect of each Note in respect of each period for which such amount is calculated, the sum of the Outstanding Principal Amounts of such Note for each calendar day during such period, divided by the actual number of calendar days in such period.

(ii)  Interest Accrual Adjustment:

With respect to any Interest Payment Date, in the event that, in respect of any Interest Accrual Period and its related Interest Calculation Date:

(a)  (i)   an Event Determination Date has occurred with respect to a Reference Entity on or prior to such Interest Determination Date but the relevant Reference Entity Valuation Date with respect to such Reference Entity has not occurred; and/or

(ii)   a Potential Failure to Pay has occurred with respect to a Reference Entity on or prior to such Interest Calculation Date and such Potential Failure to Pay has not been cured on or prior to such Interest Calculation Date; and/or

(iii)  a Potential Repudiation/Moratorium has occurred with respect to a Reference Entity on or prior to such Interest Calculation Date and such Potential Repudiation/Moratorium has not ceased to exist on or prior to such Interest Calculation Date;

(each Reference Entity referred to in sub-paragraphs (i), (ii) and (iii) above, an "**Adjustment Reference Entity**"); and

(b)  the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amount(s) in respect of all the relevant Adjustment Reference Entities is greater than zero, the Issuer shall, subject as provided

below, pay to the holder of each Note:

(1)  the Partial Interest Amount (if any) on the relevant Interest Payment Date;

(2)  the Deferred Interest Amount (if any) in respect of each such Adjustment Reference Entity on the Deferred Interest Payment Date; and

(3)  the interest accrued in respect of the period from and including the relevant Interest Payment Date to, but excluding, the related Deferred Interest Payment Date, at a rate equal to the O/N Rate, for each day (an "O/N Rate Day") during such period on an amount equal to the Deferred Interest Amount which shall be paid on such related Deferred Interest Payment Date.

"O/N Rate" means AUD-BBR-BBSW with a Designated Maturity of overnight for which the Reset Date in respect of each O/N Rate Day shall be deemed to be the same day as the O/N Rate Day. Terms used in this paragraph, but not defined in the paragraph above, shall have the meaning given to them in the 2000 ISDA Definitions Annex.

For the purposes hereof:

"Deferred Interest Amount" means, in respect of each Note on a Deferred Interest Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)  the amount of interest that would otherwise have been payable on the relevant Interest Payment Date if:

(A)  in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(B)  in the circumstances set out in sub-paragraph (a)(ii) of paragraph 12(ii) above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where

the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(C)    in the circumstances set out in sub-paragraph (a)(iii) of paragraph 12(ii) above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over:

(B)    the relevant Partial Interest Amount (if any) paid on the relevant Interest Payment Date;

"Deferred Interest Cut-off Date" means, in respect of each Adjustment Reference Entity as determined by the Calculation Agent in its sole discretion:

(A)    the final Reference Entity Valuation Date on which all Final Prices have been determined;

(B)    the date that all Potential Failure to Pay have been cured; or

(C)    the date that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"Deferred Interest Payment Date" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Interest Cut-off Date;

"Interim Calculation Amount" means, in respect of each Note and in respect of each Interest Accrual Period, an amount in AUD (rounded to the nearest cent with one half cent being rounded up) determined by the Calculation Agent in its sole discretion on the relevant Interest Calculation Date as being equal to the Weighted Average Outstanding Principal Amount of such Note for such Interest Accrual Period, except that the Weighted Average Outstanding Principal Amount shall be calculated on the basis that the Reference Entity Notional Amount of each Adjustment Reference Entity is added to the Cumulative Loss Amount as of each Event Determination Date or the date upon which a Potential Failure to Pay or Potential Repudiation/Moratorium (as applicable) occurred.

For the avoidance of doubt, in the event that the amount

9

calculated in accordance with this provision is zero or a negative number, the "Interim Calculation Amount" will be deemed to be zero; and

"**Partial Interest Amount**" means, in respect of each Note on each Interest Payment Date in respect of which an Adjustment Reference Entity exists, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the Interest Calculation Date in accordance with the foregoing "Interest Rate" provisions save that references therein to the Weighted Average Outstanding Principal Amount of each Note shall be deemed to be references to the Interim Calculation Amount (as defined above) of such Note.

| | | |
|---|---|---|
| 13 | Interest Payment Date(s): | 20 March, 20 June, 20 September and 20 December in each year, commencing on 20 June 2007, subject in each case to adjustment in accordance with the Modified Following Business Day Convention, for the avoidance of doubt, with adjustment in the interest payable as a result of such adjustment. |
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate Notes): | ISDA Determination. |
| 15 | Screen Rate Determination Condition 5(c) (ii): | Not applicable. |
| 16 | ISDA Determination (Condition 5(c) (i)): | Applicable. |
| | (a)    Floating Rate Option: | AUD-BBR-BBSW. |
| | (b)    Designated Maturity: | 3 (three) months. |
| | (c)    Reset Date: | The first day of the Interest Accrual Period. |
| | (d)    ISDA Definitions: | ISDA Definitions (as defined in Condition 5(c)(i)). |
| 17 | Margin (if applicable): | Plus 4.00 per cent. per annum. |
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Not applicable. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |

| 24 | Day Count Fraction: | Actual/365 (Fixed). |
|----|----|----|
| 25 | Interest Period Date(s) (if applicable): | 20 March, 20 June, 20 September and 20 December in each year, commencing on 20 June 2007, with adjustment. |
| 26 | Maturity Date: | The earliest to occur of: |

(i) 20 September 2014, subject to adjustment in accordance with the Modified Following Business Day Convention (the "Scheduled Maturity Date") unless an Adjustment Reference Entity (as defined in paragraph 12(ii) above) exists as at the Final Cut-off Date (as defined in paragraph 43 below) in which case the Maturity Date shall be the Deferred Redemption Date;

(ii) the Early Redemption Date (as defined in paragraph 38); and

(iii) the Zero Principal Amount Redemption Date.

For the purposes hereof:

"Zero Principal Amount Redemption Date" means the Event Determination Date upon which the Aggregate Outstanding Principal Amount is reduced to zero.

| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
|----|----|----|
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |
| 30 | Mandatory Partial Redemption (in accordance with Condition 6(c)): | For the purposes of the Notes only, Condition 6(c) shall be amended by the insertion of the following words after "payment default" in place of the original words contained in brackets: |

"(after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the Issue Date)".

| 31 | Instalment Date(s) (if applicable): | Not applicable. |
|----|----|----|
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |
| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
| 34 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | Sydney, London, Tokyo and New York. |

A07517393/2.0/16 Mar 2007

| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
|----|----|----|

37 Additional Fungible Issues Permitted:

Yes, subject to the Issuer having received from Fitch and the Swap Counterparty each of its prior written consent to any such fungible issue.

38 Details of any other additions or variation s to the Conditions (if applicable):

For the purposes of the Notes only: Notwithstanding anything to the contrary contained in Conditions 6 and 10, upon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10 (the date of the relevant occurrence, as determined by the Calculation Agent in its sole discretion, being the "Early Redemption Event Date"), the Issuer shall forthwith notify the Trustee, Fitch and the Noteholders informing them of the occurrence of such event giving notice of the date fixed for redemption, being the day falling six Business Days following the relevant Early Redemption Event Date (the "Early Redemption Date"). Upon the expiry of such notice, the Issuer shall redeem each Note at its Early Redemption Amount as set out in paragraph 44 below.

Condition 10(a) shall be amended to read as follows:

"if default is made (a) in the payment of interest in respect of the Notes or any of them for a period in excess of the sum of (i) the number of days in any grace period applicable to the payment of interest in accordance with the terms and conditions of the Collateral and (ii) three Business Days, or (b) for a period of 14 days or more in the payment of principal due in respect of the Notes or any of them; or"

Condition 10(b) shall be amended to read as follows:

"if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, it is incapable of remedy, in which case no notice shall be required, provided that such failure to perform or observe any of its obligations will be an Event of Default only if such failure by the Issuer to perform or observe any of its obligations will in the sole and absolute determination of the Trustee, lead to a failure to pay any amounts due on the Notes."

Notwithstanding anything to the contrary contained in Condition 6(i) (Purchases), the Issuer may purchase the Notes so long as an equivalent notional amount of the Swap Agreement is terminated and an equivalent principal amount

of the Collateral is delivered to the Swap Counterparty and/or
the Noteholders or liquidated, as the case may be, by the
Issuer, and the Issuer has no further liability in respect of the
purchased Notes or the terminated portion of the Swap
Agreement. No cost with respect to any such purchase by the
Issuer shall be borne by the remaining Noteholders. If the
Issuer purchases the Notes it will notify Fitch of such
purchase. Condition 6(i) shall be deemed to be amended
accordingly.

Notwithstanding Condition 14, so long as the Notes are
represented by a Global Note or a non-materialised form held
on behalf of Euroclear, Clearstream International or any other
clearing system, notices in respect thereof may be given by
their being delivered to Euroclear, Clearstream International
or such other clearing system, as the case may be. For the
avoidance of doubt, such notices shall be deemed given on
the date and, if applicable, at the time they are delivered to
Euroclear, Clearstream International or such other clearing
system, as the case may be.

Notwithstanding any provisions in the terms of the Notes,
upon the withdrawal of the rating assigned to the Notes, there
shall be no further obligation to notify Fitch in respect of any
events occurring thereafter pursuant to the terms of the Notes.

For the purpose of the Notes only, Condition 4(b)(i) shall be
amended as follows:

"(i)    *if "Swap Counterparty Priority" is specified in the
relevant Supplemental Trust Deed:*

(a)    first, in payment or satisfaction of the fees, costs,
charges, expenses and liabilities incurred by the
Trustee or any receiver in preparing and executing
the trusts in the Trust Deed (including any taxes
required to be paid, the costs of realising any
security and the Trustee's remuneration);

(b)    secondly, in payment or satisfaction of the fees,
costs, charges, expenses and liabilities incurred by
the Paying Agents and/or the Registrar and/or the
Custodian and/or the Transfer Agents and/or the
Calculation Agent and/or the Disposal Agent;

(c)    thirdly, rateably in meeting the claims (if any) of
the Swap Counterparty under each Swap
Agreement;

(d)    fourthly, rateably in meeting the claims (if any) of
the holders of Notes, Coupons and Receipts. If the
moneys received by the Trustee are not enough to
pay such amounts in full, the Trustee shall apply
them *pro rata* on the basis of the amount due to

each party entitled to such payment;

(e) fifthly, rateably in meeting the claims (if any) of the Portfolio Manager under the Portfolio Management Agreement; and

(f) sixthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the Portfolio Manager and before the claims of the Issuer in relation to the balance (if any)."

For the purpose of the Notes only, Condition 4 (b)(iii) shall be amended as follows:

"(iii)    if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:

(a) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b) secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Registrar and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c) thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(d) fourthly, rateably in meeting the claims (if any) of the Portfolio Manager under the Portfolio

Management Agreement;

(e)  fifthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(f)  sixthly, in payment of the balance (if any) to the Issuer."

| | |
|---|---|
| 39 | The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are: |

**Issuing and Paying Agent and Custodian**
JPMorgan Chase Bank, N.A.
Trinity Tower,
9 Thomas More Street,
London E1W 1YT

**Calculation Agent**
Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Australian Paying Agent and Registrar**
BTA Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 4
35 Clarence Street
Sydney
NSW 2000
Australia

**Security Arrangements**

40   Mortgaged Property:

(i)  Collateral:

Qualifying Assets (as defined below) in a principal amount equal to the Aggregate Outstanding Principal Amount of the Notes.

The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD28,600,000, to be credited into the Collection Account on or about the Issue Date (excluding any accrued interest) (the "Cash Collateral").

On or about 23 March 2007, the Issuer shall use the Cash Collateral to purchase AUD28,600,000 in principal amount of Floating Rate Notes due 20 September 2014 to be issued by GE Capital Australia Funding Pty. Ltd. (the "Collateral Issuer") and guaranteed by General Electric Capital Corporation (the "GECA Notes").

Upon completion of the purchase of the GECA Notes by the Issuer and the GECA Notes being credited into the Custody Account, the GECA Notes will constitute the Collateral in respect of the Notes.

For the avoidance of doubt, the GECA Notes may be exchanged for Qualifying Assets but subject to Fitch's rating confirmation as set out below.

On redemption of any Collateral, the redemption proceeds of such Collateral will be deposited by the Issuer in the Collection Account, subject to the security interest created pursuant to the Trust Deed.

The Cash Collateral will be credited into the Collection Account by the Issuer on or before the Issue Date and the GECA Notes will be acquired by the Issuer on or about 23 March 2007. The Collateral will be held by JPMorgan Chase Bank, N.A. of Trinity Tower, 9 Thomas More Street, London E1W 1YT in its capacity as Custodian pursuant to the Agency Agreement in the Collection Account or the Custody Account (being the account of the Custodian at Euroclear, Account No. 22066), as the case may be, subject to the security interest created pursuant to the Trust Deed. The Custodian shall notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral. Upon such notification from the Custodian, the Calculation Agent will notify Fitch of such material amendment.

If the short-term senior unsecured rating of the provider of the Collection Account, the Paying Agent or the Custodian is downgraded at any time to below "F1+" by Fitch, the Issuer shall, within 30 calendar days of the downgrade, appoint a replacement Collection Account provider, a replacement Paying Agent or a replacement Custodian (as the case may be) that has a rating assigned by Fitch of at least "F1", unless the Trustee has an alternative proposal which Fitch confirms that the then current rating of the Notes will not be reduced. The Issuer shall notify Fitch of such replacement of Collection Account provider, the Paying Agent or the Custodian (as the case may be).

Pursuant to the terms of the Swap Agreement, in the event any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, the Swap Counterparty shall, without the consent of the Trustee, the Noteholders or any other secured creditors in respect of the Notes but subject to Fitch's rating confirmation, have the right but not the obligation to exchange some or all of the Collateral with Qualifying Assets selected by it. Upon effecting such exchange, such Qualifying Assets shall constitute Collateral (and the issuer of such Qualifying Assets shall constitute a Collateral Issuer) which will be held subject to the charges in favour of the Trustee as set out or contemplated in the Supplemental Trust Deed. Any exchange of Collateral pursuant to the Swap Agreement shall be effected by the Custodian transferring the Collateral to the

Swap Counterparty in accordance with the Instructions of the Swap Counterparty and the Swap Counterparty transferring the relevant Qualifying Assets to the Custodian or to its order. The Issuer shall prepare supplementary listing particulars (if required) setting out details of such exchange and shall notify Fitch, the Noteholders and other secured creditors in respect of the Notes in accordance with Condition 14.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"Qualifying Assets" means in respect of any exchange of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:

1.  (a)  having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

    (b)  maturing on or before the Scheduled Maturity Date;

    (c)  being AUD-denominated; and

    (d)  is not a structured finance product; or

2.  any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.  AUD cash.

The Swap Counterparty shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of the Swap Agreement.

(ii)  Security (order of priorities):

The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement); or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement); or (iii) an Additional Termination Event as described in paragraph 11(h)(iv)(a), paragraph 11(h)(iv)(d) or paragraph 11(h)(v)(b) of the Credit Support Annex occurs, in which case Noteholder Priority shall apply.

(iii)  Swap Agreement (if applicable)

Under (a) a Deed of Accession dated 20 March 2007, pursuant to which the Issuer acceded to an ISDA Master Agreement and Schedule thereto dated as of 10 October

2002, as amended and restated on 21 July 2006, (together, the "ISDA Master Agreement") and (b) a confirmation thereto with an effective date of the Issue Date made between the Issuer and the Swap Counterparty (the "Swap Confirmation" and, together with the ISDA Master Agreement, the "Swap Agreement"), the Issuer will pay to the Swap Counterparty sums equal to interest payable in respect of the Collateral and the Swap Counterparty will pay to the Issuer interest amounts (including any Deferred Interest Amounts and any overnight interest accrued on any Deferred Redemption Amounts) equal to payments due under the Notes.

In addition, the Issuer will make a final payment to the Swap Counterparty equal to the redemption proceeds due under the Collateral as at the date the Swap Agreement is scheduled to terminate and the Swap Counterparty will make a final payment to the Issuer equal to the Redemption Amount (including any Deferred Redemption Amount) of the Notes.

The form of the Swap Confirmation is set out in Annex 3.

The Swap Agreement may be terminated early (either in whole or, in certain circumstances, in part only) in certain circumstances, including but not limited to:

(i)    on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date;

(ii)   at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap Agreement;

(iii)  if (subject as provided in the Swap Agreement) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement or it becomes illegal for either party to perform its obligations under the Swap Agreement (see "Transfer to avoid Termination Event" below); and

(iv)   if at any time there is a default or event of default that has been declared pursuant to the terms of (and as defined in the terms of) the Collateral.

Consequences of Early Termination:    Upon any such early termination of the Swap Agreement, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination).

Such termination payment will be based on the replacement

cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty or a Tax Event (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) (in either case the determination will be made by the Issuer) or illegality (in which case the party which is not the Affected Party (as defined in the ISDA Master Agreement) will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least five market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the proceeds from the sale or redemption of the Collateral plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.

Transfer to avoid Termination Event:    If withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement, then the Swap Counterparty shall, at its sole option, have the right to require the Issuer:

(i)    to transfer all of the Issuer's interests and obligations under the Swap Agreement together with its interests and obligations under the Notes, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Issuer, that would not have any obligation to withhold or deduct (if the Issuer is or would be required to make such deduction or withholding) or to which the Swap Counterparty would be entitled to make payments free from the relevant deduction or withholding (if the Swap Counterparty is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii)    to transfer the Issuer's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee.

If the Issuer is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date

of imposition of such withholding taxes or, if earlier, the 10th day prior to the first date on which it or the Swap Counterparty would otherwise be required to make a payment net of withholding taxes, the Swap Counterparty may terminate the swap transaction under the Swap Agreement. If the Issuer transfers its interests and obligations or residence for tax purposes, it shall notify Fitch of such transfer.

Swap Counterparty(ies):                Lehman Brothers Special Financing Inc.

Swap Guarantor (if applicable):        Lehman Brothers Holdings Inc.

(i)    Details of Credit Support
       Document (if applicable):        The obligations of the Swap Counterparty under the Swap Agreement are unconditionally guaranteed by Lehman Brothers Holdings Inc. pursuant to a guarantee dated 20 March 2007, issued in favour of the Issuer (the "Swap Guarantee").

(ii)   Credit Support Provider:         With respect to the Swap Counterparty, Lehman Brothers Holdings Inc.

(iii)  Collection Account:              The Issuer shall establish on or prior to the Issue Date an account (the "Collection Account") with the Custodian in London, into which the Issuer will deposit (a) the proceeds of the issue of the Notes, (b) the redemption proceeds of any Collateral and (c) each payment received by it pursuant to the Swap Agreement and from which (i) any purchase of Collateral shall be made, (ii) all distributions of principal and interest in respect of the Notes shall be paid to the Issuing and Paying Agent for payment to Noteholders on the due dates for payment therefor and (iii) all payments due to the Swap Counterparty under the Swap Agreement shall be made. All monies deposited from time to time in the Collection Account shall be held by the Custodian as part of the Mortgaged Property and shall be applied for the purposes herein provided.

Any monies held in the Collection Account in respect of any Deferred Interest Amount and/or any Deferred Redemption Amount shall accrue interest at a rate equal to the rate that the Custodian would pay to an independent customer on an overnight deposit of a similar size to the relevant Deferred Interest Amount or Deferred Redemption Amount, as the case may be, for a period equal to the period from and including the relevant Payment Date to, but excluding, the related Deferred Interest Payment Date or the Deferred Redemption Date, as the case may be.

**Provisions relating to Redemption**

41    Call Option (Condition 6(e)):     Upon the exercise by the Swap Counterparty of the Swap Counterparty Option (as defined below), the Issuer shall redeem the Notes in whole or in part, at the pro rata amount

of the Outstanding Principal Amount plus accrued interest (as determined and rounded by the Calculation Agent in its sole and absolute discretion) on the Interest Payment Date which is scheduled to fall on or about 20 March 2011, by giving not less than five Business Days' prior written notice to the Noteholders.

"Swap Counterparty Option" means the option of the Swap Counterparty, as provided in the Swap Agreement, to terminate the Swap Agreement in whole or in part, by giving not less than five Business Days' notice to the Issuer.

| | | |
|---|---|---|
| 42 | Put Option (Condition 6(f)): | Not applicable. |
| 43 | Redemption Amount: | Subject to the existence of an Adjustment Reference Entity as provided above, unless previously redeemed or purchased and cancelled, the Redemption Amount payable in respect of each Note on the Scheduled Maturity Date shall be an amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of: |

(a) such Note's Outstanding Principal Amount as at the Final Cut-off Date; and

(b) AUD 0.

For the purposes hereof:

"Final Cut-off Date" means the Business Day immediately prior to the Scheduled Maturity Date.

In addition to the Redemption Amount, the Issuer shall pay to the Noteholders in respect of each Note an amount equal to the pro rata amount of the aggregate Unpaid Performance Fees in respect of all Interest Payment Dates.

If

(a) an Adjustment Reference Entity exists as at the Final Cut-off Date; and

(b) the sum of the Mezzanine Loss Amount and the aggregate of the Reference Entity Notional Amount in respect of each relevant Adjustment Reference Entity is greater than zero,

the Redemption Amount in respect of each Note shall be:

(i) the Interim Calculation Amount (if any) on the Interest Payment Date falling on the Scheduled Maturity Date;

(ii) the Deferred Redemption Amount on the Deferred Redemption Date.

(iii) interest accrued in the period from and including the Scheduled Maturity Date to, but excluding, the Deferred Redemption Date, at the O/N Rate on an amount equal to the Deferred Redemption Amount

which shall be paid on the Deferred Redemption Date.

