# EXHIBIT 10



Neutral Citation Number: [2009] EWHC 1912 (Ch)

Case No: HC09C011612 & HC09C01931

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 28 July 2009

Before :

**THE CHANCELLOR OF THE HIGH COURT**
- - - - - - - - - - - - - - - - - - - -
Between :

| | |
|---|---|
| PERPETUAL TRUSTEE CO. LTD | **Claimant** |
| - and - | |
| BNY CORPORATE TRUSTEE SERVICES LTD | 1ST **Defendant** |
| LEHMAN BROTHERS SPECIAL FINANCING INC | 2nd **Defendant** |
| | |
| BELMONT PARK INVESTMENTS PTY LTD & ORS | **Claimant** |
| - and - | |
| BNY CORPORATE TRUSTEE SERVICES LTD | 1ST **Defendant** |
| LEHMAN BROTHERS SPECIAL FINANCING INC | 2nd **Defendant** |

**Mr G Moss QC & Mr D Allison** (instructed by Sidley Austin LLP) for the **Claimant**
**(Perpetual Trustee Co. Ltd)**
**Mr R Salter QC & Mr J Davies-Jones** (instructed by Lawrence Graham LLP) for the
**Claimant (Belmont Park Investments PTY Ltd & Ors)**
**Mr M Howard QC & Mr S Midwinter** (instructed by Lovells LLP) for the **1st Defendant**
**Mr R Snowden QC & Mr J Potts** (instructed by Weil, Gotshal & Manges) for the
**2nd Defendant**

Hearing dates: 7 – 9 July 2009
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

...................................

THE CHANCELLOR OF THE HIGH COURT

## The Chancellor

## Introduction

1.     In October 2002 Lehman Brothers International (Europe) ("LBIE") established a multi-issuer secured obligation programme, called the Dante Programme. Its purpose was to provide, in effect, a form of credit insurance in respect of loans or other obligations owed to LBIE or another company in the Lehman Brothers Group ("a Lehman company") by debtors called reference entities. For the purpose of the issues before me the essential elements of the Dante Programme were:

(1) the issue of notes to investors by a special purpose vehicle ("the issuer") formed by a Lehman company in a tax friendly jurisdiction;

(2) the purchase by the issuer with the subscription money paid for the notes of government bonds or other secure investments ("the collateral") vested in a trust corporation;

(3) a swap agreement entered into by a Lehman company and the issuer under which the Lehman company paid the issuer the amounts due by the issuer to the noteholders in exchange for sums equal to the yield on the collateral;

(4) the amount by which the sum payable under the swap agreement by the Lehman company exceeded the yield on the collateral represented the premium for the, in effect, credit insurance provided by the noteholders;

(5) the amount payable by the Lehman company to the issuer on the maturity of the notes (or on early redemption or termination) was the initial principal amount subscribed by the investors less amounts calculated by reference to events defined as credit events occurring during a specified period by reference to one or more reference entities, thereby giving effect to the effective insurance aspect of the programme;

(6) the collateral was charged by the issuer in favour of the trust corporation to secure its obligations to the noteholders and the Lehman company on terms which changed their respective priorities on the occurrence of certain specified events, including the insolvency of the Lehman company,

(7) each of the transactions summarised above (except the purchase of the collateral) is governed by English law.

2.     The claimants in these proceedings (respectively "Perpetual" and "Belmont") are or represent noteholders in respect of issues made under the Dante Programme by three issuers, namely Saphir Finance Public Limited Company, Zircon Finance Ltd and Beryl Finance Ltd, established by the Lehman Brothers Group in the Republic of Ireland or in the Cayman Islands. The first defendant, BNY Corporate Trustee Services Ltd ("the Trustee") is the trust corporation, incorporated in England as a

wholly-owned subsidiary of the Bank of New York Mellon, in which is vested the collateral in respect of each of the relevant issues and the chargee in respect of the charges granted by the issuers. The second defendant, Lehman Brothers Special Financing Inc ("Lehman BSF"), is the Lehman company concerned in the relevant issues and the counterparty under the swap agreements connected with them. It is incorporated in Delaware and has its principal office in New York.

3.     On 15th September 2008 Lehman Brothers Holdings Inc, the parent company of the Lehman Brothers Group, applied to the United States Bankruptcy Court, Southern District of New York for protection under Chapter 11 US Bankruptcy Code. Lehman BSF did likewise on 3rd October 2008. After 15th September 2008 the periodic payments due by the respective issuers to the noteholders and by Lehman BSF to the issuers were not made. On 13th May and 9th June 2009 Perpetual and Belmont issued part 8 claims against the Trustee for orders designed to procure the realisation of the collateral held by the Trustee in respect of each of the relevant issues and its application in favour of the respective noteholders in priority to any claim of Lehman BSF. They rely on the provision in the trust deed under which each issue was made which confers priority on the noteholders if:

> "...an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty [Lehman BSF] is the Defaulting Party (as defined in the Swap Agreement)..."

4.     Lehman BSF does not accept that the noteholders are entitled to the priority they claim. On 20th May 2009 it issued a complaint in the US Bankruptcy Court, Southern District of New York against the Trustee contending that the provisions on which the noteholders rely are forbidden by ss. 362(a)(3), 365(e)(1) and 541(c)(1)(B) US Bankruptcy Code in that they modify the interest of a debtor in a contract because of a bankruptcy filing or they exercise control over the property of Lehman BSF's estate in breach of the protection afforded by Chapter 11. In addition Lehman BSF intervened in the actions commenced by Perpetual and Belmont, has been joined as the second defendant and has applied for both actions to be stayed pending the resolution of the proceedings between Lehman BSF and the Trustee in the US Bankruptcy Court, Southern District of New York.

5.     On 10th June 2009 Lehman BSF, having been duly authorised to do so by the judge, Hon. James M. Peck, filed a motion for summary judgment on its claim in the US Bankruptcy Court. On 22nd June 2009 the Trustee applied to the same court to dismiss the complaint or to stay it on the grounds, amongst others, that the Perpetual is a necessary party to the proceedings but has not been joined by Lehman BSF, that that court is not the appropriate forum and that it should abstain from adjudicating on the issues in the interest of justice and on the basis of comity. Both applications were due to come on before Judge Peck on 15th July but have been, I understand, adjourned. The Trustee's motion to dismiss is due to be heard on 11th August 2009.

6.     Perpetual and Belmont resist the application to stay their part 8 claims on the grounds that as all the relevant transactions are governed by English law and this court has no power to decline its jurisdiction over the claims it cannot and should not stay them. Lehman BSF responds by indicating that it seeks only a temporary stay. In addition it

contends that the priority provisions on which the noteholders rely are invalid under English law by reference to the principle recognised by the House of Lords in **British Eagle International Airlines Ltd v Compagnie Nationale Air France** [1975] 1 WLR 758, namely that parties cannot, consistently with public policy, contract out of the mandatory provisions of the Insolvency Act 1986. The Trustee is concerned to obtain the indemnity to which it is entitled before it is required to take any of the steps the noteholders demand. It regards with apprehension the possibility that it might be faced with conflicting requirements imposed by the US Bankruptcy court and this court.

7.    Thus the issues for my determination are whether to grant a stay of these part 8 claims and if not what, if any, order to make in respect of them. In order to reach any conclusion on either of those broad issues it is necessary to explain the complex documents which underlie these transactions and resolve a number of issues which arise in respect of them.

