# EXHIBIT 11



Neutral Citation Number: [2009] EWCA Civ 1160

Cases Nos: A3/2009/1794, 2037, 2043, 2047

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**(The Rt Hon Sir Andrew Morritt, Chancellor)**
**(Claims Nos HC09CO1612 and HC09CO1931)**
**(The Hon Mr Justice Peter Smith)**
**Case No 10689/2009**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 6th November 2009

Before :

**THE MASTER OF THE ROLLS**
**LORD JUSTICE LONGMORE**
and
**LORD JUSTICE PATTEN**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| (1)  PERPETUAL TRUSTEE COMPANY LIMITED | Respondents |
| (2)  BELMONT PARK INVESTMENTS PTY LIMITED | Claimants |
| - and - | |
| (1)  BNY CORPORATE TRUSTEE SERVICES LIMITED | Appellants |
| (2)  LEHMAN BROTHERS SPECIAL FINANCING INC | Defendants |
| - AND - | |
| (1) DANIEL FRANCIS BUTTERS | Claimants |
| (2) NEVILLE BARRY KAHN | Appellants |
| (3) NICHOLAS JAMES DARGAN | |
| (Joint Administrators of WW Realisation 8 Limited and Woolworths Group plc) | |
| - and - | |
| (1) BBC WORLDWIDE LIMITED | Defendants |
| (2) 2 ENTERTAIN LIMITED | Respondents |
| (3) BBC VIDEO LIMITED | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Mr Richard Snowden QC and Mr James Potts (instructed by Weil, Gotshal & Manges) for Lehman Brothers Special Financing Inc
Mr Gabriel Moss QC and Mr David Allison (instructed by Sidley Austin LLP) for Perpetual Trustee Co Ltd
Mr Richard Salter QC and Mr Jonathan Davies-Jones (instructed by Lawrence Graham LLP) for Belmont Park Investments Pty Ltd
Mr Stephen Midwinter (instructed by Lovells LLP) for BNY Corporate Trustee Services Ltd
Mr Richard Sheldon QC and Mr Barry Isaacs (instructed by Denton Wilde Sapte LLP) for Messrs Butters, Kahn and Dargan
Mr Mark Howard QC, Mr Daniel Jowell and Mr Mark Arnold (instructed by Olswang LLP) for BBC Worldwide Ltd
Mr Edmund Cullen (instructed by Wiggin LLP) for BBC Video Ltd

Hearing dates : 13th, 14th and 15th October 2009
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**The Master of the Rolls :**

*Introductory*

1.  The main issue raised on these appeals concerns the extent of the so-called anti-deprivation rule ("the rule"). This rule, which has been expressed in slightly different ways in the cases, was put in these terms in *Ex p Jay; In re Harrison* (1880) 14 Ch D 19, 26 by Cotton LJ: "there cannot be a valid contract that a man's property shall remain his until his bankruptcy, and on the happening of that event shall go over to someone else, and be taken away from his creditors."

2.  In the *Perpetual* appeal, those administering the estate of Lehman Brothers Special Financing Inc ("LBSF") contends that the Chancellor was wrong to hold that the rule did not apply to a number of so-called synthetic collateralised debt obligations, set up through the medium of a special purpose vehicle ("SPV"), so as to vitiate provisions which, on an insolvency event, (a) switched the priority, which was enjoyed over the assets in the SPV between the credit default swap counterparty (LBSF) and the Noteholders, in favour of the Noteholders, and (b) changed the allocation of the so-called "unwind costs" in favour of the Noteholders to the potential detriment of LBSF. The Chancellor held that the rule did not apply for two reasons. First, the nature of the disadvantage suffered by LBSF did not fall within the rule; secondly, even if the rule would otherwise have applied, the two provisions were operated by an event before LBSF filed for Chapter 11 US Bankruptcy Code ("Chapter 11") protection in the US Bankruptcy Court (which is agreed to be the equivalent of the making of a winding up order for the purposes of the application of the rule). Perpetual Trustee Co Ltd ("Perpetual") and Belmont Park Investment Pty Ltd ("Belmont"), representing the Noteholders, say the Chancellor was right on each of those two grounds in holding that the rule did not apply. The Trustee adopted a neutral position on the appeal.

3.  In the *Butters* appeal, the administrators of WW Realisation 8 Ltd (formerly Woolworths Media Plc – "Media") and of Woolworths Group Plc ("Group") contend that, while he was right to conclude that the provisions in question, as drafted, offended the rule, Peter Smith J was wrong in the way in which he effectively deleted parts of (a) a provision in a Joint Venture Agreement ("the JVA") which enabled BBC Worldwide Limited ("BBCW") to purchase Media's shares in 2 entertain Ltd ("2e", a company it jointly owned with Media), on an insolvency event, and (b) a provision in a Master Licence ("the MLA") granted by BBCW to BBC Video Ltd ("Video", a company owned by 2e), which entitled BBCW to determine the MLA on an insolvency event. BBCW argue that the Judge was wrong to hold that the rule applied at all, as, first, even if the provisions had been operated after Media went into administration, the rule was not apt to apply on the facts, and, alternatively, if it would otherwise have applied, the rule was not engaged as the notice which operated the provisions was served before Media had been placed into administration. In the alternative, BBCW contend that, if the rule applied, the Judge was right to give effect to the two provisions as he did. There is a separate issue, which is whether the Judge was right to conclude that the grant of a temporary licence by BBCW to Video operated to determine the MLA in any event.

4.  I propose first to describe the relevant documentation and events which give rise to the issues in the *Perpetual* appeal, and then do the same thing in relation to the

*Butters* appeal; next, I shall turn to the cases on, and general approach to, the anti-deprivation rule; I shall then discuss the application of the rule to the facts of the two appeals in turn; I shall finally deal with the temporary licence issue in the *Butters* appeal.

### The facts in the *Perpetual* appeal

5.   In his judgment, [2009] EWHC 1912 (Ch), the Chancellor set out in summary form the effect of the documentation involved in the *Perpetual* case, in the following terms:

>   "(1)   the issue of Notes ("the Notes") to investors by an SPV ("the issuer") formed by a Lehman company in a tax friendly jurisdiction;
>
>   (2)   the purchase by the issuer with the subscription money paid for the Notes of government bonds or other secure investments ("the collateral") vested in a trust corporation;
>
>   (3)   a swap agreement entered into by a Lehman company and the issuer under which the Lehman company paid the issuer the amounts due by the issuer to the Noteholders in exchange for sums equal to the yield on the collateral;
>
>   (4)   the amount by which the sum payable under the swap agreement by the Lehman company exceeded the yield on the collateral represented the premium for the, in effect, credit insurance provided by the Noteholders;
>
>   (5)   the amount payable by the Lehman company to the issuer on the maturity of the Notes (or on early redemption or termination) was the initial principal amount subscribed by the investors less amounts calculated by reference to events defined as credit events occurring during a specified period by reference to one or more reference entities, thereby giving effect to the effective insurance aspect of the programme;
>
>   (6)   the collateral was charged by the issuer in favour of the trust corporation to secure its obligations to the Noteholders and the Lehman company on terms which changed their respective priorities on the occurrence of certain specified events, including the insolvency of the Lehman company,
>
>   (7)   each of the transactions summarised above (except the purchase of the collateral) is governed by English law."

6.   It is necessary, for present purposes, to describe in a little more detail the relevant provisions in the voluminous documentation in which the terms of these arrangements were recorded, and to set out briefly the events which give rise to the dispute.

7.   There are twelve. relevant issues of Notes, two being the subject of claims by Perpetual, and ten by Belmont. Subject to a few small exceptions, the documentation

in relation to all twelve Notes issues is essentially in the same form, and the facts relating to the Notes are, with one or two possible exceptions, the same so far as they affect the disputes in this appeal. Accordingly, I shall limit myself, for the moment, to the documentation and facts relating to one of the Notes issues in Perpetual's case, known as Saphir I. Some provisions are in more than one document, and I shall not identify such provisions more than once.

8.    Saphir I was governed by three documents, (i) a Principal Trust Deed ("the PTD") between Dante Finance Public Limited Company ("Dante", the first issuer under the programme) and the BNY Corporate Trustee Services Limited ("the Trustee"), (ii) a Supplemental Trust Deed and Drawdown Agreement ("the STD") made between the issuer, the Trustee (together with its associated custodian and paying agent), LBSF (described as the swap counterparty) and the Lehman company which established these Notes issues, Lehman Brothers International Europe ("LBIE"), and (iii) the Terms and Conditions ("the T & C") which were attached to the prospectus sent to potential investors. The swap agreement was regulated by two documents, (i) an ISDA Master Agreement ("the ISDA") between Dante and LBSF, and (ii) a swap confirmation.

9.    By clause 5.1 of the PTD, the issuer granted "as continuing security" the charge and security interest set out in the STD. Clause 5.5 of the PTD provided that the security so granted shall become enforceable "if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty [i.e. LBSF]." Clause 5.6 provided that the Trustee was bound "at any time after any security...shall have become enforceable" to enforce the security over the collateral, if requested by at least one fifth of the Noteholders, or by LBSF, in certain specified events, or otherwise at its discretion.

10.   Clause 6.1 of the PTD stated that moneys, received otherwise than in connection with the realisation or enforcement of the security, were to be held by the Trustee, after payment of the Trustee's costs, on trust to pay, first, the amounts due to LBSF, the Noteholders and others *pari passu*, and, secondly, the amounts due to the issuer. Clause 6.2 of the PTD directed the Trustee "to apply all moneys received by it under [the PTD] and the [STD] in connection with the realisation or enforcement of the security as follows...". There followed a number of orders of priority, which were defined in detail, two of which were "Swap Counterparty Priority" and "Noteholder Priority". The priority which was to apply in any particular case was that specified in the STD.

11.   Condition 6(d)(ii) of Part C of Schedule 2 to the PTD provided for the early redemption of the Notes if a swap agreement was terminated. In that event, the issuer was required to give the Trustee, the Noteholders and LBSF notice, at the expiration of which the Notes were to be redeemed at their early redemption amount. Condition 10 defined events of default in relation to the Notes as including default in payment of any sum due in respect of the Notes for a period of 14 days or more.

12.   Clause 5.2 of the STD contained a charge by the issuer "as continuing security in favour of the Trustee" over the collateral and other property representing it from time to time. Clause 5.3 provided that such security was "granted to the Trustee as trustee for itself and/or the holders of Notes and [LBSF] as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes (ii) for the performance

of the Issuer's obligations (if any) under the Swap Agreement...". Clause 5.5 of the STD ("clause 5.5") is of particular relevance, and it was in these terms:

> "The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: Swap Counterparty Priority unless ... an Event of Default ... occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party...in which case Noteholder Priority shall apply."

13.    Clause 6.2 of the PTD provided that "Swap Counterparty Priority" meant that the claims of LBSF were payable in priority to the claims of the Noteholders, whereas "Noteholder Priority" meant the converse, in each case after providing for payment of certain specified costs and charges. Clause 9.3 of the STD stated, so far as material:

> "[LBSF] hereby agrees that, if an Event of Default ... occurs under the Swap Agreement and [LBSF] is the Defaulting Party ....and Unwind Costs are payable by the Issuer to [LBSF], the Issuer shall apply the net proceeds from the sale or realisation of the Collateral first in redeeming the Notes in an amount as set out in the Conditions and thereafter in payment of such Unwind Costs to [LBSF]."

14.    The T & C were included in the prospectus, which pointed out that the Notes were 'credit-linked' to the reference entities (i.e. the securities whose credit was being, in effect, insured). The prospectus also pointed out that, in addition, the Notes had exposure to the value of the collateral so that "Impairment of the Collateral may result in a negative rating action on the Notes". Condition 6 of the T & C contained the details of how and by how much the principal amount due on the Notes was reducible in the event of credit events affecting a reference entity, the details of which are not material. Condition 38 provided that early redemption would be triggered by the issuer serving a notice, which was required to be done on the happening of an Event of Default under the Notes. Condition 43 of the T & C concerned the calculation of the redemption amount to be paid by the swap counterparty on the maturity of the Notes.

15.    Condition 44 of the T & C, like clause 5.5, is of central significance. It dealt with the early redemption amounts referred to in condition 6(d)(ii) of Part C of Schedule 2 to the STD. It also included a definition of "Unwind Costs". These were the amounts due to or, as the case may be, from LBSF, as the swap counterparty under the Swap Agreement at its termination. These costs were to be assessed by reference to quotations taken in the market, when the Swap Agreement terminated, for what a third party would pay to enter into a swap arrangement on similar terms, or, alternatively, what the issuer would have to pay a third party to enter into such a swap arrangement.

16.    The first paragraph of Condition 44 ("Condition 44.1") provided that the amount payable on the Notes should be the amount equal to the Notes' *pro rata* share of the proceeds from the sale or realisation of the collateral, "plus (if payable to the Issuer) or minus (if payable to [LBSF]) the amount of any Unwind Costs". So, under that paragraph, if termination occurred early, an early redemption amount was to be

calculated, and if Unwind Costs were payable under the swap to LBSF on termination, they were to be deducted when calculating any amount which would be due to the Noteholders, and if such Unwind Costs were payable the other way, they were to be added to the amount payable to the Noteholders.

17.    The second paragraph, rather than the first paragraph, of Condition 44 ("Condition 44.2") applied "if an event of default as defined in the ISDA ... occurs under the Swap Agreement and [LBSF] is the Defaulting Party". In that event, the Noteholders' *pro rata* share of the proceeds from the sale or realisation of the collateral was no longer to be subject to a deduction on account of the Unwind Costs that would be payable to LBSF, but, if the Unwind Costs were payable by LBSF to the issuer, the amount was still to be added to the amount payable to the Noteholders.

18.    Clause 5 of the ISDA defined an event of default as being "[t]he occurrence [of certain specified events] at any time with respect to [LBSF] or any Credit Support Provider" of LBSF, namely, according to 10(iv) of the swap confirmation, the ultimate parent of LBSF, Lehman Brothers Holdings Inc ["LBHI"]". Those events included failure to pay any sums due under the ISDA (after 3 days' notice of such failure), and the institution of any proceedings seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency or other similar law affecting creditors' rights ...".

19.    Clause 6 of the ISDA dealt with early termination and provided that:

> "If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party ... may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a date not earlier than the day such notice is effective as an Early Termination Date in respect of outstanding transactions..."

20.    Clause 10 of the swap confirmation included an acknowledgement by the issuer and LBSF that the transaction was not intended to constitute insurance business so that payments by each party under the transaction were independent and not dependent on proof of economic loss of the other.

21.    As to the facts giving rise to the dispute, I gratefully adopt the Chancellor's summary of them (in a slightly modified form) as regards Saphir I:

(1)    On 15 September 2008, LBHI filed for Chapter 11. As it was specified in Clause 10(iv) of the Swap Confirmation as the Credit Support Provider of LBSF, the filing constituted an Event of Default for the purposes of the swap agreements, by virtue of clause 5(a)(vii)(4) of the ISDA. Prima facie, that event gave rise to Noteholder Priority and triggered Condition 44.2.

(2)    From 15 September 2008, interest payments due under the Notes were not paid on their respective due dates and remain unpaid. Such non-payment also, at least prima facie, constituted an Event of Default by virtue of Condition 10 in Part C of Schedule 2 to the PTD.

(3)     On 3 October 2008 LBSF filed for Chapter 11. Such filing also constituted an
        Event of Default for the purposes of the swap agreements, and, prima facie,
        gave rise to Noteholder Priority and triggered Condition 44.2.

(4)     Between 28 November and 3 December 2008 the Noteholders gave notice to
        the Trustee in reliance on the Event of Default constituted by the filing for
        Chapter 11 effected by LBSF on 3 October 2008, designating 1 December
        2008 as the Early Termination Date under clause 6(a) of the ISDA. The
        Trustee caused the issuer to serve swap termination notices in those terms on
        LBSF on 1 December 2008.

(5)     On 8 May 2009 Perpetual passed extraordinary resolutions requiring the
        Trustee to serve notice on the issuer to the effect that the Notes were
        immediately due and requiring the Trustee to enforce its security.

22.     LBSF contended that Perpetual and Belmont, as Noteholders, were not entitled to rely
        on these Events of Default as triggering Noteholder Priority under clause 5.5, or
        triggering Condition 44.2, as this would fall foul of the rule. This argument was
        rejected by the Chancellor on two grounds. First, he held that, even if the triggering
        event had been the Chapter 11 filing by LBSF, there would have been nothing to
        which the rule applied; secondly, he held that, even if that was wrong, as the Event of
        Default which effected the trigger was the Chapter 11 filing by LBHI, which preceded
        the Chapter 11 filing of LBSF, so the rule did not apply.

