# EXHIBIT A

Dated as of March 6, 2007

PYXIS ABS CDO 2007-1 LTD.,
as Issuer

PYXIS ABS CDO 2007-1 LLC,
as Co-Issuer

and

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

**INDENTURE**

# TABLE OF CONTENTS

Page

ARTICLE I —DEFINITIONS AND INTERPRETATION ............................................3

Section 1.1    Definitions.................................................................................3
Section 1.2    Assumptions as to Collateral Debt Securities, Etc............................106
Section 1.3    Rules of Construction. ...............................................................109


ARTICLE II —THE SECURED NOTES ...........................................................109

Section 2.1    Forms Generally.......................................................................109
Section 2.2    Authorized Amount; Note Interest Rate; Stated Maturity;
              Denominations.....................................................................111
Section 2.3    Execution, Authentication, Delivery and Dating.............................114
Section 2.4    Registration, Transfer and Exchange of Notes. ...............................115
Section 2.5    Mutilated, Defaced, Destroyed, Lost or Stolen Notes. ......................121
Section 2.6    Payment of Principal and Interest; Rights Preserved.......................121
Section 2.7    Persons Deemed Owners. ...........................................................126
Section 2.8    Cancellation. ...........................................................................127


ARTICLE III –CONDITIONS PRECEDENT ...................................................127

Section 3.1    General Provisions.....................................................................127
Section 3.2    Security for Notes. ....................................................................130
Section 3.3    Custodianship; Transfer of Collateral Debt Securities and Eligible
              Investments. .......................................................................132


ARTICLE IV —SATISFACTION AND DISCHARGE .........................................135

Section 4.1    Satisfaction and Discharge of Indenture. .......................................135
Section 4.2    Application of Amounts in Trust. .................................................136
Section 4.3    Repayment of Amounts Held by Paying Agent................................136


ARTICLE V —EVENTS OF DEFAULT; REMEDIES .........................................136

Section 5.1    Events of Default. .....................................................................136
Section 5.2    Acceleration of Maturity; Rescission and Annulment.......................138
Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee.................140
Section 5.4    Remedies.................................................................................142
Section 5.5    Preservation of Collateral. ..........................................................144
Section 5.6    Trustee May Enforce Claims Without Possession of Notes. .................146
Section 5.7    Application of Cash Collected.....................................................146
Section 5.8    Limitation on Suits....................................................................147

Section 5.9      Unconditional Rights of Noteholders to Receive Principal and Interest. .........147
Section 5.10     Restoration of Rights and Remedies.................................................................148
Section 5.11     Rights and Remedies Cumulative.....................................................................148
Section 5.12     Delay or Omission Not Waiver.........................................................................148
Section 5.13     Control by Controlling Class. ..........................................................................148
Section 5.14     Waiver of Past Defaults....................................................................................149
Section 5.15     Undertaking for Costs.......................................................................................149
Section 5.16     Waiver of Stay or Extension Laws. ..................................................................150
Section 5.17     Sale of Collateral...............................................................................................150
Section 5.18     Action on the Notes. .........................................................................................151

ARTICLE VI —THE TRUSTEE .................................................................................................151

Section 6.1      Certain Duties and Responsibilities..................................................................151
Section 6.2      Notice of Default...............................................................................................153
Section 6.3      Certain Rights of Trustee..................................................................................153
Section 6.4      Authenticating Agents. .....................................................................................155
Section 6.5      Not Responsible for Recitals or Issuance of Notes...........................................155
Section 6.6      May Hold Notes.................................................................................................156
Section 6.7      Cash Held in Trust. ...........................................................................................156
Section 6.8      Compensation and Reimbursement. ..................................................................156
Section 6.9      Corporate Trustee Required; Eligibility............................................................158
Section 6.10     Resignation and Removal; Appointment of Successor......................................158
Section 6.11     Acceptance of Appointment by Successor. .......................................................159
Section 6.12     Merger, Conversion, Consolidation or Succession to Business of
                 Trustee...............................................................................................................160
Section 6.13     Co-Trustees........................................................................................................160
Section 6.14     Certain Duties Related to Delayed Payment of Proceeds..................................161
Section 6.15     Representations and Warranties of the Bank.....................................................162
Section 6.16     Exchange Offers.................................................................................................163
Section 6.17     Fiduciary for Noteholders Only; Agent For Other Secured Parties.................163
Section 6.18     Withholding ......................................................................................................163

ARTICLE VII —COVENANTS ...................................................................................................164

Section 7.1      Payment of Principal and Interest on the Notes................................................164
Section 7.2      Maintenance of Office or Agency.....................................................................164
Section 7.3      Cash for Note Payments to be Held in Trust. ...................................................165
Section 7.4      Existence of Co-Issuers; Compliance with Laws. ............................................167
Section 7.5      Protection of Collateral. ....................................................................................167
Section 7.6      Opinions as to Collateral...................................................................................169
Section 7.7      Performance of Obligations. .............................................................................169
Section 7.8      Negative Covenants. ..........................................................................................171
Section 7.9      Statement as to Compliance...............................................................................173
Section 7.10     Co-Issuers May Not Consolidate, Etc...............................................................173
Section 7.11     Successor Substituted.........................................................................................173

Section 7.12    No Other Business. ................................................................173
Section 7.13    Reaffirmation of Rating; Annual Rating Review. ...........................174
Section 7.14    Reporting. ..............................................................................174
Section 7.15    Calculation Agent. ..................................................................174
Section 7.16    Amendment of Certain Documents. ............................................175
Section 7.17    Purchase of Collateral. ............................................................176
Section 7.18    Class A-1 Note Purchase Agreement; Rights of Class A-1 Noteholders
                under the Indenture. ................................................................178
Section 7.19    Notional Principal Contract Treatment. ........................................183

ARTICLE VIII —SUPPLEMENTAL INDENTURES..............................................183

Section 8.1     Supplemental Indentures Without Consent of Noteholders.............183
Section 8.2     Supplemental Indentures with Consent of Noteholders...................186
Section 8.3     Execution of Supplemental Indentures. .......................................189
Section 8.4     Effect of Supplemental Indentures..............................................190
Section 8.5     Reference in Notes to Supplemental Indentures. ..........................190

ARTICLE IX —REDEMPTION OF SECURED NOTES .......................................190

Section 9.1     Redemption of Notes. ..............................................................190
Section 9.2     Notice to Trustee of Optional Redemption or Tax Redemption.......192
Section 9.3     Notice of Auction Call Redemption, Optional Redemption, Tax
                Redemption, Clean-Up Call Redemption or Maturity by the
                Co-Issuers. ............................................................................192
Section 9.4     Notes Payable on Redemption Date. ...........................................193
Section 9.5     Auction Call Redemption. ........................................................194
Section 9.6     Clean-Up Call Redemption.......................................................196

ARTICLE X —ACCOUNTS, ACCOUNTINGS AND RELEASES .......................197

Section 10.1    Collection of Cash....................................................................197
Section 10.2    Interest Collection Account; Principal Collection Account; Quarterly
                Interest Reserve Account; Reserve Account; Custodial Account;
                Synthetic Security Counterparty Account; Issuer Collateral Account;
                Class A-1 Prepayment Account....................................................198
Section 10.3    Payment Account.....................................................................209
Section 10.4    Expense Account......................................................................210
Section 10.5    [Reserved]..............................................................................211
Section 10.6    Reports by Trustee. ..................................................................211
Section 10.7    Accountings. ...........................................................................211
Section 10.8    Release of Securities.................................................................221
Section 10.9    Reports by Independent Accountants. ..........................................222
Section 10.10   Reports to Rating Agencies, Etc. ...............................................223
Section 10.11   Tax Matters. ...........................................................................223
Section 10.12   No Gross-Up. .........................................................................224

ARTICLE XI —APPLICATION OF CASH ...............................................................224

Section 11.1    Disbursements of Cash from Payment Account. ..............................224
Section 11.2    Securities Accounts..........................................................................238


ARTICLE XII —PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES;
        SUBSTITUTION ...............................................................................238

Section 12.1    Sale and Substitution of Collateral Debt Securities.........................238
Section 12.2    Eligibility Criteria and Trading Restrictions...................................243
Section 12.3    Conditions Applicable to all Transactions Involving Sale or Grant.................259
Section 12.4    Proposed Plans..................................................................................260


ARTICLE XIII —SECURED PARTIES' RELATIONS............................................261

Section 13.1    Subordination....................................................................................261
Section 13.2    Standard of Conduct. ........................................................................265


ARTICLE XIV —MISCELLANEOUS .....................................................................265

Section 14.1    Form of Documents Delivered to Trustee. .......................................265
Section 14.2    Acts of Noteholders. .........................................................................266
Section 14.3    Notices, Etc., to Trustee, the Co-Issuers, the Collateral Manager, the
        Hedge Counterparties, the Credit Default Swap Counterparty and the
        Rating Agencies. ...............................................................................267
Section 14.4    Notices and Reports to Noteholders; Waiver....................................268
Section 14.5    Effect of Headings and Table of Contents........................................269
Section 14.6    Successors and Assigns......................................................................270
Section 14.7    Severability. ......................................................................................270
Section 14.8    Benefits of Indenture.........................................................................270
Section 14.9    Tax Treatment and Relationship of the Parties with Respect to this
        Indenture. ..........................................................................................270
Section 14.10   Governing Law. .................................................................................270
Section 14.11   Submission to Jurisdiction. ...............................................................270
Section 14.12   Counterparts......................................................................................271
Section 14.13   Waiver of Jury Trial..........................................................................271
Section 14.14   Judgment Currency. ..........................................................................271
Section 14.15   Confidential Treatment of Documents..............................................272
Section 14.16   Consent to Posting of Documents on Repository. ............................272
Section 14.17   Liability of Co-Issuers. .....................................................................272


ARTICLE XV —ASSIGNMENT OF COLLATERAL MANAGEMENT AGREEMENT, ETC.273

Section 15.1    Assignment. .......................................................................................273
Section 15.2    No Impairment....................................................................................273
Section 15.3    Termination, Etc. ...............................................................................274

Section 15.4       Issuer Agreements, Etc. ....................................................................274

ARTICLE XVI —HEDGE AGREEMENTS ..............................................................275

Section 16.1       Hedge Agreements...........................................................................275

**SCHEDULES**

Schedule A       Schedule of Closing Collateral Debt Securities
Schedule B       LIBOR Formula
Schedule C       [RESERVED]
Schedule D       Loss Scenario/Recovery Rate Matrices
Schedule E       Auction Procedures
Schedule F       Standard & Poor's Asset Classes
Schedule G       Standard & Poor's Types of Asset-Backed Securities Ineligible for Notching
Schedule H       Moody's and Standard & Poor's Notching of Asset-Backed Securities
Schedule I       [RESERVED]
Schedule J       Moody's Repo Advance Rates
Schedule K       Scheduled Class E Target Principal Amounts
Schedule L       Scheduled Class F Target Principal Amounts

**EXHIBITS**

Exhibit A-1       Form of Funded Note
Exhibit A-2       Form of Class A-1 Note
Exhibit B-1       Form of Rule 144A Transfer Certificate
Exhibit B-2       Form of Regulation S Transfer Certificate
Exhibit C        Form of Funding Certificate
Exhibit D        Form of Opinion of Cadwalader, Wickersham & Taft LLP
Exhibit E        Form of Opinion of Maples and Calder
Exhibit F        Form of Opinion of In-house Counsel to the Collateral Manager
Exhibit G        Form of Opinion of Sidley Austin LLP
Exhibit H        Form of Opinion of Kennedy Covington Lobdell & Hickman LLP
Exhibit I        Form of Opinion of In-house counsel to the Credit Default Swap Counterparty
Exhibit J        Form of Opinion of Seyfarth Shaw LLC
Exhibit K        [Reserved]
Exhibit L        Form of Investor Certification
Exhibit M        Form-Approved Synthetic Securities
Exhibit N        Form-Approved Credit Default Swap Agreement

THIS INDENTURE, dated as of March 6, 2007 (this "**Indenture**"), is among PYXIS ABS CDO 2007-1 LTD., a newly formed exempted company with limited liability incorporated under the laws of the Cayman Islands (the "**Issuer**"), PYXIS ABS CDO 2007-1 LLC, a newly formed Delaware limited liability company (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"), and LASALLE BANK NATIONAL ASSOCIATION, a national banking association, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "**Trustee**").

PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the issuance of the Notes as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders, each Hedge Counterparty, the Credit Default Swap Counterparty, the Class A-1 Note Agent, each Synthetic Security Counterparty (but only to the extent of assets credited to the Synthetic Security Counterparty Account for the benefit of such Synthetic Security Counterparty), and the Collateral Manager (collectively, the "**Secured Parties**"). The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter Acquired or arising, all accounts, general intangibles, chattel paper, instruments, securities, investment property, commercial tort claims, deposit accounts, documents, goods and letter-of-credit rights and any and all other personal property (other than Excepted Property and Excluded Assets) of any type or nature owned by it, including (a) the Collateral Debt Securities, Equity Securities, Reserve Account Investments and U.S. Agency Securities that the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary) on the Closing Date (listed on the Schedule of Closing Collateral Debt Securities), all Collateral Debt Securities and Equity Securities that are delivered to the Trustee (directly or through a Securities Intermediary) after the Closing Date pursuant to the terms hereof (including the Collateral Debt Securities and Equity Securities listed, as of the Ramp-Up Completion Date, on the schedule of Collateral Debt Securities delivered by the Issuer pursuant to Section 7.17(c)) and all payments thereon or with respect thereto, (b) the rights of the Issuer under the Hedge Agreements, (c) the Interest Collection Account, the Principal collection Account, each Synthetic Security Counterparty Account and each Asset Hedge Account (but with respect to any Synthetic Security Counterparty Account and each Asset Hedge Account, subject to the prior lien of the applicable Synthetic Security Counterparty or Asset Hedge Counterparty (as applicable) with respect to which each such account (or sub-account thereof) relates), the Payment Account, the Expense Account, the Custodial Account, the Reserve Account, the Quarterly Interest Reserve Account, the Interest Equalization Account and the Issuer's rights in each of the Issuer Collateral

Accounts, the Hedge Counterparty Collateral Accounts and the Class A-1 Prepayment Accounts and the Reserve Account Investments, Eligible Investments and U.S. Agency Securities purchased with funds on deposit in said accounts and all income from the investment of funds therein, (d) for the benefit of *first*, the Credit Default Swap Counterparty (to the extent necessary to secure the Issuer's obligations under the Credit Default Swap Agreement) and *second*, the Class A-1 Noteholders, the Issuer's security interest in each Class A-1 Prepayment Account, (e) the Issuer's right to income from the investment of funds in any Synthetic Security Counterparty Account or Asset Hedge Account, (f) for the benefit of the Credit Default Swap Counterparty only, the rights of the Issuer under the Class A-1 Note Purchase Agreement to make Borrowings and Deemed Borrowings in respect of amounts owing by the Issuer to the Credit Default Swap Counterparty under the Credit Default Swap Agreement, (g) the rights of the Issuer under the Class A-1 Note Purchase Agreement to make Borrowings and Deemed Borrowings in respect of Acquisitions of Collateral Debt Securities up to the Junior Facility Amount, (h) the rights of the Issuer under the Hedge Agreements, the Credit Default Swap Agreement, the Class A-1 Note Purchase Agreement, the Collateral Management Agreement, the Collateral Administration Agreement, the Securities Purchase Agreement, the Preference Share Paying Agency Agreement and any Subscription Agreement, (i) all Cash delivered to the Trustee (directly or through a Securities Intermediary) and (j) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (collectively, the "**Collateral**").  Such Grants are made, however, to the Trustee to hold in trust to secure the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due (A) on the Notes, (B) to the Credit Default Swap Counterparty under the Credit Default Swap Agreement, (C) to any Synthetic Security Counterparty to the extent of assets credited to a Synthetic Security Counterparty Account with respect to such Synthetic Security, (D) to the Collateral Manager under the Collateral Management Agreement and (E) to the Hedge Counterparties under the Hedge Agreements, in each case in accordance with their respective terms, (ii) the payment of all other sums payable under this Indenture (including the Collateral Management Fee and all amounts payable to the Collateral Manager under the Collateral Management Agreement) and (iii) compliance with the provisions of this Indenture, the Credit Default Swap Agreement, any Synthetic Securities, the Collateral Management Agreement and the Hedge Agreements, all as provided in this Indenture (collectively, the "**Secured Obligations**").

Except to the extent otherwise provided in this Indenture, the Issuer does hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises.  The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power.  This

power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private Sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The designation of the Trustee in any transfer document or record is intended and shall be deemed, first, to refer to the Trustee as a purchaser of Collateral as custodian on behalf of the Issuer and second, to refer to the Trustee as secured party on behalf of the Secured Parties, *provided* that the Grant made by the Issuer to the Trustee pursuant to the Granting Clauses hereof shall apply to any Collateral bearing such designation.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein to the best of its ability such that the interests of the Secured Parties may be adequately and effectively protected.

None of the Trustee, the Noteholders or the other Secured Parties shall have any legal, equitable or beneficial interest in or claim to (i) the Preference Share Distribution Account (as defined in the Preference Share Paying Agency Agreement) or any amounts on deposit therein, (ii) any assets of the Co-Issuer or (iii) except as set forth in clause (c) of the first sentence of the Granting Clause, the Synthetic Security Counterparty Account or Asset Hedge Account (collectively, the "**Excluded Assets**").

## ARTICLE I—DEFINITIONS AND INTERPRETATION

Section 1.1     Definitions.

(a)    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture.  Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

"**Account**" means any of each Asset Hedge Account, each Class A-1 Prepayment Account, the Custodial Account, the Expense Account, each Hedge Counterparty Collateral Account, the Interest Collection Account, the Interest Equalization Account, each Issuer Collateral Account, the Payment Account, the Principal Collection Account, the Reserve Account, the Quarterly Interest Reserve Account, each Synthetic Security Counterparty Account and any subaccount thereof that the Trustee deems necessary or appropriate.

"**Account Control Agreement**" means the Account Control Agreement, dated as of the Closing Date, among the Issuer, the Trustee and the Custodian.

"**Account Withdrawal Payment Priority**" means, (i) *first*, in the Collateral Manager's sole discretion in the case of commitments to purchase additional Collateral Debt Securities, to the extent of the portion of the purchase price constituted by purchased accrued interest only, the Interest Collection Account, (ii) *second*, the Principal Collection Account (excluding Floating Amount Payments that are caused by any interest shortfall, which such payments shall be paid from the Interest Collection Account), (iii) *third*, the Reserve Account (*provided* that no amount may be withdrawn from the Reserve Account to fund commitments by the Issuer to purchase additional Collateral Debt Securities if the Excess Notional Amount Liquidity would be reduced to zero as the result of such withdrawal) (excluding (a) Floating Amount Payments that are caused by any interest shortfall, which such payments shall be paid from the Interest Collection Account and (b) any excess Reserve Account balance resulting from the minimum Borrowing requirement), and (iv) *fourth*, with respect to each Permitted Use (excluding CDS Termination Payments due to the Credit Default Swap Counterparty where such Credit Default Swap Counterparty is the "Defaulting Party" or sole "Affected Party" under the Credit Default Swap Agreement), (I) in the case of commitments to purchase additional Collateral Debt Securities, subject to the conditions precedent thereto set forth in the Class A-1 Note Purchase Agreement, Borrowings and Deemed Borrowings under the Class A-1 Notes up to the Junior Facility Amount and (II) in all other cases, subject to the conditions precedent thereto set forth in the Class A-1 Note Purchase Agreement, Borrowings and Deemed Borrowings under the Class A-1 Notes.

"**Accountants' Report**" means a report of a firm of Independent certified public accountants of recognized national reputation appointed by the Issuer pursuant to Section 10.9(a), which may be the firm of Independent accountants that reviews or performs procedures with respect to the financial reports prepared by the Issuer or the Collateral Manager.

"**Acquire**" means any purchase or other acquisition by the Issuer of, or entry by the Issuer into, any Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment or Synthetic Security Collateral which, for purposes of determining the date of such acquisition or entry, shall be deemed to occur on the settlement date of the transaction

-4-

pursuant to which such Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment or Synthetic Security Collateral is Acquired or entered into, assuming for these purposes, (x) settlement on the specified settlement date in accordance with the customary settlement procedures in the relevant market for such Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment or Synthetic Security Collateral and (y) if applicable, the receipt by the Issuer of Borrowings or Deemed Borrowings under the Class A-1 Notes in an amount sufficient to satisfy the Issuer's payment obligations under the transactions referred to in clause (x) on such settlement date; *provided* that (1) if such transaction does not settle by its customary settlement date, such Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment or Synthetic Security Collateral will be deemed not to have been "Acquired" by the Issuer for purposes of this definition until settlement is actually effected, (2) if at any time the Collateral Manager or the Trustee determines in good faith that the relevant transaction will not settle by its customary settlement date, then such Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment or Synthetic Security Collateral will, immediately upon such determination, be deemed not to have been "Acquired" by the Issuer for purposes of this definition until settlement is actually effected and (3) the term "**Acquisition**" shall be construed in accordance with the foregoing.

"**Act**" and "**Acts**" of Noteholders have the meanings set forth in Section 14.2.

"**Administration Agreement**" means the Administration Agreement, dated March 6, 2007, between the Administrator and the Issuer, as modified and supplemented and in effect from time to time.

"**Administrative Expenses**" means amounts due or accrued with respect to any Distribution Date and payable by the Issuer or the Co-Issuer to (i) the Trustee pursuant to Section 6.8 or any co-trustee appointed pursuant to Section 6.13, (ii) the Collateral Administrator under the Collateral Administration Agreement, (iii) the Preference Share Paying Agent under the Preference Share Paying Agency Agreement, (iv) the Administrator under the Administration Agreement, (v) the Class A-1 Note Agent under the Class A-1 Note Purchase Agreement, (vi) the Independent accountants, agents and counsel of the Issuer for reasonable fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Co-Issuers), (vii) the Rating Agencies for fees and expenses in connection with any rating (including any credit estimates and the annual fee payable with respect to the monitoring of any rating) of the Notes, including fees and expenses due or accrued in connection with any rating of the Collateral Debt Securities, (viii) the Collateral Manager under this Indenture and the Collateral Management Agreement (including amounts payable by the Issuer to any Indemnified Party (as defined in the Collateral Management Agreement) pursuant to Section 10 of the Collateral Management Agreement), (ix) any other Person in respect of any governmental fee, registered office fee, charge or tax in relation to the Issuer or the Co-Issuer (in each case as certified by an Authorized Officer of the Issuer or the Co-Issuer to the Trustee) and (x) any other Person in respect of any other fees or expenses (including indemnities) permitted under this Indenture and the Class A-1 Note Purchase Agreement and the documents delivered pursuant to or in connection with this Indenture, the Class A-1 Note Purchase Agreement and the Notes; *provided* that Administrative Expenses shall not include (a) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date, (b) amounts payable in respect of the Notes or Preference Shares, (c) amounts payable under the Hedge Agreements and

the Credit Default Swap Agreement and (d) any Senior Collateral Management Fee payable pursuant to the Collateral Management Agreement.

"**Administrator**" means Maples Finance Limited and any successor thereto appointed under the Administration Agreement.

"**Affected Class**" means any Class of Notes that as a result of the occurrence of a Tax Event would not receive 100% of the amount of any Distribution that would otherwise be payable to any such Class in accordance with the Priority of Payments.

"**Affiliate**" or "**Affiliated**" means, with respect to a specified Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, Officer, employee, member or general partner of such Person or any such other Person described in clause (a) above.  For the purposes of this definition, "control" of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; *provided* that no other special purpose company to which the Administrator provides directors and acts as share trustee or administrator shall be an Affiliate of the Issuer or the Co-Issuer.

"**Aggregate Outstanding Amount**" means, when used with respect to any Class of Notes at any time, the aggregate principal amount of such Notes Outstanding at such time. Unless otherwise specified herein, the term "Aggregate Outstanding Amount" when used herein for purposes of the Class A-1 Notes shall mean the sum of the Outstanding Class A-1 Funded Amount and the Remaining Unfunded Facility Commitment or amounts standing to the credit of any Class A-1 Prepayment Account.

"**Aggregate Principal Balance**" means, when used with respect to any Pledged Securities as of any date of determination, the sum of the Principal Balances on such date of determination of all such Pledged Securities.

"**Aggregate Ramp-Up Par Amount**" means U.S.$1,500,000,000.

"**Alternate Interest Period**" has the meaning set forth in <u>Schedule B</u>.

"**Applicable Recovery Rate**" means, with respect to any Collateral Debt Security on any Measurement Date, the lower of (a) an amount equal to the percentage for such Collateral Debt Security set forth in the Moody's Recovery Rate Matrix set forth in Part I of <u>Schedule D</u> in (x) the table corresponding to the relevant Specified Type of Collateral Debt Security, (y) the column in such table setting forth the Moody's Rating of such Collateral Debt Security as of the date of issuance of such Collateral Debt Security and (z) the row in such table opposite the percentage of the Issue of which such Collateral Debt Security including, for senior only bonds, all other bonds which are *pari passu* in terms of losses, is a part relative to the total capitalization of (including both debt and equity securities issued by) the relevant issuer of or obligor on such Collateral Debt Security, determined on the original issue date of such Collateral Debt Security, *provided* that (1) if such Collateral Debt Security is a U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, it shall be treated as an ABS Type Diversified Security for

the purposes of applying the recovery rate in Part I of <u>Schedule D</u>, (2) if the timely payment of principal of and interest on such Collateral Debt Security is guaranteed (and such guarantee ranks equally and ratably with the guarantor's senior unsecured debt) by another Person, unless such Collateral Debt Security is a U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, such amount shall be 30%, (3)(A) if such Collateral Debt Security is a REIT Debt Security other than a REIT Debt Security—Health Care or REIT Debt Security—Mortgage, such amount shall be 40% and (B) if such Collateral Debt Security is a REIT Debt Security—Health Care or REIT Debt Security—Mortgage, such amount shall be 10%, and (4) if such Collateral Debt Security is a Reinsurance Security, such amount shall be assigned by Moody's upon the purchase of each such Collateral Debt Security and (b) an amount equal to the percentage for such Collateral Debt Security set forth in the Standard & Poor's Recovery Rate Matrix set forth in Part II of <u>Schedule D</u> in (x) the applicable table, (y) the row in such table opposite the Standard & Poor's Rating of such Collateral Debt Security at the time of issuance of such Collateral Debt Security and (z)(i) for purposes of determining the Standard & Poor's Weighted Average Recovery Rate, the column in such table below the current rating of the respective Class of Notes or (ii) for purposes of determining the Calculation Amount, in the column in such table below the current rating of the Class of Outstanding Notes with the highest rating by Standard & Poor's in the Recovery Rate Matrix set forth in Part III of <u>Schedule D</u>.  For purposes of the definition of "Applicable Recovery Rate," the Issuer will request Moody's and Standard & Poor's to assign a recovery rate to any Synthetic Security that is not a Form-Approved Synthetic Security prior to the Acquisition thereof.

"**Asset-Backed Security**" means (i) a security issued by an entity formed for the purpose of holding or investing and reinvesting in a pool, either fixed or revolving (the composition of which cannot vary as a result of a decision by the Collateral Manager and its Affiliates), of receivables, debt obligations, debt securities, finance leases or other similar assets subject to specified Acquisition or investment and management criteria designed to assure the servicing or timely distribution of proceeds to holders of the securities or (ii) a beneficial interest in a trust, all of the assets of which would satisfy the Eligibility Criteria.

"**Asset Hedge Account**" means any Securities Account designated as an "Asset Hedge Account" and established in the name of the Trustee pursuant to <u>Section 16.1(e)</u>.

"**Asset Hedge Counterparty**" means any counterparty or permitted assignee or successor of a counterparty that enters into a Deemed Floating Asset Hedge Agreement with the Issuer.

"**Assigned Value**" means, as of any date of determination, the fair market value assigned to a Reference Obligation (based on the notional amount thereof) in respect of a Synthetic Security meeting the Synthetic Security Discount Criteria, by the bona fide bid for such Reference Obligation obtained by the Collateral Manager as of such date from any nationally recognized dealer chosen by the Collateral Manager, which dealer is Independent from the Collateral Manager; provided that if such bona fide bid is unavailable, such Assigned Value will be the fair market value assigned by the Collateral Manager determined by the notional amount times one minus the product of (A) and (B) where (A) is the spread duration of the underlying Reference Obligation, and (B) the difference between (i) and (ii), where (i) is the rate of the fixed premium payments in respect of the applicable Synthetic Security payable to the

related protection seller and (ii) is (a) in the case of a Reference Obligation that pays interest at a floating rate above LIBOR or above another floating rate index for Dollar-denominated obligations, the stated spread above such floating rate index at which interest accrues on the related underlying Reference Obligation or (b) in the case of a Reference Obligation that pays interest at a fixed rate, the deemed spread determined by subtracting the then-current London interbank offered rate (with the LIBOR period selected matching the periodic payment frequency of such Reference Obligation) from the total fixed rate coupon payable in respect of such Reference Obligation.

"**Assignor Class A-1 Noteholder**" has the meaning set forth in the Class A-1 Note Purchase Agreement.

"**Assumed Reinvestment Rate**" means, with respect to any Account or fund securing the Notes, the greater of (a) LIBOR *minus* 0.12% and (b) zero.

"**Auction**" has the meaning set forth in Section 9.5.

"**Auction Call Redemption**" has the meaning set forth in Section 9.5.

"**Auction Call Redemption Amount**" means the sum of (a) the Total Redemption Amount *plus* (b) on any Quarterly Distribution Date from and including the Quarterly Distribution Date in March 2014 to and including the Quarterly Distribution Date in March 2015, an amount sufficient to provide the Class E Noteholders, the Class F Noteholders and the Preference Shareholders with a combined internal rate of return of at least 5.0% of the total proceeds from the sale of the Class E Notes, the Class F Notes and the Preference Shares, and, thereafter, at least 0%, in each case on U.S.$50,000,000; *provided* that Holders of 100% of the Aggregate Outstanding Amount of any Class of Notes may elect, in connection with any Auction Call Redemption, to receive less than 100% of the portion of the Sale Proceeds received in respect of the Collateral Debt Securities pursuant to such Auction Call Redemption and the Balance of all Reserve Account Investments and Eligible Investments and Cash in the Accounts (other than any Hedge Counterparty Collateral Account, any Asset Hedge Account and any Class A-1 Prepayment Account to the extent the Issuer is not entitled to the amounts in such accounts) that would otherwise be payable to Holders of such Class of Notes if such sum were to equal the Auction Call Redemption Amount as defined without reference to this proviso, in which case the Auction Call Redemption Amount shall be reduced accordingly for purposes of this definition.

"**Auction Date**" has the meaning set forth in Section 9.5.

"**Auction Procedures**" has the meaning set forth in Section 9.5.

"**Auction Purchase Agreement**" has the meaning set forth in Schedule E.

"**Authenticating Agent**" means, with respect to the Notes of any Class, the Person designated by the Trustee, if any, to authenticate such Notes on behalf of the Trustee pursuant to Section 6.4.

"**Authorized Officer**" means (i) with respect to the Issuer, any Officer of the Issuer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer, (ii) with respect to the Co-Issuer, any Officer who is authorized to act for the Co-Issuer in matters relating to, and binding upon, the Co-Issuer, (iii) with respect to the Collateral Manager, any Officer, employee or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject matter of the request, certificate or order in question and (iv) with respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"**Available Redemption Funds**" means (i) Sale Proceeds of the sale, liquidation, termination or assignment of the Collateral Debt Securities, *plus* (ii) the balance of all Reserve Account Investments, Cash and Eligible Investments maturing on or prior to the scheduled Redemption Date credited to the Accounts (other than any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account, to the extent the Issuer is not entitled to the amounts in such accounts), *plus* (iii) proceeds that would be released to the Issuer from any Synthetic Security Counterparty Account following termination or assignment of the related Synthetic Securities and payment by the Issuer of amounts owed to such Synthetic Security Counterparty, including, in the case of a Clean-Up Call Redemption, Cash paid by the Collateral Manager in exchange for any purchase by it of Collateral Debt Securities (other than CDS Agreement Transactions).

"**Average Life**" means, on any Measurement Date with respect to any Collateral Debt Security, the quotient obtained by the Collateral Manager by *dividing* (i) the sum of the products of (a) the number of years (rounded to the nearest one tenth thereof) from such Measurement Date to the respective dates of each successive Scheduled Distribution of principal of such Collateral Debt Security and (b) the respective amounts of principal of such Scheduled Distributions *by* (ii) the sum of all successive Scheduled Distributions of principal on such Collateral Debt Security.

"**Balance**" means at any time, with respect to the Reserve Account Investments, Cash or Eligible Investments in any Account at such time, the aggregate of the (i) current balance of the Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts, repurchase obligations and Reinvestment Agreements; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"**Bank**" means LaSalle Bank National Association, a national banking association, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended or where the context requires, the applicable insolvency provisions of the laws of the Cayman Islands.

"**Base Rate**" has the meaning set forth in Schedule B.

"**Base Rate Reference Bank**" has the meaning set forth in Schedule B.

"**Benchmark Rate**" means, with respect to a Collateral Debt Security that does not bear interest at a floating rate, the yield reported, as of 10:00 a.m. (New York City time) on the second Business Day preceding the date of Acquisition of such Collateral Debt Security, on the display designated as "Page 678" on the Telerate Access Service (or such other display as may replace Page 678 on Telerate Access Service) for actively traded U.S. Treasury securities having a maturity equal to the Average Life of such Collateral Debt Security on such date of Acquisition.

"**Beneficial Owner**" means any Person owning an interest in a Global Note as reflected on the books of the Depositary or on the books of a Depositary Participant or on the books of an indirect participant for which a Depositary Participant of the Depositary acts as agent.

"**Benefit Plan Investor**" means any employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, any plan described in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code and any entity whose underlying assets include plan assets by reason of an employee benefit plan's or plan's investment in the entity.

"**Board of Directors**" means the directors of the Issuer duly appointed in accordance with the Issuer Charter.

"**Bond Purchase Payment**" has the meaning set forth in Section 7.18(d).

"**Borrowing**" has the meaning given to such term in the Class A-1 Note Purchase Agreement.

"**Borrowing Request**" has the meaning given to such term in the Class A-1 Note Purchase Agreement.

"**Borrowings Interest Amount**" has the meaning specified in Section 2.2(c).

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in New York City and London and any other city in which the Corporate Trust Office is located (initially being Chicago, Illinois) and, in the case of the final payment of principal of any Note, the place of presentation of such Note.

"**Calculation Agent**" has the meaning set forth in Section 7.15.

"**Calculation Amount**" means, with respect to any Collateral Debt Security at any time, that (i) is a Defaulted Security, (ii) is a Deferred Interest PIK Bond, (iii) has a Moody's

Rating of below "Caa3" or (iv) was received upon acceptance of an Offer under the circumstances described in clause (a) of the definition of "Principal Balance," the lesser of (a) the Fair Market Value of such Collateral Debt Security and (b) the amount obtained by *multiplying* the Applicable Recovery Rate with respect to such Collateral Debt Security by the Principal Balance of such Collateral Debt Security; *provided, however,* that the Calculation Amount for any Collateral Debt Security that has been a Defaulted Security for more than three consecutive years shall be zero.

"**Calculation Period**" means, with respect to any Monthly Distribution Date, (i) in the case of the initial Calculation Period, the period from, and including, the Closing Date to, but excluding, the first Monthly Distribution Date and (ii) thereafter, the period from, and including, the Monthly Distribution Date immediately following the last day of the immediately preceding Calculation Period to, but excluding, the next succeeding Monthly Distribution Date.

"**Cash**" means such funds denominated with currency of the United States of America as at the time shall be legal tender for payment of all public and private debts, including funds credited to a deposit account or a Securities Account.

"**CDS Agreement Transactions**" means the Synthetic Securities in the form of credit default swap transactions entered into by the Issuer with the Credit Default Swap Counterparty under the Credit Default Swap Agreement.

"**CDS Termination Payment**" has the meaning given to such term in Section 7.18(c).

"**Certificated Security**" has the meaning set forth in Section 8-102(a)(4) of the UCC.

"**Certificate of Authentication**" has the meaning set forth in Section 2.3(f).

"**Class**" means each of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes.

"**Class A-1 Make-Whole Amount**" means, with respect to an Optional Redemption that occurs prior to the Distribution Date in March 2011, an amount equal to (a) the Commitment Fee Rate multiplied by (b) the sum of (i) the Outstanding Class A-1 Funded Amount as of the applicable Redemption Date plus (ii) the Remaining Unfunded Facility Commitment as of the applicable Redemption Date multiplied by (c) the number of days in the Class A-1 Make-Whole Period divided by (d) 360.

"**Class A-1 Make-Whole Period**" means, with respect to any Optional Redemption that occurs prior to the Distribution Date in March 2011, the period from (and including) the applicable Redemption Date and ending on (but excluding) the Distribution Date occurring in March 2011 (in each case without giving effect to any Business Day adjustment thereto).

"**Class A-1 Note Agent**" means LaSalle Bank National Association (or any successor thereto), as Class A-1 Note Agent under the Class A-1 Note Purchase Agreement.

"**Class A-1 Note Interest Rate**" means, with respect to the Class A-1 Notes, a rate *per annum* equal to LIBOR (determined as set forth herein and which may be set at different levels with respect to intraperiod Borrowings or Deemed Borrowings) plus 0.32%.

"**Class A-1 Note Purchase Agreement**" means the Class A-1 Note Purchase Agreement, dated as of the Closing Date, among the Issuer, the Co-Issuer, the Class A-1 Note Agent, the Trustee and the holders from time to time of the Class A-1 Notes.

"**Class A-1 Note Rating Decline Event**" means, with respect to a Class A-1 Noteholder (other than a Class A-1 Noteholder that is the Credit Default Swap Counterparty), the failure to meet the Class A-1 Note Rating Threshold.

"**Class A-1 Note Rating Threshold**" means, (I) with respect to a Class A-1 Noteholder that is not a Designated Class A-1 Noteholder or the Credit Default Swap Counterparty, (i) a credit rating of the related Rating Determining Party with respect to its short-term unsecured debt obligations of (A) "P-1" by Moody's (and such rating has not been placed on watch for possible downgrade) and (B) "A-1+" by Standard & Poor's and (ii) a credit rating of the related Rating Determining Party with respect to its long-term unsecured debt obligations of (A) at least "Aa3" by Moody's (and, if rated "Aa3", such rating has not been placed on watch for possible downgrade) and (B) at least "AA-" by Standard & Poor's and (II) with respect to a Designated Class A-1 Noteholder, (i) a credit rating of the related Rating Determining Party with respect to its short-term unsecured debt obligations of (A) "P-1" by Moody's (and such rating has not been placed on watch for possible downgrade) and (B) "A-1" by Standard & Poor's and (ii) a credit rating of the related Rating Determining Party with respect to its long-term unsecured debt obligations of (A) at least "A1" by Moody's (and if rated "A1", such rating has not been placed on watch for possible downgrade) and (B) at least "A+" by Standard & Poor's; *provided*, that with respect to any Class A-1 Noteholder, the Class A-1 Note Rating Threshold may be modified, as agreed by the Credit Default Counterparty and such Class A-1 Noteholder, subject to the satisfaction of the Rating Condition and with written notice to Trustee of such modification; *provided*, *further*, that with respect to any Designated Class A-1 Noteholder, the Class A-1 Note Rating Threshold may be modified, as agreed by the Credit Default Counterparty and such Designated Class A-1 Noteholder, with written notice to Trustee of such modification.

"**Class A-1 Note Register**" has the meaning set forth in Section 2.4(a).

"**Class A-1 Notes**" means the U.S.$0 Class A-1 Variable Funding Senior Secured Floating Rate Notes Due 2047 issued by the Co-Issuers on the Closing Date that bear interest at a rate *per annum* equal to the Class A-1 Note Interest Rate, as provided under the terms of such Notes, which may be increased from time to time upon any Notice of Borrowing.

"**Class A-1 Prepayment Account**" has the meaning set forth in Section 10.2(p).

"**Class A-2 Notes**" means the U.S.$168,000,000 Class A-2 Senior Secured Floating Rate Notes Due 2047 issued by the Co-Issuers on the Closing Date that bear interest at a rate *per annum* equal to LIBOR plus 0.55%, as provided under the terms of such Notes.

"**Class A Notes**" means, collectively, the Class A-1 Notes and the Class A-2 Notes.

"**Class A Pro Rata Test**" means a test that is satisfied on any Measurement Date if the Net Outstanding Portfolio Collateral Balance *divided by* the sum of (x) the Outstanding Class A-1 Funded Amount, (y) the Remaining Unfunded Facility Commitment and (z) the Aggregate Outstanding Amount of the Class A-2 Notes, is equal to or greater than 126%.

"**Class B Notes**" means the U.S.$ 111,000,000 Class B Secured Floating Rate Notes Due 2047 issued by the Co-Issuers on the Closing Date that bear interest at a rate *per annum* equal to LIBOR plus 0.70%, as provided under the terms of such Notes.

"**Class C Deferred Interest**" means, with respect to the Class C Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Monthly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class C Notes**" means the U.S.$102,750,000 Class C Secured Deferrable Floating Rate Notes Due 2047 issued by the Co-Issuers on the Closing Date that bear interest at a rate *per annum* equal to LIBOR plus 2.75%, as provided under the terms of such Notes.

"**Class D-1 Cap Amount**" means, with respect to any Monthly Distribution Date prior to and including the Distribution Date occurring in March 2012, U.S.$192,105.26, and thereafter 40% of the remaining interest proceeds available pursuant to Section 11.1(i)(U).

"**Class D-1 Deferred Interest**" means, with respect to the Class D-1 Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Monthly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class D-1 Notes**" means the U.S.$73,000,000 Class D-1 Secured Deferrable Floating Rate Notes Due 2047 issued by the Co-Issuers on the Closing Date that bear interest at a rate *per annum* equal to LIBOR plus 7.25%, as provided under the terms of such Notes.

"**Class D-2 Cap Amount**" means, with respect to any Monthly Distribution prior to and including the Distribution Date occurring in March 2012, U.S.$26,973.68, and thereafter 30% of the remaining interest proceeds available pursuant to Section 11.1(i)(V).

"**Class D-2 Deferred Interest**" means, with respect to the Class D-2 Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Monthly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class D-2 Notes**" means the U.S.$10,250,000 Class D-2 Secured Deferrable Floating Rate Notes Due 2047 issued by the Co-Issuers on the Closing Date that bear interest at a rate *per annum* equal to LIBOR plus 9.00%, as provided under the terms of such Notes.

"**Class D Notes**" means, collectively, the Class D-1 Notes and the Class D-2 Notes.

"**Class E Deferred Interest**" means, with respect to the Class E Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Monthly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class E Interest Amount**" means, with respect to the Class E Notes, on any Monthly Distribution Date, the aggregate amount of interest accrued at the Class E Stated Rate during the Interest Period ending immediately prior to such Monthly Distribution Date on the Aggregate Outstanding Amount of Class E Notes as of the first day of such Interest Period (after giving effect to any payment of the Scheduled Class E Target Principal Amount on any preceding Monthly Distribution Date).

"**Class E Notes**" means the U.S.$18,000,000 Class E Deferrable Notes Due 2047 issued by the Issuer on the Closing Date.

"**Class E Payment Allocation**" means, with respect to each Monthly Distribution Date until the Aggregate Outstanding Amount of the Class E Notes is reduced to zero, the following amounts in the following order of priority: *first*, the Class E Interest Amount due and payable in respect of such Monthly Distribution Date, *second*, Class E Deferred Interest, *third*, any due and unpaid Scheduled Class E Target Principal Amount in respect of any previous Monthly Distribution Dates and *fourth*, the Scheduled Class E Target Principal Amount due and payable in respect of such Monthly Distribution Date.

"**Class E Stated Rate**" means, with respect to the Class E Notes for any Interest Period, a fixed rate *per annum* equal to 6.00% and shall be computed on the basis of a 360-day year comprised of twelve 30-day months, as provided under the terms of such Notes.

"**Class F Deferred Interest**" means, with respect to the Class F Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Monthly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class F Interest Amount**" means, with respect to the Class F Notes, on any Monthly Distribution Date, the aggregate amount of interest accrued at the Class F Stated Rate during the Interest Period ending immediately prior to such Monthly Distribution Date on the Aggregate Outstanding Amount of Class F Notes as of the first day of such Interest Period (after giving effect to any payment of the Scheduled Class F Target Principal Amount on any preceding Monthly Distribution Date).

"**Class F Notes**" means the U.S.$18,000,000 Class F Deferrable Notes Due 2047 issued by the Issuer on the Closing Date.

"**Class F Payment Allocation**" means, with respect to each Monthly Distribution Date until the Aggregate Outstanding Amount of the Class F Notes is reduced to zero, the following amounts in the following order of priority: *first*, the Class F Interest Amount due and payable in respect of such Monthly Distribution Date, *second*, Class F Deferred Interest, *third*, any due and unpaid Scheduled Class F Target Principal Amount in respect of any previous Monthly Distribution Dates and *fourth*, the Scheduled Class F Target Principal Amount due and payable in respect of such Monthly Distribution Date.

"**Class F Stated Rate**" means, with respect to the Class F Notes for any Interest Period, a fixed rate *per annum* equal to 6.00% and shall be computed on the basis of a 360-day year comprised of twelve 30-day months, as provided under the terms of such Notes.

"**Class S Interest Payment**" means, with respect to each Monthly Distribution Date through March 2047, an amount equal to (a) the Aggregate Outstanding Amount of the Class S Notes *multiplied* by (b) LIBOR plus 0.33% *multiplied* by (c) the actual number of days in the related Calculation Period *divided* by (d) 360.

"**Class S Notes**" means the U.S.$43,000,000 Class S Senior Secured Notes Due 2047 issued by the Co-Issuers on the Closing Date.

"**Class S Payment**" means, with respect to each Monthly Distribution Date, the Class S Interest Payment and the Class S Principal Payment.

"**Class S Principal Payment**" means, with respect to each Distribution Date through March 2047, an amount equal to the lesser of U.S.$716,666.67 and the Aggregate Outstanding Amount of the Class S Notes.

"**Class S Shortfall Amount**" means, with respect to the Class S Notes and any Monthly Distribution Date, any shortfall or shortfalls in the payment of the Class S Payment with respect to any preceding Monthly Distribution Date or Monthly Distribution Dates together with interest accrued thereon at the Note Interest Rate for the Class S Notes (net of all Class S Shortfall Amounts, if any, paid with respect to the Class S Notes prior to such Monthly Distribution Date).

"**Class Scenario Default Rate**" means, with respect to any Class of Notes rated by Standard & Poor's, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with Standard & Poor's rating of such Class of Notes on the Closing Date, determined by application of the Standard & Poor's CDO Monitor at such time.

"**Clean-Up Call Redemption**" has the meaning set forth in Section 9.6.

"**Clearing Agency**" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"**Clearing Corporation**" has the meaning set forth in Section 8-102(a)(5) of the UCC.

"**Clearstream, Luxembourg**" means Clearstream Banking, Luxembourg S.A.

"**Closing Date**" means March 6, 2007.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Co-Issuer**" means Pyxis ABS CDO 2007-1 LLC, a limited liability company formed under the laws of the State of Delaware.

"**Co-Issuers**" means, together, the Issuer and the Co-Issuer.

"**Collateral**" has the meaning set forth in the Granting Clauses.

"**Collateral Administration Agreement**" means the Collateral Administration Agreement, dated as of the Closing Date, among the Issuer, the Collateral Manager and the Collateral Administrator relating to certain functions performed by the Collateral Administrator for the Issuer and the Collateral Manager with respect to this Indenture and the Collateral, as amended from time to time.

"**Collateral Administrator**" means the Bank and any successor appointed as Collateral Administrator pursuant to the Collateral Administration Agreement.

"**Collateral Debt Security**" means (i) an Asset-Backed Security, a REIT Debt Security, a Mortgage Finance Company Security or a Synthetic Security that, in each case, satisfies each of the Eligibility Criteria when purchased by the Issuer, (ii) any Deliverable Obligations and (iii) any Synthetic Security Collateral that satisfies the Eligibility Criteria as to which the lien of the Synthetic Security Counterparty has been released following the termination of the Synthetic Security.

"**Collateral Management Agreement**" means the Collateral Management Agreement, dated as of the Closing Date, between the Issuer and the Collateral Manager relating to the Notes and the Collateral, as amended from time to time in accordance with the terms thereof.

"**Collateral Management Fee**" means, collectively, the Senior Collateral Management Fee and the Subordinated Collateral Management Fee.

"**Collateral Manager**" means The Putnam Advisory Company, LLC, unless a successor Person shall have become the collateral manager pursuant to the provisions of the Collateral Management Agreement, and thereafter Collateral Manager shall mean such successor Person.

"**Collateral Quality Tests**" means the Moody's Asset Correlation Test, the Moody's Maximum Rating Distribution Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Weighted Average Life Test, the Standard & Poor's CDO Monitor Test,

the Standard & Poor's Minimum Weighted Average Recovery Rate Test and the Weighted Average Premium/Spread Test.

"**Collection Accounts**" means, collectively, the Interest Collection Account and the Principal Collection Account.

"**Commitment Amount**" means, on any date and as to any Class A-1 Noteholder, the product of (a) the Commitment Percentage of such Class A-1 Noteholder as of such day and (b) an amount which is the Remaining Unfunded Facility Commitment (expressed as a Dollar amount) on such date.

"**Commitment Fee**" means a commitment fee which shall accrue at a *per annum* rate of 0.18% on the portion of the aggregate Remaining Unfunded Facility Commitment represented by the Class A-1 Notes, payable to each Class A-1 Noteholder for each day on which such Class A-1 Noteholder is a Compliant Class A-1 Noteholder from and including the Closing Date to but excluding the Commitment Termination Date.

"**Commitment Fee Rate**" means, with respect to the Commitment Fee, a rate equal to 0.18% *per annum*.

"**Commitment Percentage**" means, for any Class A-1 Noteholder as of any date of determination, a percentage equal to (a)(i) the *pro rata* portion of the Remaining Unfunded Facility Commitment represented by the Class A-1 Notes of such Class A-1 Noteholder divided by (ii) the Remaining Unfunded Facility Commitment multiplied by (b) 100%.

"**Commitment Termination Date**" means the earliest to occur of (a) the earlier of the Stated Maturity of the Notes and the Redemption Date for the Notes, (b)(i) any date after an Event of Default (other than a Specified Event of Default) has occurred and the liquidation of the Collateral under the Indenture as a result thereof has been completed or (ii) any date on which a Specified Event of Default has occurred and (c) the first date after the Reinvestment Period has terminated on which all of the CDS Agreement Transactions have been Disposed of and any termination or other payments thereunder or in connection therewith owing by the Issuer have been paid.

"**Compliant Class A-1 Noteholder**" means any holder of Class A-1 Notes (other than, for purposes of clause (b) hereof, a Class A-1 Noteholder that is also the Credit Default Swap Counterparty) that, as of any date of determination, (a) has not failed to satisfy any of its obligations under the Class A-1 Note Purchase Agreement in respect of its *pro rata* share of the Remaining Unfunded Facility Commitment and (b) either (i) satisfies the Class A-1 Note Rating Threshold or (ii) if such holder does not satisfy the Class A-1 Note Rating Threshold and such failure is continuing, has, by the date that is 30 days after the date such holder did not satisfy the Class A-1 Note Rating Threshold, either obtained a guarantor for its obligations under its Class A-1 Notes that satisfies the Class A-1 Note Rating Threshold or deposited such holder's *pro rata* share of the Remaining Unfunded Facility Commitment into a Class A-1 Prepayment Account, in each case in accordance with the Class A-1 Note Purchase Agreement; *provided* that a Class A-1 Noteholder shall be deemed to satisfy the requirements of this clause (b)(ii) (but not, for the avoidance of doubt, the foregoing clause (a)) during such 30-day grace period.

"**Control Event**" means, at any time when the Class A-1 Notes is the Controlling Class, the occurrence and continuance of an Event of Default (1) under clause (a) of the definition of "Event of Default" with respect to amounts owing to the Class A-1 Notes, the Class S Notes, the Class A-2 Notes or the Class B Notes on any Distribution Date, (2) under clause (b) of the definition of "Event of Default" or (3) under clause (h) of the definition of "Event of Default."

"**Controlling Class**" means the Class A-1 Notes or, if the Aggregate Outstanding Amount of the Class A-1 Notes is zero, the Class S Notes and the Class A-2 Notes, collectively, or, if the Aggregate Outstanding Amount of the Class A-1 Notes, the Class S Notes and the Class A-2 Notes is zero, the Class B Notes, or, if the Aggregate Outstanding Amount of the Class A-1 Notes, Class S Notes, Class A-2 Notes and Class B Notes is zero, the Class C Notes or, if the Aggregate Outstanding Amount of the Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes and Class C Notes is zero, the Class D-1 Notes or, if the Aggregate Outstanding Amount of the Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes, Class C Notes and Class D-1 Notes is zero, the Class D-2 Notes or, if the Aggregate Outstanding Amount of the Class A-1 Notes, Class S Notes and Senior Funded Notes is zero, the Class E Notes, or, if the Aggregate Outstanding Amount of the Class A-1 Notes, Class S Notes, Senior Funded Notes and Class E Notes is zero, the Class F Notes.

"**Controlling Person**"  means a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice with respect to the assets of the Issuer for a fee, direct or indirect, or an Affiliate of any such person.

"**Corporate Trust Office**" means the designated corporate trust office of the Trustee, currently located at 181 West Madison Street, 32nd Floor, Chicago, Illinois 60602, Attention: CDO Trust Services Group—Pyxis ABS CDO 2007-1 Ltd., telephone number +1 (312) 904-0881, facsimile number +1 (312) 904-0524, or such other address as the Trustee may designate from time to time by notice to the Noteholders, the Hedge Counterparties, the Collateral Manager and the Co-Issuers or the principal corporate trust office of any successor Trustee.

"**Credit Default Swap Agreement**" means (a) the ISDA Master Agreement (Multicurrency—Cross Border) (together with the schedule and any confirmations thereto), dated as of the Closing Date, between the Issuer and the Credit Default Swap Counterparty under which the Issuer, as seller, and the Credit Default Swap Counterparty, as buyer, will from time to time enter into CDS Agreement Transactions and (b) any Form-Approved Credit Default Swap Agreement entered into by the Issuer after the Closing Date.

"**Credit Default Swap Counterparty**" means (a) Lehman Brothers Special Financing Inc., in its capacity as buyer of credit protection under the CDS Agreement Transactions entered into under the Credit Default Swap Agreement, together with its successors and assigns in such capacity or (b) any Synthetic Security Counterparty which replaces the existing Credit Default Swap Counterparty by entering into a Form-Approved Credit Default Swap Agreement.

"**Credit Derivatives Definitions**" means the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. and as the same may be amended, modified or otherwise supplemented from time to time.

"**Credit Event**" means, with respect to any Synthetic Security, any event identified in the related Underlying Instruments as a "credit event" for purposes of the Credit Derivatives Definitions incorporated by reference therein.

"**Credit Improved Security**" means any Collateral Debt Security or any other security included in the Collateral that satisfies any of the following:

(i)       if Moody's has not withdrawn or reduced its long term ratings on any of the Class A Notes or Class B Notes by one or more subcategories or reduced its long term ratings on any of the Class C Notes or the Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long term rating), the Collateral Manager believes (as of the date of the Collateral Manager's determination based upon currently available information reasonably available to the Collateral Manager) that such Collateral Debt Security has significantly improved in credit quality, or

(ii)       if (i) such Collateral Debt Security is publicly rated by Moody's at any time when Moody's has withdrawn or reduced its long term ratings on any of the Class A Notes or Class B Notes by one or more subcategories or reduced its long term ratings on any of the Class C Notes or the Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long term rating), such Collateral Debt Security has been upgraded or put on a watch list for possible upgrade by Moody's by one or more rating subcategories since it was Acquired by the Issuer and the Collateral Manager believes, based on its commercially reasonable business judgment (which judgment will not be subject to question as a result of subsequent events), that such Collateral Debt Security has significantly improved in credit quality or (ii) such Collateral Debt Security is not publicly rated by Moody's, such Collateral Debt Security has increased in price to 102% or more of its original purchase price paid therefor by the Issuer (or, in the case of a CDS Agreement Transaction, the price has increased by 2% or more of its notional since purchase), since the date on which such Collateral Debt Security was Acquired and the Collateral Manager believes, based on its reasonable business judgment (which judgment will not be subject to question as a result of subsequent events), that such Collateral Debt Security has significantly improved in credit quality.

"**Credit Protection Amount**" has the meaning set forth in the Class A-1 Note Purchase Agreement.

"**Credit Protection Payment**" means any "Floating Amount" payable by the seller of protection under (and as defined in) a CDS Agreement Transaction or the Underlying Instruments relating to a Synthetic Security structured as a credit default swap.

"**Credit Risk Security**" means any Collateral Debt Security or any other security included in the Collateral that satisfies any of the following:

(i)    if Moody's has not withdrawn or reduced its long term ratings on any of the Class A Notes or the Class B Notes by one or more subcategories or reduced its long term ratings on any of the Class C Notes or the Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long term rating), the Collateral Manager believes (as of the date of the Collateral Manager's determination based upon currently available information reasonably available to the Collateral Manager) that such Collateral Debt Security has a significant risk of declining in credit quality and, with lapse of time, becoming a Defaulted Security, or

(ii)    if (i) such Collateral Debt Security is publicly rated by Moody's at any time when Moody's has withdrawn or reduced its long term ratings on any of the Class A Notes or the Class B Notes by one or more subcategories or reduced its long term ratings on any of the Class C Notes or the Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long term rating), such Collateral Debt Security has been downgraded or put on a watch list for possible downgrade by Moody's by one or more rating subcategories since it was Acquired by the Issuer and the Collateral Manager believes, based on its commercially reasonable business judgment (which judgment shall not be subject to question as a result of subsequent events), that such Collateral Debt Security has a significant risk of declining in credit quality or (ii) such Collateral Debt Security is not publicly rated by Moody's, the credit spread with respect to such Collateral Debt Security has increased over the applicable Benchmark Rate, the applicable swap benchmark or the applicable LIBOR by (x) 0.50% or more if the original credit spread (as of the date on which such Collateral Debt Security was first Acquired) was greater than 0.50% or (y) 0.25% if the original credit spread (as of the date on which such Collateral Debt Security was first Acquired) was less than or equal to 0.50% and the Collateral Manager believes, based on its reasonable business judgment (which judgment will not be subject to question as a result of subsequent events), that such Collateral Debt Security has significantly declined in credit quality, or

(iii)    at any time, such Collateral Debt Security is a Written-Down Security and the Collateral Manager believes, based on its commercially reasonable business judgment (which judgment shall not be subject to question as

a result of subsequent events), that such Collateral Debt Security has a significant risk of declining in credit quality.

"**Cumulative Class S Payment**" means, with respect to each Monthly Distribution Date through March 2047, the Class S Payment and the Class S Shortfall Amount due on such Monthly Distribution Date.

"**Cumulative Intraperiod Interest Amount**" means, as of any Monthly Distribution Date, an amount equal to the aggregate Intraperiod Interest Amounts for the preceding Interest Period.

"**Current Portfolio**" means the portfolio of (a) the Collateral Debt Securities, (b) Principal Proceeds or Uninvested Proceeds held as Cash, (c) Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds and (d) Excess Reserve Account Assets.

"**Current Spread**" means, as of any date of determination, (i) with respect to any Collateral Debt Security which is a Floating Rate Collateral Debt Security (other than a Synthetic Security), the stated spread above LIBOR at which interest accrues on such Floating Rate Collateral Debt Security, (ii) with respect to any Collateral Debt Security which is a Deemed Floating Rate Collateral Debt Security, the Deemed Floating Rate *plus* the Deemed Floating Spread, each related to such Deemed Floating Rate Collateral Debt Security, and (iii) with respect to any Collateral Debt Security which is a Fixed Rate Collateral Debt Security, the spread over the interpolated swap rate, as determined by the Collateral Manager at the time of Acquisition of such Fixed Rate Collateral Debt Security.

"**Custodial Account**" means the Securities Account designated the "Custodial Account" and established at the Custodian in the name of the Trustee pursuant to Section 10.2(l).

"**Custodian**" has the meaning set forth in Section 3.3(a).

"**Deemed Borrowing**" means the application of an amount deposited in a Class A-1 Prepayment Account for a Permitted Use pursuant to the Class A-1 Note Purchase Agreement.

"**Deemed Floating Asset Hedge Agreement**" means, with respect to a Fixed Rate Collateral Debt Security, an interest rate swap having a Notional Amount (or scheduled Notional Amounts) equal to the Principal Balance (as it may be reduced by expected amortization) of such Fixed Rate Collateral Debt Security; *provided* that (a) at the time of entry into a Deemed Floating Asset Hedge Agreement, (i) the Notional Amount of such Deemed Floating Asset Hedge Agreement is equal to the expected principal amount of the related Fixed Rate Collateral Debt Security (as calculated at such time), (ii) at the time of entry, the expected termination of such Deemed Floating Asset Hedge Agreement matches the expected maturity of the related the Fixed Rate Collateral Debt Security, (iii) the expected payment dates of the Hedge Counterparty to the Issuer match the expected payment dates of the related Fixed Rate Collateral Debt Security and (iv) the Asset Hedge Counterparty satisfies the Hedge Counterparty Ratings Requirement, (b) the Rating Agencies and the Trustee are notified prior to the Issuer's entry into a Deemed Floating Asset Hedge Agreement, and will be provided with the identity of the relevant Asset Hedge Counterparty and copies of the hedge documentation and notional

schedule, (c) the hedge documentation (including the applicable master agreement, confirmation and schedule attached thereto) either (i) is a Form-Approved Deemed Floating Asset Hedge Agreement or (ii) satisfies the Rating Condition and (d) such Deemed Floating Asset Hedge Agreement is priced at then current market rates; *provided*, *further*, that the agreement relating to such Deemed Floating Asset Hedge Agreement contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Asset Hedge Counterparty's rights in respect of the Fixed Rate Collateral Debt Security to the funds and other property credited to the Asset Hedge Account related to such Fixed Rate Collateral Debt Security.

"**Deemed Floating Rate**" means, with respect to any Deemed Floating Rate Asset Hedge Agreement, the floating rate in excess of LIBOR that the related Asset Hedge Counterparty agrees to pay on such Deemed Floating Rate Asset Hedge Agreement at the time such hedge is executed.

"**Deemed Floating Rate Collateral Debt Security**" means a Fixed Rate Collateral Debt Security the interest rate of which is hedged into a Floating Rate Collateral Debt Security using a Deemed Floating Asset Hedge Agreement; *provided* that if applicable to the relevant Collateral Debt Security, at the time of entry into a Deemed Floating Asset Hedge Agreement, (x) the average life of such Deemed Floating Rate Collateral Debt Security would not increase or decrease by more than one year from its expected average life if it were to prepay at either 50% or 150% of the average rate of prepayment during the period of six consecutive months immediately preceding the current month (or in the case of newly issued securities, its pricing speed) and (y) such Deemed Floating Rate Collateral Debt Security has a Moody's Rating of at least "Ba1".

"**Deemed Floating Spread**" means the difference between the stated rate at which interest accrues on each Fixed Rate Collateral Debt Security that comprises a Deemed Floating Rate Collateral Debt Security (excluding all Defaulted Securities and Deferred Interest PIK Bonds) and the related Fixed Payment Rate.

"**Default**" means any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"**Defaulted Hedge Termination Payment**" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement by reason of an "Event of Default" or "Termination Event" (other than "illegality" or "tax event" due to change in law) as to which the Hedge Counterparty is the "Defaulting Party" or the sole "Affected Party" (each, as defined in the relevant Hedge Agreement).

"**Defaulted Interest**" means any interest or Commitment Fee due and payable in respect of any Note which is not punctually paid or duly provided for on the applicable Distribution Date or at Stated Maturity and which remains unpaid.  In no event shall interest which is deferred as Class C Deferred Interest, Class D Deferred Interest, Class E Deferred Interest or Class F Deferred Interest in accordance with Section 2.6(a) constitute Defaulted Interest.

"**Defaulted Security**" means any Collateral Debt Security or any other security included in the Collateral:

    (i)    with respect to which there has occurred and is continuing a payment default thereunder (without giving effect to any applicable grace period or waiver); *provided* that (x) a payment default of up to five Business Days with respect to which the Collateral Manager certifies in writing to the Trustee, in its judgment is due to non-credit and non-fraud related reasons shall not cause a Collateral Debt Security to be classified as a Defaulted Security and (y) no Collateral Debt Security shall be a Defaulted Security if all payments of principal and interest due thereon (including deferred interest and Defaulted Interest and any interest due thereon) have been paid in full in Cash;

    (ii)    with respect to which there has occurred a default (other than any payment default) which entitles the holders thereof, with the giving of notice or passage of time or both, to accelerate the maturity of all or a portion of the principal amount of such obligation, and such default has not been cured or waived;

    (iii)    as to which a bankruptcy, insolvency, or receivership proceeding has been initiated with respect to the issuer of such Collateral Debt Security, or there has been proposed or effected any distressed exchange or other debt restructuring where the issuer of such Collateral Debt Security has offered the holders thereof a new security or package of securities that, in the judgment of the Collateral Manager, either (x) amounts to a diminished financial obligation or (y) has the purpose of helping the borrower to avoid default, *provided* that a security that was Acquired in exchange for a Collateral Debt Security in connection with a distressed exchange or other debt restructuring shall not constitute a "Defaulted Security" if it satisfies the requirements of the definition of a "Collateral Debt Security" including the Eligibility Criteria in Section 12.2 at the time it is Acquired and has paid and is currently paying scheduled interest and principal;

    (iv)    as to which the Collateral Manager knows the issuer thereof is (or is reasonably expected by the Collateral Manager to be, as of the next scheduled payment distribution date) in default (without giving effect to any applicable grace period or waiver) as to payment of principal and/or interest on another obligation (and such default has not been cured or waived) which is senior to or *pari passu* in right of payment to, and (in the case of Asset-Backed Securities only) is secured by the same collateral as, such Collateral Debt Security, except that a Collateral Debt Security shall not constitute a "Defaulted Security" under this clause (iv) if the Collateral Manager, in its judgment, determines that on the next scheduled payment distribution date of such Collateral Debt Security such issuer will make payments required to be made on such Collateral Debt Security on such date and the Rating Condition with respect to Standard & Poor's is satisfied in respect of such determination; *provided*, *however*, that this exception shall not apply where the issuer of such Collateral Debt Security is (or is reasonably expected by the Collateral Manager to be) in default as to payment of principal and/or interest of another obligation that is senior to or *pari passu* in right of payment to such Collateral Debt Security;

(v)        that is received upon acceptance of an Offer for another Collateral Debt Security which Offer expressly stated that failure to accept such Offer might result in a default under the related Underlying Instruments and with respect to which no payment of interest or principal has yet been received;

(vi)        that (x) has a Moody's Rating of "Ca" or "C" or (y) is rated "CC", "D" or "SD" by Standard & Poor's or was rated "CC", "D" or "SD" by Standard & Poor's prior to having its rating withdrawn;

(vii)        that is a Defaulted Synthetic Security;

(viii)        that is a Synthetic Security (other than a Defaulted Synthetic Security) with respect to which there is a Synthetic Security Counterparty Defaulted Obligation; or

(ix)        that is a debt obligation delivered to the Issuer upon the occurrence of a Credit Event under a Synthetic Security that is not a Deliverable Obligation,

*provided* that, in respect of any Collateral Debt Security that constitutes a Defaulted Security pursuant to clause (vi) above only, such Collateral Debt Security shall not be treated as a Defaulted Security other than for purposes of calculating the Net Outstanding Portfolio Collateral Balance so long as (i) such Collateral Debt Security is not a PIK Bond with respect to which any principal has been deferred and capitalized, (ii) interest in respect of such Collateral Debt Security was paid in full on the immediately preceding payment date for such Collateral Debt Security and (iii) the Collateral Manager believes in the exercise of its judgment that the interest in respect of such Collateral Debt Security will be paid in full on the next payment date for such Collateral Debt Security.

The Collateral Manager shall be deemed to have knowledge of all information received by it that is delivered to it in accordance with Section 14.3(d) and shall be responsible under the Collateral Management Agreement (to the extent provided therein) for obtaining and reviewing information available to it in its capacity as a collateral manager of national standing (except to the extent any such information has been withheld from the Collateral Manager by the Trustee or the Issuer).  Notwithstanding the foregoing, the Collateral Manager may declare any Collateral Debt Security to be a Defaulted Security if, in the Collateral Manager's judgment, the credit quality of the issuer of such Collateral Debt Security has significantly deteriorated such that there is a reasonable expectation of payment default as of the next Due Date.

Nothing in this definition of "Defaulted Security" shall be deemed to require any employees (including any portfolio manager or credit analyst) of the Collateral Manager to obtain, use or share with or otherwise distribute to any other Person (a) any information that they would be prohibited from obtaining, using, sharing or otherwise distributing by virtue of the Collateral Manager's internal policies relating to confidential communications or (b) material non-public information.

"**Defaulted Synthetic Security**" means a Synthetic Security referencing a Reference Obligation that would, if such Reference Obligation were a Collateral Debt Security, constitute a Defaulted Security under clauses (i), (ii), (iii), (iv), (v) or (vi) of the definition thereof.

"**Defaulted Synthetic Termination Payment**" means, with respect to any Synthetic Security, any termination payment (and any accrued interest thereon) payable by the Issuer pursuant to the Underlying Instruments relating thereto (including, if applicable, the Credit Default Swap Agreement) as a result of an "Event of Default" or "Termination Event" as to which the relevant Synthetic Security Counterparty is the "Defaulting Party" or the sole "Affected Party" (each as defined in such Underlying Instruments).

"**Defeased Synthetic Security**" means any Synthetic Security that requires payment by the Issuer after the date upon which it is Granted to the Trustee and that satisfies the following:    (a) the Issuer has caused to be deposited in a Synthetic Security Counterparty Account Synthetic Security Collateral in an amount at least equal to the aggregate of all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Synthetic Security Counterparty under the Synthetic Security; (b) the Underlying Instruments relating to such Synthetic Security contain "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Synthetic Security Counterparty's rights in respect of the Synthetic Security to the funds and other property credited to the Synthetic Security Counterparty Account related to such Synthetic Security; and (c) the Underlying Instruments relating to such Synthetic Security contain provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Synthetic Security Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (each, as defined in the ISDA Master Agreement relating to such Synthetic Security) (x) the Issuer may terminate its obligations under such Synthetic Security and, upon such termination, any lien in favor of the Synthetic Security Counterparty over its related Synthetic Security Counterparty Account will be terminated and (y) the Issuer will no longer be obligated to make any payments to the Synthetic Security Counterparty with respect to such Synthetic Security.

"**Deferred Interest PIK Bond**" means a PIK Bond with respect to which payment of interest either in whole or in part has been deferred or capitalized in an amount equal to the amount of interest payable in respect of the lesser of (a) one payment period and (b) a period of six months; but only until such time as payment of interest on such PIK Bond has resumed and all capitalized or deferred interest has been paid in accordance with the terms of the Underlying Instruments.  For the purposes of the Pro Rata Payment Conditions, the occurrence and continuation of an Event of Default described in clause (viii) of the definition of "Event of Default," and the determination of the termination of the Reinvestment Period or Reinvestment Period Loss Event, a PIK Bond with a Moody's Rating of at least "Baa3" (and if such rating is "Baa3", such PIK Bond has not been placed on a watch list for possible downgrade) will not be a Deferred Interest PIK Bond unless interest, either in whole or in part, has been deferred and capitalized in an amount equal to the amount of interest payable in respect of the lesser of (x) two payment periods and (y) a period of one year.

"**Deferred Senior Funded Notes Principal**" means, (a) with respect to any Determination Date occurring prior to the Determination Date immediately following the last day of the Reinvestment Period, the sum of (i) the Deferred Senior Funded Notes Principal as of the Determination Date relating to the preceding Monthly Distribution Date that was not paid to Noteholders in respect of sub-clauses (A) through (K)(a)(I) (inclusive) of Section 11.1(ii) on such preceding Monthly Distribution Date (or, in the case of the first Determination Date, zero)

*plus* (ii) the excess (if any) of (A) the Senior Funded Note Reduction Amount for the Due Period relating to the preceding Monthly Distribution Date over (B) the amount of Principal Proceeds paid to Noteholders in respect of sub-clauses (A) through (K)(a)(II) (inclusive) of Section 11.1(ii) on such preceding Monthly Distribution Date (without duplication of payments being considered under clause (a)(i) above), and (b) with respect to any Determination Date occurring on or after the Determination Date immediately following the last day of the Reinvestment Period, the sum of (i) the Deferred Senior Funded Notes Principal as of the Determination Date relating to the preceding Monthly Distribution Date that was not paid to Noteholders in respect of sub-clauses (A) through (L)(a)(I) (inclusive) of Section 11.1(ii) on such preceding Monthly Distribution Date *plus* (ii) the excess (if any) of (A) the Senior Funded Note Reduction Amount for the Due Period relating to the preceding Monthly Distribution Date over (B) the amount of Principal Proceeds paid to Noteholders in respect of sub-clauses (A) through (L)(a)(II) (inclusive) of Section 11.1(ii) on such preceding Monthly Distribution Date (without duplication of payments being considered under clause (b)(i) above).

"**Definitive Note**" has the meaning set forth in Section 2.1(c).

"**Deliverable Obligations**" means a debt obligation that may be or is delivered to the Issuer upon the occurrence of a Credit Event under a Synthetic Security that (a) satisfies the criteria set forth in paragraphs (1) through (4), (6) through (12), (14) through (32), (34) and (35) of the Eligibility Criteria at the time such debt obligation is delivered or (b) satisfies the criteria set forth in paragraphs (7), (8) and (9) of the Eligibility Criteria at the time such debt obligation is delivered and the Rating Condition.

"**Depositary**" means, with respect to the Notes issued in the form of one or more Global Notes, the Person designated as Depositary pursuant to Section 2.2(e) or any successor thereto appointed pursuant to the applicable provisions of this Indenture.

"**Depositary Participant**" means a broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"**Designated Class A-1 Noteholder**" means any Class A-1 Noteholder which the Credit Default Swap Counterparty has designated as a Designated Class A-1 Noteholder for purposes of this definition by written notice to the Trustee, the Collateral Manager, the relevant Class A-1 Noteholder and the Rating Agencies; *provided* that such notice may be updated from time to time by the Credit Default Swap Counterparty.

"**Designated Maturity**" has the meaning set forth in Schedule B.

"**Determination Date**" means the last day of a Due Period.

"**Discount Security**" means either (a) a Collateral Debt Security (other than a Synthetic Security) purchased at a purchase price (exclusive of accrued interest) of or (b) a Synthetic Security meeting the Synthetic Security Discount Criteria where the Assigned Value at acquisition applicable to the related Reference Obligation is (i) if such Collateral Debt Security or Reference Obligation is a Floating Rate Security, if such Floating Rate Security has a Moody's Rating of "Aaa", "Aa1", "Aa2" or "Aa3" or a Standard & Poor's Rating of "AAA",

"AA+", "AA" or "AA-", is less than 92.0% of the par amount thereof, (ii) if such Collateral Debt Security or Reference Obligation is a Fixed Rate Security, if such Fixed Rate Security has a Moody's Rating of "Aaa", "Aa1", "Aa2" or "Aa3" or a Standard & Poor's Rating of "AAA", "AA+", "AA" or "AA-", less than 85.0% of the par amount thereof or (iii) if such Collateral Debt Security has a Moody's Rating of "A1" or below and a Standard & Poor's Rating of "A+" or below, less than 75.0% of the par amount thereof; *provided* that the Aggregate Principal Balance of such Collateral Debt Securities and Reference Obligations may not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; and *provided*, *further*, that (A) any such Floating Rate Security if such Floating Rate Security has a Moody's Rating of "Aaa", "Aa1", "Aa2" or "Aa3" or a Standard & Poor's Rating of "AAA", "AA+", "AA" or "AA-" the Fair Market Value of which equals or exceeds 95.0% of its principal balance for a period of 60 consecutive Business Days shall no longer be considered a "Discount Security" and (B) any such Fixed Rate Security (1) if such Fixed Rate Security has a Moody's Rating of "Aaa", "Aa1", "Aa2" or "Aa3" or a Standard & Poor's Rating of "AAA", "AA+", "AA" or "AA-" the fair market value of which equals or exceeds 90.0% of its principal balance for a period of 60 consecutive Business Days or (2) if such Fixed Rate Security has a Moody's Rating of "A1" or below and a Standard & Poor's Rating of "A+" or below the fair market value of which equals or exceeds 85.0% of its principal balance for a period of 60 consecutive Business Days shall no longer be considered a "Discount Security."

"**Discount Security Haircut Amount**" means, (1) with respect to any Collateral Debt Security that is a Discount Security (other than a Synthetic Security), an amount equal to (i) the Principal Balance of such Discount Security multiplied by (ii) a fraction (A) the numerator of which is the Principal Balance of such Discount Security at the time of purchase *minus* the purchase price (exclusive of accrued interest) of such Discount Security and (B) the denominator of which is the Principal Balance of such Discount Security at the time of purchase and (2) with respect to any Synthetic Security that is a Discount Security, an amount equal to (i) the Notional Amount of the related Reference Obligation *multiplied by* (ii) a fraction (A) the numerator of which is the Notional Amount of the related Reference Obligation at the time of purchase *minus* the Assigned Value of the related Reference Obligation and (B) the denominator of which is the Notional Amount of the related Reference Obligation at the time of purchase.

"**Discretionary Sale Security**" means any Collateral Debt Security sold in accordance with Section 12.1(a)(v).

"**Discretionary Trading Loss Event**" has the meaning set forth in Section 12.1(a)(v).

"**Discretionary Trading Percentage**" has the meaning set forth in Section 12.1(a)(v).

"**Disposition**" means any sale, termination, liquidation, assignment, participation, transfer, novation or other disposition of a Collateral Debt Security, Equity Security, U.S. Agency Security, Eligible Investment or Reserve Account Investment by the Issuer which, for purposes of determining the date of such disposition by the Issuer of any Collateral Debt Security, Equity Security, U.S. Agency Security, Eligible Investment or Reserve Account Investment shall be deemed to occur on the trade date of the transaction pursuant to which such

Collateral Debt Security, Equity Security, U.S. Agency Security, Eligible Investment or Reserve Account Investment is disposed of, assuming for these purposes, (x) settlement on the specified settlement date in accordance with the customary settlement procedures in the relevant market for such Collateral Debt Security, Equity Security, U.S. Agency Security, Eligible Investment or Reserve Account Investment and (y) the receipt by the Issuer of the Disposition Proceeds from the relevant counterparty to such transaction on such settlement date; *provided* that (1) if such transaction does not settle by its customary settlement date, such Collateral Debt Security, Equity Security, U.S. Agency Security, Eligible Investment or Reserve Account Investment will be deemed not to have been "Disposed" of by the Issuer for purposes of this definition until settlement is actually effected, (2) if at any time the Collateral Manager or the Trustee determines in good faith that the relevant transaction will not settle by its customary settlement date, then such Collateral Debt Security, Equity Security, U.S. Agency Security, Eligible Investment or Reserve Account Investment will, immediately upon such determination, be deemed not to have been "Disposed" of by the Issuer for purposes of this definition until settlement is actually effected and (3) the terms "Dispose" and "Disposition" shall be construed in accordance with the foregoing.

"**Disposition Proceeds**" means all proceeds received as a result of Dispositions of Collateral Debt Securities, Equity Securities, U.S. Agency Securities and Eligible Investments pursuant to the Indenture or an Auction or otherwise which shall: (i) include, in the case of any CDS Agreement Transaction, any termination payment made by the Credit Default Swap Counterparty if the CDS Agreement Transaction is terminated or the CDS Agreement Transaction is Disposed of prior to its scheduled maturity; and (ii) be calculated net of any termination payments payable by the Issuer and net of any reasonable out of pocket expenses of the Issuer, the Collateral Manager or the Trustee in connection with any such Disposition.

"**Distribution**" means any payment of principal, interest or fee or any dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"**Distribution Date**" means any Monthly Distribution Date or Quarterly Distribution Date, as the context may require. For the avoidance of doubt, references herein to a Quarterly Distribution Date shall be deemed to include the Monthly Distribution Date occurring on the same date as such Quarterly Distribution Date, and references herein to a Monthly Distribution Date occurring in the months of March, June, September and December of each year shall be deemed to include the Quarterly Distribution Dates occurring on the same date as such Monthly Distribution Date.

"**Dollar**" or "**U.S.$**" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for all debts, public and private.

"**DTC**" means The Depository Trust Company, a New York corporation.

"**Due Date**" means each date on which a Distribution is due on a Pledged Security.

"**Due Period**" means, with respect to any Distribution Date, the period commencing on the day immediately following the fifth Business Day prior to the immediately

preceding Distribution Date (or on the Closing Date, in the case of the Due Period relating to the first Distribution Date) and ending on the fifth Business Day prior to such Distribution Date (without giving effect to any Business Day adjustment thereto), except that, in the case of the Due Period that is applicable to the Distribution Date relating to the Stated Maturity of the Notes, such Due Period shall end on the day preceding the Stated Maturity.

"**Eligibility Criteria**" has the meaning set forth in Section 12.2.

"**Eligible Investment Income**" has the meaning given to such term in Section 2.2(c).

"**Eligible Investments**" means any Dollar-denominated investment that is one or more of the following (and may include investments for which the Trustee, the Collateral Manager and/or their respective Affiliates provide services or receives compensation):

(i)    Cash;

(ii)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States;

(iii)    demand and time deposits in, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a credit rating of "AAA" by Standard & Poor's and not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's), or "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's (or "A-1" with respect to overnight time deposits offered by LaSalle Bank National Association); *provided* that in the case of commercial paper and short term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long term credit rating of not less than "AAA" by Standard & Poor's;

(iv)    unleveraged repurchase obligations with respect to (i) any security described in clause (b) above or (ii) any other Registered security issued or guaranteed by an agency or instrumentality of the United States (in each case without regard to the stated maturity of such security), in either case entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long term rating is not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and "AAA" by Standard & Poor's or whose short term

credit rating is "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's at the time of such investment; *provided* that (i) in each case, the issuer thereof must have at the time of such investment a long term credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long term credit rating of "AAA" by Standard & Poor's;

(v)   Registered debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that have a credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and "AAA" by Standard & Poor's;

(vi)   commercial paper or other short term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's; *provided* that (i) in each case, the issuer thereof must have at the time of such investment a long term credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's), and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long term credit rating of "AAA" by Standard & Poor's;

(vii)   Reinvestment Agreements issued by any bank (if treated as a deposit by such bank), or a Registered Reinvestment Agreement issued by any insurance company or other corporation or entity organized under the laws of the United States or any state thereof, in each case, that has a credit rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's; *provided* that (i) in each case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of "AAA" by Standard & Poor's; and

(viii)   investments in any money market fund or similar investment vehicle having at the time of investment therein the highest credit rating assigned by each of the Rating Agencies; *provided* that any such fund is rated "Aaa" by Moody's; *provided further*, that either (i) such fund or vehicle is formed and has its principal office outside the United States or (ii) payments in respect of such fund or vehicle are not subject to any material amount of deduction or withholding in respect of tax under sections 871 and 881 of the Code, taking into account the American Jobs Creation Act of 2004 and any amendments promulgated hereafter;

*provided* that none of the foregoing investments or securities shall constitute Eligible Investments if such investment or security has a Standard & Poor's Rating with a "p", "pi", "q", "r", or "t" subscript;

and, in each case (other than clause (i)), (i) with a stated maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Distribution Date next following the Due Period in which the date of investment occurs and (ii) either shall be treated as indebtedness for U.S. federal income tax purposes and is not a United States real property interest as defined under Section 897 of the Code, or the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or Sidley Austin LLP or an Opinion of Counsel of other nationally-recognized U.S. tax counsel experienced in such matters to the effect that such investment shall not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income tax basis; *provided* that Eligible Investments may not include (i) any Interest-Only Security, (ii) any security purchased at a price in excess of 100% of the par value thereof, (iii) any investment the income from which is or will be subject to deduction or withholding for or on account of any withholding or similar tax unless the payor is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required, (iv) any security whose repayment is subject to substantial non-credit related risk as determined in the judgment of the Collateral Manager, (v) any Asset-Backed Security, (vi) except with respect to investments described in clause (c), any Floating Rate Collateral Debt Security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index *plus* a spread or (vii) any security that is the subject of an Offer.  Eligible Investments may be obligations of any of, and may be purchased from, the Trustee, the Collateral Manager and their respective Affiliates, and may include obligations for which the Trustee or an Affiliate thereof or the Collateral Manager or an Affiliate thereof receives compensation for providing services (including the Putnam Prime Money Market Fund or a similar fund managed by the Collateral Manager or an Affiliate thereof).

"**End Value**" has the meaning set forth in Section 9.5(iv).

"**Entitlement Holder**" has the meaning set forth in Section 8-102(a)(7) of the UCC.

"**Entitlement Order**" has the meaning set forth in Section 8-102(a)(8) of the UCC.

"**Equity Security**" means any equity security Acquired by the Issuer in exchange for a Defaulted Security.

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

08-13555-mg    Doc 13327-1    Filed 12/08/10    Entered 12/08/10 17:56:34    Exhibit
Pg 39 of 321

"**Event of Default**" has the meaning set forth in <u>Section 5.1</u>.

"**Excel Default Model Input File**" means an electronic spreadsheet file in Microsoft excel format to be provided to Standard and Poor's, which file shall include the balance of Cash and Eligible Investments in each Account and the following information (to the extent such information is not confidential) with respect to each Collateral Debt Security:

(i)    the name and country of domicile of the issuer thereof and the particular issue held by the Issuer,

(ii)    the CUSIP or other applicable identification number associated with such Collateral Debt Security,

(iii)    the par value of such Collateral Debt Security,

(iv)    the type of issue (including, by way of example, whether such Collateral Debt Security is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee,

(v)    a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Security is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR),

(vi)    the coupon (in the case of a Collateral Debt Security which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Obligation which bears interest at a floating rate),

(vii)    the Standard and Poor's Industry Classification Group for such Collateral Debt Security,

(viii)    the stated maturity date of such Collateral Debt Security,

(ix)    the Standard and Poor's Rating of such Collateral Debt Security or the issuer thereof, as applicable,

(x)    the priority category assigned by Standard and Poor's to such Collateral Debt Security, if available, and

(xi)    such other information as the Trustee may determine to include in such file.

"**Excepted Property**" means (a) the U.S.$250 of capital contributed by the owners of the Issuer's ordinary shares in accordance with the Issuer Charter and U.S.$250 representing a profit fee to the owners of the Issuer's ordinary shares, together with, in each case, any interest accruing thereon and the bank account in which such Cash is held, (b) the shares of the Co-Issuer and any assets of the Co-Issuer and (c) the Preference Share Distribution Account and any funds credited thereto or deposited therein.

"**Excepted Securities**" means, for purposes of Part II of <u>Schedule D</u>, (a) cash flow structured finance obligations not rated by Standard & Poor's the cash flow of which is primarily from non-U.S. sources, (b) collateralized bond obligations the underlying collateral of which consists primarily of collateralized debt obligations, (c) collateralized bond obligations the underlying collateral of which is distressed debt, (d) obligations secured by contingent deferred sales charges, asset-based sales charges, shareholder servicing fees and other similar fees associated with the marketing and distribution of interests in, and management and servicing of, mutual funds registered under the Investment Company Act, (e) Catastrophe Bonds, (f) the first loss tranche of any securitization, (g) synthetic obligations (other than those expressly provided for in this Indenture), (h) synthetic collateralized debt obligations (other than those expressly provided for in this Indenture), (i) combination securities, (j) Re-REMICs, (k) market value collateralized debt obligations, (l) net interest margin securities, (m) Project Finance Securities, (n) Principal-Only Securities, (o) Interest-Only Securities or (p) Structured Settlement Securities.

"**Excess Notional Amount Liquidity**" means, with respect to any date of determination, the excess, if any, of (a) the sum of (i) the Remaining Unfunded Facility Commitment *plus* (ii) the Reserve Account Balance as of such date over (b) the aggregate Remaining Exposure under all CDS Agreement Transactions as of such date, as the same may be adjusted from time to time as provided herein.

"**Excess Reserve Account Assets**" means, at any time, the par value of that portion of Reserve Account Investments, application of which for any purpose permitted herein would not cause the Excess Notional Amount Liquidity to be reduced below zero.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" has the meaning set forth in the Granting Clauses.

"**Expense Account**" means the Securities Account designated the "Expense Account" and established in the name of the Trustee pursuant to <u>Section 10.4</u>.

"**Exposure Reduction Amount**" means, with respect to any time on any date after the last day of the Reinvestment Period, the greater of (i) zero and (ii) the sum of (a) the aggregate Principal Amortizations since the last day of the Reinvestment Period plus (b) the aggregate Notional Amount of the CDS Agreement Transactions which terminated since the last day of the Reinvestment Period.

"**Fair Market Value**" means, in respect of any Defaulted Security, Deferred Interest PIK Bond or Discount Security at any time, (i) the average of three *bona fide* bids for such Collateral Debt Security obtained by the Collateral Manager at such time from any three nationally-recognized dealers, which dealers are independent from one another and from the Collateral Manager, or (ii) if the Collateral Manager is unable to obtain three such bids, the lesser of two *bona fide* bids for such Collateral Debt Security or Eligible Investment obtained by the Collateral Manager at such time from any two nationally-recognized dealers acceptable to the Collateral Manager, which dealers are independent from one another and from the Collateral Manager, or (iii) if the Collateral Manager is unable to obtain two such bids, the *bona fide* bid for

such Collateral Debt Security or Eligible Investment obtained by the Collateral Manager at such time from any nationally-recognized dealer acceptable to the Collateral Manager, which dealer is independent from the Collateral Manager, or (iv) in the event the Collateral Manager is unable to obtain one such bid, the price on such date provided to the Collateral Manager by an independent pricing service reasonably selected by the Collateral Manager, or (v) in the event the Collateral Manager cannot in good faith determine the market value of such Collateral Debt Security or Eligible Investment using commercially reasonable efforts to apply the methods specified in clauses (i) through (iv) above, the Fair Market Value of such Collateral Debt Security shall be deemed to be the lesser of (x) the price on such date as determined in good faith by the Collateral Manager and (y) the Applicable Recovery Rate thereof; *provided* that the Fair Market Value of any Defaulted Security, Deferred Interest PIK Bond or Discount Security determined pursuant to clause (iv) hereof that cannot be determined pursuant to clauses (i), (ii), (iii) or (iv) for a period of 30 consecutive days shall be deemed to be zero; *provided, further*, that the Collateral Manager will only determine the "Fair Market Value" pursuant to this clause (v) if (i) the Collateral Manager determines the "Fair Market Value" of such Collateral Debt Security in the manner described in clause (v) for other purposes as well and (ii) the Collateral Manager assigns the same "Fair Market Value" to such Collateral Debt Security for all other purposes.

"**FICO Score**" means the credit score generated by the credit scoring models developed by Fair, Isaac & Company, as provided by the Collateral Manager.

"**Financial Asset**" has the meaning set forth in Section 8-102(a)(9) of the UCC.

"**Financing Statement**" means a financing statement relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"**Fixed Payment Rate**" means, with respect to any Deemed Floating Asset Hedge Agreement, the fixed rate that the Issuer agrees to pay on such Deemed Floating Asset Hedge Agreement at the time such swap is executed.

"**Fixed Rate Collateral Debt Security**" means any Collateral Debt Security other than a Floating Rate Collateral Debt Security or Hybrid Security that is currently paying a floating rate.

"**Floating Payment**" means any "Floating Amount" payable by the seller of protection under (and as defined in) a CDS Agreement Transaction or the Underlying Instruments relating to a Synthetic Security structured as a credit default swap.

"**Floating Rate Collateral Debt Security**" means any Collateral Debt Security other than a Hybrid Security that is currently paying a fixed rate or Synthetic Security (a) that is expressly stated to bear interest based upon a floating rate index for Dollar denominated obligations commonly used as a reference rate in the United States or the United Kingdom or (b) the interest payments on which are derived primarily from underlying assets that bear interest based on a floating rate index

"**Flow-Through Investment Vehicle**" means any entity (a) that would be an investment company but for the exception in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act and the amount of whose investment in the Notes (including in all Classes of the

Notes) and Preference Shares exceeds 40.0% of its total assets (determined on a consolidated basis with its subsidiaries), (b) as to which any Person owning any equity or similar interest in the entity has the ability to control any investment decision of such entity or to determine, on an investment by investment basis, the amount of such Person's contribution to any investment made by such entity, (c) that was organized or reorganized for the specific purpose of acquiring a Note or Preference Share or (d) as to which any Person owning an equity or similar interest in which was specifically solicited to make additional capital or similar contributions for the purpose of enabling such entity to purchase a Note or Preference Share.

"**Form-Approved Deemed Floating Asset Hedge Agreement**" means a Deemed Floating Asset Hedge Agreement with respect to which (a) the related Fixed Rate Collateral Debt Security could be purchased by the Issuer without any required action by the Rating Agencies and (b) the documentation of which conforms in all respects other than changes relating to the identity, nature and jurisdiction of the counterparty and the economic terms of the relevant transaction (as certified to the Trustee by the Collateral Manager) to a form which each of the Rating Agencies has confirmed within 10 days in writing of their receipt thereof will not require satisfaction of the Rating Condition if it is used as the basis for a Deemed Floating Asset Hedge Agreement for purposes hereof; *provided* that (i) either Rating Agency may revoke its consent to the use of a Form-Approved Deemed Floating Asset Hedge Agreement upon 30 days' prior written notice to the Trustee and the Collateral Manager (*provided* that such revocation shall not affect any existing Deemed Floating Asset Hedge Agreement) and (ii) the Issuer shall provide the Rating Agencies with a copy of each Deemed Floating Asset Hedge Agreement entered into pursuant to any Form-Approved Deemed Floating Asset Hedge Agreement promptly following the execution thereof.

"**Form-Approved Credit Default Swap Agreement**" means a 1992 or 2002 ISDA Master Agreement (Multicurrency—Cross Border) entered into by the Issuer for the purpose of effecting credit default swaps, the documentation of which conforms in all respects (other than changes relating to the identity, nature and jurisdiction of the counterparty and the economic terms of the relevant transaction) to a form as to which the Rating Condition was previously satisfied (as certified to the Trustee by the Collateral Manager); *provided* that (i) any Form-Approved Credit Default Swap Agreement shall be approved by each of the Rating Agencies prior to the initial use thereof, (ii) any material amendment to any Form-Approved Credit Default Swap Agreement must satisfy the Rating Condition, (iii) either Rating Agency may cancel a Form-Approved Credit Default Swap Agreement (but not any Credit Default Swap Agreement previously entered into by the Issuer) by 30 days' prior written notice to the Trustee and the Collateral Manager and (iv) the Issuer shall provide the Rating Agencies with a copy of each Credit Default Swap Agreement entered into pursuant to any Form-Approved Credit Default Swap Agreement promptly following the execution thereof.  As of the date of this Indenture and until consent is revoked by the Rating Agencies, an agreement in the form attached hereto as Exhibit N and the Credit Default Swap Agreement shall be a Form-Approved Credit Default Swap Agreement.

"**Form-Approved Synthetic Security**" means a Synthetic Security (including a CDS Agreement Transaction) (a)(i) the Reference Obligation of which, if it were a Collateral Debt Security, could be purchased by the Issuer without satisfaction of the Rating Condition or with respect to which the Rating Condition has been satisfied or (ii) the Reference Obligation of

which would satisfy clause (i) but for (x) the currency in which it is payable, and such Synthetic Security is payable in U.S. Dollars and does not expose the Issuer to currency risk or (y) the frequency of the scheduled periodic payments of interest on such Reference Obligation, (b) entered into pursuant to the Credit Default Swap Agreement or other documentation which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the Notional Amount, the effective date, the termination date and other similarly necessary changes) to a form previously approved in writing by the Rating Agencies for use by the Issuer, *provided* that any amendment to a Form-Approved Synthetic Security and any new Form-Approved Synthetic Security must be approved by Standard & Poor's (c) for which the Issuer has provided to each of the Rating Agencies notice of the purchase of such Synthetic Security within five days after such purchase, requesting the relevant Rating Agency's determination of the Moody's Applicable Recovery Rate and Moody's Rating or Standard & Poor's Applicable Recovery Rate and Standard & Poor's Rating, as applicable, with respect to such Synthetic Security; *provided* that either of the Rating Agencies may revoke its consent to the use of a Form-Approved Synthetic Security with respect to any prospective purchase by the Issuer of a Synthetic Security upon 30 days' prior written notice to the Trustee and Collateral Manager (*provided* that such revocation shall not affect the continuing effectiveness of any Synthetic Security already entered into under such cancelled Form-Approved Synthetic Security or the determination of the Moody's Recovery Rate, Standard & Poor's Recovery Rate, Standard & Poor's Rating and Moody's Rating with respect to any such Synthetic Security); and *provided*, *further*, that the Credit Default Swap Agreement will not be required to satisfy clause (c) above.

"**Funded Amount**" means with respect to (a) any funded Synthetic Security, the excess, if any of (1) the aggregate Notional Amount theretofore paid by the Issuer to the related Synthetic Security Counterparty or standing to the credit of the applicable Synthetic Security Counterparty Account in favor of the applicable Synthetic Security Counterparty in respect thereof over (2) the principal or Notional Amounts theretofore deposited as collateral by the related Synthetic Security Counterparty to the Issuer in respect thereof and (b) any Synthetic Security that is an unfunded Synthetic Security, zero.

"**Funded Notes**" means, collectively, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes.

"**GIC**" means the guaranteed investment contract, which may be entered into after the Closing Date among the Issuer, the GIC Provider and the Trustee.

"**GIC Payment Date**" means each Monthly Distribution Date on which payments are due and payable on a GIC.

"**GIC Provider**" means the entity that enters into a guaranteed investment contract with the Issuer and the Trustee.

"**Global Notes**" means the Regulation S Global Notes and the Restricted Global Notes.

"**Grant**" means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge or create a security interest in and right of set-off

against, deposit, set over and confirm.  A Grant of the Pledged Securities, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal, interest and fee payments in respect of the Pledged Securities or such other instruments, and all other Cash payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"**Hedge Agreements**" means the Interest Rate Hedge Agreements and the Deemed Floating Asset Hedge Agreements.

"**Hedge Counterparty**" means an Interest Rate Hedge Counterparty or an Asset Hedge Counterparty that in each case satisfies the Hedge Counterparty Ratings Requirement; *provided* that for purposes of Article V, Section 7.16 and Article VIII of this Indenture, the terms "Hedge Counterparty" shall not include any Asset Hedge Counterparty.

"**Hedge Counterparty Collateral Account**" means each Securities Account designated a "Hedge Counterparty Collateral Account" and established in the name of the Trustee pursuant to Section 16.1(d).

"**Hedge Counterparty Ratings Requirement**" means, with respect to any Hedge Counterparty (i) (A) the long-term senior unsecured debt of such party is rated at least "A1" by Moody's (and if rated "A1", such rating is not on watch for possible downgrade by Moody's), if such party has a long term rating only or (B) the long-term senior unsecured debt of such party is rated at least "A2" by Moody's (and if rated "A2" is not on watch for possible downgrade by Moody's); *provided* that with respect to clauses (i)(A) and (i)(B), any Hedge Counterparty shall have provisions for posting collateral satisfactory to Moody's in respect of its contingent obligations under a Credit Support Annex based on the form of the ISDA Credit Support Annex, which shall be entered into on or prior to the Closing Date or in conjunction with entering into a Deemed Floating Asset Hedge Agreement or Form-Approved Deemed Floating Asset Hedge Agreement if such agreement is executed after the Closing Date; (ii) the short-term debt of such party is rated "P-1" by Moody's (and is not on watch for possible downgrade by Moody's) and (iii) the short-term unsecured debt of such party is rated at least "A-1" by Standard & Poor's or, if no such short-term rating is available, the long-term senior unsecured debt of such party is rated at least "A+" by Standard & Poor's; *provided* that should a Rating Agency effect an overall downward adjustment of its required ratings for hedge counterparties in collateralized debt obligation transactions, then the applicable Hedge Counterparty Ratings Requirement will be subject to satisfaction of the Rating Condition with respect to the applicable Rating Agency.

"**Highest Auction Price**" means, with respect to an Auction Call Redemption, the greater of (a) the highest price bid by any Listed Bidder for all of the Collateral Debt Securities and (b) the sum of the highest prices bid by one or more Listed Bidders for each Subpool.  In each case, the price bid by a Listed Bidder shall be the Dollar amount which the Collateral Manager certifies to the Trustee based on the Collateral Manager's review of the bids, which certification shall be binding and conclusive.

"**Holder**" means a Noteholder and/or a Preference Shareholder as the context may require.

"**Hybrid Security**" means any Collateral Debt Security (including but not limited to Asset-Backed Securities the payments on which depend on the cash flow from adjustable rate mortgages) that, pursuant to its Underlying Instruments, bears interest at a fixed rate for a limited period of time, after which it bears interest based upon a floating rate index for Dollar-denominated obligations commonly used as a reference rate in the United States or the United Kingdom.

"**Indenture**" means this instrument and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"**Independent**" means, as to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions and (iii) if required to deliver an opinion or certificate to the Trustee pursuant to this Indenture, states in such opinion or certificate that the signer has read this definition and that the signer is Independent within the meaning hereof.  "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

"**Indorsement**" has the meaning set forth in Section 8-102(a)(11) of the UCC.

"**Initial Purchaser**" means each of Lehman Brothers Inc. and Lehman Brothers International (Europe).

"**Institutional Accredited Investor**" mean an institutional "accredited investor" meeting the description set forth in Rule 501(a)(1), (2), (3) or (7) of Regulation D.

"**Instruction**" has the meaning set forth in Section 8-102(a)(12) of the UCC.

"**Instrument**" has the meaning set forth in Section 9-102(a)(47) of the UCC.

"**Interest Collection Account**" means the Securities Account designated the "Interest Collection Account" and established in the name of the Trustee pursuant to Section 10.2(a).

"**Interest Distribution Amount**" means, (i) with respect to any Class of Notes other than the Class A-1 Notes, on any Distribution Date, the sum of (1) the aggregate amount of interest accrued at the Note Interest Rate (calculated pursuant to Section 7.15(b)) for such Class during the Interest Period ending immediately prior to such Distribution Date on the Aggregate Outstanding Amount of the Notes of such Class on the first day of such Interest Period (after

giving effect to any redemption of the Notes of such Class or other payment of principal of the Notes of such Class on any preceding Distribution Date *plus* (2) any Defaulted Interest in respect of the Notes of such Class and accrued interest thereon, to the extent such Defaulted Interest was not paid when due and (ii) with respect to the Class A-1 Notes, the sum of (1) the Borrowings Interest Amount for such Interest Period *plus* (2) any Defaulted Interest in respect of any accrued and unpaid Borrowings Interest Amount and accrued interest thereon, to the extent such Defaulted Interest was not paid when due.   The Interest Distribution Amount with respect to the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes shall not include any Class C Deferred Interest, Class D-1 Deferred Interest, Class D-2 Deferred Interest, Class E Deferred Interest or Class F Deferred Interest (but shall include interest on such Class C Deferred Interest, Class D-1 Deferred Interest, Class D-2 Deferred Interest, Class E Deferred Interest and Class F Deferred Interest).

"**Interest Equalization Account**" has the meaning set forth in Section 10.2(o).

"**Interest-Only Security**" means any Collateral Debt Security that does not provide for payment or repayment of a stated principal amount in one or more installments on or prior to the date two Business Days prior to the Stated Maturity of such Collateral Debt Security.

"**Interest Period**" means (a) in the case of the initial Interest Period, the period from, and including, the Closing Date (or, in the case of a Class A-1 Note, the date of the relevant Borrowing or Deemed Borrowing) to, but excluding, the first Monthly Distribution Date and (b) thereafter, the period from, and including, the Monthly Distribution Date immediately following the last day of the immediately preceding Interest Period to, but excluding, the next succeeding Monthly Distribution Date.  Notwithstanding the foregoing, with respect to the Class A-1 Notes, the term "Interest Period" shall include Alternate Interest Periods with respect to any Intraperiod Payment Amounts.

"**Interest Proceeds**" means, with respect to any Due Period, the sum (without duplication) of: (1) all payments of interest (including (a) payments of fixed premium amounts in respect of Synthetic Securities (including CDS Agreement Transactions) (net of premium payments with respect to related Short Synthetic Securities but excluding amounts that are included in Principal Proceeds pursuant to clause (13) of the definition thereof), (b) any Interest Reimbursements received by the Issuer in respect of any CDS Agreement Transactions or other Synthetic Securities structured as credit default swaps and all payments received by the Issuer under a Short Synthetic Security in respect of a failure to pay interest under the related Reference Obligation, and (c) the portion of any Sale Proceeds received in respect of the Sale or other Disposition of any Synthetic Security that is attributable to accrued but unpaid fixed premium amounts payable by the related Synthetic Security Counterparty) on the Collateral Debt Securities (other than Collateral Debt Securities that pay interest less frequently than quarterly) received in Cash by the Issuer during such Due Period or (other than with respect to Defaulted Securities and Deferred Interest PIK Bonds) in the commercially reasonable business judgment of the Collateral Manager, expected to be received in Cash by the Issuer during such Due Period and the portion of the interest on Collateral Debt Securities that pay interest less frequently than monthly received in Cash by the Issuer during such Due Period that is to be deposited in the Interest Collection Account during such Due Period pursuant to the Quarterly Interest Reserve Schedule (in each case excluding (w) payments in respect of accrued interest to the extent these

are included in Principal Proceeds pursuant to clause (7) of the definition thereof, (x) payments in respect of deferred interest on Deferred Interest PIK Bonds previously capitalized and treated as "Principal Proceeds" pursuant to clause (8) of the definition thereof, (y) interest on any Collateral Debt Security that is required to be paid to an Asset Hedge Counterparty in accordance with the terms of a Deemed Floating Asset Hedge Agreement and (z) payments of interest in respect of Defaulted Securities and Written-Down Securities (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security does not exceed the original principal amount of such Defaulted Security or Written-Down Security)), together with the amount, if any, released from the Interest Equalization Account for deposit into the Interest Collection Account with respect to such Due Period; (2) all amounts to be transferred by the Trustee from the Quarterly Interest Reserve Account to the Interest Collection Account on the third Business Day prior to the Distribution Date relating to such Due Period pursuant to the Quarterly Interest Reserve Schedule; (3) all accrued interest received in Cash by the Issuer with respect to Collateral Debt Securities sold by the Issuer (excluding payments in respect of accrued and unpaid interest on any Credit Improved Security, Credit Risk Security or any Collateral Debt Security sold pursuant to a discretionary Sale that, in each case, is sold and reinvested at the option of the Collateral Manager in any substitute Collateral Debt Security, Sale Proceeds received in respect of Defaulted Securities and Written-Down Securities (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security does not exceed the original principal amount of such Defaulted Security or Written-Down Security) and payments in respect of accrued interest included in Principal Proceeds pursuant to clause (7) of the definition of Principal Proceeds); (4) all payments of interest (including any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) on Reserve Account Investments, Eligible Investments or U.S. Agency Securities in the Collection Accounts, the Interest Equalization Account, the Quarterly Interest Reserve Account, the Reserve Account received in Cash by the Issuer during such Due Period and all payments of principal, including repayments, on Eligible Investments purchased with amounts from the Interest Collection Account received by the Issuer during such Due Period; (5) all amendment and waiver fees, all late payment fees, and all other fees and commissions received in Cash by the Issuer during such Due Period in connection with such Collateral Debt Securities, Eligible Investments, Reserve Account Investments and U.S. Agency Securities (other than fees and commissions received in respect of Defaulted Securities and Written-Down Securities, to the extent these are included in Principal Proceeds pursuant to clause (4) of the definition thereof (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security does not exceed the original principal amount of such Defaulted Security or Written-Down Security) and yield maintenance payments included in Principal Proceeds pursuant to clause (9) of the definition thereof); (6) all payments received pursuant to any Hedge Agreement or any Deemed Floating Asset Hedge Agreement (excluding any payments received by the Issuer by reason of an Event of Default or Termination Event (as defined in the relevant Hedge Agreement) that are required to be used for the purchase of a replacement Hedge Agreement) less any deferred premium payments payable by the Issuer under such Hedge Agreement during such Due Period; (7) any carry paid to the Issuer in Cash with respect to Collateral Debt Securities Acquired on behalf of the Issuer in connection with the warehousing arrangements entered into prior to the Closing Date; (8) any amounts received in respect of Negative Amortization Capitalization Amounts for such Due Period; (9) all payments

of interest on Collateral Debt Securities received in Cash by the Issuer to the extent that they represent accrued interest purchased with Interest Proceeds; and (10) with respect to the first Distribution Date, any Excess Reserve Account Assets standing to the credit of the Reserve Account on the Ramp-Up Completion Date (x) necessary for payment of the Class E Payment Allocation and the Class F Payment Allocation pursuant to clauses (S), (W) and (Y) of Section 11.1(i) (but only to the extent that application of this clause does not cause the Net Outstanding Portfolio Collateral Balance to be reduced below U.S.$1,500,000,000) or (y) that the Collateral Manager deems to be Interest Proceeds if the aggregate par amount of Collateral Debt Securities held by the Issuer *plus* any Principal Proceeds received in respect of any such Collateral Debt Securities is equal to or greater than U.S.$1,500,000,000; *provided* that (A) Interest Proceeds shall in no event include the U.S.$250 of capital contributed by the owners of the ordinary shares of the Issuer in accordance with the Issuer Charter and U.S.$250 representing a profit fee to the owner of the Issuer's ordinary shares, (B) if the presence of a legal or business holiday, whether applicable to the Notes or Credit Default Swaps, in each case, in accordance with this Indenture or applicable to any Collateral Debt Security in accordance with its Underlying Instruments, causes a scheduled distribution on any Collateral Debt Security or other security held as Collateral to be received in the period between the end of the Due Period in which such payment would otherwise have been received and the related Distribution Date, such payment will be deemed to have been received during such Due Period and (C) for purposes of clause (8) of this definition, at any time when any Negative Amortization Capitalization Amounts have accrued on a Negative Amortization Security, (x) first, unscheduled payments of principal in respect thereof and (y) second (but only if the related payment report delivered to investors indicates that the aggregate Negative Amortization Capitalization Amount (if any) in respect thereof has remained the same or decreased in the related reporting period), scheduled payments of principal in respect thereof shall be deemed to be applied to the payment of such aggregate Negative Amortization Capitalization Amount and therefore constitute "Interest Proceeds" for purposes of this definition until such aggregate Negative Amortization Capitalization Amount has been reduced to zero.

"**Interest Rate Hedge Agreement**" means the one or more interest rate protection agreements, each consisting of an interest rate swap and/or an interest rate cap entered into between the Issuer and an Interest Rate Hedge Counterparty as of the Closing Date, as amended from time to time, and any replacement hedge agreement on substantially identical terms (or on such other terms satisfying the Rating Condition) and entered into pursuant to Section 16.1. Each Interest Rate Hedge Agreement shall provide that any amount payable to the Interest Rate Hedge Counterparty thereunder shall be subject to the Priority of Payments.

"**Interest Rate Hedge Counterparty**" means (a) any counterparty to an Interest Rate Hedge Agreement that satisfies the Hedge Counterparty Ratings Requirement as of the date of the related Interest Rate Hedge Agreement or (b) any permitted assignee or successor under an Interest Rate Hedge Agreement with respect to which the Rating Condition has been satisfied.

"**Interest Reimbursement**" means, with respect to any Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction), an "Interest Shortfall Reimbursement Payment Amount" under and as defined in the Credit Default Swap Agreement or related Underlying Instruments (as applicable) or any similar amount (howsoever described).

"**Interpolated LIBOR**" has the meaning set forth in Schedule B.

"**Intraperiod Interest Amount**" means, for each Intraperiod Payment Amount, an amount equal to the product of (i) the Intraperiod Payment Amount, (ii) Interpolated LIBOR plus 0.32% and (iii) the number of days in the Alternate Interest Period divided by 360.  For the avoidance of doubt, a Borrowing or Deemed Borrowing shall not be an Intraperiod Payment Amount if such payment is made on any Distribution Date.

"**Intraperiod Payment Amount**" means any Permitted Use payment paid under the Class A-1 Note Purchase Agreement to the Issuer (including any withdrawals from the Class A-1 Prepayment Account for such purpose) from (but excluding) any Distribution Date to (but excluding) the immediately succeeding Distribution Date.

"**Investment Company Act**" means the United States Investment Company Act of 1940, as amended, and the rules thereunder.

"**Issue**" or "**Issue of Collateral Debt Securities**" means Collateral Debt Securities issued by the same issuer, secured by the same collateral pool having the same terms and conditions (as to, among other things, coupon, maturity, security and subordination).

"**Issuer**" means Pyxis ABS CDO 2007-1 Ltd., an exempted company with limited liability incorporated and existing under the law of the Cayman Islands.

"**Issuer Charter**" means the Memorandum and Articles of Association of the Issuer, filed under the Companies Law (2004 Revision) of the Cayman Islands, as modified and supplemented and in effect from time to time and certain resolutions passed by the Directors of the Issuer prior to the Closing Date.

"**Issuer Collateral Account**" has the meaning set forth in Section 10.2(n).

"**Issuer Order**" and "**Issuer Request**" mean, respectively, a written order or a written request (which may be in the form of a standing order or request), in each case dated and signed in the name of the Issuer by an Authorized Officer of the Issuer and (if appropriate) the Co-Issuer, or by an Authorized Officer of the Collateral Manager where permitted pursuant to this Indenture or the Collateral Management Agreement, as the context may require or permit.

"**Junior Facility Amount**" means U.S.$0.

"**Knowledgeable Employee**" has the meaning set forth in Rule 3c-5 promulgated under the Investment Company Act.

"**LIBOR**" means the London interbank offered rate as calculated in accordance with Schedule B.

"**LIBOR Business Day**" has the meaning set forth in Schedule B.

"**LIBOR Determination Date**" has the meaning set forth in Schedule B.

"**Listed Bidders**" has the meaning set forth in Schedule E.

"**London Banking Day**" has the meaning set forth in Schedule B.

"**Majority**" means, with respect to any Class or Classes of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount (including, in the case of the Class A-1 Notes, the Remaining Unfunded Facility Commitment) of the Notes of such Class or Classes, as the case may be.

"**Majority-in-Interest of Preference Shares**" means the holders of more than 50% of the issued and outstanding Preference Shares.

"**Margin Stock**" means "margin stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System.

"**Maturity**" means, with respect to any Note, the date on which all Outstanding unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"**Maximum Class A-1 Facility Funding Commitment**" means, in the aggregate, U.S.$945,000,000 and, with respect to any holder of Class A-1 Notes, the Maximum Class A-1 Facility Funding Commitment is the portion of such amount represented by the aggregate principal amount of the Class A-1 Notes held by such Noteholder (whether at the time funded or unfunded) which such holder may be obligated to advance from time to time to the Issuer under the Class A-1 Note Purchase Agreement.

"**Measurement Date**" means any of the following: (i) the Closing Date; (ii) the Ramp-Up Completion Date; (iii) any date after the Ramp-Up Completion Date upon which the Issuer enters into a commitment to Acquire or Dispose of any Collateral Debt Security; (iv) any date after the Ramp-Up Completion Date on which a Collateral Debt Security becomes a Defaulted Security; (v) each Determination Date; and (vi) with written notice of two Business Days to the Issuer and the Trustee, any other Business Day that either Rating Agency or a Majority of any Class of Notes requests be a "Measurement Date"; *provided* that if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the next succeeding day that is a Business Day.

"**Monthly Asset Amount**" means, with respect to any Monthly Distribution Date, the Net Outstanding Portfolio Collateral Balance on the first day of the Calculation Period commencing on the preceding Monthly Distribution Date or, in the case of the first Calculation Period, on the Closing Date.

"**Monthly Distribution Date**" means the 6th day of every calendar month, beginning on July 6, 2007; *provided* that (i) the final Monthly Distribution Date shall be the Stated Maturity or such earlier date upon which the Notes and the Preference Shares are redeemed and (ii) if any such date is not a Business Day, the relevant Monthly Distribution Date will be the next succeeding Business Day.

"**Monthly Report**" has the meaning set forth in Section 10.7(a).

"**Moody's**" means Moody's Investors Service, Inc. and any successor or successors thereto.

"**Moody's Asset Correlation Factor**" is a single number that is determined in accordance with the correlation methodology provided to the Collateral Manager and the trustee by Moody's.

"**Moody's Asset Correlation Test**" means a test that is satisfied on any Measurement Date if the Moody's Asset Correlation Factor on such Measurement Date is equal to or less than the number set forth in the column entitled "Maximum Moody's Asset Correlation Factor" in the "Moody's Correlation WARF Matrix" based upon the case or interpolation of appropriate cases chosen by the Collateral Manager as currently applicable to the Collateral Debt Securities; *provided*, that the calculation of the Moody's Asset Correlation Factor is based on a number of assets equal to 125.

"**Moody's Correlation WARF Matrix**" is the following chart, used to determine compliance with the Moody's Asset Correlation Test and Moody's Maximum Rating Distribution Test:

| Case | Maximum Moody's Asset Correlation Factor | Moody's Maximum Rating Distribution Factor |
|------|------------------------------------------|--------------------------------------------|
| 1 | 20.0% | 525 |
| 2 | 22.0% | 500 |
| 3 | 23.5% | 475 |

"**Moody's Below B3 Haircut Amount**" means, as of any Measurement Date, 50% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Moody's Rating below "B3".

"**Moody's Below Ba3 Haircut Amount**" means, as of any Measurement Date, 20% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Moody's Rating below "Ba3" by Moody's but that have a Moody's Rating of at least "B3".

"**Moody's Below Baa3 Haircut Amount**" means, as of any Measurement Date, 10% of the excess (if any) of (a) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Moody's Rating below "Baa3" but have a Moody's Rating of at least "Ba3" over (b) 10% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds).

"**Moody's Haircut Amount**" means, as of any Measurement Date, the sum (without duplication) of (i) the Moody's Below Baa3 Haircut Amount *plus* (ii) the Moody's Below Ba3 Haircut Amount *plus* (iii) the Moody's Below B3 Haircut Amount *plus* (iv) the

aggregate Discount Security Haircut Amount for all Discount Securities; *provided* that a Collateral Debt Security shall only be included in one of clauses (i) through (iv), which shall be the clause that results in the greatest Moody's Haircut Amount.

For purposes of the definitions of "Moody's Below B3 Haircut Amount," "Moody's Below Ba3 Haircut Amount," "Moody's Below Baa3 Haircut Amount" and "Moody's Haircut Amount," a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the related Reference Obligation.

"**Moody's Maximum Rating Distribution Test**" means a test that will be satisfied on any Measurement Date on or after the Ramp-Up Completion Date if the Moody's Maximum Rating Distribution of the Collateral Debt Securities as of such Measurement Date on or after the Ramp-Up Completion Date is less than or equal to the number set forth under the column entitled "Maximum Moody's Maximum Rating Distribution Factor" of the Moody's Correlation WARF Matrix.

"**Moody's Minimum Weighted Average Recovery Rate Test**" means a test satisfied, as of any Measurement Date on or after the Ramp-Up Completion Date, if the Moody's Weighted Average Recovery Rate is greater than or equal to 25%.

"**Moody's Notching Approved Security**" means any Collateral Debt Security that (a)(i) is identified on the Closing Date in a schedule attached to the Indenture or (ii) which Moody's confirms in writing to the Collateral Manager may constitute a "Moody's Notching Approved Security" for purposes of this definition (a copy of which confirmation the Collateral Manager shall promptly forward to the Trustee) and (b) the Collateral Manager has notified the Trustee shall constitute a "Moody's Notching Approved Security" for purposes of this definition; *provided* that with respect to any Collateral Debt Security that complies with the requirements of the foregoing clause (a), the Collateral Manager may, in its sole discretion at any time and from time to time, upon notice to the Trustee, withdraw or reinstate its designation of a Collateral Debt Security as a "Moody's Notching Approved Security" for purposes of this definition.

"**Moody's Rating**" means, with respect to any Collateral Debt Security, the Rating thereof determined in accordance with clause (a) of the definition of "Rating."

"**Moody's Rating Distribution**" means the number determined on any Measurement Date by dividing (i) the sum of the series of products obtained for any Pledged Collateral Debt Security that is not a Defaulted Security or Deferred Interest PIK Bond, by *multiplying* (a) the Principal Balance on such Measurement Date of each such Pledged Collateral Debt Security by (b) its respective Moody's Rating Factor on such Measurement Date by (ii) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities that are not Defaulted Securities or Deferred Interest PIK Bonds, and rounding the result up to the nearest whole number.

"**Moody's Rating Factor**" means, for purposes of computing the Moody's Rating Distribution, the number assigned below to the Moody's Rating applicable to each Collateral Debt Security.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

For purposes of the Moody's Maximum Rating Distribution Test, if a Collateral Debt Security does not have a Moody's Rating assigned to it at the date of Acquisition thereof, the Moody's Rating Factor with respect to such Collateral Debt Security shall be 10,000 for a period of 90 days from the Acquisition of such Collateral Debt Security, and after such 90-day period, if such Collateral Debt Security is not rated by Moody's and no other security or obligation of the issuer thereof or obligor thereon is rated by Moody's and the Issuer or the Collateral Manager seeks to obtain an estimate of a Moody's Rating Factor, then the Moody's Rating Factor of such Collateral Debt Security shall be deemed to be such estimate thereof as may be assigned by Moody's upon the request of the Issuer or the Collateral Manager.

"**Moody's Weighted Average Recovery Rate**" means, as of any Measurement Date, the number, expressed as a percentage, obtained by summing the products obtained by *multiplying* the Principal Balance of each Collateral Debt Security, other than a Defaulted Security or a Deferred Interest PIK Bond, by its "Applicable Recovery Rate" (determined for purposes of this definition pursuant to clause (a) of the definition of "Applicable Recovery Rate"), *dividing* such sum by the Aggregate Principal Balance of all such Collateral Debt Securities and rounding up the result to the first decimal place.

"**Negative Amortization Capitalization Amount**" means, with respect to any Negative Amortization Security and any specified period of time, the aggregate amount of accrued interest thereon that has been capitalized as principal pursuant to the related Underlying Instruments during such period, as the same may be reduced from time to time pursuant to and in accordance with the related Underlying Instruments.

"**Negative Amortization Haircut Amount**" means, with respect to any Negative Amortization Security on any date of determination, the excess (if any) of (a) the Negative Amortization Capitalization Amount therefor (if any) for the period from and including the date of issuance thereof to but excluding such date of determination over (b) the sum of (i) 5% of the original principal amount of such Negative Amortization Security upon issuance and (ii) the amount by which such Negative Amortization Security has already been haircut pursuant to the operation of sub-clause (B) of the proviso to the definition of "Net Outstanding Portfolio Collateral Balance" (taking into account the proviso to the definition of "Negative Amortization Security" below in the case of such sub-clause (B)).

"**Negative Amortization Security**" means an RMBS Security which (a) permits the related mortgage loan or mortgage loan obligor for a specified period of time to make no repayments of principal and payments of interest in amounts that are less than the interest payments that would otherwise be payable thereon based upon the stated rate of interest thereon, (b) to the extent that interest proceeds received in respect of the related underlying collateral are insufficient to pay interest that is due and payable thereon, permits principal proceeds received in respect of the related underlying collateral to be applied to pay such interest shortfall and (c) to the extent that the aggregate amount of interest proceeds and principal proceeds received in respect of the related underlying collateral are insufficient to pay interest that is due and payable thereon, permits such unpaid interest to be capitalized as principal and itself commence accruing interest at the applicable interest rate, in each case pursuant to the related Underlying Instruments.

"**Net Outstanding Portfolio Collateral Balance**" means, on any Measurement Date, an amount equal to (a) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities *plus* (b) the Aggregate Principal Balance of all Principal Proceeds held as Cash and Eligible Investments and U.S. Agency Securities purchased with Principal Proceeds and any amount on deposit at such time in the Principal Collection Account (without duplication) *plus* (c) the Excess Notional Amount Liquidity as of such Measurement Date *minus* (d) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities that are (i) Defaulted Securities or Deferred Interest PIK Bonds or (ii) Equity Securities *plus* (e) for each Defaulted Security or Deferred Interest PIK Bond, the Calculation Amount with respect to such Defaulted Security or Deferred Interest PIK Bond; *provided* that (x) for the purpose of calculating the Net Outstanding Portfolio Collateral Balance in connection with the Pro Rata Payment Conditions, the occurrence and continuation of an Event of Default described in clause (viii) of the definition of "Event of Default," any termination of the Reinvestment Period or Reinvestment Period Loss Event, the "Net Outstanding Portfolio Collateral Balance" means (A) the amount determined pursuant to the preceding clauses of this definition *minus* (B) the greatest of (1) the Standard & Poor's Haircut Amount and (2) the Moody's Haircut Amount *minus* (C) for each Negative Amortization Security, the Negative Amortization Haircut Amount (if any) with respect to such Negative Amortization Security, (y) the provisions of the preceding proviso and the definitions used therein may be modified in order to comply with any amendments or modifications to the applicable Rating Agency criteria if the Rating Condition is satisfied with respect thereto and Holders of a Majority of the Controlling Class do not object to such amendments or modifications within 15 days after receipt of notice, and (z) if more than one of clauses (A), (B) or (C) above would otherwise apply to any Collateral Debt Security, then only the clause that would effect the highest discount rate shall be deemed to apply to such Collateral Debt Security.

"**Non-LIBOR Floating Rate Collateral Debt Security**" means a Floating Rate Collateral Debt Security that bears interest based upon a floating rate index for Dollar-denominated obligations other than the London Interbank Offered Rate.

"**Note Acceleration Date**" means the Monthly Distribution Date occurring in March 2014.

"**Note Break-Even Default Rate**" means, with respect to any Class of Notes rated by Standard & Poor's, at any time, the maximum percentage of defaults (as determined by application of the Standard & Poor's CDO Monitor) which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain such that, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, will result (i) in the case of the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, in sufficient funds remaining for the payment in full of principal of and interest on such Class of Notes in full by its Stated Maturity and (ii) in the case of the Class A Notes and the Class B Notes, in sufficient funds remaining for the payment in full of principal and the timely payment of interest and Commitment Fee (as applicable) on such Class of Notes.

"**Note Interest Rate**" means, with respect to the Notes of any Class for any Interest Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Period, as set forth in Section 2.2.

"**Note Ratings Downgrade Event**" means that (i) any of the Class A Notes, the Class S Notes or the Class B Notes have been downgraded by any single Rating Agency by one or more notches from its original public rating, (ii) the Class C Notes have been downgraded by any single Rating Agency by two or more notches from its original public rating or (iii) any of the Class D Notes have been downgraded by any single Rating Agency by three or more notches from its original public rating.

"**Note Register**" and "**Note Registrar**" have the respective meanings set forth in Section 2.4(a).

"**Note Valuation Report**" has the meaning set forth in Section 10.7(b).

"**Noteholder**" means the Person in whose name a Note is registered in the Note Register.

"**Notes**" means, collectively, the Class A-1 Notes and the Funded Notes authorized by, authenticated and delivered under this Indenture.

"**Notes Default Rate Differential**" means, with respect to any Class of Notes rated by Standard & Poor's, at any time, the rate calculated by subtracting the Class Scenario Default Rate at such time from the Note Break-Even Default Rate for such Class of Notes at such time. The Notes Default Rate Differential is based on a proprietary model developed by Standard & Poor's, the application of which may change from time-to-time as directed by Standard & Poor's.

"**Notice of Borrowing**" has the meaning given to such term in the Class A-1 Note Purchase Agreement.

"**Notional Amount**" means, with respect to any Synthetic Security (including any CDS Agreement Transaction), (a) the "Floating Rate Payer Calculation Amount" as defined in the Credit Derivatives Definitions, (b) the "notional amount" as defined in the related Underlying Instruments or (c) or any similar term in the related Underlying Instruments that refers to the par

amount of indebtedness that would be valued for purposes of determining the Cash or physical settlement obligations of the parties thereto.

"**Offer**" means, with respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such security to purchase or otherwise Acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for Cash, securities or any other type of consideration or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"**Offering**" means the offering of the Notes and the Preference Shares under the Offering Memorandum.

"**Offering Memorandum**" means the final Offering Memorandum, prepared and delivered in connection with the offer and sale of the Notes and the Preference Shares, as amended or supplemented on or prior to the Closing Date.

"**Officer**" means, (a) with respect to the Issuer, any director and with respect to any other corporation, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity, (b) with respect to the Co-Issuer, the managing member or any duly appointed manager of the Co-Issuer and (c) with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"**Opinion of Counsel**" means a written opinion addressed to the Trustee and each Rating Agency (each, a "**Recipient**"), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice in any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which attorney shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"**Optional Redemption**" has the meaning set forth in Section 9.1(a).

"**Optional Redemption Amount**" means the sum of (x) the Total Redemption Amount plus (y) the amount of any accrued and unpaid and deferred Senior Collateral Management Fee (without duplication) and Subordinated Collateral Management Fee (unless otherwise waived by the Collateral Manager in whole or in part) and any interest accrued thereon, if applicable, *plus* (z) in the event the scheduled Redemption Date occurs on or after the Monthly Distribution Date occurring in March 2010 but prior to the Distribution Date occurring in March 2012, a payment to the Collateral Manager equal to 50.0% of the Senior Collateral Management Fee and 50.0% of the Subordinated Collateral Management Fee (in each case,

based on the Monthly Asset Amount with respect to the Monthly Distribution Date on or immediately preceding such Redemption Date) that would otherwise have been earned from the scheduled Redemption Date through the Distribution Date occurring in March 2012.

"**Outstanding**" means, with respect to the Notes or a particular Class of the Notes, as of any date of determination, all of the Notes or all of the Notes of such Class theretofore authenticated and delivered under this Indenture except:

(i)    Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

(ii)    Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided* that if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)    Notes in exchange for, or in lieu of, other Notes which have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course; and

(iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.5, as applicable;

*provided* that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (1) Notes beneficially owned by the Issuer or the Co-Issuer or any other obligor upon the Notes or any Affiliate of any of them shall be disregarded and deemed not to be Outstanding (2) Notes beneficially owned by the Collateral Manager, any Affiliate of the Collateral Manager or any account for which the Collateral Manager or an Affiliate of the Collateral Manager acts as investment adviser (and for which the Collateral Manager or such Affiliate has discretionary authority) shall be disregarded and deemed not to be Outstanding with respect to any assignment or termination of, any of the express rights or obligations of the Collateral Manager under the Collateral Management Agreement or this Indenture (including the exercise of any rights to remove the Collateral Manager or terminate the Collateral Management Agreement or approve or object to a replacement collateral manager (as defined in the Collateral Management Agreement), other than removal of the Collateral Manager without cause), or any amendment or other modification of the Collateral Management Agreement or this Indenture increasing the rights or decreasing the obligations of the Collateral Manager and (3) the Aggregate Outstanding Amount of the Class A-1 Notes shall for such purposes be deemed to include the Remaining Unfunded Facility Commitment; except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Trustee knows to be beneficially owned in the manner indicated in clause (1) or (2) above shall be so disregarded.  Notes owned in the manner indicated in clause (1) or (2) above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, the Collateral Manager or any

other obligor upon the Notes or any Affiliate of the Issuer, the Co-Issuer, the Collateral Manager or such other obligor or an account for which the Collateral Manager or an Affiliate of the Collateral Manager acts as investment adviser (and for which the Collateral Manager or such Affiliate has discretionary authority).  The Class A-1 Notes will be deemed to be Outstanding so long as the Commitment Termination Date has not occurred, irrespective of whether there exists an Outstanding Class A-1 Funded Amount.

"**Outstanding Class A-1 Funded Amount**" means, as of any date of determination, the outstanding principal amount of the aggregate Borrowings and Deemed Borrowings under the Class A-1 Notes as of such date of determination.

"**Paying Agent**" means any Person authorized by the Issuer to pay the principal of or interest on any Notes or make any payments to a Credit Default Swap Counterparty on behalf of the Issuer as set forth in Section 7.2.

"**Payment Account**" means the Securities Account designated the "Payment Account" and established in the name of the Trustee pursuant to Section 10.3.

"**Permanent Reduction Amount**" means, with respect to any date of determination, the sum of (i) the aggregate amount of all Principal Proceeds and Interest Proceeds applied on or prior to such date of determination by the Issuer pursuant to Sections 11.1(i)(G), (I), (L), (O), and (R) and Sections 11.1(ii)(C), (E), (G), (I), (L), and (M), to the payment of the Outstanding Class A-1 Funded Amount under the Class A-1 Note Purchase Agreement or the Indenture in reduction of the Remaining Unfunded Facility Commitment or as a deposit to the Reserve Account *plus* (ii) the aggregate amount of Principal Proceeds which the Collateral Manager elects, on or prior to such date of determination and pursuant to Section 11.1(ii)(K), to apply to the payment of the Outstanding Class A-1 Funded Amount under the Indenture or as a deposit to the Reserve Account in reduction of the Remaining Unfunded Facility Commitment *plus* (iii) the sum of the amounts of the Excess Notional Amount Liquidity which the Collateral Manager elects, during the Reinvestment Period, on or prior to such date of determination, to apply to reduce permanently the Remaining Unfunded Facility Commitment pursuant to Section 7.18(k) *plus* (iv) the aggregate amount of all Principal Proceeds applied during the period from but excluding the last day of the Reinvestment Period to and including such date of determination by the Issuer pursuant to Section 11.1(ii)(J) to the payment of the Outstanding Class A-1 Funded Amount, *plus* (v) to the extent it is not duplicative of any amounts paid in clauses (i) through (iv) above, the Exposure Reduction Amount after the last day of the Reinvestment Period.

"**Permitted Reference Obligation**" means any Asset-Backed Security that is a Specified Type of Asset-Backed Security or a REIT Debt Security and which, if purchased by the Issuer, would satisfy the Eligibility Criteria.

"**Permitted Use**" means either a Credit Protection Amount, a Bond Purchase Payment up to the Junior Facility Amount or a CDS Termination Payment, in each case, satisfying the requirements set forth in the Class A-1 Note Purchase Agreement.

"**Person**" means an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"**PIK Bond**" means any Collateral Debt Security that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred, diverted or capitalized as additional principal thereof (even if sufficient interest proceeds would have been available to pay interest on the Collateral Debt Security) or that issues identical securities in place of payments of interest in Cash (even if sufficient interest proceeds would have been available to pay interest on the Collateral Debt Security); *provided* that as of the date of such Collateral Debt Security's inclusion in the Collateral, such Collateral Debt Security has paid in Cash all interest accrued thereon up to and including such date.

"**Plan**" means a "plan" as defined in Section 4975(e)(1) of the Code.

"**Plan Asset Regulation**" means the regulation issued by the United States Department of Labor that, under specified circumstances, requires plan fiduciaries, and entities with certain specified relationships to a Plan, to "look through" investment vehicles (such as the Issuer) and treat as an "asset" of the plan each underlying investment made by such investment vehicle.

"**Pledged Collateral Debt Security**" means as of any date of determination, any Collateral Debt Security that has been Granted to the Trustee and has not been released from the lien of this Indenture pursuant to Section 10.8.

"**Pledged Securities**" means on any date of determination, (a) the Collateral Debt Securities, Equity Securities, Reserve Account Investments, U.S. Agency Securities and Eligible Investments that have been Granted to the Trustee and (b) all non-Cash proceeds thereof, in each case, to the extent not released from the lien of this Indenture pursuant hereto.

"**Preference Share Documents**" means the Preference Share Paying Agency Agreement together with this Indenture, the Issuer Charter and written resolutions of the Issuer.

"**Preference Share Paying Agency Agreement**" means the Preference Share Paying Agency Agreement, dated as of the Closing Date, among the Issuer, the Preference Share Paying Agent and the Preference Share Registrar.

"**Preference Share Paying Agent**" means LaSalle Bank National Association (or any successor thereto), as Preference Share Paying Agent for the Preference Shares, or any Person authorized by the Issuer from time to time to make payments on the Preference Shares and to deliver notices to the Preference Shareholders on behalf of the Issuer.

"**Preference Share Register**" and "**Preference Share Registrar**" have the respective meanings set forth in the Preference Share Paying Agency Agreement.

"**Preference Shareholders**" means the Persons in whose names Preference Shares are registered in the ownership register relating to the Preference Shares maintained by the Preference Share Registrar.

"**Preference Shares**" means the 90,000 Preference Shares, par value U.S.$0.01 per share, issued by the Issuer pursuant to the Issuer Charter.

"**Principal Amortization**" means, with respect to any CDS Agreement Transaction, any payment of principal paid to the holders of the related Reference Obligation.

"**Principal Balance**" or "**par**" means, with respect to any Collateral Debt Security or Eligible Investment (except, for the avoidance of doubt, any Short Synthetic Security except for as referred to in clause (ii) herein), as of any date of determination, the outstanding principal amount of such Pledged Security; *provided* that:

(i)    the Principal Balance of a Collateral Debt Security received upon acceptance of an Offer for another Collateral Debt Security, which Offer expressly states that failure to accept such Offer may result in a default under the Underlying Instruments of such tendered Collateral Debt Security, shall be deemed to be the Calculation Amount of such received Collateral Debt Security until such time as Interest Proceeds and Principal Proceeds, as applicable, are received when due with respect to such received Collateral Debt Security;

(ii)    the Principal Balance of any Synthetic Security shall be equal to (i) in the case of a Synthetic Security that is a credit default swap (including any CDS Agreement Transaction), (A) at any time prior to the delivery of a notice of physical settlement, the Notional Amount of such Synthetic Security *minus* the aggregate remaining Notional Amount of related Short Synthetic Securities or (B) at any time following the delivery of a notice of physical settlement but prior to the receipt by the Issuer of the related Deliverable Obligations, (I) in the case of an exercise in whole, the physical settlement amount of such Synthetic Security and (II) in the case of an exercise in part, the sum of the delivery amount and the remaining Notional Amount after giving effect to such delivery, in each case determined in accordance with the Underlying Instruments relating thereto and net of the aggregate applicable Notional Amount of related Short Synthetic Securities and (III) in the case of a Synthetic Security that meets the Synthetic Security Discount Criteria, the Fair Market Value of the Reference Obligation or (ii) in the case of any other Synthetic Security, the aggregate amount of the repayment obligations of the Synthetic Security Counterparty payable to the Issuer through the maturity of such Synthetic Security;

(iii)    the Principal Balance of any Equity Security, unless otherwise expressly stated herein, shall be deemed to be zero;

(iv)    the Principal Balance of any PIK Bond (including any Deferred Interest PIK Bond) shall be equal to the outstanding principal amount thereof (exclusive of any principal thereof representing capitalized interest);

(v)        the Principal Balance of any Eligible Investment that does not pay Cash interest on a current basis will be the lesser of par or the original issue price thereof;

(vi)       the Principal Balance of any Written-Down Security shall be reduced to reflect the percentage by which the aggregate par amount of the entire Issue of which such Written-Down Security is a part (taking into account all securities ranking senior in priority of payment thereto and secured by the same pool of collateral) exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such Issue (excluding defaulted collateral), as determined by the Collateral Manager using customary procedures and information available in the servicer reports relating to such Written-Down Security;

(vii)      the Principal Balance of a Zero Coupon Bond shall be the sum of (i) the original issue price thereof *plus* (ii) the aggregate amount of interest accreted thereon to but excluding such date of determination in accordance with the provisions of the related Underlying Instruments (or any other agreement between the issuer thereof and the original purchasers thereof) relating to the reporting of income by the holders of, and deductions by the issuer of, such Zero Coupon Bond for U.S. federal income tax purposes; and

(viii)     the Principal Balance of a Negative Amortization Security shall be (i) the original principal amount of such Negative Amortization Security on the date of issuance thereof (which amount shall in no event be adjusted to reflect any Negative Amortization Capitalization Amounts thereon) *minus* (ii) the aggregate amount of all payments made in respect of principal thereof (excluding any payments made in respect of Negative Amortization Capitalization Amounts for any period) from and including the date of issuance thereof to but excluding such date of determination.

"**Principal Collection Account**" means the Securities Account designated the "Principal Collection Account" and established in the name of the Trustee pursuant to Section 10.2(b).

"**Principal-Only Security**" means any Collateral Debt Security (other than a Zero Coupon Bond) that does not provide for the periodic payment of interest.

"**Principal Proceeds**" means, with respect to any Due Period, the sum (without duplication) of: (1) any amounts transferred from the Reserve Account to the Principal Collection Account pursuant to this Indenture; (2) all payments of principal on the Collateral Debt Securities and Eligible Investments received in Cash by the Issuer during such Due Period (a) excluding (x) (i) any amount representing the accreted portion of a discount from the face amount of an Eligible Investment included in Interest Proceeds pursuant to clause (4) of the definition thereof and (ii) any amounts received in respect of Negative Amortization Capitalization Amounts included in Interest Proceeds pursuant to clause (8) of the definition thereof and (y) any Principal Reimbursement received by the Issuer after the Reinvestment Period in respect of any CDS Agreement Transaction (b) but including (i) prepayments or mandatory sinking fund payments, (ii) payments in respect of optional redemptions, exchange offers, tender offers and interest (other than payments of principal of Eligible Investments

Acquired with Interest Proceeds), (iii) recoveries, deferred or capitalized interest, and other amounts on Defaulted Securities and Written-Down Securities, in each case up to an amount equal to the original principal amount of such Defaulted Securities or Written-Down Securities, as the case may be, (iv) the Sale Proceeds of a sale of any Equity Security and any amounts received as a result of optional redemptions, exchange offers, tender offers for any Equity Security and (v) any Principal Reimbursements received by the Issuer in respect of any CDS Agreement Transactions or other Synthetic Securities structured as credit default swaps other than those described in the foregoing clause (y), in each case received in Cash by the Issuer during such Due Period; (3) Sale Proceeds received by the Issuer during such Due Period (excluding those included in Interest Proceeds as defined above); (4) all amendment, waiver, late payment fees and other fees and commissions, received in Cash by the Issuer during the related Due Period in respect of Defaulted Securities and Written-Down Securities (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security does not exceed the original principal amount of such Defaulted Security or Written-Down Security); (5) any proceeds resulting from the termination, liquidation or reduction of the Notional Amount of a Hedge Agreement Transaction or the Credit Default Swap Agreement Transaction to the extent such proceeds do not represent accrued interest and exceed the cost of entering into a replacement Hedge Agreement or Credit Default Swap Agreement in accordance with the requirements set forth in Section 16.1; (6) all payments received in Cash by the Issuer during such Due Period that represent call or prepayment; (7) all payments of interest on Collateral Debt Securities received in Cash by the Issuer to the extent that they represent accrued interest purchased with Principal Proceeds or amounts standing to the credit of the Reserve Account after the Ramp-Up Completion Date; (8) all payments received in Cash by the Issuer in respect of deferred interest on Deferred Interest PIK Bonds previously capitalized; (9) all yield maintenance payments received in Cash by the Issuer during such Due Period; (10) proceeds of any assets standing to the credit of the Reserve Account and any proceeds of such proceeds; (11) Excess Reserve Account Assets that the Collateral Manager deems to be Principal Proceeds; (12) all payments received by the Issuer under a Short Synthetic Security in respect of a failure to pay, or write-down of, principal under the related Reference Obligation, net of any Principal Reimbursements paid by the Issuer in respect of any Short Synthetic Security; (13) the aggregate of the greater of (a) zero and (b) the excess of all premium payments received by the Issuer on any related CDS Agreement Transaction hedged by a Short Synthetic Security over the premium payment made by the Issuer under the related Short Synthetic Security and (14) all other payments received in connection with the Collateral Debt Securities, Reserve Account Investments and Eligible Investments that are not included in Interest Proceeds; *provided* that (i) in no event shall Principal Proceeds include the U.S.$250 of capital contributed by the owners of the ordinary shares of the Issuer in accordance with the Issuer Charter or U.S.$250 representing a profit fee to the owner of the Issuer's ordinary shares and interest thereon and (ii) if the presence of a legal or business holiday causes a scheduled distribution on any Collateral Debt Security or other security held as Collateral to be received in the period between the end of the Due Period in which such payment would otherwise have been received and the related Distribution Date, such payment will be deemed to have been received during such Due Period.

"**Principal Reimbursement**" means, with respect to any Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction), any "Writedown Reimbursement Payment Amount" or "Principal Shortfall Reimbursement Payment

Amount" under and as defined in the Credit Default Swap Agreement or related Underlying Instruments (as applicable) or any similar amount (howsoever described).

"**Priority of Payments**" has the meaning set forth in <u>Section 11.1</u>.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**Proposed Plan**" means a reasonable plan proposed by the Collateral Manager on behalf of the Issuer to the Rating Agencies prior to the Ramp-Up Completion Date, which Proposed Plan may include a proposal to (a) make payments of principal of and accrued interest, and, with respect to the Class A-1 Notes, the Commitment Fee, on the Aggregate Outstanding Amount of the Notes or a payment on a CDS Agreement Transaction in accordance with the Priority of Payments, (b) sell a portion of the Collateral, (c) subject to the terms of the Paying Agency Agreement, issue additional Preference Shares and use the proceeds from the sale of such Preference Shares to purchase Collateral, (d) extend the Ramp-Up Completion Date, (e) amend this Indenture, including, without limitation, the requirements necessary to satisfy each of the Collateral Quality Tests and any of the Eligibility Criteria, in which case all references herein to any Collateral Quality Test, Eligibility Criteria or any other provision modified pursuant to the related Proposed Plan, from the date of satisfaction of the Rating Condition, with respect to such Proposed Plan, shall be deemed to refer to such item as so modified or (f) any other action as may be proposed in a Proposed Plan that satisfies the Rating Condition; *provided* that unless the Rating Agencies agree otherwise, the Rating Agencies shall have at least 30 days to review any such Proposed Plan. In accordance with the Indenture, the terms and conditions of any Proposed Plan proposed by the Collateral Manager, on behalf of the Issuer, and in respect of which the Rating Condition has been satisfied, as described above, shall be set forth in a supplemental indenture entered into pursuant to <u>Article VIII</u> hereof.

"**Proposed Portfolio**" means the Current Portfolio adjusted for the proposed disposition of, acquisition of or entry into any Collateral Debt Securities.

"**Pro Rata Payment Conditions**" means conditions that will be satisfied, as of any Distribution Date, if (a) as of the related Determination Date, the Net Outstanding Portfolio Collateral Balance is equal to or greater than 50% of the Aggregate Ramp-Up Par Amount, (b) the Class A Pro Rata Test is satisfied on the related Determination Date and has not previously failed to be met, (c) no Event of Default has occurred and is continuing as of the related Determination Date, (d) no Discretionary Trading Loss Event or Reinvestment Period Loss Event has occurred and is continuing as of the related Determination Date and (e) as of the related Determination Date after the Reinvestment Period, if the ratio (expressed as a percentage) obtained by *dividing* (A) the Net Outstanding Portfolio Collateral Balance on such Determination Date by (B) the sum of (i) the Aggregate Outstanding Amount of the Class A-2 Notes, (ii) the Aggregate Outstanding Amount of the Class B Notes, (iii) the Outstanding Class A-1 Funded Amount and (iv) the Remaining Unfunded Facility Commitment, is equal to or greater than 112%.

"**Pure Private Collateral Debt Security**" means any Collateral Debt Security other than (a) a Collateral Debt Security that was issued pursuant to an effective registration

statement under the Securities Act or (b) a privately placed Collateral Debt Security that is eligible for resale under Rule 144A or Regulation S under the Securities Act.

"**Qualified Bidder List**" means a list of not fewer than three and not more than fourteen Persons that are nationally-recognized market makers prepared by the Collateral Manager and delivered to the Trustee on the Closing Date, as may be amended and supplemented by the Collateral Manager from time to time upon written notice to the Trustee; *provided* that any such notice shall only be effective on any Auction Date if it was received by the Trustee at least two Business Days prior to such Auction Date.

"**Qualified Bidders**" means the Persons, which may include the Collateral Manager and any of its Affiliates, whose names appear from time to time on the Qualified Bidder List.

"**Qualified Institutional Buyer**" has the meaning given to such term in Rule 144A under the Securities Act.

"**Qualified Purchaser**" means (i) a "qualified purchaser" as defined in Section 2(a)(51)(a) of the Investment Company Act, (ii) a company each of whose beneficial owners is a qualified purchaser, (iii) a "knowledgeable employee" with respect to the Issuer as specified in Rule 3c-5 promulgated under the Investment Company Act or (iv) a company owned exclusively by knowledgeable employees.

"**Qualifying Foreign Obligor**" means a corporation, partnership, trust or other entity organized in any of Australia, Canada, France, Germany, Ireland, the Netherlands, the Netherlands Antilles, New Zealand, Sweden, Switzerland or the United Kingdom, so long as the unguaranteed, unsecured and otherwise unsupported long-term Dollar sovereign debt obligations of such country are rated "Aa2" or higher by Moody's and "AA" or higher by Standard & Poor's.

"**Qualifying Investment Vehicle**" means a Flow-Through Investment Vehicle as to which all of the beneficial owners of any securities issued by the Flow-Through Investment Vehicle have made, and as to which (in accordance with the document pursuant to which the Flow-Through Investment Vehicle was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer or the Issuers, as the case may be, and the Note Registrar (or, with respect to the Preference Shares, the Preference Share Registrar) each of the representations set forth herein and in (a) the Offering Memorandum and a Subscription Agreement or (b) the transfer certificate pursuant to which Notes or Preference Shares were transferred to such Flow-Through Investment Vehicle (in each case, with appropriate modifications to reflect the indirect nature of their interests in the Notes or the Preference Shares).

"**Quarterly Asset Amount**" means, with respect to any Quarterly Distribution Date, the Net Outstanding Portfolio Collateral Balance on the first day of the Calculation Period commencing on the preceding Quarterly Distribution Date or, in the case of the first Calculation Period, on the Closing Date.

"**Quarterly Distribution Date**" means the Monthly Distribution Date occurring each March, June, September and December, beginning on September 9, 2007; *provided* that (i) the final Quarterly Distribution Date shall be the final Monthly Distribution Date and (ii) if any such date is not a Business Day, the relevant Quarterly Distribution Date shall be the next succeeding Business Day.

"**Quarterly Interest Reserve Account**" means the Securities Account designated the "Quarterly Interest Reserve Account" and established in the name of the Trustee pursuant to Section 10.2(c).

"**Quarterly Interest Reserve Schedule**" means a schedule prepared by the Collateral Manager and delivered to the Trustee and each of the Rating Agencies no later than five Business Days after the date of Acquisition thereof by the Issuer setting forth with respect to any Collateral Debt Security that pays less frequently than monthly and is not the subject of a Deemed Floating Asset Hedge Agreement (x) the portion of each scheduled payment of interest in respect of such Collateral Debt Security that pays less frequently than monthly that is to be deposited in the Interest Collection Account when received in Cash by the Issuer, (y) the portion of such payment that is to be deposited in the Quarterly Interest Reserve Account on such date and (z) the amount that is to be transferred from the Quarterly Interest Reserve Account to the Interest Collection Account on the third Business Day prior to each Distribution Date in respect of such Collateral Debt Security in accordance with Section 10.2(c).  The Quarterly Interest Reserve Schedule may be amended from time to time by the Collateral Manager with notice to the Trustee, Moody's and Standard & Poor's.

"**Ramp-Up Completion Date**" means the date that is the earlier of (a) June 2007, and (b) the first date on which the Aggregate Principal Balance of the Collateral Debt Securities held by the Issuer *plus* any Principal Proceeds received in respect of any such Collateral Debt Securities is at least equal to the Aggregate Ramp-Up Par Amount.

"**Ramp-Up Notice**" has the meaning set forth in Section 7.17(d).

"**Rating**" means:

(i)      with respect to any Asset-Backed Security, REIT Debt Security or Mortgage Finance Company Security, for determining the Moody's Rating as of any date of determination:

(a)  if such Asset-Backed Security or REIT Debt Security has a Moody's rating, the Moody's Rating shall be such rating, or, if such Collateral Debt Security does not have a Moody's rating, but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Moody's assign a rating to such Collateral Debt Security, the Moody's Rating shall be the rating so assigned by Moody's;

(b)  if such Asset-Backed Security or REIT Debt Security does not have a Moody's rating and no such rating has been assigned in accordance with clause (i) above, then the Moody's Rating of such Asset-Backed Security or REIT Debt Security may be determined using any one of the methods below:

(i)        with respect to any ABS Type Residential Security that does not have a Moody's rating, if such ABS Type Residential Security is publicly rated by Standard & Poor's, then the Moody's Rating thereof will be (1) one subcategory below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is "AAA"; (2) two rating subcategories (or, in the case of Alt-A or mixed pool RMBS Securities, three rating subcategories) below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is below "AAA" but above "BB+"; and (3) three rating subcategories (or, in the case of Alt-A or mixed pool RMBS Securities, four rating subcategories) below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is below "BBB-";

(ii)        with respect to any CMBS Conduit Security that does not have a Moody's rating, (x) if Moody's has rated a tranche or class of CMBS Conduit Security senior to the relevant Issue, then the Moody's Rating thereof shall be one and one-half rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's for purposes of determining the Moody's Rating Factor and one rating subcategory below the Moody's equivalent rating assigned by Standard & Poor's for all other purposes and (y) if Moody's has not rated any such tranche or class and Standard & Poor's has rated the subject CMBS Conduit Security, then the Moody's Rating thereof will be two rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's;

(iii)        with respect to notched ratings on any other type of Asset-Backed Securities, the Moody's Rating shall be determined in conjunction with the notching conventions set forth in Part I of Schedule H; and

(iv)        with respect to any other type of Asset-Backed Securities or REIT Debt Securities designated as a Specified Type after the date hereof pursuant to the terms hereof, pursuant to any method specified by Moody's;

(c)   with respect to any Mortgage Finance Company Security or corporate guarantees on Asset-Backed Securities or REIT Debt Securities, if such Mortgage Finance Company Securities or corporate guarantees do not have a Moody's rating but another security or obligation of the issuer or guarantor thereof (an "**other security**") has a Moody's rating, and no rating has been assigned in accordance with clause (i) above, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be determined as follows:

(i)        if the Mortgage Finance Company Security or corporate guarantee is a senior secured obligation of the issuer, guarantor or obligor

and the other security is also a senior secured obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security;

(ii)      if the Mortgage Finance Company Security or corporate guarantee is a senior unsecured obligation of the issuer, guarantor or obligor and the other security is a senior secured obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory below the rating of the other security;

(iii)      if the Mortgage Finance Company Security or corporate guarantee is a subordinated obligation of the issuer, guarantor or obligor and the other security is a senior secured obligation that is:

(A)      rated "Ba3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be three rating subcategories below the rating of the other security; or

(B)      rated "B1" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be two rating subcategories below the rating of the other security;

(iv)      if the Mortgage Finance Company Security or corporate guarantee is a senior secured obligation of the issuer, guarantor or obligor and the other security is a senior unsecured obligation that is:

(A)      rated "Baa3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security; or

(B)      rated "Ba1" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory above the rating of the other security;

(v)      if the Mortgage Finance Company Security or corporate guarantee is a senior unsecured obligation of the issuer, guarantor or obligor and the other security is also a senior unsecured obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security;

(vi)      if the Mortgage Finance Company Security or corporate guarantee is a subordinated obligation of the issuer, guarantor or obligor and the other security is a senior unsecured obligation that is:

(A)   rated "B1" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be two rating subcategories below the rating of the other security; or

(B)   rated "B2" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory below the rating of the other security;

(vii)   if the Mortgage Finance Company Security or corporate guarantee is a senior secured obligation of the issuer, guarantor or obligor and the other security is a subordinated obligation that is:

(A)   rated "Baa3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory above the rating of the other security;

(B)   rated below "Baa3" but not rated "B3" by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be two rating subcategories above the rating of the other security; or

(C)   rated "B3" by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be "B2";

(viii)   if the Mortgage Finance Company Security is a senior unsecured obligation of the issuer, guarantor or obligor and the other security is a subordinated obligation that is:

(A)   rated "Baa3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory above the rating of the other security; or

(B)   rated "Ba1" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall also be one rating subcategory above the rating of the other security; and

(ix)   if the Collateral Debt Security is a subordinated obligation of the issuer, guarantor or obligor and the other security is also a subordinated obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security;

(d)   with respect to Mortgage Finance Company Securities or corporate guarantees issued by U.S., U.K. or Canadian issuers or guarantors or by any other Qualifying Foreign Obligor, if such Mortgage Finance Company Security or corporate guarantee does not have a Moody's rating, and no other security or obligation of the issuer or guarantor thereof is rated by Moody's, then the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee may be determined using any one of the methods below:

(i)   (A)   if such Mortgage Finance Company Security or corporate guarantee is publicly rated by Standard & Poor's, then the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be (x) one rating subcategory below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BBB-" or higher by Standard & Poor's and (y) two subcategories below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BB+" or lower by Standard & Poor's; and

(B)   if such Mortgage Finance Company Security or corporate guarantee is not publicly rated by Standard & Poor's but another security or obligation of the issuer is publicly rated by Standard & Poor's (a "**parallel security**"), then the Moody's equivalent of the rating of such parallel security will be determined in accordance with the methodology set forth in subclause (1) above, and the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be determined in accordance with the methodology set forth in clause (iii) above (for such purpose treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (2));

(ii)   if such Mortgage Finance Company Security or corporate guarantee does not have a Moody's Rating and is not publicly rated Standard & Poor's, and no other security or obligation of the guarantor has a Moody's Rating or is publicly rated by Standard & Poor's, then the Issuer or the Collateral Manager on behalf of the Issuer, may present such Mortgage Finance Company Security or corporate guarantee to Moody's for an estimate of such Collateral Debt Security's rating factor, from which its corresponding Moody's Rating may be determined, which shall be its Moody's Rating;

(iii)   with respect to a Mortgage Finance Company Security or corporate guarantee issued by a U.S. corporation, if (1) neither the issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the issuer are in default, (3) none of the issuer, guarantor or any of their Affiliates have defaulted on any debt during the past two years, (4) the issuer or guarantor has been in existence for the past five years, (5) the issuer or guarantor is

current on any cumulative dividends, (6) the fixed-charge ratio for the issuer or guarantor exceeds 125% for each of the past two fiscal years and for the most recent quarter, (7) the issuer or guarantor had a net annual profit before tax in the past fiscal year and the most recent quarter and (8) the annual financial statements of the issuer or guarantor are unqualified and certified by a firm of independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be "B3";

(iv)    with respect to a Mortgage Finance Company Security or corporate guarantee issued by a non-U.S. issuer, if (1) none of the issuer, guarantor or any of their Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the issuer or guarantor has been in default during the past two years, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be "Caa2"; and

(v)    if a debt security or obligation of the issuer or guarantor has been in default during the past two years, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be "Ca";

*provided* that:

(1)    in respect of any U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, if such U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security is not assigned a Moody's Rating pursuant to clause (i) above, the Moody's Rating will be the rating assigned to the relevant guarantor of such U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security by Moody's,

(2)    the Moody's Rating of any Moody's Notching Approved Security shall be one rating subcategory below the Moody's Rating that would be applicable to such Collateral Debt Security if determined in accordance with the foregoing,

(3)    the ratings of no more than 10% of the Aggregate Principal Balance of all Collateral Debt Securities that are not Moody's Notching Approved Securities may be assigned rating factors derived via notching from single-rated instruments,

(4)    with respect to any one Rating Agency, the single-rated notched bucket for Collateral Debt Securities

that are not Moody's Notching Approved Securities may be no larger than 7.5% of the Aggregate Principal Balance of all Collateral Debt Securities,

(5)    the Aggregate Principal Balance of Collateral Debt Securities the Moody's Rating of which is based on a Standard & Poor's rating may not exceed (1) with respect to Collateral Debt Securities that are not Moody's Notching Approved Securities, 20% of the Aggregate Principal Balance of all Collateral Debt Securities and (2) with respect to Collateral Debt Securities that are Moody's Notching Approved Securities, 20% of the Aggregate Principal Balance of all Collateral Debt Securities, and the balance of the Collateral Debt Securities must be rated by Moody's or assigned Moody's rating estimates,

(6)    other than for the purposes of paragraphs (5) and (26) of the Eligibility Criteria, if a Collateral Debt Security (A) is placed on a watch list for possible upgrade by Moody's, the Moody's Rating applicable to such Collateral Debt Security shall be two rating subcategories above the Moody's Rating applicable to such Collateral Debt Security immediately prior to such Collateral Debt Security being placed on such watch list and (B) if a Collateral Debt Security is placed on a watch list for possible downgrade by Moody's, the Moody's Rating applicable to such Collateral Debt Security shall be two rating subcategories (or, in the case of a Collateral Debt Security that would otherwise have a Moody's Rating of "Aaa", one rating subcategories) below the Moody's Rating applicable to such Collateral Debt Security immediately prior to such Collateral Debt Security being placed on such watch list, and

(7)    the Moody's Rating of any Form-Approved Synthetic Security shall be the Moody's Rating that would be applicable to the related Reference Obligation if determined in accordance with the foregoing;

(ii)    for determining the Standard & Poor's Rating as of any date of determination:

(a)    with respect to any Asset-Backed Security or REIT Debt Security,

(i)    if Standard & Poor's has assigned a rating to such Collateral Debt Security either publicly or privately (*provided* that with

respect to a private or confidential rating, consent of the party that obtained such rating shall be provided to Standard & Poor's by the Collateral Manager), the Standard & Poor's Rating shall be the rating assigned thereto by Standard & Poor's (or, in the case of a REIT Debt Security, the issuer credit rating assigned by Standard & Poor's);

(ii)        if such Collateral Debt Security is not rated by Standard & Poor's but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Standard & Poor's assign a private rating to such Collateral Debt Security, the Standard & Poor's Rating shall be the rating so assigned by Standard & Poor's; *provided* that if the Issuer or the Collateral Manager on behalf of the Issuer applies to Standard & Poor's for a credit estimate of such Collateral Debt Security for purposes of obtaining a Standard & Poor's Rating, such credit estimate shall be requested prior to or upon Acquisition of the Collateral Debt Security and shall be re-applied for on each one-year anniversary of such credit estimate; and *provided, further*, that pending receipt from Standard & Poor's of such rating, (x) if such Collateral Debt Security is of a type listed on Schedule G or is not eligible for notching in accordance with Schedule H, such Collateral Debt Security shall have a Standard & Poor's Rating of "CCC-" and (y) if such Collateral Debt Security is not of a type listed on Schedule G and is eligible for notching in accordance with Schedule H, the Standard & Poor's Rating of such Collateral Debt Security shall be the rating assigned in accordance with Schedule H until such time as Standard & Poor's shall have assigned a rating thereto; and

(iii)        if such Collateral Debt Security is a Collateral Debt Security that has not been assigned a rating by Standard & Poor's pursuant to clause (A) or (B) above, but is guaranteed by a corporate guarantee (which meets the then current publicly-available guarantee criteria of Standard & Poor's), the issuer of which is rated by Standard & Poor's, the Standard & Poor's Rating shall be the rating so assigned to such guarantor; or

(iv)        if such Collateral Debt Security is a Collateral Debt Security that has not been assigned a rating by Standard & Poor's pursuant to clause (A), (B) or (C) above, and is not of a type listed on Schedule G, the Standard & Poor's Rating of such Collateral Debt Security shall be the rating determined in accordance with Part II of Schedule H; *provided* that if any Collateral Debt Security shall, at the time of its purchase by the Issuer, be on watch for a possible upgrade or downgrade by Moody's, the Standard & Poor's Rating of such Collateral Debt Security shall be one subcategory above or below, respectively, the rating otherwise assigned to such Collateral Debt Security in accordance with Part II of Schedule H;

(b)    any Mortgage Finance Company Security will be determined as follows:

(i)        if there is an issuer credit rating of the issuer of such Mortgage Finance Company Security, or a guarantor that unconditionally and irrevocably guarantees the full payment of principal and interest on such Collateral Debt Security (with such form of guarantee meeting Standard & Poor's then-current criteria for guarantees), then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be the issuer rating of such issuer or such guarantor assigned by Standard & Poor's (regardless of whether there is a published rating by Standard & Poor's on the Mortgage Finance Company Security held by the Issuer) (*provided* that with respect to a private or confidential rating, consent of the party that obtained such rating shall be provided to Standard & Poor's);

(ii)        if the criteria set forth in clause (A) above does not apply, then the Issuer or the Collateral Manager on behalf of the Issuer, may apply to Standard & Poor's for a corporate credit estimate of the issuer, which shall be the Standard & Poor's Rating of such Mortgage Finance Company Security; *provided* that pending receipt from Standard & Poor's of such estimate, such Collateral Debt Security shall have a Standard & Poor's Rating of "CCC" if the Collateral Manager believes that such estimate will be at least "CCC" and the Aggregate Principal Balance of all Collateral Debt Securities having a Standard & Poor's Rating by reason of this proviso does not exceed 5.0% of the Aggregate Principal Balance of all Collateral Debt Securities; *provided*, *further*, that such credit estimate will expire after one year at which time the Collateral Manager may reapply for a new credit estimate.

(iii)        with respect to any Synthetic Security the Reference Obligation of which is a Mortgage Finance Company Security, the Standard & Poor's Rating of such Synthetic Security shall be the rating assigned thereto by Standard & Poor's in connection with the Acquisition thereof by the Issuer upon request of the Issuer or the Collateral Manager;

(iv)        if such Mortgage Finance Company Security is not rated by Standard & Poor's, but another security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains a Standard & Poor's Rating for such Mortgage Finance Company Security pursuant to clause (B) above, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be determined as follows:  (x) if there is a rating by Standard & Poor's on a senior secured obligation of the issuer, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be one subcategory below such rating; (y) if there is a rating on a senior unsecured obligation of the issuer by Standard & Poor's, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall equal such rating; and (z) if there is a rating on a subordinated obligation of the issuer by Standard & Poor's, then the Standard & Poor's Rating of such Mortgage Finance

Company Security shall be one subcategory above such rating if such rating is higher than "BB+", and shall be two subcategories above such rating if such rating is "BB+" or lower;

(v)      if a debt security or obligation of the issuer of such Mortgage Finance Company Security has been in default during the past two years, the Standard & Poor's Rating of such Mortgage Finance Company Security will be "D"; or

(vi)     if there is no issuer credit rating published by Standard & Poor's and such Mortgage Finance Company Security is not rated by Standard & Poor's, and no other security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains an Standard & Poor's Rating for such Mortgage Finance Company Security pursuant to subclause (B) above, then the Standard & Poor's Rating of such Mortgage Finance Company Security may be determined using any one of the methods provided below:

(A)      if such Mortgage Finance Company Security is publicly rated by Moody's, then the Standard & Poor's Rating of such Mortgage Finance Company Security will be (1) one subcategory below the Standard & Poor's equivalent of the public rating assigned by Moody's if such Mortgage Finance Company Security is rated "Baa3" or higher by Moody's and (2) two subcategories below the Standard & Poor's equivalent of the public rating assigned by Moody's if such Mortgage Finance Company Security is rated "Ba1" or lower by Moody's;

(B)      if such Mortgage Finance Company Security is not publicly rated by Moody's but a security with the same ranking is publicly rated by Moody's then the Standard & Poor's Rating of such parallel security will be determined in accordance with the methodology set forth in subclause (1) above, and the Standard & Poor's Rating of such Mortgage Finance Company Security will be determined in accordance with the methodology set forth in clause (D) above (for such purposes treating the parallel security as if it were rated by Standard & Poor's at the rating determined pursuant to this subclause (2)); or

(c)  any Form-Approved Synthetic Security will be determined based upon the Standard & Poor's Rating of the related Reference Obligation as determined in accordance with sub-clauses (b)(i) and (b)(ii) above;

*provided* that, in regard to sub-clauses (b)(i)(A), (b)(i)(B) and (b)(ii)(A) through (F) above and, to the extent any of the such clauses apply to the Reference Obligation of a Form-Approved Synthetic Security, sub-clause (b)(iii), (1) if a Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation)

(x) is placed on a watch list for possible upgrade by Standard & Poor's, the Standard & Poor's Rating applicable to such Collateral Debt Security shall be one rating subcategory above the Standard & Poor's Rating applicable to such Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) immediately prior to such Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) being placed on such watch list or (y) is placed on a watch list for possible downgrade by Standard & Poor's, the Standard & Poor's Rating applicable to such Collateral Debt Security shall be one rating subcategory below the Standard & Poor's Rating applicable to such Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) immediately prior to such Collateral Debt Security or Reference Obligation (as applicable) being placed on such watch list, (2) the Rating of not more than 20.0% of the Aggregate Principal Balance of all Collateral Debt Securities may be determined pursuant to clause (b)(i)(D), (b)(ii)(F) above or (to the extent clauses (b)(i)(D) or (b)(ii)(F) are applicable thereto) (b)(iii); and *provided*, *further*, that, in respect of any U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, the Standard & Poor's Rating shall be the rating assigned to the relevant guarantor of such Collateral Debt Security by Standard & Poor's if such U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security is not assigned a Standard & Poor's Rating pursuant to (b)(i)(A) above and such security is not rated by Moody's.

"**Rating Agency**" means each of (i) Moody's, for so long as any of the Outstanding Notes are rated by Moody's (including any private or confidential rating) and (ii) Standard & Poor's, for so long as any of the Outstanding Notes are rated by Standard & Poor's (including any private or confidential rating) or, with respect to Pledged Securities generally, if at any time Moody's or Standard & Poor's ceases to provide rating services with respect to Asset-Backed Securities, any other nationally-recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes.

"**Rating Condition**" means, with respect to any action taken or to be taken hereunder or under the Collateral Management Agreement, the Credit Default Swap Agreement or any Hedge Agreement, a condition that is satisfied when each of Moody's and Standard & Poor's (or if expressly so specified in respect of such action, the specified Rating Agency) has confirmed in writing, to the Issuer, the Trustee, each Hedge Counterparty and the Collateral Manager that such action will not result in the withdrawal, reduction or other adverse action with respect to its then-current rating (including any private or confidential ratings or credit estimates) of any Class of Notes.

"**Rating Confirmation**" has the meaning set forth in Section 7.17(d).

"**Ratings Confirmation Failure**" has the meaning set forth in Section 7.17(d).

"**Rating Determining Party**" means, with respect to any Synthetic Security, (a) unless clause (b) applies, such Synthetic Security Counterparty or any transferee thereof or (b) any Affiliate of such Synthetic Security Counterparty or any transferee thereof that unconditionally and absolutely guarantees the obligations of such Synthetic Security Counterparty or such transferee, as the case may be, hereunder pursuant to a form of guarantee

that satisfies the Rating Condition with respect to Standard & Poor's. For the purpose of this definition, no direct or indirect recourse against one or more shareholders of such Synthetic Security Counterparty or any such transferee (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of such Synthetic Security Counterparty or any such transferee.

"**Record Date**" means the date on which the Holders of Notes entitled to receive a payment in respect of principal or interest on the succeeding Distribution Date or Redemption Date are determined, such date as to any Distribution Date or Redemption Date being (i) in respect of Global Notes, the Business Day prior to such Distribution Date or Redemption Date and (ii) in respect of Definitive Notes, the 15th day (whether or not a Business Day) prior to such Distribution Date or Redemption Date.

"**Redemption Date**" means any date set for a redemption of Notes pursuant to Section 9.1, 9.5 or 9.6, as applicable.

"**Redemption Date Statement**" has the meaning set forth in Section 10.7(c).

"**Redemption Price**" means, with respect to the Notes to be redeemed pursuant to Section 9.1, 9.5 or 9.6, an amount (determined without duplication) equal to (A)(i) the Aggregate Outstanding Amount of such Notes being redeemed (which in the case of the Class A-1 Notes shall be the Outstanding Class A-1 Funded Amount) *plus* (ii) accrued interest and Commitment Fee thereon (including Defaulted Interest, interest on Defaulted Interest and any Class S Shortfall Amount, Class C Deferred Interest, Class D-1 Deferred Interest, Class D-2 Deferred Interest, Class E Deferred Interest or Class F Deferred Interest, as applicable, and interest thereon) *plus* (iii) with respect to an Optional Redemption of the Class A-1 Notes during the Class A-1 Make-Whole Period, the Class A-1 Make-Whole Amount (if any) payable thereon or (B) solely with respect to a Tax Redemption, any lesser amount agreed to in writing by the Holders of at least a Majority of the respective voting rights or Holders of at least 66-⅔% of the Aggregate Outstanding Amount of an Affected Class, as the case may be, or (C) solely with respect to an Auction Call Redemption, any lesser amount agreed to in writing by the Holders of 100% of the Aggregate Outstanding Amount of any Class of Notes.

"**Reference Banks**" has the meaning set forth in Schedule B.

"**Reference Obligation**" means a Permitted Reference Obligation in respect of which the Issuer has entered into or otherwise Acquired a Synthetic Security; *provided* that the Issuer shall not enter into any CDS Agreement Transaction unless the related Reference Obligation is an RMBS Security, CMBS Security or CDO Security.

"**Reference Obligor**" means the obligor on a Reference Obligation.

"**Registered**" means in registered form for U.S. federal income tax purposes and issued after July 18, 1984, *provided* that a certificate of interest in a trust that is treated as a grantor trust for U.S. federal income tax purposes shall not be treated as Registered unless each of the obligations or securities held by the trust was issued after that date.

"**Registered Form**" has the meaning set forth in Section 8-102(a)(13) of the UCC.

"**Regulation D**" means Regulation D under the Securities Act.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Definitive Note**" has the meaning set forth in <u>Section 2.4(b)(i)(F)</u>.

"**Regulation S Global Note**" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Regulation S Note**" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Regulation S Transfer Certificate**" has the meaning set forth in <u>Section 2.4(b)(i)(C)</u>.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221, or any successor regulation.

"**Reinvestment Agreement**" means a guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity organized under the laws of the United States or any state thereof under which no payments are subject to any withholding tax; *provided* that such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Rating Agency is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

"**Reinvestment Period**" means the period from the Closing Date and ending on and including the first to occur of (i) the Distribution Date immediately following the date that the Collateral Manager (with the written consent of a Majority-in-Interest of Preference Shares) notifies the Trustee, the Credit Default Swap Counterparty and each Hedge Counterparty that, in light of the composition of Collateral Debt Securities, general market conditions and other factors (including any change in U.S. federal tax law requiring tax to be withheld on payments to the Issuer with respect to obligations or securities held by the Issuer), the Collateral Manager (in its sole discretion) determines that it does not expect to be able to identify attractive and suitable investments in additional Collateral Debt Securities in the near future and the Reinvestment Period should end; (ii) the Distribution Date occurring in March 2012; (iii) the termination of the Reinvestment Period as a result of the occurrence of an Event of Default and declaration of acceleration; (iv) if the Moody's Rating Factor exceeds 750 for four consecutive Determination Dates relating to the Monthly Distribution Dates, the fourth such Determination Date; (v) the occurrence of a Reinvestment Period Loss Event; (vi) on any Determination Date, if the ratio (expressed as a percentage) obtained by *dividing* (A) the Net Outstanding Portfolio Collateral Balance on such Determination Date by (B) the sum of (I) the Aggregate Outstanding Amount of the Class A-2 Notes, (II) the Aggregate Outstanding Amount of the Class B Notes, (III) the Outstanding Class A-1 Funded Amount and (IV) the Remaining Unfunded Facility Commitment, is less than 112% and (vii) the occurrence of a Note Ratings Downgrade Event as of any Determination Date; *provided* that if the Reinvestment Period is terminated pursuant to this clause (vii), a Majority of the Controlling Class may vote to reinstate the Reinvestment Period at

-70-

any time prior to the scheduled end of the Reinvestment Period; *provided*, *further*, that if the Reinvestment Period is terminated pursuant to this clause (vii), the Reinvestment Period will be reinstated in the event that any Notes subject to a Note Ratings Downgrade Event are subsequently upgraded to their pre-Note Ratings Downgrade Event rating; and *provided*, *further*, that if the Collateral Manager had previously terminated the Reinvestment Period pursuant to clause (i) above, the Collateral Manager may (in its sole discretion) reinstate the Reinvestment Period if such notice of reinstatement is delivered prior to the Determination Date related to the Monthly Distribution Date occurring in March 2012.

"**Reinvestment Period Loss Event**" means, as of any Determination Date, the Collateral Debt Securities have experienced aggregate cumulative par losses in excess of U.S.$90,000,000.

"**Relevant Jurisdiction**" means, as to any obligor on any Collateral Debt Security, any jurisdiction (a) in which the obligor is incorporated, organized, managed and controlled or considered to have its seat, (b) where an office through which the obligor is acting for purposes of the relevant Collateral Debt Security is located, (c) in which the obligor executes Underlying Instruments or (d) in relation to any payment, from or through which such payment is made.  With respect to any Collateral Debt Security that is a Synthetic Security, each reference in this definition to (i) the "obligor" shall include reference to the relevant Reference Obligor and Synthetic Security Counterparty and (ii) the Underlying Instruments shall also include reference to the documents evidencing or otherwise governing such Reference Obligation.

"**Relevant Persons**" has the meaning set forth in <u>Section 2.7</u>.

"**Remaining Exposure**" means with respect to (a) any Synthetic Security (other than a CDS Agreement Transaction or Short Synthetic Security) at any time, the excess, if any, of (i) the Total Exposure of such Synthetic Security at such time over (ii) the Funded Amount of such Synthetic Security at such time or (b) with respect to any CDS Agreement Transaction under which the Issuer is the seller of protection and any related Short Synthetic Security (if applicable), (i) the Total Exposure under such CDS Agreement Transaction *minus* (ii) the Total Exposure of the Credit Default Swap Counterparty under any CDS Agreement Transaction that is a related Short Synthetic Security (if any).

"**Remaining Unfunded Facility Commitment**" means, with respect to any date of determination, (i) prior to and including the last day of the Reinvestment Period, the excess (if any) of:  (A) the Maximum Class A-1 Facility Funding Commitment over (B) the sum of (x) the Outstanding Class A-1 Funded Amount and (y) the Permanent Reduction Amount, and (ii) after the last day of the Reinvestment Period, (A) on any date that is not a Distribution Date, the excess (if any) of (1) the Remaining Exposure of all CDS Agreement Transactions as of the close of business on the immediately preceding Distribution Date (including, for these purposes, the Remaining Exposure of all CDS Agreement Transactions for which the applicable trade date has occurred but excluding the Remaining Exposure of all CDS Agreement Transactions with respect to which the Issuer has entered into a binding commitment to Dispose thereof, in each case regardless of the effective date thereof) over (2) the sum of the Reserve Account Balance as of the close of business on the immediately preceding Distribution Date and the sum of all Borrowings and Deemed Borrowings made under the Class A-1 Note Purchase Agreement after

-71-

the immediately preceding Distribution Date and (B) on a Distribution Date, the excess (if any) of (1) the Remaining Exposure of all CDS Agreement Transactions (including, for these purposes, the Remaining Exposure of all CDS Agreement Transactions for which the applicable trade date has occurred but excluding the Remaining Exposure of all CDS Agreement Transactions with respect to which the Issuer has entered into a binding commitment to Dispose thereof, in each case regardless of the effective date thereof), over (2) the Reserve Account Balance; and, in any event, zero on and after the Commitment Termination Date.  For the avoidance of doubt, the Remaining Unfunded Facility Commitment shall not be reduced by the amount of any funds deposited in a Class A-1 Prepayment Account by any holder of Class A-1 Notes until such amounts are applied to a Permitted Use as a Deemed Borrowing, thereby increasing the Outstanding Class A-1 Funded Amount.

"**REMIC**" means a real estate mortgage investment conduit within the meaning of Section 860D of the Code.

"**Replacement Agreement**" has the meaning set forth in Section 7.18(h).

"**Repository**" means the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at www.cdolibrary.com and maintained by the Bond Market Association.

"**Re-REMIC**" means an Asset-Backed Security the issuer of which is a REMIC (within the meaning of the Code) and whose holders are entitled to receive payments that depend entirely on the cash flow from one or more subordinated tranches of securities issued by other REMICs.

"**Reserve Account**" has the meaning set forth in Section 10.2(k).

"**Reserve Account Balance**" means the balance of the Reserve Account Investments standing to the credit of the Reserve Account, including amounts irrevocably designated for deposit in the Reserve Account but excluding any portion thereof consisting of (i) investment income or (ii) amounts irrevocably designated for withdrawal from the Reserve Account for application as Principal Proceeds.

"**Reserve Account Investments**" means an investment that matures no later than the Business Day prior to the Monthly Distribution Date next succeeding the date of such investment where the issuer is rated "Aa3" by Moody's; *provided* that if such issuer's long-term debt rating is not at least "Aa3" by Moody's (and if "Aa3", not on credit watch for possible downgrade below "Aa3") and short-term debt rating is not "P-1" by Moody's (and is not on credit watch for possible downgrade below "P-1"), such issuer shall be replaced by an issuer with a Moody's rating of "Aa3" and is further limited to (i) any Eligible Investment or any investment that satisfies the definition of "Eligible Investments" except that the counterparty thereto has a long term rating of not less than "AA-" by Standard & Poor's and not less than "Aa3" by Moody's (and, if rated "Aa3" by Moody's, such rating is not on watch for possible downgrade by Moody's) and a short term credit rating at least "A-1+" by Standard & Poor's (or "A-1" with respect to overnight time deposits offered by LaSalle Bank National Association) and "P-1" by Moody's (and, if so rated by Moody's, such rating is not on watch for possible

downgrade by Moody's) at the time of such investment, (ii) guaranteed investment contracts, (iii) a repurchase obligation entered into with a counterparty with short-term ratings of at least "A-2" by Standard & Poor's and at least "P-1" by Moody's or (iv) other investments the Acquisition of which would satisfy the Rating Condition, in each case which mature no later than the Stated Maturity; *provided* that (A) Reserve Account Investments may not include any investment the income from or proceeds of Disposition of which is or will be subject to deduction or withholding for or on account of any withholding or similar tax unless the payor is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required and (B) any assets credited to the Reserve Account in response to (a) a requirement to cure a failure of any of the Pro Rata Payment Conditions or (b) a requirement to fund the Reserve Account pursuant to <u>Section 11.1(ii)(K)(a)(IV)</u> shall, in each case, be invested only to Reserve Account Investments satisfying clauses (i) and (ii) of this definition; *provided*, *further*, that the Reserve Account Investments may include the Putnam Prime Money Market Fund or a similar fund managed by the Collateral Manager or an Affiliate thereof.  The Credit Default Swap Counterparty shall bear any par value losses of Reserve Account Investments standing to the credit of the Reserve Account to the extent any amounts payable by the Issuer to the Credit Default Swap Counterparty under the Credit Default Swap is made using such Reserve Account Investments.

"**Resolution**" means, with respect to the Issuer a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the managing member or any duly-appointed manager of the Co-Issuer.

"**Restricted Definitive Note**" has the meaning set forth in <u>Section 2.4(b)(i)(F)</u>.

"**Restricted Global Note**" has the meaning set forth in <u>Section 2.1(b)</u>.

"**Restricted Preference Share**" means a Preference Share substantially in the form included as an exhibit to the Preference Share Paying Agency Agreement.

"**Restricted Note**" has the meaning set forth in <u>Section 2.1(b)</u>.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Information**" means such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"**Rule 144A Transfer Certificate**" has the meaning set forth in <u>Section 2.4(b)(i)(B)</u>.

"**Sale**" has the meaning set forth in <u>Section 5.17</u>.

"**Sale Proceeds**" means all proceeds received as a result of Sales of Pledged Securities in connection with an Optional Redemption or Tax Redemption or pursuant to <u>Section 12.1(a)</u>, <u>12.1(b)</u> or <u>12.1(c)</u> or an Auction, net of any reasonable out-of-pocket expenses

of the Collateral Manager or the Trustee in connection with any such Sale (including any trading gains with respect to the termination of any CDS Agreement Transaction).

"**Schedule of Closing Collateral Debt Securities**" means the list of Collateral Debt Securities securing the Notes that is attached as <u>Schedule A</u>, which Schedule shall include the Principal Balance, the interest rate, the stated maturity, the Moody's Rating and the Standard & Poor's Rating of such Collateral Debt Security.

"**Scheduled Class E Target Principal Amount**" means an amount corresponding to that set forth on <u>Schedule K</u> hereto for each Monthly Distribution Date.

"**Scheduled Class F Target Principal Amount**" means an amount corresponding to that set forth on <u>Schedule L</u> hereto for each Monthly Distribution Date.

"**Scheduled Distribution**" means, with respect to any Pledged Security, for each Due Date, the scheduled payment in Cash of principal and/or interest and/or fee due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions set forth in <u>Section 1.2</u>.

"**Second Currency**" has the meaning set forth in <u>Section 14.13</u>.

"**Secured Parties**" has the meaning set forth in the Preliminary Statement of this Indenture.

"**Securities Account**" has the meaning set forth in Section 8-501(a) of the UCC.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Securities Intermediary**" has the meaning set forth in Section 8-102(a)(14) of the UCC.

"**Securities Purchase Agreement**" means the Securities Purchase Agreement, dated as of the Closing Date, among the Issuer, the Co-Issuer, the Initial Purchaser and the Placement Agent.

"**Security**" has the meaning set forth in Section 8-102(a)(15) of the UCC.

"**Security Certificate**" has the meaning set forth in Section 8-102(a)(16) of the UCC.

"**Security Entitlement**" has the meaning set forth in Section 8-102(a)(17) of the UCC.

"**Senior Collateral Management Fee**" means the fee payable to the Collateral Manager in arrears on each Monthly Distribution Date pursuant to Section 7 of the Collateral Management Agreement, in an amount equal to 0.10% *per annum* of the Monthly Asset Amount preceding such Monthly Distribution Date; *provided* that (a) the Senior Collateral Management Fee will be payable on each Monthly Distribution Date only to the extent of funds available for

such purpose in accordance with the Priority of Payments and (b) the Senior Collateral Management Fee payable upon termination without cause pursuant to Section 13(a) of the Collateral Management Agreement shall be the Senior Collateral Management Fee (based on the Net Outstanding Portfolio Collateral Balance on or immediately following the effective date of such termination) that would have otherwise been earned for the one-year period following the effective date of such termination. Any Senior Collateral Management Fee that is due but unpaid as a result of the operation of the Priority of Payments will be deferred (without any interest accruing thereon) and will be payable on each subsequent Monthly Distribution Date on which funds are available therefor in accordance with and subject to the Priority of Payments, until paid in full. Any Senior Collateral Management Fee accrued but not paid prior to the resignation or removal of a Collateral Manager shall continue to be payable to such Collateral Manager on the Monthly Distribution Date immediately following the effectiveness of such resignation or removal. The Collateral Manager may upon notice to the Issuer and the Trustee, elect to defer for a predetermined period of time a specified percentage of the Senior Collateral Management Fee for the first Due Period in which such deferral will apply, which deferral shall not be revocable during the period specified; *provided*, *however*, that in the event that the Collateral Manager is removed, resigns or assigns its rights to any person, the election to defer the Senior Collateral Management Fee shall automatically terminate and amounts payable to the successor Collateral Manager shall revert to the Senior Collateral Management Fee. Any Senior Collateral Management Fee which is deferred as a result of such election will be payable to the Collateral Manager on one or more subsequent Quarterly Distribution Dates on which funds are available therefor, in accordance with the Priority of Payments.

"**Senior Funded Note Reduction Amount**" means, with respect to any Distribution Date, an amount equal to the greater of (a) zero and (b)(i) the Senior Funded Note Share *multiplied by* (ii) the Total Reduction Amount.

"**Senior Funded Note Share**" means, for each Monthly Distribution Date as of the related Determination Date, the ratio of (a)(i) the Aggregate Outstanding Amount of the Senior Funded Notes immediately following the previous Monthly Distribution Date (or in the case of the first Monthly Distribution Date, the initial Aggregate Outstanding Amount of the Senior Funded Notes) *minus* (ii) the Deferred Senior Funded Notes Principal to (b) the sum of (i) the Aggregate Outstanding Amount of the Senior Funded Notes immediately following the previous Monthly Distribution Date (or in the case of the first Monthly Distribution Date, the initial Aggregate Outstanding Amount of the Senior Funded Notes) *plus* (ii) the Outstanding Class A-1 Funded Amount immediately following the previous Monthly Distribution Date (or in the case of the first Monthly Distribution Date, the Outstanding Class A-1 Funded Amount on the Closing Date) *plus* (iii) the Remaining Unfunded Facility Commitment immediately following the operation of the Priority of Payments on the previous Monthly Distribution Date (or in the case of the first Monthly Distribution Date, the Remaining Unfunded Facility Commitment on the Closing Date).

"**Senior Funded Notes**" means, collectively, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Senior Secured Facility**" means the Outstanding Class A-1 Funded Amount and the Remaining Unfunded Facility Commitment.

"**Servicer**" means, with respect to any Collateral Debt Security (other than CDO Securities), the entity that, absent any default, event of default or similar condition (however described), is primarily responsible for managing, servicing, monitoring and otherwise administering the cash flows from which payments to investors in such Collateral Debt Security are made.

"**Sovereign**" means, when used with respect to any country or obligations, the central or federal executive or legislative governmental authority of such country or, insofar as any obligations are concerned, any agency or instrumentality of such governmental authority (including any central bank or central monetary authority) to the extent such obligations are fully backed by the general taxing power of such governmental authority.

"**Special Purpose Vehicle Jurisdiction**" means (x) the Cayman Islands, the Bahamas, Bermuda, the Netherlands Antilles, the Channel Islands and any other jurisdiction that is commonly used as the place of organization of special or limited purpose vehicles that issue Asset-Backed Securities, (y) that generally impose no or nominal tax on the income of such special purpose vehicle and (z) the designation of which as a Special Purpose Vehicle Jurisdiction satisfies the Rating Condition.

"**Specified Change**" means any amendment or waiver of, or supplement to, an Underlying Instrument governing or relating to a Collateral Debt Security that (a) reduces the principal amount of such Collateral Debt Security, (b) reduces the rate of interest or any fee payable on such Collateral Debt Security, (c) postpones the Due Date of any Scheduled Distribution in respect of such Collateral Debt Security, (d) alters the *pro rata* allocation or sharing, or the relative priorities, of Distributions required by such Underlying Instrument, (e) releases any material guarantor of such Collateral Debt Security from its obligations, (f) terminates or releases any material lien or security interest securing such Collateral Debt Security or (g) changes any of the provisions of such Underlying Instrument specifying the number or percentage of lenders or holders required to effect any of the foregoing; *provided* that any amendment, waiver or supplement referred to in any of clauses (a) through (g) shall constitute a "Specified Change" only to the extent the Issuer would be affected thereby.

"**Specified Currency**" has the meaning set forth in Section 14.13.

"**Specified Event of Default**" means the occurrence and continuation of an Event of Default described in Sections 5.1(f) and (g).

"**Specified Person**" has the meaning set forth in Section 2.5(a).

"**Specified Place**" has the meaning set forth in Section 14.13.

"**Specified Type**" means an Asset-Backed Security that is: (1) an Automobile Security; (2) a Car Rental Security; (3) a CDO Security; (4) a CMBS Security; (5) a Credit Card Security; (6) an Equipment Leasing Security; (7) a Home Equity Loan Security; (8) a REIT Debt Security; (9) a Residential A Mortgage Security; (10) a Residential B/C Mortgage Security; (11) an RMBS Security; (12) a Small Business Loan Security; (13) a Student Loan Security; (14) a Timeshare Security; or (15) any other type of Asset-Backed Security designated as a "Specified Type" (and designated as an "ABS Type Diversified Security," an "ABS Type

Residential Security" or an "ABS Type Undiversified Security," together with any specification by (A) Moody's of a method for determining the "Rating" thereof pursuant to clause (a)(ii)(D) of the definition thereof or (B) Standard & Poor's of a method for determining the "Rating" thereof pursuant to clause (b)(i)(B) or (b)(i)(C) of the definition thereof) in a notice from the Collateral Manager to the Trustee so long as Moody's and Standard & Poor's have confirmed in writing to the Issuer, the Trustee and the Collateral Manager that such designation satisfies the Rating Condition.  If any type of Asset-Backed Security shall be designated as an additional Specified Type pursuant to the foregoing clause (15), the definition of each Specified Type of Asset-Backed Security in existence prior to such designation shall be construed to exclude such newly-designated Specified Type of Asset-Backed Security.  After the Closing Date, any other type of Asset Backed Security may be designated as a "Specified Type" in order to comply with the Rating Agency criteria in a notice from the Collateral Manager to the Trustee so long as (i) the Controlling Class has provided the Trustee with its prior written consent and (ii) Standard & Poor's has confirmed in writing to the Issuer, the Trustee and the Collateral Manager that such designation satisfies the Rating Condition.  If any type of Asset Backed Security will be so designated as an additional Specified Type, the definition of each Specified Type of Asset Backed Security in existence prior to such designation will be construed to exclude such newly designated Specified Type of Asset Backed Security.

"**Standard & Poor's**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"**Standard & Poor's Below B- Amount**" means on any Measurement Date, the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) having a public rating below "B-" by Standard & Poor's on such date.

"**Standard & Poor's Excess BB- Amount**" means the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) publicly rated below "BB-" by Standard & Poor's over (ii) the Standard & Poor's Below B- Amount.

"**Standard & Poor's Excess BBB- Amount**" means the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds or Collateral Debt Securities that are publicly rated "Baa3" or higher by Moody's or "BBB-" or higher by Fitch) publicly rated below "BBB-" by Standard & Poor's over (ii)(a) the Standard & Poor's Excess BB- Amount *plus* (b) the Standard & Poor's Below B- Amount *plus* (c) 5% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds).

"**Standard & Poor's CDO Monitor**" is the dynamic, analytical computer program provided by Standard & Poor's to the Collateral Manager and the Trustee (together with all assumptions and instructions necessary to run such model) on or after the date of receipt by the Issuer of Standard & Poor's Rating Confirmation with respect to the initial ratings for the purpose of estimating the default risk of Collateral Debt Securities, as modified by Standard & Poor's from time to time.

"**Standard & Poor's CDO Monitor Notification Test**" means a test satisfied on any Measurement Date on or after the Ramp-Up Completion Date if, after giving effect to the Sale of a Collateral Debt Security or the purchase of a Collateral Debt Security (or both), as the case may be, on such Measurement Date the Notes Default Rate Differential of the Proposed Portfolio is positive or if the Notes Default Rate Differential of the Proposed Portfolio is negative prior to giving effect to such Sale or purchase, the extent of compliance is improved after giving effect to the Sale or purchase of a Collateral Debt Security; *provided* that the Standard & Poor's CDO Monitor Notification Test shall not apply to the Sale of a Credit Risk Security; *provided*, *further*, that for purposes of determining the Standard & Poor's CDO Monitor Notification Test, unless otherwise specified, a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the related Reference Obligation and not of the Synthetic Security.

"**Standard & Poor's Haircut Amount**" means the sum of (i) 50% of the Standard & Poor's Below B- Amount *plus* (ii) 30% of the Standard & Poor's Excess BB- Amount *plus* (iii) 15% of the Standard & Poor's Excess BBB- Amount; *provided* that a Collateral Debt Security shall only be included in one of clauses (i) through (iii), which shall be the clause that results in the greatest Standard & Poor's Haircut Amount.

"**Standard & Poor's Minimum Weighted Average Recovery Rate Test**" means a test satisfied on any Measurement Date on or after the Ramp-Up Completion Date, if the Standard & Poor's Weighted Average Recovery Rate is equal to or greater than (a) with respect to the Class A Notes, 27.0%, (b) with respect to the Class S Notes, 27.0%, (c) with respect to the Class B Notes, 32.0%, (d) with respect to the Class C Notes, 37.5%, (e) with respect to the Class D Notes, 44.0% (f) with respect to the Class E Notes, 51.0% and (g) with respect to the Class F Notes, 51.0%.

"**Standard & Poor's Rating**" means, with respect to any Collateral Debt Security, the Rating thereof determined in accordance with clause (b) of the definition of "Rating."

"**Standard & Poor's Weighted Average Recovery Rate**" means, as of any Measurement Date, the number, expressed as a percentage, obtained by summing the products obtained by *multiplying* the Principal Balance of each Collateral Debt Security, other than a Defaulted Security, by its "Applicable Recovery Rate" (determined for purposes of this definition pursuant to clause (b) of the definition of "Applicable Recovery Rate") and *dividing* such sum by the Aggregate Principal Balance of all such Collateral Debt Securities.

"**Stated Maturity**" means, with respect to any Note, the Monthly Distribution Date occurring in March 2047 or, if such date is not a Business Day, the next following Business Day.

"**Step-Down Security**" means a security which by the terms of the related Underlying Instrument provides for a decrease, in the case of a Fixed Rate Collateral Debt Security, in the *per annum* interest rate on such security or, in the case of a Floating Rate Collateral Debt Security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that (i) a Step-Down Security shall not include any

such security providing for payment of a constant rate of interest at all times after the date of Acquisition by the Issuer or any such security where the decrease is linked to a clean-up call or certain events as laid out in the Underlying Instruments or (ii) with respect to which in calculating any Collateral Quality Test by reference to the spread (in the case of a floating rate Step-Down Security) or coupon (in the case of a fixed rate Step-Down Security) of a Step-Down Security, the spread or coupon on any date shall be deemed to be the lowest spread or coupon, respectively, scheduled to apply to such Step-Down Security on or after such date.

"**Step-Up Security**" means a security which by the terms of the related Underlying Instrument provides for an increase, in the case of a Fixed Rate Collateral Debt Security, in the *per annum* interest rate on such security or, in the case of a Floating Rate Collateral Debt Security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that a Step-Up Security shall not include any such security (i) that provides for payment of a constant rate of interest at all times after the date of Acquisition by the Issuer or any such security where the increase is linked to a clean-up call or certain events as laid out in the Underlying Instruments or (ii) with respect to which, in calculating any Collateral Quality Test that is determined in part by reference to the spread thereon (in the case of a floating rate Step-Up Security) or coupon thereon (in the case of a fixed rate Step-Up Security), the Collateral Manager elects to apply on the relevant Measurement Date the stated spread or coupon in effect on such date.

"**Subordinate Interests**" has the meaning set forth in Section 13.1(a), (b), (c), (d), (e), (f) and (g), as applicable.

"**Subordinated Collateral Management Fee**" means the fee payable to the Collateral Manager in arrears on each Quarterly Distribution Date pursuant to the Collateral Management Agreement, in an amount equal to 0.07% *per annum* of the Quarterly Asset Amount preceding such Quarterly Distribution Date; *provided* that (a) the Subordinated Collateral Management Fee shall only be payable on any Quarterly Distribution Date if on such date there are sufficient funds to achieve the Target Return I and Target Return II and (b) the Subordinated Collateral Management Fee payable upon termination without cause pursuant to Section 13(a) of the Collateral Management Agreement shall be Subordinated Collateral Management Fee (based on the Net Outstanding Portfolio Collateral Balance on or immediately following the effective date of such termination) that would have otherwise been earned for the one-year period following the effective date of such termination; *provided*, *further*, that the Subordinated Collateral Management Fee shall be payable on each Quarterly Distribution Date only to the extent of funds available for such purpose in accordance with the Priority of Payments. Any Subordinated Collateral Management Fee that is due and unpaid due to failure to achieve the Target Return I or Target Return II shall be deferred (and will accrue interest at a rate equal to LIBOR as in effect for the current Interest Period) and paid on the Quarterly Distribution Date on which the Target Return I and Target Return II are met. Any Subordinated Collateral Management Fee that is due (with interest) but unpaid as a result of the operation of the Priority of Payments will be deferred and will be payable (and will accrue interest at a rate equal to LIBOR as in effect for the current Interest Period) on each subsequent Quarterly Distribution Date on which funds are available therefor in accordance with and subject to the Priority of Payments, until paid in full. Any Subordinated Collateral Management Fee accrued but not paid prior to the resignation or removal of a Collateral Manager shall continue to be

payable to such Collateral Manager and shall have priority over any Collateral Management Fees payable to any successor Collateral Manager. The Subordinated Collateral Management Fee shall be prorated for any partial periods between Distribution Dates during which the Collateral Management Agreement was in effect and shall be due and payable on the first Quarterly Distribution Date following the date of such termination subject to the Priority of Payments. The Collateral Manager may upon notice to the Issuer and the Trustee, elect to defer for a predetermined period of time a specified percentage of the Subordinated Collateral Management Fee for the first Due Period in which such deferral will apply, which deferral shall not be revocable during the period specified; *provided*, *however*, that in the event that the Collateral Manager is removed, resigns or assigns its rights to any person, the election to defer the Subordinated Collateral Management Fee shall automatically terminate and amounts payable to the successor Collateral Manager shall revert to the Subordinated Collateral Management Fee. Any Subordinated Collateral Management Fee which is deferred as a result of such election will be payable (together with interest accrued thereon accruing at a rate equal to LIBOR for the current Interest Period) to the Collateral Manager on one or more subsequent Quarterly Distribution Dates on which funds are available therefor, in accordance with the Priority of Payments.

"**Subordinated Hedge Termination Payment**" means, with respect to any Hedge Agreement, any termination payment (and any accrued interest thereon) payable by the Issuer as the result of an "Event of Default" or "Termination Event" other than "Illegality" or "Tax Event" as to which the Hedge Counterparty party thereto is the sole "Defaulting Party" or the sole "Affected Party" (each, as defined in the relevant Hedge Agreement).

"**Subpool**" means each of the groups of Collateral Debt Securities designated by the Collateral Manager in accordance with the Auction Procedures on which Listed Bidders may provide a separate bid in an Auction.

"**Subscription Agreement**" means each Subscription Agreement, dated on or prior to the Closing Date, entered into between each purchaser of Preference Shares and either Initial Purchaser.

"**Substitute Collateral Debt Securities**" means the Collateral Debt Securities Acquired in substitution for Collateral Debt Securities or Equity Securities that mature, are redeemed prior to maturity, or are sold by the Collateral Manager.

"**Synthetic CDO Security**" means any CDO Security that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of CDO Securities) on the market value of and cash flow from underlying assets of which 100% of its aggregate principal balance (or notional balance) consists of one or more credit defaults swaps that reference a portfolio of Reference Obligations; *provided* that (i) the characteristics of such portfolio of Reference Obligations including, without limitation, its portfolio characteristics, investment and reinvestment criteria and credit profile (*e.g.*, probability of default recovery upon default and expected loss characteristics) shall be those normally associated with CDO Securities with current market practice; and (ii) invests the proceeds of such CDO Security in Eligible

Investments to secure the issuer's obligations under the credit default swaps.  For purposes of this definition, Synthetic CDO Securities shall include Bespoke CDO Securities.

"**Synthetic Security**" means any credit default swap (including any CDS Agreement Transaction), total return swap, credit linked note, derivative instrument, structured note or trust certificate purchased, or entered into, by the Issuer with or from a Synthetic Security Counterparty (including, without limitation, with the Credit Default Swap Counterparty under the Credit Default Swap Agreement) that provides for payments closely correlated to the default, recovery upon default and other expected loss characteristics of a Permitted Reference Obligation (other than the risk of default of the related Synthetic Security Counterparty), but that may provide for payments based on a maturity shorter than or a principal amount, interest rate, currency, premium, payment terms or other non-credit terms different from that of the related Reference Obligation; *provided* that (i) any "credit event" under any Synthetic Security that can result in termination and settlement of the Synthetic Security prior to its scheduled maturity date (a "**Credit Event**") shall not include restructuring, repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a Deliverable Obligation to the Issuer, and not in Cash, (ii) a Deemed Floating Asset Hedge Agreement entered into by the Issuer with respect to a Collateral Debt Security held by the Issuer shall not constitute a Synthetic Security for purposes of this definition, (iii) a Negative Amortization Security shall not constitute a Synthetic Security for purposes of this definition, (iv) if such Synthetic Security requires or permits physical settlement upon the occurrence of a Credit Event or otherwise by delivery of one or more deliverable obligations, each such deliverable obligation must itself be a Permitted Reference Obligation on the date the Issuer enters into such Synthetic Security, (v) the Acquisition, ownership or Disposition of such Synthetic Security will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to net income tax and (vi) amounts receivable by the Issuer will not be subject to withholding tax in respect of the Synthetic Security or the Synthetic Security Counterparty or the Reference Obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax.

For purposes of the Moody's Asset Correlation Test and the Weighted Average Life Test, a Synthetic Security will be included as a Collateral Debt Security having the characteristics and Average Life of the related Reference Obligation (and the issuer thereof will be deemed to be the related Reference Obligor) and not of the Synthetic Security.  For purposes of the Collateral Quality Tests (other than the Moody's Asset Correlation Test and the Weighted Average Life Test), for purposes of the Standard & Poor's CDO Monitor Notification Test, and for determining the Moody's Rating and Standard & Poor's Rating, a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the Synthetic Security and not of the related Reference Obligation.

"**Synthetic Security Collateral**" means, in connection with any Synthetic Security, (i) any floating rate security which is either a credit card security or RMBS Security that is rated "AAA" by Standard and Poor's and "Aaa" by Moody's and matures no later than the Stated Maturity, the expected average life of which does not exceed the expected average life of the related Reference Obligation by more than one year, (ii) any Eligible Investment or any investment of a type described in the definition of "Eligible Investments" but with respect to which the counterparty thereto has a long term rating of not less than "A+" by Standard & Poor's

and not less than "Aa3" by Moody's (and, if rated "Aa3" by Moody's, such rating is not on watch for possible downgrade by Moody's) or a short term credit rating of not less than "A-1" by Standard & Poor's and "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) at the time of such investment, (iii) commercial paper maturing no later than the Business Day prior to the Distribution Date next succeeding the date of investment in such commercial paper having at the time of such investment a credit rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's), not less than "A-1+" by Standard & Poor's, or (iv) other investments the Acquisition of which would satisfy the Rating Condition, in each case which mature no later than the Stated Maturity; *provided* that with respect to clause (i), the market value risk and credit risk on such credit card securities and RMBS Securities shall be hedged through the use of total return swaps.

"**Synthetic Security Counterparty**" means any entity (including, without limitation, the Credit Default Swap Counterparty) that (i) is required to make payments on a Synthetic Security (whether premium payments, as a result of a Credit Event thereunder or based upon payments received from one or more Reference Obligors on one or more related Reference Obligations) and (ii) satisfies the Synthetic Security Counterparty Ratings Requirement.

"**Synthetic Security Counterparty Account**" has the meaning set forth in Section 10.2(m).

"**Synthetic Security Counterparty Defaulted Obligation**" means a Synthetic Security (other than a Defaulted Synthetic Security) with respect to which:

(i)     the long-term debt obligations of such Synthetic Security Counterparty are rated less than "A3" by Moody's (or, if rated "A3", are on watch for possible downgrade by Moody's) or the short-term debt obligations of the Synthetic Security Counterparty are rated "D" or "SD" by Standard & Poor's, or cease to be rated; *provided* that the foregoing shall not apply in the case of a Synthetic Security in respect of which the value of assets standing to the credit of the related Issuer Collateral Account (which value will be marked-to-market no less frequently than monthly) is at least equal to any termination payment that would be due to the Issuer upon the early termination of such Synthetic Security, subject to the satisfaction of the Rating Condition by Standard & Poor's; or

(ii)     the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security.

"**Synthetic Security Counterparty Ratings Requirement**" means, with respect to a Synthetic Security Counterparty, a requirement which will be satisfied if (i) either (A) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of the Rating Determining Party with respect to the related Synthetic Security Counterparty are rated at least "Aa3" by Moody's (and if rated "Aa3", such rating is not on watch for possible downgrade) and no short-term rating is available from Moody's, or (B)(1) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated at least "A1" by Moody's (and if rated "A1", such rating is not on watch for possible downgrade) and (2) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Rating Determining Party are rated at least "P-1" by Moody's (and if rated

"P-1" such rating is not on watch for possible downgrade) and (ii) either (A) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Rating Determining Party are rated "A-1+" by Standard & Poor's, (B) the unsecured, unguaranteed and otherwise unsupported senior long-term debt obligations of such Rating Determining Party are rated at least "AA-" by Standard & Poor's or (C) subject to the satisfaction of the Rating Condition by Standard & Poor's, the unsecured, unguaranteed and otherwise unsupported senior long-term debt obligations of such Rating Determining Party are rated at least "A+" by Standard & Poor's.

"**Synthetic Security Discount Criteria**" means a Synthetic Security with respect to which the difference between (i) and (ii) exceeds 2.0%, where (i) is the rate of the fixed premium payments in respect of the applicable Synthetic Security payable to the related protection seller and (ii) is (a) in the case of a Reference Obligation that pays interest at a floating rate above LIBOR or above another floating rate index for Dollar-denominated obligations, the stated spread above such floating rate index at which interest accrues on the related underlying Reference Obligation or (b) in the case of a Reference Obligation that pays interest at a fixed rate, the deemed spread determined by subtracting the then-current London interbank offered rate (with the LIBOR period selected matching the periodic payment frequency of such Reference Obligation) from the total fixed rate coupon payable in respect of such Reference Obligation.

"**Target Return I**" means, with respect to the Class E Noteholders, the Class F Noteholders and the Preference Shareholders, as of any date, the aggregate amount required to be distributed in accordance with clause (S) of Section 11.1(i) which would equal (for the related Interest Period only) 12% *per annum* on U.S.$50,000,000 calculated on the basis of a 360-day year comprised of twelve 30-day months.

"**Target Return II**" means, with respect to the Class E Noteholders, the Class F Noteholders and the Preference Shareholders, as of any date, the aggregate amount required to be distributed in accordance with clause (W) of Section 11.1(i) (after giving effect to all distributions made previously to the Class E Noteholders, the Class F Noteholders and to the Holders of the Preference Shares on such Distribution Date and each preceding Distribution Date) which would provide a cumulative distribution as of such date of 12% on U.S.$50,000,000 calculated on the basis of a 360-day year comprised of twelve 30-day months.

"**Tax Event**" means the occurrence, whether or not as a result of any change in law or interpretations, of any of the following: (i) any obligor is, or on the next scheduled payment date under any Collateral Debt Security any obligor will be, required to deduct or withhold from any payment under any Collateral Debt Security to the Issuer for or on account of any tax, and such obligor is not, or will not be, required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding occurred, (ii) the Issuer, a Synthetic Security Counterparty, a Credit Default Swap Counterparty or a Hedge Counterparty is required to deduct or withhold from any payment under a Synthetic Security, a Credit Default Swap Agreement or a Hedge Agreement for or on account of any tax and the Issuer is obligated, or such Synthetic Security Counterparty, a Credit Default Swap Counterparty or such Hedge

Counterparty is not obligated, to make a gross-up payment or (iii) any net-basis tax measured by or based on the income of the Issuer is imposed by any jurisdiction on the Issuer.

"**Tax Materiality Condition**" means a condition which will be satisfied during any twelve-month period if any combination of Tax Events results, in aggregate, in a payment by, or charge or tax burden to, the Issuer in excess of U.S.$1,000,000.

"**Tax Redemption**" has the meaning set forth in Section 9.1(a)(ii).

"**Total Exposure**" means, with respect to any Synthetic Security structured as a credit default swap (including a CDS Agreement Transaction), the aggregate Notional Amount of such Synthetic Security.

"**Total Reduction Amount**" means, with respect to any Monthly Distribution Date, (a) the sum of (i) the Excess Notional Amount Liquidity for the related Determination Date (taking into account any amounts to be transferred from the Reserve Account to the Payment Account on the related Monthly Distribution Date pursuant to Section 10.2(k) for application in accordance with the Priority of Payments) *plus* (ii)(A) for purposes of clause (K)(a)(II) of Section 11.1(ii), the remaining Principal Proceeds available after the application thereof on such Monthly Distribution Date pursuant to clauses (A) through (J) of Section 11.1(ii) (inclusive) or (B) for purposes of clause (L)(a)(II) of Section 11.1(ii), the remaining Principal Proceeds available after the application thereof on such Monthly Distribution Date pursuant to clauses (A) through (K) of Section 11.1(ii) (inclusive) *multiplied by* (b)(i) with respect to any Monthly Distribution Date occurring prior to the last day of the Reinvestment Period, a percentage not exceeding 100% determined by the Collateral Manager in its sole discretion and notified to the Trustee on or prior to the related Determination Date or (ii) otherwise, 100%.

"**Total Redemption Amount**" means an aggregate amount sufficient (A) to pay all accrued and unpaid amounts payable under the Priority of Payments prior to the payment of the Notes (including (i) any termination payments and other amounts which are or may become payable by the Issuer pursuant to the Hedge Agreements and the Credit Default Swap Agreement, (ii) any payments payable by the Issuer to the Reserve Account such that the Remaining Unfunded Facility Commitment is reduced to zero, (iii) any accrued and unpaid Commitment Fee, (iv) any accrued and unpaid interest and defaulted interest and (v) all Administrative Expenses without regard to the U.S. dollar limitation set forth in Section 11.1(i)(B)), and any fees and expenses incurred by the Trustee and the Collateral Manager in connection with the sale, termination or other disposition of Collateral Debt Securities payable by the Issuer and (B) to redeem the Notes on the scheduled Redemption Date at the applicable Redemption Prices.

"**Trading Plan**" means series of Sales and/or purchases of Collateral Debt Securities (a) that is completed within the lesser of 10 Business Days and the period of time between the date on which the first purchase or Sale is made pursuant to such Trading Plan and the next succeeding Determination Date and (b) that results in the purchase of Collateral Debt Securities having an Aggregate Principal Balance of not more than 5.0% of the Net Outstanding Portfolio Collateral Balance. The time period for a Trading Plan shall commence on the first date on which the Issuer sells or purchases (or commits to sell or purchase) a Collateral Debt

Security included in such Trading Plan and shall end on the last day on which the Issuer sells or purchases (or commits to sell or purchase) a Collateral Debt Security included in such Trading Plan.

"**Transfer Agent**" means the Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"**Trust Officer**" means, when used with respect to the Trustee, any officer within the CDO Trust Services Group of the Corporate Trust Office (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred within the CDO Trust Services Group of the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject.

"**Trustee**" means LaSalle Bank National Association, a national banking association, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter Trustee shall mean such successor Person.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**Uncertificated Security**" has the meaning set forth in Section 8-102(a)(18) of the UCC.

"**Underlying Instruments**" means the indenture or other agreement pursuant to which a Pledged Security has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Security or of which the holders of such Pledged Security are the beneficiaries.

"**Uninvested Proceeds**" means the net proceeds received by the Issuer on the Closing Date from (x) the initial issuance of the Notes and Preference Shares (net of all expenses related to the offering of the Notes and Preference Shares) and (y) any net premium payable by the Hedge Counterparty to the Issuer pursuant to any Hedge Agreement, to the extent such proceeds have not been deposited in the Expense Account, the Reserve Account or invested in Collateral Debt Securities (including the deposit of any required amounts in a Synthetic Security Counterparty Account and including the purchase of accrued interest on any Collateral Debt Security), which amount will be deposited in the Reserve Account. Gains paid to the Issuer on the Closing Date with respect to the sale of U.S. Treasury securities Acquired in connection with warehousing arrangements entered into prior to the Closing Date shall also be treated as "Uninvested Proceeds" and shall be deposited in the Reserve Account.

"**United States**" and "**U.S.**" means the United States of America, including the States thereof and the District of Columbia.

"**Unregistered Securities**" has the meaning set forth in Section 5.17(c).

"**U.S. Agency Securities**" means Registered obligations of (i) the U.S. Treasury, (ii) any U.S. federal agency or (iii)(a) the Federal National Mortgage Association, (b) the Student Loan Marketing Association or (c) the Federal Home Loan Mortgage Corporation, in each case with a stated maturity that does not exceed the Stated Maturity of the Notes.

"**U.S. Person**" has the meaning given in Regulation S under the Securities Act.

"**U.S. Treasury Benchmark**" means, for any Collateral Debt Security, the interest rate on U.S. Treasury securities used as a benchmark for that Collateral Debt Security by two market-makers, selected by the Collateral Manager, in that Collateral Debt Security.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56 (2001).

"**VFN Monthly Report**" shall have the meaning set forth in the Class A-1 Note Purchase Agreement.

"**Weighted Average Life**" means, on any Measurement Date in respect of any Collateral Debt Security other than a Defaulted Security or Deferred Interest PIK Bond, the number obtained by (a) summing the products obtained by *multiplying* (i) the Average Life at such time of each such Collateral Debt Security by (ii) the outstanding Principal Balance of such Collateral Debt Security and (b) *dividing* such sum by the Aggregate Principal Balance at such time of all such Collateral Debt Securities other than Defaulted Securities or Deferred Interest PIK Bonds.

"**Weighted Average Life Test**" means a test satisfied as of any Measurement Date if the Weighted Average Life of all Collateral Debt Securities (other than Defaulted Securities and Deferred Interest PIK Bonds) as of such Measurement Date is less than or equal to (a) 7.75 years on or after the Ramp-Up Completion Date to and including the Monthly Distribution Date in March 2012 and (b) 2.75 years thereafter.

"**Weighted Average Premium/Spread**" means, as of any Measurement Date, a number (rounded up to the next 0.001%) equal to (a) the sum of (i) the sum of the products obtained by *multiplying* (A) the fixed rate premium percentage *per annum* payable by the applicable Synthetic Security Counterparty to the Issuer under each Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction) by (B) the Notional Amount of such Synthetic Security, (ii) the sum of the products obtained by *multiplying* (A) the Current Spread on each Collateral Debt Security (other than a Synthetic Security) that is a Floating Rate Collateral Debt Security, Deemed Floating Rate Collateral Debt Security or Fixed Rate Collateral Debt Security (other than a Defaulted Security, a Written-Down Security or a Deferred Interest PIK Bond) as of such date by (B) the Principal Balance of such Collateral Debt Security as of such date *minus* (iii) the sum of the products obtained by *multiplying* (A) the fixed rate premium percentage *per annum* payable to the applicable Synthetic Security Counterparty by the Issuer under each Short Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction) by (B) the Notional Amount of such Short Synthetic Security, *divided by* (b) the sum of (i) the aggregate Notional Amount of all Synthetic Securities

(excluding the Notional Amount of any Short Synthetic Securities), *plus* (ii) without duplication, the Aggregate Principal Balance of all Collateral Debt Securities that are Floating Rate Collateral Debt Securities, Deemed Floating Rate Collateral Debt Securities or Fixed Rate Collateral Debt Securities (excluding all Defaulted Securities, Written-Down Securities and Deferred Interest PIK Bonds) *minus* (iii) the aggregate Notional Amount of Short Synthetic Securities.  For purposes of this definition, (1) a PIK Bond shall be deemed to be a Deferred Interest PIK Bond so long as any interest thereon has been deferred and capitalized for at least one payment date (until payment of interest on such PIK Bond has resumed and all capitalized and deferred interest has been paid in accordance with the terms of the Underlying Instruments) and (2) no contingent payment of interest will be included in such calculation.

"**Weighted Average Premium/Spread Test**" means a test that is satisfied on any Measurement Date on or after the Ramp-Up Completion Date if, as of such Measurement Date, the Weighted Average Premium/Spread is equal to or greater than 1.80%.

"**Written-Down Security**" means any Collateral Debt Security other than a Defaulted Security as to which the aggregate par amount of such Collateral Debt Security and all other securities secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to such Collateral Debt Security exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such securities (excluding defaulted collateral); *provided* that upon receipt of written notice of such event, the Trustee shall notify Standard & Poor's of any Collateral Debt Security that becomes a Written-Down Security.

"**Zero Coupon Bond**" means a security (other than a Step-Up Security) that, pursuant to the terms of its Underlying Instruments, on the date on which it is purchased by the Issuer, does not provide for the periodic payment of interest or provides that all payments of interest will be deferred until the final maturity thereof.

In addition, except as otherwise specified herein or as the context may otherwise require, the following additional terms have the respective meanings set forth below for all purposes of this Indenture.

"**ABS Chassis Securities**" means Asset-Backed Securities (other than Aircraft Leasing Securities, Oil and Gas Securities, Project Finance Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of chassis (other than automobiles) to commercial and industrial customers, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying chassis; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the chassis for their stated residual value, subject to payments at the end of lease term for excess usage.

"**ABS Container Securities**" means Asset-Backed Securities (other than Aircraft Leasing Securities, Oil and Gas Securities, Project Finance Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of containers to commercial and industrial customers, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying containers; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the containers for their stated residual value, subject to payments at the end of lease term for excess usage.

"**ABS Franchise Securities**" means (1) Oil and Gas Securities and (2) Restaurant and Food Services Securities, to the extent that such Oil and Gas Securities or Restaurant and Food Services Securities entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from a pool of franchise loans made to operators of franchises.

"**ABS Natural Resource Receivable Security**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend on the cash flow from the sale of products derived from the right to harvest, mine, extract or exploit a natural resource such as timber, oil, gas and minerals, generally having the following characteristics: (i) the contracts have standardized payment terms, (ii) the contracts are the obligations of a few consumers of natural resources and accordingly represent an undiversified pool of credit risk and (iii) the repayment stream on such contracts is primarily determined by a contractual payment schedule.

"**ABS Type Diversified Securities**" means (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities; and (5) any other type of Asset-Backed Securities that become a Specified Type after the date hereof pursuant to the terms hereof and is designated as "ABS Type Diversified Securities" in connection therewith.

"**ABS Type Residential Securities**" means (1) RMBS Prime Mortgage Securities; (2) RMBS Mid-Prime Mortgage Securities; (3) RMBS Sub-Prime Mortgage Securities; (4) Manufactured Housing Securities; (5) Time Share Securities and (6) any other type of Asset Backed Securities that become a Specified Type after the Closing Date as described below and are designated as "ABS Type Residential Securities" in connection therewith.

"**ABS Type Undiversified Securities**" means each Specified Type of Asset-Backed Securities, other than (a) ABS Type Diversified Securities or (b) ABS Type Residential Securities; and any other type of Asset-Backed Securities that becomes a Specified

Type after the date hereof pursuant to the terms hereof and is designated as "ABS Type Undiversified Securities" in connection therewith.

"**Aerospace and Defense Securities**" means Asset-Backed Securities (including an enhanced equipment trust certificates) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of aircraft, vessels and telecommunications equipment to businesses for use in the provision of goods or services to consumers, the military or the government, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (5) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by other assets of the lessee, sublessee or guarantees granted by third parties.

"**Aircraft Leasing Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a portfolio consisting of aircraft leases and subleases, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (5) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by other assets of the lessee or sublessee or guarantees granted by third parties.  For purposes of this definition, Aircraft Leasing Securities shall include enhanced equipment trust certificates with respect to aircraft.

"**Automobile Securities**" means Asset-Backed Securities (other than Recreational Vehicle Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from prime installment sale loans made to finance the acquisition of, or from leases of, automobiles, generally having the following characteristics: (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessees and accordingly represent a very diversified pool of obligor credit risk; (3) the borrowers or lessees under the loans or leases generally do not have a poor credit rating; (4) the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or

leases predominantly dependent upon the disposition of the underlying vehicle; and (5) such leases typically provide for the right of the lessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Bank Guaranteed Securities**" means Asset-Backed Securities as to which, (a) if interest thereon is not timely paid when due, or the principal thereof is not timely paid at stated legal maturity, a national banking association organized under United States law or banking corporation organized under the laws of a state of the United States has undertaken in an irrevocable letter of credit or other similar instrument to make such payment against the presentation of documents, but only if such letter of credit or similar instrument (1) expires no earlier than such stated maturity (or contains "evergreen" provisions entitling the beneficiary thereof to draw the entire undrawn amount thereof upon the failure of the expiration date of such letter of credit or other similar instrument to be extended beyond its then current expiry date), (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Asset-Backed Security and (3) was issued by a bank having a credit rating assigned by each nationally-recognized statistical rating organization that currently rates the relevant Asset-Backed Security higher than the credit rating assigned by such rating organization to such Asset-Backed Security, determined without giving effect to such letter of credit or similar instrument or (b) the timely payment of interest on, or the payment of principal of at stated legal maturity is, in the judgment of the Collateral Manager, dependent upon an irrevocable letter of credit or other similar instrument undertaken by a national banking association organized under United States law or a banking corporation organized under the laws of a state of the United States, *provided* that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other Specified Type of Asset-Backed Security.

"**Bank Trust Preferred CDO Securities**" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the cash flow from a pool of trust preferred securities issued by a wholly-owned trust subsidiary of a U.S. financial institution which uses the proceeds of such issuance to purchase a portfolio of debt securities issued by its parent.  They generally have the following characteristics: (1) the trust securities are non-amortizing preferred stock securities; (2) the trust securities have a 30-year maturity with a 5- or 10-year non-call period; and (3) the trust securities are subordinated debt.

"**Bespoke CDO Securities**" means single-tranche Synthetic CDO Securities that have static investment portfolios where the Collateral Manager had input into the composition of such portfolios.

"**Car Rental Receivable Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of vehicles to car rental systems (such as Hertz, Avis, National, Dollar, Budget, etc.) and their franchisees, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the subleases are obligations of numerous franchisees and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and

subleases predominantly dependent upon the disposition to a lessee or third party of the underlying vehicle; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Catastrophe Bonds**" means Asset-Backed Securities that entitle the holders thereof to receive a fixed principal or similar amount and a specified return on such amount, generally having the following characteristics: (1) the issuer of such Asset-Backed Security has entered into a swap, insurance contract or similar arrangement with a counterparty pursuant to which such issuer agrees to pay amounts to the counterparty upon the occurrence of certain specified events, including but not limited to: hurricanes, earthquakes and other events; and (2) payments on such Asset-Backed Security depend primarily upon the occurrence and/or severity of such events.

"**CDO Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from other Asset-Backed Securities (other than loans secured primarily by commercial real estate) generally having the following characteristics: (1) the debt securities have varying contractual maturities; (2) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of debt securities depending on numerous factors specific to the particular issuers or obligors and upon whether, in the case of loans or securities bearing interest at a fixed rate, such securities include an effective prepayment premium; and (3) proceeds from such repayments can for a limited period and subject to compliance with certain eligibility criteria be reinvested in additional debt securities.

"**CLO Securities**" means Collateral Debt Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Collateral Debt Securities) on the cash flow from a portfolio that includes any commercial and industrial bank loans which are generally rated by Moody's and Standard & Poor's.

"**CMBS Conduit Securities**" means Asset-Backed Securities (i) (A) issued by a single-seller or multi-seller conduit under which the holders of such Asset-Backed Securities have recourse to a specified pool of assets (but not other assets held by the conduit that support payments on other series of securities) and (B) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans generally having the following characteristics: (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans are obligations of a relatively limited number of obligors (with the creditworthiness of individual obligors being less material than for CMBS Large Loan Securities and Credit Tenant Lease Securities) and accordingly represent a relatively undiversified pool of obligor credit risk; (4) upon original issuance of such Asset-Backed Securities no 10 commercial mortgage loans account for more than 75% of the Aggregate Principal Balance of the entire pool of commercial

mortgage loans supporting payments on such securities and such pool contains at least 50 such loans; and (5) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium or (ii) backed by a pool of securities where at least 80% of the Aggregate Principal Balance of the underlying pool consists of securities described in (i) above.

"**CMBS Credit Tenant Lease Securities**" means Asset-Backed Securities (other than CMBS Large Loan Securities, CMBS Single Property Securities and CMBS Conduit Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties leased to corporate tenants (or on the cash flow from such leases). They generally have the following characteristics: (1) the commercial mortgage loans or leases have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the leases are secured by leasehold interests; (4) the commercial mortgage loans or leases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment thereof can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans or termination of leases depending on numerous factors specific to the particular obligors or lessees and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; and (6) the creditworthiness of such corporate tenants is the primary factor in any decision to invest in these securities.

"**CMBS Large Loan Securities**" means Asset-Backed Securities (other than CMBS Conduit Securities, CMBS Credit Tenant Lease Securities and CMBS Single Property Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties. They generally have the following characteristics: (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (4) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (5) the valuation of individual properties securing the commercial mortgage loans is the primary factor in any decision to invest in these securities.

"**CMBS Securities**" means CMBS Conduit Securities, CMBS Credit Tenant Lease Securities and CMBS Large Loan Securities (including CMBS Single Property Securities),

CRE CDO Securities and any Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a portfolio of loans secured primarily by commercial real estate.

"**CMBS Single Property Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from one or more commercial mortgage loans made to finance the acquisition, construction and improvement of a single property.  They generally have the following characteristics:  (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans or leases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; and (4) payment thereof can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans or termination of leases depending on numerous factors specific to the particular obligors or lessees and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium.

"**Combination Securities**" means any Securities consisting of two or more separate component securities, including a debt security component and/or an equity security component.

"**Consumer ABS Securities**" means Automobile Securities, Car Rental Receivable Securities, Credit Card Securities and Student Loan Securities.

"**CRE CDO Securities**" means collateralized debt obligations, collateralized bond obligations or collateralized loan obligations (including, without limitation, any synthetic collateralized debt obligations or synthetic collateralized loan obligations) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CRE CDO Securities) on the cash flow from (and not the market value of) a portfolio of securities related to commercial mortgage property.

"**Credit Card Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances outstanding under prime revolving consumer credit card accounts, generally having the following characteristics: (1) the accounts have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum credit limit and general economic matters.

"**EETC Security**" means an enhanced equipment trust certificate.

"**Emerging Market Securities**" means any security (i) the obligor of which is an Emerging Market Obligor or (ii) that is a Structured Finance CDO Security the Underlying Instruments of which permit more than 20% of its assets to be invested in securities the obligors of which are Emerging Market Obligors, or (iii) that is a Synthetic Security based in whole or in part on a security described in clause (i) or (ii) above. An "Emerging Market Obligor" means any obligor of a security (i) that is organized under the laws of an Emerging Market Country, Japan, Taiwan or Singapore or (ii) that is a Sovereign (whether or not a Sovereign issuer) or another governmental issuer of an Emerging Market Country, Japan, Taiwan or Singapore; *provided*, *however*, that this definition may be revised (i) with the prior written approval of a majority of the Aggregate Outstanding Amount of the Controlling Class and (ii) upon satisfaction of the Rating Condition with respect to such revision. An "**Emerging Market Country**" means any sovereign jurisdiction the long-term Dollar denominated sovereign debt obligations of which are rated below "Aa2" by Moody's or the foreign currency issue credit rating of such jurisdiction is rated below "AA" by Standard & Poor's.

"**Equipment Leasing Securities**" means Asset-Backed Securities (other than Aircraft Leasing Securities, Healthcare Securities, Oil and Gas Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of equipment (other than automobiles) to commercial and industrial customers, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage.

"**FHLMC/FNMA Guaranteed Securities**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than the stated legal maturity, is fully and unconditionally guaranteed by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association but only if such guarantee (x) expires no earlier than such stated maturity and (y) is independent of the performance by the obligor on the relevant Asset-Backed Security; *provided* that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other type of Asset-Backed Security.

"**Floorplan Receivable Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) upon assets that will consist of a revolving pool of receivables arising from the purchase and financing by domestic retail motor vehicle dealers for their new and used automobile and light-duty truck inventory.  The receivables are comprised of principal receivables and interest receivables.  In addition to receivables arising in connection with designated accounts, the trust assets may include interests in other floorplan assets, such as: (1) participation interests in pools

of assets existing outside the trust and consisting primarily of receivables arising in connection with dealer floorplan financing arrangements originated by a manufacturer or one of its Affiliates; (2) participation interests in receivables arising under dealer floorplan financing arrangements originated by a third party and participated to a manufacturer; (3) receivables originated by a manufacturer under syndicated floorplan financing arrangements between a motor vehicle dealer and a group of lenders; or (4) receivables representing dealer payment obligations arising from purchases of vehicles.

"**Franchise Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Asset-Backed Securities) primarily on the cash flow from balances outstanding on franchise loans secured by the cash flow generated at franchise or chain-store establishments, typically fast-food chains, service stations, convenience stores or funeral homes, as well as liens on real estate, furniture, fixtures and equipment, the proceeds of which were used to acquire, refinance or create a source of working capital for such franchise establishments, generally having the following characteristics: (1) the franchise loans have standardized payment terms and require minimum monthly payments; (2) the franchise loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the franchise loans are repaid; and (4) environmental liabilities and legal liabilities of the franchisees may affect their ability to repay the franchise loans.

"**Future Flow Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from trade accounts receivable, entertainment royalties, structured litigation settlements or ticket receivables.

"**Guaranteed Corporate Debt Securities**" means CDO Securities guaranteed as to ultimate or timely payment of principal or interest, including CDO Securities guaranteed by a monoline financial insurance company.

"**Healthcare Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (i) leases and subleases of equipment to hospitals, non-hospital medical facilities, physicians and physician groups for use in the provision of healthcare services or (ii) Medicare, Medicaid or any other third-party payor receivables related to medical, hospital or other health care related expenses, charges or fees.

"**High-Yield CLO Securities**" means CLO Securities which entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CLO Securities) on the cash flow from a portfolio that includes any commercial and industrial bank loans that are obligations of issuers that have a Moody's Rating below "Baa3". For purposes of clarity, "High-Yield CLO Securities" will not include High-Yield CDO Securities.

"**Home Equity Loan Securities**" means any Asset-Backed Security that entitles the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances (including revolving balances) outstanding under loans or lines of credit secured by (primarily by a second priority lien on) single family residential real estate the proceeds of which loans or lines of credit are not used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously so used), and that generally have the following characteristics: (1) where applicable, the weighted average FICO Score with respect to the obligors on all such underlying loans upon origination is greater than or equal to 625 and such security is ineligible to be classified as an Residential A Mortgage Security: (2) the balances have standardized payment terms and require minimum monthly payments; (3) the balances are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (4) the repayment stream on such balances does not depend on a contractual repayment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum line of credit and general economic matters; and (5) the line of credit or loan may be secured by residential real estate with a market value (determined on the date of origination of such line of credit or loan) that is less than the original proceeds of such line of credit or loan.

"**Hybrid Securities**" means any Collateral Debt Security (including but not limited to Asset-Backed Securities the payments on which depend on the cash flow from adjustable rate mortgages) that, pursuant to its Underlying Instruments, bears interest at a fixed rate for a limited period of time, after which it bears interest based upon a floating rate index for Dollar denominated obligations commonly used as a reference rate in the United States or the United Kingdom.

"**Insurance Company Guaranteed Securities**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is (a) unconditionally guaranteed pursuant to an insurance policy, guarantee or other similar instrument issued by an insurance company organized under the laws of a state of the United States, but only if such insurance policy, guarantee or other similar instrument (i) expires no earlier than such stated maturity, (ii) provides that payment thereunder is independent of the performance by the obligor on the relevant Asset-Backed Security and (iii) is issued by an insurance company having a credit rating assigned by each nationally-recognized statistical rating organization that currently rates such Asset-Backed Security higher than the credit rating assigned by such rating organization to such Asset-Backed Security determined without giving effect to such insurance policy, guarantee or other similar instrument or (b) in the judgment of the Collateral Manager, dependent upon an insurance policy, guarantee or other similar instrument issued by an insurance company organized under the laws of a state of the United States, *provided* that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other type of Asset-Backed Security.

"**Inverse Floating Rate Security**" means any floating rate security whose interest rate is inversely proportional to an interest rate index.

"**Lottery Receivable Security**" means an Asset-Backed Security that (a) entitles the holders thereof to receive payments that depend (except for rights or other assets designed to

assure the servicing or timely distribution of proceeds to holders of such Asset-Backed Security) upon an arrangement that compensates a winner of a state lottery with one lump sum payment in exchange for a pledge of the lottery payments that individual would have received over a future period of time and (b) is backed by a diversified pool of payments received from various state lottery commissions in exchange for a lump sum payment to a *bona fide* winner of a given state lottery.

"**Majority ABS Security**" means any security that is one of the following Specified Types: CDO Securities, Automobile Securities, CMBS Securities, Credit Card Securities, Equipment Leasing Securities, Home Equity Loan Securities, REIT Debt Securities, Residential A Mortgage Securities, Residential B/C Mortgage Securities, Small Business Loan Securities, Student Loan Securities or Mortgage Finance Company Securities.

"**Manufactured Housing Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from manufactured housing (also known as mobile homes and prefabricated homes) installment sales contracts and installment loan agreements, generally having the following characteristics: (1) the contracts and loan agreements have varying, but typically lengthy contractual maturities; (2) the contracts and loan agreements are secured by the manufactured homes and, in certain cases, by mortgages and/or deeds of trust on the real estate to which the manufactured homes are deemed permanently affixed; (3) the contracts and/or loans are obligations of a large number of obligors and accordingly represent a relatively diversified pool of obligor credit risk; (4) repayment thereof can vary substantially from the contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (5) in some cases, obligations are fully or partially guaranteed by a governmental agency or instrumentality.

"**Minority ABS Security**" means any security that is one of the following Specified Types: Bank Guaranteed Securities, FHLMC/FNMA Guaranteed Securities, Insurance Company Guaranteed Securities, Re-REMICs, U.S. Agency Guaranteed Securities, Manufactured Housing Securities and Timeshare Securities.

"**Monoline Guaranteed Securities**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is unconditionally guaranteed pursuant to an insurance policy, guarantee or other similar instrument issued by a monoline insurer organized under the laws of a state of the United States, but only if such insurance policy, guarantee or other similar instrument (1) expires no earlier than such stated maturity, (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Asset-Backed Security and (3) is issued by a monoline insurer having a credit rating assigned by a nationally-recognized statistical rating organization that currently rates such Asset-Backed Security which is higher than the credit rating assigned by such rating organization to such Asset-Backed Security determined without giving effect to such insurance policy, guarantee or other similar instrument. Notwithstanding anything herein to the contrary, any Collateral Debt Security that qualifies as a Monoline

Guaranteed Security will not qualify as any other specified type for so long as such Collateral Debt Security qualifies as a Monoline Guaranteed Security.

"**Mortgage Finance Company Security**" means a debt security (other than an Asset-Backed Security or a REIT Debt Security), which may be secured or unsecured issued by a mortgage-related finance company that, if subordinate by its terms, is subordinated only to indebtedness for borrowed money, trade claims, capitalized leases or other similar obligations.

"**Mortgage-Related Securities**" means Mortgage Finance Company Securities, CMBS Securities, ABS Type Residential Securities, REIT Debt Securities, U.S. Agency Guaranteed Securities, FHLMC/FNMA Guaranteed Securities and ABS Type Undiversified Securities that are mortgage-related.

"**Mutual Fund Fees Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of brokerage fees and costs relating to various mutual funds, generally having the following characteristics: (1) the brokerage arrangements have standardized payment terms and require minimum payments; (2) the brokerage fees and costs arise out of numerous mutual funds and accordingly represent a very diversified pool of credit risk; and (3) the collection of brokerage fees and costs can vary substantially from the contractual payment schedule (if any), with collection depending on numerous factors specific to the particular mutual funds, interest rates and general economic matters.

"**NIM Security**" means a net-interest margin security.

"**Oil and Gas Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide oil and gasoline and provide other services related thereto and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services.  They generally have the following characteristics:  (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a

franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"**Project Finance Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (1) the sale of products, such as electricity, nuclear energy, steam or water, in the utility industry by a special purpose entity formed to own the assets generating or otherwise producing such products and such assets were or are being constructed or otherwise Acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to such assets and the land on which they are located) or (2) fees or other usage charges, such as tolls collected on a highway, bridge, tunnel or other infrastructure project, collected by a special purpose entity formed to own one or more such projects that were constructed or otherwise Acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to the project and the land on which it is located).

"**Recreational Vehicle Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from installment sale loans made to finance the acquisition of, or from leases of, recreational vehicles, generally having the following characteristics:  (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessors and accordingly represent a very diversified pool of obligor credit risk; (3) the borrowers or lessees under the loans or leases generally do not have a poor credit rating; (4) the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or leases predominantly dependent upon the disposition of the underlying recreational vehicle; and (5) such leases typically provide for the right of the lessee to purchase the recreational vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Reinsurance Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend in part on the premiums from reinsurance policies held by a special purpose vehicle created for such purpose, generally having the following characteristics: (1) proceeds from the security are invested in a collateral account; (2) such collateral account is subject to claims from the reinsurance policies; and (3) the repayment of principal on the security is dependent on the exercise of the reinsurance policies.

"**REIT Debt Securities**" means debt securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision).

"**REIT Debt Securities—Diversified**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of mortgages on a portfolio of diverse real property interests, *provided* that (a) any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security and (b) any

REIT Debt Security falling within any other REIT Debt Security description set forth herein shall be excluded from this definition.

"**REIT Debt Securities—Health Care**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of mortgages on hospitals, clinics, sport clubs, spas and other health care facilities and other similar real property interests used in one or more similar businesses, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Hotel**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of hotels, motels, youth hostels, bed and breakfasts and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Industrial**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of factories, refinery plants, breweries and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Mortgage**" means REIT Debt Securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of mortgages, commercial mortgage-backed securities, collateralized mortgage obligations and other similar mortgage-related securities (including REIT Debt Securities issued by a hybrid form of such trust that invests in both commercial real estate and commercial mortgages), *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Multi-Family**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of multi-family dwellings such as apartment blocks, condominiums and co-operative owned buildings, including assets in the form of mortgages on any of the foregoing, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Office**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of

proceeds to holders of the REIT Debt Securities) of office buildings, conference facilities and other similar real property interests used in the commercial real estate business, including assets in the form of mortgages on any of the foregoing, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type REIT Debt Security.

"**REIT Debt Securities—Residential**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of residential mortgages (other than multi-family dwellings) and other similar real property interests, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Retail**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of retail stores, restaurants, bookstores, clothing stores and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Storage**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of storage facilities and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, *provided* that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Trust Preferred CDO Securities**" means Asset-Backed Securities issued by an entity formed for the purpose of holding or investing and reinvesting in a pool of trust preferred securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision).

"**Residential A Mortgage Securities**" means Asset-Backed Securities (other than Residential B/C Mortgage Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have generally been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such

-101-

mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) where applicable, the weighted average FICO Score with respect to the obligors on all such underlying loans upon origination is greater than 625.

"**Residential B/C Mortgage Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured by subprime residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have generally not been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) where applicable, the weighted average credit score based on the FICO Score with respect to the obligors on all such underlying loans is 625 or lower.

"**Restaurant and Food Services Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide goods and services relating to the restaurant and food services industries and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services. They generally have the following characteristics: (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"**RMBS Mid-Prime Mortgage Securities**" means RMBS Securities that entitles the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from balances (including revolving balances) outstanding under loans or lines of credit secured by single family residential real estate the proceeds of which loans or lines of credit are used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously so used), and that generally have the following characteristics: (1) the balances have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such balances does not depend on a contractual repayment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum line of credit and general economic matters; (4) the line of credit or loan may be secured by residential real estate with a market value (determined on the date of origination of such line of credit or loan) that is less than the original proceeds of such line of credit or loan; and (5) where applicable, the weighted average FICO Score with respect to the obligors on all such underlying loans is greater than 625 and less than 700.

"**RMBS Securities**" means Residential A Mortgage Securities, Residential B/C Mortgage Securities, RMBS Mid-Prime Mortgage Securities, RMBS Prime Mortgage Securities, RMBS Sub-Prime Mortgage Securities, Home Equity Loan Securities and FHLMC/FNMA Guaranteed Securities.

"**RMBS Prime Mortgage Securities**" means RMBS Securities (other than Collateral Debt Securities that, if owned by the Issuer, would constitute RMBS Sub-Prime Mortgage Securities or RMBS Mid-Prime Mortgage Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from residential mortgage loans secured (subject to permitted liens, easements and other encumbrances) by residential real estate (single or multifamily properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have generally been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) where applicable, the weighted average FICO Score with respect to the obligors on all such underlying loans is greater than or equal to 700.

"**RMBS Sub-Prime Mortgage Securities**" means RMBS Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from residential mortgage loans secured by subprime residential real estate (single or multifamily properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having

the following characteristics: (1) the mortgage loans have generally not been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments of interest and minimum monthly payments of principal each month; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) the weighted average FICO Score with respect to the obligors on all such underlying loans is 625 or lower.

"**Second Lien Securities**" means RMBS Securities with more than 10% of the underlying loans in such security structured as second liens.

"**Short Synthetic Security**" means a Synthetic Security (which may include a CDS Agreement Transaction) pursuant to which the Issuer transfers the credit risk associated with the related Reference Obligation to the Synthetic Security Counterparty; *provided* that the Short Synthetic Security will have the same CUSIP, Notional Amount, Reference Obligor and economic terms (except for the premium) as the CDS Agreement Transaction hedged by the related Short Synthetic Security; *provided further* that if the Short Synthetic Security does not have the same counterparty as the CDS Agreement Transaction hedged by the related Short Synthetic Security, the Issuer will not make any Floating Payments on the CDS Agreement Transaction hedged by such Short Synthetic Security until it has received related floating payments from the counterparty on the Short Synthetic Security; *provided further* that such Short Synthetic Security can only be entered into if it satisfies the Rating Condition with respect to Standard & Poor's, the application for which by the Collateral Manager, on behalf of the Issuer, shall include a pro forma calculation of the weighted average spread/premium taking into account the outflow of premium on such Short Synthetic Security; *provided further* that a termination of the Short Synthetic Security (except for a termination triggered by default of the Short Synthetic Security counterparty) shall only be permitted if it is done in conjunction with the termination of the CDS Agreement Transaction hedged by the related Short Synthetic Security and when the net CDS Termination Payment to the Issuer is greater than or equal to zero.

"**Small Business Loan Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from general purpose corporate loans made to "small business concerns" (generally within the meaning given to such term by regulations of the United States Small Business Administration), including but not limited to those (a) made pursuant to Section 7(a) of the United States Small Business Act, as amended, and (b) partially guaranteed by the United States Small Business Administration.  Small Business Loan Securities generally have the following characteristics:  (1) the loans have payment terms that comply with any applicable requirements of the Small Business Act, as amended; (2) the loans are obligations of a relatively limited number of borrowers and accordingly represent an undiversified pool of obligor credit risk; and (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the

particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium.

"**Stadium Receivables Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from ticket receipts and other revenue including, without limitation, concession and paraphernalia sales, received by a property manager of stadiums.

"**Structured Finance CDO Securities**" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the market value of, credit exposure to, or cash flow from, a portfolio consisting substantially of Asset-Backed Securities.

"**Structured Settlement Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from receivables representing the right of litigation claimants to receive future scheduled payments under settlement agreements that are funded by annuity contracts, which receivables may have varying maturities.

"**Student Loan Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from loans made to students (or their parents) to finance educational needs, generally having the following characteristics: (1) the loans have standardized terms; (2) the loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such loans is primarily determined by a contractual payment schedule, with early repayment on such loans predominantly dependent upon interest rates and the income of borrowers following the commencement of amortization; and (4) such loans may be fully or partially insured or reinsured by the United States Department of Education.

"**Tax Lien Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of tax obligations owed by businesses and individuals to state and municipal governmental taxing authorities, generally having the following characteristics: (1) the obligations have standardized payment terms and require minimum payments; (2) the tax obligations are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on the obligation is primarily determined by a payment schedule entered into between the relevant tax authority and obligor, with early repayment on such obligation predominantly dependent upon interest rates and the income of the obligor following the commencement of amortization.

"**Timeshare Securities**" means Asset-Backed Securities (other than Residential A Mortgage Securities, Residential B/C Mortgage Securities and Home Equity Loan Securities) that entitle the holders thereof to receive payments that depend primarily on the cash flow from residential mortgage loans (secured on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate the proceeds of which were used to purchase fee simple interests in timeshare estates in units in a condominium, generally having the following characteristics: (1) the mortgage loans have standardized payment terms and require minimum monthly payments; (2) the mortgage loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the mortgage loans are repaid; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium and with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling and generally no penalties for early repayment.

"**Tobacco Bonds**" means Structured Settlement Securities resulting from tobacco-related litigation.

"**U.S. Agency Guaranteed Securities**" means any Asset-Backed Securities as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is (a)(1) fully and unconditionally guaranteed by a U.S. federal agency the obligations of which are backed by the full faith and credit of the United States, but only if such guarantee (x) expires no earlier than such stated maturity and (y) is independent of the performance by the obligor on the relevant Asset-Backed Security or (b) in the judgment of the Collateral Manager dependent upon the credit of a U.S. federal agency backed by the full faith and credit of the United States; *provided* that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other type of Asset-Backed Security.

"**U.S. Agency Securities**" means Registered obligations of (i) the U.S. Treasury, (ii) any U.S. federal agency or (iii)(A) Fannie Mae, (B) SLM Corporation or (C) Freddie Mac, in each case with a stated maturity that does not exceed Stated Maturity of the Notes.

Section 1.2    Assumptions as to Collateral Debt Securities, Etc.

(a)    The provisions set forth in this Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Accounts.

(b)    All calculations with respect to Scheduled Distributions on the Pledged Securities securing the Notes and any determination of the Average Life of any Collateral Debt Security, and any determination of the rate at which interest accrues on any Pledged Security, shall be made by the Collateral Manager using (in the case of the Collateral Debt Securities) the

assumptions that (i) no Pledged Security defaults or is sold except for Pledged Securities that the Collateral Manager has identified for sale during the relevant Due Period and the sale of which, in the Collateral Manager's reasonable business judgment, is expected to be settled in whole on or prior to the last day of the current Due Period, (ii) prepayment of any Pledged Security during any month occurs at a rate equal to the average rate of prepayment (expressed as a percentage of the applicable pricing prepayment curve calculated as of the last Determination Date) during the period of six consecutive months immediately preceding the current month (or, with respect to any Pledged Security that has not been outstanding for at least six consecutive calendar months, at the rate of prepayment assumed at the time of issuance of such Pledged Security); *provided*, that such prepayment assumptions may be modified, at any time and from time to time, by the Collateral Manager, using its reasonable business judgment, (iii) any clean-up call with respect to a Pledged Security will be exercised when economic to the Person or Persons entitled to exercise such call and (iv) no other optional redemption of any Pledged Security will occur except for those that have actually occurred or as to which irrevocable notice thereof shall have been given.

(c)    For each Due Period, the Scheduled Distribution on any Pledged Security (other than (i) a Defaulted Security, (ii) a Written-Down Security or (iii) a Deferred Interest PIK Bond, which, in each case except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum (without duplication) of (x) the total amount of payments and collections in respect of such Pledged Security (including Sale Proceeds arising from the Sale of such Pledged Security received during the Due Period and not reinvested in Collateral Debt Securities or retained in the Principal Collection Account for subsequent reinvestment pursuant to Section 12.2 and expected Sale Proceeds from Collateral Debt Securities, the Sale of which, in the Collateral Manager's reasonable business judgment, is expected to be settled in whole on or prior to the last day of the current Due Period) that, if paid as scheduled, will be available in the Collection Accounts at the end of the Due Period for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer *plus* (y) any such amounts received in prior Due Periods that were not disbursed on a previous Distribution Date.

(d)    Subject to Section 1.2(c), each Scheduled Distribution receivable with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Interest Collection Account or the Principal Collection Account, as the case may be, and, except as otherwise specified, to earn interest at the Assumed Reinvestment Rate; *provided* that if the presence of a legal or business holiday (whether pursuant to this Indenture or pursuant to the terms of any Underlying Instrument) causes a Scheduled Distribution with respect to a Pledged Security to be received in the period between the end of the Due Period in which such Scheduled Distribution would otherwise have been received and the related Distribution Date, such Scheduled Distribution will be deemed to have been received during such Due Period. All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Accounts for transfer to the Payment Account and application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.

(e)    With respect to any Collateral Debt Security as to which any interest or other payment thereon is subject to withholding tax of any Relevant Jurisdiction, each

Distribution thereon shall, for purposes of the Collateral Quality Tests, be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments sufficient on an after tax basis to cover any withholding tax imposed on payments to the Issuer with respect thereto. On any date of determination, the amount of any Scheduled Distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(f)    Any reference to the fee payable to the Trustee or in the definition of "Senior Collateral Management Fee" or "Subordinated Collateral Management Fee" in Section 1.1(a) to an amount calculated with respect to a period at *per annum* rate shall be computed on the basis of a 360-day year of twelve 30-day months.

(g)    For the purpose of all calculations made under the Class A-1 Note Purchase Agreement which are based on the Remaining Exposure under the CDS Agreement Transactions, the Trustee and the Issuer shall assume that the Remaining Exposure is the amount (if positive) equal to (i) the Remaining Exposure shown on the most recent report delivered by the Credit Default Swap Counterparty *plus* (ii) the aggregate initial Notional Amount of all CDS Agreement Transactions that are not Short Synthetic Securities which the Issuer entered into since the date of such report *plus* (iii) the sum of any Principal Reimbursements paid to the Issuer under CDS Agreement Transactions since the date of such report *minus* (iv) the sum of any Principal Reimbursements paid by the Issuer under CDS Agreement Transactions that are related Short Synthetic Securities since the date of such report *minus* (v) the aggregate Notional Amount of CDS Agreement Transactions that are not related Short Synthetic Securities or CDS Agreement Transactions hedged by Short Synthetic Securities which have terminated since the date of such report *minus* (vi) the aggregate initial Notional Amount of all related Short Synthetic Securities which the Issuer entered into since the date of such report. Alternatively, the Trustee or the Issuer may request a statement from the Credit Default Swap Counterparty after receiving confirmation from the Collateral Manager of the Remaining Exposure and may rely on such statement in making any calculation hereunder or under the Class A-1 Note Purchase Agreement and the Indenture.

(h)    Unless otherwise specified, test calculations for Collateral Quality Tests and Eligibility Criteria in Section 12.2 that are generally expressed (i) to the nearest hundredths of a percent, the result will be rounded to the nearest hundredth, (ii) to the nearest tenth of a percent, the result will be rounded to the nearest tenth and (iii) as a whole number, the result will be rounded to the nearest whole number.

(i)    Unless otherwise specifically provided herein, all calculations required to be made and all reports which are to be prepared pursuant to this Indenture shall be made on the basis of the trade date for the acquisition, purchase, sale, disposition, liquidation or other transfer of an asset.

Section 1.3    Rules of Construction.

Unless the context otherwise clearly requires:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(f)    any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; and

(g)    all references in this instrument to designated "Sections," "clauses" and other subdivisions are to the designated Sections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Section, clause or other subdivision.

## ARTICLE II—THE SECURED NOTES

Section 2.1    Forms Generally.

(a)    Funded Notes offered and sold in reliance on Regulation S (each, a "**Regulation S Note**") shall be issued in fully Registered Form without interest coupons and, substantially in the form of the note attached as <u>Exhibit A-1</u> (each, a "**Regulation S Global Note**") with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  The Aggregate Outstanding Amount of each Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(b)    Funded Notes (other than the Class E Notes and the Class F Notes) offered and sold in the United States pursuant to an exemption from the registration requirements of the

Securities Act under Rule 144A ("**Restricted Notes**") shall be issued in fully Registered Form without interest coupons and substantially in the form of the note attached as Exhibit A-1 (each, a "**Restricted Global Note**"), with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  The Aggregate Outstanding Amount of each Restricted Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.  Interests in Restricted Global Notes will be shown on, and transfers thereof will be effected only through, records maintained by DTC and its direct and indirect participants  The Class E Notes and Class F Notes sold in the United States pursuant to an exemption from the registration requirements of the Securities Act under Rule 144A or pursuant to an exemption from the registration requirements of the Securities Act under Regulation D shall be issued on the Closing Date only in fully registered, definitive form without interest coupons attached, registered in the name of the legal and beneficial owner thereof, in the form attached as Exhibit A.

(c)     Regulation S Global Notes and Restricted Global Notes may also be exchanged under the limited circumstances set forth in Section 2.4 for notes in definitive fully Registered Form without interest coupons, substantially in the form of the certificated note attached as Exhibit A-1 (each a "**Definitive Note**"), which may be either a Regulation S Definitive Note or a Restricted Definitive Note, with such legends as may be applicable thereto, which shall be duly executed by the Issuer and the Co-Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.

(d)     Class A-1 Notes offered and sold in reliance upon Regulation S (each a "**Regulation S Class A-1 Note**") shall be issued in the form of one or more certificated securities in definitive, fully Registered Form, without interest coupons and with the applicable legends set forth in Exhibit A-2 hereto, as applicable, which shall be registered in the name of the Holder or a nominee thereof and duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.  Class A-1 Notes offered and sold in the United States pursuant to an exemption from the registration requirements of the Securities Act (each, a "**Restricted Class A-1 Note**") shall be issued in the form of one or more certificated securities in definitive, fully registered form, without interest coupons and with the applicable legends set forth in Exhibit A-2 hereto, which shall be registered in the name of the Holder or a nominee thereof and duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.  The Class A-1 Notes may not be assigned or transferred other than in accordance with the restrictions set forth in the Class A-1 Note Purchase Agreement and only in fully registered, definitive form.

(e)     The Co-Issuers in issuing the Notes may use "CUSIP," "ISIN" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP," "ISIN" or "private placement" numbers of the Notes in notices of redemption and related materials as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and related materials.

Section 2.2   Authorized Amount; Note Interest Rate; Stated Maturity; Denominations.

(a)   The aggregate principal amount of Notes which may be issued under this Indenture may not exceed U.S.$1,489,000,000, excluding Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.4, 2.5 or 8.5.

(b)   As provided pursuant to the terms of the Notes, such Notes shall be divided into nine Classes, in each case having designations, maximum authorized principal amounts, Note Interest Rates and Stated Maturities set forth in the table below.   On the Closing Date, the Issuer shall issue U.S.$1,489,000,000 in Principal Amount of the maximum authorized Principal Amount of Notes according to the original Principal Amounts for each Class set forth in the table below:

| Designation | Maximum Authorized Principal Amounts | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1 Notes | U.S.$945,000,000[1] | Class A-1 Note Interest Rate | March 6, 2047 |
| Class S Notes | U.S.$43,000,000 | LIBOR + 0.33% | March 6, 2047 |
| Class A-2 Notes | U.S.$168,000,000 | LIBOR + 0.55% | March 6, 2047 |
| Class B Notes | U.S.$111,000,000 | LIBOR + 0.70% | March 6, 2047 |
| Class C Notes | U.S.$102,750,000 | LIBOR + 2.75% | March 6, 2047 |
| Class D-1 Notes | U.S.$73,000,000 | LIBOR + 7.25% | March 6, 2047 |
| Class D-2 Notes | U.S.$10,250,000 | LIBOR + 9.00% | March 6, 2047 |
| Class E Notes | U.S.$18,000,000 | 6.00% | March 6, 2047 |
| Class F Notes | U.S.$18,000,000 | 6.00% | March 6, 2047 |

[1]   Represents the maximum Borrowings and Deemed Borrowings permissible.

The Notes, with the exception of the Class A-1 Notes, will be issuable in minimum denominations of U.S.$500,000 and, in each case, only in integral multiples of U.S.$1,000 in excess of such minimum denominations.   The Class A-1 Notes will be issuable in a minimum denomination of U.S.$25,000,000 and in integral multiples of U.S.$1,000,000 in excess of such minimum denominations.

(c)   As provided pursuant to the terms of the Notes, interest shall accrue on the Aggregate Outstanding Amount of each Class of Funded Notes (determined as of the first day of each Interest Period and after giving effect to any payment of principal occurring on such day) at the applicable Note Interest Rate for the applicable Interest Period (i) in the case of the initial Interest Period, for the period from and including the Closing Date to but excluding the first applicable Distribution Date and (ii) thereafter, for the period from and including the Distribution Date immediately following the immediately preceding Interest Period, to but excluding the next succeeding Distribution Date, until such Funded Notes are paid in full and will be payable monthly in arrears on each Distribution Date.   To the extent lawful and enforceable, interest shall accrue on Deferred Interest and Defaulted Interest in respect of any Funded Note at the Note Interest Rate applicable to such Funded Note until such Deferred Interest or Defaulted Interest, as applicable, is paid in full.   Interest on the Funded Notes, and interest on Deferred Interest and Defaulted Interest in respect thereof, will be computed on the basis of a 360-day year and the actual number of days elapsed.   Interest will cease to accrue on such Funded Notes or, in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless

payment of principal is improperly withheld or unless default is otherwise made with respect to such payments.

As provided pursuant to the terms of the Notes, interest shall accrue on the Class A-1 Notes as follows:

(i)    Interest shall accrue on the Outstanding Class A-1 Funded Amount of the Class A-1 Notes (determined as of the first day of each applicable Interest Period and after giving effect to any payment of principal applied to reduce the Outstanding Class A-1 Funded Amount on such day) at the Class A-1 Note Interest Rate for such Interest Period (A) in the case of the initial Interest Period, for the period from and including the Closing Date to but excluding the first applicable Distribution Date and (B) thereafter, for the period from and including the Distribution Date immediately following the immediately preceding Interest Period, to but excluding the next succeeding Distribution Date, until the Outstanding Class A-1 Funded Amount is paid in full, and will be payable on each Distribution Date; and

(ii)    the Class A-1 Notes shall accrue the Cumulative Intraperiod Interest Amount with respect to the Class A-1 Notes for the applicable Interest Period (the amounts described in clauses (i) and (ii) of this Section 2.2(c), collectively, the "**Borrowings Interest Amount**") for the applicable Interest Period; and

(iii)    in addition to its *pro rata* portion of the Borrowings Interest Amount, any Class A-1 Noteholder that has deposited a prefunding amount in a Class A-1 Prepayment Account pursuant to and in accordance with the Class A-1 Note Purchase Agreement shall be entitled to receive an amount equal to earnings in respect of Eligible Investments in such Class A-1 Prepayment Account (or subaccount, if applicable) received during the preceding Due Period (such amount, the "**Eligible Investment Income**" for the applicable Interest Period with respect to such Class A-1 Prepayment Account (or subaccount, if applicable)), and the Trustee shall withdraw the Eligible Investment Income which has been posted to such account from each Class A-1 Prepayment Account on the last day of each Due Period and distribute it to the relevant Class A-1 Noteholder on the applicable Distribution Date without regard to the Priority of Payments.

To the extent lawful and enforceable, interest shall accrue on Defaulted Interest in respect of any Class A-1 Note at the Class A-1 Note Interest Rate until such Defaulted Interest is paid in full.  Interest on the Outstanding Class A-1 Funded Amount of the Class A-1 Notes (pursuant to clause (i) of this Section 2.2(c)), and interest on Defaulted Interest in respect of any Class A-1 Notes, will be computed on the basis of a 360-day year and the actual number of days elapsed.  Interest will cease to accrue on the Outstanding Class A-1 Funded Amount and Defaulted Interest or, in the case of a partial repayment thereof, on such part, from the date of repayment or Stated Maturity unless payment thereof is improperly withheld or unless default is otherwise made with respect to such payments.

As provided pursuant to the terms of the Notes, a Commitment Fee shall be payable to each Class A-1 Noteholder on the portion of the aggregate Remaining Unfunded Facility Commitment represented by the Class A-1 Notes of such Class A-1 Noteholder (which

shall include any amounts deposited in a Class A-1 Prepayment Account (if any) of such Class A-1 Noteholder for each day on which such Class A-1 Noteholder is a Compliant Class A-1 Noteholder) from and including the Closing Date to but excluding the Commitment Termination Date, together with Defaulted Interest on such Commitment Fee to the extent not paid when due which Defaulted Interest shall accrue at the Class A-1 Note Interest Rate. The Commitment Fees shall be payable monthly in arrears on each Distribution Date in accordance with the Priority of Payments and will rank *pari passu* with the payment of the Borrowings Interest Amount on the Class A-1 Notes. The Commitment Fees will be computed on the basis of a 360-day year and the actual number of days elapsed. No Class of Notes other than the Class A-1 Notes will be entitled to the Commitment Fees.

As provided pursuant to the terms of the Notes, all of the Class A-1 Notes are entitled to receive payments *pari passu* among themselves. Payment of the Borrowings Interest Amount and Commitment Fees on the Class A-1 Notes on any Distribution Date will be subordinated to the payment of certain expenses of the Co-Issuers in accordance with Section 11.1(a) of this Indenture. Interest with respect to the Class A-1 Notes shall accrue on all Borrowings and Deemed Borrowings under the Class A-1 Notes.

(d)    The Notes shall be redeemable as provided in Sections 9 and 12.

(e)    The Depositary for the Global Notes shall initially be DTC.

(f)    The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

(g)    For all purposes hereof, all of the Class A-1 Notes are entitled to receive payments *pari passu* among themselves, all of the Class S Notes are entitled to receive payments *pari passu* among themselves, all of the Class A-2 Notes are entitled to receive payments *pari passu* among themselves, all of the Class B Notes are entitled to receive payments *pari passu* among themselves, all of the Class C Notes are entitled to receive payments *pari passu* among themselves, all of the Class D-1 Notes are entitled to receive payments *pari passu* among themselves, all of the Class D-2 Notes are entitled to receive payments *pari passu* among themselves, all of the Class E Notes are entitled to receive payments *pari passu* among themselves, all of the Class F Notes are entitled to receive payments *pari passu* among themselves and all of the Preference Shares are entitled to receive payments *pari passu* among themselves, in the case of each Class of Notes based upon the respective outstanding principal amounts thereof and in the case of the Preference Shares based on the number of shares outstanding.

(h)    The Outstanding Class A-1 Funded Amount shall be increased by Borrowings and Deemed Borrowings under the Class A-1 Note Purchase Agreement. The Outstanding Class A-1 Funded Amount will be decreased by payments of the Outstanding Class A-1 Funded Amount pursuant to the Priority of Payments, *provided* that such payments shall be applied as described in Section 2.4 of the Class A-1 Note Purchase Agreement. All of the Funded Notes will be issued and funded on the Closing Date.

Section 2.3    Execution, Authentication, Delivery and Dating.

(a)    The Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers.  The signatures of such Authorized Officers on the Notes may be manual or facsimile (including in counterparts).

(b)    Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver Notes executed by the Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)    Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date.  All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)    Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced.  In the event that any Note is divided into more than one Note in accordance with this Article II, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

(f)    No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "**Certificate of Authentication**"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers.  Such certificate upon any Note and registration in the Note Register shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

(g)    Book-Entry Provisions.  This Section 2.3(g) shall apply only to Global Notes deposited with or on behalf of the Depositary.

The Co-Issuers shall execute and the Trustee shall, in accordance with this Section 2.3(g), authenticate and deliver initially one or more Global Notes, as applicable, that (i) shall be registered in the name of the nominee of the Depositary for such Global Notes and (ii) shall be delivered by the Trustee to such Depositary or pursuant to such Depositary's instructions or held by the Trustee as custodian for the Depositary.

Depositary Participants shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depositary or under the Global Note, as applicable, and the Depositary shall be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Note for all purposes whatsoever.   Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and the Depositary Participants, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

(h)    Certificated Notes.    Except as provided in Section 2.4, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of certificated Notes.

Section 2.4    Registration, Transfer and Exchange of Notes.

(a)    Registration of Notes.   The Trustee is hereby appointed, on behalf of the Issuer, as the registrar of the Notes (the "**Note Registrar**").   The Trustee is hereby appointed, on behalf of the Issuer, as a Transfer Agent with respect to the Notes.   The Note Registrar shall keep, on behalf of the Issuer, a register (the "**Note Register**") for the Notes in its Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of and the registration of transfers of Notes.   Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of the Note Registrar.   The Co-Issuers may not terminate the appointment of the Note Registrar or any Transfer Agent or appoint a new Note Registrar or Transfer Agent without the consent of a Majority of the Controlling Class.

The Issuer shall cause to be kept a register (the "**Class A-1 Note Register**") in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Class A-1 Notes and the registration of transfers of the Class A-1 Notes. Pursuant to the Class A-1 Note Purchase Agreement, the Class A-1 Note Agent will be initially appointed "Class A-1 Note Registrar" for the purpose of registering the Class A-1 Notes and registering transfers of such Class A-1 Notes on behalf of the Issuer.   Terms and conditions applicable to the Class A-1 Note Register and the Class A-1 Note Agent are set forth in the Class A-1 Note Purchase Agreement.

Except as otherwise set forth in this Section 2.4, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2, the Co-Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at such office or agency.   Whenever any Note is surrendered for exchange, the Co-Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith and expenses of delivery (if any) not made by regular mail.

(b)    Transfers of Notes.

(i)    Subject to Section 2.4(b)(iv), exchanges or transfers of beneficial interests in a Global Note may be made only in accordance with the rules and regulations of the Depositary and the transfer restrictions contained in the legend on such Global Note and exchanges or transfers of interests in a Global Note may be made only in accordance with the following:

(A)    Subject to clauses (B) through (F) of this Section 2.4(b)(i), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(B)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Regulation S Global Note for a beneficial interest in a Restricted Global Note upon provision to the Trustee and the Issuer of a written certification in substantially the form of Exhibit B-1 (a "**Rule 144A Transfer Certificate**").

(C)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Restricted Global Note for a beneficial interest in a Regulation S Global Note upon provision to the Trustee and the Issuer of a written certification substantially in the form of Exhibit B-2 (a "**Regulation S Transfer Certificate**");

(D)    An owner of a beneficial interest in a Regulation S Global Note may transfer such interest in the form of a beneficial interest in such Regulation S Global Note without the provision of written certification;

(E)    An owner of a beneficial interest in a Restricted Global Note may transfer such interest in the form of a beneficial interest in such Restricted Global Note without the provision of written certification;

(F)    In the event Definitive Notes are issued pursuant to Section 2.4(b)(v), the Trustee shall cause the transfer of (i) any beneficial interest

in a Global Note for a Definitive Note that is a Regulation S Note (a "**Regulation S Definitive Note**"), upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate or (ii) any beneficial interest in a Global Note for a Definitive Note that is a Restricted Note (a "**Restricted Definitive Note**"), upon provision to the Trustee and the Issuer of a Rule 144A Transfer Certificate;

(ii)     Subject to Section 2.4(b)(iv), in the event Definitive Notes are issued pursuant to Section 2.4(b)(v), the Trustee shall cause the transfer of (i) any Definitive Note for a beneficial interest in a Regulation S Global Note, upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate or (ii) any Definitive Note for a beneficial interest in a Restricted Global Note, upon provision to the Trustee and the Issuer of a Rule 144A Transfer Certificate.

(iii)     Upon acceptance for exchange or transfer of a beneficial interest in a Global Note for a Definitive Note, or upon acceptance for exchange or transfer of a Definitive Note for a beneficial interest in a Global Note, each as provided herein, the Trustee shall instruct the Depositary to adjust the principal amount of such Global Note on its records to evidence the date of such exchange or transfer and the change in the principal amount of such Global Note.

(iv)     Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Definitive Notes, the Noteholder of any Definitive Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any larger authorized amount) by surrendering such Definitive Note at the Corporate Trust Office or at the office of any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment and (y) in the case of any exchange, a written request for exchange.  Following a proper request for transfer or exchange, the Trustee shall (provided it has available in its possession an inventory of Definitive Notes), within five Business Days of such request if made at such Corporate Trust Office, or within ten Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to the transferee (in the case of transfer) or Noteholder (in the case of exchange) or send by first class mail (at the risk of the transferee in the case of transfer or Noteholder in the case of exchange) to such address as the transferee or Noteholder, as applicable, may request, a Definitive Note or Notes, as the case may require, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested.  The presentation for transfer or exchange of any Definitive Note shall not be valid unless made at the Corporate Trust Office or at the office of a Transfer Agent by the registered Noteholder in person, or by a duly authorized attorney-in-fact.  Beneficial interests in Global Notes shall be exchangeable for Definitive Notes only under the limited circumstances described in Section 2.4(b)(v).

(v)     Interests in a Global Note deposited with or on behalf of the Depositary pursuant to Section 2.1 hereunder shall be transferred (A) to the owners of such interests in the form of Definitive Notes only if such transfer otherwise complies with this

<u>Section 2.4</u> (including clauses <u>(b)(i)</u> and <u>(b)(ii)</u>) and (1) the Depositary notifies the Issuer that it is unwilling or unable to continue as Depositary for the Notes, (2) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and a successor Depositary is not appointed by the Issuer within 90 days of such notice, (3) if the transferee of an interest in a Global Note is required by law to take physical delivery of securities in definitive form, (4) there is an Event of Default under the Notes or (5) if the transferee is unable to pledge its interest in a Global Note or (B) to the purchaser thereof in the form of one or more Definitive Notes in accordance with the provisions of <u>Section 2.4(b)(i)</u>.

(vi)     If interests in any Global Note are to be transferred to the Beneficial Owners thereof in the form of Definitive Notes pursuant to <u>Section 2.4(b)(v)</u>, such Global Note shall be surrendered by the Depositary, or its custodian on its behalf, to the Corporate Trust Office or to the Transfer Agent located in Chicago, Illinois, and the Trustee shall authenticate and deliver without charge, upon such transfer of interests in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.  The Definitive Notes transferred pursuant to this <u>Section 2.4</u> shall be executed, authenticated and delivered only in the denominations specified in <u>Section 2.2(b)</u> and registered in such names as the Depositary shall direct in writing.

(vii)     For so long as one or more Global Notes are Outstanding:

(A)     the Trustee and its directors, Officers, employees and agents may deal with the Depositary for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(B)     unless otherwise provided herein, the rights of Beneficial Owners shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such Beneficial Owners and the Depositary;

(C)     for purposes of determining the identity of and principal amount of Notes beneficially owned by a Beneficial Owner, the records of the Depositary shall be conclusive evidence of such identity and principal amount and the Trustee may conclusively rely on such records when acting hereunder;

(D)     the Depositary will make book-entry transfers among its Depositary Participants and will receive and transmit distributions of principal of and interest on the Global Notes to such Depositary Participants; and

(E)     the Depositary Participants shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depositary, and the Depositary may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(viii)     In connection with the transfer of Class E Notes and Class F Notes, each purchaser of a Class E Note or a Class F Note in the form of a Restricted Definitive Note

will be required to represent and warrant whether or not it is a Benefit Plan Investor or a Controlling Person. Each purchaser of a Class E Note or a Class F Note in the form of a Regulation S Global Note will be deemed to represent and warrant that it is not a Benefit Plan Investor or a Controlling Person. No purchase or transfer of a Class E Note or Class F Note to a person that has represented that it is a Benefit Plan Investor or a Controlling Person will be permitted if such purchase or transfer would result in Benefit Plan Investors owning 25% or more of the outstanding Class E Notes or Class F Notes, as applicable, immediately after such purchase or proposed transfer (determined in accordance with the Plan Asset Regulation).

(c)      <u>Transfers of Class A-1 Notes</u>.   Transfers of the Class A-1 Notes are subject to the terms and restrictions set forth in the Class A-1 Note Purchase Agreement. Transfers of a Class A-1 Note shall not require the delivery of a transfer certificate provided that such transfer is made in accordance with Section 4.1(b) of the Class A-1 Note Purchase Agreement.

(d)      <u>Legends</u>.   Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in <u>Exhibit A-1</u> or <u>A-2</u> hereto (as applicable) unless there is delivered to the Trustee, the Note Registrar, Collateral Manager, the Issuer and the Co-Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, the Note Registrar, Collateral Manager, the Issuer and the Co-Issuer to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Regulation S, as applicable, and to ensure that neither of the Co-Issuers nor the pool of Collateral becomes an investment company required to be registered under the Investment Company Act. Upon provision of such satisfactory evidence, the Trustee, at the direction of the Issuer (or the Collateral Manager on behalf of the Issuer), the Issuer and (in the case of any Note) the Co-Issuer, shall authenticate and deliver Notes that do not bear such applicable legend.

(e)      <u>Withholding Certification</u>.   As provided pursuant to the terms of the Notes, the Holder understands that each of the Co-Issuers, the Trustee or any Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each of the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the Holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), IRS Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification) or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, each of the Co-Issuers, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a

reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Holder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(f)     Tax Treatment.  Each Holder hereby agrees that, for purposes of U.S. federal, state and local income and franchise tax and any other income taxes, (i) the Issuer will be treated as a corporation, (ii) the Notes will be treated as indebtedness of the Issuer, and (iii) the Preference Shares will be treated as equity in the Issuer; the Holder agrees to such treatment and agrees to take no action inconsistent with such treatment, unless required by law.

(g)     Expenses; Acknowledgment of Transfer.  Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Noteholder except for the expenses of delivery (if any) not made by regular mail.  Registration of the transfer of a Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Co-Issuers.

(h)     Surrender upon Final Payment.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent.

(i)     Repurchase and Cancellation of Notes.  The Co-Issuers will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes except upon the redemption of the Notes in accordance with the terms of this Indenture and the Notes. The Co-Issuers will promptly cancel all Notes Acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Notes pursuant to any provision of this Indenture and no Notes may be issued in substitution or exchange for any such Notes.

(j)     Compliance with Transfer Restrictions.  Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, the rules of any Depositary, ERISA, the Code or the Investment Company Act; *provided* that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to the Trustee or the Note Registrar by a purchaser or transferee of a Note, the Trustee or the Note Registrar, as the case may be, shall be under a duty to receive and examine the same to determine whether the certificate substantially complies on its face with the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms.  To the extent applicable to the Issuer, the Issuer shall impose additional transfer restrictions to comply with the USA PATRIOT Act, and any such transfer restrictions shall be binding on each Noteholder.  The Issuer shall notify the Trustee and the Note Registrar of the imposition of any such transfer restrictions.

(k)     Flow-Through Investment Vehicles; Qualified Purchaser Status.  No transfer of a Note may be made to a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle.  Any purported transfer that is not in compliance with this Section 2.4 will be void and shall not be given effect for any purpose hereunder.

(l)    Notwithstanding anything in this <u>Section 2.4</u> to the contrary, transfers of Class A-1 Notes shall be subject to, and shall be effected only in accordance with, Section 4 of the Class A-1 Note Purchase Agreement.

Section 2.5    <u>Mutilated, Defaced, Destroyed, Lost or Stolen Notes.</u>

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers, the Trustee and the Transfer Agent (each, a "**Specified Person**") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless then, in the absence of notice to the Specified Persons that such Note has been Acquired by a *bona fide* purchaser, the Co-Issuers shall execute and shall direct the Trustee to authenticate, and upon Issuer Request the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Note, of like tenor (including the same date of issuance) and equal principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a serial number not contemporaneously outstanding to the Noteholder.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Co-Issuers in their discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this <u>Section 2.5</u>, the Co-Issuers, the Trustee or any Transfer Agent may require the payment by the registered holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this <u>Section 2.5</u> in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Co-Issuers and such new Note shall be entitled, subject to the second paragraph of this <u>Section 2.5</u>, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this <u>Section 2.5</u> are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.6    <u>Payment of Principal and Interest; Rights Preserved.</u>

(a)    As provided pursuant to the terms of the Notes, each Class of Notes, with the exception of the Class A-1 Notes, shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate, and the Class A-1 Notes shall accrue the Commitment Fee and interest at the Class A-1 Note Interest Rate, each as specified in <u>Section 2.2</u>. As provided pursuant to the terms of the Notes, interest on each Class of Notes and the Commitment Fee on the Class A-1 Notes shall be due and payable on each Distribution Date; *provided* that (i) payment of interest on the Class S Notes and the Class A-2 Notes is

subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any), (ii) payment of interest on the Class B Notes is subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes, the Class S Notes and the Class A-2 Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any), (iii) payment of interest on the Class C Notes is subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes and the Class B Notes (together with Defaulted Interest thereon and interest on Defaulted Interest, if any), (iv) payment of interest on the Class D-1 Notes is subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes and the Class C Notes (together with any Class S Shortfall Amount, Deferred Interest and Defaulted Interest thereon and interest on Defaulted Interest, if any), (v) payment of interest on the Class D-2 Notes is subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D-1 Notes (together with any Class S Shortfall Amount, Deferred Interest, Defaulted Interest thereon and interest on Defaulted Interest, if any), (vi) payments of the Class E Interest Amount and the Scheduled Class E Target Principal Amount are subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes and the Senior Funded Notes (together with any Class S Shortfall Amount, Deferred Interest, Defaulted Interest thereon and interest on Defaulted Interest, if any), (vii) payments of the Class F Interest Amount and the Scheduled Class F Target Principal Amount are subordinated to the payment on each Monthly Distribution Date of the Commitment Fee, where applicable, and interest due and payable on the Class A-1 Notes and the Senior Funded Notes (together with any Class S Shortfall Amount, Deferred Interest, Defaulted Interest thereon and interest on Defaulted Interest, if any) and (viii) payments of interest on all Notes are subordinated to the payment on each Monthly Distribution Date of other amounts in accordance with the Priority of Payments. Except as provided in Sections 5.5, 12.2 and 12.3, no payment shall be made by the Co-Issuers hereunder other than on a Distribution Date.

As provided pursuant to the terms of the Notes, so long as any Class A Notes or Class B Notes are Outstanding, any interest due on the Class C Notes, the Class D-1 Notes or the Class D-2 Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Monthly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments. As provided pursuant to the terms of the Notes, any payments of the Class E Interest Amount or the Scheduled Class E Target Principal Amount on the Class E Notes, or the Class F Interest Amount or the Scheduled Class F Target Principal Amount on the Class F Notes, which are not available to be paid as a result of the operation of the Priority of Payments on any Monthly Distribution Date shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Monthly Distribution Date on which such amounts are available to be paid in accordance with the Priority of Payments. Class C Deferred Interest, Class D-1 Deferred Interest and Class D-2 Deferred Interest on the Class C Notes, Class D-1 Notes and Class D-2 Notes, respectively, accrued to any Monthly Distribution

Date shall bear interest at the Note Interest Rate applicable to such Class and shall be payable on the first Monthly Distribution Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Class E Deferred Interest on the Class E Notes accrued to any Monthly Distribution Date shall bear interest at the Class E Stated Rate and shall be payable on the first Monthly Distribution Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Class F Deferred Interest on the Class F Notes accrued to any Monthly Distribution Date shall bear interest at the Class F Stated Rate and shall be payable on the first Monthly Distribution Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Payments of the Scheduled Class E Target Principal Amount and the Scheduled Class F Target Principal Amount which have been deferred as a result of the operation of the Priority of Payments shall not accrue interest thereon.

(b)    As provided for in the Notes, the principal of each Note shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise; *provided* that so long as any Class A-1 Notes are Outstanding, except as provided under the terms of the Notes and in Article IX and the Priority of Payments, the payment of principal of the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes and the Class D-2 Notes (x) may only occur after principal of the Class A-1 Notes has been paid in full and (y) shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A-1 Notes and other amounts payable in accordance with the Priority of Payments; *provided, further,* that so long as any Class A-1 Notes, Class S Notes or Class A-2 Notes are Outstanding, except as provided in Article IX and the Priority of Payments, the payment of principal of the Class B Notes, the Class C Notes, the Class D-1 Notes and the Class D-2 Notes (x) may only occur after principal of the Class A-1 Notes, the Class S Notes and the Class A-2 Notes has been paid in full and (y) shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A-1 Notes, the Class S Notes and the Class A-2 Notes and other amounts payable in accordance with the Priority of Payments; *provided, further,* that so long as any Class A-1 Notes, Class S Notes, Class A-2 Notes and Class B Notes are Outstanding, except as provided under the terms of the Notes and in Article IX and the Priority of Payments, the payment of principal of the Class C Notes, the Class D-1 Notes and the Class D-2 Notes (x) may only occur after principal of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes and the Class B Notes has been paid in full and (y) shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A Notes, the Class S Notes, the Class B Notes and other amounts payable in accordance with the Priority of Payments; *provided, further,* that so long as any Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes or Class C Notes are Outstanding, except as provided under the terms of the Notes and in Article IX and the Priority of Payments, the payment of principal of the Class D-1 Notes and the Class D-2 Notes (x) may only occur after principal of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes and the Class C Notes has been paid in full and (y) shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes and the Class C Notes and other amounts payable in accordance with the Priority of Payments; *provided, further,* that so long as any Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes, Class C Notes or Class D-1 Notes are Outstanding, except as provided under the terms of

the Notes and in Article IX and the Priority of Payments, the payment of principal of the Class D-2 Notes (x) may only occur after principal of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D-1 Notes has been paid in full and (y) shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D-1 Notes and other amounts payable in accordance with the Priority of Payments; *provided*, *further*, that so long as any Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes or Class D-2 Notes are Outstanding, except as provided under the terms of the Notes and in Article IX and the Priority of Payments, the payment of principal of the Class E Notes and the Class F Notes shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes and the Class D-2 Notes and other amounts payable in accordance with the Priority of Payments; *provided*, *further*, that so long as any Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes, Class D-2 Notes or Class E Notes are Outstanding, except as provided under the terms of the Notes and in Article IX and the Priority of Payments, the payment of principal of the Class F Notes shall be subordinated to the payment on each Monthly Distribution Date of the principal and interest due and payable on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes and the Class E Notes and other amounts payable in accordance with the Priority of Payments; *provided*, *further*, that any payment of principal of any Class of Notes (other than the most senior Class of Notes then Outstanding) which is not paid, in accordance with the Priority of Payments, on any Monthly Distribution Date (other than the Stated Maturity or a Redemption Date) shall not be considered "due and payable" for purposes of Section 5.1(a) until the Monthly Distribution Date on which such principal is required to be paid in accordance with the Priority of Payments.

(c)    As provided pursuant to the terms of the Notes, so long as no Event of Default has occurred and is continuing, principal will not be payable on any Class of Notes; *provided*, *however*, that payments of principal may be made on the Class A-1 Notes and the Senior Funded Notes in the following circumstances (subject, except in the case of clause (iii), to the Priority of Payments: (i) upon the occurrence of a Ratings Confirmation Failure (to the extent a Proposed Plan cannot be agreed to by the Collateral Manager on behalf of the Issuer, the Rating Agencies and a Majority of the Controlling Class), (ii) upon the occurrence of an Optional Redemption, (iii) upon the occurrence of a Tax Redemption, (iv) in the case of the Class D-1 Notes, subject to certain conditions, a portion of the remaining Interest Proceeds will be applied to pay principal of the Class D-1 Notes in an amount up to the Class D-1 Cap Amount in accordance with clause (X) of Section 11.1(i), (v) in the case of the Class D-2 Notes, subject to certain conditions, a portion of the remaining Interest Proceeds will be applied to pay principal of the Class D-2 Notes in an amount up to the Class D-2 Cap Amount in accordance with clause (V) of Section 11.1(i), (vi) if the Collateral Manager directs the Trustee to apply Principal Proceeds to redeem Notes in accordance with clause (M) of Section 11.1(ii), or (vi) solely with respect to the Class A-1 Notes, if the Outstanding Class A-1 Funded Amount is greater than the Junior Facility Amount.  After the Reinvestment Period, Principal Proceeds shall be applied on each Monthly Distribution Date in accordance with the Priority of Payments.

(d)    As provided pursuant to the terms of the Notes, as a condition to the payment of principal of and interest (or, in the case of the Class A-1 Notes, Commitment Fee) on any Note without the imposition of U.S. withholding tax, each of the Co-Issuers, the Trustee or any Paying Agent shall require certification acceptable to it to enable each of the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.  Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), IRS Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification) or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms).  In addition, each of the Co-Issuers, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  Each Holder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.  The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of deduction or withholding for or on account of any present or future taxes, duties, assessments or governmental charges with respect to the Notes.

(e)    As provided under the terms of the Notes, payments in respect of principal of and interest on the Notes (and, in the case of the Class A-1 Notes, the Commitment Fee) shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Noteholders in accordance with wire transfer instructions received by any Paying Agent on or before the Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States mailed by first class mail to the address of such Noteholder as it appears on the Note Register at the close of business on the Record Date for such payment.

(f)    As provided under the terms of the Notes, the principal of and interest on any Note (and, in the case of the Class A-1 Notes, the Commitment Fee) which is payable on a Redemption Date or in accordance with the Priority of Payments on a Distribution Date and is punctually paid or duly provided for on such Redemption Date or Distribution Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such payment.  All such payments that are mailed or wired and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in <u>Section 7.2</u>.

As provided under the terms of the Notes, payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the name of each such Holder on the Record Date for such payment bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)     As provided under the terms of the Notes, payment of any Defaulted Interest may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)     As provided under the terms of the Notes, all reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Distribution Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     As provided under the terms of the Notes and notwithstanding anything to the contrary contained herein, the obligations of the Issuer under the Notes and of the Co-Issuer under the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class S Notes and this Indenture are limited-recourse obligations of each of the Issuer and the Co-Issuer, as applicable, secured by and payable solely from the proceeds of the Collateral, and following realization of the Collateral, any claims of the Noteholders and the other Secured Parties shall be extinguished and shall not thereafter revive.  No recourse shall be had against any Officer, member, director, employee, security holder or incorporator of the Co-Issuers or their respective successors or assigns for the payment of any amounts payable under the Notes or this Indenture.  It is understood that the foregoing provisions of this <u>Section 2.6(i)</u> shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing provisions of this <u>Section 2.6(i)</u> shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person.

(j)     Subject to the foregoing provisions of this <u>Section 2.6</u> and the provisions of <u>Sections 2.4</u> and <u>2.5</u>, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest (and, in the case of the Class A-1 Notes, Commitment Fee) and principal that were carried by such other Note.

(k)     As provided under the terms of the Notes, Interest on Defaulted Interest shall accrue at the applicable Note Interest Rate.

(l)     Subject to the availability of funds and to the Priority of Payments, the Class A-1 Notes will provide for the payment of the Commitment Fee on each Monthly Distribution Date up to and including the Monthly Distribution Date occurring on or immediately following the Commitment Termination Date.

Section 2.7     <u>Persons Deemed Owners.</u>

As provided under the terms of the Notes, the Co-Issuers, the Trustee and any agent of any of them (collectively, the "**Relevant Persons**") shall treat the Person in whose name any Note on the Note Register is registered as the owner of such Note on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

Section 2.8    Cancellation.

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Co-Issuers shall direct by an Issuer Order that they are returned to it. Any Notes purchased by the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

## ARTICLE III–CONDITIONS PRECEDENT

Section 3.1    General Provisions.

The Notes may be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee (or an Authenticating Agent on its behalf) upon Issuer Request, upon receipt by the Trustee of the following:

(a)    (i) an Officer's certificate of the Issuer, (A) evidencing the authorization by Resolution of the execution and delivery of, and the performance of the Issuer's obligations under, this Indenture, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Class A-1 Note Purchase Agreement, the Account Control Agreement, the Preference Share Paying Agency Agreement, the Collateral Management Agreement and the Hedge Agreements, in each case as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of the Notes and the issuance of the Preference Shares and specifying the Stated Maturity, the maximum authorized principal amount, the original principal amount and the Note Interest Rate with respect to each Class of Notes to be authenticated and delivered, and (B) certifying that (1) the attached copy of such Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon; and

(ii)    an Officer's certificate of the Co-Issuer (A) evidencing the authorization by Resolution of the execution and delivery of, and the performance of the Co-Issuer's obligations under, this Indenture, as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class S Notes,

and specifying the Stated Maturity, the principal amount and Note Interest Rate of each Class of Notes to be authenticated and delivered, and (B) certifying that (1) the attached copy of such Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)       (i) either (A) a certificate of the Issuer, or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the Issuer satisfactory in form and substance to the Trustee on which the Trustee is entitled to rely to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares, or (B) an Opinion of Counsel to the Issuer satisfactory in form and substance to the Trustee to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares except as may have been given; and

(ii)      either (A) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the Co-Issuer satisfactory in form and substance to the Trustee on which the Trustee is entitled to rely to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class S Notes, or (B) an Opinion of Counsel to the Co-Issuer satisfactory in form and substance to the Trustee that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as may have been given;

(c)       (i) an opinion of Cadwalader, Wickersham & Taft LLP, special New York counsel to the Co-Issuers, dated the Closing Date, substantially in the form of <u>Exhibit D</u>;

(ii)      an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of <u>Exhibit E</u>;

(iii)      an opinion of in-house counsel to the Collateral Manager, dated the Closing Date, substantially in the form of <u>Exhibit F</u>;

(iv)      an opinion of Sidley Austin LLP, special counsel to the Collateral Manager, dated the Closing Date, substantially in the form of <u>Exhibit G</u>;

(v)       an opinion of Kennedy Covington Lobdell & Hickman LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of <u>Exhibit H</u>;

(vi)      an opinion of Seyfarth Shaw LLC, local counsel to the Trustee, dated the Closing Date, substantially in the form of <u>Exhibit J</u>;

(vii)      an opinion of in-house counsel to the Credit Default Swap Counterparty, dated the Closing Date, substantially in the form of <u>Exhibit I</u>;

(d)     an Officer's certificate of the Issuer, stating that the Issuer is not in Default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture and the Preference Share Paying Agency Agreement relating to the authentication and issuance of the Notes and the delivery of the Preference Shares applied for (including in Section 3.2) have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(e)     an Officer's certificate of the Co-Issuer stating that the Co-Issuer is not in Default under this Indenture and that the issuance of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class S Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Certificate of Formation or operating agreement of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class S Notes applied for have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(f)     an Accountant's Report (A) confirming the information (other than the Principal Balance and the Purchase Price) with respect to each Collateral Debt Security set forth in the Schedule of Closing Collateral Debt Securities attached hereto as Schedule A and the information provided by the Issuer with respect to every other asset forming part of the Collateral, by reference to such sources as shall be specified therein and confirming that each Collateral Debt Security satisfies paragraphs (5), (11) and (20) to (35) of the Eligibility Criteria (including any Discount Securities expected to be purchased by the Issuer on the Closing Date, together with the Acquisition prices of such Discount Securities or, if no such Discount Securities are expected to be purchased by the Issuer on the Closing Date, a statement to such effect) (B) confirming by reference to an Officer's certificate of the Issuer, that the Aggregate Principal Balance of the Collateral Debt Securities which the Issuer has purchased or entered into binding commitments to purchase on or prior to the Closing Date is at least equal to 90% of the Aggregate Ramp-Up Par Amount, (C) confirming the results of each Collateral Quality Test other than the Moody's Asset Correlation Test and the Standard & Poor's CDO Monitor Notification Test as of the Closing Date and that the Issuer is in compliance with those Collateral Quality Tests for which compliance is mandatory as of the Closing Date and (D) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements;

(g)    an executed counterpart of the Collateral Administration Agreement, the Securities Purchase Agreement, the Credit Default Swap Agreement, the Class A-1 Note Purchase Agreement, the Account Control Agreement and the Collateral Management Agreement, together with each document to be delivered on the Closing Date pursuant thereto;

(h)    [Reserved];

(i)    delivery of the Financing Statement for filing with the Recorder of Deeds in the District of Columbia;

(j)    evidence of the registration of a charge against the Issuer in the Cayman Islands;

(k)    an executed copy of the Preference Share Paying Agency Agreement;

(l)    an Issuer Order executed by the Issuer and the Co-Issuer directing the Trustee to (i) authenticate the Notes specified therein, in the amounts set forth therein and registered in the name(s) set forth therein and (ii) deliver the authenticated Notes to the Issuer to hold on behalf of the Co-Issuer or as otherwise directed by the Issuer or the Co-Issuer;

(m)    [Reserved];

(n)    if any Collateral Debt Security which pays interest less frequently than monthly are purchased by the Issuer on the Closing Date and are not the subject of a Deemed Floating Asset Hedge Agreement, a copy of the Quarterly Interest Reserve Schedule with respect to such Collateral Debt Security which pays interest less frequently than monthly; and

(o)    such other documents as the Trustee may reasonably require.

Section 3.2    Security for Notes.

Prior to the issuance of the Notes on the Closing Date, the Issuer shall cause the following conditions to be satisfied:

(a)    Grant of Security Interest; Delivery of Collateral Debt Securities.    The Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's right, title and interest in and to the Collateral and the transfer of all Collateral Debt Securities purchased by the Issuer on the Closing Date (as set forth in the Schedule of Closing Collateral Debt Securities) to the Trustee in the manner provided in Section 3.3(b).

(b)    Certificate of the Issuer.    The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer or the Collateral Manager, for and on behalf of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Collateral Debt Security Granted to the Trustee for inclusion in the Collateral Acquired by the Issuer on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such Collateral Debt Security free and clear of any liens, claims or encumbrances of any nature whatsoever except for those Granted

pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Collateral Debt Security prior to the first payment date and owed by the Issuer to the seller of such Collateral Debt Security;

(ii)    the Issuer has Acquired its ownership in such Collateral Debt Security in good faith, and in the exercise of its reasonable business judgment, without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC), except as described in clause (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Debt Security (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    in the case of each Collateral Debt Security, the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such Collateral Debt Security to the Trustee;

(v)    the information set forth with respect to such Collateral Debt Security in the Schedule of Closing Collateral Debt Securities is correct in all material respects;

(vi)    each Collateral Debt Security included in the Collateral satisfies the requirements of the definition of "Collateral Debt Security" and is transferred to the Trustee as required by Section 3.2(a);

(vii)    each Collateral Debt Security was Acquired in accordance with all applicable requirements of Section 12.2; and

(viii)    upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it under Section 3.3(b) for perfection of that interest) and a Securities Entitlement with respect to Financial Assets.

(c)    Rating Letters.  The delivery to the Trustee of an Officer's certificate of the Issuer, to the effect that (i) attached thereto are true and correct copies of (A) a letter signed by Standard & Poor's confirming that the Class A Notes and the Class S Notes have been rated "AAA" by Standard & Poor's and a letter signed by Moody's confirming that the Class A Notes and the Class S Notes have been rated "Aaa" by Moody's, (B) a letter signed by Standard & Poor's confirming that the Class B Notes have been rated at least "AA" by Standard & Poor's and a letter signed by Moody's confirming that the Class B Notes have been rated at least "Aa2" by Moody's, (C) a letter signed by Standard & Poor's confirming that the Class C Notes have been rated at least "A" by Standard & Poor's and a letter signed by Moody's confirming that the Class C Notes have been rated at least "A2" by Moody's, (D) a letter signed by Standard & Poor's confirming that the Class D-1 Notes have been rated at least "BBB" by Standard & Poor's and a letter signed by Moody's confirming that the Class D-1 Notes have been rated at least "Baa2" by Moody's, (E) a letter signed by Standard & Poor's confirming that the Class D-2 Notes have been rated at least "BBB-" by Standard & Poor's and a letter signed by Moody's

confirming that the Class D-2 Notes have been rated at least "Baa3" by Moody's, (F) a letter signed by Standard & Poor's confirming that the Class E Notes have been rated at least "BB+" by Standard & Poor's (with respect to the ultimate payment of the Class E Interest Amount and the ultimate return of the Scheduled Class E Target Principal Amount) and a letter signed by Moody's confirming that the Class E Notes have been rated at least "Ba1" by Moody's (with respect to the ultimate payment of the Class E Interest Amount and the ultimate return of the Scheduled Class E Target Principal Amount), and (G) a letter signed by Moody's confirming that the Class F Notes have been rated at least "BB-" by Standard & Poor's (with respect to the ultimate payment of the Class F Interest Amount and the ultimate return of the Scheduled Class F Target Principal Amount) and a letter signed by Standard & Poor's confirming that the Class F Notes have been rated at least "Ba3" by Moody's (with respect to the ultimate payment of the Class F Interest Amount and the ultimate return of the Scheduled Class F Target Principal Amount) and (ii) each such rating is in full force and effect on the Closing Date.

The Trustee shall notify Standard & Poor's in the event that the Scheduled Class E Target Principal Amount or the Scheduled Class F Target Principal Amount are paid in full.

(d)    Accounts.  The delivery by the Trustee of evidence of the establishment of any Asset Hedge Account, the Custodial Account, the Expense Account, any Hedge Counterparty Collateral Account, the Interest Collection Account, the Interest Equalization Account, the Issuer Collateral Account, the Payment Account, the Principal Collection Account, the Reserve Account, the Quarterly Interest Reserve Account, any Class A-1 Prepayment Account and the Synthetic Security Counterparty Account to be established on the Closing Date.

(e)    Funding Certificate.  The delivery to the Trustee of a Funding Certificate, duly executed by an Authorized Officer of the Issuer, relating to, among other things, the disposition of the proceeds of the issuance of the Notes and the Preference Shares, dated the Closing Date, in substantially the form of Exhibit C hereto.

(f)    Schedule of Collateral Debt Securities.  The delivery to the Trustee of the Schedule of Collateral Debt Securities.

(g)    Proceeds of the Preference Shares.  The Issuer has received U.S.$19,400,000 from the issuance of the Preference Shares.

Section 3.3    Custodianship; Transfer of Collateral Debt Securities and Eligible Investments.

(a)    The Trustee shall hold all Certificated Securities and Instruments in physical form at the office of a custodian appointed by it (together with any successor, the "**Custodian**").  Initially, such Custodian shall be LaSalle Bank National Association, with its address at 181 West Madison Street, 32nd Floor, Chicago, Illinois 60602, Attention: CDO Trust Services Group—Pyxis ABS CDO 2007-1 Ltd.  Any successor custodian shall be a state or national bank or trust company which is not an Affiliate of the Issuer or the Co-Issuer and has a combined capital and surplus of at least U.S.$200,000,000 and a rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's.

(b)    Each Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment and U.S. Agency Security shall be credited to the appropriate Account.  Each time that the Issuer, or the Collateral Manager on behalf of the Issuer, shall direct or cause the Acquisition of any Collateral Debt Security (other than a Synthetic Security), Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment, the Collateral Manager (on behalf of the Issuer) shall, if such Collateral Debt Security (other than a Synthetic Security), Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment has not already been transferred to the Custodial Account and credited thereto, cause the transfer of such Collateral Debt Security (other than a Synthetic Security), Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment to the Custodian to be held in and credited to the Custodial Account for the benefit of the Trustee in accordance with the terms of this Indenture.  The security interest of the Trustee in the funds or other property utilized in connection with such Acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment so Acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment.  On the Closing Date and on each day any Collateral is Acquired or otherwise becomes subject to the lien of this Indenture, the Issuer represents and warrants to the Trustee as follows:

(i)    This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest has priority over all other claims, encumbrances and liens on the Collateral, and is enforceable as such against creditors of, and purchasers from, the Issuer.

(ii)    The Collateral consists of "general intangibles" and "financial assets" (each within the meaning of the applicable Uniform Commercial Code).

(iii)    (a) The Issuer's rights under any Interest Rate Hedge Agreement, the Collateral Management Agreement, the Collateral Administration Agreement, the Class A-1 Note Purchase Agreement, the Credit Default Swap Agreement, Synthetic Securities, the Subscription Agreements and the Securities Purchase Agreement constitute "general intangibles" (as defined in the applicable Uniform Commercial Code) and (b) the assets credited to the Accounts constitute "financial assets" under the applicable Uniform Commercial Code.

(iv)    All Cash, U.S. Agency Securities, Eligible Investments and Reserve Account Investments will be credited to one of the Accounts.  The Custodian for each Account has agreed to treat all assets credited to the Accounts as "financial assets" (within the meaning of the applicable Uniform Commercial Code) and to treat the Person for whom the Account is maintained as entitled to exercise the rights that comprise such financial assets pursuant to the terms of the Account Control Agreement.

(v)    The Issuer has received all consents and approvals required by the terms of the Underlying Instrument of each item of Collateral to pledge to the Trustee its rights and interests in each Collateral.

(vi)    In order to perfect the security interest in the Collateral granted to the Trustee hereunder, the Issuer shall:

(A)    in the case of a "financial asset" credited to the Accounts, (1) deliver on the Closing Date to the Trustee a fully executed Account Control Agreement pursuant to which the Custodian, as Securities Intermediary, has agreed to comply with all instructions originated by the Trustee directing disposition of the funds in the Accounts without further consent by the Issuer; and (2) take all steps necessary to cause the Custodian, as Securities Intermediary, to identify in its records the Trustee as the Person having a security entitlement against the Custodian, as Securities Intermediary, in each of the Accounts; and

(B)    in the case of a "general intangible" or an "account" (within the meaning of the applicable Uniform Commercial Code), cause, within 10 days of the Closing Date (or 10 days of the acquisition date of such account), the filing of a Financing Statement in the proper filing office in the appropriate jurisdictions under applicable law.

(vii)    The Accounts are not maintained in the name of any Person other than the Issuer or the Trustee. The Issuer has not consented to the Securities Intermediary of any Account complying with entitlement orders of any Person other than the Trustee.

(viii)    Other than the security interest Granted to the Trustee pursuant to this Indenture, the Issuer owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.

(ix)    Other than the security interest Granted to the Trustee pursuant to this Indenture the Issuer has not Granted any security interest in, or otherwise conveyed, any of the Collateral. The Issuer has not authorized the filing of, and is not aware of, any financing statements against it that include a description of collateral covering the Collateral other than any financing statement relating to the security interest Granted to the Trustee hereunder.

(x)    The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filed against the Issuer.

The Trustee and the Co-Issuers (x) shall not, without satisfying the Rating Condition, waive any of the representations and warranties set forth in this Section 3.3(b) or a breach thereof and (y) shall provide each Rating Agency with prompt written notice of any breach of the representations and warranties set forth in this Section 3.3(b) of which the Trustee and the Co-Issuers have knowledge. The representations and warranties set forth in this Section 3.3(b) shall survive until all obligations under the Notes under this Indenture have been fully paid and shall be deemed to be repeated on each date on which Collateral is delivered as if made at and as of that time.

## ARTICLE IV—SATISFACTION AND DISCHARGE

Section 4.1    <u>Satisfaction and Discharge of Indenture.</u>

This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest (and, in the case of the Class A-1 Notes, Commitment Fee) thereon, as provided herein (including as provided in the Priority of Payments and <u>Article XIII</u>), (iv) the rights, obligations and immunities of the Trustee hereunder, (v) the rights and immunities of the Collateral Manager hereunder and under the Collateral Management Agreement, and (vi) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them; and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)    either:

(i)    all Notes theretofore authenticated and delivered (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in <u>Section 2.5</u> and (B) Notes for whose payment Cash has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in <u>Section 7.3</u>) have been delivered to the Trustee for cancellation; or

(ii)    all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, or (B) will become due and payable at their Stated Maturity within one year, or (C) are to be called for redemption pursuant to <u>Section 9.1</u> under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Co-Issuers pursuant to <u>Section 9.3</u> and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust on behalf of the Issuer for such purpose, Cash or non-callable direct obligations of the United States in an amount sufficient, as verified by a firm of nationally-recognized Independent certified public accountants, to pay and discharge the entire indebtedness on all Notes not theretofore delivered to the Trustee for cancellation, including all principal and interest (including the Commitment Fee, any Class S Shortfall Amount, Class C Deferred Interest, Class D-1 Deferred Interest, Class D-2 Deferred Interest, Class E Deferred Interest, Class F Deferred Interest, Defaulted Interest and interest on Defaulted Interest, interest on Class C Deferred Interest, interest on Class D-1 Deferred Interest, interest on Class D-2 Deferred Interest, interest on Class E Deferred Interest and interest on Class F Deferred Interest, if any) accrued to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or the Redemption Date, as the case may be; *provided* that (x) such obligations are entitled to the full faith and credit of the United States and (y) this subclause (ii) shall not apply if an election to act in accordance with the provisions of <u>Section 5.5(a)</u> shall have been made and not rescinded;

(b)    the Issuer has paid or caused to be paid all other sums payable hereunder (including all amounts payable pursuant to any Hedge Agreement, the Credit Default Swap Agreement, any Synthetic Securities, the Class A-1 Note Purchase Agreement, the Collateral Administration Agreement, the Administration Agreement, the Preference Share Paying Agency Agreement and the Collateral Management Agreement and in each case (where applicable) including all termination payments) and no other amounts will become due and payable by the Issuer; and

(c)    the Co-Issuers have delivered to the Trustee Officers' certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Collateral Manager, the Hedge Counterparties, the Credit Default Swap Counterparty and, if applicable, the Noteholders, as the case may be, under Sections 2.6, 4.1, 4.2, 5.9, 5.18, 6.7, 6.8, 7.1, 7.3, 13.1 and 14.16 shall survive such satisfaction and discharge.

Section 4.2    Application of Amounts in Trust.

All amounts deposited with the Trustee pursuant to Section 4.1 on behalf of the Issuer for the payment of principal of and interest (and, in the case of the Class A-1 Notes, Commitment Fee) on the Notes and amounts payable pursuant to the Hedge Agreements, the Collateral Administration Agreement, the Credit Default Swap Agreement and the Collateral Management Agreement shall be held in trust on behalf of the Issuer and applied by it in accordance with the provisions of the Notes, the Preference Share Paying Agency Agreement and this Indenture, including the Priority of Payments, for the payment either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the respective amounts in respect of which such amounts have been deposited with the Trustee; but such amounts need not be segregated from other funds held by the Trustee except to the extent required herein or required by law.

Section 4.3    Repayment of Amounts Held by Paying Agent.

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all amounts then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held on behalf of the Issuer and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such amounts.

## ARTICLE V—EVENTS OF DEFAULT; REMEDIES

Section 5.1    Events of Default.

"**Event of Default,**" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary

or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment of (A) any interest (or with respect to the Class A-1 Notes, the Commitment Fee) on the Class A-1 Notes, Class S Notes, Class A-2 Notes or Class B Notes, (B) if there are no Class A-1 Notes, Class S Notes, Class A-2 Notes or Class B Notes outstanding and the Commitment Termination Date has occurred, interest on any Class C Note, (C) if there are no Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes or Class C Notes outstanding, and the Commitment Termination Date has occurred, interest on any Class D-1 Note, or (D) if there are no Class A-1 Notes, Class S Notes, Class A-2 Notes, Class B Notes, Class C Notes or Class D-1 Notes outstanding, and the Commitment Termination Date has occurred, interest on any Class D-2 Note, when the same becomes due and payable, in each case which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, five Business Days after the Trustee or the Administrator is made aware of such administrative error or omission);

(b)    a default in the payment of the Outstanding Class A-1 Funded Amount or principal of any Note when the same becomes due at its Stated Maturity or Redemption Date which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, such default continues for a period of five Business Days after the Trustee or the Administrator is made aware of such administrative error or omission);

(c)    the failure on any Distribution Date to disburse amounts in excess of U.S.$1,000 and available in the Interest Collection Account or Principal Collection Account in accordance with the order of priority set forth under Section 11.1 (other than a default in payment described in clause (a) or (b) above), which failure continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, such default continues for a period of five Business Days after the Trustee or the Administrator is made aware of such administrative error or omission);

(d)    either of the Co-Issuers or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(e)    a default in the performance, or breach, of any other covenant or other agreement (other than (1) a default described in clause (a), (b), (c) or (d) above or (2) the covenant to meet the Collateral Quality Tests, the Pro Rata Payment Conditions or the Eligibility Criteria (it being understood that with respect to the purchase or Sale of any Collateral Debt Security all conditions applicable thereto hereunder, including those specified in Article XII, shall be satisfied)) of the Issuer or the Co-Issuer under this Indenture or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proves to be incorrect in any material

respect when made, and the continuation of such default or breach for a period of 30 days (or, if such default, breach or failure has an adverse effect on the validity, perfection or priority of the security interest granted thereunder, 15 days) after any of the Issuer, the Co-Issuer or the Collateral Manager has actual knowledge thereof or after notice thereof to the Issuer and the Collateral Manager by the Trustee, the Holders of at least 25% in Aggregate Outstanding Amount of Notes of the Controlling Class, the Credit Default Swap Counterparty or any of the Hedge Counterparties;

(f)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) winding up, liquidation, reorganization or other relief in respect of the Issuer or the Co-Issuer or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or the Co-Issuer or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or the Issuer or its assets shall become subject to any event that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(g)     the Issuer or the Co-Issuer shall (i) voluntarily commence any proceeding or file any petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>Section 5.1(f)</u>, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or the Co-Issuer or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or the Issuer shall cause or become subject to any event with respect to the Issuer that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing; or

(h)     on any Determination Date, if the ratio (expressed as a percentage) obtained by *dividing* (A) the Net Outstanding Portfolio Collateral Balance by (B) the sum of (i) the Aggregate Outstanding Amount of the Class A-2 Notes, (ii) the Outstanding Class A-1 Funded Amount and (iii) the Remaining Unfunded Facility Commitment, is less than 100%.

If either of the Co-Issuers shall obtain knowledge, or shall have reason to believe, that an Event of Default shall have occurred and be continuing, such Co-Issuer shall promptly notify the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Noteholders, the Credit Default Swap Counterparty, the Class A-1 Note Agent, each Hedge Counterparty, each Class A-1 Noteholder and each Rating Agency in writing of such an Event of Default.

In the event that there is a payment default on any Notes resulting from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, the Trustee shall promptly notify the Rating Agencies and the Collateral Manager of such payment default.

Section 5.2     <u>Acceleration of Maturity; Rescission and Annulment.</u>

(a)    If an Event of Default occurs and is continuing (other than a Specified Event of Default), (i) the Trustee may with the consent of a Majority of the Controlling Class, or shall at the direction of the Holders of a Majority of the Controlling Class by notice to the Co-Issuers, or (ii) a Majority of the Controlling Class, by notice to the Co-Issuers and the Trustee, may (A) declare the Outstanding Class A-1 Funded Amount (including any future additions to such Outstanding Class A-1 Funded Amount as a result of additional Borrowings or Deemed Borrowings under the Class A-1 Note Purchase Agreement) to be immediately due and payable, (B) declare the principal of and accrued and unpaid interest and Commitment Fee (including Defaulted Interest and interest on Defaulted Interest) on all of the Notes to be immediately due and payable and (C) terminate the Reinvestment Period. If a Specified Event of Default occurs, (1) such an acceleration under clauses (A) and (B) above will occur automatically and without any further action and (2) the Reinvestment Period shall terminate. Notwithstanding the foregoing, if a Specified Event of Default occurs and is continuing solely with respect to a default in the payment of any principal of or interest on the Notes of a Class other than the Controlling Class, neither the Trustee nor the Holders of such non-Controlling Class shall have the right to declare such principal and other amounts to be immediately due and payable.

(b)    At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Cash due has been obtained by the Trustee as hereinafter provided in this Article V, a Majority of the Controlling Class, by written notice to the Co-Issuers and the Trustee (which shall forward a copy of such notice to the Credit Default Swap Counterparty and the Hedge Counterparties), may rescind and annul such declaration and its consequences (including, without limitation, termination of the Reinvestment Period) if:

(i)    the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)    all overdue installments of principal of and interest on the Class A-1 Notes and Commitment Fees thereon and on the Senior Funded Notes (including, in the case of the Class C Notes, the Class D-1 Notes and the Class D-2 Notes, any Class C Deferred Interest, any Class D-1 Deferred Interest and any Class D-2 Deferred Interest, and, in the case of the Class S Notes, any Class S Shortfall Amount);

(B)    interest upon Class C Deferred Interest at the applicable Note Interest Rate and, to the extent that payment of such interest is lawful, upon Defaulted Interest at the applicable Note Interest Rate;

(C)    interest upon Class D-1 Deferred Interest at the applicable Note Interest Rate and, to the extent that payment of such interest is lawful, upon Defaulted Interest at the applicable Note Interest Rate;

(D)    interest upon Class D-2 Deferred Interest at the applicable Note Interest Rate and, to the extent that payment of such interest is lawful, upon Defaulted Interest at the applicable Note Interest Rate;

(E)    any accrued and unpaid amounts (including termination payments, if any) payable by the Issuer pursuant to the Collateral Management Agreement, the Hedge Agreements or the Credit Default Swap Agreement; and

(F)    all unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel;

(ii)    the Trustee has determined that all Events of Default, other than the nonpayment of the principal of or interest on the Notes that have become due solely by such acceleration, have been cured and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination or waived all Events of Default giving rise to such acceleration as provided in <u>Section 5.14</u>; and

(iii)    subject to <u>Section 5.2(c)</u> below, the Hedge Agreements in effect immediately prior to the declaration of such acceleration shall remain in effect.

At any such time as the Majority of the Controlling Class shall notify the Trustee in writing that it wishes to rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of <u>Section 5.5</u>; *provided* that if such preservation of the Collateral is rescinded pursuant to <u>Section 5.5</u> the Notes may subsequently be accelerated pursuant to <u>Section 5.2(a)</u>, notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this <u>Section 5.2(b)</u>.

No such rescission and annulment shall affect any subsequent Default or impair any right consequent thereon.

(c)    The Issuer shall not terminate the Credit Default Swap Agreement or any Hedge Agreement in effect immediately prior to a declaration of acceleration unless the liquidation of the Collateral has begun and such declaration is no longer capable of being rescinded or annulled.

Section 5.3    <u>Collection of Indebtedness and Suits for Enforcement by Trustee.</u>

The Co-Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest or Commitment Fee on any Class A-1 Note, the payment of principal of or interest on any Class A-2 Note, the payment of principal of or interest on any Class S Note, the payment of principal of or interest on any Class B Note, the payment of principal of or any interest on any Class C Note (but, with respect to interest, only after the Class A-1 Notes, the Class S Notes, the Class A-2 Notes and the Class B Notes and all interest and Commitment Fee accrued thereon have been paid in full), the payment of principal of or interest on any Class D-1 Note (but with respect to interest, only after the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes and the Class C Notes and all interest and Commitment Fee accrued thereon together with any Class S Shortfall Amount and Defaulted Interest thereon have been paid in full), the payment of principal of or interest on any Class D-2 Note (but with respect to interest, only after the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D-1 Notes and all interest and Commitment Fee accrued thereon have been paid in full), the Co-Issuers will, upon demand of the Trustee and any affected

Noteholder, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount, if any, then due and payable on such Note for principal and interest (and, in the case of the Class A-1 Notes, Commitment Fee) with interest upon the overdue principal amount and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest at the applicable Note Interest Rate.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may, and shall, upon the direction by a Majority of the Controlling Class, prosecute such Proceeding to judgment or final decree, and may enforce the same against the Co-Issuers or any other obligor upon the Notes and collect the Cash adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as the Trustee shall deem most effectual (if no direction by a Majority of the Controlling Class is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether (x) the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and (y) the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, upon direction by a Majority of the Controlling Class and by intervention in such Proceedings or otherwise:

(a)     to file and prove a claim or claims for the whole amount of principal and interest (and, in the case of the Class A-1 Notes, Commitment Fee) owing and unpaid in respect of the Notes, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and the Noteholders allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes, upon the direction of such Holders, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(c)    to collect and receive any Cash or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on behalf of the Noteholders and the Trustee; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof hereunder, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any action or Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements and compensation of the Trustee, each predecessor trustee and their respective agents and attorneys and counsel, shall be for the benefit of the Secured Parties and payable to the Secured Parties in accordance with the Priority of Payments.

In any Proceedings brought by the Trustee on behalf of the Holders, the Trustee shall be held to represent, subject to Section 6.17, all the Secured Parties, if applicable, pursuant to Section 6.17.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Section 5.5(a).

Section 5.4    Remedies.

(a)    If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may, after notice to the Collateral Manager, the Noteholders, the Credit Default Swap Counterparty and the Hedge Counterparties, and shall, upon direction by a Majority of the Controlling Class, to the extent

permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any Cash adjudged due;

(ii)    sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)    exercise any other rights and remedies that may be available at law or in equity;

*provided* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest on the Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in Section 5.1(e) shall have occurred and be continuing, the Trustee may, and at the request of the Holders of not less than 25% of the Aggregate Outstanding Amount of Notes of any Class or any Hedge Counterparty shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such proceeding.

(c)    Upon any Sale, whether made under the power of Sale hereby given or by virtue of judicial proceedings, any Noteholder or Secured Party or any of their respective Affiliates may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of Sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any Sale, whether made under the power of Sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the Officer making a Sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any Sale for its or

their purchase Cash, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such Sale, whether under any power of Sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee and the Noteholders, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)     Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws.  Nothing in this <u>Section 5.4</u> shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or, if longer, the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer under the Bankruptcy Code or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

Section 5.5     <u>Preservation of Collateral.</u>

(a)     If an Event of Default shall have occurred and be continuing when any Class of Notes is Outstanding or the Outstanding Class A-1 Funded Amount or the Remaining Unfunded Facility Commitment is greater than zero, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of <u>Articles X</u>, <u>XII</u> and <u>XIII</u> unless:

(i)     the Trustee determines that the anticipated net proceeds of a Sale of the Collateral (after deducting the reasonable expenses of such Sale) would be sufficient to pay the Outstanding Class A-1 Funded Amount until it has been paid in full and reduce the Remaining Exposure under the CDS Agreement Transactions to zero, to discharge in full any other amounts due and unpaid in respect of the Class A-1 Notes, to discharge in full the amounts then due and unpaid on the Funded Notes and certain Administrative Expenses (including any termination payments or other amounts that are or will become due to the Hedge Counterparties or the Credit Default Swap Counterparty) in accordance with the Priority of Payments and a Majority in Aggregate Outstanding Amount of the Controlling Class (including, in the case of the Class A-1 Notes, the Remaining Unfunded Facility Commitment) agree with such determination;

(ii)    the Holders of at least 66-⅔% in Aggregate Outstanding Amount of each Class of the Class A-1 Notes, the Class S Notes and the Senior Funded Notes and Deferred Interest thereon, if applicable, voting as a single class, the Credit Default Swap Counterparty and the Hedge Counterparties, if any, direct the Sale of the Collateral; *provided* that no consent of the Credit Default Swap Counterparty or a particular Hedge Counterparty will be required if (A) no early termination or liquidation payment would be owing by the Issuer to such Person upon the termination of the Credit Default Swap Agreement or related Hedge Agreement (as applicable) by reason of an "Event of Default" or "Termination Event" under (and as defined in) the Credit Default Swap Agreement or related Hedge Agreement (as applicable) or (B) in the case of the consent rights of the Credit Default Swap Counterparty or any Hedge Counterparty, the Credit Default Swap Counterparty or the relevant Hedge Counterparty (as applicable) is the "Defaulting Party" or sole "Affected Party" with respect to an "Event of Default" or "Termination Event" under (and as defined in) the Credit Default Swap Agreement or related Hedge Agreement (as applicable); or

(iii)    a Control Event has occurred and is continuing and a Majority of the Controlling Class (so long as the Controlling Class is the Class A-1 Notes) directs the Disposition of the Collateral (unless, in the case of a Control Event under clause (3) of the definition thereof and the Class A-2 Notes and Class B Notes would not be fully repaid after giving effect to the distribution of the Disposition Proceeds of the Collateral, a Majority of the Class A-2 Notes and the Class B Notes (voting separately) objects to such Disposition within 10 Business Days, but, with respect to Class B Notes, only if (x) the number (expressed as a percentage) calculated by *dividing* (a) the sum of the Aggregate Principal Balance of all Collateral Debt Securities plus the aggregate principal balance of the Excess Reserve Account Assets by (b) the sum of the Aggregate Outstanding Amount of the Outstanding Class A-1 Funded Amount plus the Remaining Unfunded Facility Commitment plus the Aggregate Outstanding Amount of the Class A-2 Notes plus Aggregate Outstanding Amount of the Class B Notes is more than (y) 100%); *provided* that the Credit Default Swap Counterparty shall have consented to such direction if the aggregate Disposition Proceeds of any such Disposition of the Collateral pursuant this clause (iii) would be insufficient, upon distribution pursuant to the Priority of Payments, to pay any amounts due and owing by the Issuer to the Credit Default Swap Counterparty under the Credit Default Swap Agreement (other than any Defaulted Swap Termination Payment).

If the conditions set forth in clauses (i), (ii) or (iii) above are satisfied, the Trustee shall dispose of the Collateral and apply the proceeds thereof in accordance with Section 5.7.

In the event the Trustee retains Collateral pursuant to this Section 5.5(a), the Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer, the Collateral Manager, the Credit Default Swap Counterparty and the Hedge Counterparties.  So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral securing the Notes if prohibited by applicable law.

(c)    In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally-recognized dealers, as specified by the Collateral Manager in writing, which are Independent from each other and the Collateral Manager, at the time making a market in such securities and shall compute the anticipated Sale Proceeds on the basis of the lower of such bid prices for each such security.  For the purposes of making the determinations required pursuant to Section 5.5(a)(i), the Trustee shall apply the standards set forth in Section 9.1(b).  In addition, for the purposes of determining issues relating to the execution of a Sale of the Pledged Securities and the execution of a Sale thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, the Collateral Manager, the Hedge Counterparties, the Credit Default Swap Counterparty and the Co-Issuers a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than 10 days after making such determination.    The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i).    In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture.  In determining whether the Holders of the requisite Aggregate Outstanding Amount of any Class of Notes have given any direction or notice or have agreed pursuant to Section 5.5(a), any Holder of a Note of a Class who is also a Holder of Notes of another Class or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

(d)    If an Event of Default shall have occurred and be continuing at a time when no Note is Outstanding, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of Articles X and XII unless a Majority-in-Interest of Preference Shares direct the Sale of the Collateral.

Section 5.6    Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7.

Section 5.7    Application of Cash Collected.

Any Cash collected by the Trustee with respect to the Notes pursuant to this Article V and any Cash that may then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied subject to Section 13.1 and in accordance with the provisions of Section 11.1, at the date or dates fixed by the Trustee.

Section 5.8    Limitation on Suits.

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of an Event of Default;

(b)    except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of any Class (including, in the case of the Class A-1 Notes, the Remaining Unfunded Facility Commitment) or any Hedge Counterparty or the Credit Default Swap Counterparty have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holders have provided the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the Controlling Class, notwithstanding any other provisions of this Indenture.

Section 5.9    Unconditional Rights of Noteholders to Receive Principal and Interest.

Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i)), the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest (and, in the case of the Class A-1 Notes,

-147-

Commitment Fee) on such Note as such principal and interest (and, in the case of the Class A-1 Notes, Commitment Fee) become due and payable in accordance with <u>Section 13.1</u> and the Priority of Payments.  Furthermore, subject to the provisions of <u>Section 5.8</u>, the Holder of any Note shall have the right to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

<div align="center">Section 5.10    <u>Restoration of Rights and Remedies.</u></div>

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or such Noteholder, then and in every such case the Co-Issuers, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Secured Parties shall continue as though no such Proceeding had been instituted.

<div align="center">Section 5.11    <u>Rights and Remedies Cumulative.</u></div>

No right or remedy herein conferred upon or reserved to the Trustee or the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

<div align="center">Section 5.12    <u>Delay or Omission Not Waiver.</u></div>

No delay or omission of the Trustee or any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this <u>Article V</u> or by law to the Trustee or the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or the Noteholders, as the case may be.

<div align="center">Section 5.13    <u>Control by Controlling Class.</u></div>

Notwithstanding any other provision of this Indenture (but subject to the proviso in the definition of "Outstanding" in <u>Section 1.1(a)</u>), a Majority of the Controlling Class shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee; *provided* that:

(a)    such direction shall not conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that subject to <u>Section 6.1</u>, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received satisfactory indemnity against such liability as set forth below);

<div align="center">-148-</div>

(c)      the Trustee shall have been provided with indemnity satisfactory to it; and

(d)      any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5.

Section 5.14    Waiver of Past Defaults.

Prior to the time a judgment or decree for payment of the Cash due has been obtained by the Trustee, as provided in this Section 5, a Majority of the Controlling Class may on behalf of the Controlling Class and the Holders of all the other Notes waive any past Default and its consequences, except a Default:

(a)      in the payment of the principal of any Note or in the payment of interest (and, in the case of the Class A-1 Notes, Commitment Fee) (including any Class S Shortfall Amount, Defaulted Interest, interest on Defaulted Interest, and any Deferred Interest and interest thereon);

(b)      in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note affected thereby; or

(c)      arising under Section 5.1(f) or 5.1(g).

In the case of any such waiver, (i) the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto, and (ii) the Trustee shall promptly give written notice of any such waiver to the Collateral Manager, the Credit Default Swap Counterparty, each Hedge Counterparty and each Holder of Notes.  The Rating Agencies shall be notified promptly by the Issuer of any such waiver.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, the Credit Default Swap Counterparty or any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of Class of Notes

constituting the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest (and, in the case of the Class A-1 Notes, Commitment Fee) on any Note on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16    Waiver of Stay or Extension Laws.

The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force (including but not limited to filing a voluntary petition under Chapter 11 of the Bankruptcy Code and by the voluntary commencement of a proceeding or the filing of a petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect), which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17    Sale of Collateral.

(a)    The power to effect any sale, termination, liquidation or other disposition (a "**Sale**") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid.  The Trustee may upon notice to the Noteholders and the Credit Default Swap Counterparty and shall, upon direction of a Majority of the Controlling Class from time to time, postpone any Sale by announcement made at the time and place of such Sale; *provided* that (i) if the Sale is rescheduled for a date more than 10 Business Days after the date of the determination by the Trustee pursuant to Section 5.5, such Sale shall not occur unless and until the Trustee has again made the determination required by Section 5.5 (and the Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale) and (ii) the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)    The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7.  The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so Acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any security included in the Collateral is not registered under the Securities Act ("**Unregistered Securities**"), the Trustee may seek an Opinion of Counsel, or, if

no such Opinion of Counsel can be obtained and with the consent of a Majority of the Controlling Class, seek a no-action position from the United States Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private Sale of such Unregistered Securities (the costs of which, in each case, shall be reimbursable to the Trustee pursuant to <u>Section 6.8</u> hereof).

(d)    The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a Sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a Sale thereof, and to take all action necessary to effect such Sale.  No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Cash.

Section 5.18    <u>Action on the Notes.</u>

The Trustee's right to seek and recover judgment on the Notes or on behalf of any of the Secured Parties owed any amount under this Indenture or otherwise under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer or the Co-Issuer.

## ARTICLE VI—THE TRUSTEE

Section 6.1    <u>Certain Duties and Responsibilities.</u>

(a)    Except during the continuance of an Event of Default:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided* that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not so conform.  In the case of an Officer's Certificate to be provided by the Collateral Manager or the Issuer, if a corrected form shall not have been delivered to the Trustee within 15 Business Days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b)    In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subclause (c) shall not be construed to limit the effect of subclause (a) of this Section 6.1;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith (A) in accordance with the written direction of the requisite Noteholders specified by the terms of this Indenture relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or (B) exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it (if the amount of such funds or risk or liability does not exceed the amount payable to the Trustee pursuant to Section 11.1(i)(B) net of the amounts specified in Section 6.8(a)(i), the Trustee shall be deemed to be reasonably assured of such repayment) unless such risk or liability relates to performance of its ordinary services, including under Section 5, under this Indenture.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default described in Section 5.1(d), 5.1(e), 5.1(f) or 5.1(g) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or such a Default, as the case may be, is received by the Trustee at the Corporate Trust Office. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or such a Default, as the case may be, such reference shall be construed to refer only to such an Event of Default or such a Default, as the case may be, of which the Trustee is deemed to have notice as described in this Section 6.1(d).

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.

(f)    The Trustee shall, upon reasonable (but no less than one Business Day's) prior written notice to the Trustee, permit any Holder of a Note (or representative thereof), during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee (other than items protected by attorney-client privilege) relating to the Notes, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Notes.

(g)    With respect to the security interests created hereunder, the Trustee acts as a fiduciary for the Noteholders only, and serves as a collateral agent for the Hedge Counterparties, the Credit Default Swap Counterparty and the Collateral Manager.

Section 6.2    Notice of Default.

Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall mail to the Collateral Manager, each Rating Agency (for so long as any Notes are Outstanding), the Preference Share Paying Agent, each Hedge Counterparty, the Credit Default Swap Counterparty and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

Section 6.3    Certain Rights of Trustee.

Except as otherwise provided in Section 6.1:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting in good faith and in reliance upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally-recognized accountants, investment bankers or other Persons qualified to provide the information required to make such determination, including nationally-recognized dealers in securities of the type being valued and securities quotation services;

(d)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of any Class or any Rating Agency, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and, the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Collateral Manager, to examine the books and records of the Co-Issuers and the Collateral Manager relating to the Notes and the Collateral, personally or by agent or attorney during normal business hours; *provided* that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; *provided* that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Trustee) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)     the Trustee shall not be liable for any action it takes or omits to take in good faith that, in the exercise of its judgment, it reasonably and, after the occurrence and during the continuance of an Event of Default, prudently believes to be authorized or within its rights or powers hereunder;

(i)     nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or (absent manifest error) verify any report, certificate or information received from the Issuer or Collateral Manager (unless and except to the extent otherwise expressly set forth herein or upon the request of a Rating Agency or a Majority of the Controlling Class);

(j)     the Trustee shall not be responsible or liable for the actions or omissions of, or (absent manifest error) any inaccuracies in the records of, any non-Affiliated custodian, clearing agency, common depository, Euroclear or Clearstream, Luxembourg or for the acts or omissions of the Collateral Manager or either Co-Issuer;

(k)        to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles in the United States in effect from time to time ("**GAAP**"), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants appointed pursuant to Section 10.9 as to the application of GAAP in such connection, in any instance; and

(l)        the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Co-Issuer, the Collateral Manager and/or the Holders of the Notes under the circumstances in which such direction is required or permitted by the terms of this Indenture.

Section 6.4      Authenticating Agents.

Upon the request of the Co-Issuers and on their behalf, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5 and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes.  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.4 shall be deemed to be the authentication of Notes "by the Trustee."

Any entity into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor entity.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto, and the Trustee shall be entitled to be reimbursed for such payments, subject to Section 6.8.  The provisions of Sections 2.8, 6.5 and 6.6 shall be applicable to any Authenticating Agent.

Section 6.5      Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Co-Issuers, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the

validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any Cash paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.6    May Hold Notes.

The Trustee, any Paying Agent, the Note Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, Note Registrar or such other agent.

Section 6.7    Cash Held in Trust.

Cash held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any Cash received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

Section 6.8    Compensation and Reimbursement.

(a)    The Issuer agrees:

(i)    to pay the Trustee on each Monthly Distribution Date (in accordance with the Priority of Payments) reasonable compensation for all services, including custodial services (as provided in a separate fee letter between the Issuer and the Trustee), rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 5.17, 6.3(c), 10.7 or 10.9, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith but only to the extent any such securities transaction charges have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Collateral Manager);

(iii)    to indemnify the Trustee (in its individual capacity and as Trustee) and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or

liability in connection with the exercise or performance of any of their powers or duties hereunder; and

(iv)     to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.14.

(b)     The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from Cash on deposit in the Payment Account for the Notes on a Monthly Distribution Date in accordance with Section 11.1.

(c)     The Trustee hereby agrees not to cause the filing, in its capacity as Trustee and in any individual or other capacity in respect of which it has been appointed under this Indenture, of any bankruptcy, liquidation or insolvency proceeding against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture and the final redemption of the Preferred Shares.

(d)     The amounts payable to the Trustee pursuant to Section 6.8(a) (other than amounts received by the Trustee from financial institutions under clause (a)(ii) above) shall not, except as provided by Sections 11.1(i)(T) and 11.1(ii)(P), exceed on any applicable Distribution Date the payment limitation described in Section 11.1(i)(B) for such Distribution Date, and the Trustee shall have a lien ranking senior to that of the Noteholders upon all property and funds held or collected as part of the Collateral to secure payment of amounts payable to the Trustee under this Section 6.8 not to exceed such amount with respect to any Distribution Date; *provided* that (A) the Trustee shall not institute any proceeding for enforcement of such lien except in connection with an action pursuant to Section 5.3 or 5.4 for the enforcement of the lien of this Indenture for the benefit of the Secured Parties and (B) the Trustee may only enforce such a lien in conjunction with the enforcement of the rights of the Secured Parties in the manner set forth in Section 5.4.

Fees applicable to periods shorter than a calendar quarter shall be prorated based on the actual number of days within such period.  The Trustee shall, subject to the Priority of Payments, receive amounts pursuant to this Section 6.8 and Section 11.1(i) and (ii) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default.  Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the filing of a petition in bankruptcy against the Co-Issuers for the nonpayment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.   No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

Section 6.9    Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee hereunder which shall be a national banking association, corporation or trust company organized and doing business under the laws of the United States or of any State thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state authority, having a long-term senior unsecured debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", is not on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a short-term debt rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and having an office within the United States.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.9, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

Section 6.10    Resignation and Removal; Appointment of Successor.

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11.

(b)    The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Co-Issuers, the Noteholders, the Collateral Manager, each Hedge Counterparty, the Credit Default Swap Counterparty, each Rating Agency, the Class A-1 Note Agent and the Preference Share Paying Agent.  Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor trustee or trustees, together with a copy to each Noteholder; *provided* that such successor Trustee shall be appointed at any time when an Event of Default shall have occurred and be continuing, only upon the written consent of a Majority of each Class.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder of a Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    Subject to Section 6.10(a), the Trustee may be removed at any time by Holders of at least 66-⅔% of the Aggregate Outstanding Amount of the Senior Funded Notes and the Class A-1 Notes, or at any time when an Event of Default will have occurred and be continuing by Act of a Majority of the Controlling Class, delivered to the Trustee and to the Co-Issuers.

(d)    If at any time:

(i)      the Trustee shall cease to be eligible under <u>Section 6.9</u> and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)      the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to <u>Section 6.10(a)</u>), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to <u>Section 5.15</u>, any Holder of a Senior Funded Note or a Class A-1 Note may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)      If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee.  If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, subject to <u>Section 5.15</u>, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)      The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, each Rating Agency, the Credit Default Swap Counterparty, each Hedge Counterparty and the Holders as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.11    <u>Acceptance of Appointment by Successor.</u>

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges, fees, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor

Trustee all property and Cash held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in <u>Section 6.8(d)</u>.  Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless (a) at the time of such acceptance such successor shall (i) have long-term debt rated at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a short-term debt rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and (ii) be qualified and eligible under this <u>Article VI</u> and (b) the Rating Condition with respect to the appointment of such successor Trustee shall have been satisfied with respect to Standard & Poor's and written notice shall have been given to Moody's.  No appointment of a successor Trustee shall become effective if a Majority of the Controlling Class objects to such appointment, and no appointment of a successor Trustee shall become effective until the date 10 days after notice of such appointment has been given to each Noteholder.

Section 6.12    <u>Merger, Conversion, Consolidation or Succession to Business of Trustee.</u>

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; *provided* that such Person shall be otherwise qualified and eligible under this <u>Article VI</u>, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.13    <u>Co-Trustees.</u>

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee, jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.6</u> and to make such claims and enforce such rights of action on behalf of the Holders of the Notes subject to the other provisions of this <u>Section 6.13</u>.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have power to make such appointment.  The Trustee shall provide notice of appointment of a co-trustee to the Rating Agencies.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay (subject to the Priority of Payments) for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)    the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly, as shall be provided in the instrument appointing such co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(c)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers.  A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

(d)    no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other co-trustee hereunder;

(e)    the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)    any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.14    Certain Duties Related to Delayed Payment of Proceeds.

In the event that the Trustee shall not have received a payment with respect to any Pledged Security on its Due Date (unless otherwise directed by the Collateral Manager in connection with any Pledged Security with respect to which there was a default in payment during the preceding Due Period as to which the Collateral Manager is taking action under the Collateral Management Agreement), (a) the Trustee shall promptly notify the Issuer and the Collateral Manager in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice (i) such payment shall have been received by the Trustee, or (ii) the Issuer, in its absolute discretion (but only to the extent

-161-

permitted by Section 10.2(e)), shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(e), the Trustee shall request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee, subject to the provisions of Section 6.1(c)(iv), shall take such action as the Collateral Manager shall direct in writing.  Any such action shall be without prejudice to any right to claim a Default under this Indenture.  In the event that the Issuer or the Collateral Manager requests a release of a Pledged Security and/or delivers a new Collateral Debt Security in connection with any such action under the Collateral Management Agreement, such release and/or delivery shall be subject to Section 10.8 and Article XII, as the case may be.  Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with Section 10.2(e) and this Section 6.14 and such payment shall not be deemed part of the Collateral.

Section 6.15    Representations and Warranties of the Bank.

(a)    Organization.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States of America and has the power to conduct its business and affairs as a trustee.

(b)    Authorization; Binding Obligations.  The Bank has the corporate power and authority to perform the duties and obligations of Trustee, Note Registrar and Transfer Agent under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  This Indenture has been duly executed and delivered by the Bank.  Upon execution and delivery by the Co-Issuers, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)    Eligibility.  The Bank is eligible under Section 6.9 to serve as Trustee hereunder.

(d)    No Conflict.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

(e)    No Proceedings.  There are no proceedings pending, or to the best knowledge of the Bank, threatened against the Bank before any federal, state or other governmental agency, authority, administrator or regulatory body, arbitrator, court or other

tribunal, foreign or domestic, that could have a material adverse effect on the Collateral or any action taken or to be taken by the Bank under this Indenture.

Section 6.16    Exchange Offers.

The Collateral Manager may, on behalf of the Issuer, instruct the Trustee pursuant to an Issuer Order to, and the Trustee shall, take any of the following actions with respect to a Collateral Debt Security or Equity Security as to which an exchange offer has been made: (i) exchange such instrument for other securities or a mixture of securities and other consideration pursuant to such exchange offer (and in making a determination whether or not to exchange any security, none of the restrictions set forth in Section 12.2 or 12.3 shall be applicable); and (ii) give consent, grant waiver, vote or exercise any or all other rights or remedies with respect to any such Collateral Debt Security or Equity Security.

Section 6.17    Fiduciary for Noteholders Only; Agent For Other Secured Parties.

With respect to the security interests created hereunder, the pledge of any portion of the Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties.  In furtherance of the foregoing, the possession by the Trustee of any portion of the Collateral and the endorsement to or registration in the name of the Trustee of any portion of the Collateral (including without limitation as Entitlement Holder of the Custodian Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and as agent for the other Secured Parties.  The Trustee shall not by reason of this Indenture be deemed to be acting as fiduciary for the Hedge Counterparties or the Collateral Manager; *provided* that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

Section 6.18    Withholding

If any amount is required to be deducted or withheld from any payment to any Noteholder, such amount shall reduce the amount otherwise distributable to such Noteholder. The Trustee is hereby authorized on behalf of the Issuer to withhold or deduct from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally required to be withheld or deducted (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and legally withholding payment of such tax, pending the outcome of such proceedings).  The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to such Noteholder at the time it is deducted or withheld by the Issuer or the Trustee on behalf of the Issuer, as applicable, and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion on behalf of the Issuer withhold such amounts in accordance with this Section 6.18.  If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred.  Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

## ARTICLE VII—COVENANTS

Section 7.1    Payment of Principal and Interest on the Notes.

The Issuer will duly and punctually pay all principal of and interest (including, in the case of the Class A-1 Notes, Commitment Fee) on the Notes (including Defaulted Interest and interest thereon, Class S Shortfall Amount, Class C Deferred Interest, Class D-1 Deferred Interest, Class D-2 Deferred Interest, Class E Deferred Interest, Class F Deferred Interest and interest on Class C Deferred Interest, Class D-1 Deferred Interest, Class D-2 Deferred Interest, Class E Deferred Interest and Class F Deferred Interest, if any) in accordance with the terms of the Notes and this Indenture.  Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder shall be considered as having been paid by the Issuer to such Noteholder for all purposes of this Indenture.

The Trustee hereby provides notice to each Noteholder that the failure of such Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to such Noteholder under this Indenture and that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer as provided above.

Section 7.2    Maintenance of Office or Agency.

The Co-Issuers hereby appoint the Trustee as Paying Agent for the payment of principal of and interest on the Notes.  The Co-Issuers hereby appoint CT Corporation, 111 Eighth Avenue, New York, New York 10011, as the Co-Issuers' agent where notices and demands to or upon the Co-Issuers in respect of the Notes or this Indenture may be served. Notes may be surrendered for registration of transfer or exchange at the Corporate Trust Office.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; *provided* that (A) the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of the Notes and this Indenture may be served, (B) no Paying Agent shall be appointed in a jurisdiction which would subject payments on the Notes to withholding tax as a result of the Paying Agent being located therein and (C) the Co-Issuers may not terminate the appointment of any Paying Agent without the consent of each Preference Shareholder.  The Co-Issuers shall give prompt written notice to the Trustee, the Collateral Manager, each Rating Agency and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the Paying Agent at its office (and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands).

For so long as any Class of Notes is listed on a stock exchange and such exchange shall so require, the Co-Issuers shall maintain a listing agent, a paying agent and an agent where notices and demands to or upon the Co-Issuers in respect of any Notes so listed may be served and where such Notes may be surrendered for registration of transfer or exchange.

Section 7.3    <u>Cash for Note Payments to be Held in Trust.</u>

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Issuer by the Trustee or a Paying Agent with respect to payments on the Notes. All payment of amounts due and payable with respect to any Preference Shares shall be made on behalf of the Issuer by the Trustee to the Preference Share Paying Agent for distribution to the Preference Shareholders in accordance with the Preference Share Paying Agency Agreement.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Distribution Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Distribution Date or Redemption Date, as the case may be, with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent that funds are then available for such purpose in the Payment Account or Principal Collection Account, as the case may be), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any Cash deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for credit to the appropriate Account.

The initial Paying Agent shall be as set forth in <u>Section 7.2</u>. At the direction of a Majority of the Controlling Class, the Issuer shall, by Issuer order, appoint additional successor Paying Agents; *provided* that so long as any Class of Notes is rated by the Rating Agencies and with respect to any additional or successor Paying Agent for the Notes, (i) either (a) the Paying Agent for the Notes has a rating of not less than "Aa3" (and, if rated "Aa3", such rating is not on watch for downgrade) and "P-1" (and such rating is not on watch for downgrade) by Moody's and a rating of not less than "AA-" and not less than "A-1+" by Standard & Poor's or (ii) the applicable Rating Condition with respect to the appointment of such Paying Agent shall have been satisfied. In the event that (i) such successor Paying Agent ceases to satisfy the foregoing rating requirements or (ii) the Rating Condition with respect to the appointment of such Paying Agent shall not have been satisfied, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to

execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this <u>Section 7.3</u>, that such Paying Agent will:

(a)     allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Distribution Date and Redemption Date among such Holders in the proportion specified in the instructions set forth in the applicable Note Valuation Report or Redemption Date Statement or as otherwise provided herein, in each case to the extent permitted by applicable law;

(b)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(c)     if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d)     if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e)     if such Paying Agent is not the Trustee at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Cash.

Except as otherwise required by applicable law, any Cash deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest (or, in the case of the Class A-1 Notes, Commitment Fee), as applicable, on any Note and remaining unclaimed for two years after such principal or interest (or, in the case of the Class A-1 Notes, Commitment Fee), as applicable, has become due and payable shall be paid to the Co-Issuers on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Cash (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease.  The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including mailing notice of such release to Holders whose Notes have been called but have not

been surrendered for redemption or whose right to or interest in Cash due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

<div align="center">Section 7.4     <u>Existence of Co-Issuers; Compliance with Laws.</u></div>

The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as an exempted company incorporated and registered under the laws of the Cayman Islands and as a limited liability company organized under the laws of the State of Delaware, respectively, and shall obtain and preserve their qualification to do business in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Collateral.

The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings) or registrations are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing, (a) the Issuer shall not have any subsidiaries other than the Co-Issuer, (b) the Co-Issuer shall not have any subsidiaries and (c) the Issuer and the Co-Issuer shall not (i) have any employees, (ii) engage in any transaction with any shareholder that would constitute a conflict of interest or (iii) pay dividends or other similar distributions other than in accordance with the terms of this Indenture; *provided* that the foregoing shall not prohibit the Issuer from entering into the transactions contemplated by the Administration Agreement and the Preference Share Paying Agency Agreement with the Administrator.

The Issuer and Co-Issuer shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulations), including in connection with the issuance, offer and sale of the Notes.

<div align="center">Section 7.5     <u>Protection of Collateral.</u></div>

(a)    The Collateral Manager on behalf of the Issuer, shall from time to time when deemed necessary or desirable by the Issuer, execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    Grant more effectively all or any portion of the Collateral;

(ii)    maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    maintain, preserve, perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)    enforce any of the Pledged Securities or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Trustee and the Holders of the Notes and other Secured Parties against the claims of all Persons and parties; or

(vi)    (x) pay or cause to be paid any and all taxes levied or assessed upon either of the Co-Issuers upon or in respect of all or any part of the Collateral and timely file all tax returns and information statements as required, and (y) if required to prevent the withholding or imposition of United States income tax, deliver or cause to be delivered an IRS Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to (as applicable) an item included in the Collateral at the time such item included in the Collateral is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

In addition, the Issuer hereby authorizes and designates the Trustee its agent and attorney-in-fact to execute and file upon written instruction any Financing Statement, continuation statement or other instrument required pursuant to this Section 7.5; *provided* that such appointment shall not impose upon the Trustee any of the Issuer's or the Collateral Manager's obligations under this Section 7.5. The Trustee may rely upon an Opinion of Counsel to be delivered pursuant to Section 7.6 in connection with filing any continuation statement. The Issuer agrees that a carbon, photographic, photostatic or other reproduction of this Indenture or of a Financing Statement is sufficient as a Financing Statement.

(b)    The Trustee shall not (i) except in accordance with Section 10.8(a), (b) or (c), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered on the Closing Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.6) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)    The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities that secure the Notes.

(d)    The Issuer shall enforce all of its material rights and remedies under the Collateral Management Agreement, the Hedge Agreements, the Account Control Agreement, the Administration Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Preference Share Paying Agency Agreement, the Class A-1 Note Purchase Agreement and the Underlying Instruments in respect of a Synthetic Security (including its rights and remedies in respect of any guarantor of the obligations of a Synthetic Security Counterparty under a Synthetic Security).  The Issuer will not enter into any agreement amending, modifying or terminating the Account Control Agreement, the Interest Rate Hedge Agreement, the Class A-1 Note Purchase Agreement or the Collateral Administration Agreement without (i) 10 days' prior notice to each Rating Agency, the Collateral Manager, the Credit Default Swap Counterparty, each Noteholder materially adversely affected thereby, each Hedge Counterparty affected thereby and the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder), (ii) the consent of any Hedge Counterparty and the Credit Default Swap Counterparty that forms part of the Controlling Class if such amendment, modification or termination could be reasonably expected to materially adversely affect such Person and (iii) the Rating Condition with respect to each Rating Agency relating to such amendment, modification or termination shall have been satisfied.

(e)    Without at least 30 days' prior written notice to the Trustee and the Collateral Manager, the Issuer shall not change its name, or the name under which it does business, from the name shown on the signature pages hereto, and will take such actions as are necessary to ensure that the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and shall furnish an Opinion of Counsel (which shall include assumptions and qualifications substantially similar to those set forth in Exhibit D) to such effect.

(f)    The Issuer will enter into a Credit Default Swap Agreement on the Closing Date in the form attached hereto as Exhibit N.  Upon termination of the Credit Default Swap Agreement pursuant to the terms thereof, the Issuer shall use reasonable efforts to enter into a replacement Credit Default Swap Agreement that (i) either (A) satisfies the Rating Condition or (B) is a Form-Approved Credit Default Swap Agreement and (ii) satisfies Section 12.3(d) hereof.

Section 7.6    Opinions as to Collateral.

On or before December 31 in each calendar year, commencing in 2008, the Issuer shall furnish to the Trustee and each Rating Agency (with copies to each Hedge Counterparty and the Credit Default Swap Counterparty) an Opinion of Counsel (which shall include assumptions and qualifications substantially similar to those set forth in Exhibit D) stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and describing the manner in which such security interest shall remain perfected.

Section 7.7    Performance of Obligations.

(a)    If an Event of Default has occurred and is continuing, without prior consent of a Majority of the Controlling Class, the Co-Issuers shall not take any action, and shall

use their best efforts not to permit any action to be taken by others, that would release any Person from such Person's covenants or obligations under any security included in the Collateral, except in the case of enforcement action taken with respect to any Defaulted Security in accordance with the provisions hereof and as otherwise required hereby.  The Co-Issuers may not enter into any amendment or waiver of or supplement to any Underlying Instrument with respect to any security included in the Collateral without the prior consent of a Majority of the Controlling Class and the Hedge Counterparties; *provided* that notwithstanding anything in this Section 7.7(a) to the contrary, the Co-Issuers may enter into any amendment or waiver of or supplement to any such Underlying Instrument:

      (i)      if such amendment, supplement or waiver is required by the provisions of any Underlying Instrument or by applicable law (including the USA PATRIOT Act) (other than pursuant to an Underlying Instrument),

      (ii)      if such amendment, supplement or waiver is necessary to cure any ambiguity, inconsistency or formal defect or omission in such Underlying Instrument,

      (iii)      to the extent expressly permitted or authorized by any amendment of or supplement to this Indenture entered into in accordance with Section 8.1 or 8.2 (but subject to the conditions therein specified),

      (iv)      to make any other change deemed necessary by the Issuer or the Collateral Manager on its behalf (but only if, as of the date of any such proposed amendment, waiver or supplement occurring on or after the Ramp-Up Completion Date, the Collateral Quality Tests are satisfied), or

      (v)      to make any other change deemed necessary by the Issuer or the Collateral Manager on its behalf (but only if (A) such proposed amendment, waiver or supplement does not effect a Specified Change and (B) such change does not materially adversely affect the interests of the Noteholders in the Collateral as determined by the Collateral Manager on behalf of the Issuer.

      When used in connection with a Collateral Debt Security that is a Synthetic Security, each reference in this Section 7.7 to any Underlying Instrument shall include reference to the Underlying Instrument pursuant to which the Reference Obligation has been issued or created as well as any agreement creating or otherwise governing such Synthetic Security.

      (b)      The Co-Issuers may, with the prior written consent of a Majority of each Class, a Majority-in-Interest of Preference Shares, the Credit Default Swap Counterparty and the Hedge Counterparties (except in the case of the Collateral Management Agreement as initially executed), contract with other Persons, including the Collateral Manager and the Bank, for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons and the performance of the actions and other obligations with respect to the Collateral of the nature set forth in the Collateral Management Agreement by the Collateral Manager. Notwithstanding any such arrangement, the Co-Issuers shall remain liable for all such actions and obligations.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the

Co-Issuers; and the Co-Issuers will punctually perform, and use their best efforts to cause the Collateral Manager or such other Person to perform, all of their obligations and agreements contained in the Collateral Management Agreement or such other agreement.

(c)    The Issuer shall treat all Acquisitions of Collateral Debt Securities as "purchases" for tax, accounting and reporting purposes.

Section 7.8    Negative Covenants.

(a)    The Issuer will not and, with respect to clauses (ii), (iii), (iv), (ix), (xiv), (xv) and (xvi), the Co-Issuer will not:

(i)    sell, assign, participate, transfer, exchange or otherwise Dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except as (A) expressly permitted by this Indenture and (B) a Grant of a security interest in a Synthetic Security Counterparty Account to secure the Issuer's obligations to a Synthetic Security Counterparty pursuant to the terms of the Synthetic Security;

(ii)    claim any credit on, make any deduction from, or dispute the enforceability of, the payment of the principal or interest payable in respect of the Notes (other than amounts required to be paid, deducted or withheld in accordance with any applicable law or regulation of any governmental authority) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)    (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated hereby; (B) issue any additional class of securities other than the Preference Shares or (C) issue any additional shares other than Preference Shares;

(iv)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof or (C) take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

(v)    except for any agreements involving the purchase and Sale of Collateral having customary purchase or Sale terms and documented with customary loan trading documentation (but not excepting any Synthetic Security or any Hedge Agreement), enter into any agreements unless such agreements contain "non-petition" and "limited recourse" provisions;

(vi)     use any of the proceeds of the Notes issued hereunder or the Preference Shares or payments received from the Credit Default Swap Counterparty or any Hedge Counterparty (A) to extend "purpose credit" within the meaning given to such term in Regulation U or (B) to purchase or otherwise Acquire any Margin Stock;

(vii)     permit the aggregate book value of all Margin Stock held by the Issuer on any date to exceed the net worth of the Issuer on such date (excluding any unrealized gains and losses) on such date;

(viii)     amend the Collateral Management Agreement except in accordance with Section 15 hereof and the terms of the Collateral Management Agreement;

(ix)     dissolve or liquidate in whole or in part, except as permitted hereunder and to the maximum extent permitted by applicable law;

(x)     amend any "non-petition" or "limited recourse" provisions contained in this Indenture, the Notes, any Hedge Agreement, the Preference Share Paying Agency Agreement, the Collateral Management Agreement, the Administration Agreement, the Credit Default Swap Agreement, the Class A-1 Note Purchase Agreement or the Collateral Administration Agreement or amend the "non-petition" or "limited recourse" provisions of any other documents relating to this transaction to which it is a party without satisfying the Rating Condition relating with respect to each Rating Agency;

(xi)     terminate the Credit Default Swap Agreement unless (A) no Transactions remain outstanding under (and as defined in) the Credit Default Swap Agreement or (B) the Issuer has entered into a replacement therefor pursuant to a Form-Approved Credit Default Swap Agreement;

(xii)     enter into or otherwise Acquire any Synthetic Security if such Acquisition would result in the Excess Notional Amount Liquidity to be reduced below zero;

(xiii)     enter into any CDS Agreement Transaction unless the related Reference Obligation is an RMBS Security, CMBS Security, CDO Security or REIT Debt Security;

(xiv)     commingle assets with those of another entity;

(xv)     conduct business in any name but its own; or

(xvi)     fail to correct any known misunderstanding of its separate identity.

(b)     Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise Dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted by this Indenture and the Collateral Management Agreement.

(c)     The Co-Issuer will not invest any of its assets in "securities" (as such term is defined in the Investment Company Act), and will keep all of its assets in Cash.

(d)      For so long as any of the Notes are Outstanding, the Co-Issuer shall not transfer, and the Issuer shall not permit the Co-Issuer to issue, any capital stock of the Co-Issuer to any Person other than the Issuer.  For so long as the Notes are Outstanding, the Issuer shall not transfer or otherwise dispose of the capital stock of the Co-Issuer issued to it.

Section 7.9     Statement as to Compliance.

On or before December 31 in each calendar year, commencing in 2008, or immediately if there has been a Default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee, the Preference Share Paying Agent, each Noteholder and Preference Shareholder making a written request therefor, each Hedge Counterparty and each Rating Agency an Officer's certificate stating, as to each signer thereof, that:

(a)      a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the twelve-month period ending on November 30 of such year has been made under such Officer's supervision; and

(b)      to the best of such Officer's knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout the period, or, if there has been a Default in the fulfillment of any such obligation, specifying each such Default known to such Officer and the nature and status thereof, including actions undertaken to remedy the same.

Section 7.10     Co-Issuers May Not Consolidate, Etc.

(a)      The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person.

(b)      The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person.

Section 7.11     Successor Substituted.

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer), or, the Person to which such transfer or conveyance is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each obligation or covenant of, the Issuer or the Co-Issuer, as the case may be, under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.   In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article VII may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12     No Other Business.

The Issuer shall not engage in any business or activity other than (i) Acquiring and Disposing of, and investing and reinvesting in, Collateral Debt Securities, Equity Securities, Reserve Account Investments, U.S. Agency Securities and Eligible Investments for its own account and entering into and terminating CDS Agreement Transactions and other Synthetic Securities, (ii) entering into, and performing its obligations under the Indenture, any Hedge Agreement, the Credit Default Swap Agreement, the Class A-1 Note Purchase Agreement, the Collateral Management Agreement, the Collateral Administration Agreement, the Securities Purchase Agreement, the Preference Share Paying Agency Agreement and each Subscription Agreement, (iii) issuing, selling and redeeming the Notes and the Preference Shares (as applicable), (iv) pledging the Collateral as security for its obligations in respect of the Notes and otherwise for the benefit of the Secured Parties, (v) owning the membership interests of the Co-Issuer and (vi) other activities incidental to the foregoing.  The Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and such other activities as are incidental thereto or connected therewith.  The Issuer shall not engage in any business or activity or hold any asset that would cause the Issuer to be engaged in a U.S. trade or business for U.S. federal income tax purposes.  Except for the amendment and restatement of the Issuer Charter on the date hereof, the Issuer will ensure that the Issuer Charter will not be amended, and the Issuer will not amend the Certificate of Formation or operating agreement of the Co-Issuer without satisfying the Rating Condition.

Section 7.13   Reaffirmation of Rating; Annual Rating Review.

(a)   So long as any Class of the Notes remains Outstanding or the Outstanding Class A-1 Funded Amount or the Remaining Unfunded Facility Commitment is greater than zero, on or before December 31 in each year, commencing in 2008, the Co-Issuers shall obtain and pay for an annual review of the rating or credit estimate of each Class of Notes from each Rating Agency.

(b)   The Co-Issuers shall promptly notify the Trustee in writing and the Trustee shall promptly notify the Noteholders, the Preference Shareholders, the Credit Default Swap Counterparty and the Hedge Counterparties if at any time the rating or credit estimate of any Class of Notes has been, or is known will be, changed or withdrawn.

Section 7.14   Reporting.

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of a Note, the Co-Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or Beneficial Owner, to a prospective purchaser of such Note designated by such Holder or Beneficial Owner or to the Trustee for delivery to such Holder or Beneficial Owner or a prospective purchaser designated by such Holder or Beneficial Owner, as the case may be, in order to permit compliance by such Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or Beneficial Owner.

Section 7.15   Calculation Agent.

(a)    The Co-Issuers hereby agree that for so long as any of the Notes (other than the Class E Notes or the Class F Notes) remain Outstanding, the Co-Issuers will at all times cause there to be an agent appointed to calculate LIBOR and Interpolated LIBOR in respect of each Interest Period in accordance with the terms of Schedule B (the "**Calculation Agent**"), which agent shall be a financial institution, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and having an office within the United States.    The Co-Issuers have initially appointed the Trustee as Calculation Agent for purposes of determining LIBOR and Interpolated LIBOR for each Interest Period.    The Calculation Agent may be removed by the Co-Issuers at any time.    If the Calculation Agent is unable or unwilling to act as such, is removed by the Co-Issuers or fails to determine the Note Interest Rate for any Class of Notes (other than the Class E Notes and the Class F Notes) and the Class A-1 Note Interest Rate for the Class A-1 Notes for any Interest Period and the amount of interest (and Commitment Fee, if applicable, in the case of the Class A-1 Notes) for such Interest Period, the Co-Issuers shall promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in Dollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Co-Issuers or any of their Affiliates.    The Calculation Agent may not resign its duties without a successor having been duly appointed.    The determination of the Note Interest Rate for each Class of Notes and the Class A-1 Notes for each Interest Period by the Calculation Agent shall (in the absence of manifest error) be final and binding on all parties.

(b)    The Calculation Agent shall, as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York City time) on the Business Day immediately following each LIBOR Determination Date, calculate the Note Interest Rate for each Class of Notes (other than the Class E Notes and the Class F Notes) and the Class A-1 Note Interest Rate for the Class A-1 Notes for the related Interest Period and the amount of interest (and Commitment Fee, if applicable, in the case of the Class A-1 Notes) for the related Interest Period payable in respect of each Class of Notes and the Class A-1 Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Monthly Distribution Date and will communicate such rates and amounts and the related Monthly Distribution Date to the Co-Issuers, the Trustee, each Paying Agent, the Depositary, the Custodian, Euroclear and Clearstream, Luxembourg.    The Calculation Agent shall also specify to the Co-Issuers the quotations upon which the Note Interest Rate for each Class of Notes and the Class A-1 Note Interest Rate is based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on each LIBOR Determination Date if it has not determined and is not in the process of determining such Note Interest Rates and the Class A-1 Note Interest Rate, together with its reasons therefor.

Section 7.16    Amendment of Certain Documents.

Prior to entering into any amendment to the Account Control Agreement, the Collateral Management Agreement, the Collateral Administration Agreement, the Administration Agreement, the Credit Default Swap Agreement, the Class A-1 Note Purchase Agreement or any Hedge Agreements (*provided* that the amendment to such Hedge Agreement or Credit Default Swap Agreement has been consented to by the relevant Hedge Counterparty or Credit Default Swap Counterparty, as applicable), the Issuer shall provide notice of such

amendment to each Class A-1 Noteholder, each Noteholder materially adversely affected thereby and the Credit Default Swap Counterparty (if materially adversely affected thereby) and shall obtain the written confirmation from each Rating Agency that the entry by the Issuer into such amendment satisfies the Rating Condition with respect to each Rating Agency; *provided* that the Rating Condition with respect to Standard & Poor's need not be satisfied (but written notice to Standard & Poor's must still be given) (i) to amend the terms of any documents for the purpose of facilitating compliance by the Issuer with any exemption from registration under the Investment Company Act, (ii) to cure any ambiguity or manifest error or correct or supplement any provision contained therein that is manifestly defective or inconsistent with any other provision contained in any other contract to which the Issuer is a party or in the Offering Memorandum or make any modification that is of a formal, minor or technical nature or which is made to correct a manifest and (iii) to make any change required by any stock exchange on which any Class of Notes or the Preference Shares are listed in order to permit or maintain such listing, or to de-list any Class of Notes or the Preference Shares from any stock exchange where permitted under this Indenture. Prior to entering into any waiver in respect of any of the foregoing agreements, the Issuer shall provide each Noteholder (if materially adversely affected thereby), each Rating Agency, the Credit Default Swap Counterparty, each Hedge Counterparty and the Trustee with written notice thereof and otherwise comply with the requirements of Section 7.5(d). The Issuer will not enter into any amendment to the Preference Share Paying Agency Agreement, the Collateral Administration Agreement or any Hedge Agreements without the written consent of the Collateral Manager if such amendment alters the rights or obligations of the Collateral Manager in any respect, and the Collateral Manager will not be bound by any such amendment unless the Collateral Manager has consented in writing thereto.

Section 7.17   Purchase of Collateral.

(a)   The Issuer will use its best efforts to purchase or enter into binding agreements to purchase, on or before the Ramp-Up Completion Date, Collateral Debt Securities having an Aggregate Principal Balance, together with the Aggregate Principal Balance of all Eligible Investments purchased with Principal Proceeds, not less than the Aggregate Ramp-Up Par Amount (assuming, for these purposes, (i) settlement in accordance with customary settlement procedures in the relevant markets on the Ramp-Up Completion Date of all agreements entered into by the Issuer to Acquire Collateral Debt Securities scheduled to settle on or following the Ramp-Up Completion Date and (ii) that each such Collateral Debt Security is a Pledged Collateral Debt Security).

(b)   The Issuers shall promptly notify Standard & Poor's when a Collateral Debt Security becomes a Written-Down Security.

(c)   No later than 10 Business Days after the Ramp-Up Completion Date, the Issuer (or the Collateral Manager on its behalf) shall deliver or cause to be delivered to the Trustee and each Rating Agency a list of all Collateral Debt Securities and Equity Securities held by the Issuer (or with respect to which the Issuer has entered into a binding agreement to purchase) on the Ramp-Up Completion Date, the most recent Monthly Report (if any) and an Accountant's Report (A) confirming the information (other than the Principal Balance and the Purchase Price) with respect to each Collateral Debt Security set forth on an updated Schedule of Collateral Debt Securities and the information provided by the Issuer with respect to every other

asset forming part of the Collateral, by reference to such sources as shall be specified therein, (B) confirming compliance with each Collateral Quality Test, (C) to the extent not covered by (B), compliance with each of the Eligibility Criteria set forth in paragraphs (5) through (7), (10) and (22) through (35) of <u>Section 12.2</u> for each Pledged Collateral Debt Security held by the Issuer on the Ramp-Up Completion Date and (D) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.  Notwithstanding anything to the contrary in this clause (c), if the Ramp-Up Completion Date shall occur on the Closing Date, the delivery of (A) a copy of the Accountants' Report delivered under <u>Section 3.1(f)</u> to the Trustee and each Rating Agency demonstrating compliance by the Issuer with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Notification Test) and each of the Eligibility Criteria set forth in paragraphs (5) through (7), (10) and (22) through (35) of <u>Section 12.2</u> and (B) the Schedule of Closing Collateral Debt Securities shall be deemed to satisfy the requirements of this clause (c).

(d)    No later than 25 days after the Ramp-Up Completion Date, the Issuer shall notify each of the Rating Agencies and each Hedge Counterparty in writing of the occurrence of the Ramp-Up Completion Date (each, a "**Ramp-Up Notice**") and request in writing that each of Standard & Poor's and Moody's confirm in writing within 25 days after delivery of such Ramp-Up Notice that it has not reduced or withdrawn the ratings (including any private or confidential ratings) assigned by it on the Closing Date to the Notes; *provided*, *however*, that the Issuer shall not be required to request a Rating Confirmation from Moody's if, as of the Ramp-Up Completion Date, (i) all of the Collateral Quality Tests are satisfied, (ii) the Eligibility Criteria have been complied with and (iii) the Aggregate Principal Balance of the Collateral Debt Securities held by the Issuer *plus* any Principal Proceeds received in respect of any such Collateral Debt Securities is at least equal to the Aggregate Ramp-Up Par Amount.  If the Issuer is unable to obtain a requested Rating Confirmation from either Standard & Poor's or Moody's with respect to any Class of Notes prior to the date 25 days after the delivery of the Ramp-Up Notice, a "**Ratings Confirmation Failure**" will occur.  In the event of a Ratings Confirmation Failure, and provided a Proposed Plan cannot be agreed to between the Collateral Manager, on behalf of the Issuer, and the Rating Agencies, the Issuer will be required, to the extent that funds are available for such purpose in accordance with the Priority of Payments, to apply Interest Proceeds then Principal Proceeds to *first*, reduce the Outstanding Class A-1 Funded Amount, *second*, reduce the Remaining Unfunded Facility Commitment to zero by making a deposit into the Reserve Account, and *third*, repay the principal of the Funded Notes (sequentially in direct order of Seniority) on the first Monthly Distribution Date relating to the first Determination Date thereafter to the extent necessary for each of the Rating Agencies to confirm that it has restored the ratings assigned by it on the Closing Date with respect to each such Class of Notes (a "**Rating Confirmation**") (and, pending such Rating Confirmation on such Monthly Distribution Date, each subsequent purchase of any Collateral Debt Security shall be subject to the satisfaction of the Rating Condition); *provided* that if the Ramp-Up Completion Date occurs on the Closing Date (as shall be evidenced by the Accountants' Report delivered on the Closing Date under <u>Section 3.1(f)</u> and the Schedule of Closing Collateral Debt Securities), then, notwithstanding anything to the contrary in this <u>Section 7.17</u>, (i) delivery of a copy of such Accountants' Report and the Schedule of Closing Collateral Debt Securities to the Rating Agencies shall constitute a Ramp-Up Notice, (ii) the initial assignment by Moody's and Standard & Poor's of their ratings to the Notes on the Closing Date shall constitute a Rating Confirmation and (iii) no further action by the Issuer shall be required in connection with the Ramp-Up

Completion Date under this Indenture (including, without limitation, under this <u>Section 7.17</u>). The Notional Amount of an Interest Rate Hedge Agreement may be reduced in connection with a redemption of Notes on any such Monthly Distribution Date by reason of any Ratings Confirmation Failure by an amount proportionately equal to the principal amount of Notes so redeemed.

(e)    The Issuer shall cause to be delivered to Standard & Poor's on or prior to the Ramp-Up Completion Date the Excel Default Model Input File that provides the following information (to the extent such information is not confidential) with respect to each Collateral Debt Security: (i) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (ii) the CUSIP or other applicable identification number associated with such Collateral Debt Security, (iii) the par value of such Collateral Debt Security, (iv) the type of issue (including, by way of example, whether such Collateral Debt Security is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (v) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Security is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (vi) the coupon (in the case of a Collateral Debt Security which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Security which bears interest at a floating rate), (vii) the Standard & Poor's Industry Classification Group for such Collateral Debt Security, (viii) the stated maturity date of such Collateral Debt Security and (ix) the Standard & Poor's Rating of such Collateral Debt Security or the issuer thereof, as applicable.

Section 7.18    <u>Class A-1 Note Purchase Agreement; Rights of Class A-1 Noteholders under the Indenture.</u>

(a)    On any Business Day prior to the Commitment Termination Date the Issuer may borrow amounts under the Class A-1 Note Purchase Agreement at the direction of the Collateral Manager acting pursuant to the Collateral Management Agreement.  The aggregate principal amount of any Borrowing in respect of the Class A-1 Notes (taken as a whole) shall be at least U.S.$1,000,000.

(b)    If the Issuer is required to make a Credit Protection Payment to the Credit Default Swap Counterparty pursuant to the Credit Default Swap Agreement and the funds and other property standing to the credit of the Accounts that are available therefor subject to and in accordance with the Account Withdrawal Payment Priority are insufficient to pay the full amount of such Credit Protection Payment, then the Collateral Manager on the Issuer's behalf shall deliver a Notice of Borrowing to the Trustee in accordance with the terms of the Class A-1 Note Purchase Agreement until the amount of such Borrowing would exceed the Maximum Class A-1 Facility Funding Commitment by 11:00 a.m. (New York City time) at least three Business Days prior to the Business Day on which such Credit Protection Payment is required to be paid to the Credit Default Swap Counterparty for the amount required (after taking into account the application of amounts standing to the credit of the Accounts that are available for such purpose pursuant and subject to the Account Withdrawal Payment Priority) to pay the full amount of such Credit Protection Payment.

(c)     If the Issuer is required to make a payment to the Credit Default Swap Counterparty pursuant to the Credit Default Swap Agreement with respect to a trading loss incurred as a result of the termination or assignment of a CDS Agreement Transaction (a "**CDS Termination Payment**") and the funds and other property standing to the credit of the Accounts that are available therefor subject to and in accordance with the Account Withdrawal Payment Priority are insufficient to pay the full amount of such CDS Termination Payment, then the Collateral Manager on the Issuer's behalf shall deliver a Notice of Borrowing to the Trustee in accordance with the terms of the Class A-1 Note Purchase Agreement by 11:00 a.m. (New York City time), in each case at least three Business Days prior to the Business Day on which such CDS Termination Payment is required to be paid to the Credit Default Swap Counterparty for the amount required (after taking into account the application of amounts in the Principal Collection Account and Reserve Account for such purpose) to pay the full amount of such CDS Termination Payment.

(d)     If the Issuer has entered into a commitment to purchase a Collateral Debt Security (a "**Bond Purchase Payment**") and the funds and other property standing to the credit of the Accounts that are available therefor subject to and in accordance with the Account Withdrawal Payment Priority are insufficient to pay the full purchase price of such Collateral Debt Security, then the Collateral Manager on the Issuer's behalf shall deliver a Notice of Borrowing in accordance with the terms of the Class A-1 Note Purchase Agreement to the Trustee and the Trustee shall promptly provide a copy of such notice to the Class A-1 Note Agent and to each Class A-1 Noteholder no later than 11:00 a.m. (New York City time) three Business Days prior to the proposed date for such Borrowing in connection with the purchase of such Collateral Debt Security for the amount required (after taking into account the application of amounts in the Principal Collection Account and the Excess Reserve Account Assets (if any) that, in each case, are available for such purpose) to pay the full purchase price of such Collateral Debt Security; *provided* that the Holders of the Class A-1 Notes shall have no obligation to advance funds for Borrowings in respect of any Bond Purchase Payments if (x) such Borrowing will cause the aggregate amount of Borrowings to exceed the Junior Facility Amount or (y) an Event of Default has occurred and is continuing at the time the Issuer commits to Acquire the relevant Collateral Debt Security.

(e)     The obligation of a Holder of the Class A-1 Notes to advance funds in respect of any such Borrowing Request, and the application of funds standing to the credit of a Class A-1 Prepayment Account to any Deemed Borrowing upon request therefor, is subject to certain conditions precedent. These conditions precedent include the following requirements: (1) all funds available therefor pursuant to and in accordance with the operation of the Account Withdrawal Payment Priority have been applied to fund all or part of such Permitted Use simultaneously with or immediately prior to such advance, (2) in the case of any Borrowing or Deemed Borrowing, no Specified Event of Default has occurred and is continuing, (3) in the case of any Borrowing or Deemed Borrowing to fund commitments by the Issuer to purchase additional Collateral Debt Securities, (x) such Borrowing will not cause the aggregate amount of Borrowings to exceed the Junior Facility Amount and (y) no Event of Default has occurred and is continuing at the time the Issuer commits to Acquire the relevant Collateral Debt Security, and (4) the proceeds of such Borrowing or Deemed Borrowing will be applied to a Permitted Use.

(f)     With respect to each Holder of the Class A-1 Notes (other than the Credit Default Swap Counterparty), upon the issuance or transfer of Class A-1 Notes to such Holder, the credit rating of its Rating Determining Party shall satisfy the Class A-1 Note Rating Threshold.  Pursuant to the Class A-1 Note Purchase Agreement, if any Holder of a Class A-1 Note experiences a Class A-1 Note Rating Decline Event such Holder shall (A) send a written notice to the Issuer, the Trustee and the Collateral Manager of such failure and the date of the occurrence of such failure and (B) within 30 days of the occurrence of such event, (1) find a replacement counterparty that satisfies the Class A-1 Note Rating Threshold and with respect to which the Rating Condition with respect to Standard & Poor's is satisfied, (2) obtain a guarantor (pursuant to a form of guarantee that satisfies all applicable then-current published rating criteria of the Rating Agencies, as determined by the Collateral Manager) for such Holder's (or, in the case of a Holder that is a commercial paper conduit, its external liquidity or credit support provider's) obligations under the Class A-1 Note Purchase Agreement that satisfies the Class A-1 Note Rating Threshold and with respect to which the Rating Condition with respect to Standard & Poor's is satisfied or (3) if no such replacement counterparty or guarantor has been found and such Class A-1 Note Rating Decline Event is continuing on the last day of such period (or, if such date is not a Business Day, the first Business Day thereafter), on or prior to such last day (as adjusted) transfer to the Trustee, pursuant to the Class A-1 Note Purchase Agreement, an amount equal to or greater than the entire unfunded amount in Cash and/or overnight time deposits of such Holder's *pro rata* share of the Remaining Unfunded Facility Commitment, which amount shall be deposited by the Trustee into a Class A-1 Prepayment Account established in relation to such Class A-1 Noteholder in accordance with the Indenture.  In the event that such Class A-1 Noteholder's rating is subsequently restored to a level higher than or equal to the Class A-1 Note Rating Threshold, Cash deposited by such Class A-1 Noteholder into the Class A-1 Prepayment Account shall be transferred back to such Class A-1 Noteholder.

(g)     The deposit of any amount into a Class A-1 Prepayment Account by any Holder of Class A-1 Notes pursuant to the terms of the Class A-1 Note Purchase Agreement will not reduce such Holder's Remaining Unfunded Facility Commitment until such amounts are applied to a Permitted Use, and the Commitment Fee shall continue accruing on any amounts in a Class A-1 Prepayment Account until such amounts are applied to the funding of a Permitted Use. With respect to any holder of the Class A-1 Notes that has deposited the balance of its Remaining Unfunded Facility Commitment in a Class A-1 Prepayment Account, (i) the Trustee will disburse as a Deemed Borrowing a portion of such amount on the date of a Borrowing by the Issuer in accordance with the Class A-1 Note Purchase Agreement in an amount equal to such Class A-1 Noteholder's *pro rata* share of each Borrowing and (ii) on each Monthly Distribution Date, the Trustee will pay to such Class A-1 Noteholder interest in an amount equal to earnings in respect of Eligible Investments in such Class A-1 Prepayment Account (or subaccount, if applicable) received during the preceding Due Period. Investment earnings on Eligible Investments in a Class A-1 Prepayment Account will not be transferred to the Interest Collection Account or treated as Interest Proceeds but will instead be paid directly to the Class A-1 Noteholder for whom the applicable Class A-1 Prepayment Account (or subaccount, if applicable) was established.  For the avoidance of doubt, a Class A-1 Noteholder that is also the Credit Default Swap Counterparty will have no obligation to fund any payments in a Class A-1 Prepayment Account.

(h)    Notwithstanding anything to the contrary herein, in the case of any Designated Class A-1 Noteholder for so long as it remains a Designated Class A-1 Noteholder, upon any failure to comply with the absolute funding obligation in respect of such Holder's Class A-1 Notes for any Permitted Use set forth herein and unless such failure to fund is cured by such Designated Class A-1 Noteholder by a date that is the later to occur of (i) five Business Days from the date that such defaulting Designated Class A-1 Noteholder receives written notice from the Issuer of such failure to fund or (ii) the next Monthly Distribution Date occurring after such defaulting Designated Class A-1 Noteholder receives written notice from the Issuer of such failure to fund, the Issuer shall (a) terminate such defaulting Designated Class A-1 Noteholder's Commitment Amount (after giving effect to any grace period set forth above) and (b) the Credit Default Swap Counterparty shall enter into a commitment to purchase from the Issuer a new variable funding senior secured floating rate note with the same Commitment Fee Rate, Commitment Amount and Class A-1 Note Interest Rate (the "**Replacement Agreement**").

If the Credit Default Swap Counterparty on behalf of the Issuer determines in good faith that the market commitment fee rate and/or Class A-1 Note interest rate that would be payable by the Issuer under the Replacement Agreement is greater than the Commitment Fee Rate and/or Class A-1 Note Interest Rate hereunder (as applicable), the Issuer shall direct the defaulting Designated Class A-1 Noteholder to pay the Credit Default Swap Counterparty on behalf of the Issuer within three Business Days an amount determined in good faith by Credit Default Swap Counterparty equal to a payment to the Credit Default Swap Counterparty that when combined with amounts received under the Replacement Agreement that would cause the net present value of the Replacement Agreement to equal zero. If the defaulting Designated Class A-1 Noteholder fails to make such payment in whole or in part, without limitation of any other remedies available to the Issuer or the Credit Default Swap Counterparty, the Issuer at the direction of the Credit Default Swap Counterparty shall assign all or a portion of its claims for payment of amounts owed to the Issuer under the Agreement by defaulting the Designated Class A-1 Noteholder to the Credit Default Swap Counterparty.

If the Credit Default Swap Counterparty on behalf of the Issuer determines in good faith that the market commitment fee rate and/or Class A-1 Note interest rate that would be payable by the Issuer under the Replacement Agreement is less than the Commitment Fee Rate and/or Class A-1 Note Interest Rate hereunder (as applicable), the Credit Default Swap Counterparty shall pay to the Issuer, an amount determined in good faith by Credit Default Swap Counterparty equal to a payment from the Credit Default Swap Counterparty to a third party that when combined with amounts received under the Replacement Agreement that would cause the net present value of the Replacement Agreement to equal zero. Issuer shall pay such amount to the defaulting Designated Class A-1 Noteholder within three Business Days of receipt.

In the case of a Class A-1 Noteholder that is not a Designated Class A-1 Noteholder, upon any failure to comply with the absolute funding obligation in respect of such Holder's Class A-1 Notes for any Permitted Use set forth herein, the Issuer shall be entitled to terminate such defaulting Class A-1 Noteholder's Commitment Amount unless such failure to fund is cured by such Class A-1 Noteholder by a date that is the later to occur of (i) five Business Days from the date that such defaulting Class A-1 Noteholder's failure to fund or (ii) the next Monthly Distribution Date occurring after such defaulting Class A-1 Noteholder's failure to fund.

For the avoidance of doubt, Commitment Fees shall not accrue on any Class A-1 Noteholder's (including any Designated Class A-1 Noteholder's) Commitment Amount after the date of such termination.

(i)      Each Notice of Borrowing shall be made in writing (and may be made by electronic mail or facsimile only if permitted in accordance with the notice provisions set forth in the Class A-1 Note Purchase Agreement ) to the Class A-1 Note Agent and shall contain the applicable amount requested by the Collateral Manager on the Issuer's behalf to the Class A-1 Note Agent (on behalf of the Class A-1 Noteholders) to pay the relevant Credit Protection Amount, purchase price of the Collateral Debt Security being Acquired or CDS Termination Payment (as applicable); *provided* that (i) no request with respect to a Bond Purchase Payment shall be made hereunder (A) except during the Reinvestment Period (*provided* that subject to the foregoing, the settlement date for a requested Bond Purchase Payment may occur at any time within 20 Business Days after the last day of the Reinvestment Period), (B) if the Outstanding Class A-1 Funded Amount exceeds (or, as a result of the payment of the requested Bond Purchase Payment would exceed) the Junior Facility Amount and (C) if the relevant Acquisition would result in the Excess Notional Amount Liquidity to be reduced below zero and (ii) in no event shall the amount of any payment by the Class A-1 Noteholders to the Issuer exceed the Maximum Class A-1 Facility Funding Commitment (which shall take into account such payment along with any principal repayments paid by the Issuer on the same date).

(j)      If an "Event of Default" (as defined in the Class A-1 Note Purchase Agreement) occurs as to which a Class A-1 Noteholder (other than the Credit Default Swap Counterparty) is the defaulting party, then the Collateral Manger on the Issuer's behalf shall deliver a Notice of Borrowing to the Trustee that requests the remaining Commitment Amount with respect to such defaulting Class A-1 Noteholder.

(k)      During the Reinvestment Period, if the Excess Notional Amount Liquidity is greater than zero, the Collateral Manager on behalf of the Issuer may (in its sole discretion) elect upon notice to the Trustee and the Credit Default Swap Counterparty to reduce the Excess Notional Amount Liquidity (but not to less than zero) by making a permanent reduction of the Remaining Unfunded Facility Commitment (pursuant to clause (iii) of the definition of Permanent Reduction Amount) in which case the Trustee and the Issuer will record such permanent reduction in their respective books and records where appropriate.

(l)      As a condition to the payment to an Assignor Class A-1 Noteholder hereunder without the imposition of U.S. withholding tax, each of the Co-Issuers, the Trustee or any Paying Agent shall require certification acceptable to it to enable each of the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments to an Assignor Class A-1 Noteholder under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.  Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), IRS Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign

Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, each of the Co-Issuers, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Assignor Class A-1 Noteholder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(m)    The Issuer shall not be obligated to pay any additional amounts to an Assignor Class A-1 Noteholder as a result of deduction or withholding for or on account of any present or future taxes, duties, assessments or governmental charges with respect to payments required to be made to such Assignor Class A-1 Noteholder hereunder.

Section 7.19    Notional Principal Contract Treatment.

The Issuer will treat each "Transaction" under and as defined in the Credit Default Swap Agreement as a "notional principal contract" (as defined in Treasury Regulations Section 1.446-3) for all applicable U.S. tax purposes, except as otherwise may be required by any taxing authority under applicable law or pursuant to a change in tax law.

## ARTICLE VIII—SUPPLEMENTAL INDENTURES

Section 8.1    Supplemental Indentures Without Consent of Noteholders.

Without the consent of the Noteholders, the Preference Shareholders, the Hedge Counterparties (except to the extent required by the related Hedge Agreement), the Credit Default Swap Counterparty (except to the extent required by the Credit Default Swap Agreement) or, except as provided below, the Co-Issuers, when authorized by Resolutions, and the Trustee, at any time and from time to time subject to the requirement provided below in this Section 8.1 with respect to the ratings of the Notes and subject to Section 8.3, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a)    to evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer herein and in the Notes pursuant to Section 7.10 or 7.11;

(b)    to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of all of the Notes or to surrender any right or power herein conferred upon the Co-Issuers;

(c)    to convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(d)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.12 and 6.13;

(e)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(f)    to modify the restrictions on and procedures for resales and other transfers of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(g)    to correct any inconsistency, defect or ambiguity in this Indenture or to correct any manifest error in any provision of this Indenture upon receipt by the Trustee of written direction from the Issuer describing in reasonable detail such error and the modification necessary to correct such error;

(h)    to obtain ratings on one or more Classes of the Notes from any Rating Agency;

(i)    to accommodate the issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, to be held in global form through the facilities of DTC, Euroclear or Clearstream, Luxembourg or otherwise or the listing of the Notes or Preference Shares on any exchange;

(j)    solely, in order to, and solely to the extent required to accommodate the listing or de-listing of any Notes or Preference Shares on any stock exchange or the issuance of additional Preference Shares,

(k)    to make any non-material administrative changes as the Co-Issuers deem appropriate;

(l)    to prevent the Issuer, the Noteholders, the Preference Shareholders or the Trustee from being subject to withholding or other taxes, fees or assessments or to prevent the Issuer from being treated as engaged in the United States trade or business for U.S. federal income tax purposes or otherwise subject to U.S. federal, state, local or foreign income or franchise tax on a net income tax basis;

(m)    to avoid the Issuer or the Co-Issuer or the Collateral being required to register as an investment company under the Investment Company Act;

(n)    to accommodate the issuance of any Class of Notes as Definitive Notes;

(o)    to make any change to the Indenture necessary in order to conform this Indenture to a Proposed Plan (excluding any changes to the Eligibility Criteria);

(p)    to give effect to any financing arrangements entered into by the Issuer (which may be documented by an ISDA Master Agreement or may involve the issuance of debt

securities or other instruments by the Issuer) following a failure by a holder of Class A-1 Notes to perform its obligations under the Class A-1 Note Purchase Agreement that (A) have the economic effect of replacing such holder by providing liquidity to the Issuer in order to enable it to satisfy its obligations under, and to Dispose of, CDS Agreement Transactions and (B) will not result in any reduction to amounts that would otherwise be payable or distributed to any of the Secured Parties or the Preference Shareholders under the Indenture if such failure had not occurred;

(q)    to accommodate the issuance of any Class of Notes as definitive notes; or

(r)    to conform the Indenture to the description contained in the Final Offering Memorandum.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the interests of any Noteholder or Preference Shareholder, the Credit Default Swap Counterparty or any Hedge Counterparty would be materially adversely affected thereby.  Unless notified by (i) a Majority of any Class of Notes or a Majority-in-Interest of Preference Shares that such Class or the Preference Shares will be materially adversely affected, (ii) any Hedge Counterparty or the Credit Default Swap Counterparty that such Hedge Counterparty or the Credit Default Swap Counterparty will be materially adversely affected, the Trustee shall be entitled to rely upon an Opinion of Counsel delivered pursuant to Section 8.3 hereof as to whether the interests of any Noteholder, Preference Shareholder, Credit Default Swap Counterparty or Hedge Counterparty would be materially adversely affected by any such supplemental indenture; *provided* that where any supplemental indenture reflects any proposed amendments or modifications that are quantitative or financial in nature, any counsel providing such opinion shall be entitled to rely upon a certificate of the Collateral Manager (which the Collateral Manager is not obligated to provide) stating that any proposed amendment or modification will not materially adversely affect the interests of any Noteholder, Preference Shareholder, Credit Default Swap Counterparty or Hedge Counterparty, to the extent of such quantitative or financial amendment or modification; *provided* that in no event shall any Noteholder, Preference Shareholder, Hedge Counterparty or Credit Default Swap Counterparty be materially adversely affected by any issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, in the manner contemplated by Section 8.1(i) in order to accommodate their issuance through the facilities of Euroclear or Clearstream, Luxembourg.  The Trustee shall not enter into any such supplemental indenture pursuant to clause (f), (g) or (n) of this Section 8.1 without the written consent of the Collateral Manager.  In addition, the Trustee may not enter into any supplemental indenture without the written consent of the Collateral Manager if such supplemental indenture alters the rights or obligations of the Collateral Manager in any respect, and the Collateral Manager will not be bound by any such supplemental indenture unless the Collateral Manager has consented thereto.  At the cost of the Co-Issuers, the Trustee shall provide to the Noteholders and the Preference

Share Paying Agent for distribution to the Preference Shareholders, the Hedge Counterparties and the Credit Default Swap Counterparty a copy of any proposed supplemental indenture at least 20 days prior to the execution thereof by the Trustee and a copy of the executed supplemental indenture after its execution; *provided* that no such notice shall be required in connection with any issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, in the manner contemplated by Section 8.1(i) in order to accommodate their issuance through the facilities of Euroclear or Clearstream, Luxembourg.  At the cost of the Co-Issuers, the Trustee shall provide to each Rating Agency a copy of any proposed supplemental indenture at least 20 days prior to the execution thereof by the Trustee, and, for so long as the Remaining Unfunded Facility Commitment is greater than zero or any Notes are Outstanding, request that the Rating Condition with respect to each Rating Agency with respect to such supplemental indenture be satisfied and, as soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, provide to each Rating Agency a copy of the executed supplemental indenture; *provided* that no such copy shall be required to be provided in advance of execution and delivery in connection with any issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, in the manner contemplated by Section 8.1(i) in order to accommodate their issuance through the facilities of Euroclear or Clearstream, Luxembourg.  The Trustee shall not enter into any such supplemental indenture if, with respect to such supplemental indenture, the Rating Condition with respect to each Rating Agency would not be satisfied; *provided* that the Trustee may, with the consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class, the Credit Default Swap Counterparty and each Hedge Counterparty enter into any such supplemental indenture notwithstanding any such reduction or withdrawal of the ratings of any Outstanding Class of Notes.

The Trustee shall not enter into any such supplemental indenture unless the Trustee has received advice from Cadwalader, Wickersham & Taft LLP or Sidley Austin LLP or an opinion of other nationally-recognized U.S. tax counsel experienced in such matters that (i) the modification will not cause the Noteholders to experience any material change to the timing, character or source of the income from the Notes and (ii) the proposed supplemental indenture will not cause the Issuer to be treated as engaged in a U.S. trade or business or otherwise subject to U.S. federal income tax on a net income tax basis.

For purposes of this Section 8.1, the interests of any Hedge Counterparty and the Credit Default Swap Counterparty shall be deemed not to be materially adversely affected by, and a Hedge Counterparty and the Credit Default Swap Counterparty shall have no right of consent in relation to, any supplemental indenture with respect to (i) the appointment of any successor Collateral Manager in accordance with the Collateral Management Agreement and (ii) any change to the Senior Collateral Management Fee, the Subordinated Collateral Management Fee or otherwise in respect of the fees, liabilities and expenses to apply to such successor Collateral Manager.

Section 8.2   Supplemental Indentures with Consent of Noteholders.

With the consent of (x) the Holders of not less than a Majority of each Class of Notes materially adversely affected thereby (if any Class of Notes is materially adversely affected thereby) and a Majority-in-Interest of Preference Shares (if the Preference Shareholders

are materially adversely affected thereby), by Act of said Noteholders or by written consent of the Preference Shareholders (which consent shall be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained) delivered to the Trustee and the Co-Issuers) and (y) each Hedge Counterparty (to the extent required in the related Hedge Agreement) and the Credit Default Swap Counterparty (to the extent required in the Credit Default Swap Agreement) (delivered by the relevant Hedge Counterparties and the Credit Default Swap Counterparty) to the Trustee and the Co-Issuers), the Trustee and Co-Issuers may, subject to <u>Section 8.3</u>, enter into one or more indentures supplemental hereto to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes of such Class or the Preference Shares, the Credit Default Swap Counterparty or the Hedge Counterparties, if any, as the case may be, under this Indenture; *provided* that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall be entered into, without the consent of each Holder of each Outstanding Note of each Class and each Preference Share (which consent shall be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained), the Credit Default Swap Counterparty (to the extent required in the Credit Default Swap Agreement) and the Hedge Counterparties (to the extent required in the related Hedge Agreement) if such supplemental indenture:

(a)      changes the Stated Maturity of the principal of or the due date of any installment of interest or Commitment Fee, if applicable, on any Note, reduces the principal amount thereof or the Note Interest Rate or Commitment Fee thereon, or the Redemption Price with respect thereto, changes the earliest date on which the Issuer may redeem any Note, changes the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest or Commitment Fee, if applicable, on the Notes, changes any place where, or the coin or currency in which, any Note or the principal thereof or interest or Commitment Fee, if applicable, thereon is payable, or impairs the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)      reduces the percentage of the Aggregate Outstanding Amount (including, in the case of the Class A-1 Notes, the Remaining Unfunded Facility Commitment, where applicable) of Holders of Notes of each Class and Holders of Preference Shares, in each case whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder or their consequences provided for in this Indenture;

(c)      impairs or adversely affects the Collateral pledged under this Indenture except as otherwise expressly permitted in this Indenture;

(d)      permits the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminates such lien on any property at any time subject hereto (other than in connection with the Sale thereof in accordance with this Indenture) or deprives the Holder of any Note of the security afforded by the lien of this Indenture;

(e)    reduces the percentage of the Aggregate Outstanding Amount (including, in the case of the Class A-1 Notes, the Remaining Unfunded Facility Commitment, where applicable) of Holders of Notes of each Class or removes any other Secured Party, in each case whose consent is required to request that the Trustee preserve the Collateral or rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(f)    modifies the provisions of Section 5.15;

(g)    modifies any of the provisions of this Section 8.2 requiring the consent of any Noteholders or Preference Shareholders, except to increase the percentage of Outstanding Notes or Preference Shares whose Holders' consent is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Preference Share adversely affected thereby;

(h)    modifies the definition of the term "Net Outstanding Portfolio Collateral Balance," "Outstanding," "Noteholder," "Senior Funded Notes," "Majority," "Controlling Class," or modifies the provisions of Section 11.1 or Section 13.1;

(i)    changes the permitted minimum denominations of any Class of Notes;

(j)    modifies any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of (i) any payment of interest or Commitment Fee, if applicable, of any Note or the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein or (ii) any deposit into the Reserve Account; or

(k)    changes the provisions of this Indenture relating to the application of the proceeds of any Collateral to the reduction or calculation of the Remaining Unfunded Facility Commitment.

The Trustee may not enter into any such supplemental indenture under this Section 8.2 unless (1)(x) the Rating Condition with respect to Standard & Poor's shall have been satisfied with respect to such supplemental indenture or (y) consent from 100% of Noteholders of each affected Class of Notes materially adversely affected thereby is obtained and (2) notice of such supplemental indenture has been provided to Moody's.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers shall mail to the Noteholders, each Hedge Counterparty, the Credit Default Swap Counterparty, the Preference Share Paying Agent, the Collateral Manager and each Rating Agency a copy of such proposed supplemental indenture (or a description of the substance thereof) and shall request that the Rating Condition with respect to each Rating Agency with respect to such

supplemental indenture be satisfied. If any Class of Notes is then rated by either Rating Agency, the Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the Rating Condition with respect to each Rating Agency would not be satisfied with respect to such supplemental indenture, unless each Holder of Notes of each Class whose rating or credit estimate will be reduced or withdrawn has, after notice that the proposed supplemental indenture would result in such reduction or withdrawal of the rating or credit estimate of the Class of Notes held by such Holder, consented to such supplemental indenture. Unless notified by a Majority of any Class of Notes or a Majority-in-Interest of Preference Shares that such Class of Notes or the Preference Shares will be materially adversely affected, or by a Hedge Counterparty that such Hedge Counterparty will be materially adversely affected, or by the Credit Default Swap Counterparty that it will be materially adversely affected, the Trustee may, consistent with the written advice of counsel, determine whether or not such Class of Notes, the Preference Shares, the Credit Default Swap Counterparty or such Hedge Counterparty would be materially adversely affected by such change (after giving notice of such change to the Holders of the Notes and the Preference Shares and to the Hedge Counterparties and the Credit Default Swap Counterparty). Such determination shall be conclusive and binding on all present and future Holders, the Credit Default Swap Counterparty and the Hedge Counterparties. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in <u>Section 8.3</u>.

It shall not be necessary for any Act of Noteholders or any consent of Preference Shareholders under this <u>Section 8.2</u> to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this <u>Section 8.2</u>, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Preference Share Paying Agent (for forwarding to the Preference Shareholders), the Hedge Counterparties, the Credit Default Swap Counterparty, the Collateral Manager and each Rating Agency a copy thereof. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture. In addition, the Issuer shall cause to be delivered a copy of any executed supplemental indenture to the Repository for posting on the Repository in the manner described in <u>Section 14.3</u>.

For purposes of this <u>Section 8.2</u>, the interests of the Hedge Counterparties and the Credit Default Swap Counterparty shall be deemed not to be materially adversely affected by, and the Hedge Counterparties and the Credit Default Swap Counterparty shall have no right of consent in relation to, any supplemental indenture with respect to (i) the appointment of any successor Collateral Manager in accordance with the Collateral Management Agreement and (ii) any change to the Senior Collateral Management Fee, the Subordinated Collateral management Fee, or otherwise in respect of the fees, liabilities and expenses to apply to such successor Collateral Manager.

Section 8.3    <u>Execution of Supplemental Indentures.</u>

In executing or accepting the additional trusts created by any supplemental indenture permitted by this <u>Article VIII</u> or the modifications thereby of the trusts created by this

Indenture, the Trustee shall be entitled to receive, and (subject to <u>Sections 6.1</u> and <u>6.3</u>) shall be fully protected in relying in good faith upon an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with; *provided* that the Trustee shall execute and deliver upon the request of the Issuer or the Collateral Manager, and shall be fully protected in entering into, any supplemental indenture contemplated by <u>Section 8.1(i)</u> in order to consummate the issuance through the facilities of Euroclear or Clearstream, Luxembourg of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise.  The Trustee shall not enter into any supplemental indenture (including a supplemental indenture entered into pursuant to <u>Section 8.1</u> or <u>8.2</u>) that modifies the rights or increases the obligations of the Collateral Manager or the Credit Default Swap Counterparty in any respect without the written consent of such affected Person, and none of the Collateral Manager or the Credit Default Swap Counterparty shall be bound by any amendment to this Indenture which reduces the rights or increases the obligations of such affected Person unless such affected Person shall have consented thereto in writing.

Section 8.4    <u>Effect of Supplemental Indentures.</u>

Upon the execution of any supplemental indenture under this <u>Article VIII</u>, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder, and every Holder of Preference Shares shall be bound thereby.

Section 8.5    <u>Reference in Notes to Supplemental Indentures.</u>

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this <u>Article VIII</u> may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Co-Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

## ARTICLE IX—REDEMPTION OF SECURED NOTES

Section 9.1    <u>Redemption of Notes.</u>

(a)    (i) As provided under the terms of the Notes, the Notes shall be redeemable on any Distribution Date occurring on or after the Distribution Date in March 2010 at the option of a Majority-in-Interest of Preference Shares (such redemption, an "**Optional Redemption**") from Sale Proceeds arising from the Sale of Pledged Securities and all other funds in the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account) on such monthly Distribution Date, in whole but not in

part, as specified by the Issuer, at the written direction of a Majority-in-Interest of Preference Shares, at the applicable Redemption Price therefor; *provided* that (x) such Sale Proceeds and all Cash, Reserve Account Investments and Eligible Investments credited to the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account) on the relevant Distribution Date must be at least sufficient to pay the Optional Redemption Amount and (y) such Sale Proceeds are used to make such a redemption.

(ii)     In addition, as provided under the terms of such Notes upon the occurrence of a Tax Event, the Notes shall be redeemable by the Issuer on any Monthly Distribution Date in whole but not in part (A) at the written direction of a Majority of an Affected Class or (B) at the written direction of a Majority-in-Interest of Preference Shares (such redemption, a "**Tax Redemption**") from Sale Proceeds arising from the Sale of Collateral and all other funds in the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account) on such Monthly Distribution Date at the applicable Redemption Price; *provided* that (x) such Sale Proceeds and all Cash, Reserve Account Investments and Eligible Investments credited to the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account) on the relevant Monthly Distribution Date must be at least sufficient to pay the Total Redemption Amount, (y) such Sale Proceeds are used to make such a Tax Redemption and (z) the Tax Materiality Condition is satisfied.

(iii)     In the event of an Optional Redemption or a Tax Redemption pursuant to Section 9.1(a)(i) or (ii), respectively, unless a Majority of the Preference Shareholders have directed the Issuer to redeem the Preference Shares on such Monthly Distribution Date, the amount of Collateral Debt Securities sold, terminated or otherwise liquidated in connection with such Optional Redemption or Tax Redemption shall not exceed the amount necessary for the Issuer to obtain the Optional Redemption Amount or the Total Redemption Amount, respectively.

(b)     The Notes shall not be redeemed pursuant to Sections 9.1(a), 9.5 or 9.6 unless at least four Business Days before the scheduled Redemption Date (a) the Collateral Manager shall have furnished to the Trustee, the Credit Default Swap Counterparty, the Hedge Counterparty and each Class A-1 Noteholder evidence (which evidence may be in the form of a facsimile or electronic mail indicating firm bids), that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with one or more financial institution or institutions (or any affiliate of such financial institution or any transferee thereof that guarantees the obligations of such financial institution or such transferee, as the case may be) whose short-term unsecured debt obligations are at least "A-1" by Standard & Poor's (other than such obligations whose rating is based on the credit of a person other than such institution) and whose short term unsecured debt obligations have a credit rating of "P-1" by Moody's (which rating is not on watch for possible downgrade by Moody's) (and has entered into a binding commitment with the Credit Default Swap Counterparty to liquidate the CDS Agreement Transactions) to sell, terminate or otherwise liquidate, not later than the Business Day

immediately preceding the scheduled Redemption Date, for Cash in immediately available funds, all or part of the Collateral Debt Securities on the relevant Monthly Distribution Date and (b) in the case of a Clean-Up Call Redemption, if the Collateral Manager has elected to purchase Collateral Debt Securities, the Trustee has received the purchase price therefor from the Collateral Manager in immediately-available funds, such that Available Redemption Funds on such Monthly Distribution Date will equal or exceed, in the case of an Optional Redemption, a Tax Redemption or a Clean-Up Call Redemption, the Total Redemption Amount or, in the case of an Auction Call Redemption, the Auction Call Redemption Amount.

Notwithstanding anything herein to the contrary, in connection with any Tax Redemption, Holders of at least 66-⅔% of the Aggregate Outstanding Amount of an Affected Class may elect to receive less than 100% of the Redemption Price that would otherwise be payable to Holders of such Affected Class (and the minimum Sale Proceeds requirements will be reduced accordingly).

(c)        Installments of principal and interest (and, in the case of the Class A-1 Notes, Commitment Fee), due on or prior to a Redemption Date shall continue to be payable to the Holders of such Notes as of the relevant Record Dates according to their terms.  The election of the Issuer to redeem any Notes pursuant to this Section 9.1 shall be evidenced by an Issuer Order from the Collateral Manager directing the Trustee to make the payment to the Paying Agent of the Redemption Price of all of the Notes to be redeemed from funds in the Payment Account in accordance with the Priority of Payments.  The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption, Tax Redemption or Clean-Up Call Redemption pursuant to this Section 9.1 in the Payment Account on or before the fifth Business Day prior to the Redemption Date or, if later, upon receipt.

(d)        The Issuer shall set the Redemption Date and the applicable Record Date and give notice thereof to the Trustee pursuant to Section 9.2.

(e)        Any amounts applied to the redemption of the Notes pursuant to this Section 9.1 shall be applied in accordance with the Priority of Payments.

Section 9.2        Notice to Trustee of Optional Redemption or Tax Redemption.

In the event of any redemption pursuant to Section 9.1, the Issuer shall, at least 45 days (but not more than 90 days) prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, each Rating Agency, each Hedge Counterparty, the Credit Default Swap Counterparty, the Collateral Manager and each Paying Agent of such Redemption Date, the applicable Record Date, the principal amount of each Class of Notes to be redeemed on such Redemption Date and the Redemption Price of such Notes in accordance with Section 9.1.

Section 9.3        Notice of Auction Call Redemption, Optional Redemption, Tax Redemption, Clean-Up Call Redemption or Maturity by the Co-Issuers.

Notice of redemption pursuant to Section 9.1, 9.5 or 9.6 or the Maturity of any Class of Notes shall be given by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the applicable Redemption Date or Stated Maturity to each

Holder of such Notes to be redeemed pursuant to <u>Section 9.1</u>, <u>9.5</u> or <u>9.6</u> or to mature, at such Holder's address in the Note Register with a copy to each Rating Agency, the Credit Default Swap Counterparty and each Hedge Counterparty and, if the Preference Shares are to be redeemed on such Redemption Date, to the Preference Share Paying Agent.

All notices of redemption shall state:

(a)     the applicable Redemption Date;

(b)     the applicable Record Date;

(c)     the Redemption Price;

(d)     the principal amount of each Class of Notes to be redeemed and that interest (and, in the case of the Class A-1 Notes, Commitment Fee) on such principal amount of Notes shall cease to accrue on the date specified in the notice; and

(e)     the place or places where such Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Issuer to be maintained as provided in <u>Section 7.2</u>.

The Issuer shall have the option to withdraw the notice of redemption up to the third Business Day prior to the scheduled Redemption Date by written notice to the Trustee, each Rating Agency, the Credit Default Swap Counterparty, each Hedge Counterparty and the Collateral Manager, but only if (i) the Collateral Manager shall be unable to deliver the sale agreement or agreements or certifications described in <u>Section 9.1(b)</u> in form satisfactory to the Trustee, (ii) solely with respect to an Optional Redemption, a Majority-in-Interest of the Preference Shareholders have requested that such notice of redemption be withdrawn or (iii) solely with respect to a Clean-Up Call Redemption, if the Collateral Manager has elected to purchase Collateral Debt Securities, the Trustee has not received such purchase price from the Collateral Manager in immediately-available funds.   During the period when a notice of redemption may be withdrawn, the Issuer shall not terminate any Hedge Agreement or the Credit Default Swap Agreement, and the Hedge Agreements and the Credit Default Swap Agreement shall not be terminable by the relevant Hedge Counterparty or Credit Default Swap Counterparty, respectively, in relation to such notice of redemption.

At the cost of the Co-Issuers, the Trustee, on behalf of the Issuer, shall give notice of any withdrawal by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the scheduled Redemption Date, to each Holder of Notes to be redeemed at such Holder's address in the Note Register, the Credit Default Swap Counterparty and to each Hedge Counterparty.

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

Section 9.4     <u>Notes Payable on Redemption Date.</u>

Notice of redemption having been given as aforesaid, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) such Notes shall cease to bear interest (and, in the case of the Class A-1 Notes, Commitment Fee) on the Redemption Date. Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date; *provided* that if there is delivered to the Co-Issuers and the Trustee (i) in the case of a Holder that is not a Qualified Institutional Buyer or an Institutional Accredited Investor, such security or indemnity as may be required by them to save each of them harmless and (ii) an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers and the Trustee that the applicable Note has been Acquired by a *bona fide* purchaser, such final payment shall be made without presentation or surrender. Installments of interest (and, in the case of the Class A-1 Notes, the Commitment Fee) on Notes of a Class so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.6(e).

If any Note called for redemption shall not be paid upon surrender thereof for redemption, the funded or unfunded principal thereof shall, until paid, bear interest (and, in the case of the Class A-1 Notes, Commitment Fee) from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period during which the Note remains Outstanding.

Section 9.5    Auction Call Redemption.

In accordance with the procedures set forth in Schedule E (the "**Auction Procedures**"), the Trustee shall, at the expense of and on behalf of the Issuer, conduct an auction (the "**Auction**") of the Collateral Debt Securities if, on or prior to the Note Acceleration Date, the Notes have not been (and on the Note Acceleration Date will not be) redeemed in full. The Auction shall be conducted on a date no later than 10 Business Days prior to (1) the Note Acceleration Date and (2) if the Notes are not redeemed in full on the related Distribution Date, each Distribution Date thereafter until the Notes have been redeemed in full (each such date, an "**Auction Date**"). Notwithstanding the foregoing, the Trustee shall not conduct an Auction if (i) from (and including) the Quarterly Distribution Dated in March 2014 to (and including) the Quarterly Distribution Date in March 2015 there would be insufficient funds to provide the Class E Noteholders, the Class F Noteholders and the Preference Shareholders with a combined internal rate of return of at least 5% and, thereafter, at least 0%, in each case on $50,000,000, unless the Class E Noteholders, the Class F Noteholders and the Preference Shareholders waive such requirement by vote of 100% of each of the Class E Noteholders, the Class F Noteholders and the Preference Shareholders, or (ii) on an Auction Date if an Auction was conducted on the preceding Auction Date and the Collateral Manager notifies the Trustee that, due to market conditions, an Auction on such Auction Date is unlikely to be successful. Any of the Collateral Manager, the Preference Shareholders, the Trustee, the Credit Default Swap Counterparty, the Class A-1 Noteholders or their respective Affiliates may, but shall not be required to, bid at the Auction. The Trustee shall sell, terminate or otherwise liquidate the Collateral Debt Securities and, in the case of Collateral Debt Securities that are not Synthetic Securities, transfer such

Collateral Debt Securities (which may be divided into up to eight Subpools) to the highest bidder therefor (or to the highest bidder for each Subpool) at the Auction, provided that:

> (i)      the Auction has been conducted in accordance with the Auction Procedures;

> (ii)      with respect to Collateral Debt Securities other than Synthetic Securities:

>> (A)      the Trustee has received firm bids on behalf of the Issuer for such Collateral Debt Securities (or for each of the related Subpools) from at least two Qualified Bidders (including the winning Qualified Bidder) for (x) the purchase of such Collateral Debt Securities or (y) the purchase of each Subpool; and

>> (B)      the bidder(s) who offered the Highest Auction Price for such Collateral Debt Securities (or the related Subpools) enter(s) into a written agreement with the Issuer, in a form provided by the Collateral Manager (which the Issuer shall execute if the conditions set forth in (i) through (iv) of this Section 9.5 are satisfied, which execution shall constitute certification by the Issuer that such conditions have been satisfied) that obligates such highest bidders (or the highest bidder for each Subpool) to purchase all such Collateral Debt Securities (or the relevant Subpool) with the closing of such purchase (and full payment in Cash to the Trustee) to occur on or prior to the sixth Business Day following the relevant Auction Date;

> (iii)      with respect to each Synthetic Security, the Issuer (or the Collateral Manager on behalf of the Issuer) will request that the calculation agent under such Synthetic Security determine the net termination payment payable by or to the Issuer on the date six Business Days prior to the termination date of the relevant Synthetic Security and will notify the Trustee of such amount and, in the case of a Defeased Synthetic Security, the Trustee shall determine the amount (if any) that will be released from the related Synthetic Security Counterparty Account based on the information it receives with respect to the net termination payment; and

> (iv)      the Collateral Manager, on behalf of the Issuer, certifies to the Trustee that the (I) the Highest Auction Price obtained with respect to the Collateral Debt Securities (other than Synthetic Securities) pursuant to clause (ii) above *plus* (II) the aggregate net termination or assignment payments that would be payable to the Issuer by Synthetic Security Counterparties (including, if applicable, the Credit Default Swap Counterparty) as determined pursuant to clause (iii) above *minus* (III) the excess (if any) of (A) the aggregate net termination payments that would be payable under Defeased Synthetic Securities by the Issuer to Synthetic Security Counterparties as determined pursuant to clause (iii) above over (B) the balance of all Eligible Investments standing to the credit of the Synthetic Security Counterparty Accounts *plus* (IV) the Balance of all Reserve Account Investments, Eligible Investments and Cash held by the Issuer in the Accounts (other than any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account, to the extent the Issuer is not entitled to the amounts in

such accounts) *plus* (V) the aggregate amount (if any) that will be released from the Synthetic Security Counterparty Accounts following payment of the net termination or assignment payments described in the foregoing clauses (II) and (III) (the resulting amount of the preceding clauses (I), (II), (III), (IV) and (V), the "**End Value**") will be at least equal to the Auction Call Redemption Amount.

If all of the conditions set forth in clauses (i), (ii), (iii) and (iv) of this Section 9.5 have been met, (x) the Trustee shall sell and transfer the Collateral Debt Securities that are not Synthetic Securities (or each related Subpool), without representation, warranty or recourse, to the highest bidder that has offered the Highest Auction Price (or the highest bidder for each Subpool, as the case may be) and (y) the Issuer will terminate the transactions under each Synthetic Security, in each case, in accordance with and upon completion of the Auction Procedures.  Notwithstanding the foregoing, but subject to the satisfaction of the conditions set forth in clauses (i), (ii), (iii) and (iv) of this Section 9.5, the Collateral Manager or one of its Affiliates, although it may not have been the highest bidder, will have the option to purchase the Collateral Debt Securities that are not Synthetic Securities (or any Subpool) for a purchase price equal to the highest bid therefor.  The Trustee shall deposit the Sale Proceeds from the Sale of the Collateral Debt Securities and net termination payments received in respect of the Collateral Debt Securities, together with any Synthetic Security Collateral released from the Synthetic Security Counterparty Accounts, in the Collection Accounts, and the Notes and the Preference Shares shall be redeemed on the Distribution Date immediately following the relevant Auction Date (such redemption, an "**Auction Call Redemption**").

If (x) any of the foregoing conditions is not met with respect to any Auction, (y) the highest bidder (or the highest bidder for any Subpool) or the Collateral Manager or its Affiliate, as the case may be, fails to pay the purchase price for any Collateral Debt Security that is not a Synthetic Security or (z) the relevant Synthetic Security Counterparty fails to pay any net termination payment owing to the Issuer under any Synthetic Security, in each case before the sixth Business Day following the relevant Auction Date (and, in the case of a failure by the highest bidder to pay for a Subpool or a failure by a Synthetic Security Counterparty to pay a net termination payment owing to the Issuer, the End Value is less than the Auction Call Redemption Amount), (a) the Auction Call Redemption shall not occur on the Distribution Date following the relevant Auction Date, (b) the Trustee shall give notice of the withdrawal pursuant to Section 9.3, (c) subject to clause (e) below, the Trustee shall decline to consummate such Sale and shall not solicit any further bids or otherwise negotiate any further Sale of Collateral Debt Securities in relation to such Auction, (d) the Issuer shall not terminate any Synthetic Securities in relation to such Auction and (e) unless the Notes are redeemed in full prior to the next succeeding Auction Date, or the Collateral Manager notifies the Trustee that market conditions are such that such Auction would not likely be successful, the Trustee shall conduct another Auction on the next succeeding Auction Date.

Section 9.6    Clean-Up Call Redemption.

At the direction of the Collateral Manager, the Notes will be subject to redemption by the Issuer, in whole but not in part (a "**Clean-Up Call Redemption**"), at the Redemption Price, on any Distribution Date on which the Aggregate Outstanding Amount of the Notes is less than or equal to 10% of the original Aggregate Outstanding Amount of the Notes.

Any such redemption may only be effected on a Distribution Date and only from (a) the Sale Proceeds of the Collateral and (b) the Balance of the Cash and Eligible Investments in the Interest Collection Account, the Interest Reserve Account, the Principal Collection Account, the Expense Account and the Payment Account on such Distribution Date.

Any Clean-Up Call Redemption is subject to (i) the purchase of the Collateral (other than the Cash and Eligible Investments referred to in clause (b) of this sentence) by the Collateral Manager or any of its Affiliates from the Issuer, no later than the Business Day immediately preceding the scheduled Redemption Date, for a purchase price in Cash at least equal to (a) the Total Redemption Amount *minus* (b) the Balance of the Cash and Eligible Investments in the Interest Collection Account, the Interest Reserve Account, the Principal Collection Account, the Expense Account and the Payment Account, and (ii) the receipt by the Trustee on behalf of the Issuer from the Collateral Manager, prior to such purchase, of certification from the Collateral Manager that the sum so received satisfies clause (i). Upon receipt by the Trustee on behalf of the Issuer of the certification referred to in the preceding sentence, the Trustee (pursuant to written direction from the Collateral Manager on behalf of the Issuer) and the Issuer shall take all actions necessary to sell, assign and transfer the Collateral to the Collateral Manager upon payment in immediately available funds of the Redemption Price. The Trustee shall deposit such payment into the Collection Accounts on behalf of the Issuer and apply the funds therein in accordance with the Priority of Payments on such Redemption Date.

If such Redemption Price is not paid in full in immediately available funds no later than the Business Day immediately preceding the Redemption Date, the Trustee on behalf of the Issuer shall decline to consummate the sale and shall give notice (in accordance with Sections 9.2 and 9.3) that the Clean-Up Call Redemption will not occur. Any direction of the Collateral Manager requiring a Clean-Up Call Redemption shall be given in writing to the Issuer, with a copy to the Trustee, at least 10 Business Days prior to the relevant Distribution Date. The Issuer shall, upon receipt from the Collateral Manager of a direction in writing to effect a Clean-Up Call Redemption, set the Redemption Date and the Record Date for any redemption pursuant to this Section 9.6 and give written notice thereof to the Trustee pursuant to Section 9.2 hereof.

## ARTICLE X—ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    Collection of Cash.

(a)    Except as otherwise expressly provided herein, the Trustee, on behalf of the Issuer, may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Cash and other property payable to or receivable by the Trustee, on behalf of the Issuer, pursuant to this Indenture, including all payments due on the Pledged Securities, in accordance with the terms and conditions of such Pledged Securities. The Trustee, on behalf of the Issuer, shall segregate and hold all such Cash and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.

(b)    Each of the parties hereto hereby agrees to cause the Custodian and any other Securities Intermediary that holds any Cash or other property for the Issuer or the Co-Issuer in an Account to agree with the parties hereto that (x) each Account is a Securities

Account in respect of which the Trustee is the Entitlement Holder, (y) the Cash, Securities and other property credited to an Account are to be treated as Financial Assets under Section 8 of the UCC and (z) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for such purpose will be the State of New York.  In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially Indorsed to, the Issuer unless such Financial Asset has also been Indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account.  Each Account shall be held and maintained at an office located in the State of New York or Illinois.  In addition, any Account may include any number of subaccounts deemed necessary or appropriate by the Trustee for convenience in administering such account.

Section 10.2    <u>Interest Collection Account; Principal Collection Account; Quarterly Interest Reserve Account; Reserve Account; Custodial Account; Synthetic Security Counterparty Account; Issuer Collateral Account; Class A-1 Prepayment Account.</u>

(a)    The Trustee, on behalf of the Issuer, shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Interest Collection Account**" (which may be a subaccount of the Custodial Account), which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to <u>Section 10.8(d)</u>, (i) all amounts, if any, received by the Issuer pursuant to the Hedge Agreements (other than amounts received by the Issuer by reason of an event of default or termination event (each as defined in the relevant Hedge Agreement) or other comparable event that are required, pursuant to <u>Section 16.1(d)</u> to be used for the purchase by the Issuer of a replacement Hedge Agreement), (ii) the amounts, if any, to be transferred from the Quarterly Interest Reserve Account to the Interest Collection Account in accordance with the Quarterly Interest Reserve Schedule based on the proportional allocation of Cash interest payments received from assets that pay interest on a quarterly basis, (iii) all proceeds received from the Sale of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested pursuant to <u>Section 10.2(g)</u> in other Collateral Debt Securities, subject to the Eligibility Criteria, or in Eligible Investments) and (iv) all other Interest Proceeds.

(b)    The Trustee, on behalf of the Issuer, shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Principal Collection Account**" (which may be a subaccount of the Custodial Account), which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and to the extent provided herein, the Secured Parties, into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to <u>Section 10.8(d)</u>, (i) during the Reinvestment Period, any proceeds of disposition of Excess Reserve Account Assets designated by the Collateral Manager as Principal Proceeds, (ii) after the last day of the Reinvestment Period, all proceeds received from the Sale of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in other Collateral Debt Securities, subject to the Eligibility Criteria, or in Eligible Investments), including payments of interest on Collateral Debt Securities received in Cash by the Issuer to the extent that they represent accrued interest purchased with Principal Proceeds, (iii) all proceeds from the funding of Class A-1 Notes pursuant to the Class A-1 Note Purchase Agreement and (iv) all other Principal Proceeds.  At any time during the Reinvestment Period, the Collateral Manager on behalf of the Issuer may

instruct the Trustee to apply any Sale Proceeds standing to the credit of the Principal Collection Account to the Reserve Account.

(c)    The Custodian shall, on the Closing Date, cause to be established a Securities Account which shall be designated as the "**Quarterly Interest Reserve Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time credit a portion of the amount received in respect of all payments of interest in respect of a Collateral Debt Security that pays (i) quarterly and (ii) less frequently than quarterly and is not the subject of a Deemed Floating Asset Hedge Agreement under which the Issuer receives payments from the related Asset Hedge Counterparty quarterly in accordance with the Quarterly Interest Reserve Schedule.  On the third Business Day prior to each Monthly Distribution Date, the Trustee, on behalf of the Issuer, shall transfer from the Quarterly Interest Reserve Account to the Interest Collection Account, for distribution in accordance with the Priority of Payments, the amounts specified in the Quarterly Interest Reserve Schedule.  All funds on deposit in the Quarterly Interest Reserve Account shall be invested in Eligible Investments at the direction of the Collateral Manager on behalf of the Issuer.  The Quarterly Interest Reserve Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and a combined capital and surplus of at least U.S.$200,000,000.

(d)    The Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such Cash in a Collection Account as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Cash is to be treated as Principal Proceeds or Interest Proceeds hereunder at its discretion.  All Cash deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee, on behalf of the Issuer, as part of the Collateral and shall be applied to the purposes herein provided.  The Collection Accounts shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and a combined capital and surplus of a least U.S.$200,000,000.

(e)    All Distributions, any deposit required pursuant to Section 10.2(f) and any net proceeds from the Sale of a Collateral Debt Security or Equity Security received by the Trustee shall, on behalf of the Issuer, be immediately deposited into the Interest Collection Account or the Principal Collection Account, as the case may be (unless, in the case of proceeds received from the Sale of any Collateral, such proceeds are simultaneously reinvested pursuant to Section 10.2(g) in other Collateral Debt Securities, subject to the Eligibility Criteria, or in Eligible Investments).  Subject to Sections 10.2(g), 10.2(h) and 11.2, all amounts deposited in the Collection Accounts, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee, on behalf of the Issuer, in the Collection Accounts as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2.  By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods

and retained in the Collection Accounts, as so directed in Eligible Investments.  The Trustee, within one Business Day after receipt of any Distribution or other proceeds which are not Cash, shall so notify the Issuer and the Issuer shall, within five Business Days of receipt of such notice from the Trustee, sell such Distribution or other proceeds for Cash in an arm's-length transaction to a Person that is not an Affiliate of the Issuer or the Collateral Manager and deposit the proceeds thereof in the Interest Collection Account or the Principal Collection Account, as the case may be, for investment pursuant to this Section 10.2; *provided* that the Issuer need not sell such Distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such Distributions or other proceeds constitute Collateral Debt Securities or Eligible Investments.  Notwithstanding the foregoing, the Trustee shall, on behalf of the Issuer, pay interest received in respect of any Collateral Debt Security that is the subject of a Deemed Floating Asset Hedge Agreement to the relevant Asset Hedge Counterparty in accordance with the terms of such Deemed Floating Asset Hedge Agreement.

(f)     If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(g), the Trustee shall seek instructions from the Collateral Manager within three Business Days after transfer of such funds to a Collection Account.  If the Trustee does not thereupon receive written instructions from the Issuer within five Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (iii) of the definition thereof.  After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Cash as fully as practicable in Eligible Investments of the type described in clause (iii) of the definition thereof maturing not later than the earlier of (i) 30 days after the date of such investment or (ii) the Business Day immediately preceding the next Distribution Date.  All Interest Proceeds from such investments shall be deposited in the Interest Collection Account, and all Principal Proceeds from such investments shall be deposited in the Principal Collection Account.  Any gain or loss with respect to an Eligible Investment shall be allocated in such a manner as to increase or decrease, respectively, Principal Proceeds and/or Interest Proceeds in the proportion which the amount of Principal Proceeds and/or Interest Proceeds used to Acquire such Eligible Investment bears to the purchase price thereof.  The Trustee shall not in any way be held liable by reason of any insufficiency of such Collection Account resulting from any loss relating to any such investment.

(g)     During the Reinvestment Period (and thereafter to the extent necessary to Acquire Collateral Debt Securities pursuant to contracts entered into during the Reinvestment Period), the Collateral Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, (i) reinvest Principal Proceeds in Collateral Debt Securities and (ii) reinvest Interest Proceeds to purchase accrued interest in respect of Collateral Debt Securities, in each case, as permitted under and in accordance with the requirements of Article XII and such Issuer Order.  Any such purchased accrued interest shall be purchased first with Interest Proceeds to the extent available therefor, and, if Interest Proceeds are insufficient, with Principal Proceeds; *provided* that during the period from the Closing Date to the Ramp-Up Completion Date, purchased accrued interest shall be purchased first with Excess Reserve Account Assets, then with Interest Proceeds and then with Principal Proceeds.

(h)     The Trustee, on behalf of the Issuer, shall transfer to the Payment Account for application pursuant to Section 11.1 and in accordance with the calculations and the instructions contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.7(b), on or prior to the Business Day prior to each Distribution Date, any amounts then held in the Collection Account other than (i) Interest Proceeds or Principal Proceeds received after the end of the Due Period with respect to such Distribution Date and (ii) amounts that the Issuer is entitled to reinvest in accordance with Section 12.2 and which the Issuer so elects to reinvest in accordance with the terms of this Indenture; *except* that, to the extent that Principal Proceeds in the Principal Collection Account as of such date are in excess of the amounts required to be applied pursuant to the Priority of Payments up to and including the next Distribution Date as shown in the Note Valuation Report with respect to such Distribution Date, the Issuer may direct the Trustee to retain such excess amounts in the Principal Collection Account and not to transfer such excess amounts to the Payment Account.

(i)     The Trustee, on behalf of the Issuer, shall apply amounts on deposit in the Collection Accounts in accordance with any Redemption Date Statement delivered to the Trustee in connection with the redemption of Notes pursuant to Section 9.1.

(j)     The Trustee shall, upon Issuer Order and without regard to the Priority of Payments, apply amounts on deposit in the Principal Collection Account in accordance with Section 12.2.

(k)     The Trustee shall, on behalf of the Issuer, prior to the Closing Date, cause to be established a single, segregated securities account which shall be designated as the "**Reserve Account**," which shall be held in the name of the Trustee in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties.  The Trustee shall, on behalf of the Issuer, deposit in the Reserve Account, in each case for investment in Reserve Account Investments at the direction of the Collateral Manager on behalf of the Issuer (i) such amounts as are required to be deposited into the Reserve Account pursuant to the Priority of Payments in connection with any reduction of the Remaining Unfunded Facility Commitment, (ii) any Principal Reimbursements received by the Issuer after the Reinvestment Period in respect of any CDS Agreement Transactions, (iii) the excess (if any) of the amount of any Borrowing over the amount required to make a payment in connection with the applicable Permitted Use for which such Borrowing was requested, (iv) any Sale Proceeds transferred to the Reserve Account pursuant to Section 10.2(b), (v) any Uninvested Proceeds as of the Closing Date and (vi) such amounts as the Collateral Manager may (in its sole discretion) elect to transfer from the Principal Collection Account.

At the direction of the Collateral Manager on behalf of the Issuer, any Cash standing to the credit of the Reserve Account shall be withdrawn therefrom and any Reserve Account Investments credited to the Reserve Account (except for the excess (if any) of the amount of any Borrowing or Deemed Borrowing over the amount required to make a payment in connection with the applicable Permitted Use for which such Borrowing or Deemed Borrowing was requested) may be liquidated and proceeds of such liquidation shall be applied for the following purposes, in the manner provided for in this Indenture: (1) to be credited to the Principal Collection Account for the purchase of Collateral Debt Securities and to make upfront payments payable by the Issuer in connection with the Acquisition of Synthetic Securities, in

each case, during the Reinvestment Period (but, in each case, only to the extent of Excess Reserve Account Assets), (2) to fund any Remaining Exposure under the CDS Agreement Transactions, (3) to fund trading termination payments payable by the Issuer in respect of the termination of individual CDS Agreement Transactions (except as a result of an "Event of Default" or "Termination Event" with respect to which the Credit Default Swap Counterparty is the "Defaulting Party" or sole "Affected Party" under (and each as defined in) the Credit Default Swap Agreement), (4) if on any Determination Date there exists a Senior Funded Note Reduction Amount, for deposit in the Payment Account for distribution as Principal Proceeds in accordance with the Priority of Payments on the related Distribution Date to the extent that such withdrawal will not cause the Excess Notional Amount Liquidity to be reduced below zero, (5) for deposit in the Principal Collection Account upon any Optional Redemption, Auction Call Redemption, Tax Redemption or Clean-Up Call Redemption or the liquidation in full of the Collateral upon the Stated Maturity of the Notes or following the occurrence of an Event of Default, (6) to fund the Acquisition of Collateral Debt Securities prior to the end of the Reinvestment Period so long as no such Acquisition will result in the Excess Notional Amount Liquidity to be reduced below zero, (7) on the Distribution Date relating to the first Determination Date occurring more than 20 days after the Ramp-Up Completion Date, to the extent of Excess Reserve Account Assets, transferred to the Payment Account to the extent such funds are required to cure any Ratings Confirmation Failure pursuant to <u>Section 11.1(iii)</u> and apply such funds in accordance with the Priority of Payments and (8) on the Determination Date in respect of the first Distribution Date, any Excess Reserve Account Assets to be applied to Interest Proceeds to the extent necessary to pay the Class E Payment Allocation and the Class F Payment Allocation due and payable for the first Distribution Date pursuant to clauses (S), (W) and (Y) of <u>Section 11.1(i)</u>, to the extent that Interest Proceeds otherwise available would be insufficient therefor; *provided* that any application of funds from the Reserve Account to the Interest Collections Account pursuant to this clause (8) shall not result in a reduction of the Net Outstanding Portfolio Collateral Balance to an amount below U.S.$1,500,000,000.

Funds and other property standing to the credit of the Reserve Account may be transferred to a Synthetic Security Counterparty Account during the Reinvestment period in order to fund the Acquisition by the Issuer of any Synthetic Security Collateral to the extent required pursuant to the terms of the related Defeased Synthetic Security.

On any date on which the Issuer is required to fund any Remaining Exposure, purchase price of a Collateral Debt Security or trading termination payment in respect of a CDS Agreement Transaction, at the direction of the Collateral Manager the Issuer shall apply amounts standing to the credit of the Reserve Account to the satisfaction thereof but only to the extent that there are insufficient funds available therefor standing to the credit of the Principal Collection Account. If on any Determination Date relating to a Distribution Date there exists a Senior Funded Note Reduction Amount, Reserve Account Investments in an amount equal to the lesser of (A) the Excess Notional Amount Liquidity and (B) such Senior Funded Note Reduction Amount (or such lesser amount as may be required by minimum denomination and transfer requirements applicable to the Reserve Account Investments) may at the direction of the Collateral Manager on behalf of the Issuer (or, in the case of any Excess Notional Amount Liquidity or Senior Funded Note Reduction Amount occurring after the Reinvestment Period, shall) be liquidated and the proceeds of such liquidation shall be transferred to the Principal Collection Account for application as Principal Proceeds in accordance with the Priority of

Payments on the Distribution Date relating to such Determination Date. On the date on which substantially all of the Issuer's assets have been sold or otherwise Disposed of and all Synthetic Securities terminated, the Issuer shall, by Issuer Order, direct the Trustee to transfer all funds and other property standing to the credit of the Reserve Account to the Principal Collection Account for application as Principal Proceeds in accordance with the Priority of Payments.  All funds credited to the Reserve Account shall be invested in Reserve Account Investments at the direction of the Collateral Manager on behalf of the Issuer.

Except to the extent required in order for the Issuer to comply with its obligations in respect of any Remaining Exposure or trading termination payments in respect of a CDS Agreement Transaction or that such transfer would cause the Excess Notional Amount Liquidity to be reduced below zero, the Trustee shall credit all interest and other income received in respect of Reserve Account Investments standing to the credit of the Reserve Account to the Interest Collection Account.  Any losses resulting from Reserve Account Investments will be charged to the Reserve Account.  The Trustee shall give the Issuer and the Credit Default Swap Counterparty prompt notice if the Reserve Account or any funds or other property standing to the credit of the Reserve Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Reserve Account shall remain at all times with the Trustee or with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and if rated "Baa1", such rating shall not be on watch for downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus in excess of U.S.$200,000,000.

(l)     The Trustee, on behalf of the Issuer, shall, prior to the Closing Date, cause the Custodian to establish a Securities Account which shall be designated as the "**Custodial Account**," which shall be in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer, and to the extent provided for herein, the Secured Parties and to which the Trustee shall, on behalf of the Issuer, from time to time cause Collateral to be credited.  All Collateral from time to time standing to the credit of the Custodial Account pursuant to this Indenture shall be held by the Trustee, on behalf of the Issuer, as part of the Collateral and shall be applied to the purposes herein provided.  The Trustee agrees to give the Issuer immediate notice if the Custodial Account or any property or funds standing to the credit of the Custodial Account, shall become subject to any writ, order judgment, warrant of attachment, execution or similar process. The Issuer shall have legal, equitable and beneficial interests in the Custodial Account, but such entitlement shall be subject to the Priority of Payments contained in the Notes and herein.

(m)     The Trustee shall cause to be established, on behalf of the Issuer, a Securities Account (and any sub-ledgers deemed applicable by the Trustee) for each Defeased Synthetic Security which shall each be designated as a "**Synthetic Security Counterparty Account**" and shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer, and to the extent provided for under the related Synthetic Security, the related Synthetic Security Counterparty.  The Trustee, on behalf of the Issuer, shall create a separate sub-account of the Synthetic Security Counterparty Account for each Synthetic Security Agreement entered into by the Issuer.

Upon Issuer Order, the Trustee, the Issuer, the Synthetic Security Counterparty and the Custodian shall enter into an account control agreement with respect to such account in a

form substantially similar to the Account Control Agreement entered into on the Closing Date. The Issuer shall also Grant to the Trustee for the benefit of the other Secured Parties, subject to the prior lien of the relevant Synthetic Security Counterparty, a security interest in any Synthetic Security Collateral or other amounts standing to the credit of a Synthetic Security Counterparty Account.  Upon the termination of a Defeased Synthetic Security, the prior lien of the related Synthetic Security Counterparty over any Synthetic Security Collateral standing to the credit of the related Synthetic Security Counterparty Account shall be automatically released, and any remaining Synthetic Security Collateral credited to such Synthetic Security Counterparty Account shall become subject to a first ranking lien in favor of the Secured Parties.

Except for investment earnings on the Synthetic Security Collateral, the Issuer shall not have any legal, equitable or beneficial interest in any of the Synthetic Security Counterparty Accounts other than in accordance with this Indenture, the applicable Defeased Synthetic Security and applicable law.  Upon the establishment of any Synthetic Security Counterparty Account, the Issuer shall notify the relevant Synthetic Security Counterparty of the Trustee's security interest therein and obtain the Synthetic Security Counterparty's written acknowledgement of such security interest.  The fact that the terms of a Defeased Synthetic Security do not require the Issuer immediately to deposit Synthetic Security Collateral in the related Synthetic Security Counterparty Account shall not prevent the establishment of such Account.

Upon the purchase of any Synthetic Security Collateral, the Issuer shall, by Issuer Order executed by the Collateral Manager, instruct the Trustee to deposit such Synthetic Security Collateral in the related Synthetic Security Counterparty Account.  In addition, upon any amount becoming due and payable by the Issuer under a Defeased Synthetic Security, the Issuer shall, by Issuer Order executed by the Collateral Manager, instruct the Trustee to withdraw such amount from the related Synthetic Security Counterparty Account and pay such amount to the applicable Synthetic Security Counterparty.

All deposits into, and payments made out of, the Synthetic Security Counterparty Account shall be made without regard to either Priority of Payments or the occurrence of any Event of Default (other than an Event of Default described in Section 5.1(f) or (g)).  The Trustee shall be entitled to receive and rely upon, and shall act in accordance with, any Issuer Order from the Issuer, or the Collateral Manager acting on its behalf, with respect to all withdrawals, deposits and other actions to be taken pursuant to the Synthetic Security Counterparty Account, and such Issuer Order shall include such information as the Trustee reasonably may require. Nothing herein, or otherwise, shall be construed to cause the Trustee to have any fiduciary duties to any Synthetic Security Counterparty.

Amounts credited to a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral until they are withdrawn by the Trustee at the direction of the Collateral Manager on behalf of the Issuer and applied to the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the terms of such Defeased Synthetic Security.  In particular:

(i)    Interest payments and redemption premium on the Synthetic Security Collateral shall constitute property of the Issuer and shall be paid to the Trustee, on

behalf of the Issuer, and deposited into the Interest Collection Account for application as Interest Proceeds in accordance with the Priority of Payments. Principal payments on the Synthetic Security Collateral prior to the termination of the Defeased Synthetic Security shall be held in the applicable Synthetic Security Counterparty Account and invested in Eligible Investments until reinvested in Synthetic Security Collateral in accordance with the terms hereof and the related Defeased Synthetic Security at the direction of the Collateral Manager on behalf of the Issuer.

(ii)     In the event a Defeased Synthetic Security structured as a credit default swap is terminated prior to its scheduled maturity without the occurrence of a Credit Event, the Collateral Manager, on behalf of the Issuer shall cause such portion of the related Synthetic Security Collateral or other amounts deposited in the Synthetic Security Counterparty Account pursuant to this Indenture that, in each case, is required to make any termination payment owed to the related Synthetic Security Counterparty (other than any Defaulted Synthetic Termination Payment owing to any other Synthetic Security Counterparty) to be delivered to the related Synthetic Security Counterparty and shall cause the remaining related Synthetic Security Collateral (if any) to the extent not required to be Granted to the related Synthetic Security Counterparty to be released from the lien of the related Synthetic Security Counterparty and delivered to the Trustee free of such lien.

(iii)     In the event that no Credit Event under a Defeased Synthetic Security structured as a credit default swap has occurred prior to the termination or scheduled maturity of the Defeased Synthetic Security, upon the termination or scheduled maturity of the Defeased Synthetic Security, the related Synthetic Security Counterparty's lien on the Synthetic Security Collateral (if any) related to the applicable Defeased Synthetic Security shall be released and the Collateral Manager on behalf of the Issuer shall take or cause the taking of any and all other actions necessary to create in favor of the Trustee a valid, perfected, first-priority security interest in such released Synthetic Security Collateral under applicable law and regulations (including without limitation Articles 8 and 9 of the Uniform Commercial Code in effect at the time of such release).

(iv)     Upon the occurrence of a Credit Event under a Defeased Synthetic Security structured as a credit default swap, at the direction of the Collateral Manager by Issuer Order, the Trustee shall, on behalf of the Issuer, instruct the Custodian to deliver the portion of the related Synthetic Security Collateral (if any) and/or other amounts deposited in the Synthetic Security Counterparty Account pursuant to this Indenture that is necessary to satisfy the Issuer's payment obligations in respect of Remaining Exposure thereunder to the related Synthetic Security Counterparty upon delivery of the relevant Deliverable Obligations to the Issuer.

(v)     In the event that the Issuer is required to deliver the Synthetic Security Collateral to the related Synthetic Security Counterparty or to liquidate the Synthetic Security Collateral and deliver Cash, any market risk on the liquidation of the Synthetic Security Collateral shall be allocated between the Issuer and the related Synthetic Security Counterparty in accordance with the Underlying Instruments relating to such Defeased Synthetic Security.

(vi)    Any Synthetic Security Collateral released from the lien of the related Synthetic Security Counterparty which satisfies the definition of Eligible Investments shall be treated as Eligible Investments and any Synthetic Security Collateral released from the lien of the related Synthetic Security Counterparty which satisfies the definition of Collateral Debt Security shall be treated as a Collateral Debt Security and in either case may be retained by the Trustee on behalf of the Issuer or sold by the Collateral Manager subject to the restrictions set forth herein, and the Collateral Manager shall instruct the Trustee with respect to such treatment of Synthetic Security Collateral.  Any Cash received upon the maturity or liquidation of the Synthetic Security Collateral released to the Trustee, on behalf of the Issuer, shall be deemed to be Principal Proceeds.

The Collateral Manager on behalf of the Issuer shall direct the Trustee in writing to withdraw any other amounts held in a Synthetic Security Counterparty Account after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the terms of the related Defeased Synthetic Security from such Synthetic Security Counterparty Account and deposit such amounts in the Principal Collection Account for application as Principal Proceeds in accordance with the terms of this Indenture.

Except for interest and redemption premium on the Synthetic Security Collateral credited to a Synthetic Security Counterparty Account payable to the Issuer in accordance with the foregoing, amounts contained in a Synthetic Security Counterparty Account shall not be considered to be an asset of the Issuer for purposes of any of the Collateral Quality Tests, the Standard & Poor's CDO Monitor Test or the Pro Rata Payment Conditions, but the Defeased Synthetic Security that relates to the Synthetic Security Counterparty Account shall be considered an asset of the Issuer for such purposes.

Each Synthetic Security Counterparty Account shall remain at all times with a financial institution organized and doing business under the laws of the United States or any State thereof, authorized under such laws to exercise corporate trust powers and having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating shall not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus in excess of U.S.$200,000,000.

(n)    The Trustee, on behalf of the Issuer, shall, prior to the Closing Date, cause to be established one or more Securities Accounts which shall each be designated as an "Issuer Collateral Account" and shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer, and to the extent provided for herein, the Secured Parties (each such account, an "**Issuer Collateral Account**").  At the direction of the Collateral Manager the Trustee shall, on behalf of the Issuer, deposit into the Issuer Collateral Account any premiums received from the Credit Default Swap Counterparty in accordance with the terms of the Credit Default Swap Agreement and the underlying CDS Agreement Transactions.  If at any time such amounts in the Issuer Collateral Account credited to payments under the Credit Default Swap Agreement exceed any related collateral requirements set forth thereunder, such excess shall be withdrawn from the Issuer Collateral Account at the direction off the Collateral Manager and deposited to the Interest Collection Account.  If the terms of any Synthetic Security require the Synthetic Security Counterparty to secure its obligations with respect to such Synthetic Security, at the time the Issuer enters into such Synthetic Security, the Trustee shall on behalf of the

Issuer, at the direction of the Collateral Manager, create a sub-account of the Issuer Collateral Account for the benefit of the Issuer, and to the extent provided for herein, the Secured Parties and credit thereto all funds and other property that are received from the related Synthetic Security Counterparty to secure the obligations of such Synthetic Security Counterparty in accordance with the terms of the related Synthetic Securities.

Amounts on deposit in an Issuer Collateral Account shall be invested in Synthetic Security Collateral that satisfies paragraphs (7), (8), (9) and (10) of the Eligibility Criteria as directed by an Issuer Order executed by the Collateral Manager and in accordance with the terms of the applicable Synthetic Security. Income received on amounts on deposit in each Issuer Collateral Account shall be withdrawn from such account and paid to the related Synthetic Security Counterparty or the Issuer in accordance with the applicable Synthetic Security.

Posted collateral on deposit in each Issuer Collateral Account will not be included in the Collateral and will not be available to make payments under the Notes other than as a result of an event of default, default or termination event (howsoever described) under the related Synthetic Security caused by the related Synthetic Security Counterparty. Amounts contained in any Issuer Collateral Account shall not be considered to be an asset of the Issuer for purposes of any of the Collateral Quality Tests or the Pro Rata Payment Conditions, but otherwise shall be considered an asset of the Issuer and any Synthetic Security that relates to an Issuer Collateral Account shall be considered assets of the Issuer for all purposes.

Upon the occurrence of an event of default, default or termination event (howsoever described) under the related Synthetic Security, amounts contained in the related Issuer Collateral Account shall, as directed by the Collateral Manager by Issuer Order, be withdrawn by the Trustee and applied to the payment of any termination payment or other amount payable by the related Synthetic Security Counterparty to the Issuer as a result of such event of default, default or termination event (howsoever described). Any excess amounts held in a Issuer Collateral Account after payment of all amounts owing from the related Synthetic Security Counterparty to the Issuer as a result of such event of default, default or termination event (howsoever described) shall be withdrawn from such Issuer Collateral Account and paid to the related Synthetic Security Counterparty in accordance with the applicable Synthetic Security.

Each Issuer Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's, at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000.

(o)    The Custodian shall, prior to the Closing Date, cause to be established a single, segregated Securities Account which shall be designated as the "**Interest Equalization Account**" and shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties, into which the Trustee during any Due Period will credit such amount of distributions received on any Floating Rate Collateral Debt Security during such Due Period that the Collateral Manager reasonably determines necessary to equalize monthly interest cash flows and to the extent such distributions or proceeds constitute Scheduled Distributions of interest; *provided* that in no event shall any amount be deposited in the Interest Equalization Account if such deposit would result in there

being insufficient Interest Proceeds to pay all amounts set forth in Sections 11.1(i)(A) through (Z) on any Distribution Date. Amounts deposited in the Interest Equalization Account in respect of any Due Period, together with investment earnings thereon, shall be paid into the Interest Collection Account on the last day of the next succeeding Due Period (to be applied as Interest Proceeds on the related Distribution Date in accordance with the Priority of Payments). In addition, in connection with any redemption of the Notes, the full amount on deposit in the Interest Equalization Account shall be paid into the Interest Collection Account and available to pay the Redemption Price of the Notes as if such amount had originally been on deposit in the Interest Collection Account. All funds on deposit in the Interest Equalization Account shall be invested in Eligible Investments with stated maturities no later than the last day of the next succeeding Due Period in accordance with the written instructions of the Collateral Manager on behalf of the Issuer. The Interest Equalization Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus of at least U.S.$200,000,000.

(p)     The Trustee, on behalf of the Issuer, shall cause to be established a single, segregated Securities Account which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and the applicable holder of the Class A-1 Notes (such account, the "**Class A-1 Prepayment Account**"). The Trustee, on behalf of the Issuer, shall deposit into the applicable Class A-1 Prepayment Account any amounts received from a Class A-1 Noteholder (other than a Class A-1 Noteholder that is also the Credit Default Swap Counterparty, which will have no obligation to fund amounts into any Class A-1 Prepayment Account) to prepay its Commitment Amount in accordance with the terms of the Class A-1 Note Purchase Agreement. Funds standing to the credit of a Class A-1 Prepayment Account, if invested, shall be invested and reinvested in Eligible Investments described in any of clauses (a), (c), (g) and (h) of the definition thereof as directed by the relevant Class A-1 Noteholder upon written notice to the Trustee.

Funds and other property on deposit in a Class A-1 Prepayment Account shall be withdrawn from such account and applied to fund Deemed Borrowings for Permitted Uses pursuant to the Class A-1 Note Purchase Agreement, and shall be reimbursed to the relevant Class A-1 Noteholder when required pursuant to the Class A-1 Note Purchase Agreement. Funds and other property on deposit in the Class A-1 Prepayment Account will not be available to the Issuer for payments to any Secured Parties other than the Credit Default Swap Counterparty (in connection with a Permitted Use only) and the holders of the Class A-1 Notes. With respect to any holder of Class A-1 Notes that has deposited its Commitment Amount in a Class A-1 Prepayment Account pursuant to the Class A-1 Note Purchase Agreement, (i) the Trustee will apply a portion of such amount on the date of a Deemed Borrowing by the Issuer to the relevant Permitted Use in accordance with the Class A-1 Note Purchase Agreement in an amount equal to such Class A-1 Noteholder's *pro rata* share of the total amount specified in the applicable Borrowing Request and (ii) on each Distribution Date and without regard to the Priority of Payments, the Trustee will pay directly to such Class A-1 Noteholder any interest in an amount equal to earnings in respect of Eligible Investments standing to the credit of the Class A-1 Prepayment Account of such holder during the preceding Due Period. Investment earnings on Eligible Investments standing to the credit of a Class A-1 Prepayment Account will not be transferred to the Interest Collection Account or treated as Interest Proceeds. None of the

Co-Issuers or the Noteholders other than the related holders of Class A-1 Notes shall have any rights to the amounts in a Class A-1 Prepayment Account except to satisfy the obligations of the related holder and the Class A-1 Notes to the Co-Issuers.

On each Distribution Date on which the Balance of Cash and Eligible Investments in any Class A-1 Prepayment Account is less than the related Class A-1 Noteholder's outstanding Commitment Amount, such Class A-1 Noteholder (other than a Class A-1 Noteholder that is also the Credit Default Swap Counterparty) will transfer to the Trustee an amount of Cash and/or Eligible Investments for deposit into its Class A-1 Prepayment Account such that the Balance of Cash and Eligible Investments as of such date subsequent to the transfer is equal to or greater than its outstanding Commitment Amount.

On each Distribution Date after the Reinvestment Period on which the Balance of Cash and Eligible Investments in any Class A-1 Prepayment Account exceeds such Class A-1 Noteholder's outstanding Commitment Amount, the Trustee shall withdraw an amount equal to such excess from such Class A-1 Prepayment Account and pay or transfer the same to the relevant Class A-1 Noteholder.

On the Business Day following the Commitment Termination Date, the Trustee, on behalf of the Issuer, shall withdraw all funds and other property standing to the credit of a Class A-1 Prepayment Account and pay or transfer the same to the relevant Class A-1 Noteholder pursuant to and in accordance with the Class A-1 Note Purchase Agreement.

If a Borrowing Request is made, a Borrowing or Deemed Borrowing is funded by any Class A-1 Noteholder in respect thereof and the relevant funds can no longer be applied to a Permitted Use (including, without limitation, as a result of an "Event of Default" or "Termination Event" with respect to which the Credit Default Swap Counterparty is the "Defaulting Party" or sole "Affected Party" under (and each as defined in) the Credit Default Swap Agreement), the Trustee, at the direction off the Collateral Manager, shall promptly repay such amount to the relevant Class A-1 Noteholder (for credit to the relevant Class A-1 Prepayment Account in the case of a Deemed Borrowing) without regard to the Priority of Payments.

The Class A-1 Prepayment Account shall remain at all times with a United States financial institution having a long-term debt rating of at least "A" by Standard & Poor's and at least "A2" by Moody's (and, if rated "A2", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000.

Section 10.3    Payment Account.

The Trustee on behalf of the Issuer shall, prior to the Closing Date, cause the Custodian to establish a Securities Account which shall be designated as the "**Payment Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be held in trust by the Trustee for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties.  Except as provided in Sections 11.1 and 11.2, the only permitted withdrawal

from or application of funds on deposit in, or otherwise standing to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified therein, each in accordance with the Priority of Payments. The Trustee agrees to give the Issuer, the Credit Default Swap Counterparty and the Hedge Counterparties prompt notice if the Payment Account or any funds on deposit therein, or otherwise standing to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments. The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's, at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000.

Section 10.4   Expense Account.

(a)      The Trustee on behalf of the Issuer shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Expense Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Expense Account shall be held in trust by the Trustee for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties. Except as provided in Sections 11.1 and 11.2, the only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Expense Account shall be to pay (on any day other than a Distribution Date) accrued and unpaid Administrative Expenses of the Co-Issuers (other than fees and expenses of the Trustee). On the Closing Date, the Trustee shall deposit into the Expense Account an amount equal to U.S.$150,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and the Preference Shares. In addition, on each Distribution Date on which the balance of the Expense Account is less than U.S.$150,000, additional amounts will be deposited therein to the extent that funds are available therefor in accordance with the priority described under Section 11.1(i) and (ii) to the extent necessary to cause the Balance of all Eligible Investments and Cash in the Expense Account immediately after such deposit to equal U.S.$150,000. Thereafter, the Trustee shall, on behalf of the Issuer, transfer to the Expense Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1 and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.7(b).

(b)      The Trustee agrees to give the Issuer, the Credit Default Swap Counterparty and the Hedge Counterparties prompt notice if the Expense Account or any funds on deposit in either, or otherwise standing to the credit of the Expense Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Expense Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000. By Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee no later than the Determination

Date prior to any Distribution Date, the Collateral Manager may direct the Trustee to apply amounts standing to the credit of the Collection Account to the Expense Account to the extent funds are available therefor in accordance with the Priority of Payments; *provided* that the Aggregate Principal Balance of Eligible Investments standing to the credit of the Expense Account immediately after giving effect to any such transfer does not exceed U.S.$150,000.

(c)     By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Expense Account during a Due Period, and amounts received in prior Due Periods and retained in the Expense Account, as so directed in Eligible Investments.  All interest and other income from such investments shall be deposited in the Expense Account, any gain realized from such investments shall be credited to the Expense Account, and any loss resulting from such investments shall be charged to the Expense Account.  The Trustee shall not in any way be held liable by reason of any insufficiency of such Expense Account resulting from any loss relating to any such investment.

Section 10.5    [Reserved].

Section 10.6    Reports by Trustee.

The Trustee shall supply in a timely fashion to each Rating Agency, the Credit Default Swap Counterparty, each Hedge Counterparty, the Issuer, and the Collateral Manager any information regularly maintained by the Trustee that the Issuer or the Collateral Manager may from time to time request with respect to the Pledged Securities or any Account reasonably needed to complete the Note Valuation Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.7 or to permit the Collateral Manager to perform its obligations under the Collateral Management Agreement.  The Trustee shall forward to the Collateral Manager and to any Holder of a Note shown on the Note Register, any Preference Shareholder, the Credit Default Swap Counterparty or any Hedge Counterparty upon request therefor, copies of notices and other writings received by it from the issuer of any Collateral Debt Security or from any Clearing Agency with respect to any Collateral Debt Security advising the holders of such security of any rights that the holders might have with respect thereto (including notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

As promptly as possible following the delivery of each Monthly Report and Note Valuation Report to the Trustee pursuant to Section 10.7(a) or (b), as applicable, the Issuer shall cause a copy of such report to be delivered to the Repository for posting on the Repository in the manner described in Section 14.3 and to Intex Solutions, Inc.  In connection therewith, each of the Co-Issuers and the Trustee acknowledges that each Monthly Report and Note Valuation Report shall be posted to the Repository for use in the manner described in the section headed "Terms of Use" on the Repository.

Section 10.7    Accountings.

(a)      Monthly.  Commencing on the Monthly Distribution Date in July 2007, the Issuer or the Collateral Administrator acting on behalf of the Issuer shall compile and provide or make available to each Rating Agency, the Trustee, the Collateral Manager, the Credit Default Swap Counterparty, each Hedge Counterparty and each Transfer Agent and, upon written request therefor, any Holder of a Note shown on the Note Register and any Preference Shareholder a monthly report (the "**Monthly Report**").  The Monthly Report shall contain the following information and instructions with respect to the Pledged Securities included in the Collateral and determined as of the Determination Date relating to such Monthly Distribution Date:

(a)      (x) the Aggregate Principal Balance of all Collateral Debt Securities, together with a calculation, in reasonable detail, of the sum of (A) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities, Deferred Interest PIK Bonds and Written-Down Securities) *plus* (B) with respect to each Defaulted Security or Deferred Interest PIK Bond, the Calculation Amount of such Defaulted Security or Deferred Interest PIK Bond *plus* (C) with respect to each Written-Down Security, the Aggregate Principal Balance of all such Written-Down Securities and (y) the Aggregate Principal Balance of all Collateral Debt Securities and any Principal Proceeds received in respect of any such Collateral Debt Securities as of the Ramp-Up Completion Date;

(b)      the Balance of all Reserve Account Investments, Eligible Investments and Cash in each of the Interest Collection Account, the Principal Collection Account, the Interest Equalization Account, the Quarterly Interest Reserve Account, the Reserve Account, the Class A-1 Prepayment Account and the Expense Account;

(c)      the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds, Principal Proceeds and Sale Proceeds, received since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Note Valuation Report);

(d)      to the extent available with respect to each Collateral Debt Security, Reserve Account Investment and Eligible Investment, its Principal Balance, annual interest rate, stated maturity, issuer, Moody's Rating and Standard & Poor's Rating (as of the date of Acquisition and as of the date of such Monthly Report); *provided* that any individual shadow rating or any non-public rating (including credit estimates) by Moody's or Standard & Poor's of a Collateral Debt Security obtained by the Collateral Manager on behalf of the Issuer shall not be disclosed in any Monthly Report or Note Valuation Report but shall instead be represented by an asterisk;

(e)      the identity of each Collateral Debt Security that was sold or Disposed of pursuant to Section 12.1 (indicating whether such Collateral Debt Security is a Defaulted Security, Credit Improved Security or Credit

Risk Security (in each case, as reported in writing to the Issuer by the Collateral Manager) and whether such Collateral Debt Security was sold pursuant to Section 12.1(a)(i), (ii), (iii), (iv) or (v)) or Granted to the Trustee since the date of determination of the most recent Monthly Report;

(f)     the identity of each Collateral Debt Security that is a Defaulted Security, Deferred Interest PIK Bond or a Written-Down Security, its principal amount, the Fair Market Value thereof and the date on which it became a Defaulted Security or Written-Down Security, together with a list of each Defaulted Security or Deferred Interest PIK Bond, the Fair Market Value of which is determined pursuant to clause (3) of the proviso to the definition thereof and the value assigned by the Collateral Manager thereto;

(g)     the identity of each Collateral Debt Security which has been upgraded or downgraded by one or more Rating Agencies;

(h)     the Aggregate Principal Balance of all Fixed Rate Collateral Debt Securities (other than Deemed Floating Rate Collateral Debt Securities) or Deemed Fixed Rate Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(i)     the Aggregate Principal Balance of all Floating Rate Collateral Debt Securities (other than Deemed Fixed Rate Collateral Debt Securities) or Deemed Floating Rate Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(j)     the Aggregate Principal Balance of all Deemed Fixed Rate Collateral Debt Securities or Deemed Floating Rate Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(k)     the Aggregate Principal Balance of all Pure Private Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(l)     the Aggregate Principal Balance of all Collateral Debt Securities (other than an Insurance Company Guaranteed Security, U.S. Agency Guaranteed Securities or FHLMC/FNMA Guaranteed Securities) that are guaranteed as to ultimate or timely payment of principal or interest;

(m)     for each Rating Agency, the Aggregate Principal Balance of all Collateral Debt Securities publicly rated in each rating category of such Rating Agency (and whether any such rating, in each case, is under review by any Rating Agency for possible downgrade);

(n)     the Aggregate Principal Balance of all Collateral Debt Securities with a Standard & Poor's Rating below "BB";

(o)     the identity of and the Aggregate Principal Balance of all Collateral Debt Securities whose Moody's Rating is determined as provided in clause (a)(ii) of the definition of "Rating" and the identity of and the Aggregate Principal Balance of all Collateral Debt Securities whose Standard & Poor's Rating is determined as provided in clause (b)(i)(C) or (b)(i)(B) of the definition of "Rating";

(p)     with respect to each Issue of Collateral Debt Securities, the Aggregate Principal Balance of all Collateral Debt Securities that are part of such Issue (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(q)     with respect to each Servicer of Collateral Debt Securities, the Aggregate Principal Balance of all Collateral Debt Securities serviced by such Servicer (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(r)     with respect to each Synthetic Security Counterparty, (A) the rating, if any, thereof by Standard & Poor's and (B) the Aggregate Principal Balance of all Collateral Debt Securities Acquired from such Synthetic Security Counterparty and its Affiliates;

(s)     the aggregate Notional Amount of all Synthetic Securities;

(t)     with respect to each Specified Type of Asset-Backed Security (except for REIT Debt Securities—Healthcare, REIT Debt Securities—Mortgage and related Synthetic Securities), the Aggregate Principal Balance of all Collateral Debt Securities consisting of such Specified Type of Asset-Backed Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(u)     the Aggregate Principal Balance of all PIK Bonds, Principal-Only Securities and Zero Coupon Bonds (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(v)     the Aggregate Principal Balance of all Collateral Debt Securities with a Stated Maturity occurring later than the Stated Maturity of the Notes;

(w)     (a) the Aggregate Principal Balance of all CDO Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities), (b) with respect to any single issuer of CDO Securities, the Aggregate Principal Balance of all CDO Securities issued by such issuer and (c) with respect to any single

collateral manager of CDO Securities, the Aggregate Principal Balance of all CDO Securities managed by such collateral manager.

(x)    the Aggregate Principal Balance of all Collateral Debt Securities that are Step-Down Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(y)    the Aggregate Principal Balance of all Collateral Debt Securities with attached Equity Securities;

(z)    the Aggregate Principal Balance of all Collateral Debt Securities that are Mortgage Finance Company Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(aa)    the Aggregate Principal Balance of all Collateral Debt Securities that are Insurance Company Guaranteed Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(bb)    the Aggregate Principal Balance of all Collateral Debt Securities that are Collateral Debt Securities which pay interest less frequently than quarterly and a copy of the current Quarterly Interest Reserve Schedule referring to each such Collateral Debt Security which pays interest less frequently than quarterly;

(cc)    the identity of and Aggregate Principal Balance of all Collateral Debt Securities that are on watch for possible upgrade or downgrade by a Rating Agency;

(dd)    (x) a statement of whether the Standard & Poor's CDO Monitor Notification Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Notification Test was not satisfied and (y) the Standard & Poor's Scenario Default Rate, Note Break-Even Default Rate and Notes Default Rate Differential with respect to each Class of Notes;

(ee)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test;

(ff)    a calculation in reasonable detail necessary to determine the estimated remaining average life (on an aggregate basis) of all Collateral Debt Securities that are not Synthetic Securities (using reasonable assumptions as set forth in such calculation), as provided by the Collateral Manager;

(gg)    the Notional Amount of each Synthetic Security and premium payable by the applicable Synthetic Security Counterparty to the Issuer under such Synthetic Security;

(hh)    with respect to a Pledged Collateral Debt Security that is part of a single tranche within a multiple tranche issuance, (a) the original size of such tranche expressed as a percentage of the total capital structure with respect to such issuance and (b) the relative seniority of such Pledged Collateral Debt Security within such issuance;

(ii)    the Remaining Unfunded Facility Commitment, the Outstanding Class A-1 Funded Amount, the Reserve Account Balance, the Permanent Reduction Amount and the Remaining Exposure of all CDS Agreement Transactions;

(jj)    with respect to each Negative Amortization Security, the aggregate Negative Amortization Capitalization Amounts (if any) that have accrued thereon (as the same may be reduced from time to time in accordance with sub-clause (C) of the proviso to the definition of "Interest Proceeds"); and

(kk)    with respect to a Discount Security, the Acquisition price of such Discount Security.

In addition, the Issuer shall also indicate in each such Monthly Report the respective percentage of the Net Outstanding Portfolio Collateral Balance for each aggregate amount referred to in clauses (h) through (dd) above.

In addition, in conjunction with the delivery of each Monthly Report, the Collateral Administrator on behalf of the Issuer shall provide to Standard & Poor's the Excel Default Model Input File that provides the following information (to the extent such information is not confidential) with respect to each Collateral Debt Security:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Collateral Debt Security, (c) the par value of such Collateral Debt Security, (d) the type of issue (including, by way of example, whether such Collateral Debt Security is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Security is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in the case of a Collateral Debt Security which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Security which bears interest at a floating rate), (g) the Standard & Poor's Industry Classification Group for such Collateral Debt Security, (h) the stated maturity date of such Collateral Debt Security and (i) the Standard & Poor's Rating of such Collateral Debt Security or the issuer thereof, as applicable.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained therein to the information contained in its records with respect to the Collateral and

shall, within three Business Days after receipt of such Monthly Report, notify the Issuer and the Collateral Manager if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral.  In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.9 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

(b)    Distribution Date Accounting.  The Issuer shall render or cause to be rendered an accounting ("**Note Valuation Report**"), determined as of each Determination Date, and deliver or make available the Note Valuation Report to each Rating Agency, the Trustee, each Paying Agent, the Collateral Manager, the Credit Default Swap Counterparty, each Hedge Counterparty, each Transfer Agent and, upon written request therefor, any Holder of a Note shown on the Note Register and any Preference Shareholder, not later than the related Distribution Date.  The Note Valuation Report may be combined with the Monthly Report into a single report and shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date):

(a)    the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the next Distribution Date, the amount of any Class C Deferred Interest, if any, the amount of any Class D-1 Deferred Interest, if any, the amount of any Class D-2 Deferred Interest, if any, the amount of any Class E Deferred Interest, if any, the amount of any Class F Deferred Interest, if any and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on the next Distribution Date;

(b)    the Interest Distribution Amount payable to the Holders of the Notes for the related Distribution Date (in the aggregate and by Class) and the amount payable to Holders of Preference Shares, for such Distribution Date;

(c)    the Note Interest Rate for each Class of Notes and the Class A-1 Note Interest Rate for the Class A-1 Notes for the Interest Period preceding the next Distribution Date;

(d)    the Administrative Expenses payable on the next Distribution Date on an itemized basis;

(e)    for the Interest Collection Account:

(1)    the Balance on deposit in the Interest Collection Account at the end of the related Due Period;

(2)    the amounts payable from the Interest Collection Account pursuant to Section 11.1(i) on the next Distribution Date; and

(3)    the Balance remaining in the Interest Collection Account immediately after all payments and deposits to be made on such Distribution Date;

(f)    for the Principal Collection Account:

(1)    the Balance on deposit in the Principal Collection Account at the end of the related Due Period;

(2)    the amounts payable from the Principal Collection Account pursuant to Section 11.1(ii) on the next Distribution Date; and

(3)    the Balance remaining in the Principal Collection Account immediately after all payments and deposits to be made on such Distribution Date;

(g)    the Balance on deposit in the Expense Account, the Quarterly Interest Reserve Account, each Asset Hedge Account, the Reserve Account (and the amount of Reserve Account Investments credited to the Reserve Account that constitutes Excess Reserve Account Assets), each Hedge Counterparty Collateral Account, any Synthetic Security Counterparty Account and any Issuer Collateral Account at the end of the related Due Period;

(h)    The Senior Collateral Management Fee and the Subordinated Collateral Management Fee, if any to be paid on the next Distribution Date; and

(i)    the amount to be paid to the Preference Share Paying Agent on such Distribution Date for distribution to the Preference Shareholders.

Each Note Valuation Report shall constitute instructions to the Trustee to withdraw on the related Distribution Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established in, Sections 11.1(i) and (ii).

In addition to the Note Valuation Report, upon the written request of any Holder of a Note shown on the Note Register, the Credit Default Swap Counterparty, any Hedge

Counterparty or either Rating Agency, the Issuer shall deliver to such Holder, the Credit Default Swap Counterparty, such Hedge Counterparty or Rating Agency, as the case may be, a report containing the number and identity of each Collateral Debt Security held by the Issuer on the last day of the Due Period most recently ended (indicating whether any such Collateral Debt Security is a Defaulted Security (as reported in writing to the Trustee by the Collateral Manager)).

In addition to the foregoing information, each Note Valuation Report shall include a statement to the following effect:

"The Investment Company Act of 1940, as amended (the "Investment Company Act"), requires that each holder of a Note issued by the Co-Issuers (or beneficial interest therein) that is a U.S. Person be (x) a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act and related rules or (y) a company each of whose beneficial owners is a qualified purchaser or a "knowledgeable employee" with respect to the Issuer (each a "Qualified Purchaser"). Under the rules, each of the Co-Issuers or an agent acting on its behalf must have a "reasonable belief" that each holder of its outstanding securities that is a U.S. Person, including transferees, is a Qualified Purchaser, a company each of whose beneficial owners is a Qualified Purchaser. Consequently, each resale of a Note in the United States or to a U.S. Person must be made pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), solely to a purchaser that is a "qualified institutional buyers" ("Qualified Institutional Buyer") within the meaning of Rule 144A or, solely in the case of the Class E Notes and the Class F Notes, an institutional "accredited investor" ("Institutional Accredited Investor") meeting the description set forth in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act ("Regulation D") and a Qualified Purchaser. Each transferee of a Restricted Note will be deemed to represent at the time of purchase that: (i) the transferee is a Qualified Institutional Buyer or an Institutional Accredited Investor and also a Qualified Purchaser; (ii) the transferee is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25,000,000 in securities of issuers that are not Affiliated Persons of the dealer; (iii) the transferee is not a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan; (iv) the transferee and each account for which it is purchasing, is required to hold and transfer at least the minimum denominations of the Notes specified in the Indenture and (v) the transferee will provide

written notice of the foregoing, and of any applicable restrictions on transfer, to any subsequent transferee.

The Co-Issuers direct that the recipient of this notice, and any recipient of a copy of this notice, provide a copy to any Person having an interest in the Note with respect to which this Note Valuation Report is delivered, as indicated on the books of The Depository Trust Company or on the books of a participant in The Depository Trust Company or on the books of an indirect participant for which such participant in The Depository Trust Company acts as agent.

Notwithstanding any other restrictions on transfer contained herein, if either of the Co-Issuers determines that any beneficial owner of a Restricted Note (or any interest therein) (A) is a U.S. Person and (B) is not both a Qualified Institutional Buyer or an Institutional Accredited Investor and also (x) a Qualified Purchaser, either of the Co-Issuers may require, by notice to such Holder, that such Holder sell all of its right, title and interest to such Restricted Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer or an Institutional Accredited Investor and (2) a Qualified Purchaser, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such beneficial owner fails to effect the transfer required within such 30-day period, (i) upon written direction from the Collateral Manager or the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Section 9-610 of the Uniform Commercial Code as in effect in the State of New York as applied to securities that are sold on a recognized market or that are the subject of widely distributed standard price quotations) to a Person that certifies to the Trustee and the Collateral Manager, in connection with such transfer, that such Person is (1) a Qualified Institutional Buyer or an Institutional Accredited Investor and (2) a Qualified Purchaser, in the case of the Class A-1 Noteholder prior to the Commitment Termination Date, is compliant with the Class A-1 Note Purchase Agreement and (b) pending such transfer, no further payments will be made in respect of such Note held by such beneficial owner.  As used in this paragraph, the term "U.S. Person" has the meaning given such terms in Regulation S under the Securities Act."

(c)    <u>Redemption Date Instructions</u>.  Not less than five Business Days after receiving an Issuer Request requesting information regarding a redemption pursuant to <u>Sections 9.1</u>, <u>9.5</u> or <u>9.6</u> of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is

available to the Trustee) to the Issuer, the Collateral Manager, the Credit Default Swap Counterparty and the Hedge Counterparties, and the Issuer shall compute the following information and provide such information in a statement (the "**Redemption Date Statement**") delivered to the Trustee, the Collateral Manager, the Credit Default Swap Counterparties and the Hedge Counterparties:

> (i)    the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

> (ii)    the amount of accrued interest (and, in the case of the Class A-1 Notes, Commitment Fee) due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date;

> (iii)    the Remaining Unfunded Facility Commitment;

> (iv)    the amount in the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and any Class A-1 Prepayment Account) available for application to the redemption of such Notes; and

> (v)    the Outstanding Class A-1 Funded Amount.

> (d)    If the Trustee shall not have received any accounting provided for in this Section 10.7 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Distribution Date or Redemption Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.7 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

Section 10.8    Release of Securities.

> (a)    If no Event of Default has occurred and is continuing and subject to Article XII, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the settlement date for any Sale of a security certifying that the conditions set forth in Section 12.1 are satisfied, direct the Trustee to release such security from the lien of this Indenture against receipt of payment therefor.

> (b)    The Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the date set for redemption or payment in full of a Pledged Security, certifying that such security is being redeemed or paid in full, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such security, if in physical form, duly endorsed, or, if such security is a Clearing Corporation Security, to cause it to be presented, to the appropriate paying agent therefor on or

before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof.

(c)    If no Event of Default has occurred and is continuing and subject to Article XII, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the date set for an exchange, tender or Sale, certifying that a Collateral Debt Security is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such security, if in physical form, duly endorsed, or, if such security is a Clearing Corporation Security, to cause it to be delivered, in accordance with such Issuer Order, in each case against receipt of payment therefor.

(d)    The Trustee, on behalf of the Issuer, shall deposit any proceeds received by it from the Disposition of a Pledged Security in the Interest Collection Account or the Principal Collection Account, as the case may be, unless simultaneously applied to the purchase of other Collateral Debt Securities or Eligible Investments as permitted under and in accordance with requirements of Article XII and this Article X.

(e)    The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

(f)    The Issuer may retain agents (including the Collateral Manager) to assist the Issuer in preparing any notice or other report required under this Section 10.8.

Section 10.9    Reports by Independent Accountants.

(a)    At the Closing Date the Issuer shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture.  Upon any resignation by such firm, the Issuer shall promptly appoint, by Issuer Order delivered to the Trustee, the Credit Default Swap Counterparty, each Hedge Counterparty and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee, the Collateral Manager and each Rating Agency of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer or by the Trustee as provided in Section 11.1.

(b)    On or before December 31 of each year, commencing in 2008, the Issuer shall cause to be delivered to the Trustee, the Collateral Manager and each Rating Agency an Accountants' Report specifying the procedures applied and their associated findings with respect to the Monthly Reports, the Note Valuation Reports, the VFN Monthly Reports and any Redemption Date Statements prepared in the preceding year.  At least 90 days prior to the Monthly Distribution Date occurring in March 2008 (and, if at any time a successor firm of

Independent certified public accountants is appointed, to the Distribution Date following the date of such appointment), the Issuer shall deliver to the Trustee an Accountant's Report specifying in advance the procedures that such firm will apply in making the aforementioned findings throughout the term of its service as accountants to the Issuer. The Trustee shall promptly forward a copy of such Accountant's Report to each Hedge Counterparty, the Credit Default Swap Counterparty and each Holder of Notes of the Controlling Class, at the address shown on the Note Register. The Issuer shall not approve the institution of such procedures if a Majority of the Controlling Class, by notice to the Issuer, the Collateral Manager and the Trustee within 30 days after the date of the related notice to the Trustee, object thereto.

(c)    Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee to any Holder of a Note shown on the Note Register upon written request therefor.

Section 10.10    Reports to Rating Agencies, Etc.

(a)    In addition to the information and reports specifically required to be provided to the Rating Agencies, the Credit Default Swap Counterparty and the Hedge Counterparties pursuant to the terms of this Indenture, the Credit Default Swap Agreement or the Hedge Agreements (as the case may be), the Issuer shall provide or cause to be provided to the Rating Agencies, the Credit Default Swap Counterparty and the Hedge Counterparties with (i) all information, notices or reports delivered to the Trustee hereunder, (ii) such additional information as the Rating Agencies, the Credit Default Swap Counterparty or the Hedge Counterparties may from time to time reasonably request and such information may be obtained and provided without unreasonable burden or expense, (iii) prompt notice of any decision of the Collateral Manager to agree to any consent, waiver or amendment to any Underlying Instrument that modifies the cash flows of any Collateral Debt Security and (iv) notice of any waiver given pursuant to Section 5.14.    The Issuer shall promptly notify the Trustee, the Hedge Counterparties, the Credit Default Swap Counterparty and the Collateral Manager if the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.

(b)    All reports provided to Standard & Poor's under Sections 10.6 and 10.7 shall be provided in the Trustee's standard electronic format.

Section 10.11    Tax Matters.

(a)    The Issuer, the Co-Issuer, the Trustee agree, and each Holder and beneficial owner of Notes, by accepting a Note, agrees to treat such Notes as indebtedness solely of the Issuer and not of the Co-Issuer for U.S. federal, state and local income and franchise tax purposes, to report all income (or loss) in accordance with such treatment and not to take any action inconsistent with such treatment unless otherwise required by any taxing authority under applicable law.

(b)    The Issuer has not elected and agrees not to elect to be treated as other than a corporation for U.S. federal income tax purposes.

(c)    If required to prevent the withholding or imposition of United States income tax, the Issuer shall deliver or cause to be delivered an IRS Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to any Collateral Debt Security at the time such Collateral Debt Security is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

(d)    The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally-recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(e)    The Co-Issuers and the Trustee, on behalf of each holder of Notes respectively agree that (i) for U.S. federal, state and local tax purposes this Indenture shall be treated as a mere security device for the enforcement of the rights of the holders of the Notes under the Notes, (ii) for U.S. federal, state and local tax purposes, the Collateral shall be treated as legally and beneficially owned by the Issuer, except following a Default, as provided in Article V, and (iii) the Trustee shall be the agent of the Issuer except following a Default or as otherwise provided herein.

Section 10.12  No Gross-Up.

(a)    The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes, as provided under the terms of the Notes, as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges.

## ARTICLE XI—APPLICATION OF CASH

Section 11.1    Disbursements of Cash from Payment Account.

As provided in the Notes, notwithstanding any other provision in this Indenture or in the Notes, but subject to the other clauses of this Section 11 and Section 13.1, on each Distribution Date, the Trustee, on behalf of the Issuer, shall disburse amounts as follows and for application by the Trustee in accordance with the following priorities (the "**Priority of Payments**").  For purposes of the Priority of Payments, Interest Proceeds will be assumed to be applied prior to any Principal Proceeds except where otherwise indicated:

(i)    On each Distribution Date, Interest Proceeds credited to the Payment Account with respect to the related Due Period will be distributed in the order of priority set forth below:

(A)    on any Monthly Distribution Date, to the payment of taxes and filing and registration fees owed by the Co-Issuers, if any;

(B)    on any Monthly Distribution Date, (a) *first*, to the payment to the Trustee of an amount not to exceed (x) with respect to the Monthly Distribution Date occurring in July 2007, U.S.$27,500 and (y) with respect to each subsequent

Monthly Distribution Date, 0.000458% of the Monthly Asset Amount with respect to such Monthly Distribution Date (subject to a minimum of U.S.$2,083), (b) *second*, to the payment, in the following order, to the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Class A-1 Note Agent and the Administrator, of accrued and unpaid fees, expenses and other amounts (excluding fees paid pursuant to sub-clause (a) above) owing to them under this Indenture, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement, the Class A-1 Note Purchase Agreement and the Administration Agreement, as applicable, (c) *third*, to the payment of other accrued and unpaid Administrative Expenses of the Co-Issuers (excluding indemnification amounts and fees, expenses and other amounts described in sub-clauses (a) and (b) above, the Senior Collateral Management Fee and principal of and interest (or, in the case of the Class A-1 Notes, Commitment Fee) on the Notes) and (d) *fourth*, if the balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$150,000, for deposit to the Expense Account of such amount that is the lesser of (i) U.S.$150,000 and (ii) an amount that would have caused the balance of all Eligible Investments and Cash in the Expense Account immediately after such deposit to equal U.S.$150,000; *provided* that the aggregate amount of the payments made on such Monthly Distribution Date and on the eleven immediately preceding Monthly Distribution Dates, collectively, pursuant to sub-clauses (b), (c) and (d) above shall not exceed U.S.$150,000;

(C)    on any Monthly Distribution Date, to the payment to the Credit Default Swap Counterparty of any unpaid termination payment (excluding any Defaulted Synthetic Termination Payment) payable by the Issuer in connection with the termination in full (but not the partial termination) of the Credit Default Swap Agreement, together with any accrued interest thereon;

(D)    on any Monthly Distribution Date, to the payment to the Collateral Manager of accrued and unpaid and deferred Senior Collateral Management Fee;

(E)    on any Monthly Distribution Date, to the payment, *pro rata*, (I) of all amounts scheduled to be paid to any Hedge Counterparty pursuant to any Hedge Agreement, together with any termination payments (and any accrued interest thereon) payable by the Issuer pursuant to any Hedge Agreement to which the Hedge Counterparty is a party other than a Defaulted Hedge Termination Payment and (II) of any due and unpaid amounts payable to the GIC Provider under the GIC with respect to such Monthly Distribution Date (to the extent not otherwise deducted from amounts deposited in the Interest Collection Account on the related monthly GIC Payment Date);

(F)    on any Monthly Distribution Date, to the payment of *first*, the Commitment Fee and interest with respect to the Class A-1 Notes, on a *pari passu* basis, *second*, the Cumulative Class S Payment and the interest with respect to the Class A-2 Notes, on a *pari passu* basis and *third*, interest with respect to the

Class B Notes (including, in each case, Defaulted Interest and accrued interest thereon);

(G)    on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to any Class A Notes or Class B Notes:

(I)    *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full) and *second*, the Class B Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(H)    on any Monthly Distribution Date, to the payment of interest with respect to the Class C Notes (including Defaulted Interest and accrued interest thereon and on Class C Deferred Interest but excluding Class C Deferred Interest);

(I)    on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class C Notes:

(I)    *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full) and *third*, the Class C Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(J)      on any Monthly Distribution Date, to the payment of Class C Deferred Interest;

(K)      on any Monthly Distribution Date, to the payment of interest with respect to the Class D-1 Notes (including Defaulted Interest and accrued interest thereon and on Class D-1 Deferred Interest but excluding Class D-1 Deferred Interest);

(L)      on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class D-1 Notes:

(I)      *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)      *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)      *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full) and, *fourth*, the Class D-1 Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(M)      on any Monthly Distribution Date, to the payment of Class D-1 Deferred Interest;

(N)      on any Monthly Distribution Date, to the payment of interest with respect to the Class D-2 Notes (including Defaulted Interest and accrued interest thereon and on Class D-2 Deferred Interest but excluding Class D-2 Deferred Interest);

(O)      on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class D-2 Notes:

(I)      *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full), *fourth*, the Class D-1 Notes (until the Class D-1 Notes have been paid in full) and, *fifth*, the Class D-2 Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(P)    on any Monthly Distribution Date, to the payment of any Class D-2 Deferred Interest;

(Q)    to the payment of any Defaulted Synthetic Termination Payments (and any accrued interest thereon) payable by the Issuer pursuant to the Credit Default Swap Agreement;

(R)    on the Note Acceleration Date and on each Monthly Distribution Date thereafter:

(I)    *first*, (i) *first*, to the payment of, first, all other accrued and unpaid Administrative Expenses of the Co-Issuers (including any accrued and unpaid fees, expenses and other amounts owing, in the following order, to the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Class A-1 Note Agent, the Administrator and the Collateral Manager under the Indenture, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement, the Class A-1 Note Purchase Agreement, the Administration Agreement and the Collateral Management Agreement (as applicable) not paid pursuant to clause (B) above in the order of priority set forth therein (whether as the result of the limitations on amounts set forth therein or otherwise)) and, second, if the Balance of all Eligible Investments and Cash in the Expense Account is less than U.S.$150,000, for deposit to the Expense Account of such amount required to cause the Balance of all Eligible Investments and Cash in the Expense Account to equal U.S.$150,000 (which amount shall not duplicate any deposit to the Expense Account pursuant to clause (B) above); and (ii) *second*, to the payment of any Subordinated Hedge Termination Payments

(and any accrued interest thereon) payable by the Issuer pursuant to any Hedge Agreement;

(II)    *second*, to the payment of principal of, *first*, the Class F Deferred Interest (until the Class F Deferred Interest has been paid in full), *second*, the Class E Deferred Interest (until the Class E Deferred Interest has been paid in full), *third*, the Class D-2 Notes (until the Class D-2 Notes have been paid in full), *fourth*, the Class D-1 Notes (until the Class D-1 Notes have been paid in full), *fifth*, the Class C Notes (until the Class C Notes have been paid in full), *sixth*, the Class B Notes (until the Class B Notes have been paid in full) and *seventh*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full);

(III)    *third*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero; and

(IV)    *fourth*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero;

(S)    on any Monthly Distribution Date, *first*, to the Class E Noteholders of the lesser of (a) the amount due on the Class E Notes pursuant to the Class E Payment Allocation and (b) the Target Return I, until the Aggregate Outstanding Amount of the Class E Notes has been reduced to zero, *second*, to the Class F Noteholders of the lesser of (a) the amount due on the Class F Notes pursuant to the Class F Payment Allocation and (b) the Target Return I, until the Aggregate Outstanding Amount of the Class F Notes has been reduced to zero and *third*, to the Preference Share Paying Agent for distribution to the Preference Shareholders in an amount not to exceed the Target Return I (which amount will not duplicate amounts previously paid to the Class E Noteholders, the Class F Noteholders and the Preference Shareholders on such Monthly Distribution Date);

(T)    on any Monthly Distribution Date, (i) *first*, to the payment of, *first*, all other accrued and unpaid Administrative Expenses of the Co-Issuers (including any accrued and unpaid fees, expenses and other amounts owing, in the following order, to the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Class A-1 Note Agent, the Administrator and the Collateral Manager under the Indenture, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement, the Class A-1 Note Purchase Agreement, the Administration Agreement and the Collateral Management Agreement (as applicable) not paid pursuant to clause (B) above in the order of priority set forth therein (whether as the result of the limitations on amounts set forth therein or otherwise)) and, *second*, if the Balance of all Eligible Investments

and Cash in the Expense Account is less than U.S.$150,000, for deposit to the Expense Account of such amount required to cause the Balance of all Eligible Investments and Cash in the Expense Account to equal U.S.$150,000 (which amount shall not duplicate any deposit to the Expense Account pursuant to clause (B) above); and (ii) *second*, to the payment of any Subordinated Hedge Termination Payments (and any accrued interest thereon) payable by the Issuer pursuant to any Hedge Agreement;

(U)     on any Monthly Distribution Date, to the payment of principal of the Class D-1 Notes, in an amount on such Monthly Distribution Date equal to the lesser of (a) all remaining Interest Proceeds and (b) the Class D-1 Cap Amount (until the Class D-1 Notes have been paid in full);

(V)     on any Monthly Distribution Date, (x) *first*, to the payment of principal of the Class D-2 Notes, in an amount on such Monthly Distribution Date equal to the lesser of (a) all remaining Interest Proceeds and (b) the Class D-2 Cap Amount (until the Class D-2 Notes have been paid in full) and (y) *second*, on any Monthly Distribution Date that is not also a Quarterly Distribution Date, to the Collection Account for application to the Payment Account as Interest Proceeds on the next Monthly Distribution Date;

(W)     on any Quarterly Distribution Date, *first*, to the Class E Noteholders of the lesser of (a) the amount due on the Class E Notes pursuant to the Class E Payment Allocation and (b) the Target Return II (taking into account any amounts paid in respect of the Class E Notes pursuant to clause (S) above), until the Aggregate Outstanding Amount of the Class E Notes has been reduced to zero, *second*, to the Class F Noteholders of the lesser of (a) the amount due on the Class F Notes pursuant to the Class F Payment Allocation and (b) the Target Return II (taking into account any amounts paid in respect of the Class F Notes pursuant to clause (S) above), until the Aggregate Outstanding Amount of the Class F Notes has been reduced to zero and *third*, to the Preference Share Paying Agent for distribution to the Preference Shareholders in an amount not to exceed the Target Return II (which amount will not duplicate amounts previously paid to the Class E Noteholders, the Class F Noteholders and the Preference Shareholders on such Quarterly Distribution Date);

(X)     on any Quarterly Distribution Date, to the payment to the Collateral Manager of the accrued and unpaid and deferred Subordinated Collateral Management Fee (including interest on any deferred Subordinated Collateral Management Fee);

(Y)     on any Quarterly Distribution Date, *first*, to the payment of the Class E Payment Allocation, taking into account any amounts paid in respect of the Class E Notes pursuant to clauses (S) and (W) above until the Aggregate Outstanding Amount of the Class E Notes has been reduced to zero and *second*, to the payment of the Class F Payment Allocation, taking into account any amounts paid in respect of the Class F Notes pursuant to clauses (S) and (W) above until

the Aggregate Outstanding Amount of the Class F Notes has been reduced to zero; and

     (Z)     on any Quarterly Distribution Date, to the Preference Share Paying Agent for distribution to the Preference Shareholders in accordance with the terms of the Preference Share Paying Agency Agreement.

     (ii)     On each Distribution Date, Principal Proceeds credited to the Payment Account with respect to the related Due Period will be distributed in the order of priority set forth below:

     (A)     on any Monthly Distribution Date, to the payment of the amounts referred to in clauses (A) through (E) under Section 11.1(i) in the same order of priority specified therein, but only to the extent not paid in full thereunder;

     (B)     on any Monthly Distribution Date, to the payment of the amounts referred to in clause (F) (excluding the Cumulative Class S Payment) under Section 11.1(i) in the same order of priority specified therein, but only to the extent not paid in full thereunder;

     (C)     on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class A Notes or the Class B Notes, after giving effect to the application of Interest Proceeds pursuant to clause (G) under Section 11.1(i):

     (I)     *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

     (II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

     (III)     *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full) and then, the Class B Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

     (D)     on any Monthly Distribution Date, if no Class A Notes or Class B Notes are Outstanding, to the payment of the amounts referred to in clause (H) under Section 11.1(i), but only to the extent not paid in full thereunder;

     (E)     on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class C Notes, after giving effect to (x) the application of Principal

Proceeds in accordance with clause (C) above and (y) the application of Interest Proceeds in accordance with clauses (G) and (I) under <u>Section 11.1(i)</u>:

    (I)   *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

    (II)   *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

    (III)   *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full) and *third*, the Class C Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

(F)   on any Monthly Distribution Date, if no Class A Notes, Class B Notes or Class C Notes are Outstanding, to the payment of the amounts referred to in clause (K) under <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder;

(G)   on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class D-1 Notes, after giving effect to (x) the application of Principal Proceeds in accordance with clauses (C) and (E) above and (y) the application of Interest Proceeds in accordance with clauses (G), (I) and (L) under <u>Section 11.1(i)</u>:

    (I)   *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

    (II)   *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

    (III)   *third*, to the payment of principal of, first, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), second, the Class B Notes (until the Class B Notes have been paid in full), third, the Class C Notes (until the Class C Notes have been paid in full) and fourth, the Class D-1 Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

(H)    on any Monthly Distribution Date, if no Class A Notes, Class B Notes, Class C Notes or Class D-1 Notes are Outstanding, to the payment of the amounts referred to in clause (N) under <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder;

(I)    on the Monthly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class D-2 Notes, after giving effect to (x) the application of Principal Proceeds in accordance with clauses (C), (E) and (G) above and (y) the application of Interest Proceeds in accordance with clauses (G), (I), (L) and (O) under <u>Section 11.1(i)</u>:

>    (I)    *first*, to the payment of the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to zero,

>    (II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

>    (III)    *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full), *fourth*, the Class D-1 Notes (until the Class D-1 Notes have been paid in full) and *fifth*, the Class D-2 Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

(J)    on any Monthly Distribution Date, (a) to make a payment to reduce the Outstanding Class A-1 Funded Amount until the Outstanding Class A-1 Funded Amount is reduced to the Junior Facility Amount and (b) prior to the last day of the Reinvestment Period, in connection with any Disposition of Cash Collateral Debt Securities, the purchase of which was funded by the Senior Secured Facility pursuant to the Class A-1 Note Purchase Agreement, if applicable, to reduce the Outstanding Class A-1 Funded Amount by the amount so funded, if the Issuer obtains a synthetic position with respect to such Collateral Debt Security by selling protection on such Collateral Debt Security pursuant to a CDS Agreement Transaction where the notional amount applicable to the new related Reference Obligation is equal to the Principal Balance of such Collateral Debt Security as of the time immediately prior to the sale of such Collateral Debt Security;

(K)      (x) on the first Monthly Distribution Date, if the Class E Payment Allocation due on the first Distribution Date pursuant to clause (Y) under Section 11.1(i) has not been paid in full pursuant thereto, to payment of the Class E Notes to the extent necessary to pay the Class E Payment Allocation required for the first Monthly Distribution Date (which amount shall not duplicate any amounts applied from the Reserve Account pursuant to the Indenture); *provided* that any application of funds pursuant to this clause (x) will not result in a reduction of the Net Outstanding Portfolio Collateral Balance to an amount below U.S.$1,500,000,000, (y) on the first Monthly Distribution Date, if the Class F Payment Allocation due on the first Distribution Date pursuant to clause (Y) under Section 11.1(i) has not been paid in full pursuant thereto, to payment of the Class F Notes to the extent necessary to pay the Class F Payment Allocation required for the first Monthly Distribution Date (which amount shall not duplicate any amounts applied from the Reserve Account pursuant to the Indenture); *provided* that any application of funds pursuant to this clause (y) will not result in a reduction of the Net Outstanding Portfolio Collateral Balance to an amount below U.S.$1,500,000,000; and then, (z) on any Monthly Distribution Date on or prior to the last day of the Reinvestment Period, to the Principal Collection Account to be held therein as "Principal Proceeds" deemed received during the Due Period related to the next succeeding Monthly Distribution Date (and invested in Eligible Investments pending application thereof to Acquire additional Collateral Debt Securities in accordance with the Eligibility Criteria set forth in the Indenture), provided that on any Monthly Distribution Date prior to the last day of the Reinvestment Period, the Collateral Manager may, if the Collateral Manager (in its sole discretion) determines that it does not expect to be able to identify attractive and suitable investments in additional Collateral Debt Securities in the near future, direct the Trustee by notice given no later than the related Determination Date to apply all or a portion of the Principal Proceeds remaining on such Monthly Distribution Date after the payment of all amounts payable pursuant to clauses (A) through (J) above either:

(a)      if the Pro Rata Payment Conditions are met on such Monthly Distribution Date (on a *pro forma* basis):

(I)      *first*, to the payment of principal of the Senior Funded Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Funded Notes) in an amount equal to the Deferred Senior Funded Notes Principal on the related Determination Date, and

(II)      *second*, to the payment of principal of the Senior Funded Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Funded Notes) in an amount equal to the Senior Funded Note Reduction Amount for the related Due Period,

(III)     *third*, to the payment of the Outstanding Class A-1 Funded Amount (to the extent not paid in full in clause (J) above) until the Outstanding Class A-1 Funded Amount is reduced to zero, and

(IV)     *fourth*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, or

(b)     if any of the Pro Rata Payment Conditions are not satisfied,

(I)     *first*, to the payment of the Outstanding Class A-1 Funded Amount (to the extent not paid in full in clause (J) above) until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)     *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes, including any Class C Deferred Interest (until the Class C Notes have been paid in full), *fourth*, the Class D-1 Notes, including any Class D-1 Deferred Interest (until the Class D-1 Notes have been paid in full), and *fifth*, the Class D-2 Notes, including any Class D-2 Deferred Interest (until the Class D-2 Notes have been paid in full);

(L)     on any Monthly Distribution Date after the last day of the Reinvestment Period and prior to the Note Acceleration Date, either:

(a)     if Pro Rata Payment Conditions have not previously failed to be met on any Determination Date related to a Monthly Distribution Date:

(I)     *first*, to the payment of principal of the Senior Funded Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Funded Notes) in an amount equal to the Deferred Senior Funded Notes Principal on the related Determination Date, and

(II)     *second*, to the payment of principal of the Senior Funded Notes (*pro rata* in accordance with the

respective Aggregate Outstanding Amounts of the Senior Funded Notes) in an amount equal to the Senior Funded Note Reduction Amount for the related Due Period,

(III)    *third*, to the payment of the Outstanding Class A-1 Funded Amount (to the extent not paid in full in clause (J) above) until the Outstanding Class A-1 Funded Amount is reduced to zero, and

(IV)    *fourth*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero; or

(b)    if any of the Pro Rata Payment Conditions have not been satisfied as of the related Determination Date,

(I)    *first*, to the payment of the Outstanding Class A-1 Funded Amount (to the extent not paid in full in clause (J) above) until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes, including any Class C Deferred Interest (until the Class C Notes have been paid in full), *fourth*, the Class D-1 Notes, including any Class D-1 Deferred Interest (until the Class D-1 Notes have been paid in full), and *fifth*, the Class D-2 Notes, including any Class D-2 Deferred Interest (until the Class D-2 Notes have been paid in full);

(M)    on the Note Acceleration Date and on each Monthly Distribution Date thereafter,

(I)    *first*, to the payment of the Outstanding Class A-1 Funded Amount (to the extent not paid in full in clause (J) above) until the Outstanding Class A-1 Funded Amount is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Facility Commitment is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class S Notes and the Class A-2 Notes, on a *pari passu* basis (until the Class S Notes and the Class A-2 Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes, including any Class C Deferred Interest (until the Class C Notes have been paid in full), *fourth*, the Class D-1 Notes, including any Class D-1 Deferred Interest (until the Class D-1 Notes have been paid in full), and *fifth*, the Class D-2 Notes, including any Class D-2 Deferred Interest (until the Class D-2 Notes have been paid in full);

(N)    on any Monthly Distribution Date, to the payment of the amounts referred to in clause (Q) of <u>Section 11.1(i)</u>, in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(O)    on any Monthly Distribution Date, (x) *first*, to the Class E Noteholders the payment of the amount referred to in clause (S) under <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder and (y) *second*, to the Class F Noteholders the payment of the amount referred to in paragraph (S) under <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder;

(P)    on any Monthly Distribution Date, (x) *first*, to the payment of the amounts referred to in clause (T) of <u>Section 11.1(i)</u>, in the same order of priority specified therein, but only to the extent not paid in full thereunder and (y) *second*, on any Monthly Distribution Date that is not also a Quarterly Distribution Date, to the Collection Account for application to the Payment Account as Principal Proceeds on the next Monthly Distribution Date;

(Q)    on any Quarterly Distribution Date, to the Class E Noteholders and the Class F Noteholders the payment of the amount referred to in clause (W) of <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder;

(R)    on any Quarterly Distribution Date, to the payment of the amounts referred to in clause (X) of <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder; and

(S)    on any Quarterly Distribution Date, to the Class E Noteholders and the Class F Noteholders the payment of the amount referred to in clause (Y) of <u>Section 11.1(i)</u>, but only to the extent not paid in full thereunder; and

(T)    on any Quarterly Distribution Date, to the Preference Share Paying Agent for distribution to the Preference Shareholders in accordance with the provisions of the Preference Share Paying Agency Agreement.

(iii)    Not later than 12:00 p.m., New York City time, on or before the Business Day preceding each Distribution Date, the Issuer shall, pursuant to <u>Section 10.2(h)</u> or <u>10.5</u> (as applicable), remit or cause to be remitted to the Trustee for deposit in the

Payment Account an amount of Cash sufficient to pay the amounts described in <u>Sections 11.1(i)</u> and <u>(ii)</u> required to be paid on such Distribution Date.

(iv)     If, on any Distribution Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by the statements furnished by the Issuer pursuant to <u>Section 10.7(a)</u> or <u>10.7(b)</u>, the Trustee shall make the disbursements called for in the order and according to the priority set forth under <u>Sections 11.1(i)</u> and <u>(ii)</u>, subject to <u>Section 13.1</u>, to the extent that funds are available therefor.

(v)     Except as otherwise expressly provided in this <u>Section 11.1</u>, if on any Distribution Date, Interest Proceeds and Principal Proceeds received in the related Due Period are insufficient to make the full amount of the disbursements required by any lettered subclause of <u>Section 11.1(i)</u> or <u>Section 11.1(ii)</u> to different Persons, the Trustee shall make the disbursements called for by each such subclause ratably in accordance with the respective amounts of such disbursements in such subclause then due and payable to the extent that funds are available therefor.

(vi)     Any amounts to be paid to the Preference Share Paying Agent pursuant to clause (Z) under <u>Section 11.1(i)</u> or clause (T) under <u>Section 11.1(ii)</u> will be released from the lien of this Indenture.

Section 11.2    <u>Securities Accounts.</u>

All Cash held by, or deposited with, the Trustee in any Account pursuant to the provisions of this Indenture, and not invested in Collateral Debt Securities, Reserve Account Investments or Eligible Investments as herein provided, shall be deposited in one or more Securities Accounts, maintained at a financial institution having a long-term rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus of at least U.S.$200,000,000, to be held in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties.   Except with respect to amounts on deposit in the Payment Account, to the extent Cash deposited in a Securities Account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States, such excess shall be invested on behalf of the Issuer in Eligible Investments (pursuant to and as provided in <u>Sections 10.2</u>, <u>10.3</u> and <u>10.4</u>).

## ARTICLE XII—PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES; SUBSTITUTION

Section 12.1    <u>Sale and Substitution of Collateral Debt Securities.</u>

(a)     Except as otherwise expressly permitted or required by this Indenture, the Issuer will not sell or otherwise Dispose of any Collateral Debt Security; *provided* that subject to satisfaction of any applicable conditions in <u>Section 10.8</u>, so long as (A) no Event of Default has occurred and is continuing and (B) on or prior to the trade date for such Sale the Collateral

Manager has certified to the Trustee that each of the conditions applicable to such Sale set forth below has been satisfied, the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement may direct the Trustee in writing to sell, terminate, assign or otherwise liquidate, and the Trustee on behalf of the Issuer shall sell, terminate, assign or otherwise liquidate in the manner directed by the Collateral Manager in writing (which writing shall specify whether such security is a Defaulted Security, Equity Security, Credit Risk Security or Credit Improved Security, if applicable, or whether such security is otherwise permitted to be sold, terminated, assigned or otherwise liquidated pursuant to this Section 12.1(a)):

(i)     any Defaulted Security at any time;

(ii)    any Equity Security at any time;

(iii)   any Credit Risk Security at any time (whether or not the applicable Sale Proceeds are reinvested), provided that Sale Proceeds from such Sale may only be reinvested if the Collateral Manager believes in good faith and in the exercise of its commercially reasonable business judgment that Sale Proceeds from the Sale thereof can be reinvested in (or in the case of a CDS Agreement Transaction, allocated to) one or more substitute Collateral Debt Securities having an Aggregate Principal Balance of not less than 100% of such Sale Proceeds (excluding accrued interest purchased with Interest Proceeds) (or, in the case of a CDS Agreement Transaction, having an aggregate Notional Amount not less than 100% of the Notional Amount of the CDS Agreement Transaction being terminated or assigned without causing the Excess Notional Amount Liquidity to be reduced below zero); *provided*, *further*, that after the Reinvestment Period (A) after the purchase of such substitute Collateral Debt Securities, the Collateral Quality Tests are satisfied, (B) such substitute Collateral Debt Securities have scheduled maturities equal to or less than the Collateral Debt Securities being sold, terminated, assigned or otherwise liquidated (C) such substitute Collateral Debt Securities have ratings, or notched ratings if the substitute Collateral Debt Securities are not rated by Moody's or S&P, equal to or higher than the Collateral Debt Securities being sold, terminated, assigned or otherwise liquidated and (D) no reinvestment may be made unless the then-current ratings of the Class A Notes and the Class B Notes are no lower than their initial ratings, and the then-current ratings of the Class C Notes and the Class D Notes are no lower than one subcategory lower than their initial ratings.

(iv)    any Credit Improved Security at any time (A) during the Reinvestment Period if the Collateral Manager believes in good faith and in the exercise of its commercially reasonable business judgment that proceeds from the Sale of such Collateral Debt Security can be reinvested in accordance with Section 12.2 within 20 Business Days after the trade date on which such Collateral Debt Security is sold, terminated, assigned or otherwise liquidated in one or more Substitute Collateral Debt Securities having an Aggregate Principal Balance of not less than 100% of the Principal Balance of the Collateral Debt Security being sold, terminated, assigned or otherwise liquidated and (B) after the Reinvestment Period if the Sale Proceeds (excluding accrued interest) from such Sale (1) are not less than 100% of the Principal Balance of the Credit Improved Security being sold and (2) are deposited in the Principal Collection Account and disbursed in accordance with the Priority of Payments. For avoidance of doubt, Sale

Proceeds will not be used to purchase substitute Collateral Debt Securities after the Reinvestment Period; and

(v)    without limiting the foregoing, any Collateral Debt Security that is not a Defaulted Security, an Equity Security, a Credit Risk Security or a Credit Improved Security at any time during the Reinvestment Period; *provided* that (A) the Collateral Manager believes in good faith and in the exercise of its commercially reasonable business judgment that Sale Proceeds from the Sale of such Collateral Debt Security can be reinvested in (or, in the case of a CDS Agreement Transaction, allocated to) (1) within ten Business Days of the trade date on which such Collateral Debt Security is sold in one or more Substitute Collateral Debt Securities having an Aggregate Principal Balance of not less than 100% of the Principal Balance of the Collateral Debt Security being sold, terminated, assigned or otherwise liquidated (without causing the Excess Notional Amount Liquidity to be reduced below zero) or (2) within 30 days after such Collateral Debt Security is sold, in one or more Substitute Collateral Debt Securities having an Aggregate Principal Balance of at least 105% of the Principal Balance of the Collateral Debt Security being sold, terminated, assigned or otherwise liquidated (without causing the Excess Notional Amount Liquidity to be reduced below zero), (B) no Rating Agency has withdrawn its rating (including any private or confidential rating), if any, of any Class of Notes or reduced the rating assigned to any Class A Notes or Class B Notes below the rating in effect on the Closing Date by one or more rating subcategories or reduced the ratings assigned to any Class C Notes or Class D Notes by two or more rating subcategories and (C) the Aggregate Principal Balance of (x) all such Sales (other than Sales of U.S. Agency Securities that are Collateral Debt Securities) effected for any calendar year (beginning on the Ramp-Up Completion Date) does not exceed 15.0% of the Net Outstanding Portfolio Collateral Balance as of the first day of such period and (y) all such Sales (including Sales of U.S. Agency Securities that are Collateral Debt Securities) effected during any twelve-month period (beginning on the Ramp-Up Completion Date) does not exceed 15.0% of the Net Outstanding Portfolio Collateral Balance as of the first day of such period (such percentage, the "**Discretionary Trading Percentage**"); *provided* that no discretionary trading will be permitted without the consent of the Controlling Class if, prior to the Distribution Date occurring in March 2012, the Collateral Debt Securities have experienced aggregate cumulative par losses in excess of U.S.$45,000,000 (a "**Discretionary Trading Loss Event**"); and *provided*, *further*, that (i) any Disposition of a Collateral Debt Security shall not count towards the Discretionary Trading Percentage if the Issuer obtains a position with respect to such Collateral Debt Security by selling protection on such Collateral Debt Security pursuant to a CDS Agreement Transaction where the Notional Amount applicable to the new related Reference Obligation is equal to the Principal Balance of such Collateral Debt Security as of the time immediately prior to the Sale of such Collateral Debt Security, (ii) the Issuer may purchase a Collateral Debt Security without regard to the Discretionary Trading Percentage if such Collateral Debt Security represents the Cash position of a Reference Obligation with respect to which the Issuer was the seller of protection pursuant to a CDS Agreement Transaction and the Issuer traded out of such synthetic position within 30 days prior to the purchase of such Collateral Debt Security, and (iii) the Discretionary Trading Percentage will be reduced to 0% if and for so long as any of the Class A Notes or the Class B Notes have been downgraded by one or more notches

by a single Rating Agency from its original public rating or the Class C Notes or the Class D Notes have been downgraded by two or more notches by a single Rating Agency from its original public rating; *provided further*, that the Discretionary Trading Percentage will be restored in the event (i) the Notes that had been downgraded are subsequently upgraded to their original rating in the case of the Class A Notes or the Class B Notes, or to a rating within one notch of its original public rating in the case of the Class C Notes or the Class D Notes or (ii) a Majority of each Class of Notes consents to such restoration; *provided* that, if the Collateral Manager has received written notice of termination or has provided written notice of resignation pursuant to the Collateral Management Agreement, the Collateral Manager will only be permitted to direct the Issuer to Dispose of Credit Risk Securities and Defaulted Securities.

(b)    The Issuer will:

(i)    sell, terminate, assign or otherwise liquidate any Defaulted Security within one year after the related Collateral Debt Security became a Defaulted Security (or within one year of such later date as such security may first be sold, terminated, assigned or otherwise liquidated in accordance with its terms), *provided* that (A) the Issuer shall not be required to sell, terminate, assign or otherwise liquidate such Defaulted Security if the Rating Condition with respect to Moody's is satisfied with respect to the retention of such Defaulted Security, (B) the Issuer shall not be obligated to sell, terminate, assign or otherwise liquidate any Collateral Debt Security that is a Defaulted Security solely because it is rated "CC", "D" or "SD" by Standard & Poor's, (C) the Issuer shall not be obligated to sell, terminate, assign or otherwise liquidate any Collateral Debt Security that is a Defaulted Security for up to three years after such Collateral Debt Security became a Defaulted Security, so long as the Aggregate Principal Balance of all Collateral Debt Securities that are Defaulted Securities does not exceed 5% of the Net Outstanding Portfolio Collateral Balance and (D) any Defaulted Security that is held for more than three years shall be treated as having a Principal Balance of zero;

(ii)    sell, terminate, assign or otherwise liquidate each Equity Security that is not Margin Stock and complies with paragraphs (7), (8) and (9) of the Eligibility Criteria or any security or other consideration that is received in an exchange that complies with paragraphs (7), (8) and (9) of the Eligibility Criteria within one year after the Issuer's receipt thereof (or within one year of such later date as such Equity Security or other security or consideration may first be sold, terminated or otherwise liquidated in accordance with its terms and applicable law); and

(iii)    sell, terminate, assign or otherwise liquidate each Equity Security or security or other consideration that is received in an exchange (other than an Equity Security described in clause (i) above) and any Defaulted Security that does not comply with paragraphs (7), (8) and (9) of the Eligibility Criteria not later than five Business Days after the Issuer's receipt thereof (or within five Business Days or such later date as such security or consideration may first be sold, terminated, assigned or otherwise liquidated in accordance with its terms and applicable law).

(c)      After the Issuer has notified the Trustee of an Optional Redemption or Tax Redemption in accordance with <u>Section 9.2</u>, an Auction Call Redemption in accordance with <u>Section 9.5</u> or a Clean-Up Call Redemption in accordance with <u>Section 9.6</u>, the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement may at any time direct the Trustee in writing to sell, terminate, assign or otherwise liquidate, and the Trustee, on behalf of the Issuer, shall sell, terminate, assign or otherwise liquidate in the manner directed by the Collateral Manager in writing, any Collateral Debt Security without regard to the foregoing limitations in <u>Section 12.1(a)</u>; *provided* that:

(i)      in connection with an Auction Call Redemption, Optional Redemption, Tax Redemption or Clean-Up Call Redemption, the Sale Proceeds therefrom must be used to pay certain expenses and redeem all of the Notes in whole but not in part pursuant to <u>Sections 9.1(a)</u> and <u>(b)</u>, <u>9.5</u> or <u>9.6</u>, as the case may be, and upon any such Sale the Trustee, on behalf of the Issuer, shall release such Collateral Debt Security pursuant to <u>Section 10.8</u>;

(ii)      in connection with an Auction Call Redemption, Optional Redemption, Tax Redemption or Clean-Up Call Redemption, the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) a Collateral Debt Security pursuant to this <u>Section 12.1(c)</u> unless:

(A)      the Collateral Manager on behalf of the Issuer certifies to the Trustee that (1) in its judgment based on calculations included in the certification (which shall include the Sales prices of the Collateral Debt Securities), the Sale Proceeds from the Sale of one or more of the Collateral Debt Securities (based on the criteria set forth in <u>Section 9.1(b)</u>) and all Cash and proceeds from Eligible Investments will be at least equal to the Total Redemption Amount (adjusted pursuant to the second paragraph of <u>Section 9.1(b)</u>) or the Auction Call Redemption Amount, as applicable, and (2) an Independent bond pricing service (which shall be one or more broker-dealers selected by the Collateral Manager that are rated "P-1" by Moody's (and such ratings are not on watch for possible downgrade by Moody's) and at least "A-1" by Standard & Poor's and that make a market in the applicable Collateral Debt Securities) has confirmed (which confirmation may be in the form of a firm bid) the Sales prices contained in the certification in clause (1) above (and attaching a copy of such confirmation); and

(B)      the Independent accountants appointed by the Issuer pursuant to <u>Section 10.9</u> shall confirm in writing the calculations made in <u>Section 12.1(c)(ii)(A)(1)</u> above;

(iii)      in connection with an Auction Call Redemption, Optional Redemption, Tax Redemption or Clean-Up Call Redemption, all the Collateral Debt Securities to be sold, terminated or otherwise liquidated pursuant to this <u>Section 12.1(c)</u> must be sold, terminated, assigned or otherwise liquidated in accordance with the requirements set forth in <u>Section 9.1(b)</u>; and

(iv)     the Collateral Manager shall sell, terminate, assign or otherwise liquidate any Collateral Debt Security pursuant to this Section 12.1(c) only at a price that, in its judgment is not substantially less than the fair market value of such Collateral Debt Security.

(d)     Application of Funds from Accounts to the Purchase of Collateral Debt Securities.  Notwithstanding any other provision of this Indenture, in connection with the purchase of any Collateral Debt Security (other than a Synthetic Security) by the Issuer at any time after the Closing Date in accordance with the requirements of this Indenture, the Trustee shall apply amounts credited to the Accounts in the following priorities in order to effect such purchase of any such Collateral Debt Securities:

(i)     from the Principal Collection Account, until the balance in such account is reduced to zero; then

(ii)     from the Reserve Account, until the earlier to occur of (x) the par value of Cash and Reserve Account Investments standing to the credit of the Reserve Account is reduced to zero or (y) the Excess Notional Amount Liquidity is reduced below zero as a result of any further application of proceeds from the Reserve Account; and

(iii)     by effecting a Borrowing under the Class A-1 Notes pursuant to the Class A-1 Note Purchase Agreement, until all outstanding Borrowings under the Class A-1 Notes exceeds the Junior Facility Amount.

Section 12.2     Eligibility Criteria and Trading Restrictions.

The Issuer may (a) purchase Asset-Backed Securities, REIT Debt Securities and Mortgage Finance Company Securities or enter into Synthetic Securities on the Closing Date, (b) during the Reinvestment Period (and after the Reinvestment Period, in respect of commitments entered into prior to the end of the Reinvestment Period), apply Excess Notional Amount Liquidity, Principal Proceeds and Sale Proceeds received during the Reinvestment Period to purchase or enter into Asset-Backed Securities, REIT Debt Securities, Mortgage Finance Company Securities or Synthetic Securities and (c) during the Reinvestment Period (and after the Reinvestment Period, in respect of commitments entered into prior to the end of the Reinvestment Period) apply any Excess Notional Amount Liquidity or, in connection with Principal Amortizations and the termination or assignment of individual CDS Agreement Transactions, enter into additional CDS Agreement Transactions, in each case only if, after giving effect to such investment, each of the following criteria (the "**Eligibility Criteria**") is satisfied:

| | |
|---|---|
| Assignable...................................... | (1)     the Underlying Instrument pursuant to which such security was issued permits the Issuer to purchase it and pledge it to the Trustee and such security is a type subject to Article 8 or Article 9 of the UCC; |
| Jurisdiction of Issuer........................ | (2)     the obligor on or issuer of such security (x) is organized or incorporated under the law of the United States or a State thereof or in a Special Purpose Vehicle |

Jurisdiction or (y) if it is a Qualifying Foreign Obligor, and the Aggregate Principal Balance of all Collateral Debt Securities related to Qualifying Foreign Obligors (together with the Aggregate Principal Balance of any Synthetic Securities related thereto) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Dollar Denominated........................ (3)    such security is denominated and payable only in Dollars and may not be converted into a security payable in any other currency;

Fixed Principal Amount.................. (4)    such security requires the payment of a fixed amount of principal in Cash no later than its stated maturity or termination date;

Rating.............................................. (5)    such security has a Standard & Poor's Rating of at least "BB" (and such rating does not include the subscript "p", "pi", "q", "r" or "t") and has a Moody's Rating of at least "Ba2"; *provided* that Collateral Debt Securities having a Moody's Rating of "Ba1" or "Ba2" or having a Standard & Poor's Rating of "BB+" or "BB" do not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Issuer or Obligor not Owned
  or Managed by the
  Collateral Manager........................(6)    the obligor on or issuer of such security is not a fund or other entity owned or managed by the Collateral Manager or any of its Affiliates;

Registered ...................................... (7)    such security is Registered;

Tax Status; No withholding ............ (8)    (A) either (i) such security is issued by an entity that is treated as a corporation that is not a United States real property holding corporation as defined in Section 897(c)(2) of the Code for U.S. federal income tax purposes, (ii) such security is treated as indebtedness for U.S. federal income tax purposes and is not a United States real property interest as defined under Section 897 of the Code, or (iii) the Issuer has received advice from Cadwalader, Wickersham & Taft LLP, Sidley Austin LLP or an opinion of other nationally-recognized U.S. tax counsel experienced in such matters to the effect that the Acquisition, ownership or Disposition of such security will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis and (B) such security does not provide for any payments which are or will be subject to deduction or withholding for or on account of

any withholding or similar tax, unless the issuer of such security is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required;

ERISA ............................................    (9)    such security is not a security that, pursuant to 29 C.F.R. Section 2510.3-101, (x) would be treated as an equity interest in an entity and (y) if held by an employee benefit plan subject to ERISA, would cause such employee benefit plan to be treated as owning an undivided interest in each of the underlying assets of such entity for purposes of ERISA; *provided* that this restriction shall not apply to any security issued by an entity that issues securities which are covered by Department of Labor Prohibited Transaction Exemption 2002-41 or an equivalent exemption;

Excluded Securities.........................    (10)    such security (or, in the case of a Synthetic Security, the Reference Obligation of such security) is not a Defaulted Security, a Written-Down Security, a Credit Risk Security, a Non-Libor Floating Rate Debt Security, a High-Yield CLO Security, an Emerging Market Security, a Manufactured Housing Security, a Catastrophe Bond, a Structured Settlement Security, a Tobacco Bond, a Deferred Interest PIK Bond, a NIM Security, an Interest-Only Security, a Mutual Fund Fees Security, an Aircraft Leasing Security, an EETC Security, a Future Flow Security, a Healthcare Security, a Lottery Receivable Security, a Restaurant and Food Services Security, an ABS Natural Resource Receivable Security, a Floorplan Receivable Security, a Recreational Vehicle Security, an ABS Container Security, an ABS Chassis Security, a Guaranteed Corporate Debt Security, an Oil and Gas Security, a Project Finance Security, a Stadium Receivable Security, a Combination Security, a REIT Trust Preferred CDO Security, a Bank Trust Preferred Security, a Franchise Security, a Reinsurance Security, a Tax Lien Security, a Hybrid Security, an Equity Security, an Inverse Floating Rate Security, a Synthetic Security, pursuant to which the Issuer transfers the credit risk associated with the related Reference Obligation to the Synthetic Security Counterparty or a security that accrues interest at a floating rate that moves inversely to a reference rate or index;

Average Life; Limitation on
  Stated Final Maturity ................... (11)    (A) if the stated maturity of such security occurs
later than the Stated Maturity of the Notes, the Aggregate
Principal Balance of all such Collateral Debt Securities
does not exceed 10.0% of the Net Outstanding Portfolio
Collateral Balance; *provided* that the expected maturity of
such Collateral Debt Securities shall not be later than the
Stated Maturity of the Notes; and *provided, further*, that the
stated maturity of such Collateral Debt Security will not be
later than five years past the Stated Maturity of the Notes;
and (B)(i) the Aggregate Principal Balance of all Collateral
Debt Securities having an average life of less than 8 years
is at least 60.0% of the Net Outstanding Portfolio Collateral
Balance, (ii) subject to clause (iii), no Collateral Debt
Security may have an average life in excess of 13 years and
(iii) no CDO Security may have an average life in excess of
10 years; *provided, however*, that the Collateral Manager
may assume, in its sole discretion, that the average life of
each security is unchanged since the preceding Quarterly
Distribution Date;

No Foreign Exchange Controls....... (12)    such security is not a security issued by an issuer
located in a country that imposes foreign exchange controls
that effectively limit the availability or use of Dollars to
make when due the scheduled payments of principal of and
interest on such security;

No Substantial Non-Credit-
  Related Risk ................................ (13)    such security is not a security whose timely
repayment is subject to substantial non-credit-related risk,
as determined by the Collateral Manager in its reasonable
business judgment;

No Margin Stock............................. (14)    such security and any Equity Security Acquired in
connection with such security is not Margin Stock;

Investment Company Act .............. (15)    the Acquisition of such security would not cause the
Issuer or the pool of Collateral to be required to register as
an investment company under the Investment Company
Act; and if the issuer of such security is excepted from the
definition of an "investment company" solely by reason of
Section 3(c)(1) of the Investment Company Act, then either
(x) such security does not constitute a "voting security" for
purposes of the Investment Company Act or (y) the
aggregate principal amount of such security is less than
10.0% of the entire Issue of which such security is a part;

| | |
|---|---|
| No Debtor-in-Possession Financing...................................... | (16)    such    security    is    not    a    financing    by    a debtor-in-possession in any insolvency proceeding; |
| Conversion or Exchange into Equity Securities; Attached Equity Securities ......................... | (17)    (A) such security is not a security that by the terms of its Underlying Instruments provides for conversion or exchange (whether mandatory, at the option of the issuer or the holder thereof or otherwise) into equity capital at any time prior to its maturity and (B) such security is not purchased as a unit with an attached equity security; |
| Not Subject to an Offer or a Call for Redemption..................... | (18)    such security is not the subject of an Offer and has not been called for redemption; |
| No Future Advances ....................... | (19)    after the Acquisition of such security, the Issuer is not required by the Underlying Instruments related thereto to make any payment or advance to the issuer thereof or to the related Synthetic Security Counterparty under the related Underlying Instruments (other than a Defeased Synthetic Security); |
| Fixed Rate Collateral Debt Securities...................................... | (20)    if such security is a Fixed Rate Collateral Debt Security, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that Fixed Rate Collateral Debt Securities shall not include Synthetic Securities and Deemed Floating Rate Collateral Debt Securities; |
| [Reserved]...................................... | (21)    [Reserved]; |
| Floating Rate Collateral Debt Securities; Deemed Floating Rate Collateral Debt Securities ............ | (22)    (A) if such security is a Deemed Floating Rate Collateral Debt Security, any Deemed Floating Asset Hedge Agreement entered into with respect to such Deemed Floating Rate Collateral Debt Security conforms to all the requirements set forth in the definition of "Deemed Floating Asset Hedge Agreement" and (B) if such security is a Floating Rate Collateral Debt Security or Deemed Floating Rate Collateral Debt Security, such security bears interest at a spread in excess of LIBOR; |

| | |
|---|---|
| Deemed Floating Rate Collateral Debt Securities............................ | (23)    if such security is a Deemed Floating Rate Collateral Debt Security, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance; |
| Pure Private Collateral Debt Securities............................ | (24)    if such security was not (A) issued pursuant to an effective registration statement under the Securities Act or (B) a privately placed security that is eligible for resale under Rule 144A or Regulation S under the Securities Act, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; |
| Downgraded Assets ........................ | (25) if such security either (x) has been downgraded since the date of issuance thereof or (y) is on negative credit watch by Moody's or Standard & Poor's for possible downgrade, (i) the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and (ii) such security is rated at least "BBB" by Standard & Poor's and is rated at least "Baa2" by Moody's (and if rated "BBB" by Standard & Poor's or "Baa2" by Moody's, such rating is not on negative watch for possible downgrade), *provided* that the Issuer may not Acquire any Collateral Debt Security that has been downgraded (I) by more than two subcategories by Standard & Poor's or Moody's from the original rating of such Collateral Debt Security by such Rating Agency or (II) more than once by Standard & Poor's or Moody's; |
| Single RMBS Servicer.................... | (26)    with respect to the Servicer of RMBS Securities being Acquired, the Aggregate Principal Balance of all Collateral Debt Securities serviced by such single RMBS Servicer (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed (A) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) is publicly ranked "Strong" by Standard & Poor's (and, if |

publicly ranked "Strong," is not on servicer outlook "Negative" by Standard & Poor's) or if no servicer ranking is available, its long-term senior unsecured debt rating is at least "AA", 20.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the Aggregate Principal Balance of all Collateral Debt Securities serviced by up to two such Servicers may each constitute up to 25.0% of the Net Outstanding Portfolio Collateral Balance for so long as such Servicer maintains such ratings or rankings by Standard & Poor's; (B) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) is publicly ranked "Above Average" by Standard & Poor's or is publicly ranked "Strong" by Standard & Poor's and is on servicer outlook "Negative" by Standard & Poor's, or if no servicer ranking is available, its long-term senior unsecured debt rating is at least "A-" but lower than "AA", 15.0% of the Net Outstanding Portfolio Collateral Balance; and (C) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) does not satisfy clauses (A) or (B) of this paragraph, 7.5% of the Net Outstanding Portfolio Collateral Balance;

Cash Collateral Debt Securities ...... (27)    if such security is a Cash Collateral Debt Security, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 25.0% of the Net Outstanding Portfolio Collateral Balance;

Synthetic Securities......................... (28)    if such security is a Synthetic Security then (A) unless the Synthetic Security Counterparty's obligations under such Synthetic Security are fully collateralized pursuant to collateral arrangements that satisfy the Rating Condition or such Synthetic Security is a CDS Agreement Transaction, such Synthetic Security is Acquired from a Synthetic Security Counterparty that satisfies (or with a guarantor that satisfies) the Synthetic Security Counterparty Ratings Requirement, (B)(1)(x) unless such Synthetic Security is a Form-Approved Synthetic Security, the Rating Condition with respect to each Rating Agency has been satisfied with respect to the Acquisition of such Synthetic Security and (y) unless such Synthetic Security is a Form-Approved Synthetic Security, (i) each of the Rating Agencies has assigned an Applicable Recovery Rate to such Synthetic Security, (ii) Moody's shall have assigned a Moody's Rating and Moody's Rating Factor to such Synthetic Security and (iii) Standard & Poor's shall have assigned a

Standard & Poor's Rating to such Synthetic Security, (C) if such Synthetic Security provides for any payment to be made by the Issuer after the Acquisition thereof by the Issuer, it is either (x) a Defeased Synthetic Security or (y) a CDS Agreement Transaction, (D) if such Synthetic Security is a Defeased Synthetic Security, such security complies with the requirements of the definition of Defeased Synthetic Security, (E) the Aggregate Principal Balance of any Synthetic Security which has multiple Reference Obligations does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance, (F) if such Synthetic Security is a CDS Agreement Transaction, the Acquisition of such Synthetic Security will not result in a reduction of the Excess Notional Amount Liquidity below zero, (G) the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are Fixed Rate Securities does not exceed 30.0% of the Net Outstanding Portfolio Collateral Balance, and (H) the Aggregate Principal Balance of any Synthetic Securities that are not CDS Agreement Transactions does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Specified Type Securities ...............    (29)    with respect to the following Specified Types:

(i) with respect to Equipment Leasing Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 2.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that such Collateral Debt Securities are publicly rated "A" or higher by Standard & Poor's, if rated by Standard & Poor's, or publicly rated "A2" or higher by Moody's, if rated by Moody's, (B) the Aggregate Principal Balance of all such Collateral Debt Securities that are publicly rated "A" by Standard & Poor's or publicly rated "A2" by Moody's (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance, and (C) the Aggregate Principal Balance of all such Collateral Debt Securities that are serviced by the same Servicer does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance;

(ii) with respect to CMBS Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities

(together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, (B) with respect to CMBS Credit Tenant Lease Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that no CMBS Credit Tenant Lease Securities Acquired by the Issuer will be publicly rated below "Baa2" by Moody's or publicly rated below "BBB" by Standard & Poor's (at the time of the Issuer's Acquisition thereof), (C) with respect to CMBS Single Property Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that no CMBS Single Property Securities Acquired by the Issuer will be publicly rated below "Baa2" by Moody's or publicly rated below "BBB" by Standard & Poor's (at the time of the Issuer's Acquisition thereof), (D) the Aggregate Principal Balance of all Collateral Debt Securities that are CMBS Large Loan Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that (i) no CMBS Large Loan Security will be publicly rated below "BBB" by Standard & Poor's or will be publicly rated below "Baa2" by Moody's, (ii) the percentage of the Net Outstanding Portfolio Collateral Balance comprised of Collateral Debt Securities that are CMBS Large Loan Securities that are publicly rated "Baa1" or below by Moody's or are publicly rated "BBB+" or below by Standard & Poor's does not exceed 2.5% and (iii) the percentage of the Net Outstanding Portfolio Collateral Balance comprised of Collateral Debt Securities that are CMBS Large Loan Securities that are publicly rated "A3" or higher by Moody's or are publicly rated "A-" or higher by Standard & Poor's does not exceed 7.5%, and (E) with respect to CMBS Conduit Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of

which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, *provided* that such CMBS Conduit Securities shall be publicly rated "BBB-" or higher by Standard & Poor's or publicly rated "Baa3" or higher by Moody's, and *provided, further*, that up to 3.0% of the Net Outstanding Portfolio Collateral Balance may be comprised of CMBS Conduit Securities publicly rated below "BBB-" by Standard & Poor's and publicly rated below "Baa3" by Moody's, but in no event shall such securities be publicly rated below "BB+" by Standard & Poor's or be publicly rated below "Ba2" by Moody's;

(iii) with respect to Automobile Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance, (B) such security will have a public rating of at least "BBB" by Standard & Poor's, or a rating of at least "Baa2" by Moody's, and (C) such Automobile Securities will only consist of "prime" Automobile Securities;

(iv) with respect to REIT Debt Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and (B) no such security will be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's;

(v) with respect to Car Rental Receivable Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any synthetic securities the Reference Obligations of which are such securities) does not exceed 2.0% of the Net Outstanding Portfolio Collateral Balance;

(vi) with respect to Credit Card Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance, (B) no such security will be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's

and (C) such Credit Card Securities shall only consist of "prime" Credit Card Securities;

(vii) with respect to Small Business Loan Securities, (A) the Aggregate Principal Balance of all Collateral Debt Securities that are Small Business Loan Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 2.0% of the Net Outstanding Portfolio Collateral Balance and (B) no such security will be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's;

(viii) with respect to Consumer ABS Securities, the Aggregate Principal Balance of all Collateral Debt Securities that are Consumer ABS Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

(ix) with respect to Time Share Securities, (A) the Aggregate Principal Balance of all Collateral Debt Securities that are Time Share Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance and (B) no such security will be publicly rated below "A3" by Moody's or be publicly rated below "A-" by Standard & Poor's;

(x) with respect to Student Loan Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 2.0% of the Net Outstanding Portfolio Collateral Balance and (B) no such security will be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's, *provided* that with respect to Student Loan Securities that are not guaranteed by the U.S. Department of Education, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 0% of the Net Outstanding Portfolio Collateral Balance;

(xi) with respect to Step-Up Securities, the Aggregate Principal Balance of all such Step-Up Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

(xii) with respect to Step-Down Securities, the Aggregate Principal Balance of all such Step-Down Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

(xiii) if such security is a Monoline Guaranteed Security insured by a single monoline, the Aggregate Principal Balance of such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the related guarantor of each such Monoline Guaranteed Security must be publicly rated at least "Aa3" by Moody's and be publicly rated at least "AA-" by Standard & Poor's;

(xiv) with respect to CDO Securities (or any Synthetic Securities the Reference Obligations of which are CDO Securities), (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, (B) each such Collateral Debt Security entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders thereof) on the cash flow from a portfolio of collateral comprised primarily of real estate related Asset-Backed Securities, (C) the Aggregate Principal Balance of all such Collateral Debt Securities issued by any single issuer does not exceed 1.5% of the Net Outstanding Portfolio Collateral Balance, (D) no such Collateral Debt Security will have a Moody's public rating below "Baa2" or a Standard & Poor's public rating of below "BBB", (E) with respect to CDO Securities backed by a portfolio of high-grade Asset-Backed Securities, such Collateral Debt Security will be publicly rated at least "A3" by Moody's or be publicly rated at least "A-" by Standard

& Poor's and will not be the lowest or the second-lowest tranche of the respective issuer, and the Aggregate Principal Balance of any such CDO Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance, (F) with respect to Structured Finance CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, (G) with respect to synthetic Structured Finance CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance, (H) with respect to CRE CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and (I) the Aggregate Principal Balance of all such Collateral Debt Securities managed by any single collateral manager does not exceed 2.5% of the Net Outstanding Portfolio Collateral Balance; *provided* that no CDO Securities are managed by The Putnam Advisory Company, LLC; *provided, further*, that CDO Securities not specified in this clause (x) will not be permitted; and *provided, further* that if a CDO Security is the only tranche issued by the issuer of such CDO Security and it was offered to only one investor (such security, a "Bespoke CDO Security"), the Aggregate Principal Balance of Bespoke CDO Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and will not be permitted for Acquisition after the Ramp-Up Completion Date.  The Aggregate Principal Balance of an individual Bespoke CDO Security may not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance;

PIK Bonds...................................... (30)    if such security is a PIK Bond (including mezzanine tranches of CRE CDOs), the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

| | |
|---|---|
| Interest Paid Less Frequently than Quarterly ............................. | (31)    if such security provides for periodic payments of interest in Cash less frequently than quarterly, such security is (A) included on the Quarterly Interest Reserve Schedule and (B) the Aggregate Principal Balance of all such Collateral Debt Securities that pay interest less frequently than quarterly does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; |
| Other ABS Securities ...................... | (32) with respect to Other ABS Security, (A) the Aggregate Principal Balance of all such Collateral Debt Securities with a public rating of "A3" or higher by Moody's or a public rating of "A-" or higher by Standard & Poor's does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and (B) the Aggregate Principal Balance of all such Collateral Debt Securities assigned a public rating of "A3" or higher by Moody's or a public rating of "A-" or higher by Standard & Poor's within an individual sector does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance; |
| Number of Assets ............................ | (33)    the aggregate number of Collateral Debt Securities is not less than 100; |
| Certain Issuer Concentrations ......... | (34)    with respect to all Collateral Debt Securities Acquired by the Issuer: |

(i)    the Aggregate Principal Balance of all such Collateral Debt Securities with a public rating of at least "Aa3" by Moody's, or a public rating of at least "AA-" by Standard & Poor's issued by any single issuer (including Collateral Debt Securities issued by any such single issuer in separate series) does not exceed 1.875% of the Net Outstanding Portfolio Collateral Balance;

(ii)    the Aggregate Principal Balance of all such Collateral Debt Securities assigned a public rating of "A1" or lower by Moody's, or a public rating of "A+" or lower by Standard & Poor's issued by any single issuer does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance; and

(iii)    the Aggregate Principal Balance of all such Collateral Debt Securities assigned a public rating of "Ba1" or lower by Moody's, or a public rating of "BB+" or lower by Standard & Poor's issued by any single issuer does not exceed 0.85% of the Net Outstanding Portfolio Collateral Balance;

RMBS Securities ......................... (35)   with respect to RMBS Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) comprises at least 80.0% of the Net Outstanding Portfolio Collateral Balance, (B) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) with a FICO Score (w) under 600 does not exceed 2.5% of the Net Outstanding Portfolio Collateral Balance (*provided* that Collateral Debt Securities from up to three such issuers with a credit score under 600 will be permitted), (x) lower than or equal to 625 does not exceed 60.0% of the Net Outstanding Portfolio Collateral Balance, (y) higher than 625 but lower than 700 does not exceed 65.0% of the Net Outstanding Portfolio Collateral Balance and (z) equal to or higher than 700 does not exceed 20.0% of the Net Outstanding Portfolio Collateral Balance, (C) the Aggregate Principal Balance of all such Collateral Debt Securities that are Negative Amortization Securities (*provided* such securities are publicly rated at least "AA-" by Standard & Poor's or are publicly rated at least "Aa3" by Moody's  does not exceed 2.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the Aggregate Principal Balance of all such Collateral Debt Securities that are Negative Amortization Securities and are backed by Hybrid Securities does not exceed (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) 1.0% of the Net Outstanding Portfolio Collateral Balance, (D) the Aggregate Principal Balance of Second Lien Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that such securities have no more than 45.0% second lien loans and a FICO Score of no less than 660, *provided, further*, that up to two such securities may have a FICO score below 660 and (E) with respect to RMBS Securities and CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) comprises at least 92.5% of the Net Outstanding Portfolio Collateral Balance; and

Collateral Quality Tests .................. (36)   if such security is Acquired on or after the Ramp-Up Completion Date, (A) each of the Collateral Quality

Tests is satisfied or, if immediately prior to such Acquisition one or more of the Collateral Quality Tests was not satisfied, the extent of compliance with each such Collateral Quality Test will be maintained or improved and (B) the Standard & Poor's CDO Monitor Notification Test is satisfied or, if immediately prior to such investment the Standard & Poor's CDO Monitor Notification Test was not satisfied, the result is closer to compliance and the Issuer will have promptly delivered to the Trustee, the Noteholders, each Hedge Counterparty and Standard & Poor's an Officer's certificate specifying the extent to which the Standard & Poor's CDO Monitor Notification Test was not satisfied;

*provided* that, in the case of the Eligibility Criteria set forth in paragraphs (2), (5), (11), (19), (20), (22) through (25), (27) through (31), (33) and (34) above, if prior to such investment such Eligibility Criteria is not satisfied, such Eligibility Criteria shall be deemed to be satisfied solely for the purpose of such investment if, after giving effect to such investment, the extent of compliance with such Eligibility Criteria is maintained or improved; *provided*, *further*, that the Excess Notional Amount Liquidity may be factored into any determination of the satisfaction of certain Eligibility Criteria with minimum percentage requirements, as determined by the Collateral Manager.  In addition, in the case of the Eligibility Criteria set forth in paragraph (5) above, if prior to such investment such Eligibility Criteria is not satisfied, no investment will be permitted unless such security has a Moody's Rating of "Baa3" or higher and a Standard & Poor's Rating of "BBB-" or higher.

Each calculation made to determine compliance with the Eligibility Criteria above will be made with the assumption that the Net Outstanding Portfolio Collateral Balance will remain unchanged by the Sale or purchase of the applicable Collateral Debt Security and Substitute Collateral Debt Security.

With regard to a Synthetic Security the requirements set forth in the Eligibility Criteria will apply to the applicable underlying Reference Obligation rather than the Synthetic Security itself (except with respect to paragraph (9) which shall apply to both the applicable Reference Obligation and the Synthetic Security and to paragraph (27) which shall apply to the Synthetic Security).  For purposes of determining compliance with the Eligibility Criteria set forth above in the case of Synthetic Securities, the relevant Reference Obligations will be considered as if such Reference Obligations were Collateral Debt Securities.

If the Issuer has previously entered into a commitment to Acquire an obligation or security to be Granted to the Trustee for inclusion in the Collateral as a Pledged Collateral Debt Security, then the Eligibility Criteria other than those described in paragraphs (7) through (9) above need not be satisfied (x) on the date of such Grant if the Eligibility Criteria were satisfied on the date on which the Issuer entered into such commitment or (y) on the date on which the Issuer entered into such commitment if the Eligibility Criteria were or will be satisfied on the date of such Grant.  Notwithstanding the foregoing, the Issuer may only enter into commitments

to Acquire securities for inclusion in the Collateral if such commitments to Acquire securities do not extend beyond a 60-day period.

During the Reinvestment Period, the Collateral Manager shall use reasonable commercial efforts to cause the Issuer to reinvest any Principal Proceeds received during a Due Period in Substitute Collateral Debt Securities during the same Due Period in which such Principal Proceeds are received (or, if later, the date by which the Issuer is required to reinvest proceeds received in connection with the Disposition of a Collateral Debt Security in accordance with Section 12.1).

Notwithstanding the foregoing provisions, (A) Cash on deposit in the Collection Accounts may be invested in Eligible Investments, pending investment in Collateral Debt Securities and (B) if an Event of Default shall have occurred and be continuing, no Collateral Debt Security may be Acquired unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such Event of Default.

In order to ensure that the Issuer is not treated as engaged in a U.S. trade or business for U.S. federal income tax purposes, the Issuer and the Collateral Manager will observe certain additional limitations on their activities and on the Collateral Debt Securities that may be purchased. Accordingly, although a particular prospective investment may satisfy the Eligibility Criteria, it may be ineligible for purchase by the Issuer and the Collateral Manager as a result of these limitations and restrictions.

Notwithstanding the foregoing, with respect to any series of trades in which the Issuer commits to purchase and/or sell multiple Collateral Debt Securities pursuant to a Trading Plan, compliance with the Eligibility Criteria may, at the option of the Collateral Manager, be measured by determining the aggregate effect of such Trading Plan on the Issuer's level of compliance with the Eligibility Criteria rather than considering the effect of each purchase and Sale of such Collateral Debt Securities individually.

The Collateral Manager may only specify one Trading Plan at any one time. The Collateral Manager shall provide notice to Standard & Poor's of any failed Trading Plan. Once compliance with the Eligibility Criteria is restored to its prior level the Collateral Manager may request, and Standard & Poor's may restore the Issuer's ability to implement Trading Plans.

Section 12.3    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Article XII or under Section 10.2 shall be conducted on an arm's-length basis for fair market value and in accordance with the requirements of the Collateral Management Agreement. The Collateral Manager may direct the Trustee (acting on behalf of the Issuer) to Acquire an obligation to be included in the Collateral directly or indirectly from the Collateral Manager or any of its Affiliates, acting as principal or agent, or any account or portfolio for which the Collateral Manager or any of its Affiliates serve as investment advisor or sell any obligation included in the Collateral directly or indirectly to the Collateral Manager or any of its Affiliates, acting as principal or agent, or any account or portfolio for which the Collateral Manager or any of its Affiliates serve as investment adviser, in each case only to the extent that (i) such purchases or Sales are made for fair market value (as

determined in good faith by the Collateral Manager at the time such obligation is Acquired or sold) and otherwise on arms' length terms and (ii) the Collateral Manager determines that such purchases are consistent with the investment guidelines and objectives of the Issuer, the restrictions contained in this Indenture and applicable law.   The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)     Upon any Grant pursuant to this Article XII, all of the Issuer's right, title and interest to the Pledged Security or Securities shall be Granted to the Trustee pursuant to this Indenture, such Pledged Security or Securities shall be registered in the name of the Trustee, and, if applicable, the Trustee shall receive such Pledged Security or Securities.   The Trustee shall also receive, not later than the date of delivery of any Collateral Debt Security delivered after the Closing Date, (i) an Officer's certificate of the Collateral Manager certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is permitted by this Article XII (and setting forth, to the extent appropriate, calculations in reasonable detail necessary to determine such compliance) and (ii) an Officer's certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)     Notwithstanding anything contained in this Article XII to the contrary, the Issuer shall, subject to Section 12.3(d), have the right to effect any transaction which has been consented to by the Hedge Counterparties and Holders of Notes evidencing 100% of the Aggregate Outstanding Amount of each Class of Notes and each Preference Shareholder and of which each Rating Agency has been notified in advance.

(d)     Notwithstanding anything to the contrary in this Indenture, in no event may the Issuer (i) engage in any business or activity that would cause the Issuer to be treated as engaged in a U.S. trade or business for U.S. federal income tax purposes or (ii) Acquire or hold any asset that is an equity interest in an entity that is fiscally transparent and engaged in a U.S. trade or business for U.S. federal income tax purposes or the Acquisition or ownership of which otherwise would subject the Issuer to net income tax in any jurisdiction outside the Issuer's jurisdiction of incorporation.

Section 12.4     Proposed Plans.

If on the Ramp-Up Completion Date any of the Collateral Quality Tests or the Eligibility Criteria are not satisfied, (i) the Collateral Manager, on behalf of the Issuer, may provide a Proposed Plan for satisfying such tests or limitations to each of Moody's and Standard & Poor's and (ii) the Issuer will be prohibited from purchasing additional Collateral Debt Securities (unless the first such purchase satisfies the Proposed Plan and the Proposed Plan satisfies the Rating Condition with respect to Moody's and Standard & Poor's); *provided* that such prohibition will not apply to purchases of Collateral Debt Securities which the Issuer had committed to make prior to the effective date of such prohibition.   In such event, the Collateral Manager shall give written notice to the Trustee, the Hedge Counterparties and the Noteholders that the Issuer is prohibited from purchasing additional Collateral Debt Securities other than pursuant to the above.

## ARTICLE XIII—SECURED PARTIES' RELATIONS

Section 13.1    Subordination.

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Hedge Counterparties and the Holders of the Notes agree for the benefit of the Hedge Counterparties and the Credit Default Swap Counterparty that payments to be made under the Notes and the Issuer's rights in and to the Collateral (solely with respect to all amounts payable to the Hedge Counterparties and the Credit Default Swap Counterparty pursuant to Sections 11.1(i)(C), 11.1(i)(E) and 11.1(ii)(A), the "**Subordinate Interests**") shall be subordinate and junior to the rights of the Hedge Counterparties and the Credit Default Swap Counterparty with respect to payments to be made to the Hedge Counterparties and the Credit Default Swap Counterparty pursuant to the Hedge Agreements or Credit Default Swap Agreement (as applicable) to the extent and in the manner set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), all amounts payable to the Hedge Counterparties and the Credit Default Swap Counterparty pursuant to Section 11.1 shall be paid in Cash or, to the extent the Hedge Counterparties and the Credit Default Swap Counterparty consent, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests.

(b)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes the Class E Notes and the Class F Notes agree for the benefit of the holders of the Class A-1 Notes that the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-1 Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class A-1 Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-1 Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class A-1 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class A-1 Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(c)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class S Notes and the Class A-2 Notes (on a *pari passu* basis) that the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F

Notes and the Issuer's rights in and to the Collateral (with respect to the Class B Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class S Notes and the Class A-2 Notes (on a *pari passu* basis) to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class S Notes and the Class A-2 Notes (on a *pari passu* basis) shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class S Notes and the Class A-2 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class S Notes and the Class A-2 Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(d)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class B Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class B Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class B Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(e)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class C Notes that the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class C Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class C Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class C Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders

of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class C Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(f)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class D-1 Notes that the Class D-2 Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class D-1 Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class D-1 Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class D-1 Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class D-1 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class D-1 Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(g)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class D-2 Notes that the Class E Notes and the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class D-2 Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class D-2 Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class D-2 Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class D-2 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class D-2 Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(h)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class E Notes that the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class E Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class E Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class

E Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class E Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class E Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(i)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class F Notes that the Issuer's rights in and to the Collateral (with respect to the Class F Notes, the "**Subordinate Interests**") shall be subordinate and junior to the Class F Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class F Notes shall be paid in full in Cash or, to the extent a Majority of the Class F Notes consent, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class F Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class F Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(j)    In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until all amounts payable to the Hedge Counterparties pursuant to Section 11.1(i)(E) or the Holders of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes or the Class F Notes, as the case may be, shall have been paid in full in Cash or, to the extent the relevant Hedge Counterparty or a Majority of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes or the Class F Notes, as the case may be, consent, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Hedge Counterparties and the Holders of the Notes, in accordance with this Indenture; *provided* that if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(k)    Each Holder of Subordinate Interests agrees with the Hedge Counterparties and all Holders of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes and the Class F Notes, as the case may be, that such Holder of Subordinate Interests shall

not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this <u>Section 13.1</u>; *provided* that after all amounts payable to the Hedge Counterparties pursuant to <u>Section 11.1(i)(E)</u> or in respect of principal of and accrued interest on the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes or the Class F Notes, as the case may be, have been paid in full, the Holders of Subordinate Interests shall be fully subrogated to the rights of the Hedge Counterparties or the Holders of the Class A-1 Notes, the Class S Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes, the Class D-2 Notes, the Class E Notes or the Class F Notes, as the case may be.  Nothing in this <u>Section 13.1</u> shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

(l)      The Trustee shall not institute any Proceeding for enforcement of the lien of the Trustee or any other Secured Party other than in connection with an action pursuant to <u>Section 5.3</u> or <u>Section 5.4</u> for enforcement of the lien of this Indenture for the benefit of the Noteholders, and the Trustee may only enforce its lien or the lien of any other Secured Party only in conjunction with the enforcement of the rights of the Noteholders in accordance with <u>Section 5.4</u> hereof.

Section 13.2    <u>Standard of Conduct.</u>

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Secured Party under this Indenture, subject to the terms and conditions of this Indenture, including <u>Section 5.9</u>, a Secured Party or Secured Parties shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Secured Party, the Issuer, or any other Person.

## ARTICLE XIV—MISCELLANEOUS

Section 14.1    <u>Form of Documents Delivered to Trustee.</u>

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or

opinion of, or representations by, an Authorized Officer of the Issuer, the Co-Issuer, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Collateral Manager or such other Person, unless such Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.    Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Co-Issuers' rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default as provided in Section 6.1(d).

Section 14.2    Acts of Noteholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer.    Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" and "Acts" of the Noteholders as applicable, signing such instrument or instruments.    Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 14.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in

lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 14.3    Notices, Etc., to Trustee, the Co-Issuers, the Collateral Manager, the Hedge Counterparties, the Credit Default Swap Counterparty and the Rating Agencies.

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee by any Noteholder or by the Issuer or the Co-Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Trustee addressed to it at its Corporate Trust Office, facsimile no. +1 (312) 904-0524, Attention: CDO Trust Services Group—Pyxis ABS CDO 2007-1 Ltd. or at any other address previously furnished in writing to the Co-Issuers or Noteholder by the Trustee;

(b)    the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, facsimile no. +1 (345) 945-7100, or at any other address previously furnished in writing to the Trustee by the Issuer;

(c)    the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first- class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Co-Issuer addressed to it at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention:  Donald Puglisi, Esq., facsimile no. +1 (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(d)    the Collateral Manager by the Co-Issuers or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Collateral Manager addressed to The Putnam Advisory Company, LLC, One Post Office Square, Boston, Massachusetts 02109, facsimile no. +1 (617) 760-1625, Attention: General Counsel, with copies to: Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, facsimile no. +1 (212) 839-5599, Attention: Daniel A. Gerard, Esq., or at any other address previously furnished in writing to the Co-Issuers or the Trustee by the Collateral Manager;

(e)    the Rating Agencies by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, in the case of Moody's, addressed to Moody's Investors Service, 99 Church Street, New York, New York 10007, facsimile no. +1 (212) 553-

0355, Attention: CBO/CLO Monitoring; and in the case of Standard & Poor's, addressed to Standard & Poor's, 55 Water Street, New York, New York 10041, via electronic mail to CDO_Surveillance@Standardandpoors.com, facsimile no. +1 (212) 438-2650, Attention: Structured Finance Ratings, Asset-Backed Surveillance Group—CBO/CLO;

(f)    the Hedge Counterparties by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to each Hedge Counterparty addressed to it at the address specified in the related Hedge Agreements or at any other address previously furnished in writing to the Issuer or the Trustee by such Hedge Counterparty;

(g)    the Credit Default Swap Counterparty by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to the Credit Default Swap Counterparty addressed to it at the address specified in the Credit Default Swap Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Credit Default Swap Counterparty;

(h)    to the Repository by the Issuer shall be made available to the Repository by electronic mail as a pdf (portable document format) file at CDO Library, c/o The Bond Market Association, 360 Madison Avenue (18th Floor), New York, NY 10017; electronic mail address: admin@cdolibrary.com; *provided* that the Issuer shall be identified in the electronic mail message that accompanies the delivery of any document and shall apply the following procedures in converting the document to a pdf file:

(i)    the pdf file shall be made from the original document by printing directly from the application in which the document was created (Microsoft Word, Quark Xpress, etc.) or by using Adobe Acrobat Distiller;

(ii)    all fonts shall be embedded when converting the original document to a pdf file; and

(iii)    the pdf file shall not be made from scanned pages.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective: (1) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (2) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form; and (3) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

Section 14.4    Notices and Reports to Noteholders; Waiver.

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Notes of any event,

(a)        such notice shall be in writing and mailed, first-class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice;

(b)        such report shall be made available, by the Trustee, each month to Noteholders via the Trustee's internet website, initially located at www.cdotrustee.net.   The Trustee shall have the right to change the method such reports are distributed in order to make such distribution more convenient and/or more accessible to the Noteholders and the Trustee shall provide timely notification (in any event, not less than 30 days) to all Noteholders; and

(c)        such report or notice shall be in the English language.

Any such reports or notices shall also be made available to any third party designated by any Holder.

Any such reports or notices may also be made available to any Beneficial Owners upon request therefor in the form of Exhibit L attached hereto certifying that it is a holder of a beneficial interest in any Note.   Such reports and notices will be deemed to have been sufficiently given on the date of such mailing or availability, as applicable.

The Trustee will deliver to the Holder of any Note shown on the Note Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note shall affect the sufficiency of such notice with respect to other Holders of Notes.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.   Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 14.5    Effect of Headings and Table of Contents.

The Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6    Successors and Assigns.

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7    Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8    Benefits of Indenture.

Each of the Hedge Counterparties, if any, the Credit Default Swap Counterparty and the Collateral Manager shall be third party beneficiaries of each agreement or obligation in this Indenture.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Noteholders, the Credit Default Swap Counterparty and the Hedge Counterparties, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9    Tax Treatment and Relationship of the Parties with Respect to this Indenture.

It is the intention of the parties to this Indenture, and each Noteholder by acceptance of its Note agrees, that for U.S. federal, state and local tax purposes, the Notes shall be treated as indebtedness of the Issuer and not as indebtedness of or an interest in the Trustee, the Indenture, or any other entity, or in any asset or assets.  It is the further intention of the parties hereto, and each Noteholder by acceptance of its Note agrees, that (i) for U.S. federal, state and local tax purposes, the Indenture shall be treated as a mere security device for the enforcement of the Noteholders' rights under the Notes, (ii) for U.S. federal, state and local tax purposes, the Collateral shall be treated as legally and beneficially owned by the Issuer, except following a Default, as provided in Article V, and (iii) the Trustee shall be the agent of the Issuer as provided herein except following a Default or as otherwise specifically provided herein.

Section 14.10   Governing Law.

This Indenture and each Note shall be construed in accordance with, and this Indenture, each Note and all matters arising out of or relating in any manner to this Indenture or the Notes (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

Section 14.11   Submission to Jurisdiction.

Each of the Co-Issuers hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan in The City of New York and of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan in The City of New York, and any appellate court from any thereof, in any action or proceeding arising out of

or relating to the Notes or this Indenture, and the Co-Issuers hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or federal court.  The Co-Issuers hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  The Co-Issuers irrevocably consent to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Co-Issuers' agent in New York set forth in Section 7.2.  The Co-Issuers agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.12  Counterparts.

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.13  Waiver of Jury Trial.

THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE AND THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.14  Judgment Currency.

This is an international financing transaction in which the specification of Dollars (the "**Specified Currency**"), and the specification of the place of payment, as the case may be (the "**Specified Place**"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Notes.  The payment obligations of the Co-Issuers under this Indenture and the Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place.  If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or the Notes in the Specified Currency into another currency (the "**Second Currency**"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered.  The obligation of the Co-Issuers in respect of any such sum due from the Co-Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Co-Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each

Class of Notes constituted additional principal owing in respect of such Class of Notes), agree to indemnify the Trustee and each Noteholder against, and to pay the Trustee or such Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

Section 14.15  <u>Confidential Treatment of Documents.</u>

Except as otherwise provided in this Indenture and in the "Listing and General Information" section of the Offering Memorandum or as required by law, this Indenture, the Administrative Agreement, the Collateral Management Agreement, the Credit Default Swap Agreement, the Hedge Agreements, all Monthly Reports, all VFN Monthly Reports, the Note Valuation Report and each transfer certificate shall be treated by the Trustee and the Collateral Manager as confidential and shall only be distributed to the Persons and in the manner designated herein.  The Trustee shall provide a copy of this Indenture to any Holder of a beneficial interest in any Note upon written request therefor substantially in the form of <u>Exhibit L</u> attached hereto certifying that it is such a Holder.  Notwithstanding anything herein or in any of the documents contemplated by this Indenture to the contrary, effective from the date of commencement of discussions with respect to the transactions contemplated hereby, the Trustee, the other parties to the documents and the Holders and beneficial owners of the Notes and the Preference Shares, and each employee, representative or other agent of the Trustee or such holders, may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated hereby and all materials of any kind, including opinions or other tax analyses, that are provided to such holders relating to such tax treatment and tax structure.  This authorization to disclose the tax treatment and tax structure does not permit disclosure of information identifying a Co-Issuer, the Collateral Manager or any other party to the transactions contemplated hereby, or the pricing (except to the extent that pricing is relevant to tax structure or tax treatment) of the Offering.

Section 14.16  <u>Consent to Posting of Documents on Repository.</u>

The Issuer hereby consents to (a) the posting of the final Offering Memorandum, this Indenture, the Hedge Agreements, the Credit Default Swap Agreement and the periodic reports to be delivered pursuant to the transaction documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith.  Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer and the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any Affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's Affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

Section 14.17  <u>Liability of Co-Issuers.</u>

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, *inter alia*, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers.  In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers or shall have any claim in respect of any assets of the other of the Co-Issuers while any of the Notes are Outstanding.

### ARTICLE XV—ASSIGNMENT OF COLLATERAL MANAGEMENT AGREEMENT, ETC.

Section 15.1    Assignment.

The Issuer, in furtherance of the covenants of this Indenture, and as security for the Notes and amounts payable to the Noteholders and other obligations to the Secured Parties hereunder and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Collateral Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement and the Hedge Agreements, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Manager or any other party thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Management Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including as set forth in Section 15.4), which license shall be and is hereby deemed to be automatically revoked (A) upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived, (B) upon the occurrence of a termination for "cause" specified in Section 11(d) of the Collateral Management Agreement or (C) upon a default in the performance, or breach, of any material covenant, representation, warranty or other agreement of the Collateral Manager under the Collateral Management Agreement or in any certificate or writing delivered pursuant thereto if Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of any Class give notice of such default or breach to the Trustee and the Collateral Manager and such default or breach (if remediable) continues for a period of 30 days after receipt of such notice.

Section 15.2    No Impairment.

The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Collateral Management Agreement, the Collateral Administration

Agreement, the Credit Default Swap Agreement and the Hedge Agreements nor shall any of the obligations contained in the Collateral Management Agreement be imposed on the Trustee.  For the avoidance of doubt, in no event will the Trustee be required to assume the obligations of the Collateral Manager under the Collateral Management Agreement.

Section 15.3    Termination, Etc.

Upon the redemption and cancellation of the Notes and the payment of all other Secured Obligations and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Collateral Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement and the Hedge Agreements shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

Section 15.4    Issuer Agreements, Etc.

The Issuer represents that it has not executed any other assignment of the Collateral Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement and the Hedge Agreements.  The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith.  The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify.  The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Collateral Manager in the Collateral Management Agreement to the following:

(a)    the Collateral Manager consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to the Collateral Manager and not to cause the Issuer to violate the provisions of this Indenture;

(b)    the Collateral Manager acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Collateral Management Agreement are also for the benefit of the Trustee and the other Secured Parties;

(c)    the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Management Agreement;

(d)    except as otherwise set forth herein and therein, the Collateral Manager shall continue to serve as Collateral Manager under the Collateral Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Collateral Management Agreement because sufficient funds were not then available hereunder to pay such amounts.  The Collateral Manager agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under any

bankruptcy, insolvency, reorganization or similar laws until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture and the reduction of the Remaining Unfunded Facility Commitment to zero; *provided* that nothing in this clause shall preclude, or be deemed to estop, the Collateral Manager (A) from taking any action prior to the expiration of the aforementioned one year and one day period, or, if longer, the applicable preference period then in effect, in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Collateral Manager or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding;

(e)     the Collateral Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Manager irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or federal court.  The Collateral Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  The Collateral Manager irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager.  The Collateral Manager agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

## ARTICLE XVI—HEDGE AGREEMENTS

Section 16.1     Hedge Agreements.

(a)     On the Closing Date (or any date on which the Issuer enters into a Hedge Agreement, including a replacement Hedge Agreement), (i) the Hedge Counterparty entering into the Hedge Agreements on such date (or any Affiliate of such Hedge Counterparty that shall have absolutely and unconditionally guaranteed (pursuant to a form of guarantee that satisfies all applicable then-current published rating criteria of the Rating Agencies) the obligations of such Hedge Counterparty under the Hedge Agreement) shall satisfy the Hedge Counterparty Ratings Requirement and (ii) the Issuer shall assign any such Hedge Agreement to the Trustee pursuant to this Indenture and such Hedge Counterparty shall consent to such assignment.  The Issuer may in its discretion enter into one or more Deemed Floating Asset Hedge Agreements upon or following the Acquisition of a Collateral Debt Security which Hedge Agreements in each case either (A) satisfy the Rating Condition or (B) are Form-Approved Deemed Floating Asset Hedge Agreements with respect to which details of the Collateral Debt Security that is the subject of such Acquisition have been provided to each of the Rating Agencies.  The Issuer shall not enter into any hedge agreement (including any Hedge Agreement) the payments from which are subject to withholding tax unless only the Hedge Counterparty is required to withhold and the Hedge Counterparty is required to pay additional amounts to the Issuer sufficient to cover any

withholding tax due on payments made by such hedge counterparty, subject to the Issuer making customary tax representations.

(b)     The Trustee shall, on behalf of the Issuer and in accordance with the Note Valuation Report, pay amounts due to each Interest Rate Hedge Counterparty under an Interest Rate Hedge Agreement on any Distribution Date in accordance with <u>Section 11.1</u> and shall pay, on behalf of the Issuer, amounts due to any Asset Hedge Counterparty under an Asset Hedge Agreement of on any date for payments set forth in such Asset Hedge Agreement.

(c)     In respect of any Hedge Counterparty, if:

(i)     (w)(i) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated below "A1" by Moody's (or are rated "A1" and on watch for downgrade by Moody's) or (ii) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Rating Determining Party are rated below "P-1" by Moody's (or are rated "P-1" and on watch for downgrade by Moody's), (x) if such Rating Determining Party does not have a short-term rating from Moody's, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated below "Aa3" by Moody's (or are rated "Aa3" and on watch for downgrade by Moody's), then the relevant Hedge Counterparty shall, within 10 Business Days of such ratings downgrade, enter into an agreement with the Issuer providing for the posting of collateral, which agreement satisfies the Rating Condition or (y) if such Rating Determining Party does not have a short-term rating from Standard & Poor's, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated below "A+" by Standard & Poor's or the short-term debt obligations of such Rating Determining Party are rated below "A-1" by Standard & Poor's, then the relevant Hedge Counterparty shall, within 10 Business Days of such ratings downgrade, enter into an agreement with the Issuer providing for the posting of collateral, which agreement satisfies the Rating Condition;

(ii)     such Rating Determining Party fails to satisfy the Hedge Counterparty Ratings Requirement, then the relevant Hedge Counterparty shall use its best efforts to assign its rights and obligations in and under the related Hedge Agreement (at its own expense) to another Hedge Counterparty that has ratings at least equal to the Hedge Counterparty Ratings Requirement with 30 days; *provided* that (x) neither the Issuer nor the new Hedge Counterparty is required to deduct or withhold on account of tax unless only the new Hedge Counterparty is required to withhold and the new Hedge Counterparty is required to pay additional amounts to the Issuer sufficient to cover any withholding tax due on payments made by such new Hedge Counterparty and (y) if such Hedge Counterparty has not assigned its rights and obligations within 30 days after such failure, such Hedge Counterparty shall accept any *bona fide* bid received from another Hedge Counterparty that has ratings at least equal to the Hedge Counterparty Ratings Requirement (even if no other bids are received) and satisfies clause (x) above. Failure by such Hedge Counterparty to assign its rights and obligation within such 30-day period shall be an additional "Termination Event"; *provided, further*, that if such Rating Determining Party's ratings are downgraded below investment grade, the relevant Hedge

Counterparty shall, within 10 Business Days of such ratings downgrade, assign its rights and obligations in and under the related Hedge Agreement (at its own expense) to another Hedge Counterparty that has ratings at least equal to the Hedge Counterparty Ratings Requirement.

(d)    The Trustee shall on behalf of the Issuer, prior to the entry into an Interest Rate Hedge Agreement, cause to be established one or more Securities Accounts, each of which shall be designated a "**Hedge Counterparty Collateral Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties.  The Trustee shall, on behalf of the Issuer, deposit all collateral received from any Interest Rate Hedge Counterparty under an Interest Rate Hedge Agreement in the related Hedge Counterparty Collateral Account.  Any and all funds at any time on deposit in, or otherwise standing to the credit of, any Hedge Counterparty Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties and shall be invested in Eligible Investments specified by the relevant Interest Rate Hedge Counterparty; *provided* that in the absence of such specification, such amounts shall be invested in Eligible Investments of the type described in clause (iii) of the definition thereof.  The Trustee shall not be held liable in any way by reason of any insufficiency of such Hedge Counterparty Collateral Account resulting from any loss relating to any such investment.  The only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Hedge Counterparty Collateral Account shall be (i) for application to obligations of the relevant Interest Rate Hedge Counterparty to the Issuer under the related Interest Rate Hedge Agreement that are not paid when due (whether when scheduled or upon early termination) or (ii) to return collateral to such Interest Rate Hedge Counterparty when and as required by the related Interest Rate Hedge Agreement.  Each Hedge Counterparty Collateral Account shall remain at all times with a financial institution having a combined capital and surplus of at least U.S.$200,000,000 and a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's.

(e)    The Trustee shall on behalf of the Issuer, on or prior to the entry into a Deemed Floating Asset Hedge Agreement, cause to be established one or more Securities Accounts, each of which shall be designated an "**Asset Hedge Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the relevant Asset Hedge Counterparty.  The Trustee shall deposit all amounts that are received in respect of interest on the Collateral Debt Security that is the subject of such Deemed Floating Asset Hedge Agreement and are required to be paid to the related Asset Hedge Counterparty in accordance with the terms of such Deemed Floating Asset Hedge Agreement in the related Asset Hedge Account.  As directed by an Issuer Order executed by the Collateral Manager in writing, amounts on deposit in an Asset Hedge Account shall be invested in Eligible Investments until such amounts are paid to the related Asset Hedge Counterparty in accordance with the terms of the related Deemed Floating Asset Hedge Agreement.  Any amounts (whether investment earnings on Eligible Investments or otherwise) remaining in an Asset Hedge Account on any Distribution Date that are not required to pay any amounts due to any Asset Hedge Counterparty under the related Deemed Floating Asset Hedge Agreement shall be transferred to the Interest Collection Account on such Distribution Date and applied as Interest Proceeds in accordance with the Priority of Payments on such Distribution Date. Each Asset Hedge Account shall remain at all times with a financial institution having a combined capital and surplus of at least U.S.$200,000,000 and a long-term

debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's.

(f)     Upon the default by the Hedge Counterparty thereto in the payment when due of its obligations to the Issuer under such Hedge Agreement, the Issuer shall forthwith provide telephonic notice (promptly confirmed in writing) thereof to the Trustee and, if applicable, any guarantor of the Hedge Counterparty's obligations under such Hedge Agreement. Upon its receipt of such notice (or, if earlier, when the Trustee becomes aware of such default) the Trustee shall make a demand on the relevant Hedge Counterparty, or any guarantor, if applicable, demanding payment forthwith. The Trustee shall give notice to the Noteholders and each Rating Agency upon the continuance of the failure by the relevant Hedge Counterparty to perform its obligations for two Business Days following a demand made by the Trustee on such Hedge Counterparty.

(g)     If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an "event of default" or a "termination event" (each as defined in the related Hedge Agreement) attributable to the Hedge Counterparty thereto, the Issuer and the Trustee shall take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee thereunder as may be permitted by the terms of the Hedge Agreement and consistent with the terms hereof, and the Issuer (or the Collateral Manager on its behalf) shall use the proceeds of any such actions (including the proceeds of the liquidation of any collateral pledged by such Hedge Counterparty) to enter into a replacement Hedge Agreement on substantially identical terms or on such other terms satisfying the Rating Condition, and with a Hedge Counterparty with respect to which the Rating Condition shall have been satisfied; *provided*, that any termination of a Deemed Floating Rate Asset Hedge Agreement by the Issuer shall be subject to the satisfaction of the Rating Condition by Standard & Poor's. Costs attributable to entering into a replacement Hedge Agreement following an "event of default" where the Hedge Counterparty was the defaulting party or a "termination event" where the Hedge Counterparty is the sole affected party shall be borne by such Hedge Counterparty as provided in the relevant Hedge Agreement. In determining the amount payable under the terminated Hedge Agreement, the Issuer will seek quotations from reference market-makers that satisfy the Hedge Counterparty Ratings Requirement. In addition, the Issuer will use its best efforts to cause the termination of the Hedge Agreement to become effective simultaneously with the entry into a replacement Hedge Agreement described as aforesaid, and in any event, shall enter into a replacement Hedge Agreement within 60 days of any termination of the Hedge Agreement. The Rating Condition with respect to Standard & Poor's must be satisfied prior to any designation by the Issuer of an "Early Termination Date" under and as defined in any Deemed Floating Asset Hedge Agreement, and the Issuer shall notify each of the Rating Agencies of the amount payable by or to the Issuer under any terminated Deemed Floating Asset Hedge Agreement promptly following the determination thereof.

(h)     Each Hedge Agreement shall provide that any amount payable to the relevant Hedge Counterparty thereunder shall be subject to the Priority of Payments.

IN WITNESS WHEREOF, we have set our hands a as of the date first set forth above.

PYXIS ABS CDO 2007-1 LTD., as Issuer

By: _____
    Name:  Donald J. Puglisi
    Title:   Attorney-in-Fact

PYXIS ABS CDO 2007-1 LLC

By: _____
    Name:  Donald J. Puglisi
    Title:  Manager

LASALLE BANK NATIONAL
   ASSOCIATION, as Trustee

By: _____
    Name:
    Title:

[Pyxis ABS CDO 2007-1 - Indenture]

IN WITNESS WHEREOF, we have set our hands a as of the date first set forth above.

PYXIS ABS CDO 2007-1 LTD., as Issuer

By: _____
    Name:
    Title:

PYXIS ABS CDO 2007-1 LLC

By: _____
    Name:
    Title:

LASALLE BANK NATIONAL ASSOCIATION, as Trustee

By: _____
    Name:  Anita Sterijevski
    Title:  Assistant Vice President

## SCHEDULE A

### SCHEDULE OF CLOSING COLLATERAL DEBT SECURITIES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

A-2

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

A-3

|  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

## SCHEDULE B

## LIBOR FORMULA

1.     With respect to each Interest Period, "**LIBOR**" for purposes of calculating the Note Interest Rate for each Class of Notes (other than the Class E Notes and the Class F Notes) for such Interest Period will be determined by the Calculation Agent in accordance with the following provisions:

(a)     LIBOR for any Interest Period shall equal the offered rate, as determined by the Calculation Agent, for Dollar deposits in London of one month tenor that appears on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date. "**LIBOR Determination Date**" means, with respect to any Interest Period, the second London Banking Day prior to the first day of such Interest Period.

(b)     If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Dollar deposits in London of a one-month tenor (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent are quoting on the relevant LIBOR Determination Date for Dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), to the principal London offices of leading banks in the London interbank market.

(c)     In respect of any Interest Period having a Designated Maturity other than a one-month tenor (such period, an "**Alternate Interest Period**"), LIBOR shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with clauses (a) and (b) above, one of which shall be determined as if the maturity of the Dollar deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which shall be determined as if such maturity were the period of time for which rates are available next longer than the Interest Period (such rate, "**Interpolated LIBOR**"); *provided* that if an Interest Period is less than or equal to seven days, then LIBOR shall be determined by

reference to a rate calculated in accordance with clauses (a) and (b) above as if the maturity of the Dollar deposits referred to therein were a period of time equal to seven days.

(d)     If the Calculation Agent is required but is unable to determine a rate in accordance with either procedure described in clauses (a) or (b) above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the offered quotations of the Reference Dealers as of 10:00 a.m. (New York City time) on the first day of such Interest Period for negotiable U.S. Dollar certificates of deposit of major U.S. money market banks having a remaining maturity closest to the Designated Maturity.

(e)     If the Calculation Agent is required but is unable to determine a rate in accordance with any of the procedures described in clauses (a), (b) or (d) above, LIBOR with respect to such Interest Period will be calculated on the last day of such Interest Period and shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

For purposes of clauses (a), (c), (d) and (e) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.  For the purposes of clause (b) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

2.     "**LIBOR**" for purposes of calculating the Weighted Average Premium/Spread with respect to Collateral Debt Securities paying interest at a floating rate not expressed as a stated spread above LIBOR will be determined by the Calculation Agent in accordance with the following provisions:

(a)     LIBOR for any interest period of a Collateral Debt Security shall equal the offered rate, as determined by the Calculation Agent, for Dollar deposits of a term of one month that appears on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, as of 11:00 a.m. (London time) on the applicable date of determination.

(b)     If, on any date of determination, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Dollar deposits of one month, by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such date of determination made by the Calculation Agent to the Reference Banks.  If, on any date of determination, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean.  If, on any date of determination, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent are quoting on the relevant date of

determination for Dollar deposits for the term of one month, to the principal London offices of leading banks in the London interbank market.

(c)    If the Calculation Agent is required but is unable to determine a rate in accordance with either procedure described in clauses (a) or (b) above, LIBOR with respect to such interest period shall be the arithmetic mean of the offered quotations of the Reference Dealers as of 10:00 a.m. (New York City time) on the date of determination for negotiable U.S. Dollar certificates of deposit of major U.S. money market banks having a remaining maturity closest to the Designated Maturity.

For purposes of clauses (a) and (c) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.  For the purposes of clause (b) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

As used in both paragraphs 1 and 2 above:

"**Base Rate**" means a fluctuating rate of interest determined by the Calculation Agent as being the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for Dollar loans. Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"**Base Rate Reference Bank**" means LaSalle Bank National Association, or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"**Designated Maturity**" means, (a) with respect to any applicable Class of Notes (other than the Class A-1 Notes), (i) for the first Interest Period, the number of calendar days from, and including the Closing Date to, but excluding, the first Monthly Distribution Date and (ii) for each Interest Period after the first Interest Period, one month; and (b) with respect to the Class A-1 Notes and any Borrowing or Deemed Borrowing under the Class A-1 Note Purchase Agreement after the Closing Date, (i) for the first Interest Period, from the date of such Borrowing or Deemed Borrowing to but excluding the first Monthly Distribution Date after the date of such Borrowing or Deemed Borrowing and (ii) for each Interest Period after the first Interest Period, with respect to any Borrowing or Deemed Borrowing, one month.

"**LIBOR Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in Dollars in New York City and London.

"**London Banking Day**" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"**Reference Banks**" means four major banks in the London interbank market, selected by the Calculation Agent.

"**<u>Reference Dealers</u>**" means three major dealers in the secondary market for Dollar certificates of deposit, selected by the Calculation Agent.

The determination of the Note Interest Rate for each Class of Notes by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

**<u>SCHEDULE C</u>**

**<u>[RESERVED]</u>**

## SCHEDULE D

### Part I

### Moody's Recovery Rate Matrix

### (see definition of "Applicable Recovery Rate")

**A.**    ABS Type Diversified Securities

| Percentage of Total Capitalization | Moody's Rating | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| Greater than 70% | 85% | 80% | 70% | 60% | 50% | 40% |
| Less than or equal to 70%, but greater than 10% | 75% | 70% | 60% | 50% | 40% | 30% |
| Less than or equal to 10% | 70% | 65% | 55% | 45% | 35% | 25% |

**B.**    ABS Type Residential Securities

| Percentage of Total Capitalization | Moody's Rating | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| Greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% |
| Less than or equal to 70%, but greater than 10% | 75% | 70% | 55% | 45% | 35% | 25% |
| Less than or equal to 10%, but greater than 5% | 65% | 55% | 45% | 40% | 30% | 20% |
| Less than or equal to 5%, but greater than 2% | 55% | 45% | 40% | 35% | 25% | 15% |
| Less than or equal to 2% | 45% | 35% | 30% | 25% | 15% | 10% |

**C.**    ABS Type Undiversified Securities

| Percentage of Total Capitalization | Moody's Rating | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| Greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% |
| Less than or equal to 70%, but greater than 10% | 75% | 70% | 55% | 45% | 35% | 25% |
| Less than or equal to 10%, but greater than 5% | 65% | 55% | 45% | 35% | 25% | 15% |
| Less than or equal to 5%, but greater than 2% | 55% | 45% | 35% | 30% | 20% | 10% |
| Less than or equal to 2% | 45% | 35% | 25% | 20% | 10% | 5% |

**D.**    Low-Diversity CDO Securities

| Percentage of Total Capitalization | Moody's Rating | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| Greater than 70% | 80% | 75% | 60% | 50% | 45% | 30% |
| Less than or equal to 70%, but greater than 10% | 70% | 60% | 55% | 45% | 35% | 25% |
| Less than or equal to 10%, but greater than 5% | 60% | 50% | 45% | 35% | 25% | 15% |

| | | | | | |
|---|---|---|---|---|---|
| Less than or equal to 5%, but greater than 2% | 50% | 40% | 35% | 30% | 20% | 10% |
| Less than or equal to 2% | 30% | 25% | 20% | 15% | 07% | 04% |

**E.**    High-Diversity CDO Securities

| Percentage of Total Capitalization | Moody's Rating | | | | | |
|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| Greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% |
| Less than or equal to 70%, but greater than 10% | 75% | 70% | 60% | 50% | 40% | 25% |
| Less than or equal to 10%, but greater than 5% | 65% | 55% | 50% | 40% | 30% | 20% |
| Less than or equal to 5%, but greater than 2% | 55% | 45% | 40% | 35% | 25% | 10% |
| Less than or equal to 2% | 45% | 35% | 30% | 25% | 10% | 05% |

**F.**    If the Collateral Debt Security is a Synthetic Security (other than a CDS Agreement Transaction or other Synthetic Security structured as a credit default swap that is entered into pursuant to a Form-Approved Synthetic Security), the recovery rate thereof will by assigned by Moody's upon the Acquisition of such Synthetic Security by the Issuer.

**G.**    If the Collateral Debt Security is a CDS Agreement Transaction or other Synthetic Security structured as a credit default swap that is entered into pursuant to a Form-Approved Synthetic Security, the recovery rate thereof will be the same as the Moody's recovery rate of the underlying Reference Obligation.

Part II

**Standard & Poor's Recovery Rate Matrix**

**A.**    If the Collateral Debt Security (other than a Synthetic Security, CMBS Security, REIT Debt Security, Mortgage Finance Company Security, Excepted Security or REIT Debt Security guaranteed by a corporate guarantor) is the senior-most tranche of securities issued by the issuer of such Collateral Debt Security or is a U.S. Agency Guaranteed Security or a U.S. Agency Security, the recovery rate is as follows, *provided* that for purposes of the Standard & Poor's recovery rate matrix, the applicable rating shall be the Standard & Poor's Rating of the Collateral Debt Security at the time of issuance:

| Standard & Poor's Rating at Origination | Stress Case for Liability Rating of | | | | | | |
|---|---|---|---|---|---|---|---|
| Assets | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "AA-", "AA" or "AA+" | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "A-", "A" or "A+" | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| "BBB", "BBB" or "BBB+" | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |
| "BB-", "BB" or "BB+" | 45.0% | 50.0% | 55.0% | 65.0% | 75.0% | 75.0% | 75.0% |
| "B", "B" or "B+" | 25.0% | 30.0% | 50.0% | 55.0% | 65.0% | 65.0% | 50.0% |
| "CCC+" and below | 0.0% | 0.0% | 0.0% | 0.0% | 5.0% | 10.0% | 10.0% |

**B.**    If the Collateral Debt Security (other than a Synthetic Security, CMBS Security, REIT Debt Security, Mortgage Finance Company Security, Excepted Security or REIT Debt Security guaranteed by a corporate guarantor) (1) is not the senior most tranche of securities issued by the issuer of such Collateral Debt Security or (2) is the senior-most tranche of securities issued by the issuer of such Collateral Debt Security and such Collateral Debt Security has a Standard & Poor's Rating of "BBB-" or below, the recovery rate is as follows, *provided* that for purposes of the Standard & Poor's recovery rate matrix, the applicable rating shall be the Standard & Poor's Rating of the Collateral Debt Security at the time of issuance:

| Standard & Poor's Rating at Origination | Stress Case for Liability Rating of | | | | | | |
|---|---|---|---|---|---|---|---|
| Assets | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 65.0% | 70.0% | 80.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| "AA-", "AA" or "AA+" | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| "A-", "A" or "A+" | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| "BBB", "BBB" or "BBB+" | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| "BB-", "BB" or "BB+" | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| "B", "B" or "B+" | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| "CCC+" and below | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

**C.**     If the Collateral Debt Security is a CMBS Security, the recovery rate is as follows:

| Standard & Poor's Rating at Origination | Recovery Rate Liabilities | | | | | | |
|---|---|---|---|---|---|---|---|
| Assets | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "AA", "AA" or "AA+" | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "A", "A" or "A+" | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| "BBB", "BBB" or "BBB+" | 45.0% | 50.0% | 55.0% | 60.0% | 65.0% | 70.0% | 75.0% |
| "BB", "BB" or "BB+" | 35.0% | 40.0% | 45.0% | 45.0% | 50.0% | 50.0% | 50.0% |
| "B", "B" or "B+" | 20.0% | 25.0% | 30.0% | 35.0% | 35.0% | 40.0% | 40.0% |
| "CCC+" and below | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| NR | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

**D.**     If such Collateral Debt Security is a Mortgage Finance Company Security, the recovery rate will be as specified below:

| Mortgage Finance Company Security | Recovery Rate |
|---|---|
| Senior Secured | 40% |
| Senior Unsecured | 25% |
| Subordinated | 15% |

**E.**     If the Collateral Debt Security is a Synthetic Security (other than a CDS Agreement Transaction or other Synthetic Security structured as a credit default swap that is entered into pursuant to a Form-Approved Synthetic Security) or an Excepted Security, the recovery rate thereof will by assigned by Standard & Poor's upon the Acquisition of such Synthetic Security by the Issuer.

**F.**     If the Collateral Debt Security is a CDS Agreement Transaction or other Synthetic Security structured as a credit default swap that is entered into pursuant to a Form-Approved Synthetic Security, the recovery rate thereof will be the same as the Standard & Poor's recovery rate of the underlying Reference Obligation.

**G.**     If the Collateral Debt Security is a REIT Debt Security, the recovery rate will be 40%.

**H.**     If the Collateral Debt Security (other than a Synthetic Security, REIT Debt Security, Mortgage Finance Company Security, Excepted Security or REIT Debt Security guaranteed by a corporate guarantor) is guaranteed by (1) an insurance company that has been assigned an Insurer Financial Enhancement Rating (FER) by Standard & Poor's (including Collateral Debt Securities guaranteed by a monoline financial insurance company that has been assigned a FER), the recovery rate will be 50% and (2) a company that has not been assigned an Insurer FER by Standard & Poor's the recovery rate will be 40%.

## SCHEDULE E

## AUCTION PROCEDURES

The following sets forth the auction procedures (the "**Auction Procedures**") to be followed in connection with a Sale effected pursuant to Section 9.5 of the Indenture, dated as of March 6, 2007 (the "**Indenture**"), among Pyxis ABS CDO 2007-1 Ltd., Pyxis ABS CDO 2007-1 LLC and LaSalle Bank National Association, as trustee (the "**Trustee**").  Capitalized terms used herein that are not otherwise defined shall have the meanings described thereto in the Indenture.

I.     Pre-Auction Process

(a)     The Trustee will initiate the Auction Procedures at least 24 Business Days prior to each Auction Date by:

(i)     with the assistance of the Collateral Manager, preparing a list containing the names of the issuer and guarantor (if any), the par amount and the CUSIP number (if any) with respect to each Pledged Collateral Debt Security and such other information as shall be notified to the Trustee by the Collateral Manager;

(ii)     delivering a list of the constituents of each Subpool received from the Collateral Manager as described in subparagraph (b) below, which the Collateral Manager shall prepare based upon the Collateral Manager's good faith determination of the composition of Subpools that will maximize Sale Proceeds; *provided* that the maximum number of Subpools shall be eight and if the Trustee has not received such list from the Collateral Manager at least 24 Business Days prior to the relevant Auction Date, the Trustee shall be entitled to assume that the Collateral Debt Securities will not be divided into Subpools for the purposes of the relevant Auction; and

(iii)     sending the lists prepared pursuant to clauses (i) and (ii) above to the Qualified Bidders identified on the then-current Qualified Bidder List (the "**Listed Bidders**") and requesting bids on the Auction Date.

(b)     The general solicitation package which the Trustee shall deliver to the Listed Bidders will include:  (i) a form of a purchase agreement provided to the Trustee by the Collateral Manager (which shall, among other things, provide that (A) upon satisfaction of all conditions precedent therein, the purchaser is irrevocably obligated to purchase, and the Issuer is irrevocably obligated to sell, the Collateral Debt Securities (or relevant Subpool, as the case may be) on the date and on the terms and conditions set forth therein and (B) if the Subpools are to be sold to more than one bidder, the consummation of the purchase of each Subpool must occur simultaneously and the closing of each purchase is conditional on the closing of each of the other purchases); (ii) the minimum purchase price (which shall be the Auction Call Redemption Amount); (iii) a

formal bidsheet (which shall permit the relevant bidder to bid for all of the Collateral Debt Securities, any Subpool or separately for each of the Subpools) provided to the Trustee by the Collateral Manager including a representation from the bidder that it is eligible to purchase all of the Collateral Debt Securities; (iv) a detailed timetable; and (v) copies of all transfer documents provided to the Trustee by the Collateral Manager (including transfer certificates and subscription agreements which a bidder must execute pursuant to the Underlying Instruments and a list of the requirements which the bidder must satisfy under the Underlying Instruments (*i.e.*, Qualified Institutional Buyer, Institutional Accredited Investor, Qualified Purchaser, etc.)).

(c)    The Trustee shall send solicitation packages to all Listed Bidders at least 15 Business Days before the Auction Date.  No later than 10 Business Days before the Auction Date, Listed Bidders may submit written due diligence questions relating to the legal documentation and other information contained in the general solicitation package (including comments on the draft purchase agreement to be used in connection with the Auction (the "**Auction Purchase Agreement**")) to the Collateral Manager; *provided* that the Collateral Manager shall only be obligated to answer questions relating to the Collateral to the extent that it is able to do so by reference to information which it is required to provide under the Collateral Management Agreement.  The Collateral Manager shall be solely responsible for (i) responding to all relevant questions and/or comments submitted to it in accordance with the foregoing and (ii) distributing the questions, answers and revised final Auction Purchase Agreement to all Listed Bidders at least five Business Days prior to the Auction Date.

(d)    To the extent that the information contained in the list of Collateral Debt Securities or general solicitation package and delivered to the Listed Bidders pursuant to clauses (a), (b) and (c) above is provided to the Trustee by the Collateral Manager and is not true or accurate in any respect or is misleading in any respect, the Collateral Manager shall indemnify the Trustee and its Officers, directors, employees and agents for, and hold them harmless against, any loss, liability or expense (including reasonable counsel fees) incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the provision of such information by the Collateral Manager to the Trustee, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder.

**II.**    Auction Process

(a)    The Collateral Manager or any of its Affiliates will be allowed to bid in the Auction if it deems appropriate, but will not be required to do so.

(b)    On the Auction Date, all bids will be due by facsimile to the offices of the Trustee by 11:00 a.m. New York City time, with the winning bidder to be notified by 2:00 p.m. New York City time.  All bids from Listed Bidders will be due on the

bid sheet contained in the solicitation package. Each bid shall be for the purchase and delivery to one purchaser of (i) all (but not less than all) of the Collateral Debt Securities or (ii) all (but not less than all) of the Collateral Debt Securities that constitute the components of one or more Subpools.

(c)    If the Trustee receives fewer than two bids from Listed Bidders to purchase all of the Collateral Debt Securities or to purchase each Subpool, the Trustee shall decline to consummate the Sale.

(d)    Subject to clause (c), the Collateral Manager shall select as the winning bidder the bid or bids that result in the Highest Auction Price (in excess of the minimum purchase price) from one or more Listed Bidders.

(e)    Upon notification to the winning bidder(s), the winning bidder (or, if the Highest Auction Price requires the Sale of Subpools to more than one bidder, each winning bidder) will be required to deliver to the Trustee a signed counterpart of the Auction Purchase Agreement and a good faith deposit equal to one percent (1%) of the Aggregate Principal Balance will be required to be wired to the Trustee no later than 4:00 p.m. New York City time on the Auction Date. If the Highest Auction Price requires the Sale of Subpools to more than one bidder, each winning bidder shall contribute to the good faith deposit an amount equal to one percent (1%) of the Aggregate Principal Balance of the Subpool or Subpools to which its bid relates. Such deposit will not be invested. This deposit will be credited to the purchase price but will not be refundable. The Trustee will establish a separate account for the acceptance of the good faith deposit, until such time as the winning bidder (or, if the Highest Auction Price requires the Sale of Subpools to more than one bidder, each winning bidder) pays the full purchase price in Cash, at which time all Cash will be transferred into the Collection Accounts, such payment in full of the purchase price to be made by the winning bidder prior to the sixth Business Day following the relevant Auction Date. If such good faith deposit or payment in full of the purchase price is not made when due (or, if the Subpools are to be sold to more than one bidder, if any bidder fails to make its contribution to the good faith deposit or make payment of the purchase price when due), the Trustee shall decline to consummate the Sale of each Subpool and shall give notice (in accordance with Section 9.3) that the Auction Call Redemption will not occur.

(f)    Notwithstanding the foregoing, but subject to the satisfaction of the conditions set forth in clauses (i) through (iv) of Section 9.5 of the Indenture, the Collateral Manager or any of its Affiliates, although it may not have been the highest bidder, will have the option to purchase the Collateral Debt Securities (or any Subpool) for a purchase price equal to the highest bid therefor.

**<u>SCHEDULE F</u>**

**<u>STANDARD & POOR'S ASSET CLASSES</u>**

**Part A**

1.  <u>Consumer ABS</u>
    Automobile Loan Receivable Securities
    Automobile Lease Receivable Securities
    Car Rental Receivables Securities
    Credit Card Securities
    Healthcare Securities
    Student Loan Securities

2.  <u>Commercial ABS</u>
    Cargo Securities
    Equipment Leasing Securities
    Aircraft Leasing Securities
    Small Business Loan Securities
    Restaurant and Food Services Securities
    Tobacco Bonds

3.  <u>Non-RE-REMIC RMBS</u>
    Manufactured Housing Loan Securities

4.  <u>Non-RE-REMIC CMBS</u>
    CMBS—Conduit
    CMBS—Credit Tenant Lease
    CMBS—Large Loan
    CMBS—Single Borrower
    CMBS—Single Property

5.  <u>CDO Cashflow Securities</u>
    Cash Flow CBO—at least 80% High Yield Corporate
    Cash Flow CBO—at least 80% Investment Grade Corporate
    Cash Flow CLO—at least 80% High Yield Corporate
    Cash Flow CLO—at least 80% Investment Grade Corporate

6.  <u>REITs</u>
    REIT—Multi-family & Mobile Home Park
    REIT—Retail
    REIT—Hospitality
    REIT—Office
    REIT—Industrial
    REIT—Healthcare
    REIT—Warehouse

REIT—Self Storage
REIT—Mixed Use

7.    <u>Real Estate Operating Companies</u>

**Part B**

<u>Residential Mortgages</u>
Residential "A"
Residential "B/C"
Home equity loans

**Part C**

<u>Specialty Structured</u>
Stadium Financings
Project Finance
Future flows

**SCHEDULE G**

**STANDARD & POOR'S TYPES OF ASSET-BACKED SECURITIES INELIGIBLE FOR NOTCHING**

    The following types of Asset-Backed Securities are not eligible to be notched in accordance with Part II of Schedule H unless otherwise agreed to by Standard & Poor's. Accordingly, the Standard & Poor's Rating of such Asset-Backed Securities must be determined pursuant to clause (i) or (ii) of paragraph (b) of the definition of "Rating" in Section 1.1 of the Indenture. This Schedule may be modified from time to time by Standard & Poor's and its applicability should be confirmed with Standard & Poor's prior to use.

1.  Non-U.S. Structured Finance Securities

2.  Guaranteed Securities

3.  CDOs of Structured Finance and Real Estate Securities

4.  CBOs of CDOs

5.  CLOs of Distressed Debt

6.  Mutual Fund Fee Securities

7.  Catastrophe Bonds

8.  First Loss Tranches of any Securitization

9.  Synthetics other than Form-Approved Synthetic Securities

10.  Synthetic CBOs

11.  Combination Notes

12.  RE-REMICS

13.  Market value CDOs

14.  Net Interest Margin Securities (NIMs)

15.  Any asset class not listed in Schedule H

16.  Interest-Only Securities

17.  Structured Settlement Securities Tobacco

18.  CDO of Trust Preferred Securities

19.  Hedge Fund CDOs

## SCHEDULE H

### PART I

### MOODY'S NOTCHING OF ASSET-BACKED SECURITIES

The following notching conventions are appropriate for Standard & Poor's-only rated tranches. The figures represent the number of notches to be subtracted from the Standard & Poor's rating. (For example, a "1" applied to a Standard & Poor's rating of "BBB" implies a Moody's rating of "Baa3".)

| ASSET CLASS | "AAA" to "AA-" | "A+" TO "BBB-" | Below "BBB-" |
|---|---|---|---|
| Asset-Backed | | | |
| Agricultural and Industrial Equipment loans | 1 | 2 | 3 |
| Aircraft and Auto leases and Car Rental Receivable Securities | 2 | 3 | 4 |
| Arena and Stadium | 1 | 2 | 3 |
| Financing Auto loan | 1 | 2 | 3 |
| Boat, Motorcycle, RV, Truck | 1 | 2 | 3 |
| Computer, Equipment and Small-ticket item leases | 1 | 2 | 3 |
| Consumer Loans | 1 | 3 | 4 |
| Credit Card | 1 | 2 | 3 |
| Cross-border transactions | 1 | 2 | 3 |
| Entertainment Royalties | 1 | 2 | 3 |
| Floorplan | 1 | 2 | 3 |
| Franchise Loans | 1 | 2 | 4 |
| Future Receivables | 1 | 1 | 2 |
| Health Care Receivables | 1 | 2 | 3 |
| Manufactured Housing | 1 | 2 | 3 |
| Mutual Fund Fees | 1 | 2 | 4 |
| Small Business Loans | 1 | 2 | 3 |
| Stranded Utilities | 1 | 2 | 3 |
| Structured Settlements | 1 | 2 | 3 |
| Student Loan | 1 | 2 | 3 |
| Tax Liens | 1 | 2 | 3 |
| Timeshare Securities | 1 | 2 | 3 |
| Trade Receivables | 2 | 3 | 4 |

| ASSET CLASS | "AAA" | "AA+" TO "BBB-" | Below "BBB-" |
|---|---|---|---|
| Jumbo | 1 | 2 | 3 |
| Alt-A or mixed pools | 1 | 3 | 4 |
| HEL (including Residential A, Residential B&C, RMBS Prime Mortgage Securities, RMBS Mid-Prime Mortgage Securities and RMBS Sub-Prime Mortgage Securities) | 1 | 2 | 3 |

For dual-rated Jumbo A or Alt-A transactions, take the lower of the two ratings on the security, apply the appropriate single-rated notching guideline as set forth in the definition of Moody's Rating, then go up by ½ notch. For dual-rated HEL (including Residential A,

Residential B&C) transactions, apply the Standard & Poor's-only rated tranche notching guidelines as set forth above.

The following CMBS notching conventions are with respect to S&P and Fitch.

| ASSET CLASS | Tranche Rated by Fitch and S&P; no tranche in deal rated by Moody's | Tranche Rated by Fitch and/or S&P; at least one other tranche in deal rated by Moody's |
|---|---|---|
| **Commercial Mortgage Backed Securities** | | |
| Conduit[1] | 2 notches from lower of S&P | 1.5[2] notches from lower of S&P |
| Credit Tenant Lease | Follow corporate notching practice | Follow corporate notching practice |
| Large Loan | *No Notching Permitted* | |

[1]    For this purpose, conduits are defined as fixed rate, sequential pay, multi-borrower transactions having a Herfindahl score of 40 or higher at the loan level with all collateral (conduit loans, A notes, large loans, CTLs and any other real estate collateral) factored in.

[2]    A 1.5 haircut implies, for example, that if the S&P rating were BBB, then the Moody's rating factor would be halfway between the "Baa3" and "Ba1" rating factors.

<u>PART II</u>

<u>STANDARD & POOR'S NOTCHING OF ASSET-BACKED SECURITIES</u>

The Standard and Poor's Rating of an Collateral Debt Security that is not of a type specified on <u>Schedule G</u> and that has not been assigned a rating by Standard & Poor's may be determined as set forth below.

A.    If such Collateral Debt Security is rated by Moody's, the Standard & Poor's Rating of such Collateral Debt Security shall be the Standard & Poor's equivalent of the rating that is the number of subcategories specified in Table A below the lowest of the ratings assigned by Moody's.

B.    If the Collateral Debt Security is rated by Moody's, the Standard & Poor's Rating of such Collateral Debt Security shall be the Standard & Poor's equivalent of the rating that is one subcategory below the rating that is the number of subcategories specified in Table A below the rating assigned by Moody's.

This Schedule may be modified from time to time by Standard & Poor's and its applicability should be confirmed with Standard & Poor's prior to use.

# TABLE A

| | Asset-Backed Securities issued prior to August 1, 2001 | | Asset-Backed Securities issued on or after August 1, 2001 | |
|---|---|---|---|---|
| | (Lowest) current rating is: | | (Lowest) current rating is: | |
| | "BBB-" or its equivalent or higher | Below "BBB-" or its equivalent | "BBB-" or its equivalent or higher | Below "BBB-" or its equivalent |
| **1. Consumer ABS** | -1 | -2 | -2 | -3 |
| Automobile Loan Receivable Securities | | | | |
| Automobile Lease Receivable Securities | | | | |
| Car Rental Receivables Securities | | | | |
| Credit Card Securities | | | | |
| Healthcare Securities | | | | |
| Student Loan Securities | | | | |
| **2. Commercial ABS** | -1 | -2 | -2 | -3 |
| Cargo Securities | | | | |
| Equipment Leasing Securities | | | | |
| Franchise Securities | | | | |
| Aircraft Leasing Securities | | | | |
| Small Business Loan Securities | | | | |
| Restaurant and Food Services Securities | | | | |
| Tobacco Litigation Securities | | | | |
| **3. Non-Re-REMIC RMBS** | -1 | -2 | -2 | -3 |
| Manufactured Housing Loan Securities | | | | |
| **4. Non-Re-REMIC CMBS** | -1 | -2 | -2 | -3 |
| CMBS – Conduit | | | | |
| CMBS – Credit Tenant Lease | | | | |
| CMBS – Large Loan | | | | |
| CMBS – Single Borrower | | | | |
| CMBS – Single Property | | | | |
| **5. CDO/CLO Cashflow Securities** | -1 | -2 | -2 | -3 |
| Cash Flow CBO – at least 80% High Yield Corporate | | | | |
| Cash Flow CBO – at least 80% Investment Grade Corporate | | | | |
| Cash Flow CLO – at least 80% High Yield Corporate | | | | |
| Cash Flow CLO – at least 80% Investment Grade Corporate | | | | |

|  | Asset-Backed Securities issued prior to August 1, 2001 | | Asset-Backed Securities issued on or after August 1, 2001 | |
|  | (Lowest) current rating is: | | (Lowest) current rating is: | |
|  | "BBB-" or its equivalent or higher | Below "BBB-" or its equivalent | "BBB-" or its equivalent or higher | Below "BBB-" or its equivalent |
|---|---|---|---|---|
| **6. REITs** | -1 | -2 | -2 | -3 |
| REIT – Multi-family & Mobile Home Park | | | | |
| REIT – Retail | | | | |
| REIT – Hotel | | | | |
| REIT – Hospitality REIT – Office | | | | |
| REIT – Industrial | | | | |
| REIT – Healthcare | | | | |
| REIT – Warehouse | | | | |
| REIT – Self Storage | | | | |
| REIT – Mixed Use | | | | |
| **7. Specialty Structured** | -3 | -4 | -3 | -4 |
| Stadium Financings | | | | |
| Project Finance | | | | |
| Future flows | | | | |
| **8. Residential Mortgages** | -1 | -2 | -2 | -3 |
| Residential "A" | | | | |
| Residential "B/C" | | | | |
| Home equity loans | | | | |
| **9. Real Estate Operating Companies** | -1 | -2 | -2 | -3 |

As of December 10, 2001

## **SCHEDULE I**

### [RESERVED]

## SCHEDULE J

## MOODY'S REPO ADVANCE RATES

| | | | | Ctpy Rating | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Asset Type | Coupon Type | Asset Rating | Asset Mat | Aaa | Aa1 | Aa2 | Aa3 | A1 | Below A3 |
| CDO (HYB,SF) | Floating | Aaa | < 1Y | 100.00% | 97.01% | 97.01% | 96.92% | 96.81% | 95.73% |
| CDO (HYB,SF) | Floating | Aaa | < 2Y | 100.00% | 97.06% | 97.01% | 96.75% | 96.55% | 94.61% |
| CDO (HYB,SF) | Floating | Aaa | < 5Y | 100.00% | 97.06% | 96.93% | 96.27% | 95.80% | 91.47% |
| CDO (HYB,SF) | Floating | Aaa | < 10Y | 100.00% | 97.04% | 96.72% | 95.38% | 94.55% | 87.24% |
| CDO (HYB,SF) | Floating | Aaa | < 30Y | 100.00% | 94.02% | 93.35% | 90.76% | 89.20% | 75.93% |
| CDO (HYB,SF) | Floating | Aa | < 1Y | 100.00% | 94.06% | 94.01% | 93.86% | 93.72% | 92.31% |
| CDO (HYB,SF) | Floating | Aa | < 2Y | 100.00% | 94.06% | 93.99% | 93.64% | 93.38% | 90.82% |
| CDO (HYB,SF) | Floating | Aa | < 5Y | 100.00% | 94.04% | 93.86% | 93.04% | 92.44% | 86.97% |
| CDO (HYB,SF) | Floating | Aa | < 10Y | 100.00% | 94.00% | 93.60% | 91.96% | 90.94% | 82.00% |
| CDO (HYB,SF) | Floating | Aa | < 30Y | 100.00% | 87.96% | 87.18% | 84.09% | 82.24% | 66.87% |
| CDO (HYB,SF) | Floating | A | < 1Y | 100.00% | 92.06% | 92.01% | 91.79% | 91.60% | 89.64% |
| CDO (HYB,SF) | Floating | A | < 2Y | 100.00% | 92.05% | 91.93% | 91.49% | 91.13% | 87.60% |
| CDO (HYB,SF) | Floating | A | < 5Y | 100.00% | 92.02% | 91.79% | 90.73% | 89.94% | 82.69% |
| CDO (HYB,SF) | Floating | A | < 10Y | 100.00% | 91.97% | 91.50% | 89.44% | 88.12% | 76.73% |
| CDO (HYB,SF) | Floating | A | < 30Y | 100.00% | 83.92% | 83.11% | 79.23% | 76.90% | 58.31% |
| CDO (HYB,SF) | Floating | Baa | < 1Y | 100.00% | 90.06% | 90.00% | 89.67% | 89.41% | 86.69% |
| CDO (HYB,SF) | Floating | Baa | < 2Y | 100.00% | 90.05% | 89.91% | 89.26% | 88.76% | 83.86% |
| CDO (HYB,SF) | Floating | Baa | < 5Y | 100.00% | 90.01% | 89.71% | 88.28% | 87.23% | 77.68% |
| CDO (HYB,SF) | Floating | Baa | < 10Y | 100.00% | 89.94% | 89.36% | 86.69% | 84.98% | 70.64% |
| CDO (HYB,SF) | Floating | Baa | < 30Y | 100.00% | 79.89% | 78.91% | 74.02% | 71.12% | 49.14% |
| CDO (HYL,IG) | Floating | Aaa | < 1Y | 100.00% | 98.06% | 98.01% | 97.94% | 97.85% | 96.93% |
| CDO (HYL,IG) | Floating | Aaa | < 2Y | 100.00% | 98.06% | 98.01% | 97.80% | 97.63% | 95.97% |
| CDO (HYL,IG) | Floating | Aaa | < 5Y | 100.00% | 98.06% | 97.94% | 97.39% | 96.99% | 93.29% |
| CDO (HYL,IG) | Floating | Aaa | < 10Y | 100.00% | 98.04% | 97.77% | 96.63% | 95.93% | 89.64% |
| CDO (HYL,IG) | Floating | Aaa | < 30Y | 100.00% | 96.02% | 95.46% | 93.23% | 91.88% | 80.22% |
| CDO (HYL,IG) | Floating | Aa | < 1Y | 100.00% | 95.06% | 95.01% | 94.91% | 94.81% | 93.71% |
| CDO (HYL,IG) | Floating | Aa | < 2Y | 100.00% | 95.06% | 95.00% | 94.74% | 94.53% | 92.53% |
| CDO (HYL,IG) | Floating | Aa | < 5Y | 100.00% | 95.04% | 94.88% | 94.27% | 93.81% | 89.51% |
| CDO (HYL,IG) | Floating | Aa | < 10Y | 100.00% | 95.00% | 94.65% | 93.44% | 92.64% | 85.55% |
| CDO (HYL,IG) | Floating | Aa | < 30Y | 100.00% | 89.96% | 89.35% | 86.95% | 85.47% | 72.89% |
| CDO (HYL,IG) | Floating | A | < 1Y | 100.00% | 93.06% | 93.01% | 92.88% | 92.75% | 91.41% |
| CDO (HYL,IG) | Floating | A | < 2Y | 100.00% | 93.06% | 92.95% | 92.68% | 92.43% | 90.00% |
| CDO (HYL,IG) | Floating | A | < 5Y | 100.00% | 93.02% | 92.81% | 92.16% | 91.62% | 86.56% |
| CDO (HYL,IG) | Floating | A | < 10Y | 100.00% | 92.97% | 92.57% | 91.28% | 90.37% | 82.30% |
| CDO (HYL,IG) | Floating | A | < 30Y | 100.00% | 85.92% | 85.29% | 82.74% | 81.08% | 67.25% |
| CDO (HYL,IG) | Floating | Baa | < 1Y | 100.00% | 91.06% | 91.00% | 90.79% | 90.60% | 88.61% |
| CDO (HYL,IG) | Floating | Baa | < 2Y | 100.00% | 91.05% | 90.91% | 90.49% | 90.13% | 86.53% |
| CDO (HYL,IG) | Floating | Baa | < 5Y | 100.00% | 91.01% | 90.73% | 89.78% | 89.01% | 81.91% |
| CDO (HYL,IG) | Floating | Baa | < 10Y | 100.00% | 90.95% | 90.44% | 88.63% | 87.37% | 76.53% |
| CDO (HYL,IG) | Floating | Baa | < 30Y | 100.00% | 81.89% | 81.10% | 77.63% | 75.45% | 57.89% |
| CMBS | Fixed | Aaa | < 1Y | 100.00% | 99.66% | 99.55% | 99.28% | 99.02% | 96.48% |
| CMBS | Fixed | Aaa | < 2Y | 100.00% | 99.62% | 99.40% | 98.83% | 98.33% | 93.56% |

| Asset Type | Coupon Type | Asset Rating | Asset Mat | Ctpy Rating | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Aaa | Aa1 | Aa2 | Aa3 | A1 | Below A3 |
| CMBS | Fixed | Aaa | < 5Y | 100.00% | 99.32% | 98.82% | 97.56% | 96.49% | 86.89% |
| CMBS | Fixed | Aaa | < 10Y | 100.00% | 98.83% | 98.04% | 96.23% | 94.88% | 83.22% |
| CMBS | Fixed | Aaa | < 30Y | 100.00% | 97.69% | 96.32% | 92.42% | 89.85% | 69.12% |
| CMBS | Fixed | Aa | < 1Y | 100.00% | 99.36% | 99.24% | 98.92% | 98.63% | 95.78% |
| CMBS | Fixed | Aa | < 2Y | 100.00% | 99.32% | 99.08% | 98.43% | 97.87% | 92.57% |
| CMBS | Fixed | Aa | < 5Y | 100.00% | 98.91% | 98.37% | 96.94% | 95.75% | 85.15% |
| CMBS | Fixed | Aa | < 10Y | 100.00% | 98.22% | 97.36% | 95.30% | 93.81% | 80.95% |
| CMBS | Fixed | Aa | < 30Y | 100.00% | 96.47% | 94.99% | 90.61% | 87.78% | 65.36% |
| CMBS | Fixed | A | < 1Y | 100.00% | 99.05% | 98.94% | 98.63% | 98.34% | 95.40% |
| CMBS | Fixed | A | < 2Y | 100.00% | 99.02% | 98.78% | 98.15% | 97.59% | 92.15% |
| CMBS | Fixed | A | < 5Y | 100.00% | 98.41% | 97.87% | 96.47% | 95.26% | 84.38% |
| CMBS | Fixed | A | < 10Y | 100.00% | 97.52% | 96.69% | 94.68% | 93.14% | 79.98% |
| CMBS | Fixed | A | < 30Y | 100.00% | 95.07% | 93.69% | 89.41% | 86.51% | 63.79% |
| CMBS | Fixed | Baa | < 1Y | 100.00% | 98.75% | 98.64% | 98.32% | 98.02% | 94.95% |
| CMBS | Fixed | Baa | < 2Y | 100.00% | 98.71% | 98.47% | 97.83% | 97.27% | 91.67% |
| CMBS | Fixed | Baa | < 5Y | 100.00% | 97.91% | 97.37% | 95.95% | 94.72% | 83.58% |
| CMBS | Fixed | Baa | < 10Y | 100.00% | 96.62% | 95.81% | 93.80% | 92.25% | 78.96% |
| CMBS | Fixed | Baa | < 30Y | 100.00% | 93.28% | 91.95% | 87.71% | 84.81% | 62.13% |
| CMBS | Fixed | Ba | < 1Y | 100.00% | 92.56% | 92.44% | 92.04% | 91.69% | 88.13% |
| CMBS | Fixed | Ba | < 2Y | 100.00% | 92.52% | 92.28% | 91.49% | 90.83% | 84.41% |
| CMBS | Fixed | Ba | < 5Y | 100.00% | 92.42% | 91.89% | 90.17% | 88.79% | 76.37% |
| CMBS | Fixed | Ba | < 10Y | 100.00% | 92.34% | 91.55% | 89.13% | 87.39% | 72.79% |
| CMBS | Fixed | Ba | < 30Y | 100.00% | 84.73% | 83.46% | 78.71% | 75.67% | 52.48% |
| CMBS | Fixed | B | < 1Y | 100.00% | 87.56% | 87.43% | 86.86% | 86.41% | 81.75% |
| CMBS | Fixed | B | < 2Y | 100.00% | 87.52% | 87.26% | 86.15% | 85.30% | 77.05% |
| CMBS | Fixed | B | < 5Y | 100.00% | 87.43% | 86.88% | 84.51% | 82.77% | 67.56% |
| CMBS | Fixed | B | < 10Y | 100.00% | 87.36% | 86.53% | 83.30% | 81.17% | 63.83% |
| CMBS | Fixed | B | < 30Y | 100.00% | 74.78% | 73.46% | 67.70% | 64.28% | 39.74% |
| CMBS | Fixed | Caa / NR | < 1Y | 100.00% | 75.06% | 74.93% | 73.98% | 73.30% | 66.42% |
| CMBS | Fixed | Caa / NR | < 2Y | 100.00% | 75.03% | 74.75% | 72.91% | 71.66% | 59.89% |
| CMBS | Fixed | Caa / NR | < 5Y | 100.00% | 74.97% | 74.44% | 70.98% | 68.73% | 50.10% |
| CMBS | Fixed | Caa / NR | < 10Y | 100.00% | 74.93% | 74.11% | 69.99% | 67.52% | 48.38% |
| CMBS | Fixed | Caa / NR | < 30Y | 100.00% | 49.93% | 48.56% | 43.25% | 40.25% | 20.65% |
| CMBS | Floating | Aaa | < 1Y | 100.00% | 99.66% | 99.62% | 99.60% | 99.59% | 99.20% |
| CMBS | Floating | Aaa | < 2Y | 100.00% | 99.66% | 99.61% | 99.54% | 99.48% | 98.72% |
| CMBS | Floating | Aaa | < 5Y | 100.00% | 99.43% | 99.27% | 99.01% | 98.74% | 96.19% |
| CMBS | Floating | Aaa | < 10Y | 100.00% | 98.99% | 98.68% | 98.09% | 97.61% | 93.23% |
| CMBS | Floating | Aaa | < 30Y | 100.00% | 97.91% | 97.28% | 95.55% | 94.34% | 83.84% |
| CMBS | Floating | Aa | < 1Y | 100.00% | 99.36% | 99.32% | 99.30% | 99.23% | 98.62% |
| CMBS | Floating | Aa | < 2Y | 100.00% | 99.36% | 99.30% | 99.20% | 99.09% | 97.98% |
| CMBS | Floating | Aa | < 5Y | 100.00% | 99.02% | 98.82% | 98.45% | 98.09% | 94.70% |
| CMBS | Floating | Aa | < 10Y | 100.00% | 98.37% | 98.00% | 97.22% | 96.61% | 91.07% |
| CMBS | Floating | Aa | < 30Y | 100.00% | 96.67% | 95.93% | 93.76% | 92.28% | 79.63% |
| CMBS | Floating | A | < 1Y | 100.00% | 99.06% | 99.02% | 98.97% | 98.90% | 98.13% |
| CMBS | Floating | A | < 2Y | 100.00% | 99.06% | 98.97% | 98.85% | 98.71% | 97.31% |
| CMBS | Floating | A | < 5Y | 100.00% | 98.51% | 98.28% | 97.85% | 97.42% | 93.37% |
| CMBS | Floating | A | < 10Y | 100.00% | 97.65% | 97.25% | 96.40% | 95.69% | 89.35% |

| Asset Type | Coupon Type | Asset Rating | Asset Mat | Ctpy Rating | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Aaa | Aa1 | Aa2 | Aa3 | A1 | Below A3 |
| CMBS | Floating | A | < 30Y | 100.00% | 95.25% | 94.48% | 92.15% | 90.51% | 76.54% |
| CMBS | Floating | Baa | < 1Y | 100.00% | 98.76% | 98.71% | 98.64% | 98.55% | 97.61% |
| CMBS | Floating | Baa | < 2Y | 100.00% | 98.75% | 98.65% | 98.50% | 98.33% | 96.60% |
| CMBS | Floating | Baa | < 5Y | 100.00% | 98.00% | 97.74% | 97.24% | 96.74% | 92.02% |
| CMBS | Floating | Baa | < 10Y | 100.00% | 96.74% | 96.30% | 95.35% | 94.56% | 87.49% |
| CMBS | Floating | Baa | < 30Y | 100.00% | 93.44% | 92.63% | 90.11% | 88.32% | 73.28% |
| CMBS | Floating | Ba | < 1Y | 100.00% | 92.56% | 92.51% | 92.26% | 92.05% | 89.89% |
| CMBS | Floating | Ba | < 2Y | 100.00% | 92.55% | 92.42% | 91.93% | 91.54% | 87.60% |
| CMBS | Floating | Ba | < 5Y | 100.00% | 92.50% | 92.18% | 90.90% | 89.93% | 80.93% |
| CMBS | Floating | Ba | < 10Y | 100.00% | 92.44% | 91.89% | 89.83% | 88.43% | 76.39% |
| CMBS | Floating | Ba | < 30Y | 100.00% | 84.85% | 83.85% | 79.35% | 76.59% | 55.10% |
| CMBS | Floating | B | < 1Y | 100.00% | 87.56% | 87.50% | 87.08% | 86.76% | 83.46% |
| CMBS | Floating | B | < 2Y | 100.00% | 87.55% | 87.39% | 86.58% | 85.99% | 80.08% |
| CMBS | Floating | B | < 5Y | 100.00% | 87.49% | 87.10% | 85.13% | 83.73% | 71.18% |
| CMBS | Floating | B | < 10Y | 100.00% | 87.43% | 86.76% | 83.73% | 81.81% | 65.89% |
| CMBS | Floating | B | < 30Y | 100.00% | 74.85% | 73.58% | 67.70% | 64.28% | 39.74% |
| CMBS | Floating | Caa / NR | < 1Y | 100.00% | 75.06% | 75.00% | 74.21% | 73.66% | 68.07% |
| CMBS | Floating | Caa / NR | < 2Y | 100.00% | 75.04% | 74.83% | 73.35% | 72.34% | 62.67% |
| CMBS | Floating | Caa / NR | < 5Y | 100.00% | 75.00% | 74.56% | 71.39% | 69.35% | 52.18% |
| CMBS | Floating | Caa / NR | < 10Y | 100.00% | 74.96% | 74.13% | 69.99% | 67.52% | 48.38% |
| CMBS | Floating | Caa / NR | < 30Y | 100.00% | 49.95% | 48.56% | 43.25% | 40.25% | 20.65% |
| RMBS | Fixed | Aaa | < 1Y | 100.00% | 99.95% | 99.83% | 99.52% | 99.26% | 96.88% |
| RMBS | Fixed | Aaa | < 2Y | 100.00% | 99.91% | 99.66% | 99.08% | 98.59% | 94.07% |
| RMBS | Fixed | Aaa | < 5Y | 100.00% | 99.74% | 99.16% | 97.95% | 96.89% | 87.47% |
| RMBS | Fixed | Aaa | < 10Y | 100.00% | 99.53% | 98.69% | 97.16% | 95.75% | 83.48% |
| RMBS | Fixed | Aaa | < 30Y | 100.00% | 99.11% | 97.71% | 94.24% | 91.51% | 69.54% |
| RMBS | Fixed | Aa | < 1Y | 100.00% | 99.83% | 99.71% | 99.35% | 99.07% | 96.43% |
| RMBS | Fixed | Aa | < 2Y | 100.00% | 99.78% | 99.51% | 98.87% | 98.32% | 93.33% |
| RMBS | Fixed | Aa | < 5Y | 100.00% | 99.57% | 98.97% | 97.66% | 96.52% | 86.50% |
| RMBS | Fixed | Aa | < 10Y | 100.00% | 99.28% | 98.43% | 96.81% | 95.35% | 82.64% |
| RMBS | Fixed | Aa | < 30Y | 100.00% | 98.61% | 97.20% | 93.56% | 90.74% | 68.15% |
| RMBS | Fixed | A | < 1Y | 100.00% | 99.75% | 99.62% | 99.23% | 98.90% | 95.90% |
| RMBS | Fixed | A | < 2Y | 100.00% | 99.70% | 99.42% | 98.69% | 98.07% | 92.39% |
| RMBS | Fixed | A | < 5Y | 100.00% | 99.43% | 98.82% | 97.39% | 96.15% | 85.20% |
| RMBS | Fixed | A | < 10Y | 100.00% | 99.09% | 98.27% | 96.56% | 95.01% | 81.52% |
| RMBS | Fixed | A | < 30Y | 100.00% | 98.23% | 96.86% | 93.05% | 90.07% | 66.30% |
| RMBS | Fixed | Baa | < 1Y | 100.00% | 99.64% | 99.51% | 99.08% | 98.72% | 95.45% |
| RMBS | Fixed | Baa | < 2Y | 100.00% | 99.59% | 99.30% | 98.50% | 97.83% | 91.67% |
| RMBS | Fixed | Baa | < 5Y | 100.00% | 99.26% | 98.66% | 97.16% | 95.87% | 84.44% |
| RMBS | Fixed | Baa | < 10Y | 100.00% | 98.81% | 98.01% | 96.28% | 94.71% | 81.10% |
| RMBS | Fixed | Baa | < 30Y | 100.00% | 97.65% | 96.35% | 92.50% | 89.51% | 65.61% |
| RMBS | Fixed | Ba | < 1Y | 100.00% | 97.05% | 96.92% | 96.48% | 96.12% | 92.80% |
| RMBS | Fixed | Ba | < 2Y | 100.00% | 97.00% | 96.72% | 95.90% | 95.21% | 88.96% |
| RMBS | Fixed | Ba | < 5Y | 100.00% | 96.90% | 96.33% | 94.84% | 93.58% | 82.38% |
| RMBS | Fixed | Ba | < 10Y | 100.00% | 96.83% | 96.10% | 94.43% | 92.96% | 80.01% |
| RMBS | Fixed | Ba | < 30Y | 100.00% | 93.70% | 92.52% | 88.92% | 86.15% | 63.81% |
| RMBS | Fixed | B | < 1Y | 100.00% | 95.05% | 94.91% | 94.27% | 93.81% | 89.43% |

| | | | | Ctpy Rating | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Asset Type** | **Coupon Type** | **Asset Rating** | **Asset Mat** | **Aaa** | **Aa1** | **Aa2** | **Aa3** | **A1** | **Below A3** |
| RMBS | Fixed | B | < 2Y | 100.00% | 95.00% | 94.69% | 93.51% | 92.61% | 84.46% |
| RMBS | Fixed | B | < 5Y | 100.00% | 94.91% | 94.31% | 92.23% | 90.64% | 76.79% |
| RMBS | Fixed | B | < 10Y | 100.00% | 94.85% | 94.12% | 91.85% | 90.08% | 74.72% |
| RMBS | Fixed | B | < 30Y | 100.00% | 89.74% | 88.56% | 83.93% | 80.70% | 55.51% |
| RMBS | Fixed | Caa / NR | < 1Y | 100.00% | 90.05% | 89.90% | 88.76% | 88.01% | 81.10% |
| RMBS | Fixed | Caa / NR | < 2Y | 100.00% | 90.00% | 89.64% | 87.51% | 86.08% | 73.49% |
| RMBS | Fixed | Caa / NR | < 5Y | 100.00% | 89.92% | 89.24% | 85.63% | 83.23% | 63.37% |
| RMBS | Fixed | Caa / NR | < 10Y | 100.00% | 89.88% | 89.10% | 85.30% | 82.73% | 61.75% |
| RMBS | Fixed | Caa / NR | < 30Y | 100.00% | 79.79% | 78.52% | 71.51% | 67.24% | 37.44% |
| RMBS | Floating | Aaa | < 1Y | 100.00% | 99.96% | 99.92% | 99.90% | 99.87% | 99.50% |
| RMBS | Floating | Aaa | < 2Y | 100.00% | 99.96% | 99.91% | 99.83% | 99.78% | 99.06% |
| RMBS | Floating | Aaa | < 5Y | 100.00% | 99.87% | 99.69% | 99.44% | 99.17% | 96.67% |
| RMBS | Floating | Aaa | < 10Y | 100.00% | 99.72% | 99.38% | 98.90% | 98.40% | 93.79% |
| RMBS | Floating | Aaa | < 30Y | 100.00% | 99.37% | 98.71% | 97.20% | 95.92% | 84.78% |
| RMBS | Floating | Aa | < 1Y | 100.00% | 99.84% | 99.81% | 99.76% | 99.71% | 99.14% |
| RMBS | Floating | Aa | < 2Y | 100.00% | 99.84% | 99.75% | 99.66% | 99.56% | 98.51% |
| RMBS | Floating | Aa | < 5Y | 100.00% | 99.70% | 99.48% | 99.14% | 98.80% | 95.61% |
| RMBS | Floating | Aa | < 10Y | 100.00% | 99.45% | 99.07% | 98.48% | 97.89% | 92.44% |
| RMBS | Floating | Aa | < 30Y | 100.00% | 98.84% | 98.11% | 96.34% | 94.88% | 82.23% |
| RMBS | Floating | A | < 1Y | 100.00% | 99.76% | 99.71% | 99.64% | 99.56% | 98.80% |
| RMBS | Floating | A | < 2Y | 100.00% | 99.75% | 99.65% | 99.51% | 99.36% | 97.89% |
| RMBS | Floating | A | < 5Y | 100.00% | 99.54% | 99.29% | 98.85% | 98.41% | 94.33% |
| RMBS | Floating | A | < 10Y | 100.00% | 99.24% | 98.83% | 98.12% | 97.41% | 90.93% |
| RMBS | Floating | A | < 30Y | 100.00% | 98.43% | 97.66% | 95.60% | 93.91% | 79.35% |
| RMBS | Floating | Baa | < 1Y | 100.00% | 99.65% | 99.61% | 99.50% | 99.40% | 98.40% |
| RMBS | Floating | Baa | < 2Y | 100.00% | 99.64% | 99.52% | 99.33% | 99.12% | 97.21% |
| RMBS | Floating | Baa | < 5Y | 100.00% | 99.36% | 99.08% | 98.54% | 98.02% | 93.17% |
| RMBS | Floating | Baa | < 10Y | 100.00% | 98.94% | 98.50% | 97.69% | 96.89% | 89.66% |
| RMBS | Floating | Baa | < 30Y | 100.00% | 97.82% | 97.29% | 94.75% | 92.91% | 77.12% |
| RMBS | Floating | Ba | < 1Y | 100.00% | 97.06% | 97.00% | 96.72% | 96.51% | 94.49% |
| RMBS | Floating | Ba | < 2Y | 100.00% | 97.04% | 96.90% | 96.38% | 95.96% | 92.13% |
| RMBS | Floating | Ba | < 5Y | 100.00% | 96.98% | 96.64% | 95.52% | 94.63% | 86.55% |
| RMBS | Floating | Ba | < 10Y | 100.00% | 96.93% | 96.44% | 94.97% | 93.78% | 83.17% |
| RMBS | Floating | Ba | < 30Y | 100.00% | 93.82% | 92.94% | 89.45% | 86.94% | 66.35% |
| RMBS | Floating | B | < 1Y | 100.00% | 95.06% | 94.97% | 94.52% | 94.19% | 91.10% |
| RMBS | Floating | B | < 2Y | 100.00% | 95.04% | 94.83% | 93.98% | 93.35% | 87.52% |
| RMBS | Floating | B | < 5Y | 100.00% | 94.97% | 94.55% | 92.80% | 91.53% | 80.15% |
| RMBS | Floating | B | < 10Y | 100.00% | 94.92% | 94.35% | 92.19% | 90.58% | 76.55% |
| RMBS | Floating | B | < 30Y | 100.00% | 89.81% | 88.81% | 83.93% | 80.70% | 55.51% |
| RMBS | Floating | Caa / NR | < 1Y | 100.00% | 90.06% | 89.92% | 89.03% | 88.43% | 82.82% |
| RMBS | Floating | Caa / NR | < 2Y | 100.00% | 90.03% | 89.76% | 88.03% | 86.88% | 76.56% |
| RMBS | Floating | Caa / NR | < 5Y | 100.00% | 89.96% | 89.41% | 86.08% | 83.90% | 65.65% |
| RMBS | Floating | Caa / NR | < 10Y | 100.00% | 89.91% | 89.22% | 85.30% | 82.73% | 61.75% |
| RMBS | Floating | Caa / NR | < 30Y | 100.00% | 79.83% | 78.62% | 71.51% | 67.24% | 37.44% |
| UST | Fixed | Aaa | < 1Y | 100.00% | 100.00% | 99.90% | 99.67% | 99.44% | 97.30% |
| UST | Fixed | Aaa | < 2Y | 100.00% | 99.94% | 99.68% | 99.28% | 98.85% | 94.89% |
| UST | Fixed | Aaa | < 5Y | 100.00% | 99.77% | 99.17% | 98.37% | 97.54% | 89.88% |

| Asset Type | Coupon Type | Asset Rating | Asset Mat | Ctpy Rating | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Aaa | Aa1 | Aa2 | Aa3 | A1 | Below A3 |
| UST | Fixed | Aaa | < 10Y | 100.00% | 99.59% | 98.67% | 97.62% | 96.63% | 87.62% |
| UST | Fixed | Aaa | < 30Y | 100.00% | 99.22% | 97.67% | 95.22% | 93.25% | 76.66% |

# SCHEDULE K

## SCHEDULED CLASS E TARGET PRINCIPAL AMOUNTS

| Closing Date / Monthly Distribution Date | Scheduled Class E Target Principal Balance |
|---|---|
| 7/6/07 | $300,000.00 |
| 8/6/07 | 300,000.00 |
| 9/6/07 | 300,000.00 |
| 10/6/07 | 300,000.00 |
| 11/6/07 | 300,000.00 |
| 12/6/07 | 300,000.00 |
| 1/6/08 | 300,000.00 |
| 2/6/08 | 300,000.00 |
| 3/6/08 | 300,000.00 |
| 4/6/08 | 300,000.00 |
| 5/6/08 | 300,000.00 |
| 6/6/08 | 300,000.00 |
| 7/6/08 | 300,000.00 |
| 8/6/08 | 300,000.00 |
| 9/6/08 | 300,000.00 |
| 10/6/08 | 300,000.00 |
| 11/6/08 | 300,000.00 |
| 12/6/08 | 300,000.00 |
| 1/6/09 | 300,000.00 |
| 2/6/09 | 300,000.00 |
| 3/6/09 | 300,000.00 |
| 4/6/09 | 300,000.00 |
| 5/6/09 | 300,000.00 |
| 6/6/09 | 300,000.00 |
| 7/6/09 | 300,000.00 |
| 8/6/09 | 300,000.00 |
| 9/6/09 | 300,000.00 |
| 10/6/09 | 300,000.00 |
| 11/6/09 | 300,000.00 |
| 12/6/09 | 300,000.00 |
| 1/6/10 | 300,000.00 |
| 2/6/10 | 300,000.00 |
| 3/6/10 | 300,000.00 |
| 4/6/10 | 300,000.00 |
| 5/6/10 | 300,000.00 |
| 6/6/10 | 300,000.00 |
| 7/6/10 | 300,000.00 |
| 8/6/10 | 300,000.00 |
| 9/6/10 | 300,000.00 |
| 10/6/10 | 300,000.00 |
| 11/6/10 | 300,000.00 |
| 12/6/10 | 300,000.00 |
| 1/6/11 | 300,000.00 |
| 2/6/11 | 300,000.00 |
| 3/6/11 | 300,000.00 |
| 4/6/11 | 300,000.00 |
| 5/6/11 | 300,000.00 |
| 6/6/11 | 300,000.00 |
| 7/6/11 | 300,000.00 |
| 8/6/11 | 300,000.00 |
| 9/6/11 | 300,000.00 |
| 10/6/11 | 300,000.00 |
| 11/6/11 | 300,000.00 |
| 12/6/11 | 300,000.00 |
| 1/6/12 | 300,000.00 |
| 2/6/12 | 300,000.00 |
| 3/6/12 | 300,000.00 |

| Closing Date / Monthly Distribution Date | Scheduled Class E Target Principal Balance |
|---|---|
| 4/6/12 | 300,000.00 |
| 5/6/12 | 300,000.00 |
| 6/6/12 | 300,000.00 |

## SCHEDULE L

## SCHEDULED CLASS F TARGET PRINCIPAL AMOUNTS

| Closing Date / Monthly Distribution Date | Scheduled Class E Target Principal Balance |
|---|---|
| 7/6/07 | $300,000.00 |
| 8/6/07 | 300,000.00 |
| 9/6/07 | 300,000.00 |
| 10/6/07 | 300,000.00 |
| 11/6/07 | 300,000.00 |
| 12/6/07 | 300,000.00 |
| 1/6/08 | 300,000.00 |
| 2/6/08 | 300,000.00 |
| 3/6/08 | 300,000.00 |
| 4/6/08 | 300,000.00 |
| 5/6/08 | 300,000.00 |
| 6/6/08 | 300,000.00 |
| 7/6/08 | 300,000.00 |
| 8/6/08 | 300,000.00 |
| 9/6/08 | 300,000.00 |
| 10/6/08 | 300,000.00 |
| 11/6/08 | 300,000.00 |
| 12/6/08 | 300,000.00 |
| 1/6/09 | 300,000.00 |
| 2/6/09 | 300,000.00 |
| 3/6/09 | 300,000.00 |
| 4/6/09 | 300,000.00 |
| 5/6/09 | 300,000.00 |
| 6/6/09 | 300,000.00 |
| 7/6/09 | 300,000.00 |
| 8/6/09 | 300,000.00 |
| 9/6/09 | 300,000.00 |
| 10/6/09 | 300,000.00 |
| 11/6/09 | 300,000.00 |
| 12/6/09 | 300,000.00 |
| 1/6/10 | 300,000.00 |
| 2/6/10 | 300,000.00 |
| 3/6/10 | 300,000.00 |
| 4/6/10 | 300,000.00 |
| 5/6/10 | 300,000.00 |
| 6/6/10 | 300,000.00 |
| 7/6/10 | 300,000.00 |
| 8/6/10 | 300,000.00 |
| 9/6/10 | 300,000.00 |
| 10/6/10 | 300,000.00 |
| 11/6/10 | 300,000.00 |
| 12/6/10 | 300,000.00 |
| 1/6/11 | 300,000.00 |
| 2/6/11 | 300,000.00 |
| 3/6/11 | 300,000.00 |
| 4/6/11 | 300,000.00 |
| 5/6/11 | 300,000.00 |
| 6/6/11 | 300,000.00 |
| 7/6/11 | 300,000.00 |
| 8/6/11 | 300,000.00 |
| 9/6/11 | 300,000.00 |
| 10/6/11 | 300,000.00 |
| 11/6/11 | 300,000.00 |
| 12/6/11 | 300,000.00 |
| 1/6/12 | 300,000.00 |
| 2/6/12 | 300,000.00 |
| 3/6/12 | 300,000.00 |

| Closing Date / Monthly Distribution Date | Scheduled Class E Target Principal Balance |
|---|---|
| 4/6/12 | 300,000.00 |
| 5/6/12 | 300,000.00 |
| 6/6/12 | 300,000.00 |