Law Offices of Avrum J. Rosen, PLLC
Attorneys for the Plaintiff
38 New Street
Huntington, NY 11743
By: Avrum J. Rosen, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
IN RE                                                                         Chapter 11 Case No.: 08-13555-jmp

LEHMAN BROTHERS HOLDINGS INC., *et al.*         (Jointly Administered)

        Debtors.

-----------------------------------------------------------X
WENDY M. UVINO,

        Plaintiff,                                           Adv. Proc. No.: 10-     -jmp

   -against-

LEHMAN BROTHERS HOLDINGS INC.,
ALVAREZ & MARSAL AND
ROBERT HERSHAN,

        Defendants.
-----------------------------------------------------------X

      WENDY M. UVINO ("Uvino"), the Plaintiff herein, by her attorneys, the Law Offices of

Avrum J. Rosen, PLLC as and for her complaint in this adversary proceeding, respectfully

represents as follows:

## THE PARTIES

1.     The Plaintiff is an individual residing at 50 East 89th Street, Apartment 22F, New

        York, New York.

2.     The Defendant LEHMAN BROTHERS HOLDINGS INC. ("LBHI") is one of the

        Debtors in the above-referenced chapter 11 proceeding.

3.     The Defendant ALVAREZ & MARSAL ("A&M") was retained by the Defendant

    LBHI as restructuring manager and has a principal place of business at 600 Lexington Avenue, New York, New York.

4. The Defendant Robert Hershan is a Managing Director with the Defendant A&M, in New York and is an individual, upon information and belief, residing in New Jersey.

## JURISDICTIONAL PREDICATE

5. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 (b)(1) and (2)(A) and (B).

6. This adversary proceeding relates to the above-captioned bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York and is a "core proceeding" as that term is defined in 28 U.S.C. § 157 (a), (b)(1), (b)(2)(A) and (B) and 11 U.S.C.§105 (and if in Lehman Bankruptcy § 503(b)(1)(A) and § 507 (a)(2) and Bankruptcy Rules 7001 *et. seq.*

7. In the event this Court determines that a cause of action, as alleged herein, is not a core proceeding, the Plaintiff consents to the entry of a final order and judgment by this Court determining such cause of action.

## BACKGROUND FACTS

**The LBHI Bankruptcy Filing**

8. On or about September 15, 2008 (the "Petition Date") and periodically thereafter, Defendant LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code.

9. Prior to the Petition Date, Defendant LBHI was the fourth largest investment bank in the United States with headquarters in New York.

10. On, or shortly before, the Petition Date, Defendant LBHI engaged Defendant A&M as restructuring manager and appointed Bryan Marsal as chief restructuring officer of the bankrupt entity.

11. By motion dated October 29, 2008 filed in the bankruptcy proceeding (the "Retention and Recruitment Motion"), Defendant LBHI and its affiliated debtors moved for authorization to implement a retention and recruitment program to deal with current and future employees of the bankrupt entities, which motion was granted by order dated November 21, 2008. A copy of the Retention and Recruitment Motion is annexed as "Exhibit A" and a copy of the Order approving the motion is annexed as "Exhibit B."

12. According to paragraph 16 in support of the Retention and Recruitment Motion, Defendant A&M maintained that it was necessary to retain approximately 140 people employed by Defendant LBHI prior to the Petition Date, in order to administer and wind-down Defendant LBHI's various assets including but not limited to its principal investments, real estate holdings, derivatives book, loan books and other assets.

13. Pursuant to paragraph 21 of the Retention and Recruitment Motion, Defendant LBHI represented to the court "by hiring employees that possess unique knowledge, skills, experience, and professional relationships that are vital to Lehman's business enterprise, the Debtors will be in the position to assess millions of pending transactions, minimize exposures, and monetize assets for a greater value for the benefit of all stakeholders. It would be impracticable and time consuming for the Debtors to hire new employees with no familiarity with

the Debtors' infrastructure, transactions, and businesses. Recruiting those individuals with the dedication, skill, and familiarity with the Debtors' businesses is not only efficient but essential to the preservation and maximization of value of the Debtors' estates."

14. According to paragraph 22 of the Retention and Recruitment Motion, these retained employees, would "aid in the administration of these chapter 11 cases and the wind-down of Lehman's businesses."

