MADISON AVENUE STRUCTURED FINANCE CDO I, LIMITED, Issuer,

MADISON AVENUE STRUCTURED FINANCE CDO I, CORP., Co-Issuer,

and

FIRST UNION NATIONAL BANK, Trustee

_____

INDENTURE

_____

Dated as of December 5, 2001

# TABLE OF CONTENTS

Page

## ARTICLE  I

### DEFINITIONS

Section 1.1    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1.2    Other Definitional Provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
Section 1.3    Assumptions as to Collateral Debt Securities and Collateral. . . . . . . . . . . . . . . 93

## ARTICLE  II

### THE NOTES

Section 2.1    Forms Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
Section 2.2    Form of Notes and Certificate of Authentication . . . . . . . . . . . . . . . . . . . . . . . 95
Section 2.3    Note Interest Rate; Stated Maturity; Denominations . . . . . . . . . . . . . . . . . . . . 97
Section 2.4    Execution, Authentication, Delivery and Dating . . . . . . . . . . . . . . . . . . . . . . . 97
Section 2.5    Registration, Registration of Transfer and Exchange . . . . . . . . . . . . . . . . . . . . 98
Section 2.6    Mutilated, Defaced, Destroyed, Lost or Stolen Notes . . . . . . . . . . . . . . . . . . . 107
Section 2.7    Payments on the Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
Section 2.8    Persons Deemed Owners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
Section 2.9    Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
Section 2.10   Additional Issuances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
Section 2.11   Global Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
Section 2.12   Notes Beneficially Owned by Person Not QIB/Qualified Purchaser . . . . . . . . . 117

## ARTICLE  III

### CONDITIONS PRECEDENT,
### AUTHENTICATION AND DELIVERY OF NOTES

Section 3.1    General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
Section 3.2    Security for Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
Section 3.3    Custodianship; Transfer of Collateral Debt Securities and Eligible
            Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
Section 3.4    Ramp-Up Period; Ramp-Up Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . 127

## ARTICLE  IV

### SATISFACTION AND DISCHARGE

Section 4.1    Satisfaction and Discharge of Indenture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
Section 4.2    Application of Trust Money . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

## ARTICLE  V

### REMEDIES

Section 5.1    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
Section 5.2    Acceleration of Maturity; Rescission and Annulment . . . . . . . . . . . . . . . . . . . 132
Section 5.3    Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
Section 5.4    Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
Section 5.5    Preservation of Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
Section 5.6    Trustee May Enforce Claims Without Possession of Notes . . . . . . . . . . . . . . 137
Section 5.7    Application of Money Collected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137
Section 5.8    Limitation on Suits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
Section 5.9    Unconditional Rights of Noteholders to Receive Principal and Interest . . . . . . 138
Section 5.10   Restoration of Rights and Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
Section 5.11   Rights and Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
Section 5.12   Delay or Omission Not Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
Section 5.13   Control by Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
Section 5.14   Waiver of Past Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
Section 5.15   Undertaking for Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
Section 5.16   Waiver of Stay or Execution Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
Section 5.17   Sale of Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
Section 5.18   Action on Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

## ARTICLE  VI

### THE TRUSTEE

Section 6.1    Certain Duties and Responsibilities of the Trustee . . . . . . . . . . . . . . . . . . . . . 143
Section 6.2    Notice of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
Section 6.3    Certain Rights of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
Section 6.4    Not Responsible for Recitals or Issuance of Notes . . . . . . . . . . . . . . . . . . . . . 148
Section 6.5    May Hold Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 6.6    Money Held in Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 6.7    Compensation and Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
Section 6.8    Corporate Trustee Required; Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
Section 6.9    Resignation and Removal of Trustee; Appointment of Successor . . . . . . . . . . 151

Section 6.10    Acceptance of Appointment by Successor Trustee . . . . . . . . . . . . . . . . . . . . . . 153
Section 6.11    Merger, Conversion, Consolidation or Succession to Business of Trustee . . . . 153
Section 6.12    Co-Trustees and Separate Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
Section 6.13    Certain Duties of Trustee Related to Delayed Payment of Proceeds . . . . . . . . 155
Section 6.14    Withholding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
Section 6.15    Representations and Warranties of the Trustee . . . . . . . . . . . . . . . . . . . . . . . 156
Section 6.16    Paying Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157
Section 6.17    Authenticating Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157
Section 6.18    Calculation Agent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Section 6.19    Exchange Offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
Section 6.20    Duties and Responsibilities of Trustee following Payment in Full of the
                Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
Section 6.21    Fiduciary for Noteholders Only; Agent for Hedge Counterparty . . . . . . . . . . . 160

ARTICLE  VII

COVENANTS

Section 7.1     Payment of Principal and Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
Section 7.2     Certain Tax Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
Section 7.3     Compliance With Laws  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
Section 7.4     Maintenance of Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
Section 7.5     Maintenance of Office or Agency  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
Section 7.6     Money for Note Payments to Be Held in Trust . . . . . . . . . . . . . . . . . . . . . . . . 162
Section 7.7     Existence of Co-Issuers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
Section 7.8     Protection of Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
Section 7.9     Opinions as to Collateral  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
Section 7.10    Performance of Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
Section 7.11    Negative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
Section 7.12    Statement as to Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170
Section 7.13    Co-Issuers May Consolidate, Etc., Only on Certain Terms  . . . . . . . . . . . . . . . 171
Section 7.14    Successor Substituted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
Section 7.15    No Other Business  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
Section 7.16    Purchase of Notes and Preference Shares  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
Section 7.17    Annual Rating Review; Notice of Rating  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
Section 7.18    Process Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
Section 7.19    Additional Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
Section 7.20    Representations and Warranties of the Co-Issuers . . . . . . . . . . . . . . . . . . . . . . 177
Section 7.21    Representations and Warranties by Issuer as to Security Interest  . . . . . . . . . . 179
Section 7.22    Listing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

# ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1    Supplemental Indentures Without Consent of Noteholders and Preference
Shareholders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
Section 8.2    Supplemental Indentures With Consent of Noteholders and Preference
Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
Section 8.3    Execution of Supplemental Indentures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185
Section 8.4    Effect of Supplemental Indentures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
Section 8.5    Reference in Notes to Supplemental Indentures . . . . . . . . . . . . . . . . . . . . . . . . 186
Section 8.6    Certain Further Limitations on Supplemental Indentures. . . . . . . . . . . . . . . . . 186

# ARTICLE IX

## REDEMPTION OF NOTES;
## BORROWINGS;REDUCTION OF COMMITMENTS

Section 9.1    Redemption of Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187
Section 9.2    Notice to Trustee of Optional Redemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
Section 9.3    Notice of Optional Redemption or Maturity by the Co-Issuers . . . . . . . . . . . . 190
Section 9.4    Notes Payable on Redemption Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
Section 9.5    Mandatory Redemptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
Section 9.6    Special Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

# ARTICLE X

## ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    Collection of Money . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
Section 10.2    Interest Collection Account; Principal Collection Account; Uninvested
Proceeds Account; Custodial Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
Section 10.3    Payment Account; Securities Lending Accounts . . . . . . . . . . . . . . . . . . . . . . . . 198
Section 10.4    Expense Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199
Section 10.5    Release of Collateral Debt Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
Section 10.6    Reports by Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
Section 10.7    Accountings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
Section 10.8    Reports by Independent Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
Section 10.9    Reports to the Rating Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210
Section 10.10  Notices to the Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210
Section 10.11  Securities Lending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211
Section 10.12  Procedures Relating to the Establishment of Accounts Controlled by the
Trustee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

## ARTICLE  XI

### APPLICATION OF MONIES

Section 11.1  Disbursements of Monies from Payment Account . . . . . . . . . . . . . . . . . . . . . . 214
Section 11.2  Trust Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

## ARTICLE  XII

### SALE OF COLLATERAL DEBT SECURITIES; SUBSTITUTION

Section 12.1  Sale of Collateral Debt Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223
Section 12.2  Reinvestment Criteria and Trading Restrictions . . . . . . . . . . . . . . . . . . . . . . 227
Section 12.3  Collateral Debt Securities Subject to A/B Exchange . . . . . . . . . . . . . . . . . . . 230
Section 12.4  Purchase of Additional Collateral Debt Securities . . . . . . . . . . . . . . . . . . . . 230
Section 12.5  Conditions Applicable to All Transactions Involving Purchases of
              Collateral Debt Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

## ARTICLE  XIII

### NOTEHOLDERS' RELATIONS

Section 13.1  Subordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232
Section 13.2  Standard of Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

## ARTICLE  XIV

### MISCELLANEOUS

Section 14.1  Form of Documents Delivered to Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
Section 14.2  Acts of Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235
Section 14.3  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235
Section 14.4  Notices to Noteholders; Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239
Section 14.5  Effect of Headings and Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . 240
Section 14.6  Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240
Section 14.7  Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240
Section 14.8  Benefits of Indenture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240
Section 14.9  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241
Section 14.10 Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241
Section 14.11 Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241
Section 14.12 Waiver of Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

ARTICLE XV

ASSIGNMENT OF COLLATERAL AGREEMENTS

Section 15.1   Assignment of Collateral Management Agreement . . . . . . . . . . . . . . . . . . . . . . . 241
Section 15.2   Assignment of Hedge Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
Section 15.3   Assignment of Collateral Administration Agreement . . . . . . . . . . . . . . . . . . . . . 244

ARTICLE XVI

HEDGE AGREEMENTS

Section 16.1   Hedge Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

## EXHIBITS

| | |
|---|---|
| EXHIBIT A-1 | Form of Rule 144A Class A Global Note |
| EXHIBIT A-2 | Form of Regulation S Class A Global Note |
| EXHIBIT B-1 | Form of Rule 144A Class B Global Note |
| EXHIBIT B-2 | Form of Regulation S Class B Global Note |
| EXHIBIT C-1 | Form of Rule 144A Class C1 Global Note |
| EXHIBIT C-2 | Form of Regulation S Class C1 Global Note |
| EXHIBIT C-3 | Form of Rule 144A Class C2 Global Note |
| EXHIBIT C-4 | Form of Regulation S Class C2 Global Note |
| EXHIBIT D | Reserved |
| EXHIBIT E-1 | Form of Investor Certificate (Transfer of Rule 144A Global Note to Regulation S Global Note) |
| EXHIBIT E-2 | Form of Investor Certificate (Transfer of Regulation S Global Note to Rule 144A Global Note) |
| EXHIBIT F | Form of Note Owner Certificate |
| EXHIBIT G | Form of Legal Opinions of Skadden, Arps, Slate, Meagher & Flom LLP |
| EXHIBIT H | Form of Legal Opinions of Maples and Calder |
| EXHIBIT I | Form of Security Interest Notice |
| EXHIBIT J | Form of DTC Notice to Investors |

## SCHEDULES

| | |
|---|---|
| SCHEDULE A | List of the Initial Collateral Debt Securities |
| SCHEDULE B | Moody's Industry Categories |
| SCHEDULE C | Calculation of Diversity Score |
| SCHEDULE D | S&P Industry Classification Group Categories |
| SCHEDULE E | Loss Rates |

SCHEDULE F        Asset Classes
SCHEDULE G        S&P Recovery Rates

INDENTURE, dated as of December 5, 2001 among MADISON AVENUE STRUCTURED FINANCE CDO I, LIMITED, an exempted company with limited liability incorporated under the laws of the Cayman Islands (together with its permitted successors and assigns, the "Issuer"), MADISON AVENUE STRUCTURED FINANCE CDO I, CORP., a Delaware corporation (the "Co-Issuer," and together with the Issuer, the "Co-Issuers"), and FIRST UNION NATIONAL BANK, a national banking association, as trustee for the benefit of the Noteholders and an agent for the Hedge Counterparty (herein, together with its permitted successors in the trusts hereunder, the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders and the Hedge Counterparty. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

## GRANTING CLAUSES

To secure the Issuer's obligations under the Notes and the Hedge Agreements, the Issuer hereby Grants to the Trustee, for the benefit and security of the Trustee, the Hedge Counterparty and Holders of the Notes, all of its right, title and interest, whether now owned or hereafter acquired, in and to all property now or hereafter owned by the Issuer (other than any account maintained by the Issuer in the Cayman Islands to which the proceeds of the issuance of the Issuer Ordinary Shares and the transaction fees in connection with the issuance of the Securities are deposited) including, without limitation, the property described in clauses (a) through (g) below and all investment property, financial assets, accounts, contract rights, general intangibles, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit (as such terms are defined in the UCC), Certificated Securities, Uncertificated Securities and Securities Entitlements consisting of, arising from, or relating to any such property:

(a)    the Collateral Debt Securities, Eligible Investments and Exchanged Securities acquired or received in connection with the Collateral Debt Securities (listed, as of the Closing Date, in Schedule A to this Indenture), and all distributions, dividends and other payments thereon or with respect thereto and all Collateral Debt Securities, Eligible Investments and Exchanged Securities and all distributions, dividends and other payments thereon or with respect thereto which hereafter may be Granted;

(b)      the Issuer's estate, right, title and interest in, to and under the Collateral Management Agreement and the Collateral Administration Agreement;

(c)      the Issuer's estate, right, title and interest in, to and under the Interest Rate Hedge Agreements and any additional Hedge Agreement and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder including, without limitation, the Hedge Counterparty Collateral Account (provided, however, that this clause (c) shall not constitute Collateral securing any Hedge Counterparty);

(d)      the Issuer's estate, right, title and interest in, to and under the Securities Lending Agreements, if any, and any collateral granted thereunder including, without limitation, the Securities Lending Accounts;

(e)      the Payment Account, the Collection Accounts, the Uninvested Proceeds Account, the Custodial Account, the Expense Account and any other accounts (other than any account maintained by the Issuer in the Cayman Islands to which the proceeds of the issuance of the Issuer Ordinary Shares and the transaction fees in connection with the issuance of the Securities are deposited) and any interest thereon, and all monies, securities, investment property, instruments, documents, financial assets and other property now or hereafter on deposit therein or credited thereto (including, without limitation, Eligible Investments), and all dividends, distributions and other payments thereon or with respect thereto;

(f)      all monies, securities, investment property, instruments, documents, financial assets, agreements, Collateral Debt Securities and other property of any nature in which the Issuer has an interest (other than monies deposited in the Cayman Islands account referred to in clause (e) above), including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto and all dividends, distributions and other payments thereon or with respect thereto; and

(g)      all proceeds of any of the foregoing;

but excluding, in each case, (i) the Preference Share Distribution Account, Eligible Investments purchased with funds on deposit in the Preference Share Distribution Account, and all funds deposited therein and financial assets and investment property credited thereto and income from the investment of funds therein, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto and (ii) any asset situated in the Cayman Islands (including, without limitation, the Excepted Property).

The collateral described in clauses (a) through (g) above is referred to as the "Collateral." Such Grants are made, however, in trust, to secure the Notes equally and ratably without prejudice, priority or distinction, except as expressly provided in this Indenture, between

any Note and any other Note by reason of difference in time of issuance or otherwise, and to secure (i) the payment of all amounts due on the Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture, (iii) compliance with the provisions of this Indenture and (iv) all amounts payable under the Hedge Agreements, all as provided in this Indenture.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein, for the benefit of the Trustee, the Hedge Counterparty and the Holders of the Notes. Upon the occurrence and during the continuation of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Trustee, the Hedge Counterparty and the Holders of the Notes or otherwise available at law or in equity but subject to the terms hereof, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law and the terms of this Indenture, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public and private sale.

The Trustee acknowledges such Grant, accepts the trusts hereunder in accordance with the provisions hereof and agrees to perform the duties herein to the end that the interests of the Noteholders and the Hedge Counterparty may be adequately and effectively protected.

## ARTICLE I

## DEFINITIONS

Section 1.1     Definitions.

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and, where applicable, to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination of which is governed by Section 1.3 hereof, the provisions of Section 1.3 hereof shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.3 hereof, unless some other method of calculation or determination is expressly specified in the particular provisions.

"A/B Exchange":  An exchange of one security (the "A Security") for another security of the same issuer (the "B Security") that has terms substantially identical to the A Security except that one or more transfer restrictions applicable to the A Security are inapplicable to the B Security.

"Account":  Any of the Interest Collection Account, the Principal Collection Account, the Uninvested Proceeds Account, the Payment Account, the Custodial Account, the Expense Account, the Securities Lending Accounts or the Hedge Counterparty Collateral Account.

"Accountants' Certificate":  A certificate of a firm of Independent certified public accountants of recognized national reputation in the United States of America appointed by the Issuer pursuant to Section 10.8 hereof.

"Act" and "Act of Noteholders":  The meaning specified in Section 14.2(a).

"Adjustment Amount":  As of any date of determination, an amount equal to the sum of the following:

(a)     10% multiplied by the portion of the Aggregate Adjustment Amount relating to Pledged Securities (other than Written Down Securities, Defaulted Securities, Deferred Interest PIK Securities and Exchanged Securities that are equity securities) with a Moody's Rating of below "Baa3", but at least equal to "Ba3"; plus

(b)     25% multiplied by the portion of the Aggregate Adjustment Amount relating to Pledged Securities (other than Written Down Securities, Defaulted Securities, Deferred Interest PIK Securities and Exchanged

Securities that are equity securities) with a Moody's Rating of below "Ba3", but at least equal to "B3"; <u>plus</u>

(c)    50% <u>multiplied</u> by the portion of the Aggregate Adjustment Amount relating to Pledged Securities (other than Written Down Securities, Defaulted Securities, Deferred Interest PIK Securities and Exchanged Securities that are equity securities) with a Moody's Rating of below "B3";

it being understood that the Aggregate Adjustment Amount will be allocated between the three categories of ratings described above <u>pro</u> <u>rata</u> based on the Aggregate Principal Amount of Pledged Securities in each such category.

"<u>Administration Agreement</u>":  An administration agreement dated as of December 5, 2001 between the Administrator and the Issuer in respect of certain corporate and administrative services provided to the Issuer.

"<u>Administrative Expenses</u>":  Amounts due from or accrued for the account of the Co-Issuers with respect to any Payment Date to (i) the Trustee pursuant to Section 6.7 or any co-trustee pursuant to Section 6.12; (ii) the Independent accountants, agents and counsel of the Issuer for fees and expenses (including the Collateral Administrator); (iii) the Rating Agencies for fees and expenses (including ongoing surveillance fees and fees for credit estimates) in connection with any Class of Notes rated by each such Rating Agency; (iv) the Administrator pursuant to the Administration Agreement; (v) the Collateral Manager and its counsel for fees (excluding the Collateral Management Fees and the Incentive Collateral Management Fees) and expenses as provided in the Collateral Management Agreement; (vi) the Preference Share Paying Agent pursuant to the Preference Share Paying Agency Agreement; (vii) any other Person in respect of any governmental fee, charge or tax (including all filing, registration and annual return fees payable to the Cayman Islands' government and registered office fees); and (viii) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture, the Preference Share Paying Agency Agreement, the Notes and the Preference Shares; <u>provided</u>, <u>however</u>, that Administrative Expenses shall not include (a) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date and that are paid on the Closing Date or (b) any amount due under any Hedge Agreement.

"<u>Administrator</u>":  QSPV Limited, a licensed trust company incorporated in the Cayman Islands, or any successor appointed by the Issuer.

"<u>Aerospace, Defense and Telecommunications Asset-Backed Securities</u>":  Structured Finance Securities that entitle their holders to receive payments that depend primarily on the cash flow from leases and subleases of aircraft, vessels and telecommunications equipment to businesses for use in the provision of goods or services to consumers, the military or the government, generally having the following characteristics:  (1) the loans secured by such

leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a limited number of obligors and accordingly represent an undiversified or concentrated pool of credit risk; (3) the repayment stream on loans secured by such leases and subleases is primarily determined by a contractual payment schedule; (4) early termination of such leases and subleases and repayment of the related loan predominantly depend upon the disposition to a lessee, sublessee or third party of the underlying equipment; (5) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (6) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by other assets of the lessee, sublessee or guarantees granted by third parties.

"Affiliate": With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above. For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; provided that for the avoidance of doubt, with respect to the Issuer, "Affiliate" does not include QSPV Limited or any entities which QSPV Limited controls.

"Agent Members":  Members of, or participants in, Euroclear or Clearstream.

"Aggregate Adjustment Amount":  As of any date of determination, an amount equal to the excess, if any, of the Aggregate Principal Amount of all Pledged Securities (other than Defaulted Securities and Deferred Interest PIK Securities) as of such date with a Moody's Rating of below "Baa3" in excess of 10% of the Maximum Investment Amount.

"Aggregate Amortized Cost":  With respect to any Interest Only Security, (a) on the date of acquisition thereof by the Issuer, the cost of purchase thereof and (b) on any date of determination thereafter, the present value of all remaining payments on such Interest Only Security discounted to such date of determination as of each subsequent Payment Date at a discount rate per annum equal to the internal rate of return on such Interest Only Security as initially calculated in good faith by the Collateral Manager at the time of purchase thereof by the Issuer, and as such internal rate of return may be recalculated in good faith by the Collateral Manager from time to time thereafter; provided that the Collateral Manager will not be required to recalculate such internal rate of return and will not incur any liability as a result of any failure to do so.

"Aggregate Collateral Balance":  On any Measurement Date, without duplication, an amount equal to the sum of:

(a)     the Aggregate Principal Amount of the Collateral Debt Securities (excluding (i) any Collateral Debt Security which is (A) a Defaulted Security, (B) a Deferred Interest PIK Security or (C) an Exchanged Security which is an equity security, (ii) the portion of the Principal Balance of each Collateral Debt Security which is payable after the Stated Maturity Date of the Class C Notes, (iii) any Interest Only Security and (iv) any Written Down Security);

(b)     Eligible Investments representing Principal Proceeds or Uninvested Proceeds;

(c)     with respect to each Defaulted Security or Deferred Interest PIK Security, the Calculation Amount;

(d)     the lesser of (A) the Applicable Recovery Percentage and (B) so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the S&P Recovery Rate of the portion of the Principal Balance of each Collateral Debt Security which is expected to be paid after the Stated Maturity Date of the Class C Notes, other than in respect of any Collateral Debt Security referred to in clause (c) above; and

(e)     with respect to any Written Down Security, the principal amount (not adjusted for any write downs) of such Collateral Debt Security;

provided, that (i) if at any time the Aggregate Principal Amount of all Pledged Securities (other than Pledged Securities referred to in clause (c) above) with a Moody's Rating below "Baa3" is in excess of 10% of the Maximum Investment Amount, the Aggregate Collateral Balance shall be reduced by an amount equal to the sum of the Adjustment Amount and the Written Down Security Adjustment Amount and (ii) otherwise, shall be reduced by an amount equal to the Written Down Security Adjustment Amount without regard to clause (a) of the definition thereof.

For purposes of calculating the Aggregate Collateral Balance, (i) a Synthetic Security which is not a Defaulted Security will be included as a Collateral Debt Security having the Principal Balance of such Synthetic Security and (ii) the Principal Balance of a Zero Coupon Bond will be the accreted value thereof on such date of determination.

"Aggregate Outstanding Amount": On any Measurement Date, (a) when used with respect to any Class of Notes as a whole (or any specified Notes of such Class), as of such date of determination, the original principal amount of such Class (or of such specified Notes, as the case may be) reduced by all prior payments, if any, made with respect to the principal of such Class (or such Notes, as the case may be) and (b) when used with respect to all of the Notes, the

sum of the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes, the Class C1 Notes and the Class C2 Notes.

"Aggregate Principal Amount": On any Measurement Date, (a) when used with respect to any Pledged Securities (including any Pledged Securities that have become, since the purchase thereof, Defaulted Securities, Deferred Interest PIK Securities or Exchanged Securities), the aggregate Principal Balance of such Pledged Securities included in the Collateral on such Measurement Date, (b) when used with respect to any Class of Notes as a whole (or any specified Notes of such Class), as of such Measurement Date, the outstanding principal amount of such Class (or of such specified Notes) and (c) when used with respect to all of the Notes, the sum of (i) the Aggregate Principal Amount of the Class A Notes, (ii) the Aggregate Principal Amount of the Class B Notes, (iii) the Aggregate Principal Amount of the Class C1 Notes and (iv) the Aggregate Principal Amount of the Class C2 Notes.

"Alternative Debt Test": On the date the Issuer acquires an obligation, a test which is satisfied with respect to such obligation if each of the following is satisfied: (a) the issuer of such obligation is either (i) a corporation, trust or partnership organized under U.S. Federal or state law or (ii) a bankruptcy remote entity organized or incorporated in the Cayman Islands, Bahamas, Bermuda, Channel Islands or the Netherlands Antilles or any similar jurisdiction generally imposing no or nominal taxes on the income of companies located therein; (b) the obligation is a debt instrument in form that is treated as debt under the law of the jurisdiction of organization of its issuer; (c) no document pursuant to which the asset was offered requires holders to treat it as other than debt for tax purposes; (d) the asset bears interest at either a fixed rate or a customary floating rate that is not affected by any other factor (such as the issuer's profits or cash flow); and (e) the asset has a Moody's Rating of at least "Baa3" and, for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, an S&P Rating of at least "BBB-," in each case, as to ultimate payment of principal and interest; provided, that, in the case of an obligation in the form of a beneficial interest in a trust that is treated (as evidenced by an opinion of counsel or, provided that there has been no change in the terms of such obligation prior to the date of its acquisition by the Issuer, a reference to an opinion of counsel in documents pursuant to which such obligation was offered) as a grantor trust for U.S. Federal income tax purposes (and not as a partnership or association taxable as a corporation), any of the conditions specified in clauses (a), (b), (c) and (d) may be satisfied by reference to each asset held pursuant to such grantor trust arrangement rather than by reference to such beneficial ownership interest.

"Alternative Debt Test Security": Any obligation which is a Collateral Debt Security as a result of it satisfying the Alternative Debt Test.

"Applicable Recovery Percentage": With respect to any Pledged Securities on any Measurement Date, the percentage that is equal to 100% less the Loss Rate.

"Asset Specific Counterparty": Any of (i) one or more institutions (x) whose long-term, unsecured debt obligations are rated (directly or by way of guarantee) (or whose

counterparty rating is) at least "Aa3" by Moody's (and at least "P-1" if such entity has a short term rating by Moody's) and (y) so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term rating of such entity is at least "A-1" by Standard & Poor's (or, if such institution does not have a short-term rating by Standard & Poor's, the long-term, unsecured debt obligations of which institution are rated (directly or by way of guarantee) (or whose counterparty rating is) at least "A+" by Standard & Poor's) and with respect to which each Rating Agency confirms in writing that its then-current ratings on any Class of Notes rated by such Rating Agency will not be adversely affected or (ii) any permitted assignee or successor under the Hedge Agreements with respect to which each Rating Agency confirms in writing that its then-current ratings on any Class of Notes rated by such Rating Agency will not be adversely affected.

"Asset Specific Hedge":  Any interest rate exchange agreement between the Issuer and an Asset Specific Counterparty that (a) if entered into by the Issuer in connection with the purchase or holding of a fixed-rate obligation, entitles the Issuer to receive from the related Asset Specific Counterparty payments based on LIBOR at prevailing market rates, as determined by the Collateral Manager at the date of execution of such agreement and (b) if entered into by the Issuer in connection with the purchase or holding of a floating-rate obligation, entitles the Issuer to receive from the related Asset Specific Counterparty payments based on a fixed-rate of interest at prevailing market rates, as determined by the Collateral Manager at the date of execution of such agreement.  In addition to the foregoing, each Asset Specific Hedge will be subject to the following conditions:  (a) the notional balance of each Asset Specific Hedge shall, at all times, be equal to the outstanding principal amount of the fixed-rate obligation or floating-rate obligation to which it is related; (b) each Asset Specific Hedge will amortize according to the same schedules as, and terminate on the maturity date of, the fixed-rate obligation or floating-rate obligation to which it is related; (c) the dates on which payments shall be made to the Issuer under each Asset Specific Hedge will match the dates on which interest payments shall be made to the Issuer on the fixed-rate obligation or floating-rate obligation to which it is related; (d) each Asset Specific Hedge will permit the complete or partial termination thereof without the payment by the Issuer of any penalties, fees or other similar, termination-related expenses; (e) each Asset Specific Hedge related to a Collateral Debt Security will not have the effect of obligating the Issuer to pay to the related Asset Specific Counterparty a rate of interest on the notional balance thereof that is greater than the rate of interest payable to the Issuer by the obligor of the Collateral Debt Security to which such Asset Specific Hedge is related; (f) prior to entering into any Asset Specific Hedge, each Rating Agency shall have provided a Rating Agency Confirmation to the Collateral Manager with respect to the execution and delivery of such Asset Specific Hedge; and (g) each Asset Specific Hedge will contain appropriate limited-recourse and non-petition provisions equivalent to those contained in Section 2.7(k).

"Assumed Reinvestment Rate":  A rate equal to LIBOR minus 1.0% per annum.

"Authenticating Agent":  With respect to the Notes or a Class of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to Section 6.17.

"Authorized Officer":  With respect to either of the Co-Issuers, any director, chairman, deputy chairman, president, vice president, secretary, treasurer or other officer thereof or any chairman, deputy chairman, president, vice president, secretary, treasurer or (except in connection with an Officer's Certificate) other officer of any duly appointed agent thereof who is authorized to act for the Issuer or Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or Co-Issuer.  With respect to the Collateral Manager, any officer, employee or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject matter of the request, certificate or order in question.  With respect to the Trustee or any other bank or trust company acting as trustee of any express trust or as Custodial Account Securities Intermediary, a Responsible Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Automobile Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from installment sale loans made to finance the acquisition of, or from leases of, automobiles, generally having the following characteristics:  (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessors and accordingly represent a diversified pool of obligor credit risk; (3) the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or leases predominantly dependent upon the disposition of the underlying vehicle; and (4) such leases typically provide for the right of the lessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"Available Funds":  With respect to any Payment Date, the amount of any positive Balance (of cash and Eligible Investments) in the Collection Accounts and the Uninvested Proceeds Account as of the Determination Date relating to such Payment Date and, with respect to any other date, such amount as of that date.

"Average Life":  On any Measurement Date, with respect to any Pledged Security, the quotient obtained by dividing (i) the sum of the products of (a) the number of years (rounded to the nearest one-tenth thereof) from such Measurement Date to the respective dates of each successive Scheduled Distribution of principal of such Pledged Security and (b) the respective amounts of principal of such Scheduled Distribution by (ii) the sum of all successive Scheduled Distributions of principal on such Pledged Security.

"<u>Balance</u>":  On any date, with respect to cash or Eligible Investments in any Account, the aggregate of (a) the face amount or current balance, as the case may be, of cash, demand deposits, time deposits, certificates of deposit, bankers' acceptances and federal funds; (b) outstanding principal amounts of interest-bearing government and corporate securities, money market accounts and repurchase obligations and (c) the purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"<u>Bank</u>":  First Union National Bank, a national banking association, in its individual capacity and not as Trustee, until a successor Person shall have become Trustee pursuant to the provisions of this Indenture, and then "Bank" shall mean such successor Person in its individual capacity and not as Trustee.

"<u>Bank Guaranteed Asset-Backed Securities</u>":  Structured Finance Securities as to which, if interest thereon is not timely paid when due, or the principal thereof is not timely paid at stated legal maturity, a national banking association organized under U.S. law or banking corporation organized under the law of a state of the United States has undertaken in an irrevocable letter of credit or other similar instrument to make such payment against the presentation of required documents, but only if such letter of credit or similar instrument (1) expires no earlier than such stated legal maturity (or contains "evergreen" provisions entitling the beneficiary thereof to draw the entire undrawn amount thereof upon the failure of the expiration date of such letter of credit or other similar instrument to be extended beyond its then current expiry date), (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Structured Finance Security and (3) was issued by a bank having a credit rating assigned by each nationally recognized statistical rating organization that currently rates such Structured Finance Security higher than the credit rating assigned by such rating organization to such Structured Finance Security, determined without giving effect to such letter of credit or similar instrument; <u>provided</u>, that if a rating agency has rated such Bank Guaranteed Asset-Backed Security, the underlying documentation for such Bank Guaranteed Asset-Backed Security has been reviewed as part of the rating process by such rating agency; and <u>provided</u>, <u>further</u>, that any Structured Finance Security falling within this definition shall be excluded from the definition of each other Specified Type of Structured Finance Security.

"<u>Bankruptcy Law</u>":  Title 11 of the United States Code (11 U.S.C. §§ 101 <u>et</u> <u>seq</u>.), as amended, any successor statute thereto, any similar statute enacted under the laws of any state of the United States, and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands or of any other applicable jurisdiction.

"<u>Base Rate</u>":  A fluctuating rate of interest determined by the Calculation Agent as being the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for U.S. dollar loans. Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"Base Rate Reference Bank":  Morgan Guaranty Trust Company of New York, or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for U.S. dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"Benefit Plan Investor":  Any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to Title I of ERISA and including, without limitation, governmental plans, foreign pension plans and church plans); (ii) "plan" described in Section 4975(e)(1) of the Code (whether or not subject to Section 4975 of the Code, including without limitation individual retirement accounts and Keogh plans); or (iii) entity whose underlying assets include plan assets by reason of an employee benefit plan's or plan's investment in such entity, including without limitation, as applicable, an insurance company general account.

"Business Day":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in New York, New York, in the Cayman Islands, in Dublin, Ireland (if and for so long as any Class of the Notes is listed on the Irish Stock Exchange), or in the city in which the Corporate Trust Office of the Trustee is located (which is currently Charlotte, North Carolina), are authorized or obligated by law or executive order to be closed and, in the case of the final payment of principal of any Note, the place of presentation of such Note.

"Calculation Agent":  The meaning specified in Section 6.18(a).

"Calculation Amount":  With respect to each Defaulted Security or Deferred Interest PIK Security, the lesser of (1) the product of (x) the lesser of (a) the Applicable Recovery Percentage assigned by Moody's to such Defaulted Security or Deferred Interest PIK Security, as applicable, and (b) for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the applicable S&P Recovery Rate of such Defaulted Security or Deferred Interest PIK Security, as applicable, and (y) the Principal Amount of such Defaulted Security or Deferred Interest PIK Security, as applicable, or (2) the Market Value of such Defaulted Security or Deferred Interest PIK Security, as applicable.

"Car Rental Receivable Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from leases and subleases of vehicles to car rental systems (such as Hertz, Avis, National, Dollar, Budget, etc.) and their franchisees, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the subleases are obligations of numerous franchisees and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee or third party of the underlying vehicle; and (4) such leases or subleases typically provide for the right of the lessee or

sublessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"Catastrophe Bonds": Structured Finance Securities (1) that entitle the holder thereof to receive a fixed principal or similar amount and a specified return on such amount, (2) the issuer of which enters into a swap, insurance contract, or similar arrangement with a counterparty pursuant to which the issuer agrees to pay amounts to the counterparty upon the occurrence of specified events, including but not limited to: hurricanes, earthquakes and other events; and (3) the payment of which depends primarily upon the occurrence and/or severity of such events.

"CBO/CLO PIK Securities": Any CBO/CLO Security that, by its terms, provides for the payment of rated scheduled interest payments, but permits such payments to be deferred and capitalized as additional principal thereof or that issues identical securities in place of payments of interest in cash.

"CBO/CLO Securities": Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from a portfolio of commercial and industrial bank loans, synthetic securities or debt securities or any combination of the foregoing, generally having the following characteristics: (1) the bank loans and debt securities have varying contractual maturities; (2) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual bank loans or debt securities depending on numerous factors specific to the particular issuers or obligors and upon whether, in the case of loans or securities bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (3) proceeds from such repayments can for a limited period and subject to compliance with certain eligibility criteria be reinvested in additional bank loans, synthetic securities and/or debt securities.

"Certificate of Authentication": The meaning specified in Section 2.1.

"Certificated Security": A Security that is represented by a certificate.

"Class": All of the Notes of the same alphabetical designation.

"Class A Break-Even Loss Rate": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by Standard & Poor's through the application of the S&P Trading Model, such that after giving effect to Standard & Poor's assumptions on recoveries, interest rates and timing of defaults and interest rates and to Section 11.1, will result in sufficient funds remaining for the payment of the Class A Notes in full by their Stated Maturity Date and the timely payment of interest on the Class A Notes.

"Class A Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)       the aggregate amount of interest accrued at the Class A Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class A Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class A Notes or any prepayment thereof on any preceding Payment Date), and

(ii)      any Defaulted Interest in respect of the Class A Notes and accrued interest on such Defaulted Interest;

provided, that the Class A Interest Distribution Amount shall exclude any Class A Note Increased Margin.

"Class A Loss Differential":  At any time, the rate calculated by subtracting the Class A Scenario Loss Rate at such time from the Class A Break-Even Loss Rate at such time.

"Class A Note Increased Margin":  With respect to each Class A Note for each Interest Period following the Interest Step-Up Date, the additional interest accruing on the Class A Notes at a rate per annum equal to 0.53%.

"Class A Note Interest Rate":  The interest rate for the Class A Notes specified in Section 2.3.

"Class A Notes":  The U.S. $250,000,000 Class A Floating Rate Notes due December 5, 2036.

"Class A Scenario Loss Rate":  At any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with an "AAA" rating of the Class A Notes by Standard & Poor's, determined by application of the S&P Trading Model at such time.  The Class A Scenario Loss Rate may be modified from time to time upon confirmation by Standard & Poor's that such modification will not cause its then-current rating of the Class A Notes to be reduced or withdrawn.

"Class AB Coverage Tests":  The Class AB Overcollateralization Ratio Test and the Class AB Interest Coverage Ratio Test.

"Class AB Interest Coverage Ratio":  As of any Measurement Date, the ratio calculated by dividing:

(i)       the Interest Coverage Amount; by

(ii)    the sum of scheduled interest on the Class A Notes and the Class B Notes (other than any Class A Note Increased Margin and Class B Note Increased Margin) with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the Payment Date immediately following such Measurement Date) and any Defaulted Interest in respect of the Class A Notes and the Class B Notes and accrued interest on such Defaulted Interest.

"Class AB Interest Coverage Ratio Test":  For so long as any Class A Notes or Class B Notes remain Outstanding, a test that will be met on any Measurement Date if the Class AB Interest Coverage Ratio as of any such Measurement Date is equal to or greater than 110.0%.

"Class AB Overcollateralization Ratio":  As of any Measurement Date, the ratio (expressed as a percentage) calculated by dividing:

(i)    the Aggregate Collateral Balance; by

(ii)    the Aggregate Outstanding Amount of the Class A Notes and the Class B Notes as of such Measurement Date.

"Class AB Overcollateralization Ratio Test":  For so long as any Class A Notes or Class B Notes remain Outstanding, a test satisfied on any Measurement Date if the Class AB Overcollateralization Ratio on such Measurement Date is equal to or greater than 105.5%.

"Class B Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class B Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class B Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class B Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Defaulted Interest in respect of the Class B Notes and accrued interest on such Defaulted Interest;

provided, that the Class B Interest Distribution Amount shall exclude any Class B Note Increased Margin.

"Class B Note Increased Margin":  With respect to each Class B Note for each Interest Period following the Interest Step-Up Date, the additional interest accruing on the Class B Notes at a rate per annum equal to 0.90%.

"Class B Note Interest Rate":  The interest rate for the Class B Notes specified in Section 2.3.

"Class B Notes":  The U.S. $21,000,000 Class B Floating Rate Notes due December 5, 2036.

"Class C Coverage Tests":  The Class C Overcollateralization Ratio Test and the Class C Interest Coverage Ratio Test.

"Class C Deferred Interest":  The meaning specified in Section 2.7(a).

"Class C Interest Coverage Ratio":  As of any Measurement Date, the ratio calculated by dividing:

(i)    the Interest Coverage Amount; by

(ii)    the sum of scheduled interest due on the Class A Notes, the Class B Notes and the Class C Notes (including Class C Deferred Interest and any interest thereon but excluding any Class A Note Increased Margin, Class B Note Increased Margin and Class C Note Increased Margin) with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the Payment Date immediately following such Measurement Date) and any Defaulted Interest in respect of the Class A Notes, the Class B Notes and the Class C Notes and accrued interest on such Defaulted Interest.

"Class C Interest Coverage Ratio Test":  For so long as any Class C Notes remain Outstanding, a test that will be met on any Measurement Date if the Class C Interest Coverage Ratio as of any such Measurement Date is equal to or greater than 107.0%.

"Class C Interest Distribution Amount":  With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class C1 Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class C1 Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class C1 Notes or any prepayment thereof on any preceding Payment Date),

(ii)    the aggregate amount of interest accrued at the Class C2 Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class C2 Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of

principal of the Class C2 Notes or any prepayment thereof on any preceding Payment Date), and

        (ii)     the Class C Deferred Interest, if any, and any Defaulted Interest in respect of the Class C1 Notes and the Class C2 Notes and accrued interest on such Defaulted Interest;

provided, that the Class C Interest Distribution Amount shall exclude any Class C Note Increased Margin.

"Class C Note Increased Margin": The Class C1 Note Increased Margin or the Class C2 Note Increased Margin, or both, as the context may require.

"Class C Note Interest Rate": The Class C1 Note Interest Rate or the Class C2 Note Interest Rate, or both, as the context may require.

"Class C Notes": The Class C1 Notes and the Class C2 Notes.

"Class C Overcollateralization Ratio": As of any Measurement Date, the ratio (expressed as a percentage) calculated by dividing:

        (i)     the Aggregate Collateral Balance; by

        (ii)     the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes and the Class C Notes as of such Measurement Date.

"Class C Overcollateralization Ratio Test": For so long as any Class C Notes remain Outstanding, a test that will be met on any Measurement Date if the Class C Overcollateralization Ratio on such Measurement Date is equal to or greater than 101.1%.

"Class C1 Note Increased Margin": With respect to each Class C1 Note for each Interest Period following the Interest Period relating to the Interest Step-Up Date, 2.50%."

"Class C1 Note Interest Rate": The interest rate for the Class C1 Notes specified in Section 2.3.

"Class C1 Notes": The U.S. $5,000,000 Class C1 Floating Rate Notes due December 5, 2036.

"Class C2 Note Increased Margin": With respect to each Class C2 Note for each Interest Period following the Interest Period relating to the Interest Step-Up Date, 2.50%.

       17       Draft February 3, 2002 - 5:02 pm

"Class C2 Note Interest Rate":  The interest rate for the Class C2 Notes specified in Section 2.3.

"Class C2 Notes":   The U.S. $13,000,000 Class C2 Fixed Rate Notes due December 5, 2036.

"Clearing Agency":  An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation":  The meaning specified in Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security":  A security that is registered in the name of, or endorsed to, a Clearing Corporation or its nominee or is in the possession of the Clearing Corporation in bearer form or endorsed in blank by an appropriate Person.

"Clearstream":  Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date":  December 5, 2001.

"CMBS Conduit Securities":  Structured Finance Securities (A) issued by a single-seller or multi-seller conduit under which the holders of such Structured Finance Securities have recourse to a specified pool of assets (but not other assets held by the conduit that support payments on other series of securities) and (B) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from a pool of commercial mortgage loans generally having the following characteristics:  (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans are obligations of a relatively limited number of obligors (with the creditworthiness of individual obligors being less material than for CMBS Large Loan Securities and CMBS Credit Tenant Lease Securities) and accordingly represent a relatively undiversified pool of obligor credit risk; (4) upon original issuance of such Structured Finance Securities no five commercial mortgage loans account for more than 20% of the aggregate principal balance of the entire pool of commercial mortgage loans supporting payments on such securities; and (5) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium.

"CMBS Credit Tenant Lease Securities": Structured Finance Securities (other than CMBS Large Loan Securities and CMBS Conduit Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties leased to corporate tenants (or on the cash flow from such leases). They generally have the following characteristics: (1) the commercial mortgage loans or leases have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the leases are secured by leasehold interests; (4) the commercial mortgage loans or leases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment thereof can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans or termination of leases depending on numerous factors specific to the particular obligors or lessees and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; and (6) the creditworthiness of such corporate tenants is the primary factor in any decision to invest in these securities.

"CMBS Large Loan Securities": Structured Finance Securities (other than CMBS Conduit Securities and CMBS Credit Tenant Lease Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties. They generally have the following characteristics: (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (4) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (5) the valuation of individual properties securing the commercial mortgage loans is the primary factor in any decision to invest in these securities.

"Co-Issuer": Madison Avenue Structured Finance CDO I, Corp., a Delaware corporation.

"Co-Issuers": The Issuer and the Co-Issuer, collectively.

"Code": The United States Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"Collateral":  The meaning specified in the Granting Clauses to this Indenture.

"Collateral Administration Agreement":  A collateral administration agreement, dated as of December 5, 2001, among the Issuer, the Collateral Manager and First Union National Bank, as Collateral Administrator, relating to the preparation of certain reports to be provided to the Noteholders pursuant to this Indenture, and if from time to time amended as permitted therein and in this Indenture, as so amended.

"Collateral Administrator":  The Bank, in its capacity as Collateral Administrator.

"Collateral Debt Security":  Any U.S. dollar denominated obligation that is not convertible into, or payable in, any other currency and that on the date it is purchased by the Issuer:

      (a)     is a Structured Finance Security, a REIT Security, a Synthetic Security or a Corporate Security;

      (b)     is either a security or obligation issued by an issuer incorporated or organized under the laws of (a) the United States or (b) a Qualifying Foreign Country; provided that for the purpose of this clause (ii), the Collateral Manager may determine (in its reasonable business judgment) that the issuer, Synthetic Security Counterparty or Reference Obligor of a Qualifying Tax Jurisdiction Security shall be deemed to be organized under the laws of the United States or a Qualifying Foreign Country, as applicable;

      (c)     has been assigned a Moody's Rating and, for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, an S&P Rating; provided, that no assigned rating from Standard & Poor's contains an "r" or "t" subscript unless Standard & Poor's has confirmed in writing that the purchase of such Collateral Debt Security would not cause its then-current rating of any Class of Notes to be downgraded or withdrawn;

      (d)     has a Moody's Rating of at least "Ba3" as to the ultimate payment of principal and interest;

      (e)     is not (i) a Defaulted Security, (ii) an obligation which, in the Collateral Manager's commercially reasonable business judgment, has a significant risk of declining in credit quality and, with lapse of time, will become a Defaulted Security, (iii) a Deferred Interest PIK Security or (iv) a Catastrophe Bond that is on Moody's "negative credit watch";

      (f)     is eligible under its Underlying Instrument to be purchased by the Issuer and pledged to the Trustee;

(g)      is not issued by a sovereign, or by a non-sovereign issuer located in a country, that in either case, on the date on which it is acquired by the Issuer imposes foreign exchange controls that effectively limit the availability or use of U.S. dollars to make when due the scheduled payments of principal thereof and interest thereon;

(h)      is not the subject of an exchange or conversion offer and has not been called for redemption and may not, by its terms, be converted into an equity security at the option of the issuer thereof;

(i)      provides for periodic payment of interest thereon in cash no less frequently than semi-annually (other than Collateral Debt Securities that constitute Zero Coupon Bonds) except that such Collateral Debt Securities may provide for deferment or capitalization of scheduled interest payments; provided, however, that no interest shall have been deferred and remain unpaid and there shall be no outstanding capitalized interest balance with respect to any Collateral Debt Security (other than Collateral Debt Securities that constitute Zero Coupon Bonds) that permits such deferment or capitalization as of the date of its acquisition by the Issuer;

(j)      is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and was issued after July 18, 1984;

(k)      meets at least one of the following conditions:

(i)      the asset is the obligation of a single issuer (i) incorporated as a corporation under the state or Federal law of the United States or (ii) that is a business entity described in Treasury Regulation Section 301.7701-2(b)(8);

(ii)      the Issuer has received an opinion of counsel that the issuer of such obligation will be treated as a corporation for U.S. Federal income tax purposes;

(iii)      the Issuer has received an opinion of counsel that the issuer of the obligation will not be treated as engaged in a trade or business within the United States for U.S. Federal income tax purposes;

(iv)      the Issuer has received an opinion of counsel that such obligation will or should be treated as debt for U.S. Federal income tax purposes or will be treated as a regular interest in a REMIC or FASIT (each as defined in the Code) for U.S. Federal income tax purposes;

(v)      both (a) the Issuer has received an opinion of counsel that for U.S. Federal income tax purposes the issuer of the asset is a grantor trust and (b) either (x) the Issuer has received an opinion of counsel that for U.S. Federal income tax purposes all the assets of the trust are regular interests in a REMIC or FASIT,

except that the trust may also hold notional principal contracts (within the meaning of Treasury Regulations) designed to hedge interest rate risk with respect to the interests in or the assets of the REMIC or the FASIT or (y) each of the obligations held by such trust meets the requirements in paragraphs (i), (ii), (iii) or (iv) of this clause (k) and was issued after July 18, 1984; or

(vi)     the Alternative Debt Test is satisfied;

provided, that the Issuer shall be treated as receiving an Opinion of Counsel described in paragraphs (ii), (iii), (iv) or (v) above if both (x) the Issuer has received either (i) a copy of an opinion of counsel to that effect rendered at the time of issuance of the obligation or (ii) offering documents pursuant to which such obligation was offered that state that an opinion to that effect has been rendered and (y) either (i) since the date of issuance of such obligation, there has been no change in the organizational documents of the issuer or the terms of such obligation or (ii) nationally recognized tax counsel either (A) certifies to the Issuer in writing that any such change will not affect the opinion described in paragraphs (ii), (iii), (iv) or (v) of this clause (k) rendered at the time of issuance of the obligation or (B) at the time of such change, delivered an opinion to such effect;

(l)     its acquisition would not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act;

(m)     does not require the Issuer to make any future advances to the issuer thereof;

(n)     is not an asset for which MetLife, or any of its Affiliates, or the Collateral Manager serves as asset manager, servicer or in a similar capacity for the issuer of such asset, unless a Rating Agency Confirmation shall have been received with respect to the acquisition of such asset;

(o)     is not "margin stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System;

(p)     is an obligation or security (other than an Interest Only Security) that provides for a fixed amount of principal to be payable in cash no later than its stated maturity;

(q)     is a Synthetic Security with respect to which the Issuer will receive all payments thereunder free and clear of withholding tax, or is a Structured Finance Security, a REIT Security or a Corporate Security for which either (1) the Issuer meets the

certification and other requirements to receive payments with respect thereto free of withholding tax, (2) the issuer thereof is required to make additional payments sufficient to cover any withholding tax imposed on payments made to the Issuer with respect thereto or (3) the issuer thereof has obtained or expects to obtain in the ordinary course and not more than six weeks following the issuance thereof an exemption from withholding tax for the entire period during which the Notes will be outstanding; and

(r)       is not acquired by the Issuer for the purpose of accommodating a request from a Securities Lending Counterparty to borrow such Collateral Debt Securities under a Securities Lending Agreement.

Any instrument or asset, including any equity security, into which a Collateral Debt Security may be exchanged or converted pursuant to an offer, settlement, conversion, redemption or otherwise after the date of acquisition by the Issuer will be deemed to be a "Collateral Debt Security" following such conversion, redemption or exchange but only to the extent such instrument or asset otherwise qualifies under clauses (f), (l), (m) and (p) above.

If the Collateral Debt Security is a Synthetic Security, the requirements set forth in clauses (c), (j) and (k) above shall not apply to such Synthetic Security, but shall apply to the Reference Obligation for such Synthetic Security.

"Collateralization Event":  The meaning specified in Section 16.1(h).

"Collateral Management Agreement":  A collateral management agreement, dated as of December 5, 2001, between the Issuer and the Collateral Manager relating to the Collateral, and if from time to time amended as permitted therein and in this Indenture, as so amended.

"Collateral Management Fees":  The Senior Collateral Management Fee and the Subordinate Collateral Management Fee.

"Collateral Manager": Metropolitan Life Insurance Company, in its capacity as Collateral Manager, until a successor Person shall have become the collateral manager pursuant to the provisions of the Collateral Management Agreement, and thereafter "Collateral Manager" shall mean such successor Person.  Each reference herein to the Collateral Manager shall be deemed to constitute a reference as well to any agent of the Collateral Manager and to any other Person to whom the Collateral Manager has delegated any of its duties hereunder, in each case during such time as and to the extent that such agent or other Person is performing such duties.

"Collateral Manager Order" and "Collateral Manager Request":  A written order or request dated and signed in the name of the Collateral Manager by an Authorized Officer of the Collateral Manager or, if the Issuer so elects, in an Issuer Order or Issuer Request.

"Collection Accounts":  The Interest Collection Account and the Principal Collection Account.

"Controlling Class":  The Class A Notes, or, if all principal of and interest on the Class A Notes (other than Class A Note Increased Margin) has been paid in full, the Class B Notes, or if all principal of and interest on the Class B Notes (other than Class B Note Increased Margin) has been paid in full, the Class C Notes; provided, that in the case of an Event of Default described in Section 5.1(a), the Class A Notes and the Class B Notes, together, will be the Controlling Class so long as any principal of or interest on the Class A Notes or Class B Notes (other than Class A Note Increased Margin and Class B Note Increased Margin) remain unpaid.

"Corporate Security": A (i) publicly issued or privately placed debt obligation of a corporate issuer which is not a REIT Security or a Structured Finance Security or (ii) Synthetic Security whose Reference Obligation is a Corporate Security that would, taking into account the requirements of clauses (b) through (r) of the definition of "Collateral Debt Security," qualify as a Collateral Debt Security if purchased directly by the Issuer.

"Corporate Trust Office":  The principal corporate trust office of the Trustee currently located at 401 South Tryon Street, Suite 1200, Mail Code NC-1179, Charlotte, North Carolina, 28202, Attention: Kevin Stephens, telephone: (704) 383-5132, or at such other address as the Trustee may designate from time to time by notice to the Noteholders, the Preference Share Paying Agent, the Collateral Manager, the Hedge Counterparty and the Issuer or the principal corporate trust office of any successor Trustee.

"Coverage Tests":  The Class AB Coverage Tests and the Class C Coverage Tests.

"Credit Card Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from balances outstanding under revolving consumer credit card or charge card accounts, generally having the following characteristics:  (1) the accounts have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum credit limit and general economic matters.

"Credit Improved Security":  Any Collateral Debt Security which, in the Collateral Manager's commercially reasonable business judgment, has significantly improved in credit quality; provided, that if the Moody's rating of (a) either the Class A Notes or the Class B Notes is reduced by one (1) rating subcategory by Moody's (and not subsequently upgraded or reinstated) or (b) the Class C Notes is reduced by two (2) rating subcategories by Moody's (and not subsequently upgraded to a rating not more than one (1) subcategory lower than the rating

assigned by Moody's to such Class of Notes on the Closing Date or reinstated), or if any of the Reinvestment Criteria are not satisfied, then in order to constitute a Credit Improved Security either (A) (i) in the case of a Collateral Debt Security rated "Baa3" or higher by Moody's, such Collateral Debt Security must have increased in price to 101% or more of its original purchase price paid therefor by the Issuer or must have decreased its spread over its U.S. Treasury benchmark (or its applicable benchmark index) by 0.25% or more, in each case since the date on which such Collateral Debt Security was purchased; or (ii) in the case of a Collateral Debt Security rated "Ba1" or lower by Moody's, such Collateral Debt Security must have increased in price to 103% or more of its original purchase price paid therefor by the Issuer or must have decreased its spread over its U.S. Treasury benchmark (or its applicable benchmark index) by 0.50% or more, in each case since the date on which such Collateral Debt Security was purchased or (B) such Collateral Debt Security is currently on watch for upgrade or upgraded by at least one (1) rating subcategory by at least one (1) Rating Agency since it was acquired by the Issuer.

"Credit Risk Security":  Any Collateral Debt Security (including any Written Down Security) which, in the Collateral Manager's commercially reasonable business judgment, has a significant risk of declining in credit quality or, with lapse of time, becoming a Defaulted Security at any time; provided, that if the rating of (a) either the Class A Notes or the Class B Notes is reduced by one (1) rating subcategory or withdrawn by Moody's (and not subsequently upgraded or reinstated) or (b) the Class C Notes has been reduced by two (2) rating subcategories or withdrawn by Moody's (and not subsequently upgraded to a rating not more than one (1) subcategory lower than the rating assigned by Moody's to such Class of Notes on the Closing Date or reinstated), then such Credit Risk Security must (A) have been downgraded by at least one (1) rating subcategory or been put on a watch list for possible downgrade by at least one (1) Rating Agency since it was acquired by the Issuer or (B) experienced an increase in credit spread of (x) 50 basis points or more, in the event that the original credit spread (as of the date the Issuer purchased such Collateral Debt Security) was greater than 200 basis points or (y) 25 basis points in the event that the original credit spread (as of the date the Issuer purchased such Collateral Debt Security) was less than or equal to 200 basis points since the date on which such Collateral Debt Security was purchased, in each case, in order to constitute a Credit Risk Security.

"Current Portfolio":  The portfolio of Collateral Debt Securities and Eligible Investments purchased with Principal Proceeds and Uninvested Proceeds, existing immediately prior to the sale, maturity or other disposition of a Collateral Debt Security or immediately prior to the acquisition of a Collateral Debt Security, as the case may be.

"Custodial Account":  A custodial account at the Custodial Account Securities Intermediary established in the name of the Trustee pursuant to Section 10.2(i).

"Custodial Account Securities Intermediary":  The entity with which the Trustee establishes the Accounts, which shall be the Securities Custodian.

"Default":  Any event or condition the occurrence or existence of which would, with the giving of notice or lapse of time or both, become an Event of Default.

"Defaulted Interest":  Any interest due and payable in respect of any Note (other than Increased Margin) that is not punctually paid on the applicable Payment Date or on the Stated Maturity Date and remains unpaid; provided, that for so long as any Class A Notes or Class B Notes are Outstanding (other than solely in respect of Class A Note Increased Margin and Class B Note Increased Margin), any interest payable in respect of the Class C Notes that is not punctually paid on the applicable Payment Date will not be considered Defaulted Interest, but rather Class C Deferred Interest.

"Defaulted Security":  Any Collateral Debt Security or any other debt obligation included in the Collateral:

(a)    as to which there has occurred and is continuing a default with respect to the payment of interest or principal (without giving effect to any grace period or waiver); provided, however, that a payment default of up to three Business Days that in the Collateral Manager's commercially reasonable business judgment (as certified by the Collateral Manager to the Trustee) is due to non-credit related reasons, shall not cause a Collateral Debt Security or other debt obligation to be considered defaulted for purposes of this definition;

(b)    with respect to which the Collateral Manager has received written notice stating that such Collateral Debt Security or such other debt obligation, or as to which the Collateral Manager has actual knowledge (provided, that the Collateral Manager shall be responsible under the Collateral Management Agreement for obtaining, to the extent practicable from sources of information normally available to it, such knowledge) that such Collateral Debt Security or other debt obligation, is in default under the applicable Underlying Instruments, which default entitles the holders thereof, with notice or passage of time or both, to accelerate the maturity of all or a portion of the principal balance of such obligation, but only until such default or event of default has been cured or, other than with respect to a default or event of default relating to payment of interest or principal, waived and such debt obligation satisfies the criteria for inclusion of debt obligations in the Collateral described in the definition of Collateral Debt Security or Eligible Investments as applicable to such debt obligation;

(c)    that is a Defaulted Synthetic Security;

(d)    that is a Synthetic Security Counterparty Defaulted Security;

(e)    as to which any bankruptcy, insolvency or receivership proceeding has been initiated in connection with the issuer thereof, or as to which there has been proposed or effected any distressed exchange or other distressed debt restructuring where

the issuer of such Collateral Debt Security has offered the debt holders a new security or package of securities that, in the commercially reasonable business judgment of the Collateral Manager, either (x) amounts to a diminished financial obligation or (y) has the purpose of helping the issuer avoid default (it being understood that any security actually received in an exchange for a Defaulted Security as a result of a distressed exchange or other distressed debt restructuring will not itself be treated as a Defaulted Security if it otherwise satisfies the definition of Collateral Debt Security);

(f)    that has a rating by Standard & Poor's of "D" or "SD" (for so long as any Class of Notes is Outstanding and rated by Standard & Poor's); or

(g)    that the Collateral Manager has actual knowledge (provided, that the Collateral Manager shall be responsible under the Collateral Management Agreement for obtaining, to the extent practicable from sources of information normally available to it, such knowledge) that the issuer thereof is in default (without giving effect to any applicable grace period or waiver) as to payment of principal and/or interest on another obligation (and such default has not been cured or waived and entitles the holders thereof to accelerate the maturity of all or a portion of the principal amount of such obligation) which obligation is senior or pari passu in right of payment to such Collateral Debt Security.

"Defaulted Synthetic Security": A Synthetic Security referencing a Reference Obligation that would, if such Reference Obligation were a Collateral Debt Security, constitute a "Defaulted Security" under the definition of such term.

"Deferred Interest PIK Security":  A PIK Security with respect to which rated interest has been deferred (whether or not explicitly capitalized), either in part or whole, (i) for each consecutive Payment Date occurring over a period of at least six months for Collateral Debt Securities with a Moody's Rating of "Baa3" or higher or (ii) immediately for Collateral Debt Securities with a Moody's Rating below "Baa3"; provided, that such PIK Security shall remain a Deferred Interest PIK Security only until such time as payment in cash of rated interest on such PIK Security has resumed and all deferred and capitalized interest due to be paid has been paid in cash in accordance with the terms of such PIK Security for at least one Payment Date.

"Definitive Notes":  The Regulation S Definitive Notes and the Rule 144A Definitive Notes.

"Depository" or "DTC":  The Depository Trust Company, its nominees and their respective successors.

"Designated Maturity": Three months.

"Determination Date":  With respect to any Payment Date, the last day of the related Due Period.

"Discretionary Sale":  The disposition of any Collateral Debt Security that is not a Defaulted Security, an Exchanged Security, a Credit Risk Security or a Credit Improved Security in accordance with Section 12.1(e).

"Disposition Proceeds":  Any proceeds (excluding (i) accrued interest and (ii) any portion of the proceeds of sale of an equity conversion or warrant feature of a Collateral Debt Security that is in excess of the amount of the purchase price of such equity conversion or warrant feature paid with Principal Proceeds) received with respect to sales of Collateral Debt Securities, Eligible Investments and Exchanged Securities and the termination of any Hedge Agreement, in each case, net of reasonable out-of-pocket expenses and disposition costs in connection with such sales.

"Diversity Score":  A single number that indicates collateral concentration in terms of both issuer and industry concentration.  The Diversity Score is calculated pursuant to the formula set forth in Schedule C attached hereto.

"Due Date":  Each date on which a distribution is due on a Pledged Security.

"Due Period":  With respect to any Payment Date, the period beginning on the day following the last day of the Due Period relating to the preceding Payment Date (or, in the case of the Due Period that is applicable to the first Payment Date, beginning on the Closing Date) and ending at the close of business on the 26th day of the calendar month each February, May August and November (or, if such day is not a Business Day, on the immediately succeeding Business Day).

"Effective Date Ratings Downgrade":  The failure of Moody's to confirm its original ratings on the Notes or Standard & Poor's to confirm its original rating on the Class A Notes within 30 days after the Ramp-Up Effective Date.

"Eligible Investments":  Any U.S. dollar denominated investment that is one or more of the following, including, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services:

(a)    cash;

(b)    direct Registered obligations of, and Registered obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the United States of America, or any full faith and credit agency or instrumentality thereof;

(c)    demand and time deposits in, certificates of deposit of, banker's acceptances payable within 183 days of issuance issued by, or federal funds sold by any United States federal or state depository institution or trust company (including the Bank in its individual capacity and not as Trustee), the commercial paper and/or other debt obligations of which (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or the contractual commitment providing for such investment have a credit rating of "Aa2" by Moody's and "AAA" by Standard & Poor's, in the case of long-term debt obligations, or "P-1" by Moody's and "A-1+" by Standard & Poor's, in the case of commercial paper and short-term debt obligations; provided, that in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by Standard & Poor's;

(d)    unleveraged repurchase obligations with respect to (i) any security described in clause (b) above or (ii) any other security issued or guaranteed by a full faith and credit agency or instrumentality of the United States of America (in each case without regard to the stated maturity of such security), in either case entered into with a United States federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term rating is not less than "Aa2" by Moody's and "AAA" by Standard & Poor's or whose short-term credit rating is not less than "P-1" by Moody's and "A-1+" by Standard & Poor's at the time of such investment; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by Standard & Poor's;

(e)    Registered debt securities (other than mortgage-backed securities) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof and which has a credit rating of not less than "Aa2" by Moody's and "A-1+" by Standard & Poor's at the time of such investment or contractual commitment providing for such investment;

(f)    commercial paper or other short-term debt obligations with a maturity of not more than 183 days from the date of issuance having at the time of such investment a credit rating of not less than "P-1" by Moody's and "A-1+" by Standard & Poor's; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by Standard & Poor's;

(g)    reinvestment agreements (so long as payments under any such reinvestment agreement are not subject to withholding taxes) issued by any bank (if treated as a deposit by such bank) or reinvestment agreements issued in registered form

(for purposes of the Code) after July 18, 1984 by any insurance company or other corporation or entity organized under the laws of the United States of America or any state thereof that has a credit rating of not less than "P-1" by Moody's and "A-1+" by Standard & Poor's; <u>provided</u>, that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's;

(h)    any offshore money market fund or similar investment vehicle having at the time of investment therein a credit rating of "P-1" by Moody's and "AAAm" by Standard & Poor's; <u>provided</u>, that (x) if such investment has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, (y) the ownership of such investment will not subject the Issuer to net income tax for U.S. federal income tax purposes and (z) no amount earned by the Issuer with respect to such investment will be subject to withholding tax; and

(i)    solely prior to the Ramp-Up Effective Date and solely with respect to Uninvested Proceeds, debt securities issued or guaranteed as to the timely payment of principal and interest by the government of the United States; <u>provided</u>, the stated maturity of such debt securities must be equal to or less than ten years; and <u>provided</u>, <u>further</u>, the Reinvestment Criteria will be met or improved after giving effect to the acquisition of an Eligible Investment under this clause (i), calculated as if the Eligible Investments acquired under this clause (i) are Collateral Debt Securities;

and, in each case (other than clause (i) above), with a stated maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs; <u>provided</u>, that Eligible Investments shall not include (a) any interest-only security, any security purchased at a price in excess of 100% of the par value thereof or any security whose repayment is subject to substantial non-credit related risk as determined in the sole judgment of the Collateral Manager or (b) any security whose rating assigned by Standard & Poor's includes the subscript "r" or "t." Any investment described above issued by or through the Trustee, or any of its Affiliates, or any entity to which the Trustee or any of its Affiliates provides services, shall be permissible so long as such investment otherwise meets the applicable qualifications of an "Eligible Investment" as described above.

"<u>Emerging Market Country</u>":  Any country other than the United States or a Qualifying Foreign Country; <u>provided</u> that with respect to any Qualifying Tax Jurisdiction Security, the Collateral Manager shall determine (in its reasonable business judgment), under the law of which country the issuer, Synthetic Security Counterparty or Reference Obligor of such Collateral Debt Security shall be deemed to be organized or incorporated.

"<u>Entitlement Holder</u>":  The meaning specified in Section 8-102(a)(7) of the UCC.

"Entitlement Order":  The meaning specified in Section 8-102(a)(8) of the UCC.

"Equipment Leasing Asset-Backed Securities":  Structured Finance Securities (other than Aerospace, Defense and Telecommunications Asset-Backed Securities, Healthcare Asset-Backed Securities, Restaurant and Food Services Asset-Backed Securities, and Small Business Loan Asset-Backed Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from leases and subleases of equipment (other than automobiles) to commercial and industrial customers, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage.

"ERISA":  The United States Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"Euroclear":  Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"Event of Default":  Any of the events of default described in Section 5.1 of this Indenture.

"Excepted Property":  With respect to (i) the Issuer, the $1,000 capital contributed to the Issuer by the owners of the share capital of the Issuer in accordance with the Issuer Charter, the $1,000 fee paid to the Issuer for agreeing to issue the Notes and the account established and maintained by the Issuer in the Cayman Islands into which such amounts are deposited and (ii) the Co-Issuer, the $100 capital contributed to the Co-Issuer by the owners of the equity of the Co-Issuer in accordance with the Co-Issuer's certificate of incorporation.

"Excess Interest Proceeds":  The meaning specified in Section 11.1(a)(xxii).

"Excess Principal Proceeds":  The meaning specified in Section 11.1(b)(xviii).

"Excess Proceeds":  The meaning specified in Section 11.1(b)(xviii).

"Exchange Act":  The United States Securities Exchange Act of 1934, as amended, and any successor statute thereto.

"Exchanged Security":  Any instrument or asset, including any equity security, that becomes a Collateral Debt Security pursuant to an exchange or conversion pursuant to an offer, settlement, conversion, redemption or otherwise after the date of acquisition by the Issuer but only to the extent such instrument or asset otherwise qualifies under clauses (f), (l), (m) and (p) of the definition of "Collateral Debt Security," but which would otherwise not qualify as a Collateral Debt Security.

"Expense Account":  The trust account designated the "Expense Account" and established pursuant to Section 10.4(a).

"Film/Media Asset-Backed Securities":  Structured Finance Securities that entitle their holders to receive payments that depend on the cash flow from revenues of movies, television contracts, sporting events, music records, and entertainment events, generally having the following characteristics:  (1) the balances have varying contractual maturities; (2) the balances are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risks; (3) the repayment stream on such balances is primarily determined by a contractual payment schedule; and (4) in some cases, the securities are fully or partially guaranteed by an independent or affiliated corporate credit.

"Final Maturity Date":  The Stated Maturity Date with respect to any Class of Notes, or such earlier date on which the Aggregate Outstanding Amount of such Class of Notes is paid in full.

"Final Offering Memorandum":  The offering memorandum dated on or about the date hereof relating to the offering and sale of the Notes and the Preference Shares.

"Fixed Par Amount":  The Aggregate Principal Amount of all Fixed Rate Collateral Debt Securities.

"Fixed Rate Collateral Debt Security":  Any Collateral Debt Security bearing interest at a fixed rate (other than Defaulted Securities, Deferred Interest PIK Securities, Exchanged Securities and Interest Only Securities).

"Fixed Rate Notes":  The Class C2 Notes.

"Floating Par Amount":  The Aggregate Principal Amount of all Floating Rate Collateral Debt Securities.

"Floating Rate Notes":  The Class A Notes, the Class B Notes and the Class C1 Notes.

"<u>Floating Rate Collateral Debt Security</u>":  Any Collateral Debt Security bearing interest at a floating rate (other than Defaulted Securities, Deferred Interest PIK Securities, Exchanged Securities and Interest Only Securities).

"<u>Franchise Loan Asset-Backed Securities</u>":  Structured Finance Securities that entitle their holders to receive payments that depend primarily on the cash flow from balances outstanding on franchise loans secured by the cash flow generated at franchise or chain store establishments, typically fast-food chains, service stations, convenience stores and funeral homes, as well as liens on real estate, furniture, fixtures and equipment, the proceeds of which were used to acquire, refinance or create a source of working capital for such franchise establishments, generally having the following characteristics: (1) the franchise loans have standardized payment terms and require minimum monthly payments; (2) the franchise loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the franchise loans are repaid; and (4) environmental liabilities and legal liabilities of the franchisees may affect their ability to repay the franchise loans.

"<u>Future Flow Receivables Asset-Backed Securities</u>":  Structured Finance Securities that entitle their holders to receive payments that depend primarily on the cash flow from receivables or remittances to be created in the future, often, but not necessarily, related to cross-border sales of goods, generally having the following characteristics:  (1) the Structured Finance Securities are issued based on an estimated amount of receivables or account balances or other payment stream to be created in the future; (2) the rating on the securities may be influenced by the rating of the asset seller; (3) the receivables or remittances will have varying contractual maturities; (4) the receivables or remittances will be obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risks; and (5) the cash flow stream does not depend upon a contractual payment schedule.

"<u>Global Notes</u>":  The meaning specified in Section 2.2(b) hereof.

"<u>Grant</u>":  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over and confirm.  A Grant of the Collateral, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Collateral, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Healthcare Asset-Backed Securities":  Structured Finance Securities (other than Small Business Loan Asset-Backed Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from leases and subleases of equipment to hospitals, non-hospital medical facilities, physicians and physician groups for use in the provision of healthcare, educational and childcare services, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear.

"Hedge Agreements":  The Interest Rate Hedge Agreement, the Liquidity Swap, any Asset Specific Hedge or any Timing Hedge, as the context may require.

"Hedge Counterparty":  The Interest Rate Hedge Counterparty, the Liquidity Swap Counterparty, any Asset Specific Counterparty or any Timing Hedge Counterparty, as the context may require; provided, that at the time the Issuer enters into a Hedge Agreement, the number of different Hedge Counterparties, when added to the number of Securities Lending Counterparties and Synthetic Security Counterparties at any particular time involved in transactions with the Issuer involving the Collateral, may not exceed ten (10).

"Hedge Counterparty Collateral Account":  The hedge counterparty collateral account of the Trustee established pursuant to Section 16.1(n).

"Hedge Payments":  With respect to (A) any Hedge Agreement, the sum of:  (i) the amount of scheduled payments, if any, then payable by the Issuer to the Hedge Counterparty thereunder and (ii) the amount of any early termination or liquidation payments, if any, then payable by the Issuer to the Hedge Counterparty thereunder and (B) any Hedge Agreement which is a Liquidity Swap, any interest (such interest calculated at the Class A Note Interest Rate) with respect to amounts due and unpaid to the Liquidity Swap Counterparty pursuant to clause (A) above.

"Holder":  With respect to any Note, the Person in whose name such Note is registered in the Note Register and, with respect to any Preference Share, the Person in whose name such Preference Share is registered in the Share Register.

"Home Equity Loan Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets

designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from balances (including revolving balances) outstanding under lines of credit secured by residential real estate (single or multi-family properties) the proceeds of which lines of credit are not used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the balances have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum line of credit and general economic matters.

"Incentive Collateral Management Fees":  The Primary Incentive Collateral Management Fee and the Secondary Incentive Collateral Management Fee.

"Increased Margin":  The Class A Note Increased Margin, the Class B Note Increased Margin and the Class C Note Increased Margin, collectively.

"Indenture":  This Indenture, as supplemented or amended from time to time.

"Independent":  When used with respect to any specified Person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers and any member thereof), a Person who (a) is in fact independent of either of the Co-Issuers and any other obligor upon the Notes or the Preference Shares and the Collateral Manager or any Affiliate of either of the Co-Issuers or such other obligor or the Collateral Manager, (b) does not have any direct financial interest or any material indirect financial interest in either of the Co-Issuers or in any such other obligor or the Collateral Manager or in an Affiliate of either of the Co-Issuers or such other obligor or the Collateral Manager and (c) is not connected with either of the Co-Issuers or any such other obligor or the Collateral Manager or any Affiliate of either of the Co-Issuers or such other obligor or the Collateral Manager as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions.  Whenever it is provided herein that any Independent Person's opinion or certificate shall be furnished to the Trustee, such Person shall be appointed by Issuer Order and approved by the Trustee in the exercise of reasonable care (if and to the extent such approval by the Trustee is required by the applicable terms of this Indenture) and such opinion or certificate shall state that the signer has read this definition and that the signer is independent within the meaning thereof.

"Indirect Emerging Markets Exposure":  As of any date of determination, an amount equal to the sum (without duplication) of:

(1)     the sum, with respect to all CBO/CLO Securities, of the products of (i) the maximum percentage of assets from Emerging Market Countries allowed or, if greater, the actual percentage of assets from Emerging Market Countries included, in the portfolio

of the issuer of a CBO/CLO Security as of such date of determination multiplied by (ii) the principal balance of such CBO/CLO Security as of such date of determination; and

(2)     the sum, with respect to all Structured Finance Securities (other than CBO/CLO Securities) issued by issuers organized or incorporated under the laws of the United States, Qualifying Foreign Country or Qualifying Tax Jurisdiction that are secured in whole or in part by collateral issued by entities organized or incorporated under the laws of an Emerging Market Country or with respect to which payments are otherwise sourced from an Emerging Market Country, of the products of (a) the principal balance of such Structured Finance Security as of such date of determination multiplied by (b) the aggregate par amount of such collateral securing such Structured Finance Security divided by (c) the aggregate par amount of all collateral securing such Structured Finance Security as of such date of determination, but only to the extent that the rating of any such Structured Finance Security is not constrained by the foreign currency debt rating of such Emerging Market Country through the use of a reserve account, guarantee or other structural features;

provided, that if, after inquiry of the relevant issuer, servicer, asset manager or any other person acting in a similar capacity in respect of such CBO/CLO Security or other Structured Finance Security, the Issuer is unable to obtain the information required by it to determine the related Indirect Emerging Markets Exposure pursuant to subclauses (1) or (2) above, as applicable, the Issuer shall estimate the Indirect Emerging Markets Exposure with respect to such CBO/CLO Security or other Structured Finance Security in good faith based upon all other relevant information available to the Issuer.

The Collateral Manager, on behalf of the Issuer, shall not be required to determine the Indirect Emerging Markets Exposure with respect to such CBO/CLO Security or other Structured Finance Security if the Issuer has insufficient information to make such determination and will not incur any liability as a result of any failure to do so and the Indirect Emerging Markets Exposure, if any, with respect to such CBO/CLO Security or other Structured Finance Security will not be considered for the purposes of the Reinvestment Criteria.

The Issuer will determine the Indirect Emerging Markets Exposure with respect to any specified CBO/CLO Security or other Structured Finance Security based upon information in the most recent servicing, trustee or other similar report delivered in accordance with the related Underlying Instruments, if any.

"Indorsement":  The meaning specified in Section 8-102(a)(11) of the UCC.

"Initial Purchasers":  Lehman Brothers Inc. and Lehman Brothers International (Europe), each in its capacity as initial purchaser of Class A Notes, Class B Notes, Class C Notes and Preference Shares pursuant to the Purchase Agreement.

"Institutional Investor":  Any one of the following Persons:  (i) any bank, trust company or national banking association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation or eleemosynary institution, (iii) any insurance company, (iv) any pension or retirement trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act is acting as trustee or agent, or that manages its own assets, having funds of at least U.S. $5,000,000, (v) any investment company, as defined in the Investment Company Act, (vi) any college or university, (vii) any government or public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds, or (viii) any corporation having total assets in excess of U.S. $5,000,000.

"Instruments":  The meaning specified in Section 9-105(1)(i) of the UCC.

"Insurance Company Guaranteed Asset-Backed Securities":  Structured Finance Securities as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is unconditionally guaranteed pursuant to an insurance policy, guarantee or other similar instrument issued by an insurance company organized under the law of a state of the United States (other than a monoline financial insurance company), but only if such insurance policy, guarantee or other similar instrument (1) expires no earlier than such stated legal maturity, (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Structured Finance Security and (3) is issued by an insurance company having a credit rating assigned by each nationally recognized statistical rating organization that currently rates such Structured Finance Security higher than the credit rating assigned by such rating organization to such Structured Finance Security determined without giving effect to such insurance policy, guarantee or other similar instrument; provided, that if a rating agency has rated such Insurance Company Guaranteed Asset-Backed Security, the underlying documentation for such Insurance Company Guaranteed Asset-Backed Security has been reviewed as part of the rating process by such rating agency; and provided, further, that any Structured Finance Security falling within this definition shall be excluded from the definition of each other Specified Type of Structured Finance Security.

"Intellectual Property Asset-Backed Securities":  Structured Finance Securities (other than Future Flow Receivables Asset-Backed Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow generated by the licensing or other use of copyrights, trademarks, patents, service marks and other intellectual property rights.

"Interest Collection Account":  The trust account designated the "Interest Collection Account" established pursuant to Section 10.2(a) into which all Interest Proceeds shall be deposited.

"Interest Coverage Amount":  As of any Measurement Date, the scheduled interest payments in cash on the Collateral Debt Securities (determined (a) assuming that LIBOR (or such other rate basis applicable to the relevant Collateral Debt Security pursuant to the related Underlying Instruments) remains constant throughout the related Due Period and (b) excluding (i) amounts payable in respect of Defaulted Securities, (ii) amounts payable in respect of PIK Securities that are deferring interest and (iii) the amount of any payments due on the Collateral Debt Securities in the Due Period in which such Measurement Date occurs that the Collateral Manager in its commercially reasonable business judgment does not expect to be paid) (in each case, regardless of whether the Due Date for any such interest payment has yet occurred) in such Due Period, and the scheduled interest payments on any Eligible Investments held in the Collection Accounts, plus the aggregate Principal Balance of Eligible Investments that were purchased with Interest Proceeds as of such Measurement Date, plus the scheduled amounts, if any, payable to the Issuer by the Hedge Counterparties on the Payment Date relating to such Due Period (but excluding any amounts as to which the Collateral Manager in its commercially reasonable business judgment does not expect to be paid in the related Due Period), plus any fees actually received by the Issuer during such Due Period that constitute Interest Proceeds, minus amounts payable pursuant to clauses (i) through (v) of Section 11.1(a) on such Measurement Date (or, if such Measurement Date is not a Payment Date, the Payment Date immediately following such Measurement Date).

"Interest Coverage Ratio":  The Class AB Interest Coverage Ratio and the Class C Interest Coverage Ratio.

"Interest Coverage Ratio Tests":  The Class AB Interest Coverage Ratio Test and the Class C Interest Coverage Ratio Test.

"Interest Distribution Amount":  The Class A Interest Distribution Amount, the Class B Interest Distribution Amount and the Class C Interest Distribution Amount.

"Interest Only Security":  Any Collateral Debt Security that (i) does not provide for payments of principal or the repayment of a stated principal amount or (ii) provides for payment of a *de minimis* principal amount relative to the interest rate thereon; provided, that Standard & Poor's has provided confirmation, in writing, that the proposed purchase of such Interest Only Security by the Issuer will not cause Standard & Poor's to reduce or withdraw its then-current rating, if any, of any Class of Notes.

"Interest Period":  With respect to any Note, (i) in the case of the initial Interest Period for any such Note issued on the Closing Date or any Supplemental Closing Date, the period from, and including, the Closing Date or such Supplemental Closing Date, as the case may be, to but excluding, the first Payment Date thereafter, and (ii) for each Interest Period thereafter, the period from, and including, the Payment Date ending the immediately preceding Interest Period to, but excluding, the next succeeding Payment Date (or in the case of the final Interest Period, the Stated Maturity Date).

"Interest Proceeds":  With respect to any Due Period and the related Payment Date the sum of the following amounts (without duplication):  (a) all payments of interest received in cash by the Issuer during the related Due Period on the Collateral Debt Securities (other than interest accrued on Collateral Debt Securities to the date of acquisition thereof by the Issuer and purchased with Principal Proceeds or Uninvested Proceeds) or Eligible Investments; (b) all accrued interest received in cash by the Issuer during the related Due Period with respect to Collateral Debt Securities sold by the Issuer (other than accrued interest arising from the disposition of a Collateral Debt Security designated by the Collateral Manager as Principal Proceeds or any accrued interest that was purchased with Principal Proceeds); (c) all payments of principal received in cash by the Issuer in the related Due Period on Eligible Investments to the extent such Eligible Investments were purchased with Interest Proceeds; (d) all call, redemption, yield maintenance payments and prepayment premiums received in cash by the Issuer during the related Due Period on the Collateral Debt Securities and Eligible Investments but only to the extent such premiums exceed the excess, if any, of the amount paid upon the purchase of such Collateral Debt Securities or Eligible Investments over the par amount of such Collateral Debt Securities or Eligible Investments on the date of purchase (other than call, redemption and prepayment premiums designated by the Collateral Manager in its discretion as Principal Proceeds); (e) all amendment and waiver fees, all late payment fees, any fees under any Securities Lending Agreements (net of administration fees paid in connection with such securities lending) and all other fees and commissions received (other than syndication, facility or other up-front fees) in cash by the Issuer during the related Due Period in connection with the Collateral Debt Securities and Eligible Investments (excluding fees, recoveries and commissions received in connection with a Defaulted Security, up to the principal amount thereof); (f) all amounts received with respect to the related Due Period from a Hedge Counterparty pursuant to the Hedge Agreements (other than payments of the type described in clauses (d) and (e) of the definition of Principal Proceeds); (g) Uninvested Proceeds designated as Interest Proceeds by the Collateral Manager on the Closing Date (unless recharacterized by the Collateral Manager in its discretion as Uninvested Proceeds prior to the Determination Date related to the initial Payment Date); (h) all amounts received during the related Due Period with respect to an equity warrant or conversion feature of a Collateral Debt Security to the extent such amounts, plus Disposition Proceeds from the security to which such equity warrant or conversion feature was attached exceed the principal amount of such security; (i)  amounts that would otherwise be Principal Proceeds or Uninvested Proceeds on or before the Ramp-Up Effective Date that the Collateral Manager has designated as Interest Proceeds; provided, that confirmation, in writing, is received from Moody's that such designation will not cause Moody's to reduce or withdraw its then-current rating, if any, of any Class of Notes; and (j) all amounts on deposit in the Expense Account (other than amounts on deposit in the Expense Account designated by the Collateral Manager as Principal Proceeds); provided, that in no event shall Interest Proceeds include any Excepted Property.

"Interest Rate Hedge Agreement":  The interest rate protection agreement between the Issuer and an Interest Rate Hedge Counterparty (provided, that the cumulative notional amount of such Interest Rate Hedge Agreement plus all other outstanding Interest Rate Hedge

Agreements at the time of entering into any Interest Rate Hedge Agreement with any Interest Rate Hedge Counterparty shall not exceed the Aggregate Outstanding Amount of the Notes) consisting of an interest rate swap and/or an interest rate cap entered into between the Issuer and the Interest Rate Hedge Counterparty as of the Closing Date for the sole purpose of hedging interest rate risk between the portfolio of Collateral Debt Securities and the Notes, as amended, supplemented or otherwise modified and in effect from time to time in accordance with the terms thereof, and any replacement thereto entered into in accordance with this Indenture.

"Interest Rate Hedge Counterparty":   Any of one or more institutions (x) whose long-term, unsecured debt obligations are rated (directly or by way of guarantee) (or whose counterparty rating is) at least "Aa3" by Moody's (and at least "P-1" if such entity has a short-term rating by Moody's) and (y) so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term rating of such entity is at least "A-1" by Standard & Poor's (or, if such institution does not have a short-term rating by Standard & Poor's, the long-term, unsecured debt obligations of which institution are rated (directly or by way of guarantee) (or whose counterparty rating is) at least "A+" by Standard & Poor's; provided, that any replacement of such Interest Rate Hedge Counterparty will be subject to Rating Agency Confirmation.

"Interest Step-Up Date":  The Payment Date occurring in December of 2013.

"Internal Rate of Return":  With respect to each Payment Date, the rate of return that would result in a net present value of zero, assuming (i) an aggregate purchase price of $1,000 for each Preference Share as the initial negative cash flow on the Closing Date and all deposits to the Preference Share Distribution Account on such Payment Date and each preceding Payment Date as positive cash flows, (ii) the initial date for the calculation as of the Closing Date and (iii) the number of days to each subsequent Payment Date from the Closing Date being calculated on the basis of a 360-day year consisting of twelve 30-day months on a quarterly basis; provided, that such Internal Rate of Return shall be calculated on a bond-equivalent yield basis; and provided, further, the aggregate stated purchase price of the Preference Shares for purposes of calculating the Internal Rate of Return of the Preference Shares will be adjusted to reflect any additional issuance of Preference Shares following the Closing Date; and provided, further, the Internal Rate of Return on the Preference Shares for purposes of determining whether the Incentive Collateral Management Fees are payable to the Collateral Manager on any Payment Date will be calculated on the basis of the amount of the Excess Proceeds to be deposited to the Preference Share Distribution Account on such Payment Date and deposited on prior Payment Dates rather than the amount withdrawn from such account to pay dividends or any final distribution on the Preference Shares.

"Investment Advisers Act":  The United States Investment Advisers Act of 1940, as amended.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"Investor Certificate": A certificate in the form of Exhibit E-1 or E-2 hereto, as specified in Section 2.5 hereof.

"ISDA Master Agreement": The International Swap Dealers Association, Inc. Master Agreement for 1987 or 1991, as applicable.

"Issue": Structured Finance Securities, REIT Securities and Corporate Securities issued by the same issuer, and having the same terms and conditions (as to, among other things, coupon, maturity, security and subordination) and otherwise being fungible with one another.

"Issuer": Madison Avenue Structured Finance CDO I, Limited, an exempted company with limited liability, incorporated under the laws of the Cayman Islands, and its permitted successors and assigns.

"Issuer Charter": The Amended and Restated Memorandum of Association and Amended and Restated Articles of Association of the Issuer, in each case adopted by a certain resolutions prior to the Closing Date, as each may be further amended, supplemented or otherwise modified and in effect.

"Issuer Order" and "Issuer Request": A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer, a Person designated in writing by an Authorized Officer of the Issuer or an Authorized Officer of the Collateral Manager where permitted pursuant to the Collateral Management Agreement, as the context may require or permit.

"Issuer Ordinary Shares": The 1,000 voting Issuer ordinary shares, U.S. $1.00 par value per share, of the Issuer.

"Lehman Brothers": Lehman Brothers Inc.

"Lehman Sale Agreement": The Lehman Sale Agreement dated as of December 5, 2001 between the Issuer and Lehman Brothers.

"LIBOR": As determined by the Calculation Agent with respect to each Interest Period, (i) the rate, as obtained by the Calculation Agent for U.S. dollar deposits of the Designated Maturity, which appears on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates) as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date as reported by Bloomberg Financial Markets Commodities News; (ii) if, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Eurodollar deposits of three months (except that in the case where such Interest Period

shall commence on a day that is not a Business Day, for the relevant term commencing on the next following Business Day) by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks; <u>provided</u>, that if, on such LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean; <u>provided</u>, <u>further</u>, that if, on any LIBOR Determination Date, fewer than two of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Issuer) are quoting on the relevant LIBOR Determination Date for U.S. dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a Business Day, for the relevant term commencing on the next following Business Day) to the principal London offices of leading banks in the London interbank market; (iii) in respect of any Interest Period having a Designated Maturity other than three months, LIBOR shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with clauses (i) and (ii) above, one of which shall be determined as if the maturity of the U.S. dollar deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which shall be determined as if the such maturity were the period of time for which rates are available next longer than the Interest Period; <u>provided</u>, that, if an Interest Period is less than or equal to seven days, then LIBOR shall be determined by reference to a rate calculated in accordance with clauses (i) and (ii) above as if the maturity of the U.S. dollar deposits referred to therein were a period of time equal to seven days; and (iv) if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

For purposes of clauses (i) and (iii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.  For purposes of clauses (ii) and (iv) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

"<u>LIBOR Determination Date</u>":  With respect to any Interest Period, the second London Banking Day prior to the first day of such Interest Period.

"<u>Liquidity Swap</u>":  Any one or more liquidity swaps in which the Liquidity Swap Counterparty will, on each Payment Date, pay the lesser of (i) the amount necessary to make payments of interest in respect of the Class A Notes and the Class B Notes in full, to the extent Interest Proceeds and Principal Proceeds applied in accordance with Section 11.1 hereof are insufficient for such purpose on such Payment Date and (ii) the amount of any deferred interest on all CBO/CLO PIK Securities (other than any CBO/CLO PIK Securities which are Defaulted Securities) accruing during the related Due Period.

"Liquidity Swap Counterparty":  Any Person (or any guarantor of such Person if such Person's obligations in respect of a Liquidity Swap entered into with the Issuer are absolutely and unconditionally guaranteed by such guarantor) that enters into a Liquidity Swap with the Issuer whose (at the time that the relevant Liquidity Swap is entered into) long-term, unsecured debt obligations are rated (or such Person's counterparty rating is) at least "Aa3" by Moody's and are not "Aa3" and on credit watch with negative implications by Moody's (and at least "P-1" if such Person has a short-term rating by Moody's) and, for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term debt obligations of such Person are rated (or such Person's counterparty rating is) at least "A-1+" by Standard & Poor's and are not on credit watch.

"Liquidity Swap Credit Support":  The agreement by a Liquidity Swap Counterparty, to become effective in the event that and so long as its long-term debt obligations are (directly or by way of guarantee)  (or its counterparty rating is) rated below "Aa3" by Moody's or are "Aa3" and on credit watch with negative implications by Moody's (or "P-1" if the Liquidity Swap Counterparty has a short-term rating by Moody's) or (so long as any Class of Notes is Outstanding and rated by Standard & Poor's) its issuer credit rating or its counterparty rating (directly or by way of guarantee) is rated below "AA-" or is "AA-" and on credit watch with negative implications or its short-term debt obligations are rated below "A-1+" by Standard & Poor's or are "A-1+" and on credit watch with negative implications by Standard & Poor's, obligating such Liquidity Swap Counterparty to deliver cash and U.S. Treasury obligations pursuant to an ISDA Credit Support Annex (New York law) the terms of which are subject to Rating Agency Confirmation.

"Liquidity Swap Substitution Event":  An event that will occur if the long-term rating of the Liquidity Swap Counterparty by Moody's falls below "A3" or is "A3" and on credit watch with negative implications by Moody's (or "P-1" if such Person has a short-term rating by Moody's) or (so long as any Class of Notes is Outstanding and rated by Standard & Poor's) the short-term rating of the Liquidity Swap Counterparty by Standard & Poor's falls below "A-1" or is "A-1" and on credit watch with negative implications by Standard & Poor's.

"Liquidity Swap Substitute Party":  Any Person whose (at the time that the relevant Liquidity Swap is entered into) long-term, unsecured debt obligations are rated (or such Person's counterparty rating is) at least "Aa3" by Moody's and are not "Aa3" and on credit watch with negative implications by Moody's (and at least "P-1" if such Person has a short-term rating by Moody's) and, for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term debt obligations of such Person are rated (or such Person's counterparty rating is) at least "A-1+" by Standard & Poor's and not on credit watch.

"Listing Agent in Ireland":  Ernst & Young, in its capacity as listing agent in Ireland.

"London Banking Day":  A day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Loss Rate":  With respect to any Pledged Security on any Measurement Date, the applicable percentage set forth in Schedule E hereto; provided, that for the purposes of determining the Loss Rate for Synthetic Securities, the Loss Rate shall be that of such Synthetic Security's Reference Obligation.

"Majority":  With respect to (a) the Notes or any Class thereof, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes or the Notes of such Class, as the case may be, and (b) the Preference Shares, Preference Shareholders holding more than 50% by number of the Preference Shares Outstanding.

"Manufactured Housing Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from manufactured housing (also known as mobile homes and prefabricated homes) installment sales contracts and installment loan agreements, generally having the following characteristics:  (1) the contracts and loan agreements have varying, but typically lengthy contractual maturities; (2) the contracts and loan agreements are secured by the manufactured homes and, in certain cases, by mortgages and/or deeds of trust on the real estate to which the manufactured homes are deemed permanently affixed; (3) the contracts and/or loans are obligations of a large number of obligors and accordingly represent a relatively diversified pool of obligor credit risk; (4) repayment thereof can vary substantially from the contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (5) in some cases, obligations are fully or partially guaranteed by a governmental agency or instrumentality.

"Market Value":  On any date of determination, with respect to one or more Pledged Securities, the average of two bid-side market values of such Pledged Securities obtained by the Collateral Manager from Independent, nationally recognized broker/dealers (which may include Lehman Brothers or its Affiliates) or, if two such bid-side market values are not available, either (x) the bid side market value of such Pledged Securities obtained by the Collateral Manager from one Independent, nationally recognized broker/dealer or (y) the price supplied by any of the following pricing services:  (A) Merrill Lynch IDC or FRI or (B) any other independent, nationally recognized pricing service (provided, that the Issuer shall have received Rating Agency Confirmation with respect to such pricing service) and, in each of cases (x) and (y), as certified by the Collateral Manager as being obtained from such sources.

"Mark-to-Market Value":  The meaning specified in Section 16.1(j).

"Maximum Investment Amount":  On any date prior to the Ramp-Up Effective Date, an amount equal to $300,000,000, and, on any Measurement Date after the Ramp-Up Effective Date, an amount equal to the sum of (i) the Aggregate Principal Amount of the Collateral Debt Securities, (ii) the amount of any Principal Proceeds invested in Eligible Investments and (iii) any remaining Uninvested Proceeds on the date of determination.

"Maximum Permitted Weighted Average Life":  The amount specified below opposite to the Closing Date or Payment Date most immediately preceding any Measurement Date:

| Payment Date | Maximum Permitted Weighted Average Life (in Years) |
|---|---|
| Closing Date | 8.5 |
| December 2002 | 7.5 |
| December 2003 | 6.5 |
| December 2004 | 5.5 |
| December 2005 and each Payment Date thereafter | 4.5 |

"Measurement Date":  Each of the following dates:

(i)     as of the Ramp-Up Effective Date;

(ii)    upon the acquisition or disposition by the Issuer of any Collateral Debt Security on or after the Ramp-Up Effective Date;

(iii)   on any date on or after the Ramp-Up Effective Date on which a Collateral Debt Security becomes a Defaulted Security;

(iv)    on each Determination Date on or after the Ramp-Up Effective Date; and

(v)     with reasonable notice, on any other Business Day on or after the Ramp-Up Effective Date that either Rating Agency or Holders of Notes representing at least 66⅔% of the Aggregate Outstanding Amount of any Class of Notes or the Holders of Preference Shares representing at least 66⅔% of the aggregate outstanding number of Preference Shares requests be a "Measurement Date";

provided, that if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the first following day that is a Business Day.

"MetLife":  Metropolitan Life Insurance Company, a stock life insurance company organized under the laws of the State of New York.

"MetLife Sale Agreement":  The sale agreement dated as of December 5, 2001 between the Issuer, MetLife and its applicable Affiliates.

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monoline Guaranteed Asset-Backed Securities":  Structured Finance Security as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is unconditionally guaranteed pursuant to a financial guaranty insurance policy issued by a monoline financial insurance company but only if such insurance policy (1) expires no earlier than such stated legal maturity, (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Structured Finance Security and (3) is issued by a monoline financial insurance company having a credit rating assigned by each nationally recognized statistical rating organization that currently rates such Structured Finance Security higher than the credit rating assigned by such rating organization to such Structured Finance Security, determined without giving effect to such insurance policy; provided, that if a rating agency has rated such Monoline Guaranteed Asset-Backed Security, the underlying documentation for such Monoline Guaranteed Asset-Backed Security has been reviewed as part of the rating process by such rating agency; and provided, further, that any Structured Finance Security falling within this definition shall be excluded from the definition of each other Specified Type of Structured Finance Security.

"Monthly Report":  The monthly report provided to the Trustee pursuant to Section 10.7(a) hereof, summarizing the account transactions with respect to the Pledged Securities.

"Moody's":  Moody's Investors Service, Inc. and any successor or successors thereto and, if such corporation shall for any reason no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized rating agency designated in writing by the Issuer (with a copy to the Trustee).

"Moody's Maximum Rating Distribution":  On any Measurement Date, the number determined by dividing (i) the summation of the series of products obtained for any Collateral Debt Security (other than Collateral Debt Securities with respect to which the Collateral Manager reasonably believes a default will occur or a scheduled payment will not be made when next due, Defaulted Securities, Deferred Interest PIK Securities or Exchanged Securities), by multiplying the Principal Balance on such Measurement Date of each such Collateral Debt Security by its respective Moody's Rating Factor on such Measurement Date by (ii) the sum of the Aggregate Principal Amount on such Measurement Date of all Collateral Debt Securities (other than Collateral Debt Securities with respect to which the Collateral Manager reasonably believes a default will occur or a scheduled payment will not be made when next due, Defaulted Securities, Deferred Interest PIK Securities or Exchanged Securities), and rounding the result up to the nearest whole number.

"Moody's Maximum Rating Distribution Test":  A test satisfied on any Measurement Date, if the Moody's Maximum Rating Distribution of the Collateral Debt Securities does not exceed 500.

"Moody's Minimum Weighted Average Recovery Rate Test": A test satisfied as of any Measurement Date, if the Moody's Weighted Average Recovery Rate is greater than or equal to 36.75% on such Measurement Date.

"Moody's Rating": With respect to any Collateral Debt Security, the Moody's Rating will be determined as follows:

(i)  (x) if such Collateral Debt Security is rated by Moody's, the Moody's Rating shall be such rating; provided that (A) if such Collateral Debt Security is on "negative credit watch," the Moody's Rating shall be one subcategory lower than such rating and (B) if such Collateral Debt Security is on "positive credit watch," the Moody's Rating shall be one subcategory higher than such rating, or (y) if such Collateral Debt Security is not rated by Moody's, but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Moody's assign a rating to such Collateral Debt Security, the Moody's Rating shall be the rating so assigned by Moody's;

(ii)  if such Collateral Debt Security is not rated by Moody's and Moody's has not assigned a rating to such Collateral Debt Security at the request of the Issuer or the Collateral Manager on behalf of the Issuer, then the Moody's Rating of such Structured Finance Security or REIT Security may be determined using any one of the methods below:

(A)  with respect to any Structured Finance Type Residential Security not rated by Moody's, if such Structured Finance Type Residential Security is rated by Standard & Poor's, then the Moody's Rating thereof will be (i) one subcategory below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is "AAA"; (ii) two rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is "AA+," "AA," "AA-," "A+," "A," "A-," "BBB+," "BBB" or "BBB-"; and (iii) three rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is "BB+" or below;

(B)  with respect to any CMBS Conduit Security or CMBS Credit Tenant Lease Security not rated by Moody's, (x) if Moody's has rated a tranche or class of CMBS Conduit Security or CMBS Credit Tenant Lease Security senior to the relevant Issue, then the Moody's Rating thereof shall be one and one half rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's and (y) if Moody's has not rated any such

tranche or class and Standard & Poor's has rated the subject CMBS Conduit Security or CMBS Credit Tenant Lease Security, then the Moody's Rating thereof will be two rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's;

(C)    with respect to any CMBS Large Loan Security not rated by Moody's, the Issuer or the Collateral Manager on behalf of the Issuer shall request Moody's to assign a rating to such CMBS Large Loan Security on a case-by-case basis; and

(D)    with respect to any other Specified Type of Structured Finance Security or any other type of Structured Finance Security or REIT Security or REIT Security designated as a Specified Type after the date hereof upon notification from the Collateral Manager to the Trustee and written confirmation by Moody's to the Issuer, the Trustee and the Collateral Manager that such designation will not result in the withdrawal, reduction or other adverse action with respect to its then-current rating (including any private or confidential rating) of any Class of Notes, pursuant to any method specified by Moody's;

provided that (i) the Aggregate Principal Amount of Collateral Debt Securities that may be given a rating based on a Standard & Poor's rating as provided in any of the foregoing subparagraphs may not exceed 20% of the Maximum Investment Amount and (ii) Structured Finance Securities and REIT Securities other than the Specified Types referred to in subparagraphs (A), (B), (C) and (D) above have a Moody's Rating;

(iii)   with respect to publicly issued or privately placed debt obligation of a corporate issuer which is not a REIT Security or a Structured Finance Security or corporate guarantees on Structured Finance Securities and REIT Securities (collectively, "Corporate Securities"), if such Corporate Securities are not rated by Moody's but another security or obligation of the guarantor or obligor (an "other security") is rated by Moody's, and no rating has been assigned in accordance with clause (i) above, the Moody's Rating of such Collateral Debt Security shall be determined as follows:

(A)    if the Corporate Security is a senior secured obligation of the guarantor or obligor and the other security is also a senior secured obligation, the Moody's Rating of such Collateral Debt Security shall be the rating of the other security;

(B)    if the Corporate Security is a senior unsecured obligation of the guarantor or obligor and the other security is a senior secured obligation, the

Moody's Rating of such Collateral Debt Security shall be one rating subcategory below the rating of the other security;

(C)   if the Corporate Security is a subordinated obligation of the guarantor or obligor and the other security is a senior secured obligation:

    (1)   rated "Ba3" or higher by Moody's, the Moody's Rating of such Corporate Security shall be three rating subcategories below the rating of the other security; or

    (2)   rated "B1" or lower by Moody's, the Moody's Rating of such Corporate Security shall be two rating subcategories below the rating of the other security;

(D)   if the Corporate Security is a senior secured obligation of the guarantor or obligor and the other security is a senior unsecured obligation:

    (1)   rated "Baa3" or higher by Moody's, the Moody's Rating of such Corporate Security shall be the rating of the other security; or

    (2)   rated "Ba1" or lower by Moody's, the Moody's Rating of such Corporate Security shall be one rating subcategory above the rating of the other security;

(E)   if the Corporate Security is a senior unsecured obligation of the guarantor or obligor and the other security is also a senior unsecured obligation, the Moody's Rating of such Corporate Security shall be the rating of the other security;

(F)   if the Corporate Security is a subordinated obligation of the guarantor or obligor and the other security is a senior unsecured obligation:

    (1)   rated "B1" or higher by Moody's, the Moody's Rating of such Corporate Obligation shall be two rating subcategories below the rating of the other security; or

    (2)   rated "B2" or lower by Moody's, the Moody's Rating of such Corporate Security shall be one rating subcategory below the rating of the other security;

(G)   if the Corporate Security is a senior secured obligation of the guarantor or obligor and the other security is a subordinated obligation:

(1)      rated "Baa3" or higher by Moody's, the Moody's Rating of such Corporate Security shall be one rating subcategory above the rating of the other security;

(2)      rated below "Baa3" but not rated "B3" by Moody's, the Moody's Rating of such Corporate Security shall be two rating subcategories above the rating of the other security; or

(3)      rated "B3" by Moody's, the Moody's Rating of such Corporate Security shall be "B2";

(H)      if the Corporate Security is a senior unsecured obligation of the guarantor or obligor and the other security is a subordinated obligation:

(1)      rated "Baa3" or higher by Moody's, the Moody's Rating of such Corporate Security shall be one rating subcategory above the rating of the other security; or

(2)      rated "Ba1" or lower by Moody's, the Moody's Rating of such Corporate Security shall also be one rating subcategory above the rating of the other security; and

(I)      if the Collateral Debt Security is a subordinated obligation of the guarantor or obligor and the other security is also a subordinated obligation, the Moody's Rating of such Corporate Security shall be the rating of the other security;

(iv)      with respect to Corporate Securities issued by United States, United Kingdom or Canadian or other Qualifying Foreign Country guarantors, if such Corporate Security is not rated by Moody's, and no other security or obligation of the guarantor is rated by Moody's, then the Moody's Rating of such Corporate Security may be determined using any one of the methods below:

(A)      (1)      if such Corporate Security is rated by Standard & Poor's, then the Moody's Rating of such Corporate Security will be (x) one subcategory below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BBB-" or higher by Standard & Poor's and (y) two subcategories below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BB+" or lower by Standard & Poor's; provided that the Aggregate Principal Amount of Collateral Debt Securities that may be given a rating based on a Standard & Poor's rating as provided in this subclause (A)(1) may not exceed 10% of the Maximum Investment Amount; and

(2)    if such Corporate Security is not rated by Standard & Poor's but another security or obligation of the guarantor is rated by Standard & Poor's (a "parallel security"), then the Moody's equivalent of the rating of such parallel security will be determined in accordance with the methodology set forth in subclause (1) above, and the Moody's Rating of such Corporate Security will be determined in accordance with the methodology set forth in clause (ii) above (for such purpose treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (2));

(B)    if such Corporate Security is not rated by Moody's or Standard & Poor's, and no other security or obligation of the guarantor is rated by Moody's or Standard & Poor's, then the Issuer or the Collateral Manager on behalf of the Issuer may present such Corporate Security to Moody's for an estimate of such Collateral Debt Security's rating factor, from which its corresponding Moody's rating may be determined, which shall be its Moody's Rating;

(C)    with respect to a Corporate Security issued by a U.S. corporation, if (1) none of the guarantor and its Affiliates or none of the obligor and its Affiliates, as applicable, is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the guarantor or obligor are in default, (3) none of the guarantor and its Affiliates or none of the obligor and its Affiliates, as applicable, have defaulted on any debt during the past two years, (4) the guarantor or obligor has been in existence for the past five years, (5) the guarantor or obligor is current on any cumulative dividends, (6) the fixed-charge ratio for the guarantor or obligor exceeds 125% for each of the past two fiscal years and for the most recent quarter, (7) the guarantor or obligor had a net profit before tax in the past fiscal year and the most recent quarter and (8) the annual financial statements of the guarantor or obligor are unqualified and certified by a firm of independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer, the Moody's Rating of such Corporate Security will be "B3";

(D)    with respect to a Corporate Security issued by a non-U.S. guarantor or obligor, if (1) none of the guarantor and its Affiliates or none of the obligor and its Affiliates, as applicable, is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the guarantor or obligor has been in default during the past two years, the Moody's Rating of such Collateral Debt Security will be "Caa2"; and

(E)    if a debt security or obligation of the guarantor or obligor has been in default during the past two years, the Moody's Rating of such Collateral Debt Security will be "Ca"; and

(v)    if such Collateral Debt Security is a Synthetic Security, the Moody's Rating of such Synthetic Security shall be the rating assigned thereto by Moody's in connection with the acquisition thereof by the Issuer upon the request of the Issuer or the Collateral Manager.

"Moody's Rating Factor":  For purposes of computing the Moody's Maximum Rating Distribution, the number assigned below to the Moody's Rating applicable to each Pledged Security:

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,780 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

For purposes of the Moody's Maximum Rating Distribution Test, as of any date of determination, if a Collateral Debt Security does not have a Moody's Rating assigned to it at the date of acquisition, if (i) the Aggregate Principal Amount of all such Collateral Debt Securities as of such date of determination is less than 2% of the Maximum Investment Amount and (ii) the Aggregate Principal Amount of all such Collateral Debt Securities issued by the issuer of such Collateral Debt Security as of such date of determination is less than or equal to 1% of the Maximum Investment Amount, the Moody's Rating Factor with respect to such Collateral Debt Security shall be 1,780 for a period of 90 days from the acquisition of such Collateral Debt Security.  (A) After such 90 day period or (B) if, after giving effect to the purchase of such Collateral Debt Security, (i) the Aggregate Principal Amount of all such Collateral Debt Securities as of such date of determination would be greater than 2% of the Maximum Investment Amount or (ii) the Aggregate Principal Amount of all such Collateral Debt Securities issued by the issuer of such Collateral Debt Security as of such date of determination would be greater than 1% of the Maximum Investment Amount, if such Collateral Debt Security is not rated by Moody's and no other security or obligation of the issuer thereof or obligor thereon is

rated by Moody's, then the Moody's the Moody's Rating Factor with respect to such Collateral Debt Security will be the estimate thereof assigned by Moody's upon the request of the Issuer or the Collateral Manager and until such estimate has been obtained, the Moody's Rating Factor of such Collateral Debt Security will be deemed to be 10,000. If any such Collateral Debt Security is subsequently assigned a Moody's Rating of "B1" or lower, the Collateral Manager shall not be entitled to assume a Moody's Rating Factor in respect of any other Collateral Debt Security as provided above and shall be required to obtain an estimate thereof from Moody's.

"Moody's Weighted Average Recovery Rate":  As of any Measurement Date, the number obtained by summing the products obtained by multiplying the Principal Balance of each Collateral Debt Security by the Applicable Recovery Percentage, dividing such sum by the Aggregate Principal Amount of all such Collateral Debt Securities.

For purposes of the Moody's Weighted Average Recovery Rate, the Principal Balance of a Defaulted Security or a Deferred Interest PIK Security will be deemed to be equal to its outstanding principal amount (determined without regard to any deferred and capitalized interest).  For purposes of the Moody's Weighted Average Recovery Rate, in the case of a Synthetic Security whichever of the Synthetic Security or the Reference Obligation produces the lesser value in this definition shall be used.

"Mutual Fund Fee Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from deferred mutual fund fee receivables which receivables are not contractual obligations but rather are subject to annual approval or termination by mutual fund companies' boards of directors.

"New York Presenting Agent":  The meaning specified in Section 2.11(b) hereof.

"Non-Permitted Holder":  The meaning specified in Section 2.12(b) hereof.

"Non-U.S. Issuers":  The issuers of Collateral Debt Securities consisting of obligations of non-U.S. issuers.

"Non-U.S. Person":  Any Person that is not a U.S. Person.

"Non-U.S. Structured Finance Securities":  Any Structured Finance Security other than a U.S. Structured Finance Security.

"Noteholder":  With respect to any Note, the Person in whose name such Note is registered in the Note Register.

"Note Interest Rate":  Collectively, the Class A Note Interest Rate, the Class B Note Interest Rate, the Class C1 Note Interest Rate and the Class C2 Note Interest Rate.

"Note Redemption Price":  The amount payable with respect to any Note in connection with an Optional Redemption of the Notes equal to the sum (without duplication) of:

(i)     the Aggregate Outstanding Amount of each Class A Note, Class B Note and Class C Note on such Optional Redemption Date; plus

(ii)    accrued interest on the Class A Notes, the Class B Notes and the Class C Notes (including Defaulted Interest and interest on Defaulted Interest, if any and in the case of the Class C Notes, any Class C Deferred Interest and interest on Class C Deferred Interest); plus

(iii)   any accrued and unpaid Class A Note Increased Margin, Class B Note Increased Margin and Class C Note Increased Margin; plus

(iv)    in the case of any Class C2 Note, so long as the redemption is not in connection with a Withholding Tax Event, the applicable Redemption Premium.

"Note Register":  The meaning specified in Section 2.5(a) hereof.

"Note Registrar":  Any note registrar described in Section 2.5(a) hereof.

"Notes":  The Class A Notes, the Class B Notes, the Class C1 Notes and the Class C2 Notes authorized by, and authenticated and delivered, under this Indenture.

"Notice of Default":  The meaning specified in Section 5.1(f).

"Offer":  With respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for cash or for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instruments.

"Officer":  With respect to any corporation or company other than the corporation or company acting as Trustee, the chief executive officer, the director, the president, any vice president, the secretary or the treasurer of such corporation or any other officer duly authorized by the board of directors; and with respect to the Trustee (and any bank or trust company acting

as trustee of an express trust or as Custodial Account Securities Intermediary), any Responsible Officer thereof.

"Officer's Certificate":  A certificate signed on behalf of the Issuer, the Co-Issuer or the Collateral Manager by an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager, as the case may be.

"Opinion of Counsel":  A written opinion, addressed to the Trustee and each Rating Agency and in form and substance reasonably satisfactory to the Trustee and each Rating Agency, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Collateral Manager or the Trustee and which attorney shall be reasonably satisfactory to the Trustee.  Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee or shall state that the Trustee shall be entitled to rely thereon.

"Optional Redemption":  With respect to the Notes, the redemption of the Notes by the Issuer (in whole but not in part) on any Payment Date (a) on or after the Payment Date occurring in December 2004 and before the Payment Date occurring in December 2006 at the written direction from the Holders of at least 85% of the Preference Shares Outstanding or (b) on or after the Payment Date occurring in December 2006 at the written direction from a Majority of the Preference Shares, in each case, at the applicable Note Redemption Price.  With respect to the Preference Shares, the redemption of the Preference Shares (in whole but not in part) on any Payment Date on or after payment in full of interest on and principal of the Notes by the Issuer and payment of, or establishment of a reasonable reserve (as determined by the Collateral Manager in its sole discretion) for, all other amounts payable under Section 11.1 by the Issuer at the written direction of a Majority of the Preference Shares at the Preference Share Redemption Price.

"Optional Redemption Date":  The date scheduled for an Optional Redemption of the Notes or Preference Shares, as applicable.

"Optional Redemption Date Statement":  The meaning specified in Section 10.7(d).

"Outstanding":  (a)  With respect to the Notes, as of any date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under this Indenture except:

(i)       Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

(ii)      Notes for which payment or redemption Money in the necessary amount has been theretofore irrevocably deposited with the Trustee or any paying agent in trust for the Holders of such Notes; provided, that if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course; and

(iv)     Notes alleged to have been mutilated, defaced, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.6 hereof; and

(b)  With respect to the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued and paid for except:

(i)       Preference Shares theretofore canceled by the Preference Share Paying Agent or delivered to the Preference Share Paying Agent for cancellation;

(ii)      Preference Shares in exchange for or in lieu of which other Preference Shares have been issued and paid for by the Issuer, unless proof satisfactory to the Issuer is presented that any such original Preference Shares are held by a holder in due course; and

(iii)     Preference Shares alleged to have been mutilated, defaced, destroyed, lost or stolen for which replacement Preference Shares have been issued as provided in the Preference Share Paying Agency Agreement.

provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes or aggregate outstanding number of Preference Shares have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (1) Notes or Preference Shares beneficially owned by the Issuer or the Co-Issuer or any Affiliate of either of them (excluding the Collateral Manager or its Affiliates) shall be disregarded and deemed not to be Outstanding and (2) Notes or Preference Shares beneficially owned by the Collateral Manager or any Affiliate thereof shall be disregarded and deemed not to be Outstanding only in relation to (x) any determination required to be made with respect to the removal of the Collateral Manager for "cause" pursuant to the Collateral Management Agreement and (y) any vote on whether to direct the Issuer to appoint a successor to the Collateral Manager or to disapprove of any successor to the Collateral Manager pursuant to the Collateral Management Agreement, except

that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes or Preference Shares that the Trustee knows to be beneficially owned in the manner indicated in clause (1) or (2) above shall be so disregarded.  Notes or Preference Shares owned in the manner indicated in clause (1) or (2) above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes or Preference Shares and that the pledgee is not the Issuer, the Co-Issuer, the Collateral Manager or any Affiliate of the Issuer, the Co-Issuer or the Collateral Manager.  Notwithstanding the foregoing, Notes or Preference Shares held by the Collateral Manager or its Affiliates shall be deemed to be Outstanding for the purposes of, among others, any consent or direction by the Controlling Class in which the Collateral Manager or its Affiliates are Holders of Notes of such Class.

"Overcollateralization Ratio":  The Class AB Overcollateralization Ratio and the Class C Overcollateralization Ratio.

"Overcollateralization Ratio Test": The Class AB Overcollateralization Ratio Test and the Class C Overcollateralization Ratio Test.

"Paying Agent":  The Trustee, or any successor thereto, in its capacity as Paying Agent with respect to the Notes, and Ernst & Young in Dublin, Ireland or any successor thereto, as paying agent in Ireland, if and for so long as any Class of the Notes is listed on the Irish Stock Exchange and the rules of such stock exchange so require.

"Payment Account":  The payment account of the Trustee established pursuant to Section 10.3(a).

"Payment Date":  March 5th, June 5th, September 5th and December 5th of each year commencing on March 2002 or, if any such day is not a Business Day, then the next succeeding Business Day.

"Payment Date Report":  The meaning specified in Section 10.7(b).

"Payment Default":  Any Event of Default specified in clause (a) or (b) of Section 5.1.

"Person":  Any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"PIK Security":  Any Collateral Debt Security that, by its terms, provides for the payment of rated scheduled interest payments, but permits such payments to be deferred and

capitalized as additional principal thereof or that issues identical securities in place of payments of interest in cash.

"Plan":  (i) An employee benefit plan (as defined in Section 3(3) of ERISA), (ii) a "plan" (as defined in Section 4975(e)(1) of the Code) that is subject to Section 4975 of the Code, including individual retirement accounts and Keogh plans or (iii) any other entity, including without limitation, as applicable, an insurance company general account, whose underlying assets include plan assets by reason of the investment in such entity.

"Pledged Securities":  On any date of determination, the Collateral Debt Securities (including any Collateral Debt Securities that have become, since the time of the purchase thereof, Defaulted Securities, Deferred Interest PIK Securities or Exchanged Securities) and the Eligible Investments in the Collateral.

"Portfolio Percentage Limitations":  Limitations satisfied as of any date of determination if each of the following criteria is met:

(i)    the Diversity Score, as set forth in Schedule C hereto, must be at least 20;

(ii)    the Aggregate Principal Amount of all Collateral Debt Securities that evidence securities of any single issuer (other than securities issued by the U.S. government or any agency or instrumentality thereof) does not exceed 3% of the Maximum Investment Amount;

(iii)    the Aggregate Principal Amount of all Collateral Debt Securities rated below "Baa3" by Moody's that evidence securities of any single issuer (other than securities issued by the U.S. government or any agency or instrumentality thereof) does not exceed 1.75% of the Maximum Investment Amount;

(iv)    the Aggregate Principal Amount of Collateral Debt Securities that are obligations of issuers, Synthetic Security Counterparties or Reference Obligors organized or incorporated under the laws of any jurisdiction other than the United States or any state thereof does not exceed 20% of the Maximum Investment Amount; provided that for the purpose of this clause (iv), with respect to any Qualifying Tax Jurisdiction Security, the Collateral Manager shall determine (in its reasonable business judgment), under the law of which country the issuer, Synthetic Security Counterparty or Reference Obligor of such Collateral Debt Security shall be deemed to be organized or incorporated;

(v)    the Aggregate Principal Amount of Collateral Debt Securities that are obligations of issuers, Synthetic Security Counterparties or Reference Obligors

organized or incorporated under the laws of Canada does not exceed 10% of the Maximum Investment Amount;

(vi)    the Aggregate Principal Amount of Collateral Debt Securities that are obligations of issuers, Synthetic Security Counterparties or Reference Obligors organized or incorporated under the laws of the United Kingdom does not exceed 10% of the Maximum Investment Amount;

(vii)    the Aggregate Principal Amount of Collateral Debt Securities that are obligations of issuers, Synthetic Security Counterparties or Reference Obligors organized or incorporated under the laws of any jurisdiction other than Canada, the United Kingdom or the United States, does not exceed 5% of the Maximum Investment Amount; provided that for the purpose of this clause (vii), with respect to any Qualifying Tax Jurisdiction Security, the Collateral Manager shall determine (in its reasonable business judgment), under the law of which country the issuer, Synthetic Security Counterparty or Reference Obligor of such Collateral Debt Security shall be deemed to be organized or incorporated;

(viii)    the Indirect Emerging Markets Exposure does not exceed 5% of the Maximum Investment Amount;

(ix)    the Aggregate Principal Amount of the Collateral Debt Securities that have a Moody's Rating of the type described in clauses (ii) and (iv)(A) of the definition of Moody's Rating does not exceed 20% of the Maximum Investment Amount;

(x)    for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the Aggregate Principal Amount of the Collateral Debt Securities that have an S&P Rating of the type described in clause (i)(E) of the definition of S&P Rating does not exceed 20% of the Maximum Investment Amount;

(xi)    the Aggregate Principal Amount of the Collateral Debt Securities that are (a) Synthetic Securities, (b) obligations of an issuer organized or incorporated under the laws of any jurisdiction other than (i) the United States of America or any state thereof or (ii) a Qualifying Foreign Country rated "AAA" by Standard & Poor's does not exceed 20% of the Maximum Investment Amount; provided that (a) for the purpose of this clause (xi), with respect to any Qualifying Tax Jurisdiction Security, the Collateral Manager shall determine (in its reasonable business judgment), under the law of which country the issuer, Synthetic Security Counterparty or Reference Obligor of such Collateral Debt Security shall be deemed to be organized or incorporated and (b) each of (i) the Aggregate Principal Amount of Collateral Debt Securities for which an entity is a

Synthetic Security Counterparty may not, on a combined basis, exceed the percentage of the Maximum Investment Amount set forth below opposite the long-term rating of such Synthetic Security Counterparty under the caption "Individual Counterparty Percentage" and (ii) the Aggregate Principal Amount of Collateral Debt Securities for which the related Synthetic Security Counterparties have the same long-term rating may not exceed the percentage of the Maximum Investment Amount set forth below opposite such rating under the caption "Aggregate Counterparty Percentage":

| Long-Term Senior Unsecured Debt Rating by Moody's | Long-Term Senior Unsecured Debt Rating by Standard & Poor's | Individual Counterparty Percentage | Aggregate Counterparty Percentage |
|---|---|---|---|
| Aaa | AAA | 15.0% | 20.0% |
| Aa1 | AA+ | 15.0% | 20.0% |
| Aa2 | AA | 15.0% | 17.5% |
| Aa3 | AA- | 12.5% | 15.0% |
| A1 | A+ | 7.5% | 10.0% |
| A2 or A3 | A | 5.0% | 5.0% |

(xii)    after the Ramp-Up Effective Date, the Aggregate Principal Amount of Collateral Debt Securities that bear interest at floating rates is at least equal to 40% of the Maximum Investment Amount; provided, that (a) for purposes of this clause, any Collateral Debt Security which bears interest at a floating rate that is the subject of an Asset Specific Hedge shall be considered to bear interest at a fixed rate if such Asset Specific Hedge so provides and any Collateral Debt Security which bears interest at a fixed rate that is the subject of an Asset Specific Hedge shall be considered a Collateral Debt Security bearing interest at a floating rate if such Asset Specific Hedge so provides and (b) Collateral Debt Securities that bear interest at a floating rate can be less than such percentage if a Rating Agency Confirmation is received;

(xiii)    after the Ramp-Up Effective Date, the Aggregate Principal Amount of Collateral Debt Securities that bear interest at fixed rates is at least equal to 50% of the Maximum Investment Amount; provided, that (a) for purposes of this clause, any Collateral Debt Security which bears interest at a fixed rate that is the subject of an Asset Specific Hedge shall be considered a Collateral Debt Security bearing interest at a floating rate if such Asset Specific Hedge so provides and any Collateral Debt Security which bears interest at a floating rate that is the subject of an Asset Specific Hedge shall be considered to bear interest at a fixed rate if such Asset Specific Hedge so provides and (b) Collateral Debt Securities that bear interest at a fixed rate can be less than such percentage if a Rating Agency Confirmation is received;

(xiv)    the Aggregate Principal Amount of the Collateral Debt Securities that have a Moody's Rating below "Baa3" does not exceed 10% of the Maximum Investment Amount;

(xv)    after giving effect to the purchase of a Collateral Debt Security, without duplication, the sum of (x) the Aggregate Principal Amount of the Collateral Debt Securities that have a public rating by Moody's below "Baa3" and (y) the Aggregate Principal Amount of the Collateral Debt Securities that had a public rating by S&P below "BBB-" as of their respective dates of purchase does not exceed 20% of the Maximum Investment Amount;

(xvi)    the Aggregate Principal Amount of the Collateral Debt Securities that are Corporate Securities does not exceed 15% of the Maximum Investment Amount;

(xvii)    the Aggregate Amortized Cost of the Collateral Debt Securities that are Interest Only Securities together with the Aggregate Principal Amount of the Collateral Debt Securities that are Catastrophe Bonds does not exceed 4% of the Maximum Investment Amount; provided, that for purposes of this clause (xvii) other than in connection with the purchase of a Interest Only Security or a Catastrophe Bond, the provisions of this clause (xvii) shall be considered satisfied to the extent that an excess over 4% is due to an increase in such Aggregate Principal Amount resulting from the accretion of an Interest Only Security or a Catastrophe Bond;

(xviii)    the Aggregate Principal Amount of the Collateral Debt Securities that are Step-Down Bonds does not exceed 5% of the Maximum Investment Amount;

(xix)    the Aggregate Principal Amount of the Collateral Debt Securities that are Pure Private Collateral Debt Securities does not exceed 20% of the Maximum Investment Amount;

(xx)    the Aggregate Principal Amount of Collateral Debt Securities that are Structured Finance Securities and REIT Securities serviced by any single servicer who is rated "Aa3" or higher by Moody's does not exceed  15% of the Maximum Investment Amount;

(xxi)    the Aggregate Principal Amount of Collateral Debt Securities that are Structured Finance Securities and REIT Securities serviced by any single servicer who is rated below "Aa3" by Moody's does not exceed  10% of the Maximum Investment Amount; provided, that the Aggregate Principal Amount of Collateral Debt Securities that are Structured Finance Securities and REIT

Securities serviced by any two single servicers rated below "Aa3" by Moody's may exceed 10% of the Maximum Investment Amount but not exceed 12.5% of the Maximum Investment Amount;

(xxii)   the Aggregate Principal Amount of Collateral Debt Securities that are CBO/CLO Securities sold or placed by the same lead underwriter, initial purchaser or lead placement agent (determined at the time of original issuance) does not exceed 15% of the Maximum Investment Amount;

(xxiii)  the Aggregate Principal Amount of Collateral Debt Securities that are CBO/CLO Securities that have closed within any rolling three month period does not exceed 15% of the Maximum Investment Amount;

(xxiv)  the Aggregate Principal Amount of Collateral Debt Securities that are CBO/CLO PIK Securities does not exceed 25% of the Maximum Investment Amount;

(xxv)   the Aggregate Principal Amount of Collateral Debt Securities that are Alternative Debt Test Securities does not exceed 7% of the Maximum Investment Amount; and

(xxvi)  the Aggregate Principal Amount of the Collateral Debt Securities which are Zero Coupon Bonds does not exceed 5% of the Maximum Investment Amount; provided, that for purposes of this clause (xxvi) other than in connection with the purchase of a Zero Coupon Bond, the provisions of this clause (xxvi) shall be considered satisfied to the extent that any excess over 5% is due to an increase in such Aggregate Principal Amount resulting from the accretion of Zero Coupon Bonds.

If the Issuer has previously entered into a commitment to acquire an obligation or security for inclusion in the Collateral, then the Issuer need not comply with any of the Portfolio Percentage Limitations on the date of such acquisition if the Issuer complied with each of the Portfolio Percentage Limitations on the date on which the Issuer entered into such commitment.

Notwithstanding the foregoing provisions, if an Event of Default shall have occurred and be continuing, no Collateral Debt Security may be acquired unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such Event of Default.

"Preference Share Distribution Account":  The account designated the "Preference Share Distribution Account" established by the Preference Share Paying Agent pursuant to the Preference Share Paying Agency Agreement.

"Preference Share Documents":  The Issuer Charter, the Preference Share Paying Agency Agreement and the Resolutions.

"Preference Share Paying Agency Agreement":  The Preference Share Paying Agency Agreement, dated as of December 5, 2001, between the Issuer and the Preference Share Paying Agent, relating to the Preference Shares, as the same may be amended, supplemented or otherwise modified and in effect in accordance with the terms thereof.

"Preference Share Paying Agent":  First Union National Bank, a national banking association, in its capacity as such under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the Preference Share Paying Agent pursuant to applicable provisions of the Preference Share Paying Agency Agreement, and thereafter "Preference Share Paying Agent" shall mean such successor Person.

"Preference Share Redemption Date":  The Scheduled Preference Share Redemption Date, or such earlier date on which the Preference Shares are actually redeemed.

"Preference Share Redemption Price":  The price per Preference Share equal to such Preference Share's pro rata allocation of Excess Proceeds, if any, due and payable in accordance with Section 11.1 on such date, and any funds remaining on deposit in the Preference Share Distribution Account from prior Payment Dates.

"Preference Shareholder":  With respect to any Preference Share, the Person in whose name such Preference Share is registered in the Share Register.

"Preference Shares":  The Preference Shares, par value U.S. $0.01 per share, of which 12,000 shares have been issued by the Issuer.

"Primary Incentive Collateral Management Fee":  The fee paid to the Collateral Manager on each Payment Date to the extent of the funds available for such purpose in accordance with Section 11.1, but only after the Holders of the Preference Shares have received an Internal Rate of Return of 12%.  The Primary Incentive Collateral Management Fee for each Payment Date will equal 0.125% per annum on the Quarterly Asset Amount (accruing from the Closing Date), together with any accrued and unpaid Primary Incentive Collateral Management Fee owed on any prior Payment Date.

"Principal Balance":  With respect to any Pledged Security, as of any date of determination, the outstanding principal amount of such Pledged Security; provided that the Principal Balance of (i) any Collateral Debt Security which permits the deferral or capitalization of interest shall not include any outstanding balance of deferred and/or capitalized interest, (ii) any Exchanged Security that is an equity security and any Interest Only Security shall be zero, (iii) any Step-Down Bond or any Eligible Investment that does not pay cash interest on a current basis will be the lower of the original issue price or aggregate par amount thereof, excluding any

unaccreted interest amount, (iv) any Synthetic Security shall be the notional amount of such Synthetic Security, except as otherwise explicitly provided herein, (v) any Zero Coupon Bond shall be the accreted value thereof on such date of determination and (vi) any Written Down Security shall be its Written Down Security Amount

The Collateral Manager, on behalf of the Issuer, shall determine the Principal Balance of a Written Down Security based upon information in the most recent servicing, trustee or other similar report delivered in accordance with the Underlying Instruments, if any; provided that, if no such information is available after inquiry of the relevant issuer, Servicer, asset manager or any other Person acting in a similar capacity in respect of such Written Down Security, the Collateral Manager will be responsible, under the Collateral Management Agreement, for making such determination, to the extent reasonably practicable and based upon any other sources of information normally available to it.

"Principal Collection Account":  The trust account designated the "Principal Collection Account" established pursuant to Section 10.2(b) into which all Principal Proceeds shall be deposited.

"Principal Proceeds":  With respect to any Due Period and the related Payment Date the sum of the following amounts (without duplication and to the extent not reinvested in additional Collateral Debt Securities):  (a) all payments of principal (including Unscheduled Principal Payments not reinvested in additional Collateral Debt Securities) received in cash by the Issuer during the related Due Period on the Collateral Debt Securities and Eligible Investments (other than (1) Uninvested Proceeds, in the case of any Payment Date occurring prior to the last day of the Reinvestment Period, except for such amounts, if any, designated for a Special Amortization, applied in connection with an Effective Date Ratings Downgrade or designated as Principal Proceeds in connection with a mandatory redemption, (2) amounts defined as "Interest Proceeds" pursuant to clauses (g) and (i) of the definition thereof and (3) Eligible Investments purchased with Interest Proceeds); (b) in the case of the first Payment Date following the Reinvestment Period, any Uninvested Proceeds on deposit in the Uninvested Proceeds Account on the last day of the Reinvestment Period; (c) all Disposition Proceeds (other than in respect of the Hedge Agreements) received by the Issuer during the related Due Period, including without limitation amounts received in respect of original issue or market discount and any call, redemption, yield maintenance payments and prepayment premiums and fees and commissions designated by the Collateral Manager in its discretion as Principal Proceeds, but excluding accrued interest constituting "Interest Proceeds" under clause (b) of the definition of Interest Proceeds; (d) any amounts received pursuant to the Hedge Agreements due to an event of default or termination event thereunder or in connection with the reduction of the notional amount of a Hedge Agreement (net of amounts paid to enter into a replacement Hedge Agreement to the extent so required); (e) any up-front payment from the Interest Rate Hedge Counterparty received by the Issuer on the Closing Date; (f) all fees, recoveries and commissions received in connection with Defaulted Securities (up to the principal amount thereof); (g) all amounts received by the Issuer in respect of Exchanged Securities received by the Issuer in

respect of a Defaulted Security; (h) all amounts on deposit in the Expense Account which will be transferred to the Payment Account prior to the Payment Date occurring in June 2002 for application as Principal Proceeds; (i) all amounts designated as Interest Proceeds pursuant to clauses (g) and (i) of the definition thereof that are subsequently redesignated as Principal Proceeds by the Collateral Manager (in its sole discretion) pursuant to clause (xv) of Section 11.1(a) on any preceding Payment Date; and (j) all other amounts received by the Issuer during the related Due Period which are not included in the definition of Interest Proceeds.  Any determination of the aggregate amount of Principal Proceeds with respect to any day during a Due Period will include all Principal Proceeds received by the Issuer from and including the first day of the related Due Period to and including such date of determination.

"Priority of Payments":  The meaning set forth in Section 11.1 hereof.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Process Agent":  The meaning specified in Section 7.18 hereof.

"Project Finance Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from (1) the sale of products, such as electricity, nuclear energy, steam or water, in the utility industry by a special purpose entity formed to own the assets generating or otherwise producing such products and such assets were or are being constructed or otherwise acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to such assets and the land on which they are located) or (2) fees or other usage charges, such as tolls collected on a highway, bridge, tunnel or other infrastructure project, collected by a special purpose entity formed to own one or more such projects that were constructed or otherwise acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to the project and the land on which it is located).

"Proposed Portfolio":  The portfolio of Collateral Debt Securities and Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds resulting from the proposed maturity, sale or other disposition of a Collateral Debt Security or a proposed purchase of a Collateral Debt Security, as the case may be.

"Purchase Agreement":  The Purchase Agreement, dated as of December 5, 2001, relating to the Notes and Preference Shares among the Issuer, the Co-Issuer and the Initial Purchasers.

"Pure Private Collateral Debt Security":  Any Collateral Debt Security other than (a) a Collateral Debt Security that was issued pursuant to an effective registration statement

under the Securities Act or (b) a privately placed Collateral Debt Security that is eligible for resale under Rule 144A under the Securities Act.

"Qualified Institutional Buyer" or "QIB": A "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"Qualified Purchaser": A "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act.

"Qualifying Foreign Country": A country (other than the United States) with a sovereign rating of at least "Aa2" by Moody's; provided, that a Collateral Debt Security issued by any corporation, partnership or trust not organized under the laws of a country with a sovereign rating of at least "Aa2" by Moody's that conducts its business predominantly (as determined by the Collateral Manager in its commercially reasonable business judgment) in a country (other than the United States) with a sovereign rating by Moody's of at least "Aa2" shall be deemed to be organized under the laws of a Qualifying Foreign Country (provided, that Moody's has provided confirmation in writing that the inclusion of such Collateral Debt Security in the Collateral will not result in a qualification, downgrade or withdrawal by Moody's of its then-current ratings of any Class of the Notes); provided, further, that a Structured Finance Security that is organized in a Qualifying Tax Jurisdiction shall only be deemed to be organized in the United States if (and the Collateral Manager shall not determine in its reasonable judgment that such entity is organized in the United States unless) such Collateral Debt Security has at least 80% in aggregate principal balance of the collateral securing such Collateral Debt Security issued by entities organized or incorporated under the laws of the United States or any state thereof or otherwise sourced from the United States or any state thereof.

"Qualifying Tax Jurisdiction": The Cayman Islands, Bahamas, Bermuda, Channel Islands or the Netherlands Antilles (or, if a Rating Agency Confirmation shall have been received, with respect to the acquisition of such asset, any similar jurisdiction generally imposing no or nominal taxes on the income of companies located therein); provided, that a Collateral Debt Security issued by an issuer organized or incorporated in the Cayman Islands, Bahamas, Bermuda, Channel Islands or the Netherlands Antilles (or, if a Rating Agency Confirmation shall have been received, with respect to the acquisition of such asset, any similar jurisdiction generally imposing no or nominal taxes on the income of companies located therein) shall only be deemed to be organized under the laws of a Qualifying Tax Jurisdiction if it is issued by a bankruptcy remote entity in such jurisdiction; provided, further, that a Structured Finance Security that is issued by an issuer organized or incorporated in a Qualifying Tax Jurisdiction shall only be deemed to be organized in the United States if (and the Collateral Manager shall not determine in its reasonable judgment that such entity is organized in the United States unless) such Collateral Debt Security has at least 80% in aggregate principal balance of the collateral securing such Collateral Debt Security issued by entities organized or incorporated under the

laws of the United States or any state thereof or otherwise sourced from the United States or any state thereof.

"Qualifying Tax Jurisdiction Security":  A Collateral Debt Security issued by a bankruptcy remote entity organized or incorporated in a Qualifying Tax Jurisdiction.

"Quarterly Asset Amount":  An amount equal, for any Payment Date, to the sum of (i) the Aggregate Principal Amount of all Collateral Debt Securities, (ii) the amount of Principal Proceeds on deposit in the Principal Collection Account and (iii) the amount on deposit in the Uninvested Proceeds Account (exclusive of investment earnings thereon), in each case, on the first day of the related Due Period (as shown by the Payment Date Report prepared with respect to the immediately preceding Payment Date).

"Ramp-Up Effective Date":  The earlier of (i) the 180th day after the Closing Date or (ii) if the Issuer has not provided prior notice of its intent to issue additional Notes, as described herein before such 180th day, the date on which the Issuer demonstrates that each of the Reinvestment Criteria (which includes the Coverage Tests) is satisfied.

"Ramp-Up Period":  The period from the Closing Date to the Ramp-Up Effective Date.

"Rating Agency":  Either of Moody's or for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, Standard & Poor's.  "Rating Agencies" shall mean Moody's and for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, Standard & Poor's, collectively.

"Rating Agency Confirmation":  Confirmation, in writing, from each Rating Agency that any proposed action or designation will not cause such Rating Agency to reduce or withdraw its then-current rating, if any, of any Class of Notes.

"Record Date":  The date on which the Holders of Notes entitled to receive a payment of principal or interest on the succeeding Payment Date are determined, such date as to any Payment Date being the fifteenth day prior to such Payment Date (or, if such fifteenth day is not a Business Day, the next Business Day thereafter).

"Redemption Premium":  The premium payable to Holders of the Class C2 Notes in connection with an Optional Redemption of such Notes in an amount equal to the excess, if any, of (i) the present value (discounted to the applicable Optional Redemption Date using the applicable Reinvestment Yield on a semi-annual basis using a 360-day year consisting of twelve 30-day months as the discount rate) of the remaining payments of interest and principal due on the Class C2 Notes, assuming that the entire outstanding principal amount of the Class C2 Notes will be paid on the Payment Date occurring in December 2010 and that each intervening payment of interest on the Class C2 Notes will be made on the related Payment Date in its entirety (and

therefore there is no Defaulted Interest on the Class C2 Notes and no Class C Deferred Interest on such Class C2 Notes) over (ii) the outstanding principal amount of the Class C2 Notes on the applicable Optional Redemption Date; provided, that no Redemption Premium will be payable on the Class C2 Notes in connection with a Withholding Tax Event.

"Redemption Value":  The sum of the following amounts: (a) for each Collateral Debt Security with respect to which the Collateral Manager on behalf of the Issuer has entered into a binding agreement to sell such Collateral Debt Security to a counterparty whose short-term unsecured debt obligations have a credit rating of "P-1" by Moody's (if rated by Moody's) or "A-1" by Standard & Poor's (if rated by Standard & Poor's), the agreed sale price, (b) for each Collateral Debt Security that is not described in clause (a) that has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher (for so long as any Class of Notes is Outstanding and rated by Standard & Poor's), 90% of the fair market value thereof, (c) for each other Collateral Debt Security (other than a Defaulted Security, a Deferred Interest PIK Security or a Credit Risk Security), 80% of the fair market value thereof and (d) for each Defaulted Security, Deferred Interest PIK Security or Credit Risk Security, 65% of the fair market value thereof.

"Reference Banks":  With respect to the determination of LIBOR by the Calculation Agent, any four major banks in the London interbank market selected by the Calculation Agent for such purpose.

"Reference Obligation":  With respect to a Synthetic Security, any security that on the date of acquisition of the Synthetic Security by the Issuer, would meet the definition of a Collateral Debt Security and is not Synthetic Security or a Structured Finance Security whose payments and terms serve as the basis for the payments or terms of such Synthetic Security.

"Reference Obligor":  The obligor of a Reference Obligation.

"Refinancing":  The meaning specified in Section 9.1(c).

"Refinancing Proceeds":  The meaning specified in Section 9.1(c).

"Registered":  With respect to any debt obligation, a debt obligation that is issued after July 18, 1984, and that is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code.

"Regulation S":  Regulation S under the Securities Act.

"Regulation S Definitive Notes":  The meaning specified in Section 2.11(b) hereof.

"Regulation S Global Notes":  The meaning specified in Section 2.2(a)(ii) hereof.

"Reinvestment Criteria":  The meaning specified in Section 12.2.

"Reinvestment Period":  The period beginning on the Closing Date and ending on the first to occur of:

(i)     the Scheduled Reinvestment Period Termination Date;

(ii)    the Payment Date immediately following the date on which the Collateral Manager (with the written consent of the Holders of a Majority of the Preference Shares) notifies the Trustee that, in light of the composition of Collateral Debt Securities, general market conditions and other factors, investments in additional Collateral Debt Securities within the foreseeable future would be either impractical or not beneficial to the Holders of the Preference Shares;

(iii)   the date on which all of the Notes are redeemed as a result of an Optional Redemption or a Withholding Tax Event; and

(iv)    the termination of the Reinvestment Period as a result of the occurrence of an Event of Default.

"Reinvestment Yield":  With respect to the Class C2 Notes, the rate equal to the sum of 1.5% and the applicable yield to maturity implied by (i) the yields reported, as of 10:00 a.m. (New York City time) on the tenth Business Day preceding the related Optional Redemption Date on the display designated as "Page 678" on the Telerate Service (or such other display as may replace Page 678 on the Telerate Service) for actively traded U.S. Treasury securities having a maturity as nearly as practicable equal to the Payment Date occurring in December 2010 or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the tenth Business Day preceding the Optional Redemption Date, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity as nearly as practicable equal to the Payment Date occurring in December 2010.

"REIT":  A publicly traded real estate investment trust (as defined in Section 856 of the Code or any successor provision).

"REIT Security":  A Specified Type of publicly-traded security issued by a REIT formed for the purpose of acquiring different types of real estate properties with the capital of many investors or a Synthetic Security whose Reference Obligation is a REIT Security that would, taking into account the requirements of clauses (b) through (r) of the definition of "Collateral Debt Security," qualify as a Collateral Debt Security if purchased directly by the Issuer.

"REIT Debt Securities – Diversified":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on a portfolio of diverse real property interests, provided that any REIT Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Security.

"REIT Debt Securities – Franchise":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on franchise or chain store establishments, typically fast-food chains, convenience stores and funeral homes and other similar real property interests used in one or more similar businesses.

"REIT Debt Securities – Health Care":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on hospitals, clinics, sport clubs, spas and other health care facilities and other similar real property interests used in one or more similar businesses.

"REIT Debt Securities – Hotel":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on hotels, motels, youth hostels, bed and breakfasts and other similar real property interests used in one or more similar businesses.

"REIT Debt Securities – Industrial":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on factories, refinery plants, breweries and other similar real property interests used in one or more similar businesses.

"REIT Debt Securities – Multi-Family":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of residential mortgages on multi-family dwellings such as apartment buildings, condominiums and co-operative owned buildings.

"REIT Debt Securities – Office":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on office buildings, conference facilities and other similar real property interests used in the commercial real estate business.

"REIT Debt Securities – Retail":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of mortgages on retail stores, restaurants, bookstores, clothing stores and other similar real property interests used in one or more similar businesses.

"REIT Debt Securities – Residential":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of residential mortgages (other than multi-family dwellings) and other similar real property interests.

"REIT Debt Securities – Storage":  REIT Securities issued by a REIT whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such REIT Securities) of storage facilities and other similar real property interests used in one or more similar businesses.

"Required Collateral Posting":  The meaning specified in Section 16.1(j).

"Required Weighted Average Fixed Rate Coupon":  As of any Measurement Date, 7.45%.  The Required Weighted Average Fixed Rate Coupon may be modified from time to time upon receipt of a Rating Agency Confirmation with respect to such modification.

"Required Weighted Average Floating Rate Coupon":  As of any Measurement Date, three-month LIBOR plus 1.75%.  The Required Weighted Average Floating Rate Coupon may be modified from time to time upon receipt of a Rating Agency Confirmation with respect to such modification.

"Requisite Noteholders":  The Holders of more than 66⅔% of the Aggregate Outstanding Amount of (a) the Class A Notes, so long as any Class A Notes remain Outstanding, (b) thereafter, the Class B Notes so long as any Class B Notes remain Outstanding and (c) thereafter, the Class C Notes so long as any Class C Notes remain Outstanding.

"Residential A Mortgage-Backed Securities":  Structured Finance Securities (other than Residential B/C Mortgage-Backed Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics:  (1) the mortgage loans have generally been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling.

"Residential B/C Mortgage-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from subprime residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics:  (1) the mortgage loans have generally not been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling.

"Resolutions": Certain resolutions adopted at the meeting of the Issuer's board of directors on December 3, 2001.

"Responsible Officer":  When used with respect to the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, trust officer, assistant secretary or any other officer or assistant officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred within the Corporate Trust Office because of his or her knowledge of and familiarity with the particular subject.

"Restaurant and Food Asset-Backed Services Securities":  Structured Finance Securities (other than Healthcare Asset-Backed Securities and Small Business Loan Asset-Backed Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Structured Finance Securities) on the cash flow from leases and subleases of equipment to businesses for use in the provision of restaurant and food services (other than transportation services) to consumers, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (5) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by related real estate.

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Definitive Notes":  The meaning specified in Section 2.11(b) hereof.

"Rule 144A Global Note":  The meaning specified in Section 2.2(a)(i).

"Rule 144A Information":  The meaning specified in Section 2.5(c) hereof.

"S&P Industry Classification Group":  Each of the 39 industry classification groups set forth on Schedule D.

"S&P Minimum Recovery Rate Test":  A test which will be satisfied as of any Measurement Date if the S&P Minimum Recovery Rate is greater than or equal to 27% if the Class A Notes are outstanding.

"S&P Minimum Recovery Rate":  As of any Measurement Date, a rate expressed as a percentage equal to the number obtained by (i) summing the products obtained by multiplying the Principal Balance of each Collateral Debt Security by its S&P Recovery Rate and (ii) dividing such sum by the Aggregate Principal Amount less cash and Eligible Investments representing Principal Proceeds and (iii) rounding up to the first decimal place.  For this purpose, the Principal Balance of a Defaulted Security or a Deferred Interest PIK Security will be deemed to be equal to its outstanding principal amount (excluding any capitalized interest thereon).

"S&P Rating":  With respect to any Collateral Debt Security, the S&P Rating will be determined as follows:

(i)     if such Collateral Debt Security is a Structured Finance Security, a REIT Security or a Corporate Security, the S&P Rating of such Collateral Debt Security shall be determined as follows:

(A)     if Standard & Poor's has assigned an issuer credit rating (with respect to Corporate Securities) or credit rating (with respect to Structured Finance Securities and REIT Securities) to such Collateral Debt Security, or the guarantor who unconditionally and irrevocably guarantees such Collateral Debt Security, if any, either publicly or privately, the S&P Rating shall be such rating;

(B)     if such Collateral Debt Security or guarantor, if any, is not rated by Standard & Poor's, then the Issuer or the Collateral Manager on behalf of the Issuer may apply to Standard & Poor's for a corporate credit estimate, which shall be the S&P Rating of such Collateral Debt Security; provided that pending receipt from Standard & Poor's of such estimate, such

Collateral Debt Security shall have for a maximum of thirty days from the date of settlement an S&P Rating of "B-" if the Collateral Manager believes that such estimate will be at least "B-"; provided, that only 5% of the Aggregate Principal Amount of the Collateral Debt Securities may have an S&P Rating calculated pursuant to the proviso above, and any percentage of Collateral Debt Securities exceeding the aforementioned limitation or held for more than thirty days shall have an S&P Rating of "CCC-" if the Collateral Manager believes that such estimate will be at least "CCC-" pending receipt from Standard & Poor's of such estimate;

(C)     with respect to any Collateral Debt Security that is a Catastrophe Bond, the S&P Rating of the issuer or guarantor of such Collateral Debt Security determined in the manner provided in subclauses (i)(A) or (B) above, as applicable, will be its S&P Rating; provided, that, if such issuer or guarantor is not rated by Standard & Poor's, then the S&P Rating of such Collateral Debt Security shall be the rating assigned thereto by Standard & Poor's in connection with the acquisition thereof by the Issuer upon the request of the Issuer or the Collateral Manager;

(D)     with respect to Corporate Securities, if such Collateral Debt Security is not rated by Standard & Poor's, but another security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains an S&P Rating for such Collateral Debt Security pursuant to subclause (B) above, then the S&P Rating of such Collateral Debt Security shall be the issuer credit rating, if available, or shall be determined as follows:  (a) if there is a rating on a senior secured obligation of the issuer, then the S&P Rating of such Collateral Debt Security shall be one subcategory below such rating if such Collateral Debt Security is a senior secured or senior unsecured obligation of the issuer; (b) if there is a rating on a senior unsecured obligation of the issuer, then the S&P Rating of such Collateral Debt Security shall equal such rating if such Collateral Debt Security is a senior secured or senior unsecured obligation of the issuer; and (c) if there is a rating on a subordinated obligation of the issuer, and if such Collateral Debt Security is a senior secured or senior unsecured obligation of the issuer, then the S&P Rating of such Collateral Debt Security shall be one subcategory above such rating if such rating is higher than "BB", and shall be two subcategories above such rating if such rating is "BB" or lower; and

(E)     if there is no issuer or guarantor credit rating published by Standard & Poor's and such Collateral Debt Security is not rated by Standard & Poor's, and no other security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains an S&P

Rating for such Collateral Debt Security pursuant to subclause (B) or (C) above, then the S&P Rating of such Collateral Debt Security may be determined using the methods provided below:

(a)  with respect to Corporate Securities, if such Collateral Debt Security is rated by Moody's, then the S&P Rating of such Collateral Debt Security will be (x) one subcategory below the Standard & Poor's equivalent of the rating assigned by Moody's if such Collateral Debt Security is rated "Baa3" or higher by Moody's and (y) two subcategories below the Standard & Poor's equivalent of the rating assigned by Moody's if such Collateral Debt Security is rated "Ba1" or lower by Moody's;

(b)  with respect to any Structured Finance Security or REIT Security that has been rated by both Moody's and Fitch, Inc. ("Fitch"), if such Structured Finance Security or REIT Security is not rated by Standard & Poor's, then the S&P Rating of such Structured Finance Security or REIT Security may be determined using any one of the methods below:

(i)      with respect to any type of Structured Finance Security or REIT Security listed on Part A of <u>Schedule F</u> attached hereto issued before August 1, 2001, (1) if such Structured Finance Security or REIT Security is rated at least "Baa3" by Moody's and at least "BBB" by Fitch, then the S&P Rating thereof will be one rating subcategory below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security or REIT Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be two rating subcategories below the Standard & Poor's equivalent rating;

(ii)      with respect to any type of Structured Finance Security or REIT Security listed on Part A of <u>Schedule F</u> attached hereto issued on or after August 1, 2001, (1) if such Structured Finance Security or REIT Security is rated at least "Baa3" by Moody's and at least "BBB-" by Fitch, then the S&P Rating thereof will be two rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security or REIT Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be three rating subcategories below the Standard & Poor's equivalent rating;

(iii)      with respect to any type of Structured Finance Security listed on Part B of <u>Schedule F</u> attached hereto issued before August 1, 2001, (1) if such Structured Finance Security is rated at least

"Baa3" by Moody's and at least "BBB-" by Fitch, then the S&P Rating thereof will be one rating subcategory below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be two rating subcategories below the Standard & Poor's equivalent rating;

(iv)    with respect to any type of Structured Finance Security listed on Part B of <u>Schedule F</u> attached hereto issued on or after August 1, 2001, (1) if such Structured Finance Security is rated at least "Baa3" by Moody's and at least "BBB-" by Fitch, then the S&P Rating thereof will be three rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be four rating subcategories below the Standard & Poor's equivalent rating; and

(v)    with respect to any type of Structured Finance Security listed on Part C of <u>Schedule F</u> attached hereto (1) if such Structured Finance Security is rated at least "Baa3" by Moody's and at least "BBB-" by Fitch, then the S&P Rating thereof will be three rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be four rating subcategories below the Standard & Poor's equivalent rating;

(c) with respect to any Structured Finance Security or REIT Security that has been rated by one of Moody's and Fitch, if such Structured Finance Security or REIT Security is not rated by Standard & Poor's, then the S&P Rating of such Structured Finance Security or REIT Security may be determined using any one of the methods below:

(i)    with respect to any type of Structured Finance Security or REIT Security listed on Part A of <u>Schedule F</u> attached hereto issued before August 1, 2001, (1) if such Structured Finance Security or REIT Security is rated at least "Baa3" by Moody's or at least "BBB-" by Fitch, then the S&P Rating thereof will be two rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security or REIT Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be three rating subcategories below the Standard & Poor's equivalent rating:

(ii)      with respect to any type of Structured Finance Security or REIT Security listed on Part A of <u>Schedule F</u> attached hereto issued on or after August 1, 2001, (1) if such Structured Finance Security or REIT Security is rated at least "Baa3" by Moody's or at least "BBB-" by Fitch, then the S&P Rating thereof will be three rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security or REIT Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be four rating subcategories below the Standard & Poor''s equivalent rating;

(iii)      with respect to any type of Structured Finance Security listed on Part B of <u>Schedule F</u> attached hereto issued before August 1, 2001, (1) if such Structured Finance Security is rated "Baa3" by Moody's or at least "BBB-" by Fitch, then the S&P Rating thereof will be two rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be three rating subcategories below the Standard & Poor's equivalent rating;

(iv)      with respect to any type of Structured Finance Security on Part B of <u>Schedule F</u> attached hereto issued on or after August 1, 2001, (1) if such Structured Finance Security is rated at least "Baa3" by Moody's or at least "BBB-" by Fitch, then the S&P Rating thereof will be four rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be five rating subcategories below the Standard & Poor's equivalent rating; and

(v)      with respect to any type of Structured Finance Security listed on Part C of <u>Schedule F</u> attached hereto, (1) if such Structured Finance Security is rated at least "Baa3" by Moody's or at least "BBB-" by Fitch, then the S&P Rating thereof will be four rating subcategories below the Standard & Poor's equivalent rating and (2) if such Structured Finance Security is rated below "Baa3" by Moody's or below "BBB-" by Fitch, then the S&P Rating thereof will be five rating subcategories below the Standard & Poor's equivalent rating;

(d)  if such Collateral Debt Security is not rated by Moody's or Fitch but a security with the same ranking (a "parallel security") is rated by Moody's

and/or Fitch then the S&P Rating of such parallel security will be determined in accordance with the methodology set forth in subclauses (b) and (c) above; or

(e)  with respect to Structured Finance Securities and REIT Securities, if such Collateral Debt Security is not rated by Standard & Poor's and such Structured Finance Security or REIT Security is rated by Moody's and/or Fitch, then the S&P Rating of such Collateral Debt Security may be determined in consultation with Standard & Poor's;

(ii)     if such Collateral Debt Security is a Synthetic Security, the S&P Rating of such Synthetic Security shall be the rating assigned thereto by Standard & Poor's in connection with the acquisition thereof by the Issuer upon the request of the Issuer or the Collateral Manager.

"S&P Recovery Rate":  With respect to any Pledged Security on any Measurement Date, the applicable percentage set forth in Schedule E hereto.

"S&P Trading Model":  The dynamic, analytical computer model developed by Standard & Poor's for use in estimating default risk of Collateral Debt Securities and provided to the Collateral Manager on or about the Closing Date, as such model may be modified by Standard & Poor's and provided to the Collateral Manager in connection with its confirmation of the rating of the Class A Notes following the Ramp-Up Effective Date.

"S&P Trading Model Test":  A test (to be calculated in all instances by the Collateral Manager) which is satisfied as of any Measurement Date if after giving effect to the sale of a Collateral Debt Security or the purchase of a Collateral Debt Security (or both), as the case may be, the Class A Loss Differential of the Proposed Portfolio is positive or is considered to be maintained or improved if the Class A Loss Differential of the Proposed Portfolio is greater than or equal to the Class A Loss Differential of the Current Portfolio; provided, that such test shall be deemed to be satisfied on any date prior to receipt of the S&P Trading Model by the Collateral Manager.

"Sale":  The meaning specified in Section 5.17(a) hereof.

"Scheduled Distribution":  With respect to any Pledged Security as of any date of determination, for the Due Date following such date of determination, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions set forth in Section 1.3 of this Indenture.

"Scheduled Preference Share Redemption Date":  The Payment Date occurring in December 2036.

"Scheduled Reinvestment Period Termination Date":  The Payment Date occurring in December 2006.

"Secondary Incentive Collateral Management Fee":  The fee paid to the Collateral Manager on each Payment Date to the extent of the funds available for such purpose in accordance with Section 11.1, but only after the Holders of the Preference Shares have received an Internal Rate of Return of 18%.  The Secondary Incentive Collateral Management Fee for each Payment Date will equal 0.125% per annum on the Quarterly Asset Amount (accruing from the Closing Date), together with any accrued and unpaid Secondary Incentive Collateral Management Fee owed on any prior Payment Date.

"Securities":  Collectively, the Notes and the Preference Shares.

"Securities Account":  An account to which a financial asset (within the meaning of Article 8 of the UCC) is or may be credited in accordance with an agreement under which the Person maintaining the account undertakes to treat the Person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset (within the meaning of Article 8 of the UCC).

"Securities Account Control Agreement":  The securities account control agreement dated as of December 5, 2001 between Madison Avenue Structured Finance CDO I, Limited, as debtor and First Union National Bank, as secured party and as Custodial Account Securities Intermediary.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Custodian":  The Bank or, in the event the Bank is no longer acting as Trustee hereunder, such other entity that at the time is acting as successor Trustee hereunder.

"Securities Entitlement":  The meaning specified in Section 8-102(a)(17) of the UCC.

"Securities Intermediary":  A Clearing Corporation or a Person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.

"Securities Intermediary Security":  Any of the following: (i) a Clearing Corporation Security, (ii) any other security or other financial asset issued or payable to or registered in the name of a Securities Intermediary and (iii) a security held by a Securities Intermediary in bearer form or endorsed in blank or in the name of such Securities Intermediary.

"<u>Securities Lending Account</u>":  Each trust account established pursuant to Section 10.3(b).

"<u>Securities Lending Agreement</u>":  Any agreement in substantially the form (except as otherwise provided below) of the standard Bond Market Association Master Securities Loan Agreement among the Issuer, the Trustee and any Securities Lending Counterparty relating to the loan of Collateral Debt Securities to such Securities Lending Counterparty and the pledge by such Securities Lending Counterparty of Securities Lending Collateral to the Issuer to secure such loan; <u>provided</u>, that each such agreement contains appropriate limited-recourse and non-petition provisions equivalent to those contained in Section 2.7(k); and <u>provided</u>, <u>further</u>, that the Issuer has received a Rating Agency Confirmation with respect to its entry into such agreement; <u>provided</u>, <u>further</u>, that each such agreement permits the Issuer to call the loan and receive return of the Collateral Debt Security at any time without penalty, if (a) the Collateral Manager determines that such Collateral Debt Security is a Credit Risk Security, Defaulted Security or Credit Improved Security or the Collateral Manager determines to sell such Collateral Debt Security in a Discretionary Sale, (b) such Collateral Debt Security is to be redeemed or (c) an Optional Redemption or redemption due to a Withholding Tax Event is to occur and each such agreement requires that (i) the Securities Lending Counterparty return to the Issuer debt obligations which are identical (in terms of issue and class) to the loaned Collateral Debt Security and (ii) the Securities Lending Counterparty pay to the Issuer such amounts as are equivalent to all interest and other payments which the owner of the loaned Collateral Debt Security is entitled to for the period during which the Collateral Debt Security is lent.

"<u>Securities Lending Collateral</u>":  Any cash or securities issued or guaranteed by the U.S. government pledged by a Securities Lending Counterparty as collateral pursuant to a Securities Lending Agreement.

"<u>Securities Lending Counterparty</u>":  Any bank, insurance company, broker-dealer or other financial institution which (i) has a short-term senior unsecured debt rating or has a guarantor with such rating of at least "P-1" and a long-term rating or a guarantor with such rating of at least "A1" from Moody's and (ii) has a short-term senior unsecured debt rating or a guarantor with such rating of "A-1+" from Standard & Poor's; <u>provided</u>, that at the time th Issuer enters into a Securities Lending Agreement, the number of different Securities Lending Counterparties, when added to the number of Hedge Counterparties and Synthetic Security Counterparties at any particular time involved in transactions with the Issuer involving the Collateral, may not exceed ten (10).

"<u>Security</u>":  The meaning specified in Section 8-102(a)(15) of the UCC.

"<u>Security Entitlement</u>": The meaning specified in Section 8-102(a)(17) of the UCC.

"Senior Collateral Management Fee":  With respect to each Payment Date, an amount which will accrue from the Closing Date at a rate of 0.125% per annum of the Quarterly Asset Amount.

"Servicer":  With respect to any Issue of Structured Finance Securities or REIT Securities, the entity that, absent any default, event of default or similar condition (however described), is primarily responsible for managing, servicing, monitoring and otherwise administering the cash flows from which payments to investors in such Structured Finance Securities or REIT Securities are made.

"Share Register":  The share register maintained in accordance with the Issuer Charter by the Administrator, on behalf of the Issuer, pursuant to the Preference Share Paying Agency Agreement, with respect to the Holders of the Preference Shares.

"Share Registrar":  Initially the Administrator or such other person as may be from time to time appointed by the Issuer to maintain the Share Register.

"Small Business Loan Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from general purpose corporate loans made to "small business concerns" (generally within the meaning given to such term by regulations of the U.S. Small Business Administration), including but not limited to those (a) made pursuant to Section 7(a) of the U.S. Small Business Act, as amended, and (b) partially guaranteed by the U.S. Small Business Administration.  Small Business Loan Asset-Backed Securities generally have the following characteristics:  (1) the loans have payment terms that comply with any applicable requirements of the U.S. Small Business Act, as amended; (2) the loans are the obligations of a relatively limited number of borrowers and accordingly represent an undiversified pool of obligor credit risk; and (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium.

"Sovereign":  When used in reference to an obligation, an obligation of a national government or agency thereof that is fully and irrevocably guaranteed by the full faith and credit of such government.

"Special Amortization":  The meaning specified in Section 9.6.

"Special Amortization Amount":  The aggregate amount of funds in the Principal Collection Account or the Uninvested Proceeds Account representing Principal Proceeds or Uninvested Proceeds, as applicable, that the Collateral Manager has determined cannot be reinvested in additional Collateral Debt Securities, as specified by the Collateral Manager, to be

paid to Noteholders sequentially in order of seniority in the manner provided in Section 11.1(b)(viii) on the first Payment Date after which notice is given by the Collateral Manager as to a Special Amortization pursuant to Section 9.6.

"Specified Type": (i) With respect to any Structured Finance Security, whether such Structured Finance Security is: (1) an Aerospace, Defense and Telecommunications Asset-Backed Security; (2) an Automobile Asset-Backed Security; (3) a Bank Guaranteed Asset-Backed Security; (4) a Car Rental Receivable Asset-Backed Security; (5) a Catastrophe Bond, (6) a CBO/CLO Security; (7) a CMBS Conduit Security; (8) a CMBS Credit Tenant Lease Security; (9) a CMBS Large Loan Security; (10) a Credit Card Asset-Backed Security; (11) an Equipment Leasing Asset-Backed Security; (12) a Film/Media Asset-Backed Security; (13) a Franchise Loan Asset-Backed Security; (14) a Future Flow Receivables Asset-Backed Security; (15) a Healthcare Asset-Backed Security; (16) a Home Equity Loan Asset-Backed Security; (17) an Insurance Company Guaranteed Asset-Backed Security; (18) an Intellectual Property Asset-Backed Security; (19) a Manufactured Housing Asset-Backed Security; (20) a Monoline Guaranteed Asset-Backed Security; (21) a Mutual Fund Fee Asset-Backed Security; (22) a Project Finance Security; (23) a Residential A Mortgage-Backed Security; (24) a Residential B/C Mortgage-Backed Security; (25) a Restaurant and Food Services Asset-Backed Security; (26) a Small Business Loan Asset-Backed Security; (27) a Structured Settlement Asset-Backed Security; (28) a Student Loan Asset-Backed Security; (29) a Tax Lien Asset-Backed Security; (30) a Timeshare Asset-Backed Security; or (31) any other type of Structured Finance Security designated as a "Specified Type" (and designated as a "Structured Finance Type Diversified Security", a "Structured Finance Type Residential Security" or a "Structured Finance Type Undiversified Security"); or (ii) with respect to any REIT Security, (1) a REIT Debt Security - Diversified; (2) a REIT Debt Security - Franchise; (3) a REIT Debt Security - Health Care; (4) a REIT Debt Security - Hotel; (5) a REIT Debt Security - Industrial; (6) a REIT Debt Security - Multi-Family; (7) a REIT Debt Security - Office; (8) a REIT Debt Security - Residential; (9) a REIT Debt Security - Retail; (10) a REIT Debt Security - Storage; or (11) any other type of REIT Security designated as a "Specified Type", in each case, together with any specification by Moody's of a method for determining the "Moody's Rating" thereof pursuant to clause (ii)(D) of the definition thereof and by Standard & Poor's of a method for determining the "S&P Rating" thereof pursuant to clause (i) of the definition thereof, in a notice from the Collateral Manager to the Trustee so long as Moody's has confirmed in writing to the Issuer and the Trustee that such designation will not result in the withdrawal, reduction or other adverse action with respect to its then-current rating of any Class of Notes. If any type of Structured Finance Security shall be designated as an additional Specified Type pursuant to the foregoing clause (i)(31), the definition of each Specified Type of Structured Finance Security in existence prior to such designation shall be construed to exclude such newly-designated Specified Type of Structured Finance Security. If any type of REIT Security shall be designated as an additional Specified Type pursuant to the foregoing clause (ii) (11), the definition of each Specified Type of REIT Security in existence prior to such designation shall be construed to exclude such newly-designated Specified Type of REIT Security.

"Standard & Poor's":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor or successors thereto and, if such corporation shall for any reason no longer perform the functions of a securities rating agency, "Standard & Poor's" shall be deemed to refer to any other nationally recognized rating agency designated in writing by the Issuer (with a copy to the Trustee).

"Stated Maturity":  With respect to (a) any security (other than a Note), the date specified on such security as the fixed date on which the final payment of principal of such security is due and payable and (b) any repurchase obligation, the repurchase date thereunder on which the final repurchase obligation thereunder is due and payable.

"Stated Maturity Date":   With respect to each Class of Notes, the Payment Date occurring in December 2036.

"Step-Down Bond":  A security which by the terms of the related Underlying Instrument provides for a decrease, in the case of a fixed rate security, in the per annum interest rate on such security or, in the case of a floating rate security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; provided, that a Step-Down Bond shall not include any such security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer.  In calculating any of the Reinvestment Criteria defined herein by reference to the spread (in the case of a floating rate Step-Down Bond) or coupon (in the case of a fixed rate Step-Down Bond) of a Step-Down Bond, the spread or coupon on any date shall be deemed to be the lowest spread or coupon, respectively, scheduled to apply to such Step-Down Bond on or after such date.

"Structured Finance Security":  A Specified Type of publicly issued or privately placed security (excluding, for the avoidance of doubt, any commercial loan) that entitles the holders of any such security to receive payments that depend primarily on the cash flow from specified financial assets or a specified pool of financial assets, either fixed or revolving together with any other rights or any other assets designed to assure the servicing or timely distribution of proceeds to such holder or a Synthetic Security whose Reference Obligation is a Structured Finance Security that would, taking into account the requirements of clauses (b) through (r) of the definition of "Collateral Debt Security," qualify as a Collateral Debt Security if purchased directly by the Issuer.

"Structured Finance Type Diversified Securities": (1) Automobile Asset-Backed Securities; (2) Car Rental Receivable Asset-Backed Securities; (3) Credit Card Asset-Backed Securities; (4) Student Loan Asset-Backed Securities; (5) Tax Lien Asset-Backed Securities; (6) Equipment Leasing-Asset Backed Securities; (7) Mutual Fund Fee Asset-Backed Securities; (8) Small Business Loan Asset-Backed Securities; and (9) any other type of Structured Finance Securities that become a Specified Type after the Closing Date as described below and are designated as "Structured Finance Type Diversified Securities" in connection therewith.

"Structured Finance Type Residential Securities":  (1) Home Equity Loan Asset-Backed Securities; (2) Manufactured Housing Asset-Backed Securities; (3) Residential A Mortgage-Backed Securities; (4) Residential B/C Mortgage-Backed Securities; (5) Timeshare Asset-Backed Securities; and (6) any other type of Structured Finance Securities that become a Specified Type after the Closing Date as described in Schedule E hereto and are designated as "Structured Finance Type Residential Securities" in connection therewith.

"Structured Finance Type Undiversified Securities":  (1) Each Specified Type of Structured Finance Securities as of the Closing Date, other than (a) Structured Finance Type Diversified Securities, (b) Structured Finance Type Residential Securities, (c) CBO/CLO Securities or (d) Monoline Guaranteed Asset-Backed Securities; and (2) any other type of Structured Finance Securities that become a Specified Type after the Closing Date as described in Schedule E hereto and are designated as "Structured Finance Type Undiversified Securities" in connection therewith.

"Structured Settlement Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from receivables representing the right of litigation claimants to receive future scheduled payments under settlement agreements that are funded by annuity contracts, which receivables may have varying contractual maturities.

"Student Loan Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from loans made to students (or their parents) to finance educational needs, generally having the following characteristics:  (1) the loans have standardized terms; (2) the loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such loans is primarily determined by a contractual payment schedule, with early repayment on such loans predominantly dependent upon interest rates and the income of borrowers following the commencement of amortization; and (4) such loans may be fully or partially insured or reinsured by the U.S. Department of Education.

"Subordinate Collateral Management Fee":  With respect to each Payment Date, an amount which will accrue for each Due Period at a rate equal to 0.125% per annum of the Quarterly Asset Amount.

"Subscription Agreement":  Each of the subscription agreements executed by the investors in the Preference Shares.

"Substitute Party":  The meaning set forth in Section 16.1(h).

"Substitution Event":   Any one of the following events:

(A) the Hedge Counterparty (other than the Liquidity Swap Counterparty) fails to post collateral within thirty days following a Collateralization Event,

(B) so long as any Class of Note is Outstanding and rated by Standard & Poor's, the short-term rating of any Hedge Counterparty (other than the Liquidity Swap Counterparty) falls below "A-1" by Standard & Poor's (or if such Hedge Counterparty does not have a short-term rating by Standard & Poor's, the rating of the long-term, unsecured debt obligations of such Hedge Counterparty (directly or by way of guarantee) (or such Hedge Counterparty's counterparty rating) falls below "A+" by Standard & Poor's); or

(C) the rating of the long-term, unsecured debt obligations of any Hedge Counterparty (other than the Liquidity Swap Counterparty) (directly or by way of guarantee) (or such Hedge Counterparty's counterparty rating) falls below "A2" by Moody's (or below "P-1" if Party A has a short-term rating by Moody's).

"Supplemental Closing Date": The closing date in respect of any additional issuance of Notes pursuant to Section 2.10.

"Synthetic Security":  Any swap transaction, structured bond investment or other investment purchased from, or entered into by, the Issuer with a Synthetic Security Counterparty which investment is linked to a Reference Obligation, but which may provide for a different maturity, interest rate, currency of payment or other characteristics than such Reference Obligation; provided, that (a) holding such Synthetic Security will not subject the Issuer to net income tax or cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. Federal income tax purposes, (b) no amounts receivable by the Issuer from the Synthetic Security Counterparty will be subject to withholding tax, unless the issuer thereof or the obligor thereon is required to make additional payments sufficient to cover any withholding tax imposed at any time on payments made to the Issuer with respect thereto, (c) payments to the Issuer in respect of such Synthetic Security are made in U.S. dollars, (d) such Synthetic Security shall not provide for any payment by the Issuer after the date on which it is pledged to the Trustee, (e) such Synthetic Security terminates upon the redemption or repayment in full of the Reference Obligation, (f) such Synthetic Security has a rating assigned by each Rating Agency and the Trustee has been notified in writing of the S&P Recovery Rate assigned by Standard & Poor's and the Loss Rate assigned by Moody's and (g) Standard & Poor's has provided confirmation, in writing, that the proposed purchase of such Synthetic Security by the Issuer will not cause Standard & Poor's to reduce or withdraw its then-current rating, if any, of any Class of Notes.

For purposes of the Portfolio Percentage Limitations (other than the Portfolio Percentage Limitations that address the rating and maturity of a Collateral Debt Security), such Synthetic Security will be included as a Collateral Debt Security having the characteristics of the related

Reference Obligation and not of such Synthetic Security, and the issuer of such Synthetic Security shall be deemed to be the related Reference Obligor. For purposes of the Reinvestment Criteria (other than the Portfolio Percentage Limitations that do not address the rating and maturity of a Collateral Debt Security) and for the purposes of determining the Moody's Rating of a Synthetic Security, such Synthetic Security will be included as a Collateral Debt Security having the characteristics of such Synthetic Security and not of the related Reference Obligation.

"Synthetic Security Counterparty": The entity required to make the payments on a Synthetic Security to the extent the payments are made on the related Reference Obligation; provided, that such entity shall, at the time of purchase of the Synthetic Security, be rated at least "A3" by Moody's and at least "A" by Standard & Poor's and the Rating Agencies shall have confirmed in writing that the purchase of the Synthetic Security issued by such entity shall not cause either Rating Agency to qualify, downgrade or withdraw its then-current ratings on with respect to Standard & Poor's, the Class A Notes, and with respect to Moody's, the Notes; and provided, further, that at the time any Synthetic Security is acquired by the Issuer, the percentage of the Maximum Investment Amount that represents Synthetic Securities entered into by the Issuer with a single Synthetic Security Counterparty will not exceed the individual percentage set forth below for the credit rating of such Synthetic Security Counterparty (or its Affiliates) and the percentage of the Maximum Investment Amount that represents Synthetic Securities entered into by the Issuer with counterparties having the same credit rating will not exceed the aggregate percentage set forth below for such credit rating.

| Long-Term Senior Unsecured Debt Rating by Moody's | Long-Term Senior Unsecured Debt Rating by Standard & Poor's | Individual Counterparty Percentage | Aggregate Counterparty Percentage |
|---|---|---|---|
| Aaa | AAA | 15.0% | 20.0% |
| Aa1 | AA+ | 15.0% | 20.0% |
| Aa2 | AA | 15.0% | 17.5% |
| Aa3 | AA- | 12.5% | 15.0% |
| A1 | A+ | 7.5% | 10.0% |
| A2 or A3 | A | 5.0% | 5.0% |

In addition, at the time the Issuer purchases a Synthetic Security, the number of different Synthetic Security Counterparties, when added to the number of Hedge Counterparties and Securities Lending Counterparties, if any, at any particular time involved in transactions with the Issuer involving the Collateral may not exceed ten (10).

"Synthetic Security Counterparty Defaulted Security": A Synthetic Security (other than a Defaulted Synthetic Security) with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security.

"Tax Lien Asset-Backed Securities":  Structured Finance Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Structured Finance Securities) on the cash flow from tax liens on residential, commercial and other properties for unpaid property taxes and other municipal assessments.

"Timeshare Asset-Backed Securities":  Structured Finance Securities (other than Residential A Mortgage-Backed Securities, Residential B/C Mortgage-Backed Securities and Home Equity Loan Asset-Backed Securities) that entitle the holders thereof to receive payments that depend primarily on the cash flow from residential mortgage loans (secured on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate the proceeds of which were used to purchase fee simple interests in timeshare estates in units in a condominium, generally having the following characteristics: (1) the mortgage loans have standardized payment terms and require minimum monthly payments; (2) the mortgage loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the mortgage loans are repaid; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium and with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling and generally no penalties for early repayment.

"Timing Hedge":  Any timing hedges entered into by the Issuer and a Timing Hedge Counterparty after the Closing Date, as amended from time to time, in order to manage potential mismatches between the timing of receipts of interest on the Collateral Debt Securities and Eligible Investments and the timing of payments due on the Notes pursuant to which the Issuer shall be entitled to receive payments from the related Timing Hedge Counterparty on a certain date in exchange for the Issuer's obligation to make payments to such Timing Hedge Counterparty on one or more Payment Dates to the extent that funds are available therefor pursuant to Section 11.1; provided, that (i) a Rating Agency Confirmation is received with respect to each such Timing Hedge and (ii) each Timing Hedge will contain appropriate limited-recourse and non-petition provisions equivalent to those contained in Section 2.7(k).

"Timing Hedge Counterparty":  Any of one or more institutions (x) whose long-term unsecured debt obligations are rated (directly or by way of guarantee) (or whose counterparty rating is) at least "Aa3" by Moody's (and at least "P-1" if such entity has a short term rating by Moody's) and (y) so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term rating of such entity is at least "A-1" by Standard & Poor's (or, if such institution does not have a short-term rating by Standard & Poor's, the long-term, unsecured debt obligations of which institution are rated (directly or by way of guarantee) (or

whose counterparty rating is) at least "A+" by Standard & Poor's), in each case upon the date of entry into the Timing Hedge.

"Total Redemption Amount":  The meaning specified in Section 9.1(b)(i).

"Transaction Documents":  The meaning specified in Section 7.19(c) hereof.

"Transfer Agent":  The Person or Persons, which may be the Trustee, authorized by the Issuer to exchange or register the transfer of Notes.

"Trustee":  As defined in the first sentence of this Indenture.

"UCC":  The Uniform Commercial Code as in effect from time to time in (i) the State of New York or (ii) any other jurisdiction specified in any Section of this Indenture..

"Uncertificated Security":  The meaning specified in Section 8-102(a)(15) of the UCC.

"Underlying Instrument":  The indenture or other agreement pursuant to which a Pledged Security has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Security or of which the holders of such Pledged Security are the beneficiaries, and any Instrument evidencing or constituting such Pledged Security (in the case of any Pledged Security evidenced by or in the form of an Instrument).

"Uninvested Proceeds":  The net proceeds received by the Issuer on such date from the issuance of the Notes and the Preference Shares to the extent such proceeds have not been (i) invested in Collateral Debt Securities, or (ii) designated as Interest Proceeds pursuant to clauses (g) and (i) of the definition of Interest Proceeds on the Closing Date or, provided a Rating Agency Confirmation is received, on or before the Ramp-Up Effective Date.

"Uninvested Proceeds Account":  The uninvested proceeds account of the Trustee established pursuant to Section 10.2(d).

"U.S. Person":  In reference to Persons who are permitted to own beneficial interests in the Notes, a "U.S. Person" within the meaning of Regulation S under the Securities Act and, in all other cases, (i) a citizen or resident of the United States, (ii) a corporation, partnership or limited liability company organized in or under the laws of the United States (except, in the case of a partnership, to the extent provided in treasury regulations) or (iii) any estate or trust as defined in Section 7701(a)(30)(D) or (E) of the Code, respectively.

"Unregistered Securities":  The meaning specified in Section 5.17(c) hereof.

"Unscheduled Principal Payments":  Any principal payments received as a result of redemptions, optional redemptions, exchange offers, tender offers or other unscheduled payments or prepayments, and unscheduled sinking fund payments with respect to a Collateral Debt Security.

"Valuation Date":  The meaning specified in Section 16.1(j).

"Weighted Average Fixed/Floating Rate Coupon Test":  A test that is satisfied as of any Measurement Date, if (i) the sum of (a) the Weighted Average Fixed Rate Coupon of all Fixed Rate Collateral Debt Securities multiplied by the Fixed Par Amount as of such date, (b) the Weighted Average Floating Rate Coupon of all Floating Rate Collateral Debt Securities multiplied by the Floating Par Amount as of such date and (c) the annual amount of payments expected to be received with respect to all Interest Only Securities is greater than (ii) the sum of (a) the product of the Required Weighted Average Fixed Rate Coupon and the Fixed Par Amount and (b) the product of the Required Weighted Average Floating Rate Coupon and the Floating Par Amount.

For the purposes of the Weighted Average Fixed/Floating Rate Coupon Test, a PIK Security shall be deemed to be a Deferred Interest PIK Security so long as any rated interest thereon has been deferred for at least one payment date (until the payment of rated interest on such PIK Security has resumed and all capitalized and deferred interest has been paid in accordance with the terms of its Underlying Instruments).

"Weighted Average Fixed Rate Coupon":  As of any Measurement Date, the weighted average coupon of all Fixed Rate Collateral Debt Securities.

For purposes of the definition of Weighted Average Fixed Rate Coupon, (i)(x) any Fixed Rate Collateral Debt Security that is the subject of an Asset Specific Hedge shall be considered a Floating Rate Collateral Debt Security bearing interest at a floating rate equal to the implied spread over LIBOR receivable by the Issuer pursuant to such Asset Specific Hedge and (y) any Floating Rate Collateral Debt Security that is the subject of an Asset Specific Hedge shall be considered a Fixed Rate Collateral Debt Security bearing interest at a fixed rate equal to the implied fixed rate receivable by the Issuer pursuant to such Asset Specific Hedge and (ii) the coupon or spread of a Step-Down Bond shall be the smallest coupon or spread applicable on or subsequent to the applicable Measurement Date.

"Weighted Average Floating Rate Coupon":  As of any Measurement Date, the weighted average spread above LIBOR (using with respect to Floating Rate Collateral Debt Securities whose reference index is not LIBOR, the spread over such index, adjusted upward to the extent LIBOR is less than such index and adjusted downward to the extent LIBOR is greater than such index) of all Floating Rate Collateral Debt Securities.

For purposes of the definition of Weighted Average Floating Rate Coupon, (i) (x) any Fixed Rate Collateral Debt Security that is the subject of an Asset Specific Hedge shall be considered a Floating Rate Collateral Debt Security bearing interest at a floating rate equal to the implied spread over LIBOR receivable by the Issuer pursuant to such Asset Specific Hedge and (y) any Floating Rate Collateral Debt Security that is the subject of an Asset Specific Hedge shall be considered a Fixed Rate Collateral Debt Security bearing interest at a fixed rate equal to the implied fixed rate receivable by the Issuer pursuant to such Asset Specific Hedge and (ii) the coupon of a Step-Down Bond shall be the smallest coupon applicable on or subsequent to the applicable Measurement Date.

"Weighted Average Life": On any Measurement Date with respect to any Pledged Security, the number obtained by summing the products obtained by multiplying the (i) the Average Life at such time of each Pledged Security by (ii) the outstanding Principal Balance at such time of all Pledged Securities.

"Weighted Average Life Test": A test which will be satisfied as of any Measurement Date if the Weighted Average Life of all Pledged Securities as of such Measurement Date is less than or equal to the number of years set forth in the definition of "Maximum Permitted Weighted Average Life" opposite to the Closing Date or Payment Date most immediately preceding any Measurement Date.

"Withholding Tax Event": A change in or the adoption of any U.S. or foreign tax statute or treaty, or any change in or the issuance of any regulation (whether final, temporary or proposed), rule, ruling, practice, procedure or any formal or informal interpretation of any of the foregoing, which change, adoption or issuance results in any payments due from obligors or Synthetic Security Counterparties representing in excess of 10% of the Aggregate Principal Amount of the Collateral Debt Securities then Granted as Collateral becoming properly subject to the imposition of U.S. withholding tax. A Withholding Tax Event will also occur (i) in the event that U.S. obligors or U.S. Synthetic Security Counterparties representing in excess of 5% in Aggregate Principal Amount of the Collateral Debt Securities then Granted as Collateral withhold during any 30-day period, for withholding tax purposes, any portion of payments due or (ii) on the effectiveness of any non-U.S. tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation which results in any portion of any payment due from any non-U.S. borrower, Non-U.S. Issuer or non-U.S. Synthetic Security Counterparty of Collateral Debt Securities representing in excess of 10% in Aggregate Principal Amount of the Collateral Debt Securities of non-U.S. borrowers, Non-U.S. Issuers or non-U.S. Synthetic Security Counterparties then pledged as Collateral becoming properly subject to the imposition of non-U.S. withholding tax, unless the issuer of such Collateral Debt Security is required under the terms of the related Underlying Instruments to make "gross-up" payments that cover the full amount of any such non-U.S. withholding tax (including any tax on such additional payments).

"Written Down Security": As of any date of determination, any Structured Finance Security or REIT Security as to which the aggregate par amount of the entire Issue of

such Structured Finance Security or REIT Security and all other securities secured by the same pool of collateral and that rank senior in priority of payment to such Issue exceeds the aggregate par amount of all collateral securing such Issue (excluding defaulted collateral, net of recoveries resulting, or if not yet realized expected to result, from the collection, sale or other disposition of such defaulted collateral).

The Collateral Manager, on behalf of the Issuer, shall determine if a Collateral Debt Security is a Written Down Security as of any date of determination based upon information in the most recent servicing, trustee or other similar report delivered in accordance with the related Underlying Instrument, if any; provided, that if no such information is available after inquiry of the relevant issuer, Servicer, asset manager or any other Person acting in a similar capacity in respect of such Collateral Debt Security, the Collateral Manager will be responsible, under the Collateral Management Agreement, for making such determination, to the extent reasonably practicable and based upon sources of information normally available to it.

"Written Down Security Adjustment Amount":  As of any date of determination, an amount equal to the greater of:

(a) the sum of the following:

(1)     10% multiplied by the portion of the Aggregate Adjustment Amount relating to Written Down Securities with a Moody's Rating of below "Baa3", but at least equal to "Ba3"; plus

(2)     25% multiplied by the portion of the Aggregate Adjustment Amount relating to Written Down Securities with a Moody's Rating of below "Ba3", but at least equal to "B3"; plus

(3)     50% multiplied by the portion of the Aggregate Adjustment Amount relating to Written Down Securities with a Moody's Rating of below "B3";

it being understood that the Aggregate Adjustment Amount relating to Written Down Securities will be allocated between the three categories of ratings described above pro rata based on the aggregate principal amount of Written Down Securities in each such category; and

(b)     the aggregate principal amount (not giving effect to any write downs) of all Written Down Securities minus the Written Down Security Amount.

"Written Down Security Amount":  (a) The principal amount after giving effect to any write downs, including appraisal reductions, specified in the most recent servicing, trustee

or other similar report delivered in accordance with the related underlying instruments or (b) if no such principal amount after giving effect to any write downs or appraisal reductions is specified, the Principal Balance of such Collateral Debt Security (determined without regard to this definition) <u>minus</u> the greater of zero and the product of (1) (x) the product of (I) the aggregate par amount of all defaulted collateral securing such issue <u>multiplied</u> by (II) one <u>minus</u> (A) in the case of any Collateral Debt Security other than a Home Equity Loan Asset-Backed Security, 40%, (B) in the case of a Home Equity Loan Asset-Backed Security, 0% and (C) in the case of any other type of Structured Finance Securities designated as a Specified Type after the date hereof pursuant to clause (i)(31) of the definition thereof, the rate specified for the purpose of this definition when such type is designated a Specified Type in accordance with the definition of "Specified Type" <u>minus</u> (y) the aggregate par amount of all other securities secured by the same pool of collateral that rank junior in priority of payment to such Collateral Debt Security and (2) a fraction the numerator of which is the Principal Balance of such Collateral Debt Security and the denominator of which is the aggregate par amount of all securities part of such issue (in each case, determined without regard to this definition).

"<u>Zero Coupon Bond</u>":  Any Collateral Debt Security (other than a Structured Finance Security) that as of the relevant Measurement Date does not pay a coupon or provide for deferral or capitalization of interest at the option of the issuer; <u>provided</u>, that for the avoidance of doubt, Zero Coupon Bonds will include Collateral Debt Securities which are not as of such date paying a coupon but which may pay a coupon in the future.

Section 1.2    Other Definitional Provisions.

All references in this instrument to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed.  Unless otherwise specified, the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, Subsection or other subdivision.

Section 1.3    Assumptions as to Collateral Debt Securities and Collateral.

(a)    Except as otherwise expressly set forth herein, in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.3 shall apply.

(b)    All calculations with respect to Scheduled Distributions on the Pledged Securities shall be made on the basis of information as to the terms of each such Pledged Security and upon accounting of payments, if any, received on such Pledged Security that are furnished by or on behalf of the issuer.

(c)    For each Due Period, the Scheduled Distributions on any Pledged Security (other than Defaulted Securities, Deferred Interest PIK Securities or other Collateral with a presumed principal amount of zero (other than Interest Only Securities) or other Collateral with respect to which the Collateral Manager has reasonable basis to believe payments will not be received when due, which shall be assumed to have a Scheduled Distribution of zero) shall be the minimum amount (including coupon payments, accrued interest, scheduled principal payments, if any, by way of sinking fund payments (which shall be assumed to be made on a pro rata basis) or other scheduled amortization of principal (excluding any optional redemption), return of principal, and redemption premium, if any) that, if paid as scheduled, will be available in the Collection Accounts at the end of the Due Period.

(d)    Each Scheduled Distribution with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the applicable Collection Account, and to earn interest at the Assumed Reinvestment Rate; provided, that except as expressly set forth herein, Scheduled Distributions shall not include any amount as to which the Collateral Manager or the Issuer has actual knowledge that such amount will not be paid; and provided, further, that if the nominal Due Date for any payment on a Collateral Debt Security occurs on a day during a Due Period that is not a business day under the

applicable Underlying Instrument and as a result such payment is paid and received in the following Due Period, such payment shall be deemed to have been received during the Due Period in which such nominal Due Date falls if such payment is timely made in accordance with the related Underlying Instrument. All funds assumed to earn interest as provided herein shall be assumed to continue to earn interest at the applicable rate until the date on which they are required to be available in the Collection Accounts for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable or otherwise for application in accordance with the terms of this Indenture. Scheduled Distributions of interest on floating rate Pledged Securities shall be calculated using the interest rates applicable thereto as of the date of determination to the extent the interest rate thereon for future periods has not been determined as of such date of determination.

(e)     Notwithstanding anything to the contrary contained in this Indenture, if the Trustee receives an Issuer Order or Issuer Request and also receives a Collateral Manager Order or Collateral Manager Request with respect to the same subject matter, the Issuer Order or Issuer Request, as the case may be, shall supersede any such Collateral Manager Order or Collateral Manager Request and be the controlling order or request hereunder.

(f)     For purposes of any applicable calculation or determination hereunder, the date on which Collateral Debt Securities are deemed to be acquired hereunder shall be the settlement date (and not the trade date) for such acquisition.

ARTICLE  II

THE NOTES

Section 2.1     Forms Generally.

The Class A Notes, the Class B Notes and the Class C Notes and the Trustee's certificate of authentication thereon (the "Certificate of Authentication") shall be in substantially the forms required by this Article II, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the Authorized Officers of the Issuer (in the case of the Class C Notes) or the Co-Issuers (in the case of the Class A Notes and the Class B Notes) executing such Notes as evidenced by their execution of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2    <u>Form of Notes and Certificate of Authentication</u>.

(a)    The form of the Class A Notes, the Class B Note, the Class C1 Notes and the Class C2 Notes issued as Rule 144A Global Notes, including the Certificate of Authentication, shall be as set forth respectively as <u>Exhibits A-1, B-1, C-1 and C-3</u> hereto.  The form of the Class A Notes, the Class B Notes, the Class C1 Notes and the Class C2 Notes issued as Regulation S Global Notes, including the Certificate of Authentication, shall be as set forth respectively as <u>Exhibits A-2, B-2, C-2 and C-4</u> hereto.

(i)    <u>Rule 144A Global Notes</u>.  The Class A Notes, the Class B Notes, the Class C1 Notes and the Class C2 Notes sold in the United States to U.S. Persons pursuant to Rule 144A shall be issued in the form of one or more permanent global Notes in definitive, fully-registered form without interest coupons attached with the applicable legends substantially set forth in the form of <u>Exhibits A-1, B-1, C-1 and C-3</u> hereto, respectively (each, a "Rule 144A Global Note"), which shall be deposited with the Trustee as Custodial Account Securities Intermediary for the Depository and registered in the name of Cede & Co., as nominee of the Depository, duly executed by the Co-Issuers (in the case of the Class A Notes and the Class B Notes) or the Issuer (in the case of the Class C Notes) and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(ii)    <u>Regulation S Global Notes</u>.  The Class A Notes, the Class B Notes, the Class C1 Notes and the Class C2 Notes sold to Non-U.S. Persons in offshore transactions in reliance on Regulation S shall be issued in the form of one or more permanent global Notes in definitive, fully-registered form without interest coupons attached with the applicable legends substantially as set forth in the form of <u>Exhibits A-2, B-2, C-2 and C-4</u> hereto, respectively (each, a "Regulation S Global Note"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as Custodial Account Securities Intermediary for the Depository and registered in the name of Cede & Co., as nominee of the Depository, for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers (in the case of the Class A Notes and the Class B Notes) or the Issuer (in the case of the Class C Notes) and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(b)    <u>Book-Entry Provisions</u>.  This Section 2.2(b) shall apply only to Regulation S Global Notes and Rule 144A Global Notes (collectively, the "Global Notes") deposited with or on behalf of the Depository.  The Co-Issuers (in the case of the Class A Notes and the Class B Notes) or the Issuer (in the case of the Class C Notes) shall execute and the Trustee shall, in accordance with this Section 2.2(b), authenticate and deliver initially one or more Global Notes that (i) shall be registered in the name of the nominee of the Depository for such Global Note or Global Notes and (ii) shall be delivered by the Trustee to the Depository or pursuant to the instructions of the Depository or held by the Trustee's agent as Securities Custodian for the Depository.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, will be applicable to the Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.  Account holders or participants in Euroclear and Clearstream shall have no rights under this Indenture with respect to such Global Notes held on their behalf by the Trustee, as Securities Custodian for the Depository, and the Depository may be treated by the Co-Issuers (in the case of the Class A Notes and the Class B Notes) or the Issuer (in the case of the Class C Notes), the Trustee and any agent of either of the Co-Issuers or the Trustee, as the Holder of such Global Notes for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers (in the case of the Class A Notes and the Class B Notes) or the Issuer (in the case of the Class C Notes), the Trustee, or any agent of either of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and Euroclear, Clearstream and their respective participants, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

(c)    <u>No Definitive Notes</u>.  Except as provided in Section 2.11, owners of beneficial interests in Global Notes representing Class A Notes, Class B Notes, Class C1 Notes or Class C2 Notes will not be entitled to receive physical delivery of Definitive Notes.

(d)    <u>DTC Notice to Investors</u>.  The Issuer shall (i) request of the Depository, and cooperate with the Depository to ensure, that the Depository's security description and delivery order include a "3(c)(7) marker" and confirm that the Depository's user manual contains an accurate description of the restrictions on the holding and transfer of the Notes due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the Investment Company Act, (ii) request of the Depository, and cooperate with the Depository to ensure, that the Depository sent to its Agent Members/Participants in connection with the initial offering of the Notes, a notice substantially in the form attached as <u>Exhibit J</u> hereto, and (iii) request of the Depository, and cooperate with the Depository to ensure, that the Depository's "Reference Directory" includes each Class of

Notes in the listing of 3(c)(7) issues, together with an attached description of the limitations as to the distribution, purchase, sale and holding of each Class of the Notes.

Section 2.3    Note Interest Rate; Stated Maturity; Denominations.  The Notes shall be divided into four (4) designations having original principal amounts, original Note Interest Rates and Stated Maturity Dates as follows:

| Designation | Original Principal Amount as of the Closing Date | Note Interest Rate | Stated Maturity Date |
|---|---|---|---|
| Class A Notes | $250,000,000 | LIBOR plus 0.53%[1] | December 5, 2036 |
| Class B Notes | $21,000,000 | LIBOR plus 0.90%[2] | December 5, 2036 |
| Class C1 Notes | $5,000,000 | LIBOR plus 2.50%[3] | December 5, 2036 |
| Class C2 Notes | $13,000,000 | 7.484%[4] | December 5, 2036 |

The Class A Notes, the Class B Notes and the Class C Notes shall be issuable and transferable in minimum denominations of U.S. $500,000 and integral multiples of U.S. $1,000 in excess thereof (in each case expressed in terms of the principal amounts thereof on the Closing Date).

Section 2.4    Execution, Authentication, Delivery and Dating.

---

[1] Following the Interest Step-Up Date, the Class A Notes will bear additional interest at a rate per annum equal to 0.53% (which additional interest shall not be part of the applicable Note Interest Rate but which shall constitute Increased Margin).

[2] Following the Interest Step-Up Date, the Class B Notes will bear additional interest at a rate per annum equal to 0.90%(which additional interest shall not be part of the applicable Note Interest Rate but which shall constitute Increased Margin).

[3] Following the Interest Step-Up Date, the Class C1 Notes will bear additional interest at a rate per annum equal to 2.50%(which additional interest shall not be part of the applicable Note Interest Rate but which shall constitute Increased Margin).

[4] Following the Interest Step-Up Date, the Class C2 Notes will bear additional interest at a rate per annum equal to 2.50%(which additional interest shall not be part of the applicable Note Interest Rate but which shall constitute Increased Margin).

The Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer thereof (or, in the case of the Class C Notes, by an Authorized Officer of the Issuer only, outside of the United States). The signature of such Authorized Officer(s) on the Notes may be manual or by facsimile.

Notes bearing the manual or facsimile signature of an individual who was at any time an Authorized Officer of either of the Issuer or the Co-Issuer shall bind the Issuer or the Co-Issuer, as applicable, notwithstanding the fact that such individual has ceased to hold such office prior to the authentication and delivery of such Notes or did not hold such office at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Class A Notes and the Class B Notes executed by the Co-Issuers, and the Issuer may deliver the Class C Notes executed by the Issuer, to the Trustee or the Authenticating Agent for authentication; and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise. The signature of the Trustee or the Authenticating Agent shall be manual on each authenticated Note.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the Outstanding principal amount of the Notes so transferred, exchanged or replaced. If any Note is divided into more than one Note in accordance with this Article II, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor in denominations specified by the Holders thereof, provided such denominations meet the minimum denominations and shall in the aggregate be equal to the original principal amount of such divided Note.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or the Authenticating Agent by the manual signature of one of its Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.5    <u>Registration, Registration of Transfer and Exchange</u>.

(a)     The Issuer shall cause to be kept a register (the "Note Register") in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Notes and the registration of transfers of the Notes.  The Trustee is hereby initially appointed "Note Registrar" for the purpose of registering Notes and transfers of such Notes.  The Issuer shall inform the Trustee of any such reasonable procedures it may prescribe; in the absence of any such procedures or in addition thereto, the Trustee may prescribe reasonable procedures for carrying out its function as Note Registrar; provided the same are not in conflict with procedures established by the Issuer.  In all events, the Trustee shall be entitled to maintain at its Corporate Trust Office within the United States such books and records as it may deem necessary or appropriate in respect of the performance of its function as Note Registrar.  In the event that the Trustee is no longer acting in the capacity of the Note Registrar, the Trustee shall promptly inform any such successor Note Registrar of any transfer of record ownership of a Note so that the Note Registrar may register the same in the Note Register; and upon request at any time the Note Registrar shall provide to the Trustee, the Issuer, the Collateral Manager or any Noteholder a current list of Noteholders as reflected in the Note Register.

The Issuer will notify the Trustee in writing of any Notes owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such pledge.  Upon the written request of any Noteholder, the Note Registrar shall promptly provide to such Noteholder a list of all of the existing Noteholders; provided, however, that the Note Registrar shall have no liability to any Person for furnishing the Note Register to any Noteholder.

Subject to the provisions of this Section 2.5, upon surrender for registration of transfer of any Class A Note or Class B Note, the Issuer and the Co-Issuer shall execute, and upon surrender for registration of transfer of any Class C Note, the Issuer shall execute, and the Trustee shall in each case authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same Class, of any authorized denomination and of a like aggregate principal amount.

Subject to the provisions of this Section 2.5, at the option of the Holder, Notes may be exchanged for other Notes of the same Class, in any authorized denominations and of a like aggregate principal amount, upon surrender of the Notes to be exchanged at the Corporate Trust Office of the Trustee or such other office as the Trustee may designate for such purpose.  Whenever any Class A Notes or Class B Notes are so surrendered for exchange, the Issuer and the Co-Issuer shall execute, and whenever any Class C Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall in each case authenticate and deliver, the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers (or, in the case of the Class C

Notes, of the Issuer), evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers (or, in the case of the Class C Notes, to the Issuer) and the Trustee duly executed by the Holder thereof or its attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Co-Issuers (or, in the case of the Class C Notes, the Issuer) and in each case the Trustee, may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

(b)    No Note may be sold or transferred (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act, and would not require the registration of the Co-Issuers under the Investment Company Act and is exempt under applicable state securities laws.  No Note may be offered, sold or delivered at any time within the United States or to, or for the benefit of, U.S. Persons except in accordance with (i) Rule 144A under the Securities Act, to Persons who are both Qualified Institutional Buyers and Qualified Purchasers purchasing for their own account or for the accounts of one or more Persons who are both Qualified Institutional Buyers and Qualified Purchasers for which the purchaser is acting as fiduciary or agent and (ii) the provisions of this Article II.  In addition, no Rule 144A Global Notes may be offered, sold or delivered at any time within the United States or to, or for the benefit of, U.S. Persons unless such Person (A) was not formed for the purpose of investing in either of the Co-Issuers (except when each beneficial owner of the purchaser is a Qualified Purchaser), (B) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (C) is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (D) is not a pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, and in a transaction that may be effected without loss of any applicable Investment Company Act exemption and (E) will provide notice to any subsequent transferee of the transfer restrictions provided in the legend.  The Notes may be sold in offshore transactions to Non-U.S. Persons in reliance on Regulation S under the Securities Act. None of the Co-Issuers, the Trustee or any other Person may register the Notes under the Securities Act or any state securities laws.

(c)    At any time when the Issuer is not subject to Section 13 or 15(d) of the Exchange Act upon the request of any Noteholder, the Issuer shall promptly furnish to such Noteholder or to a prospective purchaser of any Note designated by such

Noteholder, as the case may be, the information which the Issuer determines to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information") in order to permit compliance by such Noteholder with Rule 144A in connection with the resale of such Note by such Noteholder.  Upon request by the Issuer, the Trustee shall cooperate with the Issuer in mailing or otherwise distributing (at the Issuer's expense) to such Noteholders or prospective purchasers, at and pursuant to the Issuer's written direction, the foregoing materials prepared and provided by the Issuer, provided, however, that the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer that such Rule 144A Information was assembled by the Issuer and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(d)     The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of this Section 2.5, the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if an Investor Certificate is specifically required by the terms of this Section 2.5 to be provided to the Trustee by a prospective transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section.

(e)     For so long as any of the Notes are Outstanding, the Issuer shall not issue or permit the transfer of any Issuer Ordinary Shares to U.S. Persons and the Co-Issuer shall not issue or permit the transfer of any stock of the Co-Issuer to U.S. Persons.

(f)     So long as any Global Note remains outstanding and is held by or on behalf of the Depository, transfers of a Global Note, in whole or in part, shall only be made in accordance with Section 2.2(b) and this Section 2.5(f).

(i)     Rule 144A Global Note to Regulation S Global Note.  If a Holder of a beneficial interest in a Rule 144A Global Note representing a Class A Note, Class B Note or Class C Note and deposited with the Depository wishes, at any time, to transfer all or a portion of its interest in such Rule 144A Global Note to a Person who shall take delivery thereof in the form of an interest in a Regulation S Global Note, such Holder, provided such transferee is not a U.S. Person may, subject to the rules and procedures of the Depository, exchange or transfer, or cause the transfer of such interest for an equivalent beneficial interest in the Regulation S Global Note; provided that the remaining principal amount of such Holder's beneficial interest in the Rule 144A Global Note shall either equal zero or meet the applicable minimum denomination set forth in Section 2.3.  Upon receipt by the Trustee, as Note Registrar, of (A) instructions given in accordance

with the Depository's procedures from an Agent Member directing the Trustee, as Note Registrar, to cause to be credited a beneficial interest in a Regulation S Global Note in an amount equal to the principal amount of such Rule 144A Global Note, but not less than the minimum denomination applicable to such Holder's Note held through a Regulation S Global Note, to be exchanged or transferred, (B) a written order containing information regarding the Euroclear or Clearstream account to be credited with such increase and (C) an Investor Certificate in the form of Exhibit E-1 attached hereto given by the Holder of such beneficial interest stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the transferee is not a U.S. Person, and pursuant to and in accordance with Regulation S, the Trustee, as Note Registrar, shall instruct the Depository to reduce the principal amount of such Rule 144A Global Note in accordance with Section 2.11, record the transfer in the Note Register in accordance with Section 2.5(a) and instruct the Depository to increase the principal amount of the Regulation S Global Note by the principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Regulation S Global Note equal to the amount specified in the instructions received pursuant to clause (A) above.  Any purported transfer in violation of the foregoing requirements shall be null and void ab initio, and the Trustee shall not register any such purported transfer and shall not cancel such Rule 144A Global Note.

(ii)    Regulation S Global Note to Rule 144A Global Note.  If a Holder of a beneficial interest in a Regulation S Global Note representing a Class A Note, Class B Note or Class C Note and deposited with the Depository wishes at any time to transfer all or a portion of its interest in such Regulation S Global Note to a Person who shall take delivery thereof in the form of an interest in a Rule 144A Global Note, such Holder may, subject to the rules and procedures of Euroclear, Clearstream or the Depository, as the case may be, exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in a Rule 144A Global Note; provided that the remaining principal amount of such Holder's beneficial interest in the Regulation S Global Note shall either equal zero or meet the applicable minimum denomination set forth in Section 2.3.  Upon receipt by the Trustee, as Note Registrar, of (A) instructions from Euroclear, Clearstream or the Depository, as the case may be, directing the Trustee, as Note Registrar, to cause to be credited a beneficial interest in a Rule 144A Global Note in an amount equal to the beneficial interest in such Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Note held through a Rule 144A Global Note, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depository to be credited with such increase and (B) an Investor Certificate in the form of Exhibit E-2

attached hereto given by the Holder of such beneficial interest stating, among other things, that such Holder reasonably believes that the proposed transferee is both (i) a Qualified Institutional Buyer (or is acquiring the Rule 144A Global Note in reliance on an exemption from registration under the Securities Act provided by Rule 144A thereunder) and (ii) a Qualified Purchaser within the meaning of Section 3(c)(7) of the Investment Company Act who (1) was not formed for the purpose of investing in either of the Co-Issuers (except when each beneficial owner of the purchaser is a Qualified Purchaser), (2) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (3) is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (4) is not a pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, and in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (5) agrees to provide notice to any subsequent transferee of the transfer restrictions provided in the legend and (6) will provide the Issuer from time to time such information as may reasonably be requested to ascertain compliance with such Investor Certificate, then Euroclear, Clearstream or the Trustee, as Note Registrar, as the case may be, shall instruct the Depository to reduce such Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or exchanged in accordance with Section 2.11, and the Trustee shall record the transfer in the Note Register in accordance with Section 2.5(a) and the Trustee, as Note Registrar, shall then instruct the Depository concurrently with such reduction, to credit or cause to be credited to the account of the Person set forth in such instructions, a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

(iii)    <u>Restrictions on U.S. Transfers</u>.  Transfers of interests in any Regulation S Global Note to U.S. Persons shall be limited to transfers made pursuant to the provisions of Section 2.5(f)(ii).

(g)    Each Person who becomes a Holder of the Class A Notes, the Class B Notes, the Class C1 Notes or the Class C2 Notes the represented by an interest in a Rule 144A Global Note will be deemed to have represented and agreed as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S are used as defined therein):

(i)    The Holder (A) is a Qualified Institutional Buyer ("QIB") and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (B) is a Qualified Purchaser and (C) understands the Notes will bear the legend set forth in <u>Exhibits A-1, B-1, C-1 and</u>

103

<u>C-3</u> hereto, as applicable, and will be represented by one or more Rule 144A Global Notes.  In addition, the Holder represents and warrants that it (A) was not formed for the purpose of investing in either of the Co-Issuers (except when each beneficial owner of the Holder is a Qualified Purchaser), (B) has received the necessary consent from its beneficial owners if the Holder is a private investment company formed before April 30, 1996, (C) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25 million in securities of unaffiliated issuers, (D) is not a pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, and in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (E) will provide notice to any subsequent transferee of the transfer restrictions provided in the legend, (F) will hold and transfer in a principal amount of not less than $500,000 for it or for each account for which it is acting and (G) will provide the Issuer from time to time such information as it shall reasonably request in order to ascertain compliance with this paragraph (i).

(ii)      The Holder understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the applicable legend on such Notes as set forth in <u>Exhibits A-1, B-1,C-1 and C-3</u> hereto, as applicable.  The Holder acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes.

(iii)      The Holder understands that in connection with the purchase of the Class A Notes, the Class B Notes or the Class C Notes, as the case may be (<u>provided</u> that no such representations are made with respect to the Collateral Manager by any Affiliate of the Collateral Manager):  (A) none of the Co-Issuers (in the case of the Class A Notes and the Class B Notes), the Issuer (in the case of the Class C Notes), the Initial Purchasers or the Collateral Manager is acting as a fiduciary or financial or investment advisor for such beneficial owner, (B) the Holder is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers (in the case of the Class A Notes and the Class B Notes), the Issuer (in the case of the Class C Notes), the Collateral Manager or the Initial Purchasers other than any statements in a current offering memorandum for such Notes and any representations expressly set forth in a written agreement with such party, (C) the Holder has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed

necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers (in the case of the Class A Notes and the Class B Notes), the Issuer (in the case of the Class C Notes) or the Collateral Manager, (D) the Holder's purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located, (E) the Holder is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act, (F) the Holder has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes, (G) the Holder is not a (1) partnership, (2) common trust fund or (3) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made, (H) the Holder shall not hold any Notes for the benefit of any other Person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the distributions on the Notes, (I) all Notes and Preference Shares (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital and (J) the Holder is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(iv)    In the case of any beneficial owners of Notes, if any part of the assets used by such owner to acquire and hold such Notes constitutes assets of any Plan, then one or more statutory or administrative exemptions applies such that the acquisition and holding of such Notes by such owner does not and will not constitute or otherwise result in a non-exempt prohibited transaction in violation of Section 406 or 407 of ERISA or Section 4975 of the Code (or a similar law to which any such Plan may be subject).

(v)    The Holder understands that the Issuer may demand that any Holder of Rule 144A Global Notes who is determined not to be both a QIB and a Qualified Purchaser at the time of acquisition of such Notes to sell the Notes (A) to a Person who is both a QIB and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (B) to a Person who will take delivery of the Holder's Rule 144A Global Notes in the form of an interest in a Regulation S Global Note and who is not a U.S. Person in a transaction meeting the requirements of Regulation S and, if the holder does not comply with such demand within 30 days thereof, the Issuer may sell such Holder's interest in the Note.

(vi)    The Holder acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Class A Notes, the Class B Notes and the Class C Notes will be treated as indebtedness of the Issuer, and the Preference Shares will be treated as equity in the Issuer; the Holder agrees to such treatment and agrees to take no action inconsistent with such treatment.

(vii)    The Holder is aware that, except as otherwise provided in this Indenture, the Class A Notes, the Class B Notes or the Class C Notes being sold to it will be represented by one or more Rule 144A Global Notes, and that beneficial interests therein may be held only through the Depository.

(viii)    The Holder agrees that it will not offer or sell, transfer, assign, or otherwise dispose of an Notes or any interest therein except (x) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state securities laws or the applicable laws of any other jurisdiction and (y) in accordance with the provisions of this Indenture, to which provisions it agrees it is subject.

(ix)    The Holder understands that the Co-Issuers, the Trustee, the Initial Purchasers and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Holder hereby consents to such reliance.

(h)    Each Person who becomes a Holder of the Class A Notes, the Class B Notes and the Class C Notes represented by an interest in a Regulation S Global Note will be deemed to have made the representations set forth in clauses (iii), (iv), (vi), (viii) and (ix) of Section 2.5(g) and to have further represented as follows:

(i)    The Holder is aware that the sale of Notes to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on Regulation S will bear the legend set forth in Exhibits A-2, B-2, C-2 and C-4 hereto, as applicable, and be represented by one or more Regulation S Global Notes. The Notes so represented may not at any time be held by or on behalf of U.S. Persons as defined in Regulation S under the Securities Act. The Holder and each beneficial owner of the Notes that it holds is not, and will not be, a U.S. Person as defined in Regulation S under the Securities Act, and its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located.

(ii)    Such Holder, if it is not a "U.S. person" as defined in Section 7701(a)(30) of the Code, is not acquiring any Note as part of a plan to reduce,

avoid or evade U.S. federal income taxes owed, owing or potentially owed or owing.

(iii)     The Holder is aware that, except as otherwise provided in this Indenture, the Notes being sold to it will be represented by one or more Regulation S Global Notes, and that in each case beneficial interests therein may be held only through Euroclear or Clearstream.

(iv)     The purchaser understands that the Issuer may demand that any Holder of Regulation S Global Notes who is determined to be a U.S. Person sell the Notes (A) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S or (B) to a Person who will take delivery of the Holder's Regulation S Global Notes in the form of an interest in a Rule 144A Global Note and who is both a QIB and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may sell such Holder's interest in the Note.

(i)     Any purported transfer of a Note not in accordance with this Section 2.5 shall be null and void and shall not be given effect for any purpose hereunder.

Section 2.6     Mutilated, Defaced, Destroyed, Lost or Stolen Notes.

If (i) any mutilated Note is surrendered to the Trustee, Transfer Agent, Co-Issuer or Issuer, or the Issuer and the Trustee receive evidence to their reasonable satisfaction of the destruction, loss or theft of any Note and (ii) there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth of at least U.S. $200,000,000 being deemed sufficient to satisfy such security or indemnity requirement), then, in the absence of notice to the Co-Issuers (or, in the case of the Class C Notes, the Issuer) or the Trustee that such Note has been acquired by a bona fide purchaser, the Co-Issuers (or, in the case of the Class C Notes, the Issuer) shall execute and, upon a written request therefor by the Co-Issuer or the Issuer, as applicable, the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class, tenor and principal amount, bearing a number not contemporaneously outstanding.  If, after the delivery of such new Note, a protected purchaser of the original Note in lieu of which such new Note was issued presents such original Note for payment, the Issuer and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking title therefrom, except a protected purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Co-Issuers (or, in the case of the Class C Notes, the Issuer) or the Trustee in connection therewith.  If any such mutilated, defaced, destroyed, lost or stolen Note shall have become or

107

shall be about to become due and payable in full, or shall have been called for redemption in full, instead of issuing a new Note, the Co-Issuers or the Issuer, as applicable, may pay such Note without surrender thereof, except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.6, the Issuer, the Co-Issuer or the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed or any other reasonable expense in relation thereto.

Every new Note issued pursuant to this Section 2.6 in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Co-Issuer or the Issuer, as applicable, whether or not the mutilated, defaced, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section 2.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.7    Payments on the Notes.

(a)    The Class A Notes, the Class B Note, the Class C1 Notes and the Class C2 Notes shall accrue interest during each Interest Period applicable to such Notes as set forth in Section 2.3. Subject to the availability of funds and to the Priority of Payments, interest on the Class A Notes, the Class B Notes and the Class C Notes shall be due and payable on each Payment Date; provided, that (i) payment of interest on the Class B Notes is subordinated to the payment of interest due and payable on the Class A Notes together with Defaulted Interest thereon, if any, and interest on such Defaulted Interest (except that the payment of any Class A Note Increased Margin is subordinated to the payment on each Payment Date of the interest due and payable on the Class B Notes and the Class C Notes (other than Class B Note Increased Margin and Class C Note Increased Margin)), (ii) payment of interest on the Class C Notes is subordinated to the payment of the interest due and payable on the Class A Notes and the Class B Notes together with Defaulted Interest thereon, if any, and interest on such Defaulted Interest (except that the payment of any Class A Note Increased Margin and Class B Note Increased Margin is subordinated to the payment on each Payment Date of the interest due and payable on the Class C Notes, including Class C Deferred Interest and interest thereon (other than Class C Note Increased Margin)) and (iii) the application of Excess Proceeds to make deposits to the Preference Share Distribution Account is subordinated to the payment of the interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes together with Defaulted Interest thereon, if any, Class C Deferred Interest, if any, and interest on such Class C Deferred Interest, if any, Increased Margin, if any, and all other amounts payable in accordance with the Priority of Payments; and provided further, that

payments of interest on the Class A Notes, the Class B Notes and the Class C Notes and the application of Excess Proceeds to make deposits to the Preference Share Distribution Account are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments.

So long as any Class A Notes or Class B Notes are Outstanding (other than solely in respect of Class A Note Increased Margin or Class B Note Increased Margin, if any), any shortfall in the payment of the interest due on the Class C1 Notes or Class C2 Notes, as applicable, as a result of the operation of the Priority of Payments on any Payment Date (the "Class C Deferred Interest") shall not be considered "due and payable" until the Payment Date on which such interest is available to be paid in accordance with the Priority of Payments.  Class C Deferred Interest accrued to any Payment Date shall bear interest at the applicable Class C Note Interest Rate (plus, after the Interest Step-Up Date, the applicable Class C Note Increased Margin), and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Any Class C Deferred Interest and any interest accrued on any interest so deferred will not be added to principal of the Class C Notes but will accrue interest at the applicable Class C Note Interest Rate (plus, after the Interest Step-Up Date, the applicable Class C Note Increased Margin).

Interest will cease to accrue on each Class A Note, Class B Note and Class C Note, or in the case of a partial repayment, on such part, from the date of repayment or the Stated Maturity Date unless payment of principal is improperly withheld or unless Default is otherwise made with respect to such payments.  To the extent lawful and enforceable, (x) interest shall accrue on any Defaulted Interest on the Class A Notes at the Class A Note Interest Rate until paid, (y) interest shall accrue on any Defaulted Interest on the Class B Notes at the Class B Note Interest Rate until paid and (z) interest shall accrue on any Defaulted Interest (and on any Class C Deferred Interest) on the Class C Notes at the applicable Class C Note Interest Rate until paid as provided herein.  The Class C Deferred Interest accrued to any Payment Date shall bear interest at the Class C Note Interest Rate and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The Class A Note Increased Margin, Class B Note Increased Margin and Class C Note Increased Margin not paid when due by reason of the Priority of Payments shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Interest payments on the Class C1 Notes and the Class C2 Notes shall rank pari passu with each other.  No interest will accrue with respect to any Increased Margin which is not paid on any Payment Date in accordance with the Priority of Payments.

(b)    The principal of each Note shall be due and payable no later than the Stated Maturity Date thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise;

provided, that so long as any Class A Notes are Outstanding, except as provided in Article IX and the Priority of Payments, the payment of principal of the Class B Notes and the Class C Notes (x) may only occur after principal of the Class A Notes has been paid in full and (y) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes (other than any Class A Note Increased Margin) and certain other amounts payable in accordance with the Priority of Payments; provided, further, that so long as any Class A Notes or Class B Notes are Outstanding, except as provided in Article IX and the Priority of Payments, the payment of principal of the Class C Notes (x) may only occur after principal of the Class A Notes and Class B Notes has been paid in full and (y) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes (other than any Class A Note Increased Margin) and Class B Notes (other than any Class B Note Increased Margin) and certain other amounts payable in accordance with the Priority of Payments; and any payment of principal of any Class of Notes (other than the most senior Class of Notes then Outstanding) which is not paid, in accordance with the Priority of Payments, on any Payment Date shall not be considered "due and payable" for purposes of Section 5.1(b) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments; and provided, further, that the application of Excess Proceeds to make deposits to the Preference Share Distribution Account to pay dividends or any final distribution on the Preference Shares is subordinated to the payment in full of the principal of and interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes (as well as certain other amounts pursuant to Section 11.1) on any particular Payment Date.  Principal payments on the Class C1 Notes and the Class C2 Notes shall rank pari passu with each other.

(c)    So long as the Coverage Tests are met, principal will not be payable on any Class of Notes except (i) upon the occurrence of a redemption pursuant to Section 9.1 or a Special Amortization pursuant to Section 9.6, (ii) upon the occurrence of an Effective Date Ratings Downgrade and (iii) after the Reinvestment Period, on each Payment Date, principal will be payable from Principal Proceeds and, at the option of the Collateral Manager, Interest Proceeds, in accordance with the Priority of Payments.

On any Payment Date on which the Coverage Tests are not satisfied, principal payments on the Notes will be made pursuant to Section 9.5 (subject to the Priority of Payments as set forth in Section 11.1).

(d)    As a condition to the payment of principal of and interest and Redemption Premium, if applicable, on any Note without the imposition of U.S. withholding tax, the Co-Issuers (in the case of the Class A Notes and the Class B Notes) or the Issuer (in the case of the Class C Notes) shall require certification acceptable to them to enable the Co-Issuers or the Issuer, as applicable, the Trustee or any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments in respect of such Note under any present or future

law or regulation of the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirement under any such law or regulation.

(e)      Payments in respect of principal of and interest and Redemption Premium, if applicable, on any Note shall be payable by wire transfer, as directed by the Issuer, in immediately available funds to a United States dollar account maintained by the Depository or its nominee with respect to any Global Note and to the Holder or its designee with regards to a Definitive Note; provided, that if appropriate instructions for any such wire transfer are not received at least fifteen (15) Business Days prior to the relevant Payment Date, then such payment shall be made by check drawn on a United States bank mailed to the address of the Holder specified in the Note Register as of the Record Date applicable to such Payment Date.  The Co-Issuers (or the Issuer, in the case of the Class C Notes) expect that the Depository, or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note held by the Depository or its nominee shall immediately credit the applicable Agent Members' accounts with payment in amounts proportionate to the respective beneficial interests in such Global Note as shown on the records of the Depository or its nominee.  The Co-Issuers (or the Issuer, in the case of the Class C Notes) also expect that payments by Agent Members to owners of beneficial interests in such Global Note held through Agent Members shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers.  Such payments shall be the responsibility of the Agent Members.  Upon final payment due on the Final Maturity Date of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee on or prior to such Final Maturity Date; provided, however, that if the Trustee and the Co-Issuers (or the Issuer, as the case may be) shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Issuer, as applicable, or the Trustee that the applicable Note has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender.  None of the Co-Issuers, the Trustee, the Collateral Manager, the Initial Purchasers or any Paying Agent will have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, the Depository or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Regulation S Global Note or a Rule 144A Global Note.  In the case where any final payment of principal and interest is to be made on any Note (other than on the Stated Maturity Date thereof), the Co-Issuers (or the Issuer, in the case of the Class C Notes) or, upon Issuer Request, the Trustee, in the name and at the expense of the Co-Issuers or the Issuer, as applicable, shall, not more than thirty (30) nor less than ten (10) days (or twenty (20) days in the case of redemption) prior to the date on which such payment is to be made, mail (by first-class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing in the Note Register, a notice which shall state the date on which such payment will be made, the amount of such

payment per U.S. $500,000 original principal amount of Notes and shall specify the place where such Notes may be presented and surrendered for such payment.

(f)    Interest and principal payable in respect of the Notes of any Class on any Payment Date shall be paid to the Holders of the Notes of such Class as of the related Record Date.

(g)    Payment of any Defaulted Interest may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable to the Trustee.

(h)    Interest on the Floating Rate Notes (and interest on any Defaulted Interest in respect thereof) shall be computed for each Interest Period on the basis of a 360-day year and the actual number of days in such Interest Period.  Interest on the Fixed Rate (and interest on any Defaulted Interest in respect thereof) will be computed on the basis of a 360 day year consisting of twelve 30 day months.

(i)    If any Payment Date or any other date for the payment of the principal of, or interest on, or any other amount payable on or in respect of, any Note is not a Business Day, then payment need not be made on such date, but shall be made on the next succeeding Business Day with the same force and effect as if made on the nominal date of any such Payment Date or other date for the payment of the principal of, or interest on, or any other amount payable on or in respect of, any Note, as the case may be, and no additional interest shall accrue for any period as a result of such payment being made on the next succeeding Business Day.

(j)    All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Optional Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(k)    Notwithstanding any other provision of this Indenture, the Notes or any Hedge Agreement or Synthetic Security or Securities Lending Agreement or otherwise, the obligations of the Co-Issuers hereunder or thereunder are limited-recourse debt obligations of the Issuer and, in the case of the Class A Notes and the Class B Notes, non-recourse debt obligations of the Co-Issuer payable solely from the Collateral, and following realization of the Collateral any claims of the Noteholders, the Trustee and any Hedge Counterparty, Synthetic Security Counterparty or Securities Lending Counterparty shall be extinguished and shall not revive thereafter and neither the Trustee nor any Noteholder nor any Hedge Counterparty, Synthetic Security Counterparty or Securities Lending Counterparty shall be obliged or entitled to take any further steps against either

of the Co-Issuers or their other assets to recover any sums due but still unpaid in respect of this Indenture, the Notes, any Hedge Agreement, Synthetic Security, Securities Lending Agreement or otherwise.  In particular, neither the Trustee nor any Noteholder nor any Hedge Counterparty, Synthetic Security Counterparty or Securities Lending Counterparty shall be entitled to petition or take any other steps for the winding-up of the Issuer or the Co-Issuer in relation to any such sums or otherwise for a period of one year and one day (or, if longer, the then applicable preference period under the Bankruptcy Law) after payment in full of the Notes nor shall any of them have any claim in respect of any such sums in respect of any assets of the Issuer or the Co-Issuer other than the Collateral.  No recourse shall be had for the payment of any amount owing in respect of the Notes, this Indenture, any Hedge Agreement, Synthetic Security, Securities Lending Agreement or otherwise against any officer or Authorized Officer, member, director, employee, security holder or incorporator of the Co-Issuers or their respective successors or assigns for any amounts payable under the Notes or this Indenture, any Hedge Agreement, Synthetic Security, Securities Lending Agreement or otherwise.  It is understood that the foregoing provisions of this paragraph shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished or (iii) impair the right or recourse of a Preference Shareholder to any property or assets of the Issuer, if any, which are not subject to this Indenture in order to satisfy any deficiency in the application of Available Funds to make a deposit to the Preference Share Distribution Account to pay dividends and any final distribution on the Preference Shares after realization and distribution of all proceeds of the Collateral to all Noteholders (which in the case of the payment of dividends on the Preference Shares is agreed by the parties not to receive a stated rate of dividends but rather shall receive the amounts payable to the Preference Shares in accordance with Section 11.1 and Cayman Islands law), provided, that in no event shall a Preference Shareholder have any recourse to any Excepted Property.  It is further understood that the foregoing provisions of this paragraph shall not limit the right of any Person to name the Co-Issuers (or the Issuer, in the case of the Class C Notes) as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person.

(l)     Subject to the foregoing provisions of this Section 2.7 and the provisions of Sections 2.5 and 2.6, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal that were carried by such other Note.

(m)    For so long as any of the Notes are listed on any stock exchange, to the extent required by the rules of such exchange, the Co-Issuers or the Issuer, as applicable, or, upon Issuer Request, the Trustee, in the name and at the expense of the Co-Issuers, shall notify such stock exchange in the event that the Notes do not receive scheduled payments of principal or interest on any Payment Date.

Section 2.8    Persons Deemed Owners.

Except as may be otherwise expressly agreed, prior to due presentment for registration of transfer of any Note, the Co-Issuers, the Trustee and the Collateral Manager, and any agent of the Co-Issuers, the Trustee or the Collateral Manager shall treat the Person in whose name any Note is registered as it appears in the Note Register as the owner of such Note for the purpose of receiving payments of principal, interest or any other amounts in respect of such Note and for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Co-Issuer, the Trustee or the Collateral Manager, nor any agent of any of them, shall be affected by notice to the contrary; provided, however, that the Depository shall be deemed the owner of the Global Notes, and owners of beneficial interests in Global Notes shall not be considered the owners of any Notes for the purpose of receiving notices.

Section 2.9    Cancellation.

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed destroyed, lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee on behalf of the Issuer and shall be promptly canceled by the Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Collateral Manager shall direct by a Collateral Manager Order that they be returned to the Issuer. Any Notes purchased by the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

Section 2.10    Additional Issuances. Notwithstanding the foregoing, additional Notes of any one or more Classes, in excess of the limits specified in Section 2.3 above, are hereby authorized at the discretion of the Collateral Manager and may be authenticated, delivered and sold on or before the Payment Date occurring in December 2006 so long as the Reinvestment Period has not terminated prior to such date; provided, that the net proceeds from the issuance of the additional Notes are used to purchase additional Collateral and the following conditions are met:  (i) a Majority of the Preference Shares approve; (ii) the Aggregate Outstanding Amount of such additional Notes of any Class may not exceed 100% of the Aggregate Outstanding Amount of such Class determined (without reference to such additional Notes) as of the Closing Date; (iii) the terms of such additional Notes are substantially identical to the terms of the previously issued Notes of the related Class (except for issue price, interest rate and first Payment Date) and the terms of the Preference Shares to be issued simultaneously therewith pursuant to the Issuer

Charter and the Preference Share Paying Agency Agreement must be substantially identical to the terms of the previously issued Preference Shares; (iv) the Co-Issuers or the Issuer, as the case may be, shall have received a Rating Agency Confirmation with respect to such additional issuance; (v) the issuance of additional Notes and Preference Shares must be proportional across all Classes of Notes and Preference Shares based on the initial amount of each Class of Notes or the Preference Shares; (vi) an Opinion of Counsel must be delivered to the Trustee to the effect that (A) neither the Issuer nor the Co-Issuer will be required, as a result of such additional issuance of Notes, to be registered as an investment company under the Investment Company Act, (B) such additional issuance of Notes will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (C) such additional issuance of Notes would not cause Holders of the Notes previously issued to be deemed to have sold or exchanged such Notes under Section 1001 of the Code and (D) the additional Class A Notes and Class B Notes will be debt and Class C Notes should be debt for U.S. Federal income tax purposes; and (vii) an opinion of counsel must be delivered to the Trustee to the effect that neither the Issuer nor any portion of the Collateral will be treated as a "taxable mortgage pool for U.S. federal income tax purposes".  Notwithstanding anything in this Section 2.10 to the contrary, the Issuer shall be entitled to issue additional Preference Shares pursuant to the Issuer Charter and the Preference Share Paying Agency Agreement without issuing additional Notes simultaneously therewith pursuant to this Section 2.10, provided, that any additional issuance of Preference Shares shall be subject to the applicable conditions set forth in the Issuer Charter and the Preference Share Paying Agency Agreement and will be required to satisfy the conditions set forth in clauses (i), (iii) and (iv), subclauses (A) and (B) of clause (vi) and clause (vii).

Any such additional Notes shall be executed by the Co-Issuers (or in the case of additional Class C Notes, the Issuer) and shall be authenticated and delivered by the Trustee upon the Issuer's written request; and in such event, the Trustee shall be entitled to receive an Officer's Certificate of the Issuer and an Opinion of Counsel to the effect that such additional issuance is in compliance with the requirements hereof and all conditions precedent set forth in this Indenture applicable to such issuance of Notes have been satisfied or complied with.

Section 2.11    Global Notes.

(a)    A Global Note (representing a beneficial interest in the Class A Notes, the Class B Notes or the Class C Notes) deposited with the Depository pursuant to Section 2.2 shall be transferred to the beneficial owners thereof in the form of Definitive Notes only if such transfer complies with Section 2.5 of this Indenture and either (i) the Depository notifies the Trustee that it is unwilling or unable to continue as Depository for such Global Note or if at any time the Depository, Euroclear or Clearstream, to the extent applicable to such Global Note, ceases to be a Clearing Agency and, in each case a successor depository is not appointed by the Trustee within 90 days after such notice or (ii) as a result of any amendment to or change in the laws or regulations of the Cayman Islands, or of any authority therein or thereof having power to tax, or in the interpretation or administration of such laws or regulations which become effective on or after the

Closing Date, the Issuer, the Trustee or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Global Notes which would not be required if the Global Notes were not represented by global notes.

(b)    Any Rule 144A Global Note or any Regulation S Global Note that is transferable to the beneficial owners thereof pursuant to this Section 2.11 (the "Rule 144 Definitive Notes" or the "Regulation S Definitive Notes," respectively and collectively, the "Definitive Notes") shall be surrendered by the Depository to the Trustee's Corporate Trust Office or to an office or agency of the Issuer maintained in the Borough of Manhattan, The City of New York (a "New York Presenting Agent") to be so transferred, in whole or from time to time in part, without charge.  The Co-Issuers (or the Issuer, in the case of the Class C Notes) shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of certificated notes of authorized denominations (pursuant to instruction of the Depository).  The Issuer hereby appoints First Union National Bank, 599 Lexington Avenue, 22nd Floor, New York, New York 10022; Attention: Madison Avenue Structured Finance CDO I, Limited as the initial New York Presenting Agent.  Any portion of a Global Note transferred pursuant to this Section 2.11 shall be executed, authenticated and delivered only in the minimum denominations set forth in Section 2.3 and integral multiples of the amounts set forth in Section 2.3.  Any Definitive Note delivered in exchange for an interest in a Global Note shall bear the legend set forth in <u>Exhibit A-1, A-2, B-1, B-2, C-1, C-2, C-3 or C-4</u> hereto, as applicable, and shall be subject to the transfer restrictions referred to in such legends.  The Holder of such a registered individual Note may transfer such Note by surrendering it at the office or agency maintained by the Co-Issuers for this purpose in New York, New York, which initially will be the office of the New York Presenting Agent or at the office of any Paying Agent.

(c)    Subject to the provisions of paragraph (b) of this Section 2.11, the Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)    In the event of the occurrence of either of the events specified in paragraph (a) of this Section 2.11, the Co-Issuers (or the Issuer, in the case of the Class C Notes) shall promptly make available to the Trustee a reasonable supply of Definitive Notes in definitive, fully-registered form without interest coupons attached.

Pending the preparation of Definitive Notes pursuant to this Section 2.11, the Co-Issuers or the Issuer, as applicable, may execute, and upon Issuer Order the Trustee shall authenticate and deliver, temporary Definitive Notes that are printed, lithographed, typewritten, mimeographed or otherwise reproduced in any authorized denomination, substantially of the

tenor of the Definitive Notes in lieu of which they are issued and with such appropriate insertions and omissions, as conclusively evidenced by their execution of such Notes.

If temporary Definitive Notes are issued, the Co-Issuers (or the Issuer, in the case of the Class C Notes) will cause Definitive Notes to be prepared without unreasonable delay. The Definitive Notes shall be printed, lithographed or engraved, or provided by any combination thereof, or in any other manner permitted by the rules and regulations of any applicable securities exchange, all as determined by the Officers executing such Definitive Notes.  After the preparation of Definitive Notes, the temporary Definitive Notes shall be exchangeable for Definitive Notes upon surrender of the temporary Definitive Notes at the office of the Trustee or the New York Presenting Agent maintained for such purpose, without charge to the Holder. Upon surrender for cancellation of any one or more temporary Definitive Notes, the Co-Issuers or the Issuer, as applicable, shall execute, and the Trustee shall authenticate and deliver, in exchange therefor, the same aggregate principal amount of Definitive Notes of authorized denominations.  Until so exchanged, the temporary Definitive Notes shall in all respects be entitled to the same benefits under this Indenture as Definitive Notes.

Section 2.12    Notes Beneficially Owned by Person Not QIB/Qualified Purchaser.

(a)    Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any Global Notes or Definitive Notes to a U.S. Person that is not both a Qualified Purchaser and a QIB shall be null and void ab initio and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)    If any U.S. Person (as defined in Regulation S) that is not both a Qualified Purchaser and a QIB at the time it acquires an interest in a Rule 144A Global Note or Rule 144A Definitive Note shall become the beneficial owner of any Rule 144A Global Note or Rule 144A Definitive Note or if any U.S. Person (as  defined in Regulation S) becomes the beneficial owner of any Regulation S Global Note or Regulation S Definitive Note (any such Person, a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such Person is a Non-Permitted Holder by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice.  If such Non-Permitted Holder fails to transfer its Notes, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Notes or interest in Notes to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose.  The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes to the highest such bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined

by it in its sole discretion.  The Holder of each Note, the Non-Permitted Holder and each other Person in the chain of title from the Holder to the Non-Permitted Holder, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale, shall be remitted to the Non-Permitted Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and neither the Issuer nor the Trustee shall be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

## ARTICLE  III

## CONDITIONS PRECEDENT, AUTHENTICATION AND DELIVERY OF NOTES

Section 3.1    <u>General Provisions</u>.

On the Closing Date, the Notes shall be executed by the Co-Issuers (or in the case of the Class C Notes, by the Issuer) and delivered to the Trustee for authentication on behalf of the Issuer or Co-Issuer, as appropriate, and thereupon the same shall be authenticated and delivered by the Trustee upon the Issuer's written request and upon compliance with the conditions of Section 3.2, and upon receipt by the Trustee of the following:

(a)    an Officer's Certificate of each of the Issuer and the Co-Issuer (i) evidencing the authorization by board resolution of (1) the execution and delivery, with respect to the Issuer, of this Indenture, the Collateral Management Agreement, any Hedge Agreements, the Collateral Administration Agreement, the Administration Agreement, the Preference Share Paying Agency Agreement, the Purchase Agreement, the MetLife Sale Agreement, the Lehman Sale Agreement, the Securities Account Control Agreement and any other related transaction documents, and, with respect to the Co-Issuer, of this Indenture and any other related transaction documents and (2) the execution, authentication and delivery, in the case of the Issuer, of the Class A Notes, the Class B Notes and the Class C Notes and the execution and delivery, in the case of the Issuer, of the Preference Shares and, with respect to the Co-Issuer, the execution, authentication and delivery of the Class A Notes and the Class B Notes, and in each case, specifying the Stated Maturity Date, original Aggregate Outstanding Amount and Note Interest Rate of each Class of Notes to be authenticated and delivered and (ii) certifying that (1) the attached copy of the resolutions of the board of directors of the Issuer or the Co-Issuer, as applicable, is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Authorized Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)      either (i) a certificate of each of the Issuer and the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Co-Issuers to the effect that the authorization, approval or consent of no other governmental body is required for the valid issuance of the Class A Notes, the Class B Notes, the Class C Notes and the Preference Shares with respect to the Issuer and the Class A Notes and the Class B Notes with respect to the Co-Issuer, or (ii) an Opinion of Counsel of the Co-Issuers to the effect that no consent or approval of, or other action by, any administrative or governmental body which has not been obtained or taken is required for the valid issuance of the Class A Notes, the Class B Notes, the Class C Notes and the Preference Shares, with respect to the Issuer, and the Class A Notes and the Class B Notes, with respect to the Co-Issuer; provided, that the opinions of Skadden, Arps, Slate, Meagher & Flom LLP, special U.S. counsel to the Co-Issuers, and Maples and Calder, Cayman Islands counsel to the Issuer, substantially in the forms of Exhibits G and H hereto, respectively, shall satisfy this subclause (ii);

(c)      opinions of Skadden, Arps, Slate, Meagher & Flom LLP, special U.S. counsel to the Co-Issuers, dated the Closing Date, substantially in the form of Exhibit G attached hereto and relating to (i) certain corporate matters, (ii) the necessary events upon the occurrence of which the security interest in the Collateral Granted to the Trustee by this Indenture shall be a valid, perfected first-priority security interest and (iii) certain tax matters;

(d)      an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit H attached hereto;

(e)      an Officer's Certificate or Certificates stating that neither of the Co-Issuers (to the best of their respective knowledge) is in Default under this Indenture and that the issuance of the Class A Notes, the Class B Notes, the Class C Notes and the Preference Shares, with respect to the Issuer, and the Class A Notes and the Class B Notes, with respect to the Co-Issuer, will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer or the Co-Issuer is a party or by which it is bound or the certificate of incorporation, the by-laws or any board resolutions of the Co-Issuer, or any order of any court or administrative agency entered in any Proceeding to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound or to which the Issuer or the Co-Issuer, as applicable, is subject; provided, that all conditions precedent provided in this Section 3.1 and all requirements under Section 3.2 hereof and all conditions precedent otherwise provided in this Indenture relating to the authentication and delivery of the Class A Notes, the Class B Notes and/or the Class C Notes applied for and in the Preference Share Paying Agency Agreement relating to the issuance and delivery of the Preference Shares, have been complied with;

(f)      an Accountants' Certificate, satisfactory in form and substance to the Issuer and the Collateral Manager, (i) confirming the information with respect to each initial Collateral Debt Security (including any initial Collateral Debt Security which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date) attached hereto as <u>Schedule A</u> and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified by them, (ii) confirming the calculation of the Portfolio Percentage Limitations, the Moody's Maximum Rating Distribution Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Weighted Average Fixed/Floating Rate Coupon Test, the Weighted Average Life Test and the Coverage Tests with respect to the initial Collateral Debt Securities and (iii) specifying the procedures undertaken by them to review data and computations relating to the foregoing;

(g)      an executed counterpart of the Collateral Management Agreement, any outstanding Hedge Agreements, the Collateral Administration Agreement and the Administration Agreement;

(h)      a request from the Issuer and the Co-Issuer directing the Trustee to authenticate the Class A Notes and the Class B Notes, and an Issuer Request directing the Trustee to authenticate the Class C Notes in the amounts set forth therein, registered in the name(s) set forth therein or as otherwise provided to the Trustee by the Issuer or at its direction, or by the Co-Issuers at their direction, as the case may be, and to make delivery thereof to the Issuer or as it may otherwise direct therein or to the Co-Issuers or as they may otherwise direct, as the case may be;

(i)      an Officer's Certificate from the Collateral Manager dated the Closing Date (i) confirming that <u>Schedule A</u> attached to this Indenture correctly lists the initial Collateral Debt Securities to be Granted to the Trustee on the Closing Date pursuant to Section 3.2(a) hereof (including any initial Collateral Debt Securities which the Issuer has entered into commitments to purchase for settlement on or following the Closing Date); (ii) stating that each such initial Collateral Debt Security satisfies the requirements of the definition of Collateral Debt Security in Section 1.1; (iii) stating that the Aggregate Collateral Balance of such initial Collateral Debt Securities is at least equal to or greater than U.S. $256,748,551; and (iv) confirming that the Accountants' Certificate delivered pursuant to Section 3.1(f) hereof is acceptable to it in form and substance; and

(j)      such other documents as the Trustee may reasonably require.

Section 3.2      <u>Security for Notes</u>.

On the Closing Date, except as otherwise provided in this Section 3.2, the following conditions shall have been satisfied by the Issuer and/or the Co-Issuer:

(a)     Delivery of Initial Collateral Debt Securities.  The initial Collateral Debt Securities acquired prior to or on the Closing Date shall have been delivered to the Trustee on the Closing Date, and the initial Collateral Debt Securities which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date shall be delivered to the Trustee when acquired in accordance with Section 3.3 hereof, and such initial Collateral Debt Securities shall represent the expected total portfolio of Collateral Debt Securities on the Closing Date. The Grant pursuant to the Granting Clauses of this Indenture and delivery of the Pledged Securities in accordance with Section 3.3(c) or (d) hereof shall result in a valid, perfected first- priority security interest in favor of the Trustee for the benefit of the Noteholders and the Hedge Counterparty, and if any such Pledged Securities are held through a Securities Intermediary, delivery shall be deemed to have occurred upon receipt of evidence satisfactory to the Trustee that such Pledged Securities have been credited to the Custodial Account in accordance with Section 3.3 hereof.

(b)     Certificate of the Issuer.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, shall have been delivered to the Trustee to the effect that, in the case of each initial Collateral Debt Security, as of the Closing Date:

(i)     the Issuer is the owner of each such initial Collateral Debt Security, or will be the owner of any initial Collateral Debt Securities which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date, free and clear of any liens, claims or encumbrances of any nature whatsoever, except for those which are being released on or prior to the Closing Date and those which are being Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such initial Collateral Debt Security prior to the first payment date and owed by the Issuer to the seller of such initial Collateral Debt Security;

(ii)     the Issuer has acquired its ownership in each such initial Collateral Debt Security, or will acquire in the case of any initial Collateral Debt Securities which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date, in good faith without notice of any adverse claim (as such term is defined in UCC Section 8-102(a)(1)), except as described in paragraph (i) above;

(iii)     the Issuer has not assigned, pledged or otherwise encumbered any interest in such initial Collateral Debt Security (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer has delivered each such initial Collateral Debt Security, or will deliver any initial Collateral Debt Securities which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date, to the Trustee in accordance with Section 3.3(c) and (d) hereof and has not assigned, pledged or otherwise encumbered any interest in such initial Collateral Debt Security other than interests Granted pursuant to this Indenture;

(v)    the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such Collateral Debt Securities, and has Granted or does hereby Grant, such initial Collateral Debt Securities acquired prior to or on the Closing Date to the Trustee;

(vi)    the information set forth with respect to each initial Collateral Debt Security (including any portion of which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date) in the list of Collateral Debt Securities set forth in Schedule A hereto is correct;

(vii)    the initial Collateral Debt Securities included in the Collateral satisfy the requirements of the definition of Collateral Debt Security in Section 1.1;

(viii)    upon Grant pursuant to the Granting Clauses by the Issuer, the Trustee has for the benefit of the Noteholders and the Hedge Counterparty a valid lien and security interest in the Pledged Securities; and

(ix)    upon delivery of the Pledged Securities pursuant to Section 3.3(c) and (d), the lien and security interest created by this Indenture shall be a valid, perfected first-priority security interest in favor of the Trustee for the benefit of the Noteholders and the Hedge Counterparty (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it (including under Section 3.3) for perfection of that interest).

(c)    Rating Letters.

(i)    The Issuer shall have delivered to the Trustee (i) a true and correct copy of a letter signed by Moody's and confirming that the Class A Notes have been rated "Aaa" by Moody's, the Class B Notes have been rated at least "Aa2" by Moody's and the Class C Notes have been rated at least "Baa2" by Moody's, and that such ratings are in full force and effect on the Closing Date and (ii) a true and correct copy of a letter signed by Standard & Poor's and confirming that the Class

A Notes have been rated "AAA" by Standard & Poor's and that such rating is in full force and effect on the Closing Date. The Co-Issuers (or, with respect to the Class C Notes, the Issuer) will request that after the Ramp-Up Effective Date Moody's and Standard & Poor's confirm the ratings on the Class A Notes and that Moody's confirm the ratings on the Class B Notes and the Class C Notes within ten (10) Business Days after receipt of the Accountants' Certificate required to be delivered pursuant to clause 3.4(c) herein. In the event any of the Moody's rating or Standard & Poor's rating, as applicable, of the Class A Notes or the Moody's ratings of the Class B Notes and the Class C Notes is reduced or withdrawn within thirty (30) Business Days after the Ramp-Up Effective Date, all Interest Proceeds remaining after payment of amounts referred to in clauses (i) through (xii) of Section 11.1(a) will be used to pay principal _first_, of the Class A Notes until paid in full, _second_, of the Class B Notes until paid in full and _third_, of the Class C Notes until paid in full, based on the outstanding principal amount of each such Class, on the next Payment Date and each Payment Date thereafter until such ratings are reinstated. If necessary after the foregoing payments are made from Interest Proceeds on any Payment Date, Principal Proceeds in accordance with clause (vii) of Section 11.1(b) will be used to pay principal _first_, of the Class A Notes until paid in full, _second_, of the Class B Notes until paid in full and _third_, of the Class C Notes until paid in full, based on the outstanding principal amount of each Class, on such Payment Date and each Payment Date thereafter until such ratings are reinstated.

(ii)    The Issuer shall deliver to the Trustee an Officer's Certificate of the Issuer within 30 Business Days of the Ramp-Up Effective Date, to the effect that attached thereto is a true and correct copy of a letter signed by each Rating Agency and confirming that the ratings assigned to the Notes by such Rating Agency have not changed since the Closing Date and are in full force and effect as of the Ramp-Up Effective Date.

(d)    _Accounts_. The Trustee shall have certified as to the establishment of the Interest Collection Account, the Principal Collection Account, the Uninvested Proceeds Account, the Payment Account, the Custodial Account, the Expense Account and the Securities Lending Accounts and the deposit, by the Issuer, of monies into the Collection Accounts.

(e)    _Financing Statement_. The execution and delivery by the Issuer of a UCC financing statement describing the Collateral and naming itself as debtor and the Trustee as secured party to be filed by or on behalf of the Issuer in the District of Columbia within ten (10) Business Days of the Closing Date.

Section 3.3    Custodianship; Transfer of Collateral Debt Securities and Eligible Investments.

(a)    The Trustee shall appoint the Custodial Account Securities Intermediary to act as a securities intermediary with respect to the Custodial Account and to hold all Certificated Securities and Instruments that are in physical form at an office of such Custodial Account Securities Intermediary in Charlotte, North Carolina or in the Borough of Manhattan, City of New York.  Initially, such Custodial Account Securities Intermediary shall be First Union National Bank, a national banking association, with its principal address at 401 South Tryon Street, Suite 1200, Mail Code NC-1179, Charlotte, North Carolina 28202 and a New York office at 599 Lexington Avenue, 22nd Floor, New York, New York 10022.  Any successor custodian shall be a state or national bank or trust company, which is not an Affiliate of the Issuer or the Co-Issuer, organized under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers and has a combined capital and surplus of at least U.S. $200,000,000 and shall have a long-term debt rating of at least "Baa1" by Moody's and "BBB+" by Standard & Poor's.

(b)    Each time that the Issuer, or the Collateral Manager on behalf of the Issuer, shall direct or cause the acquisition of any Collateral Debt Security or Eligible Investment, the Issuer or the Collateral Manager (on behalf of the Issuer) shall:  (1) in the case of any Collateral Debt Security or Eligible Investment, cause the transfer of such Collateral Debt Security or Eligible Investment to the Custodial Account Securities Intermediary in the manner described in paragraph (c) hereof to be held in the Custodial Account (or one of the other Accounts) for the benefit of the Trustee in accordance with the terms of this Indenture or (2) in the case of any "deposit account" (as defined in Section 9-102(a)(29) of the UCC) or general intangible (as defined in the UCC) take the actions otherwise specified in paragraph (c) to cause the Trustee to have perfected security interest therein.  Notwithstanding the foregoing, the Issuer or the Collateral Manager (on behalf of the Issuer)  may cause any Collateral Debt Security or Eligible Investment to be transferred to the Custodial Account Securities Intermediary for the benefit of the Trustee or to the Trustee by such other method, or take any other appropriate action, for which an Opinion of Counsel specifies will result in a valid, perfected first- priority security interest in favor of the Trustee in each Collateral Debt Security and Eligible Investment.   The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Debt Security or Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Collateral Debt Security or Eligible Investment.  The Issuer or the Collateral Manager, on behalf of the Issuer, shall take any and all other actions necessary to create in favor of the Trustee a valid, perfected first-priority security interest in each Collateral Debt Security and Eligible Investment Granted to the Trustee

under laws and regulations (including Articles 8 and 9 of the UCC) in effect from time to time.

(c)    Except as provided in paragraph (b) above, in the case of any Collateral Debt Security or Eligible Investment to be transferred to the Custodial Account Securities Intermediary for the benefit of the Trustee or directly to the Trustee, the Issuer shall deliver, or cause to be delivered, such Collateral Debt Security or Eligible Investment as follows (provided, that in the case of any Collateral Debt Security that is an Uncertificated Security or Certificated Security held by a Clearing Corporation other than DTC, Clearstream or Euroclear, the Collateral Manager shall have delivered an Opinion of Counsel at the expense of the Issuer to the Trustee stating the necessary events upon the occurrence of which the security interest of the Trustee in such Collateral Debt Security will be a perfected first-priority security interest and the Collateral Manager shall, further, within thirty (30) days after the date of such acquisition, deliver to the Trustee a certificate stating that the necessary events set forth in such Opinion of Counsel have taken place):

(i)    in the case of an Instrument or a Certificated Security, by (A) delivering such Instrument or Certificated Security to the Custodial Account Securities Intermediary in the State of New York indorsed to the Custodial Account Securities Intermediary or indorsed in blank, in each case by an effective Indorsement, or registered in the name of the Custodial Account Securities Intermediary (unless such Instrument or Certificated Security is in bearer form in which case delivery alone shall suffice), (B) causing the Custodial Account Securities Intermediary to maintain continuous possession of such Instrument or Certificated Security in the State of New York, (C) causing the Custodial Account Securities Intermediary to credit such asset to the Custodial Account (or one of the other Accounts) and (D) causing the Custodial Account Securities Intermediary to continuously identify such Certificated Security on its books and records;

(ii)    in the case of an Uncertificated Security, by (A) causing the Custodial Account Securities Intermediary to become the registered owner of such Uncertificated Security, (B) causing such registration to remain effective, (C) causing the Custodial Account Securities Intermediary to credit such asset to the Custodial Account (or one of the other Accounts) and (D) causing the Custodial Account Securities Intermediary to continuously identify such Uncertificated Security on its books and records;

(iii)    in the case of any Securities Entitlement, by (A) causing the Custodial Account Securities Intermediary to become the Entitlement Holder of such Securities Entitlement, (B) causing the Custodial Account Securities Intermediary to credit such Securities Entitlement to the Custodial Account (or one of the other Accounts) and (C) causing the Custodial Account Securities

Intermediary to continuously identify such Securities Entitlement on its books and records;

(iv)    in the case of any Account or Eligible Investment which constitutes a "deposit account" (as defined in Section 9-102(a)(29) of the UCC), by either (x) causing the bank maintaining such deposit account to agree in writing that it will comply with all instructions originated by the Trustee and directing the disposition of funds in such deposit account without further consent of the Issuer or (y) causing the Custodial Account Securities Intermediary to become the account holder and credit such deposit account to the Custodial Account (or one of the other Accounts); and

(v)    in the case of any other general intangible by complying with Section 3.3(e) with respect to financing statements and obtaining any necessary consents to the security interest of the Trustee substantially in the form of <u>Exhibit I</u> hereto (such consent shall not be necessary with respect to those general intangibles that are "payment intangibles" in the event that any anti-assignment clause or consent requirement is rendered ineffective under the UCC).

(d)    The Collateral Manager shall cause all Collateral Debt Securities and Eligible Investments acquired by or on behalf of the Issuer to be delivered to the Custodial Account Securities Intermediary or the Trustee for the benefit of the Trustee or shall take any and all other actions necessary to create in favor of the Trustee a valid, perfected, first-priority security interest in each Collateral Debt Security and Eligible Investment Granted in accordance with Section 3.2(a), Section 3.2(b) and Section 3.3 under applicable laws and regulations (including without limitation Articles 8 and 9 of the UCC and federal regulations governing transfers of interests in government securities in effect at the time of such Grant).

(e)    The Issuer shall cause a UCC financing statement describing the Collateral by use of the words "all personal property" and naming the Issuer as debtor and the Trustee as secured party to be filed by or on behalf of the Issuer in the applicable jurisdiction, which is the District of Columbia, within ten (10) Business Days of the Closing Date.  The Issuer shall take all actions necessary to maintain the effectiveness of such financing statement and shall notify the Trustee in writing 30 days prior to any change in the Issuer's name, identity, corporate structure, jurisdiction of incorporation or jurisdiction of its chief executive office.  The Issuer hereby authorizes the Trustee to, and the Trustee shall, file such financing statement or any other financing statement, amendment, assignment or continuation statement that the Trustee shall have been advised pursuant to Section 7.9 or otherwise is necessary or advisable in connection with the security interest granted hereunder, including without limitation, financing statements describing the Collateral as "all personal property".  The Issuer shall not authorize the

filing of any financing statements naming it as debtor other than financing statements in favor of the Trustee.

(f)     In addition to those steps specified in paragraphs (c), (d) and (e) above, the Issuer or the Collateral Manager shall take all steps necessary or advisable under the laws of the Cayman Islands to protect the security interest of the Trustee including the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands.

Section 3.4    Ramp-Up Period; Ramp-Up Effective Date.

(a)     The Issuer agrees (i) to use all commercially reasonable efforts to purchase Collateral Debt Securities during the Ramp-Up Period in a manner such that each of the Reinvestment Criteria will be satisfied as of the Ramp-Up Effective Date. If any of the Reinvestment Criteria are not each satisfied on the Ramp-Up Effective Date, the Issuer shall notify in writing, the Trustee, the Collateral Manager, the Initial Purchasers and each Rating Agency of any determination made pursuant to this Section 3.4(a).

(b)     The Issuer shall cause to be delivered to the Trustee on the Ramp-Up Effective Date an amended Schedule of Collateral Debt Securities to this Indenture listing all Collateral Debt Securities Granted to the Trustee pursuant to Section 3.3 and this Section 3.4 between the Closing Date and the Ramp-Up Effective Date and owned by the Issuer on the Ramp-Up Effective Date, which schedule shall supersede any prior Schedule of Collateral Debt Securities delivered to the Trustee.

(c)     The Issuer shall cause to be delivered to the Trustee, the Collateral Manager, each of the Initial Purchasers and each Rating Agency within twenty (20) Business Days after the Ramp-Up Effective Date an Accountants' Certificate, dated as of the Ramp-Up Effective Date, (1) calculating (a) the Portfolio Percentage Limitations, (b) the Moody's Maximum Rating Distribution Test, (c) the Moody's Minimum Weighted Average Recovery Rate Test, (d) the Weighted Average Fixed/Floating Rate Coupon Test, (e) the Weighted Average Life Test, (f) the S&P Trading Model Test, (g) the S&P Minimum Recovery Rate Test and (h) the Coverage Tests, (2) confirming whether the Collateral Debt Securities included in the Collateral on the Ramp-Up Effective Date satisfy both (x) the requirements of the definition of Collateral Debt Security in Section 1.1 and (y) each of the Moody's Maximum Rating Distribution Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Weighted Average Fixed/Floating Rate Coupon Test, the Weighted Average Life Test, the S&P Trading Model Test, the S&P Minimum Recovery Rate Test, the Coverage Tests and the Portfolio Percentage Limitations and (3) specifying the procedures undertaken by them to review data and computations relating to such information.

(d)     The Co-Issuers (or, with respect to the Class C Notes, the Issuer) will request that after the Ramp-Up Effective Date Moody's confirm the ratings assigned by it as of the Closing Date to the Class A Notes, Class B Notes and Class C Notes and that Standard & Poor's confirm the rating assigned by it as of the Closing Date to the Class A Notes within ten (10) Business Days after receipt of the Accountants' Certificate required to be delivered pursuant to clause 3.4(c) herein. In the event of an Effective Date Ratings Downgrade, Interest Proceeds and, if necessary, Principal Proceeds will be diverted and used to pay principal of the Class A Notes, the Class B Notes and the Class C Notes in accordance with Section 9.7 and Section 11.1 on the immediately following Payment Date and each Payment Date thereafter until each of such ratings is reinstated.

ARTICLE  IV

SATISFACTION AND DISCHARGE

Section 4.1     <u>Satisfaction and Discharge of Indenture</u>.

This Indenture shall be discharged and shall cease to be of further effect with respect to the obligations of the Issuer under the Notes and the Collateral securing the obligations of the Issuer under the Notes except as to (i) rights of registration of transfer and exchange of Notes, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of the Noteholders to receive payments of principal thereof and interest thereon as provided herein, (iv) the rights, indemnities and immunities of the Trustee hereunder, and the obligations of the Trustee with respect to any funds or obligations deposited with the Trustee pursuant to clause (a)(ii) of this Section 4.1, (v) the rights, indemnities and immunities of the Collateral Manager hereunder and under the Collateral Management Agreement, (vi) the rights of Noteholders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them, (vii) payments of dividends or any final distribution on the Preference Shares to the Preference Share Paying Agent as provided herein and (viii) the agreement by the Trustee pursuant to Section 6.20; and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered (other than (A) Notes that have been mutilated, defaced, destroyed, lost or stolen and that have been replaced or paid as provided in Section 2.6 hereof and (B) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.6) have been delivered to the Trustee for cancellation; or

(ii)     all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, or (B) will become due and payable at their

Stated Maturity Date within one year, or (C) are to be called for redemption within one year pursuant to Section 9.1 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Co-Issuers or, in the case of the Class C Notes, the Issuer pursuant to Section 9.3 and the Issuer or the Co-Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, cash or non-callable direct obligations of the United States of America, provided, that the obligations are entitled to the full faith and credit of the United States of America or are debt obligations which are rated "Aaa" by Moody's and "AAA" by Standard & Poor's in an amount sufficient, as verified in writing to the Trustee by a firm of Independent certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of Notes that have become due and payable), or the Stated Maturity Date or the Optional Redemption Date, as the case may be; provided, however, that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

(b)    the Co-Issuers have paid or caused to be paid all other sums payable hereunder and payable by the Issuer under the Collateral Management Agreement, the Collateral Administration Agreement and any Hedge Agreement to such Stated Maturity Date or Optional Redemption Date, as the case may be, and no other amounts will become due and payable by the Co-Issuers; and

(c)    the Co-Issuers have delivered to the Trustee Officer's Certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with; provided, that in the case of clause (a)(ii) above, the Issuer has delivered to the Trustee an Opinion of Counsel of Independent U.S. tax counsel to the effect that the Holders of Class A Notes, the Class B Notes and the Class C Notes would recognize no income, gain or loss for U.S. federal income tax purposes as a result of such deposit.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Collateral Manager and, if applicable, the Noteholders, as the case may be, under this Section 4.1 and Sections 2.7, 4.2, 5.9, 5.18, 6.6, 6.7 (as limited by Section 6.7(d)), 6.14, 7.1, 7.6 and 13.1 hereof shall survive.

Section 4.2    Application of Trust Money.

All Money deposited with the Trustee pursuant to Section 4.1 hereof shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Notes and this Indenture, including, without limitation, the Priority of Payments, for the payment of principal and interest and Redemption Premium, if any, either directly or through any Paying Agent as the

Trustee may determine, to the Person entitled thereto of the principal and interest in accordance with Section 11.1 hereof for whose payment such Money has been deposited with the Trustee, and such Money shall be held in a segregated trust account identified as being held in trust for the benefit of the Noteholders.   Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any Money deposited with it.

## ARTICLE  V

## REMEDIES

Section 5.1     Events of Default.

"Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     a default in the payment of any interest on any Class A Note or on any Class B Note (other than Class A Note Increased Margin and Class B Note Increased Margin) or, if all principal of and interest on the Class A Notes or Class B Notes (other than Class A Note Increased Margin and Class B Note Increased Margin) has been paid in full, on any Class C Note (other than Class C Note Increased Margin), in each case when the same becomes due and payable, which default continues for a period of three (3) or more Business Days;

(b)     a default in the payment of principal of any Note or, with respect to any Fixed Rate Note, any Redemption Premium, when the same becomes due and payable, at its Stated Maturity Date or on any Optional Redemption Date;

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments, which failure continues for a period of three (3) or more Business Days;

(d)     the failure on any Measurement Date to maintain an Aggregate Principal Amount of Collateral Debt Securities and Eligible Investments, plus Principal Proceeds and Uninvested Proceeds held as cash and Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds at least equal at such time to 100% of the Aggregate Outstanding Amount of the Class A Notes and the Class B Notes and any amount owed under the Liquidity Swap;

(e)      either of the Co-Issuers or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(f)      a default in the performance, or breach of any other covenant or other agreement of the Issuer or the Co-Issuer under this Indenture or if any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or writing delivered pursuant hereto or in connection herewith fails to be correct in any material respect when made, which default, breach or failure could have a material adverse effect on any Holders of the Notes, and the continuation of such default, breach or failure for a period of 30 or more days after any of the Issuer, the Co-Issuer or the Collateral Manager has the earlier of (i) actual knowledge thereof or (ii) notice thereof (a "Notice of Default") to the Issuer and the Collateral Manager by the Trustee or to the Issuer, the Collateral Manager and the Trustee by the Holders of at least 25% in Aggregate Outstanding Amount of the Notes of the Controlling Class;

(g)      the entry of a decree or order by a court having competent jurisdiction adjudging either of the Co-Issuers as bankrupt or insolvent, or granting an order for relief or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Law, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or ordering the winding up or liquidation of its affairs; or an involuntary case or proceeding shall be commenced against either of the Co-Issuers seeking any of the foregoing and such case or proceeding shall continue in effect for a period of 60 consecutive days;

(h)      the institution by either of the Co-Issuers of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action; or

(i)      one or more final judgments being rendered against the Issuer or the Co-Issuer which exceed, in the aggregate, $10,000,000 (after excluding any portion of the judgment that is payable by a party other than the Issuer or the Co-Issuer pursuant to an insurance policy or other agreement) and which remain unstayed, undischarged and unsatisfied for 30 or more days after such judgment(s) becomes nonappealable, unless adequate funds have been reserved or set aside for the payment thereof.

Upon becoming aware of the occurrence of an Event of Default, the Co-Issuers shall promptly notify the Trustee, the Preference Share Paying Agent, the Noteholders, the Collateral Manager, each Hedge Counterparty and each Rating Agency in writing briefly describing the Event of Default and the actions taken by the Issuer, if any, to remedy or cure such Event of Default.

Section 5.2    Acceleration of Maturity; Rescission and Annulment.

If an Event of Default occurs and is continuing (other than an Event of Default described in Section 5.1(g) or (h) hereof, in which case the principal of and accrued interest on the Notes automatically shall become immediately due and payable), the Trustee (at the direction of not less than a Majority of the Controlling Class) or Holders of not less than a Majority of the Controlling Class may (A) declare the principal of and accrued and unpaid interest on all the Notes to be immediately due and payable and (B) terminate the Reinvestment Period.  If an Event of Default described in Section 5.1(g) or (h) occurs, such an acceleration will occur automatically and without any further action the Reinvestment Period will terminate.  If the Issuer defaults in the payment of any interest on or principal of any Class of Notes or any Redemption Premium on any Fixed Rate Notes other than the Class A Notes or the Class B Notes, neither the Trustee nor the Holders of such Notes will have the right to declare such interest, Redemption Premium or principal to be immediately due and payable.

The Preference Shareholders will not have any creditors' rights against the Issuer and will not have the right to determine the remedies to be exercised under this Indenture.

At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as provided in this Article V, a Majority of the Controlling Class, by written notice to the Issuer and Trustee, may rescind and annul such declaration and its consequences if:

(i)    the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay in accordance with the Priority of Payments, and shall pay:

(A)    all overdue installments of interest and principal of the Notes, including any Defaulted Interest and Class C Deferred Interest (other than amounts payable solely as a result of an acceleration of the Notes), and any interest thereon;

(B)    to the extent that payment of such interest on such amount is lawful, interest on Defaulted Interest on the Class A Notes, the Class B Notes and the Class C Notes;

(C)      all unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder, and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(ii)      the Trustee has determined that all Events of Default, other than the non-payment of the interest on and principal of the Notes that have become due solely by such acceleration, have been cured and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination (which agreement shall not unreasonably be withheld), or waived such Events of Default as provided in Section 5.14 hereof.

Section 5.3      Proceedings.

(a)      Notwithstanding anything to the contrary contained herein, the Co-Issuers (or with respect to the Class C Notes, the Issuer) covenant that if a Default shall occur in respect of (A) the payment of any principal of or interest on any Class A Note, (B) the payment of any principal of or interest on any Class B Note and (C) the payment of principal of or interest on any Class C Note or of Redemption Premium on any Class C2 Note (but only after principal of and interest on the Class A Notes and the Class B Notes (other than any Class A Note Increased Margin and any Class B Note Increased Margin) have been paid in full), the Co-Issuers (or the Issuer, in the case of the Class C Notes) will, upon demand of the Trustee on behalf of any affected Holder of a Class A Note, Class B Note or Class C Note, as appropriate, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount, if any, then due and payable on such Note, as appropriate, for principal, interest and Redemption Premium, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Noteholder and their respective agents and counsel.

(b)      If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, at the direction of a Majority of the Controlling Class, the Trustee, in its own name and as trustee of an express trust, shall institute a Proceeding for the collection of the sums so due and unpaid, and shall prosecute such Proceeding to judgment or final decree, and shall enforce the same against the Issuer or the Co-Issuer, as applicable, or any other obligor upon the Notes and collect the Money adjudged or decreed to be payable in the manner provided by law out of the Collateral.

(c)      Notwithstanding anything to the contrary contained herein, if an Event of Default has occurred and is continuing and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, or at any time on or after the Final Maturity Date, the Trustee may proceed to protect and

enforce its rights and the rights of the Noteholders by such appropriate Proceedings, in its own name and as trustee of an express trust, as the Trustee shall deem most effective or as the Trustee may be directed in writing by a Majority of the Controlling Class to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or for collection of sums due and unpaid, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law, but subject, however, to the terms of Section 5.4 hereof. The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee, and its agents and counsel, in connection with any such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4 hereof, shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.

Section 5.4    Remedies.

(a)    If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may (after notice to the Noteholders, and shall, upon written direction by a Majority of the Controlling Class), to the extent permitted by applicable law, exercise (or refrain from exercising, at the direction of a Majority of the Controlling Class) one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral securing the Notes monies adjudged due;

(ii)    sell all or a portion of the Collateral or rights of interest therein at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral securing the Notes;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Holders of the Notes hereunder; or

(v)    exercise any other rights and remedies that may be available at law or in equity;

provided, however, that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation, which may be Lehman Brothers (the cost of which shall be paid or reimbursed pursuant to Section 6.7) as to the feasibility of an action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest and Redemption Premium, if any, on the Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)     If an Event of Default as described in Section 5.1(f) hereof has occurred and is continuing, the Trustee may, and at the direction of Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section 5.1(f), and enforce any decree or order arising from such Proceeding.

Section 5.5     Preservation of Collateral.

(a)     If an Event of Default has occurred and is continuing when any Notes are Outstanding, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the provisions of Article X, Article XI, Article XII and Article XIII hereof unless either:

(i)     the Trustee determines that the anticipated net proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the sum of: (A) the amount of interest and principal then due and unpaid upon the Notes (including any Defaulted Interest and any Class C Deferred Interest), (B) any taxes, fees or Administrative Expenses as limited by clauses (i), (ii) and (iii) of Section 11.1(a) and (C) any other amounts then due and unpaid to the Interest Rate Hedge Counterparty (assuming, for this purpose, that the Interest Rate Hedge Agreement has been terminated by reason of the occurrence of a liquidation of the Collateral following an event of default thereunder by the Issuer), and a Majority of the Controlling Class agree with such determination,

(ii)    Subject to the provisions of Article XII hereof, the Collateral Manager may, by Collateral Manager Order delivered to the Trustee on or before the date set for an exchange, tender or sale of a Collateral Debt Security and certifying that such Collateral Debt Security is subject to an Offer and setting

forth in reasonable detail the procedure for response to such Offer, direct the Trustee to release from the lien of this Indenture such Collateral Debt Security in accordance with such Collateral Manager Order, in each case against receipt of payment therefor, or

(iii)    the Holders of 66⅔% in Aggregate Outstanding Amount of (x) each of the Class A Notes, Class B Notes and Class C Notes, voting as separate Classes, or (y) in the case of a Payment Default, the Controlling Class direct the sale and liquidation of the Collateral.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer. So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral securing the Issuer's obligations under the Notes if the conditions set forth in Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral if prohibited by applicable law or if the Trustee is directed to liquidate the Collateral pursuant to Section 5.5(a)(ii).

(c)    In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall estimate the value of the Collateral based upon bid prices obtained with respect to each security and debt obligation contained in the Collateral from two nationally recognized dealers, one of which may be Lehman Brothers as specified by the Collateral Manager in writing, at the time making a market in such securities and debt obligations and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security and debt obligation. In addition, for the purposes of determining issues relating to the Market Value of the Pledged Securities and the execution of a sale or liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee also may retain and rely on the services and/or an opinion of an Independent investment banking firm of national reputation, which may be Lehman Brothers.

(d)    The Trustee shall promptly deliver to the Noteholders and the Co-Issuers a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i). In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant (the cost of which shall be paid or reimbursed pursuant to Section 6.7) confirming the accuracy of the computations

of the Trustee and certifying their conformity to the requirements of this Indenture. In determining whether the Holders of the requisite Aggregate Outstanding Amount of the Class A Notes, Class B Notes or Class C Notes have given any direction or notice pursuant to Section 5.5(a), a Holder of any Class A Note that is also a Holder of any Class B Notes or Class C Notes or any Affiliate of any such Holder of any Class A Notes, Class B Notes or Class C Notes, as applicable, shall be counted as a Holder of each of such Notes for such purposes.

(e)    Collateral may not be sold or liquidated pursuant to Section 5.5(a) after the last date on which such sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant thereto (such last permitted date being determined based upon the anticipated proceeds of such sale or liquidation, as set forth in Section 5.5(a)(i)), unless a new determination is made in accordance with such Section 5.5(a)(i) and the Collateral is sold or liquidated prior to the last sale date permitted in accordance with such new determination.

Section 5.6    Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses and disbursements of the Trustee, each predecessor trustee and their respective agents and attorneys in counsel shall be applied as set forth in Section 5.7 hereof.

Section 5.7    Application of Money Collected.

The application of any Money collected by the Trustee with respect to the Notes pursuant to this Article V and any money that may then be held or thereafter received by the Trustee with respect to the Notes hereunder, at the date or dates fixed by the Trustee, shall be applied subject to, and in accordance with, Section 11.1 and Section 13.1, except that (subject to prior payment of Administrative Expenses and certain other payments in accordance with the Priority of Payments) the Trustee will apply the aggregate of all liquidation proceeds obtained from the sale of the Collateral in connection with an Event of Default such that the accrued and unpaid interest on, followed by the outstanding principal of, the Class A Notes (in each case, paid to the Class A Notes) will be paid in full before any payments are made on the Class B Notes, and the accrued and unpaid interest on, followed by the outstanding principal of, the Class B Notes (in each case, paid to the Class B Notes) will be paid in full before any payments are made on the Class C Notes, and the accrued and unpaid interest on, followed by the outstanding principal of, the Class C Notes (in each case, paid to the Class C Notes) will be paid in full before any dividends or other distributions are made to the Holders of the Preference Shares .

Section 5.8    Limitation on Suits.

No Holder of a Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder previously has given written notice to the Trustee of an Event of Default with respect to such Notes;

(b)    except as otherwise provided in Section 5.9, the Holders of at least 25% of the then Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c)    such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceedings; and

(e)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class, subject to and in accordance with Sections 11.1 and 13.1.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.9    Unconditional Rights of Noteholders to Receive Principal and Interest.

(a)    Notwithstanding any other provision in this Indenture, but subject to the provisions of Section 2.7(k) hereof, the Holder of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on

such Class A Note, as such principal and interest become due and payable, in accordance with Section 11.1 and Section 13.1 and, subject to the provisions of Section 5.8, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b)     Notwithstanding any other provision in this Indenture, but subject to the provisions of Section 2.7(k) hereof, the Holder of any Class B Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class B Note, as such principal and interest become due and payable, in accordance with Section 11.1 and Section 13.1.  Holders of the Class B Notes shall have no right to institute Proceedings for the enforcement of any such payment of principal until such time as no Class A Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of such Holder. For so long as any of the Class A Notes are Outstanding, the Class B Notes shall not constitute a claim against the Co-Issuers unless there are sufficient funds to make payments on the Class B Notes in accordance with the Priority of Payments and Article XIII.

(c)     Notwithstanding any other provision in this Indenture, but subject to Section 2.7(k) hereof, the Holder of any Class C Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on (and, with respect to the Class C2 Notes, Redemption Premium, if any) such Class C Note, as such principal and interest become due and payable, in accordance with Section 11.1 and Section 13.1.  Holders of Class C Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note or Class B Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.  For so long as any of the Class A Notes or Class B Notes are Outstanding, the Class C Notes shall not constitute a claim against the Co-Issuers unless there are sufficient funds to make payments on the Class C Notes in accordance with the Priority of Payments and Article XIII.

(d)     If collections in respect of the Collateral are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency following realization on the Collateral, and the obligations of the Co-Issuers (or, with respect to the Class C Notes, the Issuer) to pay any deficiency shall be extinguished and shall not revive thereafter.

Section 5.10   Restoration of Rights and Remedies.

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case, the Co-Issuers, the Trustee and such Noteholder shall, subject to any determination in

such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.11    Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Trustee or to the Holders of the Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12    Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy occurring upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article V or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

Section 5.13    Control by Noteholders.

The Holders of at least 66⅔% of the then Aggregate Outstanding Amount of (x) each of the Class A Notes, the Class B Notes and the Class C Notes, voting as separate Classes or (y) in the case of a Payment Default, the Controlling Class (and, in each case, the Interest Rate Hedge Counterparty, unless the Interest Rate Hedge Counterparty will be paid in full the amounts due and unpaid to the Interest Rate Hedge Counterparty (assuming, for this purpose, that the Interest Rate Hedge Agreement has been terminated by reason of the occurrence of an event of default thereunder by the Issuer)) shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or exercising any trust, right, remedy or power conferred on the Trustee; provided, that:

(a)    such direction shall not be in conflict with any rule of law or with any express provision of this Indenture;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction;

(c)    the Trustee shall have been provided with indemnity satisfactory to it (and the Trustee need not take any action that it determines might involve it in liability unless it has received such indemnity against such liability); and

(d)     any direction to the Trustee to undertake a Sale of the Collateral shall be by a Majority of the Controlling Class as set forth in Section 5.4 or 5.5, as applicable.

Section 5.14    Waiver of Past Defaults.

Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article V, a Majority of the Controlling Class may on behalf of the Holders of all the Notes waive, by written notice of such waiver to the Trustee, any past Default and its consequences, except a Default:

(a)     constituting a Payment Default (except a Payment Default consisting of non-payment of amounts that have become due and payable solely by virtue of an acceleration that has been rescinded pursuant to Section 5.2);

(b)     in respect of a covenant or provision hereof that under Section 8.2 hereof cannot be modified or amended without the waiver or consent of the Holders of the Outstanding Notes affected; or

(c)     constituting an Event of Default specified in clause (g) or (h) of Section 5.1.

Upon such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture and the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.  The Trustee shall promptly give written notice of any such waiver to the Preference Share Paying Agent, the Collateral Manager and to each Rating Agency.

Section 5.15    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or

interest or Redemption Premium, if any, on any Note on or after the Stated Maturity Date for such Note (or, in the case of redemption, on or after the applicable Optional Redemption Date).

Section 5.16    Waiver of Stay or Execution Laws.

Each of the Co-Issuers covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or execution law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of or the exercise of any remedies under this Indenture; and each of the Co-Issuers (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17    Sale of Collateral.

(a)    The power to effect any sale (a "Sale") of any portion of the Collateral pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral securing the Notes shall have been sold or all amounts secured by the Collateral shall have been paid.  The Trustee may, upon giving notice to the Noteholders (for so long as any Class A Notes are Outstanding), and shall, upon written direction of a Majority of the Controlling Class, from time to time postpone any Sale by public announcement made at the time of and place of such Sale.  The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale; provided, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7 or Section 11.1.

(b)    The Trustee, in its individual capacity, may bid for and acquire any portion of the Collateral in connection with a Sale thereof to the extent not prohibited by applicable law, and may pay all or part of the purchase price by crediting against amounts owing on the Notes or other amounts secured by this Indenture, all or part of the net proceeds of such Sale after deducting the costs, charges and expenses incurred by the Trustee in connection with such Sale.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral consists of securities or Collateral Debt Securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the written consent of a Majority of the Controlling Class, seek a no-action position from the Securities and Exchange Commission or any other relevant

federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities, the cost of which in each case shall be reimbursable to the Trustee.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a Sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a Sale thereof and to take all action necessary to effect such Sale.  No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18    Action on Notes.

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer or the Co-Issuer.

## ARTICLE VI

## THE TRUSTEE

Section 6.1    Certain Duties and Responsibilities of the Trustee.

(a)     Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if such

certificate or opinion does not so conform.  If a corrected certificate or opinion shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, and the continuing failure to deliver such opinion or certificate is in breach of a requirement under the Indenture, the Trustee shall so notify the Noteholders.

(b)      In case an Event of Default actually known to a Responsible Officer of the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of written directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of its own affairs.

(c)      No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)      this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(ii)      the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)      the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith (A) in accordance with the direction of the Issuer, the Co-Issuer or the Collateral Manager in accordance with this Indenture, or a Majority of the Controlling Class (or Holders with such larger percentage as may be required by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (B) while exercising any trust or power conferred upon the Trustee under this Indenture;

(iv)      no provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any financial liability in the performance of any of its duties hereunder other than the reasonable costs of performing its ordinary services under this Indenture, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not reasonably assured to it (provided, that the unsecured agreement of one or more Noteholders that are Institutional Investors organized under the laws of the United States or any state in the United States shall constitute adequate assurance with respect to repayment and indemnity if the aggregate net worth of the Institutional Investors providing such unsecured agreements is at least U.S. $200,000,000);

(v)      the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Co-Issuer, the Collateral Manager and/or the Holders of the Notes of the Controlling Class or any other required Class under circumstances in which such direction is required or permitted by the terms of this Indenture; and

(vi)      in no event shall the Trustee be liable for special, indirect or consequential loss or damage (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such damage and regardless of the form of action taken.

(d)      Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and Section 6.3 hereof.

(e)      The Trustee shall, upon reasonable (but not less than one (1) Business Day) prior written notice to the Trustee, permit a Holder of a Note, during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee relating to the Notes, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder, as applicable) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Notes.

(f)      To the extent the Bank is serving as Securities Custodian or as Custodial Account Securities Intermediary, it shall be entitled to each of the protections, benefits, immunities and indemnities available to the Trustee under this Article VI.

Section 6.2    Notice of Default.

Promptly (and in no event later than two (2) Business Days) after the occurrence of any Event of Default known to a Responsible Officer of the Trustee or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Section 5.2 hereof, the Trustee shall transmit by mail to the Hedge Counterparty, the Preference Share Paying Agent, the Collateral Manager, the Issuer, the Rating Agencies and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Defaults or Events of Default hereunder known to such Responsible Officer, unless such Event of Default shall have been cured or waived.  In addition, if and for so long as any Class of the Notes is listed on the Irish Stock Exchange and so long as the rules of such stock exchange so require, notices to the Holders of such Notes shall also be given by publication in the Irish Stock Exchange's Daily Official List.

Section 6.3     Certain Rights of Trustee.

Except as otherwise provided in Section 6.1:

(a)     the Trustee may rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document (including the Payment Date Report) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Collateral Manager mentioned herein shall be sufficiently evidenced by a Collateral Manager Request or Collateral Manager Order, as the context may require;

(c)     any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(d)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accounting firms or other Persons qualified to provide the information required to make such determination including nationally recognized dealers in securities of the type being valued and securities quotation services;

(e)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(f)     the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or to honor the request or direction of any of the Noteholders pursuant to this Indenture unless such Noteholders shall have offered to the Trustee security or indemnity satisfactory to it against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction (an unsecured indemnity agreement of one or more Institutional Investors organized under the laws of the United States or any state in the United States shall be deemed sufficient if and for so long as the aggregate net worth of the Institutional Investors providing such unsecured agreements is at least U.S. $200,000,000);

(g)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or documents, but the Trustee may and, upon written direction of a Majority of the Controlling Class shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior request (which request shall include a statement of the purpose therefor) made in advance to the Issuer and the Collateral Manager, to examine the books and records of the Issuer and the Collateral Manager relating to the Notes and the Collateral, personally or by agent or attorney during the Issuer's or the Collateral Manager's normal business hours; provided, that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority, or by the National Association of Insurance Commissioners and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(h)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent appointed and supervised, or attorney appointed, with due care by it hereunder; provided, however, that any agreement with an agent or attorney shall provide for due care by such agent or attorney in respect of the Issuer and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-affiliated agent or non-affiliated attorney which has been appointed and supervised with due care by it hereunder;

(i)    to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(j)    the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(k)    the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes and, after the occurrence and during the continuance of an Event of Default, prudently believes to be authorized or within its rights or powers hereunder and after the occurrence and during the continuance of an Event of Default, without prejudice to its fiduciary obligations hereunder; and

(l)    the Trustee shall not be charged with or deemed to have knowledge or notice of any matter unless and except to the extent written notice thereof has been received by the Trustee at the Corporate Trust Office or a Responsible Officer of the Trustee has actual knowledge thereof;

(m)    the Trustee shall not be responsible for the accuracy of the records of, or for the acts or omissions of DTC, Euroclear, Clearstream or any other Clearing Corporation; and

(n)    whenever a term hereof requires delivery of a notice or other document by any party to the Trustee and one or more other parties, the Trustee may assume delivery to such other parties on the same date when received by the Trustee without further investigation on its part (provided, that the Trustee is acting in good faith).

Section 6.4    Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Co-Issuers or, in the case of the Class C Notes, the Issuer, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral, or of the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of Notes or the proceeds thereof or any money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5    May Hold Notes.

First Union National Bank or any other Person that becomes Trustee hereunder, in any capacity, may become the owner or pledgee of Notes, and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee.

Section 6.6    Money Held in Trust.

Money held by the Trustee in trust hereunder need not be segregated from other funds held by the Trustee in trust hereunder except to the extent required herein or required by law. The Trustee shall be under no liability for interest on any Money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of First Union National Bank in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

Section 6.7    Compensation and Reimbursement.

(a)    The Issuer agrees:

(i)    to pay the Trustee on each Payment Date reasonable compensation for all services, including custodial services, rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the

compensation of a trustee of an express trust); provided, any agreement in writing between the Issuer and the Trustee on the Trustee's compensation for its services hereunder shall be reasonable compensation for purposes of this Section 6.7(a) for so long as such agreement remains in effect;

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5 or 10.8, except (a) any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith and (b) any securities transaction charges that have been waived due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments as specified by the Collateral Manager);

(iii)    to indemnify the Trustee and its officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.13.

(b)    The Issuer may remit payment of such fees and expenses to the Trustee or, in the absence thereof, the Trustee may, from time to time, deduct the payment of its fees and expenses hereunder from Interest Proceeds on deposit in the Collection Account or Payment Account (subject to Section 6.7(d) below).  If on any date when a fee or expense shall be payable to the Trustee pursuant to this Indenture, insufficient funds are available for the payment thereof, any portion of a fee or expense not so paid shall be deferred and payable on such later date on which a fee or expense shall be payable and sufficient funds are available therefor.

(c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day (or, if longer, the then applicable

preference period as provided for in the Bankruptcy Law) after the payment in full of all Notes issued under this Indenture.

(d)    The amounts payable to the Trustee by the Issuer pursuant to Section 6.7(a)(i) and Section 6.7(a)(ii), or which may be deducted by the Trustee pursuant to Section 6.7(b) during the period prior to and including the first Payment Date and, thereafter, during the period from but not including the immediately preceding Payment Date to and including such Payment Date, shall (i) in the case of any fees payable pursuant to Section 6.7(a)(i), in the aggregate not exceed the cap set forth in Section 11.1(a)(ii) and (iii) in the case of any other amounts to be reimbursed pursuant to Section 6.7(a)(ii) (excluding any accounting fees that the Trustee is required to pay pursuant to this Indenture and legal fees and expenses incurred after an Event of Default) in the aggregate not exceed the cap set forth in Section 11.1(a)(iii), in each case, for the Due Period immediately preceding such Payment Date prior to giving effect to payments on the Notes on such Payment Date and the Trustee shall have a lien ranking senior to that of the Noteholders and any Hedge Counterparty, upon all property and funds held or collected as part of the Collateral to secure payment of amounts payable to the Trustee under this Section 6.7 not to exceed such amount with respect to any Payment Date; and provided, that the Trustee shall not institute any proceeding for enforcement of such lien except in connection with an action pursuant to Section 5.3 or 5.4 for the enforcement of the lien of this Indenture for the benefit of the Trustee, the Hedge Counterparty and the Holders of the Notes; provided, further, that the Trustee may only enforce such a lien in conjunction with the enforcement of the rights of Holders of the Notes in the manner set forth in Section 5.4.

Fees applicable to periods shorter than a calendar quarter period shall be prorated based on the number of days within such period.  The Trustee shall, subject to the Priority of Payments, receive amounts pursuant to Section 5.7 and Section 11.1 only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default.  Subject to Section 6.9, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the filing of a petition in bankruptcy against either of the Co-Issuers for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day (or, if longer, the then applicable preference period as provided for in the Bankruptcy Law) after the payment in full of all Notes issued under this Indenture.  No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

If on any date when a fee shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable on such later date on which a fee shall be payable and sufficient funds are available therefor.

Section 6.8    Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee hereunder which shall be a corporation, trust company or national banking association organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S. $200,000,000, having a credit rating of "Baa1" or better by Moody's and "BBB+" or better by Standard & Poor's and subject to supervision or examination by federal or state authority. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.8, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

Section 6.9    Resignation and Removal of Trustee; Appointment of Successor.

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10 hereof. The indemnifications in favor of the Trustee in Section 6.7 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b)    The Trustee may resign at any time by giving thirty days prior written notice thereof to the Co-Issuers, the Noteholders, the Preference Share Paying Agent, the Hedge Counterparty, the Collateral Manager and the Rating Agencies. Upon receiving such notice of resignation, the Co-Issuers promptly shall appoint, in accordance with Section 6.9(e), a successor Trustee by written instrument, in duplicate, executed by an Authorized Officer of the Issuer on behalf of the Issuer and an Authorized Officer of the Co-Issuer on behalf of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee, together with a copy to each Noteholder, the Hedge Counterparty, the Collateral Manager, the Preference Share Paying Agent and the Rating Agencies; provided, that such successor Trustee shall be appointed only upon the written consent of a Majority of the Controlling Class. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the resigning Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, the Hedge Counterparty or any Holder of a Note, may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    The Trustee may be removed at any time by Act of a Majority of each Class, or may be removed at any time when an Event of Default shall have occurred and be continuing by Act of a Majority of the Controlling Class, upon 30 days written notice thereof to the Co-Issuers, the Trustee and the Collateral Manager.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.8 hereof and shall fail to resign after written request therefor by the Co-Issuers, a Majority of the Controlling Class or by any Noteholder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.9(a)), (x) the Co-Issuers, by Issuer Order, may remove the Trustee, or (y) subject to Section 5.15, any Noteholder or the Hedge Counterparty may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any cause, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee. If within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, no successor Trustee shall have been so appointed by the Co-Issuers and shall have accepted appointment in the manner hereinafter provided, a successor Trustee may be appointed by Act of a Majority of the Controlling Class delivered to the Co-Issuers and the retiring Trustee. The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers. If no successor Trustee shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15, any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)    The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to the Preference Share Paying Agent, the Collateral Manager, the Rating Agencies and to the Holders of the Notes as their names and addresses appear on the Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-

Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.10   Acceptance of Appointment by Successor Trustee.

Every successor Trustee appointed hereunder shall be required to meet the eligibility requirements set forth in Section 6.8 and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers, the successor Trustee or a Majority of the Controlling Class, such retiring Trustee shall, upon payment of its fees and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.7(d) hereof.  Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Upon acceptance of appointment by a successor Trustee as provided in this Section, the Co-Issuers shall mail notice thereof by first-class mail, postage prepaid, to the Holders of the Notes at their last addresses appearing upon the Note Register.  If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be mailed at the expense of the Co-Issuers.

Section 6.11   Merger, Conversion, Consolidation or Succession to Business of Trustee.

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided, such entity shall be otherwise qualified and eligible under this Article VI.  In the event any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

153

Section 6.12   <u>Co-Trustees and Separate Trustee</u>.  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee, jointly with the Trustee, of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Noteholders themselves may have the right to do, subject to the other provisions of this Section 6.12.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay (but only from and to the extent of the Collateral, after payment in full of the amounts payable pursuant to clauses (i) through (xxii) of Section 11.(a)) for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(i)      the Notes shall be authenticated and delivered by, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised and performed solely by, the Trustee;

(ii)      the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly in the case of the appointment of a co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(iii)      the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12, and in case an Event of Default has occurred and is continuing, the Trustee shall have

the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers.  A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12;

> (iv)    no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

> (v)    the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

> (vi)    any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13    Certain Duties of Trustee Related to Delayed Payment of Proceeds.

If in any month the Trustee shall not have received a payment with respect to any Pledged Security on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Collateral Manager in writing and (b) unless within three (3) Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, or unless the Issuer, in its absolute discretion, shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(c) hereof, or unless otherwise directed by the Collateral Manager in connection with any Pledged Security as to which the Collateral Manager is taking action under the Collateral Management Agreement, the Trustee shall request the issuer of such Pledged Security, the trustee under the related Underlying Instruments, or the paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three (3) Business Days after the date of such request.  If such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of Section 6.1(c) hereof, shall take such action as the Collateral Manager shall direct in writing.  Any such action shall be without prejudice to any right to claim an Event of Default under this Indenture.  In the event that the Issuer or the Collateral Manager requests a release of a Pledged Security in connection with any such action under the Collateral Management Agreement, such release shall be subject to Section 10.5 and Article XII, as the case may be.  Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with this Section and such payment shall not be deemed part of the Collateral.

Section 6.14    Withholding.

If any withholding tax is imposed on the Co-Issuers' payment (or allocations of income) under the Class A Notes or the Class B Notes or the Issuer's payments (or allocations of income) under the Class C Notes to any Noteholder, such tax shall reduce the amount otherwise

distributable to such Noteholder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed by the Issuer (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).  The amount of any withholding tax imposed with respect to any Noteholder shall be treated as cash distributed to such Noteholder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.14.  If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred.  Amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Co-Issuers or, in the case of the Class C Notes, the Issuer.  Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Preference Shares.

Section 6.15    <u>Representations and Warranties of the Trustee</u>.  The Trustee represents and warrants that:

(a)      the Trustee is a banking corporation with trust powers, duly and validly existing under the laws of the State of New York, with corporate power and authority to execute, deliver and perform its obligations under this Indenture, and is duly eligible and qualified to act as trustee under this Indenture;

(b)      this Indenture has been duly authorized, executed and delivered by the Trustee and constitutes the valid and binding obligation of the Trustee, enforceable against it in accordance with its terms except (i) as limited by bankruptcy, fraudulent conveyance, fraudulent transfer, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general equitable principles, regardless of whether considered in a proceeding in equity or at law and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; and

(c)      neither the execution or delivery by the Trustee of this Indenture nor performance by the Trustee of its obligations under this Indenture requires the consent or approval of, the giving of notice to or the registration or filing with, any governmental authority or agency under any existing law of the United States of America governing the banking or trust powers of the Trustee.

Section 6.16    Paying Agents.

The Co-Issuers hereby appoint the Trustee as a Paying Agent for the payment of principal of and interest and Redemption Premium, if any, on the Notes.

The Co-Issuers hereby appoint Ernst & Young to act as transfer agent in Ireland and as an additional Paying Agent in Ireland for the payment of principal of and interest on the Notes if and for so long as any Class of the Notes is listed on the Irish Stock Exchange; provided, that unless Ernst & Young shall be rated "P-1" by Moody's and "A" by Standard & Poor's, it may not hold funds pursuant to this Indenture overnight.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; provided, that no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax; provided, further, that if and for so long as any of the Notes are listed on the Irish Stock Exchange and such stock exchange shall so require, the Co-Issuers shall maintain a Paying Agent in Ireland.  The Co-Issuers shall give prompt written notice to the Trustee, the Rating Agencies and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

Section 6.17    Authenticating Agents.

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuances, transfers and exchanges under Sections 2.4, 2.5, 2.6 and 8.5, as fully and for all intents and purposes as though each such Authenticating Agent had been expressly authorized by such Sections to authenticate such Notes.  Any Authenticating Agent may, from time to time, direct the Trustee to act as Authenticating Agent hereunder with respect to one or more specified Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.17 shall be deemed to be the authentication of Notes "by the Trustee."

Any entity into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any paper or further act on the part of the parties hereto or such Authenticating Agent or such successor entity.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Co-Issuers.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.  Upon receiving such notice of resignation or upon such a termination,

the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers if the resigning or terminated Authenticating Agent was originally appointed at the request of the Issuer or the Co-Issuer.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto, and the Trustee shall be entitled to be reimbursed for such payments, subject to Section 6.7. The Co-Issuers shall be responsible for payment of the compensation and expenses of any Authenticating Agent appointed by the Trustee at their request. The provisions of Sections 2.9, 6.4 and 6.5 shall be applicable to any Authenticating Agent.

Section 6.18    Calculation Agent.

(a)    The Co-Issuers hereby agree that for so long as any of the Class A Notes, the Class B Notes or the Class C1 Notes Outstanding there will at all times be an agent appointed to calculate LIBOR in respect of each Interest Period in accordance with the terms of this Section 6.18 (the "Calculation Agent"). The Co-Issuers hereby initially appoint the Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Period, and the Trustee, by executing and delivering this Indenture, hereby acknowledges and accepts such appointment. The Calculation Agent may be removed by the Co-Issuers at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, or if the Calculation Agent fails to determine any of the information required to be notified as described in subsections (b) and (c) below, in respect of any Interest Period, the Co-Issuers will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in Eurodollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Co-Issuers or their Affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)    Any Calculation Agent other than the Trustee shall be required to agree by its execution of an agreement, and the Trustee, as Calculation Agent, hereby agrees, that as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will calculate the Note Interest Rate for the Floating Rate Notes for the immediately succeeding Interest Period and the amount of interest for such Interest Period payable in respect of each U.S. $500,000 by Aggregate Outstanding Amount of Floating Rate Notes (rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date, and will communicate such rates and amounts to the Co-Issuers or, in the case of the Class C Notes, the Issuer, the Trustee, the Depository, Euroclear, Clearstream, the Irish Stock Exchange (if and for as long as any Floating Rate Notes are listed thereon) and each Paying Agent. The Calculation Agent will also specify to the Co-Issuers or, in the case of the Class C1 Notes, the Issuer, the quotations upon which the Note Interest Rate for the

Floating Rate Notes is based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the Note Interest Rate and the amount of interest due for such Interest Period for the Floating Rate Notes or (ii) it has not determined and is not in the process of determining the Note Interest Rate and the amount of interest due for such Floating Rate Notes, together with its reasons therefor.

(c)     As soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will cause the Note Interest Rate for the Floating Rate Notes for the related Interest Period and the amount of interest for such Interest Period payable in respect of each U.S. $500,000 by Aggregate Outstanding Amount of the Floating Rate Notes (rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date to be given to the Co-Issuers or, in the case of the Class C1 Notes, the Issuer, the Trustee, the Depository, Euroclear, Clearstream, the Irish Stock Exchange (if and for as long as any Floating Rate Notes are listed thereon) and the Paying Agents. The Calculation Agent shall also inform the Irish Stock Exchange if any listed Class of Notes does not receive scheduled payments of principal or interest on a Payment Date. The Calculation Agent will also specify to the Co-Issuers or, in the case of the Class C1 Notes, the Issuer, the quotations upon which the Note Interest Rate is based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the Note Interest Rate and the amount of interest for such Interest Period for the Floating Rate Notes, or (ii) it has not determined and is not in the process of determining the Note Interest Rate and the amount of interest for such Interest Period, together with its reasons therefor. The determination of the Note Interest Rate for the Floating Rate Notes by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

Section 6.19   Exchange Offers. The Collateral Manager may, on behalf of the Issuer, instruct the Trustee pursuant to an Issuer Order to, and the Trustee shall, take any of the following actions with respect to a Defaulted Security or Exchanged Security as to which an exchange offer has been made:  (i) exchange such instrument for other securities or a mixture of securities and other consideration pursuant to such exchange offer (and in making a determination whether or not to exchange any security, none of the restrictions set forth in Article XII shall be applicable, except that if any of the Coverage Tests are not satisfied prior to such exchange, such Coverage Tests must be closer to compliance after giving effect to such exchange) and (ii) give consent, grant a waiver, vote or exercise any or all other rights or remedies with respect to any such Collateral Debt Security or Exchanged Security.

Section 6.20    Duties and Responsibilities of Trustee following Payment in Full of the Notes.

Following the payment in full of the Notes, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral in accordance with the Priority of Payments and the provisions of this Indenture and in return therefor will continue to receive its fees and reimbursement of its expenses as Trustee and have all its rights provided for hereunder until the first of the following occurs: (i) the redemption of the Preference Shares and the termination of the Preference Share Paying Agency Agreement and (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation in accordance with the Priority of Payments.

Section 6.21    Fiduciary for Noteholders Only; Agent for Hedge Counterparty.

With respect to the security interest created hereunder, the delivery of any item of the Collateral to the Trustee is to the Trustee as fiduciary for the Noteholders and as agent for the Hedge Counterparty; in furtherance of the foregoing, the possession by the Trustee of any item of the Collateral, the endorsement to or registration in the name of the Trustee of any item of the Collateral (including, without limitation, as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as fiduciary for the Noteholders and agent for the Hedge Counterparty. The Trustee shall owe no fiduciary duties to the Hedge Counterparty; provided that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture. Without limiting to any extent a Hedge Counterparty's rights under Section 14.8 hereof, until such time as all obligations owing to the Noteholders under the Indenture have been paid in full, the Trustee shall take direction solely from the Noteholders and no Hedge Counterparty shall have any ability to direct the Trustee.

ARTICLE VII

COVENANTS

Section 7.1    Payment of Principal and Interest.

The Co-Issuers or, in the case of the Class C Notes, the Issuer will duly and punctually pay all principal of and interest (including Defaulted Interest and Class C Deferred Interest, if any, as applicable and interest on such interest) on the Notes and any applicable Redemption Premium on the Fixed Rate Notes, in accordance with the terms of the Notes and this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder of principal, interest and/or applicable Redemption Premium

shall be considered as having been paid by the Co-Issuers to such Noteholder for all purposes of this Indenture.  Amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Co-Issuers or, in the case of the Class C Notes, the Issuer, as provided above.

Section 7.2      Certain Tax Matters.

It is the intent of the Issuer that, for purposes of federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Class A Notes, the Class B Notes and the Class C Notes will be treated as indebtedness of the Issuer, and the Preference Shares will be treated as equity in the Issuer.  Each Holder by acceptance of a Note agrees to such treatment and agrees to take no action inconsistent with such treatment.

Section 7.3      Compliance With Laws.

The Co-Issuers will comply in all material respects with applicable laws, rules, regulations, writs, judgments, injunctions, decrees, awards and orders with respect to them, their business and their properties.

Section 7.4      Maintenance of Books and Records.

The Co-Issuers shall maintain and implement administrative and operating procedures reasonably necessary in the performance of their obligations hereunder and the Issuer shall keep and maintain at all times, or cause to be kept and maintained at all times in its Cayman Islands office, all documents, books, records, accounts and other information reasonably necessary or advisable for the performance of its obligations hereunder.

Section 7.5      Maintenance of Office or Agency.

The Trustee will maintain an office or agency (in addition to the Corporate Trust Office) in the Borough of Manhattan, the City of New York, the State of New York, where Notes may be presented or surrendered for payment.  The Trustee hereby initially appoints the office of First Union National Bank (the "New York Presenting Agent"), 599 Lexington Avenue, 22nd Floor, New York, New York 10022, Attention: Madison Avenue Structured Finance CDO I, Limited, as such office or agency.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of the New York Presenting Agent or appoint any additional agents for any or all of such purposes; provided, that the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of the Notes and this Indenture may be served.  The Co-Issuers shall give prompt written notice to the Trustee, the Rating Agencies and the Noteholders of the appointment or termination

of the New York Presenting Agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the appropriate Paying Agent at its main office and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands.

Section 7.6    Money for Note Payments to Be Held in Trust.

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Collection Accounts or the Uninvested Proceeds Account, as applicable, and deposited into the Payment Account shall be made on behalf of the Co-Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date, a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Optional Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act.  Any moneys deposited with a Paying Agent with respect to the Classes of Notes for which it acts as a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article X.

The initial Paying Agents shall be as set forth in Section 6.16.  Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; provided, that, as long as any Class of Notes is rated by either of the Rating Agencies, such Paying Agent must either (i) have a rating of at least "A2" and "P-1" by Moody's and a rating of at least "A" and  "A-1+" by Standard & Poor's (for so long as any Class of Notes is Outstanding and rated by Standard & Poor's), (ii) agree not to hold any funds pursuant to this Indenture overnight or (iii) be acceptable to the Rating Agencies.  The Co-Issuers shall not

appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.6, that such Paying Agent will:

(i)     allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and Optional Redemption Date among such Holders in the proportion specified in the applicable report or statement in accordance herewith, in each case to the extent permitted by applicable law;

(ii)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(iii)   if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(iv)    if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer in the making of any payment required to be made; and

(v)     if such Paying Agent is not the Trustee, at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Any money deposited with a Paying Agent that remains unclaimed for twenty Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest or Redemption Premium, if any, on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-

Issuers on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts, and all liability of the Trustee or such Paying Agent with respect to such trust money (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.7    Existence of Co-Issuers. Each of the Issuer and the Co-Issuer shall take all reasonable steps to maintain its identity as a separate legal entity from that of its shareholders or stockholders, as applicable. Each of the Issuer and the Co-Issuer shall keep its principal place of business and chief executive office at the address specified in Section 14.3. The Issuer and the Co-Issuer shall keep in full force and effect their rights and franchises as corporations organized under the laws of the Cayman Islands and the State of Delaware, respectively, shall comply with the provisions of their respective organizational documents, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes and any of the Collateral; provided, that the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as (a) such change is not disadvantageous in any material respect to the Holders of the Securities, (b) written notice of such change shall have been given by the Co-Issuers to the Trustee, the Holders of the Notes and the Preference Shares and each Rating Agency and (c) on or prior to the 15th Business Day following such notice, the Trustee shall not have received written notice from a Majority of the Controlling Class objecting to such change. Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries other than subsidiaries necessitated by a change of jurisdiction pursuant to this Section 7.7, (ii) the Co-Issuer shall not have any subsidiaries and (iii) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective officers and directors), (B) engage in any transaction with any shareholder or stockholder, as applicable, that would constitute a conflict of interest (provided, that the Administration Agreement between the Issuer and the Administrator dated as of the Closing Date, and the transactions relating to the offering and sale of the Preference Shares shall not be deemed to be such a transaction that would constitute a conflict of interest) or (C) make any deposits to the Preference Share Distribution Account except in accordance with this Indenture or pay dividends or any final distribution on the Preference Shares except in accordance with the Priority of Payments, the Issuer Charter and the Preference Share Paying Agency Agreement.

Section 7.8    Protection of Collateral.

(a)      The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary to secure the rights and remedies of the Trustee, the Holders of the Notes and the Hedge Counterparty to:

(i)      Grant more effectively all or any portion of the Collateral;

(ii)      maintain or preserve the liens (and the priorities thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)      perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture;

(iv)      enforce any of the Pledged Securities or other instruments or property included in the Collateral;

(v)      preserve and defend title to the Collateral and the rights therein of the Trustee, the Hedge Counterparty and the Holders of the Notes in such Collateral against the claims of all other Persons; and

(vi)      pay any and all taxes levied or assessed upon all or any part of the Collateral.

The Issuer hereby irrevocably and by way of security designates the Trustee its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required pursuant to this Section 7.8.  The foregoing designation shall neither diminish or impose upon the Trustee the affirmative obligations of the Issuer under this Section 7.8.

(b)      The Trustee shall not (i) except in accordance with Section 10.5(b), (c) or (d), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.9 (or from the jurisdiction in which it was held as set forth in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.9) or (B) from the possession of the Person who held it on such date, (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) whose "securities intermediary's jurisdiction" (within the meaning of the UCC) is different from such jurisdiction at the time such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion

of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions or (iii) cause or permit (to its knowledge) any change in the notice, delivery and/or registration made pursuant to Section 3.3 with respect to any general intangible or participation, as applicable, unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)     The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities that secure all of the Issuer's obligations under the Notes.

(d)     The Issuer shall enforce all of its material rights and remedies under the Collateral Management Agreement and the Collateral Administration Agreement.  The Issuer will not enter into any agreement amending, modifying or terminating the Collateral Administration Agreement or the Collateral Management Agreement or providing for the succession of any other Person as Collateral Manager thereunder, without (A) ten (10) days prior notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder) and (B) a Rating Agency Confirmation.

Section 7.9     Opinions as to Collateral.

On or before December 5, in each calendar year, commencing in 2002, the Issuer shall furnish to the Trustee (with a copy to the Rating Agencies and the Hedge Counterparty) an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral is valid, perfected and in effect and that no further action (other than as specified in such opinion) needs to be taken (under then-current law) to ensure the continued validity, effectiveness and perfection of such lien over the next year ending on (and including) the following December 5.

Section 7.10     Performance of Obligations.

(a)     The Co-Issuers shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Collateral, except in the case of enforcement action taken with respect to any Defaulted Securities in accordance with the provisions hereof and as otherwise required hereby and actions taken by or on behalf of the Collateral Manager pursuant to the Collateral Management Agreement.

(b)      The Co-Issuers may, with the prior written consent of a Majority of the Controlling Class (except in the case of the Collateral Management Agreement as initially executed) and with notice to the Rating Agencies, contract with other Persons, including the Collateral Manager, for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons and the performance of the actions and other obligations with respect to the Collateral of the nature set forth in the Collateral Management Agreement by the Collateral Manager.  Notwithstanding any such arrangement, the Co-Issuers, or in the case of the Class C Notes, the Issuer shall remain primarily liable with respect thereto.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Co-Issuers; and the Issuer will punctually perform, and use its best efforts to cause the Collateral Manager or such other Persons to perform, all of their obligations and agreements contained in the Collateral Management Agreement or such other agreement.

(c)      The Co-Issuers agree to comply in all material respects with all requirements applicable to them set forth in any Opinion of Counsel obtained pursuant to any provision of this Indenture including satisfaction of any event identified in any Opinion of Counsel as a prerequisite for the obtaining or maintaining by the Trustee of a valid, first-priority perfected security interest in any Collateral Debt Security, Eligible Investment or other Collateral.

Section 7.11   <u>Negative Covenants</u>.

(a)      The Issuer will not:

(i)      sell, transfer, assign, participate, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (by security interest, lien (statutory or otherwise), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise) (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture, any Securities Lending Agreement and the Collateral Management Agreement;

(ii)      claim any credit on, or make any deduction from, the principal, interest or Redemption Premium, if any, payable in respect of the Notes (other than amounts withheld in accordance with the Code or any other applicable laws) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)      (A) incur or assume any indebtedness other than pursuant to this Indenture, (B) incur, assume or guarantee the indebtedness of any Person or (C) issue any additional class of securities other than any additional issuance of Class

A Notes, Class B Notes and Class C Notes pursuant to Section 2.10 and/or any additional issuance of Preference Shares pursuant to the Preference Share Paying Agency Agreement;

(iv)    (A)  permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, or by the Collateral Management Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including, without limitation, any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise (other than the lien of this Indenture)) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof other than pursuant to a Securities Lending Agreement, or (C) take any action that would permit the lien of this Indenture not to constitute a valid, first-priority perfected security interest in the Collateral other than pursuant to a Securities Lending Agreement;

(v)    make or incur any capital expenditures, except as reasonably required to perform its functions in accordance with the terms of this Indenture;

(vi)    become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its shareholders other than the payment of dividends to the Preference Shareholders;

(vii)    amend the "non-petition" or "limited recourse" provisions of any of the Transaction Documents;

(viii)    remove the legend from any Notes without an Opinion of Counsel that such action will not result in a violation under the Securities Act or the Investment Company Act.

(ix)    enter into any transaction with any Affiliate other than (A) the transactions contemplated by the Collateral Management Agreement, the Collateral Administration Agreement or the Administration Agreement, (B) the transactions relating to the offering and sale of the Notes and the Preference Shares or (C) transactions on terms no less favorable than those obtainable in an arms'-length transaction with a wholly unaffiliated Person;

(x)    maintain any bank accounts other than the Collection Accounts, the Uninvested Proceeds Account, the Payment Account, the Expense Account, the

Custodial Account, the Securities Lending Accounts, the Hedge Counterparty Collateral Account, the Preference Share Distribution Account and the bank account to be established in the Cayman Islands to hold the Excepted Property;

(xi)    conduct business under any other name, change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the lien or the interest hereunder of the Noteholders;

(xii)    make or declare dividends in excess of the amounts available for distribution to the Preference Share Paying Agent for payment of dividends on the Preference Shares in accordance with Section 11.1;

(xiii)    have any subsidiaries other than any subsidiaries necessitated by a change of jurisdiction pursuant to Section 7.7;

(xiv)    dissolve or liquidate in whole or in part, except as permitted hereunder; and

(xv)    have any employees.

(b)    The Co-Issuer will not:

(i)    claim any credit on, or make any deduction from, the principal or interest payable in respect of the Notes (other than amounts withheld in accordance with the Code or any other applicable laws) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(ii)    (A) incur, assume or guarantee or become directly or indirectly liable with respect to any indebtedness or any contingent obligations (including swap agreements, cap agreements, reimbursement obligations, repurchase obligations or the like), other than pursuant to the Notes, this Indenture and the other agreements and transactions expressly contemplated hereby, (B) issue any additional class of securities other than any additional issuance of Class A Notes and Class B Notes pursuant to Section 2.10 or (C) issue any additional shares of common stock;

(iii)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, or by the

Collateral Management Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including, without limitation, any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise (other than the lien of this Indenture)) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof, or (C) take any action that would cause the lien of this Indenture not to constitute a valid, first-priority perfected security interest in the Collateral, except as may be expressly permitted hereby (or in connection with a disposition of Collateral required hereby), or by the Collateral Management Agreement;

(iv)   make or incur any capital expenditures;

(v)   become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its shareholders;

(vi)   enter into any transaction with any Affiliate;

(vii)   maintain any bank accounts;

(viii)   change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the lien or the interests hereunder of the Noteholders; and

(ix)   have any subsidiaries.

(c)   Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted or required by this Indenture and the Collateral Management Agreement.

Section 7.12   Statement as to Compliance. On or before five (5) Business Days after the Payment Date in April of each year beginning in April 2003 or immediately if there has been a default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee and the Rating Agencies an Officer's Certificate stating, as to each signer thereof, that:

(a)   a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the prior calendar year (or from the Closing Date until the December 2002 Payment Date, in the case of the first such Officer's Certificate) has been made under his supervision; and

(b)     to the best of his knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout such year, or, if there has been a Default in the fulfillment of any such obligation, specifying each such Default known to him and the nature and status thereof.

Section 7.13    Co-Issuers May Consolidate, Etc., Only on Certain Terms.

(a)     The Issuer shall not consolidate or merge with or into any other Person or convey or transfer all or substantially all of its properties and assets to any Person, unless permitted by Cayman Islands law and unless:

(i)     the Issuer shall be the surviving entity, or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the properties and assets of the Issuer are transferred shall be a limited purpose company incorporated and existing under the laws of the Cayman Islands or such other jurisdiction approved by a Majority of the Controlling Class and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Noteholder, the due and punctual payment of the principal of and interest and Redemption Premium, if applicable, on all Notes and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)     The Rating Agencies shall have received prior written notice of such consolidation, merger, conveyance or transfer and the Trustee shall have received Rating Agency Confirmation from each Rating Agency;

(iii)     if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the properties and assets of the Issuer are transferred shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or convey or transfer the Collateral or all or substantially all of its properties and assets to any other Person except in accordance with the provisions of this Section 7.13;

(iv)     if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the properties and assets of the Issuer are transferred shall have delivered to the Trustee and the Rating Agencies an Officer's Certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; provided, that such Person has sufficient power and authority to

assume the obligations set forth in clause (i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; provided, that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); provided, that, immediately following the event which causes such Person to become the successor to the Issuer, (A) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral securing, in the case of a consolidation or merger of the Issuer, all of the Issuer's obligations under the Notes or, in the case of any conveyance or transfer of the Collateral securing any of the Issuer's obligations under the Notes, such obligations, (B) the Trustee continues to have a valid, perfected first priority security interest in the Collateral securing, in the case of a consolidation or merger of the Issuer, all of the Issuer's obligations under the Notes, or, in the case of any conveyance or transfer of the Collateral securing any of the Issuer's obligations under the Notes, such obligations and (C) such other matters as the Trustee or any Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

(vi)    the Issuer shall have notified the Rating Agencies in writing of such consolidation, merger, conveyance or transfer and shall have delivered to the Trustee and each Noteholder an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article VII and that all conditions precedent in this Article VII provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to any Holder of the Notes;

(vii)    after giving effect to such transaction, neither the Issuer nor the Co-Issuer will be required to register as an investment company under the Investment Company Act; and

(viii)    after giving effect to such transaction, the outstanding shares of stock of the Issuer or the Co-Issuer will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

(b)        The Co-Issuer shall not consolidate or merge with or into any other Person or convey or transfer all or substantially all of its properties and assets to any Person unless:

(i)        the Co-Issuer shall be the surviving entity, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the properties and assets of the Co-Issuer are transferred shall be a limited purpose corporation organized and existing under the laws of the State of Delaware or such other jurisdiction approved by a Majority of the Controlling Class, and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on all of the Class A Notes and the Class B Notes and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii)       The Rating Agencies shall have been notified of such consolidation, merger, conveyance or transfer and the Trustee shall have received Rating Agency Confirmation from each Rating Agency;

(iii)      if the Co-Issuer is not the surviving entity, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the properties and assets of the Co-Issuer are transferred shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Co-Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or convey or transfer its properties and assets substantially as an entirety to any other Person except in accordance with the provisions of this Section 7.13;

(iv)      if the Co-Issuer is not the surviving entity, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the properties and assets of the Co-Issuer are transferred shall have delivered to the Trustee and the Rating Agencies an Officer's Certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; provided, that such Person has sufficient power and authority to assume the obligations set forth in clause (i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; provided, that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting

the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); <u>provided</u>, that immediately following the event which causes such Person to become the successor to the Co-Issuer, (A) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral securing, in the case of a consolidation or merger of the Co-Issuer, all of the Issuer's obligations under the Notes or, in the case of any conveyance or transfer of the Collateral securing any of the Issuer's obligations under the Notes, such obligations, (B) the Trustee continues to have a valid, perfected security interest in the Collateral securing, in the case of a consolidation or merger of the Co-Issuer, all of the Issuer's obligations under the Notes, or, in the case of any conveyance or transfer of the Collateral securing any of the Issuer's obligations under the Notes, such obligations and (C) such other matters as the Trustee or any Noteholder may reasonably require;

(v)     immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

(vi)     the Co-Issuer shall have notified the Rating Agencies in writing of such consolidation, merger, conveyance or transfer and shall have delivered to the Trustee and each Noteholder an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article VII and that all conditions precedent in this Article VII provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to any Holder of the Notes;

(vii)     after giving effect to such transaction, neither the Issuer nor the Co-Issuer will be required to register as an investment company under the Investment Company Act; and

(viii)     after giving effect to such transaction, the outstanding shares of common stock of the Issuer and the Co-Issuer will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

Section 7.14     <u>Successor Substituted</u>.  Upon any consolidation or merger, or conveyance or transfer of all or substantially all of the properties and assets of the Issuer or the Co-Issuer, in accordance with Section 7.13, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer), or, the Person to which such consolidation, merger, conveyance or transfer is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each such obligation and covenant of, the Issuer or the Co-Issuer, as the case may be, under this Indenture with the same effect as if

such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.  In the event of any such consolidation, merger, conveyance or transfer, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article VII may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.15    No Other Business.

The Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture, issuing and selling the Preference Shares, entering into Hedge Agreements and acquiring, owning, disposing, holding and pledging and contracting for the management of and otherwise dealing with the Collateral Debt Securities and other Collateral in connection therewith, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Class A Notes and the Class B Notes pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, such other activities which are necessary, including, without limitation, entering into the agreements contemplated hereby, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; provided, that (i) the Issuer may co-issue additional Class A Notes and Class B Notes and issue additional Class C Notes and Preference Shares and (ii) the Co-Issuer may co-issue additional Class A Notes and Class B Notes, in each case, in accordance with Section 2.11.  The Issuer will not amend its Issuer Charter and the Co-Issuer will not amend its certificate of incorporation or by-laws, if such amendment would result in the ratings of any Class A Notes, Class B Notes or Class C Notes being reduced or withdrawn.

Section 7.16    Purchase of Notes and Preference Shares.

Notwithstanding anything contained in this Indenture to the contrary, the Issuer may acquire Notes or Preference Shares in open market or privately negotiated transactions or otherwise (and the Issuer shall give prompt written notice thereof to the Trustee); provided, however, that, (i) so long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, the Issuer shall not acquire any Preference Shares, (ii) so long as any Class A Notes or Class B Notes are Outstanding, the Issuer shall not acquire any Class C Notes or Preference Shares and (iii) so long as any Class A Notes are Outstanding, the Issuer shall not acquire any Class B Notes, Class C Notes or Preference Shares.  Any Notes or Preference Shares acquired by the Issuer shall be delivered to the Trustee or the Preference Share Paying Agent for cancellation, respectively.

Section 7.17    Annual Rating Review; Notice of Rating.

The Issuer shall use its reasonable efforts to obtain an annual review of the ratings assigned to the Class A Notes, the Class B Notes and the Class C Notes by Moody's and the rating assigned to the Class A Notes by Standard & Poor's.

The Issuer or the Co-Issuer, as applicable, shall promptly notify the Trustee in writing (who shall promptly notify the Noteholders) if at any time the rating of the Class A Notes, the Class B Notes or the Class C Notes has been, or the Issuer or the Co-Issuer, as applicable, knows will be, qualified, downgraded or withdrawn.  Upon receipt of such notice, the Trustee, in the name and at the expense of the Co-Issuers, shall promptly notify (i) the Noteholders of any such qualification, downgrade or withdrawal of the rating on the Class A Notes, the Class B Notes or the Class C Notes, as applicable, (ii) if and for so long as the Class A Notes, the Class B Notes or the Class C Notes are listed on the Irish Stock Exchange, the Irish Stock Exchange of any qualification, downgrade or withdrawal of the rating on any such Class of Notes and (iii) the Preference Share Paying Agent.

Section 7.18    Process Agents.

The Issuer irrevocably designates and appoints First Union National Bank, 599 Lexington Avenue, 22nd Floor, New York, New York 10022, Attention: Institutional Trust Services - Madison Avenue Structured Finance CDO I, Limited, as its agent (the "Process Agent") in New York for service of all process.  The Process Agent may be served in any Proceeding arising with respect to this Indenture or the Notes, such service being hereby acknowledged to be effective and binding service in every respect.

The Issuer irrevocably designates and appoints QSPV Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, British West Indies, in its capacity as a registered office for the Issuer in the Cayman Islands, as its agent in the Cayman Islands where notices and demands may be served to or upon the Issuer in respect of this Indenture or any of the Notes.

The Co-Issuer irrevocably designates First Union National Bank, 599 Lexington Avenue, 22nd Floor, New York, New York 10022, Attention: Institutional Trust Services – Madison Avenue Structured Finance CDO I, Corp., as its agent in New York for service of all process and such Person may be served in any Proceeding arising with respect to this Indenture, the Class A Notes and the Class B Notes, such service being hereby acknowledged to be effective and binding service in every respect.

Section 7.19    Additional Covenants.

(a)    Each of the Co-Issuers shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, without limitation, in connection with the issuance, offer and sale of the Notes.

(b)    The Co-Issuers shall give prompt notice in writing to the Trustee, each Hedge Counterparty and the Rating Agencies upon becoming aware of the occurrence of any Default or Event of Default under this Indenture.

(c)    The Issuer shall comply with the terms and conditions of this Indenture, the Notes, any Hedge Agreements, the Preference Share Paying Agency Agreement, the Collateral Management Agreement, the Administration Agreement and the Collateral Administration Agreement (collectively, the "Transaction Documents").  The Co-Issuer shall comply with the terms and conditions of this Indenture, the Class A Notes, the Class B Notes and the Class C Notes.  The Issuer shall take all actions as may be necessary to ensure that all of the Issuer's representations and warranties made pursuant to the Transaction Documents are true and correct as of the date thereof and continue to be true and correct for so long as any Notes are Outstanding.  The Issuer further agrees not to authorize or otherwise to permit the Collateral Administrator, the Collateral Manager or the Administrator to act in contravention of the representations, warranties and agreements of the Collateral Administrator under the Collateral Administration Agreement, the Collateral Manager under the Collateral Management Agreement or the Administrator under the Administration Agreement.

(d)    Neither of the Co-Issuers shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors; neither of the Co-Issuers shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above; and each of the Co-Issuers shall generally pay its debts as they become due and not admit in writing its inability to pay its debts as they become due.

(e)    Upon receipt by the Trustee of notice of the occurrence of a termination event under Sections 13 and 14 of the Collateral Management Agreement, the Trustee shall promptly forward such notice to the Noteholders.

Section 7.20    Representations and Warranties of the Co-Issuers.

(a)    Each of the Co-Issuers is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and in each jurisdiction where the conduct of its business requires such license, qualification or good standing, except where the failure to be so licensed or qualified or in good standing would not adversely affect the validity or enforceability of the Transaction Documents (as

defined in Section 7.19 above) to which it is a party, or the ability of the Issuer or
Co-Issuer, as the case may be, to perform its obligations hereunder or thereunder.

(b)    Each of the Co-Issuers has the power and authority to execute and deliver
the Transaction Documents to which it is a party and all other documents and agreements
contemplated hereby and thereby to which it is a party, as well as to carry out the terms
hereof and thereof.

(c)    Each of the Co-Issuers has taken all necessary action, including but not
limited to all requisite corporate action, to authorize the execution, delivery and
performance of the Transaction Documents and all other documents and agreements
contemplated hereby and thereby to which it is a party. When executed and delivered by
the Issuer or Co-Issuer, as the case may be, and in the case of the Notes, authenticated by
the Trustee as provided herein, each of the Transaction Documents will constitute the
legal, valid and binding obligation of the Issuer or Co-Issuer, as the case may be,
enforceable in accordance with its terms subject, as to enforcement, to applicable
bankruptcy, insolvency, reorganization, moratorium or other similar laws now or
hereafter in effect affecting the enforcement of creditors' rights in general, and except as
such enforceability may be limited by general principles of equity (whether considered in
a suit at law or in equity).

(d)    All authorizations, licenses, permits, certificates, franchises, consents,
approvals and undertakings which are required to be obtained by each of the Co-Issuers
under any applicable law which are material to (i) the conduct of its business, (ii) the
ownership, use, operation or maintenance of its properties or (iii) the performance by the
Issuer or Co-Issuer, as the case may be, of its obligations under or in connection with the
Transaction Documents to which it is a party, have been received and all such
authorizations, licenses, permits, certificates, franchises, consents, approvals and
undertakings are in full force and effect.

(e)    The execution, issuance and delivery of, and performance by each of the
Co-Issuers of their respective obligations under, the Transaction Documents to which it is
a party and any and all instruments or documents required to be executed or delivered
pursuant to or in connection herewith or therewith to which it is a party were and are
within the powers of the Issuer or Co-Issuer, as the case may be, and will not violate any
provision of any law, regulation, decree or governmental authorization applicable to the
Issuer or Co-Issuer, as the case may be, or its Issuer Charter or certificate of incorporation
and by-laws, as the case may be, and will not violate or cause a default under any
provision of any contract, agreement, mortgage, indenture or other undertaking to which
the Issuer or Co-Issuer, as the case may be, is a party or which is binding upon the Issuer
or Co-Issuer, as the case may be, or any of its properties or assets, and will not result in
the imposition or creation of any lien, charge, or encumbrance upon any of the properties
or assets of the Issuer or Co-Issuer, as the case may be, pursuant to the provisions of any

such contract, agreement, mortgage, indenture or other undertaking, other than as specifically set forth herein.

(f)     There are no legal, governmental or regulatory proceedings pending to which either of the Co-Issuers is a party or of which any of its properties is the subject, which if determined adversely to the Issuer or Co-Issuer, as the case may be, would individually or in the aggregate have a material adverse effect on the performance by the Issuer or Co-Issuer, as the case may be, of the Transaction Documents to which it is a party or the consummation of the transactions contemplated hereunder or thereunder, and to the best of its knowledge, no such proceedings are threatened or contemplated.

(g)     The Notes are not required to be registered pursuant to the Securities Act, neither of the Co-Issuers is required to be registered as an investment company pursuant to the Investment Company Act and this Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

Section 7.21     Representations and Warranties by Issuer as to Security Interest.

(a)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

(b)     All of the Collateral Debt Securities and Eligible Investments have been and will have been credited to one of the Custodial Account, the Interest Collection Account, the Principal Collection Account or the Expense Account.  The securities intermediary for each Securities Account has agreed to treat all assets credited to the Securities Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.  The Collateral (other than those Collateral Debt Securities and Eligible Investments which have been credited to one of the Custodial Account, the Interest Collection Account, the Principal Collection Account or the Expense Account) constitutes either "instruments" or "general intangibles" within the meaning of the applicable Uniform Commercial Code.

(c)     The Issuer owns and has good and marketable title to the Collateral Debt Securities and Eligible Investments.  The Collateral is free and clear of any lien, claim or encumbrance of any person (other than the Trustee).  The Issuer has received all consents and approvals required by the terms of the Collateral Debt Securities, Eligible Investments and Hedge Agreements to the transfer to the Trustee of its interest and rights in the Collateral Debt Securities, Eligible Investments and Hedge Agreements except to the extent that any requirement for consent or approval is rendered ineffective under the applicable Uniform Commercial Code.

(d)     The Issuer has caused or will have caused, within ten days of the issuance of the Notes, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted in the Collateral to the Trustee.

(e)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary has agreed to comply with all instructions originated by the Trustee relating to the Securities Accounts without further consent by the Issuer.

(f)     Other than the security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any part of the Collateral.  The Issuer has not authorized the filing of and is not aware of any financing statements against Issuer that include a description of collateral covering any part of the Collateral, other than any financing statements relating to the security interest granted to the Trustee.  The Issuer is not aware of any judgment or tax lien filings against the Issuer.

(g)     The Securities Accounts are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the securities intermediary of any Securities Account complying with entitlement orders of any person other than the Trustee.

(h)     All financing statements filed or to be filed against the Issuer in favor of the Trustee in connection herewith describing the Collateral contain a statement to the following effect: "The grant of a security interest in any collateral described in this financing statement will violate the rights of the Trustee."

Section 7.22    Listing.  In the case of the Class A Notes, the Class B Notes and the Class C Notes, the Issuer will use its reasonable best efforts to obtain and maintain the listing of such Notes on the Irish Stock Exchange or such other stock exchange as the Issuer may request.  In addition, if and for so long as any Class of Notes is listed in the Irish Stock Exchange, the Issuer will maintain a Listing Agent in Ireland.

## ARTICLE  VIII

## SUPPLEMENTAL INDENTURES

Section 8.1        Supplemental Indentures Without Consent of Noteholders and
Preference Shareholders.

Without the consent of the Holders of any Notes, the Holders of any Preference Shares, the Interest Rate Hedge Counterparty and the Liquidity Swap Counterparty, the Co-Issuers and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a)        to evidence the succession of any Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes;

(b)        to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Noteholders or the Preference Shareholders or to surrender any right or power conferred upon the Co-Issuers;

(c)        to Grant any additional property to or with the Trustee;

(d)        to evidence and provide for the acceptance of appointment by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the Collateral by more than one Trustee;

(e)        to correct or amplify the description of any property at any time subject to the Grant and lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subject to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(f)        to evidence and provide for additional issuances of Notes authorized pursuant to Section 2.10; provided, that such amendment, supplement or other modification shall occur during the Reinvestment Period;

(g)        to modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(h)    to correct any inconsistency, defect or ambiguity or clarify any provision in this Indenture not otherwise inconsistent with any other provision of this Indenture;

(i)    to accommodate the settlement of the Notes in book-entry form through the facilities of the Depository or otherwise;

(j)    to conform this Indenture to the Final Offering Memorandum; or

(k)    to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes required or advisable in connection with the listing of the Class A Notes, the Class B Notes or the Class C Notes on the Irish Stock Exchange or any other stock exchange and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for such Notes in connection therewith.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the interests of any Holder of Notes or any Preference Shareholder would be materially and adversely affected thereby.  The Trustee may rely upon an Opinion of Counsel as to whether the interests of any Holder of Notes or any Preference Shareholder would be materially and adversely affected by any such supplemental indenture.   Prior to entering into any supplemental indenture, the Trustee shall give written notice of such supplemental indenture to each Rating Agency (provided, a supplemental indenture pursuant to clauses (a), (f) or (j) of this Section 8.1 shall require receipt of a Rating Agency Confirmation).

At the cost of the Co-Issuers, the Trustee shall provide to the Noteholders, the Interest Rate Hedge Counterparties, the Liquidity Swap Counterparties and to the Preference Share Paying Agent for distribution to the Preference Shareholders a copy of any executed supplemental indenture under this Section 8.1 after its execution.  At the cost of the Co-Issuers, the Trustee shall provide to each Rating Agency a copy of any proposed supplemental indenture prior to the execution thereof by the Trustee, and as soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, provide to each Rating Agency a copy of the executed supplemental indenture.  The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the ratings of the Class A Notes, Class B Notes or Class C Notes would be reduced or withdrawn by either Rating Agency, as evidenced by a written instrument or instruments signed by each Rating Agency.

Section 8.2      <u>Supplemental Indentures With Consent of Noteholders and Preference Shareholders</u>.

With the consent of the Holders of not less than a Majority in Aggregate Outstanding Amount of each Class of Notes materially and adversely affected thereby by Act of said Noteholders, each Interest Rate Hedge Counterparty and Liquidity Swap Counterparty materially and adversely affected thereby, delivered to the Co-Issuers and the Trustee, the Co-Issuers and the Trustee may enter into one or more indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes of any Class under this Indenture; <u>provided</u>, that pursuant to the Preference Share Documents, the Issuer shall not enter into any supplemental Indenture that materially and adversely affects the Preference Shareholders without the consent at least a majority of the Preference Shares Outstanding; <u>provided</u>, that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of each Holder of each Outstanding Note of each Class, each Holder of Preference Shares each Interest Rate Hedge Counterparty and each Liquidity Swap Counterparty (provided, however, that if notice was sent to an Interest Rate Hedge Counterparty or Liquidity Swap Counterparty of such proposed supplemental indenture and no response is received by the Trustee within five Business Days of receipt by such Interest Rate Hedge Counterparty or Liquidity Swap Counterparty, as applicable, of such notice the consent of such materially and adversely affected Interest Rate Hedge Counterparty or Liquidity Swap Counterparty, as applicable shall be deemed to be provided), in each case, materially and adversely affected thereby:

(a)      change the Stated Maturity Date of, or the due date of any installment of interest on any Note, or the date on which any dividend or any final distribution on the Preference Shares is payable, reduce the principal amount of any Note or the Note Interest Rate thereon or the rate at which interest accrues or the manner in which Class C Deferred Interest accrues, or the Note Redemption Price with respect thereto, or change the earliest date on which any Note may be redeemed at the option of the Co-Issuers or Issuer, as applicable, change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Notes or to the payment of any dividends or final distribution on the Preference Shares or change any place where, or the coin or currency in which, any Note or the principal thereof or Redemption Premium, if any, or interest thereon or other distribution thereon is payable or any Preference Share or the payment of any dividends or final distribution thereon is payable, or impair the right to institute suit for the enforcement of any such payment on any Note on or after the Stated Maturity Date thereof (or, in the case of redemption, on or after the applicable Optional Redemption Date);

(b)      reduce the percentage in Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required for the authorization of any such supplemental indenture, or for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder and their consequences provided for in this Indenture;

(c)     reduce the number of Preference Shares, the Holders of which are required to consent to the authorization of any such supplemental indenture or for any waiver of compliance with the provisions of this Indenture of which such waiver is permitted by the Preference Shareholders or any other action under this Indenture that requires the consent of the Preference Shareholders;

(d)     impair or adversely affect in any material respect the Collateral except as otherwise permitted herein;

(e)     permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate the lien of this Indenture on any property at any time subject hereto (other than pursuant to the terms of this Indenture) or deprive any Noteholder of the security afforded by the lien of this Indenture;

(f)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request that the Trustee preserve the Collateral or to rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(g)     modify any of the provisions of this Section 8.2, except to increase the percentage of Outstanding Notes or Outstanding Preference Shares whose Holders' consent is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and the Holder of each Outstanding Preference Share affected thereby;

(h)     modify the definition of the term "Outstanding" or the Priority of Payments set forth in Section 11.1 or Section 13.1, or the definition of any of the Reinvestment Criteria or method of calculation of any of the Reinvestment Criteria (which includes the Coverage Tests); or

(i)     modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of the Redemption Premium due on any Fixed Rate Note or interest on or principal of any Note or the amount of any dividend or final distribution on the Preference Shares, in each case on any Payment Date or to affect the rights of the Noteholders to the benefit of any provisions for the redemption of such Notes contained in this Indenture or to affect the rights of the Holders of the Preference Shares to the benefit of any provisions for the redemption of the Preference Shares contained in the Preference Share Paying Agency Agreement;

provided, that the Trustee may not enter into such supplemental indenture if, as a result of such supplemental indenture, the rating of any Class of Notes would be reduced or withdrawn; provided, however, the Trustee may, with the consent of the Holders of 100% of the Aggregate

Outstanding Amount of the Notes of each Class whose rating would be reduced or withdrawn, enter into any such supplemental indenture notwithstanding any such reduction or withdrawal.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee at the expense of the Co-Issuers shall mail to the Noteholders, each Interest Rate Hedge Counterparty, each Liquidity Swap Counterparty, the Preference Share Paying Agent for distribution to the Preference Shareholders and the Rating Agencies a copy of such supplemental indenture and shall request each Rating Agency to determine and certify to the Trustee and the Co-Issuers whether such supplemental indenture would cause either Rating Agency to qualify, downgrade or withdraw its then-current rating of, in the case of Moody's, any Class A Notes, Class B Notes or Class C Notes and, in the case of Standard & Poor's, the Class A Notes.

It shall not be necessary in connection with any consent of the Interest Rate Hedge Counterparty, the Liquidity Swap Counterparty, the Noteholders or Preference Shareholders under this Section 8.2 for each Interest Rate Hedge Counterparty, each Liquidity Swap Counterparty, the Noteholders or Preference Shareholders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes, the Collateral Manager, the Interest Rate Hedge Counterparty, the Liquidity Swap Counterparty, the Preference Share Paying Agent for distribution to the Preference Shareholders, the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) and the Rating Agencies a copy thereof.

Section 8.3     Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying in good faith upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent applicable thereto under this Indenture have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.  Notwithstanding anything set forth in Sections 8.1 and 8.2 hereof, the Collateral Manager shall not be bound by any amendment to this Indenture which reduces the rights or increases or modifies the obligations or liabilities of the Collateral Manager hereunder, including any change to the Priority of Payments, the Reinvestment Criteria or the definitions used therein, unless the Collateral Manager shall have granted its prior written consent thereto (which consent, if such amendment does not materially adversely affect the Collateral Manager, shall not be unreasonably withheld)

(provided, however, that if notice was sent to an Interest Rate Hedge Counterparty or Liquidity Swap Counterparty in connection with Sections 8.1 and 8.2 and no response is received by the Trustee within five calendar days of receipt by such Interest Rate Hedge Counterparty or such Liquidity Swap Counterparty of such notice the Trustee may deem the consent of such materially and adversely affected Interest Rate Hedge Counterparty or Liquidity Swap Counterparty, as applicable).

Section 8.4    Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5    Reference in Notes to Supplemental Indentures.

Notes executed, authenticated and delivered after the execution of any supplemental indenture pursuant to this Article VIII may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers  or, in the case of the Class C Notes, the Issuer, to any such supplemental indenture, may be prepared and executed by the Co-Issuers or, in the case of the Class C Notes, the Issuer, and authenticated and delivered by the Trustee or its Authenticating Agent in exchange for Outstanding Notes.

Section 8.6    Certain Further Limitations on Supplemental Indentures.

Notwithstanding anything to the contrary herein, each of the Issuer and the Co-Issuer agree that they will not consent to or enter into any indenture supplemental hereto or any amendment to any other document related hereto that:

(a)    amends any provision of this Indenture or such other document relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent by the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceeding against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively; or

(b)      amends any provision of this Indenture or such other document that provides that the obligations of the Co-Issuers under the Class A Notes and the Class B Notes are limited-recourse senior debt obligations of the Issuer and non-recourse debt obligations of the Co-Issuer, and that the obligations of the Issuer under the Class C notes are limited-recourse subordinated debt obligations of the Issuer, in each case payable solely from the Collateral that following realization of the Collateral shall be extinguished.


ARTICLE  IX

REDEMPTION OF NOTES; BORROWINGS;
REDUCTION OF COMMITMENTS

Section 9.1      Redemption of Notes.

(a)      On any Payment Date, (i) the Notes shall be redeemable in whole but not in part upon the occurrence of a Withholding Tax Event upon receipt by the Preference Share Paying Agent of written consent or written direction from a Majority of the Preference Shares pursuant to the Preference Share Paying Agency Agreement, (ii) occurring on or after the December 2004 Payment Date and before the Payment Date occurring in December 2006, the Notes shall be redeemable in whole but not in part by the Issuer (and the Co-Issuer with respect to the Class A Notes and the Class B Notes) upon written consent or written direction from 85% of the Preference Shares Outstanding pursuant to the Preference Share Paying Agency Agreement and (iii) occurring on or after the December 2006 Payment Date, the Notes shall be redeemable in whole but not in part by the Issuer (and the Co-Issuer with respect to the Class A Notes and the Class B Notes) upon written consent or written direction from a Majority of the Preference Shares pursuant to the Preference Share Paying Agency Agreement; provided, however, that the Issuer may not direct the Collateral Manager to sell (and the Trustee shall not be required to release) any Collateral Debt Security unless there will be sufficient Disposition Proceeds after giving effect to actual or anticipated receipt of any Refinancing Proceeds, if any, and all amounts held in the Collection Accounts, the Uninvested Proceeds Account, the Payment Account and the Expense Account to pay the Total Redemption Amount.  Notwithstanding the foregoing, payments of the applicable Note Redemption Price shall only be made in accordance with the Priority of Payments.

(b)      The Notes shall not be redeemed pursuant to Sections 9.1(a) and 9.1(c) unless either:

(i)      at least four (4) Business Days before the scheduled Optional Redemption Date, the Collateral Manager shall have furnished to the Trustee evidence (which evidence may be in the form of fax or electronic mail indicating firm bids satisfactory to the Trustee), that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial institution or institutions (or a guarantor or

guarantors of the obligations thereof) (x) whose long-term unsecured debt obligations (other than such obligations whose rating is based on the credit of a Person other than such institution) have a credit rating of at least "Aa3" from Moody's and at least "AA-" from Standard & Poor's (or as otherwise agreed in writing by Moody's and Standard & Poor's), or (y) whose short-term unsecured debt obligations have a credit rating of at least "P-1" from Moody's and "A-1+" from Standard & Poor's, or (z) whose obligations under such binding agreements are supported by a letter of credit or other agreement acceptable to the Trustee issued by a financial institution (or a guarantor or guarantors of the obligations thereof) satisfying either of the foregoing clauses (x) or (y), to purchase (or provide a Refinancing), not later than the Business Day immediately preceding the scheduled Optional Redemption Date, in immediately available funds, all or part of the Collateral Debt Securities (including any Collateral Debt Securities that have become, since the time of the purchase thereof, Defaulted Securities or Exchanged Securities) and all Eligible Investments included in the Collateral at a purchase price (or in the case of a Refinancing, receive Refinancing Proceeds) at least equal to an amount sufficient, together with the Eligible Investments maturing on or prior to the scheduled Optional Redemption Date to pay, from Available Funds in the Collection Accounts or the Uninvested Proceeds Account, as applicable, and transferred to the Payment Account on or prior to the Business Day prior to such Optional Redemption Date, all Administrative Expenses and all amounts payable under the Priority of Payments prior to the payment of the Notes and any other fees and expenses incurred by the Trustee and the Collateral Manager in connection with such sale of the Collateral Debt Securities, but, in each case, excluding the Subordinate Collateral Management Fee), to pay any accrued and unpaid amounts payable by the Issuer pursuant to any Hedge Agreement and to redeem the Notes on the scheduled Optional Redemption Date at the applicable Note Redemption Price therefor, together with all accrued interest, (excluding Increased Margin) to the date of redemption (the aggregate amount required to make all such payments and to effect such redemption, the "Total Redemption Amount"); or

(ii)    prior to selling any Collateral Debt Securities and/or Eligible Investments to be sold for purposes of a redemption of the Notes (other than pursuant to binding agreements pursuant to clause (i) above), the Collateral Manager shall certify to the Trustee on behalf of the Issuer, up to fifteen (15) Business Days prior to the scheduled Optional Redemption Date, that the Redemption Value of the Collateral Debt Securities, together with all Eligible Investments maturing on or prior to the scheduled Optional Redemption Date and all cash, are at least equal to the Total Redemption Amount, subject to the requirement that no such certification may be given more than ten (10) Business Days prior to the scheduled Optional Redemption Date.

All amounts remaining after payment of the Total Redemption Amount plus the Subordinate Collateral Management Fee shall be paid to the Preference Share Distribution Account for payment by the Preference Share Paying Agent, on behalf of the Issuer, subject to the payment of the Incentive Collateral Management Fees, if any (unless otherwise agreed by the

Collateral Manager), to the Holders of the Preference Shares in respect of a redemption of the Preference Shares.

(c)     The Notes may be redeemed from Refinancing Proceeds if a Majority of the Preference Shares direct the Preference Share Paying Agent (pursuant to the Preference Share Paying Agency Agreement) to direct the Co-Issuers to redeem the Notes by obtaining a loan or an issuance of replacement Notes, the terms of which loan or issuance will be negotiated by the Collateral Manager, from one or more financial institutions or purchasers (which may include the Collateral Manager or its Affiliates) selected by the Collateral Manager (a refinancing provided pursuant to such loan or issuance, a "Refinancing"); provided, that the terms of such Refinancing and the financial institutions acting as lenders thereunder or purchasers thereof must be acceptable to a Majority of the Preference Shares and such Refinancing otherwise satisfies the conditions described below.  Prior to executing any Refinancing, the Issuer shall obtain a Rating Agency Confirmation with respect to such Refinancing.

The Issuer shall obtain a Refinancing only if (i) each financial institution participating in such Refinancing has long-term unsecured debt obligations (other than debt obligations whose ratings rely on the credit of a Person other than such institution) with a credit rating from Moody's at least equal to the lesser of  "Aa2" or the highest rating of any Notes then Outstanding and short-term unsecured debt obligations with a credit rating from Moody's of at least "P-1" and with a credit rating from Standard & Poor's at least equal to the highest rating of any Notes then Outstanding or short-term unsecured debt obligations with a credit rating from Standard & Poor's of "A-1+," (ii) the proceeds from the Refinancing (the "Refinancing Proceeds") and all amounts held in the Collection Accounts and the Uninvested Proceeds Account will be at least sufficient to redeem simultaneously the Notes, in whole but not in part, and to pay the other amounts referenced in subclause (b)(i) above in accordance with the procedures described in clause (b) above, (iii) the Refinancing Proceeds and other available funds are used (to the extent necessary) to make such redemption and (iv) the agreements relating to the Refinancing contain limited-recourse and non-petition provisions equivalent to those contained in Section 2.7(k).

Upon direction by the requisite Holders of the Preference Shares to the Preference Share Paying Agent (pursuant to the Preference Share Paying Agency Agreement) to direct the Issuer and the Collateral Manager, the Collateral Manager will, on behalf of the Issuer, seek to obtain a Refinancing satisfying the requirements described above to the extent practicable.  The Holders of the Preference Shares will not have any cause of action against any of the Co-Issuers, the Collateral Manager or the Trustee for any failure to obtain a Refinancing.  In the event that a Refinancing is obtained meeting the criteria specified above and in a manner acceptable to the requisite Holders of the Preference Shares, the Issuer and the Trustee shall amend this Indenture to the extent necessary to reflect the terms of the Refinancing and no further consent for such amendments shall be required from the Holders of the Preference Shares.  The Trustee shall not be obligated to enter into any amendments that, in its view, adversely affects its duties,

obligations, liabilities or protections hereunder; and the Trustee shall be entitled (but not obligated) to require the Issuer to provide to it an Opinion of Counsel to the effect that such amendment meets the criteria specified above and is permitted hereunder without consent of the Noteholders (except that such counsel shall have no obligation to opine as to the sufficiency of the Refinancing Proceeds, or the sufficiency of the Accountants' Certificate required under Article III).

(d)     Installments of principal and interest due on or prior to an Optional Redemption Date shall continue to be payable to the Holders of such Notes as of the relevant Record Dates according to their terms.  The election of the Issuer to redeem any Notes pursuant to this Section 9.1 shall be evidenced by a Collateral Manager Order directing the Trustee to make the payment to the Paying Agent of the Note Redemption Price of all of the Notes to be redeemed from funds in the Payment Account in accordance with the Priority of Payments.  The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption in the Payment Account on or before the fifth Business Day prior to the Optional Redemption Date or, if later, upon receipt.

(e)     The Issuer shall set the Optional Redemption Date and the applicable Record Date and give notice thereof to the Trustee pursuant to Section 9.2.

Section 9.2     Notice to Trustee of Optional Redemption.  In the event of any redemption pursuant to Section 9.1, the Issuer shall, at least 30 days (but not more than 90 days) prior to the Optional Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Rating Agencies and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) of such Optional Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Optional Redemption Date and the Note Redemption Price of such Notes in accordance with Section 9.1.

Section 9.3     Notice of Optional Redemption or Maturity by the Co-Issuers.

(a)     Notice of redemption pursuant to Section 9.1 or the Final Maturity Date of any Class of Notes shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than ten (10) Business Days prior to the applicable Optional Redemption Date or Final Maturity Date to the Rating Agencies and each Holder of Notes to be redeemed pursuant to Section 9.1, at such Holder's address in the Note Register.  In addition, if and for so long as any Class of Notes to be redeemed is listed on the Irish Stock Exchange and the rules of such exchange so require, the Trustee shall cause to be published in the Irish Stock Exchange's Daily Official List the notice of redemption given pursuant to Section 9.1 not less than ten (10) Business Days prior to the applicable Optional Redemption Date.

(b)    All notices of redemption shall state:

(i)    the applicable Optional Redemption Date;

(ii)    the applicable Record Date;

(iii)    the Note Redemption Price;

(iv)    the principal amount of each Class of Notes to be redeemed and that interest on such principal amount of Notes shall cease to accrue on the date specified in the notice; and

(v)    the place or places where such Notes to be redeemed in whole are to be surrendered for payment of the Note Redemption Price, which shall be the office or agency of the Issuer to be maintained as provided in Section 7.5.

(c)    Any notice of redemption may be withdrawn by the Issuer up to the fourth Business Day prior to the scheduled Optional Redemption Date by written notice to the Trustee and the Collateral Manager only if (i) the Collateral Manager is unable to deliver the sale agreement or agreements or certifications referred to above, as the case may be, in form satisfactory to the Trustee or (ii) the Issuer receives written direction from a Majority of the Preference Shares pursuant to the Preference Share Paying Agency Agreement (including a redemption made in connection with a Withholding Tax Event) to withdraw the notice of redemption (and the Issuer agrees for the benefit of Holders of such Notes to withdraw the notice of redemption if it receives such written direction). Notice of any such withdrawal shall be given by the Trustee to each Holder of Notes to be redeemed at such Holder's address in the Note Register and to the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon and for so long as the rules of such stock exchange so require) by courier, sent not later than the third Business Day prior to the scheduled Optional Redemption Date.

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

Section 9.4    Notes Payable on Redemption Date.  Notice of redemption having been given as aforesaid, the Notes so to be redeemed shall, on the Optional Redemption Date, become due and payable at the Note Redemption Price therein specified, and from and after the Optional Redemption Date (unless the Issuer shall default in the payment of the Note Redemption Price) such Notes shall cease to bear interest on the Optional Redemption Date. Upon final payment of a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Optional Redemption Date;

provided, that if there is delivered to the Co-Issuers and the Trustee (i) in the case of a Holder that is not a QIB, such security or indemnity as may be required by them to save each of them harmless and (ii) an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers and the Trustee that the applicable Note has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender.  Installments of interest on Notes of a Class so to be redeemed whose Stated Maturity Date is on or prior to the Optional Redemption Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.7(e).

If any Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Optional Redemption Date at the applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding.

Following the payment in full of the Notes in connection with any redemption pursuant to Section 9.1, the remaining Collateral, if any, will be available for payment of the other amounts payable in accordance with the Priority of Payments pursuant to Section 11.1, including the allocation of Excess Proceeds, if any, to deposits to the Preference Share Distribution Account to pay, subject to the payment of the Incentive Collateral Management Fees, if any, dividends due and payable on each Payment Date and any final distribution on the Preference Share Redemption Date.

Section 9.5    Mandatory Redemptions.  On any Payment Date on which the Coverage Tests were not met on the immediately preceding Determination Date, principal payments on the Class A Notes, Class B Notes and Class C Notes will be made as set forth in Section 11.1.  The Note Redemption Price for each Note in any redemption of the Notes pursuant to this Section 9.5 will be equal to the Aggregate Outstanding Amount of such Note plus accrued interest thereon (including any Defaulted Interest, if applicable).  There will be no Redemption Premium due in connection with any redemption of the Notes pursuant to this Section 9.5.

Section 9.6    Special Amortization.  During the Reinvestment Period, one or more Classes of Notes may be amortized in whole or in part sequentially in order of seniority by the Issuer (a "Special Amortization") on one or more Payment Dates if, at any time during the related Due Period, (A) the Collateral Manager has been unable, for a period of at least 30 consecutive days, to identify Collateral Debt Securities that it determines would be appropriate and meet the Reinvestment Criteria in sufficient amounts to permit the reinvestment of all or a portion of the Uninvested Proceeds or Principal Proceeds then deposited in the Uninvested Proceeds Account or the Principal Collection Account, as applicable, in additional Collateral Debt Securities and (B) the Collateral Manager elects, in its sole discretion, to designate all or a portion of such Uninvested Proceeds or Principal Proceeds for payment of principal of the Notes by notification to the Trustee, the Rating Agencies and the Issuer (the amount of such Uninvested Proceeds or Principal Proceeds, the "Special Amortization Amount").  On the first Payment Date

following any date on which such notice is given, the Special Amortization Amount will be applied as Uninvested Proceeds or Principal Proceeds, as applicable, to the extent available in accordance with the Priority of Payments, to redeem the Notes, in accordance with clause (viii) of Section 11.1(b). The Collateral Manager may withdraw any notice designating Uninvested Proceeds or Principal Proceeds as a Special Amortization Amount on or prior to the related Determination Date.

Section 9.7    <u>Mandatory Redemption in Connection with an Effective Date Ratings Downgrade</u>. On any Payment Date on which an Effective Date Ratings Downgrade has occurred all Interest Proceeds remaining after payment of amounts referred to in clauses (i) through (xii) of Section 11.1(a) will be used to pay principal <u>first</u>, of the Class A Notes until paid in full, <u>second</u>, of the Class B Notes until paid in full, and <u>third</u>, of the Class C Notes until paid in full, based on the outstanding principal amount of each Class on the next Payment Date and each Payment Date thereafter until such ratings are reinstated. If necessary after the foregoing payments are made out of Interest Proceeds on any Payment Date, Principal Proceeds remaining after payment of amounts referred to in clauses (i) through (vi) of Section 11.1(b) will be used to pay principal <u>first</u>, of the Class A Notes until paid in full, <u>second</u>, of the Class B Notes until paid in full, and <u>third</u>, of the Class C Notes until paid in full, based on the outstanding principal amount of each Class on the next Payment Date and each Payment Date thereafter until such ratings are reinstated.


ARTICLE X

ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    <u>Collection of Money</u>. Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities, in accordance with the terms and conditions of such Pledged Securities. The Trustee shall segregate and hold all such Money and property received by it in trust pursuant to the Granting Clauses, for the Holders of the Notes and the Hedge Counterparty and shall apply it as provided in this Indenture. The Accounts established by the Trustee pursuant to this Article X may include any number of sub-accounts requested by the Trustee or the Collateral Manager for convenience in administering the Collateral Debt Securities. In addition, all cash deposited into the Accounts established pursuant to this Article X shall be invested in Eligible Investments in accordance with the procedures set forth in Section 10.2(e) and any restrictions applicable to such accounts.

Section 10.2    <u>Interest Collection Account; Principal Collection Account; Uninvested Proceeds Account; Custodial Account</u>.

(a)     The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary one segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Interest Collection Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and the Trustee and over which the Trustee shall have exclusive control and sole right of withdrawal. The Trustee shall from time to time deposit all Interest Proceeds of all Collateral Debt Securities into the Interest Collection Account. All Monies deposited from time to time in the Interest Collection Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein. The Custodial Account Securities Intermediary, acting on behalf of the Trustee, agrees to give the Issuer immediate notice if it becomes aware that the Interest Collection Account or any funds on deposit in such Account, or otherwise to the credit of such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Interest Collection Account other than in accordance with the Priority of Payments. At all times, the Interest Collection Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000 having a long-term debt rating of at least "Baa2" by Moody's or a long-term rating of at least "BBB+" by Standard & Poor's.

(b)     The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary one segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Principal Collection Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and the Trustee and over which the Trustee shall have exclusive control and sole right of withdrawal. The Trustee shall from time to time deposit all Principal Proceeds on all Collateral Debt Securities (unless Principal Proceeds are simultaneously reinvested in Collateral Debt Securities ) into the Principal Collection Account. All Monies deposited from time to time in the Principal Collection Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein. The Custodial Account Securities Intermediary, acting on behalf of the Trustee, agrees to give the Issuer immediate notice if it becomes aware that the Principal Collection Account or any funds on deposit in such Account, or otherwise to the credit of such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Principal Collection Account other than in accordance with the Priority of Payments. At all times, the Principal Collection Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000 having a long-term debt rating of at least "Baa2" by Moody's or a long-term rating of at least "BBB+" by Standard & Poor's.

(c)    The Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such Monies in a Collection Account as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Monies are to be treated as Principal Proceeds or Interest Proceeds hereunder at its discretion.  All Monies deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided.  At its option, the Trustee may establish the Collection Account as a single non-interest bearing trust account of which the Interest Collection Account and the Principal Collection Account shall be sub-accounts thereof, if it shall deem such arrangement administratively convenient.

(d)    The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary one segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Uninvested Proceeds Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and the Trustee and over which the Trustee shall have exclusive control and sole right of withdrawal.  On the Closing Date, the Trustee shall deposit the net proceeds received by the Issuer on such date from the issuance of the Notes and the Preference Shares into the Uninvested Proceeds Account.  All Monies deposited in the Uninvested Proceeds Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein, including the purchase of additional Collateral Debt Securities.  The Custodial Account Securities Intermediary, acting on behalf of the Trustee, agrees to give the Issuer immediate notice if it becomes aware that the Uninvested Proceeds Account or any funds on deposit in such Account, or otherwise to the credit of such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Uninvested Proceeds Account other than in accordance with the Priority of Payments.  At all times, the Uninvested Proceeds Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000 having a long-term debt rating of at least "Baa2" by Moody's or a long-term rating of at least "BBB+" by Standard & Poor's.

(e)    All distributions, any deposit required pursuant to Section 10.2(f) and any net proceeds from the sale or other disposition of a Collateral Debt Security or Exchanged Security received by the Trustee shall be immediately deposited into the Interest Collection Account or the Principal Collection Account subject to Sections 10.2(a) and 10.2(b).  Subject to Sections 10.2(g) and 10.2(h), all amounts deposited in the Collection Accounts, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection

Accounts as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2.

By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Uninvested Proceeds Account or the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Uninvested Proceeds Account or the Collection Accounts, as so directed in Eligible Investments having stated maturities no later than the Business Day immediately preceding the next Payment Date. The Trustee, within one (1) Business Day after receipt of any distribution or other proceeds which are not cash, shall so notify the Issuer, and the Issuer shall, within five (5) Business Days of receipt of such notice from the Trustee, sell such distribution or other proceeds for cash in an arm's-length transaction to a Person which is not an Affiliate of the Issuer or the Collateral Manager and deposit the proceeds thereof in the Uninvested Proceeds Account, the Interest Collection Account or the Principal Collection Account, as applicable, for investment pursuant to this Section 10.2; provided, that the Issuer need not sell such distributions or other proceeds if it delivers an Officer's Certificate to the Trustee certifying that such distributions and other proceeds constitute Collateral Debt Securities or Eligible Investments.

(f)    If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(e), the Trustee shall seek instructions from the Collateral Manager within three (3) Business Days after transfer of such funds to a Collection Account or the Uninvested Proceeds Account, as applicable. If the Trustee does not thereupon receive written instructions from the Issuer within five (5) Business Days after transfer of such funds to such Collection Account or such Uninvested Proceeds Account, as applicable, it shall invest and reinvest the funds held in such Collection Account or such Uninvested Proceeds Account, as applicable, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (d) of the definition thereof maturing no later than the Business Day immediately preceding the next Payment Date. After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Monies as fully as practicable in Eligible Investments of the type described in clause (d) of the definition thereof maturing no later than the earlier of (i) 30 days after the date of such investment and (ii) the Business Day immediately preceding the next Payment Date. All interest and other income from such investments shall be deposited in such Collection Account or such Uninvested Proceeds Account, as applicable, any gain realized from such investments shall be credited to such Collection Account or such Uninvested Proceeds Account, as applicable, and any loss resulting from such investments shall be charged to such Collection Account or such Uninvested Proceeds Account, as applicable. The Trustee shall not in any way be held liable by reason of any insufficiency of such Collection Account or such Uninvested

Proceeds Account, as applicable, resulting from any loss relating to any such investment, except with respect to investments in obligations of the Bank or any Affiliate thereof.

(g)     During the Reinvestment Period (and thereafter to the extent necessary to acquire, or to make extensions of credit in respect of, Collateral Debt Securities pursuant to contracts entered into during the Reinvestment Period), the Collateral Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, invest Uninvested Proceeds and reinvest Principal Proceeds (and Interest Proceeds to the limited extent described in Section 12.2) in Collateral Debt Securities as permitted under and in accordance with the requirements of Article XII and such Issuer Order. After the Reinvestment Period, the Collateral Manager may instruct the Trustee to invest Unscheduled Principal Payments, in additional Collateral Debt Securities; provided, that such Unscheduled Principal Payments which are not reinvested in Collateral Debt Securities by the last Business Day of the Due Period following the Due Period of receipt shall be applied in accordance with the Priority of Payments as Principal Proceeds on such Payment Date.  From the end of the Reinvestment Period until the Payment Date occurring in December 2010, the Collateral Manager may instruct the Trustee to invest any Disposition Proceeds from the sale of Credit Risk Securities, in additional Collateral Debt Securities so long as all the Reinvestment Criteria are satisfied as of the date of such reinvestment.

(h)     The Trustee shall transfer from the Collection Accounts or the Uninvested Proceeds Account, as applicable, to the Payment Account for application pursuant to Section 11.1 and in accordance with the calculations and the instructions contained in the Payment Date Report prepared by the Issuer pursuant to Section 10.7(b), on or prior to the Business Day prior to each Payment Date, Interest Proceeds and Principal Proceeds received in respect of the Collateral during the Due Period; except that, to the extent that Principal Proceeds in the Principal Collection Account or the Uninvested Proceeds Account, as applicable, as of such date are in excess of the amounts required to be applied pursuant to the Priority of Payments on the next Payment Date as shown in the Payment Date Report with respect to such Payment Date, the Issuer may direct the Trustee to retain such excess amounts in the Principal Collection Account or the Uninvested Proceeds Account, as applicable, and not to transfer such excess amounts to the Payment Account.

(i)     The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary a segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Custodial Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and the Trustee and over which the Trustee shall have exclusive control and sole right of withdrawal and into which the Trustee shall from time to time deposit Collateral.  All Collateral deposited from time to time in the Custodial Account pursuant to this Indenture shall be held in

trust by the Trustee and shall be applied to the purposes provided herein.  The Custodial Account Securities Intermediary, acting on behalf of the Trustee, agrees to give the Issuer immediate notice if it becomes aware that the Custodial Account or any Collateral on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.  At all times, the Custodial Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000.  The Custodial Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's or a long-term rating of at least "BBB+" by Standard & Poor's.

Section 10.3    Payment Account; Securities Lending Accounts.

(a)    The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary a segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Payment Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and Trustee and over which the Trustee shall have exclusive control and sole right of withdrawal.  Except as provided in Section 11.1, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the principal of and interest on the Notes and the payment of dividends and any final distribution on the Preference Shares, in each case, in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses, Collateral Management Fees, and other amounts specified in the Priority of Payments, each in accordance with the Priority of Payments.  All Monies deposited from time to time in the Payment Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein.  The Custodial Account Securities Intermediary, acting on behalf of the Trustee agrees to give the Issuer immediate notice if it becomes aware that the Payment Account or any funds on deposit therein, or otherwise to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.  At all times, the Payment Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000.  The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's or a long-term rating of at least "BBB+" by Standard & Poor's.

198

(b)     The Trustee shall, at the time any Securities Lending Agreement is entered into, establish at the Custodial Account Securities Intermediary a segregated, non-interest bearing trust account for each Securities Lending Counterparty in the name of the Securities Lending Counterparty, subject to the lien of First Union National Bank, as Trustee, which shall be designated as a "Securities Lending Account," which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the related Securities Lending Counterparty and the Trustee for the benefit of the Noteholders and the Trustee (according to their respective interests therein) and over which the Trustee shall have exclusive control and sole right of withdrawal and into which the Trustee shall from time to time deposit Securities Lending Collateral pledged pursuant to the related Securities Lending Agreement.  All Securities Lending Collateral deposited from time to time in any Securities Lending Account pursuant to this Indenture shall be held in trust by the Custodial Account Securities Intermediary pursuant to the related Securities Lending Agreement.  Upon any default by any Securities Lending Counterparty under the related Securities Lending Agreement (known to the Trustee), the Trustee shall promptly exercise its remedies under such Securities Lending Agreement, including liquidating the related Securities Lending Collateral pursuant to direction of the Issuer or the Collateral Manager, acting on its behalf.  The proceeds of any such liquidation will be deposited into the applicable Collection Account.

(c)     The Custodial Account Securities Intermediary agrees to give the Trustee and the Co-Issuers immediate notice if any of the Securities Lending Accounts or any funds on deposit therein, or otherwise to the credit of any of the Securities Lending Accounts, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in any of the Securities Lending Accounts other than in accordance with the applicable Securities Lending Agreement and applicable law.

Section 10.4    Expense Account.

(a)     The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary a segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Expense Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and the Trustee and over which the Trustee shall have exclusive control and sole right of withdrawal.  Except as provided in Section 11.1, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Expense Account shall be up to the Payment Date occurring in June 2002 to pay (on any day other than a Payment Date) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date which were not paid on the Closing Date.  The Trustee shall transfer to the Expense Account from the Payment Account amounts required to be deposited therein pursuant to

Section 11.1 and in accordance with the calculations and the instruction contained in the Payment Date Report prepared by the Issuer pursuant to Section 10.8(b). All amounts remaining on deposit in the Expense Account on the Determination Date related to the June 2002 Payment Date in excess of the amounts allocated to the closing fees and expenses on or prior to such date, as determined by the Collateral Manager, will be transferred by the Trustee into the Payment Account for application pursuant to Section 11.1 as either Interest Proceeds or Principal Proceeds (as determined by the Collateral Manager) on the Payment Date occurring in June 2002.

(b)     All Monies deposited from time to time in the Expense Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein. The Custodial Account Securities Intermediary, acting on behalf of the Trustee agrees to give the Issuer immediate notice if it becomes aware that the Expense Account or any funds on deposit therein, or otherwise to the credit of the Expense Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Expense Account other than in accordance with the Priority of Payments. At all times, the Expense Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000. The Expense Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's or a long-term rating of at least "BBB+" by Standard & Poor's.

(c)     By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Expense Account during a Due Period, and amounts received in prior Due Periods and retained in the Expense Account, as so directed in Eligible Investments having stated maturities no later than the Business Day immediately preceding the next Payment Date. All interest and other income from such investments shall be deposited in the Expense Account, any gain realized from such investments shall be credited to the Expense Account, and any loss resulting from such investments shall be charged to the Expense Account.

Section 10.5     Release of Collateral Debt Securities.

(a)     If no Event of Default has occurred and is continuing and subject to Article XII hereof, the Collateral Manager may, by a Collateral Manager Order delivered to the Trustee at least two (2) Business Days prior to the date set for sale of a Pledged Security and certifying that it has determined that the sale of such Collateral Debt Security constitutes a Collateral Debt Security which may be sold pursuant to Section 12.1(e) hereof, or that such Collateral Debt Security has become a Credit Improved Security, Credit Risk Security, a Defaulted Security or an Exchanged Security and that the sale of such Collateral Debt Security is in compliance with Section 12.1 and Section

12.3 (if applicable) hereof, direct the Trustee to release from the lien of this Indenture the Collateral Debt Security or Collateral Debt Securities specified in such Collateral Manager Order and, upon receipt of such Collateral Manager Order, the Trustee shall release such Collateral Debt Securities from such lien in accordance with the Collateral Manager Order, in each case against receipt of sale proceeds therefor.

(b)    If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Collateral Manager may, by Collateral Manager Order delivered to the Trustee on or before the date set for redemption or payment in full of a Collateral Debt Security and certifying that such Collateral Debt Security to be released is being redeemed or paid in full, direct the Trustee in writing to release from the lien of this Indenture such Collateral Debt Security in accordance with such Collateral Manager Order, in each case against receipt of the proceeds of the redemption price therefor or payment in full thereof.

(c)    Subject to the provisions of Article XII hereof, the Collateral Manager may, by Collateral Manager Order delivered to the Trustee on or before the date set for an exchange, tender or sale of a Collateral Debt Security and certifying that such Collateral Debt Security is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee to release from the lien of this Indenture such Collateral Debt Security in accordance with such Collateral Manager Order, in each case against receipt of payment therefor.

(d)    The Trustee shall deposit all proceeds received by it from the disposition of a Collateral Debt Security in the applicable Collection Account, unless simultaneously applied to the purchase of other Collateral Debt Securities or Eligible Investments as permitted and in accordance with the requirements of Article XII and this Article X. All proceeds received by the Trustee on the Collateral Debt Securities shall be deposited to the applicable Collection Account.

(e)    The Trustee shall, upon receipt of a Collateral Manager Order at such time as there are no Notes Outstanding and all obligations of the Issuer under or pursuant to this Indenture have been satisfied, release the Collateral from the lien of this Indenture.

Section 10.6    Reports by Trustee.

The Trustee shall supply in a timely fashion to the Issuer, each Hedge Counterparty, the Collateral Manager and the Preference Share Paying Agent any information regularly maintained by the Trustee that the Issuer, each Hedge Counterparty, the Collateral Manager or the Preference Share Paying Agent may from time to time request with respect to the Pledged Securities, the Collection Accounts or the Payment Account reasonably needed to complete the Payment Date Report or the Monthly Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be

provided by Section 10.7 or to permit the Hedge Counterparty to perform its obligations under the applicable Hedge Agreement or to permit each Collateral Manager to perform its obligations under the Collateral Management Agreement or to permit the Preference Share Paying Agent to perform its obligations under the Preference Share Paying Agency Agreement.  The Trustee shall forward to the Collateral Manager copies of notices and other writings received by it from the issuer of any or from any Clearing Agency with respect to any Collateral Debt Security advising the holders of such Collateral Debt Security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.7    Accountings.

(a)    Monthly.  Not later than the fifth (5th) Business Day after the fifth (5th) day of each month (excluding the months in which a Payment Date occurs), commencing February 2002, the Issuer shall compile and provide to the Trustee, the Initial Purchasers, each Hedge Counterparty, the Preference Share Paying Agent, the Collateral Manager and the Rating Agencies, and, upon written request to the Trustee or the Preference Share Paying Agent, as applicable, accompanied by a note owner certificate in the form of Exhibit F hereto, to any Holder of a Note or Preference Share, a monthly report (the "Monthly Report"), which shall contain the following information with respect to the Pledged Securities included in the Collateral, determined as of the fifth (5th) Business Day prior to the fifth (5th) day of such month:

(i)    the Aggregate Principal Amount of the Collateral Debt Securities together with a calculation in reasonable detail, of the sum of (A) the Aggregate Principal Amount of the Collateral Debt Securities (other than Defaulted Securities, Deferred Interest PIK Securities, Exchanged Securities and Collateral Debt Securities that the Collateral Manager reasonably believes will fail to make a scheduled payment when next due) plus (B) the Aggregate Principal Amount of Exchanged Securities plus (C) with respect to each Defaulted Security or Deferred Interest PIK Security, the Calculation Amount of such Defaulted Security or Deferred Interest PIK Security;

(ii)    the Principal Balance of the Eligible Investments, the Principal Balance of each Eligible Investment, the annual interest rate, maturity date and issuer of each Eligible Investment in the Collateral, the Moody's Rating and the S&P Rating (for so long as any Class of Notes is Outstanding and rated by Standard & Poor's) of each Eligible Investment;

(iii)    the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds, Principal Proceeds and Disposition

Proceeds received since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report);

(iv)    with respect to each Collateral Debt Security, the Principal Balance, the annual coupon rate, the maturity date, the issuer, the Moody's Rating and the S&P Rating (for so long as any Class of Notes is Outstanding and rated by Standard & Poor's) of such Collateral Debt Security;

(v)    the nature, source and amount of any proceeds in the Uninvested Proceeds Account;

(vi)    the identity and Principal Balance of any Collateral Debt Securities that were released for sale or other disposition (indicating whether such Collateral Debt Security was a Defaulted Security, Exchanged Security, Credit Improved Security or Credit Risk Security or sold pursuant to Section 12.1(e) and other than pursuant to any Securities Lending Agreement (in each case, as reported in writing to the Issuer by the Collateral Manager)) or Granted since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report), together with the sale price of each such Collateral Debt Security released for sale;

(vii)    the identity and Principal Balance of each Collateral Debt Security which has experienced a decrease or step down in the amount of interest payable on such Collateral Debt Security since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report);

(viii)    the identity and Principal Balance of each Collateral Debt Security that became a Defaulted Security or a Written Down Security since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report), and the identity and Principal Balance of each Collateral Debt Security that was a Defaulted Security or a Written Down Security as of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report) and that remains a Defaulted Security or a Written Down Security, as applicable, and the Market Value of each Defaulted Security and each Written Down Security;

(ix)    the purchase price of each Pledged Security Granted and the sale price of each Pledged Security subject to a Sale since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report) and whether such Pledged Security is a Collateral Debt Security, an Eligible Investment or proceeds in the Uninvested Proceeds Account or the Collection Accounts;

(x)    the calculation of each of (a) the Coverage Tests, (b) the Portfolio Percentage Limitations, (c) the Moody's Maximum Rating Distribution Test, (d) the Moody's Minimum Weighted Average Recovery Rate Test, (e) the Weighted Average Fixed/Floating Rate Coupon Test, (f) the Weighted Average Life Test, (g) the S&P Trading Model Test, (h) the Class A Scenario Loss Rate and (i) the S&P Minimum Recovery Rate Test, accompanied by a list setting forth the applicable maximum or minimum value, percentage or ratio which must be maintained pursuant to this Indenture with respect to each of the Reinvestment Criteria and a list setting forth the results of the calculation of each of (a) the Coverage Tests, (b) the Portfolio Percentage Limitations, (c) the Moody's Maximum Rating Distribution Test, (d) the Moody's Minimum Weighted Average Recovery Rate Test, (e) the Weighted Average Fixed/Floating Rate Coupon Test, (f) the Weighted Average Life Test, (g) the S&P Trading Model Test, (h) the Class A Scenario Loss Rate and (i) the S&P Minimum Recovery Rate Test with respect to the initial Collateral Debt Securities;

(xi)    the identity of each Collateral Debt Security that was upgraded or downgraded by either Rating Agency since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report);

(xii)    the average purchase price (excluding accrued interest) of all Collateral Debt Securities;

(xiii)    the occurrence of any Optional Redemption, Special Amortization or mandatory redemption in connection with the failure to meet a Coverage Test of any or all Classes of Notes, if applicable;

(xiv)    the breach of any covenant, representation or warranty by any party to this Indenture or the Collateral Management Agreement since the last Monthly Report (or, if more recent, the date of determination of the last Payment Date Report) as to which the Collateral Manager has been notified in writing;

(xv)    the termination or change of any party to this Indenture or the Collateral Management Agreement as to which the Collateral Manager has been notified in writing;

(xvi)    the amendment or waiver of this Indenture or the Collateral Management Agreement as to which the Collateral Manager has been notified in writing;

(xvii)   with respect to each Collateral Debt Security that is a Structured Finance Security or a REIT Security, the Specified Type of Structured Finance Security or REIT Security, as applicable, and the S&P Industry Classification Group into which such Structured Finance Security or REIT Security, as applicable falls;

(xviii)  with respect to the Interest Rate Hedge Agreement, the notional balance thereof;

(xix)    with respect to each Asset Specific Hedge, (A) the notional balance thereof and (B) the scheduled outstanding principal amount of the fixed rate asset to which it is related;

(xx)     with respect to each Timing Hedge, the notional balance thereof;

(xxi)    with respect to the Liquidity Swap, the net amount, if any, to be paid by the Liquidity Swap Counterparty and any amount to be paid by the Issuer to the Liquidity Swap Counterparty; and

(xxii)   such other information as the Trustee may reasonably request.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained therein and described in clauses (i) through (xxi) above to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer and the Collateral Manager if such information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, and detail any discrepancies.  If any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 hereof to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.  The Rating Agencies shall be notified of any such revisions.

(b)      Payment Date Accounting.  The Issuer shall render an accounting (the "Payment Date Report"), determined as of each Determination Date, and delivered to the Trustee, the Initial Purchasers, the Preference Share Paying Agent, each Hedge Counterparty, the Collateral Manager and the Rating Agencies, and, upon written request to the Trustee or the Preference Share Paying Agent, as applicable, accompanied by a note owner certificate in the form of Exhibit F hereto, to any Holder of a Note or Preference Share not later than the second Business Day preceding the related Payment

Date.  Upon receipt of each Payment Date Report, the Trustee, in the name and at the expense of the Co-Issuers, shall notify the Irish Stock Exchange of the Aggregate Outstanding Amount of the Notes of each Class of Notes then Outstanding after giving effect to the principal payments, if any, on the immediately succeeding Payment Date. The Payment Date Report shall contain the following information (provided, that the information set forth in subclause (B) of clause (ii) below shall only be included in the Payment Date Report delivered to the Preference Share Paying Agent):

(i)    (A) the Aggregate Outstanding Amount of the Notes of each Class and as percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, (B) the amount of principal payments to be made on each Class of Notes on the related Payment Date, (C) the amount of any Defaulted Interest on the Class A Notes and the amount of any Class A Note Increased Margin, (D) the amount of any Defaulted Interest on the Class B Notes and the amount of any Class B Note Increased Margin and (E) the amount of any Class C Deferred Interest on the Class C1 Notes and the amount of any Class C Deferred Interest on the Class C2 Notes, the amount of any Defaulted Interest on the Class C1 Notes and the amount of any Defaulted Interest on the Class C2 Notes, and the amount of any Class C1 Note Increased Margin and any Class C2 Note Increased Margin;

(ii)    (A) the Interest Distribution Amount, if any, to be paid to the Noteholders on the related Payment Date, including Increased Margin (in the aggregate and separately for the Class A Notes, the Class B Notes, the Class C1 Notes and the Class C2 Notes) and (B) the dividend, if any, to be paid on the Preference Shares on the related Payment Date (assuming sufficient Share Surplus (as defined in the Preference Share Paying Agency Agreement) and the solvency of the Issuer under Cayman Islands law after giving effect to such dividend);

(iii)    the Note Interest Rate for each Class of Notes for the Interest Period preceding the next Payment Date;

(iv)    the Administrative Expenses payable on the related Payment Date on an itemized basis;

(v)    with respect to the Interest Collection Account, the Principal Collection Account and the Uninvested Proceeds Account:

(A)    the Balance on deposit in the Interest Collection Account, the Principal Collection Account and the Uninvested Proceeds Account at the end of the related Due Period;

(B)    the amounts payable from the Interest Collection Account, the Principal Collection Account and the Uninvested Proceeds Account, as applicable, to the Payment Account for payment pursuant to Section 11.1 on the next Payment Date; and

(C)    the Balance remaining in the Interest Collection Account, the Principal Collection Account and the Uninvested Proceeds Account, as applicable, immediately after all payments and deposits to be made on such Payment Date;

(vi)    the Balance on deposit in the Expense Account on such Payment Date;

(vii)    a list of the Collateral Debt Securities indicating the Principal Balance and issuer of each;

(viii)    the Aggregate Principal Amount of all Collateral Debt Securities;

(ix)    (A)    the results of the Coverage Tests as of the close of business on such Determination Date (both before and after giving effect to any payments to be made on such related Payment Date);

(B)    if any Coverage Test is not met on such Determination Date, the amount of principal prepayment of each applicable Class of Notes pursuant to Section 9.5 hereof that would be necessary on the related Payment Date in order to cause such Coverage Test to be met (after giving effect to all other payments to be made on such related Payment Date); and

(C)    the results of such Coverage Test on such Determination Date after giving effect to the principal prepayment pursuant to Section 9.5 hereof and the other payments, if any, to be made on such related Payment Date;

(x)    the identity and Principal Balance of each Pledged Security that became a Defaulted Security, Deferred Interest PIK Security or Exchanged Security during the related Due Period and the identity and Principal Balance of each Collateral Debt Security that was a Defaulted Security or Deferred Interest PIK Security as of the last Payment Date Report and that remains a Defaulted

Security or Deferred Interest PIK Security, as applicable, and the Market Value of each Defaulted Security and Deferred Interest PIK Security;

(xi)    the identity and Principal Balance of each Collateral Debt Security that was released for Sale or other disposition (indicating whether such Collateral Debt Security was a Defaulted Security, Credit Improved Security, Exchanged Security or Credit Risk Security or sold pursuant to Section 12.1(e) and other than pursuant to any Securities Lending Agreement (in each case, as reported in writing to the Issuer by the Collateral Manager)), and the identity of each additional Collateral Debt Security Granted, during the related Due Period;

(xii)    the calculation of each of (a) the Coverage Tests, (b) the Portfolio Percentage Limitations, (c) the Moody's Maximum Rating Distribution Test, (d) the Moody's Minimum Weighted Average Recovery Rate Test, (e) the Weighted Average Fixed/Floating Rate Coupon Test, (f) the Weighted Average Life Test, (g) the S&P Trading Model Test, (h) the Class A Scenario Loss Rate and (i) the S&P Minimum Recovery Rate Test, accompanied by a list setting forth the applicable maximum or minimum value, percentage or ratio which must be maintained pursuant to the Indenture with respect to each of the Reinvestment Criteria and a list setting forth the results of the calculation of each of (a) the Coverage Tests, (b) the Portfolio Percentage Limitations, (c) the Moody's Maximum Rating Distribution Test, (d) the Moody's Minimum Weighted Average Recovery Rate Test, (e) the Weighted Average Fixed/Floating Rate Coupon Test, (f) the Weighted Average Life Test, (g) the S&P Trading Model Test, (h) the Class A Scenario Loss Rate and (i) the S&P Minimum Recovery Rate Test with respect to the initial Collateral Debt Securities; and

(xiii)    the information required under clauses (xi), (xiii) and (xviii) through (xxi) under Section 10.7(a) for such Determination Date.

(c)    <u>Payment Date Instructions</u>.  The Payment Date Report referred to in subsection (b) of this Section 10.7 shall contain instructions to the Trustee to withdraw on or before the Payment Date relating to such Payment Date Report the Available Funds from the Payment Account and make the payments set forth in the Payment Date Report in the manner specified, and in accordance with the Priority of Payments established in Article XI hereof.

(d)    <u>Redemption Date Instructions</u>.  Not less than five (5) Business Days after receiving an Issuer Request requesting information regarding a redemption of the Notes of a Class in connection with an Optional Redemption or a Withholding Tax Event as of a proposed Optional Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer and the Issuer shall compute the following information and provide such information in a

statement (the "Optional Redemption Date Statement") delivered to the Trustee and the Collateral Manager:

(i)     the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Optional Redemption Date;

(ii)    the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Optional Redemption Date;

(iii)   the amount of Redemption Premium, if any, payable to the Class C2 Notes on such Optional Redemption Date; and

(iv)    the amount on deposit in the Interest Collection Account and Principal Collection account available for application to the redemption of such Notes.

(e)     <u>Non-Receipt of Information</u>.  If the Trustee shall not have received any accounting provided for in this Section 10.7 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall notify the Issuer thereof and the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Optional Redemption Date.

Section 10.8    <u>Reports by Independent Accountants</u>.

(a)     The Issuer hereby appoints Deloitte & Touche LLP as the firm of Independent certified public accountants to prepare and deliver the reports or certificates of such accountants required by this Indenture.  Upon any resignation by such firm, the Issuer shall promptly appoint a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation in the United States.  If the Issuer shall not have appointed a successor within 30 days of any firm resigning from the position of Independent certified public accountants to the Issuer, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation in the United States.  The fees of such firm of Independent certified public accountants and its successor shall be payable by the Issuer, and any fees not so paid by the Issuer shall be paid by the Trustee on behalf of the Issuer, if and to the extent of Available Funds therefor in the Payment Account pursuant to and subject to the terms of Section 11.1 hereof.  Nothing herein shall be construed to obligate the Trustee to advance its own funds to pay any such accountant's fees; <u>provided</u>, <u>however</u>, that should it elect to do so, it shall be entitled to reimbursement therefor pursuant to Section 6.7 hereof.

(b)　　On or before the Business Day that is two Business Days prior to each Payment Date occurring on or prior to the Payment Date in December, and on or before the 30th day after the end of the calendar year (commencing with the calendar year 2002), the Issuer shall cause to be delivered to the Trustee, the Collateral Manager, the Hedge Counterparty and the Rating Agencies a statement from the firm of Independent certified public accountants appointed by the Issuer indicating (i) that such firm has reviewed each Payment Date Report received since the last review (or since the Closing Date, in the case of the first such review), (ii) that the calculations within each such Payment Date Report have been performed in accordance with the applicable provisions of this Indenture, and (iii) the Aggregate Principal Amount of the Collateral Debt Securities securing the Notes as of the immediately preceding Measurement Date.

(c)　　The activities of a firm of Independent certified public accountants appointed pursuant to this Section 10.8 shall be conducted pursuant to an engagement letter between the Issuer and an office of such firm.

Section 10.9　　Reports to the Rating Agencies.

The Issuer shall provide the Rating Agencies with a copy of each Monthly Report, each Payment Date Report, Optional Redemption Date Statement, each Opinion of Counsel and each Accountants' Certificate delivered pursuant to the provisions of this Indenture, all information or reports delivered to the Trustee hereunder, and with such additional information as either Rating Agency may from time to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense.  The address of each Rating Agency for purposes of notices and reports hereunder shall be as set forth in Section 14.3.

Section 10.10　　Notices to the Noteholders.

Each Monthly Report, Payment Date Report and Optional Redemption Date Statement shall contain or attach a notice to the Holders of the Notes stating that (A) each Holder of a beneficial interest in the Notes (other than a Holder of a beneficial interest in the Notes offered and sold under Regulation S) shall be deemed to have (i) represented that the Holder is a QIB and a Qualified Purchaser and (ii) made all other representations set forth in the legends of the applicable Notes and (B) the Co-Issuers or the Issuer, as the case may be, shall have the right to refuse to honor a transfer of the Notes to a Person who does not satisfy the requirements set forth in Section 2.12.  In addition, promptly upon discovery that a Person is a Non-Permitted Holder, the Issuer shall demand that a Non-Permitted Holder transfer its interest in the Notes to a Person that is not a Non-Permitted Holder within 30 days of receiving notice to such effect from the Issuer and, if such Non-Permitted Holder fails to transfer its Notes, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Notes or interest in Notes to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose.  The Issuer may also request the Trustee to include, and the Trustee shall

include, a statement in the Monthly Report, the Payment Date Report and the Optional
Redemption Date Statement requesting information with respect to whether a Holder is a QIB
and a Qualified Purchaser.  To the extent a notice is sent to a Holder of Global Notes, the Trustee
will request such Holder to send the notice to the beneficial owners of such Notes.

Section 10.11  <u>Securities Lending</u>.

(a)     The Issuer may from time to time enter into Securities Lending
Agreements with Securities Lending Counterparties, subject to (i) each such Securities
Lending Agreement permitting the Issuer to call the loan and receive return of the
Collateral Debt Security at any time without penalty if (a) the Collateral Manager
determines that such Collateral Debt Security is a Credit Risk Security, Defaulted
Security or Credit Improved Security or the Collateral Manager determines to sell such
Collateral Debt Security in a Discretionary Sale, (b) such Collateral Debt Security is to be
redeemed or (c) an Optional Redemption or redemption due to a Withholding Tax Event
is to occur.  In addition, each Securities Lending Agreement shall require that (i) the
Securities Lending Counterparty return to the Issuer debt obligations which are identical
(in terms of issue and class) to the loaned Collateral Debt Securities and (ii) the Securities
Lending Counterparty pay to the Issuer such amounts as are equivalent to all interest and
other payments which the owner of the loaned Collateral Debt Security is entitled to for
the period during which the Collateral Debt Security is lent.  At the time a Securities
Lending Agreement is entered into, after giving effect to the Issuer's entry into such
Securities Lending Agreement, Collateral Debt Securities in an Aggregate Principal
Amount not greater than 50% of the Maximum Investment Amount (determined at the
time such Collateral Debt Securities are loaned) may be subject to Securities Lending
Agreements.  Each Securities Lending Counterparty must post with the Trustee collateral
in cash or securities which shall not have a term longer than 10 years issued or guaranteed
by the U.S. government to secure its obligation to return the Collateral Debt Securities.
Such collateral must be maintained at all times with the Trustee in an amount equal to at
least 102% of the current market value (determined daily by the Custodial Account
Securities Intermediary) of the loaned securities, in the case of collateral having a term of
less than one year, and otherwise, in an amount equal to at least 104% of the current
market value.  If cash collateral is received by the Trustee, the Trustee shall invest such
cash in Eligible Investments and the Issuer will be entitled to a portion of the interest on
such Eligible Investments and a portion of such interest will be paid to the Securities
Lending Counterparty, as negotiated in the Securities Lending Agreement by the
Collateral Manager.  The Collateral Manager will provide written notice to the Trustee of
the portion of interest on Eligible Investments to be allocated to the Issuer and the
Securities Lending Counterparty.  Alternatively, if securities are delivered to the Trustee
as security for the obligations of the Securities Lending Counterparty under the related
Securities Lending Agreement, the Collateral Manager on behalf of the Issuer shall
negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the
Issuer for lending the loaned Collateral Debt Securities and shall provide written notice of

such rate to the Trustee.  To the extent a Collateral Debt Security is subject to a Securities Lending Agreement, the Notes will be secured by the Issuer's rights under the related Securities Lending Agreement and not by the Collateral Debt Securities loaned pursuant to such Securities Lending Agreement.

(b)     Notwithstanding anything else contained herein, the Trustee agrees that with respect to each Securities Lending Account, it will cause each Custodial Account Securities Intermediary establishing such Securities Lending Account to enter into an agreement whereby each such Custodial Account Securities Intermediary agrees that it will (i) comply with Entitlement Orders relating to such Securities Lending Account issued by the Trustee without further consent by either the Issuer or the Securities Lending Counterparty; (ii) credit all Securities Lending Collateral to the applicable Securities Lending Account; (iii) treat each item of property credited to such Securities Lending Account as a "financial asset" within the meaning of Article 8 of the UCC; (iv) not enter into any agreement with any other Person relating to any Securities Lending Account pursuant to which agreement it has agreed to comply with Entitlement Orders made by such Person; (v) not accept for credit to any Securities Lending Account any Securities Lending Collateral which is registered in the name of, or payable to the order of, or specially indorsed to, any Person other than the Custodial Account Securities Intermediary unless it subsequently has been indorsed to such Custodial Account Securities Intermediary or is indorsed in blank; and (vi) waive any right of set-off unrelated to its fees for such Securities Lending Account.

(c)     The Collateral Manager shall provide written instruction to the Trustee with respect to the administration of any Securities Lending Agreements (including without limitation, with respect to any default and the exercise of rights and remedies thereunder) as the Trustee may reasonably require.  Any instruction by the Issuer or the Collateral Manager to the Trustee with respect to any Securities Lending Agreement, the lending or return of securities thereunder, the posting of collateral thereunder or other matters concerning the administration thereof or exercise of rights and remedies thereunder, shall contain such information as the Trustee may reasonably require to enable it to perform and carry out the terms thereof.

(d)     The Securities Lending Accounts shall remain at all times with the Custodial Account Securities Intermediary or with a financial institution having a combined capital and surplus of at least $200,000,000 and having a long-term debt rating of at least "Baa1" and "BBB+" by Moody's and Standard & Poor's, respectively; provided, that such financial institution has executed an agreement as identified in Section 10.11(b).

(e)     So long as any Collateral Debt Security is on loan pursuant to a Securities Lending Agreement (i) such Collateral Debt Security shall nevertheless be treated for all purposes as a Pledged Security hereunder (including without limitation, for purposes of applying any of the Reinvestment Criteria) unless and until (and then, to the extent of the

Collateral Debt Securities as to which) the Trustee receives notice from the Issuer or the Collateral Manager that the Securities Lending Counterparty has defaulted on its obligation to return any Collateral Debt Security on loan under the related Securities Lending Agreement and instructing the Trustee to liquidate the Collateral Debt Security on loan pursuant to such Securities Lending Agreement, (ii) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action in respect of such Collateral Debt Security by reason of its being on loan (including without limitation, any failure to take action in respect of a notice of redemption, consent solicitation, exchange or tender offer or similar corporate action) and (iii) any such loaned Collateral Debt Security shall not be disqualified for return to the Trustee as a Pledged Security by any change in circumstance or status during the time while on loan (including any change which would cause such debt security or loan to be ineligible for purchase by the Issuer under the terms hereof if applied to a proposed purchase thereof in the open market at the time such loaned Collateral Debt Security is returned).

Section 10.12  <u>Procedures Relating to the Establishment of Accounts Controlled by the Trustee</u>.

(a)    Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Accounts, it will cause each Custodial Account Securities Intermediary establishing such Accounts to enter into an agreement whereby each such Custodial Account Securities Intermediary agrees that it will (i) comply with Entitlement Orders relating to such Account issued by the Trustee without further consent by the Issuer; (ii) credit all Collateral Debt Securities, Exchanged Securities or Eligible Investments to the applicable Account; (iii) treat each item of property credited to such Account as a "financial asset" within the meaning of Article 8 of the UCC; (iv) not enter into any agreement with any other Person relating to any Account pursuant to which agreement it has agreed to comply with Entitlement Orders made by such Person; (v) not accept for credit to any Account any Collateral Debt Security, Exchanged Security or Eligible Investment which is registered in the name of, or payable to the order of, or specially indorsed to, any Person other than the Custodial Account Securities Intermediary unless it subsequently has been indorsed to such Custodial Account Securities Intermediary or is indorsed in blank; and (vi) waive any right of set-off unrelated to its fees for such Account.

(b)    The Accounts shall remain at all times with the Custodial Account Securities Intermediary or with a financial institution having a combined capital and surplus of at least $200,000,000 and having a long-term debt rating of at least "Baa1" and "BBB" by Moody's and Standard & Poor's, respectively; <u>provided</u>, that such financial institution has executed an agreement as identified in Section 10.12(a).

ARTICLE XI

APPLICATION OF MONIES

Section 11.1    Disbursements of Monies from Payment Account.

Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and Section 13.1, on each Payment Date, the Trustee shall disburse Interest Proceeds and Principal Proceeds transferred to the Payment Account from the Collection Accounts or the Uninvested Proceeds Account, as applicable, pursuant to Section 10.2(h) as follows and for application by the Trustee in accordance with the following priorities (the "Priority of Payments"):

(a)    On each Payment Date, Interest Proceeds received in respect of the Collateral during the Due Period immediately prior to such Payment Date shall be applied as follows:

(i)    to the payment of taxes, registration and filing fees, if any of the Issuer or the Co-Issuer;

(ii)    to the payment to the Trustee, the Collateral Administrator, the Preference Share Paying Agent and the Administrator of accrued and unpaid Administrative Expenses owing to them hereunder and under the Collateral Administration Agreement, the Preference Share Paying Agency Agreement, the Administration Agreement and the Issuer Charter, up to a maximum amount on any Payment Date equal to 0.04% of the Quarterly Asset Amount computed on the basis of a 360-day year and the actual number of days elapsed;

(iii)    to the payment of accrued and unpaid Administrative Expenses (other than (a) fees and expenses described in clause (ii) above and (b) the Collateral Management Fee and any Incentive Collateral Management Fees, but including other amounts payable by the Issuer to the Collateral Manager under the Collateral Management Agreement or this Indenture) of the Co-Issuers, to the extent that such payments do not exceed on any Payment Date U.S. $200,000;

(iv)    to the payment of accrued and unpaid Senior Collateral Management Fee due on such Payment Date and to the payment of any Senior Collateral Management Fee owed on any prior Payment Date and any other amounts (other than Subordinate Collateral Management Fee and the Incentive Collateral Management Fees) due to the Collateral Manager under the Collateral Management Agreement or the Indenture;

214

(v)      to the payment of the Hedge Payments, if any, payable to any Hedge Counterparty under any Interest Rate Hedge Agreement (excluding any costs of termination of such Interest Rate Hedge Agreement and any unamortized amounts required to be paid upon termination of such Interest Rate Hedge Agreement if such termination is caused, in each case, by (i) an event of default under such Interest Rate Hedge Agreement for which the Hedge Counterparty is the defaulting party or (ii) a termination event under such Interest Rate Hedge Agreement for which the Hedge Counterparty is the sole affected party) (ratably in accordance with the respective amounts thereof then due and payable);

(vi)      to the payment of the Class A Interest Distribution Amount (including Defaulted Interest and interest thereon, if any, to the extent lawful and enforceable, but excluding Class A Note Increased Margin);

(vii)      to the payment of the Class B Interest Distribution Amount (including Defaulted Interest and interest thereon, if any, to the extent lawful and enforceable, but excluding Class B Note Increased Margin);

(viii)      to the payment of Hedge Payments, if any, due to the Liquidity Swap Counterparty under the Liquidity Swap (excluding any costs of termination of such Liquidity Swap and any unamortized amounts required to be paid upon termination of such Liquidity Swap if such termination is caused, in each case, by (i) an event of default under such Liquidity Swap for which the Liquidity Swap Counterparty is the defaulting party or (ii) a termination event under such Liquidity Swap for which the Liquidity Swap Counterparty is the sole affected party);

(ix)      on and after the Ramp-Up Effective Date, if either of the Class AB Coverage Tests is not satisfied on the related Determination Date, to the payment of, first, principal of the Class A Notes, and second, on and after the Payment Date on which the outstanding principal amount of the Class A Notes has been reduced to zero, principal of the Class B Notes, but in each case only to the extent necessary to cause the Class AB Coverage Tests to be satisfied;

(x)      to the payment of the Class C Interest Distribution Amount pro rata based on the respective amounts of interest due on the Class C1 Notes and the Class C2 Notes (including Defaulted Interest and interest thereon, if any, to the extent lawful and enforceable, but excluding Class C Deferred Interest and any interest thereon and any Class C Note Increased Margin);

(xi)      to the payment of accrued and unpaid Class C Deferred Interest and any interest thereon for the Class C Notes, pro rata based on the respective

shortfall amounts payable with respect to each such Class of Notes on such Payment Date;

(xii)    on and after the Ramp-Up Effective Date, if either of the Class C Coverage Tests is not satisfied on the related Determination Date and distributions as provided under clause (ix) above are insufficient to satisfy such tests, to the payment of, first, principal of the Class A Notes, second, on and after the Payment Date on which the outstanding principal amount of the Class A Notes has been reduced to zero, principal of the Class B Notes, and third, on and after the Payment Date on which the outstanding principal amount of the Class A Notes and Class B Notes has been reduced to zero, principal of the Class C1 Notes and the Class C2 Notes pro rata (allocated on the basis of the respective amounts of principal outstanding with respect to each such Class of Notes), but in each case only to the extent necessary to cause the Class C Coverage Tests to be satisfied;

(xiii)    if an Effective Date Ratings Downgrade has occurred, to the payment of principal of the Class A Notes, the Class B Notes or the Class C Notes in order of seniority to the extent necessary for each such rating to be reinstated in respect of each such Class or Classes of Notes;

(xiv)    to the payment of any Hedge Payments payable to any Hedge Counterparty under each Hedge Agreement that constitutes a Timing Hedge or an Asset Specific Hedge (ratably in accordance with the respective amounts thereof then due and payable) (excluding any costs of termination of such Timing Hedge or such Asset Specific Hedge and any unamortized amounts required to be paid upon termination of such Timing Hedge or such Asset Specific Hedge if such termination is caused, in each case, by (i) an event of default under such Timing Hedge or such Asset Specific Hedge for which the applicable Hedge Counterparty is the defaulting party or (ii) a termination event under such Timing Hedge or such Asset Specific Hedge for which the applicable Hedge Counterparty is the sole affected party);

(xv)    for deposit into the Principal Collection Account as Principal Proceeds on such Payment Date, an amount to be designated by the Collateral Manager in its sole discretion up to the amount of Uninvested Proceeds, if any, designated as Interest Proceeds pursuant to clause (g) in the definition of "Interest Proceeds" and Uninvested Proceeds or Principal Proceeds, if any, designated as Interest Proceeds pursuant to clause (i) of the definition of "Interest Proceeds" less the amount, if any, previously designated as Principal Proceeds pursuant to this clause (xv);

(xvi)    to the payment of amounts excluded pursuant to the parenthetical in clauses (v), (viii) and (xiv) above;

(xvii)   to the payment of any expenses of the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Administrator and then the Co-Issuers, to the extent not paid under clauses (ii) or (iii) above due to limitations on the amounts paid under those clauses pursuant hereto (and in the same order of priority);

(xviii)  to the payment of the Subordinate Collateral Management Fee due on such Payment Date and to the payment of any accrued and unpaid Subordinate Collateral Management Fee owed on any prior Payment Date;

(xix)    following the Interest Step-Up Date, first, to the payment of accrued and unpaid Class A Note Increased Margin, second, to the payment of accrued and unpaid Class B Note Increased Margin and third, to the payment of accrued and unpaid Class C1 Note Increased Margin on the Class C1 Notes and accrued and unpaid Class C2 Note Increased Margin on the Class C2 Notes pro rata based on the respective amounts of Increased Margin due on the Class C1 Notes and the Class C2 Notes;

(xx)     on the Payment Date in March 2002, for redeposit into the Interest Collection Account of an amount to be designated by the Collateral Manager in its sole discretion up to the amount of Uninvested Proceeds, if any, designated as Interest Proceeds pursuant to clause (g) in the definition of "Interest Proceeds" and Uninvested Proceeds and Principal Proceeds, if any, designated as Interest Proceeds pursuant to clause (i) of the definition of "Interest Proceeds" less the amount, if any, designated as Principal Proceeds pursuant to clause (xv);

(xxi)    on or after the Payment Date in September 2002, to the redeposit into the Interest Collection Account of an amount equal to 50% multiplied by the amount of interest received in the current Due Period with respect to any Collateral Debt Security which pays interest on a semi-annual basis; and

(xxii)   all Interest Proceeds remaining, if any, after payment of the amounts set forth in clauses (i) through (xxi) above on such Payment Date (the "Excess Interest Proceeds") will be distributed on behalf of the Issuer, for application as follows:

(a)      to the Preference Share Paying Agent, on behalf of the Issuer, to the extent the holders of the Preference Shares have not received an Internal Rate of Return of 12% prior to such Payment Date, the lesser of (1) all Excess Interest Proceeds and (2) the amount of Excess Interest Proceeds required to provide an Internal Rate of Return of 12% will be deposited in the Preference Share

Distribution Account to pay a dividend or final distribution on the Preference Shares, as applicable;

(b)    to the payment of the lesser of (i) the Primary Incentive Collateral Management Fee due on such Payment Date; or (ii) 65% of the Excess Interest Proceeds remaining after allocation pursuant to clause (a) above; provided, that if the amount payable on any Payment Date pursuant to this clause (b) is equal to the amount specified in subclause (ii), then the excess, if any, of the amount specified in subclause (i) above over the amount specified in clause (ii) above will be due and payable on the following Payment Date or Payment Dates;

(c)    to the Preference Share Paying Agent, on behalf of the Issuer, to the extent the holders of the Preference Shares have not received an Internal Rate of Return of 18% prior to such Payment Date, the lesser of (i) all Excess Interest Proceeds remaining after the allocations pursuant to clauses (a) and (b) above, and (2) the amount of Excess Interest Proceeds required to provide an Internal Rate of Return of 18% will be deposited in the Preference Share Distribution Account to pay a dividend or final distribution on the Preference Shares, as applicable;

(d)    to the payment of the lesser of (i) the Secondary Incentive Collateral Management Fee due on such Payment Date and (ii) 65% of the Excess Interest Proceeds remaining after the allocation pursuant to clauses (a), (b) and (c) above; provided, that if the Secondary Incentive Collateral Management Fee payable on any Payment Date is equal to the amount specified in clause (ii) above, then the excess, if any, of the amount specified in clause (i) above over the amount specified in clause (ii) above will be due and payable on the following Payment Date or Payment Dates; and

(e)    to the Preference Share Paying Agent, on behalf of the Issuer, if any Excess Interest Proceeds are remaining after the allocations pursuant to subclauses (a), (b), (c) and (d) above, will be deposited in the Preference Share Distribution Account for the payment to the holders of the Preference Shares of a dividend thereon or the redemption thereof, as applicable.

(b)    On each Payment Date, Principal Proceeds received in respect of the Collateral during the Due Period immediately prior to such Payment Date shall be applied as follows:

(i)      to the payment of the amounts referred to in clauses (i) through (vi) of Section 11.1(a) above (in the same manner and order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for under Section 11.1(a) above;

(ii)      on and after the Payment Date on which the outstanding principal amount of the Class A Notes has been reduced to zero, to the payment of the amounts specified in clause (vii) above under Section 11.1(a) but only to the extent not previously paid in full after the application on such Payment Date provided for under Section 11.1(a) above;

(iii)      to the payment of amounts specified in clause (viii) above under Section 11.1(a) but only to the extent not previously paid in full after the application on such Payment Date provided for under Section 11.1(a) above;

(iv)      on and after the Ramp-Up Effective Date, if either of the Class AB Coverage Tests is not satisfied on the related Determination Date (after any application of Interest Proceeds to be made on such Payment Date pursuant to clauses (ix), (xii) and (xiii) under Section 11.1(a) above), to the payment of, _first_, principal of the Class A Notes, _second_, on and after the Payment Date on which the outstanding principal amount of the Class A Notes has been reduced to zero, amounts specified in clause (vii) above under Section 11.1(a) but not paid pursuant thereto, and _third_, principal of the Class B Notes, in each case only to the extent necessary to cause the Class AB Coverage Tests to be satisfied;

(v)      on and after the Payment Date on which the outstanding principal amount of the Class A Notes and the Class B Notes has been reduced to zero, to the payment of the amounts specified in clauses (x) and (xi) above under Section 11.1(a) (in the same manner and order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for under Section 11.1(a) above;

(vi)      on and after the Ramp-Up Effective Date, if either of the Class C Coverage Tests is not satisfied on the related Determination Date (after any application of Interest Proceeds to be made on such Payment Date pursuant to clauses (ix), (xii) and (xiii) under Section 11.1(a) above and Principal Proceeds pursuant to clauses (iv) and (v) above, are insufficient to satisfy such tests), to the payment of, _first_, principal of the Class A Notes, _second_, on and after the Payment Date on which the outstanding principal amount of the Class A Notes has been reduced to zero, amounts specified in clause (vii) above under Section 11.1(a) but not paid pursuant thereto, _third_, principal of the Class B Notes, _fourth_, on and after the Payment Date on which the outstanding principal amount of the Class A

Notes and the Class B Notes has been reduced to zero, amounts specified in clauses (x) and (xi) above under Section 11.1(a) but not paid pursuant thereto, and fifth, principal of the Class C1 Notes and the Class C2 Notes pro rata (allocated on the basis of the respective amounts of principal outstanding with respect to each such Class of Notes), in each case only to the extent necessary to cause the Class C Coverage Tests to be satisfied;

(vii)    if an Effective Date Ratings Downgrade has occurred (and after having made payments pursuant to clause (xiii) above under Section 11.1(a)), to the payment of principal of the Class A Notes, then principal of the Class B Notes, and then principal of the Class C1 Notes and the Class C2 Notes pro rata (allocated on the basis of the respective amounts of principal outstanding with respect to each such Class of Notes), in each case until the applicable Class has been paid in full, or until each such rating is confirmed or reinstated;

(viii)    during the Reinvestment Period, if designated by the Collateral Manager, to pay the Special Amortization Amount, first, to the payment of principal of the Class A Notes until paid in full, second, to the payment of principal of the Class B Notes until paid in full, and third, to the payment of principal of the Class C1 Notes and the Class C2 Notes pro rata (allocated on the basis of the respective amounts of principal outstanding with respect to each such Class of Notes) until paid in full, in that order in reduction of the principal amount thereof;

(ix)    in connection with a redemption of the Notes pursuant to a Withholding Tax Event or, on or after the Payment Date in December 2004, an Optional Redemption to the payment of the Total Redemption Amount plus the Subordinate Collateral Management Fee, including the Note Redemption Price payable with respect to each Class of Notes sequentially in order of seniority;

(x)    during the Reinvestment Period, to the acquisition of additional Collateral Debt Securities (and, until so applied, to be deposited in the Principal Collection Account and held therein as Eligible Investments);

(xi)    (A) after the Reinvestment Period, in the case of Unscheduled Principal Payments at the sole discretion of the Collateral Manager to the purchase of additional Collateral Debt Securities or to the purchase Eligible Investments for the purpose of investment in such Collateral Debt Securities at a later date and (B) from the end of the Reinvestment Period until the Payment Date occurring in December 2010, in the case of any Disposition Proceeds from the sale of Credit Risk Securities, at the sole discretion of the Collateral Manager, to the purchase of additional Collateral Debt Securities or to the purchase Eligible Investments for the purpose of investment in such Collateral Debt Securities at a

later date so long as all the Reinvestment Criteria are satisfied as of the date of such reinvestment, in either case, in an aggregate amount not to exceed the amount of the related Unscheduled Principal Payments and Disposition Proceeds from the sale of Credit Risk Securities for such Due Period;

(xii)    to the payment of principal of the Class A Notes until the Class A Notes have been paid in full;

(xiii)    to the payment of the amounts specified in clause (vii) above under Section 11.1(a) but only to the extent not paid in full thereunder or under clauses (ii), (iv), (vi), (vii) or (ix) of this Section 11.1(b);

(xiv)    to the payment of principal of the Class B Notes until the Class B Notes have been paid in full;

(xv)    to the payment of the amounts specified in clauses (x) and (xi) above under Section 11.1(a) (in the same manner and order of priority), but only to the extent not paid in full thereunder or under clauses (v), (vi), (vii), (viii) or (ix) of this Section 11.1(b);

(xvi)    to the payment of principal of the Class C Notes until the Class C Notes have been paid in full;

(xvii)   to the payment of the amounts referred to in clauses (xiv) through (xix) above under Section 11.1(a) (in the same manner and order of priority), but only to the extent not previously paid in full after the application on such Payment Date as provided for under Section 11.1(a) above; and

(xviii)  all Principal Proceeds remaining, if any, after payment of the amounts set forth in clauses (i) through (xvii) above on such Payment Date (such remaining principal proceeds being referred to herein as "Excess Principal Proceeds" and, together with the Excess Interest Proceeds, the "Excess Proceeds") will be distributed on behalf of the Issuer, for application as follows:

(a)    to the Preference Share Paying Agent, on behalf of the Issuer, to the extent the holders of the Preference Shares have not received an Internal Rate of Return of 12% prior to such Payment Date (after taking into account the Interest Proceeds deposited in the Preference Share Distribution Account on such Payment Date pursuant to clauses (a) and (d) of clause (xxii) of Section 11.1(a), the lesser of (1) all Excess Principal Proceeds and (2) the amount of Excess Principal Proceeds required to provide an Internal Rate of Return of 12% will be deposited in the Preference Share

Distribution Account to pay a dividend or final distribution on the Preference Shares, as applicable;

(b)    to the payment of the Primary Incentive Collateral Management Fee due on such Payment Date;

(c)    to the Preference Share Paying Agent, on behalf of the Issuer, to the extent the holders of the Preference Shares have not received an Internal Rate of Return of 18% prior to such Payment Date (after taking into account (i) the Interest Proceeds deposited in the Preference Share Distribution Account on such Payment Date pursuant to clauses (a), (c) and (e) of clause (xxii) Section 11.1(a) and (ii) the Principal Proceeds deposited in the Preference Share Distribution Account on such Payment Date pursuant to clause (a) above), the lesser of (1) all Excess Principal Proceeds and (2) the amount of Excess Principal Proceeds required to provide an Internal Rate of Return of 18% will be deposited in the Preference Share Distribution Account to pay a dividend or final distribution on the Preference Shares, as applicable;

(d)    to the payment of the Secondary Incentive Collateral Management Fee due on such Payment Date; and

(e)    to the Preference Share Paying Agent, on behalf of the Issuer, if any Excess Principal Proceeds are remaining after the allocations pursuant to clauses (a), (b),(c) and (d) above, will be deposited in the Preference Share Distribution Account for the payment to the holders of the Preference Shares of a dividend thereon or the redemption thereof, as applicable.

If, on any Payment Date, Interest Proceeds and Principal Proceeds are insufficient to pay the amounts referred to in paragraphs (iv), (vi) and (vii) of this Section 11.1(b), the Issuer will use any remaining Uninvested Proceeds to make such payments (and in the same manner and order of priority).

Section 11.2    Trust Accounts.  All Monies held by, or deposited with, the Trustee in the Collection Accounts, the Uninvested Proceeds Account, the Expense Account or the Payment Account pursuant to the provisions of this Indenture, and not invested in Collateral Debt Securities or Eligible Investments as herein provided, shall be deposited in one or more trust accounts, maintained at a financial institution whose long-term rating is at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's and with a combined capital and surplus of at least $200,000,000, to be held in trust for the benefit of the Noteholders and the Trustee.  To the extent Monies deposited in a trust account exceed amounts insured by the Bank Insurance Fund

or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States of America, such excess shall be invested in Eligible Investments, as provided elsewhere herein.

ARTICLE  XII

SALE OF COLLATERAL DEBT SECURITIES; SUBSTITUTION

Section 12.1    Sale of Collateral Debt Securities.

(a)    Defaulted Securities.  At any time during and after the Reinvestment Period, subject to satisfaction of all applicable conditions in Section 10.5, the Issuer (or the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell (in accordance with clauses (i) or (ii) below) any Defaulted Security in the manner directed by the Collateral Manager in writing; provided, that during the Reinvestment Period, the Collateral Manager shall use its commercially reasonable best efforts to purchase (on behalf of the Issuer) prior to the end of the Due Period in which such Defaulted Security is sold or within ninety days, whichever is greater, and in compliance with the Reinvestment Criteria, one or more additional Collateral Debt Securities with an Aggregate Principal Amount at least equal to the Disposition Proceeds received from such sale; provided, further, that after the Reinvestment Period, neither the Issuer nor the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to apply Disposition Proceeds of a Defaulted Security to purchase any additional Collateral Debt Securities.

(i)    The Collateral Manager acting on behalf of the Issuer shall direct the Trustee in writing to sell any Defaulted Security within two years after such Collateral Debt Security became a Defaulted Security to the extent such default is continuing, with the exception that Defaulted Securities representing no more than 5% of the Maximum Investment Amount, may be held for a period longer than two years (but no longer than three years unless a Rating Agency Confirmation is received from Moody's) after such security became a Defaulted Security.

(ii)    Any Exchanged Security received in exchange for a Defaulted Security must be sold as soon as commercially practicable, but in any event within one year after the related Collateral Debt Security became a Defaulted Security (or within one year of such later date as such security may first be sold in accordance with its terms).

(b)    Credit Risk Securities.  At any time during and after the Reinvestment Period, subject to satisfaction of all applicable conditions in Section 10.5, the Issuer (or the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Credit Risk Security; provided, however, that neither the Issuer nor the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to sell a Credit Risk Security unless on or prior to the trade date (i) the Collateral Manager believes in its commercially reasonable business judgment that such Collateral Debt Security constitutes a Credit Risk Security and (ii) following such sale, if during the Reinvestment Period, the Collateral Manager will use its commercially reasonable best efforts to purchase (on behalf of the Issuer), and the Collateral Manager believes in its commercially reasonable business judgment that it will be able to purchase, within thirty days following the sale of such Credit Risk Security, one or more additional Collateral Debt Securities (1) complying with the Reinvestment Criteria; provided, further, that the effect of any reinvestment in additional Collateral Debt Securities on the Reinvestment Criteria shall be measured by comparing the Reinvestment Criteria (other than the S&P Trading Model Test) as calculated after the purchase of such additional Collateral Debt Securities to the Reinvestment Criteria as calculated after the sale of any Credit Risk Security and the retention of the Disposition Proceeds thereof in the Principal Collection Account, in order to determine whether such Reinvestment Criteria (other than the S&P Trading Model Test) were complied with as a result of such reinvestment; provided, however, that the foregoing method of calculation shall not apply to the Moody's Maximum Rating Distribution Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Weighted Average Fixed/Floating Coupon Rate Test and the Weighted Average Life Test, which shall in all cases be measured by comparing the Reinvestment Criteria as calculated before the sale of the Credit Risk Security and after the purchase of the additional Collateral Debt Security and (2) having an Aggregate Principal Amount not less than 90% of the Disposition Proceeds received from the sale of the Credit Risk Security;

provided, however, that from the end of the Reinvestment Period until the Payment Date occurring in December 2010, the Issuer or the Collateral Manager acting on behalf of the Issuer may (but is not required to) direct the Trustee, so long as all the Reinvestment Criteria are satisfied, to apply the Disposition Proceeds of a Credit Risk Security to purchase additional Collateral Debt Securities complying with the Reinvestment Criteria as described in clause (ii)(1) above.

(c)    Credit Improved Securities.  (i)  At any time during the Reinvestment Period, subject to satisfaction of all applicable conditions in Section 10.5, the Issuer (or the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Credit Improved Security; provided, however, that during the Reinvestment Period, neither the Issuer nor

the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to sell Credit Improved Securities unless on or prior to the trade date (i) the Collateral Manager believes in its commercially reasonable business judgment that such Collateral Debt Securities constitute Credit Improved Securities and (ii) on the date of such sale, in the Collateral Manager's commercially reasonable business judgment, the Disposition Proceeds from the sale of such Credit Improved Securities can be reinvested (1) in one or more additional Collateral Debt Securities having an Aggregate Principal Amount at least equal to 100% of the Principal Balance of such Credit Improved Security within ten Business Days from the date on which such sale is settled, or (2) in one or more additional Collateral Debt Securities having an Aggregate Principal Amount at least equal to 105% of the Principal Balance of such Credit Improved Security within twenty Business Days from the date on which such sale is settled and, in each case, complying with the Reinvestment Criteria.

(ii)     After the Reinvestment Period, neither the Issuer nor the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to sell Credit Improved Securities unless on or prior to the trade date the Collateral Manager certifies to the Trustee that (A) the Collateral Manager believes in its commercially reasonable business judgment that such Collateral Debt Security constitutes a Credit Improved Security and (B) on the date of such sale, in the Collateral Manager's commercially reasonable business judgment, the Disposition Proceeds from the sale of such Credit Improved Security will be equal to or greater than the Principal Balance of the Credit Improved Security being sold;

provided, however, that after the Reinvestment Period, neither the Issuer nor the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to apply the Disposition Proceeds of a Credit Improved Security to purchase any additional Collateral Debt Securities.

(d)     Exchanged Securities.  At any time during and after the Reinvestment Period, subject to satisfaction of all applicable conditions in Section 10.5, the Issuer (or the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Exchanged Security; provided, that after the Reinvestment Period, neither the Issuer nor the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to apply Disposition Proceeds of an Exchanged Security to purchase additional Collateral Debt Securities. Any Exchanged Security converted from a debt security must be sold within 45 days after the latest to occur of (x) the Issuer's receipt thereof, (y) the date which it becomes detachable from the Collateral Debt Security or (z) the date that such Exchanged Security may first be sold in accordance with its terms, as applicable.

(e)    <u>Discretionary Sales</u>.    Without limiting the foregoing, at any time during or after the Reinvestment Period, subject to satisfaction of all applicable conditions in Section 10.5, the Issuer (or the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Collateral Debt Security which is not a Credit Risk Security, a Credit Improved Security, a Defaulted Security or an Exchanged Security; <u>provided</u>, <u>however</u>, that:

(i)    (A)  the rating of the Class A Notes and the Class B Notes confirmed as of the Ramp-Up Effective Date has not been reduced or withdrawn by Moody's (unless subsequently reinstated to the applicable rating as of the Ramp-Up Effective Date) and (B) the ratings of the Class C Notes confirmed as of the Ramp-Up Effective Date shall not have been reduced by two or more rating subcategories or withdrawn by Moody's (unless subsequently upgraded to a rating not more than one subcategory lower than the ratings assigned to the Class C Notes as of the Ramp-Up Effective Date or reinstated);

(ii)    with respect to any such sale during the Reinvestment Period:

(A) the Collateral Manager believes in its commercially reasonable business judgment that additional Collateral Debt Securities with an Aggregate Principal Amount at least equal to 100% of the Principal Balance of the Collateral Debt Security being sold can be purchased in compliance with the Reinvestment Criteria within twenty Business Days from the date on which such sale is settled and (B) the Aggregate Principal Amount of all such sales for the given annual period during the Reinvestment Period (with the first such annual period beginning on the Closing Date) does not exceed 20% of the Maximum Investment Amount on the first day of such period; and

(iii)    with respect to any such sale after the Reinvestment Period, the aggregate Principal Balance of all such Discretionary Sales for the given annual period (with the first such annual period beginning on the day after the last day of the Reinvestment Period) does not exceed 5% of the Maximum Investment Amount on the first day of such period and the Disposition Proceeds from the sale of a Collateral Debt Security pursuant to this clause will be equal to or greater than the Principal Balance of such Collateral Debt Security; <u>provided</u>, that on the date of such sale, in the Collateral Manager's commercially reasonable business judgment, the Disposition Proceeds from the sale of a Collateral Debt Security pursuant to this clause will be equal to or greater than its aggregate Principal Balance;

provided, that neither the Issuer nor the Collateral Manager acting on behalf of the Issuer shall direct the Trustee to apply Disposition Proceeds arising from any such sale after the Reinvestment Period to purchase any additional Collateral Debt Securities.

(f)    After the Issuer has notified the Trustee in writing of an Optional Redemption of the Notes in accordance with Section 9.2, the Issuer, or the Collateral Manager acting on behalf of the Issuer pursuant to the terms of the Collateral Management Agreement, may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Issuer or the Collateral Manager in writing, all of the Collateral Debt Securities subject to the procedures set forth in Section 9.1(b) or Section 9.6, as applicable, without regard to the foregoing limitations in Sections 12.1(a), (b), (c), (d) and (e); provided, that the Disposition Proceeds therefrom are used for the redemption of the Notes and pursuant to Section 11.1, and upon any such sale the Trustee shall release such Collateral Debt Securities pursuant to Section 10.5.

(g)    Notwithstanding anything to the contrary contained herein, the Collateral Manager will direct the Trustee in writing to sell, and the Trustee shall release for sale in accordance with the provisions hereof, all Collateral Debt Securities remaining in the Collateral immediately prior to the Stated Maturity Date of the Notes such that the Disposition Proceeds of such sale will be available in accordance with Section 11.1(b) for distribution on the Stated Maturity Date.

Section 12.2    Reinvestment Criteria and Trading Restrictions.

At any time on or after the Ramp-Up Effective Date, each Collateral Debt Security to be Granted to the Trustee for inclusion in the Collateral as a Collateral Debt Security will be eligible for purchase by the Issuer and inclusion in the Collateral only if, after giving effect to the purchase of such Collateral Debt Security, the following conditions (the "Reinvestment Criteria"), as certified to the Trustee by the Collateral Manager on behalf of the Issuer, are satisfied as of the date of such Grant:

(a)    Moody's Maximum Rating Distribution Test.

With respect to the purchase of any additional Collateral Debt Securities, the Moody's Maximum Rating Distribution Test shall be satisfied after giving effect to such purchase, or if not satisfied prior to giving effect to the purchase of such additional Collateral Debt Securities, such test must be satisfied or the related numerical value must be closer to being satisfied after giving effect to such purchase; provided, however, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the Moody's Maximum Rating Distribution Test shall be satisfied after giving effect to such purchase.

(b)     Portfolio Percentage Limitations.

With respect to the purchase of any additional Collateral Debt Securities, the Portfolio Percentage Limitations shall be satisfied after giving effect to such purchase or, (A) if one or more than one of the Portfolio Percentage Limitations are not satisfied prior to giving effect to the purchase of such additional Collateral Debt Securities, at least one such limitation that is not satisfied shall be closer to being satisfied after giving effect to the proposed purchase, (B) no limitation that was satisfied will be unsatisfied after giving effect to the proposed purchase and (C) no limitation that was unsatisfied and remains unsatisfied after giving effect to such proposed purchase shall be further from being satisfied after giving effect to such proposed purchase; provided, however, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the Portfolio Percentage Limitations shall be satisfied after giving effect to such purchase.

(c)     Weighted Average Life Test.

With respect to the purchase of any additional Collateral Debt Securities, the Weighted Average Life Test shall be satisfied after giving effect to such purchase, or if not satisfied prior to giving effect to the purchase of such additional Collateral Debt Securities, such test must be satisfied or the related numerical value must be closer to being satisfied after giving effect to such purchase; provided, however, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the Weighted Average Life Test shall be satisfied after giving effect to such purchase.

(d)     Moody's Minimum Weighted Average Recovery Rate Test.

With respect to the purchase of any additional Collateral Debt Securities, the Moody's Minimum Weighted Average Recovery Rate Test shall be satisfied after giving effect to such purchase, or if not satisfied prior to giving effect to the purchase of such additional Collateral Debt Securities, such test must be satisfied or the related numerical value must be closer to being satisfied after giving effect to such purchase; provided, however, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the Moody's Minimum Weighted Average Recovery Rate Test shall be satisfied after giving effect to such purchase.

(e)     Weighted Average Fixed/Floating Rate Coupon Test.

With respect to the purchase of any additional Collateral Debt Securities, the Weighted Average Fixed/Floating Rate Coupon Test shall be satisfied, or if not satisfied prior to giving effect to the purchase of such additional Collateral Debt

Securities, such test must be satisfied or the related numerical value must be closer to being satisfied after giving effect to such purchase; provided, however, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the Weighted Average Fixed/Floating Rate Coupon Test shall be satisfied after giving effect to such purchase.

(f)    S&P Trading Model Test.

With respect to the purchase of any additional Collateral Debt Securities, the S&P Trading Model Test shall be performed by the Collateral Manager in order to calculate the Class A Loss Differential, and such Class A Loss Differential shall be positive, or, if such Class A Loss Differential is negative prior to giving effect to such proposed purchase, such Class A Loss Differential shall become positive, or if not positive, shall at least be maintained or shall improve after giving effect to the purchase of such additional Collateral Debt Securities; provided, however, that during any period when the Class A Notes have been put on a watchlist for downgrade or downgraded by Standard & Poor's, the Class A Loss Differential must be improved after giving effect to the purchase of such additional Collateral Debt Securities; and provided, further, that if on any date on which the S&P Trading Model Test is performed, the Collateral Manager determines that the Class A Loss Differential becomes negative, the Collateral Manager shall provide notice to such effect to Standard & Poor's promptly, which shall in no event be later than three (3) Business Days following the date on which such determination is made.

(g)    S&P Minimum Recovery Rate Test.

With respect to the purchase of any additional Collateral Debt Securities, the S&P Minimum Recovery Rate Test will be satisfied as of any Measurement Date if the S&P Minimum Recovery Rate is greater than or equal to 27% if the Class A Notes are outstanding; provided, however, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the S&P Minimum Recovery Rate Test shall be satisfied after giving effect to such purchase.

(h)    Coverage Tests.

With respect to the purchase of any additional Collateral Debt Securities, the Coverage Tests shall be satisfied after giving effect to such purchase; provided, that with respect to the reinvestment of the proceeds from the sale of a Collateral Debt Security pursuant to Sections 12.1(a), (b), (c), (d) or (e) if any of the Coverage Tests were not satisfied prior to giving effect to such proposed sale and purchase and will not be satisfied after giving effect thereto, the ratio related to any such unsatisfied Coverage Test shall be improved after giving effect to the proposed sale and purchase of such additional

Collateral Debt Securities and no such ratio related to a satisfied Coverage Test shall be failing after giving effect to the proposed purchase of such additional Collateral Debt Security and  provided, further, that in connection with the reinvestment of Unscheduled Principal Payments or Disposition Proceeds from the sale of Credit Risk Securities after the Reinvestment Period, the Coverage Tests shall be satisfied after giving effect to such purchase.

Section 12.3    Collateral Debt Securities Subject to A/B Exchange.

Notwithstanding the occurrence and continuation of an Event of Default or anything contained in this Indenture to the contrary, a Collateral Debt Security (the "A Security") may be exchanged for another security (the "B Security") solely for purposes of effecting an A/B Exchange (as defined below) with respect to the A Security (and the Trustee shall release such security from the lien of this Indenture) if the Trustee shall have received a Collateral Manager Order with respect to such exchange, which also certifies that the requested release of the A Security is part of an A/B Exchange in compliance with this Section 12.3, and that the B Security identified therein otherwise complies with the requirements of Sections 12.2 and 12.5 hereof.  An "A/B Exchange" with respect to an A Security shall mean an exchange of the A Security for:

(i)    the B Security, which shall be issued by the issuer or issuers of the A Security and shall have substantially identical terms to the A Security, except that one or more restrictions on the ability of the holder to sell or otherwise dispose of the A Security (including without limitation the requirement that the holder deliver a prospectus to the transferee in such sale or other disposition) are intended to be inapplicable to the B Security; and

(ii)    cash or cash equivalents in settlement of fractional or unauthorized denominations of A Securities tendered for exchange or B Securities received in the exchange.

Section 12.4    Purchase of Additional Collateral Debt Securities.

Upon receipt by the Trustee of a Collateral Manager Order with respect thereto, Available Funds representing Uninvested Proceeds and Principal Proceeds may be paid out of the Uninvested Proceeds Account or the Principal Collection Account, as applicable, on any Business Day during the Reinvestment Period for the purpose of purchasing an additional Collateral Debt Security (which such Collateral Debt Security must be purchased in compliance with the Reinvestment Criteria set forth in Section 12.2) for inclusion in the Collateral in an amount not to exceed such Available Funds and specified in such Collateral Manager Order; provided, however, that with respect to Principal Proceeds and Uninvested Proceeds, during any Due Period, the Collateral Manager shall request any withdrawal from the Collection Accounts only to the extent funds are then available in the Collection Accounts plus funds expected to be in

the Collection Accounts on the related Determination Date (based on Scheduled Distributions) exceed the required amount for the related Payment Date pursuant to clauses (i) through (ix) of the Priority of Payments. In addition, the Collateral Manager may instruct the Trustee to apply Interest Proceeds to purchase accrued interest in connection with the purchase of a Collateral Debt Security.

Section 12.5    Conditions Applicable to All Transactions Involving Purchases of Collateral Debt Securities.

(a)    Any transaction effected under this Article XII or under Section 10.2 or 10.5 hereof shall be conducted on an arm's-length basis, and, if effected with the Collateral Manager, an Affiliate of the Collateral Manager, the Issuer or the Trustee, in each case acting as principal or agent, shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so affiliated and, in the case of the Collateral Manager or an Affiliate thereof, to the extent permitted under, and in compliance with, the Collateral Management Agreement; provided, however, that the Trustee shall have no responsibility to oversee compliance with this paragraph by the Issuer or the Collateral Manager.

(b)    Upon any purchase or substitution pursuant to this Article XII, all of the Issuer's right, title and interest to the Pledged Securities shall be, and hereby is, Granted to the Trustee pursuant to the Granting Clauses of this Indenture, and each such Pledged Security shall be delivered to the Trustee in the manner provided in Section 3.2. The Trustee shall also receive, not later than the date of delivery of a Collateral Debt Security delivered pursuant to this Article XII, an Officer's Certificate of the Collateral Manager certifying (1) compliance with the provisions of Section 12.2 based on calculations included in such certificate, (2) that the Collateral Debt Security to be sold constitutes a Defaulted Security sold pursuant to and in compliance with Section 12.1(a), a Credit Risk Security sold pursuant to and in compliance with Section 12.1(b), a Credit Improved Security sold pursuant to and in compliance with Section 12.1(c), an Exchanged Security sold pursuant to and in compliance with Section 12.1(d) or other Collateral Debt Security sold pursuant to and in compliance with Section 12.1(e) and (3) that any security to be purchased constitutes a Collateral Debt Security.

(c)    Upon any sale pursuant to this Article XII, the Trustee shall also receive, not later than the trade date for the sale of a Collateral Debt Security sold pursuant to this Article XII, an Officer's Certificate of the Collateral Manager certifying (1) compliance with Section 10.5 and the provisions of Section 12.2 based on calculations included in such certificate and (2) that the Collateral Debt Security to be sold constitutes a Defaulted Security sold pursuant to and in compliance with Section 12.1(a), a Credit Risk Security sold pursuant to and in compliance with Section 12.1(b), a Credit Improved Security sold pursuant to and in compliance with Section 12.1(c), an Exchanged Security sold pursuant

to and in compliance with Section 12.1(d) or other Collateral Debt Security sold pursuant to and in compliance with Section 12.1(e).

## ARTICLE XIII

### NOTEHOLDERS' RELATIONS

Section 13.1    Subordination.

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes and the Class C Notes agree for the benefit of the Holders of the Class A Notes that the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral shall be subordinate and junior to the Class A Notes to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and as hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including, without limitation, as a result of an Event of Default specified in Section 5.1(g) or (h), the Class A Notes shall be paid in full in cash or, to the extent a Majority in Aggregate Outstanding Amount of the Class A Notes consents, other than in cash, before any further payment or distribution is made on account of the Class B Notes and the Class C Notes. The Holders of the Class B Notes and the Class C Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or the Class C Notes or hereunder until the Class A Notes have been paid in full and a year and a day or, if longer, the applicable preference period then in effect under any applicable Bankruptcy Law, has elapsed since such payment.

(b)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral shall be subordinate and junior to the Class B Notes to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and as hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including, without limitation, as a result of an Event of Default specified in Section 5.1(g) or (h), the Class A Notes and the Class B Notes shall be paid in full in cash or, to the extent a Majority in Aggregate Outstanding Amount of the most senior Class of Notes then Outstanding so consents, other than in cash, before any further payment or distribution is made on account of the Class C Notes. The Holders of the Class C Notes agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder until the Class B Notes have been paid in full and a year and a day or, if longer, the applicable preference

period then in effect under any applicable Bankruptcy Law, has elapsed since such payment.

(c)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class C Notes, that the Issuer's rights in and to the Collateral shall be subordinate and junior to the Class C Notes to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and as hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, including, without limitation, as a result of an Event of Default specified in Section 5.1(g) or (h), the Class A Notes, the Class B Notes and the Class C Notes shall be paid in full in cash or, to the extent a Majority of the Controlling Class so consents, other than in cash, before any payment of dividends or other distribution is made on account of the Preference Shares.

(d)    If, notwithstanding the provisions of this Indenture, any Holder of any Class A Notes, Class B Notes or Class C Notes or the Issuer shall have received any payment or distribution in respect thereof contrary to the provisions of this Indenture, then, unless and until the Class A Notes, the Class B Notes and the Class C Notes, as the case may be, shall have been paid in full in cash or, to the extent a Majority in Aggregate Outstanding Amount of the Class A Notes, the Class B Notes and the Class C Notes, as the case may be, consent, other than in cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of Class A Notes, the Class B Notes and the Class C Notes, as the case may be, in accordance with this Indenture; provided, however, that, if any such payment or distribution is made other than in cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including, without limitation, this Section 13.1.

(e)    Each Holder of Class A Notes, Class B Notes and Class C Notes and the Issuer agrees with all Holders of Class A Notes, Class B Notes and/or Class C Notes, as the case may be, that such Holder of Class A Notes, Class B Notes and/or Class C Notes and the Issuer shall not demand, accept, or receive any payment or distribution in respect thereof in violation of the provisions of this Indenture including, without limitation, this Section 13.1.  Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of the Class A Notes, Class B Notes, Class C Notes or Preference Shares.

Section 13.2    Standard of Conduct.

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Sections 5.9 and 13.1, a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of

any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Noteholder, any Preference Shareholder, the Issuer, or any other Person.

## ARTICLE XIV

## MISCELLANEOUS

Section 14.1    <u>Form of Documents Delivered to Trustee</u>.

(a)    In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b)    Any certificate or opinion of an Authorized Officer of the Issuer, the Co-Issuer, or the Collateral Manager may be based, insofar as it relates to legal matters, upon an Opinion of Counsel or a certificate of or representations by such legal counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer or the Collateral Manager, or Opinion of Counsel or certificate of or representations by such legal counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Collateral Manager or such other Person, unless such Authorized Officer of the Issuer or the Collateral Manager or counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Collateral Manager, stating that the information with respect to such matters is in the possession of the Issuer or the Collateral Manager, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

(c)    Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 14.2    Acts of Noteholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent or proxy duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 14.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The ownership of Notes shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 14.3    Notices.

Any request, demand, authorization, direction, notice, consent, waiver or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee by any Noteholder or by the Co-Issuers shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission to the Trustee addressed to the Trustee at:

First Union National Bank
401 South Tryon Street
Suite 1200, Mail Code NC-1179
Charlotte, North Carolina 28202
Fax: (704) 715-3329
Attention: Kevin Stephens

or at any other address furnished in writing to the Co-Issuers and the Noteholders by the Trustee; or

(b)     the Preference Share Paying Agent by the Trustee shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission to the Preference Share Paying Agent addressed to the Preference Share Paying Agent at:

First Union National Bank
401 South Tryon Street
Suite 1200, Mail Code NC-1179
Charlotte, North Carolina 28202
Fax: (704) 715-3329
Attention: Kevin Stephens

or at any other address furnished in writing to the Trustee by the Preference Share Paying Agent; or

(c)     the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, to the Issuer addressed to the Issuer at:

Madison Avenue Structured Finance CDO I, Limited
c/o QSPV Limited
P.O. Box 1093GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
British West Indies
Fax:  (345) 945-7100
Attention:  Directors

With a copy to:
Maples and Calder

> P.O. Box 309, Ugland House
> South Church Street, George Town
> Grand Cayman, Cayman Islands
> British West Indies
> Fax:  (345) 949-8080
> Attention:  Graham Lockington

or at any other address furnished in writing to the Trustee and the Noteholders by the Issuer; or

(d)     the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, to the Co-Issuer addressed to the Co-Issuer at:

> Madison Avenue Structured Finance CDO I, Corp.
> 1209 Orange Street
> Wilmington, Delaware 19801
> Fax: (302) 738-7210
> Attention:  President

or at any other address furnished in writing to the Trustee and the Noteholders by the Co-Issuer; or

(e)     the Collateral Manager by any Noteholder, the Trustee or the Issuer if in writing and mailed, by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, to the Collateral Manager addressed to the Collateral Manager at:

> Metropolitan Life Insurance Company
> 334 Madison Avenue
> P.O. Box 633
> Convent Station, New Jersey 07961-0633
> Fax:  (973) 254-3052
> Attention:  Christopher Smith

with an additional copy addressed to it at:

> Metropolitan Life Insurance Company
> 334 Madison Avenue
> P.O. Box 633

> Convent Station, New Jersey 07961-0633
> Fax:  (212) 251-1606
> Attention:  Hugh McCrory, Esq.

or at any other address furnished in writing to the Noteholders, the Trustee and the Issuer by the Collateral Manager; or

   (f)    the Rating Agencies by the Trustee, the Collateral Manager and the Co-Issuers, if in writing and mailed, by certified mail return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission, or sent via email, with simultaneous mailing of the original on the same day by first class mail postage prepaid, addressed to each Rating Agency at:

> Moody's Investors Service, Inc.
> 99 Church Street
> New York, New York 10007
> Fax:  (212) 553-4170
> Email: CDOMonitoring@Moodys.com
> Attention:  CBO/CLO Monitoring Group
>
> Standard & Poor's Ratings Services
> 55 Water Street, 41st floor
> New York, New York 10041
> Fax:  (212) 438-2664
> Attention:  Asset-Backed Surveillance Group/CBO-CLO

or at any other address furnished in writing to the Trustee, the Collateral Manager and the Co-Issuers by each Rating Agency; or

   (g)    Lehman Brothers Inc. and Lehman Brothers International (Europe) by the Trustee, the Collateral Manager and the Co-Issuers, if in writing and mailed, by certified mail return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, addressed to Lehman Brothers Inc. at:

> Lehman Brothers Inc.
> 101 Hudson Street
> Jersey City, NJ 07302
> Attention:  Collateralized Debt Obligations Group
>
> Lehman Brothers International (Europe)
> One Broadgate
> London, EC2M 7HA

England
Attention:  Collateralized Debt Obligations Group

or at any address furnished in writing to the Trustee, the Collateral Manager and the Co-Issuers by Lehman Brothers Inc. or Lehman Brothers International (Europe), as applicable; or

(h)    any Hedge Counterparty by the Trustee, the Collateral Manager and the Issuer, if in writing and mailed, by certified mail return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, addressed to each such Hedge Counterparty at the address specified in the relevant Hedge Agreement or at any other address furnished in writing to the Trustee, the Collateral Manager or the Issuer; or

(i)    The Irish Stock Exchange or the Listing Agent in Ireland by the Trustee, the Collateral Manager, the Co-Issuers and the Noteholders, if in writing and mailed, by certified mail return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, addressed to Ernst & Young at:

Ernst & Young
Ernst & Young Building
Harcourt Centre
Harcourt Street
Dublin 2
Ireland
Fax: (353) 1 4750595
Attention:  Tony Spratt

or at any address furnished in writing to the Trustee, the Collateral Manager, the Co-Issuers and the Noteholders by Ernst & Young

Section 14.4    Notices to Noteholders; Waiver.

(a)    Where this Indenture provides for giving a copy of any report or notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Noteholder affected by such event, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the rules of such stock exchange so require, notices to

Noteholders shall also be published in the Irish Stock Exchange's Daily Official List.  In any case where notice to Noteholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall conclusively be presumed to have been duly given whether or not received.

(b)    Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

(c)    In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 14.5    Effect of Headings and Table of Contents.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6    Successors and Assigns.

All covenants and agreements in this Indenture by the Issuer shall bind its respective successors and assigns, whether so expressed or not.

Section 14.7    Separability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8    Benefits of Indenture.

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Noteholders, the Preference Shareholders and any Hedge Counterparty (which Hedge Counterparty shall be an express third party beneficiary of the Indenture) any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9    Governing Law.

This Indenture, each indenture supplemental hereto and each Note shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and to be performed therein.

Section 14.10    Counterparts.

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.11    Jurisdiction.

The Co-Issuers hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, this Indenture or the Collateral Management Agreement, and the Co-Issuers hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York or federal court. The Co-Issuers hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Issuer irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the agent set forth in Section 7.18. The Co-Issuers agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.12    Waiver of Jury Trial.

EACH OF THE ISSUER, THE CO-ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

ARTICLE XV

ASSIGNMENT OF COLLATERAL AGREEMENTS

Section 15.1    Assignment of Collateral Management Agreement.

(a)      The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and the performance and observance of the provisions hereof and of each Hedge Agreement, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Noteholders and the Hedge Counterparty, all of the Issuer's estate, right, title and interest in, to and under the Collateral Management Agreement, including, without limitation, (i) all of the Issuer's interest in all securities, monies and proceeds held by the Collateral Manager thereunder, (ii) the right to give all notices, consents and releases thereunder, (iii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Manager thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iv) the right to receive all notices, accountings, consents, releases and statements thereunder and (v) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided, however, so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Management Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in paragraph (f) of this Section 15.1), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived.  The Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Collateral Management Agreement (provided, however, that this Section 15.1(a) shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default).

(b)      The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Collateral Management Agreement, nor shall any of the obligations contained in the Collateral Management Agreement be imposed on the Trustee.

(c)      Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders and the Hedge Counterparty shall cease and terminate and all the estate, right, title and interest of the Issuer in, to and under the Collateral Management Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)      The Issuer represents that the Issuer has not executed any other assignment of the Collateral Management Agreement.

(e)     The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith.  The Issuer will, from time to time upon the written request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f)     The Issuer hereby agrees, and hereby undertakes to obtain the agreement of the Collateral Manager in the Collateral Management Agreement, to the following:

(i)     The Collateral Manager consents to, and agrees to perform, the provisions of this Indenture applicable to the Collateral Manager.

(ii)     The Collateral Manager acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Management Agreement to the Trustee for the benefit of the Noteholders and the Hedge Counterparty, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Collateral Management Agreement are also for the benefit of the Trustee, the Hedge Counterparty and the Noteholders.

(iii)     The Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Management Agreement.

(iv)     Neither the Issuer nor the Collateral Manager will enter into any agreement materially amending, modifying or terminating the Collateral Management Agreement or selecting or consenting to a successor manager, without the prior written consent of the Requisite Noteholders, Standard & Poor's (for so long as any Class of Notes is Outstanding and rated by Standard & Poor's), each Hedge Counterparty and any such amendment, modification, termination, selection or consent without such consent by the Requisite Noteholders and each Hedge Counterparty shall be void.

(v)     The Collateral Manager shall continue to serve as Collateral Manager under the Collateral Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Collateral Management Agreement because sufficient funds were not then available hereunder to pay such amounts and agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Collateral Manager until the earlier of (1) payment in full of all Notes issued under this Indenture plus ten days following such payment and (2) the expiration of a period equal to the applicable preference period under any applicable Bankruptcy Law.

(vi)    The Collateral Manager will perform its obligations with respect to any conflict of interest in accordance with the requirements of the Investment Advisers Act and with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the resolution of such conflict.

Section 15.2    Assignment of Hedge Agreements.

(a)    The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Noteholders, all of the Issuer's estate, right, title and interest in, to and under each Hedge Agreement entered into by the Issuer on or prior to the Closing Date.

(b)    Notwithstanding anything in this Indenture that otherwise empowers the Issuer, the Trustee or the Holders, no amendment to this Indenture or the Collateral Management Agreement that would have a material adverse effect on the rights of any Hedge Counterparty under this Indenture shall be effective without the prior written consent of such Hedge Counterparty (which consent shall not be unreasonably withheld).

Section 15.3    Assignment of Collateral Administration Agreement.

(a)    The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and the performance and observance of the provisions hereof and of each Hedge Agreement, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Noteholders and each Hedge Counterparty, all of the Issuer's estate, right, title and interest in, to and under the Collateral Administration Agreement, including, without limitation, (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Administrator thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided, however, so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Administration Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in paragraph (f) of this Section 15.3), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived.  The Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Collateral Administration Agreement (provided, however, that this

Section 15.3(a) shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default).

(b)    The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Collateral Administration Agreement, nor shall any of the obligations contained in the Collateral Administration Agreement be imposed on the Trustee.

(c)    Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders and each Hedge Counterparty shall cease and terminate and all the estate, right, title and interest of the Issuer in, to and under the Collateral Administration Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)    The Issuer represents that the Issuer has not executed any other assignment of the Collateral Administration Agreement.

(e)    The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith.  The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f)    The Issuer hereby agrees, and hereby undertakes to obtain the agreement of the Collateral Administrator in the Collateral Administration Agreement, to the following:

(i)    The Collateral Administrator acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Administration Agreement to the Trustee for the benefit of the Noteholders and each Hedge Counterparty and the Collateral Administrator agrees that all of the representations, covenants and agreements made by the Collateral Administrator in the Collateral Administration Agreement are also for the benefit of the Trustee and the Noteholders.

(ii)    The Collateral Administrator shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Administration Agreement.

(iii)    Neither the Issuer nor the Collateral Administrator will enter into any agreement amending, modifying or terminating the Collateral Administration Agreement or selecting or consenting to a successor administrator, without the prior written consent of the Requisite Noteholders and any such amendment, modification, termination, selection or consent without such consent by the Noteholders shall be void.

(iv)    The Collateral Administrator shall continue to serve as Collateral Administrator under the Collateral Administration Agreement notwithstanding that the Collateral Administrator shall not have received amounts due it under the Collateral Administration Agreement because sufficient funds were not then available hereunder to pay such amounts and agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Collateral Administrator until the earlier of (1) payment in full of all Notes issued under this Indenture plus ten days following such payment and (2) the expiration of a period equal to the applicable preference period under any applicable Bankruptcy Law.

(v)    The Collateral Administrator will perform its obligations with respect to any conflict of interest with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the resolution of such conflict.

ARTICLE XVI

HEDGE AGREEMENTS

Section 16.1    Hedge Agreements.

(a)    The Issuer shall enter into one or more Interest Rate Hedge Agreements (which may consist of an interest rate swap and/or an interest rate cap) on or prior to the Closing Date with an Interest Rate Hedge Counterparty whose long-term unsecured debt obligations are rated (directly or by way of guarantee) (or which Interest Rate Hedge Counterparty's counterparty rating is) at least "Aa3" by Moody's (and at least "P-1" if such entity has a short term rating by Moody's) and (y) so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term rating of such entity is at least "A-1" by Standard & Poor's (or, if such Interest Rate Hedge Counterparty does not have a short-term rating by Standard & Poor's, the long-term, unsecured debt obligations of which Interest Rate Hedge Counterparty are rated (directly or by way of guarantee) (or which Interest Rate Hedge Counterparty's counterparty rating is) at least "A+" by Standard & Poor's. Following the Closing Date, the Issuer may enter into one or more additional Hedge Agreements with Hedge Counterparties, at the direction of the Collateral Manager; provided, that each Rating Agency shall have provided a Rating

Agency Confirmation with respect to the execution of such Hedge Agreement.   Each Hedge Agreement shall contain appropriate limited-recourse and non-petition provisions equivalent to those contained in Section 2.7(k).

(b)     The Issuer shall not enter into any other Interest Rate Hedge Agreement without the prior written consent of the initial Interest Rate Hedge Counterparty while the initial Interest Rate Hedge Agreement is in effect, which consent shall not be unreasonably withheld.

(c)     Additional Hedge Agreements entered into following the Closing Date may include one or more Timing Hedges entered into with one or more Timing Hedge Counterparties in order to manage potential mismatches between the timing of receipts of interest on the Collateral Debt Securities and Eligible Investments and the timing of payments due in accordance with the Priority of Payments.  In connection with the Timing Hedge, the Issuer will receive a payment from a Timing Hedge Counterparty on a certain date in exchange for the Issuer's obligation to make payments to the Timing Hedge Counterparty on one or more subsequent Payment Dates out of Interest Proceeds and Principal Proceeds to the extent available in accordance with Section 11.1(a)(xiv) and Section 11.1(b)(xvii).

(d)     Additional Hedge Agreements entered into following the Closing Date may include one or more Asset Specific Hedges entered into with one or more Asset Specific Counterparties in order to manage potential interest rate mismatches resulting from a specific Collateral Debt Security.  Any payments to be made by the Issuer and proceeds to be received by the Issuer in respect of such Asset Specific Hedges generally will be made in the same manner as Timing Hedges and will be paid on one or more subsequent Payment Dates out of Interest Proceeds and Principal Proceeds to the extent available in accordance with Section 11.1(a)(xiv) and Section 11(b)(xvii).

(e)     The Issuer shall enter into one or more Liquidity Swaps in which the Liquidity Swap Counterparty will, on each Payment Date, pay (i) the lesser of the amount necessary to make payments of interest in respect of the Class A Notes and the Class B Notes in full, to the extent Interest Proceeds and Principal Proceeds applied in accordance with the Priority of Payments are insufficient for such purpose on such Payment Date and (ii) subject to certain limitations, the amount of any deferred interest on all CBO/CLO PIK Securities (other than any CBO/CLO PIK Securities which are Defaulted Securities) accruing during the related Due Period.  Any Liquidity Swap shall have received Rating Agency Confirmation with respect to the execution and delivery of such Liquidity Swap. On each Payment Date, the Issuer will pay to the Liquidity Swap Counterparty a predetermined fee.  In exchange for the payments made in clause (i) or (ii) above, the Issuer will, on each Payment Date, pay to the Liquidity Swap Counterparty any amounts previously paid by such Liquidity Swap Counterparty under clause (i) or (ii) above and not previously repaid to such Liquidity Swap Counterparty (plus interest thereon at the

Class A Note Interest Rate).  In addition to termination or liquidation payments, if any, payable by the Issuer to the Liquidity Swap Counterparty, the Issuer shall, in the event of an Optional Redemption exercised by the Issuer, pay to the Liquidity Swap Counterparty a fee based on the present value of the remaining amounts owing to the Liquidity Swap Counterparty with respect to the predetermined fee mentioned above.  Payments made to the Liquidity Swap Counterparty will be repaid prior to payments of interest in respect of the Class C Notes.  Payments made to the Liquidity Swap Counterparty by the Issuer, will, in each case be paid in accordance with Section 11.1.

(f)    At the time the Issuer enters into a Hedge Agreement, the number of different Hedge Counterparties, when added to the number of Securities Lending Counterparties and Synthetic Security Counterparties at any particular time involved in transactions with the Issuer involving the Collateral, may not exceed ten (10).

(g)    Any Hedge Agreements shall be governed by, and construed in accordance with, the laws of the State of New York.  Each Hedge Agreement shall terminate by its terms, whether or not the Class A Notes, the Class B Notes and the Class C Notes s have been paid in full prior to such termination, upon the earlier to occur of (i) certain events of bankruptcy, insolvency, conservatorship, receivership or reorganization (each as specified in the standard ISDA Master Agreement) of the Issuer or the related Hedge Counterparty or the acceleration of the Notes, and subsequent liquidation of the Collateral pursuant to Section 5.4 hereof, as a result of the occurrence of an Event of Default and (ii) a change in law making it illegal for either the Issuer or the related Hedge Counterparty to be a party to, or perform an obligation under, the Hedge Agreement.  If the Interest Rate Hedge Agreement is terminated while the Class A Notes, the Class B Notes or the Class C Notes remain Outstanding, the Collateral Manager, on behalf of the Issuer, shall use reasonable efforts to cause the Issuer to enter into a substitute Interest Rate Hedge Agreement on similar terms; provided, that no Event of Default shall occur if any Hedge Agreement is terminated.  Each Hedge Agreement shall provide for payments to the Hedge Counterparty in accordance with the terms hereof including the Priority of Payments set forth in Section 11.1.

(h)    Each Hedge Agreement (other than the Liquidity Swap) shall provide that in the event that the rating of the long-term, unsecured debt obligations of any Hedge Counterparty (other than the Liquidity Swap Counterparty) (directly or by way of guarantee) (or such Hedge Counterparty's counterparty rating) falls below "Aa3" by Moody's (or below "P-1" if such Hedge Counterparty has a short term rating by Moody's) (a "Collateralization Event"), such Hedge Counterparty shall enter into an agreement in the form of the ISDA Credit Support Annex attached to the Hedge Agreement which shall require that the Hedge Counterparty pledge and assign to the Trustee initial collateral consisting of cash and/or Eligible Investments in an amount sufficient to maintain the then-current ratings on the Notes by each Rating Agency then rating each such Class of Notes and the terms of which shall be subject to Rating Agency

Confirmation; provided, that if such Hedge Counterparty has not provided, within 30 days following such Collateralization Event, sufficient collateral, a Substitution Event shall occur. If (A) so long as any Class of Note is Outstanding and rated by Standard & Poor's, the short-term rating of any Hedge Counterparty (other than the Liquidity Swap Counterparty) falls below "A-1" by Standard & Poor's (or if such Hedge Counterparty does not have a short-term rating by Standard & Poor's, the rating of the long-term, unsecured debt obligations of such Hedge Counterparty (directly or by way of guarantee) (or such Hedge Counterparty's counterparty rating) falls below "A+" by Standard & Poor's); (B) the rating of the long-term, unsecured debt obligations of any Hedge Counterparty (other than the Liquidity Swap Counterparty) (directly or by way of guarantee) (or such Hedge Counterparty's counterparty rating) falls below "A2" by Moody's (or below "P-1" if Party A has a short-term rating by Moody's); or (C) a Substitution Event occurs, such Hedge Counterparty will be required, within 30 days following such Substitution Event, to assign its rights and obligations under the Hedge Agreement to a new Hedge Counterparty (the "Substitute Party") in accordance with the terms of such Hedge Agreement; provided, that such right shall be subject to the assumption by the Substitute Party of all of such Hedge Counterparty's obligations thereunder and subject to the payment to such Hedge Counterparty or by such Hedge Counterparty (as applicable) of a termination payment; provided, further, that if a Substitution Event occurs as a result of clause (i) above, the Issuer and such Interest Rate Hedge Counterparty shall immediately enter into an agreement in the form of the ISDA Credit Support Annex attached to the Hedge Agreement which shall require that the Hedge Counterparty pledge and assign to the Trustee initial collateral consisting of cash and/or Eligible Investments in an amount sufficient to maintain the then-current ratings on the Notes by each Rating Agency then rating each such Class of Notes.

    (i)     Each Liquidity Swap shall provide that any Person (or any guarantor of such Person if such Person's obligations in respect of a Liquidity Swap entered into with the Issuer are absolutely and unconditionally guaranteed by such guarantor) that enters into a Liquidity Swap with the Issuer (i)(a) whose (at the time that the relevant Liquidity Swap is entered into) long-term, unsecured debt obligations are rated (or such Person's counterparty rating is) at least "Aa3" by Moody's and is not "Aa3" and on credit watch with negative implications (and at least "P-1" if such Person has a short-term rating by Moody's) and, for so long as any Class of Notes is Outstanding and rated by Standard & Poor's, the short-term debt obligations of such Person are rated (or such Person's counterparty rating is) "A-1+" by Standard & Poor's and are not on credit watch, (b) who agrees (1) to post Liquidity Swap Credit Support (at such Person's expense) if its long-term debt obligations are (directly or by way of guarantee) (or its counterparty rating is) downgraded below "Aa3" by Moody's or are "Aa3" and on credit watch with negative implications (or below "P-1" if such Person has a short-term rating by Moody's) or (so long as any Class of Notes is Outstanding and rated by Standard & Poor's) its issuer credit rating or its counterparty rating (directly or by way of guarantee) is downgraded below "AA-" or is "AA-" and on credit watch with negative implications or its short-term debt

obligations are downgraded below "A-1+" by Standard & Poor's or are "A-1+" and on credit watch, and (2) if such Person has not provided, within 30 days following a downgrade specified in clause (i)(b)(1) above, sufficient collateral as required under clause (i)(b)(1) above, to use reasonable efforts to assign its rights and obligations under the Liquidity Swap (at such Person's expense) to a Person who satisfies the ratings requirements set forth in clause (i)(a) above, and (c) who agrees that if a Liquidity Swap Substitution Event occurs, such Person shall assign its rights and obligations under the Liquidity Swap (at such Person's expense) to a Person who satisfies the ratings requirements set forth in clause (i)(a) above (such Person, the "Liquidity Swap Substitute Party") within 30 days following such Liquidity Swap Substitution Event or (ii) if the long-term, unsecured debt obligations of such Person are not at such time rated (or such Person's counterparty is not then rated) at least "Aa3" by Moody's or are "Aa3" and on credit watch with negative implications (and "P-1" if such Person has a short-term rating by Moody's), or (so long as any Class of Notes is Outstanding and rated by Standard & Poor's) the short-term obligations of such Person are not rated (or such Person's counterparty is not then rated) "A-1+" by Standard & Poor's and not on credit watch, (a) each of Moody's and Standard & Poor's (so long as any Class of Notes is Outstanding and rated by Standard & Poor's) has provided Rating Agency Confirmation and (b) Standard & Poor's has consented to such Liquidity Swap Counterparty (so long as any Class of Notes is Outstanding and rated by Standard & Poor's).

(j)      If the Hedge Counterparty fails to assign its rights and obligations under the Hedge Agreement to a Substitute Party or Liquidity Swap Substitute Party, as applicable, within 30 days following such Substitution Event or Liquidity Substitution Event, as applicable, such Hedge Counterparty shall enter into an agreement, solely at the expense of the Hedge Counterparty, in the form of the ISDA Credit Support Annex attached to the Hedge Agreement which shall require that the Hedge Counterparty pledge and assign to the Trustee initial collateral consisting of cash and/or Eligible Investments in an amount sufficient to maintain the then-current ratings on the Notes by each Rating Agency then rating each such Class of Notes. So long as any Substitution Event has occurred and is in effect, until a Substitute Party or Liquidity Swap Substitute Party, as applicable, has assumed all of the Hedge Counterparty's obligations under the related Hedge Agreement, the Hedge Counterparty shall agree to calculate the mark-to-market value of the related Hedge Agreement (the "Mark-to-Market Value") weekly as of the last Business Day of each month thereafter (each such date, the "Valuation Date") and furnish such Mark-to-Market Value to the Issuer and the Rating Agencies not later than the close of business on such Valuation Date. If any posted collateral is determined to be less than the Required Collateral Posting, then the Hedge Counterparty shall, within two Business Days following the related Valuation Date, pledge and assign to the Trustee additional collateral consisting of cash and/or Eligible Investments such that the amount of the posted collateral is not less than the Required Collateral Posting. Each Hedge Agreement shall provide that any costs attributable to pledging and assigning any collateral,

calculating the Mark-to-Market Value and finding a suitable Substitute Party or Liquidity Swap Substitute Party, as applicable, shall be borne solely by the Hedge Counterparty.

(k)    Any proceeds of the liquidation of a Hedge Agreement which exceed the costs attributable to entering into a replacement Hedge Agreement will be treated as Principal Proceeds and deposited in the Principal Collection Account.  Any payment made by a Substitute Party or a Liquidity Swap Substitute Party will first be applied to make any termination payment owed to the Hedge Counterparty or Liquidity Swap Counterparty, as the case may be, in connection with entering into such replacement Hedge Agreement.

(l)    On or after the Closing Date, the Collateral Manager, on behalf of the Issuer, may sell all or a portion of any Hedge Agreement, terminate such Hedge Agreement or reduce the notional amount thereof, with the consent of the applicable Hedge Counterparty; provided, however, that if any Notes are then Outstanding, each Rating Agency shall have provided a Rating Agency Confirmation with respect to such sale, termination or reduction of the notional amount thereof.  Upon any such reduction, (i) an amount may be payable to the Issuer by the Hedge Counterparty pursuant to the Hedge Agreement and (ii) the Issuer's ongoing payment obligations will not be affected by any such reduction.  Any amount paid by the Hedge Counterparty to the Issuer in connection with such reduction shall constitute Principal Proceeds.

(m)    The Trustee shall, on behalf of the Issuer and in accordance with the Payment Date Report, pay amounts due to the Hedge Counterparty under any Hedge Agreement on any Payment Date in accordance with Section 11.1.

(n)    The Trustee shall, on or prior to the Closing Date, establish at the Custodial Account Securities Intermediary a segregated, non-interest bearing trust account in the name "Madison Avenue Structured Finance CDO I, Limited, subject to the lien of First Union National Bank, as Trustee," which shall be designated as the Hedge Counterparty Collateral Account, which shall be held by the Custodial Account Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Noteholders and the Interest Rate Hedge Counterparty and over which the Trustee shall have exclusive control and sole right of withdrawal.  The Trustee may establish any number of sub-accounts to the Hedge Counterparty Collateral Account for the convenience in administering such account.  The Trustee shall deposit all collateral received from the Interest Rate Hedge Counterparty or any Asset Specific Counterparty under the related Hedge Agreement in the Hedge Counterparty Collateral Account.  All collateral deposited from time to time in the Hedge Counterparty Collateral Account pursuant to this Indenture shall be held in trust by the Trustee and shall be applied to the purposes provided herein.  The Custodial Account Securities Intermediary, acting on behalf of the Trustee, agrees to give the Issuer immediate notice if it becomes aware that the Hedge Counterparty Collateral Account or any funds on deposit therein, or otherwise to the

credit of the Hedge Counterparty Collateral Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Hedge Counterparty Collateral Account other than in accordance with the Priority of Payments. At all times, the Hedge Counterparty Collateral Account shall remain at an institution with a combined capital and surplus in excess of $200,000,000 and having a long-term debt rating of at least "Baa1" and "BBB+" by Moody's and Standard & Poor's, respectively. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be (i) for application to obligations of the Hedge Counterparty to the Issuer under the Hedge Agreement if the Hedge Agreement becomes subject to early termination or (ii) to return collateral to the Hedge Counterparty when and as required by a Hedge Agreement.

(o)    In the event the Trustee becomes aware that a Hedge Counterparty has defaulted in the payment when due of its obligations to the Issuer under the Hedge Agreement, the Trustee shall make a demand on the Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date (or by such time on the next succeeding Business Day if such knowledge is obtained after 11:30 a.m., New York time). The Trustee shall give notice to the Noteholders upon the continuing failure by the Hedge Counterparty to perform its obligations during the two (2) Business Days following a demand made by the Trustee on the Hedge Counterparty.

IN WITNESS WHEREOF, this Indenture has been entered into as of the date first hereinabove set forth.

MADISON AVENUE STRUCTURED
FINANCE CDO I, LIMITED,
    as Issuer


By: _____
    Name:
    Title:   Director


MADISON AVENUE STRUCTURED
FINANCE CDO I, CORP.,
    as Co-Issuer


By: _____
    Name:
    Title:   President


FIRST UNION NATIONAL BANK,
    not in its individual capacity, but solely as Trustee


By: _____
    Name:
    Title:

