**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
                                        :
In re:                                  :        Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :        08-13555 (JMP)
                                        :
                Debtors.                :        (Jointly Administered)
                                        :
------------------------------------------------------------ x
```

**SIXTH APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP, COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM <u>JUNE 1, 2010 THROUGH AND INCLUDING SEPTEMBER 30, 2010</u>**

| | |
|---|---|
| Name of Applicant: | <u>Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP</u> |
| Authorized to Provide Professional Services to: | <u>Official Committee of Unsecured Creditors</u> |
| Date of Retention: | <u>November 18, 2008 (effective as of September 17, 2008)</u> |
| Period for which compensation and reimbursement is sought: | <u>June 1, 2010 – September 30, 2010</u> |

Amount of Compensation
requested:                              $18,359,367.75

Amount of Expense
Reimbursement requested:                $792,924.64

This is an: __X__ interim _____ final application.

This is the sixth interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these
cases.

**SIXTH INTERIM FEE APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL. (JUNE 1, 2010 – SEPTEMBER 30, 2010)**

| Name | Position; Experience | Hourly Rate | Total Hours | Total Compensation |
|---|---|---|---|---|
| Paul Aronzon | Financial Restructuring Partner for 20 years; admitted in 1979. | $1,050 | 36.80 | $38,640.00 |
| Dennis Dunne | Financial Restructuring Partner for 12 years; admitted in 1991. | $1,050 | 303.00 | $318,150.00 |
| Linda Dakin-Grimm | Litigation Partner for 9 years; admitted in 1985. | $1,025 | 3.00 | $3,075.00 |
| Trayton Davis | Alternative Investments Partner for 21 years, admitted in 1981. | $1,025 | 22.20 | $22,755.00 |
| Jay Grushkin | Alternative Investments Partner for 21 years, admitted in 1982. | $1,025 | 5.90 | $6,047.50 |
| Michael Hirschfeld | Litigation Partner for 28 years; admitted in 1974. | $1,025 | 26.00 | $26,650.00 |
| Rainer Magold | Leveraged Finance Partner for 5 years; admitted in 1986. | $1,025 | 2.80 | $2,870.00 |
| Marcelo Mottesi | Global Securities Partner for 11 years; admitted in 1995. | $1,025 | 104.80 | $107,420.00 |
| Andrew Tomback | Litigation Partner for 13 years; admitted in 1987. | $1,025 | 422.20 | $432,755.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 13 years; admitted in 1996. | $975 | 36.70 | $35,782.50 |
| Nicholas James Angel | Financial Restructuring Partner for 2 years; admitted in 1986. | $950 | 126.20 | $119,890.00 |
| Peter Benudiz | Global Corporate Partner for 17 years; admitted in 1987. | $950 $475* | 67.10 | $63,745.00 |
| David Cohen | Litigation Partner for 8 years; admitted in 1994. | $950 $475* | 606.90 65.60 | $576,555.00 $31,160.00 |
| Dale Ponikvar | Tax Partner for 20 years; admitted in 1981. | $950 $475 | 417.30 7.90 | $396,435.00 $3,752.50 |
| Michael Bellucci | Global Leveraged Finance Partner for 9 years; admitted in 1994. | $925 | 8.10 | $7,492.50 |
| Wilbur Foster Jr | Financial Restructuring Partner for 19 years; admitted in 1982. | $925 | 765.10 | $707,717.50 |
| David Lamb | Global Corporate Partner for 20 years; admitted in 1992. | $925 $462.5* | 111.70 | $103,322.50 |

| | | | | |
|---|---|---|---|---|
| Eric Moser | Global Finance Partner for 11 years; admitted in 1991. | $925 | 114.50 | $105,912.50 |
| Andrew Walker | Tax Partner for 7 years; admitted in 1995. | $925 | 25.50 | $23,587.50 |
| Paul Wessel | Tax Partner for 14 years; admitted in 1988. | $925 | 38.80 | $35,890.00 |
| Winthrop Brown | Global Finance Partner for 27 years; admitted in 1975. | $900 | 13.40 | $12,060.00 |
| Alberta A. Pisa | Global Finance Partner for 5 years; admitted in 1997. | $900 | 44.70 | $40,230.00 |
| Stacey J. Rappaport | Litigation Partner for 6 years; admitted in 1997. | $875 | 2.10 | $1,837.50 |
| James Warbey | Global Finance Partner for 5 years; admitted in 1996. | $875 | 395.80 | $346,325.00 |
| Thomas Ingenhoven | Global Leveraged finance Partner for 3 years; admitted in 2001. | $825 | 3.70 | $3,052.50 |
| Russell Kestenbaum | Tax Partner for 3 years; admitted in 1999. | $825 | 72.10 | $59,482.50 |
| Paul Denaro | Global Securities Partner for 2 years; admitted in 2000. | $800 | 181.20 | $144,960.00 |
| Martin Erhardt | Global Corporate Partner for 2 years; admitted in 2000. | $800 | 13.90 | $11,120.00 |
| Evan R. Fleck | Financial Restructuring Partner for 11 months; admitted in 2002. | $750<br>$375* | 892.70<br>33.30 | $669,525.00<br>$12,487.50 |
| Thomas Kleinheisterkamp | Tax Partner for 11 months; admitted in 2003. | $750 | 8.50 | $6,375.00 |
| Robert Liubicic | Litigation Partner for 11 months; admitted in 1999. | $750 | 8.60 | $6,450.00 |
| Bruce Todd Gardner | Real Estate Of Counsel for 11 years; admitted in 1978. | $870 | 7.40 | $6,438.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 8 years; admitted in 1984. | $850 | 93.40 | $79,390.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 3 years; admitted in 1992. | $810<br>$405* | 995.50<br>3.90 | $806,355.00<br>$1,579.50 |
| Richard Rosberger | Litigation Of Counsel for 3 years; admitted in 1994. | $750 | 217.20 | $162,900.00 |
| David Sieradzki | Litigation Associate for 15 years; admitted in 1996. | $720 | 66.40 | $47,808.00 |

| | | | | |
|---|---|---|---|---|
| Drew Batkin | Tax Associate for 8 years; admitted in 2003. | $695 $347.5* | 467.20 3.0 | $324,704.00 $1,042.50 |
| Andrew Beirne | Litigation Associate for 14 years; admitted in 1996. | $695 | 22.50 | $15,637.50 |
| Lisa Brabant | Real Estate Associate for 12 years; admitted in 1999. | $695 | 26.70 | $18,556.50 |
| David S. Gasperow | Global Securities Associate for 5 years; admitted in 2002. | $695 | 32.90 | $22,865.50 |
| Robert C. Hora | Litigation Associate for 5 years; admitted in 2003. | $695 | 9.20 | $6,394.00 |
| Aaron Renenger | Litigation Associate for 8 years; admitted in 2002. | $695 | 312.30 | $217,048.50 |
| Steven Szanzer | Financial Restructuring Associate for 10 years; admitted in 2001. | $695 | 143.60 | $99,802.00 |
| Stephen Tudway | Litigation Associate for 12 years; admitted in 1998. | $695 | 77.70 | $54,001.50 |
| Marl Withey | Global Corporate Associate. | $695 | 32.40 | $22,518.00 |
| Lena Mandel | Senior Attorney; admitted in 1991. | $685 | 290.20 | $198,787.00 |
| Adrian Azer | Litigation Associate for 7 years; admitted in 2003. | $675 $337.5* | 725.90 19.20 | $489,982.50 $6,480.00 |
| Irene Bogdashevsky | Financial Restructuring Associate for 7 years; admitted in 2004. | $675 | 50.30 | $33,952.50 |
| Alistair F. Hill | Global Leveraged Finance Associate for 7 years; admitted in 2003. | $675 | 38 | $25,650.00 |
| Samuel A. Khalil | Financial Restructuring Associate for 7 years; admitted in 2004. | $675 | 2.80 | $1,890.00 |
| Erika Kuver-Del Duca | Real Estate Associate for 7 years; admitted in 2004. | $675 | 22.20 | $14,985.00 |
| Neda Matar | Global Finance Associate for 7 years; admitted in 2004. | $675 | 37.60 | $25,380.00 |
| Brian Stern | Global Corporate Associate for 7 years; admitted in 2003. | $675 | 16.50 | $11,137.50 |
| Daniel De Souza | Litigation Associate for 6 years; admitted in 2005. | $650 | 93.30 | $60,645.00 |
| Peter Devonshire | Global Finance Associate for 6 years; admitted in 2007. | $650 | 13 | $8,450.00 |
| Grace Gilligan | Litigation Associate for 6 years; admitted in 2005. | $650 | 216.80 | $140,920.00 |
| Peter Newman | Financial Restructuring Associate for 6 years; admitted in 2005. | $650 | 51.10 | $33,215.00 |

| | | | | |
|---|---|---|---|---|
| Maximilian Schneider | Global Leveraged Finance Associate for 6 years; admitted in 2005. | $650 | 77.60 | $50,440.00 |
| Melanie Westover | Litigation Associate for 6 years; admitted in 2005. | $650 | 3.50 | $2,275.00 |
| Anh-Duc Cordalis | Global Leveraged Fnance Associate for 5 years. | $625 | 2.80 | $1,750.00 |
| Karen Gartenberg | Financial Restructuring Associate for 5 years; admitted in 2006. | $625 | 105.70 | $66,062.50 |
| Patrick Marecki | Litigation Associate for 5 years; admitted in 2006. | $625 | 141.30 | $88,312.50 |
| Dana Roitberg Weir | Litigation Associate for 5 years; admitted in 2006. | $625 | 122.60 | $76,625.00 |
| John White | Litigation Associate for 5 years; admitted in 2006. | $625 | 509.50 | $318,437.50 |
| Simon Williams | Global Finance Associate for 5 years; admitted in 2008. | $625 | 163.70 | $102,312.50 |
| Merih O Altay | Global Corporate Associate for 4 years; admitted in 2006. | $600 | 11.20 | $6,720.00 |
| Nicholas Bassett | Litigation Associate for 4 years; admitted in 2007. | $600 $300* | 320.80 6.10 | $192,480.00 $1,830.00 |
| Jonathan Brown | Global Finance Associate for 4 years; admitted in 2007. | $600 | 2.20 | $1,320.00 |
| Melissa Ann Clark | Global Corporate Associate for 4 years; admitted in 2006. | $600 | 49.40 | $29,640.00 |
| James Harris | Financial Restructuring Associate for 4 years; admitted in 2008. | $600 | 145.40 | $87,240.00 |
| Emma Hogwood | Litigation Associate for 4 years; admitted in 2006. | $600 | 69.90 | $41,940.00 |
| Jeremy C. Hollembeak | Financial Restructuring Associate for 4 years; admitted in 2007. | $600 | 180.50 | $108,300.00 |
| Aluyah Imoisili | Litigation Associate for 4 years; admitted in 2006. | $600 | 96.50 | $57,900.00 |
| Jeffrey W. Lesovitz | Litigation Associate for 4 years; admitted in 2007. | $600 | 276.50 | $165,900.00 |
| Gabriel Mpubani | Global Corporate Finance Associate for 4 years; admitted in 2006. | $600 | 28.50 | $17,100.00 |
| Mary Santanello | Alternative Investments Associate for 4 years; admitted in 2007. | $600 $300* | 11.10 | $6,660.00 |
| Stephanie Sklar | Real Estate Associate for 4 years; admitted in 2007. | $600 | 40 | $24,000.00 |

| Jeremy Sussman | Financial Restructuring Associate for 4 years; admitted in 2007. | $600 | 29.40 | $17,640.00 |
| Wendy Williams | Global Securities Associate for 4 years; admitted in 2007. | $600 | 15.10 | $9,060.00 |
| Constance Beverley | Litigation Associate for 3 years; admitted in 2008. | $575 $287.5* | 239.80 13.50 | $137,885.00 $3,881.25 |
| Gina Stabile | Alternative Investments Associate for 3 years; admitted in 2008. | $575 | 2.00 | $1,150.00 |
| Brianne Copp | Litigation Associate for 3 years; admitted in 2008. | $575 | 109.40 | $62,905.00 |
| Dawn Harding | Global Transportation and Space Finance Associate for 3 years. | $575 | 79.50 | $45,712.50 |
| Curtis Johnson | Litigation Associate for 3 years; admitted in 2008. | $575 | 47.80 | $27,485.00 |
| Michael Lee | Global Securities Associate for 3 years; admitted in 2008. | $575 | 200.60 | $115,345.00 |
| Nicole Leyton | Tax Associate for 3 years; admitted in 2008. | $575 | 18.40 | $10,580.00 |
| Michael Lynch | Global Corporate Associate for 3 years; admitted in 2007. | $575 | 426.60 | $245,295.00 |
| Melanie Ann McLaughlin | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 | 86.60 | $49,795.00 |
| William J. McNamara | Litigation Associate for 3 years; admitted in 2008. | $575 | 106.80 | $61,410.00 |
| Gregory Papeika | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 | 299.20 | $172,040.00 |
| Sangyoon Nathan Park | Litigation Associate for 3 years; admitted in 2008. | $575 $287.5* | 326.30 6.00 | $187,622.50 $1,725.00 |
| Charles Rubio | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 | 158.40 | $91,080.00 |
| Mikhel Schecter | Alternative Investments Associate for 3 years; admitted in 2008. | $575 | 6.20 | $3,565.00 |
| Andrew Sullivan | Global Securities Associate for 3 years; admitted in 2008. | $575 | 151.80 | $87,285.00 |
