# Exhibit 3

## The Plan Proponents' Liquidation Analysis for the Consolidated Debtors

Pursuant to section 1129(a)(7) of the Bankruptcy Code (the "Best Interest Test"), each holder of an impaired Claim or Equity Interest must either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. In determining whether the Best Interest Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the commencement of their chapter 7 cases. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interest Test has been met for general unsecured creditors, further reductions would be required to eliminate Cash and asset liquidation proceeds that would be applied to Secured Claims and amounts necessary to satisfy chapter 11 Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims that are senior to General Unsecured Claims, including any incremental Administrative Expense Claims that may result from the termination of the Debtors' businesses and the liquidation of assets. Any remaining Cash would be available for Distribution to general unsecured creditors and Equity Interest holders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Liquidation Analysis (the "Liquidation Analysis") below reflects the estimated Cash proceeds, net of liquidation-related costs that would be available to the Consolidated Debtors creditors if the Consolidated Debtors were to be liquidated in a chapter 7 case. This Liquidation Analysis is based upon the Debtors' Liquidation Analysis filed with the Debtors' Plan and Disclosure Statement and has been adjusted as necessary to conform with the terms of the Plan Proponents' Plan. Specifically, this Liquidation Analysis assumes the substantive consolidation of the Chapter 11 Debtors as such outcome is not dependent upon whether the Debtors liquidate under Chapter 7 or Chapter 11.

The Debtors report that underlying their Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSES WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

For certain assets, estimates of the liquidation proceeds were made for each asset individually. For other assets, liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a chapter 7 trustee might achieve through their disposition. A Liquidation Analysis was performed for the assets in each asset class held by the

Debtors, and assumes that the Debtors' liquidation proceeds would be distributed in accordance with Bankruptcy Code sections 726 and 1129(b) of the Bankruptcy Code. The Liquidation Analysis should be read in conjunction with the following notes.

**Assumptions**

For purposes of the Debtors' Liquidation Analysis, the Debtors disclosed that they considered many factors and made certain assumptions. The Plan Proponents have adopted these assumptions and have made certain adjustments to reflect the substantive consolidation of the Debtors' estates. These assumptions are described below.

**1. General**

**a. Conversion:** The Chapter 11 Cases are consolidated and converted to chapter 7 in 2010.

**b. Appointment of Chapter 7 Trustee:** One chapter 7 trustee is appointed to liquidate and wind down the Consolidated Debtors' estate.

**c. Chapter 7 Trustee:** The chapter 7 trustee would retain professionals (investment bankers, law firms, accounting firms, consultants, forensic experts, etc.) to assist in the liquidation and wind down of the Consolidated Debtors' estate. Although the chapter 7 trustee may retain certain of the Debtors' professionals for discrete projects, it is assumed that the trustee's primary investment banking, legal, accounting, consulting and forensic support would be provided by new professionals, because most (if not all) of these professionals will hold Claims in the chapter 7 cases. Nevertheless, given that the Debtors have been managing the orderly wind down of their estates with over 500 employees and financial advisor professionals, and have stayed current on tax filings, regulatory and judicial inquiries, and financials records for hundreds of entities and bank accounts, it is reasonable to expect that the chapter 7 trustee will require the assistance of some portion of the Debtors' professionals and/or their employees to assist in the short-term liquidations due to their institutional knowledge

**d. Start-Up Time:** Given the complexity of the Chapter 11 Cases and the underlying assets and Claims, it is anticipated that the chapter 7 trustee and any newly retained professionals will require at least three to six months to familiarize themselves with the Consolidated Debtors' estate, the assets, the Claims and related matters before they begin marketing assets or litigating Claims.

**e. Duration of Liquidation** The Liquidation Analysis assumes that after the start-up period the actual liquidation of assets of the Debtors would continue for 9 to 12 months, during which time all of the Debtors' major assets would either be sold or conveyed to the applicable lien holders and the Cash proceeds, net of liquidation-related costs, would be available for Distribution to creditors. Approximately 66,000 Claims have been filed in the Chapter 11 Cases, not including Claims of Debtor-Controlled Entities against other Debtors and Claims among Debtors. It is unlikely that the chapter 7 trustee could adequately reconcile all Claims during 12 to 18 month period of assessment and asset recovery. Therefore, a large

number of the Claims in these cases will be reconciled, valued, negotiated and settled, and/or litigated to conclusion only after the asset recovery work is mostly complete. The Debtors estimate that a chapter 7 trustee will require an additional 12 to 18 months to reconcile Claims and initiate litigation. It is possible that some Distributions could be made prior to such period, but Claims would be subject to reserves. It is not uncommon in large cases for liquidations to last many years while chapter 7 trustees prosecute difficult Claims-related and other litigation.

