HEARING DATE AND TIME: December 22, 2010 at 10:00 p.m. (Eastern)
RESPONSE DEADLINE: December 6, 2010 at 4:00 p.m. (Eastern)
(extended by agreement with the Debtors to December 20, 2010)

BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle Street
P.O. Box 9729
Portland, Maine 04104-5029
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
Michael A. Fagone, Esq.

ATTORNEYS FOR CITIBANK, N.A., IN ITS
CAPACITY AS TRUSTEE PURSUANT TO
VARIOUS TRUST AGREEMENTS

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 08-13555 (JMP) |
| **LEHMAN BROTHERS HOLDINGS, INC.,** et al., | (Jointly Administered) |
| **Debtors.** |  |

**RESPONSE OF CITIBANK, N.A., IN ITS CAPACITY AS TRUSTEE PURSUANT TO VARIOUS TRUST AGREEMENTS, TO DEBTORS' SIXTY-SEVENTH OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Citibank, N.A. (the "Trustee"), in its capacity as trustee pursuant to various trust and related agreements, hereby responds to Debtors' Sixty-Seventh Omnibus Objection to Claims (Valued Derivative Claims) [D.E. 12533] (the "Objection") as it relates to two proofs of claims filed by the Trustee. One of the two proofs of claims was filed against Lehman Brothers Special Financing, Inc. ("LBSF") in the amount of $589,099, which claim was later assigned Claim No.

22640 (the "LBSF Claim"), and the other was filed against Lehman Brothers Holdings, Inc. ("LBHI") in the same amount, which claim was later assigned Claim No. 22777 (the "LBHI Claim"). The LBSF Claim arises out of the termination of certain interest rate cap agreements shortly after the filing of LBHI's voluntary petition for relief under chapter 11, and the LBHI Claim is based on LBHI's written guarantees of the obligations of LBSF under those agreements. As set forth in greater detail below, the amount of the LBSF Claim was properly calculated in accordance with the parties' agreements (which is based on a standard and commonly-used industry contract). The amount of the LBHI Claim—which is based on one or more guarantees—does not require any separate calculation apart from that needed to compute the LBSF Claim. Although the Objection asks the Court to drastically reduce the amounts of the LBSF Claim and the LBHI Claim to less than two percent of their stated value, and to allow the claims in the reduced amounts, the Objection does not provide any evidence to support that request or substantiate the proposed modification. As the Objection offers no evidence, the Debtors cannot overcome the *prima facie* validity that attached to the LBSF Claim and the LBHI Claim (collectively, the "Claims"). As it relates to the Claims, the Objection should be overruled. In further support of this response, the Trustee states as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

1.      In general, prior to the filing of their voluntary petitions for relief under chapter 11, one or more of the Debtors sold their interests in residential mortgage loans and assigned certain related rights to various statutory trusts in a series of securitization transactions (collectively, the "Securitization Transactions"). Certificates evidencing beneficial ownership of each trust were then sold to investors. Pursuant to various agreements executed in connection

2

with the Securitization Transactions, the Trustee serves as indenture trustee in those transactions.[1]

2.   In connection with the Securitization Transactions, the Trustee and LBSF entered into seven separate agreements, with each agreement governing one or more interest rate cap or swap transactions (individually, a "Transaction" and collectively, the "Transactions"). In general, each agreement is comprised of: (1) the 1992 version of the ISDA Master Agreement (the "Master Agreement"); (2) a schedule tailoring the terms of the Master Agreement to the specific deal between the Trustee and LBSF; and (3) confirmations setting forth the terms of each Transaction. As used in this Response, the term "Agreements" refers collectively to the seven Master Agreements, as amended and modified by the applicable schedules and confirmations.

3.   To provide additional security to the Trustee, LBHI executed seven guarantees (collectively, the "Guarantees") pursuant to which LBHI unconditionally guaranteed the due and punctual payment of all amounts payable by LBSF under the each of the Agreements.[2]

4.   LBHI's filing of a voluntary petition for relief under chapter 11 on September 15, 2008 constituted an "Event of Default" under the Master Agreement. *See* Master Agreement, at § 5(a)(vii). LBSF's filing of a voluntary petition for relief under chapter 11 on October 3, 2008 also constituted an "Event of Default" under the Master Agreement. *See* id.

5.   On November 10, 2008, the Trustee sent written notices (the "Early Termination Notices") to LBSF declaring that LBSF's bankruptcy filing constituted an Event of Default

---

[1] The Securitization Transactions are far more complex than the general summary set forth above. However, a detailed description of the various parties and the agreements executed by them in connection with the Securitization Transactions is not necessary to alert the Court and the Debtors of the Trustee's position with respect to the Objection and the Claims.

