# Exhibit A

# Construction Loan Agreement

# CONSTRUCTION LOAN AGREEMENT

Dated as of October 25, 2006

Among

## TURNBERRY/CENTRA SUB, LLC,

as Borrower,

## THE INITIAL LENDER NAMED HEREIN,

## DEUTSCHE BANK TRUST COMPANY AMERICAS,

as Administrative Agent,

and

## DEUTSCHE BANK SECURITIES INC.,

as Sole Book-Running Manager and Sole Lead Arranger

## Table of Contents

### ARTICLE I
### DEFINITIONS, PRINCIPLES OF CONSTRUCTION

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Principles of Construction | 37 |

### ARTICLE II
### GENERAL

| | | |
|---|---|---|
| 2.1 | The Loan | 39 |
| 2.2 | Interest; Breakage Costs; Increased Costs; Late Payment; Illegality | 40 |
| 2.3 | Loan Payment | 46 |
| 2.4 | Prepayment | 47 |
| 2.5 | Extension of Initial Maturity Date | 48 |
| 2.6 | Method of Disbursement of Loan Amount | 50 |
| 2.7 | Pro Rata Treatment | 54 |
| 2.8 | Sharing of Payments | 54 |

### ARTICLE III
### CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 3.1 | Conditions Precedent to the Closing | 55 |
| 3.2 | Conditions Precedent to all Advances | 62 |
| 3.3 | Conditions Precedent to Final Advance | 64 |

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 4.1 | Representations and Warranties of the Borrower Parties | 65 |
| 4.2 | Representations and Warranties of the Borrower Parties | 75 |
| 4.3 | Survival of Representations; Reliance | 75 |
| 4.4 | Effect of Draw Request | 75 |

### ARTICLE V
### AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| 5.1 | Affirmative Covenants with Respect to Borrower | 76 |
| 5.2 | Covenants with Respect to the Borrower Parties | 95 |

### ARTICLE VI
### NEGATIVE COVENANTS

| | | |
|---|---|---|
| 6.1 | Negative Covenants | 96 |
| 6.2 | Agent's Approval | 101 |

### ARTICLE VII
### CONSTRUCTION PROVISIONS

| | | |
|---|---|---|
| 7.1 | Construction Covenants | 101 |
| 7.2 | Cost Overruns | 103 |
| 7.3 | Contingency Reserve | 103 |
| 7.4 | Approval of Change Orders; Cost Savings | 104 |
| 7.5 | Insufficiency of Loan Proceeds | 104 |
| 7.6 | Retainage | 105 |

| 7.7 | Stored Materials | 105 |
|---|---|---|
| 7.8 | Interest Line Item | 106 |
| 7.9 | No Reliance | 106 |
| 7.10 | No Acceptance of Construction by Agent and Lenders | 107 |
| 7.11 | Quality of Work | 107 |
| 7.12 | Assignment of Rights and Claims | 107 |

## ARTICLE VIII
## PROPERTY MANAGEMENT

| 8.1 | Property Management Documents | 107 |
|---|---|---|
| 8.2 | Modifications to Property Management Documents | 108 |

## ARTICLE IX
## ACCOUNTS

| 9.1 | Establishment of Accounts | 109 |
|---|---|---|
| 9.2 | Deposits into the Accounts | 110 |
| 9.3 | Account Name and Fees | 111 |
| 9.4 | Eligible Accounts/Characterization of Accounts | 111 |
| 9.5 | Permitted Investments | 111 |
| 9.6 | Sole Dominion and Control | 112 |
| 9.7 | Initial Deposits | 112 |
| 9.8 | Additional Deposits | 112 |
| 9.9 | Disbursements from the Holding Account | 112 |
| 9.10 | Tax Funds | 113 |
| 9.11 | Insurance Premium Funds | 113 |
| 9.12 | Capital Expenditure Funds | 114 |
| 9.13 | Rollover Funds | 116 |
| 9.14 | Security Deposits | 117 |
| 9.15 | Approved Operating Expenses | 118 |
| 9.16 | Release of Net Proceeds | 119 |
| 9.17 | Application of Account Collateral Upon Event of Default; Indemnity | 119 |
| 9.18 | Security for Debt | 119 |
| 9.19 | Prohibition Against Further Encumbrance | 119 |
| 9.20 | Permitted Investments; Earnings on Account Collateral; Monthly Statements | 120 |
| 9.21 | Income Taxes | 120 |
| 9.22 | Obligations Unaffected by Insufficiency | 120 |
| 9.23 | Agent Not Responsible | 120 |
| 9.24 | Bankruptcy | 120 |

## ARTICLE X
## INSURANCE; CONDEMNATION; CASUALTY

| 10.1 | Insurance | 120 |
|---|---|---|
| 10.2 | Policies | 124 |
| 10.3 | Insurance Premiums, Certificates of Insurance | 124 |
| 10.4 | Renewal and Replacement of Policies | 125 |
| 10.5 | Casualty | 126 |
| 10.6 | Condemnation | 126 |
| 10.7 | Disbursement of Net Proceeds | 126 |
| 10.8 | Retention of Net Proceeds by Agent | 129 |
| 10.9 | Assignment of Proceeds | 129 |
| 10.10 | No Effect on Obligations | 129 |

10.11    Transfer of Mortgaged Property Prior to Receipt of Proceeds ................................................. 129

### ARTICLE XI
### DEFAULTS AND REMEDIES

11.1    Event of Default ................................................................................................................. 129
11.2    Remedies Cumulative ........................................................................................................ 133
11.3    No Waiver .......................................................................................................................... 134
11.4    Waiver of Marshaling of Assets ........................................................................................ 134
11.5    Construction Remedies ...................................................................................................... 134

### ARTICLE XII
### MISCELLANEOUS

12.1    Survival .............................................................................................................................. 136
12.2    Governing Law; Consent to Jurisdiction ........................................................................... 136
12.3    Modification; Waiver in Writing ....................................................................................... 137
12.4    Delay Not a Waiver ........................................................................................................... 137
12.5    Notices ............................................................................................................................... 137
12.6    Trial by Jury ...................................................................................................................... 138
12.7    Counterparts ...................................................................................................................... 139
12.8    Severability ....................................................................................................................... 139
12.9    Preferences ........................................................................................................................ 139
12.10   Waiver of Notice ............................................................................................................... 139
12.11   Remedies of Borrower Party ............................................................................................. 139
12.12   Expenses ............................................................................................................................ 140
12.13   Indemnity .......................................................................................................................... 140
12.14   Offsets, Counterclaims and Defenses ............................................................................... 141
12.15   No Joint Venture or Partnership ........................................................................................ 141
12.16   Publicity; Erection of Sign ................................................................................................ 141
12.17   Waiver of Counterclaim .................................................................................................... 141
12.18   Conflict .............................................................................................................................. 141
12.19   Brokers and Financial Advisors ........................................................................................ 141
12.20   No Third Party Beneficiaries ............................................................................................ 142
12.21   Entire Agreement .............................................................................................................. 142
12.22   Right of Setoff ................................................................................................................... 142
12.23   Loan Assignability ............................................................................................................ 142
12.24   No Waiver .......................................................................................................................... 145
12.25   Exculpation of Agent and Lenders; No Petition ............................................................... 145
12.26   Exculpation of Borrower ................................................................................................... 146
12.27   Release of Deed of Trust ................................................................................................... 146
12.28   Consent of Borrower as to Certain Matters relating to the Mezzanine Loan ................... 147

### ARTICLE XIII
### AGENCY DECISIONS

13.1    Authorization and Action ................................................................................................... 147
13.2    Agent's Reliance, Etc. ....................................................................................................... 148
13.3    DBTCA and Affiliates ....................................................................................................... 149
13.4    Lender Credit Decision ...................................................................................................... 149
13.5    Indemnification .................................................................................................................. 149
13.6    Successor Agents. .............................................................................................................. 149
13.7    Amendments to this Article ............................................................................................... 150

ARTICLE XIV
RETENTION OF SERVICER

14.1    Retention .................................................................................................................. 150
14.2    Costs and Expenses; Reliance ................................................................................... 150

**EXHIBITS**

Exhibit A –    Ownership Structure

Exhibit B –    Legal Description of the Land

Exhibit C –    Construction Budget in the Form Approved as of the Closing Date

Exhibit D –    Plans and Specifications

Exhibit E-1 –    Form of Assignment and Acceptance

Exhibit E-2 –    Form of Syndication Note

Exhibit F –    Form of Anticipated Cash Report

Exhibit G-1 –    Form of General Contractor's Draw Certificate

Exhibit G-2 –    Form of Architect Draw Certificate

Exhibit G-3 –    Form of Architect Certificate of Final Completion

Exhibit H-1 –    Form of Counterparty Consent

Exhibit H-2 –    Form of Collateral Assignment of Interest Rate Agreement

Exhibit H-3 –    Initial Disbursement Schedule

Exhibit I –    Form of Architect's Closing Certificate

Exhibit J –    Form of Engineer's Closing Certificate

Exhibit K –    Form of General Contractor's Closing Certificate

Exhibit L -    Form of Borrower's Requisition Letter

Exhibit M -    Form of Borrower's Requisition Spreadsheet

Exhibit N -    Form of Date Down Endorsement

Exhibit O -    Form of Borrowing Certificate

Exhibit P –    Survey Requirements and Survey Certification

Exhibit Q –    SPE Provisions

Exhibit R –    Form of Telephonic Notice Agreement

Exhibit S –    Form of Requisition Authorization Statement

Exhibit T –    [Intentionally Omitted]

Exhibit U –      UCC Filings to be Terminated

Exhibit V –      Form of Subcontractor Recognition Agreement

Exhibit W –      Form of Subordination Non-Disturbance and Attornment Agreement

Exhibit X –      [Intentionally Omitted]

Exhibit Y –      Description of Unused Air Rights

Exhibit Z –      Form of 116.3 "New Subdivision" Endorsement

Exhibit AA –     Form of Property Manager Recognition Agreement

Exhibit BB –     Form of Construction Manager Recognition Agreement

Exhibit CC –     Plans and Specifications Approved by the County

Exhibit DD –     Description of Offsite Work

Exhibit EE –     Form of Construction Escrow Agreement

## SCHEDULES

Schedule 1.1(a) - Lender Commitments

Schedule 4.1(d) - Litigation

Schedule 4.1(k) - Material Agreements

Schedule 4.1(y) – Leases

Schedule 4.1(ll) - Acquisition Documents

This **CONSTRUCTION LOAN AGREEMENT**, dated as of October 25, 2006, by and among **TURNBERRY/CENTRA SUB, LLC**, a Delaware limited liability company ("**Borrower**"), the Lenders (hereinafter defined), **DEUTSCHE BANK TRUST COMPANY AMERICAS**, a New York banking corporation ("**DBTCA**"), as the initial Lender and as administrative agent for the Lenders, and **DEUTSCHE BANK SECURITIES INC.**, as sole book-running manager and sole lead arranger (the "**Lead Arranger**").

## W I T N E S S E T H:

WHEREAS, Borrower is a Delaware limited liability company. The ownership structure of Borrower is as set forth on **Exhibit A**;

WHEREAS, Borrower owns fee simple title to that certain parcel of real property and all easements, licenses, agreements, rights, hereditaments and privileges appurtenant to that parcel of real property (the "**Land**") described on **Exhibit B** attached hereto. The Land consists of approximately 96.85 acres and is located at the Southwest corner of the intersection of Las Vegas Boulevard and East Sunset Road in Las Vegas, Nevada;

WHEREAS, Borrower will cause to be constructed on the Land in accordance with the Plans and Specifications (hereinafter defined) an approximately 1,500,000 square foot lifestyle retail and office development (collectively, the "**Building**"), consisting of approximately 1,076,759 square feet of retail and entertainment space (the "**Retail Portion**"), approximately 191,000 square feet of office space (the "**Office Portion**") and approximately 232,241 square feet of parking (the "**Parking Portion**"), as well as other on-site amenities. The Building, the Retail Portion, the Office Portion, the Parking Portion, the on-site amenities, and all other improvements to be made to the Land, and all fixtures, machinery, furnishings, equipment, supplies, and all other property of any kind installed or used at the Land are collectively called the "**Project**";

WHEREAS, the Land and Project are collectively called the "**Premises**"; and

WHEREAS, Borrower desires to arrange financing for the purpose of providing funds for the design, construction, furnishing and equipping of the Premises, and for certain other Construction Costs (hereinafter defined). The Lenders have agreed to lend to Borrower and Borrower has agreed to borrow an aggregate principal amount not to exceed $475,000,000 (the "**Loan Amount**"), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the making of the Loan by Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I
## DEFINITIONS, PRINCIPLES OF CONSTRUCTION

1.1    Definitions.  For all purposes of this Agreement, except as otherwise expressly provided herein:

"**Acceptable Property Manager**" shall mean (a) the Turnberry Property Manager or (b) (i) (A) with respect to the Office Portion, (x) Centra Properties, LLC or (y) any reputable and experienced professional property management company which directly, or through one or more Affiliates, shall have at least ten (10) years of experience in the management of commercial office projects substantially similar to the Office Portion and at least 5,000,000 square feet of office space under management and (B) with

respect to the Retail Portion, any reputable and experienced professional property management company which directly, or through one or more Affiliates, shall have at least ten (10) years of experience in the management of retail facilities substantially similar to the Retail Portion and at least 10,000,000 square feet of retail space under management, and (ii) in each case (A) shall be a Person approved by Agent in its reasonable discretion in advance of the effective date of the applicable management, operating or other relevant agreement(s) and (B) shall provide to Agent a duly executed Property Manager Recognition Agreement at the time such Property Manager is retained.

"**Accounts**" shall mean the Collection Account, the Holding Account, the Debt Service Account, the Tax Account, the Insurance Account, the Operating Expense Account, the Rollover Account, the Capital Expenditure Account, the Excess Proceeds Account, the Tenant Security Account, the Net Proceeds Account, all other accounts created pursuant to **Article IX** and any accounts under the Property Management Documents, which accounts shall be pledged to Agent. "**Account**" shall mean any one of the foregoing.

"**Account Collateral**" shall have the meaning given such term in **Section 9.18**.

"**Account Funding Event**" means the earlier of (i) such date that is thirty (30) days prior to the date that the first Lease at the Premises shall commence pursuant to its terms, (ii) a written notice from Agent to Borrower with respect to the establishment of any Account or (iii) an extension of the Initial Maturity Date pursuant to **Section 2.5**.

"**ACR**" shall have the meaning given to such term in **Section 3.1(e)**.

"**Adjoining Properties Easement Agreement**" shall mean that certain Adjoining and VV Properties Restrictive Covenant between Borrower and the County dated September 30, 2004, and recorded on September 30, 2004 in the Office of the Clark County Recorder in Book 20040930 as Instrument Number 0006329.

"**Adjusted Base Rate**" shall mean a rate of interest per annum determined by adding the Base Rate to the Base Rate Margin.

"**Adjusted LIBO Rate**" shall mean a rate of interest per annum determined by adding the LIBO Rate to the LIBOR Margin.

"**Advance**" shall mean each disbursement of any portion of a Loan by Lenders to Borrower or on behalf of Borrower pursuant to the terms of this Agreement and the other Loan Documents.

"**Affiliate**" shall mean a Person or Persons directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with the Person or Persons in question, any Person or Affiliate Controlled or under common Control with any officer, director, partner, member or shareholder of Borrower or any Person in which such officer, director, partner, member or shareholder or Affiliate thereof has a ten percent (10%) or greater economic or voting interest.

"**Affiliate Contracts**" shall mean any contract or agreement between Borrower and an Affiliate of any of the Borrower Parties.

"**Agent**" shall mean DBTCA, in its capacity as administrative agent for Lenders, and any successor administrative agent appointed hereunder.

"**Agreement**" shall mean this Construction Loan Agreement as amended, modified, restated or supplemented from time to time.

"**Air Rights**" shall have the meaning given to such term in **Section 5.1(kk).**

"**Air Rights Release**" shall have the meaning given to such term in **Section 5.1(kk).**

"**Air Rights Release Date**" shall have the meaning given to such term in **Section 5.1(kk).**

"**Air Rights Transferee**" shall have the meaning given to such term in **Section 5.1(kk).**

"**All Risk Policy**" shall have the meaning given to such term in **Section 10.1(a)(ii)**.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**AML Laws**" shall mean money laundering and anti-terrorist Laws and Regulations and policies, including the Patriot Act and those issued by the U.S. Office of Foreign Asset Control and the U.S. Department of Treasury, all as amended, modified, succeeded or replaced from time to time.

"**Applicable Interest Rate**" shall have the meaning given to such term in **Section 2.2.2(a)**.

