performance by Borrower, shall not constitute a waiver of any Default or Event of Default or an amendment to this Agreement or any other Loan Document and shall not otherwise prejudice or limit any rights or remedies of Agent or any Lender.

2.2.4    Late Payment Premium.  Borrower shall pay to Agent for the account of Lenders a late payment premium in the amount of five percent (5%) of (i) the principal balance of the Debt if not paid when due (whether at the stated maturity, by acceleration or otherwise) and (ii) any other portion of the Debt made more than five (5) calendar days after the due date thereof, which late payment premium shall in all cases be due with any such late payment. The acceptance of a late payment premium shall not constitute a waiver of any Default or Event of Default then existing or thereafter arising. Further, Agent's failure to collect a late payment premium at any time shall not constitute a waiver of Agent's right to thereafter, at any time and from time to time (including upon acceleration of the Notes or upon payment in full of the Debt), to collect such previously uncollected late payment premiums or to collect subsequently accruing late payment premiums.

2.2.5    Illegality.  Notwithstanding any other provision of this Agreement, if a Lender, in its sole discretion, decides that the introduction of, any amendment of or any change in the interpretation of, any Law or Regulation makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to perform its obligations or agreements under any Loan Document to fund or maintain LIBOR Loan Tranches:  (a) the obligation of such Lender to make, or to convert any portion of the Loan into, LIBOR Loan Tranches shall be suspended until such Lender shall notify Borrower that the circumstances causing such suspension no longer exist and (b) Borrower shall forthwith prepay in full all LIBOR Loan Tranches then outstanding, together with interest accrued thereon and any Breakage Costs payable, unless Borrower, within five (5) Business Days of notice from Lender, converts all LIBOR Loan Tranches then outstanding into Base Rate Loan Tranches in accordance with **Section 2.2.2**.

2.3    Loan Payment.

2.3.1    Monthly Debt Service Payments.  From and after the Initial Advance, and on each and every Interest Payment Date thereafter until the Debt has been paid in full, Borrower shall, subject to **Section 2.2.3**, pay interest in arrears at the Applicable Interest Rate on the outstanding principal balance of the Loan as computed in accordance with **Section 2.2.2** (the "**Monthly Debt Service Payment Amount**").

2.3.2    Payment on Maturity Date.  The Loan shall mature on the Maturity Date and Borrower shall repay the Debt in full on the Maturity Date.

2.3.3    Making of Payments.  Each payment by Borrower hereunder or under the Notes or other Loan Documents shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to the payee thereof by 1:00 P.M. (New York City time) on the date such payment is due and shall be made in lawful money of the United States by wire transfer in federal or other immediately available funds. Payments of interest, principal and other amounts under the Loan Documents shall be made to Agent's account on behalf of the applicable Lenders (subject to **Sections 2.7** and **2.8**) pursuant to the wiring instructions provided by Agent to Borrower from time to time; until further notice to Borrower to the contrary such wiring instructions shall be as follows:

Deutsche Bank Trust Company Americas
New York, New York
ABA Number: 021-001-033
Commercial Loan Division
Account Number: 99-401-268

Attn: Deirdre Wall (201) 593-2170
Re: Turnberry/Centra Sub, LLC

Any funds received by Agent after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Except as otherwise provided herein, whenever any payment under the Loan Documents shall be stated to be due on a day which is not a Business Day, such payment shall be made on the immediately succeeding Business Day. Concurrently with making any payment to a Lender hereunder, Borrower shall provide Agent with a notice of such payment.

    2.3.4    <u>Application of Payments</u>. Payments made by Borrower in respect of the principal and interest of the Loan shall be applied first to the payment of interest at the Applicable Interest Rate, second to other sums due and outstanding under the Loan Documents and third, the remainder of such payment, to the reduction of the outstanding principal balance of the Debt, <u>provided</u> that following the occurrence and during the continuance of an Event of Default, Agent may apply any payments received to the Debt in such order, manner and amount as Agent in its sole discretion shall determine and Agent may exercise any rights and remedies available under this Agreement, the other Loan Documents, at law and in equity.

    2.3.5    <u>No Setoffs</u>. The Debt shall be payable without setoff, counterclaim or any other deduction whatsoever.

    2.3.6    <u>Loan Account</u>. Agent shall maintain a loan account on its books in the name of Borrower in which will be recorded the Loan and all payments and prepayments of principal of and interest on the Loan (<u>provided</u> that any error in such loan account shall not in any manner affect the obligations of Borrower to repay the Debt in accordance with the terms of the Loan Documents, and Lenders and Borrower acknowledge that Agent's ability to maintain such loan account shall be dependent on, among other things, Borrower's accurate reporting of payments made in accordance herewith and Lenders' objection to any inaccuracies therein).

    2.4    <u>Prepayment</u>.

    2.4.1    <u>Permitted Prepayment</u>. Subject to the terms and conditions set forth in this **Section 2.4.1**, Borrower may prepay the Loan in whole or in part (a "**Prepayment**"), <u>provided</u> that Borrower gives an irrevocable written notice (the "**Prepayment Notice**") to Agent not less than ten (10) Business Days prior to the date on which such Prepayment is to be made (the "**Prepayment Date**") specifying (a) the date and amount of the Prepayment, (b) whether the Prepayment is of a Base Rate Loan Tranche or a LIBOR Loan Tranche, or a combination thereof, and, if a combination thereof, the amount allocable to each and (c) in the case of the Prepayment of a LIBOR Loan Tranche, the expiration date of the applicable Interest Period. Agent shall provide each Lender with written notice of such Prepayment within two (2) Business Days of receiving the Prepayment Notice from Borrower. A Prepayment of all or any portion of the Loan may be made in accordance with this **Section 2.4.1**; <u>provided</u> that: (i) the principal amount prepaid is not less than $1,000,000 and (ii) on the Prepayment Date, Borrower shall pay to Agent (A) the amount of the prepayment specified in the Prepayment Notice, all accrued and unpaid interest on the principal amount being prepaid and all other sums then due and payable under all Loan Documents (including any Breakage Costs, if applicable), (B) one percent (1%) of the amount of the Loan being prepaid if such Prepayment occurs between the first Payment Date through and including the twelfth Payment Date (it being understood that no prepayment fee shall be payable after the twelfth Payment Date), (C) all costs and expenses of Agent incurred in connection with the Prepayment, including reasonable attorneys' fees and disbursements and (D) interest on the amount of the Debt being prepaid at the Applicable Interest Rate to the next succeeding Interest Payment Date to the extent that any Prepayment is made on a Prepayment Date that is not also an Interest Payment Date. Agent shall not be

obligated to accept any Prepayment unless all of the foregoing conditions are satisfied. This **Section 2.4.1** shall not apply to the application of insurance or condemnation proceeds to the repayment of the Loan in accordance with **Article X**.

2.4.2    Repayment upon Default. If all or any part of the principal amount of the Loan is prepaid after acceleration of the Loan following the occurrence of an Event of Default, Borrower shall be obligated to pay all amounts that would be payable in connection with a Prepayment under **Section 2.4.1**, including all accrued and unpaid interest on the principal balance of the Notes to the date of repayment (including interest owed at the Default Rate), all other sums then due under the Loan Documents (including any Breakage Costs, if applicable) and all Loss of Agent and any Lender incurred in connection with such Event of Default, including reasonable attorneys' fees and disbursements.

2.5    Extension of Initial Maturity Date. (a)  Subject to the provisions of this **Section 2.5(a)** and **Section 2.5(d)**, Borrower may, by irrevocable written notice (the "**First Extension Notice**") delivered to Agent not earlier than the date that is ninety (90) days nor later than thirty (30) days prior to the Initial Maturity Date, extend the Maturity Date to the date that is six (6) calendar months after the Initial Maturity Date ("**First Extension Maturity Date**"). Borrower's right to extend the Maturity Date pursuant to this **Section 2.5(a)** shall be subject to the satisfaction of each of the following conditions precedent as of the delivery of the First Extension Notice and as of the Initial Maturity Date:

(i)    no Default or Event of Default shall have occurred and be continuing;

(ii)    Borrower shall have delivered to Agent together with the First Extension Notice an Officer's Certificate which shall be deemed remade as of the Initial Maturity Date, representing and warranting to Agent and Lenders that (A) the Loan Documents are in full force and effect, (B) the Loan Documents constitute the valid and binding obligations of Borrower and the other Borrower Parties enforceable in accordance with their terms, (C) Borrower and the other Borrower Parties do not have any offsets, counterclaims or defenses with respect to the payment of the Debt or to the Loan Documents or to their respective obligations and liabilities under the Loan Documents, (D) all of the representations and warranties contained in the Loan Documents, or otherwise made with respect to the Loan, remain true and correct in all material respects, (E) there exists no Event of Default under any Loan Document and, to Borrower's knowledge, there exists no Default under any Loan Document, (F) Substantial Completion has occurred, (G) Borrower has entered into Leases in accordance with the terms of this Agreement (including those Leases entered into prior to the date of the Initial Advance) for no less than eighty-five percent (85%) of the Project and (H) the Project is open for business, and such Officer's Certificate shall be accompanied by (x) in respect of the representations and warranties contained in **clauses (F)** through **(H)** above, a Rent Roll and such other supporting documentation and information satisfactory to Agent and (y) such other documentation or information as Agent or its counsel may reasonably request with respect to the representations and warranties contained in such Officer's Certificate, in each case in form and substance satisfactory to Agent;

(iii)    On or prior to the Initial Maturity Date, Borrower and the Counterparty shall either enter into (A) an extension or renewal of the existing Interest Rate Protection Agreement acceptable to Agent extending or renewing the term of the Interest Rate Protection Agreement to the Extension Maturity Date or (B) a new Interest Rate Protection Agreement acceptable to Agent for a term commencing on the Initial Maturity Date through the Extension Maturity Date, together with any other agreements reasonably deemed necessary by Agent to assign the benefits of the Interest Rate Protection Agreement to Agent (including a Collateral Assignment of Interest Rate Agreement and a Counterparty Consent, each substantially in the form as those delivered on

the Closing Date), and the provisions of **Section 5.1(n)** shall apply to such Interest Rate Protection Agreement;

(iv)    there shall not have occurred any change, event or condition which constitutes a Material Adverse Effect;

(v)    the Borrower Parties shall have delivered to Agent a confirmation and ratification of the Loan Documents to which they are party, each in form and substance acceptable to Agent;

(vi)    to the extent not previously established and funded pursuant to **Article IX**, Borrower shall have established and funded the Debt Service Account and the Operating Expense Account, in each case in an amount determined by Agent in its reasonable discretion and otherwise in accordance with **Article IX** hereof to cover the interest payments on the Loan and Operating Expense shortfalls during the six (6)-month extension period;

(vii)    there shall not be a Shortfall under **Section 7.5**;

(viii)    the Borrower Parties shall have paid to Agent, on or prior to the Initial Maturity Date, the Extension Fee; and

(ix)    Parent shall have (x) been entitled to extend the Initial Maturity Date (as defined in the Mezzanine Loan Agreement) pursuant to Section 2.5(a) of the Mezzanine Loan Agreement and (y) paid any extension fee required to be paid pursuant to the terms of the Mezzanine Loan Documents.

(b)    Subject to the provisions of this **Section 2.5(b)** and **Section 2.5(d)**, Borrower may, by irrevocable written notice (the "**Second Extension Notice**") delivered to Agent not earlier than sixty (60) days nor later than thirty (30) days prior to the First Extension Maturity Date, extend the Maturity Date to the date that is six (6) calendar months after the First Extension Maturity Date. Borrower's right to extend the Maturity Date pursuant to this **Section 2.5(b)** shall be subject to the satisfaction of each of the following conditions precedent as of the delivery of the Second Extension Notice and as of the First Extension Maturity Date:

(i)    no Default or Event of Default shall have occurred and be continuing;

(ii)    Borrower shall have delivered to Agent together with the Second Extension Notice an Officer's Certificate which shall be deemed remade as of the First Extension Maturity Date, representing and warranting to Agent and Lenders that (A) the Loan Documents are in full force and effect, (B) the Loan Documents constitute the valid and binding obligations of Borrower and the other Borrower Parties enforceable in accordance with their terms, (C) Borrower and the other Borrower Parties do not have any offsets, counterclaims or defenses with respect to the payment of the Debt or to the Loan Documents or to their respective obligations and liabilities under the Loan Documents, (D) all of the representations and warranties contained in the Loan Documents, or otherwise made with respect to the Loan, remain true and correct in all material respects and (E) there exists no Event of Default under any Loan Document and, to Borrower's knowledge, there exists no Default under any Loan Document, and such Officer's Certificate shall be accompanied by such other documentation or information as Agent or its counsel may reasonably request with respect to the representations and warranties contained in such Officer's Certificate, in each case in form and substance satisfactory to Agent;

(iii)     On or prior to the First Extension Maturity Date, Borrower and the Counterparty shall either enter into (A) an extension or renewal of the existing Interest Rate Protection Agreement acceptable to Agent extending or renewing the term of the Interest Rate Protection Agreement to the Second Extension Maturity Date or (B) a new Interest Rate Protection Agreement acceptable to Agent for a term commencing on the First Extension Maturity Date through the Second Extension Maturity Date, together with any other agreements reasonably deemed necessary by Agent to assign the benefits of the Interest Rate Protection Agreement to Agent (including a Collateral Assignment of Interest Rate Agreement and a Counterparty Consent, each substantially in the form as those delivered on the Closing Date), and the provisions of **Section 5.1(n)** shall apply to such Interest Rate Protection Agreement;

(iv)     there shall not have occurred any change, event or condition which constitutes a Material Adverse Effect;

(v)     the Borrower Parties shall have delivered to Agent a confirmation and ratification of the Loan Documents to which they are party, each in form and substance acceptable to Agent;

(vi)     Borrower shall have funded the Debt Service Account and the Operating Expense Account, in each case in an amount determined by Agent in its reasonable discretion and otherwise in accordance with **Article IX** hereof to cover the interest payments on the Loan and Operating Expense shortfalls during the six (6)-month extension period;

(vii)     there shall not be a Shortfall under **Section 7.5**;

(viii)     the Borrower Parties shall have paid to Agent, on or prior to the First Extension Maturity Date, the Extension Fee; and

(ix)     Parent shall have (x) been entitled to extend the First Extension Maturity Date (as such term is defined in the Mezzanine Loan Agreement) pursuant to Section 2.5(b) of the Mezzanine Loan Agreement and (y) paid any extension fee required to be paid under the terms of the Mezzanine Loan Documents.

(c)     As soon as practicable following an extension of the Maturity Date pursuant to **Section 2.5(a)** or **2.5(b)**, the Borrower Parties and Agent shall (if requested by Agent) execute and deliver such amendments and modifications to the Loan Documents as may be necessary or appropriate to evidence the modifications of the terms of the Advances provided in this **Section 2.5**, provided that no failure by the Borrower Parties or Agent to enter into any such amendments shall affect the rights or obligations of the Borrower Parties, Agent or Lenders with respect to the Loan.

(d)     Notwithstanding anything contained herein or in any other Loan Document to the contrary, Borrower may only exercise its option to extend the Maturity Date pursuant to Sections 2.5(a) and 2.5(b), as applicable, to the extent Parent simultaneously exercises the corresponding option to extend the Maturity Date (as such term is defined in the Mezzanine Loan Agreement) under the Mezzanine Loan Agreement.

2.6     Method of Disbursement of Loan Amount. Each Lender severally but not jointly agrees to make its ratable share of Advances in accordance with each Approved Construction Budget and subject to the following procedures:

2.6.1     Draw Request to Be Submitted to Agent and the Construction Consultant.

(a)    Borrower shall submit to Agent and the Construction Consultant documentation (substantially in the forms attached hereto as **Exhibits L, M, O, G-1 and G-2**) (such items collectively referred to as a **"Draw Request"**) not less than ten (10) Business Days prior to the date upon which a disbursement of the Loan is requested (the **"Borrowing Date"**) and no more frequently than once in each calendar month (it being agreed that it is the intention of the parties hereto for disbursements of the Loan to occur on the twenty-fifth (25th) day of the applicable calendar month; accordingly, Borrower shall submit each Draw Request not later than the tenth (10th) day of the applicable calendar month). As part of each Draw Request, Borrower and Parent shall submit, as irrevocable notice of Borrower's intention to borrow funds under the Loan and Parent's intention to borrow funds under the Mezzanine Loan in an aggregate amount not less than $250,000 (it being agreed that such amount shall be allocated proportionately between the Loan and the Mezzanine Loan based on their respective principal amounts as adjusted to account for reallocations pursuant to **Section 5.1(l)(ii)**), a Borrower's Requisition Letter in the form set forth in **Exhibit L** (**"Borrower's Requisition Letter"**) which Borrower's Requisition Letter shall be executed by any authorized officer or authorized representative of Borrower and Parent. Each Borrower's Requisition Letter shall be accompanied by: (i) a Borrower's Requisition Spreadsheet in the form set forth in **Exhibit M**; (ii) a Borrowing Certificate in the form set forth in **Exhibit O**; (iii) a Architect Draw Certificate in the form set forth in **Exhibit G-2**; (iv) a General Contractor's Draw Certificate from each General Contractor in the form set forth in **Exhibit G-1**; (v) to the extent not previously received, duly executed contractors' affidavits and Lien waivers and releases of Lien (both equitable and legal), in a form reasonably satisfactory to Agent (provided the Title Company shall have accepted the same), from each General Contractor and all other Trade Contractors, evidencing that they have been paid in full for all Work performed and/or materials supplied to the date of the preceding Advance, except for Retainage provided for in this Agreement; (vi) at the request of Agent, current requisitions for payment from each General Contractor and all other Trade Contractors; (vii) such other information and documents as may be reasonably requested or required by the Title Company, Construction Control Agent, Agent or the Construction Consultant with respect to the Hard Costs covered by such Draw Request; and (viii) invoices, statements or such other information and documentation as Agent shall reasonably request or require with respect to any Soft Costs covered by such Draw Request. All such requests and requisitions for payment shall have been approved by Agent and, with respect to Hard Costs, recommended for payment by the Construction Consultant.

(b)    With respect to the application of the proceeds of the Mezzanine Loan, Parent shall, and shall cause Borrower to, comply with the procedures set forth in **Section 2.6.1(a)** with respect to each such request; and, Agent shall confirm to Mezzanine Lender, pursuant to the Intercreditor Agreement, that Borrower has complied with such procedures.

2.6.2    Procedure of Advances. (a) Not less than three (3) Business Days prior to the Borrowing Date, Agent shall deliver written notice to each Lender at the address specified by each Lender from time to time (or, alternatively, such notice may be given by posting the same on Intralinks or a similar electronic transmission system) which notice shall include the Borrowing Date and such Lender's ratable share of such Advance. Within seven (7) days after the Borrowing Date, Agent shall deliver to each Lender the following items to the extent not previously delivered and to the extent in Agent's possession: the items set forth in **clauses (i)** and **(iii)** of Section 2.6.1; and a copy of the "date down" endorsement provided to Agent pursuant to **Section 3.2(g)(ii)**. Lenders shall make the requested Advance on the Borrowing Date so long as all conditions to such Advance are satisfied as determined by Agent. Unless otherwise notified by Agent, each Lender may assume that all conditions to such Advance are satisfied on the Borrowing Date.

(b)    Not later than 10:30 A.M. (New York City time) on the Borrowing Date, each Lender shall make available for the account of Agent at its address referred to in **Section 12.5** or in accordance with such other instructions provided by Agent, in immediately available funds, such

Lender's ratable portion of such Advance. After Agent's receipt of such funds and, upon fulfillment of the applicable conditions in **Sections 3.1, 3.1A, 3.2** and **3.3**, as applicable, Agent will make such funds available to Borrower in accordance with the terms of this **Section 2.6**.

