of Agent, commence the construction of any other project located in, or within a thirty (30) mile radius of, Las Vegas, Nevada which could reasonably be determined to directly compete with the Project.

(y)   ERISA. Borrower shall not engage in any activity that would subject it to regulation under ERISA or qualify it as an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) to which ERISA applies and Borrower's assets do not and will not constitute Plan Assets. Borrower shall not engage in any transfer, restructuring, merger or change of control to the extent same would cause Borrower to cease to qualify as a REOC.

(z)   Payments to Affiliates. Except as may be otherwise permitted hereunder, neither Borrower, nor any Borrower Party, nor any Affiliate of any of the foregoing shall receive any payment or distribution of any kind whatsoever (whether in the nature of a dividend, interest, payment of principal, return of capital, liquidating distribution, distribution of cash flow, distribution with respect to stock or capital, payment for goods sold or services rendered, or otherwise) from Borrower.

(aa)   Alterations. From and after Substantial Completion, Borrower shall not undertake or permit any alteration of any portion of the Improvements that is (i) not Capital Expenditure Work previously approved by Agent in connection with Agent's approval of the Budget or otherwise, or (ii) not tenant improvements pursuant to any Lease approved by Agent (collectively, the "**Approved Alterations**") without giving prior written notice to Agent (accompanied by plans and specifications and a detailed budget), and Agent's prior approval shall be required in connection with any such alterations if the cost of such alterations, when aggregated with all prior alterations (other than Approved Alterations) is reasonably anticipated to exceed $1,000,000 in the aggregate. Agent may require, as a condition to granting its consent, that Borrower deliver to Agent as security for the payment of the cost of such alterations and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) Cash Equivalents or (iii) other securities acceptable in all respects to Agent.

6.2   Agent's Approval. In any instance in **Section 6.1** in which Agent agrees to be reasonable in its approval or disapproval of a transaction that would otherwise be prohibited thereunder, it is agreed that such approval may be reasonably conditioned.

## ARTICLE VII
## CONSTRUCTION PROVISIONS

7.1   Construction Covenants. Borrower hereby covenants and agrees with Agent and Lenders as follows:

(a)   Schedule of Work. To ensure that the Work proceeds in an orderly and timely fashion in accordance with the Construction Schedule.

(b)   Construction Costs and Expenses. Subject to **Section 5.1(b)(ii)**, to pay when due the Construction Costs associated with the Project.

(c)   Completion of Construction. To pursue diligently and complete construction of all Improvements to Substantial Completion and to obtain temporary certificates of occupancy on or prior to the Completion Date in accordance with the Plans and Specifications and in compliance with all Title Agreements, all Legal Requirements and with all terms and conditions of the Loan Documents; to obtain and maintain all Approvals, to pay all sums, and to perform

NYDOCS03/808140.12                                101

such duties as may be necessary to complete such construction of the Improvements in accordance with the Plans and Specifications and in compliance with all Title Agreements, Legal Requirements, and with all terms and conditions of the Loan Documents, all of which shall be accomplished on or before the Completion Date, free from any Liens (other than Liens being contested by Borrower in accordance with **Section 5.1(b)(ii)**), claims or assessments (actual or contingent) asserted against the Mortgaged Property for any material, labor or other items furnished in connection therewith. Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Agent on or before the Completion Date. In addition, Final Completion shall occur within six (6) months after the Completion Date. The failure of Substantial Completion to occur on or prior to the Completion Date shall constitute an Event of Default for which there shall be no applicable notice, grace or cure period. Further, the failure of Final Completion to occur on or prior to the date required by this **Section 7.1(c)** shall constitute an Event of Default for which there shall be no applicable notice, grace or cure period.

(d)      Fees and Expenses. To pay when due the fees and expenses of inspecting architects and engineers, title insurance companies, surveyors, environmental consultants, insurance consultants and all other consultants retained in accordance with or as permitted by the Loan Documents.

(e)      Construction Consultant/Duties and Access. To permit Agent to retain the Construction Consultant at the cost of Borrower to perform the following services on behalf of Agent:

(i)      To review and advise Agent whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory;

(ii)      To review Draw Requests and change orders;

(iii)      To make periodic inspections (approximately at the date of each Draw Request) for the purpose of assuring that construction of the Improvements to date is in accordance with the Plans and Specifications and the Construction Documents and to approve Borrower's then current Draw Request as being consistent with Borrower's obligations under this Agreement; and

(iv)      Generally, to advise Agent on matters relating to the construction of the Improvements.

The fees and expenses of the Construction Consultant and expenses incurred by Agent on account thereof shall be reimbursed to Agent out of the next available Advance, but neither Agent nor the Construction Consultant shall have any liability to Borrower on account of (A) the services performed by the Construction Consultant, (B) any neglect or failure on the part of the Construction Consultant to perform its services or (C) any approval by the Construction Consultant of construction of the Improvements. Neither Agent nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Improvements or the absence therefrom of defects.

(f)      Construction Consultant. Borrower acknowledges that (i) the Construction Consultant has been retained by Agent to act as a consultant and only as a consultant to Agent in connection with the construction of the Improvements and has no duty or obligation to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Agent or Lenders and

any such purported decision, approval, consent, act or thing by the Construction Consultant on behalf of Agent or any of Lenders shall be void and of no force or effect, (iii) while Agent is entitled to rely upon reports, opinions and advice of the Construction Consultant, Agent reserves the right to make any and all decisions required to be made by Agent under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Agent under this Agreement and to accept or not accept any matter or thing required to be accepted by Agent under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Agent or any other Person and (v) Agent reserves the right in its sole and absolute discretion to replace the Construction Consultant with another inspecting engineer at any time and without prior notice to or approval by Borrower.

(g)     Correction of Defects. To correct promptly all defects in the Improvements or any departure from the Plans and Specifications not previously approved by Agent to the extent required hereunder. Borrower agrees that the making of any Advance, whether before or after such defects or departures from the Plans and Specifications are discovered by, or brought to the attention of, Agent shall not constitute a waiver of Agent's right to require compliance with this covenant.

(h)     Bonds. To furnish to Agent all Payment and Performance Bonds required hereunder and maintain such Payment and Performance Bonds in accordance with applicable Laws and Regulations.

(i)     Trade Contractors. To notify Agent immediately, and in writing, if Borrower receives any default notice, notice of Lien or demand for past due payment, written or oral, from any Trade Contractor and to furnish to Agent at any time and from time to time upon reasonable demand by Agent, and, following payment to the applicable Major Contractor or Major Subcontractor, Lien waivers in form reasonably satisfactory to Agent bearing a then current date from the Major Contractors and the Major Subcontractors.

7.2     Cost Overruns. If Borrower becomes aware of any change in Construction Costs which will increase a category or line item of Construction Costs reflected on the Approved Construction Budget, Borrower shall within five (5) Business Days thereafter notify Agent in writing and promptly submit to Agent for its approval a revised Construction Budget for Agent's review and approval. Any reallocation of any category or line items in any Construction Budget in connection with cost overruns shall be subject to Agent's approval (other than with respect to the use of the Contingency Reserve as provided for in, and subject to the terms of, **Section 7.3**). Lenders shall have no obligation to make any further Advances unless and until the revised Construction Budget so submitted by Borrower is approved by Agent. Any revised Construction Budget so approved shall thereafter be deemed to be the "Approved Construction Budget" and shall supersede in its entirety any prior Approved Construction Budget which prior Approved Construction Budget shall be of no further force or effect.

7.3     Contingency Reserve. Subject to the prior written approval of Agent, Borrower may from time to time, by providing Agent with a revised Construction Budget indicating the proposed changes, move amounts available under (i) the Hard Costs Contingency to other Hard Costs budget lines on a *pro rata* basis according to the percentage of construction trade items completed or (ii) the Soft Costs Contingency to other Soft Costs budget lines on a *pro rata* basis according to the percentage of

construction trade items completed. Any revised Construction Budget so approved shall thereafter be deemed to be the "Approved Construction Budget" and shall supersede in its entirety any prior Approved Construction Budget which prior Approved Construction Budget shall be of no further force or effect.

7.4    Approval of Change Orders; Cost Savings. (a) Borrower shall permit no deviations from the Plans and Specifications during construction without the prior approval of Agent; provided that Borrower may make changes without Agent's prior approval so long as (i) any increased costs resulting from such changes do not exceed $500,000 individually and $2,000,000 in the aggregate, (ii) such changes do not cause any line item in the Approved Construction Budget to be exceeded (after taking into account use of the Contingency Reserve to the extent permitted under **Section 7.3**, reallocations under **Section 7.2** and this **Section 7.4**), (iii) such changes do not materially change the gross square feet or the NRSF of the Retail Portion or the Office Portion or the number of units (or number of types of units) to be contained in the Retail Portion or the Office Portion, or the basic layout of the Improvements or of the units to be contained therein, or involve the use of materials, furniture, fixtures and equipment that will not be at least equal in quality to the materials, furniture, fixtures and equipment originally specified in or required by the approved Plans and Specifications and (iv) such changes will not extend the Construction Schedule or conflict with any Legal Requirements. Borrower shall use its commercially reasonable efforts to deliver to Agent prior notice of such change orders or, if Borrower is unable to deliver prior notice, Borrower delivers such notice as soon thereafter as is reasonably practicable. Notwithstanding the foregoing, Borrower shall be allowed to make nonmaterial field changes that do not affect the scope, quality or character, or increase the cost of, the Improvements without Agent's, Lenders' or the Construction Consultant's consent or approval.

(b)    If the Loan and the Mezzanine Loan are each then in balance, Borrower may allocate verifiable cost savings actually achieved in any line item of the Approved Construction Budget to the Contingency Reserve or to other line items of such Approved Construction Budget which Borrower reasonably determines are underfunded, provided that (i) Borrower shall provide evidence of such cost savings to Agent, which evidence shall be reasonably satisfactory to Agent and (ii) if such costs savings are being allocated to an underfunded line item of the Approved Construction Budget, then (A) such underfunded line item has a binding contract or subcontract in place and (B) the applicable Work has commenced and is proceeding in accordance with the Construction Schedule and other Construction Documents.

7.5    Insufficiency of Loan Proceeds. Notwithstanding anything contained herein to the contrary, if at any time or from time to time during the term of this Agreement, in Agent's opinion (after taking into effect amounts remaining in the Contingency Reserve available for allocation to the applicable line item and based upon a percentage of completion analysis), the cost of completing any line item in the Approved Construction Budget exceeds the remaining undisbursed portion of the Loan Amount and the Mezzanine Loan Amount allocated to such line item in the Approved Construction Budget (the amount of such deficiency being the "**Shortfall**"), no further Advances to Borrower shall be made by Lenders until Borrower either individually or in combination (a) deposits with Agent the Shortfall, (b) infuses the Shortfall into the Project by payment of expenses in Cash or other manner satisfactory to Agent and delivers to Agent evidence thereof satisfactory to Agent, (c) provides Agent with other assurance satisfactory to Agent (such as a letter of credit in a form and from an issuer rated "AA-/Aa3" by the Rating Agencies and otherwise acceptable to Agent in its sole discretion or guaranty in a form and from a guarantor acceptable to Agent) that the Shortfall will be funded as and when needed, (d) to the extent permitted under **Section 7.3**, allocates the Contingency Reserve to the Shortfall and/or (e) to the extent permitted under **Section 7.4**, reallocates verifiable cost savings from the Approved Construction Budget (or other reallocations which are approved by Agent) in accordance with the terms of this Agreement; provided, however, that, notwithstanding the foregoing, in the event of a Shortfall Agent may call upon the Loan Balancing Guaranty to satisfy such Shortfall prior to a default having

occurred in the payment of any costs of completing any line item in the Approved Budget relating to such Shortfall. Any amounts deposited with Agent pursuant to **clause (a)** or **(c)** shall constitute the "**Completion Reserve**" and (i) shall be held by Agent pursuant to a pledge and assignment agreement in form and substance satisfactory to Agent, which agreement Borrower shall execute and deliver to Agent simultaneously with such deposit, (ii) shall constitute additional collateral for the Loan and (iii) may, at the option of Agent following the occurrence and during the continuance of an Event of Default, be applied either to the costs of completion of the Improvements or to the immediate reduction of the Debt in such order as Agent determines. Prior to an Event of Default, funds in the Completion Reserve shall be released by Agent to Borrower in connection with Draw Requests and following the satisfaction of the conditions set forth in **Article III** for the sole purpose of paying Approved Construction Costs and Borrower shall not use such funds for any other purpose.

       7.6    <u>Retainage</u>. The portion of Retainage that relates to Work or materials supplied by a given Trade Contractor in connection with the Improvements will upon request be disbursed to Borrower as an Advance subject to satisfaction of the following conditions, whether before or after the completion of the Improvements: (a) no Event of Default has occurred and is continuing and all other conditions to an Advance hereunder are met; (b) the Construction Consultant certifies to Agent that such Trade Contractor has completed one hundred percent (100%) of its Work, inclusive of any Punch List Items, and has supplied one hundred percent (100%) of all materials for the Project in compliance with such Trade Contractor's contract and in conformity with the Plans and Specifications; (c) such Trade Contractor will be paid in full for its Work on the Improvements upon the release of such portion of the Retainage; (d) such Trade Contractor executes and delivers all Lien waivers for the Project that may be reasonably requested or required by Agent or by the Title Company to induce the Title Company to insure the Lien of the Deed of Trust against any Lien that may be filed against the Mortgaged Property by such Trade Contractor or any Person claiming through such Trade Contractor; (e) the relevant Designer shall have approved such Trade Contractor's Work, and (f) if required by Agent, such release of such portion of the Retainage shall be approved by any surety company that has issued a payment or performance bond with respect to such Trade Contractor.

       7.7    <u>Stored Materials</u>. (a) Except as provided in this **Section 7.7** or with Agent's prior approval, Lenders shall in no event or under any circumstances have any obligation to make any Advance for materials which are stored off-site.

       (b)    Lenders shall make Advances in accordance with this Agreement to pay for Hard Costs actually incurred by Borrower for materials not yet incorporated in the Improvements but stored on site, which materials are required in connection with the construction of the Improvements, <u>provided</u> that (i) such materials are in accordance with the Plans and Specifications, (ii) such materials are securely stored on site, properly inventoried, and clearly stenciled (in accordance with customary practice) or otherwise marked to indicate that they are the property of Borrower, (iii) the bills of sale and contracts under which such materials are being provided shall be in form and substance reasonably satisfactory to Agent and Construction Consultant, (iv) such materials are insured against casualty, loss and theft in a manner reasonably satisfactory to Agent and Agent is named as a named insured and loss payee on such insurance policy with respect to such materials, (v) Borrower either owns or, after the payment of the bills and invoices therefor (which payment in full shall occur promptly after the applicable Advance for such materials), will own such materials free and clear of all Liens of any nature whatsoever, which ownership shall be established contemporaneously with or promptly after such disbursement by evidence reasonably satisfactory to Agent, (vi) Borrower executes and delivers to Agent such additional security documents as Agent shall deem necessary to create and perfect a first Lien in such materials as additional security for the payment of the Loan, (vii) the aggregate amount of such disbursements for such materials shall in no event at any time exceed the actual Hard Costs incurred by Borrower for such materials as verified by Construction Consultant pursuant to the provisions of this Agreement, (viii) the aggregate amount of such

disbursements of the Loan and the Mezzanine Loan for such materials which are stored on-site and which is outstanding at any given time shall in no event exceed $5,000,000 and (ix) if required by Agent, Architect or the Construction Consultant, shall certify that it has inspected such materials and they are in good condition and suitable for use in connection with the Project.

(c)    Lenders shall from time to time make Advances in accordance with the terms of this Agreement for the purchase of certain finally assembled, fully fabricated building materials that are ready for delivery to the Project but are temporarily stored at off-site locations in the United States other than the Project and that are approved by the Construction Consultant prior to the delivery to the Project or incorporation of such materials into the Improvements (collectively, "**Off-Site Building Materials**"); provided that, in the case of each such Advance, the conditions contained in **Section 7.7(b)** have been satisfied with respect to the Off-Site Building Materials, other than the requirement of **Section 7.7(b)(ii)** contained therein with respect to the storage of such materials on site, and Agent shall have received (i) a written statement from the manufacturer or storer of such Off-Site Building Materials (or a provision in the purchase order therefor to such effect) that Agent, the Construction Consultant and either of their agents may fully inspect such Off-Site Building Materials at all reasonable times and (ii) evidence that the aggregate amount of such disbursements of the Loan and the Mezzanine Loan for Off-Site Building Materials and which is outstanding at any given time does not at any time exceed $5,000,000.

(d)    With respect to any Off-Site Building Materials for which Borrower seeks to apply all or a portion of an Advance, Borrower shall deliver, or cause to be delivered, to Agent with the relevant Draw Request the following documents:  (i) bills of lading, warehouse receipts, delivery receipts or other documents of title with respect to the Off-Site Building Materials for which such Advance is made, which shall be in form and substance reasonably satisfactory to Agent in all respects; (ii) a statement from the seller of such Off-Site Building Materials to the effect that title thereto has passed to Borrower outright, subject only to Agent's and Lenders' Lien thereon, and that no Lien has or will be filed or claimed by the seller in connection therewith, in form and substance reasonably satisfactory to Agent in all respects; and (iii) a certificate of Borrower in form and substance reasonably acceptable to Agent in all respects to the effect that such Off-Site Building Materials are owned by Borrower outright, free and clear of all Liens, other than Liens in favor of Agent and Lenders, and that all of the terms of this paragraph have been complied with. No Advance for Off-Site Building Materials shall be made unless the Off-Site Building Materials covered thereby are stored at a location, other than the Project, acceptable to Agent and the Construction Consultant and are (A) stored in a designated and secure area, conspicuously marked to show that they are the subject of a security interest by Agent and Lenders and said Off-Site Building Materials will not be moved except in connection with their delivery to the Project; (B) effectively segregated (to the extent possible) from all other materials of whatever kind located at the off-site location in question;  and (C) reasonably anticipated to be incorporated into the Project within ninety (90) days of the Advance therefor.

