## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of July 25, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **LEHMAN BROTHERS HOLDINGS, INC.**, a Delaware corporation, doing business as Lehman Capital, a Division of Lehman Brothers Holdings Inc., having an office at 399 Park Avenue, New York, New York  10022 ("**Lender**") and **JEFFREY SOFFER AND JACQUELYN SOFFER**, each individuals having an address at 19501 Biscayne Boulevard, Suite 400, Aventura, Florida 33180 (collectively, and jointly and severally, "**Borrower**").

## W I T N E S S E T H:

**WHEREAS**, Turnberry/Centra Sub, LLC, a Delaware limited liability company ("**Town Square Property Owner**") owns the land and the improvements thereon, including the retail center currently being constructed, known as Town Square, Las Vegas (the "**Town Square Property**");

**WHEREAS**, Turnberry/Centra Crossroads, LLC, a Delaware limited liability company ("**Crossroads Property Owner**") owns the leasehold to the three parcels of land known as Crossroads, Las Vegas (the "**Crossroads Property**") (the Town Square Property Owner and Crossroads Property Owner are sometimes collectively referred to herein as the "**Property Owner**"; the Town Square Property and Crossroads Property are sometimes collectively referred to herein as the "**Property**");

**WHEREAS**, Borrower owns an indirect 45.052% interest in Town Square Property Owner and an indirect 45.052% interest in the Crossroads Property Owner;

**WHEREAS**, Borrower desires to obtain the Loan (as hereinafter defined) from Lender to pay for (or reimburse Property Owner for) Project Costs (as hereinafter defined) incurred from time to time; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1.    Definitions.** For all purposes of this Agreement, except as otherwise expressly required herein or unless the context clearly indicates a contrary intent:

"**Acorn Pledge**" shall mean that certain Pledge and Security Agreement dated as of the date hereof, made by Acorn Partners LP in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Advance**" shall mean any portion of the Loan advanced by Lender pursuant to this Agreement.

"**Applicable Interest Rate**" shall mean from the date hereof through but not including the Maturity Date, LIBOR (determined as herein set forth) plus two and one quarter of one percent (2.25%); provided, however the Applicable Interest Rate for the period commencing on the date hereof through and including August 1, 2007 shall be seven and fifty seven hundredths percent (7.57%).

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with his or her heirs, administrators, successors and permitted assigns.

"**Borrower's Disbursement Account**" shall mean the account of Borrower described in Exhibit B attached hereto.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Casualty**" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Centra Park Pledge**" shall mean that certain Pledge and Security Agreement dated as of the date hereof, made by Centra Park, LLC in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Closing Date**" shall mean the date upon which this Agreement is executed and delivered by Borrower and Lender.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement and the other Loan Documents.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

USActive 7566094.12

"**Default Rate**" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5%) above the Applicable Interest Rate.

"**Determination Date**" means, in connection with any Interest Period, the second London Business Day immediately preceding the commencement of such Interest Period.

"**Event of Default**" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"**Existing Indebtedness (Crossroads)**" shall mean the indebtedness evidenced by the loan documents entered into by the predecessor-in-title of the Crossroads Property Owner on August 24, 2001 and on July 5, 2002, and relating to the Crossroads Property.

"**Existing Lender (Crossroads)**" shall mean Conseco Mortgage Capital, Inc., together with its successors and assigns, as lender under the Existing Indebtedness (Crossroads).

"**Existing Mezzanine Indebtedness (Town Square)**" shall mean the indebtedness evidenced by the mezzanine loan documents, as amended, entered into by Turnberry/Centra Quad, LLC on October 25, 2006, and relating to the Town Square Property and the Town Square Property Owner.

"**Existing Mezzanine Lender (Town Square)**" shall mean Deutsche Bank Trust Company Americas, as agent, together with its successors and assigns, as lender under the Existing Mezzanine Indebtedness (Town Square).

"**Existing Mortgage Indebtedness (Town Square)**" shall mean the indebtedness evidenced by the loan documents, as amended, entered into by Town Square Property Owner on October 25, 2006, and relating to the Town Square Property.

"**Existing Mortgage Lender (Town Square)**" shall mean Deutsche Bank Trust Company Americas, as agent, together with its successors and assigns, as lender under the Existing Mortgage Indebtedness (Town Square).

