B 210A (Form 210A) (12/09)

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re **Lehman Brothers Holdings Inc.**                      Case No. **08-13555**

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**ILLIQUIDX LTD**                                   **KL CAPITAL AB**
Name of Transferee                                  Name of Transferor

Name and Address where notices to transferee        Court Claim # (if known): **47954**
should be sent:                                     Total Amount of Claim Filed:
                                                    USD $ 825,000.00
                                                    Amount of Claim Transferred:
                                                    $ 825,000.00 (equivalent to Swedish Kronor
                                                    (SEK) 5,000,000)
                                                    ISIN/CUSIP: SE0002419242
**Celestino Amore**                                 Date Claim Filed: October 27, 2009
**Managing Director**
**Illiquidx Ltd**
**107-111 Fleet Street**
**London EC4A 2AB, UK**
**Phone: +44 207 936 9309**                         Phone:  +46 31 733 33 50 or (+46 31 771 21 16)
**Email: amore@illiquidx.com**                      Last four Digits of Acct #:


Name and Address where transferee payments
should be sent (if different from above):


I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____                       Date:  January 26, 2011
     Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

Form 210B (12/09)

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re **Lehman Brothers Holdings Inc.**                    **Case No. 08-13555**

## NOTICE OF TRANSFER OF CLAIM
## OTHER THAN FOR SECURITY

Claim No. **47954** was filed or deemed filed under 11 U.S.C. § 1111(a) in this case by the alleged transferor. As evidence of the transfer of that claim, the transferee filed a Transfer of Claim Other than for Security in the clerk's office of this court on **January 26, 2011.**

**KL CAPITAL AB**                          **ILLIQUIDX LTD**
Name of Alleged Transferor                 Name of Transferee


Address of Alleged Transferor:             Address of Transferee:

**Kungsportsavenyen, 32**                  **Illiquidx Ltd**
**411 36 Gothenburg**                      **107-111 Fleet Street**
**Sweden**                                 **London EC4A 2AB**
                                           **United Kingdom**

~~DEADLINE TO OBJECT TO TRANSFER~~

The alleged transferor of the claim is hereby notified that objections must be filed with the court within twenty-one (21) days of the mailing of this notice. If no objection is timely received by the court, the transferee will be substituted as the original claimant without further order of the court.


Date:_____                    _____
                                  CLERK OF THE COURT

<u>**AGREEMENT AND EVIDENCE OF TRANSFER OF CLAIM**</u>
<u>**LEHMAN PROGRAM SECURITY**</u>

TO:   THE DEBTOR AND THE BANKRUPTCY COURT

1.      For value received, the adequacy and sufficiency of which are hereby acknowledged, **KL Capital AB** ("Seller") hereby unconditionally and irrevocably sells, transfers and assigns to **Illiquidx Ltd.** (the "Purchaser"), and Purchaser hereby agrees to purchase, as of the date hereof, (a) an undivided interest, to the extent of the claim amount specified in <u>Schedule 1</u> attached hereto (the "Purchased Claim"), in Seller's right, title and interest in and to Proof of Claim Number **47954** filed by or on behalf of Seller (the "Proof of Claim") against Lehman Brothers Holdings, Inc., debtor in proceedings for reorganization (the "Proceedings") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), administered under Case No. 08-13555 (JMP) (the "Debtor"), (b) all rights and benefits of Seller relating to or evidencing the Purchased Claim, including without limitation (i) any right to receive cash, securities, instruments, interest, damages, penalties, fees or other property, which may be paid or distributed with respect to the Purchased Claim or with respect to any of the documents, agreements, bills and/or other documents (whether now existing or hereafter arising) which evidence, create and/or give rise to or affect in any material way the Purchased Claim, whether under a plan of reorganization or liquidation, pursuant to a liquidation, or otherwise, (ii) any actions, claims (including, without limitation, "claims" as defined in Section 101(5) of Title 11 of the United States Code (the "Bankruptcy Code")), rights or lawsuits of any nature whatsoever, whether against the Debtor or any other party, arising out of or in connection with the Purchased Claim, (iii) any rights and benefits of Seller out of or in connection with any exhibit, attachment and/or supporting documentation relating to the Purchased Claim, and (iv) any and all of Seller's right, title and interest in, to and under the transfer agreements, if any, under which Seller or any prior seller acquired the rights and obligations underlying or constituting a part of the Purchased Claim and any and all of Seller's right, title and interest in, to and under any right or remedy of Seller or any prior seller against any prior seller in respect of the Purchased Claim, but only to the extent related to the Purchased Claim, (c) any and all proceeds of any of the foregoing (collectively, as described in clauses (a), (b), and (c), the "Transferred Claims"), and (d) the security or securities (any such security, a "Purchased Security") relating to the Purchased Claim and specified in <u>Schedule 1</u> (as "Lehman Programs Securities to which Transfer Relates") attached hereto.

2      Seller hereby represents and warrants to Purchaser that: (a) the Proof of Claim was duly and timely filed on or before 5:00 p.m. (prevailing Eastern Time) on November 2, 2009 in accordance with the Court's order setting the deadline for filing proofs of claim in respect of "Lehman Program Securities"; (b) the Proof of Claim relates to one or more securities expressly identified on the list designated "Lehman Programs Securities" available on http://www.lehman-docket.com as of July 17, 2009; (c) Seller owns and has good and marketable title to the Transferred Claims, free and clear of any and all liens, claims, set-off rights, security interests, participations, or encumbrances created or incurred by Seller or against Seller; (d) Seller is duly authorized and empowered to execute and perform its obligations under this Agreement and Evidence of Transfer of Claim; (e) the Proof of Claim includes the Purchased Claim specified in <u>Schedule 1</u> attached hereto; (f) Seller has not engaged in any acts, conduct or omissions, or had any relationship with the Debtor or its affiliates, that will result in Purchaser receiving in respect of the Transferred Claims proportionately less payments or distributions or less favorable treatment than other unsecured creditors of the Debtor that are not entitled to priority under the Bankruptcy Code and are not subordinated; and (g) Seller has not delivered any acceleration notices with respect to the Purchased Security to Lehman Brothers Treasury Co. B.V. and/or Lehman Brothers Holdings, Inc.

