WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                    :
**In re**                                           :      **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*        :      **08-13555 (JMP)**
                                                    :
                                    **Debtors.**    :      **(Jointly Administered)**
                                                    :
-------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT TO SECTION 105(a)**
**OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019**
**FOR AUTHORIZATION AND APPROVAL OF A SETTLEMENT**
**AND COMPROMISE AMONG LEHMAN BROTHERS HOLDINGS INC.,**
**LEHMAN COMMERCIAL PAPER INC. AND SWEDBANK AB, NEW YORK BRANCH**

　　　　　**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

of Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI", and

together with LBHI and its affiliated debtors in the above-referenced chapter 11 cases, as debtors

and debtors-in-possession, the "Debtors"), for authorization and approval, pursuant to section

105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure to

enter into a settlement and compromise with Swedbank AB, New York Branch ("Swedbank"),

all as more fully described in the Motion, will be held before the Honorable James M. Peck,

United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton

Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the

"Bankruptcy Court"), on **February 16, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the

"Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy

Court for the Southern District of New York, shall set forth the name of the objecting party, the

basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil

Gotshal & Manges LLP, 700 Louisiana Street, Suite 1600, Houston, Texas 77002, Attn:  Alfredo

R. Perez, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004

Attn:  Tracy Hope Davis, Esq., Elizabetta G. Gasparini, Esq. and Andrea B. Schwartz, Esq.; (iv)

Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York

10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys

for the official committee of unsecured creditors appointed in these cases and (v) DLA Piper

LLP (US), 1251 Avenue of the Americas, New York, New York 10020, Attn:  William M.

Goldman, Esq., attorneys for Swedbank, so as to be so filed and received no later than **February**

**9, 2011 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline").**

**PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: January 26, 2011
      Houston, Texas

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                            :
**In re**                                     :    **Chapter 11 Case No.**
                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :    **08-13555 (JMP)**
                                            :
                        **Debtors.**          :    **(Jointly Administered)**
                                            :
-------------------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AUTHORIZATION AND APPROVAL OF A SETTLEMENT AND COMPROMISE AMONG LEHMAN BROTHERS HOLDINGS INC., LEHMAN COMMERCIAL PAPER INC. AND SWEDBANK AB, NEW YORK BRANCH

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc.

("LCPI" and, together with LBHI and its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors-in-possession, the "Debtors"), file this motion (the "Motion") and

respectfully represent:

### Preliminary Statement

        1.      LBHI and LCPI (the "Lehman Parties") seek authorization and approval

of a settlement with Swedbank AB, New York Branch ("Swedbank" and, together with the

Lehman Parties, the "Parties") pursuant to the terms of an agreement substantially consistent with the form agreement attached hereto as Exhibit A (the "Settlement Agreement").[1]

2.      LBHI, LCPI and certain of their affiliates were parties to a Master Repurchase Agreement, dated on or around December 4, 1997 (as amended, the "Initial Repurchase Agreement"), pursuant to which LBHI sold to LCPI certain commercial mortgage loans (the "Initial Repurchase Loans"). LCPI, Lehman Brothers Inc. ("LBI") and Swedbank subsequently entered into a Master Repurchase Agreement, dated as of December 3, 2002 (as amended, the "Repurchase Agreement"). Pursuant to the Repurchase Agreement, LCPI sold to Swedbank certain of the Initial Repurchase Loans, which are listed on Exhibit A to the Settlement Agreement (the "Mortgage Assets"). Pursuant to a Guarantee delivered on or about June 12, 2001 and a Guarantee delivered on or about December 23, 2002, LBHI guaranteed payment by LCPI of certain of its obligations to Swedbank under the Repurchase Agreement. Pursuant to a Tri-Party Custody Agreement (the "Custody Agreement"), dated as of December 23, 2002, by and among Swedbank, LCPI and The Bank of New York as successor-in-interest to JPMorgan Chase Bank, (the "Custodian"), the Custodian was to hold the files (collectively, the "Collateral Files") relating to the Mortgage Assets for the benefit of Swedbank and LCPI.

3.      On September 24, 2008 (the "Default Date"), Swedbank sent a letter to LCPI declaring that an event of default had occurred under the Repurchase Agreement and the Custody Agreement as a result of the commencement of LBHI's chapter 11 case. Pursuant to the Repurchase Agreement, Swedbank became entitled to LCPI's ownership interest in the Mortgage

---

[1] The description and characterization in this Motion of (a) the events, facts and circumstances giving rise to the claims and disputes (and the settlement of certain of those claims and disputes) referenced herein and (b) the claims and disputes themselves, are for information purposes only, are subject to Rule 408 of the Federal Rules of Evidence, and are without prejudice to any claims, defenses, rights of setoff, debt, liens, losses, demands, damages, costs, and causes of action of whatever nature of the Lehman Parties, Swedbank, and their affiliates, which shall be governed solely by the terms of the Settlement Agreement.

Assets.  The Lehman Parties, on the one hand, and Swedbank, on the other hand, did not dispute the ownership rights with respect to the Mortgage Assets.  As a result, subsequent to the Default Date and the commencement of LCPI's chapter 11 case, LBHI and/or LCPI executed assignment documents confirming that Swedbank had purchased all of LCPI's or LBHI's applicable right, title and interest with respect to the Mortgage Assets pursuant to Repurchase Agreement and that Swedbank had assumed certain of LCPI's or LBHI's applicable obligations as lender arising from the documents evidencing the Mortgage Assets as of the Default Date.[2]

4.    As a result of LCPI's failure to repurchase the Mortgage Assets pursuant to the terms of the Repurchase Agreement, Swedbank has filed proofs of claim against LBHI [Claim No. 67079] and LCPI [Claim No. 67080] (collectively, the "Deficiency Claims"), each asserting a deficiency claim arising under the Repurchase Agreement  in the amount of $565,870.087.[3]  Additionally, as a result of the transactions described previously, both LBHI and Swedbank hold interests within the capital structure of certain of the same real estate projects. Many of LBHI's interests in these projects would potentially benefit from the modification of

---

[2] Because LBHI sold to LCPI the Mortgage Assets prior to LBHI's Commencement Date (as defined below), LBHI was no longer an owner of the Mortgage Assets upon the commencement of its chapter 11 case.  Similarly, as of the commencement of LCPI's chapter 11 case, LCPI was no longer an owner of the Mortgage Assets because Swedbank became entitled to their ownership after the Default Date, which was prior to LCPI's Commencement Date.  Thus, the Mortgage Assets are not and were not property of LBHI's estate or LCPI's estate.  Any actions taken by LBHI or LCPI with respect to the Mortgage Assets or in connection with executing such assignment documents or execution of or performance under the Settlement Agreement do not constitute an assumption of the Repurchase Agreement under the Bankruptcy Code (as defined below), including section 365 thereof.

[3] Swedbank initially filed unliquidated claims against LBHI [Claim No. 22119] and LCPI [Claim No. 22118] (the "Initial Proofs of Claim").  Each of the Initial Proofs of Claim was amended by the Deficiency Claim filed against LBHI or LCPI, as applicable.  The Initial Proofs of Claim were expunged as amended and superseded claims pursuant to this Courts's *Order Granting Debtors' Seventy-Second Omnibus Objection to Claims (Amended and Superseded Claims)*, dated January 20, 2011 [Docket No. 14027].  Swedbank and its affiliates have filed other proofs of claim against certain of the Debtors for matters unrelated to the Repurchase Agreement, which are not the subject of the Settlement Agreement.

their terms or completion of other transactions; however, such actions currently may require the consent and/or consensual participation of Swedbank.

5.        To resolve the Deficiency Claims and to consolidate LBHI's interests in certain real estate projects that are currently divided between LBHI and Swedbank, the Lehman Parties seek authorization to enter into the Settlement Agreement.  The Settlement Agreement principally provides for (i) the exchange of certain loans and interests in loans between the Lehman Parties, on the one hand, and Swedbank, on the other hand; (ii) agreement by the Parties to modify the terms of certain loans and refrain from taking certain actions with respect thereto; (iii) a payment to Swedbank by LBHI in the amount of $10 million as additional consideration for the exchange of loans and other agreements relating to loans;[4] (iv) the allowance of each of the Deficiency Claims in the amount of $325 million in full satisfaction of such claims; and (v) certain mutual releases between the Lehman Parties, on the one hand, and Swedbank, on the other hand, all as further provided in the Settlement Agreement and summarized herein. Importantly, the Settlement Agreement does not release or waive the claims that any Lehman Party or any of its affiliates may have against any other Lehman Party or any of its affiliates.

6.        The Settlement Agreement is fair and reasonable and in the best interests of the Lehman Parties, and their estates and creditors.  Accordingly, the Settlement Agreement should be approved.

---

[4] As further described below, the Settlement Agreement additionally contemplates the potential transfer from LBHI to Swedbank of a net profits agreement, dated January 4, 2007 (the "1407 Net Profits Agreement"), between LBHI and 1407 Broadway Real Estate LLC (the "1407 Borrower").  1407 Borrower has a right of first offer in the event of the sale or transfer of such agreement, as further specified therein.  In the event that 1407 Borrower elects to purchase the 1407 Net Profits Agreement, which would prevent LBHI from transferring it to Swedbank, LBHI will transfer to Swedbank $10 million of the purchase price paid by 1407 Borrower in addition to the $10 million dollar payment for the exchange of loans and related agreements.

**Relief Requested**

7.      Pursuant to section 105(a) of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), the Lehman Parties request authorization to enter into, and approval of, the

Settlement Agreement.   The Lehman Parties also seek authorization to take all steps necessary

to consummate the transactions set forth in the Settlement Agreement.

**Background**

8.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), the LBHI and certain of its subsidiaries commenced

with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter

11 cases have been consolidated for procedural purposes only and are being jointly administered

pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses

and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.

9.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

10.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to LBI.  A trustee appointed

under SIPA (the "SIPC Trustee") is administering LBI's estate.

11.      On January 25, 2011, the Debtors filed their first amended joint chapter 11

plan and disclosure statement [Docket Nos. 14150 and 14151].

### Jurisdiction

12.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

13.    Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide

14.    Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

### The Settlement Agreement[5]

15.    In order to resolve the disputes between the Parties regarding the

Deficiency Claims and certain other disputes relating to the Mortgage Assets and certain other

loans or interests in loans held by the Lehman Parties or Swedbank, and to avoid protracted,

costly and uncertain litigation, the Parties intend to enter into a comprehensive resolution

pursuant to the Settlement Agreement.

---

[5] This summary (the "Summary") of the Settlement Agreement is qualified in its entirety by the terms and
conditions of the Settlement Agreement.  The Summary is intended to be used for information purposes only and
shall not in any way affect the meaning or interpretation of the Settlement Agreement.

### *The Exchange*

16.     The Settlement Agreement provides for an exchange of certain commercial real estate loans and/or interests in such loans between the Lehman Parties and Swedbank (the "Exchange").  Each of the loans subject to the Exchange corresponds to a real estate project in which both Swedbank and the Lehman Parties currently have direct or indirect debt or equity investments.  The Exchange will allow the Lehman Parties to consolidate their ownership in the capital structure of such projects, and, as a result, enhance the ability of the Lehman Parties to maximize the value of their interest in such assets.

17.     As part of the Exchange, LBHI or its designee will receive, and Swedbank will relinquish, interests in the loans (collectively, the "Swedbank Loans") relating to the following properties:

- 1107 Broadway.  1107 Broadway is a 16-story vacant and fully-gutted office building containing approximately 332,000 square feet and located in Manhattan ("1107 Broadway").  LBHI currently holds a senior mortgage loan encumbering 1107 Broadway provided to finance its conversion into 165 condominium units and street-level retail.  The outstanding principal amount of the senior mortgage loan encumbering 1107 Broadway is approximately $151.4 million (plus certain protective advances).[6]  Swedbank currently holds a portion of the senior mortgage loan in the principal amount of approximately $14 million.  Woodlands Commercial Bank (formerly known as Lehman Brothers Commercial Bank) currently holds portions of the senior mortgage loan in the aggregate principal amount of approximately $6.1 million.  LBHI holds the remainder of the senior mortgage loan.  In April 2010, Lehman commenced a foreclosure action against (i) the mortgage borrower, (ii) the senior mortgage loan's guarantor, and (iii) numerous subordinate lien holders.  An assignment to LBHI of Swedbank's interest in the senior mortgage loan encumbering 1107 Broadway will enhance LBHI's ability to potentially effectuate a settlement of claims with the borrower and/or develop a business plan for the property that will

---

[6] LBHI's interest in the senior mortgage loan encumbering 1107 Broadway was acquired from Lehman Brothers Bankhaus, AG (In Insolvenz) ("Bankhaus") as part of a settlement that was completed in February 2010 pursuant to the *Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedures 9019 Authorizing and Approving of a Settlement Agreement with the Insolvency Administrator of Lehman Brothers Bankhaus AG (In Insolvenz)*, dated January 14, 2010 [Docket No. 6665] (the "Bankhaus Order").

maximize the value of LBHI's collateral, without obtaining additional cooperation from Swedbank.

- 425 Park Avenue. LBHI indirectly holds a 95% equity interest in a leasehold position in 425 Park Avenue, a 31-story, office building containing approximately 600,000 square feet and located in Manhattan that is currently 100% occupied ("425 Park Avenue").[7] LBHI's indirect interest in 425 Park Avenue is encumbered by a $27 million floating rate mortgage loan currently held by Swedbank that matures in July 2011 and includes four extension options, with a final maturity date in July 2015. By accepting assignment of the mortgage loan from Swedbank, LBHI can realize savings on interest expense and loan extension fees and have more control over capital events at or before the maturity of the mortgage loan.

