KIRKLAND & ELLIS LLP
Citigroup Center
601 Lexington Avenue
New York, NY  10022-4611
(212) 446-4800 Telephone
(212) 446-4900 Facsimile

KIRKLAND & ELLIS LLP
James H. M. Sprayregen, P.C.
David R. Seligman, P.C.
Andrew R. McGaan, P.C.
300 North LaSalle Street
Chicago, IL  60654-3406
(312) 862-2000 Telephone
(312) 862-2200 Facsimile

*Counsel for Plaintiff Pulsar Re, Ltd.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| **LEHMAN BROTHERS HOLDINGS, INC., et al.** | |
| Debtors. | **Chapter 11** |
| **PULSAR RE, LTD.,** | **Case Number 08-13555 (JMP)** |
| | **Jointly Administered** |
| Plaintiff, | |
| v. | **Adversary Case No.:** |
| **LEHMAN BROTHERS HOLDINGS, INC. and LEHMAN COMMERCIAL PAPER INC.** | |
| Defendants. | |

**ADVERSARY COMPLAINT**

Plaintiff Pulsar Re, Ltd. ("Pulsar") hereby lodges this Adversary Complaint for imposition of a constructive trust against Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI") (collectively, and together with Lehman Brothers, Inc., "Lehman"). At the time of LBHI's bankruptcy filing, Pulsar had pledged approximately $450 million to Lehman's Bermuda reinsurance affiliate, Lehman Re Ltd. ("Lehman Re") for purposes of collateralizing Pulsar's reinsurance obligations to Lehman Re. But without permission and acting outside of any contract between the parties, Lehman misappropriated all of these funds (the "Pulsar Cash Collateral") as part of its plan to provide financing to LBHI in its attempt to improve its balance sheet by moving illiquid assets to subsidiaries and other affiliates. The Pulsar Cash Collateral is not part of the Lehman estate and should be placed in trust for Pulsar.

## BACKGROUND

1. Pulsar entered into a series of agreements with Lehman Re whereby Lehman Re ceded approximately $1 billion in reinsurance risk to Pulsar. Pursuant to these agreements, Pulsar pledged to Lehman Re approximately $450 million in cash securing Pulsar's reinsurance obligations to Lehman Re. In turn, both Lehman Re and Lehman Brothers Inc. ("LBI") promised Pulsar that the Pulsar Cash Collateral would be kept in a segregated custodial account at LBI, that the Pulsar Cash Collateral would be held there solely to secure Pulsar's reinsurance obligations to Lehman Re, that any cash amounts deposited into the custodial account would remain in cash and not be converted into any other assets, and that any unused or excess portion of the Pulsar Cash Collateral would periodically be returned to Pulsar. Pulsar provided the Pulsar Cash Collateral directly to Lehman Re with the expectation and understanding that the Pulsar Cash Collateral would be deposited in the custodial account at LBI held by Lehman Re and would only be held in cash. Upon information and belief, Lehman Re never even opened a custodial account at LBI for the Pulsar Cash Collateral, nor did Lehman Re's directors and

2

officers (many of whom were LBI employees) ever even attempt to place the Pulsar Cash Collateral into LBI's custody. Instead, as Pulsar learned after Lehman's bankruptcy filings forced Lehman Re into liquidation, all of the Pulsar Cash Collateral was misappropriated by Lehman through a one-sided repurchase transaction backed by illiquid and materially overvalued assets.

2. As the Court-appointed examiner has found, in January 2008, Lehman Chairman and Chief Executive Officer, Robert S. Fuld, Jr., "ordered a firm-wide deleveraging strategy, hoping to reduce the firm's positions in commercial and residential real estate and leveraged loans in particular by half." (03/11/10 Examiner's Report, Vol. 3, at 736-37.) As part of its deleveraging strategy, Lehman inappropriately employed repurchase transactions as vehicles to manipulate its balance sheet by falsely improving its reported net leverage. (*Id.* at Vol. 3 at 907-913.) Essentially, Lehman "funded itself through the short-term repo markets and had to borrow tens or hundreds of million of dollars in those markets each day from counterparties to be able to open for business." (*Id.* at Vol. 1, at 3.)

