**QUOTA SHARE RETROCESSIONAL AGREEMENT**

between

**LEHMAN RE LTD.**

and

**PULSAR RE, LTD.**

This QUOTA SHARE RETROCESSIONAL AGREEMENT (this "Agreement"), is made on March 29, 2007 and effective as of December 1, 2005 (the "Effective Date"), by and between PULSAR RE, LTD, a Bermuda company (the "Reinsurer"), and LEHMAN RE LTD., a Bermuda company (the "Company").

**W I T N E S S E T H:**

WHEREAS, the Company and the Reinsurer wish to enter into a quota share retrocessional arrangement pursuant to which the Company will cede to the Reinsurer, and the Reinsurer will assume from the Company, on a facultative basis, a quota share of the Company's liabilities arising from certain of the Company's reinsurance contracts upon the terms and subject to the conditions described below; and

WHEREAS, but for the Reinsurer's obligations to accept and reinsure the cessions by the Company under this Agreement and provide collateral for the Reinsurer's obligations and liabilities in accordance with the terms and conditions of this Agreement, the Company would not otherwise agree to insure or reinsure the risks ceded to the Reinsurer hereunder; and

WHEREAS, the Company and the Reinsurer agree to terminate the Financial Counterparty Contract and Collateral Security and Control Agreement initially agreed March 28, 2006 and amended from time to time and further agree to treat all amounts paid and all Collateral pledged and held under the prior agreements to be transferred to this Agreement and the Collateral Security and Control Agreement (defined herein and attached hereto) and treated as amounts paid and Collateral under this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and of the mutual benefits herein provided, the Company and the Reinsurer hereby agree as follows.

**ARTICLE I**
**CLASSES OF BUSINESS REINSURED**

This Agreement shall cover liability ceded to the Reinsurer under specified Contracts (as defined below) written by the Company and ceded to the Reinsurer in accordance with

1

Article II (each such accepted Contract, a "<u>Subject Contract</u>"). Each and every Subject Contract shall be listed on a schedule (a form of which is attached as <u>Appendix A</u> hereto) to be provided by the Company (in accordance with Article X hereto) (the "<u>Reinsurance Schedule</u>"). The terms "<u>Contract(s)</u>" shall mean any and all binders, policies, certificates, agreements and contracts of reinsurance issued, accepted or held, covered provisionally or otherwise in the name of the Company.

**ARTICLE II**
**REINSURANCE CLAUSE**

Commencing on the Effective Date, the Reinsurer, from time to time, will notify the Company in writing (each a "<u>Contract Submission</u>") of all potential Contracts which the Reinsurer offers to the Company for its participation and pursuant to which the Reinsurer intends to reinsure the Company's liability thereunder in accordance with this Agreement. Among other details as may be requested by the Company for each Contract Submission, the Reinsurer shall provide the following information: Contract documentation, the original cedent name, Contract limit (including any reinstatement limit(s)), risk type, term of the Contract, attachment point/trigger, rate on line, brokerage, federal excise tax (FET)/other taxes and gross premium.

The Company will respond in writing, within three (3) Business Days of receiving a Contract Submission, to confirm or reject the Contract Submission. Acceptance of a Contract Submission shall at all times be in the sole discretion of the Company. Upon acceptance of a Contract Submission, the Company shall incorporate such Contract into the Reinsurance Schedule detailing the Limit (as defined below) and Company Premium Amount (as defined in Article VII). From the point of acceptance, the Company shall incorporate such Contract into the Collateral Requirement calculation in accordance with Article VIII of this Agreement.

The return by the Company to the Reinsurer of an executed Contract Submission signed by a duly authorized representative of the Company shall be deemed acceptance of such corresponding Contract Submission for coverage hereunder as a Subject Contract. The Reinsurer agrees to post Collateral pursuant to Article VIII of this Agreement and pay Ceding Commissions and Leverage Fees to the Company pursuant to Article VII with respect to all such Subject Contracts. All Subject Contracts accepted by the Company pursuant to an executed Contract Submission shall then be added to the list of Subject Contracts on the Reinsurance Schedule to be provided by the Company in accordance with Article X hereto.

"Business Day" as used in this Agreement shall be any day when commercial banks in both New York and Bermuda are open for business.

