Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7

8  LEHMAN BROTHERS HOLDINGS INC., et al.

9

10            Debtors.

11  - - - - - - - - - - - - - - - - - - - - - -x

12  LEHMAN BROTHERS INC.,

13

14            Debtor.

15  - - - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            January 13, 2011

21            10:20 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2     STATUS REPORT on Plan Process

3

4     HEARING re Debtors' Motion for Entry of an Order Clarifying the

5     Scope of the Procedures for the Settlement of Prepetition

6     Derivative Contracts

7

8     SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

9     HEARING re Second Motion of Unclaimed Property Recovery

10    Service, Inc. for an Order Authorizing and Directing Immediate

11    Payment Pursuant to this Court's May 25, 2010 Order

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

Page 3

1

2  A P P E A R A N C E S :

3  WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors and Debtors-in-Possession

5        767 Fifth Avenue

6        New York, NY 10153

7

8  BY:   HARVEY R. MILLER, ESQ.

9        LORI R. FIFE, ESQ.

10        SUNNY SINGH, ESQ.

11

12  STUTMAN, TREISTER & GLATT

13        Attorneys for Lehman Brothers Holdings, Inc.

14        1901 Avenue of the Stars

15        12th Floor

16        Los Angeles, CA 90067

17

18  BY:   JEFFREY H. DAVIDSON, ESQ.

19        MICHAEL NEUMEISTER, ESQ.

20        MARINA FINEMAN, ESQ.

21        ISAAC PACHULSKI, ESQ.

22        (TELEPHONICALLY)

23

24

25

Page 4

1

2    HUGHES HUBBARD & REED LLP

3         Attorneys for the SIPA Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7    BY:   JEFFREY S. MARGOLIN, ESQ.

8         DAVID W. WILTENBURG, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        One Chase Manhattan Plaza

14        New York, NY 10005

15

16   BY:   EVAN R. FLECK, ESQ.

17        DENNIS F. DUNNE, ESQ.

18        BRADLEY S. FRIEDMAN, ESQ.

19

20

21

22

23

24

25

Page 5

1

2   U.S. DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        21st Floor

6        New York, NY 10004

7

8   BY:   TRACY HOPE DAVIS, U.S. TRUSTEE

9        LINDA A. RIFFKIN, AUST

10        ANDREA B. SCHWARTZ, TRIAL ATTORNEY

11        ELISABETTA G. GASPARINI, TRIAL ATTORNEY

12

13   BROWN RUDNICK LLP

14        Attorneys for the Ad Hoc Group of Creditors

15        Seven Times Square

16        New York, NY 10036

17

18   BY:   GORDON Z. NOVOD, ESQ.

19

20

21

22

23

24

25

Page 6

1

2   BROWN RUDNICK LLP

3          Attorneys for the Ad Hoc Group of Creditors

4          One Financial Center

5          Boston, MA 02111

6

7   BY:   R. BENJAMIN CHAPMAN, ESQ.

8          PETER J.M. DECLERCQ, ESQ.

9          ANGELO THALASSINOS, ESQ.

10          (TELEPHONICALLY)

11

12   DAVIS POLK & WARDWELL LLP

13          Attorneys for Lehman Brothers International (Europe)

14          450 Lexington Avenue

15          New York, NY 10017

16

17   BY:   MARSHALL S. HUEBNER, ESQ.

18          BRIAN RESNICK, ESQ.

19

20

21

22

23

24

25

Page 7

1

2      GENOVESE JOBLOVE & BATTISTA, P.A.

3           Attorneys for Unclaimed Property Recovery Services, Inc.

4           100 Southeast Second Street

5           44th Floor

6           Miami, FL 33131

7

8      BY:   PAUL J. BATTISTA, ESQ.

9

10     WHITE & CASE LLP

11          Attorneys for Ad Hoc Group of Noteholders

12          1155 Avenue of the Americas

13          New York, NY 10036

14

15     BY:   GERARD UZZI, ESQ.

16          J. CHRISTOPHER SHORE, ESQ.

17

18     ALSTON & BIRD LLP

19          Attorneys for Azora Bank

20          One Atlantic Center

21          1201 West Peachtree Street

22          Atlanta, GA 30309

23

24     BY:   WILLIAM S. SUGDEN, ESQ.

25          (TELEPHONICALLY)

Page 8

```
 1
 2     CHAPMAN & CUTLER LLP
 3           Attorneys for US Bank
 4           111 West Monroe Street
 5           Chicago, IL 60603
 6
 7     BY:   FRANKLIN H. TOP III, ESQ.
 8           JAMES HEISER, ESQ.
 9           (TELEPHONICALLY)
10
11     CLEARY GOTTLIEB STEEN & HAMILTON LLP
12           Attorneys for Goldman Sachs Bank, USA and Goldman Sachs
13            International
14           2000 Pennsylvania Avenue, NW
15           Washington, DC 20006
16
17     BY:   BENJAMIN MEEKS, ESQ.
18           (TELEPHONICALLY)
19
20
21
22
23
24
25
```

Page 9

1

2    EDWARDS, ANGELL, PALMER & DODGE LLP

3         Attorneys for Pension Benefit Guaranty Fund of Government

4          of Canada

5         919 North Market Street

6         15th Floor

7         Wilmington, DE 19801

8

9    BY:   SELINDA A. MELNIK, ESQ.

10        (TELEPHONICALLY)

11

12   FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

13        Attorneys for CALPERS

14        400 Capitol Mall

15        Suite 1450

16        Sacramento, CA 95814

17

18   BY:   HOLLY A. ESTIOKO, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

Page 10

1

2    KRAMER LEVI NAFTALIS & FRANKEL, LLP

3         Attorneys for Attorneys for Rutger Schimmelpenninck and

4          Frederic Verhoeven as Trustees for Lehman Brothers

5          Treasury Co. B.V.

6         1177 Avenue of the Americas

7         New York, NY 10036

8

9    BY:   THOMAS MOERS MAYER, ESQ.

10        DANIEL M. EGGERMANN, ESQ.

11        (TELEPHONICALLY)

12

13   HENNIGAN BENNETT & DORMAN LLP

14        Attorneys for Bondholders

15        865 South Figueroa Street

16        Suite 2900

17        Los Angeles, CA 90017

18

19   BY:   MONIKA S. WIENER, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

Page 11

1

2    NIXON PEABODY LLP

3          Attorneys for Deutsche Bank Trust Company Americas and

4           Deutsche Bank N.A.

5          100 Summer Street

6          Boston, MA 02110

7

8    BY:   RICHARD C. PEDONE, ESQ.

9          (TELEPHONICALLY)

10

11   REED SMITH LLP

12          Attorneys for Bank of New York

13           225 Fifth Avenue

14          Pittsburgh, PA 15222

15

16   BY:   ERIC A. SCHAFFER, ESQ.

17          (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 12

1

2   SNR DENTON US LLP

3        Attorneys for LB Bankhause AG

4        233 South Wacker Drive

5        Suite 7800

6        Chicago, IL 60606

7

8   BY:   PATRICK C. MAXCY, ESQ.

9        (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 13

1                        P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Be seated, please.  Good morning.  We're

4    off to a little bit of a late start but I understand it's

5    attributable to security downstairs and not to anybody else's

6    fault.

7            MR. MILLER:  There are people downstairs, Your Honor,

8    who are selling their places in line to Mr. Marsal.  Good

9    morning, Your Honor.

10           THE COURT:  Good morning.  How are you?

11           MR. MILLER:  Well, Your Honor.  On behalf of everybody

12   assembled, a happy new year to you.

13           THE COURT:  Thank you.  Same.

14           MR. MILLER:  Your Honor, on the agenda -- the first

15   matter on the agenda is a status report.  And this is sort of

16   an auspicious date.  This is the first omnibus hearing in 2011.

17   Maybe this is the year of the confirmation of the Chapter 11

18   case of these debtors.  And I wanted to put the status

19   conference into perspective, Your Honor.

20           At a hearing held on November 17, 2010, the Court

21   remarked that the hearing did not provide any information or

22   illumination at all as to how the Chapter 11 cases were

23   progressing on an overall basis.  The Court noted that the

24   aspirational statement made by Mr. Marsal in the state of the

25   estate report on September 22nd that a Chapter 11 plan might be

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 14

1   forthcoming and confirmed before the end of the first quarter

2   of 2011.  Fortunately, the Court promptly emphasized the

3   adjective "aspirational".  Clearly, there will not be a

4   confirmation of a plan before the end of the quarter.  But that

5   is not to say that progress has not been made.  Progress is

6   being made but there remain, as one might anticipate,

7   outstanding issues in these extraordinary cases that will be

8   alluded to in the presentations that are to be made this

9   morning.

10          The Court requested on November 17 that in the future

11   a presentation be made by the debtors as to the progress being

12   made in the plan process, the problems, if any, that exist with

13   respect to the successful formulation of a consensual plan and

14   what, if any, protocols of communication exist between the

15   creditor constituencies and the debtor.  The Court emphasized

16   that a progress report of a public nature would be appropriate

17   in one of the next two omnibus hearings.  In the face of the

18   ongoing discussions between the debtors, the unsecured

19   creditors' committee and other constituencies and the hope of

20   achieving a higher level of consensus, the debtors elected to

21   make a progress report in 2011 and so notify the Court and

22   other parties in interest.

23          Since the Court was advised of the debtors' intentions

24   and on December 15, 2010, the ad hoc group of LBHI senior

25   creditors, who assert that they hold claims against LBH

Page 15

1    approximating twelve million dollars, filed a proposed joint

2    Chapter 11 plan for the debtors together with a proposed

3    disclosure statement.  The ad hoc group plan has taken a

4    different tack than the debtors' proposed Chapter 11 plan.

5    That was filed in March of 2010.  The ad hoc group plan is

6    premised upon a substantive consolidation of certain of the

7    debtors as a predicate to an overall compromise settlement of

8    the multi-factual and legal issues that have permeated these

9    cases.  The debtors do not agree with the ad hoc group's

10   proposed plan and have assiduously continued the exhaustive

11   process of negotiations with the unsecured creditors' committee

12   and multiple creditor constituencies that commenced in April of

13   2010.  Those negotiations have progressed to the point that the

14   debtors' first amended plan is being finalized as we speak and

15   will be filed with a disclosure statement within the next week

16   to ten days.

