**Hearing Date and Time: February 16, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: February 9, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Richard Engman
Scott Griffin

Attorneys for Debtor and Debtor in Possession
Lehman Commercial Paper Inc.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                      :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

### NOTICE OF MOTION OF DEBTOR LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING A SETTLEMENT AGREEMENT AMONG THE DEBTOR, GREENBRIER MINERALS HOLDINGS, LLC AND CERTAIN OF ITS AFFILIATES, MIDLAND TRAIL RESOURCES, LLC AND DOLPHIN MINING, LLC

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

of Lehman Commercial Paper Inc. ("Lehman"), as debtor and debtor in possession (together with

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, the "Debtors") pursuant to

section 105(a) of the Bankruptcy Code[1] and Bankruptcy Rule 9019 for an order approving a

settlement agreement among Lehman, Greenbrier Minerals Holdings, LLC and certain of its

affiliates, Midland Trail Resources, LLC and Dolphin Mining, LLC, will be held before the

---

[1] All capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Motion.

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **February 16, 2011 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

                **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local

Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of

the objecting party, the basis for the objection and the specific grounds thereof, shall be filed

with the Bankruptcy Court electronically in accordance with General Order M-242 (which can

be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Richard Engman and

Scott Griffin) and Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153

(Attn:  Richard P. Krasnow, Lori R. Fife, Shai Y. Waisman, and Jacqueline Marcus), attorneys

for the Debtor; (iii) the Office of the United States Trustee for the Southern District of New York,

33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Andy Velez-Rivera, Paul

Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope Davis); (iv) Milbank, Tweed,

Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn:  Dennis

F. Dunne, Dennis O'Donnell, and Evan Fleck) and Quinn Emanuel Urquhart Oliver & Hedges,

LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010 (Attn: Susheel Kirpalani),

attorneys for the official committee of unsecured creditors appointed in these cases; and

(v) Sheppard Mullin Richter & Hamilton LLP, 30 Rockefeller Plaza, 24th floor, New York, New York 10112 (Attn:  Malani J. Cademartori), so as to be received no later than **February 9, 2011 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

   **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

   **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: February 2, 2011
   New York, New York

          Respectfully submitted,

          /s/  Richard Engman
          Richard Engman
          Scott Griffin

          JONES DAY
          222 East 41st Street
          New York, New York  10017
          Telephone:  (212) 326-3939
          Facsimile:  (212) 755-7306

          *Attorneys for Debtor and Debtor in Possession*
          *Lehman Commercial Paper Inc.*

Hearing Date and Time:  February 16, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline:  February 9, 2011 at 4:00 p.m. (Prevailing Eastern Time)

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Richard Engman
Scott Griffin

Attorneys for Debtor and Debtor in Possession
Lehman Commercial Paper Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------------x

**MOTION OF DEBTOR LEHMAN COMMERCIAL PAPER INC. PURSUANT TO**
**SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019**
**FOR AN ORDER APPROVING A SETTLEMENT AGREEMENT AMONG THE**
**DEBTOR, GREENBRIER MINERALS HOLDINGS, LLC AND CERTAIN OF ITS**
**AFFILIATES, MIDLAND TRAIL RESOURCES, LLC AND DOLPHIN MINING, LLC**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("Lehman"), as debtor and debtor in possession

(together with Lehman Brothers Holdings Inc. "LBHI" and its affiliated debtors, the "Debtors"),

files this motion (the "Motion") pursuant to section 105(a) of title 11 of the United States Code,

11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and rule 9019(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") seeking an order approving the proposed

settlement (the "Settlement") evidenced by that certain settlement agreement (the "Settlement

Agreement"), dated February 2, 2011, among Lehman, Greenbrier Minerals Holdings, LLC

("Holdings") and certain of its affiliates,[1] Midland Trail Resources, LLC ("Midland Trail") and

Dolphin Mining, LLC ("Dolphin," together with Midland Trail, "Midland").  In support of the

Motion, Lehman respectfully represents as follows:

## BACKGROUND

### The Debtors' Chapter 11 Cases

1.      On September 15, 2008, and periodically thereafter, LBHI and certain of

its subsidiaries, including Lehman, commenced voluntary cases under chapter 11 of the

Bankruptcy Code with this Court.[2]  The Debtors' chapter 11 cases have been consolidated for

procedural purposes and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### Lehman and Greenbrier's Prepetition Business Relationship

#### The Credit Agreement

2.      Lehman and Greenbrier Minerals are parties to that certain Amended and

Restated Credit Agreement (as further amended, the "Credit Agreement"),[3] dated as of May 1,

2007.  The current amount outstanding under the Credit Agreement is disputed by Lehman and

Greenbrier.  According to Lehman, the amount owing as of January 25, 2010 was $211,322,098,

---

[1]     The following Holdings affiliates are party to the Settlement Agreement:  Greenbrier Minerals, LLC
("Greenbrier Minerals"); Greenbrier Smokeless Coal Mining L.L.C. ("Greenbrier Smokeless"); Powhatan
Mid-Vol Coal Sales, L.L.C. ("Powhatan"); and Matoaka Land Company, LLC ("Matoaka," together with
Greenbrier Minerals, Greenbrier Smokeless, Powhatan and Holdings, "Greenbrier").

[2]     Lehman filed its voluntary petition for chapter 11 relief with this Court on October 5, 2008.

[3]     A copy of the Credit Agreement is attached as Exhibit B to the Stay Motion (as defined below) and is
incorporated herein by reference.

which was comprised of $167,000,000 in principal, plus $36,463,820 in accrued and unpaid interest at the regular contract rate, plus $7,858,278 of additional accrued and unpaid interest at the default rate.  As further described below, Greenbrier has alleged that Lehman failed to satisfy a properly made draw request under the Credit Agreement and, as a consequence, Greenbrier has valid defenses to certain of the amounts claimed by Lehman and/or that Lehman's claims against Greenbrier must be reduced by the amount of Greenbrier's claims against Lehman.  Although Lehman and Greenbrier dispute each other's claims and defenses, for purposes of the Settlement, Greenbrier has agreed to release its claims against Lehman and Lehman has agreed to cap its claim for principal and interest under the Credit Agreement at $200,000,000.[4]

3.    In general, Greenbrier's claims and defenses against Lehman relate to a $10 million funding request that was sent to Lehman on September 18, 2008.  As further described in the proof of claim against Lehman filed by Greenbrier on September 21, 2009 (the "Proof of Claim"),[5] Greenbrier contends that Lehman breached the Credit Agreement by, among other things, not funding Greenbrier's request and, as a consequence, Greenbrier suffered direct and consequential damages.  Lehman disputes both that it breached the Credit Agreement and, if Lehman did breach, that Greenbrier is entitled to consequential damages.

The Greenbrier Operating Agreement

4.    On March 12, 2008, the members of Holdings, including Lehman, entered into that certain Amended and Restated Operating Agreement (the "Greenbrier Operating Agreement").  Pursuant to the terms of the Greenbrier Operating Agreement, Lehman alleges

---

[4]    Except that Lehman's claim would be increased by $1,000,000 to $201,000,000 if the marketing process for the Combined Sale has not commenced prior to March 31, 2011.  See Settlement Agreement at §5(a)(i) and infra at ¶ 9.

[5]    A copy of the Proof of Claim is attached as Exhibit F to the Stay Motion and is incorporated herein by reference.

that it was allocated 49,000 of Holdings' Class D ownership units and 49% voting and sharing ratios in Holdings (collectively, the "Lehman Greenbrier Equity"). Lehman further alleges that as a result of the Lehman Greenbrier Equity, it was entitled to appoint a representative to Holdings' board of managers (the "Holdings Board"), with such representative having five (5) Board votes.[6] As discussed in greater detail below, Holdings disputes the amount of Lehman Greenbrier Equity owned by Lehman, and alleges that notwithstanding the stated ownership amount in Greenbrier's books and records, Lehman did not fully earn the Lehman Greenbrier Equity and lost, as a matter of law, certain voting rights relating to the Lehman Greenbrier Equity.

<u>The Combined Sale Negotiations and Challenge to Lehman's Equity Ownership</u>

5.    In October 2009, Lehman and Greenbrier began negotiations regarding the potential liquidation of Greenbrier through a joint sale with Midland Trail[7] (the "Combined Sale"). In conjunction with those negotiations, Lehman and Greenbrier discussed, among other things, procedures for the contemplated Combined Sale, a sharing agreement with respect to the distribution of proceeds from such sale, and a settlement of each of the parties' respective claims against the other.

6.    In December 2009, a member of the Holdings Board advised Lehman that, as a result of its chapter 11 filing, Lehman lost its ability to vote the Lehman Greenbrier Equity under Delaware law.[8] Lehman disputed this contention, and the matter was left unresolved while the parties continued to negotiate a sharing agreement for the Combined Sale. In May 2010,

---

[6]    Lehman initially designated J. Robert Chambers to serve as its Board representative. In March 2009, Lehman appointed Jack McCarthy to replace Mr. Chambers as its representative to the Board.

[7]    Joseph C. Turley III (Greenbrier's President and CEO) owns a controlling interest in Midland and is also Midland's President and CEO.

[8]    Holdings is organized under the Delaware Limited Liability Company Act (the "Delaware LLC Act").

however, the issue of Lehman's continuing ownership of the Lehman Greenbrier Equity and certain related rights was raised again by Greenbrier's counsel, with counsel specifically contending that the Holdings Board did not have proper authority to act due to a lack of voting quorum resulting from Lehman's chapter 11 filing and the alleged corresponding loss of its voting interests and related rights in the Lehman Greenbrier Equity.

The Pending Litigation

7.      On June 22, 2010, Lehman filed a motion [Dkt. No. 9729] (the "Stay Motion") to enforce the automatic stay against Holdings, requesting a finding from this Court that notwithstanding its bankruptcy filing the Lehman Greenbrier Equity and all related rights, including Lehman's voting and sharing ratios, remained property of Lehman's chapter 11 estate.

8.      On July 8, 2010, Holdings filed its objection (the "Objection," together with the Stay Motion, the "Pending Litigation") [Dkt. No. 10093] to the Stay Motion contending, *inter alia*, that (i) the Lehman Greenbrier Equity should be reduced because the current level of ownership units and related voting and sharing ratios were provided contingent upon Lehman satisfying its funding commitments under the Credit Agreement; and (ii) regardless of the amount of Lehman Greenbrier Equity owned by Lehman, under the Delaware LLC Act, it was not entitled to vote or participate in the corporate governance of Holdings after its bankruptcy filing.

The Settlement Agreement

9.      To resolve the above disputes and to avoid protracted, costly and uncertain litigation, Lehman seeks authority to enter into the Settlement Agreement.[9]  The salient terms of the Settlement Agreement are as follows:[10]

---

[9]      A copy of the Settlement Agreement is attached hereto as Exhibit 1 and incorporated herein by reference. Due to the confidential nature of certain of the information contained in the Sharing Model (Exhibit A of

- <u>Existing Obligations under the Credit Agreement</u>. Principal and interest owed to Lehman under the Credit Agreement shall be limited to $200 million, provided that in the event the investment bank retained in connection with the Combined Sale has failed to commence distribution books for such sale by March 31, 2011, the limit for principal and interest owed to Lehman under the Credit Agreement shall be increased to $201 million.

