Hearing Date: March 23, 2011 at 10:00 a.m.
Objection Deadline: March 16, 2011 at 4:00 p.m.

Anthony Paduano (AP 8400)
Willard Knox (WK 5567)
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
Telephone: (212) 785-9100
Facsimile: (212) 785-9099

ATTORNEYS FOR JASON T. TAYLOR

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re:                                                         : Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS, INC., et. al.                        : Case No. 08-13555 (JMP)
                                                               : (Jointly Administered)
                        Debtors.                               :
                                                               :
---------------------------------------------------------------x

## MOTION OF JASON T. TAYLOR FOR A DETERMINATION THAT THE AUTOMATIC STAY DOES NOT APPLY OR, ALTERNATIVELY, FOR RELIEF FROM AUTOMATIC STAY

Jason T. Taylor ("Taylor"), by and through his undersigned counsel, hereby files this motion (the "Motion") pursuant to Section 362(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requesting entry of an order substantially in the form attached hereto as <u>Exhibit A</u>.  In support of the Motion, Taylor respectfully represents as follows:

## **PRELIMINARY STATEMENT**

Taylor is a former employee of Lehman Brothers, Inc. ("LBI") where he was employed as an Investment Representative in LBI's Dallas, Texas office. On August 19, 2005, Taylor executed a promissory note (the "Note") memorializing an upfront bonus paid by LBI to Taylor.

LBI filed for bankruptcy protection on September 19, 2008. On that same day, LBI terminated Taylor's employment without prior notice or cause.

On or about October 11, 2010, debtor Lehman Brothers Holdings Inc. ("LBHI") (together with LBI, "Lehman") instituted an arbitration proceeding before FINRA Dispute Resolution entitled <u>Lehman Brothers Holdings Inc., as assignee of Lehman Brothers Inc. v. Jason Taylor</u>; FINRA No. 10-04622 (the "FINRA Arbitration").[1] In the FINRA Arbitration, Lehman seeks the outstanding principal amount of the Note, plus accrued and annually compounded interest, and its attorneys' fees, costs and disbursements.

Lehman purports to bring the FINRA Arbitration against Mr. Taylor pursuant to the "Stipulation And Order Between Lehman Brothers Holdings And James W. Giddens As Trustee For The SIPA Liquidation Of Lehman Brothers Inc. With Respect To Promissory Notes Evidencing Loans To Certain Employees" (Docket No. 6038), so ordered by this Court on December 3, 2009. Mr. Taylor

---

[1] A true and correct copy of Lehman's Statement of Claim In the FINRA Arbitration is attached hereto as <u>Exhibit B</u>.

2

seeks to assert in the FINRA Arbitration counterclaims against Lehman based upon Lehman's wrongdoing against him that is detailed below (the "Counterclaims").[2]

Taylor seeks this Court's assistance so that he may assert his Counterclaims in the FINRA Arbitration—the forum selected by LBHI.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## FACTUAL BACKGROUND

2. In 2005, Lehman offered Taylor the upfront bonus reflected in the Note, to induce him to leave his employment as a financial advisor with Morgan Stanley DW, Inc., and to bring his clients with him to Lehman.

3. Over the next three years, Taylor grew his existing book of business at Lehman through his own hard work, acquiring as clients numerous high net worth individuals and institutions, thereby generating substantial revenues for Lehman.

4. Lehman aggressively pushed its financial advisors (including Taylor) to recommend to their customers Lehman's proprietary products—including structured notes, private equity and hedge funds.

---

[2] Simultaneously herewith, Taylor has filed his Statement of Answer, Affirmative Defenses and Counterclaims in the FINRA Arbitration, a true and correct copy of which is annexed hereto as Exhibit C.

3

5.    Beginning in July 2008, news of Lehman's instability began to circulate. At no time, however, did anyone at Lehman disclose to Mr. Taylor (or his clients) that Lehman faced any difficulties. Mr. Taylor's prospective and existing clients, however, grew increasingly concerned, and either declined to invest new assets or transferred their assets to other firms.

