FINRA DISPUTE RESOLUTION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Arbitration Between    :

LEHMAN BROTHERS HOLDINGS INC.    :    FINRA No. 10-04622
as assignee of Lehman Brothers, Inc.,

    :

    Claimant-Counterclaim Respondent,

    :

    -and-

    :

JASON T. TAYLOR,

    :

    Respondent-Counterclaimant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATEMENT OF ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF RESPONDENT-COUNTERCLAIMANT JASON T. TAYLOR

As and for his Answer and Affirmative Defenses to the Statement of

Claim (the "Claim") of claimant-counterclaim respondent Lehman Brothers Holdings

Inc. as assignee of Lehman Brothers Inc., and his Counterclaims, respondent Jason

T. Taylor, by his undersigned attorneys, alleges:[1]

---

[1]    Concurrently with the submission of his Statement of Answer, Affirmative Defenses and Counterclaims, Mr. Taylor is filing a Motion for Relief from Automatic Stay in the bankruptcy proceeding captioned In re Lehman Brothers Holdings Inc., Chapter 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) (the "Lehman Bankruptcy"). In his Motion for Relief from Automatic Stay, Mr. Taylor seeks a lift of the stay to assert counterclaims against Lehman in this proceeding. Mr. Taylor thus submits his counterclaims pending the resolution of his Motion for Relief from Automatic Stay in the Lehman Bankruptcy. As is detailed herein, Mr. Taylor's counterclaims allege wrongdoing and injury continuing and occurring after the institution of the Lehman Bankruptcy, and could not have been asserted by Mr. Taylor prior to the stay.

## Preliminary Statement

1.     Mr. Taylor denies each and every material allegation of wrongdoing asserted in the Claim.

2.     Lehman Brothers Holdings Inc. ("LBHI") as assignee of Lehman Brothers Inc. ("Lehman Brothers") (collectively, "Lehman") seeks to enforce a purported "Promissory Note" entered into on August 18, 2005 between Lehman Brothers and Mr. Taylor (the "Note").[2]  The Note reflects an upfront bonus paid by Lehman Brothers to Mr. Taylor to induce him to leave his prior firm and bring his existing skills and clients with him to Lehman Brothers.  As is set forth in the Note (and the Statement of Claim (the "Claim")), the Note was to be forgiven in equal installments over the next seven years—i.e., through August 2012.  Without prior notice or warning to Mr. Taylor (or his clients), however, LBHI declared bankruptcy on September 15, 2008, followed closely by Lehman Brothers' declaration of bankruptcy on September 19, 2008.  Perhaps tellingly, Lehman drops this information into a footnote. See Claim ¶ 11 n.1.

3.     As is detailed below, Lehman's own wrongdoing forced it into bankruptcy.  As a result, Mr. Taylor (not to mention his clients) was left scrambling for a new firm.  Moreover, had Lehman stayed in business, the Note would have

---

[2]  To avoid confusion, all references herein shall be to "Lehman" except where a distinction between LBHI and Lehman Brothers needs to be made for the sake of accuracy.

been forgiven in 2012.    Thus, having been left without employment or a firm to service his clients solely because of Lehman's wrongdoing, Mr. Taylor is now faced with the prospect of being held liable on the balance of a Note that would have been forgiven had Lehman run its business properly and not forced itself into bankruptcy.    Nonetheless, as is set forth below, Mr. Taylor's damages (and those of his clients) far exceed those alleged by Lehman.    The Panel should therefore deny the Claim in its entirety, and grant Mr. Taylor's claims for affirmative relief.

### Statement of Facts

**A.    Mr. Taylor's Background**

4.    In 2000, Mr. Taylor graduated from The Price College of the University of Oklahoma, with a Bachelor of Business Administration in Finance and Management Information Systems.

5.    In December 2000, Mr. Taylor became employed as an e-business consultant with e2i, Inc. in Dallas, Texas.

6.    Given his business background and experience, and his keen interest in the securities industry, Mr. Taylor joined Morgan Stanley DW Inc. ("Morgan Stanley") as a financial advisor trainee in June 2001.    Mr. Taylor then obtained his Series 7, 31 and 66 licenses in August 2001.

7.    After obtaining his securities licenses, Mr. Taylor worked tirelessly to build his book of business from the ground up. After three and one half years, Mr. Taylor was ranked first among his entering class of 245 fellow trainee advisors.

**B.    Mr. Taylor's Employment with Lehman**

8.    In 2005, a Lehman manager began to actively recruit Mr. Taylor to leave Morgan Stanley and join Lehman. The Lehman manager pitched Mr. Taylor on how he could succeed even further at Lehman because of the smaller sales force and the Lehman brand. Because Lehman did not pay commissions on client accounts with assets less than $500,000.00, however, Mr. Taylor expressed concern that part of his Morgan Stanley book would not be able to transition with him. Lehman then offered Mr. Taylor a substantial upfront bonus, and approximately $71,000.00 of restricted Lehman stock.

