Westlaw.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

**H**

United States District Court, S.D. New York.
Murray GRUBER, Helen Gruber and Gruber Enterprises, Inc., Plaintiffs and Counterclaim Defendants,
v.
Steven A. VICTOR, Defendant, Counterclaim Plaintiff and Counter-Counterclaim Defendant.
v.
Paul I. KROHN, as Chapter 7 Trustee of Syosset Laboratories Co., Inc., Counterclaim Plaintiff and Counter-Counterclaim Defendant.

No. 95 CIV. 2285 (JSM).
Aug. 28, 1996.

Michael J. Dell, New York City, for plaintiffs.

Mark S. Goldberg, Walter, Conston, Alexander & Green, New York City, for defendant.

Ian J. Gazes, New York City.

Paul I. Krohn, Brooklyn, NY, pro se.

**MEMORANDUM OPINION AND ORDER**
MARTIN, District Judge:
*Background*
*1 Plaintiffs Murray and Helen Gruber owned Syosset Laboratories, Inc. ("SLI"), which developed, manufactured and distributed dermatological products. In 1988, defendant Steven Victor and an associate, Clifford Slavin, purchased most of the assets and certain licenses of SLI under various contracts that they then assigned to Syosset Laboratories Company ("Syosset"). In 1989, Victor purchased Slavin's interest in Syosset.

The contracts included an Asset Purchase Agreement (the "APA"), a License Agreement and a Consulting Agreement. Pursuant to the APA, Syosset paid SLI $2 million for substantially all of SLI's assets. Mr. Gruber also received 10% of Syosset's stock and 10% of the stock of Syosset Chemists ("Chemists"), another company that Victor owned. What was left of SLI was renamed "Gruber Enterprises," which Murray and Helen Gruber still own and which is also a plaintiff in this action.

Under the Consulting Agreement, Syosset retained Mr. Gruber as a consultant for five years at a salary of $80,000 plus benefits. The consultancy was terminable upon 60 days notice, and Syosset did terminate in May of 1989. The Consultancy Agreement also provided that Syosset was to pay Mr. Gruber a "bonus" of $4.5 million no later than January 1, 1995. Under the Licensing Agreement, Mr. Gruber gave Syosset exclusive license to certain dermatological products in exchange for royalty payments. In this agreement, Syosset promised to use its "best efforts to sell the products."

To date, the only payments that the Grubers have received under the various agreements are the $2 million initial payment,[FN1] the 10% interests in Syosset and Chemists, and almost one year of payments to Mr. Gruber under the Consulting Agreement. Victor and Syosset do not dispute the Grubers' contention that no other payments were made.

> FN1. Under the APA, this amount was to be adjusted after an accounting of SLI's inventory. The Grubers claim that Syosset owes them an additional $637,277.51 pursuant to the adjustment, but allege that Syosset paid them only $200,000 of this amount.

The Grubers first sued Victor and Syosset in April 1989 in Nassau County Supreme Court, setting forth misrepresentation, breach of contract, conversion, defamation and other claims. For reasons not stated in the submissions, this action was discontinued. In October 1989, the Grubers filed suit against Victor and Syosset in the Eastern Dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

trict of New York for securities fraud, common-law fraud, breach of contract and conversion. Like the Nassau County suit, this action was based on the SLI sale. In August 1990, the Eastern District judge dismissed the complaint under Rule 9(b) for failure to plead fraud with particularity. The Grubers did not replead the claims. In June of 1991, the Grubers reinstated the Nassau County action. Both Victor and Syosset then asserted counterclaims against the Grubers.

When Syosset filed for bankruptcy in March of 1993 in the Eastern District of New York, the Nassau County action was stayed. The Grubers did not request relief from the Bankruptcy Code's automatic stay to proceed with the Nassau County action. By December 1993, Ivax Corporation bought Syosset's assets, including machinery and equipment. This sale netted $1.2 million for Syosset's bankruptcy estate. In 1994, Syosset's bankruptcy was converted to Chapter 7. The Chapter 7 trustee is Paul Krohn, a party to this action. In 1995, the Grubers filed proofs of claims against Syosset in the bankruptcy court, incorporating the allegations set forth in the Nassau County action.

*2 In August 1994, Victor filed individually for bankruptcy in this district, after which he removed the counterclaims that he had filed in the Nassau County action to the bankruptcy court. In 1995, Victor's bankruptcy was converted to Chapter 7. The interim trustee, Ian Gazes, now has title to any claims asserted by or against Victor's estate, and he is thus a party to this action. The Grubers filed proofs of claim against Victor in December 1994, also incorporating the Nassau County action claims. In February 1995, the Syosset Trustee filed a proof of claim against Victor in the bankruptcy proceeding, seeking $1.65 million in damages for Victor's alleged diversion of Syosset's assets.

The Grubers then filed this action in the bankruptcy court of this district, seeking a determination that Victor's debts to them were procured by fraud and thus should not be discharged in Victor's bankruptcy proceeding.[FN2] Upon a motion to withdraw

the reference to the bankruptcy court, this action is now before this Court. In the complaint against Victor, the Grubers set forth four nondischargeability causes of action:

FN2. Pursuant to § 727(b) of the Bankruptcy Code, a Chapter 7 debtor is discharged from all pre-petition debts except as provided in § 523. 11 U.S.C. 727(b). Section 523, which applies only to individual debtors, lists the various kinds of debts excepted from discharge. 11 U.S.C. 523(a). In this action, the Grubers rely upon § 523(a)(2), (4), and (6) in arguing for a determination of nondischargeability. Those sections provide:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt-

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a). Pursuant § 523(c)(1) , "the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4) [or] (6) ... of subsection (a) of this section, unless, on request of the creditor to whom such debtor is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge...." 11 U.S.C. § 523(c)(1).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

1) The Misrepresentation Claim: The Grubers allege that Victor intentionally or recklessly made material misrepresentations of fact, and failed to disclose material facts, in order to induce them to enter into the various agreements in connection with the sale of SLI. The Grubers claim to have relied on these misrepresentations and contend that they would not have sold SLI or have accepted stock for the sale if they had been aware of Victor's intention not to pay them amounts due under the agreements and of the manner in which Victor intended to run the company. They contend that this claim is nondischargeable pursuant to § 523(a)(2)(A).

2) The Diversion Claim: The Grubers claim that Victor, as a director and officer of Syosset, breached his fiduciary duties to Mr. Gruber, a Syosset shareholder, by diverting corporate assets. Victor allegedly diverted assets by, among other things, selling Syosset's products through other companies that he owned, permitting his associate to use Syosset funds for personal matters, and giving Syosset stock to his friends for inadequate consideration. The Grubers contend that this claim is nondischargeable pursuant to § 523(a)(4).

3) The Conversion Claim: The Grubers claim that Victor converted their property and otherwise breached duties owed to them. For example, the Grubers allege that Victor deposited certain dividend checks into Syosset's accounts despite the fact that these checks were for securities that, under the APA, the Grubers retained. The Grubers contend that this claim is nondischargeable pursuant to § 523(a)(4) and (6).

4) The Alter Ego Claim: The Grubers allege that Victor failed to observe corporate formalities and defrauded them by diverting corporate assets, such that the Court should pierce the corporate veil and hold Victor liable for Syosset's debts to the Grubers.[FN3] The debts for which the Grubers seek to hold Victor liable are: Syosset's failure to make payments under the various agreements, and injury to Mr. Gruber's business reputation due to defamat-

ory remarks made by Syosset's President, Mark Newman. The Grubers contend that these debts are nondischargeable pursuant to § 523(a)(2)(A), and (a)(4) and (6).

> FN3. Victor's argument that the nondischargeable alter ego claim-which was added through the Grubers' amended complaint in March 1995-is untimely is without merit. As the Grubers point out, the deadline for filing nondischargeability complaints in Victor's bankruptcy proceeding was extended to March 1996 due to the conversion to Chapter 7 of Victor's bankruptcy.

**\*3** Victor, as debtor-in-possession,[FN4] counterclaimed against the Grubers in his amended Answer to the nondischargeability complaint. Victor alleges that the Grubers: fraudulently induced him to buy SLI and to enter into the various agreements; fraudulently concealed and negligently misrepresented major regulatory and other problems with SLI in connection with the agreements; intentionally interfered with Victor's attempts to form another business and to sell Syosset; and violated federal mail fraud, extortion, and drug laws on two or more occasions thus demonstrating a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

> FN4. Victor's bankruptcy case was converted from Chapter 11 to Chapter 7 after he filed the counterclaims.

Victor also named the Chapter 7 Syosset Trustee, Paul Krohn, as a counterclaim defendant. Specifically, Victor sought a declaratory judgment on the ownership of Victor's counterclaims against the Grubers. The Syosset Trustee cross-claimed against Victor for a declaratory judgment on the same issue and also asserted counterclaims against the Grubers. In addition to stating the same causes of action as Victor, set forth above, the Syosset Trustee counterclaimed against the Grubers for breach of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

the APA, Licensing, and Consulting Agreements, and for breach of fiduciary duty. Victor and the Syosset Trustee settled in March 1995, through a stipulation assigning Syosset's counterclaims to Victor for prosecution, with any proceeds from the counterclaims to be used to pay attorney's fees and to be divided between Victor and Syosset as set forth in the stipulation.[FN5] The bankruptcy judges in both Victor's and Syosset's bankruptcy cases approved this assignment.

> FN5. Since Victor's bankruptcy case has been converted to Chapter 7, any recovery would go to his estate.

In their Replies to Victor's and the Syosset Trustee's counterclaims, the Grubers asserted counter-counterclaims against both. Against Victor, the Grubers' counter-counterclaims allege fraud and fraudulent inducement, negligent misrepresentation, fraudulent concealment, breach of fiduciary duties owed to both the Grubers and Syosset, conversion, and alter ego liability for Syosset's debts to the Grubers. Although the allegations set forth in the counter-counterclaims are substantially identical to the nondischargeability claims, they were not asserted against Victor personally under a nondischargeability theory. Rather, they were asserted as straight counterclaims against Victor as debtor-in-possession and are thus now asserted against Victor's chapter 7 estate.

Against the Syosset Trustee, the Grubers' counter-counterclaims allege fraud and fraudulent inducement, negligent misrepresentation, fraudulent concealment, conversion, breach of contract, and *respondeat superior* liability.[FN6]

> FN6. On April 9, 1996, the Syosset Trustee filed a non-dischargeability complaint against Victor in the bankruptcy court of the Southern District of New York. On April 11, 1996, Victor's Trustee filed a complaint against Victor in that same court, contending that the court should not discharge Victor from his debts. Those ac-

tions are not now before this Court.

