GREENBERG TRAURIG, LLP
Maria J. DiConza, Esq.
Gino G. Tonetti, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
          Email: diconzam@gtlaw.com
                 tonettig@gtlaw.com

and

GREENBERG TRAURIG, LLP
Joseph P. Davis III (Pro Hac Vice Pending)
John A. Sten (Pro Hac Vice Pending)
One International Place
Boston, Massachusetts 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
          Email: davisjo@gtlaw.com
                 stenj@gtlaw.com

*Attorneys for Tempe Life Care Village, Inc.,*
*d/b/a, Friendship Village of Tempe*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                              :
In re:                                        :        Chapter 11 Case No.
                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :        08-13555 (JMP)
                                              :
                    **Debtors.**              :        (Jointly Administered)
                                              :
-------------------------------------------------------------------x
                                              :
**TEMPE LIFE CARE VILLAGE, INC.,**            :
                                              :        Adv. Pro. No. _____
                    **Plaintiff,**            :
                                              :
         **v.**                               :
                                              :
**LEHMAN BROTHERS SPECIAL FINANCING, INC.,**  :
                                              :
                    **Defendant.**            :
                                              :
-------------------------------------------------------------------x

## COMPLAINT FOR DECLARATORY RELIEF

Tempe Life Care Village, Inc., d/b/a, Friendship Village of Tempe ("**Friendship Village**" or "**Plaintiff**"), by and through its undersigned counsel, brings this action against Lehman Brothers Special Financing, Inc. ("**LBSF**" or "**Defendant**") and allege upon knowledge with respect to Plaintiff and its own acts, and upon information and belief with respect to all other matters as follows:

## NATURE OF ACTION

1.     Friendship Village brings this action as a former counterparty to two outstanding swap contracts, executed under the 1992 ISDA Master Agreement, dated as of June 20, 2006 as amended, modified, and supplemented and in effect from time to time, together with the schedule thereto (collectively, the "**Master Agreement**") with LBSF.  A true and correct copy of the Master Agreement is attached hereto as **Exhibit "A"**.

2.     Friendship Village seeks a judgment declaring that the termination of the swap agreements between Friendship Village and LBSF, communicated via letter (the "**Termination Letter**") dated August 26, 2009, from Friendship Village to LBSF, is proper and effective pursuant to the terms of the Master Agreement and that the Swap Agreements (as defined below) are, therefore, terminated.

## PARTIES

3.     Friendship Village is a nonprofit corporation, incorporated under the laws of the state of Arizona.  Its principle place of business is 2645 East Southern Avenue, Tempe, Arizona 85282.

4.     LBSF is a Delaware corporation with its current principal business address at 1271 Sixth Avenue, 40th Floor, New York, New York 10020.

## JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157, 1334.  This a "core proceeding" under 28 USC § 157(b).

6.       Venue is proper pursuant to 28 USC §§ 157a, 1408, and 1409.

7.       The statutory predicates for the relief requested herein are sections 105(a), 362, 546(g), 560, and 561 of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") and section 2201 of title 28 of the United States Code, Federal Rule of Civil Procedure 57, and Rules 7001 and 9006 of the Federal Rules of Bankruptcy Procedure.

## FACTS

**Lehman's Bankruptcy Proceedings Regarding Swap Agreements**

8.       Commencing on September 15, 2008, and periodically thereafter, Lehman Brothers Holdings Inc. ("**LBHI**") and certain subsidiaries, including, but not limited to LBSF, commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "**Cases**").

9.       On September 17, 2008, the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors pursuant to section 1102 of the Bankruptcy Code .

10.       On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 with respect to Lehman Brothers Inc. ("**LBI**").  A trustee is administering LBI's estate.

11.       On January 19, 2009, the Office of the United States Trustee appointed Anton R. Valukas as examiner (the "**Examiner**") in the above-captioned chapter 11 cases.

12.       By its *Order Approving the Appointment of Examiner* (Docket No. 2583) dated

January 20, 2009, the Court approved the appointment of the Examiner.

13.    On April 14, 2010, the Debtors in the above-captioned action filed their revised joint chapter 11 plan and disclosure statement for their revised joint chapter 11 plan.

14.    On September 17, 2009, the Court issued its *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts* (Docket No. 5207) requiring certain alternative dispute resolution procedures (the "**Derivative ADR Procedures**") to apply in these Cases.

15.    Pursuant to the Derivative ADR Procedures Order requiring certain alternative dispute resolution procedures to apply in the chapter 11 cases captioned above, the Court explicitly found that "numerous open and terminated derivatives contracts, including any derivative contract that is a 'swap agreement' or 'forward contract', … , exist" that require determination by the parties as to their status and/or termination.  *See* ADR Procedures Order, at p. 1

**The Swap Agreements between LBSF and Friendship Village**

16.    On or about June 20, 2006, LBSF entered into two valid and binding swap agreements (the "**Swap Agreements**") with Friendship Village.  The trade date for both swap agreements was June 20, 2006.

17.    The Swap Agreements were given the Reference Numbers Global 2562678 (attached hereto as **Exhibit "B"**) and Global 2562663 (attached hereto as **Exhibit "C"**).

18.    With each swap agreement, Friendship Village received a "confirmation" from LBSF.

19.    The "confirmations" described in Paragraph 18 were drafted and prepared by LBSF.

4

## EACH "CONFIRMATION" STATED:

> This confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement dated as of June 20, 2006, as amended and supplemented from time to time, between Party A and Party B (the "Swap Agreement"). All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

*See* **Exhibit B** and **Exhibit C**.

