**Hearing Date: March 3, 2011 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: February 14, 2011 at 4:00 p.m. (prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Lorenzo Marinuzzi
Karen Ostad
Stacy L. Molison

*Attorneys for Chinatrust Commercial Bank*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LEHMAN BROTHERS HOLDINGS, INC., *et. al* | ) | Case No. 08-13555 (JMP) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### RESPONSE TO THE DEBTORS' EIGHTY-FOURTH
### OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)

Chinatrust Commercial Bank ("Chinatrust"), by and through its undersigned counsel, hereby submits this response (the "Response") in opposition to the *Debtors' Eighty-Fourth Omnibus Objection to Claims (Valued Derivative Claims)* [Docket No. 13955], dated January 14, 2011 (the "Objection"). In support of its Response, Chinatrust respectfully submits as follows:

### PRELIMINARY STATEMENT

1. The Debtors do not meet their burden for defeating the *prima facie* validity of Chinatrust's derivative-based proof of claim (the "Derivative Claim"). As explained in greater detail below, Chinatrust timely and properly filed the Derivative Claim against Lehman Brothers

Special Financing, Inc. ("LBSF"), asserting that LBSF owed Chinatrust $2,552,145.30, plus interest, legal fees, other fees, costs, expenses and premiums.

2.      According to well-settled case law, a duly executed proof of claim is *prima facie* evidence of the validity and amount of such claim.  The burden of proving a claim's validity and amount only shifts back to the claimant when the objecting party submits evidence that is equal in force to the claimant's original proof of claim.

3.      The Debtors assert that the Derivative Claim should be reduced by more than $1 million, from $2,552,145.30 to $1,490,857.97, but the Debtors fail to present any specific evidence rebutting Chinatrust's calculation of the Derivative Claim.  In particular, the Debtors do not indicate the manner in which they calculated the Derivative Claim beyond the vague statement that their "multi-step process" produced a different amount.  Simply asserting that the Derivative Claim amount does not match their books and records does not adequately refute Chinatrust's properly filed claim.

4.      Therefore, because the Debtors fail to carry their burden of proof, Chinatrust respectfully requests that the Objection be denied and that the Derivatives Claim be allowed in the amount of $2,552,145.30.

## BACKGROUND

5.      On November 1, 1996, Chinatrust and LBSF entered into a certain ISDA Master Agreement, including the Schedule thereto and all Confirmations of Transactions thereunder (collectively, the "Master Agreement," as amended, supplemented or modified from time to time).[1]  A copy of the Master Agreement is attached hereto as Exhibit A.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Master Agreement.

6.      Pursuant to the terms of the Master Agreement, Chinatrust entered into certain swap transactions with LBSF, and Lehman Brothers Holdings Inc. ("LBHI") issued a guarantee in favor of Chinatrust that unconditionally guaranteed the payment of all amounts owed by LBSF under the Master Agreement.

7.      On September 15, 2008 (the "LBHI Petition Date"), LBHI and certain of its affiliates (collectively, the "Debtors") filed for chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York (the "Court"), thereby triggering an event of default under the Master Agreement and resulting in an automatic termination of the Master Agreement in accordance with its terms.[2]

8.      On September 18, 2008, Chinatrust served LBSF with a notice (such notice, including amendments thereto, the "Valuation Notice") that: (i) confirmed that an Early Termination Date had occurred as of the LBHI Petition Date; and (ii) provided LBSF, pursuant to section 6(d)(i) of the Master Agreement, with Chinatrust's calculations of the amount owed under section 6(e) of the Master Agreement.  The Valuation Notice indicated that payment in the amount of $2,552,145.30, plus interest, was due and owing by LBSF to Chinatrust.  A copy of the Valuation Notice is attached hereto as Exhibit B.

9.      On October 3, 2008, LBSF filed for chapter 11 relief in the Court.

10.     On September 15, 2009, Chinatrust timely filed the Derivative Claim against LBSF, as the primary obligor, in the sum of $2,552,145.30, plus interest, Chinatrust's legal fees,

---

[2] Pursuant to section 6(a) of the Master Agreement, the bankruptcy of a "Credit Support Provider" (as defined therein) is a default that gives rise to an Early Termination Date.  *See* Master Agreement at § 6(a).  LBHI, as guarantor, was a Credit Support Provider under the Master Agreement.  As a result, an Early Termination Date occurred on the LBHI Petition Date, and all transactions subject to the Master Agreement were automatically terminated as of that date.

other fees, costs, expenses and premium, as provided for under the Master Agreement.[3] [Claim
No. 12872]. In addition, as Exhibit 2 to the Derivative Claim, Chinatrust provided evidence of
its calculation of the sums due and owing by LBSF to Chinatrust. *See* Derivative Claim at Ex. 2.
Moreover, on October 19, 2009, Chinatrust timely filed Derivative and Guarantee Questionnaires
with respect to the Derivative Claim as it relates to both LBSF and LBHI, in accordance with the
Debtors' procedures for filing proofs of claim.

## RESPONSE

11.      The Objection should be denied with respect to the Derivative Claim filed by
Chinatrust because (i) a validly filed proof of claim is *prima facie* evidence of such claim's
validity, (ii) the Debtors have not carried their burden of disproving the amount of the Derivative
Claim, and (iii) Chinatrust's methodology, discussed below, is the true and correct method to be
used in calculating the Derivative Claim.

**A.      A Filed Proof of Claim Is *Prima Facie* Evidence of the Claim's Validity**

12.      In the Second Circuit and elsewhere, it is a well-settled rule of law that a proof of
claim duly executed and filed constitutes *prima facie* evidence of the validity and amount of the
claim. *See* Fed. R. Bankr. P. 3001(f). "To overcome this prima facie evidence, the objecting
party must come forth with evidence which, if believed, would refute at least one of the
allegations essential to the claim." *Sherman v. Novack (In re Reilly)*, 245 B.R. 768, 773 (B.A.P.
2d Cir. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000) (*citing In re Allegheny Int'l, Inc.*, 954 F.2d 167
(3d Cir. 1992)); *see also Riverbank, Inc. v. Make Meat Corp. (In re Make Meat Corp.)*, No. 98
CIV. 4990 (HB), 1999 WL 178788, at *3 (S.D.N.Y. Mar. 31, 1999) ("Once the claimant has
established its prima facie case, the burden of going forward then shifts to the debtor to produce

---

[3] On September 15, 2009, Chinatrust also filed a proof of claim in the same amount against LBHI, as guarantor, for
monies due and owing under the Master Agreement. [Claim No. 12870]. However, the Objection does not appear
to address Chinatrust's claim against LBHI.

evidence sufficient to negate the prima facie validity of the filed claim."); *In re Michalek*, No. CIV-90-1212S 1991, WL 222063, at *3 (W.D.N.Y. Oct. 22, 1991) ("The party objecting to the claim has the burden of going forward with substantial evidence to rebut the prima facie validity of the claim."); *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 354-55 (Bankr. S.D.N.Y. 1995) (overruling debtor's objection to secured lender's claim for prepetition attorneys' fees because debtor had not offered evidence to support the contention that such fees were unreasonable and also overruling debtor's objection to the same creditor's claim for default interest, finding that "when two sophisticated parties enter into a contract calling for an established rate on default, this court will not disturb the agreement absent persuasive evidence of overreaching").

13.     Chinatrust duly executed and timely filed the Derivative Claim.  Thus, the Derivative Claim is *prima facie* evidence of the validity of the claim and the amount owed by LBSF to Chinatrust.

**B.     The Debtors Have Not Sufficiently Rebutted the *Prima Facie* Validity of the Derivative Claim**

14.     The burden of proving the validity and amount of a proof of claim "shifts to the claimant if the objector produces 'evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'"  *In re Oneida*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (*citing Allegheny*, 954 F.2d at 173-174); *see also In re Reilly*, 245 B.R. at 773.

15.     In the Objection, the Debtors do not state with any specificity the manner in which they recalculated the Derivative Claim to arrive at a sum that is more than $1 million less than the amount asserted by Chinatrust.

16.     Instead, the Debtors rely on general and unsubstantiated assertions that they conducted their own multistep process of collecting and reviewing documents, reconciling posted collateral and cash payments, and reviewing Chinatrust's valuation methodology, after which they arrived at an allegedly "fair, accurate and reasonable value" of the claims that are subject to the Objection, including the Derivative Claim filed by Chinatrust.  Yet, the Debtors do not explain sufficiently their own valuation methodology.

