Hearing Date: March 23, 2011 at 10:00 a.m.
Objection Deadline: March 16, 2011 at 4:00 p.m.

Anthony Paduano (AP 8400)
Willard Knox (WK 5567)
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
Telephone: (212) 785-9100
Facsimile: (212) 785-9099

ATTORNEYS FOR PHILLIP WALSH

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
In re:                                              :
                                                    :  Chapter 11
                                                    :
LEHMAN BROTHERS HOLDINGS, INC., et. al.             :  Case No. 08-13555 (JMP)
                                                    :  (Jointly Administered)
                        Debtors.                    :
                                                    :
----------------------------------------------------------------x

**MOTION OF PHILLIP WALSH FOR A DETERMINATION
THAT THE AUTOMATIC STAY DOES NOT APPLY
OR, ALTERNATIVELY, FOR RELIEF FROM AUTOMATIC STAY**

Phillip Walsh ("Walsh"), by and through his undersigned counsel, hereby files this motion (the "Motion") pursuant to Section 362(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requesting entry of an order substantially in the form attached hereto as Exhibit A. In support of the Motion, Walsh respectfully represents as follows:

## PRELIMINARY STATEMENT

Walsh is a former employee of Lehman Brothers, Inc. ("LBI") where he was employed in LBI's New York, New York office. On August 20, 2008, Walsh executed a promissory note (the "Note") memorializing retention monies paid by LBI to Walsh to induce him to remain with the firm.

LBI filed for bankruptcy protection on September 19, 2008. On September 22, 2008, LBI terminated Walsh's employment without prior notice or cause.

On or about December 15, 2010, debtor Lehman Brothers Holdings Inc. ("LBHI") (together with LBI, "Lehman") instituted an arbitration proceeding before FINRA Dispute Resolution entitled <u>Lehman Brothers Holdings Inc., as assignee of Lehman Brothers Inc. v. W. Phillip Walsh</u>; FINRA No. 10-05736 (the "FINRA Arbitration").[1] In the FINRA Arbitration, Lehman seeks the outstanding principal amount of the Note, plus accrued interest, and its attorneys' fees, costs and disbursements.

Lehman purports to bring the FINRA Arbitration against Walsh pursuant to the "Stipulation And Order Between Lehman Brothers Holdings And James W. Giddens As Trustee For The SIPA Liquidation Of Lehman Brothers Inc. With Respect To Promissory Notes Evidencing Loans To Certain Employees" (Docket No. 6038), so ordered by this Court on December 3, 2009. Walsh seeks

---

[1] A true and correct copy of Lehman's Statement of Claim In the FINRA Arbitration is attached hereto as <u>Exhibit B</u>.

2

to assert in the FINRA Arbitration counterclaims against Lehman based upon Lehman's wrongdoing against him that is detailed below (the "Counterclaims").[2]

Walsh seeks this Court's assistance so that he may assert his Counterclaims in the FINRA Arbitration—the forum selected by LBHI.[3]

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## FACTUAL BACKGROUND

2. In August 1990, Walsh joined Shearson Lehman Brothers—the predecessor to Lehman—in its New York, New York offices. Shearson Lehman Brothers offered Mr. Walsh no upfront monies to join the firm. Mr. Walsh nonetheless relied upon the firm's reputation in deciding to become affiliated with the firm (versus its competitors).

3. After obtaining his securities licenses, Walsh worked tirelessly to build his book of business from the ground up, acquiring as clients numerous high net worth individuals, institutions and prime brokerage accounts, thereby

---

[2] Simultaneously herewith, Walsh has filed his Statement of Answer, Affirmative Defenses and Counterclaims in the FINRA Arbitration, a true and correct copy of which is annexed hereto as Exhibit C.

[3] Prior to filing this Motion, Walsh's counsel requested that Lehman's counsel in the FINRA Arbitration stipulate to a lifting of the stay so that Walsh may assert his Counterclaims in the FINRA Arbitration; Lehman's counsel, however, declined to do so.

3

generating substantial revenues for Lehman. Both Mr. Walsh and his clients relied upon Lehman's reputation in deciding to maintain a relationship with the firm. Indeed, Mr. Walsh's reliance upon Lehman's reputation caused him to remain with the firm for 18 years (until Lehman summarily terminated his employment without notice or cause after it declared bankruptcy).

4. Lehman aggressively pushed Walsh and its other advisors to recommend to their clients its proprietary investment products. Mr. Walsh could not have known, however, that Lehman's hawking of its products would later lead to severe financial consequences for him and his clients.

