HEARING DATE AND TIME: March 3, 2011 at 10:00 a.m. (Eastern)
RESPONSE DEADLINE: February 14, 2011 at 4:00 p.m. (Eastern)
(extended by agreement with the Debtors to February 22, 2011)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Douglas R. Davis
Manuel S. Frey

*Counsel for Eton Park Fund, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** <br><br> **LEHMAN BROTHERS HOLDINGS, INC., et al.,** <br><br> **Debtors.** | **Case No. 08-13555 (JMP)** <br><br> **(Jointly Administered)** |

**RESPONSE OF ETON PARK FUND, L.P. TO DEBTORS' EIGHTY-FOURTH OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)**

Eton Park Fund, L.P. ("Eton Park"), through its investment manager Eton Park Capital Management, L.P., hereby responds to the Debtors' Eighty-Fourth Omnibus Objection to Claims (Valued Derivative Claims) [D.E. 13955] (the "Objection") as it relates to two proofs of claim filed by Eton Park.

Eton Park filed Claim No. 20521 against Lehman Brothers Special Financing, Inc. ("LBSF") in the amount of $14,591,700.97, plus additional contingent and unliquidated amounts for interest, fees and expenses (the "LBSF Claim"), and Claim No. 20522 against Lehman Brothers Holdings, Inc. ("LBHI") in the same amount (the "LBHI Claim," and together with the LBSF Claim, the "Claims").

The LBSF Claim arises out of the termination of certain derivative transactions shortly after the filing of LBHI's voluntary petition for relief under chapter

11, and the LBHI Claim is based on LBHI's guarantee of the obligations of LBSF pursuant to those transactions. As set forth in greater detail below, the amount of the LBSF Claim was properly calculated in accordance with the parties' agreement. The amount of the LBHI Claim—which is based on a guarantee—does not require any separate calculation apart from that needed to compute the LBSF Claim.

Although the Objection asks this Court to slash the amounts of the LBSF Claim and the LBHI Claim by nearly half of their stated value, and to allow the Claims only in the reduced amounts, the Objection provides no evidence to support that request or substantiate the proposed reduction. Likewise, the Objection asks this Court to reclassify both Claims to general unsecured claims, yet provides no basis whatsoever for the reclassification. Because the Objection offers no supporting evidence, the Debtors cannot overcome the *prima facie* validity that attached to the Claims. As it relates to the Claims, the Objection should be overruled. In further support of this response, Eton Park states as follows:

## BACKGROUND

1.  As of June 23, 2005, Eton Park and LBSF entered into that certain ISDA Master Agreement (the "<u>Master Agreement</u>"), including the Schedule to the Master Agreement, dated as of June 23, 2005 (the "<u>Schedule</u>") and the Credit Support Annex to the Schedule, also dated as of June 23, 2005 (the "<u>Credit Support Annex</u>," and together with the Master Agreement and the Schedule, all as separately amended, supplemented and otherwise modified and in effect from time to time, the "<u>Agreement</u>").[1] As the

---

[1] Capitalized terms used but not independently defined herein shall have the meanings assigned to them in the Agreement.

2

specified Credit Support Provider in the Schedule, on July 26, 2005, LBHI executed an unconditional guarantee of the obligations of LBSF under the Agreement for the benefit of Eton Park (the "LBHI Guarantee").

2.   LBHI's filing of a voluntary petition for relief under chapter 11 on September 15, 2008 constituted an Event of Default under the Master Agreement. (Master Agreement, at Section 5(a)(vii)). LBSF's filing of a voluntary petition for relief under chapter 11 on October 3, 2008 also constituted an Event of Default under the Master Agreement. (Id.)

3.   On September 15, 2008, Eton Park sent written notice (the "Early Termination Notice") to LBSF designating September 15, 2008 as the Early Termination Date pursuant to Section 6(a) of the Master Agreement and terminating all outstanding Transactions under the Agreement.

4.   On October 27, 2008, Eton Park sent LBSF a Notice of Amount Payable (the "Calculation Statement") and notified LBSF of amounts, pursuant to Section 6(d)(i) of the ISDA Master Agreement, owing to Eton Park as a result of the designation of the Early Termination Date (such amount, the "Early Termination Amount"). On September 18, 2009, Eton Park sent LBSF an Amended Notice of Amount Payable (the "Amended Calculation Statement") and notified LBSF that the Early Termination Amount equaled $14,597,372.[2] The Amended Calculation Statement provided LBSF with detailed calculations and backup materials supporting Eton Park's determination of

---

[2]   The Calculation Statement and Amended Calculation Statement each included $10,800 in legal fees in calculating the Early Termination Amount. The amount of legal fees was reduced to $5,128.97 in the Claims and Questionnaires thus resulting in a lowered Early Termination Amount of $14,591,700.97.

