HEARING DATE AND TIME: March 3, 2011 at 10:00 a.m. (Eastern)
RESPONSE DEADLINE: February 14, 2011 at 4:00 p.m. (Eastern)
(extended by agreement with the Debtors to February 22, 2011)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Douglas R. Davis
Manuel S. Frey

*Counsel for Eton Park Master Fund, Ltd..*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**LEHMAN BROTHERS HOLDINGS, INC., et al.,**<br><br>Debtors. | **Case No. 08-13555 (JMP)**<br><br>**(Jointly Administered)** |

## RESPONSE OF ETON PARK MASTER FUND, LTD. TO DEBTORS' EIGHTY-FOURTH OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)

Eton Park Master Fund, Ltd. ("Eton Park"), through its investment manager Eton Park Capital Management, L.P., hereby responds to the Debtors' Eighty-Fourth Omnibus Objection to Claims (Valued Derivative Claims) [D.E. 13955] (the "Objection") as it relates to two proofs of claim filed by Eton Park.

Eton Park filed Claim No. 20525 against Lehman Brothers Special Financing, Inc. ("LBSF") in the amount of $29,825,073.99, plus additional contingent and unliquidated amounts for interest, fees and expenses (the "LBSF Claim"), and Claim No. 20524 against Lehman Brothers Holdings, Inc. ("LBHI") in the same amount (the "LBHI Claim," and together with the LBSF Claim, the "Claims").

The LBSF Claim arises out of the termination of certain derivative transactions shortly after the filing of LBHI's voluntary petition for relief under chapter 11, and the LBHI Claim is based on LBHI's guarantee of the obligations of LBSF pursuant to those transactions. As set forth in greater detail below, the amount of the LBSF Claim was properly calculated in accordance with the parties' agreement. The amount of the LBHI Claim—which is based on a guarantee—does not require any separate calculation apart from that needed to compute the LBSF Claim.

Although the Objection asks this Court to slash the amounts of the LBSF Claim and the LBHI Claim by nearly half of their stated value, and to allow the Claims only in the reduced amounts, the Objection provides no evidence to support that request or substantiate the proposed reduction. Likewise, the Objection asks this Court to reclassify both Claims to general unsecured claims, yet provides no basis whatsoever for the reclassification. Because the Objection offers no supporting evidence, the Debtors cannot overcome the *prima facie* validity that attached to the Claims. As it relates to the Claims, the Objection should be overruled. In further support of this response, Eton Park states as follows:

## BACKGROUND

1.      As of June 23, 2005, Eton Park and LBSF entered into that certain ISDA Master Agreement (the "Master Agreement"), including the Schedule to the Master Agreement, dated as of June 23, 2005 (the "Schedule") and the Credit Support Annex to the Schedule, also dated as of June 23, 2005 (the "Credit Support Annex," and together with the Master Agreement and the Schedule, all as separately amended, supplemented

and otherwise modified and in effect from time to time, the "<u>Agreement</u>").[1]  As the

specified Credit Support Provider in the Schedule, on July 26, 2005, LBHI executed an

unconditional guarantee of the obligations of LBSF under the Agreement for the benefit

of Eton Park (the "<u>LBHI Guarantee</u>").

   2.  LBHI's filing of a voluntary petition for relief under chapter 11 on

September 15, 2008 constituted an Event of Default under the Master Agreement.

(Master Agreement, at Section 5(a)(vii)).  LBSF's filing of a voluntary petition for relief

under chapter 11 on October 3, 2008 also constituted an Event of Default under the

Master Agreement.  (Id.)

   3.  On September 15, 2008, Eton Park sent written notice (the "<u>Early

Termination Notice</u>") to LBSF designating September 15, 2008 as the Early Termination

Date pursuant to Section 6(a) of the Master Agreement and terminating all outstanding

Transactions under the Agreement.

   4.  On October 27, 2008, Eton Park sent LBSF a Notice of Amount

Payable (the "<u>Calculation Statement</u>") and notified LBSF of amounts, pursuant to Section

6(d)(i) of the ISDA Master Agreement, owing to Eton Park as a result of the designation

of the Early Termination Date (such amount, the "<u>Early Termination Amount</u>").  On

September 18, 2009, Eton Park sent LBSF an Amended Notice of Amount Payable (the

"<u>Amended Calculation Statement</u>") and notified LBSF that the Early Termination

---

[1] Capitalized terms used but not independently defined herein shall have the meanings assigned
to them in the Agreement.

3

Amount equaled \$29,836,164.[2]  The Amended Calculation Statement provided LBSF

with detailed calculations and backup materials supporting Eton Park's determination of

the Early Termination Amount.