For the avoidance of doubt, the determination of the Unpaid Performance Fees in respect of each Interest Payment Date will not be subject to the above adjustments.

For the purposes hereof:

"Deferred Redemption Amount" means, in respect of each Note on the Deferred Redemption Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the Deferred Redemption Cut-off Date as being equal to the excess (if any) of

(i) the Redemption Amount that would otherwise have been payable on the Scheduled Maturity Date in respect of which the relevant Reference Entity was an Adjustment Reference Entity if:

    (A) in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

    (B) In the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

    (C) in the circumstances set out in sub-paragraph (a)(ii) of paragraph 12(ii) above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/Moratorium had not occurred;

over

(ii)    the Interim Calculation Amount (if any) on the Interest Payment Date falling on the Scheduled Maturity Date;

"Deferred Redemption Cut-off Date" means, in respect of each Adjustment Reference Entity as determined by the Calculation Agent in its sole discretion:

(A)   the final Reference Entity Valuation Date on which all Final Prices have been determined;

(B)   the date that all Potential Failure to Pay have been cured; or

(C)   the date that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"Deferred Redemption Date" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Redemption Cut-off Date.

"Unpaid Performance Fees" means, in respect of each Interest Payment Date, an amount determined by the Calculation Agent equal to the product of (i) 0.10 per cent. per annum; (ii) the Weighted Average Outstanding Principal Amount of a Note; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction, which is calculated as the Performance Fees (as defined in the Portfolio Management Agreement) but not payable to the Portfolio Manager given that the rating of the Notes by Fitch as of the relevant Interest Calculation Date is below BBB-.

For the purpose of determining the Unpaid Performance Fees in respect of each Interest Payment Date, in the event that the Interest Accrual Adjustment provisions (as set out in paragraph 12(ii) above) are applicable, references to the Weighted Average Outstanding Principal Amount of each Note shall be deemed to be references to the Interim Calculation Amount (as defined in paragraph 12(ii) above) without subsequent adjustment.

| 44 | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | Subject as provided in the immediately succeeding paragraph below, in respect of each Note, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion and acting in good faith as being equal to (i) such Note's pro rata share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or redemption of the Collateral on behalf of the Issuer by the Disposal Agent on the day which is 3 Business Days following the Early Redemption Event Date and pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (if payable to the Issuer) or |

minus (if payable to the Swap Counterparty) (ii) the amount
of any applicable Unwind Costs divided by the total number
of Notes outstanding; provided that if the amount determined
pursuant to sub-paragraphs (i) and (ii) above exceeds (the
amount of any such excess being the "Excess Amount") such
Note's Outstanding Principal Amount as of the Early
Redemption Date together with interest accrued from, and
including, the immediately preceding Interest Payment Date
(or if the Early Redemption Date falls in the initial Interest
Accrual Period, from, and including, the Issue Date) to, but
excluding, such Early Redemption Date (such interest being
the "Accrued Early Redemption Interest Amount"), such
Excess Amount shall be payable by way of an additional
payment of interest on each Note.

Notwithstanding the above and subject to the exercise of the
Noteholders' right as set out in the following paragraph, if an
Event of Default (as defined in the ISDA Master Agreement)
occurs under the Swap Agreement and the Swap
Counterparty is the Defaulting Party (as defined in the ISDA
Master Agreement) or if a Tax Event (as defined in the ISDA
Master Agreement) occurs under the Swap Agreement and
the Swap Counterparty is the sole Affected Party (as defined
in the ISDA Master Agreement), the Early Redemption
Amount in respect of each Note shall be an amount in AUD
(rounded down to the nearest cent and subject to a minimum
of AUD 0) determined by the Calculation Agent in its sole
discretion as being equal to (i) such Note's pro rata share of
the proceeds (net of any deductions on account of taxes or
otherwise) from the sale or redemption of the Collateral on
behalf of the Issuer by the Disposal Agent pursuant to the
Supplemental Trust Deed and Drawdown Agreement, plus
(ii) (but only if payable to the Issuer) the amount of any
applicable Unwind Costs divided by the total number of
Notes outstanding; provided that if the amount determined
pursuant to sub-paragraphs (i) and (ii) above results in an
Excess Amount (as defined above), such Excess Amount
shall be payable by way of an additional payment of interest
on each Note. In the event that Unwind Costs are payable by
the Issuer to the Swap Counterparty, the Issuer shall apply the
net proceeds from the sale or redemption of the Collateral as
aforesaid (1) first in redeeming each Note in an amount equal
to its Outstanding Principal Amount as of the Early
Redemption Date plus the Accrued Early Redemption
Interest Amount and (2) thereafter, in payment of such
Unwind Costs to the Swap Counterparty.

In the event that (i) at the time of the occurrence of an Event
of Default (as defined in the ISDA Master Agreement) under

the Swap Agreement and the Swap Counterparty being the Defaulting Party or, (ii) at the time of the occurrence of an Additional Termination Event as described in paragraph 11(h)(iv)(a), paragraph 11(h)(iv)(d) or paragraph 11(h)(v)(b) of the Credit Support Annex, the Collateral consists of securities which do not fall within paragraph 2 or 3 of the definition of Qualifying Assets, then unless 100 per cent. of the Noteholders give notice   to the Issuer opposing to physical settlement, the Issuer shall satisfy the payment of the Early Redemption Amount on or before the third Business Day following the Early Redemption Event Date by (i) delivery of a Collateral Delivery Amount of Collateral, (ii) payment of the Accrued Early Redemption Interest Amount, and (iii) (but only if payable to the Issuer) payment of the amount of any applicable Unwind Costs divided by the total number of Notes outstanding. Such delivery shall be at the risk of the Noteholders.

For the purposes hereof:

"Collateral Delivery Amount" means, in respect of each Note, the outstanding principal amount of the Collateral, divided by the number of Notes outstanding.

"Unwind Costs" means the value of (i) the termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement in respect of the termination of the Swap Agreement (as determined by reference to the Reference Registry as at the date of such termination) and (ii) any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, incurred by the Issuer or the Trustee, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement (but, for the avoidance of doubt, not including the Swap Agreement), financing arrangement or other hedging transaction entered into by or on behalf of the Issuer in relation to the issue of the Notes.

**Provisions applicable to Global Notes**

| | | |
|---|---|---|
| 45 | Notes to be represented on issue by: | Non-materialised form evidenced by inscription into the relevant Register. |
| 46 | Applicable TEFRA exemption: | D Rules. |
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | Not applicable. |
| 48 | Exchange Date: | Not applicable. |

**Provisions relating only to the sale, listing and rating of the Notes**

| | | |
|---|---|---|
| 49 | Details of any additions or variations to the selling restrictions: | Any on-sale of the Notes by Noteholders shall be made in compliance with all applicable selling restrictions. |

| 50 | Listing: | None. |
|---|---|---|
| 51 | Dealer's Commission | Not applicable. |
| 52 | Net Proceeds of issue | AUD28,600,000. |
| 53 | Method of issue of Notes: | Individual Dealer. |
| 54 | The following Dealer is subscribing the Notes: | Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom, an investment bank engaged in, *inter alia*, underwriting new securities issues and trading in fixed income financial instruments. |
| 55 | Common Code (N.B. See paragraph 4 above for ISIN): | Not applicable. |
| 56 | Rating: | A rating of "BBB" is expected to be assigned by Fitch. However, there is no assurance that the Issuer will be able to obtain such the rating for the Notes as it is subject to Fitch's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. Certain substitutions in accordance with the terms of the Portfolio Management Agreement may also result in a downgrade of the rating assigned to the Notes. |

## ANNEX 1 - USE OF PROCEEDS

The net proceeds of the issue of the Notes, which are expected to amount to AUD28,600,000, will be applied by the Issuer on or about 23 March 2006 to fund the purchase of the Collateral (as described in Annex 2).

## ANNEX 2 - THE COLLATERAL

*The following information relating to the Collateral intended to be purchased on or about 23 March 2006 is a summary only of certain terms and conditions of such Collateral and has, save for the "Collateral", "Listing", "Maturity", "Business Days" and "Method of Origination/Creation" sections below, been extracted from the programme offering documents relating to the Collateral. None of the Issuer, the Arranger, the Trustee, the Agents or the Swap Counterparty has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Notes should make their own independent investigations and enquiries into the Collateral and the Collateral Issuer.*

The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD28,600,000, to be credited into the Collection Account on or about the Issue Date (excluding any accrued interest) (the "Cash Collateral"). On or about 23 March 2007, the Issuer shall use the Cash Collateral to purchase a principal amount of AUD28,600,000 Floating Rate Notes due 20 September 2014 to be issued by GE Capital Australia Funding Pty. Ltd. and guaranteed by General Electric Capital Corporation, details of which are set out below.

| | |
|---|---|
| **Collateral Issuer** | GE Capital Australia Funding Pty. Ltd. |
| **Registered Address** | 572 Swan Street, Richmond, Victoria 3121, Australia |
| **Country of Incorporation** | Australia |
| **Nature of Business** | GE Capital Australia Funding Pty. Ltd. is primarily engaged in obtaining financing in public markets to fund the operations of affiliated operating companies in Australia, principally by way of loans to such affiliated companies. |
| **Guarantor** | General Electric Capital Corporation |
| **Collateral** | AUD28,600,000 in principal amount of an issue of Floating Rate Notes due 20 September 2014 to be issued by the Collateral Issuer and guaranteed by General Electric Capital Corporation (the "GECA Notes"). |
| **Listing** | None |
| **Governing Law** | The laws of the State of New York, United States of America |
| **Maturity** | 20 September 2014 |
| **Business Days** | Sydney, Melbourne, London, New York and TARGET |
| **Method of Origination/Creation** | The Collateral is to be issued pursuant to a prospectus dated 12 May 2006 and the final terms to be dated on or about 23 March 2007 in relation to the GECA Notes (together, the "Collateral Offering Documents"). Copies of the Collateral Offering Documents are available for inspection during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent. |

Pursuant to the terms of the Swap Agreement, in the event the Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, the Swap Counterparty shall, without the consent of the Trustee, the Noteholders or any other secured creditors in respect of the Notes but subject to Fitch's rating confirmation, have the right but not the obligation to exchange some or all of the Collateral with Qualifying

Assets selected by it. Upon effecting such exchange, such Qualifying Assets shall constitute Collateral (and the issuer of such Qualifying Assets shall constitute a Collateral Issuer) which will be held subject to the charges in favour of the Trustee as set out or contemplated in the Supplemental Trust Deed. Any exchange of Collateral pursuant to the Swap Agreement shall be effected by the Custodian transferring the Collateral to the Swap Counterparty in accordance with the instructions of the Swap Counterparty and the Swap Counterparty transferring the relevant Qualifying Assets to the Custodian or to its order. The Issuer shall prepare supplementary listing particulars (if required) setting out details of such exchange and shall notify Fitch, the Noteholders and other secured creditors in respect of the Notes in accordance with Condition 14.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"Qualifying Assets" means, in respect of any exchange of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:

1.   (a)   having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

     (b)   maturing on or before the Scheduled Maturity Date;

     (c)   being AUD-denominated; and

     (d)   is not a structured finance product; or

2.   any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.   AUD cash.

The Swap Counterparty shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of the Swap Agreement.

## ANNEX 3 – FORM OF SWAP CONFIRMATION

In addition to the description of the Swap Agreement set out in paragraph 4θ(iii), the form of the Swap Confirmation is as set out below.

### SWAP CONFIRMATION

| | |
|---|---|
| Date: | 20 March 2007 |
| To: | Zircon Finance Limited |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transaction relating to Zircon Finance Limited Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 |
| Reference Number: | 630770L |

Dear Sirs,

The purpose of this letter agreement and the Schedules hereto (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement, in each case as published by the International Swaps and Derivatives Association Inc. ("ISDA") (together, the "Credit Derivatives Definitions") and the 2000 ISDA Definitions as published by ISDA (the "2000 Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the 2000 Definitions, the Credit Derivatives Definitions will govern. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. In addition, the definitions and provisions set out in Schedule B hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule B hereto and sections 1 to 11 of this Confirmation, the provisions of sections 1 to 11 shall prevail.

This Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002, as amended and restated on 21 July 2006, and as further amended and supplemented from time to time (the "Agreement") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 20 March 2007. All provisions contained in the relevant Agreement govern this Confirmation except as expressly modified below.

In this Confirmation, the "Notes" refers to Zircon Finance Limited Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 and "Conditions" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions.

In the event of any inconsistency between this Confirmation and the Agreement, this Confirmation shall prevail.

In this Confirmation, "Party A" means Lehman Brothers Special Financing Inc. and "Party B" means Zircon Finance Limited.

The terms of the Transaction to which this Confirmation relates are as follows:

## 1    General Terms

| | |
|---|---|
| Trade Date: | 1 March 2007 |
| Effective Date: | 20 March 2007 |
| Scheduled Termination Date: | 20 September 2014, subject to adjustment in accordance with the Business Day Convention |
| Termination Date: | The Scheduled Termination Date unless an Adjustment Reference Entity (as defined below) exists as at the Final Cut-off Date in which case the Termination Date shall be the Deferred Payment Date (or, where there is more than one Adjustment Reference Entity, the latest Deferred Payment Date to occur). |
| Floating Rate Payer A: | Zircon Finance Limited (the "Seller") |
| Fixed Rate Payer B: | Lehman Brothers Special Financing Inc. (the "Buyer") |
| Calculation Agent | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City | London |
| Business Days | Sydney, London, Tokyo and New York |
| Business Day Convention | Modified Following (which, subject to Section 1.4 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

## 2    Reference Entities and Reference Obligations

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below; provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or the Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed deleted from the Reference Registry with effect from the Event Determination Date with respect to such Reference Entity (other than for the purposes of determining the relevant Cash Settlement Amount) and the Reference Registry shall be amended accordingly, subject always to the provisions regarding delivery of multiple Credit Event Notices pursuant to the "Credit Event Notice After Restructuring" provisions set out in Schedule B.

For the avoidance of doubt, if an event which would otherwise constitute a Credit Event occurs prior to the commencement of |

the Credit Observation Period, the Reference Entity affected by such event will be deemed to be removed from the Reference Registry. For the avoidance of doubt, no Cash Settlement Amount shall be determined prior to the commencement of the Credit Observation Period.

"Reference Registry" means the register of Reference Entities set out in Schedule A, maintained by the Calculation Agent in accordance with this Confirmation and amended from time to time in accordance with the provisions of "Successor Substitution" below, and further amended from time to time in accordance with a portfolio management agreement ("Portfolio Management Agreement") dated 20 March 2007 between Party A, Party B, the Calculation Agent and Lion Capital Management Limited (in such capacity, the "Portfolio Manager") (the form of which is set out in Exhibit B hereto) unless and until the Portfolio Manager resigns or is removed in accordance with the Portfolio Management Agreement.

Under the Portfolio Management Agreement, Party B appoints the Portfolio Manager to effect one or more Reference Portfolio Modifications. Accordingly, the Portfolio Manager shall have the right at any time to instruct Party A, Party B and the Calculation Agent pursuant to the terms of the Portfolio Management Agreement (a "Modification Instruction") that one or more Reference Entities be removed from the Reference Registry (each a "Replaced Reference Entity") and/or one or more Reference Entities be added to the Reference Registry (each a "New Reference Entity") subject to compliance with the Reference Portfolio Guidelines (as defined in the Portfolio Management Agreement) (a "Reference Portfolio Modification").

In relation to any Reference Portfolio Modification, the Calculation Agent will review the Modification Instruction with reference to the Reference Portfolio Guidelines. The Swap Counterparty will calculate for the Portfolio Manager the value of this Transaction to the Floating Rate Payer immediately after the Reference Portfolio Modification minus the value of this Transaction to the Floating Rate Payer immediately before the Reference Portfolio Modification and the amount of adjustment required to be made to the Subordination Amount so that the value of this Transaction immediately before and after the Reference Portfolio Modification will remain the same (such amount of adjustment to the Subordination Amount being the "Subordination Adjustment"). The Subordination Adjustment, if positive, shall be a "Subordination Adjustment Increase"; if negative, shall be a "Subordination Adjustment Decrease"; the sum of the Subordination Adjustment Increase and the Subordination Adjustment Decrease, as determined by

the Calculation Agent on any date of determination being the "Subordination Adjustment Balance".

If, after such review, the Calculation Agent determines in its sole and absolute discretion that the Reference Portfolio Guidelines are satisfied as at the Modification Instruction Date (as defined in the Portfolio Management Agreement) and the Portfolio Manager has confirmed the quotation and the Subordination Adjustment, the Calculation Agent shall give notice to the parties hereto and to the Portfolio Manager of such determination and it shall amend the Reference Registry accordingly with effect from the effective date of the applicable Reference Portfolio Modification. The Calculation Agent shall further amend the Reference Registry and Schedule C, as applicable, with reference to the relevant Reference Entity in respect of the appropriate Benchmark Obligation (if any) and other relevant terms as determined by the Calculation Agent in its sole and absolute discretion.

The Reference Registry shall contain the following information in respect of each Reference Entity included therein:

(i)     the credit position applicable to such Reference Entity (the "Reference Entity Credit Position");

(ii)    whether "Monoline" is specified as "Applicable" in respect of the relevant Reference Entity, in which case the "Additional Terms for Monolines" set forth in Schedule B hereto shall apply to such Reference Entity;

(iii)   the entity type of the relevant Reference Entity (the "Entity Type") which shall determine which of the standard terms set forth in Schedule C hereto (the "Standard Terms") apply to such Reference Entity;

(iv)    the Benchmark Obligation (if any) and its seniority applicable to the Reference Entity; and

(v)     the effective date of each Successor Substitution effected with respect to the Reference Entity and any change to the Reference Entity Credit Position resulting from any Successor Substitution.

Section 2.30 (Substitute Reference Obligation) of the Credit Derivatives Definitions shall not apply to this Transaction.

Successor Substitution:

Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule B), upon the occurrence of a Succession Event (as defined in Schedule B) between two or more of the Reference Entities for the time being comprised in the Reference Registry, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer, Seller and Fitch indicating the Succession Event Date and the Succession Event Effective Date, give notice to remove one or more of those Reference

Entities that are subject to the Succession Event (each, a "Removed Succession Event Reference Entities") from the Reference Registry, and to replace such Removed Succession Event Reference Entities with one or more entities (each an "Added Succession Event Reference Entity") such that the Reference Entities resulting from the Successor Substitution shall be:

(i)     the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and /or

(ii)    a number of entities chosen in accordance with the Successor Substitution Criteria.

provided that, in any case the total number of Reference Entities in the Reference Registry will be equal to the number of Reference Entities as of the Business Day prior to such Succession Event, and also, provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "Succession Event Effective Date") to remove or replace such Reference Entities from the Reference Registry. Each Added Succession Event Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Succession Event Reference Entity will be deemed removed from the Reference Registry, in each case as of the Succession Event Effective Date. The Calculation Agent shall provide the parties hereto and Fitch with an updated Reference Registry as soon as is reasonably practicable after a Successor Substitution.

Each Added Succession Event Reference Entity shall have a Reference Entity Notional Amount equal to the sum of the Reference Entity Notional Amounts of the Removed Succession Event Reference Entities divided by the number of Added Succession Event Reference Entities, provided that the entity described in (i) above shall be ignored for the purposes of such calculation.

In the event that the Calculation Agent fails to exercise its right to remove one or more Reference Entities in accordance with the above provisions by the day which is 10 Business Days following the Succession Event Date, the provisions set out in Schedule B relating to Successors shall apply, except that if a Reference Entity becomes a Successor to another Reference Entity, such Successor Reference Entity shall be deemed to be a Reference Entity only once with respect to this Transaction, and the Reference Entity Notional Amount for such Reference Entity will be the sum of the Reference Entity Notional Amounts applicable to it and the Reference Entity to which it became a Successor prior to the Succession Event.

Succession Event Date:                    The occurrence of a Succession Event, and the date at which

such Succession Event is deemed to occur (the "Succession Event Date"), shall be determined by the Calculation Agent.

**Successor Substitution Criteria:**

Each Added Succession Event Reference Entity shall, on the date of its inclusion in the Reference Registry, have a credit rating assigned to its unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement) by Fitch equal to or higher than the lowest credit rating of the Removed Succession Event Reference Entities on the Business Day prior to the Succession Event Effective Date.

Each such determination shall be made by the Calculation Agent.

**Reference Obligation(s):**

In respect of each Reference Entity one or more obligations each of which is either:

(a)     the Benchmark Obligation, if any, specified for such Reference Entity in the Reference Registry; or

(b)     an obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, any Qualifying Guarantee), as selected by the Buyer in its sole discretion on or prior to the Valuation Date and which (i) falls within the Reference Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, (ii) has all of the Reference Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, (iii) is not subject to a counterclaim, defence (other than a counterclaim or defence based on the factors set forth in Section 4.1(a) to (d) of the Credit Derivatives Definitions) or right of set-off by or of the relevant Reference Entity or any applicable Underlying Obligor and (iv) in the case of a Qualifying Guarantee, other than a Qualifying Affiliate Guarantee, is capable, at the applicable Valuation Date, of immediate assertion or demand by or on behalf of the holder or holders against the relevant Reference Entity for an amount at least equal to the outstanding principal balance or Due and Payable Amount apart from the giving of any notice of non-payment or similar procedural requirement, it being understood that acceleration of an Underlying

Obligation shall not be considered a procedural requirement.

For the avoidance of doubt, Reference Obligation will include any obligation of a Reference Entity as provider of a guaranty of payment, surety bond or financial guarantee insurance policy issued with respect to an underlying obligation and which is in each case unconditional but for any requirement for the beneficiary to give notice that a payment is due or any similar procedural requirement; provided, however, that in the case of any such guaranty of payment, surety bond or financial guarantee insurance policy, such Reference Obligation shall include both such guaranty of payment, surety bond or financial guarantee insurance policy and the related Underlying Obligation.