## The relevant documents

8.    The Perpetual claim concerns two notes issues made by Saphir Finance Public Limited Company, a company incorporated in the Republic of Ireland, Saphir I and Saphir II. The Belmont claim concerns five notes issues made by Zircon Finance Ltd, a company incorporated in the Cayman Islands, one by Saphir Finance Public Limited Company and four by Beryl Finance Ltd, also incorporated in the Cayman Islands. It is agreed that the documentation in relation to all twelve issues is for all relevant purposes in the same form. Accordingly I shall consider the documentation relating to Saphir I which in argument was taken as the paradigm.

9.    The issue of each of the twelve series of notes is governed by three documents (1) the Principal Trust Deed made on 10th October 2002 between Dante Finance Public Limited Company (the first issuer under the programme) and the Trustee, (2) a Supplemental Trust Deed and Drawdown Agreement made between the particular issuer be it Saphir, Zircon or Beryl, the Trustee (together with its associated custodian and paying agent), Lehman BSF (described as the swap counterparty) and LBIE and (3) the Terms and Conditions of the Notes which were attached to the prospectus sent to potential investors. The swap agreement associated with each issue is regulated by two documents, namely (1) an ISDA Master Agreement originally dated 10th October 2002 but amended and restated from time to time made between Dante Finance Public Limited Company and Lehman BSF and (2) a swap confirmation in respect of each issue.

## The Principal Trust Deed

10.   The Principal Trust Deed has effect in relation to any specific note issue as amended by the Supplemental Trust Deed relating to that issue. By clause 5.1 the issuer granted "as continuing security" the charge and security interest set out in the

Supplemental Trust Deed. Clause 5.5 provides that the security so granted shall become enforceable

> "...if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty [Lehman BSF]."

Clause 5.6 provides for the Trustee to take possession of the mortgaged property. The Trustee is bound "at any time after any security...shall have become enforceable" if requested by at least one fifth of the noteholders, directed by extraordinary resolution of the noteholders or directed by the Swap Counterparty in certain specified events or otherwise at its discretion to enforce the security over the collateral. But, in every case, its obligation is "subject to it having been indemnified to its satisfaction against any loss [etc] which may be incurred or made against it in connection therewith".

11.    Clause 6 deals with the application of the moneys received by the Trustee. Clause 6.1 relates to moneys received otherwise than in connection with the realisation or enforcement of the security. Such moneys are to be held by the Trustee on trust to apply them in payment first of the Trustee's costs, second the amounts due to the Swap Counterparty or the noteholders and others pari passu and rateably and thirdly to the issuer. Clause 6.2 directs the Trustee

> "to apply moneys received by it under this Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security as follows.."

There then follow four orders of priority, which are defined in detail, respectively entitled "Swap Counterparty Priority", "Pari Passu Ranking", "Noteholder Priority" and "other priority". One of such respective priorities is to be applied "if [it] is specified in the relevant Supplemental Trust Deed."

12.    Clause 7.2.1 provides that the liability of the issuer to the Swap Counterparty is to be satisfied out of the mortgaged property, that is the collateral, so as to exclude any personal liability. Clause 9.17 provides for an indemnity for the Trustee from the mortgaged property, as envisaged by clause 5.6. Clause 20.1 specifies that the Principal Trust Deed and the Notes shall be governed by and construed in accordance with English law. Clause 20.2 confers a non-exclusive jurisdiction on the courts in England.

13.    Schedule 2 Part C to the Principal Trust Deed contain terms and conditions of the notes to be applied to all notes of any series but subject to the terms of the Supplemental Trust Deed in relation to that series. Condition 6(d)(ii) provides for the early redemption of the notes if a swap agreement is terminated. In that event the issuer is required to give an irrevocable notice of not more than 45 nor less than 15 days to the Trustee, noteholders and swap counterparty and at its expiration to redeem all the notes of that issue at their early redemption amount. The early redemption amount is defined in terms which are not material to these claims. Condition 10 defines events of default in relation to the notes to include default in payment of any sum due in respect of the notes for a period of 14 days or more.

### The Supplemental Trust Deed

14.    Clause 5.2 of the Supplemental Trust Deed contains the charge by the issuer "as continuing security in favour of the Trustee" over the collateral and other property representing it from time to time.  Clause 5.3 provides that such security

> "is granted to the Trustee as trustee for itself and/or the holders of Notes and the Swap Counterparty...as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes (ii) for the performance of the issuer's obligations (if any) under the Swap Agreement..."

Clause 5.5 is central to the issues in these claims. It provides:

> "The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:
>
> Swap Counterparty Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party, (as defined in the Swap Agreement) or....in which case Noteholder Priority shall apply."

15.    Swap Counterparty Priority and Noteholder Priority have the meanings ascribed to them in clause 6.2 of the Principal Trust Deed.  After providing for payment of certain specified costs and charges, in the former the claims of swap counterparty are payable in priority to the claims of the noteholders, in the latter the claims of the noteholders are payable in priority to the claims of the swap counterparty.  Clauses 5.9, 6, 9.3 and 14.2 contain provisions to the like effect of the clauses of the Principal Trust Deed to which I have referred in paragraph 12 above.  Clause 9.3, entitled 'Dealings in Collateral' provides, so far as material:

> "The Swap Counterparty hereby agrees that, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement)....and Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral (1)  first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter in payment of such Unwind Costs to the Swap Counterparty."

### Terms and Conditions of the Notes

16. These are attached to the prospectus issued in relation to each series. The prospectus points out that the notes are 'credit-linked' to what are described as Reference Entities. These are the entities whose credit is being, in effect, insured primarily, but not exclusively, because such entity is obliged to a Lehman company under a loan or similar transaction.    The prospectus points out that, in addition the Notes have exposure to the value of the collateral so that "Impairment of the Collateral may result in a negative rating action on the Notes". Condition 6 contains the details of how and by how much the principal amount due on the notes is reducible in the event of credit events affecting a reference entity, the details of which are not material.

17. Condition 40 deals with what is described as "Security Arrangements". Paragraph (i) relates to the collateral and provides for it to consist of the proceeds of the issue and the security to be bought with it. Paragraph (ii) sets out the priorities in the same terms as clause 5.5 of the Supplemental Trust Deed. Paragraph (iii) sets out the payments to be made under the swap Agreement, defined as the ISDA Master Agreement and the relevant confirmation, the effect of which I have summarised in paragraph 1(3) and (6) above.

18. Condition 43 concerns the calculation of the redemption amount to be paid by the swap counterparty on the maturity of the notes. Condition 44 deals with the early redemption amounts referred to in the Principal Trust Deed Schedule 2 part C condition 6(d)(ii) I have referred to in paragraph 13 above.  It also includes a definition of "Unwind Costs" as the amounts due to or by the swap counterparty under the swap agreement at its termination.

### The ISDA Master Agreement

19. As I have already mentioned it was made between Dante Finance Public Limited Company (1) and Lehman BSF (2) on 10th October 2002 but has been amended and restated from time to time in relation to its application to particular swaps. Lehman BSF is defined as Party A and the issuer as Party B. Clause 2 provides for each party to make the payments to each other specified in the relevant confirmation but in each case

> "subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

20. Events of Default and Termination Events are defined in clause 5(a) and (b) respectively. Clause 5(a), entitled Events of Default, provides so far as relevant that:

> "The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such a party...of any of the following events constitutes an event of default...with respect to such party:-

(i) Failure to pay or deliver.  Failure by the party to make, when due, any payment under this Agreement...if such failure is not remedied on or before the third local business day after notice of such failure is given to the party;

[(ii) - (vi)]

(vii) Bankruptcy.  The party, any Credit Support Provider of such party or....:-

[(1) – (3)]

(4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors rights...and in the case of any such proceeding ... (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief...or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution thereof;

[(5) – (7)]

(8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7)(inclusive); or

(9) takes any action in furtherance of, or indicating its consent to, or approval of, or acquiescence in, any of the foregoing acts;

[(viii)]

21.    Clause 6 deals with early termination and provides in (a) that:

"If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a date not earlier than the day such notice is effective as an Early Termination Date in respect of outstanding transactions..."