The facts in the Butters appeal

23.     BBCW is the proprietor of certain intellectual property rights, including DVD and
        video rights which it acquired from the BBC, of which it is an indirect wholly owned
        subsidiary. Media is an indirectly wholly owned subsidiary of Group, which, until it
        went into administration, operated the well known High Street chain of Woolworths
        shops throughout the United Kingdom.

24.     On 9 July 2004, BBCW entered into the JVA with Media, Group, and 2e, which was
        the vehicle through which the venture was to be operated. 2e was jointly owned by
        Media, as to 40%, and by BBCW, as to 60%; Media's shares were known as "V
        shares", and BBCW's shares as "B shares". As part of the venture, Video became one
        of 2e's subsidiaries.

25.     Clause 26 of the JVA set out various circumstances in which BBCW could require
        Media to sell the V shares to BBCW (or Media could require BBCW to sell the B
        shares to Media). In particular, clause 26.7 provided as follows:

            "If [Media] or any parent undertaking of [Media] or (if [Media]
            is a member of [the Woolworths group]) [Group] suffers an
            Insolvency Event the following provisions shall apply:

            26.7.1 [BBCW] may by written notice delivered to [Media]
            require [Media] to sell all … of the V Shares to them at Fair
            Value. If any notice is so given, [Media] shall be bound to sell,
            and [BBCW] shall be bound to buy, all of the V Shares. No
            notice under this clause 26.7 may be given after sixty …

Business Days following the day on which [Media] notifies [BBCW] that it, any parent undertaking of it and/or [Group] has suffered an Insolvency Event.

26.7.2 In determining Fair Value for the purpose of this clause 26.7, the Investment Bank shall be directed to take into account the continuation (on the same or on different terms) or the termination in accordance with their terms as a consequence of the Insolvency Event in question of the agreements referred to in this clause 26.7 and the consequences of any such continuation or termination.

26.7.3 The provisions of clause 16.2.5 of the Master Licence shall apply.

….."

26.    Clause 27 sets out how "Fair Value" is to be assessed; in very summary terms, it is market value, albeit no discount is to be made for the fact that the V shares represent a minority (40%) shareholding. The expression "Insolvency Event" was defined in clause 1.5.2 as including (i) the insolvency of, (ii) the presentation of a winding up petition (unless the petition was withdrawn within 15 working days) against, and (iii) the making of an administration order against, Media, any parent undertaking of Media, or Group (if Media was a member of the Woolworths group).

27.    On 27 September 2004, as was anticipated at the time the JVA was entered into, BBCW entered into the MLA with Video. Under the MLA, Video was granted a licence to exploit BBCW's video and DVD catalogue, and certain other rights in respect of the BBC's future television programmes. The MLA included the following termination provision in clause 16.2.5:

"If [Media] or any parent undertaking of [Media] or (if [Media] is a member of [the Woolworths group]) [Group], suffers an Insolvency Event and [BBCW] serve notice in accordance with the provisions of clause 26.7.1 of the Joint Venture Agreement (and become unconditionally bound to buy V Shares) this Agreement shall immediately terminate…".

28.    The Woolworths group suffered well-publicised financial difficulties during the second half of 2008, and, on 2 December, a winding up petition was presented against Group: as it was not withdrawn within 15 working days, it constituted an Insolvency Event. Subsequently, Group went into administration on 27th January 2009, and this constituted a fresh Insolvency Event. Media went into administration two weeks later, a further Insolvency Event. Messrs Kahn, Butters & Dargan of Deloitte LLP are the Joint Administrators of both companies.

29.    On 2 February 2009, in reliance on Group's insolvency, the presentation of the winding up petition against Group, and the administration order made against Group, BBCW gave notice (dated 30 January 2009, "the Notice") in accordance with clause 26.7.1 of the JVA. Media went into administration on 11 February 2009. At least according to BBCW, the effect of the Notice was to determine the MLA in

accordance with clause 16.2.5 thereof, and to create a binding and enforceable contract for the sale of Media's shares in 2e to BBCW.

30.    At the same time as the service of the Notice, BBCW wrote a letter dated 30 January 2009, offering Video a temporary licence, which Video and Media decided to accept.

31.    In his judgment, [2009] EWHC 1954 (Ch), Peter Smith J decided that the MLA had determined (a) pursuant to clause 16.2.5 as a result of the service of the Notice, although he held that the parts of clause 26.7 of the JVA and 16.2.5 of the MLA which expressly cross-referred to each other meant that there was an infringement of the rule, which could be cured by "blue-pencilling" (i.e. effectively deleting) those cross-references, or, alternatively, (b) as a result of the grant of the new licence in February 2009. He also decided that, subject to the effect of his blue pencilling, BBCW was entitled to acquire Media's shares in 2e pursuant to clause 26.7 of the JVA.

### The anti-deprivation rule

*The 19th century and early 20th century authorities*

32.    The rule has been considered and applied in a number of cases at first instance and the Court of Appeal going back into the 18th century, and probably earlier, although the observations of Lord Eldon LC in *Wilson v Greenwood* (1818) 1 Sw 471, 482 have often been taken as the starting point. It is not entirely easy to identify the rule's precise limits, or even its precise nature, from these cases, as the reasoning in the various judgments in which the rule has been considered is often a little opaque, and some of the judgments are a little hard to reconcile.

33.    The majority of reported cases on the extent and application of the rule to which we were referred were decided between 1860 and 1930. They were *Whitmore v Mason* (1861) 2 J&H 204, *Ex p Mackay. Ex p Brown. In re Jeavons* (1873) LR 8 Ch App 643, *Ex p Williams. In re Thompson* (1877) 7 Ch D 138, *Ex p Jay* 14 Ch D 19, *Ex p Newitt. In re Garrud* (1880) 16 Ch D 522, *Ex p Barter. Ex p Black. In re Walker* (1884) 26 Ch D 510, *In re Detmold. Detmold v Detmold* (1889) 40 Ch D 585, *Borland's Trustee v Steel Brothers & Co Limited* [1901] 1 Ch 279, and *In re Johns* [1928] 1 Ch 737.

34.    *Whitmore* 2 J&H 204 concerned a provision in a partnership deed which stated that, in the event of the "bankruptcy or insolvency" of a partner, an account was to be taken, and the bankrupt partner was to lose his interest in the partnership assets at a market valuation (save that his interest in a mining lease was to be excluded from the valuation). Page Wood V-C held that, only in so far as it related to the lease, the provision was void. At 2 J&H 204, 212, he identified the rule as being "no person possessed of property can reserve that property to himself until he shall become bankrupt, and then provide that, in the event of his becoming bankrupt, it shall pass to another and not to his creditors." He also made it clear that his decision would have been different if the other partners had provided the £500 which the bankrupt partner in that case had paid for his interest in the lease - see 2 J&H 204, 212 and 214-5 (and per Giffard QC in argument at 210). He also made it clear that the rule did not extend to invalidate a provision for the determination of a lease on insolvency – on the basis of the maxim *cuius est dare eius est disponere* – see 2 J&H 204, 212-213. Page Wood

V-C also held that the fact that the triggering event was Smith's insolvency rather than his bankruptcy, and therefore preceded his bankruptcy, did not enable the rule to be avoided: to hold otherwise, he considered, would mean that "the bankrupt laws might, in all cases, be defeated" – 2 J&H 204, 215.

35.     *Mackay* 8 Ch D 643 involved two transactions: the first was the sale of a patent by A to B in return for B paying royalties; the second was a loan of £12,500 from B to A. The two transactions were connected, in that the parties agreed that (i) B would keep half the royalties towards satisfying the debt, and (ii) in the event of A's bankruptcy, B could also keep the other half of the royalties. It was held that, while (i) was valid against A's trustee, (ii) was not. As explained by James LJ at 8 Ch D 643, 647, (i) represented "a good charge upon one moiety of the royalties", but (ii) "is a clear attempt to evade the operation of the bankruptcy laws" as it "provide[d] for a different distribution of [A's] effects in the event of bankruptcy from that which the law provides". At 8 Ch D 643, 648, Mellish LJ put it this way: "a person cannot make it part of his contract that, in the event of bankruptcy, he is then to get some additional advantage which prevents the property being distributed under the bankruptcy laws."

36.     The decision in *Williams* 7 Ch D 138 was, as I see it, simply based on the fact that the clause in question "was a mere sham, a mere contrivance and device" the purpose of which was to give a particular creditor additional security on bankruptcy or liquidation, and therefore preference against other creditors, only in the event of the debtor's bankruptcy – per James LJ at 7 Ch D 138, 143 (and similar language was used by Baggallay and Thesiger LJJ at 7 Ch D 138, 143 and 144).

37.     In *Jay* 14 Ch D 19, the provision under consideration was a clause which entitled a landowner, who had granted a builder possession of her land, to re-take possession and to forfeit any of the builder's chattels which were on the land, in the event of the latter's bankruptcy. There was no challenge to the right of re-entry onto the land, but the right to forfeit the chattels was held to offend the rule. The fact that the landowner had had no interest in the chattels until the builder became bankrupt seems to have been an essential feature, as is clear from the judgment of Cotton LJ at 14 Ch D 19, 26, where he distinguished two earlier cases where the rule was held not to apply, so that the forfeiture provisions were valid. His ground for distinction was that, in those two cases, "the Court considered the effect of the contract was to give the landlord from the very time when the contract was entered into an equitable interest in the chattels".

38.     The facts in *Newitt* 16 Ch D 522 were very similar to those in *Jay* 14 Ch D 19, but the provision was held to be valid. The difference between the two cases was that, in *Newitt* 16 Ch D 522, the bankrupt builder had breached the terms of his agreement with the landowner and it was provided in the agreement that the chattels would be forfeited to the landowner "as and for liquidated damages", whereas in *Jay* 14 Ch D 19, the builder was not in breach of contract, and the right to forfeit was not expressed to be in respect of any money claim. At 16 Ch D 522, 530, James LJ said that the court had "no power to add to the Act for the purpose of making this security for the performance of the contract, which was *bona fide* taken by the landowner, bad by reason of the bankruptcy of the builder." On the following page, he made the point that the "broad general principle is that the trustee in a bankruptcy takes all the bankrupt's property, but takes it subject to all the liabilities which affected it in the bankrupt's hands, unless … added to by some express provision of the bankrupt law."

39.    *Barter* 26 Ch D 510 is another example of the application of the rule. A prospective
       buyer of a ship had the right to take possession of the ship and use the shipbuilder's
       premises and chattels to complete the building work, in the event of the builder not
       proceeding with the shipbuilding or going bankrupt. The Court of Appeal applied the
       following proposition in *Whitmore* 2 J&H 204, 210:

>       "[T]he owner of property may, on alienation, qualify the
>       interest of his alienee by a condition to take effect on
>       bankruptcy; but cannot by contract or otherwise qualify his
>       own interest by a like condition, determining or controlling it in
>       the event of his own bankruptcy, to the disappointment or delay
>       of his creditors. The *jus disponendi*, which for the first purpose
>       is absolute, being, in the latter instance, subject to the
>       disposition previously prescribed by law."

40.    In *Detmold* 40 Ch D 585, the provision under consideration stated that the property in
       a marriage settlement (originating from the husband) should pass to the wife for life in
       the event of an alienation by, or the bankruptcy of, the husband. The provision was
       held valid against the husband's trustee in bankruptcy, on the ground that it had been
       triggered, prior to the commencement of the bankruptcy, by the alienation effected as
       the result of the appointment of a receiver of the property in the settlement.

41.    In *Borland* [1901] 1 Ch 279, a provision in a company's articles of association,
       providing for the transfer of a shareholder's shares to the other shareholders in the
       event of his bankruptcy, would have been held to infringe the rule (consistently with
       the decision in *Whitmore* 2 J&H 204), but for the fact that, viewed in the context of
       the provisions of the articles governing the compulsory transfer of shares in other
       circumstances, the provision was "fair", as explained at [1901] 1 Ch 279, 291. In
       particular, although the provision limited the price payable for the shares to their par
       value, it did not "compel ... persons to sell their shares in the event of bankruptcy at
       something less than the price that they would otherwise obtain"; had it done so, the
       provision would have been "repugnant to the bankruptcy law".

42.    As for *Johns* [1928] 1 Ch 737, it concerned an artificial, transparent arrangement
       between mother and son, whereby the amount repayable by the son in respect of
       periodic loans made by the mother (which could not exceed £650, and might be as
       little as £10, in all) was to increase from £650 to £1,650 (plus interest) in the event of
       the son's bankruptcy. Unsurprisingly, the Judge described it as "a deliberate device to
       secure that more money would come to the mother if the son went bankrupt, than
       would come to her if he did not; and, that being so, ... the device is bad".

*The House of Lords' decision in British Eagle [1975] 1 WLR 758*

43.    All these decisions (save, it would seem, *Williams* 7 Ch D 138, which may have
       applied on a liquidation) related to bankruptcy. It is common ground, at least at this
       level, that the rule exists and applies equally to liquidations, not least in the light of
       the decision of the House of Lords in *British Eagle International Air Lines Ltd v
       Compagnie Nationale Air France* [1975] 1 WLR 758. It is also common ground that
       the rule also applies where the company concerned goes into administration (at least
       where, as in the *Butters* case, the administration is effectively for the purpose of
       maximising the return on the insolvency and will lead to a winding up order) or where

the company concerned files for Chapter 11 protection in the United States (as in the *Perpetual* case) at least where the filing is for the purpose of maximising the return on the insolvency and cessation of business.

44.     In *British Eagle* [1975] 1 WLR 758, reversing Templeman J and a unanimous Court of Appeal, the House of Lords, by a bare majority, decided that a clearing house arrangement between a large number of airline companies relating to debts arising as between them was ineffective as against the liquidator of one of the companies, British Eagle, which had gone into liquidation. As explained by Lord Cross of Chelsea (with whom Lord Diplock and Lord Edmund-Davies agreed), this conclusion was reached on the ground that, insofar as the arrangement purported to apply to debts which existed when the members of the company passed the resolution to go into creditors' voluntary liquidation, it would have amounted to contracting out of the statutory requirement that the assets owned by the company at the date of its liquidation should be available to its liquidator, who should use them to meet the company's unsecured liabilities *pari passu*, under section 302 of the Companies Act 1948 (now effectively re-enacted as section 107 of the Insolvency Act 1986).

45.     British Eagle had gone into creditors' liquidation as a result of a members' resolution passed on 8 November 1968, having ceased carrying on business two days earlier - [1975] 1 WLR 758, 775H, 776D, and, at 778C Lord Cross said that the contention of the respondents "with regard to the September clearance must succeed" as "[c]learance in respect of business done in September was 'completed' ... on November 4, before the winding up resolution was passed". In other words, he concluded that debts which had effectively ceased to exist by the date of the winding up resolution (8 November 1968), because they had already passed into the clearing house arrangement, were not caught by the rule, which only bit on debts which existed on or after the date of the winding-up.

46.     At [1975] 1 WLR 758, 780A, there is reference to *Mackay* 8 Ch App 643, and to the respondents' argument that it "was a very different case from this", as "the provision which was impugned effected a change on bankruptcy", whereas in the case before the House, "there was no change whatever on the winding-up: the same 'clearing house' provisions applied". However, Lord Cross rejected that argument, and, at 780F-G, he relied on the decision in *Mackay* 8 Ch App 643, in which, he said, the court "could only [have] go[ne] behind [the charge on the second half of the royalties] if it was satisfied -- as was indeed obvious in that case - that it had been created deliberately in order to provide for a different distribution of the insolvent's property on his bankruptcy from that prescribed by the law", on the basis that it was "irrelevant that the parties to the 'clearing house' arrangements had good business reasons for entering into them and did not direct their minds to the question of how the arrangements might be affected by the insolvency of one or more of the parties.". At [1975] 1 WLR 758, 780H, he said that "[s]uch a 'contracting out' must, to my mind, be contrary to public policy".

47.     The main dissenting speech was given by Lord Morris of Borth-y-Gest, with whom Lord Simon of Glaisdale agreed. Lord Morris also cited *Mackay* 8 Ch App 643, and referred to *Johns* [1928] Ch 737, distinguishing them as cases where the relevant provisions were "a clear attempt to evade the operation of", or "a device for defeating", "the bankruptcy laws" (see [1975] 1 WLR 758, 770A-E).

48.     *British Eagle* [1975] 1 WLR 758 was applied in *Carreras Rothmans Ltd v Freeman
        Mathews Treasure Ltd* [1985] 1 Ch 207. At [1985] 1 Ch 207, 226E-F, Peter Gibson J
        said that "the principle that [he] extracted from" it was that "where the effect of a
        contract is that an asset which is actually owned by a company at the commencement
        of its liquidation would be dealt with in a way other than in accordance with section
        302 ... then to that extent the contract as a matter of public policy is avoided". He
        held that the rule did not apply to monies due to the company, but paid, with its
        agreement because of its financial difficulties, into an account for the benefit of third
        parties. But he went on to hold that the rule did apply to other sums.