15. Pursuant to paragraph 25 of the Retention and Recruitment Motion, "A&M designed the Retention and Recruitment Program to retain current employees and attract former employees of the Debtors to aid in the administration and wind-down the Debtors' businesses in exchange for a compensation package that rewards employees for achieving defined project objectives and their continued employment during the chapter 11 cases."

**Uvino's Employment at LBHI pre- and post-Petition Date**

16. Plaintiff was one of the employees specifically contemplated by Paragraphs16, 21, 22, and 25 of the Retention and Recruitment Motion in so far as she was, prior to the Petition Date, a Senior Vice President in the human resources department at Lehman Brothers Inc. (for sake of clarity in this complaint, all Lehman entities are referred to herein as "LBHI").

17. As a Senior Vice President in the human resources department, Plaintiff had direct responsibility for employee benefits, human resources technology, human resources operations, human resources communications as well as for Defendant LBHI's pre-Petition Date expatriate program.

18. Based upon Plaintiff's nearly 15 years of employment with pre-Petition Date LBHI, Plaintiff was uniquely qualified to assume the role of Head of Human Resources for Defendant LBHI, given her intimate knowledge of pre-Petition Date LBHI's employee benefits programs, including the pension plan and the human resources information systems.

19. Plaintiff's detailed knowledge and experience in these areas were especially critical to Defendant LBHI, as those skills allowed for the orderly transition of the pension fund to the Pension Benefits Guaranty Corporation ("PBGC"). Plaintiff's experience at pre-Petition Date LBHI also hastened the creation of an independent and much needed human resources system for Defendant LBHI that was separate and apart from the previously existing Peoplesoft human resources system which came under the control of Barclays immediately following the Petition Date.

20. In fact, Plaintiff's critical involvement in the dealings with the PBGC and in the migration from the Barclays' infrastructure enabled Defendant LBHI, and its creditors, to realize significant conservation of the Defendant's resources.

21. As stated above, Plaintiff was an employee of pre-Petition Date LBHI for approximately 15 years, and was the chairperson of the Employee Benefit Plans Committee acting as a fiduciary for LBHI's qualified benefits plans both pre- and post-petition. In the role of a fiduciary, Plaintiff was named as a defendant in a suit previously before this court which action was ultimately dismissed as against her.

22. In October 2008, Uvino met with Defendant Robert Hershan a Managing Director of Defendant A&M regarding her continued employment with Defendant LBHI.

23. On or about October 16, 2008, Uvino was presented with a letter agreement (the "Commitment Letter") outlining the proposed terms of her employment with Defendant LBHI for a term of (15) fifteen months, or until December 31, 2009. The Commitment Letter proposed an annualized base salary of $240,000, payable on a biweekly basis, and a cash bonus for delivering certain identified objectives up to a total amount of $250,000 for the 15-month period in recognition of her services.

24. According to the terms of the Commitment Letter, the cash bonus was to be paid in separate tranches: $50,000 payable in January 2009 as a pro-ration of Uvino's contributions to Defendant LBHI in 2008; and the remainder, less a 20% "hold back", payable in January 2010. The "hold back" money, $50,000, was to be paid to Uvino in January 2011.

25. Commitment Letters, such as the one given to Uvino, were provided by Defendant A&M on behalf of Defendant LBHI to all employees hired for the purpose of winding-down the extraordinarily complex business of the company. The Commitment Letters contained, amongst other things, an employee's base salary, bonus potential, benefits and severance upon termination. The terms of the Commitment Letters were important to Defendant LBHI, as it did not want employees focused on a job search prior to the expiration of the employee's commitment period.

26. In 2007, Plaintiff's compensation at pre-Petition Date LBHI was comprised of a $200,000 base salary, $310,000 cash bonus and $90,000 long term incentive in the form of restricted stock units in LBHI.

27. Uvino, during negotiations with Defendant Hershan in October 2008, expressed dissatisfaction with the compensation terms contained in the Commitment Letter. Plaintiff's dissatisfaction stemmed mainly from the fact that she was being asked to assume the role of Head of Human Resources – ostensibly an elevation from her position at pre-Petition Date LBHI – at reduced compensation. Under the terms of the Commitment Letter, Plaintiff's annual cash compensation, including base and bonus, went from $510,000 in 2007 to $260,000 in 2008, to $390,000 in 2009, representing a significant decrease in her cash compensation.