| Jennie Woltz | Litigation Associate for 3 years; admitted in 2008. | $575 | 147.30 | $84,697.50 |
| Andrew Young | Financial Restructuring Associate for 3 years; admitted in 2006. | $575 | 458.00 | $263,350.00 |

| | | | | |
|---|---|---|---|---|
| Jeeseon Ahn | Global Alternative Investments Associate for 2 years; admitted in 2009. | $525 | 29.90 | $15,697.50 |
| Sonja Andersen | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 9.20 | $4,830.00 |
| Michael Applebaum | Tax Associate for 2 years; admitted in 2009. | $525 | 13.50 | $7,087.50 |
| Kurt Avarell | Tax Associate for 2 years; admitted in 2009. | $525 | 92.60 | $48,615.00 |
| Jennifer Beaudry | Global Securities Associate for 2 years; admitted in 2009. | $525 | 21.80 | $11,445.00 |
| La Tonya D. Brooks | Litigation Associate for 2 years; admitted in 2009. | $525 | 157.20 | $82,530.00 |
| Adlin Castro | Global Securities Associate for 2 years; admitted in 2009. | $525 | 15.70 | $8,242.50 |
| Ateesh Chanda | Litigation Associate for 2 years; admitted in 2009. | $525 | 160.90 | $84,472.50 |
| Wayne Ren Chang | Litigation Associate for 2 years; admitted in 2009. | $525 | 30.30 | $15,907.50 |
| Michael Clarke | Global Finance Associate for 2 years; admitted in 2009. | $525 | 56.70 | $29,767.50 |
| Julie Constantinides | Global Corporate Associate for 2 years; admitted in 2009. | $525 | 33.80 | $17,745.00 |
| Erin Culbertson | Litigation Associate for 2 years; admitted in 2009. | $525<br>$262.5* | 310.00<br>5.20 | $162,750.00<br>$1,365.00 |
| Nicole Fidler | Litigation Associate for 2 years; admitted in 2009. | $525 | 235.60 | $123,690.00 |
| Derek Gluckman | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 7.90 | $4,147.50 |
| Joanna L. Grossman | Tax Associate for 2 years; admitted in 2009. | $525 | 18.50 | $9,712.50 |
| Christopher Hower | Litigation Associate for 2 years; admitted in 2009. | $525 | 30.70 | $16,117.50 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 2 years; admitted in 2009. | $525 | 581.80 | $305,445.00 |
| Alexander Klein | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $525 | 63.10 | $33,127.50 |
| Marianna Kosharovsky | Global Securities Associate for 2 years; admitted in 2009. | $525 | 139.00 | $72,975.00 |
| Karin Kringen | Global Securities Associate for 2 years; admitted in 2009. | $525 | 18.50 | $9,712.50 |

| Konata Lake | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $525 | 2.90 | $1,522.50 |
| Brian Lee | Global Finance Associate for 2 years; admitted in 2009. | $525 | 24.40 | $12,810.00 |
| Roger Lee | Financial Restructuring Associate for 2 years; admitted in 2009. | $525 | 77.10 | $40,477.50 |
| Ulric Lewen | Global Securities Associate for 2 years; admitted in 2009. | $525 | 60.50 | $31,762.50 |
| Andrea McNamara | Financial Restructuring Associate for Associate for 2 years; admitted in 2009. | $525 | 550.20 | $288,855.00 |
| Jan Nishizawa | Global Corporate Associate for 2 years; admitted in 2009. | $525 $262.5* | 4.00 | $2,100.00 |
| Hannibal Oezdemir | Global Corporate Associate for 2 years. | $525 | 14.20 | $7,455.00 |
| Tanja L. Olano | Global Corporate Associate for 2 years; admitted in 2009. | $525 | 30.10 | $15,802.50 |
| Rachel Pojunas | Litigation Associate for 2 years; admitted in 2009. | $525 | $192.70 | $101,167.50 |
| Brendan Riley | Litigation Associate for 2 years; admitted in 2009. | $525 | 510.90 | $268,222.50 |
| Joanne Robertson | Global Finance Associate for 2 years; admitted in 2009. | $525 | 151.30 | $79,432.50 |
| Stephen Rose | Global Securities Associate for 2 years; admitted in 2009. | $525 | 19.20 | $10,080.00 |
| Thomas Santoro | Litigation Associate for 2 years; admitted in 2009. | $525 | 160.80 | $84,420.00 |
| Jeremy Steckel | Global Securities Associate for 2 years; admitted in 2009. | $525 | 116.80 | $61,320.00 |
| Stephanie Swanson | Global Securities Associate for 2 years; admitted in 2009. | $525 | 138.90 | $72,922.50 |
| Armando Acosta III | Litigation Associate for 11 months; admitted in 2010. | $450 | 192.40 | $86,580.00 |
| Brittany Akins | Litigation Associate for 11 months; admitted in 2010. | $450 | 730.80 | $328,860.00 |
| Thallen Brassel | Tax Associate for 11 months; admitted in 2010. | $450 | 519.20 | $233,640.00 |
| Deana Brown | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 $225* | 0.90 2.20 | $405.00 $495.00 |
| John Calabrese | Litigation Associate for 11 months; admitted in 2010. | $450 | 477.70 | $214,965.00 |
| Ginni Chen | Litigation Associate for 11 months; admitted in 2010. | $450 | 413.10 | $185,895.00 |

| | | | | |
|---|---|---|---|---|
| Philippe Danielides | Global Transportation and Space Finance Associate for 11 months; admitted in 2010. | $450 | 62.90 | $28,305.00 |
| Victoria Farren | Alternative Investments Associate for 11 months; admitted in 2010. | $450 | 78.40 | $35,280.00 |
| Bradley Friedman | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 | 588.50 | $264,825.00 |
| Meghan Gabriel | Global Corporate Associate for 11 months; admitted in 2010. | $450 | 10.90 | $4,905.00 |
| Craig Gibson | Global Leveraged Finance Associate for 11 months; admitted in 2010. | $450 | 26.80 | $12,060.00 |
| Vina Ha | Litigation Associate for 11 months; admitted in 2010. | $450 | 436.20 | $196,290.00 |
| Shemetreal Harris | Alternative Investments Associate for 11 months; admitted in 2010. | $450 | 3.80 | $1,710.00 |
| Elena Hassan | Global Corporate Associate for 11 months; admitted in 2010. | $450 | 107.80 | $48,510.00 |
| Jacob Jou | Litigation Associate for 11 months; admitted in 2010. | $450 | 331.20 | $149,040.00 |
| Matthew Kanter | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 | 585.10 | $263,295.00 |
| Ethan Lee | Litigation Associate for 11 months; admitted in 2010. | $450 | 585.20 | $263,340.00 |
| Kevin Lee | Global Corporate Associate for 11 months; admitted in 2010. | $450 | 85.90 | $38,655.00 |
| Kathryn Lenahan | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 | 321.40 | $144,630.00 |
| Denise Linton | Litigation Associate for 11 months; admitted in 2010. | $450 | 540.80 | $243,360.00 |
| Tiara Lipps | Real Estate Associate for 11 months; admitted in 2010. | $450 | 74.80 | $33,660.00 |
| Alastair Macdonald | Global Transportation and Space Finance Associate for 11 months; admitted in 2010. | $450 | 68.40 | $30,780.00 |
| James Marshall | Global Securities Associate for 11 months; admitted in 2010. | $450 | 121.40 | $54,630.00 |
| Richard Mo | Global Securities Associate for 11 months; admitted in 2010. | $450 | 87.50 | $39,375.00 |
| Andrew Morton | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 | 86.90 | $39,105.00 |

| | | | | |
|---|---|---|---|---|
| Brian Murphy | Global Corporate Associate for 11 months; admitted in 2010. | $450 | 37.00 | $16,650.00 |
| Kathleen Oliver | Global Transportation and Space Finance Associate for 11 months; admitted in 2010. | $450 | 23.50 | $10,575.00 |
| Vanessa Ortblad | Global Project Finance Associate for 11 months; admitted in 2010. | $450 | 36.00 | $16,200.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 | 115.70 | $52,065.00 |
| James Reilly | Litigation Associate for 11 months; admitted in 2010. | $450 | 129.60 | $58,320.00 |
| Katherine Rhodes | Litigation Associate for 11 months; admitted in 2010. | $450 | 185.20 | $83,340.00 |
| Joanne Ricciardiello | Global Transportation and Space Finance Associate for 11 months; admitted in 2010. | $450 | 144.40 | $64,980.00 |
| Paul Riley | Litigation Associate for 11 months; admitted in 2010. | $450 | 222.40 | $100,080.00 |
| Iiya Ross | Global Securities Associate for 11 months; admitted in 2010. | $450 | 191.00 | $85,950.00 |
| Neema Saran | Litigation Associate for 11 months; admitted in 2010. | $450 | 446.10 | $200,745.00 |
| Megha Shah | Global Securities Associate for 11 months; admitted in 2010. | $450 | 349.80 | $157,410.00 |
| Nehal Siddiqui | Global Corporate Associate for 11 months; admitted in 2010. | $450 | 160.80 | $72,360.00 |
| Sunila Sreepada | Litigation Associate for 11 months; admitted in 2010. | $450 | 76.50 | $34,425.00 |
| Brian Sturm | Financial Restructuring Associate for 11 months; admitted in 2010. | $450 | 320.10 | $144,045.00 |
| Shujun Tian | Global Securities Associate for 11 months; admitted in 2010. | $450 | 2.70 | $1,215.00 |
| Matthew Telford Vidal | Global Securities Associate for 11 months; admitted in 2010. | $450 | 18.40 | $8,280.00 |
| Jonathan Walder | Litigation Associate for 11 months; admitted in 2010. | $450 | 593.50 | $267,075.00 |
| Justin Waldie | Global Leveraged Finance Associate for 11 months; admitted in 2010. | $450 | 30.20 | $13,590.00 |
| Jerry Wang | Alternative Investments Associate for 11 months; admitted in 2010. | $450 | 60.30 | $27,135.00 |
| Eric Weiss | Litigation Associate for 11 months; admitted in 2010. | $450 | 354.50 | $159,525.00 |

| | | | | |
|---|---|---|---|---|
| Jeremy Wells | Global Securities Associate for 11 months; admitted in 2010. | $450 | 190 | $85,500.00 |
| Ryan West | Litigation Associate for 11 months; admitted in 2010. | $450 | 179.40 | $80,730.00 |
| Brian Youn | Litigation Associate for 11 months; admitted in 2010. | $450 | 88.20 | $39,690.00 |
| Zen Zhang | Global Corporate Associate for 11 months; admitted in 2010. | $450 | 5.60 | $2,520.00 |
| Jenny Zhou | Litigation Associate for 11 months; admitted in 2010. | $450 | 71.10 | $31,995.00 |
| Monica Alston | Case Manager | $250 | 565.90 | $141,475.00 |
| Abayomi A. Ayandipo | Case Manager | $250 | 152.10 | $38,025.00 |
| Oscar Castrillon | Case Manager | $250 | 18.10 | $4,525.00 |
| Angel Anderson | Case Manager | $215 | 11.00 | $2,365.00 |
| Rena Ceron | Case Manager | $215 | 200.40 | $43,086.00 |
| Richard Cosentino | Legal Assistant | $275 | 307.50 | $84,562.50 |
| Randy Hooks | Legal Assistant | $275 | 343.60 | $94,490.00 |
| Kim Strosser | Legal Assistant | $275 | 133.90 | $36,822.50 |
| Charles Sheehan | Legal Assistant | $265 | 174.80 | $46,322.00 |
| Thomas Manzke | Legal Assistant | $235 | 49.10 | $11,538.50 |
| Chris Georgakis | Legal Assistant | $190 | 23.10 | $4,389.00 |
| Paul Butters | Legal Assistant | $185 | 85.60 | $15,836.00 |
| Benjamin Harris | Legal Assistant | $185 | 2.50 | $462.50 |
| Charmaine Thomas | Legal Assistant | $185 | 198.20 | $36,667.00 |
| Kyle Martin | Legal Assistant | $175 | 682.10 | $119,367.50 |
| Jason Hsu | Legal Assistant | $165 | 230.00 | $37,950.00 |
| Liga R Michailovs | Legal Assistant | $165 | 5.80 | $957.00 |
| Francesca Skrelja | Legal Assistant | $165 | 10.00 | $1,650.00 |
| Icsom W. Jones | Managing Attorney Clerk | $215 | 2.60 | $559.00 |
| Jacqueline Brewster | Managing Attorney Clerk | $175 | 65.30 | $11,427.50 |
| Matthew Ottenstein | Librarian | $205 | 8.50 | $1,742.50 |
| Robin Traylor | Librarian | $205 | 22.60 | $4,633.00 |
| Mayra Cabrera | Librarian | $190 | 2.30 | $437.00 |
| Marcin Grabysz | Litigation Support Specialist | $285 | 57.60 | $16,416.00 |
| James McGuire | Litigation Support Specialist | $285 | 6.70 | $1,909.50 |
| Shaun M. De Suze | Litigation Support Specialist | $275 | 6.80 | $1,870.00 |
| Joseph S. Klock | Litigation Support Specialist | $275 | 3.80 | $1,045.00 |
| Alexander Sacklowski | Litigation Support Specialist | $275 | 109.00 | $29,975.00 |
| Rhodely Vallon | Litigation Support Specialist | $275 | 343.10 | $94,352.50 |
| Theartis Everett | Litigation Support Specialist | $255 | 81.70 | $20,833.50 |
| Mitchell Gaines | Programmer | $230 | 3.10 | $713.00 |
| Gabrielle Zsebi | Librarian | $210 | 2.40 | $504.00 |
| John McHugh | Information Officer | $185 | 2.00 | $370.00 |
| Maria Smilen | File Clerk | $115 | 17.90 | $2,058.50 |
| | | | | |

| Total | | $557.04 (blended rate)[1] | 32,959.00 hours | $18,359,367.75 |
|---|---|---|---|---|

---

[1]    The blended rate <u>excluding</u> paraprofessionals is $589.76 per hour.