**2. Assets**

**a. Cash:** Beginning Cash is based on unrestricted Cash balances.

**b. Assets:** The assets of the Debtors are sold, transferred, abandoned or otherwise liquidated on or before one year from the date that the Chapter 11 Cases are converted. With respect to the different asset classes of the Debtors, the following assumptions were made by the Debtors when calculating the liquidation amount:

**(i)** Derivative Contracts:

The settlement or disposition of derivative contracts requires experienced derivatives and financial services experts. In a chapter 7 liquidation, it is assumed that the chapter 7 trustee will reduce the number of the Debtors' current employees, and that other employees will leave for other market opportunities. It is estimated that headcount is reduced significantly, which will result in the loss of legacy knowledge relating to the derivatives portfolio and will disrupt ongoing settlement discussions with counterparties. This will make a chapter 7 liquidation significantly more difficult and will result in lower recoveries as compared to current projections.

**(ii)** Real Estate Assets:

A forced liquidation of real estate assets over a 12-month period would have an adverse impact on the value of the Debtors' recoveries from their real estate assets. Additional discounts on current valuations would be required due to the following assumptions:

- Lack of liquidity in the market – Potential purchasers may not be able to obtain the requisite financing to purchase the Debtors' Real Estate Assets.
- Supply and demand imbalances – Given the size of the Debtors' portfolio of Real Estate Assets, if offered for sale in its entirety, the market equilibrium in certain markets or geographies may be disturbed. Assets available for sale may outweigh existing demand, inviting further discounts in order to attract non-traditional buyers.
- Bulk sales – Liquidation of the Debtors' entire portfolio of Real Estate Assets within a 12 month period would require bundling multiple positions together for purchasers (most likely by geography, property type or lien type); valuations would likely reflect discounts for what would amount to bulk purchases.

- Inability to offer seller representations or warranties – Liquidation would preclude Debtors' willingness or ability to offer representations and warranties on positions for sale. Additional discounts would be necessary to compensate buyers for the risk of not securing certain guarantees or indemnities.

Taking these assumptions into account, liquidation discounts have been applied based on lien type and property type. Discounts relative to lien type are a reflection of the priority of Claims on underlying collateral (so senior positions generally have lower discounts than equity discounts). Discounts relative to property type (office, condo/multifamily, hospitality, land, etc.) are a reflection of unique features in the markets for those assets.

In addition, there are certain Real Estate Assets within the commercial real estate portfolio that possess unique characteristics and as a result, individual liquidation discounts have been applied. This situation generally applies to larger projects that may involve multiple positions across lien and property types (*e.g.*, a condo development with some undeveloped land), and/or debt positions whereby a liquid market for a security establishes a market price.

Other considerations

A quick liquidation of the Debtors' portfolio of Real Estate Assets would likely entail significant involvement on the part of third party investment bankers, real estate brokers, and legal resources (including representation by local counsel). For the purposes of this analysis, the Debtors included fees for brokers and bankers and additional amounts to cover legal and other contingencies.

It is possible that some of the Debtors' Real Estate Assets cannot be sold in the liquidation time frame. Outstanding litigation and structural impediments (transfer consents, regulatory or environmental restrictions, rights of first refusal, *etc.*) may require that certain positions be held beyond the self-imposed deadline.

**(iii)** Private Equity/Principal Investments:

The Liquidation Analysis assumes an orderly liquidation of the Private Equity/Principal Investment portfolio over a 12-month period. The assumptions used are based on estimates and are by definition subject to variability in ultimate outcome.

Liquidation Impediments

*Contractual and Structural Impediments*

- Tag-Along Rights: Investors in certain Private Equity/Principal Investments have a right to dispose of a portion of their interest in any transaction in which the Debtors' transfer an interest. Such right may limit the amount of any Private Equity/Principal Investment that the Debtors are able to sell in any one transaction.

- Regulatory Restrictions: Certain Private Equity/Principal Investments impose regulatory restrictions on the type of buyer or quantity of ownership of such investment. Potential purchasers might demand a discount for any such Private Equity/Principal Investment due to the uncertainty of obtaining such approvals and the time necessary to obtain regulatory approvals.