[2] To date, the Trustee has not been able to locate copies of two of the LBHI guarantees. However, the Trustee believes that at least one of these guarantees was, in fact, executed and has written evidence supporting that belief.

under each of the Agreements. The Early Termination Notices also demand payment in full of all amounts owed as a result of the early termination. True and correct copies of the Early Termination Notices are attached hereto as <u>Exhibit A</u>.

6. The Trustee then retained ICP Capital ("<u>ICP</u>") to calculate the amount due (the "<u>Early Termination Payment</u>") with respect to the Early Termination Date for each of the Transactions. ICP obtained four market quotations for each of the Transactions from leading dealers in the relevant market and, using those quotations, determined the amount of the Early Termination Payment for each of the Transactions based on the terms of the Agreements. On November 19, 2008, in accordance with the terms of the Master Agreement, the Trustee served on LBSF a demand (the "<u>Demand Letters</u>") for an Early Termination Payment. True and correct copies of the Demand Letters are attached hereto as <u>Exhibit B</u>.

7. On or about September 21, 2009, the Trustee filed a proof of claim with respect to the LBSF Claim. The amount of the LBSF Claim includes the Early Termination Payments as calculated by ICP, reasonable attorneys' fees incurred by the Trustee as a result of the early termination, and the fee paid to ICP for performing its services. On or about the same day, the Trustee filed a proof of claim with respect to the LBHI Claim based on LBHI's guarantees of LBSF's obligations.[3] On October 19 and 20, 2009, the Trustee filed responses to the Derivatives and Guarantee Questionnaires with respect to both claims.

---

[3] Pursuant to the Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors, dated as of April 19, 2010, all of the information submitted in connection with the proofs of claim described herein are part of the record, and the Trustee need not resubmit them in connection with this Response.

**ARGUMENT**

8.      The Objection must be overruled with respect to the Claims because: (1) the Debtors did not present evidence in their Objection sufficient to rebut the *prima facie* evidentiary effect of the properly-completed and timely-filed proofs of claim; and (2) the Claims were properly calculated in accordance with the terms of the Agreements negotiated and executed by LBSF.

   A.   **The Objection Does Not Present Evidence Sufficient to Rebut the *Prima Facie* Evidentiary Effect of the Properly-Completed and Timely-Filed Proofs of Claim**.

9.      A proof of claim, timely and properly filed, is *prima facie* evidence of the validity of the claim.  *See* Fed. R. Bankr. P. 3001(f).  "To overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."  Sherman v. Novack (In re Reilly), 245 B.R. 768, 773 (2d Cir. 2000) (*citing* In re Allegheny Int'l, Inc., 954 F.2d 167 (3d Cir. 1992)); *see also* Riverbank, Inc. v. Make Meat Corp. (In re Make Meat Corp.), 1999 WL 178788 at *3 (S.D.N.Y. March 31, 1999) ("[o]nce the claimant has established its prima facie case, the burden of going forward then shifts to the debtor to produce evidence sufficient to negate the prima facie validity of the filed claim"); Matter of Michalek, 1991 WL 222063 at *3 (W.D.N.Y. Oct. 22, 1991) ("[t]he party objecting to the claim has the burden of going forward with substantial evidence to rebut the prima facie validity of the claim"); In re Woodmere Investors Ltd. P'ship, 178 B.R. 346, 354-55 (Bankr. S.D.N.Y. 1995) (overruling debtor's objection to secured lender's claim for pre-petition attorneys' fees where debtor had not offered any evidence to support its contention that such fees were unreasonable and also overruled debtor's objection to the same creditor's claim for default interest, holding that "when two sophisticated parties enter into a contract calling for an

5

established rate of default, this court will not disturb the agreement absent persuasive evidence of overreaching").

10. To overcome the *prima facie* effect of a properly filed proof of claim, therefore, the objecting party must "affirmatively *produce* evidence." Make Meat, 1999 WL 178788 at *4 (emphasis in original). That evidence must "refute at least one of the allegations that is essential to the claim's legal sufficiency." In re Oneida Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009). The burden shifts back to the claimant if and only if the objecting party meets this burden. Reilly, 245 B.R. at 773; In re Martinez, 409 B.R. 35, 38 (Bankr. S.D.N.Y. 2009).

11. The Trustee timely and properly filed the proofs of claim at issue here, and those proofs complied both with Fed. R. Bankr. P. 3001 and this Court's Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form (the "Bar Date Order") [D.E. 4271]. *See* Bar Date Order at 2. The proofs of claim, which set forth the amount of the Claims and contained a detailed summary referring to the Agreements, Early Terminations Notices, and Demand Letters forming the basis for the Claims, establish the *prima facie* validity of the Claims.