"**Appraisal**" shall mean an appraisal of the Mortgaged Property, addressed to Agent and Lenders, prepared not more than forty-five (45) days (or such longer period as shall be acceptable to Agent) prior to the Closing Date by a member of the Appraisal Institute selected by Agent, which appraisal shall be prepared at Borrower's sole cost and expense and shall meet the minimum appraisal standards for national banks promulgated by the Comptroller of the Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (FIRREA). The Appraisal delivered by Borrower to Agent prior to the Closing Date shall disclose an "as completed" value for the Project of at least $620,000,000.

"**Approval**" shall mean all approvals, consents, waivers, orders, acknowledgments, authorizations, licenses, permits, variances, sign-offs, filings, registrations, accreditations and certificates from any Governmental Authority or other Person required by Legal Requirement, contract or otherwise in connection with the ownership, development (including any street closures necessary to facilitate development), construction, financing, operation, marketing, advertising, management, leasing, administration, use or occupancy of the Mortgaged Property or the performance by the Borrower Parties of the transactions contemplated by the Loan Documents.

"**Approved Banks**" shall mean banks or other financial institutions which have (i) (A) a minimum net worth of $500,000,000 or (B) total assets of $5,000,000,000 and (ii) a minimum long-term senior unsecured debt rating from S&P at least equivalent to the Required Rating.

"**Approved Budget**" shall mean, with respect to any calendar year, the Budget approved by Agent for such calendar year pursuant to **Section 5.1(m)(ix)**.

"**Approved Construction Budget**" shall mean the Construction Budget for the Improvements, certified by Borrower and approved by Agent, as the same may be revised and replaced from time to time in accordance with the terms of this Agreement. Attached hereto as **Exhibit C** is a copy of the Construction Budget in the form approved by Agent as of the date hereof.

"**Approved Construction Costs**" shall mean those Construction Costs which are reflected in the Approved Construction Budget and which are approved by Agent as a part of a Draw Request.

"**Approved Fund**" means, with respect to any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is advised or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Approved Operating Expenses**" means, with respect to any calendar year, Operating Expenses set forth in the Approved Budget for such year or as otherwise approved by Agent. For clarification, "Approved Operating Expenses" shall not include (i) the Debt or any other Indebtedness of Borrower, (ii) income taxes or other taxes in the nature of income taxes, (iii) any expenses (including legal, accounting and other professional fees and disbursements) incurred in connection with and allocable to the issuance of the Notes and the execution and enforcement of the Loan Documents, (iv) distributions to the members or partners of Borrower or management fees or similar compensation payable to any Affiliate of any Borrower Party, (v) costs incurred as a result of a default by any Borrower Party under any agreement to which it is a party or is bound and (vi) rentals under capital or equipment leases except to the extent that the personal property that is the subject of such lease is customarily leased (as opposed to purchased) in connection with the operation of facilities similar to the Project in the vicinity of the Project.

"**Architect**" shall mean Marnell Architecture, a Nevada professional corporation, and any other licensed architect engaged by Borrower (and approved by Agent) in connection with architectural, structural engineering and civil engineering, and attendant coordination services, in connection with the design and construction of the Project.

"**Architect's Closing Certificate**" shall mean a certificate from Architect in the form of **Exhibit I** hereto.

"**Architect's Certificate of Final Completion**" shall mean a certificate from Architect in the form of **Exhibit G-3** hereto.

"**Architect's Draw Certificate**" shall mean a certificate from Architect in the form of **Exhibit G-2** hereto.

"**Architect's Contract**" shall mean the contract for architectural services between Borrower and Architect, with respect to the design of the Improvements, as modified, amended or replaced to the extent permitted hereunder.

"**Architect Recognition Agreement**" shall mean (i) that certain Consent and Recognition Agreement dated as of the date hereof executed by Architect, Borrower and Agent, as the same may be modified or amended as permitted by the Loan Documents and (ii) any Consent and Recognition Agreement in form and substance acceptable to Agent, executed by any successor Architect, Borrower and Agent, as the same may be modified or amended to the extent permitted hereunder.

"**Assignment**" shall have the meaning given to such term in **Section 5.1(w)**.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee and accepted by Agent, in accordance with **Section 12.23** and in substantially the form of **Exhibit E-1** hereto or any other form approved by Agent.

"**Assignment of Agreements**" shall mean that certain first priority Assignment of Agreements, Licenses, Permits and Contracts, dated as of the date hereof, from Borrower, as assignor, to Agent for the benefit of Lenders, as assignee.

"**Assignment of Leases**" shall mean (i) that certain Assignment of Leases, Rents and Revenues, dated as of the date hereof, from Borrower, as assignor, to Agent for the benefit of Lenders, as assignee and (ii) all other Assignments of Leases, Rents and Revenues executed and delivered by Borrower as required by the Loan Documents.

"**Avigation Easement Agreement**" shall mean that certain Airport Property Restrictive Covenant and Reservation of Avigation Easement between Borrower and the County dated May 6, 2004, and recorded on September 30, 2004 in the Office of the Clark County Recorder in Book 20040930 as Instrument Number 0006328.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy" as the same may be amended, modified, succeeded or replaced from time to time.

"**Base Rate**" shall mean the rate of interest per annum equal to the greater of: (i) the Prime Rate; or (ii) the Federal Funds Rate plus fifty basis points (0.50%).

"**Base Rate Loan Tranche**" shall mean any portion of the Loan that bears interest at the Adjusted Base Rate.

"**Base Rate Margin**" shall mean 1.450000000%.

"**Basic Carrying Costs**" shall mean the sum of the following costs associated with the Mortgaged Property: (i) Taxes and Other Charges and (ii) Insurance Premiums.

"**Beneficial**" when used in the context of beneficial ownership has the analogous meaning to that specified in Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

"**Bonded Subcontractor**" shall mean any subcontractor of the Marnell GC supplying labor or materials, or both, to the Project which is for an aggregate contract price equal to or greater than $500,000, whether pursuant to one contract or agreement or multiple contracts or agreements, after taking into account all change orders.

"**Borrower**" shall have the meaning given to such term in the preamble to this Agreement.

"**Borrower Account**" means Borrower's Account No. 0055 0748 3316 maintained by Borrower at Bank of America, N.A.

"**Borrower Party**" shall mean any of Borrower, Parent, each Guarantor, or any of their respective successors and assigns as permitted hereunder, and "**Borrower Parties**" shall refer to all of them.

"**Borrowing Certificate**" shall mean a certificate from Borrower in the form of **Exhibit O** hereto.

"**Borrowing Date**" shall have the meaning given to such term in **Section 2.6.1**.

"**Borrower's Requisition Letter**" shall have the meaning given to such term in **Section 2.6.1**.

"**Breakage Costs**" shall have the meaning given to such term in **Section 2.2.2(b)(ii)**.

"**Brokerage Commission**" shall have the meaning given to such term in the definition of "TI/LC Costs" in this **Section 1.1**.

"**Budget**" shall mean Borrower's operating and capital budget for the Project for the applicable Fiscal Year setting forth, in reasonable detail, good faith estimates of all (i) Operating Income, (ii) Operating Expenses, (iii) Management Fees and (iv) TI/LC Costs and Capital Expenditures, in each case for such Fiscal Year, all as certified by Borrower as being, in Borrower's good faith opinion, complete and fair.

"**Building**" shall have the meaning given to such term in the recitals.

"**Business Day**" shall mean a day of the year (other than a Saturday or Sunday) on which banks are not required or authorized by Law or Regulation to close in New York City and, if the applicable Business Day relates to any LIBOR Loan Tranche, on which dealings are carried on in the London interbank market.

"**Capital Expenditures**" shall mean the costs incurred by Borrower following Substantial Completion with respect to capital replacements and repairs made to the Mortgaged Property (including repairs to, and replacements of, the structural components, roofs, building systems, parking garages and parking lots), in each case to the extent required to be capitalized in accordance with GAAP.

"**Capital Expenditure Account**" shall have the meaning given such term in **Section 9.1.3**.

"**Capital Expenditure Funds**" shall have the meaning given such term in **Section 9.9.1**.

"**Capital Expenditure Work**" means any labor performed or materials provided in connection with any Capital Expenditure.

"**Cash**" shall mean coin or currency of the United States.

"**Cash and Cash Equivalents**" shall mean (i) Cash, (ii) U.S. Government Securities, (iii) interest bearing or discounted obligations of federal agencies and government sponsored entities or pools of such instruments offered by Approved Banks and dealers, including Federal Home Loan Mortgage Corporation participation sale certificates, Government National Mortgage Association modified pass-through certificates, Federal National Mortgage Association bonds and Notes, Federal Farm Credit System securities (provided all of the obligations described in this **clause (iii)** shall be rated "AAA" by the Rating Agencies or backed by the full faith and credit of the United States government for full and timely payment), (iv) time deposits, domestic and Eurodollar certificates of deposit, bankers acceptances or commercial paper rated at least A-1+ (or its equivalent) by the Rating Agencies, and/or guaranteed by an entity having a long-term rating at least equal to the Required Rating, (v) repurchase agreements with major banks and primary government securities dealers fully secured by U.S. government or agency collateral with a value equal to or exceeding the principal amount on a daily basis and held in safekeeping (provided that at the time of purchase the counterparty to such repurchase agreement must have a long-term senior unsecured debt rating by the Rating Agencies at least equal to the Required Rating) and (vi) investments in money market funds and money market mutual funds

substantially all of the assets of which are comprised of investments described in **clauses (i)** through **(v)** above. Except as otherwise provided in this definition, Cash and Cash Equivalents shall not include any investments commonly known as "derivatives", any investments requiring a payment above par for an obligation or any investment constituted in whole or in part by interest-only strips. Any investment in Cash and Cash Equivalents shall have a maturity date not later than one Business Day prior to the date that the proceeds therefrom are required hereunder.

"**Cash Management Bank**" shall mean, with respect to the Collection Account and each sub-account thereto, an Eligible Institution acting as Cash Management Bank under the Cash Management Agreement or other financial institution approved by Agent.

"**Cash Management Agreement**" shall mean, with respect to the Collection Account and each sub-account thereto, a tripartite depository agreement by and among Borrower, Agent and the Cash Management Bank, in form and substance satisfactory to Agent.

"**Centra Asset Management Agreement**" shall mean that certain Asset Management Agreement, dated as of September 15, 2005, between Borrower and Centra Properties, LLC.

"**Closing Date**" shall mean the date of this Agreement.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, modified, succeeded or replaced from time to time and all regulations promulgated thereunder, whether in temporary or final form.

"**Collateral**" shall mean all property of Borrower or any other Person in which Agent has or is intended to have a security interest for the benefit of the Lenders hereunder, under the Deed of Trust, the Assignment of Agreements, the Assignment of Leases and the other Loan Documents.

"**Collateral Assignment of Interest Rate Agreement**" shall mean the Collateral Assignment of Interest Rate Agreement in the form attached hereto as **Exhibit J-2**.

"**Collection Account**" shall have the meaning given such term in **Section 9.1.1**.

"**Commitment**" shall mean with respect to each Lender, the amount set forth opposite the name of such Lender on **Schedule 1.1(a)** or, if a Lender has entered into one of more Assignment and Acceptances, set forth for such Lender in the Register maintained by Agent pursuant to **Section 12.23** as such Lender's "Commitment", as such amount may be reduced hereunder at or prior to such time.

"**Completion Date**" shall mean the date by which Substantial Completion of construction of the Improvements is required to have occurred hereunder, such date being February 1, 2008.

"**Completion Guaranty**" shall mean that certain Completion Guaranty, dated as of the date hereof, made by the Guarantors, jointly and severally, in favor of Agent on behalf of Lenders.

"**Completion Reserve**" shall have the meaning given to such term in **Section 7.5**.

"**Condemnation**" shall mean a (i) taking or voluntary conveyance of the Mortgaged Property, in whole or in part, or right accruing thereto or use thereof or (ii) severance of access, whether public or private, in each case as the result of, or in settlement or in lieu of, any condemnation or other eminent domain proceeding by any Governmental Authority, whether or not the same shall have actually been commenced and whether or not for any permanent or temporary use.

"**Condemnation Proceeds**" shall have the meaning given to such term in the definition of "Net Proceeds" in this **Section 1.1**.

"**Construction Agreement**" shall mean a contract by and between Borrower and any General Contractor satisfactory to Agent in all respects for construction of the Improvements, which contract shall be a bonded guaranteed maximum price contract (a "**GMP Contract**").

"**Construction Budget**" shall mean the budget for the total estimated costs and expenses of acquiring the Land and constructing the Improvements and operating the Mortgaged Property, including costs for labor, marketing, development, materials, legal, taxes, equipment, fixtures and all reasonable architectural and engineering fees, on an itemized basis, certified by Borrower and submitted to Agent for review, and approved as to form and substance by Agent and the Construction Consultant prior to the Closing Date, and as modified from time to time following approval by Agent, which budget shall include at all times at least a five percent (5%) Hard Cost Contingency and a three percent (3%) contingency for variable Soft Costs not advanced with the Initial Advance.

"**Construction Consultant**" shall mean Inspection & Valuation International, Inc., having an address at 55 West Red Oak Lane, White Plains, New York, New York 10604, or such other qualified and experienced consultants that may be appointed by Agent in substitution thereof, and upon such appointment shall be identified by Agent to Borrower.

"**Construction Control Agent**" shall mean an entity that provides construction control services in the State of Nevada selected by Borrower and approved by Agent, it being agreed that as of the date hereof LandAmerica shall be acceptable to Agent as Construction Control Agent.

"**Construction Costs**" shall mean all costs and expenses of constructing the Improvements, including costs for labor, development, materials, legal, taxes, equipment, fixtures and architectural and engineering fees, all as delineated in the Approved Construction Budget.

"**Construction Documents**" shall mean each Construction Agreement, the Approved Construction Budget, the Construction Schedule and each other document executed in connection with the construction of the Improvements.

"**Construction Escrow**" shall have the meaning given to such term in the definition of "Construction Escrow Agreement" in this **Section 1.1**.

"**Construction Escrow Agreement**" shall mean a construction loan administration, servicing and escrow agreement, in the form of **Exhibit EE**, among Borrower, Parent (in its capacity as borrower under the Mezzanine Loan), the Construction Control Agent, the Title Company and Agent, establishing a construction escrow (the "**Construction Escrow**") with the Title Company and the Construction Control Agent through which Advances and Mezzanine Loan Advances for Construction Costs may be disbursed, which agreement shall require, with respect to Advances and Mezzanine Loan Advances for Hard Costs, delivery to Agent, Mezzanine Lender and the Title Company prior to each Advance of such documents as Agent, the Construction Control Agent and the Title Company may reasonably require, including all documents set forth in **Section 3.2**.

"**Construction Management Agreement**" shall mean (i) a development and construction management agreement by and between the Turnberry Construction Manager and Borrower pursuant to which the Turnberry Construction Manager is to provide management for the development and construction of the Project, which agreement shall be in form and substance reasonably satisfactory to Agent and (ii) any other construction management agreement entered into with the prior written consent

of Agent by and between Borrower and a Construction Manager, pursuant to which such Construction Manager is to provide management for the development and construction of the Project, which agreement or agreements shall be in form and substance reasonably satisfactory to Agent.

"**Construction Manager**" shall mean (i) the Turnberry Construction Manager and (ii) any other construction manager approved by Agent and engaged by Borrower pursuant to a Construction Management Agreement.

"**Construction Manager Recognition Agreement**" shall mean a consent, subordination and recognition agreement among Borrower, Agent and a Construction Manager, dated the date of the relevant Construction Management Agreement, in the form of **Exhibit BB**, as the same may be modified or amended as permitted by the Loan Documents.

"**Construction Schedule**" shall mean the schedule, broken down by trade, of the estimated dates of commencement and completion of the Improvements certified by Borrower and delivered to Agent as of the date hereof, and approved as to form and substance by the Construction Consultant and Agent prior to the Closing Date, and as modified from time to time following approval by Agent.

"**Contingency Reserve**" shall mean at any relevant date, the aggregate of the amount available under the Hard Cost budget lines in the Approved Construction Budget denominated as "Owner Contingency" and "Contractor Contingency" (the "**Hard Cost Contingency**") and the amount available under the Soft Cost budget line in the Approved Construction Budget denominated "Contingency" (the "**Soft Cost Contingency**").