(c)    Unless Agent shall have received notice from a Lender prior to the date of any Advance that such Lender will not make available to Agent such Lender's ratable portion of such Advance, Agent may assume that such Lender has made such portion available to Agent on the date of such Advance in accordance with **Section 2.6.2(b)**, and Agent may, in reliance upon such assumption, make available to Borrower on such date a corresponding amount. If and to the extent that any Lender (each, a **"Defaulting Lender"**) shall not have so made such ratable portion available to Agent (individually, a **"Deficiency"**, and collectively, **"Deficiencies"**) and Agent has advanced such amount to Borrower, such Defaulting Lender agrees to repay to Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to Agent at the Default Rate. If such Defaulting Lender shall repay to Agent such corresponding amount, such amount (excluding interest) so repaid shall constitute such Defaulting Lender's ratable portion of the Advance and Borrower shall have no further obligation to repay such amount forthwith on demand as provided below, but such amount shall be treated as an Advance hereunder. Each Defaulting Lender agrees that each of Borrower and any of the other Lenders shall have the right to proceed directly against any Defaulting Lender in respect of any right or claim arising out of the default of such Defaulting Lender hereunder and, so long as no Default shall have occurred or be continuing at such time and to the fullest extent permitted by applicable law, set off and otherwise apply the obligation of Borrower to make a payment to or for the account of such Defaulting Lender against the Deficiency. If there shall be a Deficiency in respect of any Defaulting Lender, the other Lenders, or any of them, may advance all or any part of the ratable portion of an Advance that should have been made by the Defaulting Lender, and the Defaulting Lender agrees to repay, upon demand, to each Lender who has advanced a portion of the Deficiency the amount advanced on behalf of the Defaulting Lender, together with interest thereon at the Default Rate. If more than one Lender elects to advance a portion of the Deficiency, such Lenders' advances shall be made based on the relative ratable shares of the Loan of each advancing Lender or as otherwise agreed to by such Lenders. In the event that Lenders do not advance any portion of the remaining Deficiency, Agent shall notify Borrower of the amount of the Deficiency and, within thirty (30) days after Borrower's receipt of such notice, Borrower shall either: (i) so long as no Default then exists, upon written notice to such Defaulting Lender and Agent, cause such Defaulting Lender to assign its interest in the Loan and its Commitment in full to an Eligible Assignee which is reasonably satisfactory to Agent (the **"Replacement Lender"**) or (ii) pay to Agent the portion of the Deficiency then outstanding, with interest thereon at the Applicable Interest Rate. In the event Borrower shall exercise its right to cause such Defaulting Lender to assign its interest in the Loan and its Commitment in full to an Eligible Assignee, the Replacement Lender shall purchase the interests of the Defaulting Lender in the Loan and its Commitment at par (plus accrued interest, fees and other expenses to the extent payable under the Loan Documents) or, such other lesser amount as may be agreed to by the Replacement Lender and the Defaulting Lender; and, upon execution by the Replacement Lender of an Assignment and Acceptance and the tender by it to the Defaulting Lender of the aforementioned purchase price, the Replacement Lender shall assume the obligations of the Defaulting Lender hereunder and under the other Loan Documents from and after the effective date of such Assignment and Acceptance. No processing fee or other fee shall be required in connection with such assignment. Upon consummation of such assignment, the Replacement Lender shall become party to this Agreement as a signatory hereto and shall have all the rights and obligations of the Defaulting Lender under this Agreement and the other Loan Documents, the Defaulting Lender shall be released from its obligations hereunder and under the other Loan Documents (from and after the effective date of such assignment; and, for the avoidance of doubt, each of Borrower and any of the other Lenders shall have the right to proceed directly against any Defaulting Lender in respect of any right or claim arising out of the default of such Defaulting Lender hereunder), and no further consent or action by any party shall be

required. Upon the consummation of such assignment, Borrower, Agent and the Defaulting Lender shall make appropriate arrangements so that a substitute Note is issued to the Replacement Lender payable in the maximum principal amount of the Replacement Lender's Commitment. Borrower shall sign such documents and take such other actions reasonably requested by the Replacement Lender to enable it to share in the benefits of the rights created by the Loan Documents. Any Lender that becomes a Defaulting Lender agrees that, upon receipt of a notice from Borrower pursuant to this **Section 2.6.2(c)**, it shall execute an Assignment and Acceptance with the Replacement Lender. The Defaulting Lender shall use reasonable efforts to minimize any increased costs, taxes and the impact of adverse Legal Requirements or market conditions. Until the consummation of an assignment in accordance with the foregoing provisions of this **Section 2.6.2(c)**, Borrower shall, subject to its right of set off under applicable law, to the extent required under the Loan Documents, continue to pay to the Defaulting Lender any obligations as they become due and payable. In the event the Defaulting Lender fails to advance or repay the Deficiency (with interest at the Default Rate) on or prior to the date of the next succeeding Advance and such Defaulting Lender has not theretofore been replaced by Borrower with a Replacement Lender, the entire interest of such Defaulting Lender in the Loan shall be subordinate to the interests of the other Lenders and all payments otherwise payable to the Defaulting Lender shall be used to advance or repay the Deficiency, as applicable, until such time as such Defaulting Lender advances or repays all Deficiencies (including interest at the Default Rate).

(d)     The failure of any Defaulting Lender to pay any Deficiency shall not relieve any other Lender of its obligation, if any, hereunder to make its ratable portion of the Advance on the date of such Advance, but no Lender shall be responsible for the failure of any Defaulting Lender to make its ratable portion of the Advance to be made by such Defaulting Lender on the date of such Advance; provided that neither Agent nor the non-defaulting Lenders shall be obligated to fund or to cause the funding of the balance of the then current Advance to Borrower (i.e., excluding the Deficiency) until the Deficiency is funded in accordance with **Section 2.6.2(c) or 2.6.2(d)**. Lenders, in the sole discretion of Agent, shall have the right to make no further Advances under the Loan if any and all Deficiencies in respect of prior Advances made more than sixty (60) days prior to the current Advance have not been funded by (i) the Defaulting Lender(s) responsible therefor, (ii) one or more of the other Lenders, (iii) Borrower with its own equity or (iv) an Eligible Assignee. In such event, the Loan Amount shall be permanently reduced by any and all Deficiencies unless and until funded as provided in **clause (i), (ii), (iii) or (iv)** above. If, pursuant to this **Section 2.6.2(d)**, Lenders are not obligated to make an Advance, Agent may nonetheless make a determination, in its discretion, that Lenders shall make such Advances and all Lenders shall be bound by such determination.

2.6.3     Funds Advanced. Each Advance of Hard Costs shall be made, at Agent's election, to the Construction Control Agent pursuant to the Construction Escrow Agreement, which shall be entered into by Borrower at any time as may be required by Agent in its sole discretion, or directly to Borrower by wire transfer to the Borrower Account. The proceeds of Advances for Soft Costs shall be made by Agent by wire transfer to the Borrower Account. All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made. Borrower shall not commingle Advances with other funds of Borrower.

2.6.4     Advances to Others. If an Event of Default then exists and Lenders elect to continue to make Advances, at Agent's option, Lenders may make any or all Advances directly to any General Contractor or any title insurer or (subject to the requirements of the applicable Construction Agreement) to any other Person to whom Agent determines in good faith payment is due, for Construction Costs which shall theretofore have been approved by Agent and for which Borrower shall have failed to make payment, and the execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization so to advance the proceeds of the Loan Amount directly to such General Contractor, such title insurer or to any such other Person as amounts become due and payable to

it hereunder. No further authorization from Borrower shall be necessary to warrant such direct Advances to such General Contractor, such title insurer or such other Persons and all such Advances shall satisfy pro tanto the obligations of Lenders hereunder and shall be secured by the Deed of Trust and the other Loan Documents as fully as if made directly to Borrower or the Construction Escrow.

      2.6.5   Advances Do Not Constitute a Waiver. No Advance shall constitute a waiver of any of the conditions of Lenders' obligation to make further Advances, and, in the event Borrower is unable to satisfy any such condition, no Advance shall have the effect of precluding Agent from thereafter declaring such inability to be an Event of Default.

      2.6.6   Advances to Pay Interest, Principal and Fees on Loan. Borrower hereby irrevocably authorizes Agent and Lenders to disburse proceeds of the Loan to pay interest accrued on the Note or Notes as it comes due or, after the occurrence and during the continuance of an Event of Default, to satisfy any of the conditions hereof, including the payment of the fees of Agent, Lenders and the Construction Consultant which are due and payable, and Agent and Lenders hereby agree to apply funds from the interest line item in the Approved Construction Budget to pay such interest, provided no Default or Event of Default has occurred and is continuing, subject to the availability of the interest line item; provided, however, that if Borrower has established the Debt Service Account, funds on deposit in the Debt Service Account shall be applied to pay interest prior to the application of amounts available in the interest line item. Notwithstanding anything to the contrary contained in this Agreement, if, when and to the extent that Agent, in its sole judgment, determines that the Project is generating for a period of three (3) consecutive months, on a cash basis, positive cash flow in excess of Borrower's other usual, reasonable and customary expenses (excluding interest expense relating to the Project), Borrower shall direct that any funds on deposit in the Excess Proceeds Account be applied to the repayment of the Debt in an amount not less than the amount of all Advances made from time to time for the payment of interest accrued on the Note or Notes, to the extent funds on deposit in the Excess Proceeds Account are sufficient therefor.

      2.7   Pro Rata Treatment. Except to the extent otherwise provided herein, the Loan, each payment or prepayment of principal of the Loan and each payment of interest on the Loan shall be allocated pro rata among Lenders in accordance with their respective Loan Percentages.

      2.8   Sharing of Payments. Each Lender agrees that, in the event that any Lender shall obtain payment in respect of the Loan owing to such Lender under this Agreement through the exercise of a right of set-off, banker's lien, counterclaim or otherwise (including pursuant to the Bankruptcy Code) in excess of its Loan Percentage as provided for in this Agreement, such Lender shall promptly notify Agent of such fact and purchase from the other Lenders a participation in the portion of the Loan held by such Lender, in such amounts and with such other adjustments from time to time as shall be equitable in order that all Lenders share such payment in accordance with their respective Loan Percentages as provided for in this Agreement. Each Lender further agrees that if a payment to a Lender (which is obtained by such Lender through the exercise of a right of set-off, banker's lien, counterclaim or otherwise) shall be rescinded or must otherwise be restored, each Lender which shall have shared the benefit of such payment shall, by repurchase of a participation theretofore sold, return its share of that benefit to each Lender whose payment shall have been rescinded or otherwise restored. Borrower agrees that any Lender so purchasing such a participation may, to the fullest extent permitted by Law and Regulation, exercise all rights of payment, including set-off, banker's lien or counterclaim, with respect to such participation as fully as if such Lender were a holder of the Loan or other obligation in the amount of such participation. Agent shall keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased pursuant to this **Section 2.8** and shall in each case notify Lenders following any such purchases. Except as otherwise expressly provided in this Agreement, if any Lender shall fail to remit to Agent or any other Lender an amount payable by such Lender to Agent or such other Lenders

pursuant to this Agreement on the date when such amount is due, such payments shall accrue interest thereon, for each day from the date such amount is due until the day such amount is paid to Agent or such other Lender, at a rate per annum equal to the Federal Funds Rate.

## ARTICLE III
## CONDITIONS PRECEDENT

3.1    Conditions Precedent to the Closing. To induce Lenders and Agent to enter into this Agreement, Borrower hereby agrees that the following conditions precedent shall be satisfied no later than the Closing Date:

(a)    Representation and Warranties; No Default; Compliance with Conditions. Each of the representations and warranties of the Borrower Parties contained in the Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, no Default or Event of Default shall have occurred and be continuing and each Borrower Party shall be in compliance in all material respects with all terms and conditions set forth in the Loan Documents on its part to be observed or performed.

(b)    Approvals. Agent shall have received copies or other evidence of all Approvals (other than Approvals which by their nature are not to be granted until further construction is completed and which are expected by Borrower, acting in good faith, to be granted when timely) required in connection with the execution, delivery and performance by the Borrower Parties, and the validity and enforceability, of the Loan Documents, and such Approvals shall be in full force and effect.

(c)    Loan Documents. Agent shall have received from Borrower fully executed and acknowledged (if applicable) original counterparts of each Loan Document required to be entered into as of the Closing Date and the appropriate UCC financing statements, each in form satisfactory for recording or filing in the appropriate public records (including the Land Records), if applicable.

(d)    Delivery of Title Insurance; Property Matters and Reports.

(i)    Survey. Agent shall have received the Qualified Survey.

(ii)    Title Agreements. Agent shall have received true and complete copies of all Title Agreements.

(iii)    Utilities. Borrower shall have delivered to Agent evidence satisfactory to Agent that all Required Utilities are in place and functioning correctly or will be in place prior to Substantial Completion.

(iv)    Zoning; Land Use. Agent shall have received (A) letters or other evidence with respect to the Mortgaged Property from the appropriate Governmental Authority concerning applicable zoning and building laws, each in form and substance satisfactory to Agent, (B) a zoning report from a service provider designated by Agent, in form and substance satisfactory to Agent and (C) an opinion of counsel as to the zoning status and land use matters relating to the Mortgaged Property, in form and substance satisfactory to Agent.

(v)     Appraisal. Agent shall have received the Appraisal in form and substance satisfactory to Agent.

(vi)     Site Inspections. Agent shall have performed or caused to be performed on its behalf, on-site due diligence reviews of the Mortgaged Property, in each case satisfactory to Agent.

(vii)     Insurance. Agent shall have received valid certificates of insurance for the Policies, satisfactory to Agent, and evidence of the payment of all Insurance Premiums then due and payable for the existing policy period. Such certificates shall indicate that Agent for the benefit of Lenders is named as an additional insured and shall contain a loss payee endorsement in favor of Agent on behalf of Lenders with respect to the Policies.

(viii)     Opinion Letter of Construction Consultant. Agent shall have received from the Construction Consultant an opinion letter as to the Project, which opinion letter shall include a discussion regarding the overall feasibility of the Project based on a review of the Construction Budget, the Construction Schedule, the Plans and Specifications and such other information and documents as the Construction Consultant may require, and otherwise be in form and substance satisfactory to Agent.

(ix)     Engineering Reports. Agent shall have received Engineering Reports in respect of the Mortgaged Property in form and substance satisfactory to Agent, together with a reliance letter confirming that Agent may rely fully on the contents thereof.

(x)     Material Agreements. Agent shall have received true and complete certified copies of all existing Material Agreements.

(xi)     Lien Search Reports. Agent shall have received search reports satisfactory to it with respect to UCC financing statements, tax liens and judgments conducted by a search firm acceptable to Agent with respect to the Collateral and the Borrower Parties in such jurisdictions as Agent shall have requested.

(e)     Construction-Related Deliveries.

(i)     Certified Agreements. Agent shall have received certified fully executed copies of (A) each Construction Agreement, (B) the Architect's Contract and (C) each Engineer's Contract.

(ii)     Approved Construction Budget; Construction Schedule. Agent shall have received the (A) Approved Construction Budget, (B) the Construction Schedule and (C) with respect to each Lease entered into prior to the date of the Initial Advance, a list of the tenant work (and related TI/LC Costs), if any, required to be completed by Borrower prior to the commencement date of such Lease.

(iii)     ACR. Agent shall have received an anticipated cost report in the form set forth in **Exhibit F** (an "ACR") executed by each General Contractor which sets forth the anticipated costs to complete construction of all Improvements, after giving effect to costs incurred to date.

(iv)    <u>Standard Form of Contract</u>. Agent shall have received from Borrower a copy of the standard form of contract and/or subcontract to be used by the General Contractors, which standard form shall be based upon appropriate AIA forms with attached riders and which forms shall be approved by Agent.

(v)    <u>Agreements with Trade Contractors</u>. Agent shall have received and approved (A) a list of all Major Contractors and Major Subcontractors who have been or, to the extent identified by Borrower, will be supplying labor or materials for the Project for Work to be performed and paid for from proceeds of the Loan and (B) certified copies of all existing contracts and agreements of such Major Contractors, Major Subcontractors and other Trade Contractors.

(vi)    <u>Plans and Specifications</u>. Agent shall have received two (2) complete sets of the Plans and Specifications together with an Officer's Certificate certifying as to the completeness of the Plans and Specifications. Borrower shall also deliver to Agent a list identifying the Plans and Specifications.

(vii)    <u>Laws and Regulations</u>. Agent shall have received evidence satisfactory to Agent that the Improvements are in compliance with all Laws and Regulations.

(viii)    <u>No Material Adverse Change</u>. Agent and each Lender shall be satisfied that as of the Closing Date, there shall have occurred no Material Adverse Effect since December 31, 2005.

(ix)    <u>Approvals</u>. Agent shall have received (A) copies of all Approvals necessary for or relating to the portion of the Work then in progress (which Approvals shall have been obtained prior to the commencement of the relevant portion of the Work and thereafter maintained in accordance with any applicable Law or Regulation), then in place, (B) evidence reasonably satisfactory to Agent that all notices required by any Governmental Authority or by any applicable Law or Regulation have been filed or issued prior to the date on which the relevant portion of the Work is commenced and/or performed, and copies of same shall have been delivered to Agent and (C) an original or certified copy of that certain Estoppel Certificate executed by the County for the benefit of Agent with respect to the County Title Documents.

(x)    <u>Name of Approvals</u>. Agent shall have received evidence satisfactory to Agent that all Approvals are in the name of Borrower.

(xi)    <u>Contractors' Affidavits and Lien Waivers</u>. Agent shall have received duly executed contractors' affidavits and Lien waivers and releases of Lien (both equitable and legal) from each General Contractor and all other Trade Contractors in form satisfactory to Agent, covering all Work to a reasonably current date, otherwise paid for or to be paid by Borrower or any other Person, all in compliance with applicable Laws and Regulations and with the requirements of Agent and the Title Company.

(f)    <u>Delivery of Organizational Documents</u>. On or before the Closing Date, Borrower shall deliver or cause to be delivered to Agent copies of all Organizational Documents related to each Borrower Party that is not a natural Person together with an Officer's Certificate of Borrower and all other documents and certificates relating to the formation, structure, existence, active status, good standing and/or qualification to do business as Agent may request, including good standing certificates, certificates of active status, qualifications to do business in

the appropriate jurisdictions, resolutions authorizing the entering into of the Loan, incumbency certificates as may be requested by Agent and evidence of such other organizational proceedings as Agent may request.

(g)    <u>Requisition Authorization Statement</u>.  Agent shall have received a duly executed and acknowledged Requisition Authorization Statement in the form attached hereto as **Exhibit S**.

(h)    <u>Opinions of Counsel</u>.  Agent shall have received legal opinions from counsel satisfactory to Agent with respect to (i) the due organization, existence and good standing of each Borrower Party that is not a natural Person, (ii) the due execution, delivery, validity, authority and enforceability of the Loan Documents, (iii) the zoning opinion described in **Section 3.1(d)** and (iv) such other matters as Agent or its counsel may reasonably require.  All such opinions shall be in form, scope and substance satisfactory to Agent.

(i)    <u>Financial Information</u>.  Borrower shall have caused each Borrower Party to provide financial information relating to such Borrower Party as requested by Agent in its reasonable discretion including current bank statements and brokerage statements.  All of the information delivered to Agent pursuant to this **Section 3.1(i)** shall be satisfactory to Agent in its reasonable discretion and accompanied by an Officer's Certificate of the applicable Borrower Party certifying that each such financial statement presents truly and fairly the financial condition of the applicable Borrower Party.

(j)    <u>Completion of Proceedings</u>.  All proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Agent, and Agent shall have received all such counterpart originals or certified copies of such documents as Agent may reasonably request.

(k)    <u>No Injunction</u>.  No Law or Regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of Agent would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loan or the consummation of the transactions contemplated hereby.

(l)    <u>Independent Member</u>.  Borrower shall provide to Agent a fully executed original counterpart of the agreement relating to the appointment of the Independent Member and the Independent Member shall be a Person acceptable to Agent.

(m)    <u>Equity Requirement</u>.  Agent shall have received evidence, satisfactory to Agent, that the Equity Requirement shall have been satisfied.

(n)    <u>Laws and Regulations</u>.  Upon request of Agent, evidence satisfactory to Agent that the Improvements are in compliance with all Laws and Regulations.

(o)    <u>Assignment of Certain Agreements</u>.  The counterparty to each Material Agreement shall be Borrower and Borrower shall have delivered to Agent valid assignments effectuating assignments of the same, to the extent Borrower is not the counterparty thereunder (including the delivery of any Approvals required to validly effectuate such assignments).

(p)    <u>No Damage</u>.  The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Agent shall have received insurance proceeds

sufficient in the judgment of Agent to effect the satisfactory restoration of the Improvements and to permit the completion thereof prior to the Completion Date.

(q)    Traffic Study. Borrower shall have delivered to Agent a traffic study in a form and substance, and prepared by a Person, satisfactory to Agent which addresses the impact of the construction and development of the Project on the traffic on the surrounding roads, what work is required for the parking access, and whether any new traffic lights must be installed as a result of the construction and development of the Project.