7.8    Interest Line Item.  The existence or establishment of an interest line item in the Approved Construction Budget shall not relieve Borrower of its obligations to pay interest, as and when due, in accordance with the Loan Documents unless and until Agent actually applies funds from such reserve to the payment of interest as provided under **Section 2.6.6**.

7.9    No Reliance.  All conditions and requirements of this Agreement are for the sole benefit of Agent and Lenders and no other Person (including the Construction Consultant or Trade Contractors) shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Agent shall have the right, in its sole and absolute discretion, to waive any such condition or requirement.

7.10    No Acceptance of Construction by Agent and Lenders. The making of an Advance by Lenders shall not constitute Agent's or Lenders' approval or acceptance of the construction theretofore completed or the materials furnished in connection therewith. Agent's inspection and approval of the Plans and Specifications, the construction of the Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Agent or Lenders, the sole obligation of Agent and Lenders as the result of such inspection and approval being to make the Advances if, and to the extent, required by this Agreement.

7.11    Quality of Work. If there exists any defective Work that has not been cured, then at the time of the next Advance hereunder following the discovery of such defective Work, a portion of such Advance in an amount determined by Agent and the Construction Consultant as necessary to cure such defective Work shall be held back by Agent and shall not be advanced until such Work has been cured to the satisfaction of Agent and the Construction Consultant.

7.12    Assignment of Rights and Claims. Borrower shall collaterally assign to Agent on behalf of Lenders, as additional security for the Loan, to the extent permitted, all rights and claims Borrower may have against all Trade Contractors, provided that Agent may not pursue any such right or claim unless an Event of Default has occurred and is continuing.

ARTICLE VIII
PROPERTY MANAGEMENT

8.1    Property Management Documents. Borrower shall enter into a Property Management Agreement and a Property Management Recognition Agreement with respect to the Office Portion and the Retail Portion on or prior to the date that is ninety (90) days prior to the date that the Project is due to open for business. With respect to each of the Office Portion and the Retail Portion, Borrower shall not enter into a Property Management Agreement unless such Property Management Agreement is with an Acceptable Property Manager and is approved by Agent in advance of the effective date of the Property Management Agreement (and Agent shall act in its reasonable discretion). Each Property Management Agreement shall provide that to the extent any Management Fees payable to the applicable Property Manager thereunder exceed two percent (2%) of gross revenue, such Management Fees shall be paid after payment of all amounts due and payable to Agent and Lenders hereunder; provided, however, that the foregoing shall not apply to amounts payable by Borrower to Centra Properties, LLC under the Centra Asset Management Agreement in connection with leasing commissions and tenant build out. Each Property Manager retained in accordance with this Agreement shall provide to Agent a duly executed Property Manager Recognition Agreement at the time such Property Manager is retained. The Mortgaged Property shall be managed under the terms of and in accordance with the Property Management Documents. Borrower shall (a) diligently perform and observe all of the terms, covenants and conditions of the Property Management Documents on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Property Management Documents and (b) promptly notify Agent of the giving of any notice to Borrower of any default or event of default (or event or condition which, with notice or passage of time, or both, would constitute a default) under any Property Management Document by Borrower in the performance or observance of any of the terms, covenants or conditions of any Property Management Document on the part of Borrower to be performed and observed and deliver to Agent within three (3) Business Days after the first to occur of (i) receipt by Borrower of such notice or (ii) the date Borrower obtains actual knowledge of the occurrence of such default or potential default, a true copy of each such notice and a detailed description of the actions to be taken by Borrower to cure such default and the dates by which each such action shall occur. Such schedule shall be subject to Agent's approval. Borrower shall take all such actions as are necessary to cure such default or potential default by the date approved by Agent (acting in its reasonable discretion). If Borrower shall default

beyond applicable cure periods in the performance or observance of any term, covenant or condition of any Property Management Document on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement or the other Loan Documents and without waiving or releasing Borrower from any of its obligations hereunder or under any other Loan Document, Agent may pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Property Management Document on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower to the end that the rights of Borrower in, to and under any Property Management Document shall be kept unimpaired and free from default and any such payment or such action is hereby authorized by Borrower. Agent and any Person designated by Agent shall have, and are hereby granted, the right to enter upon the Mortgaged Property at any time and from time to time for the purpose of taking any such action. If any Property Manager shall deliver to Agent a copy of any notice sent to Borrower of default under any Property Management Document, such notice shall constitute full protection to Agent for any action taken or omitted to be taken by Agent in good faith and in reliance thereon. Borrower hereby expressly and irrevocably authorizes Agent, and Borrower grants to Agent an irrevocable power of attorney coupled with an interest, to do, execute, acknowledge and deliver all and every such further acts, documents, deeds, and assurances in the name of Borrower or without the signature of Borrower, to the extent Agent may lawfully do so, in order to cure any and all defaults under any Property Management Document.

        8.2    <u>Modifications to Property Management Documents</u>. (a) Borrower shall not surrender any Property Management Document, consent to the assignment by any Property Manager of its interest in or under any Property Management Document or terminate or cancel any Property Management Document or modify, change, supplement, alter or amend any Property Management Document in any respect, either orally or in writing, without Agent's prior written consent. Any surrender of any Property Management Document or termination, cancellation, modification, change, supplement, alteration or amendment of any Property Management Document by Borrower without the prior consent of Agent shall be void and of no force or effect. Borrower shall, from time to time, use its commercially reasonable efforts to obtain from a Property Manager such certificates of estoppel with respect to compliance by Borrower with the terms of the Property Management Documents as may be requested by Agent. Borrower shall exercise each individual option, if any, to extend or renew the term of any Property Management Document, and Borrower hereby expressly authorizes and appoints Agent its attorney-in-fact solely to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Any sums expended by Agent pursuant to this **Article VIII** shall be deemed to constitute a portion of the Debt, shall bear interest at the Default Rate from the date such cost is incurred to and including the date of payment to Agent, shall be evidenced by this Agreement, secured by the Deed of Trust and shall be immediately due and payable upon demand by Agent therefor.

        (b)    Without limitation of the foregoing, if (i) Borrower or any Property Manager shall be adjudicated a bankrupt or insolvent, if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy Law or Regulation, or any similar federal or state Law or Regulation, shall be filed by or against, consented to or acquiesced in by Borrower or such Property Manager, or if any proceeding for the dissolution or liquidation of Borrower or such Property Manager shall be instituted or (ii) an Event of Default shall occur and be continuing, the Loan accelerated and either a receiver is appointed or Agent, any Lender, any nominee or Affiliate of Agent or any Lender, any purchaser acquiring title from any of the foregoing, any purchaser at a bankruptcy sale or any of the successors or assigns of any of the foregoing acquires title to the Mortgaged Property by virtue of foreclosure, deed in lieu of foreclosure, bankruptcy sale or otherwise, then following any event described in **clause (i)** or **(ii)**, (A) Agent may (subject to the terms of the applicable Property Manager Recognition Agreement) terminate any Property Management Document or (B) Agent may require Borrower to terminate any Property Management Document and, in either case, to engage an Acceptable Property Manager to

replace the terminated Property Manager. Borrower shall engage such Acceptable Property Manager pursuant to a written management agreement that is satisfactory to Agent in all respects and shall be the subject of a Property Manager Recognition Agreement.

ARTICLE IX
ACCOUNTS

9.1    Establishment of Accounts. Borrower acknowledges and confirms that Borrower shall establish either pursuant to **Section 5.1(mm)(i)** or in connection with an Account Funding Event, as applicable, the following Accounts with the Cash Management Bank or Deposit Bank, as applicable:

9.1.1    Collection Account. An account into which all Operating Income shall be deposited, which account shall be established on or prior to the date of the Initial Advance (the "**Collection Account**"); provided, however, that Borrower shall not be required to deposit Operating Income into the Collection Account until the occurrence of an Account Funding Event;

9.1.2    Holding Account. An account into which the Deposit Bank shall, pursuant to the Depository Agreement, transfer all Operating Income (but excluding Net Proceeds, Net Proceeds Deficiency and Security Deposits) constituting available funds on deposit in the Collection Account (the "**Holding Account**"); provided, however, that Borrower shall not be required to establish the Holding Account until the occurrence of an Account Funding Event;

9.1.3    Holding Account Sub-accounts. The following sub-accounts of the Holding Account upon establishment of the Holding Account:

(a)    Tax Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the sums required to be deposited pursuant to this **Article IX** for the payment of Taxes (the "**Tax Account**");

(b)    Insurance Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the sums required to be deposited pursuant to this **Article IX** for the payment of Insurance Premiums (the "**Insurance Account**");

(c)    Debt Service Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the amounts required to be deposited pursuant to this **Article IX** for the payment of Debt Service (the "**Debt Service Account**");

(d)    Operating Expense Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the sums required to be deposited pursuant to this **Article IX** for the payment of Approved Operating Expenses (the "**Operating Expense Account**");

(e)    Rollover Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the sums required to be deposited pursuant to this **Article IX** for the payment of leasing commissions and tenant improvement expenditures (the "**Rollover Account**");

(f)    Capital Expenditure Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the sums

required to be deposited pursuant to this **Article IX** for the payment of Approved Capital Expenditures (the "**Capital Expenditure Account**"); and

      (g)    Excess Proceeds Account. A sub-account of the Holding Account into which shall be deposited from funds on deposit in the Holding Account, the balance (if any) remaining or deposited in the Holding Account after deposits into the foregoing Accounts (the "**Excess Proceeds Account**")

      Notwithstanding anything contained herein to the contrary, if the Account Funding Event is of the type described in **clause (ii)** of the definition thereof and an Account Funding Event of the type described in **clause (i)** of the definition thereof has not yet occurred, Borrower shall only be required to establish and fund the Debt Service Account and the Operating Expense Account, until such time as an Account Funding Event of the type described in **clause (i)** of such definition occurs.

      9.1.4    Collection Account Sub-Accounts. The following sub-accounts of the Collection Account established simultaneously with the Collection Account:

      (a)    Tenant Security Account. A sub-account of the Collection Account into which shall be deposited all Security Deposits (the "**Tenant Security Account**"); and

      (b)    Net Proceeds Account. A sub-account of the Collection Account into which shall be deposited the Net Proceeds, the Net Proceeds Deficiency and the amounts required to be deposited pursuant to **Article X** (the "**Net Proceeds Account**").

      9.1.5    Deliveries to Agent. Upon the establishment of the Holding Account and the sub-accounts thereto, Borrower shall deliver to Agent simultaneously with the establishment of such Accounts, (a) if the Deposit Bank is not DBTCA, evidence of establishment of the same, (b) a fully executed original counterparts of (i) the Depository Agreement and (ii) a consent to the pledge of the Holding Account and the sub-accounts thereto (or, if Agent so determines, an account control agreement) from the Deposit Bank, in either case in a form and substance satisfactory to Agent and (c) a legal opinion from counsel satisfactory to Agent with respect to the due execution, delivery, validity, authority and enforceability of the Depository Agreement and such other matters as Agent may reasonably require.

      9.2    Deposits into the Accounts. Borrower represents, warrants and covenants that:

      9.2.1    Tenant Direction Letter. Upon a relevant Account Funding Event, Borrower shall cause all Operating Income to be deposited directly into the Collection Account within one (1) Business Day after receipt by Borrower or the applicable Property Manager, as applicable. Without limitation of the foregoing, Borrower shall notify and advise each Tenant under each Lease (whether such Lease is presently effective or executed after the date hereof) to send directly to the Collection Account all payments of Rent pursuant to an instruction letter in the form of Exhibit B to the Assignment of Leases.

      9.2.2    Accounts Receivable. Commencing with the first billing statement delivered after delivery a relevant Account Funding Event and for each subsequent statement delivered, Borrower or the applicable Property Manager shall instruct all Persons that maintain open accounts with Borrower or such Property Manager or with whom Borrower or Property Manager does business on an "accounts receivable" basis with respect to the Project to deliver all payments due under such accounts to the Collection Account. Neither Borrower nor any Property Manager shall direct any such Person to make payments due under such accounts in any other manner.

                  

9.2.3    Borrower and Manager Deposits. If after a relevant Account Funding Event, notwithstanding the provisions of this **Section 9.2**, Borrower or any Property Manager receives any revenue or proceeds or other income from the Project, then (i) such amounts shall be deemed to be Account Collateral and shall be held in trust for the benefit, and as the property, of Agent, (ii) such amounts shall not be commingled with any other funds or property of Borrower or such Property Manager or any Affiliate thereof, and (iii) Borrower or such Property Manager shall deposit such amounts in the Collection Account within one (1) Business Day of receipt.

9.2.4    No Revocation. Without the prior written consent of Agent neither Borrower nor any Property Manager shall terminate, amend, revoke or modify any Tenant Direction Letter or any Account in any manner whatsoever.

9.2.5    No Other Accounts. There are no accounts other than the Accounts maintained by Borrower, any Property Manager or any other Person into which revenues from the ownership and operation of the Project are deposited. So long as the Loan shall be outstanding, neither Borrower, any Property Manager nor any other Person shall open any other such account for the deposit of Rent or other income and proceeds from the Project.

9.3    Account Name and Fees. The Accounts shall each be in the name of Borrower for the benefit of Agent, as secured party; provided, however, that in the event Agent Transfers or assigns the Loan, the name of Agent shall be changed to the name of the Transferee or assignee. Borrower shall pay all fees, charges, costs and expense imposed by the Cash Management Bank or the Deposit Bank under the Cash Management Agreement or the Depository Agreement, as applicable, in respect of the Accounts.

9.4    Eligible Accounts/Characterization of Accounts. Each Account shall be maintained as an Eligible Account. Each Account is and shall be treated either as a "securities account" as such term is defined in Section 8-501(a) of the UCC or a "deposit account" as defined in Section 9-102(a)(29) of the UCC. Borrower acknowledges and agrees that (i) the Collection Account and each sub-account thereto shall be maintained as a deposit account in such a manner that Agent shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Collection Account and (ii) the Holding Account and each sub-account thereto shall be maintained as securities accounts in such a manner that Agent shall have control (within the meaning of Section 8-106(d)(2) of the UCC) over the Holding Account and sub-accounts thereto. In its capacity as a "securities intermediary" (within the meaning of Section 8-102(a)(14) of the UCC), the Deposit Bank shall agree that each item of property (whether investment property, financial asset, securities, instrument, cash or other property) credited to the Holding Account and each sub-account thereto shall be treated as a "financial asset" within the meaning of Section 8-102(a)(9) of the UCC. The Cash Management Bank and the Deposit Bank shall, subject to the terms of the Cash Management Agreement or the Depository Agreement, as applicable, treat Agent as entitled to exercise the rights that comprise any financial asset credited to each applicable Account. All securities or other property underlying any financial assets credited to the Holding Account and each sub-account thereto shall be registered in the name of the Deposit Bank, indorsed to the Deposit Bank or in blank or credited to another securities account maintained in the name of Agent and in no case will any financial asset credited to any Account be registered in the name of Borrower, payable to the order of Borrower or specially indorsed to Borrower. Agent shall be entitled to copies of all statements of the Deposit Bank issued in respect of any applicable Account.

9.5    Permitted Investments. Sums on deposit in the Accounts shall not be invested except in Permitted Investments in accordance with the Cash Management Agreement or Depository Agreement, as applicable.

9.6     Sole Dominion and Control.  Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Agent, its authorized agents or designees, subject to the terms hereof.  Neither Borrower nor any Property Manager shall have the right of withdrawal with respect to any Account.

9.7     Initial Deposits.  In connection a relevant Account Funding Event in accordance with this **Article IX**, Agent shall inform Borrower of the amounts, if any, Borrower is to deposit into each of the Tax Account, the Insurance Account, the Operating Expense Account, the Rollover Account and the Capital Expenditure Account.

9.8     Additional Deposits.  Borrower shall make such additional deposits into the Accounts as may be required by this **Article IX** and **Section 2.5**.