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Guarantor**" shall mean Turnberry Retail Holding, L.P., together with his or her heirs, administrators, successors and permitted assigns.

"**Guaranty**" shall mean that certain Guaranty Agreement dated as of the date hereof, made by Turnberry Retail Holding, L.P. in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Interest Period**" shall mean a calendar month; <u>provided</u>, <u>however</u>, that with respect to the Payment Date occurring in August, 2007, the Interest Period shall be the period commencing on the Closing Date to and including August, 2007.

USActive 7566094.12

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Lender's Notice**" shall have the meaning set forth in Section 2.2.4(c) hereof

"**LIBOR**" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/1000 of 1%) for deposits in U.S. dollars, for a one-month period, that appears on Telerate Page 3750 (or the successor thereto) as of 11:00 a.m., London time, on the related Determination Date. If such rate does not appear on Telerate Page 3750 as of 11:00 a.m., London time, on such Determination Date, LIBOR shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S. dollars for a one-month period that appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, if at least two such offered rates so appear. If fewer than two such offered rates appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, Lender shall request the principal London Office of any four major reference banks in the London interbank market reasonably selected by Lender, to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the then outstanding principal amount of the Loan. If at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, Lender shall request any three major banks in New York City reasonably selected by Lender, to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for the then outstanding principal amount of the Loan. If at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates. LIBOR shall be determined conclusively by Lender or its agent.

"**Loan**" shall have the meaning provided in Section 2.1. The Loan is evidenced by the Note, this Agreement and the other Loan Documents.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge, the Guaranty and all other documents executed and delivered by Borrower in connection with the Loan.

"**Loan Taxes**" shall have the meaning set forth in Section 2.2.4(a) hereof

"**London Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England or New York, New York are not open for business.

"**Maturity Date**" shall mean March 7, 2008.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan

4

Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Note**" shall mean that certain Promissory Note dated as of the date hereof in the original principal amount of up to $95,000,000.00 made by Borrower to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Payment Date**" shall mean the first (1st) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately succeeding Business Day.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge**" shall mean collectively, the Acorn Pledge, the Centra Park Pledge, the Seikaly Pledge and the Soffer Turnberry Pledge.

"**Project**" shall mean the construction and completion of Town Square, Las Vegas, Nevada, and the development or construction of Crossroads Las Vegas, Nevada.

"**Project Costs**" shall mean the hard and soft costs (including debt service) of construction and development incurred in connection with the Project, including the line items set forth in Exhibit C.

"**Request for Advance**" means a request in the form of Exhibit A fully completed and certified by Borrower.

"**Seikaly Pledge**" shall mean that certain Pledge and Security Agreement dated as of the date hereof, made by Rony Seikaly in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Soffer/Turnberry Pledge**" shall mean that certain Pledge and Security Agreement dated as of the date hereof, made by Soffer Turnberry/South Strip, LLC in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Substitute Rate**" shall have the meaning set forth in Section 2.2.4(c) hereof.

"**Substitute Spread**" shall have the meaning set forth in Section 2.2.4(c) hereof.

"**Telerate Page 3750**" means the display designated as "Page 3750" on the Dow Jones Telerate Service (or such other page as may replace Page 3750 in that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits).

5

**Section 1.2.    Principles of Construction.** All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    GENERAL TERMS

**Section 2.1.    Agreement to Lend and Borrow.** Subject to the conditions and upon the terms herein provided, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender, in installments, a maximum aggregate principal amount of Ninety Five Million and No/100 Dollars ($95,000,000.00) or such lesser amount as shall be available pursuant to the terms of this Agreement (the "Loan"). The Loan shall be repaid with interest, costs and charges as hereinafter more particularly set forth. Notwithstanding anything herein contained to the contrary, any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed. Subject to the terms and conditions of this Agreement, Advances shall be made in accordance with the provisions of Article III hereof.

**Section 2.2.    Interest Rate.**

**2.2.1    Interest Generally.** Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate. Monthly installments of interest only, in arrears, shall be paid on each monthly Payment Date commencing on August 1, 2007 and on each subsequent monthly Payment Date thereafter up to and including the Maturity Date. Interest on the outstanding principal amount of the Loan for the period from the Closing Date through and including August 1, 2007 shall be paid by Borrower on the Closing Date.