3.      Seller hereby waives any objection to the transfer of the Transferred Claims to Purchaser on the books and records of the Debtor and the Court, and hereby waives to the fullest extent permitted by law any notice or right to receive notice of a hearing pursuant to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law, and consents to the substitution of Seller by Purchaser for all purposes in the case, including, without limitation, for voting and distribution purposes with respect to the Transferred Claims. Purchaser agrees to file a notice of transfer with the Court pursuant to Federal Rule of Bankruptcy Procedure 3001(e) including this Agreement and Evidence of Transfer of Claim. Seller acknowledges and understands, and hereby stipulates, that an order of the Court may be entered without further notice to Seller transferring to Purchaser the Transferred Claims, recognizing Purchaser as the sole owner and holder of the



Transferred Claims, and directing that all payments or distributions of money or property in respect of the Transferred Claim be delivered or made to Purchaser.

4.      All representations, warranties, covenants and indemnities shall survive the execution, delivery and performance of this Agreement and Evidence of Transfer of Claim and the transactions described herein. Purchaser shall be entitled to transfer its rights hereunder without any notice to or the consent of Seller. Seller hereby agrees to indemnify, defend and hold Purchaser, its successors and assigns and its officers, directors, employees, agents and controlling persons harmless from and against any and all losses, claims, damages, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees and expenses, which result from Seller's breach of its representations and warranties made herein.

5.      Seller shall promptly (but in any event no later than three (3) business days) remit any payments, distributions or proceeds received by Seller in respect of the Transferred Claims to Purchaser. Seller has transferred, or shall transfer as soon as practicable after the date hereof, to Purchaser each Purchased Security to such account, via Euroclear or Clearstream (or similar transfer method), as Purchaser may designate in writing to Seller. This Agreement and Evidence of Transfer supplements and does not supersede any confirmation, any other automatically generated documentation or any applicable rules of Euroclear or Clearstream (or similar transfer method) with respect to the purchase and sale of the Purchased Security.

6.      Each of Seller and Purchaser agrees to (a) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents and instruments and (b) take or cause to be taken all such other and further actions as the other party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement and Evidence of Transfer, including, without limitation, cooperating to ensure the timely and accurate filing of any amendment to the Proof of Claim.

7.      This Agreement and Evidence of Transfer of Claim is subject to successful completion by the Purchaser on the date hereof of an on-sale by the Purchaser of the Transferred Claims and the Purchased Securities (the "Subsequent Sale") to be executed with a third party purchaser ("Subsequent Purchaser"). In the event that such Subsequent Purchase is not successfully completed on the date hereof (including receipt by the Purchaser from the Subsequent Purchaser of the full purchase price for such Subsequent Purchase for value on the date hereof), the Transferred Claims and the Purchased Securities shall be returned to the Seller and the purchase obligations of the Purchaser (including, without limitation, any obligation to pay purchase price) under this Agreement and Evidence of Transfer of Claim shall be cancelled accordingly.

8.      Seller's and Purchaser's rights and obligations hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction). Seller and Purchaser each submit to the jurisdiction of the courts located in the County of New York in the State of New York. Each party hereto consents to service of process by certified mail at its address listed on the signature page below.

IN WITNESS WHEREOF, this AGREEMENT AND EVIDENCE OF TRANSFER OF CLAIM is executed this 26 day of January, 2011.

**KL Capital AB**

By: _____
Name: JOHANNA STENMAN
Title: CFO KL CAPITAL

Address:
Kungsportsavenyen 32
411 36 Gothenburg, Sweden

**Illiquidx Ltd.**

By: _____
Name: Celestino Amore
Title: *Managing Director*

107-111 Fleet Street
London EC4A 2AB
England

**SCHEDULE 1**

**Transferred Claims**

**Purchased Claim**

100% of $825,000 (the outstanding amount of the Proof of Claim as of January 24, 2011) together with interest, fees, expenses and other recoveries due, transferred as set forth below.

**Lehman Programs Securities to which Transfer Relates**

| Description of Security | ISIN/CUSIP | Issuer | Guarantor | Principal/Notional Amount | Maturity | Claim Amount (as of Proof of Claim Filing Date) |
|---|---|---|---|---|---|---|
| Issue of SEK 6,000,000 Index-Linked Notes due April 2012 relating to the OMX Stockholm 30 Index Guaranteed by Lehman Brothers Holdings Inc. under the U.S. $100,000,000,000 Euro Medium-Term Note Retail Program | SE0002419242 | Lehman Brothers Treasury Co. B.V. | Lehman Brothers Holdings Inc. | $825,000 USD being 5,000,000 SEK | 4/16/2012 | $825,000 USD |

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
| Lehman Brothers Holdings Inc., et al., | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**LEHMAN SECURITIES PROGRAMS PROOF OF CLAIM**

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)       0000047954

Note: This form may not be used to file claims other than those based on Lehman Programs Securities as listed on http://www.lehman-docket.com as of July 17, 2009