- The Residences at Kapalua Bay. The Residences at Kapalua Bay is comprised of 146 three- and four-bedroom condominiums located in Hawaii managed by Ritz-Carlton ("Kapalua"). Kapalua is collateral for a multi-tranche loan in the aggregate principal amount of approximately $354 million. LBHI directly or indirectly holds three senior loan positions within the capital structure relating to Kapalua in the aggregate principal amount of approximately $161.3 million, including protective advances.[8] Swedbank holds two loans in the aggregate principal amount of approximately $15 million. LBHI, as agent for the mortgage lenders, must obtain the consent of its co-lenders, including Swedbank, and the borrower to implement a strategy to maximize the value of its loan positions. By taking assignment of the subordinate mortgage notes from Swedbank, LBHI can implement its strategy without Swedbank's consent.

- One American Center. One American Center is a 32-story, office building containing approximately 504,000 square feet and located in Austin, TX ("One American"). The property is one of ten assets owned by a partnership in which the Debtors indirectly hold a 50% equity interest[9] and in which LCPI holds interests in loans with aggregate

---

[7] The equity in 425 Park Avenue was transferred to Fenway Capital, LLC ("Fenway Capital") pursuant to certain repurchase transactions entered into in connection with a program under which Fenway Funding, LLC issued certain commercial paper to LBHI, as more particularly described in the *Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy in Connection with a Repurchase Transaction with Fenway Capital, LLC and A Commercial Paper Program with Fenway Funding, LLC* [Docket No. 7831]. Pursuant to the *Order Approving Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy in Connection with a Repurchase Transaction with Fenway Capital, LLC and A Commercial Paper Program with Fenway Funding, LLC* [Docket No. 9030] (the "Fenway Order"), the equity in 425 Park Avenue was transferred to LCPI by Fenway Capital and the repurchase transaction and commercial paper program were terminated. LBHI has reserved all rights, claims, interests pursuant to the Fenway Order.

[8] Certain of LBHI's interests in the loans within the capital structure relating to Kapalaua were acquired from Bankhaus pursuant to the Bankhaus Order.

[9] The Debtors' interests in the equity in One American were transferred to Restructured Asset Securities and Enhanced Returns, Series 2007-A Trust ("RACERS"). Pursuant to the *Order Pursuant to Section 363 of The Bankruptcy Code Amending the RACERS Transaction Documents and Terminating Certain Racers Transaction Documents*, dated August 20, 2010 [Docket No. 10943] (the "RACERS Order"), LCPI now owns the equity in One

principal amount of more than $140 million, secured by, among other things, a pledge of the equity interests in the partnership that indirectly owns One American[10]. Swedbank will assign its interest in a mortgage note in the principal amount of approximately $69.1 million encumbering One American, giving the Lehman Parties further control over the debt structure of One American, thus improving their ability to maximize the value of the interests in such property.

18.     As part of the Exchange, Swedbank will receive and the Lehman Parties will relinquish interests in loans (collectively, the "Lehman Loans" and, together with the Swedbank Loans, the "Loans") relating to the following properties:[11]

- 1407 Broadway.  1407 Broadway is a 42-story office building containing approximately 1.1 million square feet and located in Manhattan.  The property is subject to a ground lease with an extended maturity in December 2048.  The leasehold interest is encumbered by a mortgage loan in the aggregate principal amount of approximately $127.25 million that matures in January 2012.  Swedbank is the lender of record and holds an interest in the mortgage loan in the principal amount of approximately $99.99 million, and LBHI holds a participation interest in the remaining portion of the loan in the principal amount of approximately $27.26 million.  Pursuant to the Net Profits Agreement, LBHI also holds a 35% net profit interest in the leasehold, contingent upon the completion of a capital transaction, such as the sale of the leasehold.  The leasehold is the subject of litigation with the ground fee-owner.  Given the uncertainty of such litigation and the necessity of Swedbank's cooperation to effectuate any restructuring of the related mortgage loan, in the context of the overall settlement, LBHI has made the determination to assign its participation interest in such loan to Swedbank pursuant to the Settlement Agreement.  Additionally, the Settlement Agreement contemplates the potential transfer from LBHI to Swedbank of the 1407 Net Profits Agreement.  1407 Borrower has a right of first offer to purchase the 1407 Net Profits Agreement.  In the event that 1407 Broadway does not exercise such right, as further specified in the Settlement Agreement, LBHI will transfer its interest in the 1407 Net Profits Agreement to Swedbank.

- 1888 Century Park East.  1888 Century Park East is a 20-story, Class A office building containing approximately 495,000 square feet located in Los Angeles, CA ("1888 CPE").  1888 CPE is encumbered by a mortgage loan in the aggregate principal amount of approximately $177 million, consisting of an A-1 Note in the principal amount of

---

American unencumbered by the pledge to RACERS.  LBHI has reserved all rights, claims, and interests pursuant to the RACERS Order.

[10] LBHI's interests in the loans encumbering One American were transferred to Spruce CCS, Ltd. ("Spruce"). Lehman reserves all rights, claims and interests with respect to such loans.

[11] LBHI's interest in the loan encumbering 1407 Broadway and LALI's interest in the loan encumbering 1888 CPE (each as defined below) were acquired from Bankhaus pursuant to the Bankhaus Order.

$41,769,000, an A-2 Note in the principal amount of $40,131,000, a B-1 Note in the principal amount of $12,750,000, a B-2 Note (the "B-2 Note") in the principal amount of $12,250,000, a C-1 Note in the principal amount of $16,702,784.07, a C-2 Note (the "C-2 Note") in the principal amount of $16,047,772.93, a D-1 Note in the principal amount of $18,870,000.00, and a D-2 Note (the "D-2 Note") in the principal amount of $18,130,000.00, all of which mature in January 2012.  Swedbank holds the D-2 Note, and Lehman ALI Inc. ("LALI"), a non-debtor subsidiary of LBHI, holds the B-2 Note and the C-2 Note.  As part of the consideration for the benefits received by the Lehman Parties under the Settlement Agreement, LALI will transfer its interests in the B-2 Note and the C-2 Note to LBHI, and LBHI will in turn transfer such interests in the B-2 Note and the C-2 Note to Swedbank.

19.    Because the value of the Swedbank Loans is greater than the value of the Lehman Loans, as additional consideration for the Exchange, LBHI will pay Swedbank the amount of $10 million, which may be prorated due to the receipt of certain interest payments prior to closing of the Settlement Agreement.  Additionally, in the event that 1407 Borrower exercises its right to purchase the 1407 Net Profits Agreement, LBHI will transfer to Swedbank $10 million of the purchase price paid by 1407 Borrower in lieu of transferring to Swedbank the 1407 Net Profits Agreement.

### *Agreements Regarding Enforcement Actions*

20.    The Settlement Agreement further provides that the Lehman Parties will refrain from interfering with actions taken by Swedbank to enforce the terms of certain agreements ("Enforcement Actions"), as further described in the Settlement Agreement, with respect to the following properties:

- The La Posada Project.  La Posada is a 157-unit resort and spa located in Santa Fe, New Mexico (the "La Posada Project").  LBHI indirectly holds through its affiliates, an equity interest of approximately 38% in the La Posada Project and directly holds a mezzanine loan with respect thereto in the principal amount of approximately $17.2 million.[12]  La Posada Project is encumbered by a mortgage loan in the principal amount

---

[12] The equity interests in La Posada Project were transferred to RACERS.  Pursuant to the RACERS Order, LCPI now owns such interests unencumbered by the pledge to RACERS, and LBHI has reserved all rights, claims and interests.

of approximately $40.2 million held by Swedbank.  In March 2009, default notices for both loans were issued and, in October 2009, Swedbank commenced a foreclosure action with respect to the mortgage loan.  The mortgage loan agreement contains a non-recourse carveout guaranty which obligates PAMI LLC ("PAMI"), a wholly-owned indirect subsidiary of LBHI and sponsor of the La Posada Project, to reimburse the mortgage lender for fees and costs of collection, among other things.  LBHI has determined that the value of the La Posada Project is insufficient to provide for a recovery under the mezzanine loan.  Accordingly, in the context of the overall settlement, LBHI has agreed not to, in any manner, directly or indirectly, to hinder, delay, frustrate, impede, object to or obstruct or prevent Swedbank from engaging in Enforcement Actions with respect to Swedbank's interests in the La Posada Project.  In exchange, Swedbank will grant PAMI a full release under the related non-recourse carveout guaranty, with the exception of certain claims until Swedbank has resolved certain Enforcement Actions related to the La Posada Project, as further specified in the Settlement Agreement.

- The Seaview Project.  Seaview Square is a retail complex containing approximately 1.1 million square feet of gross leasable area on a 134-acre parcel of land located in Ocean Township, New Jersey (the "Seaview Project").  LBHI holds a $4.5 million mezzanine loan relating to the Seaview Project.  The Seaview Project is encumbered by a mortgage loan in the principal amount of $62.5 million held by Swedbank, among other co-lenders, which is currently the subject of a foreclosure action. LBHI has determined that the value of the Seaview Project is insufficient to provide for a recovery under both the mortgage loan and mezzanine loan.  Accordingly, in the context of the overall settlement, LBHI has agreed not to, in any manner, directly or indirectly, to hinder, delay, frustrate, impede, object to or obstruct or prevent Swedbank from engaging in Enforcement Actions with respect to Swedbank's interests in the Seaview Project.

- The Telluride Project.  Capella Telluride and Inn at Lost Creek (collectively, the "Telluride Project") are luxury hotels located in Mountain Village, Colorado.  The Capella Telluride contains a 100-unit luxury hotel, 10 employee units, 5 retail units and 60 condominium residences, while the Inn at Lost Creek is comprised of a 32-unit luxury hotel with 2 retail units.  LBHI indirectly own 50% of the equity in the Telluride Project and holds a mezzanine loan related thereto in the principal amount of approximately $35 million.[13]  The Telluride Project is encumbered by a $156 million mortgage loan held by Swedbank.  In October 2010, Swedbank commenced a foreclosure action with respect to the mortgage loan.  LBHI has determined that the value of the Telluride Project is insufficient to provide for a recovery under both the mortgage loan and mezzanine loan.  LBHI has agreed not to, in any manner, directly or indirectly, to hinder, delay, frustrate, impede, object to or obstruct or prevent Swedbank

---

[13] The mezzanine loan relating to the Telluride Project was transferred to Fenway Capital, and pursuant to the Fenway Order, transferred by Fenway Capital to LCPI.  LBHI has reserved all rights, claims, interests pursuant to the Fenway Order.

from engaging in Enforcement Actions with respect to Swedbank's interests in the
Telluride Project.

- The 1100 Vermont Project.  1100 Vermont is a 12-story, vacant office building
  containing approximately 67,000 square feet, located in Washington, D.C (the "1100
  Vermont Project").  The 1100 Vermont Project is security for a mortgage loan in the
  principal amount of approximately $14 million held by Swedbank.  LBHI holds a
  related $1.2 million mezzanine loan.  Both loans relating to the 1100 Vermont Project
  are in default.  The 1100 Vermont Project has been marketed for sale, and bids received
  have been insufficient for LBHI to obtain a recovery with respect to the mezzanine
  loan.  LBHI has agreed not to, in any manner, directly or indirectly, to hinder, delay,
  frustrate, impede, object to or obstruct or prevent Swedbank from engaging in
  Enforcement Actions with respect to Swedbank's interests in the 1100 Vermont
  Project.

### *Additional Terms*

21.    In addition to the terms outlined above, the Settlement Agreement

provides that the Parties will agree to modify the terms of certain loans.  This includes the

modification of loans relating to 816 Congress Avenue (the "816 Congress Project"), a 20-story,

430,000 square-foot office building located in Austin, TX.  LBHI indirectly holds, as of the date

hereof, 90% of the equity in 816 Congress Holdings LLC, the entity that indirectly owns the 816

Congress Project.  The remaining equity in 816 Congress Holdings LLC is held by Grubb and

Ellis Realty Investors ("G&E").  The 816 Congress Project is encumbered by a mortgage loan

held by Swedbank in the principal amount of approximately $73.6 million, of which

approximately $7 million remains to be funded.  LBHI is the lender of record for a mezzanine

loan relating to the 816 Congress Project in the principal amount of approximately $16.7 million,

of which approximately $1.5 million remains unfunded.[14]  Both of such loans mature in August

2011; however the borrower under each loan has the option to extend the loan for two 1-year

periods, subject to such borrower's satisfaction of certain conditions.  Pursuant to the Settlement

---

[14]  The equity in 816 Congress Holdings LLC was transferred to RACERS.  Pursuant to the RACERS Order, LCPI
now owns the equity in 816 Congress Holdings LLC unencumbered by such pledge.

Agreement, the Parties will agree to amend the documents evidencing the mortgage loan to provide the borrower with a maturity date of August 2013. In connection therewith, LBHI will cause certain of its affiliates to agree that any obligation of Swedbank to make further advances under the mortgage loan encumbering the 816 Congress Project has been terminated. Swedbank's actions and consents will enhance the Lehman Parties' ability to maximize a recovery with respect to the 816 Congress Project by giving the Lehman Parties complete operational control of the property including decisions surrounding financings and sales.