3. Although it was unknown to Pulsar at the time, Lehman's abuse of repurchase agreements throughout 2008 to create the false appearance of financial health was rampant. These abuses took multiple forms: inflated investment grade ratings, improper valuations, and the use of inappropriate collateral. For example, according to a senior Treasury official in April 2008, Lehman "securitized their illiquid [mortgage portfolio] and got a rating agency to say that some large fraction of it was investment grade," in order to "game" the Federal Reserve into giving Lehman "tens of billions of dollars[.]" (April 15, 2008 email from Assistant Secretary for Economic Policy Phillip Swagel, Financial Crisis Inquiry Commission JP Morgan Chronology Tab 3, available online at http://www.fcic.gov/hearings/pdfs/2010-0901-JP-Morgan-Chronology.pdf) Others have testified that Lehman pledged securities under the repurchase

3

agreements that were "illiquid, structured debt instruments that appeared to have been assigned overstated values." (Financial Crisis Inquiry Commission: *Hearing on Examining the Causes of the Current Financial and Economic Crisis of the United States and of the Collapse of Lehman Brothers* (2010) (sworn statement of Barry L. Zubrow, Chief Risk Officer of JPMorgan Chase & Co., at 5))

4.      Consistent with this pattern of abuse, Lehman used a one-sided repurchase agreement between Lehman Re and LCPI as a vehicle to loot cash from Lehman Re through transactions that were not conducted at arm's length. The vast majority of the cash taken from Lehman Re at the time of LBHI's chapter 11 filing (approximately $450 million out of the $718 million transferred from Lehman Re to LCPI or LBHI) was the Pulsar Cash Collateral. All of the Pulsar Cash Collateral was siphoned out of Lehman Re by LCPI under the guise of a repurchase agreement secured by assets worth far less than the inflated market values assigned to them by Lehman personnel. The bulk of the assets were delinquent commercial loans secured by stalled, incomplete, and underfunded real estate developments. The actual fair market values of these assets were not only were woefully below the $718 million transferred to Lehman in the repurchase transaction, but were also far below the approximately $450 million in Pulsar Cash Collateral.

5.      Even though Lehman Re was regulated by the Bermuda Monetary Authority, and was supposed to maintain certain separate operations pursuant to Bermuda law, Lehman Re was merely an extension of the Lehman enterprise; a conduit for cash with no meaningful separation from its parent, LBHI, or affiliates LCPI and LBI. Lehman Re's President, its Vice Presidents, and most of its Directors were all Lehman employees. In addition, all of Lehman Re's back-office support was provided by employees of Lehman's New York offices; at all relevant times, Lehman Re only had a single part-time employee in Bermuda. Moreover, when it was later

revealed that the Pulsar Cash Collateral was being used in repurchase transactions (which Lehman represented were fully collateralized), Lehman Re directors repeatedly responded to Pulsar's requests for additional information by responding that they would need to "check with Lehman Treasury."

6. As such, all of the Lehman employees who repeatedly promised Pulsar that the Pulsar Cash Collateral would be kept in a custodial account to be used only for specified purposes under specified circumstances knew or had reason to know that Lehman had no intention of keeping its promise. They also knew or had reason to know that the diversion of the Pulsar Cash Collateral to LCPI was a misappropriation of funds that had been designated and provided specifically and exclusively to secure Pulsar's reinsurance obligations. The Pulsar Cash Collateral should never have been transferred to other Lehman entities for any purpose other than a deposit into an LBI custodial account as previously agreed, and therefore these funds are wrongfully in Lehman's possession and are not property of the Lehman estate.

7. Accordingly, the Pulsar Cash Collateral should be disgorged from Lehman through the imposition of a constructive trust.

## JURISDICTION AND VENUE

8. This adversary proceeding is commenced pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 7001.

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), as well as the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

10. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (H) and (O).

5

## VENUE

11. Venue is proper pursuant to 28 U.S.C § 1409(a) because this proceeding is related to Case Nos. 08-13555 and 08-13900, which were brought by LBHI and LCPI, respectively, pursuant to the Bankruptcy Code and are currently pending in this Court.