**ARTICLE III**
**REINSURANCE LIMITS**

The Reinsurer shall indemnify the Company for the Company's one hundred percent

(100%) share (the "Reinsurer's Share") of Loss (the "Limit" and reinstatement limits if any) under the Subject Contracts, Loss Adjustment Expenses (as defined in Article XII hereto) and any extra-contractual obligations or losses in excess of policy limits (each as may be defined and covered pursuant to the terms and conditions of the Subject Contracts) payable by the Company under the Subject Contracts (collectively, "Losses").

**ARTICLE IV**
**TERM AND CANCELLATION**

This Agreement shall be effective from 12:01 a.m. Standard Time, December 1, 2005, and shall be continuously in force until terminated in accordance with the terms hereof. "Standard Time" shall follow the time specified in the Subject Contracts or, in the absence of any time specified under the Subject Contracts, the time as may be determined by the Company in its reasonable discretion pursuant to the terms and conditions of the Subject Contracts. If this Agreement expires while an event covered under the Subject Contracts is in progress, the Reinsurer's liability hereunder shall, subject to the other terms and conditions of this Agreement, be determined as if the entire event had occurred prior to the expiration of this Agreement acting in good faith and a commercially reasonable manner.

In the event of a termination of this Agreement by either party, the Company and the Reinsurer shall remain obligated pursuant to the terms of this Agreement until the final disposition of all of the Company's obligations and liabilities under the Subject Contracts and this Agreement and the final disposition of all of the Reinsurer's obligations and liabilities under this Agreement.

Notwithstanding anything to the contrary, any (i) failure by the Reinsurer to post the Collateral Requirement in accordance with Articles VIII and IX hereto, (ii) breach of the Collateral Security and Control Agreement among the Company, Reinsurer and Lehman Brothers, Inc. as the Custodian (the "Security Agreement", an executed copy of which is attached as Appendix B to this Agreement) by the Reinsurer (beyond any applicable cure or remedy period set forth therein), or (iii) failure by the Reinsurer to pay any Losses under this Agreement within five (5) Business Days of receipt by the Reinsurer of a Calculation Report in accordance with Article X hereto, shall provide the Company the opportunity to terminate this Agreement effective immediately and shall provide the Company the right and option to set off amounts due or payable by the Company to the Reinsurer against any amounts payable by the Reinsurer to the Company (whether or not matured or contingent and whether or not arising under this Agreement or any other agreement between the Company and the Reinsurer, regardless of currency, place of payment or booking office of the obligation). If the amount of the obligations being set off is unascertained, the Company may determine such amount after acting in good faith and using commercially reasonable procedures to determine an amount payable to the Company by the Reinsurer and providing notification of the Company's accounting to the Reinsurer once the amount is ascertained, and upon any such failure of the Reinsurer as

3

set forth in this paragraph, any obligation of the Company to make any payments under this Agreement shall be cancelled immediately.

**ARTICLE V**
**TERRITORY**

This Agreement shall follow the territorial scope of the Subject Contracts.

**ARTICLE VI**
**EXCLUSIONS**

This Agreement shall be subject to the exclusions contained in the Subject Contracts.

**ARTICLE VII**
**PREMIUM, COMMISSION AND OTHER DEDUCTIONS**

The Company shall keep a record of each and every Subject Contract and shall cede to the Reinsurer the Reinsurer's Share of all gross premiums written by the Company in respect of such Subject Contracts. The Reinsurer's Share of gross premiums after deducting any ceding commission (under the Subject Contracts), return premiums, brokerage, no claims bonuses, taxes/federal excise taxes and any other amounts for each Subject Contract shall be specified in the Reinsurance Schedule as Company Premium Amounts. The Company shall remit Company Premium Amounts to the Reinsurer periodically pursuant to Article X.

The Reinsurer shall pay the Company a monthly Ceding Commission in United States Dollars ("USD") equal to $1/12^{th}$ of the Total Portfolio Original Limit Amount (as defined below) multiplied by the weighted average rate determined per the table below:

| Total Portfolio Original Limit Amount | Basis Points |
|---|---|
| First USD 100,000,000 | 50 |
| Next USD 100,000,000 | 40 |
| Amounts in excess of USD 200,000,000 | 25 |

In addition, the Reinsurer shall pay the Company monthly "Leverage Fees" in an amount calculated as 1/12th of 0.10% multiplied by the Leverage Exposure. "Leverage Exposure" means the average over the corresponding month of: (i) the Total Portfolio Original Limit Amount, (ii) minus the total amount of collateral posted by the Reinsurer pursuant to Articles VIII and IX, (iii) plus the Outstanding Reinsurer Obligations (as defined in Article VIII hereto).