17           Now, for the purposes of presenting the requested

18   progress report as to the subject mentioned and continuing in

19   the somewhat orthodox fashion and have become the course of

20   conduct in these status conferences, the debtors' management

21   represented by Mr. Marsal as CEO, Mr. Suckow as chief operating

22   officer, and Mr. Ehrmann as senior officer and plan negotiator,

23   will present to the Court a high level overview of the

24   administration of the Chapter 11 cases and the status of the

25   plan process.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 16

1          I will emphasize that since the filing of the debtors'

2    proposed Chapter 11 plan in March of 2010, the debtors have

3    been consumed with extended meetings and negotiations among the

4    debtors, the unsecured creditors' committee, representatives of

5    foreign affiliates, major creditors, big banks and various ad

6    hoc groups as will be more broadly described by the debtors'

7    management.

8          The first amended plan, when filed, will take into

9    account the input, comments and suggestions of many parties,

10   even those of the ad hoc group, and, from the debtors'

11   perspective, represent and economic, fair, rational resolution

12   of the issues and positions taken by the parties in interest.

13   The debtors will also suggest in the following presentation the

14   process that they propose to pursue during the next thirty to

15   sixty days.  The debtors' objective is to achieve, if at all

16   possible, a consensual plan.  It is their hope that the parties

17   in interest share that objective and will continue to work

18   together cooperatively to accomplish a fair, reasonable

19   economic resolution of these cases.

20          So in the context of these cases, Your Honor, this is

21   really not the end of the beginning, but I would suggest, Your

22   Honor, that this is the beginning of the end.  And in that

23   context, Your Honor, unless Your Honor has some questions, I

24   would turn the lectern over to Mr. Marsal.

25          THE COURT:  I have no questions at the moment.  Thank

LEHMAN BROTHERS HOLDINGS INC., et al.

1   you.

2           MR. MILLER:  Mr. Marsal?

3           MR. MARSAL:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. MARSAL:  Your Honor, what I'd like to do in a very

6   simplistic fashion to give a status report is really to answer

7   the four questions that you see outlined in the presentation.

8           First question is what's happening with the assets,

9   with the asset pie, both in terms of the size of the pie and

10  the composition.  And, of course, having cash at a time of a --

11  for distribution purposes is very important to this process.

12          The second point -- the second question to be

13  addressed is what does the claims picture look like.  Lots of

14  claims were filed.  Many of those claims have been heard or

15  cleaned up.  What's that picture going to look like and how is

16  that process going?

17          The third question is how do you propose for the asset

18  pie to be divided up.  We have issues, as Mr. Miller just

19  pointed out, between the holding company and as the parent --

20  the parent creditors, the subsidiary creditors, intercompany

21  issues and their guaranty issues all of which address the

22  question of how will this pie be allocated among parties.

23          And then last but not least, once we get through all

24  that, is there any other challenges we have, and the answer is

25  yes.  On the derivative front, we have a substantial challenge

Page 18

1    of trying to -- of a way through these numerous contracts that

2    we have.  But we actually think we have a pretty interesting

3    settlement for -- framework for settlement of those disputes.

4         What I'm going to do, Your Honor, is I'm going to

5    cover points 1 and 2 very briefly.  Then I'm going to turn it

6    over to John Suckow, who is my partner and president of Lehman

7    today who's really been the architect of this plan and chief

8    negotiator of this plan, and then Mr. Ehrmann, who's handled

9    both the plan and the derivative segment, for the final

10   question.

11        Turning the page to my segment, what's the size and

12   composition of the asset pie?  At the September hearing, we

13   indicated that the estimated net recovery to the estate was

14   going to be 57.5 billion dollars.  As of the end of December,

15   six months, we believe the estimated recovery will be 60.1

16   billion dollars.  The cash composition has increased to twenty-

17   four billion.  The financial assets, or assets remaining --

18   I'll just call them the illiquid assets that remain to be

19   liquidated -- has gone down but the projected reinvestment that

20   is required to realize these assets has also declined.

21        What I would point out to Your Honor -- the footnotes

22   are very important.  The financial assets have an estimate of

23   37.1 billion.  That has to do with gross proceeds.  As you

24   know, present value is very different from gross proceeds, the

25   present value issues of the timing of the transaction.  What

Page 19

1   we're seeing is an acceleration in the marketplace of

2   transactions.  As liquidity has returned, we're seeing the --

3   an ability to liquefy -- improving.  So -- and, of course, the

4   second factor in a present value is the discount rate.  There's

5   no two creditors that have the same discount rate.  So we leave

6   it to the creditors to assess what discount rates are going to

7   apply for our present value.  But the key here is that this is

8   gross proceeds.

9          The other key points I would make to you is this does

10  not -- footnote number 3, this does not include any deduction

11  for IRS priority claims nor does it include any cost of

12  completing the administration of the case.  And also it does

13  not include any collection of -- or any recovery from the

14  litigations we have which are numerous.

15         So there's upside potentially on the receivable side,

16  on the litigation front.  But clearly, there are expenses that

17  are not included in this.

18         The team that's working this problem -- or, before I

19  get to that -- I'm sorry.  What's the status of liquidating

20  this illiquid asset pool of thirty-seven billion?  The answer

21  to that is the market or refinancings has improved and

22  continues to improve.  The levels on the commercial side and

23  multi-family side in terms of cap rates are approaching what

24  they were in mid-2008.  The peak of that -- of cap rates is

25  probably mid-2006-2007.  But this is still we think is

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 20 of 71

Page 20

1   increasingly becoming a very attractive market if it's not only

2   an attractive market.

3            On the investment side, M&A activities picking up.  So

4   we look at this as a golden opportunity right now to convert a

5   significant amount of the illiquid assets and the cash over the

6   next six to twelve months.

7            One other item I'd point out to you is that the

8   opportunity costs -- as you know in a Chapter 11, any cash that

9   we accumulate has to be invested in permitted investments which

10  would be short term Treasury bills which are -- have earned us

11  anywhere from twenty-five basis points to forty-five basis

12  points throughout the case, not a very attractive investment

13  strategy.  By holding onto the assets, we've been able to get a

14  significantly greater appreciation on the assets.  So now, the

15  time to move -- I think, the support of the unsecured committee

16  in this process, I think, is going to be paying big dividends

17  to the estate.

18           We would expect, over the next six to twelve months,

19  to have a much more aggressive disposition strategy

20  particularly on the strategic real estate assets and that

21  you're going to see some major transactions coming before this

22  Court.

23           In terms of the resources that are employed to

24  generate the asset management side of the house, this is just a

25  timeline as to what's been happening.  Again, the case needs to

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 71

Page 21

1    be bifurcated into asset management and claims administration.

2    This is -- on simply the asset management side, we see that the

3    two categories, Lehman personnel and A&M personnel, what the

4    picture is on this front, for informational purposes only.

5         Going on to the second question that was raised in --

6    what does the claims picture look like, across the horizontal

7    axis, you've got a series of what the original claims that were

8    filed and then as adjusted as cleaned up over time at various

9    points starting with April of 2010, moving to September 2010

10   and then the most likely December 2010.  Down the vertical

11   axis, you've got a breakdown of the various claim categories

12   that we have starting with LBHI and then moving on down to the

13   various guaranty or intercompany claims.

14        What I would point to is the bottom line which is in

15   bold, "Total Claims", 1.162 trillion claims was filed by the

16   bar date.  Of that 1.162, looking above two lines, 860 billion

17   related to the parent, 302 billion related to the various

18   subsidiary.  Moving on -- again, moving left to right, you'll

19   see in April we concluded that there was lots of errors and

20   duplicates in the filings which brought the number down to 605

21   billion.  However, likely claims, we felt at that point at the

22   end of the day we were still looking at 260 when we got through

23   all the scrubbings that needed to be done because of the

24   exaggeration.

25        That process continued into September when we brought

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 22

1   it down from 605 to 363, about the same likely allowed picture.

2   And then finally, in December, the number has been brought down

3   to 319 with 272 million of allowed claims.  This captures, by

4   the way, Your Honor, the proposed -- the revised POR that the

5   company will be coming out with in the next week to ten days.

6          Below that, you see the subsidiary claims.

7   Significant progress on this front.  It starts at 302 billion.

8   The first cut at it was down to 135.  And now we are at a

9   level, we believe, allowed claims will ultimately be fifty

10  billion dollars.  So fundamentally, I think where we are today

11  in the far right-hand column, you see, third line from the

12  bottom, we believe that the allowed claims will ultimately be

13  about 272 billion dollars on the Holdings company level and

14  about fifty billion dollars on the subsidiary level for a total

15  of 322 billion.  So it's really been an exaggeration of about

16  four times from the original filing.

17         In terms of the resources, lots of resources because

18  everyone has their right to their -- doesn't seem to be a

19  problem with anyone claiming whatever they want to claim.  But

20  each claim is important and it has to be gotten -- it has to be

21  investigated.  And you see the cost to the estate of doing so.

22  I mean, there's a significant cost up there, in terms of

23  resources, manpower, there's more resources being devoted to

24  the claims side of the house than to the asset management side

25  of the house.  And again, same schedule as you looked at

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 23

1   before, timeline, and then the various activities claims

2   management, the finance and the legal litigation support groups

3   that are needed for these efforts.

4         And with that, John -- I'd like to -- the third

5   question on how do you propose for the asset pie to be

6   allocated, I'd like to introduce John and ask him to walk you

7   through it.

8         MR. SUCKOW:  Good morning, Your Honor.

9         THE COURT:  Good morning.

10        MR. SUCKOW:  Two things before I get going here.  I'm

11   not sure if Mr. Miller or Mr. Marsal mentioned that this

12   presentation is now available as an 8K and also on our website

13   should the parties be interested in that.