- <u>The Combined Sale and Sharing of Sale Proceeds</u>. Greenbrier and Midland shall reasonably cooperate in the marketing of their respective properties to pursue a Combined Sale, pursuant to which the consideration paid to Greenbrier and Midland will be distributed and shared in accordance with the Sharing Model and the Settlement Agreement.

- <u>Excess Cash Flow Recapture</u>. Upon execution and Court approval of the Settlement Agreement, Greenbrier shall pay Lehman fifty percent (50%) of all excess cash flow on hand, with any such amounts paid to be applied against the agreed principal and interest owed under the Credit Agreement.

- <u>Turley Employment Agreement and Other Employment Matters</u>. Greenbrier shall, simultaneously with the execution of the Settlement Agreement, enter into an employment agreement with Joseph C. Turley, III, as CEO and President of Greenbrier. Upon the execution of the Settlement Agreement, notwithstanding anything to the contrary in the Greenbrier's Operating Agreement, Greenbrier's members appoint and authorize a Special Board consisting of William Karis, Jack McCarthy, Michael McConnell and Raymond McCormick (or each of their designees) to take action, via unanimous approval, with respect to (i) any and all matters under the employment agreement with Joseph C. Turley, III and in all respects with his employment by Greenbrier and (ii) approving bonuses for employees of Greenbrier as recommended by management of Greenbrier and voted on by the Special Board.

---

(continued…)

the Settlement Agreement) and information relating thereto (<u>Exhibit B</u> of the Settlement Agreement), <u>Exhibit A</u> and <u>Exhibit B</u> have been excluded from the version of the Settlement Agreement attached to this Motion. Copies of <u>Exhibit A</u> and <u>Exhibit B</u>, however, have been provided to the official committee of unsecured creditors appointed in these chapter 11 cases (the "<u>Creditors' Committee</u>").

[10] The summary of the terms of the Settlement Agreement set forth herein is provided for the convenience of the Court and parties in interest and does not modify the terms of the Settlement Agreement in any manner. To the extent terms of this Motion and terms of the Settlement Agreement are inconsistent, the terms of the Settlement Agreement shall govern. All capitalized terms used in the summary, but not otherwise defined, shall have the meanings ascribed to them in the Settlement Agreement.

- <u>Legal Fees and Costs</u>.    Upon a Combined Sale, Greenbrier shall be obligated to reimburse Lehman for that portion of its legal fees and expenses incurred prior to the date of the Settlement Agreement which are reimbursable by Greenbrier in accordance with the terms of the Credit Agreement.    To the extent reimbursable by Greenbrier under the Loan Documents (as defined in the Credit Agreement), Greenbrier shall also be obligated to reimburse Lehman for out-of-pocket reasonable legal fees and expenses incurred after the date of, and in connection with, the Settlement Agreement (including judicial or committee consents and approvals thereof) and consummation of the transactions contemplated thereunder.

- <u>Release by Greenbrier</u>.    Upon a Combined Sale, Greenbrier and certain of its related persons and entities (collectively, the "<u>Greenbrier Releasing Parties</u>") shall release and forever discharge Lehman and certain of its related persons and entities (collectively, the "<u>Lehman Released Parties</u>") and the other signatories to the Settlement Agreement and certain of their related persons and entities (collectively, the "<u>Non-Lehman Released Parties</u>") from any and all actions, causes of action, claims (including, but not limited to, the Proof of Claim), suits, debts, damages, judgments, liabilities and demands whatsoever that any of the Greenbrier Releasing Parties now have or may have had, or thereafter claim to have at any time against the Lehman Released Parties or the Non-Lehman Released Parties, provided that such release is not intended to release any obligations arising after the Closing Date of the Combined Sale (including, without limitation, the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts.

- <u>Release by Lehman</u>. Upon a Combined Sale, Lehman and certain of its related persons and entities (collectively, the "<u>Lehman Releasing Parties</u>") shall release any and all liens and security interests they may have on assets of Greenbrier and shall release and forever discharge, each of the Greenbrier and Midland entities and certain of their related persons and entities (collectively, the "<u>Greenbrier and Midland Released Parties</u>") and the other signatories to the Settlement Agreement and certain of their related persons (collectively, the "<u>Non-Greenbrier and Midland Released Parties</u>") from any and all actions, causes of action, claims, suits, debts, damages, judgments, liabilities and demands whatsoever that any of the Lehman Releasing Parties now have or may have had, or thereafter claims to have at any time against the Greenbrier and Midland Released Parties and the Non-Greenbrier and Midland Released Parties, provided that such release is not intended to release any obligations arising after the Closing Date of the Combined Sale (including, without limitation, the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts.

- <u>Release by Greenbrier of Midland and Members</u>. Upon a Combined Sale, Greenbrier and certain of its related persons and entities, and each member of Greenbrier's board of managers and certain of their related persons and entities (collectively, the "<u>Greenbrier and Members Releasing Parties</u>") shall release and forever discharge, Midland and certain of its related persons and entities, and each member of Midland's board of managers (collectively, the "<u>Midland and Members Released Parties</u>") from any and all actions, causes of action, claims, suits, debts, damages, judgments, liabilities and demands whatsoever that any of the Greenbrier and Members Releasing Parties now has or may have had, or thereafter claims to have at any time against the Midland and Members Released Parties, provided that such release is not intended to release any obligations arising after the Closing Date of the Combined Sale (including, without limitation, the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts.

- <u>Release by Midland of Greenbrier and Members</u>. Upon a Combined Sale, Midland and certain of its related persons and entities and each member of Midland's board of managers and certain of their related persons and entities (collectively, the "<u>Midland and Members Releasing Parties</u>") shall release and forever discharge, Greenbrier and its related persons and entities and each member of Greenbrier's board of managers (collectively, the "<u>Greenbrier and Members Released Parties</u>") and the other signatories to the Settlement Agreement and certain of their related persons (collectively, the "<u>Non-Greenbrier and Members Released Parties</u>") from any and all actions, causes of action, claims, suits, debts, damages, judgments, liabilities and demands whatsoever that any of the Midland and Members Releasing Parties now has or may have had, or thereafter claims to have at any time against the Greenbrier and Members Released Parties and the Non-Greenbrier and Members Released Parties, provided that such release is not intended to release any obligations arising after the Closing Date of the Combined Sale (including, without limitation, the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts.

## **JURISDICTION**

10.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**RELIEF REQUESTED**

11.    By this Motion, Lehman respectfully requests the entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a), approving Lehman's entry into, and performance under the Settlement Agreement.  As discussed in further detail below, the Settlement Agreement provides a fair and equitable resolution to Lehman and Greenbrier's disputes and is in the best interests of Lehman's estate.

**BASIS FOR RELIEF REQUESTED**

**Relevant Standards Governing Approval of the Settlement Agreement**

12.    Section 105 of the Bankruptcy Code permits a bankruptcy court to "issue any order that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Bankruptcy Rule 9019(a) governs the procedural prerequisites for approval of a settlement and provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). Accordingly, section 105(a) of the Bankruptcy Code together with Bankruptcy Rule 9019(a) empower a bankruptcy court to approve proposed compromises or settlements.  Vaughn v. Drexel Burnham Lambert Group (In re Drexel Burnham Lambert Group), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); In re Texaco, 84 B.R. 893, 901-02 (Bankr. S.D.N.Y. 1988).

13.    Significantly, the decision to approve a compromise or settlement is subject to the sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).  In exercising such discretion, a bankruptcy court must determine that the proposed settlement is both fair and equitable and in the best interests of the debtor's estate.  See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d  452, 462 (2d Cir. 2007) (applying "fair and equitable" standard to settlements pursuant to

Bankruptcy Rule 9019); <u>In re Enron Corp.</u>, No. 02 Civ. 8489, 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003) ("A bankruptcy court may approve a settlement where the proposed settlement is both fair and equitable and in the best interests of the estate.") (quotation omitted).  It is well established that in exercising its discretion to approve a proposed settlement, a bankruptcy court may consider general public policy favoring settlements.  <u>See</u> <u>In re Hibbard Brown & Co., Inc.</u>, 217 B.R. 41 (Bankr. S.D.N.Y. 1998) (recognizing that settlements are generally favored); <u>see also</u>, <u>Shugrue</u>, 165 B.R. at 123 (noting that settlements are not only favored, but are encouraged).

14.    In evaluating whether a proposed compromise or settlement is fair and equitable, a court should consider the following interrelated factors:

- the balance between the litigation's possibility of success and the settlement's future benefits;

- the likelihood of complex and protracted litigation, with its attendant expense, inconvenience and delay, including the difficulty in collecting on any judgment;

- the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

- whether other parties in interest support the settlement;

- the competence and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

- the nature and breadth of releases to be obtained by officers and directors; and

- the extent to which the settlement is the product of arm's length bargaining.

<u>Iridium Operating LLC</u>, 478 F.3d at 462 (citing <u>In re WorldCom, Inc.</u>, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  Although a court must consider "all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," <u>Protective Comm. for Indep.</u>

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968), it need not

conduct a "mini-trial" of the merits of the claims being settled, Cosoff v. Rodman (In re W.T.

Grant, Co.), 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation.  In re

Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).  A court need

only ensure that the settlement does not fall "below the lowest point in the range of

reasonableness." Id. at 496-97 (citation omitted).

**Application of Relevant Standards**

15.    The Settlement Agreement easily satisfies the standards for approval set

forth above.

16.    First, the Settlement Agreement obviates the need for continuing the

Pending Litigation and avoids the costs and risks associated with such litigation.  Indeed,

although Lehman believes that it has strong arguments that would support a ruling in its favor

regarding the relief requested in the Stay Motion, litigation is inherently uncertain.  Additionally,

continued litigation would be expensive and time consuming, potentially involving the retention

of experts, substantial discovery, and the appellate process.  Avoiding the costs and delays

associated with further litigation in light of the compromise reached between Lehman and

Greenbrier is in the best interests of Lehman, its estates and creditors.

17.    Second, as highlighted above, the Settlement Agreement provides the path

forward for the Combined Sale.  Upon consummation of the Combined Sale, the Sharing Model

contemplates that a portion of the sale proceeds will be distributed to Lehman on account of its

claims under the Credit Agreement and the Lehman Greenbrier Equity.  Those proceeds will be

included as a part of Lehman's bankruptcy estate and ultimately made available for distribution

to its creditors.

18.     Lastly, the Settlement Agreement is the result of months of extensive arm's length negotiations between the parties, which were all represented by competent and experienced professionals.

19.     Accordingly, as set forth herein and in the Declaration of Eric Salzman in Support of this Motion, filed contemporaneously herewith, entry into the Settlement Agreement is in Lehman's best interests.  Lehman has reasonably and appropriately exercised its sound business judgment in entering into the Settlement Agreement to resolve the disputes arising out of Lehman's relationship with Greenbrier and providing the foundation for the terms upon which the parties are willing to consummate the Combined Sale.

## NOTICE

20.     No trustee has been appointed in these chapter 11 cases.  Lehman has served notice of this Motion, in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) Approving Settlement Procedures entered by this Court on March 31, 2010 [Dkt. No. 7936], on (a) the U.S. Trustee; (b) counsel for the Creditors' Committee; (c) the Securities and Exchange Commission; (d) the United States Attorney for the Southern District of New York; (e) counsel for Greenbrier; (f) counsel for Midland; and (g) all parties who have requested notice in these chapter 11 cases.  Lehman submits that no other or further notice need be provided.