6.    Notwithstanding the increasingly alarming news about Lehman's current status and future, Lehman's senior management (up to and including Richard Fuld, Lehman's Chairman and Chief Executive Officer) repeatedly represented to Mr. Taylor and its other advisors that Lehman was in fine shape.

7.    Relying upon the representations of Lehman's senior management (including without limitation Mr. Fuld, George Walker—then head of the Lehman Brothers Wealth Management group, of which Mr. Taylor was a member, and Mark Connally, Mr. Taylor's branch office manager), Mr. Taylor repeatedly reassured his clients that all was well at Lehman, and that they need not move their accounts elsewhere. Relying further upon Lehman's representations, Mr. Taylor reasonably believed he did not need to seek other employment.

8.    On Sunday, September 14, 2008, Mr. Taylor's branch manager called him and told him that although the status of Lehman was uncertain, if he failed to appear for work the next day, he would be terminated.

9. When LBI summarily terminated Mr. Taylor's employment on September 19, 2008 (the date it sought bankruptcy protection), Lehman made no demand for repayment of the remainder of the Note or otherwise indicated to Mr. Taylor that Lehman would seek such repayment.

10. By the end of that week of LBHI and LBI's respective filings for bankruptcy, Barclays Capital Inc. ("Barclays") had announced that it would acquire the Lehman Brothers Wealth Management group, of which Mr. Taylor was a member. Mr. Taylor received from Barclays no retention bonus or other financial inducement to remain with the firm.

11. What first appeared as good news for Mr. Taylor (i.e., the acquisition by Barclays), however, quickly turned out to be otherwise (both for him and his clients). Approximately $45,000,000.00 of Mr. Taylor's client assets were invested in a Lehman proprietary hedge fund—the LibertyView Fund LLC (the "Lehman Hedge Fund")—that Lehman had aggressively pushed its advisors (including Mr. Taylor) to recommend to their clients. Notwithstanding that the Lehman Hedge Fund's assets cleared through Lehman's London office, upon Lehman Brothers' filing for bankruptcy, all of these approximately $45,000,000.00 in client assets were immediately frozen. Thus, Mr. Taylor's clients could not withdraw or transfer their funds, and found themselves entangled in Lehman Brothers' bankruptcy. Mr. Taylor also received no compensation in connection with advising his clients on these (now worthless) investments.

12. Additionally, approximately $10,000,000.00 of Mr. Taylor's clients assets were invested in Lehman proprietary structured notes that Lehman labeled as "principal protected," and which Lehman had aggressively pushed its advisors (including Mr. Taylor) to recommend to their clients. As with the Lehman Hedge Fund, however, upon Lehman's declaration of bankruptcy, all of these approximately $10,000,000.00 in client assets were immediately frozen. Thus, Mr. Taylor's clients could not withdraw or transfer their funds, and found became mere creditors in a nightmarish bankruptcy. Again, as with the Lehman Hedge Fund, Mr. Taylor received no compensation in connection with advising his clients on these (now worthless) investments.

13. Under his compensation agreement with Lehman Brothers, Mr. Taylor was to receive 50% of the client's fee to his production grid and, in turn, a 50% payout. Given that the average fee was approximately two percent of the assets invested in Lehman's proprietary hedge fund, Mr. Taylor was to receive an annualized fee of one percent. At a 50% payout, Mr. Taylor would have received more than approximately $200,000.00 in income per year.

14. Lehman's bankruptcy (and its subsequently publicly revealed wrongdoing) led to a severe loss of client confidence. Indeed, as a direct result, Mr. Taylor lost five key clients, who severed all ties with Mr. Taylor. Thus, Lehman's wrongdoing and bankruptcy severely damaged (and, in some cases, destroyed) Mr. Taylor's client relationships, not to mention his ability to support himself and his family. Moreover, given that the Lehman bankruptcy continues,

6

Mr. Taylor still must assist clients whose assets are frozen and thus cannot be reinvested, and must do so without compensation.

15. As has now been revealed by the Report of the Examiner in this proceeding, issued March 11, 2010 (the "Examiner's Report"), Lehman engaged in extensive wrongdoing that forced it into bankruptcy. In particular, Lehman repeatedly misrepresented and failed to disclose its true financial status to its own customers, not to mention Mr. Taylor and its other financial advisors.