9.    Upon joining Lehman in 2005 in its Dallas, Texas office, Mr. Taylor quickly discovered that he would have to largely rebuild his book of business. Indeed, his production dropped to approximately 25% of what it had been at Morgan Stanley. During his second year, however, Mr. Taylor (as he had at Morgan Stanley) brought in new clients and assets. By his third year, Mr. Taylor had rebuilt his book of business to where it had been at Morgan Stanley, and had a wellspring of prospects and new clients. Through his own hard work, Mr. Taylor acquired as clients numerous high net worth individuals and institutions, thereby

generating substantial revenues for Lehman.   Lehman aggressively pushed Mr.

Taylor and its other advisors to recommend to their clients its proprietary

structured notes, private equity and hedge funds.   Little did Mr. Taylor know,

however, that Lehman's hawking of its products would later lead to severe

financial consequences for his clients.

     **C.**    **Lehman's Misrepresentations**

     10.    Beginning in July 2008, news of Lehman's instability began to

circulate.   At no time, however, did anyone at Lehman disclose to Mr. Taylor (or

his clients) that Lehman faced any difficulties.   Mr. Taylor's prospective and

existing clients, however, grew increasingly concerned, and either declined to

invest new assets or transferred their assets to other firms.

     11.    Notwithstanding the increasingly alarming news about Lehman's

current status and future, Lehman's senior management (up to and including

Richard Fuld, Lehman's now disgraced Chairman and Chief Executive Officer)

began a campaign to reassure Mr. Taylor and its other advisors that Lehman was in

fine shape.

     12.    Through an onslaught of e-mails (including from Mr. Fuld

himself), conference calls and meetings, Lehman assured Mr. Taylor and its other

advisors that the firm was as successful as it had ever been, with strong financials

and more than sufficient liquidity, and urged Mr. Taylor and others to convey this

to their clients.   Lehman's senior management further conveyed that Mr. Taylor's

employment (and that of its other advisors) was secure. Indeed, Lehman's senior management represented that bankruptcy was not even a possibility.

13.     Relying upon the representations of Lehman's senior management (including without limitation Mr. Fuld, George Walker—then head of the Lehman Brothers Wealth Management group, of which Mr. Taylor was a member, and Mark Connally, Mr. Taylor's branch office manager), Mr. Taylor repeatedly reassured his clients that all was well at Lehman, and that they need not move their accounts elsewhere. Relying further upon Lehman's representations, Mr. Taylor reasonably believed he did not need to seek other employment.

14.     As the date of the still undisclosed bankruptcy approached, rumors circulated that Lehman would survive via a sale to another company. Mr. Taylor's branch manager represented that (i) the sale of Lehman to another firm was a worst case scenario, (ii) firm would continue to thrive (as would Mr. Taylor), and (iii) bankruptcy still was not a possibility.

15.     Notwithstanding the reassurances of Lehman's senior management, Mr. Taylor's clients grew increasingly concerned by the uncertainty of Lehman's future, and began liquidating their assets and transferring funds out of their accounts. Mr. Taylor's branch manager even spoke directly with one of Mr. Taylor's clients and, in addition to reassuring such client about Lehman's future, rated Lehman Brothers stock a "buy."

6

16.     On Sunday, September 14, 2008, Mr. Taylor's branch manager called him and told him that although the status of Lehman was uncertain, if he failed to appear for work the next day, he would be terminated.

### D.     Lehman's Bankruptcy

17.     Needless to say, September 15, 2008—the date LBHI filed for bankruptcy—and the ensuing days were nothing short of a nightmarish for Mr. Taylor, his clients and his family.   Having received no advance notice of the bankruptcy from Lehman, and having relied upon the repeated reassurances of Lehman's senior management that his job was secure, Mr. Taylor suddenly found himself having to obtain other employment in a matter of days.[3]   By the end of the week, Barclays Capital Inc. ("Barclays") had announced that it would acquire the Lehman Brothers Wealth Management group, of which Mr. Taylor was a member.

18.     Barclays offered Mr. Taylor no retention monies or other financial inducement to remain with the firm.   Given the difficulty of securing other employment in the chaos that ensued from Lehman's bankruptcy, and concerned about his clients' frozen assets, Mr. Taylor elected to remain with Barclays so that he might more quickly receive helpful information than he would at a competitor firm.

---

[3]   In its Claim, Lehman dryly states (without a hint of irony) that Mr. Taylor "separated" his employment from Lehman on September 19, 2008—i.e., the date (continued . . .)