*Discussion*

There are now four motions before the Court: 1) Victor moves to dismiss and/or for summary judgment on the Grubers' nondischargeability claims and counter-counterclaims; 2) the Syosset Trustee moves to dismiss the Grubers' counter-counterclaims against Syosset; 3) the Grubers move to dismiss and/or for summary judgment on Victor's and Syosset's counterclaims; and 4) the Syosset Trustee moves to be named as a party-plaintiff with the Grubers on the claims of diversion of corporate assets against Victor.

*I. Victor's Motion To Dismiss The Nondischargeability Claims and The Counter-Counterclaims.*

**\*4** Victor moves to dismiss the misrepresentation nondischargeability claim on the ground that it is actually a breach of contract claim and thus does not meet the fraud requirement of § 523(a)(2)(A). Victor also moves to dismiss all of the counter-counterclaims on the ground that they violate the automatic stay in his bankruptcy proceedings. Alternatively, Victor moves to dismiss and/or for summary judgment on the nondischargeability and counter-counterclaims on various grounds, discussed below to the extent that they are applicable.

*A. The Counter-Counterclaims Do Not Violate The Automatic Stay*

As noted above, the Grubers originally filed this action seeking a determination that debts that Victor owed to them were nondischargeable pursuant to § 523(a) of the Bankruptcy Code. These claims were filed against Victor in his individual capacity, and any debt found to be nondischargeable will survive the discharge of Victor's debts in his bankruptcy proceeding. *See* 11 U.S.C. § 1141(d)(2) (excluding from discharge any debt found to be nondischargeable under § 523).[FN7] Victor's counterclaims against the Grubers, however, are property of his estate pursuant to 11 U.S.C. § 541. *See In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 436 (S.D.N.Y.1993) ("A debtor's interests in property, including causes of action, ...

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

become assets of the estate once the bankruptcy petition is filed"), *aff'd,* 17 F.3d 600 (2d Cir.1994). The Grubers asserted their counter-counterclaims not against Victor personally, but against his estate.

> FN7. In other words, although the Grubers can participate in the estate asset distribution process to recover any debts determined to be nondischargeable in this action, they can also seek to recover any such debts outside of the distribution process. *See In re Grynberg,* 986 F.2d 367, 370 (10th Cir.), *cert. denied,* 510 U.S. 812, 114 S.Ct. 57 (1993); *In re Howell,* 84 B.R. 834 (Bankr.M.D.Fla.1988). *But see In re Mercado,* 124 B.R. 799 (C.D.Cal.1991).

With respect to Syosset, Victor and not the Grubers brought it into this action. Although Victor and Syosset settled their dispute by stipulation as explained above, Syosset asserted counterclaims against the Grubers. The Grubers then counter-counterclaimed against Syosset.

In short, there are four parties to this action: Victor personally as defendant on the nondischargeability claims, the Grubers as plaintiffs and counterclaim defendants, the Victor Trustee as counterclaim plaintiff and counter-counterclaim defendant, and the Syosset Trustee as counterclaim plaintiff and counter-counterclaim defendant. This explanation serves to illustrate the true posture of the counter-counterclaims. The Victor and Syosset Trustees in effect initiated suit against the Grubers by filing the counterclaims.[FN8] Thus, the Grubers' counter-counterclaims are really counterclaims to Victor and Syosset Trustees' claims.

> FN8. Although Victor originally filed the counterclaims, he did so as a debtor-in-possession. When his bankruptcy case was subsequently converted to Chapter 7, the Interim Trustee took title to the cause of action. The Victor Trustee has chosen to continue this action, and is therefore effectively in the position of initiator of the

counterclaims.

Victor and Syosset argue for dismissal of the counter-counterclaims on the ground that they are barred by the Bankruptcy Code's automatic stay provision. *See* 11 U.S.C. § 362(a)(1) (automatic stay operates as to "the commencement or continuation ... of a judicial ... proceeding against the debtor that was or could have been commenced before the commencement of the case under this title"). However, there is ample caselaw in this Circuit supporting the Grubers' argument that counterclaims asserted against a debtor do not violate the automatic stay.

**\*5** In *Matter of Bohack,* 599 F.2d 1160 (2d Cir.1979), the Second Circuit warned that, "[w]here a debtor institutes a lawsuit and then invokes the protection of [the automatic stay] on a counterclaim, the situation warrants a very thoughtful scrutiny." *Id.* at 1168. The *Bohack* court allowed the creditor to assert a counterclaim for setoff against the debtor, noting that because the debtor was already suing the creditor, allowing the counterclaim did not run counter to two central purposes of the stay-sparing the debtor the expense of defending itself in litigation, and protecting against interference with the administration of the debtor's estate. *Id.* at 1168-69. In *In Re Wedtech,* 87 B.R. 279 (S.D.N.Y.1988), the court lifted the stay for a counterclaim that went beyond a simple setoff, stating: "where the debtor is the initiator of costly litigation, *Bohack* teaches us that the automatic stay should not be invoked to spare the debtor the expense of defending itself." *Id.* at 290. The court also found that lifting the stay for the debtor's adversary proceeding but not the counterclaim "might hamper [the adversary proceeding judge's] ability to expeditiously and efficiently manage the ... litigation before him." *Id. But see In re Revere Copper & Brass, Inc.,* 32 B.R. 577 (Bankr.S.D.N.Y.1983).

Here, the reasoning set forth in *Bohack* and *Wedtech* is applicable. Although the Grubers formally initiated this action by suing Victor in his individual capacity, the Victor and Syosset Trustees

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

initiated suit with respect to the Grubers.[FN9] The interest in sparing the debtors the expense of litigation is thus weak. In addition, the nondischargeability claims, the counterclaims, and the counter-counterclaims all relate to the same transactions-those surrounding the Grubers' sale of SLI to Victor. *See In re Johns-Mansville Corp.,* 57 B.R. 680, 685 (S.D.N.Y.1986) ("The federal policy underlying the stay is protection of the debtor's estate from the chaos and the wasteful depletion resulting from multifold, uncoordinated and possibly conflicting litigation") (internal quotation omitted). It is simply more efficient to deal with all claims relating to the transaction in this Court.

> FN9. While it is true that the Syosset Trustee has assigned Syosset's counterclaims to the Victor Trustee, this assignment was part of a voluntary settlement. Furthermore, Syosset remains entitled to a certain portion of any recovery on the counterclaims.

Accordingly, the Court finds that the automatic stay does not serve to prohibit the Grubers from filing the counter-counterclaims.[FN10] As noted above, the allegations of the counter-counterclaims mirror those of the nondischargeability claims. The Court will thus examine Victor's and Syosset's remaining arguments with respect to both sets of claims below.

> FN10. Victor also argues that, at a minimum, the Grubers must file an application for relief from the stay before proceeding with the counter-counterclaims. However, the district court "has the authority and duty under its equity jurisdiction to lift [the automatic stay] when justice so requires." *Bernstein v. IDT Corp.,* 76 B.R. 275, 281 (S.D.N.Y.1987).

*B. The Misrepresentation Claims*

In their first nondischargeability cause of action, the Grubers allege that Victor knowingly made various misrepresentations, both affirmatively and by omission, to induce them to sell SLI and accept stock as part of the deal, and to enter into the various agreements. The Grubers claim that they reasonably relied on the misrepresentations and were damaged, so that the debts owed for the sale of SLI are nondischargeable under § 523(a)(2)(A). In his motion to dismiss, Victor argues that the misrepresentation claim is really a contract claim because it simply alleges failure to perform obligations under the APA and other agreements. Therefore, according to Victor, this claim does not involve fraud or misrepresentation as required by § 523(a)(2)(A).

**\*6** The Grubers characterize the misrepresentation allegations as falling into two distinct groups. The first group consists of allegations that Victor entered into various aspects of the various agreements when he in fact had no intention of performing them. For example, the complaint alleges that Victor never intended to pay sums due or perform other obligations under the various agreements. The second group consists of allegations that Victor made the following material misrepresentations of fact, to induce the Grubers into entering the various agreements:

-that he would use his best efforts to continue Syosset as a profitable business, and would increase profits;

-that he would comply with FDA and NY State Education laws and regulations; and

-that Mr. Gruber would continue to have an "active and substantial role in helping guide the business of Syosset."

In addition, the complaint alleges that Victor failed to disclose that he intended to:

-deprive Syosset of profits and lower Mr. Gruber's bonus by selling Syosset products through his own medical practice and other companies (i.e. diverting corporate profits);

-violate FDA and NY State Education Laws and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

regulations; and

-exclude Mr. Gruber from a significant role in Syosset's business, and refuse to pay him for expenses incurred as a consultant.

In short, the second group alleges that Victor misrepresented the manner in which he planned to run the business after he purchased it so as to induce the Grubers to sell the business and to do so in part in exchange for Syosset stock.

As a general rule, "mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement." *Sudul v. Computer Outsourcing Services,* 868 F.Supp. 59, 61 (S.D.N.Y.1994) (citations omitted); *see also Zinaman v. USTS New York,* 798 F.Supp. 128, 133-34 (S.D.N.Y.1992). In *Sudul,* this Court cited a "long line of New York" state cases which:

held that, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.

868 F.Supp. at 62.

The Grubers concede that the first group of misrepresentation allegations-that Victor never intended to pay sums due or perform other obligations under the various agreements-depend upon the terms of the agreements. Under the principles set forth in *Sudul,* allegations that a contracting party did not intend to comply with the express terms of a contract are properly asserted as breach of contract and not fraud claims, and thus state no cause of action for a determination of nondischargeability.

However, the Grubers claim that the second group of misrepresentation allegations goes to matters that are "collateral and extraneous" to the terms of the various agreements. The court in *PI, Inc. v. Quality Products, Inc.,* 907 F.Supp. 752

(S.D.N.Y.1995), recently restated the rule that "[a] cause of action for fraud can be maintained on the basis of allegations that a party made a collateral or extraneous misrepresentation that served as an inducement to the contract." *Id.* at 761. Thus,

*7 [t]o maintain a claim for fraud, a plaintiff must allege: (1) a legal duty separate and apart from the contractual duty to perform; (2) a fraudulent representation collateral or extraneous to the contract; or (3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages.

*Papa's-June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1161 (S.D.N.Y.1996); *see also Hargrave v. Oki Nursery,* 636 F.2d 897, 899 (2d Cir.1980).