20.     Thus, by their express terms, the Swap Agreements entered into between LBSF and Friendship Village were, and are, governed by the Master Agreement.

**Friendship Village Learns About LBSF's Bankruptcy**

21.     On or about September 18, 2008, Friendship Village learned that LBSF had commenced a voluntary case under chapter 11 of the Bankruptcy Code.

22.     On or about that same date, Friendship Village began the process of assessing their options regarding the Swap Agreements that they had entered into with LBSF and the implications thereof.

23.     On or about November 13, 2008, Debtor LBHI, and its affiliated debtors, made a motion to this Court for an *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts* (the "**November 12 Motion**").

24.     In paragraph 12 of the November 12 Motion, the Debtors represented to this Court that they "may propose to assume and assign some or all of these 'in the money' Derivatives Contracts to third parties in exchange for consideration that will provide realizable value to the estates."

25.     The swap contracts with Friendship Village were contemplated by the representation made by Debtors in Paragraph 12 of the November 13 Motion.

26.     As a result of such representation to this Court by Debtors, Friendship Village took a "wait-and-see" approach regarding the possible assignment of their swap agreements with LBSF.

27.     It was not until Spring of 2009 that Friendship Village learned that LBSF was having significant difficulties finding counterparties willing to accept an assignment of the Swap Agreements.

28.     In May 2009, Friendship Village contacted LSBF regarding a potential negotiated settlement of the swap agreements.

29.     During May and part of June 2009, Friendship Village engaged LBSF in negotiations in an effort to reach a negotiated settlement of the Swap Agreements.

30.     After that time, it became clear to Friendship Village that a negotiated settlement of the Swap Agreements would not be possible.  After exhausting all such efforts, Friendship Village notified LBSF in August 2009 that Friendship Village was terminating the Swap Agreements pursuant to the Master Agreement and Section 560 of the Bankruptcy Code.

**<u>The Master Agreement Governs Termination of the Swap Agreements</u>**

31.     Section 5 of the Master Agreement is entitled "Events of Default and Termination Events."  *See* **Exhibit A**.

32.     Section 5(a) of the Master Agreement, titled "Events of Default," states that

> [t]he occurrence at any time with respect to a party or, if applicable, and Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: --

*See* **Exhibit A**.

33.     Subsection (vii) of Section 5(a) of the Master Agreement establishes

6

"Bankruptcy" as an event of default.  *See* **Exhibit A**.

34.     Subsection (vii)(4) of Section 5(a) of the Master Agreement states that,

"[t]he party, any Credit Support Provider of such part or any applicable Specified Entity of such party: -- (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or retrained in each case within 30 days of the institution or presentation thereof.

*See* **Exhibit A**.

35.     Pursuant to the plain and unambiguous terms of the Master Agreement, LBSF's voluntary commencement of a case under Chapter 11 of the Bankruptcy Code was an Event of Default under section 5(a)(vii)(4) the Master Agreement.

36.     Section 6 of the Master Agreement is entitled "Early Termination."  *See* **Exhibit A**.

37.     Section 6(a) of the Master Agreement, titled "Right to Terminate Following Event of Default," states that:

[i]f at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-Defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.

*See* **Exhibit A**.

38.     Upon the Event of Default by LBSF, Friendship Village, as Non-Defaulting Party,

had the right, under the plain and unambiguous terms of the Master Agreement, to designate an Early Termination Date. *See* **Exhibit A**.

39. Section 6(c) of the Master Agreement, titled "Effect of Designation," states that:

> [i]f notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination is then continuing.

*See* **Exhibit A**.

**Friendship Village as the Non-Defaulting Party,
Has the Right to Designate the  Early Termination Date**

40. By letter to LBSF, dated August 26, 2009, Friendship Village designated August 27, 2009 as the Early Termination Date for the Swap Agreements identified as Global 2562663 and Global 2562678. *See* **Exhibit "D"**.

41. August 27, 2009 was designated as the Early Termination Date for the Swap Agreements by Friendship Village pursuant to Section 6(a) of the Master Agreement. *See* **Exhibit D**.

42. LBSF received the Termination Letter from Friendship Village designating August 27, 2009 as the Early Termination Date for the Swap Agreements on August 26, 2009.

43. LBSF responded to Friendship Village via letter dated August 27, 2009 (the "**LBSF Response Letter**"). *See* **Exhibit "E"**.

44. In LBSF Response Letter, LBSF informed Friendship Village that LBSF believed that the Termination Notice and Early Termination Date, was "voidable at the election of Lehman" and purported to reserve "the right to dispute the validity of the termination notice…". *See* **Exhibit E**.

45. Neither the Master Agreement nor the confirmations for the Swap Agreements

contain any provisions or clauses allowing LBSF, as the Defaulting Party, to "void" the Termination Notice and Early Termination Date.

46.     In the LBSF Response Letter, LBSF acknowledged that the Bankruptcy Code permits a party to "liquidate, terminate or accelerate a swap agreement." *See* **Exhibit E**.

## AN ACTUAL CONTROVERSY EXISTS BETWEEN THE PARTIES

47.     LBSF has unilaterally and improperly refused to engage in the Derivative ADR Procedures ordered by this Court on September 17, 2009 with Friendship Village on the basis of their purported "voiding" of Friendship Village's contractually granted right to Terminate the Swap Agreements  after LBSF's commencement of these Cases, an Event of Default under the Master Agreement.

48.     Friendship Village has been, and continues to be, held hostage by the improper and unilateral refusal of LBSF to engage in the Derivative ADR Procedures ordered by this Court on September 17, 2009.