17.     The Debtors, in a footnote, refer to the Mandelblatt Declaration[4] "[f]or a more comprehensive discussion of the valuation process."  *See* Objection at ¶ 14, fn. 2.  However, the Mandelblatt Declaration merely provides a general, high-level summary of the steps that the Debtors take in valuing claims.  *See* Mandelblatt Declaration at ¶¶ 18-34.

18.     Notably, neither the Objection nor the Mandelblatt Declaration provides any evidence that Chinatrust or the Court can use to discern the Debtors' method for calculating the Derivative Claim, nor is it specific enough to constitute evidence that would refute or be "equal in force" to the detailed calculation provided by Chinatrust in the Derivative Claim.  By contrast, the Derivative Claim contains a detailed, page-long calculation of the amount asserted by Chinatrust, including over fifty (50) lines of fees, maturity dates, settlement amounts, and amounts payable upon early termination by LBHI.  *See* Derivative Claim at Ex. 2.

19.     Consequently, the Debtors' arguments disputing the amount asserted by Chinatrust in the Derivative Claim are insufficient and do not provide a legal basis to rebut the *prima facie* validity of the Derivative Claim and the amount asserted against LBSF thereunder.

---

[4] The "<u>Mandelblatt Declaration</u>" refers to the *Declaration of Gary H. Mandelblatt in Support of Debtors' Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form.*  [Docket No. 4113, Ex. C].

Accordingly, Chinatrust respectfully asserts that the Debtors have failed to carry their burden of proof sufficient to rebut the presumption of the Derivative Claim's validity.

**C.      The Derivative Claim Was Properly Calculated in Accordance with the Terms of the Master Agreement**

20.      Section 6(d)(i) of the Master Agreement provides that: "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculation on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement . . . showing, in reasonable detail, such calculations . . . ." Master Agreement at § 6(d)(i).

21.      Pursuant to section 6(e) of the Master Agreement and part 1(f) of the Schedule to the Master Agreement, Chinatrust and LBSF agreed that the "Second Method and Market Quotation" methodology applies for the purpose of calculating the amount due after an Early Termination Date. *See id.* at § 6(e), sched. 1 pt. 1(f).

22.      Under the Market Quotation methodology, the Non-defaulting Party must seek at least four (4) quotations from Reference Market-makers for the "amount, if any, that would be paid to [the Non-defaulting Party] . . . or by [the Non-defaulting Party] . . . in consideration of an agreement between [the Non-defaulting Party] . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for [the Non-defaulting Party] the economic equivalent of any payment or delivery . . . in respect of such Terminated Transaction or group of Terminated Transaction that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." *Id.* at § 14.

23.      However, if the Non-defaulting Party obtains fewer than three (3) quotations for certain of the Terminated Transactions, then the Master Agreement provides that the Market

Quotation cannot be calculated for those transactions. *See id.* As a result, the Settlement Amount must then be determined in accordance with the "Loss" methodology, which provides that the Non-defaulting Party must calculate the amount that it "reasonably determines in good faith to be its total losses and costs" in connection with the Terminated Transactions. *See id.*

24.     Chinatrust has complied with the requirements set forth in Section 6(e) of the Master Agreement. Chinatrust sought quotations from four (4) Reference Market-makers with respect to each of the terminated transactions, and, when feasible, determined the Settlement Amount through Market Quotation. However, where Chinatrust did not receive at least three (3) quotations, Chinatrust employed the Loss methodology in accordance with the terms of the Master Agreement.

25.     Furthermore, section 6(e) of the Master Agreement provides that the Non-defaulting Party, not the Defaulting Party, is to determine the amount owing upon early termination under both the Market Quotation and Loss methodologies. *See id.* at § 6(e)(i)(3), (4). Here, the Non-Defaulting Party was Chinatrust, not LBSF. Chinatrust reasonably calculated an early termination payment and timely sent LBSF the Valuation Notice indicating the amount due. LBSF, as the Defaulting Party, is not entitled to calculate the amount to be paid upon termination of the Master Agreement. Therefore, the Debtors' modified claim amount does not constitute a valid determination of the Derivative Claim pursuant to the Master Agreement. Consequently, the Objection should be denied and the Derivative Claim should be allowed in the amount of $2,552,145.30, plus interest and fees.

## CONCLUSION

26.     Chinatrust submits that the Derivative Claim was properly calculated and timely filed, and therefore constitutes *prima facie* evidence of the accuracy and validity of the amount

asserted under the Derivative Claim.  The Objection fails to present any evidence that refutes the

calculations provided by Chinatrust in the Derivative Claim or specifically explains the Debtors'

methodology or formula for calculating the modified amount of the Derivative Claim.  Finally,

the valuation put forth by Chinatrust in the Derivative Claim is in accordance with the

methodology set forth in the Master Agreement, and should be accepted by the Court as the true

and correct calculation of the Derivative Claim.

WHEREFORE, Chinatrust respectfully requests that the Court (i) deny the Objection as it

pertains to the Derivative Claim filed by Chinatrust, (ii) allow the Derivative Claim in the

amount of $2,552,145.30, plus interest and fees, and (iii) grant any other relief that is just and

proper.

Dated: February 14, 2011
     New York, New York

                                     Respectfully submitted,

                                     */s/ Lorenzo Marinuzzi*
                                     MORRISON & FOERSTER LLP
                                     Lorenzo Marinuzzi
                                     Karen Ostad
                                     Stacy L. Molison
                                     1290 Avenue of the Americas
                                     New York, New York 10104
                                     Telephone: (212) 468-8000
                                     Facsimile: (212) 468-7900

                                     *Attorneys for Chinatrust Commercial Bank*

## Exhibit A

**Master Agreement**

(Multicurrency—Cross Border)

# ISDA®

International Swaps & Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of ...November 1, 1996

LEHMAN BROTHERS SPECIAL          CHINATRUST COMMERCIAL BANK
FINANCING INC., ..................... and ..................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      Interpretation

(a)      *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      Obligations

(a)      *General Conditions*.

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swaps & Derivatives Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2                                ISDA® 1992

(ii)   *Liability*. If:—

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.     Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations*.

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3                                    ISDA® 1992

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)  any other documents specified in the Schedule or any Confirmation; and

(iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.   Events of Default and Termination Events

(a)   *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)   *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)   *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)   *Credit Support Default.*

(1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)   *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)   *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)   *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                                ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                              ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                                            ISDA® 1992

9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

      (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

      (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

12

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                    ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

16                                                                ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
FINANCING INC.
.....................................
(Name of Party)

By: ...........................................
Name:
Title:     **Bruce M. Witherell**
Date:     **Managing Director**

CHINATRUST COMMERCIAL BANK

.....................................
(Name of Party)

By: ....James Shen...................
Name: James Shen (Jiam Ji Shen)
Title: Executive Vice President
Date: 2 26, 1997

18                                            ISDA® 1992

(Multicurrency—Cross Border)

**SCHEDULE**
**to the**
**Master Agreement**

dated as of November 1, 1996

between

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),
a corporation organized under the laws of the State of Delaware

and

CHINATRUST COMMERCIAL BANK ("Party B"),
a bank organized under the laws of the Republic of China (Taiwan)

Part 1.    **Termination Provisions.**

(a)    *"Specified Entity"* means in relation to Party A for the purpose of:—

Section 5(a)(v),            Not applicable.

Section 5(a)(vi),           Not applicable.

Section 5(a)(vii),          Not applicable.

Section 5(b)(iv),           Not applicable.

and in relation to Party B for the purpose of:—

Section 5(a)(v),            Not applicable.

Section 5(a)(vi),           Not applicable.

Section 5(a)(vii),          Not applicable.

Section 5(b)(iv),           Not applicable.

(b)    *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here, none.

(c)    The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14.

*"Threshold Amount"* means, with respect to Party A and its Credit Support Provider, the lesser of (i) USD 40 million and (ii) two percent (2%) of the Stockholders' Equity of its Credit Support Provider each (or its equivalent in any other currency), and, with respect to Party B and its Specified Entity, the lesser of (i) USD 40 million and (ii) two percent (2%) of the Stockholders' Equity of Party B (or its equivalent in any other currency).