5. Beginning in July 2008, news of Lehman's instability began to circulate. At no time, however, did anyone at Lehman disclose to Walsh (or his clients) that Lehman faced any difficulties. Walsh's prospective and existing clients, however, grew increasingly concerned, and either declined to invest new assets or transferred their assets to other firms.

6. Notwithstanding the increasingly alarming news about Lehman's current status and future, Lehman's senior management (up to and including Richard Fuld, Lehman's Chairman and Chief Executive Officer) repeatedly represented to Walsh and its other advisors that Lehman was in fine shape.

7. Relying upon the representations of Lehman's senior management (including without limitation Mr. Fuld, George Walker—then Global Head of Investment Management, Jack Petersen—then Global Head of Wealth Management, and Mark Stevenson, Walsh's branch office manager), Walsh

4

repeatedly reassured his clients that all was well at Lehman, and that they need not move their accounts elsewhere.

8. Indeed, approximately two months prior to the bankruptcy, Lehman management conducted a conference call with clients of Walsh who had synthetic derivatives. During that call, Lehman management represented to these clients that their trades would be safe. (These clients later lost all of their monies on these otherwise profitable trades.)

9. As Lehman's financial stability was the subject of abounding rumour and dire prediction, many of Walsh's colleagues (including his partner) exited Lehman for competitor firms. Relying further upon Lehman's representations (and its reputation), Mr. Walsh reasonably believed he did not need to seek other employment. Indeed, as a devoted and loyal employee of 18 years, Mr. Walsh did not wish to work elsewhere.

10. When LBI summarily terminated Walsh's employment on September 22, 2008 (three days after it sought bankruptcy protection), Lehman made no demand for repayment of the remainder of the Note or otherwise indicated to Walsh that Lehman would seek such repayment.

11. Walsh's decision to remain loyal to Lehman proved to be a disastrous one for his clients and for him personally. Because Walsh's clients' assets were frozen in the bankruptcy, he was unable to transfer them to his new firm (once he was finally able to obtain alternate employment). Many of Walsh's client relationships were ruined as a result.

12. Those clients of Walsh who owned Lehman proprietary structured notes lost all of their monies, even though the underlying investments were performing well. Those clients of Walsh who maintained prime brokerage accounts lost all of their monies, in turn losing all of *their* clients' monies. As was noted above, Walsh had clients with synthetic derivatives trades who lost all of their monies on these otherwise profitable trades. Some of Walsh's largest clients had invested in different Lehman Private Equity Partnerships that were negatively affected by the bankruptcy.

13. Walsh's largest client relationships were damaged as a result of the Lehman bankruptcy. Some of Walsh's institutional clients executed trades on September 10, 11 and 12, 2008 — i.e., the Wednesday, Thursday and Friday before Lehman declared bankruptcy. Because these trades could not be settled, Walsh's relationships with these clients were severely (and, in some instances, irreparably) harmed.

14. In addition to the freezing of millions of dollars in client assets, Lehman's bankruptcy (and its subsequently publicly revealed wrongdoing) further led to a severe loss of confidence among Walsh's customers. Indeed, Walsh, through no fault of his own, lost numerous clients. Thus, Lehman's wrongdoing and bankruptcy severely damaged (and, in some cases, destroyed) Walsh's client relationships, not to mention his ability to support himself and his family. Moreover, given that the Lehman bankruptcy continues, Walsh still must assist

6

clients whose assets are frozen and thus cannot be reinvested, and must do so without compensation.

15. Walsh's business and his ability to support himself and his family have been severely damaged. At the time of Lehman's summary termination of Walsh's 18-year employment in 2008, his trailing 12 commissions totaled approximately $5,597,052. For calendar year 2010, Walsh's commissions totaled approximately $1,428,426. Walsh's trailing 12 commissions currently total approximately $1,397,185. Thus, since Lehman terminated his employment, Walsh has suffered a loss of commission of approximately $4,199,867, or approximately 75%. Moreover, Walsh's assets under management have decreased from approximately $691,703,000 at Lehman to approximately $76,157,202 today. Thus, since Lehman terminated his employment, Walsh has suffered a loss of assets under management of approximately $615,545,798, or approximately 89%.

16. As has now been revealed by the Report of the Examiner in this proceeding, issued March 11, 2010 (the "Examiner's Report"), Lehman engaged in extensive wrongdoing that forced it into bankruptcy. In particular, Lehman repeatedly misrepresented and failed to disclose its true financial status to its own customers, not to mention Walsh and its other financial advisors.