3

the Early Termination Amount.

5.    On September 21, 2009, Eton Park timely filed the Claims. On October 16, 2009, Eton Park completed the Derivative Questionnaire and Guarantee Questionnaire with respect to the LBSF Claim and LBHI Claim, respectively, and pursuant thereto, uploaded copies of the Agreement, LBHI Guarantee, Early Termination Notice, Amended Calculation Notice, individual trade-level detail for all Transactions, information concerning the Collateral Eton Park posted under the Agreement and details of other fees and costs included in the Claims.

6.    Since filing the Claims and completing the Questionnaires, Eton Park has provided additional information to the Debtors at their request. To date, Eton Park has not received any information from the Debtors concerning the Claims or the Debtors' valuation thereof.

7.    By the Objection, the Debtors seek to reduce the Claims by nearly half and reclassify each claim as unsecured. As their sole support, the Debtors state that the Claims are "greater than the fair, accurate, and reasonable values determined by the Debtors after a review of the claimant's supporting documentation and the Debtors' books and records; and that the classifications (in certain instances) are improperly identified as secured … on claimants' proofs of claim." (Objection at ¶11). The Debtors have not provided any details concerning their valuation of the Claims. Nor have the Debtors asserted that Eton Park improperly calculated the Claims under the Agreement.

4

**ARGUMENT**

8. The Objection must be overruled with respect to the Claims because: (1) the Debtors did not present evidence in their Objection sufficient to rebut the *prima facie* evidentiary effect of Eton Park's properly-completed and timely-filed Claims; and (2) the Claims were properly calculated in accordance with the terms of the Agreement negotiated and executed by LBSF and the related LBHI Guarantee.

A. **The Objection Does Not Present Evidence Sufficient to Rebut the *Prima facie* Evidentiary Effect of the Properly-Completed and Timely-Filed Proofs of Claim.**

9. A proof of claim, timely and properly filed, is *prima facie* evidence of the validity and amount of the claim. *See* Fed. R. Bankr. P. 3001(f). "To overcome this *prima facie* evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novack (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000) (*citing In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992)); *see also Riverbank, Inc. v. Make Meat Corp. (In re Make Meat Corp.),* 1999 WL 178788 at *3 (S.D.N.Y. March 31, 1999) ("[o]nce the claimant has established its *prima facie* case, the burden of going forward then shifts to the debtor to produce evidence sufficient to negate the *prima facie* validity of the filed claim"); *Matter of Michalek,* 1991 WL 222063 at *3 (W.D.N.Y. Oct. 22, 1991) ("[t]he party objecting to the claim has the burden of going forward with substantial evidence to rebut the *prima facie* validity of the claim"); *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 354-55 (Bankr. S.D.N.Y. 1995) (overruling debtor's objection to secured lender's claim for pre-petition attorneys' fees where debtor had not offered any evidence to support its contention that such fees were unreasonable and also overruling debtor's objection to the same creditor's claim for default interest, holding that "when two

5

sophisticated parties enter into a contract calling for an established rate on default, this Court will not disturb the agreement absent persuasive evidence of overreaching.").

          10.     To overcome the *prima facie* effect of a properly filed proof of claim, therefore, the objecting party must "affirmatively *produce* evidence." *In re Make Meat Corp.*, 1999 WL 178788 at *4 (emphasis in original). That evidence must "refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009). The burden shifts back to the claimant if and only if the objecting party meets this burden. *In re Reilly*, 245 B.R. at 773; *In re Martinez*, 409 B.R. 35, 38 (Bankr. S.D.N.Y. 2009).

          11.     Eton Park timely and properly filed the Claims, and the Claims complied both with Fed. R. Bankr. P. 3001 and this Court's *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* (the "<u>Bar Date Order</u>") [D.E. 4271]. The Claims, as supplemented by the Questionnaires, contained: (1) a detailed narrative of the events giving rise to the Debtors' obligations; (2) copies of the Agreement, Early Termination Notice, Amended Calculation Statement, and LBHI Guarantee; and (3) additional and detailed backup information detailing Eton Park's calculation of the Claims on a trade-by-trade basis including the source of market information, interpolated prices, whether dealer quotes were obtained, how many quotes were obtained, who provided the quotes, and the relevant dates. It is beyond dispute --and the Debtors do not dispute that the Claims were properly filed --that the Claims are *prima facie* valid.