5.    On September 21, 2009, Eton Park timely filed the Claims.  On

October 16, 2009, Eton Park completed the Derivative Questionnaire and Guarantee

Questionnaire with respect to the LBSF Claim and LBHI Claim, respectively, and

pursuant thereto, uploaded copies of the Agreement, LBHI Guarantee, Early Termination

Notice, Amended Calculation Notice, individual trade-level detail for all Transactions,

information concerning the Collateral Eton Park posted under the Agreement and details

of other fees and costs included in the Claims.

6.    Since filing the Claims and completing the Questionnaires, Eton

Park has provided additional information to the Debtors at their request.  To date, Eton

Park has not received any information from the Debtors concerning the Claims or the

Debtors' valuation thereof.

7.    By the Objection, the Debtors seek to reduce the Claims by nearly

half and reclassify each claim as unsecured.  As their sole support, the Debtors state that

the Claims are "greater than the fair, accurate, and reasonable values determined by the

Debtors after a review of the claimant's supporting documentation and the Debtors'

books and records; and that the classifications (in certain instances) are improperly

identified as secured … on claimants' proofs of claim."  (Objection at ¶11).  The Debtors

---

[2]    The Calculation Statement and Amended Calculation Statement each included \$21,120 in
legal fees in calculating the Early Termination Amount.  The amount of legal fees was
reduced to \$10,029.99 in the Claims and Questionnaires thus resulting in a lowered Early
Termination Amount of \$29,825,073.99.

4

have not provided any details concerning their valuation of the Claims.  Nor have the

Debtors asserted that Eton Park improperly calculated the Claims under the Agreement.

## ARGUMENT

8.     The Objection must be overruled with respect to the Claims

because:  (1) the Debtors did not present evidence in their Objection sufficient to rebut

the *prima facie* evidentiary effect of Eton Park's properly-completed and timely-filed

Claims; and (2) the Claims were properly calculated in accordance with the terms of the

Agreement negotiated and executed by LBSF and the related LBHI Guarantee.

**A.     The Objection Does Not Present Evidence Sufficient to Rebut the**
***Prima facie* Evidentiary Effect of the Properly-Completed and**
**Timely-Filed Proofs of Claim.**

9.     A proof of claim, timely and properly filed, is *prima facie* evidence

of the validity and amount of the claim.  *See* Fed. R. Bankr. P. 3001(f).  "To overcome

this *prima facie* evidence, the objecting party must come forth with evidence which, if

believed, would refute at least one of the allegations essential to the claim." *Sherman v.*

*Novack (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000) (*citing In re Allegheny*

*Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992)); *see also Riverbank, Inc. v. Make Meat Corp. (In*

*re Make Meat Corp.),* 1999 WL 178788 at *3 (S.D.N.Y. March 31, 1999) ("[o]nce the

claimant has established its *prima facie* case, the burden of going forward then shifts to

the debtor to produce evidence sufficient to negate the *prima facie* validity of the filed

claim"); *Matter of Michalek,* 1991 WL 222063 at *3 (W.D.N.Y. Oct. 22, 1991) ("[t]he

party objecting to the claim has the burden of going forward with substantial evidence to

5

rebut the *prima facie* validity of the claim"); *In re Woodmere Investors Ltd. P'ship*, 178

B.R. 346, 354-55 (Bankr. S.D.N.Y. 1995) (overruling debtor's objection to secured

lender's claim for pre-petition attorneys' fees where debtor had not offered any evidence

to support its contention that such fees were unreasonable and also overruling debtor's

objection to the same creditor's claim for default interest, holding that "when two

sophisticated parties enter into a contract calling for an established rate on default, this

Court will not disturb the agreement absent persuasive evidence of overreaching.").

10.    To overcome the *prima facie* effect of a properly filed proof of

claim, therefore, the objecting party must "affirmatively *produce* evidence." *In re Make*

*Meat Corp.*, 1999 WL 178788 at *4 (emphasis in original).  That evidence must "refute at

least one of the allegations that is essential to the claim's legal sufficiency." *In re Oneida*

*Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009).  The burden shifts back to the claimant

if and only if the objecting party meets this burden. *In re Reilly*, 245 B.R. at 773; *In re*

*Martinez*, 409 B.R. 35, 38 (Bankr. S.D.N.Y. 2009).