Benchmark Obligation: In respect of each Reference Entity, the corresponding obligation set forth under the heading "Benchmark Obligation" in the Reference Registry.

Obligation: Any obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity, any Qualifying Guarantee), and which (i) falls within the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type and (ii) has all of the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type.

Obligations shall also include, in respect of each Reference Entity, the relevant Benchmark Obligation (if any) specified with respect to such Reference Entity in the Reference Registry.

All Guarantees: Applicable with respect to a Reference Entity only if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity.

Reference Price: 100 per cent.

Subordination Amount: On any date of determination, the sum of AUD121,550,000 and the then applicable Subordination Adjustment Balance.

Notional Amount: AUD28,600,000.

Outstanding Notional Amount: With respect to any day, the Notional Amount less the Mezzanine Tranche Loss (as defined below) as of that day, subject to a minimum of zero.

Mezzanine Loss Amount: Cumulative Loss Amount minus the Subordination Amount

Mezzanine Tranche Loss: The greater of:

(a)   the Mezzanine Loss Amount; and

(b)   zero.

Cumulative Loss Amount:

With respect to any day, the aggregate of all Cash Settlement Amounts calculated with respect to the Transaction from, and including the Trade Date, to and including such day a Cumulative Loss Amount is calculated.

3    **Buyer Payments**

   (a)   **Buyer Payments 1**

   Fixed Rate Payer Calculation Amount:

Subject as provided below, and unless the Fixed Rate Payer Payment Adjustment provisions below apply to a Fixed Rate Payer Calculation Period, the Weighted Average Outstanding Notional Amount with respect to a Fixed Rate Payer Calculation Period, calculated by the Calculation Agent.

"Weighted Average Outstanding Notional Amount" means the amount calculated by the Calculation Agent on the Business Day immediately preceding each Fixed Rate Payer Payment Date with respect to the immediately preceding Fixed Rate Payer Calculation Period by adding together the Outstanding Notional Amounts for each calendar day during such period and dividing such amount by the actual number of calendar days in such period. For the avoidance of doubt, in the event that, with respect to a Fixed Rate Payer Calculation Period, the Outstanding Notional Amount is reduced as a result of an increase in the amount of the Mezzanine Tranche Loss, such reduced Outstanding Notional Amount shall be used to calculate the Weighted Average Outstanding Notional Amount (for the purposes of calculating the 'Fixed Rate Payer Calculation Amount') as of, and from, each such Event Determination Date which resulted in a reduction of the Outstanding Notional Amount.

   Fixed Rate Payer Calculation Period:

Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Scheduled Termination Date, and for the avoidance of doubt, such dates shall be adjusted in accordance with the Business Day Convention.

   Fixed Rate Payer Payment Dates:

20 March, 20 June, 20 September and 20 December of each year commencing on 20 June 2007 and ending on, but excluding, the Scheduled Termination Date, subject in each case to adjustment in accordance with the Business Day Convention, and subject to the Fixed Rate Payer Payment Adjustment provisions below.

   Fixed Rate:

In respect of all Fixed Rate Payer Payment Dates:

   (i)    AUD-BBR-BBSW plus 4.00 per cent. per annum; and

   (ii)   0.20 per cent. per annum, (being the Portfolio

37

Management Fees (as defined in the Portfolio Management Agreement) payable by the Issuer to the Portfolio Manager pursuant to the Portfolio Management Agreement); and

(iii)  0.10 per cent. per annum (being the Performance Fees (as defined in the Portfolio Management Agreement) payable by the Issuer to the Portfolio Manager pursuant to the Portfolio Management Agreement, but only in the event that the rating of the Notes by Fitch as of the Business Day immediately preceding the relevant Fixed Rate Payer Payment Date is BBB- or above),

provided that in the event the Portfolio Management Agreement is terminated under Clause 8.1 of the Portfolio Management Agreement, the Fixed Rate Payer shall pay an amount equal to the pro rata amount of the Portfolio Management Fees and Performance Fees (if any) accrued up to and including the date of such termination on the next following Interest Payment Date.

"AUD-BBR-BBSW" means "AUD-BBR-BBSW" as defined in the 2000 Definitions with a "Designated Maturity" of three (3) months and the "Reset Date" being the day which is the first day of the Fixed Rate Payer Calculation Period.

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed). |
| Fixed Rate Payer Payment Adjustment: | With respect to any Fixed Rate Payer Payment Date, in the event that: |

(a)  (i)   an Event Determination Date has occurred with respect to a Reference Entity on, or prior to, the Business Day prior to a Fixed Rate Payer Payment Date but the relevant Reference Entity Valuation Date with respect to such Reference Entity has not occurred; and/or

(ii)  a Potential Failure to Pay has occurred with respect to a Reference Entity on or prior to the Business Day prior to a Fixed Rate Payer Payment Date and such Potential Failure to Pay has not been cured on or prior to the Business Day prior to such Fixed Rate Payer Payment Date; and/or

(iii)  a Potential Repudiation/Moratorium has occurred with respect to a Reference Entity on or prior to the Business Day prior to a Fixed Rate Payer Payment Date and such Potential Repudiation/Moratorium has not ceased to exist on or prior to the Business Day prior to such Fixed Rate Payer Payment Date;

(each Reference Entity referred to in paragraphs (i), (ii)

and (iii) above an "Adjustment Reference Entity"); and

(b) the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amount(s) in respect of all the relevant Adjustment Reference Entities is greater than zero,

the Fixed Amount payable in respect of such Fixed Rate Payer Payment Date shall be paid in accordance with the following:

(A) Buyer shall pay an amount (the "Partial Fixed Amount") on the Fixed Rate Payer Payment Date calculated in accordance with Section 5.1(b) of the Credit Derivatives Definitions but referencing the Interim Calculation Amount instead of the Fixed Rate Payer Calculation Amount; and

(B) Buyer shall pay an amount (the "Deferred Fixed Amount"), in respect of each Adjustment Reference Entity, on the third (3rd) Business Day (the "Deferred Fixed Rate Payment Date") following:

(1) the final Reference Entity Valuation Date on which all Final Prices have been determined; or

(2) if appropriate, the date that the Calculation Agent determines that all Potential Failure to Pay have been cured; or

(3) if appropriate, the date that the Calculation Agent determines that all Potential Repudiation/Moratorium have ceased to exist,

equal to the excess (if any) of:

(i) the Fixed Amount that would otherwise have been payable on the relevant Fixed Rate Payer Payment Date if

(A) in the circumstances set out in sub-paragraph (a)(i) of "Fixed Rate Payer Payment Adjustment" above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(B) in the circumstances set out in sub-paragraph (a)(ii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had

actually been determined on the date on
which such Potential Failure to Pay was
determined by the Calculation Agent to have
occurred; or (ii) where the Potential Failure
to Pay is subsequently cured, the relevant
Potential Failure to Pay had not occurred; or

(C)    in the circumstances set out in sub-paragraph
(a)(iii) of "Fixed Rate Payer Payment
Adjustment" above, (i) where the Potential
Repudiation/Moratorium develops into an
actual Repudiation/Moratorium, the Final
Price in respect of the relevant Adjustment
Reference Entity had actually been
determined on the date on which such
Potential Repudiation/Moratorium was
determined by the Calculation Agent to have
occurred; or (ii) where the Potential
Repudiation/Moratorium subsequently ceases
to exist, the relevant Potential Repudiation/
Moratorium had not occurred.

over

(ii)    the relevant Partial Fixed Amount (if any)
paid on the relevant Fixed Rate Payer
Payment Date.

(C) Buyer shall pay an additional amount equal to
interest accrued in the period from and including the
Fixed Rate Payer Payment Date to, but excluding,
the Deferred Fixed Rate Payer Payment Date, at a
rate equal to the O/N Rate (as defined in the
Conditions) for each day during such period, on an
amount equal to the Deferred Fixed Amount which
shall be paid on such Deferred Fixed Rate Payer
Payment Date.

Interim Calculation Amount:    Subject as provided below, the Fixed Rate Payer Calculation
Amount (without adjusting the Outstanding Notional Amount
with respect to an Adjustment Reference Entity except as
provided below) for the relevant Fixed Rate Payer Calculation
Period except that the Weighted Average Outstanding Notional
Amount shall be calculated on the basis that the Reference
Entity Notional Amount of each Adjustment Reference Entity is
added to the Cumulative Loss Amount as of each Event
Determination Date or the date upon which a Potential Failure
to Pay or a Potential Repudiation/Moratorium (as applicable)
occurred. For the avoidance of doubt, in the event that the
amount calculated in accordance with this provision is zero or a
negative number the "Interim Calculation Amount" will be
deemed to be zero.

A07517393/2.0/16 Mar 2007

40

**(b)    Buyer Payments 2**

Buyer Final Payment:

In addition to the Fixed Amounts payable in accordance with the provisions set out above, Buyer shall pay to Seller:

(i)    the Buyer Final Payment Amount on the Scheduled Termination Date and the Deferred Payment Date, as the case may be; and

(ii)    an amount equal to the aggregate amount of the Unpaid Performance Fees in respect of all Fixed Rate Payer Payment Dates on the Scheduled Termination Date.

For the purposes hereof:

"Unpaid Performance Fees" means, in respect of each Fixed Rate Payment Date, an amount determined by the Calculation Agent equal to the product of (i) 0.10 per cent. per annum; (ii) the Weighted Average Outstanding Notional Amount; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction, which is calculated as the Performance Fees (as defined in the Portfolio Management Agreement) but not payable to the Portfolio Manager given that the rating of the Notes by Fitch as of the Business Day immediately prior to the relevant Interest Payment Date is below BBB-.

For the purpose of determining the Unpaid Performance Fees in respect of each Fixed Rate Payer Payment Date, in the event that the Fixed Rate Payer Payment Adjustment provisions (as set out in paragraph 3 above) are applicable, references to the Weighted Average Outstanding Notional Amount shall be deemed to be references to the Interim Calculation Amount (as defined in paragraph 3 above) without subsequent adjustment.

Buyer Final Payment Amount:

An amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of:

(a)    the Outstanding Notional Amount as at the Final Cut-off Date; and

(b)    AUD 0.

For the purposes hereof if:

(i)    an Adjustment Reference Entity exists as at the Final Cut-off Date; and

(ii)    the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amounts in respect of all relevant Adjustment Reference Entities is greater than zero,

the Buyer Final Payment Amount shall be:

(i)    the Interim Calculation Amount (if any) on the Scheduled Termination Date;

(ii)    the Deferred Termination Amount on the Deferred

Payment Date; and

(iii) interest accrued in the period from and including the Scheduled Termination Date to, but excluding, the related Deferred Termination Date, at a rate equal to the O/N Rate on an amount equal to the Deferred Termination Amount which shall be paid on such related Deferred Termination Date.

For the purposes hereof:

"Deferred Termination Amount" means, in respect of each Deferred Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Payment Cut-off Date as being equal to the excess (if any) of:

    (i) the Buyer Final Payment that would otherwise have been payable on the Scheduled Termination Date if:

    (A) in the circumstances set out in sub-paragraph (a)(i) of "Fixed Rate Payer Payment Adjustment" above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

    (B) in the circumstances set out in sub-paragraph (a)(ii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

    (C) in the circumstances set out in sub-paragraph (a)(iii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/Moratorium had not occurred;

over

(ii) the Interim Calculation Amount (if any) on the Scheduled Termination Date;

"**Deferred Payment Cut-off Date**" means, in respect of each Adjustment Reference Entity in respect of which a Deferred Termination Amount may be payable, as determined by the Calculation Agent in its sole discretion:

(A) the final Reference Entity Valuation Date on which all Final Prices have been determined; or

(B) if appropriate, the date that the Calculation Agent determines that all Potential Failure to Pay have been cured; or

(C) if appropriate, the date that   the Calculation Agent determines that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"**Deferred Payment Date**" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Payment Cut-off Date.

Final Cut-off Date:

The Business Day immediately prior to Scheduled Termination Date.

## 4   Seller Payments

### (a)   Seller Payments 1

Interim Seller Payments:

In addition to the Seller Final Payment payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day that any interest and other payments and distributions of cash (other than any payments in the nature of principal payments) and other property are scheduled to be received under the Collateral, Seller will transfer to Buyer an amount equal to the aggregate amount scheduled to be received from the Collateral Issuer in respect of the Collateral.

"**Collateral**" shall bear the meaning given to such term in the Conditions. "**Collateral Issuer**" means the issuer of any Collateral.

### (b)   Seller Payments 2

Seller Final Payment:

In addition to the Interim Seller Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date.

Seller Final Payment Amount:

An amount equal to the amount standing to the credit of the Collection Account (as defined in the Conditions) on the

Scheduled Termination Date.

## 5    Provisions relating to Credit Events

| | |
|---|---|
| Floating Rate Payer Calculation Amount: | The Reference Entity Notional Amount. |
| Reference Entity Notional Amount: | For each of the 150 Reference Entities, an amount equal to the Notional Portfolio Size multiplied by the Reference Entity Credit Position set forth in respect of such Reference Entity in the Reference Registry. |
| Notional Portfolio Size: | AUD3,575,000,000. |
| Conditions to Settlement: | Credit Event Notice |

|  | Notifying Party: | Buyer |
|---|---|---|
|  | Notice of Publicly Available Information: | Applicable. |

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information.

|  | Public Sources: | Applicable |
|---|---|---|
|  | Specified Number: | Two |

| | |
|---|---|
| Credit Observation Period: | The period from and including the Trade Date to and including the Scheduled Termination Date. |
| Credit Events: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Credit Events specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Category: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Characteristics: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Excluded Obligations: | None. |

## 6    Calculation of Cash Settlement Amounts

| | |
|---|---|
| Settlement Method: | Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms: |

Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)) following the occurrence of an Event Determination Date in respect of a Reference Entity, the Calculation Agent shall determine the applicable Cash Settlement Amount.

For the avoidance of doubt, Seller shall not pay Buyer the Cash Settlement Amount, if any, with respect to such Reference Entity but the amount of each Cash Settlement Amount will be added to the Cumulative Loss Amount which will in turn be used to determine, *inter alia*, the reduction, if any, in the Outstanding Notional Amount payable by Buyer on the Scheduled Termination Date.

| | |
|---|---|
| Final Reference Obligation Price: | The price of the Reference Obligation expressed as a percentage, determined in accordance with the Valuation Method. |
| Final Price: | The Final Reference Obligation Price or, if there is more than one Reference Obligation, the Final Price shall be the weighted average of the Final Reference Obligation Prices (as weighted by the Reference Entity Notional Amount) expressed as a percentage. |
| Valuation Date: | Single Valuation Date. |
| Single Valuation Date: | Any Valuation Business Day selected by the Calculation Agent in its sole discretion falling on or after the thirtieth (30th) calendar day following the Event Determination Date provided that, if an Event Determination Date has occurred and the valuation date or physical settlement date, howsoever expressed (the "Hedge Settlement Date") in respect of any credit derivatives transaction or other hedging transaction (each a "Hedging Transaction") entered into by or on behalf of Party A in relation to the hedging of its obligations under the Transaction has been delayed in accordance with, or on terms similar to, the provisions of Section 9.9 and Section 9.10 of the Credit Derivatives Definitions (such occurrence, the "Hedging Transaction Delay"), then the Valuation Date will be any Valuation Business Day selected by the Calculation Agent occurring no later than the third Valuation Business Day after the Hedge Settlement Date. In the case of an Adjustment Reference Entity existing on the Final Cut-off Date, the Valuation Date shall be deemed to be the Final Cut-off Date. |
| Valuation Business Day: | Any Business Day which is also a Business Day in the market, as determined by the Calculation Agent in its sole discretion, on which credit default swaps in respect of the relevant Reference Entity are primarily traded. |
| Valuation Time: | 11:00 a.m. London, New York or (as applicable) Tokyo time, as determined by the Calculation Agent by reference to the market |

in which credit default swaps for such Reference Entity are primarily traded.

Bid Quotation:

With respect to each Reference Obligation selected by the Calculation Agent in respect of the relevant Reference Entity and a Valuation Date, means each firm bid quotation obtained from a Dealer at the Valuation Time for an amount selected by the Calculation Agent which is not greater than the Reference Entity Notional Amount of such Reference Entity.

Weighted Average Quotation:

With respect to each Reference Obligation selected by the Calculation Agent in respect of the relevant Reference Entity and a Valuation Date, the weighted average of firm quotations obtained from Dealers at the Valuation Time each for an amount with an outstanding principal balance not greater than the Reference Entity Notional Amount of such Reference Entity nor less than USD1,000,000, that in aggregate are equal to or greater than the Reference Entity Notional Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm quotation obtained from any Dealer.

Settlement Currency:

AUD

Reference Entity Valuation Date:

In respect of the relevant Reference Entity, the date on which the Final Price is determined in respect of such Reference Entity.

Valuation Method:

The highest Bid Quotation with respect to a Valuation Date obtained on the same Valuation Business Day by the Calculation Agent in accordance with the following:

(i)     the Calculation Agent shall attempt to obtain Bid Quotations from at least five Dealers (or if one of such Dealers is the Calculation Agent or an Affiliate of the Calculation Agent, then six Dealers) on the Valuation Date; and

(ii)    if at least three Bid Quotations are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain three Bid Quotations on each of the days which are 1, 2, 10, 11, 12, 20, 21 and 22 Valuation Business Days following the Valuation Date (the "Extended Valuation Dates").

In the event that at least three Bid Quotations cannot be obtained on an Extended Valuation Date which falls on or before the 22nd Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 23rd Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three Bid Quotations have not been obtained on or before the 22nd Valuation Business Day following the Valuation Date and (b) the Weighted Average Quotation has not been obtained on the 23rd Valuation Business Day following the Valuation Date, the Final Reference Obligation Price with respect to the Reference Obligation shall be deemed to be zero.

The Calculation Agent shall deliver a notice to the Trustee (for delivery to the Noteholders in accordance with the Conditions) and Buyer (with a written copy to Fitch) showing the Final Reference Obligation Price for each Reference Obligation on the day which is no later than 5 Business Days following each Reference Entity Valuation Date.

Dealers:

Dealers in obligations of the type of Reference Obligations for which Bid Quotations are to be obtained, and any affiliate thereof or successor thereto. For the avoidance of doubt, the Calculation Agent or any Affiliate of the Calculation Agent may be a Dealer, provided that only one of the Calculation Agent or its Affiliates may be included in the panel of six Dealers for the purposes of calculating the Final Price.

Notices:

Notwithstanding any provisions in the Credit Derivatives Definitions relating to notification of certain matters by the Calculation Agent to the parties, the Calculation Agent shall notify the parties and Fitch of the following with respect to each Reference Entity in respect of which an Event Determination Date has occurred, on the dates stated:

(i)    selected Reference Obligations: notified to the parties on or before the applicable Valuation Date; and

(ii)   Cash Settlement Amount: notified by the Calculation Agent to the parties (with a written copy to Fitch) on, or as soon as is reasonably practicable following, the applicable Reference Entity Valuation Date.

## 7    Exchange of Collateral

In the event that any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, Party A may on any Business Day by notice inform Party B and Fitch that it wishes to transfer to Party B Qualifying Assets specified in that notice in exchange for certain Collateral specified in that notice and held by Party B on such date. Subject to Fitch's rating confirmation, Party A will be obliged to transfer such Qualifying Assets to Party B promptly following such notice and Party B will be obliged to transfer to Party A securities and/or cash equivalent to the Collateral so specified upon receipt of such Qualifying Assets. Party B's obligation to transfer to Party A such equivalent securities and/or cash shall not in any event exceed the aggregate amount of all the Collateral held by it on such date.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"Qualifying Assets" means, in respect of any exchange of Collateral pursuant to the terms of this Transaction, any security with the following characteristics:

1.    (a)   having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

     (b)   maturing on or before the Scheduled Maturity Date;

     (c)   being AUD-denominated; and

     (e)   is not a structured finance product; or

2.    any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.    AUD cash.

Party A shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of this Confirmation.

## 8    Optional Termination

Party A may, by giving not less than five Business Days' notice to Party B prior to the Optional Termination Date, terminate this Transaction in whole or in part in respect of any or all of the Outstanding Notional Amount (the "Termination Option") on that Fixed Rate Payer Payment Date which is scheduled to fall on or about 20 March 2011 (the date of such termination being the "Optional Termination Date"). The Termination Option may be exercised by oral notice (and such oral notice to be confirmed in writing promptly thereafter, provided that failure to do so will not vitiate such original oral notice) from Party A to Party B.

Upon the exercise of the Termination Option, the rights and obligations of the parties under this Transaction shall cease and no further amounts shall be payable by either party except for the following:

(a)   On the Optional Termination Date, Party B shall deliver the pro rata amount of the Collateral (as defined in the Conditions) to Party A; and

(b)   On the Optional Termination Date and following Party B's delivery of the pro rata amount of the Collateral as referred to in (a) above), Party A shall pay to Party B an amount equal to the terminated Outstanding Notional Amount and such Fixed Amount (determined and rounded by the Calculation Agent in its sole and absolute discretion) as is payable by Party A hereunder in respect of the terminated Outstanding Notional Amount calculated on the basis of a Fixed Rate Payer Calculation Period from (and including) the immediately preceding Fixed Rate Payer Payment Date to (but excluding) the Optional Termination Date.