Clause 6(e) deals with the calculation of the sums due to each party in the event of an Early Termination the details of which are not material to these claims.  Clause 13(a) and Schedule Part 4 para (i) provides that the Master Agreement is to be governed by and construed in accordance with English law.  In accordance with Clause 13(b) each party to the Swap Agreement submitted to the non-exclusive jurisdiction of the

English Courts.   In Part 5(g) of that Schedule each party to the swap agreed that it was bound by the terms of the Principal Trust Deed.  In addition it was agreed that the liability of Party B (the issuer) to Party A (Lehman BSF) under the swap agreement was limited to the assets on which it was charged without recourse to Party B personally.

### The Swap Confirmation

22.    The swap confirmation supplements the Master Agreement and is subject to it as amended and restated for the purposes of a specific issue and swap agreement.  It is accepted for the purposes of these claims that the Swap Confirmation dated 6th June 2007 in relation to the Zircon Series 2007-9 Tranche A AUD 30m synthetic portfolio notes due 2013 should be taken as sufficiently representative of all swap confirmations relevant to the 12 notes issues with which I am concerned.

23.    The Swap Confirmation deals in paragraph 2 in great detail with the Reference Entities and Obligations which it is the purpose of the transaction effectively to insure.  Paragraphs 3 and 4 deal with the payment obligations of the buyer (Lehman BSF) and the seller (the issuer) under the swap agreement.  They and the remaining provisions of the confirmation give effect to the purposes I have summarised in paragraph 1(3) and (6) above.  Clause 10(iv) provides that in relation to Party A, which is both the buyer and Lehman BSF, the credit support provider is Lehman Brothers Holdings Inc.  Clause 10 also includes an acknowledgement by the issuer and Lehman BSF that the transaction is not intended to constitute insurance business so that payments by each party under the transaction are independent and not dependent on proof of economic loss of the other.

### The relevant events

24.    It is convenient at this stage to refer to the events relevant to the application of the terms and conditions of the five documents regulating the respective notes issues and swap agreements. They are as follows:

(1) On 15th September 2008 Lehman Brothers Holdings Inc filed for Chapter 11 protection.  As it was specified in Clause 10(iv) of the Swap Confirmation in respect of each issue with which I am concerned as the Credit Support Provider of Lehman BSF the filing constituted an event of default for the purposes of the swap agreements, see ISDA Master Agreement clause 5(a)(vii)(4) described and quoted in paragraph 20 above.  Prima facie, that event also gave rise to Noteholder Priority under clause 5.5 of the Supplemental Trust Deed, see paragraph 14 above.

(2) From 15th September 2008, interest payments due under all series of Notes (except Beryl 2008-14) were not paid on their respective due dates and remain unpaid.  Such non-payment constituted an event of default in respect of each of those notes issues, see Condition 10 set out in the Principal Trust Deed Schedule 2 Part C referred to in paragraph 13 above.  Prima facie such non-payments also

rendered the security for those issues enforceable in accordance with clause 5.5 of the Principal Trust Deed set out in paragraph 10 above.

(3) On 3rd October 2008 Lehman BSF filed for Chapter 11 protection. Such filing also constituted an event of default for the purposes of the swap agreements, see ISDA Master Agreement clause 5(a)(vii)(4) described and quoted in paragraph 20 above and, prima facie, gave rise to Noteholder Priority under clause 5.5 of the Supplemental Trust Deed, see paragraph 14 above.

(4) Between 28th November and 3rd December 2008 the noteholders in respect of each issue except Beryl 2008-14 gave notice to the Trustee in reliance on the event of default constituted by the filing for Chapter 11 relief effected by Lehman BSF on 3rd October 2008. In the case of Saphir I and II the notice asserted an event of default and designated 1st December 2008 to be the Early Termination Date under clause 6(a) ISDA Master Agreement. In respect of the Saphir I and II series, the Trustee caused the issuer to serve swap termination notices in those terms on Lehman BSF on 1st December 2008. In the case of all the others, except Beryl 2008-14, the notice asked the Trustee to enforce its rights over the collateral under clause 5.6 of the Principal Trust Deed by requesting the issuer to give a termination notice to Lehman BSF in respect of the swap agreement and, on its termination, to convene a meeting of noteholders to consider the realisation of the collateral.

(5) On 22nd December 2008 the Trustee caused the issuer to give notice to Lehman BSF to terminate the swap agreement in respect of the Zircon 2007-9B issue with effect from 2nd January 2009 but, absent an indemnity from the noteholders, the Trustee refused to give notice in relation to any other issue with which Belmont is concerned. Such termination is also, arguably, an event of default for the purposes of clause 5.5 of the Principal Trust Deed given that, as Lehman BSF contends, sums were then due to Lehman BSF.

(6) On 20th and 24th March 2009 the noteholders in all the series with which Belmont is concerned passed resolutions to ratify or authorise swap termination. On 24th March 2009 for one series and 16th April 2009 for the others, the Trustee caused the remaining issuers in respect of all the series with which Belmont is concerned to give notice to Lehman BSF terminating those swaps.

(7) On 6th May 2009, the Trustee issued Condition 10 notices in respect of all the series with which Belmont is concerned (other than Beryl 2008-14) declaring the notes to be due and payable.

(8) On 8th May 2009 Perpetual as the noteholder in Saphir I and II passed extraordinary resolutions requiring the Trustee to serve notice on the issuer to the effect that the notes were immediately due and requiring the Trustee to enforce its security.

## The validity of clause 5.5 of the Supplemental Trust Deed to confer Noteholder Priority

Perpetual Trustee Co.Ltd v BNY
Belmont Park v BNY

25.  Given the provisions of the relevant documents and the facts to which I have referred
it is convenient to consider first the submission of Lehman BSF to the effect that the
provision on which the claimants rely, namely clause 5.5 of the Supplemental Trust
Deeds, is void under English law. If the submission is well made then the claims fail
irrespective of the position in the US Bankruptcy Court. In that event the application
of Lehman BSF for a stay will not arise. If, on the other hand, I reject the submission
it will mean that the provision on which the claimants rely is valid under English law,
the system of law by which all the relevant documents are to be governed and
construed. Accordingly the application for a stay will have to be considered in that
context.

26.  Counsel for Lehman BSF relies on what it describes as the "anti-deprivation
principle" examined by Neuberger J in **Money Markets International Stockbrokers
Ltd v London Stock Exchange Ltd** [2002] 1 WLR 1150. In paragraphs 1, 36, 87
and 116 Neuberger J formulated the principle in a number of slightly different ways,
but his basic proposition as expressed in paragraph 87 was that:

> "there cannot be a valid contract that a man's property shall
> remain his until bankruptcy, and on the happening of that event
> go over to someone else, and be taken from his creditors."

Counsel for Lehman BSF submits that clause 5.5 of the Supplemental Trust Deeds
falls squarely within that proposition and is invalid. In argument he also contended
that the same fate befell Condition 44 of the Note Conditions, to which I have referred
in paragraph 18 above, but agreed that they stood or fell together. Accordingly I shall
only consider this submission in the context of clause 5.5 of the Supplemental Trust
Deeds.