49.     The decision of the High Court of Australia in *International Air Transport
        Association v Ansett Australia Holdings Ltd* [2008] BPIR 57, where *British Eagle*
        [1975] 1 WLR 758 was discussed and distinguished, should also be mentioned. The
        agreement creating the clearing house arrangement, as considered by the House of
        Lords, was redrafted so as to circumvent the rule. The majority of the High Court
        concluded that the document achieved its aim. At [2008] BPIR 57, para 76,
        Gummow, Hayne, Heydon, Crennan and Kiefel JJ suggested that the basis of the
        House of Lords' decision was simply that one could not contract out of section 302. In
        the following paragraph, they referred to the contention that "in insolvency law, the
        *whole* of the debtor's estate should be available for distribution to *all* his creditors,
        and that no one creditor or group of creditors can lawfully contract in such a manner
        as to defeat other creditors not parties to the contract". At [2008] BPIR 57, para 79,
        the Justices said that whether this contention was correct "depend[s] entirely upon
        what the relevant statute provides". They then rejected the suggestion inherent in the
        contention "that the public policy achieves what the statute otherwise does not
        achieve".

*The Insolvency Act 1986*

50.     As explained in the more modern authorities, *British Eagle* [1975] 1 WLR 758,
        *Carreras Rothmans* [1984] 1 Ch 207 and *Ansett Australia* [2008] BPIR 57, the rule is
        essentially based on the proposition that one cannot contract out of the provisions of
        the insolvency legislation which govern the way in which assets are dealt with in a
        liquidation. It is therefore appropriate briefly to mention the relevant provisions for
        these purposes, which are, of course, in the Insolvency Act 1986.

51.     Section 107 of the 1986 Act (the modern equivalent of section 302 of the 1948 Act
        relied on in *British Eagle* [1975] 1 WLR 758) provides that, subject to the provisions
        relating to preferential payments, "the company's property in a [voluntary] winding
        up [should] be applied in satisfaction of the company's liabilities pari passu", and rule
        4.181 of the Insolvency Rules 1986 contains a similar provision where the winding up
        is pursuant to a court order. Sections 143(1) and 144(1) state that, where a company is
        subject to a winding up order, the liquidator must "secure that the assets of the
        company are got in, realised and distributed to the company's creditors ....", and,
        subject to that, he must "take into his custody or under his control all the property and
        things in action to which the company is ... entitled".

52.     Section 127 of the 1986 Act provides that "any disposition of the company's property
        ... made after the commencement of the winding up is, unless the court otherwise
        orders, void." Sections 238 and 239 enable a liquidator to apply to the court for an
        order "restoring the position", where the company has "at a relevant time" "entered

into a transaction with any person at an undervalue", or has done anything which, in the event of the company's insolvent liquidation, would put a creditor (or guarantor) of the company in a better position than he would otherwise be in. The relevant time is backdated from "the onset of insolvency" – i.e. the making of an administration application, the appointment of an administrator or the presentation of a winding up petition, and is 2 years where the person concerned is "connected with the company" and is otherwise six months in the case of a preference. Certain floating charges are avoided under section 245 if created in favour of a person "connected with the company" within 2 years, and otherwise within 1 year, of "the onset of insolvency".

*The ambit of the rule: general approach*

53.    The present appeals raise a number of questions as to the precise ambit of the rule. When considering any question concerning the ambit of the rule, it seems to me that certain principles should be borne in mind.

54.    First, Lord Cross's speech in *British Eagle* [1975] 1 WLR 758, especially at 780C-781B, is high authority for the proposition that the rule is based on public policy, but only to the extent that one cannot contract out of the insolvency legislation. That is supported by what was said by James LJ in the Court of Appeal, in *Mackay* 8 Ch App 643 and, even more clearly, in *Newitt* 16 Ch D 522, and, more recently, by Peter Gibson J in *Carreras Rothman* [1985] 1 Ch 207 and by the majority in the Australian High Court in *Ansett Australia* [2008] BPIR 57.

55.    Secondly, as to the nature of the rule, I cannot do better than cite from the majority judgment in *Ansett Australia* [2008] BPIR 57, para 78. The justices there explained that many of the cases where the rule has been considered "can be understood as depending upon the proper application of a ... provision in the relevant statute requiring that all debts proved in an insolvency rank equally and, if the property of the insolvent is insufficient to meet them in full, they are to be paid proportionately", and some other cases "turned upon what was the 'property' of the company that was to be applied in satisfaction of its liabilities". In each case where the rule is invoked "it is essential to begin from the elementary proposition that insolvency law is statutory and primacy must be given to the relevant statutory text."

56.    Thirdly, subject to one possible qualification, when considering whether the rule applies to a particular provision, there is, at least in principle, no difference between cases where the provision is expressed to apply on insolvency or liquidation and those where it is not so expressed. That appears to me to follow from the fact that the views expressed by Lord Cross (at 780F-H) prevailed over those of Lord Edmund-Davies (at 770A-E) in *British Eagle* [1975] 1 WLR 758. The possible exception is where the provision is an attempt artificially to avoid the insolvency regime (as in *Williams* 7 Ch D 138 and *Johns* [1928] Ch 737). However, such a case may be no more than an application of the principle that a court will not give effect to a sham transaction.

57.    Fourthly, especially following the passing of the 1986 Act, the courts should not extend the rule beyond its present limits, save where logic or practicality otherwise require. Given that the rule is based on the proposition that one cannot contract out of the provisions of the insolvency legislation, it would be hard to justify going beyond the established limits of the rule, save to the extent required by legislation. Further, as Patten LJ said in argument, the 1986 Act, following the recommendations in the Cork

Report, has more detailed and wide-ranging provisions with regard to undermining transactions, or the effect of transactions, entered into before winding up than the legislation in force when the English cases so far discussed were decided.

58.     Fifthly, it is important that, so far as possible, judicial decisions in the insolvency field ensure that the law is clear and consistent. That has always been true, but the need for consistency and clarity is all the greater now that commercial contracts are becoming increasingly complex both in their underlying nature and in their detailed provisions, as is well demonstrated by the contracts in the instant cases, especially in the *Perpetual* appeal. It is also desirable that, if possible, the courts give effect to contractual terms which parties have agreed. Indeed, there is a particularly strong case for party autonomy in cases of complex financial instruments such as those involved in the *Perpetual* appeal and in arrangements involving large corporate groups, such as those who signed the agreements in the *Butters* appeal; in such cases, the parties are likely to have been commercially sophisticated and expertly advised.

The anti-deprivation rule and the Perpetual appeal

59.     As mentioned, the Chancellor had two separate reasons for concluding that the rule did not prevent Perpetual and Belmont relying on Noteholder Priority and Condition 44.2. The first reason was based on the nature of the right triggered by the Insolvency Event, and essentially turned on the extent of the anti-deprivation rule. The second reason was based on the timing of the alleged deprivation, and turned on whether the rule applies to a deprivation effected prior to a winding up (or its equivalent). I shall consider these two arguments in turn.

*Was there any "deprivation" which fell within the anti-deprivation rule?*

60.     There is obvious attraction in the argument, skilfully deployed by Mr Snowden QC on behalf of LBSF, that the "flip" from Swap Counterparty Priority to Noteholder Priority and the "flip" from Condition 44.1 to Condition 44.2 constituted deprivations which were, at least potentially, precluded by the rule. Assuming that the "flips" had applied on or after the Chapter 11 filing of LBSF, they would have had the consequence of (at least potentially) reducing the assets which would otherwise be available for distribution to the creditors of LBSF, which would appear, at least arguably, to be a "deprivation" of the company's assets, consequent on, and following, the Chapter 11 filing.

61.     However, I have reached the conclusion that this argument is not correct. The essence of the arrangements embodied in the extensive documentation appears to me to be as follows: (i) The collateral, over which the rights in question were created, was acquired mainly with money derived from the Noteholders, through their subscription monies. (ii) LBSF provided little by way of subscription monies: it simply agreed to pay the interest and capital due to the Noteholders through the SPV in exchange for the interest and collateral, albeit that it was able to reduce the payments to the Noteholders by reference to failings in the credit standing of the "reference entities". (iii) So long as there was no risk of default, the Noteholders were prepared for the scheme to provide that LBSF would have priority when it came to "unwinding" the transaction. (iv) However, the scheme provided, and was sold on the basis that, if LBSF or LBHI defaulted so that they could not, or did not, pay the interest and the capital on the Notes, then it would be the Noteholders who would have priority both

in relation to repayment and in relation to the Unwind Costs. (v) The effect of the "flips" would not be to entitle the Noteholders to more than they had subscribed (with interest), and, if there was no shortfall, LBSF would not have been out of pocket as a result of the "flips".

62.     The effect of the "flip" provisions was thus not to divest LBSF of monies, property, or debts, currently vested in it, and to revest them in the Noteholders, nor even to divest LBSF of the benefit of the security rights granted to it. It was merely to change the order of priorities in which the rights were to be exercised in relation to the proceeds of sale of the collateral in the event of a default. Further, as Mr Moss QC, for Perpetual, and Mr Salter QC, for Belmont, pointed out, the right granted to LBSF was a security right over assets purchased with the Noteholders' money, and, from the very inception, the priority, and the extent of the benefits, enjoyed by LBSF in respect of the security were contingent upon there being no Event of Default. Thus, the security rights, as granted to LBSF, included the "flip" provisions, and even at the date the "flips" operated, the priority enjoyed by LBSF was no more than a contingent right. As Patten LJ points out in his judgment, the effect of the "flip" provisions in clause 5.5 and Condition 44.2 is merely to ensure that, as far as possible, the proceeds of sale of the collateral are used to repay the Noteholders their subscription monies in full, before LBSF recovers any sums from those proceeds. There is no question of the "flip" provisions giving the Noteholders more than they subscribed, at least before LBSF is paid the sums which are secured in its favour on the collateral.

63.     In other words, the position, when the transaction came to be redeemed early, and "unwound", following an Event of Default, was not that LBSF had agreed, subsequent to the grant of the right, that it would lose the right it had been granted in relation to the proceeds of sale of the collateral as a result of the Default. Notwithstanding the Default, it retained its right, but, as had always been an agreed feature of that right, as a result of the Default, LBSF had to rank behind, rather than ahead of, the Noteholders, no doubt because it was those Noteholders whose money had been used to purchase the collateral.

64.     Three principles which can be derived from the cases come into play. The first is that the rule has been held to apply to assets which were vested in the person on whose bankruptcy the deprivation is to occur. By contrast, this is a case where all that is changing is the priorities relating to the right, pursuant to a provision in the very document creating the right. Secondly, there is authority for the principle that the rule may have no application to the extent that the person in whose favour the deprivation of the asset takes effect can show that the asset, or the insolvent person's interest in the asset, was acquired with his money – see *Whitmore* 2 J&H 204, 212 and 214-215. In this case, the collateral was effectively purchased exclusively with the Noteholders' money. The third principle is that the rule cannot apply to invalidate a provision which enables a person to determine a limited interest, such as a lease or a licence, which he has granted over or in respect of his own property, in the event of the lessee's or licensee's bankruptcy - see *Whitmore* 2 J&H 204, 210 and 212-213 and *Barter* 26 Ch D 510. While not identical to a lease or licence, a charge, or provision for priorities for repayment, has features of similarity to a lease or licence, and differs from ownership.

65.     In my view, if one applies those principles to the facts of this case, they support the Chancellor's conclusion that the rule does not apply to the operation of the "flips" in

clause 5.5 and Condition 44.2. The proper analysis is that, when it came to redemption, in relation to the proceeds of sale of the collateral, whose purchase had been entirely funded with their money, the Noteholders had been prepared to permit LBSF to enjoy priority over them, in terms of Swap Counterparty Priority and under Condition 44.1, so long as there had been no Event of Default; however, in the event of a Default, the Noteholders had provided from the start that they would no longer cede priority, and that Noteholder Priority and Condition 44.2 would apply. In other words, the effect of the documentation was that the Noteholders were granting to LBSF rights over assets derived from their monies, which rights were liable to be modified on the happening of an Event of Default. In my opinion, that was a valid arrangement, enforceable even on or after LBSF's Chapter 11 filing.

66.     Patten LJ has reached the same conclusion on the simple basis that the "flip", that is, the reversal of the order of priority against a company as the holder of a charge, in favour of another chargee over the same assets, cannot be caught by the rule, even if it operates after the liquidation of the company, at least if such a reversal was an original feature of the company's charge when it was granted. I have considerable sympathy with that view, which has the merit of simplicity, and seems to be supported by what Lloyd J said in *Re SSSL Realisations (2002) Ltd (in liquidation)* [2005] 1 BCLC 1, paragraph 45. Further, it is fair to say that the principle of party autonomy, referred to above, supports his view.

67.     However, while that view may well indeed be right, I prefer to rest my conclusion in this case on the more limited ground that, in addition to the facts relied on by Patten LJ, the assets over which the charge exists were acquired with money provided by the chargee in whose favour the "flip" operates, and that the "flip" was included merely to ensure, as far as possible, that that chargee is repaid out of those assets all that he provided (together with interest), before the company receives any money from those assets pursuant to its charge. It seems to me that there may be room for argument that, in the absence of these additional facts, the arrangement in this case would have fallen foul of the analysis in *Mackay* 8 Ch App 643 (which was arguably approved in *British Eagle* [1975] 1 WLR 758), on the basis that the right in that case to retain the second half of the royalties in the event of bankruptcy was, like the "flip" provisions here, an original feature of the contractual arrangement, and the right to recoup money under a change in priority to another chargee is every bit as much of an asset as the right to monies (in the form of royalties) arising in the future. There is also a danger that the simple analysis adopted by Patten LJ could, in the light of the very limited circumstances in which the court will hold a transaction to be a sham, make it very easy to dress up sale transactions in such a way as to enable the rule to be circumvented.

68.     Accordingly, while I am far from saying that I disagree with the simple and compelling basis upon which Patten LJ would dispose of LBSF's argument on this part of the case, I have reached the same conclusion on the rather more limited ground that I have indicated.

*If there was a deprivation, does the rule apply in the light of the timing of the deprivation?*

69.     Even if the "flips" from Swap Counterparty Priority to Noteholder Priority and/or from Condition 44.1 to Condition 44.2 had constituted a deprivation within the rule, I do not consider that the rule would have been engaged in the present case, because the

triggering event was LBHI filing for Chapter 11 which occurred on 15 September 2008, some 18 days before LBSF filed for Chapter 11. As it is common ground that filing for Chapter 11 is for the purposes of the rule equivalent to the making of a winding up order, the deprivation occurred before, not on or after, the liquidation or its equivalent.

70.    In the light of an argument raised on behalf of the administrators in the *Butters* appeal, it is right to consider an argument that, if LBSF was clearly insolvent on 15 September 2008, when Noteholder Priority and Condition 44.2 appear to have been triggered, this would have been sufficient to engage the rule even though LBSF did not file for Chapter 11 until 3 October. I do not consider that a deprivation that takes effect before a winding up order (or its equivalent, Chapter 11 filing or an administration order) is caught by the rule, (unless the deprivation is effected pursuant to a sham transaction). It is true that, at least on one view, Page Wood V-C appears to have taken the opposite view in *Whitmore* 2 J&H 204, 215. However, all that he was dealing with was the point that the deprivation provision applied on "bankruptcy or insolvency", and it may well have been that he was saying that, on its true construction, the clause only applied on bankruptcy. Further, it may be that the deprivation in that case was not actually effected until after bankruptcy. If the observations of Page Wood V-C do support LBSF's case, then it is worth mentioning that another of the first instance 19th century cases, *Detmold* 40 Ch D 585, appears to support the converse proposition.

71.    More importantly, in my judgment, the basis of the rule as explained in *British Eagle* [1975] 1 WLR 758, 780F-H, and considered in *Carreras Rothman* [1985] 1 Ch 207, 226E-F, makes such an argument difficult to sustain. There is nothing inconsistent with the provisions of the 1986 Act about a contractual agreement which effects a deprivation of an asset of a company before it goes into liquidation, save to the extent that the deprivation falls within the reach of a provision such as sections 238 and 239, which do not apply in this case. This is supported by the fact that Lord Cross made it clear at [1975] 1 WLR 758, 778C, that any deprivations effected prior to the winding up of British Eagle were not caught by the rule, even though it seems very likely that British Eagle had been insolvent some time before it was wound up. Further, it is also clear from what Lord Cross said at [1975] 1 WLR 758, 780F-G that the fact that the triggering event for the deprivation in the present case is based on insolvency or failure to pay makes no difference.