28. Defendant Robert Hershan was very familiar with the compensation practices of pre-Petition Date LBHI as they related to support staff, such as Uvino, and acknowledged as much to Plaintiff. Defendant Robert Hershan knew that support staff compensation did not fluctuate as widely as that of front office personnel and that base pay plus cash bonus remained consistent year over year for support staff. In fact, Plaintiff's cash compensation remained roughly the same for the previous 5 year period pre-Petition. Defendant Robert Hershan also knew that Plaintiff was not satisfied with the compensation package being offered to her to work for Defendant LBHI, since it represented a significant decrease from her prior earnings for the assumption of a position with more responsibility.

30. Defendant Robert Hershan advised Plaintiff that, if she agreed to stay with Defendant LBHI as Head of Human Resources, and if she preformed well in her role, she would see an increase in her bonus for this period.

31. On or about November 3, 2008, based upon Defendant Robert Hershan's representations that her total compensation would be further reviewed in the year,

   Plaintiff signed the Commitment Letter which now contained, on page (4) four, the following: "Also: The parties agree to engage in a performance review no later than 6/30/09 for consideration of a potential increase in bonus potential."

32. This addition to the Commitment Letter was placed there by the former president of Defendant LBHI who signed Uvino's letter. The added language by the former president of Defendant LBHI was a clear inducement to get Uvino to sign the Commitment Letter.

33. Defendant Robert Hershan had no intention of ever honoring this commitment.

34. This Commitment Letter was signed after the Petition Date. At the time of signing her Commitment Letter, it was represented to Uvino by Defendant Robert Hershan that the bankruptcy court had signed off on the language of the commitments letters in general and that there could be no significant variation in the language in the body of her Commitment Letter. This was why Plaintiff agreed to the handwritten addition on page (4) four, since it had been added by the former president of Defendant LBHI and been agreed to by Defendant Robert Hershan.

35. Plaintiff relied to her detriment upon the representations of Defendant Robert Hershan that she would be reviewed mid-year, when things "settled down a bit," and her bonus commitment would be upwardly adjusted. A copy of the Commitment Letter is annexed hereto as "Exhibit C".

36. Shortly after signing the Commitment Letter, it became known to Plaintiff, acting in her capacity as Head of Human Resources for Defendant LBHI, that comparable support staff was being hired by Defendant A&M to work for

Defendant LBHI under terms much more favorable to what were contained in her Commitment Letter.

37. These comparable employees, instead of having to wait until things "settled down a bit" before having their salaries and bonuses "adjusted" were being hired by Defendant LBHI through Defendant A&M - with many of their compensation packages being personally negotiated by Defendant Robert Hershan - at base salaries and cash bonuses equivalent to what they had earned the previous year as employees of pre-Petition Date LBHI, and not for amounts significantly less than the previous year as was the case with Plaintiff.

38. Nearly all of the comparable support staff hires brought in by Defendant A&M and Defendant Robert Hershan on behalf of Defendant LBHI, at no reduction in total compensation, were recruited back from Barclays to Defendant LBHI, whereas Uvino had remained at all times an employee of pre-Petition Date LBHI.

39. By late 2008 and early 2009, it became apparent that Defendant A&M could not, as initially represented to the bankruptcy court, wrap up the affairs of Defendant LBHI with just a skeleton staff as it had proposed in the Retention and Recruitment Motion. The decision was, therefore, made at that time to begin hiring upwards of 500 additional employees to fill various roles and to assist in the winding down of Defendant LBHI's derivatives book, loan portfolio and real estate holdings.

40. Because of this decision, Plaintiff, as Head of Human Resources, in addition to her other duties, was charged with hiring hundreds of new employees with little or no support staff of her own to assist in this task.

41. On or about March 3, 2009, Plaintiff sent an e-mail to Defendant Robert Hershan requesting a compensation review based on the fact that (1) the scope of her job was now even larger and more demanding than what she originally contemplated when she had expressed reservations about taking the position of Head of Human Resources in 2008 at the compensation level offered to her; (2) similarly situated employees had been hired by Defendant A&M to work at Defendant LBHI with no reduction in their prior total cash compensation and (3) such a review had been promised to her in the Commitment Letter she signed as well as by Defendant Robert Hershan's oral statements.

42. Defendant Robert Hershan sent a responsive email dated March 11, 2009 acknowledging that he had her request under review. A copy of the email chain from March 3, 2009 to March 11, 2009 is annexed hereto as "Exhibit D."