*    In accordance with the Fee Committee Guidelines, Milbank has billed non-working travel time at 50% of normal rates.

SIXTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2010 – SEPTEMBER 30, 2010)

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 370.80 | $265,488.00 |
| General Case Strategy Meetings | 20.80 | $17,475.50 |
| Project Monitoring/Court Calendar & Docket Maintenance | 441.40 | $132,607.00 |
| Hearings and Court Communications | 240.60 | $131,454.50 |
| Non-Working Travel | 167.90 | $66,323.25 |
| Interested Party Communications/Website/Lehman Team Hotline | 298.70 | $163,746.50 |
| Communications with Debtors | 92.30 | $68,013.50 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 862.20 | $586,634.50 |
| Secured Creditors Issues/Meetings/Communications | 14.40 | $11,732.50 |
| Equity Holders/Motions/Hearings | 7.00 | 4,335.50 |
| LBI/SIPC Coordination and Issues | 187.70 | $113,946.50 |
| Cash Management | 5.90 | $3,256.50 |
| Insurance Issues | 7.70 | $5,245.50 |
| Employee/ERISA/Benefits/Pension Issues | 91.50 | $64,400.50 |
| Tax Issues | 2,078.20 | $1,364,286.00 |
| Corporate Governance | 11.30 | $5,527.50 |
| Other General Business Operation Issues | 3.80 | $3,702.00 |
| Intercompany Issues | 169.90 | $105,486.00 |
| Real Estate Matters | 1,059.70 | $728,486.00 |
| Private Equity | 13.50 | $9,199.50 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 5,980.40 | $3,820,103.50 |
| Loans/Investments | 204.90 | $119,117.50 |

| | | |
|---|---:|---:|
| Domestic Bank and Related Regulatory Issues | 261.60 | $143,300.00 |
| International Insolvency Issues | 1,270.20 | $747,852.50 |
| Schedules/Statement of Financial Affairs | 2.40 | $1,258.00 |
| Non-Derivative Automatic Stay/Safe Harbor Issues | 185.80 | $86,543.00 |
| Miscellaneous Asset Sales/363 Issues | 1.30 | $750.00 |
| Non-Derivative Executory Contracts/365 Issues | 4.60 | $2,070.00 |
| DIP Financing | 6.90 | $1,990.50 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 660.00 | $450,061.00 |
| Disclosure Statement/Solicitation/Voting | 9.80 | $5,455.00 |
| Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues | 3,627.50 | $1,940,902.50 |
| Other Bankruptcy Motions and Matters | 1,160.40 | $739,334.50 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 11,178.20 | $5,514,547.50 |
| Non-Bankruptcy Litigation | 20.60 | $15,462.50 |
| 2004 Issues | 32.40 | $15,098.50 |
| Appeals | 18.00 | $8,100.00 |
| SEC/DOJ Issues | 2.50 | $712.50 |
| Examiner Issues | 100.10 | $53,559.50 |
| Proprietary Retention/Billing/Fee Applications | 1,729.10 | $670,387.00 |
| Retention Issue/Fees Applications: Ordinary Course Professionals | 170.20 | $89,542.00 |
| Retention Issue/Fees Applications: Other Professionals | 186.80 | $81,873.50 |
| | | |
| **Total** | **32,959** | **$18,359,367.75** |

**SIXTH INTERIM FEE APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL. (JUNE 1, 2010 – SEPTEMBER 30, 2010)**

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 2,255.38 |
| Cab Fares/Local Travel | 39,013.61 |
| Computer Database Research | 536,777.03 |
| Fees | 5,050.24 |
| Global Filings | 4,260.00 |
| Mail | 22.83 |
| Meals | 28,223.06 |
| Messenger | 1,128.42 |
| Misc | 319.23 |
| Outside Reproduction | 320.11 |
| Photocopies | 95,290.05 |
| Telephone/Telecopy | 33,138.69 |
| Travel | 47,125.99 |
| **TOTAL DISBURSEMENTS** | **$792,924.64**[1] |

---

[1] Expenses have been adjusted in accordance with the Fee Committee Guidelines.

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., <u>et al.</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>, | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

------------------------------------------------------------ x

**SIXTH APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
<u>**JUNE 1, 2010 THROUGH AND INCLUDING SEPTEMBER 30, 2010**</u>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("<u>Milbank</u>"), counsel to the Official

Committee of Unsecured Creditors (the "<u>Committee</u>") of Lehman Brothers Holdings Inc.

("<u>LBHI</u>"), Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), Lehman Commercial Paper Inc.

("<u>LCPI</u>") and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "<u>Debtors</u>" and, together with their non-Debtor affiliates, "<u>Lehman</u>"), hereby

submits its application (the "<u>Application</u>"), pursuant to sections 330 and 331 of chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq.</u> (as amended, the "<u>Bankruptcy</u>

<u>Code</u>"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases adopted by the Court on June 24, 1991 and amended April 21, 1995 (together,

the "Local Guidelines"), the United States Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective

January 30, 1996 (the "U.S. Trustee Guidelines"), the Third Amended Order Pursuant to

Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing

Procedures for Interim Monthly Compensation And Reimbursement Of Expenses of

Professionals, dated June 25, 2009 (the "Interim Compensation Order"), and the guidelines (the

"Fee Committee Guidelines") contained in the Fee Committee Report Pertaining to the Fourth

Interim Fee Applications of All Retained Professionals, dated August 20, 2010 (the "Fee

Committee Report"), for the allowance of interim compensation for professional services

rendered from June 1, 2010 through and including September 30, 2010 (the "Sixth Interim

Compensation Period"), and for reimbursement of expenses incurred in connection with such

services, and in support thereof respectfully represents as follows:

## I.

## INTRODUCTION

### A.    Background

1.    Bankruptcy Filing.  On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' Chapter 11 Cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2

2.    <u>Creditors' Committee</u>.  On September 17, 2008, the Office of the United

States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the

Committee in the Chapter 11 Cases.

3.    <u>SIPA Trustee</u>.  On September 19, 2008, a proceeding ("<u>SIPA</u>

<u>Proceeding</u>") was commenced under the Securities Investor Protection Act of 1970 ("<u>SIPA</u>")

with respect to Lehman Brothers Inc. ("<u>LBI</u>"), a wholly owned subsidiary of LBHI and a

registered broker-dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the

"<u>SIPA Trustee</u>") and is administering LBI's estate.

4.    <u>Examiner</u>.  The United States Bankruptcy Court for the Southern District

of New York (the "<u>Court</u>") approved the appointment of Anton R. Valukas as examiner (the

"<u>Examiner</u>") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner

dated January 20, 2009.  In accordance with his appointment, the Examiner issued his report

(the "<u>Examiner's Report</u>") on February 8, 2010, which was filed under seal and later unsealed

on March 11, 2010.

5.    <u>Fee Committee</u>.  On May 26, 2009, the Court appointed a fee committee

(the "<u>Fee Committee</u>") and approved a fee protocol (the "<u>Fee Protocol</u>") in the Chapter 11

Cases.

6.    <u>Debtors' Plan and Disclosure Statement</u>.  On March 15, 2010, the

Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors [Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed their Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holding Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code (the "<u>Debtors' Disclosure Statement</u>")

[Docket No. 8332], along with their revised Chapter 11 Plan (the "Debtors' Plan") [Docket No. 8330].

7.    <u>Jurisdiction</u>.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.  Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit "<u>A</u>."

**B.    <u>Retention of Milbank and Billing History</u>**

8.    <u>Authorization for Milbank's Retention</u>.  On November 5, 2008, pursuant to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, As Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the "<u>Retention Order</u>"), the Court authorized Milbank's retention as counsel for the Committee in these cases.  The Retention Order, which became a final order on November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.  Among other things, the Retention Order provides that Milbank's hourly rates are subject to periodic firm-wide adjustments in the ordinary course of Milbank's business.

9.    <u>First Interim Fee Application</u>.  On April 10, 2009, Milbank filed its First Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

4

Rendered And For Reimbursement Of Expenses During Period From September 17, 2008

Through And Including January 31, 2009 (the "First Interim Fee Application").  In the First

Interim Fee Application, Milbank requested (i) allowance of compensation for professional

services rendered during the period from September 17, 2008 through and including January 31,

2009 (the "First Interim Compensation Period") in the total amount of $12,123,376.00,[1] and (ii)

reimbursement of its actual and necessary expenses incurred during the First Interim

Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.  On September 10, 2009, the Court approved the release of the remaining holdback,

subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

            10.    Second Interim Fee Application.  On August 14, 2009, Milbank filed its

Second Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "Second Interim Fee Application").  In the Second Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from February 1, 2009 through and including May 31, 2009 (the

---

[1]      Milbank voluntarily reduced the fees it sought to have allowed for the First Interim Compensation Period
by $129,111.00.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of
all or a portion of such fees at a later date.

[2]      Milbank reserves the right to seek, at a later date, the allowance of all or a portion of such fees.

"Second Interim Compensation Period") in the total amount of $16,829,521.00,[3] and (ii)

reimbursement of its actual and necessary expenses incurred during the Second Interim

Compensation Period in the amount of $1,019,754.61.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $14,582,737.21 during the Second Interim

Compensation Period.  On September 25, 2009, the Court approved the Second Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.  On December 23, 2009, the Court released the ten percent holdback, subject to a

$311,734.82 deduction, at the recommendation of the Fee Committee.[4]

   11. <u>Third Interim Fee Application</u>.  On December 14, 2009, Milbank filed its

Third Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through

And Including September 30, 2009 (the "<u>Third Interim Fee Application</u>").  In the Third Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from June 1, 2009 through and including September 30, 2009 (the

"<u>Third Interim Compensation Period</u>") in the total amount of $10,881,540.00,[5] and (ii)

reimbursement of its actual and necessary expenses incurred during the Third Interim

Compensation Period in the amount of $583,803.10.  Pursuant to the Interim Compensation

---

[3]  Milbank voluntarily reduced the fees it sought to have allowed for the Second Interim Compensation Period by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[4]  Milbank reserves the right to seek, at a later date, the allowance of all or a portion of such fees.

[5]  Milbank voluntarily reduced the fees it sought to have allowed for the Third Interim Compensation Period by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Order, Milbank received payment in the amount of $7,480,652.96 during the Third Interim

Compensation Period.  On April 9, 2010, the Court approved the Third Interim Fee Application,

subject to a $292,555.40 deduction, at the recommendation of the Fee Committee.[6]

12.    <u>Fourth Interim Fee Application</u>.  On April 16, 2010, Milbank filed its

Fourth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through

And Including January 31, 2010 (the "<u>Fourth Interim Fee Application</u>").  In the Fourth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2009 through and including January 31, 2010 (the

"<u>Fourth Interim Compensation Period</u>") in the total amount of $13,595,778.50,[7] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fourth Interim

Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  On September 7, 2010, the Court approved the Fourth Interim Fee

Application, subject to an additional holdback in the amount of $733,570.87, relating to certain

unresolved objections asserted by the Fee Committee.[8]

13.    <u>Fifth Interim Fee Application</u>.  On August 16, 2010, Milbank filed its

Fifth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

---

[6]       Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a
          portion of such fees.

[7]       Milbank voluntarily reduced the fees it sought to have allowed for the Fourth Interim Compensation Period
          by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee.
          However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
          such fees at a later date.

[8]       Milbank reserves, and continues to reserve, the right to seek the allowance of all or a portion of such fees at
          a later date.

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2010 Through

And Including May 31, 2010 (the "Fifth Interim Fee Application").  In the Fifth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from February 1, 2010 through and including May 31, 2010 (the

"Fifth Interim Compensation Period") in the total amount of $19,450,342.75,[9] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fifth Interim

Compensation Period in the amount of $851,804.27.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $16,427,844.72 during the Fifth Interim

Compensation Period.  Due to recent developments relating to and ongoing discussions with the

Fee Committee, no hearing has yet been scheduled with respect to the Fifth Interim Fee

Application.[10]

       14.     Application.  Milbank makes this sixth interim application for approval

and allowance of compensation and reimbursement of expenses pursuant to sections 330 and

331 of the Bankruptcy Code.

       15.     In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors seeking interim compensation and reimbursement of

expenses.  During the Sixth Interim Compensation Period, Milbank submitted the following fee

statements:

     a.  On September 30, 2010, pursuant to the Interim Compensation Order, Milbank
        served its twenty-first fee statement for the period from June 1, 2010 through and

---

[9]    Milbank voluntarily reduced the fees it sought to have allowed for the Fifth Interim Compensation Period by $199,247.00, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[10]   Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

including June 30, 2010 (the "Twenty-First Fee Statement"). The Twenty-First Fee Statement sought (i) an allowance of $5,262,551.50 as compensation for services rendered and (ii) the reimbursement of $250,465.36 in expenses. As of the date hereof, Milbank has received a total of $4,460,050.56, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Twenty-First Fee Statement.