- Structural Impediments: With respect to certain Private Equity/Principal Investments, purchasers are likely to apply discounts in a forced sale process (see "Market Psychology" below).

*Procedural Impediments*

- Market Psychology: In a chapter 7 liquidation, potential purchasers will be aware of the Debtors' desire to liquidate its Private Equity/Principal Investments in a limited time frame, and resultant pressure to accept highest price available, regardless of the inherent value of the asset.

- Higher Expenses: The complexity of selling a large number of Private Equity/Principal Investments in a limited timeframe is likely to increase costs (e.g. financial and legal advisors) as compared to a medium-term orderly liquidation of such assets.

Liquidation Process/Assumptions

For a variety of reasons, it is possible that some Private Equity/Principal Investments cannot be sold in the liquidation time frame. Outstanding litigation and structural impediments (transfer consents, regulatory or environmental restrictions, rights of first refusal, etc.) may require that certain positions be held beyond the 9 to 12 month period assumed in this liquidation analysis.

Many of these assets are in non-Debtor entities so the normal bankruptcy sale protections are not available to the buyer. Taking the owning entity into bankruptcy raises the costs to the estates and may not attract betters offers.

Direct Portfolio

Given the concentration inherent in the portfolio of direct Private Equity/Principal Investments, with the largest 40 positions accounting for over 90% of the carrying value, it is assumed that each of the largest 40 positions are sold individually as opposed to as part of a block transaction. The remaining approximately 40 smaller Private Equity/Principal Investments in the portfolio can be divided into better known positions (sponsor co-invests) and non-sponsor positions. It is assumed that sponsor co-invests can be sold individually, while the non-sponsor positions can be sold as a block.

To sell the direct portfolio positions over a 9 to 12 month period would require the retention of multiple investment banks. The investment banks would likely run a controlled competitive

auction process (bound, to a certain extent, by the transfer and other restrictions inherent in the governing documents).

GP/LP Investments

The Private Equity/Principal Investment structured as limited partnership interests would be sold through an auction process conducted by a third party. It is unlikely that one buyer would acquire the entire portfolio though, and multiple sales would be necessary. Each position in this portfolio requires general partner consent, therefore the liquidation time frame is challenging and would likely result in larger discounts.

The hedge fund limited partnership interests would also be sold through an auction process conducted by a third party but the buyer universe is much more limited. Also, given the significant concentration in this portfolio, as well as the length of many lockups, discounts would be very significant. Finally, general partner consent is required in every case.

The general partnership interests would be sold individually. Although two are public equity positions, the size of the position and lack of trading volume make the positions highly illiquid. Third parties would be used in each case.

The aggregate cost of third parties to liquidate the GP/LP investments would be substantial.

**(iv)** Private Equity Group:

The management contracts and general partnership (in some cases) for the active private equity group were, or are in the process of being sold/spun-out. This process would continue in a chapter 7 liquidation. In this liquidation scenario, the LP stakes would need to be marketed and sold, likely through an auction process. The LP stakes could be sold either by fund or by fund family.

For the older vintage funds where certain Debtors are the general partner and manager, the underlying portfolio would be liquidated in a manner similar to the direct portfolio. Each Private Equity/Principal Investment would be marketed and sold individually. Certain investments are in publicly traded companies, which would make disposition easier and investments less subject to high discounts. The funds' concentration in certain public positions would require block trades which would command a discount.

It is assumed that financial advisers would be hired to market and sell the limited partnership interests and the direct Private Equity/Principal Investment in the funds and to facilitate any marketed secondaries. The cost of the financial adviser and legal fees would be extensive given the complexity of the Debtors' fund structures.

**(v)** Loans:

The liquidation analysis assumes an orderly liquidation of the Debtors' portfolio of Loans over a 12-month period. Below outlines the liquidation impediments and the process that would be employed to effectuate the liquidation.

To the extent that loans are fully funded, liquidation of these assets will not be difficult. Given the volume of Loans available for sale, however, and market participants' knowledge of the Debtors' mandate to liquidate their portfolio of Loans in a limited time frame, it is likely that a significant discount will be necessary to liquidate the portfolio. A description of the disposition of the different types of Loans held by the Debtors is set forth below:

Loan Positions

- Special Purpose Vehicles: Loans to special purpose vehicles are illiquid and are not traded in any commercial market. As a result, a financial player is the only possible buyer and would likely require a steep discount for purchase.