12. In support of their Objection, the Debtors state that: (1) they have undertaken a lengthy process to evaluate the Claims; (2) that process involved the collection and review of relevant documents and a review of the methodology employed by the Trustee; and (3) as a result of that process, the Debtors have determined that the $11,145.47 value listed on Exhibit A to the Objection is the "fair, accurate, and reasonable valuation" of the Claims.[4] The Debtors do

---

[4] The Trustee has learned from Debtors' counsel that the $11,145.47 figure listed on Exhibit A is erroneous. In fact, the Debtors value the LBSF Claim at $290,917.77 and the LBHI Claim at $225,451.96. Although these values are significantly higher than the $11,145.47 listed on Exhibit A, they are also substantially less than the $589,099.00 valuation determined by the Trustee with respect to each of the Claims.

6

not explain the "lengthy process" in detail or how that "process" resulted in a value that is substantially less than the value calculated in accordance with the method specified by the Agreements. Although the Debtors refer the Court to the Declaration of Gary H. Mandelblatt, originally submitted in Support of the Debtors' Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Claim Form [D.E. 4113] (the "Mandelblatt Declaration"), for a "more comprehensive discussion of the[ir] valuation process," the Mandelblatt Declaration does not provide any evidence to substantiate the Objection. See Objection at 7 n.2; Mandelblatt Declaration. As described more fully below, the Mandelblatt Declaration only affirms that the Trustee used the proper methodology to calculate the Claims. See Mandelblatt Declaration ¶¶ 30-32.

13. As in Woodmere, then, the Debtors have not affirmatively produced any evidence to rebut the *prima facie* validity of the Trustee's proofs of claim. The Objection should therefore be overruled and the Claims should be allowed in the full amount of $589,099.

**B.    The LBSF Claim was Properly Calculated in Accordance with the Terms of the Agreements.**

14. The LBSF Claim is comprised of: (1) Early Termination Payments, as calculated by ICP; (2) reasonable attorney fees incurred in connection with, and as a result of, the early termination; and (3) the reasonable costs of ICP's post-termination services. The Agreements all plainly provide for these damages and the amount of those damages were properly calculated in accordance with the method dictated by the Agreements.

15. The Master Agreement defines "Event of Default" to include, *inter alia*, the filing of a bankruptcy petition by LBSF. See Master Agreement at § 5(a)(vii). Upon the occurrence of an Event of Default, the Trustee was able to initiate an early termination of the Transactions by

7

serving LBSF with a notice specifying the relevant Event of Default and designating a day not earlier than the day such notice is effective as an Early Termination Date with respect to all outstanding Transactions. *See* id. at § 6(a). As soon as reasonably possible following an early termination, the terminating party is required to calculate the Early Termination Payment and provide to the defaulting party a statement summarizing those calculations. *See* Master Agreement at § 6(d)(i).

16. The Master Agreement sets forth four different methods for calculating the Early Termination Payment. *See* Master Agreement at § 6(e)(i). Here, the Trustee and ICP used the "Second Method and Market Quotation" to calculate the Early Termination Payments.

17. The Second Method and Market Quotation requires the *non-defaulting party* to determine the Settlement Amount by first obtaining four quotes from various leading dealers in the relevant market for a replacement contract.[5] *See* Master Agreement at §§ 6(e) (payments on occurrence of Early Termination Date), 14 (definition of "Market Quotation" and "Reference Market-makers"). If three or more quotations are provided, the highest and lowest quotes are disregarded and the remaining quotes are averaged to determine the "Market Quotation." Id. at § 14. After subtracting from the Settlement Amount any unpaid amounts owing to the defaulting party at the time of termination, the non-defaulting party is left with a figure that represents the Early Termination Payment. *See* id.

---

[5] The Master Agreement provides:

> *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (*determined by the Non-defaulting Party*) in respect of the Termination Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

Master Agreement at § 6(e)(i)(3) (emphasis added).

18. In addition to the Early Termination Payment, the Master Agreement also provides that "[a] Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement . . . by reason of the early termination of any Transaction, including, but not limited to, costs of collection." Master Agreement at § 11.

19. Neither the Master Agreement, nor any of the schedules or confirmations amending or modifying that agreement, provide the defaulting party with an opportunity to provide alternative market quotations or otherwise dispute the Settlement Amount determined by the Non-Defaulting Party, provided those damages are calculated in accordance with the Master Agreement. To the contrary, the Agreement *expressly* provides that the right to determine the Settlement Amount belongs exclusively to the Non-Defaulting Party which, in this case, is the Trustee.