"**Contingent Obligation**" as to any Person shall mean, without duplication, (i) any contingent obligation of such Person required to be shown on such Person's balance sheet in accordance with GAAP and (ii) any obligation required to be disclosed in the footnotes to such Person's financial statements in accordance with GAAP, and guaranteeing partially or in whole any non-recourse Indebtedness, lease, dividend or other obligation, exclusive of contractual indemnities (including any indemnity or price-adjustment provision relating to the purchase or sale of securities or of the assets) and guarantees of non-monetary obligations (other than guarantees of completion) which have not yet been called on or quantified, of such Person or of any or any other Person. The amount of any Contingent Obligation described in **clause (ii)** shall be deemed to be (A) with respect to a guaranty of interest or interest and principal, or operating income guaranty, the net present value of the sum of all payments required to be made thereunder (which in the case of an operating income guaranty shall be deemed to be equal to the debt service for the note secured thereby), calculated at the then LIBO Rate, through (1) in the case of an interest or interest and principal guaranty, the stated date of maturity of the obligation (and commencing on the date interest could first be payable thereunder) or (2) in the case of an operating income guaranty, the date through which such guaranty will remain in effect and (B) with respect to all guarantees not covered by the preceding **clause (A)**, an amount equal to the stated or determinable amount of the primary obligation in respect of which such guaranty is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as recorded on the balance sheet and on the footnotes to the most recent financial statements of the Person. Guarantees of completion shall not be deemed to be Contingent Obligations unless and until a claim for payment or performance has been made thereunder, at which time any such guaranty of completion shall be deemed to be a Contingent Obligation in an amount equal to any such claim. Subject to the preceding sentence, (I) in the case of a joint and several guaranty given by such Person and another Person, the amount of the guaranty shall be deemed to be one hundred percent (100%) thereof unless and only to the extent that such other Person has delivered Cash and Cash Equivalents to secure all or any part of such Person's guaranteed obligation and (II) in the case of a

guaranty (whether or not joint and several) of an obligation otherwise constituting Indebtedness of such Person, the amount of such guaranty shall be deemed to be only that amount in excess of the amount of the obligation constituting Indebtedness of such Person.

"**Contractor Contingency**" shall mean the amount available under the relevant line item in the Approved Construction Budget.

"**Control**" or "**control**" shall mean, with respect to a Person that is a corporation, the right to exercise, directly or indirectly, by ownership, proxy, voting agreement or otherwise, more than fifty percent (50%) of the voting rights attributable to the shares of the controlled corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of voting interests, by contract or otherwise. "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Counterparty**" shall mean a counterparty to the Interest Rate Protection Agreement approved by Agent.

"**Counterparty Consent**" shall the Counterparty Consent and Agreement, the form of which is attached hereto as **Exhibit H-1**.

"**County**" shall mean the County of Clark located in the State of Nevada.

"**County Title Documents**" shall mean, collectively, the Grant and Waiver Agreement, the Phasing Agreement, the Adjoining Properties Easement Agreement and the Avigation Easement Agreement.

"**DBTCA**" shall have the meaning given to such term in the preamble to this Agreement.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, the Notes, together with all interest accrued and unpaid thereon and all other sums due to Lenders and Agent in respect of the Loan, including any Breakage Costs and including any sums due or any obligation of any kind owing under the Loan Documents (including any then due but unpaid (at the time of determination) reimbursement or indemnity obligation).

"**Debt Service**" means, with respect to any particular period of time, (A) scheduled principal and interest payments under the Note and (B) all fees, charges or other amounts due to Agent and/or the Lenders and/or otherwise payable by Borrower under the terms hereof, or under any of the other Loan Documents, including, without limitation, any administrative fee owing to Agent under any fee letter with Borrower.

"**Debt Service Account**" shall have the meaning given such term in **Section 9.1.3**.

"**Deed of Trust**" shall mean that certain first priority Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of the date hereof, executed and delivered by Borrower in favor of Agent, on behalf of Lenders, as security for the Loan and encumbering the Mortgaged Property as the same may be amended, restated, replaced, supplemented, consolidated or otherwise modified from time to time pursuant to the provisions thereof or of the other Loan Documents.

"**Deed of Trust Amendment**" shall have the meaning given to such term in **Section 5.1(ll)**.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean a rate per annum equal at all times to the lesser of (i) the maximum non-usurious rate permitted by Law or Regulation and (ii) five percent (5.0%) in excess of the Applicable Interest Rate described in **Section 2.2.2(a)(i)** and **Section 2.2.2(a)(ii)**.

"**Defaulting Lender**" shall have the meaning given to such term in **Section 2.6.2(c)**.

"**Deficiency**" and "**Deficiencies**" shall have the meaning given to such terms in **Section 2.6.2(c)**.

"**Deposit Bank**" shall mean, with respect to the Holding Account and each sub-account thereto, an Eligible Institution acting as Deposit Bank under a Depository Agreement or other financial institution approved by Agent.

"**Depository Agreement**" shall mean, with respect to the Holding Account and each sub-account thereto, a tripartite depository agreement by and among Borrower, Agent and the Deposit Bank, in form and substance satisfactory to Agent.

"**Designer**" shall mean each of Architect and Engineer.

"**Development Approvals**" shall mean all zoning, design review, development plan, site plan and all other building, construction and other Approvals with respect to the Mortgaged Property, including the modified planned development site plan, in accordance with the requirements of all Governmental Authorities necessary for the initial development and, if applicable, the future development and construction of the Project.

"**Development Litigation**" shall mean those certain legal proceedings identified in **Schedule 4.1(d)** attached hereto, together with any derivative or related proceedings thereto and any appeal of any of the foregoing and any derivative action or proceeding arising after the date hereof before any Governmental Authority which could reasonably be expected to have a material adverse effect on the Development Approvals.

"**Disbursement Schedule**" shall mean the disbursement schedule prepared by Borrower (and approved by Agent) in connection with the Interest Rate Protection Agreement which sets forth the notional Advances under the Loan, as the same shall be revised from time to time at the discretion of Agent but not more frequently than quarterly. The initial Disbursement Schedule is attached hereto as **Exhibit H-3**.

"**Domestic Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" opposite its name in the Assignment and Acceptance pursuant to which it became a Lender or such other office of such Lender as such Lender may from time to time specify to Borrower and Agent.

"**Draw Request**" shall have the meaning given to such term in **Section 2.6.1**.

"**Eligible Account**" shall mean (i) a segregated trust account or accounts maintained with the corporate trust department of a federal depository institution or state-chartered depository institution subject to regulations regarding fiduciary funds on deposit such as or similar to Title 12 of the Code of Federal Regulations Section 9.10(b) which, in either case, has corporate trust powers, acting in its

fiduciary capacity or (ii) a segregated account maintained at a Eligible Institution. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Assignee**" shall mean (i) (A) commercial bank, financial institution or financial company organized under the laws of the United States or any state thereof; (B) a savings and loan association or savings bank organized under the laws of the United States or any state thereof; (C) a commercial bank, financial institution or financial company organized under the laws of any other country or a political subdivision thereof; (provided, however, that (1) such bank, financial institution or financial company is acting through a branch or agency located in the United States or (2) such bank, financial institution or financial company is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country); (D) any other Person which is an "accredited investor" (as defined in Regulation D under the Securities Act) which extends credit or buys or invests in loans including insurance companies, mutual funds and other Persons subject to the Investment Company Act of 1940, as amended, and lease financing companies; and (E) General Electric Credit Corp., its successors or any similar Person having comparable financial resources or experience or any successor thereto, in each case (under **clauses (A)** through **(E)** above) that is reasonably acceptable to Agent; provided further, however, that (x) each Eligible Assignee under **clauses (i)(A)** through **(i)(C)** above shall have a combined capital and surplus of not less than $100,000,000 and (y) each Eligible Assignee under **clause (i)(D)** and **clause (i)(E)** shall have a net worth of not less than $500,000,000; (ii) any fund (other than a mutual fund) which invests in bank loans and whose assets exceed $100,000,000; (iii) any Lender; (iv) a Person that is engaged in the business of commercial banking and that is (A) an Affiliate of a Lender, (B) an Affiliate of a Person of which a Lender is an Affiliate or (C) a Person of which a Lender is an Affiliate; and (v) any Real Estate Mortgage Investment Conduit (REMIC) or similar securitized entity or financing conduit (including a commercial paper conduit), provided that the servicers of same are approved for such purpose by a Rating Agency. Notwithstanding the foregoing, neither any Borrower Party nor any Affiliate of a Borrower Party shall qualify as an Eligible Assignee.

"**Eligible Institution**" shall mean a bank or other financial institution which has a minimum long-term unsecured debt rating of at least "A" and a minimum short-term unsecured debt rating of at least "A-1+" by each of the Rating Agencies, or if any such bank or other financial institution is not rated by all the Rating Agencies, then a minimum long-term rating of at least "A" and a minimum short-term unsecured debt rating of at least "A-1+", or their respective equivalents, by two of the Rating Agencies, but in any event one of the two Rating Agencies shall be S&P, it being understood that the A and A-1+ benchmark ratings and other benchmark ratings in this Agreement are intended to be the ratings, or the equivalent of ratings, issued by S&P.

"**Encumbrance**" means any Lien, easement, right of-way, zoning or other restriction (including any restriction or exclusive use provision in any lease or other occupancy agreement), covenant and other similar charge or encumbrance.

"**Engineer**" shall mean each of (i) Kimley Horne Associates, (ii) VTN Nevada and (iii) any other licensed engineer engaged by Borrower (and approved by Agent) in connection with the design of the Project's civil and/or mechanical, electric, plumbing, fire protection, communication technologies, energy management, and other building systems.

"**Engineer's Closing Certificate**" shall mean a certificate from each Engineer in the form of **Exhibit J** hereto.

"**Engineer's Contract**" shall mean each contract for engineering services between Borrower and the applicable Engineer, with respect to the Project, as modified, amended or replaced to the extent permitted hereunder.

"**Engineer Recognition Agreement**" shall mean each Consent, Subordination and Recognition Agreement delivered pursuant to **Section 5.1(s)(ii)** executed by the applicable Engineer or successor Engineer, as applicable, Borrower and Agent, to the extent the same may be modified or amended as permitted by the Loan Documents.

"**Engineering Report**" shall mean the structural engineering report or reports and any other studies (including wind and hurricane studies) prepared by the Engineer and/or Borrower's other consultants with respect to the Mortgaged Property and delivered to Agent in connection with this Agreement, and any amendments or supplements thereto delivered to Agent.

"**Environmental Auditor**" shall mean Terracon Consulting Engineers and Scientists, having an address at 4353 South Polaris Avenue, Las Vegas, Nevada, 89103, or any other independent environmental auditor approved by Agent.

"**Environmental Indemnity**" shall mean, collectively, (i) an Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and (ii) an Environmental Indemnity Agreement, dated as of the date hereof, executed by Guarantors, each in connection with the Loan for the benefit of Agent on behalf of Lenders

"**Environmental Reports**" shall mean (i) the environmental site assessment with respect to the Mortgaged Property prepared by the Environmental Auditor and delivered to Agent, and any amendments or supplements thereto requested by or delivered to Agent (including any "Phase II" environmental assessment required by Agent to be undertaken) and (ii) any other environmental reports delivered to Agent in connection with this Agreement and the Environmental Indemnity.

"**Equipment**" shall have the meaning given to such term in the Deed of Trust.

"**Equity Requirement**" shall mean that, as of the date hereof and each relevant date hereafter, (i) Borrower has invested Cash equity in the Land and Improvements in an aggregate amount equal to at least $8,000,000 and (ii) Borrower shall have an equity investment, in the form of land, in an amount not less than $51,900,000. The requirement set forth in **clause (ii)** of this definition shall be deemed satisfied by the Land which has a deemed land value of $51,900,000 which is approximately Borrower's basis in the Land.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified, succeeded or replaced from time to time, and the regulations promulgated thereunder.

"**Eurocurrency Liabilities**" shall have the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Event of Default**" shall have the meaning given to such term in **Section 11.1(a)**.

"**Excess Proceeds Account**" shall have the meaning given such term in **Section 9.1.3**.

"**Excluded Tax**" shall mean, with respect to the Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed

on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which Borrower is located and (c) in the case of a Lender (other than an assignee pursuant to a request by Borrower under **Section 2.2.2(k)**), any withholding tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party hereto (or designates a new lending office) or is attributable to such Lender's failure or inability (other than as a result of a Regulatory Change) to comply with **Section 2.2.2(i)**, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrower with respect to such withholding tax pursuant to **Section 2.2.2(g)**.

"**Extension Fee**" shall mean a fee payable to Agent (for the rateable benefit of Lenders) by Borrower calculated as twelve and a half basis points (0.125%) of the principal balance of the Loan outstanding as of the Initial Maturity Date.

"**Federal Funds Rate**" shall mean, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Agent from three Federal funds brokers of recognized standing selected by Agent.

"**Federal Reserve Board**" shall mean the Board of Governors of the Federal Reserve System.

"**Final Completion**" shall mean the satisfaction of the following conditions:

(i)    all Work (including Punch List Items) shall have been fully completed in a good and workmanlike manner and in accordance with the Plans and Specifications and the Construction Documents;

(ii)    subject to Borrower's right to contest Liens as set forth in **Section 5.1(b)(ii)** (such amounts being contested not to exceed, in the aggregate, $250,000), the Mortgaged Property shall be free of any Lien pertaining to the Work and all required receipts, releases of Liens, affidavits, waivers, guarantees, warranties and bonds applicable to the Lien-free completion of the Work, as well as any other documents required under this Agreement and/or pursuant to applicable Law and Regulation with respect to the Lien-free completion of the Work, shall have been issued and delivered to Agent;

(iii)    Borrower shall have obtained and delivered to Agent all Approvals relating to the Work and the lawful use, operation and occupancy of the Mortgaged Property for its intended use (including the delivering of permanent and unconditional final certificates of occupancy for one hundred percent (100%) of the Improvements on or before the expiration of any temporary certificates of occupancy relating thereto, taking into account any extensions of such expirations granted by the applicable Governmental Authority);

(iv)    Agent shall have received as-built drawings for the Work (one set prepared using the CADD method in accordance with CADD software designated by Agent and one set prepared on mylar) acceptable to Agent, and other documents, instruments, certificates and materials as are

required to be delivered to Agent on or prior to completion of the Work under this Agreement and the other Loan Documents, or as may be requested by Agent; and

(v)    the General Contractor shall have executed and delivered to Agent an affidavit and final waiver of Lien with respect to the Work as a whole.

"**First Extension Maturity Date**" shall have the meaning given to such term in **Section 2.5(a)**.

"**First Extension Notice**" shall have the meaning given to such term in **Section 2.5(a)**.

"**Fiscal Year**" shall mean the period commencing on the Closing Date and ending on and including December 31 of the calendar year in which the Closing Date occurs and thereafter each twelve-month period commencing on January 1 and ending on December 31 until the Debt is repaid in full.

"**Flyover Easement**" shall have the meaning given to such term in **Section 5.1(mm)**.

"**Force Majeure Event**" shall mean any of the following:  (i) acts of declared or undeclared war by a foreign enemy; (ii) riots; (iii) casualty or condemnation; (iv) floods or hurricanes; (v) earthquakes; (vi) acts of God; (vii) governmental preemption in the case of a national emergency; (viii) unavailability of materials to the extent not within the reasonable control of Borrower or any Trade Contractor; (ix) strikes, lockouts or other labor trouble and (x) any other event or circumstance not within the reasonable control of Borrower or any Trade Contractor, but "**Force Majeure Event**" shall not include (A) inefficiencies on the part of any Borrower Party, General Contractor, Architect, Engineer, any Trade Contractor or any design professional; (B) late performance caused by failure to hire an adequate number of Trade Contractors, supervisors and/or laborers or by failure to order supplies and materials in an orderly or timely fashion; (C) any cause or occurrence which any Borrower Party, General Contractor, Architect, Engineer, Trade Contractor or design professional could reasonably control or circumvent; and (D) delays, stoppage or any other interference with the construction of the Improvements caused by insolvency, bankruptcy or any lack of funds of General Contractor, any Trade Contractor or any Borrower Party.  If Borrower claims a Force Majeure Event, Borrower shall provide Agent with notice of such Force Majeure Event upon Borrower obtaining knowledge of the same and Borrower shall take all commercially reasonable steps to ameliorate or eliminate the effects of such Force Majeure Event and Borrower shall provide notice to Agent as soon as such Force Majeure Event has ended.

"**GAAP**" shall mean generally accepted accounting principles in the United States as of the relevant date in question, consistently applied.

"**General Contractor**" shall mean each of Marnell Carrao Associates (the "**Marnell GC**") and Vratsinas Construction Company or such other qualified and experienced General Contractor(s)/general contractor(s) engaged by Borrower in connection with a Construction Agreement, which Person(s) shall be subject to the approval of Agent.