(r)    Leases and Rent Roll. Agent shall have received (i) copies of all the (x) Leases and (y) executed letters of intent with respect to any future Lease, in each case accompanied by an Officer's Certificate certifying that such copies are true, correct, accurate and complete, and (ii) the most current Rent Roll for the Project, accompanied by an Officer's Certificate certifying that such Rent Roll is true, correct, accurate and complete.

(s)    Standard Form Lease. Agent shall have received and approved Borrower's standard form lease with respect to each of the Office Portion and the Retail Portion.

(t)    Tenant Estoppel Certificates. Agent shall have received a conforming estoppel certificate in form reasonably satisfactory to Agent (and Agent hereby agrees that an estoppel certificate executed by a Tenant in the form attached to such Tenant's Lease shall be deemed acceptable to Agent) from each Tenant that has entered into a Lease with Borrower prior to the Initial Advance Closing Date.

(u)    Subordination, Non-Disturbance and Attornment Agreements. Agent shall have received (i) a Subordination Agreement executed by Borrower and each Tenant that has entered into a Lease prior to the Closing Date and (ii) and a Rights Agreement Recognition Agreement executed by Borrower and each Tenant or Person that has entered into a Rights Agreement prior to the Closing Date in form and substance reasonably satisfactory to Agent.

(v)    Mezzanine Loan. The Mezzanine Loan shall have closed concurrently with the Loan and Agent shall have received true, correct and certified copies of the Mezzanine Loan Agreement and all documents delivered thereunder on the Closing Date to the extent the same have not also been delivered to Agent hereunder and, to the extent entered into as of the Closing Date, Agent shall have received a fully executed original counterpart of the Intercreditor Agreement.

(w)    Additional Information. Each additional document not specifically referenced herein, but relating to the transactions contemplated by the Loan Documents, shall have been duly authorized, executed and delivered by all parties thereto and Agent shall have received and approved certified copies thereof. Further, Agent shall have received such other information and documentation with respect to the Borrower Parties and their respective Affiliates, the Collateral and the transactions contemplated by the Loan Documents as Agent may reasonably request, such information and documentation to be satisfactory in form and substance to Agent.

3.1A    Conditions Precedent to the Initial Advance. The obligation of each Lender to make the Initial Advance shall be subject to satisfaction of the following conditions precedent:

(a)    Prior Conditions Satisfied. All conditions precedent to the Closing of the Loan were at the time, and, if applicable, shall continue to be, satisfied as of the date of the Initial Advance.

(b)    Payment and Performance Bonds. Agent shall have received Payment and Performance Bonds with respect to the General Contractors (other than the Marnell GC) and all existing Major Contractors and Bonded Subcontractors, in each case in amounts satisfactory to Agent.

(c)    Insurance Consultant Report. Agent shall have received a report from an insurance consultant retained by Agent, which report shall include a determination the Borrower's insurance coverage complies with the requirements of the Loan Documents and otherwise be in form and substance satisfactory to Agent.

(d)    Approvals. To the extent not theretofore delivered to Agent, Agent shall have received (A) copies of all Approvals necessary for or relating to the portion of the Work then in progress (which Approvals shall have been obtained prior to the commencement of the relevant portion of the Work and thereafter maintained in accordance with any applicable Law or Regulation), then in place and (B) evidence reasonably satisfactory to Agent that all notices required by any Governmental Authority or by any applicable Law or Regulation have been filed or issued prior to the date on which the relevant portion of the Work is commenced and/or performed, and copies of same shall have been delivered to Agent.

(e)    Interest Rate Protection. Agent shall have received fully executed original counterparts of the Interest Rate Protection Agreement, the Collateral Assignment of Interest Rate Agreement and the Counterparty Consent.

(f)    [Intentionally Omitted.]

(g)    [Intentionally Omitted.]

(h)    Pre-Funding Threshold. Agent shall have (i) received and approved valid executed Leases covering thirty-five percent (35%) of the NRSF of the Retail Portion and (ii) received evidence satisfactory to Agent that with respect to an additional forty percent (40%) of the NRSF of the Retail Portion fully negotiated Leases approved by Agent have been sent to prospective tenants for execution and/or Borrower is in active negotiations of leases for such space.

(i)    [Intentionally Omitted].

(j)    Recognition Agreements. Agent shall have received fully executed original counterparts of (i) each of the recognition agreements required to be delivered pursuant to **Section 5.1(s)**, (ii) a Property Manager Recognition Agreement from the Property Manager and (iii) a Construction Manager Recognition Agreement from the Construction Manager.

(k)    Legal Opinion. Agent shall have received a legal opinion from counsel satisfactory to Agent with respect to the enforceability of the Interest Rate Protection Agreement and related documents. Such opinion shall be in form, scope and substance satisfactory to Agent.

(l)    Non-Consolidation Opinion. Agent shall have received a legal opinion from counsel satisfactory to Agent with respect to "substantive non-consolidation." Such opinion shall be in form, scope and substance satisfactory to Agent.

(m)    Delivery of Documents for Recordation. Agent shall have received evidence that counterparts of each of the Deed of Trust, Assignment of Leases, UCC financing statements (and

all other Loan Documents that are to be filed or recorded) shall have been delivered to the Title Company for recording or filing, so as to create upon such recording or filing, as the case may be, a valid and enforceable first priority Lien upon the Mortgaged Property in favor of Agent for the benefit of Lenders, subject only to the Permitted Encumbrances.

(n)    Title Insurance; Evidence of Notices. Agent shall have received the Qualified Title Policy (or a binding commitment from the Title Company to issue the same) and evidence that all premiums and fees in respect thereof have been paid.

(o)    Encumbrances. Borrower shall have taken or caused to be taken such actions in such a manner so that Agent on behalf of Lenders has a valid and perfected first priority Lien on the Collateral as of the date of the Initial Advance, subject only to the Permitted Encumbrances, and evidence thereof satisfactory to Agent shall have been received by Agent.

(p)    Title Agreement Estoppels. Agent shall have received original executed estoppels, in form and substance satisfactory to Agent, from each counterparty to those Title Agreements for which Agent requested estoppels.

(q)    Existing Financing Documents. Agent shall have received from Borrower evidence reasonably satisfactory to Agent that (i) any existing mortgages and assignments of leases and rents encumbering the Mortgaged Property and (ii) any existing UCC financing statements relating to Borrower or the Collateral (including, but not limited to, the UCC filings identified in **Exhibit U** hereto) have been released or terminated, as applicable, in their entirety.

(r)    Environmental Reports. Agent shall have received a copy of the Environmental Reports in respect of the Mortgaged Property that are satisfactory to Agent, together with a reliance letter confirming that Agent may rely fully on the contents thereof, and shall be satisfied that Borrower and the Mortgaged Property are not subject to any present or contingent environmental liability.

(s)    Designer's and General Contractor's Closing Certificates. Agent shall have received original counterparts of the following certificates: (A) the Architect's Closing Certificate, (B) each Engineer's Closing Certificate, (C) each General Contractor's Closing Certificate and (D) a certificate from Kimley Horne Associates certifying that the Plans and Specifications are in compliance with established design criteria under The Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et. seq.) and any amendments in effect as of the date of the Initial Advance, in form and substance reasonably satisfactory to Agent.

(t)    Closing Statement. Agent shall have received an original counterpart of a detailed closing statement executed by Borrower in form and substance acceptable to Agent, which includes a complete description of Borrower's sources and uses of funds as of the date of the Initial Advance.

(u)    Fees and Lender Expenses. Borrower shall have paid (i) the fees owing to Agent as of the date of the Initial Advance pursuant to any fee letter with Borrower, (ii) all Lender Expenses and (iii) all other fees and amounts due to Agent, Lead Arranger and their Affiliates on the Closing Date.

(v)    Mezzanine Loan. All of the conditions precedent set forth in Section 3.1A of the Mezzanine Loan Agreement have been satisfied by Parent and Mezzanine Lender has notified Agent of the same. Agent shall have received true, correct and certified copies of all documents

delivered pursuant to Section 3.1A of the Mezzanine Loan Agreement to the extent the same have not also been delivered to Agent hereunder.

    3.2    <u>Conditions Precedent to all Advances</u>. The obligation of each Lender to make the Initial Advance and all subsequent Advances shall be subject to the following conditions precedent:

    (a)    <u>Prior Conditions Satisfied</u>. All conditions precedent to the Closing of the Loan, the Initial Advance and any prior Advance were at the time, and, if applicable, shall continue to be, satisfied as of the date of such subsequent Advance.

    (b)    <u>Performance; No Default</u>. The Borrower Parties shall have performed and complied with all terms and conditions in the Loan Documents required to be performed or complied with by them at or prior to the date of such Advance, and on the date of such Advance there shall exist no Default or Event of Default.

    (c)    <u>No Material Adverse Effect</u>. There shall not have occurred any change, event or condition which has or is reasonably likely to cause, a Material Adverse Effect.

    (d)    <u>Loan Documents; Deed of Trust</u>. The Loan Documents shall be in full force and effect. The Deed of Trust shall constitute a valid first priority lien on the Mortgaged Property, free and clear of all Liens except Permitted Encumbrances.

    (e)    <u>Representations and Warranties</u>. The representations and warranties made by Borrower and any other Borrower Party in the Loan Documents or otherwise made by or on behalf of Borrower or any other Borrower Party in connection therewith after the date thereof shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects on the date of such Advance as if made on and as of such date which representations and warranties shall be deemed remade as of the date of such Advance, as if made on and as of such date.

    (f)    <u>No Damage</u>. The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Agent shall have received insurance proceeds sufficient in the judgment of Agent to effect the satisfactory restoration of the Improvements and to permit the Substantial Completion thereof prior to the Completion Date.

    (g)    <u>Receipt by Agent</u>. Agent shall have received:

    (i)    <u>Draw Request</u>. A Draw Request which shall constitute Borrower's representation and warranty to Agent and Lenders that, as of the date of such Draw Request: (A) any completed construction is substantially in accordance with the Plans and Specifications, (B) all the representations and warranties of the Borrower Parties set forth in the Loan Documents continue to be true and correct in all material respects (both before and after giving effect to the making of the applicable Advance by Lenders and to the application of the proceeds therefrom), (C) no Default or Event of Default shall have occurred and be continuing under any of the Loan Documents, or would result from the making of the Advance by Lenders or from the application of the proceeds therefrom and (D) each Borrower Party continues to be in compliance in all material respects with all of the other terms, covenants and conditions contained in the Loan Documents.;

    (ii)    <u>Endorsement to Qualified Title Policy</u>. A "date down" endorsement to the Qualified Title Policy in the form attached hereto as **Exhibit N**, dated as of the date of

such Advance, which shall state, among other things, that since the last Advance on the Loan there have been no changes in the state of title, and that there are no additional survey exceptions, not previously approved by Agent;

(iii)   Contractors' Affidavits Lien Waivers.   Duly executed contractors' affidavits, Lien waivers and releases of Lien (both equitable and legal) from each General Contractor and all other Trade Contractors (other than relating to Liens being contested by Borrower in accordance with **Section 5.1(b)(ii)**) in form satisfactory to Agent, covering all Work for which all prior disbursements have been made to a date specified therein and covering all Work to a reasonably current date otherwise paid for or to be paid for by Borrower or any other Person, all in compliance with applicable Laws and Regulations and with the requirements of Agent and the Title Company, together with such invoices, contracts, or other supporting data as Agent or the Title Company may require;

(iv)   Certificates.   A duly executed Borrowing Certificate, Architect's Draw Certificate, each General Contractor's Draw Certificate, in each case dated no earlier than fifteen (15) days prior to the applicable Draw Request;

(v)   ACR.   An ACR dated no earlier than fifteen (15) days prior to the applicable Draw Request;

(vi)   Progress Reports.   (A) A monthly progress report prepared by Borrower, dated no earlier than five (5) days prior to the applicable Draw Request, in a form and substance satisfactory to Agent; and (B) to the extent the same have been delivered to Borrower, copies of the monthly progress reports prepared by each of Architect and Engineer, in each case in accordance with their respective contracts; and

(vii)   Evidence of Sufficiency of Funds.   Evidence satisfactory to Agent that (A) the sum of (I) the unadvanced principal amount of the Loan Amount and the Mezzanine Loan Amount will be sufficient to cover all remaining Construction Costs and (B) in the event that any line item of the Approved Construction Budget is deemed by Agent to be insufficient to pay for the cost of completing such line item taking into account the Contingency Reserve, such deficiency has been or will be funded by Borrower, to Agent's reasonable satisfaction, from other line item amounts reallocated pursuant to **Section 7.2, 7.3 or 7.4** or from funds other than the proceeds of the Loan, and Borrower agrees to so fund such deficiency.  Notwithstanding the foregoing, no reallocation shall be made except in accordance with applicable Laws and Regulations.

(h)   Construction Consultant Approval.   Agent shall have received advice from the Construction Consultant, satisfactory to Agent, that all matters relating to the construction of the Project are progressing in accordance with the Construction Schedule and substantially in accordance with the other Construction Documents and the Plans and Specifications.

(i)   Approvals.   To the extent not theretofore delivered to Agent, Agent shall have received (A) copies of all Approvals necessary for or relating to the portion of the Work then in progress (which Approvals shall have been obtained prior to the commencement of the relevant portion of the Work and thereafter maintained in accordance with any applicable Law or Regulation), then in place and (B) evidence reasonably satisfactory to Agent that all notices required by any Governmental Authority or by any applicable Law or Regulation have been filed

or issued prior to the date on which the relevant portion of the Work is commenced and/or performed, and copies of same shall have been delivered to Agent.

(j)    Construction Agreement.  No Advance shall be made by Lenders with respect to Work on any portion of the Project not covered by any Construction Agreement until Borrower delivers to Agent a Construction Agreement acceptable to Agent and all plans, budgets and timelines with respect to such Work have been approved by Agent.

(k)    Major Contractor and Major Subcontractor.  No Advance shall be made by Lenders with regard to Work done by or on behalf of any Major Contractor or Major Subcontractor unless Borrower shall have delivered to Agent the following documents as to such Major Contractor or Major Subcontractor, each in form and substance reasonably satisfactory to Agent:

(i)    an original counterpart of each such fully executed contract (which with respect to the contract for the construction of the Rave Movie Theater shall be a GMP Contract); and

(ii)    original Payment and Performance Bonds.

(l)    Mezzanine Loan.  All of the conditions precedent set forth in Section 3.2 of the Mezzanine Loan Agreement have been satisfied by Parent and Mezzanine Lender has notified Agent of the same.  Agent shall have received true, correct and certified copies of all documents delivered pursuant to Section 3.2 of the Mezzanine Loan Agreement to the extent the same have not also been delivered to Agent hereunder.

(m)    Other Documents.  Such other documents and certificates as Agent may reasonably request.

3.3    Conditions Precedent to Final Advance.  In addition to the conditions set forth in **Section 3.2**, each Lender's obligation to make the final advance of Retainage pursuant to this Agreement shall be subject to the occurrence of the following and the receipt by Agent of the following:

(a)    Final Completion.  Final Completion shall have occurred.

(b)    Notification of Final Completion.  Notification from the Construction Consultant that Final Completion of the Improvements has occurred in accordance with the Plans and Specifications and the Construction Documents.

(c)    Architect Certificate of Final Completion.  Agent shall have received (i) an executed Architect Certificate of Final Completion and (ii) a certificate from Kimley Horne Associates or such other architecture firm acceptable to Agent certifying that the Improvements as constructed are in compliance with The Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et. seq.) and any amendments in effect as of the date of such certificate, in each case dated no earlier than fifteen (15) days prior to the date of the Draw Request

(d)    Final Survey.  A final survey of the Project acceptable to Agent showing the as-built location of the completed Improvements of the Project dated no earlier than forty-five (45) days prior to the date of the final Advance.

(e)   _Payment of Costs._ Evidence satisfactory to Agent that all sums due in connection with the construction of all Improvements have been paid in full (or will be paid out of the funds requested to be advanced or are being contested by Borrower in accordance with **Section 5.1(b)(ii)**) and that, upon such payment, no Person claims or has a right to claim any statutory or common law Lien arising out of the construction of any Improvements or the supplying of labor, material and/or services in connection therewith.

(f)   _Mezzanine Loan._ All of the conditions precedent set forth in Section 3.3 of the Mezzanine Loan Agreement have been satisfied by Parent and Mezzanine Lender has notified Agent of the same. Agent shall have received true, correct and certified copies of all documents delivered pursuant to Section 3.3 of the Mezzanine Loan Agreement to the extent the same have not also been delivered to Agent hereunder.

(g)   _Other Documents._ Such documents, letters, affidavits, reports and assurances, as Agent and the Construction Consultant may reasonably request, including completed AIA Form G704 (Certificate of Substantial Completion) and completed AIA Form G707 (Consent of Surety to Final Payments) (or any successor forms approved by Agent).

Notwithstanding anything herein to the contrary, if any Punch List Items remain to be completed at the time of final Advance, Borrower shall withhold from the applicable Trade Contractor a sum not less than one hundred fifty percent (150%) of the estimated cost (as approved by Agent, acting reasonably) of completing such Punch List Items and Agent shall withhold a like amount from the final Advance pending completion of the same.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

4.1   _Representations and Warranties of the Borrower Parties._ Each of the Borrower Parties represents and warrants to Agent and Lenders that, as of the date hereof:

(a)   _Organization._ Each of the Borrower Parties have been duly organized, are validly existing and are in good standing, with requisite power and authority to own the Mortgaged Property (in the case of Borrower), to transact the businesses in which they are now engaged and to execute, deliver and perform the Loan Documents to which they are party. Each Borrower Party is duly qualified to do business and is in good standing, in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations.

(b)   _Proceedings._ All necessary action has been taken by each Borrower Party to authorize the execution, delivery and performance of the Loan Documents to which it is a party. No Approvals are required in connection with the execution, delivery and performance by any Borrower Party of any Loan Document to which such Borrower Party is a party that have not been obtained except for Approvals which by their nature are not to be granted until further construction is completed and which are expected by Borrower, acting in good faith, to be granted when timely.

(c)   _No Conflicts._ The execution, delivery and performance of the Loan Documents will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon the Collateral or assets pursuant to the terms of, any indenture, mortgage, deed of trust, loan agreement, partnership agreement, trust agreement or other material agreement or instrument to which any Borrower Party or any of its Affiliates is a party or by which the

properties or assets of any Borrower Party or any Affiliate thereof is subject, nor will such action result in any violation of the provisions of any Law or Regulation of any Governmental Authority having jurisdiction over any Borrower Party.

(d)    Litigation.  Except as set forth on **Schedule 4.1(d)**, there are no arbitration proceedings, governmental investigations, actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the best of Borrower's knowledge, threatened against or affecting any Borrower Party or the Collateral.  **Schedule 4.1(d)** further sets forth all arbitration proceedings, governmental investigations, actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the best of Borrower's knowledge, threatened against or affecting Guarantor in which any of the potential liability is not covered by existing policies of insurance and such potential liability could reasonably be expected to have a material adverse effect on the net worth of Guarantor.

(e)    Agreements.  No Borrower Party is a party to any agreement or instrument or subject to any restriction which is reasonably likely to have a Material Adverse Effect.  No Borrower Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower Party or the Collateral is bound, which default could reasonably be expected to result in a Material Adverse Effect.  No Borrower Party has any material financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower Party is a party or by which Borrower Party or the Collateral is otherwise bound, other than (i) obligations incurred in the ordinary course of business, (ii) obligations under the Loan Documents and (iii) Permitted Debt.