9.9     Disbursements from the Holding Account.

9.9.1     Disbursements Prior to Event of Default.  Upon the establishment of the Holding Account and sub-accounts thereto pursuant to this **Article IX**, Borrower irrevocably authorizes Agent to transfer (and, pursuant to the Depository Agreement, shall irrevocably authorize the applicable Deposit Bank to follow any corresponding instructions of Agent) from the Holding Account by 12:00 P.M. (New York City time) on each Payment Date (it being understood that with respect to transfers to each sub-account, funds may be transferred to the applicable sub-account at any time prior to 12:00 P.M. (New York City time) on the applicable Payment Date so long as there are sufficient funds in the Holding Account for such transfer), funds in the following amounts and order of priority (to the extent the applicable sub-account has been established or is required to be funded pursuant to **Section 9.1.3**):

(i)     *First*, to the Tax Account, funds sufficient to pay an amount (the "**Monthly Tax Amount**") equal to one twelfth (1/12th) of the Taxes that Agent estimates will be payable during the next ensuing twelve (12) months in order to accumulate in the Tax Account sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates (such amounts so deposited pursuant to this clause, the "**Tax Funds**");

(ii)     *Second*, to the Insurance Account, funds sufficient to pay an amount (the "**Monthly Insurance Amount**") equal to one twelfth (1/12th) of the Insurance Premiums that Agent estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate in the Insurance Account sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (such amounts so deposited pursuant to this clause, the "**Insurance Funds**");

(iii)     *Third*, to the Operating Expense Account, funds sufficient to pay the Approved Operating Expenses, as the same may be adjusted pursuant to **Section 9.15** for the then current month;

(iv)     *Fourth*, to the Debt Service Account, funds sufficient to pay the Monthly Debt Service Payment Amount due on the Payment Date, which shall be disbursed to Agent in payment of the Monthly Debt Service Payment Amount then due and payable;

(v)     *Fifth*, to the Debt Service Account, funds sufficient to pay any interest accruing at the Default Rate and late payment charges, if any, which shall be disbursed to Agent in payment of such amounts then due and payable;

(vi)    *Sixth*, to the Capital Expenditure Account, funds sufficient to pay an amount (the "**Monthly Capital Expenditure Amount**") that Agent estimates will be sufficient, when aggregated with amounts already on deposit in the Capital Expenditure Account and amounts to be deposited in the Capital Expenditure Account, to pay Approved Capital Expenditures as and when the same are due and payable (such amounts so deposited pursuant to this clause, the "**Capital Expenditure Funds**");

(vii)    *Seventh*, to the Rollover Account, funds sufficient to pay an amount (the "**Monthly Rollover Amount**") that Agent estimates will be sufficient, when aggregated with amounts already on deposit in the Rollover Account and amounts to be deposited in the Rollover Account, to pay TI/LC Costs that may be incurred following the date hereof as the same become due and payable (such amounts so deposited pursuant to this clause, the "**Rollover Funds**"); and

(viii)    *Eighth*, to the Excess Proceeds Account, all amounts remaining in the Holding Account after deposits for items (i) through (vii) to be held as additional collateral for the Loan.

Notwithstanding the foregoing, during the existence of an Event of Default, all amounts in the Accounts shall be applied in accordance with **Section 9.17**.

9.10    <u>Tax Funds</u>.

9.10.1    <u>Additional Deposits of Tax Funds</u>. If at any time Agent reasonably determines that the Tax Funds accumulated pursuant to **Section 9.9.1** will not be sufficient to pay the Taxes, Agent shall notify Borrower of such determination and the monthly deposits for Taxes pursuant to **Section 9.9.1** shall be increased by the amount that Agent estimates is sufficient to make up the deficiency at least thirty (30) days prior to the respective due dates for the Taxes; <u>provided</u> that if Borrower receives notice of any deficiency after the date that is thirty (30) days prior to the date that Taxes are due, Borrower shall deposit such amount into the Tax Account within one (1) Business Day after its receipt of such notice.

9.10.2    <u>Release of Tax Funds</u>. Agent shall direct the Deposit Bank to apply the Tax Funds to payments of Taxes. In making any payment relating to Taxes, Agent may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax Lien or title or claim thereof. If the amount of the Tax Funds shall exceed the amounts due for Taxes, Agent shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax Funds.

9.11    <u>Insurance Premium Funds</u>.

9.11.1    <u>Additional Deposits of Insurance Premium Funds</u>. If at any time Agent reasonably determines that the Insurance Funds accumulated pursuant to **Section 9.9.1** will not be sufficient to pay the Insurance Premiums, Agent shall notify Borrower of such determination and the monthly deposits for Insurance Premiums pursuant to **Section 9.9.1** shall be increased by the amount that Agent estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies; <u>provided</u> that if Borrower receives notice of any deficiency after the date that is thirty (30) days prior to the expiration of the Policies, Borrower shall deposit such amount into the Insurance Account within one (1) Business Day after its receipt of such notice.

9.11.2    <u>Release of Insurance Premium Funds</u>. Agent shall have the right to apply the Insurance Funds to payment of Insurance Premiums. In making any payment relating to Insurance Premiums, Agent may do so according to any bill, statement or estimate procured from the insurer or its

agent, without inquiry into the accuracy of such bill, statement or estimate. If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Agent shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Funds.

> 9.12    Capital Expenditure Funds.

> 9.12.1    Performance of Capital Expenditure Work. (a) From and after Substantial Completion, Borrower shall make Capital Expenditures when required in order to keep the Project in condition and repair consistent with other first class, full service office and retail property in the same market segment in the metropolitan area in which the Project is located, and to keep the Project or any portion thereof from deteriorating. Borrower shall complete all Capital Expenditure Work in a good and workmanlike manner as soon as practicable following the commencement thereof. In the event Agent determines that any Capital Expenditure Work is not being performed in a workmanlike or timely manner or that any Capital Expenditure Work has not been completed in a workmanlike or timely manner, Agent shall have the option to withhold disbursement for such unsatisfactory Capital Expenditure Work and to proceed under existing contracts or to contract with third parties to complete such Capital Expenditure Work and to apply the Capital Expenditure Funds toward the labor and materials necessary to complete such Capital Expenditure Work, without providing any further notice to Borrower and to exercise any and all other rights and remedies available to Agent upon an Event of Default.

> (c)    In order to facilitate Agent's completion of Capital Expenditure Work pursuant to this Section, Borrower grants Agent the right at the sole option of Agent to enter onto the Project and perform, or cause to be performed, any and all work and labor necessary to complete or make the Capital Expenditure Work and/or employ watchmen to protect the Project from damage. All sums so expended by Lenders, to the extent not from the Capital Expenditure Funds, shall be deemed to have been advanced under the Loan to Borrower, shall be reimbursed by Borrower upon demand and shall be secured by the Security Documents. For this purpose, from and after the occurrence and during the continuance of an Event of Default, Borrower constitutes and appoints Agent its true and lawful attorney in fact with full power of substitution to complete or undertake the Capital Expenditure Work in the name of Borrower. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked. Borrower empowers said attorney in fact as follows: (i) to use the Capital Expenditure Funds for the purpose of making or completing the Capital Expenditure Work; (ii) to make such additions, changes and corrections to the Capital Expenditure Work as shall be necessary or desirable to complete the Capital Expenditure Work; (iii) to employ such Trade Contractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Premises, or as may be necessary or desirable for the completion of the Capital Expenditure Work, or for clearance of title; and (v) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents.

> (d)    The Capital Expenditure Work and all materials, equipment, fixtures, or any other item comprising a part of any Capital Expenditure shall be constructed, installed or completed, as applicable, free and clear of all mechanic's, materialman's or other Liens.

> (e)    All Capital Expenditure Work shall comply with all applicable Laws and Regulations.

> (f)    Borrower shall permit Agent and Agent's agents and representatives (including, without limitation, Agent's engineer, architect, or inspector) or third parties to enter onto the Premises during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Capital Expenditure Work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Capital Expenditure Work. Borrower shall cause all Trade

Contractors to cooperate with Agent or Agent's representatives or such other Persons described above in connection with inspections described in this Section.

(g)     If a disbursement will exceed $100,000, Agent may require an inspection of the Project at Borrower's expense prior to making a disbursement of Capital Expenditure Funds in order to verify completion of the Capital Expenditure Work for which reimbursement is sought. Agent may require that such inspection be conducted by an appropriate independent qualified professional selected by Agent and may require a certificate of completion by an independent qualified professional architect acceptable to Agent prior to the disbursement of Capital Expenditure Funds. Borrower shall pay the expense of the inspection as required hereunder, whether such inspection is conducted by Agent or by an independent qualified professional architect.

(h)     Nothing in this Section shall (i) make Agent or any Lender responsible for making or completing the Capital Expenditure Work; (ii) require Agent or any Lender to expend funds in addition to the Capital Expenditure Funds to complete any Capital Expenditure Work; obligate Agent or any Lender to proceed with the Capital Expenditure Work; or (iv) obligate Agent or any Lender to demand from Borrower additional sums to complete any Capital Expenditure Work.

(i)     In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk, and public liability insurance and other insurance to the extent required pursuant to applicable Legal Requirements in connection with Capital Expenditure Work. All such policies shall be in form and amount satisfactory to Agent.

9.12.2    Additional Deposits of Capital Expenditure Funds. Agent may reassess its estimate of the amount necessary for Capital Expenditures from time to time, and may require Borrower to increase the monthly deposits required pursuant to **Section 9.9.1** upon thirty (30) days' notice to Borrower if Agent determines in its reasonable discretion that an increase is necessary to maintain the proper operation of the Project. Agent shall notify Borrower of such determination and the monthly deposits for Capital Expenditures pursuant to **Section 9.9.1** shall be increased by the amount that Agent estimates is sufficient to make up the deficiency at least ten (10) days prior to the date the Capital Expenditures for which there are insufficient funds in the Capital Expenditure Account are due and payable; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that the Capital Expenditures for which there are insufficient funds in the Capital Expenditure Account are due and payable, Borrower shall deposit such amount into the Capital Expenditure Account within one (1) Business Day after its receipt of such notice.

9.12.3    Release of Capital Expenditure Funds. (a) Agent shall direct the Deposit Bank to disburse Capital Expenditure Funds only for Capital Expenditures.

(b)     Agent shall direct the Deposit Bank to disburse to Borrower the Capital Expenditure Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Agent at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Capital Expenditures to be paid, (ii) on the date such request is received by Agent and on the date such payment is to be made, no Default or Event of Default shall exist, (iii) Agent shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Capital Expenditures, (B) stating that all Capital Expenditure Work at the Project to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Laws and Regulations, such certificate to be accompanied by a copy of any Approval required by any Governmental Authority in connection with the Capital Expenditure Work, (C) identifying each Person that supplied materials or labor in connection with the

Capital Expenditure Work to be funded by the requested disbursement and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by Lien waivers or other evidence of payment satisfactory to Agent, (iv) at Agent's option, a title search for the Project indicating that the Project is free from all Liens, not previously approved by Agent, (v) at Agent's option, if the cost of any individual Capital Expenditure exceeds $100,000, Agent shall have received a report satisfactory to Agent in its reasonable discretion from an architect or engineer approved by Agent regarding such architect or engineer's inspection of the applicable work, (vi) for each disbursement after the initial disbursement under this Section, Borrower shall provide evidence reasonably satisfactory to Agent of payment to the applicable Trade Contractors of all amounts for which prior disbursement have been requested and paid by Agent hereunder prior to the date of the currently requested disbursement and (vii) Agent shall have received such other evidence as Agent shall reasonably request that the Capital Expenditure Work at the Project to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Agent shall not be required to disburse Capital Expenditure Funds more frequently than once each calendar month and each requested disbursement shall be in an amount greater than $25,000 (or a lesser amount if the total amount of Capital Expenditure Funds is less than such amount, in which case the remaining amount of the Capital Expenditure Funds shall be disbursed).

9.13    Rollover Funds.

9.13.1    Deposits of Rollover Funds. Agent may reassess its estimate of the amount necessary for TI/LC Costs from time to time, and may require Borrower to increase the monthly deposits required pursuant to **Section 9.9.1** upon thirty (30) days' notice to Borrower if Agent determines in its reasonable discretion that there are and will be insufficient funds on deposit in the Rollover Account to pay TI/LC Costs as the same become due and payable. Agent shall notify Borrower of such determination and the monthly deposits for TI/LC Costs pursuant to **Section 9.9.1** shall be increased by the amount that Agent estimates is sufficient to make up the deficiency at least ten (10) days prior to the date the TI/LC Costs for which there are insufficient funds in the Rollover Account are due and payable; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that the TI/LC Costs for which there are insufficient funds in the Rollover Account are due and payable, Borrower shall deposit such amount into the Rollover Account within one (1) Business Day after its receipt of such notice.

9.13.2    Release of Rollover Funds. (a) Agent shall direct the Deposit Bank to disburse to Borrower the Rollover Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Agent at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the TI/LC Costs to be paid, (ii) on the date such request is received by Agent and on the date such payment is to be made, no Default or Event of Default shall exist, (iii) to the extent Agent's consent is required hereunder, Agent shall have reviewed and approved the Lease pursuant to which Borrower is obligated to pay or reimburse the TI/LC Costs, (iv) Agent shall have received and approved a budget for TI/LC Costs and a schedule of Brokerage Commissions and the requested disbursement will be used to pay all or a portion of such costs and payments, (v) Agent shall have received a certificate from Borrower (A) stating that all Tenant Improvement Projects at the Project to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Laws and Regulations, such certificate to be accompanied by a copy of any Approval required by any Governmental Authority in connection with the Tenant Improvement Projects, (B) identifying each Person that supplied materials or labor in connection with the Tenant Improvement Projects to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by Lien waivers or other evidence of payment satisfactory to Agent, (vi) at Agent's option, Agent shall have received a title search for the Project indicating that the Project is

free from all Liens not previously approved by Agent and (vii) Agent shall have received such other evidence as Agent shall reasonably request that the Tenant Improvement Projects at the Project to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Agent shall not be required to disburse Rollover Funds more frequently than once each calendar month and each requested disbursement shall be in an amount greater than $25,000 (or a lesser amount if the total amount of Rollover Funds is less than such amount, in which case the remaining amount of the Rollover Funds shall be disbursed).

(b)    In addition to the foregoing, with respect to disbursements for Landlord Work Costs, Borrower shall comply with and Agent shall have all of the rights specified in **Section 9.12** in all respects and such Section shall be read and applied as if the Tenant Improvement Project or any work for which Tenant Improvement Costs are to be disbursed is the "Capital Expenditure" or "Capital Expenditure Work" thereunder. With respect to disbursements for Tenant Allowances, Borrower shall deliver to Agent a certificate executed by the applicable Tenant in form and substance reasonably satisfactory to Agent certifying that the Tenant Allowance is due and payable to such Tenant and that the portion of the work that such Tenant is requesting payment for has been completed, all conditions to obtain such Tenant Allowances under its Lease have been satisfied and Tenant has received all prior payments of Tenant Allowances due under the applicable Lease. With respect to disbursements for Brokerage Commissions, Borrower shall deliver to Agent a copy of the brokerage commission agreement between Borrower or the applicable Property Manager and the broker together with a written statement from Borrower and the applicable broker certifying that such Brokerage Commission is due and payable. For each disbursement after the first disbursement under this Section, as a condition to each subsequent disbursement, Borrower shall provide evidence reasonably satisfactory to Agent of payment of the TI/LC Costs for which prior disbursements have been made to Borrower.

9.14    Security Deposits.

9.14.1    Deposits into Tenant Security Account. Borrower shall comply with all applicable Laws and Regulations and the requirements of any applicable Lease with respect to any security given under such Lease. Subject to the foregoing, upon the establishment of the Security Deposit Account pursuant to this **Article IX** Borrower shall deposit or cause to be deposited all Security Deposits (other than Lease Letters of Credit) under the Leases into the Tenant Security Account within (2) Business Days after receipt thereof, and shall comply, and cause the compliance with, all applicable Legal Requirements in connection with the acceptance, holding, use and releasing of the Security Deposits.

9.14.2    Disbursements from Tenant Security Account. Borrower may direct Agent to cause the applicable Deposit Bank to disburse funds from the Tenant Security Account in an amount equal to the applicable Security Deposit (or applicable portion thereof) at such time as no Event of Default has occurred and is continuing provided the proceeds are applied (i) in the ordinary course of business to sums due under the applicable Lease when the terms of such Lease or applicable Laws and Regulations permit the application thereof or (ii) returned to the applicable Tenant pursuant to Laws and Regulations or the terms of the applicable Lease which require Borrower to return such Security Deposit (or portion thereof); provided, however, that in the event Borrower receives or is entitled to any Security Deposit or portion thereof that is not applied in accordance with **clause (i)** above or returned to the applicable Tenant in accordance with **clause (ii)** above, such amounts shall be held in the Tenant Security Account as collateral for the Loan, except that Borrower may request the release of such funds to be used by Borrower in connection with the re-leasing of the portion of the Premises that had been occupied by the applicable Tenant. After the occurrence and during the continuation of an Event of Default, Borrower shall have no right to direct Agent to withdraw any amounts from the Tenant Security Account or apply any Security Deposits, except as may be approved by Agent. In the event an Event of Default has occurred and is continuing and Borrower is required pursuant to the terms of the applicable Lease or

applicable Laws and Regulations to return any Security Deposit (or portion thereof) to a Tenant, Borrower shall deliver a notice to Agent certifying same and stating the reason therefor. Agent may, at Agent's option and at Borrower's sole cost and expense, instruct the applicable Deposit Bank to deliver the Security Deposit (or portion thereof) (1) to Borrower for delivery to the applicable Tenant or, at Agent's election, (2) directly to the applicable Tenant. If an Event of Default exists, Agent shall have the rights and remedies with respect to the Tenant Security Account specified in this Agreement or in any other Loan Document.

9.14.3  Delivery of Lease Letter of Credit. Borrower covenants and agrees to deliver to Agent upon Borrower's or any Property Manager's receipt thereof each Lease Letter of Credit executed in connection with any Lease, which letter of credit shall name the Agent as the beneficiary thereunder. All Lease Letters of Credit shall provide that any drawing thereunder shall be by presentation of a clean sight draft, without any representations or warranties of the beneficiary and be irrevocable, transferable and otherwise acceptable to Agent in form, content and as to issuer.