**2.2.3    Interest Calculation.** Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the outstanding principal balance.

**2.2.4    Loan Taxes; Substitute Interest Rate.**

(a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed, enacted or become effective after the date hereof (such non-excluded taxes being referred to collectively as "Loan Taxes"), excluding income and franchise taxes and taxes of a similar nature based on the income of Lender of the United States of America or any political subdivision or taxing authority thereof or therein (including Puerto Rico and the U.S. Virgin Islands). If any Loan Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall

6

be increased to the extent necessary to yield to Lender (after payment of all Loan Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Loan Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Loan Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Loan Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(b) In the event that any change in any requirement of law which is applicable to all federally or state regulated banks or trust companies or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority which is applicable to all federally or state regulated banks or trust companies:

(i)     shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of LIBOR hereunder (but only to the extent that the same relate to LIBOR–based loans);

(ii)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(iii)   shall hereafter impose on Lender any other condition on the making or origination of LIBOR-based loans and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining LIBOR-based real estate secured loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as reasonably determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, Lender shall provide Borrower with not less than thirty (30) days written notice specifying in reasonable detail the event by reason of which he has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error; provided, however, that Lender shall use reasonable efforts to minimize the amount of such additional costs. This provision shall survive

payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the Loan Documents.

(c) In the event that Lender shall have reasonably determined on a non-discriminatory basis (which determination shall be conclusive and binding upon Borrower absent manifest error), that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall, by notice to Borrower ("**Lender's Notice**"), which notice shall set forth in reasonable detail such circumstances, reasonably establish the Applicable Interest Rate at Lender's then customary spread (the "**Substitute Spread**"), taking into account the size of the Loan and the creditworthiness of Borrower, above a published index used for variable rate loans as reasonably determined by Lender and which approximates LIBOR as closely as possible (the "**Substitute Rate**"). If any change in law, or any change in the interpretation of any existing law or future law or application thereof, shall hereafter make it unlawful for Lender to make or maintain the Loan at the Applicable Interest Rate as contemplated hereunder, (i) the obligation of Lender hereunder to make the Loan at the Applicable Interest Rate shall be cancelled forthwith and (ii) Lender may give Borrower a Lender's Notice, establishing the Applicable Interest Rate at the Substitute Rate plus the Substitute Spread, in which case the Applicable Interest Rate shall be a rate equal to the Substitute Rate in effect from time to time plus the Substitute Spread. If permitted by law, any change pursuant to this <u>Section 2.2.4</u> shall not become effective until the expiration of the then current Interest Period.

**2.2.5    Default Rate.** In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

**2.2.6    Usury Savings.** This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

8

**Section 2.3.    Loan Payment.**

2.3.1    **Payments Generally.** Monthly installments of interest only, in arrears, shall be paid on each monthly Payment Date commencing on August 1, 2007 and on each subsequent monthly Payment Date thereafter up to and including the Maturity Date. All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

2.3.2    **Payment on Maturity Date.** Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note and the other Loan Documents.

2.3.3    **Late Payment Charge.** If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower by the date on which it is due (other than any payment due on the Maturity Date), Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Loan Documents to the extent permitted by applicable law.

**Section 2.4.    Prepayments.**    Borrower shall have the right to prepay the Loan in whole or in part on any Payment Date prior to the Maturity Date, without penalty or premium of any kind.   Borrower shall provide prior written notice to Lender specifying the Payment Date upon which the prepayment is to be made, which notice shall be delivered to Lender not less than five (5) Business days prior to such payment.

**Section 2.5.    Manner of Making Payments.**

2.5.1    **Making of Payments.** Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 1:00 p.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date.

2.5.2    **No Deductions, etc.** All payments made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without any deduction for, any setoff, defense or counterclaims.

## III.    ADVANCES

**Section 3.1.    Requests for Advances under the Loan.**

3.1.1    **Generally.**    The proceeds of the Loan shall be advanced from time to time by transfer of such funds by Lender to Borrower's Disbursement Account or in such other

9

manner as Lender and Borrower may agree. Advances shall be made upon satisfaction of the conditions hereinafter set forth, except to the extent that Lender may elect to waive any of such conditions precedent. Each Request for Advance (together with the materials required to be submitted therewith pursuant to this Agreement) shall be submitted to Lender not less than ten (10) Business Days prior to the date proposed for such Advance in the Request for Advance.