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

KL CAPITAL AB
KUNGSPORTSAVENYEN 32
411 36 GOTHENBURG, SWEDEN

Telephone number:       Email Address: johanna@klcapital.se

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
  (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

+46 70 911 99 60

Telephone number:       Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

1.  Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

Amount of Claim: $ 825 000 ————— (Required)   *FROM OANDA.COM SEK→USD 0.150

☐  Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

2.  Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

**International Securities Identification Number (ISIN):** SE0002419242  (Required)

3.  Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

**Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:**

NEG 09101691131   (Required)

4.  Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

**Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:**

000142641162   (Required)

5.  Consent to Euroclear Bank, Clearstream Bank or Other Depository: By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

**FOR COURT USE ONLY**

FILED / RECEIVED

OCT 27 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date. | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
| OCT 21, 2009 | MICHAEL KNUTSSON   CHRISTOFFER LUNDSTEN   /BOARD MEMBERS |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571



JONANNA STENMAN
+46709119960
KL CAPITAL
STUREPLAN 4 A. 1TR
11435 STOCKHOLM
SWEDEN

ENV        1 OF 1

SHP#: 32Y6 T4SR 7BD
DATE: 23 OCT 2009

SHIP TO:
LEHMAN BROTHERS HOLDINGS CLAIMS PRO
+15035977691
EPIQ BANKRUPTCY SOLUTIONS, LLC
LEHMAN BROTHERS HOLDINGS CLAIMS PRO
3RD FLOOR
757 THIRD AVENUE
NEW YORK, NY 10017
UNITED STATES

NY 100 7-02

UPS EXPRESS        1
TRACKING #: 1Z 32Y 6T4 D3 9000 4011

BILLING: P/P
SIGNATURE REQUIRED
DESC: Dokument        EDI-DOC

RECEIVED
OCT 26 2009

**Pochette pour factures commerciales / Documents d'expédition**
Les envois internationaux qui franchissent les frontières doivent être accompagnés de certains documents.
Veuillez joindre à l'envoi un original et deux copies de la facture, reprenant:
• Votre nom complet et adresse détaillée, ainsi que ceux du destinataire
• La description détaillée et la valeur des marchandises
• Le pays d'origine des marchandises (le lieu de fabrication)
• La raison de l'exportation (vente, échantillon, retour à l'expéditeur, etc.)
Pour obtenir plus d'informations, veuillez consulter le Guide des services et tarifs UPS.

**www.ups.com**

REMOVE TO EXPOSE ADHESIVE   ENLEVER POUR CO
PER ESPORRE L'ADESIVO   SCHUTZFOLIE ENTFERNEN
REMOVE TO EXPOSE ADHESIVE   ENLEVER POUR CO
PER ESPORRE L'ADESIVO   SCHUTZFOLIE ENTFERNEN

**EXECUTION COPY**

**FINAL TERMS dated 15 April 2008**

**LEHMAN BROTHERS TREASURY CO. B.V.**
**Issue of SEK 6,000,000 Index-Linked Notes due April 2012**
**relating to the OMX Stockholm 30 Index**
**Guaranteed by Lehman Brothers Holdings Inc.**
**under the U.S.$100,000,000,000**
**Euro Medium-Term Note Retail Program**

The Base Prospectus referred to below (as completed by these Final Terms) has been prepared on the basis that, except as provided in sub-paragraph (ii) below, any offer of Notes in any Member State of the European Economic Area which has implemented the Prospectus Directive (2003/71/EC) (each, a **"Relevant Member State"**) will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of the Notes. Accordingly any person making or intending to make an offer of the Notes may only do so: (i) in circumstances in which no obligation arises for the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer; or (ii) in those Public Offer Jurisdictions mentioned in Paragraph 35 of Part A below, provided such person is one of the persons mentioned in Paragraph 35 of Part A below and that such offer is made during the Offer Period specified for such purpose therein. Neither the Issuer, the Guarantor nor any Dealer has authorised, nor do they authorise, the making of any offer of Notes in any other circumstances.

## PART A - CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated 24 July 2007 and the supplemental Prospectuses dated 20 September 2007, 15 October 2007, 17 December 2007, 05 February 2008, 11 February 2008, 27 February 2008 and 20 March 2008 which together constitute a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the **"Prospectus Directive"**). This document constitutes the Final Terms of the Notes described herein and must be read in conjunction with such Base Prospectus as so supplemented.

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus, as so supplemented.

These Notes are Swedish Notes. Holders of the Swedish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Swedish Notes.

### Risk Factors

**Prospective investors of Notes should carefully consider the following information in conjunction with other information contained in these Final Terms and the Base Prospectus before purchasing the Notes. The attention of prospective investors is drawn to the section of the Base Prospectus, headed "Risk Factors".**

**These Final Terms however cannot disclose all of the risks and other significant aspects of the Notes and investment decisions should not be made solely on the basis of these risk factors since the information contained herein cannot serve as a substitute for independent individual advice which is tailored to the requirements, investment objectives, experience, knowledge and circumstances of a prospective investor.**

**Each prospective investor of Notes should consider carefully whether the Notes are suitable for it in the light of its circumstances and financial position and in view of the complexity and risks inherent in the Notes. Prospective investors of Notes should be experienced with respect to derivatives, particularly options and options transactions. Furthermore, prospective investors of Notes should understand the risks of transactions involving the Notes and should reach an investment decision only after careful consideration of the suitability of the Notes in light of their particular financial circumstances and after consultation with their own legal, tax, accountancy and other professional advisers. No person should deal in the Notes unless that person understands fully the nature of the relevant transaction. Such transaction is suitable only for, and should be made only by, an investor who has no need for liquidity and understands and can afford the financial and other risks of this transaction.**

*Issue Price*

The Issue Price in respect of the Notes may not be an accurate reflection of the market value of such Notes as at the Issue Date. The price at which the Notes may be sold in secondary market transactions may be lower than the Issue Price. In particular, the Issue Price in respect of the Notes may take into account the distribution fee payable to any appointed distributor of the Notes with respect to the offer and sale of the Notes.