22.     The Settlement Agreement further provides for the allowance of the Deficiency Claims asserted by Swedbank against both LCPI and LBHI, each in the amount of $325 million, a reduction of approximately 43% from the amount asserted by Swedbank. The Settlement Agreement further provides, however, that Swedbank may not recover more than $325 million in the aggregate with respect to the Deficiency Claims. Additionally, the Settlement Agreement provides for certain mutual releases between the Lehman Parties, on the one hand, and Swedbank, on the other hand, as further set forth in the Settlement Agreement; however, the agreement does not release or waive the claims that any Lehman Party or any of its affiliates may have against any other Lehman Party or any of its affiliates.

### The Settlement Agreement is Fair and Equitable and Falls Well Within the Range of Reasonableness and Should Be Approved

23.     LBHI's and LCPI's entry into the Settlement Agreement is in their best interests and should be approved under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR.

P. 9019(a).  In granting a motion pursuant to Rule 9019(a), a court must find that the proposed

settlement is fair and equitable and is in the best interests of the estate.  *Protective Comm. for*

*Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v.*

*Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere*

*Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

24.    The decision to approve a particular settlement lies within the sound

discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  It is

the responsibility of a court to examine a settlement and determine whether it "falls below the

lowest point in the range of reasonableness."  *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d

599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

Additionally, a court may exercise its discretion "in light of the general public policy favoring

settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

25.    While a court must "evaluate … all … factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation.  *In re Drexel Burnham Lambert Group,*

*Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).  "[T]he bankruptcy judge does not have to

decide the numerous questions of law and fact….  The court need only canvass the settlement to

determine whether it is within the accepted range of reasonableness." *Nellis*, 165 B.R. at 123

(internal citations omitted).

26.    The Court may give weight to the informed judgment of the debtor that a

compromise is fair and equitable.  *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522

(S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998)

("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness…. If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.").

27.     The settlement and compromise set forth in the Settlement Agreement satisfies the standard for approval. The Lehman Parties have determined that the Settlement Agreement provides the best framework (i) to resolve their disputes with Swedbank over the Deficiency Claim and avoid the expense and risk inherent in litigating such a claim and (ii) to provide a mechanism to maximize the value of their existing investments relating to the Swedbank Loans.

28.     Although the Lehman Parties believe they have valid defenses to the Deficiency Claim, the prospects for success with respect to defending against the Deficiency Claim are, at best, uncertain, and in any event, will require costly and protracted litigation with Swedbank, requiring significant expenditures of both time and resources by the Lehman Parties and their professionals. While the Settlement Agreement allows for the allowance of the Deficiency Claims for $325 million; such amount is significantly below the approximately $565.8 million asserted by Swedbank with respect to the Deficiency Claims. Moreover, based on analysis of the loan attributes, property information, loan performance and collateral values with respect to the Mortgage Assets by the Lehman Parties' professionals, the Lehman Parties have determined that the amount of the Deficiency Claim to be allowed pursuant to the Settlement Agreement is reasonable. Accordingly the Settlement Agreement will allow the Lehman parties to avoid extended, expensive and uncertain litigation in exchange for a

settlement amount that is both fair given the value of the Mortgage Assets and a substantial

reduction from the amount asserted by Swedbank.

29.    The Settlement Agreement further provides for the Exchange, pursuant to

which LBHI will receive the Swedbank Loans and consolidate its interests in the properties

related to the Swedbank Loans.  LBHI already holds substantial investments in the properties

relating to such Loans (the "Investments").  However, pursuant to the Repurchase Agreement

and/or the underlying documents evidencing or governing the Investments, the Lehman Parties

and their affiliates may need the consent and/or cooperation of Swedbank to take certain actions

to enhance the value of the Investments.  The cost of pursuing the consent or cooperation of

Swedbank on a case-by-case basis could undermine the timing and economic benefits of taking

action with respect to the Investments.  Indeed, in certain instances, the inability to proceed

quickly with respect to the Investments may hinder or eliminate the ability of the Lehman Parties

and/or their affiliates to take actions most likely to benefit the Lehman Parties' estates and

creditors.   Moreover, in many instances, it may not be in Swedbank's economic interest to

cooperate or to consent.  The Exchange will enhance the Lehman Parties' ability to realize value

with respect to the Investments by enabling the Debtors to consolidate their ownership in the

various portions of the capitalization of such projects alleviating the time, cost and burden of

seeking further approval form Swedbank to take action with respect thereto.  As a result, the

Settlement Agreement serves to protect the Lehman Parties' existing interests in the Swedbank

Loans, and by extension, adds value to their estates.

30.    While the Lehman Parties are agreeing not to interfere with any

Enforcement Actions initiated by Swedbank with respect to the La Posada Project, the Telluride

Project, the Seaview Project and the 1100 Vermont Project (the "Projects"), based on the current

value of the Projects and the subordinate position of the Lehman Parties' interests in the Projects,

the Lehman Parties are unlikely to obtain recoveries with respect thereto.   While the Lehman

Parties currently hold a position senior to Swedbank with respect to one asset, 1888 CPE, in the

context of the overall benefits received by the Lehman Lenders pursuant to the Settlement

Agreement, including Swedbank's agreement to cooperate with respect to certain additional

assets including the 816 Congress Project, the Lehman Parties have determined that

relinquishing their interests in 1888 CPE is fair and appropriate under the circumstances.   With

respect to LBHI's interest in the mortgage loan made to the 1407 Borrower, given the

uncertainty of the litigation between the leasehold owner and ground fee-owner of 1407

Broadway and the necessity of Swedbank's cooperation to effectuate any restructuring of the

related mortgage loan, the Lehman Parties have determined that the assignment of its

participation interest in such loan is fair and appropriate.    In short, what the Lehman Parties are

receiving in the Exchange – interests in assets in which they hold senior positions  – substantially

outweighs what the Lehman Parties are generally relinquishing under the Settlement Agreement

– interests in or rights with respect to assets in which they hold relatively junior interests and

where the prospects of recovery are uncertain, at best.  Indeed, because the Lehman Loans are

less valuable than the Swedbank Loans, pursuant to the Settlement Agreement LBHI will agree

to pay Swedbank an additional $10 million as additional consideration for the Exchange (plus the

proceeds from the sale of the 1407 Net Profits Agreement if the 1407 Borrower elects to

purchase it).  Thus, the Exchange will allow the Debtors to achieve their objectives without

sacrificing any assets that are critical to the estates' goals of maximizing value for creditors.

            31.     The Settlement Agreement further provides that the Lehman Parties will

receive a release from Swedbank with respect to the transactions arising from the Repurchase

Agreement and the Mortgage Assets (other than the Deficiency Claims) and any actions that the

Lehman Parties took, or failed to take, with respect to the ownership and administration of the

Mortgage Assets.  Accordingly, the Lehman Parties will reduce future claims against their

estates.  Importantly, however, the Settlement Agreement preserves the claims that any Lehman

Party or any of its affiliates may have against any other Lehman Party or any of its affiliates.

32.    The terms of the Settlement Agreement are the product of an extended,

good-faith, arms'-length negotiation process.  The Parties, each represented by competent

counsel, have participated in numerous meetings and negotiations.  The terms of the Settlement

Agreement  are designed to provide mutually acceptable benefits and burdens to the Parties.

33.    For all of the foregoing reasons, the Settlement Agreement is fair,

reasonable, and in the best interests of the Lehman Parties and their estates and creditors.

Accordingly, the Court should approve the Lehman Parties' entry into an agreement substantially

consistent with the Settlement Agreement and consummation of the transactions contemplated

thereunder.

**<u>Notice</u>**

34.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) attorneys for Swedbank;

and (vii) all other parties entitled to notice in accordance with the procedures set forth in the

second amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases [Docket No. 9635].  The Lehman Parties submit that no other or

further notice need be provided.

35.    No previous request for the relief sought herein has been made by LBHI

or LCPI to this or any other Court.

WHEREFORE the Lehman Parties respectfully request that the Court grant the

relief requested herein and such other and further relief as is just.

Dated: January 26, 2011
       Houston, Texas


/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

19

## Exhibit A

**(See Attached Settlement Agreement)**

**SETTLEMENT AGREEMENT**

**By and Among**

**LEHMAN BROTHERS HOLDINGS INC.,**

**LEHMAN COMMERCIAL PAPER INC.**

**and**

**SWEDBANK AB, NEW YORK BRANCH**

**dated as of**

**January __, 2011**

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "**Agreement**"), dated as of January __, 2011 (the "**Execution Date**"), by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("**LBHI**"), **LEHMAN COMMERCIAL PAPER INC.**, a New York corporation ("**LCPI**"), and **SWEDBANK AB, NEW YORK BRANCH** ("**Swedbank**").  The parties to this Agreement are sometimes referred to individually herein as a "**Party**" and collectively as "**Parties**."

## W I T N E S S E T H :

WHEREAS, on September 15, 2008 LBHI commenced a voluntary case under the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

WHEREAS, on October 5, 2008 (the "**LCPI Petition Date**"), LCPI commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

WHEREAS, (i) LCPI, Lehman Brothers Inc. and Swedbank were parties to that certain Master Repurchase Agreement dated as of December 3, 2002, as amended (the "**Repurchase Agreement**"), pursuant to which LCPI sold to Swedbank, upon the terms as set forth in the Repurchase Agreement, certain commercial mortgage loans, which are listed on the attached Exhibit A (the "**Mortgage Assets**"), (ii) pursuant to two Guarantees delivered on or about December 23, 2002 and June 12, 2001, LBHI guaranteed payment by LCPI and its Affiliates of certain of their obligations to Swedbank under the Repurchase Agreement, (iii) pursuant to a Tri-Party Custody Agreement (the "**Custody Agreement**"), dated as of December 23, 2002, by and among Swedbank, LCPI and The Bank of New York as successor-in-interest to JPMorgan Chase Bank ("**Custodian**"), the files (collectively, the "**Collateral Files**") relating to the Mortgage Assets were held by the Custodian for the benefit of Swedbank and LCPI, and (iv) the Custodian arranged for one or more sub-custodians to take custody of the Collateral Files.

WHEREAS, September 12, 2008 was the last rollover date (the "**Last Rollover**") on which Mortgage Assets were sold to Swedbank pursuant to the Repurchase Agreement.

WHEREAS, pursuant to the Repurchase Agreement, Swedbank remitted cash to LCPI on or prior to the Last Rollover in exchange for the purchase of the Mortgage Assets.

WHEREAS, prior to the Last Rollover, LBHI sold all of the Mortgage Assets to LCPI pursuant to one or more repurchase transactions, and  LCPI re-sold all of the  Mortgage Assets to Swedbank in a back-to-back repurchase transaction pursuant to the Repurchase Agreement.

WHEREAS, on September 24, 2008 (the "**Default Date**"), Swedbank declared an Event of Default (as defined in the Repurchase Agreement) and notified LCPI in writing that it was in default under the Repurchase Agreement.  On the same day, Swedbank advised the Custodian that there had been an Event of Default and, as a result and in accordance with the Custody Agreement, the Custodian was required to follow the directions of Swedbank with regard to  the Collateral Files.

WHEREAS, since the LCPI Petition Date, either LCPI and/or LBHI, as assignor, and Swedbank as assignee, have entered into the Assignment Documents (as hereinafter defined) confirming that (i) LCPI or LBHI, as applicable, has sold, and Swedbank has purchased, all of LCPI's or LBHI's, as applicable, right, title and interest with respect to the Mortgage Assets pursuant to the Repurchase Agreement, and (ii) LCPI or LBHI, as applicable, has assigned, and Swedbank has assumed, all of LCPI's or LBHI's, as applicable, obligations as lender to arising from the documents evidencing such Mortgage Assets as of the Default Date and thereafter.

WHEREAS, the Parties desire to enter into this Agreement and to consummate each of the transactions described in Article II of this Agreement (collectively, the "**Settlement Transactions**") on the Closing Date simultaneously pursuant to the terms, covenants and conditions set forth in this Agreement.

NOW, THEREFORE, upon the foregoing recitals, which are incorporated as though fully set forth and agreed to herein and in consideration of the premises and of the respective covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1.    In addition to the terms defined above, in this Agreement (including the recitals hereto) and in the Schedules and Exhibits hereto, except as expressly provided or as the context otherwise requires:

"**816 Congress Agreements**" means those certain agreements relating to the 816 Congress Project, dated as of the Closing Date, in substantially the forms agreed upon by the Parties.

"**816 Congress Project**" means the real property and improvements commonly known as 816 Congress and located in Austin, Texas.

"**1100 Vermont Project**" means the real property and improvements commonly known as 1100 Vermont and located in Washington, D.C.

"**1407 Borrower"** means 1407 Broadway Real Estate LLC, a Delaware limited liability company.

"**1407 Net Profits Agreement"** means that certain Net Profits Agreement dated as of January 4, 2007, by and among LBHI and the 1407 Borrower.

"**1407 Net Profits Related Documents"** means, collectively, (i) the Pledge and Security Agreement Re: Net Profits Agreement (Interests in Mezzanine Borrower), dated as of January 4, 2007, by and between 1407 Broadway Mezz II LLC and LBHI, (ii) the UCC-1 Financing Statement between 1407 Broadway Mezz II LLC, as Debtor and LBHI, as Secured Party filed with the Secretary of State Delaware, (iii) the Pledge and Security Agreement Re: Net Profits Agreement (Interests in Project Owner), dated as of January 4, 2007, by and between 1407

Broadway Mezz LLC and LBHI, (iv) the UCC-1 Financing Statement between 1407 Broadway Mezz LLC, as Debtor and LBHI, as Secured Party filed with the Secretary of State Delaware, (v) the Joinder and Consent dated as of January 4, 2007 between LBHI and 1407 Borrower, and (vi) the Side Letter re: Net Profits Agreement dated January 4, 2006 between LBHI, 1407 Borrower and Lightstone Holdings LLC.