## THE PARTIES

12. Plaintiff Pulsar Re, Ltd. is a Bermuda exempt company incorporated in February 2006 for the purpose of writing reinsurance. Pulsar is registered with the Bermuda Monetary Authority as a Class 3 reinsurance company. Its principal place of business is located at Williams House, 2nd Floor, 20 Reid Street, Hamilton, Bermuda.

13. Defendant LBHI is a Delaware corporation with its principal executive office located at 745 Seventh Avenue, New York, New York 10019. LBHI is the direct parent of Lehman Re and LBI, and the indirect parent of LCPI. On September 15, 2008, LBHI and certain related entities commenced a bankruptcy proceeding under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555.

14. Defendant LCPI is a New York corporation with its principal executive office located at 745 Seventh Avenue, New York, New York 10019. LCPI was engaged in the business of administering, syndicating and trading commercial loans among the various Lehman entities. It is an indirect subsidiary of LBHI. On October 5, 2008, LCPI and certain related entities commenced a bankruptcy proceeding under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13900.

## FACTUAL BACKGROUND

### A. PULSAR'S REINSURANCE RELATIONSHIP WITH LEHMAN RE

15. Lehman Re is a Bermuda corporation and direct wholly-owned subsidiary of LBHI which did business as a reinsurance and financial services company. Lehman Re was

registered with the Bermuda Monetary Authority as a Class 4 reinsurer who during much of 2008 was rated A+ by A.M. Best.

16. Pulsar had an ongoing business relationship with Lehman Re. This relationship was formalized through the March 28, 2007 Quota Share Retrocessional Agreement ("QSRA") between Pulsar and Lehman Re. A true and correct copy of the QSRA is attached hereto as Exhibit 1.

17. Under the terms of the QSRA, Lehman Re agreed to cede certain reinsurance risks to Pulsar in exchange for a portion of the insurance premiums paid on the insurance policies. (*See* Ex. 1 QSRA, Arts. I-III, VII.) Lehman Re ceded several hundred insurance contracts to Pulsar, with an aggregate covered amount of approximately $1 billion.

18. Under the QSRA, Pulsar was required to post collateral in the amount of at least 50% of the total risk it assumed under the ceded insurance contracts. (*Id*. at Art. VIII.) The purpose of the collateral requirement was to ensure Pulsar's ability to meet its reinsurance obligations and liabilities under the QSRA. (*Id*. at 1.)

19. Pulsar and Lehman Re agreed that: "The Collateral Requirement amount stated on the most recent Reinsurance Schedule shall be maintained at all times in the [Cash Collateral Account] until all of the Outstanding Reinsurer Obligations under this Agreement have been fully and finally released." (*Id*. at Art. IX.)

20. Concurrent with the QSRA, Pulsar, Lehman Re, and LBI entered into a collateral agreement which set forth the terms and conditions relating to the maintenance and safekeeping of the Pulsar Cash Collateral (the "Collateral Agreement"). A true and authentic copy of the executed Collateral Agreement is attached hereto as Exhibit 2. Brett Houghton, a Lehman Re vice president and LBI employee, executed the Collateral Agreement on behalf of LBI. (*See* Ex. 2, Collateral Agreement, p. 17.)

7

21.     Section 1.11(g) of the Collateral Agreement provides that LBI was to serve as custodian of the Pulsar Cash Collateral. LBI explicitly acknowledged that it was to hold the Pulsar Cash Collateral "solely for the benefit of Lehman [Re] for purposes of discharging any outstanding obligations of [Pulsar] to Lehman [Re] pursuant to the terms of the [QSRA]." (*Id.* at § 1.11(g).)

22.     Section 2.1 of the Collateral Agreement provides that, as Custodian, LBI was to hold the Pulsar Cash Collateral in the "Cash Collateral Account . . . for the purpose of (i) perfecting Lehman [Re]'s security interest in the Collateral . . . and (ii) disposing of the Collateral for the benefit of Lehman [Re] *only* to discharge outstanding obligations of [Pulsar] to Lehman [Re] in accordance with the terms and conditions of the [QSRA] and this Agreement." (*Id.* at § 2.1 (emphasis added).)

23.     Under Section 2.6 of the Collateral Agreement, LBI agreed to transfer funds out of the Cash Collateral Account "***only in accordance with the written instructions of Lehman [Re] in light of the amounts owing to Lehman [Re] pursuant to the express terms of the [QSRA] and this Agreement.***" (*Id.* at § 2.6 (emphasis added).)