Ceding Commissions and Leverage Fees shall be paid periodically to the Company pursuant to Article X.

4

**ARTICLE VIII**
**COLLATERAL REQUIREMENT**

The posting of collateral by the Reinsurer in an amount calculated pursuant to this Article for the benefit of the Company, until all of the Company's obligations under the Subject Contracts are fully discharged based upon a good faith and commercially reasonable determination by the Company that it is released without further liability under the Subject Contracts, is a condition precedent for the Company's acceptance of any Subject Contracts.

The collateral to be posted by the Reinsurer hereunder shall consist of either cash or securities ("Eligible Investments" as further defined in the Security Agreement) in an amount equal to the amount(s) specified in Appendix A and shall be deposited with the Custodian as described in Article IX and Appendix B hereto.

The Collateral Requirement for the Subject Contracts as shown in the most recent Reinsurance Schedule shall be calculated using the following methodology:

Collateral Requirement means the sum of:

> (1) the greater of the Calculated Minimum Collateral Amount and 50% of the Total Portfolio Original Limit Amount; plus
> (2) the Outstanding Reinsurer Obligations.

The Calculated Minimum Collateral Amount means the sum of:

> (1) 100% of the Maximum Single Event Exposure, plus
> (2) 140% of the difference between the Total Premium Amount and the Maximum Single Event Exposure Premium Amount; plus
> (3) 10% of the difference between the Total Portfolio Original Limit Amount and the Maximum Single Event Exposure.

The Maximum Single Event Exposure means the maximum amount of the USD equivalent Limit of each Subject Contract exposed to a single event occurrence as determined by the Company in its commercially reasonable discretion.

The Maximum Single Event Exposure Premium Amount means the sum of the USD equivalent Company Premium Amounts associated with the Subject Contracts which contribute to the Maximum Single Event Exposure.

The Outstanding Reinsurer Obligations means the USD equivalent sum of incurred or invoiced Losses on Subject Contracts which have not yet been paid by the Company and reimbursed by the Reinsurer.

The Total Portfolio Original Limit Amount means an amount equal to the aggregate sum

of the USD equivalent Limit (excluding inactive reinstatements) of the Subject Contracts as identified in the applicable Reinsurance Schedule.

The Total Premium Amount means the sum of the USD equivalent amounts appearing in the Company Premium Amount column of the Calculation Report for each Subject Contract.

In addition to the Collateral Requirement, the costs of which shall be borne by the Reinsurer, the Reinsurer shall also reimburse the Company for the costs of any letter(s) of credit, trust account, cash advance or other collateral obligation of the Company pursuant to the terms of a Subject Contract. Such costs of collateral of the Company, if any, shall be added to the Losses of the Company hereunder.

The Company shall only be permitted to amend the Collateral Requirement calculation methodology upon 365 days written notice (the "Notice") to the Reinsurer or upon failure by the Reinsurer to fulfill any of its obligations under this Agreement within two business days of receiving notice from the Company of such failure.

**ARTICLE IX**
**SECURITY ACCOUNT**

No later than five (5) Business Days after receipt of an updated Reinsurance Schedule from the Company (which, pursuant to Article X, may be more frequently than quarterly), the Reinsurer shall deposit with the Custodian Cash or Eligible Investments with a fair market value equal to any increase in the Collateral Requirement calculated pursuant to Article VIII.

The Collateral Requirement amount stated on the most recent Reinsurance Schedule shall be maintained at all times in the Security Account until all of the Outstanding Reinsurer Obligations under this Agreement have been fully and finally released. Unless amended or terminated pursuant to a Notice or otherwise pursuant this Agreement, the Collateral Requirement calculation and its application shall continue to apply until the Reinsurer is fully and finally released of any and all obligations hereunder.

**ARTICLE X**
**REPORTS AND REMITTANCES**

Within ten (10) Business Days after the close of each calendar quarter, or more frequently as reasonably determined by the Company or as reasonably requested by the Reinsurer, the Company shall deliver to the Reinsurer a current Reinsurance Schedule and a report in the form attached as Appendix C hereto (the "Calculation Report") setting forth, with respect to the period beginning immediately after the end of the period covered by the immediately previous Calculation Report (or, with respect to the first Calculation Report, beginning on the Effective Date) and ending on the last day of such calendar quarter or such date as determined by the Company or as requested by the Reinsurer, as applicable, with respect to each Subject Contract and in the aggregate:

6

    (a) the Reinsurer's share of the Company Premium Amounts (and all components thereof),
    (b) accrued Ceding Commissions and Leverage Fees,
    (c) the Reinsurer's Share of Losses,
    (d) the result of (a) minus (b + c) (the aggregate result of (a) minus (b + c) is referred to herein as the "<u>Payment Amount</u>"),
    (e) the Reinsurer's Share of the total reserves for outstanding losses, Loss Adjustment Expense and unearned premiums, and
    (f) the adjustment to the Collateral Requirement, and
    (g) such other information as may be reasonably requested by the Reinsurer.