14        Mr. Marsal just referred to me as an architect of this

15   plan.  I think that's overstating it.  That may be true of the

16   plan that we filed in March.  But the plan that we're hopeful

17   to be filing in the very near term, I'd view that there are

18   many architects.  There are an awful lot of constituents not

19   the least of which is our unsecured creditors' committee and

20   advisors that have weighed in.  I think a big part of our

21   process over the last nine months or so, we've been listening

22   to people's views.

23        Page 8 -- this is a recap of what Mr. Marsal prepared

24   for the Court at that time.  I think he indicated that we would

25   be continuing our focus on claims.  We've continued to focus

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 24 of 71

Page 24

1    our efforts on trying to reach agreement with our foreign

2    affiliates and that we would engage our domestic creditor

3    affiliates.  And I will report on the progress of each and I

4    think there is progress on each of those.

5            The next slide is a discussion of the foreign

6    affiliates.  We do believe that there has been substantial

7    progress made.  There were two more global protocol group

8    meetings.  I think that brings it to a total of seven meetings

9    dedicated to the LBHI plan.  And in fact, I believe we have

10   another meeting in two weeks of the same group.

11           There have been a number of exchanges, of proposals

12   for settlement agreement to be executed by the foreign

13   affiliates.  And we're not quite there yet but I think we're

14   making progress.  Likewise, bilateral negotiations between our

15   entities and the foreign entities have continued.  Good

16   progress made with LB Bankhaus.  In fact, Dr. Frege is here

17   today in the courtroom.  We appreciate all the work that he put

18   it into this.

19           LBT -- I think we're making good progress.  I think

20   we're pretty close with the trustee and we've received an awful

21   lot of input from various creditor groups related to LBT.  And

22   we feel as though we're close to an economic compromise anyway

23   with the LB Asian entities which is led -- managed by KPMG.

24           On the LBIE front, I think Mr. Marsal reported on that

25   at the last hearing.  I would say where we are is the

Page 25

```
 1   differences between the way we view the world and they view the

 2   world are narrowing.  But in terms of the resolution, still

 3   uncertain.  But I think we're continuing to talk and I believe

 4   we're meeting again with them the first week of February.

 5          The only entity or receivership where it seems like

 6   we've taken a step back is LB Finance which is the Swiss

 7   entity.  We had some momentum going and we seemed to have

 8   entered the cone of silence.  So we're not giving that up yet

 9   but it's been a step back.  We'll begin to push that again now.

10          THE COURT:  Without opening up a can of worms, is

11   there any discloseable reason that you can identify for the

12   problems with LB Finance?

13          MR. SUCKOW:  Your Honor, I would probably just leave

14   it as -- it's putting me in a position to guess a little bit.

15   But I am hopeful that with the filing of the plan that perhaps

16   when they see what we're proposing, perhaps that's been their

17   reason for backing off of negotiation.  I don't know beyond

18   that.  I'm guessing a little bit.

19          THE COURT:  Okay.

20          MR. SUCKOW:  Okay?  Turning the page to page 10, on

21   the domestic affiliate front, since September 22nd at the last

22   state of the estate, we've been working, I think, extensively

23   and very cooperatively with the unsecured creditors' committee

24   to, in fact, develop a common approach to a compromised plan.

25   And without going too far in knowing this, Mr. Dunn can correct
```

LEHMAN BROTHERS HOLDINGS INC., et al.

 1   me if he so chooses, I feel as though we're very close on the

 2   economic compromise side of the world.  We still have some

 3   governance type matters post-emergence that we're trying to

 4   iron out.  But I believe we've made good progress and I hope

 5   they feel the same way.

 6        Also we've had numerous and, frankly, exhaustive

 7   meetings and received an awful lot of input from major

 8   creditors.  As Mr. Miller mentioned in the opening, the group

 9   of senior noteholders at LBHI just filed a plan premised on

10   substantive consolidation.  We've had multiple discussions with

11   those individuals over time.  And certainly, by having filed

12   their plan, it's clear to us what their view is.  And, in fact,

13   we will adopt elements of their plan in our proposed plan.

14        On the other end of the spectrum, we have other groups

15   representing creditors of the domestic subsidiaries that have a

16   view of the world towards nonconsolidation.  In fact, not only

17   nonconsolidation but they'll take it a step further to

18   nonconsolidation and recharacterization of intercompany debt.

19   So you've got two ends of the spectrum there.

20        THE COURT:  May I just break in for a minute.  There's

21   someone on the telephone who is projecting into the courtroom.

22   If you're listening on CourtCall, please mute your phones now

23   or stop talking if you can't mute your phone.  Thanks.

24        MR. SUCKOW:  But needless to say, in developing the

25   amended plan, the debtors have taken into account input from

Page 27

1   all of the major constituents.  And this would include

2   creditors of not only LBHI but the subsidiary debtors, LCPI,

3   LBCS and LBSF creditor groups and, of course, the creditors'

4   committee.

5          Just a footnote, since it's been raised in the prior

6   state of the estate, the communication between the debtors and

7   LBI I think has improved.  I think there's a regular weekly or

8   bi-weekly call.  In terms of settlement, continues to progress

9   slowly but at least we're communicating, Your Honor.

10          So from a domestic and foreign affiliates perspective,

11   we've received an awful lot of input from all the major

12   constituents.  And I think the debtors do fully understand at

13   this point the legal and economic positions of each of those

14   constituencies.

15          Turning the page, we really had hoped we would be

16   filing a plan by today so that we could divulge more detail of

17   the amended plan.  But what I'm providing on the next couple

18   pages is a very high level overview of what we see the

19   settlement framework being.  It's really two steps.  The first

20   step is a settlement compromise between the senior and general

21   unsecured creditors of the holding company, LBHI, and the

22   creditors of the subsidiary debtors.  In that regard, creditors

23   of certain of those subsidiary debtors will have a portion of

24   their recovery reallocated to the LBHI senior unsecured and

25   general unsecured creditors.  Likewise, creditors of those

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 28

1    subsidiary debtors that also have a guaranty claim against LBHI

2    will have a percentage of those recoveries reallocated to the

3    LBHI senior unsecured and general unsecured creditors.

4          And then lastly, nontrading intercompany claims of

5    LBHI against these subsidiaries will be reduced by a certain

6    percentage.  Cutting through all this without getting into

7    specifics, we're attempting to create a mechanism to avoid the

8    fight over substantive consolidation recharacterization of

9    debt.  It's basically what it is in a nutshell.

10         Turning the page, similarly, as between the debtors

11   and the foreign affiliates, creditors of the foreign affiliates

12   that hold guaranty claims against LBHI will have a percentage

13   of their recoveries reallocated to the LBHI senior unsecured

14   and general unsecured creditors.  And the foreign affiliate

15   guaranty claims as between the Lehman entities against LBHI

16   will be reduced depending on the type of guaranty claim.

17         So turning --

18         THE COURT:  Let me ask you a question --

19         MR. SUCKOW:  Sure.

20         THE COURT:  -- recognizing that it may be premature

21   since the plan hasn't yet been finalized and isn't yet public.

22   From your description, the compromises appear to remain to a

23   blend in which outcomes will be someplace between substantive

24   consolidation and separate plans with reallocation being a

25   mechanism to achieve that compromise.  Do I understand that

Page 29

1   correctly?

2          MR. SUCKOW:  That is correct.

3          THE COURT:  Will the plan include what amounts to an

4   allocated percentage that affects that compromise?  And is that

5   compromise something that has been the subject of ongoing

6   negotiations with creditor constituencies?

7          MR. SUCKOW:  Yes and yes --

8          THE COURT:  Fine.

9          MR. SUCKOW:  -- to both of your questions.

10         THE COURT:  And is it anticipated that the plan as

11  filed will at least have the support of some of these

12  constituencies or is that support something to be achieved over

13  time?

14         MR. SUCKOW:  It is our hope and expectation that we

15  will -- when filed, we'll have the support of our unsecured

16  creditors' committee if we can get over some of these other

17  issues that we're still to resolve.

18         Short of that, it's going to be difficult to have had

19  a negotiation with some of these other parties that, for

20  example, are not restricted.

21         THE COURT:  Understood.  Okay.  Thank you.

22         MR. SUCKOW:  So, in conclusion, on page 13, since

23  March, the debtors have refined the fact base and the legal

24  analysis especially as it relates to the various guaranty

25  claims.  The debtors have also refined their understanding of

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 71

Page 30

1   the positions taken by the numerous Lehman constituents.  Mr.

2   Marsal pointed out the debtors have continued to refine their

3   estimate of claims, especially the foreign guaranty claims.

4        The fact of the matter is the initial plan that we

5   filed did not seek compromises from all stakeholders.  This

6   plan will be looking to achieve concessions from all

7   constituencies in one form or the other.  But we do think that

8   the proposed concessions will result in a fair resolution of

9   all issues.  I hope that the parties that a lack of flexibility

10  may be detrimental to theirs and other economic interests.

11       And finally, Mr. Miller, I think, mentioned this

12  already.  But our timetable -- we really do anticipate filing

13  the plan in the very near future.  Obviously, we will review

14  and discuss the plan with the constituencies in the days and

15  weeks following the plan.  But we are hopeful, Your Honor, that

16  this is kind of it.  We -- you know, there's moving parts.  But

17  we really hope that this is -- there's not a lot of flexibility

18  on that front.  But the prosecution of the amended plan itself

19  will be dependent on the level of support -- basically goes to

20  your question -- and, of course, the Court's calendar.

21       And with that, I'll turn it over to my colleague,

22  Daniel Ehrmann, who can address kind of the additional gaiting

23  issues.

24       MR. MILLER:  Your Honor, may we amplify Mr. Suckow's

25  statements about the plan in terms of --

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 71

Page 31

1            THE COURT:  Absolutely.

2            MR. MILLER:  -- what the structure of the plan will

3    be.  Ms. Fife will do that, Your Honor.

4            MS. FIFE:  Just one point now that Mr. Suckow

5    mentioned the compromise.  The compromise with respect to

6    reallocation reflects the compromise of many issues not just

7    substantive consolidation.  That's all we wanted to point out.