## NO PRIOR REQUEST

21.     No prior request for the relief sought in this Motion has been made to this or any other court.

22.   WHEREFORE, Lehman respectfully request that the Court (a) enter an order, substantially in the form attached hereto as <u>Exhibit 2</u>, approving the Settlement Agreement; and (b) grant such other and further relief to Lehman as the Court may deem proper.

Dated:   February 2, 2011
      New York, New York

    JONES DAY

    <u>/s/ Richard Engman</u>
    Richard Engman
    Scott Griffin

    222 East 41st Street
    New York, New York  10017
    Telephone:  (212) 326-3939
    Facsimile:  (212) 755-7306

    *Attorneys for Debtor and Debtor in Possession*
    *Lehman Commercial Paper Inc.*

## Exhibit 1 - Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is dated as of the 2nd day of February, 2011, by and among Greenbrier Minerals Holdings, LLC, a Delaware limited liability company ("Holdings"), Greenbrier Minerals, LLC, a Delaware limited liability company, Greenbrier Smokeless Coal Mining, L.L.C., a Delaware limited liability company, Powhatan Mid-Vol Coal Sales, L.L.C., a Delaware limited liability company, and Matoaka Land Company LLC, a Delaware limited liability company (Holdings together with its subsidiaries, "Greenbrier"), Midland Trails Resources, LLC, a West Virginia limited liability company ("Midland Trail") and Dolphin Mining, LLC, a Pennsylvania limited liability company ("Dolphin", together with Midland Trail, "Midland"), and Lehman Commercial Paper Inc., a New York corporation ("Lehman").

WHEREAS, Greenbrier is in the business of owning and operating medium-volatile metallurgical ("met") coal mining facilities in Greenbrier County, West Virginia;

WHEREAS, Midland is located in the vicinity of Greenbrier and is also in the business of owning and operating met coal mining facilities in Greenbrier County, West Virginia;

WHEREAS, Greenbrier and Lehman (as the Administrative Agent and the sole Lender thereunder) are parties to that certain Amended and Restated Credit Agreement, dated as of May 1, 2007, as amended by Amendment No. 1 to Credit Agreement, dated as of July 27, 2007, as further amended by Amendment No. 2 to Credit Agreement, dated as of August 31, 2007, as further amended by Amendment No. 3 to Credit Agreement, dated as of September 28, 2007, as further amended by Amendment No. 4 to Credit Agreement, dated as of October 31, 2007, as further amended by Amendment No. 5 to the Credit Agreement dated as of December 21, 2007, as further amended by Amendment No. 6 to the Credit Agreement dated as of April 29, 2008, as further amended by Amendment No. 7 to the Credit Agreement dated as of June 3, 2008, as

further amended by Amendment No. 8 to the Credit Agreement dated as of September 19, 2008, as further amended by Amendment No. 9 to the Credit Agreement dated as of October 29, 2008 (as amended, the "Credit Agreement");

WHEREAS, in connection with Lehman agreeing to extend financing to Greenbrier and entry into that certain Amended and Restated Operating Agreement of Greenbrier Minerals Holdings, LLC dated as of March 12, 2008 (the "Greenbrier's Operating Agreement"), Lehman was issued Class D Units in Holdings (the "Lehman Greenbrier Equity");

WHEREAS, on October 5, 2008, Lehman commenced a case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and which case is being jointly administered as Case No. 08-13555 (JMP) with chapter 11 cases commenced by certain of Lehman's affiliates (together with Lehman, the "Lehman Entities") in the Bankruptcy Court;

WHEREAS, prior to the commencement of the Bankruptcy Case, Lehman did not fund an advance requested by Greenbrier under the Credit Agreement and has stated that no other advances will be made;

WHEREAS, Greenbrier maintains that it has suffered damages as a result of Lehman's actions and has filed a claim (the "Proof of Claim") in the Bankruptcy Case preserving its rights to assert a damage claim against Lehman;

WHEREAS, Greenbrier and Lehman have an ongoing dispute pending before the Bankruptcy Court with respect to, *inter alia,* the amount of Lehman Greenbrier Equity legally owned by Lehman and, regardless of the amount of Lehman Greenbrier Equity owned by Lehman, whether Lehman lost its right to vote such membership interests upon the commencement of the Bankruptcy Case (the "Pending Litigation");

WHEREAS, the Pending Litigation has been temporarily stayed while Greenbrier and Lehman negotiate an overall settlement of their claims and counterclaims;

WHEREAS, Dolphin owns all of the equity interests in, and is the sole member of, Midland Trail;

WHEREAS, Greenbrier's subsidiary has been acquiring low-sulfur coal from Midland Trail for purposes of blending Greenbrier's coal;

WHEREAS, the parties hereto believe that a sale of the combined operations of Greenbrier and Midland (a "Combined Sale") would derive significantly higher value than a stand alone sale of Greenbrier's and Midland Trail's respective operations;

WHEREAS, to induce both Greenbrier and Midland to enter into this Agreement and potentially liquidate their businesses in a Combined Sale, Greenbrier, Midland and Lehman have negotiated, among other things, procedures for such potential sale, a Sharing Model (as defined below) and a corresponding distribution of proceeds and settlement of claims amongst all parties, all as more specifically set forth below.

NOW THEREFORE, the parties hereto, intending to be legally bound, agree as follows:

1.    <u>Recitals</u>.  The parties agree that the recitals are true and correct and provide a reasonable basis for the compromises and agreement contained herein.

2.    <u>Definitions</u>.

Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Credit Agreement.  Certain terms used in this Agreement are listed in alphabetical order and defined or referred to below (such terms as well as any other terms defined elsewhere in this Agreement shall be equally applicable to both the singular and plural forms of the terms defined).

"<u>Agreement</u>" means this Agreement and all exhibits hereto.

"<u>Bankruptcy Case</u>" has the meaning ascribed to such term in the recitals to this Agreement.

"<u>Bankruptcy Code</u>" has the meaning ascribed to such term in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning ascribed to such term in the recitals to this Agreement.

"<u>Board Observers</u>" shall mean Eric Salzman and Tom Brewer and each of their designees.

"<u>Cash Available for Stakeholders</u>" or "<u>CAFS</u>" has the meaning ascribed to such terms in the Sharing Model and which, for the avoidance of doubt, means the sum of all cash and cash equivalents received in connection with a Combined Sale and/or received or retained by Midland or Greenbrier subsequent to the Closing Date (e.g., return of deposits posted in lieu of bonds, payments on accounts receivables, etc.) minus the aggregate amount of all liabilities of Greenbrier and/or Midland that are not assumed by the purchaser in a Combined Sale (other than the Lehman Debt, the Monarch Liability and Management Retention), including but not limited to, any and all legal fees, investment bank fees or other costs associated with the transaction and any liquidation, wind-up or other costs or expenses that are incurred after a Combined Sale.

"<u>Cash Available for Stakeholders after Management Incentive and Monarch Liability</u>" or "<u>CAFSAMM</u>" has the meaning ascribed to such terms in the Sharing Model and which, for the avoidance of doubt, means the sum of all CAFS minus the aggregate amount of the Monarch Liability and Management Retention.

"<u>Closing</u>" means the closing of the transactions contemplated by a Combined Sale.

"<u>Closing Date</u>" means the day on which the Effective Time under a Combined Sale occurs.

"<u>Combined Sale</u>" has the meaning ascribed to such term in the recitals to this Agreement.

4

"Credit Agreement" has the meaning ascribed to such term in the recitals to this Agreement.

"Effective Time" means 12:01 a.m. Eastern Time on the Closing Date.

"Escrow Account" means that segregated demand deposit account established by the Escrow Agent for the purposes of receiving monies from a Combined Sale and distributing such proceeds, all as described in this Agreement.

"Escrow Agent" shall mean that certain accountant or accounting firm designated by the Special Board.

"Excess Cash Flow" means the amount by which the sum of all cash and cash equivalents of Greenbrier on hand on the last day of a calendar month exceeds $5 million.  As used herein, the phrase "cash and cash equivalents" means cash on hand, demand deposits, certificates of deposit, money market accounts and other short-term highly liquid investments, but shall specifically exclude such items to the extent that the items are (i) pledged as collateral or escrowed to any Person other than Lehman, (ii) maintained in a payroll account in the ordinary course of business, provided that such payroll shall not be paid more than two (2) business days prior to the payroll date or (iii) maintained in a checking account to pay checks issued by Greenbrier but not yet paid by the bank (for the avoidance of doubt, accounts receivable are not liquid investments and therefore not cash or cash equivalents).

"Greenbrier's Operating Agreement" has the meaning ascribed to such term in the recitals to this Agreement.

"Investment Bank" has the meaning ascribed to such term in Section 4.

"Midland Escrow Agent" shall mean that certain accountant, accounting firm, bank, trust company, lawyer or law firm designated by Midland to act as an escrow agent for the further distribution of monies paid to the "Midland shareholders" in accordance with the Sharing Model.

"Midland Shareholders Receipts" means the line item identified as "Midland Shareholders Receipts (B)" on the Sharing Model which is to be paid to the members of Midland.

"Minimum Consideration" means cash and cash equivalents equal to the amount of CAFS shown in the column of the Sharing Model titled "Minimum CAFS".

"Monarch" means Monarch Financial Corporation, a Pennsylvania corporation.

"Monarch Escrow Agent" shall mean that certain accountant, accounting firm, bank, trust company, lawyer or law firm designated by Monarch to act as an escrow agent for the further distribution of monies paid to the "Monarch liability" in accordance with the Sharing Model.

"Monarch Liability" shall mean the deferred and subordinated obligation of Greenbrier to pay Monarch fees previously earned under that certain Agreement for Advising Services dated as of March 22, 2004, as amended by the First Amendment to Agreement for Advising Services dated July 21, 2006 by and between Greenbrier Minerals, LLC and Monarch.

"Non-Lehman Greenbrier Escrow Agent" shall mean that certain accountant, accounting firm, bank, trust company, lawyer or law firm designated by the Non-Lehman Greenbrier Members to act as an escrow agent for the further distribution of monies paid to the "Non-Lehman Greenbrier shareholders" in accordance with the Sharing Model.

"Non-Lehman Greenbrier Members" means those members of Holdings owning Class A Units, Class B Units and Class C Units (each as defined in Greenbrier's Operating Agreement), specifically excluding the interests of members holding Class D Units (as defined in Greenbrier's Operating Agreement) originally issued to Lehman.

"Non-Lehman Greenbrier Shareholders Receipts" means the line item identified as "Total Non-Lehman GB Shareholder Receipts Before Monarch Liability (C)" on the Sharing Model which is to be paid to the Non-Lehman Greenbrier Members.

"Proof of Claim" has the meaning ascribed to such term in the recitals to this Agreement.

"Sharing Model" shall have the meaning ascribed to such term in Section 6.

"Special Board" means a Board of Managers that has been designated in accordance with Section 13 below, which shall have authority to take and approve certain actions as described in this Agreement.

"Special Board Approval" means the approval or agreement of no less than four (4) of the Special Managers appointed to the Special Board in accordance with this Agreement, unless such action specifically requires unanimous consent or approval as provided herein.