16. As is set forth in the Examiner's Report:

º Lehman failed to disclose to the federal government, the rating agencies, its investors or even its own Board of Directors its use of accounting devices such as the "Repo 105" to hide the true nature of its financial condition. (Examiner's Report at 6-8)[3]

º As late as September 10, 2008 [i.e., five days before LBHI filed for bankruptcy], Lehman "publicly announced that its liquidity pool was approximately $40 billion; but a substantial portion of that total was in fact encumbered or otherwise illiquid." (Examiner's Report at 9) (Exhibit D hereto)

º The Examiner concluded that sufficient evidence exists for a trier of fact to determine that Lehman's failure to disclose its use of "Repo 105" to conceal its true financial condition was "materially misleading," and that Lehman "affirmatively misrepresented its accounting treatment for repos." (Examiner's Report at 962)[4]

---

[3] A true and correct copy of the cited excerpt of the Examiner's Report is annexed hereto as Exhibit D. The complete Examiner's Report, which consists of nine volumes totaling 4,105 pages, is incorporated herein by reference.

[4] A true and correct copy of the cited excerpt of the Examiner's Report is annexed hereto as Exhibit E.

7

º The Examiner concluded that sufficient evidence exists for a trier of fact to determine that Lehman's Forms 10-K and 10-Q were "deficient and misleading" (Examiner's Report at 985), and that the "picture Lehman painted of its financial position in late 2007 and into 2008 was materially misleading" (Examiner's Report at 987) (Exhibit E hereto)

º The Examiner further concluded that colorable claims for breach of fiduciary duty and/or gross negligence exist against Lehman's senior management for "allowing and certifying the filing of financial statements that omitted or misrepresented material information" concerning Lehman's financial condition, and for failing to disclose information about "Repo 105" to Lehman's Board of Directors. (Examiner's Report at 992) (Exhibit E hereto)

17. Thus, Lehman's highest-level management intentionally concealed from its customers, its financial advisors (including Mr. Taylor) and federal regulators the true nature of its financial condition.

18. But for Lehman's misrepresentations to Mr. Taylor, he would neither have represented to his clients that all was well with their accounts at Lehman, nor maintained his employment with Lehman.

19. Moreover, had Lehman lawfully maintained its business, the Note would have been forgiven by its own terms in 2012.

## RELIEF REQUESTED

20. By this Motion, Taylor seeks an order pursuant to Section 362(d) of the Bankruptcy Code and Bankruptcy Rule 4001 determining that the automatic stay does not apply to the Counterclaims or, in the alternative, granting Taylor relief from the automatic stay to assert the Counterclaims in the FINRA Arbitration.

8

## BASIS FOR RELIEF

### I.

### THE AUTOMATIC STAY DOES NOT APPLY TO THE COUNTERCLAIMS

21. Pursuant to Section 362(a)(1) of the Bankruptcy Code,

a bankruptcy filing petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title . . .

11 U.S.C. § 362(a)(1).

22. The automatic stay therefore applies only when a proceeding was or could have been commenced before the bankruptcy filing. If a proceeding could not have been commenced before the bankruptcy filing, the proceeding is not subject to the automatic stay. In re Galgano, 358 B.R. 90, 98 (Bankr. S.D.N.Y. 2007); In re Chateaugay Corp., 86 B.R. 33, 38 (S.D.N.Y. 1987)

23. LBI's bankruptcy filing was the act that triggered Taylor's claims against LBI. Prior to the commencement of the bankruptcy case, Taylor could not have commenced any proceeding against LBI based on the allegations asserted in the Counterclaims. Specifically, Taylor seeks to assert claims for unpaid compensation pursuant to New York Labor Law, and alternatively under causes of action for unjust enrichment and money had and received. Additionally, Taylor seeks to assert a claim based upon Lehman's fraudulently inducing him to remain employed with Lehman.

9

24. Therefore, the automatic stay mandated by Section 362(a)(1) is not applicable to the Counterclaims and Taylor should be free to assert the Counterclaims in the FINRA Arbitration—the forum selected by LBHI.

II.