19.    At the time Lehman Brothers summarily "separated" Mr. Taylor's employment on the date it filed for bankruptcy, no one at Lehman told him that he would have to pay the balance of the Note out of his own pocket, or otherwise demanded that he repay the Note.

### E.    The Injury Suffered by Mr. Taylor and His Clients

20.    What first appeared as good news for Mr. Taylor (i.e., the acquisition by Barclays), however, quickly turned out to be otherwise (both for him and his clients).  Approximately $45,000,000.00 of Mr. Taylor's client assets were invested in a Lehman proprietary hedge fund—the LibertyView Fund LLC (the "Lehman Hedge Fund")—that Lehman had aggressively pushed its advisors (including Mr. Taylor) to recommend to their clients.  Notwithstanding that the Lehman Hedge Fund's assets cleared through Lehman's London office, upon Lehman Brothers' filing for bankruptcy, all of these approximately $45,000,000.00 in client assets were immediately frozen.  Thus, Mr. Taylor's clients could not withdraw or transfer their funds, and found themselves entangled in Lehman Brothers' bankruptcy.  Mr. Taylor also received no compensation in connection with advising his clients on these (now worthless) investments.

---

(. . . continued)
that Lehman Brothers Inc. filed for bankruptcy.  See Claim ¶¶ 2, 21.  Needless to say, Mr. Taylor did not voluntarily "separate" his employment with Lehman.

21.   Additionally, approximately $10,000,000.00 of Mr. Taylor's clients assets were invested in Lehman proprietary structured notes that Lehman labeled as "principal protected," and which Lehman had aggressively pushed its advisors (including Mr. Taylor) to recommend to their clients. As with the Lehman Hedge Fund, however, upon Lehman's declaration of bankruptcy, all of these approximately $10,000,000.00 in client assets were immediately frozen. Thus, Mr. Taylor's clients could not withdraw or transfer their funds, and found became mere creditors in a nightmarish bankruptcy. Again, as with the Lehman Hedge Fund, Mr. Taylor received no compensation in connection with advising his clients on these (now worthless) investments.

22.   Mr. Taylor has always put his clients' interests well ahead of his own. Mr. Taylor's sense of duty to his clients, however, meant that he received no compensation to assist them with their frozen assets, and was paid none of the commissions tied to these now worthless, proprietary Lehman products.

23.   Under his compensation agreement with Lehman Brothers, Mr. Taylor was to receive 50% of the client's fee to his production grid and, in turn, a 50% payout. Given that the average fee was approximately two percent of the assets invested in the Lehman proprietary hedge fund, Mr. Taylor was to receive an annualized fee of one percent. At a 50% payout, Mr. Taylor would have received more than approximately $200,000.00 in income per year, but for Lehman's bankruptcy (and the preventable wrongdoing that led to its bankruptcy).

24.    In addition to the freezing of millions of dollars in client assets, Lehman's bankruptcy (and its subsequently publicly revealed wrongdoing) further led to a severe loss of confidence among Mr. Taylor's customers.   Indeed, Mr. Taylor, through no fault of his own, lost five of his key clients, all of whom severed ties with him.   Thus, Lehman's wrongdoing and bankruptcy severely damaged (and, in some cases, destroyed) Mr. Taylor's client relationships, not to mention his ability to support himself and his family.   Moreover, given that the Lehman bankruptcy continues, Mr. Taylor still must assist clients whose assets are frozen and thus cannot be reinvested, and must do so without compensation.

### F.    Lehman's Wrongdoing

25.    As has now been revealed by the Report of the Examiner in In re Lehman Bros. Holdings Inc., No. 08-13555 (Bankr. S.D.N.Y.), issued March 11, 2010 (the "Examiner's Report"), Lehman engaged in extensive wrongdoing that forced it into bankruptcy.   In particular, Lehman repeatedly misrepresented and failed to disclose its true financial status to its own customers, not to mention Mr. Taylor and its other financial advisors.

26.    As is detailed in the Examiner's Report, Lehman failed to disclose to the federal government, the rating agencies, its own customers or even its own Board of Directors the use of accounting devices such as the now infamous "Repo 105" to hide the true nature of its financial condition.   See, e.g.,

Vol. 1 of Examiner's Report at 6-8 (Exhibit 1 hereto).[4]

27.    As late as September 10, 2008 [i.e., five days before LBHI filed

for bankruptcy], Lehman "publicly announced that its liquidity pool was

approximately $40 billion; but a substantial portion of that total was in fact

encumbered or otherwise illiquid." Examiner's Report at 9 (Exhibit 1 hereto).