Although the misrepresentation allegations in the second group are not set forth in great detail in the complaint, in their Responses to Victor's First Set of Interrogatories the Grubers allege that Victor made various oral misrepresentations about the specific manner in which he would run Syosset and about Mr. Gruber's role in Syosset after the sale. [FN11] These allegations are, at least as pled, "collateral and extraneous" to the various contracts. Accordingly, Victor's motion to dismiss this group of misrepresentation claims is denied.

FN11. Victor argues that the misrepresentation claims should be dismissed for failure to comply with the specificity requirements of Federal Rule of Civil Procedure 9(b), applicable to this case through Bankruptcy Rule 7009. However, as plaintiffs note and Victor does not dispute, Victor filed an answer to the amended complaint and did not raise a Rule 9(b) objection in that answer. Instead, Victor first raised the objection in this motion to dismiss. Therefore, Victor has waived any Rule 9(b) objection. *See Todaro v. Orbit Intern. Travel, Ltd.,* 755 F.Supp. 1229, 1234

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

(S.D.N.Y.1991). Victor's argument that waiver does not apply because the parties stipulated that dispositive motions were to be made by April 10, 1995 is without mer- it.

However, the Court cautions that this group of allegations-even as set forth in the interrogatories-do not appear to be the types of misrepresentations upon which a reasonable businessman such as Mr. Gruber would rely. *See Olivieri v. McDonald's Corp.*, 678 F.Supp. 996, 1001 (E.D.N.Y.1988) ("a plaintiff must show justifiable reliance on the promise that he contends defendants made with no intention of performance"); *see also In re Schwartz & Meyers*, 130 B.R. 416, 422 (Bankr.S.D.N.Y.1991) (creditor must ultimately prove reasonable reliance by a preponderance of the evidence). While the issue of reasonable reliance has not been briefed and cannot be decided at this juncture in the case, plaintiffs should be aware that this Court is not reluctant to grant Rule 11 sanctions when frivolous allegations are made.

The first, second and third counter-counterclaims that the Grubers assert against Victor are for, respectively, fraud and fraudulent inducement, negligent misrepresentation, and fraudulent concealment. These claims are substantially identical to the nondischargeability misrepresentation claim examined immediately above and suffer from the same problem: they are essentially breach of contract claims, with the exception of the claims for misrepresentation of matters "collateral and extraneous" to the terms of the contract. For the reasons set forth above, the Court finds that only those misrepresentations that go to matters "collateral and extraneous" to the contracts-namely, the allegations that Victor made various oral misrepresentations about the manner in which he would run Syosset-may stand. Accordingly, the fraud-based counter-counterclaims that the Grubers concede are based on express contract terms are dismissed.

*C. The Diversion Claim*
In their second nondischargeability cause of ac-

tion, the Grubers claim that Victor, as a director and officer of Syosset, breached his fiduciary duties to Mr. Gruber, a Syosset shareholder, by diverting corporate assets. Victor allegedly diverted assets by: selling Syosset's products through his personal medical practice and other companies that he owned instead of through Syosset and without paying Syosset for the products; using Syosset's assets for his personal enrichment; permitting his associate to use Syosset funds for personal matters; giving Syosset stock to his friends for inadequate consideration; diverting Syosset's customer base; conducting Syosset's business in violation of statutory authority; using the services of Syosset personnel and Syosset funds to form a new company and to attempt to sell another company that Victor had already formed; and damaging his own and Syosset's reputation by appearing in "infomercials" and making allegedly false statements with respect to certain products.

**\*8** Victor moves to dismiss the diversion claim on the ground that any injury to Mr. Gruber is derivative of injury to the corporation and the Grubers thus lack standing to assert such a claim. The Grubers claim that the alleged diversion of Syosset's assets injured them by: 1) reducing sums owed to Gruber under the Consulting and License Agreements; and 2) reducing the value of Syosset stock held by Gruber. The Grubers contend that the diversion claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) (no discharge for debts "for fraud or defalcation while acting in a fiduciary capacity").

The first alleged injury, reduction of sums owed under the License and Consulting Agreements, fails to state a nondischargeability claim. Under the reasoning set forth above in the section addressing the misrepresentation claims, these allegations are in fact simply breach of contract claims and must be asserted as such. They do not go to matters collateral or extraneous to the terms of the agreements between Victor and Gruber, and they thus do not state a claim for fraud. This is ap-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

parent from the Grubers' memorandum in opposition to Victor's motion, which characterizes this injury as:

> a breach of the promise in the Licensing Agreement that Syosset would use its best efforts to promote the licensed products, and, because the diversions fraudulently reduced Syosset's reported sales, they caused a breach of the provisions of both the Consulting and Licensing Agreements that grant Mr. Gruber compensation based on Syosset's *actual* sales.

Opp.Mem. at 14-15. Furthermore, there is no fiduciary relationship-which is a necessary element of a § 523(a)(4) claim-between Mr. Gruber and Victor with respect to the Agreements; rather, the relationship is contractual. Accordingly, the court need only consider the second alleged injury, that of stock dilution.

In June of 1995, the Eastern District of New York bankruptcy court in the Syosset case denied the Grubers' request to pursue the diversion claims against Victor as derivative claims on behalf of Syosset's estate. The Grubers pursue the diversion claims here on the ground that they have standing to sue on diversion independent of such a derivative basis. Although a shareholder generally has no right to bring an action in her own name for wrongs committed against the corporation, *see First New York Bank for Business v. DeMarco*, 130 B.R. 650, 655 (S.D.N.Y.1991), "[u]nder New York law, a shareholder may bring an individual suit if the defendant has violated an independent duty to the shareholder, whether or not the corporation may also bring an action." *Ceribelli v. Elghanayan*, 990 F.2d 62, 63 (2d Cir.1993) (citations omitted). In *Abrams v. Donati*, 498 N.Y.S.2d 782, 783 (1985), the Court of Appeals recognized this "independent duty" exception to the general rule, but stated that:

> allegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue de-

rivatively but not individually. A complaint the allegations of which confuse a shareholder's derivative and individual rights will, therefore, be dismissed....

**\*9** *Id.* at 783 (citations omitted).

The *Abrams* court found that the plaintiff had no independent standing, despite his claim of a conspiracy to depress the value of his stock so that the corporation could buy it at a reduced price. *Id. See also Fifty States v. Niagara Permanent S. & L,* 396 N.Y.S.2d 925, 927 (4th Dept.1977) ("An individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a depreciation or destruction of the value of his corporate stock") (internal citation omitted).[FN12] The Grubers thus do not have independent standing to sue for stock dilution.

> FN12. The Grubers cite *Vincel v. White Motor Corp.,* 521 F.2d 1113 (2d Cir.1975), and *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell,* 521 F.Supp. 1046 (S.D.N.Y.1981), in support of their claim of individual standing. However, none of the exceptions to the general rule that individual shareholders do not have standing to sue for injury to the corporation listed in those cases apply here.

Accordingly, the diversion nondischargeability claim is dismissed.[FN13] The Grubers' fourth counter-counterclaim against Victor-for breach of fiduciary duty for diverting corporate assets-is also dismissed for lack of standing.

> FN13. The Syosset Trustee has filed a proof of claim in Victor's bankruptcy proceeding, seeking $1.65 million for Victor's alleged diversion of corporate assets from Syosset. In addition, in April of 1996 the Syosset Trustee filed a complaint against Victor in the Bankruptcy Court of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

Southern District of New York alleging that various debts, included the diversions, are nondischargeable.

*D. The Conversion Claim*

In their third nondischargeability cause of action, the Grubers claim that Victor converted their property and otherwise breached duties owed to them. According to the complaint, Victor and Syosset: 1) deposited into Syosset's account "at least two dividend checks" for marketable securities that the Grubers owned, despite the Grubers' demand that they turn over the checks; [FN14] 2) sold "certain other property ... which ... belonged to an independent corporation owned by the Grubers"; and 3) diluted Mr. Gruber's stock.

FN14. In the Asset Purchase Agreement, marketable securities were excluded from the sale of SLI's assets.

The Grubers contend that the debt owed to them because of this alleged conversion is nondischargeable under § 523(a)(4) and (6). These sections both encompass claims for conversion. *See Matter of Bercier*, 934 F.2d 689, 691 (5th Cir.1991) (Section 523(a)(6) encompasses conversion); Benjamin Weintraub & Alan N. Resnick, Bankruptcy Law Manual at 3-55-56 (3d ed. 1992) (Section 523(a)(4) encompasses conversion) (citing HR Rep. No. 95-595). Victor moves to dismiss the conversion claim for failure to state a claim or, alternatively, for summary judgment.

For the reasons set forth immediately above, in Section I.C., the Grubers cannot assert the stock dilution claim in their individual capacity. Furthermore, stock dilution is not conversion. The court in *Caballero v. Anselmo*, 720 F.Supp. 1088 (S.D.N.Y.1989), defined conversion as:

[a] disposition of the property of another, without right, as if it were one's own.... To establish a cause of action for conversion, plaintiff must show legal ownership or an immediate superior right of possession and the exercise by defendant

of unauthorized dominion over the amount in question, to the exclusion of plaintiff's rights.

*Id.* at 1098 (internal quotation omitted); *see also Crabtree v. Tristar*, 776 F.Supp. 155, 167 (S.D.N.Y.1991).

Victor seeks summary judgment on the other conversion allegations, arguing that there is no genuine issue of material fact in dispute. With respect to the dividend checks, Victor notes that the complaint alleges that they were deposited into Syosset's account. In their Responses to Victor's First Set of Interrogatories, the Grubers state that there are two dividend checks at issue and allege that they "were informed ... [that the checks] had been delivered to Syosset and given to Clifford Slavin." Response to Interrog. No. 26. [FN15] Victor has submitted an affidavit in which he states that he has no knowledge of these checks. The Grubers, however, base their conversion claim on the contention that "Syosset is unlikely to have cashed a check made out to the plaintiffs less than one year after Victor took over the business without Victor's knowledge or approval."

FN15. As noted above, Clifford Slavin purchased SLI's assets with Victor in 1988, and Victor later bought Slavin's interest in Syosset. Slavin is not a defendant in this action.

**\*10** The evidence submitted shows that Slavin, and not Victor, received the checks at issue on behalf of Syosset. The Grubers have submitted no evidence that would raise a disputed issue of fact over Victor's alleged conversion of the checks. Accordingly, summary judgment for Victor on this conversion claim is appropriate.[FN16]

FN16. However, this claim is properly asserted against Syosset, and therefore Syosset's motion to dismiss the conversion counter-counterclaim is denied as noted in Section II, below.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

Finally, the Grubers allege that Victor converted "other property" belonging to the Grubers. The Grubers' responses to Victor's interrogatories indicate that this "other property" consists of Dermavet products that Victor allegedly sold to third parties. Victor has submitted a "blue book" schedule from the SLI sale which represents that Dermavet is owned by Barry and Daryl Gruber, and that "M. Gruber" (presumably Mr. Murray Gruber, the plaintiff here) is president.[FN17] Victor is correct that the Grubers cannot assert a claim for conversion with respect to property in which they do not have an ownership interest. Accordingly, summary judgment for Victor on this conversion claim is also appropriate.[FN18]

> FN17. The "blue books" consist of three volumes of documents and information about SLI that the Grubers provided to Victor and Slavin for review before the sale. Victor and Slavin reviewed and initialed the blue book pages, which were appended to the Asset Purchase Agreement.