49.     A declaratory judgment by this Court that a) Friendship Village had the contractual right to terminate the Swap Agreements identified as Global 2562663 and Global 2562678; b) that such termination was properly affected by Friendship Village on August 26, 2009; and c) that the Swap Agreements identified as Global 2562663 and Global 2562678 have, therefore, been terminated, is the only remedy that will allow Friendship Village to escape the quagmire in which LBSF currently holds Plaintiff.

## FIRST CAUSE OF ACTION
### (Claim for Declaratory Relief)

50.     Friendship Village repeats and realleges the allegations set forth in Paragraphs 1 through 49 as if fully set forth herein.

51.     There is an actual, substantial and justiciable controversy between Friendship

Village and LBSF as demonstrated by LBSF's purported "voiding" of Friendship Village's termination of the Swap Agreements identified as Global 2562663 and Global 2562678 and by LBSF's improper and unilateral refusal to engage in the Derivative ADR Procedures ordered by this Court on September 17, 2009.

52.    Friendship Village and LSBF have adverse legal interests.

53.    The adverse legal interests between Friendship Village and LBSF are substantial.

54.    Friendship Village is entitled to a declaration pursuant to 28 U.S.C. § 2201, that:

a) Friendship Village had the contractual right to terminate the Swap Agreements;

b) that such termination was properly affected by Friendship Village on August 26, 2009; and

c) that the Swap Agreements have, therefore, been terminated.

55.    Such a declaration is necessary and appropriate at this time in order that Plaintiff may ascertain its rights with respect to defendants.

[Remainder of page intentionally left blank]

## PRAYER FOR RELIEF

WHEREFORE, Friendship Village demands judgment against LBSF stating as follows:

A.  For a declaration stating that Friendship Village had the contractual right to terminate the Swap Agreements identified as Global 2562663 and Global 2562678;

B.  For a declaration stating that such termination was properly affected by Friendship Village on August 26, 2009;

C.  For a declaration stating that the swap agreements identified as Global 2562663 and Global 2562678 have, therefore, been terminated; and

D.  For any such other relief as this Court deems just and proper.

Dated:  New York, New York
        February 10, 2011

GREENBERG TRAURIG, LLP

By: _/s/ _Maria J. DiConza_____
Maria J. DiConza
Gino G. Tonetti, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile:  (212) 801-6400
Email: diconzam@gtlaw.com
          tonettig@gtlaw.com

and

Joseph P. Davis III (Pro Hac Vice Pending)
John A. Sten (Pro Hac Vice Pending)
One International Place
Boston, Massachusetts 02110
Telephone: (617) 310-6000
Facsimile:  (617) 310-6001
Email: davisjo@gtlaw.com
          stenj@gtlaw.com

*Attorneys for Tempe Life Care Village, Inc.,
d/b/a, Friendship Village of Tempe*

# EXHIBIT A

**(Local Currency-Single Jurisdiction)**                                         Execution Copy

# ISDA®

### International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

#### dated as of June 20, 2006

Lehman Brothers Special Financing Inc. and Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe and severally have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.**     **Interpretation**

(a)     *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.**     **Obligations**

(a)     *General Conditions*.

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

1

respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    *Basic Representations.*

    (i)    *Status*. It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 2 -

NYK 924458-2.071370.0011

documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii) *No Violation or Conflict.*  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents.*  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding.*  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      *Absence of Certain Events.*  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.*  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.*  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.*  It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorizations.*  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws.*  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

-3-

5.        **Events of Default and Termination Events**

(a)        *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)        *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)        *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)        *Credit Support Default*.

(1)        Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)        the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)        the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)        *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)        *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)        *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

-4-

to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 5 -

NYK 924458-2.071370.0011

(b)    *Termination Events.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

    (i)    *Illegality.*  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Credit Event Upon Merger.*  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (iii)    *Additional Termination Event.*  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.*  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.    Early Termination

(a)    *Right to Terminate Following Event of Default.*  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 924458-2.071370.0011

(i)  **Notice**.  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)  **Two Affected Parties**.  If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)  **Right to Terminate**.  If:—

(1)  an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)  an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  **Effect of Designation**.

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  **Calculations**.

(i)  **Statement**.  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid.  In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  **Payment Date**.  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 7 -

designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*    If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.*    If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*    If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*    If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*    If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.*    If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.*    If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.*    If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.*    If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 8 -

sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.*    In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.*    The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a)    *Entire Agreement.*    This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.*    No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.*    Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

-9-

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**9.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**10.    Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 10 -

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.*    Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a)    *Governing Law.*    This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.*    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Waiver of Immunities.*    Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 11 -

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

      (a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii) on which that amount is payable, the Default Rate;

      (c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

      (d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* wi ll be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 924458-2.071370.0011

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 13 -

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled* Payment *Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

    (a)    the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

    (b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 14 -

NYK 924458-2.071370.0011

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate.    Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.    The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name: T. Courtney Jenkins
Title:  Vice President

TEMPE LIFE CARE VILLAGE, INC., D/B/A FRIENDSHIP VILLAGE OF TEMPE

By:_____
Name:
Title:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 924458-2.071370.0011

SCHEDULE
to the
MASTER AGREEMENT
dated as of June 20, 2006,
between
LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),
a corporation organized under
the laws of
the State of Delaware

and

TEMPE LIFE CARE VILLAGE, INC., D/B/A FRIENDSHIP VILLAGE OF TEMPE ("Party B"),
a non-profit corporation of
the State of Arizona

**Part 1.  Termination Provisions.**

In this Agreement:—

(a)     *"Specified Entity"* means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not Applicable. |
| Section 5(a)(vi) (Cross Default), | Not Applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not Applicable. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not applicable. |

NYK 924458-2.071370.0011

(b)     *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)     The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 12 of this Agreement.