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and Party B.

(e)    The *"Automatic Early Termination"* provisions of Section 6(a) will apply to each of Party A and Party B.

(f)    *Payments on Early Termination.*    For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

19

(g)  *"Termination Currency"* means United States Dollars ("USD").

(h)  *Additional Termination Events* will apply.  The following shall constitute an Additional Termination Event:—

Holdings or Party A, on the one hand (in which case Party A shall be the Affected Party), or Party B, on the other hand (in which case Party B shall be the Affected Party), has one or more outstanding issues of rated senior debt and it fails to have at least one of such issues with a rating of at least (i) Baa3 or higher as determined by Moody's Investors Service Inc., (ii) BBB- or higher as determined by Standard & Poor's Corporation, or (iii) an equivalent investment grade rating determined by a recognized rating service acceptable to both parties.

**Part 2.  Tax Representations.**

(a)  *Payer Representations.*  For the purpose of Section 3(e) of this Agreement, Party A will make the following representation and Party B will make the following representation:—

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) and 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)  *Payee Representations.*  For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware, and Party B represents that it is a bank duly organized and validly existing under the laws of the Republic of China (Taiwan).

**Part 3.  Agreement to Deliver Documents.**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a)  Tax forms, documents or certificates to be delivered are:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |
| Party B | Form W-8 (one original). | (A) The earlier of (i) the first Scheduled Payment Date, or (ii) promptly upon reasonable demand by Party A; and (B) thereafter prior to the first Scheduled Payment Date in each successive third calendar year during which any Transaction between Party A and such Office of Party B is in effect. |

(b)     Other documents to be delivered are:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit C to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the board of directors or loan committee of Party A, certified by a secretary, or an assistant secretary of Party A, pursuant to which Party A is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A copy of the annual report of its Credit Support Provider containing audited financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party A to Party B) and, with respect to each Transaction not covered by a previously-furnished Authorizing Resolution, within five (5) Business Days of the Trade Date. | Yes |
| Party B | A certified copy of Party B's Company License. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of Party B's Banking License. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of Party B's Business License. | Upon execution of this Agreement. | Yes |

21

| | | | |
|---|---|---|---|
| Party B | A copy of the Articles of Incorporation of Party B. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of Party B's authorized signature book; provided, however, that in the event that such signature book is not available or does not authorize a Transaction, if any, entered into hereunder, Party B shall provide to Party A (i) evidence of authorization of each trade signed by (A) the chairman of Party B or (B) the President together with one Class A senior officer of Party B; and (ii) minutes of the meeting in which the board of Party B authorized Party B to enter into each Transaction hereunder, along with chop certificates issued by the Ministry of Economic Affairs with respect to (A) the registered corporate chop and (B) the chop of Party B's chairman. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the operational rules duly adopted by the board of Party B in compliance with the Guidelines for Banks' Trading of Derivatives promulgated by the Republic of China's Ministry of Finance on April 25, 1995. | Upon execution of this Agreement. | Yes |
| Party B | A copy of the annual report of the party (or any Credit Support Provider) containing audited financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon execution of this Agreement. | Yes |
| Party B | A copy of a letter from a process agent in New York acknowledging and confirming such agent's appointment as Party B's Process Agent. | Upon execution of this Agreement. | Yes |

22

| Party B | An opinion of counsel to Party B substantially in the form of Exhibit D to this Schedule. | Upon execution of this Agreement. | Yes |

Part 4.    **Miscellaneous.**

(a)    *Addresses for Notices.* For the purpose of Section 12(a) of this Agreement:—

Address for notices or communications to Party A:—

Address:    Derivative Products Department
3 World Financial Center, 7th Floor
New York, NY 10285-0700
USA

Attention:    Operations Manager

Telephone No.:    (212) 526-8575

Facsimile No.:    (212) 528-6927

For all purposes.


Address for notices or communications to Party B:—

Address:    No.3 Sung-Shou Rd.
Taipei, Taiwan
R.O.C.

Attention:    ~~Investment Banking Group~~ Treasury Department

Telephone No.:    8862-722-2002

Facsimile No.:    8862-722-1874

For all purposes.

(b)    *Process Agent.* For the purpose of Section 13(c) of this Agreement:—

Party A appoints as its Process Agent:    Not applicable.

Party B appoints as its Process Agent:    China Trust Bank of New York
Wall Street Plaza, 88 Pine St.
New York, NY 10005
Attention: C.F.O.

(c)    *Offices.* The provisions of Section 10(a) will apply to this Agreement.

(d)    *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:—

Party A is not a Multibranch Party.

Party B is a Multibranch Party and may act through the following Offices:-

Taipei Head Office and Offshore Banking Branch

(e)    *Calculation Agent.* The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    *Credit Support Document.* Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B of this Schedule.

In the case of Party B, the Credit Support Annex attached hereto as part of this Schedule.

(g)    *Credit Support Provider.*

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc. ("Holdings").

Credit Support Provider means in relation to Party B:    Not applicable.

(h)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the substantive laws of the State of New York (without reference to choice of law doctrine).

(i)    *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement.

Part 5.    **Other Provisions.**

(a)    *Country of Domicile.*  The country of domicile of Party A is the United States of America.  The country of domicile of Party B is the Republic of China.

(b)    *Confirmation.*  A form of Confirmation is set forth as Exhibit A hereto.

(c)    *"Form W-8"* shall mean United States Internal Revenue Service Form W-8 or any successor form(s).

(d)    *"Stockholders' Equity"* means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) its treasury stock, each to be determined in accordance with generally accepted accounting principles.

(e)    *Transfer.*  Section 7 of the Agreement is hereby modified by inserting the following after the word "party" but before the comma in the third line thereof:

", provided, however, that such consent shall not be unreasonably withheld"

(f)    *Trial By Jury.*  Each party irrevocably waives, to the extent permitted by applicable law, any and all right to trial by jury in any legal proceeding in connection with this Agreement or any Transaction.

(g)    *Accuracy of Specified Information.*  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person".

(h)    *Definitions.*  This Agreement, each Confirmation, and each Transaction are subject to the 1991 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. ("ISDA") as amended, supplemented, updated, restated and superseded from time to time (the "Definitions"), and will be governed in all respects by the Definitions (except that references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions").  The Definitions as so modified, are incorporated by reference in, and made part of, this Agreement and each Confirmation as if set forth in full in this Agreement and such Confirmations.  In the event of any inconsistency between the Definitions and any other definitions, as published by ISDA, incorporated into a Confirmation, the definitions incorporated into such Confirmation will prevail for the purpose of the relevant Transaction.  Subject to Section 1(b), in the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail.  Also, subject to Section 1(b), in the event of any inconsistency between the provisions of any Confirmation and this Agreement, or the Definitions, such Confirmation will prevail for the purpose of the relevant Transaction.

(i)    *Representations.* Section 3 of the Agreement is hereby modified by inserting the following as Section 3(g) and (h):

"(g)    *Non-Reliance; Not an Advisor.* In connection with this Agreement, any Credit Support Document to which it is a party and each Transaction hereunder:

    (i)    it is not relying upon any advice (whether written or oral) of the other party to this Agreement, other than the representations expressly set forth in this Agreement and in any Confirmation;

    (ii)    it has made and will make its own decisions regarding the entering into of any Transaction under this Agreement based upon its own judgment and upon advice from such professional advisors as it has deemed necessary to consult;

    (iii)    it understands the terms, conditions and risks of each Transaction and is willing to assume (financially and otherwise) those risks;

    (iv)    it is acting solely in the capacity of an arm's length contractual counterparty with respect to this Agreement and any Transaction hereunder;

    (v)    it is not acting as a financial advisor or fiduciary of the other party (or in any similar capacity) with respect to this Agreement and any Transaction hereunder; and

    (vi)    any advice given by the other party under or in connection with this Agreement or any Transaction is and will be merely incidental to the provision of the other party's services hereunder and does not and will not serve as a primary basis of any investment decision by the party."