17. As is set forth in the Examiner's Report:

o Lehman failed to disclose to the federal government, the rating agencies, its investors or even its own Board of Directors its use of accounting devices such as the "Repo 105" to hide

the true nature of its financial condition. (Examiner's Report at 6-8)[4]

o As late as September 10, 2008 [i.e., five days before LBHI filed for bankruptcy], Lehman "publicly announced that its liquidity pool was approximately $40 billion; but a substantial portion of that total was in fact encumbered or otherwise illiquid." (Examiner's Report at 9) (Exhibit D hereto)

o The Examiner concluded that sufficient evidence exists for a trier of fact to determine that Lehman's failure to disclose its use of "Repo 105" to conceal its true financial condition was "materially misleading," and that Lehman "affirmatively misrepresented its accounting treatment for repos." (Examiner's Report at 962)[5]

o The Examiner concluded that sufficient evidence exists for a trier of fact to determine that Lehman's Forms 10-K and 10-Q were "deficient and misleading" (Examiner's Report at 985), and that the "picture Lehman painted of its financial position in late 2007 and into 2008 was materially misleading" (Examiner's Report at 987) (Exhibit E hereto)

o The Examiner further concluded that colorable claims for breach of fiduciary duty and/or gross negligence exist against Lehman's senior management for "allowing and certifying the filing of financial statements that omitted or misrepresented material information" concerning Lehman's financial condition, and for failing to disclose information about "Repo 105" to Lehman's Board of Directors. (Examiner's Report at 992) (Exhibit E hereto)

18. Thus, Lehman's highest-level management intentionally concealed from its customers, its financial advisors (including Walsh) and federal

---

[4] A true and correct copy of the cited excerpt of the Examiner's Report is annexed hereto as Exhibit D. The complete Examiner's Report, which consists of nine volumes totaling 4,105 pages, is incorporated herein by reference.

[5] A true and correct copy of the cited excerpt of the Examiner's Report is annexed hereto as Exhibit E.

8

regulators the true nature of its financial condition.

19. Thus, Lehman's highest-level management intentionally concealed from the investing public and federal regulators the true nature of Lehman's financial condition. Mr. Walsh, however, was not a manager (or other decision-maker), and had no involvement in (or knowledge of) Lehman's wrongdoing.

20. Walsh's managers furthered this scheme by inducing him to accept the retention monies and remain with the firm—i.e., if one of the firm's top producers stayed, then the firm would appear to be stable. Given that Lehman concealed material information concerning its financial status from the investing public and federal regulators, Walsh could not have known that Lehman management was, simply, lying.

21. Moreover, as an 18-year financial advisor, Walsh would not knowingly have agreed to accept such a sum less than one month before Lehman declared bankruptcy. Walsh reasonably relied upon the representations of Lehman's management that the firm would continue in business. Moreover, had Walsh foreseen the damage to his career from Lehman's wrongdoing and subsequent bankruptcy, he would never have entered into such a transaction.

22. But for Lehman's misrepresentations to Walsh, he would neither have represented to his clients that all was well with their accounts at Lehman, nor maintained his employment with Lehman.

23. Moreover, had Lehman lawfully maintained its business, the Note would have been forgiven by its own terms in 2013.

## RELIEF REQUESTED

24. By this Motion, Walsh seeks an order pursuant to Section 362(d) of the Bankruptcy Code and Bankruptcy Rule 4001 determining that the automatic stay does not apply to the Counterclaims or, in the alternative, granting Walsh relief from the automatic stay to assert the Counterclaims in the FINRA Arbitration.

## BASIS FOR RELIEF

### I.

### THE AUTOMATIC STAY DOES NOT APPLY TO THE COUNTERCLAIMS

25. Pursuant to Section 362(a)(1) of the Bankruptcy Code,

> a bankruptcy filing petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
>
> (1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor <u>that was or could have been commenced before the commencement of the case under this title</u> . . .