12. In support of their Objection, the Debtors simply state that: (1) they have undertaken a lengthy process to evaluate the Claims; (2) that process involved the collection and review of relevant documents and a review of the methodology employed by Eton Park; and (3) as a result of that process, the Debtors have determined that the $7,829,182.63 value listed on <u>Exhibit A</u> to the Objection is the "fair, accurate, and reasonable valuation" of the Claims. The Debtors do not explain the "lengthy process" in detail or how that "process" resulted in a value that is substantially less than the value calculated in accordance with the method specified by the Agreement. They provide no details whatsoever on the valuation of the multiple individual trades that comprise the Claims. Although the Debtors refer this Court to the Declaration of Gary H. Mandelblatt, originally submitted in Support of the Debtors' *Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Claim Form* [D.E. 4113] (the "<u>Mandelblatt Declaration</u>"), for a "more comprehensive discussion of the[ir] valuation process," the Mandelblatt Declaration does not provide any evidence to substantiate the Objection. (Objection at ¶ 14 n.2; Mandelblatt Declaration).

13. As in *Woodmere*, then, the Debtors have not affirmatively produced any evidence to rebut the *prima facie* validity of Eton Park's Claims. *In re Woodmere Investors Ltd. P'ship*, 178 B.R. at 354-55. The Objection should therefore be overruled and each Claim should be allowed in the full amount of $14,591,700.97.

7

      **B.**      **The LBSF Claim Was Properly Calculated in Accordance with the Terms of the Agreement**

14. Eton Park calculated the Early Termination Amount asserted in the Claims in strict accordance with the Agreement, a fact the Debtors do not dispute.

15. The Agreement defines Event of Default to include, *inter alia*, the filing of a bankruptcy petition by LBHI or LBSF. (Master Agreement at Section 5(a)(vii)(4)). Upon the occurrence of an Event of Default, Eton Park had a contractual right to terminate all outstanding Transactions under the Agreement and to designate an Early Termination Date. (Master Agreement at Section 6(a)). Eton Park exercised these rights by sending the Early Termination Notice on September 15, 2008 and designating such date as the Early Termination Date. As soon as reasonably possible following the Early Termination Date, Eton Park was required to calculate the Early Termination Amount and provide LBSF a statement summarizing those calculations. (Master Agreement at Section 6(d)(i)). Eton Park complied by sending the Calculation Statement on October 27, 2008 and the Amended Calculation Statement on September 18, 2009.

16. In the Schedule, Eton Park and LBSF agreed that, for purposes of calculating the Early Termination Amount following the designation of an Early Termination Date, "Market Quotation" and "Second Method" would apply. (Schedule at Pt. 1(f)). Accordingly, the Master Agreement provided that, upon an Event of Default:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (***determined by the Non-defaulting Party***) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(Master Agreement at Section 6(e)(i)(3) (emphasis added)).

8

17. The Master Agreement defines "Settlement Amount," in part, as "such party's Loss … for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result." (Master Agreement at Section 14). "Loss," in turn, is defined in part, as:

> [T]he Termination Currency Equivalent of *an amount that party reasonably determines in good faith to be its total losses and costs … in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions,* as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position. … A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. *A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets*.

(Master Agreement at Section14 (emphasis added)).

18. As set forth in the Calculation Statement and Amended Calculation Statement, Eton Park followed these guidelines in determining the Early Termination Amount LBSF owed Eton Park. First, Eton Park notified LBSF that it could not obtain three or more quotations from Reference Market-makers for any of the Terminated Transactions and accordingly, pursuant to Section 14 of the Master Agreement, calculated the Settlement Amount using the "Loss" methodology. In support of its "Loss" calculations, Eton Park provided LBSF with the components and assumptions relied upon by Eton Park with respect to each Terminated Transaction including, *inter*

9

*alia*, dealer quotes and published pricing information from Markit Group Limited, a leading global provider of financial information services and independent pricing and valuation data. (Amended Calculation Statement, Annex B). The data used by Eton Park to determine the Settlement Amount in the absence of quotations from Reference Market-makers, therefore, is the kind of information explicitly contemplated by the Agreement. As set forth in the Amended Calculation Statement, Eton Park calculated that it owed LBSF $60,711,869 in respect of the Settlement Amount.