11.    Eton Park timely and properly filed the Claims, and the Claims

complied both with Fed. R. Bankr. P. 3001 and this Court's *Order Pursuant to Section*

*502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the*

*Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof*

*and Approving the Proof of Claim Form* (the "Bar Date Order") [D.E. 4271].  The

Claims, as supplemented by the Questionnaires, contained:  (1) a detailed narrative of the

events giving rise to the Debtors' obligations; (2) copies of the Agreement, Early

Termination Notice, Amended Calculation Statement, and LBHI Guarantee; and (3)

additional and detailed backup information detailing Eton Park's calculation of the

Claims on a trade-by-trade basis including the source of market information, interpolated prices, whether dealer quotes were obtained, how many quotes were obtained, who provided the quotes, and the relevant dates. It is beyond dispute --and the Debtors do not dispute that the Claims were properly filed --that the Claims are *prima facie* valid.

12.    In support of their Objection, the Debtors simply state that: (1) they have undertaken a lengthy process to evaluate the Claims; (2) that process involved the collection and review of relevant documents and a review of the methodology employed by Eton Park; and (3) as a result of that process, the Debtors have determined that the $16,016,470.59 value listed on Exhibit A to the Objection is the "fair, accurate, and reasonable valuation" of the Claims. The Debtors do not explain the "lengthy process" in detail or how that "process" resulted in a value that is substantially less than the value calculated in accordance with the method specified by the Agreement. They provide no details whatsoever on the valuation of the multiple individual trades that comprise the Claims. Although the Debtors refer this Court to the Declaration of Gary H. Mandelblatt, originally submitted in Support of the Debtors' *Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Claim Form* [D.E. 4113] (the "Mandelblatt Declaration"), for a "more comprehensive discussion of the[ir] valuation process," the Mandelblatt Declaration does not provide any evidence to substantiate the Objection. (Objection at ¶ 14 n.2; Mandelblatt Declaration).

13.    As in *Woodmere*, then, the Debtors have not affirmatively produced any evidence to rebut the *prima facie* validity of Eton Park's Claims. *In re*

*Woodmere Investors Ltd. P'ship*, 178 B.R. at 354-55.  The Objection should therefore be

overruled and each Claim should be allowed in the full amount of $29,825,073.99.

### B.     The LBSF Claim Was Properly Calculated in Accordance with the Terms of the Agreement

14.     Eton Park calculated the Early Termination Amount asserted in the

Claims in strict accordance with the Agreement, a fact the Debtors do not dispute.

15.     The Agreement defines Event of Default to include, *inter alia*, the

filing of a bankruptcy petition by LBHI or LBSF.  (Master Agreement at Section

5(a)(vii)(4)).  Upon the occurrence of an Event of Default, Eton Park had a contractual

right to terminate all outstanding Transactions under the Agreement and to designate an

Early Termination Date.  (Master Agreement at Section 6(a)).  Eton Park exercised these

rights by sending the Early Termination Notice on September 15, 2008 and designating

such date as the Early Termination Date.  As soon as reasonably possible following the

Early Termination Date, Eton Park was required to calculate the Early Termination

Amount and provide LBSF a statement summarizing those calculations.  (Master

Agreement at Section 6(d)(i)).  Eton Park complied by sending the Calculation Statement

on October 27, 2008 and the Amended Calculation Statement on September 18, 2009.

16.     In the Schedule, Eton Park and LBSF agreed that, for purposes of

calculating the Early Termination Amount following the designation of an Early

Termination Date, "Market Quotation" and "Second Method" would apply.  (Schedule at

Pt. 1(f)).  Accordingly, the Master Agreement provided that, upon an Event of Default:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (***determined by the Non-defaulting Party***) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(Master Agreement at Section 6(e)(i)(3) (emphasis added)).

17. The Master Agreement defines "Settlement Amount," in part, as "such party's Loss ... for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result." (Master Agreement at Section 14). "Loss," in turn, is defined in part, as:

> [T]he Termination Currency Equivalent of ***an amount that party reasonably determines in good faith to be its total losses and costs ... in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions,*** as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position. ... A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. ***A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets***.

(Master Agreement at Section14 (emphasis added)).

18. As set forth in the Calculation Statement and Amended Calculation Statement, Eton Park followed these guidelines in determining the Early Termination

9

Amount LBSF owed Eton Park. First, Eton Park notified LBSF that it could not obtain

three or more quotations from Reference Market-makers for any of the Terminated

Transactions and accordingly, pursuant to Section 14 of the Master Agreement,

calculated the Settlement Amount using the "Loss" methodology. In support of its

"Loss" calculations, Eton Park provided LBSF with the components and assumptions

relied upon by Eton Park with respect to each Terminated Transaction including, *inter*

*alia*, dealer quotes and published pricing information from Markit Group Limited, a

leading global provider of financial information services and independent pricing and

valuation data. (Amended Calculation Statement, Annex B). The data used by Eton Park

to determine the Settlement Amount in the absence of quotations from Reference Market-

makers, therefore, is the kind of information explicitly contemplated by the Agreement.