## 9    Relationship Between Parties

Each of Buyer and Seller represents to the other that:

(a)   **Non-Reliance**

     It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

(b)   **Acceptance**

     It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

(c)    **Status of Parties**

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and

(d)    **Risk Management**

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

(e)    **Eligible Person**

It is as of the Trade Date an Eligible Person and it agrees that it shall not novate, transfer or assign this Transaction to any person which has not represented that it is an Eligible Person; provided, however, a failure to comply with the terms of the preceding clause shall not constitute an Event of Default pursuant to Section 5(a)(ii) or Section 5(a)(iv) in the absence of willful misconduct. As used herein, an "Eligible Person" is an entity which is both (1) a "qualified institutional buyer" (as defined in Rule 144A under the United States Securities Act of 1933, as amended) and (2) a "Qualified Purchaser" (within the meaning of Section 2(a)(51)(A) of the United States Investment Company Act of 1940, as amended, and the rules and regulations thereunder). Each of Buyer and Seller agrees and acknowledges that the representation set out in this paragraph shall be deemed to be amended, varied or supplemented and restated as subsequently published by ISDA.

## 10   Additional Termination Provisions

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)    The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) under the terms thereof.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(b)    A default or event of default that has been declared pursuant to the terms of (and as defined in the terms of) the Collateral prior to the Scheduled Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)    The Notes being declared redeemable pursuant to the Seller being required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of

this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(ii) **Optional Payments:** If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 11  Other Terms

(i) **Non-insurance business**

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

(ii) **Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

(iii) **Credit Support Document.**

Credit Support Document means in relation to Party A: the Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Exhibit A.

(iv) **Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

(v) **Credit Support Annex**

Party A and Party B agree that the provisions of the ISDA Credit Support Annex, as supplemented by the Elections and Variables attached hereto as Annex A shall apply to this Transaction.

(vi) **Misrepresentation**

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to Party B.

(vii) **Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B.

(viii) **Bankruptcy**

For the purposes of this Confirmation only, Sections 5(a)(vii)(2) and 5(a)(vii)(9) will not apply to Party B.

For the purposes of this Confirmation and Party B only, Section 5(a)(vii)(4) will be amended with the insertion of the following wording immediately following the end of that Section:

", other than any such proceeding initiated by Party A or any of its affiliates"

For the purposes of this Confirmation and Party B only, Section 5(a)(vii)(6) will be amended as follows:

(i)   the wordings "seeks or" will be deleted from that Section; and

(ii)   the wording ", other than the appointment of the Trustee, the Custodian (each as defined in the Conditions) or other analogous parties" will be inserted immediately following the end of that Section.

## 12   Account Details

Account details of Buyer:      Australia & New Zealand Banking Group, Melbourne (ANZBAU3M)
                               A/C 265041 00001
                               A/C Lehman Brothers Inc./BNF/IFO Lehman Brothers Special
                               Financing Inc.

Account details of Seller:     JP Morgan Chase Bank, N.A. Brisbane (CHASAU2)
                               A/C 10048091
                               A/C JP Morgan Institutional Services Australia Ltd Paying Agency
                               Account/BNF/IFO Zircon Finance Ltd Series 2007-1 Tranche B

This Confirmation shall be governed by and construed in accordance with English law.

51

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:

Title:


Confirmed on the date first above written:

**ZIRCON FINANCE LIMITED**

By:

Name:

Title:

Schedule A
Annex 1
Reference Registry

(as of 20 March 2007)

| Reference Entity | Reference Entity Credit Position | Benchmark Obligation | | | Entity Type | Monoline |
|---|---|---|---|---|---|---|
| | | CUSIP/ISIN | Coupon (%) | Maturity | | |
| AmerisourceBergen Corporation | 1.2625% | US03073EAE59 | 5.875% | 15-Sep-15 | North American High Yield | |
| ABITIBI-CONSOLIDATED INC. | 0.4500% | US003669AJ70 | 8.375% | 1-Apr-15 | North American | |
| L'AIR LIQUIDE SOCIETE ANONYME POUR L'ETUDE ET L'EXPLOITATION DES PROCEDES GEORGES CLAUDE | 0.4500% | FR0000487936 | 5.250% | 28-Dec-11 | Western European | |
| AIFUL CORPORATION | 0.4500% | JP3105048356 | 1.740% | 28-May-13 | Japanese | |
| American International Group, Inc. | 0.4500% | US026874AP25 | 0.000% | 9-Nov-31 | North American | |
| AKZO Nobel N.V. | 0.4500% | XS0170265341 | 4.250% | 14-Jun-11 | Western European | |
| Ambac Assurance Corporation | 1.2625% | *NoRefOb | *NoRefOb | *NoRefOb | North American | Applicable |
| ArvinMeritor, Inc. | 0.4500% | US043353AA92 | 8.750% | 1-Mar-12 | North American | |
| Avon Products, Inc. | 0.4500% | US054303AM47 | 7.150% | 15-Nov-09 | North American | |
| American Axle & Manufacturing, Inc. | 0.4500% | US02406PAE07 | 5.250% | 11-Feb-14 | North American | |
| BAA PLC | 0.4500% | XS0181263202 | 5.750% | 27-Nov-13 | Western European | |
| BARCLAYS BANK PLC | 0.4500% | XS0187033864 | 4.500% | 4-Mar-19 | Western European | |
| B A S F Aktiengesellschaft | 0.4500% | DE0009846718 | 3.500% | 8-Jul-10 | Western European | |
| BANCA INTESA S.P.A. | 0.4500% | XS0107999707 | 6.250% | 1-Mar-10 | Western European | |
| BRUNSWICK CORPORATION | 1.2625% | US117043AG45 | 7.125% | 1-Aug-27 | North American | |
| The Black & Decker Corporation | 1.2625% | US091797AJ96 | 7.125% | 1-Jun-11 | North American | |
| Baker Hughes Incorporated | 0.4500% | US057224AJ66 | 6.250% | 15-Jan-09 | North American | |
| BRITISH TELECOMMUNICATIONS public limited company | 0.4500% | XS0097283696 | 5.750% | 7-Dec-28 | Western European | |
| Berkshire Hathaway Inc. | 1.2625% | US084664AD30 | 4.625% | 15-Oct-13 | North American | |
| The Bear Stearns Companies Inc. | 0.4500% | US073902KF49 | 5.300% | 30-Oct-15 | North American | |
| Boston Scientific Corporation | 0.4500% | US101137AD33 | 5.450% | 15-Jun-14 | North American | |
| Anheuser-Busch Companies, Inc. | 0.4500% | US03522QAC96 | 5.625% | 1-Oct-10 | North American | |
| Beazer Homes USA, Inc. | 0.4500% | US07556QAJ40 | 6.500% | 15-Nov-13 | North American High Yield | |
| Citigroup Inc. | 0.4500% | US172967BC45 | 6.500% | 18-Jan-11 | North American | |
| Cargill, Incorporated | 0.4500% | US141781AC86 | 7.375% | 1-Oct-25 | North American | |
| Cathay United Bank | 0.4500% | XS0231644427 | 5.500% | 5-Oct-20 | Asian | |
| CBS Corporation | 1.2625% | US925524AU41 | 4.625% | 15-May-18 | North American | |
| Coca-Cola Enterprises Inc. | 0.4500% | US191219BJ26 | 6.125% | 15-Aug-11 | North American | |
| Countrywide Home Loans, Inc. | 0.4500% | US222371PA43 | 5.000% | 22-Mar-11 | North American | |
| CIT Group Inc. | 0.4500% | US125581AB41 | 7.750% | 2-Apr-12 | North American | |
| Clariant AG | 0.4500% | CH0910519475 | 4.250% | 15-Mar-08 | Western European | |
| Con-way Inc. | 1.2625% | US12612WAA27 | 8.875% | 1-May-10 | North American | |
| Continental Aktiengesellschaft | 0.4500% | XS0139722069 | 6.875% | 5-Dec-08 | Western European | |
| Computer Sciences Corporation | 1.2625% | US205363AE42 | 7.375% | 15-Jun-11 | North American | |
| CSR LIMITED | 1.2625% | AU300CSRLU19 | 6.000% | 12-Mar-09 | Australia and New Zealand | |
| CenturyTel, Inc. | 0.4500% | US156700AG13 | 7.875% | 15-Aug-12 | North American | |
| Centex Corporation | 0.4500% | US152312AQ22 | 5.250% | 15-Jun-15 | North American | |

| Reference Entity | Reference Entity Credit Position | Benchmark Obligation | | | Entity Type | Monoline |
|---|---|---|---|---|---|---|
| | | CUSIP/ISIN | Coupon (%) | Maturity | | |
| DaimlerChrysler AG | 0.4500% | US233835AW75 | 6.500% | 15-Nov-13 | Western European | |
| Dell Inc. | 0.4500% | US247025AD11 | 6.550% | 15-Apr-28 | North American | |
| Dover Corporation | 0.4500% | US260003AB46 | 6.250% | 1-Jun-08 | North American | |
| Deutsche Post AG | 0.4500% | DE0009279042 | 5.125% | 4-Oct-17 | Western European | |
| Darden Restaurants, Inc. | 1.2625% | US237194AB19 | 7.125% | 1-Feb-16 | North American | |
| Deutsche Telekom AG | 0.4500% | XS0148956559 | 8.125% | 29-May-12 | Western European | |
| ELECTRICITE DE FRANCE | 0.4500% | XS0162990229 | 5.625% | 21-Feb-35 | Western European | |
| ERP Operating Limited Partnership | 0.4500% | US26884AAM53 | 6.950% | 2-Mar-11 | North American | |
| Eaton Corporation | 0.4500% | US278058AW21 | 7.650% | 15-Nov-29 | North American | |
| EXPEDIA, INC. | 1.2625% | US30212PAA39 | 7.456% | 15-Aug-18 | North American | |
| Federal Home Loan Mortgage Corporation | 0.4500% | US3128X2UC78 | 5.000% | 7-Feb-19 | North American | |
| Federal National Mortgage Association | 1.2625% | US31359MNU35 | 5.250% | 1-Aug-12 | North American | |
| Fortune Brands, Inc. | 1.2625% | US349631AF84 | 6.250% | 1-Apr-08 | North American | |
| Financial Security Assurance Inc. | 1.2625% | *NoRefOb | *NoRefOb | *NoRefOb | North American | Applicable |
| GAZ DE FRANCE | 0.4500% | FR0000472334 | 5.125% | 19-Feb-18 | Western European | |
| Gannett Co., Inc. | 1.2625% | US364725AC59 | 6.375% | 1-Apr-12 | North American | |
| General Electric Capital Corporation | 1.2625% | US36962GYY42 | 6.000% | 15-Jun-12 | North American | |
| GKN HOLDINGS PLC | 0.4500% | XS0147740335 | 7.000% | 14-May-12 | Western European | |
| Glimir banki hf. | 0.4500% | XS0210555578 | 3mEuribor+0.15% | 27-Jan-10 | Western European | |
| Glencore International AG | 0.4500% | XS0202202937 | 5.375% | 30-Sep-11 | Western European | |
| GlobalSantaFe Corporation | 1.2625% | US37943TAB46 | 5.000% | 15-Feb-13 | North American | |
| Hannover Rueckversicherung AG | 0.4500% | XS0187043079 | 5.750% | 26-Feb-24 | Western European Insurance | |
| The Governor and Company of the Bank of Scotland | 0.4500% | XSU139647091 | 5.125% | 5-Dec-13 | Western European | |
| HEALTH CARE PROPERTY INVESTORS, INC. | 0.4500% | US4219158H13 | 6.450% | 25-Jan-12 | North American | |
| The Home Depot, Inc. | 1.2625% | US437076AL65 | 3.750% | 15-Sep-09 | North American | |
| HSBC Finance Corporation | 0.4500% | US441812JY13 | 7.000% | 15-May-12 | North American | |
| Hovnanian Enterprises, Inc. | 0.4500% | US442488AQ54 | 6.500% | 15-Jan-14 | North American High Yield | |
| BLOCK FINANCIAL CORPORATION | 1.2625% | US093662AC83 | 5.125% | 30-Oct-14 | North American | |
| IAC/InterActiveCorp | 0.4500% | US902984AD54 | 7.000% | 15-Jan-13 | North American | |
| IBERDROLA, S.A. | 0.4500% | XS0163023848 | 4.875% | 18-Feb-13 | Western European | |
| INEOS GROUP HOLDINGS PLC | 0.4500% | XS0242945367 | 7.875% | 15-Feb-16 | Western European | |
| Ingersoll-Rand Company Limited | 0.4500% | US456865AG74 | 9.000% | 15-Aug-21 | North American | |
| Johnson Controls, Inc. | 0.4500% | US478366AG24 | 7.125% | 15-Jul-17 | North American | |
| Johnson & Johnson | 0.4500% | US478160AM65 | 5.500% | 15-May-13 | North American | |
| Kaupthing banki hf. | 0.4500% | XS0206352824 | 3mEURIBOR+0.15% | 1-Dec-09 | Western European | |
| KINGFISHER PLC | 0.4500% | XS0178322474 | 5.625% | 15-Dec-14 | Western European | |
| Joint-Stock Company "Kazkommertsbank" | 0.4500% | XS0190240324 | 7.875% | 7-Apr-14 | Kazakhstan | |
| Kimberly-Clark Corporation | 1.2625% | US494368AQ68 | 6.875% | 15-Feb-14 | North American | |
| Koninklijke KPN N.V. | 0.4500% | US780541AG12 | 8.000% | 1-Oct-10 | Western European | |
| Kohl's Corporation | 0.4500% | US500255AM62 | 6.300% | 1-Mar-11 | North American | |
| LADBROKES PLC | 0.4500% | XS0145190921 | 7.125% | 11-Jul-12 | Western European | |
| Lennar Corporation | 0.4500% | US526052AG99 | 5.950% | 1-Mar-13 | North American | |
| Liz Claiborne, Inc. | 0.4500% | XS0260255160 | 5.000% | 5-Jul-13 | North American | |
| Lowe's Companies, Inc. | 0.4500% | US548661CA38 | 8.250% | 1-Jun-10 | North American | |
| Louisiana-Pacific Corporation | 0.4500% | US546347AB19 | 8.875% | 15-Aug-10 | North American | |

| Reference Entity | Reference Entity Credit Position | Benchmark Obligation | | | Entity Type | Monoline |
|---|---|---|---|---|---|---|
| | | CUSIP/ISIN | Coupon (%) | Maturity | | |
| Limited Brands, Inc. | 0.4500% | US532716AH08 | 6.125% | 1-Dec-12 | North American | |
| Southwest Airlines Co. | 1.2625% | US844741AV08 | 6.500% | 1-Mar-12 | North American | |
| LANXESS Aktiengesellschaft | 0.4500% | XS0222559880 | 4.125% | 21-Jun-12 | Western European | |
| Masco Corporation | 0.4500% | US574599AX44 | 5.875% | 15-Jul-12 | North American | |
| MBIA Insurance Corporation | 1.2625% | *NoRefOb | *NoRefOb | *NoRefOb | North American | Applicable |
| M.D.C. Holdings, Inc. | 0.4500% | US552676AN89 | 5.500% | 15-May-13 | North American | |
| Mohawk Industries, Inc. | 0.4500% | US608190AF11 | 7.200% | 15-Apr-12 | North American | |
| Motorola, Inc. | 0.4500% | US620076AK59 | 6.500% | 1-Sep-25 | North American | |
| MGIC Investment Corporation | 1.2625% | US552845AG43 | 5.625% | 15-Sep-11 | North American | |
| Nabors Industries, Inc. | 1.2625% | US629568AP37 | 0.000% | 5-Feb-21 | North American | |
| NOVA CHEMICALS CORPORATION | 0.4500% | US66977WAF68 | 6.500% | 15-Jan-12 | North American High Yield | |
| Nestle S.A. | 0.4500% | XS0146994232 | 4.750% | 25-Sep-07 | Western European | |
| Norbord Inc. | 0.4500% | US65332NAB64 | 7.250% | 1-Jul-12 | North American | |
| Novartis AG | 0.4500% | XS0158284801 | 3.750% | 6-Dec-07 | Western European | |
| NUCOR CORPORATION | 0.4500% | US670346AC90 | 4.875% | 1-Oct-12 | North American | |
| THE NEW YORK TIMES COMPANY | 1.2625% | US65011QAG73 | 4.610% | 26-Sep-12 | North American | |
| Pitney Bowes Inc. | 0.4500% | US724479AF75 | 4.625% | 1-Oct-12 | North American | |
| PCCW-HKT TELEPHONE LIMITED | 0.4500% | US69319CAA27 | 7.750% | 15-Nov-11 | Asian | |
| Pfizer Inc. | 0.4505% | US717081AQ68 | 4.650% | 1-Mar-18 | North American | |
| Pulte Homes, Inc. | 0.4500% | US745867AL56 | 7.875% | 1-Aug-11 | North American | |
| The PMI Group, Inc. | 1.2625% | US69344MAH43 | 6.000% | 15-Sep-16 | North American | |
| Portugal Telecom International Finance B.V. | 0.4500% | XS0215828830 | 3.750% | 26-Mar-12 | Western European | |
| PPG Industries, Inc. | 0.4500% | US693506AY35 | 7.050% | 15-Aug-09 | North American | |
| PEARSON plc | 1.2625% | XS0102793642 | 7.000% | 27-Oct-14 | Western European | |
| Ryder System, Inc. | 1.2625% | US783549AZ16 | 6.950% | 1-Dec-25 | North American | |
| REED ELSEVIER PLC | 0.4500% | US758202AD79 | 4.625% | 15-Jun-12 | Western European | |
| Residential Capital Corporation | 1.2625% | US76113BAR06 | 6.500% | 17-Apr-13 | North American | |
| Transocean Inc. | 0.4500% | US893830AK59 | 7.375% | 15-Apr-18 | North American | |
| Republic Services, Inc. | 0.4500% | US760759AA83 | 7.125% | 15-May-09 | North American | |
| SPRINT NEXTEL CORPORATION | 1.2625% | US852060AS17 | 8.375% | 15-Mar-12 | North American | |
| SANOFI-AVENTIS | 0.4500% | XS0176128675 | 4.250% | 15-Sep-10 | Western European | |
| SCHNEIDER ELECTRIC SA | 0.4500% | FR0000483091 | 6.125% | 19-Oct-07 | Western European | |
| The Sherwin-Williams Company | 0.4500% | US824348AL99 | 7.375% | 1-Feb-27 | North American | |
| Siemens Aktiengesellschaft | 0.4500% | XS0131224155 | 5.750% | 4-Jul-11 | Western European | |
| Aktiebolaget SKF | 0.4500% | US784375AD92 | 7.125% | 1-Jul-07 | Western European | |
| Sara Lee Corporation | 1.2625% | US803111AM56 | 6.125% | 1-Nov-32 | North American | |
| SLM Corporation | 0.4500% | US78442FAB49 | 5.125% | 27-Aug-12 | North American | |
| SOCIETE GENERALE | 0.4500% | XS0110623950 | 6.625% | 27-Apr-15 | Western European | |
| Standard Pacific Corp. | 0.4800% | US85375CAN11 | 6.875% | 15-May-11 | North American High Yield | |
| COMPAGNIE DE SAINT-GOBAIN | 0.4500% | FR0010094623 | 5.000% | 25-Apr-14 | Western European | |
| STMicroelectronics N.V. | 0.4500% | XS0173918011 | 0.000% | 5-Jul-13 | Western European | |
| The Stanley Works | 1.2625% | US854610AJ88 | 4.900% | 1-Nov-12 | North American | |
| TELUS CORPORATION | 0.4500% | US87971MAC73 | 8.000% | 1-Jun-11 | North American | |
| TELSTRA CORPORATION LIMITED | 0.4500% | XS0131858838 | 6.375% | 29-Jun-11 | Australia and New Zealand | |
| TELECOM CORPORATION OF NEW ZEALAND LIMITED | 0.4500% | XS0140346171 | 6.750% | 14-Dec-11 | Australia and New Zealand | |

| Reference Entity | Reference Entity Credit Position | Benchmark Obligation | | | Entity Type | Monoline |
| | | CUSIP/ISIN | Coupon (%) | Maturity | | |
|---|---|---|---|---|---|---|
| TELECOM ITALIA SPA | 1.2625% | XS0184373925 | 5.375% | 29-Jan-19 | Western European | |
| TeliaSonera Aktiebolag | 0.4500% | XS0101443538 | 5.500% | 10-Sep-10 | Western European | |
| THOMSON | 0.4500% | FR0000188369 | 1.000% | 1-Jan-08 | Western European | |
| TNT N.V. | 0.4500% | NL0000117190 | 3.875% | 1-Jun-15 | Western European | |
| Toll Brothers, Inc. | 1.2625% | US88947EAA82 | 6.875% | 15-Nov-12 | North American | |
| TOYOTA MOTOR CORPORATION | 0.4500% | JP363340A296 | 1.330% | 20-Sep-12 | Japanese | |
| Tyson Foods, Inc. | 0.4500% | US902494AM53 | 8.250% | 1-Oct-11 | North American | |
| Textron Inc. | 0.4500% | US883203BC54 | 6.375% | 15-Nov-09 | North American | |
| CITADEL FINANCE LTD | 1.2625% | US17285RAA86 | 6.250% | 15-Dec-11 | North American | |
| TYCO INTERNATIONAL LTD. | 1.2625% | US902118DC19 | 6.375% | 15-Oct-11 | North American | |
| UBS AG | 0.4500% | CH0009367886 | 3.500% | 27-Aug-08 | Western European | |
| Universal Health Services, Inc. | 1.2625% | US913903AM22 | 6.750% | 15-Nov-11 | North American | |
| United Parcel Service, Inc. | 0.4500% | US911308ABB4 | 8.375% | 1-Apr-30 | North American | |
| VINCI | 0.4500% | XS0151548616 | 5.875% | 22-Jul-09 | Western European | |
| VALEO | 1.2625% | FR0010037468 | 2.375% | 1-Jun-11 | Western European | |
| Vornado Realty L.P. | 0.4500% | US929042AB56 | 4.750% | 1-Dec-10 | North American | |
| VODAFONE GROUP PUBLIC LIMITED COMPANY | 0.4500% | XS0169888558 | 5.000% | 4-Jun-18 | Western European | |
| Whirlpool Corporation | 0.4500% | US963320AH94 | 7.750% | 15-Jul-16 | North American | |
| UNITED STATES STEEL CORPORATION | 0.4500% | US912909AA63 | 9.750% | 15-May-10 | North American | |
| XL Capital Assurance Inc. | 1.2625% | *NoRefOb | *NoRefOb | *NoRefOb | North American | Applicable |
| Mobil Corporation | 0.4500% | US607059AT90 | 8.625% | 15-Aug-21 | North American | |
| YRC Worldwide Inc. | 0.4500% | US985557AD75 | 3mLIBOR+1.375% | 15-May-08 | North American High Yield | |
| Vneshtorgbank | 1.2625% | XS0197141285 | LIBOR+2.9% | 30-Jul-07 | Russian | |
| | | XS0182007830 | 6.880% | 11-Dec-08 | | |
| | | XS0202919667 | 7.500% | 12-Oct-11 | | |
| | | US92909MAA80 | 7.500% | 12-Oct-11 | | |
| | | XS0233715920 | 6.250% | 30-Jun-35 | | |
| | | US92909MAB63 | 6.250% | 30-Jun-35 | | |
| | | XS0239043655 | LIBOR+0.75% | 21-Sep-07 | | |
| | | US92909MAC47 | LIBOR+0.75% | 21-Sep-07 | | |
| | | XS0244105283 | 4.250% | 15-Feb-16 | | |

## Schedule B
## Additional Definitions

### Definitions relating to Credit Events

Bankruptcy:

means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).