27.  Counsel for Lehman BSF submitted that the principle on which he relies invalidates
contractual provisions which have the effect of prejudicing creditors of a company in
the event of insolvency by the actual or effective removal of an asset from the
insolvent estate. Counsel for both Perpetual and for Belmont submit that Lehman
BSF's formulation is too wide and would, if applied in those terms, undermine a large
number of commercial transactions, the validity of which has not, so far, been
doubted. They contend that the principle goes no further than invalidating a contract
which, by reason of the insolvency proceedings, seeks to remove from the estate of
the bankrupt an asset which was his property at its commencement. They contrast
such a contract with an asset in which the bankrupt's interest is limited to cease on his
bankruptcy. Counsel for the claimants also submit that, even on the formulation
advanced by Lehman BSF, clause 5.5 is valid and, in the events which have
happened, has operated to divest Lehman BSF of priority under the charge over the
collateral because, first, there has been no insolvency process concerning Lehman
BSF in England and, second, the clause was not triggered by any insolvency of
Lehman BSF.

28.  Accordingly there are three basic issues, namely, the breadth of the principle, whether
it applies if there is no insolvency process in relation to Lehman BSF in England and
whether it applies if the clause operates on an event other than the bankruptcy of
Lehman BSF. I will deal with them in that order.

29.    I have been referred by each party to a number of reported cases on the extent and
application of the principle.  In chronological order they are **Ex parte Mackay** (1873)
LR 8 Ch App 643; **Ex parte Jay** (1880) 14 Ch D 19; **British Eagle International
Airlines v Compagnie Nationale Air France** [1975] 1 WLR 758; **Carreras Ltd v
Freeman Matthews Ltd** [1985] 1 Ch 207; **Money Markets International
Stockbrokers Ltd v London Stock Exchange Ltd** [2002] 1 WLR 1150; **Peregrine
Investments Holdings Ltd v Asia Infrastructure Fund Management Co Ltd**
[2004] 1 HKLRD 598; **Squires v AIG Europe (UK) Ltd** [2006] BCC 233; and
**IATA v Ansett Australia Holdings Ltd** [2008] BPIR 57.

30.    The authority on which counsel for Lehman BSF placed great reliance is **Ex parte
Mackay.**    In that case Jeavons sold a patent to Brown in consideration of the
payment to him of royalties.  At the same time he borrowed £12,500 from Brown on
terms that he, Brown, might retain, in repayment of the loan, half the royalties due to
Jeavons, but if Jeavons went bankrupt his right of retention should extend to all the
royalties.  Jeavons went bankrupt.   Jeavons' trustee in bankruptcy claimed that the
provision entitling Brown to retain all the royalties was a fraud on the bankruptcy law
and void.  That contention was upheld by the Court of Appeal.  James LJ considered
that (p.647):

> "If it were to be permitted that one creditor should obtain a
> preference in this way by some particular security, I confess I
> do not see why it might not be done in every case — why, in
> fact, every article sold to a bankrupt should not be sold under
> the stipulation that the price should be doubled in the event of
> his becoming bankrupt.

> It is contended that a creditor has a right to sell on these terms;
> but in my opinion a man is not allowed ... to provide for a
> different distribution of his effects in the event of bankruptcy
> from that which the law provides. It appears to me that this is a
> clear attempt to evade the operation of the bankruptcy laws."

Mellish LJ agreed.  At page 648 he added, after considering the decision of Lord
Eldon in **Higginbotham v Holme** 19 Ves.88, 92:

> "a person cannot make it part of his contract that, in the event
> of bankruptcy, he is then to get some additional advantage
> which prevents the property being distributed under the
> bankruptcy laws."

31.    These dicta must be read in context.  Thus, the decision of James LJ was based on the
proposition enunciated in the first paragraph of the quotation, namely the stipulation
for a preference in the event of the other contracting party's bankruptcy.  The second
was dealing with the argument summarised in the first line.  It was not dealing with
the facts of the case, unless the reference to "a man" is read as a reference to the
bankrupt, because the seller was the bankrupt, not his creditor.   Similarly the
quotation from the judgment of Mellish LJ represented his summary of the principle

to be extracted from the judgment of Lord Eldon. His decision was on the basis set out in the second paragraph of his judgment, namely:

> "In the simple case of a man lending money on mere personal security, and making a bargain that, in the event of his debtor becoming bankrupt, he should then have a security upon a certain portion of his property, it would be an absurd contention that he should be allowed to have the benefit of the security under the bankruptcy law."

32.     In **Ex parte Jay** a builder was let into occupation of land to build houses and to accept leases of the same once built. The agreement stipulated that the owner might re-enter in the event of either a breach of any stipulation to be performed by the builder or in the event of the bankruptcy of the builder. In the event of any such re-entry the building materials on the land should be forfeit to the owner of the land. The builder filed a liquidation petition but was not in breach of any stipulation on his part. The Court of Appeal held that the materials had not been forfeit to the owner but were the property of the trustee in bankruptcy. The relevant proposition was stated by James LJ in these terms (p.25):

> "a simple stipulation that, upon a man's becoming bankrupt, that which was his property up to the date of the bankruptcy should go over to someone else and be taken away from his creditors, is void as being a violation of the policy of the bankrupt law ... I think we cannot escape from applying that principle to the present case."

Similar statements are to be found in the judgments of Brett and Cotton LJJ.

33.     The case is also relevant for the proposition that if a particular provision is exercisable on one of a number of events, including bankruptcy, its invalidity in relation to bankruptcy does not invalidate it in relation to the other events. Thus, at page 26, Brett LJ said:

> "It appears that there was no default on the debtor's part up to the filing of the petition, and the Respondent cannot, therefore, succeed except by virtue of the provision for forfeiture on bankruptcy, and according to the authorities such a stipulation is void."

Brett LJ appears to accept that had the owner sought to re-enter for breach of stipulation the provision for re-entry would have been valid and enforceable to that extent. The judgment of Cotton LJ was even clearer. He said (p.25):

> "One of the two events is not hit by the decided cases. But, as to the other, though the contract is good between the parties to it, it is on principle void in the event of the builder's bankruptcy."

This is relevant to the third of the issues I have summarised in paragraph 28 above.

34.     **British Eagle International Airlines v Compagnie Nationale Air France**
        concerned the IATA clearing house under which debts owed by and to some 74
        airlines were set off against each other in the clearing house and only the net balance
        was paid by an airline to the clearing house or vice versa. One of the members ceased
        trading and went into liquidation. Its liquidator sought to recover a balance due by the
        defendant airline without any further set off under the clearing system. He contended
        that the clearing house system excluded the mandatory provisions of s.302 Companies
        Act 1948 and was void against him. He succeeded in the House of Lords by a
        majority. Lord Cross of Chelsea, with whom Lords Diplock and Edmund-Davies
        agreed, considered the decision of the Court of Appeal in **Ex parte Mackay** and
        concluded (p. 780) that:

> "...what the respondents are saying here is that the parties to the
> "clearing house" arrangements by agreeing that simple contract
> debts are to be satisfied in a particular way have succeeded in
> "contracting out" of the provisions contained in section 302 for
> the payment of unsecured debts "pari passu." In such a context
> it is to my mind irrelevant that the parties to the "clearing
> house" arrangements had good business reasons for entering
> into them and did not direct their minds to the question how the
> arrangements might be affected by the insolvency of one or
> more of the parties. Such a "contracting out" must, to my mind,
> be contrary to public policy. The question is, in essence,
> whether what was called in argument the "mini liquidation"
> flowing from the clearing house arrangements is to yield to or
> to prevail over the general liquidation. I cannot doubt that on
> principle the rules of the general liquidation should prevail."