72.    In addition, it seems to me that it would, or at least could, lead to uncertainty if we did not adhere to the simple proposition that, if the deprivation occurs before winding up, it does not fall within the scope of the rule, whereas if it occurs after the winding up, it does so – at least potentially. It would often be difficult for the parties involved, particularly the party with the right to effect the deprivation, to know whether the company concerned was insolvent at a particular time prior to liquidation: in some cases, it may be difficult to ascertain even after the event. No such difficulty arises in determining when a company went into liquidation. And what would happen in a case where, at the time the deprivation was to take effect, the company concerned was insolvent, but it subsequently recovered? It is hard to see how the rule, dependent as it is on the operation of the 1986 Act, could apply in such a case, but that means that, in some cases, the parties could not know whether the deprivation fell foul of the rule for some time after it had purportedly taken effect. Further, many deprivation rights

may be triggered by breach or even by notice, and it is hard to see why, or by reference to precisely what standards, it should be decided that a right to deprive for breach or by notice should be defeated simply because the company to be deprived was insolvent, but not subject to the liquidation process (or other procedures) in the 1986 Act.

73.    Quite apart from this, in the *Perpetual* case, unlike in *Whitmore* 2 J&H 204, it is the liquidation (or its equivalent) of a party other than the company which would suffer the deprivation which gives rise to the deprivation. Even if the reasoning in *Whitmore* 2 J&H 204 that the rule applies to any deprivation effected after the onset of insolvency were correct, I would find it hard to see how the rule could apply because of the insolvency of a party other than the company which would suffer the deprivation. Subject to any other arguments, to which I will turn, it is equally hard to see how the insolvency of a third party (even if closely connected with the company in question) can engage the rule. First, as the rule is based on the principle that one cannot contract out of the statutory insolvency regime, there appears to be no room for it to be invoked simply because the deprivation results from the insolvency of a third party. Secondly, such an extension of the rule would not be in line with the authorities. Thirdly, if the rule were so extended, it really would lead to confusion, as its limits would be hard to predict.

74.    In the present case, it appears to me that the way in which clause 5.5 of the STD operated, and the terms in which Condition 44 of the T&C was expressed, mean that, when, on 15 September 2008, an Event of Default, namely LBHI's filing for Chapter 11, occurred, Noteholder Priority automatically replaced Swap Counterparty Priority and Condition 44.2 automatically replaced Condition 44.1 on that date, which, crucially, was before LBSF filed for Chapter 11. It is true that the consequences of these two replacements were only enjoyed, in terms of their financial effect, after LBSF had filed for Chapter 11. However, the essential point seems to me to be that the replacement rights were vested on 15 September. Mr Snowden's argument that either or both replacement rights should be treated as occurring after 3 October (when LBSF filed for Chapter 11) presents him with a logical difficulty. If the replacement rights (i.e. Noteholder Priority and Condition 44.2) were not vested before 3 October, then *ex hypothesi* the original rights (ie. Swap Counterparty Priority and Condition 44.1) were never vested, and, if that is right, it is hard to see how LBSF could say that they had been deprived of those rights. This conclusion is inconsistent with some of the views expressed in *Fraser v Oystertech plc* [2004] BPIR 486, by Mr Peter Prescott QC, sitting as a Deputy Judge of the Chancery Division, which must therefore be treated as, to that extent, overruled.

75.    It was also suggested that the argument that LBHI's filing for Chapter 11 operated to effect a deprivation of an asset owned by one of its subsidiaries, LBSF, and so fell foul of the rule. This was advanced on two grounds. The first ground, which appealed to Peter Smith J in the *Butters* case at first instance, was that, particularly in these days of group company cross-guarantees, it was unrealistic to treat members of the same group of companies as separate entities. That has some commercial attraction, but, as Robert Walker J concluded in *Re Polly Peck International plc* [1996] BCC 486, 498B-G, it is not open to the court to treat "a closely-integrated group of companies as a single economic unit" as a matter of law (save if the rather limited grounds for piercing the veil of incorporation exist). As he explained, the need to treat

such companies as separate entities is "particularly important when creditors become involved", namely on an insolvency. The second ground was that the rule should not permit LBHI, as a company in liquidation (or Chapter 11), to have the value of one of its assets, namely its shareholding in LBSF, diminished as a result of a deprivation of property owned by LBSF, following its, LBHI's, Chapter 11 filing. That cannot be right; it is unsupported by any case, and cannot be said to be consistent with the principle on which the rule is based as explained in *British Eagle* [1975] 1 WLR 758. In any event, LBHI is not a party to the *Perpetual* proceedings.

*Differences relating to some of the other eleven issues of Notes*

76.    I have mentioned that the provisions and facts relating to Saphir I, which I have been considering, were not in all respects repeated in relation to all the other eleven issues being considered in the *Perpetual* appeal. In relation to Saphir 2006-5, Condition 38 of the T & C was slightly more prescriptive in relation to the application of Condition 44. I do not consider that this makes any difference. Similarly, Condition 44 in the case of another of the Notes issues, Beryl 2008-4, was in slightly different terms to that in the case of the other Notes issues, but, again, nothing hangs on that difference in this appeal.

77.    Further, in the case of three of the Belmont issues, LBSF did contribute towards the subscription for the issue of the Notes. However, as Mr Salter said, in one of these cases, the contribution represented a very small proportion of the total amount subscribed: while not *de minimis*, it was certainly far less than the amount subscribed by the Noteholders. In two of the three cases, the LBSF payments were more substantial, but that was because it was settling claims made by the Noteholders. I do not think that this point gets near justifying a different outcome in relation to any of those three Notes Issuers.

78.    What happened on and after 15 September 2008 in relation to the ten Notes issues where Belmont represents the Noteholders was rather different from the events relating to the two Notes issues where Perpetual represents the Noteholders. I do not propose to describe those different events, as it has not been contended that they affect the outcome of the appeal. The facts are usefully summarised in the Chancellor's judgment at [2009] EWHC 1912 (Ch), paragraph 24.

The anti-deprivation rule and the Butters appeal

79.    As in the *Perpetual* appeal, there are two main issues. The first is whether clause 26.7 of the JVA and clause 16.2.5 of the MLA could in any way give rise to an infringement of the rule. The second main issue is whether, if they could do so, the fact that they were operated before Media went into administration means that the rule nonetheless does not apply. I shall deal with these two issues in turn.

*Do clause 26.7 of the JVA and clause 16.2.5 of the MLA give rise to a deprivation?*

80.    In my judgment, there is nothing in the terms or the operation of clause 26.7 of the JVA and clause 16.2.5 of the MLA, whether taken separately or together, which could engage the anti-deprivation rule. Even assuming, in favour of the administrators, that those two clauses had been triggered after the making of the administration order in

respect of Media, there could have been no complaint that they offended against the rule.

81.     So far as clause 16.2.5 of the MLA is concerned, Mr Sheldon QC, for the administrators of Group and Media, rightly conceded that a provision in a licence in relation to intellectual property rights (or, indeed, any other type of licence) entitling the licensor to determine the licence in the event of the licensee's insolvency is in principle unobjectionable, even bearing in mind that it may only take effect after the bankruptcy or liquidation of the licensee. As Mr Howard QC said on behalf of BBCW, at least in the absence of special circumstances, a licence can be granted on any terms as to determination which the licensor wishes to agree with the licensee. As long ago as 1787, it was held that a provision for determination of a lease in the event of the tenant's bankruptcy did not contravene the law (see *Roe d. Hunter v Galliers* (1787) 2 TR 133), and such a provision is common form in most leases, and has been effectively approved by statute (see now section 146(9) of the Law of Property Act 1925). The same principle must apply to licences – see *Whitmore* 2 J&H 204 and *Barter* 26 Ch D 510. In relation to intellectual property licences, such a provision is also very common: *Laddie et al, The Modern Law of Copyright and Designs* 3rd edition, para 24.7, footnote 3, refers to such a provision being included in "[a]ny well drawn licence", and in *Fraser v Oystertech* [2004] BPIR 486, para 97, Mr Prescott referred to such a provision as a "standard term" in a licence of intellectual property rights. Most landlords and licensors do not want to have a tenant or licensee enjoying their land or exploiting their intellectual property, especially when (as is almost always the case) the tenancy or licence is granted on terms which include significant obligations, once the tenant or licensee is insolvent.

82.     In this case, of course, the basis for the right to determine the licence is a little more complex. The licensee, Video, is wholly owned by 2e, which in turn is 60% owned by the licensor, BBCW, and 40% owned by Media. The licence is determinable in the event of the insolvency of Media (or its parent, direct or indirect). In practice, therefore, the licence is determinable by the licensor, not on the insolvency of the licensee, but on the insolvency of the licensor's co-owner (through 2e) of the licensee. The provision for determination is thus a variant of the "standard term", but the variation arises from the fact that the licensor has retained a substantial interest in the licensee, and it in no way represents a departure of significance from the norm, for present purposes.

83.     As I have sought to explain, the fundamental reason why the clause does not infringe the rule is that its invocation does not involve what has been the property of the insolvent party becoming vested in a third party. It merely involves a limited interest being brought to an end, in accordance with its terms, by the third party who had granted it to the party who has become insolvent. In that connection, it can be contrasted with the other provision which falls for consideration in the *Butters* appeal, namely clause 26.7 of the JVA. This plainly does involve property which had been owned by a party who is now insolvent, namely the shares in 2e owned by Media, becoming vested in a third party, namely BBCW. But for one important feature, this clause would fall foul of the rule, at least if operated on the administration of Media. That important feature is similar to, indeed stronger than, the feature which prevented the rule applying in *Borland* [1901] 1 Ch 279. In that case, an obligation contained in the company's articles of association on a shareholder, who became bankrupt, to sell

his shares to other shareholders was held to be enforceable because the sale was to be at market value. As Farwell J made clear at [1901] 1 Ch 279, 291, he would have held otherwise if the sale was required to have been effected other than on "fair" terms, which meant, it would seem, if the terms had been different from those which applied in the other circumstances in the articles of association which gave rise to an obligation on a shareholder to sell his shares. In the present case, the price payable under clause 26.7 is market value, which cannot be objectionable: indeed, it is arguably better than market value because no discount can be made for the fact that Media has a minority shareholding in 2e.

84.     If a licence termination provision such as clause 16.2.5 of the MLA and a right of pre-emption such as clause 26.7 of the JVA is each unexceptionable on its own, it is difficult to see how they could be objectionable because they exist together. Nonetheless, Mr Sheldon advanced a most attractive case for suggesting that the combination of the two clauses did fall foul of the rule. His argument had a number of strands. First, he relied on the point that the two clauses were linked, and that, given that the MLA could not be determined by BBCW under clause 16.2.5 unless BBCW was exercising its right to purchase Media's shares in 2e under clause 26.7 of the JVA, this showed that the purpose of the two clauses was to enable BBCW to acquire those shares at a discount, as the major value in those shares was 2e's ownership of Video, so long as Video remained licensee under the MLA. The trouble with that argument is that it overlooks the fact that the practical effect of the linkage is simply this, that BBCW's ability to determine the MLA in an Insolvency Event is fettered in that it can only be operated if BBCW exercises its right under clause 26.7 of the JVA. Accordingly, BBCW (as licensor under the MLA) is worse off, and Media (as owner of 40% of the shares in 2e), better off, by the linking of the two provisions than they would be if the two provisions had not been so linked, and if they were not so linked, they would, as independent provisions, be valid, as I have discussed. Given that the rationale for the rule is to protect insolvent estates, it cannot be right that it requires the two clauses to be invalidated in any way simply because they contain a term of some potential benefit, and no potential harm, to the estate, given that, without the term, the clauses would not infringe the rule.

85.     Mr Sheldon also argued that the clauses, when read together, demonstrated that the intention of the parties was to reduce the amount of money available to be distributed to Media's creditors, by enabling BBCW to acquire Media's shares in 2e at a lower price than if Media (or its parent) had not become insolvent. I do not agree. The point is very similar to Mr Sheldon's first point, and the answer is that, viewed objectively (as supported by the witness statement evidence, whose admissibility on this point it is unnecessary to determine), the proper commercial analysis of the purpose of the two clauses appears to be as follows. BBCW, like almost any licensor of intellectual property rights, wanted to be able to determine the licence in the event of the insolvency of its effective joint venturer, Media, as co-owner through 2e, of the licensee, Video (or indeed in the event of the insolvency of any parent company of Media). In those circumstances, Media would not have wanted to have been "landed" with a minority holding in 2e, and it is for that reason, i.e. for Media's benefit, that BBCW's right to determine the MLA is dependent on it agreeing to buy out Media's shares in 2e at market value.

86.     Mr Sheldon also contrasted the valuation under clause 26.7 of the JVA with the
        valuation basis which applied in cases other than insolvency which give rise, under
        clause 26, to a right in BBCW to purchase Media's shares in 2e. In such other cases,
        the value of the shares would take into account the fact that 2e owned Video, which
        had the benefit of the MLA. Accordingly, ran the argument, reflecting the approach of
        Farwell J in *Borland* [1901] 1 Ch 279, 291, the two clauses did fall foul of the rule, as
        the price payable for Media's shares in 2e in the event of insolvency would be lower
        than if the shares were being acquired in other circumstances covered by clause 26. I
        do not accept that analysis for two reasons. First, as BBCW must pay market value
        (indeed, at least market value) for the shares, the rule cannot be engaged. Secondly, in
        every case, in which clause 26 of the JVA provides for BBCW to acquire Media's
        shares in 2e, including the occurrence of an insolvency event under clause 26.7, BBCW
        has to pay market value for those shares (subject to the exclusion of any
        discount attributable to Media having a minority interest). Accordingly, there is no
        such difference. There will be a difference in the actual price, but that is because,
        under clause 26.7, the MLA will have been determined, but as that determination is,
        as discussed, unobjectionable, no attack can be mounted against clause 26.7 on that
        ground.

87.     It follows from this that the Judge was, in my view, incorrect to hold that the rule was
        engaged on the facts of the present case. With respect to him, that conclusion is
        reinforced by the effect of the "blue pencil" exercise which he carried out: it resulted
        in the two clauses having the same commercial effect as they would have had without
        the excision of the parts which he, in effect, deleted. In that connection, it would not
        be helpful to consider the question whether, if as the Judge thought, the rule was
        engaged, it was appropriate to indulge in a blue pencilling exercise, and, if so, what
        that exercise should have involved. The extent to which the two clauses in issue
        would have to have been disregarded would have depended on the reason why, and
        extent to which, they infringed the rule. As the clauses do not infringe the rule, this
        question is not one which can be usefully considered.

*Would the rule have applied as the deprivation was prior to Media's administration?*

88.     I consider that, even if the rule had been engaged if the notice operating clause 26.7 of
        the JVA and clause 16.2.5 of the MLA had been served after the administration order
        made in relation to Media, it would not have been engaged in the present case, given
        that the relevant Insolvency Event which triggered the service of the notice related
        purely to Group, and the service of the notice which operated clause 26.7 of the JVA
        and clause 16.2.5 of the JVA was served on Media before the making of the
        administration order against Media. As already explained in relation to the *Perpetual*
        appeal, it appears to me that both principle and practicality support the view that the
        rule has no application where the deprivation has been effected by the time the
        winding up (or administration) order is made against the company which is deprived.

89.     As Mr Howard argued on behalf of BBCW, once a valid notice was served under
        clause 26.7 of the JVA on 2 February 2009, the equitable ownership in Media's shares
        in 2e passed to BBCW. Accordingly, if Media had gone into liquidation (rather than
        administration) on 11 February 2009, the liquidator could only have treated the bare
        legal title to the shares (subject to the right to be paid the "Fair Value" for those
        shares) as the property of Media. If the notice had not been served until after 11
        February, the position would have been different, as there would have been no

specifically enforceable agreement for the sale of Media's shares in 2e prior to Media going into administration, and (as administration is treated for present purposes like liquidation) it is hard to see how the reasoning of the majority in *British Eagle* [1975] 1 WLR 758 could be distinguished.

## Concluding remarks on the rule

90.     The decision of the House of Lords in *British Eagle* [1975] 1 WLR 758 is not without its critics, which is scarcely surprising given that six of the nine Judges who expressed views on the point were effectively out-voted by the other three. However, it remains the leading case on the rule in this jurisdiction, and the basis and reach of the rule is reasonably clear from the leading speech of Lord Cross, and, as Patten LJ says, there is little between Lord Cross and Lord Morris so far as principle is concerned (although, as mentioned above, they seem to have differed on the question of whether it was relevant to the application of the rule that the deprivation provision is provided to take effect on liquidation or on the happening of some other event).

91.     In this judgment, I have tried to adhere to the logic of that reasoning, while also bearing in mind the need for clarity and consistency in this area of the law, the undesirability of interfering with party autonomy in business transactions, the inappropriateness of the courts extending the law in areas where Parliament has enacted an extensive code, and the assistance which can be gleaned from a significant body of jurisprudence.