43. Thereafter, Plaintiff's duties continued to increase because of the addition of hundreds of new employees. Accordingly, Uvino, in addition to her regular duties as Head of Human Resources for Defendant LBHI had to take on the roles of human resources generalist, benefits expert and HRIS head.

44. In addition, services provided by Barclays to LBHI under the Transition Services Agreement required significant monitoring. All these functions performed by Plaintiff on behalf of Defendant LBHI were known to Defendant A&M and to Defendant Robert Hershan.

45. By June 30, 2009, despite having received an email from Defendant Robert Hershan on March 11, 2009 that her request was "under review", the performance evaluation and salary adjustment meeting as contemplated by the addendum to the

Commitment Letter failed to occur.

46. By email dated August 20, 2009, Uvino again requested that Defendant Robert Hershan meet with Plaintiff with respect to the promised mid-year performance assessment and total compensation "adjustment". A copy of the email chain between Plaintiff and Defendant Robert Hershan, dated August 20, 2009, is annexed hereto as "Exhibit E."

47. On or about November 30, 2009, some (5) five months after the performance review was supposed to have occurred, Defendant Robert Hershan delivered to Plaintiff a performance evaluation which indicated that her performance was excellent. A copy of the performance review is annexed hereto as "Exhibit F".

48. On or about November 30, 2009, Defendant Robert Hershan also reviewed with Plaintiff the renewal terms of a second commitment period beyond December 31, 2009. On or about December 3, 2009, hand delivered to Plaintiff a renewal Commitment Letter, a copy of which is annexed hereto as "Exhibit G". Plaintiff did not sign the December 3, 2009 Commitment Letter because Plaintiff continued to disagree with the terms of her compensation.

49. The renewal terms proposed by Defendant Robert Hershan on behalf of Defendant A&M and Defendant LBHI would be for twelve (12) months, beginning January 1, 2010 and continuing to December 31, 2010, with no increase to the base salary of $240,000 and a 10% increase to the bonus potential or $220,000, the standard renewal terms approved by the bankruptcy court.

50. In January 2010, Plaintiff had a follow up meeting with Defendant Robert Hershan to address her total compensation for the renewal commitment period.

        During that meeting, Plaintiff provided benchmarking data from a nationally recognized employment consulting firm which clearly showed that the median compensation level supported a salary of at least $500,000 per year for her position.

51. Defendant Robert Hershan reviewed the data and concluded he did not need to pay Plaintiff any more for her role.

52. Plaintiff indicated at the end of the meeting that she expected to be paid fairly for her work or she would have no choice but to seek employment elsewhere.

53. Plaintiff continued as an employee of Defendant LBHI without a signed Commitment Letter and was paid an annualized base salary of $240,000 payable on a bi-weekly basis until she left the employ of Defendant LBHI. On or about June 16, 2010, Plaintiff resigned from her position of employment at Defendant LBHI.

54. From the time of their January 2010 meeting until Uvino resigned her position in June 2010, Defendant Robert Hershan completely and systematically ignored Plaintiff and diminished her role in Defendant LBHI by having all communications between them funneled through his junior associate. Additionally, any interactions Plaintiff had with Defendant Robert Hershan during this period were distinctively hostile. All this was a direct result of Plaintiff indicating that she was not happy with the terms of her compensation.

55. By his action, Defendant Robert Hershan effectively terminated Plaintiff's position as Head of Human resources.

56. On numerous occasions subsequent to the January 2010 meeting, Plaintiff

attempted to approach Defendant Robert Hershan about certain matters critical to Defendant LBHI that clearly required the immediate attention of senior management, but was always referred to a junior associate with limited knowledge of Human Resources practices for resolution. Defendant Robert Hershan claimed to be "too busy" on matters ostensibly related to Defendant LBHI's derivatives book to respond to Plaintiff directly or in a timely manner and showed no interest whatsoever in any human resources issues to the detriment of the bankrupt estate.

57. In April 2010, the Defendant Robert Hershan's junior associate approached Plaintiff about a "problem". The problem was that employees on severance, who were paid salary continuation, were receiving medical benefits while on salary continuation.

58. The junior associate advised Plaintiff that it was Defendant Robert Hershan's opinion this was not the intention at the time Defendant LBHI hired the employees in or about October 2008. In fact, Questions and Answers ("Q&As") were given to employees that clearly stated that Defendant LBHI would continue paying medical benefits during any severance period. Through the junior associate, Defendant Robert Hershan continued to maintain to Plaintiff that it was not the intent to pay medical benefits despite the Q&A that was sent to employees at the time to the contrary. Defendant Robert Hershan stated, through his junior associate, that he did not care what the Q&A said.