b.    On October 15, 2010, pursuant to the Interim Compensation Order, Milbank served its twenty-second fee statement for the period from July 1, 2010 through and including July 31, 2010 (the "Twenty-Second Fee Statement"). The Twenty-Second Fee Statement sought (i) an allowance of $4,076,093.25 as compensation for services rendered and (ii) the reimbursement of $215,677.73 in expenses. As of the date hereof, Milbank has received a total of $3,476,552.33, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Twenty-Second Fee Statement.

c.    On November 9, 2010, pursuant to the Interim Compensation Order, Milbank filed and served its twenty-third fee statement for the period from August 1, 2010 through and including August 31, 2010 (the "Twenty-Third Fee Statement"). The Twenty-Third Fee Statement sought (i) an allowance of $5,255,836.00 as compensation for services rendered and (ii) the reimbursement of $202,905.34 in expenses. As of the date hereof, Milbank has received a total of $4,407,574.14, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Twenty-Second Fee Statement.

d.    On November 23, 2010, pursuant to the Interim Compensation Order, Milbank filed and served its twenty-fourth fee statement for the period from September 1, 2010 through and including September 30, 2010 (the "Twenty-Fourth Fee Statement") and, together with the Twenty-First Fee Statement, Twenty-Second Fee Statement and Twenty-Third Fee Statement, the "Fee Statements"). The Twenty-Fourth Fee Statement sought (i) an allowance of $3,764,887.00 as compensation for services rendered and (ii) the reimbursement of $135,627.47 in expenses. As of the date hereof, Milbank has received a total of $3,147,582.07, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Twenty-Second Fee Statement.

16.    Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases. No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

17.    By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the Sixth Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Sixth Interim Compensation Period.

18.    In this Application, Milbank seeks approval of $18,359,367.75[11] for legal services rendered on behalf of the Committee during the Sixth Interim Compensation Period and $792,924.64[12] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $19,152,292.39.

19.    Pursuant to the Interim Compensation Order, Milbank has already received payment of $15,491,759.01, during the Sixth Interim Compensation Period.  Milbank will seek a total payment of $3,660,533.38 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred during the Sixth Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[13]

---

[11]    The compensation sought by this Application reflects a voluntary reduction of approximately $229,420.50 including, but not limited to, certain fee issues identified by the Fee Committee.  However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

[12]    This amount reflects a reduction of certain expenses as per the Fee Committee Guidelines.  Milbank reserves the right to seek, at a later date, reimbursement for the total amount of expenses incurred in connection with its representation of the Committee.

[13]    As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the Sixth Interim Compensation Period is $11,751.26 less than the sum of fees and expenses set forth in the Fee Statements.  Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

20.     The fees sought by this Application reflect an aggregate of 32,959.00 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Sixth Interim Compensation Period, at a blended average hourly rate of $577.04 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $589.76.

21.     Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

22.     Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Sixth Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  The compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

23.     Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[14]

24.     Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses by project category and detailed descriptions of these expenses, are attached hereto as Exhibit "C."

## III.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

25.     To provide an orderly summary of the services rendered on behalf of the Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, the Fee Committee adopted the following billing categories in connection with these cases:

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |

---

[14]     Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

| 01400 | Employee/ERISA/Benefits/Pension Issues |
|-------|------------------------------------------|
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/SWAP Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |
| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | Rule 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |

26.    The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that

Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the Committee and its professional advisors, including Milbank, to address the many complex issues and problems that are presented by these extraordinary and complex cases.

A.    **General Case Administration**

27.    During the Sixth Interim Compensation Period, Milbank continued to maintain, and undertake action in accordance with, an elaborate protocol developed earlier in these cases for the organization and delegation of the substantial number of tasks engendered by Lehman's chapter 11 process.  The protocol is designed to ensure that the Committee is kept apprised of all aspects of the Chapter 11 Cases.  The protocol also guarantees that all matters are being addressed, without duplication of effort.  Due to the highly complicated nature of the Debtors' cases, these tasks require the knowledge, expertise, and input of a whole range of Milbank timekeepers, from paralegals to senior partners, all of whom have become intimately familiar with the issues and the parties in the Chapter 11 Cases.

28.    Additionally, Milbank has established a system whereby all substantive court filings are reviewed to provide the Committee with a comprehensive summary and analysis of each material pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient and comprehensive methods of administering the Committee's needs ensure that the Committee has the information necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each of the Debtors.

**B.      Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

29.      During the Sixth Interim Compensation Period, the Committee held
weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings
with the Debtors.  In addition, the Committee also held a separate weekly telephonic meeting
devoted to plan of reorganization issues.  Prior to each Committee meeting, Milbank prepared
and distributed memoranda, presentations, and other materials for the Committee members'
consideration.  During the Committee meetings, Milbank discussed with Committee members
and their counsel all significant matters arising during the Sixth Interim Compensation Period,
and in particular, the Debtors' Plan, and assisted the Committee in formulating positions with
respect to such issues.

30.      Through Committee meetings and conference calls, and numerous other
communications with members of the Committee, Milbank has assisted the Committee in
(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and
(ii) making informed decisions regarding the numerous issues that have arisen in these cases.

**C.      Project Monitoring/Court Calendar & Docket Maintenance**

31.      During the Sixth Interim Compensation Period, Milbank continued to
maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to
organize and track (i) pleadings filed in the Chapter 11 Cases, SIPA Proceeding, and related
adversary proceedings; (ii) ongoing projects; and (iii) upcoming deadlines.  On a real-time
basis, Milbank downloaded, consolidated, and organized pleadings to ensure efficient access.
Milbank also monitored the dockets and summarized and circulated substantive pleadings to the
Milbank team.  These summaries enabled Milbank to stay abreast of ongoing developments in

these cases, facilitated the assignment of projects, and helped ensure that deadlines were not missed.

32.     Additionally, Milbank maintained a comprehensive calendar of active matters in these cases.  This calendar ensured that Milbank could effectively monitor and update the status of all pending matters, a resource that proved beneficial in responding to inquiries and discussing these matters with the Committee and other parties in interest.  Milbank also maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming motions, hearing dates, and other important deadlines.

**D.     <u>Hearings and Court Communications</u>**

33.     During the Sixth Interim Compensation Period, Milbank prepared for and appeared at each of the hearings conducted before this Court, including, among others, (i) numerous regularly scheduled omnibus hearings; (ii) hearing on claims related matters; (iii) special hearings and case conferences; (iv) hearings in the SIPA Proceeding; and (v) hearings in a wide variety of adversary proceedings arising out of the Chapter 11 Cases and the SIPA Proceeding.  In advance of each omnibus hearing, Milbank would confer internally to address the issues presented by each motion or other pleading and coordinate a response thereto. To that end, among other things, Milbank reviewed and analyzed documents, including correspondence and pleadings, conducted factual and legal research, and met with numerous parties to work toward the consensual resolution of any objections raised by the Committee or other parties in interest.  Following each hearing, Milbank promptly advised the Committee of pertinent Court rulings and developments.

E.        **Interested Party Communications/Website/Lehman Team Hotline**

34.        In accordance with the Stipulation and Agreed Order Between the

Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to

Information Pursuant to 11 U.S.C §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which

the Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on

behalf of the Committee, continued to populate and maintain a public website (the "Committee

Website").  The Committee Website contains a significant amount of content produced by

Milbank, which is updated frequently and designed to provide information to creditors,

including, among other things, (i) general information concerning the Debtors' Chapter 11

Cases, including adversary proceedings, chapter 15 cases, and the SIPA Proceeding; (ii)

highlights of significant events; (iii) a database of the Court's memorandum decisions issued in

connection with the Chapter 11 Cases, adversary proceedings and the SIPA Proceeding; (iv) a

listing of the orders granting the Debtors' omnibus objections to claims, detailing the affected

claims by claim number; (v) a case calendar; and (vi) answers to frequently asked questions,

available in several foreign languages.  The Committee Website also acts as a critical pathway

for the dissemination of information between Milbank and the Debtors' creditors.  For example,

the Committee Website permits creditors to register to receive monthly reports and to submit

inquiries directly to Milbank, as to which Milbank works in collaboration with the Debtors'

counsel (as required by the Creditor Information Protocol) to provide responses.

35.        During the Sixth Interim Compensation Period, Milbank continued to

expend substantial time maintaining the Committee Website.  In addition, hundreds of creditors

contacted Milbank via the Committee Website and telephonically with questions concerning the

Chapter 11 Cases, and, more specifically, inquiries concerning the proposed treatment of certain

17

claims under the Debtors' Plan.  In accordance with the Creditor Information Protocol, Milbank

reviewed and responded to all such creditor inquiries.

36.       During the Sixth Interim Compensation Period, Milbank also continued

to spend considerable time working with each of the *ad hoc* groups that formed during the

Chapter 11 Cases to advance the objectives of various creditor constituencies, to assist such

groups' understanding of the issues in the Chapter 11 Cases, and to negotiate resolutions of

disputed issues.  Milbank also continued, at the Court's direction, to act as an information

"liaison" between the Debtors, these *ad hoc* groups, and other creditors on a frequent basis.

**F.       Communications with Debtors**

37.       During the Sixth Interim Compensation Period, Milbank continued its

frequent communication and exchange of correspondence with the Debtors' counsel regarding,

among numerous other issues, case administration, responses to pleadings, issues related to the

Debtors' Plan, negotiations with the administrators and trustees (the "Foreign Administrators")

managing the affairs of the numerous proceedings (the "Foreign Proceedings") initiated by or

against Lehman's affiliates in countries outside of the U.S. (the "Foreign Affiliates"),

substantive consolidation, claims based on purported guarantees issued by LBHI of its

affiliates' obligations (the "Guarantee Claims") and negotiations with the aforementioned *ad*

*hoc* groups.  Further, Milbank prepared for and attended in-person meetings with the Committee

members, the Debtors, and their respective professionals to, among other things, discuss the

ongoing administration of and long term strategy for the Chapter 11 Cases, and in particular, the

Debtors' Plan and LAMCO.

G.    **LBI/SIPC Coordination and Issues**

38.    During the Sixth Interim Compensation Period, in an effort to keep the

Committee apprised of the status of the claims reconciliation process in the SIPA Proceeding,

Milbank researched and drafted memoranda on the SIPA Trustee's various motions to uphold

certain claims determinations and the SIPA Trustee's related motion to expunge foreign

exchange claims.  Furthermore, Milbank also reviewed the SIPA Trustee's Interim Reports and

worked with the Committee's financial advisor, FTI Consulting, Inc. ("FTI") to analyze

customer and general estate claims filed against LBI's estate, project recoveries for such claims

and analyze the impact this could have on the Debtors' recoveries.

39.    As part of its ongoing analysis of the Debtors' claims against LBI,

Milbank continued to research the legal standards for the enforceability of intercompany

subordination agreements.  In that connection, Milbank drafted a memorandum to the

Committee analyzing the enforceability of certain subordination agreements entered into

between LBI and certain of the Debtors, and the effect of such agreements on the Debtors'

claims.

40.    Milbank also monitored the docket of the SIPA Proceeding, summarized

all significant motions for the Committee's benefit, and, where Debtor estate interests might be

implicated, filed pleadings and attended the hearings relating to such motions.  In this

connection, Milbank spent considerable time analyzing the Court's decision to overrule the

Fifth Third Structured Large Cap Plus Fund claim objection and the implications of that

decision on other of the SIPA Trustee's determinations of claims.

41.    Finally, Milbank reviewed the numerous stipulations entered into

between LBI and other parties, such as Zurcher Kantonalbank, Comvest, Bank Polska, and

Bank Pakeo, regarding the closing out of certain prepetition transactions as part of the

winddown of LBI's business.  During the Sixth Interim Compensation Period, the SIPA Trustee

closed out twenty transactions, resulting in $794,880,000 being paid into the LBI estate.

**H.    Employee/ERISA/Benefits/Pension Issues**

42.    During the Sixth Interim Compensation Period, Milbank devoted

substantial time to researching, analyzing and communicating with the Debtors' counsel with

respect to certain administrative and judicial proceedings (the "UK Pension Proceedings") in the

United Kingdom ("UK") related to the Debtors' obligations to fund the Lehman Brothers

Pension Scheme (the "Pension Scheme"), sponsored by Lehman Brothers Limited.  The UK

Pensions Regulator commenced the UK Pension Proceedings against LBHI and certain of its

non-Debtor affiliates based on a purported funding shortfall in the Pension Scheme, and

ultimately issued a "financial support directive" imposing liability on, *inter alia*, LBHI with

respect to this shortfall.  The Debtors thereafter (i) appealed the administrative ruling to issue

the financial support directive against LBHI and its non-Debtor affiliate Lehman Brothers Asset

Management, LLC in respect of the Pension Scheme; and (ii) joined the UK Pensions Regulator

as a respondent in a separate case involving the treatment of pension-related liabilities under

UK insolvency laws.

43.    In this connection, Milbank reviewed the relevant documentation,

researched applicable laws, and regularly discussed the proceedings with Debtors.  In addition,

Milbank periodically updated the Committee as to the status of the UK Pension Proceedings,

and reported to the Committee on the stipulation entered into among LBHI, as trustee of the

Pension Scheme, the Board of the Pension Protection Fund and the UK Pensions Regulator

regarding the determination of LBHI's liability under the Pension Scheme.