- Commercial Loans: Commercial loans are generally liquid and trade in commercial markets. However, many of the Debtors' Loans include future commitments to make additional funding, so the disposition of these Loans would require an additional discount to offset the buyer's obligations and additional risk. Larger positions would require a substantial discount as a result of the expedited sale.

- Distressed Debt or Claims Against Chapter 11 Debtors**:** Claims against entities in a chapter 11 proceeding are generally illiquid. The Debtors would realize significant discounts to current market value.

- Loans Participated to CLOs**:** Loans participated to collateralized loan obligations are generally liquid and trade in the commercial markets. To the extent that the revolvers are unfunded, these positions would require an additional discount to entice a buyer.

**c.** **Avoidance Actions:** Due to uncertainty and litigation risk, there are no significant amounts reflected in the liquidation analysis for avoidance actions.

**d.** **Other Litigation:** Consistent with the calculation of the estimated recoveries under the Plan, no values are included for recoveries from other litigation.

**3.** **Costs**

**a.** **Employees:** The chapter 7 trustee will require a significant number of employees to liquidate the assets. To the extent that the chapter 7 trustee terminates the post-petition employment contracts of any of the Debtors' current employees, the Debtors' estates would be subject to additional Administrative Expense Claims.

**b. Trustee Fees**: The chapter 7 trustee would be compensated in accordance with the guidelines of section 326 of the Bankruptcy Code. The liquidation analysis assumes that the chapter 7 trustee's fees would not be greater than 1% of total Distributions by the Debtors.

**c. Professional Fees:** Given that the chapter 7 trustee and, to the extent applicable, the trustee's professionals must familiarize themselves with the Debtors, their estates, their assets and the Claims asserted against them, it is anticipated that the Debtors' estates would incur significant professionals' fees in the context of a chapter 7 liquidation.

**4. Estimated Recoveries**

**a. Determination of Claims:** All Claims are either Allowed or estimated for purposes of establishing a reserve in 2011, such that first Distributions would not be made until 2012. Final determination of all disputed Claims cannot be determined at this time.

**b. Classes of Claims:** The estimated recoveries use the Classes established by the Plan to facilitate creditors' ability to compare the recoveries under the Plan versus recoveries in a chapter 7 liquidation.

**c. Timing of Distributions:** While cash may be realized sooner, it is currently contemplated that the first Distributions under the Plan would commence in 2011, the Debtors anticipate that the first Distribution to Creditors in a chapter 7 would also not be made until late 2012. This assumption is based, in part, upon the belief that the chapter 7 trustee would be reluctant to make significant interim Distributions prior to the determination of at least 50% of the disputed Claims, which would take longer with fewer employees with institutional knowledge.

**d. Additional Claims**: The liquidation of the Debtors will result in additional Claims being satisfied under chapter 7, including, but not limited to, Claims arising from the rejection of any remaining executory contracts, unexpired leases, and post-petition contracts. However, due to the uncertainty as to which contracts or leases would ultimately be rejected and the determination of the amount of any rejection damages (if any), no such Claims are included in the estimated recoveries. Accordingly, these Claims would further dilute any recoveries in a chapter 7 liquidation. Additional Claims include, but are not limited to, capital maintenance claims pursuant to section 365(o) of the Bankruptcy Code against LBHI for its Guarantee of deposits at Aurora Bank and Woodlands, as a result of their expected foreclosure. Based on the possible reduction on bank assets values in liquidation, the Claims are estimated to be $2.7 billion.

**e. Amount of Allowed Claims**: The determination of the Allowed Claims is an uncertain process given the number of disputed, contingent and/or unliquidated Claims in the Chapter 11 Cases. Furthermore, the accelerated wind down timeline and the substantial loss of experienced workforce that could result from conversion to a chapter 7 would result in a significant impairment to the Claims process. No order or findings have been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Allowed Claims used in the

liquidation analysis. To the extent that Claims have been reduced due to elimination of duplicate and superseded Claims, this is the basis for the Claims used in the liquidation analysis. Claims subject to caps in the recovery analysis for purposes of the Plan will be included at their estimated amounts for purposes of the liquidation analysis. **The actual amount of Allowed Claims could vary materially.**

**<u>Notes to Liquidation Analysis</u>**

### 1. Secured Claims

To the extent that the value of the collateral securing a Secured Claim is less than the Secured Claim, the remaining amount would be a deficiency Claim and a General Unsecured Claim against the Debtor.