20. The fact that the Debtors arrived at an alternative valuation is irrelevant: the Trustee was the *only* party authorized to determine the Settlement Amount under the terms of the Agreement. Moreover, the Trustee calculated the Settlement Amount in a manner consistent with the terms of the Agreements.

21. LBSF filed its chapter 11 bankruptcy petition on October 3, 2008. The Trustee promptly served LBSF with Early Termination Notices on November 10, 2008, designating that date as the Early Termination Date.

22. The Trustee promptly retained ICP to calculate the Early Termination Payment. For each transaction, ICP obtained dealer quotes from four of the leading dealers in the market: Royal Bank of Scotland PLC, HSBC Bank PLC, Bank of New York Mellon PLC, and Natixis.

9

ICP disregarded the highest and lowest quotes, then averaged the remaining two quotes to determine the Settlement Amount.[6]

23. On November 19 and 20, 2008, the Trustee served LBSF with Demand Letters attaching the ICP Settlement Amount calculations and demanding payment in the amount of the Early Termination Payments, plus interest at the applicable rate from the Early Termination Date.

24. The proofs of claim filed by the Trustee summarized the events giving rise to the Claim, referred the Debtors to the Early Termination Notices and Demand Letters, cited the relevant provisions of the Agreements supporting the Claims, and attached a table breaking out the components of their claims on a transaction-by-transaction basis. The proofs of claim added the Trustee's attorney fees and the cost of ICP's services in accordance with section 11 of the Master Agreement.

25. The Debtors do not explain how they determined that the Claims are worth substantially less than the value of the Claims as calculated under the Agreements. The Objection does not, and cannot, specifically challenge either the method employed by Trustee or the calculation based on the use of that method.

26. The Early Termination Notices, Early Termination Payment calculations and Demand Letters were all timely completed in a manner consistent with the terms of the Agreements and those terms were the product of arms-length negotiations between two sophisticated parties.

---

[6] Under the Master Agreement, "[i]n the absence of a written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation." *See* Master Agreement, at § 6(d)(i). Nevertheless, ICP's records are conclusive evidence of the existence and accuracy of the quotes obtained from the four dealers.

27. Moreover, the Trustee's calculation of the Claims is entirely consistent with the Debtors' previous explanation to this Court of how the "Market Quotation" method works. As Gary Mandelblatt—Head of Trading and Valuation for LBHI—explained in his declaration:

> 30. …. The Derivative Contracts, including the ISDA Master Agreements and schedules, describe standard methodologies for valuation upon early termination of the Transactions. Such valuation methods include obtaining market quotations, or using a 'loss' calculation.
>
> 31. … If the counterparty [(*i.e.*, the non-defaulting party)] was required or chose to use a market quotation method (going out into the market to determine what the market value for the trade would be) it must typically follow a specific process of seeking four quotes and then calculating value according to a formula that assesses the mean market value using such quotes. ….
>
> 32. In addition, the quotes received from Reference Market-makers must represent the actual replacement value of a Transaction as quoted by the Reference Market-maker, which preserves the economic value of the Transaction including credit support consideration. The quote is intended to represent the price at which the Reference Market-maker would enter into the same Transaction….

Mandelblatt Declaration ¶¶ 30-32. As set forth above, the Trustee calculated the Claims in accordance with these standard procedures.

28. The LBSF Claim should be allowed in full because: (1) the Trustee, as the Non-Defaulting Party, is the only party authorized to calculate the Settlement Amount under the terms of the Agreements; (2) the Trustee properly calculated the Settlement Amount in accordance with the terms of the Agreements; and (3) the Trustee properly performed all of its obligations in accordance with the termination and notification provisions of the Agreements. Because the LBHI Claim is based on written guarantees of LBSF's obligations and because the Debtors have offered no independent objection to the LBHI Claim, the LBHI Claim should also be allowed in full.

11

## **CONCLUSION**

29. The Claims were properly and timely filed, and constitute *prima facie* evidence of valid claims possessed by the Trustee. The Objection offers no evidence to rebut the presumption of validity and, therefore, should be overruled with respect to the Claims. Moreover, the LBSF Claim was accurately calculated in accordance with the terms of the Agreements. Therefore, the amount of the LBSF Claim is beyond reasonable dispute. The amount of the LBHI Claim is similarly not in dispute and, apparently, the Debtors do not challenge the LBHI Claim except based on the asserted reduction in the amount of the LBSF Claim. The Claims should both be allowed in the full amount of $589,099.

Dated: December 20, 2010
       Portland, Maine

CITIBANK, N.A., in its capacity as Trustee

By its attorneys:

*/s/ Michael A. Fagone*
Michael A. Fagone, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle Street
P.O. Box 9729
Portland, Maine 04104-5029
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
mfagone@bernsteinshur.com