"**General Contractor's Closing Certificate**" shall mean a certificate from each General Contractor in the form of **Exhibit K** hereto.

"**General Contractor's Draw Certificate**" shall mean a certificate from each General Contractor in the form of **Exhibit G-1** hereto.

"**GMP Contract**" shall have the meaning given to such term in the definition of "Construction Agreement" in this **Section 1.1**.

"**Governmental Authority**" shall mean any foreign, national, federal, state, county, regional, local or municipal government (including any agency or political subdivision of any of the foregoing) and any Person with jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or quasi-governmental issues (including any court).

"**Grant and Waiver Agreement**" shall mean that certain Grant of Easement and Waiver for Adjoining and VV Properties between Borrower and the County dated September 29, 2004, and recorded on September 30, 2004 in the Office of the Clark County Recorder in Book 20040930 as Instrument Number 0006330.

"**Granting Lender**" shall have the meaning given to such term in **Section 12.23(j)**.

"**Guaranties**" shall mean the Non-Recourse Carve-out Guaranty, the Payment Guaranty, the Loan Balancing Guaranty and the Completion Guaranty.

"**Guarantors**" shall mean, individually and collectively (as applicable), Jeffrey Soffer and Jacquelyn Soffer.

"**Guaranty Obligations**" shall mean any obligations (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guarantying any Indebtedness, leases, dividends or other obligations of any other Person in any manner, whether direct or indirect, and including any obligation, whether or not contingent, (i) to purchase any such Indebtedness or other obligation or any property constituting security therefor, (ii) to advance or provide funds or other support for the payment or purchase of such Indebtedness or obligation or to maintain working capital, solvency or other balance sheet condition of such other Person (including keep well agreements, maintenance agreements, comfort letters or similar agreement or arrangement), (iii) to lease or purchase any property, securities or services primarily for the purpose of assuring the owner of such Indebtedness or obligation or (iv) to assure otherwise or hold harmless the owner of such Indebtedness or obligation against loss in respect thereof.

"**Hard Costs**" shall mean the Construction Costs delineated in the Approved Construction Budget as hard cost line items.

"**Hard Cost Contingency**" shall have the meaning given to such term in the definition of "Contingency Reserve" in this **Section 1.1**.

"**Improvements**" shall mean those improvements to be constructed by Borrower on, under or at the Land in accordance with the Plans and Specifications (including the Retail Portion, the Office Portion and the Parking Portion).

"**Increased Costs**" shall have the meaning given to such term in **Section 2.2.2(c)(iii)**.

"**Indebtedness**" shall mean, with respect to any Person, without duplication, the following, whether direct or contingent:

      (i)     all indebtedness for borrowed money;

      (ii)    the deferred purchase price of assets or services which in accordance with GAAP would be shown to be a liability (or on the liability side of a balance sheet);

   (iii) all Guaranty Obligations;

   (iv) the maximum amount of all letters of credit issued or acceptance facilities established for the account of such Person and, without duplication, all drafts drawn thereunder (other than letters of credit (A) supporting other Indebtedness of any Borrower Party or (B) to the extent offset by Cash or Cash Equivalents held in escrow to secure such letter of credit and draws thereunder);

   (v) all capitalized lease obligations;

   (vi) all indebtedness of another Person secured by any lien on any property of any Borrower Party, whether or not such indebtedness has been assumed or is recourse;

   (vii) all obligations under take-or-pay or similar arrangements or under interest rate, currency, or commodities agreements;

   (viii) indebtedness created or arising under any conditional sale or title retention agreement (other than conditional sale and title retention agreements entered into in the ordinary course of business for assets incidental to the management and operation of the Mortgaged Property); and

   (ix) obligations of such Person with respect to withdrawal liability to or on behalf of any "multi employer plan" as defined in Section 4001(a) of ERISA;

provided, however, that Indebtedness shall not include (1) current accounts payable (other than for borrowed money or purchase money obligations) incurred in the ordinary course of business, provided that all such liabilities, accounts and claims shall be paid when due (or in conformity with customary trade terms or customary dispute resolution procedures), (2) accrued expenses (other than for borrowed money or purchase money obligations) incurred in the ordinary course of business, provided that all such liabilities, accounts and claims shall be paid when due (or in conformity with customary trade terms or customary dispute resolution procedures), (3) indemnification and similar Contingent Obligations which are not assurances of payment of the items described in **clauses (i)** through **(ix)** of this definition or not otherwise described in the Completion Guaranty, (4) liabilities for customary non-recourse carve-outs in connection with financing transactions except to the extent a claim has been asserted in respect thereof and (5) indebtedness in respect of which Cash or Cash Equivalents have been deposited with a lender or its agent as collateral to defease such indebtedness except in the case of **clauses (i)** and **(ii)** of this definition to the extent a claim has been asserted in writing as to any such item.

  "**Indemnified Costs**" shall have the meaning given to such term in **Section 13.5**.

  "**Indemnitee**" shall mean shall mean Agent, Lead Arranger, each Lender, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing of the Loan (including any Servicer), any Person in whose name the encumbrance created by the Deed of Trust is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including participants in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties), as well as the respective directors, officers, shareholders, partners, members, managers, employees, agents, designees, nominees, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Mortgaged Property, whether during the term of the Loan or as a part of or following a

foreclosure of the Loan and including any successors by merger, consolidation or acquisition of all or a substantial portion of Agent's or any Lender's assets and business).

**"Independent Director"**, **"Independent Manager"**, or **"Independent Member"** shall mean a Person who is not and will not be while serving and has never been (i) a member (other than an Independent Member), manager (other than an Independent Manager), director, (other than an Independent Director), employee, attorney, or counsel of Borrower, or any of its Affiliates, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower, or any of its Affiliates, (iii) a direct or indirect legal or beneficial owner in Borrower or any of its Affiliates, (iv) a member of the immediate family of any member, manager, employee, attorney, customer, supplier or other Person referred to above or (v) a person Controlling or under the common Control of anyone listed in **clause (i)** through **(iv)** above. A natural Person who satisfies the foregoing definition other than **clause (ii)** shall not be disqualified from serving as an Independent Director, Independent Manager or Independent Member of a Person if such individual is an independent director, manager or member provided by a company that provides professional independent directors, managers and/or members (a **"Professional Independent Provider"**) and that also provides other corporate services in the ordinary course of its business. A natural Person who otherwise satisfies the foregoing definition, except for being an independent director, independent manager or independent member of a Single Purpose Entity affiliated with Borrower, or any Person required under this Agreement to be an SPE Entity, that does not own a direct or indirect equity interest in Borrower or any person required by this Agreement to be an SPE Entity, shall not be disqualified from serving as an Independent Director, Independent Manager or Independent Member if such individual is, at the time of initial appointment or at any time while serving as an Independent Director, Independent Manager or Independent Member, a Professional Independent Provider.

**"Initial Advance"** shall mean the initial Advance by Lenders pursuant to this Agreement.

**"Initial Maturity Date"** shall mean March 1, 2008.

**"Insurance Funds"** shall have the meaning given to such term in **Section 9.9.1**.

**"Insurance Premiums"** shall have the meaning given to such term in **Section 10.3**.

**"Insurance Proceeds"** shall have the meaning given to such term in the definition of "Net Proceeds" in this **Section 1.1**.

**"Insurance Requirements"** shall mean all terms, set forth in **Article X** hereof or otherwise, of the Policies, all requirements of the issuer of any such Policy and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) applicable to or affecting the Mortgaged Property or any use of the Mortgaged Property.

**"Intercreditor Agreement"** shall mean a Subordination and Intercreditor Agreement by and between Agent and Mezzanine Lender in form and substance acceptable to Agent.

**"Interest Payment Date"** shall mean the date through which interest is accrued and on which interest is due. Interest, whether payable on a Base Rate Loan Tranche or LIBOR Loan Tranche, shall be payable monthly in arrears on the first Business Day of the first month following the Initial Advance and on the first Business Day of each month thereafter until the Debt is repaid in full, including, if applicable, following the Maturity Date.

"**Interest Period**" shall mean (i) with respect to Base Rate Loan Tranches, the period commencing on the date on which the Base Rate Loan Tranche is made and ending on the earlier of the date on which such Base Rate Loan Tranche is repaid, converted to a LIBOR Loan Tranche or the Maturity Date and (ii) with respect to any LIBOR Loan Tranche (A) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such LIBOR Loan Tranche and ending one month thereafter and (B) thereafter, each period commencing on the last day of the then expiring Interest Period applicable to such LIBOR Loan Tranche and ending one month thereafter, provided that all of the foregoing provisions relating to Interest Periods are subject to the following:  (1) if any Interest Period pertaining to a LIBOR Loan Tranche would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day, (2) any Interest Period that would otherwise extend beyond the Maturity Date shall end on the Maturity Date and (3) any Interest Period pertaining to a LIBOR Loan Tranche that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the applicable subsequent calendar month.

"**Interest Rate Protection Agreement**" shall mean an interest rate swap, cap or collar agreement (together with the confirmation and schedules relating thereto), in form and substance satisfactory to Agent, between the Counterparty and Borrower and collaterally assigned to Agent for the benefit of Lenders in accordance with the terms of the Collateral Assignment of Interest Rate Agreement.

"**knowledge**" or words of similar import shall mean the actual and constructive knowledge of a Person or, if such Person is not an individual, of such Person's representatives, agents, employees, officers or directors who would be likely to have material information as to the relevant subject matter.

"**Land**" shall have the meaning given to such term in the recitals.

"**Land Records**" shall mean the land records of Clark County, Nevada.

"**Landlord Work Costs**" shall have the meaning given to such term in the definition of "TI/LC Costs" set forth in this **Section 1.1**.

"**Laws and Regulations**" or "**Law or Regulation**" shall mean all domestic or foreign laws, statutes, treaties, codes, permits, decrees, ordinances, orders (judicial, executive or administrative), rules, regulations (temporary, interim and final), directives, determinations, judgments or requirements of any Governmental Authority, including any environmental, building, use, zoning and land use laws, ordinances or regulations (including set back requirements), and any Title Agreements, all as amended, modified, succeeded or replaced from time to time.

"**Lead Arranger**" shall have the meaning given to such term in the preamble to this Agreement.

"**Leases**" shall mean all (i) leases, subleases, sub-subleases (regardless of tier), licenses, occupancy agreements, rental agreements, franchises, concessions or grants of other possessory interests, tenancies, and any other agreements affecting the use, possession or occupancy of the Mortgaged Property (including any use or occupancy arrangements created pursuant to Section 365(d) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings, or any assignment for the benefit of creditors, in respect of any Tenant), (ii) all amendments, modifications,

supplements, extensions, renewals, terminations, surrenders and other agreements relating to any of the foregoing and (iii) every guarantee of the performance and observance of all or part of the covenants, conditions and agreements to be performed and observed by the Tenants, in the case of each of **clauses (i)** and **(ii)**, as permitted by the Loan Documents and whether now or hereafter existing or entered into and whether made before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code.

"**Lease Letter of Credit**" means a letter of credit issued for the benefit of Borrower, as landlord, as security for the payment and performance of a Tenant's obligation under its Lease.

"**Legal Requirements**" shall mean:

(i)      all Laws and Regulations; and

(ii)     all Approvals.

"**Lender**" shall mean each of DBTCA, as the initial Lender, and each Person that shall become a Lender hereunder pursuant to **Section 12.23** for so long as such initial Lender or Person, as the case may be, shall be a party to this Agreement.

"**Lender Expenses**" shall mean, without duplication, (i) all recordation and filing fees incurred in connection with the recording or filing of any documents or instruments relating to the Loan and (ii) all expenses and costs incurred by Lead Arranger, Agent and initial Lender (or any of their Affiliates) with respect to (A) the origination and making of the Loan, including expenses for preparation of audits, agreed upon procedures, travel expenses, preparation of environmental, seismic and engineering reports, consultant fees, credit reports and evaluations, collateral reports and evaluations, Patriot Act searches and other searches, appraisals, insurance reviews, duplication and due diligence and (B) the preparation, negotiation, execution, delivery and performance of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby, including accounting fees (including costs of agreed-upon procedures) and reasonable attorneys' fees and disbursements in connection therewith.

"**LIBO Rate**" shall mean, with respect to any Interest Period pertaining to a LIBOR Loan Tranche, an interest rate per annum equal to the rate per annum obtained by dividing (i) the average of the respective rates per annum (rounded upward to the next whole multiple of 1/16th of 1%) posted by each of the principal London offices of banks posting rates as displayed on the Dow Jones Markets screen, page 3750 or such other page as may replace such page on such service for the purpose of displaying the London interbank offered rate of major banks for deposits in U.S. dollars, at approximately 11:00 A.M. (London time) two Business Days before the first day of such Interest Period for deposits in an amount substantially equal to the LIBOR Loan Tranche to be outstanding during such Interest Period and for a period equal to such Interest Period by (ii) a percentage equal to one hundred percent (100%) minus the LIBOR Reserve Percentage for such Interest Period.

"**LIBOR**" shall mean the London Interbank Offered Rate.

"**LIBOR Loan Tranche(s)**" shall mean any portion or portions of the Loan bearing interest at the Adjusted LIBO Rate.

"**LIBOR Margin**" shall mean 2.250000000%.

"**LIBOR Reserve Percentage**" for any Interest Period for all LIBOR Loan Tranches comprising part of the same Advance means the reserve percentage applicable two (2) Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on LIBOR Loan Tranches is determined) having a term equal to such Interest Period.

"**Lien**" shall mean any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, preference, priority, security interest or other encumbrance or charge on or affecting the Collateral, Borrower or any Borrower Party (including any conditional sale or other title retention agreement, any sale-leaseback, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable Law or Regulation of any other jurisdiction, domestic or foreign, and mechanics', materialmen's and other similar liens and encumbrances).

"**Loan**" shall mean each Advance and all Advances in the aggregate made pursuant to this Agreement and the other Loan Documents, and evidenced by the Notes and secured by the Deed of Trust and certain other Loan Documents.

"**Loan Amount**" shall have the meaning given to such term in the recitals.

"**Loan Balancing Guaranty**" shall mean that certain Loan Balancing Guaranty, dated as of the date hereof, made by the Guarantors, jointly and severally, in favor of Agent on behalf of Lenders.

"**Loan Documents**" shall mean, collectively, this Agreement, the Notes, the Deed of Trust, any Pledge Agreement, the Telephonic Notice Agreement, the Assignment of Agreements, the Assignment of Leases, the Interest Rate Protection Agreement, the Collateral Assignment of Interest Rate Agreement, the Environmental Indemnity, the Guaranties, the Cash Management Agreement (from and after the date on which the Cash Management Agreement is entered into pursuant to **Article V**), the Depository Agreement (from and after the date on which the Depository Agreement is entered into pursuant to **Article IX**), each Property Manager Recognition Agreement, the Counterparty Consent, the Architect Recognition Agreement, each Engineer Recognition Agreement, the Construction Manager Recognition Agreement, the Recognition Agreements with Major Contractors, the Construction Escrow Agreement (from and after the date on which the Construction Escrow Agreement is entered into pursuant to **Article II**), the Managing Member SPE Agreement and each Subordination Agreement, as well as all other documents executed and/or delivered in connection with the Loan or hereafter delivered by or on behalf of the Borrower Parties pursuant to the requirements hereof or of any other Loan Document.

"**Loan Percentage**" shall mean (i) prior to any assignment by the initial Lender of any portion of the Loan in accordance herewith, for the initial Lender named herein, one hundred percent (100%) and (ii) subsequent to any such assignment, for each Lender, the percentage obtained as the quotient of the principal amount of the Loan assigned to such Lender over the aggregate principal amount of the Loan.

"**Loss**" shall mean any and all losses, liabilities, damages, punitive damages, demands, claims, actions, judgments, causes of action, assessments, penalties, costs and expenses (including sums paid in settlement of claims), liens, interest, fines or penalties, including the fees and disbursements of

accountants, consultants, experts and reasonable legal fees and disbursements, and all other costs and expenses of any kind and/or nature.

"**Major Contractor**" shall mean any contractor hired by Borrower or any General Contractor, including each General Contractor (including Affiliates), supplying labor or materials, or both, in connection with any Improvements which is for an aggregate contract price equal to or greater than $500,000, whether pursuant to one contract or agreement or multiple contracts or agreements, after taking into account all change orders.

"**Major Subcontractor**" shall mean any subcontractor engaged through the Marnell GC supplying labor or materials, or both, in connection with any Improvements which is for an aggregate contract price equal to or greater than $2,000,000, whether pursuant to one contract or agreement or multiple contracts or agreements, after taking into account all change orders.

"**Major Lease**" shall mean one or more Leases to a Tenant (including Affiliates thereof) for space at the Project, in the aggregate, of at least 5,000 NRSF.