(f)    Title.  Borrower owns the Mortgaged Property, subject to no rights of others, including any mortgages, leases, conditional sales agreements, title retention agreements, or Liens, except for the Permitted Encumbrances.  Borrower has good, marketable and insurable fee simple title to the Land and the Improvements, free and clear of all Liens whatsoever, except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. The Deed of Trust and Assignment of Leases, when properly recorded in the Land Records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will (i) create a valid, perfected first mortgage Lien on the Premises and any Improvements located thereon, subject only to Permitted Encumbrances and (ii) perfect security interests in and to, and perfect collateral assignments of, all personalty (including any Leases and Rents), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  No Person other than Borrower owns any interest in any Rents that is superior to or of equal priority with Agent's interest therein. There are no claims for payment for work, labor or materials affecting all or any portion of the Mortgaged Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents, except to the extent the same constitute Permitted Encumbrances.  Borrower represents and warrants that none of the Permitted Encumbrances will materially and adversely affect (A) the ability of Borrower to pay any of its obligations to any Person as and when due, (B) the fair market value of the Mortgaged Property, (C) the marketability of title to the Premises or (D) the use or operation of the Mortgaged Property as of the Closing Date and thereafter the completion and operation of the Project in accordance with the Construction Documents and the Plans and Specifications.  Borrower shall preserve its right, title and interest in and to the Mortgaged Property for so long as any portion of the Debt remains outstanding and will warrant and defend same and the validity and priority of the Lien hereof from and against any and all claims whatsoever other than the Permitted Encumbrances.  Nothing

in this paragraph may be relied on by the Title Company issuing any title insurance policies covering the Mortgaged Property.

(g)    No Bankruptcy Filing. No Borrower Party has or is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency Law or Regulation or the liquidation of its assets or property, and Borrower has no actual knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

(h)    Full and Accurate Disclosure. No information contained in the Loan Documents, or any written statement furnished by or on behalf of any Borrower Party pursuant to the terms of any Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise would have a Material Adverse Effect. Each Borrower Party has disclosed to Agent all material facts and has not failed to disclose any material fact that would cause any representation or warranty made in any Loan Document to be materially misleading. There is no fact or circumstance presently known to any Borrower Party which has not been disclosed to Agent and which has, or is likely to have, a Material Adverse Effect.

(i)    Compliance with ERISA. Borrower does not maintain an employee benefit plan as defined by Section 3(3) of ERISA, which is subject to Title IV of ERISA and Borrower (i) has no knowledge of any material liability which has been incurred or is expected to be incurred by Borrower which is or remains unsatisfied for any taxes or penalties with respect to any "employee benefit plan", within the meaning of Section 3(3) of ERISA, or any "plan", within the meaning of Section 4975(e)(1) of the Code or any other benefit plan (other than a multiemployer plan) maintained, contributed to, or required to be contributed to by Borrower or by any entity that is under common control with Borrower within the meaning of ERISA Section 4001(a)(14) (a "**Plan**") or any plan that would be a Plan but for the fact that it is a multiemployer plan within the meaning of ERISA Section 3(37) and (ii) has made and shall continue to make when due all required contributions to all such Plans, if any. Each such Plan has been and will be administered in compliance with its terms and the applicable provisions of ERISA, the Code, and any other applicable federal or state Law and Regulation; and no action shall be taken or fail to be taken that would result in the disqualification or loss of tax-exempt status of any such Plan intended to be qualified and/or tax exempt. Borrower is not an employee benefit plan, as defined in Section 3(3) of ERISA, subject to Title I of ERISA, none of the assets of Borrower constitutes or will constitute plan assets of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101 because Borrower is a "real estate operating company" ("**REOC**") within the meaning of paragraph (P) of the Plan Asset Regulation and Borrower is not a governmental plan within the meaning of Section 3(32) of ERISA and transactions by or with Borrower are not subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

(j)    Compliance. Borrower and the Mortgaged Property comply and, upon completion, the Improvements and the use thereof will comply in all material respects, with all applicable Legal Requirements and Insurance Requirements, including building and zoning ordinances and codes, and the Mortgaged Property will have sufficient and adequate parking facilities in accordance with all Legal Requirements and as required by any Governmental Authority. The Project complies with all applicable Laws and Regulations. The Mortgaged

Property is not a non-conforming use or legal non-conforming use and the Improvements when consummated will not constitute a non-conforming use or legal non-conforming use (except to the extent that the same would not, in Agent's opinion, affect in any material respect the operation, maintenance, value or use of the Mortgaged Property, or the ability to reconstruct the Mortgaged Property). No Borrower Party is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by or on behalf of any Borrower Party or, to Borrower's actual knowledge, any Tenant or other Person in occupancy of or involved with the operation or use of the Mortgaged Property, any act or omission affording any Governmental Authority the right of forfeiture as against the Mortgaged Property or any monies paid in performance of its obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, and to use all reasonable efforts not to permit or suffer to exist, any act or omission, affording such right of forfeiture.

(k)     Financial Information.  All financial data of the Borrower Parties, including, if applicable, the statements of cash flow and income and operating expense, that have been delivered to Agent in respect of the Collateral (i) are true, complete and correct in all material respects, (ii) fairly represent the financial condition of the Borrower Parties and the Collateral as of the date of such reports and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.  No Borrower Party has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and could reasonably be expected to have a Material Adverse Effect.  Since the date of such financial statements, there has been no material adverse change in the financial condition, operations or business of any Borrower Party or the Collateral, from that set forth in such financial statements.  No representation or warranty shall be deemed to have been made by Borrower under this **Section 4.1(k)** or elsewhere in this **Article IV** as to the likelihood that any pro-forma or other projections set forth in any financial statement delivered by Borrower to Agent will conform with actual results, provided that Borrower represents and warrants that it has no reason to believe that such projections are materially inaccurate.

(l)     Condemnation.  No Condemnation or other similar proceeding has been commenced or, to Borrower's actual knowledge, is contemplated with respect to all or any portion of the Mortgaged Property or for the relocation of roadways providing access to the Mortgaged Property.

(m)     Federal Reserve Regulations.  None of the proceeds of the Loan will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U, Regulation X or Regulation T or for the purpose of reducing or retiring any Indebtedness which was originally incurred to purchase or carry "margin stock" or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of Regulation U or Regulation X.  As of the Closing Date, Borrower does not own any "margin stock".  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying "margin stock".

(n)     Utilities and Public Access.  All utility services necessary for the development, construction and operation of the Project and the completion, use and occupancy thereof are or will be available in appropriate and sufficient quantity and quality at the boundaries of the Mortgaged Property either in the public rights-of-way abutting the Mortgaged Property (which are connected so as to serve the Mortgaged Property without passing over other property) or in recorded easements serving the Mortgaged Property, including drinking water supplies, surface drainage facilities, sanitary sewage collection and disposal facilities, electric, cable television and

telephone facilities, and Borrower has obtained or will obtain all necessary Approvals and licenses necessary for unrestricted access to and use of such services and facilities. The Mortgaged Property has rights of access to the dedicated public ways (and makes no use of any means of access that is not pursuant to such dedicated public ways or recorded, irrevocable rights-of-way or easements). With respect to roads necessary for the development, construction and operation of the Project and the completion, use and occupancy thereof, either (i) all such roads have been completed or the necessary rights of way therefor have either been acquired by the appropriate local authorities or have been dedicated to public use and accepted by such local Governmental Authorities or (ii) the applicable local Governmental Authority has executed or agreed in writing to execute such agreements as shall be necessary for such roads, and in either case, all necessary actions have been taken or will be taken by Borrower to assure the complete construction and installation thereof.

(o)    <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code and, if Borrower or any member of Borrower is a "disregarded entity" within the meaning of Treas. Reg. § 1.445-2(b)(2)(iii), then no beneficial owner of any such "disregarded entity" is a "foreign person".

(p)    <u>Separate Lots</u>. The Mortgaged Property is comprised of one or more parcels which constitute one or more separate tax lots which do not include any property not a part of the Mortgaged Property.

(q)    <u>Basic Carrying Costs, Assessments</u>. All Basic Carrying Costs due and payable as of the date hereof in respect of the Mortgaged Property have been paid in full. To the best of Borrower's knowledge, there are neither any pending or proposed special or other assessments for public improvements or other matters affecting the Mortgaged Property (except as shown in the financial statements described in **Section 4.1(k)** above) nor any contemplated improvements to the Mortgaged Property that are likely to result in such special or other assessments.

(r)    <u>Enforceability</u>. Each Loan Document to which any Borrower Party is a party is such Borrower Party's legal, valid and binding obligation, enforceable against such Borrower Party in accordance with its terms, subject only to bankruptcy, insolvency and similar Laws and Regulations affecting the enforcement of the rights or remedies of creditors generally and/or equitable principles of general application. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party and no Borrower Party has asserted any right of rescission, set-off, counterclaim or defense with respect thereto, including the defense of usury, and the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, will not render the Loan Documents unenforceable, subject to Laws and Regulations affecting the enforcement of the rights or remedies of creditors generally and/or equitable principles of general application.

(s)    <u>No Prior Assignment</u>. There are no prior assignments of the Accounts, Leases, Material Agreements or Approvals or any portion of the Rents due and payable or to become due and payable which are presently outstanding or other collateral for the Loan, except in connection with indebtedness (i) repaid in full from the proceeds of the Loan or (ii) assigned in whole to Agent on behalf of Lenders, in each case concurrently with the Closing Date.

(t)    <u>Insurance</u>. Borrower has delivered to Agent copies of all insurance binders, Policies (promptly after the same have been issued) or insurance certificates reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. All Insurance Premiums required to be paid as of the date hereof have been paid for the current policy period.

No claims have been made under any Policy, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of or under any Policy.

(u)     Approvals. Each Borrower Party has obtained all Approvals required as of the Closing Date (or any later date of an Advance, as applicable) and accomplished all filings, notifications, registrations and qualifications with (or obtained exemptions from any of the foregoing from) all applicable Governmental Authorities. Each Approval has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to Borrower's knowledge, threatened administrative or judicial proceeding to revoke, suspend, cancel or declare such Approval invalid in any respect. No Borrower Party is in default or violation with respect to any of the Approvals in a manner that would have a Material Adverse Effect, and no event has occurred which constitutes, or with due notice or lapse of time or both may constitute, a default by any Borrower Party under, or a violation of, any Approval that would have a Material Adverse Effect.

(v)     Flood Zone. The Mortgaged Property is not located in an area identified by the Federal Emergency Management Agency or the Federal Insurance Administration as an area having special flood hazards (Zone A), and, to the extent that any part of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency as an area federally designated a "100 year flood plain," the Mortgaged Property is covered by flood insurance meeting the requirements set forth in **Section 10.1(b)**.

(w)     Physical Condition. To the extent that one or more temporary certificates of occupancy have been issued with respect to any portions of the Mortgaged Property, except for the completion of Punch List Items or other work customarily completed following the issuance of a temporary certificates of occupancy, such portions of the Mortgaged Property are in good condition, order and repair in all respects material to their current use, operation and value; and, there exist no structural or other material defects or damage in or to such portions of the Mortgaged Property, whether latent or otherwise, which will materially impair the value of such portions of the Mortgaged Property or the construction of Improvement on the Project after taking into account in making such determination remedial efforts being taken by Borrower to correct such defects or damage following discovery thereof. No Borrower Party has received written notice from any insurance company or bonding company or is otherwise aware of any defects or inadequacies in any of the Mortgaged Property which would, alone or in the aggregate, adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon of any termination or threatened termination of any Policy or bond.

(x)     Leases. With respect to any existing Leases: (i) the Rent Roll attached hereto as **Schedule 4.1(x)** is true, complete and correct and the Project is not subject to any Leases other than the Leases described in **Schedule 4.1(x)**, (ii) the Leases identified on **Schedule 4.1(x)** are in full force and effect and there are no defaults thereunder by either party, (iii) Borrower has delivered copies of all Leases to Agent and the copies of the Leases delivered to Agent are true, complete and correct, and there are no oral agreements with respect thereto, (iv) no Rent (including security deposits) has been paid more than one (1) month in advance of its due date, (v) except as set forth on **Schedule 4.1(x)**, (A) all work to be performed by Borrower under each Lease has been performed as required as of the date that this representation is being made (or deemed remade pursuant to any other provision of this Agreement) and all such work has been accepted by the applicable Tenant, (B) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant as of the date that this representation is being made (or deemed remade pursuant to any other provision of this Agreement) has already been received by such Tenant, (C) all of the obligations

and duties of landlord under the Leases that are due or are to be performed (as applicable) on or prior to the date hereof have been fulfilled, and there are no pending claims asserted by any Tenant for offsets or abatements against Rent or any other monetary claim, (D) no brokerage or leasing commission or other compensation is or will be due or payable to any Person with respect to or on account of the current term of any of the Leases, other than in connection with (x) the leasing of any space pursuant to a right of first offer or first refusal or other right or option expressly set forth in the Lease, the effective date of which has not occurred as of the date hereof or (y) the failure timely to exercise, or the expiration of, any right to terminate or cancel any of the Leases and **Schedule 4.1(x)** sets forth the commissions payable in the circumstances described in the immediately preceding clauses (x) and (y), (vi) **Schedule 4.1(x)** sets forth all security deposits and letters of credit held by or on behalf of Borrower under the Leases; all such security deposits held by Borrower are held in accordance with all Legal Requirements and the terms of the applicable Leases and this Agreement; and any security deposits or letters of credit which have previously been drawn upon and/or applied have been redeposited with Borrower such that Borrower is currently holding all security deposits and letters of credit required under the applicable Leases prior to a default thereunder, (vii) Borrower has not given or suffered any present assignment, pledge or Encumbrance in respect of any of the Leases or its interests thereunder, except pursuant to the Loan Documents, and Borrower has the sole right to collect Rents and other amounts due under the Leases, (viii) no Tenant pursuant to any Lease is more than thirty (30) days in arrears on its Rent or other amounts due to the landlord under its Lease and (ix) none of the Leases contains any option to purchase, right of first refusal or right of first offer to purchase or any right to terminate the Lease (except in the event of the condemnation or destruction of all or a portion of the applicable demised premises, as more specifically set forth in the Leases). Except for Borrower and Tenants approved by Agent, no Person has any possessory interest in the Mortgaged Property or right to occupy the same. As of the date hereof, the Mortgaged Property is not subject to any Leases other than those approved by Agent pursuant to the terms of this Agreement.

(y)    Personal Property in Sales/Display Offices. All personal property in any sales/display offices located on the Mortgaged Property is owned by Borrower.

(z)    Boundaries. All of the improvements relating to the Mortgaged Property lie wholly within the boundaries and building restriction lines of the Mortgaged Property. No improvements on adjoining properties encroach upon the Mortgaged Property and no easements or other encumbrances upon the Mortgaged Property encroach upon any of the improvements, so as, in either case, to affect materially and adversely the value or marketability of the Mortgaged Property. There are no strips or gores affecting the Mortgaged Property.

(aa)    Filing and Recording Taxes. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes or recording charges required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Mortgaged Property to Borrower have been paid and all fees, recording charges and other amounts required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the granting, recording and filing of the Deed of Trust and the UCC financing statements required to be filed in connection with the Loan have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax or charge required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Deed of Trust, have been paid, and, under current Legal Requirements, the Deed of Trust is enforceable against Borrower in accordance with its terms by Agent (or any subsequent holder thereof) subject only to applicable bankruptcy, insolvency and similar Laws

and Regulations affecting rights of creditors generally, and subject as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(bb)    Taxes. Each Borrower Party and each of their Affiliates which is Controlled by a Borrower Party has filed, or caused to be filed, all material tax returns (federal, state, local and foreign) required to be filed and paid all amounts of taxes shown thereon to be due (including interest and penalties) and has paid all other taxes (including intangible fees, assessments and other governmental charges taxes) owing (or necessary to preserve any Liens in favor of Agent), except for such taxes (i) which are not yet delinquent or (ii) as are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained, but only so long as there is no risk of loss, sale or forfeiture of any collateral for the Loan, including the Collateral. No Borrower Party is aware of any proposed material tax assessment against any Borrower Party or any of their Affiliates which is Controlled by a Borrower Party. No extension of time for assessment or payment by any Borrower Party or any of their Affiliates Controlled by a Borrower Party of any foreign, federal, state or local tax is in effect.

(cc)    Fraudulent Transfer. No Borrower Party has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor. Each Borrower Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, each Borrower Party will be Solvent immediately following the execution and delivery of Loan Documents. No Borrower Party intends to, and each Borrower Party believes that it will not, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature or come due (taking into account the timing and amounts to be payable on or in respect of its obligations).

(dd)    No Other Indebtedness. Borrower has not incurred Indebtedness from any source (other than permitted pursuant to this Agreement) that has not been previously repaid in full.

(ee)    Payments under Material Agreements and Title Agreements. Prior to the date hereof, all Borrower Parties have made all payments required to be made by them under the Material Agreements and Title Agreements in accordance with the terms thereof.

(ff)    Illegal Activity; Prohibited Person. No portion of the Mortgaged Property has been purchased with proceeds of any illegal activity or in violation of any Law or Regulation. No Borrower Party nor any direct or indirect owner of any interest in a Borrower Party is (i) engaged in any money laundering scheme or activity in violation of the Patriot Act or (ii) a Prohibited Person. No Person has a direct or indirect financial interest in the Project other than as disclosed to Agent. All funds being invested by the Borrower Parties in the Project have been and are derived from legally permissible sources.

(gg)    Investment Company Act. No Borrower Party nor any of their Subsidiaries is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended or (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

(hh)    <u>Borrower Party Representations and Warranties; No Default</u>. Each of the representations and warranties made by Borrower and the other Borrower Parties in the other Loan Documents is true and correct and there is no Default or Event of Default.

(ii)    <u>Budget</u>. The Approved Construction Budget accurately reflects all Construction Costs currently contemplated to be incurred by Borrower in connection with the construction of the Improvements.

(jj)    <u>Acquisition Documents</u>. Borrower has delivered to Agent true and complete copies of all agreements and other instruments under which Borrower or any of its Affiliates or any other Person have rights or obligations in respect of Borrower's acquisition of the Mortgaged Property, in each case a true and correct listing of all such agreements and instruments is set forth on **Schedule 4.1(jj)**.

(kk)    <u>Breach by Affiliate</u>. The breach by an Affiliate of any Borrower Party of any agreement to which any Borrower Party and its Affiliates are parties shall not affect the enforceability of the terms hereof or of any Loan Document against any Borrower Party.

(ll)    <u>Feasibility</u>. Borrower (i) has prepared the Construction Schedule in good faith based upon assumptions that were fair and reasonable in light of the conditions existing at the time of delivery of such Construction Schedule, and (ii) represents, as of the time of delivery and on the date hereof, that the Construction Schedule is Borrower's best estimate of the information set forth therein, subject to the occurrence of Force Majeure Events.

(mm)    <u>Property Management Agreement; Construction Management Agreement</u>. Borrower has delivered to Agent a true and complete copy of each of the Property Management Agreement and the Construction Management Agreement entered into as of the date hereof, in each case, together with all amendments and modifications thereof.

(nn)    <u>Mortgaged Property Operations</u>. (i) Borrower has no employees and (ii) to the best of Borrower's knowledge, each employee of any Affiliate of Borrower which is Controlled by a Borrower Party (or other person otherwise under contract with any of them) employed at or directly in connection with the Mortgaged Property has obtained and maintained in force all Approvals required to authorize such employee (or other Person) to perform his or her duties on behalf of Borrower and/or its Affiliates which are Controlled by a Borrower Party.

(oo)    <u>Organizational Structure</u>. The organizational chart attached hereto as **Exhibit A** accurately sets forth (i) the identity of all holders of direct or indirect (i.e., through intermediary Persons) beneficial interests in Borrower and (ii) the relative percentage interests of such holders in Borrower and such intermediary Persons.

(pp)    <u>Plans and Specifications</u>. Borrower has furnished to Agent true and complete sets of the Plans and Specifications, which Plans and Specifications comply with all Laws and Regulations, all Approvals and all Title Agreements. The Plans and Specifications have been approved by each General Contractor, Architect, Engineer and by each such Governmental Authority as is required for construction of the Improvements.

(qq)    <u>Special Purpose Entity</u>. Until the Debt has been paid in full, each of Borrower and Parent represents, warrants and covenants that it is, shall be, and shall continue to be, a Single Purpose Entity.

(rr)    Property Acquisition Costs. No portion of the purchase price or any related acquisition costs paid by Borrower, any of its Affiliates or Guarantor to acquire the Mortgaged Property has been, or will be, reimbursed or otherwise redirected by the seller of such Mortgaged Property to any such Persons.

(ss)    Labor. No organized work stoppage or labor strike is pending or threatened by employees and other laborers at the Mortgaged Property. Neither Borrower nor any Affiliate thereof which is Controlled by a Borrower Party (i) is involved in or threatened with any labor dispute, grievance or litigation at the Mortgaged Property relating to labor matters involving any employees and other laborers at any property, including violation of any federal, state or local labor, safety or employment Laws or Regulations and/or charges of unfair labor practices or discrimination complaints at the Mortgaged Property, (ii) has engaged in any unfair labor practices within the meaning of the National Labor Relations Act or the Railway Labor Act or (iii) is currently a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Mortgaged Property and no such agreement or contract is currently being negotiated by Borrower.