9.14.4  Draws Upon Lease Letters of Credit. Borrower shall have the right to (i) make drawings under a Lease Letter of Credit at such time as no Event of Default has occurred and is continuing provided the proceeds are applied in the ordinary course of business to sums due under the applicable Lease when the terms of such Lease or applicable Legal Requirements permit the application thereof or (ii) return such Lease Letter of Credit to the applicable Tenant pursuant to Laws and Regulations or the terms of the applicable Lease which require Borrower to return such Lease Letter of Credit. After the occurrence and during the continuation of an Event of Default, Borrower shall have no right to make a drawing under, or return, a Lease Letter of Credit, except as may be approved by Agent. In the event an Event of Default has occurred and is continuing and Borrower is required pursuant to the terms of the applicable Lease or applicable Laws and Regulations to return any Lease Letter of Credit to the applicable Tenant, Borrower shall deliver a notice to Agent certifying same and stating the reason therefor and, if Agent shall be holding such Lease Letter of Credit pursuant to this **Section 9.14**, Agent may, at Agent's option and at Borrower's sole cost and expense, either deliver the Lease Letter of Credit to Borrower, or deliver the applicable Lease Letter of Credit directly to the applicable Tenant.

9.14.5  Expiring Lease Letters of Credit. In the event that at any time any Lease Letter of Credit delivered to Agent by or on behalf of Borrower or Manager pursuant to this **Section 9.14** by its terms (including pursuant to a notice given pursuant thereto) shall be due to expire within thirty (30) days, on or before the day which is thirty (30) days prior to such expiration, Borrower shall give notice thereof to Agent and Agent shall (or if Agent shall not receive such notice from Borrower, if Agent shall elect), to the extent permitted by the terms of the Lease Letter of Credit, the applicable Lease and applicable Legal Requirements, make a drawing on the Lease Letter of Credit in accordance with the applicable Lease and shall deposit such sums into the Tenant Security Account.

9.14.6  Indemnity. Borrower shall indemnify and hold the Indemnified Parties harmless from and against all Loss in connection with any claim by any Tenant or any Person claiming by or through Borrower or any Tenant in connection with any drawing by Agent on the Lease Letter of Credit or the application of any proceeds thereof or the transfer of the Lease Letter of Credit unless arising from the gross negligence or willful misconduct of Agent or Lenders. This indemnity shall survive the payment and performance of the Debt.

9.15  Approved Operating Expenses. Upon the establishment of the Operating Expense Account, Agent shall, not more frequently than once in any calendar month, direct the applicable Deposit Bank to disburse funds from the Operating Expense Account to the Borrower Account in an amount equal to the lesser of (a) the Approved Operating Expenses and (b) actual Operating Expenses for the month such transfer is made, to the extent amounts previously disbursed to Borrower pursuant to this

**Section 9.15** are insufficient to pay such Approved Operating Expenses, <u>provided</u> that (i) the aggregate amount disbursed pursuant to this **Section 9.15** shall not exceed the Budget approved by Agent pursuant to the terms of this Agreement for the calendar year in which such disbursement is made, (ii) Borrower shall deliver a request for disbursement and a certification that the costs for which such disbursement is requested are due and payable together with such reasonable supporting documentation as Agent may reasonably request not less than fifteen (15) days prior to the date of disbursement and (iii) the amounts disbursed to Borrower pursuant to this **Section 9.15** shall be used by Borrower solely to pay Approved Operating Expenses.

      9.16    <u>Release of Net Proceeds</u>.  Funds on deposit in the Net Proceeds Account shall be disbursed and applied in accordance with **Article X**.

      9.17    <u>Application of Account Collateral Upon Event of Default; Indemnity</u>. Notwithstanding any provision of this Agreement, the Cash Management Agreement or the Depository Agreement to the contrary, upon the occurrence and during the existence of an Event of Default, all funds on deposit in the Accounts shall be disbursed to or as directed by Agent; <u>provided</u>, <u>however</u>, disbursements from the Tenant Security Account during the existence of an Event of Default shall be subject to the provisions of **Section 9.14.2**.  Agent, at its option, may withdraw the funds in the aforesaid Accounts and apply the same to the items for which such Accounts were established were established or to payment of the Debt in such order, proportion and priority as Agent may determine in its sole discretion.  Agent's right to withdraw and apply the Account Collateral shall be in addition to all other rights and remedies provided to Agent under the Loan Documents.  Borrower shall indemnify, defend and hold Agent and Lenders harmless from and against any and all Losses arising from or in any way connected with the performance of the Capital Expenditure Work or Tenant Improvement Projects.

      9.18    <u>Security for Debt</u>.  To secure the full and punctual payment of the Debt and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, Borrower does hereby unconditionally and irrevocably assign, convey, grant, hypothecate, mortgage, pledge and transfer to Agent, a first priority continuing security interest in and to the following property of Borrower, whether now or existing or hereafter acquired or arising and regardless of where located (all of the same, collectively, the "**Account Collateral**"):

      (a)    the Accounts and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts, including, without limitation, all deposits or wire transfers made to the Accounts;

      (b)    any and all Permitted Investments;

      (c)    all interest, dividends, cash, instruments, investment property and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

      (d)    to the extent not covered by **clauses (a), (b)** or **(c)** above, all "proceeds" (as defined under the UCC) of any or all of the foregoing.

      Lender and Agent, as agent for the Lenders, shall have with respect to the Account Collateral, in addition to the rights and remedies herein set forth, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein.

      9.19    <u>Prohibition Against Further Encumbrance</u>.  Borrower shall not, without the prior written consent of Agent, Transfer the Account Collateral or permit any lien or encumbrance to attach

thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Agent as the secured party, to be filed with respect thereto. Borrower shall not enter into any depository, control, blocked account or similar agreement with respect to any Account, other than the Cash Management Agreement or the Depository Agreement

9.20    Permitted Investments; Earnings on Account Collateral; Monthly Statements. No Accounts other than the Security Deposit Account is required to be interest bearing. All interest or other income (whether by virtue of Permitted Investments or otherwise) accruing on any Account Collateral shall, in each case, be held as if a part of the funds so invested. All risk of loss in respect of the investments shall be borne by Borrower.

9.21    Income Taxes. Borrower shall report on its federal, state and local income tax reports all interest or income accrued on any Account Collateral.

9.22    Obligations Unaffected by Insufficiency. The insufficiency of any balance in any Account shall not relieve Borrower or any other Borrower Party from any of its payment or performance obligations under the Loan Documents.

9.23    Agent Not Responsible. Nothing in this **Article IX**, this Agreement or elsewhere in any of the other Loan Documents shall make Agent responsible for making or completing any Work in respect of the Mortgaged Property or obligate Agent to demand from Borrower additional sums to make or complete any Work.

9.24    Bankruptcy. Borrower, on behalf of itself and each Borrower Party, and Agent, on behalf of Lenders, hereby acknowledge and agree that upon the filing of a bankruptcy petition by or against any Borrower Party under the Bankruptcy Code, the Accounts, the Operating Income and Net Proceeds (whether then already in an Account or then due or becoming due thereafter) shall be deemed not to be property of any Borrower Party's bankruptcy estate within the meaning of Section 541 of the Bankruptcy Code. In the event, however, that a court of competent jurisdiction determines that, notwithstanding the foregoing characterization, one or more of the Accounts, the Operating Income or Net Proceeds do constitute property of a Borrower Party's bankruptcy estate, then Borrower, on behalf of itself and each Borrower Party, and Agent, on behalf of Lenders, hereby further acknowledge and agree that such Accounts, the Operating Income and Net Proceeds, whether due and payable before or after the filing of the petition, are and shall be cash collateral of Agent, on behalf of Lenders. Borrower, on behalf of itself and each Borrower Party, acknowledges that Agent does not consent to any Person's use of such cash collateral and that, in the event Agent elects to give such consent, such consent shall only be effective if given in writing signed by Agent. Except as provided in the immediately preceding sentence, no Borrower Party shall have any right to use or apply or require the use or application of such cash collateral (i) unless such Borrower Party shall have received a court order authorizing the use of the same and (ii) such Borrower Party shall have provided such adequate protection to Agent and Lenders as shall be required by the bankruptcy court in accordance with the Bankruptcy Code.

## ARTICLE X
### INSURANCE; CONDEMNATION; CASUALTY

10.1    Insurance. (a) (i) As and from the date that Final Completion has occurred, Borrower, at its sole cost and expense, for the mutual benefit of itself and Agent on behalf of Lenders, shall keep the Mortgaged Property insured and obtain and maintain policies of insurance insuring against loss or damage by perils currently included within the classification "All Risks of Physical Loss" or "Special Perils Form" and including additional endorsements covering loss or damage from earthquakes, floods, wind, hurricane, enforcement of law or ordinance, regulating reconstruction following loss,

terrorist acts, vandalism and malicious mischief, building collapse, boiler and machinery and such other insurable hazards as are customary in similar projects and as Agent may reasonably require. Such insurance shall (A) be in an aggregate amount equal to the then full replacement cost of the Mortgaged Property and the related Equipment with sub-limits for floods of not less than ten percent (10%) of the full replacement costs of the Mortgaged Property and the related Equipment (without deduction for physical depreciation) or such lesser amounts approved by Agent and (B) have deductibles no greater than $250,000 (with such higher deductibles acceptable to Agent. A permitted sub-limit for earthquake coverage equal to ten percent (10%) of the insurable value shall be acceptable to Agent). The policies of insurance carried in accordance with this paragraph shall contain a "Replacement Cost Endorsement" with a waiver of co-insurance or agreed amount endorsement. Such insurance policy shall name Borrower as the insured and shall also name Agent under a non-contributing New York standard mortgagee clause or an equivalent endorsement satisfactory to Agent.

        (ii)      Borrower shall upon commencement of construction of the Improvements until Final Completion thereof maintain Builder's Risk "All Risk" policies in such amount as Agent shall require but in no event less than one hundred percent (100%) of the replacement cost value of the completed Improvements ("**All Risk Policy**") with sub-limits for floods and earthquakes of not less than five percent (5%) of the full replacement cost value of the completed Improvements. The All Risk Policy shall be written on a Builder's Risk completed value form (100% non-reporting) or its equivalent and shall include coverage for loss by or with respect to (A) collapse, boiler and machinery (including testing), theft, terrorist acts, flood, water damage, windstorm, hurricane and earthquake, (B) materials, equipment, machinery, and supplies whether on-site, in transit, or stored off-site (and with respect to temporary structures and/or hoists, if Borrower is required by contract to insure such property), sidewalks, retaining walls, and underground property, (C) soft costs, plans, specifications, blueprints and models in connection with any restoration following a casualty, (D) demolition and increased cost of construction, including increased costs arising out of changes in applicable Laws and Regulations and (E) operation of building codes (which insurance under **clauses (D)** and **(E)** may contain a sublimit of $2,000,000) and soft cost coverage insuring the cost of additional interest expense, advertising, rental and sales commissions, engineering and other expenses that would be incurred in the event of a loss during construction that would delay the planned completion of the Improvements past the Completion Date. The amount of soft cost coverage shall be reasonably satisfactory to Agent. Such insurance policy shall name Borrower as the insured and shall also name Agent under a non-contributing standard mortgagee clause or an equivalent endorsement satisfactory to Agent.

        (iii)     If not included within the property insurance policies required in **Sections 10.1(a)(i)** and **(ii)** above and **(v)** below, then Borrower shall obtain an insurance policy covering loss and damage caused by either certified or non-certified acts of terrorists in an amount not less than the Loan Amount; provided, however, that if the Terrorism Risk Insurance Act of 2002 (or another statute of similar effect) shall no longer be in effect, such insurance policy can be obtained for a premium not in excess of three times the premium that would apply to a comparable policy providing such coverage for the Improvements as fully constructed and completed were such policy purchased on the date hereof. In the event that such insurance policy cannot be obtained for a premium not in excess of three times the premium that would apply to a comparable policy providing such coverage for the Improvements as fully constructed and completed were such policy purchased on the date hereof, then Borrower shall only be required to obtain an insurance policy covering loss and damage caused by the acts of terrorists in a policy amount equal to that which is available for a premium equal to three times the premium that would apply to a comparable policy providing such coverage for the Improvements as fully constructed and completed were such policy purchased on the date hereof. Agent shall be named as Mortgagee and loss proceeds shall be paid to Agent for all damage to property and business income loss.

(iv)     Borrower shall cause any and all architects, design professionals and engineers engaged by Borrower to work on or with respect to the Improvements, including the Architect and the Engineer, to obtain and maintain architect's or engineer's, as the case may be, professional liability insurance during the period commencing on the date of their respective engagement by Borrower and expiring no earlier than three (3) years after Final Completion and such coverage shall be in an amount equal to at least $5,000,000 per occurrence and in the aggregate for all design professionals for the Project.

(v)     Prior to energizing of mechanical and electrical equipment at the Project, Borrower shall obtain and maintain boiler and machinery coverage, with a $20,000,000 minimum limit for all mechanical and electrical equipment with exclusions for testing removed, and such coverage shall include all Improvements Borrower is required to insure and such policy shall name Agent as an insured under a non-contributing standard mortgagee clause or an equivalent endorsement satisfactory to Agent.

(vi)     Borrower shall cause each General Contractor and each Property Manager to obtain and maintain commercial general liability coverage including automobile liability, workers compensation and employers liability insurance (and, upon the occurrence of an Event of Default if Agent so elects, products and complete operations coverage with a three-year "tail" to extend three years after Substantial Completion) and such coverages, including Umbrella Liability Insurance, shall have primary limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate and excess limits of not less than $50,000,000 per occurrence. Borrower shall require that all Trade Contractors working on or about the Mortgaged Property maintain similar liability coverages as are required of each General Contractor or general contractor with limits of at least $5,000,000 per occurrence or such greater amount that Borrower, Agent or each General Contractor deem appropriate for the hazards associated with the Trade Contractors' operations. All Trade Contractors shall insure their own contractors' equipment, tools and other items which do not become part of the finished Improvements. All Persons engaged to work on any of the Improvements shall be required to maintain statutory workers compensation insurance in full force for all workers who are working at or on the Mortgaged Property. All Trade Contractors shall name each of Borrower and Agent as an "Additional Insured" on their liability insurance policies.

(b)     Borrower, at its sole cost and expense, for the mutual benefit of itself and Agent, shall also obtain and maintain the following policies of insurance until the Debt is repaid in full:

(i)     Flood insurance if any part of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency as an area federally designated a "100 year flood plain". The flood insurance shall be in an amount at least equal to the maximum available in the Federal Flood Insurance Program. In addition, Agent may require excess flood insurance in excess of that available in the Federal Flood Insurance Program or as required elsewhere in **Article X**;

(ii)     Commercial General Liability insurance and Automobile Liability Insurance including Hired and Non-Owned Vehicle liability insurance, in each case, including broad form property damage, blanket contractual and personal injuries (including death resulting therefrom) coverages and containing minimum limits per occurrence/accident of $1,000,000 with a $2,000,000 general aggregate per location where applicable for any policy year. In addition, at least $25,000,000 umbrella liability insurance shall be obtained and maintained for any and all claims including all legal liability imposed upon Borrower and all related court costs and attorneys' fees and disbursements. All liability insurance required to be maintained by Borrower shall name Agent as "Additional Insured";

(iii)    During construction of the Improvements, Borrower may elect to provide the insurance required in **Sections 10.1(a)(vi)** and **10.1(b)(ii)** in an Owner or Contractor sponsored Wrap Up insurance program.  The amount of liability insurance coverage to be provided in this type of program shall not be less than $75,000,000 per occurrence and in the annual aggregate.  Should losses in a given twelve (12) month period occur where the amount of loss is expected to exceed thirty-five percent (35%) of the required limits, Borrower shall purchase additional limits to reinstate the available coverage for the subsequent losses to ninety percent (90%) of the originally required limits;

(iv)    After Substantial Completion, business interruption insurance in an amount sufficient to avoid any co-insurance penalty and equal to the greater of (A) the estimated gross revenues from the operation of the Mortgaged Property, net of nonrecurring expenses, for a period of up to the next succeeding eighteen (18) months or (B) the projected Operating Expenses (plus Debt service) for the maintenance and operation of the Mortgaged Property for a period of up to the next succeeding eighteen (18) months as the same may be reduced or increased from time to time due to changes in such Operating Expenses and Debt Service.  The insurance required by this **Section 10.1(b)(iv)** shall be endorsed to provide a 180-day extended period of indemnity.  The amount of such insurance shall be increased from time to time as the estimate of (or the actual) gross revenue increases;

(v)    From and after installation, as relevant, a comprehensive boiler and machinery insurance policy, including loss by explosion of steam boilers, air conditioning equipment, high pressure piping, electrical equipment, machinery and equipment, pressure vessels or similar apparatus now or hereafter installed in any of the Improvements (without exclusion for explosions) forming part of the Mortgaged Property and insurance against loss of occupancy or use arising from any breakdown, in an amount of not less than $20,000,000 per accident for direct damage and time element loss;

(vi)    Worker's compensation insurance with respect to all employees of Borrower as and to the extent required by any Governmental Authority or Legal Requirement and employer's liability coverage of at least $1,000,000 which is scheduled as underlying on the excess and/or umbrella liability insurance as referenced in **Section 10.1(b)(ii)** above;

(vii)    Following Substantial Completion and during any period of repair or restoration, Builder's Risk "All Risk" insurance on a Builder's Risk completed value form (100% non-reporting) in an amount equal to not less than the full insurable value of the Mortgaged Property against such risks (including so-called "all risk" or "special perils" and collapse of the Improvements to agreed limits) as Agent may request, in form and substance acceptable to Agent;

(viii)    Following Substantial Completion, coverage to compensate for the cost of demolition and the increased cost of construction for the Mortgaged Property in an amount satisfactory to Agent;

(ix)    If required by Agent, earthquake insurance in an amount equal to the probable maximum loss (as determined by Agent) of the Mortgaged Property, provided that any credit enhancement proposed to be provided by or on behalf of any Borrower Party in connection with the deductible on such earthquake insurance shall be subject to the prior approval of Agent; and

(x)    Such other insurance which is commonly maintained in the case of other properties and buildings similar to the Project as may from time to time be reasonably required by

Agent in order to protect its interests, including law and ordinance coverage with respect to the Mortgaged Property.