  **3.1.2**   **Request for, and Disbursement of, Advances.**   (a) Lender shall make Advances only on account of Project Costs. Lender shall not be obligated to make Advances on account of the costs of routine maintenance to or the operation of the Property (including taxes and insurance premiums payable in respect of the Property) or any other costs, other than Project Costs.

  (b) Lender shall, upon receipt of a Request for Advance in the form of <u>Exhibit A</u>, disburse to Borrower the Advance so requested by Borrower. In no event shall Lender be obligated to make an Advance if an Event of Default has occurred and is continuing. Each Request for Advance shall specify the Project Costs for which the Advance is requested.

  **Section 3.2.**   **Frequency of Advances.** Advances shall be made no more frequently than one Advance per calendar month and shall be no less than $1,000,000; <u>provided, however</u>, Lender may waive any and all conditions precedent to the making of an Advance.

  **Section 3.3.**   **Use of Advances.** Each Advance made to Borrower shall be received, held and contributed by Borrower, as a capital contribution to Property Owner (or to the owners of Property Owner, to be further contributed by them to Property Owner) to pay for the Project Costs which were specified on the Request for Advance in accordance with which such Advance was made, and Borrower shall cause Property Owner to apply such Advances to pay for Project Costs.

  **Section 3.4.**   **No Obligation to Advance.** Notwithstanding anything to the contrary contained in this Agreement or in the other Loan Documents, in no event shall Lender be obligated to make any Advance after the Maturity Date.

## IV.   CONDITIONS PRECEDENT TO MAKING ADVANCES

  Lender shall not be obligated to make any Advance hereunder unless, in addition to the conditions set forth in <u>Article III</u>, the following conditions shall have been satisfied in the sole and absolute discretion of Lender, except to the extent that Lender may elect to waive any such conditions:

  **Section 4.1.**   **Performance; No Default.** Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by him and it at or prior to the date of such Advance, and on the date of such Advance, there shall exist no Default or Event of Default hereunder.

  **Section 4.2.**   **No Damage.** No Casualty and no Condemnation shall have occurred.

USActive 7566094.12

## V.    PERFORMANCE OF WORK; INSPECTIONS

**Section 5.1.    Lender not Responsible for Construction.**    Nothing in this Agreement shall (a) make Lender responsible for any aspect of the construction at (or any other matter, or any nature, in connection with) the Property, including completing the construction at the Property, (b) require Lender to expend funds (in addition to the amount of the Loan) to perform or complete any construction at (or any other work, of any nature, in connection with) the Property; or (c) obligate Lender to proceed with design or construction work at or in connection with the Property.

**Section 5.2.    Inspections.**    Borrower shall permit (or shall cause Property Owner and its contractors to permit) Lender and Lender's representatives, upon reasonable advance notice and accompanied by a representative of Borrower, during normal business hours to inspect the progress of construction at the Property (and any work constituting Project Costs).

## VI.    COVENANTS.

**Section 6.1.    Consents.**    Borrower has obtained all consents required in connection with the Loan, this Agreement, the Pledge and the consummation of the transactions contemplated hereby (including all consents required of the Existing Mezzanine Lender and the Existing Mortgage Lender, if required to this Agreement, the Loan and the Pledge). Borrower agrees to provide the Existing Mortgage Lender (i) on or before the 20th day of each month a copy of the Request for Advance delivered by Borrower to Lender under this Agreement and (ii) any other information it may reasonably request regarding the Loan or any Advance.

**Section 6.2.    Organizational Chart.**    Attached as Exhibit D is a true and complete organizational chart of the entities that own (indirectly) the Town Square Property Owner and the Crossroads Property Owner.

**Section 6.3.    Additional Indebtedness; Transfers.**    Except as provided (and subject to the provisions regarding transfers in) the Centra Park Pledge, Borrower shall not, nor shall Borrower permit or consent to, (i) the sale, transfer, conveyance, mortgage, hypothecation, pledge or assignment of the Town Square Property or the Crossroads Property or any direct or indirect interest therein, or (ii) the sale, conveyance, assignment, transfer, encumbrance, pledge or other transfer of any legal or beneficial interest, whether direct or indirect, in any direct or indirect owner of the Town Square Property Owner or the Crossroads Property Owner, in each case without the prior written consent of Lender.