*Principal Protection*

Prospective investors should note that principal protection only applies if the Notes are held until the Maturity Date. If the Notes are redeemed early or are sold or otherwise disposed of before the Maturity Date the redemption amount may be less than the Issue Price and may even be nil.

*Factors Affecting the Index and the Notes*

Prospective investors of Notes should be familiar with investments in global capital markets and with indices generally. The level of an index is based on the value of the assets comprised in such index although prospective investors should note that the level of the Index at any time will not include the reinvestment of the yield on the assets comprised in the Index. Prospective investors should understand that global economic, financial and political developments, among other things, may have a material effect on the value of the assets comprising the Index and/or the performance of the Index.

- 2 -

Prospective investors should also note that dividends paid to holders of the assets comprised in the Index will not be paid to the Issuer or to the Noteholders. The return on the Notes will thus not reflect any dividends which would be paid to investors that have made a direct investment in the assets comprised in the Index. Consequently, the return on the Notes may be less than the return from a direct investment in the assets comprised in the Index.

Fluctuations in the level of an Index and changes in the price or market value or level of the assets contained in an Index and/or changes in the circumstances of the issuers of such assets, might have an adverse effect on the level of an Index and might affect the value of Notes. The Final Redemption Amount is variable and dependent on the performance of the Index on the Observation Dates. The Final Redemption Amount which shall be paid on the Maturity Date (if any) shall be determined by the Calculation Agent in accordance with the formula set out in the Annex to these Final Terms.

*Investing in the Notes is not the same as investing in a Component Security*

Prospective investors should be aware that the market value of the Notes may not have a direct relationship with the prevailing level of the Index or price of component securities comprised in the Index (each, a **"Component Security"**), in that changes in the prevailing level of the Index or price of the Component Securities will not necessarily result in a comparable change in the market value of the Notes.

*Secondary market and liquidity for the Notes*

There can be no assurance as to how any Notes will trade in the secondary market, whether there will be a secondary market or, if a secondary market exists, whether such market will be sustainable or liquid or illiquid.

If the Notes are not listed or traded on any stock exchange, pricing information for such Notes may be more difficult to obtain, and the liquidity and market prices of such Notes may be adversely affected.

The liquidity of the Notes may also be affected by restrictions, if any, on offers and sales of the Notes in some jurisdictions. In any case, due to the relative complexity and lower liquidity of the Notes if compared to more conventional financial instruments such as shares, comparatively larger spreads between bid and ask quotes should be expected.

*The Notes may be redeemed prior to maturity*

In the event that the Issuer or the Guarantor would be obliged to increase the amounts payable in respect of any Notes due to any withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of The Netherlands or the USA, as the case may be, or any political subdivision thereof or any authority therein or thereof having power to tax, the Issuer may redeem all outstanding Notes in accordance with the Terms and Conditions.

*Early Redemption Amount*

In the event of an early redemption for taxation reasons or in an event of default (as described in Item 23 of the Terms and Conditions of the Notes) as determined by the Calculation Agent (as

described in the Annex), the Issuer may cancel the Notes and, if permitted by applicable law, pay the holder of each Note the Early Redemption Amount. The amount payable will be calculated by reference to the fair market value of the Notes as determined by the Calculation Agent in its sole and absolute discretion and may be reduced by an amount referable to the cost to the Issuer of unwinding any related hedging arrangements as determined by the Calculation Agent. Investors of Notes should understand that such Early Redemption Amount may be less than the Issue Price of the Notes or the amount the investor has paid for the Notes and may even be nil.

In the event of early redemption, a Note holder may not be able to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes. The Issuer is not liable for any disadvantage a Note holder may incur in respect of the new investment or non-investment of its capital.

*Potential conflicts of interest*

The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may, from time to time, engage in purchase, sale or other transactions involving the Index or a Component Security or related derivatives for their proprietary accounts and/or for accounts under their management and/or for clients. Such transactions may have a positive or negative effect on the level of the Index and consequently on the value of the Notes. In addition, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may, from time to time, act in other capacities with regard to the Notes (such as in an agency capacity and/or as the calculation agent) and may issue or participate in the issue of other competing financial instruments in respect of the Index or Component Securities and the introduction of such competing financial instruments may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any Noteholder (or any other party) to avoid such conflicts.

In connection with the offering of the Notes, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may enter into one or more hedging transactions with respect to the Index or Component Securities or related derivatives. In connection with such hedging or with respect to proprietary or other trading activities by the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may enter into transactions in relation to the Index, Component Securities or related derivatives which may affect the market price, liquidity or value of the Notes and which could be deemed to be adverse to the interests of the relevant Noteholders.

Such transactions could present certain conflicts of interest with the interest of Noteholders and may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any Noteholder (or any other party) to avoid such conflicts.

*Risk-excluding or risk-limiting transactions*

Prospective investors may not rely upon being able to enter into transactions, which may exclude or limit loss exposure to the Notes during the term of the Notes. The possibility of entering into risk-excluding or risk-limiting transactions depends in particular on market

conditions and the relevant underlying circumstances. Noteholders may be able to enter into such transactions only at an unfavourable market price resulting in an additional loss for such Noteholders.