"**Accrued Interest Amount**" shall mean, with respect to any Lehman Loan or Swedbank Loan that is not in default with respect to the payment of principal and interest on the Closing Date, the amount of accrued but unpaid interest on such Lehman Loan or Swedbank Loan through and including the Closing Date.

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such Person. A Person will be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise.

"**Allowed Repo Proofs of Claim**" shall have the meaning assigned to such term in Section 2.3 hereof.

"**Assignments**" mean with respect to (i) the Lehman Loans, those certain documents of assignment dated as of the Closing Date assigning LBHI's right, title and interest in the Lehman Loans to Swedbank in substantially the forms agreed upon by the Parties hereto, and (ii) the Swedbank Loans, those certain documents of assignment dated as of the Closing Date assigning Swedbank's right, title and interest in the Swedbank Loans to LBHI or its designee in substantially the forms agreed upon by the Parties hereto.

"**Assignment Documents**" shall have the meaning assigned to such term in Section 7.7 hereof.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder.

"**Bankruptcy Court Approval Order**" means the entry by the Bankruptcy Court of an order approving this Agreement and the transactions contemplated hereby substantially in the form of <u>Exhibit B</u> attached hereto and which has not as of the Closing Date been vacated or stayed or amended without the consent of each Party.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which banks in New York are required or permitted to be closed.

"**Closing**" shall have the meaning assigned to such term in Article IV hereof.

"**Closing Date**" shall have the meaning assigned to it in Section 4.1.

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, order, registration, declaration, filing, or notice of, with or to any Person.

"**Enforcement Action**" means any judicial or non-judicial proceeding, including, without limitation, the foreclosure of any mortgage, the exercise of any power of sale, the sale by advertisement, the appointment of a receiver, taking of a deed or assignment in lieu of foreclosure, the pursuit of any judgment, or the taking of any other action concerning any of the Mortgage Assets by Swedbank in its sole and absolute discretion.

"**Escrow Accounts**" means, in connection with any Loan, those reserves or accounts established and maintained for the deposit and retention of all collections of taxes, assessments, ground rents, hazard and other insurance and comparable items.

"**Governmental Approval**" means any Consent of or with any Governmental Authority.

"**Governmental Authority**" means any nation or government (foreign or domestic), and any state or political subdivision thereof; any self-regulatory organization acting under color of authority granted under any Legal Requirement; and any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any other nation, or any foreign or domestic, state, county, city or other political subdivision thereof.

"**Independent Borrower Parties**" means collectively, the borrower and/or real property owner under each of the commercial loans included in the Mortgage Assets as set forth on Schedule G attached hereto.

"**La Posada Principal Agreement**" means the Principal Agreement dated as of July 31, 2007 by Karim Alibhai and PAMI, LLC to and for the benefit of Swedbank, as successor-in-interest to LBHI, as amended, restated, supplemented or otherwise modified and as in effect on the date hereof.

"**La Posada Project**" means the real property and improvements commonly known as La Posada and located in Santa Fe, New Mexico.

"**Legal Requirements**" in respect of any Person means all (i) constitutions, treaties, statutes, laws, ordinances, codes, rules, regulations, standards, judgments, decrees, writs, rulings, injunctions, orders and other requirements of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"**Lehman Controlled Affiliate**" means any Person directly or indirectly controlled by a Lehman Party. A Person shall be deemed to be directly or indirectly controlled by a Lehman Party if such Lehman Party possesses, directly or indirectly, the power to direct or cause the direction of such Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise; provided, however, that "Lehman Controlled Affiliates" shall not include any of the Independent Borrower Parties.

"**Lehman Released Claims**" shall have the meaning assigned to it in Section 2.9 hereof.

"**Lehman Loans**" means the loans and interests in loans identified on Schedule A-1 attached hereto.

"**Lehman Parties**" means collectively, LBHI and LCPI.

"**Lien**" means any lien, mortgage, charge, restriction, option, contractual restriction on transfer, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other claim of any kind or nature against any property or other asset securing any indebtedness, or any agreement to create or confer any of the foregoing, in each case whether arising by agreement or under any statute or law or otherwise.

"**Loans**" means, collectively, the Swedbank Loans and the Lehman Loans.

"**Loan Documents**" means (i) with respect to whole loans, all Notes, Mortgages, pledge agreements, loan agreements, credit agreements, security agreements, environmental indemnities, guaranties, and other documents and agreements evidencing or securing any of the Loans and (ii) with respect to syndicated loans, all Notes and related assignment and assumption agreements, including, without limitation, those documents set forth on Schedule B with respect to the Swedbank Loans and those documents set forth on Schedule C with respect to the Lehman Loans. In the event any such document also secures or relates to one or more other loans which is not one of the Loans, such document shall be deemed a Loan Document, however, only such portion thereof securing or relating to the Loan shall be assigned hereunder by the Transferor.

"**Loan File**" means (i) with respect to the Lehman Loans, all records in the actual possession of a Lehman Party or any custodian or servicer relating to the servicing, title, ownership or enforcement of the Lehman Loans, as well as all third-party reports prepared with respect to the assets securing the Lehman Loans, such as environmental and engineering reports, but excluding any appraisals, valuations, analysis, work product, attorney work product and all other internally prepared documents, materials or information created by or on behalf of the Lehman Parties or any of their Affiliates or any of their respective employees, agents, representatives or counsel with respect thereto and (ii) with respect to the Swedbank Loans, all records in the actual possession of Swedbank or any custodian or servicer, relating to the servicing, title, ownership or enforcement of the Swedbank Loans, as well as all third-party reports prepared with respect to the assets securing the Swedbank Loans, such as environmental and engineering reports, but excluding any appraisals, valuations, analysis, work product, attorney work product and all other internally prepared documents, materials or information created by or on behalf of Swedbank or any of its Affiliates or any of their respective employees, agents, representatives or counsel with respect thereto.

"**Master Assignment Agreement**" shall have the meaning assigned to such term in Section 7.7 hereof.

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, assets, liabilities, operating results or financial condition of the applicable Party or any of its assets, or (b) a material adverse effect on the ability of such Party to execute and deliver this Agreement or to perform its obligations hereunder.

"**Mortgage**" means the mortgage, deed of trust or other security instrument creating a lien upon the real property described therein, and the improvements located on such real property, which secures a Loan.

"**Note**" means the promissory note or similar instrument that evidences a Loan.

"**Person**" means and includes an individual, corporation, partnership (limited or general), joint venture, association, trust, limited liability company, any other unincorporated organization or entity, or any Governmental Authority.

"**Proceeds**" means any payments made on any of the Loans together with any other consideration received from the sale, exchange, license, lease or other disposition of any specified asset or property, any value received as a consequence of the possession thereof, and any payment received from any insurer or other person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature thereof and shall include (a) all properties or other assets acquired through foreclosure or deed in lieu of foreclosure and (b) all "proceeds" as defined in the Uniform Commercial Code as in effect in the jurisdiction in which the specified asset or property is located.

"**Reference Period**" means the period commencing on the Execution Date and ending on the Closing Date.

"**Reference Period Principal Payments**" shall mean, (i) with respect to the Lehman Loans, payments of principal received by the Lehman Parties or their Affiliates during the Reference Period and (ii) with respect to the Swedbank Loans, payments of principal received by Swedbank or its Affiliates during the Reference Period.

"**Repo Documents**" means (i) the Repurchase Agreement, (ii) the Custody Agreement, (iii) those certain Guarantees delivered on or about December 23, 2002 and June 12, 2001 by LBHI in favor of Swedbank in respect of the obligations of LCPI and its Affiliates under the Custody Agreement, (iv) the notices of default, each dated September 24, 2008, from Swedbank to LCPI and the Custodian and (v) all other agreements, instruments and documents executed and delivered in connection with any of the foregoing, as all such agreements instruments and documents have been amended, restated, supplemented or otherwise modified and as in effect on the date hereof.

"**Seaview Project**" means the real property and improvements commonly known as Seaview and located in Ocean Township, New Jersey

"**Swedbank Released Claims**" shall have the meaning assigned to it in Section 2.9 hereof.

"**Swedbank Loans**" means the loans identified on Schedule A-2 attached hereto.

"**Telluride Project**" means the real property and improvements commonly known as Telluride Capella and located in Mountain Village, Colorado.

"**Transferee**" means (a) with respect to the Lehman Loans, Swedbank and (b) with respect to the Swedbank Loans, LBHI or its designee.

"**Transferor**" means (a) with respect to the Lehman Loans, LBHI or its Affiliate that is the holder of the Lehman Loans and (b) with respect to the Swedbank Loans, Swedbank.

**ARTICLE II**

**EXCHANGE OF LOANS
AND OTHER SETTLEMENT TRANSACTIONS**

2.1.    Exchange.

Upon and subject to the terms and conditions herein set forth on the Closing Date, (i) Swedbank shall transfer, assign, convey and deliver to LBHI or such other parties as LBHI shall designate, and LBHI or its designee, as applicable, shall accept from Swedbank, all of Swedbank's right, title and interest in and to the Swedbank Loans free and clear of any Liens and (ii) LBHI shall transfer, assign, convey and deliver, or shall cause to be transferred, assigned, conveyed and delivered, to Swedbank, and Swedbank shall accept, the Lehman Loans free and clear of any Liens.  With respect to the foregoing assignments, each assignment shall include, without limitation, (A) all Loan Documents and Loan Files with respect to the applicable Loans and (B) all Proceeds (other than interest) of such Loans received after the Execution Date.  The sale and exchange of the Loans and the delivery of the Assignments in connection therewith shall be made without recourse and without representation or warranty other than as expressly provided in Article III hereof.

2.2.    Payments.

(a)    Upon and subject to the terms and conditions herein set forth, (i) on the Closing Date, LBHI shall pay or cause to be paid to Swedbank the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000.00) by wire transfer of immediately available funds to the account(s) designated by Swedbank, plus (ii) (A) if the 1407 Borrower validly and timely delivers its NPA Election Notice (as defined in the 1407 Net Profits Agreement) as determined by LBHI in accordance with Section 2.8 hereof, and the 1407 Borrower closes on its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with the terms thereof as determined by LBHI, then on the later of (x) five days after the date that LBHI's interest in the 1407 Net Profits Agreement is sold to the 1407 Borrower pursuant to such NPA Election Notice or (y) the Closing Date, LBHI shall pay or cause to be paid to Swedbank the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000) by wire transfer of immediately available funds to the account(s) designated by Swedbank, or (B) if the Borrower fails to validly and timely delivers its NPA Election Notice as determined by LBHI in accordance with Section 2.8 hereof, or wrongfully fails to close on its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with the terms thereof as determined by LBHI,  then on the 1407 Closing Date, LBHI shall pay or cause to be paid to Swedbank the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000) by wire transfer of immediately available funds to the account(s) designated by Swedbank.

7

(b)    On the Closing Date, (i) the Lehman Parties shall prepare and deliver to Swedbank a statement setting forth (A) the outstanding principal balance of, and accrued and unpaid interest on, each Lehman Loan as of the Closing Date, and (B) the balance of any Escrow Accounts of each Lehman Loan, as of the Closing Date, and (C) a calculation of all Reference Period Principal Payments received by the Lehman Parties or their Affiliates with respect to the Lehman Loans and (ii) Swedbank shall prepare and deliver to the Lehman Parties a statement setting forth (A) the outstanding principal balance of, and accrued and unpaid interest on, each Swedbank Loan as of the Closing Date and (B) the balance of any Escrow Accounts of each Swedbank Loan, as of the Closing Date, and (C) a calculation of all Reference Period Principal Payments received by Swedbank or its Affiliates with respect to the Swedbank Loans.  If, based on such statements, the Parties determine that Reference Period Principal Payments with respect to the Lehman Loans together with any Accrued Interest Amounts in respect of the Swedbank Loans exceeded Reference Period Principal Payments with respect to the Swedbank Loans together with any Accrued Interest Amounts in respect of the Lehman Loans, then the Lehman Parties shall pay to Swedbank the amount of such excess and, conversely, if, based on such statements, the Parties determine that Reference Period Principal Payments with respect to the Swedbank Loans together with any Accrued Interest Amounts in respect of the Lehman Loans exceeded Reference Period Principal Payments with respect to the Lehman Loans together with any Accrued Interest Amounts in respect of the Swedbank Loans, then Swedbank shall pay to the Lehman Parties the amount of such excess.  The Parties shall cooperate with one another to reconcile Reference Period Principal Payments and Accrued Interest Amounts and shall make any payments required by the immediately preceding sentence in immediately available funds on the Closing Date.