24.     Thus, in accordance with the express terms of the QSRA and the Collateral Agreement, the Pulsar Cash Collateral belonged to Pulsar at all times, and could only be used or disposed of by Lehman Re and/or LBI to discharge Pulsar's outstanding obligations to Lehman Re under the QSRA and the Collateral Agreement.

25.     As of September 2008, Pulsar had posted approximately $450 million in Pulsar Cash Collateral for the benefit of Lehman Re. A true and correct summary of Pulsar's payments of cash collateral is attached hereto as Exhibit 3. Upon information and belief, none of the Pulsar Cash Collateral was ever transferred to LBI as required by the Collateral Agreement, but

8

instead remained in Lehman Re's bank account, where it was swept out on a nightly basis to Lehman accounts.

### B. DEFENDANTS' MISAPPROPRIATION OF PULSAR'S CASH COLLATERAL

26. On July 9, 1999, LBI, LCPI and Lehman Re entered into a Master Repurchase Agreement ("MRA"). A true and authentic copy of the MRA is attached hereto as Exhibit 4. LCPI used the MRA as a vehicle to obtain cash from Lehman Re in exchange for securities or other less liquid assets. (*See* Ex. 4, MRA, § 1.)

27. Lehman Re, in turn, had the right under the MRA to sell the assets back to LCPI at a date certain or on demand in exchange for the cash it had transferred to LCPI. (*Id*.)

28. The MRA provided Lehman Re with certain protections, including adequate collateralization of its cash and that the assets used as collateral would be of a certain quality; yet due to the one-sided and non-arm's-length nature of the relationship between Lehman and Lehman Re, the directors and officers of Lehman Re had no intention of ensuring that Lehman lived up to its obligations to Lehman Re under the MRA.

29. At some point between the execution of the QSRA and the Collateral Agreement in March 2007 and the spring of 2008, Lehman began using the Pulsar Cash Collateral in repurchase transactions.

30. Upon information and belief, prior to LBHI's chapter 11 filing on September 15, 2008, Lehman Re had transferred approximately $718 million in cash, including all of the Pulsar Cash Collateral, to LCPI under the MRA.

31. On September 17, 2008, following LBHI's chapter 11 filing, Lehman Re declared an event of default by LCPI under the terms of the MRA. A true and authentic copy of Lehman

9

Re's September 17, 2008 letter to Lehman (the "Default Notice Letter") is attached hereto as Exhibit 5.

32.     LCPI has not contested the validity of the Default Notice Letter or the event of default identified therein.

33.     As a result of LCPI's default, Lehman Re directed Bank of New York, the custodian of the repurchased assets, to place such assets in Lehman Re's name.

34.     Pulsar subsequently learned that the collateral acquired under the MRA comprised 853 residential whole loan mortgages and 23 commercial whole loans (collectively, the "Loans").

35.     Upon information and belief, LCPI had marked the value of the Loans in excess of $900 million without any justification for doing so.  Upon information and belief, instead, the collective market value of the Loans was at that time only approximately $100 million; significantly less than the $718 million in cash that Lehman Re exchanged for them, significantly less than the Pulsar Cash Collateral, and significantly less than the value marked by LCPI. Moreover, the loan documentation that Lehman provided to Pulsar was incomplete, which materially hampered Lehman Re's ability to realize any value from the Loans.

36.     Upon information and belief, LCPI transferred the Loans to Lehman Re under the MRA in exchange for the Pulsar Cash Collateral and other funds, despite the fact that Lehman knew the Loans were in many instances non-performing, illiquid and delinquent (or were highly likely to become so in the immediate future), and were secured by stalled, incomplete, and underfunded real estate developments.  Lehman knew that the value of these Loans was substantially lower than the value of the cash received.

37.     Lehman acted without Pulsar's consent in order to obtain the use of the Pulsar Cash Collateral for its own benefit, while at the same time divesting itself of loans that were of

10

limited and questionable value in furtherance of Lehman's scheme to artificially inflate its balance sheet.