When the Company delivers a Calculation Report, the Company shall remit to the Reinsurer, in immediately available funds, the Payment Amount provided that the Payment Amount is positive. Payment by the Company of any positive Payment Amount shall further be conditioned upon the Company's receipt of the corresponding premium amount on the Subject Contracts, any adjustments thereto and subject always to the fulfillment of the Reinsurer's obligations under this Agreement (including but not limited to the Reinsurer's obligation to post collateral in accordance with Articles VIII and IX hereto).

If the Payment Amount is negative, then, within five (5) Business Days of receipt of the corresponding Calculation Report, the Reinsurer shall make payment of such Payment Amount to the Company. In the event of any failure by the Reinsurer to pay such Payment Amount due to the Company within five (5) Business Days of receipt of a Calculation Report, the Company shall be permitted to direct Lehman Brothers, Inc., the securities intermediary identified in Article IX hereto, to liquidate specified collateral in the Security Account and disburse to the Company an amount of funds equal to the absolute value of the Payment Amount.

A late payment interest penalty shall be applied to any Payment Amount owed by the Reinsurer and not paid to the Company within five (5) Business Days of receipt of a Calculation Report in accordance with this Article, calculated from the date such Payment Amount is due on an annualized basis at London Interbank Offered Rate (LIBOR) plus 400 basis points.

The Company shall also deliver to the Reinsurer, promptly following receipt thereof by the Company, all notices, reports, loss advices and similar material received by the Company (other than from the Reinsurer) in connection with the Subject Contracts.

**ARTICLE XI**
**FOLLOW THE FORTUNES**

The Reinsurer's liability shall attach simultaneously with that of the Company and shall be subject in all respects to the same risks, terms, conditions, definitions, coverages, interpretations, waivers, modifications, alterations, and cancellations as the respective

insurances (or reinsurances) of the Company (including, without limitation, coverage for any extra-contractual obligations or losses in excess of policy limits, as may be covered under any Subject Contracts). The true intent of this Agreement is that the Reinsurer shall, subject to the terms, conditions and limits of this Agreement, follow the fortunes of the Company. Notwithstanding anything to the contrary, the Company and the Reinsurer agree that the Company would not otherwise agree to insure or reinsure risks under the Subject Contracts without the Reinsurer's absolute and unconditional commitment to follow the fortunes of the Company in all respects.

**ARTICLE XII**
**LOSS SETTLEMENTS AND LOSS ADJUSTMENT EXPENSES**

All good faith loss settlements (including any ex-gratia payments made by the Company in good faith), whether under strict policy conditions or by way of compromise, shall be unconditionally binding upon the Reinsurer. The Reinsurer agrees to abide by all good faith loss settlements made by the Company whether under strict policy conditions or by way of compromise, including settlements involving disputed interpretations of policy and/or Subject Contract terms and/or coverage. Loss settlements for which the Reinsurer shall be liable include but are not limited to those payments which are paid pursuant to liability under the Subject Contract, pursuant to a reasonable belief that there might be liability under the Subject Contract, or as payments made in good faith. The intent of this Agreement is that the Reinsurer agrees to follow all good faith loss settlements of the Company in all respects, as if the Reinsurer were a party to the Subject Contract, except as otherwise specified in this Agreement.

In addition to loss amounts recoverable hereunder, the Reinsurer shall bear its proportionate share of all Loss Adjustment Expenses payable by the Company and shall receive its proportionate share of any recoveries of any Loss Adjustment Expenses. "<u>Loss Adjustment Expenses</u>" shall be defined as all expenses payable by the Company in the investigation, adjustment, appraisal or defense of all claims under policies reinsured hereunder (excluding office expenses and compensation of officers and regular employees of the Company, other than out of pocket expense of the Company's officers incurred in connection with the loss). The Reinsurer's Share of Loss Adjustment Expenses shall be based upon the Reinsurer's Share of the sum of the total original limits and total reinstatement limits for the applicable Subject Contract.