8    Thank you.

9            THE COURT:  Okay.

10            MR. MILLER:  And, if I may, Your Honor, I'd like to

11    add some statements.  Your Honor, time has been very valuable

12    in these cases.  There are many, many constituencies and many

13    constituencies demanding time.  And within the framework of Mr.

14    Marsal's aspirational statement on September 22nd, the actual

15    drafting of the plan hasn't been timed to meet with every

16    single constituency to effectuate, let's call it, final

17    negotiations.  I think what Mr. Suckow was trying to say is

18    that we will be filing a plan in the next seven to ten days

19    hopefully.  And then there will be a period of time that we

20    will expect before there is a hearing to approve a disclosure

21    statement for a series of discussions and negotiations to build

22    a consensual basis for this plan.  The objective is hopefully a

23    hundred percent consent.  I have to say, Your Honor, given the

24    many constituencies, that's very aspirational.  Certainly, we

25    hope to have the UCC, the unsecured creditors' committee,

08-13555-mg    Doc 14232    Filed 01/14/11    Entered 02/01/11 12:46:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 71

Page 32

1  supporting it and other constituencies.  But the objective,

2  Your Honor, is to get a plan confirmed, whether it's a hundred

3  percent consensual or otherwise, well before the end of this

4  year.

5          THE COURT:  Fine.  Thank you.  Mr. Ehrmann, it's your

6  turn.

7          MR. EHRMANN:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. EHRMANN:  In addition to obtaining a consensus

10  around a plan of reorganization in order to ensure

11  distributions to our creditors, we obviously will need to

12  resolve the claims population.  And as Your Honor knows, the

13  largest claims and most controversial claims stem out of the

14  derivatives population.

15          While we have made significant progress with all the

16  derivative entities in terms of asset collections, we are still

17  facing numerous challenges in terms of claims resolution and

18  are fearful that our process will be very time consuming and

19  costly.

20          We have been working over the last several months on a

21  solution to that challenge which is the framework -- settlement

22  framework agreement that we want to discuss here today.  As for

23  the plan, we have not published these guidelines yet and hence

24  we'll keep it a very high level framework discussion.

25          So just to set the stage, there are approximately

08-13555-mg    Doc 14232    Filed 01/14/11    Entered 02/01/11 12:46:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 71

Page 33

1  forty-five billion derivative claims which are encompassed by

2  about 3,000 contracts represented by close to a million trades.

3  As you can see on the chart that we have on page 16, we have

4  settled about five billion worth of claims or fifty-three

5  percent of the contract, but only seven percent of the trades.

6  So there's a large population remaining.

7        Also, interesting point is that out of the large

8  population remaining, the big banks, the big financial

9  institutions that were our counterparties represent about

10 forty-eight percent of the actual claims and eighty-five

11 percent of the actual trades.

12       So going forward, in order to resolve these claims, we

13 will have two key challenges.  One is we're really getting to

14 the most controversial claims population and we're getting to

15 the larger population in terms of trade comp.  And so there's

16 really two routes that we can pursue here.  One is the route

17 that we have been pursuing today which is dealing with this

18 problem contract by contract, and we are very fearful that that

19 will result in extensive amount of work and in drawn out

20 litigation.  Two, is trying to find a global solution that we

21 apply to all of the derivative population in a uniform matter.

22       So we'll go to page 17.  What is this global

23 settlement framework that we're talking about?  We have been

24 working in collaboration with the UCC and with certain

25 financial institutions that are major counterparties in order

Page 34

1    to come up with a framework that would have a consistent set of

2    rules that we would try and apply uniformly to all of the

3    remaining derivative claims population.  What the framework

4    tries to do is do two things.  One is establish a set of rules

5    that we would apply to everybody in a consistent manner.  And

6    two, provide creditors with a commitment to a uniform process

7    and a uniform timeline to resolve the remaining claim

8    population.

9           As it pertains to the rules -- and as I said, these

10   rules are going to be very elaborate and will be developed in

11   collaboration with the unsecured creditor committee and with

12   some of the financial institutions.  But to just give you the

13   major rules -- there are really three.  There are three rules

14   that will allow the debtor to value each of the derivative

15   claims.  The first rule is that we would value derivative

16   claims at mid-prices at the end of the day of the termination

17   date of the derivative contract.  There's one exception to that

18   rule which is that if the counterparty can't satisfactorily

19   prove to us that they had an economic closeout, at a different

20   point in time during the termination date, we will accept that

21   different point in time.

22          Number two, we will look at the portfolio of trades

23   that are in a derivative contract based on a portfolio

24   aggregation methodology which is really a netting of different

25   derivative trades.  And those netting rules are still being

LEHMAN BROTHERS HOLDINGS INC., et al.

1    developed as we speak.

2         And number three, once we then have a price, we will

3    allow for a bid-to-ask allowance on top of the mid-price based

4    on commercially reasonable rules that we are still developing.

5         Those are the rules.  There are two exceptions to

6    these key rules which are on the next page.  One is if the

7    counterparty has actually replaced the trades with identical

8    trades in a commercially reasonable manner at termination date,

9    we will take their termination value -- their replacement

10   value.  I apologize.

11        Two, if the counterparty has actually used the market

12   quotation process under the 1992 ISDA and adopted that in a

13   commercially reasonable way, we will use the number that comes

14   out of that market quotation methodology.

15        So those are the rules.  Next, in terms of process and

16   timeline -- in terms of process, as I said, we are still in the

17   midst of developing these rules.  We intend to continue to work

18   with the creditors' committee in order to refine the rules.

19   And then we're actually going to work with a set of financial

20   institutions that are major counterparties to Lehman in order

21   to get input on those rules.  And then we actually would like

22   to publish those rules and the result of those rules in order

23   for the different creditors to vote on those rules and the

24   result in the context of the plan of reorganization.  So we

25   will effectively create, by derivative entity, a separate class

1    for the derivative claimants so that they can vote on this

2    framework.

3              We --

4              THE COURT:  Let me --

5              MR. EHRMANN:  Sorry.

6              THE COURT:  -- stop you for a second just so I

7    understand what you've said.  Are you saying that the plan will

8    include a mechanism that will be sent out for what amounts to

9    popular vote by members of the derivative class and if that

10   class accepts the set of rules for valuing all derivatives

11   within that class, even dissenting holders within the class

12   will be bound by the vote in accordance with 1129 principles?

13             MR. EHRMANN:  That's the expectation, correct.

14             THE COURT:  Okay.

15             MR. EHRMANN:  That's the hope.

16             MS. FIFE:  Yes.

17             THE COURT:  That's correct?

18             MR. EHRMANN:  Thank you.

19             MS. FIFE:  Yes, that's correct.

20             THE COURT:  Okay.  I just wanted to make sure I

21   understood it.

22             MR. EHRMANN:  That's correct.

23             MS. FIFE:  That's the proposal.

24             MR. EHRMANN:  One last point here.  And this is --

25   again, this is somewhat aspirational but we are targeting to be

Page 37

1   able to provide each individual derivative creditor with the

2   number that would result out of the rules by April 30th.

3            Next, just on page 20, this is merely a recap of what

4   we believe to be the benefits of the settlement framework.  We

5   believe that it's a framework that will apply uniform rules in

6   a transparent way to all of the creditors.  We believe that we

7   have set up a process that is collaborative.  We also believe,

8   however, that the same way the plan of reorganization -- this

9   framework will require compromise by a number of creditors.

10  But we believe that those compromises largely outweigh the

11  alternative which we believe to be many years of drawn out

12  litigation in this case.

13           THE COURT:  Thank you, Mr. Ehrmann.

14           MR. EHRMANN:  Thank you.

15           MR. DUNNE:  Good morning, Your Honor.

16           THE COURT:  Good morning, Mr. Dunne.

17           MR. DUNNE:  For the record, Dennis Dunne from Milbank

18  Tweed Hadley & McCloy on behalf of the official creditors'

19  committee.  I'd just like to share the committee's thoughts and

20  perspectives on the case and the status of the plan.  We echo

21  virtually all of the comments that were made by Alvarez &

22  Marsal as well as Weil.  We've worked around the clock with the

23  debtors towards the goal of filing a plan that's not a

24  placeholder plan.  That's a plan that we can march towards

25  confirmation with.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 38

1          Before I get into some of the details, let me explain

2    what were the committee's objectives and goals in this process

3    in a little more detail.  As the Court is aware, we currently

4    serve as the official committee for each of the U.S. debtors in

5    cases pending before Your Honor.  In addition, I think that we

6    are currently the only entity where the principals are fully

7    restricted and so we're sharing nonpublic information real time

8    with the debtors and thus are making decisions on a real time

9    basis.  And with the debtors, I believe we're the only other

10   fiduciary with broad duties to either the unsecureds or the

11   entire estate here.

12          We do not want this plan to be a springboard for

13   litigation but rather to serve as a framework for settlement.

14   What that means is we will not adopt any one party's position

15   in toto.  We've met with every creditor constituency.  We have

16   a sense of what they would like to see in the plan, the

17   parameters that they would find acceptable.  And the committee

18   has considered those views and it will infuse the ultimate

19   decisions that the committee makes.  But what we are striving

20   to do is come up with a reasonably good and justifiable plan.

21   It may not be anybody's version of a perfect plan.  But it's a

22   good plan and it's one that we can defend to all parties.  And

23   it will have baked into it a number of potential compromises

24   and settlements.

25          Towards that end, the committee has charged its

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 39

1    advisors with basically calling balls and strikes on a bunch of

2    legal issues, to dispassionately and impartially go legal issue

3    by legal issue and advise the committee of what is the

4    probability weighted outcome in litigation and how best to

5    avoid it with a realistic compromise.

6         We have substantially completed all of those analyses.

7    We've shared our views with the debtors.  We hope that a lot of

8    that and expect a lot of those parameters will be baked into

9    the plan.  So at the end of the day, we basically have two

10   goals.  We hope that we'll be back in front of you shortly

11   where there will be a revised plan that has the support of the

12   creditors' committee on not just the economic issues but also

13   the noneconomic terms contained in the plan and that we can

14   both stand up in front of the Court and advise Your Honor that

15   the estate's two fiduciaries support the plan.