"Special Manager" has the meaning ascribed to such term in Section 13.

3.     Agreement to Conduct a Combined Sale; Distribution of Proceeds.

Subject to the terms and conditions set forth in this Agreement, Greenbrier and Midland agree to reasonably cooperate in marketing their respective properties to prospective buyers and pursuing a Combined Sale under which, *inter alia,* the consideration to be paid to Greenbrier and Midland shall be paid directly into the Escrow Account for ultimate distribution in accordance with the Sharing Model.  Greenbrier and Midland agree to act in good faith and to take commercially reasonable efforts to document and consummate a Combined Sale so long as the CAFS to be received under such Combined Sale exceeds the Minimum Consideration.  The Special Managers shall have the authority to work with the Investment Bank to determine the method by which Greenbrier and Midland will be marketed and, in the case of multiple offers or potential offers exceeding the Minimum Consideration, approval of a Combined Sale to any particular buyer as determined by Special Board Approval to be in the best interests of the parties hereto.  Any action approved by the Special Managers' towards approving or pursuing a Combined Sale shall be deemed an authorization by (i) the members of Holdings and the Greenbrier Board of Managers to any such action and no further authorization shall be required

to authorize the officers of any Greenbrier entity to undertake such action and (ii) members and managers of Dolphin and Midland Trail and no further authorization shall be required to authorize the officers of Dolphin or Midland Trail to undertake such action.  It is acknowledged by all parties that the Special Managers shall have no authority or right to mandate that any member, officer, or employee of Greenbrier or Midland accept any employment agreement or sign any non-competition agreement in connection with any Combined Sale and any failure of such member, officer, or employee to accept any employment agreement or to sign any non-compete agreement shall not constitute a breach of this Agreement by any signatory hereto.

4.      Engagement of Investment Bank.  Midland and Greenbrier agree to jointly engage UBS Securities LLC or another investment bank approved by Special Board Approval (the "Investment Bank").  In furtherance of the foregoing, immediately after execution of this Agreement, the officers of Greenbrier and Midland, shall each be authorized (without any further action or authorization of their respective Board of Managers) to enter into such agreement with the Investment Bank on terms and conditions substantially similar to those previously provided by UBS Securities LLC to the Board of Managers of Holdings with such non-material changes as such officers shall deem appropriate.

5.      Credit Agreement.  Notwithstanding anything contained in the Credit Agreement or the Loan Documents to the contrary, Lehman and Greenbrier agree as follows:

(a)      *Existing Obligations.*  So long as there is a Combined Sale, Greenbrier and Lehman agree that the existing Obligations are as follows:

(i)      *Principal and Interest.*  The principal and interest portion of the Obligations shall be limited to $200,000,000 ("Principal and Interest Cap"); provided that, in the event that the Investment Bank has failed to commence distribution of information books for a Combined Sale by March 31, 2011, the limit on the Principal and Interest Cap shall be increased to $201,000,000.  Any payments of Excess Cash Flow paid to Lehman shall be applied to the principal and interest portion of the Obligations and shall correspondingly reduce the amount of the Principal

and Interest Cap (also known as the "Lehman Debt" in the Sharing Model); and

(ii)    *Other Obligations*.  Greenbrier and Lehman agree that the unpaid consulting, accounting and legal fees and expenses reimbursable under the Loan Documents are to be paid by Greenbrier subsequent to a Combined Sale and are not subject to the Principal and Interest Cap.

(b)    *Legal Fees and Costs*.  Greenbrier shall be obligated to reimburse Lehman for the legal fees and expenses identified in subsection 5(a)(ii) (which have been incurred prior to the date of this Agreement) plus Lehman's out-of-pocket reasonable legal fees and expenses reimbursable under the Loan Documents which are incurred after the date hereof in connection with this Agreement (including judicial or committee consents and approvals thereof) and consummation of the transactions contemplated hereby.

(c)    *Excess Cash Flow Recapture.*  In the event that Greenbrier has Excess Cash Flow for any month, fifty percent (50%) of such Excess Cash Flow shall be paid to Lehman as soon as practicable following the end of such month.  As further described below, any such Excess Cash Flow payments shall reduce the amount of "Lehman Debt" provided for in the Sharing Model.  To the extent a Combined Sale is not consummated, then any such Excess Cash Flow payments shall be applied in accordance with the Loan Documents.

(d)    It is acknowledged by the parties that Midland is not a Credit Party under the Loan Documents and has no liability to Lehman whatsoever for any of the Obligations and is not acquiring any financial liability to Lehman under such Loan Documents, this Agreement or under any other document or action by virtue of its execution of, or actions in compliance with, this Agreement.

6.    <u>Sharing of Proceeds from a Combined Sale</u>.  Greenbrier, Midland and Lehman have prepared the financial model attached as <u>Exhibit A</u> hereto that reflects how proceeds will be distributed from a Combined Sale (the "Sharing Model").  Each of the parties hereto agrees to

accept and apply payments from a Combined Sale in accordance with the Sharing Model. For the avoidance of doubt, the following parameters govern the computation of distributions under the Sharing Model:

(a)    The various line items in the Sharing Model (e.g., "total net cash liabilities of GB and Midland", "legal fees", etc.) are all estimates based upon prior financial statements. Except for the Initial Distribution, no proceeds from a Combined Sale shall be distributed from the Escrow Account until the actual amounts for each line item in the Sharing Model has been determined and agreed to by Special Manager Approval or in accordance with Section 15 hereof. Prior to consummation of a Combined Sale, Greenbrier and Midland shall prepare estimated closing balance sheets (as of a date within seven (7) days of the Closing Date) for Greenbrier and Midland and submit them to the Escrow Agent together with an estimate of the Cash Available For Stakeholders (as such term is used in the Sharing Model) that is expected from such Combined Sale. Upon Special Board Approval, amounts held in the Escrow Account will be distributed by the Escrow Agent in accordance with the Sharing Model and this Agreement. The Special Board shall from time to time estimate the amount of reserves that should be prudently retained in the Escrow Account to address the remaining liabilities and obligations of Greenbrier and Midland ("Liability Reserve"). The "Initial Distribution" shall be determined by the Special Board as the amount of CAFSAMM remaining on or about the date of a Combined Sale after deducting the Liability Reserve. The Special Board shall from time to time authorize further distributions from the Escrow Account as the Liability Reserve is revised and/or additional proceeds are received from the buyer in a Combined Sale or payments from Greenbrier or Midland as a result of cash receipts by such parties; provided, that if Special Manager Approval is not unanimous, any Special Manager who disagrees with any distribution to be made by the Escrow Agent (the "Objecting Special Manager") may deliver written notice within five (5) days

of Special Manager Approval (the "Notice Period") to the other Special Managers of any
disagreement that the Objecting Special Manager has to the amount to be distributed (the
"Notice"). The Notice shall set forth in reasonable detail the basis of such disagreement,
together with the amounts in dispute. The Special Managers shall negotiate in good faith to
resolve any objections set forth in the Notice, but if they do not reach final resolution within ten
(10) days after the delivery of the Notice, the matter will be submitted for arbitration pursuant to
Section 15 of this Agreement. Unless Special Manager Approval is unanimous, the Escrow
Agent shall not distribute any amounts until expiration of the Notice Period and, in any event,
shall only distribute amounts which are not the subject of a timely delivered Notice until the
dispute is resolved by unanimous approval of all Special Managers or upon completion of the
arbitration process set forth in Section 15.

    (b)  Distributions of the Non-Lehman Greenbrier Shareholders Receipts will
be allocated among the Non-Lehman Greenbrier Members proportionally in accordance with the
Sharing Ratio percentage (as defined in Greenbrier's Operating Agreement) that each member
holds in Holdings.

    (c)  The amount of Lehman Debt for purposes of the Sharing Model shall be
an amount equal to the Principal and Interest Cap less the aggregate amount of all Excess Cash
Flow payments made to Lehman.

    (d)  To the extent that any monies or other proceeds are paid to or received by
Greenbrier or Midland after a Combined Sale, whether from a release of bonds, payments on
receivables, insurance premiums or other source, such cash shall be treated as additional
proceeds of a Combined Sale, deposited into the Escrow Account and distributed via the Sharing
Model (i.e. all of the monies shall be distributed in accordance with the Sharing Model and not
separately retained or distributed by such entities) with the net effect of each of Greenbrier and

Midland Trail each being essentially liquidated and distributed under the Sharing Model.

Greenbrier and Midland will conduct no business after the Closing Date except for the purpose

of liquidating its assets and completing post-closing items. Unless the employment agreements

of such employees are assumed by the buyer, all employees of Greenbrier and Midland will be

terminated or retained as determined by the Special Board as of the Closing Date (including

retaining certain employees required to complete the liquidation and post-closing matters of

Midland and Greenbrier as recommended by Midland and Greenbrier and acceptable to the

Special Board) (no salaries or benefits for officers, members, managers or directors shall be paid

from the Escrow Account as liabilities for time expended subsequent to the Closing Date unless

approved by the Special Board). It is contemplated that Greenbrier and Midland will need to

continue to have officers available to sign certain documents and filings from time to time post-

closing and that Midland and Greenbrier will make appropriate arrangements to have officers

reasonably available to perform such functions from time to time on an hourly basis, provided

that Midland and Greenbrier shall continue to have director's and officer's liability insurance in

place at such time. Such officers shall be compensated on an hourly basis at a rate substantially

equivalent to the hourly pay rate of such officer prior to the Closing Date. On or before the date

of this Agreement, Greenbrier and Midland shall provide a listing of all employees with

employment agreements and a copy of all such agreements. Neither Greenbrier nor Midland

shall be permitted, without Special Board Approval, to enter into any additional employment

agreements or extensions of existing employment agreements if the amount payable under such

agreement exceeds $200,000 over the remaining life of the agreement.

        (e)      The Escrow Agent shall pay all monies distributable from time to time

under the Sharing Model to the designated parties as follows:

(i) the monies payable with respect to the "Monarch Liability" shall be paid to the

Monarch Escrow Agent and such monies may be retained by Monarch free and

clear of the terms and conditions of that certain Subordination Agreement, dated

May 1, 2007, between Monarch and Lehman;

(ii) the monies payable to the "Midland shareholders" shall be paid to the Midland

Escrow Agent;

(iii) the monies payable to the "Non-Lehman Greenbrier shareholders" shall be

paid to the Non-Lehman Greenbrier Escrow Agent; and

(iv) the monies payable as "Total Lehman receipts" shall be paid directly to

Lehman or its designee.

(f)     Attached hereto as <u>Exhibit B</u> is a hypothetical sale demonstrating how the

monies received from a Combined Sale would be distributed under this Agreement and the

Sharing Model.