## THE COURT SHOULD LIFT THE AUTOMATIC STAY

25. In the event that the Court decides that the automatic stay provisions of Section 362(a)(1) apply to the Counterclaims, the Court should nevertheless grant Taylor relief from the stay to assert the Counterclaims because to do otherwise would be inequitable and extremely prejudicial to Taylor.

26. "Where a debtor brings a lawsuit and then invokes the automatic stay to prevent the defendant from asserting counterclaims, 'the situation warrants a very thoughtful scrutiny'" Gruber v. Victor, 95 CIV. 2285 (JSM), 1996 WL 492991 (S.D.N.Y. Aug. 28, 1996) (quoting Matter of Bohack Corp. v Borden, Inc., 599 F2d 1160, 1168 (2nd Cir. 1979)) (Exhibit F hereto); In re Overmyer, 32 B.R. 597, 601 (Bankr. S.D.N.Y. 1983).

27. Courts must be "cautious to avoid a decision which would convert Code § 362 from a shield into a weapon" In re Overmyer, 32 B.R. 597, 601 (Bankr. S.D.N.Y. 1983). Yet converting the shield of the automatic stay into a weapon against Taylor is exactly what LBHI is attempting to do.

i. **There is Cause to Grant Taylor Relief from the Automatic Stay**

28. Section 362(d) of the Bankruptcy Code provides, in pertinent part, that the Court may grant relief from the automatic stay as follows:

10

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause . . . .

11 U.S.C. § 362(d)(1)

29. The term "cause" is not defined in the Bankruptcy Code. Therefore, it is in the discretion of the Court to determine whether "cause" exists to lift the automatic stay. See In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 91 (2nd Cir. 2003); Manhattan King David Restaurant, Inc. v. Levine, 163 B.R. 36, 40 (Bankr. S.D.N.Y. 1993) (citing In re Sonnax Industries, Inc., 907 F.2d 1280, 1286 (2nd Cir. 1990).

30. The Second Circuit Court of Appeals has recognized a number of factors to be considered in determining a motion for relief from the automatic stay, including:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms

In re Sonnax Industries, Inc., 907 F.2d at 1286.

31. Not all of the factors enumerated by the Second Circuit in <u>In re Sonnax Industries</u> will be relevant in every case. <u>In re Mazzeo</u>, 167 F.3d 139, 143 (2d Cir. 1999). The Court does not need to give equal weight to each factor, nor does the Court need to employ each and every factor. <u>Id.</u>; <u>see</u> <u>also</u> <u>In re New York Medical Group, P.C.</u>, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001). In the case presently before the Court, the factors that are relevant for the Court's consideration all favor lifting the stay.

32. It is inarguable that prosecution of the Counterclaims in the Arbitration would not interfere with the bankruptcy proceedings (Factor 2). LBHI initiated the Arbitration against Taylor; it cannot now claim that all counterclaims in that same Arbitration would interfere with the bankruptcy proceedings.

33. With regard to fourth <u>Sonnax</u> factor, a specialized tribunal with the necessary expertise – the FINRA arbitration panel – has been established to hear the Counterclaims. That same Panel will, at LBHI's initiative, hear LBHI's claims against Taylor; it should likewise hear Taylor's counterclaims against LBHI.

34. Factor seven looks at whether "litigation in another forum would prejudice the interests of other creditors." The Counterclaims would not prejudice the interests of any LBHI or LBI creditors. Prosecuting the Counterclaims is an entirely different matter than collecting a judgment, and Taylor would certainly return to this Court and enforce any judgment through the claims allowance process.

35. "[T]he interests of judicial economy and the expeditious and economical resolution of litigation" – the tenth Sonnax factor – clearly weigh in favor of allowing Taylor to assert his Counterclaims in the Arbitration. Arbitration is the forum that will hear LBHI's claims against Taylor and it would be expeditious and economical for the Arbitration panel to hear Taylor's Counterclaims. Conversely, it would be extremely uneconomical and inefficient to require Taylor's Counterclaims to be brought in a separate adversary action before this Court. The Court would be required to duplicate much of the Panel's work to knowledgeably decide on the merits of the Counterclaims, which is the very definition of inefficiency. In fact, the "fundamental goal of arbitration" is "to provide a simple and expeditious alternative to litigation." Natl. Ass'n of Broadcast Employees & Technicians v. Am. Broadcasting Co., Inc., 140 F.3d 459, 463 (2nd Cir. 1998). To require Taylor to defend LBHI's claims in arbitration and then pursue his own claims in this Court, would frustrate the very goal of conducting the arbitration in the first place.