28.    The Examiner concluded that sufficient evidence exists for a

trier of fact to determine that Lehman's failure to disclose its use of "Repo 105" to

conceal its true financial condition was "materially misleading," and that Lehman

"affirmatively misrepresented its accounting treatment for repos." See, e.g., Vol. 3

of Examiner's Report at 962 (Exhibit 2 hereto).

29.    The Examiner concluded that sufficient evidence exists for a

trier of fact to determine that Lehman's Forms 10-K and 10-Q were "deficient and

misleading" (Examiner's Report at 985) (Exhibit 2 hereto), and that the "picture

Lehman painted of its financial position in late 2007 and into 2008 was materially

misleading." Examiner's Report at 987 (Exhibit 2 hereto).

30.    The Examiner further concluded that colorable claims for breach

of fiduciary duty and/or gross negligence exist against Lehman's senior

management for "allowing and certifying the filing of financial statements that

omitted or misrepresented material information" concerning Lehman's financial

---

[4]  The complete Examiner's Report, which consists of nine volumes totaling 4,105
(continued . . .)

condition, and for failing to disclose information about "Repo 105" to Lehman's Board of Directors. Examiner's Report at 992. (Exhibit 2 hereto).

31.  Thus, Lehman's highest-level management intentionally concealed from its customers, its financial advisors (including Mr. Taylor) and federal regulators the true nature of Lehman's financial condition.

32.  But for Lehman's misrepresentations to Mr. Taylor, he would neither have represented to his clients that all was well with their accounts at Lehman, nor maintained his employment with Lehman.

33.  Based on the foregoing detailed wrongdoing, it shocks the conscience that Lehman would now seek repayment by Mr. Taylor of its Note, which would have been forgiven by its own terms had Lehman operated its business lawfully. Moreover, Lehman's wrongdoing directly and severely damaged Mr. Taylor, both professionally and personally.

**Affirmative Defenses**

<u>First Affirmative Defense</u>

The Claim fails to state a claim upon which relief can be granted.

<u>Second Affirmative Defense</u>

The Claim is barred in whole or in part by the doctrines of laches, waiver, ratification and estoppel.

---

(. . . continued)
pages, is incorporated herein by reference.

### Third Affirmative Defense

The Claim is barred in whole or in part by the applicable statutes of limitation and repose.

### Fourth Affirmative Defense

The Claim is barred in whole or in part because Lehman has sustained no injury arising from the conduct alleged.

### Fifth Affirmative Defense

The Claim is barred in whole or in part because any and all losses sustained by Lehman were due to its own actions, omissions, or negligence.

### Sixth Affirmative Defense

The Claim is barred in whole or in part because Lehman has failed to mitigate any damages it may have suffered.

### Seventh Affirmative Defense

Lehman is precluded from any recovery because the damages it seeks are necessarily speculative and not recoverable under the law.

### Eighth Affirmative Defense

Lehman is precluded from any recovery because the Note is void, unenforceable, and against public policy.

### Ninth Affirmative Defense

Lehman is precluded from any recovery because it has unclean hands.

**Counterclaims for Relief**

**FIRST CLAIM FOR RELIEF**
**(Fraud)**

1.   Mr. Taylor realleges and incorporates by reference the allegations set forth in paragraphs one through 33 hereof.

2.   Lehman misrepresented material facts to Taylor and/or made material omissions of fact concerning Lehman's status (including without limitation that Lehman was financially stable and would not declare bankruptcy) that were false and known to be false by Lehman.

3.   Lehman misrepresented material facts to Taylor and/or made material omissions of fact concerning Lehman's status for the purpose of inducing Taylor to rely upon such misrepresentations and/or material omissions of fact and remain with the firm.

4.   Taylor justifiably relied upon Lehman's misrepresentations and/o or material omissions and remained with the firm until Lehman declared bankruptcy and terminated him without notice or cause.

5.   Taylor suffered injury as a result of Lehman's fraud.

6.   As a direct and proximate result of Lehman's wrongdoing, Mr. Taylor has been injured and suffered damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**(Breach of Contract)**

1.     Mr. Taylor realleges and incorporates by reference the allegations set forth in paragraphs one through 33 hereof.

2.     Upon joining Lehman, a contract was formed between Lehman and Mr. Taylor whereby Lehman agreed to pay Mr. Taylor compensation pursuant to a percentage formula based upon the assets he brought into the firm and the revenues he generated for the firm.   Lehman further obligated itself under the contract and pursuant to industry rules and standards to run a legitimate brokerage firm.

3.     Mr. Taylor performed his obligations under his contract with Lehman by bringing client assets into the firm and generating revenues for the firm.

4.     Lehman failed to perform its obligations under the contract by failing to pay Mr. Taylor the agreed-upon compensation.   Lehman further failed to perform its obligations under the contract by failing to comply with industry rules and standards.