> FN18. In their Memorandum of Law in Opposition to Victor's Motion for Summary Judgment, the Grubers also allege that Victor purchased certain stock options that instead should have gone to Syosset, and that Victor diverted other "Syosset products" and took "other items" from Syosset. However, these are all claims that Victor diverted assets belonging to Syosset. Under the reasoning set forth above in Section I.C. addressing the diversion claim, the Grubers do not have standing to assert such a claim.

The Grubers' fifth counter-counterclaim against Victor is also for conversion, and summary judgment is granted to Victor on the reasoning set forth above.

*E. The Alter Ego Claims*
In their fourth nondischargeability cause of action, the Grubers allege that Victor failed to ob-

serve corporate formalities with respect to Syosset such that the Court should pierce the corporate veil and hold Victor liable for Syosset's debts to the Grubers. The debts for which the Grubers seek to hold Victor liable are: failure to make payments under the various agreements; and injury to Mr. Gruber's business reputation due to slanderous remarks made by Syosset's President, Mark Newman. The Grubers claim that these debts are nondischargeable under § 523(a)(2)(A), (a)(4) and (a)(6).

In *St. Paul Fire and Marine Ins. Co. v. PepsiCo,* 884 F.2d 688 (2d Cir.1988), the Second Circuit dismissed a creditor's alter ego claims against the parent of the bankrupt on the grounds that the cause of action did not accrue to the creditor individually because recovery would benefit all creditors, and, under Ohio law, the trustee of the bankrupt could assert the claims against the parent. *Id.* at 703-04. Similarly, under New York law "a trustee can bring an action piercing the corporate veil." *Corcoran v. Hall,* 545 N.Y.S.2d 278 (1st Dept.1989). Furthermore, if Victor is in fact liable for Syosset's debts as the Grubers claim, then a finding of alter ego liability would benefit all of Syosset's creditors.[FN19] *See Gosconcert v. Hillyer,* 158 B.R. 24 (S.D.N.Y.1993) (dismissing alter ego claim on grounds that, because alleged abuse of corporate form was claim accruing to creditors generally, it should be brought by the corporation's bankruptcy trustee and not individual creditors).

> FN19. As noted above, the Syosset Trustee has filed a proof of claim against Victor for diversion of Syosset's assets, and has also filed a complaint for the determination of nondischargeable debts against Victor.

Accordingly, the Grubers do not have standing to assert the alter ego nondischargeability claim or the sixth counter-counterclaim against Victor.[FN20]

> FN20. The alter ego claim also fails to state a nondischargeability claim under § 523. The Grubers have already conceded,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

as noted above, that claims of fraud based on the express terms of the contract must be brought as breach of contract and not fraud claims. Nor is the defamation claim nondischargeable under § 523(a).

*II. The Syosset Trustee's Motion To Dismiss The Grubers' Counter-Counterclaims*

**\*11** The Grubers' counter-counterclaims against Syosset allege fraud and fraudulent inducement, negligent misrepresentation, fraudulent concealment, conversion, breach of contract, and *respondeat superior* liability for Victor's and Slavin's debts.

Like Victor, the Syosset Trustee moves to dismiss all of the counter-counterclaims on the grounds that they violate the automatic stay in Syosset's Eastern District of New York bankruptcy proceeding. For the reasons set forth above, in Section I.A., the Court finds that the counter-counterclaims against Syosset do not violate the stay.

Alternatively, the Syosset Trustee moves to dismiss all of the counter-counterclaims-except the breach of contract claim-for failure to state a claim upon which relief can be granted. The Syosset Trustee joins Victor's arguments for dismissal of the identical counter-counterclaims.

The Grubers' first through third counter-counterclaims charge Syosset with fraud and fraudulent inducement, negligent misrepresentation, and fraudulent concealment. The Grubers repeat the misrepresentations stated in connection with the fraud-based claims against Victor, allege that Victor made the misrepresentations as an agent of Syosset, and contend that they relied on these misrepresentations when entering into the various contracts to sell SLI to Victor and when accepting the assignment of Victor's rights and obligations under the contract to Syosset. In short, the Grubers attempt to hold Syosset liable for representations that Victor made on the theory that Victor was acting as an agent of Syosset at the time that he made the

misrepresentations.

However, Syosset did not exist when the various misrepresentations were allegedly made and Syosset thus cannot be charged with having used misrepresentations to induce the Grubers to enter into the agreements. The same is true for the claim that Syosset is liable for misrepresentations in connection with the assignment, as the misrepresentations all pre-date the assignment and are in fact the same misrepresentations set forth in connection with the alleged inducement to enter into the agreements. *See Grupo Sistemas Integrales v. AT & T Communications, Inc.,* 1996 WL 312535 at \*14 (S.D.N.Y.1996). Therefore, and for the additional reasons set forth below in section III.A. dismissing Syosset's fraud-based counterclaims against the Grubers, Syosset-as assignee of the contracts-is not the proper defendant on the misrepresentation claims. Accordingly, the first, second and third counter-counterclaims against Syosset are dismissed.

For the reasons set forth above in Section I.D. and note 16 therein, the Syosset Trustee's motion to dismiss the fourth counter-counterclaim, for conversion, is denied.

In their sixth counter-counterclaim, for *respondeat superior* liability, the Grubers simply assert that: "Victor and Slavin are at all relevant times officers, directors, employees, or agents of Syosset. All of the wrongdoing alleged in these counter-claims was undertaken by Victor and Slavin within the scope of their duties as officers, directors, employees, or agents of Syosset. By reason of the foregoing, Syosset is liable for Victor's and Slavin's misconduct and for their debts to plaintiffs." As noted above, Syosset cannot be held liable for any misrepresentations that Victor may have made in connection with the sale of SLI. Since Syosset did not yet exist when Victor made the alleged misrepresentations, Victor could not have been acting within the scope of his duties for Syosset. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) ("Under New York law, the doctrine of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

*respondeat superior* renders an employer vicariously liable for a tort committed by an employee *while acting within the scope of his employment* ") (emphasis added); *see also Estate of Lundberg*, 25 N.Y.2d 467, 470, 306 N.Y.S.2d 947, 950 (1969) (same). As the Grubers' claims of misrepresentations in connection with the sale of SLI are the only claims that remain against Victor, there is no valid basis for the *respondeat superior* claim against Syosset.

   **\*12** Accordingly, the Syosset Trustee's motion to dismiss the Grubers' *respondeat superior* counter-counterclaim is granted.

*III. The Grubers' Motion For Summary Judgment And/Or Dismissal On Victor's And Syosset's Counterclaims* [FN21]

>   FN21. The Grubers request "dismissal with prejudice under Federal Rule of Civil Procedure 56," and in certain cases under both Rule 56 and Rule 12(b). Since both parties have submitted numerous materials outside of the pleadings, the Court will treat the Grubers' motion as one for summary judgment. *See Moscowitz v. Brown*, 850 F.Supp. 1185, 1991 (S.D.N.Y.1994).

   Victor, as debtor-in-possession, asserted five counterclaims against the Grubers alleging that: 1) the Grubers made various misrepresentations to induce him to enter into the APA, and he relied on their misrepresentations in both entering into the Agreement and in personally guaranteeing $2.8 million in loans to Syosset ("the fraud claim"); 2) the Grubers fraudulently concealed from Victor SLI's numerous regulatory problems in connection with the sale of SLI ("the fraudulent concealment claim"); 3) the Grubers negligently misrepresented material facts about SLI in connection with its sale, with knowledge that Victor would rely on such misrepresentations ("the negligent misrepresentation claim"); 4) after the sale, Mr. Gruber intentionally interfered with business relations by obtaining a temporary restraining order to enjoin solicitation of

limited partners for Syoderm, a company that Syosset was forming in order to sell its products in a new market, and by causing the collapse of a proposed sale of Syosset to Medicis and a related proposed consulting agreement between Victor and Medicis ("the tortious interference with business claim"); and 5) the Grubers and Gruber Enterprises on two or more occasions committed mail fraud, attempted to extort money from Victor, and manufactured, sold and concealed dangerous drugs in a scheme to defraud the FDA and Syosset, thus showing a pattern of racketeering activity in violation of 18 U.S.C. § 1962 ("the RICO claim").

   Victor's first three counterclaims-for fraud, fraudulent concealment, and negligent misrepresentation-contain two general allegations. First, Victor contends that Mr. Gruber falsely represented that FDA approval was not necessary for Syosset's "grey" area of products and that, even in a "worst scenario" in which all of Syosset's "questionable" grey area products were lost due to regulatory problems, SLI "could recoup within a short period of time by detailing and sampling the products [SLI] ha[s] which are *not* subject to any challenge." [FN22] Second, Victor alleges that the Grubers failed to inform him that SLI was in fact a rogue operation fraught with illegalities, specifically its prior and continuing "failure to comply and/or falsifying compliance with applicable federal and state regulations governing its business as a manufacturer of dermatological products."

>   FN22. The "grey" areas consisted of SLI's practice of compounding dermatologists' prescriptions for sale directly to the dermatologists, without express FDA approval.

   The Syosset Trustee, in its Answer, asserted eight claims against the Grubers. In addition to five causes of action which are substantially identical to Victor's counterclaims, the Syosset Trustee also claims that the Grubers: 1) breached the Asset Purchase and Licensing Agreements; 2) breached the Consulting Agreement; and 3) breached fiduciary duties that they owed to Syosset by virtue of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

APA.

**\*13** As noted above, the Victor Trustee, Ian Gazes, now has title to Victor's counterclaims and, through the stipulation approved by both bankruptcy courts, is prosecuting Syosset's claims against the Grubers as well. The Grubers move for summary judgment on all of the various counterclaims.

**A. Real Party In Interest**

The Grubers first argue that Victor lacks standing to pursue all of his claims except the tortious interference with business claim because he is not the real party in interest pursuant to Federal Rule of Civil Procedure 17(a) ("Every action shall be prosecuted in the name of the real party in interest"). As the court noted in *Farrell Const. Co. v. Jefferson Parish*, 896 F.2d 136 (5th Cir.1990):

> The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery. Conversely, a party not possessing a right under substantive law is not the real party in interest with respect to the right and may not assert it.