*"Threshold Amount"* means, the lesser of (i) $75,000,000 or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and $1,000,000, in the case of Party B.

For purposes hereof, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). In the event of a split rating, the lower rating shall be determinative.

(e)     The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to either Party A or Party B.

(f)     *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)     *Additional Termination Event* will not apply.

Part 2. Agreement to Deliver Documents.

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | No |
| Party B | An incumbency certificate with respect | Prior to the execution of this | Yes |

- 2 -

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | to the signatory of this Agreement. | Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction, substantially in the form of Exhibit D to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certificate from the Chief Executive Officer or the Chief Financial Officer of Party B, or the equivalent of any thereof, to the effect that any requirements of Party B's charter and/or by laws have been satisfied, substantially in the form of Exhibit E to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A | Report providing an estimate of the then-current market value of the Transactions as of the relevant date set forth in the column to the right. | Monthly, within five Business Days of the end of each month or at the request from Party B; provided that the failure of Party A to deliver such document shall not result in any Event of Default or Potential Event of Default. | No |

Part 3.  **Miscellaneous.**

(a)  *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:—

  Address for notices or communications to Party A:—

  Address:  745 Seventh Avenue, 16th Floor, New York, NY 10019

    Attention:    Municipal Financial Products - Middle Office

- 3 -

Facsimile No.:  646-758-2988

Telephone No.: 212-526-2240

Address for notices or communications to Party B:—

Address:  Friendship Village of Tempe, 2645 East Southern Avenue., Tempe, AZ  85282

<u>Attention:</u>    Darrell Jensen, Executive Director

Facsimile No.:  480/831-3495

Telephone No.: 480/831-3108

With a copy to:

Address:  B.C. Ziegler and Company, 1 South Wacker Drive, Suite 3080, Chicago, Illinois 60606

<u>Attention:</u>    Scott Determan, Vice President

Facsimile No.:  312-873-4063

Telephone No.: 312-593-1528

(b)   *Calculation Agent.*  The Calculation Agent is Party A provided, however, that in the event of an Event of Default with respect to which Party A is the Defaulting Party or a Termination Event with respect to which Party A is the sole Affected Party, the Calculation Agent shall be a third party mutually agreeable by Party A and Party B.

(c)   *Credit Support Document.*  Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A.

(d)   *Credit Support Provider.*  Credit Support Provider means in relation to Party A:  Holdings.

(e)   *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f)   *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(g)   *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

Part 4.  Other Provisions.

(a)   *Agreements.*

(i)      The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party agrees with the other (or, in the case of Section 4(d), Party B agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

- 4 -

(ii)      Section 4 of this Agreement is hereby amended by adding the following subsections "(d)" thereto:—

"(d)  *Security and Source of Payment of Party B's Obligations.* The obligation of Party B to make payments to Party A under this Agreement and each Transaction is a general unsecured obligation of Party B payable from any legally available source"

Miscellaneous:

(b)    This Agreement is hereby amended by adding the following Section "13" hereto:—

"13.     **Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):-

(a)    *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)    *Status of Parties.* The other party is not acting as a fiduciary for or as an advisor to it in respect of the Transaction.

(d)    *Eligible Contract Participant.* It is an "eligible contract participant within the meaning of Section 1(a)(12) of the Commodity Exchange Act."

(c)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

"(f)    *Set-off.*

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obligated) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation.) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation.). Y will give notice to X of any set-off effected under this provision.

-5-

     (ii)     For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

     (iii)     If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained,

     (iv)     This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement."

(d)     *Transfer*. Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of a guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then effect of the obligations of the transferor.

(e)     *Notices*. For the purposes of subsections (iii) and (v) of Section 10(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent,

(f)     *Outstanding Specified Transactions*. Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)     *Waiver of Trial by Jury*. Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)     *Accuracy of Specified Information*. Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

NYK 924458-2.071370.0011

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name: T. Courtney Jenkins

Title:   Vice President

TEMPE LIFE CARE VILLAGE, INC.,
D/B/A FRIENDSHIP VILLAGE OF TEMPE

By:_____

Title:_____

- 7 -

# EXHIBIT B

# LEHMAN BROTHERS

Date:      June 20, 2006

To:        Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe
           2645 East Southern Avenue
           Tempe, AZ  85282
           Attn:        Darrell Jensen, Executive Director
           Telephone:   480/831-3108
           Fax:         480/831-3495

From:      Lehman Brothers Special Financing Inc.
           745 Seventh Avenue
           New York, NY 10019

           Transaction Management Group
           Telephone: 212-526-7139
           Telecopier: 646-885-9558

**SUBJECT:  SWAP TRANSACTION (Ref: Global 2562678)**

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Swap Transaction"), between Lehman Brothers Special Financing Inc. ("Party A") and  Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe ("Party B").  This communication constitutes a "Confirmation" as referred to in the Swap Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement dated as of June 20, 2006, as amended and supplemented from time to time, between Party A and Party B (the "Swap Agreement").  All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represents that entering into this Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence, or the terms of any agreement to which it is a party. Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Transaction and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

This Confirmation incorporates the definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern

The terms of the particular Swap Transaction to which this communication relates are as follows:

Trade Date:                              June 20, 2006

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

| | |
|---|---|
| Effective Date: | December 1, 2006 |
| Termination Date: | December 1, 2016, subject to adjustment in accordance with the Following Business Day Convention |
| Notional Amount: | $10,000,000 |