(j)    For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

(k)    *Credit Support Event.* The Additional Termination Event specified in Part 1(h)(i) of this Schedule shall constitute a Credit Support Event (the "Credit Support Event") and whether or not such event results in an Early Termination Date, Party B upon the occurrence of one or more such events shall be required to deliver collateral to Party A as security for its obligations under this Agreement and any Transaction in accordance with the terms of the Credit Support Annex.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:     **Bruce M. Witherell**
Title:     **Managing Director**

CHINATRUST COMMERCIAL BANK

By:     James Sheu (Jeann Ji Sheu)
Title:     Executive Vice President

25

Date:        [    ]

To:        Attn: Investment Banking Group
        Chinatrust Commercial Bank
        No.3 Sung-Shou Rd.
        Taipei, Taiwan
        R.O.C.

        Telephone:
        Telecopier:

From:        Lehman Brothers Special Financing Inc.
        3 World Financial Center, New York, NY 10285
        Transaction Management - Confirmations

        Telephone: 212-526-8811
        Telecopier: 212-528-7144

**SUBJECT:  SWAP TRANSACTION (Ref:    )**

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Swap Transaction"), between Lehman Brothers Special Financing Inc. ("Party A") and Chinatrust Commercial Bank ("Party B"). This communication constitutes a "Confirmation" as referred to in the Swap Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of November 1, 1996, as amended and supplemented from time to time between Lehman Brothers Special Financing Inc. and Chinatrust Commercial Bank (the "Swap Agreement"). All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represents that entering into the Swap Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (i) it is not relying on the other party in connection with its decision to enter into this Swap Transaction; and neither party is acting as an advisor to or fiduciary of the other party in connection with this Swap Transaction regardless of whether the other party provides it with market information or its views; (ii) it understands the risks of the Swap Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Swap Transaction is appropriate for such party in light of its financial capabilities and objectives.

This Confirmation incorporates the definitions and provisions contained in the 1991 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

The terms of the particular Swap Transaction to which this communication relates are as follows:

Trade Date:

Effective Date:

Termination Date:                    [    ], subject to adjustment in accordance with the Modi-
                        fied Following Business Day Convention.

| | |
|---|---|
| Notional Amount: | [    ] |

**Fixed Amounts –**

| | |
|---|---|
| Fixed Rate Payer: | Party A/Party B |
| Fixed Rate Payer Payment Dates: | [    ] and [    ], from and including [        ] to but excluding the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | [    ]% |
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed) |

**Floating Amounts –**

| | |
|---|---|
| Floating Rate Payer: | Party A/Party B |
| Floating Rate Payer Payment Dates: | [    ] and [    ], from and including [        ] to but excluding the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | [    ] |
| Designated Maturity: | [    ] |
| Floating Rate Spread: | [None/Plus/Minus  %] |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |
| **Business Days:** | [    ] and [    ] |
| **Calculation Agent:** | Party A |
| **Other Provisions:** | |
| **Credit Support Document:** | With respect to Party A the Guarantee of Lehman Brothers Holdings Inc. provided by Party A. |
| **Branches:** | Party A is not a Multibranch Party. |
| | Party B is not a Multibranch Party. |
| **Governing Law:** | New York, without reference to choice of law doctrine |
| **Account for Payment to Party A in [    ]:** | |
| **Account for Payment to Party B in [    ]:** | |

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transaction by signing in the space provided below and sending a copy of the executed Confirmation by telecopier (212-528-7144) to Transaction Management - Confirmations, Lehman Brothers Special Financing Inc.

Very truly yours,
Lehman Brothers Special Financing Inc.

By:_____
Name:
Title:

Agreed & Accepted by:
Chinatrust Commercial Bank

By:_____
Name:
Title:

A-3

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and CHINATRUST COMMERCIAL BANK ("Party B") have entered into a Master Agreement dated as of November 1, 1996 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)      Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)      Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)      Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)      Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)      Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)      Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with Section 12 of the Agreement and will be effective if delivered to Lehman Brothers Holdings Inc., at 3 World Financial Center, 28th Floor, New York, NY 10285, USA  (Facsimile No. (212) 526-1467) with a copy to Lehman Brothers Special Financing Inc., Attention: Operations Manager at 3 World Financial Center, 7th Floor, New York, NY 10285-0700, USA (Facsimile No. (212) 528-6927).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Title: _____

B-2

EXHIBIT C to Schedule
Form of Opinion of Counsel for
Party A and its Credit Support Provider

[Date]

Chinatrust Commercial Bank
Attention:

Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of November 1, 1996 between Party A and Chinatrust Commercial Bank ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement. The Master Agreement is to be supplemented by confirmations of transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, I have examined or had examined on my behalf an executed copy of the Master Agreement and the form of Confirmation attached as Exhibit A to the Schedule thereto and the Guarantee, and certificates of public officials and officers of Party A and Guarantor and such other documents as I have deemed necessary or appropriate for the purposes of this opinion. In such opinion, I have assumed the genuineness of all the signatures, the authenticity of all documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as certified, conformed or photostatic copies. I have also assumed that each Confirmation will be in substantially the form of Exhibit A to the Schedule to the Master Agreement.

Based upon the foregoing, I am of the opinion that:

1.      Each of Party A and Guarantor is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

2.      The execution, delivery and performance of the Master Agreement and each Confirmation, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not, or, in the case of Party A with respect to each Confirmation, will not, conflict with any provision of its articles of incorporation or by-laws.

3.      The Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes, and in the case of Party A with respect to each Confirmation, upon due execution and delivery by Party A, will constitute, a legally valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

4.      To the best of my knowledge no consent, authorization, license or approval of or registration or declaration with, any United States of America federal or New York governmental authority is required in connection with the execution, delivery and performance of the Master Agreement and each Confirmation, in the case of Party A, and the Guarantee, in the case of Guarantor.

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the General Corporation Law of the State of Delaware.

Very truly yours,

C-1

EXHIBIT D to Schedule
[Form of Opinion of Counsel for Party B]

[Date]

Lehman Brothers Special Financing Inc.
3 World Financial Center
New York, NY 10285, USA

Lehman Brothers Holdings Inc.
3 World Financial Center
New York, NY 10285, USA

Gentlemen:

We have acted as counsel to Chinatrust Commercial Bank, a bank organized under the laws of the Republic of China ("Party B") in connection with the execution and delivery of the Master Agreement (the "Master Agreement") dated as of November 1, 1996 between Lehman Brothers Special Financing Inc. ("Party A") and Party B. The Master Agreement is to be supplemented by confirmations of Transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, we have examined an executed copy of the Master Agreement and the form of Confirmation attached as Exhibit A to the Schedule thereto and such corporate documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies. We have also assumed that each Confirmation will be in substantially the form of Exhibit A to the Schedule to the Master Agreement.

Based upon the foregoing, we are of the opinion that:

1.    Party B is a bank duly organized, validly existing and in good standing under the laws of the Republic of China.

2.    The execution, delivery and performance of the Master Agreement and each Confirmation by Party B are within Party B's banking power, have been duly authorized by all necessary banking action and do not, or, in the case of each Confirmation, will not, conflict with any provisions of Party B's articles of incorporation or by-laws.

3.    The Master Agreement has been duly executed and delivered by Party B and constitutes, and each Confirmation, upon due execution and delivery by Party B, will constitute, a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

4.    To the best of our knowledge, no consent, authorization, license (including exchange control licenses) or approval of, or registration or declaration with, any United States of America federal, New York or Chinese governmental authority is required in connection with the execution, delivery and performance of the Master Agreement and each Confirmation by Party B.

5.    The choice of law provision in the Master Agreement is valid and binding under the laws of the Republic of China or any political subdivision thereof and would be given effect by the courts of the Republic of China or any political subdivision thereof. The provision incorporated by reference in the Master Agreement whereby Party B irrevocably submits to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the County of New York (the "New York Courts") is valid and binding on Party B under the laws of the Republic of China and any political subdivision thereof and

if any final judgment of the New York Courts is rendered against Party B with respect to the Master Agreement, such judgment would be recognized and enforced by the courts of the Republic of China and any political subdivision thereof without reexamination or relitigation on the merits of the subject matter thereof.

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the laws of the Republic of China.

Very truly yours,

Execution Copy

## AMENDMENT AGREEMENT

AMENDMENT AGREEMENT (the "Amendment") dated as of 21st May 2008 between **LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **CHINATRUST COMMERCIAL BANK** ("Party B").