11 U.S.C. § 362(a)(1).

26. The automatic stay therefore applies only when a proceeding was or could have been commenced before the bankruptcy filing. If a proceeding could not have been commenced before the bankruptcy filing, the proceeding is not subject to the automatic stay. <u>In re Galgano</u>, 358 B.R. 90, 98 (Bankr. S.D.N.Y. 2007); <u>In re Chateaugay Corp.</u>, 86 B.R. 33, 38 (S.D.N.Y. 1987)

10

27. LBI's bankruptcy filing was the act that triggered Walsh's claims against LBI. Prior to the commencement of the bankruptcy case, Walsh could not have commenced any proceeding against LBI based on the allegations asserted in the Counterclaims. Specifically, Walsh seeks to assert claims based upon Lehman's inducement of him to remain employed with Lehman, under causes of action for fraud and fraudulent inducement. Walsh further seeks to assert claims for unpaid compensation, under causes of action for breach of contract, New York Labor Law, unjust enrichment and money had and received. Therefore, the automatic stay mandated by Section 362(a)(1) is not applicable to the Counterclaims and Walsh should be free to assert the Counterclaims in the FINRA Arbitration—the forum selected by LBHI.

II.

## THE COURT SHOULD LIFT THE AUTOMATIC STAY

28. In the event that the Court decides that the automatic stay provisions of Section 362(a)(1) apply to the Counterclaims, the Court should nevertheless grant Walsh relief from the stay to assert the Counterclaims because to do otherwise would be inequitable and extremely prejudicial to Walsh.

29. "Where a debtor brings a lawsuit and then invokes the automatic stay to prevent the defendant from asserting counterclaims, 'the situation warrants a very thoughtful scrutiny'" Gruber v. Victor, 95 CIV. 2285 (JSM), 1996 WL 492991 (S.D.N.Y. Aug. 28, 1996) (quoting Matter of Bohack

11

Corp. v Borden, Inc., 599 F2d 1160, 1168 (2nd Cir. 1979)) (Exhibit F hereto); In re Overmyer, 32 B.R. 597, 601 (Bankr. S.D.N.Y. 1983).

30. Courts must be "cautious to avoid a decision which would convert Code § 362 from a shield into a weapon" In re Overmyer, 32 B.R. 597, 601 (Bankr. S.D.N.Y. 1983). Yet converting the shield of the automatic stay into a weapon against Walsh is exactly what LBHI is attempting to do.

i. **There is Cause to Grant Walsh Relief from the Automatic Stay**

31. Section 362(d) of the Bankruptcy Code provides, in pertinent part, that the Court may grant relief from the automatic stay as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause . . . .

11 U.S.C. § 362(d)(1)

32. The term "cause" is not defined in the Bankruptcy Code. Therefore, it is in the discretion of the Court to determine whether "cause" exists to lift the automatic stay. See In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 91 (2nd Cir. 2003); Manhattan King David Restaurant, Inc. v. Levine, 163 B.R. 36, 40 (Bankr. S.D.N.Y. 1993) (citing In re Sonnax Industries, Inc., 907 F.2d 1280, 1286 (2nd Cir. 1990).

33. The Second Circuit Court of Appeals has recognized a number of factors to be considered in determining a motion for relief from the automatic stay, including:

12

(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms

In re Sonnax Industries, Inc., 907 F.2d at 1286.

34. Not all of the factors enumerated by the Second Circuit in In re Sonnax Industries will be relevant in every case. In re Mazzeo, 167 F.3d 139, 143 (2d Cir. 1999). The Court does not need to give equal weight to each factor, nor does the Court need to employ each and every factor. Id.; see also In re New York Medical Group, P.C., 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001). In the case presently before the Court, the factors that are relevant for the Court's consideration all favor lifting the stay.

35. It is inarguable that prosecution of the Counterclaims in the Arbitration would not interfere with the bankruptcy proceedings (Factor 2). LBHI initiated the Arbitration against Walsh; it cannot now claim that all counterclaims in that same Arbitration would interfere with the bankruptcy proceedings.

13

36. With regard to fourth <u>Sonnax</u> factor, a specialized tribunal with the necessary expertise – the FINRA arbitration panel – has been established to hear the Counterclaims. That same Panel will, at LBHI's initiative, hear LBHI's claims against Walsh; it should likewise hear Walsh's counterclaims against LBHI.

37. Factor seven looks at whether "litigation in another forum would prejudice the interests of other creditors." The Counterclaims would not prejudice the interests of any LBHI or LBI creditors. Prosecuting the Counterclaims is an entirely different matter than collecting a judgment, and Walsh would certainly return to this Court and enforce any judgment through the claims allowance process.