19.    Next, Eton Park offset the Settlement Amount it owed LBSF against the value of Collateral Eton Park had previously posted to LBSF ($75,298,441) in accordance with the provisions of the Credit Support Annex, which LBSF owed Eton Park. This setoff is also explicitly sanctioned by the Master Agreement, which provides that the Early Termination Amount payable in respect of an Early Termination Date "will be subject to any Set-off." (Master Agreement at Section 6(e)). The Credit Support Annex clarifies that a Secured Party holding Posted Collateral must immediately return all Posted Collateral to the Pledgor upon the occurrence or designation of an Early Termination Date as the result of an Event of Default. (Credit Support Annex at Paragraph 8(b)(iii)). Further, the Credit Support Annex grants the Pledgor the right, to the extent the Secured Party does not so return the Posted Collateral, to "Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral … held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral). (Credit Support Annex at Paragraph 8(b)(iv)(A)). Consequently, Eton Park was entitled to set off amounts owed by it to LBSF in respect of

the Early Termination Date against the amount of Posted Collateral held and not returned by LBSF.

20.   Finally, Eton Park added $5,128.97 to the Early Termination Amount on account of legal fees Eton Park incurred in terminating and closing out the Agreement.[3]  Again, the Master Agreement specifically provided that the Defaulting Party is liable for all reasonable legal fees incurred by the Non-defaulting Party to protect its rights under the Agreement or by reason of the early termination of the Agreement. (Master Agreement at Section 11).  Accordingly, Eton Park calculated that LBSF owed it $14,591,700.97 as a result of the designation of an Early Termination Date under the Agreement.  This same amount was asserted in the Claims.

21.   Neither the Master Agreement, Schedule, Credit Support Annex, or confirmations supplementing, modifying or amending the Agreement provide the Defaulting Party, LBSF, with an opportunity or right to provide alternative quotations or prices or otherwise dispute the Early Termination Amount determined by the Non-Defaulting Party, provided those amounts are calculated in accordance with the Agreement.  To the contrary, the Agreement *expressly* provides that the right to determine the Early Termination Amount belongs exclusively to the Non-Defaulting Party which, in this case, is Eton Park.

22.   The fact that the Debtors have arrived at an alternative valuation of the Early Termination Amount is irrelevant: Eton Park was the *only* party authorized to determine the Settlement Amount under the terms of the Agreement.  Eton Park

---

[3]  See *supra* ¶ 4 n.2.

11

calculated the Early Termination Amount in good faith and in a manner consistent with the terms of the Agreement.

23. The Debtors do not explain how they determined that the Claims are worth substantially less than the value of the Claims as calculated under the Agreement. The Objection does not, and cannot, specifically challenge either the method employed by Eton Park or the calculations based on the use of that method. Moreover, nothing in the Mandelblatt Declaration suggests that Eton Park's calculation of the Early Termination Amount was incorrect, commercially unreasonable or in bad faith.

24. The Early Termination Notice and Calculation Statement (as revised by the Amended Calculation Statement) were each timely delivered in a manner consistent with the terms of the Agreement and those terms were the product of arms-length negotiations between two sophisticated parties.

25. The LBSF Claim should be allowed in full because: (1) Eton Park, as the Non-defaulting Party, is the only party authorized to calculate the Early Termination Amount under the terms of the Agreement; (2) Eton Park properly calculated the Early Termination Amount in accordance with the terms of the Agreement; and (3) Eton Park properly performed all of its obligations in accordance with the termination and notification provisions of the Agreement. Because the LBHI Claim is based on the written guarantee of LBSF's obligations and because the Debtors have offered no independent objection to the LBHI Claim, the LBHI Claim should also be allowed in full.

## CONCLUSION

26.     The Claims were properly and timely filed, and constitute *prima facie* evidence of Eton Park's valid claims.  The Objection offers no evidence to rebut the presumption of validity and, therefore, should be overruled with respect to the Claims.  Moreover, the LBSF Claim was accurately calculated in accordance with the terms of the Agreement.  Therefore, the Claims should both be allowed in the full amount of $14,591,700.97.

Dated: February 18, 2011
         New York, New York

Eton Park Fund, L.P.,
By its Investment Manager, Eton Park Capital Management, L.P.

By its attorneys:

*/s/ Douglas R. Davis*
Douglas R. Davis,
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
ddavis@paulweiss.com