As set forth in the Amended Calculation Statement, Eton Park calculated that it owed

LBSF $132,024,127 in respect of the Settlement Amount.

       19.    Next, Eton Park offset the Settlement Amount it owed LBSF

against the value of Collateral Eton Park had previously posted to LBSF ($161,839,171)

in accordance with the provisions of the Credit Support Annex, which LBSF owed Eton

Park. This setoff is also explicitly sanctioned by the Master Agreement, which provides

that the Early Termination Amount payable in respect of an Early Termination Date "will

be subject to any Set-off." (Master Agreement at Section 6(e)). The Credit Support

Annex clarifies that a Secured Party holding Posted Collateral must immediately return

all Posted Collateral to the Pledgor upon the occurrence or designation of an Early

Termination Date as the result of an Event of Default. (Credit Support Annex at

Paragraph 8(b)(iii)). Further, the Credit Support Annex grants the Pledgor the right, to

the extent the Secured Party does not so return the Posted Collateral, to "Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral … held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral). (Credit Support Annex at Paragraph 8(b)(iv)(A)). Consequently, Eton Park was entitled to set off amounts owed by it to LBSF in respect of the Early Termination Date against the amount of Posted Collateral held and not returned by LBSF.

20.    Finally, Eton Park added $10,029.99 to the Early Termination Amount on account of legal fees Eton Park incurred in terminating and closing out the Agreement.[3]  Again, the Master Agreement specifically provided that the Defaulting Party is liable for all reasonable legal fees incurred by the Non-defaulting Party to protect its rights under the Agreement or by reason of the early termination of the Agreement. (Master Agreement at Section 11).  Accordingly, Eton Park calculated that LBSF owed it $29,825,073.99 as a result of the designation of an Early Termination Date under the Agreement.  This same amount was asserted in the Claims.

21.    Neither the Master Agreement, Schedule, Credit Support Annex, or confirmations supplementing, modifying or amending the Agreement provide the Defaulting Party, LBSF, with an opportunity or right to provide alternative quotations or prices or otherwise dispute the Early Termination Amount determined by the Non-Defaulting Party, provided those amounts are calculated in accordance with the Agreement.  To the contrary, the Agreement *expressly* provides that the right to

---

[3]    See *supra* ¶ 4 n.2.

11

determine the Early Termination Amount belongs exclusively to the Non-Defaulting Party which, in this case, is Eton Park.

22.    The fact that the Debtors have arrived at an alternative valuation of the Early Termination Amount is irrelevant: Eton Park was the *only* party authorized to determine the Settlement Amount under the terms of the Agreement. Eton Park calculated the Early Termination Amount in good faith and in a manner consistent with the terms of the Agreement.

23.    The Debtors do not explain how they determined that the Claims are worth substantially less than the value of the Claims as calculated under the Agreement. The Objection does not, and cannot, specifically challenge either the method employed by Eton Park or the calculations based on the use of that method. Moreover, nothing in the Mandelblatt Declaration suggests that Eton Park's calculation of the Early Termination Amount was incorrect, commercially unreasonable or in bad faith.

24.    The Early Termination Notice and Calculation Statement (as revised by the Amended Calculation Statement) were each timely delivered in a manner consistent with the terms of the Agreement and those terms were the product of arms-length negotiations between two sophisticated parties.

25.    The LBSF Claim should be allowed in full because: (1) Eton Park, as the Non-defaulting Party, is the only party authorized to calculate the Early Termination Amount under the terms of the Agreement; (2) Eton Park properly calculated the Early Termination Amount in accordance with the terms of the Agreement; and (3) Eton Park properly performed all of its obligations in accordance with the termination and notification provisions of the Agreement. Because the LBHI Claim is

12

based on the written guarantee of LBSF's obligations and because the Debtors have offered no independent objection to the LBHI Claim, the LBHI Claim should also be allowed in full.

## CONCLUSION

26.     The Claims were properly and timely filed, and constitute *prima facie* evidence of Eton Park's valid claims.  The Objection offers no evidence to rebut the presumption of validity and, therefore, should be overruled with respect to the Claims. Moreover, the LBSF Claim was accurately calculated in accordance with the terms of the Agreement.  Therefore, the Claims should both be allowed in the full amount of $29,825,073.99.

Dated: February 18, 2011
       New York, New York

Eton Park Master Fund, Ltd.,
By its Investment Manager, Eton Park
Capital Management, L.P.

By its attorneys:

*/s/ Douglas R. Davis*
Douglas R. Davis,
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
ddavis@paulweiss.com