Default Requirement:

USD 10,000,000 or its equivalent in any other currency.

Failure to Pay:

means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

Payment Requirement:      USD 1,000,000 or its equivalent in any other currency.

Restructuring:

(a) Restructuring means that, with respect to one or more Obligations and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i) a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii) a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii) a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv) a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v) any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

"Permitted Currency" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local currency long-term debt rating of either AAA or higher assigned to it by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, Aaa or higher assigned to it by Moody's Investors Service Inc. or any successor to the rating business thereof or AAA or higher assigned to it by Fitch Ratings Limited or any successor to the rating business thereof.

(b) Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i) the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts

or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c) For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Affiliate Guarantee or, if "All Guarantees" is specified as Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.

(d) With respect to a Reference Entity, unless "Multiple Holder Obligation" is specified as Not Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation.

"Multiple Holder Obligation" means an Obligation that (i) at the time the Credit Event Notice is delivered, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation) at least equal to sixty-six-and-two-thirds is required to consent to the event which would otherwise constitute a Restructuring Credit Event,

|  | provided that (ii) above shall not apply to any Obligations which are Bonds. |
|---|---|
| Obligation Acceleration: | means one or more Obligations in an aggregate amount of not less than the Default Requirement have become due and payable before they would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described), other than a failure to make any required payment, in respect of the Reference Entity under one or more Obligations. |
| Repudiation/Moratorium: | means the occurrence of both of the following events: (i) an authorised officer of a Reference Entity or a Governmental Authority (x) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, one or more Obligations in an aggregate amount of not less than the Default Requirement, or (y) declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to one or more Obligations in an aggregate amount of not less than the Default Requirement and (ii) a Failure to Pay, determined without regard to the Payment Requirement, or a Restructuring, determined without regard to the Default Requirement, with respect to any such Obligation occurs on or prior to the Repudiation/Moratorium Evaluation Date. |
| Credit Event Notice: | An irrevocable notice (which may be oral, including by telephone) from Buyer to Seller (with a written copy to Fitch) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective |
| Credit Event Notice After Restructuring: | With respect to a Reference Entity, notwithstanding anything to the contrary in the Credit Derivative Definitions, upon the occurrence of a Restructuring Credit Event during the term of the Transaction: |
|  | (a)   the Buyer may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies (with a written copy to Fitch), each such Credit Event Notice setting forth the amount of the Floating Rate Payer Calculation Amount to which such Credit Event Notice applies (the "Exercise Amount"); |
|  | (b)   if the Buyer has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then outstanding Floating Rate Payer Calculation Amount for the Reference Entity to which such Credit Event applies, it shall be construed as if the Reference Registry contained two entries for that specific Reference Entity, one which has a Floating Rate Payer Calculation Amount equal to the |

Exercise Amount and, upon satisfaction of the Conditions to Settlement, will be settled in accordance with the terms herein, and the other of which will have a Floating Rate Payer Calculation Amount equal to the Floating Rate Payer Calculation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect; and

(c) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency in which the Floating Rate Payer Calculation Amount is denominated or an integral multiple thereof.

Grace Period:

means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days.

Grace Period Extension Date:

in the event of a Potential Failure to Pay occurring on or prior to the Scheduled Termination Date, and if Grace Period Extension is specified as applicable, and the relevant Grace Period ends after the Scheduled Termination Date, the Grace Period Extension Date will be (i) in the event that the Calculation Agent determines that the Potential Failure to Pay is remedied during the Grace Period, and, in the absence of further Credit Events or further Potential Failure to Pay prior to or on the Scheduled Termination Date, the later of (A) the Scheduled Termination Date, and (B) the date which is three Business Days after the date of such remedy, or (ii) in the event that such Potential Failure to Pay is not remedied (as determined by the Calculation Agent in its sole and absolute discretion) before the expiry of the Grace Period and does not result in the occurrence of a Failure to Pay occurring prior to the expiry of the Grace Period, the date that is three Business Days following the expiry of the Grace Period.

Notice of Publicly Available Information:

means an irrevocable notice from the Calculation Agent (which may be oral, including by telephone) to the Buyer and Seller (with a written copy to Fitch) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information.

Event Determination Date:

means the first date on which both the Credit Event Notice and the Notice of Publicly Available Information are effective.

Potential Failure to Pay:

means the failure by any one of the Reference Entities to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more

|  | Obligations, without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligations, in accordance with the terms of such Obligations at the time of such failure. |
|---|---|
| Potential Repudiation/Moratorium: | means the occurrence of an event described in clause (I) of the definition at Repudiation/Moratorium. |
| Repudiation/Moratorium Evaluation Date: | means, if a Potential Repudiation/Moratorium occurs on or prior to the Scheduled Termination Date, (i) if the Obligations to which such Potential Repudiation/Moratorium relates include Bonds, the date that is the later of (A) the date that is 60 days after the date of such Potential Repudiation/Moratorium and (B) the first payment under any such Bond after the date of such Potential Repudiation/Moratorium (or, if later, the expiration date or of any applicable Grace Period in respect of such payment date) and (ii) if the Obligations to which such Potential Repudiation/Moratorium relates do not include Bonds, the date that is 60 days after the date of such Potential Repudiation/Moratorium. |

If (i) the Repudiation/Moratorium Extension Condition is satisfied and (ii) an Event Determination Date in respect of that Repudiation/Moratorium does not occur during the Notice Delivery Period, the Repudiation/Moratorium Evaluation Date will be the Termination Date (even if a Repudiation/Moratorium occurs after the Scheduled Termination Date).

| Repudiation/Moratorium Extension Condition: | The "Repudiation/Moratorium Extension Condition" is satisfied by the delivery of a Repudiation/Moratorium Extension Notice and, if specified as applicable in the related Confirmation, Notice of Publicly Available Information by the Notifying Party to the other party that is effective during the period described in clause (a) of the definition of Notice Delivery Period. |
|---|---|
| Repudiation/Moratorium Extension Notice: | means an irrevocable notice (which may be by telephone) from Notifying Party to the other party that describes a Potential Repudiation/Moratorium that occurred during the Credit Observation Period. A Repudiation/Moratorium Extension Notice must contain a description in reasonable detail of the facts relevant to the determination that a Potential Repudiation/Moratorium has occurred and indicate the date of the occurrence. The Potential Repudiation/Moratorium that is the subject of the Repudiation/Moratorium Extension Notice need not be continuing on the date the Repudiation/Moratorium Extension Notice is effective. A Repudiation/Moratorium Extension Notice shall be subject to the requirements regarding notices set forth in Section 1.10 of the Credit Derivatives definitions. |
| Qualifying Guarantee: | means an arrangement evidenced by a written instrument |

pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "**Underlying Obligation**") for which another party is the obligor (the "**Underlying Obligor**") and that is not at the time of the Credit Event Subordinated to any unsubordinated Borrowed Money obligation of the Underlying Obligor (with references in the definition of Subordination to the Reference Entity deemed to refer to the Underlying Obligor). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation.

Qualifying Affiliate Guarantee:  means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity.

Downstream Affiliate:  means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent, owned, directly or indirectly, by the Reference Entity.

Voting Shares:  means those shares or other interests that have power to elect the board of directors or similar governing body of an entity.

Governmental Authority:  means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of a Reference Entity or of the jurisdiction of organisation of a Reference Entity.

Convertible Obligation:  means any obligation that is convertible, in whole or in part, into Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

Exchangeable Obligation:  means any obligation that is exchangeable, in whole or in part, for Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

Accreting Obligation:

means any obligation (including, without limitation, a Convertible Obligation or an Exchangeable Obligation), the terms of which expressly provide for an amount payable upon acceleration equal to the original issue price (whether or not equal to the face amount thereof) plus an additional amount or amounts (on account of original issue discount or other accruals of interest or principal not payable on a periodic basis) that will or may accrete, whether or not (A) payment of such additional amounts is subject to a contingency or determined by reference to a formula or index, or (B) periodic cash interest is also payable.

Equity Securities:

means:

(A)     in the case of a Convertible Obligation, equity securities (including options and warrants) of the issuer of such obligation or depositary receipts representing those equity securities of the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time; and

(B)     in the case of an Exchangeable Obligation, equity securities (including options and warrants) of a person other than the issuer of such obligation or depositary receipts representing those equity securities of a person other than the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time.

## Obligation and Reference Obligation Definitions

Borrowed Money:

with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit).

Bond:

means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans), certificated debt security or other debt security, and shall not include any other type of borrowed money obligation.

Loan:

means with respect to any one of the Reference Entities, any

|  | one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of borrowed money obligation. |
|---|---|
| Bond or Loan: | means any obligation that is either a Bond or a Loan. |
| Specified Currencies: | meaning (a) Standard Specified Currencies and (b) any additional currencies specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to a Reference Entity. |
| Standard Specified Currency: | means an obligation payable in any of the lawful currencies of Canada, Japan, Switzerland, the United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies). |
| Domestic Currency: | means an obligation payable in the lawful currency and any successor currency of (a) the relevant Reference Entity, if the Reference Entity is a Sovereign, or (b) the jurisdiction in which the relevant Reference Entity is organised, if the Reference Entity is not a Sovereign. In no event shall Domestic Currency include any successor currency if such successor currency is the lawful currency of any of Canada, Japan, Switzerland, the United Kingdom or the United States of America or the euro (or any successor currency to any such currency). |
| Subordinated: | means an obligation that is subordinated to an obligation that is Not Subordinated. |
| Not Subordinated: | means an obligation that is not subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in the Reference Registry or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Obligation Characteristic or Reference Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date. |
| Not Contingent: | means any obligation having as of the relevant Valuation Date and all times thereafter an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an |

Accreting Obligation shall satisfy the Not Contingent Reference Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded) on or before the relevant Valuation Date.

Transferable:

means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(A) contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligation); or

(B) restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds.

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.

Maximum Maturity 30 years:

means an obligation that has a remaining maturity from the Valuation Date of not greater than 30 years.

Not Bearer:

means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream, Luxembourg or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds.

Not Sovereign Lender:

means any obligation that is not primarily owed to a Sovereign or Supranational Organisation, including, without limitation, obligations generally referred to as "Paris Club Debt".

Not Domestic Law:

means any obligation that is not governed by the laws of (A) the relevant Reference Entity, if such Reference Entity is a Sovereign, or (B) the jurisdiction or organisation of the relevant Reference Entity, if such Reference Entity is not a Sovereign.

Not Domestic Issuance:

means any obligation other than an obligation that was, at the time the relevant obligation was issued (or reissued, as the case may be) or incurred, intended to be offered for sale primarily in

the domestic market of the relevant Reference Entity. Any obligation that is registered or qualified for sale outside the domestic market of the relevant Reference Entity (regardless of whether such obligation is also registered or qualified for sale within the domestic market of the relevant Reference Entity) shall be deemed not to be intended for sale primarily in the domestic market of the Reference Entity.

**Not Domestic Currency:** means any obligation that is payable in a currency other than the Domestic Currency.

**Assignable Loan:** means a Loan that is, as of the Valuation Date, capable of being assigned or novated to, at a minimum, commercial banks or financial institutions (irrespective of their jurisdiction of organisation) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

**Consent Required Loan:** means a Loan that is, as of the Event Determination Date, capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

In the event that any Reference Obligation is a Loan which is a Consent Required Loan, the Calculation Agent will only be permitted to use a Bid Quotation from a Dealer to determine the Final Reference Obligation Price of such Reference Obligation if the Calculation Agent provided such Dealer with the information reasonably required by that Dealer to give such Bid Quotation. For the sake of clarity, information which may be reasonably requested by such Dealer (and which shall be provided by the Calculation Agent if requested in respect of such Bid Quotation) may include any of the following:

(1)   the name of the debtor;

(2)   the governing law;

(3)   guarantee (existence and description);

(4)   surety (existence and description);

(5)   description of the covenants;

(6)   maturity and amortisation profile;

(7)   coupon;

(8)   revolver or term loan;

(9)   drawn or not; and

(10)    the effective date of the loan.

### Certain additional definitions with respect to Restructuring

"**Restructuring Maturity Limitation Date**" means, with respect to a Reference Entity for which Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the earlier of (x) 30 months following the Restructuring Date and (y) the latest final maturity date of any Restructured Bond or Loan, provided, however, that under no circumstances shall the Restructuring Maturity Limitation Date be earlier than the Scheduled Termination Date or later than 30 months following the Scheduled Termination Date and, if it is, it shall be deemed to be the Scheduled Termination Date or 30 months following the Scheduled Termination Date, as the case may be.

"**Restructuring Date**" means, with respect to a Restructured Bond or Loan, the date on which a Restructuring is legally effective in accordance with the terms of the documentation governing such Restructuring.

"**Restructured Bond or Loan**" means an Obligation which is a Bond or Loan and in respect of which the Restructuring that is the subject of a Credit Event Notice has occurred.

"**Eligible Transferee**" means each of the following:

(a)

      (i)     any bank or other financial institution;

      (ii)    an insurance or reinsurance company;

      (iii)   a mutual fund, unit trust or similar collective investment vehicle (other than an entity specified in clause (c)(i) below); and

      (iv)   a registered or licensed broker or dealer (other than a natural person or proprietorship);

      provided, however, in each case that such entity has total assets of at least USD500 million;

(b)    an Affiliate of an entity specified in the preceding clause (a);

(c)    each of a corporation, partnership proprietorship, organisation, trust or other entity

      (i)     that is an investment vehicle (including, without limitation, any hedge fund, issuer of collateralised debt obligations, commercial paper conduit or other special purpose vehicle) that (1) has total assets of at least USD100 million or (2) is one of a group of investment vehicles under common control or management having, in the aggregate, total assets of at least USD100 million; or

      (ii)    that has total assets of at least USD500 million; or

      (iii)   the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in clauses (a), (b), (c)(ii) or (d); and

(d)    a Sovereign, Sovereign Agency or Supranational Organisation;

All references in this definition of USD include equivalent amounts in other currencies.

"**Fully Transferable Obligation**" means, with respect to a Reference Entity for which Fully Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Eligible

Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds. For purposes of determining whether a Reference Obligation is Transferable or is capable of being assigned or novated to Eligible Transferees, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

Any requirement that notification of transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Reference Obligation shall not be considered to be a requirement for consent for purposes of the definitions of Restructuring Maturity Limitation and Fully Transferable Obligation.

"Modified Restructuring Maturity Limitation Date" means. with respect to a Reference Entity for which Modified Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the later of (x) the Scheduled Termination Date and (y) 60 months following the Restructuring Date in the case of a Restructured Bond or Loan, or 30 months following the Restructuring Date in the case of all other Reference Obligations.

"Modified Eligible Transferee" means any bank, financial institution or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities and other financial assets.

"Conditionally Transferable Obligation" means, with respect to a Reference Entity for which Conditionally Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Modified Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds, provided, however, that a Reference Obligation other than Bonds will be a Conditionally Transferable Obligation notwithstanding that consent of the Reference Entity or the guarantor, if any, of a Reference Obligation other than Bonds (or the consent of the relevant obligor if a Reference Entity is guaranteeing such Reference Obligation) or any agent is required for such novation, assignment or transfer so long as the terms of such Reference Obligation provide that such consent may not be unreasonably withheld or delayed. Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for a Reference Obligation shall not be considered to be a requirement for consent for purposes of this definition.

For purposes of determining whether a Reference Obligation satisfies the requirements of the definition of Conditionally Transferable Obligation, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

### Certain definitions relating to Successors

(a)     In relation to a Reference Entity that is not a Sovereign, "Successor" means the entity or entities, if any, determined as set forth below:

  (i)     if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

A07517393/2.0/16 Mar 2007

69

(ii)    if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

(iii)    if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;

(iv)    if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

(v)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

(vi)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.

The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective date of the Succession Event), and with effect from the legally effective date of the Succession Event, whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

(b)    "Succession Event" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.

(c)    Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity:

(i)   each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(ii)   the Floating Rate Payer Calculation Amount in respect of each such Successor Reference Entity shall be the Floating Rate Payer Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities.

(d)   "Relevant Obligations" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

(e)   "Best Available Information" means:

(i)   in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "Successor", other relevant information that is contained in any written communication provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

(ii)   in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "Successor".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

(f)   In relation to a Sovereign Reference Entity, "Successor" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"Sovereign" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

### Additional Terms For Monolines

(a)   Qualifying Policy. "Qualifying Policy" means a financial guaranty insurance policy or similar financial guarantee pursuant to which a Reference Entity irrevocably guarantees or insures all Instrument Payments (as defined below) of an Instrument that constitutes Borrowed Money (modified

as set forth below) (the "Insured Instrument") for which another party (including a special purpose entity or trust) is the obligor (the "Insured Obligor"). Qualifying Policies shall exclude any arrangement (i) structured as a surety bond, letter of credit or equivalent legal arrangement or (ii) pursuant to the express contractual terms of which the payment obligations of the Reference Entity can be discharged or reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than the payment of Instrument Payments). The benefit of a Qualifying Policy must be capable of being Delivered together with the Delivery of the Insured Instrument.

"Instrument Payments" means (A) in the case of any Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, (x) the specified periodic distributions in respect of interest or other return on the Certificate Balance on or prior to the ultimate distribution of the Certificate Balance and (y) the ultimate distribution of the Certificate Balance on or prior to a specified date and (B) in the case of any other Insured Instrument, the scheduled payments of principal and interest, in the case of both (A) and (B) (1) determined without regard to limited recourse or reduction provisions of the type described in paragraph (d) below and (2) excluding sums in respect of default interest, indemnities, tax gross-ups, make-whole amounts, early redemption premiums and other similar amounts (whether or not guaranteed or insured by the Qualifying Policy).

"Certificate Balance" means, in the case of an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, the unit principal balance, certificate balance or similar measure of unreimbursed principal investment.

(b)     Obligation and Reference Obligation. Sections 2.14(a) and 2.15(a) of the Definitions are hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee".

(c)     Interpretation of Provisions. In the case of a Reference Entity in respect of which Monoline is specified as applicable in Reference Registry, in the event that an Obligation or a Reference Obligation is a Qualifying Policy, the terms of Section 2.21(d) of the Definitions (which shall for the purpose of this Transaction be construed so that references therein to Deliverable Obligations, Deliverable Obligation Category and Deliverable Obligation Characteristics shall be deemed to be references to Reference Obligations, Reference Obligation Category and Reference Obligation Characteristics respectively) will apply, with references to the Qualifying Guarantee, the Underlying Obligation and the Underlying Obligor deemed to include the Qualifying Policy, the Insured Instrument and the Insured Obligor, respectively, except that:

    (i)     the Obligation Category Borrowed Money and the Obligation Category and Reference Obligation Category Bond shall be deemed to include distributions payable under an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the Reference Obligation Category Bond shall be deemed to include such an Insured Instrument, and the terms "obligation" and "obligor" as used in the 2003 ISDA Credit Derivatives Definitions in respect of such an Insured Instrument shall be construed accordingly;

    (iii)    references in the definitions of Assignable Loan and Consent Required Loan to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively;

    (iv)    neither the Qualifying Policy nor the Insured Instrument must satisfy on the relevant date the Reference Obligation Characteristic of Accelerated or Matured, whether or not that characteristic is otherwise specified as applicable herein;

    (v)     if the Assignable Loan, Consent Required Loan, Direct Loan Participation or Transferable Reference Obligation Characteristics are specified herein and if the benefit of the Qualifying

Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument; and

(vi)    with respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "outstanding principal balance" shall mean the outstanding Certificate Balance and "maturity", as such term is used in the Maximum Maturity Reference Obligation Characteristic, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur.

(d)    Not Contingent. An Insured Instrument will not be regarded as failing to satisfy the Not Contingent Reference Obligation Characteristic solely because such Insured Instrument is subject to provisions limiting recourse in respect of such Insured Instrument to the proceeds of specified assets (including proceeds subject to a priority of payments) or reducing the amount of any Instrument Payments owing under such Insured Instrument, provided that such provisions are not applicable to the Qualifying Policy by the terms thereof and the Qualifying Policy continues to guarantee or insure, as applicable, the Instrument Payments that would have been required to be made absent any such limitation or reduction.