35.     In **Carreras Ltd v Freeman Matthews Ltd** Peter Gibson J was concerned with a
        case similar in effect to **British Eagle.** The principle he derived from it was (p.226):

> "where the effect of a contract is that an asset which is actually
> owned by a company at the commencement of the liquidation
> would be dealt with in a way other than in accordance with
> s.302 Companies Act 1948, then to that extent the contract as a
> matter of public policy is avoided, whether or not the contract
> was entered into for consideration and for bona fide
> commercial reasons and whether or not the contractual
> provision affecting that asset is expressed to take effect only on
> insolvency."

36.     In **Money Markets International Stockbrokers Ltd v London Stock Exchange
        Ltd** the defendant Stock Exchange was a mutual company. Its assets were held by
        another company which issued B shares to the members of the Stock Exchange.

Under the articles of association of the latter company the holders of the B shares were liable to transfer them back to the issuer or the Stock Exchange if he ceased to be a member. Under the rules of the Stock Exchange a member who was unable to fulfil its obligations under a stock exchange contract might be declared to be a defaulter in which event he would cease to be a member of the Stock Exchange. The claimant, a company incorporated in the Republic of Ireland, was wound up by the High Court in Dublin pursuant to a resolution of its members, declared to be a defaulter and ceased to be a member of the Stock Exchange. Thereafter the Stock Exchange caused the B shares held by the claimant to be retransferred. Subsequently the B shares became valuable and the liquidator of the claimant claimed reinstatement as a member or compensation for the loss of the shares. The claim was dismissed by Neuberger J. I shall have occasion to refer to his judgment in respect of each of the issues to which I have referred in paragraph 28 above. At this stage I do so only in relation to the basic principle to be applied.

37.    Neuberger J recorded the issue before him in paragraph 43 in these terms:

> "While accepting that there is a principle that certain transactions will be held invalid or unenforceable in so far as they may result in an asset being taken away on insolvency, [counsel for the Stock Exchange] contends on behalf of LSE that it does not apply to a provision inherent in the asset which provides for its forfeiture or removal, even in the event of an insolvency....He contends that an arrangement whereby A divests himself of an asset in favour of B on terms, or in such a way, that the ownership of the asset is forfeited or lost in a certain event is enforceable even if B becomes insolvent. He says that it is permissible to create a property, an interest or a right which is, in effect, validly limited in a certain event (including insolvency), provided that it is so limited at the outset, i e so that it never existed free from that limitation. By way of illustration, he refers to leases with provisos for re-entry in the event of insolvency (or on other grounds), and protective trusts, which are expressly condoned by section 33 of the Law of Property Act 1925."

Neuberger J then considered a large number of authorities, most of which I have already referred to.

38.    He accepted in paragraphs 89 and 90 that the principle did not apply to two established categories. The second is the right of the lessor to forfeit a lease in the event of the insolvency of the tenant. The first he described in these terms:

> "...an interest granted on the basis that is inherently limited on insolvency is recognised by the court. In other words, a determinable interest, that is an interest with a limitation until insolvency, is valid: see the discussions in *Snell's Equity, Underwood & Hayton* and Professor Goode's book and the passage quoted above from Fry LJ in *Ex p Barter* 26 Ch D 510, 519-520. It must, I think, follow that an interest granted on the

basis that it is inherently limited on some other event is effective, even if that event occurs on or after an insolvency."

Neuberger J then considered the ambit of that established category and concluded in paragraph 100:

"I do not consider that the suggestion that a deprivation provision on insolvency or otherwise is valid provided it is included as part of the initial bargain (or as an inherent part of the asset) is correct; nor do I consider that the more refined version of this analysis, involving a superadded requirement that the asset in question must have been acquired for no consideration or for consideration which was itself subject to a deprivation provision, can be supported. However, as is common ground, it seems that the converse proposition is correct: if a person has a specific asset which is not subject to a deprivation provision, then a deprivation provision to which he subsequently agrees to make it subject is unenforceable in the event of insolvency: see the passages quoted above from *Snell* and from *Underwood & Hayton*."

His conclusion, after considering further authorities, is expressed in paragraphs 117 and 118 as follows:

"117. First, there is no doubt that the principle exists: it has been applied or approved in a number of cases, and fairly recently in the House of Lords. Secondly, the principle is essentially based on a common law rule of public policy, which is itself based on the long-established approach of the English law to the treatment of assets and creditors on insolvency. Thirdly, there are circumstances in which the principle does not apply. Fourthly, it is not possible to discern a coherent rule, or even an entirely coherent set of rules, to enable one to assess in any particular case whether such a provision (a "deprivation provision") falls foul of the principle. Fifthly, and perhaps not surprisingly, it is not entirely easy to reconcile the conclusions, and indeed the reasoning, in some of the cases. Sixthly, there are some rules, of a somewhat "piecemeal" nature which can be derived from the cases.

118. It seems to me that one can extract the following rather limited propositions from the cases: (i) a person cannot validly arrange his affairs so that what is already his own property becomes subject to being taken away in the event of his insolvency; (ii) subject to the first proposition, the transfer of an asset for an interest coming to an end on the transferee's insolvency (or on some other event) is apparently effective even if the transferee is insolvent; (iii) subject to the following propositions, the transfer of an asset on the condition that the asset will revest in the transferor in the event of the transferee's

insolvency is generally invalid; (iv) a proviso in a lease for
determination, i e for forfeiture or re-entry, even in the event of
the lessee becoming insolvent, is enforceable where the lessee
is insolvent; (v) in deciding whether a deprivation provision,
exercisable other than on insolvency, offends against the
principle, one is primarily concerned with the effect of the
provision and not with the intention of the parties, but it may be
that, if the deprivation provision is exercisable for reasons
which are not concerned with the owner's insolvency, default or
breach, then its operation will not be within the principle; (vi)
however, if the intention of the parties when agreeing the
deprivation provision was to evade the insolvency rules, then
that may invalidate a provision which would otherwise have
been valid, and if the intention of the parties was not to evade
the insolvency laws, the court will be more ready to uphold the
deprivation provision if it provides for compensation for the
deprivation; (vii) the court will scrutinise with particular care a
deprivation provision which would have the effect of preferring
the person to whom the asset reverts or passes as against other
unsecured creditors of the insolvent person whose estate is
deprived of the asset pursuant to the provision; (viii) where the
deprivation provision relates to an asset which has no value, or
which is incapable of transfer, or which depends on the
character or status of the owner, then it will normally be
enforceable on insolvency; (ix) a deprivation provision which
might otherwise be invalid in light of the principle may be held
to be valid if the asset concerned is closely connected with or,
more probably, subsidiary to a right or other benefit in respect
of which a deprivation provision is valid; (x) if the deprivation
provision does not offend against the principle, then (subject to
there being no other objection to it) it will be enforceable
against a trustee in bankruptcy or on a liquidation just as much
as it would have been enforceable in the absence of an
insolvency."

In the event Neuberger J concluded that the principle did not apply to invalidate the
retransfer of the B share from the claimant to the Stock Exchange.

39.    In **Peregrine Investments Holdings Ltd v Asia Infrastructure Fund Management
Co Ltd** the Court of Appeal in Hong Kong was concerned with a right of pre-emption
exercisable by non-defaulting shareholders over the shares of a defaulting
shareholder. A defaulting shareholder was defined as one who committed a material
breach of the shareholders agreement, made an assignment of his property for the
benefit of his creditors generally, failed to pay his debts as they fell due, suffered a
distress or a petition was presented for its or an order was made or a resolution passed
for its winding up. A petition was presented against a shareholder on which a
winding up order was made. Non-defaulting shareholders then exercised the right of
pre-emption. Such exercise was challenged by the liquidator on a number of grounds
and the challenge was upheld by the judge and, by a majority, the Court of Appeal.