92.     It is true that the conclusion on the second issue in each appeal, namely that a deprivation will not (at least normally) be caught by the rule if it is completed before liquidation or bankruptcy (or its equivalent), means that it may be reasonably easy in many cases to devise schemes to avoid the rule. However, as Mr Moss said, the decision in *Ansett Australia* [2008] BPIR 57 shows that the effect of the rule can often be avoided by careful drafting. It is ultimately up to Parliament to legislate against anti-avoidance devices in the insolvency field, as it has done in sections 238 and 239 of the 1986 Act. Especially in an area where Parliament has intervened so substantially and so significantly, it can only be very rarely, if ever, that it would be right for the court to invent its own anti-avoidance policies and frustrate the terms of commercial contracts freely entered into by sophisticated parties.

93.     It can also be said that it is difficult to define precisely what sort of deprivation provisions are caught by the rule. That point is particularly acutely raised by the question whether there is a deprivation capable of falling within the rule in the "flip" provisions in the documentation in the *Perpetual* appeal. The difficulty is reinforced by the view expressed by Patten LJ (which I share) that the decision in *Newitt* 16 Ch D 522 cannot survive the analysis and reasoning in the speech of Lord Cross in *British Eagle* [1975] 1 WLR 758. The effect of my reasoning on the first point in the *Butters* appeal leaves, I hope, the law in a relatively clear state, but, as indicated, I am not sure that that is so true of my reasoning on the first point in the *Perpetual* appeal. However, because of the multifarious, sophisticated and increasingly complex arrangements contained in modern financial instruments, such as the synthetic collateralised debt obligations in these proceedings, it is probably inevitable that the courts must develop the law in this area, at least for the moment, on a relatively cautious, case-by-case basis.

94.     It is strictly unnecessary to decide what would happen if a third party had a right to
        acquire an interest owned by a company (either on notice or on the happening of a
        breach or other event) which was only exercised after the company went into
        liquidation. However, in agreement with Patten LJ, it seems to me that the logic of the
        decision in *British Eagle* [1975] 1 WLR 758 must mean that the right could not be
        enforced, as it would deprive the company of an asset which should be available to
        the liquidator for distribution, unless it was a right to acquire the asset at or above
        market value. However, the loss of the ability to exercise the right might well be
        something for which the third party could prove in the liquidation.

95.     I should also add that we were referred to *Peregrine Investments Holdings Ltd v Asia
        Infrastructure Fund Management Co Ltd* [2004] 1 HKLRD 598, a decision of the
        Hong Kong Court of Appeal; for the reasons given by Patten LJ, I agree with the
        minority judgment and disagree with the majority. Finally, on this aspect, it is right to
        acknowledge that the above analysis is not quite the same as, and is (I hope) rather
        more focussed than, the analysis which I proffered in *Money Markets International
        Stockbrokers Ltd (in liquidation) v London Stock Exchange Ltd* [2002] 1 WLR 1150.
        It would not be profitable to analyse the rather detailed discussion at [2002] 1 WLR
        1150, paras 87 to 118, but, while there is not much to challenge in the "rather limited
        propositions" summarised at [2002] 1 WLR 1150, para 118, proposition (iii) may be
        rather misleading.

The effect of the grant of the temporary licence in the Butters case

96.     Longmore LJ has dealt with the arguments on this issue, which, as he says, need not
        be determined in the light of our conclusion that the rule does not inhibit the operation
        of clause 26.7 of the JVA or clause 16.2.5 of the MLA.  I agree, however, with his
        view that Peter Smith J was right to conclude on the findings which he made that, if
        the MLA could not have been determined as a result of the Notice, it was determined
        by the grant and acceptance of the temporary licence.

Conclusion

97.     Accordingly, the appeal brought by LBSF against the decision of the Chancellor is
        dismissed, the appeals by the administrators of Media and Group against the decision
        of Peter Smith J are dismissed, the appeal brought by BBC Video against the decision
        of Peter Smith J is dismissed and the cross-appeal of BBCW against the decision of
        Peter Smith J is allowed.

98.     I would invite counsel in each case to agree a form of order recording the effect of our
        decision.

**Lord Justice Longmore :**

99.     I agree with the Master of the Rolls that the appeals should be dismissed and the
        cross-appeal in the *Butters* case should be allowed for the reasons which he gives.

Did the MLA come to an end in any event?

100.    The Judge held that as a result of the conduct of the parties, the licence given by BBC
        Worldwide ("BBCW") to BBC Video ("BBCV") in the MLA came to an end in any

Judgment Approved by the court for handing down.                    Perpetual Trustee Co Ltd & Anor v
                                                                    BNY Corporate Trustee Services Ltd & Anor

event because, in February 2009 after BBCW had purported to terminate the licence, they offered to grant a temporary licence (terminable on a month's notice) to BBCV/Media and BBCV/Media agreed. Even if therefore the Administrators of Media or Group are right that the termination of the original licence offended the anti-deprivation principle, that would not avail them if the Judge is correct, because the original licence no longer exists. Both the Administrators and BBCV appeal against the Judge's conclusion. The burden of this argument was assumed by Mr Cullen for BBCV.

101.    The exchange of letters, leading to the new licence was initiated by a letter from BBCW to BBCV of 30 January 2009 in the following terms:-

> "We are writing to inform you that we have today served notice on [Media] in accordance with clause [26.7.1.] ... The MLA has therefore terminated pursuant to clause 16.2.5 of the MLA, and all rights granted under or pursuant to the MLA have automatically reverted to us...
>
> In the light of the termination of the MLA and the reversion of rights that has occurred in consequence, we hereby offer you a new licence containing the same terms as are contained in the MLA save that the "Term" of such licence shall also be terminable by either party on one month's written notice...this new licence will apply to all rights under licence under or pursuant to the MLA as at the date of its termination...
>
> We will take the continued exploitation by 2e after today's date of rights previously granted as your acceptance of these offers of new licences...unless we hear from you to the contrary."

BBCV and 2e responded on 5 February 2009 by saying:-

> "BBCW has further informed us that it has served notice on [Media] pursuant to clause 26.7.1. of the JVA, with the result that the MLA has terminated pursuant to clause 16.2.5.
>
> We have also seen the offer of a new licence containing the same terms as the MLA, save that the Term shall be terminable by either party on one month's written notice with a sell-off provision...
>
> In the light of the serious consequences of the termination of the MLA for the 2 entertain group of companies, the Directors of [BBC Video] and [2e] have concluded that it is appropriate to accept the BBCW Offer".

The Judge considered the correspondence and what he described as the "coy" evidence given on both sides in relation to the question whether the parties were aware that there were possible grounds for challenging the termination of the old licence. He concluded that both parties were aware there were possible grounds for challenge on the basis of "unfairness" (para 48) but (para 52) that Media and BBCV

had no confidence in any such grounds when they were negotiating the new (temporary) licence. The Judge concluded that the MLA could not stand alongside the new licence but was supplanted by it and had governed the parties' relationship since February 2009 (para 54).

102.  Mr Cullen for BBCV (with support from Mr Sheldon QC for the Administrators) submitted (1) that the parties never intended to replace the MLA with the temporary licence, (2) that the temporary licence was subject to an express or implied condition precedent that the MLA was terminated so that, if it was not in fact terminated, the temporary licence never took effect (3) that the temporary licence was void for mistake.

103.  Since the court has concluded that the anti-deprivation principle does not apply and that the MLA did in fact validly come to an end, anything the court says on this point is irrelevant to the decision; it can, therefore, be dealt with relatively briefly. In my view the Judge came to the correct conclusion.

104.  In the first place the Judge's finding of fact, that BBCV (and Media) were aware that there were arguments for asserting that the MLA had not been validly terminated but decided to make the temporary licence agreement, was open to him on the "coy" evidence which the parties chose to put before him. It must, therefore, follow that BBCV made the agreement in that knowledge and thus agreed to give up any point they might have had in relation to the purported termination of the old licence, for the sake of having a seamless continuation of the rights which they were enjoying. On this analysis, arguments about implied conditions precedent and mistake cannot arise.

105.  Secondly, even if it were correct that both parties were labouring under a misapprehension that the MLA had been validly terminated, I cannot read the correspondence as subjecting the new agreement to any express condition that the old MLA had been validly terminated. Although it proceeds on the basis that the MLA had in fact been terminated, no statement was made about the validity of the termination. That was just not a matter which the parties discussed (or even, on this view of the case, wished to discuss).

106.  Thirdly the Judge's finding of fact is fatal to the idea of an implied condition precedent. If the parties were aware that questions of validity could arise but do not mention them, one just cannot say that business efficacy requires a term that the agreement they have just made (and have for sometime continued to act on) is to disappear if it turns out at a later stage that, for whatever reason, the termination of the old agreement was ineffective or invalid.

107.  Mr Cullen relied on the decision of Steyn J in *Associated Japanese Bank (International ) Ltd v Credit du Nord SA* [1989] 1 WLR 255. The claimants had made an agreement to buy from (but to lease back to) the seller four industrial machines. The defendants guaranteed the obligations under the lease. The seller/lessee paid one instalment of rent but then defaulted. It was then discovered that the whole arrangement was a scam and that no machines had ever existed. In these circumstances the Judge, having emphasised the importance of the sanctity of contract and the need to give effect to the reasonable expectations of honest men, construed the reference to machines in the guarantee as a reference to existing machines and said that the contract was subject to an express condition precedent (and, if necessary,

an implied condition precedent) that the machines did, in fact, exist. That seems to me to be a very different case. Machines are visible and tangible entities. It is easy to discover if they exist or not and their existence or non-existence can hardly be a matter of controversy. The question whether a licence agreement has been validly terminated and no longer exists is a different matter. A licence is not visible or tangible in the sense that a machine is. It is a legal concept. Although it may be possible to contract expressly on the basis that a licence has validly come to an end, it would be unusual because everyone knows that questions of validity of termination are (or may well be) essentially controversial. In the absence of an express term about validity of termination, it is in my judgment impossible to imply one.

108.    Fourthly the same considerations militate against the existence of mistake. Where the parties are mistaken about the physical existence of the subject-matter of the contract there may be room for a doctrine of mistake. But again that is not this case. Still less is it the case where, on a true appreciation of the facts, both parties were aware that points could be made about the validity of the termination. Once a party appreciates that an assumption underlying a contract may be legally questionable, that party will usually bear the risk that that assumption will turn out to be false. There is then no room for mistake. As Steyn J said at page 268B:-

> "... before one can turn to the rules as to mistake, whether at common law or equity, one must first determine whether the contract itself, by express or implied condition precedent or otherwise, provides who bears the risk of the relevant mistake. It is at this hurdle that many pleas of mistake will fail or prove to be unnecessary."

If there had been a condition precedent, argument about mistake is unnecessary. As it is, on the facts as found, the plea of mistake must fail.

109.    If, moreover, one applies the requirements which are necessary before a mistake can be operative as they are set out in the *The Great Peace* [2003] QB 679, this case does not meet either requirement (i) or requirement (iv). There was no common assumption that the MLA had been validly determined nor was performance of the new licence contract rendered impossible by the fact (if it had been a fact) that the MLA had not been validly terminated.

110.    I therefore reject Mr Cullen's argument which, in any event, makes no difference to the outcome of the appeal.

**Lord Justice Patten :**

111.    I agree with the order proposed by the Master of the Rolls but, because of the general interest of these appeals and the importance of the issues which they raise, I add some observations of my own.

112.    In both these appeals we are concerned with claims that significant parts of the contractual arrangements between the parties have been invalidated by the application of what has been termed the anti-deprivation rule. In the *Woolworths* appeal the agreements were made in England between English companies. In the *Lehman* appeals the companies are not English but the agreements are governed by English

law and it is common ground that, for the purposes of applying the anti-deprivation rule, the court should treat the US Chapter 11 filings as if they were insolvency proceedings in England.

113.    Expressed in its simplest and most general form, the anti-deprivation rule is said to be a common law rule of public policy that the property of an insolvent person must be administered for the benefit of his creditors in accordance with the provisions of what is now the Insolvency Act 1986.   Consistently with and as part of this rule, the individual bankrupt or insolvent company may not contract at any time, either before or after the making of the bankruptcy or winding-up order, for its property subsisting at that date to be disposed of or dealt with otherwise than in accordance with the statute. Put another way, it is not possible to contract out of the Act.

114.    So in *British Eagle International Airlines Ltd v Compagnie Nationale Air France* [1975] 1 WLR 758 the majority in the House of Lords held that, under the IATA clearing house arrangements, debts due from Air France to British Eagle in respect of services rendered between October 1st and November 6th, 1968 which had not yet been closed off under the clearing house procedures fell to be dealt with in the liquidation of British Eagle following its winding-up on 8th November and could therefore be recovered by its liquidator in full. Had it been permissible to deal with these liabilities under the IATA rules, the existence of set-offs would, on closure, have produced a nil balance in favour of British Eagle.

115.    The House of Lords were split as to whether the liquidator could claim the benefit of the sums due from Air France without giving credit for the reductions which the application of the IATA rules required to be made. Lord Morris (giving the speech for the minority) accepted that the company's receivables had to be dealt with by the liquidator for the benefit of its creditors generally.   But his view was that the receivable in this case was no more than the net balance (if any) due after the operation of the clearing house arrangements.   This appears from two passages in his speech at p. 761E and 769H:

> "When a liquidator takes over the property of a company in order to apply it according to law he may disregard an arrangement pursuant to which there would be application of the property contrary to law: but he cannot disregard or ignore or alter the features of and the nature of the property itself by describing it as something that genuinely it is not.
>
> So in the present case if the defendant company had owed money to the plaintiff company but if there was a direction to the defendant company which required them in the event of a liquidation to pay the money to some particular persons rather than for the benefit of all the creditors the liquidator could prevent what would be an evasion of the law (see *Ex parte Mackay* (1873) 8 Ch. App. 643). But if an airline company makes a contract with a number of other airline companies (the contract being in no way colourable but made for commercially beneficial reasons) for the mutual rendering of services on the terms that no money is to become payable between the various parties inter se, I do not think that a liquidator while seeking to

rely on and to extract a benefit from the contract can do so on
the basis of ignoring or transforming some of its terms or on the
basis of requiring a breach of its terms.

.......

I see no reason to think that the contracts which were entered
into by the members of the clearing house offended against the
principles of our insolvency laws. Services rendered before the
end of September 1968 were as I have stated the subject of
"clearances" within the scheme before the date of the
liquidation. "Clearance" differs from "settlement" (see
regulations B.12, 14 and 15) and "clearance" in regard to the
September items was complete before November 8. Services
rendered during October and the first few days of November
were in my view rendered under perfectly lawful contracts
which were made in the same way as contracts had been made
for years past. Because of the terms of the contracts which were
made the appellants had no claims against and no rights to sue
other individual members of the clearing house. It is a general
rule that a trustee or liquidator takes no better title to property
than that which was possessed by a bankrupt or a company. In
my view the liquidator in the present case cannot remould
contracts which were validly made. He cannot assert or assume
or surmise that different contracts could or might have been
made and then advance claims on the basis that such different
contracts had in fact been made."

116.   The majority view is set out in the speech of Lord Cross at p. 780C to 781B:

"It is true that if the respondents are right the "clearing house"
creditors will be treated as though they were creditors with
valid charges on some of the book debts of British Eagle. But
the parties to the "clearing house" arrangements did not intend
to give one another charges on some of each other's future book
debts. The documents were not drawn so as to create charges
but simply so as to set up by simple contract a method of
settling each other's mutual indebtedness at monthly intervals.
Moreover, if the documents had purported to create such
charges, the charges - as the judge saw (see [1973] 1 Lloyd's
Rep. 433) - would have been unenforceable against the
liquidator for want of registration under section 95 of the
Companies Act 1948. The "clearing house" creditors are clearly
not secured creditors. They are claiming nevertheless that they
ought not to be treated in the liquidation as ordinary unsecured
creditors but that they have achieved by the medium of the
"clearing house" agreement a position analogous to that of
secured creditors without the need for the creation and
registration of charges on the book debts in question. The
respondents argue that the position which, according to them,
the clearing house creditors have achieved, though it may be

anomalous and unfair to the general body of unsecured
creditors, is not forbidden by any provision in the Companies
Act, and that the power of the court to go behind agreements,
the results of which are repugnant to our insolvency legislation,
is confined to cases in which the parties' dominant purpose was
to evade its operation. I cannot accept this argument. In *Ex
parte Mackay,* 8 Ch.App. 643, the charge on this second half
of the royalties was - so to say - an animal known to the law
which on its face put the charge in the position of a secured
creditor. The court could only go behind it if it was satisfied -
as was indeed obvious in that case - that it had been created
deliberately in order to provide for a different distribution of
the insolvent's property on his bankruptcy from that prescribed
by the law. But what the respondents are saying here is that the
parties to the "clearing house" arrangements by agreeing that
simple contract debts are to be satisfied in a particular way
have succeeded in "contracting out" of the provisions contained
in section 302 for the payment of unsecured debts "pari passu."
In such a context it is to my mind irrelevant that the parties to
the "clearing house" arrangements had good business reasons
for entering into them and did not direct their minds to the
question how the arrangements might be affected by the
insolvency of one or more of the parties. Such a "contracting
out" must, to my mind, be contrary to public policy. The
question is, in essence, whether what was called in argument
the "mini liquidation" flowing from the clearing house
arrangements is to yield to or to prevail over the general
liquidation. I cannot doubt, that on principle the rules of the
general liquidation should prevail. I would therefore hold that
notwithstanding the clearing house arrangements. British Eagle
on its liquidation became entitled to recover payment of the
sums payable to it by other airlines for services rendered by it
during that period and that airlines which had rendered services
to it during that period became on the liquidation entitled to
prove for the sums payable to them. So, while dismissing the
appeal so far as concerns the September clearance, I would
allow it so far as concerns the period from October 1 to
November 6."