59. This behavior was a pattern by both Defendant Robert Hershan and Defendant A&M in the administration of the affairs of Defendant LBHI. Defendant A&M,

over the protests of Plaintiff, was continually changing the conditions of employment to the point that employees of Defendant LBHI did not trust Defendant A&M's representations to them. The attitude displayed by Defendant A&M, as expressed by Defendant Robert Hershan was "if employees don't like it, let them try and find another job – there are no other jobs out there."

60. In follow up discussions regarding the issue of Defendant LBHI providing medical benefits while on salary continuation in which other human resources colleagues were present as well as the General Counsel of Defendant LBHI, Defendant Robert Hershan was extremely hostile and belligerent towards Plaintiff about this topic.

61. In further discussions with the President of the subsidiary, LAMCO, where this topic was again discussed, Defendant Robert Hershan stated that Plaintiff was not "telling the truth" when she indicated that this was the decision in October 2008, and that she confirmed it with in house employment counsel who had drafted the Q&As.

62. From January 2010 onward, when Plaintiff indicated that, if she was not adequately compensated for the job she was performing she would be forced to leave Defendant LBHI, Defendant Robert Hershan systematically created a work environment where Plaintiff was either treated with hostility and disrespect or totally ignored.

63. In fact from the conversation in early 2010, when Plaintiff and Defendant Robert Hershan disagreed about compensation until her resignation in June 2010, Defendant Robert Hershan and Plaintiff had only two direct conversations and no

update meetings about anything related to the ongoing operations of Defendant LBHI. This was a deliberate attempt by Defendant Robert Hershan and Defendant A&M to get Plaintiff to voluntarily resign, so as not to have to pay her a severance package as provided for in the Retention and Recruitment Motion and corresponding Order.

64. Additionally, by being forced to deal with a junior associate rather than through the proper chain of command for a department head, Defendant Robert Hershan constructively terminated Plaintiff's position as Head of Human Resources for Defendant LBHI, thereby entitling her to the severance package provided for in the Retention and Recruitment Motion and corresponding Order.

65. During Plaintiff's exit meeting upon her resignation, Plaintiff informed the president of Defendant LBHI, John Suckow, that she should be entitled to benefits under the Retention and Recruitment order  However, Mr. Suckow said he did not have the authority to make this determination and further indicated that Plaintiff should file a complaint with the bankruptcy court for any relief as Judge Peck was the only one with authority to make this determination.

66. Following Plaintiff's departure from Defendant LBHI, Defendant A&M advertised for a replacement of her position on various job boards.  The description of what the role entailed was not the role that Plaintiff had held prior to leaving Defendant LBHI.  In fact, the role was much diminished, with emphasis on HR operational activities, which described in fact much of the activities being done by another, less senior, colleague in the department.

67. Clearly, Defendant A&M and Defendant Robert Hershan wanted to replace

Plaintiff with a less experienced and lower paid employee. This further evidences the fact that Defendant A&M and Defendant Robert Hershan created a work environment so hostile for the Plaintiff to cause her to leave Defendant LBHI with the sole purpose of eliminating her position without having to pay her what she would be entitled to receive under the Retention and Recruitment order.

### AS AND FOR A FIRST CAUSE OF ACTION

(Quantum Meruit as against Defendant LBHI)

68. Plaintiff repeats, reiterates and realleges paragraphs one (1) through sixty-seven (67) as if fully set forth herein.

69. Defendant LBHI through its agent Defendant A&M and its employees induced Plaintiff to continue working.

70. That the Debtor-Defendant LBHI benefitted from the services rendered by Plaintiff.

71. That Plaintiff performed services greater than what was contemplated at the time she entered into the Commitment Letter and was not adequately compensated by Defendant LBHI.

72. That the scope of Plaintiff's duties significantly increased while her compensation remained the same.

73. That based on the foregoing, Plaintiff demands judgment in the amount of $457,500.00 as and for compensation and bonus for the services performed that benefitted the Defendant LBHI's bankruptcy estate.

74. That Plaintiff is entitled to a post-petition priority claim in the amount of

$457,500.00 for post-petition services rendered pursuant to 11 U.S.C. §§ 503(b)((1)(A) and 507(a)(2).