I.    **Tax Issues**

44.    During the Sixth Interim Compensation Period, Milbank devoted substantial time to analyzing and evaluating federal, state, local, and international tax issues relating to the Debtors' estates.  A subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax Subcommittee, Milbank participated in the Committee's weekly telephonic meetings to (i) inform the Committee of significant tax matters (e.g., the structure of the Debtors' Plan, the status and substance of the Debtors' planned private letter ruling request from the Internal Revenue Service ("IRS") and related filings); (ii) obtain Committee input as to certain tax matters (e.g., the sale of Real Estate Mortgage Investment Conduits ("REMICs") held by Lehman Pass Through Securities Inc. and LBI, and the approval of the Debtors' settlements with the IRS and Department of Justice); and (iii) ascertain information that may be relevant to the tax analysis (e.g., recovery projections, ongoing activities that may give rise to tax and substantive consolidation discussions, and business and derivative settlements).

45.    Milbank also participated in weekly conferences with the Debtors' in-house tax department and the Debtors' tax litigation counsel, Bingham McCutcheon LLP and the Debtors' bankruptcy tax counsel, Weil Gotshal & Manges LLP, to discuss (i) the Debtors' ongoing business activities; (ii) the Debtors' tax compliance activities and preparedness; (iii) discussions and negotiations with the IRS, the Department of Justice, and state and local taxing authorities concerning tax audits by, and contests and settlement discussions with, those authorities; (iv) discussions with LBI's tax counsel, Hughes Hubbard & Reed LLP; (v) strategies for obtaining a ruling from the IRS regarding the tax consequences of the Debtors' Plan; and (vi) any miscellaneous matters materially related to the Debtors' tax positions.

21

46.     Milbank also reviewed, researched, and analyzed (i) tax issues related to the disposition of certain Debtors' assets; (ii) tax consequences to Lehman Pass Through Securities Inc. and LBI holding or disposing of REMIC residual interests; (iii) the Debtors' federal, state, local, and international tax exposures and potential refund claims; (iv) transactions subject to the ongoing IRS audit of the Debtors' estates, including foreign tax credit claims (e.g., "Goodspeed" and "Stock Loan" transactions) and LBI promoter audits; (v) activities of certain creditors relating to the motions and orders to restrict trading of equity and debt claims of the Debtors; (vi) tax allocation issues among the Debtors, non-Debtor affiliates, and LBI; (vii) the Debtors' use of net operating losses, including the effect new legislation would have on the Debtors' alternative minimum tax position; (viii) the effect of state and local tax laws and the potential impact of tax provisions in proposed legislation on the Debtors' estates; and (ix) structural issues related to the Debtors' Plan.

47.     In addition, Milbank, on the Committee's behalf, intervened in the Debtors' suit for a tax refund relating to its 1999 and 2000 tax years and undertook activities associated with preparing to represent the Committee's interests in that litigation.

48.     Finally, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) the potential exposure for significant tax liabilities related to the ownership of REMIC residual interests; (ii) the priority of various tax claims against the Debtors; (iii) the offset of tax overpayments against tax penalties; (iv) tax allocation rules related to the Debtors' right to contribution by subsidiaries; (v) the status of a controlled foreign corporation when placed in receivership; and (vi) potential withholding tax claims against the Debtors for pre- and post-petition dates.

**J.**      **Other General Business Operation Issues**

49.      During the Sixth Interim Compensation Period, Milbank continued
reviewing and analyzing the myriad issues in connection with potential business plans for the
Debtors.  In the Fifth Interim Compensation Period, the Court had approved the formation and
documentation of an asset management company for the Debtors, LAMCO.  Since that time,
Milbank has continued to work in tandem with the Committee's financial advisors to oversee
LAMCO's management of the Debtors' assets.  In addition, Milbank, together with the
Committee's financial advisors, reviewed and commented on the Debtors' proposed business
plan for LAMCO and held various meetings with the Debtors to discuss the same.

**K.**      **Intercompany Issues**

50.      During the Sixth Interim Compensation Period, Milbank expended
considerable time investigating matters related to intercompany obligations.  Most significantly,
Milbank devoted substantial resources to analyzing the treatment of the intercompany claims
between LBHI and Lehman Brothers Treasury Co. B.V. ("LBT") and LBHI and Lehman
Brothers Securities N.V. under the Debtors' Plan and their potential impact on creditor
recoveries.

51.      Milbank also worked with FTI to conduct an in-depth analysis of the
intercompany claims between LBHI and its domestic affiliates.  Milbank researched the
treatment of intercompany claims under the Debtors' Plan, and the theories to enforce or object
to such claims.  In that connection, Milbank researched and drafted a memorandum to the
Committee on the legal standards for re-characterizing intercompany loans as equity and
worked with FTI to analyze these standards in the context of the Debtors' intercompany
transactions.

L.    **Real Estate Matters**

52.    As reflected in the First Interim Fee Application, due to the size,
complexity and potential for exposure of the Debtors' real estate portfolio, the Committee
established a subcommittee (the "Real Estate Subcommittee") to evaluate issues relating to the
Debtors' extensive real estate portfolio.  During the Sixth Interim Compensation Period, the
Real Estate Subcommittee continued to hold regular meetings to address and make
recommendations to the Committee with regard to issues related to the Debtors' real estate
holdings in discrete assets (e.g., Atlas Capital, Archstone, Ballpark, Heritage Fields, High Street
Capital, Hilton, Innkeepers, Kapalua, Moonlight Basin, One Federal Plaza, Palmdale, RACERS,
Rosslyn, SunCal, 200 Fifth Avenue, 695 E. Main Street, 1107 Broadway) and work with the
Debtors under previously approved protocols to attempt to maximize the value of the Debtors'
real estate assets.

53.    The Debtors' real estate portfolio includes commercial, residential and
corporate interests in which the Debtors hold both debt and equity positions, often in the form
of joint ventures to develop large commercial projects.  Milbank continued to work closely with
the Committee's financial advisors to assess whether the Debtors should continue to meet
various funding obligations, and also reviewed and commented on the terms of the Debtors'
proposed restructurings of their debt facilities.  In connection therewith, Milbank continued to
review the Debtors' rights, obligations and exposures relative to joint venture partners,
borrowers, senior secured lenders, unsecured creditors and other third parties in order to further
analyze the potential consequences of the proposed restructurings or failures to fund capital
calls.  Milbank also continued to participate in the consensual resolution of several outstanding
real estate related motions.

54.     During the Sixth Interim Compensation Period, Milbank researched and
drafted memoranda in connection with certain real estate matters and prepared and filed several
pleadings in connection with real estate transactions requiring Court approval.  Furthermore,
Milbank monitored legal proceedings throughout the United States and abroad related to the
Debtors' real estate assets.

55.     **SunCal**.  SunCal is a collection of large-scale residential and commercial
real estate projects in California.  Prior to the Petition Date, Lehman ALI, Inc., LCPI and certain
other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling
over $2 billion.  As a result of its financial difficulties, SunCal became a debtor-in-possession
(collectively, the "SunCal Debtors") in voluntary and involuntary chapter 11 cases in California
(the "SunCal Cases").  During the Sixth Interim Compensation Period, in response to the plan
of reorganization filed by the SunCal Debtors that sought to equitably subordinate LCPI's
claims and avoid LCPI's liens on the SunCal project, Lehman filed a competing plan of
reorganization in the SunCal Cases.  In that connection, Milbank reviewed and revised various
drafts of the plan of reorganization, the disclosure statements and other related pleadings.
Milbank also attended meetings with the Committee's financial advisors and the Debtors'
advisors in connection with the restructuring proposal contained in Lehman's plan.  Finally,
Milbank attended hearings in California and New York in connection with the SunCal Cases
and provided reports to the Real Estate Subcommittee and the Committee on the foregoing.

56.     **Heritage Fields**.  Heritage Fields is a 3,723-acre master plan
development in Irvine, CA to which LBREM II, L.P. provided debt financing (the "Heritage
Fields Project") prior to the Petition Date.  During the Sixth Interim Compensation Period,
Milbank spent time considering and evaluating a proposed settlement involving Heritage Fields,

25

State Street Corporation, LBREM REIT Holdings, LLC, PCCP, LLC, and other parties in

interest.  The proposed settlement aimed to resolve all disputes regarding the Heritage Fields

Project, including the sale of the Debtors' interests in the project.  Milbank also evaluated

funding requests related to Heritage Fields, which were designed to ensure that the Heritage

Fields Project would have the sufficient capital to continue its operations until the parties

involved could finalize a settlement agreement.  As a result of this evaluation, Milbank drafted

and filed, on the Committee's behalf, a statement in connection with the Debtors' motion to

approve the proposed settlement, which was subsequently adjourned, and the Debtors' motion

to approve the funding requests [Docket No. 10746], which was granted.

57.    **Innkeepers.**  Innkeepers USA Trust ("Innkeepers") is a company that

owns hotel properties throughout the US.  Prior to the Petition Date, Lehman ALI, Inc. provided

a $220,200,000 floating rate loan to Innkeepers collateralized by twenty-one hotel properties.

As a result of its financial difficulties, Innkeepers filed for bankruptcy during the Sixth Interim

Compensation Period.  Milbank, along with the Committee's financial advisors, carefully

evaluated the strategic options available to the Debtors with respect to Innkeepers.  In

connection therewith, Milbank reviewed and commented on a plan term sheet, a plan support

agreement, a debtor in possession financing agreement and related pleadings.  At the request of

the Committee, Milbank drafted and filed a statement in support of the Debtors' motion seeking

authority to enter into the aforementioned plan support agreement and related transactions

[Docket No. 10771], which motion the Court subsequently approved.  Milbank also attended

hearings in connection with the debtor-in-possession financing motion and the motion seeking

approval of the plan support agreement.  Milbank has continued to monitor the Innkeepers'

chapter 11 cases and evaluate strategic options available to the Debtors in connection with

Innkeepers.

## M.  **Private Equity**

58.    As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Private Equity Subcommittee") to monitor and evaluate

developments with respect to the Debtors' private equity assets.  During the Sixth Interim

Compensation Period, the Private Equity Subcommittee held a meeting and continued to review

specific issues surrounding the Debtors' portfolio of private equity assets and formulate

protocols with the Debtors to maximize the value of such portfolios.  Milbank worked closely

with the Debtors, and the Debtors' professionals regarding these assets.

## N.  **Derivatives Issues**

59.    As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Derivatives Subcommittee") to evaluate issues and develop

value maximizing strategies relating to the Debtors' valuable derivatives portfolio.  During the

Sixth Interim Compensation Period, Milbank continued to conduct regular (at least weekly)

meetings with the Derivatives Subcommittee to address and, where appropriate, make

recommendations to the Committee in respect of specific issues concerning the Debtors'

portfolio of derivatives positions.

60.    **Derivatives ADR**.  On September 17, 2009, this Court entered an order

approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General

Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for

Affirmative Claims of Debtors Under Derivative Contracts (the "Derivatives ADR Order"),

pursuant to which the Committee, the Debtors and derivatives counterparties mediate disputes

27

arising from the closing out of the Debtors' "in-the-money" derivatives portfolio.  During the

Sixth Interim Compensation Period, Milbank continued to work closely with the Debtors to

review and respond to the counterparty notices filed under the Derivatives ADR Order, and to

evaluate settlement proposals under the alternative dispute resolution process.  In addition,

Milbank participated and continues to participate actively in such mediations.  In preparation for

each such mediation, Milbank conducted extensive legal and factual research on the issues in

dispute and, where appropriate, drafted memoranda to the Committee describing such issues

and seeking approval of settlement amounts.

61.    **Derivatives Litigation**.  Milbank also continued to address issues related

to, and provided recommendations on, derivatives matters, including the highly complex

derivatives-related adversary proceedings commenced by the Debtors to recover the Debtors'

"in-the-money" positions in various derivatives transactions.  To that end, Milbank devoted

substantial resources to analyzing derivatives contracts and other related transaction documents,

monitoring and participating actively in the derivatives-related adversary proceedings,

communicating with the Debtors' counsel and the Committee's financial advisors, and

developing and evaluating strategies to monetize complicated derivatives transactions for the

benefit of unsecured creditors of each of the Debtors' estates.  Milbank expended considerable

time summarizing such analyses and recommendations in numerous memoranda to the

Committee.

62.    In particular, Milbank developed innovative legal theories and

collaborated with the Debtors to draft and file over fifty adversary complaints alleging various

causes of actions, including avoidable transfers and violations of the automatic stay, arising

from the Debtors' derivatives transactions to recover billions of dollars for the benefit of the

Debtors' estates.  Milbank also devoted substantial resources to researching and analyzing the

issues presented in the appeal of the contested matter involving Swedbank AB ("<u>Swedbank</u>")

and its purported right to setoff funds the Debtors had on deposit with Swedbank against

receivables stemming from certain prepetition derivatives contracts between Swedbank and

LBHI and Swedbank and certain affiliates of LBHI.  In that connection, Milbank conducted

extensive research into US and UK law regarding setoff rights and prepared and filed an

appellate brief in support of the Debtors' position.

63.    In addition, Milbank paid considerable attention to certain adversary

proceedings, each of which raised novel issues of law.  In preparation for the representation of

the Committee in certain of the derivatives-related adversary proceedings in which the

Committee had intervened, Milbank researched complex legal issues related to, among other

things, the treatment of derivative contracts in bankruptcy.  Such research and analysis played

an essential role in the development of strategies to recover amounts due to the Debtors in

disputed derivatives transactions for the benefit of unsecured creditors of each of the Debtors'

estates.