### 2. Estimated aggregate unpaid Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims

The amount of Cash that would be available for Distributions to general unsecured creditors in a chapter 7 case would be reduced by any Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims that are senior to General Unsecured Claims in the Chapter 11 Cases. Any remaining Cash after satisfaction of these Claims would be available for Distribution to general unsecured creditors and Equity Interest holders in accordance with the Distribution hierarchy established by section 726 of the Bankruptcy Code.

### 3. Liquidation Analysis

The Liquidation Analysis is presented as the recoveries from the assets and the estimated Claims in a liquidation as compared to such amounts under the Plan.

### 4. Best Interests Test

The Debtors recoveries, as reflected in the Debtors' Plan, are based on expected undiscounted cash flows from assets managed in an orderly liquidation over the five-year period ending December 31, 2014. Solely for illustrative purposes, the Debtors also analyzed estimated recoveries under the Plan based on a range of discount rates. This range was applied to the Debtors' cash flow estimates for the recovery of distributable assets under the Debtors' Plan. Based on that analysis, the Debtors presented estimated recoveries under the Debtors Plan for General Unsecured Claims against certain Debtors whose estimated distributable assets[1] on an undiscounted basis under the Debtors' Plan collectively amount to approximately 75% of the total estimated undiscounted directly held assets of all Debtors and Debtor-Controlled entities under the Debtors' Plan (See Exhibit 5, pages 10 and 11 of the Debtors' Disclosure Statement dated April 14, 2010 [Docket No. 8332] for further information regarding the analysis).

[1] Includes all assets (Cash, Restricted Cash, real estate, loans, investments and derivatives) and excludes recoveries on Intercompany Claims, equity in Affiliates and recoveries on Guarantee Claims from LBHI).

The Consolidated Debtor recoveries in the Plan Proponents proposed Plan are based on the undiscounted cash flows as reflected in the Debtors Plan, and adjusted as necessary based upon the terms of the Plan Proponents' proposed Plan. Solely for illustrative purposes, the Plan Proponents also analyzed estimated recoveries under the proposed Plan based on a range of discount rates. This range was applied to the Consolidated Debtors' annual cash flow estimates for the recovery of distributable assets under the Plan Proponents' Plan.

Based on this analysis, estimated Plan recoveries for General Unsecured Claims against the Consolidated Debtors are as follows:

**Illustrative Plan Recoveries Under Different Discount Rates**

| | Discount Rate | | | |
|---|---|---|---|---|
| | **Undiscounted** | **6%** | **12%** | **18%** |
| General Unsecured Claims | 21.6% | 19.3% | 17.6% | 16.3% |

The Debtors also estimated recoveries under both the Debtors' Plan and a hypothetical liquidation of the distributable assets as reflected in the Debtors' Plan at various discount rates. Based on that analysis, which according to the Debtors' Plan incorporated the multitude of projections and assumptions used to project the total distributable assets available and the total Allowed Claims under the Debtors' Plan and in a hypothetical liquidation, the Debtors estimated that at discount rates up to at least 25% the plan is preferable for all creditor classes in comparison to a hypothetical liquidation.

The Plan Proponents performed the same analysis, estimating recoveries under both the Plan Proponents' Plan and a hypothetical liquidation of the distributable assets as reflected in the Plan Proponents' Plan at various discount rates. Based on that analysis, which incorporated the distributable assets and the total Allowed Claims as reflected in the Plan Proponents Plan and in a hypothetical liquidation, the Plan Proponents estimate that at discount rates up to at least 25% the Plan is preferable for all creditor classes in comparison to a hypothetical liquidation.

**LEHMAN BROTHERS HOLDINGS INC.**

**Liquidation Analysis**

The analysis contained herein is based on data, estimates, projections and assumptions made by the Debtors and their current management in the Debtors' Liquidation Analysis attached as Exhibit 5 to the Debtors' Disclosure Statement, dated April 14, 2010. The data, estimates, projections and assumptions underlying this analysis have not been independently verified, are qualified in their entirety by the statements contained in the Disclosure Statement, including, without limitation, the statements made on pages 2 through 5 thereof, which are incorporated herein by reference, and actual results may differ materially from those reflected herein.

**Exhibit 3 – Liquidation Analysis**

Lehman Brothers Holdings Inc.