"**Management Fees**" shall mean all fees, commissions, charges and other compensation (including any incentive management fees) payable by Borrower to the Acceptable Property Manager(s) for the management of the Improvements, including, where relevant, any trade name licensing or royalty fees, which Management Fees shall be commercially reasonable based upon the then current market for the area in which the Mortgaged Property is located for a property of similar type and quality.

"**Managing Member SPE Agreement**" shall meant that certain Managing Member SPE Agreement, dated as of the date hereof, between Parent and Agent.

"**Marnell GC**" shall have the meaning given to such term in the definition of General Contractor in this **Section 1.1**.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, prospects, assets or condition (financial or otherwise) of the Collateral taken as a whole or any Borrower Party, (ii) the ability of any Borrower Party to perform, in all material respects, its obligations under the Loan Documents, to which such Borrower Party is a party, (iii) the enforceability or validity of the Loan Documents or the perfection or priority of any Lien created under the Loan Documents, (iv) the value of, or cash flow from, the Collateral or the operations thereof, (v) the rights, interests and remedies of Agent or any Lender under the Loan Documents, (vi) any Tenant under a Major Lease, (vii) any General Contractor or (viii) the financial or capital markets.

"**Material Agreements**" shall mean (i) each Construction Agreement, the Architect's Contract, the Engineer's Contract, any Property Management Documents, each agreement with a Major Contractor and each agreement with a Major Subcontractor, all as amended, modified, supplemented or replaced from time to time in accordance with the terms and provisions of this Agreement and (ii) any other contracts and agreements with any Person (including Affiliates thereof) relating to the ownership, management, construction, development, use, operation, leasing, maintenance, repair or improvement of the Mortgaged Property, or otherwise imposing obligations on Borrower, under which Borrower would have the obligation to pay $100,000 or more to any Person (including Affiliates thereof) or which has an unexpired term of one (1) year or more and cannot be terminated by Borrower without cause, penalty or premium upon thirty (30) days' notice or less, all as amended or modified from time to time in accordance with the terms and provisions of this Agreement. If any representation, warranty, covenant, default or other provision contained in this Agreement refers to a Material Agreement specifically identified in **clause (i)** of this definition of "Material Agreements", then such specific representation,

warranty, covenant, default or other provision shall, to the extent of any inconsistency, govern and control over any representation, warranty, covenant, default or other provision contained in this Agreement which refers generally to "Material Agreements".

"**Maturity Date**" shall mean the earlier of (i) the Initial Maturity Date (as extended in accordance with **Section 2.5**) or, if such day is not a Business Day, then on the first Business Day prior thereto and (ii) such other date on which the outstanding principal amount of the Notes becomes due and payable as herein provided, whether by declaration of acceleration or otherwise.

"**Mezzanine Lender**" shall mean Deutsche Bank Trust Company Americas, a New York banking corporation, and its successors and permitted assigns, in its capacity as agent and lender under the Mezzanine Loan Agreement, as the context may dictate.

"**Mezzanine Loan**" shall mean that certain loan advanced or to be advanced by Mezzanine Lender pursuant to the Mezzanine Loan Agreement.

"**Mezzanine Loan Advance**" shall mean an advance of the Mezzanine Loan by the Mezzanine Lender pursuant to the terms of the Mezzanine Loan Agreement.

"**Mezzanine Loan Agreement**" shall mean that certain Mezzanine Loan and Security Agreement, dated as of the date hereof, by and between Parent and Mezzanine Lender, as amended from time to time to the extent permitted by the Intercreditor Agreement.

"**Mezzanine Loan Amount**" shall mean $45,000,000.

"**Mezzanine Loan Commitment**" shall mean, with respect to each lender under the Mezzanine Loan Agreement, the commitment of such lender under the Mezzanine Loan Agreement to fund Mezzanine Loan Advances.

"**Mezzanine Loan Documents**" shall mean the Mezzanine Loan Agreement and all other documents executed and/or delivered in connection therewith as set forth in more detail in the Mezzanine Loan Agreement.

"**Mezzanine Loan Initial Advance**" shall mean the initial advance of that certain loan advanced or to be advanced by Mezzanine Lender pursuant to the Mezzanine Loan Agreement

"**Monthly Capital Expenditure Amount**" shall have the meaning given to such term in **Section 9.9.1**.

"**Monthly Debt Service Payment Amount**" shall have the meaning given to such term in **Section 2.3.1**.

"**Monthly Insurance Amount**" shall have the meaning given to such term in **Section 9.9.1**.

"**Monthly Rollover Amount**" shall have the meaning given to such term in **Section 9.9.1**.

"**Monthly Tax Amount**" shall have the meaning given to such term in **Section 9.9.1**.

"**Moody's**" shall have the meaning given to such term in the definition of "Rating Agency" in this **Section 1.1**.

"**Mortgaged Property**" includes the Land and shall have the meaning given to such term in the Deed of Trust.

"**Multiemployer Plan**" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any member of the applicable ERISA Group is making or accruing an obligation to make contributions or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"**Net Proceeds**" shall mean:  (i) the net amount of all insurance proceeds received by Agent as a result of any damage or destruction to the Mortgaged Property, after deduction of Agent's costs and expenses (including reasonable attorneys' fees), if any, in collecting same ("**Insurance Proceeds**") or (ii) the net amount of all condemnation awards, proceeds and payments received by Agent with respect to any Partial Condemnation or Total Condemnation (as applicable), after deduction of Agent's costs and expenses (including reasonable attorneys' fees), if any, in collecting same ("**Condemnation Proceeds**").

"**Net Proceeds Account**" shall have the meaning given to such term in **Section 9.1.4**.

"**Net Proceeds Deficiency**" shall have the meaning given to such term in **Section 10.7(f)**.

"**New Plat**" shall have the meaning given such to such term in **Section 5.1(kk)**.

"**Non-Recourse Carve-out Guaranty**" shall mean that certain Non-Recourse Carve-out Guaranty dated as of the date hereof and made by the Guarantors, jointly and severally, in favor of Agent on behalf of Lenders.

"**Note**" or "**Notes**" shall mean that certain amended and restated promissory note executed and delivered by Borrower on the Closing Date evidencing the Loan and all promissory notes executed pursuant to this Agreement, including pursuant to **Sections 2.1.5, 5.1(l)(ii), 5.1(x)** and **12.23**, as all such promissory notes may be amended, modified, restated, supplemented, split, consolidated, extended, renewed or replaced from time to time.

"**NRSF**" shall mean net rentable square feet.  The NRSF for the Retail Portion shall be approximately 1,076,759.  The NRSF for the Office Portion shall be approximately 191,000.  The NRSF for the Parking Portion shall be approximately 232,241.  The NRSF of the Retail Portion, the Office Portion and the Parking Portion may be increased or decreased if such increase or decrease is approved by Agent, and, if such increase or decrease is so approved, the revised NRSF shall constitute the NRSF for the Retail Portion, the Office Portion or the Parking Portion, as applicable, for all purposes.

"**Office Development**" shall have the meaning given to such term in **Section 5.1(jj)**.

"**Office Portion**" shall have the meaning given to such term in the recitals.

"**Officer's Certificate**" shall mean, with respect to any Borrower Party (that is not a natural Person), a certificate made by an individual duly authorized to act on behalf of such Borrower Party.  Without limiting the foregoing, if the individual signing the certificate is doing so on behalf of a corporation, then such individual shall hold the office of President, Vice President, Chief Financial Officer, Treasurer or Controller (or the equivalent) with respect to such corporation and, if the certificate

is being delivered in connection with any financial statement, report or record, then such certificate shall be signed by the Chief Financial Officer of such Borrower Party.  Chief Financial Officer means the highest ranking financial officer of the relevant Person.

"**Off-Site Building Materials**" shall have the meaning given to such term in **Section 7.7(c)**.

"**Offsite Work**" shall have the meaning given to such term in **Section 4.1(aaa)**.

"**Operating Expenses**" shall mean for any specified period, all expenses paid (or due and payable) by Borrower (or by a Property Manager, agent or Affiliate for the account of Borrower) during such period in connection with the operation of the Mortgaged Property (including, without duplication, Basic Carrying Costs, any and all insurance costs, actual Management Fees, wages and other costs and expenses incurred for such Mortgaged Property and legal expenses incurred in connection with the operation of the Mortgaged Property, determined, in each case, in accordance with GAAP, consistently applied.  "Operating Expenses" shall not include (i) depreciation or amortization or other noncash items (other than expenses that are accrued but not yet paid), (ii) the Debt or any other Indebtedness of Borrower, (iii) income taxes or other taxes in the nature of income taxes, (iv) any expenses (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with and allocable to the issuance of the Notes and the execution and enforcement of the Loan Documents, (v) any Capital Expenditures, (vi) distributions to the members or partners of Borrower or any management fees or similar compensation payable to any Affiliate of any Borrower Party, (vii) any item of expense which otherwise would be considered within Operating Expenses but is paid directly by any Tenant, (viii) costs of providing the goods and services described in the definition of "Operating Income", (ix) costs incurred as a result of a default by any Borrower Party under any of the agreements to which it is a party or bound, (x) any cost or expense reimbursed by Tenants and (xi) rentals under capital or equipment leases except to the extent that the personal property the subject of such lease is customarily leased (as opposed to purchased) in connection with the operation of facilities similar to the Project and in the vicinity of the Project.  Expenses that are accrued as Operating Expenses during any period shall not be included in Operating Expenses when paid during any subsequent period.

"**Operating Income**" shall mean for any specified period, all income received by Borrower (or by a Property Manager, agent or Affiliate for the account of Borrower) from any Person during such period in connection with the operation of the Mortgaged Property, determined in accordance with GAAP, consistently applied, including the following:

(i)    all Rents and, without duplication, all charges received by Borrower for electricity, oil, gas, water, steam, heat, ventilation, air conditioning and any other energy, telecommunications, telephone, utility or similar items, including overtime usage, HVAC equipment charges, sprinkler charges, escalation charges, license fees, maintenance and cleaning fees, charges for improvements, Taxes and Other Charges and other amounts payable to Borrower under any Lease (including tenant security deposits but only to the extent Borrower is entitled to apply or retain the security deposit in accordance with the Lease and any interest income earned thereon and retained by Borrower) or other agreement relating to the Mortgaged Property;

(ii)    all amounts payable to Borrower pursuant to Title Agreements relating to the Mortgaged Property;

(iii)    condemnation awards to the extent that such awards are compensation for lost Rent or allocable to such specified period;

(iv)     business interruption and loss of "rental value" insurance proceeds to the extent such proceeds are allocable to such specified period;

(v)     all rebates and other paid concessions and discounts, including the value of all goods and services in lieu of cash payments; and

(vi)     all other income, which is recurring and collected in the ordinary course of business of operating the Mortgaged Property.

Notwithstanding the foregoing **clauses (i)** through **(vi)**, Operating Income shall not include (A) any condemnation or insurance proceeds (other than of the types described in **clauses (iii)** and **(iv)** above), (B) any proceeds resulting from the Transfer, exchange, financing or refinancing of all or any part of the Mortgaged Property (other than of the types described in **clause (iii)** above), (C) any type of income that would otherwise be considered Operating Income pursuant to the provisions above but is paid directly by any Tenant and (D) any fees or other amounts payable by a Tenant that are reimbursable by Borrower to such Tenant.

"**Organizational Documents**" shall mean (i) with respect to any Person that is a corporation, the certificate of incorporation or charter and by-laws of such Person, (ii) with respect to any Person that is a partnership, the partnership agreement and, if a limited partnership, the certificate of limited partnership of such Person and limited partnership agreement, (iii) with respect to any Person that is a limited liability company, the certificate of formation or the articles of organization and the operating agreement or limited liability company agreement of such Person and (iv) for any other Person, the documents of like import providing for the creation and continued existence and governance of such Person.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults and similar areas adjoining the Mortgaged Property, now or hereafter levied or assessed or imposed against the Mortgaged Property and payable by Borrower.

"**Other Taxes**" shall have the meaning given to such term in **Section 2.2.2(e)**.

"**Owner Contingency**" shall mean the amount available under the relevant line item in the Approved Construction Budget.

"**Parent**" means Turnberry/Centra Quad, LLC, a Delaware limited liability company.

"**Parking Portion**" shall have the meaning given to such term in the recitals.

"**Partial Condemnation**" shall mean any Condemnation other than a Total Condemnation.

"**Participation**" shall have the meaning given to such term in **Section 5.1(w)**.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, and the regulations promulgated thereunder, all as amended, modified, succeeded or replaced from time to time.

"**Payment and Performance Bonds**" mean dual-obligee payment and performance bonds relating to all (i) Major Contractors (other than the Marnell GC) and (ii) Bonded Subcontractors,

naming Agent as an obligee and issued by a surety company or companies authorized to do business in Nevada acceptable to Agent, in each case in an amount not less than the full contract price and otherwise in form and substance acceptable to Agent.

"**Payment Guaranty**" shall mean that certain Payment Guaranty, dated as of the date hereof, made by the Guarantors, jointly and severally, in favor of Agent on behalf of Lenders with aggregate liability not to exceed $40,000,000.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" shall mean an employee pension benefit plan as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which (i) is subject to the provisions of Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and (ii) is maintained by, or contributed to by, Borrower or any member of the applicable ERISA Group or with respect to which any member of the ERISA Group could reasonably be expected to incur liability under Section 4069 of ERISA.

"**Permitted Debt**" shall mean, collectively, the following as it relates to the Project: (i) the Debt and (ii) trade payables incurred in the ordinary course of Borrower's business, not to exceed $200,000 in the aggregate, not secured by Liens on the Mortgaged Property (other than liens being properly contested in accordance with **Section 5.1(b)(ii)**), payable by or on behalf of Borrower for or in respect of the development or operation of the Mortgaged Property or any other property held by Borrower in the ordinary course of operating Borrower's business, _provided_ that each such amount shall be paid within sixty (60) days following the date on which each such amount is incurred (subject to the rights of Borrower to contest such amounts in accordance with **Section 5.1(b)(ii)**). "Permitted Debt", as it relates to Parent, shall mean Permitted Mezzanine Debt.

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed and approved by Agent and set forth in the initial Qualified Title Policy, (iii) Liens, if any, for Taxes or Other Charges not yet payable or delinquent or which are being diligently contested in good faith by Borrower in accordance with **Section 5.1(b)(ii)**, (iv) Liens in respect of the Mortgaged Property imposed by law which were incurred in the ordinary course of business, such as carriers, warehousemen's, landlord's, mechanic's, materialmen's, repairmen's and other similar Liens, and Liens for workers compensation, unemployment insurance and similar programs, in each case arising in the ordinary course of business which are being diligently contested in good faith by Borrower in accordance with **Section 5.1(b)(ii)**, (v) Leases permitted by the Loan Documents, (vi) Liens created pursuant to the Mezzanine Loan (it being agreed that Mezzanine Lender shall have no Liens on or in the Mortgaged Property) until the payment and performance in full of the Secured Obligations and (vii) such other title and survey exceptions as Agent has approved or may approve in writing.

"**Permitted Mezzanine Debt**" shall have the meaning given to the term "Permitted Debt" in the Mezzanine Loan Agreement as in effect on the date hereof.

"**Person**" shall mean any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any Governmental Authority, endowment fund or any other form of entity.

"**Phasing Agreement**" shall mean that certain Improvement Phasing Agreement between Borrower and the County dated May 12, 2005, and recorded on May 13, 2005 in the Office of the Clark County Recorder in Book 20050513 as Instrument Number 0005677.

"**Plan**" shall have the meaning given to such term in **Section 4.1(i)**.

"**Plan Assets**" shall have the meaning given to such term in **Section 5.1(v)**.

"**Plan Assets Regulation**" shall mean the United States Department of Labor Plan Asset Regulation at 29 CFR 2510.3-101 as in effect from time to time.

"**Plans and Specifications**" shall mean those certain plans and specifications prepared in connection with the Project by Architect pursuant to the Architect's Contract, which plans and specifications are more particularly described on **Exhibit D** hereto, as the same may be amended, modified and supplemented from time to time to the extent permitted hereunder.

"**Pledge Agreement**" shall mean any Pledge, Assignment and Security Agreement by and between Borrower and Agent delivered into pursuant to **Section 5.1(mm)** or **Section 9.1.5**.

"**Policies**" shall have the meaning given to such term in **Section 10.2**.

"**Premises**" shall have the meaning given to such term in the recitals.

"**Prepayment**" shall have the meaning given to such term in **Section 2.4.1**.

"**Prepayment Date**" shall have the meaning given to such term in **Section 2.4.1**.