(tt)    Absence of UCC Financing Statements. Except with respect to the Permitted Encumbrances and the Loan Documents, there is no financing statement, security agreement, chattel mortgage, real estate mortgage or other document executed by Borrower and filed or recorded with any filing records, registry, or other public office, that purports to cover, affect or give notice of any present or possible future lien on, or security interest or security title in the interest in the Collateral.

(uu)    Set-Off. The Collateral and the rights of Agent and Lenders with respect to the Collateral are not subject to any setoff, claims, withholdings or other defenses.

(vv)    Taxpayer Identification Number; Organizational Identification Number; Principal Place of Business. Borrower's Federal taxpayer identification number is 20-0606788 and the organizational identification number of Borrower, as designated by the Secretary of State of the State of Delaware is 3752842. The principal place of business of Borrower and its Affiliates is at Borrower's address for notices set forth in **Section 12.5** and neither Borrower nor its Affiliates conduct business in any state other than the States of Nevada and Delaware.

(ww)    Equity Requirement. As of the date hereof, the Equity Requirement has been satisfied.

(xx)    Project Documents. Borrower has delivered or made available to Agent true and complete copies of all construction and architectural contracts, loan documents, third party budgets, engineering and environmental reports, zoning analyses, inspections, and all other agreements and other documents and records in the possession or control of Borrower and its Affiliates and officers relating to the Mortgaged Property and/or the Project. All construction, architectural and other documents relating to the Mortgaged Property are in full force and effect, and there is no outstanding breach or default, nor any notice of breach or default, by Borrower or any Affiliate of Borrower thereunder.

(yy)    New Plat. From and after such time as the New Plat has been recorded in accordance with **Section 5.1(kk)**, such New Plat shall describe the same property as is set forth in the legal description contained the Survey or, to the extent delivered pursuant to **Section 5.1(kk)**, the Updated Survey, as applicable.

(zz)    <u>Vacation Village</u>. Those certain vacant and unoccupied improvements located on the real property formerly operated as a hotel and casino project known as "Vacation Village" have been demolished to the extent required under that certain Loan and Security Agreement dated as of November 23, 2004, among Borrower, as borrower, German American Capital Corporation, a Maryland corporation, as initial lender and as administrative agent to the Lenders identified therein, and the other parties identified therein.

(aaa)    <u>County Title Documents; Flyover Easement</u>.

(i)    Neither Borrower, nor, to the best of Borrower's knowledge, the County is in default under any of the County Title Documents. Each of the County Title Documents is in full force and effect and enforceable against Borrower in accordance with its terms. From and after execution thereof by Borrower and the County, the Flyover Easement will be in full force and effect and enforceable by Borrower in accordance with its terms.

(ii)    Borrower has posted with the County the $2,487,087.00 performance bond required under the Improvement Phasing Agreement which bond has been accepted by the County and is in full force and effect.

(iii)    A list of the plans and specifications for the Improvements and any off-site structures Borrower is obligated to construct in connection with the Offsite Work pursuant to the County Title Documents and applicable Laws and Regulations, in each case which have been approved by County to the fullest extent required by any of the County Title Documents and applicable Law and Regulation, are attached hereto as **Exhibit CC**. All Offsite Work is completely and accurately accounted for in the Approved Construction Budget.

(iv)    The County has concluded that the proposed uses for the Improvements are Compatible Uses (as defined in the Avigation Easement Agreement and the Adjoining Properties Easement Agreement) and that such Improvements will be compatible with the uses of the Airports (as defined therein).

(v)    A description of the work required to be performed by Borrower outside of the boundaries of the Property (the "**Offsite Work**") pursuant to the County Title Documents and applicable Laws and Regulations is attached hereto as **Exhibit DD**. Borrower is not in default in connection with any of its obligations to perform the Offsite Work.

4.2    <u>Representations and Warranties of the Borrower Parties</u>. Each Borrower Party represents and warrants to Agent and Lenders that, as of the date hereof, the representations and warranties set forth in **Section 4.1** relating to such Borrower Party are true and correct, and each Borrower Party hereby makes each such representation and warranty for the benefit of Agent and Lenders.

4.3    <u>Survival of Representations; Reliance</u>. The representations and warranties set forth in **Sections 4.1** and **4.2** and elsewhere in the Loan Documents shall survive for so long as any portion of the Debt is outstanding or there is any remaining commitment to lend. All representations, warranties, covenants and agreements made in the Loan Documents by Borrower or any other Borrower Party shall be deemed to have been relied upon by Agent and Lenders notwithstanding any investigation heretofore or hereafter made by Agent, Lenders or on behalf of Agent or Lenders.

4.4    <u>Effect of Draw Request</u>. Each Draw Request submitted to Agent shall constitute an affirmation that the representations and warranties contained in the Loan Documents remain true and

correct in all material respects as of the date thereof and, unless Agent is notified to the contrary in writing prior to the disbursement of the requested Advance or any portion thereof, shall constitute an affirmation that the same remain true and correct in all material respects on the date of such disbursement (it being acknowledged and agreed that, pursuant to **Article III**, Lenders are not obligated to make any Advance if any representation or warranty contained in this Agreement or any other Loan Document is untrue in any material respect at the time any Advance is to be made).

ARTICLE V
AFFIRMATIVE COVENANTS

5.1    <u>Affirmative Covenants with Respect to Borrower</u>.  Borrower hereby covenants and agrees with Agent and Lenders as follows:

(a)    <u>Existence; Compliance with Legal Requirements; Insurance</u>.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights and franchises and comply in all respects with all Legal Requirements applicable to it and the Mortgaged Property.  Borrower shall obtain, as and when required, all Approvals and accomplish all filings, notifications, registrations and qualifications with (or obtain exemptions from any of the foregoing from) all applicable Governmental Authorities, in either case properly and legally to develop, own, manage, use and operate the Mortgaged Property and to conduct its business.  All such Approvals shall be in the name of Borrower.  Borrower shall at all times maintain and preserve the Mortgaged Property and shall keep the Mortgaged Property in good working order and repair, reasonable wear and tear excepted, and from time to time make, or cause to be made, all reasonably necessary and desirable repairs, renewals, replacements, betterments and improvements thereto.  Borrower shall operate, maintain, repair and improve the Mortgaged Property in compliance with all Legal Requirements and will not cause or allow the same to be misused or wasted or to deteriorate.  Promptly upon receipt thereof (but in any event within five (5) Business Days after such receipt), Borrower shall deliver, or cause to be delivered, to Agent copies of any and all notices from any Governmental Authority that any Approval relating to the development, ownership, management, operation or use of any of the Mortgaged Property is being suspended, canceled or revoked or that the Improvements are being downgraded to a substandard category or that any investigation or proceeding with respect to any such action is pending.

(b)    <u>Construction Costs, Taxes and Other Charges; Contest for Taxes and Other Charges, Legal Requirements and Liens</u>.  (i)  Subject to the provisions of **Section 5.1(b)(ii)**, Borrower shall pay all Construction Costs, Taxes and Other Charges now or hereafter levied or assessed or imposed against the Mortgaged Property prior to the date on which such sums become delinquent.  Borrower shall deliver to Agent, upon request, receipts for payment or other evidence satisfactory to Agent that the Construction Costs, Taxes and Other Charges have been so paid (<u>provided</u> that Borrower shall not be required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Agent pursuant to **Article IX**).  Subject to the provisions of **Section 5.1(b)(ii)** and other than Permitted Encumbrances, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien whatsoever that may be or become a Lien against the Mortgaged Property, and shall promptly pay for all utility services provided to the Mortgaged Property.  Subject to **Section 5.1(b)(ii)**, Borrower shall pay, bond or otherwise discharge, from time to time when the same shall become due, all claims and demands of Trade Contractors and others that, if unpaid, might result in, or permit the creation of, a Lien on the Mortgaged Property.

(ii)     After prior written notice to Agent, Borrower, at its own expense, may contest by appropriate legal, administrative or other proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges or Lien therefor or any Legal Requirement or Insurance Requirement or the application of any instrument of record affecting the Mortgaged Property (other than the Loan Documents) or any claims or judgments of Trade Contractors, or other Persons or any Lien therefor, and may withhold payment of the same pending such proceedings if permitted by Law or Regulation (or, in the case of Taxes and Other Charges, if required by Law or Regulation to protect and preserve the contesting thereof); provided that (A) no Event of Default has occurred and remains uncured, (B) to the extent permitted by Law or Regulation, such proceeding shall suspend any collection of the contested Taxes, Other Charges or Liens from the Mortgaged Property, any Borrower Party or Agent, (C) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (D) the Mortgaged Property will not be in danger of being sold, forfeited, terminated, canceled or lost, (E) to the extent not already bonded or otherwise deposited or paid in connection with such proceedings, Borrower shall have furnished Agent with security (in an amount approved by Agent) to insure the payment of any such Taxes or Other Charges, or the cost of the contested Legal Requirement, Insurance Requirement or claim or judgment or the removal of the applicable Lien, in each case together with all reasonably anticipated interest and penalties thereon, (F) in the case of an Insurance Requirement, failure by Borrower to comply therewith shall not impair the validity of any insurance required to be maintained by Borrower hereunder or the right to full payment of any claims thereunder, (G) in the case of any essential or significant service with respect to the Mortgaged Property, any contest or failure to pay will not result in a discontinuance of any such service, (H) in the case of any instrument of record affecting the Mortgaged Property, the contest or failure to perform under any such instrument shall not result in the placing of any Lien on the Mortgaged Property (except if such Lien would be removed upon completion of such proceedings and the compliance by the parties with the terms of the resulting order, decision or determination and the removal costs for such Lien have been escrowed with Agent on behalf of Lenders or in the proceeding or bonded or otherwise deposited or paid in connection with such proceedings such that the Title Company would issue an endorsement to the Qualified Title Policy insuring against all such claims or Liens, (I) neither the failure to pay or perform any obligation which Borrower is permitted to contest under this Section nor an adverse determination of any such contest shall result in a Material Adverse Effect and (J) Borrower shall, promptly upon final determination of such contest pay the amount of any such Taxes, Other Charges claims, judgments or Liens, together with all Loss that may be payable in connection therewith, or comply with such Legal Requirement or Insurance Requirement or instrument of record as and to the extent required by the resolution of such contest. Agent may pay over any such cash deposit or part thereof held by Agent to the claimant entitled thereto at any time when, in the reasonable judgment of Agent, the entitlement of such claimant is finally determined, and Agent shall otherwise remit any remaining such amounts to Borrower. Agent shall give Borrower written notice of any such payments promptly following the making thereof.

(iii)     If Borrower shall fail, within sixty (60) days after becoming aware of a claim, either (A) to discharge or (B) to contest claims asserted and give security or indemnity in the manner provided in **Section 5.1(b)(ii)**, or having commenced to contest the same, and having given such security or indemnity, shall fail to prosecute such contest with diligence, or to maintain such indemnity or security so required by Agent for its full amount, or upon adverse conclusion of any such contest, to cause any judgment or decree to be satisfied and Lien to be released, then and in any such event Agent, upon prior notice to Borrower (except no notice shall be required if an Event of Default then exists) may procure the release and discharge of any claim

and any judgment or decree thereon and, further, may in its sole discretion effect any settlement or compromise of the same, or may furnish such security or indemnity to the Title Company, and any amounts so expended by Agent, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute disbursement of the proceeds of the Loan hereunder and shall be secured by the Deed of Trust. In settling, compromising or discharging any claims, Agent shall not be required to inquire into the validity or amount of any such claim. Notwithstanding the foregoing, neither Agent nor Lenders shall have any obligation to make Advances at any time prior to such time as Borrower shall have discharged any claims in accordance with **Section 5.1(b)(i)**, unless such claims are being contested in accordance with **Section 5.1(b)(ii)**.

(c)    <u>Litigation</u>.  Borrower shall give prompt written notice to Agent of any litigation, arbitration or governmental proceedings pending or threatened in writing against Borrower or the Mortgaged Property, which, if determined adversely to Borrower or the Mortgaged Property would reasonably be expected to have a Material Adverse Effect.  Borrower shall give prompt written notice to Agent of any litigation, arbitration or governmental proceedings pending or threatened in writing against Guarantor in which any of the potential liability is not covered by insurance and which, if determined adversely to Guarantor, would reasonably be expected to have a material adverse effect on the net worth of Guarantor.

(d)    <u>Inspection</u>.  Subject to reasonable and customary rights of Tenants, Borrower shall permit agents, representatives and employees of Agent to inspect the Mortgaged Property, including to perform appraisals and environmental inspections thereof, on any Business Day at reasonable hours upon reasonable advance notice.  Borrower shall cooperate with Agent and such agents, representatives and employees in connection with the same and shall use its commercially reasonable efforts to cause each General Contractor, the other Trade Contractors and all other third Persons to so cooperate.

(e)    <u>Notice of Default</u>.  Borrower shall promptly advise Agent of any change in the condition (financial or otherwise) of any Borrower Party that could be expected to have a Material Adverse Effect or materially impair its ability to comply with its obligations under the Loan Documents, or of the occurrence of any Default or Event of Default of which any Borrower Party has actual knowledge.

(f)    <u>Cooperate in Legal Proceedings</u>.  Borrower shall cooperate (and shall cause its Affiliates and officers to cooperate) fully with Agent with respect to the Development Litigation and any other proceedings before any court, board or other Governmental Authority which would reasonably be expected to affect in any material adverse way the rights of Agent or Lenders hereunder or under any of the other Loan Documents or the ability of Borrower to perform under the Loan Documents or perform and complete the Work, and Borrower shall permit Agent, at its election, to participate in any proceedings which could reasonably be expected to have a Material Adverse Effect.

(g)    <u>Perform Loan Documents</u>.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions required to be observed, performed or satisfied by it, and shall pay when due all costs, fees and expenses required to be paid by it under the Loan Documents, subject to any applicable cure periods and contest rights provided therein.

(h)    <u>Construction Documents</u>.  Borrower shall (i) enforce the Construction Documents in the best interests of timely completion of the Improvements in accordance with good construction practices and sound business judgment, (ii) not waive any material obligations

of any of the Persons party thereto, (iii) not do any act which would relieve the contracting party from its material obligations to construct (and cause the construction of) the Improvements according to the Plans and Specifications, (iv) not make any material amendments to or changes under the Construction Documents, without the prior approval of Agent and (v) not surrender, cancel or terminate the Construction Documents, without the prior approval of Agent.

(i)    Designers' Contracts.  With respect to each of the Architect's Contract and the Engineer's Contract, Borrower shall (i) enforce such contracts in the best interests of timely completion of the Improvements in accordance with good construction practices and sound business judgment, (ii) not waive any material obligations of respective Designer under the relevant contract and (iii) not do any act which would relieve any Designer from its material obligations under its respective contract.

(j)    Application of Loan Proceeds.  Borrower shall use the proceeds of the Loan solely and exclusively for the purposes of constructing the Improvements in accordance herewith and for funding such other costs and expenses in connection herewith all in accordance with the Approved Construction Budget which shall be subject to no change except as permitted herein.

(k)    Insurance Benefits.  Borrower shall cooperate with Agent in obtaining for Agent on behalf of Lenders the benefits of any insurance proceeds lawfully or equitably payable in connection with the Mortgaged Property, and Agent shall be reimbursed for any Loss incurred in connection therewith (including reasonable attorneys' fees and disbursements and, if reasonably necessary to collect such proceeds, the expense of an appraisal on behalf of Agent in case of a fire or other casualty affecting the Mortgaged Property) out of such insurance proceeds.

(l)    Further Assurances; Loan Resizing.

(i)    Borrower shall, at its sole cost and expense:

(A)    furnish to Agent all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by any Borrower Party pursuant to the terms of the Loan Documents or reasonably requested by Agent in connection therewith;

(B)    execute and deliver to Agent such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the Liens of Agent for the benefit of Lenders at any time securing or intended to secure the obligations of any Borrower Party under the Loan Documents as Agent may reasonably require;

(C)    be responsible for, and shall pay, all Lender Expenses within ten (10) days after demand therefor; and

(D)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents as Agent shall reasonably require from time to time.

(ii)    Borrower further agrees that Agent may at any time increase or decrease the Loan Amount, provided that any such increase or decrease causes a corresponding increase or decrease, as applicable, in the Mezzanine Loan Amount such that the sum of the Loan Amount and the Mezzanine Loan Amount at all times equals $520,000,000.  Borrower further agrees that

if Agent determines that the Loan Amount is to be decreased (such that there is a corresponding increase to the Mezzanine Loan Amount), then (A) Agent, Lenders, Borrower and Parent shall take all actions as are necessary to effect the "resizing" of the Mezzanine Loan and the Loan, (B) each of Borrower and Parent shall comply, and shall use their best efforts to cause the Mezzanine Lender to comply, with its agreements to effect a "resizing" and (C) Agent and Lenders shall, on the date of the "resizing" of the Loan take such actions as are necessary to reduce the Loan Amount (which may include lending Parent the amount of such decrease in the Loan Amount by way of a reallocation of the Loan Amount and the Mezzanine Loan Amount) and Borrower and Parent shall execute and deliver any and all necessary amendments or modifications to the Mezzanine Loan Documents and the Loan Documents (including one or more substitute Notes). In addition, Borrower agrees that if Agent determines that the Loan Amount is to be increased (such that there is a corresponding decrease in the Mezzanine Loan Amount), then (1) each of Agent, Lenders, Borrower and Parent shall take all actions as are necessary to effect the "resizing" of the Loan and the Mezzanine Loan, (2) each of Borrower and Parent shall comply, and shall use their best efforts to cause the Mezzanine Lender to comply, with its agreements to effect a "resizing" and (3) Agent and Lenders, shall on the date of the "resizing" of the Loan, take such actions as are necessary to increase the Loan Amount (which may include lending Borrower the amount of such increase in the Loan Amount by way of a reallocation of the Loan Amount and the Mezzanine Loan Amount) and Borrower and Parent shall execute and deliver any and all necessary modifications to the Mezzanine Loan Documents and the Loan Documents (including one or more substitute Notes). In connection with the foregoing, Borrower agrees, but without any cost or expense to Borrower, other than reasonable administrative costs and expenses of Borrower, to execute and deliver such documents and other agreements reasonably required by Agent to "re-size" the Loan Amount as provided hereunder, including an amendment to this Agreement, any of the Notes, the Deed of Trust and the other Loan Documents and, if the Loan Amount is increased, an endorsement to the Title Policy reflecting an increase in the insured amount thereunder. Notwithstanding the foregoing, Agent agrees that any "resizing" of the Loan Amount and the Mezzanine Loan Amount shall not change the initial economic and other terms of the Loan and the Mezzanine Loan taken as a whole in a manner which is adverse to Borrower and the weighted average LIBOR Margin for the term of the substitute notes shall not exceed the weighted average LIBOR Margin applicable to the Mezzanine Loan and the Loan immediately prior to the issuance of the substitute notes. In addition to the foregoing, Borrower agrees that Agent may at any time increase or decrease the Base Rate Margin and the LIBOR Margin (provided that any such increase or decrease causes a corresponding increase or decrease in the corresponding margin under the Mezzanine Loan, such that the weighted average as between the Loan and the Mezzanine Loan at all times equals the weighted average as of the date hereof) in which event the provisions of this Section 5.1(l)(ii) with respect to the "resizing" of the Loan Amount and the Mezzanine Loan Amount shall apply to the reallocation of the Base Rate Margin and the LIBOR Margin, *mutatis mutandis*, with such changes as the context may require.

(m)    Financial Reporting and Other Information. (i)  Each Borrower Party will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in form and detail acceptable to Agent, proper and accurate books, records and accounts reflecting all of its financial affairs and all items of Operating Income, Operating Expenses and Capital Expenditures. Agent and each Lender shall have the right (at their own cost if no Event of Default then exists) from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of any Borrower Party or other Person maintaining such books, records and accounts and to make such copies or extracts thereof, as Agent or such Lender shall desire. After the occurrence and during the continuance of an Event of Default, Borrower shall pay any costs and expenses incurred by Agent or any Lender to examine such books, records and accounts.