10.2    <u>Policies</u>. All policies of insurance (the "**Policies**") required pursuant to **Section 10.1** shall be issued by companies reasonably approved by Agent and licensed to do business in the state where the Mortgaged Property is located. Further, unless otherwise approved by Agent in writing, the issuer(s) of the Policies required under **Section 10.1** shall have (x) from S&P, a claims paying ability rating of "A" or better and (y) from A.M. Best Company, Inc., a rating of "A" or better and a financial size category of "X" or better. The Policies (i) shall name Agent for the benefit of Lenders and its successors and/or assigns as their interest may appear as an additional insured and as a mortgagee (except that in the case of general liability insurance, Agent on behalf of Lenders shall be named an additional insured); (ii) shall contain a Standard Mortgagee Clause or its equivalent and a Lender's Loss Payable or Mortgagee Endorsement, or their equivalents, naming Agent as the Person to which all payments made by such insurance company shall be paid; (iii) shall include effective waivers by the insurer of all claims for Insurance Premiums against all loss payees, additional insureds and named insureds (other than Borrower) and all rights of subrogation (and Borrower hereby waives the same) against any loss payee, additional insured or named insured; (iv) shall be assigned to Agent for the benefit of Lenders; (v) except as otherwise provided above, shall not be subject to a deductible; (vi) shall contain such provisions as Agent deems reasonably necessary or desirable to protect its interests including endorsements providing that none of any Borrower Party, Agent, Lenders or any other Person shall be a co-insurer under said Policies and that no modification, reduction, cancellation or termination in amount of coverage of any of the Policies shall be effective until at least thirty (30) days after receipt by each named insured, additional insured and loss payee of written notice thereof or thirty (30) days after receipt of such notice with respect to nonpayment of Insurance Premium; (vii) shall permit Agent to pay the Insurance Premiums and continue any insurance upon failure of Borrower to pay Insurance Premiums when due, upon the insolvency of Borrower or through foreclosure or other Transfer of title to the Mortgaged Property (it being understood that Borrower's rights to coverage under the Policies may not be assignable without the consent of the insurer); and (viii) shall provide that any proceeds shall be payable to Agent for the benefit of Lenders and that the insurance shall not be impaired or invalidated by virtue of (A) any act, failure to act, negligence of, or violation of declarations, warranties or conditions contained in such policy by Borrower, Agent, Lenders or any other named insured, additional insured or loss payee, except for the willful misconduct of Agent or a Lender in violation of the conditions of such Policy, (B) the occupation, use, operation or maintenance of the Mortgaged Property for purposes more hazardous than permitted by the terms of such Policy, (C) any foreclosure or other proceeding or notice of sale relating to the Mortgaged Property or (D) any change in the possession of the Mortgaged Property without a change in the identity of the holder of actual title to the Mortgaged Property (provided that with respect to **clauses (C)** and **(D)**, any notice requirements of the applicable Policies are satisfied).

10.3    <u>Insurance Premiums, Certificates of Insurance</u>. (a) Borrower shall pay the premiums for the Policies (the "**Insurance Premiums**") as the same become due and payable and shall furnish to Agent receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Agent. Within thirty (30) days after request by Agent, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Agent, taking into consideration changes in liability laws, changes in prudent customs and practices, changes in the costs of construction and the like. In the event Borrower satisfies the requirements hereunder through the use of a Policy covering properties in addition to the Mortgaged Property, then (unless such policy is provided in substantially the same manner as it is as of the date hereof), Borrower shall provide evidence satisfactory to Agent that the Insurance Premiums for the Mortgaged Property are separately allocated under such Policy to the Mortgaged Property and that payment of such allocated amount (i) shall maintain the effectiveness of such Policy as to the Mortgaged Property and (ii) shall otherwise provide the same protection as would a separate policy that complies with the terms of this Agreement as to the Mortgaged

Property, notwithstanding the failure of payment of any other portion of the insurance premiums. If no such allocation is available, Agent may purchase a non-blanket Policy covering such Mortgaged Property from insurance companies which qualify under this Agreement and at Borrower's cost and Borrower shall reimburse Agent upon demand and such amount shall incur interest at the Default Rate until paid to Agent in full.

(b)    Borrower shall deliver to Agent on or prior to the Closing Date certificates (Acord Form 28 (or any successor thereto) or such other Acord form as Agent shall require) setting forth in reasonable detail the material terms (including any applicable notice requirements) of all Policies from the respective insurance companies (or their authorized agents) that issued the Policies, including that such Policies may not be reduced, cancelled or terminated in amount of, or materially changed (other than increased) in coverage without thirty (30) days' prior notice to Agent, or thirty (30) days' notice with respect to nonpayment of Insurance Premium. Borrower shall deliver to Agent, concurrently with each change in any Policy, a certificate (Acord Form 28 (or any successor thereto) or such other Acord form as Agent shall require) with respect to such changed Policy certified by the insurance company issuing that Policy, in substantially the same form and containing substantially the same information as the certificates required to be delivered by Borrower pursuant to the first sentence of this **Section 10.3(b)** and stating that all Insurance Premiums then due thereon have been paid to the applicable insurers and that the same are in full force and effect (or if such certificate and report shall not be obtainable by such Borrower, such Borrower may deliver an Officer's Certificate to such effect in lieu thereof). Notwithstanding the delivery of any Policies to Agent or any Lender, neither Agent nor any Lender shall be deemed by reason of the receipt thereof to have any knowledge of the contents thereof.

(c)    From time to time, Agent may request that Borrower deliver to Agent, within ten (10) Business Days of receipt of such request, a report from a consultant selected by Agent or from the insurer, setting forth the particulars as to all insurance obtained by Borrower pursuant to **Section 10.1** and then in effect and stating that all Insurance Premiums then due thereon have been paid in full to the applicable insurers, that all Policies are in full force and effect and that, in the opinion of such consultant or insurer, such insurance otherwise complies with the requirements of this **Article X**.

10.4    Renewal and Replacement of Policies. (a) Not less than thirty (30) days prior to the expiration, termination or cancellation of any Policy, Borrower shall renew such Policy or obtain a replacement Policy or Policies (or a binding commitment for such replacement Policy or Policies), which shall be effective no later than the date of the expiration, termination or cancellation of the previous Policy, and shall deliver to Agent a certificate (Acord Form 28 (or any successor thereto) or such other Acord form as Agent shall require) in respect of such Policy or Policies (i) containing the same information as the certificates required to be delivered pursuant to **Section 10.3(b)** and (ii) confirming that such Policy or Policies comply with all requirements of this **Article X**.

(b)    If the certificates as required under **Section 10.3(b)** are not furnished to Agent, Agent may procure such replacement Policy or Policies and pay the Insurance Premiums therefor, and Borrower agrees to reimburse Agent for the cost of such Insurance Premiums promptly on demand, together with interest at the Default Rate from the date Agent paid such Insurance Premiums to and including the date of reimbursement of Agent by Borrower.

(c)    Concurrently with the delivery of each replacement Policy or a binding certificate for the same pursuant to this **Section 10.4**, Borrower shall deliver to Agent a report from a consultant selected by Agent or from the insurer, setting forth the particulars as to all insurance obtained by Borrower pursuant to this **Article X** and then in effect and stating that all Insurance Premiums then due thereon have been paid in full to the applicable insurers, that all Policies are in full force and effect

and that, in the opinion of such consultant or insurer, such insurance otherwise complies with the requirements of this **Article X**.

      (d)     No Borrower Party will take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained pursuant to **Section 10.1** unless such insurance complies with **Section 10.2**.

      10.5    Casualty. (a) Borrower shall give Agent prompt written notice of the occurrence of any casualty affecting the Mortgaged Property. In the event of any casualty affecting the Mortgaged Property, Borrower shall promptly commence and diligently prosecute Restoration of such Mortgaged Property.

      (b)     If, in the event of a casualty to the Mortgaged Property, (i) the Restoration of the Mortgaged Property can be reasonably completed no later than six (6) months prior to the Maturity Date (such determination to be made solely by Agent) and (ii) all of the conditions and deliveries set forth in **Section 10.7(a)** are satisfied, the Net Proceeds shall then be disbursed by Agent to Borrower for Restoration in accordance with the terms and manner set forth in **Section 10.7**; provided that, if the amount of the Net Proceeds is less than $500,000, such Net Proceeds shall be automatically returned to Borrower without Agent's approval. If the Net Proceeds are not required to be made available for Restoration pursuant to the foregoing sentence, all Net Proceeds shall be retained by Agent in accordance with the terms of **Section 10.8**.

      10.6    Condemnation. (a) Borrower shall give Agent prompt written notice of the actual or threatened (in writing) commencement of any Partial Condemnation or Total Condemnation affecting the Mortgaged Property and shall deliver to Agent copies of any and all documents received or prepared by Borrower in connection therewith. Borrower shall, at its expense, diligently prosecute any such proceeding. Agent shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the Applicable Interest Rate provided for herein. Subject to **Section 10.6(b)**, if the Mortgaged Property is the subject of a Partial Condemnation or Total Condemnation, all Condemnation Proceeds relating thereto shall be paid to Agent and Borrower shall promptly commence and diligently prosecute the Restoration of the Mortgaged Property and otherwise comply with the provisions of **Section 10.7**.

      (b)     If, in the event of a Partial Condemnation of the Mortgaged Property, (i) the Restoration of the Mortgaged Property can be reasonably completed no later than the Completion Date (such determination to be made solely by Agent) and (ii) all of the conditions and deliveries set forth in **Section 10.7(a)** are satisfied, the Net Proceeds shall then be disbursed by Agent to Borrower for Restoration in accordance with the terms and manner set forth in **Section 10.7**. If the Net Proceeds are not required to be made available for Restoration pursuant to the foregoing sentence, all Net Proceeds shall be retained by Agent in accordance with the terms of **Section 10.8**.

      (c)     In the event of a Total Condemnation, all Net Proceeds shall be retained by Agent in accordance with the terms of **Section 10.8**.

      10.7    Disbursement of Net Proceeds. (a) If Net Proceeds are required to be made available for Restoration pursuant to either **Section 10.5** or **10.6**, Agent shall make such Net Proceeds available to Borrower for the Restoration; provided that each of the following conditions are first met:

      (i)     no Event of Default shall have occurred and be continuing;

(ii)    not more than ten percent (10%) of Leases shall be terminated as a result of such casualty or Partial Condemnation (as applicable) and the projected date for completion of Restoration will not allow Leases to be terminated so that more than ten percent (10%) are terminated as a result of such casualty or Partial Condemnation (as applicable), and Borrower has received no notices of termination constituting terminations in excess of such limit (and otherwise has no knowledge of prospective terminations in excess of such limit);

(iii)    Borrower promptly commences Restoration and diligently pursues the same to Agent's satisfactory completion;

(iv)    Restoration is being performed diligently by Borrower in compliance with all applicable Legal Requirements and the Mortgaged Property and the use thereof after Restoration will be in material compliance with and permitted under applicable Legal Requirements and the terms hereof;

(v)    the quality and character of the Mortgaged Property after Restoration shall be at least equivalent to the quality and character of the Mortgaged Property immediately prior to such casualty or Partial Condemnation;

(vi)    if such casualty occurs during a time when business interruption insurance is required to be in effect pursuant to **Section 10.1(b)**, the estimated time to complete the Restoration, as estimated by the Construction Consultant, does not exceed the effective period of business interruption insurance available to Agent on account of such casualty;

(vii)    Borrower delivers to Agent a written undertaking that it will expeditiously commence and satisfactorily complete with due diligence Restoration in accordance with the terms of this Agreement; and

(viii)    Borrower delivers to Agent evidence that the Net Proceeds, together with any Net Proceeds Deficiency, are sufficient to cover all costs of the Restoration as determined by the Construction Consultant and Agent.

In the event any of the foregoing conditions are not satisfied at any time, the disbursement of Net Proceeds shall be made in accordance with **Section 10.8**.

(b)    The Net Proceeds shall be held in an interest bearing escrow account designated by Agent, and until disbursed in accordance with the provisions of this **Section 10.7** shall constitute additional security for repayment of the Debt. The Net Proceeds shall be disbursed by Agent to Borrower from time to time during the course of Restoration, (i) upon the satisfaction by Borrower of all the conditions precedent set forth in **Section 3.2** and (ii) upon receipt of evidence (including Lien waivers) satisfactory to Agent, providing that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full and (B) there exist no notices of pendency, stop orders, Liens or notices of intention to file same (other than notices of Lien or other inchoate Liens with respect to amounts not yet due and payable), or any other Liens of any nature whatsoever affecting the Mortgaged Property, arising out of the Restoration which have not either been fully bonded to the satisfaction of Agent and discharged of record or in the alternative fully insured to the satisfaction of Agent by the Title Company or are being contested by Borrower in accordance with **Section 5.1(b)(ii)**. Agent's costs and expenses for processing the payment of Net Proceeds to Borrower shall be deducted from each disbursement of Net Proceeds.

(c)     All plans and specifications required in connection with any Restoration shall be reviewed and approved by the Construction Consultant and Agent.  Agent shall have the use of the plans and specifications and all Approvals required or obtained in connection with the Restoration.  The identity of the Trade Contractors engaged in such Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and approval by Agent and the Construction Consultant, which approval shall not be unreasonably withheld.  All costs and expenses incurred by Agent in connection with making the Net Proceeds available for the Restoration (including reasonable attorneys' fees and disbursements) and the Construction Consultant's fees and expenses, shall be paid by Borrower upon demand.

(d)     In no event shall Agent be obligated to make disbursements of Net Proceeds in excess of an amount equal to the costs (without reduction for any Retainage permitted under any Trade Contractor agreement) actually incurred from time to time for work in place as part of the Restoration, as certified by the Construction Consultant, minus the Retainage.  The final advance of Retainage shall not be made until (i) sixty (60) days after the Construction Consultant certifies to Agent that (A) the Restoration has been completed in accordance with the provisions of this **Section 10.7** and (B) all Approvals necessary for the re-occupancy and use of the Mortgaged Property have been obtained from all appropriate Governmental Authorities, (ii) Agent receives evidence satisfactory to Agent that the costs of the Restoration have been paid in full or will be paid in full out of the Retainage and (iii) Agent receives and approves an endorsement to the Qualified Title Policy insuring the first priority Lien of the Deed of Trust.  If required by Agent, the release of the final portion of the Retainage shall be approved by the surety company, if any, which has issued a payment and performance bond with respect to any Trade Contractor.

(e)     Agent shall not be obligated to make disbursements of the Net Proceeds more frequently than once in any calendar month.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not be sufficient to pay the balance of the total costs which are estimated by the Construction Consultant to be incurred in connection with the completion of the Restoration, Borrower shall promptly deposit with Agent Cash and Cash Equivalents in an amount equal to the deficiency (the "**Net Proceeds Deficiency**") before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Agent shall be held by Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this **Section 10.7** shall constitute additional security for the obligations of Borrower hereunder and under the other Loan Documents.

(g)     Provided that no Event of Default shall have occurred and be continuing, if at any time following substantial completion of the Restoration, the Net Proceeds, together with any Net Proceeds Deficiency, or the undisbursed balance thereof, shall be in excess of the total costs which are estimated by the Construction Consultant to be incurred in connection with the completion of the Restoration, Agent shall pay such excess to Borrower.  No payment made to Borrower pursuant to this **Section 10.7** shall in any event prevent Agent from requiring Borrower to make further Net Proceeds Deficiency deposits in the event same shall be required pursuant to **Section 10.7(f)**.

(h)     Any excess of Net Proceeds (together with any earnings thereon) and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Agent (together with any earnings thereon) shall be remitted by Agent to Borrower, provided that no Event of Default shall have occurred and be continuing under this Agreement, after the Construction Consultant certifies to Agent that Restoration has been finally completed in accordance with the provisions of this **Section 10.7** and the

receipt by Agent of evidence satisfactory to Agent that all costs incurred in connection with Restoration have been paid in full.

10.8    Retention of Net Proceeds by Agent. All Net Proceeds (together with any earnings thereon) not required (a) to be made available for the Restoration or (b) to be returned to Borrower as excess Net Proceeds pursuant to **Section 10.7(g)** or **(h)** may be retained and applied by Agent after such funds are received toward the payment of the Debt whether or not then due and payable or, at the discretion of Agent, the same may be paid, either in whole or in part, to Borrower. If Agent shall receive and retain Net Proceeds, the Lien of the Deed of Trust shall be reduced only by the amount thereof received and retained by Agent and actually applied by Agent in reduction of the outstanding principal balance of the Debt. If Agent elects to pay down the Debt with the Net Proceeds as provided in this **Section 10.8**, no Breakage Costs or prepayment fee shall be due and owing by Borrower with respect to such prepayment.