## VII.    EVENTS OF DEFAULT

**Section 7.1.    Events of Default.** The following shall each constitute an "**Event of Default**" hereunder:

(a)    if (i) any monthly installment of interest due under the Note is not paid when due, (ii) the payment due on the Maturity Date is not paid when due or (iii) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

USActive 7566094.12

(b)     if Borrower breaches any covenant contained in <u>Section 6.3</u>;

(c)     if Borrower, Pledgor, Town Square Property Owner or the Crossroads Property Owner shall make an assignment for the benefit of creditors;

(d)     if a receiver, liquidator or trustee shall be appointed for Borrower, Pledgor, Town Square Property Owner or the Crossroads Property Owner or if Borrower, Pledgor, Town Square Property Owner or the Crossroads Property Owner shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Pledgor, Town Square Property Owner or the Crossroads Property Owner or if any proceeding for the dissolution or liquidation of Borrower, Pledgor, Town Square Property Owner or the Crossroads Property Owner shall be instituted; <u>provided</u>, <u>however</u>, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Pledgor, Town Square Property Owner or the Crossroads Property Owner upon the same not being discharged, stayed or dismissed within sixty (60) days;

(e)     if an Event of Default (as such term is defined in the loan documents evidencing, in each case, the Existing Mortgage Indebtedness, the Existing Mezzanine Indebtedness and/or the Existing Crossroads Indebtedness) exists and is not cured within any applicable cure period provided therein.

(f)     if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in <u>subsections (a)</u> to <u>(d)</u> above, for ten (10) days after notice to Borrower and Centra Park, LLC from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender to Borrower and Centra Park, LLC in the case of any other Default; <u>provided</u>, <u>however</u>, that if such non monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and <u>provided</u> <u>further</u> that Borrower or Centra Park, LLC shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower or Centra Park, LLC in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days.

Section 7.2.    <u>Acceleration of Loan.</u> Upon and at any time after the occurrence of any Event of Default, Lender may declare the indebtedness evidenced by the Note and the other Loan Documents, together with all other sums payable hereunder and thereunder, immediately due and payable.

Section 7.3.    <u>Lender's Right to Stop Disbursing Funds.</u> In addition to any other rights and remedies which Lender may have pursuant to this Agreement and the other Loan Documents or pursuant to law or equity, and without limitation thereof, (i) if any Default shall occur and be continuing or any Event of Default shall occur, then Lender may decline to make all or any portion of such further Advances as Lender may elect and/or (ii) if any Event of Default shall occur, any or all obligations of Lender under this Agreement, at the option of Lender, shall cease and terminate; <u>provided</u>, <u>however</u>, Lender may make all or any portion of any Advance so long as any such Default or Event of Default shall exist without thereby

12

becoming obligated to make all or a portion of any other or further Advance or waiving Lender's right to exercise any of Lender's rights and remedies pursuant to any one or more of the Loan Documents or as may be available at law or equity.

## VIII.  MISCELLANEOUS

Section 8.1.  No Waivers. The making of any Advance hereunder shall not constitute or a waiver of any of the conditions precedent to Lender's obligation to make further Advances (absent a statement by or the intention of Lender that such Advance shall constitute a waiver), nor, in the event that Borrower is unable to satisfy any such conditions precedent, shall any such failure to insist upon Borrower's compliance with any obligation hereunder have the effect of precluding Lender from thereafter declaring such inability to be a Default or an Event of Default as herein provided. Any Advance made by Lender in the absence of strict compliance with any or all of the conditions precedent to Lender's obligation to make such Advance or in conjunction with a waiver by Lender of Borrower's compliance with any of such conditions precedent shall be deemed to have been made pursuant to this Agreement and not in modification of the terms hereof.

Section 8.2.  Entire Agreement. This Agreement and the other Loan Documents embody the entire agreement and understanding between the parties with respect to the Loan and supersede and cancel all prior loan applications, expressions of interest, commitments, agreements and understandings, whether oral or written, relating to the subject matter hereof, except as specifically agreed to the contrary.