Prospective investors intending to purchase Notes to hedge the market risk associated with investing in the Component Security should be aware of the difficulties associated therewith. For example, the value of the Notes may not exactly correlate with the value of the Component Security.

*Determinations by the Calculation Agent*

The Calculation Agent has certain discretions to determine whether certain events as further set out in the Annex have occurred. Prospective investors should be aware that any determination made by the Calculation Agent may have an adverse effect on the value of the Notes. For example, the Calculation Agent may determine that a Market Disruption Event has occurred or exists at a relevant time which may affect the determination of the level of the Index on a relevant Scheduled Trading Day and/or may delay settlement in respect of the Notes. Any such discretion exercised by, or any calculation made by, the Calculation Agent (in the absence of manifest error) shall be binding.

*Adjustments*

The Calculation Agent may adjust the terms of the Notes in the case of a Hedging Disruption, Market Disruption Event, an Index Adjustment Event and/or such other similar adjustment or extraordinary event pursuant to terms as set out in the Annex to these Final Terms. Such adjustment may have an adverse impact on the value of the Notes. Any such discretion exercised by, or any calculation made by the Calculation Agent (in the absence of manifest error) shall be binding.

*Creditworthiness of the Issuer and Guarantor*

Any person who purchases the Notes is relying upon the creditworthiness of the Issuer and the Guarantor and has no rights against any other person. The Notes constitute general, unsecured, unsubordinated, contractual obligations of the Issuer and of no other person. The Notes rank *pari passu* among themselves.

*VPC (Värdepapperscentralen Ab)*

All Securities will be registered in uncertificated and dematerialised form, in the book-entry system of VPC. The investor will therefore have to rely on VPC's procedures for transfers, payment and communication. Title to the Securities will pass by Transfer between accountholders at VPC, perfected in accordance with the legislation (including the Swedish Financial Instruments Accounts Act (SFS 1998:1479)), rules and regulations applicable to and/or issued by VPC, that are in force and effect from time to time (the "Rules"). The VPC will maintain records of the person in whose name a Note is registered, in a VPC Account in the book-entry settlement system of VPC, or any other person recognised as a holder of Notes pursuant to the Rules and accordingly, where Notes are held through a registered nominee, the nominee (the "Securityholder"). The Securityholder must thereful rely on the procedures of the VPC to receive payments under the Ntoes. The Issuer has no responsibility or liability for the records relating to,, or payments made in respect of, interests in the Notes.

*Hedging Disruption*

The Calculation Agent may determine that a Hedging Disruption has occurred. In this event, the Calculation Agent is able to make amendments to the terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate or if the Calculation Agent determines that no adjustment that it could make will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine and in the event of such early redemption the Issuer will pay to each Noteholder the Alternative Settlement Amount with respect to each Note held by such Noteholder.

## PART A –TERMS AND CONDITIONS OF THE NOTES

1.   (i)   Issuer:                             Lehman Brothers Treasury Co. B.V.

    (ii)   Guarantor:                    Lehman Brothers Holdings Inc.

2.   (i)   Series Number:                 10347

    (ii)   Tranche Number:               1

3.   Specified Currency or Currencies:     Swedish Krona ("**SEK**")

4.   Aggregate Nominal Amount:

    (i)   Series:                          SEK 6,000,000

    (ii)   Tranche:                     SEK 6,000,000

5.   Issue Price:                        110 per cent. of the Aggregate Nominal Amount

In connection with the sale of the Notes, one or more distributors (each a "**Distributor**") may acquire the Notes from the Dealer at a discount to the Issue Price or at the Issue Price. Alternatively, if a Distributor acquires the Notes at the Issue Price, the Dealer will pay a distribution fee to such Distributor. Any such amount received by a Distributor may be in addition to the brokerage cost/fee normally applied by such Distributor. Neither the Dealer nor the Issuer has any further information with respect to the contractual or financial arrangements between a Distributor's customers and such Distributor or whether and, if so on what terms such Distributor is willing to assist its customers or potential customers. Any person seeking further information with respect to such matters should refer to the relevant Distributor. Neither the Dealer nor the Issuer is responsible for (i) the contractual arrangements between a Distributor and its customer, (ii) any information so provided or (iii) for whether or not the Distributor provides such information.

6.   Specified Denominations:

    (i)   Specified Denomination(s):      SEK 50,000 per Note

|  |  |  |
|---|---|---|
| (ii) | Calculation Amount: | Not Applicable |
| (iii) | Trading in Units: | Not Applicable |
| 7. (i) | Issue Date: | 15 April 2008 |
| (ii) | Interest Commencement Date: | Not Applicable |
| 8. | Maturity Date: | 16 April 2012, subject to adjustment in accordance with the Modified Following Business Day Convention |
| 9. | Interest Basis: | Not Applicable |
| 10. | Redemption/Payment Basis: | Index-Linked Redemption as provided for in the Annex hereto |
| 11. | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12. | Put/Call Options: | Not Applicable |
| 13. (i) | Status of the Notes: | Senior Notes |
| (ii) | Status of the Guarantee: | Senior Guarantee |
| 14. | Method of distribution: | Non-syndicated |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

|  |  |  |
|---|---|---|
| 15. | Fixed Rate Note Provisions | Not Applicable |
| 16. | Floating Rate Note Provisions | Not Applicable |
| 17. | Zero Coupon Note Provisions | Not Applicable |
| 18. | Index-Linked Interest Note/other variable-linked interest Note Provisions | Not Applicable |
| 19. | Dual Currency Note Provisions | Not Applicable |