2.3.    <u>Deficiency Claim</u>.  Upon and subject to the terms and conditions herein set forth, with respect to the proofs of claim listed on Schedule D attached hereto that were filed by Swedbank against LBHI and/or LCPI (collectively, the "**Allowed Repo Proofs of Claim**"), from and after the Closing Date in satisfaction in full of such proofs of claim, Swedbank will have an allowed, non-priority, non-subordinated unsecured claim against each of LCPI and LBHI in their respective chapter 11 cases in the amount of THREE HUNDRED TWENTY FIVE MILLION DOLLARS AND NO/100 ($325,000,000) (the "**Settlement Amount**"); provided, however, that the aggregate recovery of Swedbank in respect of the Allowed Repo Proofs of Claim shall not exceed the Settlement Amount and that, for the avoidance of doubt, the claim set forth in each of the Allowed Repo Proofs of Claim shall have the same treatment as other claims within its class under the plan confirmed by the Bankruptcy Court in the chapter 11 cases of LCPI and LBHI, as applicable.  The Allowed Repo Proofs of Claim shall not be subject to objections or defenses, whether by way of netting, set off, recoupment, counterclaim or otherwise, or be subject to any claim under section 510 of the Bankruptcy Code or otherwise that would have the effect of subordinating such claims to the claims of other general unsecured creditors.

2.4.    <u>816 Congress</u>.  The Parties agree that, on the Closing Date, each of the Parties shall execute and deliver to the other Parties the 816 Congress Agreements.

2.5.    <u>La Posada, Seaview, Telluride and 1100 Vermont</u>.  Each of the Lehman Parties covenants, agrees, warrants, and represents that from and after the Closing Date, (i) it shall not, and shall take such action to cause each of the Lehman Controlled Affiliates not to, in any manner, directly or indirectly, hinder, delay, frustrate, impede, object to, obstruct or prevent

Swedbank or its Affiliates, successors or assigns from commencing, pursuing, consummating, and completing any Enforcement Action that Swedbank or its Affiliates, successors or assigns may determine and elect to pursue, in its sole and absolute discretion, with respect to the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project or any loans held by Swedbank secured by any of the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project, and (ii) it shall take such action, and shall cause each of the Lehman Controlled Affiliates to take such action, to cooperate, in good faith, with Swedbank or its Affiliates, successors and assigns in connection with any Enforcement Action that Swedbank or its Affiliates, successors and assigns may determine and elect to pursue, in its sole and absolute discretion, with respect to the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project or any loans held by Swedbank or its Affiliates, successors and assigns secured by any of the La Posada Project, the Seaview Project, the Telluride Project or the 1100 Vermont Project (including, but not limited to, in the case of the La Posada Project, consenting to a stipulated judgment of foreclosure in form agreed to by the Parties hereto); provided, however, that notwithstanding the foregoing, the Lehman Parties shall not be required by the foregoing to take, or refrain from taking, any action that could breach or violate, or cause any Affiliate to breach or violate, (i) any existing contractual obligations that the Lehman Parties or their Affiliates owe to any unrelated third party, (ii) any obligations the Lehman Parties or their Affiliates owe to unrelated third parties provided for under applicable law or (iii) any fiduciary duties that the Lehman Parties or their Affiliates may owe to any equity holder in any entity in which any Lehman Party or its Affiliate holds an interest. Notwithstanding the foregoing or anything to the contrary contained herein, it is understood and agreed that (a) neither the Lehman Parties nor any of their Affiliates shall have any obligation to cause any of the Independent Borrower Parties to take any action or refrain from taking any action with respect to any such Enforcement Action nor shall any Lehman Party or any Affiliate thereof have any responsibility or liability with respect to the action or inaction of any Independent Borrower Party in connection with any such Enforcement Action and (b) the Lehman Parties shall have no further obligation under this Section 2.5 if a deficiency judgment is sought by Swedbank or its Affiliates, successors or assigns against either Lehman Party or any of its Affiliates (other than the Independent Borrower Parties) in connection with any Enforcement Action, unless such effort is abandoned within ten (10) Business Days after notice of such attempt is given to Swedbank by Lehman. For the avoidance of doubt, the term "Lehman Controlled Affiliates" shall not include any of the Independent Borrower Parties, and the Lehman Parties shall have no obligation to cause any of the Independent Borrower Parties to take, or refrain from taking, any action pursuant to this Section 2.5 or otherwise.

2.6.    <u>Intentionally Omitted</u>.

2.7.    <u>Additional La Posada Agreement</u>.  Effective as of the Closing Date, (i) PAMI LLC's obligations under the La Posada Principal Agreement shall be limited to only those items set forth in Sections 9(c)(vii) and 9(d)(iii) of the La Posada Note and (ii) PAMI LLC shall be released and discharged of all its obligations under the La Posada Principal Agreement upon the completion of the foreclosure sale of the La Posada Project, all as provided in a separate agreement in form agreed to by the Parties hereto.

2.8.    <u>1407 Net Profits Agreement</u>.  On the Execution Date, LBHI will provide the 1407 Borrower with the NPA ROFO Notice (as defined in the 1407 Net Profits Agreement) with

respect to the proposed sale of LBHI's interest in the 1407 Net Profits Agreement to Swedbank pursuant to the terms of this Agreement. If the 1407 Borrower either (i) fails to validly and timely deliver the NPA Election Notice (as defined in the 1407 Net Profits Agreement) in response thereto, or (ii) fails to timely close upon its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with such NPA Election Notice and the terms of the 1407 Net Profits Agreement, then subject to the terms and conditions herein set forth, within five (5) days after the later of (i) if the Borrower fails to validly and timely deliver such NPA Election Notice as determined by LBHI, the date that is thirty days after the 1407 Borrower's receipt of the NPA ROFO Notice, or (ii) if the Borrower validly and timely delivers such NPA Election Notice, but wrongfully fails to close on its purchase of LBHI's interest in the 1407 Net Profits Agreement in accordance with the terms thereof as determined by LBHI, the NPA ROFO Closing Date (as defined in the 1407 Net Profits Agreement) (the later of (i) the date that is five days after the later of such dates or (ii) the Closing Date being the **"1407 Closing Date"**), LBHI shall transfer, assign, convey and deliver to Swedbank as an additional portion of the Lehman Loans, and Swedbank shall accept from LBHI as an additional portion of the Lehman Loans, LBHI's rights, title and interest in, the 1407 Net Profits Agreement, and each of the 1407 Net Profits Related Documents, free and clear of any Liens, and, in exchange therefor, Swedbank shall pay to LBHI or its designee the sum of TEN MILLION DOLLARS AND NO/100 ($10,000,000) by wire transfer of immediately available funds to the account designated by LBHI. On the 1407 Closing Date, LBHI and Swedbank shall each deliver to the other, an Assignment with respect to LBHI's interest in the 1407 Net Profits Agreement and each of the 1407 Net Profits Related Documents. The sale of LBHI's interest in the 1407 Net Profits Agreement and each of the 1407 Net Profits Related Documents and the delivery of the Assignment in connection therewith shall be made without recourse, representation or warranty other than as expressly provided in Article III hereof.

2.9.    <u>Mutual Releases</u>.

(a)    Except as to the acknowledgements, agreements and performance of the obligations set forth in the Assignment Documents, this Agreement and the documents, instruments and agreements executed in connection herewith, effective from and after the Closing Date, Swedbank, for itself and its Affiliates, and their successors and assigns, expressly releases and waives, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debt, liens, losses, demands, damages, costs and causes of action of whatever nature, whether asserted or unasserted, known or unknown, in contract or tort, unsecured, secured, priority, administrative or otherwise (collectively, "**Swedbank Released Claims**"), that Swedbank or any of its Affiliates may have against any of the Lehman Parties and/or any of their respective direct or indirect parents, subsidiaries and Affiliates, or the respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, successors or assigns of any and all of the foregoing (other than the Independent Borrower Parties), arising from, in connection with, or relating in any manner to the Repo Documents, the Lehman Loans or the Mortgage Assets or the transactions contemplated thereby, including, without limitation (i) any delay in the execution and delivery of the Assignment Documents; (ii) acts or omissions of any kind occurring prior to, or on or after the Default Date by the Lehman Parties or any of their affiliates, in the capacity as lender, or as agent, administrative agent, collateral agent, servicer, trustee, or in any other capacity on behalf or at the direction of the lenders under any of the Mortgage Assets, or in connection with the

ownership, administration or servicing thereof; (iii) other than as provided in Section 2.7, the La Posada Principal Agreement and any other agreement, instrument or document evidencing or securing, or otherwise in connection with, the loan in the original principal amount of $40,000,000 held by Swedbank and encumbered by the La Posada Project; and (iv) any acts or omission of any kind by the Lehman Parties or their Affiliates, as the holder of the mezzanine loan with respect to, or any other matters relating to, the Seaview Project.  The foregoing release shall not waive, diminish or in any way prejudice any rights of Swedbank under this Agreement or any of the Assignment Documents.   Notwithstanding anything to the contrary contained herein, (i) the Parties expressly acknowledge and agree that the foregoing release does not release, waive or limit the validity or effectiveness of any of the Assignment Documents, and (ii) the Lehman Parties expressly acknowledge that with respect to the Seaview Project, Swedbank and its Affiliates do not control any of the other holders of the mortgage loan encumbering the Seaview Project and, accordingly, with respect to such other holders, Swedbank and its Affiliates can only release Swedbank Released Claims held by Swedbank.  Swedbank shall not, and shall take such action to cause such holders and each of its Affiliates under its control not to, in any manner, directly or indirectly, pursue any Swedbank Released Claims they may have against the Lehman Parties and/or their Affiliates in connection with the mezzanine loan with respect to the Seaview Project; provided, however, that notwithstanding the foregoing, Swedbank shall not be required by the foregoing to take, or refrain from taking, any action with respect to the Seaview Project that could breach or violate, or cause any Affiliate to breach or violate (i) any existing contractual obligations that Swedbank or its Affiliate owe to any unrelated third party, (ii) any obligations Swedbank or its Affiliates owe to unrelated third parties provided for under applicable law or (iii) any obligations that Swedbank may owe to any co-lenders having an interest in the Seaview Project.

(b)     Except as to the acknowledgements, agreements and performance of the obligations set forth in the Assignment Documents, this Agreement and the documents, instruments and agreements executed in connection herewith, effective from and after the Closing Date, each of the Lehman Parties, for itself, and its Affiliates, and their successors and assigns, expressly waives and releases, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages, costs and causes of action of whatever nature, whether asserted or unasserted, known or unknown, in contract or tort, unsecured, secured, priority, administrative or otherwise (collectively, "**Lehman Released Claims**"), that the Lehman Parties (or any of their Affiliates) may have against Swedbank and/or any of its respective direct or indirect parents, subsidiaries and Affiliates, or the respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, successors or assigns of any and all of the foregoing, arising from, in connection with, or relating in any manner to the Repo Documents, the Swedbank Loans or the Mortgage Assets or the transactions contemplated thereby, including, without limitation (i) any delay in the execution and delivery of the Assignment Documents; and (ii) acts or omissions of any kind occurring on or after the Default Date by Swedbank or any of its Affiliates, in the capacity as lender, or as agent, administrative agent, collateral agent, servicer, trustee, or in any other capacity on behalf or at the direction of the lenders under any of the Mortgage Assets, or in connection with the ownership, administration or servicing thereof.  The foregoing release shall not waive, diminish or in any way prejudice any rights of the Lehman Parties under this Agreement or any of the Assignment Documents.

(c)    Notwithstanding anything to the contrary contained herein, the releases set forth in Sections 2.9(a) and (b) do not release any Party or any of their Affiliates in their respective capacities as borrower under, or the holder of a direct or indirect interest in any loan that is either senior, subordinate or pari passu to, any of the Mortgage Assets identified on Schedule E attached hereto and the Parties retain all of their respective rights with respect to their borrower-lender, mezzanine lender-mortgage lender, or co-lender relationship relative to such Mortgage Assets, as applicable.

(d)    To the extent that after the Closing Date hereof a borrower (or other party to a Mortgage Asset asserting a claim) asserts a claim against either Party in its capacity as lender, or as agent or in any other capacity under any of the Mortgage Assets based on an affirmative act or omission of such lender or agent prior to the date hereof, the Parties shall cooperate with one another (at no cost or liability to the cooperating party unless reimbursed by the party requesting such cooperation) in the defense of such claim to the extent practical and consistent with applicable fiduciary duties and rules of privilege.

(e)    Notwithstanding anything to the contrary contained herein, the release set forth in this Section shall not waive, diminish, release in any way, or prejudice, any defenses or affirmative defenses (but not counterclaims) (i) that Swedbank may have with respect to any Lehman Released Claims brought by, through or on behalf of any of the Lehman Parties or any of their respective Affiliates, or any of their respective successors or assigns or (ii) that any of the Lehman Parties may have with respect to any Lehman Released Claims brought by, through or on behalf of Swedbank, or any of its Affiliates, or any of their respective successors or assigns.

(f)    Nothing in this Agreement shall constitute a release or waiver of any Lehman Released Claims that any Lehman Party or any of its Affiliates may have against any other Lehman Party or any of its Affiliates.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.1.    <u>Representations and Warranties by the Lehman Parties</u>.  Each Lehman Party hereby represents and warrants to Swedbank with respect to itself as follows, as of the date hereof:

(a)    <u>Organization; Power and Authority of the Lehman Parties</u>.  (i) LBHI is a corporation duly organized and validly existing under the laws of the State of Delaware, (ii) LCPI is a corporation duly organized and validly existing under the laws of the State of New York, and (iii) each of the Lehman Parties has the corporate power and authority to own, lease and operate its property and to conduct its business as it is now being conducted.