38.     Lehman knew that the Pulsar Cash Collateral belonged to Pulsar, not Lehman Re, and that, pursuant to the terms of the QSRA and the Collateral Agreement, only Lehman Re could use or dispose of the Pulsar Cash Collateral and only for the limited purpose of discharging Pulsar's obligations under the QSRA. Lehman also knew that it had no right, contractual or otherwise, to use the Pulsar Cash Collateral in repurchase transactions or to convert it into any instrument other than its original cash form. Further, Lehman knew that in using the Pulsar Cash Collateral to purchase the Loans, the Pulsar Cash Collateral was not being disposed of to discharge Pulsar's obligations under the QSRA and the Collateral Agreement. Moreover, Pulsar had met its obligations under the QSRA at all relevant times, and Lehman has never contended otherwise; therefore, neither Lehman Re nor Lehman had recourse to the Pulsar Cash Collateral.

### C.    DEFENDANTS' MISREPRESENTATIONS WITH RESPECT TO THE CASH COLLATERAL

39.     During the time period between the execution of the QSRA and the Collateral Agreement in March 2007 and the spring of 2008, Lehman misrepresented, omitted and concealed from Pulsar the fact that the Pulsar Cash Collateral had been used in repurchase transactions.

40.     During this time period, Lehman sent Pulsar electronic transmittals of collateral statements (the "Collateral Statements") falsely showing that the Pulsar Cash Collateral was held in cash and generating interest as agreed. True and authentic copies of the Collateral Statements are attached hereto as Exhibit 6.

11

41. During this time period, Lehman also transmitted a series of false emails to Pulsar, the purpose of which was to mislead Pulsar into believing that the Pulsar Cash Collateral had been placed into a segregated account.

42. For example, on April 2, 2008, William Messmore, a Lehman employee who also held a position at Lehman Re, sent an electronic mail (the "April 2 Email") to Charlie Vaughan and Rick Montgomerie of Pulsar and David O'Brien of Lehman, stating that the Pulsar Cash Collateral was "segregated at Lehman Re to secure the obligations of the Counterparty (Pulsar). Collateral is earmarked for discharging outstanding obligations of Pulsar to Lehman [Re] according to [the QSRA]." A true and authentic copy of the April 2 Email is attached hereto as Exhibit 7.

43. On April 22, 2008, representatives of Pulsar and Lehman Re met in Bermuda as part of a due diligence meeting requested by Pulsar to discuss ongoing operations and their future relationship (the "April 2008 Meeting"). The attendees included Douglas McBeth, the head of Lehman Brothers Inc.'s Insurance Products Group, who was also the CEO and a director of Lehman Re.

44. At the April 2008 Meeting, McBeth finally informed Pulsar representatives that Lehman Re had entered into a number of reverse repurchase transactions with Lehman to exchange cash for Lehman assets. McBeth revealed that the Pulsar Cash Collateral was used to fund these reverse repurchase transactions. However, McBeth assured Pulsar that the repurchase transactions were fully collateralized, when in fact the underlying collateral could not be deemed to be fully collateralized given the false and overstated valuations Lehman assigned to the underlying properties. McBeth also attempted to create the impression that the repurchase agreement was conducted at arm's-length, on market terms, when, as Pulsar ultimately learned, it clearly was not.

45. Pulsar diligently attempted to obtain additional knowledge about the repurchase transactions. For instance, on May 8, 2008, Pulsar sought confirmation that the Pulsar Cash Collateral was "maintained in 'segregated accounts' which were controlled by [Lehman Re] and not accessible by Lehman Bros." A true and authentic copy of the May 8, 2008 email is attached hereto as Exhibit 8.

46. On May 14, 2008, Messmore sent a response (the "May 14 Email") to Vaughan, Montgomerie and Peter Vloedman of Pulsar stating that the Pulsar Cash Collateral was "invested in a reverse repo position with LCPI that is fully collateralized." A true and authentic copy of the May 14 Email is attached hereto as Exhibit 9.

47. On May 15, 2008, Messmore sent an electronic mail (the "May 15 Email") to Vaughan and Montgomerie, and copying senior Lehman personnel McBeth and O'Brien, again representing that the Pulsar Cash Collateral was "invested in a reverse repo position with LCPI that is fully collateralized." Messmore further affirmed that "Lehman Holdings does not have the legal right to claim Lehman Re's collateral to extinguish Lehman Holdings' own obligations." A true and authentic copy of the May 15 Email is attached hereto as Exhibit 10.