**ARTICLE XIII**
**CURRENCY**

Wherever the word "Dollars", "USD" or sign "$" appear in this Agreement they shall be construed to mean United States Dollars.

For purposes of this Agreement, where the Company receives premiums or pays losses and/or commissions in currencies other than United States currency, such premiums or losses and commissions shall be converted into United States Dollars at the same rates of exchange as entered in the Company's books.

8

**ARTICLE XIV**
**EXCLUSIVITY**

In the event that the Reinsurer maintains at all times Subject Contracts with the Company wherein the USD equivalent Total Original Portfolio Limit Amount is in excess of $150,000,000, then the Company agrees that it shall not enter into new or additional agreements with third parties other than the Reinsurer in respect of transactions structured in a fashion similar to this Agreement without the express written approval of the Reinsurer. In addition, when acceptable to original ceding companies, the Reinsurer will use reasonable efforts to offer proposed Contracts only to the Company.

**ARTICLE XV**
**ACCESS TO RECORDS/CONFIDENTIALITY**

The Reinsurer or its representatives shall have reasonable access to the books and records of the Company at all reasonable times for the sole purpose of obtaining information concerning this Agreement or the subject matter hereof.

The Reinsurer agrees, on behalf of itself and its representatives, to hold and keep confidential, and not to disclose to any third party (unless requested or required by relevant insurance regulatory authorities or otherwise compelled to do so by applicable law, regulation or judicial or regulatory proceeding), any confidential and proprietary information of the Company which it receives or has access to pursuant to the above paragraph. The Reinsurer agrees to abide by any determination by the Company that any information provided to the Reinsurer constitutes confidential and proprietary information.

**ARTICLE XVI**
**ARBITRATION**

Any dispute or claim arising out of or relating to this Agreement, including its formation and validity, shall be referred to arbitration. Arbitration shall be initiated by the delivery, by mail, facsimile, or other reliable means, of a written demand for arbitration by one party to the other. The arbitration shall be held in Hamilton, Bermuda or such other place as the parties may mutually agree.

Arbitration shall be conducted before a three-person arbitration panel appointed as follows. Each party shall appoint one arbitrator, and the two arbitrators so appointed shall then appoint a neutral umpire before proceeding. If either party fails to appoint an arbitrator within thirty (30) days after it receives a written request by the other party to do so, the requesting party may appoint both arbitrators. Should the two arbitrators fail to choose an umpire within thirty (30) days of the appointment of the second arbitrator, the parties shall appoint the umpire pursuant to the ARIAS•U.S. Umpire Selection Procedure. The arbitrators and umpire shall be either present or former executive officers of insurance or reinsurance companies, or arbitrators certified by ARIAS•U.S. The

9

arbitrators and umpire shall not be under the control of either party, and shall have no financial interest in the outcome of the arbitration.

The arbitrators and umpire shall interpret this Agreement as an honorable engagement, and shall not be obligated to follow the strict rules of law or evidence. In making their award, they shall apply the custom and practice of the insurance and reinsurance industry, with a view to effecting the general purpose of this Agreement.

The decision of a majority of the arbitration panel shall be final and binding. The arbitration panel shall render its award in writing. Judgment upon the award may be entered in any court having jurisdiction. Each party shall pay: (1) the fees and expenses of its own arbitrator; and (2) an equal share of the fees and expenses of the umpire and of the other expenses of the arbitration.

**ARTICLE XVII**
**NOTICES**

All notices, requests, demands and other communications hereunder must be in writing (including facsimile transmission or electronic mail) and shall be deemed to have been duly given (i) when received if delivered by hand against written receipt, (ii) when received if sent by facsimile transmission or electronic mail between 9:00 a.m. and 5:00 p.m. on a day when the Federal Reserve Bank and the Bank of Bermuda are open for business, provided such transmission is confirmed by the transmitting machine or e-mail system of the sender, (iii) five (5) days after being mailed if mailed by prepaid, first class certified mail, return receipt requested, or (iv) if sent by overnight courier, two (2) days after delivery to a recognized major overnight courier service, fees prepaid. In each case notices shall be addressed as follows:

If to the Company:

Lehman Re Ltd.
Cumberland House – 3rd Floor
Hamilton HM 11 Bermuda
Attn: Grant Hall
Tel: 441-294-0000
Fax: 441-296-8452
E-mail: grant.hall@lehman.com

With a copy to:

Brett Houghton
Lehman Brothers Inc.
745 Seventh Avenue – 3rd Floor
New York, New York 10019
Tel: 212-526-9660
Fax: 646-758-2027

10

If to the Reinsurer:

Pulsar Re, Ltd
c/o Marsh Management Services (Bermuda) Ltd.
Victoria Hall
11 Victoria Street, 2nd Floor
Hamilton HM 11
Bermuda
Attn: Jonathan Rawdon
Tel: 441-292-4402
Fax: 441-292-1563

With a copy to:

Pulsar Re, Ltd
Cumberland House, 7th Floor
1 Victoria Street
Hamilton HM 11
Bermuda
Attn: Sean Belton
Tel: 441-298-2408
Fax: 441-298-2401

Any party by notice in writing sent to the other may change the contact information to which notices, requests, demands or other communications to it shall be given.

**ARTICLE XVIII**
**MISCELLANEOUS**

**A. Offset.** Both the Reinsurer and the Company shall have, and may exercise at any time, the right to offset any balance or balances due from one party to the other or, to the extent permitted by applicable law, such other's successor, including a successor by operation of law. Such offset may only include balances due under this Agreement and any other agreements heretofore or hereafter entered into between the Reinsurer and the Company, regardless of whether such balances are in respect of premiums, commission, losses or otherwise, and regardless of the capacity of any party, whether as reinsurer or reinsured or otherwise, under the various agreements involved. Notwithstanding the foregoing, the Company shall also have the right to cross default with other contractual obligations of the Reinsurer to Lehman Brothers Special Financing and other affiliates of the Company, and only if further agreed to in writing between the parties hereto between the Company and/or its affiliates and the Reinsurer and/or its affiliates, resulting in forfeiture of all or part of collateral posted hereto by the Reinsurer and early termination of this Agreement at the Company's sole discretion.

**B. Taxes.** Except for any taxes or federal excise taxes owed by the Company pursuant

to the terms of a Subject Contract, which amounts shall be deducted by the Company from the premium ceded to the Reinsurer hereunder, each party shall be responsible for its own taxes in connection with any remittances under this Agreement.

**C. Entire Agreement.** This Agreement (including any endorsements hereto), together with each executed Contract Submissions and each updated Reinsurance Schedule hereto, contains the entire agreement between the parties, and supersedes all prior or contemporaneous discussions, negotiations, representations, or agreements, relating to the subject matter hereof.

**D. Governing Law.** This Agreement shall be construed and enforced in accordance with, and governed by, the laws of Bermuda.

**E. Third Party Rights.** This Agreement is intended for the exclusive benefit of the parties to this Agreement and their respective successors and permitted assigns, and nothing contained in this Agreement shall be construed as creating any rights or benefits in or to any third party.

**F. Errors and Omissions.** Any inadvertent delay, omission, or error shall not be held to relieve either party hereto from any liability which would attach to it hereunder if such delay, omission or error had not been made, provided such delay, omission or error is rectified promptly upon discovery.

**G. Headings.** The captions of the various sections of this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning thereof.

**H. Amendments.** This Agreement may not be modified or amended or any term or provision hereof waived or discharged except in writing signed by the party against whom such amendment, modification, waiver or discharge is sought to be enforced.

**I. Severability.** If any term or provision of this Agreement is determined to be invalid or unenforceable in whole or in part, such term or provision shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions of this Agreement enforceable, and the Agreement as so amended shall be enforced to give effect to the intention of the parties insofar as that remains possible.

**J. Waiver.** Except as otherwise provided in this Agreement, any failure or delay on the part of any party in exercising any power or right hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise of any such right or power preclude any other or further exercise thereof or the exercise of any other right or power hereunder or otherwise available at law or in equity.

**K. Assignment.** The Company may assign any of its rights or obligations under this Agreement without the written consent of the Reinsurer. The Reinsurer may assign its rights or obligations under this Agreement only with the prior written consent of the Company. In accordance with this paragraph or except as otherwise provided in this

Agreement, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective successors and assigns of each party to this Agreement.

**L. Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their duly authorized officers.

**LEHMAN RE LTD.**

By: *[signature]*
Name: C. GRANT HALL
Title: ASSISTANT VICE PRESIDENT
Date: 28 MARCH 2007
HAMILTON, BERMUDA

**PULSAR RE, LTD.**

By: *[signature]*
Name: PETER H. VLOEDMAN
Title: DIRECTOR
Date: 28 MAR 07

14