16        One last point.  We have been working also on a

17   discovery protocol.  This is a post-plan filing action item.

18   But after the plan is filed, a lot of the parties are going to

19   want to know how do we build up to these various compromises

20   and settlements contained in the plan.  We're working on a

21   protocol to provide access to the material facts relevant to

22   each of those legal issues which we hope to settle in the plan

23   and in that manner provide access to various parties in

24   interest or anyone who so chooses to avail themselves of that

25   protocol.

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 71

Page 40

1        And with that, unless Your Honor has any questions,

2   I'll cede the --

3        THE COURT:  I don't.  Thank you.

4        MR. SHORE:  Good morning, Your Honor.  Chris Shore

5   from White & Case.  I had some prepared comments and then I'm

6   happy to answer any questions the Court may have.  We've

7   appeared before Your Honor a number of times in these cases.

8   But let me begin by an introduction.  White & Case has actively

9   the ad hoc group of Lehman Brothers creditors in these cases.

10  It consists largely of pension funds, municipalities,

11  institutional holders and secondary holders including

12  distressed funds.  While the group's members hold claims across

13  the Lehman capital structure, the holdings are principally

14  weighted towards direct claims against LBHI in the form of

15  senior notes and similar claims.  Many of the group's holders

16  are large holders and, in fact, perhaps the largest creditors

17  in these cases.  But others are relatively small.  Notably,

18  certain of the group's members are pre-petition par holders who

19  are among those most affected by Lehman's collapse.

20        On December 15th, 2010, as mentioned, the group filed

21  a proposed plan and related disclosure statement.  At that

22  time, we disclosed we held over twelve billion dollars of

23  claims across the Lehman capital structure including

24  approximately 9.4 billion at LBHI.

25        Since the filing of that plan, a number of additional

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 41

1    entities have joined the group including the City of Fremont,

2    Canyon Partners and PIMCO.  As a consequence of these

3    additions, the group's holdings have almost doubled in the last

4    month and the group now holds over twenty billion dollars of

5    claims across the Lehman enterprise including approximately

6    sixteen billion of senior unsecured claims at LBHI.  We're in

7    the process of adding additional members and as soon as our

8    holdings stabilize, we'll file addition appropriate disclosures

9    with the Court.  But as far as things stand today, we believe,

10   Your Honor, that our group now holds substantially more claims

11   than the members of the official committee or any other

12   member -- or any other group in this case and, in fact, believe

13   this group is the largest ad hoc group of creditors ever put

14   together in any Chapter 11 case.

15        While the debtors have expressed their own views as to

16   what, if any, progress is being made given that our plan is

17   currently on file, we believe it is appropriate and necessary

18   for us to provide our perspective on Your Honor's questions and

19   focus on a question that really wasn't addressed which Your

20   Honor asked which is the need for creditor involvement in these

21   cases.

22        At the outset of these cases, Mr. Marsal stated that

23   the debtors' internal objective was to have a plan confirmed

24   within eighteen to twenty-four months.  Obviously, that's not

25   happened and for good reason.  As complex as these cases seemed

Page 42

1    when they were first filed, they've only become more complex

2    over time.  One need look no further than the RASCAL's

3    litigation or the Repo 105 disclosures, the related

4    whistleblower letter and the attorney general's lawsuits that

5    were just filed against E&Y to see just how much more

6    complexity exists in these cases than anyone expected.  That

7    said, our principle issues, concerns and the reasons we filed

8    this plan are not based upon the debtors' failure to achieve

9    exit within two years.  Rather, our overriding concern is the

10   debtors have not used any of that two years to facilitate

11   intercreditor negotiations that are going to be essential to

12   moving this process forward in a meaningful way.

13          I'm going to come back to that but it's clear that the

14   debtors have not established any communication or discovery

15   protocol between creditors.  They have not called intercreditor

16   meetings.  They have not sought to foster other formal or

17   informal creditor groups forming within the capital structure.

18   And as of today, they still have no creditor support for any

19   plan on file.  From a plan process standpoint then, very

20   little, if any, real progress has been made towards exit.

21          Why are creditors important here?  The debtors'

22   current plan on file as well as the one that was just outlined,

23   purport to recognize the corporate integrity of each debtor.

24   That is, to set up plans based upon a statement of the assets

25   and liabilities of each debtor.  They then propose an economic

Page 43

1    resolution of the hundreds of billions of dollars of claims by

2    and between the twenty-three debtors in these cases with pay-

3    overs and claim caps and claim discounts and other bells and

4    whistles.  We suspect the reason why the architects chose such

5    a convoluted structure relates to the perceived evidentiary

6    burden that comes along with substantive consolidation which

7    would get rid of all of those issues.  But any one who opposes

8    substantive consolidation in these cases does so on an untested

9    premise that one can ever obtain a judicial determination of

10   each debtor estate's respective assets and liabilities in these

11   cases.  Based upon what we've been able to see here,

12   nonconsolidation of Lehman entities will prove a fiction and

13   substantive consolidation, by default, is going to be the only

14   way that we can get these cases out in a reasonable period of

15   time and do so according to the Bankruptcy Code.

16         To be clear, the plans we've seen from the debtors are

17   not true deconsolidated plans.  They are admittedly books and

18   records plans which start with the books and records of Lehman

19   and make adjustments off that.  But there's a substantial

20   difference between a books and records plan and a

21   nonconsolidated plan.  Any plan that purports to accept

22   Lehman's books and records as a starting point at face value

23   without validation or correction in accordance with the Code

24   presents a significant legal and equitable problem for the

25   Court and all creditors.  One need look no further again at

Page 44

```
 1   Repo 105 to understand that the books and records of Lehman as
 2   they exist do not reflect interdebtor transactions of economic
 3   substance or a fair and legal representation of interdebtor
 4   relations.  As the Court knows, there are a plethora of
 5   interdebtor issues that have already arisen in this case that
 6   have been tabled for further resolution.  And we believe there
 7   are substantially more interdebtor disputes to follow.  For
 8   obvious reasons, however, there are substantial limitations on
 9   how far these debtors and their representatives are able to
10   pursue any litigated resolution of interdebtor disputes.  As a
11   result, and you've heard it now multiple times today, the
12   debtors have a hope plan which is based upon the hope that
13   creditors accept what the debtors propose.  Or, if the debtors
14   (sic) do not accept the proposal, the debtors do not have a
15   legal path to confirmation and exit.  One might fairly ask
16   what's the problem of hoping for settlement.  The problem, from
17   our perspective, is that without a legal path to exit there's
18   no impetus for creditors to step forward and join in the plan
19   process.  In fact, that's exactly been borne out in these
20   cases.  There's been a plan on file since last March.  There
21   has been almost no engagement between creditors on issues
22   related to that plan or any dialogue in the court reflecting
23   creditor views of the plan.  Until there is a possibility of
24   proceeding without consent, no creditors are going to consent
25   to anything.
```

Page 45

1          To be crystal clear, the debtors' plan, based on the

2     books and records, we believe, could just bring more delay and

3     gridlock if we get to the point where the hope doesn't pan out

4     because the relationship between the Lehman entities and the

5     allocation of assets and liabilities based upon the interdebtor

6     issues sit squarely in the path to any exit.  To put some

7     significance around -- or some context around the significance

8     of the interdebtor issues, you just need to look at the three

9     main estates in this case:  LBHI, LBSF and LCPI.  A third of

10    LBHI's total distributable assets consist of intercompany

11    receivables from other debtors.  A sixth of estimated allowable

12    claims at LBHI, or more than forty billion, are either direct

13    intercompany claims or related third party claims such as

14    claims arising under what has been referred to as the board

15    resolution guaranties.  While a small fraction of LBSF's total

16    distributable assets, around seven percent, consists of

17    intercompany receivables, more than half of LBSF's total

18    estimated claims are asserted by other debtors.  With respect

19    to LCPI, more than seventy percent of the total estimated

20    claims against that debtor are claims that are asserted by

21    other debtors.

22          So in the simplest of terms, in the absence of

23    substantive consolidation, someone, in our view the creditors,

24    are going to have to prosecute and defend these claims and

25    allocate recoveries if the hope doesn't pan out.  To that end,

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 71

Page 46

```
 1    on June 29th, 2010, our group filed a preliminary objection to

 2    the debtor's plan and disclosure statement based on these

 3    concerns.  Notwithstanding our objection, the group has

 4    consistently expressed a desire to see these Chapter 11 cases

 5    resolve themselves quickly and with minimal administrative

 6    overhead.  Accordingly, at that status conference, we suggested

 7    that the Court adopt a set of discovery procedures for the

 8    prompt and efficient resolution of interdebtor issues.  At the

 9    hearing, the debtors expressed maybe a reluctant willingness to

10    consider adopting a process for transparency and creditor

11    participation, but over the last six months we've heard

12    numerous promises of action that have not panned out at all.

13    This Court has twice now asked what's happening with any kind

14    of procedures and protocols.  To date, there has been no

15    proposal put forward.  We have not seen a single concrete

16    suggestion as to how the debtors or the committee intend to run

17    the confirmation process.  And nor was anything outlined even

18    today.  To add to the problem, the debtors have rebuffed or

19    provided insufficient responses to our group's discovery

20    requests regarding interdebtor issues and we don't believe they

21    responded to anybody else's discovery requests.  For instance,

22    although the debtors have established a data room, it still

23    contains a relatively small number of documents the bulk of

24    which are either public or nonresponsive to interdebtor issues.

25    As a plan proponent now, we are in a position of not being able
```