7.     <u>Termination of this Agreement</u>.  This Agreement shall be binding upon the parties

hereto and shall govern all facets of a Combined Sale; provided that, in the event that a

Combined Sale has not been consummated and is not being diligently pursued by a potential

buyer, then this Agreement will terminate upon the earlier of (i) nine (9) months from the date of

this Agreement; provided however, this period shall be extended for three (3) additional months

to the extent that it is determined by Special Board Approval that a potential buyer is diligently

pursuing consummation of a Combined Sale, (ii) the Special Board determines, by unanimous

approval (provided that the approval of Joseph C. Turley, III shall not be required in the event

that all other members of the Special Board determine in good faith that Midland has materially

breached any provision of this Agreement), that it is no longer in the best interest of Greenbrier

and Midland to pursue a Combined Sale; (iii) the written request of Greenbrier (as unanimously

approved by a vote of William Karis, Joseph C. Turley, III, Michael McConnell and Raymond

McCormick (Jack McCarthy being recused from voting)) or Midland in the event that the

Bankruptcy Court fails to enter an order approving this Agreement as contemplated by Section

25 below prior to February 28, 2011 or (iv) written notice by Midland in the event that it receives

written notice that Greenbrier will no longer forbear from execution as provided in Section 8

below.

8.    <u>Greenbrier Forbearance</u>.  So long as Midland is continuing to conduct its business

activities with Greenbrier in a manner substantially similar to that conducted prior to the date of

this Agreement, is complying with the terms of this Agreement and does not owe Greenbrier

more than $27,000,000 (provided that, if the term of this Agreement has been extended to more

than twelve (12) months from the date of its execution, such amount shall be increased by

$400,000 per month for each additional month), then, unless this Agreement terminates as

provided in Section 7, Greenbrier and each member of Holdings shall forbear from and shall not

take any actions to collect any outstanding obligations owing by Midland to Greenbrier.  If

Greenbrier or a member of Holdings believes that an event of default  has occurred under this

paragraph that no longer requires it to forbear, it will give written notice to Midland, and

Midland shall have 45 days to cure such default before any actions are taken to collect such

outstanding obligations unless this Agreement has terminated.

9.    <u>Turley Employment Agreement and Other Employment Matters</u>.

Contemporaneous with the execution of this Agreement, Greenbrier by its Secretary, Clarence

Hodge, or other authorized representative, shall enter into the employment agreement with

Joseph C. Turley, III, as CEO and President of Greenbrier, in the form attached hereto as <u>Exhibit
C</u>, with a term that extends through the later of June 30, 2011, the termination of this Agreement

or the Closing Date of a Combined Sale.  By the execution of this Agreement, notwithstanding

anything to the contrary in the Greenbrier's Operating Agreement, Greenbrier's members hereby appoint and authorize a special committee of William Karis, Jack McCarthy, Michael McConnell and Raymond McCormick (and each of their designees) to take action, via unanimous approval, with respect to any and all matters (i) under the employment agreement with Joseph C. Turley, III and in all respects with his employment by Greenbrier and (ii) approving bonuses for employees of Greenbrier as recommended by management of Greenbrier and voted on by the Special Board.

10.     <u>Conduct of Businesses</u>.  From the date hereof until a Combined Sale or termination of this Agreement in accordance with Section 7, except as otherwise consented to in writing by Midland or Greenbrier, on the one hand to the other party (which consent shall not be unreasonably withheld, conditioned or delayed), Greenbrier and Midland each agree to, (x) conduct the business of Greenbrier and Midland in the ordinary course of business consistent with past practices; and (y) use reasonable best efforts to maintain and preserve intact the current organization and business of Greenbrier and Midland, as the case may be, and to preserve the rights, goodwill and relationships of its landlords, mineral owners, employees, customers, lenders, suppliers, regulators and others having business relationships with Greenbrier and Midland, respectively.  Greenbrier and Midland each acknowledge and agree that the Sharing Model has been prepared based upon prior financial information shared among Greenbrier, Midland and Lehman.  The Sharing Model assumes that each business will continue to operate in the ordinary course and Greenbrier and Midland each agree that, since delivered to the Special Board the balance sheet of Greenbrier, dated November 30, 2010 and the condensed balance sheet of Midland, dated November 30, 2010, respectively, there has not been, and will not be, any:

(a)     declaration or payment of any dividends or distributions on or in respect of any of its membership interest or redemption, purchase or acquisition of its membership interests;

(b)     transfer, assignment, sale or other disposition of any of the assets of such company or cancellation of any debts or entitlements except for fair and reasonable value in the ordinary course of business consistent with past practices;

(c)     any capital investment in, or any loan to, any other person;

(d)     grant of any bonuses, whether monetary or otherwise, or any general wage or salary increases in respect of its employees, other than as consistent with past practice, or change in the terms of employment for any Employee except (1) for the bonuses to key employees (other than the CEO and President of each entity) of Greenbrier and Midland upon a Combined Sale in an aggregate amount of up to $500,000 as provided for in the Sharing Model with $400,000 being allocated among certain Greenbrier employees as recommended by the management of Greenbrier (one of the conditions of such bonus shall be the continued employment of such employee through the date of the Combined Sale) and approved by Special Board Approval and $100,000 to be allocated among certain Midland employees and (2) as contained in that certain employment agreement to be entered into between Greenbrier and Joseph C. Turley, III;

(e)     entry into or termination of any employment agreement (other than that certain employment agreement to be entered into between Greenbrier and Joseph C. Turley, III) or collective bargaining agreement, written or oral, or modification of the terms of any such existing agreement;

(f)     loan to, or enter into any other transaction, unless fair and reasonable, with any of its members (direct and indirect), managers and officers of such company other than in

the ordinary course of business in accordance with past practices; provided that with respect to

any transaction involving $25,000 or more, such transaction shall be disclosed to the Special

Board prior to the consummation of such transaction (it is acknowledged that the following

transactions have been disclosed to the Special Board: (i) Greenbrier is entering into an

employment agreement with Joseph C. Turley, III, contemporaneously herewith, and (ii) Joseph

C. Turley, III continues to accrue a payable for salary and benefits package from Midland at the

rate of $31,500 per month);  and, for the avoidance of doubt, the parties also acknowledge that

the foregoing restrictions do not apply to the leasing of equipment, sharing of personnel, and coal

sales between Midland and Greenbrier on terms and conditions substantially similar to those

previously conducted between the parties;

   (g) acquisition by merger or consolidation with, or by purchase of a

substantial portion of the assets or stock of, or by any other manner, any business or any person

or any division thereof;

   (h) adoption, amendment, modification or termination of any bonus, profit

sharing, incentive, severance, or other plan, contract or commitment for the benefit of any of its

managers, members, officers and employees except for the bonuses to key employees of

Greenbrier and Midland in an aggregate amount of up to $500,000 as provided for in the Sharing

Model;

   (i) cash payments of salary and benefits by Midland to Joseph C. Turley, III,

provided that nothing shall prohibit or restrict Midland from continuing to accrue such salary and

benefits in accordance with its past practices; or

   (j) any contract to do any of the foregoing, or any action or omission that

would result in any of the foregoing.

11.    <u>No Solicitation of Other Bids</u>.  So long is this Agreement has not terminated,

except for a Combined Sale, neither Greenbrier nor Midland will, and will not authorize or

permit any of its affiliates or any of its or their representatives to, directly or indirectly, (i)

encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii)

enter into discussions or negotiations with, or provide any information to, any person concerning

a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether

or not binding) regarding an Acquisition Proposal. For purposes hereof, "Acquisition Proposal"

means any inquiry, proposal or offer from any person concerning (i) a merger, consolidation,

liquidation, recapitalization, share exchange or other business combination transaction involving

such company; (ii) the issuance or acquisition of shares of capital stock or other equity securities

of such company or its subsidiaries; or (iii) the sale, lease, exchange or other disposition of any

significant portion of such company's properties or assets or the properties or assets of its

subsidiaries.

12.    <u>Access to Information</u>.  From the date hereof until the earlier of a Combined Sale

or the termination of this Agreement, Greenbrier and Midland agree:  (i) to afford Weir

International, Inc. ("Weir") and the Investment Bank (a) full and free access to and the right to

inspect all of the properties, assets, premises, books and records, contracts and other documents

and data related to the respective company and its subsidiaries; and (b) furnish such financial,

operating and other data and information related to the company as Weir and/or the Investment

Bank may reasonably request; and (ii) that the Special Board and Board Observers shall be

provided with full and free access to any reports or other materials prepared by Weir and/or the

Investment Bank, provided that no particular Manager or either of the Board Observers shall be

permitted to separately contact, request information or give instructions to Weir or the

Investment Bank without the prior approval of the Special Board and that the day to day delivery

of information will be handled by the management teams at Greenbrier and Midland, respectively.  The Special Board will request that both the Investment Bank and Weir agree to provide the Special Board and Board Observers with updates on at least a weekly basis.

13.    <u>Special Board Matters</u>.  The parties hereto have designated that the following five (5) individuals be designated to act as a "Special Board" for the purposes of determining Excess Cash Flow, approving of a Combined Sale (if there are multiple offers exceeding the Minimum Consideration), approving distributions from the Escrow Account, determining compliance with this Agreement and taking other actions specified under this Agreement (each a "Special Manager" and collectively the "Special Managers"):

(a)    Joseph C. Turley, III or such person designated by him;

(b)    William Karis or such person designated as the Independent Manager (as such term is defined in Greenbrier's Operating Agreement);

(c)    Jack McCarthy or such person designated by Lehman;

(d)    Michael McConnell or such person designated as the Class B Manager  (as such term is defined in Greenbrier's Operating Agreement); and

(e)    Raymond McCormick or such person designated by him.

Not less than two (2) days notice must be provided to all five (5) Special Managers and the Board Observers before the Special Board may act on any matter; provided such notice may be waived by the unanimous consent of all Special Managers.  Action may be taken by the affirmative vote ("Special Board Approval") of four (4) of the five (5) Special Managers whether at meetings of the Special Board of Managers either in person, telephonically, or via written consents and communications (including e-mail); provided that approval of all five (5) Special Managers shall be required to approve a sale if the CAFS to be received under a Combined Sale will be less than the Minimum Consideration.  No Special Manager as such or any officer,

director, employee or agent of any member of Greenbrier or Midland following the directions of

a Special Board Approval shall be liable to any member, Lehman, Greenbrier or Midland for

losses or liabilities arising from the decisions or conduct of the affairs of the Special Managers or

from the conduct of any employee or agent of Greenbrier or Midland following such

instructions.  Greenbrier and Midland  indemnify and hold harmless the Special Managers

against all damages, losses, fines, costs and expenses (including attorneys' fees and

disbursements) resulting from or relating in any way to any claim or demand made or threatened,

or any action, proceeding or investigation commenced or threatened, omitted to have been taken

(or alleged to have been taken or omitted to have been taken) by such person in connection with

the organization, business or other affairs of Greenbrier or Midland (including any amounts paid

or property transferred, and all costs and expenses, including attorneys' fees and disbursements,

incurred in connection with any settlement of any such claim, action, proceeding, or

investigation), except that such indemnification shall be made only if such action or omission of

such person is not determined to constitute willful misconduct, recklessness, gross negligence or

material breach of this Agreement, with respect to the matter or matters as to which indemnity is

sought.  The Special Board shall have no authority to amend, modify, or waive any provision of

this Agreement.