36. Finally, the impact of the stay and the balance of equities weigh in Taylor's favor. Imposition of the stay on the Counterclaims would force Taylor to defend himself in the Arbitration and then commence separate proceedings in this Court for his claims against LBHI and LBI. This would be extremely expensive and inefficient, and could result in inconsistent decisions.

37. Further, such a result would be inequitable to Taylor. LBHI has initiated the FINRA Arbitration against Taylor, yet has asserted that Taylor is prohibited from asserting his Counterclaims because of the automatic stay.[5] Such a result would clearly harm Taylor while benefiting LBHI.

38. By contrast, LBHI would suffer relatively minimal harm from a lifting of the stay to allow Taylor to assert his Counterclaims. LBHI is the party that commenced the arbitration, and could have easily foreseen that Taylor would seek to assert counterclaims against it. LBHI might incur additional expenses as a result of defending against the Counterclaims, but when compared with the risk of Taylor losing any right to assert those counterclaims, the harm to LBHI is relatively small. See Gruber v. Victor, 1996 WL 492991 *5 (holding that where the debtor is the initiator of costly litigation, the automatic stay should not be invoked to spare the debtor the expense of defending itself) (Exhibit F hereto); In Re Wedtech, 87 B.R. 279, 290 (S.D.N.Y. 1988).

### ii. Lifting the Stay Would Conform with the Purpose of the Stay

39. The purpose of the automatic stay is to give the debtor "breathing space" from its creditors and to "centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." See Teachers Ins. & Annuity Ass'n of America v. Butler, 803 F.2d 61, 64 (2nd Cir.

---

[5] A true and correct copy of a letter from LBHI's counsel in the FINRA Arbitration to FINRA, dated January 31, 2011, is attached hereto as Exhibit G.

14

1986) (quoting legislative history); In re Petrusch, 667 F.2d 297, 299 (2nd Cir. 1981) (same), cert. denied, 456 U.S. 974 (1982); In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2d Cir. 1990)

40. Lifting the stay to permit Taylor to assert Counterclaims in a proceeding initiated by LBHI conforms to the purposes of the stay. LBHI has had more than two years since its bankruptcy filing to get "breathing space" from its creditors. In fact, LBHI would not even need protection from Taylor had LBHI not initiated proceedings against Taylor. Furthermore, because it was the debtor – LBHI – that chose to pursue its dispute against Taylor in arbitration, there can be no concern that the Counterclaims would further de-centralize the dispute or cause inefficiencies in the reorganization process. See Gruber v. Victor, 1996 WL 492991 at *5 (Exhibit F hereto); Matter of Bohack Corp. Borden, Inc., 599 F2d at 1168 – 69.

41. No prior request for the relief sought herein has been made to this or any other court.

42. In light of the foregoing, Taylor respectfully requests the following relief:

> • that the Court enter an Order that the automatic stay does not apply to the Counterclaims Taylor seeks to assert against LBHI in the FINRA Arbitration;
>
> • alternatively, if the Court holds that the automatic stay does apply to the Counterclaims, that the Court enter an Order lifting the automatic stay so that Taylor may assert the Counterclaims in the FINRA Arbitration; and

- such other and further relief as the Court deems just and appropriate.

## Conclusion

For the reasons set forth above, Taylor respectfully requests the Court enter an order holding that the automatic stay does not apply to the Counterclaims or, alternatively, lifting the automatic stay to allow Taylor to assert the Counterclaims, and granting Taylor such other and further relief as is just and proper.

Dated: New York, New York
February 7, 2011

PADUANO & WEINTRAUB LLP

BY: *[signature]*
Anthony Paduano
Willard Knox
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)

Attorneys for Jason T. Taylor

16