5.     Lehman's failure to perform its obligations under its contract with Mr. Taylor resulted in damage to Mr. Taylor, both in the form of unpaid compensation and lost business, including without limitation loss of existing and prospective clients.

6.    As a direct and proximate result of Lehman's wrongdoing, Mr. Taylor has been injured and suffered damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Fraudulent Inducement)**

1.    Mr. Taylor realleges and incorporates by reference the allegations set forth in paragraphs one through 33 hereof.

2.    Lehman misrepresented to Mr. Taylor material facts concerning the financial health and well-being of the firm so that he (and his clients) would remain with the firm.

3.    Lehman knew that its representations to Mr. Taylor (and his clients) concerning the firm were false, and intended to be relied upon Mr. Taylor (and his clients) when made.

4.    Mr. Taylor justifiably relied upon Lehman's representations, such that he (and his clients) remained with the firm.

5.    Lehman's fraud resulted in injury to Mr. Taylor (and his clients), in that he (i) did not seek an alternate firm for him and his clients; and (ii) could not reinvest his clients' assets, which were frozen upon Lehman's bankruptcy.

6.    As a direct and proximate result of Lehman's wrongdoing, Mr. Taylor has been injured and suffered damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
#### (New York Labor Law)

1. Mr. Taylor realleges and incorporates by reference the allegations set forth in paragraphs one through 33 hereof.

2. Lehman's willful failure to pay Mr. Taylor his earned compensation is in violation of the provisions of Article 6 of New York's Labor Law.

3. Pursuant to the terms of Article 6 of the Labor Law, Mr. Taylor is entitled to an award of liquidated damages equal to 25% in addition to the total amount of wages due to him, plus his attorneys' fees and costs.

4. As a direct and proximate result of Lehman's violation of New York Labor Law, Mr. Taylor has been injured and suffered damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
#### (Unjust Enrichment)

1. Mr. Taylor realleges and incorporates by reference the allegations set forth in paragraphs one through 33 hereof.

2. Lehman was enriched through Mr. Taylor's bringing in of clients and client assets that generated revenues for the firm and compensation for Mr. Taylor.

3. By failing to pay Mr. Taylor his earned compensation, Lehman was enriched at Mr. Taylor's expense.

4.     Equity and good conscience militate against permitting Lehman to retain Mr. Taylor's earned compensation.

5.     As a direct and proximate result of Lehman's wrongdoing, Mr. Taylor has been injured and suffered damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### (Money Had and Received)

1.     Mr. Taylor realleges and incorporates by reference the allegations set forth in paragraphs one through 33 hereof.

2.     Lehman received money belonging to Mr. Taylor in the form of compensation earned by Mr. Taylor in connection with his sale of investments to his customers.

3.     Lehman benefited from the receipt of the money.

4.     Under principles of equity and good conscience, Lehman should not be permitted to keep the money.

5.     As a direct and proximate result of Lehman's wrongdoing, Mr. Taylor has been injured and suffered damages in an amount to be determined at trial.

WHEREFORE Mr. Taylor respectfully requests that judgment be entered in his favor dismissing the Statement of Claim, and against Lehman as follows:

A.    Declaring that Mr. Taylor is not liable to Lehman in any respect;

B.    Declaring that the purported Note is void and unenforceable;

C.    Granting Mr. Taylor compensatory damages on his claims for breach of contract, fraud, unjust enrichment, money had and received and fraudulent inducement;

D.    Granting Mr. Taylor compensatory damages, statutory liquidated damages and attorneys fees pursuant to N.Y. Labor Law § 198 (1-a); and

E.    Granting Mr. Taylor such other and different relief as the Panel may deem just and proper.

Dated:    New York, New York
February 7, 2011

PADUANO & WEINTRAUB LLP

By: _____
Anthony Paduano
Willard Knox
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100

Attorneys for Jason T. Taylor

EXHIBIT   1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                                         :
In re                                                    :    Chapter 11 Case No.
                                                         :
LEHMAN BROTHERS HOLDINGS INC.,                           :    08-13555 (JMP)
*et al.*,                                                :
                                                         :    (Jointly Administered)
                                     Debtors.            :
-------------------------------------------------------- x

## REPORT OF
## ANTON R. VALUKAS, EXAMINER

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                              *Counsel to the Examiner*

## VOLUME 1 OF 9

### Sections I & II:  Introduction, Executive Summary & Procedural Background

### Section III.A.1:  Risk

maintain its ratings and confidence.  So at the end of the second quarter of 2008, as

Lehman was forced to announce a quarterly loss of $2.8 billion – resulting from a

combination of write-downs on assets, sales of assets at losses, decreasing revenues, and

losses on hedges – it sought to cushion the bad news by trumpeting that it had

significantly reduced its net leverage ratio to less than 12.5, that it had reduced the net

assets on its balance sheet by $60 billion, and that it had a strong and robust liquidity

pool.[19]