*Id.* at 140. Here, "in the context of an action under a statute that merely provides a federal forum or remedy, the court, as it does in diversity actions, will look to state law to determine if the party actually possesses a substantive claim for relief and is the real party in interest." 6A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1544 at 344-45 (1990).

The Grubers base their argument on the fact that Victor assigned his rights under the various agreements to Syosset. Due to the assignment, the Grubers contend, any claim that they made misrepresentations or omissions in connection with the sale of SLI belongs to Syosset and not Victor. The Court must therefore examine relevant New York law on the ownership of fraud and misrepresentation claims in connection with assignment of a contract in order to determine which party-Syosset or Victor-possesses the substantive right.

It is true that Victor assigned "all of [his] right, title and interest" in the Asset Purchase, Licensing and Consulting Agreements to Syosset,[FN23] "subject to the assumption by [Syosset] of all of the obligations to be performed" under those agreements. In signed writings, Syosset accepted the assignments of the three agreements and assumed the obligations thereunder. However, under the principles set forth in *Fox v. Hirshfield*, 142 N.Y.S. 261 (1st Dept.1913), and recently affirmed in *Banque Arabe et Internationale v. Maryland Nat. Bank*, 57 F.3d 146 (2d Cir.1995), this assignment was not sufficient to transfer Victor's tort causes of action based on the alleged misrepresentations and omissions. As the *Fox* court stated:

> FN23. The assignment was actually to "Slavin-Victor Corporation," which was shortly thereafter renamed Syosset.

> The fraud was perpetrated upon the plaintiff, and he being the purchaser, if the premises were worth less than they would have been if as represented, he necessarily sustained damages; and notwithstanding the fact that he assigned the contract, ... the right to rescind the contract, or to bring an action for fraud, remained in him, ... provided he has not assigned his cause of action [for fraud].

**\*14** 142 N.Y.S. at 262-63. The assignment in *Fox* stated in relevant part: "I hereby sell, assign, transfer, and set unto [the assignee] all my right, title, and interest in and to the within contract." *Id.* at 262. The plaintiff was found not to have assigned his cause of action for fraud: "[t]he cause of action was, of course, assignable; but the language employed in the assignment of the contract was not appropriate to assign a cause of action arising, not under the contract, but for the fraudulent representations of the defendant." *Id.* at 264; *see also Nearpark Realty Corp. v. City Investing Co.*, 112 N.Y.S.2d 816, 817 (N.Y.S.Ct.1952). *Compare Banque Arabe*, 57 F.2d at 152

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

(language assigning all rights in the transaction, rather than simply in the contract, were sufficient to find assignment of fraud claims where the assignment was to a parent from a subsidiary that was about to become defunct).

The Victor Trustee may thus assert the fraud counterclaims on behalf of Victor's bankruptcy estate. However, Syosset cannot sue the Grubers for the alleged misrepresentations and omissions. *See Nearpark* 112 N.Y.S.2d at 817 (assignee of contract cannot seek rescission based on fraudulent misrepresentations and concealment; representations were made to assignor "and it alone had the right to rely upon them since there was not an assignment ... of the cause of action for rescission or the cause of action for fraud and deceit").

Accordingly, the Syosset Trustee's claims for fraud, fraudulent concealment, and negligent misrepresentation against the Grubers are dismissed.

*B. The Fraud Claim*
The Grubers set forth a number of alternative arguments in support of summary judgement on Victor's third counterclaim, the fraud claim.

The Grubers argue that Victor's fraud counterclaim-which alleges that they made false representations in the APA and attached blue books-must be dismissed because it is actually a breach of contract claim.[FN24] As noted above in Section I.B. addressing Victor's motion to dismiss the Grubers' nondischargeability misrepresentation claim, the general rule is that a plaintiff cannot support a fraud claim with the mere "allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties." *Sudul v. Computer Outsourcing Services,* 868 F.Supp. 59, 62 (S.D.N.Y.1994) (citations omitted). The Grubers argue that Victor has done just this here, in essence alleging that the Grubers "promised but did not intend to deliver a business that complied with governmental regulations."

FN24. As noted above, Victor could not-

and indeed did not-file a breach of contract claim against the Grubers, because he assigned the various contracts to Syosset. The Syosset Trustee has sued the Grubers for breach of contract, and the Grubers' motion to dismiss the breach of contract claims is discussed below.

While this argument has superficial appeal, upon closer examination it must fail. In the nondischargeability fraud claims that the Court dismissed above, the Grubers were claiming that Victor never intended to pay them amounts that he promised in the contract to pay in the future. These claims were based on an alleged misrepresentation of intention to perform the express terms of the contract, and were therefore subject to the "collateral and extraneous" rule set forth above. Victor, on the other hand, claims not that the Grubers promised but did not intend to deliver a business in regulatory compliance, but rather that they falsely represented a fact that was already known to them. In other words, they represented that the business was in compliance when it in fact was not. This alleged misrepresentation of fact is properly asserted as a fraud claim. *See e.g., Faller Group, Inc. v. Jaffe,* 564 F.Supp. 1177, 1180-81 (S.D.N.Y.1983) (court found actionable fraud claim where plaintiff alleged that defendant did not tell him about a governmental investigation that was ongoing, and instead represented in the contract that there were no investigations ongoing).

**\*15** The Grubers also argue that Victor's fraud claim should be dismissed because he cannot meet the reasonable reliance requirement for a fraud cause of action due to disclaimer clauses in the agreements. *See Harsco Corp. v. Segui,* 1996 WL 428911 at \*4 (2d Cir.1996) ("Reasonable reliance must ... be proved under New York law to recover for fraud and negligent misrepresentation"). The relevant APA clause provides:

2. *Representations of the Purchaser.* Purchaser represents and acknowledges that Purchaser has had full opportunity to inspect the Business of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

Seller and all assets included in this sale, has had a full opportunity to investigate the affairs of the Business and has been supplied by Seller with all documentation and information requested by Purchaser. Purchaser has bought the assets included in this sale "as is". The acceptance by Purchaser of delivery of the Bill of Sale and Assignments are deemed to be the full performance and discharge of every agreement and obligation (either express or implied) on the part of Seller to be performed pursuant to this Agreement except those, if any, which are herein specifically stated to survive the date hereof. Purchaser has been advised by Seller and fully understands that Seller is a research and development, and not a commercial, company.

The relevant Bill of Sale language provides:
SELLER DOES NOT, EXCEPT AS SET FORTH ABOVE, WARRANT THE ACQUIRED ASSETS IN ANY RESPECT, EITHER EXPRESSLY OR BY IMPLICATION, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS OR ADEQUACY FOR ANY PURPOSE OF USE, QUALITY, PRODUCTIVENESS OR CAPACITY OF SAID ACQUIRED ASSETS. THE ACQUIRED ASSETS ARE SOLD TO PURCHASER "AS IS", "WHERE IS" AND "WITH ALL FAULTS".

The basis of Victor's fraud claim is that the Grubers specifically misrepresented that SLI was in compliance with relevant regulations. The APA contains two clauses relevant to Victor's claim:

(m) Except as disclosed on Exhibit "F", the Seller has all necessary permits, licenses and new drug applications for it to operate its facilities as presently operated and to conduct its business as presented conducted ("Necessary Permits"). A list of the Necessary Permits is annexed as Exhibit "F". All such Necessary Permits possessed by the Seller are in full force and effect and to the

best of Seller's knowledge (i) no suspension or cancellation of any Necessary Permit is threatened, (ii) there is no reason to believe that on expiration any Necessary Permit may not be renewed, and (iii) none of the Necessary Permits will be adversely affected by the consummation of the transactions contemplated in this Agreement.[FN25]

> FN25. The parties agree that there is no Exhibit F to the APA.

(q) No statement in this Agreement or in any exhibit hereto, or in any certificate or other writing furnished or to be furnished to the Purchaser pursuant to this Agreement, or in connection with any of the transactions contemplated hereby, is or will be an untrue statement of a material fact, or knowingly omits or will knowingly omit a material fact necessary to make the statement, in the light of the circumstances under which it is made, not misleading.

**\*16** "[T]he rule announced by the New York Court of Appeals in *Danann Realty Co. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) [is that]: where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter the contract by the very representation it has disclaimed reliance upon." *Harsco,* 1996 WL 428911 at \*8. However, "New York cases distinguish between specific and general disclaimers of reliance on representations. A general disclaimer clause ... will not bar an action for fraud in the inducement of a contract." *Applications Inc. v. Hewlett Packard Co.,* 501 F.Supp. 129, 135 n. 6 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1076 (2d Cir.1982). Contrary to the Grubers' characterization, the disclaimers set forth above are general. The contracts do not contain any specific disclaimers as to regulatory compliance and, indeed, any such disclaimer would be in direct conflict with the "Necessary per-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

mits" representation.[FN26]

> FN26. For these same reasons, the Court rejects the Grubers' argument that Victor's fraud claim must be dismissed under the APA's acceptance and discharge language, quoted above.

The Grubers also argue that Victor cannot claim misrepresentation in connection with SLI's regulatory compliance because the blue books, which were attached to the APA and which Victor read and initialed, gave ample warning of potential regulatory difficulties. It is true that the blue books are replete with general warnings. For example, Gruber stated in the blue books:

-"I wish to reiterate and emphasize that unforeseen as well as current problems may be encountered with the FDA."

-"It is obvious to you as well as me that we are not in compliance with all F.D.A. requirements. I don't believe there is *any* company in full compliance."

-"I shall never guarantee the regulatory actions of any Federal, State or City Agency!!!"

However, the blue books also represent:
During the past 10 years Syosset has been the subject of inspections by various FDA Investigators. In the past seven years each inspection resulted in reports which were free of adverse criticism or extremely minor observations.

Syosset has all necessary permits (except alcohol which Dermavet has and can be transferred) registrations, NDA and ANDAs from FDA and (Dermavet EPA) to operate its business as presently conducted.

Many of the blue book disclosures address what Gruber describes as "grey" areas. The "grey" areas consisted of SLI's practice of compounding dermatologists' prescriptions for sale directly to the dermatologists, without express FDA approval. SLI did not make such products commercially available. The blue books warn that the FDA might view SLI's compounding as non-compliant, but also represent Gruber's belief that FDA approval was not necessary and that the FDA had never taken action on this issue.