**FIXED AMOUNTS:**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payment Dates: | The first calendar day of each month, commencing on January 2, 2007 and ending on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate: | 3.889% |
| Fixed Rate Day Count Fraction: | 30/360 |

**FLOATING AMOUNTS**

| | |
|---|---|
| Floating Rate Payer | Party A |
| Floating Rate Payer Payment Dates: | The first calendar day of each month, commencing on January 2, 2007 and ending on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate Option: | The product of 67.00% *and* USD-LIBOR-BBA |
| | provided that for purposed of this Confirmation the definitions of USD-LIBOR-BBA appearing in the ISDA Definitions, is amended by replacing the words "the day that is two London Banking Days preceding" with the words "the day that is one London Banking Day preceding". |
| Designated Maturity: | One Month |
| Reset Dates: | Thursday of each week (or if such is not a Business Day, then the succeeding Business Day). |
| Method of Averaging: | Weighted Average |
| Spread: | None |
| Floating Rate Day Count Fraction: | Actual/Actual |

**Other Provisions**

| | |
|---|---|
| Optional Termination by Party B | Party B may, on any Business Day terminate this Transaction in whole or in part by providing prior |

written notice to Party A designating a day not earlier than the third (3rd) day following the day on which such notice is effective as the "Optional Termination Date". The amount due with respect to any such termination shall be determined pursuant to Section 6 of the Agreement as if (a) the Optional Termination Date is the Early Termination Date, (b) Party B is the sole Affected Party (for all purposes other than the election to terminate), (c) this Transaction is the sole Affected Transaction and (d) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Notwithstanding anything herein to the contrary, the parties will be obligated to pay any accrued amounts that would otherwise be due on the Optional Termination Date. Party B agrees that it shall not optionally terminate this Transaction unless it shall have sufficient funds to pay any Settlement Amount to Party A which may be due as provided herein

**Swap Advisory Fee**

Party A will pay $52,115.00 to Ziegler Capital Markets Group, on behalf of Party B, as a swap advisory fee for services provided by Ziegler Capital Markets Group, to Party B.

**Calculation Agent:**

Party A, or as specified in the Swap Agreement

**Business Days:**

New York

**Account details:**

Account for payment to Party A in:

JPMorgan Chase Bank ABA # 021000021, A/C of Lehman Brothers Special Financing Inc, A/C # 066-143543

Account for Payment to Party B in:

**PLEASE PROVIDE**

Global Deal ID: 2562678

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transaction by signing in the space provided below and sending a copy of the executed Confirmation by telecopier (646-885-9558) the Confirmation Group, Lehman Brothers Special Financing Inc.

Very truly yours,
**Lehman Brothers Special Financing Inc.**

By:_____
Name:  T. Courtney Jenkins
Title:    Vice President

Agreed & Accepted by:
**Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe**

By:_____
Name:
Title:

# EXHIBIT C

# LEHMAN BROTHERS

Date:      June 20, 2006

To:        Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe
           2645 East Southern Avenue
           Tempe, AZ 85282
           Attn:        Darrell Jensen, Executive Director
           Telephone:   480/831-3108
           Fax:         480/831-3495

From:      Lehman Brothers Special Financing Inc.
           745 Seventh Avenue
           New York, NY 10019

           Transaction Management Group
           Telephone: 212-526-7139
           Telecopier: 646-885-9558

**SUBJECT:   SWAP TRANSACTION (Ref: Global 2562663)**

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Swap Transaction"), between Lehman Brothers Special Financing Inc. ("Party A") and Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe ("Party B"). This communication constitutes a "Confirmation" as referred to in the Swap Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement dated as of June 20, 2006, as amended and supplemented from time to time, between Party A and Party B (the "Swap Agreement"). All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represents that entering into this Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence, or the terms of any agreement to which it is a party. Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Transaction and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

This Confirmation incorporates the definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern

The terms of the particular Swap Transaction to which this communication relates are as follows:

Trade Date:                    June 20, 2006

| | |
|---|---|
| Effective Date: | December 1, 2006 |
| Termination Date: | December 1, 2011, subject to adjustment in accordance with the Following Business Day Convention |
| Notional Amount: | $10,000,000 |

**FIXED AMOUNTS:**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payment Dates: | The first calendar day of each month, commencing on January 2, 2007 and ending on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate: | 4.077% |
| Fixed Rate Day Count Fraction: | 30/360 |

**FLOATING AMOUNTS**

| | |
|---|---|
| Floating Rate Payer | Party A |
| Floating Rate Payer Payment Dates: | The first calendar day of each month, commencing on January 2, 2007 and ending on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate Option: | USD-BMA Municipal Swap Index |
| Floating Rate Spread: | None |
| Floating Rate Day Count Fraction: | Actual/Actual |

**Other Provisions**

| | |
|---|---|
| Optional Termination by Party B | Party B may, on any Business Day terminate this Transaction in whole or in part by providing prior written notice to Party A designating a day not earlier than the third (3rd) day following the day on which such notice is effective as the "Optional Termination Date". The amount due with respect to any such termination shall be determined pursuant to Section 6 of the Agreement as if (a) the Optional Termination Date is the Early Termination Date, (b) Party B is the sole Affected Party (for all purposes other than the election to terminate), (c) this Transaction is the sole Affected Transaction and (d) Market Quotation and Second Method are selected for purposes of Payments on Early Termination. Notwithstanding anything herein to the contrary, the parties will be obligated to |

pay any accrued amounts that would otherwise be due on the Optional Termination Date. Party B agrees that it shall not optionally terminate this Transaction unless it shall have sufficient funds to pay any Settlement Amount to Party A which may be due as provided herein

**Swap Advisory Fee**                Party A will pay $30,450.00 to Ziegler Capital Markets Group, on behalf of Party B, as a swap advisory fee for services provided by Ziegler Capital Markets Group, to Party B.