### WITNESSETH

WHEREAS, Party A and Party B have entered into the ISDA Master Agreement dated as of 1st November, 1996, as amended, updated, modified or supplemented from time to time (the "Master Agreement") and

WHEREAS, Party A and Party B wish to amend the Master Agreement and to have the Master Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Party A and Party B hereby acknowledge and agree as follows:

1. <u>Certain Definitions.</u> Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement.

2. <u>Amendments.</u>

(a) The Schedule to the Master Agreement is hereby amended by adding the following Part 7 at the end thereto:

### "Part 7: Additional Terms for Commodity Transactions

(a) **Definitions.** This Agreement and each Transaction are subject to the 2006 ISDA Definitions (the "2006 Definitions"), and the 2005 ISDA Commodity Definitions (the "2005 Definitions"), (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions, but without regard to any further amendments, supplements, updates or restatements made to the Definitions unless otherwise agreed to in a Confirmation (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are incorporated herein by reference in and made a part of, this Agreement as if set forth in full herein. In the event of any inconsistency between the 2006 Definitions and the 2005 Definitions, the 2005 Definitions will prevail.

(b) **Rounding.** Section 9 of the 2005 Definitions is deleted in its entirety and the following is substituted therefore:

"**Section 9.** For purposes of preparing any calculations referred to in the 2005 Definitions, unless otherwise agreed and specified in a Confirmation, rounding conventions shall be as follows:

| | |
|---|---|
| Commodity Pricing in MWh: | rounded to four (4) decimals; |
| Commodity Pricing in MMBtus: | rounded to four (4) decimals; |
| Commodity Pricing in Gal: | rounded to four (4) decimals; |
| Commodity Pricing in BBL: | rounded to three (3) decimals; |
| Commodity Pricing in NGL: | rounded to five (5) decimals; |
| Commodity Pricing in MT: | rounded to three (3) decimals; |
| All Dollar Amounts: | rounded to the nearest cent." |

3. Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4.    Each of the parties hereby represents and warrants that:

(a)  the representation and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)  the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.    This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.    This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the day and year first above written.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | CHINATRUST COMMERCIAL BANK |
|---|---|
| *Party A* | *Party B* |

Name:     Locke R. McMurray
          Managing Director

Title:

Date:

Name:

Title:

Date:

Name : Larry Hsu

Title : Managing Director,
         Investment Banking Group

Date :

Name : Jack T.K. Cheng

Title : Managing Director,
         Corporate Credit Risk Management Group

Date :

2

## AMENDMENT AGREEMENT

AMENDMENT AGREEMENT (the "Amendment") dated as of August 10, 2005 between **LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **CHINATRUST COMMERCIAL BANK** ("Party B").

### WITNESSETH

WHEREAS, Party A and Party B have entered into an ISDA Master Agreement dated as of November 1, 1996 (the "Master Agreement") and

WHEREAS, Party A and Party B wish to amend the Master Agreement and to have the Master Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Party A and Party B hereby acknowledge and agree as follows:

1.    <u>Certain Definitions.</u>  Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement.

2.    <u>Amendments.</u>

(a)    Part 1(h) of the Schedule to the Master Agreement is hereby deleted in its entirety and replaced with the following:

(h)    **Additional Termination Events** will apply.  Each of the following shall constitute an Additional Termination Event:

(i)    **Ratings Decline.**  Holdings, in the case of Party A, (1) fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's"); or (2) fails to maintain a long-term senior unsecured debt rating of at least BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. ("S&P"); or (3) ceases to be rated by either Moody's or S&P.  For clarification, in the event Moody's assigns a rating to Holdings that is below the rating specified in (1) above or S&P assigns a rating to Holdings that is below the rating specified in (2) above, such rating shall be determinative.  For the purpose of the foregoing Termination Event, Party A shall be the Affected Party.

(ii)    **Ratings Decline.**  Party B (1) fails to maintain a foreign currency issuer credit rating of at least BBB- as determined by S&P; or (2) fails to maintain a long-term senior unsecured debt rating of at least BBB- as determined by S&P on any day following the assignment of a long-term senior unsecured debt rating to Party B by S&P; or (3) fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's; or (4) fails to maintain an issuer rating of at least Baa3 as determined by Moody's on any day following the assignment of an issuer rating to Party B by Moody's; or (5) ceases to be rated by either Moody's or S&P.  For clarification, in the event S&P assigns a rating to Party B that is below the rating specified in either (1) or (2) above or Moody's assigns a rating to Party B that is below the rating specified in either (3) or (4) above, then such rating shall be determinative.  For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(b)    Part 4(a) of the Schedule to the Master Agreement in respect of Party A is hereby deleted in its entirety and replaced with the following:

(a)    **Addresses for Notices.**  For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A:**

Address:         Lehman Brothers Special Financing Inc.
                 c/o Lehman Brothers Inc.
                 Transaction Management Group
                 Corporate Advisory Division
                 745 Seventh Avenue
                 New York, NY 10019

Attention:       Documentation Manager
Telephone No.:   (212) 526-7187
Facsimile No.:   (212) 526-7672

For all purposes.

(c)    Part 4(k) of the Schedule to the Master Agreement is hereby deleted in its entirety.

(d)    The Schedule to the Master Agreement is hereby amended by adding the following Part 6 at the end thereto:

### Part 6: Additional Terms for FX Transactions and Currency Options

(a)    **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

   (i)    <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

   (ii)    <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

   Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

   **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)    **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein. Unless either party objects to the terms contained in any such Confirmation within three (3) Local Business Days of receipt thereof, the terms of such Confirmation shall be deemed correct and accepted in the absence of manifest error, unless a corrected Confirmation is sent by a party within such three day periods, in which case the party receiving such corrected Confirmation shall have two (2) Local Business Days after receipt thereof to object to the terms contained in such corrected Confirmation.

2

(c)    **Netting and Related Provisions.**  Section 2(c) shall not apply to FX Transactions or Currency Option Transactions.  In lieu thereof, the following shall apply:

    (i)    <u>Netting, Discharge and Termination of FX Transactions</u>.  The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount.  Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

    (ii)    <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>.  The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies.**  In the event of any conflict between:

    (i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

    (ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

    (iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.**  Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

(e)    The Master Agreement is hereby amended, as of the date hereof, by incorporating therein the 1994 ISDA Credit Support Annex as a Credit Support Document with respect to Party A and Party B, a copy of which is attached hereto as Annex 1 (the "CSA").  Party A and Party B acknowledge that the CSA shall supplement and form a part of the Master Agreement as if set forth in full therein so that the Master Agreement and the CSA shall constitute a single agreement between Party A and Party B.  Party A and Party B further acknowledge that the CSA supercedes and replaces the 1994 ISDA Credit Support Annex dated as of November 1, 1996 between Party A and Party B.

3

3.    Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4.    Each of the parties hereby represents and warrants that:

(a)    the representation and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)    the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.    This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.    This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

4

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the day and year first above written.

| **LEHMAN BROTHERS**<br>**SPECIAL FINANCING INC.** | **CHINATRUST COMMERCIAL BANK** |
|---|---|
| *Party A* | *Party B* |

By: _Scott E. Willoughby_

Name: Scott Willoughby

Title: Senior Vice President

Date: 12/19/05

By: _____

Name: Larry Hsu

Title: Executive Vice President

Date:

By: _____

Name: Jack T.K. Cheng

Title: Executive Vice President

Date:

## Exhibit B

**Valuation Notice**


中 國 信 託
**Chinatrust**

September 29, 2008

Lehman Brothers Special Financing Inc.

c/o Lehman Brothers Inc.

Transaction Management Group

Corporate Advisory Division

745 Seventh Avenue

New York, NY 10019, USA

Attention: Documentation Manager

Telephone No.: (212)526-7187

Facsimile No.: (212)526-7672

ISDA Master Agreement – Calculation of Payment on Early Termination

Dear Sirs,

Reference is made to the ISDA Master Agreement between Lehman Brother Special Financing Inc. ("LB") and Chinatrust Commercial Bank ("CTCB") dated November 1, 1996 and the amendment(s) thereto (the "Agreement") and the Transactions thereunder.    Capitalized terms used herein not otherwise defined shall have the meaning as defined in the Agreement.