38. "[T]he interests of judicial economy and the expeditious and economical resolution of litigation" – the tenth <u>Sonnax</u> factor – clearly weigh in favor of allowing Walsh to assert his Counterclaims in the Arbitration. Arbitration is the forum that will hear LBHI's claims against Walsh and it would be expeditious and economical for the Arbitration panel to hear Walsh's Counterclaims. Conversely, it would be extremely uneconomical and inefficient to require Walsh's Counterclaims to be brought in a separate adversary action before this Court. The Court would be required to duplicate much of the Panel's work to knowledgeably decide on the merits of the Counterclaims, which is the very definition of inefficiency. In fact, the "fundamental goal of arbitration" is "to provide a simple and expeditious alternative to litigation." <u>Natl. Ass'n of Broadcast Employees & Technicians v. Am. Broadcasting Co., Inc.</u>, 140 F.3d 459, 463 (2nd Cir. 1998).

14

To require Walsh to defend LBHI's claims in arbitration and then pursue his own claims in this Court, would frustrate the very goal of conducting the arbitration in the first place.

39. Finally, the impact of the stay and the balance of equities weigh in Walsh's favor. Imposition of the stay on the Counterclaims would force Walsh to defend himself in the Arbitration and then commence separate proceedings in this Court for his claims against LBHI and LBI. This would be extremely expensive and inefficient, and could result in inconsistent decisions.

40. Further, such a result would be inequitable to Walsh. LBHI has initiated the FINRA Arbitration against Walsh, yet will not consent to a lifting of the stay so that Walsh may assert his Counterclaims in the FINRA Arbitration. Such a result would clearly harm Walsh while benefiting LBHI.

41. By contrast, LBHI would suffer relatively minimal harm from a lifting of the stay to allow Walsh to assert his Counterclaims. LBHI is the party that commenced the arbitration, and could have easily foreseen that Walsh would seek to assert counterclaims against it. LBHI might incur additional expenses as a result of defending against the Counterclaims, but when compared with the risk of Walsh losing any right to assert those counterclaims, the harm to LBHI is relatively small. See Gruber v. Victor, 1996 WL 492991 *5 (holding that where the debtor is the initiator of costly litigation, the automatic stay should not be invoked to spare the debtor the expense of defending itself) (Exhibit F hereto); In Re Wedtech, 87 B.R. 279, 290 (S.D.N.Y. 1988).

### ii. Lifting the Stay Would Conform with the Purpose of the Stay

42. The purpose of the automatic stay is to give the debtor "breathing space" from its creditors and to "centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." See Teachers Ins. & Annuity Ass'n of America v. Butler, 803 F.2d 61, 64 (2nd Cir. 1986) (quoting legislative history); In re Petrusch, 667 F.2d 297, 299 (2nd Cir. 1981) (same), cert. denied, 456 U.S. 974 (1982); In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2d Cir. 1990)

43. Lifting the stay to permit Walsh to assert Counterclaims in a proceeding initiated by LBHI conforms to the purposes of the stay. LBHI has had more than two years since its bankruptcy filing to get "breathing space" from its creditors. In fact, LBHI would not even need protection from Walsh had LBHI not initiated proceedings against Walsh. Furthermore, because it was the debtor – LBHI – that chose to pursue its dispute against Walsh in arbitration, there can be no concern that the Counterclaims would further de-centralize the dispute or cause inefficiencies in the reorganization process. See Gruber v. Victor, 1996 WL 492991 at *5 (Exhibit F hereto); Matter of Bohack Corp. Borden, Inc., 599 F2d at 1168 – 69.

44. No prior request for the relief sought herein has been made to this or any other court.

16

45. In light of the foregoing, Walsh respectfully requests the following relief:

- that the Court enter an Order that the automatic stay does not apply to the Counterclaims Walsh seeks to assert against LBHI in the FINRA Arbitration;

- alternatively, if the Court holds that the automatic stay does apply to the Counterclaims, that the Court enter an Order lifting the automatic stay so that Walsh may assert the Counterclaims in the FINRA Arbitration; and

- such other and further relief as the Court deems just and appropriate.

## Conclusion

For the reasons set forth above, Walsh respectfully requests the Court enter an order holding that the automatic stay does not apply to the Counterclaims or, alternatively, lifting the automatic stay to allow Walsh to assert the Counterclaims, and granting Walsh such other and further relief as is just and proper.

Dated: New York, New York
February 17, 2011

PADUANO & WEINTRAUB LLP

BY: _[signature]_
Anthony Paduano
Willard Knox
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)

Attorneys for Phillip Walsh