(e)    Deliver. For purposes of Section 8.2 of the Definitions, "Deliver" with respect to an obligation that is a Qualifying Policy means to Deliver both the Insured Instrument and the benefit of the Qualifying Policy (or a custodial receipt issued by an internationally recognized custodian representing an interest in such an Insured Instrument and the related Qualifying Policy), and "Delivery" and "Delivered" will be construed accordingly.

(f)    Provisions for Determining a Successor. Section 2.2(c) of the Definitions is hereby amended by adding "or insurer" after "or guarantor".

(g)    Substitute Reference Obligation. Section 2.30 of the Definitions is hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee" in the definition of Substitute Reference Obligation and paragraph (b) thereof. For purposes of Section 2.30(a)(ii)(B) and Section 1.14(b)(ii) of the Definitions, references to the Qualifying Guarantee and the Underlying Obligation shall be deemed to include the Qualifying Policy and the Insured Instrument, respectively.

(h)    Other Provisions. For purposes of Sections 2.15(a)(ii), 4.1, 8.2, 9.1 and 9.2(a) of the Definitions, references to the Underlying Obligation and the Underlying Obligor shall be deemed to include Insured Instruments and the Insured Obligor, respectively.

## Schedule C

The standard terms relating to each Entity Type are set out in this Schedule C.

### STANDARD TERMS FOR WESTERN EUROPEAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |
| Reference Obligation | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated<br>Specified Currency – Standard Specified Currencies<br>Not Contingent<br>Assignable Loan<br>Consent Required Loan<br>Transferable<br>Maximum Maturity 30 years<br>Not Bearer |

Exclude Accrued Interest

## STANDARD TERMS FOR WESTERN EUROPEAN INSURANCE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension: | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency - Standard Specified Currencies |
| | Not Contingent |
| | Assignable Loan |
| | Consent Required Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |

Exclude Accrued Interest

## STANDARD TERMS FOR AUSTRALIAN AND NEW ZEALAND ENTITIES

All Guarantees                Applicable

Credit Events                 Bankruptcy

                              Failure to Pay

                              Restructuring

                                 Restructuring  Maturity  Limitation  and  Fully  Transferable  Obligation:
                                 Applicable

                                 Modified Restructuring Maturity Limitation and Conditionally Transferable
                                 Obligation: Not Applicable

                                 Multiple Holder Obligation: Applicable

Grace Period Extension         Not Applicable

Obligation

                              Obligation Category:            Borrowed Money

                              Obligation Characteristics:     None

Reference Obligation

                              Reference Obligation Category:        Bond or Loan

                              Reference Obligation Characteristics:  Not Subordinated
                                                                     Specified Currency – Standard
                                                                        Specified Currencies, plus AUD and
                                                                        NZD
                                                                     Not Contingent
                                                                     Assignable Loan
                                                                     Consent Required Loan
                                                                     Transferable
                                                                     Maximum Maturity 30 years
                                                                     Not Bearer

                              Exclude Accrued Interest

## STANDARD TERMS FOR JAPANESE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

Repudiation/Moratorium (applicable only to Sovereigns)

Section 3.9 of the Credit Derivatives Definitions shall not apply.

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |
| | Obligation Category:      Borrowed Money |
| | Obligation Characteristics:      Not Subordinated |
| Reference Obligation | |
| | Reference Obligation Category:      Bond or Loan |

Reference Obligation Characteristics:     Not Subordinated
Specified Currency – Standard Specified
Currencies
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity 30 years
Not Bearer

Exclude Accrued Interest

## STANDARD TERMS FOR SINGAPOREAN ENTITIES

| | | |
|---|---|---|
| All Guarantees | Applicable | |
| Credit Events | Bankruptcy | |
| | Failure to Pay | |
| | Restructuring | |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable | |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable | |
| | Multiple Holder Obligation: Applicable | |
| | Repudiation/Moratorium (applicable only to Sovereigns) | |
| Grace Period Extension | Not Applicable | |
| Obligation | | |
| | Obligation Category: | Bond or Loan |
| | Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard |
| | | Specified Currencies, plus SGD |
| | | Not Sovereign Lender |
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard |
| | | Specified Currencies, plus SGD |
| | | Not Sovereign Lender |
| | | Not Contingent |
| | | Assignable Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |
| | Exclude Accrued Interest | |

A07517393/2.0/16 Mar 2007

## STANDARD TERMS FOR ASIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable |
| | Multiple Holder Obligation: Applicable |
| | Repudiation/Moratorium (applicable only to Sovereigns) |
| Grace Period Extension | Not Applicable |
| Obligation | |
| | Obligation Category:        Bond or Loan |
| | Obligation Characteristics:   Not Subordinated |
| | Not Sovereign Lender |
| | Not Domestic Currency |
| | Not Domestic Issuance |
| | Not Domestic Law |
| Reference Obligation | |
| | Reference Obligation Category:   Bond or Loan |
| | Reference Obligation Characteristics:   Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Sovereign Lender |
| | Not Domestic Law |
| | Not Domestic Currency |
| | Not Contingent |
| | Not Domestic Issuance |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| | Exclude Accrued Interest |

STANDARD TERMS FOR NORTH AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable |
| | Multiple Holder Obligation: Applicable |
| Grace Period Extension | Not Applicable |
| Obligation | |
| | Obligation Category:   Borrowed Money |
| | Obligation Characteristics:   None |
| Reference Obligation | |
| | Reference Obligation Category:   Bond or Loan |
| | Reference Obligation Characteristics:   Not Subordinated |

Reference Obligation Characteristics:
Not Subordinated
Specified Currency -- Standard Specified Currencies
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity 30 years
Not Bearer

Exclude Accrued Interest

## STANDARD TERMS FOR NORTH AMERICAN HIGH YIELD ENTITIES

| | | |
|---|---|---|
| All Guarantees | Not Applicable | |
| Credit Events | Bankruptcy | |
| | Failure to Pay | |
| Grace Period Extension | Not Applicable | |
| Obligation | | |
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard |
| | | Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |
| | Exclude Accrued Interest | |

## STANDARD TERMS FOR EMERGING MARKET SOVEREIGNS

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/ Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |

Exclude Accrued Interest

STANDARD TERMS FOR RUSSIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable with respect to Obligation Category of "Bonds"; Applicable with respect to Obligation Category of "Loans".

| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest

## STANDARD TERMS FOR EMERGING MARKETS ENTITIES

| | | |
|---|---|---|
| All Guarantees | Applicable | |
| Credit Events | Bankruptcy | |
| | Failure to Pay | |
| | Obligation Acceleration | |
| | Repudiation/Moratorium | |
| | Restructuring | |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

| | | |
|---|---|---|
| Grace Period Extension | Applicable | |
| Obligation | | |
| | Obligation Category: | Bond or Loan |
| | Obligation Characteristics: | Not Subordinated |
| | | Not Domestic Currency |
| | | Not Domestic Law |
| | | Not Domestic Issuance |
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency — Standard Specified Currencies |
| | | Not Domestic Law |
| | | Not Contingent |
| | | Not Domestic Issuance |
| | | Transferable |
| | | Not Bearer |
| | | Assignable loan |
| | | Consent required loan |
| | Exclude Accrued Interest | |

## STANDARD TERMS FOR LATIN AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Grace Period Extension: Applicable |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable |
| | Multiple Holder Obligation: Not Applicable |
| Obligation | |
| | Obligation Category:       Bond or Loan |
| | Obligation Characteristics:       Not Subordinated<br>Not Domestic Currency<br>Not Domestic Law<br>Not Domestic Issuance |
| Reference Obligation | |
| | Reference Obligation Category:       Bond or Loan |
| | Reference Obligation Characteristics:       Not Subordinated<br>Specified Currency – Standard Specified Currencies<br>Not Domestic Law<br>Not Contingent<br>Not Domestic Issuance<br>Transferable<br>Not Bearer<br>Assignable Loan<br>Consent Required Loan |
| | Exclude Accrued Interest |

## STANDARD TERMS FOR KAZAKHSTAN ENTITIES

| | | |
|---|---|---|
| All Guarantees | Applicable | |
| Credit Events | Bankruptcy | |
| | Failure to Pay | |
| | Obligation Acceleration | |
| | Repudiation/Moratorium | |
| | Restructuring | |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable | |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable | |
| | Multiple Holder Obligation: Not Applicable | |
| Grace Period Extension | Not Applicable | |
| Obligation | | |
| | Obligation Category: | Bond or Loan |
| | Obligation Characteristics: | Not Subordinated |
| | | Not Domestic Currency |
| | | Not Domestic Law |
| | | Not Domestic Issuance |
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency -- Standard |
| | | Specified Currencies |
| | | Not Domestic Law |
| | | Not Contingent |
| | | Not Domestic Issuance |
| | | Transferable |
| | | Not Bearer |
| | | Assignable Loan |
| | | Consent Required Loan |
| | Exclude Accrued Interest | |

For the avoidance of doubt, "Assignable Loan" and "Consent Required Loan" shall not apply to Obligations, which are Bonds.

Obligations that are in the form of a "Loan" need only satisfy one of the characteristics "Assignable Loan" and "Consent Required Loan".

**Annex A**

**PARAGRAPH 11**

**of the**

**CREDIT SUPPORT ANNEX**

to the Schedule to the ISDA Master Agreement

dated as of 10 October 2002 (as amended and restated on 21 July 2006)

between

**Lehman Brothers Special Financing Inc.**     and          **Zircon Finance Limited**

("Party A")                                        ("Party B")

pursuant to a Deed of Accession dated 20 March 2007

**Paragraph 11. Elections and Variables**

(a)   *Base Currency and Eligible Currency.*

    (i)   "Base Currency" means AUD.

    (ii)   "Eligible Currency" means the Base Currency and each other currency specified here: none.

(b)   *Credit Support Obligations.*

    (i)   *Delivery Amount, Return Amount and Credit Support Amount.*

        (a)   "*Delivery Amount*" has the meaning specified in Paragraph 2(a) except that the Transferee shall be deemed to have made a demand on each Valuation Date.

        (b)   "*Return Amount*" has the meaning specified in Paragraph 2(b).

        (c)   "*Credit Support Amount*" has the meaning specified in Paragraph 10.

    (ii)   *Eligible Credit Support.* The following items will qualify as "*Eligible Credit Support*" for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash in an Eligible Currency. | X | X | 100% |
| (B) | AUD denominated government debt obligations assigned with a credit rating of "AAA" by Fitch (as defined below). | X | X | As agreed with Fitch |
| (C) | AUD denominated money market funds with a credit rating assigned by Fitch (or its successor) equal to "V-1+". | X | X | 100% |

    (iii)   *Thresholds.*

        (a)   "*Independent Amount*" means with respect to Party A and to Party B: not applicable.

        (b)   "*Threshold*" means with respect to Party A: zero
           "*Threshold*" means with respect to Party B: not applicable

(c)  *"Minimum Transfer Amount"* means with respect to Party A: AUD1

   *"Minimum Transfer Amount"* means with respect to Party B: AUD1

(d)  *Rounding.* Not Applicable.

(c)  *Valuation and Timing.*

   (i)    *"Valuation Agent"* means Party A.

   (ii)   *"Valuation Date"* means: 20 March 2007 and, thereafter, Friday of each week, provided that
         if such day is not a day on which commercial banks are open for business in London, the
         Valuation Date shall be the immediately following day on which commercial banks are open
         for business in London.

   (iii)  *"Valuation Time"* means:

         [X]  the close of business in the place of location of the Valuation Agent on the Valuation
              Date or date of calculation, as applicable;

         [ ]  the close of business on the Local Business Day immediately preceding the Valuation
              Date or date of calculation, as applicable;

   *provided* that the calculations of Value and Exposure will, as far as practicable, be made as of
   approximately the same time on the same date.

   (iv)   *"Notification Time"* means 1:00 p.m., London time, on a Local Business Day.

(d)  *Exchange Date.* *"Exchange Date"* has the meaning specified in Paragraph 3(c)(ii).

(e)  *Dispute Resolution.*

   (i)    *"Resolution Time"* means 1:00 p.m., London time, on the Local Business Day following the
         date on which the notice is given that gives rise to a dispute under Paragraph 4.

   (ii)   *Value.* For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the
         outstanding Credit Support Balance or of any transfer of Eligible Credit Support or
         Equivalent Credit Support, as the case may be, will be calculated by Party A reasonably and
         in good faith.

   (iii)  *Alternative.* The provisions of Paragraph 4 will apply.

(f)  *Distributions and Interest Amount.*

   (i)    *Interest Rate.* Not Applicable. The definition of "Interest Amount" in Paragraph 10 shall be
         amended as follows:

         "Interest Amount" means, with respect to an Interest Period, the aggregate sum of the Base
         Currency Equivalents of the amounts of interest accrued in such Interest Period on the
         principal amount of the portion of the Credit Support Balance comprised of cash in such
         currency, as determined by the Valuation Agent.

   (ii)   *Transfer of Interest Amount.* The transfer of the Interest Amount will be made on each
         Valuation Date.

   (iii)  *Alternative to Interest Amount.* The provisions of Paragraph 5(c)(ii) will apply.

(g)  *Addresses for Transfers.*

   Party A: As notified by the parties from time to time.

   Party B: As notified by the parties from time to time.

A07517393/2.0/16 Mar 2007

Account details of Transferee:

Australia and New Zealand Banking Group Ltd (ANZBAU3MXXX)
A/C 21803200001
A/C JP Morgan Chase Bank, N.A., London
FFC: a/c 36573602
Ref: Zircon 2007-1B

(h)   *Other Provisions.*

   (i)   *Scope*

This Annex relates to the Transaction (the "Swap Transaction") between Party A and Party B with an Effective Date of 20 March 2007 relating to Zircon Finance Limited Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 (the "Tranche B Notes" or the "Notes"). The provisions of the Agreement shall apply both to the Swap Transaction and the Transaction evidenced by the Annex so that the Agreement, the Confirmation relating to the Swap Transaction and this Annex form a single agreement.

   (ii)   *Exposure*

The definition of "Exposure" shall be deleted and replaced with the following:

"*Exposure*" means, with respect to Party B on a Valuation Date, and subject to Paragraph 4 in the case of a dispute, zero, unless the Credit Rating of Party A's Credit Support Provider by Fitch is below "A"/"F1", in which case it shall mean the amount (expressed as a positive number) equal to the Swap Premium Exposure."

   (iii)   *Additional definitions for calculating Exposure*

For the purposes herein, the following definitions shall apply:

"*Aggregate Outstanding Principal Amount*" shall bear the meaning given to such term in the Series Prospectus with respect to the Notes;

"*Credit Rating*" means the rating assigned in respect of short term or long term (as applicable) unsecured and unsubordinated debt obligations (not supported by third party credit enhancement);

"*Fitch*" means Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto; and

"*Swap Premium Exposure*" means the amount equal to the sum of (1) the Fixed Amount payable by Party A under the Swap Transaction on the next succeeding Fixed Rate Payer Payment Date, and (2) the Grace Period Amount, where "*Grace Period Amount*" means an amount equal to: (x) the Aggregate Outstanding Principal Amount of the Notes, multiplied by (y) the Fixed Rate under the Swap Transaction, multiplied by (z) 11/360. For the purposes of calculating the Swap Premium Exposure: (i) the Fixed Amount and the Grace Period Amount shall be calculated as of each Valuation Date; (ii) the Aggregate Outstanding Principal Amount on each day of the Fixed Rate Payer Calculation Period following the relevant Valuation Date shall be equal to the Aggregate Outstanding Principal Amount as of such Valuation Date; and (iii) no reduction of the Aggregate Outstanding Principal Amount shall be made to reflect Credit Events in respect of which Potential Failure to Pay which have not been cured or Potential Repudiation/Moratorium which have not ceased to occur

(and not resulted in the occurrence of a Credit Event) still exist (in each case) as of such Valuation Date.

(iv) *Additional Termination Event; Transfer of additional Eligible Credit Support*

    (a) The failure by Party A to transfer the Eligible Credit Support to Party B in respect of any Valuation Date shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

    (b) Without prejudice to the calculation of Party B's Exposure, upon each occurrence of a Rating Event and while such Rating Event is continuing, Party A shall transfer Eligible Credit Support (or such other items as may be satisfactory to the Trustee and Fitch) in an amount satisfactory to the Trustee and Fitch (acting reasonably and in good faith) within 10 calendar days of such Rating Event. Such amount of Eligible Credit Support shall be an Independent Amount for the purposes of this Annex (unless otherwise agreed) and shall be calculated and maintained as agreed between Party A, the Trustee and Fitch.

    (c) In the event that Party A and Party B fail to reach the agreement contemplated in sub-paragraph (b) above within such 10 calendar day period Party A shall effect a Permitted Transfer or procure a Permitted Guarantee.

    (d) The failure by Party A to procure a Permitted Guarantee or effect a Permitted Transfer contemplated by sub-paragraph (c) above shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

For the purposes herein:

"*Permitted Guarantee*" means a guarantee or indemnity from an entity with a Required Rating in respect of Party A's obligations under the Swap Transaction in a form and substance reasonably satisfactory to the Trustee and the Issuer and on substantially the same terms as the Credit Support Document relating to the Swap Transaction;

"*Permitted Transfer*" means a transfer of all of Party A's rights and obligations with respect to the Swap Transaction to another entity which has (or whose obligations under the Swap Transaction are unconditionally and irrevocably guaranteed by an entity which has) a Required Rating;

"*Rating Event*" means the Credit Rating by Fitch of Party A's Credit Support Provider falls below the Required Ratings; and

"*Required Rating*" means a Credit Rating by Fitch of "F2" or above and "BBB+" or above.

(v) *Delivery of legal opinion*

    (a) In the event that Party A transfers Eligible Credit Support to Party B pursuant to Paragraph 11(h)(iv) above, Party A agrees to provide to Fitch within 10 calendar days of the occurrence of the Rating Event a legal opinion from its external legal advisers in form and substance reasonably satisfactory to Fitch (acting reasonably and in good faith), such opinion confirming, but not limited to, that the Eligible Credit Support so transferred shall not be required to be repaid, reimbursed or otherwise disgorged by

the Issuer, otherwise than in accordance with the terms of this Annex or the Swap Transaction.

(b) The failure of Party A to provide such legal opinion within such 10 calendar day period shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

(vi) *Single Transferor*

Notwithstanding anything contained in this Annex, Party A only shall be a Transferor and Party B only shall be a Transferee.

(vii) *No set-off*

Notwithstanding any set-off right between Party A and Party B, whether now or hereafter in existence, each of Party A and Party B agrees that, subject as provided in this Agreement, all payments required to be made by it under this Transaction shall be made without set-off and that it shall not withhold payment or delivery under this Transaction in respect of any default by the other party under any agreement other than this Agreement or any amount relating to any agreement other than this Agreement between the other party on the one hand and it on the other. For the avoidance of doubt, references in this paragraph to "this Agreement" include the ISDA Master Agreement.


Signed for and on behalf of                    Signed for and on behalf of
Lehman Brothers Special Financing Inc.         Zircon Finance Limited

By:                                            By:
Name: _____           Name: _____
Date:    20 March 2007                          Date:    20 March 2007

## Exhibit A
### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and ZIRCON FINANCE LIMITED ("Party B") have, pursuant to a Deed of Accession dated 20 March 2007, entered into a Master Agreement dated as of 10 October 2002, as amended and restated on 21 July 2006 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement for the Transaction evidenced by a Confirmation dated 20 March 2007 relating to the Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 of Party B (the "2007-1 Tranche B Transaction"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     The Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the 2007-1 Tranche B Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defence of a guarantor (excluding the defence of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect the Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement

and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Title: _____

Date: 20 March 2007

## Exhibit B
## PORTFOLIO MANAGEMENT AGREEMENT

Dated 20 March 2007

ZIRCON FINANCE LIMITED

and

LEHMAN BROTHERS SPECIAL FINANCING INC.

and

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

and

LION CAPITAL MANAGEMENT LIMITED
(Company Registration No. 1986017451)

PORTFOLIO MANAGEMENT AGREEMENT

in relation to the Zircon Finance Limited Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes
due 2014

**Linklaters**

10th Floor, Alexandra House
Chater Road
Hong Kong

Telephone (852) 2842 4888
Facsimile (852) 2810 8133/2810 1695

Ref ACM/KKYI

A07517393/2.0/16 Mar 2007

THIS AGREEMENT is made on 20 March 2007

BETWEEN:

(1)    ZIRCON FINANCE LIMITED (the "Issuer");

(2)    LEHMAN BROTHERS SPECIAL FINANCING INC. (the "Swap Counterparty");

(3)    LEHMAN BROTHERS INTERNATIONAL (EUROPE) (the "Calculation Agent"); and

(4)    LION CAPITAL MANAGEMENT LIMITED (the "Portfolio Manager").

Whereas:

(A)    The Issuer has issued Series 2007-1 Tranche B AUD28,600,000 Synthetic Portfolio Notes due 2014 (the "Notes") pursuant to its Multi-Issuer Secured Obligation Programme.

(B)    The Swap Counterparty has entered into a portfolio credit default swap (the "Swap Agreement") with the Issuer on the terms set out in a swap confirmation dated 20 March 2007 in connection with the issue of the Notes.

(C)    Pursuant to the terms and conditions of the Notes (the "Terms and Conditions") and the Swap Agreement, the Calculation Agent will maintain a registry of Reference Entities (as defined in the Terms and Conditions) from time to time (the "Reference Registry") and the Portfolio Manager may direct the Calculation Agent to amend the Reference Registry.

(D)    The Issuer wishes to engage the Portfolio Manager to provide the services described herein in relation to the Reference Registry and the Portfolio Manager agrees to perform such services.

(E)    The Portfolio Manager has agreed to enter into this Agreement.

IT IS AGREED as follows:

1    Interpretation

1.1    Terms used, but not defined, in this Agreement shall have the meanings given to them in the Terms and Conditions and the Swap Agreement.