Rogers V-P referred to a number of authorities, including those to which I have referred. He considered (para 27) the principle to be derived from them to be "no one can be allowed to derive a benefit from a contract that is in fraud of the insolvency laws". Later he identified the mischief sought to be avoided by the application of that principle to be "permitting contractual arrangements taking effect which would give the contractors an advantage at the expense of creditors where there was an insolvency".

40. Later still, in paragraph 33 Rogers V-P considered the argument that the principle only applied to cases where the owner of property had made the offending contract in respect of his property. In his view such an argument missed the point and added:

> "In the first place, the anti-deprivation policy looks to whether a person can insist on retaining an unfair advantage to himself at the expense of creditors in a bankruptcy. In any event, whether it is the insolvent himself, or itself, who disposes of his property or its value to the detriment of the creditors or whether it is a trustee of the insolvent's property or whether it is whoever is in charge of the insolvent's asset or the maintenance of the value of an asset for the ultimate benefit of the insolvent (in this case the directors of PII whose duty it was to maintain the value of PII for the ultimate benefit of PIH), matters not. It is the dealing with property the benefit of which the insolvent is ultimately entitled to and the diminution of the value therein that is important."

The same point was dealt with by Woo V-P in paragraph 86 in these terms:

> "In my view, however, if the subject matter is an asset of the company, although not strictly property of the company within the ambit of section 182, if the effect of a contractual provision is to deprive the company of it or reduce its value to the detriment of the company's general creditors in insolvent liquidation, that must equally be contrary to the public policy of equitable and fair distribution amongst unsecured creditors in insolvency."

41. In **Squires v AIG Europe (UK) Ltd** the issue was whether an agreement that the inter-company debts of a group of petrol retailers should be subordinated to the debt due to a company which had provided a bond to HM Customs & Excise for payment of the relevant excise duty was valid. Lloyd J considered that it was. In paragraph 45 of his judgment he said:

> "In my judgment, the application of the pari passu principle has to be considered separately in relation to each insolvency. As between the creditors of Stations, the subordination, by their agreement, of the debts due to Group and to other members of the Save group does not infringe the principle. It is valid because they have agreed to it, as the junior creditor did in the

> *Horne* case. Nothing turns on the question whether the
> subordination arises from the initial terms of the transaction
> creating the debt or from a later agreement, nor on whether the
> debtor is a party to such an agreement (though in the present
> case the debtor, Stations, was such a party). Equally, in the
> liquidation of Group there is no breach of the principle, and the
> assets which Group's liquidators are able to collect in would, if
> sufficient, be applied rateably between all its relevant creditors.
> The fact that Group will not be able to collect in its main asset,
> namely the inter-company debt, does not interfere with this
> principle. The situation is therefore quite different from that in
> the *British Eagle* case, or in *Ex p Mackay* and other cases of
> that kind."

The decision of Lloyd J was upheld in the Court of Appeal. At paragraph 66
Chadwick LJ said:

> "It seems to me to be commercially important that, if group
> companies enter into subordination agreements of this nature
> with their creditors while solvent, they and the creditors should
> be held to the bargain when the event for which the agreement
> was intended to provide (insolvency) occurs."

42.    Finally on this part of the case I should refer to **IATA v Ansett Australia Holdings
       Ltd.** It concerned a clearing house system between airlines similar to but not the
       same as that with which the House of Lords was concerned in **British Eagle.** The
       difference lay in the fact that as between members of the clearing house there were no
       debts inter se. Instead the right and obligation of a member was to the clearing house
       alone. One of the members became insolvent and the liquidator sought to recover
       sums alleged to be due by another airline member of the clearing house on the basis
       that the clearing house rules were, to that extent, unenforceable. The High Court of
       Australia rejected that contention. As Gleeson CJ said (paragraph 16):

> "The purpose of the amendment made to reg 9(a) was to
> remove the premise upon which the reasoning of the majority
> in the House of Lords proceeded (that, at the time of its
> insolvency, British Eagle owned property in the form of a debt
> owed to it by Air France), and to restore the contractual
> position found at first instance, and in the Court of Appeal, and
> accepted by the minority in the House of Lords. If there never
> was any property of British Eagle in the form of a debt owed to
> it by Air France, then there was no attempt to dispose of or deal
> with such property in a manner inconsistent with the insolvency
> laws."

On that basis (paragraph 23):

> "...the property of Ansett did not include debts owed to it by other airline operators and the liabilities of Ansett did not include debts owed by it to other airline operators. The relevant property of Ansett was "the contractual right to have a clearance in respect of all services which had been rendered on the contractual terms and the right to receive payment from IATA if on clearance a credit in favour of the company resulted."

In paragraph 27 Gleeson CJ emphasised the importance of applying the principle to the agreement the parties made.

> "Public policy may render a contractual provision invalid; but it cannot create a contract to which the parties have never agreed."

43. That it is contrary to public policy and therefore void, by contract to exclude the mandatory provisions of the Insolvency Act 1986 is clear enough. It is also clear that there exists an exception to that principle for the grant of an interest in property determinable on the insolvency of the grantee, but not of the grantor. Between those two extremes there exists an uncertain area. I share the views of Neuberger J expressed in the first five propositions in **Money Markets** para 117 which I have quoted in paragraph 38 above. In any given case it is necessary to construe the relevant documents in the light of the decided cases to ascertain whether the transaction falls into the first category or the second.

44. In this case counsel for Lehman BSF relies strongly on the words in clause 5.5 of the supplemental trust deeds to the effect that Swap Counterparty Priority obtains "unless" there is an event of default and the swap counterparty is the defaulting party. This, he submits, is a clear case of forfeiture by condition subsequent, the condition being the insolvency of Lehman BSF and the result the removal of the benefit of the swap counterparty priority from the bankrupt estate. Counsel for Perpetual and for Belmont rely on the structure of the transaction as a whole as demonstrating that Lehman BSF never had an interest greater than one determinable on those events. They contend that the right of Lehman BSF both before and after its insolvency was to compel the Trustee to carry out the trusts of the Principal and Supplemental Trust Deeds. Counsel for Belmont suggests that if I accede to the submissions of counsel for Lehman BSF it will create uncertainty in a number of significant commercial areas, not least because, except for **British Eagle**, the principle has not been previously applied to executory contracts.

45. In my view clause 5.5 of the Supplemental Trust Deeds is not contrary to public policy on the grounds relied on or at all. I reach that conclusion for a number of reasons. First it is necessary to consider the structure of the transaction as a whole, not the terms of clause 5.5 of the Supplemental Trust Deed in isolation. The security conferred by that clause is in respect of the collateral. The collateral was bought by the issuer with the money subscribed by the investors for the notes. In no sense was it derived directly or indirectly from Lehman BSF as the swap counterparty. Second, on

general principles the court should not be astute to interpret commercial transactions so as to invalidate them, particularly when, as counsel for Belmont suggested, consequential doubt might be cast on other long-standing commercial arrangements. Third, the involvement of Lehman BSF is the consequence of the swap agreement under which it sought and obtained, in effect, credit insurance in respect of the Reference Entities. As long as that agreement was being performed it was appropriate for Lehman BSF to have security for the obligations of the issuer as the other party to the swap agreement in priority to the issuer's obligations to the noteholders under the trust deeds and the terms and conditions of the notes. It is plain that the intention of all parties was that the priority afforded to Lehman BSF was conditional on Lehman BSF continuing to perform the swap agreement. Fourth, so regarded, the priority of Lehman BSF never extended to a time after the event of default in respect of which it was the defaulting party had occurred. Fifth, it follows that such beneficial interest by way of security as Lehman BSF had in the collateral was, as to its priority, always limited and conditional. As such it never could have passed to a liquidator or trustee in bankruptcy free from those limitations and conditions as to its priority.