117.    What is clear from this passage is that the IATA clearing house arrangements did not
survive the liquidation of British Eagle because they amounted to an attempt to
administer debts due to the company otherwise than in accordance with what was then
s.302 of the Companies Act 1948: i.e. a pari passu distribution amongst all of the
company's general creditors. Although the rules of the scheme prohibited member
airlines from suing each other to recover the money due and instead required them to
obtain payment through the clearing house system, Lord Cross considered that the
sum due from Air France was nonetheless a chose in action having some but not all of
the characteristics of a debt: see p. 778H. It was this chose in action which
constituted the property of the company on liquidation and therefore fell to be dealt
with under the Companies Act rather than in accordance with the IATA scheme.

118.   Once one moves beyond the particular issue in that case of whether the Air France
debt or the end balance represents the property of British Eagle on liquidation there is
no real difference between the majority and minority views. Both Lord Cross and
Lord Morris accepted that s.302 and the pari passu rule apply to the administration of
the company's property in liquidation and that it is impossible to contract out of that.
The common law rule of public policy applied in that case was therefore no more than
the application of s.302 to the property of the company at the date of liquidation with
the necessary corollary that a contract to administer the debts in some other way was
unenforceable. The IATA scheme (which of course operates generally and has no
special provisions dealing with insolvency) simply ceased to apply to the debts due to
British Eagle once the liquidation took effect.

119.   This view of the limited scope of the decision in *British Eagle* is confirmed by the
recent decision of the High Court of Australia in *IATA v Ansett Australia Holdings
Ltd* [2008] HCA 3. The rules of the clearing house scheme were modified following
*British Eagle* so as to exclude any liability or right of action for payment between
member airlines. The only liabilities of the airlines in respect of services rendered to
each other are now to the clearing house for the balances due on closure. The
administrators of Ansett sought a declaration that the clearing house scheme was
unenforceable against the company post administration and that the only debtor-
creditor relationship was between it and the other airlines.

120.   The High Court decided by a majority that the rule changes were effective to make
IATA the sole creditor of Ansett and that the revised system did not therefore have
the effect of administering debts due to an insolvent company otherwise than in
accordance with the mandatory pari passu rule imposed on the company by a deed of
arrangement made under the powers contained in the Australian Corporations Act.
After quoting the passage from Lord Cross referred to above, Gummow J (at
paragraphs 76-79) said this:

"[76]   .....

... There appear to be two strands of thought in this passage.
One is that the Clearing House arrangements, as they then
stood, so operated as to give British Eagle an asset, the money
claim against Air France, and that in the face of the mandatory
operation of s 302 of the Companies Act 1948 (UK), this asset
could not be captured for the netting-off system. This
conclusion would flow from the operation of s 302 and would
be analogous to the situation in *Re Jeavons, ex parte Mackay*
discussed above. No recourse to 'public policy' would be called
for. The second strand of thought is apparent in the references
to 'mini liquidation', 'contracting out' and 'public policy'. But
the critical point is that there was 'property' of British Eagle to
which s 302 applied and a contractual provision negating that
outcome could not prevail against the terms of the statute.
Hence it perhaps is not surprising that Lord Cross did not spell
out the content of any relevant public policy.

[77]   Subsequently, however, in *Horne v Chester & Fein
Property Developments Pty Ltd* [1987] VR 913, at 919, the rule

Judgment Approved by the court for handing down.                    Perpetual Trustee Co Ltd & Anor v
                                                                    BNY Corporate Trustee Services Ltd & Anor

was expressed as being that, 'in insolvency law, the *whole* of
the debtor's estate should be available for distribution to *all*
creditors, and that no one creditor or group of creditors can
lawfully contract in such a manner as to defeat other creditors
not parties to the contract' (emphasis added). And Ansett
submitted that this formulation of the rule captures the essence
of a public policy said to have been recognised and applied as a
'fundamental tenet of insolvency law generally' in various
common law jurisdictions.

[78]    It is not necessary to examine in any detail the several
cases in which the rule is said to have been recognised and
applied. Many can be understood as depending upon the proper
application of a generally expressed provision in the relevant
statute requiring that all debts proved in an insolvency rank
equally and, if the property of the insolvent is insufficient to
meet them in full, they are to be paid proportionately, See, for
example, Corporations Act 2001 (Cth) (the Corporations Act),
s 555. Others, including *British Eagle*, turned upon what was
the 'property' of the company that was to be applied in
satisfaction of its liabilities (Companies Act 1948 (UK), s 302;
cf the Corporations Act, s 478). Instead, it is essential to begin
from the elementary proposition that insolvency law is statutory
and primacy must be given to the relevant statutory text.

[79]    Whether the *whole* of the debtor's estate is available for
distribution to *all* creditors, and whether *all* creditors are to
participate *equally* in the distribution of that estate, are
questions that depend entirely upon what the relevant statute
provides. What is advanced as a rule of public policy assumes
that there can be both an affirmative and a negative answer to
each of those questions. To the extent that the rule of public
policy depends upon there being universal and invariable rules
that the *whole* estate is available to *all* creditors and *all*
creditors are entitled to participate *equally*, the rule of public
policy depends upon an affirmative answer to both of the
identified questions. Yet by asserting that the public policy
achieves what the statute otherwise does not achieve, the rule
assumes that the questions identified have been answered in the
negative. This contradiction suggests that the rule that is
asserted is unsound."

121.    A similar view of what was decided in *British Eagle* was expressed by Peter Gibson J
in *Carreras Ltd v Freeman Matthews Ltd* [1985] 1 Ch 207 at p. 226F:

"Thus the principle that I would extract from that case is that
where the effect of a contract is that an asset which is actually
owned by a company at the commencement of its liquidation
would be dealt with in a way other than in accordance with
section 302 of the Companies Act 1948, then to that extent the
contract as a matter of public policy is avoided, whether or not

> the contract was entered into for consideration and for bona
> fide commercial reasons and whether or not the contractual
> provision affecting that asset is expressed to take effect only on
> insolvency."

122.    Before the law can strike down a commercial contract on grounds of public policy it
needs, in my judgment, to be certain of two things. The first is what the rule of public
policy which is sought to be enforced actually is. The second is whether the invalidity
or unenforceability of the contract is necessary in order to give effect to the policy
objective enshrined in the rule.

123.    On the authority of the decision in *British Eagle* the anti-deprivation principle is little
more than the direct application of the provisions of the Insolvency Act to the
transaction under consideration. Compliance with the statute is both the foundation
for the rule prohibiting the enforcement of contracts which are in conflict with the
application of the statutory provisions and is its only rationale. Consistently with this,
it is difficult to see how a contract can offend against the principle unless there is both
property of the bankrupt or the company in liquidation to which it relates and its
treatment of that property produces a result which is inconsistent with the provisions
of the Act.

124.    For this reason alone the suggestion made by the Deputy Judge (Mr Peter Prescott
QC) in *Fraser v Oystertec PLC* [2004] BPIR 486 that the anti-deprivation rule can
apply to invalidate contracts even when no bankruptcy or winding-up order is ever
made seems to me to be wrong in principle and should not be followed.

125.    Rule 4.181 of the Insolvency Rules 1986 provides for a pari passu distribution of the
assets of a company to the unsecured creditors who are not preferential creditors. A
similar rule is contained in s.107 of the Act for voluntary liquidations and in s.328(3)
for bankruptcy. The functions of the liquidator are "to secure that the assets of the
company are got in, realised and distributed to the company's creditors, and if there is
a surplus, to the persons entitled to it": see s.143(1). In bankruptcy the estate of the
bankrupt vests in the trustee on appointment (s.306) and includes all property
belonging to the bankrupt at the commencement of the bankruptcy together with any
property treated as falling within the estate under the provisions of the Act: see
s.283(1). The second limb of this formula is a reference to the provisions of ss.339-
342F which enable the court to set aside certain specified types of prior transactions
including transactions at an undervalue and preferences. Similar provisions relating
to companies in liquidation can be found in ss.238-246 of the Act.

126.    Where a winding-up or bankruptcy order is made the operation of the pari passu rule
relates to property of the company or the bankrupt from the commencement of the
relevant insolvency process. In the case of companies, winding-up commences from
the date of the presentation of the petition or, in a voluntary liquidation, from the date
of the resolution to wind-up: see IA s.129. Consistently with this, s.127(1) of the Act
invalidates any disposition of the company's property or any alteration in the status of
the company's members made after the commencement of the winding-up unless the
court orders otherwise.

127.    On an application for a validation order in the period between the presentation of the
petition and its hearing, the court will need to be satisfied that it is in the interests of

the creditors generally that the transaction should be allowed to proceed: see *Re Gray's Inn Construction Co Ltd* [1980] 1 WLR 711 at p. 717. In *Denney v John Hudson & Co* [1992] BCLC 901 Fox LJ (at p. 904) set out the following principles derived from that earlier decision of the Court of Appeal:

"(1) The discretion vested in the court by s 522 is entirely at large, subject to the general principles which apply to any kind of discretion, and subject also to limitation that the discretion must be exercised in 'the context of the liquidation provisions of the statute.

(2) The basic principle of law governing the liquidation of insolvent estates, whether in bankruptcy or under the companies' legislation, is that the assets of the insolvent at the time of the commencement of the liquidation will be distributed pari passu among the insolvent's unsecured creditors as at the date of the bankruptcy.

In a company's compulsory liquidation this is achieved by s 227 of the 1948 Act (now s.127 of the Insolvency Act 1986 of the current legislation).

(3) There are occasions, however, when it may be beneficial not only for the company but also for the unsecured creditors, that the company should be able to dispose of some of its property during the period after the petition has been presented, but before the winding-up order has been made. Thus, it may sometimes be beneficial to the company and its creditors that the company should be able to continue the business in its ordinary course.

(4) In considering whether to make a validating order, the court must always do its best to ensure that the interests of the unsecured creditors will not be prejudiced.

(5) The desirability of the company being enabled to carry on its business was often speculative. In each case the court must carry out a balancing exercise.

(6) The court should not validate any transaction or series of transactions which might result in one or more pre-liquidation creditors being paid in full at the expense of other creditors, who will only receive a dividend, in the absence of special circumstances making such a course desirable in the interest of the creditors generally. If, for example, it were in the interests of the creditors generally that the company's business should be carried on, and this could only be achieved by paying for goods already supplied to the company when the petition is presented (but not yet paid for) the court might exercise its discretion to validate payments for those goods.

(7) A disposition carried out in good faith in the ordinary course of business at a time when the parties were unaware that a petition had been presented would usually be validated by the court unless there is ground for thinking that the transaction may involve an attempt to prefer the disponee – in which case the transaction would not be validated.

(8) Despite the strength of the principle of securing pari passu distribution, the principle has no application to post-liquidation creditors; for example, the sale of an asset at full market value after the presentation of the petition. That is because such a transaction involves no dissipation of the company's assets for it does not reduce the value of its assets."

128.    As I shall explain later, propositions (6) and (8) are particularly relevant to the issues canvassed on these appeals.

129.    If validation is sought after a winding-up order is made it is likely to be even more difficult to justify any disposition which is in conflict with the operation of the pari passu principle. The party in whose favour the disposition was made may seek to plead that he received the property or payment without notice of the petition but, where in a contract the event which triggers the disposition is expressly the bankruptcy or liquidation of the counterparty, it is difficult to see how the transaction could ever be regarded as anything but an agreement to prefer one creditor to the detriment of the general creditors as a whole. The strongest evidence will be the terms of the agreement itself.

130.    Bankruptcy commences from the date of the making of the bankruptcy order (see IA s.278) but again any payments or dispositions by the bankrupt of his property made between the presentation of the petition and the bankruptcy order are rendered void by s.284 unless the property was received in good faith before the making of the bankruptcy order and without notice of the presentation of the petition: see s.284(4).

131.    "Property" includes money, goods, things in action, land and every description of property wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property: see IA s.436.

132.    A straightforward application of these provisions to the contracts under consideration on these appeals would not bring them within the anti-deprivation rule. In the two Lehman cases the charge over the collateral provided by clause 5.3 of the Supplemental Trust Deed was granted to the trustee on behalf of both the Noteholders and the swap counterparty to secure payment of the sums due from the issuers to the Noteholders under the Notes and the payment to the swap counterparty of the sums due to it from the issuers under the swap agreement. The Noteholders were not parties to the swap agreement and their only contractual rights were to payment under the Notes.

133.    Clause 5.5 of the Supplemental Trust Deed gave the swap counterparty priority in every distribution of the proceeds obtained from the realisation of the security unless it was the Defaulting Party under the swap agreement in respect of an Event of

Default. During the continuance of the swap agreement it therefore enjoyed priority over the collateral purchased with the Noteholders' money so long as it continued to perform its obligations by paying to the issuers the sums due from them to the Noteholders. If those payments ceased and an Event of Default occurred which would leave the issuers to pay the sums due under the Notes without the financial assistance of the swap counterparty then the Noteholders became entitled to priority over the proceeds from the collateral to meet any shortfall.

134.    The definition of an Event of Default in the ISDA Master Agreement to include the bankruptcy of either the swap counterparty (LBSF) or a Credit Support Provider (Lehman Brothers Holdings Inc) ("LBHI") as well as a failure to pay meant that by the time that the first swap termination notices came to be served in late November 2008 there were at lease two (and possibly three) events which could be relied upon by the Noteholders as constituting events of default for the purposes of clauses 5.5 and 9.3 of the Supplemental Trust Deed. The first was the Chapter 11 filing by LBHI which occurred on 15th September 2008. The second was any non-payment under the swaps that constituted an Event of Default thereunder. The dates on which payments fell due and were missed under the swaps varied among the series but were in some cases before and some cases after 3rd October 2008. The third was the Chapter 11 filing by LBSF which occurred on 3rd October 2008.

135.    Even if one accepts that the date for determining the order of priority under clause 5.5 is that of the realisation or distribution of the proceeds of the collateral (rather than 15th September as held by the Chancellor) and that it therefore post-dates the bankruptcy of LBSF, the consequence of the operation of clause 5.5 is not to deprive LBSF or its creditors of any property or asset which they would have been entitled to but for its bankruptcy. The only interest or property which the company ever enjoyed in the collateral was a charge granted by the issuers of the Notes on the terms of the Supplemental Trust Deed. That security interest remains part of the property of the company unchanged by the event of its bankruptcy. The reversal of the order of priority under clause 5.5 was always a facet of the security designed to regulate the competing interests over the collateral of LBSF and the Noteholders. To say that its operation in the event of the company's bankruptcy constitutes the removal of an asset from the liquidation is to confuse the security itself with the operation of its terms in the events prescribed by the charge. LBSF retains the same asset as it had before its bankruptcy and is free to deal with any recoveries for the benefit of its general creditors in accordance with the applicable statutory regime. Likewise the Noteholders do not obtain any security over the collateral which they did not have before. This was essentially the reasoning of the Chancellor and I agree with it.

136.    The same point can be made about Mr Snowden's reliance on condition 44 of the terms and conditions attached to the prospectus which establishes the amounts due under the swap agreements if terminated on an Event of Default. Condition 44 is said to have the effect of increasing the amount payable to Noteholders in the event of LBSF being the defaulting party under the swap agreement by diverting to the Noteholders monies which would otherwise have been payable to it in order to discharge the issuers' liability for Unwind Costs. But the operation of condition 44 does not give to the Noteholders more than the right to recover the whole of the sums due under the Notes in priority to any claim over the collateral by LBSF for the Unwind Costs. It simply adjusts the balances on early termination to ensure that the

Noteholders are paid the whole of what is due to them in priority to the sums payable to LBSF. If there is no shortfall in the security LBSF will recover the sums due to it in full. Condition 44 does not therefore remove an asset from LBSF. Nor does it give to the Noteholders security over an asset in which they previously had no interest. It merely regulates the order in which the company and the Noteholders are entitled to be recouped out of the security. Although the amount of the security available to meet LBSF's claims is obviously reduced in the event of a shortfall in the value of the security over what it would have been had no Event of Default occurred, that is simply a function of the change in priority which was always a feature of the security which the company enjoyed.