## AS AND FOR A SECOND CAUSE OF ACTION

(Constructive discharge as against Defendants LBHI, A&M and Robert Hershan.)

75. Plaintiff repeats, reiterates and realleges paragraphs one (1) through seventy-four (74) as if fully set forth herein.

76. That Defendants LBHI, A&M, and Robert Hershan failed to adequately support Plaintiff in her duties by failing to provide adequate supervision and management.

77. That Defendants LBHI, A&M, and Robert Hershan (collectively the "Defendants") caused a junior associate with limited abilities to supervise and support Plaintiff.

78. That the failure of the Defendants to adequately support Plaintiff in the performance of her job responsibilities rendered it difficult if not impossible to adequately perform her job duties.

79. Defendant effectively demoted Plaintiff by failing to adequately support or supervise her role. Defendants' actions were clearly made to induce Plaintiff to resign her job.

80. At no time did Defendants express any indication that Plaintiff's performance had anything to do with the demotion.

81. Defendants, through their actions, constructively terminated Plaintiff.

82. That on or about June 16, 2010, Plaintiff resigned from her position of employment at Defendant LBHI.

83. That the Plaintiff's resignation was actually a termination caused by the Defendants and resulting in a constructive discharge of the Plaintiff.

84. That had Plaintiff continued in the employment of Defendant LBHI, she would have received salary in the amount of $240,000 annualized.

85. That had Plaintiff continued in the employment of Defendant LBHI, she would have received a bonus of $210,000 plus $50,000 of "hold-back" bonus that was earned in respect to her performance in 2009.

86. That based upon the constructive discharge, Plaintiff is entitled to severance in the amount of 21 weeks of base pay.

87. That Plaintiff is entitled to damages in the amount of $457,500.00 representing six (6) months of unpaid salary as severance and bonus.

## AS AND FOR A THIRD CAUSE OF ACTION

(Hostile Work Environment against Defendants A & M and Robert Hershan)

88. Plaintiff repeats, reiterates and realleges paragraphs one (1) through eighty-seven (87) as if fully set forth herein.

89. That Defendants A&M and Robert Hershan created a hostile and abusive work environment by stating in front of others that the Plaintiff was not being truthful, by behaving in a hostile manner towards Plaintiff in meetings and by ignoring Plaintiff, providing no communications or advice to Plaintiff, so that she could perform her job as head of human resources.

90. That such work environment altered a term or condition of Plaintiff's employment and forced her to resign.

91. That all damages which Plaintiff has sustained was a result of Defendants' conduct, including but not limited to back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for Defendants' practices.

92. That Plaintiff is entitled to damages for emotional distress, humiliation, embarrassment and anguish.

93. That Plaintiff is entitled to exemplary and punitive damages so as to deter future malicious, reckless and/or intentional conduct.

94. Based on the foregoing, plaintiff demands judgment in an amount to be determined at trial for back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for Defendants' practices, emotional distress, humiliation, embarrassment, and anguish, exemplary and punitive damages so as to deter future malicious, reckless and/or intentional conduct, and awarding Plaintiff costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs; pre-judgment and post-judgment interest, as provided by law; and granting plaintiff other and further relief as this Court finds necessary and proper.

WHEREFORE, the Plaintiff respectfully prays for judgment as follows:

(A) On the First Cause of Action in an amount to be determined at trial but not less than $457,500.00 together with attorneys' fees, costs and disbursements of this action.

(B) On the Second Cause of Action in an amount to be determined at trial but not less

                than $457,500.00 together with attorneys' fees, costs and disbursements of this action.

( C)    On the Third Cause of Action in an amount to be determined at trial but not less than $500,000 for back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for Defendants' emotional distress, humiliation, embarrassment, and anguish, exemplary and punitive damages so as to deter future malicious, reckless and/or intentional conduct, and awarding Plaintiff costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs; Pre-judgment and post-judgment interest, as provided by law; and granting plaintiff other and further relief as this Court finds necessary and proper.

Dated: Huntington, New York
        December 14, 2010

                                                The Law Offices of Avrum J. Rosen, PLLC

                                                By: */s/ Avrum J. Rosen*
                                                    Avrum J. Rosen, Esq.
                                                    Attorneys for the Plaintiff
                                                    38 New Street
                                                    Huntington, New York 11743
                                                    (631) 423-8527