64.    Finally, Milbank continued to take an active role in the adversary

proceeding involving BNY Corporate Trustee Services Limited.  Milbank expended

considerable time and resources researching and analyzing issues of first impression presented

in the appeal of the Court's determination of the same.

**O.    <u>Loans/Investments</u>**

65.    As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "<u>Loan Book Subcommittee</u>") to review and analyze matters

related to the Debtors' loan book.  During the Sixth Interim Compensation Period, the Loan

Book Subcommittee reviewed several structured finance vehicles established by the Debtors, including: (i) a collateralized loan obligation with Pine CCS, Ltd. ("Pine") as the issuer; (ii) a collateralized loan obligation with Spruce CCS Ltd. ("Spruce") as the issuer; (iii) a collateralized loan obligation with Verano CCS Ltd. ("Verano") as the issuer; and (iv) a statutory trust, Restructured Asset Securities with Enhanced Returns Series 2007-7-MM Trust (the "RACERS MM Trust").

66.    Milbank reviewed and analyzed the governing documents of Pine, Spruce and Verano and reviewed the transfers of cash, notes and other assets to determine if there were any applicable avoidance actions in connection with the bankruptcy.  In connection with the RACERS MM Trust, LBHI and LCPI filed a motion with the bankruptcy court seeking to terminate and/or amend certain of the governing documents and remove U.S. Bank National Association as Indenture Trustee, Owner Trustee, Custodian and Administrator & Paying Agent for the RACERS MM Trust.  Milbank reviewed the motion and advised the Committee regarding the effects the proposed actions would have on the unsecured creditors.

67.    Additionally, Milbank continued to work with the Committee's financial advisors to analyze and present the legal and financial implications of the Debtors' loan book transactions to the Loan Book Subcommittee in order to facilitate its recommendations and responsive courses of action to the full Committee.  To that end, the Loan Book Subcommittee convened meetings to discuss and formulate recommendations regarding all outstanding loan book matters.

## P.    Domestic Bank and Related Regulatory Issues

68.    During the Sixth Interim Compensation Period, Milbank continued to expend considerable time in connection with Woodlands Commercial Bank and Aurora Bank

FSB (together, the "Banks"), which are overseen by the Office of Thrift Supervision (the

"OTS") and the Federal Deposit Insurance Company (the "FDIC," together with the OTS, the

"Regulators").  Throughout the Chapter 11 Cases, the Debtors' and Committee's professionals

have sought to improve the capital levels at each of the Banks to satisfy regulatory

requirements, avoid potential seizures and liquidations by the Regulators, and facilitate the

resumption of depository functions at the Banks to preserve and maximize value.  Accordingly,

Milbank continued to work closely with the Debtors and their professionals in attempting to

structure solutions to the various issues confronting the Banks, including communicating with

the Regulators to discuss the Banks' alternatives and to negotiate a mutually acceptable solution

to the Banks' regulatory issues.

   69. Milbank has taken, and continues to take, measures to ensure that the

Banks are being properly managed to maximize their value for the Debtors' estates and

creditors.  To that end, during the Sixth Interim Compensation Period, Milbank, among other

things, continued to (i) analyze the claims of the Regulators against LBHI with respect to its

obligations owed to the Banks; (ii) research precedent involving thrifts and defenses to claims

brought by regulators regarding capital maintenance commitments of holdings companies under

section 365(o) of the Bankruptcy Code; (iii) monitor issues regarding the proposed settlement

agreement with the Regulators to resolve disputes arising out of a certain master forward

agreement between LBHI and Aurora; and (iv) discuss with the Committee's financial advisors

and the Debtors' advisors restructuring strategies for the Banks and approaches to resolving

disputes with the Regulators.

   70. Additionally, during the Sixth Interim Compensation Period, the

Committee's advisors worked closely with the Debtors and their advisors on finalizing the

terms of settlements with the Debtors and the Banks to achieve the approval of the Regulators to resume normal profit-generating banking and lending operations.  On September 1, 2010, the Debtors filed the Debtors' Motion, Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363 of the Bankruptcy Code, for Approval of (I) A Settlement Agreement between the Debtors and Woodlands Commercial Bank and (II) Certain Related Relief, Including Authorization of (A) Certain Debtors to Make Capital Transfers and (B) LBHI to Enter Into a Capital Maintenance Agreement [Docket No. 11142], and the Debtors' Motion, Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363 of the Bankruptcy Code, for Approval of (I) a Settlement Agreement between the Debtors and Aurora Bank FSB Regarding the Master Forward Agreement and Other Matters and (II) Certain Other Related Relief, Including Authorization of (A) Certain Debtors to Make Capital Transfers, (B) LBHI to Enter Into a Capital Maintenance Agreement, and (C) LBHI to Extend the Duration of the Amended Repurchase Agreement and Financing Facility [Docket No. 11142] (together, the "Bank Settlement Motions").  Milbank spent considerable time analyzing and discussing with the Committee the terms of the settlements and the effect they would have on the potential recovery for creditors in the Chapter 11 Cases.  In connection therewith, Milbank, on behalf of the Committee, drafted and filed with the Court a statement in support of the Bank Settlement Motions and the settlements contemplated thereby [Docket No. 11470], which were subsequently approved by the Court and finally executed on November 30, 2010.

Q.    **International Insolvency Matters**

71.    During the Sixth Interim Compensation Period, Milbank continued to monitor and analyze issues regarding the Foreign Proceedings, including, without limitation, the proceedings pending in (i) the UK; (ii) Hong Kong; (iii) Japan; (iv) the Netherlands; (v)

Switzerland; (vi) Germany; (vii) Australia; (viii) Singapore; (ix) the Philippines;

(x) Luxembourg; and (xi) Bermuda.

72.    **Analysis of Foreign Proceedings, Claims and Discussions**.  During the

Sixth Interim Compensation Period, Milbank attorneys and paraprofessionals across various

jurisdictions collaborated with each other, the Debtors' counsel, and the Foreign Administrators

regarding the status of major issues, including the proposed settlements regarding the Debtors'

Plan.  Milbank also reviewed and analyzed status reports published by the Foreign

Administrators and other publicly available information, specifically reviewing information

related to asset recoveries and claims reconciliation.  Based on such analyses, Milbank provided

regular updates to the Committee regarding the status of the Foreign Proceedings and their

impact on the Debtors and their creditors.  Specifically, Milbank researched and prepared

various memoranda for the Committee on topics relevant to the Foreign Proceedings in, *inter

alia*, Australia, Hong Kong, Japan, the Philippines, Singapore, Switzerland, and the United

Kingdom, including issues related to intercompany claims, guarantee claims and the treatment

of such claims in the relevant jurisdictions.

73.    In addition, Milbank continued to monitor compliance with and

developments regarding that certain Cross-Border Insolvency Protocol for the Lehman Brothers

Group of Companies (the "Protocol"), approved by the Court on June 17, 2009.  In connection

therewith, Milbank reported to the Committee on the developments at the meetings of the

Protocol signatories held in London in June 2010 and Berlin in July 2010, in which Milbank

participated.  At the Protocol meetings, Milbank engaged with certain Foreign Administrators to

understand their concerns regarding the Debtors' Plan and other issues in the Chapter 11 Cases.

Milbank also engaged in discussions with the Debtors to facilitate potential settlements among

the Debtors and the Foreign Administrators.  Furthermore, Milbank corresponded with the Foreign Administrators, reviewed their counterproposals to the Debtors' Plan, discussed such counterproposals with the Committee and evaluated potential resolutions of contested issues.  In connection with each of the foregoing, Milbank regularly updated the Committee on the progress of negotiations with the Foreign Administrators.

74.    Moreover, during the Sixth Interim Compensation Period, Milbank, among other activities, (i) researched and presented to the Committee an analysis of foreign jurisdictions in which LBHI's receivables would be subject to mandatory setoff; (ii) identified and analyzed various leverage points with respect to certain Foreign Affiliates and their claims to assist in the Debtors' negotiations with the respective Foreign Administrators; and (iii) analyzed applicable equitable subordination and avoidance laws in various relevant jurisdictions.

75.    **Hong Kong Issues.**    In September 2008, petitions were submitted by representatives of certain of the Foreign Affiliates in Hong Kong (collectively, the "HK Debtors")[15] for the winding up of the HK Debtors pursuant to section 179(1) of the Hong Kong Companies Ordinance.  During the Sixth Interim Compensation Period, Milbank continued to monitor the Hong Kong liquidation proceedings, reviewed relevant publicly available information, analyzed the status of and major issues arising in the proceedings, and prepared a memorandum and open issues list regarding the foregoing.  In addition, Milbank conducted research regarding the HK Debtors and jurisdiction-specific laws, and their impact on the Debtors' interests.

---

[15]    The HK Debtors include:  (i) Lehman Brothers Asia Holdings Ltd.; (ii) Lehman Brothers Asia Limited; (iii) Lehman Brothers Futures Asia Limited; (iv) Lehman Brothers Securities Asia Limited; (v) LBQ Hong Kong Funding Limited; (vi) Lehman Brothers Nominees (H.K. Limited); (vii) Lehman Brothers Asia Capital Company; and (viii) Lehman Brothers Commercial Corporation Asia Limited.

76.    **Japan Issues.**  The Tokyo District Court recently approved the Proposed

Rehabilitation Plan to liquidate Lehman Brothers Japan, Inc. ("LBJ"), the principal Lehman

operating entity in Japan.  During the Sixth Interim Compensation Period, Milbank prepared a

memorandum for the Committee explaining the status of LBJ's rehabilitation proceeding and

the effect of the Japanese proceedings on the Debtors and their creditors.  In particular, Milbank

evaluated the Debtors' claims against Lehman Brothers Asia Holdings, which had the potential

to be significantly impacted by LBJ's rehabilitation proceeding.  The Debtors also hold

significant claims against Sunrise Financial Co. ("Sunrise"), a wholly owned subsidiary of LBJ.

Accordingly, Milbank researched and drafted a memorandum analyzing how recovery levels

with respect to the Debtors' claims could be affected by the creditor recoveries projected in

Sunrise's proposed plan of rehabilitation.

77.    **UK Issues.**  LBIE, the Debtors' principal trading company in the UK,

along with several other British subsidiaries and affiliates of the Debtors, were placed into

insolvency administration in the UK (the "UK Administration"), and the English High Court

appointed PricewaterhouseCoopers, as joint administrators (the "Joint Administrators").  During

the Sixth Interim Compensation Period, Milbank continued to monitor developments in the UK

Administration, including reviewing the Joint Administrators' published progress reports and

monitoring various pending litigation matters in the UK.  In connection therewith, Milbank and

the Committee's financial advisors prepared memoranda and presentations summarizing and

analyzing financial and legal issues arising from the UK Administration.  Milbank also provided

English law advice in relation to, among other things, various swaps and derivatives

transactions to which the Debtors are party.  The foregoing items involved numerous internal

telephone conversations, email communication and memoranda, as well as email

communication and conversations with the Committee's financial advisors and the Debtors' advisors. In addition, Milbank met with counsel for the Joint Administrators to discuss relevant issues and potential settlements affecting the Debtors.

78.      In connection with its ongoing review of issues that arise in the UK Administration, Milbank, among other activities, (i) researched and drafted a memorandum to the Committee providing an overview of the application made by the Joint Administrators to the UK High Court for directions regarding the legal effects of an internal process of the Debtors applied to securities held in LBIE's "house" (*i.e.*, non-client) accounts, known as the Regulation and Administration of Safe Custody and Local Settlement; (ii) monitored the LBIE client money appeal in the UK High Court, and reported back to the Committee on the UK High Court judgment's impact on distributions out of the LBIE estate; (iii) continued to analyze various issues arising with respect to the claims of LBIE against the Debtors' estates; (iv) continued to monitor the Perpetual matter and the subsequent appeal of the UK Court of Appeal's ruling to the UK Supreme Court; and (v) researched English setoff laws in the context of receiverships and administrative receiverships for a supplemental appellate brief that the Committee filed in conjunction with the pending appeal from the Court's order enforcing the automatic stay against Swedbank and compelling Swedbank to pay the Debtors postpetition funds.

79.      **German Bank Issues.** Lehman Brothers Bankhaus AG ("Bankhaus") is a wholly-owned subsidiary of LBHI that was placed into an insolvency proceeding by the Frankfurt Local Court (*Amtsgericht*) on November 13, 2008. On April 29, 2009, Bankhaus filed a petition with this Court for recognition of a foreign main proceeding under chapter 15 of the Bankruptcy Code. During the Sixth Interim Compensation Period, Milbank analyzed numerous issues relating to Bankhaus, including working with the Debtors and the Committee's

financial advisors to review the terms of the proposed settlement agreement with Bankhaus

regarding the Debtors' Plan and legal issues arising in connection therewith.