*($ in millions)*

**Assets**

| | Plan Value[1] | Liquidation Value[2] | % |
|---|---|---|---|
| Cash & Cash Equivalents | 10,537 | 10,537 | 100.0% |
| Restricted Cash | 4,304 | 4,304 | 100.0% |
| Financial Instruments & Other Inventory | | | |
| Real Estate | 9,060 | 4,080 | 45.0% |
| Loans | 7,080 | 5,248 | 74.1% |
| Principal Investments | 2,990 | 1,530 | 51.2% |
| Derivatives & Other Contracts | 5,366 | 3,349 | 62.4% |
| Other Assets | 3,470 | 826 | 23.8% |
| **Operating Asset Recoveries** | **42,807** | **29,874** | **69.8%** |
| Intercompany Receivables | 9,100 | 6,069 | |
| Equity Interests in Affiliates | 945 | 411 | |
| **TOTAL ASSETS** | **52,852** | **36,354** | |
| Estate Expenses | | | |
| Operating Expenses | (2,393) | (2,344) | |
| Post-Petition Payables | (2,635) | (2,635) | |
| Admin Claims & Other[8] | (2,050) | (1,916) | |
| **NET DISTRIBUTABLE ASSETS** | **45,774** | **29,459** | |

**Estimated Claims/Recoveries**

| | Liquidation | | | Plan | |
|---|---|---|---|---|---|
| | **Liquidation Estimated Claims[3]** | **Recovery Amount** | **Recovery %[4]** | **Recovery Amount** | **Adjusted Recovery %[4]** |
| Class 1 - Priority Non-Tax Claims | 2,722 | 2,722 | 100.0% | 22 | 100.0%[5] |
| Class 2 - Secured Claims | 2,726 | 2,726 | 100.0% | 2,726 | 100.0% |
| Class 3 - Senior Unsecured Claims[6] | 83,723 | 11,920 | 14.2% | 21,360 | 25.5% |
| Class 4 - General Unsecured Claims | 29,012 | 3,493 | 12.0% | 6,259 | 21.6% |
| Class 5 - Subordinated Unsecured Claims | 15,284 | - | 0.0% | - | 0.0% |
| Class 6 - Subsidiary Unsecured Claims | 27,190 | 3,274 | 12.0% | 5,866 | 21.6% |
| Class 7 - Consolidated Third-Party Guarantee Claims | - | - | - | - | - |
| Class 8 - Non-Consolidated Third-Party Guarantee Claims | 25,341 | 3,051 | 12.0% | 5,467 | 21.6% |
| Class 9 - Non-Consolidated Intercompany Claims[7] | 18,879 | 2,273 | 12.0% | 4,073 | 21.6% |
| Class 10 - LBT Intercompany Claims | - | - | - | - | - |
| Class 11 - LBT Third-Party Gurantee Claims | - | - | - | - | - |
| Class 12 - Designated Non-Debtor Affiliate Intercompany Claims | - | - | - | - | - |
| Class 13 - Designated Non-Debtor Affiliate Third-Party Guarantee Claims | - | - | - | - | - |
| Class 14 - Section 510(b) Claims | - | - | - | - | - |
| **TOTAL CLAIMS/RECOVERIES** | **204,877** | **29,459** | | **45,774** | |
| Class 15 - Equity Interests | - | - | | - | - |
| **TOTAL RECOVERIES** | | **29,459** | | **45,774** | |

Note: All values that are exactly zero and all recovery percentages where the corresponding recovery amount is zero are shown as "-". Values between zero and $500,000 appear as "0".

1 Estimated undiscounted cash flows from assets as of December 31, 2009.

2 Estimated undiscounted liquidation cash flows as of December 31, 2009.

3 "Liquidation Estimated Claims" means, for all Classes except Classes 4, 7, 8, and 11, the Debtors' estimate of Allowed Claims, and for Classes 7, 8, and 11, the Permitted Third-Party Guarantee Claims. Class 4 includes the Plan Proponents estimate of General Unsecured Claims as the result of the substantive consolidation of LBT. Claim amounts assume all Classes reject the Plan, and are therefore included with no enhancements.

4 Recovery shown as a percentage of Liquidation Estimated Claims.

5 Recovery shown as 100% because $2.7 billion of Liquidation Estimated Claims only arise under liquidation.

6 Any amounts allocated to LBHI Class 5 are reallocated to LBHI Class 3.

7 Includes Pre-petition Intercompany Claims only. Post-petition Intercompany Claims are Administrative Expense Claims.

8 Comprised of Administrative Expense Claims, professional compensation and Priority Tax Claims.