"**Prepayment Notice**" shall have the meaning given to such term in **Section 2.4.1**.

"**Prime Rate**" shall mean the rate of interest announced publicly by Deutsche Bank Trust Company Americas in New York, New York, from time to time, as its prime lending rate. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer; Deutsche Bank AG and its Affiliates may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Professional Independent Provider**" shall have the meaning given to such term in the definition of "Independent Director" in this **Section 1.1**.

"**Prohibited Person**" shall mean (i) any Person listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism, (ii) any Person that is named as a "specifically designated national (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov/offices/eotffc/ofac/sdn/t11sdn.pdf) or at any replacement website or other replacement official publication of such list or is named on any other Governmental Authority or regulatory list issued after September 11, 2001, (iii) any Person acting, directly or indirectly, in contravention of any AML Law, (iv) any terrorist organizations or narcotics traffickers, including those Persons that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Financial Action Task Force on Money Laundering, U.S. Office of Foreign Assets Control, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, all as may be amended, modified, succeeded or replaced from time to time or (v) any Person that is owned or Controlled by, or acting for or on behalf of, any Person described in any of **clauses (i), (ii), (iii)** or **(iv)** above.

"**Project**" shall have the meaning given to such term in the recitals to this Agreement.

"**Project Sale**" shall mean the closing of a sale by Borrower of its interest in the Project to a bona fide third party purchaser if, following such sale, (i) neither Borrower, its Affiliates nor Guarantor retain any continuing equity interest or other interest in the Project and (ii) neither Borrower, its Affiliates nor Guarantor have any right to reacquire any interest in the Project for a period of five (5) years thereafter.

"**Project Sale Default**" shall have the meaning set forth in **Section 6.1(i)(iv)**.

"**Property Management Agreement**" shall mean, collectively, (i) the Turnberry Property Management Agreement and (ii) a property management agreement by and between Borrower and a Property Manager, pursuant to which such Property Manager is to provide management and other services with respect to the Mortgaged Property and any other management agreement entered into with the prior written consent of Agent, which agreement or agreements shall be in form and substance reasonably satisfactory to Agent.

"**Property Management Documents**" shall mean, with respect to any Property Manager, the applicable Property Management Agreement, and all other agreements, leases, licenses, or contracts approved by Agent by and among Borrower and such Property Manager and/or any Affiliate thereof.

"**Property Manager**" shall mean, collectively, (i) the Turnberry Property Manager and (ii) any "Acceptable Property Manager" or any replacement "Property Manager" appointed in accordance with **Section 8.2(b).**

"**Property Manager Recognition Agreement**" shall mean a consent, subordination and recognition agreement among Borrower, Agent and a Property Manager, dated the date of the relevant Property Management Agreement, in the form of **Exhibit AA**, as the same may be modified or amended as permitted by the Loan Documents.

"**Punch List Items**" shall mean minor or insubstantial details of construction and mechanical adjustment, the non-completion of which does not interfere with the marketability, use or occupancy of the Mortgaged Property for its intended use.

"**Qualified Lease**" means a Lease (i) that has been approved by Agent in accordance with this Agreement or (ii) the approval of which by Agent is not required in accordance with this Agreement but which otherwise complies with the Qualified Lease Conditions.

"**Qualified Lease Conditions**" means a Lease that (i) contains a minimum average annual base rent and other economic terms consistent with the market rate for similar space, as determined by Borrower in good faith, provided that such annual base rent and other economic terms are not less than 95% of the *pro forma* amounts for such space projected by Borrower and approved by Agent, (ii) is the result of arm's length negotiations, (iii) does not violate any other Leases, (iv) is with a Tenant that would reasonably be considered creditworthy in the context of its obligations under the Lease, (v) does not contain terms that would materially adversely affect any Lender's or Agent's rights under the Loan Documents, (vi) is on Borrower's standard form of lease approved by Agent  and (vii) is subordinate to the Deed of Trust and in which the Tenant agrees to attorn to Agent on behalf of the Lenders at Agent's request (subject to the execution and delivery by Agent of a subordination, non-disturbance and attornment agreement (in the form contemplated by this Agreement) if required pursuant to the terms of this Agreement) and in which Tenant agrees to deliver an estoppel certificate to the landlord upon the landlord's reasonable request.

"**Qualified Survey**" shall mean a current (i.e., dated no earlier than thirty (30) days before the Closing Date) land survey of the Mortgaged Property that, except as otherwise approved by Agent, (i) is in form and content satisfactory to Agent, (ii) is prepared by a professional and properly licensed land surveyor satisfactory to Agent in accordance with the 1992 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys, (iii) reflects the same legal description set forth in the Qualified Title Policy relating to the Mortgaged Property, (iv) includes the matters and meets the requirements set forth on **Exhibit P** attached hereto and (v) contains a certification in the form attached hereto as **Exhibit P**.

"**Qualified Title Policy**" shall mean an ALTA Construction Loan title insurance policy or policies (1975 unmodified form) issued by the Title Company, with ALTA facultative reinsurance and direct access agreements or co-insurance acceptable to Agent and from title companies selected by Agent, which title insurance policy or policies shall (i) provide coverage in the Loan Amount (including a "pending disbursements" clause), (ii) insure Agent for the benefit of Lenders that the Deed of Trust creates a valid first priority mortgage Lien on the Mortgaged Property (which shall include any easements created by the Title Agreements or otherwise for the benefit of the Mortgaged Property), free and clear of all exceptions from coverage (other than Permitted Encumbrances) and such standard exceptions and exclusions from coverage as Agent shall approve, (iii) contain such endorsements and affirmative coverage as Agent requests, including an interim mechanics' lien endorsement, (iv) name Agent for the benefit of Lenders as the insured and (v) be assignable by its terms with a Transfer of the Loan.

"**ratable share**" or "**ratably**" shall mean, with respect to any Lender, its share of the Loan based on the proportion of the outstanding principal of the Loan advanced by such Lender to the total outstanding principal of the Loan.

"**Rate Request**" shall mean Borrower's irrevocable telephonic notice (to be promptly confirmed in writing), to be received by Agent by 11:00 A.M. (New York City time) three (3) Business Days prior to the date specified in the Rate Request for the commencement of the Interest Period (which specified date must be a Business Day), of: (i) its intention to have (A) all or any portion of the principal amount under the Notes which is not then the subject of an Interest Period (other than an Interest Period which is terminating on the Business Day specified in the notice) and/or (B) all or any portion of any Advance, which is to be made on the Business Day specified in the notice, bear interest as either a Base Rate Loan Tranche or a LIBOR Loan Tranche; and (ii) the Interest Period desired by Borrower in respect of the amount specified whenever such notice is for LIBOR Loan Tranches.

"**Rating Agency**" shall mean any one or more of Standard & Poor's Ratings Group, a division of The McGraw Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), Fitch IBCA, Inc. and any other nationally recognized statistical rating agency and their respective successors, as selected from time to time by Agent.

"**RBC Change**" shall have the meaning given to such term in **Section 2.2.2(c)**.

"**Recognition Agreement with Major Contractor**" shall mean any Consent and Recognition Agreement in form and substance acceptable to Agent, executed by any Major Contractor or Major Subcontractor, as applicable, Borrower and Agent, as the same may be modified or amended to the extent permitted by the Loan Documents; provided, however, that with respect to subcontractors, any such Consent and Recognition Agreement shall be in substantially the form of **Exhibit V** hereto and otherwise acceptable to Agent.

"**Register**" shall have the meaning given to such term in **Section 12.23(d)**.

"**Regulation D**" shall mean Regulation D of the Federal Reserve Board, as in effect from time to time.

"**Regulatory Change**" shall mean any change after the date of this Agreement in any Law or Regulation or the adoption or the making, after such date, of any Law or Regulation or of any interpretations, directives or requests of any Law or Regulation applying to a class of banks or Persons Controlling banks, including any Lender or any Person Controlling a Lender, by any Governmental Authority.

"**Release Notice**" shall have the meaning given to such term in **Section 5.1(jj)**.

"**Rent Roll**" means a list of all Leases and Tenants at the Project in form and substance satisfactory to Agent, setting forth, among other things, (1) the name of each Tenant, (2) each Lease and all amendments thereto, (3) the location and rentable square footage of all demised space, (4) current base rent and future step-ups, (5) base years for taxes and operating expenses and current escalations, (6) defaults and arrearages, (7) any subleases and (8) without duplication of any of the foregoing, those items set forth in **Section 5.1(m)(iv)**.

"**Rents**" shall mean all rents, issues, profits, royalties (including all oil and gas or other hydrocarbon substances), earnings, receipts, revenues, proceeds, accounts, accounts receivable, security deposits and other deposits (subject to the prior right of the Tenants making such deposits) and income, including fixed, additional and percentage rents, and all operating expense reimbursements, reimbursements for increases in taxes, sums paid by Tenants to Borrower to reimburse Borrower for amounts originally paid or to be paid by Borrower or Borrower's agents or Affiliates for which such Tenants were liable, for example, Tenant improvements costs in excess of any work letter, lease takeover costs, moving expenses and tax and operating expense pass-throughs for which a Tenant is solely liable, parking, maintenance, common area, tax, insurance, utility and service charges and contributions, proceeds of sale of electricity, gas, heating, air-conditioning and other utilities and services, deficiency rents and liquidated damages, proceeds of "rent" insurance or business interruption insurance and other benefits now or hereafter derived from the Mortgaged Property or otherwise due and payable or to become due and payable as a result of any ownership, use, possession, occupancy or operation thereof and/or services rendered, goods provided and business conducted in connection therewith (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in arrangement, insolvency, dissolution, receivership or similar proceedings, or any assignment for the benefit of creditors, in respect of any Tenant and all claims as a creditor in connection with any of the foregoing) and all cash or security deposits, advance rentals, and all deposits or payments of a similar nature relating thereto, now or hereafter, including during any period of redemption, derived from the Mortgaged Property and all proceeds from the cancellation, surrender or Transfer of the Leases.

"**REOC**" shall have the meaning given to such term in **Section 4.1(i)**.

"**Replacement Lender**" shall have the meaning given to such term in **Section 2.6.2(c)**.

"**Required Lenders**" shall mean, if there is only one Lender hereunder, that Lender, and if there is more than one Lender, Lenders holding at least sixty-six and two-thirds percent (66 2/3%) of the total principal amount outstanding under the Loan; provided, however, that, if any Lender shall be a Defaulting Lender at such time, there shall be excluded from the determination of Required Lenders at such time the aggregate principal amount of the Loan owing to such Defaulting Lender in its capacity as a Lender and outstanding at such time.

"**Required Rating**" shall mean "AA-" (or its equivalent) by the Rating Agencies.

"**Required Records**" shall have the meaning given to such term in **Section 5.1(m)**.

"**Required Utilities**" shall mean all utilities, including water, electric, telephone, sewer, sanitary sewer and storm drain facilities, necessary or desirable to service the Mortgaged Property.

"**Restoration**" shall mean the repair and restoration of the Mortgaged Property as nearly as possible to the condition the Mortgaged Property was in immediately prior to such casualty or Partial Condemnation, as applicable, together with such alterations as may be approved by Agent.

"**Retail Portion**" shall have the meaning given to such term in the recitals.

"**Retainage**" shall mean the total amount actually held back by Borrower from each General Contractor or each Trade Contractor with respect to the value of its Work in place with respect to the Improvements, which shall not, at any time, be less than ten percent (10%) of the aggregate Hard Costs theretofore incurred by Borrower with respect to such Trade Contractor for Work in place, as verified from time to time by the Construction Consultant pursuant to the provisions of this Agreement. There shall be no Retainage on Soft Costs, unless retainage on Soft Costs is required under the relevant contract or subcontract, in which case the Retainage for such Soft Costs shall be as set forth in the relevant contract or subcontract.

"**Rights Agreement**" shall have the meaning given to such term in **Section 5.1(u)(viii)**.

"**Rights Agreement Recognition Agreement**" shall have the meaning given to such term in **Section 5.1(u)(viii)**.

"**Risk-Based Capital Guidelines**" shall have the meaning given to such term in **Section 2.2.2(c)**.

"**Rollover Account**" shall have the meaning given to such term in **Section 9.1.3**.

"**Rollover Funds**" shall have the meaning given to such term in **Section 9.9.1**.

"**S&P**" shall have the meaning given to such term in the definition of "Rating Agencies" in **Section 1.1**.

"**Second Extension Maturity Date**" shall have the meaning given to such term in **Section 2.5(b)**.

"**Second Extension Notice**" shall have the meaning given to such term in **Section 2.5(b)**.

"**Secured Obligations**" shall have the meaning given to such term in the Deed of Trust.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, modified, succeeded or replaced from time to time.

"**Security Deposit**" means any Cash deposit or deposits delivered or required to be delivered by a Tenant to Borrower (or to a Property Manager, as agent for Borrower) as security for the performance of Tenant's obligations under its Lease.

"**Servicer**" means any Person appointed by Agent to service the Loan or its successor in interest, or if any successor servicer is appointed pursuant to a servicing agreement, such successor servicer. If at any time no Person shall be so appointed, Servicer shall be deemed to refer to Agent.

"**Shortfall**" has the meaning given to such term in **Section 7.5**.

"**Single Purpose Entity**" shall mean a Person, other than a natural Person, which (i) is formed or organized solely for the purpose of either owning, holding, developing, using, operating, financing, leasing and selling the Mortgaged Property or owning an equity interest in an SPE Entity, as applicable, (ii) does not engage in any business unrelated to the Mortgaged Property and the ownership, development, use, operation, financing, leasing and selling thereof or the ownership of an equity interest in an SPE Entity, as applicable, and other activities incidental thereto, (iii) has not and will not have any assets other than those related to its interest in the Mortgaged Property or the ownership, development, operation, management, financing, leasing and selling thereof or in its equity interest in any SPE Entity, as applicable, or any indebtedness other than the Permitted Debt, (iv) maintains its own separate books and records and its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, (v) holds itself out as being a Person, separate and apart from any other Person, (vi) does not and will not commingle its funds or assets with those of any other Person, (vii) conducts its own business in its own name; (viii) maintains separate financial statements, (ix) pays its own liabilities out of its own funds, (x) observes all partnership, corporate or limited liability company formalities, as applicable, (xi) pays the salaries of its own employees, if any, and maintains a sufficient number of employees, if any, in light of its contemplated business operations, (xii) does not guarantee or otherwise obligate itself with respect to the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, (xiii) does not acquire obligations or securities of its partners, members or shareholders, (xiv) allocates fairly and reasonably shared expenses, including any overhead for shared office space, if any, (xv) uses separate stationery, invoices, and checks, (xvi) maintains an arms-length relationship with its Affiliates and officers, (xvii) does not and will not pledge its assets for the benefit of any other Person or make any loans or advances to any other Person, (xviii) does and will continue to use commercially reasonable efforts to correct any known misunderstanding regarding its separate identity, (xix) maintains adequate capital for the satisfaction of obligations that are reasonably foreseeable in a business of its character and in light of its contemplated business operations, (xx) has and will continue to have Organizational Documents which have been approved by Agent, (xxi) has not and will not engage in, seek, or consent to a dissolution, winding up, liquidation, consolidation or merger and, except as otherwise permitted in this Agreement, (xxii) has not and will not engage in, seek or consent to any asset sale, transfer of partnership, membership or shareholder interests and (xxiii) has not and will not amend its Organizational Document except in accordance with this Agreement. In addition, if such Person is a limited liability company, (A) such Person shall have at least two (2) Independent Members and (B) the operating agreement of such Person shall contain the provisions set forth in **Exhibit Q** attached hereto; provided, however, that, if the operating agreement of such Person contains the provisions set forth in **Exhibit Q**, and such Person conducts its business in accordance with those provisions, then such Person shall be deemed to be a Single Purpose Entity within the meaning of this definition notwithstanding any inconsistency between the provisions of **clauses (ii)** through **(xxii)** hereof and **Exhibit Q**. If such Person is a partnership, all general partners of such Person shall be Single Purpose Entities and if such Person is a corporation then, at all times, such Person shall have at least two (2) Independent Directors, and in either case, the Organizational Documents of such Person shall contain provisions substantially similar to the provisions set forth in **Exhibit Q** attached hereto.

"**Soft Costs**" shall mean all Construction Costs other than Hard Costs.

"**Soft Cost Contingency**" shall have the meaning given to such term in the definition of "Contingency Reserve" in this **Section 1.1**.

"**Solvent**", with respect to any Person on a particular date, shall have the meaning ascribed to such term in the Bankruptcy Code and any applicable state fraudulent conveyance Law or Regulation, to include the following: that on such date (i) the fair value of all assets of such Person is

greater than the total amount of liabilities, including contingent liabilities, of such Person and (ii) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's net assets would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPC**" shall have the meaning given to such term in **Section 12.23(j)**.