(ii)    Borrower shall furnish or cause to be furnished to Agent within one hundred twenty (120) days following the end of each Fiscal Year and Borrower shall cause each other Borrower Party to furnish to Agent within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Borrower's or such Borrower Party's, as the case may be, annual financial statements, audited by a "Big Four" accounting firm or another independent certified public accounting firm acceptable to Agent, together with an audit report from such accounting firm, for such Fiscal Year and containing a balance sheet, income statement, cash flow statement and a schedule of contingent liabilities, all in such form and detail acceptable to Agent. Such annual financial statements shall be accompanied by (A) an Officer's Certificate from the Person submitting such statements certifying that each such annual financial statement presents fairly, in all material respects, the financial condition and results of operation being reported upon and (B) a management report, in form and substance satisfactory to Agent, discussing the reconciliation between the financial statements for such Fiscal Year and the applicable annual Budget. Together with Borrower's annual financial statements, Borrower shall furnish to Agent (1) an Officer's Certificate of Borrower certifying as of the date thereof whether, to Borrower's knowledge, there exists a Default or Event of Default, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same and (2) an annual report, in such form and detail acceptable to Agent, for the most recently completed Fiscal Year, containing (x) details regarding leasing by Borrower at the Project and such other information as Agent may request and (y) following Substantial Completion, Capital Expenditures made in respect of the Mortgaged Property, including separate line items with respect to any Capital Expenditures in excess of $50,000.

(iii)    Borrower shall furnish, or cause to be furnished, to Agent on or before the forty-fifth (45th) day after the end of each of the first three (3) fiscal quarters of each Fiscal Year, the following items, accompanied by an Officer's Certificate of Borrower, certifying that such items are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Mortgaged Property (subject to normal year-end adjustments and the absence of footnotes):

(A)    quarterly and year-to-date unaudited financial statements prepared for such fiscal quarter with respect to Borrower and each Guarantor, including a balance sheet, income statement and cash flow statement for such periods, all in such form and detail acceptable to Agent; and

(B)    an Officer's Certificate of Borrower certifying as of the date thereof whether to such Borrower's knowledge, there exists a Default or an Event of Default, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action being taken to remedy the same.

(iv)    Borrower shall furnish, or cause to be furnished, to Agent on or before the twentieth (20th) day after the end of each month, (A) a current Rent Roll for the Project identifying (1) each Tenant, (2) the monthly rent and additional rent, if any, payable by such Tenant, (3) the expiration date of such Tenant's Lease, (4) the security deposit, if any, held by Borrower under the Lease and (5) the space covered by the Lease, together with (x) a delinquency report setting forth all arrearages under all Leases and (y) a leasing report which shall include a schedule of all vacant space in the Project, the names of all prospective Tenants with respect to such vacant space and the status of negotiations with such prospective Tenants; and (B) with respect to the Retail Portion, the sales per square foot of each Tenant, to the extent reported by Tenants under the terms of the Leases, together with a summary report containing each of the following with respect to the Retail Portion for the most recent calendar month: (x) aggregate

sales by Tenants under Leases or other occupants of the Retail Portion, both on an actual sales (or to the extent such information is not provided by Tenants, the applicable Property Manager's or Borrower's best estimate) and on a comparable store basis, (y) rent per square foot payable by each Tenant and (z) aggregate occupancy of the Retail Portion by anchor space and in-line store space as of quarter end, all in such form and detail acceptable to Agent. Such items shall be accompanied by an Officer's Certificate of Borrower certifying that such items are true, correct, accurate and complete and fairly present the financial condition and results described therein.

(v)    Borrower shall furnish to Agent, within ten (10) Business Days after request, such further detailed information with respect to the Leases, the operation of the Mortgaged Property and the financial affairs of Borrower or any Borrower Party as may be reasonably requested by Agent.

(vi)    Borrower shall furnish to Agent, within three (3) Business Days after receipt, a copy of any notice received by or on behalf of Borrower from any Governmental Authority having jurisdiction over the Mortgaged Property with respect to any Hazardous Substance Activity or Hazardous Substance Claim (as such terms are defined in the Environmental Indemnity).

(vii)    Borrower shall promptly notify Agent in writing upon learning of the occurrence of: (a) any Event of Default or Default; (b) any event which materially and adversely affects the ability of Borrower, any Borrower Party or any Guarantor to perform any of its respective obligations hereunder or under any of the other Loan Documents; (c) any event which adversely affects the priority of Lender's first lien on the Premises; (d) any litigation or other proceeding filed or threatened in writing against Borrower or the Premises and (e) any litigation or other proceeding filed or threatened against any Borrower Party or any Guarantor which could have a Material Adverse Effect.

(viii)    Borrower shall within ten (10) days of receipt provide Agent with a copy of any notice received from a Tenant threatening nonpayment of Rent or other default, alleging or acknowledging a default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants.

(ix)    Following Substantial Completion, Borrower shall furnish to Agent, by November 30 of each Fiscal Year, the proposed Budget for the succeeding Fiscal Year for Agent's approval and such Budget shall be in such detail and in such form as Agent shall reasonably request. Borrower shall not amend or modify any approved Budget without Agent's prior written consent and shall use all reasonable efforts to operate and maintain the Mortgaged Property in accordance therewith.

(x)    Borrower shall cause each Borrower Party who is a natural Person to furnish to Agent a copy of such Borrower Party's federal tax return within thirty (30) days from the filing of such federal tax return.

(xi)    Borrower shall, at any and all times, within a reasonable time after written request by Agent, furnish or cause to be furnished to Agent, in such manner and in such detail as may be requested by Agent, such information as may be necessary to permit Agent or any Lender to comply with any request for information made by an investor or prospective institutional

holder of a Note in connection with an Assignment or Participation to be furnished under Rule 144A(d) under the Securities Act (including any of the same relating to a Borrower Party).

(xii)    Borrower shall, within ten (10) Business Days from receipt of the same, furnish to Agent copies of all financials, reports, statements, information, reporting disclosures, budgets and other documents received under or pursuant to any Property Management Document.

(xiii)    If Borrower fails to provide to Agent or its designee any of the financial statements, certificates, reports, documents or information (the "**Required Records**") required by this **Section 5.1(m)** on the date upon which such Required Record is due, the same shall constitute an Event of Default.

(xiv)    Agent shall have the right at any time and from time to time to audit the financial information provided by any Borrower Party pursuant to the terms of this Agreement in accordance with the then customary audit policies and procedures of Agent. Agent shall pay for the costs of its auditors, provided that if (A) such audit shall have been commenced when an Event of Default exists or (B) such audit reveals a material discrepancy from the information previously provided to Agent, Borrower shall pay the cost and expenses of such audit.

(xv)    At Agent's request, Borrower shall cause any of the Required Records to also be delivered in electronic format. Agent may distribute copies of any of the Required Records to any Lender and to any participant in any Lender's interest in the Loan.

(n)    <u>Interest Rate Protection Agreement</u>. On or prior to the date of the Initial Advance, Borrower shall obtain, and thereafter maintain in effect, an Interest Rate Protection Agreement, having a term through the Maturity Date, which caps the thirty (30) day LIBO Rate with a strike price equal to 5.25% per annum and in a notional amount equal to the portion of the Loan Amount then outstanding (which amount shall be adjusted pursuant to the Disbursement Schedule, as the same may be revised from time to time with the consent of Agent). The Counterparty under any Interest Rate Protection Agreement shall initially meet the Required Rating. In the event of any downgrade of such Counterparty's rating to below "A" (or its equivalent) by the Rating Agencies, Borrower shall replace the Interest Rate Protection Agreement with a new Interest Rate Protection Agreement with a Counterparty that meets the Required Rating not later than ten (10) Business Days after receipt of notice from Agent of such downgrade. If the principal of the Loan advanced to Borrower exceeds the Disbursement Schedule by more than ten percent (10%) for at least two (2) consecutive months, Borrower shall, upon a request by Agent, provide additional hedging reasonably satisfactory to Agent within fifteen (15) days after such request. Any such additional hedging shall be pledged to Agent for the benefit of Lenders as security for the Debt and Borrower shall execute documentation reasonably requested by Agent to create, perfect and maintain such security interest. The terms and provisions of the Interest Rate Protection Agreement, including the strike price, the interest rate and the Counterparty, shall be in form and substance acceptable to Agent. Borrower shall comply with all requirements of Agent with respect to obtaining the Interest Rate Protection Agreement and shall pay all Loss incurred by Agent (including reasonable attorneys' fees and disbursements) in connection therewith. The failure of Borrower to obtain and maintain the Interest Rate Protection Agreement as specified above on or before the date specified herein or to maintain in effect the Interest Rate Protection Agreement at all times thereafter shall constitute an Event of Default. Borrower shall at all times after execution of the Interest Rate Protection Agreement comply in all material respects with all of its obligations under the terms and provisions of the Interest Rate Protection Agreement. Borrower shall take all action reasonably requested by Agent to enforce Agent's rights under the Interest Rate Protection Agreement in the

event of a default by the Counterparty and shall not terminate, cancel, surrender or assign the Interest Rate Protection Agreement or waive, amend or otherwise modify in any material respect any of its rights thereunder without in either case the prior consent of Agent.  Notwithstanding anything set forth in the Loan Documents to the contrary, unless the Counterparty is DBTCA or an Affiliate thereof, the Interest Rate Protection Agreement and any other hedging arrangements shall not be secured by a Lien on the Mortgaged Property or any other collateral for the Loan as described in the Loan Documents.  If the Counterparty is DBTCA or an Affiliate thereof, at the election of DBTCA, the Interest Rate Protection Agreement and any other hedging arrangements where DBTCA or an Affiliate thereof is the counterparty, shall be secured, on a *pro rata* basis, by a Lien on the Mortgaged Property and any other collateral for the Loan, and Borrower shall, at its cost, execute such documents reasonably required by DBTCA to create, perfect and maintain such Liens.

(o)    <u>Business and Operations; Material Agreements; Title Agreements</u>.  Borrower shall continue to engage in the business currently conducted by it as and to the extent the same is necessary for the ownership, construction, development, maintenance, management and operation of the Improvements and the Mortgaged Property.  Borrower shall qualify to do business and shall remain in good standing or have active status, as the case may be, under the laws of each jurisdiction as and to the extent the same are required for the ownership, construction, development, maintenance, management and operation of the Improvements and the Mortgaged Property.  Borrower shall at all times (i) maintain the Mortgaged Property or cause the Mortgaged Property to be maintained as a Class "A" project consisting of office and retail facilities; (ii) maintain or cause to be maintained sufficient inventory and Equipment of types and quantities at the Mortgaged Property to enable the operation of the Mortgaged Property; (iii) maintain such Approvals or arrangements in connection therewith so as to permit the Mortgaged Property to be maintained at a standard at least equal to that maintained by Class "A" managers of similar facilities located in the vicinity of the Mortgaged Property; (iv) promptly perform and/or observe in all respects all of the covenants and agreements required to be performed and observed by it under the Title Agreements and Material Agreements, and do all things necessary to preserve and to keep unimpaired its rights thereunder; (v) promptly notify Agent in writing of its receipt or delivery of any notice of any default sent by any party under any Title Agreement or Material Agreement; and (vi) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other party under each Title Agreement and Material Agreement.

(p)    <u>Title to the Mortgaged Property</u>.  Borrower shall warrant and defend against the claims of all Persons whomsoever (i) its title to the Mortgaged Property and (ii) the validity and priority of the Lien of the Deed of Trust, subject only to the Permitted Encumbrances.

(q)    <u>Costs of Enforcement</u>.  In the event (i) that the Deed of Trust is foreclosed in whole or in part or the Notes, any Loan Document, including the Deed of Trust, is put into the hands of an attorney for collection, suit, action or foreclosure, (ii) of the foreclosure of any Lien or mortgage prior to or subordinate to the Deed of Trust in which proceeding any Lender or Agent is made a party, (iii) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or an assignment by Borrower for the benefit of its creditors or (iv) Agent or any Lender shall attempt to remedy any Event of Default hereunder, Borrower shall be chargeable with and agrees to pay all Loss incurred by Agent or such Lender or Lenders as a result thereof, including costs of collection and defense in connection therewith and in connection with any administrative, bankruptcy, appellate proceeding or otherwise or post-judgment action involved therein, which shall be due and payable together with all required service or use taxes.

(r)     Estoppel Statements. (i) Borrower shall, from time to time, upon ten (10) Business Days' prior written request from Agent, execute, acknowledge and deliver to Agent, an Officer's Certificate containing the following: (A) a statement that this Agreement and the other Loan Documents are unmodified and in full force and effect or, if there have been modifications, that this Agreement and the other Loan Documents are in full force and effect as modified and setting forth such modifications, (B) a statement of the amount of accrued and unpaid interest and the outstanding principal amount of the Notes, (C) a statement that either no Event of Default exists hereunder or, if any Event of Default shall exist hereunder, a description of such Event of Default and the steps being taken to cure such Event of Default and (D) such other information with respect to any Borrower Party, the Collateral and/or the Loan as Agent shall reasonably request.

(ii)     With respect to any Material Agreements, Borrower shall, from time to time, upon ten (10) Business Days' prior written request from Agent, execute, acknowledge and deliver to Agent, an Officer's Certificate containing the following: (A) a statement that such Material Agreement is unmodified and in full force and effect or, if there have been modifications, that the Material Agreement is in full force and effect as modified and setting forth such modifications, (B) a statement that either Borrower is not in default thereunder beyond any applicable grace, cure or notice period or, if any such default shall exist thereunder, a description of such default and the steps being taken to cure such default, (C) a statement that, to Borrower's knowledge, either the other party thereto is not in default thereunder beyond any applicable grace, cure or notice period or, if any such default shall exist thereunder, a description of such default and the steps being taken to cure such default and (D) such other information with respect to Borrower and/or the Material Agreement as Agent shall reasonably request.

(iii)     With respect to any Material Agreement, Borrower shall use commercially reasonable efforts to deliver to Agent from time to time (provided that Borrower shall not be required to deliver such certificates more frequently than four times in any calendar year), within twenty (20) Business Days of Agent's request, a certificate from the counterparty to such Material Agreement containing the following: (A) a statement that such Material Agreement is unmodified and in full force and effect or, if there have been modifications, that the Material Agreement is in full force and effect as modified and setting forth such modifications, (B) a statement that either such other party is not in default thereunder beyond any applicable grace, cure or notice period or, if any such default shall exist thereunder, a description of such default and the steps being taken to cure such default, (C) a statement that, to such counterparty's knowledge, either Borrower is not in default thereunder beyond any applicable grace, cure or notice period or, if any such default shall exist thereunder, a description of such default and the steps being taken to cure such default and (D) such other information with respect to such other party, Borrower and/or the Material Agreement as Agent shall reasonably request.

(iv)     With respect to each Tenant that enters into a Lease, Borrower shall promptly request an estoppel certificate from such Tenant for delivery to Agent, which estoppel certificate may be in the form provided under such Lease or if no form is therein provided, in a form reasonably satisfactory to Agent, such that prior to the date that the Project opens for business, Borrower shall have delivered to Agent confirming estoppel certificates from Tenants occupying 75% of the NRSF of the Project.

(v)     With respect to each Lease, as soon as possible after requested by Agent, Borrower shall promptly request an estoppel certificate from each Tenant under such Lease for delivery to Agent, which estoppel certificate may be in the form provided under such Lease or if

no form is therein provided, in a form reasonably satisfactory to Agent, provided that Borrower shall not be required to deliver more than two (2) such certificates in any calendar year per Lease.

(s)    Recognition Agreements.  Borrower shall cause (i) Architect to execute and deliver to Agent (prior to the date of Initial Advance in connection with the initial Architect and upon the execution of any subsequent Architect's Contract in connection with a successor Architect), an Architect Recognition Agreement, (ii) Engineer to execute and deliver to Agent (prior to the date of the Initial Advance with respect to all Engineers existing prior to the Closing Date and upon the execution of any subsequent Engineer Agreement in connection with a successor Engineer), an Engineer Recognition Agreement, (iii) each Major Contractor and Major Subcontractor to execute and deliver to Agent (prior to the date of the Initial Advance with respect to all Major Contractors and Major Subcontractors existing prior to the Closing Date and upon execution of any agreement with a Major Contractor or Major Subcontractor with respect to all other Major Contractors and Major Subcontractors), a Recognition Agreement with Major Contractor and (iv) any Construction Manager to execute and deliver to Agent (prior to the date of Initial Advance in connection with the initial Construction Manager and upon execution of any subsequent Construction Management Agreement in connection with a successor Construction Manager), a Construction Manager Recognition Agreement Manager, and in each case, without limiting the generality of the foregoing, Architect, Engineer, each Major Contractor and any Construction Manager shall agree in such recognition agreements to perform their respective contracts at no additional cost or expense for the benefit of Agent, a Lender or a nominee or Affiliate of Agent or Lender in the event that Agent so elects upon an Event of Default or a foreclosure of the Deed of Trust, delivery of a deed-in-lieu of foreclosure or bankruptcy sale.

(t)    Accounts.  Borrower shall maintain each Account and, without the prior written consent of Agent, shall not (i) modify or attempt to modify the terms of any Account or the Depository Agreement or Cash Management Agreement or (ii) close or attempt to close any Account.

(u) Leasing Matters.  (i)  If an Event of Default then exists, neither Borrower nor any Property Manager shall, without Agent's approval (A) amend, modify, supplement, restate, extend, terminate, accept a surrender of or otherwise change (each a "**Material Lease Change**") any existing Lease or (B) enter into any Lease.

(ii)    Borrower shall not enter into any Lease that is not a Qualified Lease.  Borrower shall not (A) enter into any Major Lease, (B) materially amend or modify or terminate any Lease or (C) create any sublease under any Major Lease (each such action shall constitute a Material Lease Change for the purposes of this Agreement) without Agent's approval, not to be unreasonably withheld.

(iii)    If Agent's approval of a Lease or Material Lease Change is required hereunder, Agent shall either approve or disapprove such Lease or Material Lease Change within twenty (20) Business Days after its delivery to Agent together with (A) all information and materials regarding the financial status, creditworthiness and reputation of such Tenant as Agent shall reasonably require and (B) a copy of such Lease marked against the standard form Lease previously approved by Agent (if any), and provided that such Lease or Material Lease Change is delivered to Agent accompanied by a notice stating in upper case bold-faced type: "THIS IS A REQUEST FOR LEASE APPROVAL.  IF AGENT FAILS TO RESPOND WITHIN 20 BUSINESS DAYS, THE LEASE OR MATERIAL LEASE CHANGE WILL BE DEEMED APPROVED".  If Agent fails to approve or reject the Lease or Material Lease Change within

such twenty (20) Business Day period (notice by facsimile on the same day being acceptable for this purpose), such Lease or Material Lease Change will be deemed approved by Agent.

(iv)    Borrower (A) shall observe and perform the obligations imposed upon the lessor under the Leases, (B) shall enforce the terms, covenants and conditions contained in the Leases on the part of the Tenants thereunder to be observed or performed in a commercially reasonable manner, (C) shall not collect any of the base or minimum rents more than one (1) month in advance (other than security deposits), (D) shall not execute or consent to any assignment of Tenant's interest in the Leases or the Rents (except for the Deed of Trust and the Assignment of Leases) or the subletting by a Tenant without the approval of Agent, not to be unreasonably withheld, (E) shall assign each Lease entered into after the Closing Date to Agent, on behalf of Lenders, as security for the Loan on terms substantially similar to those set forth in the Assignment of Leases and (F) shall not take any action in any Tenant bankruptcy, insolvency or similar proceedings without the approval of Agent, such approval not to be unreasonably withheld.

(v)    Any Lease shall be subject and subordinate to the Lien of the Deed of Trust, and Agent shall not be obligated to deliver a subordination, non-disturbance and attornment agreement in favor of the Tenant thereunder; provided, however, that (A) if Agent elects, such Tenant shall enter into a Subordination Agreement and (B) Agent shall enter into a Subordination Agreement with each Major Lease Tenant, subject to commercially reasonable changes acceptable to such Major Lease Tenant and Agent.

(vi)    Borrower shall deliver, or cause Property Manager to deliver, to Agent a copy of (A) any Lease, and any amendment, modification, supplement or termination of any Lease, executed by Borrower after the date hereof and (B) any consent to a sublease executed by Borrower after the date hereof, within ten (10) Business Days after the execution of any such document by Borrower. Each Material Lease Change delivered to Agent shall be accompanied by a statement of the strategic purpose for, and economic impact on, the Project from such Material Lease Change.