10.9    Assignment of Proceeds. Subject to the proviso in **Section 10.5(b)**, all Insurance Proceeds and Condemnation Proceeds relating to the Mortgaged Property are hereby irrevocably assigned to and shall be paid to Agent, and Agent shall deposit such amounts received hereunder into an escrow account designated by Agent for disbursement in accordance with this **Article X**. Agent may participate in any action, suit or proceeding relating to any such amounts, causes of action, claims, compensation, awards or recoveries, and Agent is hereby authorized, in its own name or in Borrower's name, to adjust any Loss covered by insurance, or any Partial Condemnation or Total Condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Borrower shall from time to time deliver to Agent any instrument required to permit such participation or further evidence such.

10.10    No Effect on Obligations. Notwithstanding any casualty, Partial Condemnation or Total Condemnation, Borrower shall continue to make all payments required to be made pursuant to this Agreement and the other Loan Documents at the time and in the manner provided for herein or therein, as the case may be, and the outstanding principal balance of the Debt shall not be reduced until any Net Proceeds shall have been actually received and applied by Agent to the reduction or discharge of the outstanding principal balance of the Debt.

10.11    Transfer of Mortgaged Property Prior to Receipt of Proceeds. If the Mortgaged Property is Transferred, through foreclosure or otherwise, prior to the receipt by Agent of the Insurance Proceeds or Condemnation Proceeds (as applicable) in respect thereof, Agent shall have the right, whether or not a deficiency judgment shall have been sought, recovered or denied, to receive such Insurance Proceeds or Condemnation Proceeds (as applicable) or a portion thereof sufficient to pay the outstanding Debt.

ARTICLE XI
DEFAULTS AND REMEDIES

11.1    Event of Default. (a) Each of the following events shall constitute an event of default hereunder (each, an "**Event of Default**"):

(i)    Payment. If (i) any payment of principal or interest is not paid when due or (ii) any other payment due under this Agreement or any other Loan Document is not paid within five (5) days after such payment is due (other than any such payment due on the Maturity Date, all such amounts to be paid on the Maturity Date); or

(ii)     Taxes and Other Charges. If any of the Taxes or Other Charges are not paid prior to the date on which the same become delinquent, subject to Borrower's right to contest Taxes and Other Charges in accordance with **Section 5.1(b)(ii)**; or

(iii)     Insurance Policies. If the Policies are not kept in full force and effect, or if the Policies are not delivered to Agent upon request, and in the latter case, such Default is not cured within ten (10) days after written notice thereof from Agent; or

(iv)     Transfers. If (A) Borrower Transfers, directly or indirectly, all or any portion of, or any interest in, any of the Mortgaged Property, except as expressly permitted hereunder, (B) Borrower does not apply the applicable Net Proceeds in accordance with **Article X** or (C) any interest in any Borrower Party is Transferred in violation of the terms hereof; or

(v)     Representations and Warranties; Certifications. If (A) any representation or warranty made by any Borrower Party herein or in any other Loan Document or (B) any certification made by any Borrower Party or Affiliate thereof in connection with any legal opinion delivered pursuant to this Agreement shall be false, inaccurate or misleading in any material respect as of the date the representation or warranty or certification, as applicable, was or shall be made or repeated or deemed repeated; or

(vi)     Inability to Pay Debts. If any Borrower Party shall make an assignment for the benefit of creditors, if any Borrower Party shall generally not be paying its debts as they become due or has admitted in writing its inability to pay its debts, or if any Borrower Party is not Solvent; or

(vii)     Bankruptcy. If a receiver, liquidator or trustee shall be appointed for any Borrower Party, or if any Borrower Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy Law or Regulation, or any similar federal or state Law or Regulation, shall be filed by or against, consented to or acquiesced in by any Borrower Party, or if any proceeding for the dissolution or liquidation of any Borrower Party shall be instituted; <u>provided</u> that if such appointment, adjudication, petition or proceeding was involuntary and not consented to by any of the Borrower Parties, upon the same not being discharged, stayed or dismissed within sixty (60) days; or

(viii)     Prohibited Assignment. If any Borrower Party attempts to assign or delegate or encumber its rights under this Agreement or under any other Loan Document or any interest herein or therein except in accordance with the terms hereof; or

(ix)     Control. If there is a breach of any of the covenants set forth in **Section 5.1(cc)**; or

(x)     Cross Default. If an Event of Default as defined or described herein or in any of the other Loan Documents occurs, or if any other event shall occur or condition shall exist if the effect of such event or condition (and the expiration of any applicable notice and cure periods, if any) is to accelerate the maturity of any portion of the Debt or to permit Agent to accelerate the maturity of all or any portion of the Debt in accordance with the terms of any such Loan Document; or

(xi)     Failure to Deposit into Accounts. If Borrower shall be in default of its obligations to make deposits into any Account as and when required by the terms of the Loan Documents; or

(xii)    Covenant Defaults.  If any Borrower Party shall continue to be in default under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not specified in **Sections 11.1(a)(i)** to **(xi)** above for ten (10) days after notice from Agent, in the case of any Default that can be cured by the payment of a sum of money or for thirty (30) days after notice from Agent in the case of any other Default; provided that if such nonmonetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period; and provided further that such Borrower Party shall have commenced to cure such default within such 30-day period and thereafter diligently and expeditiously proceeds to cure the same, such 30-day period shall be extended for an additional period of time as is reasonably necessary for such Borrower Party in the exercise of due diligence to cure such Default, but the aggregate cure period under this **Section 11.1(a)(xii)** shall not exceed ninety (90) days; or

(xiii)    [Intentionally Omitted.]

(xiv)    ERISA.  If (A) notice of intent to terminate or to amend a Pension Plan shall have been filed with any affected party (as defined in Section 4001 of ERISA) if, after giving effect thereto, the Plan is a plan described in Section 4041(c) of ERISA, or notice of an application by the PBGC to institute proceedings to terminate a Pension Plan pursuant to Section 4042 of ERISA shall have been received by Borrower; (B) Borrower or any member of its respective ERISA Group incurs liability under Sections 4062(e), 4063 or 4064 of ERISA in respect of a Pension Plan; (C) an amendment is adopted to a Pension Plan which would require security to be given to such Pension Plan pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; or (D) Borrower or any member of its respective ERISA Group fails to make a payment to a Pension Plan that would give rise to a lien in favor of such Plan under Section 302(f) of ERISA, which in any case described in any of **clauses (A)** through **(D)**, alone or in the aggregate, would have a Material Adverse Effect; or

(xv)    Material Adverse Change.  There occurs any change, event or condition which has a Material Adverse Effect; or

(xvi)    Invalidity.  If any Loan Document shall fail to be in full force and effect or to give Agent or Lenders the Liens, rights, powers and privileges purported to be created thereby for ten (10) days after the notice to the applicable Borrower Party from Agent or if Borrower or any Borrower Party shall assert that any Loan Document is not in full force and effect or fails to give Agent or Lenders the Liens, rights, powers and privileges purported to be created thereby; or

(xvii)    Judgments.  If one or more final judgments or decrees shall be entered against any Borrower Party involving a liability for which the creditor has recourse against such Borrower Party of $500,000 or more in any instance, or $1,000,000 or more in the aggregate for all such judgments and decrees collectively (not paid or fully covered by insurance provided by a carrier who has acknowledged coverage) and any such judgments or decrees shall not have been vacated, discharged, paid or stayed within thirty (30) days after entry thereof; or

(xviii)    Construction Suspended.  If construction of any Improvements, shall, after being commenced, cease or be suspended for fifteen (15) consecutive Business Days (except as provided for in the Construction Schedule) for any reason other than a Force Majeure Event; or

(xix)    Construction Not Progressing.  If, in the reasonable judgment of the Construction Consultant, (A) any of the Improvements will not be completed by the Completion Date or (B) Substantial Completion will not occur by the Completion Date, except, in either case, on account of a Force Majeure Event; or

(xx)    Survey.  The appearance on any survey required hereunder of any material adverse condition not approved by Agent and such condition is not remedied within thirty (30) days after notice thereof by Agent to Borrower; or

(xxi)    Approvals.  Any Approval is withdrawn, suspended, canceled, terminated or modified to the material detriment of Borrower or the construction of any of the Improvements, unless Borrower reinstates and confirms in all respects such Approval within a period of fifteen (15) days thereafter; or

(xxii)    Plans and Specifications.  The failure to complete any Improvements in accordance with the Plans and Specifications, other than deviations therefrom otherwise permitted hereunder that, in the judgment of Agent, individually and in the aggregate, are nonmaterial and do not adversely affect the use of the Improvements for their intended purpose or the value of the Improvements; or

(xxiii)    Attachment.  If the Collateral shall be taken, attached or sequestered on execution or other process of law in any action against any Borrower Party and any such taking, attachment or sequestration shall not have been released or stayed within thirty (30) days after Borrower receives actual notice thereof; or

(xxiv)    Abandonment.  If Borrower requests a termination of the Loan, confesses inability to continue or complete construction of the Improvements in accordance with this Agreement or ceases to do business; or

(xxv)    Fraudulent Submission.  If any voucher or invoice is fraudulently submitted by Borrower in connection with any Advance for services performed or for materials used in or furnished for the Mortgaged Property or if any payment is made by Borrower to any Affiliate without disclosure to Agent of (and prior approval by Agent to the extent required hereunder) the affiliation; or

(xxvi)    Non-Recourse Carveout Events.  The occurrence of one or more of the non-recourse carveout events set forth in **Section 12.26(a)** or **(b)**; or

(xxvii)    Breach of Contract.  Any breach of or default by any Borrower Party under any Material Agreement or Title Agreement shall occur beyond any applicable notice or cure periods set forth therein; or

(xxviii)    Default of Guarantor.  If any Guarantor shall default under the terms of any of the Guaranties beyond any applicable or cure periods; any Guarantor shall be bankrupt or liquidated; any Guarantor shall for any reason contest, repudiate, or purport to revoke any of the Guaranties; or any of the Guaranties for any reason (except pursuant to the express terms thereof) shall cease to be in full force and effect as to any Guarantor or shall be judicially declared null and void as to any Guarantor; or

(xxix)    Interest Rate Protection Agreement.  If Borrower shall fail to obtain and maintain the Interest Rate Protection Agreement as required hereunder; or

(xxx)    Other Events of Default.  The occurrence of any other event or circumstance that is described as an Event of Default in any Loan Document.

(b)    Subject to the provisions of **Section 12.26**, upon the occurrence and during the continuation of an Event of Default and at any time thereafter, Agent shall be entitled to exercise all rights, remedies and actions available under any Loan Document, at law or in equity, and Agent may take any such action, without notice or demand, that Agent deems advisable to protect and enforce its rights against each and every (or less than all) Borrower Party and in and to the Collateral, including declaring the Commitment of each Lender and the obligation of each Lender to make Advances to be terminated (whereupon the same shall forthwith terminate) and the Debt to be immediately due and payable (provided that, with respect to an Event of Default described in **clause (iv), (vi), (vii), (viii)** or **(ix)** above, the Debt and all other obligations of Borrower and each other Borrower Party hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower and each Borrower Party hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding), and Agent may enforce or avail itself of any or all rights, remedies and actions of Agent and Lenders provided in the Loan Documents, at law or in equity.

(c)    Upon the occurrence and during the continuation of an Event of Default, Agent may, without notice to or demand on any Borrower Party and without releasing any Borrower Party from any obligation under an Loan Document, take any action to cure such Event of Default or accept the curing of such Event of Default by Borrower. Agent may enter upon the Mortgaged Property for such purposes or appear in, defend, or bring any action or proceeding to protect Lenders' interests and the interests of Agent on behalf of Lenders in the Collateral or to foreclose the Deed of Trust or collect the Debt. The costs and expenses incurred by Agent in exercising rights under this paragraph (including reasonable attorneys' fees to the extent permitted by Law or Regulation), with interest at the Default Rate for the period after notice from Agent that such costs or expenses were incurred to the date of payment to Agent, shall constitute a portion of the Debt, shall be secured by the Deed of Trust and the other Loan Documents and shall be due and payable to Agent upon demand therefor. All funds advanced by Agent pursuant to this Section 11.1(c) or any other provision of this Agreement for the performance of any obligation of Borrower or to protect Lenders' interest in the Collateral shall be deemed obligatory advances regardless of the Person to whom such funds are furnished.

(d)    Upon the occurrence and during the continuation of an Event of Default, in addition to other rights and remedies provided for herein or otherwise available to it, Agent may exercise all the rights and remedies of a secured party upon default under the Uniform Commercial Code, whether or not the Uniform Commercial Code applies to any of the Collateral. Without limiting the generality of the foregoing, Agent may require Borrower to assemble any portion of the Collateral that is personal property and make it available to Agent at a location designated by Agent. This **Section 11.1(d)** shall not apply to any collateral that constitutes real property (other than fixtures as defined in the Uniform Commercial Code).

11.2    Remedies Cumulative. Upon the occurrence and during the continuation of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent and Lenders against any Borrower Party under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or such other Borrower Party or at law (including an action for collection) or in equity may be exercised by Agent at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any portion of the Collateral. Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Agent may determine, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

Without limiting the generality of the foregoing, each Borrower Party agrees that if an Event of Default is continuing (i) Agent is not subject to any "one action" or "election of remedies" law or rule and (ii) all Liens and other rights, remedies or privileges provided to Agent and Lenders shall remain in full force and effect until Agent has exhausted all of its remedies against the Collateral and the Deed of Trust has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full. All remedies hereunder shall be exercised by Agent upon the direction of the Required Lenders, and, in exercising all remedies hereunder, Agent shall at all times act (or refrain from acting) hereunder upon the direction of the Required Lenders, provided that this sentence shall solely be for the benefit of Lenders and may not be relied upon by any Borrower Party. During the period from when Agent seeks direction from the Required Lenders and the time in which the Required Lenders respond (or are deemed to have responded), Agent may take such action as Agent believes in good faith is necessary, desirable or appropriate to preserve the Collateral and any other Loan collateral and to preserve the rights, interests and position of Lenders.

11.3    No Waiver. No delay or omission to exercise any remedy, right or power accruing upon the occurrence and during the continuation of an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to any Borrower Party shall not be construed to be a waiver of any subsequent Default or Event of Default with respect to such Borrower Party or any other Borrower Party or to impair any remedy, right or power consequent thereon. Subject to the provisions of **Section 12.26**, nothing herein shall be construed as prohibiting Agent from seeking, and Agent reserves the right to seek, a deficiency judgment or preserve a deficiency claim to the extent that Agent deems the same necessary in connection with any foreclosure or similar proceeding.

11.4    Waiver of Marshaling of Assets. To the fullest extent a Borrower Party may legally do so, each Borrower Party waives all rights to a marshaling of the assets of such Borrower Party, its members, if any, and others with interests in said Borrower Party and of the Collateral, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any Laws or Regulations pertaining to the marshaling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents or any other matters whatsoever to defeat, reduce or affect the right of any Lender or Agent under the Loan Documents to a sale of the Collateral for the collection of the related Debt without any prior or different resort for collection, or the right of any Lender or Agent or any deed of trust trustee to the payment of the related Debt out of the net proceeds of the Collateral in preference to every other claimant whatsoever. In addition, Borrower, for itself and its successors and assigns, waives in the event of foreclosure of the Deed of Trust, any equitable right otherwise available to such Borrower which would require the separate sale of portions of the Mortgaged Property.

11.5    Construction Remedies. (a) Upon the occurrence and during the continuation of an Event of Default, Agent may cause the Improvements to be completed and may enter upon the Mortgaged Property and construct, equip and complete the Improvements in accordance with the Plans and Specifications, with such changes therein as Agent may, from time to time, deem necessary or desirable. In connection with any construction of the Improvements undertaken by Agent pursuant to the provisions of this Section, Agent may:

(i)    use any funds of Borrower, including any balance which may be held by Agent as security or in escrow (provided that no Security Deposits may be applied to the payment of the Debt or otherwise retained or used by Agent or Lenders) and any unadvanced principal amount under the Loan;

(ii)     employ existing Trade Contractors and design professionals including Major Contractors, agents, architects, engineers, and the like, or terminate the same and employ others;

(iii)     employ security watchmen to protect the Mortgaged Property;

(iv)     make such additions, changes and corrections in the Plans and Specifications as shall, in the judgment of Agent, be necessary or desirable;

(v)     take over and use any and all personal property contracted for, leased by or purchased by Borrower, if appropriate, or dispose of the same as Agent sees fit;

(vi)     execute all applications and certificates on behalf of Borrower which may be required by any Governmental Authority or Legal Requirement or contract documents or agreements;

(vii)     pay, settle or compromise all existing or future bills and claims which are or may be Liens against the Mortgaged Property, or may be necessary for the completion of the Improvements or the clearance of title to the Mortgaged Property, including all Taxes and Other Charges;

(viii)     complete the marketing and leasing of leasable space in the Improvements, enter into new leases and occupancy agreements with respect to any portion of the Project, and modify or amend existing sales contracts or leases and occupancy agreements, all as Agent shall deem to be necessary or desirable and all on terms acceptable to Agent;

(ix)     prosecute and defend all actions and proceedings in connection with the construction of the Improvements or in any other way affecting the Mortgaged Property, the Improvements and take such action and require such performance as Agent deems necessary under the Payment and Performance Bonds; and

(x)     take such other action hereunder, or refrain from acting hereunder, as Agent may, in its sole and absolute discretion, from time to time determine, and without any limitation whatsoever, to carry out the intent of this Section. Borrower shall be liable to Agent for all Loss paid or incurred in connection with all of the foregoing, including with respect to the construction, completion and equipping of any of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section or otherwise, and all payments made or Loss incurred by Agent hereunder of any kind whatsoever shall be deemed to constitute part of the outstanding Debt and shall be secured by the Deed of Trust.