Section 8.3.  Amendments, Etc. No amendment, modification, termination, or waiver of any provision of this Agreement shall be effective unless in writing and signed by Borrower and Lender. No consent to any departure by Borrower from any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

Section 8.4.  Joint and Several Obligations; Assignment; Binding Effect. Each individual comprising Borrower shall be jointly and severally liable for payment of the Debt and the performance of all obligations hereunder and under the other Loan Documents. Neither individual comprising Borrower may assign this Agreement or any rights or obligations or interests herein (or in any other Loan Document), or delegate any duties or responsibilities set forth in this Agreement or in any of the other Loan Documents, without in each case the prior written consent of Lender.  This Agreement shall be binding upon and inure to the benefit of Lender and its successors and assigns and shall be binding upon Borrower and Borrower's heirs, administrators, successors and permitted assigns.

Section 8.5.  Severability of Provisions. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be, as to such jurisdiction, ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction.

13

USActive 7566094.12

**Section 8.6.**    **Headings, Etc.** The headings and captions of various Sections of this Agreement have been inserted for convenience only and are not to be construed as defining, modifying, limiting or amplifying, in any way, the scope or intent of the provisions hereof.

**Section 8.7.**    **No Joint Venture.** Borrower is not and shall not be deemed to be a joint venturer, partner, tenant in common or joint tenant with Lender for any purpose.

**Section 8.8.**    **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**Section 8.9.**    **Lender's Discretion.** Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Whenever this Agreement expressly provides that Lender may not withhold its consent or its approval of an arrangement or term, such provisions shall also be deemed to prohibit Lender from delaying or conditioning such consent or approval.

**Section 8.10.**    **Notices.** All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this Section 8.10):

If to Lender:             Lehman Brothers Holdings, Inc.
                          399 Park Avenue
                          New York, New York 10022
                          Attention: Josh Freedman
                          Facsimile No.: (212) 520-0407

With a copy to:           Cadwalader, Wickersham & Taft LLP
                          One World Financial Center
                          New York, NY 10281
                          Attention: Fredric L. Altschuler, Esq.
                          Facsimile No.: (212) 504-6666

If to Borrower:           Turnberry Associates
                          19501 Biscayne Boulevard
                          Suite 400
                          Aventura, FL 33180
                          Attention: Legal Dept.
                          Facsimile No.: (305) 933-5535

14

| with a copy to: | Turnberry Associates |
| | 19501 Biscayne Boulevard |
| | Suite 400 |
| | Aventura, FL 33180 |
| | Attention: Lori Hartglass |
| | Facsimile No.: (305) 933-5535 |

| If to Centra Park, LLC: | Centra Park, LLC |
| | 8363 West Sunset Road |
| | Suite 350 |
| | Las Vegas, NV 89113 |
| | Attention: Ken Sullivan |
| | Facsimile No.: (702) 851-9401 |

| with a copy to: | Sklar Warren Conway & Williams |
| | 8363 West Sunset Road |
| | Suite 300 |
| | Las Vegas, NV 89113 |
| | Attention: Alan Sklar |
| | Facsimile No.: (702) 360-0000 |

A notice shall be deemed to have been given: in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

**Section 8.11.  Governing Law.**

(A)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT THERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

USActive 7566094.12

(B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT:

>Corporation Service Company
>1133 Avenue of the Americas
>Suite 3100
>New York, NY 10036

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

Section 8.12.  Trial by Jury.☐BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

USActive 7566094.12

**Section 8.13.** **Headings.** The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 8.14.** **Brokers and Financial Advisors.** Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person has a right to any fees in connection with the transactions contemplated herein. The provisions of this Section 8.14 shall survive the expiration and termination of this Agreement and the payment of the Debt.

**Section 8.15.** **Prior Agreements.** This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 8.16.** **Collateral for the Loan.** Borrower shall use commercially reasonable efforts to provide to Lender, and Lender agrees to accept (subject to customary underwriting standards), as additional collateral for the Loan (at such time as the same is or are made available to Borrower):

(i) a deed of trust on the Crossroads Property (a "**Deed of Trust**") in form and substance acceptable to Lender and granting to Lender a first priority lien in respect of Crossroad Property Owner's ground leasehold interest in all three parcels constituting the Crossroads Property, provided that Clark County (the ground lessor of the Crossroads Property) consents to such leasehold Deed of Trust; and