**PROVISIONS RELATING TO REDEMPTION**

|  |  |  |
|---|---|---|
| 20. | Call Option | Not Applicable |
| 21. | Put Option | Not Applicable |
| 22. | Final Redemption Amount of each Note: | As described in the Annex |
| 23. | Early Redemption Amount of each Note |  |
|  | Early Redemption Amount(s) of each Note payable on redemption for taxation reasons or on event of default and/or the method of | In respect of each Note, an amount in the Specified Currency equal to the fair market value of such Note (which value shall be less |

|  | calculating the same (if required or if different from that set out in the Conditions): | the proportion attributable to that Note of the reasonable cost to the Issuer of unwinding any related hedging arrangements) on such day as is selected by the Calculation Agent in its sole and absolute discretion (provided that such day is not more than 15 days before the date fixed for redemption of the Note). |

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

| 24. | Form of Notes: | The Notes are Swedish Notes and are in uncertificated and dematerialised book-entry form. |
|---|---|---|
| 25. | Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | Not Applicable |
| 26. | Details relating to Partly Paid Notes: amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any right of the Issuer to forfeit the Notes and interest due on late payment: | Not Applicable |
| 27. | Details relating to Instalment Notes and Instalment Dates: | Not Applicable |
| 28. | Details relating to Extendible Notes: | Not Applicable |
| 29. | Consolidation provisions: | The provisions in Condition 18 (*Further Issues of Notes*) apply |
| 30. | Other final terms: | As described in the Annex |
|  |  | Business Days: London and Stockholm |

**DISTRIBUTION**

| 31. | (i) | If syndicated, names and addresses of Managers and underwriting commitments: | Not Applicable |
|---|---|---|---|
|  | (ii) | Date of Syndicated Trade Agreement: | Not Applicable |
|  | (iii) | Stabilizing Manager(s) (if any): | Not Applicable |
| 32. |  | If non-syndicated, name and address of Dealer: | Lehman Brothers International (Europe) 25 Bank Street |

London E14 5LE

33. Total commission and concession:          Not Applicable

34. Selling restrictions:                      As set out in the section entitled
                                               "Subscription and Sale" in the Base
                                               Prospectus, as supplemented as at the Issue
                                               Date

    (i)  Additional Selling Restrictions:      Not Applicable

35. Non-exempt Offer:                          Not Applicable

## PURPOSE OF FINAL TERMS

These Final Terms comprise the final terms required for terms required for issue pursuant to the U.S.$100,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.

## RESPONSIBILITY

The Issuer accepts responsibility for the information contained in these Final Terms. The information contained in these Final Terms relating to the Index has been extracted from information published by the website of the Index Sponsor (www.omxgroup.com). The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by the Index Sponsor, no facts have been omitted which would render the reproduced information inaccurate or misleading.

Signed on behalf of the Issuer:

By: ............................................

    Duly authorised

- 10 -

## PART B – OTHER INFORMATION

1. **LISTING**

   (i) Listing:                          None

   (ii) Admission to trading:            Not Applicable

2. **RATINGS**                          A rating has not been sought for the Notes.

3. **INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

   Save as discussed in the section headed "Subscription and Sale" on pages 203-211 of the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

4. **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES**

   Not Applicable

5. **YIELD (Fixed Rate Notes Only)**     Not Applicable

6. **HISTORIC INTEREST RATES**

   Not Applicable

7. **PERFORMANCE OF INDEX/FORMULA/other variable, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS and other information concerning the underlying (INDEX-LINKED OR OTHER VARIABLE-LINKED NOTES ONLY)**

   See the Annex.

   Details on historical levels of the Index can be found on http://omxnordicexchange.com.

   The Issuer does not intend to provide post issuance information regarding the Index.

8. **PERFORMANCE OF RATES OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (DUAL CURRENCY NOTES ONLY)**

   Not Applicable

9. **OPERATIONAL INFORMATION**

   ISIN Code:                           SE0002419242

   Common Code:                         000241924

   Cusip:                               Not Applicable

| | |
|---|---|
| New Global Note intended to be held in a manner which would allow Eurosystem eligibility: | Not Applicable |
| Any clearing system(s) other than Euroclear Bank S.A./N.V. and Clearstream Banking Societe Anonyme and the relevant identification number(s): | VPC (Värdepapperscentralen Ab)  - The Swedish Local Clearing System |
| Delivery: | Delivery against payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of USD 1.00 = SEK 5.99206 producing a sum of: | USD 1,001,325 |
| Names and addresses of Additional Paying Agent(s) (if any): | Not Applicable |

10.    **TERMS AND CONDITIONS OF THE OFFER**

Not Applicable

# ANNEX

1. **Final Redemption Amount of each Note**

Unless previously redeemed or purchased and cancelled, and subject to the terms herein, each Note shall be redeemed on the Maturity Date at a Final Redemption Amount ("FRA") in the Specified Currency determined by the Calculation Agent on the Final Observation Date in accordance with the following formula:

$$FRA = SD \times \left( CP + P \times Max \left[ \frac{(FinalLevel - InitialLevel)}{InitialLevel} ; 0 \right] \right)$$

Where:

"**CP**" means 100 per cent.;

"**Final Level**" means, in respect of the Index, the arithmetic average of the Closing Levels on each of the Observation Dates, as determined by the Calculation Agent on the Final Observation Date;

"**Initial Level**" means, in respect of the Index, the lowest Closing Level observed on any of the Fixing Dates, as determined by the Calculation Agent on the Final Fixing Date;

"**Max**", followed by a series of numbers or formulae inside brackets separated by a semi-colon, means whichever is the greater of these numbers or the results of the formulae inside those brackets;

"**P**" means 110 per cent.; and

"**SD**" means the Specified Denomination of each Note, being SEK 50,000.