(b)    <u>Authority, Approvals and Consents</u>.  Such Lehman Party has the corporate power and authority to execute and deliver and, subject to receipt of the Bankruptcy Court Approval Order, perform this Agreement and consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by all necessary

action on the part of such Lehman Party and no other corporate proceedings on the part of such Lehman Party are necessary to authorize and approve this Agreement and the transactions contemplated hereby. This Agreement has been duly executed and delivered by such Lehman Party and constitutes a valid and binding obligation of such Lehman Party. The execution, delivery and performance of this Agreement by each Lehman Parties and the consummation by each Lehman Parties of the Settlement Transactions do not (a) contravene or otherwise violate any provisions of the Articles of Incorporation or By-Laws or other organizational documents of such Lehman Party, (b) conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment, understanding or arrangement of any kind to which such Lehman Party is a party or which, to such Lehman Party's knowledge, relates to the Lehman Loans or by which, to such Lehman Party's knowledge, any of the Lehman Loans are bound, (c) violate or conflict with any Legal Requirements applicable to the business conducted by such Lehman Party except for such violations and conflicts as have not had and would not be reasonably expected to have a Material Adverse Effect with respect to such Lehman Party or (d) require any Governmental Approval or other Consent except for any such Governmental Approval or other Consent that has heretofore been obtained, and the Bankruptcy Court Approval Order.

(c)     Interests in the Lehman Loans. The Lehman Parties have good and valid title to each of the Lehman Loans and are the sole owners and holders of the Lehman Loans and the related Loan Documents, free and clear of all Liens. The Lehman Parties right to sell and assign the Lehman Loans to Swedbank is not be subject to any other party's right, title or interest or to an agreement with any other party that would be binding on Swedbank or the Lehman Loans. Neither of the Lehman Parties has terminated, modified or canceled in writing any Loan Document relating to any Lehman Loan except as reflected on Schedule C attached hereto and neither of the Lehman Parties has foreclosed or exercised any similar remedies upon any collateral securing any Lehman Loan.

(d)     Legal Matters. To the best of such Lehman Party's knowledge, except to the extent Swedbank has previously received notice to the contrary, (i) such Lehman Party has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or in respect of any of the Lehman Loans which would affect the execution, delivery or enforceability of this Agreement and (ii) neither Lehman Party has received written notice of any non-compliance by either Lehman Party with any Legal Requirements governing or affecting their ownership and use of the Lehman Loans.

(e)     Loan Documents. Attached hereto as Schedule C is a true, correct and complete list of all of the Loan Documents (as the same may have been amended, restated, replaced, supplemented or otherwise modified in writing) as of the date hereof that contain and/or disclose any material obligations and/or liabilities of the borrower, any guarantor or indemnitor, or the Lehman Parties or any other lenders relating to the Lehman Loans (other than the 1407 Broadway mortgage loan) and that the Lehman Parties have furnished to Swedbank true and correct copies thereof. The terms of the Loan Documents for each such Lehman Loan have not been waived in writing, modified or altered in writing, satisfied, cancelled, subordinated or rescinded in writing in any respect except as set forth on Schedule C; the related collateral has not been released from the lien or other encumbrance of, nor has the mortgagor or pledgor under

such Lehman Loan been released from its obligations under, such Loan Documents, in whole or in any part, in a manner which materially interferes with the benefits of the security intended to be provided by any such Loan Documents or the use, enjoyment, value or marketability of such collateral for the purposes specified in such Loan Documents.

(f)      Loan and Escrow Balances.    Schedule F attached hereto accurately identifies (a) the outstanding principal balance of, and accrued and unpaid interest on, each Lehman Loan and (b) the balance of any Escrow Accounts of each Lehman Loan, in each case, as of the Execution Date.

(g)      Claims by Borrowers and Co-Lenders.  Except to the extent Swedbank has previously received notice to the contrary, such Lehman Party has no actual knowledge of any claims by the borrower, any guarantor or any other obligor of any default or breach by any Lehman Party under any of the Loan Documents relating to any of the Lehman Loans.  Except to the extent Swedbank has received notice of the same, such Lehman Party has no actual knowledge of any claims by any co-lender of any default by any Lehman Party under any of the Loan Documents relating to the Lehman Loans.

(h)      No Claims.  To the best of such Lehman Party's knowledge, except to the extent Swedbank has previously received notice to the contrary, such Lehman Party has not received written notice of any claim or right of rescission, setoff, counterclaim, claims of lender liability, or defense by the mortgagor or any other obligor(s) under any Lehman Loan or by any other Person obligated to perform under any Loan Documents for any such Lehman Loans.

3.2.    Representations and Warranties by Swedbank.  Swedbank hereby represents and warrants to the Lehman Parties as follows as of the date hereof:

(a)      Organization and Good Standing of Swedbank.  Swedbank (a) is the New York branch of Swedbank AB, which is duly organized and validly existing under the laws of Sweden and (b) has the corporate power and authority to own, lease and operate its property and to conduct its business as it is now being conducted.

(b)      Authority, Approvals and Consents.  Swedbank has the corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by all necessary action on the part of Swedbank and no other corporate proceedings on the part of Swedbank are necessary to authorize and approve this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Swedbank and constitutes a valid and binding obligation of Swedbank.   The execution, delivery and performance of this Agreement by Swedbank and the consummation of the transactions contemplated hereby by Swedbank does not (a) contravene or otherwise violate any provisions of the Articles of Incorporation, By-Laws or other organizational documents of Swedbank, (b) conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment, understanding or arrangement of any kind to which Swedbank is a party or to which Swedbank is subject, (c) violate or conflict with any Legal

Requirements applicable to Swedbank or any of its business or property except for such violations and conflicts as have not had and would not be reasonably expected to have a Material Adverse Effect with respect to Swedbank or (d) require any Governmental Approval or other Consent on the part of Swedbank.

       (c)    <u>Interests in the Swedbank Loans</u>.  Swedbank has good and valid title to each of the Swedbank Loans and is the sole owner and holder of the Swedbank Loans and the related Loan Documents, free and clear of all Liens.  Swedbank's right to sell and assign the Swedbank Loans to LBHI or its designee is not be subject to any other party's right, title or interest or to an agreement with any other party that would be binding on the Lehman Parties or the Swedbank Loans.  Swedbank has not terminated, modified or canceled in writing any Loan Document relating to any Swedbank Loan except as reflected on <u>Schedule B</u> attached hereto and Swedbank has not foreclosed or exercised any similar remedies upon any collateral securing any Swedbank Loan.

       (d)    <u>Legal Matters</u>.  To the best of Swedbank's knowledge, except to the extent the Lehman Parties have previously received notice to the contrary, (i) Swedbank has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or in respect of any of the Swedbank Loans which would affect the execution, delivery or enforceability of this Agreement and (ii) Swedbank has not received written notice of any non-compliance by Swedbank with any Legal Requirements governing or affecting its ownership and use of the Swedbank Loans.

       (e)    <u>Loan Documents</u>.  Attached hereto as <u>Schedule B</u> is a true, correct and complete list of all of the Loan Documents (as the same may have been amended, restated, replaced, supplemented or otherwise modified in writing) as of the date hereof that contain and/or disclose any material obligations and/or liabilities of the borrower, any guarantor or indemnitor, or Swedbank or any other lenders relating to the Swedbank Loans and that Swedbank has furnished to the Lehman Parties true and correct copies thereof.  The terms of the Loan Documents for each Swedbank Loan have not been waived in writing, modified or altered in writing, satisfied, cancelled, subordinated or rescinded in writing in any respect except as set forth on <u>Schedule B</u>; the related collateral has not been released from the lien or other encumbrance of, nor has the mortgagor or pledgor under such Swedbank Loan been released from its obligations under, such Loan Documents, in whole or in any part, in a manner which materially interferes with the benefits of the security intended to be provided by any such Loan Documents or the use, enjoyment, value or marketability of such collateral for the purposes specified in such Loan Documents.

       (f)    <u>Loan and Escrow Balances</u>.  <u>Schedule F</u> attached hereto accurately identifies (a) the outstanding principal balance of, and accrued and unpaid interest on, each Swedbank Loan and (b) the balance of any Escrow Accounts of each Swedbank Loan, in each case, as of the Execution Date.

       (g)    <u>Claims by Borrowers and Co-Lenders</u>.  Except to the extent the Lehman Parties have previously received notice to the contrary, Swedbank has no actual knowledge of any claims by the borrower, any guarantor or any other obligor of any default or breach by Swedbank under any of the Loan Documents relating to any of the Swedbank Loans.  Except to

the extent the Lehman Parties have received notice of the same, Swedbank has no actual knowledge of any claims by any co-lender of any default by Swedbank under any of the Loan Documents relating to the Swedbank Loans.

(h)    No Claims.  To Swedbank's actual knowledge, except to the extent the Lehman Parties have previously received notice to the contrary, Swedbank has not received written notice of any claim or right of rescission, setoff, counterclaim, claims of lender liability, or defense by the mortgagor or any other obligor(s) under any Swedbank Loan or by any other Person obligated to perform under any Loan Documents for any such Swedbank Loans.

(i)    Allowed Repo Proofs of Claim.  Swedbank owns all of the legal and beneficial interest in, and has good, valid title to the Allowed Repo Proofs of Claim, free and clear of all Liens, claims, set-off rights, security interests, participations or encumbrances, and Swedbank has not transferred or assigned to any other Person any of the claims or receivables that are the subject of this Agreement, including, without limitation, the Allowed Repo Proofs of Claim or any interest therein.

3.3.    DISCLAIMER OF REPRESENTATIONS AND WARRANTIES.  EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 3, THE LOANS ARE BEING SOLD AND ASSIGNED "AS IS" WITHOUT ANY RECOURSE, REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, EXPRESS OR IMPLIED.    EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS ARTICLE, THE PARTIES HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATE AND DISCLAIM ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE LEHMAN LOANS OR THE SWEDBANK LOANS, AS APPLICABLE. EACH PARTY HERETO ACKNOWLEDGES THAT THE OTHER PARTIES HAVE NOT AUTHORIZED ANY EMPLOYEE, AGENT, REPRESENTATIVE, BROKER, THIRD PARTY OR OTHER PARTY TO MAKE AND, TO THE EXTENT SO MADE, SPECIFICALLY NEGATE AND DISCLAIM, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE SWEDBANK LOANS OR THE LEHMAN LOANS, AS APPLICABLE, SUCH PARTY IS RELYING SOLELY ON ITS OWN INVESTIGATION AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED, DIRECTLY OR INDIRECTLY, BY ANY OTHER PARTY.  EACH PARTY HERETO FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ANY OTHER PARTY WITH RESPECT TO THE SWEDBANK LOANS OR THE LEHMAN LOANS, AS APPLICABLE, WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SUCH OTHER PARTY HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.   IT IS UNDERSTOOD AND AGREED THAT THE SWEDBANK LOANS AND THE LEHMAN LOANS ARE SOLD AND TRANSFERRED AS IS, WHERE IS AND SUBJECT TO THE FOREGOING.

3.4.   <u>Survival of Representations and Warranties</u>.   The representations and warranties of the Lehman Parties and Swedbank set forth in Sections 3.1(a),(b),(c) and (d) and Sections 3.2(a),(b),(c) and (d) shall survive the Closing for a period of two (2) years and all other representations and warranties of the Lehman Parties and Swedbank set forth in Sections 3.1 and 3.2, respectively, shall survive the Closing for a period of one (1) year.


## ARTICLE IV

## CLOSING AND TERMINATION

4.1.   <u>Closing</u>.   The closing of the Settlement Transactions (the "**Closing**") shall occur and the documents referred to in Sections 4.2 and 4.3 shall be delivered at the offices of the Lehman Parties' counsel, Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153, or at such other place as is mutually agreed upon by the Parties on a date mutually agreed by the Parties but not later than the date ten (10) Business Days following the Bankruptcy Court Approval Order (the "**Closing Date**").

4.2.   <u>Lehman Deliveries</u>.   At the Closing, the Lehman Parties shall deliver or cause to be delivered to Swedbank each of the following:

(a)   With respect to each Lehman Loan, to the extent applicable (i) an original allonge endorsement to the Note, (ii) the Loan Documents and Loan File (including, without limitation, the original Note or, if such original Note has been lost, a lost note affidavit and indemnity or equivalent documents), (iii) an original Assignment of Mortgage in recordable form, (iv) an original Assignment, (v) UCC-3s assigning to Swedbank the secured party's rights under all financing statements and (vi) if required by the applicable Loan Documents, a notice to each borrower of the transfer of such Lehman Loan.

(b)   An Assignment for each Swedbank Loan.

(c)   An agreement, in form and substance reasonably satisfactory to the Parties, evidencing the agreements described in Section 2.7 hereof.

(d)   Executed counterparts of each of the 816 Congress Agreements.

4.3.   <u>Swedbank Deliveries</u>.   At the Closing, Swedbank shall deliver to the Lehman Parties each of the following:

(a)   With respect to each Swedbank Loan, to the extent applicable (i) an original allonge endorsement to the Note, (ii) the Loan Documents and Loan File (including, without limitation, the original Note or, if such original Note has been lost, a lost note affidavit and indemnity or equivalent documents), (iii) an original Assignment of Mortgage in recordable form, (iv) an original Assignment, (v) UCC-3s assigning to LBHI or its designee the secured party's rights under all financing statements and (vi) if required by the applicable Loan Documents, a notice to each borrower of the transfer of such Swedbank Loan.

(b)     An Assignment for each Lehman Loan.

(c)     An agreement, in form and substance reasonably satisfactory to the Parties, evidencing the agreements described in Section 2.7 hereof.