48. The statements made in the Collateral Statements, the April 2 Email, the April 2008 Meeting, the May 14 Email and the May 15 Email were false when made, in that they were intended to give and did give the false and misleading impression that the Pulsar Cash Collateral had been, and continued to be, earmarked for the sole purpose of discharging Pulsar's obligations under the QSRA and was fully collateralized.

49. At the time Lehman made these statements to Pulsar, Lehman knew that the Pulsar Cash Collateral was not earmarked for the purpose of discharging Pulsar's obligations, nor was it fully collateralized.

13

50. Lehman sent the Collateral Statements, the April 2 Email, the May 14 Email and the May 15 Email, and made the statements at the April 2008 Meeting with the intention that Pulsar would rely on the statements contained therein as an assurance of the safety of the Pulsar Cash Collateral. Pulsar did in fact reasonably rely on these statements.

## COUNT I - CONSTRUCTIVE TRUST
**(Lehman Defendants)**

51. Plaintiff realleges and incorporates Paragraphs 1–50 as if set forth fully herein.

52. Though Pulsar had a contractual relationship with Lehman Re, it had no such relationship with Lehman. Instead, Pulsar relied on the ongoing assurances Lehman employees gave to Pulsar regarding the safety and security of its Cash Collateral. Lehman's assurances that Pulsar's Cash Collateral was held in segregated accounts and/or fully collateralized and secured by Lehman, among other things, created a relationship of trust and confidence between Pulsar and Lehman.

53. Lehman Re was required to cause the Pulsar Cash Collateral to be deposited into the segregated account established under the Collateral Agreement. Under the Collateral Agreement, LBI was obligated to take custody of the Pulsar Cash Collateral and hold it as security for Pulsar's obligations. Specifically, the Pulsar Cash Collateral was required to be held in a custodial account, which was to be maintained in cash, for the benefit of Lehman Re, solely for the express purpose of discharging Pulsar's obligations to Lehman Re under the QSRA.

54. Pursuant to the QSRA and the Collateral Agreement, Pulsar pledged the Pulsar Cash Collateral to Lehman Re.

55. As a result of Lehman's complete control and manipulation of Lehman Re, LBHI, LCPI and LBI knew or had reason to know that the Pulsar Cash Collateral was to be held in a custodial account for Pulsar's benefit, as required under the Collateral Agreement. However, the

Lehman entities, acting in concert, misappropriated the Pulsar Cash Collateral and converted it for Lehman's own benefit.

56. Through the Lehman entities' wrongful actions, LCPI took possession of the Pulsar Cash Collateral. Upon information and belief, some or all of the Pulsar Cash Collateral may have also been transferred to other Lehman entities, including, but not limited to, LBHI.

57. Because the Pulsar Cash Collateral was required to be held in a custodial account for the benefit of Lehman Re, Lehman had no right to these funds. Therefore, they are not property of the Lehman estate.

58. Lehman has been and continues to be unjustly enriched by retaining possession of the Pulsar Cash Collateral.

59. The Court should exercise its equitable power to impose a constructive trust for the benefit of Pulsar over the Pulsar Cash Collateral and any other cash or assets that Lehman has acquired through its use.

### **PRAYER FOR RELIEF**

WHEREFORE, Pulsar respectfully prays that this Court enter a judgment in favor of Pulsar, and: (1) impose a constructive trust for the benefit of Pulsar over the Pulsar Cash Collateral and any other cash or assets that Lehman has acquired through its use, plus any interest earned thereon; (2) award Pulsar its costs, including reasonable attorneys' fees; and (3) grant Pulsar such other and further relief as the Court deems necessary or appropriate.

15

Dated: January 26, 2011    Respectfully submitted,
      New York, New York

/s/ Andrew R. McGaan, P.C.
James H. M. Sprayregen, P.C.
Andrew R. McGaan, P.C.
David R. Seligman, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654-3406
(312) 862-2000 Telephone
(312) 862-2200 Facsimile

*Counsel for Plaintiff Pulsar Re, Ltd.*