Page 47

```
 1    to wait for the debtors to find a path to exit nor to have the
 2    debtors and the committee dictate what the process is going to
 3    be.  In the absence of something coming forward in the very
 4    near term, we're going to file a motion then to establish
 5    procedures related to the pursuit of any plan including
 6    discovery protocols for anybody who wishes to participate.  The
 7    Court can then approve what it sees to be the most reasonable
 8    and appropriate solution but there has to be something put
 9    forward if we're going to proceed to exit.
10          As for our plan, following the July omnibus hearing,
11    it became clear to the group that the debtors had little
12    inclination to facilitate a meaningful process to resolve
13    interdebtor issues.  Moreover, over the summer and early fall,
14    it became clear that creditors in these cases can't sit back
15    and wait for a hope plan being confirmed while professional
16    fees and expenses continue to accrue at historic rates.
17    Accordingly, the group proposed and filed its own plan.  Now I
18    don't see today as the day to discuss details or plan mechanics
19    or the merits of this plan or any other alternative plan, but
20    in essence, our plan is based, as was said, on a substantive
21    consolidation of each debtor estates as well as certain other
22    Lehman entities.  Based on all that we've seen, we believe that
23    the Court can and should enter that relief if we need to get
24    there.  That is, we have a litigated out if necessary.  But we
25    need to be clear on this point.  We want economic peace.  We've
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 48

1  said it before; we believe it and that's where we believe these

2  cases have to go.  A key feature of our plan then are optional

3  settlement treatments designed to avoid the cost and delay

4  associated with litigation over the appropriateness of

5  substantive consolidation and other related interdebtor issues.

6  With sufficient creditor support, some or all of the debtor

7  estates and their creditors can bypass any litigation under our

8  plan.  But unlike the debtors' plan, ours does allow for a

9  judicially ordered resolution with respect to groups that do

10  not consent.  In this respect, we are not constrained by merely

11  hoping for acceptance; we have a path to exit.

12      The group also believes that in contradistinction to

13  the debtors' construct, substantive consolidation has key

14  benefits to all besides avoiding the war.  First, it allows for

15  a recombination of Lehman assets within the enterprise which

16  can accrue substantial additional value without the overhang of

17  interdebtor issues.  Second, substantive consolidation will

18  resolve dozens if not hundreds of asset ownership issues and

19  other interdebtor issues that are left open under a books and

20  records plan.  Even assuming confirmation of a hope plan based

21  on books and records, to be clear about this, there are going

22  to be years of additional post-confirmation litigation and the

23  accrual of massive professional fees.  There has to be a better

24  alternative than that.

25      In connection with proposing our particular

Page 49

 1    alternative, the group has met with a number of significant

 2    parties in these Chapter 11 cases as well in addition to the

 3    debtors and the creditors' committee.  We've met with

 4    representatives of foreign affiliates and a number of other ad

 5    hoc groups and large creditors.  We have additional meetings

 6    scheduled going forward with groups, trustees, foreign

 7    representatives and the Lehman board.  We understand that the

 8    debtors are now seeking to adopt certain of our mechanisms in

 9    their plan and we'll be their plan closely and engaging with

10    them.

11            But despite the devotion of our time to this problem,

12    we have no pride in authorship over our plan and hope that a

13    consensual resolution of these Chapter 11 cases is ultimately

14    reached.  In this respect, we welcome further plan and process-

15    related discussions with other interested creditors, parties in

16    interest and the debtors themselves.  In fact, I personally

17    invite anyone who would like to add input on discovery protocol

18    before we have to file our motion to call me directly.  We

19    really should all be getting together on that.  I'd be happy to

20    discuss the plan with anybody as well as my partner, Gerard

21    Uzzi.  Our door is open and we're prepared to move the process

22    forward.

23            With respect to the process, as noted in our

24    disclosure statement, we're, for the time being, in a holding

25    period awaiting a long promised amended plan from the debtors.

Page 50

1   It is our intention that provided that plan is filed in the

2   near term, we would seek approval of our disclosure statement

3   contemporaneously with the debtors to allow for joint

4   solicitation and concurrent discovery and prosecution of the

5   plan.  Neither the creditors nor the Court can afford to wait

6   indefinitely, though.  We trust that this time the debtors are

7   accurate in their predictions of an imminent filing, but if the

8   opposite proves true, it may be simply that we have to come

9   back to the court and seek a disclosure statement hearing in

10  the absence of the debtors' plan.  Every month in these cases

11  accrues more professional fees than are awarded in almost any

12  other Chapter 11 case for the life of the case and we need to

13  get the process moving.

14          Unless the Court has any other questions, I've got

15  nothing further for now.

16          THE COURT:  Actually, I haven't asked you any

17  questions.

18          MR. SHORE:  Okay.  If you have any questions.

19          THE COURT:  I have a bunch of them but I think this is

20  probably not the right time to ask them.  I think this process

21  needs to ripen a bit more.  And I don't think it would be

22  useful for me to ask questions before I've had an opportunity

23  to allow this process to move forward after the debtors' plan

24  has been filed.  I'm conscious of your concluding remarks in

25  which you indicate that you're very willing to work with the

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 71

Page 51

1    debtor in the development of a consensual plan and you're

2    anxious to see which parts of your work product have been

3    adopted by the debtors.  Presumably, if sufficient

4    accommodation has already been made, there may be an

5    opportunity for you to work within the confines of the debtors'

6    plan.  If not, I'm hearing you suggest that a competing plan

7    process in which one of the plans calls for a substantive

8    consolidation is, in your view, a more efficient process than

9    developing a consensual plan as proposed by the debtors'

10   professionals.  I think that's a highly debatable proposition

11   but I'm not going to debate you on it now.

12            MR. SHORE:  Okay.  All right.  Thank you, Your Honor.

13            THE COURT:  Okay.

14            MR. MILLER:  If Your Honor please, Harvey Miller.

15   Just to clarify the record, Your Honor, Mr. Shore's statements

16   are overblown.  We didn't come here today to debate the merit

17   of substantive consolidation or all the other issues that have

18   to be resolved in this case.  For Mr. Shore to stand up here

19   and say this case has gotten more complex is utterly absurd.

20   The two years that have been spent have been determining what

21   is this entity -- these entities that are before the Court.

22   And there is an awful lot of information that has been

23   furnished, Your Honor.  Every constituency has a financial

24   advisor who has signed a confidentiality agreement including

25   the ad hoc committee.  One of the problems in this case is Mr.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 52

1   Shore's clients don't want to be restricted.  They want to get

2   into the asset levels because there's constant trading going on

3   in the claims in these estates.  And that makes a difficulty in

4   providing them with information.

5          Now, Your Honor, I wrote a letter to Mr. Shore on

6   November 10, 2010 concerning his discovery requests.  There was

7   never an answer to this letter.  We wrote a letter on January

8   3, 2011.  There hasn't been any answer to that letter.  We had

9   a meet and confer with the ad hoc representatives, Your Honor.

10  And we said we had to have one discovery process for everybody,

11  not two or three, four, five different times.  And for Mr.

12  Shore to say there's no exit in our plan, there is an exit.

13  And if there's anything that's a hope plan, hope belongs to the

14  ad hoc creditors' plan.  It's a compromise and settlement plan

15  very much like what was described today.  It's going to depend

16  on constituencies.  And Mr. Shore stands here, Your Honor, and

17  he says substantive consolidation like that is the simplest

18  thing to get in the world of bankruptcy.  He forgets about the

19  holdings and decisions of the Second Circuit, that substantive

20  consolidation is a Draconian remedy.  And there are plenty of

21  creditors out here, Your Honor, who believe in noncon, if you

22  want to use that word.  And what our -- or the debtors are

23  proposing, Your Honor, is almost, in the broadest terms, a way

24  to avoid litigation over substantive consolidation which,

25  again, will take this Court in endless hearings, endless

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 53 of 71

Page 53

1    discovery about each and every aspect of the operation.  It's

2    in the economic interest of everybody, Your Honor, to reach a

3    fair economic resolution of these cases.  And that's what the

4    debtors want to do.

5              And as I said before, Your Honor, time is valuable.

6    It's a very big case.  And to compare this case in terms of

7    professional fees or almost anything to any other Chapter 11

8    case, it's not a comparable situation.

9              We have a creditors' committee, Your Honor.  We have

10   spent enormous amounts of time with this creditors' committee

11   which is the anointed body for negotiating a Chapter 11 plan.

12   And, Your Honor, we are not adopting the work product of White

13   & Case.  These negotiations about how to figure out the

14   economic solution have been going on since April.  And the

15   idea, and as Mr. Suckow said and Mr. Marsal said, is to find

16   the solution in which not everybody's going to be happy.  In

17   fact, everybody will be a little bit unhappy.  And that will be

18   a good deal, Your Honor, if we can get it through.

19             And in terms of the exit, Your Honor, if we don't get

20   a hundred percent consent, we do have an exit.  We will go

21   forward.  We will go forward to a confirmation hearing.  What

22   we're trying to avoid is a confirmation hearing which will

23   consume this Court and the parties for months.

24             Everybody involved in this case, Your Honor, will come

25   to conclusions at some point in time that economically a

08-13555-mg    Doc 14232    Filed 01/14/11    Entered 02/01/11 12:46:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 54 of 71

Page 54

1    compromise and settlement of all these issues, and on very

2    serious issues, Your Honor -- that's not only substantive

3    consolidation.  It's recharacterization of debt.  It's

4    corporate authority.  The Repo 105, Your Honor, is a red

5    herring.  If the former attorney general thought that was a

6    good lawsuit, it's a Martin Act lawsuit, has nothing to do with

7    the administration of this estate, Your Honor.  And if we look

8    at the dollars involved in Repo 105, it's not going to make a

9    big difference.  And whether there are claims that belong to

10   this estate or not on Repo 105 is a determination that will

11   have to be made.

12          But what I want to point out, Your Honor, is that

13   since April of 2010, there has been very substantial progress.

14   Other constituencies have not complained, Your Honor, about a