   14. <u>Confidentiality</u>.  The parties to this Agreement and their respective legal counsel

agree that the Sharing Model and all of its terms shall be kept confidential and shall not be

disclosed in any form, except that the same may be disclosed if required by judicial order, or if

required by law or regulation, and the same may be disclosed to their underwriters, lenders,

accountants, inside and outside auditors, as necessary.  Nothing in this Agreement shall be

construed as to prevent a party from complying with a subpoena duces tecum or discovery

request related to litigation and/or a court order (provided that Lehman shall not be permitted to

publicly disclose the Sharing Model in any manner in its Bankruptcy Case without the prior

written consent of Greenbrier and Midland or opportunity for Greenbrier and Midland to object

to such disclosure) to produce a copy of the Sharing Model or to testify to the subject matters

contained in or related to the Sharing Model.  However, the party under the obligations to

produce or testify about the Sharing Model shall inform the other parties, as soon as practicable,

to provide the other parties an opportunity to intervene to preserve their rights.  In the event that

Lehman discloses the Sharing Model in its Bankruptcy Case over the objections of Greenbrier or

Midland, Greenbrier and Midland shall each have the right to terminate this Agreement.  This

confidentiality provision applies equally to the parties as well as their respective lawyers,

accountants, shareholders, members, managers, officers, directors, and anyone else employed by

or representative of the parties.  All confidential documents exchanged by the parties shall be

returned or destroyed.  If a party chooses to destroy the confidential documents of the other

parties, the destroying party shall provide the other party/parties with a letter certifying that the

confidential documents have been destroyed.

      15.    <u>Arbitration</u>.  Any controversy or claim arising out of or relating to this

Agreement, or the breach thereof, will be settled by arbitration in Pittsburgh, Pennsylvania, in

accordance with the Commercial Arbitration Rules of the American Arbitration Association (the

"AAA").  All parties agree that such location is the most convenient forum for the parties.  The

parties elect to provide for pre-arbitration discovery pursuant to the provisions of the Federal

Rules of Civil Procedure.  Unless modified by the arbitrators in their discretion, the arbitration

will proceed upon the following schedule:

      (a) within 10 business days from the service of a notice of demand for arbitration,

the parties to the dispute will exchange names of acceptable AAA arbitrators in an effort

to identify three arbitrators that are acceptable to all parties.

(b) It the parties are unable to agree upon an arbitrator, the AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. If the parties are unable to agree upon three arbitrators, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.  Unless the parties agree upon all three arbitrators, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators;

(c) within 10 business days after selection of the arbitrators, the parties will conduct a pre-arbitration conference at which a schedule of pre-arbitration discovery will be set, all pre-arbitration motions scheduled and any other necessary pre-arbitration procedural matters decided;

(d) all discovery will be completed within 20 days following the pre-arbitration conference;

(e) all pre-arbitration motions will be filed and briefed so that they may be heard no later than 15 days following the discovery cut-off;

(f) the arbitration will be scheduled to commence no later than 10 business days after the decision on all pre-arbitration motions, but in any event no later than 3 months following the service of the demand for arbitration; and

(g) the arbitrators will agree to hear the claim on successive days and will render their written decision within 15 business days following the submission of the matter. Such arbitration will be final and binding on all of the parties thereto, no appeals may be taken therefrom, and judgment upon any award rendered may be entered in any court having jurisdiction therefor.  The substantially prevailing party/parties in any legal proceeding will be entitled to recover its/theirs legal fees and expenses.

16.    Governing Law.  Except as provided herein, this Agreement shall be interpreted under and governed by the laws of the State of Delaware without giving effect to conflicts of law provisions thereof that would make the law of any other jurisdiction applicable to this Agreement.

17.    Agreement on Damages.  EACH OF THE PARTIES HERETO WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

18.    Modification of Greenbrier's Operating Agreement.  The Sharing Model provides for distributions among the Classes of equity in Greenbrier which differ from Greenbrier's Operating Agreement.  To the extent necessary to facilitate the sharing of proceeds from a Combined Sale in accordance with the Sharing Model, Greenbrier's Operating Agreement shall be deemed amended by this Agreement.  To the extent of any conflict between Greenbrier's Operating Agreement and this Agreement with respect to those matters to be voted on by the

Special Board (including the provisions of paragraph 13 with respect to the Special Board) and distributions to members of Holdings, the terms of this Agreement shall prevail.

19.    <u>Release by Greenbrier</u>.  In consideration of the obligations undertaken in this Agreement, upon a Combined Sale, each of Greenbrier's entities on behalf of themselves and any and all of their predecessors, successors, assigns, heirs, parent companies, members, shareholders, creditors, direct subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, members of the Board of Managers, employees and transferees (collectively, the "Greenbrier Releasing Parties") hereby release and forever discharge, to the fullest extent that such parties are permitted by law, Lehman and each of the other signatories hereto and all of its or their predecessors, successors, assigns, heirs, parent companies, members, shareholders, creditors, direct subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, employees and transferees from and against any and all actions, causes of action, claims (including, but not limited to, the Proof of Claim), suits, debts, damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured, whether at law or equity, whether before a local, state, or federal court, state or federal administrative agency or commission, or arbitration tribunal, regardless of location and whether now known or unknown, contingent, liquidated or unliquidated, that any of the Greenbrier Releasing Parties now have or may have had, or thereafter claim to have, on behalf of itself or themselves, or any other person or entity, at any time except that the foregoing release is not intended to release any obligations arising after the Closing Date (including, without limitation, the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts.  For the avoidance of doubt, it is acknowledged that the foregoing release, upon becoming effective, shall release any and all claims that Greenbrier may have against Robert E. Heuler in connection with services that he performed as an independent contractor to Greenbrier.

20.    <u>Release by Lehman</u>.  In consideration of the obligations undertaken in this

Agreement, upon a Combined Sale, Lehman, on behalf of itself and all of its predecessors,

successors, assigns, heirs, parent companies, members, shareholders, creditors, direct

subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, employees and transferees

(collectively, the "Lehman Releasing Parties") hereby agree to release any and all liens and

security interests they may have on assets of Greenbrier and to release and forever discharge, to

the fullest extent that such parties are permitted by law, each of Greenbrier's and Midland's

entities and each of the other signatories hereto and all of its or their predecessors, successors,

assigns, heirs, parent companies, members, shareholders, creditors, direct subsidiaries, indirect

subsidiaries, affiliates, agents, directors, officers, members of the Board of Managers, employees

and transferees from and against any and all actions, causes of action, claims, suits, debts,

damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured,

whether at law or in equity, whether before a local, state, or federal court, state or federal

administrative agency or commission, or arbitration tribunal, regardless of location and whether

now known or unknown, contingent, liquidated or unliquidated, that any of the Lehman

Releasing Parties now has or may have had, or thereafter claims to have, on behalf of itself or

themselves, or any other person or entity, at any time except that the foregoing release is not

intended to release any obligations arising after the Closing Date (including, without limitation,

the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts.

21.    <u>Greenbrier Release of Midland and Members</u>.  In consideration of the obligations

undertaken in this Agreement, upon a Combined Sale, Greenbrier and each of its members, on

behalf of themselves and all of their predecessors, successors, assigns, heirs, parent companies,

members, shareholders, creditors, direct subsidiaries, indirect subsidiaries, affiliates, agents,

directors, officers, employees and transferees (collectively, the "Greenbrier and Members

Releasing Parties") hereby release and forever discharge, to the fullest extent that such parties are permitted by law, Midland and all of their predecessors, successors, assigns, heirs, parent companies, members, shareholders, creditors, direct subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, members of the board of managers, employees and transferees from and against any and all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured, whether at law or in equity, whether before a local, state, or federal court, state or federal administrative agency or commission, or arbitration tribunal, regardless of location and whether now known or unknown, contingent, liquidated or unliquidated, that any of the Greenbrier and Members Releasing Parties now has or may have had, or thereafter claims to have, on behalf of itself or themselves, or any other person or entity, at any time except that the foregoing release is not intended to release any obligations arising after the Closing Date (including, without limitation, the distribution of proceeds in accordance with the Sharing Model) or relating to fraudulent acts. Contemporaneous with a Combined Sale, Greenbrier will immediately release any and all liens and security interests that Greenbrier may have on the assets of Midland.

22.    <u>Midland Release of Greenbrier and Members</u>.  In consideration of the obligations undertaken in this Agreement, upon a Combined Sale, Midland, and each of its members on behalf of themselves and all of their predecessors, successors, assigns, heirs, parent companies, members, shareholders, creditors, direct subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, employees and transferees (collectively, the "Midland and Members Releasing Parties") hereby release and forever discharge, to the fullest extent that such parties are permitted by law, Greenbrier and each of the other signatories hereto and all of its or their predecessors, successors, assigns, heirs, parent companies, members, shareholders, creditors, direct subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, members of the

Board of Managers, employees and transferees from and against any and all actions, causes of

action, claims, suits, debts, damages, judgments, liabilities, and demands whatsoever, whether

matured or unmatured, whether at law or equity, whether before a local, state, or federal court,

state or federal administrative agency or commission, or arbitration tribunal, regardless of

location and whether now known or unknown, contingent, liquidated or unliquidated, that any of

the Midland and Members Releasing Parties now has or may have had, or thereafter claims to

have, on behalf of itself or themselves, or any other person or entity, at any time except that the

foregoing release is not intended to release any obligations arising after the Closing Date

(including, without limitation, the distribution of proceeds in accordance with the Sharing

Model) or relating to fraudulent acts.

      23.     <u>Non-Disparagement and Public Statements</u>.  The parties agree that if asked by any

third-party about this Agreement or the outcome of any dispute and/or disagreement with, or

claims against any other party to this Agreement, each shall state only that the parties reached a

mutually-satisfactory compromise and/or settlement, or words to that effect.

      24.     <u>No Admission of Liability; Settlement</u>.  Nothing contained in this Agreement

shall constitute or be considered an admission of facts or liability by any party in connection with

any legal proceeding other than a proceeding to enforce this Agreement.  Upon consummation of

a Combined Sale, the parties agree that:

      (i) this Agreement constitutes a compromise of disputed claims and shall never be

construed as an admission of liability or responsibility for any purpose by any party; and

      (ii) the parties to this Agreement expressly acknowledge and agree that they have

accepted the consideration set forth herein as a complete compromise and settlement of

matters involving disputed issues of law and/or fact, and that the aforementioned parties

assume the risk that the law and/or facts may be otherwise than they believe; and that in

making this settlement, the aforementioned parties further agree that they have not been influenced to any extent whatsoever by any representations or statements regarding any other matter made by any party released herein or its counsel.

25.    <u>Dismissal of Pending Litigation</u>.  The parties hereto agree to immediately seek approval of this Agreement by the Bankruptcy Court.  Upon a Combined Sale, the Pending Litigation and all pleadings filed in connection therewith shall be marked settled, dismissed and closed with prejudice, all without any further approval by the Bankruptcy Court.  Each party will bear its own incurred fees and costs relating to this Agreement, including all documents and pleadings filed with the Bankruptcy Court in support of this Agreement.

26.    <u>Accounting and Audited Matters</u>.  Subsequent to Bankruptcy Court approval of this Agreement as contemplated by paragraph 25 above:

(i) Greenbrier and Midland agree to provide copies to the Special Board of their monthly production and financial statements, internally prepared balance sheets, year-end financial statements (as prepared by accountants) and tax returns and also such additional financial information as shall from time to time be reasonably requested by Special Board Approval; and

(ii)  by Special Board Approval, the Special Board shall have the right from time to time to engage, at Greenbrier's expense (which expense may (if not previously paid by Greenbrier) be paid out of the proceeds of a Combined Sale in the same manner as any other liability of Greenbrier), an accounting firm to consult with and advise the Special Board as to tax and accounting matters and to verify and/or audit the accounts payable, financial statements and other financial matters relating to Greenbrier, Midland, the Combined Sale or this Agreement; provided that, with respect to any Combined Sale, the

parties agree that any structuring of a transaction for tax or accounting benefits shall treat

Greenbrier and Midland (and their members) in a fair and equitable manner.