Lehman did not disclose, however, that it had been using an accounting device

(known within Lehman as "Repo 105") to manage its balance sheet – by temporarily

removing approximately $50 billion of assets from the balance sheet at the end of the

first and second quarters of 2008.[20]  In an ordinary repo, Lehman raised cash by selling

assets with a simultaneous obligation to repurchase them the next day or several days

later; such transactions were accounted for as financings, and the assets remained on

Lehman's balance sheet.  In a Repo 105 transaction, Lehman did exactly the same thing,

but because the assets were 105% or more of the cash received, accounting rules

permitted the transactions to be treated as sales rather than financings, so that the assets

---

[19] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Preliminary Earnings Call (June 9, 2008), at pp. 7-8.
[20] LBHI 2007 10-K, at p. 63; LBHI 10-Q Apr. 9, 2008, at p. 72; Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at p. 88 ("LBHI 10-Q July 10, 2008"); Examiner's Interview of Martin Kelly, Oct. 1, 2009; Examiner's Interview of Ed Grieb, Oct. 2, 2009.

could be removed from the balance sheet.[21]  With Repo 105 transactions, Lehman's

reported net leverage was 12.1 at the end of the second quarter of 2008; but if Lehman

had used ordinary repos, net leverage would have to have been reported at 13.9.[22]

Contemporaneous Lehman e-mails describe the "function called repo 105

whereby you can repo a position for a week and it is regarded as a true sale to get rid of

net balance sheet."[23] Lehman used Repo 105 for no articulated business purpose except

"to reduce balance sheet at the quarter-end."[24]  Rather than sell assets at a loss, "[a]

Repo 105 increase would help avoid this without negatively impacting our leverage

ratios."[25]  Lehman's Global Financial Controller confirmed that "the only purpose or

motive for [Repo 105] transactions was reduction in the balance sheet" and that "there

was *no substance* to the transactions."[26]

Lehman did not disclose its use – or the significant magnitude of its use – of

Repo 105 to the Government, to the rating agencies, to its investors, or to its own Board

---

[21] See Section III.A.4 (discussing Repo 105).
[22] LBHI 10-Q July 10, 2008, at p. 89; Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 7.  See also Section I.A of this Report, which discusses net leverage.
[23] E-mail from Anthony Jawad, Lehman, to Andrea Leonardelli, Lehman (Feb. 29, 2008) [LBEX-DOCID 224902].
[24] E-mail from Raymond Chan, Lehman, to Paul Mitrokostas, Lehman, *et al.* (Jul. 15, 2008) [LBEX-DOCID 3384937].
[25] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007), at p. 1 [LBEX-DOCID 2489498], attached to e-mail from Joseph Gentile, Lehman, to Ed Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714].
[26] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9.

of Directors.[27]  Lehman's auditors, Ernst & Young, were aware of but did not question

Lehman's use and nondisclosure of the Repo 105 accounting transactions.[28]

In mid-March 2008, after the Bear Stearns near collapse, teams of Government

monitors from the Securities and Exchange Commission ("SEC") and the Federal

Reserve Bank of New York ("FRBNY") were dispatched to and took up residence at

Lehman,[29] to monitor Lehman's financial condition with particular focus on liquidity.[30]

---

[27] Lehman did not disclose its use of Repo 105 in public filings. Examiner's Interview of Ed Grieb, Oct. 2, 2009, at p. 14; Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 15; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 16.  Lehman did not disclose its use of Repo 105 to rating agencies.  See Lehman, S&P Ratings Q2 2008 Update (June 5, 2008) [S&P-Examiner 000946] (Lehman did not disclose its use of Repo 105 to Standard & Poor's in its ratings presentation); Lehman, Fitch Ratings Q2 2008 Update (June 3, 2008) [LBHI_SEC07940_513239] (Lehman similarly did not disclose its use of Repo 105 to Fitch as part of its presentation where Lehman touted its balance sheet reduction).  The Examiner interviewed representatives from the three leading ratings agencies, Fitch, S&P and Moody's, and none had knowledge of Lehman's use of Repo 105/108 transactions, either by name or by description.  Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 5.  Lehman did not disclose its use of Repo 105 to Government regulators.  Examiner's Interview of Ronald S. Marcus, Nov. 4, 2009, at p. 11; Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 5; Examiner's Interview of Jan H. Voigts, Oct. 1, 2009.  Lehman did not disclose its use of Repo 105 to its Board of Directors.  Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 21; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10; Examiner's Interview of Roland Hernandez, Oct. 2, 2009; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 22; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 4.