It is clear from the above-referenced portions of the blue book that, to the extent Victor bases his claim on the Grubers' alleged underestimation of general future regulatory problems and on problems in the "grey" areas, Victor cannot survive a motion for summary judgment on the element of reasonable reliance. However, Victor also alleges that the blue books "vastly understated the actual amount of questionable bulk prescription sales and the impact of their loss to Syosset." In the blue book excerpts provided to the Court, Mr. Gruber states that the "grey area" consists of "three groups of products which cumulatively account for approximately $550,000 in sales." Victor claims that the "grey area" products actually consisted of $1,500,000 in sales, or 60-80% of Syosset's business, which Syosset lost when the FDA and New York State Education Department forced it to discontinue its bulk prescription business. To the extent that Victor bases his claim on Mr. Gruber's allegedly false statement of the value of "grey area" products, there are disputed issues of fact that make summary judgment inappropriate.

**\*17** Moreover, the complaint also charges "failure to comply and/or falsifying compliance with applicable federal and state regulations governing its business as a manufacturer of dermatological products." Paragraphs 68-100 of the complaint, as well as deposition testimony submitted in opposition to the Grubers' motion, detail the alleged violations. They include the following:

1) Gruber submitted fraudulent New Drug Applications to the FDA for SLI's C-Solve 2 and E-Solve 2 lotions by failing to disclose to the FDA that these products had failed stability tests. Victor claims to have discovered the products' instability only in 1990-91;[FN27] and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

FN27. In July 1990, Syosset entered into license, sales agency, and manufacturing agreements with Medicis Pharmaceuticals, Inc. ("Medicis"). Victor contends that the purpose of these agreements was to allow Syosset to expand its market beyond the limited number of dermatologists for whom the Grubers had previously manufactured products. The arrangement, under which Medicis marketed Syosset's C-Solve 2, proved successful until that product began to fail stability tests. Victor alleges that as a result of these failures, Syosset discovered that Mr. Gruber had falsified records submitted to the FDA in obtaining approval for C-Solve 2. Since the product was unstable, Syosset had to recall hundreds of thousands of bottle and stop manufacturing the product.

In 1992, Syosset believed that it had developed a stable formula for C-Solve 2. At that time, Victor was negotiating to sell Syosset to Medicis for $4,000,000, plus contingent payments. He was also negotiating a consulting contract between himself and Medicis, which was potentially worth $5,000,000. Victor alleges that, when the new formula proved unstable, Medicis reduced the sale price by $1,700,000 and then withdrew from the deal altogether.

2) the substitution of the product germall for bronopol in SLI's Hydrocortisone Cream USP 1% product, without FDA approval. Victor claims that Syosset discovered the substitution after the closing, thereafter had to stop manufacturing what had been one of Syosset's most important products, and subsequently lost a valuable government contract because it could no longer produce the Hydrocortisone product; and

3) Gruber concealed regulatory problems from the FDA when the FDA had inspected SLI, including concealment of certain portions of SLI's plant through the use of sliding walls and false signage.

Although the blue books were sufficient to warn of potential problems with pending FDA applications and "grey" areas, they did not warn that certain permits were obtained with false information, that components had been substituted after a permit was received for the original components, or that SLI passed regulatory inspections by hiding aspects of its business. There are clearly disputed facts about these claims, and whether or not Victor reasonably relied on the Grubers' "Necessary Permits" and other representations is a disputed factual inquiry which makes summary judgment inappropriate.[FN28]

FN28. In an affidavit submitted in opposition to the Grubers' motion for summary judgment, Victor makes other allegations, including claims that Gruber falsified manufacturing records and used unlawful means to conceal bacteriological contamination of the Syosset plant's water supply.

The Grubers also move for summary judgment on Victor's counterclaim for negligent misrepresentation on the ground that Victor has failed to show a relationship of trust between himself and the Grubers. Similarly, the Grubers move for summary judgment on Victor's fraudulent concealment counterclaim, contending that Victor has failed to show that the Grubers had a duty to disclose the information that they allegedly failed to disclose.

An essential element of a negligent misrepresentation claim under New York law is that there exist "a special relationship of trust and confidence between the parties." *Banque Arabe et Internationale v. Maryland Nat. Bank,* 819 F.Supp. 1282, 1293 (S.D.N.Y.1993), *aff'd,* 57 F.3d 146 (2d Cir.1995); *see also Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 531 (S.D.N.Y.1996). The tort of fraudulent concealment similarly requires a relationship between the parties creating a duty to disclose. *See Grupo Sistemas Integrales v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

*AT & T Communications, Inc.,* 1996 WL 312535 at *8 (S.D.N.Y.1996). As the court noted in *Grupo Sistemas,* "the same special relationships that impose on parties a duty not to speak negligently to each other also impose on them a duty not fraudulently to conceal information from each other." *Id.* at *9. The inquiry into whether or not a "special relationship" exists "is a matter for case-by-case analysis." *Polycast Technology Corp. v. Uniroyal, Inc.,* 1988 WL 96586 at *9 (S.D.N.Y.1988).

**\*18** Although the Grubers filed counter-counterclaims for negligent misrepresentation and fraudulent concealment against Victor, they argue here, in moving for summary judgment on Victor's identical counterclaims, that the requisite "special relationship" does not exist. For the purposes of this motion, the Grubers characterize the sale of SLI as a "one time buyer-seller relationship" that does not meet the "special relationship" standard. *Patell Industrial Machine Co., Inc. v. Toyoda Machinery U.S.A., Inc.,* 880 F.Supp. 96, 99 (S.D.N.Y.1995). However, a duty to disclose exists "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150-151 (2d Cir.1993). In his fraudulent concealment and negligent misrepresentation claims, Victor contends that Mr. Gruber had information about the manner in which SLI obtained FDA approval on certain products and about SLI's non-compliance with FDA regulations that he failed to disclose to Victor. Such information would not have been readily available to Victor. For example, with respect to the Grubers' alleged secret substitution of the product germall for bronopol in SLI's Hydrocortisone Cream USP 1% product, Victor did not have "an opportunity equal to that of [the Grubers] to obtain [the relevant] information." *Id.* at 151. Furthermore, it is reasonable to infer that Victor acted on the basis of such mistaken knowledge. This is thus the type of information that the Grubers were bound, under the superior knowledge rule, to disclose to Victor.

Victor's allegations could, if proven, fulfill the "special relationship" element of the fraudulent concealment and negligent misrepresentation claims. As the court noted in *Grupo Sistemas,* "those courts that have found, applying New York law, that no special relationship existed have typically done so, not at the pleading stage, but after trial, on the basis that plaintiffs have failed to carry their evidentiary burden." 1996 WL 312535 at *9. Accordingly, the Grubers' motion for summary judgment on Victor's fraudulent concealment and negligent misrepresentation counterclaims is denied.

*C. Syosset's Breach of Fiduciary Duty Claim*

In its sixth counterclaim against the Grubers, the Syosset Trustee alleges that the Grubers owed Syosset fiduciary duties "by virtue of the Purchase Agreement ... as shareholders and fiduciaries of Syosset."

The Grubers move for summary judgment on this claim on the grounds that they are not fiduciaries of Syosset. Although the Syosset Trustee does not directly address the Grubers' motion with respect to the breach of fiduciary duty claim, Victor argues that a fiduciary relationship between Syosset and the Grubers existed for two reasons: 1) Victor and the Grubers were related by marriage; and 2) Mr. Gruber was a consultant for Syosset under the Consultancy Agreement.

**\*19** The fact that Victor married a relative of Mrs. Gruber and treated Mr. Gruber's children without charge for dermatological problems does not create a fiduciary relationship between the Grubers and Syosset. Nor does the fact that Mr. Gruber did consulting work for Syosset for one year before being terminated make him a fiduciary of Syosset. Syosset has failed to show that Mr. Gruber's duties under the Consultancy Agreement were anything but contractual, and any claim for breach of that agreement is thus properly asserted as a contract claim. *See Compania Sud-Americana de Vapores v. IBJ Schroder,* 785 F.Supp. 411, 426 (S.D.N.Y.1992) ("New York law is ... quite clear ...

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

that 'a conventional business relationship, without more, does not become a fiduciary relationship by mere allegation' ") (quoting *Oursler v. Women's Interart Center, Inc.,* 170 A.D.2d 407, 566 N.Y.S.2d 295 (1st Dept.1991)).

Accordingly, the Grubers' motion for summary judgment on Syosset's breach of fiduciary duty claim is granted.

### D. The Breach of Contract Claims

In its first counterclaim, Syosset alleges that the Grubers breached the APA and Licensing Agreement by failing to: provide physical inventory; transfer various licenses for certain dermatological products to Syosset; and disclose adverse material information about SLI's regulatory problems. [FN29] In its second counterclaim, Syosset alleges that the Grubers breached the Consulting Agreement by failing to "research and develop new products to be marketed by the company," despite being compensated for such services as provided for under the agreement. The Grubers move for summary judgment on Syosset's contract claims, contending that Syosset has failed to identify any contractual breach.

FN29. Paragraph 1(q) of the APA provides:

No statement in this Agreement or in any exhibit hereto, or in any certificate or other writing furnished or to be furnished to the Purchaser pursuant to this Agreement, or in connection with any of the transactions contemplated hereby, is or will be an untrue statement of a material fact, or knowingly omits or will knowingly omit a material fact necessary to make the statement, in light of the circumstances under which it is made, not misleading.

Syosset's counterclaim also references the APA clause which represents that the Grubers had all "necessary permits and

licenses and new drug applications." The full text of this clause is set forth in Section III.B., above.

With respect to Syosset's first counterclaim, the Grubers argue that Syosset has failed to: 1) identify any specific license or inventory that the Grubers failed to provide under the agreements; 2) identify what information the Grubers should have disclosed; and 3) allege that Syosset has performed its own duties under the contracts. The Court rejects all of these arguments. Syosset's Reply, which contains the counterclaims, includes the allegation that inventory that SLI provided pursuant to the APA was "worthless inventory incapable of being used in manufacturing." The Reply is also replete with specific allegations about the Grubers' numerous misrepresentations in violation of the APA. Furthermore, these alleged breaches may have excused Syosset from performance under the agreements. *See* Corbin on Contracts § 977 at 920 (1951).[FN30] Accordingly, the Grubers' motion for summary judgment on Syosset's first counterclaim, for breach of contract, is denied.

FN30. The Grubers also argue that they cannot be sued under the APA because they did not sell anything under that agreement. While it is true that SLI is referenced as the "Seller" in the APA, both Murray and Helen Gruber were listed as "stockholders," and the first paragraph of the agreement is entitled: "Representations of Seller and Stockholders." Furthermore, both of the Grubers signed the APA, and both sue Syosset for breach of the APA.