**Calculation Agent:**               Party A, or as specified in the Swap Agreement

**Business Days:**                   New York

**Account details:**

  Account for payment to Party A in:    JPMorgan Chase Bank ABA # 021000021, A/C of Lehman Brothers Special Financing Inc, A/C # 066-143543

  Account for Payment to Party B in:    **PLEASE PROVIDE**

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transaction by signing in the space provided below and sending a copy of the executed Confirmation by telecopier (646-885-9558) the Confirmation Group, Lehman Brothers Special Financing Inc.

Very truly yours,
**Lehman Brothers Special Financing Inc.**

By:_____
Name:  T. Courtney Jenkins
Title:    Vice President

Agreed & Accepted by:
**Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe**

By:_____
Name:
Title:

# EXHIBIT D



August 26, 2009

From:  Tempe Life Care Village, Inc.
       d/b/a Friendship Village of Tempe
       2645 East Southern Avenue
       Tempe, AZ 85282
       Attention: Darrell Jensen, Executive Director

To:    Lehman Brothers Special Financing Inc.
       1271 Sixth Avenue, 40th Floor
       New York, NY 10020
       Attention: Locke R. McMurray

**NOTICE DESIGNATING AN EARLY TERMINATION DATE**

Ladies and Gentlemen:

Reference is made to (i) 1992 ISDA Master Agreement (Local Currency-Single Jurisdiction), dated as of June 20, 2006 (as amended, modified and supplemented and in effect from time to time, together with the Schedule thereto, dated as of June 20, 2006, (collectively, the "Master Agreement")), between Tempe Life Care Village, Inc. d/b/a Friendship Village of Tempe (the "Company") and Lehman Brothers Special Financing Inc. (the "Counterparty"); and (ii) the Confirmations, dated June 20, 2006, under the Master Agreement with Reference Numbers Global 2562663 and Global 2562678, between the Company and the Counterparty. Capitalized terms used but not otherwise defined herein shall have the respective meanings given to such terms in the Master Agreement.

It has come to our attention that Lehman Brothers Holdings Inc., the Credit Support Provider of the Counterparty, and the Counterparty have filed for voluntary bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. Such event constitutes an Event of Default under Section 5(a)(vii)(4) of the Master Agreement. Accordingly, pursuant to Section 6(a) of the Master Agreement, by this notice we hereby designate August 27, 2009 as the Early Termination Date in respect of all outstanding Transactions under the Master Agreement.

The consequence of the occurrence of an Early Termination Date is that:

(a)    no further payments or deliveries under Section 2(a)(i) or 2(d) of the Master Agreement in respect of all Transactions will be required to be made; and

(b)    the amount, if any, payable in respect of the Early Termination Date shall be determined pursuant to Section 6(e) of the Master Agreement.

2645 East Southern Avenue ▪ Tempe, Arizona 85282
. (480) 831-5000 ▪ (800) 824-1112 ▪ www.friendshipvillageaz.com

In accordance with Section 6(d)(i) of the Master Agreement, attached as Exhibit A is our Statement of Determination of Early Settlement Amount.

Sincerely,

Tempe Life Care Village, Inc.
d/b/a Friendship Village of Tempe

By: _____
Name: Darrell Jensen
Title:   Executive            Director

2

# EXHIBIT E

# LEHMAN BROTHERS

August 27, 2009

**Via UPS and Fax**

Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe
2645 East Southern Avenue
Tempe, AZ 85282
Attn: Darrell Jensen
Facsimile No.: 480-831-3495

Greenberg Traurig, LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Attn: Andrew P. Schmutz
Facsimile No.: 215-717-5234

With a copy to:
B.C. Ziegler and Company
1 South Wacker Drive, Suite 3080
Chicago, Illinois 60606
Attn: Scott Determan
Facsimile No.: 312-873-4063

Ladies and Gentlemen:

I am the head of the Derivatives Legal function for Lehman Brothers Holdings Inc. and its affiliate Lehman Brothers Special Financing Inc. ("Lehman"). Lehman has commenced a case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

Reference is hereby made to that certain ISDA Master Agreement dated as of June 20, 2006 between Lehman and Tempe Life Care Village, Inc., d/b/a Friendship Village of Tempe ("Counterparty") (such agreement, as amended, supplemented or otherwise modified from time to time, and together with any Schedule and Credit Support Annex thereto and Transactions thereunder, the "Agreement"). Terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

Lehman is in receipt of your correspondence (the "Termination Notice") purporting to declare an Event of Default and Early Termination Date under the Agreement. The Termination Notice violates the Bankruptcy Code and is accordingly voidable at the election of Lehman. The Bankruptcy Code prohibits the enforcement of ipso facto clauses, such as clauses in executory contracts like the Agreement that permit the termination of such contracts solely based on the filing of bankruptcy cases. *See* 11 USC 365(e)(1). Although the Bankruptcy Code permits a party under certain circumstances to "liquidate, terminate, or accelerate a swap agreement," (11 U.S.C. 560), this authorization is available only for terminations effected solely as a result of the insolvency, financial condition or bankruptcy of the debtor (*see, e.g. In Re Enron Corp.*, 306

B.R. 465 (Bkrtcy.S.D.N.Y. 2004)).   Given the amount of time that has passed since the commencement of the Chapter 11 Case, it is clear that Counterparty has not relied upon Lehman's insolvency, financial condition or bankruptcy to liquidate, terminate or accelerate the Agreement, but has done so on the basis of some other reason. Consequently, Lehman reserves the right to dispute the validity of the Termination Notice.