As LB also had entered into certain spot forex transactions with CTCB (identified on Exhibit 1 hereto) which were not included in the calculation provided in our prior Notice pursuant to Section 6 of the Agreement sent to you on September 18, 2008, we are providing you with this further Notice with revised calculations that take account of these spot forex transactions. Exhibit 2 here sets forth the revised calculation of payment under Section 6(d). Please be advised that the amount of the payment calculated as of the Early Termination Date in respect of the Terminated Transactions is USD2,552,145.30, which amount is due to CTCB.

The payment in the amount of USD2,552,145.30 (together with interest at the rate of USD-Prime-H.15 plus 1% from (including ) the Early Termination Date to (but excluding) the date such amount is paid and calculated on the basis of daily compounding and the actual number of days elapsed) is immediately due and payable by you and shall be made by wired to our account as follows:

中國信託商業銀行  Chinatrust Commercial Bank

台北市110信義區松壽路3號  No.3, Sung Shou Rd., Taipei 110, Taiwan, R.O.C.

Tel: 886-2-2722-2002

中 國 信 託
**Chinatrust**

A/C BANK OF NEW YORK,NEW YORK( ▉▉▉▉▉▉▉▉▉▉ )

F/O CHINATRUST COMMERCIAL BANK,TAIPEI ( ▉▉▉▉

▉▉▉▉▉▉▉▉ )

▉▉▉▉▉▉▉▉▉▉

USD- Prime-H 15 means that the rate set forth in H.15(519) as defined in the 2006 ISDA Definition for each day opposite the caption "Bank prime loan".   If such rate is not yet published, the rate for the first preceding day for which such rate is set forth in H.15 (519) opposite the caption "Bank prime loan".

This notice shall not constitute a waiver of any rights, defenses or remedies of CTCB or its affiliates under the Agreement or any other agreements between such parties, at law or otherwise, and CTCB expressly reserves all such rights, remedies and defenses, including without limitation, any rights of set off of CTCB or its affiliates and any of their respective rights, remedies and defenses arising upon any other default by LB or any of its affiliates.

Yours truly,

Larry Hsu
Managing Director
Investment Banking Group
Chinatrust Commercial Bank

Aaron King
Compliance Officer

中國信託商業銀行  Chinatrust Commercial Bank
台北市110信義區松壽路3號  No.3, Sung Shou Rd., Taipei 110, Taiwan, R.O.C.
Tel: 886-2-2722-2002

中國信託 Chinatrust            **Chinatrust Commercial Bank**                 Exhibit 1

*Trade Reference ID*   *Maturity Date*

| Sequence No. | Trn Key | Trn Entity | Maturity DT | LM Ctpy | Settlement Amount | | Unpaid Amount owing to CTCB | Unpaid Amount owing to LB | Payment on Early Termination by LB (Second Method and Market Quotation) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (A) 1 Market Quotation | (A) 2 Loss | (B) | (C) | (A)+(B)-(C) |
| 1 | MX4287753 | CTCB HK | 9/16/2008 | LEH SPE | 160,619.30 | na | 0.00 | 0.00 | 160,619.30 |
| 2 | MX4291673 | CTCB HK | 9/16/2008 | LEH SPE | 1,614.74 | na | 0.00 | 0.00 | 1,614.74 |
| 3 | MX4291805 | CTCB HK | 9/16/2008 | LEH SPE | 7,123.86 | na | 0.00 | 0.00 | 7,123.86 |
| 4 | MX4291820 | CTCB HK | 9/16/2008 | LEH SPE | 0.00 | na | 0.00 | 0.00 | 0.00 |
| 5 | MX4293414 | CTCB HK | 9/16/2008 | LEH SPE | -21,000.00 | na | 0.00 | 0.00 | -21,000.00 |
| | | | | | 148,357.90 | 0.00 | 0.00 | 0.00 | 148,357.90 |