1.2    For the purpose of this Agreement:

"Fitch" means Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto; and

2    Rights of the Portfolio Manager

2.1    The Portfolio Manager may instruct the Swap Counterparty and the Issuer to effect one or more Reference Portfolio Modifications in accordance with the provisions of this Agreement. The Portfolio Manager agrees, in exercising its rights hereunder, to act in good faith with reasonable skills, care and diligence and subject to the terms and conditions of this Agreement.

2.2    The Portfolio Manager shall as soon as practicable notify the Issuer, the Swap Counterparty and the Calculation Agent (with a copy of such notice to Fitch) if a material adverse change in its business and operations has occurred or is continuing such that, as a result of such change, the Portfolio Manager no longer has the capacity or the competence to perform its obligations as Portfolio Manager hereunder.

2.3    In consideration of the services rendered by the Portfolio Manager hereunder and subject to Clause 2.4 below, the Issuer shall pay to the Portfolio Manager as soon as practicable following receipt of such amounts from the Swap Counterparty on the relevant Interest Payment Date pursuant to the Swap Agreement an amount equal to:

A07517393/2.0/16 Mar 2007

2.3.1    in respect of all Interest Payment Dates of the Notes, the product of (i) 0.20 per cent. per annum; (ii) the Weighted Average Outstanding Principal Amount of a Note; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction (the "**Portfolio Management Fees**"),

provided that in the event that the Interest Accrual Adjustment provisions (as set out in paragraph 12(ii) of the Terms and Conditions) are applicable, the Issuer shall, subject as provided below, pay to the Portfolio Manager:

(a)    the Partial Fees (if any) as soon as practicable following receipt of such amounts from the Swap Counterparty on the relevant Interest Payment Date pursuant to the Swap Agreement; and

(b)    the Deferred Fees (if any) in respect of each such Adjustment Reference Entity as soon as practicable following receipt of such amounts from the Swap Counterparty on the Deferred Interest Payment Date pursuant to the Swap Agreement; and

2.3.2    in respect of all Interest Payment Dates of the Notes where the rating of the Notes by Fitch as of the relevant Interest Calculation Date is BBB- or above (the "**Performance Criteria**"), the product of (i) 0.10 per cent. per annum; (ii) the Weighted Average Outstanding Principal Amount of a Note; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction (the "**Performance Fees**", and together with the Portfolio Management Fees, the "**Fees**"). In the event that the Performance Criteria is not met as of the Interest Calculation Date in respect of the relevant Interest Payment Date, the Performance Fees will not be payable by the Issuer to the Portfolio Manager. An amount equal to the aggregate amount of such unpaid amount (the "**Unpaid Performance Fees**") for all Interest Payment Dates of the Notes will be paid by the Issuer to the Noteholders on the Maturity Date of the Notes in accordance with the Terms and Conditions.

For the purposes of this Clause 2.3;

"**Deferred Fees**" means, in respect of each Deferred Interest Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Fees Cut-off Date as being equal to the excess (if any) of:

(i)    the amount of Portfolio Management Fees that would otherwise have been payable on the relevant Interest Payment Date if:

(a)    in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) of the Terms and Conditions, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(b)    in the circumstances set out in sub-paragraph (a)(ii) of paragraph 12(ii) of the Terms and Conditions, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(c)    in the circumstances set out in sub-paragraph (a)(iii) of paragraph 12(ii) of the Terms and Conditions, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment

Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over:

(ii)    the relevant Partial Fees (if any) paid on the relevant Interest Payment Date;

"Deferred Fees Cut-off Date" means, in respect of each Adjustment Reference Entity, as determined by the Calculation Agent in its sole discretion:

(i)    the final Reference Entity Valuation Date on which all Final Prices have been determined;

(ii)    the date that all Potential Failures to Pay have been cured; or

(iii)    the date that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"Deferred Interest Payment Date" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Fees Cut-off Date;

"Interim Calculation Amount" means, in respect of each Note and in respect of each Interest Accrual Period, an amount in AUD (rounded to the nearest cent with one half cent being rounded up) determined by the Calculation Agent in its sole discretion on the relevant Interest Calculation Date as being equal to the Weighted Average Outstanding Principal Amount of such Note for such Interest Accrual Period, except that the Weighted Average Outstanding Principal Amount shall be calculated on the basis that the Reference Entity Notional Amount of each Adjustment Reference Entity is added to the Cumulative Loss Amount as of each Event Determination Date or the date upon which a Potential Failure to Pay or Potential Repudiation/Moratorium (as applicable) occurred.

For the avoidance of doubt, in the event that the amount calculated in accordance with this provision is zero or a negative number, the "Interim Calculation Amount" will be deemed to be zero; and

"Partial Fees" means, in respect of each Interest Payment Date in respect of which an Adjustment Reference Entity exists, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the Interest Calculation Date in accordance with Clause 2.3.1 above save that references therein to the Weighted Average Outstanding Principal Amount of each Note shall be deemed to be references to the Interim Calculation Amount (as defined above) of such Note.

2.4    In the event that the Portfolio Management Agreement is terminated pursuant to Clause 8.1 below, the Issuer shall pay to the Portfolio Manager the pro rata amount of the Fees accrued up to and including the date of such termination as soon as practicable after receipt of such amounts from the Swap Counterparty pursuant to the Swap Agreement.

2.5    The Portfolio Manager (i) does not assume any fiduciary duty or responsibility with regard to the Issuer, the Calculation Agent or the Swap Counterparty and (ii) does not guarantee or otherwise assume any responsibility for the performance of the Notes, or the performance by any third party of any contract entered into on behalf of the Issuer under this Agreement.

2.6    Nothing herein shall prevent the Portfolio Manager or any of its Affiliates from engaging in any lawful business, or from rendering services of any kind to or investing or dealing in obligations of or credit or other risks in respect of any Reference Entity, or any affiliates of any Reference Entity, the Noteholders or any other person or entity. Without prejudice to the generality of the foregoing, the Portfolio

Manager, its Affiliates and the directors, officers, employees and agents of the Portfolio Manager or its Affiliates may, among other things:

2.6.1   serve as directors (whether supervisory or managing), partners, officers, employees, agents, nominees or signatories for any Reference Entity provided, that such activity is undertaken by such person in good faith and in the reasonable opinion of such person, is not undertaken with the intent to create a material adverse effect on the Reference Registry;

2.6.2   receive fees for services of any nature rendered to any Reference Entity provided that such activity may only be undertaken by such persons if it is undertaken by such person in good faith and in the reasonable opinion of such person, is not undertaken with the intent to create a material adverse effect on the Reference Registry;

2.6.3   be a secured or unsecured creditor of or hold an equity interest in any Reference Entity;

2.6.4   invest for its own account in any Reference Entity or Reference Entities;

2.6.5   serve as a member of any "creditors' committee" in respect of any Reference Entity which has defaulted;

2.6.6   act as the adviser or investment adviser to any other person, entity or fund; and

2.6.7   maintain other relationships with any Reference Entity or any of their Affiliates.

## 3   Reference Portfolio Modification

3.1   The Portfolio Manager may, on any Modification Business Day (as defined below) during the term of this Agreement, request to the Swap Counterparty and the Issuer that one or more Reference Entities be removed from the Reference Registry and/or one or more new Reference Entities be added to the Reference Registry, provided that the Calculation Agent determines that all the Reference Portfolio Guidelines (as defined in Clause 3.4 below) are met (each such amendment, a "Reference Portfolio Modification"), by notifying (the "Modification Instruction") the Calculation Agent, the Issuer and the Swap Counterparty (which notice, if oral, shall be followed as soon as practicably by confirmation in writing). The Modification Instruction shall contain:

3.1.1   the legal name of each Reference Entity to be removed from the Reference Registry (the "Replaced Reference Entity");

3.1.2   in respect of each Replaced Reference Entity, the legal name of the Reference Entity to be added to the Reference Registry (such entity, the "New Reference Entity");

3.1.3   the Benchmark Obligation of the New Reference Entity and the seniority of such Benchmark Obligation;

3.1.4   the Reference Entity Credit Position of each Replaced Reference Entity and each New Reference Entity;

3.1.5   a request for the Swap Counterparty to amend the Swap Agreement in accordance with Clauses 3.1.1 to 3.1.4 above and calculate the amount of adjustment required to be made to the Subordination Amount so that the value of the credit swap transaction under the Swap Agreement (the "Credit Swap") before and after the Reference Portfolio Modification will remain the same (such amount of adjustment to the Subordination Amount being the "Subordination Adjustment"); and

3.1.6    a statement whether the request pursuant to Clause 3.1.5 above is subject to a minimum Subordination Adjustment Increase or a maximum Subordination Adjustment Decrease in relation to the relevant Reference Portfolio Modification.

3.2    A Modification Instruction received before 12.00 noon Hong Kong time on any business day in Hong Kong and each city where credit default swaps in respect of the Replaced and New Reference Entities are primarily traded (each such day, a "Modification Business Day") shall be deemed to be received on such date and a Modification Instruction received after 12.00 noon Hong Kong time on any Modification Business Day shall be deemed to be received on the succeeding Modification Business Day (as applicable, the "Modification Instruction Date").

3.3    The Portfolio Manager will not make a Modification Instruction unless it reasonably believes that, after the proposed Reference Portfolio Modification is effected, the Notes will be in compliance with the Reference Portfolio Guidelines (other than in the event that a Guideline Waiver has been given pursuant to Clause 3.6 below) or, if the Notes are not in compliance with the Reference Portfolio Guidelines immediately prior to such Reference Portfolio Modification, such Reference Portfolio Modification will not increase the extent of that non-compliance.

3.4    Subject to Clause 3.6, on the Modification Instruction Date, the Calculation Agent shall, acting in good faith and in a commercially reasonable manner determine whether the criteria set out in Appendix A to this Agreement (the "Reference Portfolio Guidelines") are satisfied in respect of the proposed Reference Portfolio Modification.

3.5    Subject to Clause 3.6, if, in respect of the proposed Reference Portfolio Modification, the Calculation Agent determines that all of the Reference Portfolio Guidelines (as modified by Clause 3.3 above) are satisfied, the Calculation Agent shall on the next Modification Business Day after the Modification Instruction Date (the "Modification Date") (but in no event later than 12.00 noon Hong Kong time on such date), notify the Portfolio Manager, the Swap Counterparty, Fitch and the Issuer whether the Reference Portfolio Modification has been effected (as the case may be, subject to the conditions applicable to it pursuant to Clause 3.1.6) and the amount of any Subordination Adjustment, (such notice, the "Modification Information Notice"; which notice, if oral, shall be followed as soon as practicably by confirmation in writing). The Subordination Adjustment, if positive, shall be a "Subordination Adjustment Increase"; if negative, shall be a "Subordination Adjustment Decrease"; the sum of the Subordination Adjustment Increase and the Subordination Adjustment Decrease, as determined by the Calculation Agent on any date of determination being the "Subordination Adjustment Balance". The Modification Information Notice shall specify:

3.5.1    the names of the Replaced Reference Entity and the New Reference Entity;

3.5.2    the Benchmark Obligation and its seniority in respect of the New Reference Entity;

3.5.3    the Reference Entity Credit Position of each Replaced Reference Entity and each New Reference Entity;

3.5.4    the relevant Entity Type; and

3.5.5    the relevant Subordination Adjustment.

3.6    The Portfolio Manager may request a waiver of any or all of the Reference Portfolio Guidelines in Appendix A in relation to a proposed Reference Portfolio Modification, which waiver shall be deemed to be approved upon the written consent by the holders of not less than two-thirds of the Outstanding Principal Amount of the Notes (each, a "Guideline Waiver"). Upon obtaining any Guideline Waiver, the Portfolio Manager shall deliver written notice of such Guideline Waiver to the Issuer, the Swap Counterparty and the Calculation Agent (and, if the Notes are rated by Fitch at the relevant time, with a

A07517393/2.0/16 Mar 2007

copy to Fitch) together with the Modification Instruction. Upon receipt of a notice of a Guideline Waiver, the Calculation Agent shall, for the purposes of making a determination in respect of such proposed Reference Portfolio Modification pursuant to Clauses 3.4 and 3.5, disregard any or all of the Reference Portfolio Guidelines in Appendix A which were waived. The Portfolio Manager acknowledges that effecting a Reference Portfolio Modification pursuant to a Guideline Waiver may cause the rating assigned to the Notes to be subject to downgrade or withdrawal.

3.7    If any of the Reference Portfolio Guidelines are not satisfied in respect of a proposed Reference Portfolio Modification, the Calculation Agent will notify the Portfolio Manager and the Swap Counterparty of such fact and the relevant circumstances, on the next Modification Business Day after the Modification Instruction Date, but in no event later than 12.00 noon Hong Kong time on such date (which notice, if oral, shall be followed as soon as practicably by confirmation in writing).

3.8    Following each Reference Portfolio Modification, the Swap Counterparty will send the revised Reference Registry to Fitch together with any other information requested by Fitch.

3.9    For the avoidance of doubt (i) the Calculation Agent, the Issuer, the Portfolio Manager (subject to the terms of this Agreement) and the Swap Counterparty shall have no liability whatsoever for the consequences of any Reference Portfolio Modification or compliance with the Reference Portfolio Guidelines, (ii) if the Calculation Agent or the Portfolio Manager refuses to allow a Reference Portfolio Modification on the basis that the relevant Reference Portfolio Guidelines have not been met, then such determination shall be conclusive and binding on all parties in all circumstances without liability to the Swap Counterparty, the Portfolio Manager (subject to the terms of this Agreement) or the Calculation Agent, and (iii) no Reference Portfolio Modification, once agreed to between the Calculation Agent and the Portfolio Manager, can be set aside on the basis that, as a factual matter, the Reference Portfolio Guidelines were not satisfied.  During the term of this Agreement, the Swap Counterparty shall provide the Portfolio Manager with the mid market spreads for each Reference Entity, as required and available on a best efforts basis.  Notwithstanding the aforesaid, at the request of the Portfolio Manager, the Swap Counterparty shall, or shall procure that its agents shall, provide to the Portfolio Manager such information, reports and other data (but only to the extent such information, reports or data are within such party's possession and subject to any duties of confidentiality by which such party may be bound) as may reasonably be required by the Portfolio Manager to enable the Portfolio Manager to carry out its duties in accordance with the terms of this Agreement.

3.10   The Portfolio Manager shall provide a monthly report on the 10th business day of every month during the term of the Notes to the Issuer, the Calculation Agent and the Swap Counterparty (and, if the Notes are rated by Fitch at the relevant time, with a copy to Fitch), which shall contain the following particulars for the relevant month:

3.10.1    a comparison of the Reference Registry on the Issue Date of the Notes with the then current Reference Registry in terms of the ratings and spreads of the Reference Entities;

3.10.2    a description of any change in the ratings of the Reference Entities in the Reference Registry;

3.10.3    a description of any modification of the Reference Registry and the reasons for such modification;

3.10.4    a description of any Subordination Adjustment;

3.10.5    a statement that the modification made to the Reference Registry is in compliance with the requirements as set out in this Agreement;

3.10.6    a comparison of the Subordination Amount against the Fitch Rating Loss Rate; and

3.10.7    details of all the existing Reference Entities in the Reference Registry.

3.11    Notwithstanding Clause 3.10, the Portfolio Manager shall not be responsible for, and does not represent or warrant, the accuracy or completeness of any data provided by any third party including those set out in the monthly reports (the "Third Party Data") and shall have no liability for the contents, adequacy, any errors, inaccuracies or omissions of any Third Party Data so long as it has exercised reasonable care in accurately reproducing the Third Party Data.

## 4    Delegation and Transfer

4.1    The Portfolio Manager may delegate its duties under this Agreement to its Affiliates (as defined in the 2003 ISDA Credit Derivatives Definitions) only, and may take advice from third parties, provided, however, that (i) the Portfolio Manager shall not be relieved of any of its duties or obligations hereunder as a result of such delegation to or employment of third parties, (ii) the Portfolio Manager shall be solely responsible for the fees and expenses payable to any such third party, (iii) in the case of delegation, the Portfolio Manager shall notify the Issuer, the Swap Counterparty, Fitch and the Calculation Agent of such arrangements, and (iv) the Issuer shall only be obliged to pay the Portfolio Management Fees and the Bonus Portfolio Management Fees under Clause 2.3 to the Portfolio Manager but not to its delegates.

4.2    The Portfolio Manager may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Issuer, the Swap Counterparty and the Calculation Agent (such consent not to be unreasonably withheld) and the prior consultation with Fitch that such assignment or transfer will not have an adverse impact on the rating of the Notes.

## 5    Conflicts of Interest

5.1    The parties to this Agreement acknowledge and agree that the Portfolio Manager and its Affiliates may:

5.1.1    have proprietary interests in, and may manage or advise accounts or investment funds that have investment criteria similar or dissimilar to those of the Reference Registry, the Issuer, the Calculation Agent and the Swap Counterparty and/or which engage in transactions in the same types of securities and investments as the Issuer, the Calculation Agent and the Swap Counterparty and as a result may compete with the Issuer, the Calculation Agent and the Swap Counterparty for appropriate investment opportunities; and

5.1.2    have interests in, or may enter into derivatives transactions relating to, any Reference Entities, including any proposed Replaced Reference Entity, or any instruments linked to the performance of the Reference Entities, including the Notes.

5.2    The parties to this Agreement acknowledge and agree that from time to time at the Portfolio Manager's discretion, any of its managing directors, directors, officers or other of its employees engaged in advisory activities outside the scope of this Agreement (the "Advisory Personnel") may consult with managing directors, directors, officers and employees in proprietary trading or other business areas of the Portfolio Manager and its Affiliates (the "Proprietary Personnel"), or act on and form investment policy committees comprised of such Advisory Personnel, and the performance by such Advisory Personnel of their obligations related to their consultation with the Portfolio Manager could conflict with their areas of primary responsibility. In connection with their activities with the Portfolio Manager, the Advisory Personnel may receive information regarding the Portfolio Manager's proposed investment activities which is not generally available to the public. However, there will be no

obligation on the part of such Advisory Personnel to make any such information available for use by the Proprietary Personnel providing advice for the purpose of this Agreement. In addition, the Portfolio Manager and its Affiliates will be under no obligation to make available any research or analysis prior to its public dissemination.

5.3  Notwithstanding anything in this Agreement, in exercising its powers and duties under this Agreement, the Portfolio Manager shall not be required to, and shall not be responsible for any failure to, make any recommendations or take any action whatsoever in relation to the Reference Registry in circumstances where to do so may, in its reasonable opinion, give rise to, constitute or result in a breach of any of the provisions of any insider dealing legislation or other laws of any nature whatsoever to which it, its Affiliates or the Calculation Agent or the Swap Counterparty or the Issuer are subject or any confidentiality agreement or undertaking which is binding on its or its Affiliates. No warranty is given by the Portfolio Manager as to the performance of the Reference Entities or the losses that may be suffered in respect of the performance of the Reference Entities.

## 6    Expenses

The Portfolio Manager shall be responsible for all of the expenses incurred in performing its obligations under this Agreement.

## 7    Obligations and Acknowledgement of Portfolio Manager

7.1    The Portfolio Manager shall not knowingly take any action which would:

7.1.1    result in the Issuer, the Swap Counterparty or the Calculation Agent being in breach of the terms of the Swap Agreement; or

7.1.2    have a material adverse effect on the Reference Registry.

7.2    The Portfolio Manager acknowledges that it has received a copy of the Swap Agreement.

## 8    Term and Termination

8.1    This Agreement shall become effective on the date hereof and shall continue in full force and effect until the earliest occurrence of any of the following events, upon which this Agreement shall terminate:

8.1.1    the termination of the Swap Agreement;

8.1.2    the resignation of the Portfolio Manager upon 30 days' prior written notice to the Issuer, the Swap Counterparty and the Calculation Agent (such notice to be copied to Fitch) or immediately if the resignation of the Portfolio Manager results from a material change in the laws or regulations applicable to the Portfolio Manager's performance of its obligations under this Agreement which renders such performance to be a violation of such modified laws or regulations; and

8.1.3    the termination of the Portfolio Manager's appointment for cause upon 30 days' prior written notice from the Issuer (such notice to be copied to Fitch). For purposes of determining "cause" for the purpose of this Clause 8.1.3, such term shall mean any one of the following events:

(i)    wilful and intentional breach by the Portfolio Manager of any provision of this Agreement;

(ii)    breach by the Portfolio Manager of any provision of this Agreement that has a material adverse effect on the Issuer and the failure to cure such breach within 30 days' of becoming aware (or receiving notice) of it;

8.1.4    the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial part of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) admits in writing its inability to pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue unstayed for 30 consecutive days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain unstayed for 30 consecutive days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains unstayed for 30 consecutive days;

8.1.5    the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement or the indictment of the Portfolio Manager for a criminal offence materially related to investment-related business, which has a material adverse effect on the Issuer;

8.1.6    the Portfolio Manager consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another Person and either (i) at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee Person fails to or cannot assume all the obligations of the Portfolio Manager under this Agreement or (ii) the resulting, surviving or transferee Person lacks the legal capacity to perform the obligations of the Portfolio Manager under this Agreement under which the Portfolio Manager acts as an agent on behalf of the Issuer; or

8.1.7    the termination of the Portfolio Manager's appointment approved by a resolution passed by the holders of not less than two-thirds of the Outstanding Principal Amount of the Notes and upon 30 days' written notice from the Issuer to the Portfolio Manager of such resolution.

8.2    Clauses 9, 10, and 14 shall survive the termination of this Agreement.

8.3    For the avoidance of doubt, upon the resignation or removal of the Portfolio Manager pursuant to Clauses 8.1.2 to 8.1.6 above or otherwise, no further changes shall be made to the Reference Registry, except as otherwise provided in the Swap Agreement.