46.     Such a conclusion is consistent with all the authorities to which I have referred. There is no attempt to oust the mandatory provisions of the Insolvency Act (cp **British Eagle International Airlines v Compagnie Nationale Air France and IATA v Ansett Australia Holdings Ltd**). There is no springing security for the obligations of Lehman BSF because the security enjoyed by the noteholders is security for the obligations of the issuer (cp **Ex parte Mackay**). There is no determination of an unlimited interest in property owned by the insolvent at the commencement of the insolvency process by virtue of his insolvency (cp **Ex parte Jay, Carreras Ltd v Freeman Matthews Ltd, Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd and Peregrine Investments Holdings Ltd v Asia Infrastructure Fund Management Co Ltd**).

47.     In those circumstances neither of the other two issues referred to in paragraph 28 arises. Nevertheless, as this case is likely to go further it may help if, briefly, I express my views on them. The second issue focuses on the fact that Lehman BSF is not subject to any insolvency process in England. As the principle is based on public policy in England in relation to the Insolvency Act so, it is said, it cannot apply when the company in question is only subject to insolvency processes in another state under different legislation. I am not, it is said, entitled to take account of the public policy of other states in respect of other legislation. A similar submission was, at one stage, made to Neuberger J in **Money Markets**. In that case the company in question was being wound up by the High Court in Ireland. He rejected it on the grounds that the law of insolvency in the Republic of Ireland was essentially the same as the law of England, on grounds of comity and in reliance on provisions of the EC Treaty.

48.     The logic of the submission that the principle of **British Eagle** is based on the insolvency law of England, not that of any foreign state, and therefore requires some insolvency process in England appears to be impeccable. But it leads no where. Both the common law and the UNCITRAL model law of insolvency, given statutory force in the United Kingdom by Insolvency Act 2000 and Cross-Border Insolvency Regulations 2006 SI 2006 No 1030, invite this court to co-operate with the insolvency regimes of foreign states, see **Barclays Bank plc v Homan** [1993] BCLC 680, 687

and 691 and **Cambridge Gas Transportation Corporation v Unsecured Creditors of Navigator Holdings plc** [2007] 1 AC 508, 518 paras 20 to 22. It is common ground that in exercise of that jurisdiction this court can assume that the insolvency proceedings in the US are insolvency proceedings in England. But, if that is not enough, those in control of Lehman BSF can procure that it is wound up in England on a petition presented either by the Company itself or by its foreign representative appointed by the US Bankruptcy Court and recognised in England under Article 15 of the UNCITRAL Model Law of Insolvency. In those circumstances a conclusion to the effect that the principle in **British Eagle** is not applicable in the circumstances of this case would be absurd; not least because it is Lehman BSF which contends that it applies and which, if I concluded that it did not apply, could ensure that it did.

49.    The other issue is whether, if the **British Eagle** principle were capable of applying, it would do so where the event which caused the switch to Note-holder Priority was not the commencement of the relevant insolvency process. The point arises from the facts that under clause 5.5 of the Supplemental Trust Deeds priority is changed if there is "an Event of Default (as defined in the Swap Agreement) and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement)". The "Events of Default" are set out in clause 5(a) of the Swap Agreement of which I have quoted the material passages in paragraph 20 above. The bankruptcy events include those occurring in relation to the credit support provider of Lehman BSF, defined in paragraph 10(iv) of the Swap Confirmation as Lehman Brothers Holdings Inc (see paragraph 23 above). "Defaulting Party" is defined in clause 6(a) of the swap agreement as the party in respect of which the event of default occurs. Accordingly I do not think there can be any doubt that an event of default, as defined, arose on 15th September 2008, Lehman BSF was the defaulting party in respect of it and that that was an event other than the insolvency of Lehman BSF.

50.    The effect of the termination of an interest on two or more events, one of which was the insolvency of the holder of the interest has arisen in two cases in the Court of Appeal. The first was **Ex Parte Jay** to which I have referred in detail in paragraphs 32 and 33 above. In that case bankruptcy was only one of the events on which forfeiture occurred. The fact that forfeiture on that event would have been void did not render ineffective forfeiture on one of the others. That seems to me to be direct and binding authority for the proposition that the invalidity of a forfeiture on one of the several events on which it might be made was not affected by the fact that a forfeiture on another of those events, namely bankruptcy, would have been contrary to public policy and void. The second was **Ex Parte Newitt** (1881) 16 ChD 522. In that case the interest of a builder in his building materials on site was forfeited to the owner of the land in the event of non payment of rent, failure to perform and observe the terms of the building agreement or failure to complete the buildings. The builder went into liquidation and the owner re-entered. The Court of Appeal, being the same constitution as in **Ex Parte Jay**, followed their own earlier decision.

51.    This point was considered by Neuberger J in **Money Markets** paragraphs 104 to 109. There he considered that the decision in **Ex Parte Newitt** supported the proposition that a provision applicable on events other than the insolvency of the person concerned if exercised for such other reason would be valid. However he was concerned whether it was consistent with the reasoning of the majority in **British Eagle**. Counsel for Belmont submits that the decision of the Court of Appeal in **Ex**

**Parte Jay** is a decision binding on me to the effect that a forfeiture provision exercisable on a number of events of which bankruptcy is one is valid if exercised in reliance on such other events notwithstanding that it would have been invalid if exercised on the ground of insolvency. Neuberger J did not consider whether that aspect of **Ex Parte Jay** was binding on him. Had he done so then he would have had also to consider whether it was open to him, rather than the Court of Appeal, to treat it as inconsistent with the decision of the House of Lords in **British Eagle**. In my view there is no sufficient inconsistency between the decision of the Court of Appeal in **Ex Parte Jay** and of the House of Lords in **British Eagle** to entitle me to decline to follow the former.

52.    The response of counsel for Lehman BSF is that the alternative priorities for which clause 5.5 of the Supplemental Trust Deed provides apply only to the application of the moneys received from the realisation or enforcement of the collateral. Under clause 5.5 of the Principal Trust Deed the security over the collateral is not enforceable unless and until either an amount due under the notes has not been paid or the swap agreement has been terminated with sums due to the swap counterparty. He points out that the termination of the swap agreement depends not only on the occurrence of the same event of default but also the giving of a notice in accordance with clause 6(a) of the swap agreement. That provides that the notice must specify the relevant event of default. It is not in dispute that the notices given by Perpetual and Belmont only specified the chapter 11 filing by Lehman BSF, not the earlier filing by Lehman Brothers Holdings Inc.

53.    The response of counsel for Perpetual and Belmont is to point out that their clients' termination notices were expressly without prejudice to any earlier rights. In addition they rely on a general principle entitling a party to justify his actions by reference to facts then existing but only discovered later said to be illustrated by the decision of the Court of Appeal in **Byblos Bank SAL v Khudairy** [1987] BCLC 232 and Chitty on Contracts 13th Ed. para 24-014.

54.    In my view the resolution of this issue depends on the proper construction of the relevant documents. The submission for Lehman BSF involves the proposition that an event of default sufficient to trigger a change of priority under clause 5.5 of the Supplemental Trust Deed must also be the event of default relied on to trigger the realisation or enforcement of the security. That is not an express requirement of clause 5.5 but is said to be implicit in the fact that the opening words of clause 5.5 show that the clause as a whole is dealing with the application of the proceeds of realisation or enforcement.