137.    A change in priority consequent upon the insolvency or liquidation of a company is not prohibited by any express term of the Insolvency Act and, for the reasons I have given, does not amount to the disposition of any property of the company. If the anti-deprivation rule is to be effective to invalidate the provisions of clause 5.5 and condition 44 then it has to be based on a wider principle than that applied by the House of Lords in *British Eagle*.

138.    Is the position any different in respect of the termination of the Master Licence Agreement ("MLA") and the operation of clause 26.7 of the Joint Venture Agreement ("JVA") in the *Woolworths* appeal? Under the MLA BBC Worldwide Ltd ("BBCW") granted to BBC Video Ltd ("Video") an exclusive but non-assignable licence to manufacture, distribute and sell video cassettes and DVDs of existing and future BBC titles. The MLA did not include an assignment of any copyright, trade mark or other intellectual property rights in respect of those titles. In common with most such agreements, it was terminable by notice under clause 16 on various grounds including the insolvency of Woolworths Group plc ("Group"), the ultimate parent of WW Realisation 8 Ltd ("Media") which is the counterparty under the JVA and the 40% shareholder in 2 Entertain Ltd ("2e").

139.    Clause 16.2.5 makes the effective termination of the MLA on the grounds of the insolvency of Group dependent on the service of a notice under clause 26.7.1 of the JVA. BBCW must, as part of that condition, become unconditionally bound to buy Media's shares in 2e which will be the effect of the service of the clause 26.7.1 notice.

140.    Under clause 26.7.1 BBCW is required to pay Fair Value for the shares. This is expressed to be the market value of the shares at the date of the notice disregarding any premium for majority control or any discount for a minority holding: see clause 27.2.1. The Investment Bank which is to carry out the valuation must have regard to recent comparables but:

> "26.7.2    In determining Fair Value for the purpose of this clause 26.7, the Investment Bank shall be directed to take into account the continuation (on the same or on different terms) or the termination in accordance with their terms as a consequence of the Insolvency Event in question of the agreements referred to in this clause 26.7 and the consequences of any such continuation or termination.

> 26.7.3 The provisions of clause 16.2.5 of the Master Licence
> shall apply."

141.    These latter provisions mean that there is no significant departure from reality in assessing 2e's worth at the relevant date but no discount is to be allowed against market value on account of the shareholding being a minority interest. Although this is obviously favourable to Media, the administrators' case is that the combination of the power of termination contained in clause 16.2.5 and the basis of valuation to be applied under clause 26.7.1 operates to deprive Media of its shares at an undervalue. Mr Sheldon submitted in terms that the purpose and effect of these provisions was to allow BBCW to get the shares cheap.

142.    Before the Judge it seems to have been accepted by the administrators that, looked at in isolation, neither the provisions of clause 26.7.1 of the JVA nor those of clause 16.2.5 of the MLA could be said to be within the anti-deprivation rule. But the express linkage in these provisions to each other was said to be sufficient to transform them into an unenforceable contract. Like the Master of the Rolls, I consider that neither this submission nor the Judge's acceptance of it were correct. The provisions of clause 26.7.3 which expressly apply to the valuation exercise the provisions of clause 16.2.5 of the MLA do no more than to require the valuation of the shares to take into account the status of the licence granted to BBC Video under the MLA according to its actual terms. To value the company on any other basis would be counter-factual. The valuation exercise therefore requires the Investment Bank to take into account the termination of the licence which has occurred. If there is nothing objectionable in a provision which entitles one shareholder in a company to acquire the shares of another in the event of its or its parent's insolvency then the basis of valuation prescribed by clause 26.7.3 is also unobjectionable. Therefore Mr Sheldon's submission that the effect of these provisions was to enable BBCW to purchase the shares at an undervalue can only be correct if the termination of the licence in the event of the insolvency of Group is in some way precluded by the operation of the anti-deprivation rule. Otherwise the Fair Value formula operates to give Media the market value of its 2e shares with no discount for a minority stake.

143.    A licence can terminate either by effluxion of time or on the happening of a specified event. Alternatively it may be terminable on notice in certain circumstances. If a licence for a specified period terminates by effluxion of time after bankruptcy or the liquidation of a company no-one contends that it infringes the anti-deprivation rule. The liquidator or trustee in bankruptcy never inherits more than a finite interest. Similarly if a licence were expressed to determine automatically upon the insolvency of the licensee or its parent no complaint could be made. There would be no property to fall into the insolvent estate.

144.    In the cases of a lease or licence which are terminable by notice on the insolvency of the licensee the interest will continue into the period of insolvency and therefore form part of the estate. But again the trustee or liquidator will take the interest subject to the licensor's power of termination and cannot therefore complain if it is exercised. The cases draw no distinction between a lease or licence terminable post-insolvency for a breach of its terms and cases where the agreement is expressly terminable on bankruptcy or liquidation. It seems to have been established since at least the eighteenth century that a proviso in a lease for re-entry on an act of bankruptcy was not void on grounds of public policy: see *Roe d. Hunter v Galliers* (1787) 2 TR 132.

145.    In the case of bankruptcy or winding-up there is no statutory inhibition under the Insolvency Act on the exercise of these powers.  Administration bars the exercise of a landlord's right of forfeiture by peaceful re-entry or by legal process without the consent of the administrators or the court (see Insolvency Act, Schedule B1, paragraph 43(1)) but this merely demonstrates that the inclusion in a lease of a proviso for re-entry in the event of bankruptcy is not per se unenforceable.

146.    In principle a licence terminable on the liquidation or bankruptcy of the licensee can be no different.  The power of termination does not infringe the anti-deprivation rule because it does not remove from the estate property in which prior to its insolvency the bankrupt or insolvent company ever had an unfettered interest.  The trustee or liquidator is bound to take the licence on the terms on which it was granted.  If the event of insolvency which triggers the right to terminate is that of a parent or group company rather than the licensee then the position is a fortiori.

147.    Like the Master of the Rolls I find it difficult to see how provisions in a licence which enable it to be terminated on the bankruptcy of a parent company and which are otherwise legally unobjectionable can be transformed into an unenforceable contract by the insertion of provisions designed to ensure that the right of termination is only exercised in conjunction with the acquisition of Media's shares.  Even without that provision BBCW would be entitled, upon terminating the licence, to acquire the shares on terms which took account of the termination of the licence.

148.    If the termination of the MLA was valid one needs to return to clause 26.7 of the JVA.  An option to acquire shares in the event of bankruptcy is not objectionable on grounds of public policy unless the price paid for the shares would constitute an undervalue.  The trustee or liquidator is bound by the contract which was made as an incident of the property which falls into the insolvent estate.  If the event of bankruptcy is that of the shareholder itself then IA s.127(1) will render the transfer void unless validated by the Court.  But, as Fox LJ indicated as his proposition (8) in *Denney v John Hudson & Co* (supra), the sale of an asset at full value will not infringe the pari passu principle.  The option therefore remains contractually exercisable unless the price fixed by the option agreement is less than the shares could otherwise be sold for: see *Borland's Trustee v Steel Brothers & Co Ltd* [1901] 1 Ch 279.  A contract to acquire the shares at an undervalue on bankruptcy was treated as a fraud on the bankruptcy laws in the older cases because it was tantamount to the gratuitous transfer to the option holder of part of the bankrupt's uncharged estate which would otherwise have been available for distribution between his general creditors.

149.    In the *Woolworths* appeal the clause 26.7 notice was served on 2nd February 2009 before Media was placed into administration on 11th February.  But even had the notice been served after that date the outcome would be no different.  Given the enforceability of the termination provisions contained in clause 16.2.5 of the MLA, the Fair Value formula when operated in the context of clause 26.7 of the JVA cannot be said to produce a price which is less than the market value for the shares.  The administrators (like their counterparts in the Lehman appeals) can therefore only succeed in their claim to invalidate the option provisions if they can establish and rely upon a wider rule of public policy which invalidates contractual provisions merely because they have the economic effect of reducing the value of the insolvent estate.

150.    Peter Smith J accepted an argument to that effect.  He said:

"114. In my view clause 26.7.3 of the JVA and its linkage to clause 16.2.5 of the MLA inevitably means that upon insolvency of any of the companies in the Woolworths Group that provision enables BBCW to acquire the shares at less than the Fair Value price that would have appertained but for the Insolvency Event. That in my view is a classic situation where the deprivation principle would apply. It does not matter in my view that it was a negotiated provision nor does it matter that it was not intended to be the effect nor does it matter that the Insolvency Event relied upon is not connected (as BBCW would argue) with the insolvency of Media.

115. It would have been otherwise in my view if the two agreements had not been linked. Thus for example if clause 16.2.5 had removed from it the linkage to the Notice so it became a general insolvency clause this would not pose a difficulty to BBCW. In that eventuality in my view the deprivation principle would have no application. The reason for that is that the MLA would have a standard provision for termination on insolvency. It has long been the case that such a provision is not subject to the deprivation principle see Neuberger J above. Mr Sheldon QC initially accepted that was the case even if the Insolvency Event was a different company within the group. He later resiled from that proposition and said it would only be a normal provision if the insolvency was the party to the MLA. I do not accept that. There are compelling reasons why the Insolvency Event would be triggered for any company within the group. That too in my view is not an unusual provision it merely reflects refinement of the clause over the years to deal with the possibility of the contracting company being kept alive artificially while all the other companies in the group collapse around it to avoid the determination provision. Thus if the clause read:-

"If a holder of [Media's shares] or any parent undertaking of a holder of [Media's shares] or if the holder of [Media's shares] is a member of the Woolworths Group as defined in the Joint Venture Agreement Woolworths suffers an Insolvency Event ......this Agreement should immediately terminate....."

116. That of course is not the agreement that was negotiated between the parties. I have no power to renegotiate the agreement. Thus it is of no assistance to BBCW to argue that the clause reflects the ordinary provision that on

insolvency BBCW will have the right to terminate the MLA (per BBCW's supplemental note paragraph 7). I fully accept the gestation of the clause and why BBCW would consider it unfair in effect to have to "buy back" its own rights. However one is concerned as Neuberger J sets out above with the consequences of the operation of the clause in the facts of the case. The consequence is inevitable namely that as a determination only takes effect on the insolvency **and** the giving of the Notice its sole purpose is to produce a termination of the MLA for the purposes of calculating the Fair Value in the light of the Notice given by the BBCW. Nobody could expect that clause operating that way to achieve anything other than a reduced price in my view. It is self evident that 2e does not have much of a business if the MLA is terminated.

117. As I said in argument (and this is relevant to a further part of my judgment) the reality is that the situation has come about by a drafting problem. There would have been no reason why the agreed terms of the parties could not have been achieved by redrawing clause 16.2.5 of the MLA as set out above. Thus the application of the deprivation principle has an unintended consequence. I cannot believe that either BBCW or Media ever contemplated that there would be some principle that would prevent their freely negotiated agreement coming into effect.

118. I therefore nevertheless conclude that clause 16.2.5 and the linkage to the JVA by clause 26.7.3 is also void. They both together infringe the deprivation principle.

119. Finally, the fact that the event which causes the problem (clause 16.2.5 of the MLA) is in a document to which Media is not a party is in my view irrelevant. One looks at the facts, one looks at the events and if the consequence is that an asset is removed from the availability for the creditors at a lesser value than otherwise it would have been then the deprivation principle is infringed. Support for this is to be found in the Hong Kong Court of Appeal decision provided by Mr Sheldon QC in *Peregrine Investments Holdings Ltd (In liquidation) & Ors v Asian Infrastructure Fund Management Company Ltd LDC & Ors CACV 32/203* at paragraph 87."

151. I have already explained why the linkage between the two clauses is not sufficient in itself to convert what the Judge rightly regarded as two valid provisions (if independent of each other) into an invalid one. His view, however, that the application of the anti-deprivation rule depends upon the economic outcome of the transaction for the insolvent estate is troubling as a definition of the scope of the rule. On one view, it would catch almost any contractual provision affecting the property of an insolvent company which, when operated, reduced the value of the estate. This

would include provisions (e.g) for the forfeiture of a lease or licence on insolvency which the Judge accepted were otherwise unobjectionable. It is necessary therefore to look at the decision of the Hong Kong Court of Appeal in *Peregrine Investment Holdings* and at the earlier English cases on which the majority's decision purports to be based.

152.    As the Master of the Rolls has pointed out, there is a well-settled line of nineteenth century authorities that a contract under which a person's property is transferred to a third party on his bankruptcy is void at common law as what the cases describe as a fraud on the bankruptcy laws. Fraud for this purpose does not imply deception or dishonesty or even a conscious determination to avoid the effect of the Bankruptcy Act on insolvency. The contract is void because it has the effect of removing from the bankrupt's estate property which would otherwise remain and vest in the trustee for the benefit of the general creditors.

153.    So in *Wilson v Greenwood* (1818) 1 Sw 471 Lord Eldon LC held that articles in a partnership deed which dissolved the partnership on bankruptcy but gave an option to the bankrupt's partners to acquire his share in the partnership at a valuation and to pay for it by yearly instalments over seven years were void because they removed from his assignees in bankruptcy their entitlement to a distribution of the bankrupt's share of the partnership property on dissolution. Lord Eldon's reasoning is set out in the following passage at p. 482:

> "I have no doubt, therefore, whether, on general principle, or on the construction of the deeds, that the law of this case is, that the partnership was dissolved by bankruptcy; and the property must be divided as in the ordinary event of dissolution without special provision. The consequence is, that the assignees of the bankrupt partner are become, *quoad* his interest, tenants in common with the solvent partner; and the Court must then apply the principle on which it proceeds in all cases, where some members of a partnership seek to exclude others from that share to which they are entitled, either in carrying on the concern, or in winding it up, when it becomes necessary to sell the property, with all the advantages relative to good will, &c."

154.    This was applied by Page Wood V-C in *Whitmore v Mason* (1861) 2 J. & H. 204. In that case the partnership deed provided for the bankrupt partner's share in the partnership assets to be valued and for the value to be paid to his assignees in bankruptcy. But it excluded from this process his share in a mining lease, the benefit of which was simply to pass to his partners without payment. At p. 212 the Vice-Chancellor said that:

> "...the law is too clearly settled to admit of a shadow of doubt that no person possessed of property can reserve that property to himself until he shall become bankrupt, and then provide that, in the event of his becoming bankrupt, it shall pass to another and not to his creditors."

155.    Both these cases were therefore concerned with contracts which removed the bankrupt's share in the partnership assets out of his estate on bankruptcy and

Perpetual Trustee Co Ltd & Anor v
                                                                                BNY Corporate Trustee Services Ltd & Anor

transferred it to his partners on terms which departed from the provisions of the
bankruptcy laws and deprived the estate and its creditors of its ordinary entitlement to
a distribution of the assets or their value on dissolution. But the principle set out in
*Whitmore v Mason* has been applied more widely. In *Ex p. Mackay* (1873) LR 8 Ch
App. 643 the assignee of a patent who contracted as a term of the assignment to pay
the royalties to the assignor agreed with him that in return for advancing £12,500 by
way of loan, he should be entitled to retain one half of the royalties to be applied
towards the satisfaction of the debt. It was also agreed that if the assignor should
become bankrupt then the assignee should be entitled to retain the whole of the
royalties until the debt was discharged. The Court of Appeal held that the provision
for additional security over the royalties in the event of the assignor's bankruptcy was
void because it provided on bankruptcy for a disposition of the bankrupt's assets
which was not in accordance with the Bankruptcy Act. At p. 647 James LJ said that:

> "I entertain no doubt that there is a good charge upon one
> moiety of the royalties, because they are part of the property
> and effects of the bankrupt. But, on the other hand, it is equally
> clear to me that the charge cannot extend to the other moiety. If
> it were to be permitted that one creditor should obtain a
> preference in this way by some particular security, I confess I
> do not see why it might not be done in every case - why, in
> fact, every article sold to a bankrupt should not be sold under
> the stipulation that the price should be doubled in the event of
> his becoming bankrupt.
>
> It is contended that a creditor has a right to sell on these terms;
> but in my opinion a man is not allowed, by stipulation with a
> creditor, to provide for a different distribution of his effects in
> the event of bankruptcy from that which the law provides. It
> appears to me that this is a clear attempt to evade the operation
> of the bankruptcy laws. The result is that the order will be
> varied so as to declare that there is a security on one moiety
> only."

156.    Although the assignor was a creditor of the bankrupt, the principle is not confined to
        circumstances amounting to a preference. The provision for additional security is
        void because it removes property from the estate over which the creditor had no prior
        entitlement or interest and which, but for the provision, would fall to be administered
        as part of the bankrupt's estate. The only purpose and effect of the further charge was
        therefore to encumber the remaining half of the royalties on bankruptcy in favour of
        the assignee in priority to the rights of the general creditors. This was by contrast to
        the original charge over the first half of the royalties which took effect prior to and
        without reference to any act of bankruptcy by the assignor and was therefore binding
        on his trustee.