80.    As part of Milbank's ongoing analysis of the intercompany claims

between Bankhaus and certain of the Debtors, Milbank, among other things, (i) drafted a motion

to obtain access to records in Bankhaus' insolvency proceedings; (ii) researched and drafted a

memorandum on regulatory capital requirements under German law; (iii) researched German

regulatory requirements with respect to intra-group claims; and (iv) monitored the proceedings

in the Frankfurt Regional Court (*Landgericht*), which ultimately dismissed the petition of the

Joint Administrators of LBIE to (a) render information on the whereabouts of the client money;

(b) repay $1 billion plus interest under an alleged trust agreement, or, in the alternative, (c) pay

$1 billion plus interest for breach of the alleged trust agreement, or, in the further alternative, (d)

acknowledge an insolvency claim in the amount of $1 billion plus interest.

**R.    Non-Derivative Automatic Stay/Safe Harbor Issues**

81.    During the Sixth Interim Compensation Period, Milbank reviewed

numerous motions filed by parties in interest seeking to lift the automatic stay to enforce

various contractual agreements or otherwise exercise rights against the Debtors' estates, as well

as motions filed by the Debtors seeking to enforce the automatic stay against parties that had

violated the stay.

82.    **SunCal**.  Milbank reviewed and analyzed the Motion of the Chapter 11

Trustee of the SunCal Master Debtors for an Order Granting Relief from the Automatic Stay

(the "SunCal Trustee's Motion") [Docket No. 9642] and in response thereto, filed with the

Court, on behalf of the Committee, a joinder in the Debtors' objection to the SunCal Trustee's

Motion (the "Joinder") [Docket No. 10121].  The Joinder concurred with the Debtors' view that

the SunCal Trustee failed to demonstrate that the automatic stay should be lifted pursuant to the

factors enunciated by the Second Circuit in In re Sonnax Indus. Inc., 907 F.2d 1280 (2d Cir.

1990).  In particular, the interests of judicial economy weighed strongly in favor of denying the

SunCal Trustee's Motion.  Adopting the reasoning set forth by the Debtors and the Committee,

the Court ultimately denied the SunCal Trustee's Motion.

83.    **Latshaw**.  During the Sixth Interim Compensation Period, Milbank

reviewed and analyzed the disputes among LCPI, Latshaw Drilling Company, LLC and

Latshaw Drilling & Exploration Company (together, "Latshaw") regarding (i) an adversary

proceeding in Latshaw's chapter 11 cases related to LCPI's claims against Latshaw for

$45,847,390.21 for amounts allegedly owed to LCPI under a prepetition credit agreement

among the parties; and (ii) the Debtors' objection to Latshaw's $47,540,482 claim against the

Debtors' estates for LCPI's alleged failure to fund under that same credit agreement.  In an

effort to resolve their disputes, LCPI and Latshaw sought approval of a stipulation and

agreement (the "Latshaw Stipulation") lifting the automatic stay in LCPI's chapter 11 case for

the limited purpose of permitting Latshaw's objection to LCPI's claim against Latshaw in its

chapter 11 cases pending before a court in Oklahoma (the "Latshaw Objection").  Milbank

analyzed the Latshaw Objection and the Latshaw Stipulation, researched the "defensive" use of

the automatic stay and worked with the Debtors to revise the Latshaw Stipulation to ensure that

the Debtors' rights were protected and that their estates were not adversely affected.  Milbank

also drafted a memorandum for the Committee analyzing the terms of the Latshaw Stipulation

and the Latshaw litigation in Oklahoma and the impact of the foregoing on LCPI.

84.    **Motions to Enforce the Automatic Stay**.  Milbank also analyzed the

Debtors' motions to enforce the automatic stay against various parties, including (i) Greenbrier

38

Minerals Holdings, LLC ("Greenbrier"); and (ii) the trustees of the UK Pension Scheme and the

Board of the UK Pension Protection Fund.  In each case, Milbank reviewed the Debtors'

motion, researched relevant legal issues, drafted a memorandum to the Committee analyzing the

motion and providing a recommended course of action.

85.    In particular, with respect to LCPI's motion to enforce the automatic stay

against Greenbrier [Docket No. 9729], Milbank reviewed the motion and Greenbrier's response,

and researched issues regarding the termination of membership interests under the Delaware

Limited Liability Company Act and interpretation of the relevant provisions of Greenbrier's

operating agreement.  On behalf of the Committee, Milbank drafted a statement in connection

with LCPI's motion [Docket No. 10148], although the hearing on the motion was subsequently

adjourned.

86.    Additionally, Milbank spent considerable time analyzing the Debtors'

motion to enforce the automatic stay against certain UK administrative bodies with respect to

the UK Pension Proceedings [Docket No. 10834].  In particular, Milbank reviewed the motion

and researched the underlying domestic and UK legal issues, including recent decisions directly

affecting the proposed action of the UK Board of the Pension Protection Fund.  Milbank worked

with the Debtors' counsel in reaching an agreement reflected in the stipulation and agreement

allowing for limited relief from the automatic stay to continue portions of the UK Pension

Proceedings in order to assess LBHI's potential purview [Docket No. 11042].  On behalf of the

Committee, Milbank filed a statement in support of the stipulation [Docket No. 11094].

S.    **Non-Derivative Executory Contracts/365 Issues**

87.    During the Sixth Interim Compensation Period, Milbank reviewed and

analyzed pleadings filed with respect to the Debtors' executory contracts, including motions by

certain of the Debtors' counterparties seeking to compel the respective Debtor to assume or

reject a particular executory contract.  Such review and analysis included legal research

regarding the relief sought by such pleadings, analysis of the Debtors' rights and obligations

under the applicable executory contracts, consultation with the Committee's financial advisors

regarding the financial implications of the proposed treatment of the subject contracts,

correspondence with the Debtors' legal and financial advisors regarding the financial context

and implications of the proposed courses of action, and assessment of the potential impact on

the Debtors' estates.

**T.      Plan of Reorganization/Plan Confirmation/Plan Implementation**

88.      After the filing of the Debtors' Plan and Disclosure Statement, Milbank,

together with the Committee's financial advisors, continued its extensive review of the myriad

issues involved in developing a confirmable plan of reorganization.  Such analysis included the

review of bankruptcy, corporate governance, pension, tax and structural issues, and the

preparation and review of recovery scenarios.  In connection therewith, Milbank, along with the

Committee's financial advisors, regularly met with the Debtors and their advisors to discuss the

proposed treatment of a variety of plan-related issues, including the preservation of net

operating losses, substantive consolidation, intercompany claims and Guarantee Claims

reconciliation, corporate governance, plan currency and claims between the Debtors and certain

of the Foreign Affiliates.

89.      Additionally, Milbank continued its work on a comprehensive analysis of

substantive consolidation and the factors generally considered by courts when analyzing

substantive consolidation.   In preparing such analyses, Milbank conducted in-depth research on

all reported cases discussing the doctrine of substantive consolidation and also undertook

40

extensive factual investigation on the issue, including document review and employee and

creditor interviews.  In connection therewith, Milbank, together with the Committee's financial

advisors, also continued its analysis of the potential applicability of the principles articulated in

such cases to the facts and circumstances of the Chapter 11 Cases.  Milbank researched and

drafted several comprehensive memoranda on substantive consolidation and its implications on

the Debtors' estates, on a Debtor by Debtor basis, and made numerous presentations to the

Committee with respect to the foregoing.

90.    Finally, Milbank and Houlihan Lokey Howard & Zukin, the Committee's

financial advisor, analyzed different scenarios that would serve to settle the issues of substantive

consolidation and had numerous meetings with the Debtors and certain creditor groups with

respect thereto.  Specifically, the Committee individually met with the LBT Noteholder Group,

the LBT Ad Hoc Group, The Baupost Group, the LBSF Ad Hoc Consortium of Claimholders

and the LBSF Alliance to discuss each of their positions on substantive consolidation, the

Debtors' Plan, and alternative proposals to settle certain issues that arose in connection with the

Debtors' Plan, including domestic substantive consolidation and the treatment of the claim

arising from the structured notes issued by LBHI and LBT.

**U.    Claims Analysis**

91.    **Claims Database**.  Milbank continued, during the Sixth Interim

Compensation Period, to expand and refine the database of the Debtors' and certain of the

Foreign Affiliates' debt offering documents ("Database") that was created and developed during

the First Interim Compensation Period.  Milbank continued to use the Database to develop and

present summary forensic capital structure information to the Committee and its advisors, as

well as to answer individual queries from the Committee and the public about specific Lehman

debt instruments. The Database is used by Milbank and the Committee's financial advisors on a regular basis to determine and analyze the Debtors' and certain Foreign Affiliates' capital structures, review proofs of claim, establish a basis upon which to determine and validate claim amounts, and analyze substantive consolidation, intercompany, preference and other potential issues. Milbank continued to review and analyze the debt securities and guarantees of LBHI and its affiliates in order to expand the Database with respect to the structured notes issued by LBT and to address issues related to the Debtors' securities raised by the Committee. Access to the Database has proven invaluable to the Committee and its advisors, including with respect to the matters related to the claims reconciliation process and the Debtors' Plan.

92.    **Capital Structure Issues**. Milbank also analyzed current and anticipated disputed topics relating to the Debtors' capital structure, including the treatment of the subordinated notes issued by LBHI under the governing documents as versus under the Debtors' Plan, the valuation of the structured notes issued by LBHI and LBT, and the structure of such notes.

## V.    Other Bankruptcy Motions and Matters

93.    During the Sixth Interim Compensation Period, Milbank devoted substantial time to researching and evaluating potential claims on behalf of the Debtors' estates, including voidable transfer claims. Pursuant to section 546(a) of the Bankruptcy Code, the deadline for bringing avoidance actions is two years after the entry of the order for relief, which in this case was September 15, 2010. Due to this time limitation, Milbank conducted considerable diligence in connection with potential avoidance actions. In particular, Milbank continued working with the Debtors, the Debtors' counsel and advisors, the Committee's financial advisors, the Committee's conflicts counsel, the SIPA Trustee and the SIPA Trustee's

advisors, among other things, to (i) identify and analyze categories of pre and postpetition

transfers potentially subject to avoidance and recovery; (ii) analyze the prepetition financial

condition of the Debtors to determine whether the Debtors were insolvent and/or

undercapitalized during any period for purposes of pursuing preference and constructive

fraudulent transfer claims; (iii) investigate and analyze in greater depth particular transfers

identified as potential avoidance targets; (iv) analyze potential legal issues that might arise in

connection with the pursuit of any avoidance actions; and (v) develop potential litigation

strategies.

94.    Milbank analyzed various categories of potentially voidable transfers

based on information provided by the Debtors' advisors and contained the Examiner's Report,

including payments to insiders and vendors, and transfers made in connection with the treasury

and trading activities of the Debtors.  Milbank met and corresponded extensively with the

Committee's financial advisors, and counsel and financial advisors to the Debtors and the SIPA

Trustee to discuss various types of prepetition transfers made by the Debtors, the prepetition

financial condition of the Debtors, various issues relating to the joint pursuit of avoidance

actions by the Debtors and the SIPA Trustee and strategies for and mechanics of sending

demand letters and tolling agreements to and/or filing complaints against transferees.

95.    Milbank worked extensively with the Debtors' counsel and counsel to the

SIPA Trustee in drafting demand letters and tolling agreements and developing lists of

transferees to whom such demand letters and tolling agreements were sent prior to the deadline

for bringing avoidance actions.  Milbank also continued looking into particular transfers in

which potential recoveries for the estates appeared to be substantial, and developed potential

theories of recovery for such transfers.  Through these analyses and discussions, Milbank

continued working with the Debtors to determine which transfers might create viable causes of action under avoidance and other theories and which transfers could be eliminated from further consideration.

96.     Milbank also continued assessing the financial condition of the Debtors prior to the Petition Date for purposes of preference and constructive fraudulent transfer causes of action.  In that connection, Milbank (i) engaged in discussions and correspondence with the Debtors' counsel regarding the Debtors' prepetition financial condition and (ii) worked extensively with the Committee's financial advisors in developing work plans to coordinate with the Debtors' professionals in assessing the Debtors' financial condition.

97.     Milbank engaged in extensive research with respect to factual and legal issues with respect to potential avoidance actions and prepared memoranda and presentations to the Committee in connection therewith.  In particular, Milbank researched and analyzed, among other things, issues such as the general mechanics and legal bases of avoidance actions, potential recoveries resulting from avoidance actions, legal defenses to avoidance actions, potentially safe harbored transfers, collateral legal risks of pursuing certain avoidance actions, Committee standing to pursue avoidance actions and other legal issues that might arise in connection with particular categories of prepetition transfers.

W.     **Non-Derivative Adversary Proceedings Preparation and Litigation**

98.     During the Sixth Interim Compensation Period, Milbank researched and prepared memoranda regarding the claims and issues raised by a wide range of pending lawsuits and potential settlements impacting the Debtors' estates.  Milbank also held teleconferences and meetings, both internally and with the Debtors and their advisors, with regard to the foregoing and provided regular updates to the Committee.

44

99.     More specifically, with the exception of cases in which the Committee's interests are represented by the Committee's conflicts counsel, Milbank monitored developments in (i) all pending adversary proceedings commenced in this Court; (ii) lawsuits commenced prepetition against the Debtors and pre and post-petition against non-Debtor affiliates, officers, directors, and related parties; (iii) litigation issues similar to those raised or to be raised in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11 Cases.  When appropriate and directed by the Committee, Milbank intervened in such matters on the Committee's behalf.  In connection with the monitored proceedings, Milbank reviewed and analyzed proposed settlement agreements and advised the Committee regarding the same.