"**SPE Entity**" shall mean Borrower, Parent and any other Person which is required by this Agreement to be, as long as the Debt is outstanding, a Single Purpose Entity.

"**Sponsors**" shall mean, individually and collectively (as applicable), Jeffrey Soffer and Jacquelyn Soffer.

"**Subordination Agreement**" shall mean, with respect to any Lease, a subordination, non-disturbance and attornment agreement executed by Borrower, Agent and the applicable Tenant substantially in the form of **Exhibit W** or otherwise in form and substance satisfactory to Agent.

"**Subsidiary**" shall mean, with respect to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time, any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries, (ii) any partnership, association, trust, joint venture, limited liability company or other entity in which such Person directly or indirectly through Subsidiaries has more than a fifty percent (50%) equity interest at any time and (iii) any partnership, association, trust, joint venture, limited liability company or other entity which is required to be consolidated with such Person in accordance with GAAP.

"**Substitute Lender**" shall have the meaning given such term in **Section 2.2.2(k)**.

"**Substantial Completion**" shall mean the satisfaction of the following conditions:

(i)    the Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Documents; provided, however, that Punch List Items may be outstanding at such time so long as (A) Borrower is diligently pursuing completion of such Punch List Items in a good and workmanlike manner (and Borrower agrees to complete or cause the completion of such Punch List Items prior to Final Completion, and (B) each of the categories of such Punch List Items have been approved by the Construction Consultant;

(ii)    a temporary certificate of occupancy for the Project shall have been issued and Borrower shall have obtained and delivered to Agent all required Approvals regarding the Improvements;

(iii)    subject to Borrower's right to contest Liens as set forth in **Section 5.1(b)(ii)**, the Mortgaged Property shall be free of any Lien pertaining to any Work and Agent shall have received such releases of Liens, waivers and affidavits with respect thereto as it may require to evidence such Lien-free completion;

(iv)    all Required Utilities are supplied to the Project and are operating fully;

(v)    the Improvements shall be in broom clean condition ready for occupancy for the intended purposes; and

(vi)    Agent shall have received from Borrower all other evidence of substantial completion of the Improvements that Agent may reasonably require.

"**Supplemental Agent**" shall have the meaning given to such term in **Section 13.1(e)**.

"**Tax Account**" shall have the meaning given to such term in **Section 9.1.3**.

"**Tax Funds**" shall have the meaning given to such term in **Section 9.9.1**.

"**Taxes**" shall mean all real estate and personal property taxes, assessments and fees, and all taxes on rents or rentals, and all water rates or sewer rents, and all other similar charges of or by any Governmental Authority now or hereafter levied or assessed or imposed against Borrower or the Mortgaged Property or Rents therefrom which, if unpaid, could result in a Lien on any portion of the Mortgaged Property.

"**Telephonic Notice Agreement**" shall mean that certain telephonic notice agreement in the form attached hereto as **Exhibit R**, which shall be executed by Borrower and delivered to Agent on the Closing Date.

"**Tenant**" shall mean any Person liable by contract or otherwise to pay Rent pursuant to a Lease.

"**Tenant Allowance**" shall have the meaning specified in the definition TI/LC Costs.

"**Tenant Direction Letter**" shall have the meaning given to such term in **Section 9.2.1**.

"**Tenant Improvement Costs**" shall have the meaning given to such term in the definition of "TI/LC Costs" in this **Section 1.1**.

"**Tenant Improvement Project**" shall have the meaning given to such term in the definition of "TI/LC Costs" in this **Section 1.1**.

"**Tenant Security Account**" shall have the meaning given to such term in **Section 9.1.4**.

"**TI/LC Costs**" means the following costs and expenses actually incurred by Borrower with respect to a Lease at the Premises: (a) hard costs and soft costs in connection with construction by or on behalf of Borrower (but not any Tenant) of tenant improvements required pursuant to the terms of a Lease (the construction of such tenant improvements being a "**Tenant Improvement Project**"), but excluding any fees paid to or any general administrative costs and other overhead expenses of Borrower, but including construction supervision fees and other similar compensation payable pursuant to any Property Management Agreement (as the same may be amended in accordance with this Agreement) or any other property level management or leasing agreement (provided that any such other management or leasing agreement has been approved by Agent) ("**Landlord Work Costs**"); (b) tenant allowances, payments, contributions or reimbursements made by Borrower to a Tenant pursuant to the terms of the applicable Lease for construction by or on behalf of such Tenant of tenant improvements ("**Tenant Allowance**"; Landlord Work Costs and Tenant Allowance are collectively "**Tenant Improvement Costs**"); and (c) brokerage commissions paid to licensed leasing brokers, in accordance with the execution and delivery of a Lease by Borrower ("**Brokerage Commission**").

"**Title Agreements**" shall mean easement and/or operating agreements, declarations, covenants, conditions and restrictions, and similar agreements affecting the Mortgaged Property and binding upon and/or benefiting the Mortgaged Property, Borrower or any third Person, whether or not involving Governmental Authorities or private Persons.

"**Title Company**" shall mean Lawyers Title Insurance Corporation or another nationally recognized title insurance company selected by Agent.

"**Total Condemnation**" shall mean any Condemnation of any portion of or interest in the Mortgaged Property or access therefrom or thereto or of any adjacent property that, when completed, would leave, in Agent's reasonable determination, a balance of the Mortgaged Property that, due either to the area so taken or the location of the part so taken in relation to the part not taken, would not, under economic conditions, physical constraints, zoning laws, building regulations and other Laws and Regulations then existing, readily accommodate a new or reconstructed building or buildings and other improvements of a type fully comparable to the Improvements existing or proposed to be constructed as of the date of such taking or Condemnation or new or reconstructed building or buildings and other improvements that are the economic and functional equivalent of the Project as planned on the date hereof, or would allow for reasonable access to and egress from the Mortgaged Property for people and vehicles or reasonable and efficient utility services.

"**Trade Contractor**" shall mean each General Contractor and each Major Contractor, Major Subcontractor, contractor, subcontractor, laborer, supplier, vendor, mechanic and materialman.

"**Trade Payables**" shall mean unsecured amounts payable by or on behalf of Borrower for or in respect of the operation of the Mortgaged Property or operations of Borrower in the ordinary course and which would under GAAP be regarded as ordinary expenses, including amounts payable to Trade Contractors or other Persons providing property or services to the Mortgaged Property or Borrower.

"**Transfer**" shall mean sale, transfer, dispose, convey, issue, redeem, pledge, hypothecate and/or assign.

"**Transition Letter**" shall mean a letter from Mezzanine Lender addressed to Agent confirming that Borrower has fulfilled its obligations to Mezzanine Lender under Section 5.1(dd) of the Mezzanine Loan Agreement as in effect on the date hereof.

"**Turnberry Construction Manager**" shall mean Turnberry Development, LLC.

"**Turnberry Property Manager**" shall mean Turnberry West Realty, Inc.

"**Turnberry Property Management Agreement**" shall mean a property management agreement to be entered into between the Turnberry Property Manager and Borrower in form and substance satisfactory to Agent.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code in effect in the State in which the Land is located or, if the creation, perfection and enforcement of any security interest herein granted is governed by the laws of a state other than the State in which the Land is located, then, as to the matter in question, the Uniform Commercial Code in effect in that state.

"**Updated Survey**" shall have the meaning given to such term in **Section 5.1(jj)**.

"**U.S. Government Securities**" shall mean securities evidencing an obligation to pay principal and interest in a full and timely manner that are (i) direct obligations of the United States for the payment of which its full faith and credit is pledged or (ii) obligations of a Person Controlled or supervised by and acting as an agency or instrumentality of and guaranteed as a full faith and credit obligation by the United States (including a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such securities or a specific payment of principal of or interest on any such securities held by such custodian for the account of the holder of such depository receipt, *provided* that (except as required by Law or Regulation) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the securities or the specific payment of principal of or interest on the securities evidenced by such depository receipt).

"**U.S. Tax**" shall mean any present or future tax, assessment or other charge or levy imposed by or on behalf of the United States or any taxing authority thereof.

"**Work**" shall mean all construction, labor, materials, supplies, monitoring, supervision, administration, contracting and other services or materials necessary or desirable for the satisfactory performance, execution and Final Completion of the construction of the Improvements in accordance with the Plans and Specifications, the Construction Documents and good construction practice.

      1.2    Principles of Construction. In this Agreement and in the other Loan Documents, except as otherwise expressly provided:

      (a)    words expressing the singular include the plural and vice versa;

      (b)    words denoting gender include all genders;

      (c)    words denoting the whole of a matter or thing include a part of the matter or thing;

      (d)    the terms "Collateral" and "Mortgaged Property" shall be construed to be followed by the phrase "or any part or portion thereof or interest therein";

      (e)    words and expressions importing natural Persons include Persons that are not natural Persons and vice versa;

      (f)    the words "hereof", "herein" and "hereunder" and words of similar import shall refer to this Agreement or the applicable Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such Loan Document;

      (g)    the words "include", "includes", "including" and similar terms shall be construed as if followed by the words "without being limited to";

      (h)    the words "shall" and "will" shall be construed as obligatory terms;

      (i)    the word "may" shall be construed as a discretionary term (and, as if followed by "but shall not be obligated to");

      (j)    all references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement or the applicable Loan Document, as the case may be;

(k)    article, section, subsection and paragraph headings and captions and any tables of contents are included solely for convenience of reference only and shall not constitute a part of this Agreement or the applicable Loan Document, as the case may be, for any other purpose;

(l)    exhibits and schedules annexed to this Agreement or the applicable Loan Document, as the case may be, are hereby incorporated into this Agreement or such Loan Document, as the case may be, as a part of this Agreement or such Loan Document, as the case may be, with the same effect as if set forth in the body of this Agreement or such Loan Document, as the case may be;

(m)    the recitals to this Agreement are incorporated into this Agreement and form a part of this Agreement and Borrower represents and warrants that, as of the date hereof, such recitals are true and correct;

(n)    a reference to a document or agreement, including this Agreement or any Loan Document, includes a reference to such document or agreement as novated, amended, amended and restated, modified, supplemented or replaced from time to time in each case pursuant to the terms of such document or agreement or of any other Loan Document;

(o)    derivatives of a word defined herein or therein, as the case may be, have a corresponding meaning;

(p)    a reference to writing includes printing, engraving, typewriting, lithography, photography and any other mode of reproducing or representing words, figures or symbols in a permanent and visible form;

(q)    a reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification, replacement or re-enactment thereof, any legislative provision substituted therefor, and all regulations, rules, rulings and statutory instruments issued thereunder or pursuant thereto;

(r)    a reference to "Dollars" and "$" refers to amounts in United States currency;

(s)    a reference to a party to this Agreement, any Loan Document or another agreement or document includes such party's executors, administrators, successors and permitted assigns (provided that the foregoing shall not be deemed to permit any Transfer of any ownership interest that is otherwise prohibited hereunder);

(t)    if a provision binds two or more parties that provision binds those parties jointly and severally;

(u)    if a party comprises two or more Persons, the provisions of this Agreement or the applicable Loan Document, as the case may be, binding that party bind those Persons jointly and severally;

(v)    except as otherwise provided herein, if a payment obligation comes due on a day which is not a Business Day, payment shall be due on the immediately succeeding Business Day;

(w)    attorneys', consultants' and experts' fees shall include customary disbursements and related charges of the professional involved;

(x)    "Approval", "approved", "approval" or "approved" shall mean, as the context so determines, an approval in writing given to the party seeking approval after full disclosure to the party giving approval of all material facts necessary in order to determine whether approval should be granted. Approvals by Agent or any Lender may be granted or withheld in the absolute and sole discretion of Agent or such Lender unless this Agreement or any Loan Document expressly provides otherwise. Similarly, where a matter is stated to be in Agent's or any Lender's opinion, in Agent's or any Lender's judgment, acceptable to Agent or any Lender, satisfactory to Agent or any Lender, required by Agent or any Lender, determined by Agent or any Lender or subject to Agent's or any Lender's consent or like phrases, unless this Agreement or any Loan Document expressly provides otherwise, such terms shall be construed to mean in Agent's or such Lender's sole opinion, in Agent's or such Lender's sole judgment, acceptable to Agent or such Lender in its sole discretion, satisfactory to Agent or such Lender in its sole discretion, required by Agent or such Lender in its sole discretion, determined by Agent or such Lender in its sole discretion, and subject to Agent's or such Lender's consent in its sole discretion;

(y)    whenever a consent, approval, request or like act may not be unreasonably withheld, it shall also not be unreasonably delayed or conditioned;

(z)    the principle of construing this Agreement or any other Loan Document against the party that drafted the same (i.e., the principle of contra proferentum) is expressly excluded; and

(aa)    whenever Borrower is permitted, without Agent's approval or consent, to make any amendments or modifications or sets of amendments or modifications in the aggregate to any document that are "reasonable and nonmaterial", Borrower shall have the burden of establishing that such standard has been satisfied.

ARTICLE II
GENERAL

2.1    The Loan.

2.1.1    Commitment; Termination of Commitments. Subject to and upon the terms and conditions set forth herein, each Lender hereby severally agrees to make the Loan to Borrower in accordance with the amount of its Commitment. The aggregate amount of the Loan shall not exceed the Loan Amount. The Loan shall mature on the Maturity Date. Borrower hereby agrees to accept the Loan, subject to and upon the terms and conditions set forth herein and in the other Loan Documents. If Borrower has not satisfied the conditions precedent to the Initial Advance on or prior to November 30, 2006, time being of the essence with respect to such date, at Agent's election, the Commitments and the Loan Documents shall be terminated and, except for any obligations or liability that expressly survive the termination of the Loan Documents, the parties shall have no further obligations or liability under the Loan Documents.

2.1.2    Use of Proceeds; Approved Construction Budget. The proceeds of Advances and Mezzanine Loan Advances shall only be used by Borrower to pay, or to reimburse Borrower for, the Approved Construction Costs actually incurred in connection with the construction of the Improvements. The Approved Construction Budget reflects, by category and line items, the purposes and the amounts for which funds to be advanced by Lenders to Borrower under this Agreement and by the Mezzanine Lender under the Mezzanine Loan Agreement are to be used. Subject to **Sections 7.2, 7.3** and **7.4**, Lenders shall not be required to disburse for any category or line item more than the amount specified therefor in the Approved Construction Budget. Any fees or payments to be made pursuant to the Affiliate Contracts

shall only be disbursed hereunder at such times provided under and otherwise in accordance with said Affiliate Contracts (but in no event shall such payments exceed from time to time the amount allocated therefor in the Approved Construction Budget).

2.1.3    Amount of Advances. In no event shall any Advance and any Mezzanine Loan Advance, in the aggregate, in respect of the Project exceed an amount equal to the full amount of Construction Costs (without reduction for any retainage permitted under any applicable Trade Contractor agreement) incurred by Borrower through the date of the Draw Request for such Advance and such Mezzanine Loan Advance minus the applicable Retainage for each contract and subcontract and minus the full amount of Construction Costs theretofore paid. It is further understood that the Retainage described above is intended to provide a contingency fund protecting Lenders against the failure of Borrower or another Borrower Party to fulfill any obligations under the Loan Documents and that Agent may charge amounts against such Retainage in the event Agent or Lenders are required or elect to expend funds to cure any Default or Event of Default.

2.1.4    No Re-advances. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.5    The Notes. The Loan shall be evidenced by the Notes. Except as otherwise provided in **Section 2.2.3**, the Notes shall bear interest at the Applicable Interest Rate to and including the date upon which the Debt is required pursuant to the Loan Documents to be paid in full and thereafter at the Default Rate until the Debt is repaid in full, whether before or after judgment. The Notes shall be subject to repayment as provided in **Section 2.3**, shall be entitled to the benefits of this Agreement and shall be secured by the Deed of Trust and by certain of the other Loan Documents.

2.2    Interest; Breakage Costs; Increased Costs; Late Payment; Illegality.

2.2.1    Generally. Except as otherwise provided in **Section 2.2.3**, interest on the Loan and the Notes shall accrue at the Applicable Interest Rate and shall be calculated on the basis of a year of 360 days for the actual number of days elapsed in the applicable Interest Period, provided that the first day of the Interest Period shall be included and, if the interest is timely paid, the last day of said Interest Period shall be excluded. Except as set forth in **Section 2.3.5**, if an Advance is repaid on the same day on which it is made, one (1) day's interest shall be paid on such Advance as well as all Breakage Costs. Any change in the Prime Rate or the Federal Funds Rate shall be automatically effective as of the day on which such change in rate occurs.