(vii)    In the event Borrower desires to amend, modify or replace any standard form of lease approved by Agent in accordance with this Agreement, Borrower shall obtain Agent's approval of such amendment, modification or replacement prior to the use thereof by Borrower at the Project.

(viii)    Borrower shall not (A) enter into any agreement with any Tenant or any other Person granting such Tenant or other Person rights or a license to (I) solicit, secure, manage and maintain advertising, marketing and promotional relationships with respect to any space located with in the Premises, which relationships shall consist of the applicable Tenant or Person granting third parties the certain benefits within the Premises, including, without limitation, (w) the placement of electronic and static signage and other advertising displays, (x) the display of branded environments and showcases, (y) the placement of hanging displays and (z) the display and sampling of products and services, including through the use of kiosks or (II) lease space within the Premises in such Person's capacity as a broker (any such agreement, a "**Rights Agreement**") or (B) materially amend or modify or terminate any Rights Agreement without Agent's approval, not to be unreasonably withheld. In addition, in the event Borrower enters into a Rights Agreement, at the time such Rights Agreement is entered into between the applicable parties, subject to Agent's approval rights set forth herein, Borrower shall deliver, or cause to be delivered, to Agent a consent, subordination and recognition agreement among Borrower, Agent

and such Tenant or other Person in form and substance reasonably satisfactory to Agent (a "**Rights Agreement Recognition Agreement**").

(v)    <u>ERISA</u>.  Borrower shall do, or cause to be done, all things necessary to ensure that it will not be deemed to hold "plan assets" within the meaning of the Plan Assets Regulation ("**Plan Assets**") at any time during the term that the Loan is outstanding and Borrower shall comply with all requirements and take all actions necessary to maintain Borrower's status as a REOC and to otherwise operate so as to continue to qualify as a REOC at any time during the term that the Loan is outstanding.  Borrower has certified to Agent that it does not hold, nor would it be deemed to hold, Plan Assets as of the date hereof.  Borrower shall require, or cause to be required, each proposed transferee of any direct or indirect equity interest in Borrower, as a condition precedent to such transfer, to certify to Borrower and Agent, that the source of funds used or to be used by it to acquire its direct or indirect interest in Borrower are not Plan Assets and are not deemed to be Plan Assets under the U.S. Department of Labor's plan asset regulations.  Borrower has provided Agent with a copy of Borrower's certification and agrees to deliver to Agent from time to time throughout the term the Loan is outstanding, as requested by Agent, but no more than once in any twelve month period, a copy of each such certification from each proposed transferee.  Borrower shall deliver to Agent such certificates or other evidence from time to time throughout the term of the Loan, as reasonably requested by Agent that Borrower qualifies as a REOC.

(w)    <u>Assignment or Participation of Notes</u>.  In the event that Agent notifies Borrower that a Transfer of any of the Notes or any interest in any thereof (including a Transfer of any Note held by Lenders to a trust, partnership, business trust or other issuance vehicle accompanied by the simultaneous issuance by such vehicle of a security backed by or representing an interest in such Notes, either alone or together with other assets Transferred by a Lender or other Persons) (an "**Assignment**"), or a sale of a participation interest in any of the Notes (a "**Participation**"), to one or more other Persons as permitted by this Agreement is desirable, then Borrower and the other Borrower Parties shall cooperate with such Lender in order to effectuate such Assignment or Participation.  Any reasonable costs and expenses relating to Assignments and Participations (including all costs and expenses resulting from Lender's request that Borrower enter into certain documentation to effectuate such Assignments or Participations) shall be paid by Borrower upon demand.

(x)    <u>Splitting of Notes</u>.  Agent has the right, without any Borrower Party's consent, on one or more occasions, upon consent of all Lenders, to split the Loan into two (2) or more separate loans, each in a principal amount as determined by Lenders and providing for such subordination as between such split loans as Lenders shall elect.  The interest rate and economic terms for the aggregated split loans shall be the same as that of the Loan as determined pursuant to this Agreement and the Notes.  Lenders shall have the right to allocate the security for the split loans in their sole and absolute discretion, including the right to allocate the security provided by the Guaranties and the Deed of Trust, <u>provided</u> that the same do not increase, on an overall basis, the liability (monetary or otherwise) of any Borrower Party.  Each of the Borrower Parties shall cooperate with Agent to effectuate the same, including executing any documentation requested by Agent.  In connection with any such splitting of the Loan, conforming changes shall be made to the Loan Documents as required to reflect such splitting.  Each Borrower Party agrees with the foregoing and shall cooperate in any such splitting of the Loan, including entering into such amendments, modifications or new documentation as reasonably required by any Lender to effectuate the splitting of the Loan.

(y)    <u>Cooperation for Syndication</u>. Borrower shall (i) at its cost (subject to **Section 5.1(w)**), assist Agent in the syndication of the Loan, which assistance may include, among other things, providing to Agent information prepared by or on behalf of the Borrower Parties relating to the Project and the business, assets, financial condition, operations and prospects of Borrower with respect to the Project; (ii) supplement such information from time to time after request by Agent, or otherwise to ensure the accuracy of such information, until such time as the syndication of the Loan has been completed; and (iii) make members of the Borrower Parties' management and their consultants, agents and advisors (including the Architect, the Engineer and each General Contractor) available during regular business hours upon reasonable advance written notice (A) to answer questions regarding the Project and the Loan, (B) to review, comment on and assist in the preparation of the syndication memorandum relating to the Loan, (C) to meet with prospective Lenders and (D) to use its reasonable efforts to benefit the syndication efforts of Agent.

(z)    <u>Title Agreements</u>. To submit to Agent for Agent's written approval, prior to the execution thereof by Borrower, all proposed Title Agreements (including modifications thereto), accompanied by a survey showing the proposed location thereof, if relevant, and such other information as Agent shall reasonably require. Borrower shall not subject the Mortgaged Property to any Title Agreement (including any restriction or exclusive use provision in any Lease) without such prior written approval of Agent.

(aa)    <u>Further Assurance of Title</u>. To further assure title as follows: if at any time Agent has reason to believe in its opinion that any Advance is not secured or will or may not be secured by the Deed of Trust as a first and prior Lien on the Mortgaged Property (subject only to the Permitted Encumbrances), then Borrower shall, within ten (10) days after written notice from Agent, do, at its cost, all things and matters reasonably necessary (including execution and delivery to Agent of all further documents and performance of all other acts which Agent reasonably deems necessary or appropriate) to assure to the satisfaction of Agent that any Advance previously made hereunder or to be made hereunder is secured or will be secured by the Deed of Trust as a first and prior Lien with respect to the Mortgaged Property (in each case, subject only to the Permitted Encumbrances). Lenders, in accordance with the terms of this Agreement, may decline to make further Advances until Agent has received all such assurances.

(bb)    <u>Prohibited Person/Patriot Act</u>. Each Borrower Party shall notify Agent immediately if it or any direct or indirect owner of any interest therein is or becomes (i) engaged in any money laundering scheme or activity in violation of the Patriot Act or (ii) a Prohibited Person. Each Borrower Party (i) understands and acknowledges that Agent and Lenders are, or may in the future become subject to, AML Laws and agrees to execute instruments, provide information or perform any other acts as may be requested by Agent for the purpose of: (A) carrying out due diligence as may be required by AML Laws to establish the identity of such Borrower Party, as well as the identity of any of its direct or indirect shareholders, partners, members, directors, officers, beneficiaries, (B) maintaining records of such identities or verifications or certifications as to the same and (C) taking any other actions as may be required to comply with and remain in compliance with AML Laws applicable to Agent or Lenders, (ii) authorizes and consents to Agent contacting each bank or other financial institution with which such Borrower Party maintains an account and verifying with each such bank or other financial institution such Borrower Party's identity, (iii) authorizes and consents to Agent and Lenders releasing confidential information about such Borrower Party and its direct or indirect shareholders, partners, members, directors, officers, beneficiaries to the appropriate Governmental Authorities (or to other financial institutions) if Agent or any such Lender determines that it is in its best interest in light of applicable AML Laws and (iv) understands and acknowledges that, if Agent or any such Lender reasonably believes that such Borrower Party (or

any direct or indirect owner of any interest therein) is a Prohibited Person or such Borrower Party (or any direct or indirect owner of any interest therein) has otherwise breached its representations and warranties hereunder as to its identity, Agent and Lenders may be obligated to refuse to make additional Advances to Borrower and acknowledges and agrees that Agent and Lenders may take such action and any other action required or permitted by Law or Regulation and further acknowledges and agrees that no Borrower Party (or any direct or indirect owner of any interest therein) will have any claim whatsoever against any Indemnitee for any Loss incurred by it as a result of any of the foregoing actions. The Borrower Parties shall comply with all AML Laws.

(cc)    Control. Borrower shall, at all times, cause the Sponsors to (i) own, indirectly, not less than forty-five percent (45%) of the equity interests of Borrower and (ii) Control the Borrower Parties, including maintaining the power and authority to approve material decisions with respect to the use, operation, development, management, financing and disposition of Borrower and the Mortgaged Property.

(dd)    Access and Utility Easements. Throughout the term of the Loan, Borrower shall establish (following approval of Agent as required hereunder) and shall cause to be maintained such easements as may from time to time be necessary (or required by Agent in its reasonable discretion) to adequately assure appropriate access and the availability of utilities to the Premises for the Project.

(ee)    Single Purpose Entity. (i) Each of Borrower and Parent is and shall remain a Single Purpose Entity. Each of Borrower and Parent has, since the respective date of its formation, complied with the separateness covenants in its organizational documents. Parent shall, at all times, cause Borrower to comply with each of Borrower's undertakings set forth in this Agreement or its Organizational Documents that relate to Borrower being a Single Purpose Entity.

(ii)    Each of Borrower and Parent shall continue to maintain its own deposit account or accounts, separate from those of any Affiliate, with commercial banking institutions. None of the funds of Borrower and Parent will be diverted to any other Person or for other than business uses of Borrower and Parent, nor will such funds be commingled with the funds of any other Affiliate.

(iii)    To the extent that Borrower, Parent or any other SPE Entity shares the same officers or other employees as any of Borrower, Parent or their Affiliates, the salaries of and the expenses related to providing benefits to such officers and other employees shall be fairly allocated among such entities, and each such entity shall bear its fair share of the salary and benefit costs associated with all such common officers and employees.

(iv)    To the extent that Borrower or Parent jointly contracts with any of Borrower, Parent or any of their Affiliates, as applicable, to do business with vendors or service providers or to share overhead expenses, the costs incurred in so doing shall be allocated fairly among such entities, and each such entity shall bear its fair share of such costs. To the extent that either Borrower or Parent contracts or does business with vendors or service providers where the goods and services provided are partially for the benefit of any other Person, the costs incurred in so doing shall be fairly allocated to or among such entities for whose benefit the goods and services are provided, and each such entity shall bear its fair share of such costs. All material transactions between (or among) Borrower, Parent and any of their respective Affiliates shall be conducted on substantially the same terms (or on more favorable terms for Borrower or Parent, as applicable) as would be conducted with third parties.

(v)    To the extent that Borrower, Parent or any of their Affiliates have offices in the same location, there shall be a fair and appropriate allocation of overhead costs among them, and each such entity shall bear its fair share of such expenses.

(vi)    Borrower and Parent shall (and Parent shall cause Borrower to) conduct its affairs strictly in accordance with its Organizational Documents, and observe all necessary, appropriate and customary corporate, limited liability company or partnership formalities, as applicable, including obtaining any and all members' consents necessary to authorize actions taken or to be taken, and maintaining accurate and separate books, records and accounts, including, without limitation, payroll and intercompany transaction accounts.

(ff)    Consents. If Borrower or any other SPE Entity is a corporation, the board of directors of such Person may not take any action described below requiring the unanimous affirmative vote of one hundred percent (100%) of the members of the board of directors unless all of the directors, including the Independent Director, shall have participated in such vote. An affirmative vote of one hundred percent (100%) of the directors, board of managers or members, including the Independent Director, Independent Manager or Independent Member, as applicable, of Borrower or any other SPE Entity shall be required for such entity to (i) file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings or to authorize Borrower or any other SPE Entity, as the case may be, to do so or (ii) file an involuntary bankruptcy petition against any Affiliate thereof. Furthermore, Borrower's and each other SPE Entity's by-laws, operating agreement or limited partnership agreement, as applicable, shall expressly state that for so long as any portion of the Debt is outstanding, none of Borrower nor any other SPE Entity shall be permitted to (A) dissolve, liquidate, consolidate, merge or sell all or substantially all of Borrower's or such other SPE Entity's assets, as the case may be, other than in connection with the repayment of the Loan or (B) engage in any other business activity and such restrictions shall not be modified or violated for so long as any portion of the Debt is outstanding.

(gg)    As-Built Drawings of Foundation. Borrower shall deliver to Agent, within ninety (90) days following the date of completion thereof, as-built drawings (one set prepared using the CADD method in accordance with CADD software designated by Agent and one set prepared on mylar) of the foundation of the Building.

(hh)    Updated Appraisal. Upon the written request of Agent, Borrower shall promptly reimburse Agent for the cost of an updated Appraisal; provided, however, that Borrower shall not be required to reimburse Agent for an updated Appraisal more frequently than once per annum.

(ii)    Debt. Borrower shall duly and promptly pay the Debt to Agent and Lenders according to the terms of this Agreement, the Note and the other Loan Documents.

(jj)    Conveyance of Air Rights. Subject to receipt of Agent's approval, which may be granted or withheld in its sole discretion, Borrower shall be permitted, on a one-time basis, to obtain a release of the Lien of the Deed of Trust and the other Loan Documents on certain unused development rights (the "Air Rights") associated with the Land and described in more detail on Exhibit Y in connection with the transfer of such Air Rights to an Affiliate of Borrower (the "Air Rights Transferee") for the development of office space of approximately 120,000 NRSF (the "Office Development") in a manner that is generally consistent with the character, nature and quality of the Project (the "Air Rights Release"), provided that the following conditions shall be satisfied to Agent's satisfaction:

(A)    At least 120 days prior to the date on which Borrower desires to effect the Air Rights Release, Borrower shall deliver prior written notice (the "**Release Notice**") to Agent of Borrower's desire to effect the Air Rights Release, which Release Notice shall include (I) the name of the proposed Air Right Transferee, (II) an organizational chart indicating the Air Rights Transferee's relationship to Borrower, (III) the Business Day (the "**Air Rights Release Date**") on which Borrower desires that Agent release its Lien on the Air Rights and (IV) whether Borrower intends to allocate any portion of the first floor common area currently allocated to the Retail Portion to the Office Development, which allocation Agent may approve or reject in its sole discretion at any time after its receipt of the Release Notice;

(B)    No Event of Default shall have occurred and be continuing on the date on which Borrower delivers the Release Notice or on the Air Rights Release Date;

(C)    There shall not have occurred any change, event or condition which has or is reasonably likely to cause, a Material Adverse Effect on the date on which Borrower delivers the Release Notice or on the Air Rights Release Date;

(D)    To the extent required by applicable Legal Requirements, Borrower shall cause the Project and the Office Development to be subject to a condominium regime pursuant to condominium documents and instruments satisfactory to Agent; provided, that if a condominium regime is not required by applicable Legal Requirements, Borrower shall provide evidence satisfactory to Agent that the space constituting the Air Rights and the remainder of the Premises constitute separate legal lots under applicable Laws and Regulations;

(E)    Agent shall have received and approved (I) copies in reasonable detail of the construction budget, construction schedule, plans and specifications (including site plans and schematic design plans) and projected cash flows for the proposed Office Development, (II) evidence of the financing commitment for the Office Development obtained by the Air Rights Transferee, including, without limitation, a commitment letter from an institutional lender or copies of construction loan documents, (III) copies of all documents relating to the transfer of the Air Rights to the Air Rights Transferee, including, to the extent required by Agent or otherwise applicable, purchase and sale agreements, reciprocal easement agreements, including with respect to use of common areas and parking (including provisions for expense reimbursement based on such use), condominium documents, leases, documents covering the allocation of operating costs and the resolution of operating issues between Borrower and the Air Rights Transferee and instruments to be recorded in the land records, (IV) all subdivision plans, permits, approvals, licenses, consents and other governmental authorizations to the extent required with respect to the Air Rights Release and (V) any other documents or instruments reasonably required by Agent

(F)    Agent shall have received from Borrower evidence satisfactory to Agent that the Project after giving effect to the Air Rights Release shall comply in all respects with (I) all applicable Legal Requirements and (II) all applicable zoning requirements, and Borrower shall have delivered to Agent and Lenders an Officer's Certificate certifying the same;

(G)    Agent shall have received from Borrower evidence satisfactory to Agent that the Office Development when completed will be generally consistent with the

character, nature and quality of the Project, and Borrower shall have delivered to Agent and Lenders an Officer's Certificate certifying the same;

(H)    Agent shall have received from Borrower evidence satisfactory to Agent that the Air Rights Transferee has purchased insurance in connection with the development of the Office Development with coverages, in amounts and issued by insurers satisfactory to Agent;

(I)    Borrower shall have executed and delivered such other instruments, certificates, opinions of counsel and documentation as Agent shall reasonably request in order to preserve, confirm or secure the Liens and security granted to Agent for the benefit of the Lenders by the Loan Documents, including any amendments, modifications or supplements to any of the Loan Documents and endorsements to the existing Qualified Title Policy;

(J)    Agent shall have received from Borrower evidence satisfactory to Agent that the Air Rights Transferee shall have assumed the cost and expense of, and any liabilities arising from, the Office Development or any improvements otherwise constructed within the areas covered by the Air Rights, or by reason of the Office Development or any such improvements (e.g., the construction and operation of elevators serving the Office Development); and

(K)    Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred in connection with the Air Rights Release, including, without limitation, the reasonable attorneys' fees and disbursements incurred by Agent and any Servicer and all title insurance premiums, service charges and recordation costs incurred in connection with such Air Rights Release; provided, however, that for the avoidance of doubt, and without limitation of the foregoing, Borrower acknowledges that its obligations under this **clause (J)** shall apply to any proposed Air Rights Release and that Borrower shall pay all such costs, expenses and charged upon demand regardless of whether such proposed Air Rights Release shall be consummated.

Upon satisfaction of each of the applicable conditions contained in this **Section 5.1(kk)** and provided that Agent shall have otherwise approved the Air Rights Release as set forth in this first proviso of this **Section 5.1(kk)**, Agent shall execute and deliver all customary and appropriate documentation required to release the Air Rights from the Lien of the Deed of Trust and the other Loan Documents.

(kk)    <u>Recordation of New Plat</u>.  Within 45 days after the Closing Date, Borrower shall record a new map (the "**New Plat**") with respect to the Property (as such time period may be extended in Agent's sole discretion), and within 45 days after such recordation (as such time period may be extended in Agent's sole discretion) Borrower shall deliver the following:

(i)    with respect to the Qualified Title Policy, (x) the following endorsements: (A) a date-down endorsement in the form of **Exhibit N**. amending the effective date of the Qualified Title Policy to be the date and time of recording of the Deed of Trust Amendment, (B) a new "land same as survey" endorsement, (C) a new contiguity endorsement and (D) a 116.3 "new subdivision" endorsement in the form attached hereto as **Exhibit Z**; (y) revisions to the legal description contained in the Qualified Title Policy and to match the Updated Survey; and (z) confirmation that Borrower is the owners of record of the land and improvements covered by the New Plat, in each case in form and  substance reasonably satisfactory to Agent;

(ii)    a revised Qualified Survey (the "**Updated Survey**"), for which all necessary fees (where applicable) have been paid, dated no more than thirty (30) days before the filing of the applicable Deed of Trust Amendment or such other date as Agent shall reasonably determine, consistent with the Qualified Survey,

(iii)    an amendment to the Deed of Trust (the "**Deed of Trust Amendment**"), duly executed and acknowledged by Borrower and in a form suitable for filing or recording, revising the legal description set forth in Exhibit A of the Deed of Trust so that it is consistent with the New Plat and the Updated Survey and otherwise in form and substance reasonably satisfactory to Lender; and

(iv)    an amendment to any UCC fixture filings filed in connection with the closing of the Loan in a form suitable for filing or recording, revising the legal description set forth therein so that it is consistent with the New Plat and the Updated Survey and otherwise in form and substance reasonably satisfactory to Agent.

(ll)    County Title Document and Flyover Easement Requirements.