(b)     To the extent that any Loss so paid or incurred by Agent, together with all other Advances made by Lenders hereunder, exceed the Loan Amount, such excess amount shall be paid by Borrower to Agent on demand, with interest thereon at the Default Rate until paid in full; and Borrower shall execute such notes or amendments to the Notes as may be requested by Agent to evidence Borrower's obligation to pay such excess amount and until such notes or amendments are so executed by Borrower, Borrower's obligation to pay such excess amount shall be deemed to be evidenced by this Agreement.

(c)     In the event Agent takes possession of the Mortgaged Property and assumes control of such construction as aforesaid, Agent shall not be obligated to continue such construction longer than Agent shall see fit and may thereafter, at any time, change any course of action undertaken by

it or abandon such construction and decline to make further payments for the account of Borrower whether or not the Improvements shall have been completed.

(d)     Upon the occurrence and during the continuation of an Event of Default, in addition to other rights and remedies provided for herein or otherwise available to it, Agent may exercise all the rights and remedies of a secured party upon default under the Uniform Commercial Code, whether or not the Uniform Commercial Code applies to the applicable collateral.

ARTICLE XII
MISCELLANEOUS

12.1     <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lenders of the Loan and the execution and delivery to Lenders of the Notes, and shall continue in full force and effect so long as all or any of the Debt of Borrower is outstanding and unpaid. All covenants, promises and agreements in this Agreement contained, by or on behalf of Borrower, shall inure to the benefit of the respective legal representatives, successors and assigns of each Lender and Agent.

12.2     <u>Governing Law; Consent to Jurisdiction</u>. (a) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDERS AND AGENT AND ACCEPTED BY BORROWER AND EACH OTHER BORROWER PARTY IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTES DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED AND CONTEMPLATED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAWS OF SUCH STATE, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND THE ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE INDEBTEDNESS OR OBLIGATIONS ARISING HEREUNDER OR THEREUNDER TO THE FULLEST EXTENT PERMITTED BY LAW. BORROWER AND EACH OTHER BORROWER PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTES, AND THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY LENDER OR AGENT ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, PURSUANT TO § 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND BORROWER AND THE OTHER BORROWER PARTIES WAIVE ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND

BORROWER AND EACH OTHER BORROWER PARTY HEREBY IRREVOCABLY SUBMITS TO
THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. EACH
BORROWER PARTY DOES HEREBY DESIGNATE AND APPOINT CT CORPORATION SYSTEM
COMPANIES, L.P., WITH OFFICES AT 1633 BROADWAY, NEW YORK, NEW YORK 10022, OR
AT SUCH OTHER OFFICE IN NEW YORK, NEW YORK, AS ITS AUTHORIZED AGENT TO
ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS
WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL
OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS
UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF
BORROWER PARTY MAILED OR DELIVERED TO SUCH BORROWER PARTY IN THE
MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE
OF PROCESS UPON SUCH BORROWER PARTY IN ANY SUCH SUIT, ACTION OR
PROCEEDING IN THE STATE OF NEW YORK. EACH BORROWER PARTY (I) SHALL GIVE
PROMPT NOTICE TO AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT
HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A
SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH
OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS) AND (III)
SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES
TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A
SUCCESSOR.

12.3    Modification; Waiver in Writing. No modification, amendment, extension,
discharge, termination or waiver of any provision of this Agreement, or of any Notes, or of any other
Loan Document, nor any consent to any departure by Borrower or any other Borrower Party therefrom,
shall in any event be effective unless the same shall be in a writing signed by the Person against whom
enforcement is sought, and then such waiver or consent shall be effective only in the specific instance,
and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or
demand on Borrower or any other Borrower Party, shall entitle Borrower or such Borrower Party (as
applicable) to any other or future notice or demand in the same, similar or other circumstances.

12.4    Delay Not a Waiver. Neither any failure nor any delay on the part of Agent or
any Lender in insisting upon strict performance of any term, condition, covenant or agreement, or
exercising any right, power, remedy or privilege hereunder, or under any Notes or under any other Loan
Document, or any other instrument given as security therefor, shall operate as or constitute a waiver
thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of
any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting
payment after the due date of any amount payable under this Agreement, any Note or any other Loan
Document, Agent shall not be deemed to have waived any right either to require prompt payment when
due of all other amounts due under this Agreement, the Notes or the other Loan Documents, or to declare
a default for failure to effect prompt payment of any such other amount.

12.5    Notices. Except as expressly provided in the definition of "Rate Request", all
notices, consents, communications, approvals and requests required or permitted hereunder or under any
other Loan Document shall be in writing and mailed, telegraphed or hand delivered:

If to the initial Lender named herein or Agent:

Deutsche Bank Trust Company Americas
60 Wall Street
New York, New York 10005
Attention: Ms. Amy Sinensky

Mr. Stephen Choe
Mr. James Griffith
Facsimile No: (212) 797 4461
Confirmation No.: (212) 250-6911

and

Deutsche Bank Trust Company Americas
200 Crescent Court, Suite 550
Dallas, Texas 75201
Attention:  Mr. Gerard Dupont
Facsimile No: (214) 740-7910
Confirmation No.: (214) 740-7913

with a copy to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York  10022
Attention:  Malcolm K. Montgomery, Esq. (2138/461)
Facsimile No: (646) 848-7587
Confirmation No.: (212) 848-7587

If to Borrower or any other Borrower Party:

Turnberry/Centra Sub, LLC
19501 Biscayne Boulevard, Suite 400
Aventura, Florida  33180
Attention:  Lori Hartglass
Facsimile No.: (305) 933-5535
Confirmation No.: (305) 933-5576

with a copy to:

c/o Turnberry Associates
1972 S. University Drive
Davie, Florida 33324
Attention: Tracy Rubin
Facsimile No.: (954) 236-0089
Confirmation No.: (954) 423-2719

and if to any other Lender, at its Domestic Lending Office specified in the Assignment and Acceptance pursuant to which it became a Lender; or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties.  All such notices, consents, communications, approvals and requests shall, when mailed, be effective when deposited in the mails, except that all notices, requests and communications to Agent shall not be effective until received by Agent.

12.6    Trial by Jury.  EACH LENDER, AGENT, BORROWER AND EACH OTHER BORROWER PARTY HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO

THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH LENDER, AGENT, BORROWER AND EACH OTHER BORROWER PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS EACH LENDER, TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH LENDER, AGENT, BORROWER AND EACH OTHER BORROWER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

12.7    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original and all of which together shall constitute a single instrument. Delivery by telecopier of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the other Loan Documents or of any Exhibit hereto or thereto to be executed and delivered hereunder or thereunder shall be effective as delivery of an original executed counterpart thereof.

12.8    Severability. Any provision of this Agreement, which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Each such invalid or unenforceable provision will be ineffective only to the extent of such invalidity or unenforceability, and this Agreement otherwise construed to the greatest extent possible to accomplish fairly the purposes and intentions of the parties hereto.

12.9    Preferences. Agent and each Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by any Borrower Party to any portion of the obligations of Borrower Party under the Loan Documents. To the extent Borrower or any other Borrower Party makes a payment or payments to any Lender or Agent, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by such Lender or Agent.

12.10    Waiver of Notice. None of the Borrower Parties shall be entitled to any notices of any nature whatsoever from any Lender or Agent except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Agent to Borrower or any other Borrower Party and except with respect to matters for which any Borrower Party is not, pursuant to applicable Laws and Regulations, permitted to waive the giving of notice. Each Borrower Party hereby expressly waives the right to receive any notice from any Lender or Agent with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by any Lender or Agent to such Borrower Party.

12.11    Remedies of Borrower Party. In the event that a claim is made that Agent, any Lender or any of their respective agents (including any Servicer), has acted unreasonably or unreasonably delayed (or refrained from) acting or have unreasonably conditioned its act in any case where by Law or Regulation or under this Agreement or the other Loan Documents, Agent, such Lender or such agent, as the case may be, has an obligation to act reasonably or promptly or to only reasonably condition its act, each Borrower Party agrees that none of Agent, such Lender nor such agent, shall be liable for any

monetary damages, and the sole remedy of such Borrower Party shall be limited to commencing an action seeking injunctive relief or declaratory judgment, and in no event shall Agent, any Lender or any of their respective agents have any liability for monetary damages.

12.12    Expenses.  (a) Borrower agrees to pay on demand:  (i) Lender Expenses; (ii) all costs and expenses required to be reimbursed to Agent, Lead Arranger or any Lender pursuant to any other provision of the Loan Documents, including this Agreement; (iii) all costs and expenses of the Lead Arranger and Agent in connection with the preparation, execution, delivery, administration, performance, modification and amendment of, or any consent, approval or waiver under, the Loan Documents (including (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, title insurance, escrow fees and (B) the reasonable fees and expenses of counsel for the Lead Arranger and Agent with respect thereto (including with respect to reviewing and advising on matters required to be completed by the Borrower Parties on a post-closing basis) and with respect to advising Agent as to its rights and responsibilities, or the perfection, protection or preservation of Liens, rights or interests, under the Loan Documents, with respect to negotiations with any Borrower Party or with other creditors of any Borrower Party or any of its Affiliates arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto), (ii) all costs and expenses of the Lead Arranger and Agent and each Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including reasonable fees and expenses of counsel for the Lead Arranger and Agent and each Lender with respect thereto) and (iii) any and all present and future recording, transfer, documentary and intangible taxes and fees in connection with any of the foregoing.

(b)    In connection with its administration of the Loan and the Loan Documents, including the exercise of the rights and remedies set forth therein, Agent shall be entitled to rely, and shall be fully protected in relying, upon any advice and statements of legal counsel (including counsel to Borrower or any Borrower Party), independent accountants and other experts selected by Agent that Agent deems necessary or desirable.  Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice and/or statements.

(c)    The provisions of this **Section 12.12** shall survive the expiration and termination of this Agreement and the repayment of the Debt.

12.13    Indemnity.  (a) Borrower shall indemnify and hold harmless each Indemnitee from and against any and all Loss in connection with the negotiation, preparation, execution, delivery, administration or enforcement of the Loan Documents, including any investigative, administrative or judicial proceeding in connection therewith commenced or threatened, whether a suit is brought or whether such Indemnitee shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnitee in any manner relating to or arising out of any breach by any Borrower Party of its obligations under, or any misrepresentation by any Borrower Party contained in the Loan Documents, including any delay in failing to pay any Taxes; except to the extent that such Loss arises directly from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnitee.

(b)    Each indemnity provided for herein or in any other Loan Document is separate and distinct and shall not in any manner limit or supersede any other indemnity provided for herein or in any other Loan Document.  In the event two or more indemnities appear to cover the same claim the broadest of the indemnities shall be the applicable indemnity.

(c)     The provisions of this **Section 12.13** shall survive the expiration and termination of this Agreement and the repayment of the Debt.

12.14    Offsets, Counterclaims and Defenses.  Any transferee of any Lender's interest in and to this Agreement, the Notes and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which any Borrower Party may otherwise have against any such Lender, and no such unrelated counterclaim or defense shall be interposed or asserted by any Borrower Party in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower and each Borrower Party.

12.15    No Joint Venture or Partnership.  Borrower, on the one hand, and Lenders and Agent, on the other hand, intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower or any Borrower Party, on the one hand, and Lenders and Agent, on the other hand.

12.16    Publicity; Erection of Sign.  (a)  All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to any Lender or Agent, shall be subject to the prior written approval of Agent.

(b)     Agent and Lenders may advertise that the construction financing for the Project has been arranged through and supplied by Agent and Lenders.

(c)     Upon the request of Agent, but subject to Borrower's reasonable approval as well as all applicable Laws and Regulations, Borrower shall erect a sign at the Project in a prominent location selected by Borrower (and reasonably approved by Agent) indicating that the construction financing for the Project has been arranged through and supplied by Agent and such other Lenders that Agent sets forth in its request to Borrower; provided, however, that neither the principal amount of, nor interest rate on, the Loan shall be disclosed on any such sign.

12.17    Waiver of Counterclaim.  Borrower and each other Borrower Party hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by any Lender or Agent on behalf of Lenders or its agents (including any Servicer).

12.18    Conflict.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.

12.19    Brokers and Financial Advisors.  Borrower hereby represents and warrants to Agent and Lenders that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower hereby indemnifies Agent and Lenders and holds Agent and Lenders harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this **Section 12.19** shall survive the expiration and termination of this Agreement and the repayment of the Debt.

12.20    No Third Party Beneficiaries.  This Agreement and the other Loan Documents are solely for the benefit of each Lender and Agent and the Borrower Parties, and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than each Lender and Agent and the Borrower Parties any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of each Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of each Lender and Agent, and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that any Lender and Agent will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by any Lender or Agent if, in such Lender's or Agent's sole discretion, such Lender or Agent deems it advisable or desirable to do so.

12.21    Entire Agreement.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

12.22    Right of Setoff.  In addition to any rights now or hereafter granted under Law or Regulation or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, subject to **Section 2.8**, each Lender is authorized at any time and from time to time, subject to and with the prior approval of the Required Lenders, without presentment, demand, protest or other notice of any kind (all of which rights being hereby expressly waived), to set-off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by a Lender (including branches, agencies or Affiliates of a Lender wherever located) to or for the credit or the account of any Borrower Party (to the extent such credit or account is for the benefit of any Borrower Party), against the obligations and liabilities of the Borrower Parties to Lenders hereunder, under the Notes, the other Loan Documents or otherwise, irrespective of whether a Lender or Agent shall have made any demand hereunder and although such obligations, liabilities or claims, or any of them, may be contingent or unmatured, and any such set-off shall be deemed to have been made immediately upon the occurrence of an Event of Default even though such charge is made or entered on the books of such Lender subsequent thereto.

12.23    Loan Assignability.  (a)  Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment or Commitments, the Advances owing to it and the Note or Notes held by it); provided, however, that (i) each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of the Loan, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement and the other Loan Documents, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 and shall be in an integral multiple of $500,000 (or such lesser amount as shall be approved by Agent), (iii) each such assignment shall be to an Eligible Assignee, (iv) no such assignments shall be permitted without the consent of Agent until Agent shall have notified the Lenders that syndication of the Commitments hereunder has been completed and (v) the parties to each such assignment shall execute and deliver to Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note or Notes subject to such assignment and a processing and recordation fee of $3,500.

(b)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under **Sections 2.2.2** and **12.13** to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement and the other Loan Documents (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto).

(c)     By executing and delivering an Assignment and Acceptance, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower Party or the performance or observance by any Borrower Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in **Section 5.1(m)** and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)     Agent shall maintain at its address referred to in **Section 12.5** a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders, the Commitments and principal amount of the Advances owing to each Lender from time to time (the **"Register"**). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrower, Agent and Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement and the other Loan Documents. The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with any Note or Notes subject to such assignment, Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of **Exhibit E-1** hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give notice thereof to Borrower. In the case of any assignment by a Lender, within five (5) Business Days after its receipt of such notice, Borrower, at its own expense, shall execute and deliver to

Agent in exchange for the surrendered Note or Notes a new Note to the order of such Eligible Assignee in an amount equal to the Commitment assumed by it pursuant to such Assignment and Acceptance and, if any assigning Lender has retained a Commitment, a new Note to the order of such assigning Lender in an amount equal to the Commitment retained by it hereunder.  Such new Note or Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Note or Notes, shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of **Exhibit E-2** hereto.

(f)    Each Lender may sell participations to one or more Persons (other than any Borrower Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments, the Advances owing to it and the Note or Notes, if any, held by it); provided, however, that (i) such Lender's obligations under this Agreement and the other Loan Documents (including its Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) Borrower, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents and (v) no participant (other than a participant of DBTCA that qualifies as an Eligible Assignee) under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Borrower Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the collateral for the Loan.

(g)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this **Section 12.23**, disclose to the assignee or participant or proposed assignee or participant any information relating to Borrower furnished to such Lender by or on behalf of Borrower.

(h)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including the Advances owing to it and the Note or Notes held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(i)    Notwithstanding anything to the contrary contained herein, any Lender that is a fund that invests in bank loans may create a security interest in all or any portion of the Advances owing to it and the Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided, that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this **Section 12.23**, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to Agent and Borrower (an "**SPC**") the option to provide all or any part of any Advance that such Granting Lender would otherwise be obligated to make pursuant to this Agreement, provided that (i) nothing herein shall constitute a commitment by any SPC to fund any

Advance and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Advance, the Granting Lender shall be obligated to make such Advance pursuant to the terms hereof. The making of an Advance by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Advance were made by such Granting Lender. Each party hereto hereby agrees that (A) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, (B) no SPC shall be entitled to the benefits of **Section 2.2.2(c)** (or any other increased costs protection provision) and (C) the Granting Lender shall for all purposes, including the approval of any amendment or waiver of any provision of any Loan Document requiring the Granting Lender's consent or approval, remain the Lender of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the Laws or Regulations of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (1) with notice to, but without prior consent of, Borrower and Agent and with the payment of a processing fee of $500, assign all or any portion of its interest in any Advance to the Granting Lender and (2) disclose on a confidential basis any non-public information relating to its funding of Advances to any Rating Agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This **Section 12.23(j)** may not be amended without the prior written consent of each Granting Lender, all or any part of whose Advances are being funded by the SPC at the time of such amendment.