(ii) a deed of trust on the Town Square office parcel to the extent the same comprises the Office Development as described in Section 5.1(jj) of the Construction Loan Agreement dated as of October 25, 2006 among Town Square Property Owner, Deutsche Bank Trust Company Americas as Agent, and the Lenders identified therein (the "**Office Parcel**") (which Office Parcel shall have been subdivided from the rest of the Town Square Property, and shall constitute a separate and distinct tax lot), in form and substance satisfactory to Lender and granting to Lender a first priority lien thereon, and in connection therewith Borrower shall cause fee simple to such Office Parcel to be conveyed to a new separate single purpose entity controlled by Borrower.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

_____
Jeffrey Soffer

_____
Jacquelyn Soffer

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

_____

Jeffrey Soffer

_____

Jacquelyn Soffer

**LENDER:**

**LEHMAN BROTHERS HOLDINGS, INC.,** a
Delaware corporation

By: _____
    Name: Charlene Thomas
    Title: Authorized Signatory

## EXHIBIT A

### Request for Advance

Pursuant to Section 3.1.2 of the Loan Agreement dated as of July 25, 2007 (the "Loan Agreement") between Lehman Brothers Holdings Inc. ("Lender") and the undersigned, as borrower (the "Borrower"), I hereby certify as follows:

(a)    The representations and warranties of the Borrower set forth in the Loan Agreement, or in any of the Loan Documents, any certificate, document or financial or any other statement furnished pursuant to or in connection with the Loan Agreement, are true and correct on and as of the date hereof with the same effect as if made on the date hereof;

(b)    Immediately prior to and immediately after the making of the Advance requested to be made pursuant to this Request for Advance, no Default or Event of Default shall have occurred and be continuing under the Loan Agreement;

(c)    No part of the Property has suffered a Casualty or Condemnation;

(d)    The Advance that is the subject of this Request for Advance will be applied to pay for Project Costs actually incurred;

(e)    The Project Costs that are the subject of this Request for Advance have not been subject to previous disbursements or requisition requests; and

(f)    The Project Costs that are the subject of this Request for Advance are listed on Schedule I.

All capitalized terms used in this Certificate shall have the meanings ascribed to such terms in the Loan Agreement.

Date:    _____

By: _____
    Authorized Agent for Jeffrey Soffer and
    Jacquelyn Soffer

## EXHIBIT B

**Company:**       Turnberry Centra Sub LLC

**Bank:**          Bank of America

**Account:**       005507483316

**ABA:**           063000047

Exhibit B

## EXHIBIT C

## Project Costs

Exhibit C

**Lehman Bros. Interim Advance**

| | |
|---|---|
| **Office A** | |
| Site Development | |
| On-Site Costs | |
| Staking | $750,000 |
| Other Decorative & Site Lighting Buyout | $500,000 |
| Utility Relocation | $250,000 |
| Re-Route Utilities | $300,000 |
| Children's Park | $3,300,000 |
| Town Square Park | $2,500,000 |
| Texas Art | $200,000 |
| Sunset Right of Way - Clark County | $1,700,000 |
| Landscaping | $8,500,000 |
| Off-Site Improvements | |
| Nevada Power (Phases III & IV) | $300,000 |
| Additional Off-Site Improvements | $738,633 |
| Site Development Contingency | $571,159 |
| Contractor's Fee | $490,245 |
| Hard Costs | |
| Tenant Improvements - Retail | |
| Retail | $1,857,431 |
| Office | $4,393,000 |
| Soft Costs | |
| Construction | |
| DDG Contract & Changes | $300,000 |
| MCA Construction Documents | $1,900,000 |
| Facade Consultant | $200,000 |
| A&E Reimbursables | $500,000 |
| Civil Engineering (On-Site) | $200,000 |
| Pre-Opening Operations | $2,942,867 |
| Legal (Leasing) | $10,593 |
| Marketing & Advertising | |
| Leasing Commissions | $18,287 |
| Co-Broker Leasing Fees | $1,950,000 |
| Grand Opening Expenses (Net) | $1,750,000 |
| Soft Cost Contingency | $255,970 |

| | |
|---|---|
| Total Development Costs | $36,378,185 |

| | |
|---|---|
| **Total Retail/Office A Cumulative Spending Cumulative Remaining Balance** | **$36,378,185** |