2. **Definitions**

In these Final Terms (including this Annex), the following expressions have the following meanings:

"**Calculation Agent**" means Lehman Brothers International (Europe), 25 Bank Street, London E14 5LE;

"**Closing Level**" means, in relation to the Index and any Scheduled Trading Day, the official level of the Index, as calculated and announced by the relevant Index Sponsor at the Valuation Time on that day, as determined by the Calculation Agent;

"**Disrupted Day**" means any Scheduled Trading Day on which the Exchange or Related Exchange fails to open for trading during its regular trading session, or on which a Market Disruption Event has occurred;

"**Early Closure**" means the closure on any Exchange Business Day of any relevant Exchange(s) relating to the securities thereof that comprise 20 per cent. or more of the level of the Index or any Related Exchange(s) prior to its Scheduled Closing Time unless such earlier closing time is announced by such Exchange(s) or Related Exchange(s) at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on such Exchange(s) or Related Exchange(s) on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day;

"**Exchange**" means Nasdaq OMX or any successor to such exchange or quotation system;

"**Exchange Business Day**" means any Scheduled Trading Day on which the Exchange and Related Exchange are open for trading during their respective regular trading sessions, notwithstanding the Exchange or Related Exchange closing prior to its Scheduled Closing Time;

"**Exchange Disruption**" means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions on the Exchange in securities thereof that comprise 20 per cent. or more of the level of the Index, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the Index on the Related Exchange;

"**Fixing Date**" means each of 01 April 2008, 08 April 2008, 15 April 2008, 22 April 2008, 29 April 2008, 06 May 2008, 13 May 2008, 20 May 2008, 27 May 2008 and 03 June 2008 (the "**Final Fixing Date**"), provided however, that if any such day is not a Scheduled Trading Day, the relevant Fixing Date shall be the first succeeding day which is a Scheduled Trading Day, and subject to section 3 (*Disrupted Days*) below. For the avoidance of doubt there will be a total of 10 Fixing Dates;

"**Index**" means the OMX Stockholm 30 Index (Bloomberg code: OMX);

"**Index Sponsor**" means Nasdaq OMX and/or, as the context requires or permits, any successor sponsor accepted by the Calculation Agent pursuant to section 4 (*Hedging Disruption*) below;

"**Market Disruption Event**" means the occurrence or existence, in respect of any security thereof, of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material at any time during the one hour period that ends at the Valuation Time, or (iii) an Early Closure.

For the purposes of determining whether a Market Disruption Event exists, if a Market Disruption Event occurs in respect of a security thereof at that time, then the relevant percentage contribution of that security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that security to (y)

- 14 -

the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event:

"**Observation Date**" means each of 01 April 2011, 01 May 2011, 01 June 2011, 01 July 2011, 01 August 2011, 01 September 2011, 01 October 2011, 01 November 2011, 01 December 2011, 01 January 2012, 01 February 2012, 01 March 2012 and 01 April 2012 (the "**Final Observation Date**"), provided however that if any such day is not a Scheduled Trading Day, the relevant Observation Date shall be the first succeeding day which is a Scheduled Trading Day, and subject to section 3 (*Disrupted Days*) below. For the avoidance of doubt there will be a total of 13 Observation Dates;

"**Related Exchange**" means All Exchanges, or any successor to such exchange or quotation system;

"**Scheduled Closing Time**" means, in respect of the Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"**Scheduled Trading Day**" means any day on which the Exchange and Related Exchange are scheduled to be open for trading for their respective regular trading sessions;

"**Trading Disruption**" means any suspension of or limitation imposed on trading by the Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the Exchange or Related Exchange or otherwise (i) on the Exchange relating to securities that comprise 20 per cent. or more of the level of the Index, or (ii) in futures or options contracts relating to the Index on the Related Exchange; and

"**Valuation Time**" means the official close of trading of the relevant Exchange.

3.    **Disrupted Days**

If any Fixing Date and/or Observation Date is a Disrupted Day, then the relevant Fixing Date and/or Observation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day *provided that* the relevant Fixing Date and/or Observation Date shall be not later than and deemed to be the earlier of (i) the eighth following Scheduled Trading Day and (ii) the third weekday (meaning a day other than a Saturday or Sunday) prior to the Maturity Date, notwithstanding that such day is a Disrupted Day (the "**Deemed Date**"); and

the Calculation Agent shall determine its good faith estimate of the level of the Index that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date.

4.    **Hedging Disruption**

If a Hedging Disruption occurs as determined by the Calculation Agent in its sole and absolute discretion, then the Calculation Agent shall either (A)(1) make such adjustment

- 15 -

to the exercise, settlement, payment or any other terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate and (2) determine the effective date of that adjustment, or (B) if the Calculation Agent determines that no adjustment that it could make under (A) will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine by notice given to the Noteholders and in the event of such early redemption the Issuer will pay to each Noteholder the Alternative Settlement Amount with respect to each Note held by such Noteholder. Payment will be made in such manner as shall be notified to the Noteholders, in accordance with Condition 15.