(d)     Executed counterparts of each of the 816 Congress Agreements.

4.4.    <u>Termination of Agreement</u>.  This Agreement may be terminated as follows:

(a)     by mutual written consent of the Lehman Parties and Swedbank;

(b)     by Swedbank, if the conditions precedent to the obligations of Swedbank set forth in Section 5.2 shall have not been fulfilled by the Closing Date;

(c)     by the Lehman Parties, if the conditions precedent to the obligations of the Lehman Parties set forth in Section 5.3 shall have not been fulfilled by the Closing Date; or

(d)     by Swedbank or the Lehman Parties if the Bankruptcy Court Approval Order has not been obtained on or prior to March 31, 2011.

4.5.    <u>Procedure Upon Termination; Effect of Termination</u>.  In the event of termination by Swedbank or the Lehman Parties, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party and this Agreement shall terminate and the Settlement Transactions shall be abandoned, without further action by any Party.  In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement (other than any such obligations that expressly survive such termination), no Party shall have any further rights or obligations pursuant to this Agreement, and such termination shall be without liability to the Parties except as otherwise provided in this Agreement, including, without limitation, the last sentence of Section 6.3.

## ARTICLE V

## CONDITIONS PRECEDENT

5.1.    <u>Conditions Precedent to the Obligations of each of the Parties</u>.  The obligation of Swedbank to effect the Settlement Transactions is subject to the entry of the Bankruptcy Court Approval Order, and all obligations of the Lehman Parties under this Agreement (other than the obligations set forth in Section 6.2) are subject to the entry of the Bankruptcy Court Approval Order.

5.2.    <u>Conditions Precedent to the Obligations of Swedbank</u>.  The obligations of Swedbank to close the Settlement Transactions shall be subject to the fulfillment or waiver by Swedbank at or prior to the Closing Date of the following conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Lehman Parties contained in Article III hereof shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date; and

(b)    _Performance of Obligations_.    The Lehman Parties shall have made the payment described in Section 2.2 hereof and shall have delivered, or caused to be delivered in all material respects the items set forth in Section 4.2 hereof.

5.3.    _Conditions Precedent to the Obligations of the Lehman Parties_.    The obligations of the Lehman Parties to close the Settlement Transactions shall be subject to the fulfillment or waiver by the Lehman Parties at or prior to the Closing Date of the following conditions:

(a)    _Representations and Warranties_.    The representations and warranties of Swedbank contained in Article III hereof shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date; and

(b)    _Performance of Obligations_.    Swedbank shall have delivered or caused to be delivered in all material respects the items set forth in Section 4.3 hereof.

## ARTICLE VI

## COVENANTS

6.1.    _Conduct Prior to Closing_.    From the date hereof to the earlier to occur of the Closing or termination of this Agreement, except as may be consented to in writing by the Transferee or as otherwise expressly provided for in this Agreement, neither Transferor shall:

(a)    sell, assign, transfer or otherwise dispose of any Loan or any interest therein, whether in whole or in part;

(b)    encumber any Loan;

(c)    amend, modify, terminate or subordinate any Loan Document, waive, alter, cancel or accept a discounted payoff of any Loan in any respect, or foreclose or otherwise proceed against the collateral for, accept a deed in lieu of foreclosure of, or compromise or settle any claims with respect to, any Loan, or rescind, and the related collateral shall not be released from, the Lien or other encumbrance of, nor shall the mortgagor be released from its obligations under, the related Mortgage, in whole or in part, nor shall any instrument be executed by the Transferor that would effect any such waiver, modification, alteration, cancellation, discounted payoff, subordination, foreclosure, deed in lieu of foreclosure, compromise or settlement, rescission or release, except as required by law or by the related Loan Documents;

(d)    take any action which would cause any of the representations or warranties contained in Section 3.1 or Section 3.2, as applicable, to be untrue in any material respect; and

(e)    agree to do, directly or indirectly, any of the foregoing items (a) through (d) of this Section.

6.2.    _Bankruptcy Court Approval Order_.    Promptly following the Execution Date, the Lehman Parties will file a motion with the Bankruptcy Court seeking approval of the Settlement Agreement and the Settlement Transactions, it being agreed and understood by Swedbank that

neither Lehman Party makes any assurance or guarantee of any kind that the Bankruptcy Court Approval Order will be received.

6.3.    Swedbank Cooperation.  From the date hereof to the earlier to occur of the Closing or termination of this Agreement, (i) Swedbank shall cooperate, in good faith, with the Lehman Parties to effectuate a discounted payoff of, or a sale or "short sale" of the collateral securing the mortgage loans encumbering the Kapalua Project and/or the 1107 Broadway Project, underlined, that if the closing of any such transactions occurs prior to the Closing, the discounted payoff, sale or "short sale" of the collateral securing, the mortgage loans encumbering the Kapalua Project and/or the 1107 Broadway Project shall be at a price not less than the respective prices agreed to in writing among the Parties on or prior to the date hereof, (ii) Swedbank shall cooperate with and consent to closings of individual units at the Kapalua Project so long as the unit sale prices are not less than those agreed to in writing among the Parties on or prior to the date hereof, and (iii) Swedbank shall cooperate with and consent to the Lehman Parties, other lenders and/or the applicable Independent Borrower Parties entering into agreements with Eastdil Secured, L.L.C. and Replay Management Ltd. with respect to the Kapalua Project.  If this Agreement is validly terminated and, prior to such termination, (i) any unit purchase agreements have been executed or closed in accordance with the terms hereof or (ii) agreements with Eastdil Secured, L.L.C. or Replay Management Ltd. have been entered into, in each case, in accordance with the immediately preceding sentence, then any such unit purchase agreements and any closings thereof and any such agreements with Eastdil and/or Replay shall continue in effect and Swedbank's consent thereto shall be effective for all purposes, notwithstanding the termination of this Agreement.

6.4.    Swedbank Claims.  Swedbank shall not (a) during the period from the Execution Date until the earlier of the Closing Date or the termination of this Agreement, transfer any of the Swedbank Loans, the Proceeds of the Swedbank Loans, the Swedbank Released Claims or the Allowed Repo Proofs of Claim, or any interest in any of the foregoing, or any rights or interests arising thereunder, in whole or in part; provided, however, that, notwithstanding the foregoing, Swedbank shall have the right to transfer Allowed Repo Proofs of Claim to any of its wholly-owned subsidiaries provided that any such subsidiary agrees to be bound by the terms of this Agreement in all respects and/or (b) from and after the Closing Date, transfer any such claims or receivables or any interest therein or any rights or interests arising thereunder except to a Person that agrees that the terms of this Agreement shall be binding in all respects thereupon and shall govern its acts; provided, however, that the restriction set forth in this clause (b) shall not apply to Swedbank's Allowed Repo Proofs of Claim in the LBHI and LCPI chapter 11 cases as provided in Section 2.3 hereof.

## ARTICLE VII

## MISCELLANEOUS

7.1.    Further Assurances.  After the Closing, the Transferor will, at the Transferee's sole cost and expense, promptly execute, acknowledge and deliver any other assurances or documents reasonably requested by the Transferee from time to time to satisfy the Transferor's obligations hereunder or to accomplish the purposes of this Agreement.  After the Closing, the Transferor and the Transferee shall furnish to each other such information and assistance as may

reasonably be requested in connection with the transactions consummated pursuant to this Agreement.

7.2.    <u>Expenses</u>.  The fees and expenses incurred by each Party (including the fees of any lawyers, accountants, investment bankers or others engaged by such party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party.

7.3.    <u>Headings</u>.  The Section headings herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.  References to Sections, unless otherwise indicated, are references to Sections of this Agreement.

7.4.    <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

To LCPI or LBHI at:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn:  Joelle Halperin
Telephone:  (646) 285-9066
Facsimile:  (646) 285-9305

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  W. Michael Bond, Esq.
Telephone:  (212) 310-8035
Facsimile:  (212) 310-8007

To Swedbank at:

Swedbank AB, New York Branch
One Penn Plaza
15th Floor
New York, New York 10119

Attention:  John Matthews, General Manager
Telephone:  212 486-8400
Facsimile:  212 486-3220

with a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Attention:  William M. Goldman
Telephone:  212 335-4770
Facsimile:  212 884-8589

and a copy via email to:

Erik Odhnoff at erik.odhnoff@swedbank.se

or to such other address as may have been furnished by a party to each of the other parties by notice given in accordance with the requirements set forth above.

7.5.    Assignment.  This Agreement and all provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that neither this Agreement nor any right, interest, or obligation hereunder may be assigned by any party hereto without the prior written consent of the other Parties; provided, further, that Swedbank may assign any Allowed Repo Proof of Claim that it has in the LBHI and LCPI chapter 11 cases pursuant to Section 2.3 hereof in accordance with the provisions of Section 6.4 hereof.

7.6.    Entire Agreement.  This Agreement shall be of no force or effect until executed and delivered by each of the parties hereto.  Subject to Section 7.7 below, this Agreement and the other documents contemplated hereby (which documents are not a part of or incorporated by reference into this Agreement) embody the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto.

7.7.    Assignment Documents.  The Parties hereto acknowledge and agree that the letter agreement dated as of November 20, 2008 between Swedbank and LCPI (the "**Master Assignment Agreement**") has been terminated; provided however that (i) the assumption of obligations by Swedbank under the Mortgage Assets pursuant thereto shall remain in full force and effect and (ii) except for the assignment of the Swedbank Loans to LBHI pursuant hereto, this Agreement does not waive, alter, modify, or otherwise amend the various assignment agreements, note allonges and other instruments, agreements and documents executed and delivered pursuant to or in connection with the Master Assignment Agreement (collectively, the "**Assignment Documents**").  Except as modified hereby, the Assignment Documents are and remain in full force and effect, unmodified, enforceable in accordance with their terms and shall remain in full force and effect unless and until amended or modified by a written agreement (and

only to the extent provided therein) executed hereafter in accordance with the provisions of the Assignment Documents.  In addition, each of Swedbank and LCPI hereby otherwise reserves all of its respective rights, remedies, claims and defenses, available at law or in equity, and under, related to, or in connection with, the Assignment Documents.

7.8.    <u>Lehman Brothers Inc.</u>.  Notwithstanding anything to the contrary contained herein or in any of the agreements, instruments and documents executed and delivered in connection herewith, neither this Agreement nor any of such agreements, instruments and documents are intended to affect in any manner the rights and obligations of Lehman Brothers Inc. under the Repurchase Agreement and the agreements, instruments and documents executed and delivered in connection therewith.

7.9.    <u>Amendment; Waiver</u>.

(a)    This Agreement may only be amended or modified in writing signed by the party against whom enforcement of any such amendment or modification is sought.

(b)    Any party hereto may, by an instrument in writing, waive compliance with any term or provision of this Agreement on the part of such other party hereto.  The waiver by any party hereto of a breach of any term or provision of this Agreement will not be construed as a waiver of any subsequent breach.

7.10.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts (including via facsimile or other electronic means), all of which will be considered one and the same agreement and each of which will be deemed an original.

7.11.    <u>Governing Law</u>.  This Agreement will be governed by the laws of the State of New York (regardless of the laws that might be applicable under principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect and performance.

7.12.    <u>Severability</u>.  If any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Agreement will not be affected thereby, and the parties hereto will use their reasonable efforts to substitute one or more valid, legal and enforceable provisions which insofar as practicable implement the purposes and intent hereof.  To the extent permitted by applicable law, each party waives any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

7.13.    <u>Third Person Beneficiaries</u>.  Except as expressly provided herein, this Agreement is not intended to confer upon any other Person (other than PAMI LLC) any rights or remedies hereunder, except as provided herein with respect to successors and, if approved by the other party pursuant to Section 7.5 above, such permitted assigns.

7.14.    <u>No Strict Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption

or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

7.15.    Survival.  Subject to the limitations set forth in Section 3.4 above, the provisions of this Agreement shall survive the Closing.

7.16.    Jurisdiction.

(a)    Commencing on September 15, 2008, LBHI and certain of its affiliates filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court which are being jointly administered under Case No. 08-13555 (collectively, the "**Bankruptcy Case**").  LBHI is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The parties hereto agree that no action relating to the interpretation and enforcement of this Agreement may be brought in a court that is not located within New York County, the State of New York.  To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over such actions.  Each of the parties hereto agrees that a final judgment in any such action, including all appeals, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the LBHI, LCPI, Swedbank or any other party may otherwise have to bring any action or proceeding to enforce any Loan or any of the documents, instruments or agreements evidencing or securing any Loan or otherwise relating to any Loan against any obligor or its respective properties in the courts of any jurisdiction.

(b)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (A) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any document executed pursuant hereto in any court referred to in paragraph (a) of this subsection; and (B) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 7.4 hereof.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**7.17.    <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS**

**AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR IN ANY WAY RELATING TO THE EXCHANGE OF LOANS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH, WHETHER IN CONTRACT OR IN TORT, AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.**

7.18.  <u>Approvals by Parties</u>.  Unless otherwise provided herein to the contrary, any matter to be approved by any Party hereto shall be subject to the approval of such Party in its sole and absolute discretion.