15   diligent -- access to information.  Other constituencies have

16   their own views.  And what we are trying to do is put all of

17   this together.  And we've listened, as Mr. Suckow said, to

18   every constituency including the ad hoc committee.  And we've

19   tried to come up with something that incorporates the best

20   features of everything.  But we have -- we will have a plan on

21   file, Your Honor, which has an exit strategy and which can be

22   prosecuted to fulfillment and confirmation.  And it's going to

23   be a better plan, Your Honor, than the ad hoc plan.  And to say

24   that they are the only serious creditor -- I think he mentioned

25   twenty billion dollars.  We're talking about claims of over 300

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 71

Page 55

1    billion dollars, Your Honor.  And every creditor constituency

2    has its own problems or its own desires.  What the debtors are

3    trying to do is be the mediator in effect of all of that, Your

4    Honor.

5          So we didn't come here, as I said, prepared to argue

6    substantive consolidation.  Someday we may be here to argue

7    that.  But this is not the time, Your Honor.  And we did not

8    expect to talk about the issues that Mr. Shore brought up.  And

9    I can't let the record sit the way he left it, Your Honor.

10   Thank you.

11         THE COURT:  Okay.  Mr. Huebner?

12         MR. HUEBNER:  Good morning, Your Honor.  For the

13   record, I am --

14         THE COURT:  Do you have a plan, Mr. Huebner?

15         MR. HUEBNER:  I definitely do not.

16         THE COURT:  Good.

17         MR. HUEBNER:  And let me be -- let me explain exactly

18   why I am standing, Your Honor.  For the record, I am Marshall

19   Huebner of Davis Polk & Wardwell on behalf of LBIE which is

20   also a rather large and to date somewhat less noisy creditor in

21   this case than Mr. Shore's clients.

22         Your Honor, we actually do have a plan.  And it's not

23   filed.  And hopefully it never will be filed.  And I want the

24   silent majority's view, at least as I see it, to be as clear as

25   Mr. Shore's very detailed presentation.  I didn't come here

Page 56

1   with a twenty-five page state of the estate from my perspective

2   because that's not what the Court asked for from each

3   individual creditor.  Otherwise, the line was out the door this

4   morning.  There would currently be a line up here at the podium

5   to make the same speeches.

6          So let me just be very compressed but very clear.  We

7   view the legal issues in Mr. Shore's plan very, very

8   differently than White & Case does.  We stand absolutely ready

9   to litigate them if a compromise can't be reached.  We stand

10  ready within seven to ten days to file a plan.  We have no

11  intention of ever doing so because it's the wrong approach.  If

12  this case evolves into the LBSF creditors filing their plan and

13  Mr. Shore's LBHI parent creditors filing their plan and LBT,

14  which has a thirty-four billion dollar claim filed in the plan,

15  and LBIE, which has huge claims, filing a plan, we'll be here

16  more than months.  We'll be here years.  Whether we end up

17  ultimately speaking only for LBIE supporting what the debtors

18  and the committee are working on which we have not yet seen, I

19  don't know.  What I can tell you, as the Alvarez & Marsal

20  gentleman correctly stated, we are working extraordinarily hard

21  at the most senior levels to resolve the issues outstanding

22  between LBIE and the debtors which are very serious issues.

23  We've had in-person summit meetings in New York with named

24  administrators and senior A&M people, the people you've heard

25  from at the podium today.  We have another one coming up in

08-13555-mg    Doc 14232    Filed 01/14/11    Entered 02/01/11 12:46:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 57 of 71

Page 57

1    February.  I'm hopeful that we can get to a deal.  But I want

2    there to be no mistake.  The primrose path that Mr. Shore

3    described which is, Your Honor, our plan is great because it

4    will take us on the quick track to confirmation and provide a

5    method for roping everyone in, like it or not.  That is simply

6    totally false.  And again, I'm not going to make a detailed

7    presentation on why it's false.  There are some things in their

8    plan that are okay.  There are some things in their plan that

9    are totally misleading and misrepresent existing case law.

10   There are things in their plan that are laugh-out-loud funny

11   like if any entity doesn't turn over all of its assets,

12   automatically it's death-trapped into receiving nothing and has

13   no claims irrespective of the law.

14          But that's not today's hearing.  So I'm not going to

15   give a parallel presentation.  I just want to be clear.  There

16   are lots of people that could have gotten up and explained the

17   world as they see it like Mr. Shore did.  Most of them

18   hopefully will not do that.  Maybe I'll serve as a bit of a

19   proxy.  But I do share Mr. Miller's view that the passage of

20   time has, in fact, made many things more clear rather than less

21   clear.  And Mr. Shore actually mentioned RASCALS which was sort

22   of an odd example.  That's true.  There was a very serious,

23   very complex dispute about ownership among the Lehman entities

24   of certain classes of assets.  It was teed up.  It was

25   presented to the Court.  It was litigated.  It was ruled on.

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 58 of 71

Page 58

1    And now the parties know.  And another issue is now behind us

2    as opposed to in front of us.

3           So, you know, the claim reconciliation process is

4    another good example.  Again, I'm not signing on to any of the

5    specific numbers on A&M's presentation.  I didn't see it

6    before.  But what I think clearly is directionally true is that

7    as the parties talk, the claim and the gaps between them get

8    narrower and narrower.  The legal issues yet to be resolved get

9    smaller and more attackable and digestible.  And that's

10   certainly what's happening with us.  And I'll be very upfront

11   about this.  The claims that we now -- we believe we have

12   against the estate are still very sizeable.  But they are very,

13   very much smaller than the claim that has a protective matter

14   like all creditors do with limited information at the time and

15   bar dates were originally filed.  The legal issues that

16   separate us continue to get narrowed as we have discussions.

17   And we're soon hopefully going to enter the phase where we're

18   really negotiating over appropriate discounts for each theory

19   as opposed to gathering wool about the theories as a whole.

20          So I'll stop there because, again, if sort of Immanuel

21   Kant was here and everyone acted as if he acted, this would be

22   very terrible indeed.  But I do want to be very clear that we

23   disagree with almost everything he said and stand ready, should

24   we need to, to send this in the type of direction that he would

25   like to see.  You shouldn't be impressed by his twenty billion

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 59 of 71

Page 59

1    dollars.  You shouldn't be impressed by his sixteen billion.

2    What he's really telling you is we're the parent creditors and

3    what we want is what's good for the parent company and very,

4    very bad for everyone else.  I understand that.  They're

5    entitled to advocate for that.  But to stand up here as some

6    sort of arbiter as the discoverer of the elixir or the process

7    that will save us all, that's really not okay.  In fact, there

8    are many, many more billions and tens of billions of creditors

9    who are very misaligned with them.  And should that day ever

10   come, there will be quite a war indeed.

11          THE COURT:  Thank you, Mr. Huebner.

12          MR. DUNNE:  Your Honor, may I just make a suggestion

13   to try to avoid the constant back and forth?

14          THE COURT:  I don't think there's going to be a

15   problem with constant back and forth.  I think we're going to

16   be very quickly coming to the end of the status conference.

17          MR. DUNNE:  Okay.  Good because I'm not going to stand

18   up -- and I could go through and advise White & Case and the

19   other ad hoc what the countervailing arguments are in favor of

20   decon.  I could -- and I'm not going to --

21          THE COURT:  By the way, I actually know all these

22   arguments.  And they were alluded to rather discreetly in the

23   September 22, 2010 status conference in which Mr. Marsal, in a

24   manner that I thought was rather delicate, identified without

25   advocacy arguments in favor of substantive consolidation and

08-13555-mg    Doc 14232    Filed 01/14/11    Entered 02/01/11 12:46:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 60 of 71

Page 60

 1    arguments that were opposed to substantive consolidation and

 2    took no position one way or the other as to whether substantive

 3    consolidation made sense in this case.

 4         Additionally, I am personally familiar with all

 5    applicable Second Circuit case law on the subject of

 6    substantive consolidation because, at least in an earlier day

 7    in my life, I used to do nonconsolidation opinions and I'm

 8    really glad I don't do those anymore.

 9         MR. DUNNE:  I was going to say my condolences, Your

10    Honor.

11         THE COURT:  So I'm fully aware of the applicable law.

12    I recognize how incredibly difficult it is to achieve

13    substantive consolidation except in a consensual setting and

14    have taken with more than a grain of salt everything I've heard

15    from the ad hoc committee and everybody else, for that matter.

16         MR. DUNNE:  And, Your Honor, what we're trying to

17    accomplish with the debtors is a compromise of those issues.

18    It's not going to be, as we said, a wholesale adoption of any

19    one party's interests.  So let's wait to see what the plan

20    looks like.  We'll have discussions with the creditor

21    constituencies, Mr. Huebner's clients, Mr. Shore's clients and

22    everyone else, and gauge their reaction.  They may like a lot

23    of what they see in that plan.  And we're counting on the fact,

24    and everyone has said this, that we should all try to avoid

25    litigation here and getting caught in the quagmire of multiple

Page 61

1    years to figure out whether one party's complete win position

2    is going to prevail because there's a real benefit to emerging

3    from these Chapter 11 cases this year, beginning distributions.

4    And I'm sure all the creditors who are our constituents are

5    very focused on the time value of money.  We think that's a

6    real benefit that's going to be embedded in the debtors' plan

7    that hopefully we can support.

8          In the interim, I think that we can have dialogue on

9    the discovery protocol, hopefully have something in place and

10   roll that out shortly after the filing of the plan.  Thank you.

11         THE COURT:  Okay.  Mr. Miller, do you want the last

12   word?

13         MR. MILLER:  The debtors have nothing further, Your

14   Honor.

15         THE COURT:  What's that?

16         MR. MILLER:  The debtors have nothing further.

17         THE COURT:  Fine.  I think -- here's what I think

18   makes sense.  I think this has been a very useful public airing

19   of issues that surround the plan process.  There's an obvious

20   open and unresolved question concerning a discovery protocol.

21   I believe that, if I understood the committee's earlier

22   presentation, that was something that the committee was

23   interested in helping to develop as well.  Mr. Shore made a --

24   almost a solicitation for people to call him.  I'm not sure

25   that's a good idea but anybody who wants to call him can find

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 71

Page 62

1   his phone number on the internet.  There's certainly nothing

2   that I'm intending to do to discourage open communication among