All of the foregoing requests shall be reasonable in scope and shall be conducted in a

manner that will not materially affect the business activities or operations of the

companies.

27.   <u>Construction</u>.  Each party hereto represents and warrants that it has had an

opportunity to fully review the provisions of this Agreement with attorneys of its own choice as a

result of which the parties hereto acknowledge and agree (a) that any rule of law that provides

that ambiguities are to be construed against the drafting party shall not be employed in the

interpretation of this Agreement and (b) that each party signing this Agreement is entering into

this Agreement knowingly, voluntarily, and of its own free will.

28.   <u>Severability</u>.  Should any provision of this Agreement or the exhibits hereto be

held by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason,

then the remaining portions of this Agreement will nonetheless remain in full force and effect,

unless such portion of the Agreement is so material that its deletion would violate the obvious

purpose and intent of the parties.

29.   <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to

the benefit of the heirs, personal representatives, successors and assigns of the parties hereto.

30.   <u>Entire Agreement</u>.  The parties hereto acknowledge that this Agreement

constitutes the entire agreement between the parties with respect to the subject matter hereof, and

all prior agreements, negotiations and understandings with respect to the subject matter hereof

are superseded by this Agreement.  This Agreement may not be varied in its terms by an oral

agreement or representation or otherwise, except by an instrument in writing of subsequent date

hereof executed by all of the parties hereto.

31.    <u>Authority</u>.  Each individual signing this Agreement on behalf of any party represents and warrants that he/she has full authority to do so.

32.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same agreement.  Signatures may be exchanged by electronic means, including facsimile, and each of the parties agrees that it will be bound by its electronic signature, including facsimile signature, and that it accepts such signatures of the other parties.

[SIGNATURE PAGE 1 OF 3 TO SETTLEMENT AGREEMENT]

**GREENBRIER MINERALS HOLDINGS, LLC**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**GREENBRIER MINERALS, LLC**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**GREENBRIER SMOKELESS COAL MINING, L.L.C.**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**POWHATAN MID-VOL COAL SALES, L.L.C.**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**MATOAKA LAND COMPANY LLC**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**MIDLAND TRAILS RESOURCES, LLC**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**DOLPHIN MINING, LLC**

By: _____
Name:  Joseph C. Turley, III
Title:  President & CEO

**[SIGNATURE PAGE 2 OF 3 TO SETTLEMENT AGREEMENT]**

**LEHMAN COMMERCIAL PAPER INC.**

By:_____

Name:  Ashvin Rao

Title:  Vice President

**[SIGNATURE PAGE 3 OF 3 TO SETTLEMENT AGREEMENT]**

Intending to be legally bound hereby, each of the following persons consents to, authorizes and approves of the provisions of the above Agreement with respect to each respective entity without the need for such entity to separately take any such action and without the need to modify or amend such entity's operating agreement or other governing documents or instruments.

**GREENBRIER MINERALS HOLDINGS, LLC VOTING MEMBERS:**

**DOLPHIN MINING, LLC MEMBERS:**

**CLASS A MEMBERS:**

_____
Joseph C. Turley, III

_____
Raymond McCormick

_____
Joseph C. Turley, III

_____
C. Thomas Brewer

**CLASS B MEMBER:**

Greenbrier Equity Opportunity, LP

By:  MHM Greenbrier, LP, its General Partner
By:  MHM Coal Ventures, LLC, its General
        Partner

By:_____
        Michael McConnell, President

By:_____
        Michael McConnell

**CLASS C MEMBERS:**

_____
Robert E. Heuler

Greenbrier Investments, L.P.
By: Greenbrier Investments, LLC

_____
By: William A. Ladie, President

## [SIGNATURE PAGE 3 OF 3 TO SETTLEMENT AGREEMENT]

Intending to be legally bound hereby, each of the following persons consents to, authorizes and approves of the provisions of the above Agreement with respect to each respective entity without the need for such entity to separately take any such action and without the need to modify or amend such entity's operating agreement or other governing documents or instruments.

**GREENBRIER MINERALS HOLDINGS, LLC VOTING MEMBERS:**

**DOLPHIN MINING, LLC MEMBERS:**

**CLASS A MEMBERS:**

_____
Joseph C. Turley, III

_____
Joseph C. Turley, III

_____
Raymond McCormick

_____
C. Thomas Brewer

**CLASS B MEMBER:**

Greenbrier Equity Opportunity, LP

By: MHM Greenbrier, LP, its General Partner
By: MHM Coal Ventures, LLC, its General
    Partner


By:_____
     Michael McConnell, President


By:_____
     Michael McConnell

**CLASS C MEMBERS:**

_____
Robert E. Heuler

Greenbrier Investments, L.P.
By: Greenbrier Investments, LLC

_____
By: William A. Ladie, President

**[SIGNATURE PAGE 3 OF 3 TO SETTLEMENT AGREEMENT]**

Intending to be legally bound hereby, each of the following persons consents to, authorizes and approves of the provisions of the above Agreement with respect to each respective entity without the need for such entity to separately take any such action and without the need to modify or amend such entity's operating agreement or other governing documents or instruments.

**GREENBRIER MINERALS HOLDINGS, LLC VOTING MEMBERS:**

**DOLPHIN MINING, LLC MEMBERS:**

**CLASS A MEMBERS:**

_____
Joseph C. Turley, III

_____
Joseph C. Turley, III

_____
Raymond McCormick

_____
C. Thomas Brewer

**CLASS B MEMBER:**

Greenbrier Equity Opportunity, LP

By:  MHM Greenbrier, LP, its General Partner
By:  MHM Coal Ventures, LLC, its General
       Partner

By:_____
       Michael McConnell, President

By:_____
       Michael McConnell

**CLASS C MEMBERS:**

_____
Robert E. Heuler

Greenbrier Investments, L.P.
By: Greenbrier Investments, LLC
_____
By: William A. Ladie, President

**[SIGNATURE PAGE 3 OF 3 TO SETTLEMENT AGREEMENT]**

Intending to be legally bound hereby, each of the following persons consents to, authorizes and approves of the provisions of the above Agreement with respect to each respective entity without the need for such entity to separately take any such action and without the need to modify or amend such entity's operating agreement or other governing documents or instruments.

**GREENBRIER MINERALS HOLDINGS, LLC VOTING MEMBERS:**

**CLASS A MEMBERS:**

**DOLPHIN MINING, LLC MEMBERS:**

_____
Joseph C. Turley, III

_____
Raymond McCormick

_____
Joseph C. Turley, III

_____
C. Thomas Brewer

**CLASS B MEMBER:**

Greenbrier Equity Opportunity, LP

By: MHM Greenbrier, LP, its General Partner
By: MHM Coal Ventures, LLC, its General
    Partner

By: _____
Michael McConnell, President

By: _____
Michael McConnell

**CLASS C MEMBERS:**

_____
Robert E. Heuler

Greenbrier Investments, L.P.
By: Greenbrier Investments, LLC
_____
By: William A. Ladie, President

## [SIGNATURE PAGE 3 OF 3 TO SETTLEMENT AGREEMENT]

Intending to be legally bound hereby, each of the following persons consents to, authorizes and approves of the provisions of the above Agreement with respect to each respective entity without the need for such entity to separately take any such action and without the need to modify or amend such entity's operating agreement or other governing documents or instruments.

**GREENBRIER MINERALS HOLDINGS, LLC VOTING MEMBERS:**

**DOLPHIN MINING, LLC MEMBERS:**

**CLASS A MEMBERS:**

_____
Joseph C. Turley, III

_____
Joseph C. Turley, III

_____
Raymond McCormick

_____
C. Thomas Brewer

**CLASS B MEMBER:**

Greenbrier Equity Opportunity, LP

By:  MHM Greenbrier, LP, its General Partner
By:  MHM Coal Ventures, LLC, its General
        Partner

By:_____
        Michael McConnell, President

By:_____
        Michael McConnell

**CLASS C MEMBERS:**

_____
Robert E. Heuler

Greenbrier Investments, L.P.
By: Greenbrier Investments, LLC

_____
By: William A. Ladie, President

NYI-4316599v7

33

[SIGNATURE PAGE 3 OF 3 TO SETTLEMENT AGREEMENT]

Intending to be legally bound hereby, each of the following persons consents to, authorizes and approves of the provisions of the above Agreement with respect to each respective entity without the need for such entity to separately take any such action and without the need to modify or amend such entity's operating agreement or other governing documents or instruments.

**GREENBRIER MINERALS HOLDINGS, LLC VOTING MEMBERS:**

**DOLPHIN MINING, LLC MEMBERS:**

**CLASS A MEMBERS:**

_____
Joseph C. Turley, III

_____
Joseph C. Turley, III

_____
Raymond McCormick

_____
C. Thomas Brewer

**CLASS B MEMBER:**

Greenbrier Equity Opportunity, LP

By: MHM Greenbrier, LP, its General Partner
By: MHM Coal Ventures, LLC, its General
      Partner

By:_____
      Michael McConnell, President

By:_____
      Michael McConnell

**CLASS C MEMBERS:**

_____
Robert E. Heuler

Greenbrier Investments, L.P.
By: Greenbrier Investments, LLC
_William A. Ladie_
By: William A. Ladie, President

_____
Frank Stacy


_____
Clarence Hodge


_____
William Karis


**CLASS D MEMBER:**

Lehman Commercial Paper, Inc.


By:_____
        Eric Salzman, Managing Director -
        Private Equity & Principal Investments
        for LAMCO LLC

_____
Frank Stacy

_____
Clarence Hodge

_____
William Karis

**CLASS D MEMBER:**

Lehman Commercial Paper, Inc.

By:_____
        Eric Salzman, Managing Director -
        Private Equity & Principal Investments
        for LAMCO LLC

_____
Frank Stacy


_____
Clarence Hodge

_____
William Karis


**CLASS D MEMBER:**

Lehman Commercial Paper, Inc.


By:_____
       Eric Salzman, Managing Director -
       Private Equity & Principal Investments
       for LAMCO LLC

_____

Frank Stacy


_____

Clarence Hodge


_____

William Karis


**CLASS D MEMBER:**

Lehman Commercial Paper, Inc.

By:_____
          Ashvin Rao
          Vice President

Settlement Agreement - Exhibit A

(Not Attached)

Settlement Agreement - Exhibit B

(Not Attached)

Settlement Agreement - Exhibit C

(Employment Agreement)

## GREENBRIER MINERALS, LLC'S
## EMPLOYMENT AGREEMENT FOR JOSEPH C. TURLEY, III

This Employment Agreement ("Agreement") is made as of January 1, 2010, between Greenbrier Minerals, LLC, a Delaware limited liability company (hereinafter called "Greenbrier") and the undersigned individual, Joseph C. Turley, III (hereinafter called "Turley").