[28] Examiner's Interview of Ernst & Young, Repo 105 session, Oct. 16, 2009, at pp. 8-9 (statement of William Schlich); Examiner's Interview of Ernst & Young, Nov. 3, 2009, at pp. 14-15 (statement of Hillary Hansen).

[29] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 5 (Eichner told the Examiner that after Bear Stearns nearly collapsed, the SEC had monitors on-site at Lehman "almost all the time."  Eichner also told the Examiner that the FRBNY had people "in residence" with actual offices at Lehman); Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 1 (Voigts monitored Lehman's liquidity position, embedded on-site with the firm, from March 16, 2008 through mid-September, 2008).

[30] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 4 (after Bear Stearns nearly collapsed, Geithner met with Lehman and other investment banks about moving the banks to a "more conservative place" regarding capital and liquidity.  Geithner indicated that his primary concern was Lehman's funding structure.  He told the Examiner that he was "consumed" with figuring out how to make Lehman "get more conservatively funded").

Lehman publicly asserted throughout 2008 that it had a liquidity pool sufficient to weather any foreseeable economic downturn.[31]

But Lehman did not publicly disclose that by June 2008 significant components of its reported liquidity pool had become difficult to monetize.[32] As late as September 10, 2008, Lehman publicly announced that its liquidity pool was approximately $40 billion;[33] but a substantial portion of that total was in fact encumbered or otherwise illiquid.[34] From June on, Lehman continued to include in its reported liquidity substantial amounts of cash and securities it had placed as "comfort" deposits with various clearing banks; Lehman had a technical right to recall those deposits, but its ability to continue its usual clearing business with those banks had it done so was far from clear.[35] By August, substantial amounts of "comfort" deposits had become actual

---

[31] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Preliminary Earnings Call (June, 9, 2008), at p. 8 (Lehman's liquidity pool reported at $45 billion); Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Earnings Call (June 16, 2008), at p. 6 (Lehman's liquidity pool reported at $45 billion); Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 10 (Lehman's liquidity pool reported at $42 billion).

[32] Lehman, Liquidity Pool Table Listing Collateral and Ability to Monetize (Sept. 12, 2008) [LBEX-WGM 784607] (listing $30.1 billion of assets as "low ability to monetize").

[33] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 10.

[34] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19 (Lehman included $2 billion that it pledged to Citibank as a comfort deposit in its liquidity pool); Security Agreement between LBHI and Bank of America, N.A. (Aug. 25, 2008) [LBEX-DOCID 000584] (providing for a $500 million security deposit from Lehman to BofA); Lehman, Liquidity Pool Table Listing Collateral and Ability to Monetize (Sept. 9, 2008), at p. 2 [LBHI_SEC07940_557815] (showing the $500 million BofA deposit in the liquidity pool); Lehman, Liquidity Update (Sept. 10, 2008), at p. 3 ($1 billion in Lehman's liquidity pool was earmarked to HSBC and listed as "Low ability to monetize.").

[35] See Section III.A.5 (discussing potential claims against secured lenders).

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                    :
In re                                               :      Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC.,                      :      08-13555 (JMP)
*et al.*,                                           :
                                                    :      (Jointly Administered)
                          Debtors.                  :
------------------------------------------------------- x

## REPORT OF
## ANTON R. VALUKAS, EXAMINER


Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                          *Counsel to the Examiner*


## VOLUME 3 OF 9

### Section III.A.4: Repo 105

### (5) Accounting-Motivated Transactions

Ernst & Young did not evaluate the possibility that Repo 105 transactions were accounting-motivated transactions that lacked a business purpose.[3722] Schlich characterized the off-balance sheet treatment of Lehman's assets in Repo 105 transactions as a consequence of the accounting rules, rather than a motive for the transactions.[3723]

### j)    The Examiner's Conclusions

There is sufficient evidence to support a determination by a trier of fact that Lehman's failure to disclose that it relied upon Repo 105 transactions to temporarily reduce the firm's net balance sheet and net leverage ratio was materially misleading.  In addition, a trier of fact could find that Lehman affirmatively misrepresented its accounting treatment for repos by stating that Lehman treated repo transactions as financing transactions rather than sales for financial reporting purposes, despite the fact that Lehman treated tens of billions of dollars in repo transactions – namely, Repo 105 transactions – as true sale transactions.