The Grubers are correct that both the License Agreement and the Consulting agreement were between Syosset and Mr. Gruber, and therefore any cause of action for breach of those contracts can only be between Mr. Gruber and Syos- set.

The Court rejects the remainder of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

Grubers' arguments, which include the contention that the Court should dismiss this counterclaim for failure to answer interrogatories, as without merit.

With respect to Syosset's second counterclaim, for breach of the Consulting Agreement, the Grubers argue that it must be dismissed because Syosset failed to provide Mr. Gruber with an office and laboratory in Naples, Florida. Paragraph 2(b) of the Consulting Agreement provides:

**\*20** The company undertakes to obtain for you an office and laboratory to your specifications in Naples, Florida at a point close to your Naples, Florida residence for the performance of your responsibilities and duties hereunder.

The agreement also provides, at ¶ 2(a), that "[a]s to research and development work to be performed by [Mr. Gruber] in the future, the same shall be performed at such times and at such places as [Mr. Gruber] in [his] sole discretion determine ..."

Syosset does not contest Mr. Gruber's allegation that it failed to provide him with an office and laboratory in Florida. However, Syosset alleges in its Reply that Mr. Gruber "insisted that whatever formulations he would perform under the Consulting Agreement, entitled him to further royalty payments which had not originally negotiated at the time of entry into the Purchase Agreement." *See also* Victor Aff. ¶ 121-23.

It has not been established that the nature of the work that Mr. Gruber was to perform in Florida was the totality of his obligation under the Consulting Agreement. For example, the submissions suggest that Mr. Gruber was in New York at least some portion of the time after the sale and before Syosset terminated the Consulting Agreement. It is not clear if his alleged refusals to perform occurred while he was in New York-where he presumably could have performed research at Syosset's facilities-or rather occurred while he was in Florida without an office

or laboratory in which to perform the required research. It is thus unclear whether Syosset's failure to procure an office and lab is a material breach that would excuse Mr. Gruber from performing. *See Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976) ( "A 'material' breach has been defined as one which would justify the other party to suspend his own performance"); *see also* Williston on Contracts § 829 at 81 ("the rule is well established that only a *material* breach of a contract or a substantial failure in its performance justifies a party thereto in rescinding it"). Accordingly, Mr. Gruber's motion for summary judgment on Syosset's second counterclaim is denied.

The Grubers also move for summary judgment on their fifth counter-counterclaim, in which they allege that Syosset has failed to make various payments under the Asset Purchase, Licensing and Consulting Agreements and has thus breached those contracts. In their motion, the Grubers request only partial summary judgment, for: 1) $437,277.51 allegedly due pursuant to paragraph 5 of the APA, plus interest from October 1, 1988; and 2) $4,500,000 allegedly due under paragraph 9(c) of the Consulting Agreement plus interest from January 1, 1995.

Paragraph 5 of the APA, "Adjustment to Purchase Price," provides for a post-sale audit by a named accountant firm. In the event that the agreed-upon accountants valued accounts receivable or inventory at more than $200,000, "such additional amounts shall be paid by the Purchaser to the Seller." Paragraph 5 thus provides for payment beyond the $2 million purchase price, depending upon the accountants' determination. The Grubers allege that the named accountancy firm valued Syosset's inventory as $510,314 and its receivables as $526,963.51, thus entitling Gruber Enterprises to a payment of $637,277.51. According to the Grubers, Gruber Enterprises has been paid only $200,000 of this amount, and Syosset thus owes it the remaining $437,277.51. [FN31]

FN31. In its complaint, Syosset alleges

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

that "Gruber's accountants" submitted an invoice for inventory that relied on improper pricing methods, and that, when Syosset demanded backup documentation, Gruber refused to provide it. It is unclear whether Syosset is simply characterizing the agreed-upon accountancy firm, Feiman, Geller & Feiman, as "Gruber's accounts," or whether Gruber's above-cited figures in fact come from a source other than that agreed upon in the APA. If the figures are indeed from the Feiman firm, then Syosset is bound to accept them under ¶ 5(a)'s provision that "[t]he determination of the accountants shall be final and conclusive on Seller and Purchaser."

**\*21** Paragraph 9 of the Consulting Agreement provides for a bonus to Mr. Gruber from Syosset. Although a specific formula, linked to Syosset's annual gross sales, is set forth in 9(a), subsection (b) provides that Mr. Gruber shall in any event receive no more or less than $4,500,000 in bonus compensation. Paragraph 9(c) provides that Mr. Gruber shall receive the $4,500,000 "by no later than seventy-eight (78) months of July 1, 1988." Therefore, the amount was due by January 1, 1995. Under paragraph 9(d), Syosset agreed to pay the bonus compensation notwithstanding termination by either party of the consultancy.

In the sections above, the Court denied dismissal and/or summary judgment on certain aspect of both the Grubers' and Victor's fraud claims against each other. There thus remain in this action disputes over whether or not the Grubers used fraud to induce Victor to enter into the agreements under which they now sue Syosset for breach of contract. Summary judgment for the Grubers on a breach of contract claim for contracts that they may be found to have procured by fraud is not appropriate. The viability of the Grubers' breach of contract claims depends upon the ultimate validity of Victor's fraud claims. Accordingly, the Grubers' motion for partial summary judgment on their breach of contract

claim is denied.

*E. The Tortious Interference With Business Claims*

In his fourth counterclaim, Victor alleges that Mr. Gruber intentionally interfered with Syosset's business relations by: 1) obtaining a temporary restraining order to enjoin solicitation of limited partners for Syoderm, a company that Syosset was forming in order to sell its products in a new market; and 2) by causing the collapse of a proposed sale of Syosset to Medicis and a related proposed consulting agreement between Victor and Medicis.[FN32] In its seventh counterclaim, the Syosset Trustee also asserts an interference with business claim, but does so only with respect to the Syoderm incident.

FN32. See note 27 for description of Syosset's relationship with Medicis.

"[T]o maintain an action for intentional interference with prospective economic advantage there must be some certainty that plaintiff would have gotten the contract but for the defendant's interference." *Mandleblatt v. Devon Stores, Inc.,* 521 N.Y.S.2d 672, 677 (1st Dept.1987) (internal quotation omitted). The Grubers contend that the evidence submitted shows that Victor and Syosset cannot fulfill this essential causation element.

Victor alleges that, in the spring of 1990, Mr. Gruber posed as a Smith Barney stock analyst to gain entry into a meeting between Syosset and Medicis, where the parties were negotiating sales and consulting agreements. At the meeting, Mr. Gruber allegedly made false statements accusing Victor and other Syosset officers of misconduct, and did so "for the sole purpose of poisoning the business relationship between Victor and Syosset, on the one hand, and Medicis, on the other." However, in his affidavit submitted in opposition to the Grubers' motion for summary judgment, Victor states that Syosset entered into license, sales agency, and manufacturing agreements with Medicis in July of 1990. These agreements post-date Mr. Gruber's allegedly tortious behavior, and strongly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

undermine Victor's and Syosset's claim that Mr. Gruber's Spring 1990 behavior caused their relationship with Medicis to deteriorate.

**\*22** Victor's affidavit also appears to conflict with the claim in his Answer that in 1989, Syosset and Victor entered into negotiations for the sale and consultancy agreements, and received letters of intent from Medicis. In his affidavit, Victor describes the sale and consulting agreement negotiations as having taken place in May of 1992. This suggests that the 1989 negotiations were in fact for the license, sales agency and manufacturing agreements, which Syosset did enter into with Medicis.

Finally, the Grubers have submitted a sworn affidavit from Jonah Shacknai, Chairman and Chief Executive Officers of Medicis since July 1988. Mr. Shacknai states that the discussion concerning the sale of Syosset to Medicis began "[i]n or around 1991." He states that Medicis decided not to buy Syosset because "renovating the company to make it suitable for [Medicis'] purposes would be too expensive to make purchasing the company worthwhile." Most significant to this motion, Mr. Shacknai denies Victor's allegation that Medicis' decision was based on Mr. Gruber's alleged interference. Mr. Shacknai states:

This allegation is completely untrue. Our decision was not based on any information provided to us by Murray Gruber or any statement made by him. Indeed, Mr. Gruber's views had no bearing at all on Medicis' decision not to purchase Syosset and not to retain Victor as a consultant.

In view of all of the above, the Court finds that Victor cannot show that, but for Mr. Gruber's interference, he and Syosset would have entered into sale and consulting agreements with Medicis. In fact, the evidence shows that Mr. Gruber neither directly caused nor was even connected to the collapse of the Medicis arrangements.[FN33]

FN33. Victor alleges that Mr. Gruber's interference, "coupled with the necessity for

Syosset to recall products sold to Medicis, ... caused the proposed lucrative business arrangements ... to collapse." The product recall, described in note 27 above, cannot be the basis for the interference with business claim. Even if the Grubers are ultimately found responsible for the recall, their actions occurred long before Victor and Syosset began negotiations with Medicis, and they thus cannot be said to have been taken with the intent to interfere with the Medicis deal.

Next, the Court must examine Victor's and Syosset's interference with business relations claim with respect to the Syoderm venture. According to the counterclaims, Syosset created Syoderm in order to develop new markets for Syosset's products through distribution agreements. Under the agreements, Syosset would reserve to itself the exclusive right to sell its bulk and finished products directly to physicians and other previous customers of Syosset. This allowed Syosset to "preserv[e] its sales in the traditional market," while Syoderm would develop new markets. Victor and Syosset allege that Mr. Gruber participated in Syoderm's formation but that, "when [he] saw that various individuals were subscribing to the Syoderm venture, [he] seized upon the opportunity to exert additional pressure upon the officers of Syosset to pay him pursuant to the Purchase Agreement." Mr. Gruber allegedly applied such pressure by obtaining a temporary restraining order ("TRO") prohibiting Syosset from any further performance of the distribution agreements with Syoderm. Some two weeks later, the TRO was vacated and Mr. Gruber's application for a preliminary injunction was denied.

Victor and Syosset allege that the schedule for the Syoderm marketing campaign required a direct solicitation of prospective investors in April of 1989 and that Mr. Gruber, by obtaining the TRO, "destroy[ed] the proposed venture." Victor also alleges that he "committed substantial sums of money to the formation of Syoderm." However, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

Grubers have submitted a letter from Robert Barandes, an attorney with the law firm that handled the Syoderm transaction, in which Mr. Barandes states that "no monies were ever raised in connection with the offering" of Syoderm. In addition, Victor provided no answer to the Grubers' interrogatory requesting information on the persons who would have invested in Syoderm but for the TRO. In short, neither Victor nor Syosset have offered any evidence that would tend to show that the two-week delay under the TRO caused the entire Syoderm venture to collapse. This claim thus suffers from the same causation problem as the Medicis claim.