Reference is hereby also made to the calculation (the "Settlement Calculation") you provided under Section 6(d)(i) of the Agreement stating that an amount is due to Lehman as a result of the termination of the Transaction(s) under the Agreement.  Please be advised that Lehman's internal processes require it to apply considerable diligence to such calculations and accordingly that Lehman is unable at this time to verify or agree the Settlement Calculation.  Accordingly, Lehman's receipt of the Settlement Calculation shall not be deemed to represent Lehman's agreement to the calculations set forth therein.

Notwithstanding, Lehman hereby demands payment of any amounts ("Lehman Receivables") you claim are owing to Lehman without prejudice to Lehman's right to verify or dispute the accuracy of those amounts and the right to dispute the validity of the Termination Notice and to treat any putative payment to Lehman under Section 6(d)(i) of the Agreement as a pre-payment of Counterparty's on-going obligations to Lehman as if no Early Termination Date had been declared.  Settlement instructions are enclosed herewith.

This letter is sent without prejudice or limitation to any rights or remedies Lehman may have under any agreement(s) or other document(s) related to the Agreement or the Transaction(s) or applicable law and Lehman hereby reserves all rights and remedies under such agreement(s), document(s) and applicable law.  Nothing herein shall be construed as an admission of any fact, including without limitation the validity of the termination of the Transaction(s), or the establishment of any position by or on behalf of Lehman.

Further correspondence on this matter may be directed to:

Lehman Brothers
1271 Sixth Avenue, 40th Floor
New York, New York 10020
Attn: Locke R. McMurray
Tel. 212-526-7186
locke.mcmurray@lehman.com

Very truly yours,

Locke R. McMurray

# LEHMAN BROTHERS

ON BEHALF OF LEHMAN BROTHERS HOLDINGS INC.

January 14, 2009

**To: Counterparties to Lehman Brothers Special Financing Inc**

**Re: LBSF Standard Settlement Instructions – IMMEDIATE ACTION REQUIRED**

Effective immediately, please ensure the beneficiary wire information for settlement transactions with Lehman Brothers Special Financing Inc. are directed to the settlement accounts listed on the following pages. Your prompt attention and implementation is greatly appreciated.

**Please make sure to follow these specific directions when remitting funds. Failure to comply with these instructions may cause your remittance to be returned by the bank.**

Include your entity's name and trade identifier, if available, in the Reference field.

For all FX transfers other than CAD, EUR, GBP and JPY, instruct "For further credit to: Lehman Brothers Special Financing a/c 152308786598" in the routing instructions (in addition to listing your entity's name and trade identifier in the Reference field).

To the extent any funds are transferred to a Lehman entity in satisfaction of an amount that has been calculated by a counterparty, kindly be advised that unless otherwise specifically agreed Lehman is not able at this time to verify such calculations and must reserve its right to request further funds if its calculations later show a greater amount due, and also reserves any other rights that it may have under applicable law.

If you have any questions, please contact Yuliya Martiak at Yuliya.Martiak@lehman.com or Helen Chu at Helen.Chu@lehman.com.

By: _____

David Coles

Chief Financial Officer, Treasurer and Controller:

Lehman Brothers Special Financing, Inc.

# LEHMAN BROTHERS

## ON BEHALF OF LEHMAN BROTHERS HOLDINGS INC.

**AED (UAE Dirhams)**
Pay    National Bank of Abu Dhabi, Abu Dhabi
       Swift NBADAEAAVOS

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 250009440
       Attn STL FX
       For further credit to: Lehman Brothers Special Financing a/c 162308786598
       Reference: [Include your counterparty name and applicable trade identifier]

**AUD (Australian Dollar)**
Pay    National Australia Bank Limited, Melbourne
       Swift NATAAU33033

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 1803005789500
       Attn STL FX
       For further credit to: Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

**CAD (Canadian Dollar)**
Pay    Citibank N.A., London (direct via MT103)
       Swift CITIGB2L

For    Lehman Brothers Special Financing - DIP
       a/c 001-2136333
       Reference: [Include your counterparty name and applicable trade identifier]

Send   Separate cover message (MT202) via your correspondent bank to Citibank Canada, Toronto
       (CITICATT)

**CHF (Swiss Franc)**
Pay    UBS AG, Zurich
       Swift UBSWCHZH80A

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 0230000078890050000N
       Attn STL FX
       For further credit to: Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

**CZK (Czech Koruna)**
Pay    BAWAG Bank CZ AS, Prague
       Swift BAWACZPP

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 4049215502CZK
       Attn STL FX
       For further credit to: Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

LEHMAN BROTHERS
1271 AVENUE OF THE AMERICAS, 46TH FLOOR, NEW YORK, NY  10019 TEL 212 526-3770

# LEHMAN BROTHERS

### ON BEHALF OF LEHMAN BROTHERS HOLDINGS INC.

**DKK (Danish Kroner)**
Pay     Danske Bank, Copenhagen
        Swift DABADKKK

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 39963007504713
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

**EUR (Euro)**
Pay     Citibank N.A., London (without deduction via direct clearing linkage)
        Swift CITIGB2L

For     Lehman Brothers Special Financing Inc - DIP
        a/c 001-2136325
        Reference: [Include your counterparty name and applicable trade identifier]

**GBP (British Pound)**
Pay     Citibank N.A., London (without deduction via direct clearing linkage)
        Swift CITIGB2L
        Sort Code 18-50-08