△ *Trade Data*    △ *Trade Type*

 中國信託 Chinatrust

**Chinatrust Commercial Bank**   Exhibit 2

| Sequence No. | Trn Key | Trn Entity | Maturity DT | LM Ctpy | Settlement Amount | | Unpaid Amount owing to CTCB | Unpaid Amount owing to LB | Payment on Early Termination by LB (Second Method and Market Quotation) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (A) 1 Market Quotation | (A) 2 Loss | (B) | (C) | (A)+(B)-(C) |
| 1 | MX4049019 | CTCB HK | 01/05/2009 | LEH SPE | 123,879.81 | na | 0.00 | 0.00 | 124,029.81 |
| 2 | MX3428935 | CTCB HK | 01/09/2009 | LEH SPE | 220,797.10 | na | 0.00 | 0.00 | 221,097.10 |
| 3 | MX3464358 | CTCB HK | 01/20/2009 | LEH SPE | 149,619.90 | na | 0.00 | 0.00 | 149,769.90 |
| 4 | MX3498263 | CTCB HK | 01/23/2009 | LEH SPE | -154,325.80 | na | 0.00 | 0.00 | -154,175.80 |
| 5 | MX4077563 | CTCB HK | 07/14/2009 | LEH SPE | 480,953.10 | na | 0.00 | 0.00 | 481,253.10 |
| 6 | MX3059239 | CTCB HK | 09/24/2008 | LEH SPE | -214,746.36 | na | 0.00 | 0.00 | -214,596.36 |
| 7 | MX4237185 | CTCB HK | 09/30/2008 | LEH SPE | 101,521.27 | na | 0.00 | 0.00 | 101,596.27 |
| 8 | MX4238888 | CTCB HK | 09/30/2008 | LEH SPE | -99,751.40 | na | 0.00 | 0.00 | -99,676.40 |
| 9 | MX4258688 | CTCB HK | 10/06/2008 | LEH SPE | 55,883.27 | na | 0.00 | 0.00 | 55,958.27 |
| 10 | MX3749765 | CTCB HK | 10/10/2008 | LEH SPE | 242,374.20 | na | 0.00 | 0.00 | 242,584.20 |
| 11 | MX4152617 | CTCB HK | 11/05/2008 | LEH SPE | -463,236.44 | na | 0.00 | 0.00 | -463,086.44 |
| 12 | MX3428742 | CTCB HK | 11/10/2008 | LEH SPE | 88,169.09 | na | 0.00 | 0.00 | 88,409.09 |
| 13 | MX3592920 | CTCB HK | 11/28/2008 | LEH SPE | 147,693.20 | na | 0.00 | 0.00 | 147,843.20 |
| 14 | MX4007373 | CTCB HK | 12/23/2008 | LEH SPE | 719,626.89 | na | 0.00 | 0.00 | 719,776.89 |
| 15 | MX3566047 | CTCB HK | 12/24/2008 | LEH SPE | 515,927.02 | na | 0.00 | 0.00 | 516,527.02 |
| 16 | MX4287753 | CTCB HK | 9/16/2008 | LEH SPE | 160,619.30 | na | 0.00 | 0.00 | 160,619.30 |
| 17 | MX4291673 | CTCB HK | 9/16/2008 | LEH SPE | 1,614.74 | na | 0.00 | 0.00 | 1,614.74 |
| 18 | MX4291805 | CTCB HK | 9/16/2008 | LEH SPE | 7,123.86 | na | 0.00 | 0.00 | 7,123.86 |
| 19 | MX4291820 | CTCB HK | 9/16/2008 | LEH SPE | 0.00 | na | 0.00 | 0.00 | 0.00 |
| 20 | MX4293414 | CTCB HK | 9/16/2008 | LEH SPE | -21,000.00 | na | 0.00 | 0.00 | -21,000.00 |
| 21 | XMLH080061/FXO080131 | CTCB HK | 11/19/2008 | LEH SPE | na | 33,000.00 | 0.00 | 0.00 | 33,000.00 |
| 22 | XMLH080062/FXO080133 | CTCB HK | 11/19/2008 | LEH SPE | | | | | |
| 23 | XMLH080063/FXO080135 | CTCB HK | 11/19/2008 | LEH SPE | na | 48,500.00 | 0.00 | 0.00 | 48,500.00 |
| 24 | XMLH080064/FXO080137 | CTCB HK | 11/19/2008 | LEH SPE | | | | | |
| 25 | MX4262384 | CTCB TPE | 10/06/2008 | LEH SPE | na | 28,918.45 | 0.00 | 0.00 | 28,918.45 |
| 26 | XMLCDS080001 | CTCB TPE | 03/20/2013 | LEH SPE | na | 276,258.02 | 0.00 | 0.00 | 276,258.02 |
| 27 | XMLCDS080002 | CTCB TPE | 03/20/2013 | LEH SPE | na | 262,028.59 | 0.00 | 0.00 | 262,028.59 |
| 28 | XMLCDS080024 | CTCB TPE | 03/20/2013 | LEH SPE | na | 23,369.99 | 0.00 | 0.00 | 23,369.99 |
| 29 | XMLCDS080028 | CTCB TPE | 03/20/2013 | LEH SPE | na | -17,632.51 | 0.00 | 0.00 | -17,632.51 |
| 30 | XMLCDS070005 | CTCB TPE | 06/20/2012 | LEH SPE | na | 157,806.80 | 0.00 | 0.00 | 157,806.80 |
| 31 | XMLCDS080037 | CTCB TPE | 06/20/2013 | LEH SPE | -646,029.58 | na | 0.00 | 0.00 | -646,029.58 |
| 32 | XMLCDS070014 | CTCB TPE | 09/20/2012 | LEH SPE | na | 464,224.21 | 0.00 | 0.00 | 464,224.21 |
| 33 | XMLCDS070015 | CTCB TPE | 09/20/2012 | LEH SPE | na | -136,178.42 | 0.00 | 0.00 | -136,178.42 |
| 34 | XMLCDS070016 | CTCB TPE | 09/20/2012 | LEH SPE | na | -1,236,145.24 | 0.00 | 0.00 | -1,236,145.24 |
| 35 | XMLCDS070023 | CTCB TPE | 09/20/2012 | LEH SPE | na | 433,354.41 | 0.00 | 0.00 | 433,354.41 |
| 36 | XMLCDS070026 | CTCB TPE | 09/20/2012 | LEH SPE | 343,052.08 | na | 0.00 | 0.00 | 343,052.08 |
| 37 | XMLCDS070028 | CTCB TPE | 09/20/2012 | LEH SPE | -215,809.51 | na | 0.00 | 0.00 | -215,809.51 |
| 38 | XMLCDS070029 | CTCB TPE | 09/20/2012 | LEH SPE | na | -211,031.90 | 0.00 | 0.00 | -211,031.90 |
| 39 | XMLCDS070030 | CTCB TPE | 09/20/2012 | LEH SPE | na | -409,168.11 | 0.00 | 0.00 | -409,168.11 |
| 40 | XMLCDS070032 | CTCB TPE | 09/20/2012 | LEH SPE | na | -201,934.31 | 0.00 | 0.00 | -201,934.31 |
| 41 | XMLCDS070039 | CTCB TPE | 09/20/2012 | LEH SPE | na | 211,208.30 | 0.00 | 0.00 | 211,208.30 |
| 42 | XMLCDS070040 | CTCB TPE | 09/20/2013 | LEH SPE | na | 179,632.54 | 0.00 | 0.00 | 179,632.54 |
| 43 | XMLCDS080075 | CTCB TPE | 09/20/2013 | LEH SPE | na | -468,540.60 | 0.00 | 0.00 | -468,540.60 |
| 44 | XMLCDS080076 | CTCB TPE | 09/20/2013 | LEH SPE | na | -109,689.44 | 0.00 | 0.00 | -109,689.44 |
| 45 | XMLCDS070012 | CTCB TPE | 10/29/2008 | LEH SPE | na | 20,444.44 | 0.00 | 0.00 | 20,444.44 |
| 46 | XMLCDS070047 | CTCB TPE | 12/20/2012 | LEH SPE | na | 269,684.81 | 0.00 | 0.00 | 269,684.81 |
| 47 | XMLCDS070052 | CTCB TPE | 12/20/2012 | LEH SPE | na | -120,327.11 | 0.00 | 0.00 | -120,327.11 |
| 48 | XMLCDS070057 | CTCB TPE | 12/20/2012 | LEH SPE | na | 211,777.27 | 0.00 | 0.00 | 211,777.27 |
| 49 | XMLCDS070063 | CTCB TPE | 12/20/2012 | LEH SPE | na | 749,113.86 | 0.00 | 0.00 | 749,113.86 |
| 50 | MX630612 | CTCB TPE | 01/20/2010 | LEH SPE | na | 2,024,535.32 | 0.00 | 0.00 | 2,024,535.32 |
| 51 | XMLIRS05058 | CTCB TPE | 01/27/2015 | LEH SPE | na | 300,385.00 | 0.00 | 0.00 | 300,385.00 |
| 52 | MX2491761 | CTCB TPE | 03/18/2019 | LEH SPE | na | 4,159,593.78 | 0.00 | 0.00 | 4,159,593.78 |
| 53 | MX2462420 | CTCB TPE | 09/17/2018 | LEH SPE | na | -6,302,279.57 | 0.00 | 0.00 | -6,302,279.57 |
| 54 | XMLFXO200801110202 | CTCB TPE | 09/22/2008 | LEH SPE | na | 148,371.00 | 0.00 | 0.00 | 148,371.00 |
| 55 | XMLFXO200802010001 | CTCB TPE | 09/22/2008 | LEH SPB | na | 196,350.00 | 0.00 | 0.00 | 196,350.00 |
| 56 | XMLFXO200802010002 | CTCB TPE | 09/22/2008 | LEH SPE | na | 19,635.00 | 0.00 | 0.00 | 19,635.00 |
| | | | | | 1,543,955.73 | 1,005,264.57 | 0.00 | 0.00 | 2,552,145.30 |

/ |

September 18, 2008

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019, USA

Attention: Documentation Manager
Telephone No.: (212)526-7187
Facsimile No.: (212)526-7672

ISDA Master Agreement – Calculation of Payment on Early Termination

Dear Sirs,

Reference is made to the ISDA Master Agreement between Lehman Brother Special
Financing Inc. ("LB") and Chinatrust Commercial Bank ("CTCB") dated November 1,
1996 and the amendment(s) thereto (the "Agreement") and the Transactions
thereunder.    Capitalized terms used herein not otherwise defined shall have the
meaning as defined in the Agreement.

The purpose of this letter is to notify you of the following,

  (1) the Event of Default has occurred as a result of Bankruptcy of Lehman Brother
      Holdings Inc., ("LBHI") (acting as the Credit Support Provider of Lehman
      Brother Special Financing Inc.) on September 15,2008 in accordance with Section
      5(a)(vii)(4) of the Agreement and an Early Termination Date of September 15,
      2008 has automatically occurred in respect of the all Transactions outstanding
      under the Agreement;
  (2) the Calculation of payments in the amount of US$2,403,787.40 on Early
      Termination in respect of the Terminated Transactions in accordance with Section
      6(d) is set forth in the Attachment 1;
  (3) this Notice is effective on the date hereof; and
  (4) the payment in the amount of US$2,403,787.40 (together with interest at the rate
      of USD-Prime-H.15 plus 1% from (including ) the Early Termination Date to (but
      excluding) the date such amount is paid and calculated on the basis of daily

1

中 國 信 託
Chinatrust

compounding and the actual number of days elapsed) is immediately due and payable by you and shall be made by wired to our account as follows:



A/C BANK OF NEW YORK,NEW YORK( ███████████████ )
F/O CHINATRUST COMMERCIAL BANK,TAIPEI ( ███████
███████████ )
███████████

USD- Prime-H 15 means that the rate set forth in H.15(519) as defined in the 2006 ISDA Definition for each day opposite the caption "Bank prime loan".   If such rate is not yet published, the rate for the first preceding day for which such rate is set forth in H.15 (519) opposite the caption "Bank prime loan".

This notice shall not constitute a waiver of any rights, defenses or remedies of CTCB or its affiliates under the Agreement or any other agreements between such parties, at law or otherwise, and CTCB expressly reserves all such rights, remedies and defenses, including without limitation, any rights of set off of CTCB or its affiliates and any of their respective rights, remedies and defenses arising upon any other default by LB or any of its affiliates.