9    Indemnity

9.1    The Portfolio Manager shall indemnify and hold harmless the Issuer, the Swap Counterparty and the Calculation Agent from and against any and all losses, liabilities, damages, expenses and claims to which either of them may become subject:

9.1.1    by reason of acts or omissions constituting bad faith, wilful misconduct, breach of contract, negligence or reckless disregard of its obligations in the performance of its duties under this Agreement ; or

9.1.2     with respect to any information provided in writing to the Issuer, the Swap Counterparty or the Calculation Agent by the Portfolio Manager expressly for the inclusion in the Series Prospectus, any marketing materials or offer documents in relation to the Notes and this Agreement, such information containing any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

9.1.3     by reason of any other material breach by the Portfolio Manager of this Agreement.

9.2     The Calculation Agent shall indemnify and hold harmless the Portfolio Manager from and against any and all losses, liabilities, damages, expenses and claims to which it may become subject by reason of acts or omissions constituting bad faith, wilful misconduct or negligence of the Calculation Agent in the performance of its obligations under this Agreement in determining whether the Reference Portfolio Guidelines have been met.

## 10   Confidentiality

10.1     The Portfolio Manager shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to third parties which are not its Affiliates, except to the extent permitted with the prior written consent of the Swap Counterparty or as required by law, regulation, court order or the rules, regulations or request of any stock exchange or in connection with any judicial process regarding any legal action or proceeding arising out of or related to this Agreement or as requested by any governmental or quasi-governmental authority, self-regulatory organisation, body or official or to its professional advisors and auditors or such information as shall have been publicly disclosed other than in violation of this Agreement.

10.2     Notwithstanding Clause 10.1, the Portfolio Manager shall be permitted to disclose (to the extent reasonably necessary for purposes of marketing its services as a portfolio manager) the following information:

10.2.1     that it is the portfolio manager of the Reference Registry;

10.2.2     the tranche size, maturity and coupon of the Notes, and the relevant attachment and detachment points;

10.2.3     the rating of the Notes as at the Issue Date, the then current rating of the Notes and any other historical ratings of such Notes;

10.2.4     the number of credit events and/or change in subordination which has occurred in relation to the Notes; and

10.2.5     the role of Lehman Brothers International (Europe) as the Arranger of the Notes and the role of Lehman Brothers Special Financing Inc. as the Swap Counterparty.

## 11   No Partnership or Joint Venture

Nothing contained in this Agreement (a) shall constitute the Calculation Agent, the Issuer, the Swap Counterparty and the Portfolio Manager, members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (b) shall be construed to impose any liability as such on any of them or (c) shall be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of the other.

## 12   Representations and Warranties

12.1   The Portfolio Manager hereby represents and warrants as of the date of this Agreement, and is deemed to represent and warrant as of each Modification Instruction Date, to the Issuer, the Swap Counterparty and the Calculation Agent as follows:

    12.1.1   The Portfolio Manager has been duly organised and is validly existing under Singapore law.

    12.1.2   The Portfolio Manager has corporate capacity and power to enter into and to perform its obligations under this Agreement and has taken all necessary corporate action to execute, deliver and perform this Agreement.

    12.1.3   The entry into and performance of this Agreement by the Portfolio Manager does not violate any applicable law or its own constitutional documents and no consent, license, approval or authorisation of, or registration or filings with, any governmental authority in relation to the entry into and performance of this Agreement.

12.2   The Issuer hereby represents and warrants as of the date of this Agreement, and is deemed to represent and warrant as of each Modification Instruction Date, to the Swap Counterparty, the Calculation Agent and the Portfolio Manager as follows:

    12.2.1   The Issuer has been duly organised and is validly existing under Cayman Islands law.

    12.2.2   The Issuer has corporate capacity and power to enter into and to perform its obligations under this Agreement and has taken all necessary corporate action to execute, deliver and perform this Agreement.

    12.2.3   The entry into and performance of this Agreement by the Issuer does not violate any applicable law or its own constitutional documents and no consent, license, approval or authorisation of, or registration or filings with, any governmental or other authority in relation to the entry into and performance of this Agreement.

## 13   Limited Recourse and Non Petition

The parties to this Agreement shall have recourse against the Issuer only to sums derived from the Mortgaged Property, and the Trustee having realised the same, the parties to this Agreement or anyone acting on behalf of any of them shall not be entitled to take any further steps against the Issuer to recover any sum still unpaid and all sums due but still unpaid shall be extinguished. In particular, the parties to this Agreement shall not be entitled to petition or take any other step for the winding up of the Issuer, nor shall any of them have any claim in respect of any sum arising in respect of the Mortgaged Property for any other Series of Notes.

## 14   Notices

Any notice, demand, consent or notification in any form to be given hereunder may be orally communicated or sent by facsimile transmission. Any oral communication shall be confirmed in writing by the notifying party no later than one Business Day (in the applicable business centre) from the receipt of such oral communication. Any such notice, demand, consent or notification shall be made or given to the following address or to such other address as may from time to time be notified (in accordance with this clause) by the relevant party to the others:

if to the Swap Counterparty:    Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, NY 10019

*Modification Instructions:*

| | |
|---|---|
| Fax: | (852) 2372-5832 |
| Telephone: | (852) 2252-6832 |
| Attention: | Saurabh Upadhyay/Teck How Tay |

*All other notices:*

| | |
|---|---|
| Fax: | (852) 2372-5832 |
| Attention: | Structured Credit Trading |

if to the Calculation Agent:      Lehman Brothers International (Europe)
                                  25 Bank Street
                                  London E14 5LE

*Modification Instructions:*

Care of: Lehman Brothers Special Financing Inc.
Structured Credit Trading, CDO Trading (as set out above)

Structured Credit Trading

*All other notices:*

| | |
|---|---|
| Fax: | (852) 2372-5832 |
| Attention: | Structured Credit Trading |

if to the Portfolio Manager:      Lion Capital Management Limited

| | |
|---|---|
| Fax: | (65) 6417 6801 |
| Telephone: | (65) 6417 6800 |
| Attention: | Kon Choe Keat/Goh Soo May |

if to the Issuer:                 c/o Walkers SPV Limited
                                  Walker House
                                  87 Mary Street
                                  George Town
                                  Grand Cayman KY1-9002
                                  Cayman Islands

| | |
|---|---|
| Fax: | 1-345-945-3727 |
| Telephone: | 1-345 945 4757 |
| Attention: | Directors |

if to Fitch:                      Fitch Ratings
                                  Level 43, AMP Centre
                                  50 Bridge Street
                                  Sydney NSW 2000

| | |
|---|---|
| Email: | Australia.Surveillance@fitchratings.com |
| | hongkong.cdosurveillance@fitchratings.com |
| Tel: | 612-82560300 |
| Fax: | 612-82560301 |

For the avoidance of doubt, a Modification Instruction, a Modification Information Notice and any notice required to be given pursuant to Clause 3.7, including in each case copies thereof, may be given by oral communication and confirmed in writing as described above.

15   Governing Law

15.1   Governing Law: This Agreement shall be governed by and construed in accordance with English Law.

15.2   Jurisdiction: The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and accordingly any legal action or proceedings arising out of or in connection with this Agreement ("Proceedings") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of each of the other parties hereto and the holders of Notes shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

15.3   Service of Process: This Agreement is governed by, and shall be construed in accordance with, English law. The Portfolio Manager hereby irrevocably and unconditionally submits to the jurisdiction of the Courts of England for all purposes in relation to this Agreement and waives any objections on the ground of venue or forum non convenience or on similar grounds.

16   Descriptive Headings

The descriptive headings in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

17   Counterparts

This Agreement may be executed in separate counterparts and by each party separately on a separate counterpart, and each such counterpart, when so executed, shall be an original. Such counterparts shall together constitute one and the same instrument.

18   Contracts (Rights of Third Parties) Act 1999

A person who is not party to this Agreement has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Agreement except that and to the extent (if any) that this Agreement expressly provides for that Act to apply to any of its terms.

19   Amendments

Any term of this Agreement may only be amended or waived with the written consent executed by all parties to this Agreement.

20   Invalidity

If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, under any enactment or rule of law, such provision or part shall to that extent be deemed not to form part of this Agreement but the legality, validity and enforceability of the remainder of this Agreement shall not be affected.

21   Entire Agreement

This Agreement supersedes any previous written or oral agreement between the parties in relation to the matters dealt with in this Agreement and contains the whole agreement between the parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be

A07517393/2.0/16 Mar 2007

excluded by contract. In this Clause 21, "this Agreement" includes all documents entered into pursuant to this Agreement.

22  **Process Agent**

The Issuer irrevocably appoints Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE to receive, for them and on their behalf, service of process in any legal action or proceedings in England arising out of or in connection with this Agreement. If for any reason a process agent ceases to be able to act as such or no longer has an address in England, the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the Swap Counterparty and shall immediately notify the Swap Counterparty and the Calculation Agent of such appointment. Nothing in this Agreement shall affect the right to serve process in any other manner permitted by law.

Signed by the authorised representatives of the parties:

ZIRCON FINANCE LIMITED
as Issuer


By: _____


LEHMAN BROTHERS SPECIAL FINANCING INC.
as Swap Counterparty


By: _____


LEHMAN BROTHERS INTERNATIONAL (EUROPE)
as Calculation Agent


By: _____


LION CAPITAL MANAGEMENT LIMITED
as Portfolio Manager


By: _____

## Appendix A

### Reference Portfolio Guidelines

The "**Reference Portfolio Guidelines**" applicable with respect to a Reference Portfolio Modification are the following:

(a)    the Reference Entity Calculation Percentage for any Reference Entity does not exceed 1.2625 per cent.;

(b)    the aggregate Reference Entity Calculation Percentage of Reference Entities in each industry (other than the Banking& Finance) does not exceed 15.0 per cent.;

(c)    the aggregate Reference Entity Calculation Percentage of Reference Entities in Banking& Finance does not exceed 25.0 per cent.;

"**Reference Entity Calculation Percentage**" means, for each Reference Entity included in the Reference Registry, as of any date of determination, the Reference Entity Notional Amount of that Reference Entity divided by the aggregate of the Reference Entity Notional Amounts of all Reference Entities included in the Reference Registry, each as of such date, expressed as a percentage rounded to the nearest one-hundredth of one per cent.; and

(d)    the Fitch Guidelines are complied with.

The Fitch Guidelines (DPG) specify that:

(a)    in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would result in the Fitch Risk Tranche Current Credit Enhancement Level exceeding the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of up to one notch below the Fitch rating of the relevant tranche of the Notes on the Issue Date, then the Fitch DPG Test will not be applied;

(b)    in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would not result in the Fitch Risk Tranche Current Credit Enhancement Level equalling or exceeding the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of up to one notches below the Fitch rating of the relevant tranche of the Notes on the Issue Date, then in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would result in the Fitch Risk Tranche Current Credit Enhancement Level exceeding the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of two notches below the Fitch rating of the relevant tranche of the Notes on the Issue Date, the Fitch DPG Test will be applied save in the case of a Reference Portfolio Modification the effect of which would decrease the absolute value of the Reference Entity Credit Position of a Credit Risk Reference Entity; and

(c)    in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would result in the Fitch Risk Tranche Current Credit Enhancement Level being below the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of two notches below the Fitch rating of the relevant tranche of the Notes on the Issue Date, then no Reference Portfolio Modification may be executed save if the execution thereof would result in the Rating Implied of the relevant tranche of the Notes being at least one notch higher than the Rating Implied of the relevant tranche of the Notes before the contemplated Reference Portfolio Modification.

The aforementioned Reference Portfolio Guidelines (a), (b), (c) and (d) and Fitch Guidelines (DPG) (a), (b) and (c) above  may be disapplied subject to approval by the holders of at least two-thirds of the Outstanding Principal Amount of the Notes.

"Credit Risk Reference Entity" means, if applicable, with respect to any Reference Entity:

(a)     any Reference Entity which, in the Portfolio Manager's reasonable judgement (which shall not be called into question as a result of subsequent events), has a significant risk of materially declining in credit quality; or

(b)     any Reference Entity which since it was added to the relevant Reference Registry has been downgraded or placed on credit watch for possible downgrade by one or more rating notch by any Rating Agency.

"Rating Implied" means the highest attainable rating indicated by the Fitch Default VECTOR Model for the Fitch Risk Tranche Current Credit Enhancement Level.

"Fitch Default VECTOR Model" means the version of Fitch's proprietary computer programme available from time to time at www.fitchratings.com. The Fitch Default VECTOR Model calculates the cumulative loss rate of a pool of Reference Entities consistent with a specified benchmark rating level (the "Rating Loss Rate") by considering the number of Reference Entities in the Reference Registry, the country, asset type and industry concentration in the Reference Portfolio and the Fitch Rating.

"Fitch Dynamic Portfolio Guidelines (DPG) Test" means the test which will be satisfied with respect to a Reference Registry on any date of a Reference Portfolio Modification if the Fitch Rating Cushion (such Fitch Rating Cushion being measured only in respect of those Series of Notes which are rated by Fitch and which reference such Reference Registry) calculated on such date on the Reference Portfolio after taking into account the contemplated Reference Portfolio Modification is either:

(a)     greater than or equal to zero if such Fitch Rating Cushion calculated as at the date of the Reference Portfolio Modification before taking into account the contemplated Reference Portfolio Modification is greater than or equal to zero; or

(b)     if such Fitch Rating Cushion is negative, not lower than the Fitch Rating Cushion calculated as at the date of the Reference Portfolio Modification prior to the contemplated Reference Portfolio Modification and the Risk Tranche Current Credit Enhancement after the contemplated Reference Portfolio Modification is consistent with a rating equal to or higher than the then current rating of the relevant tranche of Notes prior to the contemplated Reference Portfolio Modification.

The Fitch DPG test outlined above must be applied in accordance with Fitch's then prevailing emerging market CDO criteria as well as Fitch's then current criteria with respect to short positions.

For the avoidance of doubt, the compliance or otherwise of the Reference Registry with the Fitch DPG Test on any date does not imply any affirmation, upgrade or downgrade of the then current ratings assigned by Fitch.

"Fitch Recovery Rate" means, with respect to any Reference Entity, the recovery rate percentage as stated in the Fitch Default VECTOR Model.

"Fitch Rating Cushion" means (i) the Fitch Risk Tranche Current Credit Enhancement Level minus (ii) the Fitch Risk Tranche Rating Loss Rate.

"Fitch Risk Tranche Current Credit Enhancement Level" means on any date, the number, expressed as a percentage of the Notional Amount, equal to the quotient of (i) the Loss Threshold minus the Accumulated Loss Amount divided by (ii) the Notional Amount.

"Fitch Risk Tranche Rating Loss Rate" means on any date, the number equal to the Rating Loss Rate expressed as a percentage and calculated on such date from the Fitch Default VECTOR Model based on the

Reference Registry as at such date and consistent with the Fitch rating of the relevant tranche of the Notes on the Issue Date.

"**Loss Threshold**" means the Subordination Amount.

"**Accumulated Loss Amount**" means the aggregate of all Reference Entity Notional Amount(s) in respect of all relevant Adjustment Reference Entities existing on such day plus the Cumulative Loss Amount as of such day.

"**Rating Agency**" means Moody's Investors Service Ltd. ("Moody's") and/or Fitch Ratings Ltd. ("Fitch"), and/or Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc. ("Standard & Poor's").

"**Fitch Rating**" means, in respect of any Reference Entity, (in the following order of progression):

(i)     if the Reference Entity is publicly rated by Fitch, such *public rating* assigned by Fitch;

(ii)    if the Reference Entity has not been assigned a *public rating* by Fitch, the Fitch Rating of such Reference Entity shall be the shadow rating assigned by Fitch, as requested by the Substitution Agent;

(iii)   if the Reference Entity has not been assigned a *public rating* or shadow rating (at the request of the Portfolio Manager) by Fitch but is publicly rated investment grade by both Moody's and S&P, the Fitch equivalent of the lowest of the public ratings assigned by Moody's and S&P, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised;

(iv)    if the Reference Entity has not been assigned a *public rating* or shadow rating (at the request of the Portfolio Manager) by Fitch but is publicly rated sub-investment grade by both Moody's and S&P, the rating as defined and applied in the Fitch Default Vector Model using a default probability equivalent to the mid-point of the *public ratings* assigned by Moody's and S&P, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised; or

(v)     if the Reference Entity has not been assigned a *public rating* or shadow rating (at the request of the Portfolio Manager) by Fitch and does not fall within paragraph (iv) above but is publicly rated by Moody's and/or S&P, the Fitch equivalent of the lowest *public rating*, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised.

Where any Reference Entity is placed on watch for a possible downgrade by Fitch, Moody's or S&P, the *public rating* assigned thereto shall be deemed to be the rating which is one sub-category lower than the *public rating* assigned thereto, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised.

Where any Reference Entity is placed on watch for a possible upgrade by Fitch, Moody's or S&P, the *public rating* assigned thereto shall be deemed to be the rating which is one sub-category higher than the *public rating* assigned thereto, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised.

References to "public rating" above shall be references to the following:

(i)     for reference entities rated by Fitch, excluding insurance firms, the *public rating* corresponds to the Issuer Default Rating ("IDR");

(ii)    for a Fitch rated financial guaranty insurance (*monoline*) operating entity, the *public rating* is given by the Insurer Financial Strength Rating ("IFS Rating");

A07517393/2.0/16 Mar 2007

(iii)    for all other types of insurance entities rated by Fitch the appropriate *public rating* is that assigned to the unsubordinated unsecured financial obligations of the insurer. In the latter case, IFS Ratings tend to be above the ratings of the unsubordinated unsecured financial obligations of the insurer and in addition reflect the ability of the insurer to meet its *non-defaultable (contingent)* obligations such as life & health, property & casualty policies underwritten.; and

(iv)    where no *public rating* corresponding to the IDR or IFS Rating, where appropriate, is available then the benchmark probability of default rating is given by the *public rating* assigned to the reference entity in respect of its unsubordinated unsecured financial obligations.

Any senior unsecured *public rating* of the reference entity is considered with reference to a foreign currency senior unsecured debt rating that may be assigned to the reference entity.

## ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY
## AND THE SWAP GUARANTOR

### Lehman Brothers Special Financing Inc.

Lehman Brothers Special Financing Inc. (the "Swap Counterparty") was incorporated under the laws of the State of Delaware of the United States of America on 17 August 1984.

The principal executive office of the Swap Counterparty is located at 745 Seventh Avenue, New York, New York 10019, U.S.A. The Swap Counterparty's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Counterparty is engaged in the fixed income and currency, swaps and derivatives business. The Swap Counterparty's principal activities are to provide a wide range of derivative products including interest rate, currency, credit and mortgage derivatives.

The Swap Counterparty is a wholly-owned subsidiary of Lehman Brothers Inc.

### Lehman Brothers Holdings Inc.

Lehman Brothers Holdings Inc. (the "Swap Guarantor") was incorporated under the laws of the State of Delaware of the United States of America on 29 December 1983.

The principal executive office of the Swap Guarantor is located at 745 Seventh Avenue, New York, New York 10019, The Swap Guarantor's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Guarantor is a holding company that is primarily engaged in funding activities. Through its U.S. and non-U.S. subsidiaries and affiliates it provides equity and fixed income sales, trading and research, investment banking, mortgage, private equity and private client services on a global basis. The Swap Guarantor provides these products and services to a wide array of clients, including corporations, governments and municipalities, institutional clients, and high-net-worth individuals.

The Swap Guarantor funds its activities through a combination of master notes, commercial paper, bank credit facilities and other money market related instruments, medium and long-term debt, and an unsecured flexible cash capital facility.

The common stock of the Swap Guarantor is listed on the New York Stock Exchange.

## ANNEX 5 – DESCRIPTION OF THE PORTFOLIO MANAGER

Lion Capital Management Limited ("Lion Capital") was created from the merger of the asset management businesses of OCBC Asset Management Limited and Straits Lion Asset Management Limited in September 2005.

With total assets under management of over S$32 billion (as at 28 February 2007) and a staff strength of over 130, Lion Capital offers a comprehensive suite of investment products covering a wide range of asset classes. Clients of Lion Capital include statutory boards, government-linked companies and agencies, public and private companies, charitable organisations, endowment funds and individual investors.

Lion Capital is also involved in Asian hedge funds through its 65%-owned subsidiary Lion Fairfield Capital Management Limited.

**REGISTERED OFFICE OF THE ISSUER**

Walkers SPV Limited
Walker House
87 Mary Street
George Town
Grand Cayman KY1-9002
Cayman Islands

**TRUSTEE**

BNY Corporate Trustee Services Limited (formerly known as J.P. Morgan Corporate Trustee Services Limited)
One Canada Square
London E14 5AL

**SWAP COUNTERPARTY**

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York
New York 10019
U.S.A.

**ISSUING AND PAYING AGENT AND CUSTODIAN**

JPMorgan Chase Bank, N.A.
Trinity Tower
9 Thomas More Street
London E1W 1YT

**AUSTRALIAN PAYING AGENT AND REGISTRAR**

BTA Morgan Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 4
35 Clarence Street
Sydney
NSW 2000
Australia

**CALCULATION AGENT**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**PORTFOLIO MANAGER**

Lion Capital Management Limited
One George Street
#08-01 Singapore 049145

**LEGAL ADVISERS**

| | |
|---|---|
| *to the Issuer*<br>*as to Cayman Islands law* | *to the Arranger and the Trustee*<br>*as to English law* |
| Walkers<br>Walker House<br>87 Mary Street<br>George Town , Grand Cayman KY1-9001<br>Cayman Islands | Linklaters<br>10th Floor, Alexandra House<br>Chater Road<br>Central<br>Hong Kong |

A07517393/2.0/16 Mar 2007