55.    I do not accept that submission. The security may become enforceable under clause 5.5 of the Principal Trust Deed otherwise than on the termination of the swap agreement. Had it been intended that the priorities should depend on any such termination, clause 5.5 of the Supplemental Trust Deed could easily have so provided. Plainly the event of default sufficient to trigger clause 5.5 of the Supplemental Trust Deed must precede the termination of the swap agreement. I see no reason why, given the forms of their respective notices, Perpetual and Belmont should not be entitled to rely on the event of default constituted by Lehman Brothers Holdings Inc filing for Chapter 11 protection as triggering clause 5.5 of the Supplemental Trust Deed. Accordingly had I considered that the **British Eagle** principle did apply I

should also have held that it was not, on the facts of this case, engaged so as to invalidate the operation of clause 5.5 of the Supplemental Trust Deed.

56.    It was agreed at the hearing that I should defer all questions relating to the indemnities to which the Trustee is entitled as a condition for the enforcement of the security. It follows that the hearing of these claims will have to be adjourned for further argument in the light of my conclusions so far. Counsel for Perpetual and Belmont invited me, if I came to the conclusion I have, to make appropriate orders subject only to the resolution of the outstanding issues in relation to indemnities. But whether or not that would be appropriate must await my conclusion on the applications of Lehman BSF for these claims to be stayed. It is to those applications I now turn.

### The Stay Applications

57.    The applications issued by Lehman BSF invoke CPR 3.1(2)(f) and the inherent power of the Court. They seek a stay "pending the resolution of proceedings" between Lehman BSF and the Trustee in the US Bankruptcy Court, Southern District of New York. The reasons for the application stated in the application notices are:

> "The issues to be addressed in the Bankruptcy Court proceedings are whether and if so to what extent the agreements in issue in this claim are valid and binding against Lehman BSF which is a debtor subject to Chapter 11 of the US Bankruptcy Code. Those issues ought to be determined prior to the determination of this claim in order that the parties' rights and obligations in relation to the agreements can be properly understood. As a matter of the just and efficient management of this case and/or in the interests of comity, it is therefore appropriate for this Court to make its determination after and in the light of the judgment of the Bankruptcy Court. Furthermore these proceedings are brought in breach of the automatic stay which is in place over claims against Lehman BSF and its estate pursuant to chapter 11 of the US Bankruptcy Code."

58.    The responses of Perpetual and Belmont were that the applications should be dismissed on three grounds. They were that (1) under the Judgments Regulation (Council Regulation EC 44/2001) I have no jurisdiction to grant a permanent stay; (2) even if I had jurisdiction I should not do so as the provisions of a foreign bankruptcy code cannot be applied when determining the interpretation of a contract governed by English law; and (3) if and in so far as the stay sought is a temporary one the court's power to grant one on case management grounds should be exercised only in rare and compelling cases, which these are not.

59.    In the event the application made by counsel for Lehman BSF was much more limited than that presaged by the application notices and on substantially different grounds, thereby rendering much of the written arguments of Perpetual and Belmont redundant. The grounds advanced by counsel for Lehman BSF were to the effect that this court should not by its order inhibit the US Bankruptcy Court from determining the

complaint made to it by Lehman BSF and Lehman Brothers Holdings Inc. Nor should it grant relief in these claims which might disable it from requesting this court for assistance either under its general jurisdiction or under UNCITRAL Model Law of Insolvency. Accordingly he seeks only a temporary stay.

60.     Counsel for Perpetual and Belmont complained that the extent to which the stay sought might be temporary would depend on what use Lehman BSF sought to make of any judgment it obtained from the US Bankruptcy Court. It was suggested that I should require, as a condition for the grant of a temporary stay, an undertaking that Lehman BSF would not seek to obtain or use any judgment obtained from the US Bankruptcy Court so as to bind the Trustee.

61.     The nature and purpose of the stay sought by counsel for Lehman BSF was clarified in oral argument to be the co-ordination of the insolvency jurisdictions of the US and the UK. That was further limited to the giving of time for the US Bankruptcy Court to formulate and transmit to this court such request or requests for assistance as it might think fit under either the common law or the UNCITRAL Model Law. The response of counsel for Perpetual and Belmont is to the effect that there is no assistance which the US Bankruptcy Court might request this court to give which it would be entitled to give. This submission was based on the fact, as to which there is no issue, that s.426 Insolvency Act 1986 does not apply so the only entitlement to render assistance would be under the common law or the UNCITRAL Model Law. Counsel for Perpetual and Belmont submit that neither of those jurisdictions would entitle this court to apply foreign law to the dispute before it.

62.     Whether or not under the common law this court would be entitled to give effect to foreign law was doubted by the Privy Council in **Cambridge Gas Transportation Corporation v Unsecured Creditors of Navigator Holdings plc** [2007] 1 AC 508, 518 para 22. But the arguments of counsel showed that there is an important issue as to the extent of this Court's powers under the UNCITRAL Model Law. Article 21(1) provides that:

> "upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including..."

Similarly, Article 25(1) provides that:

> "In matters referred to in paragraph 1 of Article 1, the court may co-operate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder."

The matters referred to in paragraph 1 of Article 1 include:
> "where --
>
> (a) assistance is sought in Great Britain by a foreign court or a foreign representative in connection with a foreign proceeding; or

[(b)] or

(c) a foreign proceeding and a proceeding under British insolvency law in respect of the same debtor are taking place concurrently;or

(d) creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under British insolvency law."

63.    Counsel for Lehman BSF submitted that those provisions could entitle this court to apply provisions of the US Bankruptcy Code. In the course of his reply he informed me that it was intended to seek the appointment of a foreign representative. No doubt such representative, when appointed, will consider whether by himself under Article 9 of the UNCITRAL Model Law or through the US Bankruptcy Court pursuant to Article 25 to make any and what requests for assistance from this court. It would be premature and academic for this court to decide on the extent of its powers under the UNCITRAL Model Law or the common law in the absence of a specific request or requests. Similarly it would be inappropriate for me now, as counsel for Perpetual and Belmont invited me to do, to make the orders and declarations that they seek subject only to the provision to the Trustee of appropriate indemnities. Such relief would effectively preclude any request or other application made by the foreign representative or the US Bankruptcy Court. As these claims have to be adjourned to enable the issue of indemnities to be agreed or determined and as they cannot be listed for any further hearing before October 2009 that ought to give the foreign representative and the US Bankruptcy Court sufficient time to determine what they wish to do in relation to these proceedings and in the light of my conclusion on the validity of clause 5.5 of the Supplemental Trust Deeds under English law by which all the relevant documents are governed and are to be interpreted.

64.    In all these circumstances and for the reasons I have explained I will adjourn these proceedings to a date to be fixed through the usual channels, such date not to be earlier than 1st October 2009.

### Summary of Conclusions

65.    In my judgment the principle of **British Eagle** is not engaged by the provisions of clause 5.5 of the Supplemental Trust Deed. Accordingly under English law, by which those Trust Deeds are governed and are to be interpreted, those clauses are, in the events which have happened, valid. I invite counsel to consider whether it is appropriate for me to make a declaration to that effect now so that, subject to permission being granted, there is an order against which an appeal on that issue could be brought at this stage. If they consider that it is, then I invite them to draft and, if possible, agree the form of that declaration. Whether or not I make any such

declaration I will adjourn the further hearing of these claims to a date to be fixed not before 1st October 2009.