157.    It is not difficult to see why *Ex p. Mackay* was referred to by both Lord Morris and
        Lord Cross in *British Eagle* as an example of a case in which the charge had (to use
        Lord Cross's words) "been created deliberately in order to provide for a different
        distribution of the insolvent's property on his bankruptcy from that prescribed by the
        law": see *British Eagle* at p. 780G. As mentioned earlier, this is implicit in the
        nomination of the debtor's bankruptcy as the occasion for the creation of the charge.

The deed was designed to apply a different treatment of an otherwise unencumbered asset specifically in the event of bankruptcy. There is nothing in *Ex p. Mackay* to support any wider principle.

158.   *Ex p. Jay* (1880) 14 Ch.D 19 is to the same effect. There the landowner was entitled under the building agreement to forfeit on bankruptcy the builder's interest under the agreement in any houses which had not yet been completed and demised to him under a lease. The agreement also gave the landowner the right to take possession of and resell any unused building materials on the site. The Court of Appeal held that this latter right was unenforceable. James LJ at p. 25 said that:

> "... it appears to me that it is governed by the decisions of this Court in *Ex parte Mackay* and *Ex parte Williams*, which only followed much older decisions. The principle of those decisions is this, that a simple stipulation that, upon a man's becoming bankrupt, that which was his property up to the date of the bankruptcy should go over to some one else and be taken away from his creditors, is void as being a violation of the policy of the bankrupt law. Now that we have all the facts before us, I think we cannot escape from applying that principle to the present case. According to the debtor's own evidence everything that he was bound to do under the agreement had been performed by him up to the date of the bankruptcy, and therefore no right was vested in the lessor except by virtue of the bankruptcy. Her title is founded only on the stipulation that in the event of the builder's bankruptcy the materials which had been placed on the land should become her property. It seems to me impossible to distinguish the case from those authorities to which I have referred."

159.   This is simply an application of the rule explained in *Ex p. Mackay* but the case is important because the right of forfeiture over the building materials could, under the agreement, have been exercised either on bankruptcy or for a failure by the builder to complete the houses in accordance with the agreement. In his judgment, Cotton LJ (at p. 26) said that:

> "I am of the same opinion. This case is governed by the decision of Lord *Eldon* in *Higinbotham v. Holme*, that there cannot be a valid contract that a man's property shall remain his until his bankruptcy, and on the happening of that event shall go over to some one else, and be taken away from his creditors. Here the forfeiture is to take place on the happening of either of two events. There is no stipulation as to the mode in which the lessor shall use the materials when they become forfeited to her. One of the two events is not hit by the decided cases. But, as to the other, though the contract is good as between the parties to it, it is on principle void in the event of the builder's bankruptcy."

160.   The exercise of a landowner's right to forfeiture on grounds other than bankruptcy was considered further by the Court of Appeal in *Ex p. Newitt* (1881) 16 Ch.D 522.

There the landowner's right to forfeit the unused building materials was exercisable in the event of the builder's failure to complete the agreement but was not a right to forfeit on bankruptcy. The builder filed a bankruptcy petition in the county court and on the same day the landowner gave him notice of forfeiture. The Court of Appeal held that the landowner's right was not affected by the intervening bankruptcy of the builder. James LJ (at page 531) said that:

> "... it is immaterial at what particular moment the seizure was made. The broad general principle is that the trustee in a bankruptcy takes all the bankrupt's property, but takes it subject to all the liabilities which affected it in the bankrupt's hands, unless the property which he takes as the legal personal representative of the bankrupt is added to by some express provision of the bankrupt law. There is no such provision applicable to the present case. The building agreement provides, in effect, that in a certain event certain property of the builder may be taken by the landowner in full satisfaction of the agreement. It appears to me analogous to a sale of property with a power of repurchase in a certain event. I am of opinion that this point fails like the others. I think that the Judge of the County Court has miscarried, and that the *Bills of Sale Act* does not apply, and I am of opinion that the landowner is entitled at Law and in Equity, as he certainly is morally, to the benefit of the stipulation in the agreement."

161.    This decision and Cotton LJ's judgment in *Ex p. Jay* were relied on by the Chancellor in the *Lehman* appeals as support for the view that a right of forfeiture which is exercisable on an event other than the insolvency of the counterparty may lawfully be exercised on those alternative grounds even if the bankruptcy of the counterparty has occurred.

162.    I agree with the Master of the Rolls that, if the provisions in question can be and are operated on other grounds prior to the commencement of any bankruptcy proceedings, it is difficult to see why the anti-deprivation rule should apply. The property has been removed pursuant to a valid contractual provision on grounds other than the insolvency of the counterparty and cannot, on any view, form part of the insolvent estate. If the transaction is to be reversed it can only be by the operation of the provisions of the Insolvency Act mentioned earlier which apply to prior transactions such as transfers at an undervalue and preferences. Where Parliament has expressly considered the kind of transactions which fall within these anti-avoidance provisions it is not appropriate in my view for the Court to seek to widen the scope of those provisions by the extension of a common law rule. This is a point of principle to which I shall have to return. Therefore the only real area of dispute is in relation to the enforceability of provisions which might infringe the anti-deprivation rule when operated post-bankruptcy on grounds of insolvency but which are in fact operated at that time on some alternative grounds.

163.    The determination of this issue is not necessary for the resolution of these appeals and does not arise on the facts. But, in the light of the decision of the House of Lords in *British Eagle*, I have some difficulty in accepting the correctness of the proposition that, following the making of a bankruptcy or winding-up order, provisions of the

kind described in *Ex p. Jay* and *Ex p. Newitt* could remain exercisable on grounds other than insolvency. As mentioned earlier, the IATA clearing house rules made no specific provision for the bankruptcy of one of the airline members but were still held to contravene the anti-deprivation rule because they had the effect of excluding the property of British Eagle from the operation of s.302 of the Companies Act. The forfeiture of the building materials would obviously constitute a disposition of the bankrupt's property vested in his trustee otherwise than in accordance with the pari passu rule. On that basis, it seems to me that a provision in an agreement which removes an asset of the kind under consideration in cases like *Ex p. Mackay* and *Ex p. Jay* out of the bankrupt's estate following his bankruptcy is also caught by the rule. Once the bankruptcy or winding-up order is made the priorities between creditors is to be determined by the provisions of the Insolvency Act. The validity of the operation of a forfeiture provision of the kind considered in these cases cannot depend on whether the event relied on to trigger the provision was insolvency or a breach of the building agreement. Once the Insolvency Act regime has come into effect a contractual provision which seeks to remove property out of the estate and to vest it in a third party cannot override the provisions of the Act. The creditor must prove for his loss in the bankruptcy or liquidation. I would therefore decline to follow *Ex p. Newitt* on this point.

164.    I return then to the central question of what types of transaction are rendered unenforceable by the bankruptcy or liquidation of the counterparty. All the decided cases such as *Ex p. Mackay* are instances of where the bankrupt has agreed to his property being transferred in the event of his bankruptcy to a particular creditor or other third party who has no prior security or other interest in that asset. They are therefore fundamentally different from cases where a lease or licence terminates on insolvency or where security is granted over the bankrupt's property to secure his obligations prior to any act of insolvency. But they have been relied on by Mr Sheldon (and, to a lesser extent, by Mr Snowden) as providing a foundation for a wider principle that the anti-deprivation rule should apply to transactions which reduce or limit the economic value of the estate.

165.    Some support for this is said to be contained in the decision of the Court of Appeal of Hong Kong in *Peregrine Investment Holdings*. The issue in that case was whether the terms of a shareholders' agreement under which the shares of one of the parties in a management company could be acquired by the others at par value in the event of the insolvency of an affiliate as defined breached the anti-deprivation rule in relation to the insolvency of the ultimate parent company of the party whose shares were the subject of the compulsory acquisition provisions. The view of the majority of the Court of Appeal was that the rule did apply to render the provisions unenforceable because the subsidiary company (PII) was an asset of the holding company in liquidation (PIH) and the removal of its only asset (the shares in the management company) at an undervalue reduced indirectly the value of PIH.

166.    The idea that the asset of a subsidiary can be regarded as the property of its parent seems to me both novel and unprincipled. The majority in the Court of Appeal, I think, recognised the difficulties presented by the doctrine of separate legal personality and the fact that PII (the owner of the shares) was not itself subject to any process of insolvency. Therefore to link the provisions of the shareholders' agreement to PIH (which was not itself even a party to the agreement) the anti-

deprivation rule was held to apply not merely to an agreement for the removal of the property of an insolvent company, but also to any contractual arrangement which had the effect of reducing its value even if it did not affect the ownership of its property.

167.    Rogers V-P at paragraph 33 described the operation of the rule in this way:

> "33. In the first place, the anti-deprivation policy looks to whether a person can insist on retaining an unfair advantage to himself at the expense of creditors in a bankruptcy. In any event, whether it is the insolvent himself, or itself, who disposes of his property or its value to the detriment of the creditors or whether it is a trustee of the insolvent's property or whether it is whoever is in charge of the insolvent's asset or the maintenance of the value of an asset for the ultimate benefit of the insolvent (in this case the directors of PII whose duty it was to maintain the value of PII for the ultimate benefit of PIH), matters not. It is the dealing with property the benefit of which the insolvent is ultimately entitled to and the diminution of the value therein that is important."

168.    Woo V-P's analysis was as follows:

> "86. Mr Thomas' argument is that if the property deprived is not the property of the insolvent company the anti-deprivation principle does not normally apply, because there is no deprivation. This is tantamount to saying that since the property that is disposed of is not within the reach of section 182 of the Companies Ordinance because it is not legally vested in the insolvent company, the common law anti-deprivation principle similarly has no application. In my view, however, if the subject matter is an asset of the company, although not strictly property of the company within the ambit of section 182, if the effect of a contractual provision is to deprive the company of it or reduce its value to the detriment of the company's general creditors in insolvent liquidation, that must equally be contrary to the public policy of equitable and fair distribution amongst unsecured creditors in insolvency.
>
> ....
>
> 106. It was, indeed, based on the separate legal personality of companies that the judge rejected the plaintiffs' case that PII was the nominee or bare trustee of PIH in PII's holding of the Shares. However, Mr Tong stresses that he is not asking this Court to pierce the corporate veil. He is relying on the fact that the Shares held by PII were an asset of PVC and in turn an asset of PIH, which would but for clause 14 be available for pari passu distribution to PIH's general creditors. Clause 14 had the effect of diminishing the value of the asset to the detriment of the creditors. The court does not pierce the corporate veil to

give effect to the anti-deprivation principle in striking down
clause 14. I agree."

169.    This wide view of the scope of the anti-deprivation rule was rejected by Cheung JA.
He considered that the rule of public policy established in the earlier authorities I have
referred to does not extend to a case where the insolvent person did not personally
agree to dispose of his own property in the event of insolvency. In the *Peregrine* case
neither of these two conditions was satisfied. PIH was not a party to the shareholders'
agreement nor did it own the shares in the management company. At paragraphs 148
to 150 the Judge said:

> "148. It is clear that the rationale of principle is to ensure that
> the assets of an insolvent is made available for distribution to
> its creditors who will share it on an equal footing. I am happy
> to accept that this is a matter of public policy in light of the
> insolvency law. But what is equally clear is that this public
> policy is developed from a situation of an insolvent making
> provisions prior to his insolvency in respect his own property.
> In such a situation the public policy will interfere and set aside
> the transaction made pursuant to the arrangement of the
> insolvent and another party. This is no doubt a drastic measure
> but is nonetheless an acceptable one because the court is only
> interfering with an arrangement that had been made personally
> by the insolvent who had put his assets out of the reach of the
> creditors.
>
> 149. However, there has never been a case, like the present
> case, where the insolvent had not made an arrangement in
> respect of his own property and yet the principle was
> nonetheless applied. Although in both *Higinbotham* and
> *MacKay* there were statements which seemed to refer to a
> wider principle that no one can have the benefit from a contract
> that is a fraud on the bankruptcy law, the courts there were
> really concerned with an arrangement made by the bankrupt
> himself. These statements were made in respect of the corollary
> of the situation, namely, how the other party to the transaction
> would be affected when there was a fraud of the bankruptcy
> laws. The courts held that they could not take the benefit of the
> arrangement. They were not propounding a free standing
> principle which would apply whenever the property of a
> bankrupt is affected as a result of his bankruptcy irrespective of
> whether the bankrupt has made the arrangement himself or not.
>
> 150. Likewise the cases on the disposal of the insolvent's assets
> at an undervalue were merely illustrations of the original
> principle. They did not articulate a free standing wide principle
> which is to be applied as soon as the value of the insolvent's
> property is affected by an arrangement not entered into by him
> personally."

170.    I prefer this view of the law. In appropriate cases the court has always reserved to itself the power to look through a transaction and to pierce the corporate veil when the property in question is in substance that of the company in liquidation. But when that cannot be done the anti-deprivation rule has, in my judgment, to be confined to cases where property of the insolvent company or bankrupt within the meaning of the Insolvency Act is removed from the insolvent estate either for less than its market value or for no value at all.

171.    There is, I think, a basic point of principle which needs to be addressed. Some of the arguments advanced on behalf of LBSF have treated the anti-deprivation rule as if it had or should have an existence and operation of its own entirely divorced from the terms of the provisions of the Insolvency Act which it is supposed to protect. Many of the contracts which feature in such cases as *Ex p. Mackay* are nowadays likely to fall foul of the express provisions of the Insolvency Act. As mentioned earlier, dispositions of the property of a company are invalidated when they occur at any time following the presentation of the petition unless validated by the court. That power will, in practice, never be exercised unless the terms of the disposition offer full value to the creditors of the company. If the dispositions are made prior to the commencement of the winding-up but at a time when the company is insolvent then the court has power to set them aside if they constitute transactions at an undervalue or a preference. Similar provisions apply in bankruptcy.

172.    Although not essential for the determination of these appeals, it seems to me to be extremely questionable whether what is said to be a common law rule of public policy can have any existence or purpose at all as a legal rule separate from the Insolvency Act. Whatever may have been the position in the nineteenth century, the Insolvency Act now contains a detailed code for determining and regulating the property of a bankrupt or insolvent company for the benefit of its general creditors. The Act itself really says and does all that is necessary. By the same token, if the rule continues to exist it can have no wider scope than the statutory provisions it is designed to enforce. When Parliament has expressly considered the categories of transaction which should not be allowed to survive bankruptcy or liquidation I can see no proper basis on which the court can arrogate to itself the right to widen the sanction of invalidity so as to encompass transactions which the application of the Insolvency Act would leave untouched. That should be something for the legislature alone to decide. This has, I think, the consequence of placing the anti-deprivation principle within relatively narrow bounds the key to which, as I have explained, is the ability to identify in the transaction under consideration a disposition of property on insolvency otherwise than in accordance with the Act. But, as explained at the outset of this judgment, that is all that the authority of *British Eagle* permits. The rule is therefore restricted to protecting the creditors of the bankrupt or company in liquidation by, in effect, enforcing the provisions of the Insolvency Act in respect of their property. It does not entitle the court to set aside contracts between subsidiaries not in liquidation or administration and third parties merely because they may have some economic effect on the value of the holding company.

173.    In the *Woolworths* appeal that particular difficulty does not exist in relation to the JVA. Mr Sheldon, I think, accepts that the application of the anti-deprivation rule depends upon the administration of Media rather than that of its parent and it is Media's shares in 2e which are in issue in relation to clause 26.7. But Peter Smith J

accepted that, in relation to the MLA (to which Media was not, of course, a party), the rule had an application because the termination of the licence impacted on the value of Media's shares in 2e. That is not in my view sufficient to invoke the rule in relation to the MLA. As explained earlier in this judgment, the termination of a licence for an event of insolvency does not of itself contravene the anti-deprivation rule even when the insolvency is that of the licensee. But, in the present case, the administrators of Media are seeking to impugn the validity of clause 16.2.5 which operates under a contract to which they are not parties and which has only an economic effect on the value of the shares in 2e.

174.    Likewise in the *Lehman* appeals, it is not possible to strike down the provisions of clause 5.5 and condition 44 merely because their operation may affect the value of the security available to LBSF in the event of a shortfall. There is nothing in the English authorities which supports the extension of the anti-deprivation principle to encompass transactions which do not alter the property of the insolvent company in the asset in question and it would require, I think, a significant amendment to the provisions of the Insolvency Act before such transactions could be struck down. Although such provisions exist in other jurisdictions, they are not yet part of the English statutory regime.

175.    That leaves the subsidiary issue in the *Woolworths* appeal about the effect of the temporary licence. I agree that Peter Smith J reached the correct conclusion on this point for the reasons given by Longmore LJ.