## X.     2004 Issues

100.    During the Sixth Interim Compensation Period, Milbank reviewed and analyzed discovery requests and stipulations filed by various parties in interest, such as Intel Corporation and Rosslyn Investors I, LLC.  Milbank also researched potential targets of Rule 2004 discovery by the Committee and drafted pleadings and correspondence in connection with such potential discovery.

## Y.     Examiner Issues

101.    During the Sixth Interim Compensation Period, Milbank reviewed, analyzed, and conducted legal research in connection with the Examiner's Motion for Order Discharging Examiner and Granting Related Relief [Docket No. 9361], filed on June 2, 2010 (the "Discharge Motion"), and assessed its potential implications for the Committee.  Milbank also reviewed drafts of the proposed order granting the Discharge Motion and collaborated with counsel for the Debtors to submit proposed revisions to the proposed order.  After entry of the

order discharging the Examiner (the "Discharge Order"), Milbank continued to review requests

for information from the Examiner and other correspondence relating to the Discharge Order.

**Z.    Firm's Own Billing/Fee Applications**

102.    During the Sixth Interim Compensation Period, Milbank reviewed the

Fee Statements for, among other purposes, compliance with the Interim Compensation Order,

the Local Guidelines and the Fee Committee Guidelines.  Milbank also prepared and served its

Fee Statements and its Fifth Interim Fee Application on all parties as required by the Interim

Compensation Order.

103.    In connection with the appointment of the Fee Committee, during the

Sixth Interim Compensation Period, Milbank reviewed and analyzed matters related to the Fee

Protocol, and regularly corresponded with the members of the Fee Committee and the other

professionals retained in the Chapter 11 Cases regarding such matters.  Additionally, Milbank

continued to work cooperatively with the Fee Committee to settle certain outstanding issues

identified in the Fee Committee reports pertaining to the retained professionals' fourth and fifth

interim fee applications.

**AA.    Third Party Retention/Fee Application/Other Issues**

104.    During the Sixth Interim Compensation Period, Milbank reviewed the

retention applications of Dechert, LLP; Sonnenschein, Nath & Rosenthal, LLP; Paul, Hastings,

Janofsky & Walker, LLP; Momo-o, Matsuo & Namba, and others, as certain of these

professionals originally retained as ordinary course professionals pursuant to the Court's Order

Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtors

to Employ Professionals Utilized in the Ordinary Course of Business, dated November 5, 2008

(the "<u>OCP Order</u>") [Docket No. 1394], exceeded the $1 million cap on fees during the pendency of the Chapter 11 Cases established in the OCP Order.

        105.    Milbank also reviewed the monthly fee statements received from other professionals pursuant to the Interim Compensation Order.  Finally, Milbank assisted in the filing and service of the fifth interim fee applications of other Committee professionals.

## IV.

## <u>ALLOWANCE OF COMPENSATION</u>

        106.    The professional services rendered by Milbank have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by the Committee.  The services rendered to the Committee were performed efficiently, effectively and economically, and that the results obtained to date have benefited not only the members of the Committee, but also the unsecured creditors of each of the Debtors' estates.

        107.    The allowance of interim compensation for services rendered and reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered . . . as is provided under section 330 of this title.

11 U.S.C. § 331.

        108.    With respect to the level of compensation, section 330(a)(1)(A) of the Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person, "reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn, provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or
> beneficial at the time which the service was rendered toward the
> completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount
> of time commensurate with the complexity, importance, and nature
> of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board
> certified or otherwise has demonstrated skill and expertise in the
> bankruptcy field; and
>
> (F)    whether the compensation is reasonable based on the customary
> compensation charged by comparably skilled practitioners in cases
> other than cases under this title.

11 U.S.C. § 330(a)(3).

109.    The congressional policy expressed above provides for adequate

compensation in order to continue to attract qualified and competent professionals to

bankruptcy cases.  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994)

("Congress rather clearly intended to provide sufficient economic incentive to lure competent

bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation

marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y.

1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys'

rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

110.    In assessing the "reasonableness" of the fees requested, courts have

looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First

<u>Colonial Corp. of America</u>, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[16]  <u>See</u> <u>In re Nine Assocs., Inc.</u>, 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting <u>First

Colonial/Johnson</u> analysis); <u>In re Cuisine Magazine, Inc.</u>, 61 B.R. 210, 212-13 (Bankr. S.D.N.Y

1986) (same); <u>see generally</u> 3 <u>Collier on Bankruptcy</u> ¶ 330.04[3] (Lawrence P. King et al., eds.,

15th rev. ed. 2009) (enumerating <u>First Colonial</u> and <u>Johnson</u> as the "leading cases to be

considered in determining a reasonable allowance of compensation").  Milbank respectfully

submits that the consideration of these so-called <u>Johnson</u> factors should result in this Court's

allowance of the full compensation requested.

(A)    <u>The Time and Labor Required</u>.  The Debtors' cases are among the largest, most complex and active bankruptcy cases ever filed.  Accordingly, the professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.

(B)    <u>The Novelty and Difficulty of Questions</u>.  Novel and complex issues have arisen in the course of these chapter 11 cases, and it can be anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Milbank's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

(C)    <u>The Skill Requisite to Perform the Legal Services Properly</u>.  Milbank believes that its recognized expertise in the area of financial restructuring, its ability to draw from highly experienced professionals in other areas of its practice such as securities, structured products, asset divestiture, litigation, and regulatory law and its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

---

[16]    The factors embraced by the Fifth Circuit in <u>First Colonial</u> were first adopted by the Fifth Circuit's decision in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974), except that <u>First Colonial</u> also included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the Bankruptcy Code.  <u>Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.)</u>, 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the <u>First Colonial</u> factors are now codified in section 330(a)(3). 3 <u>Collier on Bankruptcy</u> ¶ 330.04[3].

(D)     <u>The Preclusion of Other Employment by Applicant Due to Acceptance of the
Case</u>.  Due to the size of Milbank's financial restructuring department and the
firm as a whole, Milbank's representation of the Committee has not precluded the
acceptance of new clients.  However, the number of matters needing attention on
a continuous basis has required numerous Milbank attorneys, across multiple
practice groups, to commit significant portions of their time to these cases.

(E)     <u>The Customary Fee</u>.  The compensation sought herein is based upon Milbank's
normal hourly rates for services of this kind.  Milbank respectfully submits that
the compensation sought herein is not unusual given the magnitude and
complexity of these cases and the time dedicated to the representation of the
Committee.  Such compensation is commensurate with fees Milbank has been
awarded in other cases, as well as with fees charged by other attorneys of
comparable experience.

(F)     <u>Whether the Fee is Fixed or Contingent</u>.  Milbank charges customary hourly rates,
as adjusted annually, for the time expended by its attorneys and paraprofessionals
in representing the Committee, and Milbank's fee is not outcome dependent.

(G)     <u>Time Limitations Imposed by Client or Other Circumstances</u>.  As stated above,
Milbank has been required to attend to various issues as they have arisen in these
cases.  Often, Milbank has had to perform these services under significant time
constraints requiring attorneys and paraprofessionals assigned to these cases to
work evenings and on weekends.

(H)     <u>The Amount Involved and Results Obtained</u>.  The Committee represents the
interests of unsecured creditors of each of the Debtors that, in the aggregate, hold
unsecured claims estimated to be valued in the hundreds of billions of dollars, in
what has been widely described as the largest chapter 11 case ever filed.  The
Committee's participation, with Milbank's counsel and guidance, has greatly
contributed to the efficient administration and prospects for reorganization of
these cases.

(I)     <u>The Experience, Reputation and Ability of the Attorneys</u>.  Milbank has a
sophisticated and nationally recognized corporate reorganization and financial
restructuring practice, and Milbank attorneys involved in this representation have
played a major role in numerous complex restructurings including, for example,
the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc.,
Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North
America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries
Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications
Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc.,
Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores,
Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access,
Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen
Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc.,
Seven-Up/RC Bottling Company of Southern California, Inc., and Ames

50

Department Stores, Inc. Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)     The "Undesirability" of the Case. These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)     Nature and Length of Professional Relationship. Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008. Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

111.    The total time spent by Milbank attorneys and paraprofessionals during the Sixth Interim Compensation Period was 32,959.00 hours and has a fair market value of $18,359,367.75. As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts. In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

## V.

## EXPENSES

112.    Milbank has incurred a total of $792,924.64 in expenses in connection with representing the Committee during the Sixth Interim Compensation Period. Milbank records all expenses incurred in connection with the performance of professional services. A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

113.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients. The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges,

mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

114.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents ($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00, such charges were accrued in connection with conference calls in which the Committee, the Debtors and/or other parties in interest participated.

115.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[17]  Additionally, Milbank has further limited and defined its expenses in accordance with the Fee Committee Guidelines.

116.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

117.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff

---

[17]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

services because such items are not included in the firm's overhead for the purpose of setting the billing rates.

118.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the Sixth Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## NOTICE

119.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the United States Trustee, and (d) the members of the Fee Committee.

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Sixth Interim Compensation Period in the amount of $18,359,367.75 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $792,924.64, for a total award of $19,152,292.39; (ii) authorizing and directing the Debtors to pay to Milbank $3,660,533.38 which is an amount equal to the difference between (a) this $19,152,292.39 award and (b) $15,491,759.01, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation

Order for services rendered and expenses incurred during the Sixth Interim Compensation

Period; and (iii) granting such further relief as is just.

Dated: New York, New York
December 14, 2010

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By:   /s/ Dennis F. Dunne_____
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                         :

In re:                             :              Chapter 11 Case No.
                                         :

LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,  :           08-13555 (JMP)
                                       :

                     Debtors.        :              (Jointly Administered)
                                         :
------------------------------------------------------------ x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF SIXTH APPLICATION OF MILBANK,
TWEED, HADLEY & M<sup>C</sup>CLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>JUNE 1, 2010 THROUGH AND INCLUDING SEPTEMBER 30, 2010</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "<u>Local Guidelines</u>"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, adopted on January 30, 1996 (the "<u>U.S. Trustee Guidelines</u>" and,

together with the Local Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") of Lehman Brothers Holdings Inc., Lehman Brothers

Special Financing Inc., Lehman Brothers Commercial Paper Inc. and their affiliated debtors in

possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby certifies with

respect to Milbank's sixth application for allowance of compensation for services rendered and

for reimbursement of expenses, dated December 14, 2010 (the "<u>Application</u>"), for the period of

June 1, 2010 through and including September 30, 2010 (the "<u>Sixth Interim Compensation</u>

<u>Period</u>") as follows:

      1.    I am the professional designated by Milbank in respect of compliance with

the Guidelines.

      2.    I make this certification in support of the Application, for interim

compensation and reimbursement of expenses for the Sixth Interim Compensation Period, in

accordance with the Local Guidelines.

      3.   In respect of section B.1 of the Local Guidelines, I certify that:

      a.    I have read the Application.

      b.    To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines.

      c.    Except to the extent that fees or disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at rates in accordance with practices customarily employed by Milbank and generally accepted by Milbank's clients.

      d.    In providing a reimbursable service, Milbank does not make a profit on that service, whether the service is performed by Milbank in-house or through a third party.[1]

      4.   In respect of section B.2 of the Local Guidelines, I certify that Milbank has

provided statements of Milbank's fees and disbursements previously accrued, by filing and

serving monthly statements in accordance with the Interim Compensation Order (as defined in

the Application), except that completing reasonable and necessary internal accounting and

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

5.   In respect of section B.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the members of the Fee Committee.

6.   I certify that the Application for interim compensation and reimbursement of

expenses for the Sixth Interim Compensation Period has been prepared in accordance with the

Fee Committee Guidelines (as defined in the Application).

Dated:      New York, New York
            December 14, 2010


                              By: /s/ Dennis F. Dunne
                                  Dennis F. Dunne

# EXHIBIT B

**Time Entry Records**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

# EXHIBIT C

**Expenses**[1]

---

[1]      Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the members of the Fee Committee.

# <u>EXHIBIT D</u>

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| FOURTH INTERIM FEE PERIOD OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 Docket No. 8432 | $13,595,778.50 | $12,908,822.79 | $1,359,577.85 | $6,211,791.04 | $451,410.54 | $404,795.38 |

| FIFTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10 Docket No. 10804 | $19,450,342.75 | [ ][1] | $1,945,034.28 | $11,674,570.75 | $851,804.27 | [ ] |

| SIXTH INTERIM FEE PERIOD JUNE 1, 2010 – SEPTEMBER 30, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & | 12/14/10 | $18,359,367.75[2] | [ ] | $1,835,936.78 | $3,681,873.55 | $792,924.64 | [ ] |

[1] Due to recent developments relating to and ongoing discussions with the Fee Committee, no hearing has yet been scheduled with respect to the Fifth Interim Fee Application.

**FEE SCHEDULE A(1)**

| McCloy LLP | Docket No. [     ] | | | | | | | |
|---|---|---|---|---|---|---|---|---|

---

[2] The amount requested on account of fees and expenses incurred by Milbank during the Sixth Interim Compensation Period was $11,751.26 less than the sum of fees and expenses set forth in the Fee Statements served during the Sixth Interim Compensation Period.

**FEE SCHEDULE A(1)**