2.2.2    Determination of Interest Rate. (a) The rate or rates at which the outstanding principal amount of the Loan bears interest from time to time shall be referred to as the "**Applicable Interest Rate**", including, where applicable, the Default Rate. Subject to the terms and conditions of this **Section 2.2.2** and, without limiting the provisions of **Section 2.2.3**, Borrower shall pay interest on the outstanding principal amount of the Loan at the Applicable Interest Rate for the applicable Interest Period. Each determination by Agent of the Applicable Interest Rate shall be conclusive and binding for all purposes, absent manifest error. The Applicable Interest Rate with respect to any portion of the Loan shall be:

(i)    Base Rate. During the periods, if any, during which this Agreement provides that any portion of the Loan shall bear interest as a Base Rate Loan Tranche, a rate per annum equal at all times to the Adjusted Base Rate, payable monthly in arrears on each Interest Payment Date.

(ii)    LIBO Rate. Except as specified herein to the contrary, the Loan shall bear interest as a LIBOR Loan Tranche at a rate per annum equal at all times during each Interest

Period to the Adjusted LIBO Rate for such Interest Period, payable monthly in arrears on each Interest Payment Date.

(b)    (i)    Each Rate Request shall specify the portion of the Loan to be designated as a Base Rate Loan Tranche or a LIBOR Loan Tranche and, if applicable, the Interest Period applicable thereto.  Borrower may elect pursuant to a Rate Request to convert all or any portion of an outstanding Base Rate Loan Tranche to a LIBOR Loan Tranche, provided that no Base Rate Loan Tranche may be converted into a LIBOR Loan Tranche: (A) when any Event of Default has occurred under the Loan Documents and is continuing and Agent has determined that such a conversion is not appropriate or (B) after the date which is one month prior to the Maturity Date.  Borrower may elect pursuant to a Rate Request to convert all or any portion of the outstanding LIBOR Loan Tranches to a Base Rate Loan Tranche.  Any LIBOR Loan Tranche may be continued upon the expiration date of its then current Interest Period by Borrower pursuant to a Rate Request, provided that no LIBOR Loan Tranche may be continued: (1) when any Event of Default has occurred and is continuing and Agent has determined that such a continuation is not appropriate or (2) after the date that is one month prior to the Maturity Date.  If Borrower fails to submit a Rate Request to Agent in accordance with the provisions of this **Section 2.2.2(b)**, Agent shall continue the LIBOR Loan Tranche as a one month LIBOR Loan Tranche.  All borrowings and continuations of the Loan and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Loan comprising each LIBOR Loan Tranche shall be at least equal to $1,000,000 or such lesser amount as Agent may approve in its discretion.  No more than five (5) LIBOR Loan Tranches and one (1) Base Rate Tranche in the aggregate may be outstanding at any time under this Agreement or the Notes.  Each Rate Request shall be irrevocable and binding on Borrower.

(ii)    Borrower shall pay directly to a Lender, immediately upon request and notwithstanding contrary provisions contained in the Loan Documents, such amounts as shall, in the judgment of such Lender (which judgment shall be conclusive absent manifest error), compensate it for any Loss incurred by such Lender and/or any Person Controlling such Lender as a result of or arising from (A) any payment or prepayment (under any circumstances whatsoever, whether voluntary or involuntary) of any portion of the Loan bearing interest as a LIBOR Loan Tranche on a date other than the last day of an applicable Interest Period, (B) the conversion (for any reason whatsoever, whether voluntary or involuntary) of a LIBOR Loan Tranche to a Base Rate Loan Tranche with respect to any portion of the Loan then bearing interest as a LIBOR Loan Tranche on a date other than the last day of an applicable Interest Period, (C) the failure of all or a portion of an Advance of the Loan which was to have borne interest as a LIBOR Loan Tranche pursuant to a Rate Request to be made, (D) the failure of Borrower to borrow in accordance with a Rate Request submitted by it or Borrower's failure to continue or convert a LIBOR Loan Tranche in accordance with a Rate Request submitted by it, (E) the failure of Borrower to make a prepayment after Borrower has given irrevocable notice thereof in accordance with this Agreement or (F) the reemployment of funds obtained, from fees payable to terminate the deposits from which such funds were obtained or from which such funds were obtained or from terminating or reversing any swap or other interest rate hedging arrangements.  Such amounts shall include an amount equal to the excess, if any, of (1) the amount of interest which would have accrued at the Adjusted LIBO Rate on the amount so prepaid, converted, not advanced, not borrowed, not continued, not converted or not prepaid, as the case may be, for the period from the date of the occurrence to the last day of the applicable Interest Period at the Applicable Interest Rate for such Loans provided for herein (excluding, however, the applicable margin included therein, if any) over (2) the amount of interest (as reasonably determined by such Lender) which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  The provisions of this Section shall survive the repayment of the Debt and the termination of this Agreement (all amounts payable by Borrower pursuant to this **Section 2.2.2(b)(ii)** are herein referred to as **"Breakage Costs"**).

(c)    If as a result of any Regulatory Change or RBC Change:

(i)    the basis of taxation of payments to any Lender of the principal of or interest on the Loan is changed; or

(ii)    any reserve, special deposit or similar requirements (other than such requirements as are taken into account in determining the LIBO Rate) relating to any extensions of credit or other assets of, or any deposits with or other liabilities of any Lender is imposed, modified or deemed applicable to any Lender; or

(iii)    any other condition affecting the Loan is imposed on any Lender and such Lender reasonably determines that, by reason thereof, the cost to such Lender of making or maintaining the Loan is increased or its rate of return is reduced, or any amount receivable by such Lender hereunder in respect of any portion of the Loan is reduced, in each case by an amount deemed by such Lender to be material (such increases in cost, reductions in amounts receivable and other matters and conditions referred to in **clauses (i)**, **(ii)** and **(iii)** being herein referred to as "**Increased Costs**"),

then Borrower agrees that (except with respect to Taxes, U.S. Taxes and Other Taxes as covered hereinafter in this **Section 2.2.2** and except with respect to the imposition of, or any change in the rate of any Excluded Tax payable by any Lender) it will pay to such Lender upon that Lender's or Agent's request such additional amount or amounts as will compensate such Lender for such Increased Costs. Agent on behalf of Lenders will notify Borrower of any event occurring after the date hereof which will entitle any Lender to compensation pursuant to this **Section 2.2.2(c)** after it obtains knowledge thereof and such Lender notifies Agent that is has determined to request such compensation hereunder.  If any Lender requests compensation under this **Section 2.2.2(c)**, Borrower may, by notice to Agent or such Lender, require that, and Agent and such Lender, as applicable, shall (A) furnish to Borrower a statement setting forth the basis for requesting such compensation and the method for determining the amount thereof, (B) upon payment by Borrower of the Increased Costs incurred to the date of such conversion, convert the interest rate on the Loan from the Adjusted LIBO Rate to the Adjusted Base Rate and/or (C) designate a different lending office to maintain its portion of the Loan if such different designation would avoid, or reduce the amount of, Increased Costs, provided that such designation does not in any manner limit or reduce the rights of such Lender hereunder or under any of the other Loan Documents and is not otherwise disadvantageous to such Lender in its sole discretion, and provided further that no Lender shall have any obligation to designate an applicable lending office in the United States.  As used in this **Section 2.2.2(c)**, the term "Lender" shall mean "Lender or any Person Controlling Lender".  "**RBC Change**" shall mean (1) any change after the date of this Agreement in the Risk-Based Capital Guidelines or (2) adoption of or change in any Law or Regulation after the date of this Agreement which affects the amount of capital required or expected to be maintained by any Lender or any lending office or any Person Controlling any Lender.  "**Risk-Based Capital Guidelines**" shall mean (x) the risk-based capital guidelines in effect in the United States on the date of this Agreement, including transition rules and (y) the corresponding capital regulations promulgated by regulatory authorities outside the United States implementing the July 1988 report of the Basle Committee on Banking Regulation and Supervisory Practices entitled "International Convergence of Capital Measurements and Capital Standards," including transition rules, and any amendments to such regulations adopted prior to the date of this Agreement.

(d)    Without limiting the effect of **Section 2.2.2(c)**, in the event that (i) by reason of any Regulatory Change, any Lender incurs Increased Costs based on or measured by the excess above a specified level of the amount of a category of deposits or other liabilities of such Lender, which includes deposits by reference to which the LIBO Rate is determined, (ii) Agent shall have determined that U.S. dollar deposits in the principal amount of the Loan are not generally available in the London interbank

market or (iii) Agent shall have determined that reasonable means do not exist for ascertaining the LIBO Rate, then, if Agent or such Lender so elects by notice to Borrower, the interest rate applicable to the then outstanding principal balance of the Loan comprising each LIBOR Loan Tranche shall be converted to the Adjusted Base Rate. As used in this **Section 2.2.2(d)**, the term "Lender" shall mean "Lender or any Person Controlling Lender". If subsequent to the conversion of the interest rate to the Adjusted Base Rate, such event which caused such conversion shall cease to exist, Agent shall notify Borrower of same and Borrower shall again have the right to make Rate Requests in accordance with **Section 2.2.2(b)**.

(e)     In addition, Borrower agrees to pay all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto and any present or future stamp or documentary taxes, state or local taxes, excise or property taxes, charges or similar levies which arise from any payment made hereunder, or from the execution, delivery, recording or registration of, or otherwise with respect to, this Agreement, the other Loan Documents or the Loan (collectively, "**Other Taxes**"). Other Taxes shall not include Excluded Taxes.

(f)     Borrower shall indemnify each Lender and Agent for the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed by any Governmental Authority on amounts payable under this **Section 2.2.2**) paid by such Lender or Agent (as the case may be) and any Loss arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. Payment under this indemnification shall be made within fifteen (15) days after the date such Lender or Agent (as the case may be) makes written demand therefor.

(g)     If Borrower is required by Law or Regulation to withhold or deduct any amount from any payment hereunder in respect of any U.S. Tax, Borrower shall withhold or deduct the appropriate amount, remit such amount to the appropriate Governmental Authority and pay to each Person to whom there has been an Assignment or Participation of the Loan and who is not a U.S. Person such additional amounts as are necessary in order that the net payment of any amount due to such non-U.S. Person hereunder after deduction for or withholding in respect of any U.S. Tax imposed with respect to such payment (or in lieu thereof, payment of such U.S. Tax by such non-U.S. Person), will not be less than the amount stated herein to be then due and payable, provided that the foregoing obligation to pay such additional amounts shall not apply:

(i)     subject to **Section 2.2.2(j)**, to any payment to any Person unless such Person (or if such Person is not the beneficial owner of the relevant Loan, such beneficial owner) has contemporaneously with its becoming a party to an Assignment or Participation, complied with its obligations under **Section 2.2.2(i)**;

(ii)     to any U.S. Taxes imposed solely by reason of the failure by such Person (or, if such Person is not the beneficial owner of the relevant Loan, such beneficial owner) to comply with applicable certification, information, documentation or other reporting requirements concerning the nationality, residence, identity or connections with the United States of such Person (or beneficial owner, as the case may be) if such compliance is required by Law or Regulation of the United States as a precondition to relief or exemption from such U.S. Taxes unless such Person is legally unable to do so as a result of a Regulatory Change;

(iii)     with respect to any Person who is a fiduciary or partnership or other than the sole beneficial owner of such payment, to any U.S. Tax imposed with respect to payments made under any Notes to a fiduciary or partnership to the extent that the beneficial owner or member of the partnership would not have been entitled to the additional amounts if such beneficial owner or member of the partnership had been the holder of the Notes; or

(iv)    subject to **Section 2.2.2(j)**, to any U.S. Tax imposed as a result of any act or omission by a Person that is a holder or beneficial owner of the Notes that would cause the Person to be unable to comply with **Section 2.2.2(i)**.

(h)    Within thirty (30) days after paying any amount from which it is required by Law or Regulation to make any deduction or withholding, and within thirty (30) days after it is required by Law or Regulation to remit such deduction or withholding to any relevant taxing or other Governmental Authority, Borrower shall deliver to such non-U.S. Person satisfactory evidence of such deduction, withholding or payment (as the case may be).

(i)    Each Lender organized under the Laws or Regulations of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each initial Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by Borrower (but only so long thereafter as such Lender remains lawfully able to do so), provide each of Agent and Borrower with two (2) original Internal Revenue Service Forms W-8BEN or W-8EC1, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or the Notes or any other Loan Document. If the forms provided by a Lender at the time such Lender first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from obligations of Borrower to make payment to a Lender pursuant to **Section 2.2.2(g)** unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from any obligation of Borrower to make payment to a Lender pursuant to **Section 2.2.2(g)** for periods governed by such forms. If any form or document referred to in this **Section 2.2.2(i)** requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8EC1, that the applicable Lender reasonably considers to be confidential, such Lender shall give notice thereof to Borrower and shall not be obligated to include in such form or document such confidential information.

(j)    For any period with respect to which a Lender has failed to provide Borrower with the appropriate form, certificate or other document described in **Section 2.2.2(i)** (other than if such failure is due to a change in Law or Regulation, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under **Section 2.2.2(i)**), such Lender shall not be entitled to the benefits under **Section 2.2.2(f)** with respect to Taxes and Other Taxes and **Section 2.2.2(g)** with respect to U.S. Taxes imposed by the United States by reason of such failure; provided, however, that should a Lender become subject to U.S. Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrower Parties shall take such steps as such Lender shall reasonably request to assist such Lender to recover such U.S. Taxes from the appropriate Governmental Authority.

(k)    Any Lender claiming any additional amounts payable pursuant to **Sections 2.2.2(f), (g), (i)** or **(j)** agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different lending office for funding or booking its Commitment hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Section 2.2.2** (other than **Section 2.2.2(b)(ii)**) in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in

connection with any such designation or assignment provided such Lender has provided notice and an estimate thereof to Borrower prior to such designation or assignment. In addition, in the event that any Lender claims any additional amounts payable pursuant to **Sections 2.2.2(f), (g), (i) or (j)**, Borrower shall have the right, so long as no Default or Event of Default has occurred and is continuing, upon written notice to such Lender and Agent, to cause such Lender to assign its interest in the Loan and its Commitment in full to an Eligible Assignee which is reasonably satisfactory to Agent (the "**Substitute Lender**"). In the event Borrower shall exercise its right to cause such Lender to assign its interest in the Loan and its Commitment in full to an Eligible Assignee, the Substitute Lender shall purchase the interests of such Lender in the Loan and its Commitment at par (plus accrued interest, fees and other expenses to the extent payable under the Loan Documents) or, such other lesser amount as may be agreed to by the Substitute Lender and such Lender; and, upon execution by the Substitute Lender of an Assignment and Acceptance and the tender by it to such Lender of the aforementioned purchase price, the Substitute Lender shall assume the obligations of such Lender hereunder and under the other Loan Documents from and after the effective date of such Assignment and Acceptance. Borrower shall pay the processing fee or other fee in connection with such assignment. Upon consummation of such assignment, the Substitute Lender shall become party to this Agreement as a signatory hereto and shall have all the rights and obligations of such Lender under this Agreement and the other Loan Documents, such Lender shall be released from its obligations hereunder and under the other Loan Documents (from and after the effective date of such assignment), and no further consent or action by any party shall be required. Upon the consummation of such assignment, Borrower, Agent and such Lender shall make appropriate arrangements so that a new Note is issued to the Substitute Lender payable in the maximum principal amount of the Substitute Lender's Commitment; and, the Lender assigning its interests in the Loan shall cancel its Note and return it to Borrower. Borrower shall sign such documents and take such other actions reasonably requested by the Substitute Lender to enable it to share in the benefits of the rights created by the Loan Documents. Any Lender that is replaced pursuant to this subsection agrees that it shall execute an Assignment and Acceptance with the Substitute Lender. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment cease to apply.

(l)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this **Section 2.2.2** shall survive the payment in full of the Debt, and the termination of this Agreement and the other Loan Documents.

(m)     If the Agent or a Lender determines, in its sole discretion, that it has received a refund of any taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Agreement, it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Agreement with respect to the taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), underlined provided that Borrower, upon the request of the Agent or such Lender, agrees to repay the amount paid over to Borrower (plus any penalties or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender in the event the Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other Person.

2.2.3    Default Rate. If an Event of Default shall have occurred and be continuing (including the failure of Borrower to make a payment of principal or interest on the Payment Date therefor), Borrower shall pay interest at the Default Rate on the Debt (which interest at the Default Rate shall be payable both before and after any Lender has obtained a judgment with respect to the Loan). Payment or acceptance of the Default Rate is not a permitted alternative to timely payment or full