(i)    Not later than April 7, 2007 Borrower shall file an extension of time application with the Board of County Commission with respect to the issuance of the H-1 zoning designation as contemplated under land use application NZC-1866-03 approved by the Board of County Commission on April 7, 2004, and shall proceed with diligence to procure the issuance of such an extension of time.

(ii)    Borrower shall fully perform its obligations under the County Title Documents and the Flyover Easement and shall immediately notify Agent of any default or event which, given notice, the passage of time, or both, could become a default, under any of the County Title Documents or the Flyover Easement.

(iii)    Borrower shall timely obtain approval from the County of any Plans and Specifications that have the potential of interfering with takeoffs and landings at airports that are in the vicinity of the Project to the fullest extent required under Section 3(b)(i) of the Airport Property Restrictive Covenant, and provide evidence thereof to Agent promptly after receipt of the same.

(mm)    Conditions Subsequent to Closing.

(i)    Within thirty (30) days after the Closing Date (as such time period may be extended in Agent's sole discretion), Borrower shall open the Collection Accounts and sub-accounts thereto. Upon the establishment of the Collection Account and the sub-accounts thereto, Borrower shall deliver to Agent simultaneously with the establishment of such Accounts, (a) if the Cash Management Bank is not DBTCA, evidence of establishment of the same, (b) a fully executed original counterparts of (i) the Cash Management Agreement and the Pledge Agreement and (ii) a consent to the pledge of the Cash Management Account and the sub-accounts thereto (or, if Agent so determines, an account control agreement) from the Cash Management Bank, in either case in a form and substance satisfactory to Agent and (c) a legal opinion from counsel satisfactory to Agent with respect to the due execution, delivery, validity, authority and enforceability of the Cash Management Agreement and Pledge Agreement such other matters as Agent may reasonably require.

(ii)    Within thirty (30) days after the Closing Date (as such time period may be extended in Agent's sole discretion), Borrower shall deliver to Agent copies of the electric and telecom will-serve letters required for the Project.

(iii)    Within thirty (30) days after the Closing Date (as such time period may be extended in Agent's sole discretion), Borrower shall enter into an easement agreement (the "**Flyover Easement**") with the County providing for, among other things, access by the County over certain portions of the Property, maintenance by Borrower of a public road and construction by Borrower of a "flyover" ramp adjacent to the Property, which Flyover Easement shall be substantially in the form approved by Agent prior to the Closing Date or otherwise in form and substance satisfactory to Agent in its sole discretion.  Upon execution of the Flyover Easement by Borrower and the County, Borrower shall promptly cause the Flyover Easement to be recorded in the Office of the Clark County Recorder.

(iv)    At the request of Agent, Borrower shall deliver to Agent original counterparts of (A) each Construction Agreement, (B) the Architect's Contract and (C) each Engineer's Contract.

5.2    <u>Covenants with Respect to the Borrower Parties</u>.  Each of the Borrower Parties hereby covenant and agree with Lenders and Agent as follows:

(a)    <u>Transfers; Subsidiaries</u>.  No Borrower Party shall permit to be Transferred in any manner any ownership interest in Borrower or Parent (other than as permitted under **Section 6.1(i)(ii)**) and no Borrower Party shall form any Subsidiaries.

(b)    <u>Independent Member</u>.  During the period when any portion of the Debt is outstanding, Parent shall maintain at least two (2) Independent Members or Independent Managers and a failure to do so shall constitute an immediate Event of Default.

(c)    <u>Covenants; Representations and Warranties</u>.  Each Borrower Party shall (A) make the representations and warranties set forth in **Section 4.2** and (B) comply with, perform and observe all obligations, covenants, obligations and duties and make, as and when required, the representations and warranties, hereunder and under any other Loan Document that purport to bind it or apply to it, including those provisions of the Loan Documents that apply to a "Borrower Party" or the "Borrower Parties".

(d)    <u>Certain Guarantor Covenants relating to Net Worth and Cash and Cash Equivalents</u>.  (i) Each Guarantor hereby covenants and agrees with Agent and Lenders that, until such time as the Debt shall have been unconditionally paid in full and the Lenders' Commitments have been terminated, Guarantors shall together (A) maintain a minimum tangible aggregate net worth of not less than $650,000,000 in the aggregate and (B) maintain, from and after the date of the Initial Advance, Cash and Cash Equivalents, in an aggregate amount not less than $25,000,000, which Cash and Cash Equivalents shall be at all times free and clear of all Liens (and are not otherwise subject to any contractual restrictions).

(ii)    In the event (A) any contingent liabilities or guarantees of either Guarantor become an actual cost overrun and become due and payable or (B) any Indebtedness of either Guarantor in the aggregate principal amount in excess of $25,000,000 shall not be paid on its scheduled maturity, unless extended by the applicable lender, shall be declared (or shall become) due and payable prior to its scheduled maturity by the applicable lender or shall be required to be prepaid other than by a regularly scheduled prepayment prior to the stated maturity thereof, Guarantor shall promptly provide Agent with notice of the same along with a certificate from

Guarantors confirming that Guarantors remain in compliance with the requirements of **Sections 5.2(d)(i)(A)** and **5.2(d)(i)(B)**.

(iii)    Each Sponsor hereby further covenants and agrees with Agent and Lenders that, other than with respect to Sponsor's proposed Fontainebleau Las Vegas project located at the intersection of Las Vegas Boulevard and Riviera Drive in Las Vegas, Nevada and the construction of additional retail space on the Fry parcel located adjacent to the Project, until such time as the Debt shall have been unconditionally paid in full and the Lenders' Commitments have been terminated, without the prior written consent of Agent to be granted or withheld in Agent's sole discretion, neither Sponsor shall commence construction in respect of any other property located in, or within a thirty (30) mile radius of, Las, Vegas, Nevada which could reasonably be determined to directly compete with the Project.

## ARTICLE VI
## NEGATIVE COVENANTS

6.1    <u>Negative Covenants</u>.  Borrower hereby covenants and agrees with Agent and Lenders as follows:

(a)    <u>Operation of Property</u>.  Borrower shall not (except as elsewhere herein expressly provided): (i) surrender, cancel or terminate, or permit the surrender, cancellation or termination of, any Material Agreement, (ii) except as permitted by this **Section 6.1(a)**, increase or consent to the increase of the amount of any fees or charges under any Material Agreement without Agent's approval, (iii) enter into any Material Agreement without the prior written approval of Agent or (iv) except as permitted by this **Section 6.1(a)**, otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement in each case without Agent's approval and in the case of any such surrender, cancellation or termination of a Material Agreement, Borrower shall, following the approval of Agent, replace such Material Agreement within a commercially reasonable period with another agreement that provides substantially equivalent benefits to Borrower, on terms and conditions no worse to Borrower than the corresponding benefits, terms and conditions which applied under the agreement replaced and upon terms and conditions approved by Agent.  Any and all amendments, supplements or other modifications to any Material Agreement that are conditioned upon Agent's approval must be requested in writing by Borrower, and any such amendments, supplements or other modifications which (A) if they relate to non-monetary rights or obligations under the applicable Material Agreement, are material or (B) if they relate to monetary rights or obligations under the applicable Material Agreement, result in an increase, individually and when aggregated with all prior increases, exceeding five percent (5%) of the fees and charges payable thereunder in any one or more calendar years or for the entire remaining term of the applicable Material Agreement, shall be conditioned upon the written consent of Agent, which consent may be subject to such conditions and qualifications as Agent may reasonably prescribe, and Agent at all times has the right to require compliance with the original agreement relating thereto, except where modified as herein provided.  To the extent of any inconsistency between the preceding sentence and **Section 7.4(a)**, **Section 7.4(a)** shall govern and control.  Any Material Agreement or amendment or other modification thereto that requires Agent's consent pursuant to this **Section 6.1(a)** shall be delivered to Agent for approval not less than ten (10) days prior to the effective date of the same.  Any request by Borrower for the approval by Agent of any amendments, supplements, replacements or other modifications to a Material Agreement required pursuant to this **Section 6.1(a)** shall be delivered to Agent in writing and Agent shall advise Borrower whether such consent is granted or denied within ten (10) Business Days after receipt of such written notice; <u>provided, however</u>, that, if Agent shall not advise Borrower of its determination within such ten

(10) Business Day period, then such proposed amendments, supplements, replacements or other modifications shall be deemed approved by Agent.

(b)    Liens. Other than in connection with the Loan Documents or as otherwise expressly permitted by the Loan Documents, Borrower shall not (i) create or incur or suffer to be created or incurred or to exist any lien, security title, encumbrance, mortgage, pledge, negative pledge, charge, restriction or other security interest of any kind upon all or any portion of the Collateral, or upon the income or profits therefrom, other than the Permitted Encumbrances; (ii) Transfer any of the Collateral or the income or profits therefrom for the purpose of subjecting the same to the payment of Indebtedness or performance of any other obligation in priority to payment of its general creditors; (iii) suffer to exist for a period of more than thirty (30) days after the same shall have been incurred any Indebtedness (other than Permitted Debt) or claim or demand against it that if unpaid might by Law or Regulation or upon bankruptcy or insolvency, or otherwise, be given any priority whatsoever over its general creditors; (iv) sell, assign, pledge or otherwise Transfer any accounts, contract rights, general intangibles, chattel paper or instruments, with or without recourse, that constitute any portion of the Collateral; or (v) incur or maintain any obligation to any holder of Indebtedness which prohibits the creation or maintenance of any lien securing the Secured Obligations.

(c)    Dissolution, Significant Capital Transactions, Restrictions on Acquisitions and Commencement of Development; Partition. (i) None of the Borrower Parties shall (A) dissolve, terminate, wind up its affairs, liquidate, merge with or consolidate into another Person, except as permitted expressly hereunder, (B) (1) file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings, (2) dissolve, liquidate, consolidate, merge or sell all or substantially all of its assets other than in connection with the repayment of the Debt or (3) file or solicit the filing of an involuntary bankruptcy petition against Borrower or any Affiliate or officer of Borrower or (C) Transfer or lease, in one transaction or any combination of transactions, all or any part of any of the Collateral (except for the entering into by Borrower of Leases, in each case as permitted by and in accordance with the Loan Documents), or all or any material part of its assets unrelated to the Collateral (other than the pledging by Parent of its limited liability company interests in Borrower in accordance with the terms of the Mezzanine Loan Agreement).

(ii)    Borrower shall not acquire any real property other than the Mortgaged Property or commence any development, construction or material alteration of any project other than the Project.

(iii)    Borrower shall not partition or subdivide all or any portion of the Mortgaged Property without Agent's prior consent.

(d)    Change in Business. Neither Borrower not Parent shall make any material change in the scope or nature of its business objectives or purposes, or undertake or participate in activities other than the continuance of their present businesses.

(e)    Debt Cancellation. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to it in connection with the Mortgaged Property, including any arising under any of the applicable Leases and Material Agreements except (i) with respect to such Leases and Material Agreements, in accordance with and subject to the terms of this Agreement and (ii) with Agent's consent, with respect to other matters, for adequate consideration in the ordinary course of such Person's business and on commercially reasonable terms, subject to other restrictions contained herein or in any other Loan Document.

(f)      Affiliate Transactions.  Borrower shall not, without Agent's consent, enter into, or be a party to, any transaction with any other Borrower Party or any Affiliate of any Borrower Party relating to or which affects the Collateral, other than (i) transactions which are customary and in the normal course of business, and on terms and conditions substantially as favorable to Borrower as would be obtainable by any of them in a comparable arm's-length transaction with a Person other than an Affiliate and (ii) after notice to Agent expressly stating that consent is sought for a transaction with an Affiliate and accompanied by a copy of the final form of the proposed agreement.

(g)      Zoning and Uses.  Borrower shall not (i) initiate or support any limiting change in the permitted uses of the Mortgaged Property (or, to the extent applicable, zoning reclassification of the Mortgaged Property), seek any variance under existing land use restrictions, Laws or Regulations (or, to the extent applicable, zoning ordinances) applicable to the Mortgaged Property or use or permit the use of the Mortgaged Property in a manner that would result in such use becoming a nonconforming use under applicable land-use restrictions (and, if any, zoning ordinances) or that would violate the terms of any Lease, Title Agreement, Insurance Requirements, Legal Requirements or any Permitted Encumbrance, (ii) modify, amend or supplement any of the terms of any Permitted Encumbrance or Title Agreement, (iii) impose or permit or suffer the imposition of any Title Agreements other than a Permitted Encumbrance, (iv) execute or file any subdivision plat affecting the Mortgaged Property, institute, or permit the institution of, proceedings to alter any tax lot comprising the Mortgaged Property or (v) permit or suffer the Mortgaged Property to be used by the public or any Person in such manner as might make possible a claim of adverse usage or possession or of any implied dedication or easement.

(h)      Debt.  Borrower shall not incur, create, assume or be liable with respect to any additional indebtedness (including any secondary or junior financing or any preferred equity investment) with respect to all or any portion of the Mortgaged Property other than Permitted Debt, or create or permit to be created or to remain, any Lien on, or conditional sale or other title retention agreement with respect to the Premises or any part thereof or income therefrom, other than the Loan Documents and the Permitted Encumbrances.

(i)      Transfers.  (i)  Transfer of the Collateral.  Except in compliance with another express provision of this Agreement, there shall be no Transfer of the Collateral, directly or indirectly, by operation of law or otherwise.

(ii)      No Transfers of Interests in Borrower Parties.  No Borrower Party shall Transfer (or permit the Transfer of) any interest in itself.  If any Borrower Party or Person Controlled by a Borrower Party shall Transfer any direct or indirect interest held by it in a Borrower Party, directly or indirectly, by operation of law or otherwise to any Person, such Transfer (unless approved in writing in advance by Agent) shall constitute an Event of Default; provided that the foregoing shall not preclude the pledging by Parent of one hundred percent (100%) of its limited liability company interests in Borrower to Mezzanine Lender in accordance with the terms of the Mezzanine Loan Agreement or, subject to the terms of the Intercreditor Agreement, the Transfer of such interest to Mezzanine Lender by foreclosure, a transfer in lieu of foreclosure or otherwise in connection with Mezzanine Lender's exercise of its remedies pursuant to the Mezzanine Loan Agreement.

(iii)      Transfer of Equipment.  Notwithstanding **Section 6.1(i)(i)**, Borrower may Transfer Equipment that is either being replaced or that is no longer necessary in connection with the operation of the Mortgaged Property free from the interest of Lenders or Agent under this Agreement or any other Loan Document, provided that such Transfer (when compared to the

non-Transfer of such Equipment) will not materially adversely affect the value of the Mortgaged Property, will not impair the utility thereof and (except where the same would not have a Material Adverse Effect) will not result in a reduction or abatement of, or right of offset against, the rentals or other amounts payable under any Lease or any Title Agreement, in either case as a result thereof, <u>provided</u> that any new Equipment acquired by Borrower (and not so disposed of) shall be subject to the interest of Agent under this Agreement and the other Loan Documents unless leased to Borrower (in which event, Agent shall be made a collateral assignee of Borrower's interest in such lease (but, unless expressly subsequently assumed by Agent, Agent shall have no obligations under Borrower's interest therein)).

(iv)    <u>Project Sales</u>.  Neither Borrower, its Affiliates nor any Guarantor shall reacquire any interest in the Project within five (5) years after the date of a prepayment of the Debt by Borrower in connection with a Project Sale (any such reacquisition, a "**Project Sale Default**"). The covenant set forth in the foregoing sentence shall survive the expiration or earlier termination of the Loan Documents and the payment of the Debt.

(j)    <u>Transfer of Approvals; Transfer and Removal of Books and Records</u>.  Borrower shall not Transfer any of its interest in any Approval pertaining to the Mortgaged Property, or Transfer or remove or permit any other Person to Transfer or remove any books or records pertaining to the Collateral.

(k)    <u>Place of Business</u>.  Borrower shall not change its principal place of business and chief executive office set forth on the first page of this Agreement without first giving Agent thirty (30) days' prior written notice (but in any event, within the period required pursuant to the Uniform Commercial Code).  Borrower shall not establish a place of business in any state other than the State of Nevada unless, prior to such establishment, at Borrower's sole cost and expense, Borrower delivers a replacement opinion reasonably acceptable to Agent from Borrower's counsel, confirming that a New York court (or a federal court applying New York choice of law rules) would conclude as binding the designation of New York as the jurisdiction whose law is to govern the provisions of the Loan Documents.

(l)    <u>Property Management Documents</u>.  Borrower shall not, without Agent's prior written consent, permit or suffer any significant delegation or subcontracting of a Property Manager's duties set forth in the applicable Property Management Documents or of the Construction Manager's duties set forth in the Construction Management Agreement, unless Agent agreed to such delegation or subcontracting in connection with its approval of the applicable Property Management Documents or Construction Management Agreement.

(m)    <u>Operating Obligations</u>.  Borrower shall not enter into, assume or permit to exist any obligations for the payment of rent for any property (real, personal or mixed, tangible or intangible) under leases, subleases or similar arrangements as lessee other than operating leases entered into in ordinary course of business for Equipment incidental to the management and operations of the Mortgaged Property (in which event, Agent shall be made a collateral assignee of Borrower's interest in such lease (but, unless expressly subsequently assumed by Agent, Agent shall have no obligations under Borrower's interest therein).

(n)    <u>Sale and Leaseback</u>.  Borrower shall not enter into any arrangement pursuant to which it will lease back, as lessee, any property (real, personal or mixed, tangible or intangible) previously owned by any Borrower Party and Transferred, directly or indirectly, to the owner-lessor of such property.

(o)    Limitation on Distributions.  Except as approved by Agent, Borrower shall not permit (i) any distribution of any Rents or other disbursements (including direct or indirect redemptions of membership interests) to or (ii) any payments of any kind on any loans or other advances from, any member, partner, principal, officer, employee, director, shareholder or Affiliate of any Borrower Party at any time the Debt or any portion thereof is outstanding.

(p)    Limitation on Negative Pledge Clauses.  Borrower shall not enter into with any Person any agreement which prohibits or limits the ability of Borrower to create, incur, assume or suffer to exist any Lien on the Collateral, other than this Agreement, the other Loan Documents and the Mezzanine Loan Documents.

(q)    Limitation on Securities Issuances.  None of the Borrower Parties shall issue any membership interests, ownership interests, shares, securities, equity interests, or warrants, rights or options.

(r)    Limitation on Subsidiary Formation.  None of Borrower or Parent shall form a Subsidiary or a partnership, joint venture or other similar arrangement with, or enter into any merger or consolidation with, any Person (except for mergers with Affiliates of Borrower or Parent where one of such entities is the surviving Person), without Agent's prior written reasonable consent in each instance.

(s)    Organizational Documents.  None of Borrower or Parent shall materially amend or modify any of its Organizational Documents without Agent's consent (not to be unreasonably withheld, conditioned or delayed), other than in connection with any Transfer permitted pursuant to **Section 6.1(i)(ii)** or to reflect any change in capital accounts, contributions, distributions, allocations or other provisions that do not and could not reasonably be expected to have a Material Adverse Effect.  Notwithstanding the foregoing, in no event shall Borrower or Parent amend or modify (or permit to be amended or modified) any of its Organizational Documents if such amendment or modification would cause it to cease to be a Single Purpose Entity.

(t)    No Joint Assessment.  Borrower shall not suffer, permit or initiate the joint assessment of the Mortgaged Property (i) with any other real property constituting a tax lot separate from any of the Mortgaged Property and (ii) unless required by applicable Law or Regulation, with any portion of the Mortgaged Property that may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes that may be levied against such personal property shall be assessed or levied or charged to the Mortgaged Property.

(u)    Brokerage Agreements.  Borrower shall not enter into any brokerage or listing agreements for the Mortgaged Property, without Agent's prior written consent.

(v)    Waste.  Borrower shall not commit, permit or cause any waste to the Mortgaged Property.

(w)    Misappropriation/Misapplication.  Borrower shall not commit, cause or permit any misappropriation or misapplication of Rent, Operating Income, security deposits, Insurance Proceeds or Condemnation Proceeds relating to the Mortgaged Property.

(x)    No Other Development Activity.  Except as may be otherwise provided in **Section 5.2(d)(ii)**, until such time as the Debt shall have been unconditionally paid in full and the Lenders' Commitments have been terminated, none of Borrower, Parent, Sponsor or any Affiliate of any of the foregoing which is Controlled by a Borrower Party shall, without the prior consent