12.24   No Waiver. Notwithstanding anything to the contrary in the Loan Documents, Lenders and Agent shall not be deemed to have waived any right which Lenders or Agent may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim against Borrower for the full amount of the Debt secured by the Deed of Trust or to require that all collateral shall continue to secure all of the Debt owing to Lenders and Agent.

12.25   Exculpation of Agent and Lenders; No Petition. Neither any Lender nor Agent undertakes nor assumes any responsibility or duty to any Borrower Party or any other Person to select, review, inspect, examine, supervise, pass judgment upon or inform Borrower Party or any third Person of (a) the existence, quality, adequacy or suitability of appraisals of the Mortgaged Property or any other collateral, (b) any environmental report or (c) any other matters or items, including engineering, soils and seismic reports, which are contemplated in the Loan Documents. Any such selection, review, inspection, examination and the like, and any other due diligence conducted by any Lender or Agent, is solely for the purpose of protecting such Lender's or Agent's rights under the Loan Documents and shall not render such Lender or Agent liable to any Borrower Party or any third Person for the existence, sufficiency, accuracy, completeness or legality thereof. Each Borrower Party, each Lender, Agent and each other Person which becomes a party to this Agreement hereby acknowledges that Agent has originated the Loan and is responsible for all conversations and negotiations with Borrower and each other Borrower Party with respect to the Loan Documents and for all negotiation and preparation of the Loan Documents on behalf of Lenders and Agent. Each Borrower Party hereby agrees that the sole obligation of each Lender under the Loan Documents and in connection therewith is to fund its portion of the Loan, that such Lender has no other obligations or liabilities arising under or in connection with any Loan Document and shall not be liable or responsible to any Person to act or for the failure to act in connection with any Loan Document except for its funding obligation. Each Borrower Party, each Lender, Agent and each other Person which becomes a party to this Agreement hereby agrees that prior to the date that is one year and one day after the payment in full of all outstanding Debt, they will not institute against any Lender, or join any other Person in instituting against any Lender, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the Laws or Regulations of the United States or any state thereof.

12.26    Exculpation of Borrower. Notwithstanding any provision of this Agreement or any other Loan Document to the contrary but subject to the balance of this **Section 12.26**: (a) the recourse of Agent and Lenders hereunder and under the other Loan Documents shall be limited to Borrower and its assets and (b) none of the direct or indirect members, partners, officers, shareholders, principals, directors or agents of Borrower or any Borrower Party or any of their respective members, partners, officers, shareholders, principals, directors or agents shall have any personal liability for and on account of any nonpayment of the Debt, or for any nonperformance of any of the obligations under the Loan Documents to be performed by Borrower or any other Borrower Party, or for any breach of any covenant, representation or warranty made by Borrower or any other Borrower Party under the Loan Documents. Nothing contained in this **Section 12.26**, however, shall (i) be deemed to be a release or impairment of the Debt or the Lien of the Deed of Trust or the other Loan Documents against the Collateral, (ii) preclude Agent from foreclosing on the Deed of Trust or from enforcing any of the other rights or remedies of Agent against the Collateral or the Borrower, (iii) be deemed to release or otherwise affect, impair or limit the obligations of any Borrower Party under any Guaranty or the Environmental Indemnity or (iv) be deemed to release, affect, impair or limit the personal liability of any Guarantor under any Guaranty or any Indemnitor (as defined in the Environmental Indemnity) under the Environmental Indemnity. Notwithstanding anything set forth in this **Section 12.26** to the contrary, Borrower shall be personally liable to Agent and Lenders for:

(a)    Any Loss (which may include loss of principal or interest and reasonable attorneys' fees and collection costs) incurred or to be incurred by Agent or Lenders and arising out of or connected with any of the following circumstances: (A) any fraud or willful material misrepresentation committed by any Borrower Party or any of its Affiliates; (B) any waste by Borrower or any of its Affiliates of any material portion of the Collateral; (C) any misappropriation or misapplication of Rent, Operating Income, Security Deposits, Insurance Proceeds or Condemnation Proceeds relating to the Collateral; (D) the occurrence of an Event of Default with respect to the breach of any representation and warranty set forth in **Section 4.1(ff)** or any breach of any covenant set forth in **Section 5.1(bb), 5.1(cc), 6.1(h)** or **6.1(i)(ii)**; (E) any distributions or other payments made by Borrower after the occurrence and during the continuance of an Event of Default in violation of this Agreement or any other Loan Document; (F) any payments to Affiliates of Borrower unless disclosed to and approved by Agent; (G) the removal or disposal of any portion of the Mortgaged Property other than items of personal property permitted to be removed under any Loan Document or the placing voluntarily of a Lien on any portion of the Collateral by Borrower (except to the extent permitted by this Agreement); (H) any matters covered by the Environmental Indemnity; or (I) any Transfer of the Collateral in violation of this Agreement; and

(b)    The entire outstanding amount of the Debt upon the filing of any (i) voluntary petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy Law or Regulation, or any similar federal or state Law or Regulation, by Borrower or any other Borrower Party or (ii) involuntary petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy Law or Regulation, or any similar federal or state Law or Regulation, against Borrower or any other Borrower Party, in which any of Borrower or any other Borrower Party collude.

12.27    Release of Deed of Trust. Except as set forth in this **Section 12.27**, no repayment or prepayment of less than all of the Debt shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Deed of Trust on the Mortgaged Property. Agent on behalf of Lenders shall, at the expense of Borrower, upon unconditional payment in full of the Debt and termination of the Commitments (including pursuant to **Section 2.1.1**) and receipt by Agent of Mezzanine Lender's Transition Letter (which receipt shall be deemed to have occurred on the twenty-eighth (28th) day

146

following the unconditional payment in full of the Debt), release the Lien of the Deed of Trust and related Loan Documents.

        12.28    <u>Consent of Borrower as to Certain Matters relating to the Mezzanine Loan</u>. Borrower hereby agrees that upon the unconditional payment in full of the Debt and the termination of the Commitments, Mezzanine Lender shall, to the extent provided in the Mezzanine Loan Agreement and to the extent amounts owing thereunder remain outstanding, succeed to all applicable rights of Agent and Lenders under the Loan Documents. In connection with the succession of Mezzanine Lender to such rights, Borrower consents to the assignment or transfer by Agent of the Accounts and any Completion Reserve to Mezzanine Lender and Agent taking such actions as shall be reasonably requested by Mezzanine Lender in order to complete such transfer. Borrower agrees that in no event shall Agent release any funds deposited in the Accounts or the Completion Reserve to Borrower or any other Borrower Party upon the unconditional payment in full of the Debt and the termination of the Commitments, it being the intention of Borrower and Mezzanine Lender that all such funds shall remain on deposit and that the Accounts and the Completion Reserve be assigned or transferred to Mezzanine Lender in connection with the succession of Mezzanine Lender to the rights of Agent and the Lenders under the Loan Documents

ARTICLE XIII
AGENCY DECISIONS

        13.1    <u>Authorization and Action</u>. (a) Each Lender hereby appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto (it being understood that no Lender shall have the right to enforce the Loan Documents directly). As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of Notes; <u>provided</u>, <u>however</u>, that no Agent shall be required to take any action that exposes Agent to personal liability or that is contrary to this Agreement or applicable Law or Regulation. Agent agrees to give to each Lender prompt notice of each notice given to it by Borrower pursuant to the terms of this Agreement.

        (b)    Notwithstanding anything set forth herein to the contrary, any and all actions and matters relating to the following matters shall be deemed to have been delegated to Agent exclusively and shall not constitute a matter requiring the approval of any Lender: (i) except as otherwise set forth in **Section 13.1(c)**, construction of the Improvements, including waiver of conditions precedent to Advances, approval of changes to the Approved Construction Budget, Plans and Specifications, contracts and subcontracts with Major Contractors, Major Subcontractors and other Trade Contractors, and Payment and Performance Bonds and (ii) approval of Leases and Material Agreements and amendments, modifications and terminations thereof.

        (c)    Agent shall not (x) without the consent of all Lenders (i) agree to any amendment, modification or waiver to the Loan Documents which would (A) increase or decrease the Commitment of any Lender (except to the extent provided herein, other than with respect to **Section 5.1(l)(ii)**), (B) reduce the principal of or rate of interest on the Loan or any fees specified herein, (C) postpone the Maturity Date (other than the maturity date extension described in **Section 2.5**), (D) increase the aggregate Commitments or (E) release any collateral for the Loan (except as contemplated under this Agreement or any other Loan Document), (ii) release any Guaranty (except as contemplated by the terms

thereof) or (iii) amend this **Section 13.1(c)**, and (y) without the consent the Required Lenders (i) agree to any material changes to the Approved Construction Budget or Plans and Specifications, (ii) approve any distribution or payment under **Section 6.1(o)** or (iii) consent to the formation of any subsidiaries under **Section 6.1(r)**.

    (d)    In furtherance of the foregoing, each Lender hereby appoints and authorizes Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on collateral granted by any of the Borrower Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, Agent (and any Supplemental Agent appointed by Agent pursuant to **Section 13.1(c)** for purposes of holding or enforcing any Lien on the collateral (or any portion thereof) granted under the Loan Documents, or for exercising any rights or remedies thereunder at the direction of Agent), shall be entitled to the benefits of this **Article XIII** (including **Section 13.5** as though such Supplemental Agent was an "Agent" under the Loan Documents) as if set forth in full herein with respect thereto.

    (e)    Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the collateral (or any portion thereof) granted under the Loan Documents or of exercising any rights and remedies thereunder at the direction of Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. Agent may also from time to time, when Agent deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "**Supplemental Agent**") with respect to all or any part of the collateral; provided, however, that no such Supplemental Agent shall be authorized to take any action with respect to any collateral unless and except to the extent expressly authorized in writing by Agent. Should any instrument in writing from Borrower or any other Borrower Party be required by any Supplemental Agent so appointed by Agent to more fully or certainly vest in and confirm to such Supplemental Agent such rights, powers, privileges and duties, Borrower shall, or shall cause such Borrower Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by Agent. If any Supplemental Agent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by Law or Regulation, shall automatically vest in and be exercised by Agent until the appointment of a new Supplemental Agent. No Agent shall be responsible for the negligence or misconduct of any Supplemental Agent that it selects in accordance with the foregoing provisions of this **Section 13.1(e)** in the absence of Agent's gross negligence or willful misconduct.

    13.2    <u>Agent's Reliance, Etc.</u> Neither Agent, its respective Affiliates, or their respective officers, directors, employees, shareholders, members, partners, managers, agents (including any Servicer), or attorneys-in-fact shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, Agent: (a) may treat the payee of any Note as the holder thereof until, in the case of Agent, Agent receives and accepts an Assignment and Acceptance entered into by the Lender that is the payee of such Note, as assignor, and an Eligible Assignee, as assignee; (b) may consult with legal counsel (including counsel for any Borrower Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Borrower Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Borrower Party; (e) shall not be responsible to any

Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or telex) believed by it to be genuine and signed or sent by the proper party or parties.

      13.3    DBTCA and Affiliates. With respect to its Commitments, the Advances made by it and the Notes issued to it, DBTCA shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not Agent; and the term "Lender" shall, unless otherwise expressly indicated, include DBTCA in its individual capacity. DBTCA and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Borrower Party, any of its Subsidiaries and any Person that may do business with or own securities of any Borrower Party or any such Subsidiary, all as if DBTCA was not Agent and without any duty to account therefor to the Lenders. No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Borrower Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as Agent.

      13.4    Lender Credit Decision. Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the financial statements referred to in **Section 5.1(m)** and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

      13.5    Indemnification. Each Lender severally agrees to indemnify Agent (to the extent not promptly reimbursed by Borrower) from and against such Lender's ratable share of any and all Loss that may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by Agent under the Loan Documents (collectively, the **"Indemnified Costs"**); provided, however, that no Lender shall be liable for any portion of such Loss resulting directly from Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its ratable share of any costs and expenses (including fees and expenses of counsel) payable by Borrower under **Section 12.13**, to the extent that Agent is not promptly reimbursed for such costs and expenses by Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this **Section 13.5** applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. The failure of any Lender to reimburse Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse Agent for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this **Section 13.5** shall survive the payment in full of the Debt.

      13.6    Successor Agents. Agent may resign at any time by giving written notice thereof to the Lenders and Borrower and may be removed at any time with or without cause by the Required Lenders; provided, however, that any removal of Agent will not be effective until it has also been replaced as Agent and released from all of its obligations in respect thereof. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent. If no successor Agent

shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within thirty (30) days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $250,000,000. Upon the acceptance of any appointment as Agent hereunder by a successor Agent and, in the case of a successor Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Deed of Trust, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Loan Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents. If within forty-five (45) days after written notice is given of the retiring Agent's resignation or removal under this **Section 13.6** no successor Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Agent's resignation or removal shall become effective, (b) the retiring Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring Agent's resignation or removal hereunder as Agent shall have become effective, the provisions of this **Article XIII** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. Agent shall give Borrower prompt written notice of the appointment of a successor Agent hereunder.

    13.7 <u>Amendments to this Article</u>. Notwithstanding anything to the contrary in this Agreement, Agent and Lenders may amend the provisions of this **Article XIII** without the consent or approval of any Borrower Party, provided that no such amendment shall in any manner increase the obligations and liability or decrease the rights of Borrower hereunder.

ARTICLE XIV
RETENTION OF SERVICER

    14.1 <u>Retention</u>. Agent on behalf of Lenders reserves the right to retain a Servicer to act as its agent with respect to the Loan and the Loan Documents with such powers as are specifically delegated to the Servicer by Agent, whether pursuant to this Agreement, a servicing agreement, or otherwise, together with such other powers as are reasonably incidental thereto.

    14.2 <u>Costs and Expenses; Reliance</u>. Borrower shall pay any costs, expenses and fees relating to any servicing of the Loan (including special servicing fees and any fees and expenses of the Servicer in connection with a release of the Collateral, release of the Deed of Trust, assumption of the Loan, modification of or amendment to the Loan, any requests by Borrower for waivers or consents, and the enforcement of the Loan Documents). Borrower shall have the right to rely on any notices given by any Servicer with the same force and effect as if such notices had been given by Lenders or Agent on behalf of Lenders.

*    *    *    *

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BORROWER:**

**TURNBERRY/CENTRA     SUB,     LLC,** a Delaware limited liability company

By:   Turnberry/Centra Quad, LLC, a Delaware limited liability company, its sole managing member

By:   Turnberry/Centra Development, LLC, a Delaware limited liability company, its sole managing member

By:  Turnberry/South Strip, L.P., a Nevada limited partnership, its managing member

By:   Turnberry/ South Strip, LLC, a Nevada limited liability company, its general partner

By:  Tumberry Retail Holding, L.P., a Delaware limited partnership, its sole managing member

By:   Turnberry Retail Subsidiary GP, LLC, a Delaware limited liability company, its general partner

By:   Turnberry Retail Developers, L.P., a Delaware limited partnership, its managing member

By:   Turnberry Retail GP, LLC, a Delaware limited liability company, its general partner

By: _____
      Name: Jacquelyn Soffer,
      Title: Managing Member

(SIGNATURES CONTINUE ON NEXT PAGE)

S-1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:

**TURNBERRY/CENTRA SUB, LLC,**
a Delaware limited liability company

By: _____
        Name:
        Title:


AGENT:

**DEUTSCHE BANK TRUST COMPANY AMERICAS**

By: _____
        Name: James F. Griffith
        Title: Director

By: _____
        Name:
        Title: MARY BRUNDAGE
               DIRECTOR


LENDER:

**DEUTSCHE BANK TRUST COMPANY AMERICAS**

By: _____
        Name: James F. Griffith
        Title: Director

By: _____
        Name:
        Title: MARY BRUNDAGE
               DIRECTOR

S-1

The undersigned hereby execute this Agreement solely for the purposes of agreeing to comply with, perform and observe all obligations, covenants, obligations and duties and make, as and when required, the representations and warranties, hereunder and under any other Loan Document that purport to bind it or apply to it, including those provisions of the Loan Documents that apply to a "Borrower Party" or the "Borrower Parties".

_____
**JEFFREY SOFFER**, an individual

_____
**JACQUELYN SOFFER**, an individual

**TURNBERRY/CENTRA    QUAD,    LLC,    a**
Delaware limited liability company

By:    Turnberry/Centra Development, LLC, a Delaware limited liability company, its sole managing member

By:    Turnberry/South Strip, L.P., a Nevada limited partnership, its managing member

By:    Turnberry/ South Strip, LLC, a Nevada limited liability company, its general partner

By:    Turnberry Retail Holding, L.P., a Delaware limited partnership, its sole managing member

By:    Turnberry Retail Subsidiary GP, LLC, a Delaware limited liability company, its general partner

By:    Turnberry Retail Developers, L.P., a Delaware limited partnership, its managing member

By:    Turnberry Retail GP, LLC, a Delaware limited liability company, its general partner

By: _____
Name: Jacquelyn Soffer,
Title: Managing Member

S-3