| | BUDGET |
|---|---|
| **Office B/Fry Parcel ($75 Million)** | |
| **Office B** | |
| Site Development | $661,500 |
| Hard Costs | |
| Buildings H & R | $23,768,516 |
| Parking Garage | $8,444,130 |
| Hard Cost Contingency | $1,610,632 |
| Contractors's Fee | $1,691,164 |
| Project Supervision | $532,717 |
| Tenant Improvements (G) | $4,472,387 |
| Soft Costs | |
| Construction | $2,946,491 |
| Marketing & Advertising | $1,761,078 |
| Financing Costs | $150,000 |
| Interest/Interest Reserve | $2,062,500 |
| Soft Cost Contingency | $376,003 |
| | |
| **Fry Parcel** | |
| Mortgage Payoffs **(F)** | $0 |
| Site Development | $1,377,594 |
| Hard Costs | |
| Building Shell & General Conditions | $2,381,400 |
| Hard Cost Contingency | $119,070 |
| Contractors's Fee | $125,024 |
| Project Supervision | $210,039 |
| Tenant Improvements | $1,140,000 |
| Soft Costs | |
| Construction | $1,635,541 |
| Marketing & Advertising | $186,044 |

| | |
|---|---:|
| Financing Costs | $337,500 |
| Loan Origination Fee | $950,000 |
| Interest/Interest Reserve | $928,125 |
| Soft Cost Contingency | $154,360 |
| | |
| **Total Development Costs** | $58,621,815 |

| | |
|---|---:|
| **Total Office B/Fry Parcel** | **$58,621,815** |
| **Cumulative Spending** | |
| **Cumulative Remaining Balance** | |
| | |
| **Total Lehman Bros. Interim Funding** | **$95,000,000** |

# EXHIBIT D

## ORGANIZATIONAL CHART

Exhibit D



% Ownership based 2005 Tax Returns (Schedule K1) and Contribution and Assignment Agreement dated 8/1/05
Rev. 6/28/07

LEHMAN BROTHERS HOLDINGS, INC.
399 Park Avenue
New York, New York  10022

July 10
June __, 2008

Jeffrey Soffer and Jacquelyn Soffer
19501 Biscayne Boulevard, Suite 400
Aventura, Florida 33180

Re:  Town Square, Las Vegas

Reference is made to that certain Loan Agreement dated as of July 25, 2007 (as amended from time to time, the "Loan Agreement") between Lehman Brothers Holdings, Inc., as lender, and each of you, collectively, as borrower.  All capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

This letter is being executed and delivered to confirm the following:

(i)    The term "Maturity Date" shall, for all purposes of the Loan Agreement and other Loan Documents, be amended to mean February 27, 2009.

(ii)    Concurrently herewith, Borrower shall pay to Lender a non-refundable extension fee equal to Nine Hundred Fifty Thousand and no/100 Dollars ($950,000.00).

Except as specifically modified and amended herein, all other terms, conditions and covenants contained in the Loan Agreement (and all other Loan Documents) shall remain in full force and effect.

This letter may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.

This letter shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

This letter shall be governed by New York law, without regard to conflicts of law principles.

Please indicate your agreement with the above by (i) countersigning the attached copy of this letter and returning it (together with the extension fee) to the undersigned and (ii) causing the Guarantor to countersign the attached copy of this letter and returning it to the undersigned.

USActive 13205130.2

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation

By: _____

Name:

Title:

**Agreed and Accepted:**

**BORROWER:**

_____

Jeffrey Soffer

_____

Jacquelyn Soffer

**Agreed and Accepted, and Guaranty Ratified:**

**TURNBERRY RETAIL HOLDING, L.P.,**
     a Delaware limited partnership

    By:  Turnberry Retail Subsidiary GP, LLC,
         a Delaware limited liability company, its
         general partner

    By:  Turnberry Retail Developers, L.P.,
         a Delaware limited partnership, its
         managing member

    By:  Turnberry Retail GP, LLC,
         a Delaware limited liability company, its
         general partner

By: _____
     Name:  Jacquelyn Soffer
     Title:  Managing Member

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware
     corporation

By: _____

Name:

Title:

**Agreed and Accepted:**

**BORROWER:**

_____
Jeffrey Soffer

_____
Jacquelyn Soffer

USActive 13205130.2