For the purposes of this section 4 the following terms shall have the following respective meanings:

"**Alternative Settlement Amount**" means, in respect of any Notes, an amount in the Settlement Currency equal to the fair market value of such Notes, less the cost to the Hedging Party of unwinding any related hedging arrangements, all as determined by the Calculation Agent in its sole and absolute discretion as of the date so determined by the Calculation Agent to be the appropriate date in the circumstances;

"**Hedging Disruption**" means that the Hedging Party is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

"**Hedging Party**" means the Issuer or any of its affiliates.

5.    **Adjustments to Index**

5.1    *Successor Index*: If the Index is (i) not calculated and announced by the Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case that index (the "Successor Index") will be deemed to be the Index.

5.2    *Index Adjustment Event*: If (i) on or prior to any Fixing Date and/or Observation Date Date, the Index Sponsor announces that it will make a material change in the formula for or the method of calculating the Index or in any other way materially modifies the Index (other than a modification prescribed in that formula or method to maintain the Index in the event of changes in constituent stock and capitalization and other routine events) (an "Index Modification") or permanently cancels the Index and no Successor Index exists (an "Index Cancellation") or (ii) on any Fixing Date and/or Observation Date, the Index Sponsor fails to calculate and announce the Closing Level (an "Index Disruption" and together with an Index Modification and an Index Cancellation, each an "Index Adjustment Event"), then the Calculation Agent shall determine if such

- 16 -

Index Adjustment Event has a material effect on the Notes and, if so, shall make its determination for the purposes of calculating the Early Redemption Amount or the Final Redemption Amount, as the case may be, using, in lieu of a published level for the Index, the level for the Index as at the relevant Fixing Date and/or Observation Date, as determined by the Calculation Agent in accordance with the formula for and method of calculating the Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised the Index immediately prior to that Index Adjustment Event.

6.    **Correction of Index**

In the event that any price or level published on the Exchange or by the Index Sponsor and which is utilised for any calculation or determination made under the provisions of these Final Terms or the Terms and Conditions of the Notes is subsequently corrected and the correction is published by the Exchange or the Index Sponsor within one Settlement Cycle after the original publication, the Calculation Agent will determine the amount that is payable or deliverable as a result of that correction, and, to the extent necessary, will adjust the provisions of these Final Terms or the Conditions to account for such correction, provided that any correction effected and published after the third weekday (meaning any day of the week except Saturday and Sunday) before the Maturity Date shall be ignored.

For the purposes of this section 5 the following terms shall have the following respective meanings:

"**Clearance System**" means, in respect of the Index at any time, the domestic clearance system customarily used for settling trades in shares underlying the Index at that time;

"**Clearance System Business Day**" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"**Settlement Cycle**" means, in respect of the Index, the period of Clearance System Business Days following a trade in the shares underlying the Index on the Exchange in which settlement will customarily occur according to the rules of such Exchange (or if there are multiple Exchanges in respect of an Index, the longest such period); and

"**Settlement Disruption Event**" means, in respect of the Index, an event beyond the control of the Issuer as a result of which the relevant Clearing System cannot clear the transfer of shares underlying the Index.

7.    **Notification of Early Redemption Amount, Alternative Settlement Amount, Final Redemption Amount, Disrupted Days, and Index Adjustment Event**

7.1    *Notice to Issuer:* As soon as reasonably practicable after calculating or otherwise determining the Early Redemption Amount, Alternative Settlement Amount, or the Final Redemption Amount, as the case may be, the Calculation Agent shall give notice of the relevant amount to the Issuer.

- 17 -

7.2   *Notice of Disrupted Day:*   The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disrupted Day on the day which but for such Disrupted Day would have been a Fixing Date and/or Observation Date.

7.3   *Notice of Index Adjustment Event and/or Hedging Disruption*:   The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of an Index Adjustment Event and/or Hedging Disruption.

7.4   *Notice to Noteholders:*   Adjustments in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (*Notices*) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

8.    **The Calculation Agent**

The Calculation Agent shall have no responsibility to Noteholders for good faith errors or omissions in its calculations and determinations as provided in the Terms and Conditions except such as may result from its own wilful default, gross negligence or bad faith.  The calculations and determinations of the Calculation Agent shall be made in accordance with the Terms and Conditions (having regard in each case to the criteria stipulated herein and where relevant on the basis of information provided to or obtained by employees or officers of the Calculation Agent responsible for making the relevant calculation or determination) and shall, in the absence of manifest error, be final, conclusive and binding on the Noteholders.  Noteholders shall not be entitled to make any claim against the Calculation Agent, the Issuer or the Guarantor in the case where the Index Sponsor shall have made any error, omission or other incorrect statement in connection with the calculation and public announcement of the Index.

Nothing contained herein shall prevent the Calculation Agent from dealing in these Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer (or any of its affiliates) or any holder of Notes (or any of its affiliates).

9.    **Index Disclaimer**

The Securities are not in any way sponsored, endorsed, sold or promoted by OMX AB (publ) (**"OMX"**) and OMX makes no warranty or representation whatsoever, express or implied, either as to the results to be obtained from the use of the OMXS30™ index and/or the figure at which the said OMXS30™ index stands at any particular time on any particular day or otherwise. The OMXS30™ index is compiled and calculated solely by Stockholm Stock Exchange Ltd. However, Stockholm Stock Exchange shall not be liable (whether in negligence or otherwise) to any person for any error in the OMXS30™ index and the exchange shall not be under any obligation to advise any person of any error therein.

- 18 -

All rights to the trademarks OMX™, OMXS30™ and OMXS30 INDEX™ are vested in
OMX and are used under licence from OMX or a subsidiary to OMX.