7.19.  <u>Loan Files</u>.  (a)  Notwithstanding anything to the contrary contained in this Agreement, (i) for the purpose of ascertaining the existence of Loan Files (or portions thereof) in the actual possession of the Lehman Parties, the Lehman Parties shall only be obligated to make commercially reasonable inquiry of those current employees of the commercial real estate group of the Lehman Parties that the Lehman Parties reasonably determine would be likely to possess such Loan Files or portions thereof, and (ii) on the Closing Date, the Lehman Parties shall only be obligated to deliver to Swedbank those Loan Files in the actual possession of the Lehman Parties that were found as the result of the commercially reasonable inquiry set forth in clause (i) above.  From time to time, upon written request of Swedbank (setting forth with reasonable specificity documents that would constitute Loan Files that Swedbank has reason to believe were not included in the delivery of Loan Files at Closing), the Lehman Parties shall make commercially reasonable inquiries and shall promptly deliver to Swedbank any such requested additional Loan Files discovered by the Lehman Parties through such process.  Provided that the Lehman Parties use commercially reasonable efforts to locate any requested additional Loan Files as provided in the preceding sentence and promptly delivers any such later discovered Loan Files to Swedbank as provided herein, the Lehman Parties shall have no obligation or liability for the failure to discover and deliver any such missing documents held by the Lehman Parties to Swedbank.  Notwithstanding anything to the contrary contained in this Agreement, while electronic mail correspondence shall be considered a writing for purposes of this Agreement, electronic mail correspondence shall not be considered a Loan File or be subject to search or delivery by the Lehman Parties as provided in this Section.

(b)  Notwithstanding anything to the contrary contained in this Agreement, (i) for the purpose of ascertaining the existence of Loan Files (or portions thereof) in the actual possession of Swedbank, Swedbank shall only be obligated to make commercially reasonable inquiry of

those current employees of Swedbank that Swedbank reasonably determines would be likely to possess such Loan Files or portions thereof, and (ii) on the Closing Date, Swedbank shall only be obligated to deliver to LBHI those Loan Files in the actual possession of Swedbank that were found as the result of the commercially reasonable inquiry set forth in clause (i) above.  From time to time, upon written request of LBHI (setting forth with reasonable specificity documents that would constitute Loan Files that LBHI has reason to believe were not included in the delivery of Loan Files at Closing), Swedbank shall make commercially reasonable inquiries and shall promptly deliver to LBHI any such requested additional Loan Files discovered by Swedbank through such process.  Provided that Swedbank  uses commercially reasonable efforts to locate any requested additional Loan Files as provided in the preceding sentence and promptly delivers any such later discovered Loan Files to LBHI as provided herein, Swedbank shall have no obligation or liability for the failure to discover and deliver any such missing documents held by Swedbank to LBHI.  Notwithstanding anything to the contrary contained in this Agreement, while electronic mail correspondence shall be considered a writing for purposes of this Agreement, electronic mail correspondence shall not be considered a Loan File or be subject to search or delivery by Swedbank as provided in this Section.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be duly executed as of the day and year first above written.

SWEDBANK AB (PUBL) NEW YORK BRANCH

By: _____
    Name: _____
    Title: _____

By: _____
    Name: _____
    Title: _____

LEHMAN COMMERCIAL PAPER INC., a New York corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
    Name: _____
    Title: _____

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
    Name: _____
    Title: _____

## LIST OF SCHEDULES AND EXHIBITS

Schedule A-1 –    Lehman Loans

Schedule A-2 –    Swedbank Loans

Schedule B    –    List of Loan Documents for Swedbank Loans

Schedule C    –    List of Loan Documents and Modifications for Lehman Loans

Schedule D    –    Allowed Repo Proofs of Claim

Schedule E    –    On-Going    Borrower-Lender    and    Mezzanine    Lender-Mortgage    Lender
Relationships

Schedule F    –    Balances, Escrow Balances and Unfunded Amounts of Loans

Schedule G         Independent Borrower Parties

Exhibit A    –    Mortgage Assets

Exhibit B    –    Form of Bankruptcy Court Approval Order

## SCHEDULE A-1

### Lehman Loans

1.      1407 Broadway Participation Interest in Mortgage Loan

2.      Project Deuce 1888 B-2 Loan and C-2 Loan

**SCHEDULE A-2**

**Swedbank Loans**

1.      1107 Broadway Project A Loan

2.      425 Park Avenue Leasehold Mortgage Loan

3.      Kapalua B-2 Loan and C-2 Loan

4.      Austin-One American Center B Loan

**SCHEDULE B**

**List of Loan Documents for Swedbank Loans**

**[TO COME]**

## SCHEDULE C

**List of Loan Documents for Lehman Loans**

**[TO COME]**

**SCHEDULE D**

**Allowed Repo Proofs of Claim**

| <u>Claim</u> | <u>Creditor Name</u> | <u>Date</u> | <u>Total Claim Value</u> |
|---|---|---|---|
| 67079 | Swedbank AB, New York Branch | 9/20/2010 | $565,870,087.00 |
| 67080 | Swedbank AB, New York Branch | 9/20/2010 | $565,870,087.00 |

**SCHEDULE E**

**On-Going Borrower-Lender and Mezzanine Lender-Mortgage Lender Relationships**

**[TO COME]**

**SCHEDULE F**

**Outstanding Principal Balances, Unpaid Interest, Escrow Balances
and Unfunded Commitment**

Swedbank Loans

| Loan | Principal Balance | Unpaid Interests | Escrow Balance | Unfunded Commitment |
|---|---|---|---|---|
| 1. 1107 Broadway Project A Loan | $_____ | $_____ | $_____ | $_____ |
| 2. 425 Park Mortgage Loan | $_____ | $_____ | $_____ | $_____ |
| 3. Kapalua B2 Loan | $_____ | $_____ | $_____ | $_____ |
| 4. Kapalua C2 Loan | $_____ | $_____ | $_____ | $_____ |
| 5. One American Center B Loan | $_____ | $_____ | $_____ | $_____ |

Lehman Loans

| Loan | Principal Balance | Unpaid Interests | Escrow Balance | Unfunded Commitment |
|---|---|---|---|---|
| 1. Project Deuce 1888 B2 Loan | $_____ | $_____ | $_____ | $_____ |
| 2. Project Deuce 1888 C2 Loan | $_____ | $_____ | $_____ | $_____ |
| 3. 1407 Broadway Participation Interest | $_____ | $_____ | $_____ | $_____ |

**SCHEDULE G**

**Independent Borrower Parties**

**[TO COME]**

**EXHIBIT A**

**MORTGAGE ASSETS**

1.      425 Park Avenue Leasehold Mortgage Loan
2.      610 Lexington Acquisition B Loan, Project B Loan, and Building B Loan
3.      816 Congress Deed of Trust Loan
4.      1100 Vermont Deed of Trust Loan
5.      1107 Broadway Project A Loan
6.      1133 Westchester Acquisition Loan B and Project Loan B
7.      1150 18th Street B Loan
8.      1407 Broadway Leasehold Mortgage Loan
9.      2300 Cropsey Consolidated Acquisition Loan and Project Loan
10.     AGC Philadelphia (Ritz Philly) Construction Loan
11.     Austin-Corporate Loan (Frost Bank) Loan
12.     Austin-One American Center B Loan
13.     Austin-One Congress B Loan
14.     Bachelors Gulch Deed of Trust Loan
15.     Bulletin Building A-2 Loan
16.     Castle Hot Springs Deed of Trust Loan
17.     Cherry Lawn Consolidated Mortgage Loan, Building Loan, and Project Loan
18.     Concordia Deed of Trust Loan
19.     Cumberland Galleria A Loan
20.     East 46th Acquisition Loan Mortgage, Building Loan Mortgage, and Project Loan
        Mortgage
21.     East 49th Consolidated Acquisition Loan Mortgage, Consolidated Building Loan
        Mortgage, and Consolidated Project Loan Mortgage
22.     Four Seasons Bermuda Mortgage Loan
23.     Harbor View Mortgage Loan
24.     Hollins Ferry Mortgage Loan
25.     Howard Building Deed of Trust Loan
26.     Icon Brickell Mortgage Loan
27.     Kapalua B2 Loan, C2 Loan, and Interest in Construction Loan
28.     Kulahani Senior Loan and Subordinate Loan
29.     La Posada Deed of Trust Loan
30.     LeCraw A Loan
31.     Lyons Monarch B Loan
32.     North Beach Tower Construction Loan
33.     Potomac Mortgage Loan
34.     Project Deuce 1888 D-2 Loan
35.     Project Easy Living A-1 Loan
36.     Retreat at Speedway Deed of Trust Loan
37.     Riande-1825 Collins Avenue A-2 Loan
38.     Seaview Square A-3 Loan
39.     SGS Holdings (Sunset Gower) Fee and Leasehold Deed of Trust Loan

40.    Somerhill Farm Credit Line Deed of Trust Loan

41.    South Park Deed of Trust Loan

42.    Storage Deluxe-47th Avenue Building Loan Leasehold Mortgage, Supplemental Building Loan Leasehold Mortgage, and Project Loan Leasehold Mortgage

43.    Storage Deluxe-481 Grand Consolidated Mortgage Loan

44.    Storage Deluxe-Cromwell Building Loan

45.    Storage Deluxe-Pitkin Building Loan

46.    Storage Deluxe-Shelton Open-Ended Building Loan

47.    Storage Deluxe-Stanley Acquisition Loan, Building Loan, and Project Loan

48.    Storage Deluxe-White Plains Building Loan

49.    Storage Deluxe-Van Buren Acquisition Loan, Project Loan, Building Loan, and Supplemental Building Loan

50.    Telluride Construction Loan

51.    Trump Hollywood B Loan

52.    Williamsburg Building Loan, Project Loan, Acquisition Loan, and Junior Building Loan

## EXHIBIT B

**FORM OF BANKRUPTCY COURT APPROVAL ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                    :

In re                                :        Chapter 11 Case No.
                                    :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :        08-13555 (JMP)
                                    :

            Debtors.               :        (Jointly Administered)
                                    :

------------------------------------------------------------------x

**ORDER PURSUANT TO SECTION 105(a)
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE
9019(b) AUTHORIZING AND APPROVING A SETTLEMENT
AND COMPROMISE AMONG LEHMAN BROTHERS HOLDINGS INC.,
LEHMAN COMMERCIAL PAPER INC. AND SWEDBANK AB, NEW YORK BRANCH**

Upon the motion (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI")

and Lehman Commercial Paper Inc. ("LCPI"), for an order, pursuant to section 105(a) of title 11

of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing and approving a settlement with

Swedbank AB, New York Branch ("Swedbank") on the terms set forth in a Settlement

Agreement,[1] as more fully set forth in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the United States

Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to Swedbank; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635]; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBHI and LCPI, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, the Settlement Agreement is approved, and LBHI and LCPI are each duly authorized to (i) consummate all of the transactions contemplated thereby and (ii) execute and deliver such documents and instruments and to take such other actions as may be reasonably necessary to consummate the transactions contemplated by the Settlement Agreement, it being understood that any actions described in this paragraph taken by LBHI, LCPI or any of the affiliates of LBHI or LCPI may be taken without the necessity of any further Court proceedings or approval and shall be conclusive and binding in all respects on all parties in interest in these cases; and it is further

ORDERED that, upon and subject to the terms and conditions set forth in the Settlement Agreement, with respect to Claim No. 67080 filed by Swedbank against LCPI and Claim No. 67079 filed by Swedbank against LBHI (collectively, the "Allowed Repo Proofs of Claim") from and after the Closing Date (as defined in the Settlement Agreement) in satisfaction

in full of such proofs of claim, Swedbank will have an allowed, non-priority, non-subordinated

unsecured claim against each of LCPI and LBHI in their respective chapter 11 cases in the

amount of $325,000,000 (the "Settlement Amount"); provided, however, that the aggregate

recovery of Swedbank in respect of the Allowed Repo Proofs of Claim shall not exceed the

Settlement Amount and that, for the avoidance of doubt, the claim set forth in each of the

Allowed Repo Proofs of Claim shall have the same treatment as other claims within its class

under the plan confirmed by the Court in the chapter 11 cases of LCPI and LBHI, as applicable;

and it is further;

ORDERED that the Settlement Agreement and any related agreements,

documents or other instruments may be modified, amended or supplemented by the parties

thereto, in a writing signed by such parties, and in accordance with the terms thereof, without

further order of the Court, *provided* that any such modification, amendment or supplement does

not have a material adverse effect on the Debtors' estates; and it is further

ORDERED that any and all claims, defenses, rights of setoff, debt, liens, losses,

demands, damages, costs, and causes of action of whatever nature in connection with or relating

to the Repurchase Agreement, the Mortgage Assets, the Settlement Agreement or any related

transaction by and among the Debtors and their affiliates shall be expressly reserved and not

affected by entry into the Settlement Agreement or consummation of the transactions

contemplated thereunder pursuant to section 2.9(f) of the Settlement Agreement; and it is further

ORDERED that the Mortgage Assets are not and were not property of LBHI's

estate or LCPI's estate; and it is further

ORDERED that neither LBHI nor LCPI have assumed or assumed and assigned

nor will assume or assume and assign the Repurchase Agreement pursuant to the Bankruptcy

Code, including section 365 thereof, in connection herewith or with the Settlement Agreement or

any of the transactions contemplated thereby; and it is further

    ORDERED that, Swedbank is the owner of the Mortgage Assets, other than the

Swedbank Loans upon the closing of the Settlement Agreement; and it is further

    ORDERED that the Bankruptcy Court retains jurisdiction to enforce the

Settlement Agreement and any disputes arising thereunder.

Dated: February __, 2011
  New York, New York


      _____
      UNITED STATES BANKRUPTCY JUDGE