3   all parties in interest.  But I do think that some level of

4   coordination makes sense, that the plan which has been

5   described by the debtor but which has not yet been revealed in

6   detail, to the extent that it enjoys the support of the

7   official committee of unsecured creditors, we'll have what I

8   think is something close to prima facie validity going for it

9   and, under those circumstances, may turn out to be the vehicle

10  that is most efficiently to be reviewed and modified, if

11  necessary, to achieve consensus with the greatest number of

12  creditors.  I hope the process is a successful one and I look

13  forward to presiding over hearings that will no doubt take

14  place in the months to come.

15          We have a calendar that includes other items this

16  morning.  And I recognize that most people are here for the

17  status report.  Accordingly, I'm going to take about a ten

18  minute adjournment to give people an opportunity who wish to

19  leave to do so.  And we'll resume at a quarter of the hour.

20      (Recess from 11:36 a.m. until 11:49 a.m.)

21          THE COURT:  Be seated, please.

22          MR. SINGH:  Good morning, Your Honor.  Sunny Singh,

23  Weil Gotshal & Manges, on behalf of the debtors.  Your Honor,

24  the only motion on the LBHI portion of this morning's agenda is

25  the uncontested motion to clarify the order authorizing

Page 63

1   procedures for settlement of derivative contracts.

2          Your Honor, the motion requested a clarification to

3   the procedures that were ordered in December 2008 and

4   supplemented from time to time to make it clear that the

5   debtors' authority is not limited if there's an adversary

6   proceeding pending or if there's a party other than the direct

7   counterparty to a settlement such as an indenture trustee.

8          There was only one response filed, Your Honor, and

9   that was by BNY in its capacity as indenture trustee.  That's

10  been withdrawn in light of the revisions that we made to the

11  order and filed in advance of the hearing.  Your Honor, those

12  changes are consistent with the changes that we made to the

13  first -- to the fourth supplemental order that make it clear

14  that any party that objected and was carved out from that order

15  must consent to a termination in order for the procedures to

16  apply to them.  Other than that, Your Honor, no other responses

17  were filed.  And unless you have any questions, we'd ask that

18  the order be entered.

19         THE COURT:  I don't have any questions.  I've reviewed

20  the Bank of New York objection, unfortunately before I saw the

21  withdrawal of the objection.  So I'm familiar with the issues.

22  And let me just ask if there's anybody from Bank of New York

23  present.  Apparently not.  The motion for entry of an order

24  clarifying the scope of the procedures for settlement of pre-

25  petition derivative contracts is approved.

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 64 of 71

Page 64

1          MR. SINGH:  Thank you, Your Honor.  The LBI portion of

2     the agenda is next.

3          MR. WILTENBURG:  Good morning, Your Honor.  David

4     Wiltenburg, Hughes Hubbard & Reed, for James Giddens as the

5     SIPA trustee.  With adjournments, there's a single matter on

6     the calendar today.  There's the second motion of Unclaimed

7     Property Recovery Service, Inc. for an order authorizing and

8     directing immediate payment pursuant to this Court's May 25,

9     2010 order.  The motion has been briefed and if Mr. Battista

10    would care to make some remarks on behalf of the motion, I

11    would invite him to do so.

12         THE COURT:  He's coming to the podium now.

13         MR. BATTISTA:  Good morning, Your Honor.  Paul

14    Battista for Unclaimed Property Recovery Services.  I had hoped

15    that this matter would never be back before the Court.  You may

16    remember that almost two years ago, my client, which served as

17    a finder, pursuant to a contract with Lehman Brothers, brought

18    a motion to be paid for its services.  At the time, it was our

19    understanding that the Office of Unclaimed Property in the

20    state of New York held as much as six million dollars in

21    unclaimed property attributable to Lehman Brothers as well as

22    to various predecessors and subsidiary corporations of Lehman

23    Brothers.  The Court urged both sides to reach a resolution of

24    the issues presented by my client's contractual claim of ten

25    percent of funds recovered from the unclaimed property division

Page 65

1    of New York State.

2         We, over the course of time, have had to bring several

3    motions including the motion about a year ago for at, frankly,

4    the Court's suggestion to get to first base by having the state

5    of New York actually transfer to the clerk of the court the

6    funds involved in this.  At the time, as I mentioned, we

7    thought there might be as much as six million dollars there.

8    There proves to be fourteen million dollars there.

9         At the Court's urging and after several motions we had

10   brought before they were resolved, we did reach an agreement in

11   May of last year with the -- with Lehman Brothers, the debtor

12   under which, as I interpret it and I think the contract is

13   quite clear, my client is entitled to ten percent of the

14   deposited funds.  The deposited funds are defined as the funds

15   held by the state of New York and deposited with the clerk of

16   the court.

17        We did receive, again after bringing a motion that did

18   not need to be resolved by the Court -- it was the motion --

19   the issues raised by the motion were resolved after the papers

20   were served but before the Court was required to rule.  We did

21   reach an interim agreement with the trustee under which --at

22   the time, there were in excess -- the funds from the state of

23   New York came in in stages beginning, I believe, in October of

24   2010.

25        THE COURT:  Mr. Battista, I'm actually familiar with

Page 66

1    the history and I've read the papers.  And I also understand

2    that the trustee is really seeking what amounts to an

3    adjournment so that allocation issues with other Lehman

4    entities can be resolved before further funds are paid to your

5    client.  Obviously, you're showing -- or your client's showing

6    extreme impatience with that.  And I don't want to hear anymore

7    background.  Tell me why you're here today.

8            MR. BATTISTA:  Your Honor, we think the stipulation is

9    quite clear, that we are entitled within ten days of the

10   receipt of funds from the state of New York to ten percent of

11   the aggregate amount received.  At the moment, more than

12   fourteen million dollars have been received.  We calculated the

13   present debt, the present fee, at 680,000 dollars based on the

14   number as it existed in late December.  We think this is a

15   simple matter of applying the ten percent to the amount of

16   funds deposited by the state of New York with the clerk of the

17   court.

18           THE COURT:  Trustee says that the stipulation only

19   obligates payment once the funds have been received.

20           MR. BATTISTA:  And they were received.  The deposited

21   funds are defined as the amount transferred by the state of New

22   York to the registry of the court.  I understand what the

23   trustee is saying is that it needs to go through a process with

24   LBHI to determine which of the two is entitled to the

25   fourteen -- what portion of the fourteen million dollars in

08-13555-mg   Doc 14232   Filed 01/14/11   Entered 02/01/11 12:46:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 71

Page 67

 1    funds that have been deposited.  Our position is that the

 2    stipulation is quite clear --

 3            THE COURT:  I know what your position is.  I've read

 4    it.

 5            MR. BATTISTA:  And at this stage, even assuming that

 6    the trustee is correct that the timing of the payment is

 7    somehow subject to whatever process LBHI and LBI are going to

 8    go through to whack up or allocate the funds, there's no sense

 9    to that provision.  We could theoretically be waiting until

10    this entire proceeding is wound up.  Again --

11            THE COURT:  Have you explored a holdback of some sort

12    that would accommodate the allocation issue or did you just

13    decide to press forward and continue to litigate this issue?

14            MR. BATTISTA:  Well, one --

15            THE COURT:  Could you answer the question?

16            MR. BATTISTA:  We obviously are here --

17            THE COURT:  Did you explore a holdback with the

18    trustee?

19            MR. BATTISTA:  We had some discussions about a

20    holdback.

21            THE COURT:  It seems to me that this entire issue has

22    been litigated unnecessarily.  I read your papers.  I read Mr.

23    Gelb's declaration.  And, frankly, this is another indication

24    of too much litigation and not enough negotiation.  I suggest

25    that you proceed with negotiations leading to a reasonable

Page 68

1    holdback.  You may disagree as to that.  But the trustee is

2    going to have a full opportunity to avoid payment risk.  If

3    there's a meaningful claim that Lehman entities have to these

4    funds, that needs to be determined.  And I read your papers and

5    the relative de minimis funds that are allocated to Lehman.

6    But I also read the papers in response suggesting that there

7    may be other claims far greater than as identified in Mr.

8    Gelb's declaration.  And I'm, frankly, disappointed that the

9    parties haven't tried to explore a business solution to what is

10   fundamentally a business issue.  If you're looking to win

11   today, the answer is no.

12        MR. BATTISTA:  I understand.

13        THE COURT:  If you're looking to reach an agreement

14   today, I suspect you could do that if you spoke with the

15   trustee's lawyers.

16        MR. BATTISTA:  Well, can we go out into the hall and

17   do that right now?

18        THE COURT:  This isn't a personal injury case.  You

19   can take the time that's necessary to do it right.  You're not

20   getting relief today.  To the extent that the trustee's

21   response is what amounts to a request for an adjournment, that

22   request is granted.  And you can work out what you can work out

23   between now and April.

24        MR. BATTISTA:  Thank you, Judge.

25        MR. WILTENBURG:  Thank you, Your Honor.  I believe

Page 69

1    that concludes the LBI calendar today.

2         THE COURT:  Okay.  What we're going to do is adjourn

3    until the 2:00 adversary proceeding calendar.  But there are

4    parties who are in court today representing the interest of the

5    fee committee.  We're going to have what amounts to a chambers

6    conference except we'll stay in the courtroom for it.  Those

7    parties who are present simply as observers will go to lunch.

8    And everybody else who's here for the fee committee discussion

9    will stay.  We'll take about a five minute break to allow the

10   courtroom to clear.

11        MR. WILTENBURG:  Thank you, Your Honor.

12        (Whereupon these proceedings were concluded at 12:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    I N D E X

3

4                                  R U L I N G S

5    DESCRIPTION                                        PAGE      LINE

6    Debtors' motion for entry of an order               63        25

7    clarifying the scope of the procedures

8    for settlement of pre-petition derivative

9    contracts approved

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1

2                        C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6           Lisa Bar-Leib          Digitally signed by Lisa Bar-Leib
                                    DN: cn=Lisa Bar-Leib, o, ou,
                                    email=digital1@veritext.com,
                                    c=US
7    _____   Date: 2011.01.14 12:54:25 -05'00'

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  January 14, 2011

18

19

20

21

22

23

24

25