WHEREAS, this Agreement is a term and condition of Turley's employment and is made in consideration for employment, wages and benefits offered to Turley contemporaneously with this Agreement;

WHEREAS, this Agreement is necessary for the protection of Greenbrier's legitimate and protectible business interests in its accounts and confidential, proprietary and trade secret information; and

NOW THEREFORE, for the consideration set forth herein, the receipt and sufficiency of which is acknowledged by the parties, Greenbrier and Turley agree as follows:

1.    DEFINITIONS.  As used herein:

(a)    "Greenbrier" shall mean Greenbrier Minerals, LLC, a Delaware limited liability Greenbrier, and its affiliated companies.

(b)    "Confidential Information" shall include, but is not necessarily limited to, any information which may include, in whole or part, information concerning Greenbrier's or its subsidiaries' existing and prospective contracts, accounts, sales, sales volume, sales methods, sales proposals, coal reserve information, coal quality specifications (including drill hole data from holes drilled for Greenbrier or its subsidiaries), Greenbrier manuals, formulae, products, processes, methods, compositions, ideas, improvements, inventions, research, computer programs, system documentation, software products, patented products, copyrighted information, know how and operating methods and any other trade secret or proprietary information belonging to Greenbrier or relating to Greenbrier's affairs that is not public information.

2.    DUTIES.  Turley, will be employed in the position of President and Chief Executive Officer of Greenbrier as of the date of this Agreement, and agrees to be responsible for such duties as are commensurate with and required by such position, and agrees to fulfill his fiduciary obligations to Greenbrier.

3.    OBLIGATIONS RELATING TO CORPORATE OPPORTUNITIES.  Turley recognizes his fiduciary obligation to Greenbrier as its President & CEO, and agrees that he will make a good faith effort to keep Greenbrier's Board of Managers ("BOM") informed about material corporate opportunities that could reasonably advantage Greenbrier.

4.    COMPENSATION.  Turley will be compensated for his performance as follows:

(a) As of the date of this Agreement, Turley will be entitled to receive gross annual base compensation of five hundred thousand dollars ($500,000.00), paid pursuant to Greenbrier's normal payroll practices.  It is acknowledged that this Agreement is being executed several months after its effective date, that Turley has been receiving compensation at a rate of $350,000 per year during this period and that Turley shall be entitled to the incremental amount of his salary as stated in this Agreement for the period from the date of this Agreement to present.

(b) In the event that Greenbrier is sold during the Term of this Agreement, or within three (3) months thereafter, Turley will  receive a bonus of five hundred thousand dollars ($500,000.00), less taxes and withholdings.

(c)   Turley was entitled and did receive an additional end of year bonus at the end of 2010, as determined by the BOM in its sole discretion.  This additional bonus was based upon the overall performance of Greenbrier including, but not necessarily limited to, adding new coal reserves, increasing the production of clean coal tonnage, maintaining an excellent safety record,  and reducing the overall cost of production per ton of clean coal.

5.    BENEFITS.   Turley will receive standard Greenbrier benefits substantially similar to those provided to Turley last year, which standard benefits may be modified by mutual agreement between Turley and Greenbrier from time to time.

6.    POLICIES AND PRACTICES.   Turley agrees to abide by all Greenbrier rules, handbook, regulations, policies, practices and procedures which Greenbrier may amend from time to time in its sole discretion.

7.    NONDISCLOSURE OF CONFIDENTIAL INFORMATION.   Turley covenants and agrees during Turley's employment or for one (1) year after the termination of such employment, not to communicate or divulge to any person, firm or corporation, either directly or indirectly, and to hold in strict confidence for the benefit of Greenbrier, all Confidential Information except that Turley may disclose such Information to persons, firms or corporations who need to know such Information during the course and within the scope of Turley's employment.  Turley agrees to return all Greenbrier property including any copies thereof upon termination of employment for any reason.

8.    TERM.  The "Term" of this Agreement shall be for period commencing on the date hereof and ending on the later of (i) June 30, 2011 or (ii) the date that the Settlement Agreement, dated as of January __, 2011, by and among, Greenbrier Minerals Holdings, LLC, Greenbrier Minerals, LLC, Powhatan Mid-Vol Coal Sales, L.L.C., Matoaka Land Company LLC, Midland Trails Resources, LLC, Dolphin Mining, LLC and Lehman Commercial Paper Inc. is terminated or a "Combined Sale" (as defined therein) has occurred.  Said Term may be extended and/or modified, upon mutual, written agreement of the parties.

9.    TERMINATION.     Turley may terminate employment upon 30 days' written notice to Greenbrier.  Notwithstanding anything to the contrary contained in this Agreement, Greenbrier (via action by the special committee in accordance with paragraph 9 of the Settlement

Agreement) may only terminate Turley's employment upon 30 days' written notice to Turley should any of the following events occur:

>  (a) Should Greenbrier terminate its business and liquidate its assets;

>  (b) Greenbrier's filing of bankruptcy or chapter 11 reorganization;

>  (c) where Turley's termination is for "Cause". Cause shall mean (i) the commission of a crime involving theft, fraud or deceit; (ii) conduct which brings the Company or any of its related entities into public disgrace or disrepute, (iii) substantial or continued unwillingness to perform duties as reasonably directed by BOM; (iv) engaging in conduct that has a material and adverse effect on Greenbrier's business; (v) any material breach of this Agreement.

10.   <u>EQUITABLE RELIEF; FEES AND EXPENSES</u>.   Turley stipulates and agrees that any material breach of paragraphs 3 or 7 of this Agreement by Turley will result in immediate and irreparable harm to Greenbrier, the amount of which will be extremely difficult to ascertain, and that Greenbrier could not be reasonably or adequately compensated by damages in an action at law.   For these reasons, Greenbrier shall have the right, without objection from Turley, to obtain such preliminary, temporary or permanent injunctions or restraining orders or decrees as may be necessary to protect Greenbrier against, or on account of, any breach by Turley of the provisions of this Agreement, without the need to post a bond in excess of five hundred dollars ($500.00).   Such right to equitable relief is in addition to all other legal remedies Greenbrier may have to protect its rights.

11.   <u>SETTLEMENT BY ARBITRATION</u>.   Any claim of controversy that arises out of or relates to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the commercial rules of the American Arbitration Association, with both parties splitting the cost of the arbitration proceedings.   Judgment upon the award rendered may be entered in any court with jurisdiction.   This settlement procedure does not preclude Greenbrier from seeking injunctive relief pursuant to paragraph 10 above.

12.   <u>AMENDMENTS</u>.   No supplement, modification, amendment or waiver of the terms of this Agreement shall be binding on the parties hereto unless executed in writing by the party to be bound thereby.   No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.   Any failure to insist upon strict compliance with any of the terms and conditions of this Agreement shall not be deemed a waiver of any such terms or conditions.

13.   <u>FULL UNDERSTANDING</u>. Turley acknowledges that he has carefully read and fully understands all of the provisions of this Agreement and that Turley, in consideration for the compensation set forth herein, is voluntarily entering into this Agreement.

14.   <u>SEVERABILITY</u>.   This Agreement supersedes all prior agreements, written or oral, between the parties hereto concerning the subject matter hereof.   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid

under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

15.    <u>CHOICE OF LAW, JURISDICTION AND VENUE</u>.  The parties agree that this Agreement shall be deemed to have been made and entered into in West Virginia and that the Law of the State of West Virginia shall govern this Agreement.  Jurisdiction and venue is proper in any proceeding by Greenbrier to enforce its rights hereunder filed in any court geographically located in the State of West Virginia.

16.    <u>SUCCESSORS IN INTEREST</u>.  This Agreement shall be binding upon and shall inure to the benefit of the successors or assigns of Greenbrier.  Turley may not assign this Agreement.

17.    <u>HEADINGS</u>.  The headings used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

ACKNOWLEDGED AND AGREED TO, INTENDING TO BE LEGALLY BOUND HEREBY:

Greenbrier Minerals, LLC                         Joseph C. Turley, III


By: _____        By: _____
Name: Clarence Hodge_
Its:    Secretary

Date: _____                 Date: _____

-4-

## **Exhibit 2 - Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                     :    Case No. 08-13555 (JMP)
                                                             :
                        Debtors.                             :    (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULE 9019 APPROVING A SETTLEMENT
AGREEMENT AMONG LEHMAN COMMERCIAL PAPER INC., GREENBRIER
MINERALS HOLDINGS, LLC AND CERTAIN OF ITS AFFILIATES, MIDLAND
TRAIL RESOURCES, LLC AND DOLPHIN MINING, LLC**

This matter coming before the Court on the Motion (the "Motion") of Debtor

Lehman Commercial Paper Inc. ("Lehman") for an Order Pursuant to Section 105(a) of the

Bankruptcy Code[1] and Bankruptcy Rule 9019 Approving a Settlement Agreement Between

Lehman, Greenbrier and Midland, filed by the debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors"); the Court having reviewed the Motion and

having considered the statements of counsel and the evidence adduced with respect to the Motion

at a hearing before the Court (the "Hearing"); the Court finding that (i) the Court has jurisdiction

over this matter pursuant to 28 U.S.C. § 1334, (ii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b) and (iii) notice of the Motion and the Hearing was sufficient under the circumstances;

and the Court having found and determined the relief sought in the Motion is in the best interests

of the Debtor, its estates and creditors, and all parties in interest and that the legal and factual

---

[1]     Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the
Motion.

bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ADJUDGED, FOUND AND DETERMINED:

(a)    This Court has jurisdiction over the Motion and the Settlement Agreement pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

(b)    The statutory predicates for the relief sought in the Motion and granted in this Order include, without limitation, section 105(a) of the Bankruptcy Code, and Bankruptcy Rule 9019.

(c)    As evidenced by the affidavit and certificate of service filed with the Court, the Court finds that:  (1) proper, timely, adequate and sufficient notice of the Motion and the Settlement Agreement has been provided by the Debtor; (2) such notice, and the form and manner thereof, was good, sufficient, reasonable and appropriate under the circumstances prevailing in these chapter 11 cases; and (3) no other or further notice of the Motion or the Settlement Agreement is or shall be required.

(d)    A reasonable opportunity to object to and to be heard at the Hearing on the Motion and the relief requested therein has been given as required by the Bankruptcy Code and all Bankruptcy Rules to all persons entitled to notice.

(e)    Entry into the Settlement Agreement is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the fair, reasonable and appropriate exercise of the Debtor's sound business judgment.

NYI-4342780v6

(f)    The Settlement Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtor, Greenbrier and Midland in good faith, without collusion and from arm's length bargaining positions.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Settlement Agreement is approved in its entirety.  The Debtor is authorized to enter into, and perform its obligations under, the Settlement Agreement pursuant to Bankruptcy Rule 9019.  The Settlement Agreement is legal, valid and binding upon the Debtor.

3.    The Debtor and its successors are authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Settlement Agreement.

4.    Upon a Combined Sale (as defined in the Settlement Agreement), Greenbrier shall withdraw the Proof of Claim in its entirety.

5.    To enable the parties to immediately take action under the Settlement Agreement, this Order shall become effective immediately upon its entry.

6.    The Court shall retain jurisdiction to hear and determine all matters arising from, related to or in connection with the implementation, interpretation, enforcement or application of this Order.


Dated: February ___, 2011
       New York, New York            _____
                                     HONORABLE JAMES M. PECK
                                     UNITED STATES BANKRUPTCY JUDGE

NYI-4342780v6