---

[3722] Examiner's Interview of Ernst & Young, Repo 105 Session, Oct. 16, 2009, at p. 13 (statement of William Schlich).  An SEC staff paper discourages "accounting-motivated structured transactions" because a company engaging in such transactions runs the risk of presenting an inaccurate picture of its true financial condition. *See* OFFICE OF THE CHIEF ACCOUNTANT, SEC, REPORT AND RECOMMENDATIONS PURSUANT TO SECTION 401(C) OF THE SARBANES-OXLEY ACT OF 2002 ON ARRANGEMENTS WITH OFF-BALANCE SHEET IMPLICATIONS, SPECIAL PURPOSE ENTITIES AND TRANSPARENCY OF FILINGS BY ISSUERS, at p. 100 (2005) ["SEC SOX Off Balance Sheet Report"].  According to this report, "accounting-motivated structured transactions" are "transactions that are structured in an attempt to achieve reporting results that are not consistent with the economics of the transaction, and thereby impair the transparency of financial reports." *Id.* "[A]ttempt[s] to portray the transactions differently from their substance do not operate in the interests of investors, and may be in violation of the securities laws." *Id.*
[3723] *Id.*

a temporary basis. The categories of asset classes were very broad, and the disclosures are snapshots of quarter-end only, which do not allow the user to determine balances of securities moving on or off balance sheet on an intra-quarter basis. Additionally, to the extent that the reader could see various security balances increasing or decreasing, *i.e.*, that Lehman sold liquid securities, the reader would not know the sales were temporary from the information provided.

- Moreover, sophisticated readers of financial statements – the professional analysts who covered Lehman – asked Lehman officers during earnings calls what Lehman was selling in order to ascertain what types of assets Lehman was moving in its efforts to deleverage.[3790] Former CFO Erin Callan informed analysts that Lehman was selling illiquid positions to deleverage.[3791]

### (d)  Conclusions Regarding Lehman's Failure to Disclose

**SEC Filings.**  As discussed above, Section 13(a) of the Securities Exchange Act of 1934 required Lehman to file periodic reports with the SEC, including its annual report on Form 10-K and quarterly reports on Form 10-Q.  Those filings must contain the information required by the SEC's Rules and Interpretations, including the MD&A requirement discussed above.  In addition, SEC Rule 12b-20 requires that all filings contain such additional information necessary to make the information contained in the filing not misleading.  There is sufficient evidence to support a determination by the trier of fact that Lehman's filings were deficient and misleading.   In the wake of the Enron scandal, at the request of four major accounting firms, the SEC provided additional guidance with respect to the duty to provide meaningful discussion of a company's financial statements.  Among other things, SEC guidance from 2002 stated:

---

[3790] *See* Section III.A.4.e.6.a of this Report (discussing analyst statements).
[3791] *Id.*

Sufficient evidence exists to support a finding by the trier of fact that as a result of failing to disclose its use of and accounting treatment for Repo 105 transactions, Lehman misled readers of its Forms 10-K and 10-Q about its financial condition. Typically, seven or ten days after executing Repo 105 transactions, Lehman had to repay the Repo 105 cash borrowing (*i.e.*, repurchase the assets). In order to repay the cash borrowing (plus an interest rate) shortly after the reporting period, Lehman had to obtain financing. The obligation to repay the cash borrowing (repurchase the assets) was not reflected in Lehman's periodic reports. As a result, Lehman's statements in its MD&A regarding liquidity were rendered misleading. This is exactly the kind of information the SEC has expressly required:

> Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations. Accordingly, the development of MD&A disclosure should begin with management's identification and evaluation of what information, including the potential effects of known trends, commitments, events, and uncertainties, is important to providing investors and others and accurate understanding of the company's current and prospective financial position and operating results.[3793]

For the reasons outlined above, sufficient evidence exists from which a finder of fact could conclude that the picture Lehman painted of its financial position in late 2007 and into 2008 was materially misleading because Lehman failed to inform investors and the market that it managed its balance sheet by accounting for a large volume of repo transactions as true sales on the basis of an English opinion letter. Lehman employed

---

[3793] *Id.*

for any transaction from which the director derives an improper personal benefit.[3797]

Courts will uphold such a clause as protecting directors from liability so long as there is not a concurrent violation of the duty of loyalty, which was not implicated here.[3798]

Second, Lehman's directors were not informed about the existence of Lehman's Repo 105 program.  No director had even heard of Repo 105 transactions, either by name or description.

### (b) Breach of Fiduciary Duty Claims Against Specific Lehman Officers

There is sufficient evidence to support a colorable claim that certain Lehman officers – Richard Fuld, Chris O'Meara, Erin Callan, and Ian Lowitt – breached their fiduciary duties by engaging in one or more of the following: (1) allowing and certifying the filing of financial statements that omitted or misrepresented material information regarding Lehman's use of Repo 105 transactions and their accounting treatment, thus exposing the firm to potential liability; and/or (2) failing to disclose to Lehman Directors information about the firm's Repo 105 program.

As a threshold matter, the business judgment rule is a standard of judicial review requiring a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

---

[3797] Lehman Brothers Holdings, Inc., Certificate of Incorporation, at § 10.1, Limitation of Liability of Directors.
[3798] *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006) ("Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.").