**\*23** Even if Victor or Syosset supported their claim that the TRO caused the collapse, their cause of action would be improper because "[p]etitions to a governmental agency are privileged under the First Amendment and cannot form the basis of a claim for tortious interference with business." *Hotel St. George Associates v. Morgenstern,* 819 F.Supp. 310, 320 (S.D.N.Y.1993); *see also Rudoff v. Huntington Symphony Orchestra,* 397 N.Y.S.2d 863, 865 (N.Y.App.Term.1977) ("Public policy dictates that the tort of interference not be extended to those situations where a citizen petitions an agency of his government").[FN34]

> FN34. In their Answers, both Victor and Syosset also describe what they characterize as Mr. Gruber's "relentless letter writing campaign" to various regulatory officials, which Mr. Gruber allegedly undertook in order to interfere with Syosset's and Victor's business. Neither expressly addresses the letter campaign in their specific interference with business counterclaim, although both incorporate by reference the prior paragraphs which contain those allegations. However, those same prior paragraphs undermine the argument that the letter campaign damaged Syosset in any way. Paragraph 149 of Victor's Answer, and ¶ 98 of Syosset's Answer state:

Gruber's allegation to the Town of Oyster Bay with respect to the improper storage of equipment in its premises, and the Town's subsequent inspection, *never resulted in any violation, warning or recommendation.* Similarly, Gruber's allegations to various State and County agencies concerning Syosset's alleged dumping of hazardous materials *never resulted in any warning, recommendation, violation or citation or any kind.*

(emphasis added). Accordingly, the letter campaign cannot form the basis of an interference claim.

Accordingly, the Grubers' motion for summary judgment on Victor's and Syosset's counterclaims for tortious interference with business is granted.

*F. The RICO Claim:*

Victor's fifth counterclaim alleges that the Grubers and Gruber Enterprises violated federal mail fraud, extortion and drug laws on two or more occasions, thus showing a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Syosset alleges a RICO violation in its eighth counterclaim, but lists only mail fraud as a predicate.

As a preliminary matter, the allegation that Mr. Gruber attempted to or did extort money from Victor through his letter writing campaign to local and state officials is entirely without support. Extortion is defined in 18 U.S.C. § 1951 as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The mere allegation that Mr. Gruber, in writing letters to various officials, was attempting to "extort" money from Victor-without any allegation or indication that Mr. Gruber at any time used actual or threatened force, violence, fear, or color of official right to obtain funds from Victor-is not sufficient to survive a motion for summary judgment.

The second group of alleged predicate acts-the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 25

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

manufacture, sale and concealment of dangerous drugs in violation of § 1961(1)-does not meet the proximate cause requirement of the RICO statute. *See In re American Express Co. Shareholder Litigation,* 39 F.3d 395 (2d Cir.1994). The court in *American Express* stated:

> RICO grants standing to sue to "[a]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c) (1988) (emphasis added). This language limits standing to plaintiffs whose injuries are both factually and proximately caused by the alleged RICO violation.

*Id.* at 399. The court found that the plaintiff shareholders did not have standing to assert RICO claims against the defendant corporation for the corporation's scheme to injure third party. *Id.* at 399-401. If the Grubers did manufacture dangerous drugs as Victor alleges, Victor was "certainly not the intended target[ ] of the RICO violations." *Id.* at 400. Obviously, Victor could not have been the target of any violations before he bought SLI.

**\*24** After the sale and assignment to Syosset, Victor would lack standing to asset a RICO claim based on the drug predicate because his injury would be derivative of any injury to the corporation. As the court noted in *Manson v. Stacescu,* 11 F.3d 1127 (2d Cir.1993), *cert. denied,* 115 S.Ct. 292 (1994):

> A shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock. This is true even when the plaintiff is the sole shareholder of the injured corporation.

*Id.* at 1131. Victor has not alleged that he sustained an injury separate and distinct from the injury sustained by Syosset with respect to Mr. Gruber's alleged post-sale manufacturing of dangerous drugs. *Id.* Furthermore, it is doubtful that Syosset could even assert a RICO claim based on the alleged violation of drug laws because Syosset was

not the intended victim of any such violation. If Mr. Gruber did violate drug laws, either before or after the sale, he presumably did so to benefit and not injure the corporation. *See American Express,* 39 F.3d at 400 ("the RICO defendants' actions, however misguided and injurious to American Express in the end, were undertaken to further American Express's competitive interests").

This leaves one group of predicate acts-the mail fraud allegations. Victor and Syosset claim that the Grubers' "uses of the mail included, but were not limited to, transmittal of the Purchase Agreements together with various other correspondence containing false, misleading and material misrepresentations by the counterclaim Defendant Murray Gruber." [FN35] These are the only predicate acts pleaded that arguably meet the proximate cause requirement. The only specific allegation of mail fraud goes to the transmittal of the APA, which contained the allegedly false representations. However, Victor and Syosset have failed to allege or indicate in any way that the transmittal of the APA meets the "pattern of racketeering activity" requirement of § 1961(5). To meet this requirement, the plaintiff must show that the racketeering activities are both related and continuous. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* 109 S.Ct. 2893, 2900 (1989). Since there is no indication in the submissions that the transmittal of this single document was a continuing activity which produced a pattern of racketeering activity, it cannot asserted as a RICO claim.

> FN35. Victor also alleges that the Grubers' committed mail fraud violations by "the transmittal of false and fraudulent [Abbreviated New Drug Applications] and related correspondence to the FDA." Here again, Victor does not have standing to sue because he was not the intended victim of any such fraud.

Accordingly, the Grubers' motion for summary judgment on Victor's and Syosset's RICO claims is granted.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

### G. The Claims Against Mrs. Gruber

Finally, the Grubers move for dismissal of all claims against Mrs. Gruber on the ground that neither Syosset nor Victor "makes any specific allegation of any misrepresentation, breach of duty, or other wrongful conduct by her."

The only counterclaims left against the Grubers are Victor's fraud, negligent misrepresentation and fraudulent concealment claims, and Syosset's breach of contract claims. For the reasons set forth in note 30, the Court declines to dismiss Syosset's claim for breach of the APA against Mrs. Gruber, but does dismiss Syosset's claims for breach of the Consulting and License Agreements, to which Mrs. Gruber was not a party. The Court also declines to dismiss Victor's fraud-based claims. These claims are based on alleged misrepresentations in the APA, which Mrs. Gruber signed and in which she made representations, as noted in note 30.

### IV. The Syosset Trustee's Motion To Be Named As A Party Plaintiff Against Victor On The Diversion Claims.

*25 As described above, the Grubers allege, in a nondischargeability claim against Victor and a counter-counterclaim against Victor's estate, that Victor diverted Syosset's assets and misappropriated corporate opportunities in violation of his fiduciary duties (the "diversion claims"). In February 1995, the Syosset Trustee filed a proof of claim against Victor in the bankruptcy proceeding, seeking $1.65 million in damages for these same alleged diversions. In June of 1995, Mr. Gruber moved for leave to prosecute the diversion claims on behalf of the Syosset estate on the ground that the Syosset estate was unable to fund prosecution of the claims because of the estate's lack of assets. As noted above, Eastern District Bankruptcy Judge Marvin Holland denied that motion.

In this motion to be named as a party plaintiff, the Syosset Trustee argues that any action to restore corporate assets belongs to Syosset and that the Grubers' diversion claims are thus derivative claims brought on behalf of the Syosset Trustee. In short,

the Syosset Trustee agrees with Victor's argument that the Grubers lack standing to pursue the diversion claims. However, the Syosset Trustee contends that the Syosset estate has no money to pursue the diversion claims and that the Trustee should be allowed to become a party plaintiff *with* Gruber (not instead of Gruber) on the diversion claims.

As the Court has dismissed the Grubers' diversion nondischargeability claim, this motion is moot. However, even if the diversion claims remained in this case, the Court would deny the motion. The Syosset Trustee is, in effect, trying to circumvent Judge Holland's denial of the Grubers' motion to prosecute the diversion claims on behalf of Syosset. There is no reason to revisit that decision here. Furthermore, the Syosset Trustee's argument that it lacks funds to pursue the diversion claims is undermined by the fact that, in April of 1996, the Syosset Trustee filed a complaint against Victor in the Bankruptcy Court of the Southern District of New York alleging that various debts, included the diversions, are nondischargeable.

Accordingly, the Syosset Trustee's motion to be named as a party plaintiff is denied as moot.

### Conclusion

Victor's motion to dismiss and/or for summary judgment on plaintiffs' nondischargeability claims and counter-counterclaims is granted in part and denied in part as set forth in Section I.

The Syosset Trustee's motion to dismiss plaintiffs' counter-counterclaims is granted in part and denied in part as set forth in Section II.

Plaintiffs' and counterclaim defendants' motion for summary judgment on Victor's and Syosset's counterclaims is granted in part and denied in part as set forth in Section III.

The Syosset Trustee's motion to be named as a party plaintiff is denied as set forth in Section IV.

SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 492991 (S.D.N.Y.), RICO Bus.Disp.Guide 9124
**(Cite as: 1996 WL 492991 (S.D.N.Y.))**

S.D.N.Y.,1996.
Gruber v. Victor
Not Reported in F.Supp., 1996 WL 492991
(S.D.N.Y.), RICO Bus.Disp.Guide 9124

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Date of Printing: Feb 07, 2011

## KEYCITE

**H** Gruber v. Victor, 1996 WL 492991, RICO Bus.Disp.Guide 9124 (S.D.N.Y.,Aug 28, 1996) (NO. 95 CIV. 2285 (JSM))

### History

### Direct History

=>    1  **Gruber v. Victor,** 1996 WL 492991, RICO Bus.Disp.Guide 9124 (S.D.N.Y. Aug 28, 1996) (NO. 95 CIV. 2285 (JSM))

### Related References

**H**    2 Gruber v. Victor, 1999 WL 144519 (S.D.N.Y. Mar 17, 1999) (NO. 95 CIV. 2285 JSM)
*New Trial Denied by*
**H**    3 Gruber v. Victor, 1999 WL 518832 (S.D.N.Y. Jul 20, 1999) (NO. 95 CIV. 2285 (JSM))

### Court Documents

### Dockets (U.S.A.)

**S.D.N.Y.**

4 GRUBER, ET AL v. VICTOR, NO. 1:95cv02285 (Docket) (S.D.N.Y. Apr. 06, 1995)

© 2011 Thomson Reuters. All rights reserved.