For     Lehman Brothers Special Financing Inc - DIP
        a/c 001-2136358
        Reference: [Include your counterparty name and applicable trade identifier]

**HKD (Hong Kong Dollar)**
Pay     Hang Seng Bank Limited, Hong Kong
        Swift HASEHKHH

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 250012507001
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

**HUF (Hungary Forint)**
Pay     Magyar Kulkereskedelmi Bank RT, Budapest
        Swift MKKBHUHB

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 10300002-2052049000003285
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

# LEHMAN BROTHERS

## ON BEHALF OF LEHMAN BROTHERS HOLDINGS INC.

**ILS (Israeli Shekel)**
Pay      Bank Hapoalim B.M., Tel Aviv
         Swift POALILIT

For      US Bank, Minneapolis, MN
         Swift USBKUS44FEX
         a/c 517375
         Attn STL FX
         For further credit to:  Lehman Brothers Special Financing a/c 152308786598
         Reference: [Include your counterparty name and applicable trade identifier]

**INR (Indian Rupees)**
Pay      Bank of Nova Scotia, Bombay
         Swift NOSCINBB

For      US Bank, Minneapolis, MN
         Swift USBKUS44FEX
         a/c 012/12/921180
         Attn STL FX
         For further credit to:  Lehman Brothers Special Financing a/c 152308786598
         Reference: [Include your counterparty name and applicable trade identifier]

**JPY (Japanese Yen)**
Pay      Citibank N.A., London (direct via MT103)
         Swift CITIGB2L

For      Lehman Brothers Special Financing Inc - DIP
         a/c 001-2136341
         Reference: [Include your counterparty name and applicable trade identifier]

Send     Separate cover message (MT202) via your correspondent bank to Citibank N.A., Tokyo
         (CITIJPJT). Favour acct number a/c 0201109418.

**KRW (Korean Won)**
Pay      Standard Chartered Bank, Seoul
         Swift SCBLKRSE

For      US Bank, Minneapolis, MN
         Swift USBKUS44FEX
         a/c 5038967254
         Attn STL FX
         For further credit to:  Lehman Brothers Special Financing a/c 152308786598
         Reference: [Include your counterparty name and applicable trade identifier]

**MXN (Mexican Peso)**
Pay      Banamex, Mexico City
         Swift CITIUS33MER

For      US Bank, Minneapolis, MN
         Swift USBKUS44FEX
         a/c 00028075053
         Attn STL FX
         For further credit to:  Lehman Brothers Special Financing a/c 152308786598
         Reference: [Include your counterparty name and applicable trade identifier]

LEHMAN BROTHERS
1371 AVENUE OF THE AMERICAS, 46TH FLOOR, NEW YORK, NY  10019 TEL 212 526-3778

# LEHMAN BROTHERS

ON BEHALF OF LEHMAN BROTHERS HOLDINGS INC.

**NOK (Norwegian Kroner)**
Pay     Den Norske Bank ASA, Oslo
        Swift DNBANOKK

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 7001-02-42965
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

**NZD (New Zealand Dollar)**
Pay     Bank of New Zealand, Wellington
        Swift BKNZNZ22965

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 2435190001
        Attn STL FX
        For further credit to: .Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

**PLN (Polish Zloty)**
Pay     Bank Pekao SA, Warsaw
        Swift PKOPPLPW

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 1458601112
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

**SAR (Saudi Riyals)**
Pay     National Commercial Bank, Jeddah
        Swift NCBKSAJE

For     US Bank, Minneapolis, MN  .
        Swift USBKUS44FEX
        a/c 55531159000108
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

**SEK (Swedish Kroner)**
Pay     Skandinaviska Enskildabanken, Stockholm
        Swift ESSESESS

For     US Bank, Minneapolis, MN
        Swift USBKUS44FEX
        a/c 52018513680
        Attn STL FX
        For further credit to:  Lehman Brothers Special Financing a/c 152308786598
        Reference: [Include your counterparty name and applicable trade identifier]

LEHMAN BROTHERS
1271 AVENUE OF THE AMERICAS, 45TH FLOOR, NEW YORK, NY  10019 TEL 212 526-3779

# LEHMAN BROTHERS

## ON BEHALF OF LEHMAN BROTHERS HOLDINGS INC.

**SGD (Singapore Dollar)**
Pay    United Overseas Bank, Singapore
       Swift UOVBSGSG

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 101-399-071-4
       Attn STL FX
       For further credit to:  Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

**THB (Thailand Baht)**
Pay    Standard Chartered Bank, Bangkok
       Swift SCBLTHBX

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 100201482
       Attn STL FX
       For further credit to:  Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

**TRY (Turkish Lira)**
Pay    Garanti Bank, Istanbul
       Swift TGBATRIS093

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 930-6499679
       Attn STL FX
       For further credit to:  Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

**USD (US Dollar)**
Pay    Citibank N.A., New York
       Swift CITIUS33
       ABA 021-000-089

For    Lehman Brothers Special Financing Inc. - DIP
       a/c 3078-4731
       Reference: [Include your counterparty name and applicable trade identifier]

**ZAR (South African Rand)**
Pay    Nedbank, Johannesburg
       Swift NEDSZAJJ

For    US Bank, Minneapolis, MN
       Swift USBKUS44FEX
       a/c 1966250784
       Attn STL FX
       For further credit to:  Lehman Brothers Special Financing a/c 152308786598
       Reference: [Include your counterparty name and applicable trade identifier]

LEHMAN BROTHERS
1271 AVENUE OF THE AMERICAS, 45TH FLOOR, NEW YORK, NY 10019 TEL 212 526-3778