Yours truly,


Larry Hsu                                Aaron King
Manager Director                         Compliance Officer
Investment Banking Group
Chinatrust Commercial Bank

中 國 信 託
Chinatrust



中國信託 **Chinatrust Commercial Bank**                Attachment 1
Chinatrust

| Seq No. | Trn Key | Trn Entity | Maturity DT | LM Ctpy | Settlement Amount (A) 1 Market Quotation | (A) 2 Loss | Unpaid Amount owing to CTCB (B) | Unpaid Amount owing to LB (C) | Payment on Early Termination by LB (Second Method and Market Quotation) (A)+(B)-(C) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | MX4049019 | CTCB HK | 01/05/2009 | LEH SPE | 124,030 | | 0 | 0 | 124,030 |
| 2 | MX3428935 | CTCB HK | 01/09/2009 | LEH SPE | 221,097 | | 0 | 0 | 221,097 |
| 3 | MX3464358 | CTCB HK | 01/20/2009 | LEH SPE | 149,770 | | 0 | 0 | 149,770 |
| 4 | MX3498263 | CTCB HK | 01/23/2009 | LEH SPE | -154,176 | | 0 | 0 | -154,176 |
| 5 | MX4077563 | CTCB HK | 07/14/2009 | LEH SPE | 481,253 | | 0 | 0 | 481,253 |
| 6 | MX3059239 | CTCB HK | 09/24/2008 | LEH SPE | -214,596 | | 0 | 0 | -214,596 |
| 7 | MX4237185 | CTCB HK | 09/30/2008 | LEH SPE | 101,596 | | 0 | 0 | 101,596 |
| 8 | MX4238888 | CTCB HK | 09/30/2008 | LEH SPE | -99,676 | | 0 | 0 | -99,676 |
| 9 | MX4258688 | CTCB HK | 10/06/2008 | LEH SPE | 55,958 | | 0 | 0 | 55,958 |
| 10 | MX3749765 | CTCB HK | 10/10/2008 | LEH SPE | 242,584 | | 0 | 0 | 242,584 |
| 11 | MX4152617 | CTCB HK | 11/05/2008 | LEH SPE | -463,086 | | 0 | 0 | -463,086 |
| 12 | MX3428742 | CTCB HK | 11/10/2008 | LEH SPE | 88,409 | | 0 | 0 | 88,409 |
| 13 | MX3592920 | CTCB HK | 11/28/2008 | LEH SPE | 147,843 | | 0 | 0 | 147,843 |
| 14 | MX4007373 | CTCB HK | 12/23/2008 | LEH SPE | 719,777 | | 0 | 0 | 719,777 |
| 15 | MX3566047 | CTCB HK | 12/24/2008 | LEH SPE | 516,527 | | 0 | 0 | 516,527 |
| 16 | XMLH080061/FXO08013 | CTCB HK | 11/19/2008 | LEH SPE | | 33,000.00 | 0 | 0 | 33,000.00 |
| 17 | XMLH080062/FXO08013 | CTCB HK | 11/19/2008 | LEH SPE | | | | | |
| 18 | XMLH080063/FXO08013 | CTCB HK | 11/19/2008 | LEH SPE | | 48,500.00 | 0 | 0 | 48,500.00 |
| 19 | XMLH080064/FXO08013 | CTCB HK | 11/19/2008 | LEH SPE | | | | | |
| 20 | MX4262384 | CTCB TPE | 10/06/2008 | LEH SPE | | 28,918.45 | 0 | 0 | 28,918.45 |
| 21 | XMLCDS080001 | CTCB TPE | 03/20/2013 | LEH SPE | | 276,258.02 | 0 | 0 | 276,258.02 |
| 22 | XMLCDS080002 | CTCB TPE | 03/20/2013 | LEH SPE | | 262,028.59 | 0 | 0 | 262,028.59 |
| 23 | XMLCDS080024 | CTCB TPE | 03/20/2013 | LEH SPE | | 23,369.99 | 0 | 0 | 23,369.99 |
| 24 | XMLCDS080028 | CTCB TPE | 03/20/2013 | LEH SPE | | -17,632.51 | 0 | 0 | -17,632.51 |
| 25 | XMLCDS070005 | CTCB TPE | 06/20/2013 | LEH SPE | | 157,806.80 | 0 | 0 | 157,806.80 |
| 26 | XMLCDS080037 | CTCB TPE | 06/20/2013 | LEH SPE | -646,029.58 | | 0 | 0 | -646,029.58 |
| 27 | XMLCDS070014 | CTCB TPE | 09/20/2012 | LEH SPE | | 464,224.21 | 0 | 0 | 464,224.21 |
| 28 | XMLCDS070015 | CTCB TPE | 09/20/2012 | LEH SPE | | -136,178.42 | 0 | 0 | -136,178.42 |
| 29 | XMLCDS070016 | CTCB TPE | 09/20/2012 | LEH SPE | | -1,236,145.24 | 0 | 0 | -1,236,145.24 |
| 30 | XMLCDS070023 | CTCB TPE | 09/20/2012 | LEH SPE | | 433,354.41 | 0 | 0 | 433,354.41 |
| 31 | XMLCDS070026 | CTCB TPE | 09/20/2012 | LEH SPE | 343,052.08 | | 0 | 0 | 343,052.08 |
| 32 | XMLCDS070028 | CTCB TPE | 09/20/2012 | LEH SPE | -215,809.51 | | 0 | 0 | -215,809.51 |
| 33 | XMLCDS070029 | CTCB TPE | 09/20/2012 | LEH SPE | | -211,031.90 | 0 | 0 | -211,031.90 |
| 34 | XMLCDS070030 | CTCB TPE | 09/20/2012 | LEH SPE | | -409,168.11 | 0 | 0 | -409,168.11 |
| 35 | XMLCDS070032 | CTCB TPE | 09/20/2012 | LEH SPE | | -201,934.31 | 0 | 0 | -201,934.31 |
| 36 | XMLCDS070039 | CTCB TPE | 09/20/2012 | LEH SPE | | 211,208.30 | 0 | 0 | 211,208.30 |
| 37 | XMLCDS070040 | CTCB TPE | 09/20/2012 | LEH SPE | | 179,632.54 | 0 | 0 | 179,632.54 |
| 38 | XMLCDS080075 | CTCB TPE | 09/20/2013 | LEH SPE | | -468,540.60 | 0 | 0 | -468,540.60 |
| 39 | XMLCDS080076 | CTCB TPE | 09/20/2013 | LEH SPE | | -109,689.44 | 0 | 0 | -109,689.44 |
| 40 | XMLCDS070012 | CTCB TPE | 10/29/2008 | LEH SPE | | 20,444.44 | 0 | 0 | 20,444.44 |
| 41 | XMLCDS070047 | CTCB TPE | 12/20/2012 | LEH SPE | | 269,684.81 | 0 | 0 | 269,684.81 |
| 42 | XMLCDS070052 | CTCB TPE | 12/20/2012 | LEH SPE | | -120,327.11 | 0 | 0 | -120,327.11 |
| 43 | XMLCDS070057 | CTCB TPE | 12/20/2012 | LEH SPE | | 211,777.27 | 0 | 0 | 211,777.27 |
| 44 | XMLCDS070063 | CTCB TPE | 12/20/2012 | LEH SPE | | 749,113.86 | 0 | 0 | 749,113.86 |
| 45 | MX630612 | CTCB TPE | 01/20/2010 | LEH SPE | | 2,024,535.32 | 0 | 0 | 2,024,535.32 |
| 46 | XMLIRS05058 | CTCB TPE | 01/27/2015 | LEH SPE | | 300,385.00 | 0 | 0 | 300,385.00 |
| 47 | MX2491761 / MX2491762 | CTCB TPE | 03/18/2019 | LEH SPE | | 4,159,593.78 | 0 | 0 | 4,159,593.78 |
| 48 | MX2462420 / MX2462421 | CTCB TPE | 03/04/2019 | LEH SPE | | -6,302,279.57 | 0 | 0 | -6,302,279.57 |
| 49 | XMLFXO200801110202 | CTCB TPE | 09/22/2008 | LEH SPE | | 148,371.00 | 0 | 0 | 148,371.00 |
| 50 | XMLFXO200802010001 | CTCB TPE | 09/22/2008 | LEH SPE | | 196,350.00 | 0 | 0 | 196,350.00 |
| 51 | XMLFXO200802010002 | CTCB TPE | 09/22/2008 | LEH SPE | | 19,635.00 | 0 | 0 | 19,635.00 |
| | | | | | 1,398,522.83 | 1,005,264.57 | 0 | 0 | 2,403,787.40 |